# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

    v.                                    Case No. 3:21-cv-1066

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    *Defendants*.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The Southwest border is in crisis, with record numbers of migrants illegally entering our country.

2.      While some arriving migrants have legitimate asylum claims, many do not. Some are gang members and drug traffickers exploiting the crisis at the border, as evidenced by the skyrocketing amount of Fentanyl seized at the border this year.[1]

3.      Congress, aware of these issues, created a system for the orderly processing of migrants. This system allows authorities to admit the small fraction of migrants with valid asylum claims and to expel those who do not, or worse, who mean our country harm.

4.      All arriving aliens, even those claiming asylum, are required by law to be detained pending a decision as to whether they have a valid basis to enter the United States. *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1225(b)(1)(B).

5.      This rule applies to any arriving alien "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. *Id.* § 1225(a)(1).

6.      As the Supreme Court recently explained, there is only one "circumstance[] under which" these arriving aliens "may be released" from detention: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and

---

[1] https://www.cbsnews.com/news/fentanyl-seizures-texas-mexico-border-immigration/.

only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

7.     The Biden Administration is ignoring these requirements. It has released at least 225,000 illegal border crossers since taking office,[2] including "[a]bout 50,000" whom the government released without initiating immigration court proceedings as required by law.[3] This practice was apparently authorized by "[g]uidance sent to border patrol . . . from agency leadership," which has not been made public, and which appears to claim broad "prosecutorial discretion" to ignore the requirements of the immigration laws.[4]

8.     The government is not free to ignore the clear commands of Congress. It has claimed that it lacks the resources and detention capacity to process the surge of migrants arriving at the border. But the Biden Administration has actively sought to eliminate measures that increase its resources and detention capacity, such as the Migrant Protection Protocols (also known as the "wait in Mexico policy"), and has even asked Congress to *reduce* the number of immigration detention beds available to it. Further, it is the Biden Administration's misguided policies that have

---

[2]   https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[3]     https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[4]     https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

encouraged more migrants to make the dangerous journey to the United States. The government cannot, therefore, use a purported lack of resources as an excuse to ignore congressional mandates.

9.      The Biden Administration's illegal border policies cause Florida harm. Many of the aliens illegally released by the Biden Administration are arriving or will arrive in Florida,[5] harming the State's quasi-sovereign interests and forcing it to incur millions of dollars in expenses.

## PARTIES

10.      Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

11.      Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

12.      Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

---

[5] *See* https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (explaining that a majority of unlawful aliens live in just six states, including Florida); *see also Texas v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *9 (N.D. Tex. 2021) (finding that the Biden Administration's border policies harm the State of Missouri).

13.     Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the Biden Administration's illegal policies.

14.     Defendant Alejandro Mayorkas is the Secretary of DHS. Florida sues him in his official capacity.

15.     Defendant Tae Johnson is the Acting Director of ICE. Florida sues him in his official capacity.

16.     Defendant Troy Miller is the Acting Commissioner of CBP. Florida sues him in his official capacity.

17.     Defendant Ur M. Jaddou is the Director of USCIS. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–703.

19.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–2202, the Constitution, and the Court's equitable powers.

20.   Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).[6] Further, because illegal border crossers typically cross into Florida's territory in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here.

## FACTUAL BACKGROUND

### The Relevant Federal Immigration Scheme

21.   "[T]he Immigration and Nationality Act (INA) . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[7]

22.   When aliens arrive in this country, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i),

---

[6] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

[7] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n, Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

unless they indicate an intention to apply for asylum, *id.* In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution. *Id.* § 1225(b)(1)(B)(ii). If the alien makes that showing, he "shall be detained for further consideration of the application for asylum." *Id.*; *see Jennings*, 138 S. Ct. at 837.

23.    Aliens not subject to Section 1225(b)(1) are governed by Section 1225(b)(2). Under (b)(2), unless an alien is "clearly and beyond a doubt entitled to be admitted," Congress has mandated that the alien "shall be detained" pending further immigration proceedings. *See Jennings*, 138 S. Ct. at 837.

