**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

    *Plaintiff*,

    v.                           Case No. 3:21-cv-1066-TKW-EMT

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; CHRIS MAGNUS,
Commissioner of U.S. Customs and
Border Protection, in his official capacity;
U.S. CUSTOMS AND BORDER
PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; UR M.
JADDOU, Director of U.S. Citizenship
and Immigration Services, in her official
capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    *Defendants*.
_____/

**FIRST AMENDED COMPLAINT FOR**
**<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**

## INTRODUCTION

1.      The Southwest border is in crisis, with record numbers of migrants illegally entering our country. In President Trump's last full month in office, Border Patrol released 17 migrants caught at the border into the interior of the United States. In December 2021, President Biden's Border Patrol released over 50,000.[1]

2.      While some arriving migrants have legitimate asylum claims, many do not. Some are gang members and drug traffickers exploiting the immigration crisis, as evidenced by the skyrocketing amount of fentanyl being seized at the border.[2]

3.      In order to protect national security and public safety, but also ensure that those with a legitimate basis to do so may enter the country, Congress created a system for the orderly processing of migrants. This system allows authorities to admit the small fraction of migrants with valid asylum claims and to expel those who are not entitled to asylum, or worse, who mean our country harm.

4.      All arriving aliens, even those claiming asylum, are required by law to be detained pending a decision as to whether they have a valid basis to enter the

---

[1]  Defendant Customs and Border Protection reports these numbers on its website. Numbers for FY2022 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, and numbers for FY2021 are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021#. The numbers were calculated using the "U.S. Border Patrol – Dispositions and Transfers" tab and combining the "Notice to Appear/Order of Recognizance" and "Parole + ATD" rows. (The "Parole + ATD" row is only used in FY2022.)

[2] CBP Release Operation Fiscal Year 2021 Statistics, U.S. Customs & Border Protection, (Jan. 3, 2022),   https://www.cbp.gov/newsroom/national-media-release/cbp-releases-operational-fiscal-year-2021-statistics (noting that fentanyl seizures increased 134% in FY2021).

United States. *See* 8 U.S.C. § 1225(b)(2)(A); *id.* § 1225(b)(1)(B). That decision is made via immigration proceedings—often called "removal proceedings"—before an immigration judge. In expedited removal proceedings, a decision can be made quickly. If the government chooses not to use expedited removal, it can take much longer.

5.      Either way, Congress has commanded the Executive Branch to detain arriving aliens until a final decision is made regarding removal. Section 1225 "sets forth a general, plainly obligatory rule: detention for aliens seeking admission." *Texas v. Biden*, 20 F.4th 928, 996 (5th Cir. 2021).

6.      This mandatory detention rule applies to any arriving alien "whether or not" the alien presents himself at a "designated port of arrival" or crosses the border illegally. 8 U.S.C. § 1225(a)(1).

7.      And the rule makes good sense. "[M]ost aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 3603341, at *4 (N.D. Tex. Aug. 13, 2021). This is, in part, because many aliens claim asylum in bad faith hoping to be released into the interior of the United States and abscond. *See* Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,946 (Nov. 9, 2018) (explaining that in

2

FY2018, a staggering 31% of those who were released after passing an initial asylum screening—called a "credible-fear screening"—absconded and did not appear at their immigration hearings).

8.      There are two exceptions to this mandatory detention rule. First, there is one (and only) "circumstance[] under which" these arriving aliens "may be released" into the United States: when the federal government exercises its "temporary parole" authority. *Jennings v. Rodriguez*, 138 S. Ct. 830, 844 (2018) (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In short, the government "cannot use that power to parole aliens *en masse*." *Texas v. Biden*, 20 F.4th at 997.

9.      Second, § 1225(b)(2)(C) allows the government to "return . . . aliens" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. In other words, when migrants arrive at the southern border and claim asylum, the federal government may—instead of detaining them—require them to wait in Mexico while their claims are adjudicated.

10.    Even though Congress has spoken unambiguously, the Biden Administration is willfully ignoring these requirements. It has released at least 366,000 illegal border crossers since taking office.[3]

11.    Before November 2021, the government was not only unlawfully releasing aliens, it was also frequently refusing to initiate immigration court proceedings as required by law.[4] Instead of issuing charging documents to aliens before (unlawfully) releasing them, the government was issuing something called a "notice to report," essentially a request for the alien to turn himself in at a later date. This practice—which is not authorized by any statute or regulation—was apparently described in "[g]uidance sent to border patrol . . . from agency leadership," and was based on an unprecedented assertion of "prosecutorial discretion" to ignore the requirements of the immigration laws.[5]

12.    After Florida filed this suit, the government realized it could not defend that practice. On November 2, 2021, the government issued a new memo (the November memo), which it has now made public only to defend this litigation. *See*

---

[3] *See supra* note 1.

