# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                              Case No. 3:21-cv-1066-TKW-EMT

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## <u>FLORIDA'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS</u>

The non-detention policy and the Parole + ATD policy resulted in "over 50,000" releases at the border in December of 2021 alone, compared with only 17 in President Trump's last full month in office. Doc. 16 ¶ 1. Yet the government denies that there was a change in detention policy when President Biden took office, argues that its unlawful actions are not subject to judicial review, and defends its actions on the merits based on a sweeping assertion of prosecutorial discretion.

The challenged policies—and the resulting releases—are unlawful. "Read most naturally, §§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018). The only "circumstance[] under which aliens detained under § 1225(b) may be released" is when the government exercises its parole authority

under 8 U.S.C. § 1182. *Jennings*, 138 S. Ct. at 844. But the parole authority may be used only on a "case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit," limits added by Congress in 1996 due to its "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011); *see id.* (explaining that the statute used to allow parole "for emergent reasons or for reasons deemed strictly in the public interest" and had no "case-by-case" requirement).

Florida has standing to challenge these policies. As the Supreme Court has recognized, States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). Florida spends hundreds of millions per year as a result of the government's immigration failures, including over $100 million per year incarcerating aliens who commit crimes in the State and over $8,000 dollars per student per year on primary and secondary education. Doc. 16 ¶¶ 73–74. These harms are sufficient to establish standing because they flow from "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

The government's remaining arguments similarly fail. Most are premised on the same flawed argument the government makes on the merits—that it has

"prosecutorial discretion" to ignore the clear commands of Congress. The motion should be denied.

## BACKGROUND

### The Immigration Scheme

The Immigration and Nationality Act (INA) "establishes a comprehensive scheme for aliens' exclusion from and admission to the United States." *Moorhead v. United States*, 774 F.2d 936, 941 (9th Cir. 1985). This comprehensive scheme describes when aliens should be admitted, when they should be excluded, and how to remove aliens with no legal right to be present in the United States.[1] Depending on which stage of the process an alien is in, the alien is subject to one of three detention schemes.

A removable alien already present in the United States is subject to § 1226. Under that section, the government has discretion whether to detain the alien during removal proceedings, unless the alien is a criminal alien. *Compare* 8 U.S.C. § 1226(a) (using "may be arrested and detained"), *with id.* § 1226(c) (using "shall take into custody" with respect to criminal aliens). *Accord Nielsen v. Preap*, 139 S. Ct. 954, 966 (2019) (explaining that, under § 1226(c), the government "*must* arrest those aliens guilty of a predicate offense" and "may *not* release" them).

---

[1] Additional background on the immigration system is provided in Florida's amended complaint, Doc. 16 ¶¶ 35–48, and in *Jennings*, 138 S. Ct. at 836–38, 842.

When an alien reaches the end of the immigration process and the government obtains a final order of removal, the alien is subject to § 1231. Under that section, the government does not have discretion to release the alien—it must detain. *See* 8 U.S.C. § 1231(a)(2) (using "shall detain the alien"). Detention, however, may not be indefinite. It must end once "there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). This occurs, for example, when the United States lacks diplomatic relations with the alien's home country.

Aliens arriving at the border, those at issue in this action, are covered by a third scheme. Like aliens with final orders of removal and criminal aliens in the interior—but unlike non-criminal aliens in the interior—arriving aliens are subject to mandatory detention. These aliens are treated as "applicant[s] for admission," whether they "arrive[] . . . at a designated port of arrival" or cross illegally. 8 U.S.C. § 1225(a)(1). And under § 1225(b)(1)–(2), "detention of applicants for admission" is "mandat[ory]." *Jennings*, 138 S. Ct. at 842 (discussing 8 U.S.C. § 1225(b)(1)(B)(ii), (2)(A)); *see also* Doc. 16 ¶¶ 36–39.

There are only two exceptions to mandatory detention under § 1225. First, there is one "circumstance[] under which" arriving aliens "may be released" into the interior: when the government exercises its "temporary parole" authority. *Jennings*, 138 S. Ct. at 844 (discussing 8 U.S.C. § 1182(d)(5)(A)). But that authority may be

used only "on a case-by-case basis" and only "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In other words, the government "cannot use that power to parole aliens *en masse*." *Texas v. Biden*, 20 F.4th 928, 997 (5th Cir. 2021).

Second, § 1225(b)(2)(C) allows the government to "return . . . alien[s]" who "arriv[e] on land . . . from a foreign territory contiguous to the United States . . . to that territory pending" immigration proceedings. The government has invoked this authority to require aliens to wait in Mexico during their proceedings. *See* Doc. 16 ¶ 16.

