**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| STATE OF FLORIDA,<br><br>                Plaintiff,<br><br>v.<br><br>The UNITED STATES OF AMERICA; et al.,<br><br>                Defendants. | Case No. 3:21-cv-1066-TKW-EMT |

**BRIEF OF IMMIGRATION REFORM LAW INSTITUTE
AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
matt.crapo@pm.me
litigation@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 2

   I.     Florida Has Standing To Raise An Independent Take Care Claim ...................... 2

   II.    Defendants' Unlawful Actions Are Reviewable .................................................. 4

CONCLUSION ............................................................................................. 15

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Arizona v United States*,
567 U.S. 387 (2012) ............................................................................ 3, 4, 5

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ............................................................................ 3

*Davis v. Passman*,
442 U.S. 228 (1979) ............................................................................ 3

*Ex parte Young*,
209 U.S. 123 (1908) ............................................................................ 4

*Galvan v. Press*,
347 U.S. 522 (1954) ............................................................................ 2

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............................................................................ 13, 14

*Jennings v. Rodriguez*,
138 S. Ct. 830 (2018) ............................................................................ 7

*Larson v. Domestic & Foreign Comm. Corp.*,
337 U.S. 682 (1949) ............................................................................ 4

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ............................................................................ 3

*Matter of E-R-M- & L-R-M-*,
25 I&N Dec. 520 (BIA 2011) ............................................................................ 10

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) ............................................................................ 2

*Northshore Dev., Inc. v. Lee*,
835 F.2d 580 (5th Cir. 1988) ............................................................................ 7

*Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC"),*
   525 U.S. 471 (1999) ................................................................................. 4

*Texas v. Biden ("Texas MPP"),*
   20 F.4th 928 (5th Cir. 2021) ....................................................... 7, 8, 9, 13, 14

## STATUTES

5 U.S.C. § 706 ...................................................................................................... 3

8 U.S.C. § 1151(c) ............................................................................................. 13

8 U.S.C. § 1151(d) ............................................................................................. 13

8 U.S.C. § 1151(e) ............................................................................................. 13

8 U.S.C. § 1182(a) ............................................................................................... 4

8 U.S.C. § 1182(a)(6)(C) ..................................................................................... 5

8 U.S.C. § 1182(a)(7) ........................................................................................... 5

8 U.S.C. § 1182(d)(5) ....................................................................................... 7, 8

8 U.S.C. § 1225 .................................................................................................... 5

8 U.S.C. § 1225(a)(1) ........................................................................................... 5

8 U.S.C. § 1225(a)(3) ........................................................................................... 5

8 U.S.C. § 1225(b) ........................................................................................... 5, 9

8 U.S.C. § 1225(b)(1) ....................................................................................... 7, 9

8 U.S.C. § 1225(b)(1)(A)(i) .............................................................................. 5, 6

8 U.S.C. § 1225(b)(1)(B)(ii) ............................................................................. 6, 9

8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ........................................................................ 6

8 U.S.C. § 1225(b)(2) ........................................................................................... 7

8 U.S.C. § 1225(b)(2)(A) ............................................................................. 6, 9, 10

8 U.S.C. § 1225(b)(2)(B)...........................................................................................6

8 U.S.C. § 1225(b)(2)(C)...........................................................................................7

8 U.S.C. § 1226(a)......................................................................................................9

8 U.S.C. § 1227(a)......................................................................................................4

8 U.S.C. § 1229(a)....................................................................................................10

8 U.S.C. § 1229a..............................................................................................5, 6, 10

28 U.S.C. § 1331.........................................................................................................3

§ 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08...............8

§ 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Title VI of Div. C, Pub. L. No. 104-208, 110 Stat. 3009, 3009-689 ..........................7

U.S. CONST. art. I, § 10 ..............................................................................................2

U.S. CONST. art. II, § 3 ............................................................................................14

## REGULATIONS

8 C.F.R. § 208.30(f)..................................................................................................10

8 C.F.R. § 212.5(b)......................................................................................................9

8 C.F.R. § 235.3(b)(2)(iii) ..........................................................................................9

8 C.F.R. § 235.3(b)(4)(ii) .......................................................................................8, 9

8 C.F.R. § 235.3(c) .................................................................................................9, 10

## MISCELLANEOUS

Executive Order 13993 of January 20, 2021, *Revision of Civil Immigration Enforcement
    Policies and Priorities*, 86 Fed. Reg. 7051 (Jan. 25, 2021)...........................................1

