# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**STATE OF FLORIDA**,

    **Plaintiff**,

**v.**                                         **Case No. 3:21cv1066-TKW-EMT**

**UNITED STATES OF AMERICA**,
et al.,

    **Defendants**.

_____/

## ORDER DENYING MOTION TO DISMISS

This case is before the Court based on Defendants' motion to dismiss (Doc. 23). No hearing is necessary to rule on the motion, and upon due consideration of the motion and the related filings,[1] the Court finds for the reasons that follow that the motion is due to be denied.

### Overview

This case is about the immigration "crisis" at the southern border. The plaintiff is the State of Florida and the defendants are the United States of America and various federal immigration agencies and officials.

---

[1] Defendants' supporting memorandum (Doc. 23-1); Plaintiff's response in opposition (Doc. 31), Defendants' reply (Doc. 40), the Immigration Reform Law Institute's amicus brief (Doc. 36-1), and Defendants' notice of supplemental authority (Doc. 42) and Plaintiff's response to that notice (Doc. 43).

Florida alleges in the amended complaint (Doc. 16) that Defendants have adopted and are implementing policies that contravene explicit mandates and restrictions in the immigration statutes and that the policies have effectively turned the southern border into little more than a speedbump for the hundreds of thousands of aliens[2] who have flooded across the border into the country since January 2021 and the thousands more who are arriving at the border daily.  Florida challenges the policies under the Administrative Procedure Act (APA) and the Constitution and seeks declaratory and injunctive relief.

Defendants dispute the existence of one of the challenged policies and argue that the amended complaint should be dismissed because Florida lacks legal standing to challenge the policies, because the policies are beyond judicial review, and because the amended complaint fails to assert any plausible claims upon which relief can be granted.  Each of these arguments is addressed (and rejected) in detail below.

Suffice it to say the Court is wholly unpersuaded by Defendants' position that they have unfettered discretion to determine how (or if) to comply with the immigration statutes and that there is nothing that Florida or this Court can do about their policies even if they contravene the immigration statutes.  This position is as

---

[2]   The Court is aware that some consider the term "alien" to be offensive and "dehumanizing" and that Defendants prefer the term "noncitizen."  However, the Court will use the term "alien" in this Order because that is the term used throughout the immigration statutes and the term "noncitizen" is underinclusive because the statutory definition of "alien" includes both noncitizens and persons who are "not a … <u>national</u> of the United States."  8 U.S.C. §1101(a)(3) (emphasis added).

remarkable as it is wrong because it is well established that no one, not even the President, is above the law and the Court unquestionably has the authority to say what the law is and to invalidate action of the executive branch that contravenes the law and/or the Constitution.   Thus, if Florida's allegations that Defendants are essentially flaunting the immigration laws are proven to be true, the Court most certainly can (and will) do something about it.

### Relevant Statutory Framework

"Policies pertaining to the entry of aliens and their right to remain here are … entrusted exclusively to Congress …."  *Galvan v. Press*, 347 U.S. 522, 531 (1954). Congress has enacted a comprehensive statutory scheme for the admission and exclusion of aliens—the Immigration and Nationality Act (INA), which is codified as amended in 8 U.S.C. §1101, et. seq.  Executive branch immigration officials are granted "broad discretion" under the INA, *see Arizona v. United States*, 567 U.S. 387, 395-96 (2012); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1995), but their discretion is not boundless.

Under the INA, an alien who arrives in the United States is considered an applicant for admission, irrespective of whether the alien arrives at a designated point of entry or illegally crosses the border at another location.  *See* 8 U.S.C. §1225(a)(1).   If immigration officials determine that the alien is inadmissible

because of certain misrepresentations[3] or lack of proper documentation,[4] the alien is to be removed "without further hearing or review" unless the alien indicates an intention to apply for asylum or a fear of persecution.  *See* 8 U.S.C. §1225(b)(1)(A). For all other aliens, unless immigration officials determine that the alien is clearly and beyond a doubt entitled to be admitted, "the alien shall be detained for a [removal] proceeding."  8 U.S.C. §1225(b)(2)(A) (emphasis added).  Alternatively, for aliens arriving by land from a contiguous territory (e.g., Mexico), "the Attorney General may return the alien to that territory pending a [removal] proceeding" in lieu of detention.  8 U.S.C. §1225(b)(2)(C).

"Read most naturally, §§1225(b)(1) and (b)(2) … mandate detention of applicants for admission until certain proceedings have concluded.  Section 1225(b)(1) aliens are detained 'for further consideration of the application for asylum,' and section 1225(b)(2) aliens are in turn detained for 'removal proceedings.'"  *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (cleaned up). These statutes "mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin."  *Id.* at 845.

Removal proceedings are initiated by a "notice to appear," which gives the alien notice of (among other things) the charges against him or her, the place at

---

[3]  8 U.S.C. §1182(a)(6)(C).

[4]  8 U.S.C. §1182(a)(7).

which the removal proceeding will be held, and the consequences of failing to appear at the proceeding.  *See* 8 U.S.C. §1229(a).  Thus, until a notice to appear has been issued, a removal case has not been initiated against the alien.   The removal proceeding is a trial-like proceeding conducted by an administrative law judge, and in cases where the alien is an applicant for admission, the alien has the burden to prove that he or she is "clearly and beyond doubt entitled to be admitted and is not inadmissible under section 1182."  *See* 8 U.S.C. §1229a(c)(2)(A).  If an alien fails to appear at the removal proceeding after having been received a notice to appear, the alien "shall be ordered removed in absentia."  8 U.S.C. §1229a(b)(5)(A).

