State of Florida

vs.

United States

---

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

---

July 13, 2022

*Vol 1*

---



PHIPPS REPORTING

*Raising the Bar!*

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

              Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

              Defendants.
_____/


VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
BEHALF OF THE PLAINTIFF


Volume 1
Pages 1 through 137


Wednesday, July 13, 2022
8:33 a.m. CT - 2:17 p.m. CT


Location:  Remote via Zoom
Washington, D.C.


Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 2

```
 1    APPEARANCES: (All appearing remotely via Zoom)

 2
      On behalf of the Plaintiff:
 3
           OFFICE OF THE ATTORNEY GENERAL
 4         The Capitol, PL-01
           Tallahassee, Florida 32399-1050
 5         850.414.3665
           BY:  ANITA J. PATEL, ESQ.
 6              ELIZABETH TEEGEN, ESQ.
                anita.patel@myfloridalegal.com
 7

 8    On behalf of Defendant United States of America:

 9         DEPARTMENT OF JUSTICE
           P.O. Box 868
10         Ben Franklin Station
           Washington, D.C. 20044
11         202.514.0618
           BY:  JOSEPH ANTON DARROW, ESQ.
12              ELISSA FUDIM, ESQ.
                joseph.a.darrow@usdoj.gov
13

14    On behalf of Defendant Department of Homeland
      Security:
15
           DEPARTMENT OF HOMELAND SECURITY
16         Office of the General Counsel
           2707 Martin Luther King, Jr.  Avenue SE
17         Washington, D.C. 20528
           BY:  KAITLYN CHARETTE, ESQ.
18

19    On behalf of Defendant U.S. Customs and Border
      Protection:
20
           U.S. CUSTOMS and BORDER PROTECTION
21         Office of Chief Counsel
           1300 Pennsylvania Avenue, Suite 4, 4-B
22         Washington, D.C. 20229
           BY:  STEPHANIE MUFFETT, ESQ.
23              SAMANTHA POON, ESQ.

24
      ALSO PRESENT:  David Celani, Videographer
25
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 3

1                          I N D E X

2   July 13, 2022                                    Page

3   TONY BARKER
        Direct Examination by Ms. Patel............   6
4       Cross-Examination by Mr. Darrow........... 198
        Redirect Examination by Ms. Patel......... 200
5
    Certificate of Oath......................... 204
6   Certificate of Reporter..................... 205
    Read and sign letter to witness............. 206
7   Errata sheet (forwarded upon completion)...... 207

8                       E X H I B I T S
                                        Identified Marked
9   Plaintiff's Exhibit 1              12        12
        Deposition Notice (7 pages)
10
    Plaintiff's Exhibit 2              19        19
11      DHS Organizational Chart (1 page)

12  Plaintiff's Exhibit 3              21        21
        CBP Organizational Chart (1 page)
13
    Plaintiff's Exhibit 4              34        34
14      CBP website Information Center
        (3 pages)
15
    Plaintiff's Exhibit 5              44        45
16      CBP Encounters Fiscal Year 2022
        to Date (1 page)
17
    Plaintiff's Exhibit 6              82        82
18      USCBP Processing Pathways Chart
        (1 page)
19
    Plaintiff's Exhibit 7              83        83
20      USCBP Custody and Transfer
        Statistics FY 2022 (5 pages)
21
    Plaintiff's Exhibit 8             115       114
22      USCBP Custody and Transfer
        Statistic FY 2021 (4 pages)
23
    Plaintiff's Exhibit 9             119       119
24      USCBP Custody and Transfer
        Statistics FY 2020 (7 pages)
25

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 4

```
 1

 2                    E X H I B I T S  (Cont'd)

 3    VOLUME 2
                                     Identified Marked
 4
      Plaintiff's Exhibit 10              142        142
 5       USCBP November 2, 2021 memorandum
         (3 pages)
 6
      Plaintiff's Exhibit 11              160        160
 7       Fiscal Year 2020 Enforcement
         Lifecycle Reporter (21 pages)
 8
      Plaintiff's Exhibit 12              169        169
 9       DHS April 26, 2022 memo (20 pages)

10    Plaintiff's Exhibit 13              182        182
         Texas v. Biden Monthly Report
11       Reporting Period: April 1, 2022 –
         April 30, 2022 (6 pages)
12
      Plaintiff's Exhibit 14              188        188
13       Defendant's Response to Plaintiff's
         First Set of Interrogatories (11 pages)
14
      Plaintiff's Exhibit 15              184        184
15       Texas v. Biden Monthly Report
         Reporting Period: January 21, 2021 –
16       November 30, 2021 (13 pages)

17

18

19

20

21

22

23

24

25
```

Page 5

1    Thereupon,

2    the following proceedings began at 8:33 a.m.:

3             THE VIDEOGRAPHER:  We are now on the

4         record and the time is 8:33 a.m.  This is the

5         video recorded deposition of Tony Barker in the

6         matter of State of Florida versus the United

7         States of America, et al.  This deposition is

8         being held via Zoom video on July 13, 2022.

9         The videographer is David Celani and the

10        stenographer is Helen Chase.  Both in

11        association with Phipps Reporting.

12             Will counsel, please, announce their

13        appearances for the record?

14        MS. PATEL:  Anita Patel, counsel for the

15        State of Florida.

16        MR. DARROW:  Joseph Darrow, counsel for

17        the United States of America.

18        MS. FUDIM:  Elissa Fudim, also counsel for

19        the United States of America.

20             I don't intend to make speaking objections

21        during the course of this deposition, so if

22        there's no objection from plaintiff's counsel,

23        there may be points where I turn my video off.

24        I'm just observing.

25        MS. PATEL:  That's fine.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 6

1          MS. FUDIM:  Thank you.

2          THE STENOGRAPHER:  Ms. Poon and Ms.

3     Teegen, please, announce yourselves.

4          MS. MUFFETT:  Stephanie Muffett, counsel

5     for the defendant.

6          MS. CHARETTE:  Kaitlyn Charette, counsel

7     for the defendant.

8          MS. POON:  This is Samantha Poon, counsel

9     for CBP, and I do not intend to be objecting or

10     speaking.

11          THE STENOGRAPHER:  Ms. Teegen?

12          Okay.  She's choosing not going to

13     announce herself, so we can go on.

14          MS. PATEL:  All right.  So, before we

15     begin, I just want to mention that we are

16     conducting this deposition by remote means, so

17     we need to get a stipulation from defendant's

18     counsel to pursue -- to continue the deposition

19     in that manner.

20          MR. DARROW:  So stipulated.

21                 DIRECT EXAMINATION

22    BY MS. PATEL:

23          Q.   Good morning, Chief Barker.  My name is

24    Anita Patel.  I am counsel for the State of Florida

25    and I will be conducting the deposition today.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1              Have you ever been deposed before?
 2       A.    Yes.
 3       Q.    Okay.  How many times have you been
 4  deposed?
 5       A.    Just once.
 6       Q.    And when was that?
 7       A.    In the 2018, 2019 year time frame.
 8       Q.    And what was that case regarding?
 9       A.    It was an EEO complaint.
10       Q.    And that's an employment issue; is that
11  correct?
12       A.    Yes.  Yes, that's correct.
13       Q.    Okay.  And in what capacity were you
14  deposed?
15       A.    The same thing, defendant.
16       Q.    Okay.  Were you deposed as a corporate
17  representative or as a fact witness?
18       A.    It would have been a fact witness.
19       Q.    Okay.  Was that in your individual
20  capacity?
21       A.    No, representing as the Deputy Chief of
22  the Detroit Sector --
23       Q.    Okay.  So --
24       A.    -- at the time.
25       Q.    Okay.  And I'll just go ahead and give you
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 8

1   a few ground rules before we begin.

2              So, we are here.  The court reporter is

3   taking down everything that we say, so I ask that

4   you give audible responses.

5              If I don't understand a question that I

6   ask, please, just let me know and I can rephrase it

7   or repeat it.

8              Your attorney, Mr. Darrow, might from time

9   to time lodge an objection.  If he does so, please,

10  go ahead and answer the question unless you're

11  specifically instructed not to.

12             If you need to take a break, please, let

13  me know.  I just ask that we don't take a break

14  while there's a question pending.

15             And since there is a court reporter taking

16  down everything that we're saying, let's try not to

17  talk over each other.  Otherwise, it will make her

18  job pretty difficult today.

19             And where are you currently located?

20             THE STENOGRAPHER:  Hold on.  I'm going to

21       break in because I didn't swear in the witness.

22       Here we go.

23             Mr. Barker, would you raise your right

24       hand for me, please?

25             Do you solemnly swear or affirm that the

Page 9

```
 1        testimony that you are about to give in this

 2        cause will be the truth, the whole truth and

 3        nothing but the truth?

 4             THE WITNESS:  I do.

 5             THE STENOGRAPHER:  Thank you very much and

 6        I apologize.

 7                  DIRECT EXAMINATION (Cont'd)

 8     BY MS. PATEL:

 9        Q.   All right.  So, let's just quickly go over

10     this again.  Chief Barker, have you ever been

11     deposed before?

12        A.   Yes.

13        Q.   And how many times?

14        A.   Once.

15        Q.   When was that?

16        A.   In the 2018, 2019 time frame.

17        Q.   Okay.  And what type of case?

18        A.   An EEO case.

19        Q.   Okay.  And that's an employment case?

20        A.   Yes.

21        Q.   Okay.  And were you testifying as a

22     corporate representative for CBP?

23        A.   Yes, fact witness for CBP.

24        Q.   Okay.  And that was in your corporate

25     capacity as opposed to an individual?
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 10

1      A.   Correct.  That's correct, as the Deputy

2   Chief of the Detroit Sector at the time.

3      Q.   All right.  Thank you.

4           So, quickly, we have a court reporter

5   taking down everything that's being said today.

6   Just let's try not to talk over each other so she

7   can get a clear record.  So, please, also give

8   audible responses.  She can't take down nodding of

9   the head or any type of hand gestures.

10          Your attorney, Mr. Darrow, may object from

11  time to time.  Please, just answer the question

12  unless he specifically instructs you not to.

13          If you need a break, please, let me know.

14          And where are you currently located?

15     A.   In Washington, D.C.

16     Q.   Okay.  And who is in the room with you?

17     A.   Counsel.

18     Q.   And would that be Mr. Darrow to your

19  right?

20     A.   Yes, correct.

21     Q.   Anyone else?

22     A.   Left, and then to the right Kaitlyn.

23     Q.   Okay.

24     A.   And after that Stephanie.

25     Q.   Okay.  Do you have any other screens open

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 11

```
 1    on your computer?

 2         A.   No.

 3         Q.   Do you have a cell phone in the area?

 4         A.   It's on my hip.

 5         Q.   Okay.  Do you understand that you're under

 6    oath and you're required to tell the truth today?

 7         A.   Yes.

 8         Q.   Okay.  And if, at any time during this

 9    testimony, you realize that you misspoke, please,

10    just let me know.  Okay?

11              Are you under the influence of any alcohol

12    or substances that would impair your ability to tell

13    the truth?

14         A.   No.

15         Q.   Okay.  And you understand that you are

16    being deposed today in both your corporate capacity

17    and in your individual capacity?

18         A.   Yes.

19         Q.   Okay.  And so, in order to -- just so

20    you're clear, the first part of this deposition will

21    be me asking you questions in your corporate

22    capacity.  We will then switch to me asking you

23    questions in your individual capacity.  Does that

24    make sense?

25         A.   Yes.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 12

1        Q.   Okay.  So, I am going to drop an

2   exhibit -- this is Exhibit 1 -- into the chat.  Are

3   you guys able to pull it up or would you like me to

4   share screen?

5             MR. DARROW:  We are pulling it up now.

6             MS. PATEL:  Okay.

7             MR. DARROW:  Anita, this is the most

8        recent version of the 30(b)(6) deposition

9        notice?

10             MS. PATEL:  Yes, I believe so.

11             MR. DARROW:  I have it.  I printed out a

12        copy.  If it's fine with you, I can have Chief

13        Barker look at this copy.

14             MS. PATEL:  That's perfectly fine.

15             MR. DARROW:  We also have it up on the

16        screen now, too, so...

17             MS. PATEL:  Okay.

18             (Plaintiff's Exhibit 1 was received

19        electronically, marked for identification and

20        is attached hereto.)

21   BY MS. PATEL:

22        Q.   And so, Chief Barker, have you reviewed

23   this document before?

24        A.   I believe so, yes.  Yes.

25        Q.   Okay.  And is it your understanding that

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1   you are testifying as to Topic 2, Topic 4, Topic 9,
 2   Topic 11, Topic 12, Topic 13, and Topic 16 today?
 3        A.   Yes.
 4        Q.   Okay.  Are there any other topics that you
 5   intend to testify as to?
 6        A.   No.
 7        Q.   Okay.  How did you prepare for this
 8   deposition?
 9        A.   Just reviewing, reviewing notes in regards
10   to Parole ATD current, I'll say, SOPs or standard
11   practices, if you will, and then, obviously, just
12   prep with counsel.
13        Q.   Okay.  These documents that you just
14   mentioned, were those disclosed to us in discovery?
15        A.   The memo, I mean, that's what they showed
16   me, I assume that they were but defer to counsel as
17   to what they've given.
18        Q.   Are you referring to the Parole + ATD
19   memo?
20        A.   Yes.
21        Q.   You also mentioned some standard
22   practices?
23        A.   That's just our normal border patrol
24   procedures.
25        Q.   Can you explain a little bit what specific
```

Page 14

1   procedures you reviewed?

2         A.   Well, I mean, just our normal -- our daily

3   numbers, our daily apprehensions, if you will.   I

4   mean, it's just, you know, just the -- I'll say the

5   history of, you know, the several months of traffic

6   and encounters that we've, that we've encountered

7   over -- you know, over the time since -- you know,

8   since the January time period -- or I should say

9   really March time period when things first started

10  increasing to current.

11        Q.   Okay.  So, are you referring to data that

12  you reviewed?

13        A.   Correct.

14        Q.   Okay.  So, when you say "standard

15  operating procedures," is that different than actual

16  data?

17        A.   Well, I mean, it's -- yeah, it's the data

18  based upon different processing dispositions and

19  those type of, those type of aspects.

20        Q.   Okay.

21        A.   Like, just -- you know, just the breakdown

22  of how many people were processed for what and when,

23  if that makes sense.

24        Q.   Okay.  Did you review any other documents?

25        A.   No, that was pretty much it.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 15

1        Q.    Okay.  Did you speak with anyone?

2        A.    Just counsel.

3        Q.    Okay.  And so, did you already have

4    sufficient knowledge to speak as to Topic 2 or did

5    you have to speak to anyone or review any documents

6    to prepare?

7        A.    Just counsel.

8        Q.    Okay.  And did you already have sufficient

9    knowledge to speak to Topic 4 or did you speak to

10    someone or review any documents?

11        A.    No.  It -- I mean, just counsel and then,

12    of course, like I said, just the processing

13    disposition, you know, data that we, that we

14    normally collect month over month.

15        Q.    Okay.  Did you have sufficient knowledge

16    to speak as to Topic 9 or did you review any

17    documents or speak to anyone?

18        A.    The same, you know, just had existing

19    knowledge.

20        Q.    Okay.  And what about Topic 11?

21        A.    I really defer to counsel in regards to

22    discovery items.  I mean, I don't know what they've

23    turned over to you, so I couldn't even -- I defer to

24    them in regards to that, but just speaking with

25    counsel in regards to 11.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 16

1      Q.   Okay.  Did you review any documents to

2   prepare to speak to Topic 11?

3      A.   Well, your topic lists the memo, you know,

4   I think that really encompasses the information,

5   really that was provided.

6      Q.   What about Topic 12?

7      A.   Again, I go back to just the -- like I

8   said, the memo just -- I'm not sure of everything

9   they provided to you for discovery, so...

10     Q.   Okay.  What about Topic 13?

11     A.   The same.

12     Q.   Okay.  What about Topic 16?

13     A.   I'm not sure about the facts that are --

14   and information cited in a footnote.

15     Q.   Okay.  Did you review the first amended

16   complaint?

17     A.   I can't recall the footnote to be honest.

18     Q.   Okay.  My question is, did you review the

19   first amended complaint?

20     A.   I, I have what you have in front of me.  I

21   reviewed that.  I have not reviewed the entire

22   complaint, no.

23     Q.   I don't know what's in front of you.  So,

24   what are you referring to?

25     A.   The document you have up on the screen.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      Q.   Okay.  So, that's not the first amended

2   complaint.  Have you reviewed the first amended

3   complaint?

4      A.   No.

5      Q.   Okay.  Have you reviewed the monthly

6   status reports that were filed in the Texas v. Biden

7   case?

8      A.   So, I am familiar with the monthly status

9   reports in regards to the numbers aspect.

10      Q.   Okay.  Are you familiar with the data

11   that's provided on the CBP website in terms of

12   processing dispositions?

13      A.   Yes.

14      Q.   Okay.  All right.  Have you read any of

15   the court filings in this case?

16      A.   No, to be honest.

17      Q.   Okay.  And have you reviewed the State's

18   discovery responses?

19      A.   No.

20      Q.   Have you reviewed DHS's responses to

21   Florida's request for production?

22      A.   No.

23      Q.   Have you reviewed DHS's responses to

24   Florida's interrogatories?

25      A.   No.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 18

1      Q.   And what about DHS's responses for

2   Florida's request for admissions?

3      A.   I believe that I -- we reviewed those

4   during prep, but I can't, I can't remember them off

5   the top of my head.

6      Q.   Okay.  Do you remember signing your --

7   DHS's responses to Florida's interrogatories?

8      A.   Actually, yes, as a matter of fact, I do

9   now that I recall as we're sitting here.  So, I do,

10  I do remember having -- reviewing some of the

11  interrogatories.

12     Q.   What is your understanding as to what this

13  lawsuit's about?

14     A.   The utilization of Parole ATD.

15     Q.   Anything else?

16     A.   I think it's the utilization of Parole

17  ATD, but we'll, obviously, see what the questions

18  are.

19     Q.   Could you briefly tell me about your

20  educational background?

21     A.   Sure, I have an undergraduate degree from

22  the University of Maine in Presque Isle, a graduate

23  degree, Master's degree from Champlain, and a Ph.D.

24  from Capella.

25     Q.   What is your undergraduate degree in?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 19

```
 1      A.   Criminal justice.

 2      Q.   What about your graduate?

 3      A.   Business.

 4      Q.   And your Ph.D.?

 5      A.   Business.

 6      Q.   And when did you get your undergraduate

 7   degree?

 8      A.   2000, I believe.

 9      Q.   What about your graduate?

10      A.   In '18 or '19, somewhere right around

11   there.

12      Q.   And then your Ph.D.?

13      A.   Probably '19.

14           And then just recently this year.

15      Q.   Okay.  And how long have you been working

16   for DHS?

17      A.   21 years.  Since May 20, 2001.

18      Q.   Let me drop another exhibit.  This is

19   Exhibit 2.

20      A.   Okay.

21           (Plaintiff's Exhibit 2 was received

22      electronically, marked for identification and

23      is attached hereto.)

24   BY MS. PATEL:

25      Q.   Okay.  Do you recognize this document?
```

Page 20

```
 1        A.    It's a table of organization.

 2        Q.    Okay.  An organizational chart for DHS?

 3        A.    Correct.

 4        Q.    Okay.  Does this look like an accurate

 5   version of the organizational chart for DHS?

 6        A.    From what I'm seeing, yes.

 7        Q.    Okay.  And so, this shows the various

 8   subcomponents within DHS, correct?

 9        A.    Correct.

10        Q.    And in the bottom left-hand corner there's

11   U.S. Customs and Border Protection?

12        A.    Correct.

13        Q.    And in the bottom right-hand corner there

14   is U.S. Immigration and Customs Enforcement; is that

15   accurate.

16        A.    Yes.

17        Q.    Can you, please, briefly explain to me

18   what the mission of CBP is?

19        A.    Sure.  So, CBP in a nutshell is to protect

20   our nation's borders while promoting legitimate

21   trade and travel.

22        Q.    Okay.  And how is that different from the

23   mission of ICE?

24        A.    You know, we work with ICE.  I don't

25   represent ICE.  But ultimately, you know, ICE does,
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 21

 1  does, I'll say, criminal prosecutions, you know,

 2  for -- from migrants who, you know, are living,

 3  residing in the United States away from the exact

 4  border area, you know, kind of beyond our -- you

 5  know, I would say beyond what would be commonly

 6  patrolled by the border patrol.  You know, as well

 7  as administrative removal and so on, but...

 8      **Q.   And I'm going to drop one more exhibit.**

 9  **This is Exhibit 3.**

10      A.   Okay.

11          (Plaintiff's Exhibit 3 was received

12          electronically, marked for identification and

13          is attached hereto.)

14   BY MS. PATEL:

15      **Q.   Is this the organizational chart for CBP?**

16      A.   It is an organizational chart of CBP.

17      **Q.   Okay.  And in the middle, the four blocks,**

18  **it says Chief of Border Patrol and then Office of**

19  **Field Operations.  Do you see that?**

20      A.   Yes.

21      **Q.   Okay.  What is the difference between**

22  **these two components?**

23      A.   United States Border Patrol protects the

24  nation's border between the ports of entry.  Office

25  of Field Operations runs and oversees legitimate

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 22

1    trade and travel at the ports of entry.

2        **Q.   Okay.  Do you share a processing station?**

3        A.   So, how are you defining a "station"?  I

4    ask because are you talking about an actual terminal

5    or are you talking about a system, are you talking

6    about a building?

7        **Q.   I'm talking about a building.  So, let's**

8    **say, for instance, border patrol apprehends someone.**

9    **Do they bring them to a building or office that's**

10   **operated by OFO?**

11       A.   No, not, not -- no.

12       **Q.   Okay.**

13       A.   I mean, in rare circumstances, we can work

14   together, you know, in regards to that type of

15   format, but there's no, there's no, I would consider

16   as a joint processing location if that's what you're

17   asking.

18       **Q.   Okay.  And in which component of DHS did**

19   **you first start working?**

20       A.   In the border patrol.

21       **Q.   Okay.  So, you spent all 21 years in**

22   **border patrol; is that correct?**

23       A.   Yes.  Yeah, I've been a border patrol

24   agent.

25       **Q.   Okay.  And what was your job title when**

Page 23

```
 1   you first started?

 2        A.   Border patrol agent.

 3        Q.   Okay.  And how long were you in that

 4   position?

 5        A.   Until 2006.

 6        Q.   So, how many years was that?

 7        A.   5 years.

 8        Q.   Okay.  And what were your job duties and

 9   responsibilities in that role?

10        A.   Patrolling the border.

11        Q.   And where were you located?

12        A.   In Del Rio, Texas.

13        Q.   Okay.  So, that was along the Southwest

14   Border; is that accurate?

15        A.   Yes.

16        Q.   And were you in any specific station

17   within that sector?

18        A.   Del Rio station.

19        Q.   Okay.  And so, did that sector primarily

20   deal with persons who are illegally crossing the

21   border?

22        A.   Yes, between the ports of entry.

23        Q.   And in that job did you develop any

24   policy?

25        A.   No.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 24

1        Q.    Did you implement any policy?

2        A.    We -- yeah, implementation -- well, as far

3    as -- more on the execution aspect.  I was an agent.

4    We didn't -- you know, whatever policies may have

5    come down at that point in time, we just -- you

6    know, yeah, we were in the execution aspect of that.

7        Q.    Okay.  And how were you notified that

8    there were new policies that came down?

9        A.    Through memorandum and, you know, speaking

10   at -- you know, having our leadership speak at what

11   we consider musters or, basically, meetings in the

12   morning -- or I should say before the shift, you

13   know.  You know, so through written memorandum as

14   well as oral communication.

15       Q.    And did you receive any type of training

16   when these memorandums would come out?

17       A.    It just -- I mean, it depends.  It depends

18   on what the -- whatever guidance was being put out.

19   You know, sometimes if there were, you know -- you

20   know, if there was a training requirement for that

21   or pertaining to that, whatever that new policy or

22   guidance or direction is, then, yeah, we would

23   receive training, but that's -- we didn't always

24   have training in regards to it.  It just depended.

