# Exhibit B

State of Florida

vs.

United States Plaintiff vs UNITED STATES

---

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

---

July 13, 2022

*Vol 2*

---



PHIPPS REPORTING

*Raising the Bar!*

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066


STATE OF FLORIDA,

                 Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

                 Defendants.
_____/


   VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
   TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
   STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
              BEHALF OF THE PLAINTIFF


                    Volume 2
              Pages 138 through 207


              Wednesday, July 13, 2022
              8:33 a.m. CT - 2:17 p.m. CT


        Location:  Remote via Zoom
                   Washington, D.C.




        Stenographically Reported Via Zoom By:
                Helen Marie Chase
Job No.: 259222

                                        Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

 1    APPEARANCES: (All appearing remotely via Zoom)

 2

      On behalf of the Plaintiff:
 3
            OFFICE OF THE ATTORNEY GENERAL
 4          The Capitol, PL-01
            Tallahassee, Florida 32399-1050
 5          850.414.3665
            BY:  ANITA J. PATEL, ESQ.
 6               ELIZABETH TEEGEN, ESQ.
                 anita.patel@myfloridalegal.com
 7

 8    On behalf of Defendant United States of America:

 9          DEPARTMENT OF JUSTICE
            P.O. Box 868
10          Ben Franklin Station
            Washington, D.C. 20044
11          202.514.0618
            BY:  JOSEPH ANTON DARROW, ESQ.
12               ELISSA FUDIM, ESQ.
                 joseph.a.darrow@usdoj.gov
13

14    On behalf of Defendant Department of Homeland
      Security:
15
            DEPARTMENT OF HOMELAND SECURITY
16          Office of the General Counsel
            2707 Martin Luther King, Jr.  Avenue SE
17          Washington, D.C. 20528
            BY:  KAITLYN CHARETTE, ESQ.
18

19    On behalf of Defendant U.S. Customs and Border
      Protection:
20
            U.S. CUSTOMS and BORDER PROTECTION
21          Office of Chief Counsel
            1300 Pennsylvania Avenue, Suite 4, 4-B
22          Washington, D.C. 20229
            BY:  STEPHANIE MUFFETT, ESQ.
23               SAMANTHA POON, ESQ.

24
      ALSO PRESENT:  David Celani, Videographer
25

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 140

1                          I N D E X

2    July 13, 2022                                        Page

3    TONY BARKER
         Direct Examination by Ms. Patel............   6
4        Cross-Examination by Mr. Darrow........... 198
         Redirect Examination by Ms. Patel......... 200
5
     Certificate of Oath.......................... 204
6    Certificate of Reporter...................... 205
     Read and sign letter to witness.............. 206
7    Errata sheet (forwarded upon completion)...... 207

8                        E X H I B I T S
                                      Identified Marked
9    Plaintiff's Exhibit 1                 12        12
         Deposition Notice (7 pages)
10
     Plaintiff's Exhibit 2                 19        19
11       DHS Organizational Chart (1 page)

12   Plaintiff's Exhibit 3                 21        21
         CBP Organizational Chart (1 page)
13
     Plaintiff's Exhibit 4                 34        34
14       CBP website Information Center
         (3 pages)
15
     Plaintiff's Exhibit 5                 44        45
16       CBP Encounters Fiscal Year 2022
         to Date (1 page)
17
     Plaintiff's Exhibit 6                 82        82
18       USCBP Processing Pathways Chart
         (1 page)
19
     Plaintiff's Exhibit 7                 83        83
20       USCBP Custody and Transfer
         Statistics FY 2022 (5 pages)
21
     Plaintiff's Exhibit 8                115       114
22       USCBP Custody and Transfer
         Statistic FY 2021 (4 pages)
23
     Plaintiff's Exhibit 9                119       119
24       USCBP Custody and Transfer
         Statistics FY 2020 (7 pages)
25

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 141

1

2                    E X H I B I T S (Cont'd)

3    VOLUME 2
                              Identified  Marked
4
     Plaintiff's Exhibit 10                142        142
5      USCBP November 2, 2021 memorandum
        (3 pages)
6
     Plaintiff's Exhibit 11                160        160
7      Fiscal Year 2020 Enforcement
        Lifecycle Reporter (21 pages)
8
     Plaintiff's Exhibit 12                169        169
9      DHS April 26, 2022 memo (20 pages)

10   Plaintiff's Exhibit 13                182        182
       Texas v. Biden Monthly Report
11     Reporting Period: April 1, 2022 -
        April 30, 2022 (6 pages)
12
     Plaintiff's Exhibit 14                188        188
13     Defendant's Response to Plaintiff's
        First Set of Interrogatories (11 pages)
14
     Plaintiff's Exhibit 15                184        184
15     Texas v. Biden Monthly Report
        Reporting Period: January 21, 2021 -
16     November 30, 2021 (13 pages)

17

18

19

20

21

22

23

24

25

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 142

```
 1              THE VIDEOGRAPHER:  The time is 12:36 and
 2        we are back on the record.
 3              MS. PATEL:  Thank you.  And for the
 4        videographer, you just announced it's 12:36.
 5        You are announcing central time; is that
 6        accurate?
 7              THE VIDEOGRAPHER:  That's what my notice
 8        said and that's what I've been saying all the
 9        way through, from the read-on through now.
10              MS. PATEL:  Okay.  Thank you so much.
11              (Plaintiff's Exhibit 10 was received
12        electronically, marked for identification and
13        is attached hereto.)
14     BY MS. PATEL:
15        Q.   Chief Barker, I dropped another exhibit
16     into the chat.  It's Exhibit 10.  It's a copy of the
17     Parole + ATD policy.
18        A.   I don't see it.  I don't see it on this
19     side.
20        Q.   Okay.  I sent it again.  This time to
21     everyone.
22        A.   Gotcha.  I see it on the site now.
23        Q.   So, we've been talking quite a bit about
24     the Parole + ATD policy.  I'm just wanted to
25     confirm, is this document the policy that you've
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 143

1   been referencing?

2       A.   It's not a policy, but that's the

3   operational guidance.

4       Q.   And this is the operational guidance that

5   you've been referencing?

6       A.   Yes.  Yeah, November 2nd, yeah, yeah.

7       Q.   When did this guidance take effect?

8       A.   November 2nd.

9       Q.   Okay.  And did you have any role in

10  developing this policy?

11          MR. DARROW:  And I'm going to make the

12          same objections that I made before.  First of

13          all, Parole + ATD, the policy itself is in the

14          determination an administrative record

15          according to the court's order; secondly, we

16          have a different witness designated to speak to

17          Topic Number 1, and to the extent that Chief

18          Barker gives any answers on this, it's going to

19          be speaking from his personal capacity and not

20          as a 30(b)(6) deponent from DHS.

21          MS. PATEL:  Okay.  And I'll just provide

22          this response.  Topic Number 4 also addresses

23          Parole + ATD, and so I do believe that it's

24          appropriate to discuss with Chief Barker.

25          MR. DARROW:  Yes, and I'm going to respond

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1          to that.  It does discuss Parole + ATD as a
2          possible choice among the different processing
3          dispositions, but if you're going to down and
4          question about how Parole + ATD came to be and
5          the different policy decisions that went into
6          it, that seems much more appropriate to Topic
7          Number 1.
8                MS. PATEL:  Okay.  Understood.
9       BY MS. PATEL:
10          **Q.   Chief Barker, I think you can answer the**
11   **question unless your counsel's instructing you not**
12   **to.**
13                MR. DARROW:  You can answer if you know
14          from your personal capacity.
15          A.   So, can you, can you restate your
16   question?
17       BY MS. PATEL:
18          **Q.   Sure.  Did you have any role in developing**
19   **this policy?**
20          A.   So, the operational guidance, yes.  I
21   mean, it, it -- I was at that period of time, you
22   know, engaged as we were looking to define triggers,
23   if you will -- that's further down the document --
24   as to when, you know, Parole ATD would be utilized,
25   formally, you know, ceasing the utilization of

Exhibit B

Page 145

1    Notice to Appear and migrating over to a Parole +

2    ATD in the -- you know, so that -- that's my -- that

3    was my involvement, if you will, in helping, I'll

4    say, or being involved in crafting of this

5    operational guidance memo.

6        **Q.   And prior to this operational guidance**

7    **memo, were families being paroled or released into**

8    **the interior?**

9        A.   Were families being -- are you talking

10   about the, the Parole + ATD aspect of families, you

11   know, when we started utilizing it in the July time

12   frame?  Is that what you're asking for?  And I'm

13   trying to understand your question.

14       **Q.   What do you mean "in the July time frame"?**

15       A.   So, so, you know, basically, when we

16   started attaching NTRs and -- excuse me, attaching

17   Parole ATDs to those individuals we were placing on

18   parole would have been roughly around in July.  This

19   memo coming out, you know, I'll say formalizing

20   Parole ATD, if you will, under Chief Ortiz's

21   signature in November.  I guess that should probably

22   be the more direct answer for you.

23       **Q.   Okay.  So, this guidance or what is**

24   **described in this guidance started in July of when?**

25   **2021?**

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 146

1      A.   Yes, yes.  So, it would have been roughly
2   that time frame when, when we started, you know,
3   collectively between CBP and ICE utilizing the ATD
4   portion of the parole, if you will.
5      **Q.   Okay.  And then it wasn't formalized until**
6   **November of 2021?**
7             MR. DARROW:  Same objections.
8             You can answer from your personal
9      capacity.
10     A.   That's when the memo was, was, was
11  completed.
12   BY MS. PATEL:
13     **Q.   Okay.  Prior to this memo, were there any**
14  **trainings or instructions provided to staff as to**
15  **how to implement what is the process that is**
16  **described in this guidance?**
17            MR. DARROW:  Same objection.
18            You can answer from your personal
19     capacity.
20     A.   You know, there, there is the, the March
21  2021 NTR guidance that was put out, I believe, at
22  that period of time under Chief Rodney Scott's
23  signature.  You know, that was, that was the
24  guidance at that period.
25   BY MS. PATEL:

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 147

1          Q.    Okay.  So, the NTR policy is reduced to
2    writing?  NTR practice is reduced to writing?
3          A.    I guess I'm not understanding what the
4    question is.  It doesn't -- is there a question,
5    ma'am?  I apologize.
6          Q.    Yeah.  You were talking about the NTR
7    guidance.  Is that a written document?
8          A.    It's the one that's referring to the
9    document that you're, you're seeing here.  Right?
10   "...the prosecutorial discretion and issuance of
11   NTRs as issued in March of 2021."
12         Q.    Okay.  Was there any specific training
13   that border patrol officers received on the process
14   described in this November 2nd memo prior to this
15   memo being formalized?
16              MR. DARROW:  Same objection.
17              You can answer from your personal
18         capacity.
19         A.    So, there, there -- you know, there's a
20   written guidance of NTRs, right, that came out in
21   March 2021, you know, and that is the processing,
22   you know, I-385, G-56.  There was -- there's no
23   written guidance -- again, I'm going to go back to
24   attaching, you know, the monitoring mechanism of the
25   ATD is really ICE, so I defer you to ICE.  But, you

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 148

1  know, during that time period, you know, previous to

2  November, like July I was just talking about, is

3  when ICE started really, I'll say, attaching the ATD

4  monitoring mechanisms to those who were, who were

5  getting processed for, for release.  Hence, the

6  creation of the Parole ATD application.

7     BY MS. PATEL:

8       Q.   Okay.  I understand that, but was there

9  any training in July that occurred, around July of

10  2021?

11      A.   You'd have to -- you'd have to ask ICE, I

12  mean, how they trained their people to attach ATD.

13  ATD is not a CBP program, so I'd really defer to

14  ICE.

15      Q.   Okay.  Who makes the decision to use a

16  tracking device?

17      A.   You've got to talk to ICE on that one.

18  That's their -- that's their program.

19      Q.   Okay.  So, does that mean that CBP does

20  not make a decision whether to use a tracking

21  device?

22      A.   That's completely ICE's decision.

23      Q.   Okay.  So, prior to the use of Parole +

24  ATD, were families being processed and released

25  under NTA/OR?

Exhibit B

Page 149

1      A.   Yes.

2      Q.   Okay.  Was there any other mechanism that
3   families were being processed and released into the
4   interior?

5      A.   So, you know, in certain circumstances,
6   you know, the, the border patrol has utilized parole
7   for humanitarian reasons as well.  An example of
8   that would be, for instance, if somebody, you know,
9   has an extremely serious injury is a prime example.
10   You know, they fall from a fence or, you know -- you
11   know, had a tragic accident in, you know, a
12   smuggling load or something along those lines.  And
13   I -- just to give as an example.  You know, we may,
14   we may place and effectuate humanitarian parole of
15   that individual.  You know, parole is applied on an,
16   on an individual case-by-case basis and thereby, you
17   know, is contingent upon the circumstances
18   surrounding that individual's, you know, situation.

19      Q.   Okay.  Are there any other instances in
20   which you would provide humanitarian parole other
21   than for medical reasons?

22      A.   Oh, of course.  Of course.  I mean, it --
23   it just depends on the circumstances that are, that
24   are surrounding it.  You know, we've had individuals
25   who have, you know, shown up to -- you know, at the

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 150

1   border with, with, you know, bullet wounds.  We've

2   had -- I mean, just it -- you know, there are just

3   different circumstances.  Right?  I mean, the vast

4   majority of them are, are all medical related.

5        Q.   Okay.  I'm just tying to figure out

6   whether there's, like, an unfettered discretion in

7   when to provide humanitarian parole or whether

8   there's any confines of criteria with respect to

9   that?

10       A.   So, you know, again, I go back to the

11  case-by-case basis.  Right?  So, there's -- it's not

12  what I would consider as unfettered, by any means.

13  I mean, when we you take a look at each individual

14  circumstance that's presented to us, you know, we

15  attempt to detain or remove those individuals, you

16  know, it may be other circumstances with that

17  individual detention or capacity which drive us to

18  utilize different pathways.

19       Q.   So, whether you use humanitarian parole

20  could also be driven by detention capacity?

21       A.   True, could be.

22       Q.   How often does that happen?

23       A.   So, the, the -- you know, the

24  circumstances which we face -- and it's actually

25  noted in the memo that you just sent us -- with

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 151

1    COVID-19 would be, would be a case in point of a --

2    you know, a humanitarian utilization of Parole ATD,

3    right, in order to be able to rapidly decompress,

4    decompress our, our detention facilities or, you

5    know, our custody and holding numbers because of the

6    pandemic.

7              You know, I'll be honest with you, we've

8    lost 19 border patrol agents to COVID, COVID deaths,

9    you know, directly associated with COVID that they

10   have contracted on duty working in, you know,

11   facilities which are, which are well over capacity

12   and in that congregate setting, you know, creating a

13   significant life and safety risk to the agents,

14   officers, migrants and professional staff that are

15   all being detained there.

16             So, so, I'll be honest, sitting here as

17   the Chief of Operations, having spent, you know, 21

18   plus years in a green uniform working on the border,

19   19 deaths that, that are associated with, you know,

20   a public health pandemic due to overcrowding within

21   our facilities is something that we take direly

22   seriously not only for the agents, but for the

23   migrants and the professional staff working in that

24   environment as well.

25        Q.   Okay.  I believe you previously testified

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 152

1   that border patrol agents have discretion as to

2   whether to apply Parole + ATD; is that accurate?

3        A.   Within the confines of the, of the

4   guidance that has been sent out, which you,

5   obviously, have it.  You sent it to us.

6        Q.   Okay.  Understood.

7             So, is there any mechanism in place to

8   review those individual enforcement decisions?

9        A.   Yes, actually.  I mean -- so, I mean,

10  there's various levels of supervision within any

11  processing location, all the way from a patrol agent

12  in charge all the way to, to what I would consider

13  the first line, you know, supervisor or supervisory

14  border patrol agent.  It's kind of what I referred

15  to when I was talking about some of the previous

16  jobs that I had held.  You know, all of those

17  individuals are, you know, commonly operating or

18  commonly involved in the processing areas and

19  overseeing the process.

20            You know, it -- you know, additionally

21  speaking, you know, we, we look at the same numbers

22  that, that you presented here today as well as on a

23  daily basis, you know, so that we can monitor the

24  detention capacities within the sectors that are

25  impacted, principally Del Rio and Yuma, you know,

Exhibit B

Page 153

1    what are their TIC times, what are their capacities,

2    what are the demographics that they have in custody,

3    those type of aspects in order to be able to, to

4    make what I would consider a broader decision

5    making, which is then, obviously, brought down to a

6    case-by-case basis based upon the individual they

7    have in front of them.

8         Q.   Are you aware if there are any terms for

9    the conditions of their parole?

10        A.   Yes.

11        Q.   And what are those terms?

12        A.   So, so, you know, as an example, you know,

13   it was originally that, that all the migrants,

14   basically, report to an ICE facility within 15 days.

15   We have increased it between anywhere -- you know,

16   over time, you know, between, you know, 60, 30 or 15

17   just depending on, on the rate at which people were

18   showing up to various ICE offices that terms or

19   conditions of parole, you know, are -- that we are

20   putting on the forms are, are, you know, driven in

21   conjunction with ICE, but ultimately, you know,

22   those conditions, by and large, are ICE conditions

23   and to really get the background of it, I refer you

24   to ICE on that.

25        Q.   Okay.  Do you have any knowledge as to

Exhibit B

Page 154

1    when it was increased from 15 to 30?

2         A.   Not off the top of my head, no.  I just

3    can't remember the dates off the top of my head.

4         Q.   Okay.  Do you have any knowledge as to

5    when it increased to 60 days?

6         A.   No, I can't, I can't remember it.  Not off

7    the top of my head.  I just know that -- I just know

8    that we have.  I just, I just can't -- I can't

9    remember the time frames.

10        Q.   Okay.  Do you know what the current number

11   of days are?  Is it currently 60 days you're saying

12   getting the Notice to Appear?

13        A.   I believe it's 15, but, but don't quote me

14   on it.  I just -- I don't -- I can't, I can't recall

15   off the top of my head as to what it is right now.

16   The last time I remember, it was 15.

17        Q.   Okay.  So, once these families reach their

18   intended destination in the United States -- these

19   are families who have school-aged children; is that

20   correct?

21        A.   Completely varies.

22        Q.   Okay.  Are there some families with

23   school-aged children?

24        A.   Yes, of course.

25        Q.   Okay.  Is it fair to say that when those

Exhibit B

Page 155

1    families reach their intended destination that they

2    are likely to place their children in school?

3              MR. DARROW:  Objection.  That's outside

4         the scope of this witness' testimony.

5              You can answer if you know.

6    A.    You'd have to ask the families.

7    BY MS. PATEL:

8    Q.    I'm asking you.  Is it fair to say that

9    those families would put their children in school?

10             MR. DARROW:  Objection, calls for

11        speculation.

12             You can answer if you know.

13    A.    Yeah, I have no idea.  I don't track the

14    families after their release.

15    BY MS. PATEL:

16    Q.    And you don't think that families will

17    place their children in school once they arrive at

18    their destination?

19             MR. DARROW:  Objection, asked and

20        answered.

21             Answer if you know.

22    A.    We can debate good parenting all day.

23    BY MS. PATEL:

24    Q.    Do you think it's likely that most of them

25    would put their children in school?

Exhibit B

Page 156

1                MR. DARROW:  Objection, beyond the scope

2         of this witness' testimony and calls for

3         speculation.

4                You can answer.

5         A.   Yeah.  As a good parent, I would -- maybe.

6    I -- you know, I have two little ones of my own,

7    so...

8      BY MS. PATEL:

9         Q.   **Are these families coming to the United**

10   **States to build a life here?**

11               MR. DARROW:  Objection, beyond the scope

12        of this witness' testimony and calls for

13        speculation.

14               You can answer if you know.

15        A.   I, I have heard in my career a myriad of

16   reasons why people come here.

17     BY MS. PATEL:

18        Q.   **Is one of those reasons to build a life in**

19   **the United States?**

20               MR. DARROW:  Same objections.

21               You can answer if you know.

22        A.   Sure.  Absolutely.

23     BY MS. PATEL:

24        Q.   **And isn't it reasonable to think that if**

25   **you have school-aged children and you're trying to**

                                          Exhibit B

Page 157

1    build a life here that you would educate those

2    children by putting them in school?

3              MR. DARROW:  Same objections.

4              You can answer.

5         A.   You know, if they're a good parent, I, I

6    would assume that they would try and educate their,

7    their children.

8     BY MS. PATEL:

9         Q.   Do you think that there are good parents

10   that are trying to come into the United States with

11   their families?

12             MR. DARROW:  Same objection.

13             You can answer if you know.

14        A.   I am, I am sure there are good parents as

15   well as there's bad parents.

16    BY MS. PATEL:

17        Q.   Okay.  And it would be reasonable to think

18   that those good parents, as you call them, would put

19   their children in school; is that fair?

20             MR. DARROW:  Same objections.

21             You can answer.

22        A.   Sure, I guess.

23    BY MS. PATEL:

24        Q.   Okay.  And it's likely that they'll put

25   their kids probably in public school, correct?

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 158

