# Exhibit D

State of Florida

vs.

United States

---

Deposition of:

C/R: Department of Homeland Security (Robert Guadian)

---

July 14, 2022

---

*Vol 1*



**PHIPPS REPORTING**

*Raising the Bar!*

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO:  3:21-cv-1066

STATE OF FLORIDA,

      Plaintiff,

v.

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity;
U.S. CUSTOMS AND BORDER PROTECTION;
TAE JOHNSON, Acting Director of U.S.
Immigration and Customs Enforcement, in
his official capacity, U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; UR M. JADDOU,
Director of U.S. Citizenship and Immigration
Services, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION SERVICES,

      Defendants.
_____/

VIDEO-RECORDED REMOTE DEPOSITION OF
ROBERT GUADIAN,
CORPORATE REPRESENTATIVE OF
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
PURSUANT TO RULE 30(b)(6)

VOLUME 1
(Pages 1-188)

THURSDAY, JULY 14, 2022
10:14 a.m. - 4:05 p.m. EST
Remote via Zoom
Washington, D.C.

STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
BY:  FRANCINE O'CLAIRE, RPR

Job No.:  259224

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 2

```
 1                    APPEARANCES:

 2                   REMOTE VIA ZOOM

 3      On behalf of the Plaintiff:

 4           Office of Attorney General
             400 South Monroe Street
 5           Tallahassee, FL  32399
             850-414-3665
 6

 7            BY:  KAREN BRODEEN, ESQ.
              karen.brodeen@myfloridalegal.com
 8

 9      On behalf of the Defendant United States of
    America:
10

11           U.S. Department of Justice-USAO
             Civil Division - Immigration Litigation
12           P.O. Box 868
             Ben Franklin Station
13           Washington, D.C.  20044
             202-514-0618
14

15           BY:  JOSEPH DARROW, ESQ.
             joseph.a.darrow@usdoj.gov
16

17           Also Present:  Collin Vickers, DOJ Paralegal
                            Maria Latimer, DOJ Paralegal
18                          Elissa Fudim, DOJ
                            Samantha Poon, CBP
19                          David Celani, Videographer

20

21

22

23

24

25
```

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 3

1                    I N D E X

2      Testimony of ROBERT GUADIAN                    PAGE

3   Direct Examination by Ms. Brodeen                     5
    Cross-Examination by Mr. Darrow                     182
4

5   Certificate of Oath                                185
    Certificate of Reporter                            186
6   Read and Sign Letter                               187
    Errata Sheet                                       188
7

8                    PLAINTIFF'S EXHIBITS

9    EXHIBIT   DESCRIPTION                             PAGE

10    1       Notice of Deposition                       9
      2       DHS Public Organizational Chart           19
11    3       Parole Plus ADT Chart                     40
      4       Notice to Report                          50
12    5       1/27/21 Email from Enrique Lucero         93
      8       Defendants' Responses to Plaintiff's     161
13            First Set of Interrogatories
      9       ICE Data                                 118
14   10       4/29/22 Letter to Alejandra Mayorkas     167
              and Tae Johnson
15   12       2/16/21 Email from Rodney Scott          149
              to redacted name/cc: Raul Ortiz

16

17

18

19

20              (Exhibits are attached.)

21

22

23

24

25

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 4

1  Proceedings began at 10:14 a.m. EST:

2          THE VIDEOGRAPHER:  We are now on the record,

3  and the time is 10:14 a.m.

4          This is the video-recorded deposition of

5  Robert Guadian, as corporate rep of Homeland Security,

6  in the matter of the State of Florida versus the United

7  States of America, et al.

8          This deposition is being held via Zoom video

9  on July 14th, 2022.

10          The videographer is David Celani, and the

11  stenographer is Francine O'Claire, both in association

12  with Phipps Reporting.

13          Will counsel please announce their appearances

14  for the record?

15          MS. BRODEEN:  This is Karen Brodeen from the

16  Florida Office of Attorney General on behalf of

17  plaintiff, State of Florida.

18          MR. DARROW:  Joseph Darrow from U.S.

19  Department of Justice on behalf of the United States.

20          THE STENOGRAPHER:  Sir, would you raise your

21  right hand, please?

22          Do you consent to my administering the oath

23  remotely?

24          THE WITNESS:  Yes.

25          THE STENOGRAPHER:  Do you solemnly swear the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 5

1  testimony you give will be the truth, the whole truth,

2  and nothing but the truth?

3          THE WITNESS:  Yes.

4          THE STENOGRAPHER:  Thank you.

5  THEREUPON,

6                  ROBERT GUADIAN,

7  having been first duly sworn or affirmed remotely, as

8  hereinafter certified, testified as follows:

9                  DIRECT EXAMINATION

10  BY MS. BRODEEN:

11      Q.   Okay.  Mr. Guadian, am I pronouncing your name

12  correctly, by the way --

13      A.   Yes.

14      Q.   -- Mr. Guadian?  Thank you.  And can you tell

15  me what your business address is?  Okay.

16      A.   No, it's at the Potomac Center, north building

17  in Washington, D.C., just on K and Independence, I

18  believe -- 500 12th Street, Washington, D.C.

19      I apologize.  I didn't know it off the top of my

20  head.

21      Q.   And where do you work currently?

22      A.   I'm currently senior executive service member

23  assigned to enforcement removal operations with

24  Immigration and Customs Enforcement.

25      Q.   Okay.  And you said enforcement removal

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1  operations?

 2      A.   Oh, I'm sorry.  It's enforcement and removal

 3  operations with Immigration and Customs Enforcement.

 4      Q.   Okay.  So from this point on, we can refer to

 5  that as ERO, okay?

 6      A.   Yes.

 7      Q.   And then ICE is --

 8      A.   ICE.

 9      Q.   Have you ever given a deposition before?

10      A.   Yes.

11      Q.   How many times?

12      A.   I apologize -- No, I go back.  I need to

13  clarify.  No, I have not given a deposition.

14      Q.   All right.  And your attorney's probably gave

15  you some ground rules on how a deposition works, so I'm

16  gonna give you some also.

17      A.   Okay.

18      Q.   Remember to give audible responses.  Don't

19  shake your head or nod, give an audible response for

20  the court reporter to get down.

21      A.   Okay.

22      Q.   If you don't understand a question, please ask

23  me to repeat it.

24      If it's vague or you don't understand it perhaps,

25  ask me to rephrase it; can you do that for me?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 7

1     A.   Yes.

2     Q.   Okay.  It's very important that you understand

3  all the questions.  And your lawyer might object from

4  time to time.  But you still -- If you can, go ahead

5  and give an answer.  If he says something is

6  confidential or privileged, don't give an answer; okay?

7     A.   Yes.

8     Q.   If you need a break, let me know.  Do you need

9  a break now?

10    A.   No, I'm good.

11    Q.   Okay.  All right.  Where are you currently

12 located?

13    What building are you physically in today?

14    A.   At the Department of Justice building in

15 Washington, D.C.  I don't know the exact name of the

16 building though.

17    Q.   All right.  And do you have any screens open

18 on your phone other than for purposes of getting this

19 deposition going?

20    A.   No screens are open, but there are alerts that

21 come through every so often.  So you may hear pinging

22 and that kind -- that sort of thing, just normal.

23    Q.   Can you turn your phone on mute, so you don't

24 have pinging or do you need to have it on for work?

25    A.   Yeah, it's part of the programs that are

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   running in the background for ICE notifications.

2       Q.   All right.  Do you need to have them on?

3       A.   I don't know how -- how to turn them off.  I

4   apologize.

5       Q.   Okay.  And you understand you're under oath

6   today, and you're required to tell the truth?

7       A.   Yes.

8       Q.   Are you under the influence of any alcohol or

9   substances that would impair your ability to tell the

10  truth today?

11      A.   No.

12      Q.   That would impair your ability to understand

13  my questions today?

14      A.   No.

15      Q.   All right.  Well, let's get started.  You're

16  set for two depositions today.  One is what we call a

17  Rule 30(b)(6) deposition, and one is you as an

18  individual as a fact witness.

19          So we're gonna first take the 30(b)(6) part of the

20  deposition, which will be much longer than the second

21  one, by the way.

22          In a 30(b)(6) deposition you're here on behalf of

23  the defendant on certain topics that we noticed for

24  deposition.

25          And I would like to show you Exhibit 1 to this

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 9

1  deposition, which is the deposition notice.

2          (Exhibit No. 1 was marked.)

3     A.    Could you repeat the last part, which is what?

4  BY MS. BRODEEN:

5     Q.    **The deposition notice for this deposition.**

6     A.    Oh, gotcha.

7     Q.    **I'm gonna show it to you.  Can you see it?**

8  **It's dropped in the chat.**

9     A.    Looking now.  I'm still trying to bring it up.

10  Wonder if we double-click it.

11    Q.    **Is it not opening?**

12    A.    We're -- We're trying to open the document

13  that's in the chat.

14          MS. BRODEEN:  Francine, can you open it?

15          (Stenographer commented off the record due to

16  technical difficulties.)

17    A.    Sounds good.  I do see the document.

18  BY MS. BRODEEN:

19    Q.    **Okay.  And if you just scroll through it, have**

20  **you seen this before?**

21    A.    I don't recall this document.

22    Q.    **You don't -- Did you say you do not recall**

23  **seeing this document?**

24    A.    No, it's possible I've seen it; but I don't

25  recall the exact document.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1      Q.   Does it look like what you've seen before?

 2      A.   I believe so.  I believe this is -- looks very

 3 familiar.

 4      Q.   Okay.  And part of this document is a list of

 5 topics, and your attorney's previously designated you

 6 for topics.  And I'm just gonna run through this, and

 7 we'll break it down later.  Topics 1, 2, 5, 6, 7, 8,

 8 10, 11, 12, 13, and 14.

 9      Are you comfortable answering questions in these

10 topics today?

11      A.   I am.  Looking at this document, it looks

12 very -- It looks very similar to the document I

13 previously reviewed.

14      Q.   Okay.  What did -- Did you do anything to

15 prepare for this deposition today?

16      A.   Yes.

17      Q.   What did you do?

18      A.   So consulted with our -- my attorneys, also

19 consulted with our leadership team, mister --

20 specifically the deputy executive associate director

21 for ICE, Mr. Dan Bible, also spoke to field office --

22 the acting field office director in the Miami field

23 office to prepare, and also spoke to the assistant

24 director Monica Burke in custody management.

25      Q.   And I was just corrected.  You're also

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  designated for topic 16.

2      A.    Okay.

3      Q.    And who are these leadership team members in

4  relation to ICE or -- not the lawyers, but who are

5  these people?

6      A.    Sure.  So Dan Bible is the deputy executive

7  associate director for ERO.  He's the second in command

8  of ERO.

9      Monica Burke is the assistant director over

10  custody programs within ERO.  Her portfolio includes

11  all the detention management associated with ICE

12  detention.

13      And the acting field office director in Miami,

14  Juan -- his last name -- I'll remember his last name,

15  but it will come to me.  He's -- He has operational

16  control over all office -- all ICE offices in the state

17  of Florida -- Juan Agudelo, A-G-U-D-E-L-O.

18      Q.    And how many times did you meet?  Did you meet

19  in one big group setting or did you have individual

20  meetings with different people?

21      A.    Individual discussions.

22      Q.    Okay.  And how many times did you meet with

23  anybody -- how many meetings total?

24      A.    Met with Dan twice, met with the field office

25  director in Miami about three times and met with Monica

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 12

1  Burke two times.

2      Q.   And did you read anything to prepare yourself

3  for this deposition?

4      A.   Yes.

5      Q.   What was that that you read?

6      A.   It was the court documents that we, I believe,

7  went over to all in terms of discovery, the documents

8  that I reviewed.

9      Q.   Okay.  And are you saying you read the answers

10  to interrogatories provided by the Department of

11  Justice to us -- interrogatory --

12     A.   Yes.

13     Q.   -- interrogatories?

14     A.   I don't recall the exact document, but I did

15  review the documents that were prepared for you all.

16     Q.   And did you read the State of Florida's

17  amended complaint in this case?

18     A.   Yes, I believe so.

19     Q.   All right.  What is your understanding about

20  what Florida is challenging in this lawsuit?

21     A.   My understanding of what Florida is

22  challenging in the lawsuit is in terms of the southwest

23  border arrest conducted by U.S. Border Patrol and their

24  impact on the State of Florida as it relates to aliens

25  released to the State of Florida and potential criminal

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 13

 1  histories associated with those releases.

 2      Q.   Is that your understanding based on your

 3  reading of the amended complaint?

 4      A.   Yes.

 5      Q.   Is there anything else that you understand is

 6  the subject of the amended complaint?

 7      A.   Not that I can think of.

 8      Q.   Is there anything else that you read related

 9  to this litigation, discovery documents?  You already

10  mentioned the medical claim, anything else, the answer

11  that was provided by defendants in response to the

12  amended complaint, for example?

13      A.   I did review some documents from the U.S.

14  Border Patrol, the documents that they do issue their

15  releases that are done under NTR, releases that are

16  done under the ATD -- the ATD Plus Program.  I believe

17  that was also included in the discovery as well.

18      Q.   May be part of the production of documents

19  that we asked for?

20      A.   Right.  That's my understanding, yes.

21      Q.   Well, let's -- Let's start out easy.

22  Summarize your post-secondary education, please.

23      A.   My post-secondary education, so I graduated

24  from Southwest Texas State University in San Marcos,

25  Texas in 1993; and I received a bachelors -- Bachelor

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  of Arts in political science.

2     Q.    And did you have any further education that

3  maybe did not lead to a degree?

4     A.    No.

5     Q.    Do you have any professional certifications?

6     A.    Not that I recall.

7     Q.    Do you have -- Do you have any specialized

8  training in any particular field?

9     A.    Federal law enforcement training conducted

10  at -- in Glynco, Georgia, 1997.

11     Q.    Are you a sworn law enforcement officer?

12     A.    I am.

13     Q.    Okay.  And is that for U.S. Law Enforcement

14  generally?

15     A.    Yeah, so I am a federal law enforcement

16  officer, began my career as a deportation officer --

17  Actually, no strike that.  I began my career as an

18  immigration inspector with Legacy Immigration and

19  Naturalization Service.  And once the Immigration

20  Natural -- Naturalization Service was abolished, joined

21  ICE in 2003 as a deportation officer and worked my way

22  up the ranks as a supervisor detention of deportation

23  officer and assistant field office director, a chief of

24  staff, a deputy field office director; and then I

25  joined the senior executive service in 2019 and became

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 15

1  the field office director in Chicago.

2       All those positions are law enforcement positions.

3       Q.   Okay.  And then you beat me to my next

4  question, summarize professional work experience.

5       Is there anything else you've done professionally

6  that you'd just not list for me?

7       A.   Yes.  So my current position is the deputy

8  assist director for field operations here in

9  Washington, D.C.  And my responsibilities are to

10  supervise the 12 ERO field offices east of the

11  Mississippi.

12       Q.   Okay.  And how long have you been in that

13  position?

14       A.   Since 2020.

15       Q.   Okay.  You say that is a position with

16  responsibility in the east side of the United States?

17       A.   Correct.

18       Q.   Okay.  So if we imagine the southwest border,

19  does it bisect that in some way?

20       A.   No.  The east -- The east does not -- I don't

21  have any offices along the southwest border.

22       Q.   Okay.  Do you have any offices in Florida?

23       A.   I do.  So our Miami field office is

24  responsible for the entire state of Florida.  Within

25  the state of Florida are a large -- Most of our

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  footprint is within an hour of the Miami city limits.

2  But we do have offices in Tallahassee.  We do have

3  offices in Jacksonville, Orlando, and Tampa, as well as

4  smaller -- We have some smaller offices as well,

5  co-located within some of our county jails.

6      But I don't recall exactly which county jails

7  those would be.

8      Q.   Have you --

9      A.   We have a fairly large footprint in Florida.

10     Q.   And have you ever been stationed along the

11  southwest border for any of these jobs you've had?

12     A.   Yes; yes.  So the majority of my career was

13  spent along the southwest border.  I became an

14  immigration inspector in Laredo, Texas.

15     I became a deportation officer in Harlingen,

16  Texas, which is in deep South Texas.  Then I went to

17  San Antonio, which also has offices along the southwest

18  border.

19     And then I was in Dallas, which we also have a

20  nexus to the southwest border in some of our locations.

21     Q.   Have you been stationed at the south -- Are

22  you finished?  I'm sorry.

23     A.   Oh, I was about to say I spent 18 years

24  working with the southwest border.

25     Q.   Okay.  And how much time have you spent

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 17

1  working along the southwest border since January 20th,

2  2021?

3      A.   At that time I was here in Washington, D.C.

4      Q.   Okay.  But since you've been in your current

5  position, have you spent time at the southwest border

6  for any reason for job-related purposes?

7      A.   Personal reasons, yes; professional, no.

8      Q.   Now, does ICE divide up portions of the

9  southwest border by sectors?

10      A.   No, so sectors is primarily what the border

11  patrol uses to define their areas of responsibility.

12      ICE uses areas of responsibilities, field offices.

13      They use field offices to describe their

14  jurisdiction.

15      So along the southwest border, we have offices

16  in -- Harlingen is a field office.  Our San Antonio

17  field office also has offices along the southwest

18  border, El Paso, Phoenix, and San Diego.

19      Q.   Harlingen, is that in Texas?

20      A.   Yes, it is.  It's in deep South Texas.

21      Q.   And in your current position with ERO, what

22  are your main job duties?

23      A.   So in my current position as a deputy

24  assistant director for field operations, I'm

25  responsible for the 12 field offices that fall under my

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 18

1  jurisdiction, which is all the ERO offices east of the

2  Mississippi ensuring that those offices are applying

3  policies consistently across the board, providing

4  technical expertise.

5      I'm the second-line supervisor -- or actually, no,

6  the first-line supervisor for all the field office

7  directors along in those 12 offices.

8      Many of those field office directors are members

9  of the senior executive service as well.

10      I am the conduit for those field offices here at

11  headquarters.  I provide support, logistical support,

12  that they need, budgetary needs, supply needs, and

13  provide leadership for those field offices east of the

14  Mississippi.

15      **Q.   Okay.  Do you have a counterpart for west of**

16  **the Mississippi with ERO?**

17      A.   I do.

18      **Q.   And who is that?**

19      A.   Currently the deputy assistant director for

20  the western offices is Mr. Jesse Williams.

21      **Q.   And who do you report to at ICE?**

22      A.   I report to Juan Acosta.  He's an assistant

23  director.

24      **Q.   And who does he report to?**

25      A.   He reports to deputy executor associate

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 19

 1   direct -- Deputy Executive Associate Director Dan

 2   Bible.

 3       Q.   And who is he?

 4       A.   EMI -- Yes, he's with ICE.  He is Juan

 5   Acosta's supervisor.

 6       Q.   And I'd like to show you another document in

 7   the chat screen.  It's going to be Exhibit 2 to this

 8   deposition.

 9            (Exhibit No. 2 was marked.)

10   BY MS. BRODEEN:

11       Q.   Have you been able to call it up yet?

12       A.   Not yet.  Yep, see it now.

13       Q.   Okay.  So this is an organizational chart of

14   DHS.  Does it look accurate to the best of your

15   knowledge?

16       A.   It appears accurate to the best of my

17   knowledge.

18       Q.   And under this organizational chart, the head

19   of ICE reports directly to the DHS secretary --

20       A.   Right.

21       Q.   -- and his deputy, correct?  So being a member

22   of the senior executive services, do you have a role in

23   developing policies and guidance for people who work in

24   ICE in ERO?

25       A.   No.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    Q.    At what level does that start happening where
2    people have input into policies?
3    A.    Generally the policies are -- come from the
4    secretary.  We operationalize those policies as members
5    of the senior executive service.
6    Q.    When you say secretary, are you referring to
7    the secretary of DHS?
8    A.    Correct.
9    Q.    And can you just briefly explain for me what
10    the mission of ICE is?
11    A.    Sure.  So -- So if you think back to, of
12    course, 9 -- the terrible events in 911, ICE was
13    created as a result of that.
14    We combined -- The U.S. Government combined many
15    different agencies into the Department of Homeland
16    Security for a new cabinet-level organization.  ICE was
17    part of that and still is part of DHS.
18    It was -- ICE was combining the Immigration and
19    Naturalization Services with the former custom service.
20    So we became married and became ICE in 2000 --
21    2003.
22    So our responsibilities, first and foremost,
23    within ICE is to prevent terrorism, right.  That's --
24    That's our overarching goal.
25    Secondly, within our -- Within ICE, we have

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  different directorates.  We have enforcement removal

2  operations.  We have Homeland Security investigations.

3      We have the office of the principal legal advisor.

4  And we have a mission support unit management in

5  administration.  So our -- Our second purpose, really

6  the overarching purpose of ICE, as well is to disrupt

7  and dismantle transnational criminal organizations that

8  are moving people and drugs across our borders as well

9  as interdicting and disrupting activities as they

10  relate to weapons and money going southbound or going

11  outside the United States.

12      We also investigate allegations of -- of

13  trafficking.

14      We also have a very big cyber secure -- cyber

15  crime component within HSI.

16      And we also -- We're also responsible for

17  identifying, detaining and removing unlawful aliens in

18  the United States as well; and that's primarily done

19  through our ERO office.

20      And we utilize, for the most part, very successful

21  program called the criminal alien program where we

22  identify foreign-born nationals in state or county

23  custody; and we identify them and place holds with

24  those counties in the form of an immigration detainer,

25  an I-247 letting that jurisdiction know that once the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 22

1  county is finished with their criminal proceedings to

2  please notify ICE to pick those people up because we

3  would like to take them into custody because we have

4  reason to believe that they are here unlawfully; and it

5  fits with our mission set to identify, detain and

6  remove unlawful aliens.

7      So in a nutshell, just some broad strokes of what

8  ICE does, we're also 20,000 -- We have 20,000 employees

9  within the organization as well.

10     Q.   Thank you.  I'd like to come back to your

11  detaining program.  You mentioned letting counties know

12  when the criminal proceedings are over.  Do you also do

13  that when they're state proceedings?

14     A.   Could you clarify that?  Can you give me an

15  example?

16     Q.   What detainer program where somebody, I

17  assume, is arrested on a state criminal charge?

18     A.   Yes.

19     Q.   Okay.  So you mentioned that you let the

20  county know to let them know -- let you know when the

21  criminal proceedings are over.

22     A.   Correct.

23     Q.   You also work with states on, you know, when

24  they're released from prisons, for example?

25     A.   Yes, we do.  So the criminal alien program,

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 23

1  within the criminal alien program, we have what's

2  called an institutional hearing program where we -- we

3  cooperate with our state partners to identify foreign-

4  born nationals in state jails.

5      And we also do the same thing with our BOP, with

6  the federal partners, within the Bureau of Prisons; and

7  we also identify aliens that are potentially unlawfully

8  here, need to be detained and removed.  So we -- We

9  work with all three levels, at the local, at the state

10  and at the federal level.

11      **Q.   Getting back to the state partners, when it**

12  **comes to prisons, in Florida, would that be the Florida**

13  **Department of Correction that is your state partner?**

14      A.   I don't know specifically for Florida.  But in

15  a general sense, it's typically the Department of

16  Corrections for that particular state is who we

17  coordinate with.

18      And it's usually their intake office that holds

19  the files for the individuals.  And when we file the

20  detainer, we'll generally do it electronically or in

21  person and that we request that that detainer follows

22  that detainee and his -- his or her file.

23      **Q.   What information do you provide to the State**

24  **Department of Corrections about the alien status of**

25  **that person?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 24

1    A.    So I don't have an I-247 in front of me,

2  detainer; but we're making allegations on that detainer

3  that that person is a -- has been identified as

4  potentially being unlawfully present in the United

5  States.

6      We request -- We also make a request to the state

7  or the locals or federal to let us know in advance

8  before that person is released to allow ICE an

9  opportunity to come and pick that person up at that

10 jail and take them into custody.

11     We -- The identifiers we include on that document

12 include the person's name, date of birth, and potential

13 A numbers, alien numbers, if we have them.

14    **Q.    What is an "A number"?**

15    A.    A number is reference to their alien number.

16 And it's in -- it's -- It's their file within ICE -- or

17 actually within the entire Homeland Security

18 enterprise.

19     That A number is how we identify the record of

20 proceeding against that particular individual.

21    **Q.    Who assigns them the alien number?**

22    A.    So it depends, depending on who makes the

23 arrest.  ICRO is not the only agency that can enforce

24 immigration law.

25     So the agency that's making the arrest will

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  typically issue the A file and the A number.

2      Q.   Okay.  And what other agencies besides ICE do

3  that, Custom and Border Patrol?

4      A.   Correct.  Customs and Border Protection and

5  their subcomponents as well as Homeland Security

6  Investigations.

7      Q.   And you mentioned identifiers that were

8  provided to State Departments of Correction about

9  unlawfully present aliens.

10     Do you let the State Department of Corrections

11  know where they crossed over into the United States?

12     A.   In a general sense, no.  There's not -- That's

13  not information included on the I-247.

14     Q.   Do you provide the State Department of

15  Corrections information about when they crossed into

16  the interior of the United States illegally?

17     A.   No, I don't believe so.

18     Q.   Do you provide information to State Department

19  of Corrections as to the status of their seeking

20  asylum?

21     A.   No.

22     Q.   Do you provide them information as to the

23  status of their removal proceedings?

24     A.   No.  What the 247 is essentially telling them

25  is that ICE has reason to believe that they are

Exhibit D

Page 26

1  unlawfully present in the United States.

2      Q.   Okay.  And then after they serve their state

3  sentence, what happens?

4      A.   So typically the jails will notify ICE via

5  email, phone call.  There's -- On occasions also we

6  have officers working inside those jails as well.

7      I'm not familiar with what we're doing in Florida

8  in terms of whether we have deportation officers

9  co-located at the jails; but we may.

10     In those cases, it's -- It's typically somebody

11 from the -- from the particular state walks over to our

12 deportation officer and hand them the information we

13 need in order to effectuate the arrest.

14     Q.   When you refer to jails, are you referring to

15 county jails that are operated by sheriffs as opposed

16 to state prisons?

17     A.   No, just to clarify, when I mean jails, it

18 could be a prison, it could be a state -- or it could

19 be a state jail; it could be a county jail.

20     Q.   And you work with county jails in Florida, not

21 just state prisons in terms of relaying --

22     A.   Right.

23     Q.   -- information about people you might be

24 interested in?

25     A.   That's correct.  And we also in many

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 27

1   locations -- I'm not familiar with our -- our footprint

2   in Florida.

3       But we also utilize a contract -- We also work

4   with contracted locations.  There are certain states

5   that also rely on contractors to house their inmates.

6       So in those cases, we'll work with the contractor

7   that the state has identified that houses their state

8   inmates.  So there's -- There's also cases where we

9   work with contractors as well.

10      **Q.   And you mentioned that at one point in your**

11  **career you were a deportation officer; what is that?**

12      A.   Sure.  So a deportation officer is a federal

13  law enforcement officer.  We have the authority to

14  enforce immigration law, and we essentially enforce the

15  decisions of an immigration judge.

16      On those occasions where immigration judges order

17  somebody removed, we ensure that that removal is

18  completed pursuant to the judge's order to the extent

19  that we can, also the fugitive -- We also in those

20  cases where aliens fail to report for their hearing

21  before the immigration judge, the immigration judge may

22  issue hearing absentia and a final order in that

23  particular case; and the deportation officers will be

24  responsible for locating, arresting, detaining and

25  removing that individual pursuant to the IJ's order.

Exhibit D

Page 28

1     So in a nutshell, we're -- We enforce the

2  decisions of an immigration judge.

3     We identify, arrest, remove unlawful aliens in the

4  United States; and we also prosecute cases as well for

5  reentry.

6     **Q.   How do you -- how does -- I'm sorry.  Keep**

7  **going.**

8     A.   8 U.S.C. 1326 is our primary prosecutions

9  unit.  That's the primary chart that we utilize.

10     Since most of our cases are off the border, we

11  don't typically do -- excuse me -- U.S.C. 1325, which

12  is misdemeanor illegal entry.

13     We'll focus on 1326s, which are reentry after

14  deportation.

15     **Q.   Okay.  And section 1226 addresses apprehension**

16  **and detention of aliens -- I believe that's the**

17  **title -- is that correct?**

18     A.   I'm sorry.  Can you tell me the corresponding

19  INAPs -- I'm not familiar with the code.

20     **Q.   Okay.  Do you also implement section 8 U.S.C.**

21  **1182, inadmissible aliens?**

22     A.   Can you tell me the corresponding INAPs?  I'm

23  not familiar with the U.S. code.

24     **Q.   Section -- Okay.  INA 212, immigration?**

25     A.   Is that 212(d)(5)?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    Q.    Would include (d)(5).

2    A.    Yes, inadmissible aliens, section 212, is

3  that --

4    Q.    Yes.

5    A.    Yes, we do.

6    Q.    Okay.

7    A.    We'll use those as the basis for removability

8  of aliens that have entered without inspection.

9    Q.    And when you talk about the ability to

10  prosecute cases, under which of these statutes is that

11  authority?

12    A.    8 U.S.C. 1326, little A, little B.

13    Q.    Okay.  And what is -- What exactly does ERO do

14  to prosecute those cases?

15    A.    So when we encounter individuals that have

16  reentered the United States after deportation, we will

17  typically look at that case working with the Assistant

18  U.S. Attorney's Office to prosecute those individuals

19  for 8 U.S.C. 1326.

20    Q.    So in those proceedings, who acts as the

21  prosecutor?

22    A.    The assistant U.S. attorney.

23    Q.    Okay.  And who's the judge?

24    A.    It's a federal judge, either U.S. -- It's a

25  federal judge.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1      Q.   Is it an immigration judge or --

 2      A.   No.

 3      Q.   -- a magistrate?

 4      A.   No, it's a district court judge.

 5      Q.   All right.  Thank you for that clarification.

 6      Do you also implement any rules or regulations in

 7  addition to statutes?

 8      A.   Can you -- I don't believe so.  But can you

 9  clarify that question?

10      Q.   Well, I mean, in your duties at ERO, do you

11  implement any rules or regulations?

12      A.   No.

13      Q.   Do you implement any policies at ERO?

14      A.   We don't create the policies, but we

15  operationalize the policies.

16      Q.   What types of policies do you operationalize?

17      A.   Let me see, off the top of my head -- I'm

18  drawing a blank.  But, for example, I mean, we have the

19  parole policy that was issued ten years ago; so we

20  operationalize that with our field office directors.

21  But there's -- There's many policies.

22      Q.   So when you say you operationalize a parole

23  policy that's been in effect for ten years, what is

24  that specific policy?

25      A.   So the parole policy that we have as it

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  relates -- as it relates to aliens that have entered

2  the United States and they're expedited to be removed

3  and they're turned over to ICE under an expedited

4  removal, and they're kept in our custody because ERO --

5  Actually, no ERs are one of the mandatory detention

6  cases for us; so we keep them detained.

7      But there is a permissible provision within

8  that -- within that section of law that allows us to

9  parole on a case-by-case basis.

10     And that policy spells out what we should be

11  looking at in those cases, you know, namely significant

12  public benefit, humanitarian concerns, risk to the

13  community, or whether or not they have identity

14  documents is another one or are they a risk to abscond.

15     So we do an in-depth review of each one of those

16  cases that -- where we're exercising our discretion in

17  terms of that policy, using that policy as a guided

18  post.

19     So that's one -- one of the policies that we

20  operate -- that we're responsible for operationalizing.

21     **Q.   Okay.  So when you use the term parole, what**

22  **does that mean?**

23     A.   Parole is under -- What I'm referencing is

24  section 212(d)(5) parole.

25     **Q.   What is the term -- What does parole mean?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      A.   Oh, so --

**2      Q.   -- and it relates?**

3      A.   Yeah, so it's a mechanism that allows the

4   alien that's been in custody to be released.  It's a

5   discretionary form of release.  And it's dependent on

6   an in-depth case review for all cases.

7      It allows the alien to be in the community while

8   they await their asylum hearing or their immigration

9   hearing depending on why the parole was issued and who

10  it was issued by.

**11      Q.   You said that policy has been in effect for**

**12  ten years; do you know who issued that policy?**

13      A.   I don't recall.  I don't recall.

**14      Q.   Okay.  And you used the term "expedited**

**15  removal"; what is expedited removal?**

16      A.   So expedited removal refers to the authorities

17  that are granted to ICE and CBP that allow for removal

18  enter -- removal order to be entered against an alien

19  that has entered the country illegally if they've met

20  certain parameters.

21      Those parameters include being in the country less

22  than 14 days, being in the -- being within 100 miles of

23  the -- of the southwest border.

24      The person can't be a juvenile.  There may be some

25  other considerations as well.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 33

1      But those are the primary ones, to my knowledge.

2      Q.    What about the family units; are they eligible

3  for expedited removal?

4      A.    I believe so, but I don't know for certain

5  because initially -- And I'll just give you some

6  background on that, is that although southwest -- I

7  mean, ERO does have access along the southwest border,

8  the primary responsibility for securing our southwest

9  border making interdictions or arrests for people

10  entering illegally falls on the shoulders of our

11  brothers and sisters at the Customs and Border

12  Protection.

13      So it's generally not something ERO would look at

14  for expedited removals of those kind of cases because

15  we wouldn't encounter those type of aliens, so that's

16  -- that's the reason I don't know that -- the answer to

17  that particular question.

18      Q.    So let me get it straight, so if family units

19  are being released under expedited removal, that's

20  probably happening with CBP?

21      A.    Correct.

22      Q.    So can you explain to me how CBP and ICE

23  interact with each other, if at all?  Is there a

24  relationship there?

25      A.    Of course, yes.  We do -- We do work together.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 34

1    So our -- Our offices along the southwest border,

2    the offices I alluded to earlier, Harlingen, El Paso,

3    San Antonio, Phoenix, and San Diego communicate --

4    communicate quite regularly in terms of detention

5    requirements, terms of arrest and needs.

6        And anything that might cross over because since

7    we essentially work really close -- closely along the

8    southwest border in order to ensure that, you know, the

9    border patrol has the support that they need.

10       Q.   What kind of support does ICE give CBP?

11       A.   So currently we current -- ICE has officers on

12   TDY, on temporary assignment, temporary duty, down

13   along the southwest border.

14       We have about more -- more than 300 officers

15   currently assigned to locations co-located with the

16   U.S. Border Patrol to assist them with their ATD Parole

17   Plus ATD program.

18       And our officers are responsible for placing the

19   individuals released by Border Patrol on some type of

20   alternatives to detention.  Alternatives to Detention

21   is a program wholly within ICE.  And it -- it -- It

22   allows for tracking of and an accounting for the

23   releases that Border Patrol is doing from the southwest

24   border utilizing ankle bracelets that are GPS enabled

25   allowing us to locate that individual anywhere in the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 35

1    United States.

2        It also includes -- potentially could include

3    telephonic reporting where they're checking in via

4    telephone, as well as facial recognition reporting

5    where they can communicate directly with their

6    deportation officer using an app; and that app is

7    called SmartLINK.  So that program -- That alternatives

8    to detention program is a program that's within ICE.

9        But we're currently assisting the Border Patrol at

10   their locations placing the aliens that they release on

11   those types of alternatives to detention.

12       **Q.   How long have those ICE officers been**

13   **temporarily assigned to locations along the southwest**

14   **border?**

15       A.   I don't recall the exact date, but I know it

16   was in at least 2021 -- since 2021.

17       **Q.   And do you know which CBP sectors they've been**

18   **assigned to or CBP ports of entry location?**

19       A.   I don't believe there are port of entries.

20       My understanding is that they are the Border

21   Patrol stations, and I believe every sector has at

22   least one location that has ERO officers.

23       **Q.   And what else do the ERO officers do at those**

24   **temporary locations along the southwest border besides**

25   **ATD?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.    I don't know.  I don't know anything beyond

2    the ATD component of anything they may be doing.

3        Q.    And does ERO operate detention facilities?

4    A.    Yes, we do.

5        Q.    Okay.  Does CBP sometimes transfer noncitizens

6    to your facilities?

7    A.    Yes.

8        Q.    Under what circumstances do they transfer

9    noncitizens to your detention facilities?

10    A.    Those aliens that require detention, they

11    would be transferred to one of our detention locations.

12        Q.    Let's talk about the first topic, which is

13    Parole Plus ATD.  You've already gotten into that a

14    little bit.

15        Can you explain to me the history of ATD; when did

16    it start becoming a thing?

17    A.    Sure.  Approximately 2002 was when we started

18    receiving funding for the alternatives to detention

19    program.

20        That's been very successful.  Over the last five

21    years, we've -- Congress has allotted additional funds

22    towards the ATD program.

23        The program is a success because it -- It

24    increases or it has a very high appearance rate

25    within -- with the immigration courts, meaning when we

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 37

1  place an alien on ATD, the rate of appearance at their

2  immigration court hearings is very high.

3      The amount of cases or aliens that are not

4  successful on ATD is very low.

5      And we have an overwhelming positive experience

6  with alternatives to detention, and it's much cheaper

7  than detention.

8      It's less than $10 a day to keep someone on ATD

9  where it's approximately $150 a day in detention.

10     **Q.   And when the program was started in 2002,**

11 **which types of noncitizens qualified to be placed in**

12 **ATD?**

13     A.   So I don't recall what we were doing in 2002.

14 I can't say that today.  Noncitizens that aren't a

15 threat a community, they're not public safety risk,

16 they don't have medical conditions, something that

17 would prohibit like an ankle bracelet being

18 administered.  They can't be unaccompanied children as

19 well.

20     And typically, if they're family units, we -- we

21 would -- We would place ATD on the head of household in

22 that instance.

23     But every case is different.  And we look at the

24 different -- We look at the case as a whole, and then

25 we make the decision on what type of monitoring would

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   be best for that individual case.

2       And we look at things like previous -- Were they

3   on a program previously, how well did they do on the

4   program.  We look at risk of flight as well.

5       It's a case-by-case decision on what type of

6   technology we actually use on the ATD program.

7       Q.   When you say you look at whether they've been

8   on the program before, what program are you referring

9   to?

10      A.   I'm sorry.  The ATD program.

11      Q.   So some people have been on ATD more than

12  once?

13      A.   It's possible.

14      Q.   When you say it has a high appearance rate,

15  approximately what is that appearance rate with ATD?

16      A.   It's more than 90 percent appearance rate with

17  immigration court.

18      Q.   And without ATD, what is the appearance rate?

19      A.   I don't know that statistic.  I'm sorry.

20      Q.   I'm just trying to get a sense to compare it

21  to.

22      A.   Yep, understood.

23      Q.   So in 2002, what types of technology devices

24  did you use -- implement the policy of ATD?  How has it

25  changed?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 39

 1    A.   I don't know.  But what I can say is that when

 2  we rolled out ATD as an agency back in 2002, we didn't

 3  have a lot of the tools that we have today.

 4    You know, facial recognition was not a thing.  It

 5  was not something that was done.

 6    My sense is that we looked at radio frequency

 7  devices in those days.  We -- But I don't know the

 8  entire -- all the equipment that we had in regards to

 9  ATD back in 2002.

**10    Q.   Were individuals eligible for ATD back in**

**11  2002?**

12    A.   Yes.

**13    Q.   Okay.  Was there ever a period of time since**

**14  2002 when individual adults were not eligible for ATD?**

15    A.   Could you repeat that question?

**16    Q.   Was there ever a period of time since 2002**

**17  when an individual adult was not eligible to use ATD**

**18  program?**

19    A.   Yes.  So it's -- I can't speak to 2002.  But,

20  you know, just currently, aliens that don't have -- if

21  they're -- If they're a risk to the community, they

22  wouldn't be eligible for ATD.

23    If they are -- If they have medical concerns or

24  medical conditions that would prohibit the placement of

25  an ankle monitor, they would not be eligible.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      If they're unaccompanied children or children --
2  anybody under the age of eighteen -- Actually, I'd like
3  to amend my previous answer.  Actually anyone under the
4  age of eighteen would not be eligible for the ATD
5  program.
6      Q.   So is it possible currently for an individual
7  adult to be eligible for ATD program?
8      A.   Yes.
9      Q.   And is it also possible for an entire family
10  unit to be placed in ATD currently?
11      A.   Not if there's children in that family, we
12  wouldn't place the children in ATD -- in the ATD
13  program.
14      Q.   Okay.  So let me pull up Exhibit 3 in the
15  chat.
16          (Exhibit No. 3 was marked.)
17  BY MS. BRODEEN:
18      Q.   And topic one is DHS's Parole Plus ATD policy,
19  which rescinded and replaced the notice to report
20  policy, including the reasons for implementing it and
21  its impact.
22      For this topic, who did you talk to to get
23  information, if anybody, besides yourself?
24          MR. DARROW:  I'm gonna object.  Mr. Guadian is
25  here to speak to the ICE portion of ATD.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1          If you have questions that are regarding the

2    overall policy followed by CBP, we have a different

3    witness designated to speak to that.

4          MS. BRODEEN:  Okay.  Well, he's designated for

5    part of this, and the question is who he talked to to

6    get ready for questions for topic one.

7          I don't think that's off bounds here.

8    BY MS. BRODEEN:

9      Q.   **Just who did you talk to?**

10         MR. DARROW:  You can answer.

11     A.   Okay.  This particular I didn't talk to

12    Customs and Border Protection in terms of their policy.

13    I did speak to my attorneys.

14    BY MS. BRODEEN:

15     Q.   **Okay.  Anybody else in ERO or elsewhere at ICE**

16    **that helped you with understanding what you might be**

17    **asked about this topic?**

18     A.   Yes.  Yes.  Field Office Director San Antonio,

19    Mr. Correa -- Jose Correa.

20     Q.   **Okay.  I'm gonna show you this memo.  It's**

21    **dated November 2nd, 2021, signed by Raul Ortiz, U.S.**

22    **Border Patrol.  Have you seen this memo before?**

23     A.   Yes.

24     Q.   **Okay.  When did you first see this memo?**

25     A.   I don't recall.  I don't recall exactly when I

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 42

1  saw the memo.  It was after it was already implemented.

2  I know that.  I didn't see it on November 2nd.  It was

3  sometime after that.

4      Q.   Okay.  But certainly before you got ready for

5  this deposition, correct?

6      A.   Yes, correct.

7      Q.   Okay.  And what -- Who gave it to you; how did

8  you get it?

9      A.   I believe the chief of staff, Mike Bernacki,

10  sent it out as an FYI.

11      Q.   Okay.  And was that, you know, something that

12  is done from time to time, even though it's done by

13  CBP, it's something that you need to know about?

14      A.   Yeah.  Anything that might touch ERO's

15  policies as when they're talking alternatives to

16  detention, for visibility it's typical to receive memos

17  from other components within DHS.

18      Q.   So when your temporary assigned ERO officers

19  who are co-located with CBP, do the ATD portion of the

20  policy, what exactly are they using now down at the

21  southwest border technology wise?

22      A.   So they're -- They're allowed to use the three

23  technologies that I referenced previously, which is

24  ankle monitors, GPS-enabled ankle monitors.

25      They're allowed to use the telephonic monitoring

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  as well and the SmartLINK system, which a facial

2  recognition system.

3      Q.   Okay.  And I think you said that the head of

4  household gets the ankle monitor; did you say that?

5      A.   Potentially.  I didn't mean to cut you off.

6  Potentially, yes.  It could be one -- any of the three,

7  just -- It would be the head of household that would

8  receive the ATD.

9      Now, as to which form, that would be up to the

10  supervisor on-site to determine which technology to use

11  in that particular case.

12     Q.   Okay.  So ATD refers to a technology?

13     A.   Correct.  It's three different types of

14  technology that we have in the program.

15     Q.   Okay.  So the ankle bracelet monitor, if

16  there's a family unit, only one person gets the ankle

17  monitor?

18     A.   Yes.

19     Q.   Does anybody -- anybody in that family unit

20  also get a cell phone?

21     A.   I don't know the answer to that.  Sorry.

22     Q.   What about facial recognition, who gets the

23  facial recognition?

24     A.   So -- So we wouldn't typically have two

25  technologies for one person.  It would be one of the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 44

1    three, if that gives you a little background.

2         And then it would be case specific.  And it would

3    be the supervisor on-site that would determine the

4    technology best to use.

5         **Q.   Okay.  Now, are any of those technologies ever**

6    **used on the child in the family unit?**

7         A.   Not to my knowledge, no.

8         **Q.   What about fingerprints; are fingerprints**

9    **taken of the family unit?**

10        A.   So the arrest processing would be done by

11   Customs and Border Protection.  They would have --

12   process those families at arrest.  That would not be

13   ICE.

14        But what I can say is that there is -- we -- ICE

15   does not fingerprint anyone under the age of fourteen.

16        **Q.   Why is that?**

17        A.   It may be -- I don't know.  I believe it's --

18   It might be a regulation or a law.  I'm not 100 percent

19   sure.

20        **Q.   And if you look at this memo, it references**

21   **superseding a previous notice to report policy; do you**

22   **see that?**

23        A.   Yeah.  What part?

24        **Q.   The first paragraph, it says this policy --**

25   **This memo replaces the NTR, the notice to report?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 45

1    A.   Oh, yes.  Yes, I see it.

2    Q.   **What is notice to report?**

3    A.   So from an ICE perspective, the notice to

4  report is a program that is utilized by Customs and

5  Border Protection.  That started in March of 2021.

6       And it was directing the alien to report to the

7  nearest ICE office upon release from the Border Patrol.

8       And the NTRs did not have an ATD component with

9  it.

10      And that program, from ICE's perspective, ended in

11 November of 2021.

12   Q.   **And -- And do you know whether the NTR release**

13 **included a notice to appear?**

14   A.   From the ICE perspective, the NTR is a Customs

15 and Border Protection program.  And my understanding is

16 that, no, there was -- It did not have an aspect where

17 Border Patrol was issuing notice to appears.

18   Q.   **Okay.  And was -- When somebody was issued a**

19 **notice to report, how long did they have to do what?**

20   A.   I don't know the answer to that.  What I can

21 say is that what -- From what I've seen in the

22 different documents, it looks like it may have varied

23 depending on the time frame that the NTR program was in

24 place.

25      My sense is that it was anywhere between 50 and 30

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  days or 50 and 45 days.

2      But I'm not entirely sure what -- what Border

3  Patrol was requiring as far as check-ins.

4      **Q.   Okay.  What -- What do you mean by requiring a**

5  **check-in?  What is a check-in?  Where would they have**

6  **to check-in?**

7      A.   So the Border Patrol under the NTR program was

8  requiring that the aliens check into the nearest ERO

9  office closest to where they would be residing.

10     **Q.   Okay.  So the closest ERO office to final**

11 **destination?**

12     A.   To their -- to their -- their residence.  So I

13 would say, yes, their final destination.

14     **Q.   All right.  And when the NTR policy was in**

15 **effect, was that information about their identity and**

16 **their intended destination put into a database anywhere**

17 **so they could be tracked?**

18     A.   I don't recall.  I don't know enough about the

19 NTR and what database the Border Patrol was using.

20     My sense is that the Unified Immigration Portal

21 captured a lot of that information, but since the

22 Unified Immigration Portal is not an ICE database, I

23 can't answer that complete.

24     **Q.   What is uniform -- I'm sorry.  I forgot the**

25 **name already.  What is it?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 47

```
 1    A.   Unified -- Unified Immigration Portal is a
 2 database that CBP created.
 3    And it had information -- or still has information
 4 regarding names, locations where people were -- their
 5 releases were going to be residing.
 6    ICE does have access to that unified -- Unified
 7 Immigration Portal, and we utilize that to obtain
 8 addresses on occasion.
 9    Q.   Okay.  So after ATD is put in place on an
10 individual for the head of household or whoever, does
11 ICE track that person or somebody else?
12    A.   ICE tracks it.  So part of ICE's
13 responsibility is that once an alien is placed in
14 proceedings, the deportation officer is responsible for
15 tracking that notice to appear due to immigration
16 courts and -- and executing the judge's decision.
17    When this policy -- when the N -- When the Parole
18 Plus ATD policy, CBP policy came about, we were able to
19 track individuals as they went to their -- their --
20 their final destinations and their residences.
21    Q.   And is that real-time tracking?
22    A.   So if they -- If it was a GPS-enabled device
23 that they had, like an ankle monitor, it would be real-
24 time tracking.
25    Q.   Okay.  And how do you track somebody with a
```

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   cell phone?  Can't they turn it off, and you can't

2   track them?

3       A.   So cell phones typically aren't used to track.

4   They're used for check-in on the cell phones and as

5   well as the app, the SmartLINK app, are used for check-

6   ins.

7       Q.   So they're --

8       A.   I don't know the answer to the question

9   whether those cell phones could be used to track.  I

10  don't know that.

11      Q.   And what is facial recognition used for as

12  opposed to the other two types of ATD?

13      A.   So facial recognition allows check-in with the

14  deportation officer face to face.

15      Q.   To identify them or what?

16      A.   Correct; correct.

17      Q.   Okay.  And what database is that compared

18  against?  We're talking about people that come from

19  over 150 countries, right?

20      A.   Right.

21      Q.   So --

22      A.   So your only -- I'm sorry.

23      Q.   What databases do you have to compare them?

24      A.   So it's not a data -- a database to -- per se.

25  It's when they're initially enrolled into the ATD

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 49

1  program into the SmartLINK program, they're enrolled

2  via their face at the point of arrest -- or at the

3  point of release from the Border Patrol.

4      Q.   Okay.  So I misunderstood.  It's not used to

5  confirm who they are?

6      A.   No.

7      Q.   I got that incorrect.  All right.  Thank you

8  for that.

9      What percentage of people that are paroled under

10 Parole Plus ATD get a tracking device of a ankle

11 monitor?

12     A.   I don't know the answer to that question.  I

13 don't recall that.

14     Q.   Okay.  Under the former notice to report

15 policy, were they tracked by ICE?

16     A.   Not in the same way that you would track via

17 ATD.  But they're -- We utilize the Unified Immigration

18 Portal to determine their residences.  In a sense they

19 were tracked.

20     Q.   Does congress require them to be tracked in

21 any way?

22     A.   Not to my knowledge.

23     Q.   Does congress require addresses of final

24 destination to be gathered?

25     A.   I don't know the answer to that question.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 50

1  Sorry.

2      Q.   And so if I wanted to know where certain

3  people are -- I mean, how many people are in Florida

4  that have been released under Parole Plus ATD, is it

5  possible to get a number?

6      A.   Yes, it's gonna be -- I think it's kind of

7  difficult because we would have to rely on customs --

8  the numbers from the Customs and Border Protection

9  cross-referenced with ICE databases.

10     Q.   Do you have any contractors to help with

11  tracking of these released people?

12     A.   So the ATD program does have contractors

13  assigned to it.

14     The name of the company is BI.  They're the

15  contractors responsible for supervising the ATD program

16  for us for ICE.

17         (Exhibit No. 4 was marked.)

18  BY MS. BRODEEN:

19     Q.   I want to show you Exhibit 4.  It's just one

20  page.  It's something I got from a nongovernmental

21  organizational website, and if I can turn your

22  attention to the form that is inset in this page; do

23  you see that form in the page?

24     A.   I'm pulling it up now.

25         MR. DARROW:  I'm gonna object.  Notices to

Exhibit D

Page 51

```
 1   report -- The actual notice to report program is not
 2   any of the topics for any of the witnesses in this
 3   case, let alone Mr. Guadian.
 4           MS. BRODEEN:  Well, it generally comes in
 5   under topic two, which is all kinds of policies, not
 6   just the -- the Parole Plus ATD, which is topic one.
 7           MR. DARROW:  Even if it does come under number
 8   two, we have a different -- We have two different
 9   witnesses actually designated to speak to number two,
10   not Mr. Guadian.
11           MS. BRODEEN:  Okay.  Well, I just want him to
12   identify this.  I mean, I couldn't find this form on
13   the website of any DHS entity.
14   BY MS. BRODEEN:
15       Q.   Can you just take a look at this form that's
16   inset in this document?
17           MR. DARROW:  I mean, it's the same objection.
18   You can look at the form.
19   BY MS. BRODEEN:
20       Q.   Yeah, just go ahead and look at the form; do
21   you see it?
22       A.   Yes.
23       Q.   It says it's for I-385 at the bottom, I
24   believe; do you see that?
25       A.   Yes.
```

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 52

1     Q.   Have you seen a form I-385 before?

2     A.   Yes.

3     Q.   Okay.  Is this an example of a form I-35

4  (sic)?

5     A.   It appears so.

6     Q.   All right.  And the Parole Plus ATD policy

7  that your temporary assigned employees down at the

8  southwest border to assist CBP with, does that apply

9  all across the southwest Florida, not just the sectors

10  as mentioned in this memo specifically?

11     A.   Yes, that's my understanding -- Well, let me

12  backtrack.  I believe San Diego is using internal

13  deportations officers to supplement.  So those

14  individuals are not TDY, now that I think about it; but

15  I believe the other sectors have the support from ERO.

16     Q.   What is TDY?

17     A.   I'm sorry, temporary duty.

18     Q.   Okay.  Is there -- Do you know whether this

19  November 2nd, 2021, memo of Raul Ortiz is applied in

20  the San Diego sector by CBP?

21          MR. DARROW:  Objection.  We have a different

22  witness designated to speak to --

23          MS. BRODEEN:  Okay.

24          MR. DARROW:  -- that.

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      Q.    Okay.  If you know.

2      A.    I don't know.

3      Q.    Do you have any understanding of the

4  circumstances that led to the issuance of this

5  November 2nd, 2021, memo of Raul Ortiz, if you know?

6          MR. DARROW:  Same objection.

7  BY MS. BRODEEN:

8      Q.    Go ahead and answer if you can.  If you don't

9  know, that's --

10     A.    I don't know the answer.

11     Q.    Are you familiar with a part of DHS called the

12  office of immigration studies?

13     A.    No.

14     Q.    Okay.  Do you know anything about the capacity

15  of potential facilities that ICE operates and has

16  contracts to -- for?

17     A.    We -- we have -- We operate a lot -- quite a

18  large number of detention facilities.  Can you be more

19  specific as to what location?

20     Q.    Okay.  Can you tell what kind of network do

21  you have of detention facilities?

22     A.    Sure.  Sure.  So ICE operates a nationwide

23  network of detention beds.  And we're funded for 31,500

24  beds this year; and we were funded for 31,500 beds last

25  year.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 54

1       And those beds are located in county jails.

2    They're located at private prisons.  ICE owns a few

3    locations that are ICE-owned detention beds.  And we

4    call those service processing centers.

5       We are also -- Some locations that operate with

6    the U.S. Marshal Service, we -- we -- We house at those

7    locations as well, as ICE is a rider on their contract.

8       So we -- We also utilize some U.S. Marshal beds

9    nationwide, so we have a nation -- a nationwide network

10   of beds that we operate.

11      Some of the challenges to operating the nationwide

12   network are the current posture that certain states and

13   cities and counties have in regards to cooperation with

14   ICE.

15      So although we could be funded for a thousand beds

16   in the state of California, the reality is that those

17   beds cannot be used because of state laws that do not

18   allow the -- either contractor or a county or a

19   government facility -- a government organization within

20   that state to cooperate with ICE.  So we have some

21   challenges.

22      And that's one of our primary challenges to

23   utilize our bed space nationwide.

24      Some other challenges include, you know, the

25   willingness of sheriffs to cooperate with ICE as well.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 55

1      And also with contracting, there's only a limited

2   amount of -- of people -- of corporations that actually

3   are in the private corrections business.  So there's

4   contracting challenges with that as well.

5      Some of the things that also impact our ability to

6   utilize every bed that we have are over the last two

7   years we've had, you know, COVID in jail; so we've been

8   required to, like certain litigations, to look at our

9   detention capacities in our facilities to try to

10  prevent the transmission of COVID in our detention

11  settings.

12      And we're -- We adhere to CDC guidance, as well as

13  litigation that also has taken some of our beds offline

14  as through a -- district court decisions.  So there's

15  quite a few challenges.

16      And I know a spoke a lot, but detention is -- It's

17  a big topic.  I just wanted to give you an overview of,

18  you know, what ICE's role is in with ICE detention and

19  some of the challenges associated with it.

20      **Q.   All right.  So today how many beds -- Is that**

21  **the way you measure detention capacity beds?**

22      A.   Correct.

23      **Q.   How many beds in your whole network right now**

24  **are online?**

25      A.   We have access to at least -- I'm sorry, I

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1 don't know the exact figure.  I won't be able -- I

2 can't tell you.

3      But it fluctuates on a daily basis.  I know every

4 morning we receive an update in regards to available

5 bed space.  I didn't look at this morning's.

6      You know, yesterday I believe it was close to

7 3,000 empty beds.

**8      Q.   Now, do you have contingencies of --**

**9 contingent addressed in contracts -- You mentioned**

**10 county jails, I believe, and some other private**

**11 facilities.  Are they kind of like overflow capacity**

**12 for you or are they like primary capacity in some**

**13 situations?**

14      A.   I think the -- I think the overflow capacity's

15 really controlled by the -- by the vendor, whether it's

16 private contractor or the county sheriff, in terms of

17 providing overflow needs.

18      It's not -- I don't recall anything -- I may have

19 seen some, but I don't recall specifically what those

20 overflow measures may be.

21      I can say in the past when we've had -- When we've

22 had to relocate people, for example, in the New Orleans

23 field office with the hurricanes they've been having

24 recently, our contingency plan in that particular AOR

25 required mass movements of people from one -- from

Exhibit D

Page 57

1  detention centers that were closer to the Gulf of

2  Mexico to detention centers that were closer to -- that

3  that were in the interior.

4      So it's really specific geographics, specific to

5  geography; and it's specific to the vendor and what

6  they can provide in terms of overflow capacity.

7      Q.   Who is a vendor?

8      A.   I'm sorry, a vendor -- A vendor could be a

9  county sheriff.  It could be a contract -- a contractor

10  similar to one -- any corporation that does -- that

11  engages in private corrections.

12      That's the term we use when talking about our

13  contracting needs.

14      Q.   And do you have the authority to enter into

15  vendor contract as the need increases for detention

16  capacity?

17      A.   I don't have that authority, but there are

18  others in ICE in my organization that have that

19  authority.

20      Q.   Okay.  So ICE has the authority to contract

21  with a vendor for expert capacity for detention,

22  correct?

23      A.   For capacity in general, yes.

24      Q.   And how does ICE determine which detention

25  facility to send someone to?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 58

1    A.   So that's -- That's also a difficult question

2  to answer.  I can say that some facilities -- we always

3  try to max -- to limit the amount of movements that we

4  try to -- from the -- from the new arrests arrive in

5  the southwest borders, so typically the first stop for

6  an alien that has been arrested and requires detention

7  would be to one of our locations on the southwest

8  border.

9    But we also need those facilities to have the

10 capacity to decompress the Border Patrol station.

11   Decompress is a term that the Border Patrol uses

12 that signifies a need to decrease the amount of aliens

13 in their -- in the Border Patrol stations.

14   So we have to keep those facilities that are close

15 to the southwest border in a position to absorb and to

16 support the decompression efforts from the Border

17 Patrol.

18   We also operate a fleet of aircraft.  And we'll

19 move detainees around the country to different

20 detention locations based on that capacity.

21   **Q.   When you say that you help -- you assist**

22 **Border Patrol with decompressing, are you saying that**

23 **when they need extra capacity for their custody, you**

24 **will step in and assist them with capacity?**

25   **I'm sorry, I don't understand how you help them**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1  decompress.

 2     A.   Yeah.  No, so it's -- The Border Patrol has

 3  the authority -- or their facilities are built for

 4  short-term processing.

 5     So we don't house for the Border Patrol while

 6  they're processing people.

 7     You know, they have to be charged and issued

 8  either a warrant of arrest requiring their detention or

 9  they'll have to have a final order in the terms of

10  expedited removal, something that makes them --

11  something that requires their -- the aliens that

12  they're processing to be detained.

13     At that point ICE will accept custody of that

14  alien at that point.

15     We don't -- We don't hold unprocessed or aliens

16  that have not been issued a notice to appear or warrant

17  of arrest or final order of removal from the Border

18  Patrol.

19     And Border Patrol stations -- don't want to speak

20  for them -- but typically their stations are built for

21  short-term holds, so it's not -- It's not for long

22  terms.

23     And when I say we -- we keep -- we support them in

24  their decompression efforts, I mean, we keep enough

25  beds at our facilities along the southwest border to

Exhibit D

Page 60

1   support those arrests because we're seeing that the

2   arrests from the southwest border can fluctuate; so we

3   want to make sure and keep that capacity available for

4   the Border Patrol to use within a close distance of the

5   border.

6       **Q.   So how many detention facilities does ICE**

7   **operate along the southwest border?**

8       A.   I'm sorry.  I don't recall that number.

9       **Q.   Like --**

10      A.   I can tell -- I don't know an approximate.

11      What I can say is that a majority of our bed space

12  is located along the southwest border.  There's -- That

13  would be the majority of it.

14      **Q.   Okay.  So a majority of your entire detention**

15  **capacity throughout this vast network is located along**

16  **the southwest border; did I get that correct?**

17      A.   Yes, that's my understanding.  I don't have

18  the specific numbers.  But we have a large capacity to

19  hold along the southwest border.

20      **Q.   How many detention facilities does ICE**

21  **operate, not through vendors, but independently operate**

22  **yourselves?**

23      A.   I don't recall.  The Port Isabel Service

24  Processing Center, the -- There's a facility in

25  Phoenix, which is the Florence Service Processing

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 61

1 Center, the Batavia Service Processing Center in

2 Buffalo.  Krome in Miami is a service processing

3 center.  I may be missing one.  But that's -- Those are

4 the ones I can recall.  There may be a couple of

5 others.

6     Q.   You said service processing center; is that

7 what I'm referring to as a detention facility?

8     A.   Yes, the service processing center designates

9 an ICE-owned facility.

10     Q.   Okay.  Thank you for that clarification.

11     So when -- Approximately when did ICE or the

12 federal government start building these process --

13 service processing centers; how long ago?

14     A.   I don't know.  It was probably before I came

15 onboard in 1997.  I don't know the answer to that.  I'm

16 sorry.

17     Q.   To your knowledge, has additional service

18 processing centers been built?

19     A.   No.

20     Q.   To the original number they are before your

21 time with ICE?

22     A.   No.  No, I -- And I would -- I would just give

23 you a background that DHS service processing centers

24 would be on a -- needing an authorization by congress

25 to build any additional service processing centers.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 62

1      Q.    And what part of your job description is

2   budgetary, I believe you said, correct?

3      A.    I'm sorry?  Say that again.

4      Q.    You -- When you were earlier giving your

5   description of your current job, you talked about

6   budgetary functions, I believe, is one of them?

7      A.    So in my role as a DAD, as the deputy

8   assistant director, for the eastern offices, I ensure

9   that the field offices, if they have budget needs that

10  I circulate that information with our headquarter's

11  component and try to connect the right component within

12  ICE headquarters with our field office.  And I actively

13  look for funding for necessary actions that are needed

14  by the field office.

15     Q.    Okay.  And is ICE able to make a budget

16  request for additional detention facilities?

17     A.    So the budgeting process for ICE, while we can

18  always recommend, ultimately the Department or the --

19  The Department with OMD and makes the request to

20  congress, and congress will authorize the

21  appropriations; so our role is to make the request.

22     Q.    Okay.  Do you know whether ICE has made that

23  request for additional detention capacity?

24         MR. DARROW:  I'm gonna object to that.  That's

25  deliberative-process privilege.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 63

1          MS. BRODEEN:  It's a budget request.  It's
2   public knowledge if they did or not, isn't it?

3          MR. DARROW:  The president's budget, that's --
4   that's public knowledge.

5          The internal policy requests about either --
6   individual agencies, rather, those are deliberative
7   process.

8   BY MS. BRODEEN:

9      **Q.    Okay.  And do you know what has happened with**
10  **budget requests if they've been granted by congress**
11  **since you started with ICE, additional capacities**
12  **requested in a budget?**

13         MR. DARROW:  I'm gonna ask for clarification.

14         Do you mean agency budget or the president's?

15         MS. BRODEEN:  The agency, the request for
16  additional capacity for detention that's been approved
17  by congress.

18         MR. DARROW:  I'm gonna object again.  That
19  calls for revealing deliberative process, protected
20  information.

21         MS. BRODEEN:  I'm asking if it's been granted.
22  If it's granted, isn't that public domain?  I'm sorry.
23  Things are different in Florida.  We have transparency.

24         MR. DARROW:  You can ask if the president's
25  budget was granted.  That's in the public domain.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 64

1            But if you're asking the witness to discuss

2  whether or not the agency made a request for different

3  detention capacity that was granted, then you're

4  requiring the witness to divulge whether or not the

5  agency made that request; and that would be

6  deliberative-process protected.

7  BY MS. BRODEEN:

8       Q.   Okay.  Do you know whether there's ever been a

9  president's budget, including additional detention

10  capacity?

11      A.   Detention capacity that congress authorized in

12  20 -- 2020 and 2019 was at 45 -- close -- approximately

13  45,000 beds in each of those years.

14      Q.   And was that approved by congress?

15      A.   That was what congress appropriated for ERO.

16      Q.   And is that capacity still there?

17      A.   The funded capacity for ERO is 31,500.

18      Q.   And when you say "funded capacity," is that

19  for this current fiscal year --

20      A.   Correct.

21      Q.   -- funding?  Has that been higher funding

22  capacity in the past?

23      A.   In 2019 and 2020, it was approximately 45,000.

24      Q.   And what is a fiscal year for federal

25  government; when does it go from?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 65

1    A.   October to September.

**2    Q.   October 1st to September 30th?**

3    A.   Yes.

**4    Q.   And you mentioned that there's a fleet of**

**5  aircraft; are those owned by ICE?**

6    A.   No, they're not.  They're contracted.  They're

7  contractors that provide that air support in the

8  mainframes.  And that contract has the ability to

9  increase or decrease as we see as needed.

**10    Q.   And when you put noncitizens on one of these**

**11  planes, do they always go to another detention**

**12  facility?**

13    A.   Yes.

**14    Q.   Okay.**

15    A.   Yeah -- Well, no, let me -- Let me retract.

16    So those -- Those aircraft could be also --

17  they're -- they're -- They are used also to repatriate

18  nationals, so they could be picking up -- For example,

19  they could be picking up in Miami and delivering to

20  Tegucigalpa, Honduras.  So, no, the -- The answer is

21  not always.

**22    Q.   And are any of your service processing centers**

**23  currently operating at full capacity?**

24    A.   I think the term "full capacity" can -- can

25  you give me a -- I can tell you that full capacity

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 66

1   there's -- that's -- Let me give you some -- a little

2   background on that.

3       So as I described earlier, there's challenges to

4   keeping every bed filled, that's especially in -- you

5   know, in certain states where we have litigation that

6   prevents us from utilizing all of our beds, as well as

7   trying to prevent the transmission of COVID and trying

8   to keep a six-foot distance between people.

9       And it all depends also on the location of SPC.

10  For example, if we have a location that has a high

11  COVID transmission rate in a community, we typically

12  can't utilize every single one of our beds, as well as,

13  you know, we can't mix male and female either.

14      So although we may have a pod of 50, a pod is a

15  housing unit within a jail.

16      We may have 50 beds in a pod.  And if there are

17  two females in there, we -- Those are -- The 48 beds

18  are offline, unless we have another female arrest that

19  we can put in there.

20      So it's not -- It's not as easy as saying that we

21  can utilize all our bed capacity.  We do our best to

22  utilize what we can.

23      But, you know, some of the -- Some of the

24  challenges I just described prevent us from using every

25  single bed in our detention inventory.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 67

 1     Q.   But COVID has affected your detention

 2   capacity, correct?

 3     A.   It has.  And, more importantly, the litigation

 4   that's attached to the COVID to -- from district courts

 5   as it relates to COVID and exposure and transmission in

 6   a detainee setting has impacted our detention

 7   capacities.

 8     Q.   And which -- What court decisions are you

 9   referring to there?

10     A.   Can I take a second to talk to my attorneys?

11   I don't know the exact names of the litigation.

12     But I -- I know there's -- There's the Fraihat

13   litigation out of California.

14     There's also litigation out of Los Angeles that

15   impacts our Adelanto facility.

16     There's litigation here in -- here in Virginia

17   that impacts our -- our detention beds here in

18   Virginia.

19     So it's really -- There's quite a few.  I don't

20   know -- I don't recall the names off the top of my

21   head, but they should be available on the public

22   docket.

23     Q.   And is it your understanding that the effect

24   of those legal decisions is still in play?

25     A.   Yes.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 68

1      Q.   This reduction in funding you referred to most

2   recently, was that a reduction in capacity based on a

3   request from the White House, to your knowledge?

4           MR. DARROW:  Objection to -- I need

5   clarification.

6           Do you mean request from the president or do

7   you mean from the White House itself as in --

8           MS. BRODEEN:  The president.  The president.

9   The president.  Same thing; he lives there.

10          MR. DARROW:  You can answer.

11     A.   I don't know the answer to that question.

12  BY MS. BRODEEN:

13     Q.   All right.  Do you need a break yet?

14     A.   I do.  I was just about to ask you.

15     Q.   You should have spoken up.

16     A.   We were on a roll there.

17     Q.   I know.  You're doing a great job being very

18  forthcoming.  I appreciate that.

19          THE VIDEOGRAPHER:  The time is 11:42.  We are

20  off the record.

21          (Recess had 11:42 a.m. - 11:53 a.m. EST.)

22          THE VIDEOGRAPHER:  The time is 11:53, and we

23  are back on the record.

24  BY MS. BRODEEN:

25     Q.   All right.  I want to circle back to something

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  **you said earlier that ERO has a fairly-large footprint**

2  **in Florida; what do you mean by that?**

3      A.   So ERO's Miami is responsible for the entire

4  state of Florida as well as the Virgin Islands and

5  Puerto Rico.

6      And what I mean by "footprint," I mean staffing.

7  Our staffing is quite large in the ERO field office.

8      We have many suboffices in terms of when you

9  relay -- You know, when you look other -- as compared

10 to other field offices around the nation.

11     You know, as I mentioned, we have offices in

12 Tallahassee.  We have offices in Jacksonville, Tampa,

13 Orlando, and a bunch of locations around Miami proper

14 all within an hour to include the Krome process --

15 service processing center.

16     So if Miami's got -- is considered a large field

17 office when it comes to field offices for ERO, it's one

18 of the larger ones, it's got quite a large -- In our

19 terms, it's a large footprint in terms of staffing and

20 of the -- and of the actual physical structures that we

21 have in the Miami field office.

22     **Q.   So you had a large footprint in terms of**

23 **personnel and also infrastructure, correct?**

24     A.   Correct.

25     **Q.   Okay.  And is there any other state that has**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 70

1   more ERO personnel and infrastructure than Florida?

2        A.   I don't recall.  Florida's got to be in the --

3   one of the top -- top five offices.  San Antonio was

4   recently split in two.  So it was our largest office,

5   and now I'm not sure what the ranking is for Florida,

6   but it's -- it's one of our largest.

7        Q.   Okay.  And is Florida ERO presence so large

8   because there's such a large number of migrants that

9   end up in Florida?

10       A.   I don't know the answer to that.  But what I

11  can say are we're always looking at our resources in

12  terms of criminal program.  We're looking at our

13  resources when it comes to prosecutions, our detention

14  capacities.

15       So if we would -- We are continually evaluating

16  where to put our staffing, when to put it, when to add

17  additional office space.  It's all a range of factors.

18       I don't know specifically, but enforcement actions

19  would be one that we would consider when looking at

20  augmenting or building out new offices in any of our

21  AORs.

22       Q.   And what about the offices along the southwest

23  border, how do they compare in size and personnel to

24  southwest Florida ARO?

25            MR. DARROW:  Objection.  What topic does that

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 71

1  relate to that Mr. Guadian is designated to speak to?

2          MS. BRODEEN:  Well, it's just general

3  background information of ICE.

4          MR. DARROW:  Again, I don't -- I don't think

5  that that was any of the topics.  If you -- In his

6  personal capacity, he can answer.

7          MS. BRODEEN:  Okay.  Well, go ahead and

8  answer.  If you can instruct him not to answer, just --

9  because it's not one of the topics.  Go ahead and

10  answer if you can.

11          MR. DARROW:  If you -- If you know personally.

12  BY MS. BRODEEN:

13      Q.  **Yes, go ahead.**

14      A.  My experience with the southwest border, I

15  think Miami is of a similar size to Phoenix.  I think

16  it's bigger than San Diego.  And I don't recall the

17  others where they fall in terms of scale when it comes

18  to staffing in their footprint, infrastructure, things

19  of that nature.

20      Q.  **And have you ever heard the term BINs number?**

21          MR. DARROW:  Objection again.  What topic --

22  Which topics does that relate?

23          MS. BRODEEN:  It's something that was used in

24  the deposition of Mr. Barker yesterday.

25          I wondered if it's good or bad and if it's the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 72

1   same thing as the alien number that Mr. Guadian

2   referred to earlier.

3             MR. DARROW:  Well --

4             MS. BRODEEN:  I think it's different.

5             MR. DARROW:  That's not any of the topics

6   that --

7             MS. BRODEEN:  No, but --

8   BY MS. BRODEEN:

9        Q.   Okay.  Well, you mentioned earlier there's

10  something called an A number, correct?

11       A.   Correct.

12       Q.   Okay.  And are you familiar with something

13  called a BINs number?

14       A.   Yes.

15       Q.   What -- Are they the same thing?  Are they

16  different?

17       A.   They're different.  To my knowledge, they're

18  different.  BINs numbers are biometric based.

19  Fingerprints and -- and A files are actual records of

20  proceedings where we keep our record of proceedings.

21       Q.   And getting back to Parole Plus ADT -- ATD,

22  when a noncitizen is processed under that, are they

23  also given at that time a notice to appear or do they

24  have to do that later?

25       A.   From an ICE perspective, you don't issue any

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 73

1  NTAs for Border Patrol Plus ATD programs, I would have

2  to refer to CBP on that on what they -- what charges

3  they issue.

4      Q.   Okay.  Well, let's assume that somebody who's

5  processed under and released under Parole Plus AD --

6  alternative to detention has a cell phone, can they use

7  that cell phone to check-in with ICE and get scheduled?

8      A.   I don't know the answer to that question, but

9  what I can say is that ICE has a public-facing

10 scheduler for aliens that were processed under the

11 notice to report or the Parole Plus ATD program where

12 aliens can go into that system and schedule a visit

13 with ICE ERO, and that's a public-facing website on

14 ICE.gov.

15      And that's really to the extent -- That's the

16 extent I have on that as far as background.

17      Q.   Okay.  And when these people are processed

18 under Parole Plus ATD, do you know whether ICE or

19 anybody gives them information about resources they can

20 use when they get to a community, such as schools,

21 financial assistance, food stamps?  Do you know if they

22 give that information to them?

23      A.   I don't know if the Border Patrol provides

24 that information.  I would defer you to the Border

25 Patrol.  I'm not sure on that.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      Q.   Does ICE provide that information when they

2   release people from detention?

3      A.   So depending on what -- if people are released

4   on alternatives to detention, alternatives to detention

5   to program, the contractor does have what's called wrap

6   around services where that includes classes, that

7   includes getting them in touch with nongovernmental

8   organizations in the community, things of that nature,

9   more so getting them acclimated to American culture and

10  those type of resources that are available to them.

11     Q.   Do they get them in touch with any

12  governmental resources?

13     A.   It's possible, but I don't know the answer to

14  that.

15     Q.   Okay.  So -- So when an ankle monitor is

16  placed on somebody, is that -- does that require Wi-Fi

17  connection?

18     A.   I don't think so, but I'm not certain.

19     I think the GPS ankle monitors is strictly GPS; it

20  relies on GPS for tracking.

21     Q.   Does it require connectivity?

22     A.   I don't know the answer to that question.

23     Q.   All right.  I want to show you Exhibit 6.

24          (Exhibit No. 6 was marked.)

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 75

1    Q.    And this is from the discovery responses we

2  received from your attorneys, specifically request for

3  production 13 response.

4    This is a letter.  Do you have that up in your

5  chat screen?

6    A.    I'm pulling it up now.  Yep, we've got the

7  letter up.

8    Q.    Okay.  Have you seen this document before?

9    A.    I have.

10   Q.    Okay.  And how recently was the first time you

11 saw that letter?

12   A.    Approximately three weeks ago, four weeks ago.

13   Q.    Okay.  Have you ever seen it any other time?

14   A.    No, not to my -- not to my recollection.

15   Q.    So it's signed by Tae Johnson -- sorry, that

16 was a thunder cloud here -- Tae Johnson, acting

17 director for ICE.

18   A.    I see a signature.

19   Q.    Okay.  And is he still with ICE?

20   A.    He is.  He is the acting director for ICE.

21   Q.    Still the acting director?

22   A.    Correct.

23   Q.    Do you know if he drafts his own letter or if

24 he has staff prepare his draft letters?

25   A.    I don't know the answer to that question.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 76

1    Q.   Okay.  So did you talk to anybody about this

2   letter and try to do any fact finding for yourself?

3        MR. DARROW:  Objection as to form.

4   BY MS. BRODEEN:

5    Q.   Okay.  Have you talked to anybody about this

6   letter other than your attorney?

7    A.   Let me -- Let me read it for a second.

8    Q.   Okay.  Go ahead; take your time.  There's an

9   attachment that has some items on it.

10   A.   No.  I'll need to confer with my attorneys on

11  this letter.

12   Q.   And I'd like to turn your attention to what is

13  Bates stamped on the bottom as page three of this

14  document -- actually page four.  It's -- At the top it

15  says Department of Homeland Security's response to

16  Governor Ron DeSantis' August 26, 2021, letter?

17   A.   I'm still looking for it.

18   Q.   Okay.  It's the fourth page of this letter I

19  want to turn your attention to.

20   A.   Yep, there it is.  Yes, I see it now.

21   Q.   Okay.  So in bold face it says the number of

22  aliens without lawful status, including unaccompanied

23  minors, apprehended at the southwest border whom DHS

24  knows has resettled in Florida since January 2021 until

25  the date of this letter, parenthesis, August 26th,

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  2021, closed parenthesis.

2      And there's some numbers in this following

3  paragraph that gives information on this topic,

4  correct?

5      A.   Correct.  I would add that the letter I saw

6  didn't -- I don't remember this portion of it, but I'm

7  happy to answer questions.

8      Q.   All right.  Well, turn -- It says your

9  current -- currently tracking 5900 single adult

10  noncitizens who entered the U.S. at the southwest

11  border, and it continues; and then checked in an ICE

12  field office in Florida.

13      And that time period will be between January 2021

14  and August 26th, 2021, correct, the way this is

15  reading?

16      A.   Yes, it sounds like you're reading the number

17  one, yeah, I agree that that's -- yes.

18      Q.   Okay.  And then since August 26th, 2021,

19  there's going to be additional people that you tracked

20  who are single adults who entered the U.S. at the

21  southwest border and checked in at ICE field office in

22  Florida, correct?  There will be more people since

23  August 26 of 2020?

24      A.   Yes, if that's in terms of ATD, people that

25  arrest are considered a tracking mechanism, then, yes,

Exhibit D

Page 78

1  there are individuals that were released on Parole Plus

2  ATD that are currently being tracked after -- When did

3  Parole Plus start, August 26th?  Parole Plus started

4  in -- I don't know.  I don't know what the gaps are.

5      It looks like there might be a gap from the

6  time -- from August 26th, 2021, to when the Parole Plus

7  started in November.  So September, October, November,

8  there's three months in there that I can't speak to in

9  terms of tracking.

10     But those released on Parole Plus ADT after

11  November from -- that were released by the Border

12  Patrol and placed on ATD, those were tracked by ICE

13  ERO.

14     **Q.  And how many of those people that were**

15  **released under Parole Plus ADT ended up in Florida?**

16     A.   I -- I don't have that information.  I thought

17  it was part of the discovery that was sent.

18     **Q.   Okay.  But ICE tracks that number, right?**

19     A.   For purposes of this litigation, the number

20  was provided.

21     **Q.   Well, I'm looking at Exhibit 1, our topic**

22  **five, which you are listed -- where you've been**

23  **designated for information and data regarding the**

24  **number of applicants for admission who entered the**

25  **country on or after January 1st, 2020, and who DHS**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 79

1  knows or has reason to believe have resettled in

2  Florida.

3      Do you have a number of how many of those people

4  who have applied for admission since January 1st, 2020,

5  have resettled in Florida?

6      A.   Information regarding number of applicants for

7  admission who entered on or after January -- it was --

8  I believe this was part of the production that was

9  submitted for discovery.  I don't have it here in front

10  of me.

11      Q.   Topic six, information and data regarding the

12  number of applicants for admission who were released

13  into the U.S. interior from January 1st, 2020, to

14  present, including whether they failed to show up for

15  their immigration proceedings or to check-in at a DHS

16  office as required; do you have that information?

17      A.   I've seen that information.  It is my

18  understanding it was presented in terms of discovery,

19  but I don't have the number in front of me.

20          MR. DARROW:  And, Karen, we have it printed

21  out if I can provide it to the witness.

22          MS. BRODEEN:  Okay.  We'll get to it later.

23          I have that later under the topic for

24  documents produced under request for production.

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 80

1    Q.   Okay.  So turning back to this letter that

2  has -- to the governor, so these numbers that are

3  provided in this page four, item No. 1, these numbers

4  would continue to have people come into Florida,

5  correct?  There's more people -- There's still people

6  coming into Florida to check-in at ICE since

7  August 26th, 2021, correct?

8    A.   That were released on the Parole Plus ATD

9  program, that's correct.

10    Q.   And there's a sentence here, while DHS does

11  not resettled noncitizens, 2,266 noncitizens were

12  processed at the southwest border under PD between

13  March 21st, 2021, and August 20th, 2021, who then

14  checked-in with ICE in Florida.

15    That would continue to be those people since

16  August 23rd, 2021, who ended up in Florida, correct?

17    A.   I'm confused.  Can you repeat?

18    Q.   I'm looking at that middle sentence, both DHS

19  has not resettled noncitizens.

20    A.   Yes.

21    Q.   And then it talks about 2,266 noncitizens who

22  were processed at the southwest border under

23  prosecutorial discretion is what PD means, I believe,

24  between March 21st, 2021, and August 20th, 2021, who

25  then checked-in with ICE in Florida.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 81

1     A.   I gotcha.

2     Q.   **Since August 20, 2021, there are those people**

3  **who still check-in with Florida ICE, correct?**

4     A.   Correct.

5     Q.   **That's an -- a rolling number?**

6     A.   Correct.

7     Q.   **Okay.  Then -- Then the next sentence, there**

8  **have been 1,229 noncitizens who entered the United**

9  **States and were enrolled on DD; what is DD?**

10    A.   In this sense, my -- I don't know exactly

11 since there's not a footnote; but my sense is that it

12 would be dedicated docket.

13    Q.   **Between May 28th, 2021, and August 23rd, 2021,**

14 **and who had an intended address or enrolled at location**

15 **of Florida and then checked-in with ICE in Florida.**

16    **There would be more people since August 23rd,**

17 **2021, who were enrolled on DD and checked in in Florida**

18 **with ICE with an intended address or enrollment**

19 **location in Florida, correct?**

20    A.   I haven't seen the numbers for dedicated

21 docket.  I don't believe I saw that in any of the

22 productions so I can't -- My sense is that -- The

23 dedicated docket is a continuing program all across --

24 in eleven cities across the U.S.  So my sense is that

25 the dedicated docket has continued in Miami.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 82

1      But I don't know -- I haven't seen the stat in

2  terms of how many were enrolled into the dedicated

3  docket after August 23rd, 2021.

4      **Q.   But there still would be people that**

5  **qualified?**

6      A.   Potentially.  Potentially.  Yeah, like I said,

7  I haven't seen the stat for dedicated docket in terms

8  of Miami check-ins being enrolled into dedicated docket

9  or the number associated with that.

10     **Q.   Okay.  Then the next sentence is, there's been**

11  **2,495 noncitizens who were paroled in through MPP**

12  **between February 19th, 2021, and August 23rd, 2021, who**

13  **had a case on a docket in Florida and then checked-in**

14  **with ICE in Florida.  What does MPP stand for, that**

15  **sentence?**

16          MR. DARROW:  Objection.  People coming from

17  MPP and then going to Florida, that's beyond the scope

18  of any of the topics.

19          MS. BRODEEN:  Okay.  I'm just trying to get a

20  sense about who checked-in in ICE in Florida and this

21  sentence says that.

22          MR. DARROW:  Right.  Who checked into ICE in

23  Florida among the population of the people we're

24  talking about, not other populations like MPP.

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      Q.   Well, were these -- Were these people released

2  in -- at the southwest border, Mr. Guadian?

3           MR. DARROW:  Same objection.  You can answer

4  if you know.

5      A.   I don't know the answer to that question.  MPP

6  is primarily a Border Patrol program.

7  BY MS. BRODEEN:

8      Q.   Can you explain to me what the phrase paroled

9  in through MPP means?

10          MR. DARROW:  Same objection.  MPP is beyond

11  the scope of any of the topics we have Mr. Guadian for.

12          MS. BRODEEN:  They're in Florida.  They're not

13  in Mexico.

14          MR. DARROW:  It doesn't matter.  The MPP is

15  not what's at issue in any of these topics.

16          If you want to ask him in his personal

17  capacity, then that's fine; but I would ask that you

18  save that for the fact portion.

19          MS. BRODEEN:  Well, I mean, these are people

20  being paroled that have been in MPP -- They're back in

21  the country, aren't they?  They're not in Mexico.

22  They're in the United States, they're in Florida,

23  right?

24          MR. DARROW:  I'm -- if you feel that this is,

25  you know, pertaining to the non-detention policy, you

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 84

1  know, that's fine; you can ask that to the witnesses

2  that we have for -- for number two.

3          But Mr. Guadian is not one of those witnesses.

4  BY MS. BRODEEN:

5      Q.   Can you answer the question?  I need to clear

6  it up.  He was designated for topic number two.  I'll

7  take a look at Exhibit 1.

8      DHS's non-detention policy as described in

9  Florida's amended complaint, including the reasons for

10  implementing it and its impact; that will include the

11  number of people that are in Florida.

12          MR. DARROW:  We didn't designate him for

13  No. 2.  We have Deponent Barker and --

14          MS. BRODEEN:  I have him down as -- You have

15  him down for -- for two.

16          I have him down for two.  You have Barker,

17  Davies and Guadian -- Guadian.  I'm looking at an email

18  from Erin Ryan Friday, June 24, 2022, 1:39, where she

19  designated Mr. Guadian for several topics, including

20  topic two.

21          MR. DARROW:  Okay.  We'll --

22          MS. BRODEEN:  Do you have that email?

23          MR. DARROW:  We won't waste time here.  We'll

24  sort that out on a break.

25          Mr. Guadian, you can -- You can answer if you

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 85

1   know.

2       A.   I don't know the answer to this question.

3   MPP, as I said, is a Border Patrol program, CBP

4   program.  I don't have any visibility on who they

5   paroled, why they paroled them or where they went to

6   live.

7   BY MS. BRODEEN:

8       **Q.   Are people still being paroled in through MPP**

9   **that check into Florida?**

10      A.   I don't know the answer to that question.  As

11  I said, MPP is a CBP, Border Patrol Program.  I don't

12  have any visibility on who they released, when they

13  released or why they released them and where they're

14  going.

15      **Q.   And do you have any information about the**

16  **number of people who don't check-in that were released**

17  **under Parole Plus ATD that had a final destination in**

18  **Florida?**

19      A.   I believe that that number is in the

20  production as well.  I don't have it in front of me,

21  but I believe that number is in the production.  I

22  don't recall the number.

23      **Q.   All right.  Does ICE have access to real-time**

24  **information about the number of noncitizens who were**

25  **released under Parole Plus ATD, you know, wherever they**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 86

1  are at any one time?  If somebody wants to know where

2  they are, can you get that information together?

3       MR. DARROW:  Objection as to form.  You can

4  answer if you understand.

5       A.   No, I didn't.  Can you phrase it different --

6  differently?

7  BY MS. BRODEEN:

8       Q.   Okay.  Yeah, I will.  If somebody wanted to

9  know how many people released under Parole Plus ATD are

10  in Florida, would you be able to get that information,

11  somebody from ICE could get that information?

12      A.   Yes.

13      Q.   Okay.  So how long would it take to get that

14  information?

15      A.   I've not been in the system myself, so I can't

16  speak to the time frame.  But that Unified Immigration

17  Portal that we spoke about previously is the primary

18  tool that ICE uses to determine who the Border Patrol

19  released and where they said they were going to be

20  residing.

21      As I said, UIP, the Unified Immigration Portal, is

22  a CBP system.  So I don't know how accurate or how --

23  what time frames.  That's what we utilize to determine

24  how many have been released in that particular area of

25  responsibility.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 87

 1     Q.    And if a noncitizen fails to report to ICE

 2  pursuant to a notice to appear, what does ERO do, if

 3  anything?

 4     A.    Oh, I'd ask that you just clarify the

 5  statement a little bit because they're certain aliens

 6  that aren't required to report to ICE ERO at all while

 7  they're going through their immigration proceedings.

 8     Can you give me an example of what type of --

 9  what -- if somebody that was -- Can you just tell me

10  what -- Give me an example so I can kind of think about

11  it?

12     Q.    Okay.  So what is your understanding of what a

13  notice of appear is -- notice to appear is?

14     A.    So a notice to appear is the charging document

15  that is utilized by ICE and Customs and Border

16  Protection to be filed with immigration court.  And the

17  immigration court schedules hearings based on that

18  notice to appear.

19     That notice to appear has address -- an address

20  for the respondent.

21     And our attorneys and DHS will be representing the

22  government.  And the alien will either secure counsel

23  or appear on his own.

24     But after the charging document, the NTA is filed

25  with the court.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 88

1      The role that ICE has is to track that case

2  through -- or I should say ERO has is to track that

3  case through the proceedings.

4      **Q.   If somebody is scheduled to appear and they**

5  **don't, does ICE do anything about that?**

6      A.   Can you clarify scheduled to appear where?

7      **Q.   Before an immigration judge.**

8      A.   Okay.  I would -- I would refer you to EOIR

9  and what their policies are for people that don't --

10  for respondents that don't appear in court.

11      But what I can say is that if an immigration judge

12  enters an order in absentia, meaning that the

13  respondent hasn't appeared for his hearing, and the

14  immigration judge has ordered removal, then that case

15  would be referred to ERO.  And we would -- We would

16  locate, arrest, detain and remove that individual from

17  the United States.

18      **Q.   So in the ICE tracking mechanism, do you track**

19  **the scheduling of an immigration proceeding?  Is that**

20  **part of your tracking or is that not in it?**

21      A.   No, not generally.  We do -- we do have -- We

22  get notifications of when hearings occur, our systems

23  that EOIR provides us a next hearing date for

24  individuals.  But there's no -- we're -- We're only

25  coming to -- It's really an EOIR function on how they

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 89

 1  schedule their respondents and when they come in.

 2      As I said, we just -- We enforce the decisions of

 3  an immigration judge.  If one of those failures to

 4  appear in court results in a hearing in absentia and

 5  the IJ issues that removal order, at that time ERO will

 6  identify where -- actually will locate, arrest, detain

 7  and remove an individual.

 8      **Q.  So if somebody is released under Parole Plus**

 9  **ATD and they do not check-in to an ICE office, what**

10  **happens?**

11      A.  So the -- We have a scheduler within the

12  ICE.gov public-facing website for aliens to schedule

13  themselves to report in, so they very well -- because

14  they have -- Just because someone hasn't checked in,

15  they could still be within the time frame for scheduled

16  check-in, if that makes sense.  They could still be --

17  be with -- For example, if an alien went to check into

18  the -- the immigration appointment scheduler and

19  scheduled their appointment for two months from now,

20  the period from now for two months out doesn't mean

21  that they have -- they haven't -- they haven't failed

22  to check-in; they're just waiting for their appointment

23  to check-in with ICE.

24      **Q.  All right.  So can they check-in with ICE**

25  **online?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 90

1       A.   They can.  So it's -- It's specific to

2   location.  So we -- In ICE we've recently been allowed

3   to bring our staff back at certain locations at 100

4   percent levels effective March of -- the end of March

5   of 2022.

6       So before that, there was very limited access to

7   -- to get an appointment with ICE because we -- the

8   posture that we had at our public-facing locations was

9   reduced because of the pandemic.

10       So that's part of the reason we saw some of the

11   long lines in our Orlando office and some of -- and our

12   Miramar office in Florida because we had that pent-up

13   interest in checking in with ICE.  They just couldn't

14   do it because some of these locations were closed.

15   There were at partial staffing, all because of our

16   posture as it relates to the pandemic.  As I said, we

17   just recently went -- got to our final stage.  March

18   29th we were allowed -- We allowed the field offices to

19   staff at 100 percent.

20       But it also has a caveat that we have to look at

21   our community-transmission levels to make sure that

22   we're operating in a safe space for not just our

23   employees but for our -- for our aliens that are

24   checking in as well.

25       Q.   Okay.  You mentioned March 29th you entered

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 91

1  final stage of all staffing, I believe?

2      A.   We were -- We allowed the field offices to go

3  to 100 percent staffing because of -- We were in the

4  phase three of the reconstitution plan for ICE.

5      Q.   What's "the reconstitution plan for ICE"?

6      A.   So it was -- The reconstitution plan was our

7  operating instructions while we were under the

8  pandemic.

9      And it guided our field offices at what levels and

10  what guideposts to use to determine how many people

11  needed -- how many employees would be at our -- at each

12  of our offices nationwide.

13      Q.   And who -- Whose plan was that?  Who came up

14  with that plan?

15      A.   That was ICE director.

16      Q.   And at this time are your ICE offices

17  operating with any COVID protocols such as spacing?

18      A.   It depends.  It depends on the community-

19  transmission levels near -- near that office.

20      We look at the CDC guidance for that particular

21  county.

22      And that reconstitution plans provides the field

23  office directors with some guideposts to use as to when

24  to have 50 percent staffing, when to have 75 percent

25  staffing or 100 percent staffing based on community-

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 92

1  transmission levels in and around that field office --

2  or that suboffice.

3      Q.   Okay.  And when you said CDC, what does that

4  stand for?

5      A.   Centers for Disease -- or, I'm sorry.  I'm

6  sorry.  Hold on.  It caught me off guard.  The Center

7  for Disease Control.

8      Q.   Okay.  And did CDC also have a role in coming

9  up with the plan to begin with?

10     A.   No.  No, we relied on CDC guidance, in

11 general.

12     Q.   So the guidance was what was used but not

13 talking to anybody at CDC; is that the distinction

14 you're making?

15     A.   Yeah, the ICE guidance was based on public --

16 publicly-available guidance that the CDC has provided.

17     We developed our reconstitution plan based on than

18 guidance?

19     Q.   But just to be clear, but you did not consult

20 with CDC; you just relied on the guidance that's

21 publicly available, correct?

22     A.   Correct.  Correct.

23     Q.   Do you want to take a lunch break at this

24 point?

25     A.   I'm good to go.  I'm good to go for at least

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 93

1   another 30 minutes.

2          (Exhibit No. 5 was marked.)

3   BY MS. BRODEEN:

4      **Q.   Okay.  I want to show you Exhibit 5.  It's an**

5   **email from another case, just going to ask if you've**

6   **seen it before.  Is it in the chat screen for you to**

7   **read?**

8      A.   Looking at it now.  It says Exhibit 6.

9      **Q.   Yes.  Well, that's from another case.  But**

10  **it's Exhibit 5 to this depo.**

11         MR. DARROW:  Yeah.  I'm gonna object.  This --

12  This does not pertain to any of the topics for which we

13  have Mr. Guardian.

14         MS. BRODEEN:  Well, I'm gonna ask him about

15  the memo that's referenced in here; and it has to do

16  with enforcement, which certainly is something we've

17  been talking about a good part today and is part of the

18  topics.

19         MR. DARROW:  If you're talking about

20  enforcement priorities, that doesn't relate to --

21         MS. BRODEEN:  The detention capacity.

22         MR. DARROW:  How does this document relate to

23  detention capacity?

24         MS. BRODEEN:  I have -- I haven't asked a

25  question yet.  I'm just showing him the email.  Then I

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 94

1  have some questions about it.

2          I mean, there's some acronyms in here I don't

3  understand.

4          The term book-ins is new to me.  But it looks

5  like this has to do with detention capacity, which is a

6  topic to the deposition today.

7          MR. DARROW:  This is -- This is totally

8  unrelated to this case.

9          We haven't prepared this witness to talk about

10  the cases.

11          MS. BRODEEN:  You don't have to know -- You

12  don't have to know what all of my exhibits are in

13  advance.

14          I just want to show him something and ask him

15  what these acronyms are and about this 50 percent

16  reduction.

17          It's part I think he's got -- If I ask him a

18  question about what's it about, I think it's going to

19  become clear.  It's about detention capacity, and the

20  detention capacity is a depo topic today with this

21  witness.  I can show him things he's never seen before.

22          MR. DARROW:  Start with your questions, and I

23  guess we'll see where they go.

24          MS. BRODEEN:  All right.

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 95

1      Q.    Okay.  Have you seen this email before?

2      A.    Oh, okay; we're scrolling down through it.

3      Q.    Just like a paragraph and then a sentence;

4  regards, Henry.

5      A.    Historical data based on DHS memos, yeah --

6  no, I don't think -- I don't think I've seen this

7  email.

8      Q.    Okay.  But do you know who Enrique Lucero is?

9      A.    I do.

10      Q.    Okay.  And what is his title at the end of

11  this email that you're looking at as Exhibit 5?

12      A.    Acting executive associate director.

13      Q.    And of ERO at ICE, correct?

14      A.    Correct.

15      Q.    Okay.  Is he still working at ICE?

16      A.    He is.

17      Q.    In what capacity?

18      A.    I believe he's a deputy assistant director

19  with HSI.

20      Q.    And what is HSI?

21      A.    Homeland Security Investigations.

22      Q.    Okay.  So I just want to turn your attention

23  to the first sentence in this email.  It says, to all,

24  ERO ran historical data based on the new DHS memo

25  priorities for enforcement.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1       So this is dated January 27, 2021.  Do you know

2   what he's referring to when he says "new DHS memo

3   priorities for enforcement"?

4            MR. DARROW:  I'm gonna object again.

5            None of these questions relate to detention

6   capacity.

7            MS. BRODEEN:  We haven't got to the last

8   sentence of the paragraph yet.  We will.

9            And it also is relevant to topic two, not

10  detention policies other than Parole Plus ATD.

11           MR. DARROW:  This -- None of the -- The

12  enforcement memo was not related to detention policies

13  and we didn't -- This wasn't produced to us in

14  discovery.  We've never even seen this document.

15           MS. BRODEEN:  Well, you're seeing it.  You

16  didn't ask for it.  This is -- This is an email from

17  ICE.  I guess I didn't give it to you, but we got it.

18  BY MS. BRODEEN:

19       Q.  So anyways, you don't know what -- what is

20  referenced here when it refers to "new DHS memo

21  priorities for enforcement," correct?

22           MR. DARROW:  I'm going to say for the record

23  that this is totally not the topics that this

24  witness -- we're prepared for.

25           So if he answers, it's purely in his personal

Exhibit D

Page 97

1  capacity based on what he can see in that email.

2  BY MS. BRODEEN:

3  **Q.   Okay.  Go ahead and answer the question.**

4       A.   ERO ran historical data based on the new DHS

5  memo priorities for enforcement to inform decision

6  makers on potential impacts of the interim guidance.

7       I don't know what specifically he's referencing

8  to.  I have to -- I don't know if the DHS memo -- I

9  don't know when it was -- which one what he was

10 referring to because I know it did -- Is he talking

11 about Tae Johnson's memo or a departmental memo?  I'm

12 not -- It's not clear to me.

13 **Q.   When you say Tae Johnson's memo, what are you**

14 **referring to there?**

15      A.   Just the series of memos from -- not a series,

16 but, you know, whenever we have new policy or

17 direction, typically Tae Johnson will put out a memo.

18 **Q.   And then the next sentence, it says the data**

19 **also compares what PEP would have looked like for**

20 **reference; what is PEP?**

21      A.   Priority Enforcement Program.

22 **Q.   Okay.  What is that?**

23      A.   It's a program that existed under President

24 Obama.

25 **Q.   And what did it do?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 98

1    A.   It outlined priorities for immigration

2  enforcement.

3    **Q.   And how did those priorities change from Obama**

4  **to the current administration?**

5    A.   I don't know that.  I haven't seen that memo

6  in a long time.  I don't know.

7    **Q.   That's fair.  Okay.  Next sentence, LESA,**

8  **acronym -- L-E-S-A -- should be able to filter data as**

9  **needed to show weekly or monthly impacts.**

10    **What does LESA stand for?**

11    A.   Law Enforcement and Systems Analysis.

12    **Q.   What is that?**

13    A.   AR -- ICE's division that creates -- They're

14  our statisticians.

15    **Q.   And do you know what unit they're attached to**

16  **under ICE?**

17    A.   They're attached to ERO.

18    **Q.   Next sentence, rough estimate is book-ins**

19  **would be reduced by 50 percent of historical numbers**

20  **and the vast majority of book-ins would come from CBP**

21  **transfers.  What is a book-in?  The next sentence**

22  **defines it, but I want to --**

23    A.   A book-in is we're referencing our ICE

24  Enterprise systems, and it refers to when someone is

25  booked-in to one of our ICE detention beds.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 99

1      Q.    What is ICE Enterprise Systems?

2      A.    Our databases and our systems that we use when

3 we process aliens for removal.

4      Q.    And this sentence is estimating that the vast

5 majority of book-ins would come from CBP transfers;

6 does that sound accurate to you?

7      A.    I don't know.  I don't know the analysis that

8 was done in this.

9      Q.    Okay.  And then it says a book-in is defined

10 as an individual entering ICE custody from a single

11 event, parenthesis, arrest by CBP or ICE, closed

12 parenthesis; that's your understanding of what a book-

13 in is?

14     A.    Entering ICE custody from a single event, I

15 don't -- I think he's -- I don't know to be -- I don't

16 want to speculate.  I don't know the answer to that

17 question.

18     Q.    Okay.  To your knowledge, has -- Have you ever

19 seen a target number for reducing book-ins?

20     A.    No.

21     Q.    We talked earlier about prosecutorial

22 discretion.  Who uses prosecutorial discretion when it

23 comes to noncitizens, in what context?

24     A.    Well, from an ICE perspective, I can only talk

25 about ICE operations.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 100

1      Q.    Okay.

2      A.    But with -- Within immigration enforcement, as

3 federal law enforcement officers, we're expected to

4 exercise prosecutorial discretion throughout our

5 activities -- enforcement activities.

6      It's something that's inherent to law enforcement,

7 not specifically just to federal law enforcement in

8 ICE; but anyone that enforces laws has to consider

9 prosecutorial discretion in the course of their regular

10 duties.

11      **Q.    And does prosecutorial discretion sometimes**

12 **lead to release into the interior of a noncitizen?**

13      A.    So ICE is -- From an ICE perspective, if we've

14 exercise discretion, it could mean a multitude of

15 things.

16      Sometimes exercising discretion is choosing not to

17 take any enforcement action.

18      Sometimes prosecutorial discretion could include

19 issuing paroles.

20      Sometimes it can include reducing bond amounts.

21 It could include just a very high number of things, so

22 not necessarily just releases into the interior; but

23 that is definitely one of the categories.

24      **Q.    Okay.  You mentioned bond amounts; when is a**

25 **bond issued?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 101

1    A.    So there's a few instances where bonds are

2  issued.  So when it -- When ICE issues an NTA on

3  someone and we'll look at the case, we'll take a

4  thorough review of the case and any -- any factors

5  associated with that case, and we look at whether the

6  person is a mandatory detention case.

7    In certain cases, aliens are ineligible for bond.

8    For example, cases that are -- reinstates under

9  section 241, they've been ordered removed by an

10  immigration officer, those individuals are not eligible

11  for a bond.

12    Certain aggregated felonies under 236C are not

13  eligible for a bond.

14    Sometimes ICE will issue a bond.  The minimum bond

15  amount is $1500.  And there's no maximum.

16    And sometimes immigration judge will issue an

17  immigration bond as well.

18    **Q.    Okay.**

19    A.    The bond is conditioned on the delivery of the

20  alien for either interview, removal or their court

21  hearing.

22    Those are the -- That's the purpose of the bond is

23  to ensure that that alien either, when asked, reports

24  to either an immigration officer when asked, to a

25  courtroom when required, or for removal as required.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 102

1      Q.   Okay.  In your experience are bonds when
2  they're eligible -- they're eligible to be used, are
3  they used or more frequently not used when they're
4  possibly an option?

5           MR. DARROW:  Objection as to form.  You can
6  answer if you understand.

7      A.   I didn't understand.  I'm sorry.  Can you
8  repeat?

9  BY MS. BRODEEN:

10     Q.   Okay.  So -- Okay.  So where it's possible for
11 bond to be issued, how often is a bond required?

12     A.   How often is a bond required?  So the law's
13 pretty clear on when bonds are not required -- I'm
14 sorry, when bonds are -- they're in -- when aliens are
15 ineligible for bond.  And it really would depend.

16     Case specific is when aliens would be eligible for
17 bond.  I mean, that's -- That's a decision that the
18 supervisor makes at the arrest site.

19     Q.   Okay.  And that's an ICE supervisor?

20     A.   Correct.

21     Q.   Who's authorized to grant asylums to aliens?

22          MR. DARROW:  Objection.  Asylum is not any of
23 the topics that we have Mr. Guadian designated for.

24 BY MS. BRODEEN:

25     Q.   Well, go ahead and answer it if you can.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 103

1          MR. DARROW:  Definitely -- No, this is totally

2  beyond the scope of what we have prepared this witness

3  for.

4          If you want to ask it, if he knows it as a

5  NOB, he can answer it.

6          MS. BRODEEN:  If he doesn't know the answer,

7  I'll ask him in his individual.  He might know.

8          MR. DARROW:  No.  But the question's not does

9  he know the answer.  The question is, is this the topic

10  to which he's designated as a 30(b)(6) witness.

11          You can ask him in his personal capacity if he

12  knows about this as an individual, that's fine.

13          MS. BRODEEN:  I mean, it might be --

14          MR. DARROW:  This is not one of his topics.

15  BY MS. BRODEEN:

16     **Q.    Do you know who's authorized to grant asylums**

17  **to aliens?**

18          MR. DARROW:  Do not answer the question.

19          MS. BRODEEN:  Are you telling him not to

20  answer the question?

21          MR. DARROW:  Yes, I'm instructing him not to

22  answer the question.  It's privileged.

23          MS. BRODEEN:  What's the privilege or --

24  privilege or confidential statute?

25          MR. DARROW:  It's wildly irrelevant to the

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 104

1  topics he's designated and prepared.

2       MS. BRODEEN:  I don't think it is.  Well, I'll

3  ask him in his individual.  But I don't think you can

4  tell him not to answer if there's no privilege.

5       MR. DARROW:  That's fine.  You can ask him in

6  his individual capacity.

7       MS. BRODEEN:  Okay.

8    A.   Can you repeat the question?

9       MR. DARROW:  Don't answer.

10      MS. BRODEEN:  I'm gonna do it later on.

11   A.   I'm sorry.  I'm sorry.

12  BY MS. BRODEEN:

13   **Q.   Your attorney instructed you not to answer.**

14  **I'll move all those questions to your individual**

15  **deposition.**

16   A.   Thank you.

17   **Q.   Now, these temporary ICE assignments to the**

18  **southwest border, what type of training are they given**

19  **before they're allocated to the southwest border to**

20  **assist them with the ATD program; what training do they**

21  **get?**

22   A.   The general sense, the officers -- Many of the

23  officers that work the southwest border are already

24  familiar with the ATD program, so training is pretty

25  minimal.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      But for those officers that haven't had exposure

2  to the Alternatives to Detention Program, there are

3  supervisors on-site to -- to conduct on-the-job

4  training for those individuals.

5      **Q.   Okay.  So do the ICE officers assign the**

6  **southwest border stay in a building or do they ever go**

7  **on the field with a CBP officer?**

8      A.   No, they -- They don't patrol the border with

9  Customs and Border Protection.  Their responsibility is

10 primarily to assist with AD -- ATD portion of their

11 releases.  And that typically takes place at a Border

12 Patrol Station or a soft-sided structure along the

13 southwest Florida.

14     **Q.   I'm getting ready to go into another topic.**

15     **Do you want to take another break or a lunch**

16 **break?**

17     A.   I think we break for lunch in 15 minutes, if

18 that's good.

19     **Q.   Okay.  Let's get back to -- Okay.  Topic**

20 **eight, information and data relating -- regarding the**

21 **number of aliens in Florida DHS knows to have committed**

22 **crimes.  You've been designated for that.**

23          MS. BRODEEN:  Is that correct, Mr. Darrow?  Is

24 he -- is he --

25          MR. DARROW:  Yes.  Sorry.  Didn't realize you

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 106

1  were asking me.  Yes.

2          MS. BRODEEN:  Yes.  I wanted to make sure.

3  BY MS. BRODEEN:

4      Q.  Okay.  Does DHS in any way track aliens who

5  committed crimes in the United States?

6      A.  Can you clarify "track"?

7      Q.  Okay.  Does -- Does DHS have any database that

8  shows that an alien committed a crime to the United

9  States?

10     A.  We have the capability to run criminal history

11 checks on aliens that are on -- are on our nondetained

12 docket as well as those on detained docket and recent

13 arrests as well.

14     Q.  So how do you get that criminal history on

15 them?

16     A.  So the criminal history, we run their criminal

17 history by using name and date of birth or an FBI

18 number or by metrics (biometrics).

19     So there's a host of ways that we can obtain that

20 criminal history.

21     Q.  Okay.  And when do you obtain that criminal

22 history from an alien?

23     A.  So typically criminal history is run at

24 arrest, at the point of arrest; and it's also

25 periodically done throughout the life cycle of the

Exhibit D

Page 107

1   immigration case as well.

2   Q.   And what is the life cycle of an immigration

3   case from start to finish?

4   A.   Sure.  So it starts with an issuance of notice

5   to appear after having been arrested by ICE for our

6   sister agencies.  Then the NTA is filed with the court.

7        There's a couple of tracks it can take.  Aliens

8   can be placed in a detention center or released into

9   the community to await their immigration hearing.

10       Then the immigration judge will issue a decision

11  in that immigration case.  Then the order comes over to

12  ICE, and we'll execute the order of the immigration

13  judge, whether that's removal or whether that's a grant

14  of relief.  If there's a grant of relief in that case,

15  we'll forward the A file, the record of proceedings,

16  over to our sister agency NCIS, who are -- have the

17  responsibility of bringing benefits.

18       So we ensure that the immigration judge's

19  decisions are completed.

20       And once the ultimate -- either the grants of

21  relief or the removal is effected, that completes the

22  life cycle of an immigration case.

23  Q.   All right.  And does the criminal history that

24  you have access to include charges or just convictions?

25  A.   It will have the charges, and it will have the

Exhibit D

Page 108

1   disposition as well if it's available.

2       Q.   Okay.  And do you get information from other

3   countries about the criminal history of these people?

4       A.   Not normally.  There are -- when there's -- We

5   do have overseas locations.  ICE officers, we're at 25

6   different locations worldwide.

7       And there are times when we do receive warrants

8   for extra -- for -- I'm looking for the word -- for --

9   that the country wants that person back to stand

10  charges for their crime.  Typically they're some type

11  of crime against person, murder, something like that,

12  is typically when they'll send us that warrant on those

13  occasions.

14      There may be other occasions when we receive

15  information from -- from countries abroad via their

16  councilor officials here in the United states that let

17  us know that there's a -- some type of foreign -- a

18  foreign want, a warrant for that person, will

19  coordinate removal of that -- of that person; so he

20  can -- they can stand trial in that country.

21      Q.   Great.  So do you routinely consult with

22  embassies of other countries when you're encountering

23  somebody?

24      A.   So, yes, we do have a responsibility to notify

25  certain countries that we've taken one of their

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  nationals or citizens into our custody.

2      Not every country is part of that agreement.  But

3  for the countries that are part of that agreement, we

4  do notify the local consulates for the embassy that

5  they are in our country -- in our custody.

6      **Q.   How do you know whether somebody committed a**

7  **crime in another country?**

8      A.   So we -- Our databases don't -- We run the --

9  the NCIC databases, which is just for the United

10  States.

11      We don't have any system that tracks foreign-born

12  convictions or indictments or any kind of wants, as I

13  said.

14      Typically that will come from the country that

15  wants that person.  And it will be delivered to us by

16  their councilor official or it will be delivered to an

17  attache officer, an ICE officer abroad; and they'll get

18  us that information.  But typically we don't have a

19  system that we can look for criminal histories and

20  charges similar to NCIC.

21      **Q.   So if somebody's from Guatemala, let's say for**

22  **example, and they've been convicted of murder in**

23  **Guatemala, you would not know he was convicted in**

24  **Guatemala unless Guatemala sent us something; is that**

25  **correct?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 110

1          MR. DARROW:  Objection; calls for speculation.

2     You can answer.

3          A.   So, in my experience, the -- if that -- If

4     that occurred, it's really dependent on Guatemala

5     getting our ICE an attache at the embassy.

6          That information -- or for the councilor officials

7     to get us that information due to their regular lines

8     of communication with us.

9     BY MS. BRODEEN:

10         **Q.   Well, how would that initiate?  Would they**

11    **know that this person is in the United States now?**

12         A.   Yes, we have responsibilities to certain

13    countries to let them know that we have their nationals

14    in our custody.

15         **Q.   Are there some countries that are more**

16    **cooperative than others that you've dealt with?**

17         A.   As I mentioned, not every country is part of

18    that agreement.  I don't want to speculate on a

19    percentage.

20         But it's more than 50 percent of countries require

21    notification.  It's a reciprocal type of agreement

22    where if there's a U.S. citizen that's detained in that

23    country, we also -- not ICE -- but the U.S. Government

24    will receive notification that you've been taken into

25    custody abroad.  It's typically how that agreement

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  works.

2      Not every country is part of that agreement.  But

3  I would defer to the Department of State as to

4  specifically what type of -- why certain countries are

5  participating.  I don't know the answer to that.

6      **Q.   Okay.  In your experience, about how many**

7  **countries of origin are there for aliens entering**

8  **across the southwest border?**

9      **Do they just come from Mexico and Central America**

10  **or about how many countries?**

11      A.   No, I don't know the answer to that question.

12      What I can say is, over at least -- over 100

13  countries -- We deported people to over 100 countries

14  last year.

15      **Q.   And this agreement you referenced about**

16  **letting people know that their -- one of their**

17  **nationals is in our country, are there any countries in**

18  **South or Central America that are not part of that**

19  **agreement?**

20          MR. DARROW:  Objection.  That's privileged

21  information.  Do not answer.

22          MS. BRODEEN:  Don't answer it.  It's

23  privileged, I guess.

24          MR. DARROW:  Yes, law enforcement and

25  diplomatic.

Exhibit D

Page 112

1            MS. BRODEEN:  So -- So we're not allowed to

2    know which countries our federal government has an

3    agreement with; did I get that correct?  Whatever.

4    Okay.

5            MR. DARROW:  Yes.

6    BY MS. BRODEEN:

7        **Q.   Okay.  All right.  So based on what ICE**

8    **databanks have about people who have committed crimes,**

9    **how many of those people are in Florida who have been**

10   **charged with committing a crime?**

11       A.   I have that number in part -- as part of the

12   production.  I don't have it here in front of me.

13       **Q.   Okay.**

14           MR. DARROW:  Here you go.

15           MS. BRODEEN:  Do you want to provide him that

16   number?  Okay.  What did you just get?

17           MR. DARROW:  Yeah, it's a copy of the ICE data

18   that we provided to you.

19           Do you have it handy, we can email it?  It's

20   the Excel spreadsheet.

21           MS. BRODEEN:  Is that part of the email

22   spreadsheet?

23           MR. DARROW:  Yes.

24       A.   I'm sorry, could you repeat which -- which

25   stack it was?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 113

1  BY MS. BRODEEN:

2      **Q.   Okay.  So how many aliens currently are in**

3  **Florida who have been charged with committing a**

4  **crime -- charged with?**

5      A.   So I know in here it doesn't have the columns,

6  but the last column, released after being -- And you're

7  talking for aliens that are in the community, not in

8  detention centers?

9      **Q.   Well, in Florida in the community.**

10     A.   Okay.  I don't have the -- I don't think it

11  was one of the questions in here, so there's not a

12  production on that number.

13     But I do have where the State of Florida for the

14  number of people that are at large or in the community

15  with pending criminal charges.

16     **Q.   Okay.  What number is that?**

17     A.   It is -- Forgive me if I get this wrong.  I'm

18  getting a little I can't read these.

19     So it looks like if you go to the second to the

20  last column, and it's the one, two, three, four, five

21  -- six -- it's row five and six, as well as the last

22  column, row five and six; so all those numbers added

23  together would be the pending criminal charges.

24     I don't have a calculator in front of me.

25     **Q.   I tell you what, it's been 15 minutes.  Is it**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 114

1   a good time to break for lunch?  Then we'll get back

2   into this?

3        A.   It's good with me.

4        Q.   Okay.  How long did you need for lunch,

5   Mr. Guadian?

6        A.   If we can do an hour, that would be great.

7             MS. BRODEEN:  What time would that be, 1:55?

8        A.   Yes.

9             MS. BRODEEN:  Okay.

10            THE VIDEOGRAPHER:  The time is 12:55, and we

11   are off the record.

12            (Recess had 12:55 p.m. - 2:04 p.m. EST.)

13            THE VIDEOGRAPHER:  The time is 2:04, and we

14   are back on the record.

15   BY MS. BRODEEN:

16        Q.   Okay.  All right.  I'd like to start to go

17   back to Exhibit 3, which is the Raul Ortiz November

18   2021 memo.  I think it's up on the screen, Exhibit 3.

19            MR. DARROW:  Karen, before we get to the

20   questioning, I just want to state on the record that

21   the defendant strongly objected to Exhibit 4, which we

22   looked up and is a document provided in discovery in a

23   different case in which Florida is a litigant over a

24   different program that we have not seen.

25            It's improper to use one case to obtain

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 115

1  discovery for another case.

2          MS. BRODEEN:  It was filed.  Look at the top

3  of the page.

4          MR. DARROW:  In a totally different case

5  regarding a different program in a different

6  jurisdiction.

7          MS. BRODEEN:  Okay.  So what exactly is the

8  legal basis for your objection?

9          MR. DARROW:  The legal basis is using one case

10  to obtain discovery for a different case.

11          MS. BRODEEN:  Okay.  What's the rule on that?

12  Is there a case on point?

13          MR. DARROW:  It's --

14          MS. BRODEEN:  I don't think so.

15          MR. DARROW:  Why would it be relevant to the

16  --

17          MS. BRODEEN:  I think you're making this up.

18  You're making it up, Joe.  Let's move on.

19          You already made your objections at the time.

20  It's too late to make another objection.

21  BY MS. BRODEEN:

22      Q.   Okay.  So let's go onto Exhibit 3.

23          MR. DARROW:  Sorry, just for clarification,

24  we're back in 30(b)(6) mode, right?

25          MS. BRODEEN:  Yes, for a while.

Exhibit D

Page 116

1          MR. DARROW:  Okay.

2          MS. BRODEEN:  Yeah, we're not done.

3   BY MS. BRODEEN:

4      Q.   Okay.  Exhibit 3.  Okay.  So now in this memo,

5   there's an outline of the Parole Plus ATD policy that

6   CBP can use for processing aliens, correct?  I'm

7   summarizing.

8      A.   Could you say that again?

9      Q.   Okay.  So in this memo, there's an outline of

10  the Parole Plus ATD policy that CBP can use to process

11  aliens, correct?

12     A.   That's -- that's what -- That's the way it

13  appears to me, yes.

14     Q.   Okay.  And you previously testified that ICE

15  is responsible -- responsible for administering the ATD

16  portion of the process that's discussed in this memo,

17  right?

18     A.   Correct.

19     Q.   Okay.  And what is your understanding of when

20  ATD was first used as outlined in this memo?

21     A.   I would say the date of this memo.  I don't

22  know for sure.  But my -- My thought is that the date

23  of this memo was issued, November 2nd of 2021.

24     Q.   Okay.  Is it possible that maybe it was

25  utilized earlier than that?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 117

 1      A.   No, it may be possible.  I just don't have any
 2   information on that.
 3      Q.   Okay.  All right.  So let's get back to topic
 4   eight, information and data regarding the number of
 5   aliens in Florida DHS knows to have committed crimes.
 6      And this also dovetails into the topic about
 7   documents produced during discovery from defendant to
 8   State of Florida since I think you already testified
 9   that we have to look at those documents that were
10   provided in discovery, correct, about the numbers of
11   people committing crimes in Florida?
12      A.   Yes.  Yes.  The numbers were provided in the
13   production.
14      Q.   Okay.  So let's -- Let's call up Exhibit 9.  I
15   know you don't have these things memorized.
16      And we're gonna put it on the big screen since
17   some of this writing is very small.
18      Okay.  Can you -- It says disk error on my end.
19   Can you -- Can you get into there?
20           MR. DARROW:  Is it in the chat?  We don't see
21   it popping up yet.
22   BY MS. BRODEEN:
23      Q.   Okay.  It says disk I/O error.  I don't know
24   what that means.
25           Okay.  So -- All right.  It's on the big

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 118

```
 1   screen.  Can you see it?  All right.  Now, it should be
 2   chat screened.
 3            MR. DARROW:  We just saw a pop up come on.
 4   Let me see if we can open it.
 5   BY MS. BRODEEN:
 6       Q.   Okay.  Now, we're gonna share a screen.  There
 7   we go.
 8       Okay.  Now, if you can look at this -- And I think
 9   you need to scroll down too.
10       Okay.  Let's start at this part of Exhibit 9.
11            (Exhibit No. 9 was marked.)
12   BY MS. BRODEEN:
13       Q.   And this has rows and columns with headings,
14   and then it has some information filled in.  Most of it
15   is N, slash, A; and then there's some numbers in some
16   of these.
17       Do you see that right now, Mr. Guadian?
18       A.   Yes, I do see it.
19       Q.   Okay.  And have you seen this document before,
20   this page?
21       A.   Yes, I have.
22       Q.   Did you help prepare this document?
23       A.   No.
24       Q.   Okay.  Let's look at the first row going
25   across.  There is an acronym, this sentence, NTA.  It
```

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 119

1  says released after being encountered at or near

2  southwest Florida on January 2020 to January 19, 2021.

3  NTA, slash, own recognizance.

4       What does NTA stand for?

5       A.   Notice to appear.

6       Q.   Okay.  And own recognizance, what is that?

7       A.   That refers to release on their own

8  recognizance.  It's from I-220 alpha.

9       Q.   And who releases these people on their own

10 recognizance; is that done by ICE?

11      A.   If we go to the next tab, STU, STU provided,

12 it kind of gives the background who -- 1359, was

13 that -- I'm sorry.  Was that the number on the first

14 one?  Yeah, 1359.

15      Q.   1359; okay.

16      A.   And this -- this -- This number is

17 representative of not just ICE releases.  This -- This

18 could also have been Border Patrol releases as well,

19 ICE -- that are currently on ICE -- ICE nondetained

20 docket.

21      And if we look at the footnote, the very last

22 footnote, I think line 24, ERO cannot identify if the

23 release is directly following an encounter at or near

24 the southwest border.

25      Our statisticians could not isolate that

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 120

1   population, so they included the entire universe of

2   arrests to include arrests that occurred that ICE may

3   have made as well just to give you a little background

4   in regards to that number.

5        Q.   Okay.  Thank you.  Let's go back to the --

6   Okay.  Okay.  Then we go down the column, there's

7   several different categories.

8        Do any of these have any additional qualifications

9   to them?

10       A.   Yes.  So I'll start with the row with the --

11  I'm sorry, the column B.

12       Can you go back to the STU provided again?  And I

13  want to amend what that order of release on

14  recognizance.  I want to qualify that with this

15  particular footnote on line 18, an ICE -- Let me see,

16  where is it?  An ICE -- An ICE final release is defined

17  as a final book-out that reflects one of the following

18  release reasons, although it says OREC, which is order

19  of release on recognizance, it's actually a large -- It

20  includes a larger number of people than just people

21  released on recognizance.

22       It also includes people that bonded out of

23  custody.  It includes people that released on an order

24  of supervision, which is an I 220B, as in bravo.

25       It also includes people that were paroled and

Exhibit D

Page 121

1  those released on prosecutorial discretion.

2      So it's just to clarify that the OREC is actually

3  a larger group than just OREC releases.

4      **Q.   Thank you.  What is an order of supervision?**

5      A.   Order of supervision is different.  It's

6  similar to an order of recognizance in that it has

7  conditions that an alien must abide by while they're

8  released into the community.

9      But the difference within an OREC to an OSUP is

10  that only aliens that have final orders of removal are

11  issued orders of supervision.  I-220 bravo, whereas

12  I-220 alphas are given to aliens that are currently

13  pending removal proceedings before an immigration

14  Judge.

15     **Q.   All right.  Let's go back to the -- I don't**

16  **know what you call it -- rows and columns.  Okay.  Any**

17  **other qualifications you want to make about what's on**

18  **the rows and columns?**

19     A.   Yes.  Let me take a look -- another look at

20  that.  ERO docket with criminal history and the

21  criminal charges could represent misdemeanors to

22  include traffic offenses all the way up to felonies; so

23  it's not just one type of criminal history, just if

24  we're representing everything that we had encountered

25  in the NCIC databases, which is the national system

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 122

1    that we search for criminal histories to include also

2    the state identification bureau's criminal histories.

3        Typically those are like traffic offenses and

4    things of that nature.

5        ERO Miami check-in I would add as a qualifier that

6    although this check-in number -- this check-in, the

7    definition of check-in does not include people that

8    arrived at ERO offices and were given a sheet of how to

9    enroll into the ICE appointment scheduler.

10       So it -- It may look like they didn't check-in

11   officially.  But they -- we have officers working these

12   lines that are giving information to the aliens as they

13   wait to actually go back home and to check-in on the --

14   on the I scheduler.  That -- Those numbers are not

15   captured here.

16       Although we do have people that try to show up,

17   it's not captured as a check-in.

18       Q .  All right.  Let's go back to STU provided.

19       Okay.  So -- Okay.  So what are the number of

20   paroled -- Okay.  Under which statute are people

21   paroled?  Is it under section 1182 or 1226?

22       A.   Can you give me the corresponding INA?  I'm

23   not familiar.

24       Q.   Okay.  So 8 U.S.C. 1182 or 8 U.S.C. 1226, that

25   would be INA 212?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 123

1      A.    212B5 is the authoritative parole.

2      Q.    Okay.  Thank you.  All right.  Let's go back

3  to that rows and columns.

4      Okay.  Now, I'm looking at row 11.  It says

5  individuals who failed to check-in who provided a

6  Florida address, and then all across it's N/A.

7      I thought that ICE had that information.  Why am I

8  incorrect?

9      A.    The last two boxes were the ones that applied

10  to this particular releases after being encountered at

11  or near southwest border January 2021 to November 1st

12  on a notice to report.

13      We have that number.  It should have been provided

14  in production, I believe.  I don't have it in front of

15  me.

16      The reason the others are N/As, if we look at like

17  column -- at column E, released after encountered at or

18  near southwest border, January 20th, 2021, to present,

19  on the NTA own recognizance, go back to the first

20  column.

21      Q.    Okay.  So where it's blank for F and G, are

22  there numbers?

23      A.    There are.  I don't think it was in this

24  particular -- We do have those numbers though.

25      Q.    Can we get those numbers, and then also below

Exhibit D

Page 124

1  it too?

2     A.   So you all have the numbers for the one below.

3  We weren't able to capture the numbers or our

4  statisticians because these numbers have -- were

5  drawing a lot -- a lot on the Customs and Border

6  Protection databases, so it's really difficult to

7  reconcile that.

8     So we do have the numbers for row 11, column F

9  and G.

10     Q.   Okay.

11     A.   We can produce those.

12     Q.   I would like that.  When do you think we could

13  get them?

14     A.   Confer with my attorneys for a second.

15     Q.   I got them here.  Okay.  Okay.  Are you

16  conferring with Mr. Darrow about when he can produce?

17          MR. DARROW:  Yes, I'm sorry.  I was just

18  trying to figure out when we can produce them to you.

19  One second.

20          MS. BRODEEN:  Anything else on this?  I got

21  your questions.

22  BY MS. BRODEEN:

23     Q.   Okay.  So I have general questions about these

24  sheets.  How does a person get referred to the

25  nondetained docket?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 125

1    A.    So the deportation officers are responsible

2  for tracking AL institute black cycle in their

3  immigration proceedings, and that can be in one of two

4  ways.

5    One is through the detained -- through detained

6  docket management, which is -- Essentially when we have

7  aliens into custody in -- in one of our detention

8  centers, we'll track those cases on a detained docket.

9    It's also different when it's on a different track

10 as well with EOIR.  It's on a detained track.

11   And we also supervise aliens in a nondetained

12 setting, those aliens that are not in custody at one of

13 our detention centers.  They're tracked separately from

14 the detained docket, and they're also tracked

15 separately and differently by EOIR.

16   **Q.    And when you say EYOR (sic), what is that?**

17   A.    Executive Office for Immigration Review.

18   There's -- that's what the -- That's where the

19 immigration judges -- That's the agency that

20 immigration judges work for.

21   **Q.    And who employs those people; which agency?**

22   A.    Department of Justice.

23   **Q.    So for these people who get referred to the**

24 **nondetained docket, can some of those have been**

25 **detained at one point and then released?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 126

1     A.   It's possible, yes.

2     Q.   **Okay.  And if they were released, under what**

3     **specific statutory authority would they have been**

4     **released?**

5          MR. DARROW:  Objection; calls for legal

6     conclusion.

7          MS. BRODEEN:  Well, he applies statutes all

8     the time.  This is part of his job.

9          MR. DARROW:  He applies the programs.  Whether

10    or not those programs fall under particular statute,

11    that's a legal conclusion.

12         MS. BRODEEN:  Well, go ahead and answer it if

13    you can.

14         MR. DARROW:  If you know the answer, you can

15    answer.

16    A.   I'm not gonna guess at the different statutes,

17    but there's -- There's quite a few different statutes

18    that allow us to release aliens from ICE detention.

19         MS. BRODEEN:  And in the future, Mr. Darrow,

20    could you just object to form instead of coaching him

21    with speaking objections?

22         MR. DARROW:  Sure.  I just thought you'd want

23    the basis for my objection.

24         MS. BRODEEN:  Well, if I need it, I will ask

25    you for it; but don't coach him, please.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 127

1  BY MS. BRODEEN:

2      Q.   Okay.  When these people are in the -- Do

3  these people get referred to a specific docket in Miami

4  as opposed to another location?

5      A.   From an ICE perspective, once that alien is

6  placed on a nondetained track, their NTA is filed with

7  the Executive Office for Immigration Review and EO -- I

8  don't want to speak to ERs -- EYO -- EOIR's processes,

9  but generally, they'll be placed on a nondetained

10  track; and typically those cases are set with different

11  time frames than the detained docket is.

12      Q.   But if they're in a docket in Miami, is that

13  because they provided a destination in Florida?

14      A.   Yes.  So if they're docketed in Miami, their

15  resident -- Their area of response -- if EOIR -- The

16  location of their residence dictates where the NTA will

17  be filed.

18      Q.   And what is meant by the statement ERO cannot

19  identify if the release is directly following an

20  encounter at or near the southwest border?

21      A.   So our databases, our statisticians, as I

22  stated previously, we have to rely on Customs and

23  Border Protection data, our systems aren't capable of

24  identifying the subset of people that cross through the

25  southwest border because we have two different systems

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  that we're looking at.

2      We only see part of the story.

3      Q.   So -- So can they only identify that they're

4  in the country illegally as opposed to when they

5  entered?

6      A.   I'm sorry, I didn't understand the question.

7  Can --

8      Q.   Okay.  So -- So the customs -- I mean, the

9  customs' database, does it identify that -- only that

10  they're in the country illegally; they don't tell you

11  where they crossed into?

12     A.   I'm sorry, I don't know that answer.

13     I don't know what their databases do show and

14  don't show.

15     Q.   Okay.  Who would know that at ICE?

16     A.   At ICE we wouldn't know about CBP databases.

17  That would be a CBP question.

18     Q.   Okay.  What does "directly released" mean?

19     A.   I'm sorry, what -- What line are you looking

20  at, so I can follow along?

21     Q.   Let's find that.  Line 24.  ERO cannot

22  identify if the release is directly following an

23  encounter at or near southwest border; what does

24  directly mean?

25     A.   Yes, that's -- That's what I'm mentioning is

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 129

1   that we can't identify the subset of individuals that

2   crossed specifically through the southwest border in

3   this particular data set.

4        Q.   Okay.  And then as to the terms convicted

5   criminal pending, criminal charges and immigration

6   violator, there's the term at the time of enforcement

7   action; what does that enforcement action refer to

8   there?

9        A.   Typically that enforcement action will be the

10  issuance of a charging document, whether that's a

11  notice to appear, an expedited removal, a

12  reinstatement, some type of enforcement action that

13  the -- that the Department has taken.

14       Q.   And what does OREC, O-R-E-C, stand for?

15       A.   Order of release on their own recognizance.

16       Q.   And what is an ICE final release?

17       A.   What line is that?

18       Q.   19 -- or 18, 19.  And ICE -- It's defined in

19  several of these things.  Never mind.  You answered

20  that.  Knock that off my question.

21       Let's go back to the chart.  When it talks about

22  people with criminal history, is that a criminal

23  history only in this country or can it include other

24  countries?

25       A.   So typically it would only include criminal

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  history from this country, so crimes that we've

2  identified in -- in NCIC or the State Identification

3  Bureau.

4      Q.   Okay.  Pending criminal charges, row -- those

5  are -- Are those U.S. charges pending or abroad?

6      A.   Correct -- Oh, no, I'm sorry.

7      Q.   Pending --

8      A.   U.S. charges, not abroad.

9      Q.   Okay.  And are they for any particular -- Are

10 they for charges for crimes that occurred before or

11 after they were released into the interior?

12     A.   I can't tell that from the data.

13     Q.   Okay.  Let's look at 22, ICE defines

14 immigration violators criminality in the following

15 manner; what is other immigration violators referring

16 to?

17     A.   Oh, the last, on line 22, other immigration

18 violators refers to immigration violators without any

19 known criminal convictions or pending charges entered

20 into the ICE system of record at the time of the

21 enforcement action so --

22     Q.   Go ahead.

23     A.   So immigration violators could also include

24 overstays on visas.  They can include overstays on visa

25 labor pilot programs, other forms of immigration

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 131

1  violations other than criminal convictions.

2  Administrative violators, I think it got -- That's a

3  little bit more clear.

4      A lot of our work is done not in the criminal

5  setting but in the administrative setting.

6      **Q.   So does the term "other immigration violators"**

7  **include people who entered the United States illegally?**

8      A.   Yes.

9      **Q.   That alone is a violation that's picked up**

10 **here?**

11     A.   It is.

12     **Q.   Okay.**

13     A.   The notice to appear is an administrative

14 process.  It's not a criminal one, so it would be

15 captured in that.

16     **Q.   What do you think it is?  Okay.  So let's look**

17 **at the bottom of request F2, F4 footnotes.**

18     **Is the information that's missing in the chart in**

19 **rows F and G here perhaps, if you look at the**

20 **footnotes; and we just need to put them in the blanks?**

21     A.   No, no, that's not the same.  This is

22 different.

23     **Q.   Okay.  Let's look at request D2 to D4, top**

24 **sort of.  What is this showing us here on this chart**

25 **here?  Would you sum it up real quick?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.   It's after being encountered at or near

2  southwest border January '20 to January 19, 2021, on

3  Parole Plus ATD.

4    Q.   So --

5    A.   Excuse me.  So these -- These numbers are not

6  just Border Patrol numbers, but they're both ICE and

7  CBP numbers.

8    Q.   Okay.  So are these people who were

9  encountered that were released under Parole Plus ATD

10 between January 2020 to January 19, 2021?  I'm trying

11 to understand.

12   A.   Release with -- release reason of parole

13 between January 20 -- or January 1st, 2020, and January

14 19, 2021.  They were released on parole.

15   Q.   It says Parole Plus ATD above that right under

16 request D2 to D4, release after encountered at

17 southwest border January 2020 -- January 2020 to

18 January 19, 2021, hyphen, Parole Plus ATD.  It looks

19 like they're encountered under -- and released under

20 Parole Plus ATD.

21   A.   No, I think that might be incorrect because

22 Parole Plus ATD program didn't start until November of

23 2021.

24   Q.   Are you sure it started in November of 2021?

25   A.   From an ICE perspective, I only have the memo

Exhibit D

Page 133

1  to go by, the memo from Chief Ruiz.

2     Q.   Okay.  Request E2 to E4.  And for these people

3  who were released on -- on -- at or near southwest

4  border January 2020 -- 2021 to present, hyphen, NTA,

5  slash, on recognizance; can you tell me under what

6  authority they were released?

7     A.   No, I can't.  As I mentioned earlier, the

8  data's not broken down by this specific statute that

9  they were released on.

10    There's multiple statutes that allow or order ICE

11  release on their own recognizance to include IJ

12  decisions that we have to enforce, if an IJ orders

13  somebody removed -- released on their own recognizance,

14  that's something that ICE will enforce.

15    Q.   Do -- Go ahead.

16    A.   No, there's also other litigation.  District

17  courts may order people released as well.

18    Q.   Can you give me some examples of statutes

19  under which these people would have been released, just

20  some of them, one or two even?

21    A.   The -- the authority -- The bond rules allow

22  ICE to release people on their own recognizance.  I'm

23  not -- I don't know the exact section of law that that

24  is.

25    Q.   All right.  So let's move to request F9 to

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 134

1   F10.  And then I think it's also related to G9 and G10.

2       Can you first look at F9 to F10?  Can you tell

3   what check-in facilities were used for this data?

4       A.   Sure.  So check-ins represent individuals that

5   have checked into an ERO office.

6       It also represents individuals that weren't --

7   didn't check-in but were issued a charging document.

8       As I mentioned earlier, many of our locations

9   didn't have the capability to have aliens check-in.

10  They were processed remotely, issued NTAs via the mail;

11  and that was considered a check-in as well.

12      If they checked in virtually on the phone, that

13  was also counted.

14      What's not represented here are the check-ins done

15  by our contractor for the ATD program.  If they checked

16  in with the ATD program and our contractor,

17  behavioral -- BI, that number is not included here on

18  the check-ins; so they're not checked in.

19      Q.   Okay.  So what's the name of the vendor again?

20  You said it real quickly.

21      A.   BI, as in bravo, India; BI, Incorporated.

22      Q.   If you don't know, that's okay.

23      A.   I thought I answered it.

24          MR. DARROW:  I'm sorry, I think you were muted

25  in the first part of that second question, Karen.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 135

 1          We didn't hear it.

 2   BY MS. BRODEEN:

 3      Q.   So where is that vendor located or based out

 4   of?

 5      A.   I don't know.  I'm sorry.

 6      Q.   That's okay.  Okay.  So this information on

 7   check-in facilities, was that gathered from Florida or

 8   do you know what database that was gleaned from?  Was

 9   it Florida specific or more national database?

10      A.   No, this particular one says noncitizens

11   release with a notice of report between January 20th,

12   2021, to November 1st, 2021, by check-in and latest

13   case criminality; so this is a nationwide number.  This

14   isn't a Florida-specific number.

15      Q.   Okay.  What about request G9 to G10; do you

16   have the same information about where that data came

17   from or is it different?

18      A.   This is similar in the sense that this is a

19   nationwide data, and the check-ins are the same.

20      It's -- We included people that physically

21   checked-in, people that checked-in virtually, people

22   that were issued their notice to appears -- notice to

23   appears via mail.

24      What we did not include is those individuals that

25   had checked-in to the BI, ATD -- the BI contractor

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  under the ATD program.

2      Q.   Did you just mention check-in by mail?

3      A.   Notice to appear by mail.  We issued --

4      Q.   Okay.

5      A.   We had a time frame that, due to our

6  reconstitution plan and ICE, that many of our offices

7  were either minimally staffed or not open.  So we

8  issued our NTA's via certified mail to those aliens,

9  and we also considered that a check-in.

10     Q.   Got it.  Okay.  That covered two of our

11 topics, by the way, not just one.

12     Okay.  I want to go back to detention capacity.

13     How is it determined what a detention facility's

14 maximum capacity is?  Is there some kind of regulation

15 or guidelines that's applied that determines how many

16 people you can house at one place?

17     A.   So we -- In ICE we have our -- our

18 performance-based national detention standards, and the

19 capacity is the factors varies when it comes to

20 capacity.  We work closely with the vendor, whether the

21 vendor's a private contractor, state, local, to

22 determine what their capacities are.

23     For example, some things we look at are the number

24 of showers in each individual pod, the number of

25 toilets in each individual pod, the type of medical

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 137

1  care that we can provide in that particular facility,

2  recreation space, how much recreation indoor and

3  outdoor space do we have for detainees in our custody.

4      All those factors -- There's more, like -- I can't

5  think of off the top of my head.  But as an example,

6  those are some of the things we consider in identifying

7  the population capacities at our detention centers.

8  PBNDS is Performance-based National Detention

9  Standards, are very different than correctional

10  standards for states and cities and counties.

11      Our detainees are detained for civil detention --

12  It's civil detention.  It's not criminal detention.

13  It's not punitive in nature.

14      Our detainees are only held for two reasons.  One

15  is for their hearings, for the immigration hearings,

16  and for removal; it's not punitive.

17      So under the civil detention framework, they're

18  afforded many more liberties than the criminal

19  population.

20      So that impacts also -- That also impacts how much

21  beds that we can -- we can rate our facility for.

22      Q.   You referred to the term "pod"; what is a

23  "pod"?

24      A.   All right.  So a pod represents -- In a

25  typical jail, a pod is a housing unit.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 138

1        And, for example, a jail may have the capacity to

2   hold 1,000 people; but they do that in about 20

3   different pods.

4        Each -- or as an example, they'll break down the

5   housing unit into more manageable sizes.  It has to do

6   a lot with officer's safety and also when you have

7   different classifications of detainees.

8        Our low-level detainees our level ones, are

9   generally held together.  Our detainees that are --

10  have a criminal history, maybe level twos, and they're

11  housed separately.  Excuse me.  And then you have the

12  level threes, which are your aggravated felons, may

13  have a propensity for violence, those are housed

14  separately.

15       So pods are important for the housing units and

16  the housing assignments of where we put people.  And,

17  again, it speaks to the challenges that we have in

18  filling our beds, right.

19       So although we have 50 beds available in a

20  level -- or, let's say, 25 beds available in a level

21  one, we can't place a level-three detainee in that

22  level-one pod or housing unit.  And that speaks to one

23  of the many challenges that we have with filling all of

24  our beds.

25       Q.   When you describe these pods, are they like

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 139

1  open-bay dormitory situations or are they like cells

2  with bars?

3      A.   So, generally, in my experience in this -- I

4  can't speak for all the detention centers, our

5  location in our inventory because everyone's -- Every

6  detention location is different.

7      But generally the pods are housing units typically

8  with a couple of stories, one story on the bottom, one

9  story on the top.

10     And it has telephones.  It has a dayroom.  It has

11  televisions.  It has bathroom facilities.  It has --

12  Some have computers in the pods as well or lap -- or

13  not laptops, but tablets in order to communicate with

14  their deportation officers or with their legal

15  providers.

16     Q.   Any kitchen facilities like a microwave?

17     A.   Sometimes.  Sometimes depending on -- You

18  know, depending on the population, right, the -- We may

19  place microwaves in some of those -- in some of those

20  pods.

21     Q.   Okay.  And have family units ever been housed

22  in any of those units?

23     A.   So the -- we don't -- We don't house family

24  units in correctional facilities.  There -- They're

25  actually under a different standard, which is called

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 140

1  the family residential standard.

2      They don't fall under PBNDS.  There's specific

3  standards that we utilize to house family units.

4      **Q.   Okay.  And where have you applied those family**

5  **residential unit standards to facilities?**

6      A.   Nowhere currently.  Previously we had applied

7  the family residential standards at our Karnes facility

8  in Texas and our Dilley facility in Texas, and in

9  Pennsylvania the Burkes facility, and as well as our

10  hotel -- our hotels as well when we had hotels.

11      **Q.   Did you say hotels, H-O-T-E-L-S?**

12      A.   Right.

13      **Q.   Like hotels that people check-in to on a**

14  **transient basis?**

15      A.   Yes.  Yes.  So in May of 2021, we entered into

16  a -- a contract with a contract provider to give us

17  act -- to provide us beds at hotels.

18      And what we -- what we did was -- or what the

19  contractor did is rented out the entire hotel so

20  people -- The public weren't allowed to check-in to

21  those particular hotels.  We utilized those hotels for

22  our family detention.

23      **Q.   And where were those hotels located?**

24      A.   I don't know, but the majority of them were

25  along the southwest border --

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    Q.   Okay.

2    A.   -- typically.

3    Q.   And during what period of time were those

4   hotels under contract to house family units by ICE?

5    A.   May 2021 to -- I'm sorry.  March of 2021 to

6   March of 2022.

7    Q.   Okay.  And what happened in March of 2022 that

8   caused them to no longer be used by family units?

9    A.   So ICE determined that we were experiencing a

10   large number of adults crossing the southwest border,

11   and we needed additional adult beds; and also we

12   determined that ATD was a better alternative for family

13   units.  It was in -- When we released the family on

14   alternatives to detention, it's more humane.  It's a

15   more humane system -- effort in order to track those

16   cases through the system.

17      What we found with our family residential

18   standards were also impacted by litigation that doesn't

19   allow us to detain families more than 20 days.

20      So we made the decision -- As we always are

21   looking at our detention inventory to see how best to

22   support the U.S. Border Patrol in their bed space

23   needs, we made the decision that since more single

24   adults were crossing the southwest border, we made

25   those -- We converted the family residential centers to

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 142

1  adult beds as opposed to family beds based on the need

2  on the southwest border.

3      Q.   And what about the hotels, were individual

4  adults housed in hotels after March --

5      A.   No.

6      Q.   -- 2022?

7      A.   No.  No, they weren't.

8      Q.   Was that contract just dropped with the hotels

9  after March 2022, no need for the space?

10     A.   I don't know the status to the contract.

11     Q.   Okay.

12     A.   We don't use the hotels as of March 2022.

13     Q.   Okay.  So would you say that ATD was more

14  humane, something like that; did you say something

15  about --

16     A.   So we've seen a high success rate with our

17  alternatives to detention program.  A high percentage

18  remain compliant with the program.  We see a very high

19  rate of court appearances within the program.  And that

20  particular population, as vulnerable as they are, as

21  family units crossing with small children, we made the

22  decision -- ICE made the decision that alternatives to

23  detention was our best option for that particular

24  subset of detainee.

25     Q.   Okay.  And then when those people were

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 143

1  released, those family units were released under Parole

2  Plus ATD, do you know what kind of conditions they were

3  released into where they lived, if there were

4  improvements to what you provided previously?

5      A.   I don't know the answer to that question.  Can

6  you rephrase it?

7      Q.   Okay.  So do you have any information that

8  after you released family units under Parole Plus ATD,

9  they were released into better conditions than what you

10 provided at hotels, Dilley, Karnes or Burke?

11     A.   No, I don't; I don't have any information on

12 that.

13     Q.   Which -- Have you ever been to these hotels

14 that were under contract for housing family units?

15     A.   No.

16     Q.   Did you get any reports that there were

17 inhumane conditions at those hotels?

18     A.   I don't recall any of that.

19     Q.   Okay.  What about Dilley, Karnes and Burke,

20 were they inhumane conditions that you operated?

21     A.   Yes.

22     Q.   What was inhumane about those -- the

23 operation?

24     A.   Oh, just -- I strike my -- I thought you said

25 the other question.  I thought you said were they

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 144

1  humane.

2      Q.   Oh, okay.  Were the -- Were the conditions at

3  Dilley, Karnes and Burke for family units humane, in

4  your opinion?

5      A.   The conditions were humane, yes.

6      Q.   Okay.  All right.  And were Dilley, Karnes and

7  Burke in operation for family units in 2020?

8      A.   Yes.

9      Q.   What -- Were they used in 2021 for family

10  units for part of that year?

11     A.   Yes.

12     Q.   Okay.  Did it change from family units to

13  something else at any time?

14     A.   Yes, it did.  It changed from family units to

15  single adults.

16     Q.   Single adults; when did it change?  Did all

17  three of them change at the same time?

18     A.   About -- No, they were -- There were different

19  times.  I want to -- I don't know exactly the dates.

20         But about February 2021, we started transitioning

21  the family residential centers to adult beds.  I don't

22  know the exact order.  But I believe that was completed

23  a few months after February where all three locations

24  were converted to single adults.

25     Q.   Okay.  So is it your understanding that

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 145

1  currently those three facilities, Dilley, Karnes and

2  Burke, are operated to detain single adults?

3      A.   Correct.

4      Q.   Who made the decision to transition away from

5  family units being housed by ICE?

6      A.   ICE made that decision.

7      Q.   Okay.  Who at ICE?

8           MR. DARROW:  Objection; that's beyond the

9  scope of any of these topics.

10          MS. BRODEEN:  We have a whole topic about

11  detention capacity.

12          MR. DARROW:  About the capacity, not about

13  decisions on families versus individuals.

14          MS. BRODEEN:  It says including inference to

15  increase or decrease that capacity.  I think this is a

16  reasonable topic under that topic.  It's a reasonable

17  question.

18          Just object and then, you know, let's get on

19  with the answer if he can answer it, if he knows who at

20  ICE made the decision to transition away from family

21  units being housed by ICE.

22  BY MS. BRODEEN:

23      Q.   Who at ICE made that decision?

24          MR. DARROW:  Same objection.  You can answer,

25  if you know.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      A.    That answer is Tae Johnson, the ICE director.

2  BY MS. BRODEEN:

3      Q.    And ICE -- something called a Flores consent

4  decree?

5      A.    Can you repeat the question?  I'm sorry.

6      Q.    Are you familiar with the Flores, F-L-O-R-E-S,

7  consent decree?

8            MR. DARROW:  I'm gonna object again.

9            Flores is not relevant to any of these topics.

10            MS. BRODEEN:  It has to do with your detention

11  centers.  It's one of your --

12            MR. DARROW:  It hasn't conditions --

13            MS. BRODEEN:  Okay.  Just object to the form.

14            Okay.  All right.  Go ahead.  You know, you

15  objected; it's outside the scope of topics.

16  BY MS. BRODEEN:

17      Q.    Go ahead and answer if you can.

18      A.    Can you repeat the question?

19      Q.    Are you familiar with the Flores consent

20  decree?

21      A.    Yes.

22      Q.    Okay.  Is it fair to say that it's difficult

23  to create family detention centers that comply with

24  that consent decree?

25      A.    I can't speak to the difficulty.  The family

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 147

1  residential standards are -- are based on a civil

2  detention model, and we take the Flores agreement

3  into -- And we factor those into our family residential

4  standards.

5      As I stated previously, it's -- The Flores

6  litigation does not allow us to detain families beyond

7  20 days.

8      **Q.   Is it possible for ICE to create new detention**

9  **centers that comply with the Flores consent decree?**

10         MR. DARROW:  Objection again; beyond the scope

11  of this topic.

12         MS. BRODEEN:  Okay.

13         MR. DARROW:  If you know.

14  BY MS. BRODEEN:

15     **Q.   Is it possible that ICE could create new**

16  **detention centers that comply with the Flores consent**

17  **decree?**

18     A.   I don't know that answer.  I know that our

19  authorization for funding of new facilities would be

20  based by congressional appropriation.

21     I'm sorry, I don't know the answer to that.

22     **Q.   And did you ever express concerns about**

23  **closing any of these family-unit facilities?**

24         MR. DARROW:  Objection.  You're talking to the

25  witness now as a 30(b)(6) witness.  If you have

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 148

1  questions about what he said or did, you can save that

2  for the fact portion.

3          MS. BRODEEN:  Okay.  You made your objection.

4  BY MS. BRODEEN:

5      Q.   **Okay.  Did you express concerns regarding the**

6  **closing of these family-units facilities?**

7          MR. DARROW:  Karen, it's getting very

8  confusing if we don't segregate the 30(b)(6) and --

9          MS. BRODEEN:  Well, I can ask again.  I can

10 ask again.  I just want to know now while we're all on

11 the same topic of detention capacity and increase,

12 decrease their capacity.

13         MR. DARROW:  No, he will answer that when we

14 get to the fact portion.

15         MS. BRODEEN:  Well, he -- Okay.  Don't tell me

16 how to ask my questions, please.  I'm getting really

17 irritated here.  Just make your objection and move on.

18 BY MS. BRODEEN:

19     Q.   **Okay.  Did you express concerns with anybody**

20 **regarding the closing of these family-unit detention**

21 **facilities?**

22     A.   I don't recall.

23     Q.   **What did you say?**

24     A.   I don't recall.

25     Q.   **Okay.  So I want to show you documents based**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 149

1  on your responses to some questions I just asked you

2  about Dilley, Karnes and Burke.

3      You said that they're currently repurposed to

4  house single adults, correct?

5          (Stenographer interrupted for clarification.)

6      A.   Correct.

7  BY MS. BRODEEN:

8      Q.   So popping something in the chat room for you

9  to look at.  What do we call it, 12?  It's Exhibit 12,

10  by July production.

11          (Exhibit No. 12 was marked.)

12      A.   Yep, we have it now up on the screen.

13  BY MS. BRODEEN:

14      Q.   Is it up?

15      A.   Yes.

16          MR. DARROW:  Yes.

17  BY MS. BRODEEN:

18      Q.   Okay.  I'm sorry.  I didn't know.

19      Okay.  So have you ever seen this document before?

20      A.   I don't recall ever seeing this document.

21      Q.   Okay.  So this is an email from somebody named

22  Rodney Scott, and then the name has been redacted to

23  whom it was sent.  But it's copied to Raul Ortiz.  Do

24  you know who Rodney Scott is?

25      A.   I don't know him personally, but I know there

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   was a Rodney Scott that was chief of the Border Patrol

2   at one point.  He's retired, I believe.

3        Q.   Okay.  So if you can go down toward the bottom

4   of this, I want to ask you about a sentence that threw

5   me for a loop when you gave your testimony.

6        It says, gents, just spoke with -- redaction -- at

7   ERO, and he advised me that the three FRCs,

8   parenthesis, Dilley, Karnes and Burke, closed

9   parenthesis, were transitioning to reception areas

10  where family units will be tested for COVID and

11  released within 72 hours, period.  They are still

12  figuring out -- redaction, redaction -- what they

13  cannot receive; we will continue to OR and ATD as

14  available, period.

15       And my question is, were you aware that there was

16  any transitioning to reception areas as opposed to

17  single-family detention at --

18       A.   Yeah, there was a -- Yes, there was a period

19  of time when the family-residential centers went from

20  longer-term detention to a -- under 72-hour detention.

21       I'm not familiar with the time frame or how long

22  that lasted.

23       Q.   That was associated with COVID, correct?

24       A.   I don't recall the reasoning behind it.

25       Q.   So earlier you talked about the detention

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 151

1   facilities having to scale back capacity because of

2   COVID protocols, correct?

3       A.   We had to operationalize many things during

4   the COVID pandemic.  The most impactful thing was the

5   different litigations that required us to have beds

6   offline during the COVID pandemic, so that was a factor

7   and -- That was a factor with COVID, as well as the

8   jails themselves and not having adequate staff at some

9   locations to staff the jails.  So it was -- There was

10  many factors as well.  Each -- Each location was

11  different.  The COVID period -- The time that COVID was

12  prevalent was very difficult for keeping -- keeping our

13  facilities full just because of the litigation and the

14  actual toll that COVID took on the staff at the

15  detention centers.

16      Q.   You generically referred to litigation.  What

17  type of litigation resulted you taking beds offline

18  from the facilities?

19      A.   There's multiple litigations.  I don't know

20  that -- the names of the litigations off the top of my

21  head.

22      But the litigation that impacted Adelanto facility

23  in L.A., the litigation that impacted our locations

24  here in Virginia as well, and as well as the Fraihat

25  litigation.  I do know that -- the name of that

Exhibit D

Page 152

1  litigation, the Fraihat litigation, that was in effect

2  during that time period.

3      Q.   Okay.  So when you say litigations, what type

4  of -- What was the subject of the litigation?  What

5  were the people complaining about that were plaintiffs?

6  Were they complaining about overcrowding or they were

7  getting COVID, for example?

8      A.   In a general sense.  I don't know each case

9  specifically.  I know that our office of principal

10  legal advisors, their staff was responsible for

11  litigating those cases, and determining the strategies

12  for them.  But in a general sense, it's premised on the

13  fact that people in detention are -- especially those

14  that have high-risk factors for COVID are at risk for

15  developing serious complications to COVID.  So it

16  was -- As ICE, we have to minimize that risk by taking

17  a look at whom we can release from custody and also

18  keeping in mind that we have to keep the six foot --

19  six-foot barrier at our -- at our different locations,

20  which took a lot of beds offline by us having to

21  maintain social distancing in our facilities.

22      Q.   All right.  So who are the high-risk people

23  that you've had to make accommodations for?

24      A.   So I don't have the list in front of me, but

25  it includes conditions such as asthma, chronic care

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 153

1  conditions like heart disease, lung disease, high blood

2  pressure.

3       Many different types of illnesses were considered

4  high risk for -- for developing serious complications

5  from COVID.

6       Q.   Diabetes, for example?

7       A.   Yes, diabetes was one as well.

8       Q.   Okay.  Obesity?

9       A.   Yes.

10      Q.   So do you know whether ICE ever considered

11  releasing people who have high-risk conditions as

12  opposed to not detaining family units?

13           MR. DARROW:  Objection as to form.  You can

14  answer.

15      A.   Can you restate the question?  I'm not sure I

16  followed.

17  BY MS. BRODEEN:

18      Q.   Do you know if ICE ever considered as an

19  alternative to releasing family units just releasing

20  people who are high risk for COVID if they got

21  infected?

22      A.   No, I don't have any knowledge on that.

23      Q.   And for the facilities that ICE operated, what

24  were the COVID protocols that you put in place like

25  safe distancing, how many beds in a pod, for example?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 154

1    A.    So ICE produced a document called the Pandemic

2   Response Requirements.  That's posted on the ICE.gov

3   public-facing website.  It's available to review.  I

4   don't -- Like I don't have it here in front of me.  But

5   I can tell you some of the things we looked at were

6   testing at intake, quarantine measures, masks,

7   sanitation standards, also looking at high-risk

8   individuals.

9       There was a multitude of things that we looked at

10   as part of our pandemic response requirements.  And, as

11   I said, that -- I think we're on version 9.0.

12      And that's publicly-available information on our

13   website.

14      **Q.    And are those protocols still in place under**

15   **version 9.0 of the pandemic response?**

16          MR. DARROW:  I'm gonna object before he

17   answers.  This is really far field from topic 10 now.

18          MS. BRODEEN:  I was asking detention

19   capacity -- Hey, just object.

20   BY MS. BRODEEN:

21      **Q.    Okay.  He objected.  Now, go ahead and answer**

22   **if you can.**

23      **Are these pandemic protocols still in place under**

24   **version 9.0 at your ICE facilities?**

25      A.    Some as we go through the different versions,

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  things are added based on new guidance that CDC

2  provides, as well as our healthcare professionals that

3  we have within ICE.

4      One group that we have within ICE that we rely on

5  for our medical operation, which is the Immigration of

6  Health Service Corps, IHOC, and their public health

7  service officers; and we rely on them as well to

8  interpret the CDC data; and we operationalize that into

9  our pandemic response requirement.

10     **Q.   To the best of your knowledge, since**

11  **January 20, 2021, has any family unit been detained**

12  **anywhere in the ICE network?**

13     A.   Can you repeat the question?

14     **Q.   Okay.  Since January 20th, 2021, has a family**

15  **unit been housed anywhere in an ICE detention unit**

16  **facility?**

17     A.   Just to clarify, that's an adult ICE detention

18  facility?

19     **Q.   Well -- Well, any facility that you have or**

20  **you have under contract, have you housed a family unit**

21  **since January 20, 2021?**

22         MR. DARROW:  Before he answers, I'm gonna

23  object again; beyond the scope of detention capacity

24  guidelines.

25  BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 156

1    Q.    Okay.  Well, go ahead.

2    A.    So if my memory serves correct, our family

3  residential centers in our hotels did not -- We didn't

4  cease our hotel functions until March of this year of

5  2022, so we would have housed in our hotels.

6        And previous to that, our FRCs were open up until

7  February.  We didn't shut down our first FRC

8  approximately February of 2021, so there should have --

9  there could have been -- There could have been some

10 detentions that our family residential centers in those

11 time frames.

12   Q.    And -- And since November 2, 2021, how many

13 family units have been in ICE detention anywhere?

14   A.    I'm sorry, I don't have that data.

15   Q.    Are there family units since November 2, 2021,

16 that have been in ICE detention?

17   A.    So when -- The term ICE detention, I'm taking

18 it to mean that it also includes hotels?

19   Q.    Yeah.  Your vendors too.

20   A.    Yeah, our vendors.  So we -- we -- Our hotels,

21 we stopped hoteling family units in March of 2022.

22   Q.    And when did Dilley, Karnes and Burke

23 transition to single adults; is that in 2021, did you

24 say?

25        MR. DARROW:  I'm gonna object again before he

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 157

1  answers; beyond the scope of detention capacity topic.

2  BY MS. BRODEEN:

3      **Q.   Go ahead.  Is that 2021 that they transitioned**

4  **to single adult?**

5      A.   The transition began in February of 2021, but

6  it was staged transition, it was -- Not all facilities

7  went offline at the same time.  I don't know exactly

8  the dates that they all -- that the last one went

9  offline.

10     But we started transitioning in -- Actually, no,

11  I'm getting confused.  Let me strike that.

12     They -- we were -- Before they closed, they were

13  family trans -- where they were held for under 72

14  hours, so we had that first.  Then we closed those

15  facilities and became -- They became adult detention

16  centers.

17     I'm not clear on the exact dates though.

18     **Q.   Have you ever seen anything in writing about**

19  **there being a preference to not detain family units**

20  **anymore?**

21         MR. DARROW:  Objection; far beyond the scope

22  of topic 12.

23  BY MS. BRODEEN:

24     **Q.   Go ahead and answer.**

25     A.   I don't recall.

Exhibit D

Page 158

 1      Q.   Now, let's go back to Exhibit 5, the Lucero

 2  email that referred to book-ins.  Do you got that open

 3  now?

 4      A.   We've got it up.

 5      Q.   So according to this email, book-ins were

 6  expected to decrease perhaps up to 50 percent, correct?

 7           MR. DARROW:  Same objection as before.  It is

 8  beyond the scope of this topic and it's --

 9           MS. BRODEEN:  I don't care.

10  BY MS. BRODEEN:

11      Q.   Go ahead and answer.

12      A.   What --

13      Q.   Did it decrease approximately 50 percent?

14      A.   What sentence are you referring to, is it

15  the --

16      Q.   Oh, it's -- It's in the first paragraph.

17      A.   The rough estimate is book-ins would be

18  reduced by 50 percent of historical numbers, and the

19  vast majority of book-ins would come from CBP

20  transfers, I don't know what any background on what

21  Henry was talking about here.

22      Q.   Okay.  But if it turns out that book-ins do

23  decrease by 50 percent, that would allow additional

24  capacity for ICE detention, correct?

25           MR. DARROW:  Same objection.  Plus also

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 159

1  objection; it calls for speculation.

2      A.   Yeah, I don't know the -- the background of

3  what Henry was referring to and what facilities or the

4  type of detainee he's talking about.

5           MS. BRODEEN:  Okay.  That was coaching the

6  witness again.  Now, of course, you said object to

7  speculation, and he says, oh, this causes me to

8  speculate basically.  Don't do it anymore, please,

9  Mr. Darrow.

10          MR. DARROW:  Karen, we can make a record for

11  the basis for our objection.

12          UNKNOWN SPEAKER:  Karen told the judge that if

13  you want to make a form objection, use as an argument

14  for a protective order.

15  BY MS. BRODEEN:

16      **Q.   All right.  So -- Okay.  Okay.  Let's just**

17  **look, hypothetically, if book-ins decrease by 50**

18  **percent, would that mean there's more capacity at an**

19  **ICE detention facility?**

20          MR. DARROW:  Same objection.  You can answer.

21      A.   So, you know, it's not as easy an answer.

22      So when it comes to operational capacity is one

23  thing.  When it comes to numbers, it's another.

24      So, yes, if we're saying that that book-ins are

25  reduced by 50 percent, yes, there could be a -- There

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 160

1  could be a chance it increases the number of

2  operational beds.  But not knowing the context, whether

3  this -- was this happening during COVID, were there --

4  what state was this occurring in because if this is

5  happening in California, it doesn't matter their book-

6  ins are reduced by 50 percent, we're not using those

7  beds.  Those beds are going to be offline because of

8  litigation in that particular state.

9  BY MS. BRODEEN:

10      Q.   Okay.  And this email is dated January 27,

11  2021; that's during the pandemic, correct?

12      A.   Correct.

13      Q.   Now, you mentioned Fraihat; what is that?

14      A.   So it's spelled F-R-A-I-H-A-T, Fraihat; and

15  it's a -- So I'm an operator.  I'm not an attorney.

16      But it is one of the decisions out in California

17  that severely restricts how many beds that we use

18  operationally because it requires us to conduct a case-

19  by-case review and assessment of each detainee, their

20  risk factors for COVID versus their threats to the

21  community.  And the judge in that particular -- I think

22  that's all I can say about that.  I don't want to

23  misspeak.  I don't know the case that well.  But I do

24  know operationally it takes a lot of our beds offline.

25      Q.   It takes -- That case takes beds offline

Exhibit D

Page 161

1   because of what's going on with COVID?

2      A.   Correct.

3      Q.   Okay.  Okay.  Let's look at Exhibit 8.

4          (Exhibit No. 8 was marked.)

5   BY MS. BRODEEN:

6      Q.   I'm gonna drop that in your chat there.  You

7   got it open?

8      A.   Got it open now.

9      Q.   Okay.  So these are the answers to

10  interrogatories that CHS provided through Department of

11  Justice to us and I believe you signed on behalf of ICE

12  as to interrogatories No. 2, 3, 4 and 5.

13     Do you want to scroll through that and see if

14  that's correct?

15     A.   Let me see.

16     Q.   Okay.  All right.  So Interrogatory No. 2

17  reads, please explain upon what authority or

18  authorities DHS relies on to release applicants for

19  admission as reflected in status reports filed by DHS

20  in Texas versus Biden.  Then it gives the case number.

21     Is this -- did you -- Did you come up with this

22  answer on your own or did you have assistance for

23  Interrogatory No. 2?  Was it strictly you that answered

24  this or did you have assistance?

25     A.   So all of my declarations are with the advice

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 162

1   of counsel.

2       Q.   Okay.  And to the best of your knowledge, is

3   this an exhaustive list of the authority that's

4   requested in this interrogatory or is there anything

5   else possibly?

6       A.   No, I think this is exhaustive.

7       Q.   Okay.  And there's a reference here in your

8   answer to CFR section 212.5 for paroled cases.

9       Is this what we referred to earlier as INA 212 or

10  is this a regulation that implements 212 that we talked

11  about earlier?

12      A.   I can't answer.

13      Q.   If you don't know, that's okay.

14      A.   I don't know.

15      Q.   Okay.  What is a parole case that's referenced

16  in this section?

17      A.   Those are paroles under 212D, D5 of the INA.

18      Q.   INA you said?

19      A.   Yes.

20      Q.   Okay.  Let's look at Interrogatory No. 3,

21  please explain whether DHS believes it has authority or

22  discretion to release applicants for admission pursuant

23  to 8 U.S.C. section 1226 if DHS decides to place an

24  alien in standard removal of proceedings rather than

25  expedited removal of proceedings; and then you gave a

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 163

1    response.  Did you have assistance in answering this?

2        A.    Utilized of my counsel.

3        Q.    Okay.  And Interrogatory No. 4, if DHS

4    believes it has authority or discretion to release

5    applicants for admission pursuant to 8 U.S.C. section

6    1226, please explain what criteria DHS uses to

7    determine when to do so, comma, as opposed to detain

8    the alien as required by 8 U.S.C. section 1225.  You

9    give a response here.  Did anybody assist you with

10   this?

11       A.    I coordinated with my -- I sought the advice

12   of my counsel.

13       Q.    Okay.  And interrogatory -- Interrogatory

14   No. 5, last one, if DHS believes it has authority or

15   discretion to release applicants for admission pursuant

16   to 8 U.S.C. section 1226, please explain whether DHS's

17   initial arrest in those cases are made pursuant to an

18   immigration warrant, period.

19       You gave a response here that refers to some

20   statutes.  Did anybody assist you with this response?

21       A.    I coordinated my responses with my counsel.

22            MS. BRODEEN:  Can I just take a couple minutes

23   to go through my notes?  This is a good thing, by the

24   way.

25            MR. DARROW:  Sure.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 164

1               (Brief recess had.)

2               MS. BRODEEN:  Okay.  So I'm done with the

3     30(b)(6).  Okay.  We're going to take a ten-minute

4     break if we could.

5         A.   Okay.  Sounds good.

6               MR. DARROW:  Sounds good.

7               MS. BRODEEN:  Okay.

8               THE VIDEOGRAPHER:  The time is 3:13, and we

9     are off the record.

10              (Recess had 3:13 p.m. - 3:26 p.m. EST.)

11              THE VIDEOGRAPHER:  The time is 3:26, and we

12    are back on the record.

13    BY MS. BRODEEN:

14        **Q.   Okay.  So earlier, Mr. Guadian, you were**

15    **talking about hotels that were under contract to house**

16    **family units.  Which hotel chain was that; do you**

17    **recall?**

18              MR. DARROW:  Same objection based off scope.

19              MS. BRODEEN:  Okay.

20              MR. DARROW:  Answer.

21              MS. BRODEEN:  Detention facility.  Go ahead.

22    Just say object to the form, Joe.

23        A.   I don't know the names of the hotel chains.

24    It was multiple chains, not one chain in specific.

25    BY MS. BRODEEN:

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 165

1    Q.    Do you know if the family units were free to

2  come and go or was there a fence or guards around them?

3         MR. DARROW:  Object to form.

4    A.    There were no fences around these locations.

5  BY MS. BRODEEN:

6    Q.    So were the people free to come and go?

7    A.    I don't know.

8         MR. DARROW:  Object to form.

9  BY MS. BRODEEN:

10   Q.    Okay.  So let's move -- move on to detention

11 facilities, in general.  Does DHS view the detention of

12 family units as inhumane?

13        MR. DARROW:  Object to form.

14   A.    Can you repeat the question, please?

15 BY MS. BRODEEN:

16   Q.    Does DHS view the detention of family units as

17 inhumane?

18   A.    I can't speak to DHS.  What I can say from an

19 ICE perspective is that we transition our family

20 residential centers to adult detention centers to

21 maximize our adult detention space based on the

22 increasing amounts of single adult arrests made on the

23 southwest quarter.

24   Q.    So does ICE view the detention of family units

25 as humane -- or inhumane or humane or do you not know?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 166

1    A.    I don't know the answer to that question.

2    Q.    **And does ICE view immigration detention**

3    **generally as something that's cruel and unjust?**

4          MR. DARROW:  Object to form.

5    A.    I don't know that -- the answer to that

6    question.

7          What I can say is we have our performance-based

8    national detention standards with detainee care in

9    mind, as well as our family residential standards with

10   family's care in mind.  And we utilize standards

11   that -- that meet -- these standards, we address

12   quality of care in these standards.  So we provide

13   medical service -- services.  We provide recreational

14   opportunities.  We provide opportunities for the aliens

15   to contact counsel.

16         So I can't speak to the very comprehensive

17   standards that we have in place to care for everyone

18   that -- everyone that are in our care and custody.

19   BY MS. BRODEEN:

20   Q.    **Do you know the names of any of the**

21   **nongovernmental organizations that support release --**

22   **people that are released from ICE custody?**

23   A.    No.  No, I don't.

24   Q.    **Okay.  Let's move on to topic 14, facts and**

25   **information regarding the process and delays in and**

Exhibit D

Page 167

1  around April 2022 and May 2022 at the ICE facility in

2  Orlando.

3       Okay.  Let's show you Exhibit 10, which is a

4  letter from two congress people.

5            (Exhibit No. 10 was marked.)

6  BY MS. BRODEEN:

7       Q.   Now, when family units are processed under

8  Parole Plus ATD, they're told to report to the nearest

9  ICE location to their destination, correct?

10      A.   That's correct.

11      Q.   Okay.  And this letter that you're looking at,

12 have you ever seen this letter before?

13      A.   If you can scroll down --

14      Q.   It's three paragraphs.

15      A.   Yes, I think I have.  I think I have seen this

16 letter.

17      Q.   When's the first time you saw this letter?

18      A.   45 minutes ago.

19      Q.   Okay.  So it was basically to prepare for this

20 deposition?

21      A.   I believe so.  I don't recall specifically,

22 but potentially that's what it was.

23      Q.   Okay.  And what type of ICE facility is -- are

24 they referring to here?  It's at 9495 Delegates Drive,

25 Orlando; what type of a ICE facility is that?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.   I don't know the -- I don't know the ICE

2    facility.  I'd have to make assumption.

3    I'm thinking that that's the ERO ICE facility in

4    Orlando, but I'm not 100 percent sure because I don't

5    know the address to that location.

6    **Q.   So what did you do to prepare for this topic**

7    **14 that we have in the deposition notice?**

8    A.   So I believe there was a response to this

9    letter, that's what I'm looking at.  And I also spoke

10   to the field office director in Miami in regards to

11   this situation.

12   **Q.   Okay.  So who is the field office director in**

13   **Miami?**

14   A.   Field office -- It's the Acting Field Office

15   Director Juan Agudela, A-G-U-D-E-L-A.

16   **Q.   And who is the head of the facility in**

17   **Orlando?**

18   A.   I'm sorry, I don't know that answer.

19   **Q.   So you did not talk with anybody in Orlando**

20   **ICE facility, correct?**

21   A.   Correct.  The FOD, the field office director,

22   in Miami has the responsibility for the Orlando office.

23   He has subordinates that work at that location.

24   **Q.   And did you say there was a response to this**

25   **letter?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 169

1      A.   I believe so.

2      **Q.   Have you seen the response?**

3      A.   I believe it was part of the production, if

4   I'm not mistaken.

5      **Q.   It was part of what?**

6      A.   It may have been part of the production.  I

7   remember seeing a letter.  Who is this from?  I could

8   be mistaken.  I know I saw a letter from -- Maybe it

9   was from Florida.

10     Maybe it was the State of Florida that was asking.

11     I could be mistaken though.

12     **Q.   Are you thinking maybe the letter to Governor**

13  **DeSantis from Tae Johnson we talked about?**

14     A.   Yes, yes, that's -- That's the letter.  That's

15  the letter I'm thinking.

16     **Q.   And just to be clear, that letter is not a**

17  **response to this April 29th, 2022, letter, correct?**

18     A.   Oh, gotcha.  I haven't seen the response to

19  this then.

20     **Q.   Okay.  So what -- When did you talk to the**

21  **field -- acting field director in Miami about this**

22  **letter?**

23     A.   I spoke to him this week.

24     **Q.   Okay.  And how -- Did you talk to him by**

25  **phone?**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 170

 1    A.   I did.

 2    Q.   And how long was that phone conversation?

 3    A.   I spoke to him a few times, a couple, maybe

 4 two -- two, three times.  And each time was probably

 5 for ten minutes.

 6    Q.   Okay.  So does he work under you or is he --

 7    A.   Yes.

 8    Q.   Okay.  So you're his boss or his boss's boss

 9 or something like that?

10    A.   I'm his boss, direct supervisor.

11    Q.   Okay.  So the first time you talked, what did

12 you discuss specifically?

13    A.   I don't recall the conversation, but it had to

14 do with to provide the information on what occurred in

15 Orlando and what steps we had taken to correct the --

16 to correct the issue of people waiting out in the sun.

17    Q.   Okay.  And what -- What did he convey to you

18 was the situation in Orlando that led to this letter?

19    A.   So there was a few factors.  One, as I

20 mentioned previously, is that we had our reconstitution

21 efforts.  We had just entered phase three at the end of

22 March where we allowed 100 percent of our employees to

23 come back to work, which meant that we could staff

24 our -- our check-in location more fully.

25    That led to an increase in reportings.  We had

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 171

1   people that had been waiting for us to be open and to

2   increase our capacity for interviews.

3       And when we opened back at 100 percent, they

4   arrived in mass, people that had been waiting to check-

5   in with ICE while we were -- These were people that

6   were waiting to check-in with ICE while we had

7   locations that were closed and locations that were

8   minimally staffed.  So once we went to 100 percent at

9   the end of March, the people started to arrive.

10      And, of course, ICE, we're not similar to

11  citizenship and immigration services where we have

12  large waiting rooms.  That's not something that ICE --

13  we really plan for.

14      Our waiting rooms are very small.  We have small

15  numbers of check-ins.  And numbers of people that

16  arrived at our location was overwhelming after March 29

17  and months of April, May.

18      So some steps that we took to -- to kind of

19  mitigate that and to prevent people waiting out in the

20  hot sun was we worked on our immigration ICE -- our ICE

21  check-in scheduler that's available now at our public-

22  facing website where the aliens that have -- that are

23  requesting check-ins can actually go into the website

24  and schedule themselves to speak to us.

25      So we are -- If people show up without an

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 172

1  appointment, we're not seeing them.  We're sending

2  those people back home to schedule themselves in the

3  ICE scheduler.

4      And that minimized the amount of people waiting in

5  line.

6      Q.   I think you mentioned that there were other

7  locations that were closed which led --

8      A.   Yes, so every location is different across the

9  U.S. with the pandemic.  The ICE reconstitution plan is

10  very flexible.  Depending on local transmission rates

11  for COVID, the field office directors have great

12  discretion on how much they actually open up their

13  public's -- public-facing services at each one of their

14  locations depending on community transmission.

15      Q.   And those locations that were closed, were any

16  of them in Florida?

17      A.   Yes.

18      Q.   Which locations in Florida were closed at this

19  time?

20      A.   I couldn't tell you the time frames or the

21  locations, but I know that there were multiple office

22  closures to include Orlando.

23      I couldn't tell you how long they were closed,

24  if -- And they were also opened at -- during periods of

25  time with a reduced staffing footprint, which also led

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  to reduced check-in capability at those locations.

2      Q.   Okay.  And did -- Did the field director

3  mention to you how many people were camped outside of

4  the ICE facility in Orlando?

5      The letter says at least 250 people.  Did he

6  confirm or deny that number?

7      A.   I think he -- He confirmed that that was

8  accurate.

9      Q.   Okay.  And it also says including small

10  children; did he confirm or deny that there were small

11  children waiting outside?

12     A.   I don't think we talked about small children

13  specifically.

14     Q.   Okay.  Were some of these people who are

15  waiting outside applicant's permission who crossed the

16  southwest border within the last since -- since

17  November 2021?

18     A.   I -- I don't know the answer to that question.

19     My sense is that many of these individuals were

20  part of the NTR and of equal plus.

21     Q.   So if -- And they're told to check-in within

22  how many days?

23     A.   That's -- Customs and Border Protection

24  actually provides the requirement.  How many days, I've

25  seen some paperwork that requires them to report within

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 174

1  15 days, other paperwork that requires them to report

2  in -- within 30 days.

3      So I don't know if it's -- And it's a question

4  better -- better situated for CBP on what stations do

5  operationally as far as their check-in dates are

6  concerned.

7      **Q.   Okay.  So if somebody was required to check-in**

8  **to ICE within -- within four months of being**

9  **encountered, they would have crossed the southwest**

10 **border under the A -- Parole Plus ATD policy, correct?**

11         MR. DARROW:  Object to form.

12 BY MS. BRODEEN:

13     **Q.   If it's a family unit, they're released,**

14 **they're told to check-in under the November 2021 memo,**

15 **they're sitting outside Orlando, would they have been**

16 **people who crossed -- include people who crossed the**

17 **southwest border under that policy?**

18     A.   It's possible.  I'd add that what we currently

19 do -- One of the steps that we've also taken to

20 minimize lines is that we have officers working outside

21 where the people are lined up.  And by issuing the

22 paperwork with instructions on how to check-in online,

23 using the online ICE appointment scheduler, and that

24 has greatly minimized the -- it has completely -- We

25 don't see people camping outside our facilities anymore

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 175

1  because we're actively working with the lines and

2  getting them -- getting the information to them about

3  how to schedule themselves on the -- on the -- on the

4  scheduler.

5      Q.   On the online scheduler, correct?

6      A.   Correct.

7      Q.   Okay.  So do they need a device to connect to

8  the internet and internet service provider to do that?

9      A.   Yes, they need to go online either with -- and

10 get onto the internet, just like the regular public

11 would either through cellular capabilities or through

12 Wi-Fi or if you're with an internet service provider.

13     Q.   And do you know how many of these people that

14 are released through Parole Plus ATD have access to the

15 internet through a device and an internet provider?

16          MR. DARROW:  Object to form.

17     A.   I don't know the answer to that question.

18 BY MS. BRODEEN:

19     Q.   What happens to somebody if they fail to

20 check-in timely?

21     A.   Could you explain what you mean by "check-in,"

22 and what do you mean by "timely"?

23     Q.   Well, I mean, if they're told to check-in to

24 ICE within a certain number of days, and they don't

25 check-in within that time period, what happens?

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.   So there's a -- There's a few things.  So if

2  they're -- A lot of the check-ins, typically a person

3  checks into ICE, they're issued the charging document

4  for these NTR and these Parole Plus ATD cases.

5    As I mentioned previously, some individuals do

6  arrive in line without an appointment.  Those

7  individuals are told to go back home and schedule

8  themselves online.  Excuse me.

9    **Q.   Okay.  So -- Go ahead.  Keep going.  I'm**

10  **sorry.**

11    A.   No, I was gonna just mention that they're told

12  to go back home and schedule themselves online for an

13  appointment that makes sense to them, you know, working

14  around their schedules.  They can -- It's a self-

15  service type website.  So it's not fair to say, you

16  know, just because they didn't check-in, ICE has to

17  take an action.  They -- They may have checked in, but

18  they're within the time frame to actually check-in.

19    **Q.   What happens if they don't check-in at all?**

20    A.   Again, in this -- In this scenario, just to

21  add some more context, can you describe who ordered the

22  check-in or did they themselves or --

23    **Q.   Okay.  So under the Parole Plus ATD policy, if**

24  **somebody's who released but told to check-in to ICE and**

25  **they fail to check-in to ICE at all, what happens to**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 177

1  that family unit or the head of household?

2      A.   So I can tell you that we -- knowing that

3  during the time period, especially during COVID and

4  when we were closed, we had quite a bit of people that

5  couldn't check-in; so what we ended up doing was

6  issuing their notice to appear via certified mail to

7  get them in immigration proceedings.  And, furthermore,

8  we placed -- If they were family units and they were

9  eligible, if they lived in 11 cities that were

10  considered -- that were cities under our program called

11  dedicated docket, we placed those families on the

12  dedicated docket.

13      The dedicated docket means that they would get

14  expedited hearings.  We would get an immigration

15  hearing done more quickly on a faster track than we

16  would in a regular non-docket.

17      Q.   Okay.  And what percentage of those mailings

18  that were sent by certified mail were returned?

19      A.   So I don't have the data in front of me, but

20  less than five percent of the -- of the individuals

21  that we issued NTAs for have invalid addresses.

22      Q.   Okay.  So you said individuals, what about

23  family units?

24      A.   Yes, that's head of households.

25      Q.   Head of households, so -- And do you track

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 178

1 those who don't check-in at all to continue to track

2 them till a certain point?

3     A.   Our field offices will utilize the Unified

4 Immigration Portal to determine how many releases are

5 within their area of responsibility.

6     They ensure that those people are either checking

7 in, scheduled to check-in or have been issued a notice

8 to appear.

9     Many of these individuals are also checking-in to

10 ATD and are BI contractor, large percentage of the

11 people that haven't checked in with ICE have -- have

12 checked in with BI.

13     Q.   Okay.  And is -- Are those people who checked

14 in with BI family units or heads of household family

15 units?

16     A.   They could be family units.  It could be

17 single adults as well.

18     Q.   Okay.  Okay.  So do you know whether the

19 addresses they give are their own addresses or somebody

20 else's address?

21     A.   I don't know the answer to that question.  But

22 what I can say is that those addresses are provided to

23 the U.S. Border Patrol and uploaded into the Unified

24 Immigration Portal.

25     And my sense -- and I would defer to CBP.  But my

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 179

1 sense is that CBP has their own systems that can verify

2 the ability to impact address.

3    **Q.    And match it up with the people that**

4 **supposedly live at that address?**

5    A.    I would have to defer on CBP.  I don't know

6 the mechanics of that end of it in regards to the

7 addresses.

8    **Q.    Okay.  So how did you meet with your field**

9 **director who works for you about what to do for**

10 **response?  Is he -- Is he directing a response or do**

11 **you know if anybody has responded to this letter?**

12        MR. DARROW:  Object to form.

13    A.    I can't answer that.

14        MS. BRODEEN:  All right.  Anything else?

15 Okay.  I don't have anything further, so I'll turn it

16 over to -- Hold on.  Let's take a break.  Somebody has

17 a question.  Can we take a five-minute break?

18        MR. DARROW:  Sure.

19        THE VIDEOGRAPHER:  The time is 3:47, and we

20 are off the record.

21        (Recess had 3:47 p.m. - 4:00 p.m. EST.)

22        THE VIDEOGRAPHER:  The time is four

23 o'clock p.m., and we are back on the record.

24 BY MS. BRODEEN:

25    **Q.    Okay.  Shortly before we broke, we were**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 180

1   talking about what happens when somebody who is

2   released under Parole Plus ATD does not check-in, and I

3   believe you said there's a certified letter that's sent

4   to their address?

5   A.   Okay.  So I'll need to clarify.  There

6   isn't -- The notice to appear isn't sent certified

7   mail.  It's sent by regular mail.

8   Q.   Oh, regular mail.  Okay.

9   A.   Correct.

10   Q.   So -- And when you said before about five

11   percent of them come back, is that still your answer

12   that five percent of those sent by regular mail come

13   back?

14   A.   I wouldn't say regular five -- Less than five

15   percent are invalid addresses, and I don't know exactly

16   if we're determining that by the number of returned

17   NTAs or if we're actually doing a home visit; so it

18   could be a combination of things.

19   Q.   So if they give an address and it's actually a

20   valid address, just not theirs, would it necessarily be

21   returned or would they -- would the person who gets it

22   just throw it out?

23   MR. DARROW:  Object to form.  You can answer.

24   A.   I don't know the answer.  Sorry.  The -- The

25   way the NTAs, they're issued via regular mail.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 181

 1      We also notify the court of the address of the

 2   respondent, and the Court will provide the respondent

 3   notices to appear in court as well.

 4   BY MS. BRODEEN:

 5      Q.   So it's returned and -- Can ICE initiate that

 6   notice to appear to be issued?  How does that happen?

 7      A.   If an NTA that's been mailed is returned

 8   because of what was the -- I didn't catch that.

 9      Q.   Say it comes back, but, nevertheless, can ICE

10   do something to trigger a notice to appear to be issued

11   to a person who doesn't check-in --

12      A.   Yes.

13      Q.   -- or not checking in people?

14      A.   Yes, so ICE has the capability to arrest FR

15   aliens.

16      Q.   Okay.  But can it also ask immigration

17   director or somebody to issue a notice to appear?

18      A.   No, the notice to appears are issued by law

19   enforcement officers.  And the true charging document

20   is issued by DHS requiring the alien to appear before

21   an immigration judge.

22          MS. BRODEEN:  Okay.  I just want to point out

23   to the court reporter there's no Exhibit 7.  You're not

24   missing anything.  You got it?  You're nodding.  I

25   can't hear you audibly.

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 182

```
 1            THE STENOGRAPHER:  Yes.  Thank you.

 2            MS. BRODEEN:  Okay.  All right.  We're done on

 3    my end.  Now Mr. Darrow can ask you questions if he

 4    wants to.

 5            MR. DARROW:  Yes, just -- Just a very few

 6    questions.  I won't keep us here longer than we have to

 7    be.

 8                        CROSS-EXAMINATION

 9    BY MR. DARROW:

10        Q.   Mr. Guadian, before -- I think you said -- and

11    please correct me if I'm misstating your testimony --

12    that ICE has the capacity to contract with vendors for

13    more bed space; is that accurate?

14        A.   It's accurate to the extent that congress has

15    appropriated the funds for those beds.

16        Q.   So congress hasn't provided any more funding;

17    you can't go out and contract more bed space?

18        A.   Correct.

19        Q.   Is your ability to contract more bed space

20    also governed by the -- I believe PBNDS is the acronym

21    you used before and the four factors that you used --

22        A.   Yes.

23        Q.   -- as well as the family residential

24    standards?

25            MR. DARROW:  That's it from us for 30(b)(6).
```

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 183

1          MS. BRODEEN:  Okay.  So, Mr. Guadian, if this

2   deposition is transcribed, you have the opportunity to

3   read it and make any changes and errors the

4   transcription or you can waive that right.

5          Mr. Darrow would advise you probably to read

6   it.

7       A.   Yes, I want to read it.

8          MS. BRODEEN:  All right.  And, Phipps,

9   Francine, can we have a three-day turnaround

10  transcription?

11         THE STENOGRAPHER:  Yes.

12         MS. BRODEEN:  All right.  Thank you.

13         Joe, do you want to get a copy?

14         MR. DARROW:  Yes, I would like to request to

15  please send us a copy, and also if you could send the

16  exhibits together in one email, just because getting

17  them off the chat isn't always that easy.

18         THE VIDEOGRAPHER:  We have two transcripts.

19         MR. DARROW:  Oh, no, I'm sorry, I meant to

20  request the plaintiff send us a copy.

21         MS. BRODEEN:  Okay.  We can do that.  We can

22  do that.

23         MR. DARROW:  Thank you.

24         THE VIDEOGRAPHER:  This concludes the video-

25  recorded deposition of Robert Guadian as corporate

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 184

1   representative for Homeland Security Thursday,

2   July 14th, 2022, at 4:05 p.m.

3            (Proceedings concluded at 4:05 p.m. EST.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 185

1                    CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA     )

5    COUNTY OF ESCAMBIA   )

6

7

8

9

10            I, the undersigned authority, certify that

11   ROBERT GUADIAN, Corporate Representative of United

12   States Department of Homeland Security, pursuant to

13   Rule 30(b)(6), appeared remotely before me on the 14th

14   day of July, 2022, and was duly sworn.

15   Identification Produced:  Driver's License

16            Signed this 18th day of July, 2022.

17

18

19

20

21

22   _____

23   FRANCINE O'CLAIRE
     Notary Public State of Florida
24   Comm# 1654948 Exp. 03/31/2025

25

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 186

1                  CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA      )

4

5   COUNTY OF ESCAMBIA    )

6

7         I, FRANCINE O'CLAIRE, RPR, do hereby certify

8   that I was authorized to and did stenographically

9   report the foregoing video-recorded remote deposition

10  of ROBERT GUADIAN, Corporate Representative of United

11  States Department of Homeland Security, pursuant to

12  Rule 30(b)(6); that a review of the transcript was

13  requested; and that the foregoing transcript, pages

14  numbered 1 through 184, is a true record of my

15  stenographic notes.

16        I FURTHER CERTIFY that I am not a relative,

17  employee, attorney or counsel of any of the parties or

18  counsel connected with the action, nor am I financially

19  interested in the action.

20        DATED this 18th day of July, 2022.

21

22

23        _____

24        FRANCINE O'CLAIRE, RPR
          Stenographer

25

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 187

July 18, 2022

Robert Guadian,
Corporate Representative of
United States Department of Homeland
Security, Pursuant to Rule 30(b)(6)


C/O Joseph Darrow, Esquire
joseph.a.darrow@usdoj.com

Re:  State of Florida v. United States of America, et
al.
Case No.:  3:21-cv-1066


Please take notice that on the 14th day of July, 2022,
you gave your deposition in the above cause.  At that
time, you did not waive your signature.  The transcript
is now available for your review.

Please call (888)811-3408 or e-mail
production@phippsreporting.com between the hours of
9:00 a.m. and 4:00 p.m., Monday through Friday, for
access to a read-only PDF transcript via computer.

Please execute the PDF-fillable Errata Sheet which will
be forwarded to you by Phipps Reporting.  The Errata
Sheet can also be downloaded from
www.phippsreporting.com.  Once completed, please print,
sign and return to us for distribution to all parties.

If you wish to waive your signature now, please sign in
the blank at the bottom of this letter and return to
the address listed below.

Very truly yours,


Francine O'Claire, RPR
Phipps Reporting, Inc.
www.PhippsReporting.com

I do hereby waive my signature.


_____

ROBERT GUADIAN

Job No.:  259224

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 188

1                      E R R A T A   S H E E T

2                      DO NOT WRITE ON TRANSCRIPT
                       ENTER CHANGES ON THIS SHEET
3

4   Style of Case:        STATE OF FLORIDA V. UNITED
                          STATES OF AMERICA, ET AL.
5   Deponent:             ROBERT GUADIAN, CORPORATE
                          REPRESENTATIVE OF UNITED STATES
6                         DEPARTMENT OF HOMELAND SECURITY,
                          PURSUANT TO RULE 30(b)(6)
7   Date of Deposition: JULY 14, 2022
    Case No.:             3:21-cv-1066
8

    PAGE LINE       CORRECTION              REASON
9

10  _____
    _____
11  _____
    _____
12  _____
    _____
13  _____
    _____
14  _____
    _____
15  _____
    _____
16  _____
    _____
17  _____
    _____
18  _____
    _____
19  _____
    _____
20  _____
    _____
21  _____

22  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
    are true.
23

    SIGNATURE OF DEPONENT:  _____
24  Dated this:_____day of _____, 2022.

25  Job No.:  259224

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                                 1

---

**Exhibits**

**Exhibit 001 Gua
dian**
 8:25 9:2
 78:21 84:7

**Exhibit 002 Gua
dian**
 19:7,9

**Exhibit 003 Gua
dian**
 40:14,16
 114:17,18
 115:22 116:4

**Exhibit 004 Gua
dian**
 50:17,19
 114:21

**Exhibit 005 Gua
dian**
 93:2,4,10
 95:11 158:1

**Exhibit 008 Gua
dian**
 161:3,4

**Exhibit 009 Gua
dian**
 117:14
 118:10,11

**Exhibit 010 Gua
dian**
 167:3,5

**Exhibit 012 Gua
dian**
 149:9,11

---

**$**

**$10**

37:8
**$150**
 37:9
**$1500**
 101:15

---

**(**

**(d)(5)**
 29:1

---

**1**

**1**
 8:25 9:2 10:7
 78:21 80:3
 84:7
**1,000**
 138:2
**1,229**
 81:8
**10**
 10:8 154:17
 167:3,5
**100**
 32:22 44:18
 90:3,19 91:3,
 25 111:12,13
 168:4 170:22
 171:3,8
**10:14**
 4:1,3
**11**
 10:8 123:4
 124:8 177:9
**1182**
 28:21 122:21,
 24
**11:42**
 68:19,21

**11:53**
 68:21,22
**12**
 10:8 15:10
 17:25 18:7
 149:9,11
 157:22
**1225**
 163:8
**1226**
 28:15 122:21,
 24 162:23
 163:6,16
**12:55**
 114:10,12
**12th**
 5:18
**13**
 10:8 75:3
**1325**
 28:11
**1326**
 28:8 29:12,19
**1326s**
 28:13
**1359**
 119:12,14,15
**14**
 10:8 32:22
 166:24 168:7
**14th**
 4:9
**15**
 105:17 113:25
 174:1
**150**
 48:19
**16**

**11:1**
**18**
 16:23 120:15
 129:18
**19**
 119:2 129:18
 132:2,10,14,
 18
**1993**
 13:25
**1997**
 14:10 61:15
**19th**
 82:12
**1:39**
 84:18
**1:55**
 114:7
**1st**
 65:2 78:25
 79:4,13
 123:11 132:13
 135:12

---

**2**

**2**
 10:7 19:7,9
 84:13 156:12,
 15 161:12,16,
 23
**2,266**
 80:11,21
**2,495**
 82:11
**20**
 64:12 81:2
 132:2,13
 138:2 141:19

---

Exhibit D

147:7 155:11,
21

**20,000**
22:8

**2000**
20:20

**2002**
36:17 37:10,
13 38:23
39:2,9,11,14,
16,19

**2003**
14:21 20:21

**2019**
14:25 64:12,
23

**2020**
15:14 64:12,
23 77:23
78:25 79:4,13
119:2 132:10,
13,17 133:4
144:7

**2021**
17:2 35:16
41:21 45:5,11
52:19 53:5
76:16,24
77:1,13,14,18
78:6 80:7,13,
16,24 81:2,
13,17 82:3,12
96:1 114:18
116:23 119:2
123:11,18
132:2,10,14,
18,23,24
133:4 135:12
140:15 141:5
144:9,20

155:11,14,21
156:8,12,15,
23 157:3,5
160:11 173:17
174:14

**2022**
4:9 84:18
90:5 141:6,7
142:6,9,12
156:5,21
167:1 169:17

**20th**
17:1 80:13,24
123:18 135:11
155:14

**212**
28:24 29:2
122:25 162:9,
10

**212(d)(5)**
28:25 31:24

**212.5**
162:8

**212B5**
123:1

**212D**
162:17

**21st**
80:13,24

**22**
130:13,17

**220B**
120:24

**236C**
101:12

**23rd**
80:16 81:13,
16 82:3,12

**24**
84:18 119:22
128:21

**241**
101:9

**247**
25:24

**25**
108:5 138:20

**250**
173:5

**26**
76:16 77:23

**26th**
76:25 77:14,
18 78:3,6
80:7

**27**
96:1 160:10

**28th**
81:13

**29**
171:16

**29th**
90:18,25
169:17

**2:04**
114:12,13

**2nd**
41:21 42:2
52:19 53:5
116:23

---
**3**
---

**3**
40:14,16
114:17,18
115:22 116:4

161:12 162:20

**3,000**
56:7

**30**
45:25 93:1
174:2

**30(b)(6)**
8:17,19,22
103:10 115:24
147:25 148:8
164:3 182:25

**300**
34:14

**30th**
65:2

**31,500**
53:23,24
64:17

**3:13**
164:8,10

**3:26**
164:10,11

**3:47**
179:19,21

---
**4**
---

**4**
50:17,19
114:21 161:12
163:3

**45**
46:1 64:12
167:18

**45,000**
64:13,23

**48**
66:17

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022
3

**4:00**
179:21

---

**5**

**5**
10:7 93:2,4,
10 95:11
158:1 161:12
163:14

**50**
45:25 46:1
66:14,16
91:24 94:15
98:19 110:20
138:19 158:6,
13,18,23
159:17,25
160:6

**500**
5:18

**5900**
77:9

---

**6**

**6**
10:7 74:23,24
93:8

---

**7**

**7**
10:7 181:23

**72**
150:11 157:13

**72-hour**
150:20

**75**
91:24

---

**8**

**8**
10:7 28:8,20
29:12,19
122:24 161:3,
4 162:23
163:5,8,16

---

**9**

**9**
20:12 117:14
118:10,11

**9.0**
154:11,15,24

**90**
38:16

**911**
20:12

**9495**
167:24

---

**A**

**A-G-U-D-E-L-A**
168:15

**A-G-U-D-E-L-O**
11:17

**a.m.**
4:1,3 68:21

**abide**
121:7

**ability**
8:9,12 29:9
55:5 65:8
179:2 182:19

**abolished**
14:20

**abroad**
108:15 109:17
110:25 130:5,
8

**abscond**
31:14

**absentia**
27:22 88:12
89:4

**absorb**
58:15

**accept**
59:13

**access**
33:7 47:6
55:25 85:23
90:6 107:24
175:14

**acclimated**
74:9

**accommodations**
152:23

**accounting**
34:22

**accurate**
19:14,16
86:22 99:6
173:8 182:13,
14

**Acosta**
18:22

**Acosta's**
19:5

**acronym**
98:8 118:25
182:20

**acronyms**
94:2,15

**act**
140:17

**acting**
10:22 11:13
75:16,20,21
95:12 168:14
169:21

**action**
100:17 129:7,
9,12 130:21
176:17

**actions**
62:13 70:18

**actively**
62:12 175:1

**activities**
21:9 100:5

**acts**
29:20

**actual**
51:1 69:20
72:19 151:14

**AD**
73:5 105:10

**add**
70:16 77:5
122:5 174:18
176:21

**added**
113:22 155:1

**addition**
30:7

**additional**
36:21 61:17,
25 62:16,23
63:11,16 64:9
70:17 77:19
120:8 141:11
158:23

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022
4

**address**
5:15 81:14,18
87:19 123:6
166:11 168:5
178:20 179:2,
4 180:4,19,20
181:1

**addressed**
56:9

**addresses**
28:15 47:8
49:23 177:21
178:19,22
179:7 180:15

**Adelanto**
67:15 151:22

**adequate**
151:8

**adhere**
55:12

**administered**
37:18

**administering**
4:22 116:15

**administration**
21:5 98:4

**administrative**
131:2,5,13

**admission**
78:24 79:4,7,
12 161:19
162:22 163:5,
15

**ADT**
72:21 78:10,
15

**adult**
39:17 40:7
77:9 141:11

142:1 144:21
155:17 157:4,
15 165:20,21,
22

**adults**
39:14 77:20
141:10,24
142:4 144:15,
16,24 145:2
149:4 156:23
178:17

**advance**
24:7 94:13

**advice**
161:25 163:11

**advise**
183:5

**advised**
150:7

**advisor**
21:3

**advisors**
152:10

**affected**
67:1

**affirmed**
5:7

**afforded**
137:18

**age**
40:2,4 44:15

**agencies**
20:15 25:2
63:6 107:6

**agency**
24:23,25 39:2
63:14,15
64:2,5 107:16
125:19,21

**aggravated**
138:12

**aggregated**
101:12

**agree**
77:17

**agreement**
109:2,3
110:18,21,25
111:2,15,19
112:3 147:2

**Agudela**
168:15

**Agudelo**
11:17

**ahead**
7:4 51:20
53:8 71:7,9,
13 76:8 97:3
102:25 126:12
130:22 133:15
146:14,17
154:21 156:1
157:3,24
158:11 164:21
176:9

**air**
65:7

**aircraft**
58:18 65:5,16

**alcohol**
8:8

**alerts**
7:20

**alien**
21:21 22:25
23:1,24
24:13,15,21
32:4,7,18

37:1 45:6
47:13 58:6
59:14 72:1
87:22 89:17
101:20,23
106:8,22
121:7 127:5
162:24 163:8
181:20

**aliens**
12:24 21:17
22:6 23:7
25:9 27:20
28:3,16,21
29:2,8 31:1
33:15 35:10
36:10 37:3
39:20 46:8
58:12 59:11,
15 73:10,12
76:22 87:5
89:12 90:23
99:3 101:7
102:14,16,21
103:17 105:21
106:4,11
107:7 111:7
113:2,7
116:6,11
117:5 121:10,
12 122:12
125:7,11,12
126:18 134:9
136:8 166:14
171:22 181:15

**allegations**
21:12 24:2

**allocated**
104:19

**allotted**
36:21

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                              5

allowed
  42:22,25
  90:2,18  91:2
  112:1  140:20
  170:22
allowing
  34:25
alluded
  34:2
alpha
  119:8
alphas
  121:12
alternative
  73:6  141:12
  153:19
alternatives
  34:20  35:7,11
  36:18  37:6
  42:15  74:4
  105:2  141:14
  142:17,22
amend
  40:3  120:13
amended
  12:17  13:3,6,
  12  84:9
America
  4:7  111:9,18
American
  74:9
amount
  37:3  55:2
  58:3,12
  101:15  172:4
amounts
  100:20,24
  165:22

analysis
  98:11  99:7
Angeles
  67:14
ankle
  34:24  37:17
  39:25  42:24
  43:4,15,16
  47:23  49:10
  74:15,19
announce
  4:13
answering
  10:9  163:1
answers
  12:9  96:25
  154:17  155:22
  157:1  161:9
Antonio
  16:17  17:16
  34:3  41:18
  70:3
anymore
  157:20  159:8
  174:25
AOR
  56:24
AORS
  70:21
apologize
  5:19  6:12  8:4
app
  35:6  48:5
appearance
  36:24  37:1
  38:14,15,16,
  18
appearances
  4:13  142:19

appeared
  88:13
appears
  19:16  45:17
  52:5  116:13
  135:22,23
  181:18
applicant's
  173:15
applicants
  78:24  79:6,12
  161:18  162:22
  163:5,15
applied
  52:19  79:4
  123:9  136:15
  140:4,6
applies
  126:7,9
apply
  52:8
applying
  18:2
appointment
  89:18,19,22
  90:7  122:9
  172:1  174:23
  176:6,13
apprehended
  76:23
apprehension
  28:15
appropriated
  64:15  182:15
appropriation
  147:20
appropriations
  62:21

approved
  63:16  64:14
approximate
  60:10
approximately
  36:17  37:9
  38:15  61:11
  64:12,23
  75:12  156:8
  158:13
April
  167:1  169:17
  171:17
AR
  98:13
area
  86:24  127:15
  178:5
areas
  17:11,12
  150:9,16
argument
  159:13
ARO
  70:24
arrest
  12:23  24:23,
  25  26:13  28:3
  34:5  44:10,12
  49:2  59:8,17
  66:18  77:25
  88:16  89:6
  99:11  102:18
  106:24  163:17
  181:14
arrested
  22:17  58:6
  107:5
arresting

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                                6

27:24

**arrests**
33:9 58:4
60:1,2 106:13
120:2 165:22

**arrive**
58:4 171:9
176:6

**arrived**
122:8 171:4,
16

**Arts**
14:1

**aspect**
45:16

**assessment**
160:19

**assign**
105:5

**assigned**
5:23 34:15
35:13,18
42:18 50:13
52:7

**assignment**
34:12

**assignments**
104:17 138:16

**assigns**
24:21

**assist**
15:8 34:16
52:8 58:21,24
104:20 105:10
163:9,20

**assistance**
73:21 161:22,
24 163:1

**assistant**
10:23 11:9
14:23 17:24
18:19,22
29:17,22 62:8
95:18

**assisting**
35:9

**associate**
10:20 11:7
18:25 19:1
95:12

**association**
4:11

**assume**
22:17 73:4

**assumption**
168:2

**asthma**
152:25

**asylum**
25:20 32:8
102:22

**asylums**
102:21 103:16

**ATD**
13:16 34:16,
17 35:25
36:2,13,15,22
37:1,4,8,12,
21 38:6,10,
11,15,18,24
39:2,9,10,14,
17,22 40:4,7,
10,12,18,25
42:19 43:8,12
45:8 47:9,18
48:12,25
49:10,17
50:4,12,15

51:6 52:6
72:21 73:1,
11,18 77:24
78:2,12 80:8
85:17,25 86:9
89:9 96:10
104:20,24
105:10 116:5,
10,15,20
132:3,9,15,
18,20,22
134:15,16
135:25 136:1
141:12 142:13
143:2,8
150:13 167:8
174:10 175:14
176:4,23
178:10 180:2

**attache**
109:17 110:5

**attached**
67:4 98:15,17

**attachment**
76:9

**attention**
50:22 76:12,
19 95:22

**attorney**
4:16 29:22
76:6 104:13
160:15

**attorney's**
6:14 10:5
29:18

**attorneys**
10:18 41:13
67:10 75:2
76:10 87:21
124:14

**audible**
6:18,19

**audibly**
181:25

**augmenting**
70:20

**August**
76:16,25
77:14,18,23
78:3,6 80:7,
13,16,24
81:2,13,16
82:3,12

**authoritative**
123:1

**authorities**
32:16 161:18

**authority**
27:13 29:11
57:14,17,19,
20 59:3 126:3
133:6,21
161:17 162:3,
21 163:4,14

**authorization**
61:24 147:19

**authorize**
62:20

**authorized**
64:11 102:21
103:16

**await**
32:8 107:9

**aware**
150:15

———————

**B**

———————

**Bachelor**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                                7

13:25

**bachelors**
  13:25

**back**
  6:12 20:11
  22:10 23:11
  39:2,9,10
  68:23,25
  72:21 80:1
  83:20 90:3
  105:19 108:9
  114:1,14,17
  115:24 117:3
  120:5,12
  121:15
  122:13,18
  123:2,19
  129:21 136:12
  151:1 158:1
  164:12 170:23
  171:3 172:2
  176:7,12
  179:23
  180:11,13
  181:9

**background**
  8:1 33:6 44:1
  61:23 66:2
  71:3 73:16
  119:12 120:3
  158:20 159:2

**backtrack**
  52:12

**bad**
  71:25

**Barker**
  71:24 84:13,
  16

**barrier**
  152:19

**bars**
  139:2

**based**
  13:2 58:20
  68:2 72:18
  87:17 91:25
  92:15,17
  95:5,24 97:1,
  4 112:7 135:3
  142:1 147:1,
  20 148:25
  155:1 164:18
  165:21

**basically**
  159:8 167:19

**basis**
  29:7 31:9
  56:3 115:8,9
  126:23 140:14
  159:11

**Batavia**
  61:1

**Bates**
  76:13

**bathroom**
  139:11

**beat**
  15:3

**bed**
  54:23 55:6
  56:5 60:11
  66:4,21,25
  141:22
  182:13,17,19

**beds**
  53:23,24
  54:1,3,8,10,
  15,17 55:13,
  20,21,23 56:7
  59:25 64:13

**66**:6,12,16,17
  67:17 98:25
  137:21
  138:18,19,20,
  24 140:17
  141:11 142:1
  144:21 151:5,
  17 152:20
  153:25 160:2,
  7,17,24,25
  182:15

**began**
  4:1 14:16,17
  157:5

**begin**
  92:9

**behalf**
  4:16,19 8:22
  161:11

**behavioral**
  134:17

**believes**
  162:21 163:4,
  14

**benefit**
  31:12

**benefits**
  107:17

**Bernacki**
  42:9

**BI**
  50:14 134:17,
  21 135:25
  178:10,12,14

**Bible**
  10:21 11:6
  19:2

**Biden**
  161:20

**big**
  11:19 21:14
  55:17 117:16,
  25

**bigger**
  71:16

**BINS**
  71:20 72:13,
  18

**biometric**
  72:18

**biometrics**
  106:18

**birth**
  24:12 106:17

**bisect**
  15:19

**bit**
  36:14 87:5
  131:3 177:4

**black**
  125:2

**blank**
  30:18 123:21

**blanks**
  131:20

**blood**
  153:1

**board**
  18:3

**bold**
  76:21

**bond**
  100:20,24,25
  101:7,11,13,
  14,17,19,22
  102:11,12,15,
  17 133:21

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

**bonded**
120:22

**bonds**
101:1 102:1,
13,14

**book-**
99:12 160:5

**book-in**
98:21,23 99:9

**book-ins**
94:4 98:18,20
99:5,19
158:2,5,17,
19,22 159:17,
24

**book-out**
120:17

**booked-in**
98:25

**BOP**
23:5

**border**
12:23 13:14
15:18,21
16:11,13,18,
20,24 17:1,5,
9,10,15,18
25:3,4 28:10
32:23 33:7,9,
11 34:1,8,9,
13,16,19,23,
24 35:9,14,
20,24 41:12,
22 42:21
44:11 45:5,7,
15,17 46:2,7,
19 49:3 50:8
52:8 58:8,10,
11,13,15,16,
22 59:2,5,17,

19,25 60:2,4,
5,7,12,16,19
70:23 71:14
73:1,23,24
76:23 77:11,
21 78:11
80:12,22
83:2,6 85:3,
11 86:18
87:15 104:18,
19,23 105:6,
8,9,11 111:8
119:18,24
123:11,18
124:5 127:20,
23,25 128:23
129:2 132:2,
6,17 133:4
140:25
141:10,22,24
142:2 150:1
173:16,23
174:10,17
178:23

**borders**
21:8 58:5

**born**
23:4

**boss**
170:8,10

**boss's**
170:8

**bottom**
51:23 76:13
131:17 139:8
150:3

**bounds**
41:7

**boxes**
123:9

**bracelet**
37:17 43:15

**bracelets**
34:24

**bravo**
120:24 121:11
134:21

**break**
7:8,9 10:7
68:13 84:24
92:23 105:15,
16,17 114:1
138:4 164:4
179:16,17

**briefly**
20:9

**bring**
9:9 90:3

**bringing**
107:17

**broad**
22:7

**Brodeen**
4:15 5:10
9:4,14,18
19:10 40:17
41:4,8,14
50:18 51:4,
11,14,19
52:23,25 53:7
63:1,8,15,21
64:7 68:8,12,
24 71:2,7,12,
23 72:4,7,8
74:25 76:4
79:22,25
82:19,25
83:7,12,19
84:4,14,22
85:7 86:7

93:3,14,21,24
94:11,24,25
96:7,15,18
97:2 102:9,24
103:6,13,15,
19,23 104:2,
7,10,12
105:23 106:2,
3 110:9
111:22 112:1,
6,15,21 113:1
114:7,9,15
115:2,7,11,
14,17,21,25
116:2,3
117:22 118:5,
12 124:20,22
126:7,12,19,
24 127:1
135:2 145:10,
14,22 146:2,
10,13,16
147:12,14
148:3,4,9,15,
18 149:7,13,
17 153:17
154:18,20
155:25 157:2,
23 158:9,10
159:5,15
160:9 161:5
163:22 164:2,
7,13,19,21,25
165:5,9,15
166:19 167:6
174:12 175:18
179:14,24
181:4,22
182:2 183:1,
8,12,21

**broke**
179:25

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

9

broken
133:8

brothers
33:11

budget
62:9,15 63:1,
3,10,12,14,25
64:9

budgetary
18:12 62:2,6

budgeting
62:17

Buffalo
61:2

build
61:25

building
5:16 7:13,14,
16 61:12
70:20 105:6

built
59:3,20 61:18

bunch
69:13

Bureau
23:6 130:3

bureau's
122:2

Burke
10:24 11:9
12:1 143:10,
19 144:3,7
145:2 149:2
150:8 156:22

Burkes
140:9

business
5:15 55:3

by-case
160:19

─────────────

C

cabinet-level
20:16

calculator
113:24

California
54:16 67:13
160:5,16

call
8:16 19:11
26:5 54:4
117:14 121:16
149:9

called
21:21 23:2
35:7 53:11
72:10,13 74:5
139:25 146:3
154:1 177:10

calls
63:19 110:1
126:5 159:1

camped
173:3

camping
174:25

capabilities
175:11

capability
106:10 134:9
173:1 181:14

capable
127:23

capacities
55:9 63:11

67:7 70:14
136:22 137:7

capacity
53:14 55:21
56:11,12
57:6,16,21,23
58:10,20,23,
24 60:3,15,18
62:23 63:16
64:3,10,11,
16,17,18,22
65:23,24,25
66:21 67:2
68:2 71:6
83:17 93:21,
23 94:5,19,20
95:17 96:6
97:1 103:11
104:6 136:12,
14,19,20
138:1 145:11,
12,15 148:11,
12 151:1
154:19 155:23
157:1 158:24
159:18,22
171:2 182:12

capacity's
56:14

capture
124:3

captured
46:21 122:15,
17 131:15

care
137:1 152:25
158:9 166:8,
10,12,17,18

career
14:16,17

16:12 27:11

case
12:17 27:23
29:17 32:6
37:23,24 38:1
43:11 44:2
51:3 82:13
88:1,3,14
93:5,9 94:8
101:3,4,5,6
102:16 107:1,
3,11,14,22
114:23,25
115:1,4,9,10,
12 135:13
152:8 160:23,
25 161:20
162:15

case-
160:18

case-by-case
31:9 38:5

cases
26:10 27:6,8,
20 28:4,10
29:10,14
31:6,11,16
32:6 33:14
37:3 94:10
101:7,8 125:8
127:10 141:16
152:11 162:8
163:17 176:4

catch
181:8

categories
100:23 120:7

caught
92:6

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                    10

caused
  141:8
caveat
  90:20
CBP
  32:17 33:20,
  22 34:10
  35:17,18 36:5
  41:2 42:13,19
  47:2,18 52:8,
  20 73:2 85:3,
  11 86:22
  98:20 99:5,11
  105:7 116:6,
  10 128:16,17
  132:7 158:19
  174:4 178:25
  179:1,5
CDC
  55:12 91:20
  92:3,8,10,13,
  16,20 155:1,8
cease
  156:4
Celani
  4:10
cell
  43:20 48:1,3,
  4,9 73:6,7
cells
  139:1
cellular
  175:11
center
  5:16 60:24
  61:1,3,6,8
  69:15 92:6
  107:8
centers

54:4 57:1,2
61:13,18,23,
25 65:22 92:5
113:8 125:8,
13 137:7
139:4 141:25
144:21
146:11,23
147:9,16
150:19 151:15
156:3,10
157:16 165:20
Central
  111:9,18
certifications
  14:5
certified
  5:8 136:8
  177:6,18
  180:3,6
CFR
  162:8
chain
  164:16,24
chains
  164:23,24
challenges
  54:11,21,22,
  24 55:4,15,19
  66:3,24
  138:17,23
challenging
  12:20,22
chance
  160:1
change
  98:3 144:12,
  16,17
changed

38:25 144:14
charge
  22:17
charged
  59:7 112:10
  113:3,4
charges
  73:2 107:24,
  25 108:10
  109:20
  113:15,23
  121:21 129:5
  130:4,5,8,10,
  19
charging
  87:14,24
  129:10 134:7
  176:3 181:19
chart
  19:13,18 28:9
  129:21
  131:18,24
chat
  9:8,13 19:7
  40:15 75:5
  93:6 117:20
  118:2 149:8
  161:6 183:17
cheaper
  37:6
check
  46:8 85:9
  89:17
check-
  48:5 171:4
check-in
  46:5,6 48:4,
  13 73:7 79:15
  80:6 81:3

85:16 89:9,
16,22,23,24
122:5,6,7,10,
13,17 123:5
134:3,7,9,11
135:7,12
136:2,9
140:13,20
170:24 171:6,
21 173:1,21
174:5,7,14,22
175:20,21,23,
25 176:16,18,
19,22,24,25
177:5 178:1,7
180:2 181:11
check-ins
  46:3 82:8
  134:4,14,18
  135:19
  171:15,23
  176:2
checked
  77:11,21
  81:17 82:22
  89:14 134:5,
  12,15,18
  176:17
  178:11,12,13
checked-in
  80:14,25
  81:15 82:13,
  20 135:21,25
checking
  35:3 90:13,24
  178:6 181:13
checking-in
  178:9
checks
  106:11 176:3

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022
11

Chicago
15:1

chief
14:23 42:9
133:1 150:1

child
44:6

children
37:18 40:1,
11,12 142:21
173:10,11,12

choosing
100:16

chronic
152:25

CHS
161:10

circle
68:25

circulate
62:10

circumstances
36:8 53:4

cities
54:13 81:24
137:10 177:9,
10

citizen
110:22

citizens
109:1

citizenship
171:11

city
16:1

civil
137:11,12,17
147:1

claim
13:10

clarification
30:5 61:10
63:13 68:5
115:23 149:5

clarify
6:13 22:14
26:17 30:9
87:4 88:6
106:6 121:2
155:17 180:5

classes
74:6

classifications
138:7

clear
84:5 92:19
94:19 97:12
102:13 131:3
157:17 169:16

close
34:7 56:6
58:14 60:4
64:12

closed
77:1 90:14
99:11 150:8
157:12,14
171:7 172:7,
15,18,23
177:4

closely
34:7 136:20

closer
57:1,2

closest
46:9,10

closing

147:23 148:6,
20

closures
172:22

cloud
75:16

co-located
16:5 26:9
34:15 42:19

coach
126:25

coaching
126:20 159:5

code
28:19,23

column
113:6,20,22
120:6,11
123:17,20
124:8

columns
113:5 118:13
121:16,18
123:3

combination
180:18

combined
20:14

combining
20:18

comfortable
10:9

comma
163:7

command
11:7

commented
9:15

committed
105:21 106:5,
8 109:6 112:8
117:5

committing
112:10 113:3
117:11

communicate
34:3,4 35:5
139:13

communication
110:8

community
31:13 32:7
37:15 39:21
66:11 73:20
74:8 107:9
113:7,9,14
121:8 160:21
172:14

community-
91:18,25

community-
transmission
90:21

company
50:14

compare
38:20 48:23
70:23

compared
48:17 69:9

compares
97:19

complaining
152:5,6

complaint
12:17 13:3,6,
12 84:9

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                          12

complete
46:23

completed
27:18 107:19
144:22

completely
174:24

completes
107:21

compliant
142:18

complications
152:15 153:4

comply
146:23 147:9,
16

component
21:15 36:2
45:8 62:11

components
42:17

comprehensive
166:16

computers
139:12

concerned
174:6

concerns
31:12 39:23
147:22 148:5,
19

concludes
183:24

conclusion
126:6,11

conditioned
101:19

conditions
37:16 39:24
121:7 143:2,
9,17,20
144:2,5
146:12 152:25
153:1,11

conduct
105:3 160:18

conducted
12:23 14:9

conduit
18:10

confer
76:10 124:14

conferring
124:16

confidential
7:6 103:24

confirm
49:5 173:6,10

confirmed
173:7

confused
80:17 157:11

confusing
148:8

congress
36:21 49:20,
23 61:24
62:20 63:10,
17 64:11,14,
15 167:4
182:14,16

congressional
147:20

connect
62:11 175:7

connection
74:17

connectivity
74:21

consent
4:22 146:3,7,
19,24 147:9,
16

considerations
32:25

considered
69:16 77:25
134:11 136:9
153:3,10,18
177:10

consistently
18:3

consulates
109:4

consult
92:19 108:21

consulted
10:18,19

contact
166:15

context
99:23 160:2
176:21

contingencies
56:8

contingency
56:24

contingent
56:9

continually
70:15

continue
80:4,15

150:13 178:1

continued
81:25

continues
77:11

continuing
81:23

contract
27:3 54:7
57:9,15,20
65:8 140:16
141:4 142:8,
10 143:14
155:20 164:15
182:12,17,19

contracted
27:4 65:6

contracting
55:1,4 57:13

contractor
27:6 54:18
56:16 57:9
74:5 134:15,
16 135:25
136:21 140:19
178:10

contractors
27:5,9 50:10,
12,15 65:7

contracts
53:16 56:9

control
11:16 92:7

controlled
56:15

conversation
170:2,13

converted
141:25 144:24

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

13

convey
170:17

convicted
109:22,23
129:4

convictions
107:24 109:12
130:19 131:1

cooperate
23:3 54:20,25

cooperation
54:13

cooperative
110:16

coordinate
23:17 108:19

coordinated
163:11,21

copied
149:23

copy
112:17
183:13,15,20

corporate
4:5 183:25

corporation
57:10

corporations
55:2

Corps
155:6

Correa
41:19

correct
15:17 19:21
20:8 22:22
25:4 26:25
28:17 33:21

42:5,6 43:13
48:16 55:22
57:22 60:16
62:2 64:20
67:2 69:23,24
72:10,11
75:22 77:4,5,
14,22 80:5,7,
9,16 81:3,4,
6,19 92:21,22
95:13,14
96:21 102:20
105:23 109:25
112:3 116:6,
11,18 117:10
130:6 145:3
149:4,6
150:23 151:2
156:2 158:6,
24 160:11,12
161:2,14
167:9,10
168:20,21
169:17
170:15,16
174:10 175:5,
6 180:9
182:11,18

corrected
10:25

Correction
23:13 25:8

correctional
137:9 139:24

corrections
23:16,24
25:10,15,19
55:3 57:11

correctly
5:12

councilor
108:16 109:16
110:6

counsel
4:13 87:22
162:1 163:2,
12,21 166:15

counted
134:13

counterpart
18:15

counties
21:24 22:11
54:13 137:10

countries
48:19 108:3,
15,22,25
109:3 110:13,
15,20 111:4,
7,10,13,17
112:2 129:24

country
32:19,21
58:19 78:25
83:21 108:9,
20 109:2,5,7,
14 110:17,23
111:2,17
128:4,10
129:23 130:1

county
16:5,6 21:22
22:1,20
26:15,19,20
54:1,18
56:10,16 57:9
91:21

couple
61:4 107:7
139:8 163:22

170:3

court
6:20 12:6
30:4 37:2
38:17 55:14
67:8 87:16,
17,25 88:10
89:4 101:20
107:6 142:19
181:1,2,3,23

courtroom
101:25

courts
36:25 47:16
67:4 133:17

covered
136:10

COVID
55:7,10 66:7,
11 67:1,4,5
91:17 150:10,
23 151:2,4,6,
7,11,14
152:7,14,15
153:5,20,24
160:3,20
161:1 172:11
177:3

create
30:14 146:23
147:8,15

created
20:13 47:2

creates
98:13

crime
21:15 106:8
108:10,11
109:7 112:10
113:4

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

14

crimes
105:22 106:5
112:8 117:5,
11 130:1,10

criminal
12:25 21:7,21
22:1,12,17,
21,25 23:1
70:12 106:10,
14,16,20,21,
23 107:23
108:3 109:19
113:15,23
121:20,21,23
122:1,2
129:5,22,25
130:4,19
131:1,4,14
137:12,18
138:10

criminality
130:14 135:13

criteria
163:6

cross
34:6 127:24

CROSS-
EXAMINATION
182:8

cross-
referenced
50:9

crossed
25:11,15
128:11 129:2
173:15 174:9,
16

crossing
141:10,24
142:21

cruel
166:3

culture
74:9

current
15:7 17:4,21,
23 34:11
54:12 62:5
64:19 77:9
98:4

custody
10:24 11:10
21:23 22:3
24:10 31:4
32:4 58:23
59:13 99:10,
14 109:1,5
110:14,25
120:23 125:7,
12 137:3
152:17
166:18,22

custom
20:19 25:3

customs
5:24 6:3 25:4
33:11 41:12
44:11 45:4,14
50:7,8 87:15
105:9 124:5
127:22 128:8
173:23

customs'
128:9

cut
43:5

cyber
21:14

cycle
106:25 107:2,

22 125:2

———————————

D

———————————

D.C.
5:17,18 7:15
15:9 17:3

D2
131:23 132:16

D4
131:23 132:16

D5
162:17

DAD
62:7

daily
56:3

Dallas
16:19

Dan
10:21 11:6,24
19:1

Darrow
4:18 40:24
41:10 50:25
51:7,17
52:21,24 53:6
62:24 63:3,
13,18,24
68:4,10 70:25
71:4,11,21
72:3,5 76:3
79:20 82:16,
22 83:3,10,
14,24 84:12,
21,23 86:3
93:11,19,22
94:7,22 96:4,
11,22 102:5,
22 103:1,8,

14,18,21,25
104:5,9
105:23,25
110:1 111:20,
24 112:5,14,
17,23 114:19
115:4,9,13,
15,23 116:1
117:20 118:3
124:16,17
126:5,9,14,
19,22 134:24
145:8,12,24
146:8,12
147:10,13,24
148:7,13
149:16 153:13
154:16 155:22
156:25 157:21
158:7,25
159:9,10,20
163:25 164:6,
18,20 165:3,
8,13 166:4
174:11 175:16
179:12,18
180:23 182:3,
5,9,25 183:5,
14,19,23

data
48:24 78:23
79:11 95:5,24
97:4,18 98:8
105:20 112:17
117:4 127:23
129:3 130:12
134:3 135:16,
19 155:8
156:14 177:19

data's
133:8

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                    15

databanks
  112:8
database
  46:16,19,22
  47:2 48:17,24
  106:7 128:9
  135:8,9
databases
  48:23 50:9
  99:2 109:8,9
  121:25 124:6
  127:21
  128:13,16
date
  24:12 35:15
  76:25 88:23
  106:17
  116:21,22
dated
  41:21 96:1
  160:10
dates
  144:19 157:8,
  17 174:5
David
  4:10
Davies
  84:17
day
  37:8,9
dayroom
  139:10
days
  32:22 39:7
  46:1 141:19
  147:7 173:22,
  24 174:1,2
  175:24
DD

81:9,17
dealt
  110:16
decides
  162:23
decision
  37:25 38:5
  47:16 97:5
  102:17 107:10
  141:20,23
  142:22 145:4,
  6,20,23
decisions
  27:15 28:2
  55:14 67:8,24
  89:2 107:19
  133:12 145:13
  160:16
declarations
  161:25
decompress
  58:10,11 59:1
decompressing
  58:22
decompression
  58:16 59:24
decrease
  58:12 65:9
  145:15 148:12
  158:6,13,23
  159:17
decree
  146:4,7,20,24
  147:9,17
dedicated
  81:12,20,23,
  25 82:2,7,8
  177:11,12,13

deep
  16:16 17:20
defendant
  8:23 114:21
  117:7
defendants
  13:11
defer
  73:24 111:3
  178:25 179:5
define
  17:11
defined
  99:9 120:16
  129:18
defines
  98:22 130:13
definition
  122:7
degree
  14:3
delays
  166:25
Delegates
  167:24
deliberative
  63:6,19
deliberative-
process
  62:25 64:6
delivered
  109:15,16
delivering
  65:19
delivery
  101:19
deny
  173:6,10

Department
  4:19 7:14
  12:10 20:15
  23:13,15,24
  25:10,14,18
  62:18,19
  76:15 111:3
  125:22 129:13
  161:10
departmental
  97:11
Departments
  25:8
depend
  102:15
dependent
  32:5 110:4
depending
  24:22 32:9
  45:23 74:3
  139:17,18
  172:10,14
depends
  24:22 66:9
  91:18
depo
  93:10 94:20
Deponent
  84:13
deportation
  14:16,21,22
  16:15 26:8,12
  27:11,12,23
  28:14 29:16
  35:6 47:14
  48:14 125:1
  139:14
deportations
  52:13

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

deported
111:13

deposition
4:4,8 6:9,13,
15 7:19 8:17,
20,22,24 9:1,
5 10:15 12:3
19:8 42:5
71:24 94:6
104:15 167:20
168:7 183:2,
25

depositions
8:16

deputy
10:20 11:6
14:24 15:7
17:23 18:19,
25 19:1,21
62:7 95:18

Desantis
169:13

Desantis'
76:16

describe
17:13 138:25
176:21

description
62:1,5

designate
84:12

designated
10:5 11:1
41:3,4 51:9
52:22 71:1
78:23 84:6,19
102:23 103:10
104:1 105:22

designates

61:8

destination
46:11,13,16
49:24 85:17
127:13 167:9

destinations
47:20

detain
22:5 88:16
89:6 141:19
145:2 147:6
157:19 163:7

detained
23:8 31:6
59:12 106:12
110:22 125:5,
8,10,14,25
127:11 137:11
155:11

detainee
23:22 67:6
138:21 142:24
159:4 160:19
166:8

detainees
58:19 137:3,
11,14 138:7,
8,9

detainer
21:24 22:16
23:20,21 24:2

detaining
21:17 22:11
27:24 153:12

detention
11:11,12
14:22 28:16
31:5 34:4,20
35:8,11 36:3,
9,10,11,18

37:6,7,9
42:16 53:18,
21,23 54:3
55:9,10,16,
18,21 57:1,2,
15,21,24
58:6,20 59:8
60:6,14,20
61:7 62:16,23
63:16 64:3,9,
11 65:11
66:25 67:1,6,
17 70:13 73:6
74:2,4 93:21,
23 94:5,19,20
96:5,10,12
98:25 101:6
105:2 107:8
113:8 125:7,
13 126:18
136:12,13,18
137:7,8,11,
12,17 139:4,6
140:22
141:14,21
142:17,23
145:11
146:10,23
147:2,8,16
148:11,20
150:17,20,25
151:15 152:13
154:18
155:15,17,23
156:13,16,17
157:1,15
158:24 159:19
164:21
165:10,11,16,
20,21,24
166:2,8

detentions
156:10

determine
43:10 44:3
49:18 57:24
86:18,23
91:10 136:22
163:7 178:4

determined
136:13 141:9,
12

determines
136:15

determining
152:11 180:16

developed
92:17

developing
19:23 152:15
153:4

device
47:22 49:10
175:7,15

devices
38:23 39:7

DHS
19:14,19
20:7,17 42:17
51:13 53:11
61:23 76:23
78:25 79:15
80:10,18
87:21 95:5,24
96:2,20 97:4,
8 105:21
106:4,7 117:5
161:18,19
162:21,23
163:3,6,14
165:11,16,18

Exhibit D

181:20

DHS's
  40:18 84:8
  163:16

diabetes
  153:6,7

dictates
  127:16

Diego
  17:18 34:3
  52:12,20
  71:16

difference
  121:9

differently
  86:6 125:15

difficult
  50:7 58:1
  124:6 146:22
  151:12

difficulties
  9:16

difficulty
  146:25

Dilley
  140:8 143:10,
  19 144:3,6
  145:1 149:2
  150:8 156:22

diplomatic
  111:25

direct
  5:9 19:1
  170:10

directing
  45:6 179:10

direction
  97:17

directly
  19:19 35:5
  119:23 127:19
  128:18,22,24

director
  10:20,22,24
  11:7,9,13,25
  14:23,24
  15:1,8 17:24
  18:19,23 19:1
  41:18 62:8
  75:17,20,21
  91:15 95:12,
  18 146:1
  168:10,12,15,
  21 169:21
  173:2 179:9
  181:17

directorates
  21:1

directors
  18:7,8 30:20
  91:23 172:11

discovery
  12:7 13:9,17
  75:1 78:17
  79:9,18 96:14
  114:22 115:1,
  10 117:7,10

discretion
  31:16 80:23
  99:22 100:4,
  9,11,14,16,18
  121:1 162:22
  163:4,15
  172:12

discretionary
  32:5

discuss
  64:1 170:12

discussed
  116:16

discussions
  11:21

disease
  92:5,7 153:1

disk
  117:18,23

dismantle
  21:7

disposition
  108:1

disrupt
  21:6

disrupting
  21:9

distance
  60:4 66:8

distancing
  152:21 153:25

distinction
  92:13

district
  30:4 55:14
  67:4 133:16

divide
  17:8

division
  98:13

divulge
  64:4

docket
  67:22 81:12,
  21,23,25
  82:3,7,8,13
  106:12 119:20
  121:20 124:25
  125:6,8,14,24

127:3,11,12
177:11,12,13

docketed
  127:14

document
  9:12,17,21,
  23,25 10:4,
  11,12 12:14
  19:6 24:11
  51:16 75:8
  76:14 87:14,
  24 93:22
  96:14 114:22
  118:19,22
  129:10 134:7
  149:19,20
  154:1 176:3
  181:19

documents
  12:6,7,15
  13:9,13,14,18
  31:14 45:22
  79:24 117:7,9
  148:25

domain
  63:22,25

dormitory
  139:1

double-click
  9:10

dovetails
  117:6

draft
  75:24

drafts
  75:23

drawing
  30:18 124:5

Drive

Exhibit D

167:24

**drop**
161:6

**dropped**
9:8 142:8

**drugs**
21:8

**due**
9:15 47:15
110:7 136:5

**duly**
5:7

**duties**
17:22 30:10
100:10

**duty**
34:12 52:17

---

**E**

**E2**
133:2

**E4**
133:2

**earlier**
34:2 62:4
66:3 69:1
72:2,9 99:21
116:25 133:7
134:8 150:25
162:9,11
164:14

**east**
15:10,16,20
18:1,13

**eastern**
62:8

**easy**
13:21 66:20

159:21 183:17

**education**
13:22,23 14:2

**effect**
30:23 32:11
46:15 67:23
152:1

**effected**
107:21

**effective**
90:4

**effectuate**
26:13

**effort**
141:15

**efforts**
58:16 59:24
170:21

**eighteen**
40:2,4

**E1**
17:18 34:2

**electronically**
23:20

**eleven**
81:24

**eligible**
33:2 39:10,
14,17,22,25
40:4,7
101:10,13
102:2,16
177:9

**else's**
178:20

**email**
26:5 84:17,22
93:5,25 95:1,

7,11,23 96:16
97:1 112:19,
21 149:21
158:2,5
160:10 183:16

**embassies**
108:22

**embassy**
109:4 110:5

**EMI**
19:4

**employees**
22:8 52:7
90:23 91:11
170:22

**employs**
125:21

**empty**
56:7

**enabled**
34:24

**encounter**
29:15 33:15
119:23 127:20
128:23

**encountered**
119:1 121:24
123:10,17
132:1,9,16,19
174:9

**encountering**
108:22

**end**
70:9 90:4
95:10 117:18
170:21 171:9
179:6 182:3

**ended**
45:10 78:15

80:16 177:5

**enforce**
24:23 27:14
28:1 89:2
133:12,14

**enforcement**
5:23,24,25
6:2,3 14:9,
11,13,15 15:2
21:1 27:13
70:18 93:16,
20 95:25
96:3,12,21
97:5,21 98:2,
11 100:2,3,5,
6,7,17 111:24
129:6,7,9,12
130:21 181:19

**enforces**
100:8

**engages**
57:11

**Enrique**
95:8

**enroll**
122:9

**enrolled**
48:25 49:1
81:9,14,17
82:2,8

**enrollment**
81:18

**ensure**
27:17 34:8
62:8 101:23
107:18 178:6

**ensuring**
18:2

**enter**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

19

32:18 57:14

**entered**
29:8 31:1
32:18,19
77:10,20
78:24 79:7
81:8 90:25
128:5 130:19
131:7 140:15
170:21

**entering**
33:10 99:10,
14 111:7

**enterprise**
24:18 98:24
99:1

**enters**
88:12

**entire**
15:24 24:17
39:8 40:9
60:14 69:3
120:1 140:19

**entity**
51:13

**entries**
35:19

**entry**
28:12 35:18

**EO**
127:7

**EOIR**
88:8,23,25
125:10,15
127:15

**EOIR's**
127:8

**equal**
173:20

**equipment**
39:8

**Erin**
84:18

**ERO**
6:5 11:7,8,10
15:10 17:21
18:1,16 19:24
21:19 29:13
30:10,13 31:4
33:7,13
35:22,23 36:3
41:15 42:18
46:8,10 52:15
64:15,17
69:1,7,17
70:1,7 73:13
78:13 87:2,6
88:2,15 89:5
95:13,24 97:4
98:17 119:22
121:20 122:5,
8 127:18
128:21 134:5
150:7 168:3

**ERO's**
42:14 69:3

**error**
117:18,23

**errors**
183:3

**ERS**
31:5 127:8

**essentially**
25:24 27:14
34:7 125:6

**EST**
4:1 68:21
114:12 164:10
179:21

**estimate**
98:18 158:17

**estimating**
99:4

**et al**
4:7

**evaluating**
70:15

**event**
99:11,14

**events**
20:12

**everyone's**
139:5

**exact**
7:15 9:25
12:14 35:15
56:1 67:11
133:23 144:22
157:17

**EXAMINATION**
5:9

**examples**
133:18

**Excel**
112:20

**excuse**
28:11 132:5
138:11 176:8

**execute**
107:12

**executing**
47:16

**executive**
5:22 10:20
11:6 14:25
18:9 19:1,22
20:5 95:12

125:17 127:7

**executor**
18:25

**exercise**
100:4,14

**exercising**
31:16 100:16

**exhaustive**
162:3,6

**exhibit**
8:25 9:2
19:7,9 40:14,
16 50:17,19
74:23,24
78:21 84:7
93:2,4,8,10
95:11 114:17,
18,21 115:22
116:4 117:14
118:10,11
149:9,11
158:1 161:3,4
167:3,5
181:23

**exhibits**
94:12 183:16

**existed**
97:23

**expected**
100:3 158:6

**expedited**
31:2,3 32:14,
15,16 33:3,
14,19 59:10
129:11 162:25
177:14

**experience**
15:4 37:5
71:14 102:1

Exhibit D

110:3 111:6
139:3

experiencing
141:9

expert
57:21

expertise
18:4

explain
20:9 33:22
36:15 83:8
161:17 162:21
163:6,16
175:21

exposure
67:5 105:1

express
147:22 148:5,
19

extent
27:18 73:15,
16 182:14

extra
58:23 108:8

EYO
127:8

EYOR
125:16

_____

**F**

F-L-O-R-E-S
146:6

F-R-A-I-H-A-T
160:14

F10
134:1,2

F2
131:17

F4
131:17

F9
133:25 134:2

face
48:14 49:2
76:21

facial
35:4 39:4
43:1,22,23
48:11,13

facilities
36:3,6,9
53:15,18,21
55:9 56:11
58:2,9,14
59:3,25 60:6,
20 62:16
134:3 135:7
139:11,16,24
140:5 145:1
147:19,23
148:6,21
151:1,13,18
152:21 153:23
154:24 157:6,
15 159:3
165:11 174:25

facility
54:19 57:25
60:24 61:7,9
65:12 67:15
137:1,21
140:7,8,9
151:22
155:16,18,19
159:19 164:21
167:1,23,25
168:2,3,16,20
173:4

facility's
136:13

facing
171:22

fact
8:18 76:2
83:18 148:2,
14 152:13

factor
147:3 151:6,7

factors
70:17 101:4
136:19 137:4
151:10 152:14
160:20 170:19
182:21

facts
166:24

fail
27:20 175:19
176:25

failed
79:14 89:21
123:5

fails
87:1

failures
89:3

fair
98:7 146:22
176:15

fairly
16:9

fairly-large
69:1

fall
17:25 71:17
126:10 140:2

falls
33:10

familiar
10:3 26:7
27:1 28:19,23
53:11 72:12
104:24 122:23
146:6,19
150:21

families
44:12 141:19
145:13 147:6
177:11

family
33:2,18 37:20
40:9,11
43:16,19
44:6,9
139:21,23
140:1,3,4,7,
22 141:4,8,
12,13,17,25
142:1,21
143:1,8,14
144:3,7,9,12,
14,21 145:5,
20 146:23,25
147:3 150:10
153:12,19
155:11,14,20
156:2,10,13,
15,21 157:13,
19 164:16
165:1,12,16,
19,24 166:9
167:7 174:13
177:1,8,23
178:14,16
182:23

family's
166:10

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

21

family-
residential
  150:19
family-unit
  147:23 148:20
family-units
  148:6
faster
  177:15
FBI
  106:17
February
  82:12 144:20,
  23 156:7,8
  157:5
federal
  14:9,15 23:6,
  10 24:7 27:12
  29:24,25
  61:12 64:24
  100:3,7 112:2
feel
  83:24
felonies
  101:12 121:22
felons
  138:12
female
  66:13,18
females
  66:17
fence
  165:2
fences
  165:4
field
  10:21,22
  11:13,24

14:8,23,24
15:1,8,10,23
17:12,13,16,
17,24,25
18:6,8,10,13
30:20 41:18
56:23 62:9,
12,14 69:7,
10,16,17,21
77:12,21
90:18 91:2,9,
22 92:1 105:7
154:17
168:10,12,14,
21 169:21
172:11 173:2
178:3 179:8
figure
  56:1 124:18
figuring
  150:12
file
  23:19,22
  24:16 25:1
  107:15
filed
  87:16,24
  107:6 115:2
  127:6,17
  161:19
files
  23:19 72:19
filled
  66:4 118:14
filling
  138:18,23
filter
  98:8
final
  27:22 46:10,

13 47:20
49:23 59:9,17
85:17 90:17
91:1 120:16,
17 121:10
129:16
financial
  73:21
find
  51:12 128:21
finding
  76:2
fine
  83:17 84:1
  103:12 104:5
fingerprint
  44:15
fingerprints
  44:8 72:19
finish
  107:3
finished
  16:22 22:1
first-line
  18:6
fiscal
  64:19,24
fits
  22:5
five-minute
  179:17
fleet
  58:18 65:4
flexible
  172:10
flight
  38:4

Florence
  60:25
Flores
  146:3,6,9,19
  147:2,5,9,16
Florida
  4:6,16,17
  11:17 12:20,
  21,24,25
  15:22,24,25
  16:9 23:12,14
  26:7,20 27:2
  50:3 52:9
  63:23 69:2,4
  70:1,5,7,9,24
  76:24 77:12,
  22 78:15
  79:2,5 80:4,
  6,14,16,25
  81:3,15,17,19
  82:13,14,17,
  20,23 83:12,
  22 84:11
  85:9,18 86:10
  90:12 105:13,
  21 112:9
  113:3,9,13
  114:23 117:5,
  8,11 119:2
  123:6 127:13
  135:7,9
  169:9,10
  172:16,18
Florida's
  12:16 70:2
  84:9
Florida-
specific
  135:14
fluctuate
  60:2

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

fluctuates
  56:3
focus
  28:13
FOD
  168:21
follow
  128:20
food
  73:21
foot
  152:18
footnote
  81:11 119:21,
  22 120:15
footnotes
  131:17,20
footprint
  16:1,9 27:1
  69:1,6,19,22
  71:18 172:25
foreign
  108:17,18
foreign-
  23:3
foreign-born
  21:22 109:11
foremost
  20:22
Forgive
  113:17
forgot
  46:24
form
  21:24 32:5
  43:9 50:22,23
  51:12,15,18,
  20 52:1,3

76:3 86:3
102:5 126:20
146:13 153:13
159:13 164:22
165:3,8,13
166:4 174:11
175:16 179:12
180:23
forms
  130:25
forthcoming
  68:18
forward
  107:15
found
  141:17
fourteen
  44:15
fourth
  76:18
FR
  181:14
Fraihat
  67:12 151:24
  152:1 160:13,
  14
frame
  45:23 86:16
  89:15 136:5
  150:21 176:18
frames
  86:23 127:11
  156:11 172:20
framework
  137:17
Francine
  4:11 9:14
  183:9

FRC
  156:7
FRCS
  150:7 156:6
free
  165:1,6
frequency
  39:6
frequently
  102:3
Friday
  84:18
front
  24:1 79:9,19
  85:20 112:12
  113:24 123:14
  152:24 154:4
  177:19
fugitive
  27:19
full
  65:23,24,25
  151:13
fully
  170:24
function
  88:25
functions
  62:6 156:4
funded
  53:23,24
  54:15 64:17,
  18
funding
  36:18 62:13
  64:21 68:1
  147:19 182:16
funds

36:21 182:15
future
  126:19
FYI
  42:10

───────────

G

G10
  134:1 135:15
G9
  134:1 135:15
gap
  78:5
gaps
  78:4
gathered
  49:24 135:7
gave
  6:14 42:7
  150:5 162:25
  163:19
general
  4:16 23:15
  25:12 57:23
  71:2 92:11
  104:22 124:23
  152:8,12
  165:11
generally
  14:14 20:3
  23:20 33:13
  51:4 88:21
  127:9 138:9
  139:3,7 166:3
generically
  151:16
gents
  150:6

Exhibit D

geographics
  57:4
geography
  57:5
Georgia
  14:10
give
  5:1 6:16,18,
  19 7:5,6
  22:14 33:5
  34:10 55:17
  61:22 65:25
  66:1 73:22
  87:8,10 96:17
  120:3 122:22
  133:18 140:16
  163:9 178:19
  180:19
giving
  62:4 122:12
gleaned
  135:8
Glynco
  14:10
goal
  20:24
good
  7:10 9:17
  71:25 92:25
  93:17 105:18
  114:1,3
  163:23 164:5,
  6
gotcha
  9:6 81:1
  169:18
governed
  182:20
government

20:14 54:19
61:12 64:25
87:22 110:23
112:2
governmental
  74:12
governor
  76:16 80:2
  169:12
GPS
  34:24 74:19,
  20
GPS-ENABLED
  42:24 47:22
graduated
  13:23
grant
  102:21 103:16
  107:13,14
granted
  32:17 63:10,
  21,22,25 64:3
grants
  107:20
great
  68:17 108:21
  114:6 172:11
greatly
  174:24
ground
  6:15
group
  11:19 121:3
  155:4
Guadian
  4:5 5:6,11,14
  40:24 51:3,10
  71:1 72:1
  83:2,11 84:3,

17,19,25
102:23 114:5
118:17 164:14
182:10 183:1,
25
guard
  92:6
Guardian
  93:13
guards
  165:2
Guatemala
  109:21,23,24
  110:4
guess
  94:23 96:17
  111:23 126:16
guidance
  19:23 55:12
  91:20 92:10,
  12,15,16,18,
  20 97:6 155:1
guided
  31:17 91:9
guidelines
  136:15 155:24
guideposts
  91:10,23
Gulf
  57:1

─────────────

          H

H-O-T-E-L-S
  140:11
hand
  4:21 26:12
handy
  112:19

happen
  181:6
happened
  63:9 141:7
happening
  20:1 33:20
  160:3,5
happy
  77:7
Harlingen
  16:15 17:16,
  19 34:2
head
  5:20 6:19
  19:18 30:17
  37:21 43:3,7
  47:10 67:21
  137:5 151:21
  168:16 177:1,
  24,25
headings
  118:13
headquarter's
  62:10
headquarters
  18:11 62:12
heads
  178:14
health
  155:6
healthcare
  155:2
hear
  7:21 135:1
  181:25
heard
  71:20
hearing

Exhibit D

23:2 27:20,22
32:8,9 88:13,
23 89:4
101:21 107:9
177:15

**hearings**
37:2 87:17
88:22 137:15
177:14

**heart**
153:1

**held**
4:8 137:14
138:9 157:13

**helped**
41:16

**Henry**
95:4 158:21
159:3

**hereinafter**
5:8

**Hey**
154:19

**high**
36:24 37:2
38:14 66:10
100:21
142:16,17,18
153:1,4,20

**high-risk**
152:14,22
153:11 154:7

**higher**
64:21

**historical**
95:5,24 97:4
98:19 158:18

**histories**
13:1 109:19

122:1,2

**history**
36:15 106:10,
14,16,17,20,
22,23 107:23
108:3 121:20,
23 129:22,23
130:1 138:10

**hold**
59:15 60:19
92:6 138:2
179:16

**holds**
21:23 23:18
59:21

**home**
122:13 172:2
176:7,12
180:17

**Homeland**
4:5 20:15
21:2 24:17
25:5 76:15
95:21

**Honduras**
65:20

**host**
106:19

**hot**
171:20

**hotel**
140:10,19
156:4 164:16,
23

**hoteling**
156:21

**hotels**
140:10,11,13,
17,21,23

141:4 142:3,
4,8,12
143:10,13,17
156:3,5,18,20
164:15

**hour**
16:1 69:14
114:6

**hours**
150:11 157:14

**house**
27:5 54:6
59:5 68:3,7
136:16 139:23
140:3 141:4
149:4 164:15

**housed**
138:11,13
139:21 142:4
145:5,21
155:15,20
156:5

**household**
37:21 43:4,7
47:10 177:1
178:14

**households**
177:24,25

**houses**
27:7

**housing**
66:15 137:25
138:5,15,16,
22 139:7
143:14

**HSI**
21:15 95:19,
20

**humane**

141:14,15
142:14 144:1,
3,5 165:25

**humanitarian**
31:12

**hurricanes**
56:23

**hyphen**
132:18 133:4

**hypothetically**
159:17

---

**I**

**I-220**
119:8 121:11,
12

**I-247**
21:25 24:1
25:13

**I-35**
52:3

**I-385**
51:23 52:1

**I/o**
117:23

**ICE**
6:7,8 8:1
10:21 11:4,
11,16 14:21
17:8,12 18:21
19:4,19,24
20:10,12,16,
18,20,23,25
21:6 22:2,8
24:8,16 25:2,
25 26:4 31:3
32:17 33:22
34:10,11,21
35:8,12 40:25

41:15 44:13,
14 45:3,7,14
46:22 47:6,
11,12 49:15
50:9,16
53:15,22
54:2,7,14,20,
25 55:18
57:18,20,24
59:13 60:6,20
61:11,21
62:12,15,17,
22 63:11 65:5
71:3 72:25
73:7,9,13,18
74:1 75:17,
19,20 77:11,
21 78:12,18
80:6,14,25
81:3,15,18
82:14,20,22
85:23 86:11,
18 87:1,6,15
88:1,5,18
89:9,23,24
90:2,7,13
91:4,5,15,16
92:15 95:13,
15 96:17
98:16,23,25
99:1,10,11,
14,24,25
100:8,13
101:2,14
102:19 104:17
105:5 107:5,
12 108:5
109:17 110:5,
23 112:7,17
116:14
119:10,17,19
120:2,15,16

122:9 123:7
126:18 127:5
128:15,16
129:16,18
130:13,20
132:6,25
133:10,14,22
136:6,17
141:4,9
142:22 145:5,
6,7,20,21,23
146:1,3
147:8,15
152:16
153:10,18,23
154:1,24
155:3,4,12,
15,17 156:13,
16,17 158:24
159:19 161:11
165:19,24
166:2,22
167:1,9,23,25
168:1,3,20
171:5,6,10,
12,20 172:3,9
173:4 174:8,
23 175:24
176:3,16,24,
25 178:11
181:5,9,14
182:12

**ICE's**
45:10 47:12
55:18 98:13
**ICE-OWNED**
54:3 61:9
**ICE.GOV**
89:12 154:2
**Ice.gov.**
73:14

**ICRO**
24:23
**identification**
122:2 130:2
**identified**
24:3 27:7
130:2
**identifiers**
24:11 25:7
**identify**
21:22,23 22:5
23:3,7 24:19
28:3 48:15
51:12 89:6
119:22 127:19
128:3,9,22
129:1
**identifying**
21:17 127:24
137:6
**identity**
31:13 46:15
**IHOC**
155:6
**IJ**
89:5 133:11,
12
**IJ's**
27:25
**illegal**
28:12
**illegally**
25:16 32:19
33:10 128:4,
10 131:7
**illnesses**
153:3
**imagine**
15:18

**immigration**
5:24 6:3
14:18,19
16:14 20:18
21:24 24:24
27:14,15,16,
21 28:2,24
30:1 32:8
36:25 37:2
38:17 46:20,
22 47:1,7,15
49:17 53:12
79:15 86:16,
21 87:7,16,17
88:7,11,14,19
89:3,18 98:1
100:2 101:10,
16,17,24
107:1,2,9,10,
11,12,18,22
121:13 125:3,
17,19,20
127:7 129:5
130:14,15,17,
18,23,25
131:6 137:15
155:5 163:18
166:2 171:11,
20 177:7,14
178:4,24
181:16,21
**impact**
12:24 40:21
55:5 84:10
179:2
**impacted**
67:6 141:18
151:22,23
**impactful**
151:4

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

impacts
67:15,17 97:6
98:9 137:20

impair
8:9,12

implement
28:20 30:6,
11,13 38:24

implemented
42:1

implementing
40:20 84:10

implements
162:10

important
7:2 138:15

importantly
67:3

improper
114:25

improvements
143:4

in-depth
31:15 32:6

INA
28:24 122:22,
25 162:9,17,
18

inadmissible
28:21 29:2

INAPS
28:19,22

include
24:11,12 29:1
32:21 35:2
54:24 69:14
84:10 100:18,
20,21 107:24

120:2 121:22
122:1,7
129:23,25
130:23,24
131:7 133:11
135:24 172:22
174:16

included
13:17 25:13
45:13 120:1
134:17 135:20

includes
11:10 35:2
74:6,7
120:20,22,23,
25 152:25
156:18

including
40:20 64:9
76:22 79:14
84:9,19
145:14 173:9

Incorporated
134:21

incorrect
49:7 123:8
132:21

increase
65:9 145:15
148:11 170:25
171:2

increases
36:24 57:15
160:1

increasing
165:22

Independence
5:17

independently

60:21

India
134:21

indictments
109:12

individual
8:18 11:19,21
24:20 27:25
34:25 38:1
39:14,17 40:6
47:10 63:6
88:16 89:7
99:10 103:7,
12 104:3,6,14
136:24,25
142:3

individuals
23:19 29:15,
18 34:19
39:10 47:19
52:14 78:1
88:24 101:10
105:4 123:5
129:1 134:4,6
135:24 145:13
154:8 173:19
176:5,7
177:20,22
178:9

indoor
137:2

ineligible
101:7 102:15

infected
153:21

inference
145:14

influence
8:8

inform
97:5

information
23:23 25:13,
15,18,22
26:12,23
40:23 46:15,
21 47:3 62:10
63:20 71:3
73:19,22,24
74:1 77:3
78:16,23
79:6,11,16,17
85:15,24
86:2,10,11,14
105:20 108:2,
15 109:18
110:6,7
111:21 117:2,
4 118:14
122:12 123:7
131:18 135:6,
16 143:7,11
154:12 166:25
170:14 175:2

infrastructure
69:23 70:1
71:18

inherent
100:6

inhumane
143:17,20,22
165:12,17,25

initial
163:17

initially
33:5 48:25

initiate
110:10 181:5

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

27

inmates
  27:5,8

input
  20:2

ins
  48:6 160:6

inset
  50:22 51:16

inside
  26:6

inspection
  29:8

inspector
  14:18 16:14

instance
  37:22

instances
  101:1

institute
  125:2

institutional
  23:2

instruct
  71:8

instructed
  104:13

instructing
  103:21

instructions
  91:7 174:22

intake
  23:18 154:6

intended
  46:16 81:14,
  18

interact
  33:23

interdicting
  21:9

interdictions
  33:9

interest
  90:13

interested
  26:24

interim
  97:6

interior
  25:16 57:3
  79:13 100:12,
  22 130:11

internal
  52:12 63:5

internet
  175:8,10,12,
  15

interpret
  155:8

interrogatories
  12:10,13
  161:10,12

interrogatory
  12:11 161:16,
  23 162:4,20
  163:3,13

interrupted
  149:5

interview
  101:20

interviews
  171:2

invalid
  177:21 180:15

inventory
  66:25 139:5

141:21

investigate
  21:12

investigations
  21:2 25:6
  95:21

irrelevant
  103:25

irritated
  148:17

Isabel
  60:23

Islands
  69:4

isolate
  119:25

issuance
  53:4 107:4
  129:10

issue
  13:14 25:1
  27:22 72:25
  73:3 83:15
  101:14,16
  107:10 170:16
  181:17

issued
  30:19 32:9,
  10,12 45:18
  59:7,16
  100:25 101:2
  102:11 116:23
  121:11 134:7,
  10 135:22
  136:3,8 176:3
  177:21 178:7
  180:25 181:6,
  10,18,20

issues

89:5 101:2

issuing
  45:17 100:19
  174:21 177:6

item
  80:3

items
  76:9

_____

J

Jacksonville
  16:3 69:12

jail
  24:10 26:19
  55:7 66:15
  137:25 138:1

jails
  16:5,6 23:4
  26:4,6,9,14,
  15,17,20 54:1
  56:10 151:8,9

January
  17:1 76:24
  77:13 78:25
  79:4,7,13
  96:1 119:2
  123:11,18
  132:2,10,13,
  17,18 133:4
  135:11
  155:11,14,21
  160:10

Jesse
  18:20

job
  17:22 62:1,5
  68:17 126:8

job-related
  17:6

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

28

jobs
  16:11
Joe
  115:18 164:22
  183:13
Johnson
  75:15,16
  97:17 146:1
  169:13
Johnson's
  97:11,13
joined
  14:20,25
Jose
  41:19
Joseph
  4:18
Juan
  11:14,17
  18:22 19:4
  168:15
judge
  27:15,21 28:2
  29:23,24,25
  30:1,4 88:7,
  11,14 89:3
  101:16
  107:10,13
  121:14 159:12
  160:21 181:21
judge's
  27:18 47:16
  107:18
judges
  27:16 125:19,
  20
July
  4:9 149:10

June
  84:18
jurisdiction
  17:14 18:1
  21:25 115:6
Justice
  4:19 7:14
  12:11 125:22
  161:11
juvenile
  32:24

_____

K

Karen
  4:15 79:20
  114:19 134:25
  148:7 159:10,
  12
Karnes
  140:7 143:10,
  19 144:3,6
  145:1 149:2
  150:8 156:22
keeping
  66:4 151:12
  152:18
kind
  7:22 33:14
  34:10 50:6
  53:20 56:11
  87:10 109:12
  119:12 136:14
  143:2 171:18
kinds
  51:5
kitchen
  139:16
Knock
  129:20

knowing
  160:2 177:2
knowledge
  19:15,17 33:1
  44:7 49:22
  61:17 63:2,4
  68:3 72:17
  99:18 153:22
  155:10 162:2
Krome
  61:2 69:14

_____

L

L-E-S-A
  98:8
L.A.
  151:23
labor
  130:25
lap
  139:12
laptops
  139:13
Laredo
  16:14
large
  15:25 16:9
  53:18 60:18
  69:7,16,18,
  19,22 70:7,8
  113:14 120:19
  141:10 171:12
  178:10
larger
  69:18 120:20
  121:3
largest
  70:4,6

lasted
  150:22
late
  115:20
latest
  135:12
law
  14:9,11,13,15
  15:2 24:24
  27:13,14 31:8
  44:18 98:11
  100:3,6,7
  111:24 133:23
  181:18
law's
  102:12
lawful
  76:22
laws
  54:17 100:8
lawsuit
  12:20,22
lawyer
  7:3
lawyers
  11:4
lead
  14:3 100:12
leadership
  10:19 11:3
  18:13
led
  53:4 170:18,
  25 172:7,25
Legacy
  14:18
legal
  21:3 67:24

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

115:8,9
126:5,11
139:14 152:10

**LESA**
98:7,10

**let alone**
51:3

**letter**
75:4,7,11,23
76:2,6,11,16,
18,25 77:5
80:1 167:4,
11,12,16,17
168:9,25
169:7,8,12,
14,15,16,17,
22 170:18
173:5 179:11
180:3

**letters**
75:24

**letting**
21:25 22:11
111:16

**level**
20:1 23:10
138:8,10,12,
20

**level-one**
138:22

**level-three**
138:21

**levels**
23:9 90:4,21
91:9,19 92:1

**liberties**
137:18

**life**
106:25 107:2,

22

**limit**
58:3

**limited**
55:1 90:6

**limits**
16:1

**lined**
174:21

**lines**
90:11 110:7
122:12 174:20
175:1

**list**
10:4 15:6
152:24 162:3

**listed**
78:22

**litigant**
114:23

**litigating**
152:11

**litigation**
13:9 55:13
66:5 67:3,11,
13,14,16
78:19 133:16
141:18 147:6
151:13,16,17,
22,23,25
152:1,4 160:8

**litigations**
55:8 151:5,
19,20 152:3

**live**
85:6 179:4

**lived**
143:3 177:9

**lives**
68:9

**local**
23:9 109:4
136:21 172:10

**locals**
24:7

**locate**
34:25 88:16
89:6

**located**
7:12 54:1,2
60:12,15
135:3 140:23

**locating**
27:24

**location**
35:18,22
53:19 66:9,10
81:14,19 90:2
127:4,16
139:5,6
151:10 167:9
168:5,23
170:24 171:16
172:8

**locations**
16:20 27:1,4
34:15 35:10,
13,24 36:11
47:4 54:3,5,7
58:7,20 69:13
90:3,8,14
108:5,6 134:8
144:23 151:9,
23 152:19
165:4 171:7
172:7,14,15,
18,21 173:1

**logistical**
18:11

**long**
15:12 35:12
45:19 59:21
61:13 86:13
90:11 98:6
114:4 150:21
170:2 172:23

**longer**
8:20 141:8
182:6

**longer-term**
150:20

**looked**
39:6 97:19
114:22 154:5,
9

**loop**
150:5

**Los**
67:14

**lot**
39:3 46:21
53:17 55:16
124:5 131:4
138:6 152:20
160:24 176:2

**low**
37:4

**low-level**
138:8

**Lucero**
95:8 158:1

**lunch**
92:23 105:15,
17 114:1,4

**lung**
153:1

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

**M**

**made**
62:22 64:2,5
115:19 120:3
141:20,23,24
142:21,22
145:4,6,20,23
148:3 163:17
165:22

**magistrate**
30:3

**mail**
134:10 135:23
136:2,3,8
177:6,18
180:7,8,12,25

**mailed**
181:7

**mailings**
177:17

**main**
17:22

**mainframes**
65:8

**maintain**
152:21

**majority**
16:12 60:11,
13,14 98:20
99:5 140:24
158:19

**make**
24:6 37:25
60:3 62:15,21
90:21 106:2
115:20 121:17
148:17 152:23
159:10,13

168:2 183:3

**makers**
97:6

**makes**
24:22 59:10
62:19 89:16
102:18 176:13

**making**
24:2,25 33:9
92:14 115:17,
18

**male**
66:13

**manageable**
138:5

**management**
10:24 11:11
21:4 125:6

**mandatory**
31:5 101:6

**manner**
130:15

**March**
45:5 80:13,24
90:4,17,25
141:5,6,7
142:4,9,12
156:4,21
170:22 171:9,
16

**Marcos**
13:24

**marked**
9:2 19:9
40:16 50:17
74:24 93:2
118:11 149:11
161:4 167:5

**married**
20:20

**Marshal**
54:6,8

**masks**
154:6

**mass**
56:25 171:4

**match**
179:3

**matter**
4:6 83:14
160:5

**max**
58:3

**maximize**
165:21

**maximum**
101:15 136:14

**meaning**
36:25 88:12

**means**
80:23 83:9
117:24 177:13

**meant**
127:18 170:23
183:19

**measure**
55:21

**measures**
56:20 154:6

**mechanics**
179:6

**mechanism**
32:3 77:25
88:18

**medical**
13:10 37:16

39:23,24
136:25 155:5
166:13

**meet**
11:18,22
166:11 179:8

**meetings**
11:20,23

**member**
5:22 19:21

**members**
11:3 18:8
20:4

**memo**
41:20,22,24
42:1 44:20,25
52:10,19 53:5
93:15 95:24
96:2,12,20
97:5,8,11,13,
17 98:5
114:18 116:4,
9,16,20,21,23
132:25 133:1
174:14

**memorized**
117:15

**memory**
156:2

**memos**
42:16 95:5
97:15

**mention**
136:2 173:3
176:11

**mentioned**
13:10 22:11,
19 25:7 27:10
52:10 56:9

Exhibit D

65:4 69:11
72:9 90:25
100:24 110:17
133:7 134:8
160:13 170:20
172:6 176:5

**mentioning**
128:25

**met**
11:24,25
32:19

**metrics**
106:18

**Mexico**
57:2 83:13,21
111:9

**Miami**
10:22 11:13,
25 15:23 16:1
61:2 65:19
69:3,13,21
71:15 81:25
82:8 122:5
127:3,12,14
168:10,13,22
169:21

**Miami's**
69:16

**microwave**
139:16

**microwaves**
139:19

**middle**
80:18

**migrants**
70:8

**Mike**
42:9

**miles**
32:22

**mind**
129:19 152:18
166:9,10

**minimal**
104:25

**minimally**
136:7 171:8

**minimize**
152:16 174:20

**minimized**
172:4 174:24

**minimum**
101:14

**minors**
76:23

**minutes**
93:1 105:17
113:25 163:22
167:18 170:5

**Miramar**
90:12

**misdemeanor**
28:12

**misdemeanors**
121:21

**missing**
61:3 131:18
181:24

**mission**
20:10 21:4
22:5

**Mississippi**
15:11 18:2,
14,16

**misspeak**
160:23

**misstating**
182:11

**mistaken**
169:4,8,11

**mister**
10:19

**misunderstood**
49:4

**mitigate**
171:19

**mix**
66:13

**mode**
115:24

**model**
147:2

**money**
21:10

**Monica**
10:24 11:9,25

**monitor**
39:25 43:4,
15,17 47:23
49:11 74:15

**monitoring**
37:25 42:25

**monitors**
42:24 74:19

**monthly**
98:9

**months**
78:8 89:19,20
144:23 171:17
174:8

**morning**
56:4

**morning's**
56:5

**move**
58:19 104:14
115:18 133:25
148:17 165:10
166:24

**movements**
56:25 58:3

**moving**
21:8

**MPP**
82:11,14,17,
24 83:5,9,10,
14,20 85:3,8,
11

**multiple**
133:10 151:19
164:24 172:21

**multitude**
100:14 154:9

**murder**
108:11 109:22

**mute**
7:23

**muted**
134:24

**N**

**N/a**
123:6

**N/as**
123:16

**named**
149:21

**names**
47:4 67:11,20
151:20 164:23
166:20

**nation**

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

32

54:9 69:10

**national**
121:25 135:9
136:18 137:8
166:8

**nationals**
21:22 23:4
65:18 109:1
110:13 111:17

**nationwide**
53:22 54:9,
11,23 91:12
135:13,19

**Natural**
14:20

**Naturalization**
14:19,20
20:19

**nature**
71:19 74:8
122:4 137:13

**NCIC**
109:9,20
121:25 130:2

**NCIS**
107:16

**nearest**
45:7 46:8
167:8

**necessarily**
100:22 180:20

**needed**
62:13 65:9
91:11 98:9
141:11

**needing**
61:24

**network**
53:20,23

54:9,12 55:23
60:15 155:12

**nexus**
16:20

**NOB**
103:5

**nod**
6:19

**nodding**
181:24

**non-detention**
83:25 84:8

**non-docket**
177:16

**noncitizen**
72:22 87:1
100:12

**noncitizens**
36:5,9 37:11,
14 65:10
77:10 80:11,
19,21 81:8
82:11 85:24
99:23 135:10

**nondetained**
106:11 119:19
124:25
125:11,24
127:6,9

**nongovernmental**
50:20 74:7
166:21

**normal**
7:22

**north**
5:16

**notes**
163:23

**notice**
9:1,5 40:19
44:21,25
45:2,3,13,17,
19 47:15
49:14 51:1
59:16 72:23
73:11 87:2,
13,14,18,19
107:4 119:5
123:12 129:11
131:13
135:11,22
136:3 168:7
177:6 178:7
180:6 181:6,
10,17,18

**noticed**
8:23

**notices**
50:25 181:3

**notification**
110:21,24

**notifications**
8:1 88:22

**notify**
22:2 26:4
108:24 109:4
181:1

**November**
41:21 42:2
45:11 52:19
53:5 78:7,11
114:17 116:23
123:11
132:22,24
135:12
156:12,15
173:17 174:14

**NTA**

87:24 101:2
107:6 118:25
119:3,4
123:19 127:6,
16 133:4
181:7

**NTA's**
136:8

**NTAS**
73:1 134:10
177:21
180:17,25

**NTR**
13:15 44:25
45:12,14,23
46:7,14,19
173:20 176:4

**NTRS**
45:8

**number**
24:14,15,19,
21 25:1 50:5
51:7,9 53:18
60:8 61:20
70:8 71:20
72:1,10,13
76:21 77:16
78:18,19,24
79:3,6,12,19
81:5 82:9
84:2,6,11
85:16,19,21,
22,24 99:19
100:21 105:21
106:18
112:11,16
113:12,14,16
117:4 119:13,
16 120:4,20
122:6,19
123:13 134:17

Exhibit D

135:13,14
136:23,24
141:10 160:1
161:20 173:6
175:24 180:16

numbers
24:13 50:8
60:18 72:18
77:2 80:2,3
81:20 98:19
113:22
117:10,12
118:15 122:14
123:22,24,25
124:2,3,4,8
132:5,6,7
158:18 159:23
171:15

nutshell
22:7 28:1

O

O'CLAIRE
4:11

O-R-E-C
129:14

oath
4:22 8:5

Obama
97:24 98:3

Obesity
153:8

object
7:3 40:24
50:25 62:24
63:18 93:11
96:4 126:20
145:18 146:8,
13 154:16,19

155:23 156:25
159:6 164:22
165:3,8,13
166:4 174:11
175:16 179:12
180:23

objected
114:21 146:15
154:21

objection
51:17 52:21
53:6 68:4
70:25 71:21
76:3 82:16
83:3,10 86:3
102:5,22
110:1 111:20
115:8,20
126:5,23
145:8,24
147:10,24
148:3,17
153:13 157:21
158:7,25
159:1,11,13,
20 164:18

objections
115:19 126:21

obtain
47:7 106:19,
21 114:25
115:10

occasion
47:8

occasions
26:5 27:16
108:13,14

occur
88:22

occurred
110:4 120:2
130:10 170:14

occurring
160:4

October
65:1,2 78:7

offenses
121:22 122:3

office
4:16 10:21,
22,23 11:13,
16,24 14:23,
24 15:1,23
17:16,17
18:6,8 21:3,
19 23:18
29:18 30:20
41:18 45:7
46:9,10 53:12
56:23 62:12,
14 69:7,17,21
70:4,17
77:12,21
79:16 89:9
90:11,12
91:19,23 92:1
125:17 127:7
134:5 152:9
168:10,12,14,
21,22 172:11,
21

officer
14:11,16,21,
23 16:15
26:12 27:11,
12,13 35:6
47:14 48:14
101:10,24
105:7 109:17

officer's
138:6

officers
26:6,8 27:23
34:11,14,18
35:12,22,23
42:18 52:13
100:3 104:22,
23 105:1,5
108:5 122:11
125:1 139:14
155:7 174:20
181:19

offices
11:16 15:10,
21,22 16:2,3,
4,17 17:12,
13,15,17,25
18:1,2,7,10,
13,20 34:1,2
62:8,9 69:10,
11,12,17
70:3,20,22
90:18 91:2,9,
12,16 122:8
136:6 178:3

official
109:16

officially
122:11

officials
108:16 110:6

offline
55:13 66:18
151:6,17
152:20 157:7,
9 160:7,24,25

OMD
62:19

on-site
43:10 44:3
105:3

on-the-job
105:3

onboard
61:15

online
55:24 89:25
174:22,23
175:5,9
176:8,12

open
7:17,20 9:12,
14 118:4
136:7 156:6
158:2 161:7,8
171:1 172:12

open-bay
139:1

opened
171:3 172:24

opening
9:11

operate
31:20 36:3
53:17 54:5,10
58:18 60:7,21

operated
26:15 143:20
145:2 153:23

operates
53:15,22

operating
54:11 65:23
90:22 91:7,17

operation
143:23 144:7
155:5

operational
11:15 159:22
160:2

operationalize
20:4 30:15,
16,20,22
151:3 155:8

operationalizing
31:20

operationally
160:18,24
174:5

operations
5:23 6:1,3
15:8 17:24
21:2 99:25

operator
160:15

opinion
144:4

opportunities
166:14

opportunity
24:9 183:2

opposed
26:15 48:12
127:4 128:4
142:1 150:16
153:12 163:7

option
102:4 142:23

order
26:13 27:16,
18,22,25
32:18 34:8
59:9,17 88:12
89:5 107:11,
12 120:13,18,

23 121:4,5,6
129:15
133:10,17
139:13 141:15
144:22 159:14

ordered
88:14 101:9
176:21

orders
121:10,11
133:12

OREC
120:18 121:2,
3,9 129:14

organization
20:16 22:9
54:19 57:18

organizational
19:13,18
50:21

organizations
21:7 74:8
166:21

origin
111:7

original
61:20

Orlando
16:3 69:13
90:11 167:2,
25 168:4,17,
19,22 170:15,
18 172:22
173:4 174:15

Orleans
56:22

Ortiz
41:21 52:19
53:5 114:17

149:23

OSUP
121:9

outdoor
137:3

outline
116:5,9

outlined
98:1 116:20

overarching
20:24 21:6

overcrowding
152:6

overflow
56:11,14,17,
20 57:6

overseas
108:5

overstays
130:24

overview
55:17

overwhelming
37:5 171:16

owned
65:5

owns
54:2

---

**P**

---

p.m.
114:12 164:10
179:21,23

pandemic
90:9,16 91:8
151:4,6
154:1,10,15,
23 155:9

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                          35

160:11 172:9

**paperwork**
173:25 174:1,
22

**paragraph**
44:24 77:3
95:3 96:8
158:16

**paragraphs**
167:14

**parameters**
32:20,21

**parenthesis**
76:25 77:1
99:11,12
150:8,9

**parole**
30:19,22,25
31:9,21,23,
24,25 32:9
34:16 36:13
40:18 47:17
49:10 50:4
51:6 52:6
72:21 73:5,
11,18 78:1,3,
6,10,15 80:8
85:17,25 86:9
89:8 96:10
116:5,10
123:1 132:3,
9,12,14,15,
18,20,22
143:1,8
162:15 167:8
174:10 175:14
176:4,23
180:2

**paroled**
49:9 82:11

83:8,20 85:5,
8 120:25
122:20,21
162:8

**paroles**
100:19 162:17

**part**
7:25 8:19 9:3
10:4 13:18
20:17 21:20
41:5 44:23
47:12 53:11
62:1 78:17
79:8 88:20
90:10 93:17
94:17 109:2,3
110:17 111:2,
18 112:11,21
118:10 126:8
128:2 134:25
144:10 154:10
169:3,5,6
173:20

**partial**
90:15

**participating**
111:5

**partner**
23:13

**partners**
23:3,6,11

**Paso**
17:18 34:2

**past**
56:21 64:22

**patrol**
12:23 13:14
17:11 25:3
34:9,16,19,23
35:9,21 41:22

45:7,17 46:3,
7,19 49:3
58:10,11,13,
17,22 59:2,5,
18,19 60:4
73:1,23,25
78:12 83:6
85:3,11 86:18
105:8,12
119:18 132:6
141:22 150:1
178:23

**PBNDS**
137:8 140:2
182:20

**PD**
80:12,23

**pending**
113:15,23
121:13 129:5
130:4,5,7,19

**Pennsylvania**
140:9

**pent-up**
90:12

**people**
11:5,20 19:23
20:2 21:8
22:2 26:23
33:9 38:11
47:4 48:18
49:9 50:3,11
55:2 56:22,25
59:6 66:8
73:17 74:2,3
77:19,22,24
78:14 79:3
80:4,5,15
81:2,16 82:4,
16,23 83:1,19

84:11 85:8,16
86:9 88:9
91:10 108:3
111:13,16
112:8,9
113:14 117:11
119:9 120:20,
22,23,25
122:7,16,20
125:21,23
127:2,3,24
129:22 131:7
132:8 133:2,
17,19,22
135:20,21
136:16 138:2,
16 140:13,20
142:25 152:5,
13,22 153:11,
20 165:6
166:22 167:4
170:16 171:1,
4,5,9,15,19,
25 172:2,4
173:3,5,14
174:16,21,25
175:13 177:4
178:6,11,13
179:3 181:13

**PEP**
97:19,20

**percent**
38:16 44:18
90:4,19 91:3,
24,25 94:15
98:19 110:20
158:6,13,18,
23 159:18,25
160:6 168:4
170:22 171:3,
8 177:20

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

36

180:11,12,15

**percentage**
49:9 110:19
142:17 177:17
178:10

**performance-based**
136:18 137:8
166:7

**period**
39:13,16
77:13 89:20
141:3 150:11,
14,18 151:11
152:2 163:18
175:25 177:3

**periodically**
106:25

**periods**
172:24

**permissible**
31:7

**permission**
173:15

**person**
23:21,25
24:3,8,9
32:24 43:16,
25 47:11
101:6 108:9,
11,18,19
109:15 110:11
124:24 176:2
180:21 181:11

**person's**
24:12

**personal**
17:7 71:6
83:16 96:25

103:11

**personally**
71:11 149:25

**personnel**
69:23 70:1,23

**perspective**
45:3,10,14
72:25 99:24
100:13 127:5
132:25 165:19

**pertain**
93:12

**pertaining**
83:25

**phase**
91:4 170:21

**Phipps**
4:12 183:8

**Phoenix**
17:18 34:3
60:25 71:15

**phone**
7:18,23 26:5
43:20 48:1
73:6,7 134:12
169:25 170:2

**phones**
48:3,4,9

**phrase**
83:8 86:5

**physical**
69:20

**physically**
7:13 135:20

**pick**
22:2 24:9

**picked**
131:9

**picking**
65:18,19

**pilot**
130:25

**pinging**
7:21,24

**place**
21:23 37:1,21
40:12 45:24
47:9 105:11
136:16 138:21
139:19 153:24
154:14,23
162:23 166:17

**placement**
39:24

**placing**
34:18 35:10

**plaintiff**
4:17 183:20

**plaintiffs**
152:5

**plan**
56:24 91:4,5,
6,13,14 92:9,
17 136:6
171:13 172:9

**planes**
65:11

**plans**
91:22

**play**
67:24

**pod**
66:14,16
136:24,25
137:22,23,24,
25 138:22
153:25

**pods**
138:3,15,25
139:7,12,20

**point**
6:4 27:10
49:2,3 59:13,
14 92:24
106:24 115:12
125:25 150:2
178:2 181:22

**policies**
18:3 19:23
20:2,3,4
30:13,14,15,
16,21 31:19
42:15 51:5
88:9 96:10,12

**policy**
30:19,23,24,
25 31:10,17
32:11,12
38:24 40:18,
20 41:2,12
42:20 44:21,
24 46:14
47:17,18
49:15 52:6
63:5 83:25
84:8 97:16
116:5,10
174:10,17
176:23

**political**
14:1

**pop**
118:3

**popping**
117:21 149:8

**population**
82:23 120:1

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                    37

137:7,19
139:18 142:20

**populations**
82:24

**port**
35:19 60:23

**Portal**
46:20,22
47:1,7 49:18
86:17,21
178:4,24

**portfolio**
11:10

**portion**
40:25 42:19
77:6 83:18
105:10 116:16
148:2,14

**portions**
17:8

**ports**
35:18

**position**
15:7,13,15
17:5,21,23
58:15

**positions**
15:2

**positive**
37:5

**possibly**
102:4 162:5

**post**
31:18

**post-secondary**
13:22,23

**posted**
154:2

**posture**
54:12 90:8,16

**potential**
12:25 24:12
53:15 97:6

**potentially**
23:7 24:4
35:2 43:5,6
82:6 167:22

**Potomac**
5:16

**preference**
157:19

**premised**
152:12

**prepare**
10:15,23 12:2
75:24 118:22
167:19 168:6

**prepared**
12:15 94:9
96:24 103:2
104:1

**presence**
70:7

**present**
24:4 25:9
26:1 79:14
123:18 133:4

**presented**
79:18

**president**
68:6,8,9
97:23

**president's**
63:3,14,24
64:9

**pressure**
153:2

**pretty**
102:13 104:24

**prevalent**
151:12

**prevent**
20:23 55:10
66:7,24
171:19

**prevents**
66:6

**previous**
38:2 40:3
44:21 156:6

**previously**
10:5,13 38:3
42:23 86:17
116:14 127:22
140:6 143:4
147:5 170:20
176:5

**primarily**
17:10 21:18
83:6 105:10

**primary**
28:8,9 33:1,8
54:22 56:12
86:17

**principal**
21:3 152:9

**printed**
79:20

**priorities**
93:20 95:25
96:3,21 97:5
98:1,3

**Priority**
97:21

**prison**
26:18

**prisons**
22:24 23:6,12
26:16,21 54:2

**private**
54:2 55:3
56:10,16
57:11 136:21

**privilege**
62:25 103:23,
24 104:4

**privileged**
7:6 103:22
111:20,23

**proceeding**
24:20 88:19

**proceedings**
4:1 22:1,12,
13,21 25:23
29:20 47:14
72:20 79:15
87:7 88:3
107:15 121:13
125:3 162:24,
25 177:7

**process**
44:12 61:12
62:17 63:7,19
69:14 99:3
116:10,16
131:14 166:25

**processed**
72:22 73:5,
10,17 80:12,
22 134:10
167:7

**processes**
127:8

**processing**
44:10 54:4
59:4,6,12

Exhibit D

60:24,25
61:1,2,6,8,
13,18,23,25
65:22 69:15
116:6

**produce**
124:11,16,18

**produced**
79:24 96:13
117:7 154:1

**production**
13:18 75:3
79:8,24
85:20,21
112:12 113:12
117:13 123:14
149:10 169:3,
6

**productions**
81:22

**professional**
14:5 15:4
17:7

**professionally**
15:5

**professionals**
155:2

**program**
13:16 21:21
22:11,16,25
23:1,2 34:17,
21 35:7,8
36:19,22,23
37:10 38:3,4,
6,8,10 39:18
40:5,7,13
43:14 45:4,
10,15,23 46:7
49:1 50:12,15
51:1 70:12

73:11 74:5
80:9 81:23
83:6 85:3,4,
11 97:21,23
104:20,24
105:2 114:24
115:5 132:22
134:15,16
136:1 142:17,
18,19 177:10

**programs**
7:25 11:10
73:1 126:9,10
130:25

**prohibit**
37:17 39:24

**pronouncing**
5:11

**propensity**
138:13

**proper**
69:13

**prosecute**
28:4 29:10,
14,18

**prosecutions**
28:8 70:13

**prosecutor**
29:21

**prosecutorial**
80:23 99:21,
22 100:4,9,
11,18 121:1

**protected**
63:19 64:6

**Protection**
25:4 33:12
41:12 44:11
45:5,15 50:8

87:16 105:9
124:6 127:23
173:23

**protective**
159:14

**protocols**
91:17 151:2
153:24
154:14,23

**provide**
18:11,13
23:23 25:14,
18,22 57:6
65:7 74:1
79:21 112:15
137:1 140:17
166:12,13,14
170:14 181:2

**provided**
12:10 13:11
25:8 78:20
80:3 92:16
112:18 114:22
117:10,12
119:11 120:12
122:18 123:5,
13 127:13
143:4,10
161:10 178:22
182:16

**provider**
140:16 175:8,
12,15

**providers**
139:15

**providing**
18:3 56:17

**provision**
31:7

**public**
31:12 37:15
63:2,4,22,25
67:21 92:15
140:20 155:6
175:10

**public's**
172:13

**public-**
171:21

**public-facing**
73:9,13 89:12
90:8 154:3
172:13

**publicly**
92:21

**publicly-
available**
92:16 154:12

**Puerto**
69:5

**pull**
40:14

**pulling**
50:24 75:6

**punitive**
137:13,16

**purely**
96:25

**purpose**
21:5,6 101:22

**purposes**
7:18 17:6
78:19

**pursuant**
27:18,25 87:2
162:22 163:5,
15,17

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

**put**
  46:16 47:9
  65:10 66:19
  70:16 97:17
  117:16 131:20
  138:16 153:24

**Q**

**qualifications**
  120:8 121:17

**qualified**
  37:11 82:5

**qualifier**
  122:5

**qualify**
  120:14

**quality**
  166:12

**quarantine**
  154:6

**quarter**
  165:23

**question**
  6:22 15:4
  30:9 33:17
  39:15 41:5
  48:8 49:12,25
  58:1 68:11
  73:8 74:22
  75:25 83:5
  84:5 85:2,10
  93:25 94:18
  97:3 99:17
  103:9,18,20,
  22 104:8
  111:11 128:6,
  17 129:20
  134:25 143:5,
  25 145:17

  146:5,18
  150:15 153:15
  155:13 165:14
  166:1,6
  173:18 174:3
  175:17 178:21
  179:17

**question's**
  103:8

**questioning**
  114:20

**questions**
  7:3 8:13 10:9
  41:1,6 77:7
  94:1,22 96:5
  104:14 113:11
  124:21,23
  148:1,16
  149:1 182:3,6

**quick**
  131:25

**quickly**
  134:20 177:15

**R**

**radio**
  39:6

**raise**
  4:20

**ran**
  95:24 97:4

**range**
  70:17

**ranking**
  70:5

**ranks**
  14:22

**rate**

  36:24 37:1
  38:14,15,16,
  18 66:11
  137:21
  142:16,19

**rates**
  172:10

**Raul**
  41:21 52:19
  53:5 114:17
  149:23

**read**
  12:2,5,9,16
  13:8 76:7
  93:7 113:18
  183:3,5,7

**reading**
  13:3 77:15,16

**reads**
  161:17

**ready**
  41:6 42:4
  105:14

**real**
  131:25 134:20

**real-**
  47:23

**real-time**
  47:21 85:23

**reality**
  54:16

**realize**
  105:25

**reason**
  17:6 22:4
  25:25 33:16
  79:1 90:10
  123:16 132:12

**reasonable**
  145:16

**reasoning**
  150:24

**reasons**
  17:7 40:20
  84:9 120:18
  137:14

**recall**
  9:21,22,25
  12:14 14:6
  16:6 32:13
  35:15 37:13
  41:25 46:18
  49:13 56:18,
  19 60:8,23
  61:4 67:20
  70:2 71:16
  85:22 143:18
  148:22,24
  149:20 150:24
  157:25 164:17
  167:21 170:13

**receive**
  42:16 43:8
  56:4 108:7,14
  110:24 150:13

**received**
  13:25 75:2

**receiving**
  36:18

**recent**
  106:12

**recently**
  56:24 68:2
  70:4 75:10
  90:2,17

**reception**
  150:9,16

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

40

**recess**
68:21 114:12
164:1,10
179:21

**reciprocal**
110:21

**recognition**
35:4 39:4
43:2,22,23
48:11,13

**recognizance**
119:3,6,8,10
120:14,19,21
121:6 123:19
129:15 133:5,
11,13,22

**recollection**
75:14

**recommend**
62:18

**reconcile**
124:7

**reconstitution**
91:4,5,6,22
92:17 136:6
170:20 172:9

**record**
4:2,14 9:15
24:19 68:20,
23 72:20
96:22 107:15
114:11,14,20
130:20 159:10
164:9,12
179:20,23

**recorded**
183:25

**records**
72:19

**recreation**
137:2

**recreational**
166:13

**redacted**
149:22

**redaction**
150:6,12

**reduced**
90:9 98:19
158:18 159:25
160:6 172:25
173:1

**reducing**
99:19 100:20

**reduction**
68:1,2 94:16

**reentered**
29:16

**reentry**
28:5,13

**refer**
6:4 26:14
73:2 88:8
129:7

**reference**
24:15 97:20
162:7

**referenced**
42:23 93:15
96:20 111:15
162:15

**references**
44:20

**referencing**
31:23 97:7
98:23

**referred**

68:1 72:2
88:15 124:24
125:23 127:3
137:22 151:16
158:2 162:9

**referring**
20:6 26:14
38:8 61:7
67:9 96:2
97:10,14
130:15 158:14
159:3 167:24

**refers**
32:16 43:12
96:20 98:24
119:7 130:18
163:19

**reflected**
161:19

**reflects**
120:17

**regular**
100:9 110:7
175:10 177:16
180:7,8,12,
14,25

**regularly**
34:4

**regulation**
44:18 136:14
162:10

**regulations**
30:6,11

**reinstatement**
129:12

**reinstates**
101:8

**relate**
21:10 71:1,22

93:20,22 96:5

**related**
13:8 96:12
134:1

**relates**
12:24 31:1
32:2 67:5
90:16

**relating**
105:20

**relation**
11:4

**relationship**
33:24

**relay**
69:9

**relaying**
26:21

**release**
32:5 35:10
45:7,12 49:3
74:2 100:12
119:7,23
120:13,16,18,
19 126:18
127:19 128:22
129:15,16
132:12,16
133:11,22
135:11 152:17
161:18 162:22
163:4,15
166:21

**released**
12:25 22:24
24:8 32:4
33:19 34:19
50:4,11 73:5
74:3 78:1,10,
11,15 79:12

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

41

80:8 83:1
85:12,13,16,
25 86:9,19,24
89:8 107:8
113:6 119:1
120:21,23
121:1,8
123:17 125:25
126:2,4
128:18 130:11
132:9,14,19
133:3,6,9,13,
17,19 141:13
143:1,3,8,9
150:11 166:22
174:13 175:14
176:24 180:2

**releases**
13:1,15 34:23
47:5 100:22
105:11 119:9,
17,18 121:3
123:10 178:4

**releasing**
153:11,19

**relevant**
96:9 115:15
146:9

**relied**
92:10,20

**relief**
107:14,21

**relies**
74:20 161:18

**relocate**
56:22

**rely**
27:5 50:7
127:22 155:4,
7

**remain**
142:18

**remember**
6:18 11:14
77:6 169:7

**remotely**
4:23 5:7
134:10

**removability**
29:7

**removal**
5:23,25 6:2
21:1 25:23
27:17 31:4
32:15,16,17,
18 33:3,19
59:10,17
88:14 89:5
99:3 101:20,
25 107:13,21
108:19
121:10,13
129:11 137:16
162:24,25

**removals**
33:14

**remove**
22:6 28:3
88:16 89:7

**removed**
23:8 27:17
31:2 101:9
133:13

**removing**
21:17 27:25

**rented**
140:19

**rep**
4:5

**repatriate**
65:17

**repeat**
6:23 9:3
39:15 80:17
102:8 104:8
112:24 146:5,
18 155:13
165:14

**rephrase**
6:25 143:6

**replaced**
40:19

**replaces**
44:25

**report**
18:21,22,24
27:20 40:19
44:21,25
45:2,4,6,19
49:14 51:1
73:11 87:1,6
89:13 123:12
135:11 167:8
173:25 174:1

**reporter**
6:20 181:23

**reporting**
4:12 35:3,4

**reportings**
170:25

**reports**
18:25 19:19
101:23 143:16
161:19

**represent**
121:21 134:4

**representative**
119:17

**represented**
134:14

**representing**
87:21 121:24

**represents**
134:6 137:24

**repurposed**
149:3

**request**
23:21 24:6
62:16,19,21,
23 63:1,15
64:2,5 68:3,6
75:2 79:24
131:17,23
132:16 133:2,
25 135:15
183:14,20

**requested**
63:12 162:4

**requesting**
171:23

**requests**
63:5,10

**require**
36:10 49:20,
23 74:16,21
110:20

**required**
8:6 55:8
56:25 79:16
87:6 101:25
102:11,12,13
151:5 163:8
174:7

**requirement**
155:9 173:24

**requirements**
34:5 154:2,10

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                    42

requires
  58:6 59:11
  160:18 173:25
  174:1
requiring
  46:3,4,8 59:8
  64:4 181:20
rescinded
  40:19
resettled
  76:24 79:1,5
  80:11,19
residence
  46:12 127:16
residences
  47:20 49:18
resident
  127:15
residential
  140:1,5,7
  141:17,25
  144:21 147:1,
  3 156:3,10
  165:20 166:9
  182:23
residing
  46:9 47:5
  86:20
resources
  70:11,13
  73:19 74:10,
  12
responded
  179:11
respondent
  87:20 88:13
  181:2
respondents
  88:10 89:1

response
  6:19 13:11
  75:3 76:15
  127:15 154:2,
  10,15 155:9
  163:1,9,19,20
  168:8,24
  169:2,17,18
  179:10
responses
  6:18 75:1
  149:1 163:21
responsibilitie
s
  15:9 17:12
  20:22 110:12
responsibility
  15:16 17:11
  33:8 47:13
  86:25 105:9
  107:17 108:24
  168:22 178:5
responsible
  15:24 17:25
  21:16 27:24
  31:20 34:18
  47:14 50:15
  69:3 116:15
  125:1 152:10
restate
  153:15
restricts
  160:17
result
  20:13
resulted
  151:17
results
  89:4

retired
  150:2
retract
  65:15
returned
  177:18
  180:16,21
  181:5,7
revealing
  63:19
review
  12:15 13:13
  31:15 32:6
  101:4 125:17
  127:7 154:3
  160:19
reviewed
  10:13 12:8
Rico
  69:5
rider
  54:7
risk
  31:12,14
  37:15 38:4
  39:21 152:14,
  16 153:4,20
  160:20
Robert
  4:5 5:6
  183:25
Rodney
  149:22,24
  150:1
role
  19:22 55:18
  62:7,21 88:1
  92:8

roll
  68:16
rolled
  39:2
rolling
  81:5
Ron
  76:16
room
  149:8
rooms
  171:12,14
rough
  98:18 158:17
routinely
  108:21
row
  113:21,22
  118:24 120:10
  123:4 124:8
  130:4
rows
  118:13
  121:16,18
  123:3 131:19
Ruiz
  133:1
rule
  8:17 115:11
rules
  6:15 30:6,11
  133:21
run
  10:6 106:10,
  16,23 109:8
running
  8:1
Ryan

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

84:18

**S**

**safe**
90:22 153:25

**safety**
37:15 138:6

**San**
13:24 16:17
17:16,18 34:3
41:18 52:12,
20 70:3 71:16

**sanitation**
154:7

**save**
83:18 148:1

**scale**
71:17 151:1

**scenario**
176:20

**schedule**
73:12 89:1,12
171:24 172:2
175:3 176:7,
12

**scheduled**
73:7 88:4,6
89:15,19
178:7

**scheduler**
73:10 89:11,
18 122:9,14
171:21 172:3
174:23 175:4,
5

**schedules**
87:17 176:14

**scheduling**

**schools**
73:20

**science**
14:1

**scope**
82:17 83:11
103:2 145:9
146:15 147:10
155:23 157:1,
21 158:8
164:18

**Scott**
149:22,24
150:1

**screen**
19:7 75:5
93:6 114:18
117:16 118:1,
6 149:12

**screened**
118:2

**screens**
7:17,20

**scroll**
9:19 118:9
161:13 167:13

**scrolling**
95:2

**search**
122:1

**second-line**
18:5

**secretary**
19:19 20:4,6,
7

**section**
28:15,20,24
29:2 31:8,24

101:9 122:21
133:23 162:8,
16,23 163:5,
8,16

**sector**
35:21 52:20

**sectors**
17:9,10 35:17
52:9,15

**secure**
21:14 87:22

**securing**
33:8

**Security**
4:5 20:16
21:2 24:17
25:5 95:21

**Security's**
76:15

**seeking**
25:19

**segregate**
148:8

**self-**
176:14

**send**
57:25 108:12
183:15,20

**sending**
172:1

**senior**
5:22 14:25
18:9 19:22
20:5

**sense**
23:15 25:12
38:20 39:6
45:25 46:20
49:18 81:10,

11,22,24
82:20 89:16
104:22 135:18
152:8,12
173:19 176:13
178:25 179:1

**sentence**
26:3 80:10,18
81:7 82:10,
15,21 95:3,23
96:8 97:18
98:7,18,21
99:4 118:25
150:4 158:14

**separately**
125:13,15
138:11,14

**September**
65:1,2 78:7

**series**
97:15

**serve**
26:2

**serves**
156:2

**service**
5:22 14:19,
20,25 18:9
20:5,19 54:4,
6 60:23,25
61:1,2,6,8,
13,17,23,25
65:22 69:15
155:6,7
166:13 175:8,
12 176:15

**services**
19:22 20:19
74:6 166:13
171:11 172:13

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                                    44

set
 8:16 22:5
 127:10 129:3

setting
 11:19 67:6
 125:12 131:5

settings
 55:11

severely
 160:17

shake
 6:19

share
 118:6

sheet
 122:8

sheets
 124:24

sheriff
 56:16 57:9

sheriffs
 26:15 54:25

short-term
 59:4,21

Shortly
 179:25

shoulders
 33:10

show
 8:25 9:7 19:6
 41:20 50:19
 74:23 79:14
 93:4 94:14,21
 98:9 122:16
 128:13,14
 148:25 167:3
 171:25

showers

136:24

showing
 93:25 131:24

shows
 106:8

shut
 156:7

sic
 52:4 125:16

side
 15:16

signature
 75:18

signed
 41:21 75:15
 161:11

significant
 31:11

signifies
 58:12

similar
 10:12 57:10
 71:15 109:20
 121:6 135:18
 171:10

single
 66:12,25
 77:9,20
 99:10,14
 141:23
 144:15,16,24
 145:2 149:4
 156:23 157:4
 165:22 178:17

single-family
 150:17

Sir
 4:20

sister
 107:6,16

sisters
 33:11

site
 102:18

sitting
 174:15

situated
 174:4

situation
 168:11 170:18

situations
 56:13 139:1

six-foot
 66:8 152:19

size
 70:23 71:15

sizes
 138:5

slash
 118:15 119:3
 133:5

small
 117:17 142:21
 171:14 173:9,
 10,12

smaller
 16:4

Smartlink
 35:7 43:1
 48:5 49:1

social
 152:21

soft-sided
 105:12

solemnly
 4:25

somebody's
 109:21 176:24

sort
 7:22 84:24
 131:24

sought
 163:11

sound
 99:6

sounds
 9:17 77:16
 164:5,6

south
 16:16,21
 17:20 111:18

southbound
 21:10

southwest
 12:22 13:24
 15:18,21
 16:11,13,17,
 20,24 17:1,5,
 9,15,17 32:23
 33:6,7,8
 34:1,8,13,23
 35:13,24
 42:21 52:8,9
 58:5,7,15
 59:25 60:2,7,
 12,16,19
 70:22,24
 71:14 76:23
 77:10,21
 80:12,22 83:2
 104:18,19,23
 105:6,13
 111:8 119:2,
 24 123:11,18
 127:20,25
 128:23 129:2

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022
45

132:2,17
133:3 140:25
141:10,24
142:2 165:23
173:16 174:9,
17

**space**
54:23 56:5
60:11 70:17
90:22 137:2,3
141:22 142:9
165:21
182:13,17,19

**spacing**
91:17

**SPC**
66:9

**speak**
39:19 40:25
41:3,13 51:9
52:22 59:19
71:1 78:8
86:16 127:8
139:4 146:25
165:18 166:16
171:24

**SPEAKER**
159:12

**speaking**
126:21

**speaks**
138:17,22

**specialized**
14:7

**specific**
30:24 44:2
53:19 57:4,5
60:18 90:1
102:16 126:3
127:3 133:8

135:9 140:2
164:24

**specifically**
10:20 23:14
52:10 56:19
70:18 75:2
97:7 100:7
111:4 129:2
152:9 167:21
170:12 173:13

**speculate**
99:16 110:18
159:8

**speculation**
110:1 159:1,7

**spelled**
160:14

**spells**
31:10

**spent**
16:13,23,25
17:5

**split**
70:4

**spoke**
10:21,23
55:16 86:17
150:6 168:9
169:23 170:3

**spoken**
68:15

**spreadsheet**
112:20,22

**stack**
112:25

**staff**
14:24 42:9
75:24 90:3,19
151:8,9,14

152:10 170:23

**staffed**
136:7 171:8

**staffing**
69:6,7,19
70:16 71:18
90:15 91:1,3,
24,25 172:25

**stage**
90:17 91:1

**staged**
157:6

**stamped**
76:13

**stamps**
73:21

**stand**
82:14 92:4
98:10 108:9,
20 119:4
129:14

**standard**
139:25 140:1
162:24

**standards**
136:18 137:9,
10 140:3,5,7
141:18 147:1,
4 154:7
166:8,9,10,
11,12,17
182:24

**start**
13:21 20:1
36:16 61:12
78:3 94:22
107:3 114:16
118:10 120:10
132:22

**started**
8:15 36:17
37:10 45:5
63:11 78:3,7
132:24 144:20
157:10 171:9

**starts**
107:4

**stat**
82:1,7

**state**
4:6,17 11:16
12:16,24,25
13:24 15:24,
25 21:22
22:13,17
23:3,4,9,11,
13,16,23 24:6
25:8,10,14,18
26:2,11,16,
18,19,21 27:7
54:16,17,20
69:4,25 111:3
113:13 114:20
117:8 122:2
130:2 136:21
160:4,8
169:10

**stated**
127:22 147:5

**statement**
87:5 127:18

**states**
4:7,19 15:16
21:11,18
22:23 24:5
25:11,16 26:1
27:4 28:4
29:16 31:2
35:1 54:12

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

46

66:5 81:9
83:22 88:17
106:5,9
108:16 109:10
110:11 131:7
137:10

**station**
58:10 105:12

**stationed**
16:10,21

**stations**
35:21 58:13
59:19,20
174:4

**statistic**
38:19

**statisticians**
98:14 119:25
124:4 127:21

**status**
23:24 25:19,
23 76:22
142:10 161:19

**statute**
103:24 122:20
126:10 133:8

**statutes**
29:10 30:7
126:7,16,17
133:10,18
163:20

**statutory**
126:3

**stay**
105:6

**stenographer**
4:11,20,25
5:4 9:15
149:5 182:1

183:11

**step**
58:24

**steps**
170:15 171:18
174:19

**stop**
58:5

**stopped**
156:21

**stories**
139:8

**story**
128:2 139:8,9

**straight**
33:18

**strategies**
152:11

**Street**
5:18

**strictly**
74:19 161:23

**strike**
14:17 143:24
157:11

**strokes**
22:7

**strongly**
114:21

**structure**
105:12

**structures**
69:20

**STU**
119:11 120:12
122:18

**studies**
53:12

**subcomponents**
25:5

**subject**
13:6 152:4

**submitted**
79:9

**suboffice**
92:2

**suboffices**
69:8

**subordinates**
168:23

**subset**
127:24 129:1
142:24

**substances**
8:9

**success**
36:23 142:16

**successful**
21:20 36:20
37:4

**sum**
131:25

**summarize**
13:22 15:4

**summarizing**
116:7

**sun**
170:16 171:20

**superseding**
44:21

**supervise**
15:10 125:11

**supervising**
50:15

**supervision**
120:24 121:4,

5,11

**supervisor**
14:22 18:5,6
19:5 43:10
44:3 102:18,
19 170:10

**supervisors**
105:3

**supplement**
52:13

**supply**
18:12

**support**
18:11 21:4
34:9,10 52:15
58:16 59:23
60:1 65:7
141:22 166:21

**supposedly**
179:4

**swear**
4:25

**sworn**
5:7 14:11

**system**
43:1,2 73:12
86:15,22
109:11,19
121:25 130:20
141:15,16

**systems**
88:22 98:11,
24 99:1,2
127:23,25
179:1

---

**T**

---

**tab**
119:11

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022                                                              47

tablets
 139:13

Tae
 75:15,16
 97:11,13,17
 146:1 169:13

takes
 105:11
 160:24,25

taking
 151:17 152:16
 156:17

talk
 29:9 36:12
 40:22 41:9,11
 67:10 76:1
 94:9 99:24
 168:19
 169:20,24

talked
 41:5 62:5
 76:5 99:21
 150:25 162:10
 169:13 170:11
 173:12

talking
 42:15 48:18
 57:12 82:24
 92:13 93:17,
 19 97:10
 113:7 147:24
 158:21 159:4
 164:15 180:1

talks
 80:21 129:21

Tallahassee
 16:2 69:12

Tampa
 16:3 69:12

target
 99:19

TDY
 34:12 52:14,
 16

team
 10:19 11:3

technical
 9:16 18:4

technologies
 42:23 43:25
 44:5

technology
 38:6,23 42:21
 43:10,12,14
 44:4

Tegucigalpa
 65:20

telephone
 35:4

telephones
 139:10

telephonic
 35:3 42:25

televisions
 139:11

telling
 25:24 103:19

temporarily
 35:13

temporary
 34:12 35:24
 42:18 52:7,17
 104:17

ten
 30:19,23
 32:12 170:5

ten-minute

164:3

term
 31:21,25
 32:14 57:12
 58:11 65:24
 71:20 94:4
 129:6 131:6
 137:22 156:17

terms
 12:7,22 26:8,
 21 31:17
 34:4,5 41:12
 56:16 57:6
 59:9,22 69:8,
 19,22 70:12
 71:17 77:24
 78:9 79:18
 82:2,7 129:4

terrible
 20:12

terrorism
 20:23

tested
 150:10

testified
 5:8 116:14
 117:8

testimony
 5:1 150:5
 182:11

testing
 154:6

Texas
 13:24,25
 16:14,16
 17:19,20
 140:8 161:20

thing
 7:22 23:5

36:16 39:4
 68:9 72:1,15
 151:4 159:23
 163:23

things
 38:2 55:5
 63:23 71:18
 74:8 94:21
 100:15,21
 117:15 122:4
 129:19 136:23
 137:6 151:3
 154:5,9 155:1
 176:1 180:18

thinking
 168:3 169:12,
 15

thought
 78:16 116:22
 123:7 126:22
 134:23
 143:24,25

thousand
 54:15

threat
 37:15

threats
 160:20

three-day
 183:9

threes
 138:12

threw
 150:4

throw
 180:22

thunder
 75:16

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022
48

till
  178:2
time
  4:3 7:4 16:25
  17:3,5 39:13,
  16 42:12
  45:23 47:24
  61:21 68:19,
  22 72:23
  75:10,13 76:8
  77:13 78:6
  84:23 86:1,
  16,23 89:5,15
  91:16 98:6
  114:1,7,10,13
  115:19 126:8
  127:11 129:6
  130:20 136:5
  141:3 144:13,
  17 150:19,21
  151:11 152:2
  156:11 157:7
  164:8,11
  167:17 170:4,
  11 172:19,20,
  25 175:25
  176:18 177:3
  179:19,22
timely
  175:20,22
times
  6:11 11:18,
  22,25 12:1
  108:7 144:19
  170:3,4
title
  28:17 95:10
today
  7:13 8:6,10,
  13,16 10:10,
  15 37:14 39:3

55:20 93:17
94:6,20
toilets
  136:25
told
  159:12 167:8
  173:21 174:14
  175:23 176:7,
  11,24
toll
  151:14
tool
  86:18
tools
  39:3
top
  5:19 30:17
  67:20 70:3
  76:14 115:2
  131:23 137:5
  139:9 151:20
topic
  11:1 36:12
  40:18,22
  41:6,17 51:5,
  6 55:17 70:25
  71:21 77:3
  78:21 79:11,
  23 84:6,20
  94:6,20 96:9
  103:9 105:14,
  19 117:3,6
  145:10,16
  147:11 148:11
  154:17 157:1,
  22 158:8
  166:24 168:6
topics
  8:23 10:5,6,
  7,10 51:2

71:5,9,22
72:5 82:18
83:11,15
84:19 93:12,
18 96:23
102:23 103:14
104:1 136:11
145:9 146:9,
15
total
  11:23
totally
  94:7 96:23
  103:1 115:4
touch
  42:14 74:7,11
track
  47:11,19,25
  48:2,3,9
  49:16 88:1,2,
  18 106:4,6
  125:8,9,10
  127:6,10
  141:15
  177:15,25
  178:1
tracked
  46:17 49:15,
  19,20 77:19
  78:2,12
  125:13,14
tracking
  34:22 47:15,
  21,24 49:10
  50:11 74:20
  77:9,25 78:9
  88:18,20
  125:2
tracks
  47:12 78:18

107:7 109:11
traffic
  121:22 122:3
trafficking
  21:13
training
  14:8,9
  104:18,20,24
  105:4
trans
  157:13
transcribed
  183:2
transcription
  183:4,10
transcripts
  183:18
transfer
  36:5,8
transferred
  36:11
transfers
  98:21 99:5
  158:20
transient
  140:14
transition
  145:4,20
  156:23 157:5,
  6 165:19
transitioned
  157:3
transitioning
  144:20 150:9,
  16 157:10
transmission
  55:10 66:7,11
  67:5 91:19

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

92:1 172:10,
14

**transnational**
21:7

**transparency**
63:23

**trial**
108:20

**trigger**
181:10

**true**
181:19

**truth**
5:1,2 8:6,10

**turn**
7:23 8:3 48:1
50:21 76:12,
19 77:8 95:22
179:15

**turnaround**
183:9

**turned**
31:3

**turning**
80:1

**turns**
158:22

**twos**
138:10

**type**
33:15 34:19
37:25 38:5
74:10 87:8
104:18
108:10,17
110:21 111:4
121:23 129:12
136:25 151:17
152:3 159:4

167:23,25
176:15

**types**
30:16 35:11
37:11 38:23
43:13 48:12
153:3

**typical**
42:16 137:25

**typically**
23:15 25:1
26:4,10 28:11
29:17 37:20
43:24 48:3
58:5 59:20
66:11 97:17
105:11 106:23
108:10,12
109:14,18
110:25 122:3
127:10 129:9,
25 139:7
141:2 176:2

---

**U**

---

**U.S.**
4:18 12:23
13:13 14:13
20:14 28:23
29:18,22,24
34:16 41:21
54:6,8 77:10,
20 79:13
81:24 110:22,
23 130:5,8
141:22 172:9
178:23

**U.S.C.**
28:8,11,20
29:12,19

122:24 162:23
163:5,8,16

**UIP**
86:21

**ultimate**
107:20

**ultimately**
62:18

**unaccompanied**
37:18 40:1
76:22

**understand**
6:22,24 7:2
8:5,12 13:5
58:25 86:4
94:3 102:6,7
128:6 132:11

**understanding**
12:19,21
13:2,20 35:20
41:16 45:15
52:11 53:3
60:17 67:23
79:18 87:12
99:12 116:19
144:25

**understood**
38:22

**unified**
46:20,22
47:1,6 49:17
86:16,21
178:3,23

**uniform**
46:24

**unit**
21:4 28:9
40:10 43:16,
19 44:6,9

66:15 98:15
137:25 138:5,
22 140:5
155:11,15,20
174:13 177:1

**United**
4:6,19 15:16
21:11,18 24:4
25:11,16 26:1
28:4 29:16
31:2 35:1
81:8 83:22
88:17 106:5,8
108:16 109:9
110:11 131:7

**units**
33:2,18 37:20
138:15 139:7,
21,22,24
140:3 141:4,
8,13 142:21
143:1,8,14
144:3,7,10,
12,14 145:5,
21 150:10
153:12,19
156:13,15,21
157:19 164:16
165:1,12,16,
24 167:7
177:8,23
178:14,15,16

**universe**
120:1

**University**
13:24

**unjust**
166:3

**UNKNOWN**
159:12

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

unlawful
  21:17 22:6
  28:3
unlawfully
  22:4 23:7
  24:4 25:9
  26:1
unprocessed
  59:15
unrelated
  94:8
update
  56:4
uploaded
  178:23
utilize
  21:20 27:3
  28:9 47:7
  49:17 54:8,23
  55:6 66:12,
  21,22 86:23
  140:3 166:10
  178:3
utilized
  45:4 87:15
  116:25 140:21
  163:2
utilizing
  34:24 66:6

V

vague
  6:24
valid
  180:20
varied
  45:22
varies

136:19
vast
  60:15 98:20
  99:4 158:19
vendor
  56:15 57:5,7,
  8,15,21
  134:19 135:3
  136:20
vendor's
  136:21
vendors
  60:21 156:19,
  20 182:12
verify
  179:1
version
  154:11,15,24
versions
  154:25
versus
  4:6 145:13
  160:20 161:20
video
  4:8
video-
  183:24
video-recorded
  4:4
view
  165:11,16,24
  166:2
violation
  131:9
violations
  131:1
violator
  129:6

violators
  130:14,15,18,
  23 131:2,6
violence
  138:13
Virgin
  69:4
Virginia
  67:16,18
  151:24
virtually
  134:12 135:21
visa
  130:24
visas
  130:24
visibility
  42:16 85:4,12
visit
  73:12 180:17
vulnerable
  142:20

W

wait
  122:13
waiting
  89:22 170:16
  171:1,4,6,12,
  14,19 172:4
  173:11,15
waive
  183:4
walks
  26:11
wanted
  50:2 55:17
  86:8 106:2

warrant
  59:8,16
  108:12,18
  163:18
warrants
  108:7
Washington
  5:17,18 7:15
  15:9 17:3
waste
  84:23
ways
  106:19 125:4
weapons
  21:10
website
  50:21 51:13
  73:13 89:12
  154:3,13
  171:22,23
  176:15
week
  169:23
weekly
  98:9
weeks
  75:12
west
  18:15
western
  18:20
When's
  167:17
White
  68:3,7
wholly
  34:21
Wi-fi

Exhibit D

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

74:16 175:12

**wildly**
103:25

**Williams**
18:20

**willingness**
54:25

**wise**
42:21

**witnesses**
51:2,9 84:1,3

**wondered**
71:25

**word**
108:8

**work**
5:21 7:24
15:4 19:23
22:23 23:9
26:20 27:3,6,
9 33:25 34:7
104:23 125:20
131:4 136:20
168:23 170:6,
23

**worked**
14:21 171:20

**working**
16:24 17:1
26:6 29:17
95:15 122:11
174:20 175:1
176:13

**works**
6:15 111:1
179:9

**worldwide**
108:6

**wrap**
74:5

**writing**
117:17 157:18

**wrong**
113:17

---

**Y**

---

**year**
53:24,25
64:19,24
111:14 144:10
156:4

**years**
16:23 30:19,
23 32:12
36:21 55:7
64:13

**yesterday**
56:6 71:24

---

**Z**

---

**Zoom**
4:8

Exhibit D