# Exhibit E

State of Florida

vs.

United States

---

Deposition of:

Tony Barker

July 13, 2022

*Vol 1*

---

# PHIPPS REPORTING

*Raising the Bar!*

Tony Barker
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

                Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

                Defendants.
_____/


VIDEO RECORDED REMOTE DEPOSITION OF TONY BARKER,
A WITNESS, TAKEN ON BEHALF OF THE PLAINTIFF


Volume 1
Pages 1 through 25


Wednesday, July 13, 2022
2:33 p.m. CT - 2:58 p.m. CT


Location:  Remote via Zoom
Washington, D.C.


Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

Exhibit E

Tony Barker
July 13, 2022

Page 2

```
 1    APPEARANCES: (All appearing remotely via Zoom)

 2
      On behalf of the Plaintiff:
 3
          OFFICE OF THE ATTORNEY GENERAL
 4        The Capitol, PL-01
          Tallahassee, Florida 32399-1050
 5        850.414.3665
          BY:  ANITA J. PATEL, ESQ.
 6             ELIZABETH TEEGEN, ESQ.
               anita.patel@myfloridalegal.com
 7

 8    On behalf of Defendant United States of America:

 9        DEPARTMENT OF JUSTICE
          P.O. Box 868
10        Ben Franklin Station
          Washington, D.C. 20044
11        202.514.0618
          BY:  JOSEPH ANTON DARROW, ESQ.
12             ELISSA FUDIM, ESQ.
               joseph.a.darrow@usdoj.gov
13

14    On behalf of Defendant Department of Homeland
      Security:
15
          DEPARTMENT OF HOMELAND SECURITY
16        Office of the General Counsel
          2707 Martin Luther King, Jr.  Avenue SE
17        Washington, D.C. 20528
          BY:  KAITLYN CHARETTE, ESQ.
18

19    On behalf of Defendant U.S. Customs and Border
      Protection:
20
          U.S. CUSTOMS and BORDER PROTECTION
21        Office of Chief Counsel
          1300 Pennsylvania Avenue, Suite 4, 4-B
22        Washington, D.C. 20229
          BY:  STEPHANIE MUFFETT, ESQ.
23             SAMANTHA POON, ESQ.

24
      ALSO PRESENT:  David Celani, Videographer
25
```

Exhibit E

Tony Barker
July 13, 2022

Page 3

1                         I N D E X

2   July 13, 2022                                    Page

3   TONY BARKER
        Direct Examination by Ms. Patel............   5
4

5   Certificate of Oath.........................   22
    Certificate of Reporter.....................   23
6   Read and sign letter to witness.............   24
    Errata sheet (forwarded upon completion)......   25
7

8                      E X H I B I T S

9                   NO EXHIBITS MARKED

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit E

Page 4

1    Thereupon,

2    the following proceedings began at 2:33 p.m.:

3              THE VIDEOGRAPHER:  We are now on the

4         record and the time is 2:33 p.m.  This is the

5         video recorded deposition of Tony Barker in his

6         capacity as an individual in the matter of

7         State of Florida versus United States of

8         America, et al.  This deposition is being held

9         via Zoom video on July 13, 2022.  The

10        videographer is David Celani and the

11        stenographer is Helen Chase.  Both in

12        association with Phipps Reporting.

13             Will counsel, please, announce their

14        appearances for the record?

15             MS. PATEL:  Anita Patel, counsel for the

16        State of Florida.

17             MR. DARROW:  Joseph Darrow, counsel for

18        the United States.

19             MS. MUFFETT:  Stephanie Muffett, counsel

20        for CBP.

21             MS. CHARETTE:  Kaitlyn Charette, counsel

22        for DHS.

23             MS. POON:  Samantha Poon, counsel for CBP.

24             THE STENOGRAPHER:  Raise your right hand,

25        Chief Barker, please.

Exhibit E

Page 5

1           Do you solemnly swear or affirm that the

2       testimony that you are about to give in this

3       cause will be the truth, the whole truth and

4       nothing but the truth?

5           THE WITNESS:  I do.

6           THE STENOGRAPHER:  Thank you.

7   Thereupon,

8                   TONY BARKER,

9   having been first duly sworn or affirmed, was

10  examined and testified as follows:

11               DIRECT EXAMINATION

12    BY MS. PATEL:

13      **Q.   Okay, Chief Barker, we just completed your**

14  **corporate representative depo.  Do you recall at the**

15  **beginning of that depo I gave you a bunch of ground**

16  **rules --**

17      A.   Yes.

18      **Q.   -- as to how to conduct the deposition?**

19      A.   Yes.

20      **Q.   So, those ground rules still apply here.**

21  **If I were to ask you the same questions that I asked**

22  **you during the corporate representative portion or**

23  **deposition, would you provide the same answers in**

24  **your individual capacity?**

25      A.   Yes.

Exhibit E

Tony Barker
July 13, 2022

Page 6

1      Q.   Okay.  Have you ever expressed concerns to

2   a DHS official regarding the closing of detention

3   facilities?  Specifically family detention

4   facilities.

