# EXHIBIT G

**FOR OFFICIAL USE ONLY**



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536

April 7, 2020

Mr. Michael Rigas
Acting Director
U.S. Office of Personnel Management
1900 E Street, NW
Washington, DC 20415

Dear Acting Director Rigas:

This letter is to request that the U.S. Office of Personnel Management (OPM) identify U.S. Immigration and Customs Enforcement (ICE) as a "security/sensitive" agency and amend the November 2018 OPM data release policy to reflect such designation. The misleading and politicized rhetoric surrounding the ongoing immigration debate, especially related to ICE's mission enforcing the nation's laws governing border control, customs, trade, and immigration, has led to an increase in threats against ICE employees, both law enforcement and non-law enforcement personnel. Due to the current threatening, and politicized environment, ICE has already taken extensive action to ensure the safety and security of ICE personnel reporting to work across the country, including but not limited to: regularly advising employees on the necessary steps to enhance their personal safety and security; assessing the security posture at all satellite field offices; partnering with the Federal Protective Service (FPS) to ensure all FPS-recommended security countermeasures are implemented wherever feasible; engaging state/local partners to ensure prompt response when threats against agency personnel and/or facilities arise; and reassigning agency personnel to identify, investigate, and mitigate threats directed toward ICE employees, operations, and facilities.

Unfortunately, ICE employees continue to face the risk of being targeted and harmed simply because of their employment with the agency. Moreover, many threat actors do not differentiate between law enforcement and non-law enforcement personnel. These risks led to the former Acting Secretary of Homeland Security initiating unprecedented action in assigning additional FPS resources to protect all ICE facilities nationwide and increasing security to ICE employees. However, OPM's continued disclosure of identifying information, pursuant to Freedom of Information Act (FOIA) requests, such as names and duty stations, further exposes ICE employees to the additional risk of harm by publishing personal data which is being misused by those individuals with nefarious intentions against ICE. Therefore, ICE respectfully requests that OPM designate ICE as a "security/sensitive" agency and withhold all ICE employees' names, duty stations, and related location data elements as outlined in OPM's data release policy.

**FOR OFFICIAL USE ONLY**

Acting Director Rigas         **FOR OFFICIAL USE ONLY**
Page 2

*FOIA and OPM's Data Release Policy*

Congress enacted the FOIA to promote transparency across the Federal Government. *See Stern v. FBI,* 737 F.2d 84, 88 (D.C. Cir. 1984). However, to protect legitimate governmental and private interests that could be harmed by the release of information, Congress included nine exemptions permitting agencies to withhold information from disclosure. *See* 5 U.S.C. § 552(b). Exemption 6 specifically protects information in personnel, medical, and similar files when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." *See* 5 U.S.C. § 552(b)(6). The Exemption 6 analysis requires a balancing of the public's right to disclosure against the invasion of an individual's privacy. *See Dep't of the Air Force v. Rose*, 425 U.S. 352, 372 (1976).

In its November 2018 Data Release Policy, OPM stated that it continues to comply with FOIA and endeavors to make a wide range of workforce information and reports readily available to the public. Pursuant to 5 C.F.R. § 293.311, information collected in OPM databases concerning federal employees and former employees is routinely released to the public. The categories of information that may generally be released are: name; job title; grade level; position description; duty station; and salary. Once released by OPM, the information is frequently available in publicly searchable formats on the Internet. However, OPM withholds certain information under FOIA Exemption 6. Notably, OPM withholds the names and organization component codes of employees who work for agencies designated by OPM as "security/sensitive." For those employees, OPM also redacts duty stations and related location data elements when the duty stations are outside the Washington, DC area. The current "security/sensitive" agencies are: U.S. Customs and Border Protection; Federal Bureau of Investigation; Drug Enforcement Administration; Bureau of Alcohol, Tobacco, Firearms and Explosives; Alcohol and Tobacco Tax and Trade Bureau; U.S. Mint; U.S. Secret Service; and all U.S. Attorneys' Offices. As of September 2008, the names of employees in "security/sensitive" agencies, except the U.S. Attorneys' Offices, are withheld by the human resources service provider, not OPM.

