# Exhibit 13

```
 1              UNITED STATES DISTRICT COURT
 2          for the Northern District of Florida
 3     ----------------------------------------------
 4    STATE OF FLORIDA,
 5                 Plaintiff,
 6      v.
 7    UNITED STATES OF AMERICA, et al.,
 8                 Defendant.
 9     ----------------------------------------------
10
11           Deposition of COREY A. PRICE
12                  Washington, DC
13              Friday, September 9, 2022
14                    11:00 a.m.
15
16
17
18
19
20    Job:   463273
21    Pages:   1 - 155
22    Transcribed by:  Pamela A. Flutie
```

```
 1       Deposition of COREY A. PRICE, held at the
 2   offices of:
 3
 4
 5            ICE Headquarters
 6            500 12th Street SW, #5600
 7            Washington, DC 20536
 8
 9
10       Pursuant to Notice/Pursuant to agreement,
11   before Mawira Nyamete, Notary Public in and for
12   the District of Columbia.
13
14
15
16
17
18
19
20
21
22
```

```
 1   a chief of staff.
 2        A.   He is the Chief of Staff for ICE, yes.
 3        Q.   Okay, all right.  And it has numbers
 4   about -- it appears about NTRs at least.
 5        A.   Yes.
 6        Q.   And it has that there were 93,964
 7   NTRs.  Is that correct?
 8             MR. DARROW:  Objection.
 9        A.   It is referring to that number, yes.
10        Q.   And it -- and it indicates that 19,158
11   of that number were over the 60-day mark, and
12   then in parentheses says were non-compliant,
13   right?
14             MR. DARROW:  Objection.
15        A.   That's correct.
16        Q.   So, that's 20% roughly had had not
17   reported, correct?
18        A.   That 20% in that 19,158 would be
19   either non-reported or otherwise violated the
20   terms, yes.
21        Q.   Okay.  I'm going to show you what I've
22   marked for identification as Exhibit 19 to your
```

1   deposition.  Just keep this by you, because
2   we're going to get back to it.
3        A.    Thank you.
4        Q.    This is a document -- I think it's a
5   query from LESA, right?
6        A.    Yes, that's what it appears to be.
7        Q.    All right.  And LESA is part of --
8   again, part of ERO?
9        A.    That is correct.  That's one of the
10  divisions of ERO.
11       Q.    Okay.  And how many aliens who had
12  indicated they were going to a Florida address
13  who were put on NTR failed to be compliant?
14              MR. DARROW:  Objection.
15       A.    It's the top query.
16       Q.    As of this date, it says 1,127.
17       A.    Okay, all right.  And since we're --
18  so, maybe you can just put aside this document.
19  There's a second query on this exhibit, Exhibit
20  19, how many aliens who were put on parole plus
21  ATD, which would be assumingly just the Border
22  Patrol policy given the date of the query,

1    failed to be compliant?
2            MR. DARROW:  Objection.
3        A.   As of this date that's reflected of
4    July 4th, 47,983.
5        Q.   Okay.  So, almost -- between the two,
6    almost 50,000 aliens who said they were going to
7    go to Florida failed to show up in an ICE
8    location and finish their -- the processing and
9    the issuance of a notice to appear, right?
10           MR. DARROW:  Objection.
11       A.   That was the data as of July 4, 2022,
12   yes.
13       Q.   Okay.  And July 4, 2022, the other
14   policy we were looking at, the new policy, was
15   July 18th, right?
16       A.   Yes, I believe that's correct.
17       Q.   So, this data --
18       A.   Right before that policy, yes.
19       Q.   Okay.  Because there was never a
20   notice to appear issued to any of the 50,000
21   non-compliant aliens who gave Florida addresses,
22   those non-compliant aliens are not subject to

1   being removed in absentia, right?
2           MR. DARROW:  Objection.
3       A.  I would have to discuss with the
4   Office of the Principle Legal Advisor to verify,
5   but I do not believe so.
6       Q.  Okay, all right.  And if Border Patrol
7   had issued them a notice to appear instead of an
8   NTR or processing them pursuant to a parole plus
9   ATD, those same aliens would have been subject
10  to being removed in absentia, correct?
11      A.  That's my understanding.
12      Q.  Okay.
13      A.  Do aliens who are paroled and place on
14  alternatives to detention, either the original
15  Border Patrol policy or their joint policy,
16  remain on ATD until they are removed or granted
17  asylum?
18          MR. DARROW:  Objection.
19      A.  It's a case-by-case basis.  Each case
20  is reviewed by an officer, and depending upon a
21  number of things like medical and criminal
22  history, new criminal history, you know, where

1 the individual is from, I mean, a number of
2 factors would go into that and an officer would
3 make a decision whether to de-escalate or even
4 escalate the form of supervision they're under.
5      Q.   Okay.  Have aliens that were paroled
6 and granted ATD been taken off ATD before they
7 have gone to ICE and completed their immigration
8 interview and gotten into -- gotten a notice to
9 appear?
10           MR. DARROW:  Objection.
11      A.   I don't know if any have or not.  Some
12 ATDs were done via mailout.  So, I just don't
13 have that data.
14      Q.   Okay.  If you want to turn back to
15 Exhibit 18, are you familiar with something
16 known as Operation Horizon?
17      A.   I am.
18      Q.   All right.  What was Operation
19 Horizon?
20      A.   Operation Horizon was an operation
21 that we put together in ICE ERO to address the
22 outcome of the parole plus ATD and before that,

