# Exhibit 14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

              Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

              Defendants.
_____/


VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
BEHALF OF THE PLAINTIFF


Volume 1
Pages 1 through 137


Wednesday, July 13, 2022
8:33 a.m. CT - 2:17 p.m. CT


Location:  Remote via Zoom
Washington, D.C.


Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 83

1    patrol agents?

2         A.    Yes.

3         Q.    Okay.  Is this, is this document accurate?

4    Does it accurately depict the processing pathways?

5         A.    The path -- I mean, the pathways, yes.  I

6    mean, obviously, with the redactions, I'd, you know,

7    have to see those, to, to see what -- I would

8    consider is the assumptions behind that, but yes.

9         Q.    I'm going to drop another exhibit into the

10   chat.

11             (Plaintiff's Exhibit 7 was received

12             electronically, marked for identification and

13             is attached hereto.)

14   BY MS. PATEL:

15        Q.    And this is information that's obtained

16   from the Customs and Border Protection website,

17   specifically statistics.  Do you recognize this

18   document and the information contained inside of it?

19        A.    Yes, yes.

20        Q.    All right.  So, if you turn to page 3 of

21   this document and the heading USBP Monthly Southwest

22   Border Encounters by Processing Disposition.

23        A.    Yes.

24             MS. PATEL:  And I apologize.  This is

25             Exhibit 7.  The USBP Processing Pathways with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 84

1          the chart, the diagram, is Exhibit 6.
2      BY MS. PATEL:
3          Q.   So, in terms of Exhibit 7, which is the
4      Custody and Transfer Statistics from the fiscal year
5      2022, page 3 under U.S. Border Patrol Monthly
6      Southwest Border Encounters by Processing
7      Disposition, do you see the column for processing
8      disposition?
9          A.   Yes.
10         Q.   Are the entries there the same as what was
11     reflected on the processing pathways?
12         A.   Yeah, I mean, minus other -- I think
13     that's...
14         Q.   You're saying that the other category was
15     not on the processing pathways?
16         A.   Well, one's on one side, one's not on the
17     other.
18         Q.   Okay.  So, I want to talk to you a little
19     bit about the information that's contained in this
20     document.  So, are all of the pathways that are
21     currently available reflected in this chart?
22             MR. DARROW:  For clarification, which
23             document are you talking about, 6 or 7?
24     BY MS. PATEL:
25         Q.   I'm sorry.  Exhibit 7, page 3, Monthly

Page 85

1   Southwest Border Encounters by Processing

2   Disposition.

3       A.   So, now that I know which one we're

4   looking at, what was your question again?  My

5   apologies.

6       Q.   So the question is, are all the current

7   processing dispositions reflected in this chart?

8       A.   Absolutely not.

9       Q.   Okay.  What other processing dispositions

10  are not reflected in this chart?

11      A.   I mean, rare ones, right, that we utilize.

12  You know, bag and baggage, somebody who has

13  already -- you know, has a -- already has a formal

14  order of removal and it just hasn't been

15  effectuated, you know, crewman, you know, I mean,

16  somebody overstayed, you know, like there's -- not

17  overstayed, but like -- oh, my gosh.  Like when a

18  crewman, like when they jump overboard and they

19  don't get back on the boat.  Anyway, it's a rare

20  one.  These are the mainstay ones.  These the

21  principal processing dispositions that we utilize,

22  but it's, obviously, not every single possible

23  processing disposition.

24      Q.   Okay.  Just going back to Exhibit 6, then,

25  that chart, that also did not include, for instance,

Page 86

1    the example of a crewman or bag and baggage?

2        A.    Bag and baggage is on there.  It's under

3    reinstatement of prior order of removal.

4        Q.    Okay, gotcha.  But it doesn't include the

5    other one that you just mentioned about the crewman?

6        A.    Yeah, I mean, that -- the extreme vast

7    majority are within that -- you know, the

8    dispositions that you have there, the processing

9    pathways that you have there.

10       Q.    So, if we turn back to Exhibit 7 and that

11   chart that we were talking about, are all of these

12   processing dispositions available to single adults?

13       A.    Yes.

14       Q.    Are they all available to family units?

15       A.    I mean, to a degree they are available,

16   correct.  There are certain things, obviously, that,

17   that are dependent upon that, but they are

18   available.

19       Q.    Okay.  And you said that everything here

20   is available to single adults.  Parole + ATD is

21   listed here.

22       A.    Yes.

23       Q.    Can individuals be processed under

24   Parole + ATD?

25       A.    I apologize, again.  I couldn't hear you.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 87

1    I couldn't understand you at all.

2        Q.   Can individuals be processed under

3    Parole + ATD?

4             MR. DARROW:  Objection.  Parole + ATD is

5        defined as the administrative record.

6             You can answer.

7    A.   Yes.

8      BY MS. PATEL:

9        Q.   So, so I understand, individuals who are

10   not a part of a family unit as they present at the

11   border or on U.S. soil, Parole + ATD is an option to

12   them?

13            MR. DARROW:  Same objection.

14            THE WITNESS:  Can I answer?

15            MR. DARROW:  Yes, you can answer.

16   A.   Yes.

17     BY MS. PATEL:

18       Q.   Okay.  Under what circumstances is it

19   available for single adults?

20            MR. DARROW:  Same objection.

21            You can answer.

22   A.   If they're a Cuban, Venezuelan or

23   Nicaraguan single adult who does not have a border

24   security or national security risk, then, then a

25   Parole ATD may be utilized with that individual.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 88

1    And I just say "may," because it's, it's not a

2    shall.

3      BY MS. PATEL:

4      **Q.   All right.  Does permission need to be**

5    **obtained on a case-by-case basis from a supervisor**

6    **or someone higher up in order to apply Parole + ATD**

7    **to a single adult?**

8            MR. DARROW:  Same objection.

9            You can answer.

10     A.   No, no.  The utilization of Parole ATD in

11   a sector, you know, obviously, you know, that

12   permission is given by a supervisor, actually, you

13   know, at the commissioner level.  But the

14   application of Parole ATD to a specific individual,

15   each and every time that is determined on a

16   case-by-case basis to the agent or officer that is

17   processing that individual.

18     BY MS. PATEL:

19     **Q.   Okay.  And since when has Parole + ATD**

20   **been authorized to apply to single adults?**

21           MR. DARROW:  Same objection.

22           You can answer.

23     A.   It's going to be within the past couple

24   months.  I can't recall exactly when we started, you

25   know, utilization of it for single adults.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 89

1       BY MS. PATEL:

2           **Q.   Okay.  And is this being -- is this**

3       **process available at only the two sectors referenced**

4       **in the Parole + ATD memo or in additional sectors as**

5       **well?**

6                MR. DARROW:  Same objection.

7                You can answer.

8           A.   The Parole ATD is currently being utilized

9       in Yuma and Del Rio Sectors.

10      BY MS. PATEL:

11          **Q.   Okay.  So, it's not being used in the Rio**

12      **Grande Valley?**

13          A.   There -- it's used on an ad hoc basis in

14      the Rio Grande Valley based upon what the conditions

15      of their detention is, you know, currently.  So, as

16      their numbers are lower and the detention, you know,

17      is less, you know, then, then they're not going to

18      utilize Parole ATD.  They have the authorization to

19      use Parole ATD, but -- but, again, you know, if they

20      don't -- if they do not need to utilize Parole ATD,

21      then they're not utilizing it, and they will utilize

22      it in the Del Rio and Yuma Sectors.

23          **Q.   Okay.  When was the Yuma Sector authorized**

24      **to use Parole + ATD?**

25                MR. DARROW:  Same objection.

Page 90

1              You can answer.

2      A.    It's going to be around the December-ish

3   time frame.  I can't remember exactly.

