# Exhibit 15

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO:  3:21-cv-1066

STATE OF FLORIDA,

       Plaintiff,

v.

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity;
U.S. CUSTOMS AND BORDER PROTECTION;
TAE JOHNSON, Acting Director of U.S.
Immigration and Customs Enforcement, in
his official capacity, U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; UR M. JADDOU,
Director of U.S. Citizenship and Immigration
Services, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION SERVICES,

       Defendants.
_____/

VIDEO-RECORDED REMOTE DEPOSITION OF
ROBERT GUADIAN,
CORPORATE REPRESENTATIVE OF
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
PURSUANT TO RULE 30(b)(6)

VOLUME 1
(Pages 1-188)

THURSDAY, JULY 14, 2022
10:14 a.m. - 4:05 p.m. EST
Remote via Zoom
Washington, D.C.

STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
BY:  FRANCINE O'CLAIRE, RPR

Job No.:  259224

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 45

1      A.   Oh, yes.  Yes, I see it.

2      Q.   **What is notice to report?**

3      A.   So from an ICE perspective, the notice to

4   report is a program that is utilized by Customs and

5   Border Protection.  That started in March of 2021.

6      And it was directing the alien to report to the

7   nearest ICE office upon release from the Border Patrol.

8      And the NTRs did not have an ATD component with

9   it.

10     And that program, from ICE's perspective, ended in

11  November of 2021.

12     Q.   **And -- And do you know whether the NTR release**

13  **included a notice to appear?**

14     A.   From the ICE perspective, the NTR is a Customs

15  and Border Protection program.  And my understanding is

16  that, no, there was -- It did not have an aspect where

17  Border Patrol was issuing notice to appears.

18     Q.   **Okay.  And was -- When somebody was issued a**

19  **notice to report, how long did they have to do what?**

20     A.   I don't know the answer to that.  What I can

21  say is that what -- From what I've seen in the

22  different documents, it looks like it may have varied

23  depending on the time frame that the NTR program was in

24  place.

25     My sense is that it was anywhere between 50 and 30

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  days or 50 and 45 days.

2      But I'm not entirely sure what -- what Border

3  Patrol was requiring as far as check-ins.

4      Q.   Okay.  What -- What do you mean by requiring a

5  check-in?  What is a check-in?  Where would they have

6  to check-in?

7      A.   So the Border Patrol under the NTR program was

8  requiring that the aliens check into the nearest ERO

9  office closest to where they would be residing.

10     Q.   Okay.  So the closest ERO office to final

11  destination?

12     A.   To their -- to their -- their residence.  So I

13  would say, yes, their final destination.

14     Q.   All right.  And when the NTR policy was in

15  effect, was that information about their identity and

16  their intended destination put into a database anywhere

17  so they could be tracked?

18     A.   I don't recall.  I don't know enough about the

19  NTR and what database the Border Patrol was using.

20     My sense is that the Unified Immigration Portal

21  captured a lot of that information, but since the

22  Unified Immigration Portal is not an ICE database, I

23  can't answer that complete.

24     Q.   What is uniform -- I'm sorry.  I forgot the

25  name already.  What is it?

Page 68

1      **Q.    This reduction in funding you referred to most**

2   **recently, was that a reduction in capacity based on a**

3   **request from the White House, to your knowledge?**

4           MR. DARROW:  Objection to -- I need

5   clarification.

6           Do you mean request from the president or do

7   you mean from the White House itself as in --

8           MS. BRODEEN:  The president.  The president.

9   The president.  Same thing; he lives there.

10          MR. DARROW:  You can answer.

11      A.   I don't know the answer to that question.

12   BY MS. BRODEEN:

13      **Q.   All right.  Do you need a break yet?**

14      A.   I do.  I was just about to ask you.

15      **Q.   You should have spoken up.**

16      A.   We were on a roll there.

17      **Q.   I know.  You're doing a great job being very**

18   **forthcoming.  I appreciate that.**

19          THE VIDEOGRAPHER:  The time is 11:42.  We are

20   off the record.

21          (Recess had 11:42 a.m. - 11:53 a.m. EST.)

22          THE VIDEOGRAPHER:  The time is 11:53, and we

23   are back on the record.

24   BY MS. BRODEEN:

25      **Q.   All right.  I want to circle back to something**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 69

1  you said earlier that ERO has a fairly-large footprint

2  in Florida; what do you mean by that?

3      A.   So ERO's Miami is responsible for the entire

4  state of Florida as well as the Virgin Islands and

5  Puerto Rico.

6      And what I mean by "footprint," I mean staffing.

7  Our staffing is quite large in the ERO field office.

8      We have many suboffices in terms of when you

9  relay -- You know, when you look other -- as compared

10 to other field offices around the nation.

11     You know, as I mentioned, we have offices in

12 Tallahassee.  We have offices in Jacksonville, Tampa,

13 Orlando, and a bunch of locations around Miami proper

14 all within an hour to include the Krome process --

15 service processing center.

16     So if Miami's got -- is considered a large field

17 office when it comes to field offices for ERO, it's one

18 of the larger ones, it's got quite a large -- In our

19 terms, it's a large footprint in terms of staffing and

20 of the -- and of the actual physical structures that we

21 have in the Miami field office.

22     Q.   So you had a large footprint in terms of

23 personnel and also infrastructure, correct?

24     A.   Correct.

25     Q.   Okay.  And is there any other state that has

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1   **more ERO personnel and infrastructure than Florida?**

 2       A.   I don't recall.  Florida's got to be in the --

 3   one of the top -- top five offices.  San Antonio was

 4   recently split in two.  So it was our largest office,

 5   and now I'm not sure what the ranking is for Florida,

 6   but it's -- it's one of our largest.

 7       **Q.   Okay.  And is Florida ERO presence so large**

 8   **because there's such a large number of migrants that**

 9   **end up in Florida?**

10       A.   I don't know the answer to that.  But what I

11   can say are we're always looking at our resources in

12   terms of criminal program.  We're looking at our

13   resources when it comes to prosecutions, our detention

14   capacities.

15       So if we would -- We are continually evaluating

16   where to put our staffing, when to put it, when to add

17   additional office space.  It's all a range of factors.

