UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

v.                                      Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

   *Defendants*.
_____/

**FLORIDA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Florida's second amended complaint challenges two policies: (1) the non-detention policy and (2) the Parole + ATD policy. Doc. 74. The non-detention policy is described in Florida's second amended complaint as "the government's policy of releasing aliens subject to mandatory detention." *Id.* ¶ 20. The policy includes releases "based on an untenable assertion of enforcement discretion to ignore" 8 U.S.C. § 1225 or "an abuse of the parole authority under" 8 U.S.C. § 1182. Doc. 74 ¶ 20.

Though sometimes discussed by the parties as separate policies, Florida's view following discovery is that Parole + ATD is really a subpart of the Biden Administration's broader non-detention policy. In other words, Parole + ATD is

merely one of several mechanisms the federal government is using to implement its general policy of releasing aliens subject to mandatory detention.

In light of this, Florida no longer intends to seek summary judgment on the merits of either policy. A trial is necessary to prove that the non-detention policy exists. And if the Court vacates the broader non-detention policy under the APA, the scope of that vacatur should include the Parole + ATD policy. Only in the event that the Court declines to vacate the non-detention policy is there reason to review the Parole + ATD policy as a standalone policy.

Florida looks forward to proving its case at trial. But Florida believes it would be a misuse of this Court's time and the parties' resources to litigate Florida's standing at trial. Defendants admitted during discovery that over 100,000 of the inadmissible aliens released since President Biden took office have likely settled in Florida. And Defendants cannot reasonably dispute that Florida spends money on inadmissible aliens—in fact, Florida spends hundreds of millions per year. Florida therefore moves for partial summary judgment on the issue of standing.

## BACKGROUND

### I.  FLORIDA'S CLAIMS

Florida challenges Defendants' policy of not detaining aliens subject to mandatory detention under 8 U.S.C. § 1225, including its practice of improperly releasing aliens under 8 U.S.C. § 1182(d)(5). Doc. 74 ¶ 20. As a result of these

policies, Defendants have released over 800,000 aliens into the United States since President Biden took office. *See* Doc. 85-7 at 3–4; Doc. 85-8 at 3–4; Doc. 85-14 at 83, 114–15.[1]

To establish standing, Florida's second amended complaint alleges that "[m]any of the aliens illegally released by the Biden Administration will come to Florida and cause the State to incur . . . expenses." Doc. 74 ¶ 76. Specifically, the State relies on (a) the cost of incarcerating inadmissible aliens who commit crimes, (b) public school expenses, (c) public assistance, (d) emergency medical services, (e) unemployment benefits, and (f) costs associated with issuing driver's licenses and identification cards. *Id.* ¶¶ 70–75.

In denying Defendants' motion to dismiss for lack of standing, this Court found those allegations legally sufficient. Doc. 45 at 13. Specifically, the Court concluded that "Florida has plausibly alleged that the challenged policies already have and will continue to cost it millions of dollars, including the cost of incarcerating criminal aliens and the cost of providing a variety of public benefits." *Id.*

---

[1] For depositions, Florida cites the transcript page rather than the ECF page.

## II. EVIDENCE REGARDING ALIENS RELEASED AT THE BORDER TRAVELING TO FLORIDA

As explained above, the Biden Administration has released over 800,000 inadmissible aliens at the border since taking office. Doc. 85-7 at 3–4; Doc. 85-8 at 3–4. The fact that some of these aliens settle in Florida cannot seriously be disputed. *Cf.* Doc. 85-15 at 69–70 (explaining that the ICE field office in Miami is one of the largest ICE offices).

Even before Florida filed suit, Defendants confirmed in a letter to Governor DeSantis that they were aware of thousands of inadmissible aliens released by the Biden Administration who had settled in Florida. Doc. 85-9 at 5. During discovery, Defendants produced data, which demonstrates that the Biden Administration has likely released more than 100,000 such aliens into Florida. Doc. 85-10 at 2.

Interpreting this data requires an understanding of two things: first, the categories of DHS's unlawful releases, and second, the way DHS tracks released aliens. The former (release mechanism) is reflected in the columns of the data, while the latter (tracking method) is reflected in the rows. Doc. 85-10 at 2.

Defendants' unlawful releases fall into three categories: (1) aliens released with a designation of "Notice To Appear/Own Recognizance,"[2] Doc. 85-7 at 3–4;

---

[2] Defendants rely on 8 U.S.C. § 1226 for the releases marked "Notice To Appear/Own Recognizance." Doc. 85-11 at 4. Florida disputes that 8 U.S.C. § 1226 authorizes the release of aliens at the border, but that is beyond the scope of this motion.

