State of Florida

vs.

United States

---

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

July 13, 2022

---

*Vol 1*

# PHIPPS REPORTING

*Raising the Bar!*

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    who is an unaccompanied child and who is not.

2        Q.    Okay.  What constitutes a family unit?

3        A.    So, a family unit is a child who -- or,

4    you know, a child who is, you know, with their,

5    their parent or legal guardian when they are

6    encountered by us.

7        Q.    Would you say that everyone who crosses

8    the border fits into one of these categories, either

9    single adult, family unit or unaccompanied minor/

10   single minor?

11       A.    Yes.

12       Q.    Okay.  So --

13       A.    And I'll -- yeah, I mean, by and large.

14   They're not all illegal migrants.  We do have United

15   States citizens and others as well, but,

16   nevertheless, yes, those categories.

17       Q.    Okay.  I just want to walk through some

18   hypotheticals with you.  So, let's just say that

19   border patrol encounters a single adult that's 100

20   feet past the Southwest Border on U.S. soil.  Can

21   you walk me through the steps that the border patrol

22   agent would take at that point?

23       A.    Yes, sure.  So, the agent will encounter

24   that individual, determine if that -- determine,

25   basically, who the individual is, you know, ensure

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      Q.   Okay.  So, let's go back to Exhibit 7 and

2   I just want to walk through each of these pathway

3   dispositions with you.

4            The first one is Notice to Appear/Own

5   Recognizance, NTA/OR.  So, when would that be

6   applied to a single adult?

7      A.   Again, it just depends on the

8   circumstances in front of them.  You know, an

9   individual who, you know, is claiming fear, an

10  individual who, you know, may have, we'll say, you

11  know, issues to where they cannot be detained.

12  Fraihat (phonetic) being -- just as an example, just

13  one example.  You know, if we have no available

14  space in order to be able to remove single adults

15  to, you know, in ICE custody; i.e., you know, that

16  locale has no available space open to them, we would

17  end up placing a single adult into an NTA/OR.  You

18  know, those are all -- there's just a variety of

19  circumstances where, where it can be applied.

20     Q.   Let me backtrack a little bit.  Do border

21  patrol agents have discretion in deciding which one

22  of these pathways to use?

23     A.   Yes.

24     Q.   Okay.

25     A.   We have the discretion in order to be able

Page 97

1  to determine which pathway, but, but, you know,

2  again, there's -- this kind of goes back to your

3  previous question.  Supervision is well engaged in

4  the processing areas in monitoring, you know, who

5  agents are processing, which pathways are assigned

6  to individuals and so on.

7      Q.   Are there specific criteria that an

8  officer would apply in determining which pathway to

9  choose?

10      A.   It's based upon the circumstances of the

11  individual in front of them.

12      Q.   What do you mean by that?

13      A.   So, so, you know, as in -- I think it's

14  Exhibit 6, you had what appeared to be kind of

15  almost like a decision tree for lack of better

16  terms.  I think it was that number, so don't quote

17  me on it, but -- well, I guess you're going to quote

18  me on it, but, you know, the -- that's, that's like

19  a decision tree, but ultimately the determination is

20  based upon the circumstances in front of the agent

21  at the time of the individual there.

22      Q.   So, there are no set criteria that's

23  applied?

24      A.   Well, I mean, of course, yes, there's set

25  criteria.  I mean, if a person has, you know,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 98

1    previously been deported, so that's going to be for

2    instance, a reinstatement of a previous removal; if

3    they have an order of removal that has not been

4    effectuated, that's going to be a bag and baggage.

5    I mean, so you kind of see -- that -- again, I go

6    back to it's kind of like a decision tree.  It's not

7    a true decision tree.  So, there are circumstances

8    that are involved in what you're applying that Title

9    8 pathway to to those individuals.

10        Q.    Okay.  Are there any other criteria?  You

11   just named two.

12        A.    Yeah, I mean, there's going to be several.

13   Right?  So, national security, border security

14   threat, what's their criminal history, what's their

15   immigration history, are they applicable to -- you

16   know, to MPP, are they applicable to detention, are

17   they claiming fear, are they not claiming fear, you

18   know, are they a single adult, are they a family

19   unit, what's the detention availability for that

20   person?  I mean, it's -- you know, does ICE have bed

21   space, do they not have bed space to detain?  I

22   mean, these are all a variety of different

23   circumstances that are all taken into those

24   decisions.

