

# Transcript of Corey A. Price

**Date:** September 9, 2022
**Case:** State of Florida -v- United States of America

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

```
 1            UNITED STATES DISTRICT COURT
 2         for the Northern District of Florida
 3    ---------------------------------------------
 4    STATE OF FLORIDA,
 5               Plaintiff,
 6      v.
 7    UNITED STATES OF AMERICA, et al.,
 8               Defendant.
 9    ---------------------------------------------
10
11           Deposition of COREY A. PRICE
12                  Washington, DC
13             Friday, September 9, 2022
14                    11:00 a.m.
15
16
17
18
19
20    Job:  463273
21    Pages:  1 - 155
22    Transcribed by:  Pamela A. Flutie
```

1     A.   I don't recall the total number
2 exactly, but that sounds correct.
3     Q.   Okay. The Biden administration ended
4 the detention of family units, right?
5     A.   Correct.
6     Q.   Okay. And ICE is repurposing the
7 family -- family residential centers to house
8 single adults, correct?
9     A.   Correct.
10    Q.   Okay. Once repurposed, ICE will lose
11 the ability to detain families unless it
12 reconfigures or builds new facilities, correct?
13    MR. DARROW: Objection.
14    A.   Could you repeat that one more time?
15    Q.   Sure. Once repurposed, ICE will lose
16 the ability to detain families unless it
17 reconfigures or builds new facilities, right?
18    MR. DARROW: Objection.
19    A.   We can reconfigure those same
20 facilities back to family detention so that we
21 could, yes.
22    Q.   Okay. When did the Biden

1  February of 2021 as the director of ERO, when
2  was it communicated to you that it was decided
3  that ICE would stop housing family units?
4         MR. DARROW:  Objection.
5     A.   We had multiple discussions, I would
6  say over the course of 2021, where we would get
7  the best bang for our buck out of our detention
8  facilities to include the FRCs for a number of
9  reasons.  Border Patrol was in great need of
10 additional detention beds.  So, I think we
11 actually converted back and forth from family to
12 adults a couple of times at places like Diley to
13 try to maximize the utilization of those beds.
14 So, I don't recall like a single point in time
15 when the administration, you know, directed
16 anybody to end family detention.
17    Q.   Who inside ICE would have knowledge
18 about the decision regarding detention of family
19 units?
20        MR. DARROW:  Objection.
21    A.   Again, I -- I would have some
22 knowledge because we did have discussions that

1 were more, I would say, logistical in nature,
2 where we were going to get the best bang for our
3 buck and then, so I would have some of that
4 knowledge.
5     Q.   Who beside you?
6     A.   Acting Director Johnson would have
7 knowledge. Peter Berg, who is the Acting Deputy
8 Executive Associate Director would have
9 knowledge. Chief of Staff -- well, former Chief
10 of Staff Tim Perry would have knowledge, and I
11 believe former Deputy Director Matt Allen. I
12 don't know if PJ Lechleiter was in place at the
13 time, but if he was, then he would have
14 knowledge.
15     Q.   Okay. I'm going to show you an E-mail
16 then I'm going to mark for identification as
17 Exhibit, I think it's 9 to your deposition.
18 Exhibit 9 is a border patrol E-mail that you're
19 not copied on that recounts a conversation
20 between someone -- and I can't tell you who
21 because it's blacked out -- at ERO and someone
22 at Border Patrol -- and I can't tell you who at

1     A.   I can't speak to that because ICE
2  isn't issuing those paroles.  That's being
3  handled by Border Patrol.  So, I would have to
4  defer to Border Patrol on how they're -- they're
5  instituting their case-by-case decisions.
6     Q.   Okay.  But detention is not an option?
7     A.   For family units right now today,
8  detention is not an option.
9     Q.   Under the Trump administration, parole
10 had been significantly curtailed, right?
11         MR. DARROW:  Objection.
12    A.   I don't know, to the extent of what
13 CBP was, you know, issuing for all under that
14 administration.  I can't speak to that, I'm
15 sorry.
16    Q.   Okay.  Now, are you familiar with a
17 concept called expedited removal?
18    A.   I am.
19    Q.   What is expedited removal?
20    A.   Expedited removal is an authority that
21 an immigration officer can use when that
22 individual is eligible for expedited removal

