State of Florida

vs.

United States

---

Deposition of:

C/R: Department of Homeland Security (Robert Guadian)

July 14, 2022

*Vol 1*

---



Page 30

1      Q.   Is it an immigration judge or --

2      A.   No.

3      Q.   -- a magistrate?

4      A.   No, it's a district court judge.

5      Q.   All right.  Thank you for that clarification.

6      Do you also implement any rules or regulations in

7   addition to statutes?

8      A.   Can you -- I don't believe so.  But can you

9   clarify that question?

10     Q.   Well, I mean, in your duties at ERO, do you

11   implement any rules or regulations?

12     A.   No.

13     Q.   Do you implement any policies at ERO?

14     A.   We don't create the policies, but we

15   operationalize the policies.

16     Q.   What types of policies do you operationalize?

17     A.   Let me see, off the top of my head -- I'm

18   drawing a blank.  But, for example, I mean, we have the

19   parole policy that was issued ten years ago; so we

20   operationalize that with our field office directors.

21   But there's -- There's many policies.

22     Q.   So when you say you operationalize a parole

23   policy that's been in effect for ten years, what is

24   that specific policy?

25     A.   So the parole policy that we have as it

Page 31

1  relates -- as it relates to aliens that have entered

2  the United States and they're expedited to be removed

3  and they're turned over to ICE under an expedited

4  removal, and they're kept in our custody because ERO --

5  Actually, no ERs are one of the mandatory detention

6  cases for us; so we keep them detained.

7       But there is a permissible provision within

8  that -- within that section of law that allows us to

9  parole on a case-by-case basis.

10      And that policy spells out what we should be

11  looking at in those cases, you know, namely significant

12  public benefit, humanitarian concerns, risk to the

13  community, or whether or not they have identity

14  documents is another one or are they a risk to abscond.

15      So we do an in-depth review of each one of those

16  cases that -- where we're exercising our discretion in

17  terms of that policy, using that policy as a guided

18  post.

19      So that's one -- one of the policies that we

20  operate -- that we're responsible for operationalizing.

21      **Q.   Okay.  So when you use the term parole, what**

22  **does that mean?**

23      A.   Parole is under -- What I'm referencing is

24  section 212(d)(5) parole.

25      **Q.   What is the term -- What does parole mean?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.    Oh, so --

**2    Q.    -- and it relates?**

3    A.    Yeah, so it's a mechanism that allows the

4  alien that's been in custody to be released.  It's a

5  discretionary form of release.  And it's dependent on

6  an in-depth case review for all cases.

7        It allows the alien to be in the community while

8  they await their asylum hearing or their immigration

9  hearing depending on why the parole was issued and who

10  it was issued by.

**11    Q.    You said that policy has been in effect for**

**12  ten years; do you know who issued that policy?**

13    A.    I don't recall.  I don't recall.

**14    Q.    Okay.  And you used the term "expedited**

**15  removal"; what is expedited removal?**

16    A.    So expedited removal refers to the authorities

17  that are granted to ICE and CBP that allow for removal

18  enter -- removal order to be entered against an alien

19  that has entered the country illegally if they've met

20  certain parameters.

21        Those parameters include being in the country less

22  than 14 days, being in the -- being within 100 miles of

23  the -- of the southwest border.

24        The person can't be a juvenile.  There may be some

25  other considerations as well.

Page 36

1    A.   I don't know.  I don't know anything beyond

2    the ATD component of anything they may be doing.

3    **Q.   And does ERO operate detention facilities?**

4    A.   Yes, we do.

5    **Q.   Okay.  Does CBP sometimes transfer noncitizens**

6    **to your facilities?**

7    A.   Yes.

8    **Q.   Under what circumstances do they transfer**

9    **noncitizens to your detention facilities?**

10   A.   Those aliens that require detention, they

11   would be transferred to one of our detention locations.

12   **Q.   Let's talk about the first topic, which is**

13   **Parole Plus ATD.  You've already gotten into that a**

14   **little bit.**

15   **Can you explain to me the history of ATD; when did**

16   **it start becoming a thing?**

17   A.   Sure.  Approximately 2002 was when we started

18   receiving funding for the alternatives to detention

19   program.

20   That's been very successful.  Over the last five

21   years, we've -- Congress has allotted additional funds

22   towards the ATD program.

