1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF FLORIDA

PENSACOLA DIVISION

- - - - - - - - - - - - - - - - - x

STATE OF FLORIDA,                  :

        Plaintiff,        :

    vs.                           : Case No.

THE UNITED STATES OF AMERICA,      : 3:21-cv-1066

et al.,                            :

        Defendants.       :

- - - - - - - - - - - - - - - - - x

                   Arlington, Virginia

                   Thursday, July 28, 2022

      Videotaped Deposition of RAUL L. ORTIZ, a

witness herein, called for examination by counsel for

Plaintiff in the above-entitled matter, pursuant to

notice, taken at the offices of Henderson Legal

Services, 2300 Wilson Boulevard, Seventh Floor,

Arlington, Virginia, at 9:32 a.m. on Thursday, July

28, 2022, and the proceedings being taken down by

stenotype by and transcribed by KAREN YOUNG.

1    Q.   Okay.  And the Flores consent decree deals
2    with the detention and treatment of juveniles, does
3    it not?
4    A.   Yes.
5    Q.   Would you agree that the detention of
6    juveniles raises additional challenges for the Border
7    Patrol that are not present when you're dealing with
8    single adults?
9         MR. DARROW:  Objection.
10   A.   Yes.
11   Q.   What are those additional challenges?
12   **A.   So one, the Border Patrol facilities were**
13   **never designed to support long-term detention of**
14   **juveniles.  Juveniles require different care, to**
15   **include, you know, in some cases infant and tender**
16   **age children under the age of seven.  Our Border**
17   **Patrol agents first off didn't receive training at**
18   **their academy to be able to support the wrap-around**
19   **services that unaccompanied children pose in our, and**
20   **so just in general, when you -- when you're housing,**
21   **you know, large numbers of unaccompanied children in**
22   **congregate settings with adults and family units, the**

1 **facilities do not have sufficient space to ensure**

2 **that their safety and security is -- can be**

3 **prioritized the way it should be in a family**

4 **residential center or facility that HHS may operate.**

5     Q.   Okay.  I want to kind of carve off

6 unaccompanied children from family units.

7     **A.**   **Okay.**

8     Q.   Both of them have juveniles, correct?

9     **A.**   **That's correct.**

10     Q.   All right.  Unaccompanied children, Border

11 Patrol doesn't turn those children over to ICE,

12 correct?

13     **A.**   **That's correct.**

14     Q.   Instead, it turns them over to Department

15 of Health and Human Services, right?

16     **A.**   **HHS, yes.**

17     Q.   All right.  I'm going to call it HHS just

18 to -- for ease and comfort.  And does Border Patrol

19 segregate for a short time juveniles apart from

20 family units and single adults?

21         MR. DARROW:  Objection.

22     **A.**   **Yes.**

1          MR. DARROW:  Objection.
2     **A.   Yes.**
3     Q.    Okay.  Do you know when parole plus ATD was
4  first utilized with single adults?
5     **A.   I'd have to go back and check.**
6     Q.    Okay.  Was it in the last fiscal year?
7     **A.   Yes.**
8     Q.    Okay.  Was it since January?
9     **A.   Yes.**
10    Q.    Okay.  For single adults where parole plus
11 ATD is being utilized, are there any common
12 characteristics like national origin that are defined
13 when it is used and when it is not used?
14    **A.   Yes.**
15    Q.    All right.  What are those common
16 characteristics?
17    **A.   Quite often it's going to be from**
18 **populations where we do not have a return mechanism,**
19 **and then also it would be, you know, for those**
20 **populations with no criminal history, they are deemed**
21 **not a security risk, and more often than not, they**
22 **would be considered vulnerable population.**

1       Q.    All right.  You've actually increased
2  Border Patrol's detention capacity, right?
3       A.    Yes.
4       Q.    You put up I think one or two soft-sided
5  facilities; is that correct?
6       **A.    We put up multiple soft-sided facilities,**
7  **and we also completed our centralized processing**
8  **center in Rio Grande Valley, which is our Ursula**
9  **facility.  We stood that up under the previous**
10 **administration after the -- in 2014, and continued to**
11 **operate that for the next four years, but it needed**
12 **some engineer's modifications to bring it up to code,**
13 **and so we in essence had to shut it down, but over**
14 **the last -- I believe we opened it back up in**
15 **December.**
16      Q.    Okay.  And increasing detention capacity
17 for any organization, but for a federal government
18 agency, takes time, right?
19      **A.    Yeah, most definitely.  You need both, in**
20 **this case, the contracting ability to be able to do**
21 **it, you have to have the funding to be able to do it,**
22 **and then you have to have the manpower to support**

