State of Florida

vs.

United States

Deposition of:

Matthew Davies

July 18, 2022

*Vol 01*

**PHIPPS REPORTING**

*Raising the Bar!*

1  future.
2         Other disposition outcomes include withdrawal
3  of application for admission, a voluntary act that
4  CBP may offer as an act of discretion for a
5  noncitizen that we feel is inadmissible, they may be
6  subject to expedited removal, they may be issued a
7  notice to appear in removal proceedings in front of
8  an immigration judge.
9         I'm trying to think through, there may
10 be a few other dispositions for -- oh, so for
11 arriving -- arriving noncitizens may also be paroled.
12 We see this a lot with individuals who are coming to
13 seek medical -- urgent medical treatment.  There may
14 be times where that parole is coordinated in advance
15 by either the USCIS, United States Citizenship and
16 Immigration Services, or ICE, Immigration and Customs
17 Enforcement, depending on whether it's for
18 humanitarian or law enforcement reasons.
19         CBP operates independent or has independent
20 parole authority for similar circumstances to the
21 extent that some of those cases may not have been
22 prearranged with USCIS or ICE.
23         We may also for non-arriving noncitizens have
24 case dispositions that would include voluntary
25 return, which is similar to a withdrawal of

Matthew Davies
July 18, 2022

Page 65

1   A.  So the -- the administration has been
2   trying to at points remove or move us away from
3   Title 42, and we have been as a part of that effort,
4   trying to increase the number of exceptions that we
5   can process at ports of entry.
6         We have the ability to process more
7   individuals, but I think one of the complicating
8   factors in all of this has been that if those
9   individuals were processed at ports of entry without
10  consideration for where they go after we're done with
11  their processing, it would -- it would create
12  additional strain on the system, right, and so I
13  think one of those -- one of those things that we
14  look at is to the extent that individuals may not be
15  subject to detention, whether there's similar
16  capacity downstream for our partners with
17  non-governmental organizations and others who operate
18  shelters or provide assistance to undocumented
19  noncitizens after they have been processed through a
20  port of entry.
21         MS. RYAN:  Can we take a ten?
22         MS. PATEL:  Yes, can I just ask, I have
23      just a couple more questions on this document
24      and then it's a good stopping point.
25         MS. RYAN:  Sure.

Matthew Davies
July 18, 2022

Page 68

1  other options ICE may provide if any.
2  So in the case where there's some other
3  option that is pursued, ICE is the one making those
4  decisions and ultimately executing.  There are other
5  cases, including cases that are not -- that may not
6  be referred to ICE on an individual basis where OFO
7  is executing a parole after the initiation of removal
8  proceedings.
9  BY MS. PATEL:
10  Q.  In what such circumstances would OFO
11  entering a parole?
12  MS. RYAN:  Objection.
13  A.  So if we're talking about people who are
14  issued a notice to appear, then OFO may -- may
15  execute a parole if there are humanitarian or medical
16  concerns.  Largely those are going to be the
17  overriding factors.
18  But we're also looking at whether there is a
19  flight risk, whether there are other factors that
20  would be aggravating and warrant detention.  So we're
21  looking at things like is there a threat posed to the
22  community, is there a concern about a terrorist
23  threat or a national security threat or is there
24  evidence of criminal history, those are the types of
25  things we will be looking at.  And if there was

Matthew Davies
July 18, 2022

Page 69

```
 1   evidence of any of those threat factors, those are
 2   the cases that we would typically be referring to ICE
 3   for detention.
 4   BY MS. PATEL:
 5         Q.  Okay.  I think it's a good time to
 6   take a little ten-minute break if you want to do
 7   that.
 8              MS. RYAN:  Yeah, let's do that, the time
 9         is 11:00 exactly so.
10              MS. PATEL:  All right.  Let's be back at
11         11:10.
12              THE VIDEOGRAPHER:  The time is 10:59 and
13         we are off the record.
14              (Brief break.)
15              THE VIDEOGRAPHER:  The time is 11:13 and
16         we are back on the record.
17   BY MS. PATEL:
18         Q.  All right.  So I want to go back to the
19   discussion we were having regarding transfer to ICE
20   custody, or ICE detention capacity.  So when you make
21   a referral to ICE, does ICE actually take custody of
22   the person?
23              MS. RYAN:  Objection.
24         A.  So the way that we contact ICE in the
25   field, it sometimes varies, because we don't have ICE
```

