

Secretary
U.S. Department of Homeland Security
Washington, DC 20528

February 20, 2017

MEMORANDUM FOR:   Kevin McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Lori Scialabba
Acting Director
U.S. Citizenship and Immigration Services

Joseph B. Maher
Acting General Counsel

Dimple Shah
Acting Assistant Secretary for International Affairs

Chip Fulghum
Acting Undersecretary for Management

FROM: John Kelly
Secretary

SUBJECT: **Implementing the President's Border Security and Immigration Enforcement Improvements Policies**

This memorandum implements the Executive Order entitled "Border Security and Immigration Enforcement Improvements," issued by the President on January 25, 2017, which establishes the President's policy regarding effective border security and immigration enforcement through faithful execution of the laws of the United States. It implements new policies designed to stem illegal immigration and facilitate the detection, apprehension, detention, and removal of aliens who have no lawful basis to enter or remain in the United States. It constitutes guidance to all Department personnel, and supersedes all existing conflicting policy, directives, memoranda, and other guidance regarding this subject matter—to the extent of the conflict—except as otherwise expressly stated in this memorandum.

## A. Policies Regarding the Apprehension and Detention of Aliens Described in Section 235 of the Immigration and Nationality Act.

The President has determined that the lawful detention of aliens arriving in the United States and deemed inadmissible or otherwise described in section 235(b) of the Immigration and Nationality Act (INA) pending a final determination of whether to order them removed, including determining eligibility for immigration relief, is the most efficient means by which to enforce the immigration laws at our borders. Detention also prevents such aliens from committing crimes while at large in the United States, ensures that aliens will appear for their removal proceedings, and substantially increases the likelihood that aliens lawfully ordered removed will be removed.

These policies are consistent with INA provisions that mandate detention of such aliens and allow me or my designee to exercise discretionary parole authority pursuant to section 212(d)(5) of the INA only on a case-by-case basis, and only for urgent humanitarian reasons or significant public benefit. Policies that facilitate the release of removable aliens apprehended at and between the ports of entry, which allow them to abscond and fail to appear at their removal hearings, undermine the border security mission. Such policies, collectively referred to as "catch-and-release," shall end.

Accordingly, effective upon my determination of (1) the establishment and deployment of a joint plan with the Department of Justice to surge the deployment of immigration judges and asylum officers to interview and adjudicate claims asserted by recent border entrants; and, (2) the establishment of appropriate processing and detention facilities, U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) personnel should only release from detention an alien detained pursuant to section 235(b) of the INA, who was apprehended or encountered after illegally entering or attempting to illegally enter the United States, in the following situations on a case-by-case basis, to the extent consistent with applicable statutes and regulations:

1. When removing the alien from the United States pursuant to statute or regulation;

2. When the alien obtains an order granting relief or protection from removal or the Department of Homeland Security (DHS) determines that the individual is a U.S. citizen, national of the United States, or an alien who is a lawful permanent resident, refugee, asylee, holds temporary protected status, or holds a valid immigration status in the United States;

3. When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director consents to the alien's withdrawal of an application for admission, and the alien contemporaneously departs from the United States;

4. When required to do so by statute, or to comply with a binding settlement agreement or order issued by a competent judicial or administrative authority;

2

5. When an ICE Field Office Director, ICE Special Agent-in-Charge, U.S. Border Patrol Sector Chief, CBP Director of Field Operations, or CBP Air & Marine Operations Director authorizes the alien's parole pursuant to section 212(d)(5) of the INA with the written concurrence of the Deputy Director of ICE or the Deputy Commissioner of CBP, except in exigent circumstances such as medical emergencies where seeking prior approval is not practicable. In those exceptional instances, any such parole will be reported to the Deputy Director or Deputy Commissioner as expeditiously as possible; or

6. When an arriving alien processed under the expedited removal provisions of section 235(b) has been found to have established a "credible fear" of persecution or torture by an asylum officer or an immigration judge, provided that such an alien affirmatively establishes to the satisfaction of an ICE immigration officer his or her identity, that he or she presents neither a security risk nor a risk of absconding, and provided that he or she agrees to comply with any additional conditions of release imposed by ICE to ensure public safety and appearance at any removal hearings.

