# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-01066 |
| | ) | |
| The UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

BACKGROUND .................................................................................2

    Legal Framework........................................................................2

    Factual and Procedural Background for Parole+ATD............................3

    Undisputed Material Facts...........................................................5

STANDARD OF REVIEW .................................................................8

ARGUMENT .....................................................................................9

I.    Florida Lacks Standing to Bring This Case ...............................9

    A.    States May Not Sue the Federal Government Based on the
        Incidental Effects of Federal Action .................................10

    B.    The Evidence Does Not Show Injury or Causation ..........................12

        i.    Department of Education (DOE)................................14

        ii.    Department of Corrections (DOC)............................15

        iii.    Department of Economic Opportunity (DEO)........................15

        iv.    Agency for Health Care Administration (AHCA) ....................16

        v.    Department of Children and Families (DCF) ..........................16

        vi.    Department of Highway Safety and Motor Vehicles (HSMV) 17

    C.    Florida's Claims are not Redressable ................................18

II.    Florida Cannot Obtain Review Under the APA .........................20

     A.    Final Agency Action.................................................................20

     B.    Committed to Agency Discretion..........................................22

III.    The Non-detention Policy Claims Fail on the Merits .................25

     A.    Count I (Violation of Law) and Count 7 (Action Unlawfully Withheld) ...............................................................29

     B.    Count 3 (Arbitrary and Capricious) ....................................33

     C.    Count Five (Notice and Comment) ......................................37

IV.    Parole+ATD Claims.................................................................38

     A.    Count 2 (Violation of Law) ..................................................38

     B.    Count 4 (Arbitrary and Capricious) ....................................42

     C.    Count 7 (Notice and Comment) ...........................................47

 V.    Count Eight (Constitutional Claim) Fails as a Matter of Law ................48

    CONCLUSION..............................................................................50

# TABLE OF AUTHORITIES

## CASES

*Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*,
462 F. App'x 933 (11th Cir. 2012)......................................................24

*Arizona v. Biden*,
40 F.4th 375, 391 (6th Cir. 2022).........................................................13

*Arizona v. United States*,
567 U.S. 387 (2012) ........................................................... 1, 23, 24, 31

*Arpaio v. Obama*,
27 F. Supp. 3d 185 (D.D.C. 2014).....................................................11

*Arpaio v. Obama*,
797 F.3d 11, 22 (D.C. Cir. 2015) ......................................................13

*Baker v. Carr*,
369 U.S. 186 (1962) ..........................................................................19

*Baltimore Gas & Electric Co. v. NRDC*,
462 U.S. 87 (1983) ............................................................................45

*Bennett v. Spear*,
520 U.S. 154 (1997) .................................................................... 13, 20

*Brnovich v. Biden*,
No. CV-23-01568-PHX-MTL, 2022 WL 4448322
(D. Ariz. Sept. 23, 2022) ......................................... 21, 25, 28, 48, 49

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .............................................................................8

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ..........................................................................40

*Chiles v. United States*,
69 F.3d 1094 (11th Cir. 1995) ..................................................... 19, 25

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ....................................................... 23, 31

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ..........................................................................10

*Dawson v. Asher*,
   447 F. Supp. 3d 1047 (W.D. Wash. 2020) ...........................................28

*Demore v. Kim*,
   538 U.S. 510 (2003) .............................................................................3

*Department of Commerce v. New York*,
   139 S. Ct. 2551 (2019).......................................................................10

*Matter of E-R-M- & L-R-M-*,
   25 I. & N. Dec. 520 ...........................................................................31

*Florida v. Mellon*,
   273 U.S. 12 (1927) ............................................................................10

*Florida v. United States*,
   540 F. Supp. 3d 1144 (M.D. Fla. 2021) ..............................................22

*Garcia-Mir v. Smith*,
   766 F.2d 1478 (11th Cir. 1985)..........................................................24

*Garland v. Aleman Gonzalez*,
   142 S. Ct. 2057, 2064 (2022) ............................................................20

*Geyen v. Marsh*,
   775 F.2d 1303 (5th Cir. 1985)...........................................................49

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
   425 F.3d 158 (2d Cir. 2005) .............................................................41

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ..........................................................................22

*Hollingsworth v. Perry*,
   570 U.S. 693 (2013) ..........................................................................11

*INS v. Aguirre-Aguirre*,
   526 U.S. 415 (1999) ..........................................................................41

*Jean v. Nelson*,
   711 F.2d 1455 (11th Cir. 1983) .................................................... 21, 22

*Jean v. Nelson*,
   727 F.2d 957 (11th Cir. 1984) ...................................................24

*Jeanty v. Bulger*,
   204 F. Supp. 2d 1366 (S.D. Fla. 2002) .................................... 22, 24, 33

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ...................................................31

*Keohane v. Fla. Dep't of Corr. Sec'y*,
   952 F.3d 1257 (11th Cir. 2020) ...................................................38

*Knauff v. Shaughnessy*,
   338 U.S. 537 (1950) ...................................................2

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ...................................................12

*Locke v. Warren*,
   No. 19-61056-CIV, 2019 WL 4805716 (S.D. Fla. Oct. 1, 2019) .......................49

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................... *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) .......................................... 21, 26, 28

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ...................................................19

*Matter of J-A-B- & I-J-V-A-*,
   27 I. & N. Dec. 168 (BIA 2017) ...................................................31

*Mendoza v. Perez*,
   754 F.3d 1002, 1023 (D.C. Cir. 2014) ..............................................48

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (11th Cir. 2009) .................................................... 34, 42

*Mileski v. Gulf Health Hosps., Inc.*,
No. 14-0514-C, 2016 WL 1295026 (S.D. Ala. Mar. 31, 2016) ............................8

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
416 U.S. 267 (1974) ...............................................................42

*Nat'l Parks Conservation Ass'n v. Norton*,
324 F.3d 1229 (11th Cir. 2003).................................................... 20, 21

*Nat'l Treasury Emps. Union v. Nixon*,
492 F.2d 587 (D.C. Cir. 1974)......................................................49

*New Mexico v. McAleenan*,
450 F. Supp. 3d 1130 (D.N.M. 2020)................................................40

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55, 66 (2004) ............................................................26

*Padilla v. ICE,*
953 F.3d 1134 (9th Cir. 2020) .....................................................33

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ...............................................................47

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*,
87 F.3d 1242 (11th Cir. 1996) ......................................................9

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989).......................................................49

*Raines v. Byrd*,
521 U.S. 811 (1997) ..............................................................10

*Reno v. AADC*,
525 U.S. 471 (1999) ..............................................................23

*Sea Turtle Conservancy v. Locke*,
No. 1:09-CV-259-SPM-GRJ, 2011 WL 13227945 (N.D. Fla. July 5, 2011) ....6, 9

*Sierra Club v. Van Antwerp*,
526 F.3d 1353 (11th Cir. 2008).....................................................34

vi

*Simmat v. U.S. Bureau of Prisons*,
    413 F.3d 1225 (10th Cir. 2005)...........................................................49

*State of Mississippi v. Johnson*,
    71 U.S. 475 (1866) .............................................................................49

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...........................................................................11

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ...........................................................................12

*Swain v. Junior*,
    961 F.3d 1276 (11th Cir. 2020)..........................................................41

*Texas v. Biden*,
    142 S. Ct. 2528 (2022).................................................................. *passim*

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .............................................................18

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ............................................................... 23, 24, 31

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).........................................................................9

*Vill. of Bald Head Island v. U.S. Army Corps of Engineers*,
    714 F.3d 186 (4th Cir. 2013) .......................................................28, 38

*Warshauer v. Solis*,
    577 F.3d 1330 (11th Cir. 2009)............................................. 37, 47, 48

*Washington v. Trump*,
    302 F. Supp. 3d 127 (D.D.C. 2018) ...................................................48

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ...........................................................................10

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .............................................................................3

**STATUTES**

5 U.S.C. § 533 ................................................................................................37

5 U.S.C. § 551(13) .........................................................................................28

5 U.S.C. § 553(a)(2) .................................................................................. 37, 48

5 U.S.C. § 701(a)(2) .......................................................................................22

5 U.S.C. § 704 ................................................................................................20

5 U.S.C. § 706(2)(B) ......................................................................................49

6 U.S.C. § 202(5) .......................................................................................2, 25

8 U.S.C. 1101 ...................................................................................................1

8 U.S.C. § 1103(a)(3) .......................................................................................2

8 U.S.C. § 1157(a) ..........................................................................................39

8 U.S.C. § 1182(d)(5) .............................................................................. *passim*

8 U.S.C. § 1182(d)(5)(A) ......................................................................... *passim*

8 U.S.C. § 1184(p)(2) .....................................................................................39

8 U.S.C. § 1225 ......................................................................................... 23, 32

8 U.S.C. § 1225(a)(1) ........................................................................................2

8 U.S.C. § 1225(b)(1) ............................................................................... *passim*

8 U.S.C. § 1226(a) .................................................................................... *passim*

8 U.S.C. § 1226(a)(3) ......................................................................................17

8 U.S.C. § 1229a .............................................................................................3

8 U.S.C. § 1229a(b)(5)(A) ..............................................................................45

8 U.S.C. § 1151(c)(1) .....................................................................................39

8 U.S.C. § 1226(e) ..........................................................................................24

28 U.S.C. § 2401(a) ...............................................................................11

## FEDERAL REGULATIONS

8 C.F.R. § 212.5(b)(1).............................................................................41

8 C.F.R. § 212.5(b)(5).............................................................................32

## **INTRODUCTION**

The "federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Indeed, a "principal feature" of the immigration enforcement system that Congress codified in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq*., is the "broad discretion exercised by immigration officials." *Id*. at 395-96. This system reflects the practical reality that officials must prioritize the use of finite resources.

