# EXHIBIT 16

Exhibit 16 - 001


**September 2022**

# SOUTHWEST BORDER

# Challenges and Efforts Implementing New Processes for Noncitizen Families

# GAO Highlights

Highlights of GAO-22-105456, a report to congressional requesters

## SOUTHWEST BORDER

## Challenges and Efforts Implementing New Processes for Noncitizen Families

## Why GAO Did This Study

In fiscal year 2021, Border Patrol reported about 1.7 million apprehensions of noncitizens between ports of entry—a 300 percent increase over fiscal year 2020. This included approximately 451,000 apprehensions of family unit members. Compounding this increase were continued concerns related to COVID-19 and physical distancing protocols that imposed space limitations on facilities.

To address these concerns and reduce time in custody, Border Patrol and ICE initiated two new processes in 2021, referred to as NTR and parole plus ATD. Border Patrol released family units into the U.S. without first issuing them a charging document—generally a Notice to Appear—which places them into immigration court removal proceedings. Instead, Border Patrol instructed them to report to an ICE field office. ICE officials are to further process family unit members who report to field offices, such as issuing them a Notice to Appear.

GAO was asked to review Border Patrol's and ICE's implementation of the NTR and parole plus ATD processes. This report describes (1) Border Patrol and ICE implementation of the NTR and parole plus ATD processes, and (2) ICE's efforts to initiate removal proceedings for family unit members processed with NTRs or under parole plus ATD.

GAO analyzed Border Patrol and ICE policies, guidance, and data on individuals processed with an NTR or under parole plus ATD and who reported to ICE as required. GAO also interviewed officials in Border Patrol and ICE headquarters and selected field locations.

View GAO-22-105456. For more information, contact Rebecca Gambler at (202) 512-8777 or GamblerR@gao.gov.

## What GAO Found

U.S. Border Patrol's implementation of the Notice to Report (NTR) process created challenges for U.S. Immigration and Customs Enforcement (ICE), which the agencies sought to address in developing the parole plus Alternatives to Detention (ATD) process. In March 2021, Border Patrol initiated the NTR process to reduce agents' administrative processing times by releasing noncitizen family units (parents and children under 18) without Notices to Appear. However, Border Patrol and ICE identified challenges with the NTR process. ICE officials stated they were concerned that family units were not reporting to field offices as required. Further, ICE had difficulty locating some of these individuals due to limited address information. Border Patrol released about 94,000 family unit members with an NTR before terminating this process in November 2021.

In July 2021, Border Patrol and ICE initiated a second process whereby agents release family units into the U.S. on humanitarian parole and enroll the heads of household in ICE's ATD program (or, parole plus ATD). ATD uses case management and electronic monitoring to help ensure noncitizens comply with their release conditions, allowing ICE to better track those released without a Notice to Appear. From July 2021 through February 2022, Border Patrol released about 91,000 family unit members under parole plus ATD.

ICE has efforts underway to initiate removal proceedings for family units that Border Patrol released with an NTR or under parole plus ATD. As of March 1, 2022, about three-quarters of family unit members (nearly 140,000) had reported to an ICE field office. To try to locate those who had not reported, ICE undertook several nationwide enforcement operations between November 2021 and June 2022. ICE officials stated family units that do not report, or that ICE does not locate, are to be referred for further enforcement action on a case-by-case basis to focus on the greatest threats to homeland security.

As of March 20, 2022, ICE issued Notices to Appear to about half of all family unit members (about 100,000) processed with an NTR or under parole plus ATD. According to ICE officials, ICE faces resource constraints processing those who report and issuing Notices to Appear. In July 2022, U.S. Customs and Border Protection and ICE issued a new policy under which they will share responsibility for initiating removal proceedings for those released without Notices to Appear.

**Noncitizen Family Unit Members Processed with a Notice to Report (March through November 2021) and under Parole plus Alternatives to Detention (July 2021 through February 2022)**



Source: GAO analysis of U.S. Border Patrol and ICE data. | GAO-22-105456

[a]Data as of Mar. 18, 2022, for Notices to Report and Mar. 21, 2022, for parole plus Alternatives to Detention.

Exhibit 16 - 003

United States Government Accountability Office

# Contents

Letter                                                                                          1

        Background                                                                         6

        Border Patrol's Implementation of NTR Process Created
           Challenges, Which it Sought to Address in Developing the
           Parole plus ATD Process with ICE                                         14

        ICE Has Efforts Underway to Initiate Removal Proceedings for
           Family Unit Members Processed with NTRs or Under Parole
           plus ATD                                                                 28

        Agency Comments                                                                  36

Appendix I       Additional Information on Noncitizen Family Units Processed
        with Notices to Report and Parole                                                38

Appendix II      GAO Contact and Staff Acknowledgments                                          52

Tables

        Table 1: Noncitizen Family Unit Members Whom Border Patrol
           Processed with a NTR, by Country of Citizenship (March
           2021 through November 2021)                                              38

        Table 2: Noncitizen Family Unit Members Whom Border Patrol
           Processed under Parole plus ATD, by Country of
           Citizenship (July 2021 through February 2022)                            39

        Table 3: Appointments Scheduled for Noncitizen Family Units
           Processed with an NTR or under Parole plus ATD, by
           ERO Field Office (July 2021 through February 2022)                       47

Figures

        Figure 1: Timeline of Border Patrol's Implementation of the NTR
           and Parole plus ATD Processes in 2021                                    10

        Figure 2: Number of Noncitizen Family Unit Members Whom
           Border Patrol Processed with a NTR, by Sector and
           Month (March through September 2021)                                     17

        Figure 3: Percentage of Noncitizen Family Unit Members Whom
           Border Patrol Processed with a NTR and Collected a
           Complete Intended Destination Address, by Sector and
           Month (March through September 2021)                                     19

Exhibit 16 - 004

Figure 4: Number of Noncitizen Family Unit Members Whom Border Patrol Processed with Parole plus ATD, by Sector and Month (July 2021 through February 2022)                    22

Figure 5: Percentage of Noncitizen Family Unit Members Border Patrol Processed with Parole plus ATD and Collected a Complete Intended Destination Address, by Sector and Month (July 2021 through February 2022)                    24

Figure 6: Noncitizen Family Unit Members Who Reported to ICE with an NTR or under Parole plus ATD                    29

Figure 7: Noncitizen Family Unit Members Processed with a NTR or under Parole plus ATD for Whom ICE Has Initiated Removal Proceedings                    30

Figure 8: In-Person Appointments Scheduled with ICE for Noncitizen Family Units Processed with NTRs or under Parole plus ATD, by Month                    32

Figure 9: Public Queue Outside of ICE's ERO Baltimore Field Office, September 9, 2021                    34

Figure 10: States Identified as Intended Destination Address by Noncitizen Family Unit Members Processed with a NTR from March 2021 through February 2022                    41

Figure 11: States Identified as Intended Destination Address by Noncitizen Family Unit Members Processed under Parole plus ATD from July 2021 through February 2022                    42

Figure 12: Number of Noncitizen Family Unit Members Processed with an NTR Who Reported to ICE as of March 1, 2022, by ERO Field Office                    44

Figure 13: Number of Noncitizen Family Unit Members Processed under Parole plus ATD Who Reported to ICE as of March 1, 2022, by ERO Field Office                    45

Figure 14: Number of Notices to Appear Issued by ICE as of March 20, 2022 for Noncitizen Family Unit Members Processed with a NTR, by ERO Field Office                    48

Figure 15: Number of Notices to Appear Issued by ICE as of March 20, 2022 for Noncitizen Family Unit Members Processed under Parole plus ATD, by ERO Field Office                    49

Figure 16: Number of Unique Family Units Processed under Parole plus ATD, by Border Patrol Sector and Month (July 2021 through February 2022)                    50

Exhibit 16 - 005

**Abbreviations**

| | |
|---|---|
| ATD | Alternatives to Detention |
| CBP | U.S. Customs and Border Protection |
| CDC | Centers for Disease Control and Prevention |
| DHS | Department of Homeland Security |
| ERO | Enforcement and Removal Operations |
| ICE | U.S. Immigration and Customs Enforcement |
| NTR | Notice to Report |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

September 28, 2022

The Honorable James Lankford
Ranking Member
Subcommittee on Government Operations and Border Management
Committee on Homeland Security and Governmental Affairs
United States Senate

The Honorable John Cornyn
Ranking Member
Subcommittee on Immigration, Citizenship, and Border Safety
Committee on the Judiciary
United States Senate

Within the Department of Homeland Security's (DHS) U.S. Customs and Border Protection (CBP), U.S. Border Patrol is responsible for securing the border between U.S. ports of entry. In fiscal year 2021, Border Patrol reported about 1.7 million apprehensions of noncitizens—a 300 percent increase over fiscal year 2020.[1] This included approximately 451,000 apprehensions of noncitizen family unit members (parents and children under 18 years old).[2] Compounding the significant increase in apprehensions at the border were continued concerns during this time related to COVID-19. Physical distancing protocols imposed space and other limitations on facilities and operations and Border Patrol had to balance its critical enforcement mission while also ensuring the health and safety of its personnel and those in its custody.[3]

To help address the significant increase in apprehensions, in the spring and summer of 2021, Border Patrol initiated two new processes for family

---

[1]For the purposes of this report, we use the term "apprehension" to describe Border Patrol's first interactions with noncitizens between U.S. ports of entry, whether under Title 42 or Title 8 of the U.S. Code. We provide additional information on Title 42 and Title 8 later in the report.

[2]Federal immigration law does not specifically define the term "family unit." However, CBP and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

[3]For more information on CBP's response to COVID-19, see GAO, *Border Security: CBP's Response to COVID-19*, GAO-21-431 (Washington, D.C.: June 14, 2021).

units at the southwest border aimed at reducing the time they remain in custody.[4] Under both processes, Border Patrol agents release family unit members into the country without placing them into removal proceedings before the immigration courts.[5] More specifically, to reduce the time agents need to complete the required release paperwork, agents release such individuals without issuing charging documents, such as a Notice to Appear, which initiate such proceedings.[6]

First, in March 2021, Border Patrol initiated the Notice to Report (NTR) process, whereby agents released family unit members into the U.S. without first issuing them a Notice to Appear. Agents gave them instructions to report, at a later date, to a U.S. Immigration and Customs Enforcement (ICE) field office to receive a Notice to Appear or other appropriate charging document.[7] Second, in July 2021, Border Patrol initiated a separate but similar process, one in which it released family

---

[4]Border Patrol officials stated that they mainly applied these new processes to family units; however, at certain points in time and in certain locations, officials stated that agents may have applied these processes to a relatively small number of single adults such as a married couple in which a spouse had a late-term pregnancy. In addition, Border Patrol began processing noncitizen single adults under the parole plus Alternatives to Detention process on March 20, 2022. For the purpose of this report, we focused on Border Patrol's application of these processes to family units.

