# EXHIBIT 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.: 3:21-cv-1066

STATE OF FLORIDA,

Plaintiff,

vs.

UNITED STATES OF AMERICA, et al.,

Defendants.
_______________________________/

VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON BEHALF OF THE PLAINTIFF

Volume 1
Pages 1 through 137

Wednesday, July 13, 2022
8:33 a.m. CT - 2:17 p.m. CT

Location: Remote via Zoom
Washington, D.C.

Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

**Q. Right. So, if they committed -- if they entered illegally and then they committed a crime --**

A. So, we have two crimes? I'm just trying to determine --

**Q. I'm sorry. Maybe I'm not being clear.**

A. No.

**Q. So, they entered illegally and in doing so they've committed a crime?**

A. Yes.

**Q. Okay. At that point, is that person arrested and taken to a separate location for processing?**

A. So, yes, depending upon the circumstance. It depends on what their nationality is. So, you know, we, we have the, the public health authority of Title 42, which we would detain somebody, process them, right, which is really just recording the encounter. You know, and, and then ultimately expel them. You know, so it's not necessarily an arrest. It's an encounter. So, it's through the expulsion. Right?

And in other circumstances where we can not apply Title 42 to somebody, then -- yes, then they are placed under arrest and taken to a location, you know, most often in order to process.

In certain circumstances, you know, we, we even have the ability to process directly in the field. So, taking somebody to a place is really subjective due to the circumstances that, that are present with that, that exact individual.

**Q. Okay. So, under the situation of Title 42, what would happen at that point if you determined that someone would be expelled under Title 42?**

A. Right. So, we'll take a Mexican national as an example under the circumstances that I'm working on the border with Mexico just to kind of -- to, to hone in the situation.

So, if we encounter a Mexican national who's crossed illegally into the United States, doesn't have any documentation to be and remain in the United States legally, right, but that person is applicable to Title 42, which we can, we can still apply Title 42 to Mexico, that person's -- basically, their biographical and biometric information will be taken in order to be able to record the encounter and to ensure what was the criminality of that person that's in front of us, right, or do they pose a national security or border security risk.

If they pose a national security or border security risk, we are not going to Title 42 them back to Mexico. We will take them into custody and then we'll, obviously, prosecute and all kinds of -- place him into Title 8 proceedings.

If that person does not present any type of border security or national security risk and is applicable to Title 42, then we will expel them directly from the field and return them over to Mexico.

That's the circumstances. That's just an example.

**Q. Okay. And so, when you take this biographical and biometric information in the field, how do the agents do that?**

A. So, it -- (a), first off, it's dependent upon connectivity. But when we have connectivity, certain places have what I would say is sufficient -- the reality is we work in austere environments, but when we can and we can work into a situation or an area to where we have sufficient connectivity, we actually have two different devices which, which we can search somebody's biometric or biographic information.

**Q. Okay. So, you're searching that**

**information? You're not necessarily taking biographic information?**

A. Well, no, we take it, you have to take it, and then it's ran through a series of databases in order to be able to determine if that person has a, a border security, national security, criminal history or immigration history nexus or history, if you will.

**Q. And what type of biometric information do you take?**

A. So, it's, you know, facial, right, so a picture, basically. So, facial as well as, as their fingerprints.

**Q. Okay. So, now let's say that the person is not amenable to Title 42 and goes through Title 8. What happens at that point?**

A. So, if we cannot expel that individual -- you know, because not all countries will accept, you know, Title 42 returns in their countries. So, if we cannot expel that individual, then we will place them into a -- you know, a Title 8 proceeding. Now, with that -- or I should say that track, if you will. Processing track.

So, with that being the case, you know, the first and foremost thing is we will try and,

and -- we will attempt to be able to detain anyone that we can for detention or removal. All right? So, we're immediately taking a look at can I remove this person from, from the United States or not? Can I detain them and can I remove them?

