# EXHIBIT 19

State of Florida

vs.

United States

---

Deposition of:

C/R: Department of Homeland Security (Robert Guadian)

July 14, 2022

---

*Vol 1*



*Raising the Bar!*

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO: 3:21-cv-1066

STATE OF FLORIDA,

    Plaintiff,

v.

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity;
U.S. CUSTOMS AND BORDER PROTECTION;
TAE JOHNSON, Acting Director of U.S.
Immigration and Customs Enforcement, in
his official capacity, U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; UR M. JADDOU,
Director of U.S. Citizenship and Immigration
Services, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION SERVICES,

    Defendants.
_____/

VIDEO-RECORDED REMOTE DEPOSITION OF
ROBERT GUADIAN,
CORPORATE REPRESENTATIVE OF
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
PURSUANT TO RULE 30(b)(6)

VOLUME 1
(Pages 1-188)

THURSDAY, JULY 14, 2022
10:14 a.m. - 4:05 p.m. EST
Remote via Zoom
Washington, D.C.

STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
BY: FRANCINE O'CLAIRE, RPR

Job No.: 259224

1 under the ATD program.
2     Q.   Did you just mention check-in by mail?
3     A.   Notice to appear by mail.  We issued --
4     Q.   Okay.
5     A.   We had a time frame that, due to our
6 reconstitution plan and ICE, that many of our offices
7 were either minimally staffed or not open.  So we
8 issued our NTA's via certified mail to those aliens,
9 and we also considered that a check-in.
10     Q.   Got it.  Okay.  That covered two of our
11 topics, by the way, not just one.
12     Okay.  I want to go back to detention capacity.
13     How is it determined what a detention facility's
14 maximum capacity is?  Is there some kind of regulation
15 or guidelines that's applied that determines how many
16 people you can house at one place?
17     A.   So we -- In ICE we have our -- our
18 performance-based national detention standards, and the
19 capacity is the factors varies when it comes to
20 capacity.  We work closely with the vendor, whether the
21 vendor's a private contractor, state, local, to
22 determine what their capacities are.
23     For example, some things we look at are the number
24 of showers in each individual pod, the number of
25 toilets in each individual pod, the type of medical

Page 137

1  care that we can provide in that particular facility,
2  recreation space, how much recreation indoor and
3  outdoor space do we have for detainees in our custody.
4      All those factors -- There's more, like -- I can't
5  think of off the top of my head.  But as an example,
6  those are some of the things we consider in identifying
7  the population capacities at our detention centers.
8  PBNDS is Performance-based National Detention
9  Standards, are very different than correctional
10 standards for states and cities and counties.
11     Our detainees are detained for civil detention --
12 It's civil detention.  It's not criminal detention.
13 It's not punitive in nature.
14     Our detainees are only held for two reasons.  One
15 is for their hearings, for the immigration hearings,
16 and for removal; it's not punitive.
17     So under the civil detention framework, they're
18 afforded many more liberties than the criminal
19 population.
20     So that impacts also -- That also impacts how much
21 beds that we can -- we can rate our facility for.
22     **Q.   You referred to the term "pod"; what is a**
23 **"pod"?**
24     A.   All right.  So a pod represents -- In a
25 typical jail, a pod is a housing unit.

Page 138

1      And, for example, a jail may have the capacity to
2  hold 1,000 people; but they do that in about 20
3  different pods.
4      Each -- or as an example, they'll break down the
5  housing unit into more manageable sizes.  It has to do
6  a lot with officer's safety and also when you have
7  different classifications of detainees.
8      Our low-level detainees our level ones, are
9  generally held together.  Our detainees that are --
10 have a criminal history, maybe level twos, and they're
11 housed separately.  Excuse me.  And then you have the
12 level threes, which are your aggravated felons, may
13 have a propensity for violence, those are housed
14 separately.
15     So pods are important for the housing units and
16 the housing assignments of where we put people.  And,
17 again, it speaks to the challenges that we have in
18 filling our beds, right.
19     So although we have 50 beds available in a
20 level -- or, let's say, 25 beds available in a level
21 one, we can't place a level-three detainee in that
22 level-one pod or housing unit.  And that speaks to one
23 of the many challenges that we have with filling all of
24 our beds.
25     Q.  When you describe these pods, are they like