24.    Because Congress has mandated detention under both subsection (b)(1) and subsection (b)(2), arriving aliens—other than those who are clearly and beyond a doubt entitled to be admitted—are to be released only pursuant to the government's parole authority, which is described in 8 U.S.C. § 1182(d)(5)(A). This authority may be used only "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Other than parole, there are "no other circumstances under which aliens detained under § 1225(b) may be released." *Jennings*, 138 S. Ct. at 844; *see also* 8 C.F.R. § 208.30(f)(2) (explaining

that Section 1182(d)(5) is the only basis for releasing an alien to which Section 1225(b)(1) applies);[8] 8 C.F.R. § 212.5 (describing some of DHS's parole practices).

25.     Notably, the government's parole authority used to be broader, and could be used "for emergent reasons or for reasons deemed strictly in the public interest." Congress, however, narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

26.     Mandatory detention aside, the government is also required to initiate removal proceedings against these aliens. The government does so by serving the alien with a charging document, which is the document that initiates proceedings in immigration court. For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[9]

---

[8] The regulation refers to INA § 212(d)(5), which is the same as 8 U.S.C. § 1182(d)(5).

[9] *See* https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal%20-%20English%20%2817%29.pdf, at 1–2 (discussing other similar charging documents).

27.    For aliens falling under Section 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed . . . without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i). For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed . . . without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I). And even for aliens who pass a credible fear screening, they still must be served with a charging document. Defendant USCIS admits this.[10]

28.    The same is true of aliens falling under Section 1225(b)(2). These aliens must be "detained *for a proceeding under Section 1229a*," 8 U.S.C. § 1225(b)(2)(A) (emphasis added), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

<u>The Biden Administration's Actions</u>

29.    The Biden Administration is systematically violating each of these requirements. For the entire month of December 2020—President Trump's last full month in office—Defendant CBP reports that Border Patrol released into the interior only 17 aliens after arresting them crossing the Southwest border and serving them

---

[10]    *See*    https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28 Approved%20as%20final%2011-7-11%29.pdf, at 2 (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf, at 5.

with a notice to appear.[11] By July 2021, that number had risen to over 60,000, and the total number of unlawful aliens that Border Patrol has released at the border since President Biden took office is over 225,000.[12]

30.    Releasing this many arriving aliens into the interior necessarily means that the government is violating congressional commands in the immigration laws. If immigration officials are simply releasing these aliens, they are violating the mandatory detention provisions in Section 1225. If they are, instead, paroling each of these individuals, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

31.    It is also unclear whether the numbers reported by CBP include the approximately "50,000 migrants who crossed the southern border illegally" and were released without even being served with a notice to appear.[13] For these unlawful aliens, and likely many more, the government has instead served them with

---

[11]   https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab).

[12]   The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (U.S. Border Patrol – Dispositions and Transfers tab).  In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

[13]   https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

a "notice to report," a document nowhere mentioned in statute or regulation, which apparently functions as "immigration enforcement by the honor system."[14] Predictably, although the notice to report asks these aliens to turn themselves into an ICE office within 60 days, approximately 80% fail to do so.[15]

32.     Beyond the Biden Administration's failed honor-system policy, serving a notice to report has other significant consequences. Most importantly, once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed in *absentia*." *Texas v. Biden*, --- F. Supp. 3d ---, 2021 WL 3603341, at *4 (N.D. Tex. 2021). After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who declines to report following issuance of a notice to report—again, because this document has no legal significance and is nowhere to be found in statute or regulation.

33.     And, as further explained in ¶¶ 44–45, even aliens who are served with charging documents frequently do not appear for their removal proceedings. The Biden Administration is thus giving tens-of-thousands of aliens per month, in essence, license to disappear into the interior of the United States.

---

[14] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

[15] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

34.     Defendants will no doubt claim that they are overwhelmed by the surge of migrants at the Southwest border and have no choice but to release them. This argument is the first step in the Biden Administration's open-borders playbook, which involves a two-pronged approach: *First*, violate the congressionally mandated requirements in the immigration laws, and insist the government does not have the resources to comply. *Second*, eliminate effective measures that make more detention capacity available and otherwise relieve the taxed immigration system, so these unlawful actions appear justified and necessary.