[4] Stef W. Kight, *Scoop: 50,000 migrants released; few report to ICE*, Axios (July 27, 2021), https://www.axios.com/migrant-release-no-court-date-ice-dhs-immigration-33d258ea-2419-418d-abe8-2a8b60e3c070.html.

[5] Stef W. Kight, *Rio Grande Valley border patrol releasing migrants without court date*, Axios (Mar. 22, 2021), https://www.axios.com/border-patrol-rio-grande-valley-release-migrant-families-67e8cdc1-d549-47e1-aba3-8baca26025d8.html.

ECF 6-2 (designating the memo "law enforcement sensitive"). The memo states that, "[e]ffective immediately, [Border Patrol] is ceasing the use of" notices to report. *Id.* at 2.[6]

13.     The memo, however, does little more than move the goalposts. The government has replaced notices to report with a policy called "Parole + ATD" or "Parole and Alternative to Detention." *Id.* at 2–4. The Parole + ATD policy still involves releasing aliens subject to mandatory detention without initiating removal proceedings. But unlike with the notice to report policy, where the government could point to no authority whatsoever, the government now relies on a cramped reading of its parole authority in § 1182.

14.     The government "cannot use that power to parole aliens *en masse*," *Texas v. Biden*, 20 F.4th at 997, which is precisely what the Parole + ATD policy purports to authorize. While the memo implies that this "alternative path" will be used sparingly, ECF 6-2 at 2, the government released over *18,000 migrants* in December 2021 using the Parole + ATD policy.[7]

15.     Taking the challenged policies together, the government is violating clear congressional commands tens of thousands of times per month. It has claimed that it lacks the resources and detention capacity to process and detain the surge of

---

[6] Florida cites to ECF pagination rather than to internal pagination unless otherwise indicated.

[7] *See supra* note 1.

migrants arriving at the border. But if that is true, it is only because the Biden Administration has tied its own hands behind its back.

16.     For example, the government has flatly refused to use its power under § 1225(b)(2)(C) to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. As the Fifth Circuit recently held, Defendants simply "don't want to do [the] one thing Congress allowed" as an alternative to detention. *Texas v. Biden*, 20 F.4th at 996. They have instead terminated the program under that provision—known as the "Migrant Protection Protocols" or the "wait in Mexico policy"—even though that program was incredibly effective. *See Texas v. Biden*, 2021 WL 3603341 at *5 (discussing an October 2019 assessment of that program, in which the government found this policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border").

17.     The Biden Administration has also—in an incredibly cynical fashion given its litigating position that it cannot detain all those it is required to detain—asked Congress to *reduce* the number of immigration detention beds available to it. It has also refused to avail itself of other options—such as reprogramming funds—to increase that capacity.

18.     To top it off, this Administration's misguided policies are the cause of the surge at the border in the first place. The Biden Administration has publicly

touted its lax border policies. As Defendant Secretary Mayorkas recently boasted, "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action."[8] The Biden Administration is not *unable* to control the border; it is *unwilling* to do so.

19.    This Court, therefore, should vacate and permanently enjoin Defendants from enforcing their (1) policy of releasing aliens subject to mandatory detention (the non-detention policy)—either based on an untenable assertion of enforcement discretion to ignore § 1225 or an abuse of the parole authority under § 1182—and (2) the November memo (the Parole + ATD policy), which also misuses the parole authority under § 1182.

20.    With respect to the non-detention policy, the government insists that "no such 'policy' exists." ECF 6-1 at 37. Discovery will show the opposite. In any event, the government does not deny that it is releasing and paroling arriving migrants by the tens of thousands, and the government cannot avoid judicial review of its widespread and unlawful practices by refusing to put them in writing, or more likely, putting them in writing and refusing to make them public. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities establishing that unwritten policies are subject to APA

---

[8] *Secretary Mayorkas Delivers Remarks at the U.S. Conference of Mayors*, U.S. Dep't of Homeland Security (Jan. 20, 2022), https://www.dhs.gov/news/2022/01/20/secretary-mayorkas-delivers-remarks-us-conference-mayors, but it has since been removed.

review); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (reasoning that a court may infer the existence of an immigration policy where the facts suggest that one exists).