<u>The Crisis at the Southern Border</u>

On President Trump's last full month in office, Border Patrol released 17 migrants at the border into the interior of the United States. Doc. 16 ¶ 1 & n.1. By March 2021, that number was in the tens of thousands. *Id.* ¶ 1 n.1. And in December 2021, the most recent month available when Florida filed its amended complaint, that number had reached over 50,000. *Id.* ¶ 1 & n.1. While some of these migrants may be otherwise law-abiding, others are gang members and drug traffickers. *Id.* ¶ 2.

This crisis is not the result of a random "migration surge[]" as Defendant Secretary Mayorkas has suggested.[2] Rather, it is a byproduct of the Biden Administration's deliberate policy choices.

For example, the government has "flatly refused" to return arriving aliens to Mexico under § 1225(b)(2)(C) and instead terminated the Migrant Protection Protocols or the "wait in Mexico policy." Doc. 16 ¶ 16; *see also Texas*, 20 F.4th at 996 n.18 (explaining that the government is "refusing to avail itself of [(b)(2)](C)'s authorized alternative, and then complaining that it doesn't like its options"). The government did so even though its own internal assessments found the policy "effective[]" and an "indispensable tool in addressing the ongoing crisis at the southern border." *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 3603341, at *5 (N.D. Tex. Aug. 13, 2021).

Similarly, the government has intentionally reduced the number of immigration detention beds available to it, Doc. 16 ¶ 64, refused to use other available measures to increase that capacity, such as reprogramming funds, *id.* ¶ 67, and revoked executive orders designed to eliminate the unlawful release of arriving aliens, *id.* ¶ 66.

---

[2] Statement by Homeland Security Secretary Alejandro N. Mayorkas Regarding the Situation at the Southwest Border, U.S. DHS (Mar. 16, 2021), https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n-mayorkas-regarding-situation.

Perhaps most egregiously, the Biden Administration has sent a clear message to citizens of other countries: If you violate our laws and our sovereignty, there will be no consequences. Defendant Secretary Mayorkas has even publicly boasted that "[u]nlawful presence in the United States will alone not be a basis for an immigration enforcement action." *Id.* ¶ 18.

This Action

Florida filed its complaint on September 28, 2021. Doc. 1. The complaint alleged that the government had a policy of releasing arriving aliens subject to mandatory detention (the non-detention policy)—based both on an assertion of prosecutorial discretion and improper use of the parole authority. *Id.* ¶ 30. Florida also alleged that the government had a policy of issuing "notices to report" to arriving aliens—essentially "immigration enforcement by the honor system"—rather than the required charging documents, which initiate immigration proceedings (the notice to report policy). *Id.* ¶¶ 31–32.

On December 3, the government moved to dismiss.[3] *See* Doc. 6. The motion informed Florida and this Court for the first time that the government, less than a month after being served, had rescinded the notice to report policy and replaced it with the Parole Plus Alternatives to Detention policy (the Parole + ATD policy). *See* Doc. 6-2. The government did not rescind or replace the non-detention policy.

---

[3] The government is entitled to 60 days before responding to a complaint under Rule 12(a).

The Parole + ATD policy asserts that "issuing" the proper charging documents is "time consuming" and that Border Patrol needs to "relieve overcrowding in congregate settings" in light of COVID-19. Doc. 6-2 at 2.[4] It thus creates an "alternative processing pathway" for processing arriving aliens when "conditions in custody warrant . . . more expeditious processing." *Id.* at 3. The policy involves the granting of temporary parole under 8 U.S.C. § 1182 solely on the ground that the government is experiencing "capacity constraints." Doc. 6-2 at 3.

After the parties litigated the government's motion to transfer, Doc. 7-1, which this Court denied, Doc. 13, Florida filed its amended complaint on February 1, 2022, Doc. 16. The government again moves to dismiss. Doc. 23.

## LEGAL STANDARD

When deciding a motion to dismiss, a court must take all "factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Dismissal under Rule 12(b)(6) is only warranted if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And when a plaintiff's standing is challenged under Rule 12(b)(1), "general factual allegations of injury can suffice." *Muranksy v.*

---

[4] Florida cites to ECF pagination unless otherwise noted.

*Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (en banc) (quotations omitted).

## ARGUMENT

Florida challenges two policies: the non-detention policy and the Parole + ATD policy. The non-detention policy has two basic features. First, the government—under the guise of "prosecutorial discretion"—is releasing tens of thousands of arriving aliens per month who are subject to mandatory detention under § 1225. Second, in some cases the government is basing these mass releases on its parole authority under § 1182(d)(5)(A), which authorizes the temporarily release of individuals "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

The Parole + ATD policy involves only the latter issue. The policy invokes the government's parole authority to release arriving aliens at the border *en masse*. Doc. 6-2 at 3. The policy assumes that paroling individuals for the sole reason that the government wishes to avoid "overcrowding in CBP facilities" and relieve "capacity constraints" is an appropriate exercise of that power. *Id.* at 2–3.