H.R. Rep. No. 104-469, part 1 (1996) .......................................................................8

Proclamation 10142 of January 20, 2021, *Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction*, 86 Fed. Reg. 7225 (Jan. 27, 2021) ................................................... 1

S. Rep. No. 104-249 (1996) ........................................................................................ 8

*Security Bars and Processing; Delay of Effective Date*,
    86 Fed. Reg. 73615 (Dec. 28, 2021) ...................................................... 10

*Security Bars and Processing (Final Rule)*,
    85 Fed. Reg. 84160, 84195 (Dec. 23, 2020) ............................................. 10

*Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers*,
    87 Fed. Reg. 18078 (Mar. 29, 2022) .......................................................... 9

## INTRODUCTION

This case arises from the Executive Branch's stunning abdication of its duty to enforce the nation's immigration laws. Immediately upon being sworn into office, this Administration began dismantling programs and policies designed to secure the nation's borders and fully to enforce the Immigration and Nationality Act ("INA"). For example, the Administration revised immigration enforcement priorities and terminated border wall construction. *See* Executive Order 13993, 86 Fed. Reg. 7051 (Jan. 25, 2021) (revising priorities); Proclamation 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021) (terminating border wall construction). The Department of Homeland Security ("DHS") also announced the "suspension" of the Migrant Protection Protocols ("MPP"), commonly referred to as the "remain in Mexico" policy, and issued a memorandum in which it announced an immediate 100-day pause of all removals.

Although some of these actions were subsequently enjoined by the courts, they signaled to potential border crossers—and to the human-trafficking and drug cartels that coordinate illegal border crossing—that this Administration is unwilling to secure our border, and they have predictably resulted in the ongoing, record-setting surge of migrants at the southern border. As Florida alleged in its First Amended Complaint, many of the migrants unlawfully released at the border resettle in Florida. *See* First Amended Complaint, Dkt. 16, ¶¶ 21-22; *see also id.* at ¶¶ 72-77 (alleging expenses incurred by the State as a result of unlawful immigration).

A central part of the Executive Branch's abdication of its immigration enforcement duties is its refusal to detain inadmissible arriving aliens and its abuse of its

parole authority by adopting a policy of releasing vast numbers of illegal aliens *en masse*, on a class-wide basis. Indeed, the Administration's own data show that it in addition to the thousands of aliens released on its purported parole authority, it is releasing at least as many illegal aliens without even that purported statutory justification. These nonenforcement policies irreparably harm Florida and should be enjoined. Because Florida has established standing and stated cognizable claims for relief, the Court should deny the Defendants' motion to dismiss.

## ARGUMENT

### I.   Florida Has Standing To Raise An Independent Take Care Claim

In its response to Defendants' motion to dismiss, Florida has demonstrated that it has alleged sufficient injury, causation, and redressability to establish standing. *See* Florida's Response to Defendants' Motion to Dismiss, Dkt. 31 at 28-32. *Amicus* would simply add that Florida is entitled to special consideration of its constitutional Take Care claim.

It has long been recognized that the power "to forbid the entrance of foreigners … or to admit them only in such cases and upon such conditions as it may see fit to prescribe" is an inherent sovereign prerogative. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Under our constitution, this sovereign prerogative is entrusted exclusively in Congress. *See Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Thus, upon her admission to the Union, Florida (at least absent "actual[] inva[sion]," U.S. CONST. art. I, § 10) ceded her sovereign prerogative to

2

control her respective borders to the federal government—to Congress in particular. But now the Executive branch of the federal government, by refusing to enforce—indeed, effectively suspending—the laws passed by Congress, is signally failing to take care that the laws be faithfully executed.

In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court recognized that that "States are not normal litigants for the purposes of invoking federal jurisdiction" and can, where quasi-sovereign interests are implicated, establish standing "without meeting all the normal standards for redressability and immediacy." *Id.* at 518. Here, Florida is precluded from exercising her sovereign prerogative to control her borders because "the removal process is entrusted to the [sole] discretion of the Federal Government." *Arizona v United States*, 567 U.S. 387, 409 (2012). Under this "special solicitude" standard, because "there is some possibility that the requested relief will prompt [Defendants] to reconsider" their parole policies, Florida meets the Article III standard for standing. *Massachusetts*, 549 U.S. at 518.