The Attorney General has the authority (with certain exceptions not applicable here) to "parole … temporarily" any alien applying for admission to the United States.  *See* 8 U.S.C. §1182(d)(5)(A).  This parole may only be granted "on a <u>case-by-case basis</u> for urgent humanitarian reasons or significant public benefit,"[5] and the

---

[5]  This restriction was added in 1996 to "limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool."  *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021); *see also* Doc. 36-1, at 8 n.4 (discussing the legislative history of the 1996 amendments to §1182).  The parole authority is further limited by regulations adopted by the Department of Homeland Security (DHS).  For example, parole for aliens subject to expedited removal under §1225(b)(1) or in detention pending an asylum is only allowed when "required to meet a medical emergency or is necessary for a legitimate law enforcement objective."  8 C.F.R. §235(b)(2)(iii), (b)(4)(ii).   However, DHS recently published amendments to that regulation, which, effective May 31, 2022, will broaden the parole authority for aliens subject to expedited removal or in detention pending an asylum determination by cross-referencing the regulation that governs parole of aliens detained under §1225(b)(2).  *See* 87 Fed. Reg. 18078, 18220 (Mar. 29, 2022).  That regulation identifies classes of aliens for whom parole would "generally be justified only on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,'" including aliens who have serious medical conditions, are pregnant, will be witnesses in judicial proceedings, or "whose detention is not in the public interest."  8 C.F.R. §212.5(b).

alien shall be returned to the custody from which he or she was paroled when the Attorney General determines that "the purposes of such parole shall … have been served." *Id.* (emphasis added).  Thereafter, "[the alien's] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

The policies challenged in this case primarily implicate the detention requirement in §1225(b)(2)(A) and the parole authority in §1182(d)(5)(A).  The policies also implicate §1225(b)(2)(C) insofar as Defendants' failure to utilize the alternative to detention provided by that statute contributed to the problem that the challenged polices seek to alleviate, but the legality of Defendants' decision to terminate the so-called "remain in Mexico policy"[6] under that statute is not at issue in this case and is currently under review by the Supreme Court in *Biden v. Texas*, No. 21-954.  The challenged polices may also implicate §1225(b)(1)(B)(ii) and (b)(1)(B)(iii)(IV) to the extent that the policies are being used to parole aliens who are seeking asylum based on a credible fear of persecution, and §1225(b)(1) more generally if they are being used to parole inadmissible aliens who are not seeking asylum and who should be summarily removed.

---

[6]  The formal name for the policy is Migrant Protection Protocols (MPP).  *See* 84 Fed. Reg. 6811 (Feb. 28, 2019).

## Procedural Background

Florida initiated this case in September 2021 by filing a complaint in this Court.   The complaint challenged Defendants' notice to report (NTR) policy pursuant to which aliens arriving at the southern border were simply being released into the county with orders to report to the Immigration and Customs Enforcement (ICE) agency for issuance of a notice to appear.  The NTR policy—which Florida described as "immigration enforcement by the honor system"—was used because it was a "significantly faster mechanism for processing noncitizens" as compared to the "much more time consuming" process of issuing a notice to appear.  The NTR policy was replaced in November 2021 with a new policy—Parole Plus Alternative to Detention (parole + ATD).

The parole + ATD policy is set forth in a memorandum from the Chief of the United States Border Patrol (USBP) to all chief and deputy chief border patrol agents.  The memorandum explained that the parole + ATD policy is "an alternate processing pathway" that border patrol agents may use for family units rather than issuing a notice to appear in order to "deal with situations in which capacity constraints or conditions in custody warrant the more expeditious processing."[7]

---

[7]   The memorandum specifically authorizes the use of parole + ATD pathway for family units in the Del Rio and Rio Grande Sectors, but also states that it USBP officials can authorize the use of parole + ATD in other sectors in which "capacity constraints or conditions in custody show that there is a urgent humanitarian need to release [family units] in a more expeditious fashion" because of the health risks of COVID-19.

Aliens released into the country under the parole + ATD policy are required to report to ICE within 15 days to be processed for a notice to appear, but the policy does not explain how that requirement will be enforced or what happens if the alien fails to report to ICE.

The memorandum asserts that "[u]se of Parole + ATD is consistent with 8 U.S.C. §1182(d)(5), which provides that certain noncitizens may be paroled temporarily 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit'—namely, the urgent humanitarian need to protect the workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in [Customs and Border Protection] facilities." The memorandum states that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway," but the parole + ATD policy is apparently still in use notwithstanding Defendants' contemporaneous efforts to terminate the "Title 42" restrictions on immigration.[8]

---

[8] Under a series of orders entered between March 2020 and August 2021 pursuant to 42 U.S.C. §§265, 268 and 42 C.F.R. §71.40, the Center for Disease Control (CDC) restricted immigration based on public health concerns related to COVID-19. *See, e.g.*, 85 Fed. Reg. 16559 (Mar. 24, 2020); 86 Fed. Reg. 42828 (Aug. 5, 2021). Without these orders, even more aliens likely would have been released into the country (under the parole + ATD policy or otherwise) because, according to the amicus brief filed by the Immigration Reform Law Institute, more than half of the 1.2 million aliens encountered at the southern border between August 2021 and February 2022, were "expelled" under Title 42 whereas more than two-thirds of the remaining aliens (over 445,000) were released into the country. Despite the beneficial aspects of the Title 42 orders, CDC determined in consultation with DHS that, effective May 23, 2022, "suspending the right to introduce migrants into the United States is no longer necessary [because] current public health conditions and an increased availability of tools to fight COVID-19 (such as highly effective

In December 2021, Defendants filed a motion to dismiss the complaint arguing (among other things) that Florida's challenge to the NTR policy is moot because it was replaced by the parole + ATD policy.  The Court denied the motion to dismiss as moot after Florida filed an amended complaint.  *See* Doc. 17.