25       Q.    And why did you leave that position?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 25

```
 1        A.   I got promoted.
 2        Q.   Okay.  And what did you get promoted to?
 3        A.   To a supervisory border patrol agent in
 4   Senoita, Arizona.
 5        Q.   Was that also along the Southwest Border?
 6        A.   Yes, yes, the Arizona border.
 7        Q.   And how long were you in that position?
 8        A.   From 2006 until 2008.
 9        Q.   What were your job duties and
10   responsibilities in that position?
11        A.   Supervising the men and women of the
12   border patrol at the Senoita Station, so I was the
13   supervisor of, essentially, a shift at that station.
14        Q.   And how many people were you supervising?
15        A.   Probably between 50 and 60 people per
16   shift at that time.
17        Q.   Okay.  And when you say you were
18   supervising, what did that specifically entail just
19   briefly?
20        A.   Everything from assigning daily job duties
21   to, you know, overseeing operations, processing
22   prosecutions, I mean, asset forfeitures, seizures.
23   I mean, just you really -- you know, you're
24   overseeing the entire operations of that unit, you
25   know, that were supervised.
```

Page 26

```
 1        Q.   When you just spoke about providing verbal
 2   updates or instructions to border patrol agents when
 3   new policies came down, was that part of your role
 4   as supervisor?
 5        A.   Yes.
 6        Q.   Okay.  And why did you leave that
 7   position?
 8        A.   Got promoted.
 9        Q.   And what did you get promoted to?
10        A.   To an operations officer in headquarters
11   Washington, D.C. in the Enforcement and Information
12   Technology branch.
13        Q.   And how long were you in that position?
14        A.   Maybe a year and a half roughly.  I'd have
15   to -- I don't have my resume in front of me,
16   obviously.
17        Q.   So, about from 2008 to somewhere in 2009
18   or 2010?
19        A.   Yeah, '9 or '10, somewhere right around
20   there.
21        Q.   And what were your job duties and
22   responsibilities in that role?
23        A.   So, in essence, you know, evaluating, you
24   know, I'll say technology gaps in the field, working
25   with the private sector in order to be able to
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1  identify technology which may fulfill that gap or

2  that need in the field, procuring, you know, that --

3  the technology.  Working, obviously, with other

4  departments who do the procurement fees, but

5  ultimately and then fielding that equipment to the

6  field.

7      **Q.   And I assume you were promoted again; is**

8  **that correct?**

9      A.   That would be correct.

10     **Q.   Okay.  And what was your new promotion?**

11     A.   Assistant Chief, and that would have been

12  in that 2010-ish -- '9, '10-ish time frame.

13     **Q.   Okay.  And how long were you in that**

14  **position?**

15     A.   For roughly a year.

16     **Q.   And was that still in the same enforcement**

17  **and --**

18     A.   It is, yeah.  The verbatim same, same,

19  same -- I'll say it's the same track of rules and

20  responsibilities just at a supervisory level of an

21  assistant chief.

22     **Q.   Okay.  And then did you get promoted to**

23  **another position?**

24     A.   Yes.  Yup.  In 2011 I was promoted to the,

25  the Deputy Patrol Agent in Charge of the Van Buren

Page 28

1   Station in Van Buren, Maine.

2       Q.   And what was your job duties and

3   responsibilities in that position?

4       A.   So, at that role and responsibility,

5   you're overseeing the daily operations of the entire

6   station versus a unit previously.  So, the entire

7   station.

8       Q.   Okay.  And in that role were you involved

9   in developing policy?

10      A.   No.

11      Q.   Implementing or executing policies?

12      A.   Execution.  You know, again, I mean,

13  that's more of the, the, you know, implementing and

14  executing whatever policy changes might happen to

15  come down.

16      Q.   Okay.  And were you promoted to another

17  position?

18      A.   Yes.  Patrol Agent in Charge of the

19  Houlton Sector Intelligence Unit.  That should have

20  been somewhere in the -- like the 2013-ish range,

21  somewhere in there.

22      Q.   You were promoted in 2013?

23      A.   Yeah.  Like I said, I don't have my resume

24  in front of me, so I'm really kind of just going off

25  the best memory I have.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 29

1        Q.    And that's fine.  How long were in that

2   position?

3        A.    Same thing.  For, for roughly, you know,

4   two years in that role.

5        Q.    All right.

6        A.    And I was overseeing all of the

7   intelligence functions for the Houlton Sector.

8        Q.    Is that sector in Maine?

9        A.    It is.  Houlton, Maine.

10        Q.    And so, when you say you were overseeing

11   intelligence functions, can you, please, briefly

12   describe what your job duties were?

13        A.    Sure.  So, you know, leading the men and

14   women of the intelligence unit in Houlton Sector.

15   These are all professional staff as well as agent

16   staff who really kind of, I'll say, assess the

17   threats, vulnerabilities and risks.  Both, you know,

18   people who may pose a risk to our nation's security

19   as well as, you know, deployment of personnel,

20   whatever risks or vulnerabilities may come about,

21   you know, due to, you know, let's say station

22   manpower, deployment strategies, you know, the,

23   the -- I'll say the criminal presence on the other

24   side of the border.  Canada being in this case.  You

25   know, the criminal element there and what they were

Page 30

 1   trying to do to exploit our nation's borders.

 2        Q.   Okay.  Have you held any similar position

 3   in regards to the Southwest Border?

 4        A.   Any intelligence position, no, no.

 5        Q.   All right.  So, you were promoted again;

 6   is that accurate?

 7        A.   Correct.  Correct.  Division Chief of

 8   Houlton Sector overseeing operations of the entire

 9   Houlton Sector.

10        Q.   And what were the dates for that

11   employment?

12        A.   That would have been that -- well, that

13   same time period, maybe 2015 to 2016, somewhere

14   right around in there.

15        Q.   Okay.  And what were your job duties and

16   responsibilities?

17        A.   That's the one I just said.  Overseeing

18   the entire operations of the Houlton Sector.

19        Q.   Okay.  And then you were promoted again,

20   correct?

21        A.   Yes, in 2016 I was promoted to the Deputy

22   Chief of the Detroit, the Detroit Sector.  So, this

23   is -- you know, the role and responsibilities that I

24   had is overseeing all of the functionality that

25   occurs in the sector.  Not only the operational

Page 31

```
 1    aspect, which is the delineating difference between
 2    the previous role, but as well as the professional
 3    staff, mission support, all of those type of things.
 4    So, totally encompassing the operations of the
 5    sector.
 6        Q.   And then, what was your next position
 7    within DHS?
 8        A.   Sure.  So, after that my next move was
 9    here to Washington, D.C. as the Deputy Chief of
10    Operations at headquarters U.S. Border Patrol.  And
11    that was in 2016 -- or, excuse me, that was in 2020,
12    rather.
13        Q.   And what were your job duties and
14    responsibilities?
15        A.   So, at that period of time, you know, in
16    essence, I, I oversee... I'll say the operations,
17    you know, or the liaison in representation of the
18    various sectors in the U.S. Border Patrol through
19    corridors; and then, of course, you know, that
20    thereby I can brief headquarters' leadership in
21    regard to what the field's needs are as well as the
22    national intelligence component for the U.S. Border
23    Patrol.
24        Q.   Okay.  And in that position, were you
25    implementing -- or were you developing any policies?
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 32

 1      A.   So, in that, in that role I was absolutely

 2   involved in the development of policy, advising, if

 3   you will, you know.  And, of course, when a policy

 4   was decided, you know, then, then, you know,

 5   dissemination to the field with regards to

 6   implementation.  As far as the execution that

 7   happens in the field, I was no longer involved in

 8   the execution phase, but really just a compilation

 9   in regards to development and then implementation.

**10      Q.   Okay.  What type of policies did you help**

**11   develop?**

12      A.   I mean, you know -- you know, as an

13   example, as we're, you know, moving through and

14   helping, you know -- and the policies are in

15   constant, constant periods of reevaluation.  Right?

16   You know, helping to support, you know, our pursuit

17   policies, canine policies, our horse patrol.  These

18   are all different, different policies that were --

19   are in a -- what I consider is a constant state of

20   review and implementation.  We have a policy branch

21   at, at headquarters border patrol which is SPAD, our

22   Strategic Policy Analysis Directorate.  They are the

23   ones who actually do most of the policy work.

24   Ultimately we're in a -- more of a consultation type

25   of application.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 33

1      Q.    And then did you move to your current

2  position at DHS?

3      A.    Right.  So, it would have been...  I don't

4  know, probably right around, say, February,

5  March-ish time frame, somewhere right around in

6  there, 2021 moved into the Acting Chief role.  It

7  would have been somewhere right around there.  I

8  can't remember the exact time frame.  Obviously, I

9  would have to look it up.

10      Q.    And Acting Chief, is that of a specific

11  unit?

12      A.    No, the same thing, over operations at

13  headquarters border patrol.  And ultimately it's

14  just, just overseeing that same functionality just

15  at a different -- you know, instead of a deputy

16  level at the principal level as the chief.

17      Q.    Okay.  And were you promoted again?

18      A.    Nope.  That's currently what I'm doing

19  right now.

20      Q.    All right.

21      A.    We've reached the end of the road.

22      Q.    All right.  I have as your title the Chief

23  of Law Enforcement Operations Director.  That's what

24  we're referring to?

25      A.    Yes.

Page 34

```
 1         Q.    Okay.  When you first started working at
 2    DHS, did you receive any type of training?
 3         A.    At the Border Patrol Academy right from
 4    the very get-go.
 5         Q.    Okay.  And can you, please, describe for
 6    me what the training entailed with the Border
 7    Academy -- Border Patrol Academy?
 8         A.    Sure.  So, you know, a wide very dynamic
 9    myriad of different subjects over a six-month period
10    of time.  Everything from criminal law,
11    constitutional law, immigration law, law enforcement
12    tactics and techniques, driving, shooting, you know,
13    techniques as well in Spanish.
14         Q.    Okay.  So, I just dropped another exhibit
15    into the chat.  It's Exhibit 4.
16              (Plaintiff's Exhibit 4 was received
17              electronically, marked for identification and
18              is attached hereto.)
19       BY MS. PATEL:
20         Q.    This is a document that was pulled from
21    CBP's Information Center basically describing the
22    Border Patrol Academy.  Can you just take a brief
23    look at it?
24         A.    Uh-huh.  Yup.
25         Q.    Let me know once you've had an opportunity
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 35

1   to review it.

2        A.   All right.  Yup, I've reviewed it.

3        **Q.   So, on the first page, the second bullet**

4   **point, it talks about instruction regarding**

5   **administration law and immigration law?**

6        A.   Correct.

7        **Q.   Can you briefly describe the types of**

8   **instruction that's given?**

9        A.   Yeah.  We, we have a -- whether it's

10  border patrol agents or attorneys -- by and large,

11  it's attorneys to be honest -- and come in and

12  provide, you know, training in regards to the

13  administrative and immigration law.

14       **Q.   Okay.  Sometimes there are active border**

15  **patrol agents that provide that training?**

16       A.   Yeah, it's more the -- you know, it's the

17  hand-to-hand instruction between the attorneys and

18  the agents who deliver the training so that the

19  agents can speak to what I consider as kind of the

20  practical application of the law, right, marrying

21  up, you know, art and science, if you will.

22       **Q.   And why is it important for the agents to**

23  **have instruction on immigration law?**

24       A.   Because it's very complex.

25       **Q.   Is it something that they apply doing**

Page 36

1   their jobs?

2        A.   Absolutely.

3        Q.   And how so?

4        A.   I mean, as we encounter individuals who

5   are entering illegally between the ports of entry,

6   you know, we have to, to determine, you know, if

7   there is a, a legal basis for, for the arrest,

8   which, obviously, would be a violation of law and,

9   of course, you know, the -- what I would consider is

10  the legal application of, you know, that, that law.

11  Right?  So, you know, whether we're taking them into

12  custody or whatever that may be, you know, having a

13  foundational knowledge of immigration law is

14  fundamental.

15       Q.   So, are you familiar with 8 U.S.C. Section

16  1225?

17       A.   Yes.

18       Q.   Okay.  Also referred to as INA 235?

19       A.   Yes.

20       Q.   Is that a statute that CBP implements?

21       A.   It is -- well, yes, it is.  Yes.

22       Q.   Okay.  And what is your understanding of

23  that provision?

24       A.   In, in -- coming from the basis of the

25  memo, the November 2nd memo, it's the ability to

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1  parole individuals into the United States based

2  upon, you know, certain circumstances, humanitarian

3  exigent circumstances, whatever that maybe.

4       Q.   All right.  Are you familiar with 8 U.S.C.

5  Section 1226?

6       A.   No, you'd have to tell me.

7       Q.   Okay.  That's also referred to as Section

8  236 of the INA.

9       A.   Yeah.  No, I can't cite it to you, no.

10       Q.   Are you familiar with 8 U.S.C. Section

11  1182, also referred to as Section 212 of the INA?

12       A.   212 I'm familiar with.

13       Q.   And what is your understanding of that?

14       A.   Well, it's just the different immigration

15  laws.  Right?  I mean, just it's the charges that

16  are in 212.

17       Q.   And what about 8 U.S.C. Section 1229(a)?

18       A.   Yeah, it's -- I, I don't know them off the

19  top of my head, no.

20       Q.   Okay.  Do you have a general understanding

21  of what that provision relates to?

22       A.   If you tell me what it relates to, I can

23  tell you if I've applied it.

24       Q.   Removal proceedings.

25       A.   Yes.

Page 38

1     Q.    Okay.  At the Border Patrol Academy do

2     they provide training on what to do when you

3     encounter someone who's crossing illegally?

4     A.    Yes.

5     Q.    Okay.  Is that both -- is that between

6     ports of entry?

7     A.    Yes.

8     Q.    And at a port of entry?

9     A.    No, we do not, we do not train on at ports

10    of entry encounters.

11    Q.    And what does that training entail?

12    A.    So, between the ports of entry encounters

13    is what we, what we train on.  So, it's, it's

14    everything from how to detect that there is illegal

15    entry to what to do when we first encounter someone

16    to certain questions that we would need to ask in

17    order to be able to determine illegal alien -- I'll

18    just say aliens period.

19          If there is a violation of law, taking

20    that person safely into custody, transporting them

21    back to a location where we would be able to process

22    them, how to process an individual and any type of

23    disposition after that, whether that is a removal or

24    return, you know, an expulsion now with Title 42,

25    transferring to ICE, whatever that -- whatever --

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1  some of those dispositions, whatever the myriad of

2  dispositions could be.

3      **Q.   Okay.  So, who exactly attends the Border**

4  **Patrol Academy?  Is it just patrol officers?**

5      A.   It's just agents that would attend the

6  Border Patrol Agent Academy.  We have, we have

7  other -- we have other individual border patrol

8  processing coordinators who also go to a similar

9  type of academy, but it is not an agent -- the

10  agents' academy.

11     **Q.   Okay.  And so, when you refer to a border**

12  **patrol agent, that would be someone who is**

13  **performing the law enforcement function out in the**

14  **field; is that accurate?**

15     A.   Correct.

16     **Q.   All right.  What other types of officers**

17  **or positions are there within the border patrol?**

18     A.   Are you talking about a law enforcement

19  position?

20     **Q.   Not necessarily.**

21     A.   So, I mean, you know, we have everything

22  from, from mission support staff, you know,

23  individuals who, you know, you know, help us out in

24  regards to the administrative aspect of the job,

25  right, you know, to keep the wheels turning, gas in

Page 40

1    the vehicles, lights on and people paid.

2              You know, we additionally have, obviously,

3    the agents that you just spoke about.

4              We have seized property specialists that

5    we employee as well who, who, you know, focus on the

6    asset forfeiture aspect of the job.

7              We have border patrol processing

8    coordinators who, who assist us with, you know, the

9    processing and detention logistics of, of -- you

10   know, of the minors who we are encountering.

11             There's a myriad of different positions

12   within the border patrol.

13   **Q.    All right.  Are the persons who engage in**

14   **the processing aspect, are they border patrol**

15   **agents?**

16        A.   Yes, border patrol agents are going to be

17   one of the individuals.  We also have, like I said,

18   border patrol processing coordinators as well as we

19   just recently let a contract for individuals who are

20   assisting us with processing functions but they are

21   not fully processing people.

22        **Q.    Okay.  Do the persons who engage in**

23   **processing, do they receive any type of training?**

24        A.   Yes, yes, but I, I -- you know, there's --

25   I think that it is important to delineate as we

Page 41

```
 1   speak about what I would consider as, you know, the
 2   different people who can process, there are really,
 3   you know, some fundamental aspects that only the
 4   agents are going to be doing, right, and that's
 5   determining lineage, determining which pathway an
 6   individual's going to be processed in, taking an
 7   oral declaration as well as a sworn declaration, and
 8   serving paperwork, you know, serving processing
 9   paperwork.  An agent will retain those duties to
10   just an agent.
11           So, do they receive training?  Yes, they
12   receive training in those aspects.
13       Q.   Okay.  And is that training limited to the
14   Border Patrol Academy or do they receive ongoing
15   training?
16       A.   Ongoing.
17       Q.   Okay.  How often is that training?
18       A.   It just -- you know, it really depends.  I
19   mean, as there are new evolutions made to the,
20   the -- I'll say the, the process.  Right?  Whether
21   that's legal or law changes, whether that's policies
22   and procedures, whether that's evolution within the
23   processing main frame in and of itself that we
24   process people in, there will be, you know,
25   reiterative training, you know, that, that gets
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 42

 1   rolled out for those.

 2       Q.   Okay.  Let's talk about all of the changes

 3   at the Southwest Border.  You briefly described how

 4   policy changes were -- how you were informed of

 5   policy changes when you were a border patrol agent.

 6   Is that same process being followed today at the

 7   Southwest Border?

 8       A.   Yes.

 9       Q.   Okay.  And do the agents receive any

10   training or instructions as to MPP or Parole + ATD?

11   Do you provide any training to border patrol agents

12   regarding MPP, the Minor Protection Protocol?

13       A.   Yup.  No, I'm familiar with MPP.  Yeah, we

14   have -- yes, we have field guidance that was sent to

15   the field in regards to MPP.

16       Q.   Okay.  And how...  And how was that

17   guidance communicated to actual agents on the

18   ground?

19       A.   So, in essence, what happens is we have a

20   branch that, that sits within RIAD (phonetic), which

21   is what I oversee, that will create the field

22   guidance based on, you know, for instance, MPP.  So,

23   it will be field guidance with, in essence, like a

24   Power Point associated with it in regards to how to

25   process somebody, and that information is sent to

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 43

1   individuals in the sectors who have that same degree

2   of role and responsibility.  Their focus is that

3   processing, you know, and aspect.  That's what they

4   focus in.  So, that information is sent to the

5   sectors, the chief, the deputy, and those

6   individuals, you know, who will then, you know,

7   cascade that information out and to the, to the

8   agents.

9        Q.   Okay.  Is that Power Point presentation

10  accompanied by some type of verbal instruction?

11       A.   Right.  So, they'll, they'll, you know,

12  speak to that when they're briefing their, their

13  agents in regards to the -- whatever the change may

14  be.

15       Q.   Okay.  Was there any type of training or

16  instruction provided in relation to Parole + ATD?

17            MR. DARROW:  Objection.  Parole + ATD is

18       not binding, it's an administrative record.

19            You can answer if you know.

20       A.   So, we have the memo.  We have the

21  November 2nd memo which came out, which is, which is

22  guidance.

23    BY MS. PATEL:

24       Q.   Okay.  Was that -- was training to the

25  border patrol agents provided on that memo?

Page 44

1              MR. DARROW:  Objection.  Same objection.

2         A.   So, we have -- you know, we have the memo

3    that, that is -- clearly delineates the time frames

4    or the circumstances, if you will, when Parole ATD

5    may be applied.  So, I mean, the memo speaks for

6    itself to be honest.

7       BY MS. PATEL:

8         **Q.   Okay.  So, am I understanding that no**

9    **additional instruction was provided other than that**

10   **memo?**

11             MR. DARROW:  Objection.  Parole ATD is

12        defined as administrative record.

13        A.   So, you know, we've, obviously, had

14   conversations with the chiefs and the deputies in

15   the field as I meet with them on a regular

16   reoccurring basis in regards to the, the application

17   of Parole ATD.

18      BY MS. PATEL:

19        **Q.   Okay.  Is this a circumstances where**

20   **something such as a Power Point would not have been**

21   **created?**

22        A.   I don't know if we created a Power Point.

23   I do not believe so, but I'm not for certain.

24        **Q.   Okay.  Excuse me.  I'm going to drop**

25   **another exhibit.  This is Exhibit Number 5.**

Page 45

```
 1              (Plaintiff's Exhibit 5 was received

 2         electronically, marked for identification and

 3         is attached hereto.)

 4     BY MS. PATEL:

 5         Q.   This is a document pulled from the CPB

 6    (sic) website entitled U.S. Custom and Border

 7    Protection Encounters from Fiscal Year 2022.

 8         A.   Uh-huh.

 9         Q.   So, are you familiar with these statistics

10    that are on CPB's website?

11         A.   If it's from the website -- there's no way

12    I'd be able to memorize all those statistics, so

13    I'll just say it looks like it's a -- it appears to

14    be a document from our website.

15         Q.   All right, fair enough.  So, I want to ask

16    you about the chart.  It has different categories

17    there; Single Adults, FMUA, UC/Single Minors, and

18    Accompanied Minors.  Do you see that?

19         A.   Yeah.  So I, so I -- I do.  I have, I have

20    Single Adults, Families, UC/Single Minors, yeah.

21         Q.   Okay.  So, instead of FMUA as opposed to

22    FMU, is there a difference between those two

23    acronyms?

24         A.   So, so, FMUA and FMU is the same.  So,

25    it's a family unit.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1        Q.    All right.  And the chart is further

2    segmented into OFO and U.S. Border Patrol.  Do you

3    see that?

4        A.    Yes.  Yeah.

5        Q.    Under the U.S. Border Patrol portion of

6    the graph Accompanied Minors is absent.  Do you know

7    why that would be absent?

8        A.    Because due to -- so, do we, do we track

9    what I would consider is family groups that we

10   encounter?  Yes.  But the reality is that we don't

11   have Accompanied Minors because of the application

12   of TVPRA.

13          So, if we encounter somebody between the

14   ports of entry who is, who is, you know, accompanied

15   by, as an example, an aunt, uncle, cousin, whatever

16   that may be, that, that individual, per the rules of

17   TVPRA, for us is an unaccompanied child.  So, that

18   individual -- that child will be separated from that

19   individual because it is not considered a family

20   unit per the definition of TVPRA.

21       Q.    And you just said TVPRA, what is that?

22       A.    So, and I'm going -- it's, basically, the

23   anti-trafficking statute to prevent the trafficking

24   of children, which outlines certain circumstances of

25   what is an unaccompanied child and what is not --

Page 47

1  who is an unaccompanied child and who is not.

**2      Q.    Okay.  What constitutes a family unit?**

3      A.    So, a family unit is a child who -- or,

4  you know, a child who is, you know, with their,

5  their parent or legal guardian when they are

6  encountered by us.

**7      Q.    Would you say that everyone who crosses**

**8  the border fits into one of these categories, either**

**9  single adult, family unit or unaccompanied minor/**

**10  single minor?**

11     A.    Yes.

**12     Q.    Okay.  So --**

13     A.    And I'll -- yeah, I mean, by and large.

14  They're not all illegal migrants.  We do have United

15  States citizens and others as well, but,

16  nevertheless, yes, those categories.

**17     Q.    Okay.  I just want to walk through some**

**18  hypotheticals with you.  So, let's just say that**

**19  border patrol encounters a single adult that's 100**

**20  feet past the Southwest Border on U.S. soil.  Can**

**21  you walk me through the steps that the border patrol**

**22  agent would take at that point?**

23     A.    Yes, sure.  So, the agent will encounter

24  that individual, determine if that -- determine,

25  basically, who the individual is, you know, ensure

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 48

1   that that person is not posing any threat or harm to

2   the agent.  You know, at that point in time, when

3   the agent is considered that -- whatever, considers

4   the scene is safe, if you will, or that encounter is

5   safe at that moment, then the agent will, you know,

6   attempt to identify who that individual is as well

7   as their -- you know, determining if they are

8   legally, if they are legally present in the United

9   States, you know, or if there's any other applicable

10  rule or law that may apply to them.

11         So, so, you know, if, if a violation of

12  law is found, that person is determined illegally

13  present or there's a different violation of law that

14  may be present, then the agent would take that

15  person into custody and then process them

16  appropriately, you know, with -- through whatever

17  disposition is appropriate to that individual.

18      **Q.   All right.  So, I just want to break that**

19  **down a little bit.  How would the border patrol**

20  **agent confirm the identity of the person?**

21      A.   You know, through just the encounter,

22  speaking to the individual.  Does he have any form

23  of identification on them?  You know, it just --

24  just determining -- you know, attempting to

25  determine who they are.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 49

1      Q.    Do they typically have a form of
2  identification?
3      A.    It just depends.  I mean, I've -- on
4  numerous occasions I've personally encountered
5  people who have not and on numerous occasions I've
6  encountered people who have.  It just depends.
7      Q.    Okay.  How do they determine the alienage?
8      A.    So, you know, you know, again, going back
9  to determine -- you know, asking somebody, you know,
10  where they're born, looking for any type of
11  documentation they may have.  Some people do cross
12  with passports, they do -- sometimes they do cross
13  with birth certificates, and then other times they
14  don't.  And then ultimately, you know, the interview
15  that we're having with that person, you know, is
16  what we will take into consideration.
17      Q.    Is that interview considered to be an
18  inspection?
19      A.    So, so, that -- ultimately it is.  Right?
20  We are interviewing an individual at that point in
21  time and inspecting them.
22      Q.    Okay.  If the border patrol agent
23  determines that they may be violating law, meaning
24  that they are here illegally, what happens at that
25  point?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1              MR. DARROW:  Objection to the form.

2              You can answer.

3         A.   So, if we determine that the individual

4    has entered illegally, then, then most -- well, I'll

5    say most often we will, we will take that person and

6    arrest them, but, again, you know, I think that

7    it's -- I think it's critical to say up front every

8    circumstance is independent upon that circumstance

9    of that encounter.  Right?  So it's -- every

10   encounter is very unique.  We have to evaluate each

11   of those circumstances per that individual.

12     BY MS. PATEL:

13        **Q.   Okay.  What do you mean by that?**

14        A.   So, you know, it just -- it depends,

15   right, the circumstances surrounding the encounter.

16   You know, as an example, if I have somebody who just

17   purely, you know, crossed the border illegally, you

18   know, who, who might have identification on them,

19   you know, you know, identifying them as born in a

20   foreign country -- we'll just use Guatemala as an

21   example -- you know, and does not have any legal

22   documentation to be legally present in the United

23   States, we'll apprehend them.

24              If we have another individual who's

25   entered illegally but they have created some degree

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 51

1   of crime in the process, granted, we may apprehend

2   them, but we may be turning them over to a partner

3   organization or agency for their prosecutorial

4   process.  Right?  It just depends upon the

5   circumstances.

6           Or we can have somebody who has entered

7   between the ports of entry as a United States

8   citizen and not necessarily entering the United

9   States illegally in the fashion where we would

10  apprehend them, but we will turn them over to Office

11  of Field Operations.

12          So, those are just three examples of

13  situations I confronted myself in my own duties and

14  roles and responsibilities.  And, again, kind of

15  going back to we have to -- each individual

16  circumstance is evaluated, you know, by the officer

17  or the agent.  To broadbrush it is extremely

18  difficult.

19      **Q.   Okay.  So, if someone has entered**

20  **illegally without committing any type of crime --**

21      A.   Well, if they entered illegally, they

22  would have committed a crime.

23      **Q.   Well, so --**

24      A.   Term of illegal means it's committing a

25  crime.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 52

1      Q.   Right.  So, if they committed -- if they
2  entered illegally and then they committed a crime --
3      A.   So, we have two crimes?  I'm just trying
4  to determine --
5      Q.   I'm sorry.  Maybe I'm not being clear.
6      A.   No.
7      Q.   So, they entered illegally and in doing so
8  they've committed a crime?
9      A.   Yes.
10     Q.   Okay.  At that point, is that person
11 arrested and taken to a separate location for
12 processing?
13     A.   So, yes, depending upon the circumstance.
14 It depends on what their nationality is.  So, you
15 know, we, we have the, the public health authority
16 of Title 42, which we would detain somebody, process
17 them, right, which is really just recording the
18 encounter.  You know, and, and then ultimately expel
19 them.  You know, so it's not necessarily an arrest.
20 It's an encounter.  So, it's through the expulsion.
21 Right?
22          And in other circumstances where we can
23 not apply Title 42 to somebody, then -- yes, then
24 they are placed under arrest and taken to a
25 location, you know, most often in order to process.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 53

1    In certain circumstances, you know, we, we even have

2    the ability to process directly in the field.  So,

3    taking somebody to a place is really subjective due

4    to the circumstances that, that are present with

5    that, that exact individual.

6        **Q.   Okay.  So, under the situation of Title**

7    **42, what would happen at that point if you**

8    **determined that someone would be expelled under**

9    **Title 42?**

10       A.   Right.  So, we'll take a Mexican national

11   as an example under the circumstances that I'm

12   working on the border with Mexico just to kind of --

13   to, to hone in the situation.

14            So, if we encounter a Mexican national

15   who's crossed illegally into the United States,

16   doesn't have any documentation to be and remain in

17   the United States legally, right, but that person is

18   applicable to Title 42, which we can, we can still

19   apply Title 42 to Mexico, that person's --

20   basically, their biographical and biometric

21   information will be taken in order to be able to

22   record the encounter and to ensure what was the

23   criminality of that person that's in front of us,

24   right, or do they pose a national security or border

25   security risk.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 54

1            If they pose a national security or border

2    security risk, we are not going to Title 42 them

3    back to Mexico.  We will take them into custody and

4    then we'll, obviously, prosecute and all kinds of --

5    place him into Title 8 proceedings.

6            If that person does not present any type

7    of border security or national security risk and is

8    applicable to Title 42, then we will expel them

9    directly from the field and return them over to

10   Mexico.

11           That's the circumstances.  That's just an

12   example.

13        **Q.    Okay.  And so, when you take this**

14   **biographical and biometric information in the field,**

15   **how do the agents do that?**

16        A.   So, it -- (a), first off, it's dependent

17   upon connectivity.  But when we have connectivity,

18   certain places have what I would say is

19   sufficient -- the reality is we work in austere

20   environments, but when we can and we can work into a

21   situation or an area to where we have sufficient

22   connectivity, we actually have two different devices

23   which, which we can search somebody's biometric or

24   biographic information.

25        **Q.    Okay.  So, you're searching that**

Page 55

1    information?  You're not necessarily taking

2    biographic information?

3         A.   Well, no, we take it, you have to take it,

4    and then it's ran through a series of databases in

5    order to be able to determine if that person has a,

6    a border security, national security, criminal

7    history or immigration history nexus or history, if

8    you will.

9         Q.   And what type of biometric information do

10   you take?

11        A.   So, it's, you know, facial, right, so a

12   picture, basically.  So, facial as well as, as their

13   fingerprints.

14        Q.   Okay.  So, now let's say that the person

15   is not amenable to Title 42 and goes through Title

16   8.  What happens at that point?

17        A.   So, if we cannot expel that individual --

18   you know, because not all countries will accept, you

19   know, Title 42 returns in their countries.  So, if

20   we cannot expel that individual, then we will place

21   them into a -- you know, a Title 8 proceeding.  Now,

22   with that -- or I should say that track, if you

23   will.  Processing track.

24             So, with that being the case, you know,

25   the first and foremost thing is we will try and,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 56

1    and -- we will attempt to be able to detain anyone

2    that we can for detention or removal.  All right?

3    So, we're immediately taking a look at can I remove

4    this person from, from the United States or not?

5    Can I detain them and can I remove them?

6              If we cannot detain them or remove them,

7    then, obviously, other pathways are applicable.  And

8    if we can detain them or remove them, we have to

9    take a look if this is their first entry, if this is

10   a repeated entry, so they might be a reinstatement,

11   you know, are there, are there -- are there other

12   contributing aspects with this that, you know, as

13   we, as we evaluate the case to where we would seek a

14   prosecution?  It just depends very specifically on

15   the individual.  But, in essence, we are going to

16   take a look to see, you know, what we can -- you

17   know, what the legal charges are if we're going to

18   charge somebody and then place them into detention

19   and removal proceedings.

20        **Q.   Okay.  So, at that point if you're going**

21   **to pursue the Title 8 option, what type of interview**

22   **or information do you obtain from them?**

23        A.   So, I mean, it's really all the

24   circumstances from, from, you know -- I'll put it to

25   you this way:  The interviews that we conduct in the

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 57

1   field are very, are very comprehensive.  So, it's

2   going to be everything that we can find out about

3   that individual who is in front of us as well as

4   everything along their journey.  Everything from how

5   did you make the arrangements to come to this

6   country to what were your steps along the way, who

7   did you contact, what organization did you meet

8   along the way in order to be able to get here?  All

9   to be able to try and gain what I would consider is

10  knowledge or intelligence to illuminate the criminal

11  network that's even bringing people here in the

12  first place.

13          So, not only the information about the

14  individual, but the circumstances that, that, I'll

15  say, facilitated them arriving at our border.  So,

16  all of that stuff is going to be taken into account

17  during the interview.

18      **Q.   Okay.  Does that interview -- you said it**

19  **occurs in the field, correct?**

20      A.   So, it, it -- by and large, no.  That

21  interview, because it's, obviously, a longer time

22  period that we're with somebody, it typically

23  happens, you know, at a station or a processing

24  center.

25      **Q.   Okay.  So, I just want to make sure I have**

Page 58

1   this clear.  So, if the person is not amenable to

2   Title 42, you start the process under Title 8, the

3   person then goes, probably, to some other location

4   that's not in the field --

5        A.   Yes.

6        Q.   -- where they are subjected to this

7   interview or engaged in this interview and where

8   biographic information and just history is taken.

9   Is that accurate?

10       A.   Correct, biometric and biographic --

11  again, because in some locations in the field we may

12  not have biometric information that we're able to

13  capture there.  Right?  It's going to be dependent

14  upon technology and connectivity.  But back at the

15  station location biometric and biographic and what I

16  would consider history is -- you know, is taken from

17  that person in the interview.

18       Q.   Okay.  Is the person conducting the

19  interview the same person who encountered the

20  individual?

21       A.   That depends.  It just -- you know,

22  it's -- you know, in certain circumstances where we

23  have lesser traffic in a sector, it very well may be

24  the individual who encounters somebody in the field

25  who is, who is, you know, continuing that interview

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 59

1    in the station or the processing center.

2              In other locations where it's extremely

3    busy, then in, in some circumstances it's not.  You

4    know, somebody might apprehend them in the field,

5    they're bringing very large groups into the stations

6    and the processing centers and there's, and there's

7    multiple people who are helping to interview that

8    group.

9              Now, if it's the same agent, you know, the

10   agent will just, you know, continue upon that course

11   of action.  If it's a different agent, the agent

12   when they, when they have that person in front of

13   them, will go back through all of what I would

14   consider is that biographical information of the

15   individual.

16        Q.   Okay.  Is that biographical information

17   then put into an electronic system or database?

18        A.   Correct.

19        Q.   Okay.  And I presume the file would be

20   under that person's name?

21        A.   No.

22        Q.   Okay.

23        A.   So, the reason why it's not -- now, to

24   explain the system.  So, we identify people

25   numerically.  So, there is, there is an event,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 60

1    right, which means this whole group of people that

2    we've encountered are under one specific event

3    number, and then each individual person within that

4    event will have an individual FINS.  And a FINS

5    number, right, which is an identification number,

6    Federal identification number, right, FINS, that is

7    individual to the very specific person.

8         Because the reality is is that people lie

9    to us every day.  They may tell us different names

10   every time they encounter us.  But the information

11   of somebody's biometric and biographic information

12   is always kept consistent within, within them under

13   the FINS, which are identified by their fingerprints

14   as well as the information associated with, with

15   the -- their face.

16        I hope that makes sense.  I know it's a

17   complex system, but it's the way we're able to track

18   somebody numerically independent of the biographical

19   information that they're verbally telling us, which

20   is not always accurate.

21        **Q.   Okay.  So, let's say that same person has**

22   **made multiple attempts to enter the country**

23   **illegally and has been -- has had multiple**

24   **encounters.  Would each encounter be noted**

25   **underneath that person's FINS?**

Page 61