```
 1              MR. DARROW:  Same objections.

 2              You can answer if you know.

 3         A.   I wouldn't even begin to guess or

 4    speculate if they're putting them in private or

 5    public school.

 6      BY MS. PATEL:

 7         Q.   They could put them in public school; is

 8    that fair?

 9              MR. DARROW:  Same objections.

10         A.   They could put them in private school.  I,

11    I don't know.

12      BY MS. PATEL:

13         Q.   But they could also put them in public

14    school, correct?

15              MR. DARROW:  Same objections, plus asked

16         and answered.

17              You can answer.

18         A.   I guess, sure.  I mean, that's one, one

19    available avenue of many.

20      BY MS. PATEL:

21         Q.   And if these families are coming here to

22    build a life in America, is it reasonable to say

23    that they would seek employment specifically the

24    adults in the family unit?

25              MR. DARROW:  Same objection, calls for
```

Exhibit B

Page 159

1      speculation.

2             You can answer if you know.

3      A.   I am aware of migrants getting employment

4    authorization documents and working.

5    BY MS. PATEL:

6      **Q.   Okay.  And if they get employment and they**

7    **lose their job, is it fair to say that they could be**

8    **eligible to receive reemployment benefits?**

9             MR. DARROW:  Same objections.

10            You can answer if you know.

11     A.   I, I couldn't even speculate on what the

12   rules of benefits will be per state.  I defer to

13   that state.

14   BY MS. PATEL:

15     **Q.   If a state allows reemployment benefits**

16   **for adults that have come in and started working, I**

17   **mean, it would be reasonable that they would try to**

18   **seek that; is that fair?**

19            MR. DARROW:  Objection.  This is getting

20            wildly off the scope of what this witness is

21            designated to testify.  If you -- you know, if

22            you want to ask about benefits of reemployment

23            in Florida, we have another witness who is

24            designated to talk about that, but this is

25            totally beyond the boundaries of what we have

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 160

1              Chief Barker here to talk to you about today.
2                    MS. PATEL:  Well, I mean, if you want me
3              to stop this line of questioning and ask it to
4              him in his individual depo, I can surely do
5              that, but these questions will get asked, so --
6                    MR. DARROW:  Yeah.  So, it would be
7              helpful to not do it now, so if you could ask
8              him in the individual portion that would be --
9              that would be better.  Thank you.
10                   MS. PATEL:  This is also, I would say,
11             relevant to our standing argument, so --
12                   MR. DARROW:  That's fine.  I'm not
13             objecting to relevance, just to what we have
14             different designees for and the question of
15             topics.
16                   MS. PATEL:  We'll move on and bring it
17             back up after we finish the corporate rep.
18                   Let's move on to a different exhibit.
19                   (Plaintiff's Exhibit 11 was received
20             electronically, marked for identification and
21             is attached hereto.)
22        BY MS. PATEL:
23             Q.   So, I dropped Exhibit 11.  It is a
24        document from DHS titled Fiscal Year 2020
25        Enforcement Lifecycle Report.  Are you familiar with

Exhibit B

Page 161

1   this document?

2        A.   No.

3        Q.   Okay.  This has the DHS seal on it,

4   correct?

5        A.   Yup.

6        Q.   Do you have any reason to believe that it

7   is not, in fact, a DHS document or report?

8        A.   Yeah, I mean, it -- I assume it would be.

9        Q.   Okay.  If you want --

10       A.   Taken at face value.

11       Q.   If you want to flip through it, you're

12   free to do that.  I am going to direct you to page

13   13, and at the top it says -- there's a heading that

14   says, Enforcement Outcomes by Family Status.  I'll

15   give you minute to read this document.  Why don't I

16   do that?

17       A.   I'm just trying to digest the graph.

18            Okay.  All right.  Gotcha.  Okay.

19       Q.   Okay.  So, that first paragraph below the

20   graph is what I want to point you to.  So, according

21   to that paragraph, how many encounters of single

22   adults from 2014 to 2019 have remained unresolved by

23   the end of the 2020 second quarter?

24            MR. DARROW:  You want to scroll down.

25       A.   Well, it says 2.1 million have been

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 162

1    resolved if that's what you're, what you're asking

2    for.  85 percent.  Roughly 14 percent remaining

3    unresolved.

4      BY MS. PATEL:

5      Q.   Okay.  And then that following paragraph

6    discusses the family units; is that accurate?

7      A.   Yes.

8      Q.   And how many of those have remained

9    unresolved?

10     A.   The vast majority.  91 percent -- or 94

11   percent, rather, is what it's saying with no

12   departure, 4 percent granted relief, 89 percent of

13   which remain unresolved.

14     Q.   You can come back.  Does this sound

15   correct to you?

16     A.   If this is the data that -- so, to draw a

17   clear distinction, this is way -- this data is

18   referring to processes that are way after CBP's

19   encountering somebody.  You know, this is dependent

20   upon DOJ and CIS and ICE and all of those entities,

21   not CBP.  So, on face value, I'll say, yeah, you

22   know, it's in the report, but whether that's

23   accurate or not, I really defer you to DOJ, CIS and

24   ICE.

25     Q.   All right.  We'll come -- let's come back

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 163

1   to this document.

2        So, what instructions has CBP been given

3   since January 20, 2021 regarding the detention of

4   applicants for admission at the Southwest Border?

5        A.   Are you talking about out of port of

6   entry?

7        Q.   Let's start with between a port of entry.

8        A.   It's exactly what I just referred earlier.

9   So, you know, we will, we will utilize all the

10  processes in order to, to detain, remove, expel, you

11  know, or in some circumstances release individuals

12  based upon the processing pathways and the

13  circumstances of that individual's time in custody.

14  There is no -- there is no change, I would say, in

15  regards to necessarily how we're doing business.

16       Q.   Okay.  Well... were any specific

17  instructions given regarding family units?

18       A.   No, no, just the normal processing

19  pathways which we described earlier, and that's what

20  would be applicable to family units.

21       Q.   Okay.  Have any instructions been given

22  since January 20, 2021 regarding a preference for

23  one of the pathways that we had discussed over the

24  other pathways?

25       A.   No.  No, I mean, it would -- again, I go

Exhibit B

Page 164

1    back to, you know, the first thing we'll take a look

2    at is if somebody's applicable to Title 42.  If

3    they're not applicable to Title 42, we will look to

4    detain or remove them, and, you know -- and then

5    after that we'll take a look at the various

6    circumstances that might be applicable to that

7    individual or family.  I guess you were talking

8    about family.

9        Q.   Okay.  Is there a greater preference to

10   use orders of recognizance?

11       A.   So, that is -- you know, I would say if we

12   are, if we are faced with the circumstances where

13   somebody is going to be released and the myriad of

14   circumstances that we spoke about earlier, our, our

15   primary or principal avenue in which we will process

16   somebody for that release pathway is going to be an

17   NTA/OR, right, but, again, caveated with when

18   applicable in the myriad of circumstances we

19   described earlier.

20       Q.   All right.  Is there a greater preference

21   to use of parole?

22            MR. DARROW:  Objection.  Can you clarify,

23        a greater preference as to when?

24   BY MS. PATEL:

25       Q.   From January 20, 2021 to present, has

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 165

1    there been a greater preference to use parole?

2        A.   So, there is -- there's not a

3    preference -- the preference still remains to

4    utilize NTA/OR, to be honest.  I mean, that's the

5    preference.  If, if it is a circumstance that is

6    going to result in having to utilize a pathway which

7    will result in a release, i.e., an NTA/OR, that is

8    the preferred pathway.

9        Q.   And why is that the preferred pathway?

10       A.   Because that person is provided a Notice

11   to Appear with a date, time, place, location to be

12   able to appear in front of a, of a judge.

13       Q.   Okay.  Since January 20, 2021, has there

14   been a preference against using Expedited Removal?

15       A.   Only since we've been enjoined.  So, you

16   know, Expedited Removal or ER when applicable has

17   definitely been utilized and will continue to be

18   utilized.  We're currently on a -- and by no means

19   am I an attorney, you know, but we are currently

20   under a TRO in -- you know, to utilize Title 42 and

21   not utilize other pathways like ER, so we continue

22   to utilize Title 42, but we absolutely utilize an ER

23   pathway when we can.

24       Q.   Okay.  Since January 20, 2021, have any

25   pathways been added?

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 166

1       A.   Since January 2021?  So, you know, the --

2   and it's really not even a pathway, to be honest,

3   but, you know, the application or utilization of

4   parole, which was a pathway previous to January 20,

5   2021, you know, is a pathway that we have utilized

6   more often, but as far as new pathways being

7   presented, it's not a new pathway.

8       Q.   Why has parole been used more often?

9       A.   Again, it goes back to the processing time

10  frames that we, we spoke about earlier.  Again, it

11  goes back to the detention conditions, the high TIC

12  times, the high capacity numbers, the fact that we

13  have no return mechanisms to, to certain

14  demographics like Cubans, Venezuelans, Nicaraguans.

15  It's those circumstances which we talked about

16  earlier.

17           I mean, the COVID pandemic, you know, the

18  literal death and dying of agents and officers as

19  they try to do their job, you know, in protecting

20  the border, you know, and as well as protecting the

21  migrants and the professional staff that are working

22  every day as well.

23           So, there are certain real -- there's

24  certain applications of parole like we've spoken

25  about during those circumstances.  Again, based upon

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 167

1   the circumstance of the individual in front of us as

2   well.

3       Q.   I just want to -- a point of

4   clarification.  For Parole + ATD, when it comes to

5   family units, is that applied to families regardless

6   of their nationality?

7       A.   So, it -- Parole + ATD may be applied,

8   and, and at this point in time, you know, the

9   nationalities in which we are applying Parole ATD

10  are Cubans, Venezuelans and Nicaraguans because we

11  have no return rights to those countries, either.

12  We can't send them back.

13          If we have a return mechanism in order to

14  be able to send somebody back to another country --

15  I'll just use Colombia as an example -- you know, we

16  will process them accordingly and, and return them

17  to the best of our ability.  Guatemala is another

18  prime example of a country, you know, that we have

19  return rights to.  Right?  So, if we're able to

20  return somebody to their home country, then we will,

21  we will place them into a removal type proceeding.

22      Q.   Okay.  So, as of right now, it's only

23  being applied to those nationalities that you just

24  mentioned; is that fair?

25      A.   So, yes, by and large to those, those

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 168

1  nationalities in which, in which we were -- you

2  know, we are not able to return to.  You know, there

3  are countries -- Colombia is another example to

4  where through, I'll say, political dynamics we have

5  recently gained the ability to start return or

6  returning to, but we had not previously.  So,

7  through negotiations gained the ability to return to

8  Colombia, and hence, now, you know, processing more

9  Colombians to -- you know, with a, with a removal

10  pathway.

11       **Q.   Were there other nationalities that you --**

12  **since Parole + ATD has been implemented, are there**

13  **other nationalities to which it has been applied?**

14            MR. DARROW:  Objection.  We're going to

15       have another witness speak to Parole + ATD.

16            You can answer.

17       A.   Not that I'm aware of off the top of my

18  head.  I'm not -- I would have to ask.  I just don't

19  know.  I don't know off the top of my head.

20  BY MS. PATEL:

21       **Q.   Okay.  So, since January 20, 2021, have**

22  **any pathways been removed?**

23       A.   Yes.

24       **Q.   Which pathways?**

25       A.   HARP and PACR.

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 169