5      A.   The closing of detention facilities, yes.

6   As, you know, an executive order for the closing of

7   privatized detention facilities could potentially

8   impact the border area, yes.  In regards to the

9   family detention which you were speaking about, that

10   detention facility space was repurposed for single

11   adults, which, you know, as I had mentioned

12   previously, it's still, roughly, you know, 70

13   percent of the, the encounters -- the individuals

14   who we are encountering right now.

15      Q.   Okay.  So, I guess I'm a little unclear

16   from your answer.  Did you -- so, I just want to

17   make sure.  Have you ever expressed concerns to a

18   DHS official regarding closing of family detention

19   facilities?

20      A.   So, families, no.

21      Q.   Okay.  What about for the private

22   facilities, what were your specific concerns?

23      A.   Just the losing of detention space.  You

24   know, as, as -- and this is really a question more

25   fit for ICE because it's really ICE's contracts.

Exhibit E

Tony Barker
July 13, 2022

Page 7

1  Right?  It's ICE's detention space.  You know, as

2  you know, privatized facilities are -- you know,

3  those contracts are either not extended, it could

4  impact what we would consider as available detention

5  space for CBP.  That's the simple, you know,

6  concerns that were levied.

7      Q.   Okay.  And who did you express these

8  concerns to?

9      A.   Just it would have been like individuals,

10  you know, within the DHS enterprise.  Right?  So,

11  you know -- you know, ICE -- either ICE leadership,

12  those who are assigned, you know, working with me at

13  a peer level.  You know, so those are, you know,

14  some of the upper -- I'll say like upper leadership,

15  like the deputy commissioner and stuff like that,

16  so...

17      Q.   Okay.  When did you express those

18  concerns?

19      A.   It's been, it's been at least like two --

20  two, three months.  It's when the contract impacts

21  were -- I should say the potential contract impacts,

22  and I couldn't even tell you what -- you know, what

23  ended up happening with the, with the space to be

24  honest.

25      Q.   Okay.

Exhibit E

Tony Barker
July 13, 2022

Page 8

1      A.   That's really a question more fit for ICE

2  and their contract.

3      **Q.   Has anyone expressed a concern to you**

4  **regarding the closing of family detention**

5  **facilities?**

6      A.   Not that I recall.

7      **Q.   Has anyone expressed a concern to you**

8  **regarding closing of the private facilities?**

9      A.   Yes.

10      **Q.   Okay.  Who expressed those concerns?**

11      A.   Chief Aaron Heitke, who is the chief

12  patrol agent of the San Diego Sector, as one of the

13  private facilities was in his area of operation.

14      **Q.   Okay.  And what were those specific**

15  **concerns?**

16      A.   Just that, that potential loss of space

17  could potentially impact the amount of people who we

18  would be moving to ICE detention.

19      **Q.   Was he speaking about potential impacts in**

20  **his state alone?**

21      A.   So, his, his area of operations is, is, in

22  essence, the State of California.  So, by and large,

23  it was his operation within his state.

24      **Q.   Okay.  And when did he express these**

25  **concerns?**

Exhibit E

Tony Barker
July 13, 2022

Page 9

1      A.   Again, same time frame, about two or three

2   months ago.

3      **Q.   Has anyone else ever expressed concerns**

4   **about any closing of the private detention centers?**

5      A.   Not that I recall.  I think that's the

6   only person who, who brought it up.

7      **Q.   Okay.  Have you ever expressed concerns**

8   **regarding the termination of MPP?**

9      A.   Yes, you know... during the time period

10   where MPP was in, in heavy litigation and we had

11   stopped MPP, you know, I didn't know what, what --

12   you know, what -- how the cessation of MPP could

13   impact the rates of flows of migrants that we

14   were -- we are encountering or were encountering.

15      **Q.   Did you think that it would increase the**

16   **rate of flow?**

17      A.   Potentially, yes.

18      **Q.   And who did you express these concerns to?**

19      A.   Peer group.

20      **Q.   Why did you think that it would increase**

21   **the migration flow?**

22      A.   So, there's -- I mean, there's many things

23   that impact flow, you know, there's many different

24   reasons.  But, you know, any degree of conversation

25   in regards to changing of policy or operational

Exhibit E

Tony Barker
July 13, 2022

Page 10

1    stance or anything along those lines has the

2    potential to impact -- to impact the migration flows

3    that we encounter at the Southwest Border.

4         **Q.   Okay.  So, changes in policy could impact**

5    **changes in migration.  Are you aware of any attempts**

6    **made to assess whether the changes -- specific**

7    **changes in policy impact the flow of migration?**

8         A.   You have to narrow down what policy you're

9    talking about.

10        **Q.   For instance, Parole + ATD.**

11        A.   So, the, the -- you know, whether we

12   evaluated the impact or the potential impact of

13   flow, you know, you know, I -- I guess the answer

14   would be we're in a constant state of evaluation to

15   how pathways impact flow, right, and constantly

16   evaluating that aspect, but Parole ATD is utilized

17   with the population -- again, going back to, you

18   know, for me to be able to make a very pointed

19   statement.  You know, Parole ATD is utilized in a

20   very specific geographical area based upon the flow

21   rate that we are, you know, encountering at the

22   time.  Again, the vast majority of the 8600 people

23   per day are going through very specific geographical

24   areas.

25             The population which we are encountering

Exhibit E

Tony Barker
July 13, 2022

Page 11

1  in those areas which PATD is associated with or

2  applied to is predominantly the CVN population,

3  right, is the Cuban, Venezuelan, Nicaraguan

4  population, and no return mechanism for them.