OPM also withholds information such as names, duty stations, basic pay, and locality pay area when employees are in occupations deemed "sensitive" by OPM. Fortunately, ICE law enforcement officers (LEOs) are in occupations deemed "sensitive" and their identifying information is not disclosed by OPM. However, ICE is not currently an overall classified "security/sensitive" agency. Therefore, the names and duty locations of ICE's non-LEO workforce are released by OPM whenever that information is requested by members of the public under FOIA. These ICE employees include those working critical mission support duties in such areas as human capital, information technology, budgeting, legal, and program management (areas essential to fulfilling ICE's law enforcement mission).

*Threats and Risk of Harm to ICE Employees*

The immigration debate has existed for many years; however, the current politically polarized climate and public outrage surrounding ICE law enforcement operations continue to incite a toxic operating environment. Such messaging impacts the day-to-day mission activities of ICE and its employees, adding to the potential for threats directed at ICE's workforce and facilities.

**FOR OFFICIAL USE ONLY**

Acting Director Rigas  **FOR OFFICIAL USE ONLY**
Page 3

In addition to the ongoing challenges regarding the immigration debate affecting ICE and the immigration enforcement mission, there are also the long-term threats impacting ICE employees working ICE's national security and counter-terrorism missions. ICE has broad investigative authorities to fight terrorism, and actively focuses on preventing terrorist organizations' efforts to move weapons, money, and people across international borders. This includes identifying and prioritizing terrorists and others who overstay their period of lawful admission or otherwise violate the terms or conditions of their admission to the United States. The potential for compromising ICE counter-terrorism operations or further exposing ICE personnel to harm by bad actors is a credible danger as noted by the Director of National Intelligence, "Terrorists could obtain and disclose compromising or personally identifiable information through cyber operations, and they may use such disclosures to coerce, extort, or to inspire and enable physical attacks against their victims."[1] Similarly, the former Acting Secretary of Homeland Security noted in his September 2019 memorandum, "Our ICE law enforcement partners are coming under increased and ever more violent assault for merely doing their jobs."[2]

The growing negative rhetoric and divisive tone in speeches and public statements in the public forum directed at ICE contributes to an ongoing contentious operating environment with an increase in documented threats and the potential for violence against ICE personnel. These growing threats are an ongoing concern for all ICE personnel and continue to impact the morale and well-being of the entire ICE workforce. From November 2018 to July 2019, there were 982,079 criticisms of and/or threats toward ICE on social media. Also, during this period, the ICE Joint Intelligence Operations Center received 466 reports regarding threat information made against ICE. In Fiscal Year 2019, there were 313 protests/demonstrations/rallies that occurred across ICE facilities nationwide, some of which involved civil disobedience and protestors being arrested.

The volume of targeted threats against ICE personnel, compilations of their personal information, and posting this information on the Internet for nefarious purposes has also increased. Outlined below are just some examples of the on-going harassment and threats faced by ICE employees.

- Two of the largest doxing incidents affecting the agency involved an online database containing personal information about current and former ICE employees. Over 1,600 LinkedIn users who posted ICE as their employer had their personal information posted online. In addition, WikiLeaks published the identities and information of approximately 9,243 current and former ICE employees on a WikiLeaks-hosted database entitled "ICE Patrol." (June 2018)

- The Federal Bureau of Investigation's Boston Joint Terrorism Task Force and ICE/Homeland Security Investigations (HSI)-Boston office received information from the Boston Regional Intelligence Center indicating that a Twitter user called for the contract killing of an ICE agent. The subject was fortunately arrested in New York for the Twitter murder-for-hire solicitation to kill an ICE agent. (July 2018)

---

[1] Director of National Intelligence, "Statement for the Record Worldwide Threat Assessment of the U.S. Intelligence Community," (January 29, 2019, 6).
[2] Acting Secretary Kevin K. McAleenan, Memorandum "Protecting Our DHS Law Enforcement Partners," (Sept. 12, 2019).