1    the NTR that was occurring.  So, essentially,
2    the individuals that were paroled or otherwise
3    released that didn't have a charging document,
4    ERO officers primarily, it did include some from
5    HSI, but it was -- the vast majority was ICE ERO
6    officers completing mailout NTAs when they
7    could.  For those that they could not to do
8    mailout, they would bring into the office to do
9    an NTA in person and they would also go out and
10   target and arrest those that were at large that
11   were not complying with the terms of it.  This
12   was largely accomplished on overtime, as opposed
13   to, you know, during their normal course of
14   duty.
15        Q.   Okay.  So, Operation Horizon was ERO's
16   effort to get the backlog kind of at least into
17   a more -- a better posture.  Let's just say
18   better posture.
19        A.   Yes.
20        Q.   Okay.  There still is -- even after
21   Operation Horizon, there still is a backlog,
22   correct?

1      A.   Yes.

2      Q.   Okay, all right. And every thirty
3 days that DHS continues parole plus ATD, it's
4 going to take another year and cost $8 million
5 more to clear the backlog, correct?

6      MR. DARROW: Objection.

7      A.   I don't know if those figures are
8 accurate.

9      Q.   Well, let's look at SAR 262.

10      A.   Okay. That's the Exhibit 7?

11      Q.   Exhibit 18, yeah.

12      A.   262?

13      Q.   Yep. And again, I can't give you the
14 names of who's sending these E-mails, and I
15 don't even know if they're ERO or not ERO or who
16 they are. I know they're ICE because I do have
17 the part of their E-mail address that has ICE in
18 it. But if you look at the second E-mail on the
19 chain on this page, which is an E-mail dated May
20 5th of 2022, basically, every thirty days p-plus
21 ATD continues, this is this cost us about a year
22 and $8 million, right?

1         MR. DARROW:  Objection.
2     A.   That's what this reflects as of May
3  5th, yes.
4     Q.   Okay.  Was Operation Horizon completed
5  before May 5th, or was it continuing going on?
6     A.   No, it's ongoing and we run different
7  sprints with Operation Horizon.
8     Q.   Okay.
9     A.   I don't anticipate it ending until
10 we've addressed the entire backlog.
11    Q.   Okay, all right.  And if you look
12 down, there's a chart at the bottom of page SAR
13 262 of Exhibit 18.  It is saying that if parole
14 plus ATD continued for ninety days beyond May
15 5th, it would take five and a half years to
16 clear the backlog and cost $49 million, correct?
17        MR. DARROW:  Objection.
18    A.   That's correct.
19    Q.   And that would be five and a half
20 years to start the immigration process with
21 respect to the people that have been paroled
22 plus ATD, right?

1          MR. DARROW:  Objection.
2     Q.   Obviously, the people are coming in
3 over time.
4     A.   That's what I believe this to mean,
5 yes.
6     Q.   Okay.  And so, there would be some
7 period of time added to the five years that it
8 takes on the non-detained docket before an order
9 removal was entered.
10         MR. DARROW:  Objection.
11    A.   Yes.
12    Q.   And during that period of time, those
13 aliens would be at large in different --
14 whatever states they are residing in, correct?
15         MR. DARROW:  Objection.
16    A.   Yes.
17    Q.   Okay.  And some of them would commit
18 crimes, correct.
19         MR. DARROW:  Objection.
20    A.   I mean, I don't have -- I can't tell
21 the future, but it's reasonable to assume that
22 some would commit some kind of criminal

```
 1  activity, yes.
 2       Q.   All right.  I mean, you have right
 3  now, I mean, you have -- you launched detainers,
 4  ERO does, all the time, correct?
 5       A.   Every day.
 6       Q.   Every day.  And you -- and you're your
 7  lodging detainers against aliens who've
 8  committed crimes, right?
 9            MR. DARROW:  Objection.
10       A.   Yes.
11       Q.   Okay.  And so, past experience tells
12  you why you may not be able to see the future,
13  that some number of aliens that are included in
14  this parole population are going to commit
15  crimes, right?
16            MR. DARROW:  Objection.
17       A.   Yes.
18       Q.   And they're going to be -- that that's
19  going to cause the states where these aliens
20  live to incur cost for state criminal
21  proceedings, correct?
22            MR. DARROW:  Objection.
```

1    A.    Yes, that's been the way our
2    immigration system has worked for as long as
3    I've been in this job.
4    Q.    Okay.  And it's going to cause states
5    to incur the cost of providing housing if the
6    aliens are put in prison, right?
7         MR. DARROW:  Objection.
8    A.    I don't know the state funding
9    mechanism for that, but, you know, yes, it's
10   reasonable to assume that wherever they're
11   incarcerated, they would incur those costs, yes.
12   Q.    Okay.  And cost -- and to the extent
13   that they have children, schooling costs for
14   those -- education costs for those for those
15   kids, right?
16        MR. DARROW:  Objection.
17   A.    Yes.
18   Q.    And costs for health care to the
19   extent they qualify for Medicaid, right?
20        MR. DARROW:  Objection.
21   A.    Yeah, I don't know the, you know,
22   qualifications for Medicaid myself, but yes.