4      BY MS. PATEL:

5      **Q.    And when you say December, are you talking**

6   **about 2021?**

7      A.    2021, yes.

8      **Q.    Okay.  And for Rio Grande Valley, how**

9   **often has it been used since this policy memo came**

10  **out?**

11             MR. DARROW:  Same objection.

12             You can answer.

13     A.    I don't know what their sector by sector

14  PATD numbers are off the top of my head.

15     BY MS. PATEL:

16     **Q.    Okay.  So, you're saying that currently,**

17  **as we sit here today, it's not being used there?**

18             MR. DARROW:  Same objection.

19             You can answer.

20     A.    They'll utilize it depending upon the

21  circumstances.  They're involved in lateral

22  decompression, you know, because Del Rio Sector is

23  extremely high, they're taking on large -- they're

24  accepting, if you will, large volumes of migrants to

25  process because of Del Rio's volumes, you know, then

Page 91

1    they may end up utilizing it, but, but, you know,

2    it's very specific to the circumstances at the time

3    and the individual they have in front of them.

4        BY MS. PATEL:

5        **Q.    Okay.  You just used the term "lateral**

6    **decompression."  What do you mean by that?**

7        A.    That means, basically, that a sector, you

8    know, has -- is significantly over their 100 percent

9    capacity.  And I say significant.  They're over

10   their 100 percent capacity.

11       **Q.    Okay.  And then what happens at that**

12   **point?**

13       A.    So, then --

14            MR. DARROW:  Same objection.

15            You can answer.

16       A.    -- we'll utilize various conveyances, such

17   as a plane and/or to move migrants from an area that

18   has, you know, very high custody numbers to areas

19   that have lower custody numbers in order to be able

20   to, you know, just decompress ultimately.

21       BY MS. PATEL:

22       **Q.    And when you say transfer them, are you**

23   **referring to transferring them from border patrol**

24   **custody to border patrol custody?**

25       A.    Yes, for processing, correct.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 92

```
 1        Q.   And in terms of Del Rio, has Parole + ATD
 2   been used for substantially all the time that the
 3   path -- that this memo's been in place?
 4             MR. DARROW:  I'm going to object on the
 5        same grounds.  And also, Anita, we have Chief
 6        Ortiz designated to speak to this.  This is
 7        Topic 1.  This is off the topics for
 8        designation for Chief Barker here.
 9             MS. PATEL:  Understood, but he did give
10        some testimony as to, you know, when Parole +
11        ATD is used, so I'm just following up on that
12        line of questioning.
13             MR. DARROW:  You can answer if you know.
14        A.   Can you reask your question?
15   BY MS. PATEL:
16        Q.   Yes.  So, in the Del Rio Sector, has
17   Parole + ATD been consistently used since the memo
18   was implemented?
19        A.   It's been utilized, you know, consistently
20   as their -- as their population and detention
21   decreased, you know, I'm aware of several occasions
22   where they have not utilized it and went strictly to
23   Title 8 pathway and not needed to utilize Parole ATD
24   pathway.
25        Q.   Who authorized the use of Parole + ATD for
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

 1   **single adults?**

 2          MR. DARROW:  I'm going to object again.

 3      Anita, we have somebody else prepared to speak

 4      to this topic.

 5          MS. PATEL:  Well, if he doesn't know, then

 6      he doesn't know, but, you know, I think it's

 7      fair to ask the question.

 8          MR. DARROW:  You can answer if you know.

 9      A.   You know, any utilization of Parole ATD,

10   whether that's changed, meaning that it's moved to a

11   different sector, moved to a different demographic,

12   you know, that's approved by the chief of the border

13   patrol and the commissioner.

14      BY MS. PATEL:

15      **Q.    For what reason do they authorize use of**

16   **Parole + ATD for a single adult?**

17          MR. DARROW:  Objection again, beyond the

18      scope of this witness' testimony and also

19      Parole + ATD is confined to the administrative

20      record.

21          You can answer if you know.

22      A.   We included single adults in the, in the

23   Parole ATD pathway due to the fact that 73 percent

24   of all individuals who we were -- we were and are,

25   roughly -- I say roughly -- encountering -- we can

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 94

1    use 70 as an average -- are single adults.  Very

2    specifically from Cuba, Venezuela or Nicaragua.

3       BY MS. PATEL:

4          **Q.   And so, I think -- so, I need you to**

5    **connect the dots for me here.  Simply because most**

6    **of the people are single adults, why does that mean**

7    **that you approve the use of Parole + ATD?**

8             MR. DARROW:  Same objection.

9             You can answer if you know.

10      A.   We utilize the application of Parole + ATD

11   for Cuban, Venezuelan and Nicaraguan single adults

12   due to the fact that there is no return mechanisms

13   to those countries.  So, if we would place a person

14   into detention, the detention would not have any

15   degree of finalization of removal.  You know, the

16   person may receive a final order of removal and then

17   we would have no mechanism to actually remove that

18   person from the country.

19      BY MS. PATEL:

20         **Q.   And what is the consequence of that?**

21            MR. DARROW:  Same objection.

22            You can answer.

23      A.   The consequence of what?  I'm not sure

24   what --

25      BY MS. PATEL:

**www.phippsreporting.com**
**(888) 811-3408**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 95

1      Q.    Of you not being able to remove them from

2   the country.

3      A.    Well, so, if we can't remove them from the

4   country to any other country, you know, by default

5   and they're here, they continue to remain here.

6      Q.    Would they remain here in detention?

7          MR. DARROW:  Same objection.  Also,

8      objection as to vague.

9   BY MS. PATEL:

10      Q.    You say that they would remain here.  If

11   you didn't apply Parole + ATD to them, would they be

12   subject to detention?

13          MR. DARROW:  Same objection.

14          You can answer.

15      A.    So, if we didn't apply Parole + ATD to

16   them, there are various pathways that they could

17   be -- that would be able to be applied to them, not

18   all of them resulting in detention.

19   BY MS. PATEL:

20      Q.    Okay.  What pathways could be applied

21   where they would not be subject to detention?

22          MR. DARROW:  Same objection.

23      A.    NTA/OR.  So, a notice to appear, released

24   on their own recognizance.

25   BY MS. PATEL:

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 96

1      Q.    Okay.  So, let's go back to Exhibit 7 and

2   I just want to walk through each of these pathway

3   dispositions with you.

4            The first one is Notice to Appear/Own

5   Recognizance, NTA/OR.  So, when would that be

6   applied to a single adult?

7      A.    Again, it just depends on the

8   circumstances in front of them.  You know, an

9   individual who, you know, is claiming fear, an

10  individual who, you know, may have, we'll say, you

11  know, issues to where they cannot be detained.

12  Fraihat (phonetic) being -- just as an example, just

13  one example.  You know, if we have no available

14  space in order to be able to remove single adults

15  to, you know, in ICE custody; i.e., you know, that

16  locale has no available space open to them, we would

17  end up placing a single adult into an NTA/OR.  You

18  know, those are all -- there's just a variety of

19  circumstances where, where it can be applied.

20     Q.    Let me backtrack a little bit.  Do border

21  patrol agents have discretion in deciding which one

22  of these pathways to use?

23     A.    Yes.

24     Q.    Okay.

25     A.    We have the discretion in order to be able

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 97

1    to determine which pathway, but, but, you know,

2    again, there's -- this kind of goes back to your

3    previous question.  Supervision is well engaged in

4    the processing areas in monitoring, you know, who

5    agents are processing, which pathways are assigned

6    to individuals and so on.

7         Q.    Are there specific criteria that an

8    officer would apply in determining which pathway to

9    choose?

10        A.    It's based upon the circumstances of the

11   individual in front of them.

12        Q.    What do you mean by that?

13        A.    So, so, you know, as in -- I think it's

14   Exhibit 6, you had what appeared to be kind of

15   almost like a decision tree for lack of better

16   terms.  I think it was that number, so don't quote

17   me on it, but -- well, I guess you're going to quote

18   me on it, but, you know, the -- that's, that's like

19   a decision tree, but ultimately the determination is

20   based upon the circumstances in front of the agent

21   at the time of the individual there.

22        Q.    So, there are no set criteria that's

23   applied?

24        A.    Well, I mean, of course, yes, there's set

25   criteria.  I mean, if a person has, you know,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 98

1    previously been deported, so that's going to be for

2    instance, a reinstatement of a previous removal; if

3    they have an order of removal that has not been

4    effectuated, that's going to be a bag and baggage.

5    I mean, so you kind of see -- that -- again, I go

6    back to it's kind of like a decision tree.  It's not

7    a true decision tree.  So, there are circumstances

8    that are involved in what you're applying that Title

9    8 pathway to to those individuals.

10        Q.   Okay.  Are there any other criteria?  You

11   just named two.

12        A.   Yeah, I mean, there's going to be several.

13   Right?  So, national security, border security

14   threat, what's their criminal history, what's their

15   immigration history, are they applicable to -- you

16   know, to MPP, are they applicable to detention, are

17   they claiming fear, are they not claiming fear, you

18   know, are they a single adult, are they a family

19   unit, what's the detention availability for that

20   person?  I mean, it's -- you know, does ICE have bed

21   space, do they not have bed space to detain?  I

22   mean, these are all a variety of different

23   circumstances that are all taken into those

24   decisions.

25        Q.   Okay.  Does -- you mentioned whether or

Page 99

1    not they are or are not a family unit is one of the

2    criteria?

3        A.    Absolutely.

4        Q.    And how is that criteria applied?

5        A.    So, for family units, you know, if we're

6    able to expel them, if we're able to return them

7    rapidly through ER, as an example, you know, then we

8    will -- if those countries are able to or are

9    accepting, you know, individuals back, right,

10   they're allowing us to return or remove individuals,

11   then we will, right, and we'll apply that specific

12   pathway.

13           You know, if they're from a country who is

14   not accepting, you know, returns, removal or

15   expulsions from us, and we have, we have no bed

16   space for detention, then we will utilize a release

17   mechanism for families we have no availability to

18   detain.

19       Q.    Okay.  First you mentioned ER.  Were you

20   referring to Expedited Removal?

21       A.    Expedited Removal.

22       Q.    And you also said when there is no bed

23   space for detention.  Were you referring to bed

24   space at a border patrol facility?

25       A.    So, so, we don't detain.  We will hold in

Page 100

 1   a border patrol facility, right, but ICE has

 2   detention and ICE does not currently have any bed

 3   space for detention of family units.

 4          Q.    And why is that?

 5          A.    You'd have to ask ICE, ma'am.

 6          Q.    Okay.  So, does that mean that they will

 7   not accept any family units?

 8          A.    Meaning ICE?

 9          Q.    Correct.

10          A.    Yeah, ICE has no current bed space for

11   family units, to detain family units.

12          Q.    And so, how does that then impact CPB --

13   CBP?

14          A.    So, as we, as we decide which pathway we

15   are going to apply to a family, we have to keep in

16   mind that, that this family will not be able to be

17   detained outside of border patrol's detention

18   center -- or holding center, I'll say.

19          Q.    So, does that mean that they have to be

20   released into the interior?

21          A.    Depending upon the pathway.

22          Q.    So, what -- in what circumstance would

23   they not be released into the interior?

24          A.    As an example, if we're able to apply

25   Expedited Removal or Title 42, right, but I know

Page 101

1    we're talking about a Title 8 pathway, so we'll stay

2    in the Title 8 frame.

3            So, if we're able to place families into

4    Expedited Removal, then we, then we will hold them

5    within border patrol's holding and we'll place them

6    on a flight within 24 to 48 hours depending upon the

7    return requirements or manifesting requirements of

8    that country and then we'll transfer them to ICE

9    custody on a runway and they will be removed back to

10   their home countries.

11       **Q.   You did mention that when applying**

12   **Expedited Removal you would consider whether or not**

13   **the country would be amenable to taking the persons**

14   **back.  Is that fair?**

15       A.   Yes.

16       **Q.   What else do you -- does CBP consider?**

17       A.   In regards to placing somebody into ER?

18       **Q.   Correct.**

19       A.   So, it's -- you know, again, it's that

20   same kind of decisionary (sic) process that we made.

21   You know, is there a national security, border

22   security, you know, threat to -- you know, that

23   would place them into a different Title 8 pathway.

24   But if, if we can achieve a return or removal of an

25   individual from the country who has entered

Page 102