18       I don't know specifically, but enforcement actions

19   would be one that we would consider when looking at

20   augmenting or building out new offices in any of our

21   AORs.

22       **Q.   And what about the offices along the southwest**

23   **border, how do they compare in size and personnel to**

24   **southwest Florida ARO?**

25           MR. DARROW:  Objection.  What topic does that

Page 71

1  relate to that Mr. Guadian is designated to speak to?

2          MS. BRODEEN:  Well, it's just general

3  background information of ICE.

4          MR. DARROW:  Again, I don't -- I don't think

5  that that was any of the topics.  If you -- In his

6  personal capacity, he can answer.

7          MS. BRODEEN:  Okay.  Well, go ahead and

8  answer.  If you can instruct him not to answer, just --

9  because it's not one of the topics.  Go ahead and

10 answer if you can.

11         MR. DARROW:  If you -- If you know personally.

12 BY MS. BRODEEN:

**13     Q.   Yes, go ahead.**

14      A.   My experience with the southwest border, I

15 think Miami is of a similar size to Phoenix.  I think

16 it's bigger than San Diego.  And I don't recall the

17 others where they fall in terms of scale when it comes

18 to staffing in their footprint, infrastructure, things

19 of that nature.

**20     Q.   And have you ever heard the term BINs number?**

21         MR. DARROW:  Objection again.  What topic --

22 Which topics does that relate?

23         MS. BRODEEN:  It's something that was used in

24 the deposition of Mr. Barker yesterday.

25         I wondered if it's good or bad and if it's the

Page 117

1    A.   No, it may be possible.  I just don't have any

2  information on that.

3    Q.   Okay.  All right.  So let's get back to topic

4  eight, information and data regarding the number of

5  aliens in Florida DHS knows to have committed crimes.

6    And this also dovetails into the topic about

7  documents produced during discovery from defendant to

8  State of Florida since I think you already testified

9  that we have to look at those documents that were

10  provided in discovery, correct, about the numbers of

11  people committing crimes in Florida?

12    A.   Yes.  Yes.  The numbers were provided in the

13  production.

14    Q.   Okay.  So let's -- Let's call up Exhibit 9.  I

15  know you don't have these things memorized.

16    And we're gonna put it on the big screen since

17  some of this writing is very small.

18    Okay.  Can you -- It says disk error on my end.

19  Can you -- Can you get into there?

20         MR. DARROW:  Is it in the chat?  We don't see

21  it popping up yet.

22  BY MS. BRODEEN:

23    Q.   Okay.  It says disk I/O error.  I don't know

24  what that means.

25         Okay.  So -- All right.  It's on the big

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 118

1   screen.  Can you see it?  All right.  Now, it should be

2   chat screened.

3              MR. DARROW:  We just saw a pop up come on.

4   Let me see if we can open it.

5   BY MS. BRODEEN:

6       Q.   Okay.  Now, we're gonna share a screen.  There

7   we go.

8       Okay.  Now, if you can look at this -- And I think

9   you need to scroll down too.

10      Okay.  Let's start at this part of Exhibit 9.

11             (Exhibit No. 9 was marked.)

12  BY MS. BRODEEN:

13      Q.   And this has rows and columns with headings,

14  and then it has some information filled in.  Most of it

15  is N, slash, A; and then there's some numbers in some

16  of these.

17      Do you see that right now, Mr. Guadian?

18      A.   Yes, I do see it.

19      Q.   Okay.  And have you seen this document before,

20  this page?

21      A.   Yes, I have.

22      Q.   Did you help prepare this document?

23      A.   No.

24      Q.   Okay.  Let's look at the first row going

25  across.  There is an acronym, this sentence, NTA.  It

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 119

1   says released after being encountered at or near

2   southwest Florida on January 2020 to January 19, 2021.

3   NTA, slash, own recognizance.

4        What does NTA stand for?

5        A.   Notice to appear.

6        Q.   Okay.  And own recognizance, what is that?

7        A.   That refers to release on their own

8   recognizance.  It's from I-220 alpha.

9        Q.   And who releases these people on their own

10  recognizance; is that done by ICE?

11       A.   If we go to the next tab, STU, STU provided,

12  it kind of gives the background who -- 1359, was

13  that -- I'm sorry.  Was that the number on the first

14  one?  Yeah, 1359.

15       Q.   1359; okay.

16       A.   And this -- this -- This number is

17  representative of not just ICE releases.  This -- This

18  could also have been Border Patrol releases as well,

19  ICE -- that are currently on ICE -- ICE nondetained

20  docket.

21       And if we look at the footnote, the very last

22  footnote, I think line 24, ERO cannot identify if the

23  release is directly following an encounter at or near

24  the southwest border.

25       Our statisticians could not isolate that

1  population, so they included the entire universe of

2  arrests to include arrests that occurred that ICE may

3  have made as well just to give you a little background

4  in regards to that number.

5      **Q.  Okay.  Thank you.  Let's go back to the --**

6  **Okay.  Okay.  Then we go down the column, there's**

7  **several different categories.**

8      **Do any of these have any additional qualifications**

9  **to them?**

10     A.  Yes.  So I'll start with the row with the --

11 I'm sorry, the column B.

12     Can you go back to the STU provided again?  And I

13 want to amend what that order of release on

14 recognizance.  I want to qualify that with this

15 particular footnote on line 18, an ICE -- Let me see,

16 where is it?  An ICE -- An ICE final release is defined

17 as a final book-out that reflects one of the following

18 release reasons, although it says OREC, which is order

19 of release on recognizance, it's actually a large -- It

20 includes a larger number of people than just people

21 released on recognizance.

22     It also includes people that bonded out of

23 custody.  It includes people that released on an order

24 of supervision, which is an I 220B, as in bravo.

25     It also includes people that were paroled and

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 121

1  those released on prosecutorial discretion.

2      So it's just to clarify that the OREC is actually

3  a larger group than just OREC releases.

4      Q.    Thank you.  What is an order of supervision?

5      A.    Order of supervision is different.  It's

6  similar to an order of recognizance in that it has

7  conditions that an alien must abide by while they're

8  released into the community.