Doc. 85-8 at 3–4, (2) aliens released under "prosecutorial discretion," including releases with a "notice to report," Doc. 85-14 at 147; Doc. 85-12 at 4–5, and (3) aliens paroled into the United States, typically under the Parole + ATD program, Doc. 85-8 at 3–4. The six columns reflect these three release mechanisms, with comparison columns for President Trump's last year in office and President Biden's first year and a half in office.[3] Doc. 85-10 at 2.

While the document contains several rows, Florida asks the Court to focus on only two of those rows: (a) the top row, entitled "ERO Miami non-detained docket (total)," and (b) the second to last row, entitled "Individuals who failed to check in who provided a Florida address."

**ERO Miami non-detained docket (total)**: ERO Miami refers to the Miami field office of ICE's component, Enforcement and Removal Operations, which is responsible for immigration enforcement in the State of Florida, Puerto Rico, and the Virgin Islands. Doc 85-15 at 69. "Non-detained docket" refers to aliens with pending removal proceedings who are not detained. Doc. 85-15 at 125. What this row shows, therefore, is the number of non-detained aliens with immigration proceedings pending in Miami, separated by the time and method of release. By adding up the corresponding columns, the data demonstrates that 110,748 aliens

---

[3] Notice to report releases supposedly stopped on November 2, 2021, when Parole + ATD releases supposedly began. Doc. 85-15 at 45; *see also* Doc. 6-2. The time ranges in the columns reflect that.

5

released by the Biden Administration have an immigration case pending in Miami, including 67,185 released via "Notice to Appear/Own Recognizance," 9,544 released via notice to report, and 34,019 released via Parole + ATD. Doc. 85-10 at 2, 4–6.[4] The vast majority of these aliens are likely living in Florida. *See* Doc. 85-15 at 127 (explaining that immigration proceedings are assigned to where aliens reside).

**Individuals who failed to check in who provided a Florida address**: Aliens released at the border without being served a notice to appear are supposed to check in with ICE at their final destination. Doc. 85-15 at 46. For aliens who do not do so, Defendants could not provide a location for their immigration proceedings (because none exists). As such, for these aliens, the parties used the address provided by the alien at the time of his initial release. Doc. 85-13 at 122–23; Doc. 85-15 at 123–25. This row, therefore, reflects aliens who told DHS they were coming to Florida but never checked in with ICE. In other words, 49,111 at-large inadmissible aliens are likely in Florida, including 1,127 released via notice to report and 47,984 released via Parole + ATD. Doc. 85-10 at 2, 9; Doc. 85-13 at 122–23.

---

[4] For notice to report and Parole + ATD, Defendants provided two numbers. It is the top number, however, that reflects aliens with a case pending in Miami. Florida is not relying on the other numbers, which reflect something called "ICE final releases." Doc. 85-10 at 5–6.

Below is a simplified representation of the data consistent with the explanation provided above:

|  | NTA/Own Recognizance release from Jan. 20, 2021 through Jul. 4, 2022. | Notice to report release from Jan. 20, 2021 to Nov. 2, 2021. | Parole + ATD release from Nov. 2, 2021 to Jul. 4, 2022. |
|---|---|---|---|
| Immigration case pending in Miami. | 67,185 | 9,544 | 34,019 |
| No immigration case pending but provided Florida address. | N/A | 1,127 | 47,984 |

\* \* \*

While the data produced by Defendants is complex, Florida relies on the data solely for one basic proposition—that many inadmissible aliens unlawfully released by the Biden Administration are traveling to Florida. The fact that Defendants' own data shows that 110,748 aliens released by the Biden Administration have immigration cases pending in Miami and another 49,111 told DHS they were coming to Florida is sufficient to establish that fact.

### III. EVIDENCE REGARDING FLORIDA'S EXPENDITURES

Attached to this motion are declarations substantiating the expenditures Florida alleges in the second amended complaint. Doc. 85-1; Doc. 85-2; Doc. 85-3; Doc. 85-4; Doc. 85-5; Doc. 85-6. Florida spends over $100 million per year incarcerating inadmissible aliens, around $8,000 *per student* per year educating the

children of inadmissible aliens, and tens of millions more on other public services, including public assistance, emergency medical services, unemployment benefits, and identification cards like driver's licenses. *See infra* at 10–14; *see also* Doc. 85-1 ¶ 6 (providing examples of individuals known to have been released at the border by the Biden Administration who obtained IDs in Florida).

In his deposition, Corey Price, head of the ERO component of ICE, agreed that the States incur costs when DHS releases aliens into the interior. Doc. 85-13 at 130–33; *see also* Doc. 75 at 13 (explaining that Mr. Price "oversee[s] all immigration enforcement . . . for the entire country"). Specifically, Mr. Price testified that some released aliens will commit crimes, some will enroll their children in public schools, and some will qualify for government assistance. Doc. 85-13 at 130–31. Mr. Price also agreed that the States would not incur these costs if the aliens were detained. Doc. 85-13 at 133. According to Mr. Price, "that's been the way our immigration system has worked for as long as I've been in this job." Doc. 85-13 at 131.