25        Q.    Okay.  Does -- you mentioned whether or

State of Florida

vs.

United States Plaintiff vs UNITED STATES

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

July 13, 2022

*Vol 2*

# PHIPPS REPORTING

*Raising the Bar!*

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 149

1      A.    Yes.

2      Q.    Okay.  Was there any other mechanism that

3    families were being processed and released into the

4    interior?

5      A.    So, you know, in certain circumstances,

6    you know, the, the border patrol has utilized parole

7    for humanitarian reasons as well.  An example of

8    that would be, for instance, if somebody, you know,

9    has an extremely serious injury is a prime example.

10   You know, they fall from a fence or, you know -- you

11   know, had a tragic accident in, you know, a

12   smuggling load or something along those lines.  And

13   I -- just to give as an example.  You know, we may,

14   we may place and effectuate humanitarian parole of

15   that individual.  You know, parole is applied on an,

16   on an individual case-by-case basis and thereby, you

17   know, is contingent upon the circumstances

18   surrounding that individual's, you know, situation.

19     Q.    Okay.  Are there any other instances in

20   which you would provide humanitarian parole other

21   than for medical reasons?

22     A.    Oh, of course.  Of course.  I mean, it --

23   it just depends on the circumstances that are, that

24   are surrounding it.  You know, we've had individuals

25   who have, you know, shown up to -- you know, at the

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 150

1  border with, with, you know, bullet wounds.  We've

2  had -- I mean, just it -- you know, there are just

3  different circumstances.  Right?  I mean, the vast

4  majority of them are, are all medical related.

5      Q.   Okay.  I'm just tying to figure out

6  whether there's, like, an unfettered discretion in

7  when to provide humanitarian parole or whether

8  there's any confines of criteria with respect to

9  that?

10     A.   So, you know, again, I go back to the

11  case-by-case basis.  Right?  So, there's -- it's not

12  what I would consider as unfettered, by any means.

13  I mean, when we you take a look at each individual

14  circumstance that's presented to us, you know, we

15  attempt to detain or remove those individuals, you

16  know, it may be other circumstances with that

17  individual detention or capacity which drive us to

18  utilize different pathways.

19     Q.   So, whether you use humanitarian parole

20  could also be driven by detention capacity?

21     A.   True, could be.

22     Q.   How often does that happen?

23     A.   So, the, the -- you know, the

24  circumstances which we face -- and it's actually

25  noted in the memo that you just sent us -- with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 151

1   COVID-19 would be, would be a case in point of a --

2   you know, a humanitarian utilization of Parole ATD,

3   right, in order to be able to rapidly decompress,

4   decompress our, our detention facilities or, you

5   know, our custody and holding numbers because of the

6   pandemic.

7           You know, I'll be honest with you, we've

8   lost 19 border patrol agents to COVID, COVID deaths,

9   you know, directly associated with COVID that they

10  have contracted on duty working in, you know,

11  facilities which are, which are well over capacity

12  and in that congregate setting, you know, creating a

13  significant life and safety risk to the agents,

14  officers, migrants and professional staff that are

15  all being detained there.

16          So, so, I'll be honest, sitting here as

17  the Chief of Operations, having spent, you know, 21

18  plus years in a green uniform working on the border,

19  19 deaths that, that are associated with, you know,

20  a public health pandemic due to overcrowding within

21  our facilities is something that we take direly

22  seriously not only for the agents, but for the

23  migrants and the professional staff working in that

24  environment as well.

25          Q.   Okay.   I believe you previously testified

Page 163

1    to this document.

2              So, what instructions has CBP been given

3    since January 20, 2021 regarding the detention of

4    applicants for admission at the Southwest Border?

5         A.   Are you talking about out of port of

6    entry?

7         Q.   Let's start with between a port of entry.

8         A.   It's exactly what I just referred earlier.

9    So, you know, we will, we will utilize all the

10   processes in order to, to detain, remove, expel, you

11   know, or in some circumstances release individuals

12   based upon the processing pathways and the

13   circumstances of that individual's time in custody.

14   There is no -- there is no change, I would say, in

15   regards to necessarily how we're doing business.

16        Q.   Okay.  Well... were any specific

17   instructions given regarding family units?

18        A.   No, no, just the normal processing

19   pathways which we described earlier, and that's what

20   would be applicable to family units.