1  Like, they can't make a normal phone call to
2  whoever they want, but it is a way to
3  communicate with their deportation officer or
4  the contractor, and I believe it also can make
5  like emergency calls to 911, yes.
6      Q.  Okay.  Thank you for clearing that up.
7  Now, before ERO made its decision to terminate
8  family detention, none of its FRC facilities
9  were having capacity issues, were they?
10         MR. DARROW:  Objection.
11     A.  Our FRCs have had a number of
12 challenges ever since inception, but the
13 majority of them have revolved around not
14 necessarily the capacity, because we've never
15 been able to detain people long enough to
16 actually need more capacity.  We have -- there's
17 been a court order that's a Flores decision that
18 limits our ability to detain to under twenty-one
19 days, so essentially twenty days.  So, that's --
20 that's where our biggest limitations have been.
21     Q.  Okay.  And that's -- you can only
22 detain a juvenile twenty-one days.

1  is going out and contracting -- signing a
2  multimillion-dollar contract to put aliens in
3  hotels, right?
4          MR. DARROW:  Objection.
5      A.   Correct.
6      Q.   Right.  Now, the Biden administration
7  has not only ended family detention, the Biden
8  administration have cut ICE's detention capacity
9  significantly, correct? Objection.
10     A.   There have been some facilities that
11 have that have closed or otherwise had contracts
12 terminated while we've had other facilities that
13 have been stood up.  So, I don't know off the
14 top of my head what the total net number of beds
15 is.  Unfortunately, we've had a lot of
16 litigation that has, you know, hampered our
17 ability to detain at some facilities.  So, I'd
18 have to get some more details on that.
19     Q.   I'm going to -- why don't we take a
20 break?
21     A.   Sounds good.
22          VIDEOGRAPHER:  It's 12:29 and we are

1 requirements of parole, right?

2        MR. DARROW: Objection.

3    A.   Yes.

4    Q.   Okay. And so, despite that
5 requirement, or that requirement of mandatory
6 detention, the Biden administration sought to
7 reduce ICE's detention capacity, correct?

8        MR. DARROW: Objection.

9    A.   I don't know what went into the
10 methodology used in this, but I can tell you
11 that we've never been in a position to detain
12 everybody who has come across the southwest
13 border.

14    Q.   I appreciate that. But my question
15 was that in the -- with the mandatory detention
16 subject of parole, with a historic surge of
17 aliens across the border, the Biden
18 administration's response was to reduce
19 detention capacity, correct?

20        MR. DARROW: Objection.

21    A.   It appears so.

22    Q.   Okay. So, looking at that document

1  the individual is from, I mean, a number of
2  factors would go into that and an officer would
3  make a decision whether to de-escalate or even
4  escalate the form of supervision they're under.
5       Q.   Okay.  Have aliens that were paroled
6  and granted ATD been taken off ATD before they
7  have gone to ICE and completed their immigration
8  interview and gotten into -- gotten a notice to
9  appear?
10         MR. DARROW:  Objection.
11      A.   I don't know if any have or not.  Some
12  ATDs were done via mailout.  So, I just don't
13  have that data.
14      Q.   Okay.  If you want to turn back to
15  Exhibit 18, are you familiar with something
16  known as Operation Horizon?
17      A.   I am.
18      Q.   All right.  What was Operation
19  Horizon?
20      A.   Operation Horizon was an operation
21  that we put together in ICE ERO to address the
22  outcome of the parole plus ATD and before that,

1  the NTR that was occurring.  So, essentially,
2  the individuals that were paroled or otherwise
3  released that didn't have a charging document,
4  ERO officers primarily, it did include some from
5  HSI, but it was -- the vast majority was ICE ERO
6  officers completing mailout NTAs when they
7  could.  For those that they could not to do
8  mailout, they would bring into the office to do
9  an NTA in person and they would also go out and
10 target and arrest those that were at large that
11 were not complying with the terms of it.  This
12 was largely accomplished on overtime, as opposed
13 to, you know, during their normal course of
14 duty.
15     Q.   Okay.  So, Operation Horizon was ERO's
16 effort to get the backlog kind of at least into
17 a more -- a better posture.  Let's just say
18 better posture.
19     A.   Yes.
20     Q.   Okay.  There still is -- even after
21 Operation Horizon, there still is a backlog,
22 correct?