23   The program is a success because it -- It

24   increases or it has a very high appearance rate

25   within -- with the immigration courts, meaning when we

Page 37

1  place an alien on ATD, the rate of appearance at their

2  immigration court hearings is very high.

3      The amount of cases or aliens that are not

4  successful on ATD is very low.

5      And we have an overwhelming positive experience

6  with alternatives to detention, and it's much cheaper

7  than detention.

8      It's less than $10 a day to keep someone on ATD

9  where it's approximately $150 a day in detention.

10     **Q.   And when the program was started in 2002,**

11  **which types of noncitizens qualified to be placed in**

12  **ATD?**

13     A.   So I don't recall what we were doing in 2002.

14  I can't say that today.  Noncitizens that aren't a

15  threat a community, they're not public safety risk,

16  they don't have medical conditions, something that

17  would prohibit like an ankle bracelet being

18  administered.  They can't be unaccompanied children as

19  well.

20     And typically, if they're family units, we -- we

21  would -- We would place ATD on the head of household in

22  that instance.

23     But every case is different.  And we look at the

24  different -- We look at the case as a whole, and then

25  we make the decision on what type of monitoring would

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 39

1    A.   I don't know.  But what I can say is that when

2  we rolled out ATD as an agency back in 2002, we didn't

3  have a lot of the tools that we have today.

4    You know, facial recognition was not a thing.  It

5  was not something that was done.

6    My sense is that we looked at radio frequency

7  devices in those days.  We -- But I don't know the

8  entire -- all the equipment that we had in regards to

9  ATD back in 2002.

10   **Q.   Were individuals eligible for ATD back in**

11  **2002?**

12   A.   Yes.

13   **Q.   Okay.  Was there ever a period of time since**

14  **2002 when individual adults were not eligible for ATD?**

15   A.   Could you repeat that question?

16   **Q.   Was there ever a period of time since 2002**

17  **when an individual adult was not eligible to use ATD**

18  **program?**

19   A.   Yes. So it's -- I can't speak to 2002. But,

20  you know, just currently, aliens that don't have -- if

21  they're -- If they're a risk to the community, they

22  wouldn't be eligible for ATD.

23   If they are -- If they have medical concerns or

24  medical conditions that would prohibit the placement of

25  an ankle monitor, they would not be eligible.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 59

 1  **decompress.**

 2      A.    Yeah.  No, so it's -- The Border Patrol has

 3  the authority -- or their facilities are built for

 4  short-term processing.

 5      So we don't house for the Border Patrol while

 6  they're processing people.

 7      You know, they have to be charged and issued

 8  either a warrant of arrest requiring their detention or

 9  they'll have to have a final order in the terms of

10  expedited removal, something that makes them --

11  something that requires their -- the aliens that

12  they're processing to be detained.

13      At that point ICE will accept custody of that

14  alien at that point.

15      We don't -- We don't hold unprocessed or aliens

16  that have not been issued a notice to appear or warrant

17  of arrest or final order of removal from the Border

18  Patrol.

19      And Border Patrol stations -- don't want to speak

20  for them -- but typically their stations are built for

21  short-term holds, so it's not -- It's not for long

22  terms.

23      And when I say we -- we keep -- we support them in

24  their decompression efforts, I mean, we keep enough

25  beds at our facilities along the southwest border to

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 60

1  support those arrests because we're seeing that the

2  arrests from the southwest border can fluctuate; so we

3  want to make sure and keep that capacity available for

4  the Border Patrol to use within a close distance of the

5  border.

6      **Q.   So how many detention facilities does ICE**

7  **operate along the southwest border?**

8      A.   I'm sorry.  I don't recall that number.

9      **Q.   Like --**

10     A.   I can tell -- I don't know an approximate.

11  What I can say is that a majority of our bed space

12  is located along the southwest border.  There's -- That

13  would be the majority of it.

14     **Q.   Okay.  So a majority of your entire detention**

15  **capacity throughout this vast network is located along**

16  **the southwest border; did I get that correct?**

17     A.   Yes, that's my understanding.  I don't have

18  the specific numbers.  But we have a large capacity to

19  hold along the southwest border.

20     **Q.   How many detention facilities does ICE**

21  **operate, not through vendors, but independently operate**

22  **yourselves?**

23     A.   I don't recall.  The Port Isabel Service

24  Processing Center, the -- There's a facility in

25  Phoenix, which is the Florence Service Processing

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 66

1  there's -- that's -- Let me give you some -- a little

2  background on that.