121

1    those facilities.
2        Q.    And standing up additional facilities is
3    something that takes time, right?  Takes multiple
4    years, correct?
5        A.    Typically -- I mean, we have stood up some
6    soft-sided facilities in relatively quick periods of
7    time depending on the conditions, but more often than
8    not, it takes months if not a year to plan.
9        Q.    Okay, and today, you can now handle a
10   higher volume of aliens as far as processing than you
11   could before January of 2021, right?
12           MR. DARROW:  Objection.
13       A.    So depending on what you are sort of -- so
14   we were already dealing with this COVID environment
15   in January 2021, and so our ability to safely care
16   for, detain, process the migrant population as well
17   as care -- ensure safety and security of our
18   personnel was already being challenged.  When you
19   think about, you know, having the ability to --
20   normally without it being in a pandemic or in a COVID
21   environment, a whole 17,000 people at max capacity,
22   that's not optimal.  When you talk about detention,

123

1    A.    No, in some levels it was very dependent on
2    the community, the facility itself, some of the -- as
3    I mentioned, the engineering controls that existed in
4    some of those facilities, and in some facilities, we
5    had to process outside because we did not have enough
6    space to process the amount of migrants we were
7    encountering.
8    Q.    Okay.  I'm going to show you what I've
9    marked for identification as Exhibit 12 to your
10   deposition.
11                         (Ortiz Exhibit No. 12
12                          was marked for
13                          identification.)
14         BY MR. GUARD:
15   Q.    Have you seen Exhibit 12 before, Chief
16   Ortiz?
17   A.    I have.
18   Q.    Okay.  And Exhibit 12 is Homeland
19   Security's FY 2021 budget and brief, correct?
20   A.    Yeah, it appears to be the '21 budget.
21   Q.    Okay, and what this is is a -- kind of a
22   summary that Homeland Security publishes of its

                                                                    140

1    **A.    It looks like it decreases the detention**
2    **capacity but increases the ATD program by $527**
3    **million.**
4      Q.    And so you brought up ATD, and so instead
5    of detaining aliens, this administration has decided
6    to release aliens, including inadmissible aliens into
7    the interior of the country, correct?
8           MR. DARROW:  Objection.
9    **A.    It decided to put them in another program**
10   **of detention, which is alternative to detention with**
11   **either electronic monitoring devices or another**
12   **technical means.**
13     Q.    Or having them call in or report
14   occasionally to an ICE facility, correct?
15   **A.    That's correct.**
16     Q.    All right.  I would assume, since you're
17   not an ICE person, you have no idea how many people
18   they're actually electronically monitoring right now,
19   do you?
20          MR. DARROW:  Objection.
21   **A.    I do not.**
22     Q.    Okay.  You do not know how many people

1  filed how they should get filed, so we'll work with

2  that through your counsel.  And so he would have

3  signed a similar memorandum to this, to your

4  recollection?

5       **A.    Typically that's how information would be**

6  **distributed to the field, which is why I thought**

7  **there was a notice to report memoranda, but when I**

8  **looked through my files, I could not find one either.**

9       Q.    Okay.  And the justification for this

10 policy is the health of aliens, correct?

11            MR. DARROW:  Objection.

12      **A.    Yes.**

13      Q.    And the health of Border Patrol employees,

14 right?

15            MR. DARROW:  Objection.

16      **A.    Well, it's not just that.  I mean, it's the**

17 **health of the communities.  At the time, almost every**

18 **single one of the border communities that we have a**

19 **sector or experiencing significant increases in COVID**

20 **exposures, to include COVID deaths, we had a**

21 **significant spike across the entire southwest border**

22 **and COVID exposures, and even to this day, this**

1   morning I think I had 388 agents still in quarantine

2   status.  We've had 11,692 agents I believe that

3   tested positive for COVID out of 19,355.  We had 19

4   agents die due to COVID, to include two contractors

5   that I attended probably 75 percent of their

6   funerals.

7            Our communities, the health officials, our

8   law enforcement partners were also under the same

9   issues and faced with some of the same concerns that

10  we had as a law enforcement organization.  Typically

11  we use local county detention facilities to house

12  some of our prosecutions, and they were experiencing

13  complete shut-downs of their facilities because of

14  COVID exposures.  So it wasn't just the migrants, it

15  wasn't just our agents, but it was our families, the

16  communities, and all of this was placing a

17  significant strain on the entire border environment.

18     Q.   And I agree and appreciate that, but in the

19  first sentence of the second paragraph, would you

20  agree with me that it only mentions the health and

21  safety of migrants and the health of the work force?

22            MR. DARROW:  Objection.

201

1        BY MR. GUARD:

2     Q.    First sentence of the second paragraph.

3     **A.    That first sentence, that's exactly what**
4  **that says, yes.**

5     Q.    Okay, and at least -- and I'm not
6  minimizing this, because I agree with you, and I've
7  attended too many law enforcement funerals in the
8  last year as well, so I'm not minimizing that at all,
9  but at least I hadn't seen mention of, at least in
10 this document, of the community as a reason for the
11 policy.