1  going to be an impact on OFO operations. If we are
2  required to hold an individual, and which may also be
3  impacted by whether there is detention capacity, so
4  in a roundabout way, even if we're not directly
5  considering detention capacity, we may be concerned
6  about the impacts of holding individuals for a
7  prolonged period of time in our limited holding
8  facilities at ports of entry.
9  BY MS. PATEL:
10      Q.  Are there any restrictions or guidelines
11  on how long you can hold someone at your temporary
12  holding facility?
13      A.  Typically we try not to keep people at a
14  port of entry in the holding facility longer than 72
15  hours. Really we try to get people out quicker than
16  that if at all possible. And if it -- typically in a
17  case where we're going to have someone who may extend
18  beyond 24 hours, if it's -- if it's possible, we try
19  to temporarily transfer that person into ICE custody
20  so that they can have access to a facility that meets
21  certain standards in regard to detention that we are
22  unable to provide at a port of entry.
23      Q.  Does the country of origin make a
24  difference as to the available processing outcome?
25      A.  So typically would say no, I know that

Matthew Davies
July 18, 2022

Page 81

1  recently we've had two -- two specific programs where
2  we have looked at world events and exercised
3  discretionary authority on behalf of DHS for in the
4  first instance, individuals fleeing from Afghanistan
5  last year, starting in August where that was a factor
6  that was considered because of the events that were
7  occurring in Afghanistan along -- along with other
8  factors.
9       So you know, we were looking at individuals
10  who were fleeing from events in Afghanistan and, you
11  know, whether -- and how they could be facilitated
12  for entry into the United States, whether through an
13  existing program, whether they were in the pipeline
14  so to speak, for special immigrant Visa processing or
15  whether they had other family members, but because of
16  the urgency and the urgent humanitarian needs, we
17  decided to parole a large number of those individuals
18  in directly.
19       And then following in February, March of this
20  year, given the events in Ukraine, enacted a somewhat
21  similar program for Ukrainian nationals who are
22  seeking to temporarily flee from the violence in
23  their country.
24       Q.  Okay.  Is there anyone else, any other
25  countries?

1   isn't a potential processing pathway; is that
2   accurate?
3           MS. RYAN:  Objection.
4       A.  We are currently processing people who
5   may have -- who have entered the United States for
6   expulsion to the extent they don't need an exception
7   under Title 42.  And yes, we are still preventing the
8   entry of individuals.
9           To the extent we are preventing their entry,
10  I don't know that we would call it a processing
11  disposition, because they're not really being
12  processed, but the expulsions I think may be
13  clarified fairly as a processing disposition.
14  BY MS. PATEL:
15      Q.  Okay.  Does OFO issue notices to appear
16  and then release persons on their own recognizance?
17      A.  Typically when OFO issues a notice to
18  appear and that person is not put into detention,
19  they are paroled from custody by OFO.
20      Q.  Under what circumstances would OFO issue
21  a notice to appear and then parole, issue parole?
22          MS. RYAN:  Objection.
23      A.  So we -- I think I covered when we came
24  back.  So there is a number of instances where we
25  would issue a notice to appear, largely for any of

Matthew Davies
July 18, 2022

Page 84

1  the circumstances where an individual could be
2  inadmissible after having been inspected at a port of
3  entry.
4        And the cases that would potentially be
5  eligible for parole following that issuance would be
6  those where there are -- where management has decided
7  based on a review of the totality of circumstances
8  and all of the factors outlined in the discretionary
9  checklist, that that's an appropriate outcome, you
10 know, largely focusing on those factors that would
11 represent a threat to the community as the reasons
12 for pursuing detention.
13 BY MS. PATEL:
14       Q.  Okay.  And that option is available for
15 both individuals and families; is that accurate?
16            MS. RYAN:  Objection.
17       A.  The option of issuing an NTA and then
18 being paroled?
19 BY MS. PATEL:
20       Q.  Correct.
21       A.  Yes.
22       Q.  Okay.  How long does that process
23 typically take for an individual?
24            MS. RYAN:  Objection.
25       A.  It varies.  It varies on a number of