To the extent current regulations are inconsistent with this guidance, components will develop or revise regulations as appropriate. Until such regulations are revised or removed, Department officials shall continue to operate according to regulations currently in place.

As the Department works to expand detention capabilities, detention of all such individuals may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual alien is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3. This guidance does not prohibit the return of an alien who is arriving on land to the foreign territory contiguous to the United States from which the alien is arriving pending a removal proceeding under section 240 of the INA consistent with the direction of an ICE Field Office Director, ICE Special Agent-in-Charge, CBP Chief Patrol Agent, or CBP Director of Field Operations.

## B. Hiring More CBP Agents/Officers

CBP has insufficient agents/officers to effectively detect, track, and apprehend all aliens illegally entering the United States. The United States needs additional agents and officers to ensure complete operational control of the border. Accordingly, the Commissioner of CBP shall—while ensuring consistency in training and standards—immediately begin the process of hiring 5,000 additional Border Patrol agents, as well as 500 Air & Marine Agents/Officers, subject to the availability of resources, and take all actions necessary to ensure that such agents/officers enter on duty and are assigned to appropriate duty stations, including providing for the attendant resources and additional personnel necessary to support such agents, as soon as practicable.

Human Capital leadership in CBP and ICE, in coordination with the Under Secretary for

Management, Chief Financial Officer, and Chief Human Capital Officer, shall develop hiring plans that balance growth and interagency attrition by integrating workforce shaping and career paths for incumbents and new hires.

### C. Identifying and Quantifying Sources of Aid to Mexico

The President has directed the heads of all executive departments to identify and quantify all sources of direct and indirect Federal aid or assistance to the Government of Mexico. Accordingly, the Under Secretary for Management shall identify all sources of direct or indirect aid and assistance, excluding intelligence activities, from every departmental component to the Government of Mexico on an annual basis, for the last five fiscal years, and quantify such aid or assistance. The Under Secretary for Management shall submit a report to me reflecting historic levels of such aid or assistance provided annually within 30 days of the date of this memorandum.

### D. Expansion of the 287(g) Program in the Border Region

Section 287(g) of the INA authorizes me to enter into a written agreement with a state or political subdivision thereof, for the purpose of authorizing qualified officers or employees of the state or subdivision to perform the functions of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States. This grant of authority, known as the 287(g) Program, has been a highly successful force multiplier that authorizes state or local law enforcement personnel to perform all law enforcement functions specified in section 287(a) of the INA, including the authority to investigate, identify, apprehend, arrest, detain, transport and conduct searches of an alien for the purposes of enforcing the immigration laws. From January 2006 through September 2015, the 287(g) Program led to the identification of more than 402,000 removable aliens, primarily through encounters at local jails.

Empowering state and local law enforcement agencies to assist in the enforcement of federal immigration law is critical to an effective enforcement strategy. Aliens who engage in criminal conduct are priorities for arrest and removal and will often be encountered by state and local law enforcement officers during the course of their routine duties. It is in the interest of the Department to partner with those state and local jurisdictions through 287(g) agreements to assist in the arrest and removal of criminal aliens.

To maximize participation by state and local jurisdictions in the enforcement of federal immigration law near the southern border, I am directing the Director of ICE and the Commissioner of CBP to engage immediately with all willing and qualified law enforcement jurisdictions that meet all program requirements for the purpose of entering into agreements under 287(g) of the INA.

The Commissioner of CBP and the Director of ICE should consider the operational functions and capabilities of the jurisdictions willing to enter into 287(g) agreements and structure such agreements in a manner that employs the most effective enforcement model for that jurisdiction, including the jail enforcement model, task force officer model, or joint jail enforcement-task force officer model. In furtherance of my direction herein, the Commissioner of

CBP is authorized, in addition to the Director of ICE, to accept state services and take other actions as appropriate to carry out immigration enforcement pursuant to 287(g).