Overlooking these legal and practical realities, Florida asks this Court to second-guess discretionary decisions by the Department of Homeland Security (DHS) about how to enforce immigration law most effectively and efficiently. Florida challenges Defendants' Parole Plus Alternatives to Detention (Parole+ATD) policy, which provides guidance on how immigration officers are to use their *discretionary* parole authority under 8 U.S.C. § 1182(d)(5) in certain limited circumstances, and a purported generalized "non-detention" policy, which Florida asserts violates the INA.

This Court should decline Florida's invitation to undermine the principles of federalism and separation of powers upon which the U.S. constitutional system is based. Florida lacks Article III standing because it cannot identify any direct injury caused by the challenged practices. Regardless, Florida's challenges to Parole+ATD and the alleged "non-detention" policies are nonjusticiable under the Administrative

Procedure Act (APA). In addition, the record demonstrates that the alleged non-detention policy does not exist and that the Parole+ATD policy is consistent with the INA. Accordingly, the Court should grant summary judgment to Defendants on all claims.

## BACKGROUND

**Legal Framework**

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see*, *e.g.*, 6 U.S.C. § 202(5); 8 U.S.C. § 1103(a)(3).

Florida challenges Defendants' detention and release of "applicants for admission"— noncitizens seeking to enter the United States at ports of entry, or who have entered between ports of entry without authorization. *See* 8 U.S.C. § 1225(a)(1). Applicants for admission who are inadmissible because they lack valid entry documentation may be subject to expedited removal and detention pending removal. §§ 1225(b)(1)(A); 1182(a)(7). Those who demonstrate a credible fear of persecution "shall be detained" for consideration for asylum. § 1225(b)(2)(B)(ii). The INA further specifies that others who are not placed into expedited removal and are deemed "not clearly and beyond a doubt entitled to admission . . ." shall be detained for removal proceedings under 8 U.S.C. § 1229a. *See id.* § 1225(b)(2)(A).

However, DHS also "may release" on bond or conditional parole pending a removal determination those apprehended *after* crossing the border between ports of entry without authorization, except that DHS may not release noncitizens with certain qualifying criminal convictions. 8 U.S.C. § 1226(a), (c)(2). DHS may parole any applicant for admission into the United States "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" *Id.* § 1182(d)(5)(A). Finally, the Government may not indefinitely detain individuals it cannot realistically remove, *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001), and likewise may detain noncitizens for civil immigration offenses only "for the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003).

**Factual and Procedural Background for Parole+ATD**

For a brief period, beginning in March 2021, due to the strain of an influx of migrants on processing resources, U.S. Customs and Border Protection (CBP) released noncitizens with a Notice to Report (NTR) to report to U.S. Immigration and Customs Enforcement (ICE) within a specified timeframe to receive their charging documents. ECF 87-1, SAR0162. In November 2021 guidance, DHS ended the use of NTRs, and in its place authorized the use of Parole+ATD. ECF 87-1, SAR0162. Parole+ATD combines the conditional release of noncitizens on parole, where appropriate, with enrollment in one of ICE's Alternative To Detention (ATD)

3

programs to better ensure accountability after release. ECF 87-1, SAR0002-0004, 0162-0163.  As the November 2021 guidance explained, enrollment in Parole+ATD is significantly faster than immediately fully processing a noncitizen for removal proceedings, and helps avoid serious overcrowding at immigration facilities that may pose health and safety risks to both migrants and staff. ECF 87-1, SAR0002-0003.

On July 18, 2022, DHS rescinded the November 2021 guidance that initially authorized reliance on Parole+ATD and provided new guidance that more clearly specified and limited its use. ECF 87-1, SAR0001. Under the current guidance, Parole+ATD is available only for individual Border Patrol (BP) sectors following a weekly determination by CBP leadership under specific criteria that threshold overcapacity exists. ECF 87-1, SAR0003.

The threshold criteria merely allow CBP to authorize use of Parole+ATD. Even when those threshold criteria are met, BP agents still must assess "each individual noncitizen … on a case-by-case individualized basis to determine whether he or she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit." ECF 87-1, SAR0003-0004; 8 U.S.C. § 1182(d)(5)(A). Examples of significant public benefits that may justify parole where applicable are "disease-mitigation" or the prevention of overcrowding in facilities that jeopardizes health and safety.  ECF 87-1, SAR0002-0003.

Through a case-by-case analysis, CBP determines the appropriate processing pathway for a particular noncitizen. If parole is appropriate, the noncitizen is referred to ICE for enrollment in its ATD program and a case-by-case determination of the kind of technology and supervision that is necessary to ensure compliance with release conditions, court appearances, and removal orders. ECF 87-1, SAR0002. Responding to a growing processing backlog, the current Parole+ATD guidance authorizes CBP to assist ICE with processing of the parolees' Notice to Appears (NTAs) to place them into removal proceedings; these NTAs are served on parolees either when they check into regional DHS offices near the addresses they have identified or via mail. ECF 87-1, SAR0004, 0165-69.

**Undisputed Material Facts**

Florida challenges Parole+ATD and an alleged "non-detention policy" under the APA and Constitution, asserting that these policies impose costs on six of its agencies that serve noncitizens in Florida. ECF 74 ¶¶ 70-75. None of those agencies, however, can show that it has spent any funds or provided any services to applicants for admission at the border released by federal authorities. ECF 87-3, 35:15-23, 36:20-37:5, 37:6-14, 38:13-40:3, 70:20-71:1; ECF 87-4, 31:16-19, 32:9-16; ECF 87-5, 53:18-54:1, 54:16-55:14; ECF 87-6, 32:22-33:13; ECF 87-7, 36:5-13, 37:2-38:1; ECF 87-8, 25:3-7, 26:3-6, 29:18-19, 48:5-23, 51:23-52:2, 67:16-23, 70:17-25; ECF 87-9, 32:15-34:13, 71:11-18, 74:24-75:5, 84:23-85:3; ECF 87-10, 43:16-44:12,

57:14-58:13, 75:25-76:4. In fact, Florida actually nets revenue from issuing forms of identification to noncitizens because it charges more in fees than it spends on the identified verification costs. ECF 87-10, 58:5-8, 59:12-14, 43:3-5.

As for the alleged "non-detention policy," the evidence shows it does not exist. DHS makes detention and conditional release decisions pursuant to the statutory standards laid out in 8 U.S.C. §§ 1182(d)(5)(A) and 1226 and based on case-by-case assessments guided by longstanding guidance issued under multiple prior administrations and on-the-ground application of individualized facts and law-enforcement considerations. ECF 87-11, 47:17, 96:20-98:24, 150:5-18; ECF 87-13, 30:16-31:20. The increased number of releases under 8 U.S.C. §§ 1182(d) or 1226(a) is due not to a policy directive to release more noncitizens but rather to several factual circumstances, including a significant increase in migration by noncitizens whom the United States is currently unable to remove (because, for example, refusal of their countries of origin to accept removals) and overcrowding concerns and disease risks in detention facilities. ECF 87-11, 150:19-151:24, 198:13-199:7, 201:2-20; ECF 87-13, 59:23-60:5.

In response to increased flows, CBP has also built additional holding facilities and has developed technology to permit rapid processing in the field. ECF 87-14, 120:1-121:1, 245:13-247:19. ICE has repurposed three former family detention centers to house single adults. ECF 87-13, 140:4-142:2, 147:5-7. The use of these

6

facilities is a pragmatic response to the greater volume of single adults currently arriving at the border, as well as the comparatively high expense and significant space and length limitations on detaining family units. ECF 87-13, 141:7-142:2; ECF 87-14, 30:11-31:4; ECF 87-12, 67:6-20; 52:15-21, 54:21-55:4; ECF 87-15, 12:12-13:3. In those situations where detention of a member of a family unit is appropriate, such as for national-security or public-safety concerns, DHS detains that individual and releases the other family members, albeit with protections to ensure communication among family members and timely reunification when warranted. ECF 87-16, 111:1-112:10; ECF 87-14, 220:14-221:11.