[5]Upon apprehending noncitizens, Border Patrol generally determines how to process them, including whether to place them into full or expedited immigration removal proceedings. See 8 U.S.C. §§ 1225(b), 1229a; see also 8 C.F.R. § 235.3(b)(4). In full removal proceedings, noncitizens have the opportunity to present evidence to an immigration judge to challenge their removal from the country and apply for various forms of relief or protection, including asylum. See 8 U.S.C. § 1158. In expedited removal proceedings, the government can order noncitizens removed from the U.S. without further hearings before an immigration judge unless they indicate an intention to apply for asylum, a fear of persecution or torture, or a fear of return to their home country. With some exceptions, including unaccompanied children, generally noncitizens present in the U.S. without being admitted or paroled who are encountered by an immigration officer within 100 air miles of the border and who have not been physically present in the U.S. for 14 days may be placed into expedited removal. See 69 Fed. Reg. 48,877-01 (Aug. 11, 2004).

[6]Full removal proceedings are initiated by the issuance and service of a Notice to Appear. See 8 U.S.C. § 1229; 8 C.F.R. § 239.1. Removal proceedings are commenced by the filing of a Notice to Appear with the immigration court. 8 C.F.R. § 1239.1.

[7]ICE officials told us that, although Notices to Appear are generally issued, in some cases, they may use other charging documents. For example, there may be situations when a family unit member is found to have a prior removal order. ICE would then reinstate an order of removal instead of issuing a second Notice to Appear. For the purposes of this report, we mainly refer to Notices to Appear, as ICE officials stated these are generally the charging documents served.

Exhibit 16 - 008

unit members into the U.S. on humanitarian parole.[8] ICE also enrolled the families' heads of household in the Alternatives to Detention (ATD) program as a condition of their release on humanitarian parole, referred to as parole plus ATD.[9] The ATD program uses case management and electronic monitoring to help ensure participants comply with their release conditions, such as requirements to appear at immigration court hearings, and final orders of removal from the U.S.

You asked us to review Border Patrol's and ICE's implementation of the NTR and parole plus ATD processes. This report describes (1) Border Patrol's and ICE's implementation of the NTR and parole plus ATD processes, and (2) ICE's efforts to initiate removal proceedings for family unit members processed with NTRs or under parole plus ATD.

To address both objectives, we interviewed Border Patrol and ICE officials from headquarters and selected field locations to obtain information about the planning, development, implementation, and interagency coordination associated with the NTR and parole plus ATD processes. Regarding Border Patrol, we selected three of its nine southwest border sectors (Del Rio, Texas; Rio Grande Valley, Texas; and Yuma, Arizona). Border Patrol authorized use of NTRs or parole plus ATD in these sectors, which had high numbers of apprehensions of family unit members and experienced a high percentage increase in apprehensions in fiscal year 2021 over the prior year. These three sectors also processed a large number of family unit members with an NTR or under parole plus ATD, according to Border Patrol data and officials.[10] Regarding ICE, we selected five field offices located along the southwest

---

[8]CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to allow an individual to receive medical treatment or to apply for asylum. 8 U.S.C. § 1182(d)(5).

[9]ICE, among other things, is responsible for determining whether to detain noncitizens or to release them into the country while they await their hearings before the immigration courts. Except for certain individuals who are required by law to be detained during removal proceedings, ICE has wide discretion to detain or release individuals awaiting resolution of their proceedings in immigration court. When Border Patrol or ICE release individuals in removal proceedings on a conditional basis into the community, ICE is responsible for monitoring their compliance with the terms of their release. One way ICE monitors released individuals is through the ATD program.

[10]For the purposes of this report, we use the term "processed" to refer to the steps Border Patrol agents take, including interviewing noncitizens and collecting personal information (such as names and countries of nationality), before releasing them into the U.S. with an NTR or under parole plus ATD.

Exhibit 16 - 009

border and within the interior of the U.S.—(1) Harlingen, Texas; (2) Houston, Texas; (3) Miami, Florida; (4) New York, New York; and, (5) Phoenix, Arizona. In particular, the New York and Miami field offices processed a large number of family unit members that reported with an NTR or under parole plus ATD, according to ICE data and officials.

To address the first objective, we analyzed Border Patrol and ICE documentation regarding the NTR and parole plus ATD processes, such as policy memos, emails, and guidance. Generally, these documents described the circumstances under which each process was authorized, the timeframes associated with the implementation and termination of the NTR and parole plus ATD processes in certain southwest border sectors, and the steps agents are to follow for each process. We also analyzed documentation that Border Patrol provided to family units that describe instructions for reporting to ICE field offices. In addition, we examined documentation for ICE's Field Office Appointment Scheduler, a web-based scheduling system that ICE developed for family units that need to make an appointment with ICE. We also examined Border Patrol and ICE efforts to share data on individuals processed with an NTR or under parole plus ATD. Lastly, we analyzed DHS, Border Patrol, and ICE documentation for interagency coordination, including mass migration contingency plans.

We also analyzed Border Patrol summary data to determine the number of family unit members and unique family units that Border Patrol processed with an NTR or under parole plus ATD from March 2021 through February 2022.[11] Specifically, we analyzed data on Border Patrol's use of NTRs over this time period by month, by Border Patrol sector, and by country of citizenship. In addition, we analyzed summary data on the completeness of the intended destination address Border

---

[11]DHS's Enforcement Integrated Database maintains information about noncitizens apprehended by Border Patrol from arrest to release. For example, the database tracks if the individual is part of a family unit and conditions of their release—such as ATD. Border Patrol used a unique combination of data fields and values from this database to generate the summary NTR and parole plus ATD data provided to us. According to Border Patrol officials, the NTR summary data may include some individuals who were released under prosecutorial discretion and were not issued an NTR. However, the number of these individuals would be very small, according to officials. The NTR summary data were current as of March 18, 2022. According to Border Patrol officials, the summary parole plus ATD data may include some individuals whom Border Patrol paroled into the U.S. for humanitarian reasons and did not place into ATD. However, because Border Patrol limited the summary data to family unit members, the number of individuals paroled for humanitarian reasons should be very small, according to officials. The summary parole plus ATD data were current as of March 21, 2022.

Patrol collected in its data system and the intended destination state that family unit members provided agents. To assess the reliability of these data, we reviewed them for reasonableness, accuracy, and consistency. We interviewed Border Patrol headquarters officials responsible for overseeing data collection to understand processes for collecting and maintaining these data. We also discussed data collection procedures with agents in the three selected sectors. We determined that these data were sufficiently reliable to describe the numbers, destination addresses, and citizenship of family unit members processed with NTRs or under parole plus ATD.

To address the second objective, we analyzed ICE email directives, reference guides, and other guidance to Enforcement and Removal Operations (ERO) officers regarding how to process family units reporting to an ERO field office. In addition, we examined ICE documentation related to enrolling family units into parole plus ATD such as forms officers are to use or provide upon release. We also examined strategy documents and guidance for a multiphase ICE enforcement operation aimed at identifying and locating family units processed with an NTR or under parole plus ATD and placing them into removal proceedings.

In addition, we analyzed summary ICE data on family unit members and unique family units that Border Patrol processed with an NTR or under parole plus ATD from March 2021 through February 2022.[12] We analyzed these summary data to determine how many family unit members had reported and not reported to ICE by individual ERO field offices.[13] In addition, we analyzed summary ICE data on the number of Notices to Appear issued by individual field offices.[14] We also analyzed summary data on the number of appointments that ICE had scheduled for unique

---

[12]DHS's Enforcement Integrated Database maintains information about noncitizens' processing—such as issuance of a Notice to Appear. ICE used a unique combination of data fields and values from this database to generate summary data provided to us on the extent to which family units processed with an NTR or under parole plus ATD had reported to an ICE field office and whether ICE had issued them a Notice to Appear.

[13]ICE's summary data on the number of family unit members who reported to an ICE field office are as of March 1, 2022.

[14]ICE's summary data on the number of family unit members issued a Notice to Appear and placed into removal proceedings are as of March 20, 2022.

Exhibit 16 - 011

family units to report to a field office for processing from July 2021 through August 2024 by month and by field office.[15]

To assess the reliability of these data, we reviewed them for reasonableness, accuracy, and consistency. We also interviewed ICE officials at headquarters and in the field to understand processes for collecting and maintaining these data. Specifically, we interviewed ERO officials responsible for overseeing data collection, as well as officials in the five selected ERO field offices. We determined that these summary data were sufficiently reliable to describe the numbers of family unit members that had reported or not reported to ICE, been issued a Notice to Appear by ICE, or scheduled an appointment with ICE for further processing.

We conducted this performance audit from October 2021 to September 2022 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Border Patrol and ICE Roles and Responsibilities for Processing Family Units

**Border Patrol.** Along the southwest border, Border Patrol divides responsibility for border security operations geographically among nine sectors, which include border stations and centralized processing centers.[16] After Border Patrol agents apprehend noncitizens, they are to interview each individual, using interpreters if needed, and collect personal information such as their names, countries of nationality, and age. They also collect biometric information, such as photographs and

---

[15]ICE's summary data on the number of scheduled appointments are from its Field Office Appointment Scheduler and are as of March 21, 2022.

[16]The nine sectors are San Diego, El Centro, Yuma, Tucson, El Paso, Del Rio, Big Bend, Laredo, and Rio Grande Valley.

fingerprints, from certain individuals.[17] Border Patrol agents use fingerprints to run records checks against federal government databases to determine if noncitizens have any previous immigration or criminal history. According to Border Patrol officials, agents decide on a case-by-case basis how to process individuals and family units consistent with the Immigration and Nationality Act and other authorities.[18]

As of June 2022, Border Patrol agents process noncitizens, including family units, under two broad authorities referred to as Title 42 and Title 8.[19] In March 2020, the Centers for Disease Control and Prevention (CDC) issued an order, under Title 42 of the U.S. Code, which allows the government to suspend the introduction of individuals from foreign countries to prevent the spread of communicable diseases.[20] Under the order, the CDC temporarily suspended the introduction of certain individuals who would be detained in congregate settings to prevent the spread of COVID-19. Instead, these individuals are to be immediately expelled to their country of last transit or country of origin.[21] Title 42 is not

---

[17]See 8 C.F.R. § 236.5. CBP does not typically collect fingerprints for children under the age of 14. However, on a case by case basis, CBP may fingerprint children under age 14 in certain instances, such as when they suspect the child may be the victim of trafficking or involved in smuggling. For more information on CBP processes for apprehended family units, see GAO, *Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination between DHS and HHS*, GAO-20-245 (Washington, D.C.: Feb. 19, 2020).