If we cannot detain them or remove them, then, obviously, other pathways are applicable. And if we can detain them or remove them, we have to take a look if this is their first entry, if this is a repeated entry, so they might be a reinstatement, you know, are there, are there -- are there other contributing aspects with this that, you know, as we, as we evaluate the case to where we would seek a prosecution? It just depends very specifically on the individual. But, in essence, we are going to take a look to see, you know, what we can -- you know, what the legal charges are if we're going to charge somebody and then place them into detention and removal proceedings.

**Q. Okay. So, at that point if you're going to pursue the Title 8 option, what type of interview or information do you obtain from them?**

A. So, I mean, it's really all the circumstances from, from, you know -- I'll put it to you this way: The interviews that we conduct in the

field are very, are very comprehensive. So, it's going to be everything that we can find out about that individual who is in front of us as well as everything along their journey. Everything from how did you make the arrangements to come to this country to what were your steps along the way, who did you contact, what organization did you meet along the way in order to be able to get here? All to be able to try and gain what I would consider is knowledge or intelligence to illuminate the criminal network that's even bringing people here in the first place.

So, not only the information about the individual, but the circumstances that, that, I'll say, facilitated them arriving at our border. So, all of that stuff is going to be taken into account during the interview.

**Q. Okay. Does that interview -- you said it occurs in the field, correct?**

A. So, it, it -- by and large, no. That interview, because it's, obviously, a longer time period that we're with somebody, it typically happens, you know, at a station or a processing center.

**Q. Okay. So, I just want to make sure I have**

**this clear. So, if the person is not amenable to Title 42, you start the process under Title 8, the person then goes, probably, to some other location that's not in the field --**

A. Yes.

**Q. -- where they are subjected to this interview or engaged in this interview and where biographic information and just history is taken. Is that accurate?**

A. Correct, biometric and biographic -- again, because in some locations in the field we may not have biometric information that we're able to capture there. Right? It's going to be dependent upon technology and connectivity. But back at the station location biometric and biographic and what I would consider history is -- you know, is taken from that person in the interview.

**Q. Okay. Is the person conducting the interview the same person who encountered the individual?**

A. That depends. It just -- you know, it's -- you know, in certain circumstances where we have lesser traffic in a sector, it very well may be the individual who encounters somebody in the field who is, who is, you know, continuing that interview

in the station or the processing center.

In other locations where it's extremely busy, then in, in some circumstances it's not. You know, somebody might apprehend them in the field, they're bringing very large groups into the stations and the processing centers and there's, and there's multiple people who are helping to interview that group.

Now, if it's the same agent, you know, the agent will just, you know, continue upon that course of action. If it's a different agent, the agent when they, when they have that person in front of them, will go back through all of what I would consider is that biographical information of the individual.

**Q. Okay. Is that biographical information then put into an electronic system or database?**

A. Correct.

**Q. Okay. And I presume the file would be under that person's name?**

A. No.

**Q. Okay.**

A. So, the reason why it's not -- now, to explain the system. So, we identify people numerically. So, there is, there is an event,

right, which means this whole group of people that we've encountered are under one specific event number, and then each individual person within that event will have an individual FINS. And a FINS number, right, which is an identification number, Federal identification number, right, FINS, that is individual to the very specific person.

Because the reality is is that people lie to us every day. They may tell us different names every time they encounter us. But the information of somebody's biometric and biographic information is always kept consistent within, within them under the FINS, which are identified by their fingerprints as well as the information associated with, with the -- their face.

I hope that makes sense. I know it's a complex system, but it's the way we're able to track somebody numerically independent of the biographical information that they're verbally telling us, which is not always accurate.

**Q. Okay. So, let's say that same person has made multiple attempts to enter the country illegally and has been -- has had multiple encounters. Would each encounter be noted underneath that person's FINS?**

A. Exactly.

**Q. Okay. And when the person is taken into custody or arrest, is there a warrant that's obtained first?**

A. No. No, I mean, we -- I mean, don't get me wrong. I mean, we execute warrants for sure, you know, but, but, you know, I mean, we don't have warrants when we're encountering somebody between the ports of entry. You know, we -- obviously, we don't do that, so...