Page 139

1  open-bay dormitory situations or are they like cells
2  with bars?
3      A.   So, generally, in my experience in this -- I
4  can't speak for all the detention centers, our
5  location in our inventory because everyone's -- Every
6  detention location is different.
7      But generally the pods are housing units typically
8  with a couple of stories, one story on the bottom, one
9  story on the top.
10     And it has telephones.  It has a dayroom.  It has
11 televisions.  It has bathroom facilities.  It has --
12 Some have computers in the pods as well or lap -- or
13 not laptops, but tablets in order to communicate with
14 their deportation officers or with their legal
15 providers.
16     Q.   Any kitchen facilities like a microwave?
17     A.   Sometimes.  Sometimes depending on -- You
18 know, depending on the population, right, the -- We may
19 place microwaves in some of those -- in some of those
20 pods.
21     Q.   Okay.  And have family units ever been housed
22 in any of those units?
23     A.   So the -- we don't -- We don't house family
24 units in correctional facilities.  There -- They're
25 actually under a different standard, which is called

```
 1   the family residential standard.
 2        They don't fall under PBNDS.  There's specific
 3   standards that we utilize to house family units.
 4        Q.   Okay.  And where have you applied those family
 5   residential unit standards to facilities?
 6        A.   Nowhere currently.  Previously we had applied
 7   the family residential standards at our Karnes facility
 8   in Texas and our Dilley facility in Texas, and in
 9   Pennsylvania the Burkes facility, and as well as our
10   hotel -- our hotels as well when we had hotels.
11        Q.   Did you say hotels, H-O-T-E-L-S?
12        A.   Right.
13        Q.   Like hotels that people check-in to on a
14   transient basis?
15        A.   Yes.  Yes.  So in May of 2021, we entered into
16   a -- a contract with a contract provider to give us
17   act -- to provide us beds at hotels.
18        And what we -- what we did was -- or what the
19   contractor did is rented out the entire hotel so
20   people -- The public weren't allowed to check-in to
21   those particular hotels.  We utilized those hotels for
22   our family detention.
23        Q.   And where were those hotels located?
24        A.   I don't know, but the majority of them were
25   along the southwest border --
```

Page 141

1   Q.   Okay.

2   A.   -- typically.

3   Q.   And during what period of time were those

4   hotels under contract to house family units by ICE?

5   A.   May 2021 to -- I'm sorry.  March of 2021 to

6   March of 2022.

7   Q.   Okay.  And what happened in March of 2022 that

8   caused them to no longer be used by family units?

9   A.   So ICE determined that we were experiencing a

10  large number of adults crossing the southwest border,

11  and we needed additional adult beds; and also we

12  determined that ATD was a better alternative for family

13  units.  It was in -- When we released the family on

14  alternatives to detention, it's more humane.  It's a

15  more humane system -- effort in order to track those

16  cases through the system.

17      What we found with our family residential

18  standards were also impacted by litigation that doesn't

19  allow us to detain families more than 20 days.

20      So we made the decision -- As we always are

21  looking at our detention inventory to see how best to

22  support the U.S. Border Patrol in their bed space

23  needs, we made the decision that since more single

24  adults were crossing the southwest border, we made

25  those -- We converted the family residential centers to

Page 142

1   adult beds as opposed to family beds based on the need
2   on the southwest border.
3       Q.   And what about the hotels, were individual
4   adults housed in hotels after March --
5       A.   No.
6       Q.   -- 2022?
7       A.   No.  No, they weren't.
8       Q.   Was that contract just dropped with the hotels
9   after March 2022, no need for the space?
10      A.   I don't know the status to the contract.
11      Q.   Okay.
12      A.   We don't use the hotels as of March 2022.
13      Q.   Okay.  So would you say that ATD was more
14  humane, something like that; did you say something
15  about --
16      A.   So we've seen a high success rate with our
17  alternatives to detention program.  A high percentage
18  remain compliant with the program.  We see a very high
19  rate of court appearances within the program.  And that
20  particular population, as vulnerable as they are, as
21  family units crossing with small children, we made the
22  decision -- ICE made the decision that alternatives to
23  detention was our best option for that particular
24  subset of detainee.
25      Q.   Okay.  And then when those people were