35.     This is already playing out, as the Biden Administration is intentionally violating several congressional mandates in the immigration laws. *See, e.g.*, *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 2096669, at *38 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, --- F. Supp. 3d ---, 2021 WL 3683913, at *42 (S.D. Tex. 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).[16]

36.     The Administration has even been found to have violated Section 1225(b)'s detention requirements, the same requirements Florida claims the government is violating here. *See Texas v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021)

---

[16] A panel of the Fifth Circuit stayed that preliminary injunction in part, but declined to stay the injunction insofar as it required the federal government not to release aliens subject to those two statutes. *See Texas v. United States*, --- F.4th ---, 2021 WL 4188102, at *3 (5th Cir. 2021).

(denying a stay because "the Government has not come close to showing that it is likely to succeed in challenging" the conclusion that it violated 8 U.S.C. § 1225).[17]

37.     In those cases, the Biden Administration insisted it lacked the resources to comply with its duties. *See, e.g.*, Mot. for Stay at 4, *Texas*, 2021 WL 3683913 (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

38.     Meanwhile, the Biden Administration is going out of its way to make its bad-faith prediction come true. For example, the Administration has asked Congress to *reduce* the number of immigration detention beds available to it.[18] It has justified this request in part based on "recent decreases in interior enforcement activity."[19]

39.     Similarly, the Administration has eliminated programs designed to reduce the taxing of immigration resources and detention space. For example, on its first day in office, the Biden Administration suspended the Migrant Protection

---

[17] The Supreme Court also denied the government a stay. *See Biden v. Texas*, --- S. Ct. ---, 2021 WL 3732667 (Aug. 24, 2021)

[18] https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-4d7427ff67d5 86a77487b7efec58e74d;   Congressional   Research   Service,   *DHS Budget Request Analysis: FY2022*, at 13 (noting that DHS's FY 2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY 2021 (reducing that average to 30,000)).

[19]         https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_ enforcement.pdf, at 43.

Protocols. *Biden*, 2021 WL 3603341 at *7. This DHS program "returned some aliens temporarily to Mexico during the pendency of their removal proceedings." *Id.* at *1. As Defendant CBP's reported statistics show, the Migrant Protection Protocols were effective at eliminating the illegal release of arriving aliens at the border because aliens remained in Mexico pending adjudication of their asylum claims rather than occupying DHS detention capacity.[20] *See also Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of the program, in which DHS found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border"). Unlike the Biden Administration's release policies, this program is expressly authorized by the immigration laws, which provide that "[i]n the case of an alien . . . who is arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," DHS "may return the alien to that territory pending a [removal] proceeding." 8 U.SC. § 1225(b)(2)(C).

40.     And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. *See, e.g.*, Exec. Order No. 14,010, Creating a Comprehensive Regional Framework to Address the Causes of Migration, 86 Fed. Reg. 8267, 8270 (Feb. 2,

---

[20]  https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics (U.S. Border Patrol – Dispositions and Transfers tab); https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (same).

2021) (revoking, among others, Executive Order 13767, which directed DHS to "terminat[e] . . . the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

41.     Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[21] The Biden Administration has, of course, not sought to do so.

<u>Irreparable Harm to Florida</u>

42.     States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Florida thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

43.     As a result, there is little Florida can do about the thousands of migrants who have arrived or will arrive in Florida. Some of these unlawful aliens may be

---

[21] https://www.gao.gov/assets/gao-18-343.pdf.

otherwise law-abiding, but others are gang members, drug traffickers, and other dangerous criminals.

44.     Many, if not most, of these individuals will never leave the country. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and did not show up to their hearings. *Biden*, 2021 WL 3603341 at *4. Of course, for those who never receive a notice to appear, a much higher number will abscond.[22]

45.     Moreover, "most aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Biden*, 2021 WL 3603341 at *4. Even most aliens who *pass* a credible-fear screening are not ultimately granted asylum. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,946 (Nov. 9, 2018) (explaining that in FY 2018, 71% of those who had passed a credible-fear screening were denied asylum). And a high percentage of those who claim asylum appear to be doing so in bad faith. *See id.* (explaining that in FY 2018, 31% of those who passed a credible-fear screening absconded and did not show up to their immigration hearings).