21.    These policies harm Florida. The Biden Administration is releasing tens of thousands of migrants at the border every month.[9] Many of these migrants are arriving or will arrive in Florida,[10] harming the State's quasi-sovereign interests and forcing it to incur millions of dollars in expenses. The government has even confirmed in writing to Florida that it is aware of thousands of arriving aliens who have resettled in Florida.

22.    A video released only days ago demonstrates that federal immigration officials are not just unlawfully releasing migrants, they are affirmatively assisting them in resettling around the country, including in Florida.[11] In the video, federal immigration officials are seen transporting large groups of adult males by bus, and then by taxi, to an airport in the border city of Brownsville, Texas.[12] According to

---

[9] *See supra* note 1.

[10] *See U.S. unauthorized immigrant population estimates by state, 2016*, Pew Res. Ctr. (Feb. 5, 2019), https://www.pewresearch.org/hispanic/interactives/u-s-unauthorized-immigrants-by-state/ (explaining that a majority of unlawful aliens live in just six states, including Florida); *see also Texas v. Biden*, 2021 WL 3603341, at *9 (finding that the Biden Administration's border policies harm the State of Missouri).

[11]    @BillFOXLA, Twitter (Jan. 25, 2022, 10:05 AM), https://mobile.twitter.com/BillFOXLA/status/1485992229017731077.

[12] The video is difficult to reconcile with public statements from the Biden Administration—not to mention representations made in this litigation—that the federal government is expelling single

---

the government, TSA is even accepting immigration arrest warrants as identification sufficient to board a domestic flight.[13]

23.     Despite all this, in its recently filed motion to dismiss, the government argues that any harm to Florida from the challenged policies is "speculative." ECF 6-1 at 21. That is a remarkable statement.[14] Florida spends over $100 million per year just on incarcerating unlawful aliens who commit crimes in the State.[15] And as further described below, Florida spends millions of dollars providing public services and benefits to unlawful immigrants.

---

adults under its public health authority given the COVID-19 pandemic, and therefore not processing them under the immigration laws. *See* Adam Shaw, *DeSantis requests Biden administration stop resettling illegal immigrants in Florida*, Fox News (Aug. 28, 2021), https://www.foxnews.com/politics/desantis-biden-administration-resettling-illegal-immigrants-florida; ECF 6-1 at 15–16 ("[A]lternative processing is not available to individuals . . . covered by" the CDC's "Title 42 Order.").

[13] Adam Shaw et al., *TSA confirms it lets illegal immigrants use arrest warrants as ID in airports*, Fox News (Jan. 21, 2022), https://www.foxnews.com/politics/tsa-confirms-allows-illegal-immigrants-arrest-warrants-id-airports.

[14] In the aforementioned video, one of the migrants is asked, "¿A dónde van?" [Where are you going.] The migrant responds, "A Miami." [To Miami.]

[15] Only months ago, an alien released by the Biden Administration brutally stabbed a Floridian to death. Jack Morphet et al., *Illegal immigrant who posed as minor while crossing border charged with murder in Florida*, N.Y. Post (Nov. 4, 2021, 5:00 AM), https://nypost.com/2021/11/04/illegal-immigrant-who-posed-as-minor-while-crossing-border-charged-with-murder/.

## PARTIES

24.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens.

25.    Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

26.    Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1346.

27.    Defendant Department of Homeland Security (DHS) is the federal agency principally responsible for immigration enforcement. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and Immigration and Customs Enforcement (ICE), which are responsible for administering the Biden Administration's unlawful policies.

28.    Defendant Alejandro Mayorkas is the Secretary of DHS. Florida sues him in his official capacity.

29.    Defendant Tae Johnson is the Acting Director of ICE. Florida sues him in his official capacity.

30.     Defendant Chris Magnus is the Commissioner of CBP. He is automatically substituted for Acting Commissioner Troy Miller under Federal Rule of Civil Procedure 25(d). Florida sues him in his official capacity.

31.     Defendant Ur M. Jaddou is the Director of USCIS. Florida sues her in her official capacity.

## JURISDICTION AND VENUE

32.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–03.

33.     The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

34.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division).[16] Further, because illegal border crossers typically cross into Florida's territory in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here. This Court has already denied Defendants' motion to transfer venue. *See* ECF 13.

---

[16] *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892).

## FACTUAL BACKGROUND

### The Relevant Federal Immigration Scheme

35.     "[T]he Immigration and Nationality Act [INA] . . . establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985).[17]

36.     When aliens arrive in this country, either at a port of entry or when caught crossing the border illegally, they are subject to 8 U.S.C. § 1225. Section 1225 mandates detention for all arriving aliens. *Jennings*, 138 S. Ct. at 837.