Both policies are subject to judicial review, violate the APA, and cause Florida imminent harm.

## I.     THE CHALLENGED POLICIES ARE SUBJECT TO JUDICIAL REVIEW.

"The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted). Applying that presumption here, this Court should review the challenged policies.[5]

### a.  The challenged policies are not committed to agency discretion by law.

The government argues that the challenged policies are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2) and therefore not subject to judicial review. Doc. 23-1 at 22. But "to honor the presumption of review," the Supreme Court reads that exception "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018). It applies only in the "rare circumstances" where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 370 (quoting *Lincoln v. Virgil*, 508 U.S. 182, 191 (1993)). In other words, it is not enough that the agency has discretion. Judicial

---

[5] APA reviewability aside, Count 8 asserts a claim for unconstitutional and ultra vires agency action. Doc. 16 ¶¶ 110–12. At a minimum, this Court should review Florida's allegations under those theories, which rely on the same set of facts. *Id.* The government argues that there is no such cause of action, Doc. 23-1 at 43–45, but it ignores scores of cases to the contrary. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (discussing "a long history of judicial review of illegal executive action"); *accord Phila. Co. v. Stimson*, 223 U.S. 605, 619–20 (1912); *Simmat v. BOP*, 413 F.3d 1225, 1231 (10th Cir. 2005) (McConnell, J.); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996).

review remains available unless the agency's "discretion [is] unbounded." *Dep't of Com.*, 139 S. Ct. at 2568.

Neither the government's decision to release arriving aliens subject to § 1225 nor its decision to parole them *en masse* involves unbounded discretion conferred by Congress. As such, neither of the challenged policies is committed to agency discretion by law.

### i. Detaining arriving aliens under § 1225 is not committed to agency discretion.

Congress has not given immigration officials unbounded discretion regarding the detention of arriving aliens. It has instead expressly commanded those officials to detain arriving aliens. Under 8 U.S.C. § 1225, the government "shall . . . detain[]" arriving aliens pending immigration proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(ii), (2)(A). The word "shall" in § 1225 means what it says. "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Jennings*, 138 S. Ct. at 844 (quotations omitted); *accord United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) ("[W]here Congress uses the word 'shall,'" it "intends to command rather than suggest."); *Sierra Club v. Johnson*, 436 F.3d 1269, 1280 (11th Cir. 2006) (interpreting "shall" to create a mandatory requirement for the EPA).

Mandatory detention of arriving aliens has a long history. When Congress enacted the INA in 1952, it codified a basic distinction between aliens arriving in

the United States seeking admission and aliens already in the country subject to removal. Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952). Under the 1952 statute, aliens seeking admission who were not clearly entitled to be admitted were subject to mandatory detention. *Id.* § 235(b), 66 Stat. at 199 (explaining that these aliens "shall be detained for further inquiry"). Deportable aliens already present in the United States, by contrast, were not subject to mandatory detention. *Id.* § 242(a), 66 Stat. at 208–09 (explaining that these aliens "may . . . be arrested and taken into custody").

Congress has maintained that basic distinction to this day. *Compare* 8 U.S.C. § 1225(b)(1)(B)(ii) (using "shall" for arriving aliens), *and id.* § 1225(b)(2)(A) (same), *with* 8 U.S.C. § 1226(a) (using "may" for aliens present in the interior). Congress's use of the permissive "may" with certain categories of aliens and the mandatory "shall" with other categories confirms that § 1225 is a command. "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004). Congress also used permissive language in other provisions of § 1225. *See, e.g.*, 8 U.S.C. § 1225(b)(1)(A)(iii)(I) (explaining that the Attorney General "may" use expedited screening procedures for certain aliens in his "sole and unreviewable discretion"); *id.* § 1225(a)(4) ("An alien

applying for admission may, in the discretion of the Attorney General . . . , be permitted to withdraw the application for admission.").

Given all this, it is unsurprising that the Supreme Court has interpreted § 1225 to "mandate detention of applicants for admission until certain proceedings have concluded."[6] *Jennings*, 138 S. Ct. at 842; *accord Texas*, 20 F.4th at 978 (explaining that § 1225's detention requirement is "obviously a mandatory statutory command— not a commitment to agency discretion").

The government argues otherwise, invoking the principle that "[t]he choice to refrain from pursuing particular enforcement actions is 'generally committed to an agency's absolute discretion.'" Doc. 23-1 at 22 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). But *Heckler* does not foreclose judicial review of sweeping nonenforcement policies, especially policies that result in tens of thousands of statutory violations per month. It applies only to "one-off nonenforcement decisions." *Texas*, 20 F.4th at 983–84; *accord Heckler*, 470 U.S. at 833 n.4 (distinguishing "a general policy that is so extreme as to amount to an abdication of statutory responsibilities").