In addition, unconstitutional agency action or inaction violates the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 706, and can be enjoined on that basis. Violations of the Take Care Clause, however, are also actionable independently of the APA, and this Court can enjoin the Defendants' violations of their Take Care obligations under its inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England"); *Davis v. Passman*, 442 U.S. 228, 241-44 (1979) (holding that the Constitution itself, coupled with 28 U.S.C. § 1331, provides a cause of

action to challenge federal officials who violate the Constitution). The Constitution, moreover, permits anyone with standing to raise equitable claims (and seek injunctive relief) against federal officers who act unconstitutionally. *Larson v. Domestic & Foreign Comm. Corp.*, 337 U.S. 682, 698-99 (1949); *cf. Ex parte Young*, 209 U.S. 123 (1908). Thus, even if Florida's claims fail under the APA, the Take Care Clause provides an independent cause of action to challenge the Executive's nonenforcement policies.

## II.   Defendants' Unlawful Actions Are Reviewable

Defendants repeatedly assert that the Executive Branch exercises "broad discretion" under the INA, and that their actions are committed to agency discretion by law and therefore unreviewable. *See* Dkt. 23-1 at 11, 23 (citing *Arizona*, 567 U.S. at 395-96; *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 484, 490 (1999)). But Defendants' arguments conflate the broad discretion that Congress conferred upon the Executive Branch with respect to the removal of certain classes of aliens with the strict and mandatory inspection and detention scheme governing arriving aliens apprehended at the border.

Congress has established a comprehensive and uniform immigration system governing who may enter and remain in the United States. Congress has specified numerous classes of aliens who are removable from the United States, such as aliens who enter illegally, commit certain crimes, violate the terms of their status (visa overstays), obtain admission through fraud or misrepresentation, vote unlawfully, become a public charge, and whose work would undermine wages or working conditions of American workers. *See generally* 8 U.S.C. §§ 1182(a) (describing inadmissible aliens) and 1227(a)

(describing deportable aliens). By simply defining the various classes of removable aliens and merely establishing a procedure to adjudicate whether aliens are removable, *see* 8 U.S.C. § 1229a (establishing removal proceedings), Congress generally left the determination of whether to seek removal of specific aliens in the discretion of DHS.[1] Thus, it is fair to say, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

Congress did not, however, leave such discretion unbounded. Congress has established a comprehensive scheme governing the inspection, detention, and removal of illegal aliens who attempt to enter the United States without proper documentation and has mandated certain enforcement actions be taken with respect to illegal border crossers. *See generally* 8 U.S.C. § 1225. For instance, "an alien present in the United States who has not been admitted or who arrives in the United States … shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). This designation triggers § 1225(a)(3), which specifies that all applicants for admission "shall be inspected by immigration officers."

Section 1225(b), which governs inspection of applicants for admission, distinguishes between two classes of arriving aliens. The first class consists of aliens who either have no entry documents or attempt to gain admission through misrepresentation or fraud ("B-1 aliens"). 8 U.S.C. § 1225(b)(1)(A)(i).[2] The other class consists of all other

---

[1]  It further provided for various forms of discretionary relief from removal, such as asylum, cancellation of removal, and adjustment of status.

[2]  Section 1225(b)(1)(A)(i) refers to aliens who are "inadmissible under § 1182(a)(6)(C) or 1182(a)(7) of this title." Section 1182(a)(6)(C) describes aliens who

arriving aliens ("B-2 aliens"). 8 U.S.C. § 1225(b)(2)(A), (B) (excluding B-1 aliens from the definition of B-2 aliens).

B-1 aliens are subject to mandatory detention and expedited removal. Such aliens "shall be" ordered removed from the United States "without further hearing or review unless the alien indicates either an intention to apply for asylum under section 1158 of this title or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). If an alien claims a fear of persecution, the alien "shall be detained pending a final determination of credible fear of persecution." *Id.* at § 1225(b)(1)(B)(iii)(IV). If the alien fails to establish a credible fear of persecution, the alien "shall be detained … until removed." *Id.* Even if the alien successfully establishes a credible fear of persecution, the alien remains subject to mandatory detention until the asylum claim is finally adjudicated. *See id.* at § 1225(b)(1)(B)(ii) ("the alien *shall be detained for further consideration of the application for asylum*") (emphasis added).