The amended complaint, filed in February 2022,[9] challenges the parole + ATD policy as well as what Florida characterized as Defendants' "non-detention policy" of "releasing aliens subject to mandatory detention … either based on an untenable assertion of enforcement discretion to ignore §1225 or an abuse of the parole authority under §1182."  The amended complaint seeks declaratory and injunctive relief and asserts seven counts[10] under the APA and one "non-statutory cause of action" challenging Defendants' alleged "unlawful, ultra vires conduct" and violations of "the separation of powers doctrine and the Take Care Clause."

---

vaccines and therapeutics)." *See* 87 Fed. Reg. 19941 (Apr. 6, 2022).  However, the termination order was temporarily enjoined in *Arizona v. Ctrs. for Disease Control & Prevention*, 2022 WL 1276141 (W.D. La. Apr. 27, 2022).

[9]  The delay between the filing of the motion to dismiss and the amended complaint was attributable to the holidays and motion practice related to Defendants' request to transfer this case to a different division (i.e., judge) of this Court.  *See* Doc. 13 (denying motion to transfer venue).

[10]  Count 1 alleges that the non-detention policy is not in accordance with law and exceeds statutory authority, and Count 2 alleges the same about the parole + ATD policy.  Count 3 alleges that the non-detention policy is arbitrary and capricious, and Count 4 alleges the same about the parole + ATD policy.  Count 5 alleges that the non-detention policy did not comply with the notice and comment procedures in the APA, and Count 6 alleges the same about the parole + ATD policy.  Count 7 alleges that the non-detention policy "qualifies as agency action unlawfully withheld or unreasonably delayed."

Defendant responded to the amended complaint in March 2022 with a motion to dismiss.  The motion argues that the amended complaint should be dismissed under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction because Florida lacks standing and its claims are not justiciable.  Additionally, the motion argues that amended complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) because it fails to state a plausible claim upon which relief may be granted.  Each argument will be addressed in turn, after summarizing the applicable standards of review.

## Analysis

Florida has the burden to establish that the Court has subject-matter jurisdiction over its claims.  *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005) ("The burden for establishing federal subject matter jurisdiction rests with the party bringing the claim.").  Where, as here, the defendant raises a factual (rather than facial) challenge to the Court's subject-matter, the Court may consider "material extrinsic from the pleadings."  *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008).

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The "plausibility standard"

requires a showing of "more than a sheer possibility" that the defendants are liable for the claim. *Id.* "Detailed factual allegations" are not required, but legal "labels and conclusions," unsupported by factual allegations, will not suffice. *Twombly*, 550 U.S. at 555.

At the motion to dismiss stage of the case, the Court is required to accept the operative complaint's well-pleaded factual allegations as true and construes them, along with the reasonable inferences they create, in the light most favorable to the plaintiff. *See Iqbal*, 556 U.S. at 679; *Cinotto v. Delta Air Lines Inc.*, 674 F.3d 1285, 1291 (11th Cir. 2012). Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

<u>Standing</u>

"Article III of the U.S. Constitution permits federal courts to adjudicate only 'cases or controversies,' not any political dispute that happens to arise between the state and federal executive branches." *Arizona v. Biden*, 2022 WL 1090176, at *2 (6th Cir. Apr. 12, 2022). To establish Article III standing, the plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

At the motion to dismiss stage, a complaint need only "clearly allege[] facts demonstrating each element" of standing. *See Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) (quoting *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019)). General factual allegations are sufficient, so long as the complaint plausibly alleges a concrete injury. *See id.*

States are entitled to "special solicitude" in the standing analysis if (1) the challenged action affects the state's "quasi-sovereign interests" and (2) Congress has conferred a procedural right to challenge the action in question. *See Massachusetts v. EPA*, 549 U.S. 497, 519-20 (2007); *Texas v. Biden*, 20 F.4th at 969-70. Special solicitude allows a state to establish standing "without meeting all the normal standards for redressability and immediacy." *Massachusetts*, 549 U.S. at 517-18 (quoting *Lujan*, 504 U.S. at 572 n.7).

Florida argues that it is entitled to "special solicitude" here because its quasi-sovereign interests are affected by the challenged policies and Congress conferred a procedural right to challenge the policies under the APA. The Court agrees on both points.

On the first point, Defendants' alleged abdication of their duty to enforce the detention mandates in the INA directly affects Florida's quasi-sovereign interests because Florida is dependent on Defendants to properly control the flow of aliens into the country since it ceded its sovereign prerogative to keep aliens out of its territory to the federal government when it joined the Union. *See Massachusetts*, 549 U.S. at 519 (finding that state has special solicitude when suing the federal Environmental Protection Agency because the state had surrendered "sovereign prerogatives" concerning air pollution to the federal government).[11]   On the second point, the APA provides Florida a procedural right to challenge the policies at issue in this case. *Id.* at 520; *Texas v. Biden*, 20 F.4th at 570.  According, Florida is entitled to special solicitude in the standing analysis.

Florida has plausibly alleged that the challenged policies already have and will continue to cost it millions of dollars, including the cost of incarcerating criminal aliens and the cost of providing a variety of public benefits, including unemployment benefits, free public education, and emergency services to aliens who settle in Florida after being "paroled" into the country.  "[E]conomic detriment … is the epitome of an injury in fact," *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th

---

[11]  The Court did not overlook Defendants' citation of *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009), for the proposition that standing is "substantially more difficult to establish" when the plaintiff is "not himself the object of the government action or inaction he challenges," but that case is distinguishable because it involved environmental organizations, not a state.