```
 1      A.   Exactly.
 2      Q.   Okay.  And when the person is taken into
 3  custody or arrest, is there a warrant that's
 4  obtained first?
 5      A.   No.  No, I mean, we -- I mean, don't get
 6  me wrong.  I mean, we execute warrants for sure, you
 7  know, but, but, you know, I mean, we don't have
 8  warrants when we're encountering somebody between
 9  the ports of entry.  You know, we -- obviously, we
10  don't do that, so...
11      Q.   Okay.  Is a warrant obtained at some later
12  point or date?
13      A.   It just depends.  I mean, we, we have --
14  you know, we have the ability to process somebody
15  for a Warrant of Arrest/Notice to Appear where we've
16  kept them in detention.  But, you know, it's
17  dependent upon the circumstances that are in front
18  of us.  Sometimes there's no warrant that is, that
19  is generated for an individual who, who we are --
20  have arrested in processing.
21      Q.   So, under what circumstances would a
22  warrant be generated?
23      A.   As an example, if somebody has a -- you
24  know, a criminal history and we are, you know, going
25  to be processing somebody for -- you know, for
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 62

```
 1   detention or prosecution is a perfect example, you
 2   know, we'll do a Warrant of Arrest/Notice to Appear
 3   or we'll have a warrant completed.
 4        Q.   So, when you say "criminal history," are
 5   you referring to any type of criminal history?
 6        A.   It just depends.  So, it depends on
 7   severity of the crime, what the crime is.  You know,
 8   are they a CIMT, crime of immoral turpitude.  You
 9   know, it just depends on what the criminal history
10   is.  But, ultimately, you know, you know,
11   somebody -- as an example, somebody may have a
12   criminal history for burglary who we're absolutely
13   going to, you know, try to prosecute and detain and
14   remove from the country.  Somebody has a criminal
15   history of speeding on their record, we may not be
16   doing that.
17             It just depends.  It's dependents upon the
18   circumstances in front of us.  And it's dependent
19   upon other circumstances as well.  You know, for
20   instance, the ability for DOJ to prosecute, for us
21   to be able to detain.  There are several
22   circumstances that surround what the ability is.
23        Q.   Okay.  Does it matter whether the person
24   committed a crime in another country as opposed to
25   in the United States?
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 63

 1       A.   It's dependent upon -- well, (a), no.  So,

 2  it's dependent upon the, the -- our ability to be

 3  able to prove that criminal history, right, or to be

 4  able to gain the information.  Not every country

 5  submits their information into a database which

 6  we're able to see, right, international.  It's

 7  dependent upon our ability to be able to see the

 8  information when a crime is committed in an

 9  international -- on an international basis.

**10       Q.   Okay.  And so, at the point that we just**

**11  left off a few minutes ago regarding the obtaining**

**12  of biographical and biometric information from the**

**13  individual, at that point is a decision made as to**

**14  processing pathway?**

15       A.   Yes, most often, you know, you know,

16  because we have to determine what pathway we're

17  going to process somebody into, correct.

**18       Q.   So, before we get into the processing**

**19  pathway, I just want to back up and give you a**

**20  hypothetical.  Instead of it being an individual**

**21  that was caught -- like, let's just say we have a**

**22  family unit that crosses the border, they're a**

**23  hundred feet onto U.S. soil and they're an applicant**

**24  for admission.  Can you describe the pathway in that**

**25  circumstance?**

Page 64

1          A.    Same process by and large.  You know, it

2     depends if they have one adult, two adults in the

3     family unit.  Just it depends.  Is it a family group

4     or is this a family unit?  You know, this is the

5     complexities of an operational requirement.

6               So, if it's a family unit -- and I'll use

7     your word verbatim.  If it's a family unit, you

8     know, then we'll have to evaluate is there one adult

9     or two adults and it's the same process.  Right?

10    We're still determining, you know, border security,

11    national security nexus to those individuals.  We

12    are still, you know, evaluating that that child is

13    actually their child and not, not some other type of

14    circumstance, which is extremely, unfortunately,

15    presented sometimes.

16              So, so -- but by and large that same

17    circumstance, you know, the same, I'll say, process

18    is there.  Right?  We're going to determine if we

19    can Title 42 them.  If we can't Title 42 them, then,

20    you know, because they won't accept them, we'll

21    place them into a Title 8, you know, type of

22    pathway.  They're transported back to the station or

23    to a processing center.  It's the same, it's the

24    same process by and large.

25          Q.    Okay.  You say "by and large."  So, is

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 65

1    there anything specific that you can identify that

2    is different?

3         A.    Yeah, so, so, you know, we -- you know, as

4    we -- as we take a look at, you know, the

5    individuals who we have in front of us, you know,

6    there are circumstances where, you know, we may have

7    to separate that, that parent from the child

8    ultimately, but those are, those are extremely rare

9    circumstances and based upon, you know -- again, you

10   know, a much more complex situation that we end up

11   having in front of us.

12        Q.    When you say "separate," what are you

13   referring to?

14        A.    I'll give you an example of a situation

15   just yesterday.  So, you know, we have a mother who

16   crosses with her child.  The mother has significant

17   criminal history where we are going to prosecute the

18   mother for the illegal entry.  So, they are excepted

19   from the Title 42 pathway and they are placed into a

20   Title 8 proceeding.

21        Q.    Okay.  How do you verify whether a child

22   is, in fact, the child of the parent or legal

23   guardian?

24        A.    So, there are a couple different -- I

25   mean, obviously, interview is, is -- you know, is

Page 66

```
 1   you know, critical, both interviewing the child as
 2   well as the parent, but we also have what we
 3   consider is rapid DNA processing, which is,
 4   essentially, able to determine, you know, a parental
 5   connection with the child.
 6       Q.   Okay.  So, how do you determine under
 7   Parole + ATD if the person is really a parent?
 8            MR. DARROW:  Objection, Parole + ATD is
 9       confined to administrative record.
10            You can answer the question.
11       A.   Could you reask your question?  My
12   apologies.
13    BY MS. PATEL:
14       Q.   Sure, of course.  So, how do you determine
15   under Parole + ATD whether the adult is actually the
16   parent?
17       A.   It's completely two separate -- a parental
18   hereditary, you know, or connection to an adult in
19   Parole ATDs is -- that's a, that's a processing
20   pathway versus if somebody is related to another
21   individual.  But I'll answer your question directly.
22            If we determine that, you know, a family
23   unit is a family unit, then they may be applicable
24   to various Title 8 pathways.  If we determine that a
25   child, through interviewer or rapid DNA, is not
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 67

1  determined to be part of that family unit and it

2  would be either a family group or completely an

3  unaccompanied child and a single adult, which we

4  also encounter, then the child is, is processed for

5  Title 8 and turned over to the custody of HHS, to

6  Health and Human Services, DHHS, right, federal, and

7  we transfer them to OOR and then, of course, the

8  adult is processed in some degree of Title 8

9  pathway.

10      Q.   Okay.  So, do you do the DNA testing prior

11  to making a decision as to whether someone --

12      A.   Yes.

13      Q.   -- is eligible for Parole + ATD?

14      A.   We will do the -- we will do the

15  determination of -- you know, if it's in question,

16  we will determine parental relationship before a

17  Title 8 pathway is determined for those individuals.

18      Q.   So, when would, when would it not be a

19  question whether or not they are family?

20      A.   Well, I mean, if there's nothing that

21  indicates to us that it could be a fraudulent

22  family, then we're going to continue to process them

23  as a family unit.

24      Q.   Okay.  Is everyone given a DNA test?

25      A.   No.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1       Q.   Okay.   Under what circumstances would a

2   family be given a DNA test?

3       A.   So, if there, if there is any -- if there

4   is, you know, anything within the case presented in

5   front of us that -- you know, that, that the agent

6   who is there or it may -- you know, quite possibly

7   an HSI agent, which is, which is a component of ICE,

8   Homeland Security Investigations, if they feel that

9   there is any degree of family fraud, then we will,

10   you know, conduct interviews and then -- and, if

11   necessary, get a rapid DNA test completed.

12       Q.   So, how would someone determine whether or

13   not there is fraud?  Is this just based on

14   questioning of the alleged parent and then the

15   alleged child?

16       A.   Yeah, so -- yeah, questioning, you know,

17   you know, whatever -- you know, whatever information

18   they may have on them at the time.  You know, it

19   just, just depends.

20       Q.   When you say information that they might

21   have on them, are you referring to documents?

22       A.   Yeah, I mean, documentation.  You know,

23   our lingo, you know, we call it pocket trash, but

24   whatever somebody might happen to have in their

25   pockets, you know, just whatever information happens

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 69

1    to be on their person or in their belongings.

2        **Q.   Okay.  So, if a parent says, this is my**

3    **child, and the child says, this is my mother, is**

4    **that enough for the person to be -- or the family to**

5    **be confirmed, in fact, a family?**

6            MR. DARROW:  Objection, calls for

7        speculation.

8            You can answer.

9        A.   I mean, you know, I hate to continue to

10   give you the "it depends."  So, you know, there's a

11   lot of conversation that is happening with this

12   family group, you know, you know, or this family

13   unit.  So, you know, both talking to the parent and

14   the child.  Sometimes we have children that are too

15   young to even speak, you know, so a lot of it we

16   have to -- we take, obviously, on face value of the

17   individual and the circumstances we have in front of

18   us.  If there's nothing to -- you know, to raise the

19   suspicious level of the agent or officer that

20   happens to be there processing them, you know, then

21   they will get processed as a family unit.

22   BY MS. PATEL:

23       **Q.   Okay.  Is biographical information taken**

24   **as to each member of that family unit?**

25       A.   Yes.

Page 70

1      Q.    Okay.  Is biometric information taken as

2  to each member of that family unit?

3      A.    It depends on the age of the child.

4      Q.    Okay.  So, is there a certain age upon

5  which biometrics would not be taken?

6      A.    Traditionally speaking it's 13 years of

7  age or older.

8      Q.    Okay.

9      A.    But between the ages of 6 and 13 we may

10  still take the biometric information of the child if

11  we believe that there is a family fraud type

12  situation that is occurring.

13      Q.    Okay.  Do you attempt to verify the age of

14  the child?

15      A.    Yes.

16      Q.    And how do you do that?

17      A.    Whether they have a birth certificate or

18  not on them, you know, that the parent -- you know,

19  whoever happens to be there, you know, whether

20  there's a birth certificate there, speaking to the

21  child, speaking to the, the -- you know, whoever

22  the -- you know, the parent is at that point.

23      Q.    Do you use any type of software or

24  technology to identify the age of the child?

25            MR. DARROW:  Objection as to form.

Page 71

1          You can answer.

2     A.   You know, in some circumstances, you know,

3  you know, we may contact a consulate if we're having

4  questions in regards to, you know, potential family

5  fraud or anything along those lines.  So, in some

6  circumstances, we'll contact the consulate of that

7  country and see if they can verify for us, but,

8  again, those are those situations where we believe

9  there may be some type of fraud occurring.

10    BY MS. PATEL:

11    **Q.   Do you also assign a FINS number to this**

12    **family?**

13    A.   So, the FINS is assigned to the person.

14  There is a family group number, essentially, like a

15  family unit number, if you will, that is assigned if

16  they're a family unit and that is what is allowing

17  us to be able to attach it -- you know, the

18  individuals within that family unit.

19          So, to kind of, to kind of break it down

20  for you.  It's still the event number, right, which

21  is the large group of people, and then if there's a

22  family unit, they will have a family unit number and

23  each individual person within that family unit will

24  have an individual FINS number.

25          Sorry.  I know that's many layers.

Page 72

1    Q.   Okay.  So, each member in that family unit
2    will have a FINS number.  Is that regardless of the
3    age of any children?
4    A.   Right.  So, so, you know, as we're
5    entering them into the system, they're issued a FINS
6    number.
7    Q.   Okay.
8    A.   And this is all automated.  It's not like
9    it's a human being that's doing these, by the way.
10   Q.   You mean the creation of the FINS number?
11   A.   All the numbers; the event, group, FINS.
12   Q.   Okay.  And is the number of encounters
13   also tracked for family units?
14   A.   So, yes, we can do a search for how many
15   family units that we encounter, but every individual
16   is tracked as an encounter.
17   Q.   Okay.
18   A.   That's the reason why -- when you saw on
19   that graphic a minute ago, you said what is FMUA or
20   FMU?  That's, that's how many family -- those are
21   individuals who are attached to a, to a -- as a
22   family.
23   Q.   How long does it take to go through the
24   processing that you just described for an
25   individual?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 73

1      A.   Which aspect?  Like, what pathway are you

2  talking about?

3      **Q.   Well, not necessarily -- well, so, let's**

4  **say they're not -- well, let's start with Title 42.**

5  **How long does it take to identify whether someone is**

6  **amenable to Title 42?**

7      A.   I mean, to determine if somebody is

8  amenable it would take minutes.  You know, the --

9  we're pretty clearly defined on which countries will

10  take back people via Title 42 at this point.

11      **Q.   Okay.  And that's irrespective of whether**

12  **it's a family or an individual that's encountered?**

13      A.   By and large.  I mean -- I think your

14  question was to determine if somebody is amenable to

15  Title 42.  I mean, Title 42, we know the countries.

16  So, they'll be amenable.  Whether they're accepted

17  is a whole different conversation.

18      **Q.   Okay.  What about to find out whether or**

19  **not they would be accepted?**

20      A.   So, I mean, there's going to be the

21  circumstances that, that are in front of us.  Right?

22  So, you know, I mean, it may be they may not be

23  amenable to Title 42 at that moment because they

24  have a clear -- a claim of fear at the CAT

25  withholding standard, you know, which, you know, we

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 74

1  have to move into the CIS process for CIS to

2  determine what that is, if it's a valid claim or

3  not.

4          So, there are many circumstances around

5  that to determine if somebody is not going to be

6  placed into, into Title 42 and is going to either

7  (a) going into what I would consider like a delayed

8  Title 42, you know, status, if you will, like,

9  basically, hey, there's other things we have to do

10  in order to be able to determine if they're

11  applicable to -- for the actual expulsion or we're

12  placing them into Title 8.

13          So, certain circumstances are very easy.

14  Other circumstances, like I just talked to you about

15  the family, that is going to be hours upon hours

16  upon hours upon hours.  So, you know, sometimes days

17  even just depending upon how rapid we can get the

18  results of the DNA testing.  Sometimes DNA testing

19  takes up to 48 hours.  And, you know, we, obviously,

20  don't want to, you know, improperly release a child

21  to somebody we don't believe is their parent.

22          So, it just takes -- it just depends, and

23  the reason why I say that is that, you know, the

24  time in custody is something that we watch very

25  closely.

Page 75

1        Q.   Okay.  Right.  So, in those instances

2   where it does not take minutes, are those persons

3   brought into a CPB detention facility?

4        A.   So, so, if somebody's going to be -- if

5   somebody cannot be processed for Title 42 in the

6   field and must be brought into a station or a

7   processing center or somebody's going to be placed

8   into a Title 8 pathway, then they're brought in,

9   they're brought into those, those various locations

10  and then, obviously, you know, that's a much longer

11  time period as we are transporting somebody from the

12  field to one of those stations or processing center

13  locations and, of course, the interview and

14  processing and so on and so forth.

15       Q.   Okay.  And at that point, once they're

16  transferred into that station, is it a matter of

17  days versus hours before that person is --

18       A.   It just depends on the circumstances

19  present.  There's a lot of, there's a lot of factors

20  that impact time in custody.

21       Q.   Okay.  So, let's say it's not Title 42 and

22  it's Title 8.  In that instance, what would be the

23  processing time for an individual?

24       A.   For what pathway?  I think it's depending

25  upon the pathway that you tell me.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 76

1      Q.   Okay.  So, you're talking the ultimate

2   processing disposition?

3      A.   Right.  So, so, you know, interviewing --

4   it's just going to -- it's going to vary greatly.

5   Right?  You may have somebody who has a -- you know,

6   is very forthcoming, is not trying to lie to us, you

7   know, who, who we can process relatively quickly

8   just depending on what, what type of pathway we're

9   processing them into, and there's other individuals

10   who, who, you know, you know, for lack of better

11   terms, are pure criminals, you know, and we're

12   prosecuting them and that will be a much longer time

13   frame.  You now, so it's going to vary based upon

14   the circumstance of that individual.

15           You know, our current time in custody

16   right now before I walked in here, you know, on

17   average across the entire country is sitting at

18   right around 60 hours.  Right?  That's the entire

19   country, you know, and that's just approximately.

20   It's not the exact time frame, but approximately

21   that.  You know, the -- but there are certainly

22   individuals who are processed faster than that and

23   there are most certainly individuals who are

24   processed in a longer time period than that.

25      Q.   Okay.  But those 60 hours, would that be

Page 77

1   referring to just conducting the interview or

2   conducting the interview through the processing

3   disposition?

4        A.   Right, exactly correct.  So, that would be

5   encompassed between the period of time which we took

6   them in custody to the period of time in which they

7   are either released, returned, removed, expelled,

8   transferred to ICE.

9        Q.   Okay.  I'm just going to get into the

10   processing pathways, but we have been going for a

11   while, so I just wanted to check to see if you

12   need --

13        A.   A break would be great.

14        Q.   All right.

15             MS. PATEL:  What do you want, like ten

16        minutes?

17             MR. DARROW:  Yeah.

18             THE WITNESS:  Yeah.

19             MS. PATEL:  All right, sounds good.

20             MS. POON:  Before you go, we're having a

21        hard time with the documents your paralegal

22        sent last night.  We can't open them.  We've

23        had two tech people try to do it.

24             THE STENOGRAPHER:  Let me go off the

25        record first.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 78

1            MS. POON:  I thought we were off the

2       record.  I'm sorry.

3            THE STENOGRAPHER:  No, we're not, not yet.

4            THE VIDEOGRAPHER:  The time is 10:06 and

5       we are off the record.

6            (Brief recess 10:06 a.m. until 10:17 a.m.)

7            THE VIDEOGRAPHER:  The time is 10:17 and

8       we are back on the record.

9       BY MS. PATEL:

10           Q.   All right.  Chief Barker, it has come to

11      my attention that I was previously saying CPB

12      instead of CBP.  Do you understand that I was

13      referring to Customs and Border Protection?

14           A.   Yes.

15           Q.   All right.  So, you mentioned earlier, you

16      made a distinction between family units and family

17      groups.  Can you, please, explain what the

18      difference is between the two?

19           A.   Sure.  So -- and one clarifying point, you

20      know, in regards to my, my aspect as well.  So, I

21      think you had previously asked if I was familiar

22      within 1324, 25, 26, those types.  Yes, I'm very

23      familiar with that, those legal aspects.  You know,

24      if I was questioning that at all, I'm familiar with

25      that.  So, just for clarity, and that was some of

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 79

1   the previous questions that you asked, but --

2           So, to go into the family group versus

3   family unit.  So, family unit is clearly defined by

4   the TVPRA, which is a parent or legal guardian of

5   the child.  That's it.  Family group can be anything

6   other than that, in essence, that is showing up at

7   our borders.  Quite often we end up seeing where

8   this is something along the lines of a child with an

9   uncle, aunt, cousin, some type of relative, right,

10  some other type of relative that's not the parent or

11  legal guardian.  That would be the definition of a

12  family group.

13      **Q.    Okay.  Thank you for that.**

14           **And I don't know that I asked you this**

15  **before, but how do you determine whether someone is,**

16  **in fact, a legal guardian of a child?**

17      A.    So, you know, often what we'll see in

18  those circumstances is there will be something from

19  the state or the country or, or, to be honest with

20  you, sometimes counsel, you know, those type of --

21  those type of individuals, you know, from the

22  different countries, they'll have some type of

23  documentation on them, you know, so and so is the

24  legal guardian of -- you know, of a certain child,

25  and, of course, you know, it's the interview, you

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1  know, as well.  So, you know, talking, talking to

2  whoever the individual is and the child.

3      **Q.   Okay.  Is there any attempt that's made to**

4  **verify whether or not the documents are, in fact,**

5  **you know, legitimate?**

6      A.   If there's any indication or concern

7  that -- and just for note, I mean, it is more on the

8  rare side that we see this, although we have seen

9  this.  In those type of circumstances we do feel

10  there's some degree of fraud there, you know, at

11  all, if there's any concern, we'll typically reach

12  out to that country's consulate and have them start

13  engaging as well.  Most often in circumstances where

14  there's either family fraud or, you know, I would

15  consider, you know, as a family unit like we were

16  just talking about, you know, where there's question

17  there, the consulates gets very heavily engaged with

18  us as well.  Most often they'll even show up to the

19  building and interview the child and the -- and

20  whoever that parent is as well.

21      **Q.   Are family groups processed in a different**

22  **manner than family units?**

23      A.   So, family group is a -- I'm trying to

24  stay away from calling it a term of art, but a

25  family group, in essence, is an unaccompanied child

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 81

```
 1   and a relative adult.  So, they are processed as an
 2   unaccompanied child and the other person is
 3   processed as a single adult.
 4        Q.   Okay.  Understood.
 5             So, you mentioned previously that you use
 6   facial recognition as a form of biometrics.  Do you
 7   also have any type of software that estimates the
 8   age of someone, of a child?
 9        A.   No, not that I'm aware of.
10        Q.   Okay.  And is there any -- do you actually
11   track the length of the interviews?
12        A.   No.
13        Q.   Each family and individual?
14        A.   No, if -- well, again, I go back to it
15   depends.  You know, the system, in and of itself,
16   will track when we are, you know, entering data and
17   those type of aspects.  So, at that point in time,
18   obviously, it's tracking and identifying when we're,
19   you know, quote, unquote, interviewing or engaging
20   somebody if it's on the computer base.
21             As well as if we think that we're going to
22   prosecute somebody we will -- we'll start, you know,
23   taking down a -- you know, a chronological time
24   frame order of when we are, you know, interviewing
25   and, you know, things that we have been, you know,
```

Page 82

1    finding within the interview.

2        Q.   Okay.  You also mentioned that there are

3    times when you are in the field and you don't have

4    any connectivity.  In that instance, how do you

5    create a FINS number?

6        A.   So, they're brought -- and most often, you

7    know, it's the circumstance where that's created

8    when they go back to the stations, the stations or

9    processing center.