```
 1              (Plaintiff's Exhibit 12 was received
 2         electronically, marked for identification and
 3         is attached hereto.)
 4    BY MS. PATEL:
 5         Q.   I'm going to drop another exhibit.  This
 6    is Exhibit 12.  This is a document from DHS dated
 7    April 26 --
 8              MR. DARROW:  We're not seeing it.
 9         A.   There we go.  It just dropped over here.
10    BY MS. PATEL:
11         Q.   Okay.  So, this is a DHS document dated
12    April 26, 2022.  It's a memorandum from Alejandro
13    Mayorkas with a subject line of DHS Plan for
14    Southwest Border Security and Preparedness.
15         A.   It's just opening up on our side here,
16    so --
17         Q.   Okay, sorry.
18         A.   No, no, you're good, you're good.  Okay.
19    It's loaded.
20         Q.   I'll give you a minute to look through it.
21         A.   Oh, this is the pillars document.  Yes,
22    I'm familiar, ma'am.
23         Q.   Okay.  So, you are familiar with this
24    document?
25         A.   Yes, ma'am.
```

Exhibit B

Page 170

```
 1       Q.    How are you familiar with it?

 2       A.    I've seen it distributed.  I've, I've

 3  heard it spoken about in discussion in regards to,

 4  to pillars.

 5       Q.    Okay.  So, the top of page 2 kind of gives

 6  a description of what's below in the pillars, but it

 7  sounds like you have some basic understanding of

 8  that, so I will skip to Border Security Pillar 3,

 9  which is on page 2 towards the bottom.

10       A.    Uh-huh.

11       Q.    So, can you just read that pillar really

12  quick?

13       A.    Sure.  "We are administering consequences

14  for unlawful entry, including removal, detention,

15  and prosecution."

16       Q.    Okay.  And it says, "Core to this plan is

17  our commitment to continue to strictly enforce our

18  immigration laws.  This includes increased use of

19  Expedited Removal, detaining single adults when

20  appropriate, referring for prosecution those whose

21  conduct warrants it, and accelerating asylum

22  adjudications that enable us to more quickly process

23  and remove from the United States those who do not

24  qualify for relief under our laws."  Did I read that

25  correctly?
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 171

```
 1       A.   Yes, ma'am.correct.
 2       Q.   All right.  So, I'd like to ask you about
 3   the second paragraph.
 4       A.   Sure.
 5       Q.   The reference to "detaining single adults
 6   when appropriate."
 7       A.   Uh-huh.
 8       Q.   Why does this document only reference
 9   detaining single adults and omit any reference to
10   family units?
11       A.   Because there's currently no family unit
12   detention.
13       Q.   So, it's because there's no ability to
14   detain family units.  Am I understanding that
15   correctly?
16       A.   So, (a), first off, I mean, that would be
17   my -- I'm not the author of the document, so that's
18   just me assuming based on the circumstances.  You
19   know, you have to ask the Secretary as to the family
20   piece.  But the -- you know, obviously, yes,
21   detaining single adults when we can.
22       Q.   Okay.  Does DHS believe that it's
23   appropriate to detain family units?
24            MR. DARROW:  Objection.  We have another
25       witness who's going to speak to detention
```

Exhibit B

Page 172

1        capacity issues.

2              MS. PATEL:  I believe this witness is

3        designated for Topic Number 2.

4              MR. DARROW:  Yes, I thought you just asked

5        him about detention, not release.

6              You can answer the question if you know.

7        A.   So, can you restate your question?

8    BY MS. PATEL:

9        **Q.   Well, my question is, does DHS believe it**

10   **is, it is appropriate to detain family units?**

11       A.   So, I would defer you to DHS leadership in

12   regards to what they view as, as appropriate or not,

13   but with that being said and I also think it's

14   extraordinarily important to note that we do detain,

15   hold within CBP custody family units pending

16   Expedited Removal from the United States.  Remember,

17   I referred to that previously in regards to holding

18   in our custody or 24 to 48 hours depending on the

19   manifesting requirements of those countries.

20       **Q.   Okay.  Is that the only circumstance in**

21   **which DHS would detain a family?**

22       A.   Within CBP's custody that is, that is --

23   that is when we are currently holding families

24   pending removal.

25       **Q.   If you could turn to page 4 of this**

Exhibit B

Page 173

 1    document, the very bottom paragraph.  Let me know

 2    when you're there.

 3         A.   Yes, ma'am.

 4         Q.   Okay.  It says, "Along with our efforts to

 5    secure the border, over the past 15 months, we

 6    implemented critical reforms that ended cruel and

 7    unjust policies of the prior Administration."  Did I

 8    read that correctly?

 9         A.   Yes, ma'am.

10         Q.   All right.  So, what policies are being

11    referred to there?

12              MR. DARROW:  Objection.  This is outside

13         the scope of this witness' testimony.

14              You can answer if you know.

15         A.   I, I couldn't tell you, ma'am.

16    BY MS. PATEL:

17         Q.   Is detention of family units one of the

18    policies that is viewed by DHS as cruel and unjust?

19              MR. DARROW:  Objection.  Same objection.

20              You can answer.

21         A.   Same answer.  I couldn't, I couldn't tell

22    you.  There is no policy of not detaining families.

23    BY MS. PATEL:

24         Q.   Does DHS view the detention of family

25    units as inhumane?

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 174

```
 1              MR. DARROW:  Same objection.

 2              You can answer if you know.

 3       A.   Same answer, ma'am.  I can't, I can't

 4  answer that.  You have to, you have to ask DHS.  We

 5  are currently detaining and holding families pending

 6  removal within CBP.

 7    BY MS. PATEL:

 8       Q.   Does DHS view immigration detention

 9  generally as cruel and unjust?

10              MR. DARROW:  Same objection.

11              You can answer if you know.

12       A.   Same answer.

13    BY MS. PATEL:

14       Q.   Does DHS view Expedited Removal as cruel

15  and unjust?

16              MR. DARROW:  Same objection.

17              You can answer if you know.

18       A.   Yeah.  Same answer.  We utilize ER daily.

19    BY MS. PATEL:

20       Q.   Does DHS view MPP as cruel and unjust?

21              MR. DARROW:  Same objection.

22              You can answer if you know.

23       A.   Yeah, same answer.  We currently utilize

24  MPP.

25    BY MS. PATEL:
```

Exhibit B

Page 175

1       Q.    Does DHS view Title 42 as cruel and

2   unjust?

3             MR. DARROW:  Same objection.

4       A.    Same answer.

5     BY MS. PATEL:

6       Q.    So, does DHS view the immigration laws as

7   they currently exist as cruel and unjust?

8             MR. DARROW:  Same objection.

9       A.    Same, same answer.

10    BY MS. PATEL:

11      Q.    When you use the term detention, or when

12  CBP uses the term detention, what does that mean?

13      A.    So, basically, that they're in our

14  facility, they're in our care and custody.  As

15  they're within, within our custody, you know, I'll

16  say either -- you know, waiting every aspect of the

17  process from the point in which they enter the --

18  well, really, you know, from the point of encounter,

19  honestly, when somebody's placed under arrest to the

20  point where they are removed, repatriated, expelled,

21  released or turned over to another agency.

22      Q.    Okay.  So, you're familiar with the term

23  alternatives to detention, correct?

24      A.    Yes.

25      Q.    What does that mean?

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 176

1        A.   Alternatives to detention.  I don't know
2   what to tell you.
3        Q.   **What would constitute an alternative to**
4   **detention?**
5        A.   Kind of like we talked about earlier.
6        Q.   **Is there anything -- is there anything**
7   **other than Parole + ATD, that type of framework?**
8        A.   I mean, really, I defer you to ICE in
9   regards to ATD.  They, they own that program.  And
10  the circumstances in which they place ATD on
11  somebody, I would -- without any degree of doubt, I
12  can tell you it's broader than just Parole ATD.
13       Q.   **Do you agree that immigration increases**
14  **cost to the state?**
15       A.   I couldn't speak to the cost to the state.
16  I know that migrants migrate to various states in
17  the United States.
18       Q.   **Okay.  Do you believe that immigration**
19  **enforcement reduces cost to the states?**
20            MR. DARROW:  Objection.  If this is
21            speaking to Topic 9, the court clarified that
22            you can ask about whether DHS considers cost to
23            the states, but the determination was that
24            generally asking about cost is off limits.
25            MS. PATEL:  I'm not asking for a specific

Exhibit B

Page 177

```
 1        cost.  I'm asking if he believes that

 2        immigration enforcement reduces cost to the

 3        states.

 4        A.   I couldn't tell you if it does or it

 5   doesn't.  I guess a lessening flow of migration may

 6   have a -- I'm pulling, I'm pulling at straws here --

 7   a lesser impact.  I couldn't quantify as to what

 8   that is or even speculate to be honest.

 9     BY MS. PATEL:

10        Q.   Okay.  Is it the Federal government's job

11   to enforce immigration law?

12        A.   Yes.

13        Q.   Can states enforce immigration laws

14   themselves?

15        A.   Not that I'm aware of.

16        Q.   Okay.  Do you believe that you have a duty

17   to enforce immigration law?

18        A.   Yes.

19        Q.   Do you believe that part of that duty is

20   preventing harm to the states and the people who

21   live in them?

22        A.   My duty is to protect the borders and

23   enforce immigration and criminal statutes, you know,

24   at the border.

25        Q.   Okay.  So, I'll ask again.  Do you believe
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 178

1    that part of the duty is preventing harm to the

2    states and the people who live in them?

3        A.    So, protecting those people or those

4    individuals in the state from any harm that could

5    befall them from somebody that crossed the border,

6    absolutely.

7        Q.    Does DHS consider the cost to the states?

8    Have they considered the cost to the states?

9            MR. DARROW:  Objection, vague.  In what

10           circumstances are you talking about?

11    BY MS. PATEL:

12       Q.    Well, does DHS have any information on

13    whether states will be financially impacted by the

14    release of tens of thousands of aliens into the

15    interior?

16       A.    So, I personally don't, but I, you know --

17    you know, I have absolutely been in discussions to

18    where the discussions surrounding the states, the

19    impact to the states of migration or migrants who

20    are released, as well as the impacts to the

21    nongovernment organizations that, that help service

22    both the state as well as the migrants in those

23    conditions, you know, have discussed various impacts

24    to them as well as the governments.  You know, and

25    mainly DHS through FEMA through the ESFP funding,

Exhibit B

Page 179

1    which is the Emergency Supplemental Food and Shelter

2    funding, to the states has been discussed as well.

3    As to what those impacts are, the financial gravity

4    of what those may be or the financial assets that

5    are provided to the NGOs, that I don't have any

6    scope on.

7         **Q.   So, what is your understanding as to**

8    **whether the states are impacted by DHS's release of**

9    **tens of thousands of people into the interior?**

10             MR. DARROW:  Objection.  Are you asking

11        his understanding as an individual fact witness

12        or DHS's understanding?

13             MS. PATEL:  DHS's understanding.

14    A.   So, again, I go back to kind of my, my

15    statement a minute ago.  You know, I, I am generally

16    familiar with the concerns of various what I would

17    consider as border states in regards to, you know,

18    some of the financial impacts or strains upon the

19    state and/or the NGOs, those nongovernment

20    organizations, but what the specific constraints

21    are, specific impacts are I -- it's just not the

22    avenue that I -- that I am involved in.

23     BY MS. PATEL:

24        **Q.   Okay.  So, you're speaking specifically as**

25    **to border states, meaning those states that are**

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 180

1   along the Southwest Border?

2        A.   Well, I think it's, it's a broader -- let

3   me redefine and just say states period, because it's

4   been -- you know, I've been in conversations with --

5   and it was discussed beyond the border state area.

6        **Q.   Did DHS consider the impact of closing the**

7   **family detention centers on the states?**

8             MR. DARROW:  I'm going to object to that

9             as well as this witness has testified

10            detention -- family detention -- detention of

11            families is an ICE topic, which you will have

12            an ICE person to speak to, but more

13            importantly, the court's order said that you

14            can ask about consideration for, quote,

15            non-detention policies, not closing family

16            detention centers.

17            MS. PATEL:  We think they're interrelated.

18   BY MS. PATEL:

19        **Q.   So, please, go ahead and answer if you**

20   **can.**

21        A.   I defer to ICE.

22            MS. PATEL:  All right.  So, Joe, I think

23            that Chief Barker here was designated to talk

24            to Topic Number 9.  So, is the ICE witness

25            tomorrow going to be able to answer this

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 181