5  They're, they're -- so, there's no way to, to, you

6  know, return or repatriate.  You know, the -- you

7  know, we would, we would, you know, prioritize

8  detention and prioritize NTA/OR processing for this

9  population or for these individuals.

10           We are utilizing Parole ATD as an absolute

11  last chance or last -- you know, last ditch effort,

12  if you will, in order to be able to move people out

13  of our custody as quickly as possible.  Again, going

14  back to the various time frames in order -- that it

15  takes to be able to process them totally is very

16  significantly less than an NTA/OR or a detention, a

17  detention avenue.  You know, we are utilizing it as,

18  basically, a last chance or a last ditch effort in

19  order to be able to move people out of our facility

20  because, as I sit here right now, we have roughly

21  eleven and a half thousand people in our detention

22  within, within Border Patrol holdings.

23           If we were not using Parole ATD today,

24  right know as we sit here, I can guarantee we would

25  be well over 20,000, probably close to 30,000 people

Exhibit E

Tony Barker
July 13, 2022

Page 12

1    in custody and we would have a significant risk of

2    people dying in our custody with that many people in

3    a very small -- in a smaller space.  Like A space

4    not designed to be able to hold that degree of

5    people.  So, we're utilizing Parole ATD in a very

6    limited individual case -- case-by-case basis to

7    really balance life and death decisions.

8         **Q.   So, based upon what you just said, why is**

9    **it that you wouldn't have concern regarding closure**

10   **of the family detention facilities?**

11        A.   I guess I'm having a hard time to draw how

12   those two pieces are correlated.

13        **Q.   Well, you, basically, said that without**

14   **Parole + ATD there would be, you know, 20,000 people**

15   **in your facilities and that would expose them to**

16   **life and death situations, but if there were family**

17   **detention facilities, some of that could have --**

18   **some of that overpopulation could be relieved,**

19   **correct?**

20        A.   So, so, those -- the facilities that were,

21   that were family detention facilities were actually

22   switched to single adult detention and thereby

23   increasing the detention capacity for a population

24   we have a higher population thereof.  Single adults

25   being 70 percent of it.  So, we actually increased

Exhibit E

Tony Barker
July 13, 2022

Page 13

1    detention capacity versus the smaller demographic.

2        Q.   Understood.  But I had understood your

3    testimony to say that if we don't have Parole + ATD,

4    instead of having 11,000 people in your custody you

5    would have 20,000.  So, those would necessarily

6    families, right?  Because Parole + ATD applies

7    mostly to families?

8        A.   Well, it's families and single adults in

9    those two areas of operation that we just spoke

10   about.

11       Q.   Okay.  So, are you talking about an

12   increase in single adults from 11,000 to 20,000?

13       A.   Well, it would be the -- I mean, you know,

14   to correlate, you know, scope and scale, right, so,

15   you know, to take that -- the current population and

16   associate that with a larger population, you would

17   assume that naturally the demographic distribution

18   would remain constant, especially with a population

19   of that size.  Right?  So, thereby, you would assume

20   that the population of the increase would thereby be

21   70 percent single adults, you know, you know,

22   15 percent, 20 percent families, and the rest of it,

23   you know, unaccompanied children.

24       Q.   Okay.  Would application of MPP alleviate

25   some of that overcrowding that you just discussed?

Exhibit E

Tony Barker
July 13, 2022

Page 14

1      A.   Not with the restrictions that Mexico has

2  upon the numbers of MPP.

3      **Q.   Okay.  So, your concerns regarding the**

4  **termination of MPP, when did you give those**

5  **concerns, express those concerns?**

6      A.   Back -- you know, back when, you know, we

7  were -- you know, back when MPP was, was -- we were

8  stopping -- MPP was pulled down.  You know, I can't

9  remember when, when that was.  I'd have to refer to

10  it.

11      **Q.   Have you ever expressed concerns to a DHS**

12  **official regarding the Parole + ATD policy?**

13      A.   Well, it's not a policy.  It's guidance.

14  You know, I, I -- in regards to what nature?  I

15  mean, like concern that it -- I mean, again, I go

16  back to the, you know, the -- what I would consider

17  is the strategic utilization of Parole ATD is what

18  it's providing us occupational capacity to deal with

19  the flows that we're receiving.  You know, and we

20  constantly evaluate what the impact of certain

21  pathways are, the application of certain pathways on

22  flows.

23      **Q.   Okay.  So, I guess to clarify my question,**

24  **my question is, have you ever expressed concerns to**

25  **a DHS official about the Parole + ATD policy, any**

Exhibit E

Tony Barker
July 13, 2022

Page 15

1   aspect of it?

2        A.    Yes.  Yeah.

3        Q.    And what are those concerns?

4        A.    The limited nature in which we, we are, we

5   are currently scoped with the application of Parole

6   ATD within Del Rio, Yuma and RGV.  As we face -- let

7   me digress for two seconds.

8             So, you know, agility in order, you know,

9   to apply the pathways is what's essential in order

10  to be able to operate in the dynamic environment

11  that we're in.  You know, and one of the things that

12  we have to do is be responsive to, to those

13  situations which, you know, are presented to us that

14  we have even applied Parole ATD in the first place.