**FOR OFFICIAL USE ONLY**

- A small group of protestors gathered outside an ICE facility in San Antonio, TX. These individuals parked a vehicle in the parking lot in front of the building. One individual then began filming employees (both law enforcement and non-law enforcement) and their cars, including license plates, as the employees entered and left the building and the secure parking lot. The protestors shouted that they would post the information on social media. (February 2020)

- A social media user created a post on a popular social media outlet, which implored viewers to vote for which ICE employee residence to target with a residential demonstration. Specifically, the post listed the names of two ICE employees (one law enforcement and the other non-law enforcement) and one ICE contractor. (February 2020)

- An ICE Public Affairs Officer (a non-law enforcement position) in Washington State reported having received a voicemail from an individual stating, "It's shocking how willing you are to. Let it be documented that are on the wrong side of history. This will not end well for you." Another voice message left by the same caller stated, "You can't just terrorize people like this. We are not going to stand for this. You are going to be shot/shut (unintelligible) down." A social media user messaged an ICE Enforcement and Removal Assistant (a non-law enforcement position) with vulgar threats of violence towards the employee and threats of sexual violence towards the employee's daughters. (January 2020)

- A Mission Support Specialist (MSS) (a non-law enforcement position) in the Philadelphia Field Office reported that his name was included, along with a list of other ICE employees, on social media outlets highlighting his employment with ICE. On January 5, 2020, the same MSS received a text message on his personal cell phone. The message listed the MSS's name, age, and home address. The text message also included the names of his spouse, child, mother, and father, followed with photos of dismembered, decapitated, and mutilated bodies. (December 2018 & January 2020)

- The ICE Office of the Principal Legal Advisor (OPLA) uncovered a doxing threat with the names and home addresses of ICE OPLA employees (who are all non-law enforcement) in Charlotte, North Carolina, posted on the Internet with the caption of "meet your local lawyers sending people to concentration camps." (October 2019)

- One or more unidentified individual(s) fired at least three rounds of ammunition at the Jefferson Bank Building, which houses the ICE Enforcement and Removal Operations (ERO)-San Antonio Field Office. One round impacted an ERO Operations Center window, striking the blinds and falling to the floor. While the office was occupied at the time by five (5) ERO-San Antonio Deportation Officers, no personnel were struck by the rounds and no injuries were reported. (August 2019)

- An ICE Mission Support Specialist (a non-law enforcement position) reported that a sign was hung outside his wife's business with reportedly threatening remarks. The sign read, "(ICE Employee's Name) ICE Agent & Owner of Salon Bellisimo is a Danger to Our Community." (July 2019)

- ICE's ERO-Austin office reported observing anti-ICE graffiti in two different places on the J.J. Pickle Federal Building. One message read "FIGHT ICE WITH FIRE" and the other read "COMBAT US IMPERIALISM" with a hammer & sickle symbol. Since this incident, ICE employees associated with the office reported that they were followed and surveilled. Also, U.S. Customs and Border Protection (CBP) issued an intelligence alert reporting that the migration crisis could lead to violent acts against DHS personnel, and this alert warned that a group in Texas called for all ICE agents to be killed (confusing ICE and U.S. Border Patrol). (July 2019)

- A social media user using Twitter was identified as creating an account and posting personal data on a continuous and automatic loop (Twitter bot)—the very data that OPM releases to the public through requests under the FOIA. The OPM released data included the names, salaries, occupations, and work locations of both ICE and CBP employees. The posting included a statement that the named employees are "part of the bureaucracy that is locking children and families in concentration camps at the border." The intent of the posting was clear: to publicly shame, harass, and threaten ICE and CBP employees. In response to the Twitter bot posting, ICE leadership notified those ICE employees affected, reminding them to be vigilant and take precautionary measures, such as limiting online discussions and interactions on social media and not self-identifying as an ICE employee. (July 2019)

In addition to the noted physical threats, there is also a direct impact to the morale of non-LEO personnel at an individual level. During the summer of 2018, for example, an OPLA supervisor working in the Pacific Northwest was continuously harassed at her home by anti-ICE activists after her personal information was posted publicly throughout the city and online. The perpetrators posted flyers throughout the city containing her and her family's picture, home phone number, and other identifying information with a note stating that she was a "Gestapo Agent" and a "monster that prosecutes immigrant families while living in safety and comfort with her husband in their newly purchased home." Later, two dozen eggs and large balls filled with paint were thrown at her house and vehicles in the middle of the night, causing significant property damage. The employee and her spouse also received threatening text messages on their personal cell phones and through their Facebook accounts. As a direct result of this harassment and threats to her family's safety, the OPLA employee reluctantly felt compelled to resign her employment with ICE, sold her home, and moved to another state.