1        Q.    But you understand that it's a
2    program aimed at primarily lower socioeconomic
3    demographics?
4        A.    I am aware of that.
5        Q.    Okay.  And many of the folks that are
6    coming over the border are within those lower
7    socioeconomic demographics, right?
8              MR. DARROW:  Objection.
9        A.    I don't know the percentages, but
10   yeah, the aliens cut across all demographic
11   areas.
12       Q.    All right.  But at least some of them
13   are -- are probably not rich, correct?
14             MR. DARROW:  Objection.
15       A.    Yes.
16       Q.    Okay, all right.  And, indeed, during
17   the time period -- in the delayed time period
18   caused by the backlog, states are going to incur
19   costs regarding any form of government
20   assistance that it offers, right?
21             MR. DARROW:  Objection.
22       A.    I would assume.

1       Q.   Okay.  If the aliens that were
2  released on either NTR or parole plus ATD were
3  instead detained, states would not have incurred
4  those costs, right?
5            MR. DARROW:  Objection.
6       A.   It's a little complicated.  They would
7  have not have incurred the costs while they were
8  in ICE custody.  We would -- the federal
9  government would then bear those costs, ICE
10 specifically, but when they are released, if
11 they are not, you know, removed within, you
12 know, a short amount of time because we can only
13 detain for so long, they're going to be released
14 anyway.  If there is somebody who we simply
15 cannot remove because their country won't accept
16 them back, they would have to be released
17 anyway, so.
18      Q.   Okay.  But for at least for the period
19 of time they are detained, the state would not
20 bear those costs, right?
21           MR. DARROW:  Objection.
22      A.   That is correct.

1  Q.  Okay, all right.  And the delay by not
2  issuing NTAs in an inadmissible alien -- the
3  delay and removal for an inadmissible alien,
4  because they were not provided an NTA, for that
5  additional time period, the state is going to
6  bear that additional cost, right?
7           MR. DARROW:  Objection.
8       A.  Yes, that's reasonable.
9       Q.  Okay, all right.  If you'll -- looking
10 back at 262, which we have in front of us, it
11 indicated at least as of May 5, 2022, there was
12 110,700 aliens that did not have notices to
13 appear issued, right?
14          MR. DARROW:  Objection.
15      A.  That's what this reflects, yes.
16      Q.  Okay, all right.  If you'll turn to
17 SAR 266, this indicates here at the top of the
18 page, total PD release cases since March 21,
19 2021, NTR, NTR plus, now parole plus ATD began
20 8/6/21 226,297, right?
21      A.  Yes.
22      Q.  Okay.  Do you know what NTR plus was?

```
1              CERTIFICATE OF NOTARY PUBLIC

2         I, Mawira Nyamete, Notary Public for the

3    State of Maryland, do hereby certify that on

4    September 9, 2022, the witness, Corey Price, was

5    sworn before me at the aforementioned location,

6    and that I am neither counsel for, related to,

7    nor employed by any of the parties to this case

8    and have no interest, financial or otherwise, in

9    its outcome.

10        IN WITNESS WHEREOF, I have hereunto set my

11   hand and affixed my notarial seal this 9th day

12   of September, 2022.

13

14   _Mawira Nyamete_____

15   NOTARY PUBLIC IN AND FOR THE STATE OF MARYLAND

16

17

18

19

20

21

22
```

```
1            CERTIFICATE OF TRANSCRIBER

2            I, Pamela A Flutie, do hereby certify

3    that the foregoing transcript is a true and

4    correct record of the recorded proceedings; that

5    said proceedings were transcribed to the best of

6    my ability from the audio recording and

7    supporting information; and that I am neither

8    counsel for, related to, nor employed by and of

9    the parties to this case and have no interest,

10   financial or otherwise, in its outcome.

11

12

13        [signature: Pamela A. Flutie]
14   _____

15   Pamela A. Flutie
```

ERRATA SHEET FOR THE TRANSCRIPT OF:

Caption: State of Florida v. The United States of America, et. al.

Deponent: Corey A. Price, Individually

Deposition Date: September 9, 2022

Case No.: 3:21-cv-1066

| Page | Line | Correction | Reason |
|---|---|---|---|
| Pg 15 | 7 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 47 | 14 | Change "loss" to "ALOS" | Mis-spelled. ALOS is an acronym. |
| Pg 115 | 5 | Change "board parole" to "Border Patrol" | Mis-spelled |
| Pg 122 | 15 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 122 | 16 | Change "Q" to "A" | It was an Answer, not a Question |
| Pg 122 | 17 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 147 | 12 | Change "we're" to "we use" | Mis-spelled |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true to the best of my knowledge and belief.

Signature of Deponent: _____

Dated this: __21__ day of __September__, 2022