```
 1  illegally, that's what we're going to do.

 2      Q.   In what circumstance would you not use

 3  Expedited Removal for a particular family?

 4      A.   As an example, if they claim fear, we will

 5  place them into an, an NTA/OR process because we

 6  have no family detentions.  Like, if you place them

 7  into ERCF, we have no availability to detain them,

 8  you know, and so it's -- ultimately if they claim

 9  fear, we'll place them into NTA/OR and their claim

10  of fear will be heard on a non-detained docket.

11      Q.   Okay.  And what percentage of the families

12  complain fear?

13      A.   I couldn't tell you.

14      Q.   Is it a high percentage?

15      A.   So, it just -- it really is dependent.  I

16  couldn't even tell you.

17      Q.   All right.  What if they fail the credible

18  fear screening?

19      A.   That's really where ICE takes over and I

20  defer you to ICE as to their process.

21      Q.   Okay.  So, in the interim if the family

22  cannot be detained in ICE custody, where would they

23  be located?

24      A.   Well, they're placed on NTA/OR, so it's

25  wherever they would be destined to live at.  I mean,
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   we have -- we, as in CBP -- so, speaking strictly

2   with the CBP path, you know, we -- after they are

3   released from our custody, they are really the

4   responsibility of, of -- I'll say the monitoring of

5   that person falls to ICE.

6       **Q.   Okay.  But, if I understand correctly,**

7   **families who are not amenable to Expedited Removal**

8   **as determined by CBP then get put into a Notice to**

9   **Appear/Own Recognizance track, at which point they**

10  **can be paroled or bonded out; is that accurate?**

11          MR. DARROW:  Objection, misstates the

12      testimony.

13          You can answer.

14      A.   Yeah, that's, that's not accurate.  It's

15  my fault if I didn't explain it clearly enough.  So,

16  so, there are a couple different pathways.  If we

17  have a family who we cannot -- is not amenable to

18  Expedited Removal, we cannot return to their home

19  country, right, we can't or is not amenable, we will

20  place them into an NTA/OR or a Parole ATD type of

21  pathway for removal -- from release, rather, from

22  our custody.  I'll be very specific with my words.

23  From release from our custody.

24      **Q.   When you say release from your custody,**

25  **does -- that means that they are, in fact, released**

Page 104

1   from any custody, correct?

2       A.   So, you know, as a -- so, they're not in

3   custody, you know, by the term of law.  No, they're

4   not in custody anymore.

5       Q.   Okay.  So, they get released and then they

6   can go to whatever final destination they choose

7   within the United States; is that accurate?

8       A.   Correct.

9       Q.   Was there a family detention available

10  before January 20th of 2021?

11      A.   ICE had two or three -- two or three

12  different family detention locations, but I cannot

13  recall when they transitioned those locations to

14  single adult detention.  I just can't remember the

15  date.