9      But the difference within an OREC to an OSUP is

10  that only aliens that have final orders of removal are

11  issued orders of supervision.  I-220 bravo, whereas

12  I-220 alphas are given to aliens that are currently

13  pending removal proceedings before an immigration

14  Judge.

15      Q.    All right.  Let's go back to the -- I don't

16  know what you call it -- rows and columns.  Okay.  Any

17  other qualifications you want to make about what's on

18  the rows and columns?

19      A.    Yes.  Let me take a look -- another look at

20  that.  ERO docket with criminal history and the

21  criminal charges could represent misdemeanors to

22  include traffic offenses all the way up to felonies; so

23  it's not just one type of criminal history, just if

24  we're representing everything that we had encountered

25  in the NCIC databases, which is the national system

Page 122

1  that we search for criminal histories to include also

2  the state identification bureau's criminal histories.

3      Typically those are like traffic offenses and

4  things of that nature.

5      ERO Miami check-in I would add as a qualifier that

6  although this check-in number -- this check-in, the

7  definition of check-in does not include people that

8  arrived at ERO offices and were given a sheet of how to

9  enroll into the ICE appointment scheduler.

10      So it -- It may look like they didn't check-in

11  officially.  But they -- we have officers working these

12  lines that are giving information to the aliens as they

13  wait to actually go back home and to check-in on the --

14  on the I scheduler.  That -- Those numbers are not

15  captured here.

16      Although we do have people that try to show up,

17  it's not captured as a check-in.

18      **Q . All right.  Let's go back to STU provided.**

19      **Okay.  So -- Okay.  So what are the number of**

20  **paroled -- Okay.  Under which statute are people**

21  **paroled?  Is it under section 1182 or 1226?**

22      A.   Can you give me the corresponding INA?  I'm

23  not familiar.

24      **Q.   Okay.  So 8 U.S.C. 1182 or 8 U.S.C. 1226, that**

25  **would be INA 212?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1     A.    212B5 is the authoritative parole.

2     Q.    **Okay. Thank you. All right. Let's go back**

3  **to that rows and columns.**

4     **Okay.  Now, I'm looking at row 11.  It says**

5  **individuals who failed to check-in who provided a**

6  **Florida address, and then all across it's N/A.**

7     **I thought that ICE had that information.  Why am I**

8  **incorrect?**

9     A.    The last two boxes were the ones that applied

10  to this particular releases after being encountered at

11  or near southwest border January 2021 to November 1st

12  on a notice to report.

13     We have that number.  It should have been provided

14  in production, I believe.  I don't have it in front of

15  me.

16     The reason the others are N/As, if we look at like

17  column -- at column E, released after encountered at or

18  near southwest border, January 20th, 2021, to present,

19  on the NTA own recognizance, go back to the first

20  column.

21     Q.    **Okay.  So where it's blank for F and G, are**

22  **there numbers?**

23     A.    There are.  I don't think it was in this

24  particular -- We do have those numbers though.

25     Q.    **Can we get those numbers, and then also below**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 124

1   it too?

2       A.   So you all have the numbers for the one below.

3   We weren't able to capture the numbers or our

4   statisticians because these numbers have -- were

5   drawing a lot -- a lot on the Customs and Border

6   Protection databases, so it's really difficult to

7   reconcile that.

8       So we do have the numbers for row 11, column F

9   and G.

10      Q.   Okay.

11      A.   We can produce those.

12      Q.   I would like that.  When do you think we could

13  get them?

14      A.   Confer with my attorneys for a second.

15      Q.   I got them here.  Okay.  Okay.  Are you

16  conferring with Mr. Darrow about when he can produce?

17          MR. DARROW:  Yes, I'm sorry.  I was just

18  trying to figure out when we can produce them to you.

19  One second.

20          MS. BRODEEN:  Anything else on this?  I got

21  your questions.

22  BY MS. BRODEEN:

23      Q.   Okay.  So I have general questions about these

24  sheets.  How does a person get referred to the

25  nondetained docket?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.    So the deportation officers are responsible

2    for tracking AL institute black cycle in their

3    immigration proceedings, and that can be in one of two

4    ways.

5        One is through the detained -- through detained

6    docket management, which is -- Essentially when we have

7    aliens into custody in -- in one of our detention

8    centers, we'll track those cases on a detained docket.

9        It's also different when it's on a different track

10   as well with EOIR.  It's on a detained track.

11       And we also supervise aliens in a nondetained

12   setting, those aliens that are not in custody at one of

13   our detention centers.  They're tracked separately from

14   the detained docket, and they're also tracked

15   separately and differently by EOIR.

16       Q.    And when you say EYOR (sic), what is that?

17       A.    Executive Office for Immigration Review.

18   There's -- that's what the -- That's where the

19   immigration judges -- That's the agency that

20   immigration judges work for.

21       Q.    And who employs those people; which agency?

22       A.    Department of Justice.

23       Q.    So for these people who get referred to the

24   nondetained docket, can some of those have been

25   detained at one point and then released?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 126

1    A.   It's possible, yes.

**2    Q.   Okay.  And if they were released, under what**

**3  specific statutory authority would they have been**

**4  released?**

5         MR. DARROW:  Objection; calls for legal

6  conclusion.

7         MS. BRODEEN:  Well, he applies statutes all

8  the time.  This is part of his job.

9         MR. DARROW:  He applies the programs.  Whether

10  or not those programs fall under particular statute,

11  that's a legal conclusion.

12         MS. BRODEEN:  Well, go ahead and answer it if

13  you can.

14         MR. DARROW:  If you know the answer, you can

15  answer.

16    A.   I'm not gonna guess at the different statutes,

17  but there's -- There's quite a few different statutes

18  that allow us to release aliens from ICE detention.

19         MS. BRODEEN:  And in the future, Mr. Darrow,

20  could you just object to form instead of coaching him

21  with speaking objections?

22         MR. DARROW:  Sure.  I just thought you'd want

23  the basis for my objection.

24         MS. BRODEEN:  Well, if I need it, I will ask

25  you for it; but don't coach him, please.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 127

1  BY MS. BRODEEN:

2      Q.    Okay.  When these people are in the -- Do

3  these people get referred to a specific docket in Miami

4  as opposed to another location?