## SUMMARY JUDGMENT STANDARD

Under Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant makes that showing when "a reasonable factfinder" could not make a finding for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A party may move for partial summary judgment, including on standing. *See* Fed. R. Civ. P. 56(a); *see, e.g.*, *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 n.8 (11th Cir. 2017). "When considering standing, [courts] assume the validity of the [plaintiff's] merits argument." *McNary v. Fed. Mine Safety & Health Rev. Comm'n*, 989 F.3d 21, 23 (D.C. Cir. 2021) (quotations omitted).

## ARGUMENT

To establish standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "A state has standing to sue in its sovereign capacity when it has suffered an economic injury." *Chiles v. Thornburgh*, 865 F.2d 1197, 1208 (11th Cir. 1989). And as this Court has recognized, "States are entitled to 'special solicitude' in the standing analysis where," as here: "(1) the challenged action affects the state's 'quasi-sovereign interests' and (2) Congress has conferred a procedural right to challenge the action in question." Doc. 45 at 12–13.

Here, Florida can demonstrate standing in two ways. First, Florida can show that it expends funds on specific individuals who were released under the challenged policies. Second, Florida can show that aliens are coming to Florida and would not be in Florida but for the challenged policies, and Florida provides and pays for services available to aliens such that there can be "little doubt" aliens utilize those

services. *Texas v. United States* (*DAPA*), 809 F.3d 134, 171 (5th Cir. 2015), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016). Undisputed evidence supports both propositions.

First, Florida has expended funds on specific aliens who were released pursuant to the challenged policies, and Florida will continue to do so. The Florida Department of Highway Safety and Motor Vehicles (FLHSMV) is responsible for issuing driver's licenses and state identification cards. Doc. 85-1 ¶ 3. When an alien applies for a license or ID card, FLHSMV must verify their eligibility through DHS's Systematic Alien Verification System (SAVE). Doc. 85-1 ¶ 4. FLHSMV incurs a cost of at least 50 cents per alien when it runs a SAVE inquiry. Doc. 85-1 ¶¶ 7–8. Florida does not charge aliens an additional fee to cover the 50-cent charge. Doc. 85-1 ¶¶ 7–8. Several examples of specific aliens released by the Biden Administration, for whom Florida paid that 50-cent fee, are attached to Exhibit 1. Doc. 85-1 ¶ 6.

Second, through various state programs, Florida expends funds on the mass number of aliens in Florida. As explained above, there is no serious dispute that some aliens released under the challenged policies settle in Florida. *See supra* at 4–7. These aliens will cost the state hundreds of millions of dollars through (a) the cost of incarcerating inadmissible aliens who commit crimes, (b) public school expenses,

(c) public assistance, (d) emergency medical services, (e) unemployment benefits, and (f) costs associated with issuing driver's licenses and identification cards.

*Incarceration of inadmissible aliens who commit crimes*. The Florida Department of Corrections (FDC) spends over $100 million per year on the incarceration of criminal aliens. Doc. 85-2 ¶¶ 6–7. Florida tracks these expenses because the federal government operates the State Criminal Alien Assistance Program (SCAAP), which provides limited repayments for these expenses. Doc. 85-2 ¶ 6; 8 U.S.C. § 1231(i). This repayment, however, covers only a fraction of the cost. Doc. 85-2 ¶¶ 7–8. For example, in the last reporting period, July 1, 2018, to June 30, 2019, the federal government only reimbursed $8,236,498 of the $131,529,255 paid by Florida. Doc. 85-2 at Tbl. 1.

*Public assistance*. The Florida Department of Children and Families (DCF) provides a variety of social services and benefits to all Florida residents—regardless of immigration status—including temporary cash assistance, nutrition benefits, substance abuse and mental health treatment, domestic violence services, and child welfare. Doc. 85-3 ¶¶ 3, 9–10, 15–16. For some of these services, Florida specifically tracks services to inadmissible aliens. For example, in fiscal year 2021–2022, DCF spent $7,636,351 on these aliens in state residential treatment facilities for mental health and substance abuse. Doc. 85-3 ¶ 11. Other services are expressly made available to aliens, but Florida does not track alien-specific expenditures.

11

Aliens paroled under 8 U.S.C. § 1182(d)(5), for example, are eligible for temporary cash assistance. *See* Doc. 85-3 ¶ 8; § 414.095(3), Fla. Stat. (defining a "qualified noncitizen" as an individual granted parole under § 1182(d)(5)[5] for at least one year). Florida spent $974,774 on temporary cash assistance from January 2020 through January 2022. Doc. 85-3 ¶ 9(a). Finally, Florida provides certain services, such as investigating allegations of child abuse, without regard to immigration status. Doc. 85-3 ¶ 15.