21        Q.   Okay.  Have any instructions been given

22   since January 20, 2021 regarding a preference for

23   one of the pathways that we had discussed over the

24   other pathways?

25        A.   No.  No, I mean, it would -- again, I go

Page 164

1    back to, you know, the first thing we'll take a look

2    at is if somebody's applicable to Title 42.  If

3    they're not applicable to Title 42, we will look to

4    detain or remove them, and, you know -- and then

5    after that we'll take a look at the various

6    circumstances that might be applicable to that

7    individual or family.  I guess you were talking

8    about family.

9         Q.    Okay.  Is there a greater preference to

10   use orders of recognizance?

11        A.    So, that is -- you know, I would say if we

12   are, if we are faced with the circumstances where

13   somebody is going to be released and the myriad of

14   circumstances that we spoke about earlier, our, our

15   primary or principal avenue in which we will process

16   somebody for that release pathway is going to be an

17   NTA/OR, right, but, again, caveated with when

18   applicable in the myriad of circumstances we

19   described earlier.

20        Q.    All right.  Is there a greater preference

21   to use of parole?

22             MR. DARROW:  Objection.  Can you clarify,

23        a greater preference as to when?

24   BY MS. PATEL:

25        Q.    From January 20, 2021 to present, has

Page 165

1    there been a greater preference to use parole?

2        A.    So, there is -- there's not a

3    preference -- the preference still remains to

4    utilize NTA/OR, to be honest.  I mean, that's the

5    preference.  If, if it is a circumstance that is

6    going to result in having to utilize a pathway which

7    will result in a release, i.e., an NTA/OR, that is

8    the preferred pathway.

9        Q.    And why is that the preferred pathway?

10        A.    Because that person is provided a Notice

11    to Appear with a date, time, place, location to be

12    able to appear in front of a, of a judge.

13        Q.    Okay.  Since January 20, 2021, has there

14    been a preference against using Expedited Removal?

15        A.    Only since we've been enjoined.  So, you

16    know, Expedited Removal or ER when applicable has

17    definitely been utilized and will continue to be

18    utilized.  We're currently on a -- and by no means

19    am I an attorney, you know, but we are currently

20    under a TRO in -- you know, to utilize Title 42 and

21    not utilize other pathways like ER, so we continue

22    to utilize Title 42, but we absolutely utilize an ER

23    pathway when we can.

24        Q.    Okay.  Since January 20, 2021, have any

25    pathways been added?