1     A.   Yes.

2     Q.   Okay, all right. And every thirty

3 days that DHS continues parole plus ATD, it's

4 going to take another year and cost $8 million

5 more to clear the backlog, correct?

6     MR. DARROW: Objection.

7     A.   I don't know if those figures are

8 accurate.

9     Q.   Well, let's look at SAR 262.

10     A.   Okay. That's the Exhibit 7?

11     Q.   Exhibit 18, yeah.

12     A.   262?

13     Q.   Yep. And again, I can't give you the

14 names of who's sending these E-mails, and I

15 don't even know if they're ERO or not ERO or who

16 they are. I know they're ICE because I do have

17 the part of their E-mail address that has ICE in

18 it. But if you look at the second E-mail on the

19 chain on this page, which is an E-mail dated May

20 5th of 2022, basically, every thirty days p-plus

21 ATD continues, this is this cost us about a year

22 and $8 million, right?

1          MR. DARROW:  Objection.
2      A.   That's what this reflects as of May
3  5th, yes.
4      Q.   Okay.  Was Operation Horizon completed
5  before May 5th, or was it continuing going on?
6      A.   No, it's ongoing and we run different
7  sprints with Operation Horizon.
8      Q.   Okay.
9      A.   I don't anticipate it ending until
10 we've addressed the entire backlog.
11     Q.   Okay, all right.  And if you look
12 down, there's a chart at the bottom of page SAR
13 262 of Exhibit 18.  It is saying that if parole
14 plus ATD continued for ninety days beyond May
15 5th, it would take five and a half years to
16 clear the backlog and cost $49 million, correct?
17         MR. DARROW:  Objection.
18     A.   That's correct.
19     Q.   And that would be five and a half
20 years to start the immigration process with
21 respect to the people that have been paroled
22 plus ATD, right?

1  alternatives for detention or detention?
2     A.   Greater accountability?  Detention.
3  However, alternatives to detention is a fraction
4  of the cost.  So, I believe the average is
5  around the $7 a day to have somebody on ATD as
6  opposed to, I believe, it's around $130 a day to
7  keep somebody in detention.
8     Q.   So, per dollar spent, ICE is able to
9  have more non-citizens in alternatives for
10 detention than it could if that same amount of
11 money was spent on detention?
12    A.   Yes.  I mean, we have what roughly
13 300,000 on ATD today.  We have approximately
14 26,000 in custody.  So, obviously, we're able to
15 keep tabs, you know, for lack of a better term,
16 on more than 10 times the number today.
17    Q.   We talked a bit about the parole ATD
18 program.  In that program, which agency makes
19 the decision whether to release the non-citizen?
20    A.   On the parole plus ATD program?
21 Border Patrol.
22    Q.   Okay.  What's ICE's role in that

1  program?

2  A.  If the determination is made that that

3  person is going to be released, then ICE -- an

4  officer would come in, review that case for that

5  individual to see what form of ATD would be

6  appropriate, and then they would go ahead and do

7  that.  And not all cases are going to get

8  electronic monitoring.  We have limitations on

9  you know, the number and also there's things

10 like, again, like I mentioned earlier, if we

11 have somebody who is a say a minor, or somebody

12 who is pregnant, they're not going to have say

13 an ankle bracelet.  So, we can't just put that

14 on everybody.

15 Q.  With the family residential centers

16 that ICE formerly had --

17 A.  Yes.

18 Q.  -- what were some of the factors that

19 limited the ability to maximize use of all the

20 space in family residential centers when they

21 were in operation?