3      So as I described earlier, there's challenges to

4  keeping every bed filled, that's especially in -- you

5  know, in certain states where we have litigation that

6  prevents us from utilizing all of our beds, as well as

7  trying to prevent the transmission of COVID and trying

8  to keep a six-foot distance between people.

9      And it all depends also on the location of SPC.

10  For example, if we have a location that has a high

11  COVID transmission rate in a community, we typically

12  can't utilize every single one of our beds, as well as,

13  you know, we can't mix male and female either.

14      So although we may have a pod of 50, a pod is a

15  housing unit within a jail.

16      We may have 50 beds in a pod.  And if there are

17  two females in there, we -- Those are -- The 48 beds

18  are offline, unless we have another female arrest that

19  we can put in there.

20      So it's not -- It's not as easy as saying that we

21  can utilize all our bed capacity.  We do our best to

22  utilize what we can.

23      But, you know, some of the -- Some of the

24  challenges I just described prevent us from using every

25  single bed in our detention inventory.

Page 74

1    Q.    **Does ICE provide that information when they**

2    **release people from detention?**

3    A.    So depending on what -- if people are released

4    on alternatives to detention, alternatives to detention

5    to program, the contractor does have what's called wrap

6    around services where that includes classes, that

7    includes getting them in touch with nongovernmental

8    organizations in the community, things of that nature,

9    more so getting them acclimated to American culture and

10   those type of resources that are available to them.

11   Q.    **Do they get them in touch with any**

12   **governmental resources?**

13   A.    It's possible, but I don't know the answer to

14   that.

15   Q.    **Okay.  So -- So when an ankle monitor is**

16   **placed on somebody, is that -- does that require Wi-Fi**

17   **connection?**

18   A.    I don't think so, but I'm not certain.

19   I think the GPS ankle monitors is strictly GPS; it

20   relies on GPS for tracking.

21   Q.    **Does it require connectivity?**

22   A.    I don't know the answer to that question.

23   Q.    **All right.  I want to show you Exhibit 6.**

24         (Exhibit No. 6 was marked.)

25   BY MS. BRODEEN:

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 91

1  final stage of all staffing, I believe?

2      A.    We were -- We allowed the field offices to go

3  to 100 percent staffing because of -- We were in the

4  phase three of the reconstitution plan for ICE.

5      Q.    What's "the reconstitution plan for ICE"?

6      A.    So it was -- The reconstitution plan was our

7  operating instructions while we were under the

8  pandemic.

9      And it guided our field offices at what levels and

10  what guideposts to use to determine how many people

11  needed -- how many employees would be at our -- at each

12  of our offices nationwide.

13     Q.    And who -- Whose plan was that?  Who came up

14  with that plan?

15     A.    That was ICE director.

16     Q.    And at this time are your ICE offices

17  operating with any COVID protocols such as spacing?

18     A.    It depends.  It depends on the community-

19  transmission levels near -- near that office.

20     We look at the CDC guidance for that particular

21  county.

22     And that reconstitution plans provides the field

23  office directors with some guideposts to use as to when

24  to have 50 percent staffing, when to have 75 percent

25  staffing or 100 percent staffing based on community-

Page 141

1      Q.   Okay.

2      A.   -- typically.

3      Q.   **And during what period of time were those**

4   **hotels under contract to house family units by ICE?**

5      A.   May 2021 to -- I'm sorry.  March of 2021 to

6   March of 2022.

7      Q.   **Okay.  And what happened in March of 2022 that**

8   **caused them to no longer be used by family units?**

9      A.   So ICE determined that we were experiencing a

10   large number of adults crossing the southwest border,

11   and we needed additional adult beds; and also we

12   determined that ATD was a better alternative for family

13   units.  It was in -- When we released the family on

14   alternatives to detention, it's more humane.  It's a

15   more humane system -- effort in order to track those

16   cases through the system.

17      What we found with our family residential

18   standards were also impacted by litigation that doesn't

19   allow us to detain families more than 20 days.

20      So we made the decision -- As we always are

21   looking at our detention inventory to see how best to

22   support the U.S. Border Patrol in their bed space

23   needs, we made the decision that since more single

24   adults were crossing the southwest border, we made

25   those -- We converted the family residential centers to

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  adult beds as opposed to family beds based on the need

2  on the southwest border.