12         MR. DARROW:  Objection.

13    **A.    Well, I can tell you as the person who**
14 **signed this document, that the communities certainly**
15 **were a factor in my decision-making process.**

16    Q.    Okay, all right.

17    **A.    My mother lives in a border community in**
18 **Del Rio.  She's 85 years old, very vulnerable and**
19 **certainly susceptible to COVID, and so I can**
20 **guarantee you I factored her health into the issuance**
21 **of this memoranda.**

22    Q.    Again, I'm not quibbling with that at all.

1   accepting custody of any citizens, was it?

2           MR. DARROW:  Objection.

3       **A.    I don't believe so.**

4       Q.    Okay.  So that was always going to be a no.
5   I mean, you were always going to read that bullet
6   point, right?

7           MR. DARROW:  Objection.

8       **A.    Yeah, I think there were maybe some**
9   **conditions where there was a mandatory hold on**
10  **certain populations if they were bag and baggage,**
11  **flight risk.  So there were some exceptions.**

12      Q.    Okay.

13      **A.    Well, it says it in the next bullet.**

14      Q.    Okay.  Well, in the next bullet is -- it
15  makes it -- whether the non-citizen poses a threat to
16  national security, border security or a heightened
17  public safety risk.  Now, this e-mail for whatever
18  reason doesn't -- the previous one has citizens with
19  a paren S closed paren.  This one doesn't.  Is this
20  e-mail saying that you could actually split apart a
21  family unit and peel off a criminal or if someone
22  was, you know, the son of a terrorist, you know, you

1  would have the mother and son could go through and

2  the father who's a terrorist would be split off?  Is

3  that what it's kind of suggesting?

4         MR. DARROW:  Objection.

5     **A.    We have had situations in encounters of**

6  **family units where it could be potentially a mother**

7  **and a father, and the father would have a criminal**

8  **record and would be a mandatory detention, and so in**

9  **that case you're not separating the child from the**

10 **father, but you are taking one of the adults into**

11 **custody.**

12    Q.   Okay, all right.  That makes sense.  All

13 right.  And then the rest of the guidance on AR 0019

14 is just you have the documentation --

15    **A.    The process, yes.**

16    Q.   All right, and if you look at AR 21, it is

17 slightly different.  This is on August 11th, so the

18 process I guess has changed in some way, and what I'm

19 referring to specifically on the previous one, it

20 said until the date, and it had 15 days from entry,

21 and this one is says 60 days from entry, right?

22    **A.    That's correct.**

 1   environment, and lack of opportunities in some of

 2   these countries is certainly pushing migrant -- these

 3   migrant populations to an area where, you know, our

 4   medical care and facilities are much better than what

 5   they may be experiencing in Central America, South

 6   America.  You see the political unrest that's

 7   occurring in Peru and Venezuela and some of the other

 8   countries is a significant driver of the population

 9   into the U.S.

10       Q.   All right, we don't need to look at that

11   exhibit anymore.  How has Border Patrol's processing

12   capacity changed since January 20th, 2021?

13       A.   One of the things that question have been

14   able to invest in considerably is our ability to

15   process the migrant populations much more

16   efficiently.  We have made some significant

17   investments in our ability to begin the process much

18   sooner.  We have and are currently working on an

19   electronic A file.  Traditionally Border Patrol, when

20   they would issue an A file, everything was done via

21   computer and printed out and signed and stored in a

22   paper file system.

1              We are rolling out our electronic A file
2     system across the country.  We are working on our
3     unified processing module, which will allow us to
4     transfer information from us to the other component
5     agencies to include CIS and ICE, Immigration and
6     Customs Enforcement.  We are able to take biometrics
7     in the field and determine immediately whether
8     somebody has been apprehended previously, whether
9     they have a criminal record, and whether they are a
10    threat to our national security or to our officers.
11             So what we've been able to do is speed up
12    the processing in some locations by as much as, you
13    know, half, or cut the processing times in half in
14    many locations, and this is -- you know, we do not
15    have unfortunately mobile devices in every Border
16    Patrol agent's hands, but we're working on
17    prioritizing that in those sectors that are seeing
18    the highest increases of flow.  Yuma's a hundred
19    percent conducting mobile intake, and our plan is to
20    roll it out to Del Rio and Rio Grande Valley, and
21    then continue to expand that across both the
22    southwest border and the northern border.