Matthew Davies
July 18, 2022

Page 105

1  between the data that's contained in each of these
2  rows?
3        A.  Sure.  So the first row that says NTA and
4  Paroled into the U.S. on a case-by-case basis, that
5  reflects the individuals who -- the noncitizens who
6  were processed for NTA on our Southwest Border and
7  were subsequently paroled, that not -- not referred
8  for detention by ICE.
9        The second column parole disposition is all
10 of the other noncitizens that we processed at the
11 Southwest Border during that period of time, that
12 particular month where the individual was paroled,
13 where they were not put into removal proceedings but
14 where there was some other circumstance that
15 warranted the exercise of our discretionary
16 authority, so.
17       Q.  Can you give me an example as to the
18 parole disposition?
19       A.  Sure, so there are a number of reasons we
20 might parole an individual into the United States for
21 either humanitarian, law enforcement purposes, for
22 significant public benefit.
23       The most common reasons that we see I think
24 typically along the Southwest Border are urgent
25 medical concerns, there are people coming to attend

Matthew Davies
July 18, 2022

Page 106

1  funerals within a couple of days of a family member
2  who deceased in the United States and they were
3  unable to obtain travel documents.
4       We have noncitizen emergency response workers
5  who are part of mutual assistance agreements between
6  border communities along the border where they come
7  to provide emergency response services in the United
8  States, but would be inadmissible under our temporary
9  visitor classifications.
10      And so they need to be paroled in to perform
11 those functions, those are the types of examples of
12 what would be under the parole disposition.
13      **Q. And so when they're paroled under the**
14 **parole disposition, are they given any type of**
15 **paperwork?**
16      A.  Yes.  So the -- the documentation for a
17 parole is typically what we call an I-94, that's an
18 arrival/departure record.  Up until a few years ago,
19 we would have given those in paper format but we have
20 been working to automate those records so that
21 individuals who are, even those processed for parole,
22 are able to access an electronic version of their
23 arrival/departure record, their I-94 through CBP's
24 website, i94.cbp.dhs.gov.
25      Q.  Are there specific conditions for this

Matthew Davies
July 18, 2022

Page 111

1   Q.  Okay.  What specific instructions has OFO
2   received regarding family units?
3           MS. RYAN:  Objection.
4   A.  So we have -- it would have been part of
5   the conversations where the guidance is to maintain
6   family unity, but I don't think any of those
7   conversations have really explicitly changed the fact
8   that family unity can be preserved either in a
9   detention setting or typically --
10          And in fact, while there have been
11  conversations about maintaining family unity, OFO has
12  on occasion and when warranted, continued to separate
13  individuals who are part of the family because of
14  particularly egregious criminal histories for
15  example.
16  BY MS. PATEL:
17  Q.  The circumstance that you are speaking
18  about, like how do you separate them?
19          MS. RYAN:  Objection.  Can I get
20          clarification what topic this is covering?
21          MS. PATEL:  This is regarding the
22          non-detention policy topic, topic number two,
23          and I'm just following up on a statement that
24          he just made.
25  A.  So the -- so you're asking how the

Matthew Davies
July 18, 2022

Page 112

1  families are separated. So typically that means that
2  the individual who is a part of a family who may have
3  a criminal history or represent a threat to the
4  community would be prioritized for detention, and if
5  it was not possible to detain the family unit, the
6  rest of that family with that individual, then that
7  individual would be prioritized for detention and
8  the rest of the family would be paroled, presuming
9  that they did not present similar risks to the
10 community.
11 BY MS. PATEL:
12     Q.  And would that parole decision be made by
13 OFO?
14          MS. RYAN:  Objection.
15     A.  Again, that would depend on the
16 circumstances of the case. It may be the case, and I
17 would -- I would expect that in most cases because of
18 our guidance to maintain family unity, that
19 where OFO was advocating for prioritization of one
20 member of a family unit, the entire family unit would
21 be referred to ICE for determination of detention
22 capacity.
23          But I can't rule out the possibility that
24 there might have been some case at some point where
25 OFO would have made that decision, but typically it