### E. Commissioning a Comprehensive Study of Border Security

The Under Secretary for Management, in consultation with the Commissioner of CBP, Joint Task Force (Border), and Commandant of the Coast Guard, is directed to commission an immediate, comprehensive study of the security of the southern border (air, land and maritime) to identify vulnerabilities and provide recommendations to enhance border security. The study should include all aspects of the current border security environment, including the availability of federal and state resources to develop and implement an effective border security strategy that will achieve complete operational control of the border.

### F. Border Wall Construction and Funding

A wall along the southern border is necessary to deter and prevent the illegal entry of aliens and is a critical component of the President's overall border security strategy. Congress has authorized the construction of physical barriers and roads at the border to prevent illegal immigration in several statutory provisions, including section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, 8 U.S.C. § 1103 note.

Consistent with the President's Executive Order, the will of Congress and the need to secure the border in the national interest, CBP, in consultation with the appropriate executive departments and agencies, and nongovernmental entities having relevant expertise—and using materials originating in the United States to the maximum extent permitted by law—shall immediately begin planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, along the land border with Mexico in accordance with existing law, in the most appropriate locations and utilizing appropriate materials and technology to most effectively achieve operational control of the border.

The Under Secretary for Management, in consultation with the Commissioner of CBP shall immediately identify and allocate all sources of available funding for the planning, design, construction and maintenance of a wall, including the attendant lighting, technology (including sensors), as well as patrol and access roads, and develop requirements for total ownership cost of this project, including preparing Congressional budget requests for the current fiscal year (e.g., supplemental budget requests) and subsequent fiscal years.

### G. Expanding Expedited Removal Pursuant to Section 235(b)(1)(A)(iii)(I) of the INA

It is in the national interest to detain and expeditiously remove from the United States aliens apprehended at the border, who have been ordered removed after consideration and denial of their claims for relief or protection. Pursuant to section 235(b)(1)(A)(i) of the INA, if an immigration officer determines that an arriving alien is inadmissible to the United States under

5

section 212(a)(6)(C) or section 212(a)(7) of the INA, the officer shall, consistent with all applicable laws, order the alien removed from the United States without further hearing or review, unless the alien is an unaccompanied alien child as defined in 6 U.S.C. § 279(g)(2), indicates an intention to apply for asylum or a fear of persecution or torture or a fear of return to his or her country, or claims to have a valid immigration status within the United States or to be a citizen or national of the United States.

Pursuant to section 235(b)(1)(A)(iii)(I) of the INA and other provisions of law, I have been granted the authority to apply, by designation in my sole and unreviewable discretion, the expedited removal provisions in section 235(b)(1)(A)(i) and (ii) of the INA to aliens who have not been admitted or paroled into the United States, who are inadmissible to the United States under section 212(a)(6)(C) or section 212(a)(7) of the INA, and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been continuously physically present in the United States for the two-year period immediately prior to the determination of their inadmissibility. To date, this authority has only been exercised to designate for application of expedited removal, aliens encountered within 100 air miles of the border and 14 days of entry, and aliens who arrived in the United States by sea other than at a port of entry.[1]

The surge of illegal immigration at the southern border has overwhelmed federal agencies and resources and has created a significant national security vulnerability to the United States. Thousands of aliens apprehended at the border, placed in removal proceedings, and released from custody have absconded and failed to appear at their removal hearings. Immigration courts are experiencing a historic backlog of removal cases, primarily proceedings under section 240 of the INA for individuals who are not currently detained.

During October 2016 and November 2016, there were 46,184 and 47,215 apprehensions, respectively, between ports of entry on our southern border. In comparison, during October 2015 and November 2015 there were 32,724 and 32,838 apprehensions, respectively, between ports of entry on our southern border. This increase of 10,000–15,000 apprehensions per month has significantly strained DHS resources.