Additionally, DHS continues to consider alternatives to detention because the influx of noncitizens at the southwest border has long exceeded all detention space available to DHS.  Parole coupled with accountability measures, such as electronic monitoring and other ATD, remains a critical aspect of DHS's management of its resources. The President's budget for FY 2022 and FY 2023 requested significantly more funding than previous years for ATD. ECF 87-14, 140:1-12. DHS can, per dollar spent, monitor and account for tenfold or more noncitizens via ATD compared to traditional detention. ECF 87-13, 36:15-37:9; ECF 87-12, 143:3-16. DHS officers assign detention or ATD as appropriate to noncitizens after considering the likelihood of absconding, threat to national security or public safety, likelihood of being ordered removed, and ability to effect that removal. ECF 87-14, 115:15-22;

ECF 87-11, 149:2-18; 188:17-189:12; 199:22-200:11; ECF 87-16, 68:10-69:3; ECF

87-13, 30:22-32:10. Rates of noncitizen compliance under ATD are "very high":

93.2% for single adults and 82% for family units for the first part of FY 2022. ECF

87-13, 142:16-19; ECF 87-1, SAR0255, 0272.

### STANDARD OF REVIEW

Nondetention Policy Claims. Summary judgment should be granted if the

pleadings, depositions, affidavits, and other evidence show that no genuine issue of

material fact exists, and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

The party moving for summary judgment bears the initial responsibility of

demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at

323. Once the moving party has met its burden, Rule 56 requires the nonmoving

party to present specific facts sufficient to create a genuine issue for trial. *Id.* at 324.

"[T]here is no genuine issue for trial '[w]here the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party[.]'" *Mileski v. Gulf

Health Hosps., Inc.*, No. 14-0514-C, 2016 WL 1295026, at *12 (S.D. Ala. Mar. 31,

2016).

Parole + ATD Claims. Under APA review, "the material facts are those facts

present in the agency's administrative record" and the Court's function on summary

judgment "is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did." *Sea Turtle Conservancy v. Locke*, No. 1:09-CV-259-SPM-GRJ, 2011 WL 13227945, at *2 (N.D. Fla. July 5, 2011). "[T]he task of the reviewing court is to apply the appropriate ... standard of review ... to the agency decision based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996).

## ARGUMENT

The Court should grant Defendants' summary judgment on all claims. The Court should dismiss all of Florida's claims on standing, and justiciability grounds. Florida also lacks a cognizable cause of action under the APA. Should the Court reach the merits, there is no genuine dispute of material fact regarding the alleged nondetention policy—there is no evidence of such a policy, let alone one that violates the INA or the Constitution—and the administrative record provides ample basis to reject Florida's challenges to Parole+ATD.

## I. **Florida Lacks Standing to Bring This Case.**

A case or controversy exists only if the plaintiff has standing—that is, only if the plaintiff has suffered an injury in fact that is traceable to the challenged action and would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). An Article III injury requires the invasion of a "legally and judicially cognizable" interest, which means the dispute must be of the sort

"traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

## A.   States May Not Sue the Federal Government Based on the Incidental Effects of Federal Action.

A state may sue the federal government when the state is the object of the challenged federal action. *See Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). But a state may not bring suit simply because a federal policy has incidental effects on the state; it must have suffered a "*direct* injury" at the hands of the federal government. *Florida v. Mellon*, 273 U.S. 12, 18 (1927).[1] Indirect financial harm to the state's coffers or economy is insufficient. *Id.*; *cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues"). These principles direct the outcome here.

First, Florida's claimed harm is in essence the simple fact that noncitizens released pending removal proceedings may settle there and use public services. However, this possibility has always been permitted by 8 U.S.C. §§ 1182(d)(5), 1226(a), and their implementing regulations, which authorize the Government to

---

[1] Whether states have standing in such circumstances is currently pending before the Supreme Court. *See United States v. Texas*, No. 22-58.

release noncitizens, who are then free to settle in any state.  Florida does not

challenge these longstanding provisions here (and could not do so due to the time

bar, *see* 28 U.S.C. § 2401(a)). Florida thus lacks cognizable harm.

Florida alleges that the Parole+ATD policy and the nonexistent

"nondetention" policy have increased its noncitizen population and therefore that

Florida will expend more resources on noncitizens than it otherwise would, had the

policy not been in place. ECF 74 ¶¶69-76. Even if that were true—and as explained

below, it is not—it would not give rise to standing because the challenged policies

do not instruct Florida what to do, do not operate on Florida directly, and do not

deprive Florida of any legal rights. *See Summers v. Earth Island Inst.*, 555 U.S. 488,

493-94 (2009). A state "has not suffered an injury in fact to a legally cognizable

interest" when "a federal government program is anticipated to produce an increase

in that state's population and a concomitant increase in the need for the state's

resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797

F.3d 11 (D.C. Cir. 2015). Such an injury is a non-cognizable generalized grievance.

*Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). Accepting it "would permit nearly

all state officials to challenge a host of Federal laws simply because they disagree

with how many—or how few—Federal resources are brought to bear on local

interests." *Arpaio*, 27 F. Supp. 3d at 202.

In addition, Florida lacks standing because a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Florida's claims are premised on its contention that the government is not initiating removal proceedings against individuals or detaining them when in Florida's view it should be. Such claims are foreclosed under settled law. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws").

**B.   The Evidence Does Not Show Injury, Causation, or Redressability.**

Even assuming Florida's legal theory of injury is cognizable, the undisputed evidence shows no actual injury to Florida caused by the challenged policies. Florida alleges that six state agencies are harmed by the presence of applicants for admissions who were paroled or released by the federal government at the southwest border: Department of Education, Department of Corrections, Department of Economic Opportunity, Department of Children and Families, Agency for Health Care Administration, and Department of Highway Safety and Motor Vehicles. ECF 87-2. However, Florida fails to provide any evidence showing concrete and particularized harm to these agencies. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

12

Florida's alleged harms stem from the unsubstantiated allegation that additional releases of noncitizens at the border increase the population of Florida. But Florida merely asserts that it provides social benefits to state residents and then speculates that costs will increase if its population increases. Indeed, months of discovery demonstrates that Florida cannot quantify alleged injuries caused by the presence of noncitizens who were released subject to the challenged practices. Florida thus cannot demonstrate any actual or imminent injury caused by those policies. *Id.*

Likewise, Florida's alleged injuries—even if found to be more than mere speculation—are not traceable to the challenged policies because they would be caused, if at all, by third parties. *See id.* Florida's whole case is based on the decision of noncitizens released at the southwest border deciding to move to Florida. But Florida cannot show the challenged conduct has a "determinative or coercive effect upon the action of someone else." *Bennett v. Spear,* 520 U.S. 154, 169 (1997). Thus, the alleged injuries, assuming they occur, would be the result of "unfettered choices made by independent actors," and not the challenged policy. *Lujan*, 504 U.S. at 562. Where predictions are so uncertain, [the Court] is prohibited from finding standing." *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015); *see Arizona v. Biden*, 40 F.4th 375, 387 (6th Cir. 2022).

i.    <u>Department of Education (DOE)</u>

For DOE's alleged harm, Florida provided the amount it spends per student and described the federal funding it receives for each "immigrant child" enrolled in school in Florida.  ECF 87-2. The number of "immigrant students," however, is not an accurate indicator of the injury alleged in this case, as Florida defines an "immigrant student" as any student born abroad and educated outside the United States in the last three academic school years. ECF 87-3, 38:1-12, 68:21-69:11. The "immigrant student" label thus has no relation to that student's citizenship status generally, let alone whether that student is an applicant for admission whose conditional release is challenged in this case. *Id.*, 38:13-16.

So, despite putting forward the number of "immigrant students" as indicative of its harm, DOE has no way of knowing a student's immigration status, or whether they were paroled. *Id.*, 35:15-23, 36:20-37:5 38:13-20, 38:24-39:17. In fact, DOE cannot articulate any specific harm attributable to the practices challenged, which concern only the release of applicants for admission at the border, nor show a single dollar is spent on any specific type of noncitizen students. *Id.*, 38:21-40:3, 37:6-14, 70:20-71:1. If Florida cannot quantify its harm, it cannot establish standing, which requires the evidence of harm to be "concrete and particularized" and have a "causal connection…to the conduct complained of…" *Lujan*, 504 U.S. at 560-61.