[18]See, e.g., 8 U.S.C. §§ 1225(b), 1229a; 42 U.S.C. § 265; 42 C.F.R. § 71.40.

[19]According to Border Patrol, this includes noncitizens who do not have proper travel documents, noncitizens whose entry is otherwise contrary to law, and noncitizens who are apprehended at or near the border seeking to unlawfully enter the U.S. between the ports of entry.

[20]See 85 Fed. Reg. 16,559 (Mar. 24, 2020). This order has been extended, amended and reissued. See, e.g., 86 Fed. Reg. 42,828 (Aug. 5, 2021). The termination of this order is the subject of ongoing litigation, but remains in place as of September 2022. See Louisiana v. Ctrs. For Disease Control & Prevention, No. 22-CV-00885 (W.D. La. May 20, 2022 preliminary injunction). In assisting CDC with implementing the CDC Order under Title 42, CBP is operating pursuant to 42 U.S.C. § 268(b), aiding the CDC in the enforcement of its authority pursuant to 42 U.S.C. § 265, 42 C.F.R. § 71.40. This Order is referred to as "Title 42" because it directs the processing of certain noncitizens under the title of the U.S. Code that pertains to public health (Title 42), as opposed to the title of the U.S. Code that pertains to immigration and nationality (Title 8).

[21]In April 2022, the CDC announced that it would terminate its Title 42 order on May 23, 2022. However, this termination was enjoined by a federal court as of May 20, 2022, thereby leaving Title 42 in place. See Louisiana v. Ctrs. for Disease Control & Prevention, No. 22-CV-00885 (W.D. La. May 20, 2022 preliminary injunction). Litigation related to Title 42 was ongoing as of September 2022.

Exhibit 16 - 013

applicable to individuals whom agents determine, with approval from a supervisor, should be excepted based on factors such as public safety, humanitarian, and public health interests.[22]

In particular, since March 2020, Border Patrol has expelled certain apprehended family unit members under Title 42. For example, in March 2021, DHS reported that Mexican, Guatemalan, Honduran, and El Salvadoran family units would be expelled to Mexico unless Mexico did not have the capacity to receive them.[23] At that time, families from countries other than these countries were expelled by plane to their countries of origin, as appropriate. In addition to Mexico's capacity to receive expelled individuals from the U.S., Border Patrol faced difficulties expelling individuals from certain countries under Title 42 due to various factors. For example, flights to a noncitizen's country of origin may not be available. In addition, Border Patrol officials stated that they may not expel noncitizens to countries with whom the U.S. lacks diplomatic relations—such as Cuba or Venezuela. Furthermore, some countries have placed limits on accepting individuals expelled from the U.S. For example, Border Patrol officials stated that, as of July 8, 2022, Honduras authorized nine flights a week and limited each to 135 passengers. In addition, as of that date, Peru authorized two flights per week and limited each to 100 passengers.

If noncitizens are not subject to or are otherwise excepted from Title 42, Border Patrol may process them under Title 8, which governs immigration and nationality. Under Title 8, Border Patrol has the authority to apprehend individuals crossing the border unlawfully, hold apprehended individuals for general processing prior to transferring them to the appropriate agency for continued custody or release, and place noncitizens into full or expedited removal proceedings, among other authorities.[24] Also pursuant to Title 8, Border Patrol can release noncitizens into the country on humanitarian parole, which can be affirmatively granted on a case-by-case basis for significant public benefit

---

[22]The Title 42 Orders do not apply to U.S. citizens or legal residents, but to those who would be otherwise be introduced into a congregate setting in a port of entry or U.S. Border Patrol station at or near the U.S. land and adjacent coastal borders.

[23]See: https://www.dhs.gov/news/2021/03/16/statement-homeland-security-secretary-alejandro-n -mayorkas-regarding-situation. CBP officials noted that the countries to which individuals may be expelled are subject to change and may vary over time.

[24]See generally 8 U.S.C. §§ 1225, 1229.

Exhibit 16 - 014

or urgent humanitarian reasons.[25] According to DHS, once the CDC order under Title 42 is no longer in place, Border Patrol plans to process all individuals apprehended at the border pursuant to Title 8.[26]

**ICE.** ICE is responsible for detaining and removing noncitizens, including family unit members, who are in the U.S. in violation of immigration law and subject to removal, among other things. In particular, ICE's ERO enforces the nation's immigration laws by detaining apprehended noncitizens when legally required or appropriate during their immigration proceedings and upon completion of those proceedings.[27] In doing so, it ensures that those who receive a final order of removal leave the U.S. ICE determines whether to detain individuals in its custody, on a discretionary or mandatory basis, or release them to the community while their removal proceedings are ongoing, subject to certain criteria.[28] ICE is also responsible for supervising individuals, including family unit members, who are released to the community under the ATD program or other release conditions.[29] The ATD program uses technologies, such as telephonic reporting, smartphone application (SmartLINK), or GPS ankle monitors, to monitor those whom ERO is not detaining. ERO performs these functions from 25 field offices throughout the country.[30]

---

[25]8 U.S.C. § 1182(d)(5). Parole allows an individual who may be inadmissible or otherwise ineligible for admission to be temporarily present in the U.S. An individual granted parole has not been formally admitted to the country for purposes of immigration law.

[26]Department of Homeland Security, *Statement by Secretary Mayorkas on CDC's Title 42 Order Termination* (Washington D.C.: Apr. 1, 2022).

[27]DHS has broad statutory discretion (subject to certain legal standards) to detain foreign nationals, depending on the circumstances and statutory basis for detention. For example, the law requires DHS to detain particular categories of foreign nationals, such as those deemed inadmissible for certain criminal convictions or terrorist activity. See 8 U.S.C. §§ 1225, 1226, 1226a, 1231; 8 C.F.R. § 236.1

[28]DHS has broad statutory discretion (subject to certain legal standards) to detain, or release foreign nationals on bond, conditional parole, terms of supervision, or other conditions, depending on the circumstances and statutory basis for detention. The law requires DHS to detain particular categories of foreign nationals, such as those deemed inadmissible for certain criminal convictions or terrorist activity. See 8 U.S.C. §§ 1225, 1226, 1226a, 1231; 8 C.F.R. § 236.1.

[29]ERO field officials are to determine the level of supervision and technology assigned to an individual based on several factors, such as individuals' immigration status, criminal history, and whether they have been complying with program requirements, if already enrolled.

[30]Each of ERO's field offices oversees sub-offices located in its geographic area of responsibility, which may include all or part of a state or several states (see appendix I).

**Exhibit 16 - 015**

## NTR and Parole plus ATD Processes

For certain family unit members not expelled under Title 42 or placed into full or expedited removal proceedings under Title 8, Border Patrol initiated its Notice to Report process in the Rio Grande Valley sector in March 2021 and Del Rio sector in May 2021. In late July and early August 2021, Border Patrol initiated its parole plus ATD process in these sectors. Figure 1 depicts the timeline of Border Patrol's implementation of the NTR and parole plus ATD processes in 2021.

**Figure 1: Timeline of Border Patrol's Implementation of the NTR and Parole plus ATD Processes in 2021**



Legend
Related to authorization of the processes
Related to termination of the processes

Source: GAO analysis of U.S. Border Patrol documents. | GAO-22-105456

Notes: U.S. Customs and Border Protection (CBP) may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to allow an individual to receive medical treatment or to apply for asylum. 8 U.S.C. § 1182(d)(5).

In the November 2, 2021 memorandum terminating the use of NTRs, the Chief of the Border Patrol stated that agents in the Del Rio and Rio Grande Valley sectors may authorize the processing of family units under parole plus ATD on a case-by-case basis under certain conditions. According to the memorandum, outside of the Del Rio and Rio Grande Valley sectors, any sector seeking to utilize parole plus ATD must obtain approval from the Chief of the Border Patrol and the Commissioner of CBP. As of July 2022, Border Patrol continues to authorize sectors to enroll family units as well as individuals in parole plus ATD.

**Notice to Report.** Border Patrol authorized the NTR process in the Rio Grande Valley sector on March 20, 2021, and expanded the process to the Del Rio sector on May 30, 2021. According to Border Patrol's

guidance, this authorization was contingent on the sectors having met one or more conditions such as:

- the sector reached 100 percent of total detention capacity;

- the sector reached 75 percent total detention capacity and the number of apprehended individuals arriving in custody exceeded the discharge of individuals out of custody over a 24 hour period;

- the average time-in-custody of unprocessed individuals exceeded 24 hours and the number of apprehended individuals arriving in custody was projected to exceed the discharge of those out of custody over the next 24-hour period; or

- in coordination with Border Patrol headquarters, the sector determined the circumstances dictated the need to exercise prosecutorial discretion to maintain national security or safeguard human life.

Similar to its standard approach, Border Patrol agents were to interview family unit members to collect personal information (such as their names, countries of nationality, and age) and biometric information (such as photographs and fingerprints). Border Patrol agents also used fingerprints to run record checks against federal government databases to determine if they had any previous immigration or criminal history. Border Patrol agents then released the family unit members without formally charging them with a violation of U.S. immigration law or issuing them a Notice to Appear. Instead, agents instructed them to report to an ERO field office after release from Border Patrol custody for further processing, including for a Notice to Appear, as appropriate.[31] On November 2, 2021, the Chief of the Border Patrol issued a memorandum ceasing the use of NTRs.

**Parole plus ATD.** Beginning in July 2021, Border Patrol authorized the parole plus ATD process in the Rio Grande Valley sector and expanded the process to other sectors in Texas and Arizona in August and September 2021. Similar to the NTR process, Border Patrol agents are to collect personal and biometric information and determine if family unit members have any previous immigration or criminal history, among other things. Then, under the Secretary of Homeland Security's humanitarian parole authority, Border Patrol is to release the family unit members into the country without issuing them charging documents, such as Notices to

---

[31]Border Patrol instructed individuals issued an NTR to report to an ERO field office within 60 days.