**Q. Okay. Is a warrant obtained at some later point or date?**

A. It just depends. I mean, we, we have -- you know, we have the ability to process somebody for a Warrant of Arrest/Notice to Appear where we've kept them in detention. But, you know, it's dependent upon the circumstances that are in front of us. Sometimes there's no warrant that is, that is generated for an individual who, who we are -- have arrested in processing.

**Q. So, under what circumstances would a warrant be generated?**

A. As an example, if somebody has a -- you know, a criminal history and we are, you know, going to be processing somebody for -- you know, for

detention or prosecution is a perfect example, you know, we'll do a Warrant of Arrest/Notice to Appear or we'll have a warrant completed.

**Q. So, when you say "criminal history," are you referring to any type of criminal history?**

A. It just depends. So, it depends on severity of the crime, what the crime is. You know, are they a CIMT, crime of immoral turpitude. You know, it just depends on what the criminal history is. But, ultimately, you know, you know, somebody -- as an example, somebody may have a criminal history for burglary who we're absolutely going to, you know, try to prosecute and detain and remove from the country. Somebody has a criminal history of speeding on their record, we may not be doing that.

It just depends. It's dependents upon the circumstances in front of us. And it's dependent upon other circumstances as well. You know, for instance, the ability for DOJ to prosecute, for us to be able to detain. There are several circumstances that surround what the ability is.

**Q. Okay. Does it matter whether the person committed a crime in another country as opposed to in the United States?**

A. It's dependent upon -- well, (a), no. So, it's dependent upon the, the -- our ability to be able to prove that criminal history, right, or to be able to gain the information. Not every country submits their information into a database which we're able to see, right, international. It's dependent upon our ability to be able to see the information when a crime is committed in an international -- on an international basis.

**Q. Okay. And so, at the point that we just left off a few minutes ago regarding the obtaining of biographical and biometric information from the individual, at that point is a decision made as to processing pathway?**

A. Yes, most often, you know, you know, because we have to determine what pathway we're going to process somebody into, correct.

**Q. So, before we get into the processing pathway, I just want to back up and give you a hypothetical. Instead of it being an individual that was caught -- like, let's just say we have a family unit that crosses the border, they're a hundred feet onto U.S. soil and they're an applicant for admission. Can you describe the pathway in that circumstance?**

**the example of a crewman or bag and baggage?**

A. Bag and baggage is on there. It's under reinstatement of prior order of removal.

**Q. Okay, gotcha. But it doesn't include the other one that you just mentioned about the crewman?**

A. Yeah, I mean, that -- the extreme vast majority are within that -- you know, the dispositions that you have there, the processing pathways that you have there.

**Q. So, if we turn back to Exhibit 7 and that chart that we were talking about, are all of these processing dispositions available to single adults?**

A. Yes.

**Q. Are they all available to family units?**

A. I mean, to a degree they are available, correct. There are certain things, obviously, that, that are dependent upon that, but they are available.

**Q. Okay. And you said that everything here is available to single adults. Parole + ATD is listed here.**

A. Yes.

**Q. Can individuals be processed under Parole + ATD?**

A. I apologize, again. I couldn't hear you.

I couldn't understand you at all.

**Q. Can individuals be processed under Parole + ATD?**

MR. DARROW: Objection. Parole + ATD is defined as the administrative record.

You can answer.

A. Yes.

BY MS. PATEL:

**Q. So, so I understand, individuals who are not a part of a family unit as they present at the border or on U.S. soil, Parole + ATD is an option to them?**

MR. DARROW: Same objection.

THE WITNESS: Can I answer?

MR. DARROW: Yes, you can answer.

A. Yes.

BY MS. PATEL:

**Q. Okay. Under what circumstances is it available for single adults?**

MR. DARROW: Same objection.

You can answer.

A. If they're a Cuban, Venezuelan or Nicaraguan single adult who does not have a border security or national security risk, then, then a Parole ATD may be utilized with that individual.

And I just say "may," because it's, it's not a shall.

BY MS. PATEL:

**Q. All right. Does permission need to be obtained on a case-by-case basis from a supervisor or someone higher up in order to apply Parole + ATD to a single adult?**

MR. DARROW: Same objection.