Page 143

1  released, those family units were released under Parole
2  Plus ATD, do you know what kind of conditions they were
3  released into where they lived, if there were
4  improvements to what you provided previously?
5      A.   I don't know the answer to that question.  Can
6  you rephrase it?
7      Q.   Okay.  So do you have any information that
8  after you released family units under Parole Plus ATD,
9  they were released into better conditions than what you
10 provided at hotels, Dilley, Karnes or Burke?
11     A.   No, I don't; I don't have any information on
12 that.
13     Q.   Which -- Have you ever been to these hotels
14 that were under contract for housing family units?
15     A.   No.
16     Q.   Did you get any reports that there were
17 inhumane conditions at those hotels?
18     A.   I don't recall any of that.
19     Q.   Okay.  What about Dilley, Karnes and Burke,
20 were they inhumane conditions that you operated?
21     A.   Yes.
22     Q.   What was inhumane about those -- the
23 operation?
24     A.   Oh, just -- I strike my -- I thought you said
25 the other question.  I thought you said were they

1  humane.
2    Q.   Oh, okay.  Were the -- Were the conditions at
3  Dilley, Karnes and Burke for family units humane, in
4  your opinion?
5    A.   The conditions were humane, yes.
6    Q.   Okay.  All right.  And were Dilley, Karnes and
7  Burke in operation for family units in 2020?
8    A.   Yes.
9    Q.   What -- Were they used in 2021 for family
10 units for part of that year?
11   A.   Yes.
12   Q.   Okay.  Did it change from family units to
13 something else at any time?
14   A.   Yes, it did.  It changed from family units to
15 single adults.
16   Q.   Single adults; when did it change?  Did all
17 three of them change at the same time?
18   A.   About -- No, they were -- There were different
19 times.  I want to -- I don't know exactly the dates.
20 But about February 2021, we started transitioning
21 the family residential centers to adult beds.  I don't
22 know the exact order.  But I believe that was completed
23 a few months after February where all three locations
24 were converted to single adults.
25   Q.   Okay.  So is it your understanding that

Page 145

1  currently those three facilities, Dilley, Karnes and
2  Burke, are operated to detain single adults?
3      A.   Correct.
4      Q.   Who made the decision to transition away from
5  family units being housed by ICE?
6      A.   ICE made that decision.
7      Q.   Okay.  Who at ICE?
8           MR. DARROW:  Objection; that's beyond the
9  scope of any of these topics.
10          MS. BRODEEN:  We have a whole topic about
11 detention capacity.
12          MR. DARROW:  About the capacity, not about
13 decisions on families versus individuals.
14          MS. BRODEEN:  It says including inference to
15 increase or decrease that capacity.  I think this is a
16 reasonable topic under that topic.  It's a reasonable
17 question.
18          Just object and then, you know, let's get on
19 with the answer if he can answer it, if he knows who at
20 ICE made the decision to transition away from family
21 units being housed by ICE.
22 BY MS. BRODEEN:
23     Q.   Who at ICE made that decision?
24          MR. DARROW:  Same objection.  You can answer,
25 if you know.

Page 146

```
 1      A.   That answer is Tae Johnson, the ICE director.
 2   BY MS. BRODEEN:
 3      Q.   And ICE -- something called a Flores consent
 4   decree?
 5      A.   Can you repeat the question?  I'm sorry.
 6      Q.   Are you familiar with the Flores, F-L-O-R-E-S,
 7   consent decree?
 8           MR. DARROW:  I'm gonna object again.
 9           Flores is not relevant to any of these topics.
10           MS. BRODEEN:  It has to do with your detention
11   centers.  It's one of your --
12           MR. DARROW:  It hasn't conditions --
13           MS. BRODEEN:  Okay.  Just object to the form.
14           Okay. All right. Go ahead. You know, you
15   objected; it's outside the scope of topics.
16   BY MS. BRODEEN:
17      Q.   Go ahead and answer if you can.
18      A.   Can you repeat the question?
19      Q.   Are you familiar with the Flores consent
20   decree?
21      A.   Yes.
22      Q.   Okay.  Is it fair to say that it's difficult
23   to create family detention centers that comply with
24   that consent decree?
25      A.   I can't speak to the difficulty.  The family
```