---

[22] https://www.nationalreview.com/corner/immigration-enforcement-on-the-honor-system/.

46.     The presence of these aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State millions.

47.     Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government pursuant to 8 U.S.C. § 1231(i).

48.     Florida spends an average of almost $8,000 *per student* each year on public school education,[23] which it provides regardless of immigration status.

49.     Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

50.      Finally, the State frequently pays the cost of emergency medical services for the uninsured.

51.     Many of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur more of these expenses.

---

[23] https://www.fldoe.org/core/fileparse.php/7507/urlt/1920District-State-PerPupil.pdf.

## CLAIMS

## <u>COUNT 1</u>

**Agency action that is not in accordance with law
and is in excess of authority, in violation of the APA**

52. Florida repeats and incorporates by reference ¶¶ 1–51.

53. Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

54. Defendants' policy—whether codified in writing or not[24]—of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2). And if Defendants claim to be exercising their parole authority, their policy is contrary to 8 U.S.C. § 1182 because that authority is neither being used "on a case-by-case basis" nor limited to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

55. Nor does any regulation authorize Defendants' policy. 8 C.F.R. § 212.5—the principal parole regulation—says nothing about the mass release of arriving aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of Sections 1225(b) and 1182(d)(5)(A).

---

[24] An unwritten policy is subject to APA challenge just as a written policy is. *See Bhd. of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities).

56.     Moreover, for the reasons described in ¶¶ 26–28, Defendants are required at a minimum to issue charging documents to arriving aliens released into the interior and initiate removal proceedings, which the Biden Administration has failed to do at least 50,000 times since taking office.

57.     Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT 2

### Arbitrary and capricious agency action in violation of the APA

58.     Florida repeats and incorporates by reference ¶¶ 1–51.

59.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

60.     Defendants' policy is arbitrary and capricious for several reasons, including because it ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

61.     Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858

18

(N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

62.     Moreover, Defendants have neither accounted for Florida's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Regents*, 140 S. Ct. at 1913.

63.     Finally, insofar as Defendants claim their policy is justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## COUNT 3

### Failure to conduct notice and comment in violation of the APA

64.     Florida repeats and incorporates by reference ¶¶ 1–51.

65.     The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

66.     Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483

(11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[25]

## COUNT 4

### Agency action unlawfully withheld or unreasonably delayed in violation of the APA

67.    Florida repeats and incorporates by reference ¶¶ 1–51.

68.    At a minimum, Defendants' near-blanket refusal to comply with the mandatory-detention provisions in Section 1225 and the limits on their parole authority in Section 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT 5

### Violation of the INA and the Constitution

69.    Florida repeats and incorporates by reference ¶¶ 1–51, 54–56.

70.    The APA aside, the federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Count 1. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

---

[25] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). But the reason the en banc court did not address the notice-and-comment argument is because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

## COUNT 6

**Declaratory judgment that the Biden Administration's policy is unlawful**

71.    Florida repeats and incorporates by reference ¶¶ 1–51, 54–56.

72.    For the same reasons described in Counts 1 and 5, Florida is entitled to a declaratory judgment that the Biden Administration is violating the law.

### PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a) Hold unlawful and set aside the Biden Administration's policy of releasing arriving aliens subject to mandatory detention, of paroling aliens without engaging in case-by-case adjudication or abiding by the other limits on that authority, and of failing to serve charging documents or initiate removal proceedings against plainly inadmissible aliens who are being released into the interior of the United States.

b) Issue permanent injunctive relief enjoining Defendants from enforcing that policy.

c) Compel the agency to comply with these binding requirements pursuant to 5 U.S.C. § 706.

d) Issue declaratory relief declaring the policy unlawful.

e) Award Florida costs and reasonable attorney's fees.

f) Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 1029143)
SENIOR ASSISTANT ATTORNEY GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Rachel Siegel (FBN 1029143)
DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*