37.     Section 1225(b)(1) applies to aliens who are inadmissible due to fraud, misrepresentation, or lack of valid documentation. *See Jennings*, 138 S. Ct. at 837. These aliens are ordered removed "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), unless they indicate an intention to apply for asylum, *id.* In that case, an immigration officer conducts an interview to determine if the alien has a credible fear of persecution (also known as a "credible-fear screening"). *Id.* § 1225(b)(1)(B)(ii). Even if the alien makes that showing, he "*shall be detained* for further consideration of the application for asylum." *Id.* (emphasis added); *see Jennings*, 138 S. Ct. at 837.

---

[17] Following the creation of DHS, many of the INA's references to the "Attorney General" are now understood to refer to the Secretary of DHS. *See La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014).

38.     Aliens not subject to § 1225(b)(1) are governed by § 1225(b)(2). Under (b)(2), unless an alien is "clearly and beyond a doubt entitled to be admitted," Congress has mandated that the alien "*shall be detained*" pending further immigration proceedings. *Jennings*, 138 S. Ct. at 837 (quoting 8 U.S.C. § 1225(b)(2)(A)) (emphasis added).

39.     In short, whether the alien falls under (b)(1) or (b)(2), whether the alien applies for asylum or not, and whether the alien passes a credible-fear screening or not, the alien is subject to mandatory detention. *Jennings*, 138 S. Ct. at 842 ("Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applications for admission until [their] proceedings have concluded."); *accord Texas v. Biden*, 20 F.4th at 996 (explaining that § 1225 "sets forth a general, plainly obligatory rule: detention for aliens seeking admission").

40.     There are only two exceptions to this mandatory detention rule. First, there is one (and only) "circumstance[] under which" these arriving aliens "may be released": when the federal government exercises its "temporary parole" authority. *Jennings*, 138 S. Ct. at 844 (discussing 8 U.S.C. § 1182(d)(5)(A)); *see also* 8 C.F.R. § 208.30(f)(2) (providing parole under § 1182(d)(5) as the only basis for releasing an alien to which § 1225(b)(1) applies);[18] 8 C.F.R. § 212.5 (describing some of

---

[18] The regulation refers to INA § 212(d)(5), which is codified at 8 U.S.C. § 1182(d)(5).

DHS's parole practices). But that authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In other words, the government "cannot use that power to parole aliens *en masse*." *Texas v. Biden*, 20 F.4th at 997.

41.    Second, § 1225(b)(2)(C) allows the government to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings.

42.    Notably, the government's parole authority used to be broader and could be used "for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (1995). But Congress narrowed this provision in 1996, adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, 110 Stat. 3009–689; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

43.    In addition to detaining these aliens, the government is required to initiate removal proceedings against these aliens. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(1)(B)(iii)(I), (b)(2)(A). The government does so by serving the alien with a

charging document, which is the document that initiates proceedings in immigration court (much like an information or indictment). For ordinary removal proceedings, this document is called a "notice to appear." *See* 8 C.F.R. § 1239.1(a).[19]

44.     For aliens falling under § 1225(b)(1) who do not seek to claim asylum, an immigration officer "shall order the alien removed . . . without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i).

45.     For aliens who claim asylum but fail the credible-fear screening, immigration officers likewise "shall order the alien removed . . . without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

46.     This language, which is identical in both provisions, refers to expedited removal proceedings. But even if, as the government insists, it has "discretion whether to use expedited or full removal proceedings," ECF 6-1 at 13, this language at a minimum commands the government to initiate those proceedings (and thus serve a charging document).

47.     Even aliens who pass a credible fear screening must be served with a charging document. Defendant USCIS admits this.[20]

---

[19] *See What To Do if You Are in Expedited Removal or Reinstatement of Removal*, Florence Immigrant & Refugee Rights Project, at 1–2 (Oct. 2011), https://www.justice.gov/sites/default/files/eoir/legacy/2013/01/22/Expedited%20Removal% 20-%20English%20%2817%29.pdf (discussing other similar charging documents).

[20] *See Revised Guidance for the Referral of Cases and Issuance of Notice to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens*, U.S. Citizenship & Immigration Servs., at 4

48.     The same is true of aliens falling under § 1225(b)(2). These aliens "shall be detained *for a proceeding under section 1229a*," 8 U.S.C. § 1225(b)(2)(A) (emphasis added), which is the statutory provision governing ordinary removal proceedings. *See Jennings*, 138 S. Ct. at 837.