Moreover, the Supreme Court in *Heckler* "emphasize[d] that the decision" not to take enforcement action "is only presumptively unreviewable." *Heckler*, 470 U.S.

---

[6] While immigration proceedings can take time, an alien is free to withdraw his application for admission and depart the United States. *See* 8 U.S.C. § 1225(a)(4).

at 832. This presumption "d[oes] not set agencies free to disregard legislative direction," and it "may be rebutted where," as here, "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 832–33.  And *Heckler* in no way forecloses review of whether the enforcement action is properly classified as "discretionary" in the first place—the issue here.[7]

The government also suggests that it has discretion to release arriving aliens because it "does not have adequate resources." Doc. 23-1 at 28 n.7. Congress, however, was well aware of the government's resource constraints when it enacted the current version of § 1225 in 1996. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, § 302, 110 Stat. 3009-546, 3009-579. In that same legislation, Congress for the first time instructed the government to detain "criminal aliens" present in the interior of the United States. *Id.* § 303, 110 Stat. at 3009-585. When it created that duty, Congress created a mechanism for the government to receive a temporary reprieve from that obligation until it could increase detention capacity. *Id.* at 3009-586 to -587; *see Preap*, 139 S. Ct. at 969 (referring to this provision as the "Transition Period Custody Rules"). Congress was

---

[7] *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005) is similar. There, the Court addressed whether "an individual who has obtained a state-law restraining order has a constitutionally protected interest in having the police enforce the restraining order." *Id.* at 750–51. As in *Heckler*, the Court held that the statute did not create a mandatory duty, which "would require some stronger indication from the Colorado Legislature" than use of the phrase "shall use every reasonable means." *Id.* at 761. As explained, that stronger indication exists here.

thus aware of the resource constraints the government faces but nonetheless preserved mandatory detention for arriving aliens.

In any event, the government has gone out of its way to reduce its detention capacity, eliminate effective enforcement tools, and send a message to the world that the border is open. *See* Doc. 16 ¶¶ 18, 63–67. It cannot now use this crisis of its own making to ignore the clear commands of Congress.

Because § 1225 imposes a mandatory duty to detain arriving aliens, the government's policy of releasing arriving aliens in not committed to agency discretion by law.[8]

> ## ii. The decision to release aliens en masse under § 1182 is not committed to agency discretion by law.

For similar reasons, the government does not have unbounded discretion to parole arriving aliens *en masse* under 8 U.S.C. § 1182.

The parole authority may be used "only on a case-by-case basis" and only for "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Congress added those limits in 1996 because of its "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel*, 650 F.3d at 199 n.15. And the Fifth

---

[8] *Chiles v. United States*, 69 F.3d 1094 (11th Cir. 1995), does not hold otherwise. That case involved only a general argument that "the Attorney General is [not] adequately guarding the borders." *Id.* at 1096. The Court did not consider the statutes Florida relies on in this case.

Circuit has recognized that the government "cannot use that power to parole aliens *en masse*." *Texas*, 20 F.4th at 997.

The government argues to the contrary because, it says, individual government decisions to grant or deny parole are unreviewable. Doc. 23-1 at 24 ("[T]he Secretary '*may . . . in his discretion* parole into the United States . . . .'" (quoting 8 U.S.C. § 1182(d)(5)(A))). But the statute only confers discretion to deny parole when it would otherwise be permitted, not to grant parole when it would not be permitted. In any event, Florida does not ask this Court to review individual parole decisions. It asks this Court to review two national policies that instruct inferior officials to use the parole authority in a manner expressly forbidden by Congress.[9]

Moreover, "[e]ven when a decision is committed to agency discretion, a court may consider allegations that an agency failed to follow its own regulations." *Kurapati v. U.S. Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1262 (11th Cir. 2014) (quotations omitted). All the more so when an agency fails to follow the statute itself.

---

[9] *Garcia-Mir v. Smith*, 766 F.2d 1478 (11th Cir. 1985), and *Jean v. Nelson* (*Jean II*), 727 F.2d 957 (11th Cir. 1984) (en banc), do not hold otherwise. Those cases involved aliens seeking grants of parole, not a suit seeking vacatur of a nationwide policy that violates the express terms of the parole statute. Moreover, those cases were decided before Congress amended the parole statute to add the limits Florida relies on, particularly the "case-by-case" requirement.

### b. The challenged policies are final agency action.

The non-detention policy and the Parole + ATD policy are final agency action. The government "has completed its decisionmaking process," *Canal A Media Holding, LLC v. USCIS*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)), and the policies determine "rights or obligations" and have "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).[10]

#### i. *The non-detention policy is final agency action.*

The government argues that the non-detention policy is not the consummation of its decisionmaking process because, it says, there is no such policy and each release is attributable to "an individual discretionary decision." Doc. 23-1 at 27. But Florida alleges that there is such a policy.[11] Doc. 16 ¶ 20.