Inadmissible B-2 aliens are similarly subject to mandatory detention pending final adjudication of their admissibility. If, upon inspection, an immigration officer determines that a B-2 alien "is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained for a proceeding* under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). Such a proceeding refers to regular removal proceedings before an immigration judge. *See generally* 8 U.S.C. § 1229a. Accordingly, regardless of whether aliens fall within the B-1 or B-2 class of applicants for admission, the aliens are subject to

---

seek a visa or admission through misrepresentation as inadmissible. Section 1182(a)(7), in turn, deems aliens with no valid entry document as inadmissible.

mandatory detention pending a final determination of their admissibility or asylum claims. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) ("Read most naturally, §§ 1225(b)(1) and (b)(2) … mandate detention of applicants for admission until certain proceedings have concluded.").

Congress has only authorized two exceptions to this mandatory detention scheme. First, Congress has granted DHS the authority to return certain aliens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States … to that territory pending a proceeding under section 1229a of this title," 8 U.S.C. § 1225(b)(2)(C). *See generally Texas v. Biden ("Texas MPP")*, 20 F.4th 928, 993-98 (5th Cir. 2021) (discussing the limited alternatives to mandatory detention under § 1225(b)(2)(A)). This discretionary authority permits DHS to return certain aliens to contiguous territory in lieu of mandatory detention. *Texas MPP*, 20 F.4th at 995 ("Section 1225(b)(2)(C) then explains a permissible alternative to otherwise-mandatory detention."). Second, Congress has authorized the DHS Secretary to "parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). This case concerns only the latter exception to detention, the parole exception.

The current language in § 1182(d)(5)(A), including the "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" limitation, was added by § 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRIRA"),[3] "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Texas MPP*, 20 F.4th at 947.[4]

The regulations governing the inspection of B-1 aliens further restrain the executive's discretion in exercising its parole power. Detention for B-1 aliens who raise a persecution claim remains mandatory pending a credible fear determination, and parole of any such alien under § 1182(d)(5) "may be permitted only when [DHS] determines, in the exercise of discretion, that parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 8 C.F.R. § 235.3(b)(4)(ii).[5]

---

[3] Title VI of division C of Pub. L. No. 104-208, 110 Stat. 3009, 3009-689; *see also* § 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08 (providing that DHS "may not parole into the United States an alien who is a refugee unless [DHS] determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee") (emphasis added).

[4] The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of the parole authority. For instance, a House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration in "using the parole authority to admit up to 20,000 Cuban nationals annually." H.R. Rep. No. 104-469, part 1 at 140 (1996). The committee report concluded:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, such as life-threatening humanitarian medical emergencies, or for specified public interest reasons, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

*Id.* at 141. The Senate Judiciary Committee Report stated that its parole reform provision was intended to "reduce[] the abuse of parole" and "[t]ighten[] the Attorney General's parole authority," and that "[t]he committee bill is needed to address ... the abuse of humanitarian provisions such as asylum and parole." S. Rep. No. 104-249 at 2 (1996).

[5] A DHS "Interim final rule with request for comments" purports to remove the "medical emergency" or "legitimate law enforcement objective" language and to replace it with the following: "Parole of such alien shall only be considered in accordance with

Similarly, parole of B-2 aliens is further restricted by regulation. Pursuant to regulation, B-2 aliens remain subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A) and parole of such aliens is governed by 8 C.F.R. § 212.5(b). 8 C.F.R. § 235.3(c) (describing B-2 aliens who appear inadmissible and are placed in regular removal proceedings). Under the regulation governing parole, parole of B-2 aliens is limited to those who have serious medical conditions, are pregnant, are minors, who will be a witness in a judicial, administrative, or legislative proceeding, or whose continued detention is not in the public interest as determined by an authorized official. *See* 8 C.F.R. § 212.5(b).

Nothing in the INA or relevant regulations authorizes Defendants to "parole aliens *en masse*" or otherwise to release such inadmissible aliens into the United States. *Texas MPP*, 20 F.4th at 997; *see also id.* at 995-98 (noting that the bond-and-conditional-parole provisions under 8 U.S.C. § 1226(a) do not apply to aliens detained under § 1225(b)). Indeed, the congressional scheme is designed to ensure that illegal aliens apprehended at the border are detained until they are either removed or have their asylum claims or removal proceedings fully adjudicated.