Cir. 1989), and Florida's allegations are sufficient to establish injury in fact at this stage of the case. *See Texas v. Biden*, 10 F.4th 538, 547-48 (5th Cir. 2021) (state established standing by showing that it incurs costs in determining whether an alien satisfies the requirements for a driver's license and issuing a license to those who do, as well as educational, healthcare, and correctional costs); *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015) (state established standing by demonstrating that it would incur significant costs in issuing driver's licenses to aliens subject to deferred prosecution program); *see also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005) (state established injury based on adverse impact to its economy); *Florida v. Nelson*, 2021 WL 6108948, at *8 (M.D. Fla. Dec. 22, 2021) ("[F]ederal executive action that adversely affects Florida's economy and that violates federal law governing … administrative procedure amounts to a constitutional injury."); *Florida v. Becerra*, 544 F. Supp. 3d 1241, 1253 (M.D. Fla. 2021) (ongoing economic injury to political subdivisions of the state were sufficient to establish standing).

The Court did not overlook Defendants' argument that Florida lacks standing because its alleged injuries are premised on the very existence of Defendants' statutory parole authority and its implementing regulations, which authorize the actions that Florida challenges.  However, this argument is not persuasive because under the plain language of the statute, Defendants do not have unfettered discretion

in their use of the parole authority; rather, an arriving alien may only be paroled "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. §1182(d)(5)(A).   Moreover, although a plaintiff generally "lacks a judicially cognizable interest in the prosecution or nonprosecution of another," *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), that principle does not squarely apply here because Florida is not challenging Defendants' detention/parole decision with respect to any <u>individual</u> alien, but rather it is challenging Defendants' alleged failure to comply with the mandates and limitations in the INA with respect to its detention and parole <u>policies</u>.

Nor did the Court overlook Defendants arguments that Florida's predictions of injury are too attenuated and uncertain to provide standing because the injury depends on the actions of third parties (i.e., aliens "paroled" into the country) and because it is uncertain how many of those released under the challenged policies will end up in Florida.  The Court finds this argument unpersuasive.

As to the first point, injury depending on the actions of third parties can still provide standing when the "third parties will likely react in predictable ways" to a particular government action, *see Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019); *Texas v. Biden*, 20 F.4th at 972-73, and, here, Florida's claim "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of*

15

*Com.*, 139 S. Ct. at 2566.[12]  And as to the second point, Florida at least plausibly alleges that aliens paroled into the country have settled in Florida and will continue to do so if the challenged policies are allowed to continue, thereby imposing economic costs on Florida.  At this stage of the case, Florida need not show anything more, *see Glynn Env't Coal.*, 26 F.4th at 1240, particularly given that the state is entitled to special solicitude in the standing analysis.

None of Defendants' other standing arguments are persuasive.  First, the claims asserted in the amended complaint are not time-barred under 28 U.S.C. §2401(a) because Florida is challenging policies put into place over the course of the last two years, not the legality of the parole statute as amended in 1996.  Second, a determination that Florida has standing here does not equate to a finding that any state would have standing to challenge any federal policy in the federal courts.  *See*

---

[12] The Court did not overlook *Arizona v. Biden*, *supra*, in which a panel of the Sixth Circuit held that the plaintiff states lacked standing because their alleged injuries depended on the actions of third parties.  However, the Court finds that case distinguishable because the policies challenged in that case involved removal of removal of aliens already in the country and implicated an entirely different statutory regime and set of injuries and underlying policy concerns.  The same is true of *Arizona v. United States*, *supra*.  Moreover, the states in the Sixth Circuit case did not challenge the Government's asserted prosecutorial discretion or dispute that individual immigration officers retain control over the volume of removals and detentions they effect.  *See Arizona v. Biden*, 2022 WL 1090176, at *3.  Here, by contrast, Florida argues that Defendants do not have discretion—or that they are operating outside of the discretion they do have—regarding detention of arriving aliens.  Moreover, applying the Sixth Circuit's analysis to this case would run afoul of the Supreme Court's statements in *Jennings*, *supra*, that detention under §1225(b) is mandatory rather than permissive.  Finally, this case is in a different procedural posture than the Sixth Circuit case and, unlike the plaintiff states in that case that had the burden of proving likelihood of success to secure a preliminary injunction, here Florida only has the burden to plausibly allege the elements of its claims to survive dismissal.

*Texas v. Biden*, 20 F.4th at 974-75; *accord Texas v. United States*, 809 F.3d at 161;

*Massachusetts*, 549 U.S. at 546 (Roberts, C.J., dissenting).   Third, Florida's

challenge is not merely a "generalized grievance" because it has alleged injuries that

are not common to all members of the public.[13]   *See Texas v. United States*, 86 F.

Supp. 3d 591, 619-20 (S.D. Tex. 2015) (explaining that injury to a state's proprietary

interests, such as the cost of providing services to aliens, is not a generalized

grievance).