10       Q.   So, I'm going to drop another exhibit into

11   the chat.

12            (Plaintiff's Exhibit 6 was received

13            electronically, marked for identification and

14            is attached hereto.)

15   BY MS. PATEL:

16       Q.   And I will represent to you that this is a

17   document entitled USBP Processing Pathways that was

18   disclosed by DHS in discovery, response to

19   discovery.  Have you seen this document before?

20       A.   Yes, I'm familiar with it.

21       Q.   You're familiar with it.  Do you know when

22   this document was created?

23       A.   I'm not aware.

24       Q.   Is this a representation of the current

25   processing pathways that are available to border

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 83

1    patrol agents?

2         A.   Yes.

3         Q.   Okay.  Is this, is this document accurate?

4    Does it accurately depict the processing pathways?

5         A.   The path -- I mean, the pathways, yes.  I

6    mean, obviously, with the redactions, I'd, you know,

7    have to see those, to, to see what -- I would

8    consider is the assumptions behind that, but yes.

9         Q.   I'm going to drop another exhibit into the

10   chat.

11             (Plaintiff's Exhibit 7 was received

12             electronically, marked for identification and

13             is attached hereto.)

14   BY MS. PATEL:

15        Q.   And this is information that's obtained

16   from the Customs and Border Protection website,

17   specifically statistics.  Do you recognize this

18   document and the information contained inside of it?

19        A.   Yes, yes.

20        Q.   All right.  So, if you turn to page 3 of

21   this document and the heading USBP Monthly Southwest

22   Border Encounters by Processing Disposition.

23        A.   Yes.

24             MS. PATEL:  And I apologize.  This is

25             Exhibit 7.  The USBP Processing Pathways with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 84

1          the chart, the diagram, is Exhibit 6.

2     BY MS. PATEL:

3          Q.   So, in terms of Exhibit 7, which is the

4     Custody and Transfer Statistics from the fiscal year

5     2022, page 3 under U.S. Border Patrol Monthly

6     Southwest Border Encounters by Processing

7     Disposition, do you see the column for processing

8     disposition?

9          A.   Yes.

10          Q.   Are the entries there the same as what was

11     reflected on the processing pathways?

12          A.   Yeah, I mean, minus other -- I think

13     that's...

14          Q.   You're saying that the other category was

15     not on the processing pathways?

16          A.   Well, one's on one side, one's not on the

17     other.

18          Q.   Okay.  So, I want to talk to you a little

19     bit about the information that's contained in this

20     document.  So, are all of the pathways that are

21     currently available reflected in this chart?

22          MR. DARROW:  For clarification, which

23          document are you talking about, 6 or 7?

24     BY MS. PATEL:

25          Q.   I'm sorry.  Exhibit 7, page 3, Monthly

Page 85

1    **Southwest Border Encounters by Processing**

2    **Disposition.**

3        A.    So, now that I know which one we're

4    looking at, what was your question again?  My

5    apologies.

6        **Q.    So the question is, are all the current**

7    **processing dispositions reflected in this chart?**

8        A.    Absolutely not.

9        **Q.    Okay.  What other processing dispositions**

10   **are not reflected in this chart?**

11       A.    I mean, rare ones, right, that we utilize.

12   You know, bag and baggage, somebody who has

13   already -- you know, has a -- already has a formal

14   order of removal and it just hasn't been

15   effectuated, you know, crewman, you know, I mean,

16   somebody overstayed, you know, like there's -- not

17   overstayed, but like -- oh, my gosh.  Like when a

18   crewman, like when they jump overboard and they

19   don't get back on the boat.  Anyway, it's a rare

20   one.  These are the mainstay ones.  These the

21   principal processing dispositions that we utilize,

22   but it's, obviously, not every single possible

23   processing disposition.

24       **Q.    Okay.  Just going back to Exhibit 6, then,**

25   **that chart, that also did not include, for instance,**

Page 86

1    the example of a crewman or bag and baggage?

2        A.    Bag and baggage is on there.  It's under

3    reinstatement of prior order of removal.

4        Q.    Okay, gotcha.  But it doesn't include the

5    other one that you just mentioned about the crewman?

6        A.    Yeah, I mean, that -- the extreme vast

7    majority are within that -- you know, the

8    dispositions that you have there, the processing

9    pathways that you have there.

10       Q.    So, if we turn back to Exhibit 7 and that

11   chart that we were talking about, are all of these

12   processing dispositions available to single adults?

13       A.    Yes.

14       Q.    Are they all available to family units?

15       A.    I mean, to a degree they are available,

16   correct.  There are certain things, obviously, that,

17   that are dependent upon that, but they are

18   available.

19       Q.    Okay.  And you said that everything here

20   is available to single adults.  Parole + ATD is

21   listed here.

22       A.    Yes.

23       Q.    Can individuals be processed under

24   Parole + ATD?

25       A.    I apologize, again.  I couldn't hear you.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 87

```
 1   I couldn't understand you at all.
 2        Q.   Can individuals be processed under
 3   Parole + ATD?
 4             MR. DARROW:  Objection.  Parole + ATD is
 5        defined as the administrative record.
 6             You can answer.
 7        A.   Yes.
 8     BY MS. PATEL:
 9        Q.   So, so I understand, individuals who are
10   not a part of a family unit as they present at the
11   border or on U.S. soil, Parole + ATD is an option to
12   them?
13             MR. DARROW:  Same objection.
14             THE WITNESS:  Can I answer?
15             MR. DARROW:  Yes, you can answer.
16        A.   Yes.
17     BY MS. PATEL:
18        Q.   Okay.  Under what circumstances is it
19   available for single adults?
20             MR. DARROW:  Same objection.
21             You can answer.
22        A.   If they're a Cuban, Venezuelan or
23   Nicaraguan single adult who does not have a border
24   security or national security risk, then, then a
25   Parole ATD may be utilized with that individual.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 88

1    And I just say "may," because it's, it's not a

2    shall.

3        BY MS. PATEL:

4        **Q.    All right.  Does permission need to be**

5    **obtained on a case-by-case basis from a supervisor**

6    **or someone higher up in order to apply Parole + ATD**

7    **to a single adult?**

8                MR. DARROW:  Same objection.

9                You can answer.

10       A.    No, no.  The utilization of Parole ATD in

11   a sector, you know, obviously, you know, that

12   permission is given by a supervisor, actually, you

13   know, at the commissioner level.  But the

14   application of Parole ATD to a specific individual,

15   each and every time that is determined on a

16   case-by-case basis to the agent or officer that is

17   processing that individual.

18       BY MS. PATEL:

19       **Q.    Okay.  And since when has Parole + ATD**

20   **been authorized to apply to single adults?**

21               MR. DARROW:  Same objection.

22               You can answer.

23       A.    It's going to be within the past couple

24   months.  I can't recall exactly when we started, you

25   know, utilization of it for single adults.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 89

```
 1   BY MS. PATEL:
 2       Q.   Okay.  And is this being -- is this
 3   process available at only the two sectors referenced
 4   in the Parole + ATD memo or in additional sectors as
 5   well?
 6            MR. DARROW:  Same objection.
 7            You can answer.
 8       A.   The Parole ATD is currently being utilized
 9   in Yuma and Del Rio Sectors.
10   BY MS. PATEL:
11       Q.   Okay.  So, it's not being used in the Rio
12   Grande Valley?
13       A.   There -- it's used on an ad hoc basis in
14   the Rio Grande Valley based upon what the conditions
15   of their detention is, you know, currently.  So, as
16   their numbers are lower and the detention, you know,
17   is less, you know, then, then they're not going to
18   utilize Parole ATD.  They have the authorization to
19   use Parole ATD, but -- but, again, you know, if they
20   don't -- if they do not need to utilize Parole ATD,
21   then they're not utilizing it, and they will utilize
22   it in the Del Rio and Yuma Sectors.
23       Q.   Okay.  When was the Yuma Sector authorized
24   to use Parole + ATD?
25            MR. DARROW:  Same objection.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 90

     1              You can answer.

     2         A.   It's going to be around the December-ish

     3    time frame.  I can't remember exactly.

     4      BY MS. PATEL:

     5         Q.   **And when you say December, are you talking**

     6    **about 2021?**

     7         A.   2021, yes.

     8         Q.   **Okay.  And for Rio Grande Valley, how**

     9    **often has it been used since this policy memo came**

    10    **out?**

    11              MR. DARROW:  Same objection.

    12              You can answer.

    13         A.   I don't know what their sector by sector

    14    PATD numbers are off the top of my head.

    15      BY MS. PATEL:

    16         Q.   **Okay.  So, you're saying that currently,**

    17    **as we sit here today, it's not being used there?**

    18              MR. DARROW:  Same objection.

    19              You can answer.

    20         A.   They'll utilize it depending upon the

    21    circumstances.  They're involved in lateral

    22    decompression, you know, because Del Rio Sector is

    23    extremely high, they're taking on large -- they're

    24    accepting, if you will, large volumes of migrants to

    25    process because of Del Rio's volumes, you know, then

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

 1   they may end up utilizing it, but, but, you know,

 2   it's very specific to the circumstances at the time

 3   and the individual they have in front of them.

 4     BY MS. PATEL:

 5       Q.   Okay.  You just used the term "lateral

 6   decompression."  What do you mean by that?

 7       A.   That means, basically, that a sector, you

 8   know, has -- is significantly over their 100 percent

 9   capacity.  And I say significant.  They're over

10   their 100 percent capacity.

11       Q.   Okay.  And then what happens at that

12   point?

13       A.   So, then --

14           MR. DARROW:  Same objection.

15           You can answer.

16       A.   -- we'll utilize various conveyances, such

17   as a plane and/or to move migrants from an area that

18   has, you know, very high custody numbers to areas

19   that have lower custody numbers in order to be able

20   to, you know, just decompress ultimately.

21     BY MS. PATEL:

22       Q.   And when you say transfer them, are you

23   referring to transferring them from border patrol

24   custody to border patrol custody?

25       A.   Yes, for processing, correct.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 92

1      Q.   And in terms of Del Rio, has Parole + ATD

2   been used for substantially all the time that the

3   path -- that this memo's been in place?

4            MR. DARROW:  I'm going to object on the

5        same grounds.  And also, Anita, we have Chief

6        Ortiz designated to speak to this.  This is

7        Topic 1.  This is off the topics for

8        designation for Chief Barker here.

9            MS. PATEL:  Understood, but he did give

10       some testimony as to, you know, when Parole +

11       ATD is used, so I'm just following up on that

12       line of questioning.

13           MR. DARROW:  You can answer if you know.

14     A.   Can you reask your question?

15   BY MS. PATEL:

16     Q.   Yes.  So, in the Del Rio Sector, has

17   Parole + ATD been consistently used since the memo

18   was implemented?

19     A.   It's been utilized, you know, consistently

20   as their -- as their population and detention

21   decreased, you know, I'm aware of several occasions

22   where they have not utilized it and went strictly to

23   Title 8 pathway and not needed to utilize Parole ATD

24   pathway.

25     Q.   Who authorized the use of Parole + ATD for

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 93

1   single adults?

2           MR. DARROW:  I'm going to object again.

3       Anita, we have somebody else prepared to speak

4       to this topic.

5           MS. PATEL:  Well, if he doesn't know, then

6       he doesn't know, but, you know, I think it's

7       fair to ask the question.

8           MR. DARROW:  You can answer if you know.

9       A.   You know, any utilization of Parole ATD,

10  whether that's changed, meaning that it's moved to a

11  different sector, moved to a different demographic,

12  you know, that's approved by the chief of the border

13  patrol and the commissioner.

14    BY MS. PATEL:

15      **Q.   For what reason do they authorize use of**

16  **Parole + ATD for a single adult?**

17          MR. DARROW:  Objection again, beyond the

18      scope of this witness' testimony and also

19      Parole + ATD is confined to the administrative

20      record.

21          You can answer if you know.

22      A.   We included single adults in the, in the

23  Parole ATD pathway due to the fact that 73 percent

24  of all individuals who we were -- we were and are,

25  roughly -- I say roughly -- encountering -- we can

Page 94

1  use 70 as an average -- are single adults.  Very

2  specifically from Cuba, Venezuela or Nicaragua.

3    BY MS. PATEL:

4      **Q.   And so, I think -- so, I need you to**

5  **connect the dots for me here.  Simply because most**

6  **of the people are single adults, why does that mean**

7  **that you approve the use of Parole + ATD?**

8            MR. DARROW:  Same objection.

9            You can answer if you know.

10     A.   We utilize the application of Parole + ATD

11  for Cuban, Venezuelan and Nicaraguan single adults

12  due to the fact that there is no return mechanisms

13  to those countries.  So, if we would place a person

14  into detention, the detention would not have any

15  degree of finalization of removal.  You know, the

16  person may receive a final order of removal and then

17  we would have no mechanism to actually remove that

18  person from the country.

19    BY MS. PATEL:

20     **Q.   And what is the consequence of that?**

21            MR. DARROW:  Same objection.

22            You can answer.

23     A.   The consequence of what?  I'm not sure

24  what --

25    BY MS. PATEL:

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 95

1        Q.    Of you not being able to remove them from
2    the country.
3        A.    Well, so, if we can't remove them from the
4    country to any other country, you know, by default
5    and they're here, they continue to remain here.
6        Q.    Would they remain here in detention?
7            MR. DARROW:  Same objection.  Also,
8        objection as to vague.
9        BY MS. PATEL:
10       Q.    You say that they would remain here.  If
11   you didn't apply Parole + ATD to them, would they be
12   subject to detention?
13           MR. DARROW:  Same objection.
14           You can answer.
15       A.    So, if we didn't apply Parole + ATD to
16   them, there are various pathways that they could
17   be -- that would be able to be applied to them, not
18   all of them resulting in detention.
19       BY MS. PATEL:
20       Q.    Okay.  What pathways could be applied
21   where they would not be subject to detention?
22           MR. DARROW:  Same objection.
23       A.    NTA/OR.  So, a notice to appear, released
24   on their own recognizance.
25       BY MS. PATEL:

Page 96

1       Q.   Okay.  So, let's go back to Exhibit 7 and

2    I just want to walk through each of these pathway

3    dispositions with you.

4            The first one is Notice to Appear/Own

5    Recognizance, NTA/OR.  So, when would that be

6    applied to a single adult?

7       A.   Again, it just depends on the

8    circumstances in front of them.  You know, an

9    individual who, you know, is claiming fear, an

10   individual who, you know, may have, we'll say, you

11   know, issues to where they cannot be detained.

12   Fraihat (phonetic) being -- just as an example, just

13   one example.  You know, if we have no available

14   space in order to be able to remove single adults

15   to, you know, in ICE custody; i.e., you know, that

16   locale has no available space open to them, we would

17   end up placing a single adult into an NTA/OR.  You

18   know, those are all -- there's just a variety of

19   circumstances where, where it can be applied.

20      Q.   Let me backtrack a little bit.  Do border

21   patrol agents have discretion in deciding which one

22   of these pathways to use?

23      A.   Yes.

24      Q.   Okay.

25      A.   We have the discretion in order to be able

Page 97

```
 1   to determine which pathway, but, but, you know,

 2   again, there's -- this kind of goes back to your

 3   previous question.  Supervision is well engaged in

 4   the processing areas in monitoring, you know, who

 5   agents are processing, which pathways are assigned

 6   to individuals and so on.

 7        Q.    Are there specific criteria that an

 8   officer would apply in determining which pathway to

 9   choose?

10        A.    It's based upon the circumstances of the

11   individual in front of them.

12        Q.    What do you mean by that?

13        A.    So, so, you know, as in -- I think it's

14   Exhibit 6, you had what appeared to be kind of

15   almost like a decision tree for lack of better

16   terms.  I think it was that number, so don't quote

17   me on it, but -- well, I guess you're going to quote

18   me on it, but, you know, the -- that's, that's like

19   a decision tree, but ultimately the determination is

20   based upon the circumstances in front of the agent

21   at the time of the individual there.

22        Q.    So, there are no set criteria that's

23   applied?

24        A.    Well, I mean, of course, yes, there's set

25   criteria.  I mean, if a person has, you know,
```

Page 98

1  previously been deported, so that's going to be for

2  instance, a reinstatement of a previous removal; if

3  they have an order of removal that has not been

4  effectuated, that's going to be a bag and baggage.

5  I mean, so you kind of see -- that -- again, I go

6  back to it's kind of like a decision tree.  It's not

7  a true decision tree.  So, there are circumstances

8  that are involved in what you're applying that Title

9  8 pathway to to those individuals.

10      Q.   Okay.  Are there any other criteria?  You

11  just named two.

12      A.   Yeah, I mean, there's going to be several.

13  Right?  So, national security, border security

14  threat, what's their criminal history, what's their

15  immigration history, are they applicable to -- you

16  know, to MPP, are they applicable to detention, are

17  they claiming fear, are they not claiming fear, you

18  know, are they a single adult, are they a family

19  unit, what's the detention availability for that

20  person?  I mean, it's -- you know, does ICE have bed

21  space, do they not have bed space to detain?  I

22  mean, these are all a variety of different

23  circumstances that are all taken into those

24  decisions.

25      Q.   Okay.  Does -- you mentioned whether or

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 99

1   not they are or are not a family unit is one of the

2   criteria?

3       A.   Absolutely.

4       Q.   And how is that criteria applied?

5       A.   So, for family units, you know, if we're

6   able to expel them, if we're able to return them

7   rapidly through ER, as an example, you know, then we

8   will -- if those countries are able to or are

9   accepting, you know, individuals back, right,

10  they're allowing us to return or remove individuals,

11  then we will, right, and we'll apply that specific

12  pathway.

13          You know, if they're from a country who is

14  not accepting, you know, returns, removal or

15  expulsions from us, and we have, we have no bed

16  space for detention, then we will utilize a release

17  mechanism for families we have no availability to

18  detain.

19      Q.   Okay.  First you mentioned ER.  Were you

20  referring to Expedited Removal?

21      A.   Expedited Removal.

22      Q.   And you also said when there is no bed

23  space for detention.  Were you referring to bed

24  space at a border patrol facility?

25      A.   So, so, we don't detain.  We will hold in

Page 100

1    a border patrol facility, right, but ICE has

2    detention and ICE does not currently have any bed

3    space for detention of family units.

4         Q.    And why is that?

5         A.    You'd have to ask ICE, ma'am.

6         Q.    Okay.  So, does that mean that they will

7    not accept any family units?

8         A.    Meaning ICE?

9         Q.    Correct.

10        A.    Yeah, ICE has no current bed space for

11   family units, to detain family units.

12        Q.    And so, how does that then impact CPB --

13   CBP?

14        A.    So, as we, as we decide which pathway we

15   are going to apply to a family, we have to keep in

16   mind that, that this family will not be able to be

17   detained outside of border patrol's detention

18   center -- or holding center, I'll say.

19        Q.    So, does that mean that they have to be

20   released into the interior?

21        A.    Depending upon the pathway.

22        Q.    So, what -- in what circumstance would

23   they not be released into the interior?

24        A.    As an example, if we're able to apply

25   Expedited Removal or Title 42, right, but I know

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 101

1    we're talking about a Title 8 pathway, so we'll stay

2    in the Title 8 frame.

3              So, if we're able to place families into

4    Expedited Removal, then we, then we will hold them

5    within border patrol's holding and we'll place them

6    on a flight within 24 to 48 hours depending upon the

7    return requirements or manifesting requirements of

8    that country and then we'll transfer them to ICE

9    custody on a runway and they will be removed back to

10   their home countries.

11        **Q.   You did mention that when applying**

12   **Expedited Removal you would consider whether or not**

13   **the country would be amenable to taking the persons**

14   **back.  Is that fair?**

15        A.   Yes.

16        **Q.   What else do you -- does CBP consider?**

17        A.   In regards to placing somebody into ER?

18        **Q.   Correct.**

19        A.   So, it's -- you know, again, it's that

20   same kind of decisionary (sic) process that we made.

21   You know, is there a national security, border

22   security, you know, threat to -- you know, that

23   would place them into a different Title 8 pathway.

24   But if, if we can achieve a return or removal of an

25   individual from the country who has entered

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 102

 1  illegally, that's what we're going to do.

 2      Q.   In what circumstance would you not use

 3  Expedited Removal for a particular family?

 4      A.   As an example, if they claim fear, we will

 5  place them into an, an NTA/OR process because we

 6  have no family detentions.  Like, if you place them

 7  into ERCF, we have no availability to detain them,

 8  you know, and so it's -- ultimately if they claim

 9  fear, we'll place them into NTA/OR and their claim

10  of fear will be heard on a non-detained docket.

11      Q.   Okay.  And what percentage of the families

12  complain fear?

13      A.   I couldn't tell you.

14      Q.   Is it a high percentage?

15      A.   So, it just -- it really is dependent.  I

16  couldn't even tell you.

17      Q.   All right.  What if they fail the credible

18  fear screening?

19      A.   That's really where ICE takes over and I

20  defer you to ICE as to their process.

21      Q.   Okay.  So, in the interim if the family

22  cannot be detained in ICE custody, where would they

23  be located?

24      A.   Well, they're placed on NTA/OR, so it's

25  wherever they would be destined to live at.  I mean,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 103

 1    we have -- we, as in CBP -- so, speaking strictly

 2    with the CBP path, you know, we -- after they are

 3    released from our custody, they are really the

 4    responsibility of, of -- I'll say the monitoring of

 5    that person falls to ICE.

 6        **Q.   Okay.  But, if I understand correctly,**

 7    **families who are not amenable to Expedited Removal**

 8    **as determined by CBP then get put into a Notice to**

 9    **Appear/Own Recognizance track, at which point they**

10    **can be paroled or bonded out; is that accurate?**

11            MR. DARROW:  Objection, misstates the

12        testimony.

13            You can answer.

14        A.   Yeah, that's, that's not accurate.  It's

15    my fault if I didn't explain it clearly enough.  So,

16    so, there are a couple different pathways.  If we

17    have a family who we cannot -- is not amenable to

18    Expedited Removal, we cannot return to their home

19    country, right, we can't or is not amenable, we will

20    place them into an NTA/OR or a Parole ATD type of

21    pathway for removal -- from release, rather, from

22    our custody.  I'll be very specific with my words.

23    From release from our custody.

24        **Q.   When you say release from your custody,**

25    **does -- that means that they are, in fact, released**

Page 104

1   from any custody, correct?

2        A.   So, you know, as a -- so, they're not in

3   custody, you know, by the term of law.  No, they're

4   not in custody anymore.

5        **Q.   Okay.  So, they get released and then they**

6   **can go to whatever final destination they choose**

7   **within the United States; is that accurate?**

8        A.   Correct.

9        **Q.   Was there a family detention available**

10  **before January 20th of 2021?**

11       A.   ICE had two or three -- two or three

12  different family detention locations, but I cannot

13  recall when they transitioned those locations to

14  single adult detention.  I just can't remember the

15  date.

16       **Q.   Do you remember who was President at the**

17  **time?**

18            MR. DARROW:  Objection.  Family detention

19       does not relate to any of the topics for which

20       Chief Barker is designated.

21            You can answer.

22       A.   I, I couldn't even tell you when -- again,

23  I don't remember the date in which they switched, so

24  I really refer you to ICE, to be honest, with

25  regards to the date.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 105

 1    BY MS. PATEL:

 2        **Q.    All right.  You don't remember who was**

 3    **President?**

 4            MR. DARROW:  Same objection.  Also,

 5        objection, asked and answered.

 6            You can answer.

 7    A.    Yeah.  No, I have been through multiple

 8    administrations in my role and responsibility.  I

 9    cannot remember.  You'd have to ask ICE when they

10    switched over and then find the applicable

11    administration that was in office.

12    BY MS. PATEL:

13        **Q.    Okay.  Does the location in terms of how**

14    **far a person made it into the interior affect what**

15    **processing pathway is applied?**

16    A.    I mean, determining if they're applicable

17    to ER.

18        **Q.    Okay.  How so?**

19    A.    I mean, there's certain standards of ER.

20    You know, there's certain time frames and mileage

21    requirements.  Otherwise, if we catch somebody who's

22    what we consider is -- or encounter somebody who is,

23    you know, more along the interior, they may not be

24    applicable to ER, but they'd be applicable to other

25    Title 8 pathways and we just process them on other

Page 106

1    Title 8 pathways.

2        Q.    And then, does the determination as to

3    whether a family is, in fact, a family unit, does

4    that impact the decision as to which processing

5    pathway to choose?

6        A.    Yes.

7        Q.    How so?

8        A.    Because if they're not a family unit, then

9    they're an unaccompanied child and a single adult.

10       Q.    If they are a family unit, how does that

11   impact the decision making in terms of processing

12   disposition?

13       A.    So, if they're a family unit, knowing that

14   there's no family unit detention, you know, we will

15   not utilize a pathway that will -- that would

16   intentionally place a family into, into a detention,

17   right, situation.  You know, there's no point in

18   doing all the paperwork, you know, when there's no

19   detention available.

20       Q.    Okay.  So, going back to Exhibit 7, which

21   of these pathways would be amenable to family units?

22       A.    Well, they would technically all be

23   amenable to family units depending if we had

24   detention or not.

25       Q.    Okay.  Well, you do not have detention,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 107

1   correct?

2       A.   Right.

3       Q.   And you --

4       A.   You mean right now?  You mean currently?

5       Q.   Currently, correct.

6       A.   Okay.  I gotcha, I gotcha.

7            So, amenable to family units right now.

8   Family unit right now would be NTA/OR, Parole ATD,

9   ER.  We could even do -- we could even reprocess

10  somebody who has a previous removal through an ER

11  again.  Warrant of Arrest/Notice to Appear, meaning

12  detention ultimately would not be applicable.  We

13  can voluntary return a family.  We are not currently

14  implementing or applying MPP to families.  When I

15  say ER, it's going to be dependent because the

16  circumstances surrounding the ER is going to

17  determine if, if they're, obviously, amenable to ER

18  or not.  Right?  You know, if -- yeah, I guess

19  that's the easiest way to explain it.

20      Q.   When did you stop applying MPP to

21  families?

22           MR. DARROW:  Objection.  That's beyond the

23       scope of this deposition and the topics for

24       which he's designated.

25           You can answer if you know.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 108

1      A.   Under the -- when we had the restart of

2   MPP -- and I don't recall the time frame.  I just --

3   I can't remember the month that we restarted MPP in,

4   but, you know, under, under the most recent

5   application or iteration of MPP it's been applied to

6   single adults.

7           MS. PATEL:  And I just want to note for

8        the record that Topic 4 is directly on point as

9        to this line of questioning.

10   BY MS. PATEL:

11      Q.   All right.  So, under what circumstance

12   would CBP apply the NTA/OR to individuals?

13      A.   Single adults?

14      Q.   Correct.

15      A.   It kind of goes back to the question I

16   answered on this earlier, which is really, you know,

17   depending upon the circumstances of that single

18   adult, you know, does ICE have detention

19   availability or not?  You know, does -- is the

20   person applicable to, you know, the Fraihat

21   detention restriction where it's not applicable to

22   them?  You know, these are circumstances where we

23   would, you know, apply an NTA/OR to a single adult.

24      Q.   Okay.  Did you say a Fraihat detention?

25      A.   Yeah.  So, Fraihat litigation is certain

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 109

1   circumstances which prohibit us detaining.  And it's

2   not us.  I'm using "us" as the larger DHS entity.  I

3   really kind of defer you to counsel and to ICE in

4   regards to that because that's their standards of

5   detention.  But when ICE tells us that they cannot

6   detain a certain individual -- a single adult, they

7   cannot detain a single adult, then that detention

8   pathway is removed, obviously.

9        Q.    Okay.  Do -- those same factors, are they

10   considered as to a family unit?