```
 1       question?  Is he going to be also designated
 2       for that topic?
 3              THE WITNESS:  I can be very direct.
 4              MR. DARROW:  I think our main problem is
 5       that this is beyond what the court said was a
 6       fair topic for Topic Number 9.  The court
 7       talked about asking about whether DHS
 8       considered cost to states in a non-detention
 9       policy.
10              MS. PATEL:  We are referring to the
11       non-detention policy.  Closing of detention
12       centers is equivalent to not detaining them.
13              MR. DARROW:  The witness can answer if he
14       knows.
15       A.   I have no knowledge in any way, shape or
16   form if that consideration was, was had or not, and
17   I would defer to ICE.  I was in no conversations,
18   you know, regarding that, so, really, I defer to DHS
19   and ICE on that.
20              MS. PATEL:  Okay.  And we'll just leave
21       the deposition open if we need to to readdress
22       his inability to answer that question.
23              MR. DARROW:  There was no reasonable way
24       we could understand that you were going to ask
25       about closing family detention centers based on
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

                                                      Page 182

```
 1        how the court described Topic Number 9 in his

 2        order.

 3             MS. PATEL:  Well, we can discuss this

 4        further off the record if we need to later.

 5     BY MS. PATEL:

 6        Q.   All right.  I'm going to drop another

 7     exhibit.

 8        A.   Is there any way we can stretch my legs a

 9     little bit?

10        Q.   Yes, absolutely.  So, how long do you want

11     to take?  A five, ten-minute break?  It's up to you.

12        A.   Ten would be fantastic.

13             MS. PATEL:  All right.  Let's take a

14        ten-minute break.

15             THE WITNESS:  I appreciate it.

16             THE VIDEOGRAPHER:  The time is 1:30 and we

17        are off the record.

18             (Brief recess 1:30 p.m. until 1:42 p.m.)

19             THE VIDEOGRAPHER:  The time is 1:42 and we

20        are back on the record.

21             (Plaintiff's Exhibit 13 was received

22        electronically, marked for identification and

23        is attached hereto.)

24     BY MS. PATEL:

25        Q.   All right.  I have dropped a new exhibit,
```

Exhibit B

Page 183

```
 1    Exhibit Number 13, into the chat.  And, Chief
 2    Barker, once you have it open, can you just let me
 3    know if you recognize the document?
 4        A.   Yes.  Yes, it's -- yes, it's a report,
 5    Texas v. Biden.  Yes, I'm familiar with it.
 6        Q.   And so, this is for the month of April 1,
 7    2022 through April 30, 2022 and it is the Texas v.
 8    Biden Monthly Report.  If you can, please, turn to
 9    page 5, I just have some questions regarding the
10    entries in this chart.
11             So, under Border Patrol it says Parole
12    Disposition.  Do you see that?
13        A.   Yes.
14        Q.   And then under OFO it says, NTA and
15    Paroled and then there's also a row for Parole
16    Disposition.  Do you see that?
17        A.   Yes.
18        Q.   What's the difference between the NTA and
19    Paroled into the United States on a case-by-case
20    basis pursuant to Section 1182 and the Parole
21    Disposition row?
22        A.   You'd have to ask OFO.
23             MR. DARROW:  Yeah, just for clarification,
24        we're going to have an OFO person who can speak
25        to this particular field.
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 184

1    BY MS. PATEL:

2        Q.   Okay.  So, under U.S. Border Patrol, under

3    the Patrol Disposition, what is included in that

4    role?

5        A.   Those would be individuals who we

6    processed for parole.

7        Q.   So, what type of parole?

8        A.   Parole.  So, whether it's a Parole ATD,

9    parole for humanitarian reasons, parole -- it's what

10   we talked about earlier.  If you recall, we were

11   referring back to -- we used medical as an example.

12   It's going to be all-encompassing.  It's all

13   inclusive.

14       Q.   Okay.  So, unlike what looks like OFO is

15   separated out, Border Patrol is not separated out;

16   is that -- am I understanding that correctly?

17       A.   Correct.  Parole disposition is a parole

18   disposition.

19       Q.   Okay.  I think you've answered my question

20   as to that exhibit.

21            (Plaintiff's Exhibit 15 was received

22            electronically, marked for identification and

23            is attached hereto.)

24   BY MS. PATEL:

25       Q.   Let me drop another one into the chat.

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 185

```
 1   Exhibit Number 14 -- no, Exhibit Number 15.  We'll
 2   take this a little out of order.  This is Texas v.
 3   Biden Monthly Reporting for the reporting period
 4   January 21, 2021 through November 30, 2021.  Is that
 5   an accurate statement from this document?
 6        A.   For the Title 8 reporting, yes.
 7        Q.   Can you turn to page 13 (sic) of this
 8   document?
 9        A.   Yes, I gotcha.
10        Q.   So, at the top it says, this "Data
11   includes Deportable Migrants only."  So, what is
12   that referring to?
13        A.   There -- you know, so it's an immigration
14   classification.  Right?  So, somebody could be
15   non-deportable.  It'd be like a LAPR, a legal alien
16   permanent resident.
17        Q.   Okay.  And so, it looks like, according to
18   this chart, about 105,504 people were released on
19   NTA or OR due to lack of space; is that accurate?
20        A.   I think -- so, out of the report, as I'm
21   looking at, I think it's, what, 5,889, something
22   around there.
23        Q.   Are you looking at -- oh, I'm sorry.  Are
24   you on page -- I think I told you page 13.  I meant
25   page 12.  Can you look at page 12 for me?
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 186

 1        A.    Okay.  All right.  I'm on page 12 now.

 2        Q.    I'm looking at the top chart.

 3        A.    Okay.  I gotcha.

 4        Q.    Okay.  Can you actually explain to me

 5   what's in this chart?

 6        A.    Let me just read real quick.  All right.

 7   So, these are going to be all individuals who, who

 8   we have -- just one second.  Just one second.  Let

 9   me zoom out here.  Okay.  So, these are going to be

10   individuals who, who were processed for an NTA/OR

11   and that, that could have been detained and they

12   were placed on an NTA/OR due to the fact that ICE

13   did not have space available for detention.

14              So, then, of course, the parole aspect is

15   exactly the same thing.  Right?  So, they were

16   processed for parole due to the fact that ICE did

17   not have space for detention.

18        Q.    Okay.  Is that as to both of the totals as

19   listed in the right-hand column, the 105,000 and the

20   101,000?  Because I see that "Lack of Space" is --

21        A.    Yes.

22        Q.    -- also noted for that top row.

23        A.    Yeah, I mean, I'm not the originator of

24   the document.  Do I know the numbers?  I mean, I

25   think it's probably -- the way that I'm reading it

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 187

1  is encompassing both of those aspects for lack of

2  space, but, but I'd have -- you'd have to ask who

3  polled it.

4      Q.   So, I'm looking at the footnote below.

5  It, essentially, infers or states that that "Lack of

6  Space" category was kind of added in by whoever was

7  inputting the information?

8      A.   Yes.

9      Q.   Okay.  But that's not something that the

10  agent necessarily has to put in a descriptor; is

11  that accurate?

12      A.   It is not a -- what I would consider as a

13  prefill or a check box or a drop down, you know what

14  I mean, so there's -- so, it has to be manually

15  entered.

16      Q.   Okay.  Other than Lack of Space, are there

17  other entries that people typically put in for the

18  reason for an NTA or OR?

19      A.   Yeah, I mean, it could be, you know, you

20  know, that, that they are claiming fear and placed

21  in a non-detained docket, you know, because they

22  are, you know, being processed, you know, to have

23  their fear claim heard.

24      Q.   Okay.  Have you seen people actually input

25  that descriptor into this information system?

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 188

1      A.   I have seen people identify that the

2   subjects are claiming fear.

3      **Q.   Okay.**

4      A.   It's because there's a CIS mechanism that

5   gets, you know, started, if you will, when that

6   happens.

7           (Plaintiff's Exhibit 14 was received

8           electronically, marked for identification and

9           is attached hereto.)

10   BY MS. PATEL:

11      **Q.   I'm going to drop another exhibit.  This**

12   **is Exhibit Number 14 and it's DHS's response to**

13   **Florida's interrogatories, and if you could turn to**

14   **page 5, the response to our interrogatory number 4.**

15   **I'll give you a minute to read it.**

16      A.   All right.  Gotcha.

17      **Q.   Okay.  So, that last sentence says, "In**

18   **addition, CBP assesses whether each individual**

19   **applicant for admission may be considered for**

20   **release on a case-by-case basis."  What is this**

21   **referring to?**

22      A.   So, it's, it's what I was talking about

23   earlier.  Right?  I mean, it's -- you know, each

24   individual who, who we are encountering between the

25   ports of entry or even at the ports of entry, right,

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 189

1  that's an applicant for admission.  Right?  So, we

2  are, we are determining, you know, on a case-by-case

3  basis what pathway we're going to place that

4  individual into.  Again, I go back to the Title 42,

5  determining if somebody is a border security,

6  national security threat, you know, are they

7  removable, returnable back to their country, you

8  know, what processing pathway is applicable with the

9  TIC time and the detention capacity capabilities of

10  both the sector as well as ICE.  You know, all of

11  these different degrees of factors go into

12  determining that case-by-case basis.

13      **Q.   Okay.  Under the NTA/OR that we were**

14  **previously discussing, do you obtain a warrant for**

15  **arrest?**

16      A.   No, I do not believe a, a warrant for

17  arrest is in an NTA packet.

18      **Q.   Okay.  And in the Warrant for Arrest/NTA -**

19  **detained, in that case a warrant for arrest is**

20  **obtained, correct?**

21      A.   Yes.

22      **Q.   Under what circumstances would you get a**

23  **warrant for arrest?**

24      A.   Most often when they're, when they're

25  getting detained and prosecuted.

Exhibit B

Page 190

```
 1        Q.    Are there any other --

 2        A.    And if they're moving into a period of

 3   detention, right, for administrative proceedings.

 4        Q.    Is that the only instances in which you

 5   would get a warrant of arrest?

 6        A.    No, I mean, there's numerous.  Right?  I

 7   mean, there's, there's numerous.  If, if -- you

 8   know, I mean, you know, we, we get warrants on a

 9   daily basis to be able to arrest criminals, you

10   know, within our, within our operational space on a,

11   on a daily basis.  You know, whether -- you know,

12   for, for a myriad of reasons.  You know, criminal

13   violations.

14        Q.    What about administrative warrants

15   specifically?

16        A.    Yeah, I mean, again, going back to the, to

17   the detention.

18        Q.    Okay.  I just want to make sure I'm clear.

19   So, for -- under what circumstances would you get an

20   administrative warrant of arrest?

21        A.    For the detention -- when somebody is

22   remaining in custody pending their removal

23   proceedings.

24        Q.    Is that the only circumstance in which you

25   would get an administrative warrant of arrest?
```

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 191

1        A.    I'm sure there's others, but that's the

2    one that, that comes to mind.

3              MS. PATEL:  Okay.  Can I just have a

4        minute?

5              MR. DARROW:  Sure.

6              THE VIDEOGRAPHER:  The time is 1:56 and we

7        are off the record.

8              (Brief recess 1:56 p.m. until 1:58 p.m.)

9              THE VIDEOGRAPHER:  The time is 1:58 and we

10       are back on the record.

11   BY MS. PATEL:

12       **Q.    So, when persons are released from CBP**

13   **custody, do you provide them with information on**

14   **available resources?  Such as community resources or**

15   **resources in the communities.**

16       A.    So, we provide them with a list of pro

17   bono attorneys, but almost all individuals who are

18   released are transferred -- and this is -- and my

19   assumption is you're talking about people who are

20   released.

21              Released, we transfer them to an NGO, a

22   nongovernment organization, who works to be able to

23   provide them the resourcing that you're talking

24   about as well as onward movement and so on and so

25   forth, you know, and services.  So, we organically

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 192

1    provide a list of attorneys and the NGOs are

2    providing those other pieces.

3        **Q.   All right.  So, can you describe to me the**

4    **relationship between border patrol and those NGOs?**

5        A.   Yes.  That's a great question.  So, we

6    coordinate with the NGOs literally daily, every

7    single day within the sectors.  We actually identify

8    agents who are the NGO liaisons who work with the

9    NGOs every single day throughout the day so that the

10   NGOs have an accurate representation and description

11   of the individuals who we are releasing, you know,

12   that, that are ultimately going to be transferred to

13   them or what type of individual requirements may be

14   necessary in order for them to be able to do that,

15   and that's all through a very heavy liaison with the

16   various NGOs.  So, so, consistent constant

17   communication and, and I think a very close working

18   relationship.