15            As I sit here right now speaking to you,

16  we are not utilizing Parole ATD in El Centro Sector.

17  We could utilize Parole ATD in El Centro Sector

18  based upon the triggers in the memo.  Right?  It's a

19  may, not a shall.  We are not utilizing Parole ATD

20  there because we have other decompression mechanisms

21  which we utilize in order to be able to decompress

22  an area like El Centro.

23            So, my concern about the Parole ATD aspect

24  by and large and the ones that I have levied is what

25  I would consider is the extremely narrow and

Exhibit E

Tony Barker
July 13, 2022

Page 16

1    stringent level of application of Patrol ATD as a

2    decompression methodology.  I think that we need to

3    be more nimble in the way that we're able to apply

4    it in certain circumstances.

5            But with that being said, I think that

6    because it is a case-by-case basis and extremely

7    strategically delivered, it has the right checks and

8    balance measures that are built into it, that being

9    approval of the chief and the commissioner before

10   it's utilized anywhere else but Del Rio, Yuma and

11   RGV.

12       Q.   So, would it be fair to say Parole + ATD

13   guidance should be utilized in more sectors?

14       A.   No, I just think that the ability to --

15   you know, the agility to apply the pathway, you

16   know -- increasing the ability to be able to, to

17   lower the decision making of moving it and applying

18   it in circumstances that meet the triggers should be

19   easier to do, right, operationally more feasible.

20   But as a manager and a leader in the United States

21   Border Patrol, I also understand the control

22   mechanisms that are in play, right, which is

23   approval by the chief and the commissioner before

24   it's expanded beyond those areas.

25       Q.   Has anyone ever expressed to you

Exhibit E

Tony Barker
July 13, 2022

Page 17

1    concerns -- a concern regarding Parole + ATD?

2        A.   As far as, as far as what?  Like, what

3    concern?  What are you, what are you -- do you mean

4    in regards to the flows like we were speaking about

5    or -- I'm trying to, to narrow the question down.

6        Q.   Any type of concern regarding Parole +

7    ATD.

8        A.   Yeah.  So, I mean, the field chiefs have,

9    have absolutely raised concern in regards to, you

10   know, the time frame necessary for ICE to, to apply

11   the ATD mechanism to migrants, you know, and, again,

12   the impact that that creates.  Again, you know, when

13   you're encountering 6800 people a day, the impact of

14   seconds to minutes of one person times by 6,000 is

15   quite an impact operationally.

16            So -- you know, so, some of the concerns,

17   right, that were expressed were, you know, the time

18   frame that it takes in order to be able to fully

19   implement, you know, or attach, if you will, you

20   know, the ATD mechanism.  Those are some of the --

21   you know, what I consider some of the consistent

22   concerns that we have faced previously.

23       Q.   Okay.  What other concerns have you faced?

24       A.   You know, just, just the various tracking

25   mechanisms.  Right?  And a lot of these are just

Exhibit E

Tony Barker
July 13, 2022

Page 18

1   going to be -- are really questions that are more

2   suited for ICE, but these are questions that we

3   have, you know, had with ICE on numerous occasions.

4           You know, the -- I'll give you an -- and

5   just as an example.  You know, when we first were,

6   you know, working with ICE and ICE was implementing

7   what you would consider like the cellular phone

8   technology for ATD that required a very quiet

9   location to be able to conduct voice recognition.  I

10  don't know if you've ever been to a border patrol

11  agent -- I mean, a border patrol station.  Quiet and

12  a border patrol station are not normally in the same

13  context.  You know, it's was taking, roughly, 20

14  minutes per migrant in order to be able to program

15  the phone.  20 minutes is far too long.  Right?  So,

16  those impacts.

17          Those are just -- you know, those are --

18  and I understand completely those are what you would

19  consider as tactical level impacts, but ultimately

20  that's the world that we live in.

21      Q.   Does ICE attach the ATD mechanism at the

22  processing facility?

23      A.   Yes.  By and large, yes.  I mean, they,

24  obviously, have their own facilities as well, but --

25  and you can ask them about ATD, but in the context

Exhibit E

Tony Barker
July 13, 2022

Page 19

1    of PATD, they're actually embedded into the

2    facilities with us.  The processing centers and

3    stations with us.

4         **Q.   Have you ever expressed concerns to anyone**

5    **that policies of the current administration have**

6    **increased flows?**

7         A.   No.  So, I guess this is probably the

8    easiest way to answer it.  You know, there hasn't --

9    there hasn't been, you know, what I would consider

10   is major policy changes impacting flows.  There are

11   different reasons why people migrate to the U.S, you

12   know, and, you know, I think it would be foolhardy

13   of me to sit here and try and quantify, you know,

14   the degree to which, you know, socioeconomic

15   drivers, political destabilization, climate impacts,

16   you know, policy change, you know, how all of those,

17   those impact flows.

18             Do they impact flows?  For sure, they do.

19   To what degree?  That's going to vary per migrant.

20   Right?  You know, it -- so, you know, I'm absolutely

21   astute to the fact that policy changes impact flows

22   of the migration pattern, to what extent, you know,

23   it would be foolhardy for me to sit here and

24   speculate.