The public access to ICE employee information and the politically-charged rhetoric transcends morale and safety concerns, complicating other ICE mission support areas. For example, many colleges and universities refused to allow ICE onto their campuses for recruitment events, causing challenges for ICE human resources staff in recruiting top talent across the country. In addition, some private companies that ICE has historically done business with are pulling out of contracts or are publicly making statements about disagreement with ICE's immigration mission creating frustration and more work for ICE acquisition and information technology professionals. Moreover, the Anti-Defamation League withdrew support in 2018 after a long partnership in offering implicit bias training for ICE personnel due to its disagreement with ICE's operations. This caused difficulty for ICE leadership and career development professionals to effectively develop an appropriate replacement training program. Also, ICE saw a one percent drop in the

Employee Engagement Index in Fiscal Year 2019 compared to Fiscal Year 2018, while the Department saw a modest increase.

*Possible Legal Challenges*

If OPM recognizes ICE as a "security/sensitive" agency and withholds ICE employees' names and duty stations under FOIA Exemption 6, there could potentially be a challenge in federal court. However, it is very likely that OPM would prevail as OPM was already successful in defending a FOIA lawsuit concerning the same protections afforded to similarly situated employees of other "security/sensitive" agencies. *See Long v. OPM*, 692 F.3d 185 (2d Cir. 2012). In *Long v. OPM*, the court held that the names and duty station records of agencies designated by OPM as "security/sensitive" were exempt from disclosure. *See* 692 F.3d at 198. In the event of a challenge, ICE believes it is very likely that a federal court would make a similar finding with respect to ICE employee information.

In analyzing a FOIA lawsuit challenging the application of Exemption 6 in this context, a court would first look to whether a measurable privacy interest exists. *See Long*, 692 F.3d at 191 (citing *Multi Ag Media, LLC v. Dep't of Agric.*, 515 F.3d.1224, 1229 (D.C. Cir. 2008)). If the court found that threshold to be met, the court would then determine whether the disclosure of the information requested would compromise a substantial, as opposed to de minimis, privacy interest. *See id.* Such an analysis is context specific. Names and other identifying information do not always pose a significant threat to an individual's privacy interest. *Id.* In *Long v. OPM*, the court was persuaded that employees in the "security/sensitive" agencies have a cognizable privacy interest in keeping their names from being disclosed, as the disclosure could permit the targeting of the employees and their families outside of work. 692 F.3d at 192. The court highlighted OPM's statement in the record that the "security/sensitive" agencies are national security, homeland security and law enforcement agencies. *Id.* The record also contained OPM's statement that "the mission and nature of the work performed by those agencies rendered not only individuals in specific occupations within the agencies, but any employee in the agency, vulnerable to harassment or attack." *Id.* Based on ICE's homeland security and law enforcement mission, the polarized rhetoric surrounding ICE's operations, and increasing threats to ICE employees, OPM would be able to make the same assertions regarding ICE.

Once the privacy interest is identified, it must be weighed against the public interest that would further the disclosure. *Id.* at 193. The cognizable public interest at issue here is the understanding of the operations or activities of the government. *Id.* However, if the justification for identifying specific federal workers is simply to know *who* is performing government work (rather than *what* the government work is), the public interest would be comparatively low and seemingly place the most trivial interest in learning personal information above privacy protections afforded by Exemption 6. *Id.* And, while disclosure of federal workers' personal information depends on the circumstances, in many contexts, federal courts found that the disclosure of individual employee names provides no information about the activities of the government. *Id.* (citing *Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503 (2d Cir. 1992)); *Schwartz v. U.S. Dep't of Treasury*, 131 F. Supp. 2d 142, 150 (D.D.C. 1996)). In *Long v. OPM*, the court ultimately found that the Plaintiffs identified no appreciable public interest in favor of disclosure. *Id* at 195. Thus, it is unlikely that a Plaintiff would be able to identify a public interest that would outweigh ICE employees' interest in keeping their names from being disclosed.