16      Q.   Do you remember who was President at the

17  time?

18          MR. DARROW:  Objection.  Family detention

19      does not relate to any of the topics for which

20      Chief Barker is designated.

21          You can answer.

22      A.   I, I couldn't even tell you when -- again,

23  I don't remember the date in which they switched, so

24  I really refer you to ICE, to be honest, with

25  regards to the date.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1    BY MS. PATEL:
 2        Q.   All right.  You don't remember who was
 3    President?
 4             MR. DARROW:  Same objection.  Also,
 5        objection, asked and answered.
 6             You can answer.
 7        A.   Yeah.  No, I have been through multiple
 8    administrations in my role and responsibility.  I
 9    cannot remember.  You'd have to ask ICE when they
10    switched over and then find the applicable
11    administration that was in office.
12    BY MS. PATEL:
13        Q.   Okay.  Does the location in terms of how
14    far a person made it into the interior affect what
15    processing pathway is applied?
16        A.   I mean, determining if they're applicable
17    to ER.
18        Q.   Okay.  How so?
19        A.   I mean, there's certain standards of ER.
20    You know, there's certain time frames and mileage
21    requirements.  Otherwise, if we catch somebody who's
22    what we consider is -- or encounter somebody who is,
23    you know, more along the interior, they may not be
24    applicable to ER, but they'd be applicable to other
25    Title 8 pathways and we just process them on other
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 106

1    Title 8 pathways.

2         Q.    And then, does the determination as to

3    whether a family is, in fact, a family unit, does

4    that impact the decision as to which processing

5    pathway to choose?

6         A.    Yes.

7         Q.    How so?

8         A.    Because if they're not a family unit, then

9    they're an unaccompanied child and a single adult.

10        Q.    If they are a family unit, how does that

11   impact the decision making in terms of processing

12   disposition?

13        A.    So, if they're a family unit, knowing that

14   there's no family unit detention, you know, we will

15   not utilize a pathway that will -- that would

16   intentionally place a family into, into a detention,

17   right, situation.  You know, there's no point in

18   doing all the paperwork, you know, when there's no

19   detention available.

20        Q.    Okay.  So, going back to Exhibit 7, which

21   of these pathways would be amenable to family units?

22        A.    Well, they would technically all be

23   amenable to family units depending if we had

24   detention or not.

25        Q.    Okay.  Well, you do not have detention,

Page 107

1    correct?

2         A.    Right.

3         Q.    **And you --**

4         A.    You mean right now?  You mean currently?

5         Q.    **Currently, correct.**

6         A.    Okay.  I gotcha, I gotcha.

7               So, amenable to family units right now.

8    Family unit right now would be NTA/OR, Parole ATD,

9    ER.  We could even do -- we could even reprocess

10   somebody who has a previous removal through an ER

11   again.  Warrant of Arrest/Notice to Appear, meaning

12   detention ultimately would not be applicable.  We

13   can voluntary return a family.  We are not currently

14   implementing or applying MPP to families.  When I

15   say ER, it's going to be dependent because the

16   circumstances surrounding the ER is going to

17   determine if, if they're, obviously, amenable to ER

18   or not.  Right?  You know, if -- yeah, I guess

19   that's the easiest way to explain it.

20        Q.    **When did you stop applying MPP to**

21   **families?**

22               MR. DARROW:  Objection.  That's beyond the

23          scope of this deposition and the topics for

24          which he's designated.

25               You can answer if you know.

Page 108

1       A.   Under the -- when we had the restart of

2   MPP -- and I don't recall the time frame.  I just --

3   I can't remember the month that we restarted MPP in,

4   but, you know, under, under the most recent

5   application or iteration of MPP it's been applied to

6   single adults.

7            MS. PATEL:  And I just want to note for

8            the record that Topic 4 is directly on point as

9            to this line of questioning.

10  BY MS. PATEL:

11      Q.   All right.  So, under what circumstance

12  would CBP apply the NTA/OR to individuals?

13      A.   Single adults?

14      Q.   Correct.

15      A.   It kind of goes back to the question I

16  answered on this earlier, which is really, you know,

17  depending upon the circumstances of that single

18  adult, you know, does ICE have detention

19  availability or not?  You know, does -- is the

20  person applicable to, you know, the Fraihat

21  detention restriction where it's not applicable to

22  them?  You know, these are circumstances where we

23  would, you know, apply an NTA/OR to a single adult.

24      Q.   Okay.  Did you say a Fraihat detention?

25      A.   Yeah.  So, Fraihat litigation is certain

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 109

1   circumstances which prohibit us detaining.  And it's

2   not us.  I'm using "us" as the larger DHS entity.  I

3   really kind of defer you to counsel and to ICE in

4   regards to that because that's their standards of

5   detention.  But when ICE tells us that they cannot

6   detain a certain individual -- a single adult, they

7   cannot detain a single adult, then that detention

8   pathway is removed, obviously.

9       Q.   Okay.  Do -- those same factors, are they

10  considered as to a family unit?

11      A.   Well, there is no detention of family

12  units currently available, so, yeah, but it's

13  implied, right, because there's no detention.

14      Q.   Understood.  Under what circumstances

15  would CBP apply Parole + ATD to a family unit?

16          MR. DARROW:  Objection, Parole ATD is

17      beyond the scope.  Also, we have another

18      witness to discuss Parole ATD.

19          You can answer.

20      A.   So, Parole ATD would be applied to a

21  Cuban, Nicaraguan or Venezuelan family unit as these

22  three demographic -- or these three country

23  demographics or citizenships, nationalities

24  currently do not allow us to repatriate those

25  individuals, so no returns, no removals, and we have

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   no current detention capability to be able to detain

2   families; so, therefore, we may utilize the Parole

3   ATD in certain circumstances in the sectors who are

4   impacted by flow with high TIC times as well as high

5   custody numbers.

6       BY MS. PATEL:

7       Q.    All right.  Under what circumstances would

8   Notice to Report be applied to individuals?

9       A.    None.

10      Q.    What about to families?

11      A.    None.

12      Q.    What about Expedited Removal as to

13  individuals?

14      A.    So, if we're able to --

15      Q.    Single adults.

16      A.    Yeah, yeah, yeah, you're talking single

17  adults.  You know, for those, for those single

18  adults who, you know, are originating from a country

19  to where we have, you know, the availability to be

20  able to remove or return them, then we'll place them

21  into an ER, an ER pathway and then, and then place

22  them into custody.  You know, transfer to ICE if ICE

23  has -- and, of course, this is dependent upon ICE

24  either having the availability, meaning the

25  detention space, or CBP having the available holding

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 111

1   space and capacity to be able to expeditiously

2   remove somebody, you know, you know, through,

3   through the ER pathway.  Right?  If we're able to

4   get somebody on a flight within 24 to 48 hours, like

5   I was just discussing earlier, we'll hold them

6   within our custody and get them to a flight line.

7        **Q.   If you have a single adult where ER is**

8   **not -- they're not amenable to ER, what is typically**

9   **done at that point, what pathway?**

10       A.   So, first off we'll determine if we're

11  going to prosecute them.  Right?  1325, 24, 26, it

12  just depends.  So, if we're going to, to prosecute

13  them, then they'll go -- you know, they could go

14  into a WA/NTA, which is your Warrant of

15  Arrest/Notice to Appear, you know, a WA/NTA type of

16  pathway, you know, we could place them -- you

17  know -- and, of course, that's going to be holding

18  them and then removing them.  This will be a

19  post-prosecution, by the way.

20           Or we could go like a 1326 where we're

21  reinstating a previous order of removal.  You know,

22  they may serve some jail time on the prosecution,

23  remain detained and then removed.