5      A.    From an ICE perspective, once that alien is

6  placed on a nondetained track, their NTA is filed with

7  the Executive Office for Immigration Review and EO -- I

8  don't want to speak to ERs -- EYO -- EOIR's processes,

9  but generally, they'll be placed on a nondetained

10  track; and typically those cases are set with different

11  time frames than the detained docket is.

12      Q.    But if they're in a docket in Miami, is that

13  because they provided a destination in Florida?

14      A.    Yes.  So if they're docketed in Miami, their

15  resident -- Their area of response -- if EOIR -- The

16  location of their residence dictates where the NTA will

17  be filed.

18      Q.    And what is meant by the statement ERO cannot

19  identify if the release is directly following an

20  encounter at or near the southwest border?

21      A.    So our databases, our statisticians, as I

22  stated previously, we have to rely on Customs and

23  Border Protection data, our systems aren't capable of

24  identifying the subset of people that cross through the

25  southwest border because we have two different systems

Page 128

1   that we're looking at.

2       We only see part of the story.

3       Q.    So -- So can they only identify that they're

4   in the country illegally as opposed to when they

5   entered?

6       A.    I'm sorry, I didn't understand the question.

7   Can --

8       Q.    Okay.  So -- So the customs -- I mean, the

9   customs' database, does it identify that -- only that

10  they're in the country illegally; they don't tell you

11  where they crossed into?

12      A.    I'm sorry, I don't know that answer.

13      I don't know what their databases do show and

14  don't show.

15      Q.    Okay.  Who would know that at ICE?

16      A.    At ICE we wouldn't know about CBP databases.

17  That would be a CBP question.

18      Q.    Okay.  What does "directly released" mean?

19      A.    I'm sorry, what -- What line are you looking

20  at, so I can follow along?

21      Q.    Let's find that.  Line 24.  ERO cannot

22  identify if the release is directly following an

23  encounter at or near southwest border; what does

24  directly mean?

25      A.    Yes, that's -- That's what I'm mentioning is

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 129

1  that we can't identify the subset of individuals that

2  crossed specifically through the southwest border in

3  this particular data set.

4      **Q.   Okay.  And then as to the terms convicted**

5  **criminal pending, criminal charges and immigration**

6  **violator, there's the term at the time of enforcement**

7  **action; what does that enforcement action refer to**

8  **there?**

9      A.   Typically that enforcement action will be the

10  issuance of a charging document, whether that's a

11  notice to appear, an expedited removal, a

12  reinstatement, some type of enforcement action that

13  the -- that the Department has taken.

14      **Q.   And what does OREC, O-R-E-C, stand for?**

15      A.   Order of release on their own recognizance.

16      **Q.   And what is an ICE final release?**

17      A.   What line is that?

18      **Q.   19 -- or 18, 19.  And ICE -- It's defined in**

19  **several of these things.  Never mind.  You answered**

20  **that.  Knock that off my question.**

21      **Let's go back to the chart.  When it talks about**

22  **people with criminal history, is that a criminal**

23  **history only in this country or can it include other**

24  **countries?**

25      A.   So typically it would only include criminal

Page 130

1  history from this country, so crimes that we've

2  identified in -- in NCIC or the State Identification

3  Bureau.

4      **Q.   Okay.  Pending criminal charges, row -- those**

5  **are -- Are those U.S. charges pending or abroad?**

6      A.   Correct -- Oh, no, I'm sorry.

7      **Q.   Pending --**

8      A.   U.S. charges, not abroad.

9      **Q.   Okay.  And are they for any particular -- Are**

10 **they for charges for crimes that occurred before or**

11 **after they were released into the interior?**

12     A.   I can't tell that from the data.

13     **Q.   Okay.  Let's look at 22, ICE defines**

14 **immigration violators criminality in the following**

15 **manner; what is other immigration violators referring**

16 **to?**

17     A.   Oh, the last, on line 22, other immigration

18 violators refers to immigration violators without any

19 known criminal convictions or pending charges entered

20 into the ICE system of record at the time of the

21 enforcement action so --

22     **Q.   Go ahead.**

23     A.   So immigration violators could also include

24 overstays on visas.  They can include overstays on visa

25 labor pilot programs, other forms of immigration

Page 131

1  violations other than criminal convictions.

2  Administrative violators, I think it got -- That's a

3  little bit more clear.

4      A lot of our work is done not in the criminal

5  setting but in the administrative setting.

6      **Q.   So does the term "other immigration violators"**

7  **include people who entered the United States illegally?**

8      A.   Yes.

9      **Q.   That alone is a violation that's picked up**

10 **here?**

11     A.   It is.

12     **Q.   Okay.**

13     A.   The notice to appear is an administrative

14 process.  It's not a criminal one, so it would be

15 captured in that.

16     **Q.   What do you think it is?  Okay.  So let's look**

17 **at the bottom of request F2, F4 footnotes.**

18     **Is the information that's missing in the chart in**

19 **rows F and G here perhaps, if you look at the**

20 **footnotes; and we just need to put them in the blanks?**

21     A.   No, no, that's not the same.  This is

22 different.

23     **Q.   Okay.  Let's look at request D2 to D4, top**

24 **sort of.  What is this showing us here on this chart**

25 **here?  Would you sum it up real quick?**

Page 132

1    A.   It's after being encountered at or near

2  southwest border January '20 to January 19, 2021, on

3  Parole Plus ATD.

4    **Q.   So --**

5    A.   Excuse me.  So these -- These numbers are not

6  just Border Patrol numbers, but they're both ICE and

7  CBP numbers.

8    **Q.   Okay.  So are these people who were**

9  **encountered that were released under Parole Plus ATD**

10  **between January 2020 to January 19, 2021?  I'm trying**

11  **to understand.**

12    A.   Release with -- release reason of parole

13  between January 20 -- or January 1st, 2020, and January

14  19, 2021.  They were released on parole.