*Public school expenses*. Florida pays to educate the children of inadmissible aliens who enroll in public schools. Doc. 85-4 ¶ 4. Specifically, Florida offers public education to every school-aged child in the State and may not exclude inadmissible aliens. Doc. 85-4 ¶ 4; *Plyler v. Doe*, 457 U.S. 202, 230 (1982) (explaining that States must include inadmissible aliens in public school education). The average cost per student for fiscal year 2021–2022 was $7,812, and it is projected to be over $8,200 per student in fiscal year 2022–2023. Doc. 85-4 ¶ 5. While Florida does not know the exact number of inadmissible aliens who have enrolled their children in public school, the State does track the number of "immigrant children"—defined as a child born outside the United States or Puerto Rico who has not been educated in the United States for the past three years, *see* 20 U.S.C. § 7011(5).[6] Doc. 85-4 ¶ 6. In

---

[5] 8 U.S.C. § 1182(d)(5) is sometimes referred to as INA or INS Section 212(d)(5).

[6] Federal funds received for these children are used to fund ancillary services and are not used to offset the cost of public school education referenced above. Doc. 85-4 ¶ 5.

Florida's most recent survey, there were 101,125 children who meet this definition enrolled in Florida's schools. Doc. 85-4 ¶ 6.

*Emergency medical services.* Through the Agency for Health Care Administration (AHCA), Florida administers Medicaid, which covers emergency services for aliens. Doc. 85-5 ¶ 5. In fact, Florida is required by federal law to pay for certain emergency services regardless of immigration status. 42 U.S.C. § 1395dd (requiring participating Medicaid facilities to provide emergency services to immigrants regardless of status). From January 2020 to April 2022, AHCA spent $111,451,901 in state funds on these services for aliens. Doc. 85-5 ¶ 7.

*Unemployment benefits.* The Florida Department of Economic Opportunity (DEO) administers Florida's Reemployment Assistance Program, which provides unemployment benefits. Doc. 85-6 ¶ 3. Aliens authorized to work in the United States are eligible, Doc. 85-6 ¶ 7, which can include aliens paroled under 8 U.S.C. § 1182(d)(5) and other aliens with pending asylum claims.[7] From January 2020 to May 2022, DEO paid $426,521,033 in said benefits to aliens. Doc. 85-6 ¶ 7.

*Driver's licenses and ID cards.* As discussed above, Florida incurs costs for every driver's license or ID card issued to an alien. In addition to the specific

---

[7] 8 C.F.R. § 274a.12(c)(11) (recognizing that aliens paroled into the United States under § 1182(d)(5) are eligible to apply for work authorization); Asylum, USCIS, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum (last visited Oct. 3, 2022) (noting that immigrants may apply for work authorization 150 days after they complete an asylum application).

instances discussed above, *see supra* at 10, FLHSMV issued 1,074,448 IDs or licenses to eligible aliens from January 2020 to August 2022. Doc. 85-1 ¶ 6. In each instance, Florida would have incurred at least one 50-cent charge for a SAVE inquiry to confirm eligibility. Doc. 85-1 ¶ 8.

\* \* \*

For purposes of this motion, the only question the Court need resolve is whether aliens released into Florida pursuant to the challenged policies will cost the State at least one dollar. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008) (noting that the loss of "a dollar or two" is sufficient to confer Article III standing). Under both of the methods described above, Florida has more than cleared that bar. *See Texas v. United States*, 40 F.4th 205, 216–17 (5th Cir. 2022) (finding injury where Texas bore the cost of incarcerating aliens and providing "education and state-sponsored healthcare to aliens who would otherwise have been removed pursuant to federal statutory law"); *accord Texas v. Biden*, 20 F.4th 928, 970–74 (5th Cir. 2021), *rev'd on other grounds Biden v. Texas*, 142 S. Ct. 2528 (2022). Indeed, given the number of aliens released into Florida and the amount Florida spends on services, "it's impossible to imagine how the [g]overnment could" continue their unlawful policies "*without* costing [Florida] any money." *Texas v. Biden*, 20 F.4th at 971.

## CONCLUSION

For these reasons, the Court should grant partial summary judgment on the issue of Florida's standing.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

*/s/ Natalie P. Christmas*
Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 1029143)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

Bilal Faruqui (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
natalie.christmas@myfloridalegal.com

*Counsel for the State of Florida*

15

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 56.1(B), this motion contains 3,249 words.

## CERTIFICATE OF SERVICE

I certify that on October 3, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ Natalie P. Christmas*
Assistant Attorney General