Page 177

```
 1        cost.  I'm asking if he believes that
 2        immigration enforcement reduces cost to the
 3        states.
 4        A.   I couldn't tell you if it does or it
 5   doesn't.  I guess a lessening flow of migration may
 6   have a -- I'm pulling, I'm pulling at straws here --
 7   a lesser impact.  I couldn't quantify as to what
 8   that is or even speculate to be honest.
 9   BY MS. PATEL:
10        Q.   Okay.  Is it the Federal government's job
11   to enforce immigration law?
12        A.   Yes.
13        Q.   Can states enforce immigration laws
14   themselves?
15        A.   Not that I'm aware of.
16        Q.   Okay.  Do you believe that you have a duty
17   to enforce immigration law?
18        A.   Yes.
19        Q.   Do you believe that part of that duty is
20   preventing harm to the states and the people who
21   live in them?
22        A.   My duty is to protect the borders and
23   enforce immigration and criminal statutes, you know,
24   at the border.
25        Q.   Okay.  So, I'll ask again.  Do you believe
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      that part of the duty is preventing harm to the

2      states and the people who live in them?

3          A.    So, protecting those people or those

4      individuals in the state from any harm that could

5      befall them from somebody that crossed the border,

6      absolutely.

7          Q.    Does DHS consider the cost to the states?

8      Have they considered the cost to the states?

9              MR. DARROW:   Objection, vague.   In what

10             circumstances are you talking about?

11     BY MS. PATEL:

12         Q.    Well, does DHS have any information on

13     whether states will be financially impacted by the

14     release of tens of thousands of aliens into the

15     interior?

16         A.    So, I personally don't, but I, you know --

17     you know, I have absolutely been in discussions to

18     where the discussions surrounding the states, the

19     impact to the states of migration or migrants who

20     are released, as well as the impacts to the

21     nongovernment organizations that, that help service

22     both the state as well as the migrants in those

23     conditions, you know, have discussed various impacts

24     to them as well as the governments.   You know, and

25     mainly DHS through FEMA through the ESFP funding,

Page 179

1   which is the Emergency Supplemental Food and Shelter

2   funding, to the states has been discussed as well.

3   As to what those impacts are, the financial gravity

4   of what those may be or the financial assets that

5   are provided to the NGOs, that I don't have any

6   scope on.

7        Q.   So, what is your understanding as to

8   whether the states are impacted by DHS's release of

9   tens of thousands of people into the interior?

10            MR. DARROW:  Objection.  Are you asking

11        his understanding as an individual fact witness

12        or DHS's understanding?

13            MS. PATEL:  DHS's understanding.

14        A.   So, again, I go back to kind of my, my

15   statement a minute ago.  You know, I, I am generally

16   familiar with the concerns of various what I would

17   consider as border states in regards to, you know,

18   some of the financial impacts or strains upon the

19   state and/or the NGOs, those nongovernment

20   organizations, but what the specific constraints

21   are, specific impacts are I -- it's just not the

22   avenue that I -- that I am involved in.

23   BY MS. PATEL:

24        Q.   Okay.  So, you're speaking specifically as

25   to border states, meaning those states that are

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 180

1   along the Southwest Border?

2       A.   Well, I think it's, it's a broader -- let

3   me redefine and just say states period, because it's

4   been -- you know, I've been in conversations with --

5   and it was discussed beyond the border state area.

6       Q.   Did DHS consider the impact of closing the

7   family detention centers on the states?

8           MR. DARROW:   I'm going to object to that

9           as well as this witness has testified

10          detention -- family detention -- detention of

11          families is an ICE topic, which you will have

12          an ICE person to speak to, but more

13          importantly, the court's order said that you

14          can ask about consideration for, quote,

15          non-detention policies, not closing family

16          detention centers.

17          MS. PATEL:   We think they're interrelated.

18   BY MS. PATEL:

19      Q.   So, please, go ahead and answer if you

20   can.

21      A.   I defer to ICE.

22          MS. PATEL:   All right.   So, Joe, I think

23          that Chief Barker here was designated to talk

24          to Topic Number 9.   So, is the ICE witness

25          tomorrow going to be able to answer this

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 188

1      A.    I have seen people identify that the

2    subjects are claiming fear.

3      Q.    Okay.

4      A.    It's because there's a CIS mechanism that

5    gets, you know, started, if you will, when that

6    happens.

7              (Plaintiff's Exhibit 14 was received

8              electronically, marked for identification and

9              is attached hereto.)

10   BY MS. PATEL:

11     Q.    I'm going to drop another exhibit.  This

12   is Exhibit Number 14 and it's DHS's response to

13   Florida's interrogatories, and if you could turn to

14   page 5, the response to our interrogatory number 4.

15   I'll give you a minute to read it.

16     A.    All right.  Gotcha.

17     Q.    Okay.  So, that last sentence says, "In

18   addition, CBP assesses whether each individual

19   applicant for admission may be considered for

20   release on a case-by-case basis."  What is this

21   referring to?

22     A.    So, it's, it's what I was talking about

23   earlier.  Right?  I mean, it's -- you know, each

24   individual who, who we are encountering between the

25   ports of entry or even at the ports of entry, right,

Page 189

1    that's an applicant for admission.  Right?  So, we

2    are, we are determining, you know, on a case-by-case

3    basis what pathway we're going to place that

4    individual into.  Again, I go back to the Title 42,

5    determining if somebody is a border security,

6    national security threat, you know, are they

7    removable, returnable back to their country, you

8    know, what processing pathway is applicable with the

9    TIC time and the detention capacity capabilities of

10   both the sector as well as ICE.  You know, all of

11   these different degrees of factors go into

12   determining that case-by-case basis.

13       **Q.   Okay.  Under the NTA/OR that we were**

14   **previously discussing, do you obtain a warrant for**

15   **arrest?**

16       A.   No, I do not believe a, a warrant for

17   arrest is in an NTA packet.

18       **Q.   Okay.  And in the Warrant for Arrest/NTA -**

19   **detained, in that case a warrant for arrest is**

20   **obtained, correct?**

21       A.   Yes.

22       **Q.   Under what circumstances would you get a**

23   **warrant for arrest?**

24       A.   Most often when they're, when they're

25   getting detained and prosecuted.

Page 198

```
 1    available to people who are released into the

 2    interior?