22 A.  A number of factors.  So, we have

1  litigation, of course, like I had mentioned
2  before, but one of the biggest drivers I would
3  say would be because of COVID and the
4  restrictions that were put in place because of
5  COVID.  We also have logistical concerns.  If
6  somebody is arrested in say California, you
7  can't necessarily get them to an FRC.  They
8  would have to sit with Border Patrol for several
9  days until they can get a flight for us to fly
10 them down to, you know, South Texas to be held
11 at one of our FRCs.  Like I said, there's a
12 variety of things that impact, you know, our
13 ability to maximize all of our beds.  You have
14 things like the -- the demographics of the
15 family unit itself and, you know, I'm not the
16 expert.  I would defer to my Custody Division to
17 give you all the, you know, facts there.  But if
18 you have, say, a dual head of household mom and
19 dad with a 6-year-old girl, they're not going to
20 be able to be held in the same dorm, as say, a
21 dad with a 13-year-old son.  So, those also kind
22 of limit our ability to how many -- how many

1  people we can put into facility.
2      Q.   Are there fewer limitations with
3  detention of single adults?
4      A.   There are still limitations, but there
5  are fewer than with family.  That's -- that's
6  for sure.
7      Q.   We talked about the Flores consent
8  decree.  That's been in place for decades,
9  right?
10     A.   Yes.
11     Q.   And throughout that entire period of
12 time, ICE always had to release family units
13 before that 21-day mark?
14     A.   Oh, yes.
15     Q.   And when ICE had to release those
16 aliens before that 21-day mark, they were then
17 always being placed on the non-detained docket?
18     A.   They'd be on the non-detained docket,
19 yes.
20     Q.   Okay.  During the period of time when
21 family units were being temporarily held in
22 hotels, were they still being detained by ICE

1 during that period?
2     A. Yes.
3     Q. Have the changes to ensuring the
4 accountability of family units impacted ICE's
5 ability to determine the whereabouts and ensure
6 the accountability of those family units?
7     A. Can you say that one more time?
8     Q. Sure. Have the changes to ICE's
9 ability to detain family units impacted ICE's
10 ability to ensure the whereabouts and the
11 accountability of those family units?
12     A. I mean, we're ATD on them, so we're
13 still, you know, tracking where their locations
14 are, whether they're in custody or out of
15 custody.
16     Q. Are all non-citizens who are caught
17 entering the country illegally subject to
18 mandatory detention under INA 235?
19     A. I do not believe so. I would have to
20 consult with OPLA to verify but no, I do not
21 believe they all are.
22     Q. They might be subject to other

```
1   detention authority?
2        A.   Correct.
3        Q.   Do you know what that would be?
4        A.   I don't know the -- the actual
5   citation.  I would have to consult with OPLA to
6   get that.
7        Q.   That authority would allow other
8   release options besides just parole for those
9   aliens?
10       A.   Yes.
11       Q.   What would those release options be?
12       A.   The same that we use now when we
13  release somebody on a bond or order
14  reconnaissance or supervision and then place ATD
15  along with it, we can still use that.
16       Q.   Okay, that's it for me.  Thank you.
17       EXAMINATION BY COUNSEL FOR PLAINTIFF
18  BY MR. GUARD:
19       Q.   All right, I have a few questions.
20       A.   Yes, sir.
21       Q.   You talked about expulsions?
22       A.   Yes.
```

ERRATA SHEET FOR THE TRANSCRIPT OF:

Caption: State of Florida v. The United States of America, et. al.

Deponent: Corey A. Price, Individually

Deposition Date: September 9, 2022

Case No.: 3:21-cv-1066

| Page | Line | Correction | Reason |
|---|---|---|---|
| Pg 15 | 7 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 47 | 14 | Change "loss" to "ALOS" | Mis-spelled. ALOS is an acronym. |
| Pg 115 | 5 | Change "board parole" to "Border Patrol" | Mis-spelled |
| Pg 122 | 15 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 122 | 16 | Change "Q" to "A" | It was an Answer, not a Question |
| Pg 122 | 17 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 147 | 12 | Change "we're" to "we use" | Mis-spelled |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true to the best of my knowledge and belief.

Signature of Deponent: _____

Dated this: __21__ day of __September__, 2022