**3      Q.   And what about the hotels, were individual**

**4  adults housed in hotels after March --**

5      A.   No.

**6      Q.   -- 2022?**

7      A.   No.  No, they weren't.

**8      Q.   Was that contract just dropped with the hotels**

**9  after March 2022, no need for the space?**

10     A.   I don't know the status to the contract.

**11     Q.   Okay.**

12     A.   We don't use the hotels as of March 2022.

**13     Q.   Okay.  So would you say that ATD was more**

**14  humane, something like that; did you say something**

**15  about --**

16     A.   So we've seen a high success rate with our

17  alternatives to detention program.  A high percentage

18  remain compliant with the program.  We see a very high

19  rate of court appearances within the program.  And that

20  particular population, as vulnerable as they are, as

21  family units crossing with small children, we made the

22  decision -- ICE made the decision that alternatives to

23  detention was our best option for that particular

24  subset of detainee.

**25     Q.   Okay.  And then when those people were**

Page 143

1  released, those family units were released under Parole

2  Plus ATD, do you know what kind of conditions they were

3  released into where they lived, if there were

4  improvements to what you provided previously?

5      A.   I don't know the answer to that question.  Can

6  you rephrase it?

7      Q.   Okay.  So do you have any information that

8  after you released family units under Parole Plus ATD,

9  they were released into better conditions than what you

10 provided at hotels, Dilley, Karnes or Burke?

11     A.   No, I don't; I don't have any information on

12 that.

13     Q.   Which -- Have you ever been to these hotels

14 that were under contract for housing family units?

15     A.   No.

16     Q.   Did you get any reports that there were

17 inhumane conditions at those hotels?

18     A.   I don't recall any of that.

19     Q.   Okay.  What about Dilley, Karnes and Burke,

20 were they inhumane conditions that you operated?

21     A.   Yes.

22     Q.   What was inhumane about those -- the

23 operation?

24     A.   Oh, just -- I strike my -- I thought you said

25 the other question.  I thought you said were they

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 147

1   residential standards are -- are based on a civil

2   detention model, and we take the Flores agreement

3   into -- And we factor those into our family residential

4   standards.

5       As I stated previously, it's -- The Flores

6   litigation does not allow us to detain families beyond

7   20 days.

8       **Q.   Is it possible for ICE to create new detention**

9   **centers that comply with the Flores consent decree?**

10          MR. DARROW:  Objection again; beyond the scope

11  of this topic.

12          MS. BRODEEN:  Okay.

13          MR. DARROW:  If you know.

14  BY MS. BRODEEN:

15      **Q.   Is it possible that ICE could create new**

16  **detention centers that comply with the Flores consent**

17  **decree?**

18      A.   I don't know that answer.  I know that our

19  authorization for funding of new facilities would be

20  based by congressional appropriation.

21      I'm sorry, I don't know the answer to that.

22      **Q.   And did you ever express concerns about**

23  **closing any of these family-unit facilities?**

24          MR. DARROW:  Objection.  You're talking to the

25  witness now as a 30(b)(6) witness.  If you have

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 160

1  could be a chance it increases the number of

2  operational beds.  But not knowing the context, whether

3  this -- was this happening during COVID, were there --

4  what state was this occurring in because if this is

5  happening in California, it doesn't matter their book-

6  ins are reduced by 50 percent, we're not using those

7  beds.  Those beds are going to be offline because of

8  litigation in that particular state.

9  BY MS. BRODEEN:

10      Q.    Okay.  And this email is dated January 27,

11  2021; that's during the pandemic, correct?

12      A.    Correct.

13      Q.    Now, you mentioned Fraihat; what is that?

14      A.    So it's spelled F-R-A-I-H-A-T, Fraihat; and

15  it's a -- So I'm an operator.  I'm not an attorney.

16      But it is one of the decisions out in California

17  that severely restricts how many beds that we use

18  operationally because it requires us to conduct a case-

19  by-case review and assessment of each detainee, their

20  risk factors for COVID versus their threats to the

21  community.  And the judge in that particular -- I think

22  that's all I can say about that.  I don't want to

23  misspeak.  I don't know the case that well.  But I do

24  know operationally it takes a lot of our beds offline.

25      Q.    It takes -- That case takes beds offline

Page 162

1   of counsel.

2       Q.   Okay.  And to the best of your knowledge, is

3   this an exhaustive list of the authority that's

4   requested in this interrogatory or is there anything

5   else possibly?