1            So on top of being able to make some
2   investments in some of our processing centers, to
3   include the one I mentioned earlier, the Ursula
4   facility, which has the ability to house about a
5   thousand people in a hardened structure, we continue
6   to also update and modernize our processing programs
7   because they certainly were in need of improvement.
8        Q.   And what impact does -- does cutting
9   processing time have on the immigration process as a
10  whole?
11       A.   Well, one, it's going to make it more
12  efficient, and two, it allows us to segregate the no-
13  threat humanitarian asylum seeker population from
14  what would -- what I would consider my normal or
15  traditional border security work, which are those
16  migrants that are seeking to come to the U.S. for
17  strictly economic reasons and would not, you know, be
18  eligible for some sort of immigration benefit based
19  upon, you know, humanitarian or political conditions.
20            MR. DARROW:  All right.  Thank you very
21  much, Chief.  That's it for us.
22            FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

249

1    **A.**    Uh-huh.

2    Q.    And then finally -- well, I may have two

3    questions.  You mentioned that you had been chasing

4    traffic since you got on the job and had seen

5    previous surges, right?  Have you ever seen traffic

6    like this before?

7    **A.    Yes, in -- let me explain.  In 1991, when I**

8    **started, we had about 4,000 Border Patrol agents, and**

9    **the amount of apprehensions didn't even come close to**

10   **the amount of people that got away from us.  There --**

11   **I mean, we couldn't even count how many people got**

12   **away from us.  So I can tell you that, you know,**

13   **those first couple of years in my career weren't even**

14   **close, and that was -- and I was only one sector.  I**

15   **didn't have the national perspective, but I'm sure**

16   **that played out in multiple sectors.**

17        **Two, the population that we're experiencing**

18   **now is a little bit different than what we've**

19   **experienced in other surges.  When I was assigned to**

20   **South Texas in '96, Arizona in 2000, Southern**

21   **California in '98, during those surges, that**

22   **population wasn't turning themselves in to our Border**

250

1   Patrol agents.  They were all trying to evade

2   apprehension.  What we're experiencing now,

3   specifically in Yuma, Del Rio, and to some degree Rio

4   Grande Valley is, you know, 75 percent of that

5   population is turning themselves in, and then roughly

6   25 or maybe a little bit more than that are actually

7   trying to evade apprehension.

8           This isn't a matter of us not having the

9   ability to encounter those groups.  This is when you

10  break down the 1.8 million apprehensions that we've

11  already made so far this year, I would imagine quite

12  a few of those large groups are this no-threat

13  humanitarian population that, you know, should be

14  processed at a port of entry.

15       Q.   Are the individuals that are turning

16  themselves in -- are they turning themselves in

17  because they believe they're going to be paroled?

18           MR. DARROW:  Objection.

19           THE WITNESS:  I would imagine that they're

20  turning themselves in because they think they're

21  going to be released, yes.

22           MR. GUARD:  Okay, all right.  I don't think

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Caption: State of Florida v. The United States of America; Alejandro Mayorkas
Deponent: Raul Oritz
Dep. Date: July 28, 2022

I wish to make the following changes for the following reasons:

| Pg. | Ln. | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 15 | 9 | | Graduation year should be corrected from "1919" to "1991" | (Reason: Typo/accuracy) |
| 25 | 18-19 | | "any time I or my expectation is that anybody within the Border Patrol witnesses...." | (Reason: bold/underlined words are needed to make complete sentence) |
| 29 | 15-16 | "hearing under the Flores doctrine" | should be "hearing about the Flores doctrine" | (Reason: accuracy) |
| 48 | 7, 9 | | Note that the answer responds to the question as "fiscal year" and not "physical year" | (Reason: note counsel conversation clarifying language at pg 50) |
| 49 | 15, 21-22 | | Note that the answer responds to the question as "fiscal year" and not "physical year" | (Reason: note counsel conversation clarifying language at pg 50) |
| 51 | 4-7 | | Note that the answer responds to the question as "fiscal year" and not "physical year" | (Reason: note counsel conversation clarifying language at pg 50) |
| 52 | 14 | | Note that the answer responds to the question as "fiscal year" and not "physical year" | (Reason: note counsel conversation clarifying language at pg 50) |
| 67 | 15 | "temporary protective status" | should be "temporary protected status" | (Reason: typo) |
| 166 | 13 | "ITR" | should be "NTR-Notice to Report" | (Reason: typo) |
| 182 | 14 | | Note that the answer responds to the question as "fiscal year" and not "physical year" | (Reason: note counsel conversation clarifying language at pg 50) |
| 222 | 7 | "A Chief" | should be "Associate Chief" | (Reason: Explanation of shorthand language) |
| 229 | 17 | "ATDP" | should be "P+ATD" | (Reason: Correction of acronym) |
| 232 | 12 | "65, 70 thousand" | should be "65 to 70 hundred" | (Reason: accuracy; correct numbers are 6,500-7,000) |

_[signature]_
SIGNATURE OF THE WITNESS

this __10__ day of __September__, 20__22__.