Furthermore, according to EOIR information provided to DHS, there are more than 534,000 cases currently pending on immigration court dockets nationwide—a record high. By contrast, according to some reports, there were nearly 168,000 cases pending at the end of fiscal year (FY) 2004 when section 235(b)(1)(A)(i) was last expanded.[2] This represents an increase of more than 200% in the number of cases pending completion. The average removal case for an alien who is not detained has been pending for more than two years before an immigration judge.[3] In some immigration courts, aliens who are not detained will not have their cases heard by an

---

[1] Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68924 (Nov. 13, 2002); Designating Aliens For Expedited Removal, 69 Fed. Reg. 48877 (Aug. 11, 2004); Eliminating Exception to Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 Fed. Reg. 4902 (Jan. 17, 2017).
[2] Syracuse University, *Transactional Records Access Clearinghouse (TRAC) Data Research*; available at http://trac.syr.edu/phptools/immigration/court_backlog/.
[3] *Id.*

6

immigration judge for as long as five years. This unacceptable delay affords removable aliens with no plausible claim for relief to remain unlawfully in the United States for many years.

To ensure the prompt removal of aliens apprehended soon after crossing the border illegally, the Department will publish in the *Federal Register* a new Notice Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(a)(iii) of the Immigration and Nationality Act, which may, to the extent I determine is appropriate, depart from the limitations set forth in the designation currently in force. I direct the Commissioner of CBP and the Director of ICE to conform the use of expedited removal procedures to the designations made in this notice upon its publication.

### H. Implementing the Provisions of Section 235(b)(2)(C) of the INA to Return Aliens to Contiguous Countries

Section 235(b)(2)(C) of the INA authorizes the Department to return aliens arriving on land from a foreign territory contiguous to the United States, to the territory from which they arrived, pending a formal removal proceeding under section 240 of the INA. When aliens so apprehended do not pose a risk of a subsequent illegal entry or attempted illegal entry, returning them to the foreign contiguous territory from which they arrived, pending the outcome of removal proceedings saves the Department's detention and adjudication resources for other priority aliens.

Accordingly, subject to the requirements of section 1232, Title 8, United States Code, related to unaccompanied alien children and to the extent otherwise consistent with the law and U.S. international treaty obligations, CBP and ICE personnel shall, to the extent appropriate and reasonably practicable, return aliens described in section 235(b)(2)(A) of the INA, who are placed in removal proceedings under section 240 of the INA—and who, consistent with the guidance of an ICE Field Office Director, CBP Chief Patrol Agent, or CBP Director of Field Operations, pose no risk of recidivism—to the territory of the foreign contiguous country from which they arrived pending such removal proceedings.

To facilitate the completion of removal proceedings for aliens so returned to the contiguous country, ICE Field Office Directors, ICE Special Agents-in-Charge, CBP Chief Patrol Agent, and CBP Directors of Field Operations shall make available facilities for such aliens to appear via video teleconference. The Director of ICE and the Commissioner of CBP shall consult with the Director of EOIR to establish a functional, interoperable video teleconference system to ensure maximum capability to conduct video teleconference removal hearings for those aliens so returned to the contiguous country.

### I. Enhancing Asylum Referrals and Credible Fear Determinations Pursuant to Section 235(b)(1) of the INA

With certain exceptions, any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum. For those aliens who are subject

to expedited removal under section 235(b) of the INA, aliens who claim a fear of return must be referred to an asylum officer to determine whether they have established a credible fear of persecution or torture.[4] To establish a credible fear of persecution, an alien must demonstrate that there is a "significant possibility" that the alien could establish eligibility for asylum, taking into account the credibility of the statements made by the alien in support of the claim and such other facts as are known to the officer.[5]