### ii.   Department of Corrections (DOC)

DOC's alleged harm is paying for the cost of incarcerating what it terms "criminal aliens." ECF 87-2. While Florida claims to identify the number of "criminal aliens" that the state is eligible to receive federal reimbursement for,[2] *id.*, DOC cannot say whether *any* noncitizen inmates were conditionally released pending removal proceedings, and thus are covered by this litigation. ECF 87-4, 31:16-19, 32:9-16. Crucially, DOC cannot show how much of the money spent on noncitizen inmates is spent on noncitizens conditionally released pursuant to the policies it is challenging. ECF 87-5, 53:18-54:1, 54:16-55:14. Again, without demonstrating a concrete injury, this is not sufficient to establish standing. *Lujan*, 504 U.S. at 560-61.

### iii.   Department of Economic Opportunity (DEO)

DEO alleges harm via its Reemployment Assistance Program, which provides temporary wage replacement benefits to certain unemployed individuals, including noncitizens. ECF 87-2. However, aside from citizenship status generally, DEO has no way of knowing if an individual was paroled or released pursuant to a challenged practice by the federal government, *see* ECF 87-6, 32:22-33:13, particularly since

---

[2] Just as with DOE, the number of "criminal alien" inmates is not indicative of injury related to the policies challenged in this case. Only certain noncitizen inmates are eligible to be counted for this reimbursement. ECF 87-5, 55:20-56:24. Whether the inmate is one that was paroled or released pending removal proceedings is not a factor taken into consideration for federal funding. *Id.* at 56:25-57:5.

many of those paroled or released would not be eligible for work authorization in any event, *see* 8 U.S.C. § 1226(a)(3). This is insufficient to establish standing because the alleged harm cannot be concretely identified or traced to the challenged conduct. *See Lujan*, 504 U.S. at 560-61.

iv.   Agency for Health Care Administration (AHCA)

AHCA claims harm from providing Medicaid reimbursement for "emergency medical services" used by "undocumented aliens." ECF 87-2. However, AHCA has no records indicating the immigration status of noncitizens, and thus cannot say how many—if any—applicants for admission released under the challenged practices received emergency medical care they were unable to pay for. ECF 87-7, 36:5-13, 37:2-38:1. In fact, AHCA conceded the possibility that no noncitizens released under the challenged policies received emergency medical services. *Id.* Florida has not put forward any evidence of actual harm. *See Lujan*, 504 U.S. at 560-61.

v.   Department of Children and Families (DCF)

DCF alleges four areas of injury: economic and public assistance benefits, substance abuse and mental health treatment programs, child welfare services, and domestic violence services. ECF 87-2. But DCF has not demonstrated injury with respect to any of them.

First, noncitizens are not eligible for the economic assistance benefits unless they have been on parole for five years. ECF 87-8, 25:3-7, 26:3-6, 29:18-19; ECF

87-9, 32:15-34:13. Because Florida only challenges practices instituted after the Administration changed on January 20, 2021, Florida cannot allege harm based on those services.

Second, for the remaining services—domestic violence, child welfare, and substance abuse and mental health treatment—DCF does not collect the immigration status of individuals using those services, so Florida is unable to identify any specified costs or harm from noncitizens. ECF 87-8, 51:23-52:2, 48:5-23, 70:17-25.

Finally, DCF cannot say whether any of the noncitizens using their services were paroled or released pursuant to the challenged practices; thus, Florida is unable to identify a traceable, objective injury due to these policies. ECF 87-8, 67:16-23; ECF 87-9, 71:11-18, 74:24-75:5, 84:23-85:3; *see Lujan*, 504 U.S. at 560-61.

vi.   Department of Highway Safety and Motor Vehicles (HSMV)

HSMV claims injury from providing driver's licenses and identification cards to noncitizens in Florida. ECF 87-2. Specifically, HSMV claims it must verify a noncitizen's immigration status with DHS' verification system, which costs Florida a monthly flat fee to access and a nominal cost for each verification. *Id.*

However, only certain noncitizens who can prove a "lawful" immigration status are eligible to obtain a state identification. ECF 87-10, 43:16-44:12. HSMV cannot say how many, if any, of those noncitizens submitting documentation are applicants for admission at the border released pursuant to the practices challenged

17

here. *Id.*, 57:14-58:13. Nor can HSMV quantify any harm suffered from the federal government's release practices at the border. *Id.*, 75:25-76:4.

Moreover, it ultimately does not cost Florida anything to provide such identification. Instead, HSMV actually generates significant revenue by issuing IDs to noncitizens. Florida is charged $25 a month to access the SAVE system and 50 cents for each verification, for approximately $372,000 in costs for issuing identifications to noncitizens for the period of January 2020 to March 2022. *Id.*, 58:5-8. However, by charging $25 for each identification card (*id.* at 59:12-14), and $48 for each driver's license (*id.* at 43:3-5), Florida made between $18.6 million to $35.8 million in profit during that same period from serving noncitizens alone.

Thus, the undisputed evidence fails to establish Florida's standing, as Florida cannot demonstrate a concrete injury that is traceable to the challenged practices and redressable in this forum.

## C.   Florida's Claims are not Redressable.

Finally, Florida's challenges to the alleged "non-detention" policy are not redressable for the additional reason that they are nonjusticiable political questions. Florida's claims boil down to its disagreement with how Defendants utilize various INA release mechanisms, and space and funding for prioritizing detention space. Florida seeks to "require[] the Secretary to enforce the immigration laws" according to Florida's wishes and to "change his priorities for" detention of noncitizens. *Texas*

*v. United States*, 809 F.3d 134, 169 (5th Cir. 2015). Likewise, Florida seeks to "substitute [its] judgment" for that of the federal political branches in determining which noncitizens should be detained and which released, and how best to fund and deploy enforcement resources, and Florida would "have the judiciary formulate or rewrite immigration policy" to that end. *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 84 (1976)). As the Eleventh Circuit has explained, however, "Congress intended whether the [Executive Branch] is adequately guarding the borders of the United States to be 'committed to agency discretion by law' and, thus, unreviewable," and challenges asserting such claims invoke fundamentally "political questions." *Chiles v. United States*, 69 F.3d 1094, 1096, 1097 (11th Cir. 1995). Here, there are no judicially discoverable or manageable standards for determining how much or what type of detention (which is funded by Congress) is enough to safeguard the country and facilitate immigration processing, how many applicants for admission ought as a matter of policy be paroled or otherwise released, and how much money should be sought or provided for immigration enforcement and for what operations in particular. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Chiles*, 69 F.3d at 1096-1097. Accordingly, the court lacks authority to "fashion[] a remedy" concerning the correct amount of releases or detentions of individual noncitizens, and these claims are "nonjusticiable." *Chiles*, 69 F.3d at 1097.

19

To the extent Plaintiff seeks injunctive relief, its claims are additionally not redressable because 8 U.S.C. § 1252(f)(1) prohibits lower courts from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the … statutory provisions" at issue here. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022).

## II.  **Florida Cannot Obtain Review Under the APA.**

Florida cannot obtain review under the APA because it challenges agency activities that (1) do not constitute final agency action; (2) are "committed to agency discretion by law," and (3) do not fall within the applicable statutory zone of interests.

### A.  **Final Agency Action**

Florida does not challenge "final agency action." 5 U.S.C. § 704. Agency action is final if it determines legal "rights or obligations." *Bennett*, 520 U.S. at 178. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003). Neither the alleged "non-detention policy" nor Parole+ATD satisfies this rule.

*First*, Florida has not identified any actual "non-detention policy." *Infra,* § III. Instead, Florida challenges an amalgam of agency operations and individual release determinations, not any regulation, rule, or policy statement. *Id.* These operational

decisions do not represent an "agency action" cognizable under the APA, much less a "final" one. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Texas v. Biden*, 142 S. Ct. 2528, 2545 (2022) (quoting 5 U.S.C. § 551(4)). Applying these precedents, a court recently rejected an identical challenge to Defendants' alleged "mass-parole and non-detention policies," holding that Arizona could not challenge an "amalgam of release decisions" or "some generalized and amorphous conception of Defendants' detention and parole policies" under the APA because these did not provide the requisite "agency action." *Brnovich v. Biden*, No. CV-23-01568-PHX-MTL, 2022 WL 4448322 at *10, 12 (D. Ariz. Sept. 23, 2022).

*Second*, the Parole+ATD memorandum neither creates legal rights nor imposes legal obligations. *See Norton,* 324 F.3d at 1236; ECF 87-1, SAR0002-0004. The Parole+ATD program does not require DHS officers to take any specific action. The officers retain discretion to detain or parole noncitizen on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. ECF 87-1, SAR0003-0004. Because agency officials are thus "free to exercise discretion" to grant or deny parole in particular cases, the July 2022 memorandum does not constitute final agency action. *See Jean v. Nelson,* 711 F.2d 1455, 1481

(11th Cir. 1983), *aff'd*, 472 U.S. 846 (1985) (*Jean I*); *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*.