Appear.[32] As with NTRs, agents instruct them to report to an ERO field office to receive a Notice to Appear.[33] However, as a condition of their presence in the U.S. under parole, Border Patrol agents are to assign the head of household an A-number and ERO officials located on-site in Border Patrol facilities enroll the head of household in ATD.[34]

Similar to NTRs, in July 2021, Border Patrol established triggers for when sectors could use the parole plus ATD process. Those triggers included

- when a sector reaches 75 percent total detention capacity and the number of apprehended individuals arriving in custody exceeds the discharge of those out of custody over a 24-hour period; or

- when the average time-in-custody of unprocessed individuals exceeds 48 hours and the number of subjects arriving in custody is projected to exceed the discharge of persons out of custody over the next 24-hour period.

In Border Patrol's November 2021 memorandum terminating the use of NTRs, the Chief of the Border Patrol stated that Chief Patrol Agents in Del Rio and Rio Grande Valley sectors may authorize the processing of family units under parole plus ATD on a case-by-case basis under certain conditions, which varied slightly from those Border Patrol initially developed. First, the sector must utilize all available temporary staffing such as support from agents from other sectors and contractors. Second, the 7-day average of apprehensions must be greater than the sectors' daily average in May 2019.[35] Third, one or both of the following must exist

- the average time in custody in the sector exceeds 72 hours and the individuals who were taken into custody in the sector during the

---

[32]See 8 U.S.C. § 1182(d)(5). Humanitarian parole allows an individual who may be inadmissible or otherwise ineligible for admission to be temporarily present in the U.S., but the individual is not considered formally admitted into the U.S.

[33]In July 2021, Border Patrol instructed individuals processed under parole plus ATD to report to an ICE field office within 60 days of release. On August 12, 2021, Border Patrol reduced the reporting period to 15 days post-release. Subsequently, as of April 4, 2022, Border Patrol revised the report period again to 60 days post-release.

[34]An A-number is a unique number assigned to a noncitizen's administrative file by DHS for tracking purposes.

[35]According to the memorandum, in May 2019, the average daily rate was 1,607 apprehensions for Rio Grande Valley and 276 for Del Rio.

preceding 48 hours exceeds the number of individuals released in the same period, and/or

- the sector exceeds 100 percent of the total non-COVID detention capacity and the number of individuals who were taken into custody in the sector during the preceding 48 hours exceeds the number of individuals released in the same period.[36]

According to the memorandum, Border Patrol headquarters is to reassess conditions in Del Rio and Rio Grande Valley on a daily basis. Furthermore, outside of the Del Rio and Rio Grande Valley sectors, any sector seeking to utilize parole plus ATD must obtain approval from the Chief of the Border Patrol and the CBP Commissioner.[37]

---

[36]Border Patrol officials stated that "non-COVID detention capacity" is defined as 100 percent of its capacity in non-COVID-restricted circumstances. For example, Border Patrol officials noted that during the pandemic, Border Patrol sectors lost about 75 percent of holding capacity in hard structures and about 50 percent of holding capacity in soft-sided buildings due to physical distancing procedures in such facilities.

[37]On July 18 2022, CBP and ICE issued a memorandum on the use of parole plus ATD to update the triggers, among other things. First, CBP must apprehend more than 6,000 noncitizens per day across the southwest border over a 72-hour period. Second, one or both of the following conditions must also exist (a) there are more than 15,000 noncitizens in Border Patrol custody across all southwest border sectors, and/or (b) a sector or centralized processing center's in-custody total exceeds 100 percent of its full capacity. Similar to the November 2021 memorandum, as of July 2022, Border Patrol Sector Chiefs must request approval to use parole plus ATD from the Commissioner of CBP, through the Border Patrol Chief.

# Border Patrol's Implementation of NTR Process Created Challenges, Which it Sought to Address in Developing the Parole plus ATD Process with ICE

## Border Patrol Implemented NTR and Parole plus ATD Processes as Exercise of Prosecutorial Discretion

Border Patrol developed and implemented the NTR and parole plus ATD processes in 2021 as an exercise of prosecutorial discretion. Prosecutorial discretion is the longstanding authority of an agency to decide where to focus its resources and how to enforce the law against an individual. We have previously reported that, due to limited resources, DHS cannot respond to all immigration violations or remove all individuals who are determined to be in the U.S. without lawful immigration status.[38] Therefore, DHS has exercised prosecutorial discretion in the enforcement of the law.

Current and prior administrations have exercised prosecutorial discretion and developed various priorities for the enforcement of civil immigration laws. According to Border Patrol guidance, Border Patrol agents are authorized to exercise prosecutorial discretion authority in certain circumstances and release noncitizens without placing them in removal proceedings. The intention of this authority and the associated procedures are to mitigate operational challenges, including risks to national security, during significant surges in migration, according to Border Patrol documentation.

Due to the increases in apprehensions and decreased capacity level in facilities, senior Border Patrol officials stated they sought to expedite processing for those in custody and decrease overall time in custody. In particular, for an individual to be issued a Notice to Appear and placed into full removal proceedings, Border Patrol headquarters and sector

---

[38]See GAO, *Immigration Enforcement: Arrests, Detentions, and Removals, and Issues Related to Selected Populations,* GAO-20-36 (Washington, D.C.: Dec. 5, 2019), and *Immigration: Information on Deferred Action for Childhood Arrivals,* GAO-22-104734 (Washington, D.C.: Jan. 12, 2022).

officials told us that an agent typically needs approximately 2 to 2.5 hours to complete the necessary paperwork. In contrast, officials estimated that an agent would usually need 30 minutes to process an individual with an NTR or parole plus ATD and release them from custody. Further, officials stated that, due to COVID-19 protocols, Border Patrol only had the capability to hold about 5,000 individuals at any given time across all of its facilities along the southwest border. Officials stated that Border Patrol had the capability to hold about 15,000 individuals prior to COVID-19 restrictions.

Border Patrol guidance directed agents to only process family units with NTRs or under parole plus ATD when processing options under Title 42 and Title 8 were unavailable or not applicable, or if CBP decided to exempt an individual from Title 42 on a case-by-case basis.[39] In particular, the guidance noted that upon apprehension, agents should determine whether ERO will accept custody of the individuals. If ERO declined to take custody, Border Patrol's guidance stated that agents may use discretion, on a case-by-case basis, to release individuals under prosecutorial discretion through one of these two new processes.

## Border Patrol Developed and Implemented the NTR Process Quickly, and Challenges Resulted

Senior Border Patrol headquarters officials stated that they developed and implemented the NTR process over the course of a few days in March 2021, which resulted in various challenges for ICE. In seeking to address concerns with crowded facilities and increasing time in custody in the Rio Grande Valley sector, officials stated they developed guidance and procedures for the NTR process with little advance planning or outreach to Border Patrol sectors or ERO field offices.[40] Border Patrol officials in the Rio Grande Valley sector told us they did not participate in any planning for the new NTR process, and also did not receive advance notice from headquarters before they were instructed to implement the NTR process. Specifically, officials in the Rio Grande Valley sector stated that they received guidance from headquarters on March 20, 2021, and

---

[39]According to Border Patrol guidance, under no circumstances should a noncitizen who claims to be, is suspected to be, or is determined to be an unaccompanied child as defined by 6 U.S.C. § 279(g)(2), be processed for release with an NTR or under parole plus ATD. Further, the guidance noted that Border Patrol agents were to consider whether the noncitizen poses a threat to national security, border security, or a heightened public safety risk if released under either process.

[40]CBP data indicate that Border Patrol experienced almost 500,000 apprehensions in that sector in fiscal year 2021—a 500 percent increase from the previous fiscal year. See https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

began implementing the process the next day. Similarly, senior ERO headquarters officials told us that Border Patrol did not consult with ERO in developing the NTR process, and also did not provide advanced notice before implementation of the NTR process. Senior Border Patrol headquarters officials stated that they did not consult with Border Patrol sectors or ERO headquarters or field office officials in advance because of the limited time they had to develop and implement the process.

From March 2021 through September 2021, Border Patrol processed about 93,900 family unit members with an NTR.[41] As figure 2 illustrates, Border Patrol issued the majority (about 82 percent) of NTRs to family unit members in the Rio Grande Valley sector, and the remaining portion (about 18 percent) in the Del Rio sector. Approximately 70 percent of family unit members processed with an NTR were nationals of Honduras, Guatemala, and El Salvador (see appendix I for more information).[42]

---

[41]Border Patrol data indicate this comprised about 36,500 unique family units.

[42]The majority of the remaining 30 percent of family unit members processed with an NTR were nationals of Ecuador, Nicaragua, Haiti, Venezuela, Chile, Cuba, and Brazil.

**Exhibit 16 - 022**

**Figure 2: Number of Noncitizen Family Unit Members Whom Border Patrol Processed with a NTR, by Sector and Month (March through September 2021)**



**Number of family unit members** (in thousands)

Legend:
- Del Rio sector
- Rio Grande Valley sector

NTR    Notice to Report

Source: GAO analysis of U.S. Border Patrol data.  |  GAO-22-105456

Notes: Data are as of March 18, 2022.

U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

Although Border Patrol terminated the NTR process on November 2, 2021, Border Patrol data indicate that agents did not process any family unit members with a NTR in October or November 2021.

Senior ERO officials stated that its field offices faced significant challenges processing family units reporting with NTRs. These officials stated that, if Border Patrol had given them the opportunity to provide input during the development of the NTR process, they would have recommended changes prior to its implementation. Border Patrol headquarters officials told us they recognized that challenges resulted from their limited advance planning and consultation with ICE. For example, within the first few months of implementing the NTR process, Border Patrol and ERO officials told us they became concerned that only a small proportion of family units released with NTRs were reporting to

Exhibit 16 - 023

field offices, as required. When issuing an NTR, Border Patrol agents instructed family unit members to report to a field office near their intended destination address. Border Patrol agents in the Rio Grande Valley and Del Rio sectors provided a list of field offices to each family unit processed with an NTR. However, ERO officials noted that family unit members were not required to report to a specific field office and, as a result, it was difficult for ERO to track where family units would report.