You can answer.

A. No, no. The utilization of Parole ATD in a sector, you know, obviously, you know, that permission is given by a supervisor, actually, you know, at the commissioner level. But the application of Parole ATD to a specific individual, each and every time that is determined on a case-by-case basis to the agent or officer that is processing that individual.

BY MS. PATEL:

**Q. Okay. And since when has Parole + ATD been authorized to apply to single adults?**

MR. DARROW: Same objection.

You can answer.

A. It's going to be within the past couple months. I can't recall exactly when we started, you know, utilization of it for single adults.

BY MS. PATEL:

**Q. Okay. And is this being -- is this process available at only the two sectors referenced in the Parole + ATD memo or in additional sectors as well?**

MR. DARROW: Same objection.

You can answer.

A. The Parole ATD is currently being utilized in Yuma and Del Rio Sectors.

BY MS. PATEL:

**Q. Okay. So, it's not being used in the Rio Grande Valley?**

A. There -- it's used on an ad hoc basis in the Rio Grande Valley based upon what the conditions of their detention is, you know, currently. So, as their numbers are lower and the detention, you know, is less, you know, then, then they're not going to utilize Parole ATD. They have the authorization to use Parole ATD, but -- but, again, you know, if they don't -- if they do not need to utilize Parole ATD, then they're not utilizing it, and they will utilize it in the Del Rio and Yuma Sectors.

**Q. Okay. When was the Yuma Sector authorized to use Parole + ATD?**

MR. DARROW: Same objection.

You can answer.

A. It's going to be around the December-ish time frame. I can't remember exactly.

BY MS. PATEL:

**Q. And when you say December, are you talking about 2021?**

A. 2021, yes.

**Q. Okay. And for Rio Grande Valley, how often has it been used since this policy memo came out?**

MR. DARROW: Same objection.

You can answer.

A. I don't know what their sector by sector PATD numbers are off the top of my head.

BY MS. PATEL:

**Q. Okay. So, you're saying that currently, as we sit here today, it's not being used there?**

MR. DARROW: Same objection.

You can answer.

A. They'll utilize it depending upon the circumstances. They're involved in lateral decompression, you know, because Del Rio Sector is extremely high, they're taking on large -- they're accepting, if you will, large volumes of migrants to process because of Del Rio's volumes, you know, then

they may end up utilizing it, but, but, you know, it's very specific to the circumstances at the time and the individual they have in front of them.

BY MS. PATEL:

**Q. Okay. You just used the term "lateral decompression." What do you mean by that?**

A. That means, basically, that a sector, you know, has -- is significantly over their 100 percent capacity. And I say significant. They're over their 100 percent capacity.

**Q. Okay. And then what happens at that point?**

A. So, then --

MR. DARROW: Same objection.

You can answer.

A. -- we'll utilize various conveyances, such as a plane and/or to move migrants from an area that has, you know, very high custody numbers to areas that have lower custody numbers in order to be able to, you know, just decompress ultimately.

BY MS. PATEL:

**Q. And when you say transfer them, are you referring to transferring them from border patrol custody to border patrol custody?**

A. Yes, for processing, correct.

**Q. And in terms of Del Rio, has Parole + ATD been used for substantially all the time that the path -- that this memo's been in place?**

MR. DARROW: I'm going to object on the same grounds. And also, Anita, we have Chief Ortiz designated to speak to this. This is Topic 1. This is off the topics for designation for Chief Barker here.

MS. PATEL: Understood, but he did give some testimony as to, you know, when Parole + ATD is used, so I'm just following up on that line of questioning.

MR. DARROW: You can answer if you know.

A. Can you reask your question?

BY MS. PATEL:

**Q. Yes. So, in the Del Rio Sector, has Parole + ATD been consistently used since the memo was implemented?**

A. It's been utilized, you know, consistently as their -- as their population and detention decreased, you know, I'm aware of several occasions where they have not utilized it and went strictly to Title 8 pathway and not needed to utilize Parole ATD pathway.