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 185

1    CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA    )

5    COUNTY OF ESCAMBIA  )

6

7

8

9

10         I, the undersigned authority, certify that
11   ROBERT GUADIAN, Corporate Representative of United
12   States Department of Homeland Security, pursuant to
13   Rule 30(b)(6), appeared remotely before me on the 14th
14   day of July, 2022, and was duly sworn.
15   Identification Produced:  Driver's License
16            Signed this 18th day of July, 2022.

17

18

19

20

21   *[signature: Francine L. O'Claire]*

22   _____

23   FRANCINE O'CLAIRE
     Notary Public State of Florida
24   Comm# 1654948 Exp. 03/31/2025

25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 186

1                CERTIFICATE OF REPORTER

2

3  STATE OF FLORIDA    )

4

5  COUNTY OF ESCAMBIA  )

6

7         I, FRANCINE O'CLAIRE, RPR, do hereby certify

8  that I was authorized to and did stenographically

9  report the foregoing video-recorded remote deposition

10 of ROBERT GUADIAN, Corporate Representative of United

11 States Department of Homeland Security, pursuant to

12 Rule 30(b)(6); that a review of the transcript was

13 requested; and that the foregoing transcript, pages

14 numbered 1 through 184, is a true record of my

15 stenographic notes.

16        I FURTHER CERTIFY that I am not a relative,

17 employee, attorney or counsel of any of the parties or

18 counsel connected with the action, nor am I financially

19 interested in the action.

20        DATED this 18th day of July, 2022.

21

22       *[signature: Francine L. O'Claire]*

23       _____

24       FRANCINE O'CLAIRE, RPR
         Stenographer
25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 188

```
1                    E R R A T A   S H E E T

2                   DO NOT WRITE ON TRANSCRIPT
                    ENTER CHANGES ON THIS SHEET
3

4    Style of Case:        STATE OF FLORIDA V. UNITED
                           STATES OF AMERICA, ET AL.
5    Deponent:             ROBERT GUADIAN, CORPORATE
                           REPRESENTATIVE OF UNITED STATES
6                          DEPARTMENT OF HOMELAND SECURITY,
                           PURSUANT TO RULE 30(b)(6)
7    Date of Deposition: JULY 14, 2022
     Case No.:             3:21-cv-1066
8
     PAGE LINE       CORRECTION                    REASON
9
       Page 19 Line 4 " EMI" delete      recording artifact
10     Page 24 Line 23 "ICRO" to "ICE ERO"     misspelt
       Page 28 Line 9 " Chart to Charge"        misspelt
11     Page 28 Line 19 "INAP" to "INA"
                                                misspelt
       Page 28 Line 22 "INAP" to "INA"   misspelt
12     Page 72 Line 18 "BINS" to "FINS"  misspelt
       Page 78 Line 18 "ADT" to "ATD"
13                                              misspelt
       Page 107 Line 16 "NCIC" to "CIS"
14                                              misspelt

       Page 123 Line 1 "212b5" to "212d5"
15     Page 125 Line line 2 "AL institute black cycle" delete
       Page 130 line 25 "labor to "waiver"   misspelt
16

17
       Page 155 line 6 " IHOC" to "IHSC"  misspelt
18     Page 168 line 15 "Agudela" to "Agudelo"  misspelt
       Page 173 line 20 "and of equal" delete, artifact
19
           page 179 line 2 "ability to impact" delete,artifact
20    page 181 line 14 " "FR" delete , artifact

21
     Under penalties of perjury, I declare that I have read
22   the foregoing document and that the facts stated in it
     are true.
23                                  ROBERT      Digitally signed by ROBERT
                                                GUADIAN JR
     SIGNATURE OF DEPONENT: _____GUADIAN JR___ Date: 2022.08.31 13:06:18
                                                -04'00'
24   Dated this:_____day of _____, 2022.

25   Job No.:  259224
```