The Biden Administration's Actions

49.     The Biden Administration is systematically violating these congressional commands. For the entire month of December 2020—President Trump's last full month in office—Defendant CBP reports that Border Patrol (a component of CBP) released into the interior only 17 aliens after arresting them crossing the southern border and serving them with a notice to appear.[21] By July 2021, that number had risen to over 60,000.[22] In December 2021, the number was

---

(Nov. 7, 2011), https://www.uscis.gov/sites/default/files/document/memos/NTA%20PM%20%28Approved%20as%20final%2011-7-11%29.pdf (explaining that serving a notice to appear on aliens who pass a credible-fear screening is required by 8 C.F.R. § 208.30(f)). The Biden Administration has expressly adopted this November 2011 guidance. *See* Memorandum from David Pekoske, Acting Sec'y Dep't of Homeland Security, to Troy Miller, Senior Official Performing the Duties of the Comm'r, U.S. Custom & Border Protection 5 (Jan. 20, 2021), https://www.dhs.gov/sites/default/files/publications/21_0120_enforcement-memo_signed.pdf.

[21] *See supra* note 1 (FY2021).

[22] *See supra* note 1 (FY2021).

over 50,000,[23] bringing the total number since President Biden took office to 366,000.[24]

50.     Releasing this many arriving aliens into the interior necessarily means that the government is violating congressional commands in the immigration laws. When immigration officials release these aliens, they violate the mandatory detention provisions in § 1225. When they, instead, parole aliens *en masse*, they are not limiting the use of parole to "case-by-case bas[e]s" nor to situations presenting "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Given the Biden Administration's over 366,000 unlawful releases at the border since February 2021, it is committing more than *one thousand discrete statutory violations per day*.

51.     When Florida filed its original complaint, ECF 1, the Biden Administration was also releasing tens of thousands of migrants without serving a notice to appear. It was instead issuing only a "notice to report," which is essentially a request for the immigrant to turn himself in at a later to date.

---

[23] *See supra* note 1 (FY2022).

[24] *See supra* note 1. The low number in December 2020 was not caused by COVID-19, as the number in January 2020 was only 76. *See Custody and Transfer Statistics FY2020*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020 (last visited Jan. 31, 2022) (U.S. Border Patrol – Dispositions and Transfers tab). In addition, because the total number of releases reported here likely does not include releases by other DHS components, the total is probably even larger.

52.     With its motion to dismiss, however, the government attached the November memo, which claims to rescind the government's notice to report policy and replace it with the Parole + ATD policy. *See* ECF 6-2. That policy still involves releasing aliens in violation of the mandatory detention requirements and without initiating removal proceedings, but now doubles down on the government's misuse of its parole authority in § 1182. *Id.* at 3 (expressly invoking that authority).

53.     According to the November memo, § 1182's "urgent humanitarian reasons or significant public benefit" condition is satisfied by the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." ECF 6-2 at 3.

54.     In other words, the government is claiming that any time "capacity constraints or conditions in custody warrant . . . more expeditious" processing, it can ignore the requirements of the immigration laws because those conditions present either "urgent humanitarian reasons" or a "significant public benefit" justifying parole. *Id.*; 8 U.S.C. § 1182(d)(5)(A).

55.     But even if the government's understanding of "urgent humanitarian reasons" or "significant public benefit" were accurate (it is not), Parole + ATD fails to satisfy the "case-by-case" requirement. *See* 8 U.S.C. § 1182(d)(5)(A). For example, the Biden Administration released over *18,000 migrants* in December 2021

using Parole + ATD.[25] Over 550 grants of parole *per day* is not what Congress had in mind when it amended that provision to add the case-by-case requirement. *See Cruz-Miguel*, 650 F.3d at 199 n.15 (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

56.     Moreover, the Parole + ATD policy is a clear attempt to continue the notice to report policy of declining to issue charging documents. Specifically, "as a condition of their parole," individuals processed using Parole + ATD are "required to report to ICE within 15 days to be processed for" a notice to appear. ECF 6-2 at 3.

57.     The failure to issue charging documents immediately, has important consequences. Once a charging document is served, an alien who fails to appear for his removal proceedings and instead absconds can be "ordered removed *in absentia*." *Texas v. Biden*, 2021 WL 3603341, at *4. After this occurs, the alien can be quickly and easily removed whenever DHS locates him because he already has a final order of removal. By contrast, DHS cannot obtain a final order of removal for an alien who is not issued a charging document.

---

[25] *See supra* note 1 (FY2022).