And while the Court need not resolve this dispute at this stage, the specific facts Florida alleges are more than sufficient to infer the existence of a policy. An exponential increase in the number of unlawful releases at the border is enough to infer the existence of a policy. Doc. 16 ¶ 49. "[N]umerous courts have found that a plaintiff can satisfy the finality requirement without offering evidence of a formal or

---

[10] Florida need only show either (a) that the policies determine rights or obligations or (b) that they have legal consequences. Florida has shown both.

[11] The government appears to agree that unwritten policies can be subject to APA review. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities).

official statement." *Amadei v. Nelson*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (collecting authorities); *accord Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (finding the existence of a policy where statistics of parole application denials were "irrefutable"). Moreover, the Biden Administration has been open about its desire to reduce detention at the border, which is strong evidence that the non-detention policy exists. *See* Doc. 16 ¶ 66 (discussing the revocation of executive orders designed to end catch-and-release); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39, 145–47 (D.D.C. 2018) (recognizing the existence of an unwritten policy based on statements of high-ranking officials).[12]

Regarding rights and obligations or legal consequences, the non-detention policy establishes "new marching orders" directing immigration officials, whether in writing or not, to not comply with the law. *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007); Doc. 16 ¶ 50. For aliens, the non-detention policy results in their being permitted to enter the United States. And if they are paroled, or

---

[12] At a minimum, the government admits that it has a policy of allowing "individual discretionary decision[s]" to determine whether arriving aliens are released or paroled *en masse*. Doc. 23-1 at 27. The government's position that it authorizes officials at the border to make these unlawful decisions admits the existence of at least some version of a non-detention policy. If nothing else, Florida challenges the government's policy of allowing immigration officers to refrain from doing things Congress has required.

if they file an asylum claim, they are eligible for work authorization.[13] Finally, these releases determine rights, obligations, and legal consequences for Florida's administration of Medicaid. *See* 42 U.S.C. § 1395dd (requiring that participating Medicaid facilities provide emergency services to immigrants regardless of status).

### ii.   The Parole + ATD policy is final agency action.

For similar reasons, the Parole + ATD policy is final agency action. As to whether it is the consummation of the government's decisionmaking process, the government argues that it "retains the discretion to alter or revoke the guidance at will." Doc. 23-1 at 26. But the fact that an agency may "revise" its decision "is a common characteristic of agency action and does not make an otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016).

As to whether the policy determines rights and obligations or legal consequences, as explained above, grants of parole do so. The government argues to the contrary because, it says, the policy "does not itself adversely affect" Florida. Doc. 23-1 at 26. But the test is whether it determines rights and obligations or legal

---

[13] 8 C.F.R. § 274a.12(c)(11) (recognizing that aliens paroled into the United States under § 1182(d)(5)(A) are eligible to apply for work authorization); *Asylum*, USCIS, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Mar. 24, 2022) (noting that immigrants may apply for work authorization 365 days after they complete an asylum application).

consequences, not whether it adversely affects Florida. In any event, the Parole +

ATD policy adversely affects Florida in several ways, as explained in Section IV.

### c. The INA does not foreclose review of the challenged policies.

The government argues that various provisions of 8 U.S.C. § 1252 preclude

judicial review of the challenged policies. Doc. 23-1 at 28. But that section, as its

heading makes clear, addresses "judicial review of *orders of removal.*" 8 U.S.C.

§ 1252 (emphasis added). An order of removal is a document specific to an

individual that orders his departure from the country. Florida's challenge does not

seek review of a specific alien's order of removal or of any alien-specific action.

Florida instead seeks APA review of two national immigration policies.

"[T]he entirety of the text and structure of § 1252 indicates that it operates

only on denials of relief for individual aliens." *Texas*, 20 F.4th at 977; *accord*

*Regents*, 140 S. Ct. at 1907 (interpreting two provisions of § 1252 not to apply when

"the parties are not challenging any removal proceedings"). Even § 1252(e)(3) and

§ 1225(a)(2)(A)(iv), which reference review of implementing policies, make clear

that these provisions only limit review of such policies when an alien challenges

them as a basis to invalidate an order of removal. Both provisions are found in

subsections that address only review of final orders of removal. 8 U.S.C. § 1252(e)

(discussing "judicial review of orders" under § 1225(b)(1)); *id.* § 1252(a)(1)

(discussing "[j]udicial review of a final order of removal").