In addition to requiring detention, both the statute and regulations require Defendants to initiate removal proceedings against both B-1 and B-2 aliens. Although § 1225(b)(1) provides only for full consideration of an asylum claim after a B-1 alien establishes a credible fear of persecution, 8 U.S.C. § 1225(b)(1)(B)(ii) (requiring

---

section 212(d)(5) of the Act and § 212.5(b) of this chapter." 87 Fed. Reg. 18078, 18220 (Mar. 29, 2022) (promulgating amended 8 C.F.R. § 235.3(b)(2)(iii) and (b)(4)(ii)).

detention of a B-1 alien pending "further consideration of the application for asylum"), the Board of Immigration Appeals has held that DHS retains discretion to place B-1 aliens in regular removal proceedings. *See Matter of E-R-M- & L-R-M-*, 25 I&N Dec. 520, 523 (BIA 2011). In turn, the regulations governing the credible fear screening process direct immigration officers to initiate regular removal proceedings against any B-1 alien who establishes a credible fear of persecution. *See* 8 C.F.R. § 208.30(f) (2020) ("If an alien … is found to have a credible fear of persecution or torture, the asylum officer will so inform the alien and issue a Form I-862, Notice to Appear, for full consideration of the asylum and withholding of removal claim in proceedings under [8 U.S.C. § 1229a].").[6]

Section 1225(b)(2)(A) similarly requires initiation of removal proceedings against B-2 aliens. 8 U.S.C. § 1225(b)(2)(A) (providing that inadmissible B-2 aliens "shall be detained *for a proceeding under section 1229a* of this title") (emphasis added). The regulation governing inspections of such B-2 aliens simply restates this requirement. *See* 8 C.F.R. § 235.3(c) ("[A]ny arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings … shall be detained in accordance with [8 U.S.C. § 1225(b)]").

---

[6] A notice to appear is the charging document that initiates removal proceedings against an alien. *See* 8 U.S.C. § 1229(a). On December 23, 2020, DHS published a final rule amending 8 C.F.R. § 208.30(f) to require referral of such cases to an immigration judge for an "asylum-and-withholding-only proceeding" as opposed to a full removal proceeding. *See* Security Bars and Processing (Final Rule), 85 Fed. Reg. 84160, 84195 (Dec. 23, 2020). That amendment has been delayed until at least December 31, 2022. *See generally* Security Bars and Processing; Delay of Effective Date, 86 Fed. Reg. 73615 (Dec. 28, 2021).

Notably, nothing in the INA or regulations purports to authorize or empower Defendants to release arriving aliens into the United States outside of the constraints established by Congress. Nevertheless, data provided by this Administration shows that the Executive Branch is releasing tens of thousands of aliens into the United States absent any such statutory authority.

Since the Biden administration took office in early 2021, the number of illegal aliens apprehended at the southwest border and subsequently released into the United States has skyrocketed. *See generally* https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021#, last visited March 29, 2022, which includes the following screenshot under the "U.S. Border Patrol - Dispositions and Transfers" tab showing that the number of aliens released into the United States went from fewer than two dozen per month in late 2020 to tens of thousands per month by mid-2021:

### USBP Monthly Southwest Border Apprehensions by Transfer Destination

*Following processing, U.S. Border Patrol arranges transfer of individuals to the appropriate entity based on disposition and other factors such as criminal charges. The transfer destinations below are representative of the time data was aggregated. The data does not reflect subsequent transfer destinations after subjects leave Border Patrol custody and are subject to change if an individual returns to U.S. Border Patrol custody during the same event.*

| Transfer Destination | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Humanitarian Release | 21 | 13 | 17 | 1,320 | 8,797 | 26,025 | 25,880 | 26,342 | 34,732 | 60,564 | 44,036 |

Since August 2021, Defendants have paroled or otherwise released tens of thousands of aliens apprehended at the southwest border into the United States. The number of aliens encountered at the southwest border, expelled under Title 42 in response

to the COVID pandemic, removed or returned, or paroled or otherwise released into the United States since August 2021 is summarized in the following chart:[7]

| | Aliens Encountered at the SW Border | Title 42 expulsions | Applicants for Admission | Removed or Returned | Paroled under § 1182(d)(5) | Released into U.S. (paroled or otherwise) |
|---|---|---|---|---|---|---|
| Aug. 2021 | 208,887 | 93,414 | 115,473 | 5,062 | 12,469 | 65,766 |
| Sept. 2021 | 191,677 | 101,799 | 89,878 | 5,293 | 28,372 | 60,670 |
| Oct. 2021 | 164,303 | 93,676 | 70,627 | 8,957 | 16,880 | 42,560 |
| Nov. 2021 | 173,620 | 87,341 | 86,279 | 9,394 | 15,353 | 83,725 |
| Dec. 2021 | 178,840 | 78,589 | 100,251 | 7,753 | 23,098 | 74,799 |
| Jan. 2022 | 153,941 | 78,486 | 75,455 | 7,740 | 18,576 | 62,573 |
| Feb. 2022 | 164,973 | 91,513 | 73,460 | 8,335 | 13,413 | 55,043 |
| **TOTAL** | **1,236,241** | **624,818** | **611,423** | **52,534** | **128,161** | **445,136** |

These numbers show that during this seven-month period, just over half of the aliens encountered at the southwest border have been expelled under Title 42, and that, of the remaining 611,000 applicants for admission, more than 445,000 have been paroled *or otherwise released* into the United States. That is, some tens of thousands of aliens are released into the United States absent any statutory authority.