In addition to Article III standing, a plaintiff alleging a statutory violation

must also show that its interests are "arguably" within the "zone of interests" that

Congress intended to protect by that statute.   *See Lexmark Int'l, Inc. v. Static Control

Components, Inc.*, 572 U.S. 118, 129-30 (2014).   This test is not especially

demanding, particularly in the APA context, and it "forecloses suit only when a

---

[13]   On this point, it is noteworthy that although courts have routinely held that individual suits over the federal government's perceived noncompliance with federal law are generalized grievances, courts have also permitted states to sue the federal government over its potentially unlawful policies, provided that the state has itself suffered a direct injury. *Compare United States v. Richardson*, 418 U.S. 166 (1974) (taxpayer was not entitled to sue for more detailed information on government expenditures); *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) (citizens and taxpayers lacked standing to challenge federal government's conveyance of surplus property to a religious college), *with Massachusetts*, *supra* (state had standing to challenge federal agency's refusal to adopt regulation for greenhouse gas emissions from motor vehicles); *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) (state had standing to challenge to COVID-19 vaccination mandate for federal contractors); *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021) (state had standing to challenge to suspension of MPP); *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (state had standing to challenge to deferred prosecution policy); *Nelson*, 2021 WL 6108948 (state had standing to challenge to COVID-19 vaccination mandate for federal contractors); *Becerra*, 544 F. Supp. 3d 1241 (state had standing to challenge to CDC restrictions on cruise industry).

plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *See id.* at 130 (internal quotation marks omitted). *Federation for American Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996), cited by Defendants, is not contrary authority because it was decided before the Supreme Court's clarification of the leniency of the zone of interest test in *Lexmark* and it did not involve a state plaintiff. *See Texas v. Biden*, 20 F.4th at 976 (finding *FAIR* inapposite for similar reasons).

Other courts have found that a state's economic interests are within the zone of interests protected by the INA. *Texas v. Biden*, 20 F.4th at 975-76; *Texas v. United States*, 809 F.3d at 163; *see also Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 220 (7th Cir. 2020) (county was within the zone of interests of the federal immigration statutes based on its financial interests). Accordingly, it follows that the interests Florida seeks to vindicate in this case are within the zone of interest of the INA.

Florida is not required to <u>prove</u> its standing at this stage of the case. It is only required to <u>allege</u> facts that, if proven, will establish its standing—and for the reasons stated above, it has done so. Accordingly, the amended complaint is not due to be dismissed for lack of standing.

<u>Justiciability</u>

Defendants argue that the challenged policies are not subject to judicial review because they involve matters committed to agency discretion, because there has been no final agency action subject to judicial review, and because the INA precludes such review.  Each argument will be addressed in turn.

*Committed to Agency Discretion*

Challenged activities that are "committed to agency discretion by law" are not subject to judicial review under the APA.  5 U.S.C. §701(a)(2); *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1082 (11th Cir. 2012).  However, this exception is read "quite narrowly," and only applies to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (the "committed to agency discretion" exception only applies "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." (internal quotation marks omitted)); *Conservancy of Sw. Fla.*, 677 F.3d at 1082 ("[T]he absence of any applicable legal standard that limits the agency's discretion precludes APA review."); *see also Dep't of Com.*, 139 S. Ct. at 2568 (judicial review is only precluded when the agency's

19

discretion is "unbounded" or the challenged action is in "one of those areas traditionally committed to agency discretion").

Here, the primary statutory provisions at issue are §§1225(b)(1)(B)(iii)(IV) and (b)(2)(A) and §1182(d)(5)(A).  Defendants argues that §1225 affords it broad enforcement discretion to establish policies and priorities, including the option to decline to institute removal proceedings at all.  Florida responds that the cited provisions of §1225 expressly require aliens to be detained until removal proceedings have concluded, and that §1182(d)(5)(A) does not authorize Defendants to circumvent the mandatory detention requirement as it is allegedly doing through the challenged policies.  The Court agrees with Florida.

The cited provisions in §1225 clearly and unambiguously state that aliens arriving at the border "shall be detained," not that they may be detained.  The word "shall" connotes a requirement or a command, rather than a suggestion or an opportunity for the exercise of discretion.  *See United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) ("The word 'shall' does not convey discretion.  It is not a leeway word. … [W]here Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest."); *cf. In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1257 (11th Cir. 2020) ("The use of the permissive word 'may' vests the [agency] with discretionary authority.").  The Supreme Court reached the same conclusion in *Jennings* when it stated that

20

"§§1225(b)(1) and (b)(2) do not use the word 'may' [and] [i]nstead, they unequivocally mandate that aliens falling within their scope 'shall' be detained." 138 S. Ct. at 844.

The Court did not overlook Defendants' reliance on *Heckler v. Chaney*, 470 U.S. 821 (1985), for the proposition that the decision to release an individual on parole is committed to agency discretion because it involves the balancing of factors within the agency's particular expertise.[14]  This argument is not persuasive because the Supreme Court acknowledged in *Heckler* itself that it did not apply to "a situation where it could justifiably be found that the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."  *Id.* at 833 n.4 (internal quotation marks omitted); *see also Texas v. Biden*, 20 F.4th at 983-84 ("*Heckler* … shelter[s] one-off nonenforcement decisions rather than decisions to suspend entire statutes.").  Such a situation is precisely what Florida alleges here.  Moreover, *Heckler* only establishes a presumption, which may be rebutted where "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."  470 U.S.

---

[14]  Defendants also cite *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995), for the proposition that the overall statutory immigration scheme forecloses judicial review of whether the immigration laws are being adequately enforced.  That argument is unpersuasive.  *See Texas v. United States*, 86 F. Supp. 3d at 637 n.45 (distinguishing *Chiles* and other cases because they did not involve a stated policy of nonenforcement, the plaintiffs did not provide proof of any direct damages, and they predate the REAL ID Act of 2005 which requires a state to pay a fee to verify an applicant's identity prior to issuing a driver's license).

21

at 832-33.  Here, the statutory scheme cabins Defendants' discretion and guides its application of §1225 by expressly limiting its parole authority in §1182(d)(5)(A), and the core issue in this case is whether Defendants acted in compliance with those requirements.