11       A.    Well, there is no detention of family

12   units currently available, so, yeah, but it's

13   implied, right, because there's no detention.

14       Q.    Understood.  Under what circumstances

15   would CBP apply Parole + ATD to a family unit?

16            MR. DARROW:  Objection, Parole ATD is

17            beyond the scope.  Also, we have another

18            witness to discuss Parole ATD.

19            You can answer.

20       A.    So, Parole ATD would be applied to a

21   Cuban, Nicaraguan or Venezuelan family unit as these

22   three demographic -- or these three country

23   demographics or citizenships, nationalities

24   currently do not allow us to repatriate those

25   individuals, so no returns, no removals, and we have

Page 110

1   no current detention capability to be able to detain

2   families; so, therefore, we may utilize the Parole

3   ATD in certain circumstances in the sectors who are

4   impacted by flow with high TIC times as well as high

5   custody numbers.

6     BY MS. PATEL:

7       Q.   All right.   Under what circumstances would

8   Notice to Report be applied to individuals?

9       A.   None.

10       Q.   What about to families?

11       A.   None.

12       Q.   What about Expedited Removal as to

13   individuals?

14       A.   So, if we're able to --

15       Q.   Single adults.

16       A.   Yeah, yeah, yeah, you're talking single

17   adults.   You know, for those, for those single

18   adults who, you know, are originating from a country

19   to where we have, you know, the availability to be

20   able to remove or return them, then we'll place them

21   into an ER, an ER pathway and then, and then place

22   them into custody.   You know, transfer to ICE if ICE

23   has -- and, of course, this is dependent upon ICE

24   either having the availability, meaning the

25   detention space, or CBP having the available holding

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 111

1    space and capacity to be able to expeditiously

2    remove somebody, you know, you know, through,

3    through the ER pathway.  Right?  If we're able to

4    get somebody on a flight within 24 to 48 hours, like

5    I was just discussing earlier, we'll hold them

6    within our custody and get them to a flight line.

7          **Q.   If you have a single adult where ER is**

8    **not -- they're not amenable to ER, what is typically**

9    **done at that point, what pathway?**

10         A.   So, first off we'll determine if we're

11   going to prosecute them.  Right?  1325, 24, 26, it

12   just depends.  So, if we're going to, to prosecute

13   them, then they'll go -- you know, they could go

14   into a WA/NTA, which is your Warrant of

15   Arrest/Notice to Appear, you know, a WA/NTA type of

16   pathway, you know, we could place them -- you

17   know -- and, of course, that's going to be holding

18   them and then removing them.  This will be a

19   post-prosecution, by the way.

20              Or we could go like a 1326 where we're

21   reinstating a previous order of removal.  You know,

22   they may serve some jail time on the prosecution,

23   remain detained and then removed.

24              Or, you know, they could be placed into

25   MPP, which is a prime example as to what we're doing

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

                                                    Page 112
1    right now as well, you know, and -- you know, those

2    are -- you know, they could be placed into NTA/OR or

3    even Parole ATD, just depending on the circumstances

4    surrounding that.

5           It's really is depending on the

6    circumstances with the individual as well as the

7    circumstances around what I consider is custody and

8    detention.

9        **Q.   I think we've been over the circumstances**

10   **in which Expedited Removal would be applied to a**

11   **family unit.  I'm going to move to the next entry.**

12          **In what circumstances would Reinstatement**

13   **of Prior Order of Removal apply to an individual?**

14       A.   When we have a previous order of removal

15   and we're reinstating it.

16       **Q.   Can it be applied to a family unit?**

17       A.   Individuals within the family unit, yes.

18       **Q.   Okay.  And what circumstances would a**

19   **Warrant of Arrest/Notice to Appear-(detained) be**

20   **applied to an individual?**

21       A.   There's a myriad of circumstances.  So,

22   this could be from anything from -- you know, from

23   prosecuting on a simple 1325, you know -- you know,

24   1324s if there -- you know, if there's some type of

25   criminality.  You know, again, I'll broadbrush it in

Page 113

```
 1    regards to if there's a national security or border
 2    security or criminal threat there where we're
 3    seeking a prosecution or, or we're not -- you know,
 4    we're going to place somebody into a detention
 5    setting with ICE for, for a removal as well, you
 6    know, due to whatever circumstance, criminal ICE
 7    maybe one where we're not necessarily going to
 8    prosecute for the 1325, but we're going to continue
 9    to detain and remove, another example of that.
10            So, these would be all circumstances where
11    we would issue an WA/NTA.  And that's just an
12    example.  There's a myriad of different reasons.
13        Q.    Okay.  What about as a family unit?
14        A.    When would we put a WA/NTA in regards to a
15    family unit?
16        Q.    Correct.
17        A.    We're not right now.  There's no detention
18    for family units.
19        Q.    What about when is there a Voluntary
20    Return for individuals?
21        A.    And it's a Title 8 pathway, so Canada is a
22    perfect example, Mexico is another perfect example.
23    You know, if we encounter, you know, single adults
24    or families, you know, from those countries, you
25    know, we could place them into Voluntary Return,
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    even children, to be honest, but it's just depending

2    certain circumstances depending -- surrounding that.

3    But, yeah, so Mexico or Canadian nationals.

4         **Q.   What about under what circumstances would**

5    **you put an individual in MPP?**

6         A.   So, if the individual in front of us is

7    claiming fear of returning to their home country but

8    not claiming fear of returning to Mexico -- Mexico's

9    the only country applicable, and in the geographic

10   areas that Mexico has agreed to be able to take back

11   MPP returns and were within the numerical limiting

12   framework that Mexico has restricted us to in

13   regards to MPP returns and an individual is not

14   excepted from MPP for a myriad of different reasons,

15   right, because of vulnerabilities, and that person

16   doesn't have fear of going back to Mexico, they

17   could be placed into MPP.  There's a lot of coulds

18   in there.

19        **Q.   Is that the same for family units?**

20        A.   We are currently not applying MPP to

21   family units.

22        **Q.   And I'm going to drop another exhibit.**

23            (Plaintiff's Exhibit 8 was received

24            electronically, marked for identification and

25            is attached hereto.)

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1     BY MS. PATEL:

 2        Q.   So, this is Customs and Border Protection

 3     statistics from the website for the fiscal year

 4     2021.  So, it's similar to what we were just looking

 5     at with just a different fiscal year.  If you could

 6     turn to page 2.  And this is -- will be marked as

 7     Exhibit 8.  And we're looking under the same heading

 8     here, USBP Monthly Southwest Border Apprehensions by

 9     Processing Disposition.

10        A.   Uh-huh.

11        Q.   So, there are a few processing

12     dispositions that are different in this chart, so I

13     just wanted to ask you about them.  Just by looking

14     at this, does this look like a list of a majority of

15     the pathways that were used during the 2021 fiscal

16     year except for, you know, those other pathways that

17     you discussed previously?

18        A.   Yes.

19        Q.   Okay.  So, this chart also includes PACR,

20     HARP and ACA?

21        A.   Yes.

22        Q.   Do you see that?

23        A.   Yes.

24        Q.   Okay.  Are those processing options -- or

25     what are those processing options?
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      A.   So, those are, in essence -- so, PACR,

2   HARP and an ACA agreement with Guatemala.  So, those

3   are three processing pathways which, you know, were

4   created where a person -- and, again, this is going

5   to go Mexican and non-Mexican nationals, right, so

6   there's a difference.

7           So, basically, what ends up happening is

8   these individuals would come in and claim fear of

9   returning to their country or returning to Mexico

10   and we would hold them within a border patrol --

11   within border patrol custody as they went through

12   their credible fear process with CIS.  And in HARP

13   and PACR just differentiates between Mexican

14   nationals and not -- OTMs.  You know, other than

15   members and nationals.  And then ACA is an agreement

16   to where, you know, individuals were, you know,

17   basically, returned back to Guatemala or could be

18   returned back to Guatemala under a safe return

19   agreement.

20      Q.   And just below that disposition there's

21   another one, Notice to Appear/Order of Recognizance,

22   I-385 - Released.  Do you see that?

23      A.   Yeah, NTA/OR.

24      Q.   NTA/OR?

25      A.   NTA/OR, Notice to Appear, Order of

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 117

1   Release, yeah.

2       Q.   You referred to NTA/OR in the last 2022

3   statistics; is that accurate?

4       A.   Right, right, NTA/OR.

5       Q.   But there is an addition of the I-385.  Do

6   you see that?

7       A.   Yes.

8       Q.   So, what is I-385?

9       A.   So, an I-385, I believe, is -- we used to

10  call them like camp cards.  Essentially, it's,

11  basically, like an identification document.

12      Q.   So, why would I-385 be included here as a

13  processing disposition?

14      A.   So, it's, it's not a disposition.  So,

15  there is -- I didn't create the form, so I'm not

16  sure the ideology behind why it's numerically

17  created that way, but a, but a 385 is not a

18  processing disposition.  It's, basically, an

19  identification card.

20      Q.   Okay.  So, do you have any understanding

21  of why it would be included in this chart?

22      A.   I didn't create the chart, so I'm not sure

23  where it's included in this format.

24      Q.   Is this identification card, would it be

25  something that's completed for all of the other

Page 118

1   processing pathways?

2        A.   So, so -- we call them camp cards.  Right?

3   So, it's created on numerous pathways, but an

4   I-385... an I-385 was utilized during this time

5   frame attached to the NTR process, the Notice to

6   Report process.  Because the I-385 was a form of

7   identification which would allow that individual to

8   be able to board a plane.  I'm recalling as I'm

9   sitting here.

10       Q.   Okay.  So, the numbers that are reflected

11  in this row for NTA/OR, I-385 include persons who

12  were released on a Notice to Report?

13       A.   Again, I didn't create this nor do I --

14  so, from looking at this, you know, it appears in

15  the nomenclature that 385 is included just from the

16  processing disposition header, but I can't speak to

17  the numbers.

18       Q.   Okay.  So, the Notice to Report was being

19  used in the time frame reflected in this chart,

20  correct?

21       A.   I believe that we, we started the Notice

22  to Report in the March time frame.

23       Q.   Okay.  And there's not a separate entry

24  related in the report; is that accurate?

25       A.   Not that it appears in the processing

Page 119

 1   disposition drop down here.

 2        Q.   Okay.  So, is it fair to assume that

 3   anyone that was issued a Notice to Report would be

 4   included in the NTA/OR column or row?

 5        A.   That's what the name appears.

 6        Q.   And going back to the PACR, HARP, ACA, are

 7   those no longer in use?

 8        A.   Correct.

 9        Q.   Okay.  And what happened to those?  Why

10   are they no longer in use?

11        A.   They were discontinued.  The direction

12   from, from -- you know, from the department was that

13   we were going to cease the utilization of PACR and

14   HARP.

15        Q.   Do you know the reason?

16        A.   You'd have to ask the department, ma'am.

17        Q.   All right.  And then I'm going to drop

18   another exhibit.  This is Exhibit 9.  It is also

19   statistics pulled from CBP's website and this one is

20   for fiscal year 2020.

21             (Plaintiff's Exhibit 9 was received

22        electronically, marked for identification and

23        is attached hereto.)

24   BY MS. PATEL:

25        Q.   If you can turn to page 4.  Does this

Page 120

1  reflect all of the processing dispositions that were

2  available during this fiscal year?

3       A.   Going back to the same type of comment

4  earlier, it's not all, but those are the, the vast

5  majority.

6       Q.   Were all of these available to single

7  adults?

8       A.   Yes.

9       Q.   Were they all available to family units?

10      A.   Yes, to a degree, yeah, yeah.

11      Q.   What do you mean "to a degree"?

12      A.   Well, I'm not going to put a child into

13 Reinstatement of a Previous Order of Removal unless

14 a child has a removal, obviously, which is not

15 common.  But, yes, yeah.

16      Q.   Okay.  Did any of these require a family

17 unit to be detained?

18      A.   Yes.

19      Q.   Which ones required the family unit to be

20 detained?

21      A.   During this time period, you know, we did

22 have family detention, so we could place families

23 into an ERCF process and transfer them to ICE

24 custody.  HARP and PACR is applicable to families

25 and would have remained in CBP custody through their

Page 121

1  asylum hearing, right, so their claim of fear

2  hearing.  ER would be applied.  MPP would be

3  applied.  Even NTA/OR would have been applied to

4  families as well.

5       Q.   Okay.  If we go back to Exhibit 8 for the

6  fiscal year 2021, I don't think I asked you, would

7  all of these processing dispositions have been

8  applied to single adults?

9       A.   We were not applying NTRs to single

10  adults.  Meaning the 385 piece of that number would

11  not have been single adults.

12       Q.   Okay.  Would all of these processing

13  dispositions have applied to family units?

14       A.   Yeah, again, same statement, right, you

15  know, to a degree in regards to the Reinstatement --

16  the Reorder -- Reinstatement of Order of Removal,

17  but, yes, yeah.

18       Q.   With any of these processing dispositions

19  would family units have been detained?

20       A.   Yeah.  Yeah.  Family units would have been

21  detained for -- or kept into custody I think is the

22  easier way to explain it, you know, for certain

23  aspects.  Right?  You know, HARP, PACR.  You know,

24  they would have remained into custody, application

25  for ER, much like they're doing now as well.  Just

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 122

1   to give you an example.

2        Q.   Would they have been -- when you say

3   "detained," I was referring to ICE, detained by ICE.

4        A.   Okay.  So, ICE detention?

5        Q.   Yes.

6        A.   So, if they were placed -- again, I'll go

7   back to -- so, I'm going to caveat it with you're

8   going to have to check with ICE with regards to

9   when -- you have to ask ICE when they, when they

10  switched family detention to single adult detention

11  in their facilities, but, you know, we were

12  detaining families for an ERCF process within ICE

13  holdings.

14       Q.   So, I think you mentioned earlier -- and

15  correct me if I'm wrong, but that the processing

16  times would vary depending upon the actual

17  processing disposition that was chosen; is that

18  accurate?

19       A.   Yes.

20       Q.   All right.  So, as we look back at Exhibit

21  7, the NTA/OR, what would the processing disposition

22  time typically be for an individual?

23       A.   An hour and a half to two hours.

24       Q.   What about for a family?

25       A.   Depends on the composition of the family,

Page 123

1    but per person it's going to, roughly, be an hour

2    and a half to two hours just depending.

3         Q.    What about for Parole + ATD for an

4    individual?

5         A.    About 15 minutes.

6         Q.    What about Parole + ATD for a family?

7         A.    Again, same thing, composition of the

8    family.  So, if you have two people in the family,

9    30 minutes.  You see where I'm going with that?

10        Q.    So, it would be 15 minutes per person?

11        A.    Yeah, roughly.

12        Q.    Okay.  What about how long would it take

13   to process Expedited Removal for an individual?

14        A.    Hour and a half.

15        Q.    What about for a family?

16        A.    Same thing, right, it's per person, right,

17   it's compounding.  Hour and a half for the adult, an

18   hour and a half for the child, you know.

19        Q.    Understood.

20        A.    To give you an example.

21        Q.    Okay.  And so, what about for

22   Reinstatement of Prior Order of Removal for

23   individual?

24        A.    Yeah, so that's a whole -- that's a

25   different process.  So, you're talking several hours

Page 124

1   with that because we have to contact the National

2   Records Center, get the previous order.  There's

3   much -- there's a greater degree of work that's

4   involved in that, so we're talking several hours of

5   processing there.

6        **Q.   Okay.  Are you talking --**

7        A.   To include, to include even potentially,

8   you know, much larger -- much longer than a 24 to 48

9   hour, you know, time period, like 24 hours -- right,

10  between 24 and 48 just depending on the National

11  Records Center, if they're open or not.

12       **Q.   Is that the same for families?**

13       A.   So, so, it just depends on the

14  circumstance.  Right?  If, if -- you know, if we're

15  going to reinstate a previous order of removal, you

16  know, for a family unit, it's still -- we're still

17  going to be holding them while we get the records,

18  which is the longest -- that's the most unknown, if

19  you will, within the processing time frames.

20       **Q.   Okay.  Is it safe to say that it takes**

21  **probably at least the time, if not more, compared to**

22  **processing an individual?**

23       A.   Absolutely.

24       **Q.   What about the Warrant of Arrest/Notice to**

25  **Appear for an individual?**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      A.   Yeah, two hours plus just depending on

2   what the reasoning -- what we're going to be

3   processing them for a WA/NTA, a Warrant for Arrest/

4   Notice to Appear.

5      Q.   What about for a family?

6      A.   Again, we're not detaining families.  We

7   won't be processing a family for a WA/NTA.

8      Q.   Is that -- currently; is it correct?  At

9   some point you were?

10      A.   No, we really, we really don't process a

11   family for WA/NTA.  They will be detained under --

12   you know, it just depends.  Right?  I mean, it -- by

13   and large, we either process a family for ER -- that

14   would have been the detention mechanism.  If for

15   some odd reason ER might not be applicable to that

16   family when we were detaining families, then, yes,

17   WA/NTA is a possibility or is a pathway that could

18   be utilized, but in my entire career I don't know if

19   I've ever processed a family for WA/NTA when we had

20   ER present.

21      Q.   What about Voluntary Return for an

22   individual?

23      A.   About 15 to 20 minutes.

24      Q.   And what about for a family?

25      A.   Same thing.  Same, 15 to 20 minutes just

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 126

1  compounded by the number of people in the family.

**2      Q.   What about MPP for an individual?**

3      A.   Currently it's taking very long to do MPP.

4  So, it's an extremely complex process.  It's taking

5  us several days to return somebody for MPP.

**6      Q.   And understanding you're currently not**

**7  applying MPP to family units, but you were at one**

**8  point; is that correct?**

9      A.   Yes.

**10      Q.   And how long did it take?**

11      A.   Several hours.

**12      Q.   Per person?**

13      A.   Well, for the family.  Right?  So, per

14  person, you're talking a couple hours, you know,

15  processing time per person, and then if you have a

16  family, because you were asking about family,

17  compound that and then by the time you get the

18  return worked out and all that.

**19      Q.   So, once CBP chooses a pathway, can it**

**20  change it?**

21      A.   Yes.  Well, it just depends.  Right?  If

22  we place somebody into a Title 8 pathway, I cannot

23  remove them from a Title 8 pathway and place them

24  into a Title 42.  Right?  Certain circumstances, you

25  know, we just -- we can't necessarily change a

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 127

1   pathway.

2              But, with that being said, you know, there

3   are times when due to the facts of the case and the

4   individual that's in front of us, we have changed

5   the pathways for sure.  I think just my own personal

6   experience, you know, I have processed, you know, or

7   begun the process of somebody for a Voluntary

8   Return, something happens, you know, exacerbates the

9   situation and we end up processing them for a WA/NTA

10  and sending them to jail.  So, there are

11  possibilities for changing pathways.  It's just

12  depending.

13       Q.   So, is it determined on a case-by-case

14  basis?

15       A.   Yes.

16       Q.   Are there specific circumstances when CBP

17  would always change the pathway?

18       A.   Not that I can think of.  A carte blanche

19  changing of pathways?  Not that I can think of.

20       Q.   Okay.  Are there circumstances in which

21  CBP would typically change a pathway?

22       A.   Are we talking about including Title 42?

23       Q.   Sure.

24       A.   If they're -- you know, if the processing

25  pathway was Title 42 that we were encountering

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

 1   somebody, you know, that we were trying to process

 2   somebody into and their country cannot accept them

 3   back, for instance, Cubans, Venezuelans,

 4   Nicaraguans, we would not be processing them under

 5   Title 42.

 6       Q.   Okay.  So, let's change it to

 7   circumstances in which we're only looking at Title 8

 8   processing disposition.

 9       A.   You know, I mean, the only -- I'd say the

10   time frames when -- so much of this is dependent

11   upon the circumstances of the individual in front of

12   us, but time periods when we would inherently have

13   to enact a different process is when somebody would

14   claim fear.

15       Q.   Okay.  So, as to the issue of pathways

16   that we discussed, is the person given

17   documentation -- for instance, if they're not -- if

18   they're not detained, if they're released, are they

19   given any type of immigration papers or documents

20   that show their status?

21       A.   That show their -- that they've been

22   released from custody, you mean?

23       Q.   Correct.

24       A.   Yes.

25       Q.   So, what type of documentation would they

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   receive under Parole + ATD?

2        A.   They would receive a copy of the

3   documentation demonstrating that they've been

4   paroled and then a G-56, which is a document which

5   provides them the locations of the various ICE

6   offices throughout the United States, along with

7   their addresses and contact numbers.  A document

8   that -- and all of this is incorporated within the

9   parole documentation.  A document that also

10  demonstrates or defines the conditions of the parole

11  as well as any ATD documentation.  That's what they

12  would ultimately end up having.

13        Q.   Would somebody -- I'm sorry.

14        A.   Go ahead.  I was going to go on an NTA/OR,

15  but go ahead.

16        Q.   That's exactly what I was going to ask you

17  about.

18        A.   Now, under an NTA/OR they are provided

19  with the documentation of their, their Notice to

20  Appear.  They're going to have a copy of, you know,

21  in essence, when, where, what time, date, location

22  they're to appear, you know, for their court

23  hearing.  They're also going to get a copy of pro

24  bono attorneys.  They are going -- you know, in case

25  they want to contact an attorney.  They're also

Page 130

```
 1    going to get information in regards to the closest

 2    ICE offices, just like I was talking about earlier,

 3    and a copy of what is considered their processing

 4    paperwork, if you will.  So, it's a packet of

 5    information.

 6         Q.   And is this information given by border

 7    patrol?

 8         A.   Yes.

 9         Q.   Does CBP ask where the family intends to

10    go when they're paroled or otherwise released into

11    the interior?

12         A.   Yes.

13         Q.   Okay.  And do they record that information

14    in a database?

15         A.   Yes.

16         Q.   Is that put in their FINS file?

17         A.   It's placed in their -- yes, to a degree.

18    I understand your question.  It is placed in the

19    data that is -- that is individualized to them.

20         Q.   Okay.  Do they inquire as to whether the

21    family members have any other family in the United

22    States?

23         A.   No, we do not get into sponsor

24    information, if that's what you're asking about, or

25    relative information.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 131

1          Q.    Okay.  Do you ask information as to

2     whether they have any other contacts in the United

3     States?

4          A.    It depends.  If it is a child -- if it's

5     an unaccompanied child, we do collect that data.

6     That's what I was referring to in regards to sponsor

7     information.  Right?  If it's an unaccompanied

8     child, we do ask that data.  For adults, we do not

9     ask that data.

10         Q.    Why not?

11         A.    We don't.  It's just not something that we

12    collect.

13         Q.    Do you ask them why they are going to a

14    particular destination?

15         A.    As part of a routine interview, no.  I

16    mean, if it happens to come up in conversation, they

17    just may, but no.

18         Q.    And why isn't that information obtained?

19         A.    It's just we don't ask about, you know,

20    who they have here, what family and who -- and why

21    they're intending to go to a certain -- we just

22    don't do that.  At 6,800 people a day, you know, we

23    just, we just don't ask that information.

24         Q.    Is that the same regardless of whether

25    it's a single adult or a family?

Page 132

```
 1        A.   Yeah, we don't, we don't, we don't ask
 2   adults, right, regardless if they're a family unit
 3   or a single adult, who they know in the U.S. and why
 4   they're traveling to a certain area necessarily.
 5   Necessarily.  Again, I go back to the interview may
 6   go in that direction.  Again, based upon the
 7   circumstances that that individuals who are
 8   immigrating present, it may go that way, but it is
 9   not dictated that it's going to go that way.
10        Q.   All right.  And I may have asked you this
11   already, but do you make a notation of where they
12   plan to resettle in your files?
13        A.   Yes.
14        Q.   All right.  For those families that are
15   paroled or otherwise released into the interior, are
16   they tracked in any way through a monitoring device?
17        A.   Yes.
18        Q.   Okay.  So, let's start with Parole + ATD.
19   Families that are released pursuant to Parole + ATD,
20   are they tracked?
21        A.   Yes.
22        Q.   How so?
23        A.   Through various ATD methodologies.
24        Q.   Can you describe those methodologies?
25             MR. DARROW:  Objection.  We have another
```

1        witness who's going to speak to Parole + ATD.

2        If you're going to keep going down the Parole +

3        ATD with Chief Barker here, he can answer in

4        his personal capacity, but he's not speaking as

5        a Rule 36 witness for DHS.

6        MS. PATEL:  Understood.

7        MR. DARROW:  You can answer in your

8        personal capacity.

9     A.   I'm personally familiar with various ATD

10   methodologies.  Right?  Where people call and phone

11   into ICE and, you know, ankle bracelets or phones,

12   you know, that they utilize, but I really defer you

13   to ICE and the specifics of the ATD program.

14   BY MS. PATEL:

**15     Q.   I mean, do you have a general idea of the**

**16   types of tracking devices that are used?**

17     A.   I just, I just gave them.  You know,

18   again, you know, cellular, like a phone, ankle

19   bracelet, you know -- you know, people who call in,

20   show in certain dates and times, that type of thing.

21   But that's just my general knowledge of that.  I

22   mean, I really defer you to ICE in regards to ATD

23   methodologies and all that kind of stuff.  That's is

24   truly their program.

**25     Q.   All right.  Are single adults -- I'm**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    sorry.  So, yeah, are single adults under Parole +

2    ATD also given tracking devices, the same type of

3    tracking devices that you just mentioned?

4         A.   Yeah, I mean, again, I'd defer you to ICE

5    in regards to what methodologies they're applying to

6    single adults versus families.  I'm assume that's

7    your next question.  It just -- really, I defer you

8    to ICE on what they're applying and the reasoning

9    why.  That's all their -- that's their program,

10   their policy, their procedures, their protocols.

11   That's all their stuff.  You know, with that, I'm

12   just aware of tracking of both families and single

13   adults by those methodologies I just said.

14        Q.   What about for persons who have an NTA/OR?

15        A.   ATD is not inclusive or mutually exclusive

16   of processing pathway.  So, we have absolutely

17   released people on an NTA/OR with ATD.  Right?  ATD

18   is just a tracking methodology, not a processing

19   pathway.

20        Q.   Okay.  So, I'm not sure that I'm clear as

21   to what you were just saying.  I guess my

22   question -- and maybe your answer was responsive,

23   but my question was, those who are released on their

24   own recognizance, are they also tracked?

25        A.   So, the... the application of ATD in an

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 135

1   NTA/OR processing pathway is not necessarily

2   inclusive.  Right?  Just because I'm processing an

3   NTA/OR doesn't mean that ICE is going to attach ATD

4   on somebody, but it doesn't mean that they won't.

5   ICE can, if they decide to, place ATD on an

6   individual released on NTA/OR.  So, they're not

7   mutually exclusive or, you know, inclusive, either.

8   Like, it's dependent upon the circumstances, which

9   is really ICE's decision if they're going to place

10  somebody on ATD intensive.  The reason why I'm --

11  I'm trying to answer the best I can, but I really

12  defer you to ICE in regards to that decision-making

13  process and how they're -- and what they're doing

14  with it.

15       **Q.   So, if ATD is an ICE decision-making**

16  **process, then why is it that, for instance, on**

17  **Exhibit 7, which has U.S. Border Patrol Monthly**

18  **Southwest Border Encounters, Parole + ATD is listed**

19  **with numbers for the number of people who are**

20  **processed under the Parole + ATD?**

21       A.   Sure.  So, that is, that is ultimately

22  when ICE is, in essence, placing ATD on somebody who

23  we are processing for parole.  Right?  So, it's the

24  tracking mechanism that is associated with it.