19       **Q.   What type of services do those NGOs**

20   **provide?**

21       A.   Really, I mean, you have to get with the

22   specific NGOs, but in a nutshell, you know,

23   assisting, you know, not only COVID testing and

24   vaccination, you know, if necessary, quarantine --

25   we'll call it consequence management.  I know it's a

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    medical term, but, you know, basically, if

2    somebody's COVID positive, providing quarantine

3    accommodations for them, onward movement and travel,

4    you know, clothes, food, housing, those type of

5    things on a short-term basis, you know, that's what

6    the NGOs provide in a nutshell.  Legal, legal

7    counsel as well.

8            You know, in a nutshell that's what the

9    NGOs are providing.  I know that that's not

10   standard, like I said, you know, in every NGO across

11   the United States.  For specific pieces you'd have

12   to ask those NGOs.

13       **Q.   Okay.  You just referenced that they**

14   **provide onward movement and travel.  What is that?**

15       A.   So, you know, whether, whether the migrant

16   needs help with, you know, onward movement, right,

17   so movement away from the border area or travel

18   arrangements away from the border area, the NGOs

19   will assist them in making those arrangements.  And

20   I am familiar with a couple situations that, you

21   know, just off the top of my head where NGOs have

22   assisted -- actually financially assisted with the

23   movements as well.

24       **Q.   Okay.  And are you referring to travel,**

25   **providing travel for the applicant for admission to**

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 194

1   their final destination?

2        A.   They wouldn't be an applicant for

3   admission anymore.  They would -- we would, we would

4   have released them from CBP custody.  Whether that's

5   an NTA/OR or Parole ATD, whatever that might happen

6   to look like.  So, with that being said, they

7   wouldn't be an applicant for admission.  But are

8   they providing what you're referring to as travel

9   for, for onward movement to the migrant?  Is that --

10  I mean, (a), first off, I really refer you to the

11  NGOs; (b), that's a case-by-case basis, you know,

12  based upon the financial means that a migrant may

13  have.

**14       Q.   I'm just asking because, you know, you**

**15  referenced that they provide onward movement and**

**16  travel.  So, I guess the natural question that comes**

**17  from that is, are they providing this travel or**

**18  onward movement to the destination that they intend**

**19  their future would be at?**

20       A.   I couldn't tell you because we -- "we"

21  meaning CBP -- do not track that individual post our

22  custody.  That's ICE.  So, you know, the cross

23  reference of the data given and provided versus the

24  travel of the migrant would really be -- would be an

25  ICE question.

Exhibit B

Page 195

1      Q.   Okay.  Do you have any knowledge as to

2   whether this onward movement or travel is provided

3   to specific states?

4      A.   Yeah, I mean, you really have to ask the

5   NGOs how they go about arranging their course of

6   business.  Whether it's at the request of the

7   migrant, I really couldn't tell you.

8      Q.   Are you aware if any of the applicants for

9   admission who came through the Southwest Border

10   after January 2021 have settled in Florida?

11           MR. DARROW:  Objection.  We have another

12       witness designated to speak to this topic.

13           You can answer if you know.

14      A.   Yeah, I wouldn't have any clue.  That's,

15   that's a question more appropriate for ICE.

16   BY MS. PATEL:

17      Q.   I think -- can you give me a minute?

18      A.   Sure.

19      Q.   All right.  Does CBP have any -- or work

20   with any NGOs that are not in the border states?

21      A.   Yes.

22      Q.   Okay.  In what states are they providing

23   services?

24      A.   We don't provide services to the NGOs.

25      Q.   Well, no, I'm saying, in what states are

Exhibit B

Page 196

1    those NGOs providing services?

2         A.   Oh, okay.  So, again, I mean, off the top

3    of my head.  So, the, you know, states in which I

4    have been involved in communication with, meaning

5    that I'll call or whatever, I've been invited to,

6    you know, like, you know, here in the area of the

7    District of Columbia, Maine, you know, obviously,

8    you know, we discussed earlier some previous

9    experience there, New York most recently.  You know,

10   I do know there's communication that has occurred

11   with the State of Florida as well.  I'm trying to

12   figure -- I'm trying to think about the ones that

13   are off the border area -- the direct border, border

14   area.  Some northern border states as well.  I just

15   can't -- I can't remember if it's Montana or

16   North -- somewhere right around in there as well.

17   But that gives you an idea -- oh, and Michigan.

18        **Q.   Okay.  The communications with the NGOs in**

19   **Florida, what was the context of those**

20   **communications?**

21        A.   It was, it was literally just to kind of

22   brief them on the situation that was occurring at

23   the border so that -- and mind you, you know, we

24   have, basically, nationwide calls where the states

25   and NGOs -- the state emergency management as well

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 197

1  as the NGOs can call in to in order to be able to --

2  so that we can provide briefings to them as to what

3  is occurring on the border so that they may better

4  plan for and understand what we are seeing and, and,

5  you know, we've been experiencing.  Providing them

6  situational awareness.  So, that's the conversations

7  that, that are occurring in the various states that

8  are calling in to those.

9       Q.   Okay.  And how often are those calls?

10      A.   You know, I -- so, with me -- me,

11 personally, I have not done one for maybe a month,

12 month and a half, somewhere around in there, but,

13 again, I go back to we have individuals who, who are

14 very heavily engaged in these, these communication

15 patterns who are having these calls daily with NGOs

16 throughout the various states in the United States.

17      Q.   Okay.  And you said -- do you recall the

18 communication with the Florida NGO, when that was?

19      A.   I couldn't even tell you.  I'd have to --

20 I'd have to look.

21      Q.   Okay.  Do you know what type of services

22 they're providing to those in Florida?

23      A.   No.

24      Q.   Okay.  Do you know if NGOs in general

25 provide information regarding social services

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    available to people who are released into the

2    interior?

3        A.   I don't know.

4            MS. PATEL:  Okay.  I think I have no

5        further questions for the 30(b)(6) component of

6        this deposition, so, Mr. Darrow, if you have

7        any follow-up.

8            MR. DARROW:  Yes.  Just briefly and then

9        we're going to switch over to fact witness

10       time; is that correct?

11           MS. PATEL:  Correct.

12                   CROSS-EXAMINATION

13   BY MR. DARROW:

14       Q.   Chief Barker, when you testified a bit

15   before that we were -- and I don't want to

16   paraphrasing incorrectly, but that you had seen that

17   there were more parole dispositions since January

18   20, 2021, was that due to any policy telling you to

19   use parole more often?

20       A.   No.

21       Q.   What would you describe -- the use of

22   parole more frequently, what were the causes with

23   respect to that?

24       A.   That directly related to the aspect of,

25   you know, we're seeing increased migration to very

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 199

1  specific geographical locations along the Southwest

2  Border, principally Del Rio and Yuma right now -- it

3  was RGV, Del Rio and Yuma, but Del Rio and Yuma

4  right now -- with the population which cannot be

5  removed or returned back to their home country,

6  which is, which is, you know, Cubans, Venezuelans

7  and Nicaraguans.

8          You know, coupled with at the rate that we

9  are encountering and -- you know, and the extremely

10  high, you know, detention rates that we have within

11  the stations and the processing centers in those

12  locations, dangerously high, you know, custody

13  numbers and exaggerated TIC times or high TIC times,

14  you know, the utilization of Parole ATD was

15  utilized -- or is utilized in order to be able to

16  rapidly what I would consider is decompress in

17  selected populations where, again, we have really

18  either no ability to detain or no ability to remove,

19  either.  So, that, that would be utilization of, of

20  the Parole ATD during those time frames that you're

21  referring to.

22      **Q.   And even in scenarios -- I should say in**

23  **scenarios where the high TIC times and high**

24  **decompression rates helps lead to Parole ATD, does**

25  **that necessitate, then, that a particular individual**

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 200

1   will be realized?

2       A.   Absolutely not.  You know, very

3   specifically it's based upon the circumstances of

4   the individual there.  You know, so it does not

5   dictate that in any way.  You know, as a matter of

6   fact, quite conversely.  You know, one of the things

7   that I had said a couple times so far is that, you

8   know, our first principal, you know, course of

9   action is to try and expel someone, and if not, then

10  it is to detain or remove -- you know, detain and

11  remove someone.  So, return or remove.

12          You know, so, so, those are the actual

13  principal mechanisms which we rely on.  You know,

14  for lack of better terms, we're utilizing Parole ATD

15  as an, as an emergency mechanism, you know, a course

16  of last resort, for lack of better terms, in order

17  to be able to rapidly decompress the holdings in

18  woefully overcrowded detention centers with high --

19  or detention facilities, if you will, or processing

20  facilities.  You know, that's, that's what we're

21  utilizing it for.

22          MR. DARROW:  I don't have any more

23      questions.

24          MS. PATEL:  I do have some brief redirect.

25              REDIRECT EXAMINATION

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 201

1    BY MS. PATEL:

2        Q.   **You just testified that the increase in**

3    **parole decisions is not due to a policy, but that it**

4    **was in part due to increased migration; is that**

5    **correct?**

6        A.   Tell me that's -- again, I mean, that's

7    one facet of several facets that I just described,

8    right, so it's not just migration.  You know, it's,

9    it's very concentrated high flows of illegal

10   migration in very specific geographical areas of a

11   very specific demographic of which we have either no

12   ability to detain or no ability to remove as well.

13   Right?  So, it's,it's that complexity which has

14   created, you know, extremely high TIC times, you

15   know, time in custody time, extremely high

16   capacities with the very specific population.

17           With that being said, even with those

18   pieces involved, it's still based on a case-by-case

19   basis of the conditions of the individual who's

20   presented in front of us.

21       Q.   **Is it fair to say that closing family**

22   **detention centers has, has led to an increase in**

23   **releases on parole or on an order of recognizance?**

24           MR. DARROW:  I'm going to object as beyond

25       the scope of this witness' testimony, but he

Exhibit B

Page 202

1        can answer if he knows.

2        A.   Yeah, I mean, I mean, just to draw the

3   correlation, the relationship of those two variables

4   would be very -- there's no way I could do that.

5   That's a difficult equation to try and draw a

6   conclusion to.

7             MS. PATEL:  All right.  I have no further

8        questions.

9             MR. DARROW:  Nor do I.

10            THE VIDEOGRAPHER:  Reading, waiving?

11            THE STENOGRAPHER:  I do not believe it's

12        over.

13            MR. DARROW:  Yeah, one section is over.

14        Anita, correct me in I'm wrong.  We're going to

15        come back with Chief Barker in his individual

16        capacity as opposed to a 30(b)(6) deponent.

17            MS. PATEL:  That is correct.

18            THE VIDEOGRAPHER:  So, are we ending this

19        and reading him on differently or...

20            THE STENOGRAPHER:  Are you starting

21        another depo with him in his individual

22        capacity?

23            MS. PATEL:  Yes.

24            THE STENOGRAPHER:  Okay.  Yes, David.

25            MR. DARROW:  Can we know for the record

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 203

1   what time the 30(b)(6) deposition ends?

2        THE VIDEOGRAPHER:  Okay.  I'll read this

3   one off.  Anita, are you ordering?

4        MS. PATEL:  We are not ordering a copy of

5   the video, but we would like a copy of the

6   actual transcript.

7        THE VIDEOGRAPHER:  Joe, is the DOJ

8   ordering?

9        MR. DARROW:  Same for us.  We are not

10   ordering a copy of the video, but we would like

11   a copy of the transcript.

12        THE VIDEOGRAPHER:  This concludes the

13   video --

14        MS. PATEL:  I believe Ms. Chase wanted to

15   speak after, but we are requesting that on an

16   expedited basis in case you need to get that on

17   the record as well.

18        THE STENOGRAPHER:  Do you want to read or

19   waive, Chief Barker?

20        THE WITNESS:  Read.

21        THE VIDEOGRAPHER:  This concludes the

22   video recorded deposition of Tony Barker,

23   Wednesday, July 13, 2022 at 2:17 p.m.

24        (Witness excused.)

25        (Proceedings were concluded at 2:17 p.m.)

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 204

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH


            I, the undersigned authority, certify

    that TONY BARKER remotely appeared before me and

    having produced his U.S. Custom and Border

    Protection ID badge was duly sworn on the 13th

    day of July, 2022.

            Signed this 18th day of July, 2022.


    _____
    HELEN MARIE CHASE, Stenographic Reporter
    Notary Public, State of Florida
    My Commission No. GG 283850
    Expires: 2/20/2023

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 205

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH


      I, HELEN MARIE CHASE, Stenographic Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing video recorded remote Rule 30(B)(6) deposition of TONY BARKER; pages 1 through 207; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

      I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

      Dated this 18th day of July, 2022.


_____
HELEN MARIE CHASE, Stenographic Reporter

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 206

July 18, 2022

Tony Barker c/o Joseph Darrow, Esq.
joseph.a.darrow@usdoj.gov
P.O. Box 868 - Ben Franklin Station
Washington, D.C. 20044

Re:  State of Florida v. United States of America,
     et al.
Case No.:  3:21-cv-1066

On July 13, 2022 you gave your deposition in the
above cause.  At that time, you did not waive your
signature.  The transcript is now available for you
to read and sign.

Please call (888)811-3408 or e-mail
production@phippsreporting.com between the hours of
9:00 a.m. and 4:00 p.m., Monday through Friday, to
arrange to come to one of our offices to read or for
access to a read-only PDF transcript via computer.

Please execute the PDF-fillable Errata Sheet which
will be forwarded to you by Phipps Reporting.  The
Errata Sheet can also be downloaded from
www.phippsreporting.com.  Once completed, please
print, sign, and return to us for distribution to
all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,


HELEN MARIE CHASE, Stenographic Reporter
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.