25        **Q.   Have you ever expressed concerns that the**

Exhibit E

Tony Barker
July 13, 2022

1   policies have impacted flows or led to increased

2   flows?

3        A.   I mean, again, in the scope of, you know,

4   understanding how policy changes and communication

5   impact flows, absolutely.

6             You know, I reflect back to September, you

7   know, when we had Haitians -- you know, 17,000

8   Haitians under a bridge in, in Del Rio, Texas.

9   Right?  You know, there is a reason why people show

10  up.

11            Again, going back to the previous, you

12  know, talking points, you know, there are obviously

13  concerns in regards to how communication -- again,

14  going back to political destabilization, Venezuela

15  prime example, you know, geo -- you know, I'll say

16  socioeconomic changes, you know, Haitians, right,

17  climate impacts, Haitians, you know, migrants -- it

18  impacts different populations differently.  Those

19  push and pull factors are going to vary.  Those are

20  all concerns.

21        Q.   And these are concerns that you have

22  expressed to another DHS official?

23        A.   Well, of course.  I mean, any, any person

24  in a leadership position is going to express similar

25  concerns within the gamut of the, of the discussion

Exhibit E

Tony Barker
July 13, 2022

Page 21

1    points I was just saying.

2         Q.    Okay.  And when did you express those

3    concerns?

4         A.    Since about... I don't know, about May 20,

5    2001.  That's when I entered the border patrol.

6         Q.    All right.  Just give me a minute.

7              MS. PATEL:  All right.  I have no further

8         questions for you, Chief Barker.

9              Mr. Darrow?

10             MR. DARROW:  No, I have no questions.

11             THE STENOGRAPHER:  Do you want to read or

12        waive this one?

13             MR. DARROW:  He'll read.

14             THE VIDEOGRAPHER:  Anita, are you

15        ordering?

16             MS. PATEL:  We are ordering, again just a

17        copy of the transcript on an expedited basis,

18        three day if possible.

19             THE VIDEOGRAPHER:  Okay.  Joe, ordering?

20             MR. DARROW:  Yes, as we worked out before.

21             THE VIDEOGRAPHER:  This concludes the

22        video recorded deposition of Tony Barker,

23        Wednesday, July 13, 2022 at 2:58 p.m.

24             (Witness excused.)

25             (Proceedings were concluded at 2:58 p.m.)

Exhibit E

Tony Barker
July 13, 2022

Page 22

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

          I, the undersigned authority, certify
that TONY BARKER remotely appeared before me and
having produced his U.S. Custom and Border
Protection ID badge was duly sworn on the 13th
day of July, 2022.

          Signed this 18th day of July, 2022.

_____
HELEN MARIE CHASE, Stenographic Reporter
Notary Public, State of Florida
My Commission No. GG 283850
Expires: 2/20/2023

Exhibit E

Tony Barker
July 13, 2022

Page 23

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, HELEN MARIE CHASE, Stenographic Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing video recorded remote deposition of TONY BARKER; pages 1 through 25; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 18th day of July, 2022.

_____
HELEN MARIE CHASE, Stenographic Reporter

Exhibit E

Tony Barker
July 13, 2022

Page 24

July 18, 2022

Tony Barker c/o Joseph Darrow, Esq.
joseph.a.darrow@usdoj.gov
P.O. Box 868 - Ben Franklin Station
Washington, D.C. 20044

Re:  State of Florida v. United States of America,
     et al.
Case No.:  3:21-cv-1066

On July 13, 2022 you gave your deposition in the
above cause.  At that time, you did not waive your
signature.  The transcript is now available for you
to read and sign.

Please call (888)811-3408 or e-mail
production@phippsreporting.com between the hours of
9:00 a.m. and 4:00 p.m., Monday through Friday, to
arrange to come to one of our offices to read or for
access to a read-only PDF transcript via computer.

Please execute the PDF-fillable Errata Sheet which
will be forwarded to you by Phipps Reporting.  The
Errata Sheet can also be downloaded from
www.phippsreporting.com.  Once completed, please
print, sign, and return to us for distribution to
all parties.

If you do not read and sign the deposition within
thirty (30) days, the original, which has already
been forwarded to the ordering attorney, may be
filed with the Clerk of the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return to the address listed below.

Very truly yours,


HELEN MARIE CHASE, Stenographic Reporter
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.


_____
TONY BARKER

Exhibit E

Tony Barker
July 13, 2022

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re:  State of Florida vs. United States of
America, et al.
Case No.:  3:21-cv-1066
TONY BARKER (259222)
July 13, 2022

PAGE    LINE         CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.