Acting Director Rigas     **FOR OFFICIAL USE ONLY**
Page 7

In *Long v. OPM*, the court also found that employees of "security/sensitive" agencies have a privacy interest in their duty station location even after their names were redacted. The court highlighted OPM's affidavits explaining how those wanting to do harm could derive specific work addresses from specific duty stations. *Id* at 196. The court also emphasized that the primary purpose of FOIA Exemption 6 is to protect individual physical safety. *Id*. Ultimately, the court found that redaction of employees' names alone does not allay the threat of harassment or attack of federal employees. *Id* at 197. While the court recognized a public interest in knowing where the government deploys its personnel, it also noted the threat of targeted violence against federal employees. *Id* at 197-98. In the end, the court held that OPM demonstrated that employee privacy concerns outweighed the public interest in disclosure. *Id* at 198. OPM would be able to similarly highlight the threat to ICE employee safety and demonstrate that ICE employees' interest in privacy outweighs the public interest in knowing their individual names and duty locations.

The prolific use of social media could also be raised in FOIA litigation. It is common for government employees to share information regarding their employment, including their names and duty locations, on social media sites. The D.C. Circuit has held that under the public domain doctrine, information that would be otherwise subject to a FOIA exemption must be disclosed if the information is easily accessible by the public. *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d, 16, 19 (D.C. Cir. 1999). However, for the public domain doctrine to apply, a requester must be able to point "to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. U.S. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983). In addition, the Supreme Court has found that individuals can have a cognizable privacy interest in their identifying information that might be found after a diligent search of publicly available sources. *See U.S. Dep't of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 764 (1989). Further, the mere fact that some members of the public may know the information does not negate the individual's privacy interest in preventing further dissemination to the public at large. *See Forest Serv. Employees for Envt. Ethics*, 524 F.3d at 1025 n.3 (9th Cir. 2008).

Therefore, the posting of some ICE employees' names and duty locations on social media sites would not negate the employees' privacy interest in keeping that information from being disclosed by OPM. In addition, it is unlikely that a Plaintiff would be able to show that the specific information sought, such as a list or report of ICE employees' names and duty stations, already exists in the public domain. Moreover, OPM would be able to show that ICE warned employees about possible threats and recommended that employees reduce their social media footprint. *See, e.g.,* ICE Social Media Privacy and Open Source Opt-Out Guidance (May 2018). In addition, it is important to note there is a difference between the federal government releasing private information on an individual and an individual willingly releasing personal information.

In sum, noting the favorable consideration OPM gave to CBP for receiving security agency designation, ICE should be similarly given the same designation. The almost identical national security, homeland security, and law enforcement nature of ICE's work renders ICE employees (even those not directly employed in a law enforcement capacity) vulnerable to harassment or attack from outside sources that are able to acquire information such as names and duty stations directly from OPM. ICE employees should receive the same protection afforded to similarly situated employees of other homeland security and law enforcement agencies. As outlined in the examples above, due to the mission and nature of work performed by ICE, every employee in the

Acting Director Rigas **FOR OFFICIAL USE ONLY**
Page 8

agency is vulnerable to harassment or attack. The ongoing protracted immigration debate and the resulting polarizing rhetoric and misinformation disseminated regarding ICE operations, continues to pose a serious threat to ICE employees. Regrettably, OPM's release of ICE employee's names and duty locations makes it easier for ICE employees to be targeted, harassed, and harmed.

Therefore, ICE respectfully requests that OPM designate ICE as a "security/sensitive" agency and withhold ICE employees' names, duty stations, and related location data elements as outlined in OPM's data release policy. My point of contact for any related questions is Ms. Staci Barrera, Executive Associate Director, Management and Administration, who may be reached at (202) 732-5702 or via e-mail at Staci.A.Barrera@ice.dhs.gov.

Sincerely,

Matthew T. Albence
Deputy Director and Senior Official Performing the Duties of the Director
U.S. Immigration and Customs Enforcement