24           Or, you know, they could be placed into

25  MPP, which is a prime example as to what we're doing

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 112

 1    right now as well, you know, and -- you know, those

 2    are -- you know, they could be placed into NTA/OR or

 3    even Parole ATD, just depending on the circumstances

 4    surrounding that.

 5            It's really is depending on the

 6    circumstances with the individual as well as the

 7    circumstances around what I consider is custody and

 8    detention.

 9       Q.   I think we've been over the circumstances

10    in which Expedited Removal would be applied to a

11    family unit.  I'm going to move to the next entry.

12            In what circumstances would Reinstatement

13    of Prior Order of Removal apply to an individual?

14       A.   When we have a previous order of removal

15    and we're reinstating it.

16       Q.   Can it be applied to a family unit?

17       A.   Individuals within the family unit, yes.

18       Q.   Okay.  And what circumstances would a

19    Warrant of Arrest/Notice to Appear-(detained) be

20    applied to an individual?

21       A.   There's a myriad of circumstances.  So,

22    this could be from anything from -- you know, from

23    prosecuting on a simple 1325, you know -- you know,

24    1324s if there -- you know, if there's some type of

25    criminality.  You know, again, I'll broadbrush it in

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 113

1    regards to if there's a national security or border

2    security or criminal threat there where we're

3    seeking a prosecution or, or we're not -- you know,

4    we're going to place somebody into a detention

5    setting with ICE for, for a removal as well, you

6    know, due to whatever circumstance, criminal ICE

7    maybe one where we're not necessarily going to

8    prosecute for the 1325, but we're going to continue

9    to detain and remove, another example of that.

10          So, these would be all circumstances where

11   we would issue an WA/NTA.  And that's just an

12   example.  There's a myriad of different reasons.

13        **Q.   Okay.  What about as a family unit?**

14        A.   When would we put a WA/NTA in regards to a

15   family unit?

16        **Q.   Correct.**

17        A.   We're not right now.  There's no detention

18   for family units.

19        **Q.   What about when is there a Voluntary**

20   **Return for individuals?**

21        A.   And it's a Title 8 pathway, so Canada is a

22   perfect example, Mexico is another perfect example.

23   You know, if we encounter, you know, single adults

24   or families, you know, from those countries, you

25   know, we could place them into Voluntary Return,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   even children, to be honest, but it's just depending

2   certain circumstances depending -- surrounding that.

3   But, yeah, so Mexico or Canadian nationals.

4        **Q.   What about under what circumstances would**

5   **you put an individual in MPP?**

6        A.   So, if the individual in front of us is

7   claiming fear of returning to their home country but

8   not claiming fear of returning to Mexico -- Mexico's

9   the only country applicable, and in the geographic

10  areas that Mexico has agreed to be able to take back

11  MPP returns and were within the numerical limiting

12  framework that Mexico has restricted us to in

13  regards to MPP returns and an individual is not

14  excepted from MPP for a myriad of different reasons,

15  right, because of vulnerabilities, and that person

16  doesn't have fear of going back to Mexico, they

17  could be placed into MPP.  There's a lot of coulds

18  in there.

19       **Q.   Is that the same for family units?**

20       A.   We are currently not applying MPP to

21  family units.

22       **Q.   And I'm going to drop another exhibit.**

23            (Plaintiff's Exhibit 8 was received

24            electronically, marked for identification and

25            is attached hereto.)

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    BY MS. PATEL:

2       Q.   So, this is Customs and Border Protection

3    statistics from the website for the fiscal year

4    2021.   So, it's similar to what we were just looking

5    at with just a different fiscal year.   If you could

6    turn to page 2.   And this is -- will be marked as

7    Exhibit 8.   And we're looking under the same heading

8    here, USBP Monthly Southwest Border Apprehensions by

9    Processing Disposition.

10      A.   Uh-huh.

11      Q.   So, there are a few processing

12   dispositions that are different in this chart, so I

13   just wanted to ask you about them.   Just by looking

14   at this, does this look like a list of a majority of

15   the pathways that were used during the 2021 fiscal

16   year except for, you know, those other pathways that

17   you discussed previously?

18      A.   Yes.

19      Q.   Okay.   So, this chart also includes PACR,

20   HARP and ACA?

21      A.   Yes.

22      Q.   Do you see that?

23      A.   Yes.

24      Q.   Okay.   Are those processing options -- or

25   what are those processing options?

Page 116

```
1        A.    So, those are, in essence -- so, PACR,

2    HARP and an ACA agreement with Guatemala.  So, those

3    are three processing pathways which, you know, were

4    created where a person -- and, again, this is going

5    to go Mexican and non-Mexican nationals, right, so

6    there's a difference.

7             So, basically, what ends up happening is

8    these individuals would come in and claim fear of

9    returning to their country or returning to Mexico

10   and we would hold them within a border patrol --

11   within border patrol custody as they went through

12   their credible fear process with CIS.  And in HARP

13   and PACR just differentiates between Mexican

14   nationals and not -- OTMs.  You know, other than

15   members and nationals.  And then ACA is an agreement

16   to where, you know, individuals were, you know,

17   basically, returned back to Guatemala or could be

18   returned back to Guatemala under a safe return

19   agreement.

20       Q.    And just below that disposition there's

21   another one, Notice to Appear/Order of Recognizance,

22   I-385 - Released.  Do you see that?

23       A.    Yeah, NTA/OR.

24       Q.    NTA/OR?

25       A.    NTA/OR, Notice to Appear, Order of
```

Page 117

1    Release, yeah.

2         Q.   You referred to NTA/OR in the last 2022

3    statistics; is that accurate?

4         A.   Right, right, NTA/OR.

5         Q.   But there is an addition of the I-385.  Do

6    you see that?

7         A.   Yes.

8         Q.   So, what is I-385?

9         A.   So, an I-385, I believe, is -- we used to

10   call them like camp cards.  Essentially, it's,

11   basically, like an identification document.

12        Q.   So, why would I-385 be included here as a

13   processing disposition?

14        A.   So, it's, it's not a disposition.  So,

15   there is -- I didn't create the form, so I'm not

16   sure the ideology behind why it's numerically

17   created that way, but a, but a 385 is not a

18   processing disposition.  It's, basically, an

19   identification card.

20        Q.   Okay.  So, do you have any understanding

21   of why it would be included in this chart?

22        A.   I didn't create the chart, so I'm not sure

23   where it's included in this format.

24        Q.   Is this identification card, would it be

25   something that's completed for all of the other

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 118

 1   processing pathways?

 2       A.   So, so -- we call them camp cards.  Right?

 3   So, it's created on numerous pathways, but an

 4   I-385... an I-385 was utilized during this time

 5   frame attached to the NTR process, the Notice to

 6   Report process.  Because the I-385 was a form of

 7   identification which would allow that individual to

 8   be able to board a plane.  I'm recalling as I'm

 9   sitting here.

10       Q.   Okay.  So, the numbers that are reflected

11   in this row for NTA/OR, I-385 include persons who

12   were released on a Notice to Report?

13       A.   Again, I didn't create this nor do I --

14   so, from looking at this, you know, it appears in

15   the nomenclature that 385 is included just from the

16   processing disposition header, but I can't speak to

17   the numbers.

18       Q.   Okay.  So, the Notice to Report was being

19   used in the time frame reflected in this chart,

20   correct?

21       A.   I believe that we, we started the Notice

22   to Report in the March time frame.

23       Q.   Okay.  And there's not a separate entry

24   related in the report; is that accurate?

25       A.   Not that it appears in the processing

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   disposition drop down here.

2       Q.   Okay.  So, is it fair to assume that

3   anyone that was issued a Notice to Report would be

4   included in the NTA/OR column or row?