15    **Q.   It says Parole Plus ATD above that right under**

16  **request D2 to D4, release after encountered at**

17  **southwest border January 2020 -- January 2020 to**

18  **January 19, 2021, hyphen, Parole Plus ATD.  It looks**

19  **like they're encountered under -- and released under**

20  **Parole Plus ATD.**

21    A.   No, I think that might be incorrect because

22  Parole Plus ATD program didn't start until November of

23  2021.

24    **Q.   Are you sure it started in November of 2021?**

25    A.   From an ICE perspective, I only have the memo

Page 133

1  to go by, the memo from Chief Ruiz.

2     Q.   Okay.  Request E2 to E4.  And for these people

3  who were released on -- on -- at or near southwest

4  border January 2020 -- 2021 to present, hyphen, NTA,

5  slash, on recognizance; can you tell me under what

6  authority they were released?

7     A.   No, I can't.  As I mentioned earlier, the

8  data's not broken down by this specific statute that

9  they were released on.

10     There's multiple statutes that allow or order ICE

11  release on their own recognizance to include IJ

12  decisions that we have to enforce, if an IJ orders

13  somebody removed -- released on their own recognizance,

14  that's something that ICE will enforce.

15     Q.   Do -- Go ahead.

16     A.   No, there's also other litigation.  District

17  courts may order people released as well.

18     Q.   Can you give me some examples of statutes

19  under which these people would have been released, just

20  some of them, one or two even?

21     A.   The -- the authority -- The bond rules allow

22  ICE to release people on their own recognizance.  I'm

23  not -- I don't know the exact section of law that that

24  is.

25     Q.   All right.  So let's move to request F9 to

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  **F10.  And then I think it's also related to G9 and G10.**

2  **Can you first look at F9 to F10?  Can you tell**

3  **what check-in facilities were used for this data?**

4  A.   Sure.  So check-ins represent individuals that

5  have checked into an ERO office.

6  It also represents individuals that weren't --

7  didn't check-in but were issued a charging document.

8  As I mentioned earlier, many of our locations

9  didn't have the capability to have aliens check-in.

10  They were processed remotely, issued NTAs via the mail;

11  and that was considered a check-in as well.

12  If they checked in virtually on the phone, that

13  was also counted.

14  What's not represented here are the check-ins done

15  by our contractor for the ATD program.  If they checked

16  in with the ATD program and our contractor,

17  behavioral -- BI, that number is not included here on

18  the check-ins; so they're not checked in.

19  **Q.   Okay.  So what's the name of the vendor again?**

20  **You said it real quickly.**

21  A.   BI, as in bravo, India; BI, Incorporated.

22  **Q.   If you don't know, that's okay.**

23  A.   I thought I answered it.

24  MR. DARROW:  I'm sorry, I think you were muted

25  in the first part of that second question, Karen.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1          We didn't hear it.

2    BY MS. BRODEEN:

3        **Q.   So where is that vendor located or based out**

4    **of?**

5        A.   I don't know.  I'm sorry.

6        **Q.   That's okay.  Okay.  So this information on**

7    **check-in facilities, was that gathered from Florida or**

8    **do you know what database that was gleaned from?  Was**

9    **it Florida specific or more national database?**

10       A.   No, this particular one says noncitizens

11   release with a notice of report between January 20th,

12   2021, to November 1st, 2021, by check-in and latest

13   case criminality; so this is a nationwide number.  This

14   isn't a Florida-specific number.

15       **Q.   Okay.  What about request G9 to G10; do you**

16   **have the same information about where that data came**

17   **from or is it different?**

18       A.   This is similar in the sense that this is a

19   nationwide data, and the check-ins are the same.

20       It's -- We included people that physically

21   checked-in, people that checked-in virtually, people

22   that were issued their notice to appears -- notice to

23   appears via mail.

24       What we did not include is those individuals that

25   had checked-in to the BI, ATD -- the BI contractor

Page 136

1    under the ATD program.

2        Q.    Did you just mention check-in by mail?

3        A.    Notice to appear by mail.  We issued --

4        Q.    Okay.

5        A.    We had a time frame that, due to our

6    reconstitution plan and ICE, that many of our offices

7    were either minimally staffed or not open.  So we

8    issued our NTA's via certified mail to those aliens,

9    and we also considered that a check-in.

10        Q.    Got it.  Okay.  That covered two of our

11    topics, by the way, not just one.

12        Okay.  I want to go back to detention capacity.

13        How is it determined what a detention facility's

14    maximum capacity is?  Is there some kind of regulation

15    or guidelines that's applied that determines how many

16    people you can house at one place?

17        A.    So we -- In ICE we have our -- our

18    performance-based national detention standards, and the

19    capacity is the factors varies when it comes to

20    capacity.  We work closely with the vendor, whether the

21    vendor's a private contractor, state, local, to

22    determine what their capacities are.

23        For example, some things we look at are the number

24    of showers in each individual pod, the number of

25    toilets in each individual pod, the type of medical

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 166

1     A.    I don't know the answer to that question.

2     **Q.    And does ICE view immigration detention**

3  **generally as something that's cruel and unjust?**

4           MR. DARROW:  Object to form.

5     A.    I don't know that -- the answer to that

6  question.

7        What I can say is we have our performance-based

8  national detention standards with detainee care in

9  mind, as well as our family residential standards with

10  family's care in mind.  And we utilize standards

11  that -- that meet -- these standards, we address

12  quality of care in these standards.  So we provide

13  medical service -- services.  We provide recreational

14  opportunities.  We provide opportunities for the aliens

15  to contact counsel.

16        So I can't speak to the very comprehensive

17  standards that we have in place to care for everyone

18  that -- everyone that are in our care and custody.

19  BY MS. BRODEEN:

20     **Q.    Do you know the names of any of the**

21  **nongovernmental organizations that support release --**

22  **people that are released from ICE custody?**

23     A.    No.  No, I don't.

24     **Q.    Okay.  Let's move on to topic 14, facts and**

25  **information regarding the process and delays in and**

Page 167

1  around April 2022 and May 2022 at the ICE facility in

2  Orlando.

3      Okay.  Let's show you Exhibit 10, which is a

4  letter from two congress people.

5          (Exhibit No. 10 was marked.)