 3         A.   I don't know.

 4              MS. PATEL:  Okay.  I think I have no

 5         further questions for the 30(b)(6) component of

 6         this deposition, so, Mr. Darrow, if you have

 7         any follow-up.

 8              MR. DARROW:  Yes.  Just briefly and then

 9         we're going to switch over to fact witness

10         time; is that correct?

11              MS. PATEL:  Correct.

12                        CROSS-EXAMINATION

13    BY MR. DARROW:

14         Q.   Chief Barker, when you testified a bit

15    before that we were -- and I don't want to

16    paraphrasing incorrectly, but that you had seen that

17    there were more parole dispositions since January

18    20, 2021, was that due to any policy telling you to

19    use parole more often?

20         A.   No.

21         Q.   What would you describe -- the use of

22    parole more frequently, what were the causes with

23    respect to that?

24         A.   That directly related to the aspect of,

25    you know, we're seeing increased migration to very
```

Page 199

1  specific geographical locations along the Southwest

2  Border, principally Del Rio and Yuma right now -- it

3  was RGV, Del Rio and Yuma, but Del Rio and Yuma

4  right now -- with the population which cannot be

5  removed or returned back to their home country,

6  which is, which is, you know, Cubans, Venezuelans

7  and Nicaraguans.

8          You know, coupled with at the rate that we

9  are encountering and -- you know, and the extremely

10 high, you know, detention rates that we have within

11 the stations and the processing centers in those

12 locations, dangerously high, you know, custody

13 numbers and exaggerated TIC times or high TIC times,

14 you know, the utilization of Parole ATD was

15 utilized -- or is utilized in order to be able to

16 rapidly what I would consider is decompress in

17 selected populations where, again, we have really

18 either no ability to detain or no ability to remove,

19 either.  So, that, that would be utilization of, of

20 the Parole ATD during those time frames that you're

21 referring to.

22     Q.   And even in scenarios -- I should say in

23 scenarios where the high TIC times and high

24 decompression rates helps lead to Parole ATD, does

25 that necessitate, then, that a particular individual

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 200

1  will be realized?

2      A.    Absolutely not.   You know, very

3  specifically it's based upon the circumstances of

4  the individual there.   You know, so it does not

5  dictate that in any way.   You know, as a matter of

6  fact, quite conversely.   You know, one of the things

7  that I had said a couple times so far is that, you

8  know, our first principal, you know, course of

9  action is to try and expel someone, and if not, then

10 it is to detain or remove -- you know, detain and

11 remove someone.   So, return or remove.

12             You know, so, so, those are the actual

13 principal mechanisms which we rely on.   You know,

14 for lack of better terms, we're utilizing Parole ATD

15 as an, as an emergency mechanism, you know, a course

16 of last resort, for lack of better terms, in order

17 to be able to rapidly decompress the holdings in

18 woefully overcrowded detention centers with high --

19 or detention facilities, if you will, or processing

20 facilities.   You know, that's, that's what we're

21 utilizing it for.

22             MR. DARROW:   I don't have any more

23    questions.

24             MS. PATEL:   I do have some brief redirect.

25                   REDIRECT EXAMINATION

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      BY MS. PATEL:

2          Q.    You just testified that the increase in

3      parole decisions is not due to a policy, but that it

4      was in part due to increased migration; is that

5      correct?

6          A.    Tell me that's -- again, I mean, that's

7      one facet of several facets that I just described,

8      right, so it's not just migration.  You know, it's,

9      it's very concentrated high flows of illegal

10     migration in very specific geographical areas of a

11     very specific demographic of which we have either no

12     ability to detain or no ability to remove as well.

13     Right?  So, it's,it's that complexity which has

14     created, you know, extremely high TIC times, you

15     know, time in custody time, extremely high

16     capacities with the very specific population.

17             With that being said, even with those

18     pieces involved, it's still based on a case-by-case

19     basis of the conditions of the individual who's

20     presented in front of us.

21         Q.    Is it fair to say that closing family

22     detention centers has, has led to an increase in

23     releases on parole or on an order of recognizance?

24             MR. DARROW:  I'm going to object as beyond

25         the scope of this witness' testimony, but he