6       A.   No, I think this is exhaustive.

7       Q.   Okay.  And there's a reference here in your

8   answer to CFR section 212.5 for paroled cases.

9       Is this what we referred to earlier as INA 212 or

10  is this a regulation that implements 212 that we talked

11  about earlier?

12      A.   I can't answer.

13      Q.   If you don't know, that's okay.

14      A.   I don't know.

15      Q.   Okay.  What is a parole case that's referenced

16  in this section?

17      A.   Those are paroles under 212D, D5 of the INA.

18      Q.   INA you said?

19      A.   Yes.

20      Q.   Okay.  Let's look at Interrogatory No. 3,

21  please explain whether DHS believes it has authority or

22  discretion to release applicants for admission pursuant

23  to 8 U.S.C. section 1226 if DHS decides to place an

24  alien in standard removal of proceedings rather than

25  expedited removal of proceedings; and then you gave a

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 163

1    response.  Did you have assistance in answering this?

2       A.    Utilized of my counsel.

3       Q.    Okay.  And Interrogatory No. 4, if DHS

4    believes it has authority or discretion to release

5    applicants for admission pursuant to 8 U.S.C. section

6    1226, please explain what criteria DHS uses to

7    determine when to do so, comma, as opposed to detain

8    the alien as required by 8 U.S.C. section 1225.  You

9    give a response here.  Did anybody assist you with

10   this?

11      A.    I coordinated with my -- I sought the advice

12   of my counsel.

13      Q.    Okay.  And interrogatory -- Interrogatory

14   No. 5, last one, if DHS believes it has authority or

15   discretion to release applicants for admission pursuant

16   to 8 U.S.C. section 1226, please explain whether DHS's

17   initial arrest in those cases are made pursuant to an

18   immigration warrant, period.

19      You gave a response here that refers to some

20   statutes.  Did anybody assist you with this response?

21      A.    I coordinated my responses with my counsel.

22           MS. BRODEEN:  Can I just take a couple minutes

23   to go through my notes?  This is a good thing, by the

24   way.

25           MR. DARROW:  Sure.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.   So there's a -- There's a few things.  So if

2  they're -- A lot of the check-ins, typically a person

3  checks into ICE, they're issued the charging document

4  for these NTR and these Parole Plus ATD cases.

5    As I mentioned previously, some individuals do

6  arrive in line without an appointment.  Those

7  individuals are told to go back home and schedule

8  themselves online.  Excuse me.

9    **Q.   Okay. So -- Go ahead. Keep going.  I'm**

10  **sorry.**

11    A.   No, I was gonna just mention that they're told

12  to go back home and schedule themselves online for an

13  appointment that makes sense to them, you know, working

14  around their schedules.  They can -- It's a self-

15  service type website.  So it's not fair to say, you

16  know, just because they didn't check-in, ICE has to

17  take an action.  They -- They may have checked in, but

18  they're within the time frame to actually check-in.

19    **Q.   What happens if they don't check-in at all?**

20    A.   Again, in this -- In this scenario, just to

21  add some more context, can you describe who ordered the

22  check-in or did they themselves or --

23    **Q.   Okay.  So under the Parole Plus ATD policy, if**

24  **somebody's who released but told to check-in to ICE and**

25  **they fail to check-in to ICE at all, what happens to**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  that family unit or the head of household?

2      A.   So I can tell you that we -- knowing that

3  during the time period, especially during COVID and

4  when we were closed, we had quite a bit of people that

5  couldn't check-in; so what we ended up doing was

6  issuing their notice to appear via certified mail to

7  get them in immigration proceedings.  And, furthermore,

8  we placed -- If they were family units and they were

9  eligible, if they lived in 11 cities that were

10  considered -- that were cities under our program called

11  dedicated docket, we placed those families on the

12  dedicated docket.

13      The dedicated docket means that they would get

14  expedited hearings.  We would get an immigration

15  hearing done more quickly on a faster track than we

16  would in a regular non-docket.

17      Q.   Okay.  And what percentage of those mailings

18  that were sent by certified mail were returned?

19      A.   So I don't have the data in front of me, but

20  less than five percent of the -- of the individuals

21  that we issued NTAs for have invalid addresses.

22      Q.   Okay.  So you said individuals, what about

23  family units?

24      A.   Yes, that's head of households.

25      Q.   Head of households, so -- And do you track