The Director of USCIS shall ensure that asylum officers conduct credible fear interviews in a manner that allows the interviewing officer to elicit all relevant information from the alien as is necessary to make a legally sufficient determination. In determining whether the alien has demonstrated a significant possibility that the alien could establish eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, the asylum officer shall consider the statements of the alien and determine the credibility of the alien's statements made in support of his or her claim and shall consider other facts known to the officer, as required by statute.[6]

The asylum officer shall make a positive credible fear finding only after the officer has considered all relevant evidence and determined, based on credible evidence, that the alien has a significant possibility of establishing eligibility for asylum, or for withholding or deferral of removal under the Convention Against Torture, based on established legal authority.[7]

The Director of USCIS shall also increase the operational capacity of the Fraud Detection and National Security (FDNS) Directorate and continue to strengthen the integration of its operations to support the Field Operations, Refugee, Asylum, and International Operations, and Service Center Operations Directorate, to detect and prevent fraud in the asylum and benefits adjudication processes, and in consultation with the USCIS Office of Policy and Strategy as operationally appropriate.

The Director of USCIS, the Commissioner of CBP, and the Director of ICE shall review fraud detection, deterrence, and prevention measures throughout their respective agencies and provide me with a consolidated report within 90 days of the date of this memorandum regarding fraud vulnerabilities in the asylum and benefits adjudication processes, and propose measures to enhance fraud detection, deterrence, and prevention in these processes.

### J. Allocation of Resources and Personnel to the Southern Border for Detention of Aliens and Adjudication of Claims

The detention of aliens apprehended at the border is critical to the effective enforcement of the immigration laws. Aliens who are released from custody pending a determination of their removability are highly likely to abscond and fail to attend their removal hearings. Moreover, the screening of credible fear claims by USCIS and adjudication of asylum claims by EOIR at

---

[4] *See* INA § 235(b)(1)(A)-(B); 8 C.F.R. §§ 235.3, 208.30.
[5] *See* INA § 235(b)(1)(B)(v).
[6] *See id.*
[7] *Id.*

8

detention facilities located at or near the point of apprehension will facilitate an expedited resolution of those claims and result in lower detention and transportation costs.

Accordingly, the Director of ICE and the Commissioner of CBP should take all necessary action and allocate all available resources to expand their detention capabilities and capacities at or near the border with Mexico to the greatest extent practicable. CBP shall focus these actions on expansion of "short-term detention" (defined as 72 hours or less under 6 U.S.C. § 211(m)) capability, and ICE will focus these actions on expansion of all other detention capabilities. CBP and ICE should also explore options for joint temporary structures that meet appropriate standards for detention given the length of stay in those facilities.

In addition, to the greatest extent practicable, the Director of USCIS is directed to increase the number of asylum officers and FDNS officers assigned to detention facilities located at or near the border with Mexico to properly and efficiently adjudicate credible fear and reasonable fear claims and to counter asylum-related fraud.

### K. Proper Use of Parole Authority Pursuant to Section 212(d)(5) of the INA

The authority to parole aliens into the United States is set forth in section 212(d)(5) of the INA, which provides that the Secretary may, in his discretion and on a case-by-case basis, temporarily parole into the United States any alien who is an applicant for admission for urgent humanitarian reasons or significant public benefit. The statutory language authorizes parole in individual cases only where, after careful consideration of the circumstances, it is necessary because of demonstrated urgent humanitarian reasons or significant public benefit. In my judgment, such authority should be exercised sparingly.

The practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration.

Therefore, the Director of USCIS, the Commissioner of CBP, and the Director of ICE shall ensure that, pending the issuance of final regulations clarifying the appropriate use of the parole power, appropriate written policy guidance and training is provided to employees within those agencies exercising parole authority, including advance parole, so that such employees are familiar with the proper exercise of parole under section 212(d)(5) of the INA and exercise such parole authority only on a case-by-case basis, consistent with the law and written policy guidance.