## B.   Committed to Agency Discretion

The practices Florida challenges are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

*First*, the various operational decisions that Florida refers to as the "non-detention policy," *infra,* § III, all involve the same "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" and is therefore committed to agency discretion. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Indeed, such determinations encompass, *inter alia*, "the possibility that [a noncitizen] may abscond to avoid being returned to his or her home country," "priorities for the use of limited detention space," whether detention is in the public interest, and of course, the statutory requirements that parole be for "urgent humanitarian reasons or significant public benefit." *See Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003); 8 U.S.C. § 1182(d)(5).

*Second*, the decision whether or when to commence removal proceedings or to release noncitizens on parole pursuant to Parole+ATD is committed to agency discretion. 5 U.S.C. § 701(a)(2). The choice to refrain from pursuing enforcement actions is also "generally committed to an agency's absolute discretion." *Heckler,*

470 at 831. Such decisions "often involve[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another … and, indeed, whether the agency has enough resources to undertake the action." *Id.*

Florida contends that section 1225(b) strictly requires DHS to detain all amenable noncitizens. The statute, however, imposes no unconditional duty. *Infra,* § III.A. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005). In any event, nothing in the statute evinces a "stronger indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord Arizona*, 40 F.4th at 391. If anything, the opposite is true, given the INA's provision of parole for section 1225(b) detainees.

This understanding is bolstered by precedent discussing the Government's charging authority under section 1225. DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396; *see Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015) ("[Section 1225] does not limit the authority of DHS to determine whether to pursue the removal of the immigrant."); *Reno v. AADC*, 525 U.S. 471, 483–84 (1999). Here, the evidence shows Defendants are choosing to pursue removal of noncitizens in Parole+ATD;

all that is at issue is the timing of serving NTAs. ECF 87-12, 125:18-128:10. As Defendants have discretion to not pursue removal at all, *Arizona*, 567 U.S. at 396, this discretion necessarily includes the timing of that action, and Defendants' timing decision at issue here is even more forcefully committed to agency discretion by law.

*Third*, regarding conditional release from detention, the principle that seemingly mandatory statutory language does not supplant inherent enforcement discretion applies equally to the phrase "shall detain" in section 1225(b). *See Castle Rock*, 545 U.S. at 761.[3] "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean v. Nelson*, 727 F.2d 957, 966 & n.8 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (*Jean II*). Further underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty*, 204 F. Supp. 2d at 1382.

---

[3] Florida's reading of section 1225(b) is unprecedented and infeasible. Congress has never appropriated the resources to detain every applicant for admission. ECF 87-12, 101:4-13. An order requiring DHS to detain all applicants for admission would completely overwhelm DHS's capacity, and compromise DHS's ability prioritize detention space for national-security or public-safety threats over other applicants for admission. *Infra* § III.A.

Florida argues that Defendants cannot have any priorities for the operation of its statutorily authorized discretion. But Congress has said otherwise, authorizing DHS and its components to establish "immigration enforcement policies and priorities." 6 U.S.C. § 202(5). Indeed, "Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable." *Chiles,* 69 F.3d at 1096. Florida's efforts in this case to have the Court second-guess Defendants' discretionary enforcement and resource allocation decisions are unreviewable.[4]

## III.   The Non-detention Policy Claims Fail on the Merits.

In Counts 1, 3, 5, 7, and 8, Florida brings various APA and constitutional challenges to the alleged "non-detention policy."

At the threshold, the undisputed material evidence establishes that there is no such policy, and the conduct Florida challenges is not cognizable under the APA. There can be no review under the APA of "abstract decision[s] apart from specific agency action." *Texas*, 142 S. Ct. at 2545; *see Brnovich*, 2022 WL 4448322 at *10. This principle is fatal to the "non-detention policy" claims because Florida cannot point to any evidence of a policy created since January 20, 2021 that provides rules, guidelines, or preferences for detention or release of noncitizens entering the United

---

[4] Additionally, Defendants maintain and restate their argument that Florida does not fall within the statutory zone of interests, ECF 23-1 at 21-22, but recognize that the Court already ruled on this, ECF 45 at 17-18.

States (outside of the Parole+ATD program, and the NTR practice it replaced, separately addressed).

The evidence has shown that DHS has not communicated or mandated any new non-detention policy. ECF 87-11, 163:2-164; ECF 87-12, 54:5-16. Instead, CBP and ICE have continued to make case-by-case detention and conditional release decisions utilizing the mechanisms available in 8 U.S.C. § 1182(d)(5)(A) and 1226(a) based on longstanding practice implemented under multiple prior administrations and informed by common sense, on-the-ground application of law enforcement principles by the line officers themselves. ECF 87-11, 47:17, 96:20-98:24; 150:5-18; ECF 87-13, 30:16-31:20.

Florida's allegations about "changes" to detention practices are unsupported and do not address cognizable "agency action[s]," but rather, at best, operational decisions. *See Lujan*, 497 U.S. at 891; *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 66 (2004) (APA does not permit general challenges regarding "compliance with broad statutory mandates"). CBP, for example, in response to changing migratory flows, has built additional holding facilities and has developed technology to permit rapid processing in the field. ECF 87-14 at 120:1-121:1, 245:13-247:19. ICE is continuously re-evaluating the optimal use of its detention space to meet current immigration conditions. To respond to the increased number of single adults encountered at the border, it has repurposed three former family detention centers to

26

house single adults instead. ECF 87-13, 140:4-142:2, 147:5-7. This reversible move, which maximizes the use of those facilities, was a pragmatic and flexible response to the greater flow of single-adult noncitizens, who are most amenable to expedited removal, providing for greater throughput. ECF 87-13, 141:7-142:2; ECF 87-14, 30:11-31:4; ECF 87-12, 67:6-20; 54:21-55:4. ICE is continually evaluating and optimizing its resources. ECF 87-15, 12:12-13:3; ECF 87-12, 52:15-21, 63:7-8.

In addition, CBP has developed technology to permit on-the-spot processing in the field to further improve processing times and thus allow greater throughput in its facilities.  ECF 87-14, 120:1-121:1, 245:13-247:19. To the extent there has been an increase in the number of releases under sections 1182(d)(5)(A) or 1226(a) since January 20, 2021, this has not been due to an orchestrated top-down policy decision, but instead is driven by several factual circumstances, including a significant increase in migration by noncitizens that the United States is currently unable to remove (because, for example, of a lack of diplomatic relations with their countries of origin) and overcrowding concerns and attendant disease risks in detention facilities. ECF 87-11,150:19-151:24, 198:13-199:7, 201:2-20; ECF 87-13, 59:23-60:5.

The President's budget for FY 2022 and FY 2023 requested significantly more funding than previous years for electronic monitoring and other ATD. ECF 87-14, 140:1-12. ATD yields high compliance rates with court obligations and removal

orders, ECF 87-13 at 142:16-19[5]—which is ultimately the purpose of detention pending removal, *Dawson v. Asher*, 447 F. Supp. 3d 1047, 1050 (W.D. Wash. 2020)—while being more fiscally sustainable. That is, DHS can, dollar for dollar, ensure the accountability of several times more noncitizens via detention alternatives such as electronic monitoring, which costs less than $10 per day, than an exclusive focus on traditional detention, which costs roughly $150 per day per individual. ECF 87-13, 36:15-37:9; ECF 87-12, 143:3-16.

Even if the Court holds it can review these operational decisions, *see supra* § II, they do not support any APA cause of action. The APA provides a waiver of sovereign immunity only to challenge "agency action," 5 U.S.C. § 551(13), a term that does not include agency activities such as building facilities or "operating a program." *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013); *see Lujan*, 497 U.S. at 890. The undisputed evidence establishes that there is no "non-detention policy." Florida's amalgamation of individual release decisions and discretionary funding and resource allocation calls are not challengeable agency actions under the APA. *See Lujan,* 497 U.S. at 890; *Texas*, 142 S. Ct. at 2545; *Brnovich*, 2022 WL 4448322 at *10.

---

[5] Statistics for FY 2022 through March 2022 show a 93.2% compliance rate for single adults and 82% for family units. ECF 87-1, SAR0255, 0272.

However, as explained below, even assuming *arguendo* these diverse and reversible operational developments could be deemed a cohesive and substantive "non-detention policy," Florida's claims nevertheless still fail on the merits.

## A.   Count 1 (Violation of Law) and Count 7 (Action Unlawfully Withheld)

Counts 1 and 7 maintain that the alleged "non-detention policy" is unlawful because it violates the detention and charging provisions of section 1225(b)(1)-(2) and the parole provision, 8 U.S.C. § 1182(d)(5)(A). These claims fail both as a matter of fact and law.

As an initial matter, the claims are not supported factually.