Furthermore, senior ERO headquarters officials stated they became concerned that Border Patrol had not obtained complete and valid destination addresses for many family units processed with an NTR. According to these officials, collecting accurate information about a family unit's intended destination address is critical to ERO's ability to contact the individuals and further process their removal case. According to Border Patrol's guidance to the Rio Grande Valley sector establishing the NTR process in late March 2021, agents were to use due diligence to obtain an onward destination address, to the extent the individuals know and can provide one. The March 2021 guidance also instructed agents to record the address in Border Patrol's system of record.[43] Border Patrol reiterated similar guidance to the Del Rio sector on May 30, 2021.

However, ERO headquarters told us that the addresses Border Patrol agents initially collected in the Rio Grande Valley sector were often incomplete or invalid.[44] For example, officials stated that Border Patrol sometimes recorded the onward destination state but not a street or city. These officials also stated that the addresses were sometimes associated with an apartment building, but the apartment number was not included. Or, they stated agents may have misspelled the address in the data system or listed an ERO field office as the family unit's destination

---

[43]Border Patrol uses an information system known as e3 to collect and maintain biographic, encounter, and biometric data of individuals encountered by Border Patrol. Within e3, agents can validate an address through an automated U.S. Postal Service feature as an agent enters the address into the "U.S. (Domestic) Address" field. However, agents can also enter an address in e3 without using the automated validation feature. Additionally, the address is considered valid, generally, as long as it is a valid mailing address—the U.S. Postal Service feature is not designed to determine if the address is residential or commercial, for example.

[44]ERO officials told us that issues with complete and accurate destination addresses is not unique to those released with an NTR or under parole plus ATD. Border Patrol and ERO officials noted several reasons why individuals may be unable or unwilling to provide complete destination address information, including that they may not have a specific onward address to provide at the time of release.

Exhibit 16 - 024

address. From March 2021 through June 2021, Border Patrol data indicate that the average monthly percentage of complete destination addresses for family unit members issued NTRs by the Rio Grande Valley sector was about 40 percent (see fig. 3).[45]

**Figure 3: Percentage of Noncitizen Family Unit Members Whom Border Patrol Processed with a NTR and Collected a Complete Intended Destination Address, by Sector and Month (March through September 2021)**



NTR   Notice to Report

Source: GAO analysis of U.S. Border Patrol data.   |   GAO-22-105456

Notes: Data are as of March 18, 2022.

U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

According to Border Patrol officials, to be considered a complete address, the address must be a valid mailing address. Specifically, the address must have a street, city, and state listed. An address does not have to be residential to be considered complete.

[45]Five U.S. states—Florida, Texas, New York, California, and New Jersey—represent the initial intended destinations of 41 percent of the noncitizens whom Border Patrol processed with an NTR, according to Border Patrol data (see appendix I for more information).

Exhibit 16 - 025

ERO headquarters and Border Patrol officials stated that, upon receiving ERO's feedback, Border Patrol took steps to emphasize to its agents the importance of collecting complete address information.[46] On June 4, 2021, Border Patrol sent guidance to the Del Rio and Rio Grande Valley sectors emphasizing and reiterating the requirement that agents populate the domestic U.S. address tab in Border Patrol's system. If the destination address was unknown, Border Patrol agents were to at least fill out the field labeled "State" when processing individuals with an NTR. Border Patrol also instructed family unit members to notify ICE of any change of address. As shown above in figure 3, Border Patrol data for the Rio Grande Valley sector indicate that the percentage of complete destination addresses increased from about 40 percent from March to June 2021, to more than 90 percent in July 2021.

## Border Patrol and ICE Took Steps to Address Challenges with NTRs in Developing and Implementing the Parole plus ATD Process

Senior Border Patrol and ERO headquarters officials stated that in July and August 2021 they developed and implemented the parole plus ATD process to address the challenges encountered with the NTR process. According to these officials, developing the parole plus ATD process necessitated a concerted effort and consultation between Border Patrol and ERO. Officials stated their goals were to employ additional mechanisms to track and monitor family unit members whom Border Patrol processed without Notices to Appear and increase the likelihood that such family units would report to an ERO field office.

In particular, Border Patrol and ERO determined that Border Patrol agents are to provide the head of household for each family unit an A-number.[47] By giving the head of household an A-number, Border Patrol officials stated they can more easily share information with ERO on those who are required to report to ERO field offices. In addition, ICE requires an A-number to enroll individuals in the ATD program. To implement parole plus ATD process in the summer of 2021, ERO placed officers in Border Patrol facilities along the southwest border to enroll heads of households for family units whom Border Patrol released on parole, according to Border Patrol and ICE officials. ICE's contractor is then responsible for monitoring those enrolled in ATD to ensure they meet the

---

[46]According to Border Patrol officials, to be considered a complete address, the address must be a valid mailing address. Specifically, the address must have a street, city, and state listed. An address does not have to be residential to be considered complete.

[47]An A-number is a unique number assigned to a noncitizen's administrative file by DHS for tracking purposes.

Exhibit 16 - 026

terms of the program.[48] These include requirements to keep monitoring devices charged, physically checking-in with the contractor at one of its sites, or being subject to virtual case management through the monitoring devices.

During the 8-month period from July 2021 through February 2022, Border Patrol processed about 91,000 family unit members with parole plus ATD.[49] As figure 4 illustrates, the monthly volume of those processed under parole plus ATD varied during this period, ranging from a high of about 22,000 in September 2021 to a low of about 6,000 in November 2021. The majority of family unit members processed with parole plus ATD during this period were in three Border Patrol sectors—Del Rio (44 percent), Rio Grande Valley (29 percent), and Yuma (24 percent).

---

[48]In March 2020, ICE awarded a contract with a total value of $2.2 billion to BI Incorporated to help implement the ATD program. BI Incorporated is the full name of the company and is not an abbreviation. There are five types of ATD sites, which vary with respect to the scope of services the contractor provides and other factors. See GAO, *Alternatives to Detention: ICE Needs to Better Assess Program Performance and Improve Contract Oversight,* GAO-22-104529 (Washington D.C.: June 22, 2022).

[49]Border Patrol data indicate this comprised about 32,300 unique family units (see appendix I for more information on the number of heads of household processed under parole plus ATD). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to allow a member of the family unit to receive medical treatment at a local hospital. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, such situations would be rare. As a result, for the purposes of this report, numbers are rounded to the nearest hundred.

**Figure 4: Number of Noncitizen Family Unit Members Whom Border Patrol Processed with Parole plus ATD, by Sector and Month (July 2021 through February 2022)**



Number of family unit members (in thousands)

Del Rio sector
Rio Grande Valley sector
Yuma sector
Other sectors

ATD   Alternatives to Detention

Source: GAO analysis of U.S. Border Patrol data.  |  GAO-22-105456

Notes: Data are as of March 21, 2022.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

[a]Data for July 2021 includes five individuals.

**Exhibit 16 - 028**

Border Patrol data indicate that sectors began decreasing the frequency with which they used NTRs with the implementation of parole plus ATD in late summer 2021. During a 3-month period when certain Border Patrol sectors had authorization to use both NTRs and parole plus ATD, the number of family unit members processed with NTRs decreased from about 33,000 in July 2021 to about 2,000 in September 2021.[50] Border Patrol officials stated that being able to transition from NTRs to parole plus ATD was dependent, in part, on the availability of ATD technologies at Border Patrol facilities.

Further, ICE implemented an appointment schedule system in September 2021, known as the Field Office Appointment Scheduler, to facilitate family units' reporting to ERO field offices following their release from Border Patrol custody. The web-based, bilingual, and smartphone-compatible system allows them to schedule their required check-in appointments at field offices online as they await immigration proceedings. Previously, appointments had to be made via phone or in person. Through this online system, family units can create an appointment online and eliminate the need to wait on the phone or travel to a field office to make an appointment on a walk-in basis. According to ERO officials, the online appointment system allows field offices to better track family units' reporting by field office location.

In addition to taking steps aimed at improving tracking and monitoring of family units processed without a Notice to Appear, Border Patrol data indicate that agents consistently collected a large proportion of complete destination addresses for those processed under parole plus ATD. Specifically, Border Patrol data indicate that agents collected complete address information for about 94 percent of family unit members processed under parole plus ATD during the 8-month period from July 2021 through February 2022 (see fig. 5).[51] Additionally, individual Border

---

[50]On September 1, 2021, Border Patrol limited the issuance of NTRs to the Del Rio sector and instructed other sectors—such as Rio Grande Valley and Yuma—to utilize parole plus ATD, as appropriate. On October 15, 2021, Border Patrol further instructed all sectors via email notice to cease using NTRs.

[51]Five U.S. states—Florida, Texas, New York, California, and New Jersey—represent the destinations of more than half of the noncitizens whom Border Patrol processed under parole plus ATD from July 2021 through February 2022, according to Border Patrol data (see appendix I for more information).

Exhibit 16 - 029

Patrol sectors consistently collected largely complete destination address for the vast majority of parole plus ATD cases.[52]

**Figure 5: Percentage of Noncitizen Family Unit Members Border Patrol Processed with Parole plus ATD and Collected a Complete Intended Destination Address, by Sector and Month (July 2021 through February 2022)**



Source: GAO analysis of U.S. Border Patrol data. | GAO-22-105456

Notes: Data are as of March 21, 2022.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a

[52]During the 8-month period from July 2021 through February 2022, the monthly percentage of complete destination addresses collected by individuals sectors ranged from 86 percent (Rio Grande Valley in September 2021) to 100 percent (Rio Grande Valley in February 2022).

**Exhibit 16 – 030**

limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

Complete destination addresses must be a valid mailing address and include a street, city, and state, according to Border Patrol officials. Del Rio, Rio Grande Valley, and Yuma comprised 98 percent of family unit members processed under parole plus ATD cases. If the month is missing a Border Patrol sector (e.g., July 2021), that sector did not process any individuals under parole plus ATD during that month.

[a]Data for July 2021 includes five individuals for whom Border Patrol collected a complete destination address.

[b]The "total" line shows the percentage of complete addresses collected from all family unit members processed under parole plus ATD in the Del Rio, Rio Grande Valley, and Yuma sectors.

In addition to collecting better address information, Border Patrol and ICE took steps to improve their sharing of data. Specifically, Border Patrol gave ERO access to more data on those processed with an NTR or under parole plus ATD within CBP's Unified Immigration Portal.[53] In the summer of 2021, Border Patrol developed a dashboard within the portal that provided ERO with access to summary information on those processed with NTRs and under parole plus ATD. ERO headquarters officials told us that they used Border Patrol's data in the portal to create their own internal dashboard to monitor ERO's efforts to process family units and issue Notices to Appear. As part of its dashboard, ERO tracks various information such as the expected field office check-in location, the actual field office check-in location, and the type of technology issued for those processed under parole plus ATD.