**Q. Who authorized the use of Parole + ATD for**

**single adults?**

MR. DARROW: I'm going to object again. Anita, we have somebody else prepared to speak to this topic.

MS. PATEL: Well, if he doesn't know, then he doesn't know, but, you know, I think it's fair to ask the question.

MR. DARROW: You can answer if you know.

A. You know, any utilization of Parole ATD, whether that's changed, meaning that it's moved to a different sector, moved to a different demographic, you know, that's approved by the chief of the border patrol and the commissioner.

BY MS. PATEL:

**Q. For what reason do they authorize use of Parole + ATD for a single adult?**

MR. DARROW: Objection again, beyond the scope of this witness' testimony and also Parole + ATD is confined to the administrative record.

You can answer if you know.

A. We included single adults in the, in the Parole ATD pathway due to the fact that 73 percent of all individuals who we were -- we were and are, roughly -- I say roughly -- encountering -- we can

use 70 as an average -- are single adults. Very specifically from Cuba, Venezuela or Nicaragua.

BY MS. PATEL:

**Q. And so, I think -- so, I need you to connect the dots for me here. Simply because most of the people are single adults, why does that mean that you approve the use of Parole + ATD?**

MR. DARROW: Same objection.

You can answer if you know.

A. We utilize the application of Parole + ATD for Cuban, Venezuelan and Nicaraguan single adults due to the fact that there is no return mechanisms to those countries. So, if we would place a person into detention, the detention would not have any degree of finalization of removal. You know, the person may receive a final order of removal and then we would have no mechanism to actually remove that person from the country.

BY MS. PATEL:

**Q. And what is the consequence of that?**

MR. DARROW: Same objection.

You can answer.

A. The consequence of what? I'm not sure what --

BY MS. PATEL:

**Q. Of you not being able to remove them from the country.**

A. Well, so, if we can't remove them from the country to any other country, you know, by default and they're here, they continue to remain here.

**Q. Would they remain here in detention?**

MR. DARROW: Same objection. Also, objection as to vague.

BY MS. PATEL:

**Q. You say that they would remain here. If you didn't apply Parole + ATD to them, would they be subject to detention?**

MR. DARROW: Same objection.

You can answer.

A. So, if we didn't apply Parole + ATD to them, there are various pathways that they could be -- that would be able to be applied to them, not all of them resulting in detention.

BY MS. PATEL:

**Q. Okay. What pathways could be applied where they would not be subject to detention?**

MR. DARROW: Same objection.

A. NTA/OR. So, a notice to appear, released on their own recognizance.

BY MS. PATEL:

**Q. Okay. So, let's go back to Exhibit 7 and I just want to walk through each of these pathway dispositions with you.**

**The first one is Notice to Appear/Own Recognizance, NTA/OR. So, when would that be applied to a single adult?**

A. Again, it just depends on the circumstances in front of them. You know, an individual who, you know, is claiming fear, an individual who, you know, may have, we'll say, you know, issues to where they cannot be detained. Fraihat (phonetic) being -- just as an example, just one example. You know, if we have no available space in order to be able to remove single adults to, you know, in ICE custody; i.e., you know, that locale has no available space open to them, we would end up placing a single adult into an NTA/OR. You know, those are all -- there's just a variety of circumstances where, where it can be applied.

**Q. Let me backtrack a little bit. Do border patrol agents have discretion in deciding which one of these pathways to use?**

A. Yes.

**Q. Okay.**

A. We have the discretion in order to be able

to determine which pathway, but, but, you know, again, there's -- this kind of goes back to your previous question. Supervision is well engaged in the processing areas in monitoring, you know, who agents are processing, which pathways are assigned to individuals and so on.

**Q. Are there specific criteria that an officer would apply in determining which pathway to choose?**

A. It's based upon the circumstances of the individual in front of them.

**Q. What do you mean by that?**

A. So, so, you know, as in -- I think it's Exhibit 6, you had what appeared to be kind of almost like a decision tree for lack of better terms. I think it was that number, so don't quote me on it, but -- well, I guess you're going to quote me on it, but, you know, the -- that's, that's like a decision tree, but ultimately the determination is based upon the circumstances in front of the agent at the time of the individual there.