58.     Finally, the government's rationale regarding the "need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities," ECF 6-2 at 3, is an implausible basis for the Parole + ATD policy given the CDC's Title 42 Order, which addresses those concerns and which this Administration has not taken full advantage of. *See* Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 85 Fed. Reg. 65,806 (Oct. 13, 2020) (exercising the CDC's power under 42 U.S.C. §§ 265, 268 to suspend the introduction of migrants into the United States to protect public health).[26]

59.     The government insists that it lacks the resources to control the surge of migrants at the border. But, as explained in ¶¶ 16–18, these circumstances are of the government's own making.

60.     The Biden Administration is thus promoting its open borders agenda with two steps. One, eliminate effective immigration enforcement measures, and two, use the resulting crisis as a basis to violate congressionally mandated requirements in the immigration laws.

---

[26] This order has been renewed. *See* Notice of Temporary Exception from Expulsion of Unaccompanied Noncitizen Children Pending Forthcoming Public Health Determination, 86 Fed. Reg. 9,942 (Feb. 17, 2021); Public Health Reassessment and Order Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021).

61.     This has been playing out since the first days of the Administration. *See, e.g.*, *Texas v. United States*, 524 F. Supp. 3d 598, 651–52661–62 (S.D. Tex. 2021) (finding the government in violation of the mandatory removal provision in 8 U.S.C. § 1231(a)(1)(A)); *Texas v. United States*, No. 6:21-cv-16, 2021 WL 3683913, at *42 (S.D. Tex. Aug. 19, 2021) (finding the government in violation of the mandatory detention provisions in 8 U.S.C. §§ 1231(a)(2) & 1226(c)).

62.     The Administration has even been found to have violated § 1225's mandatory detention provisions, the same requirements Florida claims the government is violating here. *See Texas v. Biden*, 20 F.4th at 998.[27]

63.     In those cases, the Biden Administration insists it lacks the resources to comply with its duties. *See, e.g.*, Defs.' Emergency Mot. for Admin. Stay & Stay Pending Appeal at 4, *Texas v. Biden*, No. 6:21-cv-16 (S.D. Tex. Aug. 20, 2021) (claiming that "ICE lacks the resources, including appropriated funds and bedspace, to detain all noncitizens potentially implicated by the injunction").

64.     Meanwhile, the Biden Administration is going out of its way to make its bad-faith prediction come true. For example, the Administration has asked Congress to *reduce* the number of immigration detention beds available to it.[28] It has

---

[27] The Supreme Court denied the government a stay in that case. *See Biden v. Texas*, No. 21A21, 2021 WL 3732667 (Aug. 24, 2021).

[28] Philip Marcelo et al., *Immigrant detention soars despite Biden's campaign promises*, AP News (Aug. 6, 2021), https://apnews.com/article/joe-biden-health-immigration-coronavirus-pandemic-

justified this request in part based on "recent decreases in interior enforcement activity."[29]

65.     Similarly, as discussed above, *see* ¶ 16, the Administration has abandoned the Migrant Protection Protocols, which reduced the strain on the immigration detention system by requiring arriving migrants to wait in Mexico while their immigration proceedings were pending. Unlike the Biden Administration's policies, this program is expressly authorized by the immigration laws. *See* 8 U.S.C. § 1225(b)(2)(C); ¶ 16.

66.     And President Biden has revoked Executive Orders expressly aimed at eliminating "catch and release," a colloquialism for the unlawful practices at issue here. *See, e.g.*, Exec. Order No. 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8,267, 8,270 (Feb. 2, 2021) (revoking, among others, Executive Order 13767, Border Security and Immigration

---

4d7427ff67d586a77487b7efec58e74d ("Biden has proposed funding for 32,500 immigrant detention beds in his budget, a modest decrease from 34,000 funded by Trump."); Cong. Rsch. Serv., R46822, DHS Budget Request Analysis: FY2022 13 (2021) (noting that DHS's FY2022 request "includes a $78 million decrease, representing a reduction in support costs for 1,500 individuals in the average population of adult detainees from FY2021 (reducing that average to 30,000)").

[29] *Fiscal 2022 Congressional Justification*, U.S. Immigration & Customs Enforcement 43 https://www.dhs.gov/sites/default/files/publications/u.s._immigration_and_customs_enforcement .pdf.

Enforcement Improvements, 82 Fed. Reg. 8,793 (Jan. 25, 2017), which directed DHS to "terminat[e] . . . the practice commonly known as 'catch and release,' whereby aliens are routinely released into the United States shortly after their apprehension for violations of immigration law," and revoking the Presidential Memorandum of April 6, 2018, entitled "Ending 'Catch and Release' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement").

67.    Finally, DHS has the power to "reprogram and transfer millions of dollars into, out of, and within its account used to fund its detention system."[30] The Biden Administration has, of course, not sought to do so.