20

In other words, an APA challenge seeking vacatur of a policy, rather than review of an individual order of removal, is outside the scope of § 1252, especially given the "presumption of judicial review for one suffering legal wrong because of agency action." *Regents*, 140 S. Ct. at 1905.

## II.   FLORIDA STATES A CLAIM AGAINST THE NON-DETENTION POLICY.

### a.  The non-detention policy is contrary to law.

As explained in Section I.a.i, the non-detention policy flagrantly violates the detention requirements of § 1225 and runs roughshod over limits on the government's parole authority in § 1182(d)(5)(A). *See* 5 U.S.C. § 706(2)(A), (C) (requiring vacatur of unlawful agency action); Doc 16 ¶¶ 78–83. As a result of this policy, the government is releasing tens of thousands of arriving aliens per month, even though these aliens are subject to mandatory detention and may only be paroled under very specific circumstances.[14] The agencies, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).

### b.  The non-detention policy is arbitrary and capricious.

The non-detention policy is arbitrary and capricious on several grounds. *See* 5 U.S.C. § 706(2)(A); Doc 16 ¶¶ 87–94. The government's sole argument against

---

[14] Florida further addresses the government's parole practices in explaining why the Parole + ATD policy is contrary to law.

Florida's arbitrary and capricious claim is that "no such policy exists." Doc. 23-1 at 39–40.

As explained above, however, Florida has alleged the existence of a policy. That is a fact that the Court must accept as true at the motion to dismiss stage and that may be explored in discovery. And the government's failure to defend its behavior through public agency action is telling. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (discussing the APA's reasoned decisionmaking requirements). Nor has the government shown that it considered the costs imposed on Florida by the policy, Florida's reliance on the previous Administration's compliance with §§ 1225 and 1182, or lesser alternatives. *See Regents*, 140 S. Ct. at 1913.

What is more, even if the government were correct that it lacks the resources to comply with the mandatory detention requirements of § 1225, it should at a minimum do everything in its power to comply and its policy should explain any failure to do so. Instead, the government "entirely failed to consider an important aspect of the problem." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Finally, the government's insistence that it lacks the resources to comply is blatantly pretextual given it has reduced its detention capacity, eliminated effective enforcement tools, and created the current border crisis. *See* Doc. 16 ¶¶ 63–67.

### c.  The non-detention policy is subject to notice and comment.

The non-detention policy is subject to notice and comment because it "affect[s] individual rights and obligations," *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979), as explained in Section I.b.i. *See* 5 U.S.C. § 553; Doc 16 ¶¶ 101–03.

The government argues otherwise because, it says, the policy is merely a series of individual acts of discretion and therefore a general statement of policy exempted from notice and comment. Doc. 23-1 at 41–42; *see* 5 U.S.C. § 553(b) (exempting "general statements of policy").

The government's insistence that the non-detention policy does not exist, however, dooms it under binding Eleventh Circuit precedent. *See Jean v. Nelson* (*Jean I*), 711 F.2d 1455, 1476–83 (11th Cir. 1983).[15] In *Jean I*, the plaintiffs challenged the federal government's detention policy for arriving Haitians. After "weeks of trial and pages of exhibits and testimony, no clear picture of the entire policy emerged." *Id.* at 1468. On that record, the court held that the government

---

[15] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean II*, 727 F.2d at 957, 962. The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

should have defined the policy through notice and comment, *id.* at 1476–77, and rejected the government's invocation of the general statements of policy exception, *id.* at 1482–83. Like in *Jean I*, the government here insists that thousands of individual actions—unlawful ones at that—are not the product of a single coherent government policy. Doc. 23-1 at 41–42.

In any event, the non-detention policy is not a general statement of policy because it does not "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp.*, 441 U.S. at 302 n.31); *see also Texas v. United States* (*DAPA*), 809 F.3d 134, 171 (5th Cir. 2015) (explaining that exceptions to notice and comment "must be narrowly construed"), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016). The non-detention policy has not been announced publicly, so it cannot "advise the public." *See* Doc. 16 ¶ 12. And the policy is not an exercise of a discretionary power because there is no discretion to release arriving aliens or parole them *en masse*.

## III.   FLORIDA STATES A CLAIM AGAINST THE PAROLE + ATD POLICY.

### a.  The Parole + ATD policy is contrary to law.

The Parole + ATD policy is contrary to law because it ignores both the "case-by-case" requirement and the "urgent humanitarian reasons or significant public

benefit" requirement in the parole statute.  *See* 5 U.S.C. § 706(2)(A), (C); Doc 16 ¶¶ 84–86.

It ignores the "case-by-case" requirement because, as explained in Florida's amended complaint, the government is paroling aliens into the United States *en masse*. "[T]he government released over 18,000 migrants in December 2021 using the Parole + ATD policy." Doc. 16 ¶ 14. Calling that "case-by-case" is not a plausible argument.