To put this number in perspective, the total number of immigrant visas available for fiscal year 2022 is 561,000. *See* Annual Numerical Limits FY-2022 (estimated), available at: https://travel.state.gov/content/dam/visas/Statistics/Immigrant-Statistics/Annual%20%20Numerical%20%20Limits%20-%20FY%202022.pdf (showing 226,000 family-based visas and 280,000 employment-based visas available for fiscal year

---

[7] The data contained in the chart are derived from monthly status reports that the government has filed with the United States District Court for the Northern District of Texas in *Texas v. Biden*, No. 2:21-CV-067-Z, Dkt. Nos. 106, 112, 115, 119, 124, 129, and 133. These data also correspond roughly with the data depicted at: https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, but are more comprehensive because they include data from ICE in addition to CBP.

2022); *see also* 8 U.S.C. § 1151(e) (making 55,000 diversity immigrant visas available annually).[8] In other words, the number of illegal aliens apprehended at the southwest border and subsequently released into the United States is on pace to surpass the number of immigrant visas Congress has made available for the entire fiscal year.

In their motion to dismiss, Defendants erroneously conflate the discretion to decline to take an enforcement action in a particular instance with a practice or policy of general applicability precluding enforcement actions against certain classes of aliens. The government avers that the "choice to refrain from pursuing particular enforcement actions is 'generally committed to an agency's absolute discretion.'" Dkt. 23-1 at 22 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). But as the Fifth Circuit recently held, *Heckler*'s non-reviewability presumption with respect to nonenforcement decisions does not apply to practices or rules of general applicability and is instead limited only to the government's "discretion to do nothing in a particular case." *Texas MPP*, 20 F.4th at 982.

In *Texas MPP*, the Fifth Circuit distinguished between a "rule," which is prospective and of general applicability, and an "order," which is a final disposition of a particular matter at a particular moment in time, and held that *Heckler*'s presumption is inapplicable to "rules" and only applied to "orders." *See id.* at 982-83. There is no question that the Parole + ATD guidelines at issue here are rules as described in *Texas*

---

[8]   The number of family and employment-based immigrant visas available each fiscal year varies depending on the number of visas issued in preceding years and are also subject to a nationality cap. *See generally* 8 U.S.C. § 1151(c)-(d).

*MPP*. *See* Dkt. 6-2 at 2-3 (authorizing Parole + ATD only for a whole class of aliens, that is, a class of aliens who are members of a family unit (or FMU)).

Addressing the reviewability of agency rules, the Fifth Circuit recounted how the "take care" clause of the Constitution, Art. II, sec. 3, derived from the prohibition in the English Bill of Rights against the English kings' prerogatives to suspend or dispense with the laws, *see id.* at 978-82, and concluded that:

> Congress *can* rebut the common-law presumption that nonenforcement discretion is unreviewable. Specifically, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." [*Heckler*, 470 U.S.] at 832-33. In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand. So *Heckler* expressly embraces the common law's condemnation of the dispensing power. ... Moreover, the Court emphasized that nothing in the *Heckler* opinion should be construed to let an agency "consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (quotation omitted). This, of course, is a condemnation of the suspending power.

*Texas MPP*, 20 F.4th at 982 (emphases in original).

Here, Congress directed DHS to enforce the immigration laws in specific ways (mandatory detention and initiation of removal proceedings) against specific classes of individuals (inadmissible applicants for admission). Because Defendants' refusal to comply with the law is actionable, Florida has stated a cognizable claim for relief.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Respectfully submitted on April 1, 2022,

*/s/ Matt Crapo*
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
matt.crapo@pm.me
litigation@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

**CERTIFICATE OF WORD COUNT**

I hereby certify, in conformance with Local Rule 7.1(F), that this brief contains

3,887 words.

/s/ Matt Crapo
MATT A. CRAPO

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2022, a true and accurate copy of the foregoing

document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Matt Crapo
MATT A. CRAPO