Relatedly, the Court did not overlook Defendants' argument that Congress's failure to define "urgent humanitarian reasons" or "significant public benefit" in §1182(d)(5)(A) gives them discretion to fill in the gaps.  Even if that is true, Defendants do not have unfettered discretion to define those terms however they choose; rather, the interpretation must be reasonable.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[A] court may not substitute its own construction of a statutory provision for a <u>reasonable</u> interpretation made by the administrator of an agency." (emphasis added)).  If, as Florida alleges, Defendants have adopted policies pursuant to which they are effectively paroling arriving aliens en masse without commencing removal proceedings solely because of resource constraints (some of which are alleged to be of Defendants' own making), it seems unlikely that would be a reasonable interpretation of the terms "urgent humanitarian reasons" or "significant public benefit."  Moreover, such an interpretation may be at odds with Defendants' existing regulations, which limit the classes of aliens that can be paroled on a case-by-case basis.  *See* note 5, *supra.*

Nor did the Court overlook Defendants' argument that Congress has authorized it to establish immigration enforcement policies and priorities, specifically those related to allocating its limited resources, thereby conveying discretion. However, Congress was presumably aware that Defendants have limited resources when it enacted the detention requirement, yet it still chose to use language mandating detention. Even if resource allocation and other policy priorities can be considered in Defendants' exercise of their limited parole authority under §1182(d)(5)(A), those considerations do not give Defendants carte blanche to release arriving aliens without undertaking individualized case-by-case assessments as required by that statute, as they have allegedly done through the challenged policies—particularly if, as Florida alleges, Defendants have essentially created the problem the challenged policies seek to alleviate.

Finally, the Court did not overlook Defendants' assertion that the Court lacks jurisdiction to review parole decisions. However, the Court finds the cases cited in support of that proposition inapposite because Florida is not challenging individual immigration decisions. Instead, Florida is seeking to ensure that Defendants' policies and practices comply with the controlling law.

*Final Agency Action*

Only "final agency action" is subject to judicial review under the APA. 5 U.S.C. §704. "[T]wo conditions must be satisfied for agency action to be 'final':

First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted)).

As to the non-detention policy, Defendants first argue that the policy is not the consummation of their decisionmaking process because (at least according to Defendants) there is no policy of non-detention, but rather "an amalgam of parole decisions."  The Court rejects this argument for two reasons.  First and foremost, Florida has plausibly alleged that there is such a policy, and at this stage of the case, the Court is required to accept that allegation as true.  Second, it defies logic and common sense to suggest that there is no overriding policy against detaining aliens when hundreds of thousands have been paroled or otherwise released into the country, and it would be highly improbable (if not statistically impossible) for this to have resulted by happenstance from an "amalgamation" of individual case-by-case decisions rather than a policy directive.

Alternatively, Defendants argue that even if a non-detention policy exists, it would not be final agency action because it has no "direct and appreciable legal consequences" on Florida.  The Court rejects this argument for two reasons.  First, Florida plausibly alleges that the non-detention policy effectively establishes "new

marching orders" directing immigration officials to act out of compliance with applicable laws, thereby affecting the rights and obligations of both the paroled aliens and of Florida.  Second, the test for finality is whether the agency action determines rights or obligations or has legal consequences, not whether the party challenging the agency action is directly regulated by it and, here, Florida plausibly alleges that the policies affect its legal obligations insofar as it is obligated by law to provide certain services to aliens who settle within its borders.

As to the parole + ATD policy, Defendants argue that the policy is merely "guidance" that does not create legal rights or impose legal obligations (and therefore is not a final agency action) because the agency retains the discretion to alter or revoke the policy at will and because agency officials retain discretion to act on a case-by-case basis.  The Court disagrees.  The fact that an agency can revise or revoke its guidance does not make its decision nonfinal.  *See U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016) ("Th[e] possibility [that the agency may revise its decision] is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."); *Texas v. Biden*, 20 F.4th at 949 ("The Government's rule would render any agency action nonreviewable so long as the agency retained its power to undo that action or otherwise alter it in the future. That accords with neither common sense nor the law.").  Nor does the fact that agency officials may retain a modicum of case-by-case discretion because they

are not specifically required to parole all arriving aliens necessarily negate the alleged overarching policy directive to release arriving aliens into the country without instituting formal immigration proceedings against them.  Finally, as with the non-detention policy, Florida has plausibly alleged that the parole + ATD policy has legal consequences for the state.

### Review Precluded by Statute

Judicial review of an agency action under the APA is barred if such review is explicitly prohibited by statute.  5 U.S.C. §701(a)(1); *see also Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 673 (1986) (presumption of judicial review can be overcome by statutory language).  Here, Defendants allege §1252(a)(2)(B)(ii) and §1225(g) preclude judicial review.  The Court disagrees.

The statutes cited by Defendants provide that "no court shall have jurisdiction to review" certain immigration decisions.  Specifically, §1252(a)(2)(B)(ii) precludes judicial review of any immigration decision or action "the authority for which is specified … to be in the discretion of the Attorney General or the Secretary of Homeland Security" and §1252(g) precludes judicial review of "any cause or claim by or on behalf of any alien arising from the decision or action … to commence proceedings, adjudicate cases, or execute removal orders against any alien."

These statutes do not bar judicial review of the challenged policies or the claims asserted in the amended complaint because they only preclude review of

individual immigration decisions. *See Texas v. Biden*, 20 F.4th at 977 & n.11 ("[T]he entirety of the text and structure of §1252 indicates that it operates only on denials of relief for individual aliens."); *see also DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (holding that various provisions of §1252 did not bar judicial review because no removal proceedings were challenged); *Jennings*, 138 S. Ct. at 841 (same with respect to §1226(e)).