25       **Q.   All right.  Is the November memo the only**

Page 136

```
 1   Parole + ATD policy?

 2        A.   Well, it's not a policy, but that's the

 3   only Parole ATD guidance that we have out at this

 4   time is the November -- that's the -- what I

 5   consider the superseding memo.

 6        Q.   Okay.  You're saying it's not a policy

 7   because it's guidance?

 8        A.   Yes, it's operational guidance.

 9        Q.   Okay.  So, is it also authorized by some

10   other SOP?

11        A.   No, just the memo.

12        Q.   Give me a minute.  I'm going through my

13   outline.  I might have asked you some of these

14   questions already, so we can...

15             MS. PATEL:  Well, actually, can we take

16        like a five-minute break?

17             MR. DARROW:  Sure.

18             THE WITNESS:  That'd be fantastic.

19             MS. PATEL:  Sorry.  If you ever need a

20        break, please, let me know.

21             THE WITNESS:  I'm hanging with you.  I'm

22        hanging with you.

23             MS. PATEL:  All right.  Let's take a

24        five-minute break and we can go off the record.

25             THE VIDEOGRAPHER:  The time is 11:41 and
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 137

1    we are off the record.

2          (Brief recess 11:41 a.m. until 12:36 p.m.)

3          (Deposition continues in Volume 2.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                1

**(**

**(a)**
54:16 63:1
74:7

---

**1**

**1**
12:2,18 92:7
**10**
26:19
**10-ish**
27:12
**100**
47:19 91:8,10
**10:06**
78:4,6
**10:17**
78:6,7
**11**
13:2 15:20,25
16:2
**1182**
37:11
**11:41**
136:25
**12**
13:2 16:6
**1225**
36:16
**1226**
37:5
**1229(a)**
37:17
**13**
5:8 13:2
16:10 70:6,9

**1324**
78:22
**1324s**
112:24
**1325**
111:11 112:23
113:8
**1326**
111:20
**15**
123:5,10
125:23,25
**16**
13:2 16:12
**18**
19:10
**19**
19:10,13

---

**2**

**2**
13:1 15:4
19:19,21
115:6
**20**
19:17 125:23,
25
**2000**
19:8
**2001**
19:17
**2006**
23:5 25:8
**2008**
25:8 26:17
**2009**
26:17

**2010**
26:18
**2010-ish**
27:12
**2011**
27:24
**2013**
28:22
**2013-ish**
28:20
**2015**
30:13
**2016**
30:13,21
31:11
**2018**
7:7 9:16
**2019**
7:7 9:16
**2020**
31:11 119:20
**2021**
33:6 90:6,7
104:10 115:4,
15 121:6
**2022**
5:8 45:7 84:5
117:2
**20th**
104:10
**21**
19:17 22:21
**212**
37:11,12,16
**235**
36:18
**236**
37:8

**24**
101:6 111:4,
11 124:8,9,10
**25**
78:22
**26**
78:22 111:11
**2nd**
36:25 43:21

---

**3**

**3**
21:9,11 83:20
84:5,25
**30**
123:9
**30(b)(6)**
12:8
**36**
133:5
**385**
117:17 118:15
121:10

---

**4**

**4**
13:1 15:9
34:15,16
108:8 119:25
**42**
38:24 52:16,
23 53:7,9,18,
19 54:2,8
55:15,19 58:2
64:19 65:19
73:4,6,10,15,
23 74:6,8
75:5,21

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

100:25 126:24
127:22,25
128:5

**48**
 74:19 101:6
 111:4 124:8,
 10

---

**5**

**5**
 23:7 44:25
 45:1

**50**
 25:15

---

**6**

**6**
 70:9 82:12
 84:1,23 85:24
 97:14

**6,800**
 131:22

**60**
 25:15 76:18,
 25

---

**7**

**7**
 83:11,25
 84:3,23,25
 86:10 96:1
 106:20 122:21
 135:17

**70**
 94:1

**73**
 93:23

---

**8**

**8**
 36:15 37:4,
 10,17 54:5
 55:16,21
 56:21 58:2
 64:21 65:20
 66:24 67:5,8,
 17 74:12
 75:8,22 92:23
 98:9 101:1,2,
 23 105:25
 106:1 113:21
 114:23 115:7
 121:5 126:22,
 23 128:7

**8:33**
 5:2,4

---

**9**

**9**
 13:1 15:16
 26:19 27:12
 119:18,21

---

**A**

**a.m.**
 5:2,4 78:6

**ability**
 11:12 36:25
 53:2 61:14
 62:20,22
 63:2,7

**absent**
 46:6,7

**absolutely**
 32:1 36:2

62:12 85:8
99:3 124:23
134:16

**ACA**
 115:20 116:2,
 15 119:6

**academy**
 34:3,7,22
 38:1 39:4,6,
 9,10 41:14

**accept**
 55:18 64:20
 100:7 128:2

**accepted**
 73:16,19

**accepting**
 90:24 99:9,14

**accompanied**
 43:10 45:18
 46:6,11,14

**account**
 57:16

**accurate**
 20:4,15 23:14
 30:6 39:14
 58:9 60:20
 83:3 103:10,
 14 104:7
 117:3 118:24
 122:18

**accurately**
 83:4

**achieve**
 101:24

**acronyms**
 45:23

**Acting**
 33:6,10

**action**
 59:11

**active**
 35:14

**actual**
 14:15 22:4
 42:17 74:11
 122:16

**ad**
 89:13

**addition**
 117:5

**additional**
 44:9 89:4

**additionally**
 40:2

**addresses**
 129:7

**administration**
 35:5 105:11

**administrations**
 105:8

**administrative**
 21:7 35:13
 39:24 43:18
 44:12 66:9
 87:5 93:19

**admission**
 63:24

**admissions**
 18:2

**adult**
 47:9,19 64:2,
 8 66:15,18
 67:3,8 81:1,3
 87:23 88:7
 93:16 96:6,17
 98:18 104:14
 106:9 108:18,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                              3

23 109:6,7
111:7 122:10
123:17 131:25
132:3

**adults**
45:17,20
64:2,9 86:12,
20 87:19
88:20,25
93:1,22 94:1,
6,11 96:14
108:6,13
110:15,17,18
113:23 120:7
121:8,10,11
131:8 132:2
133:25 134:1,
6,13

**advising**
32:2

**affect**
105:14

**affirm**
8:25

**age**
70:3,4,7,13,
24 72:3 81:8

**agency**
51:3

**agent**
22:24 23:2
24:3 25:3
27:25 28:18
29:15 39:6,9,
12 41:9,10
42:5 47:22,23
48:2,3,5,14,
20 49:22
51:17 59:9,
10,11 68:5,7

69:19 88:16
97:20

**agents**
26:2 35:10,
15,18,19,22
39:5 40:3,15,
16 41:4 42:9,
11,17 43:8,
13,25 54:15
83:1 96:21
97:5

**agents'**
39:10

**ages**
70:9

**agreed**
114:10

**agreement**
116:2,15,19

**ahead**
7:25 8:10
129:14,15

**alcohol**
11:11

**alien**
38:17

**alienage**
49:7

**aliens**
38:18

**alleged**
68:14,15

**allowing**
71:16 99:10

**amenable**
55:15 58:1
73:6,8,14,16,
23 101:13
103:7,17,19

106:21,23
107:7,17
111:8

**amended**
16:15,19
17:1,2

**America**
5:7,17,19

**Analysis**
32:22

**and/or**
91:17

**Anita**
5:14 6:24
12:7 92:5
93:3

**ankle**
133:11,18

**announce**
5:12 6:3,13

**anti-**
**trafficking**
46:23

**anymore**
104:4

**apologies**
66:12 85:5

**apologize**
9:6 83:24
86:25

**Appear-(**
**detained)**
112:19

**Appear/order**
116:21

**Appear/own**
96:4 103:9

**appearances**

5:13

**appeared**
97:14

**appears**
45:13 118:14,
25 119:5

**applicable**
48:9 53:18
54:8 56:7
66:23 74:11
98:15,16
105:10,16,24
107:12
108:20,21
114:9 120:24
125:15

**applicant**
63:23

**application**
32:25 35:20
36:10 44:16
46:11 88:14
94:10 108:5
121:24 134:25

**applied**
37:23 44:5
95:17,20
96:6,19 97:23
99:4 105:15
108:5 109:20
110:8 112:10,
16,20 121:2,
3,8,13

**apply**
35:25 48:10
52:23 53:19
88:6,20
95:11,15 97:8
99:11 100:15,
24 108:12,23

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                          4

109:15 112:13

**applying**
98:8 101:11
107:14,20
114:20 121:9
126:7 134:5,8

**apprehend**
50:23 51:1,10
59:4

**apprehends**
22:8

**apprehensions**
14:3 115:8

**appropriately**
48:16

**approve**
94:7

**approved**
93:12

**approximately**
76:19,20

**area**
11:3 21:4
54:21 91:17
132:4

**areas**
91:18 97:4
114:10

**Arizona**
25:4,6

**arrangements**
57:5

**arrest**
36:7 50:6
52:19,24 61:3
125:3

**Arrest/notice**
61:15 62:2

107:11 111:15
112:19 124:24

**arrested**
52:11 61:20

**arriving**
57:15

**art**
35:21 80:24

**aspect**
17:9 24:3,6
31:1 39:24
40:6,14 43:3
73:1 78:20

**aspects**
14:19 41:3,12
56:12 78:23
81:17 121:23

**assess**
29:16

**asset**
25:22 40:6

**assign**
71:11

**assigned**
71:13,15 97:5

**assigning**
25:20

**assist**
40:8

**assistant**
27:11,21

**assisting**
40:20

**association**
5:11

**assume**
13:16 27:7
119:2 134:6

**assumptions**
83:8

**asylum**
121:1

**ATD**
13:10,18
18:14,17
42:10 43:16,
17 44:4,11,17
66:7,8,15
67:13 86:20,
24 87:3,4,11,
25 88:6,10,
14,19 89:4,8,
18,19,20,24
92:1,11,17,
23,25 93:9,
16,19,23
94:7,10
95:11,15
103:20 107:8
109:15,16,18,
20 110:3
112:3 123:3,6
129:1,11
132:18,19,23
133:1,3,9,13,
22 134:2,15,
17,25 135:3,
5,10,15,18,
20,22 136:1,3

**ATDS**
66:19

**attach**
71:17 135:3

**attached**
12:20 19:23
21:13 34:18
45:3 72:21
82:14 83:13
114:25 118:5

119:23

**attempt**
48:6 56:1
70:13 80:3

**attempting**
48:24

**attempts**
60:22

**attend**
39:5

**attends**
39:3

**attention**
78:11

**attorney**
8:8 10:10
129:25

**attorneys**
35:10,11,17
129:24

**audible**
8:4 10:8

**aunt**
46:15 79:9

**austere**
54:19

**authority**
52:15

**authorization**
89:18

**authorize**
93:15

**authorized**
88:20 89:23
92:25 136:9

**automated**
72:8

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                    5

**availability**
98:19 99:17
102:7 108:19
110:19,24

**average**
76:17 94:1

**aware**
81:9 82:23
92:21 134:12

---

**B**

---

**back**
16:7 38:21
49:8 51:15
54:3 58:14
59:13 63:19
64:22 73:10
78:8 81:14
82:8 85:19,24
86:10 96:1
97:2 98:6
99:9 101:9,14
106:20 108:15
114:10,16
116:17,18
119:6 120:3
121:5 122:7,
20 128:3
132:5

**background**
18:20

**backtrack**
96:20

**bag**
85:12 86:1,2
98:4

**baggage**
85:12 86:1,2
98:4

**Barker**
5:5 6:23 8:23
9:10 12:13,22
78:10 92:8
104:20 133:3

**base**
81:20

**based**
14:18 37:1
42:22 65:9
68:13 76:13
89:14 97:10,
20 132:6

**basically**
24:11 34:21
46:22 47:25
53:20 55:12
74:9 91:7
116:7,17
117:11,18

**basis**
36:7,24 44:16
63:9 88:5,16
89:13 127:14

**bed**
98:20,21
99:15,22,23
100:2,10

**began**
5:2

**begin**
6:15 8:1

**begun**
127:7

**belongings**
69:1

**Biden**
17:6

**binding**

43:18

**biographic**
54:24 55:2
58:8,10,15
60:11

**biographical**
53:20 54:14
59:14,16
60:18 63:12
69:23

**biometric**
53:20 54:14,
23 55:9
58:10,12,15
60:11 63:12
70:1,10

**biometrics**
70:5 81:6

**birth**
49:13 70:17,
20

**bit**
13:25 48:19
84:19 96:20

**blanche**
127:18

**blocks**
21:17

**board**
118:8

**boat**
85:19

**bonded**
103:10

**bono**
129:24

**border**
13:23 20:11
21:4,6,18,23,

24 22:8,20,
22,23 23:2,
10,14,21
25:3,5,6,12
26:2 29:24
30:3 31:10,
18,22 32:21
33:13 34:3,6,
7,22 35:10,14
38:1 39:3,6,
7,11,17 40:7,
12,14,16,18
41:14 42:3,5,
7,11 43:25
45:6 46:2,5
47:8,19,20,21
48:19 49:22
50:17 53:12,
24 54:1,7
55:6 57:15
63:22 64:10
78:13 82:25
83:16,22
84:5,6 85:1
87:11,23
91:23,24
93:12 96:20
98:13 99:24
100:1,17
101:5,21
113:1 115:2,8
116:10,11
130:6 135:17,
18

**borders**
20:20 30:1
79:7

**born**
49:10 50:19

**bottom**
20:10,13

bracelet
  133:19

bracelets
  133:11

branch
  26:12 32:20
  42:20

break
  8:12,13,21
  10:13 48:18
  71:19 77:13
  136:16,20,24

breakdown
  14:21

briefing
  43:12

briefly
  18:19 20:17
  25:19 29:11
  35:7 42:3

bring
  22:9

bringing
  57:11 59:5

broadbrush
  51:17 112:25

brought
  75:3,6,8,9
  82:6

building
  22:6,7,9
  80:19

bullet
  35:3

Buren
  27:25 28:1

burglary
  62:12

Business
  19:3,5

busy
  59:3

—————————————
            C
—————————————

call
  68:23 117:10
  118:2 133:10,
  19

calling
  80:24

calls
  69:6

camp
  117:10 118:2

Canada
  29:24 113:21

Canadian
  114:3

canine
  32:17

capability
  110:1

capacity
  7:13,20 9:25
  11:16,17,22,
  23 91:9,10
  111:1 133:4,8

Capella
  18:24

capture
  58:13

card
  117:19,24

cards
  117:10 118:2

career
  125:18

carte
  127:18

cascade
  43:7

case
  7:8 9:17,18,
  19 17:7,15
  29:24 55:24
  56:13 68:4
  127:3 129:24

case-by-case
  88:5,16
  127:13

CAT
  73:24

catch
  105:21

categories
  45:16 47:8,16

category
  84:14

caught
  63:21

caveat
  122:7

CBP
  6:9 9:22,23
  17:11 20:18,
  19 21:15,16
  36:20 78:12
  100:13 101:16
  103:1,2,8
  108:12 109:15
  110:25 120:25
  126:19
  127:16,21
  130:9

CBP's
  34:21 119:19

cease
  119:13

Celani
  5:9

cell
  11:3

cellular
  133:18

center
  34:21 57:24
  59:1 64:23
  75:7,12 82:9
  100:18 124:2,
  11

centers
  59:6

certificate
  70:17,20

certificates
  49:13

Champlain
  18:23

change
  43:13 126:20,
  25 127:17,21
  128:6

changed
  93:10 127:4

changing
  127:11,19

Charette
  6:6

charge
  27:25 28:18
  56:18

charges

37:15 56:17

**chart**
20:2,5 21:15,
16 45:16 46:1
84:1,21 85:7,
10,25 86:11
115:12,19
117:21,22
118:19

**Chase**
5:10

**chat**
12:2 34:15
82:11 83:10

**check**
77:11 122:8

**chief**
6:23 7:21
9:10 10:2
12:12,22
21:18 27:11,
21 30:7,22
31:9 33:6,10,
16,22 43:5
78:10 92:5,8
93:12 104:20
133:3

**chiefs**
44:14

**child**
46:17,18,25
47:1,3,4
64:12,13
65:7,16,21,22
66:1,5,25
67:3,4 68:15
69:3,14 70:3,
10,14,21,24
74:20 79:5,8,
16,24 80:2,

19,25 81:2,8
106:9 120:12,
14 123:18
131:4,5,8

**children**
46:24 69:14
72:3 114:1

**choose**
97:9 104:6
106:5

**chooses**
126:19

**choosing**
6:12

**chosen**
122:17

**chronological**
81:23

**CIMT**
62:8

**circumstance**
50:8 51:16
52:13 63:25
64:14,17
76:14 82:7
100:22 102:2
108:11 113:6
124:14

**circumstances**
22:13 37:2,3
44:4,19 46:24
50:11,15 51:5
52:22 53:1,4,
11 54:11
56:24 57:14
58:22 59:3
61:17,21
62:18,19,22
65:6,9 68:1
69:17 71:2,6

73:21 74:4,
13,14 75:18
79:18 80:9,13
87:18 90:21
91:2 96:8,19
97:10,20
98:7,23
107:16
108:17,22
109:1,14
110:3,7
112:3,6,7,9,
12,18,21
113:10 114:2,
4 126:24
127:16,20
128:7,11
132:7 135:8

**CIS**
74:1 116:12

**cite**
37:9

**cited**
16:14

**citizen**
51:8

**citizens**
47:15

**citizenships**
109:23

**claim**
73:24 74:2
102:4,8,9
116:8 121:1
128:14

**claiming**
96:9 98:17
114:7,8

**clarification**
84:22

**clarifying**
78:19

**clarity**
78:25

**clear**
10:7 11:20
52:5 58:1
73:24 134:20

**closely**
74:25

**closest**
130:1

**collect**
15:14 131:5,
12

**column**
84:7 119:4

**comment**
120:3

**commissioner**
88:13 93:13

**committed**
51:22 52:1,2,
8 62:24 63:8

**committing**
51:20,24

**common**
120:15

**commonly**
21:5

**communicated**
42:17

**communication**
24:14

**compared**
124:21

**compilation**
32:8

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

complain
102:12

complaint
7:9 16:16,19,
22 17:2,3

completed
62:3 68:11
117:25

completely
66:17 67:2

complex
35:24 60:17
65:10 126:4

complexities
64:5

component
22:18 31:22
68:7

components
21:22

composition
122:25 123:7

compound
126:17

compounded
126:1

compounding
123:17

comprehensive
57:1

computer
11:1 81:20

concern
80:6,11

conditions
89:14 129:10

conduct
56:25 68:10

conducting
6:16,25 58:18
77:1,2

confined
66:9 93:19

confirm
48:20

confirmed
69:5

confronted
51:13

connect
94:5

connection
66:5,18

connectivity
54:17,22
58:14 82:4

consequence
94:20,23

consideration
49:16

considered
46:19 48:3
49:17 109:10
130:3

considers
48:3

consistent
60:12

consistently
92:17,19

constant
32:15,19

constitutes
47:2

constitutional
34:11

consulate
71:3,6 80:12

consulates
80:17

consultation
32:24

Cont'd
9:7

contact
57:7 71:3,6
124:1 129:7,
25

contacts
131:2

contained
83:18 84:19

continue
6:18 59:10
67:22 69:9
95:5 113:8

continuing
58:25

contract
40:19

contributing
56:12

conversation
69:11 73:17
131:16

conversations
44:14

conveyances
91:16

coordinators
39:8 40:8,18

copy
12:12,13
129:2,20,23

130:3

corner
20:10,13

corporate
7:16 9:22,24
11:16,21

correct
7:11,12 10:1,
20 14:13
20:3,8,9,12
22:22 27:8,9
30:7,20 35:6
39:15 57:19
58:10 59:18
63:17 77:4
86:16 91:25
100:9 101:18
104:1,8
107:1,5
108:14 113:16
118:20 119:8
122:15 125:8
126:8 128:23

correctly
103:6

corridors
31:19

coulds
114:17

counsel
5:12,14,16,
18,22 6:4,6,
8,18,24 10:17
13:12,16
15:2,7,11,21,
25 79:20
109:3

countries
55:18,19
73:9,15 79:22

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

9

94:13 99:8
101:10 113:24

country
50:20 57:6
60:22 62:14,
24 63:4 71:7
76:17,19
79:19 94:18
95:2,4 99:13
101:8,13,25
103:19 109:22
110:18 114:7,
9 116:9 128:2

country's
80:12

couple
65:24 88:23
103:16 126:14

court
8:2,15 10:4
17:15 129:22

cousin
46:15 79:9

CPB
45:5 75:3
78:11 100:12

CPB's
45:10

create
42:21 82:5
117:15,22
118:13

created
44:21,22
50:25 82:7,22
116:4 117:17
118:3

creation
72:10

credible
102:17 116:12

crewman
85:15,18
86:1,5

crime
51:1,20,22,25
52:2,8 62:7,
8,24 63:8

crimes
52:3

criminal
19:1 21:1
29:23,25
34:10 55:6
57:10 61:24
62:4,5,9,12,
14 63:3 65:17
98:14 113:2,6

criminality
53:23 112:25

criminals
76:11

criteria
97:7,22,25
98:10 99:2,4

critical
50:7 66:1

cross
49:11,12

crossed
50:17 53:15

crosses
47:7 63:22
65:16

crossing
23:20 38:3

Cuba
94:2

Cuban
87:22 94:11
109:21

Cubans
128:3

current
13:10 14:10
33:1 76:15
82:24 85:6
100:10 110:1

custody
36:12 38:20
48:15 54:3
61:3 67:5
74:24 75:20
76:15 77:6
84:4 91:18,
19,24 96:15
101:9 102:22
103:3,22,23,
24 104:1,3,4
110:5,22
111:6 112:7
116:11
120:24,25
121:21,24
128:22

Custom
45:6

Customs
20:11,14
78:13 83:16
115:2

_____

D

D.C.
10:15 26:11
31:9

daily
14:2,3 25:20
28:5

Darrow
5:16 6:20 8:8
10:10,18
12:5,7,11,15
43:17 44:1,11
50:1 66:8
69:6 70:25
77:17 84:22
87:4,13,15,20
88:8,21 89:6,
25 90:11,18
91:14 92:4,13
93:2,8,17
94:8,21 95:7,
13,22 103:11
104:18 105:4
107:22 109:16
132:25 133:7
136:17

data
14:11,16,17
15:13 17:10
81:16 130:19
131:5,8,9

database
59:17 63:5
130:14

databases
55:4

date
61:12 104:15,
23,25 129:21

dates
30:10 133:20

David
5:9

day
60:9 131:22

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                 10

days
  74:16 75:17
  126:5
deal
  23:20
December
  90:5
December-ish
  90:2
decide
  100:14 135:5
decided
  32:4
deciding
  96:21
decision
  63:13 67:11
  97:15,19
  98:6,7 106:4,
  11 135:9
decision-making
  135:12,15
decisionary
  101:20
decisions
  98:24
declaration
  41:7
decompress
  91:20
decompression
  90:22 91:6
decreased
  92:21
default
  95:4
defendant
  6:5,7 7:15

defendant's
  6:17
defer
  13:16 15:21,
  23 102:20
  109:3 133:12,
  22 134:4,7
  135:12
defined
  44:12 73:9
  79:3 87:5
defines
  129:10
defining
  22:3
definition
  46:20 79:11
degree
  18:21,23,25
  19:7 43:1
  50:25 67:8
  68:9 80:10
  86:15 94:15
  120:10,11
  121:15 124:3
  130:17
Del
  23:12,18
  89:9,22
  90:22,25
  92:1,16
delayed
  74:7
delineate
  40:25
delineates
  44:3
delineating
  31:1

deliver
  35:18
demographic
  93:11 109:22
demographics
  109:23
demonstrates
  129:10
demonstrating
  129:3
department
  119:12,16
departments
  27:4
depended
  24:24
dependent
  54:16 58:13
  61:17 62:18
  63:1,2,7
  86:17 102:15
  107:15 110:23
  128:10 135:8
dependents
  62:17
depending
  52:13 74:17
  75:24 76:8
  90:20 100:21
  101:6 106:23
  108:17 112:3,
  5 114:1,2
  122:16 123:2
  124:10 125:1
  127:12
depends
  24:17 41:18
  49:3,6 50:14
  51:4 52:14

56:14 58:21
61:13 62:6,9,
17 64:2,3
68:19 69:10
70:3 74:22
75:18 81:15
96:7 111:12
122:25 124:13
125:12 126:21
131:4
depict
  83:4
deployment
  29:19,22
deported
  98:1
deposed
  7:1,4,14,16
  9:11 11:16
deposition
  5:5,7,21
  6:16,18,25
  11:20 12:8
  13:8 107:23
deputies
  44:14
deputy
  7:21 10:1
  27:25 30:21
  31:9 33:15
  43:5
describe
  29:12 34:5
  35:7 63:24
  132:24
describing
  34:21
designated
  92:6 104:20

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

107:24

**designation**
92:8

**destination**
104:6 131:14

**destined**
102:25

**detain**
52:16 56:1,5,
6,8 62:13,21
98:21 99:18,
25 100:11
102:7 109:6,7
110:1 113:9

**detained**
96:11 100:17
102:22 111:23
120:17,20
121:19,21
122:3 125:11
128:18

**detaining**
109:1 122:12
125:6,16

**detect**
38:14

**detention**
40:9 56:2,18
61:16 62:1
75:3 89:15,16
92:20 94:14
95:6,12,18,21
98:16,19
99:16,23
100:2,3,17
104:9,12,14,
18 106:14,16,
19,24,25
107:12
108:18,21,24

109:5,7,11,13
110:1,25
112:8 113:4,
17 120:22
122:4,10
125:14

**detentions**
102:6

**determination**
67:15 97:19
106:2

**determine**
36:6 38:17
47:24 48:25
49:7,9 50:3
52:4 55:5
63:16 64:18
66:4,6,14,22,
24 67:16
68:12 73:7,14
74:2,5,10
79:15 97:1
107:17 111:10

**determined**
48:12 53:8
67:1,17 88:15
103:8 127:13

**determines**
49:23

**determining**
41:5 48:7,24
64:10 97:8
105:16

**Detroit**
7:22 10:2
30:22

**develop**
23:23 32:11

**developing**
28:9 31:25

**development**
32:2,9

**device**
132:16

**devices**
54:22 133:16
134:2,3

**DHHS**
67:6

**DHS**
19:16 20:2,5,
8 22:18 31:7
33:2 34:2
82:18 109:2
133:5

**DHS's**
17:20,23
18:1,7

**diagram**
84:1

**dictated**
132:9

**difference**
21:21 31:1
45:22 78:18
116:6

**differentiates**
116:13

**difficult**
8:18 51:18

**DIRECT**
6:21 9:7

**direction**
24:22 119:11
132:6

**directly**
53:2 54:9
66:21 108:8

**Director**
33:23

**Directorate**
32:22

**disclosed**
13:14 82:18

**discontinued**
119:11

**discovery**
13:14 15:22
16:9 17:18
82:18,19

**discretion**
96:21,25

**discuss**
109:18

**discussed**
115:17 128:16

**discussing**
111:5

**disposition**
15:13 38:23
48:17 76:2
77:3 83:22