_____
TONY BARKER

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 207

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re:  State of Florida vs. United States of
America, et al.
Case No.:  3:21-cv-1066
TONY BARKER (259222)
July 13, 2022

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| | | | |

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

_____                _____
Date                                              TONY BARKER

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                                1

---
**(**
---

**(a)**
  171:16 194:10
**(b)**
  194:11

---
**1**
---

**1**
  143:17 144:7
  183:6
**10**
  142:11,16
**101,000**
  186:20
**105,000**
  186:19
**105,504**
  185:18
**11**
  160:19,23
**1182**
  183:20
**12**
  169:1,6
  185:25 186:1
**12:36**
  142:1,4
**13**
  161:13 182:21
  183:1 185:7,
  24 203:23
**14**
  162:2 185:1
  188:7,12
**15**
  153:14,16

**154**:1,13,16
**173**:5 184:21
**185**:1
**19**
  151:8,19
**1:30**
  182:16,18
**1:42**
  182:18,19
**1:56**
  191:6,8
**1:58**
  191:8,9

---
**2**
---

**2**
  170:5,9 172:3
**2.1**
  161:25
**20**
  163:3,22
  164:25
  165:13,24
  166:4 168:21
  198:18
**2014**
  161:22
**2019**
  161:22
**2020**
  160:24 161:23
**2021**
  145:25 146:6,
  21 147:11,21
  148:10 163:3,
  22 164:25
  165:13,24
  166:1,5

**168**:21 **185**:4
**195**:10 **198**:18
**2022**
  169:12 183:7
  203:23
**21**
  151:17 185:4
**24**
  172:18
**26**
  169:7,12
**2:17**
  203:23,25
**2nd**
  143:6,8
  147:14

---
**3**
---

**3**
  170:8
**30**
  153:16 154:1
  183:7 185:4
**30(b)(6)**
  143:20 198:5
  202:16 203:1

---
**4**
---

**4**
  143:22 162:12
  172:25 188:14
**42**
  164:2,3
  165:20,22
  175:1 189:4
**48**
  172:18

---
**5**
---

**5**
  183:9 188:14
**5,889**
  185:21

---
**6**
---

**60**
  153:16 154:5,
  11

---
**8**
---

**8**
  185:6
**85**
  162:2
**89**
  162:12

---
**9**
---

**9**
  176:21 180:24
  181:6 182:1
**91**
  162:10
**94**
  162:10

---
**A**
---

**ability**
  167:17 168:5,
  7 171:13
  199:18 201:12
**absolutely**
  156:22 165:22

Exhibit B

178:6,17
182:10 200:2

**accelerating**
170:21

**accident**
149:11

**accommodations**
193:3

**accurate**
142:6 152:2
162:6,23
185:5,19
187:11 192:10

**action**
200:9

**actual**
200:12 203:6

**added**
165:25 187:6

**addition**
188:18

**additionally**
152:20

**addresses**
143:22

**adjudications**
170:22

**administering**
170:13

**Administration**
173:7

**administrative**
143:14 190:3,
14,20,25

**admission**
163:4 188:19
189:1 193:25
194:3,7 195:9

**adults**
158:24 159:16
161:22 170:19
171:5,9,21

**agency**
175:21

**agent**
152:11,14
187:10

**agents**
151:8,13,22
152:1 166:18
192:8

**agree**
176:13

**ahead**
180:19

**Alejandro**
169:12

**alien**
185:15

**aliens**
178:14

**all-
encompassing**
184:12

**alternative**
176:3

**alternatives**
175:23 176:1

**America**
158:22

**and/or**
179:19

**Anita**
202:14 203:3

**announced**
142:4

**announcing**
142:5

**answers**
143:18

**anymore**
194:3

**apologize**
147:5

**applicable**
163:20 164:2,
3,6,18 165:16
189:8

**applicant**
188:19 189:1
193:25 194:2,
7

**applicants**
163:4 195:8

**application**
148:6 166:3

**applications**
166:24

**applied**
149:15 167:5,
7,23 168:13

**apply**
152:2

**applying**
167:9

**April**
169:7,12
183:6,7

**area**
180:5 193:17,
18 196:6,13,
14

**areas**
152:18 201:10

**argument**
160:11

**arrangements**
193:18,19

**arranging**
195:5

**arrest**
175:19
189:15,17,19,
23 190:5,9,
20,25

**Arrest/nta**
189:18

**arrive**
155:17

**aspect**
145:10 175:16
186:14 198:24

**aspects**
153:3 187:1

**assesses**
188:18

**assets**
179:4

**assist**
193:19

**assisted**
193:22

**assisting**
192:23

**assume**
157:6 161:8

**assuming**
171:18

**assumption**
191:19

**asylum**
170:21

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

3

**ATD**
142:17,24
143:13,23
144:1,4,24
145:2,10,20
146:3 147:25
148:3,6,12,
13,24 151:2
152:2 167:4,
7,9 168:12,15
176:7,9,10,12
184:8 194:5
199:14,20,24
200:14

**ATDS**
145:17

**attach**
148:12

**attached**
142:13 160:21
169:3 182:23
184:23 188:9

**attaching**
145:16 147:24
148:3

**attempt**
150:15

**attorney**
165:19

**attorneys**
191:17 192:1

**author**
171:17

**authorization**
159:4

**avenue**
158:19 164:15
179:22

**aware**

153:8 159:3
168:17 177:15
195:8

**awareness**
197:6

---

**B**

---

**back**
142:2 147:23
150:10 160:17
162:14,25
164:1 166:9,
11 167:12,14
179:14 182:20
184:11 189:4,
7 190:16
191:10 197:13
199:5 202:15

**background**
153:23

**bad**
157:15

**Barker**
142:15
143:18,24
144:10 160:1
180:23 183:2
198:14 202:15
203:19,22

**based**
153:6 163:12
166:25 171:18
181:25 194:12
200:3 201:18

**basic**
170:7

**basically**
145:15 153:14
175:13 193:1

196:24

**basis**
149:16 150:11
152:23 153:6
183:20 188:20
189:3,12
190:9,11
193:5 194:11
201:19 203:16

**befall**
178:5

**begin**
158:3

**believes**
177:1

**benefits**
159:8,12,15,
22

**Biden**
183:5,8 185:3

**bit**
142:23 182:9
198:14

**bono**
191:17

**border**
147:13 149:6
150:1 151:8,
18 152:1,14
163:4 166:20
169:14 170:8
173:5 177:24
178:5 179:17,
25 180:1,5
183:11 184:2,
15 189:5
192:4 193:17,
18 195:9,20
196:13,14,23
197:3 199:2

**borders**
177:22

**bottom**
170:9 173:1

**boundaries**
159:25

**box**
187:13

**break**
182:11,14

**briefings**
197:2

**briefly**
198:8

**bring**
160:16

**broader**
153:4 176:12
180:2

**brought**
153:5

**build**
156:10,18
157:1 158:22

**bullet**
150:1

**business**
163:15 195:6

---

**C**

---

**call**
157:18 192:25
196:5 197:1

**calling**
197:8

**calls**
155:10 156:2,
12 158:25

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                            4

196:24 197:9,
15

**capabilities**
189:9

**capacities**
152:24 153:1
201:16

**capacity**
143:19 144:14
146:9,19
147:18
150:17,20
151:11 166:12
172:1 189:9
202:16,22

**care**
175:14

**career**
156:15

**case**
151:1 189:19
203:16

**case-by-case**
149:16 150:11
153:6 183:19
188:20 189:2,
12 194:11
201:18

**category**
187:6

**caveated**
164:17

**CBP**
146:3 148:13,
19 162:21
163:2 172:15
174:6 175:12
188:18 191:12
194:4,21

195:19

**CBP's**
162:18 172:22

**ceasing**
144:25

**centers**
180:7,16
181:12,25
199:11 200:18
201:22

**central**
142:5

**change**
163:14

**charge**
152:12

**chart**
183:10 185:18
186:2,5

**Chase**
203:14

**chat**
142:16 183:1
184:25

**check**
187:13

**Chief**
142:15
143:17,24
144:10 145:20
146:22 151:17
160:1 180:23
183:1 198:14
202:15 203:19

**children**
154:19,23
155:2,9,17,25
156:25 157:2,
7,19

**choice**
144:2

**circumstance**
150:14 165:5
167:1 172:20
190:24

**circumstances**
149:5,17,23
150:3,16,24
163:11,13
164:6,12,14,
18 166:15,25
171:18 176:10
178:10 189:22
190:19 200:3

**CIS**
162:20,23
188:4

**claim**
187:23

**claiming**
187:20 188:2

**clarification**
167:4 183:23

**clarified**
176:21

**clarify**
164:22

**classification**
185:14

**clear**
162:17 190:18

**close**
192:17

**closing**
180:6,15
181:11,25
201:21

**clothes**
193:4

**clue**
195:14

**collectively**
146:3

**Colombia**
167:15 168:3,
8

**Colombians**
168:9

**Columbia**
196:7

**column**
186:19

**commitment**
170:17

**commonly**
152:17,18

**communication**
192:17 196:4,
10 197:14,18

**communications**
196:18,20

**communities**
191:15

**community**
191:14

**completed**
146:11

**completely**
148:22 154:21

**complexity**
201:13

**component**
198:5

**concentrated**
201:9

Exhibit B

concerns
179:16

concluded
203:25

concludes
203:12,21

conclusion
202:6

conditions
153:9,19,22
166:11 178:23
201:19

conduct
170:21

confines
150:8 152:3

confirm
142:25

congregate
151:12

conjunction
153:21

consequence
192:25

consequences
170:13

consideration
180:14 181:16

considered
178:8 181:8
188:19

considers
176:22

consistent
192:16

constant
192:16

constitute
176:3

constraints
179:20

context
196:19

contingent
149:17

continue
165:17,21
170:17

contracted
151:10

conversations
180:4 181:17
197:6

conversely
200:6

coordinate
192:6

copy
142:16 203:4,
5,10,11

Core
170:16

corporate
160:17

correct
154:20 157:25
158:14 161:4
162:15 175:23
184:17 189:20
198:10,11
201:5 202:14,
17

correctly
170:25 171:15
173:8 184:16

correlation
202:3

cost
176:14,15,19,
22,24 177:1,2
178:7,8 181:8

counsel
193:7

counsel's
144:11

countries
167:11 168:3
172:19

country
167:14,18,20
189:7 199:5

couple
193:20 200:7

coupled
199:8

court
176:21 181:5,
6 182:1

court's
143:15 180:13

COVID
151:8,9
166:17 192:23
193:2

COVID-19
151:1

crafting
145:4

created
201:14

creating
151:12

creation

148:6

criminal
177:23 190:12

criminals
190:9

criteria
150:8

critical
173:6

cross
194:22

CROSS-
EXAMINATION
198:12

crossed
178:5

cruel
173:6,18
174:9,14,20
175:1,7

Cubans
166:14 167:10
199:6

current
154:10

custody
151:5 153:2
163:13
172:15,18,22
175:14,15
190:22 191:13
194:4,22
199:12 201:15

───────────
D
───────────

daily
152:23 174:18
190:9,11

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022
6

192:6 197:15

**dangerously**
199:12

**Darrow**
143:11,25
144:13 146:7,
17 147:16
155:3,10,19
156:1,11,20
157:3,12,20
158:1,9,15,25
159:9,19
160:6,12
161:24 164:22
168:14 169:8
171:24 172:4
173:12,19
174:1,10,16,
21 175:3,8
176:20 178:9
179:10 180:8
181:4,13,23
183:23 191:5
195:11 198:6,
8,13 200:22
201:24 202:9,
13,25 203:9

**data**
162:16,17
185:10 194:23

**date**
165:11

**dated**
169:6,11

**dates**
154:3

**David**
202:24

**day**
155:22 166:22

192:7,9

**days**
153:14 154:5,
11

**death**
166:18

**deaths**
151:8,19

**debate**
155:22

**decision**
148:15,20,22
153:4

**decisions**
144:5 152:8
201:3

**decompress**
151:3,4
199:16 200:17

**decompression**
199:24

**defer**
147:25 148:13
159:12 162:23
172:11 176:8
180:21
181:17,18

**define**
144:22

**degree**
176:11

**degrees**
189:11

**Del**
152:25 199:2,
3

**demographic**
201:11

**demographics**
153:2 166:14

**departure**
162:12

**dependent**
162:19

**depending**
153:17 172:18

**depends**
149:23

**depo**
160:4 202:21

**deponent**
143:20 202:16

**Deportable**
185:11

**deposition**
181:21 198:6
203:1,22

**describe**
192:3 198:21

**description**
170:6 192:10

**descriptor**
187:10,25

**designated**
143:16
159:21,24
172:3 180:23
181:1 195:12

**designees**
160:14

**destination**
154:18 155:1,
18 194:1,18

**detain**
150:15 163:10
164:4 171:14,

23 172:10,14,
21 199:18
200:10 201:12

**detained**
151:15 186:11
189:19,25

**detaining**
170:19 171:5,
9,21 173:22
174:5 181:12

**detention**
150:17,20
151:4 152:24
163:3 166:11
170:14
171:12,25
172:5 173:17,
24 174:8
175:11,12,23
176:1,4
180:7,10,16
181:11,25
186:13,17
189:9 190:3,
17,21 199:10
200:18,19
201:22