_____          _____
Date                      TONY BARKER

Exhibit E

**1**

11,000
   13:4,12
13
   4:9 21:23
15
   13:22
17,000
   20:7

**2**

20
   13:22 18:13,
   15 21:4
20,000
   11:25 12:14
   13:5,12
2001
   21:5
2022
   4:9 21:23
2:33
   4:2,4
2:58
   21:23,25

**3**

30,000
   11:25

**6**

6,000
   17:14
6800
   17:13

**7**

70
   6:12 12:25
   13:21

**8**

8600
   10:22

**A**

Aaron
   8:11
ability
   16:14,16
absolute
   11:10
absolutely
   17:9 19:20
   20:5
administration
   19:5
adult
   12:22
adults
   6:11 12:24
   13:8,12,21
affirm
   5:1
affirmed
   5:9
agent
   8:12 18:11
agility
   15:8 16:15
alleviate
   13:24

America
   4:8
amount
   8:17
Anita
   4:15 21:14
announce
   4:13
answers
   5:23
appearances
   4:14
application
   13:24 14:21
   15:5 16:1
applied
   11:2 15:14
applies
   13:6
apply
   5:20 15:9
   16:3,15 17:10
applying
   16:17
approval
   16:9,23
area
   6:8 8:13,21
   10:20 15:22
areas
   10:24 11:1
   13:9 16:24
aspect
   10:16 15:1,23
assess
   10:6
assigned
   7:12

associate
   13:16
association
   4:12
assume
   13:17,19
astute
   19:21
ATD
   10:10,16,19
   11:10,23
   12:5,14 13:3,
   6 14:12,17,25
   15:6,14,16,
   17,19,23
   16:1,12 17:1,
   7,11,20 18:8,
   21,25
attach
   17:19 18:21
attempts
   10:5
avenue
   11:17
aware
   10:5

**B**

back
   10:17 11:14
   14:6,7,16
   20:6,11,14
balance
   12:7 16:8
Barker
   4:5,25 5:8,13
   21:8,22
based