5       A.   That's what the name appears.

6       Q.   And going back to the PACR, HARP, ACA, are

7   those no longer in use?

8       A.   Correct.

9       Q.   Okay.  And what happened to those?  Why

10  are they no longer in use?

11      A.   They were discontinued.  The direction

12  from, from -- you know, from the department was that

13  we were going to cease the utilization of PACR and

14  HARP.

15      Q.   Do you know the reason?

16      A.   You'd have to ask the department, ma'am.

17      Q.   All right.  And then I'm going to drop

18  another exhibit.  This is Exhibit 9.  It is also

19  statistics pulled from CBP's website and this one is

20  for fiscal year 2020.

21          (Plaintiff's Exhibit 9 was received

22          electronically, marked for identification and

23          is attached hereto.)

24  BY MS. PATEL:

25      Q.   If you can turn to page 4.  Does this

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

                Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

                Defendants.
_____/


   VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
   TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
   STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
              BEHALF OF THE PLAINTIFF


                    Volume 2
              Pages 138 through 207


               Wednesday, July 13, 2022
               8:33 a.m. CT - 2:17 p.m. CT


         Location:  Remote via Zoom
                    Washington, D.C.




         Stenographically Reported Via Zoom By:
                  Helen Marie Chase
      Job No.: 259222

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 142

1           THE VIDEOGRAPHER:  The time is 12:36 and
2      we are back on the record.
3           MS. PATEL:  Thank you.  And for the
4      videographer, you just announced it's 12:36.
5      You are announcing central time; is that
6      accurate?
7           THE VIDEOGRAPHER:  That's what my notice
8      said and that's what I've been saying all the
9      way through, from the read-on through now.
10          MS. PATEL:  Okay.  Thank you so much.
11          (Plaintiff's Exhibit 10 was received
12      electronically, marked for identification and
13      is attached hereto.)
14    BY MS. PATEL:
15      Q.   Chief Barker, I dropped another exhibit
16    into the chat.  It's Exhibit 10.  It's a copy of the
17    Parole + ATD policy.
18      A.   I don't see it.  I don't see it on this
19    side.
20      Q.   Okay.  I sent it again.  This time to
21    everyone.
22      A.   Gotcha.  I see it on the site now.
23      Q.   So, we've been talking quite a bit about
24    the Parole + ATD policy.  I'm just wanted to
25    confirm, is this document the policy that you've

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 143

1   been referencing?

2       A.   It's not a policy, but that's the

3   operational guidance.

4       **Q.   And this is the operational guidance that**

5   **you've been referencing?**

6       A.   Yes.  Yeah, November 2nd, yeah, yeah.

7       **Q.   When did this guidance take effect?**

8       A.   November 2nd.

9       **Q.   Okay.  And did you have any role in**

10  **developing this policy?**

11          MR. DARROW:  And I'm going to make the

12          same objections that I made before.  First of

13          all, Parole + ATD, the policy itself is in the

14          determination an administrative record

15          according to the court's order; secondly, we

16          have a different witness designated to speak to

17          Topic Number 1, and to the extent that Chief

18          Barker gives any answers on this, it's going to

19          be speaking from his personal capacity and not

20          as a 30(b)(6) deponent from DHS.

21          MS. PATEL:  Okay.  And I'll just provide

22          this response.  Topic Number 4 also addresses

23          Parole + ATD, and so I do believe that it's

24          appropriate to discuss with Chief Barker.