6  BY MS. BRODEEN:

7      Q.   Now, when family units are processed under

8  Parole Plus ATD, they're told to report to the nearest

9  ICE location to their destination, correct?

10     A.   That's correct.

11     Q.   Okay.  And this letter that you're looking at,

12 have you ever seen this letter before?

13     A.   If you can scroll down --

14     Q.   It's three paragraphs.

15     A.   Yes, I think I have.  I think I have seen this

16 letter.

17     Q.   When's the first time you saw this letter?

18     A.   45 minutes ago.

19     Q.   Okay.  So it was basically to prepare for this

20 deposition?

21     A.   I believe so.  I don't recall specifically,

22 but potentially that's what it was.

23     Q.   Okay.  And what type of ICE facility is -- are

24 they referring to here?  It's at 9495 Delegates Drive,

25 Orlando; what type of a ICE facility is that?

Page 168

1    A.   I don't know the -- I don't know the ICE

2  facility.  I'd have to make assumption.

3    I'm thinking that that's the ERO ICE facility in

4  Orlando, but I'm not 100 percent sure because I don't

5  know the address to that location.

6    **Q.   So what did you do to prepare for this topic**

7  **14 that we have in the deposition notice?**

8    A.   So I believe there was a response to this

9  letter, that's what I'm looking at.  And I also spoke

10  to the field office director in Miami in regards to

11  this situation.

12    **Q.   Okay.  So who is the field office director in**

13  **Miami?**

14    A.   Field office -- It's the Acting Field Office

15  Director Juan Agudela, A-G-U-D-E-L-A.

16    **Q.   And who is the head of the facility in**

17  **Orlando?**

18    A.   I'm sorry, I don't know that answer.

19    **Q.   So you did not talk with anybody in Orlando**

20  **ICE facility, correct?**

21    A.   Correct.  The FOD, the field office director,

22  in Miami has the responsibility for the Orlando office.

23    He has subordinates that work at that location.

24    **Q.   And did you say there was a response to this**

25  **letter?**

Page 169

1      A.   I believe so.

**2**      **Q.   Have you seen the response?**

3      A.   I believe it was part of the production, if

4  I'm not mistaken.

**5**      **Q.   It was part of what?**

6      A.   It may have been part of the production.  I

7  remember seeing a letter.  Who is this from?  I could

8  be mistaken.  I know I saw a letter from -- Maybe it

9  was from Florida.

10     Maybe it was the State of Florida that was asking.

11     I could be mistaken though.

**12**     **Q.   Are you thinking maybe the letter to Governor**

**13 DeSantis from Tae Johnson we talked about?**

14     A.   Yes, yes, that's -- That's the letter.  That's

15 the letter I'm thinking.

**16**     **Q.   And just to be clear, that letter is not a**

**17 response to this April 29th, 2022, letter, correct?**

18     A.   Oh, gotcha.  I haven't seen the response to

19 this then.

**20**     **Q.   Okay.  So what -- When did you talk to the**

**21 field -- acting field director in Miami about this**

**22 letter?**

23     A.   I spoke to him this week.

**24**     **Q.   Okay.  And how -- Did you talk to him by**

**25 phone?**

Page 170

1       A.   I did.

2       **Q.   And how long was that phone conversation?**

3       A.   I spoke to him a few times, a couple, maybe

4   two -- two, three times.  And each time was probably

5   for ten minutes.

6       **Q.   Okay.  So does he work under you or is he --**

7       A.   Yes.

8       **Q.   Okay.  So you're his boss or his boss's boss**

9   **or something like that?**

10      A.   I'm his boss, direct supervisor.

11      **Q.   Okay.  So the first time you talked, what did**

12  **you discuss specifically?**

13      A.   I don't recall the conversation, but it had to

14  do with to provide the information on what occurred in

15  Orlando and what steps we had taken to correct the --

16  to correct the issue of people waiting out in the sun.

17      **Q.   Okay.  And what -- What did he convey to you**

18  **was the situation in Orlando that led to this letter?**

19      A.   So there was a few factors.  One, as I

20  mentioned previously, is that we had our reconstitution

21  efforts.  We had just entered phase three at the end of

22  March where we allowed 100 percent of our employees to

23  come back to work, which meant that we could staff

24  our -- our check-in location more fully.

25          That led to an increase in reportings.  We had

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 171

1  people that had been waiting for us to be open and to

2  increase our capacity for interviews.

3      And when we opened back at 100 percent, they

4  arrived in mass, people that had been waiting to check-

5  in with ICE while we were -- These were people that

6  were waiting to check-in with ICE while we had

7  locations that were closed and locations that were

8  minimally staffed.  So once we went to 100 percent at

9  the end of March, the people started to arrive.

10      And, of course, ICE, we're not similar to

11  citizenship and immigration services where we have

12  large waiting rooms.  That's not something that ICE --

13  we really plan for.

14      Our waiting rooms are very small.  We have small

15  numbers of check-ins.  And numbers of people that

16  arrived at our location was overwhelming after March 29

17  and months of April, May.

18      So some steps that we took to -- to kind of

19  mitigate that and to prevent people waiting out in the

20  hot sun was we worked on our immigration ICE -- our ICE

21  check-in scheduler that's available now at our public-

22  facing website where the aliens that have -- that are

23  requesting check-ins can actually go into the website

24  and schedule themselves to speak to us.

25      So we are -- If people show up without an

Page 172

1  appointment, we're not seeing them.  We're sending

2  those people back home to schedule themselves in the

3  ICE scheduler.

4     And that minimized the amount of people waiting in

5  line.

6     **Q.   I think you mentioned that there were other**

7  **locations that were closed which led --**

8     A.   Yes, so every location is different across the

9  U.S. with the pandemic.  The ICE reconstitution plan is

10 very flexible.  Depending on local transmission rates

11 for COVID, the field office directors have great

12 discretion on how much they actually open up their

13 public's -- public-facing services at each one of their

14 locations depending on community transmission.

15    **Q.   And those locations that were closed, were any**

16 **of them in Florida?**

17    A.   Yes.

18    **Q.   Which locations in Florida were closed at this**

19 **time?**

20    A.   I couldn't tell you the time frames or the

21 locations, but I know that there were multiple office

22 closures to include Orlando.