Notwithstanding any other provision of this memorandum, pending my further review and evaluation of the impact of operational changes to implement the Executive Order, and additional guidance on the issue by the Director of ICE, the ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or

torture shall remain in full force and effect.[8] The ICE policy directive shall be implemented in a manner consistent with its plain language. In every case, the burden to establish that his or her release would neither pose a danger to the community, nor a risk of flight remains on the individual alien, and ICE retains ultimate discretion whether it grants parole in a particular case.

### L. Proper Processing and Treatment of Unaccompanied Alien Minors Encountered at the Border

In accordance with section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (codified in part at 8 U.S.C. § 1232) and section 462 of the Homeland Security Act of 2002 (6 U.S.C. § 279), unaccompanied alien children are provided special protections to ensure that they are properly processed and receive the appropriate care and placement when they are encountered by an immigration officer. An unaccompanied alien child, as defined in section 279(g)(2), Title 6, United States Code, is an alien who has no lawful immigration status in the United States, has not attained 18 years of age; and with respect to whom, (1) there is no parent or legal guardian in the United States, or (2) no parent of legal guardian in the United States is available to provide care and physical custody.

Approximately 155,000 unaccompanied alien children have been apprehended at the southern border in the last three years. Most of these minors are from El Salvador, Honduras, and Guatemala, many of whom travel overland to the southern border with the assistance of a smuggler who is paid several thousand dollars by one or both parents, who reside illegally in the United States.

With limited exceptions, upon apprehension, CBP or ICE must promptly determine if a child meets the definition of an "unaccompanied alien child" and, if so, the child must be transferred to the custody of the Office of Refugee Resettlement within the Department of Health and Human Services (HHS) within 72 hours, absent exceptional circumstances.[9] The determination that the child is an "unaccompanied alien child" entitles the child to special protections, including placement in a suitable care facility, access to social services, removal proceedings before an immigration judge under section 240 of the INA, rather than expedited removal proceedings under section 235(b) of the INA, and initial adjudication of any asylum claim by USCIS.[10]

Approximately 60% of minors initially determined to be "unaccompanied alien children" are placed in the care of one or more parents illegally residing in the United States. However, by Department policy and practice, such minors maintained their status as "unaccompanied alien children," notwithstanding that they may no longer meet the statutory definition once they have been placed by HHS in the custody of a parent in the United States who can care for the minor. Exploitation of that policy led to abuses by many of the parents and legal guardians of those minors and has contributed to significant administrative delays in adjudications by immigration

---

[8] ICE Policy No. 11002.1: Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture (Dec. 8, 2009).
[9] *See* 8 U.S.C. § 1232(b)(3).
[10] *See generally* 8 U.S.C. § 1232; INA § 208(b)(3)(C).

courts and USCIS.

To ensure identification of abuses and the processing of unaccompanied alien children consistent with the statutory framework and any applicable court order, the Director of USCIS, the Commissioner of CBP, and the Director of ICE are directed to develop uniform written guidance and training for all employees and contractors of those agencies regarding the proper processing of unaccompanied alien children, the timely and fair adjudication of their claims for relief from removal, and, if appropriate, their safe repatriation at the conclusion of removal proceedings. In developing such guidance and training, they shall establish standardized review procedures to confirm that alien children who are initially determined to be "unaccompanied alien child[ren]," as defined in section 279(g)(2), Title 6, United States Code, continue to fall within the statutory definition when being considered for the legal protections afforded to such children as they go through the removal process.

### M. Accountability Measures to Protect Alien Children from Exploitation and Prevent Abuses of Our Immigration Laws

Although the Department's personnel must process unaccompanied alien children pursuant to the requirements described above, we have an obligation to ensure that those who conspire to violate our immigration laws do not do so with impunity—particularly in light of the unique vulnerabilities of alien children who are smuggled or trafficked into the United States.