*First*, section 1226, not section 1225(b), governs many or most of the noncitizen releases Florida challenges in this case.   ECF 87-11, 164:9-165:12. Florida's theory that Defendants are violating a detention mandate hinges on an argument that the word "shall" in section 1225(b) requires detention of this entire population ECF 74 ¶¶79-80, 86. However, this argument ignores section 1226, which also applies to noncitizens who have illegally crossed the border; section 1226(a) explicitly authorizes release in the discretion of the government. *See* 8 U.S.C. § 1226(a) (providing that DHS "may release the alien on" "bond" or "conditional parole" without any standard); ECF 87-12, 147:16-148:15; ECF 87-13, 162:20-163:12; ECF 87-17, Nos. 3 & 4.

29

*Second*, there is no genuine factual dispute that grants of parole under 8 U.S.C. § 1182(d)(5)(A) are conducted on a "case-by-case" basis, with DHS officials examining the particular circumstances of each noncitizen, and grant parole only for an urgent humanitarian reason or significant public benefit. ECF 87-13, 31:10-18; ECF 87-11, 149:2-151:24; ECF 87-14, 199:9-200:17; ECF 87-16, 58:9-22, 68:10-69:3, 80:23-81:23, 83:20-84:12, 105:17-106:12. All relevant witnesses testified that, even when limited detention capacity was a consideration in deciding to conditionally release a noncitizen, DHS officers still examined the noncitizens' particular circumstances in deciding to do so and in assigning the appropriate type of monitoring. ECF 87-14, 115:15-22; ECF 87-11, 149:2-18; 188:17-189:12; 199:22-200:11; ECF 87-16, 68:10-69:3; ECF 87-13, 30:22-32:10.

Similarly, despite claims to the contrary, DHS does not have a policy of non-detention for all members of family units. Even absent family facilities, if detention of a family-unit member is warranted due, for instance, to one of the family members posing a national-security or public-safety threat, DHS detains that individual and releases the family members not posing such a threat (with protections to ensure intrafamilial communication and timely reunifications when warranted). ECF 87-16, 111:1-112:10; ECF 87-14, 220:14-221:11.

*Third*, Florida's claim that Defendants are "fail[ing] to serve charging documents and initiate removal proceedings as required by law," ECF No. 74 ¶108,

is simply untrue. DHS policy and practice is to serve NTAs—both by mail and in person—on all noncitizens conditionally released at the border without receiving an NTA at that time. ECF 87-12, 125:18-128:10; ECF 87-13, 176:23-177:7.

Florida's arguments are also legally flawed.

*First*, as discussed *supra* § II.B, nothing in section 1225(b)(1)-(2) overcomes the "deep-rooted nature of law-enforcement discretion." *Castle Rock*, 545 U.S. at 760-61. The fact that section 1225(b) uses the terms "shall ... detain[]" and "shall order" does not constrain the government's longstanding discretion to determine whether commencement of removal proceedings is appropriate. *See id.* at 761.

*Second*, sections 1225(b)(1)-(2) by their terms do not require initiating removal proceedings and detention in all cases or within a particular timeframe. Nothing in these provisions mandates the commencement of expedited or full removal proceedings against all amenable noncitizens immediately upon encounter, or at all. *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. 168, 172 (BIA 2017) (section 1225(b)(1)); *E-R-M-*, 25 I. & N. Dec. at 523 (section 1225(b)(2)(A)). Rather, section 1225(b) "authorizes the Government to detain certain aliens" seeking admission to the United States *if* it decides to remove them. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018); *AADC*, 525 U.S. at 483–84. The antecedent decision whether to pursue removal is a separate, discretionary decision of the Secretary. *See Arizona*, 567 U.S. at 396; *Crane*, 783 F.3d at 249. Unless and until the Government charges

and places noncitizens in expedited or full removal proceedings, section 1225(b) does not require their detention. *See id.*; 8 U.S.C. § 1225(b)(1), (b)(2)(A). And even once in proceedings, the INA permits noncitizens subject to section 1225(b) to be released on parole under section 1182(d), and those subject to section 1226(a) to be released on "bond" or "conditional parole," 8 U.S.C. §§ 1182(d)(5)(A), 1226(a)(2)(A)-(B).

*Finally*, section 1226(a) does not require a specific justification for release by DHS, and the evidence shows that parole under section 1182(d)(5)(A) is granted only a case-by-case basis for urgent humanitarian reasons or a significant public benefit.  Parole decisions may be premised in part on lack of detention space, but the ultimate parole decision is still made based on the specific case-by-case assessment of the individual's circumstances. *Supra,* pp. 4-8.

Longstanding regulations make clear that where "continued detention is not in the public interest," this can constitute an urgent humanitarian reason or significant public benefit permitting parole on a case-by-case basis, provided there is no security or flight risk. 8 C.F.R. § 212.5(b)(5). Notably, Florida does not challenge this regulation.  And for good reason: no administration since section 1225 was enacted has had sufficient funding, or has sought, to detain every noncitizen applicant for admission who is potentially amenable to detention. ECF 87-12, 101:4-13; *Texas*, 142 S. Ct. at 2535 ("DHS has never had sufficient detention capacity to

maintain in custody every single person described in section 1225"). As a result, every administration since the Illegal Immigration Reform and Immigration Responsibility Act of 1996 has had to make decisions about how to use limited detention space and recognized that the use of parole frees up limited detention capacity for other, higher-priority noncitizens like criminals. *See, e.g.*, ECF 87-18; ECF 87-19; ECF 87-20. Notably, Courts also have accepted that consideration of detention resources is appropriate in exercise of the parole authority. *See Padilla v. ICE*, 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021); *Jeanty*, 204 F. Supp. 2d at 1377. To the extent the operations termed a "non-detention policy" are even challengeable, they do not violate sections 1225, 1226 or 1182.

## B.    Count 3 (Arbitrary and Capricious)

Florida argues that the alleged "non-detention policy" is arbitrary and capricious under the APA because it ignores costs to states, is pretextual and implemented in bad faith, fails to explain Defendants' departure from prior practice, does not "account for Florida's reliance interests" nor address "lesser alternatives," and ignores the rate of absconding by noncitizens released. ECF 74 ¶¶87-94.

The undisputed evidence establishes, however, that no "non-detention policy" exists. *Supra* § III. Further, any operational activities that Florida contests, including the reversible conversion of family facilities to single-adult detention, *see* ECF 87-

15 at 12:12-13:3; ECF 87-12 at 52:15-21, 63:7-8, are not challengeable "agency action" under the APA. *Supra* §§ II.A, III.

Moreover, to the extent the Court concludes that DHS's operational activities and fluctuating resource allocations constitute a "policy," Florida's arguments still fail on the merits. The arbitrary and capricious review standard is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). The Court must uphold the agency's conclusions "as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). Florida cannot show that the agency failed to consider all appropriate factors, or that its decisions are clearly irrational. *See id.*

*First*, Defendants do consider the possible interests, of states and affected communities and individuals, in their operational decisions. ECF 87-11 at 177:25-180:6; 179:7-180:5. DHS actively discusses and considers "the impact to the states of migration or migrants who are released, as well as the impacts to the nongovernment organizations that … help service both the state as well as the migrants [released into] those conditions[.]" ECF 87-11, 178:12-179:2; *accord* ECF 87-13, 74:1-10. DHS also considers, *inter alia*, whether each individual poses a danger to the community, the states' ability to absorb these individuals, the impact of its practices—both detention and release—on the local communities hosting its facilities, and the ability of both DHS itself and non-governmental organizations to

provide essential relief and services to the migrants in their destination states. *See, e.g.,* ECF 87-16, 65:6-20, 68:18-25, 84:4-12, 112:1-10; ECF 87-13, 31:10-14, 37:13-19, 39:19-22, 66:9-13, 91:16-19, 160:16-21; ECF 87-11, 188:17-189:12; ECF 87-14, 123:1-7, 201:13-21.

*Second*, there is nothing pretextual or in bad faith about Defendants' current posture of using family detention facilities for single adults, or of prioritizing resources on electronic monitoring over obtaining more detention beds. DHS can maximize the capacity of its detention facilities *and* allocate those facilities to single adults, as that is the demographic that both is more amenable to expedited removal (permitting their rapid removal) and otherwise requires more detention space. ECF 87-13, 141:7-142:2; ECF 87-14, 30:11-31:4; ECF 87-12, 67:6-20; 54:21-55:4; ECF 87-15, 12:12-13:3; ECF 87-12, 52:15-21, 54:5-16; 67:6-20; 144:15-146:6. DHS has made additional operational changes such as building new facilities and funding technology that permit it to process noncitizens faster, reducing the need for detention space for processing, and to supervise more than ten times as many noncitizens via ATD as it could detain. ECF 87-14, 120:1-121:1, 245:13-247:19; ECF 87-13, 36:15-37:9; ECF 87-12, 143:3-16. Choosing between multiple operational paths to accomplish its mission like this is a quintessential, and unreviewable, act of agency discretion. *Supra* §§ II-III.