# DHS and Its Components Have Efforts Underway to Respond to Future Migrant Surges at the Southwest Border

DHS, CBP, and ICE have each either developed or are developing contingency plans to respond to surges of apprehensions at the southwest border. Generally, these plans direct DHS and its components to take actions during migration surges to help ensure noncitizens are processed quickly, safely, and humanely. As of March 2022, both DHS and ICE's plans were finalized and CBP's plan was not in force, as discussed in more detail below. In addition to these plans, DHS and its components have efforts underway to help improve the efficiency of processing noncitizens at the border.

**DHS's Southwest Border Mass Irregular Migration Contingency Plan.** In February 2022, DHS finalized a plan to respond to potential significant increases in migration at the southwest border and to coordinate among federal partners to create capacity and capability to

---

[53]The portal, operated by CBP, provides agencies involved in the immigration process a means to view and access certain information from each of the respective agencies from a single portal in near real time (as the information is entered into the source systems).

process migrants. The plan specifies four phases of action and establishes triggers for each phase.[54] For example, during phase 1, DHS is to conduct a gap analysis to assess CBP and ICE capacity to handle an influx of migrants at the border. During phase 2, DHS is to take steps to address critical shortfalls and capability gaps. For example, according to the plan, DHS may utilize support agreements among federal partners to expand CBP and ICE's ability to transport, shelter, and process noncitizens. The plan states that DHS will conduct after-action reviews to identify operational deficiencies and lessons learned and to update actions as needed to incorporate identified best practices for responding to future surge operations. As of June 2022, DHS officials stated the department had experienced migration levels that have triggered certain elements of the contingency plan. For example, DHS established the Southwest Border Coordination Center to facilitate coordination among DHS personnel and facilities regarding transportation and medical needs as well as requesting assistance from non-DHS entities.

**CBP's Integrated Southwest Border Mass Irregular Migration Contingency Plan.** In 2021, CBP began developing a plan to prevent, prepare for, respond to, and recover from mass irregular migration surges along the southwest border. According to DHS's contingency plan, CBP's plan supplements DHS's and will provide specific details on tactical operations. For example, DHS's plan notes that CBP is to establish an emergency operation center, establish support agreements with external partners, identify shortfalls in funding and resources, and request support from external partners such as ICE. As of June 2022, CBP had not finalized its plan.

**ERO's Migration Event Plan.** In July 2021, ERO finalized a plan that provides guidance to its components on how to support an irregular migration event. Similar to both DHS and CBP's plan, ERO's plan includes four phases and each phase includes specific goals.[55] For example, during phase 1, ERO is to develop response procedures and coordinate contracts and establish relationships with other agencies and nongovernmental organizations. Phase 2 includes plans to identify resource requirements and mobilize ERO personnel. Phase 3 establishes

---

[54]The phases are: (1) initial influx, (2) major influx, (3) mass irregular migration, and (4) return to steady state. Each phase is triggered when migration levels reach capacity. For example, phase one is triggered when migration levels at all southwest border facilities are greater than 75 percent of pre-COVID capacity.

[55]The phases are: (1) steady state, (2) alert and mobilization, (3) response, and (4) recovery.

processes for ERO staff to assist Border Patrol in processing migrants at the border. Lastly, phase 4 includes guidance and requirements for developing after action reports, as well as corrective action plans. As of June 2022, a senior ERO official stated that ERO had activated certain phases of the plan in locations along the southwest border when conditions on the ground met the plan's requirements. For example, the officials stated that ERO established an action team that reports to the director. ERO officials noted that they intend to begin updating the plan in fiscal year 2023.

In addition to the above contingency plans, DHS and its components have efforts underway to improve the efficiency of processing noncitizens at the border. DHS's contingency plan states that although DHS utilizes a variety of traditional options to remove noncitizens from the country, it will be necessary for DHS components to use certain processes such as parole plus ATD in the event of significant surges in apprehensions. Border Patrol officials stated that efforts to streamline administrative processes are critical to sectors' ability to release individuals with Notices to Appear under Title 8 processes. For example:

- CBP's Review and Approval Portal routes electronic files, such as immigration processing forms, among Border Patrol staff for review. According to DHS, this portal is designed to provide a digital workflow among agents and their supervisors to finalize processing forms. For example, the portal provides agents the ability to submit electronic forms to their supervisors for review. Furthermore, the portal provides supervisors the ability to review and comment on these forms and send them back to the processing agent to update and subsequently re-submit for final signature. According to Border Patrol officials, the portal was launched in in one sector in August 2021 and was implemented in all sectors as of June 2022.

- CBP and ICE have digitized certain administrative processes at the border. Historically, CBP and ICE have relied on a manual paper and email-based process to transfer custody of individuals. According to DHS, this is a time-intensive process that requires agents to consolidate information from a variety of systems. To help streamline the transfer of individuals from CBP custody into ICE custody, ICE created the Case Acceptance System, which allows completed records to be transmitted electronically from CBP to ICE. According to DHS, this will expedite ICE's acceptance of records for individuals

transferred from CBP.[56] The system was implemented at all nine Border Patrol sectors along the southwest border in April 2021, according to ERO officials.

# ICE Has Efforts Underway to Initiate Removal Proceedings for Family Unit Members Processed with NTRs or Under Parole plus ATD

## The Majority of Family Unit Members Processed with an NTR or under Parole plus ATD Have Reported to ICE

About three-quarters of family unit members whom Border Patrol processed with an NTR or under parole plus ATD from March 2021 through February 2022 have reported to ICE as of March 1, 2022. Specifically, approximately 78 percent (or, about 72,500) of family unit members whom Border Patrol processed with an NTR (from March through November 2021) had reported to ICE. About 75 percent (or, about 67,100) of family unit members processed under parole plus ATD (from July 2021 through February 2022) had reported to ICE (see fig. 6 below).[57]

---

[56]According to DHS, ICE's Case Acceptance System is integrated with CBP's Unified Immigration Portal to view forms and information relevant for transfer. CBP users can upload relevant forms into the system for review by ICE before ICE accepts transfer and custody of an individual.

[57]ICE officials stated that ICE considers a family unit to have reported if at least one member of the family unit made contact with an ERO field office either in person or via phone, or if a family unit member has an appointment in ICE's online Field Office Appointment Scheduler. Reporting to an ERO field office does not necessarily mean that ERO issues family unit members a Notice to Appear and places them into removal proceedings.

**Figure 6: Noncitizen Family Unit Members Who Reported to ICE with an NTR or under Parole plus ATD**



Source: GAO analysis of ICE data. | GAO-22-105456

Notes: Data are as of March 1, 2022.

U.S. Customs and Border Protection (CBP) and ICE policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to U.S. Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare. For the purposes of this report, numbers are rounded to the nearest hundred.

Border Patrol initiated the NTR process in March 2021 and terminated NTRs in November 2021. Border Patrol initiated the parole plus ATD process in July 2021 and has continued to authorize it under certain conditions as of July 2022. This figure includes individuals who were processed under either process through February 2022. Individuals processed under parole plus ATD after February 13, 2022 would still be within the required 15-day reporting time period.

Family unit members processed with NTRs have reported to ICE at a slightly higher rate than those processed under parole plus ATD, as of March 1, 2022. According to senior ERO officials, generally, family unit members processed with an NTR have had more time to report to ICE compared to those processed under parole plus ATD. In addition, since Border Patrol terminated the use of NTRs in November 2021, certain sectors have continued to process thousands of additional family unit members under parole plus ATD. This has added to the total universe of individuals needing to report to ICE. ERO officials also noted that ICE's contractor continues to monitor heads of household for those processed under parole plus ATD and that field offices continue to schedule future appointments.

**Exhibit 16 - 035**

## ICE Initiated Removal Proceedings for About Half of Family Unit Members Processed with an NTR or under Parole plus ATD

ICE issued a Notice to Appear and initiated removal proceedings for about 54 percent of family unit members whom Border Patrol processed from March 2021 through February 2022 with an NTR or under parole plus ATD, as of March 20, 2022. Specifically, ICE data indicate that it issued Notices to Appear for about 52,500 family unit members (about 56 percent) whom Border Patrol processed with an NTR (from March through November 2021). Similarly, ICE had issued a Notice to Appear for about 47,600 family unit members (about 52 percent) processed under parole plus ATD (from August 2021 through February 2022) (see fig. 7).[58]

**Figure 7: Noncitizen Family Unit Members Processed with a NTR or under Parole plus ATD for Whom ICE Has Initiated Removal Proceedings**



Source: GAO analysis of Immigration and Customs Enforcement (ICE) data. | GAO-22-105456

Notes: Data are as of March 20, 2022.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody. This figure includes individuals who Border Patrol processed through February 2022.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to U.S. Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare. For the purposes of this report, numbers are rounded to the nearest hundred.

---

[58]According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose, such as to allow a member of the family unit to receive medical treatment at a local hospital. According to Border Patrol officials, such situations are rare. As a result, for the purposes of this report, numbers are rounded to the nearest hundred.

## ICE Faces Challenges Initiating Removal Proceedings for Family Unit Members Issued NTRs or Processed under Parole plus ATD, but Has Efforts Underway to Help Address Them

As ICE takes steps to initiate removal proceedings for family unit members whom Border Patrol processed with an NTR or under parole plus ATD, it has faced challenges in doing so. In particular, ERO field offices have faced resource constraints and other challenges addressing this additional workload. Further, ICE has been unable to locate some family units who have not reported since being processed by Border Patrol.

**Processing family unit members who report to ICE.** According to senior ERO headquarters officials, as well as officials from all of the five field offices we interviewed, ICE faces significant challenges processing family unit members in a timely manner due to resource constraints. First, ICE faces challenges addressing the unpredictable nature of the workload associated with processing such family units. If family units appear on a walk-in basis at an ERO field office without making an appointment in advance, ERO officials stated it is extremely difficult to complete their administrative processing and issue them a Notice to Appear that same day. For example, officials at one field office said that on certain days, 300 to 500 individuals may report in person to the field office, most of whom do not have appointments. In such cases, ERO officials stated that the field offices may record that a family unit has reported to the field office for purposes of meeting the terms of their parole, and then schedule them for a future appointment to complete processing and issue a Notice to Appear within the same day. In other cases, officials said the family may leave the queue at the field office before they interact with an ERO official and thus officials may not be able to record the family unit as having reported.