**Q. So, there are no set criteria that's applied?**

A. Well, I mean, of course, yes, there's set criteria. I mean, if a person has, you know,

previously been deported, so that's going to be for instance, a reinstatement of a previous removal; if they have an order of removal that has not been effectuated, that's going to be a bag and baggage. I mean, so you kind of see -- that -- again, I go back to it's kind of like a decision tree. It's not a true decision tree. So, there are circumstances that are involved in what you're applying that Title 8 pathway to to those individuals.

**Q. Okay. Are there any other criteria? You just named two.**

A. Yeah, I mean, there's going to be several. Right? So, national security, border security threat, what's their criminal history, what's their immigration history, are they applicable to -- you know, to MPP, are they applicable to detention, are they claiming fear, are they not claiming fear, you know, are they a single adult, are they a family unit, what's the detention availability for that person? I mean, it's -- you know, does ICE have bed space, do they not have bed space to detain? I mean, these are all a variety of different circumstances that are all taken into those decisions.

**Q. Okay. Does -- you mentioned whether or**

**not they are or are not a family unit is one of the criteria?**

A. Absolutely.

**Q. And how is that criteria applied?**

A. So, for family units, you know, if we're able to expel them, if we're able to return them rapidly through ER, as an example, you know, then we will -- if those countries are able to or are accepting, you know, individuals back, right, they're allowing us to return or remove individuals, then we will, right, and we'll apply that specific pathway.

You know, if they're from a country who is not accepting, you know, returns, removal or expulsions from us, and we have, we have no bed space for detention, then we will utilize a release mechanism for families we have no availability to detain.

**Q. Okay. First you mentioned ER. Were you referring to Expedited Removal?**

A. Expedited Removal.

**Q. And you also said when there is no bed space for detention. Were you referring to bed space at a border patrol facility?**

A. So, so, we don't detain. We will hold in

a border patrol facility, right, but ICE has detention and ICE does not currently have any bed space for detention of family units.

**Q. And why is that?**

A. You'd have to ask ICE, ma'am.

**Q. Okay. So, does that mean that they will not accept any family units?**

A. Meaning ICE?

**Q. Correct.**

A. Yeah, ICE has no current bed space for family units, to detain family units.

**Q. And so, how does that then impact CPB -- CBP?**

A. So, as we, as we decide which pathway we are going to apply to a family, we have to keep in mind that, that this family will not be able to be detained outside of border patrol's detention center -- or holding center, I'll say.

**Q. So, does that mean that they have to be released into the interior?**

A. Depending upon the pathway.

**Q. So, what -- in what circumstance would they not be released into the interior?**

A. As an example, if we're able to apply Expedited Removal or Title 42, right, but I know

we're talking about a Title 8 pathway, so we'll stay in the Title 8 frame.

So, if we're able to place families into Expedited Removal, then we, then we will hold them within border patrol's holding and we'll place them on a flight within 24 to 48 hours depending upon the return requirements or manifesting requirements of that country and then we'll transfer them to ICE custody on a runway and they will be removed back to their home countries.

**Q. You did mention that when applying Expedited Removal you would consider whether or not the country would be amenable to taking the persons back. Is that fair?**

A. Yes.

**Q. What else do you -- does CBP consider?**

A. In regards to placing somebody into ER?

**Q. Correct.**

A. So, it's -- you know, again, it's that same kind of decisionary (sic) process that we made. You know, is there a national security, border security, you know, threat to -- you know, that would place them into a different Title 8 pathway. But if, if we can achieve a return or removal of an individual from the country who has entered

illegally, that's what we're going to do.

**Q. In what circumstance would you not use Expedited Removal for a particular family?**

A. As an example, if they claim fear, we will place them into an, an NTA/OR process because we have no family detentions. Like, if you place them into ERCF, we have no availability to detain them, you know, and so it's -- ultimately if they claim fear, we'll place them into NTA/OR and their claim of fear will be heard on a non-detained docket.