<u>Irreparable Harm to Florida</u>

68.    States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). They are, however, limited in their ability to "engage in" their own immigration "enforcement activities." *Id.* at 410. Florida thus relies significantly on the federal government to fulfill its duties under the immigration laws, particularly when Congress has created mandatory obligations or otherwise limited the federal government's discretion.

---

[30] U.S. Gov't Accountability Off., GAO-18-343, Immigration Detention: Opportunities Exist to Improve Cost Estimates 2 (2018), https://www.gao.gov/assets/gao-18-343.pdf.

69.     As a result, there is little Florida can do about the thousands of migrants who have arrived or will arrive in Florida. Some of these unlawful aliens may be otherwise law-abiding, but others are gang members, drug traffickers, and other dangerous criminals.

70.     Many, if not most, of these individuals will never leave the country. Between Fiscal Year 2008 and 2019, for example, "32 percent of aliens referred to [immigration courts] absconded into the United States" and did not show up to their hearings. *Texas v. Biden*, 2021 WL 3603341, at *4.

71.     Moreover, "most aliens lack[] meritorious claims for asylum," as "only 14 percent of aliens who claimed credible fear of persecution or torture were granted asylum between Fiscal Year 2008 and Fiscal Year 2019." *Texas v. Biden*, 2021 WL 3603341, at *4. Even most aliens who *pass* the initial credible-fear screening are not ultimately granted asylum. *See* 83 Fed. Reg. at 55,946 (explaining that, in FY2018, 71% of those who had passed a credible-fear screening were denied asylum). And a high percentage of those who claim asylum appear to be doing so in bad faith. *See id.* (explaining that, in FY2018, 31% of those who passed a credible-fear screening absconded and did not show up to their immigration hearings).

72.     The presence of these aliens in Florida—who have been excluded by federal law—violates the State's quasi-sovereign interest in its territory and the welfare of its citizens. It also costs the State millions.

73.     Florida's state prison system alone spends over $100 million per year incarcerating unlawfully present aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government pursuant to 8 U.S.C. § 1231(i).

74.     Florida spends an average of almost $8,000 *per student* each year on public school education,[31] which it provides regardless of immigration status.

75.     Florida's Department of Children and Families provides a variety of public services to unlawful aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

76.      Finally, the State frequently pays the cost of emergency medical services for the uninsured.

77.     Many of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur more of these expenses.

---

[31] Every Student Succeeds Act, 2019-20 Per-pupil Expenditures – District and State, Fla. Dep't of Ed., https://www.fldoe.org/core/fileparse.php/7507/urlt/1920District-State-PerPupil.pdf.

## CLAIMS

## <u>COUNT 1</u>

**Agency action that is not in accordance with law
and is in excess of authority, in violation of the APA
(Non-detention policy)**

78.     Florida repeats and incorporates by reference ¶¶ 1–77.

79.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

80.     The government's policy of refusing to detain arriving aliens is contrary to the mandatory detention provisions in 8 U.S.C. § 1225(b)(1)–(2).

81.     And to the extent the government attempts to justify those releases under the parole authority in § 1182(d)(5)(A), that authority may only be used "on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The government's self-imposed crisis does not suddenly render tens of thousands of migrants eligible for relief limited to incredibly narrow circumstances. And even if it did, the government cannot ignore the "case-by-case" requirement.

82.     Nor does any regulation authorize Defendants' policy. The principal parole regulation, 8 C.F.R. § 212.5, says nothing about the mass release of arriving

aliens. And even if there were a regulation authorizing that conduct, it would be invalid given the plain text of §§ 1225(b) and 1182(d)(5)(A).

83.     Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

## COUNT 2

### Agency action that is not in accordance with law and is in excess of authority, in violation of the APA (Parole + ATD policy)

84.     Florida repeats and incorporates by reference ¶¶ 1–77, 79.

85.     For similar reasons, the Parole + ATD policy is unlawful. The government cannot parole aliens *en masse* and none of its rationales satisfy the exceedingly high standards in 8 U.S.C. § 1182.

86.     Finally, because this policy is not a valid exercise of the government's § 1182 power, it violates the mandatory detention provisions in § 1225.

## COUNT 3

### Arbitrary and capricious agency action in violation of the APA (Non-detention policy)

87.     Florida repeats and incorporates by reference ¶¶ 1–77.

88.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

89.     The government insists that "no such 'policy' exists." ECF 6-1 at 37. But the facts overwhelmingly suggest otherwise, which means that the government is either withholding the written policy in bad faith, or it has not reduced it to writing. If it is the latter, that means the government has implemented this policy without offering any reasoning in support of it, which is per se arbitrary and capricious.