The statute also requires that parole be granted "*only* on a case-by-case *basis*." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). "Basis" means "[t]he justification for or reasoning behind something." *Basis*, New Oxford American Dictionary (3d ed. 2010). What that means is that the statute does not just require that parole be granted to individuals rather than groups, but that the underlying reason for parole be specific to the parolee. General overcrowding at the government's facilities, and the resulting strain on the government's resources, is not specific to the parolee and therefore cannot be a "case-by-case basis" for parole.

Nor does the Parole + ATD policy limit parole to "urgent humanitarian reasons" or circumstances providing a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Addressing "overcrowding in congregate settings"—a problem of the government's own creation—does not meet that standard, nor does relieving the government's "capacity constraints." Doc. 6-2 at 2–3. Appearing to recognize as

25

much, the government asks for *Chevron* deference. Doc. 23-1 at 38. That is wrong for several reasons.[16]

First, the only decisional document the government cites in support of that deference is the Parole + ATD policy itself. But that document was created in response to Florida's challenge to explain practices that were already occurring. This is not a basis for *Chevron* deference. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (concluding that deference was "inappropriate" for agency interpretations advancing a "convenient litigating position" or a post hoc rationalization used to defend agency actions). That is especially so given that the policy has not gone through a formal process such as notice-and-comment rulemaking. *See United States v. Mead Corp.*, 533 U.S. 218, 230–31 & n.12, 234 (2001).

Second, the relevant language is not ambiguous, and even if it were, the government's interpretation is not reasonable. *See Pub. Emps. Retirement Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself."). "[U]rgent humanitarian reasons" or "significant public benefit"—when compared to "for

---

[16] The government is incorrect insofar as it suggests that the previous Administration endorsed its unlawful use of the parole authority. Doc. 23-1 at 36. *See, e.g.*, Exec. Order No. 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793, 8,795 (Jan. 25, 2017) ("It is the policy of the executive branch to end the abuse of parole."); *Damus*, 313 F. Supp. 3d at 323 (explaining that the Trump Administration ceased certain parole abuses and adopted a policy of "systematic detention").

emergent reasons or for reasons strictly in the public interest"—communicates that the parole authority is reserved for extraordinary circumstances. *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1191 (11th Cir. 2018) ("[C]hanges in statutory language generally indicate an intent to change the meaning of the statute."); *Cruz-Miguel*, 650 F.3d at 199 n.15 (explaining that Congress amended § 1182 due to its "concern that parole . . . was being used by the executive to circumvent congressionally established immigration policy"). The government's position, that it can exercise the parole authority to address its own resource constraints, gives no legal effect to Congress's change and should be rejected.

### b. The Parole + ATD policy is arbitrary and capricious.

The Parole + ATD policy is arbitrary and capricious for many of the same reasons as the non-detention policy. *See* Section II.b; 5 U.S.C. § 706(2)(A); Doc. 16 ¶¶ 95–100. The policy does not address the costs imposed on States like Florida, States' reliance interests, or lesser alternatives.

On top of that, the Parole + ATD policy ignores the statutory requirement that, "when the purposes of parole . . . have been served," the alien "shall forthwith return . . . to the custody from which he was paroled."  8 U.S.C. § 1182(d)(5)(A); *Succar v. Ashcroft*, 394 F.3d 8, 27 n.24 (1st Cir. 2005) ("The Attorney General has no authority to allow an individual to remain in parole once the reasons for the initial parole are exhausted."). In other words, even assuming overcrowding and resource

constraints are a basis for parole, the Parole + ATD policy should instruct officials to revoke parole and detain arriving aliens the moment overcrowding ceases and more resources become available. Because the Parole + ATD policy utterly fails to even acknowledge this legal requirement, it is arbitrary and capricious. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (invaliding agency action where the agency "entirely failed to consider an important aspect of the problem").

### c. The Parole + ATD policy is subject to notice and comment.

For similar reasons as the non-detention policy, the Parole + ATD policy is subject to notice and comment. *See* Section II.c; 5 U.S.C. § 553; Doc 16 ¶¶ 104–07; *Jean I*, 711 F.2d at 1477–83.

Moreover, even if the government were correct that the actions contemplated by the Parole + ATD policy were permissible acts of discretion, the policy sets out specific circumstances when the "processing pathway" may be used, *see* Doc. 6-2 at 3, and when it may not be used, *id.* at 4. "[T]his type of cabining of an agency's prosecutorial discretion" suggests a legislative rule subject to notice and comment. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987).