\*   \*   \*

In sum, for the reasons stated above, the Court finds no merit in Defendants' arguments that the APA claims asserted in the amended complaint are not subject to judicial review.

## Failure to State a Claim

Having determined that the Court has jurisdiction because Florida has standing to assert its claims and those claims are justiciable, the Court will now turn to Defendants' argument that Florida has not asserted any plausible claims upon which relief may be granted. Before doing so, however, the Court will address Defendants' argument that §1252(f)(1) precludes the Court from granting injunctive relief against the challenged policies.[15]

---

[15] The Court was not required to consider this argument because it was buried in a footnote in the motion to dismiss (Doc. 23-1, at 25 n.4), but the Court elected to consider the argument for sake of completeness. *See Pinson v. JPMorgan Chase Bank, Nat'l Ass'n*, 942 F.3d 1200, 1209 n.5 (11th Cir. 2019) ("We do not ordinarily consider arguments raised in passing in one footnote rather than the body of the brief." (emphasis added)).

Section 1252(f)(1) provides that "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated."  The Court finds this provision inapposite for two reasons.

First, Florida is not asking the Court to "enjoin or restrain the operation" of the immigration statutes governing mandatory detention and limiting parole, but rather Florida is seeking an order directing Defendants to enforce these statutes as they are written.  *See Texas v. Biden*, 20 F.4th at 1003-04 ("Far from 'restrain[ing]' the 'operation' of the statute, the [district court's] injunction restored it."); *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010) ("Petitioner here does not seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct it asserts is not authorized by the statutes."); *but see Hamama v. Adducci*, 912 F.3d 869, 879-80 (6th Cir. 2018) (rejecting the argument that "the district court was not enjoining or restraining the statutes" because the district court's order included "limitations on what the government can and cannot do under the removal and detention provisions" that qualified as "restraints").  Second, "part IV" of the immigration subchapter of the INA only includes §§1221 through 1232, so even if

§1252(f)(1) was somehow applicable to the claims in this case, it would not preclude an order retraining or enjoining the use of parole under §1182 since that statute is in a different part (part II) of the immigration subchapter.

*Counts 1, 2, and 7*

Florida alleges in Count 7 of the amended complaint that Defendants' refusal to comply with the mandatory detention requirement in §1225 and the limits on their parole authority in §1182, as reflected in the non-detention policy, "qualifies as agency action unlawfully withheld or unreasonably delayed" under §706(1) of the APA; and Florida alleges in Counts 1 and 2 that the non-detention and parole + ATD policies are "in excess of statutory … authority" and "not in accordance with the law" under §706(2)(A) and (2)(C) of the APA because the policies conflict with statutory detention mandates and the statutory limits on Defendants' parole authority.  Defendants' motion to dismiss these counts essentially rehashes their statutory interpretation arguments, namely that §1225(b)(1) and (b)(2) do not mandate detention, but rather contemplates discretion.  Defendants also maintain that they are making case-by-case parole determinations in compliance with §1182(d)(5)(A).

For the reasons stated above, the Court is not persuaded by Defendants' statutory interpretation arguments.  Moreover, whether Defendants are truly making

individualized case-by-case parole decisions in compliance with the statutory scheme is a disputed factual issue that cannot be resolved at this stage of the case.

Accordingly, Defendants' motion to dismiss is due to be denied as to Counts 1, 2, and 7 of the amended complaint.

*Counts 3 and 4*

Florida alleges in Counts 3 and 4 of the amended complaint that the non-detention and parole + ATD policies are arbitrary and capricious under §706(2)(A) of the APA because they are supported by insufficient rationale and because Defendants failed to consider important factors in formulating these policies. Defendants argue that these counts should be dismissed because they do not have the "parole policy" that Florida claims they have.

The problem with Defendants' argument is that Florida has plausibly alleged that they do have policies (namely, the non-detention policy and the parole + ATD policy) that have resulted in the release of hundreds of thousands of aliens into the country without initiating removal proceedings.  Florida's allegations are not, as Defendants claim, based on "mere conjecture" or "speculation," but rather are based on facts that, viewed in the light most favorable to Florida, suggest the existence of an overarching policy rather than a mere "amalgam of … individual parole decisions."

Accordingly, Defendants' motion to dismiss is due to be denied as to Counts 3 and 4.

*Counts 5 and 6*

Florida alleges in Counts 5 and 6 of the amended complaint that Defendants did not engage in notice and comment under §553 of the APA when adopting the non-detention and parole + ATD policies. Defendants raise two arguments in support of dismissal of these counts, neither of which is persuasive.

First, Defendants argue that no rulemaking occurred, but rather only individual adjudications (i.e., individual parole decisions) that are not subject to notice and comment procedures. However, as previously discussed, the Court is simply not persuaded by Defendants' argument that what is alleged to be happening at the southern border is merely the result of an "amalgamation" of individual decisions, rather than a blanket policy—particularly when the allegations in the amended complaint are accepted as true as is required at this stage of the case.

Second, Defendants argue that the challenged policies, if they existed, would not be subject to notice and comment under §553(b)(A) of the APA because they are merely "general statements of policy." A general statement of policy "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197 (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979)). However, at this stage of the case, the Court cannot

say that this exception applies, because Florida has plausibly alleged that the challenged policies do not merely explain the exercise of a discretionary power, but instead purport to exercise discretion that Defendants do not have under the statutory scheme.