84:7,8 85:2,
23 106:12
115:9 116:20
117:13,14,18
118:16 119:1
122:17,21
128:8

**dispositions**
14:18 17:12
39:1,2 85:7,
9,21 86:8,12
96:3 115:12
120:1 121:7,
13,18

**dissemination**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

32:5

**distinction**
78:16

**Division**
30:7

**DNA**
66:3,25
67:10,24
68:2,11 74:18

**docket**
102:10

**document**
12:23 16:25
19:25 34:20
45:5,14
82:17,19,22
83:3,18,21
84:20,23
117:11 129:4,
7,9

**documentation**
49:11 50:22
53:16 68:22
79:23 128:17,
25 129:3,9,
11,19

**documents**
13:13 14:24
15:5,10,17
16:1 68:21
77:21 80:4
128:19

**DOJ**
62:20

**dots**
94:5

**driving**
34:12

**drop**

12:1 19:18
21:8 44:24
82:10 83:9
114:22 119:1,
17

**dropped**
34:14

**due**
29:21 46:8
53:3 93:23
94:12 113:6
127:3

**duties**
23:8 25:9,20
26:21 28:2
29:12 30:15
31:13 41:9
51:13

**dynamic**
34:8

---

**E**

**earlier**
78:15 108:16
111:5 120:4
122:14 130:2

**easier**
121:22

**easiest**
107:19

**easy**
74:13

**educational**
18:20

**EEO**
7:9 9:18

**effectuated**
85:15 98:4

**electronic**
59:17

**electronically**
12:19 19:22
21:12 34:17
45:2 82:13
83:12 114:24
119:22

**element**
29:25

**eligible**
67:13

**Elissa**
5:18

**employee**
40:5

**employment**
7:10 9:19
30:11

**enact**
128:13

**encompassed**
77:5

**encompasses**
16:4

**encompassing**
31:4

**encounter**
36:4 38:3,15
46:10,13
47:23 48:4,21
50:9,10,15
52:18,20
53:14,22
60:10,24 67:4
72:15,16
105:22 113:23

**encountered**
14:6 47:6

49:4,6 58:19
60:2 73:12

**encountering**
40:10 61:8
93:25 127:25

**encounters**
14:6 38:10,12
45:7 47:19
58:24 60:24
72:12 83:22
84:6 85:1
135:18

**end**
33:21 65:10
79:7 91:1
96:17 127:9
129:12

**ends**
116:7

**enforcement**
20:14 26:11
27:16 33:23
34:11 39:13,
18

**engage**
40:13,22

**engaged**
58:7 80:17
97:3

**engaging**
80:13 81:19

**ensure**
47:25 53:22

**entail**
25:18 38:11

**entailed**
34:6

**enter**
60:22

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                              13

entered
  50:4,25 51:6,
  19,21 52:2,7
  101:25

entering
  36:5 51:8
  72:5 81:16

entire
  16:21 25:24
  28:5,6 30:8,
  18 76:17,18
  125:18

entitled
  45:6 82:17

entity
  109:2

entries
  84:10

entry
  21:24 22:1
  23:22 36:5
  38:6,8,10,12,
  15 46:14 51:7
  56:9,10 61:9
  65:18 112:11
  118:23

environments
  54:20

equipment
  27:5

ER
  99:7,19
  101:17
  105:17,19,24
  107:9,10,15,
  16,17 110:21
  111:3,7,8
  121:2,25
  125:13,15,20

ERCF
  102:7 120:23
  122:12

essence
  26:23 31:16
  42:19,23
  56:15 79:6
  80:25 116:1
  129:21 135:22

essentially
  25:13 66:4
  71:14 117:10

estimates
  81:7

et al
  5:7

evaluate
  50:10 56:13
  64:8

evaluated
  51:16

evaluating
  26:23 64:12

event
  59:25 60:2,4
  71:20 72:11

evolution
  41:22

evolutions
  41:19

exacerbates
  127:8

exact
  21:3 33:8
  53:5 76:20

EXAMINATION
  6:21 9:7

examples

51:12

excepted
  65:18 114:14

exclusive
  134:15 135:7

excuse
  31:11 44:24

execute
  61:6

executing
  28:11,14

execution
  24:3,6 28:12
  32:6,8

exhibit
  12:2,18
  19:18,19,21
  21:8,9,11
  34:14,15,16
  44:25 45:1
  82:10,12
  83:9,11,25
  84:1,3,25
  85:24 86:10
  96:1 97:14
  106:20
  114:22,23
  115:7 119:18,
  21 121:5
  122:20 135:17

exigent
  37:3

existing
  15:18

Expedited
  99:20,21
  100:25 101:4,
  12 102:3
  103:7,18

110:12 112:10
123:13

expeditiously
  111:1

expel
  52:18 54:8
  55:17,20 99:6

expelled
  53:8 77:7

experience
  127:6

explain
  13:25 20:17
  59:24 78:17
  103:15 107:19
  121:22

exploit
  30:1

expulsion
  38:24 52:20
  74:11

expulsions
  99:15

extreme
  86:6

extremely
  51:17 59:2
  64:14 65:8
  90:23 126:4

_____

_____
          F

face
  60:15 69:16

facial
  55:11,12 81:6

facilitated
  57:15

facilities
  122:11
facility
  75:3 99:24
  100:1
fact
  7:17,18 9:23
  18:8 65:22
  69:5 79:16
  80:4 93:23
  94:12 103:25
  106:3
factors
  75:19 109:9
facts
  16:13 127:3
fail
  102:17
fair
  45:15 93:7
  101:14 119:2
falls
  103:5
familiar
  17:8,10 36:15
  37:4,10,12
  42:13 45:9
  78:21,23,24
  82:20,21
  133:9
families
  45:20 99:17
  101:3 102:11
  103:7 107:14,
  21 110:2,10
  113:24
  120:22,24
  121:4 122:12
  124:12 125:6,
  16 132:14,19

134:6,12
family
  45:25 46:9,19
  47:2,3,9
  63:22 64:3,4,
  6,7 66:22,23
  67:1,2,19,22,
  23 68:2,9
  69:4,5,12,21,
  24 70:2,11
  71:4,12,14,
  15,16,18,22,
  23 72:1,13,
  15,20,22
  73:12 74:15
  78:16 79:2,3,
  5,12 80:14,
  15,21,22,23,
  25 81:13
  86:14 87:10
  98:18 99:1,5
  100:3,7,11,
  15,16 102:3,
  6,21 103:17
  104:9,12,18
  106:3,8,10,
  13,14,16,21,
  23 107:7,8,13
  109:10,11,15,
  21 112:11,16,
  17 113:13,15,
  18 114:19,21
  120:9,16,19,
  22 121:13,19,
  20 122:10,24,
  25 123:6,8,15
  124:16 125:5,
  7,11,13,16,
  19,24 126:1,
  7,13,16
  130:9,21
  131:20,25

132:2
fantastic
  136:18
fashion
  51:9
faster
  76:22
fault
  103:15
fear
  73:24 96:9
  98:17 102:4,
  9,10,12,18
  114:7,8,16
  116:8,12
  121:1 128:14
February
  33:4
federal
  60:6 67:6
feel
  68:8 80:9
fees
  27:4
feet
  47:20 63:23
field
  21:19,25
  26:24 27:2,6
  32:5,7 39:14
  42:14,15,21,
  23 44:15
  51:11 53:2
  54:9,14 57:1,
  19 58:4,11,24
  59:4 75:6,12
  82:3
field's
  31:21

fielding
  27:5
file
  59:19 130:16
filed
  17:6
files
  132:12
filings
  17:15
final
  94:16 104:6
finalization
  94:15
find
  57:2 73:18
  105:10
finding
  82:1
fine
  5:25 12:12,14
  29:1
fingerprints
  55:13 60:13
FINS
  60:4,6,13,25
  71:11,13,24
  72:2,5,10,11
  82:5 130:16
fiscal
  45:7 84:4
  115:3,5,15
  119:20 120:2
  121:6
fits
  47:8
five-minute
  136:16,24

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

**flight**
101:6 111:4,6

**Florida**
5:6,15 6:24

**Florida's**
17:21,24
18:2,7

**flow**
110:4

**FMU**
45:22,24
72:20

**FMUA**
45:17,21,24
72:19

**focus**
40:5 43:2,4

**footnote**
16:14,17

**foreign**
50:20

**foremost**
55:25

**forfeiture**
40:6

**forfeitures**
25:22

**form**
48:22 49:1
50:1 70:25
81:6 117:15
118:6

**formal**
85:13

**format**
22:15 117:23

**forthcoming**
76:6

**found**
48:12

**foundational**
36:13

**Fraihat**
96:12 108:20,
24,25

**frame**
7:7 9:16
27:12 33:5,8
41:23 76:13,
20 81:24 90:3
101:2 108:2
118:5,19,22

**frames**
44:3 105:20
124:19 128:10

**framework**
114:12

**fraud**
68:9,13 70:11
71:5,9 80:10,
14

**fraudulent**
67:21

**front**
16:20,23
26:15 28:24
50:7 53:23
57:3 59:12
61:17 62:18
65:5,11 68:5
69:17 73:21
91:3 96:8
97:11,20
114:6 127:4
128:11

**Fudim**
5:18 6:1

**fulfill**
27:1

**fully**
40:21

**function**
39:13

**functionality**
30:24 33:14

**functions**
29:7,11 40:20

**fundamental**
36:14 41:3

---

**G**

**G-56**
129:4

**gain**
57:9 63:4

**gap**
27:1

**gaps**
26:24

**gas**
39:25

**gave**
133:17

**general**
37:20 133:15,
21

**generated**
61:19,22

**geographic**
114:9

**gestures**
10:9

**get-go**
34:4

**give**
7:25 8:4 9:1
10:7 63:19
65:14 69:10
92:9 122:1
123:20 136:12

**good**
6:23 77:19

**gosh**
85:17

**gotcha**
86:4 107:6

**graduate**
18:22 19:2,9

**Grande**
89:12,14 90:8

**granted**
51:1

**graph**
46:6

**graphic**
72:19

**great**
77:13

**greater**
124:3

**greatly**
76:4

**ground**
8:1 42:18

**grounds**
92:5

**group**
59:8 60:1
64:3 67:2
69:12 71:14,
21 72:11
79:2,5,12

80:23,25

**groups**
46:9 59:5
78:17 80:21

**guardian**
47:5 65:23
79:4,11,16,24

**Guatemala**
50:20 116:2,
17,18

**guess**
97:17 107:18
134:21

**guidance**
24:18,22
42:14,17,22,
23 43:22
136:3,7,8

**guys**
12:3

---

**H**

---

**half**
26:14 122:23
123:2,14,17,
18

**hand**
8:24 10:9

**hand-to-hand**
35:17

**hanging**
136:21,22

**happen**
28:14 53:7
68:24

**happened**
119:9

**happening**

69:11 116:7

**hard**
77:21

**harm**
48:1

**HARP**
115:20 116:2,
12 119:6,14
120:24 121:23

**hate**
69:9

**head**
10:9 18:5
37:19 90:14

**header**
118:16

**heading**
83:21 115:7

**headquarters**
26:10 31:10
32:21 33:13

**headquarters'**
31:20

**health**
52:15 67:6

**hear**
86:25

**heard**
102:10

**hearing**
121:1,2
129:23

**heavily**
80:17

**held**
5:8 30:2

**Helen**
5:10

**helping**
32:14,16 59:7

**hereditary**
66:18

**hereto**
12:20 19:23
21:13 34:18
45:3 82:14
83:13 114:25
119:23

**hey**
74:9

**HHS**
67:5

**high**
90:23 91:18
102:14 110:4

**higher**
88:6

**hip**
11:4

**history**
14:5 55:7
58:8,16 61:24
62:4,5,9,12,
15 63:3 65:17
98:14,15

**hoc**
89:13

**hold**
8:20 99:25
101:4 111:5
116:10

**holding**
100:18 101:5
110:25 111:17
124:17

**holdings**
122:13

**home**
101:10 103:18
114:7

**Homeland**
68:8

**hone**
53:13

**honest**
16:17 17:16
35:11 44:6
79:19 104:24
114:1

**hope**
60:16

**horse**
32:17

**Houlton**
28:19 29:7,9,
14 30:8,9,18

**hour**
122:23 123:1,
14,17,18
124:9

**hours**
74:15,16,19
75:17 76:18,
25 101:6
111:4 122:23
123:2,25
124:4,9 125:1
126:11,14

**HSI**
68:7

**human**
67:6 72:9

**humanitarian**
37:2

**hundred**
63:23

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                    17

**hypothetical**
 63:20

**hypotheticals**
 47:18

---

### I

**I-385**
 116:22 117:5,
 8,9,12 118:4,
 6,11

**i.e.**
 96:15

**ICE**
 20:23,24,25
 38:25 68:7
 77:8 96:15
 98:20 100:1,
 2,5,8,10
 101:8 102:19,
 20,22 103:5
 104:11,24
 105:9 108:18
 109:3,5
 110:22,23
 113:5,6
 120:23 122:3,
 4,8,9,12
 129:5 130:2
 133:11,13,22
 134:4,8
 135:3,5,12,
 15,22

**ICE's**
 135:9

**idea**
 133:15

**identification**
 12:19 19:22
 21:12 34:17

45:2 48:23
49:2 50:18
60:5,6 82:13
83:12 114:24
117:11,19,24
118:7 119:22

**identified**
 60:13

**identify**
 27:1 48:6
 59:24 65:1
 70:24 73:5

**identifying**
 50:19 81:18

**identity**
 48:20

**ideology**
 117:16

**illegal**
 38:14,17
 47:14 51:24
 65:18

**illegally**
 23:20 36:5
 38:3 48:12
 49:24 50:4,
 17,25 51:9,
 20,21 52:2,7
 53:15 60:23
 102:1

**illuminate**
 57:10

**immediately**
 56:3

**immigrating**
 132:8

**immigration**
 20:14 34:11
 35:5,13,23

36:13 37:14
55:7 98:15
128:19

**immoral**
 62:8

**impact**
 75:20 100:12
 106:4,11

**impacted**
 110:4

**impair**
 11:12

**implement**
 24:1

**implementation**
 24:2 32:6,9,
 20

**implemented**
 92:18

**implementing**
 28:11,13
 31:25 107:14

**implements**
 36:20

**implied**
 109:13

**important**
 35:22 40:25

**improperly**
 74:20

**INA**
 36:18 37:8,11

**include**
 85:25 86:4
 118:11 124:7

**included**
 93:22 117:12,
 21,23 118:15

119:4

**includes**
 115:19

**including**
 127:22

**inclusive**
 134:15 135:2,
 7

**incorporated**
 129:8

**increasing**
 14:10

**independent**
 50:8 60:18

**indication**
 80:6

**individual**
 7:19 9:25
 11:17,23
 38:22 39:7
 46:16,18,19
 47:24,25
 48:6,17,22
 49:20 50:3,
 11,24 51:15
 53:5 55:17,20
 56:15 57:3,14
 58:20,24
 59:15 60:3,4,
 7 61:19
 63:13,20
 66:21 69:17
 71:23,24
 72:15,25
 73:12 75:23
 76:14 80:2
 81:13 87:25
 88:14,17 91:3
 96:9,10
 97:11,21

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022
                                                                    18

101:25 109:6
112:6,13,20
114:5,6,13
118:7 122:22
123:4,13,23
124:22,25
125:22 126:2
127:4 128:11
135:6

**individual's**
41:6

**individualized**
130:19

**individuals**
36:4 37:1
39:23 40:17,
19 43:1,6
64:11 65:5
67:17 71:18
72:21 76:9,
22,23 79:21
86:23 87:2,9
93:24 97:6
98:9 99:9,10
108:12 109:25
110:8,13
112:17 113:20
116:8,16
132:7

**influence**
11:11

**information**
16:4,14 26:11
34:21 42:25
43:4,7 53:21
54:14,24
55:1,2,9
56:22 57:13
58:8,12
59:14,16
60:10,11,14,

19 63:4,5,8,
12 68:17,20,
25 69:23
70:1,10
83:15,18
84:19 130:1,
5,6,13,24,25
131:1,7,18,23

**informed**
42:4

**inherently**
128:12

**inquire**
130:20

**inside**
83:18

**inspecting**
49:21

**inspection**
49:18

**instance**
22:8 42:22
62:20 75:22
82:4 85:25
98:2 128:3,17
135:16

**instances**
75:1

**instructed**
8:11

**instruction**
35:4,8,17,23
43:10,16 44:9

**instructions**
26:2 42:10

**instructs**
10:12

**intelligence**
28:19 29:7,

11,14 30:4
31:22 57:10

**intend**
5:20 6:9 13:5

**intending**
131:21

**intends**
130:9

**intensive**
135:10

**intentionally**
106:16

**interim**
102:21

**interior**
100:20,23
105:14,23
130:11 132:15

**international**
63:6,9

**interrogatories**
17:24 18:7,11

**interview**
49:14,17
56:21 57:17,
18,21 58:7,
17,19,25 59:7
65:25 66:25
75:13 77:1,2
79:25 80:19
82:1 131:15
132:5

**interviewing**
49:20 66:1
76:3 81:19,24

**interviews**
56:25 68:10
81:11

**Investigations**
68:8

**involved**
28:8 32:2,7
90:21 98:8
124:4

**irrespective**
73:11

**Isle**
18:22

**issue**
7:10 113:11
128:15

**issued**
72:5 119:3

**issues**
96:11

**items**
15:22

**iteration**
108:5

---

**J**

**jail**
111:22 127:10

**January**
14:8 104:10

**job**
8:18 22:25
23:8,23 25:9,
20 26:21 28:2
29:12 30:15
31:13 39:24
40:6

**jobs**
36:1

**joint**
22:16

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Joseph
  5:16

journey
  57:4

July
  5:8

jump
  85:18

justice
  19:1

**K**

Kaitlyn
  6:6  10:22

kind
  21:4  28:24
  29:16  35:19
  51:14  53:12
  71:19  97:2,14
  98:5,6  101:20
  108:15  109:3
  133:23

kinds
  54:4

knowing
  106:13

knowledge
  15:4,9,15,19
  36:13  57:10
  133:21

**L**

lack
  76:10  97:15

large
  35:10  47:13
  57:20  59:5
  64:1,16,24,25

71:21  73:13
90:23,24
125:13

larger
  109:2  124:8

lateral
  90:21  91:5

law
  33:23  34:10,
  11  35:5,13,
  20,23  36:8,
  10,13  38:19
  39:13,18
  41:21  48:10,
  12,13  49:23
  104:3

laws
  37:15

lawsuit's
  18:13

layers
  71:25

leadership
  24:10  31:20

leading
  29:13

leave
  24:25  26:6

left
  10:22  63:11

left-hand
  20:10

legal
  36:7,10  41:21
  47:5  50:21
  56:17  65:22
  78:23  79:4,
  11,16,24

legally
  48:8  50:22
  53:17

legitimate
  20:20  21:25
  80:5

length
  81:11

lesser
  58:23

level
  27:20  33:16
  69:19  88:13

liaison
  31:17

lie
  60:8  76:6

lights
  40:1

limited
  41:13

limiting
  114:11

lineage
  41:5

lines
  71:5  79:8

lingo
  68:23

list
  115:14

listed
  86:21  135:18

lists
  16:3

litigation
  108:25

live
  102:25

living
  21:2

locale
  96:16

located
  8:19  10:14
  23:11  102:23

location
  22:16  38:21
  52:11,25
  58:3,15
  105:13  129:21

locations
  58:11  59:2
  75:9,13
  104:12,13
  129:5

lodge
  8:9

logistics
  40:9

long
  19:15  23:3
  25:7  26:13
  27:13  29:1
  72:23  73:5
  123:12  126:3,
  10

longer
  32:7  57:21
  75:10  76:12,
  24  119:7,10
  124:8

longest
  124:18

lot
  69:11,15

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

75:19 114:17

**lower**
89:16 91:19

---

**M**

**made**
41:19 60:22
63:13 78:16
80:3 101:20
105:14

**main**
41:23

**Maine**
18:22 28:1
29:8,9

**mainstay**
85:20

**majority**
86:7 115:14
120:5

**make**
5:20 8:17
11:24 57:5,25
132:11

**makes**
14:23 60:16

**making**
67:11 106:11

**manifesting**
101:7

**manner**
6:19 80:22

**manpower**
29:22

**March**
14:9 118:22

**March-ish**
33:5

**marked**
12:19 19:22
21:12 34:17
45:2 82:13
83:12 114:24
115:6 119:22

**marrying**
35:20

**Master's**
18:23

**matter**
5:6 18:8
62:23 75:16

**meaning**
49:23 93:10
100:8 107:11
110:24 121:10

**means**
6:16 51:24
60:1 91:7
103:25

**mechanism**
94:17 99:17
125:14 135:24

**mechanisms**
94:12

**meet**
44:15 57:7

**meetings**
24:11

**member**
69:24 70:2
72:1

**members**
116:15 130:21

**memo**
13:15,19
16:3,8 36:25
43:20,21,25

44:2,5,10
89:4 90:9
92:17 135:25
136:5,11

**memo's**
92:3

**memorandum**
24:9,13

**memorandums**
24:16

**memorize**
45:12

**memory**
28:25

**men**
25:11 29:13

**mention**
6:15 101:11

**mentioned**
13:14,21
78:15 81:5
82:2 86:5
98:25 99:19
122:14 134:3

**methodologies**
132:23,24
133:10,23
134:5,13

**methodology**
134:18

**Mexican**
53:10,14
116:5,13

**Mexico**
53:12,19
54:3,10
113:22 114:3,
8,10,12,16
116:9

**Mexico's**
114:8

**middle**
21:17

**migrants**
21:2 47:14
90:24 91:17

**mileage**
105:20

**mind**
100:16

**minor**
42:12 47:9,10

**minors**
40:10 45:17,
18,20 46:6,11

**minus**
84:12

**minute**
72:19 136:12

**minutes**
63:11 73:8
75:2 77:16
123:5,9,10
125:23,25

**mission**
20:18,23 31:3
39:22

**misspoke**
11:9

**misstates**
103:11

**moment**
48:5 73:23

**monitoring**
97:4 103:4
132:16

**month**

15:14 108:3

**monthly**
17:5,8 83:21
84:5,25 115:8
135:17

**months**
14:5 88:24

**morning**
6:23 24:12

**mother**
65:15,16,18
69:3

**move**
31:8 33:1
74:1 91:17
112:11

**moved**
33:6 93:10,11

**moving**
32:13

**MPP**
42:10,12,13,
15,22 98:16
107:14,20
108:2,3,5
111:25 114:5,
11,13,14,17,
20 121:2
126:2,3,5,7

**Muffett**
6:4

**multiple**
59:7 60:22,23
105:7

**musters**
24:11

**mutually**
134:15 135:7

**myriad**
34:9 39:1
40:11 112:21
113:12 114:14

———————————

———————————

**N**

———————————

**named**
98:11

**names**
60:9

**nation's**
20:20 21:24
29:18 30:1

**national**
31:22 53:10,
14,24 54:1,7
55:6 64:11
87:24 98:13
101:21 113:1
124:1,10

**nationalities**
109:23

**nationality**
52:14

**nationals**
114:3 116:5,
14,15

**necessarily**
39:20 51:8
52:19 55:1
73:3 113:7
126:25 132:4,
5 135:1

**needed**
92:23

**network**
57:11

**nexus**
55:7 64:11

**Nicaragua**
94:2

**Nicaraguan**
87:23 94:11
109:21

**Nicaraguans**
128:4

**night**
77:22

**nodding**
10:8

**nomenclature**
118:15

**non-detained**
102:10

**non-mexican**
116:5

**normal**
13:23 14:2

**notation**
132:11

**note**
80:7 108:7

**noted**
60:24

**notes**
13:9

**notice**
12:9 95:23
96:4 103:8
110:8 116:21,
25 118:5,12,
18,21 119:3
125:4 129:19

**notified**
24:7

**November**
36:25 43:21

135:25 136:4

**NTA/OR**
95:23 96:5,17
102:5,9,24
103:20 107:8
108:12,23
112:2 116:23,
24,25 117:2,4
118:11 119:4
121:3 122:21
129:14,18
134:14,17
135:1,3,6

**NTR**
118:5

**NTRS**
121:9

**number**
44:25 60:3,5,
6 71:11,14,
15,20,22,24
72:2,6,10,12
82:5 97:16
121:10 126:1
135:19

**numbers**
14:3 17:9
72:11 89:16
90:14 91:18,
19 110:5
118:10,17
129:7 135:19

**numerical**
114:11

**numerically**
59:25 60:18
117:16

**numerous**
49:4,5 118:3

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                              22

**nutshell**
  20:19

---

**O**

**oath**
  11:6
**object**
  10:10 92:4
  93:2
**objecting**
  6:9
**objection**
  5:22 8:9
  43:17 44:1,11
  50:1 66:8
  69:6 70:25
  87:4,13,20
  88:8,21 89:6,
  25 90:11,18
  91:14 93:17
  94:8,21 95:7,
  8,13,22
  103:11 104:18
  105:4,5
  107:22 109:16
  132:25
**objections**
  5:20
**observing**
  5:24
**obtain**
  56:22
**obtained**
  61:4,11 83:15
  88:5 131:18
**obtaining**
  63:11
**occasions**
  49:4,5 92:21

**occurring**
  70:12 71:9
**occurs**
  30:25 57:19
**odd**
  125:15
**office**
  21:18,24 22:9
  51:10 105:11
**officer**
  26:10 51:16
  69:19 88:16
  97:8
**officers**
  39:4,16
**offices**
  129:6 130:2
**OFO**
  22:10 46:2
**older**
  70:7
**one's**
  84:16
**ongoing**
  41:14,16
**OOR**
  67:7
**open**
  10:25 77:22
  96:16 124:11
**operated**
  22:10
**operating**
  14:15
**operational**
  30:25 64:5
  136:8

**operations**
  21:19,25
  25:21,24
  26:10 28:5
  30:8,18 31:4,
  10,16 33:12,
  23 51:11
**opportunity**
  34:25
**opposed**
  9:25 45:21
  62:24
**option**
  56:21 87:11
**options**
  115:24,25
**oral**
  24:14 41:7
**order**
  11:19 26:25
  38:17 52:25
  53:21 55:5
  57:8 74:10
  81:24 85:14
  86:3 88:6
  91:19 94:16
  96:14,25 98:3
  111:21
  112:13,14
  116:25 120:13
  121:16 123:22
  124:2,15
**organization**
  20:1 51:3
  57:7
**organizational**
  20:2,5 21:15,
  16
**originating**
  110:18

**Ortiz**
  92:6
**OTMS**
  116:14
**outline**
  136:13
**outlines**
  46:24
**overboard**
  85:18
**oversee**
  31:16 42:21
**overseeing**
  25:21,24 28:5
  29:6,10 30:8,
  17,24 33:14
**oversees**
  21:25
**overstayed**
  85:16,17

---

**P**

**packet**
  130:4
**PACR**
  115:19 116:1,
  13 119:6,13
  120:24 121:23
**paid**
  40:1
**papers**
  128:19
**paperwork**
  41:8,9 106:18
  130:4
**paralegal**
  77:21

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

23

**parent**
47:5 65:7,22
66:2,7,16
68:14 69:2,13
70:18,22
74:21 79:4,10
80:20

**parental**
66:4,17 67:16

**parole**
13:10,18
18:14,16 37:1
42:10 43:16,
17 44:4,11,17
66:7,8,15,19
67:13 86:20,
24 87:3,4,11,
25 88:6,10,
14,19 89:4,8,
18,19,20,24
92:1,10,17,
23,25 93:9,
16,19,23
94:7,10
95:11,15
103:20 107:8