**determination**
143:14 176:23

**determining**
189:2,5,12

**developing**
143:10 144:18

**device**
148:16,21

**DHS**
143:20 160:24
161:3,7
169:6,11,13
171:22 172:9,

Exhibit B

11,21 173:18,
24 174:4,8,
14,20 175:1,6
176:22 178:7,
12,25 180:6
181:7,18

**DHS's**
179:8,12,13
188:12

**dictate**
200:5

**difference**
183:18

**differently**
202:19

**difficult**
202:5

**digest**
161:17

**direct**
145:22 161:12
181:3 196:13

**directly**
151:9 198:24

**direly**
151:21

**discretion**
147:10 150:6
152:1

**discuss**
143:24 144:1
182:3

**discussed**
163:23 178:23
179:2 180:5
196:8

**discusses**
162:6

**discussing**
189:14

**discussion**
170:3

**discussions**
178:17,18

**disposition**
183:12,16,21
184:3,17,18

**dispositions**
144:3 198:17

**distinction**
162:17

**distributed**
170:2

**District**
196:7

**docket**
187:21

**document**
142:25 144:23
147:7,9
160:24 161:1,
7,15 163:1
169:6,11,21,
24 171:8,17
173:1 183:3
185:5,8
186:24

**documents**
159:4

**DOJ**
162:20,23
203:7

**doubt**
176:11

**draw**
162:16 202:2,
5

**drive**
150:17

**driven**
150:20 153:20

**drop**
169:5 182:6
184:25 187:13
188:11

**dropped**
142:15 160:23
169:9 182:25

**due**
151:20 185:19
186:12,16
198:18 201:3,
4

**duty**
151:10
177:16,19,22
178:1

**dying**
166:18

**dynamics**
168:4

---

**E**

**earlier**
163:8,19
164:14,19
166:10,16
176:5 184:10
188:23 196:8

**educate**
157:1,6

**effect**
143:7

**effectuate**
149:14

**efforts**
173:4

**electronically**
142:12 160:20
169:2 182:22
184:22 188:8

**eligible**
159:8

**emergency**
179:1 196:25
200:15

**employment**
158:23 159:3,
6

**enable**
170:22

**encompassing**
187:1

**encounter**
175:18

**encountering**
162:19 188:24
199:9

**encounters**
161:21

**end**
161:23

**ended**
173:6

**ending**
202:18

**ends**
203:1

**enforce**
170:17
177:11,13,17,
23

**enforcement**

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                    8

152:8 160:25
161:14 176:19
177:2

**engaged**
144:22 197:14

**enjoined**
165:15

**enter**
175:17

**entered**
187:15

**entities**
162:20

**entries**
183:10 187:17

**entry**
163:6,7
170:14 188:25

**environment**
151:24

**equation**
202:5

**equivalent**
181:12

**ER**
165:16,21,22
174:18

**ESFP**
178:25

**essentially**
187:5

**exaggerated**
199:13

**EXAMINATION**
200:25

**excuse**
145:16

**excused**
203:24

**exhibit**
142:11,15,16
160:18,19,23
169:1,5,6
182:7,21,25
183:1 184:20,
21 185:1
188:7,11,12

**exist**
175:7

**expedited**
165:14,16
170:19 172:16
174:14 203:16

**expel**
163:10 200:9

**expelled**
175:20

**experience**
196:9

**experiencing**
197:5

**explain**
186:4

**extent**
143:17

**extraordinarily**
172:14

**extremely**
149:9 199:9
201:14,15

––––––––––––
**F**
––––––––––––

**face**
150:24 161:10
162:21

**faced**
164:12

**facet**
201:7

**facets**
201:7

**facilities**
151:4,11,21
200:19,20

**facility**
153:14 175:14

**fact**
161:7 166:12
179:11
186:12,16
198:9 200:6

**factors**
189:11

**fair**
154:25 155:8
157:19 158:8
159:7,18
167:24 181:6
201:21

**fall**
149:10

**familiar**
160:25
169:22,23
170:1 175:22
179:16 183:5
193:20

**families**
145:7,9,10
148:24 149:3
154:17,19,22
155:1,6,9,14,
16 156:9
157:11 158:21

**faced**
167:5 172:23
173:22 174:5
180:11

**family**
158:24 161:14
162:6 163:17,
20 164:7,8
167:5 171:10,
11,14,19,23
172:10,15,21
173:17,24
180:7,10,15
181:25 201:21

**fantastic**
182:12

**fear**
187:20,23
188:2

**Federal**
177:10

**FEMA**
178:25

**fence**
149:10

**field**
183:25

**figure**
150:5 196:12

**final**
194:1

**financial**
179:3,4,18
194:12

**financially**
178:13 193:22

**fine**
160:12

**finish**
160:17

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                    9

Fiscal
  160:24
flip
  161:11
Florida
  159:23 195:10
  196:11,19
  197:18,22
Florida's
  188:13
flow
  177:5
flows
  201:9
follow-up
  198:7
food
  179:1 193:4
footnote
  187:4
form
  181:16
formalized
  146:5 147:15
formalizing
  145:19
formally
  144:25
forms
  153:20
frame
  145:12,14
  146:2
frames
  154:9 166:10
  199:20
framework
  176:7

free
  161:12
frequently
  198:22
front
  153:7 165:12
  167:1 201:20
funding
  178:25 179:2
future
  194:19

_____

       G

G-56
  147:22
gained
  168:5,7
general
  197:24
generally
  174:9 176:24
  179:15
geographical
  199:1 201:10
give
  149:13 161:15
  169:20 188:15
  195:17
good
  155:22 156:5
  157:5,9,14,18
  169:18
gotcha
  142:22 161:18
  185:9 186:3
  188:16
government's
  177:10

governments
  178:24
granted
  162:12
graph
  161:17,20
gravity
  179:3
great
  192:5
greater
  164:9,20,23
  165:1
green
  151:18
Guatemala
  167:17
guess
  145:21 147:3
  157:22 158:3,
  18 164:7
  177:5 194:16
guidance
  143:3,4,7
  144:20 145:5,
  6,23,24
  146:16,21,24
  147:7,20,23
  152:4

_____

       H

half
  197:12
happen
  150:22 194:5
harm
  177:20 178:1,
  4

HARP
  168:25
head
  154:2,3,7,15
  168:18,19
  193:21 196:3
heading
  161:13
health
  151:20
heard
  156:15 170:3
  187:23
heavily
  197:14
heavy
  192:15
held
  152:16
helpful
  160:7
helping
  145:3
helps
  199:24
hereto
  142:13 160:21
  169:3 182:23
  184:23 188:9
high
  166:11,12
  199:10,12,13,
  23 200:18
  201:9,14,15
hold
  172:15
holding
  151:5 172:17,

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

10

23 174:5

**holdings**
200:17

**home**
167:20 199:5

**honest**
151:7,16
165:4 166:2
177:8

**honestly**
175:19

**hours**
172:18

**housing**
193:4

**humanitarian**
149:7,14,20
150:7,19
151:2 184:9

---

**I**

**I-385**
147:22

**i.e.**
165:7

**ICE**
146:3 147:25
148:3,11,14,
17 153:14,18,
21,22,24
162:20,24
176:8 180:11,
12,21,24
181:17,19
186:12,16
189:10
194:22,25
195:15

**ICE's**
148:22

**idea**
155:13 196:17

**identification**
142:12 160:20
169:2 182:22
184:22 188:8

**identify**
188:1 192:7

**illegal**
201:9

**immigration**
170:18 174:8
175:6 176:13,
18 177:2,11,
13,17,23
185:13

**impact**
177:7 178:19
180:6

**impacted**
152:25 178:13
179:8

**impacts**
178:20,23
179:3,18,21

**implement**
146:15

**implemented**
168:12 173:6

**important**
172:14

**importantly**
180:13

**inability**
181:22

**included**

184:3

**includes**
170:18 185:11

**including**
170:14

**inclusive**
184:13

**incorrectly**
198:16

**increase**
201:2,22

**increased**
153:15 154:1,
5 170:18
198:25 201:4

**increases**
176:13

**individual**
149:15,16
150:13,17
152:8 153:6
160:4,8 164:7
167:1 179:11
188:18,24
189:4 192:13
194:21 199:25
200:4 201:19
202:15,21

**individual's**
149:18 163:13

**individuals**
145:17 149:24
150:15 152:17
163:11 178:4
184:5 186:7,
10 191:17
192:11 197:13

**infers**
187:5

**information**
178:12 187:7,
25 191:13
197:25

**inhumane**
173:25

**injury**
149:9

**input**
187:24

**inputting**
187:7

**instance**
149:8

**instances**
149:19 190:4

**instructing**
144:11

**instructions**
146:14 163:2,
17,21

**intend**
194:18

**intended**
154:18 155:1

**interior**
145:8 149:4
178:15 179:9
198:2

**interrelated**
180:17

**interrogatories**
188:13

**interrogatory**
188:14

**invited**
196:5

Exhibit B

involved
  145:4 152:18
  179:22 196:4
  201:18

involvement
  145:3

issuance
  147:10

issued
  147:11

issues
  172:1

it's,it's
  201:13

**J**

January
  163:3,22
  164:25
  165:13,24
  166:1,4
  168:21 185:4
  195:10 198:17

job
  159:7 166:19
  177:10

jobs
  152:16

Joe
  180:22 203:7

judge
  165:12

July
  145:11,14,18,
  24 148:2,9
  203:23

**K**

kids
  157:25

kind
  152:14 170:5
  176:5 179:14
  187:6 196:21

knowledge
  153:25 154:4
  181:15 195:1

**L**

lack
  185:19 186:20
  187:1,5,16
  200:14,16

LAPR
  185:15

large
  153:22 167:25

law
  177:11,17

laws
  170:18,24
  175:6 177:13

lead
  199:24

leadership
  172:11

leave
  181:20

led
  201:22

legal
  185:15 193:6

legs

182:8

lessening
  177:5

lesser
  177:7

levels
  152:10

liaison
  192:15

liaisons
  192:8

life
  151:13
  156:10,18
  157:1 158:22

Lifecycle
  160:25

limits
  176:24

lines
  149:12

list
  191:16 192:1

listed
  186:19

literal
  166:18

literally
  192:6 196:21

live
  177:21 178:2

load
  149:12

loaded
  169:19

location
  152:11 165:11

locations
  199:1,12

long
  182:10

lose
  159:7

lost
  151:8

**M**

ma'am.correct.
  171:1

made
  143:12

main
  181:4

Maine
  196:7

majority
  150:4 162:10

make
  143:11 148:20
  153:4 190:18

makes
  148:15

making
  153:5 193:19

management
  192:25 196:25

manifesting
  172:19

manually
  187:14

March
  146:20
  147:11,21

marked

Exhibit B

142:12 160:20
169:2 182:22
184:22 188:8

matter
200:5

Mayorkas
169:13

meaning
179:25 194:21
196:4

means
150:12 165:18
194:12

meant
185:24

mechanism
147:24 149:2
152:7 167:13
188:4 200:15

mechanisms
148:4 166:13
200:13

medical
149:21 150:4
184:11 193:1

memo
145:5,7,19
146:10,13
147:14,15
150:25

memorandum
169:12

mentioned
167:24

Michigan
196:17

migrant
193:15 194:9,
12,24 195:7

migrants
151:14,23
153:13 159:3
166:21 176:16
178:19,22
185:11

migrate
176:16

migrating
145:1

migration
177:5 178:19
198:25 201:4,
8,10

million
161:25

mind
191:2 196:23

minute
161:15 169:20
179:15 188:15
191:4 195:17

monitor
152:23

monitoring
147:24 148:4

Montana
196:15

month
183:6 197:11,
12

Monthly
183:8 185:3

months
173:5

move
160:16,18

movement

191:24 193:3,
14,16,17
194:9,15,18
195:2

movements
193:23

moving
190:2

MPP
174:20,24

myriad
156:15
164:13,18
190:12

_____

**N**

national
189:6

nationalities
167:9,23
168:1,11,13

nationality
167:6

nationwide
196:24

natural
194:16

necessarily
163:15 187:10

necessitate
199:25

negotiations
168:7

NGO
191:21 192:8
193:10 197:18

NGOS
179:5,19

192:1,4,6,9,
10,16,19,22
193:6,9,12,
18,21 194:11
195:5,20,24
196:1,18,25
197:1,15,24

Nicaraguans
166:14 167:10
199:7

non-deportable
185:15

non-detained
187:21

non-detention
180:15 181:8,
11

nongovernment
178:21 179:19
191:22

normal
163:18

North
196:16

northern
196:14

note
172:14

noted
150:25 186:22

notice
142:7 145:1
154:12 165:10

November
143:6,8
145:21 146:6
147:14 148:2
185:4

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                13

NTA
  183:14,18
  185:19 187:18
  189:17
NTA/OR
  148:25 164:17
  165:4,7
  186:10,12
  189:13 194:5
NTR
  146:21 147:1,
  2,6
NTRS
  145:16
  147:11,20
number
  143:17,22
  144:7 154:10
  172:3 180:24
  181:6 182:1
  183:1 185:1
  188:12,14
numbers
  151:5 152:21
  166:12 186:24
  199:13
numerous
  190:6,7
nutshell
  192:22 193:6,
  8

_____

          O

_____

object
  180:8 201:24
objecting
  160:13
objection
  146:17 147:16

155:3,10,19
156:1,11
157:12 158:25
159:19 164:22
168:14 171:24
173:12,19
174:1,10,16,
21 175:3,8
176:20 178:9
179:10 195:11
objections
  143:12 146:7
  156:20 157:3,
  20 158:1,9,15
  159:9
obtain
  189:14
obtained
  189:20
occurred
  148:9 196:10
occurring
  196:22 197:3,
  7
officers
  147:13 151:14
  166:18
offices
  153:18
OFO
  183:14,22,24
  184:14
omit
  171:9
onward
  191:24 193:3,
  14,16 194:9,
  15,18 195:2
open

181:21 183:2
opening
  169:15
operating
  152:17
operational
  143:3,4
  144:20 145:5,
  6 190:10
Operations
  151:17
opposed
  202:16
order
  143:15 151:3
  153:3 163:10
  167:13 180:13
  182:2 185:2
  192:14 197:1
  199:15 200:16
  201:23
ordering
  203:3,4,8,10
orders
  164:10
organically
  191:25
organization
  191:22
organizations
  178:21 179:20
originally
  153:13
originator
  186:23
Ortiz's
  145:20
Outcomes

161:14
overcrowded
  200:18
overcrowding
  151:20
overseeing
  152:19

_____

          P

_____

p.m.
  182:18 191:8
  203:23,25
packet
  189:17
PACR
  168:25
pandemic
  151:6,20
  166:17
paragraph
  161:19,21
  162:5 171:3
  173:1
paraphrasing
  198:16
parent
  156:5 157:5
parenting
  155:22
parents
  157:9,14,15,
  18
parole
  142:17,24
  143:13,23
  144:1,4,24
  145:1,10,17,
  18,20 146:4

Exhibit B

148:6,23
149:6,14,15,
20 150:7,19
151:2 152:2
153:9,19
164:21 165:1
166:4,8,24
167:4,7,9
168:12,15
176:7,12
183:11,15,20
184:6,7,8,9,
17 186:14,16
194:5 198:17,
19,22 199:14,
20,24 200:14
201:3,23

**paroled**
145:7 183:15,
19

**part**
177:19 178:1
201:4

**past**
173:5

**PATEL**
142:3,10,14
143:21 144:8,
9,17 146:12,
25 148:7
155:7,15,23
156:8,17,23
157:8,16,23
158:6,12,20
159:5,14
160:2,10,16,
22 162:4
164:24 168:20
169:4,10
172:2,8
173:16,23

174:7,13,19,
25 175:5,10
176:25 177:9
178:11
179:13,23
180:17,18,22
181:10,20
182:3,5,13,24
184:1,24
188:10 191:3,
11 195:16
198:4,11
200:24 201:1
202:7,17,23
203:4,14