Exhibit E

10:20 12:8
15:18

**basically**
11:18 12:13

**basis**
12:6 16:6
21:17

**began**
4:2

**beginning**
5:15

**border**
6:8 10:3
11:22 16:21
18:10,11,12
21:5

**bridge**
20:8

**brought**
9:6

**built**
16:8

**bunch**
5:15

---
C
---

**California**
8:22

**capacity**
4:6 5:24
12:23 13:1
14:18

**case**
12:6

**case-by-case**
12:6 16:6

**CBP**
4:20,23 7:5

**Celani**
4:10

**cellular**
18:7

**centers**
9:4 19:2

**Centro**
15:16,17,22

**cessation**
9:12

**chance**
11:11,18

**change**
19:16

**changing**
9:25

**Charette**
4:21

**Chase**
4:11

**checks**
16:7

**chief**
4:25 5:13
8:11 16:9,23
21:8

**chiefs**
17:8

**children**
13:23

**circumstances**
16:4,18

**clarify**
14:23

**climate**
19:15 20:17

**close**
11:25

**closing**
6:2,5,6,18
8:4,8 9:4

**closure**
12:9

**commissioner**
7:15 16:9,23

**communication**
20:4,13

**completed**
5:13

**completely**
18:18

**concern**
8:3,7 12:9
14:15 15:23
17:1,3,6,9

**concerns**
6:1,17,22
7:6,8,18
8:10,15,25
9:3,7,18
14:3,5,11,24
15:3 17:1,16,
22,23 19:4,25
20:13,20,21,
25 21:3

**concluded**
21:25

**concludes**
21:21

**conduct**
5:18 18:9

**consistent**
17:21

**constant**
10:14 13:18

**constantly**
10:15 14:20

**context**
18:13,25

**contract**
7:20,21 8:2

**contracts**
6:25 7:3

**control**
16:21

**conversation**
9:24

**copy**
21:17

**corporate**
5:14,22

**correct**
12:19

**correlate**
13:14

**correlated**
12:12

**counsel**
4:13,15,17
19,21,23

**creates**
17:12

**Cuban**
11:3

**current**
13:15 19:5

**custody**
11:13 12:1,2
13:4

**CVN**
11:2

---
D
---

**Darrow**

Exhibit E

4:17 21:9,10,
13,20

**David**
4:10

**day**
10:23 17:13
21:18

**deal**
14:18

**death**
12:7,16

**decision**
16:17

**decisions**
12:7

**decompress**
15:21

**decompression**
15:20 16:2

**degree**
9:24 12:4
19:14,19

**Del**
15:6 16:10
20:8

**delivered**
16:7

**demographic**
13:1,17

**depo**
5:14,15

**deposition**
4:5,8 5:18,23
21:22

**deputy**
7:15

**designed**
12:4

**destabilization**
19:15 20:14

**detention**
6:2,3,5,7,9,
10,18,23 7:1,
4 8:4,18 9:4
11:8,16,17,21
12:10,17,21,
22,23 13:1

**DHS**
4:22 6:2,18
7:10 14:11,25
20:22

**Diego**
8:12

**differently**
20:18

**digress**
15:7

**DIRECT**
5:11

**discussed**
13:25

**discussion**
20:25

**distribution**
13:17

**ditch**
11:11,18

**draw**
12:11

**drivers**
19:15

**duly**
5:9

**dying**
12:2

**dynamic**

15:10

---

**E**

---

**easier**
16:19

**easiest**
19:8

**effort**
11:11,18

**El**
15:16,17,22

**eleven**
11:21

**embedded**
19:1

**encounter**
10:3

**encountering**
6:14 9:14
10:21,25
17:13

**encounters**
6:13

**ended**
7:23

**entered**
21:5

**enterprise**
7:10

**environment**
15:10

**essence**
8:22

**essential**
15:9

**et al**
4:8

**evaluate**
14:20

**evaluated**
10:12

**evaluating**
10:16

**evaluation**
10:14

**EXAMINATION**
5:11

**examined**
5:10

**excused**
21:24

**executive**
6:6

**expanded**
16:24

**expedited**
21:17

**expose**
12:15

**express**
7:7,17 8:24
9:18 14:5
20:24 21:2

**expressed**
6:1,17 8:3,7,
10 9:3,7
14:11,24
16:25 17:17
19:4,25 20:22

**extended**
7:3

**extent**
19:22

**extremely**
15:25 16:6

Exhibit E

Tony Barker
July 13, 2022

4

---

**F**

---

face
  15:6
faced
  17:22,23
facilities
  6:3,4,5,7,19,
  22 7:2 8:5,8,
  13 12:10,15,
  17,20,21
  18:24 19:2
facility
  6:10 11:19
  18:22
fact
  19:21
factors
  20:19
fair
  16:12
families
  6:20 13:6,7,
  8,22
family
  6:3,9,18 8:4
  12:10,16,21
feasible
  16:19
field
  17:8
fit
  6:25 8:1
Florida
  4:7,16
flow
  9:16,21,23
  10:7,13,15,20

flows
  9:13 10:2
  14:19,22 17:4
  19:6,10,17,
  18,21 20:1,2,
  5
foolhardy
  19:12,23
frame
  9:1 17:10,18
frames
  11:14
fully
  17:18

---

**G**

---

gamut
  20:25
gave
  5:15
geo
  20:15
geographical
  10:20,23
give
  5:2 14:4 18:4
  21:6
ground
  5:15,20
group
  9:19
guarantee
  11:24
guess
  6:15 10:13
  12:11 14:23
  19:7

guidance
  14:13 16:13

---

**H**

---

Haitians
  20:7,8,16,17
half
  11:21
hand
  4:24
happening
  7:23
hard
  12:11
He'll
  21:13
heavy
  9:10
Heitke
  8:11
held
  4:8
Helen
  4:11
higher
  12:24
hold
  12:4
holdings
  11:22
honest
  7:24

---

**I**

---

ICE
  6:25 7:11
  8:1,18 17:10

18:2,3,6,21
ICE's
  6:25 7:1
impact
  6:8 7:4 8:17
  9:13,23 10:2,
  4,7,12,15
  14:20 17:12,
  13,15 19:17,
  18,21 20:5
impacted
  20:1
impacting
  19:10
impacts
  7:20,21 8:19
  18:16,19
  19:15 20:17,
  18
implement
  17:19
implementing
  18:6
increase
  9:15,20
  13:12,20
increased
  12:25 19:6
  20:1
increasing
  12:23 16:16
individual
  4:6 5:24 12:6
individuals
  6:13 7:9 11:9
instance
  10:10

Exhibit E

**J**

Joe
  21:19
Joseph
  4:17
July
  4:9 21:23

**K**

Kaitlyn
  4:21

**L**

large
  8:22 15:24
  18:23
larger
  13:16
leader
  16:20
leadership
  7:11,14 20:24
led
  20:1
level
  7:13 16:1
  18:19
levied
  7:6 15:24
life
  12:7,16
limited
  12:6 15:4
lines
  10:1

litigation
  9:10
live
  18:20
location
  18:9
long
  18:15
losing
  6:23
loss
  8:16
lot
  17:25
lower
  16:17

**M**

made
  10:6
major
  19:10
majority
  10:22
make
  6:17 10:18
making
  16:17
manager
  16:20
matter
  4:6
measures
  16:8
mechanism
  11:4 17:11,20
  18:21

mechanisms
  15:20 16:22
  17:25
meet
  16:18
memo
  15:18
mentioned
  6:11
methodology
  16:2
Mexico
  14:1
migrant
  18:14 19:19
migrants
  9:13 17:11
  20:17
migrate
  19:11
migration
  9:21 10:2,5,7
  19:22
minute
  21:6
minutes
  17:14 18:14,
  15
months
  7:20 9:2
move
  11:12,19
moving
  8:18 16:17
MPP
  9:8,10,11,12
  13:24 14:2,4,
  7,8

Muffett
  4:19

**N**

narrow
  10:8 15:25
  17:5
naturally
  13:17
nature
  14:14 15:4
necessarily
  13:5
Nicaraguan
  11:3
nimble
  16:3
NTA/OR
  11:8,16
numbers
  14:2
numerous
  18:3

**O**

occasions
  18:3
occupational
  14:18
official
  6:2,18 14:12,
  25 20:22
operate
  15:10
operation
  8:13,23 13:9

Exhibit E

Tony Barker
July 13, 2022

6

operational
  9:25

operationally
  16:19 17:15

operations
  8:21

order
  6:6 11:12,14,
  19 15:8,9,21
  17:18 18:14

ordering
  21:15,16,19

overcrowding
  13:25

overpopulation
  12:18

_____

**P**

p.m.
  4:2,4 21:23,
  25

Parole
  10:10,16,19
  11:10,23
  12:5,14 13:3,
  6 14:12,17,25
  15:5,14,16,
  17,19,23
  16:12 17:1,6