25          MR. DARROW:  Yes, and I'm going to respond

Page 144

```
1          to that.  It does discuss Parole + ATD as a
2          possible choice among the different processing
3          dispositions, but if you're going to down and
4          question about how Parole + ATD came to be and
5          the different policy decisions that went into
6          it, that seems much more appropriate to Topic
7          Number 1.
8              MS. PATEL:  Okay.  Understood.
9     BY MS. PATEL:
10         Q.  Chief Barker, I think you can answer the
11    question unless your counsel's instructing you not
12    to.
13             MR. DARROW:  You can answer if you know
14         from your personal capacity.
15         A.  So, can you, can you restate your
16    question?
17    BY MS. PATEL:
18         Q.  Sure.  Did you have any role in developing
19    this policy?
20         A.  So, the operational guidance, yes.  I
21    mean, it, it -- I was at that period of time, you
22    know, engaged as we were looking to define triggers,
23    if you will -- that's further down the document --
24    as to when, you know, Parole ATD would be utilized,
25    formally, you know, ceasing the utilization of
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   Notice to Appear and migrating over to a Parole +

2   ATD in the -- you know, so that -- that's my -- that

3   was my involvement, if you will, in helping, I'll

4   say, or being involved in crafting of this

5   operational guidance memo.

6       **Q.   And prior to this operational guidance**

7   **memo, were families being paroled or released into**

8   **the interior?**

9       A.   Were families being -- are you talking

10  about the, the Parole + ATD aspect of families, you

11  know, when we started utilizing it in the July time

12  frame?  Is that what you're asking for?  And I'm

13  trying to understand your question.

14      **Q.   What do you mean "in the July time frame"?**

15      A.   So, so, you know, basically, when we

16  started attaching NTRs and -- excuse me, attaching

17  Parole ATDs to those individuals we were placing on

18  parole would have been roughly around in July.  This

19  memo coming out, you know, I'll say formalizing

20  Parole ATD, if you will, under Chief Ortiz's

21  signature in November.  I guess that should probably

22  be the more direct answer for you.

23      **Q.   Okay.  So, this guidance or what is**

24  **described in this guidance started in July of when?**

25  **2021?**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      A.   Yes, yes.  So, it would have been roughly

2   that time frame when, when we started, you know,

3   collectively between CBP and ICE utilizing the ATD

4   portion of the parole, if you will.

5      **Q.   Okay.  And then it wasn't formalized until**

6   **November of 2021?**

7           MR. DARROW:  Same objections.

8           You can answer from your personal

9      capacity.

10      A.   That's when the memo was, was, was

11   completed.

12   BY MS. PATEL:

13      **Q.   Okay.  Prior to this memo, were there any**

14   **trainings or instructions provided to staff as to**

15   **how to implement what is the process that is**

16   **described in this guidance?**

17           MR. DARROW:  Same objection.

18           You can answer from your personal

19      capacity.

20      A.   You know, there, there is the, the March

21   2021 NTR guidance that was put out, I believe, at

22   that period of time under Chief Rodney Scott's

23   signature.  You know, that was, that was the

24   guidance at that period.

25   BY MS. PATEL:

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 147

1          Q.    Okay.  So, the NTR policy is reduced to
2     writing?  NTR practice is reduced to writing?
3          A.    I guess I'm not understanding what the
4     question is.  It doesn't -- is there a question,
5     ma'am?  I apologize.
6          Q.    Yeah.  You were talking about the NTR
7     guidance.  Is that a written document?
8          A.    It's the one that's referring to the
9     document that you're, you're seeing here.  Right?
10    "...the prosecutorial discretion and issuance of
11    NTRs as issued in March of 2021."
12         Q.    Okay.  Was there any specific training
13    that border patrol officers received on the process
14    described in this November 2nd memo prior to this
15    memo being formalized?
16              MR. DARROW:  Same objection.
17              You can answer from your personal
18         capacity.
19         A.    So, there, there -- you know, there's a
20    written guidance of NTRs, right, that came out in
21    March 2021, you know, and that is the processing,
22    you know, I-385, G-56.  There was -- there's no
23    written guidance -- again, I'm going to go back to
24    attaching, you know, the monitoring mechanism of the
25    ATD is really ICE, so I defer you to ICE.  But, you

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 148

1    know, during that time period, you know, previous to

2    November, like July I was just talking about, is

3    when ICE started really, I'll say, attaching the ATD

4    monitoring mechanisms to those who were, who were

5    getting processed for, for release.  Hence, the

6    creation of the Parole ATD application.

7        BY MS. PATEL:

8        Q.   Okay.  I understand that, but was there

9    any training in July that occurred, around July of

10   2021?

11       A.   You'd have to -- you'd have to ask ICE, I

12   mean, how they trained their people to attach ATD.

13   ATD is not a CBP program, so I'd really defer to

14   ICE.

15       Q.   Okay.  Who makes the decision to use a

16   tracking device?

17       A.   You've got to talk to ICE on that one.

18   That's their -- that's their program.

19       Q.   Okay.  So, does that mean that CBP does

20   not make a decision whether to use a tracking

21   device?

22       A.   That's completely ICE's decision.

23       Q.   Okay.  So, prior to the use of Parole +

24   ATD, were families being processed and released

25   under NTA/OR?

Page 149

1    A.   Yes.

2    **Q.   Okay.  Was there any other mechanism that**

3    **families were being processed and released into the**

4    **interior?**

5    A.   So, you know, in certain circumstances,

6    you know, the, the border patrol has utilized parole

7    for humanitarian reasons as well.  An example of

8    that would be, for instance, if somebody, you know,

9    has an extremely serious injury is a prime example.

10   You know, they fall from a fence or, you know -- you

11   know, had a tragic accident in, you know, a

12   smuggling load or something along those lines.  And

13   I -- just to give as an example.  You know, we may,

14   we may place and effectuate humanitarian parole of

15   that individual.  You know, parole is applied on an,

16   on an individual case-by-case basis and thereby, you

17   know, is contingent upon the circumstances

18   surrounding that individual's, you know, situation.

19   **Q.   Okay.  Are there any other instances in**

20   **which you would provide humanitarian parole other**

21   **than for medical reasons?**

22   A.   Oh, of course.  Of course.  I mean, it --

23   it just depends on the circumstances that are, that

24   are surrounding it.  You know, we've had individuals

25   who have, you know, shown up to -- you know, at the

Page 150

1    border with, with, you know, bullet wounds.  We've

2    had -- I mean, just it -- you know, there are just

3    different circumstances.  Right?  I mean, the vast

4    majority of them are, are all medical related.

5         **Q.   Okay.  I'm just tying to figure out**

6    **whether there's, like, an unfettered discretion in**

7    **when to provide humanitarian parole or whether**

8    **there's any confines of criteria with respect to**

9    **that?**

10        A.   So, you know, again, I go back to the

11   case-by-case basis.  Right?  So, there's -- it's not

12   what I would consider as unfettered, by any means.

13   I mean, when we you take a look at each individual

14   circumstance that's presented to us, you know, we

15   attempt to detain or remove those individuals, you

16   know, it may be other circumstances with that

17   individual detention or capacity which drive us to

18   utilize different pathways.

19        **Q.   So, whether you use humanitarian parole**

20   **could also be driven by detention capacity?**

21        A.   True, could be.

22        **Q.   How often does that happen?**

23        A.   So, the, the -- you know, the

24   circumstances which we face -- and it's actually

25   noted in the memo that you just sent us -- with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    COVID-19 would be, would be a case in point of a --

2    you know, a humanitarian utilization of Parole ATD,

3    right, in order to be able to rapidly decompress,

4    decompress our, our detention facilities or, you

5    know, our custody and holding numbers because of the

6    pandemic.

7              You know, I'll be honest with you, we've

8    lost 19 border patrol agents to COVID, COVID deaths,

9    you know, directly associated with COVID that they

10   have contracted on duty working in, you know,

11   facilities which are, which are well over capacity

12   and in that congregate setting, you know, creating a

13   significant life and safety risk to the agents,

14   officers, migrants and professional staff that are

15   all being detained there.

16             So, so, I'll be honest, sitting here as

17   the Chief of Operations, having spent, you know, 21

18   plus years in a green uniform working on the border,

19   19 deaths that, that are associated with, you know,

20   a public health pandemic due to overcrowding within

21   our facilities is something that we take direly

22   seriously not only for the agents, but for the

23   migrants and the professional staff working in that

24   environment as well.

25        Q.   Okay.  I believe you previously testified

Page 152

1    that border patrol agents have discretion as to

2    whether to apply Parole + ATD; is that accurate?

3         A.   Within the confines of the, of the

4    guidance that has been sent out, which you,

5    obviously, have it.  You sent it to us.

6         Q.   Okay.  Understood.

7              So, is there any mechanism in place to

8    review those individual enforcement decisions?

9         A.   Yes, actually.  I mean -- so, I mean,

10   there's various levels of supervision within any

11   processing location, all the way from a patrol agent

12   in charge all the way to, to what I would consider

13   the first line, you know, supervisor or supervisory

14   border patrol agent.  It's kind of what I referred

15   to when I was talking about some of the previous

16   jobs that I had held.  You know, all of those

17   individuals are, you know, commonly operating or

18   commonly involved in the processing areas and

19   overseeing the process.

20             You know, it -- you know, additionally

21   speaking, you know, we, we look at the same numbers

22   that, that you presented here today as well as on a

23   daily basis, you know, so that we can monitor the

24   detention capacities within the sectors that are

25   impacted, principally Del Rio and Yuma, you know,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 153

1   what are their TIC times, what are their capacities,

2   what are the demographics that they have in custody,

3   those type of aspects in order to be able to, to

4   make what I would consider a broader decision

5   making, which is then, obviously, brought down to a

6   case-by-case basis based upon the individual they

7   have in front of them.

8       Q.   Are you aware if there are any terms for

9   the conditions of their parole?

10      A.   Yes.

11      Q.   And what are those terms?

12      A.   So, so, you know, as an example, you know,

13  it was originally that, that all the migrants,

14  basically, report to an ICE facility within 15 days.

15  We have increased it between anywhere -- you know,

16  over time, you know, between, you know, 60, 30 or 15

17  just depending on, on the rate at which people were

18  showing up to various ICE offices that terms or

19  conditions of parole, you know, are -- that we are

20  putting on the forms are, are, you know, driven in

21  conjunction with ICE, but ultimately, you know,

22  those conditions, by and large, are ICE conditions

23  and to really get the background of it, I refer you

24  to ICE on that.

25      Q.   Okay.  Do you have any knowledge as to

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    when it was increased from 15 to 30?

2        A.   Not off the top of my head, no.  I just

3    can't remember the dates off the top of my head.

4        Q.   Okay.  Do you have any knowledge as to

5    when it increased to 60 days?

6        A.   No, I can't, I can't remember it.  Not off

7    the top of my head.  I just know that -- I just know

8    that we have.  I just, I just can't -- I can't

9    remember the time frames.

10        Q.   Okay.  Do you know what the current number

11    of days are?  Is it currently 60 days you're saying

12    getting the Notice to Appear?

13        A.   I believe it's 15, but, but don't quote me

14    on it.  I just -- I don't -- I can't, I can't recall

15    off the top of my head as to what it is right now.

16    The last time I remember, it was 15.

17        Q.   Okay.  So, once these families reach their

18    intended destination in the United States -- these

19    are families who have school-aged children; is that

20    correct?

21        A.   Completely varies.

22        Q.   Okay.  Are there some families with

23    school-aged children?

24        A.   Yes, of course.

25        Q.   Okay.  Is it fair to say that when those

Page 155

1     families reach their intended destination that they

2     are likely to place their children in school?

3                 MR. DARROW:  Objection.  That's outside

4           the scope of this witness' testimony.

5                 You can answer if you know.

6           A.    You'd have to ask the families.

7     BY MS. PATEL:

8           Q.    I'm asking you.  Is it fair to say that

9     those families would put their children in school?

10                MR. DARROW:  Objection, calls for

11          speculation.

12                You can answer if you know.

13          A.    Yeah, I have no idea.  I don't track the

14    families after their release.

15    BY MS. PATEL:

16          Q.    And you don't think that families will

17    place their children in school once they arrive at

18    their destination?

19                MR. DARROW:  Objection, asked and

20          answered.

21                Answer if you know.

22          A.    We can debate good parenting all day.

23    BY MS. PATEL:

24          Q.    Do you think it's likely that most of them

25    would put their children in school?

Page 156