23    I couldn't tell you how long they were closed,

24 if -- And they were also opened at -- during periods of

25 time with a reduced staffing footprint, which also led

Page 173

1   to reduced check-in capability at those locations.

2       Q.   Okay.  And did -- Did the field director

3   mention to you how many people were camped outside of

4   the ICE facility in Orlando?

5       The letter says at least 250 people.  Did he

6   confirm or deny that number?

7       A.   I think he -- He confirmed that that was

8   accurate.

9       Q.   Okay.  And it also says including small

10  children; did he confirm or deny that there were small

11  children waiting outside?

12      A.   I don't think we talked about small children

13  specifically.

14      Q.   Okay.  Were some of these people who are

15  waiting outside applicant's permission who crossed the

16  southwest border within the last since -- since

17  November 2021?

18      A.   I -- I don't know the answer to that question.

19      My sense is that many of these individuals were

20  part of the NTR and of equal plus.

21      Q.   So if -- And they're told to check-in within

22  how many days?

23      A.   That's -- Customs and Border Protection

24  actually provides the requirement.  How many days, I've

25  seen some paperwork that requires them to report within

Page 174

1  15 days, other paperwork that requires them to report

2  in -- within 30 days.

3      So I don't know if it's -- And it's a question

4  better -- better situated for CBP on what stations do

5  operationally as far as their check-in dates are

6  concerned.

7      **Q.   Okay.  So if somebody was required to check-in**

8  **to ICE within -- within four months of being**

9  **encountered, they would have crossed the southwest**

10 **border under the A -- Parole Plus ATD policy, correct?**

11          MR. DARROW:  Object to form.

12 BY MS. BRODEEN:

13     **Q.   If it's a family unit, they're released,**

14 **they're told to check-in under the November 2021 memo,**

15 **they're sitting outside Orlando, would they have been**

16 **people who crossed -- include people who crossed the**

17 **southwest border under that policy?**

18     A.   It's possible.  I'd add that what we currently

19 do -- One of the steps that we've also taken to

20 minimize lines is that we have officers working outside

21 where the people are lined up.  And by issuing the

22 paperwork with instructions on how to check-in online,

23 using the online ICE appointment scheduler, and that

24 has greatly minimized the -- it has completely -- We

25 don't see people camping outside our facilities anymore

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 175

1 because we're actively working with the lines and

2 getting them -- getting the information to them about

3 how to schedule themselves on the -- on the -- on the

4 scheduler.

5     **Q.   On the online scheduler, correct?**

6     A.   Correct.

7     **Q.   Okay.  So do they need a device to connect to**

8 **the internet and internet service provider to do that?**

9     A.   Yes, they need to go online either with -- and

10 get onto the internet, just like the regular public

11 would either through cellular capabilities or through

12 Wi-Fi or if you're with an internet service provider.

13     **Q.   And do you know how many of these people that**

14 **are released through Parole Plus ATD have access to the**

15 **internet through a device and an internet provider?**

16         MR. DARROW:  Object to form.

17     A.   I don't know the answer to that question.

18 BY MS. BRODEEN:

19     **Q.   What happens to somebody if they fail to**

20 **check-in timely?**

21     A.   Could you explain what you mean by "check-in,"

22 and what do you mean by "timely"?

23     **Q.   Well, I mean, if they're told to check-in to**

24 **ICE within a certain number of days, and they don't**

25 **check-in within that time period, what happens?**

Page 176

1    A.   So there's a -- There's a few things.  So if

2    they're -- A lot of the check-ins, typically a person

3    checks into ICE, they're issued the charging document

4    for these NTR and these Parole Plus ATD cases.

5        As I mentioned previously, some individuals do

6    arrive in line without an appointment.  Those

7    individuals are told to go back home and schedule

8    themselves online.  Excuse me.

9    **Q.   Okay. So -- Go ahead.  Keep going.  I'm**

10   **sorry.**

11   A.   No, I was gonna just mention that they're told

12   to go back home and schedule themselves online for an

13   appointment that makes sense to them, you know, working

14   around their schedules.  They can -- It's a self-

15   service type website.  So it's not fair to say, you

16   know, just because they didn't check-in, ICE has to

17   take an action.  They -- They may have checked in, but

18   they're within the time frame to actually check-in.

19   **Q.   What happens if they don't check-in at all?**

20   A.   Again, in this -- In this scenario, just to

21   add some more context, can you describe who ordered the

22   check-in or did they themselves or --

23   **Q.   Okay.  So under the Parole Plus ATD policy, if**

24   **somebody's who released but told to check-in to ICE and**

25   **they fail to check-in to ICE at all, what happens to**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 177

1   that family unit or the head of household?

2       A.   So I can tell you that we -- knowing that

3   during the time period, especially during COVID and

4   when we were closed, we had quite a bit of people that

5   couldn't check-in; so what we ended up doing was

6   issuing their notice to appear via certified mail to

7   get them in immigration proceedings.  And, furthermore,

8   we placed -- If they were family units and they were

9   eligible, if they lived in 11 cities that were

10  considered -- that were cities under our program called

11  dedicated docket, we placed those families on the

12  dedicated docket.

13      The dedicated docket means that they would get

14  expedited hearings.  We would get an immigration

15  hearing done more quickly on a faster track than we

16  would in a regular non-docket.

17      Q.   Okay.  And what percentage of those mailings

18  that were sent by certified mail were returned?

19      A.   So I don't have the data in front of me, but

20  less than five percent of the -- of the individuals

21  that we issued NTAs for have invalid addresses.

22      Q.   Okay.  So you said individuals, what about

23  family units?

24      A.   Yes, that's head of households.

25      Q.   Head of households, so -- And do you track

Page 178

1  those who don't check-in at all to continue to track

2  them till a certain point?

3      A.   Our field offices will utilize the Unified

4  Immigration Portal to determine how many releases are

5  within their area of responsibility.

6      They ensure that those people are either checking

7  in, scheduled to check-in or have been issued a notice

8  to appear.

9      Many of these individuals are also checking-in to

10  ATD and are BI contractor, large percentage of the

11  people that haven't checked in with ICE have -- have

12  checked in with BI.