The parents and family members of these children, who are often illegally present in the United States, often pay smugglers several thousand dollars to bring their children into this country. Tragically, many of these children fall victim to robbery, extortion, kidnapping, sexual assault, and other crimes of violence by the smugglers and other criminal elements along the dangerous journey through Mexico to the United States. Regardless of the desires for family reunification, or conditions in other countries, the smuggling or trafficking of alien children is intolerable.

Accordingly, the Director of ICE and the Commissioner of CBP shall ensure the proper enforcement of our immigration laws against any individual who—directly or indirectly—facilitates the illegal smuggling or trafficking of an alien child into the United States. In appropriate cases, taking into account the risk of harm to the child from the specific smuggling or trafficking activity that the individual facilitated and other factors relevant to the individual's culpability and the child's welfare, proper enforcement includes (but is not limited to) placing any such individual who is a removable alien into removal proceedings, or referring the individual for criminal prosecution.

### N. Prioritizing Criminal Prosecutions for Immigration Offenses Committed at the Border

The surge of illegal immigration at the southern border has produced a significant increase in organized criminal activity in the border region. Mexican drug cartels, Central American gangs, and other violent transnational criminal organizations have established sophisticated criminal

enterprises on both sides of the border. The large-scale movement of Central Americans, Mexicans, and other foreign nationals into the border area has significantly strained federal agencies and resources dedicated to border security. These criminal organizations have monopolized the human trafficking, human smuggling, and drug trafficking trades in the border region.

It is in the national interest of the United States to prevent criminals and criminal organizations from destabilizing border security through the proliferation of illicit transactions and violence perpetrated by criminal organizations.

To counter this substantial and ongoing threat to the security of the southern border—including threats to our maritime border and the approaches—the Directors of the Joint Task Forces-West, -East, and -Investigations, as well as the ICE-led Border Enforcement Security Task Forces (BESTs), are directed to plan and implement enhanced counternetwork operations directed at disrupting transnational criminal organizations, focused on those involved in human smuggling. The Department will support this work through the Office of Intelligence and Analysis, CBP's National Targeting Center, and the DHS Human Smuggling Cell.

In addition, the task forces should include participants from other federal, state, and local agencies, and should target individuals and organizations whose criminal conduct undermines border security or the integrity of the immigration system, including offenses related to alien smuggling or trafficking, drug trafficking, illegal entry and reentry, visa fraud, identity theft, unlawful possession or use of official documents, and acts of violence committed against persons or property at or near the border.

In order to support the efforts of the BESTs and counter network operations of the Joint Task Forces, the Director of ICE shall increase of the number of special agents and analysts in the Northern Triangle ICE Attaché Offices and increase the number of vetted Transnational Criminal Investigative Unit international partners. This expansion of ICE's international footprint will focus both domestic and international efforts to dismantle transnational criminal organizations that are facilitating and profiting from the smuggling routes to the United States.

### O. Public Reporting of Border Apprehensions Data

The Department has an obligation to perform its mission in a transparent and forthright manner. The public is entitled to know, with a reasonable degree of detail, information pertaining to the aliens unlawfully entering at our borders.

Therefore, consistent with law, in an effort to promote transparency and renew confidence in the Department's border security mission, the Commissioner of CBP and the Director of ICE shall develop a standardized method for public reporting of statistical data regarding aliens apprehended at or near the border for violating the immigration law. The reporting method shall include uniform terminology and shall utilize a format that is easily understandable by the public in a medium that can be readily accessed.

At a minimum, in addition to statistical information currently being publicly reported regarding apprehended aliens, the following information must be included: the number of convicted criminals and the nature of their offenses; the prevalence of gang members and prior immigration violators; the custody status of aliens and, if released, the reason for release and location of that release; and the number of aliens ordered removed and those aliens physically removed.

### P. No Private Right of Action

This document provides only internal DHS policy guidance, which may be modified, rescinded, or superseded at any time without notice. This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

In implementing this guidance, I direct DHS Components to consult with legal counsel to ensure compliance with all applicable laws, including the Administrative Procedure Act.