*Third*, the evidence shows that the agency considered alternatives regarding its detention decisions. DHS examined (and tried) the alternative of detaining more noncitizens before determining it could maximize enforcement via electronic monitoring and other ATD. ECF 87-13, 36:15-37:9; ECF 87-12, 143:3-16. DHS also reasonably decided that its detention resources were better spent holding single adults than family units after experience with family detention. ECF 87-13, 141:7-142:2.

*Fourth*, DHS has explained its rationale for its current repurposing of family centers for individuals, based on several factors including the greater volume of individuals, the desire to maximize use of the space, and legal and logistic limitations on housing families. ECF 87-13, 141:7-142:2; ECF 87-14, 30:11-31:4; ECF 87-12, Price Dep. 67:6-20; 52:15-21, 54:21-55:4; ECF 87-15, 12:12-13:3. It also has explained its rationale for focusing more of its resources on processing speed and alternatives to detention, as these reduce the need for detention and impact a considerably greater number of individuals. ECF 87-14, 120:1-121:1, 245:13-247:19; ECF 87-13, 36:15-37:9; ECF 87-12, 143:3-16.

*Finally*, DHS has considered and accounted for the rate at which noncitizens might abscond if released. ECF 87-13, 142:16-19; ECF 87-1, SAR0255, 0272. DHS has noted the rates of compliance are extremely high when ATD is employed, *id.*, and for that reason has invested heavily in monitoring technology for (as well as

36

prioritized its detention space for) those who might abuse release. ECF 87-14, 140:1-12. A "policy" supported by such sensible considerations cannot be deemed arbitrary and capricious.

## C.   Count Five (Notice and Comment)

Florida erroneously contends the alleged "non-detention policy" required notice-and-comment rulemaking. ECF 74 ¶¶ 101-03. Even if the undisputed facts showed that there was such a policy, the APA only requires notice and comment for "rule making." 5 U.S.C. § 533; *see id.* § 551(4)-(5) (defining "rule" and "rule making"). Absent a "legislative rule," which "creates new law, rights, or duties," notice-and-comment is not required. *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009). Florida has not identified, and there is no evidence of, any "rule" at issue regarding DHS's current posture of prioritizing resources for single-adult detention or focusing funding on improved processing and expanded use of electronic monitoring. Indeed, the APA expressly excepts "matter[s] relating to agency management," such as these challenges to management of DHS's programs and facilities, from "rulemaking." 5 U.S.C. § 553(a)(2). The APA does not require notice

and comment, or any other procedure, for the ground-level operational activities that Florida challenges in this case. *See Vill. of Bald Head Island*, 714 F.3d at 193.

## IV.  Parole+ATD Claims

### A.  Count 2 (Violation of Law)

Florida alleges that Parole+ATD is unlawful because it does not satisfy section 1182(d)(5)(A)'s case-by-case and substantive requirements and therefore violates section 1225(b)'s detention provision. ECF 74 ¶¶ 83-86. Florida challenges both the November 2021 memorandum first describing Parole+ATD and the July 2022 memorandum that supplanted it. *Id.* ¶ 84.

As an initial matter, Defendants' official rescission of the November 2, 2021 memorandum and replacement with a new and different Parole+ATD memorandum on July 18, 2022 moots Florida's challenge to the November 2, 2021 iteration of the program. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 81 (2021). Only the July 2022 memorandum is a live agency action subject to review here, as that memorandum expressly "rescinds and replaces all prior guidance regarding the use of Parole+ATD, including but not limited to the November 2, 2021, memorandum[.]" ECF 87-1, SAR0001. The July 2022 memorandum represents a new, distinct agency action because it looked at the issue afresh and provided "several new reasons" for the policy, as well as altered

parts of the practice and added additional aspects, ECF 87-1, SAR0003-0004, "absent from the [earlier] memorandum." *See Texas*, 142 S. Ct. at 2544.

Florida's claim that the July 2022 memorandum is unlawful also fails.[6] Florida contends that the number of paroles alone indicates that the Government is violating section 1182(d). ECF 74, ¶ 54. Section 1182(d)(5)(A) grants the DHS Secretary full "discretion [to] parole into the United States" any applicant for admission "temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit[.]" 8 U.S.C. § 1182(d)(5)(A). Unlike many other provisions of the INA providing for entry of noncitizens, this section places no numerical limit on the number of individuals who may be paroled. *Compare* 8 U.S.C. § 1182(d)(5)(A) *with* 8 U.S.C. § 1157(a) (numerical limits on admission of refugees); 8 U.S.C. § 1184(p)(2) (principal U-visas capped at 10,000 per year); 8 U.S.C. §§ 1151(c)(1), 1152, 1153(a)(1)-(4) (numerical caps on visas for family preference categories). The INA thus permits DHS to parole in its sole discretion any number of applicants for admission as long as they satisfy both the case-by-case and substantive elements of section 1182(d)(5)(A).

---

[6] To the extent the Court finds the November 2021 memorandum still operative, all Defendants' arguments regarding the procedural and substantive validity of Parole+ATD under the July 2022 memorandum equally pertain to the first memorandum.

The grants of parole authorized by the July 2022 memorandum satisfy this standard. First, the guidance is clear in its requirement that enrollment in Parole+ATD requires individualized, case-by-case determinations of urgent humanitarian reasons and significant public benefit. ECF 87-1, SAR0002-0004. While there are sector-specific capacity criteria that must be met before Parole+ATD is authorized, these triggering criteria do not guarantee that any noncitizen in that sector will be paroled. Whether release is appropriate must still be determined for each individual on a case-by-case basis for urgent humanitarian reasons or significant public benefit. ECF 87-1, SAR0003. "Parole+ATD may not be used for noncitizens who, based on an individualized assessment, pose a national security risk, unmitigable flight risk, public safety threat," unaccompanied children, or are likely subject to mandatory detention for criminal noncitizens. *Id.*

As for parole's substantive standard, the INA does not define "urgent humanitarian reasons" or "significant public benefit." Congress thus delegated to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1175 n.5 (D.N.M. 2020) (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits"). While the memorandum does not limit the urgent humanitarian reasons or significant public benefits that may justify use of Parole+ATD in each individual case, it provides that health and safety

concerns associated with overcrowding, and hence the need to decompress facilities, provide a significant public benefit and meet urgent humanitarian needs. ECF 87-1, SAR0002-0003. The record establishes, for example, that many migrants and officers in overcrowded BP detention facilities have contracted, and on several occasions died from, COVID-19. ECF 87-1, SAR0101, 0114, 0116. Other health and safety risks result from overcrowding.

Defendants' implementation of "significant public benefit" to include preventing health and safety risks resulting from overcrowded detention facilities is reasonable. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-425 (1999). The applicable regulation and numerous authorities recognize the significant public benefit in fighting the spread of disease, and ensuring public health generally.[7] *see, e.g.,* 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens with "serious medical conditions in which continued detention would not be appropriate"); *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (identifying the promotion of "public health" as a "significant public interest[]").

---

[7] To the extent detention capacity plays any role in this disease and death mitigation rationale, regulation, precedent, and accepted agency practice have recognized the need to prioritize limited detention space as a valid basis for parole. *See supra* § III.A.

41

The record thus defeats any argument that Parole+ATD represents an unlawful use of parole under section 1182, and thereby violates section 1225(b).

## B.   Count 4 (Arbitrary and Capricious)

Florida contends that Parole+ATD is arbitrary and capricious for numerous reasons, all of which lack merit. ECF No. 74 ¶¶95-100. The agency's conclusions need only be "rational" to be upheld. *Miccosukee Tribe*, 566 F.3d at 1264. Florida cannot meet this high bar for challenging Parole+ATD because DHS considered all appropriate factors and aspects of the problem, and its justifications are rational. *See id.*

*First*, Florida argues that Parole+ATD fails to consider costs to states, reliance interests, and lesser alternatives. But Florida has not identified any legally cognizable reliance interests that DHS failed to consider. An agency generally must consider only the reliance interests of a regulated industry or individual subject to some unexpected civil or criminal liability by the challenged regulatory action—not the interests of states or other third parties that might feel incidental effects. *See, e.g., N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974). Regardless, DHS considered the costs of the program to all affected parties and interests, and determined that the costs were outweighed by the demonstrated benefits of the program for achieving the agency's enforcement mission by

prioritizing its resources on those most likely to abscond or pose a danger. ECF 87-1, SAR0252-0254, 0261-0270.

DHS considered a range of interests related to Parole+ATD. Those include the interests of its officers and workforce, the communities surrounding border detention facilities, and the migrants themselves, especially in protecting individuals against the spread of COVID-19. ECF 87-1, SAR0002-0004. DHS also considered the communities to which released noncitizens will settle, by requiring biometric and background screening for all Parole+ATD enrollees, and by refusing to release anyone who poses a public-safety or national security threat. ECF 87-1, SAR0004. Likewise, DHS considered and accounted for the communities surrounding ICE offices where parolees will check in, by having CBP officers assist with charging document issuance, and by engaging in NTA mailouts to reduce lines and backlogs at those field locations. ECF 87-1, SAR0004, 0165-0169, 0179-251.