As of March 21, 2022, ICE data indicate that ICE had scheduled about 19,700 appointments for family units to appear at an ERO field office to complete their processing through February 2022 (see fig. 8 and appendix I for more information). In addition, ICE had scheduled an additional approximately 15,100 appointments from March 2022 through March 2024.

**Figure 8: In-Person Appointments Scheduled with ICE for Noncitizen Family Units Processed with NTRs or under Parole plus ATD, by Month**



Number of appointments

ICE   U.S. Immigration and Customs Enforcement

Source: GAO analysis of ICE data.  |  GAO-22-105456

Notes: Data are as of March 21, 2022.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody. This figure includes individuals who were processed through February 2022.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to U.S. Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

Second, officials at ERO headquarters and at each of the five field offices we spoke with said they were concerned about ERO's lack of personnel necessary to address this workload—a responsibility not typically assigned to ICE. Officials said completing the administrative processes to issue Notices to Appear to family unit members at an ERO field office can take multiple hours per family. This limits the number of family units that

ERO can schedule and process into removal proceedings each day. ERO field offices must also balance their other daily roles and responsibilities such as coordinating the detention and removal of other individuals. ERO officials at one field office said that their office only has capacity to process up to 100 people in person per day. Officials at another field office told us their office has the capacity to complete 65 appointments per week for NTR or parole plus ATD cases.

Third, ERO reported facing challenges processing family unit members due to space constraints within its field offices. Most field offices are not equipped to handle several hundred visitors per day in a large-scale processing operation, according to ERO officials. Officials said that space in these offices is limited and that ERO's normal daily business functions must also occur while processing NTR and parole plus ATD cases, which has created problems with traffic, long lines outside of buildings, and overcrowding (see fig. 9). For example, ERO officials stated that one of its field offices has a waiting room that can accommodate only six people. Further, they stated that field offices are generally designed to serve single adults and not families. In addition, the COVID-19 pandemic has placed limitations on the number of people who can safely gather in indoor spaces at one time. ERO headquarters officials told us that it is up to each field office to determine how many NTR and parole plus ATD cases it can accommodate per month, and to use the ICE online schedule system to create appointments, as is feasible.

**Figure 9: Public Queue Outside of ICE's ERO Baltimore Field Office, September 9, 2021**



Source: U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Office (ERO). | GAO-22-105456

To help address some of these challenges, in November 2021, February 2022, and June 2022, ICE implemented a nationwide enforcement operation to enter family unit members into removal proceedings by mailing Notices to Appear to those for whom ICE had a valid address or serving Notices to Appear at a residence. If officers were unsure of an address's validity, they were to attempt to contact the individuals by phone (if a phone number was available). As of March 20, 2022, ICE data indicate that ICE had mailed about 48,500 Notices to Appear to family unit members (about 21,700 processed with an NTR and about 26,800 enrolled in parole plus ATD).

According to ERO officials, field offices received authorization to work overtime on evenings and weekends to undertake the first two phases of this operation. ERO officials stated they also utilized staff from other ICE offices, such as Homeland Security Investigations, to assist in processing the cases remotely and mailing the Notices to Appear. In June 2022, ICE completed a third phase of this operation, in which officers issued charging documents (such as Notices to Appear) in person to 618

individuals at their places of residence. This phase focused on individuals who had not reported to ICE as required after being processed by Border Patrol with an NTR or under parole plus ATD.

However, ERO officials also stated that they are concerned about the continuing workload their field offices will experience given the large numbers of family units whom Border Patrol has released into the country under parole plus ATD in the spring of 2022. Specifically, Border Patrol reported that agents processed about 14,600 family unit members under this process in March 2022, nearly 16,600 in April 2022, and almost 25,900 in May 2022. Moreover, Border Patrol officials stated that in March 2022, Border Patrol began processing single adults under parole plus ATD. Specifically, according to CBP, Border Patrol processed nearly 8,800 single adults in March 2022, about 23,400 in April 2022, and nearly 25,700 in May 2022.

In light of continuing high levels of migration along the southwest border, on July 18, 2022, the CBP Commissioner and ICE Acting Director issued a memorandum updating the policy on the use of parole plus ATD. Specifically, the memorandum allows Border Patrol to continue processing noncitizens (family unit members and single adults) under parole plus ATD. The policy states that Border Patrol should use parole plus ATD sparingly and on a case-by-case basis when sectors meet certain conditions and obtain necessary authorization from headquarters. It is not meant to be a primary means by which agents process noncitizens, according to the memorandum.[59] In addition, the memorandum states that Border Patrol agents must collect and document a physical address from each noncitizen processed under parole plus ATD. CBP must also report daily to DHS headquarters and ICE detailing the number of noncitizens processed under parole plus ATD to help identify the need for any operational changes. Further, CBP's Commissioner or Deputy Commissioner is to reassess the use of parole plus ATD on a weekly basis, according to the memorandum.

In addition, the memorandum directs CBP and ICE to work jointly to streamline and complete the processing of charging documents such as

---

[59]As in the previous iteration of parole plus ATD policy, certain groups, such as unaccompanied children, are ineligible. In addition, CBP is to conduct biometric identity checks and thoroughly evaluate any potential national security and public safety concerns prior to processing individuals under parole plus ATD. Individuals whom Border Patrol determines pose a national security or public safety risk are also ineligible. ICE and CBP, *Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations* (July 18, 2022).

Exhibit 16 - 041

Notices to Appear for those processed under parole plus ATD. Specifically, the memorandum states that each agency will be responsible for completing at least 50 percent of the total workload (such as initiating removal proceedings) associated with those individuals processed under parole plus ATD. According to ERO officials, this is a key change, which should help reduce the strain on ICE personnel and resources.

**Family unit members who have not reported to ICE.** ERO officials stated that family unit members who do not report at all are to be referred to the Fugitive Operation division for further enforcement action, as appropriate. Prior to being struck down by a federal court in June 2022, DHS's *Guidelines for the Enforcement of Civil Immigration Law* focused enforcement efforts on the apprehension and removal of noncitizens who were a threat to national security, public safety, and border security.[60] As we have previously reported, DHS's immigration enforcement agencies do not have the operational capability to apprehend, detain, and remove every individual who is unlawfully present in the U.S.[61] ICE officers are to make discretionary enforcement decisions on a case-by-case basis to focus on the greatest threats to homeland security, according to officials. ERO officials stated that, as resources allow and based on the facts and circumstances of each case, they will continue to take steps to locate family unit members who have not reported as instructed and for whom ICE does not have valid addresses.

## Agency Comments

We provided a draft of this report to DHS for review and comment. The department did not provide formal written comments, but did provide technical comments on the draft, which we incorporated as appropriate.

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to the appropriate congressional committees, the Secretary of Homeland Security, and other

---

[60]DHS, *Guidelines for the Enforcement of Civil Immigration Law* (September 30, 2021). The DHS Guidelines have been vacated by a federal court. See Texas v. United States, --- F.Supp. 3d ---, 2022 WL 2109204 (S.D. Tex. June 10, 2022), cert. granted, --- S. Ct. ---, 2022 WL 2841804 (2022) (Mem.). Accordingly, effective June 25, 2022, ICE ceased to follow the DHS guidelines. The Southern District of Texas's final judgment vacating the DHS guidelines is pending before the U.S. Supreme Court with argument set for December 2022. United States v. Texas, No. 22-58 (July 21, 2022).

[61]GAO, *Immigration: Information on Deferred Action for Childhood Arrivals*, GAO-22-104734 (Washington, D.C.: Jan. 12, 2022), and *Immigration Enforcement: Arrests, Detentions and Removals, and Issued Related to Selected Populations*, GAO-20-36 (Washington, D.C.: Dec. 5, 2019).

Exhibit 16 - 042

interested parties. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions, please contact me at (202) 512-8777 or gamblerr@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made significant contributions to this report are listed in appendix II.

Rebecca Gambler
Director, Homeland Security and Justice

# Appendix I: Additional Information on Noncitizen Family Units Processed with Notices to Report and Parole

This appendix provides additional information on Notices to Report (NTR) and parole plus Alternatives to Detention (ATD), including information on noncitizen family unit members' country of citizenship, their self-reported intended destinations within the U.S., and the extent to which they reported to U.S. Immigration and Customs Enforcement (ICE). The appendix also includes information on ICE's efforts to enter family unit members into removal proceedings.

## Citizenship Data

When apprehending and processing noncitizens, U.S. Border Patrol agents record certain biographic information, including their country of citizenship. Tables 1 and 2 show the country of citizenship for family unit members whom Border Patrol apprehended along the southwest border and processed with a NTR or under parole plus ATD from March 1, 2021 through February 28, 2022.

**Table 1: Noncitizen Family Unit Members Whom Border Patrol Processed with a NTR, by Country of Citizenship (March 2021 through November 2021)**

| Country of citizenship | Number of family unit members processed with a Notice to Report (NTR) |
|---|---:|
| Honduras | 38,585 |
| Guatemala | 19,368 |
| El Salvador | 8,904 |
| Ecuador | 8,465 |
| Nicaragua | 5,560 |
| Haiti | 4,987 |
| Venezuela | 3,946 |
| Chile | 1,348 |
| Cuba | 633 |
| Brazil | 542 |
| Romania | 384 |
| Colombia | 268 |
| Mexico | 252 |
| Peru | 198 |
| Other | 496 |
| **Total** | **93,909** |

Source: GAO analysis of U.S. Border Patrol data. | GAO-22-105456

Notes: Data are as of March 18, 2022. Data represent all family unit members whom Border Patrol processed with a NTR from March 1, 2021 through November 2, 2021. Countries with fewer than 100 such individuals are included in the "Other" category.