**Q. Okay. And what percentage of the families complain fear?**

A. I couldn't tell you.

**Q. Is it a high percentage?**

A. So, it just -- it really is dependent. I couldn't even tell you.

**Q. All right. What if they fail the credible fear screening?**

A. That's really where ICE takes over and I defer you to ICE as to their process.

**Q. Okay. So, in the interim if the family cannot be detained in ICE custody, where would they be located?**

A. Well, they're placed on NTA/OR, so it's wherever they would be destined to live at. I mean,

we have -- we, as in CBP -- so, speaking strictly with the CBP path, you know, we -- after they are released from our custody, they are really the responsibility of, of -- I'll say the monitoring of that person falls to ICE.

**Q. Okay. But, if I understand correctly, families who are not amenable to Expedited Removal as determined by CBP then get put into a Notice to Appear/Own Recognizance track, at which point they can be paroled or bonded out; is that accurate?**

MR. DARROW: Objection, misstates the testimony.

You can answer.

A. Yeah, that's, that's not accurate. It's my fault if I didn't explain it clearly enough. So, so, there are a couple different pathways. If we have a family who we cannot -- is not amenable to Expedited Removal, we cannot return to their home country, right, we can't or is not amenable, we will place them into an NTA/OR or a Parole ATD type of pathway for removal -- from release, rather, from our custody. I'll be very specific with my words. From release from our custody.

**Q. When you say release from your custody, does -- that means that they are, in fact, released**

**from any custody, correct?**

A. So, you know, as a -- so, they're not in custody, you know, by the term of law. No, they're not in custody anymore.

**Q. Okay. So, they get released and then they can go to whatever final destination they choose within the United States; is that accurate?**

A. Correct.

**Q. Was there a family detention available before January 20th of 2021?**

A. ICE had two or three -- two or three different family detention locations, but I cannot recall when they transitioned those locations to single adult detention. I just can't remember the date.

**Q. Do you remember who was President at the time?**

MR. DARROW: Objection. Family detention does not relate to any of the topics for which Chief Barker is designated.

You can answer.

A. I, I couldn't even tell you when -- again, I don't remember the date in which they switched, so I really refer you to ICE, to be honest, with regards to the date.

BY MS. PATEL:

**Q. All right. You don't remember who was President?**

MR. DARROW: Same objection. Also, objection, asked and answered.

You can answer.

A. Yeah. No, I have been through multiple administrations in my role and responsibility. I cannot remember. You'd have to ask ICE when they switched over and then find the applicable administration that was in office.

BY MS. PATEL:

**Q. Okay. Does the location in terms of how far a person made it into the interior affect what processing pathway is applied?**

A. I mean, determining if they're applicable to ER.

**Q. Okay. How so?**

A. I mean, there's certain standards of ER. You know, there's certain time frames and mileage requirements. Otherwise, if we catch somebody who's what we consider is -- or encounter somebody who is, you know, more along the interior, they may not be applicable to ER, but they'd be applicable to other Title 8 pathways and we just process them on other

A. I have seen people identify that the subjects are claiming fear.

**Q. Okay.**

A. It's because there's a CIS mechanism that gets, you know, started, if you will, when that happens.

(Plaintiff's Exhibit 14 was received electronically, marked for identification and is attached hereto.)

BY MS. PATEL:

**Q. I'm going to drop another exhibit. This is Exhibit Number 14 and it's DHS's response to Florida's interrogatories, and if you could turn to page 5, the response to our interrogatory number 4. I'll give you a minute to read it.**

A. All right. Gotcha.

**Q. Okay. So, that last sentence says, "In addition, CBP assesses whether each individual applicant for admission may be considered for release on a case-by-case basis." What is this referring to?**

A. So, it's, it's what I was talking about earlier. Right? I mean, it's -- you know, each individual who, who we are encountering between the ports of entry or even at the ports of entry, right,

that's an applicant for admission. Right? So, we are, we are determining, you know, on a case-by-case basis what pathway we're going to place that individual into. Again, I go back to the Title 42, determining if somebody is a border security, national security threat, you know, are they removable, returnable back to their country, you know, what processing pathway is applicable with the TIC time and the detention capacity capabilities of both the sector as well as ICE. You know, all of these different degrees of factors go into determining that case-by-case basis.