90.     In any event, the policy is arbitrary and capricious for several reasons. It ignores costs to the States, a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015).

91.     Defendants have also failed to explain their "extreme departure from prior practice," *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018), as required by the APA, *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

92.     Moreover, Defendants have neither accounted for Florida's reliance interests nor considered lesser alternatives, each of which renders Defendants' policy arbitrary and capricious. *Id.*

93.     And Defendants ignored an important aspect of the problem because they did not consider the high rate at which those who are released abscond and do not show up to their immigration proceedings.

94.     Finally, insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Com. V. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## COUNT 4

### Arbitrary and capricious agency action in violation of the APA (Parole + ATD policy)

95.     Florida repeats and incorporates by reference ¶¶ 1–77, 88.

96.     The November memo, ECF 6-2, is arbitrary and capricious and should be set aside for many reasons, including that it ignores costs to the States, *Michigan v. EPA*, 576 U.S. at 752–53, and neither accounts for reliance interests nor considers lesser alternatives, *Regents*, 140 S. Ct. at 1913.

97.     The November memo also fails to provide any reasoned explanation for its policy change, a *per se* violation of administrative law's reason-giving requirements. *See Dep't of Com.*, 139 S. Ct. at 2575–76 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

98.     And the government did not consider the degree to which those subject to Parole + ATD will not report to an ICE facility as they are directed to do.

99.     Further, the memo's claim that overcrowding and lack of resources satisfy the "urgent humanitarian reasons or significant public benefit" requirement is an unreasonable interpretation of § 1182.

100.    Finally, insofar as Defendants claim their policies are justified by resource constraints, this rationale is pretextual given the Biden Administration's calculated strategy of reducing immigration resources and detention capacity. *See Dep't of Com.*, 139 S. Ct. at 2573–74. And the government's reliance on the COVID-19 pandemic is incredulous given it simultaneously claims the power to exclude immigrants wholesale to guard public health against the same pandemic. *See* ¶ 58.

## COUNT 5

### Failure to conduct notice and comment in violation of the APA
### (Non-detention policy)

101.    Florida repeats and incorporates by reference ¶¶ 1–77.

102.    The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. § 553.

103.    Even assuming Defendants have discretion to depart from the clear requirements of the INA with respect to arriving aliens, a sea change of this magnitude required notice and comment. *See Jean v. Nelson*, 711 F.2d 1455, 1483

(11th Cir. 1983) (holding that a significant new, binding government policy regarding immigration detention is subject to notice and comment).[32]

## COUNT 6

### Failure to conduct notice and comment in violation of the APA
### (Parole + ATD policy)

104.   Florida repeats and incorporates by reference ¶¶ 1–77, 102.

105.   The November memo, ECF 6-2, announces a drastic expansion of the government's use of its parole authority.

106.   The government granted parole to *18,000 migrants* in December 2021 alone under this policy.[33]

107.   To the extent this does not violate § 1182, the November memo significantly affected rights and obligations and at a minimum required notice and comment. *See Chrysler Corp.*, 441 U.S. at 303; *Jean*, 711 F.2d at 1482–83.

## COUNT 7

### Agency action unlawfully withheld or
### unreasonably delayed in violation of the APA
### (Non-detention policy)

108.   Florida repeats and incorporates by reference ¶¶ 1–77.

---

[32] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

[33] *See supra* note 1.

109.   Defendants' near-blanket refusal to comply with the mandatory-detention provisions in § 1225 and the limits on their parole authority in § 1182, as well as their failure to serve charging documents and initiate removal proceedings as required by law, qualifies as agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706(1).

## COUNT 8

### Violation of the INA and the Constitution

110.   Florida repeats and incorporates by reference ¶¶ 1–77, 80–83, 85–86.

111.   Florida has a non-statutory cause of action to challenge the government's unlawful, ultra vires conduct, which does indeed "survive[] displacement by the APA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)).

112.   The federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause—provides a separate cause of action to challenge the conduct described in Counts 1 and 2. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a)  Hold unlawful and set aside the November memo and the non-detention

policy.

b)  Issue permanent injunctive relief enjoining Defendants from enforcing

those policies.

c)  Compel Defendants to comply with applicable requirements pursuant to

5 U.S.C. § 706.

d)  Issue declaratory relief declaring the policies unlawful.

e)  Award Florida costs and reasonable attorney's fees.

f)  Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry Whitaker (FBN 1031175)
SOLICITOR GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Rachel Siegel (FBN 1029143)
DEPUTY SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ James H. Percival
James H. Percival