### IV.   FLORIDA HAS STANDING.

States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. And States are entitled to "special solicitude" in establishing standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). The challenged policies

in this case have resulted in the release "of thousands of migrants at the border every month," and "[m]any of these migrants are arriving or will arrive in Florida," as the government has confirmed in writing. Doc. 16 ¶ 21. Despite the "epidemic of crime, safety risks, serious property damage, and environmental problems associated with the influx of illegal migration," *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178 (9th. Cir. 2019) (quoting *Arizona*, 567 U.S. at 398), the government argues that Florida lacks both Article III and prudential standing. The government is wrong.

### a.  Florida satisfies Article III.

Florida alleges that the challenged policies cost Florida millions of dollars in pocketbook injury. These injuries include the cost of incarcerating criminal aliens, Doc. 16 ¶ 73, the cost of providing free education, *id.* ¶ 75; *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (explaining that States must provide free education to illegal immigrants), and the cost of providing a variety of public services, Doc. 16 ¶¶ 75–76; § 443.101(7), Fla. Stat. (providing unemployment benefits for certain aliens who are paroled into the State); 42 U.S.C. § 1395dd (requiring participating Medicaid facilities to provide emergency services to immigrants regardless of status).

These allegations are sufficient to establish standing. "[E]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989). In fact, the Eleventh Circuit "readily conclude[d]" that Florida had standing to challenge agency action that "*may* adversely impact" its

"economy." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (emphasis added). And courts have routinely found standing where a federal policy increased the cost of state programs. *E.g.*, *DAPA*, 809 F.3d at 155–56 (driver's licenses); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021) (unemployment benefits). Moreover, at this stage in the litigation, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Bennett*, 520 U.S. at 168 (quotations omitted).[17]

The government argues to the contrary because, it says, "Florida's alleged costs" are "caused, if at all, by third parties." Doc. 23-1 at 20. The government, however, fails to acknowledge the Supreme Court's decision in *Department of Commerce*, in which it held that actions of third parties provide a basis for standing so long as third parties "will likely react in predictable ways" to the challenged policy. 139 S. Ct. at 2566.

The government also argues that Florida's challenge is a "generalized grievance." Doc. 23-1 at 19. But Florida alleges several specific injuries that are caused by the government's unlawful policies. And the government's position, that only those directly regulated by immigration laws can challenge immigration policies, assumes that States can never challenge immigration policies. *But see, e.g.*,

---

[17] The government claims to raise a "factual attack" on this Court's jurisdiction, Doc. 23-1 at 16, but offers no evidence of matters outside the pleadings to support any such attack.

*DAPA*, 809 F.3d at 156 (Texas challenge to deferred action); *Trump v. Hawaii*, 138 S. Ct. 2392 (2018) (Hawaii challenge to the travel ban).

Finally, in addition to pocketbook injury, Florida has a quasi-sovereign interest in ending the continued entry of plainly inadmissible aliens into its territory, especially since *Arizona*, 567 U.S. 387, limits Florida's ability to solve the issue on its own. Doc. 16 ¶¶ 21, 72; *Texas v. United States*, 524 F. Supp. 3d 598, 624 (S.D. Tex. 2021) ("[I]njury to a State can flow from the fact that aliens are free to move among states." (quotations omitted)); *Florida v. Nelson*, No. 8:21-cv-2524, 2021 WL 6108948, at *9 (M.D. Fla. Dec. 22, 2021) (explaining that States may sue the federal government under the APA to vindicate quasi-sovereign interests and collecting authorities).

### b. Florida satisfies the prudential zone of interests test.

Florida similarly has prudential standing to sue under the APA because it falls within the "zone of interests" of the INA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). Though the government tries to limit the "zone of interests" to those directly regulated by an action, Doc. 23-1 at 30, the Supreme Court has repeatedly emphasized that the test is "not meant to be especially demanding." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 400 (1987); *Patchak*, 567 U.S. at 225 (explaining "that the benefit of any doubt goes to the plaintiff").

"It's clear that the INA aimed, at least in part, to protect States from" harms to its fisc. *Texas*, 20 F.4th at 975; *see Demore v. Kim*, 538 U.S. 510, 517–22 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's inability to remove deportable aliens). Congress has even provided a mechanism to reduce costs to the States from failed immigration enforcement. *See* 8 U.S.C. § 1231(i) (providing partial reimbursement for incarceration of criminal aliens).

The challenged policies cost Florida millions of dollars, its hands are tied by Supreme Court precedent, and Congress has recognized and sought to ameliorate the State's harms. Florida is within the zone of interests. *See Texas*, 20 F.4th at 975 (finding Texas's challenge based on § 1225 within the zone of interests); *Cook Cnty. v. Wolf*, 962 F.3d 208, 220 (7th Cir. 2020) (finding a county within the zone of interests of § 1182).

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to dismiss the amended complaint.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F), this motion contains 7,534 words.

## CERTIFICATE OF SERVICE

I certify that on March 25th, 2022, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ James H. Percival
Deputy Attorney General