Accordingly, Defendants' motion to dismiss is due to be denied as to Counts 5 and 6.

*Count 8*

Florida asserts a "non-statutory cause of action" in Count 8, alleging that the non-detention and parole + ATD policies are "unlawful [and] ultra vires" and violate the "separation of powers doctrine" and the Take Care Clause[16] of the Constitution. Defendants raise three arguments in support of dismissal of this count, none of which are persuasive.

First, Defendants argue that Florida offers no factual allegations in support of this claim and that the claim is conclusory. This argument ignores the fact that the first paragraph of Count 8 incorporates all the underlying substantive factual allegations in the amended complaint as well as the allegations in Counts 1 and 2 that the challenged policies contravene the INA. Based on the rulings above

---

[16] U.S. Const., Art. II, §3 (requiring the President to "take Care that the Laws be faithfully executed").

regarding Counts 1 and 2, it follows that Count 8 is not due to be dismissed for inadequate factual support.

Second, Defendants argue that the separation of powers doctrine does not favor, but rather defeats, Florida's legal theory, because the executive branch, not the judiciary, has the authority to decide to whether and when to detain aliens arriving at the border.  However, the judiciary does have the authority to say what the law is and to invalidate action of the executive branch that contravenes the law and/or the Constitution.

Third, Defendants argue that the Take Care Clause does not provide a private right of action pursuant to which Florida can bring a claim.  Although some district courts have agreed with this argument,[17] there is no binding authority on this point, and the Court sees no reason why such a claim could not be pursued at least in circumstances where (as alleged here) the executive branch has completely abdicated its responsibility to enforce the law as written.  *See generally Heckler*, 470 U.S. at 833 n.4 (suggesting that an agency's decision not to enforce a law might be reviewable "where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication

---

[17] *See Las Americas Immigrant Advoc. Ctr. v. Biden*, -- F. Supp. 3d --, 2021 WL 5530948, at *3 (D. Ore. Nov. 24, 2021); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800-03 (D. Md. 2020); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C. 1985); *see also Texas v. United States*, 86 F. Supp. 3d at 677 n.110 (noting the "dearth of cases in which the Take Care Clause has been pursued as a cause of action rather than asserted as an affirmative defense").

of its statutory responsibilities"); *Kendall v. United States*, 37 U.S. 524, 613 (1838) ("To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible."); *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994) (distinguishing between "single-shot" non-enforcement decisions by agencies, which are generally not subject to judicial review, and "general enforcement policies" that could show that the agency has abdicated its duty to faithfully execute the law).  This conclusion is supported by the Supreme Court's observation that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity" and the "long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (collecting cases recognizing an implied private right of action to challenge government action directly under the Constitution); *Sierra Club v. Trump*, 929 F.3d 670, 694-98 (9th Cir. 2019) (finding an equitable cause of action for a plaintiff seeking to challenge government action under the Appropriations Clause, and collecting cases in which courts have permitted a plaintiff to sue in equity to enjoin unconstitutional actions by federal officials); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 404 (1971) (Harlan, J., concurring in the judgment) (recognizing "the

presumed availability of federal equitable relief against threatened invasions of constitutional interests").

The Court did not overlook Defendants' argument that their prosecutorial discretion cannot be subjected to equitable judicial review because this case involves "executive and political" duties rather than "ministerial" duties. *See Mississippi v. Johnson*, 71 U.S. 475, 498-99 (1866); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974). The problem with this argument is that the statutory duties in this case fall somewhere in between these two extremes because although §1182(d)(5)(A) clearly affords Defendants some discretion to parole aliens notwithstanding the explicit detention mandates in §1225(b)(1) and (b)(2), that discretion is not absolute because the grounds and duration of parole authority are specifically limited by statute. Thus, Defendants' parole polices are not immune from judicial review. *See Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1262 (11th Cir. 2014) ("Even when a decision is committed to agency discretion, a court may consider allegation that an agency failed to follow its own binding regulations." (internal quotations omitted)); *NAACP v. Levi*, 418 F. Supp. 1109, 1116 (D.D.C. 1976) (explaining that in cases where prosecutorial discretion is altered or limited by statute, "the judiciary has the responsibility of assuring that the purpose and intent of congressional enactments are not negated"); *Nader v. Saxbe*, 497 F.2d 676, 679 n.19 (D.C. Cir. 1974) ("[T]he exercise of

prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review. The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority.  Judicial review of the latter sort is normally available unless Congress has expressly withdrawn it.  The decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness." (citations omitted)).

Finally, the Court did not overlook Defendants' argument that the 1976 amendments to the APA supplant constitutional claims for injunctive relief against federal agencies and officers.  However, courts have recognized that claims may be cognizable under both the APA and under a court's inherent equitable power, and that those two claims do not necessarily foreclose each other.  *See Sierra Club*, 929 F.3d at 699; *but see California v. Trump*, 963 F.3d 926, 941 n.12 (9th Cir. 2020) (finding it unnecessary to address a state's equitable ultra vires claim because the state prevailed under the APA and sought the same scope of relief under each claim, but acknowledging that "each of the claims can proceed separately"); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 53-54 (D.D.C. 2020) (dismissing constitutional claims because they merely recast APA and other statutory claims).

**Conclusion**

In sum, for the reasons stated above, it is **ORDERED** that:

1.      Defendants' motion to dismiss (Doc. 23) is **DENIED**.

2.      Defendants shall have 14 days from the date of this Order to answer the

amended complaint.  *See* Fed. R. Civ. P. 12(a)(4)(A).

        **DONE and ORDERED** this 4th day of May, 2022.

*T. Kent Wetherell, II*

**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**