109:15,16,18,
20 110:2
112:3 123:3,6
129:1,9,10
132:18,19
133:1,2 134:1
135:18,20,23
136:1,3

**paroled**
103:10 129:4
130:10 132:15

**part**
11:20 26:3
67:1 87:10
131:15

**partner**
51:2

**passports**
49:12

**past**
47:20 88:23

**PATD**
90:14

**Patel**
5:14,25 6:14,
22,24 9:8
12:6,10,14,
17,21 19:24
21:14 34:19
43:23 44:7,18
45:4 50:12
66:13 69:22
71:10 77:15,
19 78:9 82:15
83:14,24
84:2,24 87:8,
17 88:3,18
89:1,10 90:4,
15 91:4,21
92:9,15 93:5,
14 94:3,19,25
95:9,19,25
105:1,12
108:7,10
110:6 115:1
119:24 133:6,
14 136:15,19,
23

**path**
83:5 92:3
103:2

**pathway**
41:5 63:14,
16,19,24
64:22 65:19

66:20 67:9,17
73:1 75:8,24,
25 76:8
92:23,24
93:23 96:2
97:1,8 98:9
99:12 100:14,
21 101:1,23
103:21 105:15
106:5,15
109:8 110:21
111:3,9,16
113:21 125:17
126:19,22,23
127:1,17,21,
25 134:16,19
135:1

**pathways**
56:7 66:24
77:10 82:17,
25 83:4,5,25
84:11,15,20
86:9 95:16,20
96:22 97:5
103:16 105:25
106:1,21
115:15,16
116:3 118:1,3
127:5,11,19
128:15

**patrol**
13:23 21:6,
18,23 22:8,
20,22,23 23:2
25:3,12 26:2
27:25 28:18
31:10,18,23
32:17,21
33:13 34:3,7,
22 35:10,15
38:1 39:4,6,

7,12,17 40:7,
12,14,16,18
41:14 42:5,11
43:25 46:2,5
47:19,21
48:19 49:22
83:1 84:5
91:23,24
93:13 96:21
99:24 100:1
116:10,11
130:7 135:17

**patrol's**
100:17 101:5

**patrolled**
21:6

**Patrolling**
23:10

**pending**
8:14

**people**
14:22 25:14,
15 29:18
40:1,21 41:2,
24 49:5,6,11
57:11 59:7,24
60:1,8 71:21
73:10 77:23
94:6 123:8
126:1 131:22
133:10,19
134:17 135:19

**percent**
91:8,10 93:23

**percentage**
102:11,14

**perfect**
62:1 113:22

**perfectly**
12:14

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

24

performing
  39:13

period
  14:8,9 30:13
  31:15 34:9
  38:18 57:22
  75:11 76:24
  77:5,6 120:21
  124:9

periods
  32:15 128:12

permission
  88:4,12

person
  38:20 48:1,
  12,15,20
  49:15 50:5
  52:10 53:17,
  23 54:6 55:5,
  14 56:4 58:1,
  3,17,18,19
  59:12 60:3,7,
  21 61:2 62:23
  66:7 69:1,4
  71:13,23
  75:17 81:2
  94:13,16,18
  97:25 98:20
  103:5 105:14
  108:20 114:15
  116:4 123:1,
  10,16 126:12,
  14,15 128:16

person's
  53:19 59:20
  60:25

personal
  127:5 133:4,8

personally
  49:4 133:9

personnel
  29:19

persons
  23:20 40:13,
  22 75:2
  101:13 118:11
  134:14

pertaining
  24:21

Ph.d.
  18:23 19:4,12

phase
  32:8

Phipps
  5:11

phone
  11:3 133:10,
  18

phones
  133:11

phonetic
  42:20 96:12

picture
  55:12

piece
  121:10

place
  53:3 54:5
  55:20 56:18
  57:12 64:21
  92:3 94:13
  101:3,5,23
  102:5,6,9
  103:20 106:16
  110:20,21
  111:16 113:4,
  25 120:22
  126:22,23
  135:5,9

places
  54:18

placing
  74:12 96:17
  101:17 135:22

plaintiff's
  5:22 12:18
  19:21 21:11
  34:16 45:1
  82:12 83:11
  114:23 119:21

plan
  132:12

plane
  91:17 118:8

pocket
  68:23

pockets
  68:25

point
  24:5 35:4
  42:24 43:9
  44:20,22
  47:22 48:2
  49:20,25
  52:10 53:7
  55:16 56:20
  61:12 63:10,
  13 70:22
  73:10 75:15
  78:19 81:17
  91:12 103:9
  106:17 108:8
  111:9 125:9
  126:8

points
  5:23

policies
  24:4,8 26:3
  28:11 31:25

32:10,14,17,
  18 41:21

policy
  23:24 24:1,21
  28:9,14 32:2,
  3,20,22,23
  42:4,5 90:9
  134:10 136:1,
  2,6

Poon
  6:2,8 77:20
  78:1

population
  92:20

port
  38:8

portion
  46:5

ports
  21:24 22:1
  23:22 36:5
  38:6,9,12
  46:14 51:7
  61:9

pose
  29:18 53:24
  54:1

posing
  48:1

position
  23:4 24:25
  25:7,10 26:7,
  13 27:14,23
  28:3,17 29:2
  30:2,4 31:6,
  24 33:2 39:19

positions
  39:17 40:11

possibilities

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                25

127:11

**possibility**
125:17

**possibly**
68:6

**post-prosecution**
111:19

**potential**
71:4

**potentially**
124:7

**Power**
42:24 43:9
44:20,22

**practical**
35:20

**practices**
13:11,22

**prep**
13:12 18:4

**prepare**
13:7 15:6
16:2

**prepared**
93:3

**presence**
29:23

**present**
48:8,13,14
50:22 53:4
54:6 75:19
87:10 125:20
132:8

**presentation**
43:9

**presented**
64:15 68:4

**President**
104:16 105:3

**Presque**
18:22

**presume**
59:19

**pretty**
8:18 14:25
73:9

**prevent**
46:23

**previous**
31:2 79:1
97:3 98:2
107:10 111:21
112:14 120:13
124:2,15

**previously**
28:6 78:11,21
81:5 98:1
115:17

**primarily**
23:19

**prime**
111:25

**principal**
33:16 85:21

**printed**
12:11

**prior**
67:10 86:3
112:13 123:22

**private**
26:25

**pro**
129:23

**procedures**
13:24 14:1,15

41:22 134:10

**proceeding**
55:21 65:20

**proceedings**
5:2 37:24
54:5 56:19

**process**
38:21,22
41:2,20,24
42:6,25 48:15
51:1,4 52:16,
25 53:2 58:2
61:14 63:17
64:1,9,17,24
67:22 74:1
76:7 89:3
90:25 101:20
102:5,20
105:25 116:12
118:5,6
120:23 122:12
123:13,25
125:10,13
126:4 127:7
128:1,13
135:13,16

**processed**
14:22 41:6
67:4,8 69:21
75:5 76:22,24
80:21 81:1,3
86:23 87:2
125:19 127:6
135:20

**processing**
14:18 15:12
17:12 22:2,16
25:21 39:8
40:7,9,14,18,
20,21,23
41:8,23 43:3

52:12 55:23
57:23 59:1,6
61:20,25
63:14,18
64:23 66:3,19
69:20 72:24
75:7,12,14,23
76:2,9 77:2,
10 82:9,17,25
83:4,22,25
84:6,7,11,15
85:1,7,9,21,
23 86:8,12
88:17 91:25
97:4,5 105:15
106:4,11
115:9,11,24,
25 116:3
117:13,18
118:1,16,25
120:1 121:7,
12,18 122:15,
17,21 124:5,
19,22 125:3,7
126:15 127:9,
24 128:4,8
130:3 134:16,
18 135:1,2,23

**procurement**
27:4

**procuring**
27:2

**production**
17:21

**professional**
29:15 31:2

**program**
133:13,24
134:9

**prohibit**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                26

109:1

**promoted**
25:1,2 26:8,9
27:7,22,24
28:16,22
30:5,19,21
33:17

**promoting**
20:20

**promotion**
27:10

**property**
40:4

**prosecute**
54:4 62:13,20
65:17 81:22
111:11,12
113:8

**prosecuting**
76:12 112:23

**prosecution**
56:14 62:1
111:22 113:3

**prosecutions**
21:1 25:22

**prosecutorial**
51:3

**protect**
20:19

**Protection**
20:11 42:12
45:7 78:13
83:16 115:2

**protects**
21:23

**Protocol**
42:12

**protocols**

134:10

**prove**
63:3

**provide**
35:12,15 38:2
42:11

**provided**
16:5,9 17:11
43:16,25 44:9
129:18

**providing**
26:1

**provision**
36:23 37:21

**public**
52:15

**pull**
12:3

**pulled**
34:20 45:5
119:19

**pulling**
12:5

**pure**
76:11

**purely**
50:17

**pursuant**
132:19

**pursue**
6:18 56:21

**pursuit**
32:16

**put**
24:18 56:24
59:17 103:8
113:14 114:5
120:12 130:16

_____

**Q**
_____

**question**
8:5,10,14
10:11 16:18
66:10,11,21
67:15,19
73:14 80:16
85:4,6 92:14
93:7 97:3
108:15 130:18
134:7,22,23

**questioning**
68:14,16
78:24 92:12
108:9

**questions**
11:21,23
18:17 38:16
71:4 79:1
136:14

**quickly**
9:9 10:4 76:7

**quote**
81:19 97:16,
17

_____

**R**
_____

**raise**
8:23 69:18

**ran**
55:4

**range**
28:20

**rapid**
66:3,25 68:11
74:17

**rapidly**

99:7

**rare**
22:13 65:8
80:8 85:11,19

**reach**
80:11

**reached**
33:21

**read**
17:14

**reality**
46:10 54:19
60:8

**realize**
11:9

**reask**
66:11 92:14

**reason**
59:23 72:18
74:23 93:15
119:15 125:15
135:10

**reasoning**
125:2 134:8

**reasons**
113:12 114:14

**recall**
16:17 18:9
88:24 104:13
108:2

**recalling**
118:8

**receive**
24:15,23 34:2
40:23 41:11,
12,14 42:9
94:16 129:1,2

**received**

12:18 19:21
21:11 34:16
45:1 82:12
83:11 114:23
119:21

**recent**
12:8 108:4

**recently**
19:14 40:19

**recess**
78:6

**recognition**
81:6

**recognizance**
95:24 96:5
103:9 116:21
134:24

**recognize**
19:25 83:17

**record**
5:4,13 10:7
43:18 44:12
53:22 62:15
66:9 77:25
78:2,5,8 87:5
93:20 108:8
130:13 136:24

**recorded**
5:5

**recording**
52:17

**records**
124:2,11,17

**redactions**
83:6

**reevaluation**
32:15

**refer**
39:11 104:24

**referenced**
89:3

**referred**
36:18 37:7,11
117:2

**referring**
13:18 14:11
16:24 33:24
62:5 65:13
68:21 77:1
78:13 91:23
99:20,23
122:3 131:6

**reflect**
120:1

**reflected**
84:11,21
85:7,10
118:10,19

**regard**
31:21

**regular**
44:15

**reinstate**
124:15

**reinstatement**
56:10 86:3
98:2 112:12
120:13
121:15,16
123:22

**reinstating**
111:21 112:15

**reiterative**
41:25

**relate**
104:19

**related**
66:20 118:24

**relates**
37:21,22

**relation**
43:16

**relationship**
67:16

**relative**
79:9,10 81:1
130:25

**release**
74:20 99:16
103:21,23,24
117:1

**released**
77:7 95:23
100:20,23
103:3,25
104:5 116:22
118:12
128:18,22
130:10
132:15,19
134:17,23
135:6

**remain**
53:16 95:5,6,
10 111:23

**remained**
120:25 121:24

**remember**
18:4,6,10
33:8 90:3
104:14,16,23
105:2,9 108:3

**remote**
6:16

**removal**
21:7 37:24
38:23 56:2,19

85:14 86:3
94:15,16
98:2,3 99:14,
20,21 100:25
101:4,12,24
102:3 103:7,
18,21 107:10
110:12 111:21
112:10,13,14
113:5 120:13,
14 121:16
123:13,22
124:15

**removals**
109:25

**remove**
56:3,5,6,8
62:14 94:17
95:1,3 96:14
99:10 110:20
111:2 113:9
126:23

**removed**
77:7 101:9
109:8 111:23

**removing**
111:18

**reoccurring**
44:16

**Reorder**
121:16

**repatriate**
109:24

**repeat**
8:7

**repeated**
56:10

**rephrase**
8:6

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

report
110:8 118:6,
12,18,22,24
119:3

reporter
8:2,15 10:4

Reporting
5:11

reports
17:6,9

represent
20:25 82:16

representation
31:17 82:24

representative
7:17 9:22

representing
7:21

reprocess
107:9

request
17:21 18:2

require
120:16

required
11:6 120:19

requirement
24:20 64:5

requirements
101:7 105:21

resettle
132:12

residing
21:3

response
82:18

responses
8:4 10:8

17:18,20,23
18:1,7

responsibilitie
s
23:9 25:10
26:22 27:20
28:3 30:16,23
31:14 51:14

responsibility
28:4 43:2
103:4 105:8

responsive
134:22

restart
108:1

restarted
108:3

restricted
114:12

restriction
108:21

resulting
95:18

results
74:18

resume
26:15 28:23

retain
41:9

return
38:24 54:9
94:12 99:6,10
101:7,24
103:18 107:13
110:20
113:20,25
116:18 125:21
126:5,18
127:8

returned
77:7 116:17,
18

returning
114:7,8 116:9

returns
55:19 99:14
109:25
114:11,13

review
14:24 15:5,
10,16 16:1,
15,18 32:20
35:1

reviewed
12:22 14:1,12
16:21 17:2,5,
17,20,23 18:3
35:2

reviewing
13:9 18:10

RIAD
42:20

right-hand
20:13

Rio
23:12,18
89:9,11,14,22
90:8,22 92:1,
16

Rio's
90:25

risk
29:18 53:25
54:2,7 87:24

risks
29:17,20

road
33:21

role
23:9 26:3,22
28:4,8 29:4
30:23 31:2
32:1 33:6
43:2 105:8

roles
51:14

rolled
42:1

room
10:16

roughly
26:14 27:15
29:3 93:25
123:1,11

routine
131:15

row
118:11 119:4

rule
48:10 133:5

rules
8:1 27:19
46:16

runs
21:25

runway
101:9

_____

_____

S

safe
48:4,5 116:18
124:20

safely
38:20

Samantha
6:8

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

scene
  48:4

science
  35:21

scope
  93:18 107:23
  109:17

screen
  12:4,16 16:25

screening
  102:18

screens
  10:25

search
  54:23 72:14

searching
  54:25

Section
  36:15 37:5,7,
  10,11,17

sector
  7:22 10:2
  23:17,19
  26:25 28:19
  29:7,8,14
  30:8,9,18,22,
  25 31:5 58:23
  88:11 89:23
  90:13,22 91:7
  92:16 93:11

sectors
  31:18 43:1,5
  89:3,4,9,22
  110:3

security
  29:18 53:24,
  25 54:1,2,7
  55:6 64:10,11
  68:8 87:24

98:13 101:21,
22 113:1,2

seek
  56:13

seeking
  113:3

segmented
  46:2

seized
  40:4

seizures
  25:22

sending
  127:10

Senoita
  25:4,12

sense
  11:24 14:23
  60:16

separate
  52:11 65:7,12
  66:17 118:23

separated
  46:18

series
  55:4

serve
  111:22

Services
  67:6

serving
  41:8

set
  97:22,24

setting
  113:5

severity
  62:7

share
  12:4 22:2

shift
  24:12 25:13,
  16

shooting
  34:12

show
  80:18 128:20,
  21 133:20

showed
  13:15

showing
  79:6

shows
  20:7

sic
  45:6 101:20

side
  29:24 80:8
  84:16

significant
  65:16 91:9

significantly
  91:8

signing
  18:6

similar
  30:2 39:8
  115:4

simple
  112:23

Simply
  94:5

single
  45:17,20
  47:9,10,19
  67:3 81:3

85:22 86:12,
20 87:19,23
88:7,20,25
93:1,16,22
94:1,6,11
96:6,14,17
98:18 104:14
106:9 108:6,
13,17,23
109:6,7
110:15,16,17
111:7 113:23
120:6 121:8,
9,11 122:10
131:25 132:3
133:25 134:1,
6,12

sit
  90:17

sits
  42:20

sitting
  18:9 76:17
  118:9

situation
  53:6,13 54:21
  65:10,14
  70:12 106:17
  127:9

situations
  51:13 71:8

six-month
  34:9

software
  70:23 81:7

soil
  47:20 63:23
  87:11

solemnly
  8:25

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

30

somebody's
54:23 60:11
75:4,7

SOP
136:10

SOPS
13:10

sounds
77:19

Southwest
23:13 25:5
30:3 42:3,7
47:20 83:21
84:6 85:1
115:8 135:18

space
96:14,16
98:21 99:16,
23,24 100:3,
10 110:25
111:1

SPAD
32:21

Spanish
34:13

speak
15:1,4,5,9,
16,17 16:2
24:10 35:19
41:1 43:12
69:15 92:6
93:3 118:16
133:1

speaking
5:20 6:10
15:24 24:9
48:22 70:6,
20,21 103:1
133:4

speaks
44:5

specialists
40:4

specific
13:25 23:16
33:10 60:2,7
65:1 88:14
91:2 97:7
99:11 103:22
127:16

specifically
8:11 10:12
25:18 56:14
83:17 94:2

specifics
133:13

speculation
69:7

speeding
62:15

spent
22:21

spoke
26:1 40:3

sponsor
130:23 131:6

staff
29:15,16 31:3
39:22

standard
13:10,21
14:14 73:25

standards
105:19 109:4

start
22:19 58:2
73:4 80:12
81:22 132:18

started
14:9 23:1
34:1 88:24
118:21

state
5:6,15 6:24
32:19 79:19

State's
17:17

statement
121:14

States
5:7,17,19
21:3,23 37:1
47:15 48:9
50:23 51:7,9
53:15,17 56:4
62:25 104:7
129:6 130:22
131:3

station
22:2,3 23:16,
18 25:12,13
28:1,6,7
29:21 57:23
58:15 59:1
64:22 75:6,16

stations
59:5 75:12
82:8

statistics
45:9,12 83:17
84:4 115:3
117:3 119:19

status
17:6,8 74:8
128:20

statute
36:20 46:23

stay
80:24 101:1

stenographer
5:10 6:2,11
8:20 9:5
77:24 78:3

Stephanie
6:4 10:24

steps
47:21 57:6

stipulated
6:20

stipulation
6:17

stop
107:20

Strategic
32:22

strategies
29:22

strictly
92:22 103:1

stuff
57:16 133:23
134:11

subcomponents
20:8

subject
95:12,21

subjected
58:6

subjective
53:3

subjects
34:9

submits
63:5

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                        31

substances
11:12

substantially
92:2

sufficient
15:4,8,15
54:19,21

superseding
136:5

supervised
25:25

supervising
25:11,14,18

Supervision
97:3

supervisor
25:13 26:4
88:5,12

supervisory
25:3 27:20

support
31:3 32:16
39:22

surround
62:22

surrounding
50:15 107:16
112:4 114:2

suspicious
69:19

swear
8:21,25

switch
11:22

switched
104:23 105:10
122:10

sworn
41:7

system
22:5 59:17,24
60:17 72:5
81:15

——————————
T

table
20:1

tactics
34:12

takes
74:19,22
102:19 124:20

taking
8:3,15 10:5
36:11 38:19
41:6 53:3
55:1 56:3
81:23 90:23
101:13 126:3,
4

talk
8:17 10:6
42:2 84:18

talked
74:14

talking
22:4,5,7
39:18 69:13
73:2 76:1
80:1,16 84:23
86:11 90:5
101:1 110:16
123:25 124:4,
6 126:14
127:22 130:2

talks
35:4

tech
77:23

technically
106:22

techniques
34:12,13

technology
26:12,24
27:1,3 58:14
70:24

Teegen
6:3,11

telling
60:19

tells
109:5

ten
77:15

term
51:24 80:24
91:5 104:3

terminal
22:4

terms
17:11 76:11
84:3 92:1
97:16 105:13
106:11

test
67:24 68:2,11

testify
13:5

testifying
9:21 13:1

testimony
9:1 11:9

92:10 93:18
103:12

testing
67:10 74:18

Texas
17:6 23:12

That'd
136:18

thing
7:15 29:3
33:12 55:25
123:7,16
125:25 133:20

things
14:9 31:3
74:9 81:25
86:16

thought
78:1

threat
48:1 98:14
101:22 113:2

threats
29:17

TIC
110:4

time
5:4 7:7,24
8:8,9 9:16
10:2,11 11:8
14:7,8,9 24:5
25:16 27:12
30:13 31:15
33:5,8 34:10
44:3 48:2
49:21 57:21
60:10 68:18
74:24 75:11,
20,23 76:12,

15,20,24
77:5,6,21
78:4,7 81:17,
23 88:15 90:3
91:2 92:2
97:21 104:17
105:20 108:2
111:22 118:4,
19,22 120:21
122:22 124:9,
19,21 126:15,
17 128:10,12
129:21 136:4,
25

**times**
7:3 9:13
49:13 82:3
110:4 122:16
127:3 133:20

**title**
22:25 33:22
38:24 52:16,
23 53:6,9,18,
19 54:2,5,8
55:15,19,21
56:21 58:2
64:19,21
65:19,20
66:24 67:5,8,
17 73:4,6,10,
15,23 74:6,8,
12 75:5,8,21,
22 92:23 98:8
100:25 101:1,
2,23 105:25
106:1 113:21
126:22,23,24
127:22,25
128:5,7

**today**
6:25 8:18

10:5 11:6,16
13:2 42:6
90:17

**Tony**
5:5

**top**
18:5 37:19
90:14

**topic**
13:1,2 15:4,
9,16,20 16:2,
3,6,10,12
92:7 93:4
108:8

**topics**
13:4 92:7
104:19 107:23

**totally**
31:4

**track**
27:19 46:8
55:22,23
60:17 81:11,
16 103:9

**tracked**
72:13,16
132:16,20
134:24

**tracking**
81:18 133:16
134:2,3,12,18
135:24

**trade**
20:21 22:1

**Traditionally**
70:6

**traffic**
14:5 58:23

**trafficking**
46:23

**train**
38:9,13

**training**
24:15,20,23,
24 34:2,6
35:12,15,18
38:2,11 40:23
41:11,12,13,
15,17,25
42:10,11
43:15,24

**transfer**
67:7 84:4
91:22 101:8
110:22 120:23

**transferred**
75:16 77:8

**transferring**
38:25 91:23

**transitioned**
104:13

**transported**
64:22

**transporting**
38:20 75:11

**trash**
68:23

**travel**
20:21 22:1

**traveling**
132:4

**tree**
97:15,19
98:6,7

**true**
98:7

**truth**
9:2,3 11:6,13

**turn**
5:23 51:10
83:20 86:10
115:6 119:25

**turned**
15:23 67:5

**turning**
39:25 51:2

**turpitude**
62:8

**TVPRA**
46:12,17,20,
21 79:4

**type**
9:17 10:9
14:19 22:14
24:15 31:3
32:10,24 34:2
38:22 39:9
40:23 43:10,
15 49:10
51:20 54:6
55:9 56:21
62:5 64:13,21
70:11,23 71:9
76:8 79:9,10,
20,21,22 80:9
81:7,17
103:20 111:15
112:24 120:3
128:19,25
133:20 134:2

**types**
35:7 39:16
78:22 133:16

**typically**
49:1 57:22
80:11 111:8

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

122:22 127:21

**U**

**U.S.**
20:11,14
31:10,18,22
45:6 46:2,5
47:20 63:23
84:5 87:11
132:3 135:17

**U.S.C.**
36:15 37:4,
10,17

**UC/SINGLE**
45:17,20

**Uh-huh**
34:24 45:8
115:10

**ultimate**
76:1

**ultimately**
20:25 27:5
32:24 33:13
49:14,19
52:18 62:10
65:8 91:20
97:19 102:8
107:12 129:12
135:21

**unaccompanied**
46:17,25
47:1,9 67:3
80:25 81:2
106:9 131:5,7

**uncle**
46:15 79:9

**undergraduate**
18:21,25 19:6

**underneath**
60:25

**understand**
8:5 11:5,15
78:12 87:1,9
103:6 130:18

**understanding**
12:25 18:12
36:22 37:13,
20 44:8
117:20 126:6

**Understood**
81:4 92:9
109:14 123:19
133:6

**unique**
50:10

**unit**
25:24 28:6,19
29:14 33:11
45:25 46:20
47:2,3,9
63:22 64:3,4,
6,7 66:23
67:1,23
69:13,21,24
70:2 71:15,
16,18,22,23
72:1 79:3
80:15 87:10
98:19 99:1
106:3,8,10,
13,14 107:8
109:10,15,21
112:11,16,17
113:13,15
120:17,19
124:16 132:2

**United**
5:6,17,19

21:3,23 37:1
47:14 48:8
50:22 51:7,8
53:15,17 56:4
62:25 104:7
129:6 130:21
131:2

**units**
72:13,15
78:16 80:22
86:14 99:5
100:3,7,11
106:21,23
107:7 109:12
113:18
114:19,21
120:9 121:13,
19,20 126:7

**University**
18:22

**unknown**
124:18

**unquote**
81:19

**updates**
26:2

**USBP**
82:17 83:21,
25 115:8

**utilization**
18:14,16
88:10,25 93:9
119:13

**utilize**
85:11,21
89:18,20,21
90:20 91:16
92:23 94:10
99:16 106:15
110:2 133:12

**utilized**
87:25 89:8
92:19,22
118:4 125:18

**utilizing**
89:21 91:1

**V**

**vague**
95:8

**valid**
74:2

**Valley**
89:12,14 90:8

**Van**
27:25 28:1

**variety**
96:18 98:22

**vary**
76:4,13
122:16

**vast**
86:6 120:4

**vehicles**
40:1

**Venezuela**
94:2

**Venezuelan**
87:22 94:11
109:21

**Venezuelans**
128:3

**verbal**
26:1 43:10

**verbally**
60:19

**verbatim**
27:18 64:7

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                    34

**verify**
  65:21 70:13
  71:7 80:4

**version**
  12:8 20:5

**versus**
  5:6 28:6
  66:20 75:17
  79:2 134:6

**video**
  5:5,8,23

**violating**
  49:23

**violation**
  36:8 38:19
  48:11,13

**volumes**
  90:24,25

**voluntary**
  107:13
  113:19,25
  125:21 127:7

**vulnerabilities**
  29:17,20
  114:15

———————

**W**

**WA/NTA**
  111:14,15
  113:11,14
  125:3,7,11,
  17,19 127:9

**walk**
  47:17,21 96:2

**walked**
  76:16

**wanted**
  77:11 115:13

**warrant**
  61:3,11,15,
  18,22 62:2,3
  107:11 111:14
  112:19 124:24
  125:3

**warrants**
  61:6,8

**Washington**
  10:15 26:11
  31:9

**watch**
  74:24

**website**
  17:11 45:6,
  10,11,14
  83:16 115:3
  119:19

**wheels**
  39:25

**wide**
  34:8

**withholding**
  73:25

**witness'**
  93:18

**women**
  25:11 29:14

**word**
  64:7

**words**
  103:22

**work**
  20:24 22:13
  32:23 54:19,
  20 124:3

**worked**
  126:18

**working**
  19:15 22:19
  26:24 27:3
  34:1 53:12

**written**
  24:13

**wrong**
  61:6 122:15

———————

**Y**

**year**
  7:7 19:14
  26:14 27:15
  45:7 84:4
  115:3,5,16
  119:20 120:2
  121:6

**years**
  19:17 22:21
  23:6,7 29:4
  70:6

**yesterday**
  65:15

**young**
  69:15

**Yuma**
  89:9,22,23

**Yup**
  27:24 34:24
  35:2 42:13

———————

**Z**

**Zoom**
  5:8