**pathway**
164:16 165:6,
8,9,23 166:2,
4,5,7 168:10
189:3,8

**pathways**
150:18
163:12,19,23,
24 165:21,25
166:6 168:22,
24

**patrol**
147:13 149:6
151:8 152:1,
11,14 183:11
184:2,3,15
192:4

**patterns**
197:15

**pending**
172:15,24
174:5 190:22

**people**
148:12 153:17
156:16 177:20

178:2,3 179:9
185:18
187:17,24
188:1 191:19
198:1

**percent**
162:2,10,11,
12

**period**
144:21
146:22,24
148:1 180:3
185:3 190:2

**permanent**
185:16

**person**
165:10 180:12
183:24

**personal**
143:19 144:14
146:8,18
147:17

**personally**
178:16 197:11

**persons**
191:12

**piece**
171:20

**pieces**
192:2 193:11
201:18

**pillar**
170:8,11

**pillars**
169:21 170:4,
6

**place**
149:14 152:7
155:2,17

165:11 167:21
176:10 189:3

**placing**
145:17

**plaintiff's**
142:11 160:19
169:1 182:21
184:21 188:7

**plan**
169:13 170:16
197:4

**point**
151:1 161:20
167:3,8
175:17,18,20

**policies**
173:7,10,18
180:15

**policy**
142:17,24,25
143:2,10,13
144:5,19
147:1 173:22
181:9,11
198:18 201:3

**political**
168:4

**polled**
187:3

**population**
199:4 201:16

**populations**
199:17

**port**
163:5,7

**portion**
146:4 160:8

**ports**
188:25

Exhibit B

**positive**
    193:2

**post**
    194:21

**practice**
    147:2

**preference**
    163:22 164:9,
    20,23 165:1,
    3,5,14

**preferred**
    165:8,9

**prefill**
    187:13

**Preparedness**
    169:14

**present**
    164:25

**presented**
    150:14 152:22
    166:7 201:20

**preventing**
    177:20 178:1

**previous**
    148:1 152:15
    166:4 196:8

**previously**
    151:25 168:6
    172:17 189:14

**primary**
    164:15

**prime**
    149:9 167:18

**principal**
    164:15 200:8,
    13

**principally**
    152:25 199:2

**prior**
    145:6 146:13
    147:14 148:23
    173:7

**private**
    158:4,10

**pro**
    191:16

**problem**
    181:4

**proceeding**
    167:21

**proceedings**
    190:3,23
    203:25

**process**
    146:15 147:13
    152:19 164:15
    167:16 170:22
    175:17

**processed**
    148:5,24
    149:3 184:6
    186:10,16
    187:22

**processes**
    162:18 163:10

**processing**
    144:2 147:21
    152:11,18
    163:12,18
    166:9 168:8
    189:8 199:11
    200:19

**professional**
    151:14,23
    166:21

**program**
    148:13,18

                    176:9

**prosecuted**
    189:25

**prosecution**
    170:15,20

**prosecutorial**
    147:10

**protect**
    177:22

**protecting**
    166:19,20
    178:3

**provide**
    143:21 149:20
    150:7 191:13,
    16,23 192:1,
    20 193:6,14
    194:15 195:24
    197:2,25

**provided**
    146:14 165:10
    179:5 194:23
    195:2

**providing**
    192:2 193:2,
    9,25 194:8,17
    195:22 196:1
    197:5,22

**public**
    151:20 157:25
    158:5,7,13

**pulling**
    177:6

**pursuant**
    183:20

**put**
    146:21 155:9,
    25 157:18,24
    158:7,10,13

                    187:10,17

**putting**
    153:20 157:2
    158:4

_____
            **Q**

**qualify**
    170:24

**quantify**
    177:7

**quarantine**
    192:24 193:2

**quarter**
    161:23

**question**
    144:4,11,16
    145:13 147:4
    160:14 172:6,
    7,9 181:1,22
    184:19 192:5
    194:16,25
    195:15

**questioning**
    160:3

**questions**
    160:5 183:9
    198:5 200:23
    202:8

**quick**
    170:12 186:6

**quickly**
    170:22

**quote**
    154:13 180:14

_____
            **R**

**rapidly**
    151:3 199:16

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

16

200:17

**rate**
  153:17 199:8

**rates**
  199:10,24

**reach**
  154:17 155:1

**read**
  161:15
  170:11,24
  173:8 186:6
  188:15 203:2,
  18,20

**read-on**
  142:9

**readdress**
  181:21

**reading**
  186:25
  202:10,19

**real**
  166:23 186:6

**realized**
  200:1

**reason**
  161:6 187:18

**reasonable**
  156:24 157:17
  158:22 159:17
  181:23

**reasons**
  149:7,21
  156:16,18
  184:9 190:12

**recall**
  154:14 184:10
  197:17

**receive**

159:8

**received**
  142:11 147:13
  160:19 169:1
  182:21 184:21
  188:7

**recently**
  168:5 196:9

**recess**
  182:18 191:8

**recognizance**
  164:10 201:23

**recognize**
  183:3

**record**
  142:2 143:14
  182:4,17,20
  191:7,10
  202:25 203:17

**recorded**
  203:22

**redefine**
  180:3

**redirect**
  200:24,25

**reduced**
  147:1,2

**reduces**
  176:19 177:2

**reemployment**
  159:8,15,22

**refer**
  153:23 194:10

**reference**
  171:5,8,9
  194:23

**referenced**
  193:13 194:15

**referencing**
  143:1,5

**referred**
  152:14 163:8
  172:17 173:11

**referring**
  147:8 162:18
  170:20 181:10
  184:11 185:12
  188:21 193:24
  194:8 199:21

**reforms**
  173:6

**related**
  150:4 198:24

**relationship**
  192:4,18
  202:3

**release**
  148:5 155:14
  163:11 164:16
  165:7 172:5
  178:14 179:8
  188:20

**released**
  145:7 148:24
  149:3 164:13
  175:21 178:20
  185:18
  191:12,18,20,
  21 194:4
  198:1

**releases**
  201:23

**releasing**
  192:11

**relevance**
  160:13

**relevant**

160:11

**relief**
  162:12 170:24

**rely**
  200:13

**remain**
  162:13

**remained**
  161:22 162:8

**remaining**
  162:2 190:22

**remains**
  165:3

**remember**
  154:3,6,9,16
  172:16 196:15

**removable**
  189:7

**removal**
  165:14,16
  167:21 168:9
  170:14,19
  172:16,24
  174:6,14
  190:22

**remove**
  150:15 163:10
  164:4 170:23
  199:18
  200:10,11
  201:12

**removed**
  168:22 175:20
  199:5

**rep**
  160:17

**repatriated**
  175:20

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                17

report
  153:14 160:25
  161:7 162:22
  183:4,8
  185:20

reporting
  185:3,6

representation
  192:10

request
  195:6

requesting
  203:15

requirements
  172:19 192:13

resident
  185:16

resolved
  162:1

resort
  200:16

resources
  191:14,15

resourcing
  191:23

respect
  150:8 198:23

respond
  143:25

response
  143:22
  188:12,14

restate
  144:15 172:7

result
  165:6,7

return
  166:13

167:11,13,16,
19,20 168:2,
5,7 200:11

returnable
  189:7

returned
  199:5

returning
  168:6

review
  152:8

RGV
  199:3

right-hand
  186:19

rights
  167:11,19

Rio
  152:25 199:2,
  3

risk
  151:13

Rodney
  146:22

role
  143:9 144:18
  184:4

roughly
  145:18 146:1
  162:2

row
  183:15,21
  186:22

rules
  159:12

—————————
        S
—————————

safety
  151:13

scenarios
  199:22,23

school
  155:2,9,17,25
  157:2,19,25
  158:5,7,10,14

school-aged
  154:19,23
  156:25

scope
  155:4 156:1,
  11 159:20
  173:13 179:6
  201:25

Scott's
  146:22

scroll
  161:24

seal
  161:3

Secretary
  171:19

section
  183:20 202:13

sector
  189:10

sectors
  152:24 192:7

secure
  173:5

security
  169:14 170:8
  189:5,6

seek
  158:23 159:18

selected
  199:17

send
  167:12,14

sentence
  188:17

separated
  184:15

service
  178:21

services
  191:25 192:19
  195:23,24
  196:1 197:21,
  25

setting
  151:12

settled
  195:10

shape
  181:15

Shelter
  179:1

short-term
  193:5

showing
  153:18

shown
  149:25

sic
  185:7

side
  142:19 169:15

signature
  145:21 146:23

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                18

significant
  151:13

single
  161:21 170:19
  171:5,9,21
  192:7,9

site
  142:22

sitting
  151:16

situation
  149:18 196:22

situational
  197:6

situations
  193:20

skip
  170:8

smuggling
  149:12

social
  197:25

somebody's
  164:2 175:19
  193:2

sound
  162:14

sounds
  170:7

Southwest
  163:4 169:14
  180:1 195:9
  199:1

space
  185:19
  186:13,17,20
  187:2,6,16
  190:10

speak
  143:16 168:15
  171:25 176:15
  180:12 183:24
  195:12 203:15

speaking
  143:19 152:21
  176:21 179:24

specific
  147:12 163:16
  176:25
  179:20,21
  192:22 193:11
  195:3 199:1
  201:10,11,16

specifically
  158:23 179:24
  190:15 200:3

speculate
  158:4 159:11
  177:8

speculation
  155:11 156:3,
  13 159:1

spent
  151:17

spoke
  164:14 166:10

spoken
  166:24 170:3

staff
  146:14
  151:14,23
  166:21

standard
  193:10

standing
  160:11

start
  163:7 168:5

started
  145:11,16,24
  146:2 148:3
  159:16 188:5

starting
  202:20

state
  159:12,13,15
  176:14,15
  178:4,22
  179:19 180:5
  196:11,25

statement
  179:15 185:5

states
  154:18
  156:10,19
  157:10 170:23
  172:16
  176:16,17,19,
  23 177:3,13,
  20 178:2,7,8,
  13,18,19
  179:2,8,17,25
  180:3,7 181:8
  183:19 187:5
  193:11 195:3,
  20,22,25
  196:3,14,24
  197:7,16

stations
  199:11

Status
  161:14

statutes
  177:23

STENOGRAPHER
  202:11,20,24

203:18

stop
  160:3

strains
  179:18

straws
  177:6

stretch
  182:8

strictly
  170:17

subject
  169:13

subjects
  188:2

supervision
  152:10

supervisor
  152:13

supervisory
  152:13

Supplemental
  179:1

surely
  160:4

surrounding
  149:18,24
  178:18

switch
  198:9

system
  187:25

————————————
           T
————————————

talk
  148:17 159:24
  160:1 180:23

Exhibit B

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022                                                                19

talked
  166:15 176:5
  181:7 184:10
talking
  142:23 145:9
  147:6 148:2
  152:15 163:5
  164:7 178:10
  188:22
  191:19,23
telling
  198:18
Ten
  182:12
ten-minute
  182:11,14
tens
  178:14 179:9
term
  175:11,12,22
  193:1
terms
  153:8,11,18
  200:14,16
testified
  151:25 180:9
  198:14 201:2
testify
  159:21
testimony
  155:4 156:2,
  12 173:13
  201:25
testing
  192:23
Texas
  183:5,7 185:2
thing
  164:1 186:15

things
  193:5 200:6
thought
  172:4
thousands
  178:14 179:9
threat
  189:6
TIC
  153:1 166:11
  189:9 199:13,
  23 201:14
time
  142:1,5,20
  144:21
  145:11,14
  146:2,22
  148:1 153:16
  154:9,16
  163:13 165:11
  166:9 167:8
  182:16,19
  189:9 191:6,9
  198:10 199:20
  201:15 203:1
times
  153:1 166:12
  199:13,23
  200:7 201:14
Title
  164:2,3
  165:20,22
  175:1 185:6
  189:4
titled
  160:24
today
  152:22 160:1
told

185:24
tomorrow
  180:25
Tony
  203:22
top
  154:2,3,7,15
  161:13
  168:17,19
  170:5 185:10
  186:2,22
  193:21 196:2
topic
  143:17,22
  144:6 172:3
  176:21
  180:11,24
  181:2,6 182:1
  195:12
topics
  160:15
totally
  159:25
totals
  186:18
track
  155:13 194:21
tracking
  148:16,20
tragic
  149:11
trained
  148:12
training
  147:12 148:9
trainings
  146:14
transcript

203:6,11
transfer
  191:21
transferred
  191:18 192:12
travel
  193:3,14,17,
  24,25 194:8,
  16,17,24
  195:2
triggers
  144:22
TRO
  165:20
True
  150:21
turn
  172:25 183:8
  185:7 188:13
turned
  175:21
tying
  150:5
type
  153:3 167:21
  176:7 184:7
  192:13,19
  193:4 197:21
typically
  187:17

_____

_____ U _____

U.S.
  184:2
Uh-huh
  170:10 171:7
ultimately
  153:21 192:12

Exhibit B

**understand**
145:13 148:8
181:24 197:4

**understanding**
147:3 170:7
171:14 179:7,
11,12,13
184:16

**Understood**
144:8 152:6

**unfettered**
150:6,12

**uniform**
151:18

**unit**
158:24 171:11

**United**
154:18 156:9,
19 157:10
170:23 172:16
176:17 183:19
193:11 197:16

**units**
162:6 163:17,
20 167:5
171:10,14,23
172:10,15
173:17,25

**unjust**
173:7,18
174:9,15,20
175:2,7

**unlawful**
170:14

**unlike**
184:14

**unresolved**
161:22 162:3,
9,13

**utilization**
144:25 151:2
166:3 199:14,
19

**utilize**
150:18 163:9
165:4,6,20,
21,22 174:18,
23

**utilized**
144:24 149:6
165:17,18
166:5 199:15

**utilizing**
145:11 146:3
200:14,21

---

**V**

**vaccination**
192:24

**vague**
178:9

**variables**
202:3

**varies**
154:21

**vast**
150:3 162:10

**Venezuelans**
166:14 167:10
199:6

**versus**
194:23

**video**
203:5,10,13,
22

**view**
172:12 173:24

174:8,14,20
175:1,6

**viewed**
173:18

**violations**
190:13

---

**W**

**waiting**
175:16

**waive**
203:19

**waiving**
202:10

**wanted**
142:24 203:14

**warrant**
189:14,16,18,
19,23 190:5,
20,25

**warrants**
170:21 190:8,
14

**Wednesday**
203:23

**wildly**
159:20

**witness'**
155:4 156:2,
12 173:13
201:25

**woefully**
200:18

**work**
192:8 195:19

**working**
151:10,18,23
159:4,16

166:21 192:17

**works**
191:22

**wounds**
150:1

**writing**
147:2

**written**
147:7,20,23

**wrong**
202:14

---

**Y**

**Year**
160:24

**years**
151:18

**York**
196:9

**Yuma**
152:25 199:2,
3

**Yup**
161:5

---

**Z**

**zoom**
186:9

Exhibit B