PATD
  11:1 19:1

Patel
  4:15 5:12
  21:7,16

pathway
  16:15

pathways
  10:15 14:21

15:9

patrol
  8:12 11:22
  16:1,21
  18:10,11,12
  21:5

pattern
  19:22

peer
  7:13 9:19

people
  8:17 10:22
  11:12,19,21,
  25 12:2,5,14
  13:4 17:13
  19:11 20:9

percent
  6:13 12:25
  13:21,22

period
  9:9

person
  9:6 17:14
  20:23

Phipps
  4:12

phone
  18:7,15

pieces
  12:12

place
  15:14

play
  16:22

pointed
  10:18

points
  20:12 21:1

policies
  19:5 20:1

policy
  9:25 10:4,7,8
  14:12,13,25
  19:10,16,21
  20:4

political
  19:15 20:14

Poon
  4:23

population
  10:17,25
  11:2,4,9
  12:23,24
  13:15,16,18,
  20

populations
  20:18

portion
  5:22

position
  20:24

potential
  7:21 8:16,19
  10:2,12

potentially
  6:7 8:17 9:17

predominantly
  11:2

presented
  15:13

previous
  20:11

previously
  6:12 17:22

prime
  20:15

prioritize
  11:7,8

private
  6:21 8:8,13
  9:4

privatized
  6:7 7:2

proceedings
  4:2 21:25

process
  11:15

processing
  11:8 18:22
  19:2

program
  18:14

provide
  5:23

providing
  14:18

pull
  20:19

pulled
  14:8

push
  20:19

_____

**Q**

quantify
  19:13

question
  6:24 8:1
  14:23,24 17:5

questions
  5:21 18:1,2
  21:8,10

quickly
  11:13

Exhibit E

quiet
  18:8,11

_____
        R

Raise
  4:24
raised
  17:9
rate
  9:16 10:21
rates
  9:13
read
  21:11,13
reason
  20:9
reasons
  9:24 19:11
recall
  5:14 8:6 9:5
receiving
  14:19
recognition
  18:9
record
  4:4,14
recorded
  4:5 21:22
refer
  14:9
reflect
  20:6
relieved
  12:18
remain
  13:18
remember

  14:9
repatriate
  11:6
Reporting
  4:12
representative
  5:14,22
repurposed
  6:10
required
  18:8
responsive
  15:12
rest
  13:22
restrictions
  14:1
return
  11:4,6
RGV
  15:6 16:11
Rio
  15:6 16:10
  20:8
risk
  12:1
roughly
  6:12 11:20
  18:13
rules
  5:16,20

_____
        S

Samantha
  4:23
San
  8:12

scale
  13:14
scope
  13:14 20:3
scoped
  15:5
seconds
  15:7 17:14
Sector
  8:12 15:16,17
sectors
  16:13
September
  20:6
show
  20:9
significant
  12:1
significantly
  11:16
similar
  20:24
simple
  7:5
single
  6:10 12:22,24
  13:8,12,21
sit
  11:20,24
  15:15 19:13,
  23
situations
  12:16 15:13
size
  13:19
small
  12:3

smaller
  12:3 13:1
socioeconomic
  19:14 20:16
solemnly
  5:1
Southwest
  10:3
space
  6:10,23 7:1,
  5,23 8:16
  12:3
speaking
  6:9 8:19
  15:15 17:4
specific
  6:22 8:14
  10:6,20,23
Specifically
  6:3
speculate
  19:24
spoke
  13:9
stance
  10:1
state
  4:7,16 8:20,
  22,23 10:14
statement
  10:19
States
  4:7,18 16:20
station
  18:11,12
stations
  19:3

Exhibit E

Tony Barker
July 13, 2022

8

stenographer
  4:11,24  5:6
  21:11
Stephanie
  4:19
stopped
  9:11
stopping
  14:8
strategic
  14:17
strategically
  16:7
stringent
  16:1
stuff
  7:15
suited
  18:2
swear
  5:1
switched
  12:22
sworn
  5:9

――――――――――
          T

tactical
  18:19
takes
  11:15  17:18
taking
  18:13
talking
  10:9  13:11
  20:12
technology

18:8
termination
  9:8  14:4
testified
  5:10
testimony
  5:2  13:3
Texas
  20:8
thereof
  12:24
things
  9:22  15:11
thousand
  11:21
time
  4:4  9:1,9
  10:22  11:14
  12:11  17:10,
  17
times
  17:14
today
  11:23
Tony
  4:5  5:8  21:22
totally
  11:15
tracking
  17:24
transcript
  21:17
triggers
  15:18  16:18
truth
  5:3,4
type
  17:6

――――――――――
          U

U.s
  19:11
ultimately
  18:19
unaccompanied
  13:23
unclear
  6:15
understand
  16:21  18:18
understanding
  20:4
understood
  13:2
United
  4:7,18  16:20
upper
  7:14
utilization
  14:17
utilize
  15:17,21
utilized
  10:16,19
  16:10,13
utilizing
  11:10,17  12:5
  15:16,19

――――――――――
          V

vary
  19:19  20:19
vast
  10:22

Venezuela
  20:14
Venezuelan
  11:3
versus
  4:7  13:1
video
  4:5,9  21:22
voice
  18:9

――――――――――
          W

waive
  21:12
Wednesday
  21:23
worked
  21:20
working
  7:12  18:6
world
  18:20

――――――――――
          Y

Yuma
  15:6  16:10

――――――――――
          Z

Zoom
  4:9

Exhibit E