```
 1              MR. DARROW:  Objection, beyond the scope
 2        of this witness' testimony and calls for
 3        speculation.
 4              You can answer.
 5        A.   Yeah.  As a good parent, I would -- maybe.
 6   I -- you know, I have two little ones of my own,
 7   so...
 8     BY MS. PATEL:
 9        Q.   Are these families coming to the United
10   States to build a life here?
11              MR. DARROW:  Objection, beyond the scope
12        of this witness' testimony and calls for
13        speculation.
14              You can answer if you know.
15        A.   I, I have heard in my career a myriad of
16   reasons why people come here.
17     BY MS. PATEL:
18        Q.   Is one of those reasons to build a life in
19   the United States?
20              MR. DARROW:  Same objections.
21              You can answer if you know.
22        A.   Sure.  Absolutely.
23     BY MS. PATEL:
24        Q.   And isn't it reasonable to think that if
25   you have school-aged children and you're trying to
```

Page 157

1    build a life here that you would educate those

2    children by putting them in school?

3              MR. DARROW:  Same objections.

4              You can answer.

5        A.   You know, if they're a good parent, I, I

6    would assume that they would try and educate their,

7    their children.

8    BY MS. PATEL:

9        Q.   Do you think that there are good parents

10   that are trying to come into the United States with

11   their families?

12             MR. DARROW:  Same objection.

13             You can answer if you know.

14       A.   I am, I am sure there are good parents as

15   well as there's bad parents.

16   BY MS. PATEL:

17       Q.   Okay.  And it would be reasonable to think

18   that those good parents, as you call them, would put

19   their children in school; is that fair?

20             MR. DARROW:  Same objections.

21             You can answer.

22       A.   Sure, I guess.

23   BY MS. PATEL:

24       Q.   Okay.  And it's likely that they'll put

25   their kids probably in public school, correct?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 158

```
 1              MR. DARROW:  Same objections.

 2              You can answer if you know.

 3      A.   I wouldn't even begin to guess or

 4  speculate if they're putting them in private or

 5  public school.

 6   BY MS. PATEL:

 7      Q.   They could put them in public school; is

 8  that fair?

 9              MR. DARROW:  Same objections.

10      A.   They could put them in private school.  I,

11  I don't know.

12   BY MS. PATEL:

13      Q.   But they could also put them in public

14  school, correct?

15              MR. DARROW:  Same objections, plus asked

16        and answered.

17              You can answer.

18      A.   I guess, sure.  I mean, that's one, one

19  available avenue of many.

20   BY MS. PATEL:

21      Q.   And if these families are coming here to

22  build a life in America, is it reasonable to say

23  that they would seek employment specifically the

24  adults in the family unit?

25              MR. DARROW:  Same objection, calls for
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1      speculation.

 2              You can answer if you know.

 3      A.    I am aware of migrants getting employment

 4  authorization documents and working.

 5   BY MS. PATEL:

 6      Q.    Okay.  And if they get employment and they

 7  lose their job, is it fair to say that they could be

 8  eligible to receive reemployment benefits?

 9              MR. DARROW:  Same objections.

10              You can answer if you know.

11      A.    I, I couldn't even speculate on what the

12  rules of benefits will be per state.  I defer to

13  that state.

14   BY MS. PATEL:

15      Q.    If a state allows reemployment benefits

16  for adults that have come in and started working, I

17  mean, it would be reasonable that they would try to

18  seek that; is that fair?

19              MR. DARROW:  Objection.  This is getting

20              wildly off the scope of what this witness is

21              designated to testify.  If you -- you know, if

22              you want to ask about benefits of reemployment

23              in Florida, we have another witness who is

24              designated to talk about that, but this is

25              totally beyond the boundaries of what we have
```

Page 160

1            Chief Barker here to talk to you about today.

2                 MS. PATEL:  Well, I mean, if you want me

3            to stop this line of questioning and ask it to

4            him in his individual depo, I can surely do

5            that, but these questions will get asked, so --

6                 MR. DARROW:  Yeah.  So, it would be

7            helpful to not do it now, so if you could ask

8            him in the individual portion that would be --

9            that would be better.  Thank you.

10                 MS. PATEL:  This is also, I would say,

11            relevant to our standing argument, so --

12                 MR. DARROW:  That's fine.  I'm not

13            objecting to relevance, just to what we have

14            different designees for and the question of

15            topics.

16                 MS. PATEL:  We'll move on and bring it

17            back up after we finish the corporate rep.

18                 Let's move on to a different exhibit.

19                 (Plaintiff's Exhibit 11 was received

20            electronically, marked for identification and

21            is attached hereto.)

22       BY MS. PATEL:

23            Q.   So, I dropped Exhibit 11.  It is a

24       document from DHS titled Fiscal Year 2020

25       Enforcement Lifecycle Report.  Are you familiar with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

         I, the undersigned authority, certify

that TONY BARKER remotely appeared before me and

having produced his U.S. Custom and Border

Protection ID badge was duly sworn on the 13th

day of July, 2022.

         Signed this 18th day of July, 2022.

_____
HELEN MARIE CHASE, Stenographic Reporter
Notary Public, State of Florida
My Commission No. GG 283850
Expires: 2/20/2023

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 205

CERTIFICATE OF REPORTER


STATE OF FLORIDA

COUNTY OF PALM BEACH


       I, HELEN MARIE CHASE, Stenographic
Reporter, do hereby certify that I was authorized
to and did stenographically report the foregoing
video recorded remote Rule 30(B)(6) deposition of
TONY BARKER; pages 1 through 207; that a review
of the transcript was requested; and that the
transcript is a true record of my stenographic
notes.

       I FURTHER CERTIFY that I am not a
relative, employee, attorney, or counsel of any
of the parties, nor am I a relative or employee
of any of the parties' attorneys or counsel
connected with the action, nor am I financially
interested in the action.

       Dated this 18th day of July, 2022.


_____

HELEN MARIE CHASE, Stenographic Reporter

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 207

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re:  State of Florida vs. United States of
America, et al.
Case No.:  3:21-cv-1066
TONY BARKER (259222)
July 13, 2022

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 25 | 4, 12 | "Senoita" should be "Sonoita" | typo |
| 27 | 5 | missing word between "ultimately" and "and" | typo |
| 33 | 23 | "Director" should be "Directorate" | typo |
| 42 | 20 | Phonetic word is: LEOD | typo |
| 69 | 8 | "of immoral" should be "involving moral" | typo |
| 69 | 19 | "suspicious" should be "suspicion" | typo |
| 70 | 7 | "older" should be "younger" | typo |
| 77 | 20 | "Ms. Poon" is incorrect. Unclear who speaker was. Likely a Florida attorney. | typo |
| 91 | 17 | Missing word  after "and/or." Could be bus | typo |
| 185 | 15 | "legal alien" should be "lawfully admitted" | typo |
| 187 | 3 | "polled" should be "pulled" | typo |

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

08-15-22
_____        _____
Date                            TONY BARKER