13      Q.   Okay.  And is -- Are those people who checked

14  in with BI family units or heads of household family

15  units?

16      A.   They could be family units.  It could be

17  single adults as well.

18      Q.   Okay.  Okay.  So do you know whether the

19  addresses they give are their own addresses or somebody

20  else's address?

21      A.   I don't know the answer to that question.  But

22  what I can say is that those addresses are provided to

23  the U.S. Border Patrol and uploaded into the Unified

24  Immigration Portal.

25      And my sense -- and I would defer to CBP.  But my

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  sense is that CBP has their own systems that can verify

2  the ability to impact address.

3      **Q.   And match it up with the people that**

4  **supposedly live at that address?**

5      A.   I would have to defer on CBP.  I don't know

6  the mechanics of that end of it in regards to the

7  addresses.

8      **Q.   Okay.  So how did you meet with your field**

9  **director who works for you about what to do for**

10 **response?  Is he -- Is he directing a response or do**

11 **you know if anybody has responded to this letter?**

12          MR. DARROW:  Object to form.

13     A.   I can't answer that.

14          MS. BRODEEN: All right.  Anything else?

15 Okay.  I don't have anything further, so I'll turn it

16 over to -- Hold on.  Let's take a break.  Somebody has

17 a question.  Can we take a five-minute break?

18          MR. DARROW: Sure.

19          THE VIDEOGRAPHER:  The time is 3:47, and we

20 are off the record.

21          (Recess had 3:47 p.m. - 4:00 p.m. EST.)

22          THE VIDEOGRAPHER:  The time is four

23 o'clock p.m., and we are back on the record.

24 BY MS. BRODEEN:

25     **Q.   Okay.  Shortly before we broke, we were**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 180

1  talking about what happens when somebody who is

2  released under Parole Plus ATD does not check-in, and I

3  believe you said there's a certified letter that's sent

4  to their address?

5      A.   Okay.  So I'll need to clarify.  There

6  isn't -- The notice to appear isn't sent certified

7  mail.  It's sent by regular mail.

8      Q.   Oh, regular mail.  Okay.

9      A.   Correct.

10     Q.   So -- And when you said before about five

11  percent of them come back, is that still your answer

12  that five percent of those sent by regular mail come

13  back?

14     A.   I wouldn't say regular five -- Less than five

15  percent are invalid addresses, and I don't know exactly

16  if we're determining that by the number of returned

17  NTAs or if we're actually doing a home visit; so it

18  could be a combination of things.

19     Q.   So if they give an address and it's actually a

20  valid address, just not theirs, would it necessarily be

21  returned or would they -- would the person who gets it

22  just throw it out?

23          MR. DARROW:  Object to form.  You can answer.

24     A.   I don't know the answer.  Sorry.  The -- The

25  way the NTAs, they're issued via regular mail.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 185

1                    CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA     )

5    COUNTY OF ESCAMBIA   )

6

7

8

9

10          I, the undersigned authority, certify that

11   ROBERT GUADIAN, Corporate Representative of United

12   States Department of Homeland Security, pursuant to

13   Rule 30(b)(6), appeared remotely before me on the 14th

14   day of July, 2022, and was duly sworn.

15   Identification Produced:  Driver's License

16          Signed this 18th day of July, 2022.

17

18

19

20

21   _____

22

23   FRANCINE O'CLAIRE
     Notary Public State of Florida
24   Comm# 1654948 Exp. 03/31/2025

25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 186

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA      )

4

5    COUNTY OF ESCAMBIA    )

6

7            I, FRANCINE O'CLAIRE, RPR, do hereby certify

8    that I was authorized to and did stenographically

9    report the foregoing video-recorded remote deposition

10   of ROBERT GUADIAN, Corporate Representative of United

11   States Department of Homeland Security, pursuant to

12   Rule 30(b)(6); that a review of the transcript was

13   requested; and that the foregoing transcript, pages

14   numbered 1 through 184, is a true record of my

15   stenographic notes.

16           I FURTHER CERTIFY that I am not a relative,

17   employee, attorney or counsel of any of the parties or

18   counsel connected with the action, nor am I financially

19   interested in the action.

20           DATED this 18th day of July, 2022.

21

22

23   _____

24   FRANCINE O'CLAIRE, RPR
     Stenographer

25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 188

1              E R R A T A   S H E E T

2              DO NOT WRITE ON TRANSCRIPT
               ENTER CHANGES ON THIS SHEET

3

4  Style of Case:        STATE OF FLORIDA V. UNITED
                         STATES OF AMERICA, ET AL.

5  Deponent:             ROBERT GUADIAN, CORPORATE
                         REPRESENTATIVE OF UNITED STATES

6                        DEPARTMENT OF HOMELAND SECURITY,
                         PURSUANT TO RULE 30(b)(6)

7  Date of Deposition: JULY 14, 2022
   Case No.:            3:21-cv-1066

8

   PAGE LINE        CORRECTION              REASON

9
    Page 19 Line 4 " EMI" delete    recording artifact

10  Page 24 Line 23 "ICRO" to "ICE ERO"      misspelt
    Page 28 Line 9 " Chart to Charge"      misspelt

11  Page 28 Line 19 "INAP" to "INA"         misspelt

12  Page 28 Line 22 "INAP" to "INA"      misspelt
    Page72 Line 18 "BINS" to "FINS"       misspelt

13  Page 78 Line 18 "ADT" to "ATD"         misspelt
    Page 107 Line 16 "NCIC" to "CIS"        misspelt

14

15  Page 123 Line 1 "212b5" to "212d5"
    Page 125 Line line 2 "AL institute black cycle" delete

16  Page 130 line 25 "labor to "waiver"     misspelt

17

18  Page 155 line 6 " IHOC" to "IHSC" misspelt
    Page 168 line 15 "Agudela" to "Agudelo" misspelt

19  Page 173 line 20 "and of equal" delete,artifact

20  page 179 line 2 "ability to impact" delete,artifact
   page 181 line 14 " "FR" delete , artifact

21

22  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
    are true.

23

    SIGNATURE OF DEPONENT: _____
24  Dated this:_____day of _____, 2022.

25  Job No.:  259224