DHS also considered several alternatives. Before revising the program in July 2022, DHS considered the cost and impact of continuing the program for 30, 60, or 90 days, or halting it immediately. ECF 87-1, SAR0261-0265. Further, the structure of Parole+ATD itself requires that CBP reconsider ending it or continuing it only in certain sectors *every week*. ECF 87-1, SAR0003-0004. The very fact that Parole+ATD is currently authorized only in certain sectors reflects DHS's careful determination that the significant public benefit in preventing disease and death in

crowded facilities outweighs the costs of the program in those areas. ECF 87-1, SAR0002-0004, 0165. Finally, in each individual's case where the Parole+ATD guidance is applied, the CBP and ICE officers must consider several alternatives, including detaining individuals or placing them on more restrictive monitoring. ECF 87-1, SAR0003-0004.

*Second*, Florida argues that the July 2022 memorandum "fails to provide a reasoned explanation." The memorandum itself belies this claim and carefully explains its basis in border-capacity conditions and public-health risks as discussed *supra*. ECF 87-1, SAR0002-0004.

*Third*, Florida argues that Defendants did not consider the possibility that parolees would abscond, "whether to increase detention capacity or reopen family detention centers," and "whether the Parole+ATD policy is creating a perception among potential migrants" that they will be released and thus "is exacerbating the border crisis." ECF 74, ¶98. Those arguments are refuted by the record to the extent that they are even relevant.

Defendants carefully considered whether noncitizens released on Parole+ATD would abscond. DHS examined the rates of absconding and found that enrolling parolees in ATD achieves very high compliance rates. ECF 87-1, SAR0255, 0272 (93.2% compliance rate for single adults and 82% for family units on ATD). Defendants further considered the small percentage for whom ATD would

not prevent absconding and undertook an operation to mail or otherwise serve NTAs on those who failed to check in. ECF 87-1, SAR0165-0169. Once served with an NTA, noncitizens who fail to show for their removal proceedings generally will be ordered removed *in absentia*. 8 U.S.C. § 1229a(b)(5)(A).

Plaintiff's arguments about increasing detention capacity, family detention, and migrant pull factors fundamentally misunderstand the record and APA review. First, DHS indisputably took detention capacity into consideration when formulating Parole+ATD. ECF 87-1, SAR0002 ("Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border.")  Florida's claims to the contrary have no basis in the record.

Furthermore, under APA review, an agency need not expressly address every conceivable factor, however tangential, but only "relevant factors." *Baltimore Gas & Electric Co. v. NRDC*, 462 U.S. 87, 105 (1983)). Parole+ATD was created to adjust resources to migration flows. The policy is relied upon only when migration flows reach certain limits within a certain sector. ECF 87-1, SAR0003. Although the record does not explicitly discuss "pull factors," the July 22 memorandum explicitly accounts for and responds to the day-to-day flows at the border.

*Fourth*, Parole+ATD represents a valid use of section 1182(d)(5)(A). *Supra* § IV.A.

*Finally*, the record defeats Florida's unsupported assertion that "resource constraints or the COVID-19 pandemic" justifications for Parole+ATD are "pretextual." Those concerns have a firm basis in fact. Parole+ATD is only authorized on a weekly basis where there are "15,000 noncitizens in USBP custody across all Southwest border sectors or a sector or centralized processing center's in-custody total exceeds 100% of its full capacity; and CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period." SAR0003. Those conditions create "urgent crowding and excess time in custody concerns" that cause significant resource constraints and increase the chance of spread of contagious diseases. ECF 87-1, SAR0003.

Meanwhile, the health concerns resulting from overcrowding are real and consequential. *See, e.g.*, ECF 87-1, SAR0101 (45 CBP employee *deaths* due to COVID-19, 45 fully vaccinated employees testing positive); ECF 87-1, SAR01114 (97 BP employees and 22 detainees in isolation due to COVID-19 in RGV Sector alone).

Florida cannot show that DHS failed to consider all relevant factors or that its conclusions and justifications for Parole+ATD are irrational. This claim fails.

## C.    Count 7 (Notice and Comment)

Florida contends that Parole+ATD requires notice-and-comment rulemaking. ECF 74 ¶¶ 104-106. But the notice-and-comment requirement does not apply to "interpretative rules" or "general statements of policy." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike legislative rules, such memoranda "simply state[] what the administrative agency thinks the statute means"; they do not create rights or duties but merely "remind[] affected parties of existing duties." *Warshauer*, 577 F.3d at 1337. The difference "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.*

The July 2022 memorandum is, at most, an interpretive rule or general statement of policy. It offers guidance that directly tracks the language of section 1182(d)(5)(A): "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." ECF 87-1, SAR0003; *see Warshauer*, 577 F.3d at 1337. It does not create any rights or duties for the agency or noncitizens, or expand the use of parole beyond the confines permitted under the statute. *See id.* It merely states DHS' understanding of the statute: that an "urgent humanitarian reason or significant public benefit," 8 U.S.C. §1182(d)(5)(A), can include considerations of health and safety where certain detention crowding conditions are present. Such explanatory guidance does not require notice-and-comment rulemaking. *Warshauer*, 577 F.3d at 1337.

Alternatively, the memorandum qualifies as a rule of "agency organization, procedure, or practice," 5 U.S.C. 553(b)(A), because it regulates the agency's own behavior without changing the substantive rights of parties outside the agency, *see Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

## V.     <u>Count Eight (Constitutional Claim) Fails as a Matter of Law.</u>

Count 8 challenges the alleged "non-detention policy" and Parole+ATD under the Take Care Clause (apparently informed by the separation of powers doctrine) and a freestanding constitutional claim at equity challenging unlawful executive action. ECF 74 ¶¶ 109-12. Both theories fail on the facts and the law.

First, as explained, *supra* §§ III-IV, the undisputed facts establish that neither the nonexistent "non-detention policy" nor Parole+ATD violate the law, and this derivative constitutional claim therefore lacks any wrongdoing to challenge as derelict or ultra vires.

Second, neither theory is a viable cause of action. No court has directly held that the Take Care Clause provides a private right of action. *Brnovich*, 2022 WL 4448322 at *13-14 (dismissing Take Care Clause claim in identical context); *accord Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018). Even were the Court to recognize such a cause of action, it could only provide relief regarding ministerial duties where "nothing was left to discretion" and there was "no room for the exercise of judgment." *State of*

*Mississippi v. Johnson*, 71 U.S. 475, 498 (1866); *see Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 608 (D.C. Cir. 1974). Ruling that DHS's discretionary enforcement decisions and resource prioritizations are unlawful as Florida alleges would constitute impermissible "judicial interference with the exercise of Executive discretion." *Johnson*, 71 U.S. at 499; *see Brnovich*, 2022 WL 4448322 at *13-14.

Equitable ultra vires relief is unavailable in a suit under the APA, which offers its own version of this claim, 5 U.S.C. § 706(2)(B). The 1976 amendment to the APA was intended "to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer[,]" *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989), and thus "do away with the ultra vires doctrine," *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). *See, e.g., Locke v. Warren*, No. 19-61056-CIV, 2019 WL 4805716, at *4 (S.D. Fla. Oct. 1, 2019) (collecting cases).

Even were this claim still available, it does not encompass claims for "injunctions requiring officials to act." *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005). Granting relief here would require affirmative acts: ordering the government to detain rather than release certain noncitizens on Parole+ATD or requiring it to repurpose its detention space for family units or obtain more detention space.

## **CONCLUSION**

For these reasons, the Court should grant summary judgment in Defendants'

favor on all claims.

Date: October 3, 2022                    Respectfully submitted,

JASON R. COODY                           BRIAN M. BOYNTON
*United States Attorney*                 *Principal Deputy Assistant Attorney General*

MARIE A. MOYLE                           WILLIAM C. PEACHEY
*Assistant United States Attorney*       *Director*
Northern District of Florida             Office of Immigration Litigation
                                         District Court Section

                                         EREZ REUVENI
                                         *Assistant Director*

                                         /s/ *Joseph A. Darrow*
                                         JOSEPH A. DARROW
                                         ERIN T. RYAN
                                         *Trial Attorneys*
                                         U.S. Department of Justice
                                         Civil Division
                                         Office of Immigration Litigation
                                         District Court Section
                                         P.O. Box 868, Ben Franklin Station
                                         Washington, DC 20044
                                         Tel.: (202) 805-7537
                                         Joseph.a.darrow@usdoj.gov

50

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Local Rule 7.1(F) and the Court's order permitting 11,000 words because, excluding parts of the document exempted by the Rule, it contains 10,999 words.

*/s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of Florida by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division