U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has

no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

**Table 2: Noncitizen Family Unit Members Whom Border Patrol Processed under Parole plus ATD, by Country of Citizenship (July 2021 through February 2022)**

| Country of citizenship | Number of family unit members processed under parole plus Alternatives to Detention (ATD) |
|---|---|
| Venezuela | 26,549 |
| Honduras | 10,922 |
| Nicaragua | 7,901 |
| Colombia | 6,916 |
| Cuba | 6,719 |
| Haiti | 5,825 |
| Brazil | 5,633 |
| Ecuador | 5,427 |
| El Salvador | 4,180 |
| Guatemala | 3,560 |
| Chile | 2,108 |
| Peru | 1,457 |
| India | 775 |
| Romania | 565 |
| Panama | 289 |
| Angola | 273 |
| Mexico | 249 |
| Uzbekistan | 235 |
| Russia | 184 |
| Uruguay | 130 |
| Democratic Republic of the Congo | 122 |
| Other | 1,074 |
| **Total** | **91,093** |

Source: GAO analysis of U.S. Border Patrol data. | GAO-22-105456

Notes: Data are as of March 18, 2022. Data represent all family unit members whom Border Patrol processed under parole plus ATD from July 1, 2021 through February 28, 2022. Nationalities with fewer than 100 noncitizens are included in the "Other" category.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This

**Exhibit 16 - 045**

may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

## Intended Destination Data

According to Border Patrol guidance, agents are to record information about noncitizens' self-reported intended destination address within the U.S. These officials said that noncitizens are not always willing or able to provide a destination address to Border Patrol agents. Border Patrol instructed agents to obtain, at a minimum, a destination U.S. state. Figures 10 and 11 show the states identified by apprehended family unit members whom Border Patrol processed with an NTR or under parole plus ATD from March 1, 2021 through February 28, 2022.

**Figure 10: States Identified as Intended Destination Address by Noncitizen Family Unit Members Processed with a NTR from March 2021 through February 2022**



Source: GAO analysis of U.S. Border Patrol data.  |  GAO-22-105456

Notes: Data are as of March 18, 2022. Data represent all family unit members whom Border Patrol processed with a NTR from March 1, 2021 through February 28, 2022. This figure does not include about 17,000 family unit members who did not provide a destination state to Border Patrol agents.

U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

**Figure 11: States Identified as Intended Destination Address by Noncitizen Family Unit Members Processed under Parole plus ATD from July 2021 through February 2022**



Legend

| | |
|---|---|
| | 0 |
| | 1–400 |
| | 401–1,000 |
| | 1,001–5,000 |
| | 5,001 or more |

ATD    Alternatives to Detention

Federated States of Micronesia    Guam    Commonwealth of the Northern Mariana Islands    American Samoa    Puerto Rico    U.S. Virgin Islands

St. Thomas and St. John

St. Croix

Source: GAO analysis of U.S. Border Patrol data.  |  GAO-22-105456

Notes: Data are as of March 20, 2022. Data represent all family unit members whom Border Patrol processed under parole plus ATD from July 1, 2021 through February 28, 2022. This figure does not include about 900 family unit members who did not provide a destination state to Border Patrol agents.

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This

**Exhibit 16 – 048**

may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

## Data on ICE's Enforcement Efforts

As described earlier in this report, when Border Patrol agents process family unit members with an NTR or under parole plus ATD, they provided instructions to report to an Enforcement and Removals Operations (ERO) field office within a certain number of days. Agents were to identify the nearest ERO field office based on the family unit's stated destination address. For example, those who intended to travel to Miami, Florida, would be instructed to report to the Miami ERO office. Figures 12 and 13 show the number of family unit members who reported to each ERO field office as of March 1, 2022.

Figure 12: Number of Noncitizen Family Unit Members Processed with an NTR Who Reported to ICE as of March 1, 2022, by
ERO Field Office



Source: U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO). | GAO-22-105456

Notes: Data represent all family unit members whom U.S. Border Patrol processed with an NTR from
March 1, 2021 through February 28, 2022, and who reported to an ERO field office as of March 1,
2022. In addition, 355 family unit members reported to the ERO field office in Harlingen, Texas, which
ICE established in July 2021 during the course of our review, as of the same date.

U.S. Customs and Border Protection and ICE policy and guidance documents generally define a
family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S.
and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical
custody.

ERO officials stated that ERO considers a family unit to have reported if at least one member of the
family unit made contact with an ERO field office either in person or via phone, or if a family unit
member has an appointment in ICE's online Field Office Appointment Scheduler.

Figure 13: Number of Noncitizen Family Unit Members Processed under Parole plus ATD Who Reported to ICE as of March 1, 2022, by ERO Field Office



Source: U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO). | GAO-22-105456

Notes: Data represent all family unit members whom Border Patrol processed under parole plus ATD from July 1, 2022 through February 28, 2022 and who reported to an ERO field office as of March 1, 2022. In addition, 301 family unit members reported to the ERO field office in Harlingen, Texas, which ICE established in July 2021 during the course of our review, as of the same date.

U.S. Customs and Border Protection (CBP) and ICE policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to U.S. Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were

Exhibit 16 - 051

granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

ERO officials stated that ERO considers a family unit to have reported if at least one member of the family unit made contact with an ERO field office either in person or via phone, or if a family unit member has an appointment in ICE's online Field Office Appointment Scheduler.

Family units were also able to schedule appointments to report to an ERO field office using ICE's online Field Office Appointment Scheduler. Table 3 shows the number of appointments scheduled for those processed with an NTR or under parole plus ATD, by ERO field office, from July 2021 through February 2022.

**Table 3: Appointments Scheduled for Noncitizen Family Units Processed with an NTR or under Parole plus ATD, by ERO Field Office (July 2021 through February 2022)**

| Enforcement and Removal (ERO) field office | Number of appointments for family units processed with a Notice to Report (NTR) | Number of appointments for family units processed under parole plus Alternatives to Detention (ATD) | Total |
|---|---|---|---|
| Atlanta | 808 | 481 | 1,289 |
| Baltimore | 168 | 52 | 220 |
| Boston | 636 | 525 | 1,161 |
| Buffalo | 19 | 55 | 74 |
| Chicago | 764 | 689 | 1,453 |
| Dallas | 911 | 1,012 | 1,923 |
| Denver | 113 | 35 | 148 |
| Detroit | 267 | 235 | 502 |
| El Paso | 31 | 52 | 83 |
| Harlingen | 11 | 10 | 21 |
| Houston | 686 | 394 | 1,080 |
| Los Angeles | 533 | 412 | 945 |
| Miami | 935 | 1,001 | 1,936 |
| Newark | 713 | 731 | 1,444 |
| New Orleans | 846 | 552 | 1,398 |
| New York City | 1,237 | 749 | 1,986 |
| Philadelphia | 352 | 119 | 471 |
| Phoenix | 16 | 33 | 49 |
| Seattle | 159 | 84 | 243 |
| San Francisco | 398 | 169 | 567 |
| Salt Lake City | 70 | 199 | 269 |
| San Antonio | 434 | 526 | 960 |
| San Diego | 47 | 16 | 63 |
| Minneapolis-St. Paul | 374 | 207 | 581 |
| Washington, D.C. | 484 | 375 | 859 |
| **Total** | **11,012** | **8,713** | **19,725** |

Source: GAO analysis of U.S. Immigration and Customs Enforcement (ICE) data. | GAO-22-105456

Notes: Data represent appointments scheduled through February 2022 for family units (as of March 21, 2022) that U.S. Border Patrol processed with an NTR or under parole plus ATD from March 2021 through February 2022 to check in at an ERO field office.

U.S. Customs and Border Protection and ICE policy and guidance
documents generally define a family unit as a noncitizen child under the
age of 18 who has no lawful immigration status in the U.S. and is
accompanied by a noncitizen parent or legal guardian who is able to
provide care and physical custody.

ICE has initiated removal proceedings for family units that Border Patrol
processed with an NTR or under parole plus ATD by issuing them a
Notice to Appear. Figures 14 and 15 show the number of Notices to
Appear that ICE had issued as of March 20, 2022.

**Figure 14: Number of Notices to Appear Issued by ICE as of March 20, 2022 for Noncitizen Family Unit Members Processed with a NTR, by ERO Field Office**



Source: U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO). | GAO-22-105456

Exhibit 16 – 054

Notes: Data represent all family unit members whom U.S. Border Patrol processed with an NTR from March 2021 through November 2021 and who reported to an ERO field office. Date were current as of March 20, 2022. In addition, ERO's Harlingen, Texas field office, which ICE established in July 2021 during the course of our review, issued 660 Notices to Appear as of the same date.

U.S. Customs and Border Protection and ICE policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

**Figure 15: Number of Notices to Appear Issued by ICE as of March 20, 2022 for Noncitizen Family Unit Members Processed under Parole plus ATD, by ERO Field Office**



Source: U.S. Immigration and Customs Enforcement's (ICE) Enforcement and Removal Operations (ERO).  |  GAO-22-105456

Notes: Data represent all family unit members whom Border Patrol processed under parole plus ATD from July 1, 2022 through February 28, 2022. In addition, ERO's Harlingen, Texas field office, which ICE established in July 2021 during the course of our review, issued 475 Notices to Appear as of the same date.

Exhibit 16 – 055

Data are as of March 20, 2022. U.S. Customs and Border Protection (CBP) and ICE policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to U.S. Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

Figure 16 shows the number of unique family units that Border Patrol processed each month under parole plus ATD from July 2021 through February 2022.

**Figure 16: Number of Unique Family Units Processed under Parole plus ATD, by Border Patrol Sector and Month (July 2021 through February 2022)**



Source: GAO analysis of U.S. Border Patrol data.  |  GAO-22-105456

Notes: Data represent all family unit members whom Border Patrol processed under parole plus ATD from July 1, 2022 through February 28, 2022, as of March 21, 2022.

**Exhibit 16 – 056**

U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement policy and guidance documents generally define a family unit as a noncitizen child under the age of 18 who has no lawful immigration status in the U.S. and is accompanied by a noncitizen parent or legal guardian who is able to provide care and physical custody.

CBP may grant humanitarian parole to noncitizens on a case-by-case basis for certain reasons, such as significant public benefit or urgent humanitarian reasons. In this context, parole generally refers to permitting an individual to temporarily enter or remain in the U.S. for a limited purpose, such as to allow an individual to receive medical treatment. 8 U.S.C. § 1182(d)(5). According to Border Patrol officials, Border Patrol data include all family unit members released under humanitarian parole during this time period. This may include family unit members not processed under parole plus ATD who were granted parole for a limited purpose such as to receive medical treatment. According to Border Patrol officials, such situations are rare.

# Appendix II: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Rebecca Gambler, (202) 512-8777, gamblerr@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Kathryn Bernet (Assistant Director), Anne Akin (Analyst-in-Charge), Michele Fejfar, Bethany Gracer, Eric Hauswirth, Susan Hsu, Ben Nelson, and Heidi Nielson made key contributions to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. |
| | Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. |
| | Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: |
| | Website: https://www.gao.gov/about/what-gao-does/fraudnet |
| | Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

**Exhibit 16 - 059**