**Q. Okay. Under the NTA/OR that we were previously discussing, do you obtain a warrant for arrest?**

A. No, I do not believe a, a warrant for arrest is in an NTA packet.

**Q. Okay. And in the Warrant for Arrest/NTA - detained, in that case a warrant for arrest is obtained, correct?**

A. Yes.

**Q. Under what circumstances would you get a warrant for arrest?**

A. Most often when they're, when they're getting detained and prosecuted.

**Q. Are there any other --**

A. And if they're moving into a period of detention, right, for administrative proceedings.

**Q. Is that the only instances in which you would get a warrant of arrest?**

A. No, I mean, there's numerous. Right? I mean, there's, there's numerous. If, if -- you know, I mean, you know, we, we get warrants on a daily basis to be able to arrest criminals, you know, within our, within our operational space on a, on a daily basis. You know, whether -- you know, for, for a myriad of reasons. You know, criminal violations.

**Q. What about administrative warrants specifically?**

A. Yeah, I mean, again, going back to the, to the detention.

**Q. Okay. I just want to make sure I'm clear. So, for -- under what circumstances would you get an administrative warrant of arrest?**

A. For the detention -- when somebody is remaining in custody pending their removal proceedings.

**Q. Is that the only circumstance in which you would get an administrative warrant of arrest?**

A. I'm sure there's others, but that's the one that, that comes to mind.

MS. PATEL: Okay. Can I just have a minute?

MR. DARROW: Sure.

THE VIDEOGRAPHER: The time is 1:56 and we are off the record.

(Brief recess 1:56 p.m. until 1:58 p.m.)

THE VIDEOGRAPHER: The time is 1:58 and we are back on the record.

BY MS. PATEL:

**Q. So, when persons are released from CBP custody, do you provide them with information on available resources? Such as community resources or resources in the communities.**

A. So, we provide them with a list of pro bono attorneys, but almost all individuals who are released are transferred -- and this is -- and my assumption is you're talking about people who are released.

Released, we transfer them to an NGO, a nongovernment organization, who works to be able to provide them the resourcing that you're talking about as well as onward movement and so on and so forth, you know, and services. So, we organically

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, the undersigned authority, certify that TONY BARKER remotely appeared before me and having produced his U.S. Custom and Border Protection ID badge was duly sworn on the 13th day of July, 2022.

Signed this 18th day of July, 2022.

HELEN MARIE CHASE, Stenographic Reporter
Notary Public, State of Florida
My Commission No. GG 283850
Expires: 2/20/2023

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, HELEN MARIE CHASE, Stenographic Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing video recorded remote Rule 30(B)(6) deposition of TONY BARKER; pages 1 through 207; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 18th day of July, 2022.

HELEN MARIE CHASE, Stenographic Reporter

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re: State of Florida vs. United States of America, et al.
Case No.: 3:21-cv-1066
TONY BARKER (259222)
July 13, 2022

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|
| 25 | 4, 12 | "Senoita" should be "Sonoita" | typo |
| 27 | 5 | missing word between "ultimately" and "and" | typo |
| 33 | 23 | "Director" should be "Directorate" | typo |
| 42 | 20 | Phonetic word is: LEOD | typo |
| 69 | 8 | "of immoral" should be "involving moral" | typo |
| 69 | 19 | "suspicious" should be "suspicion" | typo |
| 70 | 7 | "older" should be "younger" | typo |
| 77 | 20 | "Ms. Poon" is incorrect. Unclear who speaker was. Likely a Florida attorney. | typo |
| 91 | 17 | Missing word after "and/or." Could be bus | typo |
| 185 | 15 | "legal alien" should be "lawfully admitted" | typo |
| 187 | 3 | "polled" should be "pulled" | typo |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

08-15-22
Date

TONY BARKER