# EXHIBIT 21

```
1              UNITED STATES DISTRICT COURT

2          for the Northern District of Florida

3    -------------------------------------------------

4    STATE OF FLORIDA,

5              Plaintiff,

6      v.

7    UNITED STATES OF AMERICA, et al.,

8              Defendant.

9    -------------------------------------------------

10

11          Deposition of COREY A. PRICE

12               Washington, DC

13         Friday, September 9, 2022

14               11:00 a.m.

15

16

17

18

19

20   Job:  463273

21   Pages:  1 - 155

22   Transcribed by:  Pamela A. Flutie
```

Transcript of Corey A. Price
September 9, 2022                                    55

1    were more, I would say, logistical in nature,

2    where we were going to get the best bang for our

3    buck and then, so I would have some of that

4    knowledge.

5         Q.    Who beside you?

6         A.    Acting Director Johnson would have

7    knowledge.  Peter Berg, who is the Acting Deputy

8    Executive Associate Director would have

9    knowledge.  Chief of Staff -- well, former Chief

10   of Staff Tim Perry would have knowledge, and I

11   believe former Deputy Director Matt Allen.  I

12   don't know if PJ Lechleiter was in place at the

13   time, but if he was, then he would have

14   knowledge.

15        Q.    Okay.  I'm going to show you an E-mail

16   then I'm going to mark for identification as

17   Exhibit, I think it's 9 to your deposition.

18   Exhibit 9 is a border patrol E-mail that you're

19   not copied on that recounts a conversation

20   between someone -- and I can't tell you who

21   because it's blacked out -- at ERO and someone

22   at Border Patrol -- and I can't tell you who at

Transcript of Corey A. Price
September 9, 2022

```
 1    border patrol because that also is blacked out -
 2    - but the E-mail itself is dated February 16,
 3    2021, right?
 4         A.   Yes.
 5         Q.   Okay.  Just take a minute and you can
 6    read it and I'll then ask you a series of
 7    questions.
 8         A.   Okay.
 9         Q.   All right.  And February 16, 2021 is
10    twenty-six days after President Biden was
11    inaugurated, correct?
12              MR. DARROW:  Objection.
13         A.   Correct.
14         Q.   Okay.  And some time before this E-
15    mail was sent, ERO had decided that it was no
16    longer going to detain family units that had
17    previously been detained under the Trump
18    administration, right?  Objection.
19         A.    I can't assume this is a Border Patrol
20    E-mail.  I wasn't part of this.  So, I -- I have
21    no knowledge of any decision in February of 2021
22    to end the family detention, no.
```

Transcript of Corey A. Price
September 9, 2022                              57

1        Q.   All right.  Well, someone who again, I

2   can't tell who because it's been blacked out,

3   because there's been a privilege claimed, from

4   ERO, at least that's what it's recounting a

5   conversation, right, and somebody at ERO was

6   telling the, I think it's the acting chief of

7   law enforcement at Border Patrol, right, that

8   ERO was no longer going to detain family units,

9   right?

10       A.   That's what it appears on this E-mail

11  that Border Patrol was speaking about, but I

12  don't have knowledge of that conversation.  I

13  don't recall this.

14       Q.   Okay.  Do you recall ever authorizing

15  anyone to communicate to Border Patrol that ERO

16  was ending family detention in February of 2021?

17            MR. DARROW:  Objection.

18       A.   I don't recall that.  I do recall that

19  there were many discussions over the course of

20  2021 on what options we could come up with to

21  increase the number of people we could take into

22  custody or otherwise assist with decompressing,

Transcript of Corey A. Price
September 9, 2022                                58

1  which was the word that Border Patrol was using,

2  decompressing their stations.  But I don't

3  specifically recall this.

4      Q.   Okay.  Are you aware that the -- the

5  communication that is contained in this E-mail

6  or the discussion that is summarized in this E-

7  mail caused Border Patrol to undertake -- to

8  undertake some actions?

9           MR. DARROW:  Objection.

10     A.   No, I'm not aware of that.

11     Q.   Have you ever heard of a program

12 called notice to report?

13     A.   I have.

14     Q.   Okay.  What is noticed to report?

15     A.   I would have to defer to CBP,

16 specifically Border Patrol, what their

17 definition of that is.  I am aware that they --

18 they instituted that.  But for all specifics,

19 I'd have to defer to them.

20     Q.   Okay.  I understand that, you know,

21 you didn't run notice to report.  But notice to

22 report had had an impact -- an effect on ICE,

Transcript of Corey A. Price
September 9, 2022                                   59

1    right?

2              MR. DARROW:  Objection.

3        A.   Yes.

4        Q.   All right.  And the impact in effect

5    was that Border Patrol was releasing aliens from

6    the border without notices to appear, correct?

7              MR. DARROW:  Objection.

8        A.   Correct.

9        Q.   And then hopefully giving the aliens

10   ISE's addresses around the location where they

11   were supposed to be going, right?

12             MR. DARROW:  Objection.

13       A.   Correct.

14       Q.   And with the direction to the aliens

15   of going to the ICE facility to finish their

16   immigration paperwork, right?

17             MR. DARROW:  Objection.

18       A.   That's correct.

19       Q.   Okay.  And because of the number of

20   people that were being released, a backlog

21   occurred, right?

22             MR. DARROW:  Objection.

Transcript of Corey A. Price
September 9, 2022                                    60

1        A.    Correct.

2        Q.    Okay.  When did you learn about the

3    notice to report program?

4              MR. DARROW:  Objection.

5        A.    I don't recall the specific date, but

6    it was sometime in 2021.

7        Q.    Okay.  And what was your response to

8    learning about the notice to report program?

9    Objection.

10       A.    I was very concerned at the amount of

11   workload that was going to be put onto my staff

12   and our facilities.

13       Q.    Okay.  Now, are you familiar with the

14   Immigration and Nationality Act?

15       A.    I am.

16       Q.    Okay.  Are you generally familiar with

17   the regulations that -- that are there under it

18   as well?

19       A.    In general.  Of course, I consult with

20   my team at OPLA on many specific laws, but yes,

21   in general.

22       Q.    Okay.  Is the notice to report

Transcript of Corey A. Price
September 9, 2022                                    61

1   anything under either the Immigration and

2   Nationality Act or under the regulations?

3            MR. DARROW:  Objection.

4        A.   I've never heard of the term notice to

5   report prior to 2021.

6        Q.   Okay.  It was a program that Border

7   Patrol basically just made up, correct?

8            MR. DARROW:  Objection.

9        A.   To the best of my knowledge.

10       Q.   Okay, all right.  Now, at some point

11  in time, it was decided and -- and your

12  testimony was that it was later in 2021 that ICE

13  would no longer detain family units, correct?

14       A.   That's correct.

15       Q.   Okay.  With that decision -- that

16  decision by the Biden administration on family

17  units, family units entering this country

18  illegally will never be detained, right?

19           MR. DARROW:  Objection.

20       A.   I can't say that because we could

21  always convert them back.  You know, our FRCs,

22  the three of them that we have, so that they

1    could detain them, but as of today, no, we

2    cannot.

3        Q.   Okay.  So, family units illegally

4    entering the United States across the border

5    right now cannot be detained?

6             MR. DARROW:  Objection.

7        A.   Without converting them back, that's

8    correct.

9        Q.   Okay, all right.  Now, under the

10   Immigration and Nationality Act, aliens who are

11   caught illegally entering the United States are

12   subject to mandatory -- mandatory detention

13   unless they're paroled, right.

14            MR. DARROW:  Objection.

15       A.   Yes.

16       Q.   Okay.  And that parole is supposed to

17   be on a case-by-case decision, correct?

18       A.   To the best of my knowledge, yes.

19       Q.   Okay.  But with this policy on family

20   units, a case-by-case decision cannot be made,

21   because there's no option to detain, right?

22            MR. DARROW:  Objection.

Transcript of Corey A. Price
September 9, 2022                                         63

```
1        A.   I can't speak to that because ICE

2   isn't issuing those paroles.  That's being

3   handled by Border Patrol.  So, I would have to

4   defer to Border Patrol on how they're -- they're

5   instituting their case-by-case decisions.

6        Q.   Okay.  But detention is not an option?

7        A.   For family units right now today,

8   detention is not an option.

9        Q.   Under the Trump administration, parole

10  had been significantly curtailed, right?

11            MR. DARROW:  Objection.

12       A.   I don't know, to the extent of what

13  CBP was, you know, issuing for all under that

14  administration.  I can't speak to that, I'm

15  sorry.

16       Q.   Okay.  Now, are you familiar with a

17  concept called expedited removal?

18       A.   I am.

19       Q.   What is expedited removal?

20       A.   Expedited removal is an authority that

21  an immigration officer can use when that

22  individual is eligible for expedited removal
```

Transcript of Corey A. Price
September 9, 2022                                    64

1    where they can process that person and order

2    them removed without them being able to see an

3    immigration judge.

4         Q.   Okay.  What are those characteristics

5    or requirements to be able to have someone be

6    eligible?

7              MR. DARROW:  Objection.

8         A.   I'd have to defer to my colleagues in

9    OPLA to give us like all the specifics on that.

10        Q.   Okay.  Isn't it something as simple as

11   they don't have a password and/or a visa to

12   enter the United States?

13             MR. DARROW:  Objection.

14        A.   I believe it's a little bit more

15   complicated than that.  But again, ERO uses it

16   so little that I'm just not personally familiar

17   with all the details or all the facets that are

18   required of it.

19        Q.   Now, expedited removal mainly applies

20   to recent border crossers, correct?

21        A.   Correct.

22        Q.   Okay.  So, people that were caught at

Transcript of Corey A. Price
September 9, 2022                                          65

1    the border and people that have been here less

2    than, I think it's two years, right?

3              MR. DARROW:  Objection.

4         A.   I believe that's correct, yes.

5         Q.   Okay.  Now, because detention was not

6    an option, ERO or Border Patrol, or I don't --

7    strike that.  Let me back up and come at it a

8    different way.  Who makes the decision whether

9    an alien should be enrolled in alternatives to

10   detention?

11        A.   The officer.  So, in our case, like at

12   ATD, it would be the ERO deportation officer

13   that is reviewing that specific cases.

14        Q.   Okay.  So, in the case of someone who

15   gets caught at the border, it would be probably

16   the Border Patrol agent in the first instance,

17   correct?

18        A.   The Border Patrol agent would send

19   somebody over after they're -- they're completed

20   with their processing, whatever processing

21   pathway they -- they use, and if that person is

22   not going to be detained, they would come over

Transcript of Corey A. Price
September 9, 2022                                    66

1    to an ERO officer, who would then evaluate that

2    case to see what form of ATD would be

3    appropriate for them.  We have a variety of

4    different forms that we can use.

5         Q.   Do you have a program called ISAP?  I

6    think it's ISAP-4 now.

7         A.   That's -- that's one of them, yes.

8         Q.   Okay.  Is that a common one?

9         A.   Right now, the -- the biggest one that

10   we use is what's known as the GPS ankle monitors

11   and then the other one is SmartLink, which is --

12   it's an app that we can put on the alien's phone

13   or if they don't have a phone, our contractor

14   can actually provide them a phone to monitor

15   their whereabouts.

16        Q.   Okay.  So, in some instances ICE is or

17   ICE's contractor is providing aliens a telephone

18   or cell phone?

19        A.   That's correct.

20        Q.   All right.  And the alien is free to

21   use that for their own purposes as well?

22        A.   It has very limited functionality.

Transcript of Corey A. Price
September 9, 2022                                    99

1    budget for ICE, and that continues through page

2    35, right?

3         A.    Correct.

4         Q.    All right.  If you'll turn to page 35

5    of Exhibit 15, on page 35, there is one single

6    major decrease to ICE's budget that is being

7    highlighted in this document, correct?

8         A.    That is correct.

9         Q.    All right.  Go ahead.  All right.  And

10   that one single major decrease to ICE's proposed

11   budget is to decrease the detention capacity of

12   ICE, right?

13             MR. DARROW:  Objection.

14        A.    It appears so.

15        Q.    Okay.  When this budget was being

16   proposed, the southwest border was seeing a

17   historic surge of illegal aliens entering the

18   United States, correct?

19             MR. DARROW:  Objection.

20        A.    I don't know the whole history of the

21   data on what the numbers at the southwest border

22   have shown, but we have seen a significant

Transcript of Corey A. Price
September 9, 2022

1  increase at the southwest border for the last

2  few years, yes.

3      Q.   Okay.  So, you're unaware that roughly

4  1.9 million encounters occurred on the southwest

5  border in 2021 and more than 2 million

6  encounters have occurred on the southwest border

7  this past year?

8          MR. DARROW:  Objection.

9      A.   I would defer to Border Patrol on this

10 specific numbers, but that does sound right from

11 my understanding.

12     Q.   Okay.  And that's higher than any

13 previous year ever in the history of the United

14 States, right?

15         MR. DARROW:  Objection.

16     A.   Again, I don't -- I don't have those

17 numbers, but from what I've seen in the public

18 data from Border Patrol, that appears so.

19     Q.   Okay.  Now, I think we talked about

20 this a little bit earlier.  Illegal aliens

21 caught entering the United States are subject to

22 mandatory detention unless they meet the

Transcript of Corey A. Price
September 9, 2022
101

1    requirements of parole, right?

2            MR. DARROW:  Objection.

3        A.   Yes.

4        Q.   Okay.  And so, despite that

5    requirement, or that requirement of mandatory

6    detention, the Biden administration sought to

7    reduce ICE's detention capacity, correct?

8            MR. DARROW:  Objection.

9        A.   I don't know what went into the

10   methodology used in this, but I can tell you

11   that we've never been in a position to detain

12   everybody who has come across the southwest

13   border.

14       Q.   I appreciate that.  But my question

15   was that in the -- with the mandatory detention

16   subject of parole, with a historic surge of

17   aliens across the border, the Biden

18   administration's response was to reduce

19   detention capacity, correct?

20           MR. DARROW:  Objection.

21       A.   It appears so.

22       Q.   Okay.  So, looking at that document

Transcript of Corey A. Price
September 9, 2022

1    the Trump administration was proposing a 55,000

2    bed capacity -- was actually proposing an

3    increase from the 55,000 bed capacity it had for

4    the 2019 surge to 60,000 capacity, right?

5          A.    Yes, that's what that said.

6          Q.    Okay.  And instead of having a 60,000

7    capacity, the Biden administration is reducing

8    that in roughly half, right?

9                MR. DARROW:  Objection.

10         A.    Yes, it appears so.

11         Q.    All right.  With reduced detention

12   capacity and the ending of other programs like

13   the Migrant Protection Protocols, the Biden

14   administration was ensuring more illegal aliens

15   were going to be released into the United

16   States, correct?

17               MR. DARROW:  Objection.

18         A.    I apologize.  Can you just repeat that

19   one more time?

20         Q.    I don't know if I can.

21         A.    Okay.

22         Q.    I'm going to ask the reporter if he

Transcript of Corey A. Price
September 9, 2022
103

1    can read it back.  If not, I'll try.

2        A.   Okay.  I just want to make sure I

3    understood it correctly.

4        Q.   I'll just do it.  I'll try to

5    remember.

6        A.   Okay.

7        Q.   With reduced -- I'll just do it,

8    sorry.  With reduced detention capacity and

9    ending of other programs like the Migrant

10   Protection Protocols, the Biden administration

11   was ensuring that more illegal aliens would be

12   released into the United States, correct?

13            MR. DARROW:  Objection.

14       A.   That would have been the end result.

15       Q.   I'm going to show you what I'm going

16   to -- I'm going to show you what I've marked for

17   identification as Exhibit 16 to your deposition.

18       A.   Thank you.

19       Q.   Exhibit 16 is the Department of

20   Homeland Security's 2023 budget in brief, right?

21       A.   Yes, it is.

22       Q.   This would have been President Biden's

Transcript of Corey A. Price
September 9, 2022                                    104

1    second proposed budget, correct?

2        A.   Yes.

3        Q.   All right.  If you'll turn to page 33

4    of Exhibit 16.  Page 33 of Exhibit 16 starts the

5    section of DHS's proposed budget in brief

6    relating to ICE's budget, correct?

7        A.   Yes.

8        Q.   And that continues through, I think,

9    it's about page 37.

10       A.   Page 40.

11       Q.   Page 40, sorry.  If you'll turn to

12   page 40 of Exhibit 16.  Page 40 of Exhibit 16

13   lists yet again one single major decrease to

14   ICE's budget, right?

15       A.   That's correct.

16       Q.   And in its second budget, the Biden

17   administration is proposing an additional

18   reduction of adult beds and the elimination of

19   all family detention beds, correct?

20            MR. DARROW:  Objection.

21       A.   Yes.

22       Q.   So, the Biden administration was

Transcript of Corey A. Price
September 9, 2022                                    105

```
1   proposing a further decrease to a detention

2   capacity of 25,000 beds, while a historic

3   migration surge had been occurring for more than

4   a year, right?

5           MR. DARROW:  Objection.

6       A.   Yes.

7       Q.   So, ICE will not have the

8   approximately 55,000 bed capacity it had for the

9   2019 surge, nor the 60,000 capacity the Trump

10  administration tried to secure before the end of

11  COVID, but it instead would have less than half

12  that capacity, right?

13          MR. DARROW:  Objection.

14      A.   That's correct.

15      Q.   And again, you would have -- and on

16  top of that, ICE would have no capacity to house

17  family units, right?

18          MR. DARROW:  Objection.

19      A.   That's correct.

20      Q.   Okay.  By further reducing detention

21  capacity, the Biden administration with its 2023

22  budget was ensuring that more illegal aliens
```

1   were going to have to be released into the

2   interior, right?

3          MR. DARROW:  Objection.

4      A.   I can't speak to the administration's

5   intent.  But yes, that would have been the

6   result.

7      Q.   Okay.  Put that aside.  I'm going to

8   show you what I've marked for identification as

9   Exhibit 17 to your deposition.  Exhibit 17 Is

10  the Congressional justification for ICE's 2023

11  budget request, correct?

12     A.   Yes, it is.

13     Q.   All right.  If you look -- I don't

14  know who came up with this page numbering system

15  -- to the page that's marked ICE-3.

16     A.   Okay, I have it.

17     Q.   All right.  If you'll look at the

18  third set of blocks or third, I guess, table

19  down, it has a -- it has a section that deals

20  with the detention capacity.

21     A.   Page ICE-3?

22     Q.   It's just ICE-3.  It looks like --

Transcript of Corey A. Price
September 9, 2022                                              107

1          A.    You mean ICE -- hold on.

2          [Discussion and cross-talk regarding

3     pages.]

4          Q.    All right.  Now, going back to Exhibit

5     17.  Let's go to -- let's try to see if this is

6     there, ICE ONS-29.

7          A.    Got it.

8          Q.    That one was easy to find.

9          A.    Hopefully it's the one on the top that

10    says program change 11.

11         Q.    Yes, it is.

12         A.    We've got the same paper.

13         Q.    Okay, program change 11 provides the

14    justification for the family bed decrease,

15    correct?

16         A.    That is correct.

17         Q.    All right.  And the justification for

18    getting rid of -- at least what is expressed in

19    this document -- of all family detention beds,

20    is to ensure a -- I need some water -- to ensure

21    a more humane treatment of families, right?

22              MR. DARROW:  Objection.

Transcript of Corey A. Price
September 9, 2022                                    108

1        A.    That is what that says.

2        Q.    Okay.  From your perspective, was

3   there anything inhumane about how families were

4   being detained?

5        A.    No.

6        Q.    Okay.  Now, we've got a while and we

7   kind of hit at it a little bit, but we've not

8   really talked about the southwest border.  You,

9   during your career, were actually stationed at

10  the southwest border, now El Paso, correct?

11       A.    That's correct.

12       Q.    All right.  Director, as we speak here

13  today in this deposition, are there aliens

14  entering this country illegally --

15            MR. DARROW:  Objection.

16       Q.    -- across the southwest border?

17       A.    Yes.

18       Q.    Okay.  Director, are there historic

19  numbers of aliens attempting to enter this

20  country along the southwest border since

21  President Biden was inaugurated?

22            MR. DARROW:  Objection.

Transcript of Corey A. Price
September 9, 2022                                          109

1        A.    Yes.

2        Q.    Director, did an increase of aliens

3   across the southwest border begin with President

4   Biden's election and inauguration?

5              MR. DARROW:   Objection.

6        A.    We've been seeing a steady increase

7   along the southwest border at numbers that I

8   haven't seen in my career, I would say over the

9   last four to five years.

10       Q.    Okay.  Except for the 2020 year where

11  the border was shut down or NPP was in full

12  force, right?

13             MR. DARROW:   Objection.

14       A.    I believe there was a dip in 2020,

15  yes.

16       Q.    Okay.  Now, Director Price, the aliens

17  entering this country illegally are primarily

18  walking across the southwest border, right?

19             MR. DARROW:   Objection.

20       A.    I think they come in various manners,

21  but I would defer to BP to give specifics on all

22  the ways they come in.

Transcript of Corey A. Price
September 9, 2022                                      110

1      Q.   Okay.  So, you're not -- what ways do

2  -- do aliens cross the southwest border that

3  you're aware of?

4      A.   With a number, again, I would defer to

5  BP to give you all the intel on that.  But boats

6  rafts, vehicles, walking through tunnels, coming

7  to the ports of entry coming, in between the

8  ports of entry, planes, you name it.

9      Q.   Okay.  And we kind of also talked

10  about this a little bit.  You're familiar with

11  the US Centers for Disease Control and

12  Prevention's Title 42 order with respect to the

13  border?

14      A.   I am.

15      Q.   Okay.  And that order allows ICE and

16  other agencies to expel aliens without screening

17  for asylum, correct?

18           MR. DARROW:  Objection.

19      A.   That is correct.

20      Q.   All right.  Director, does ICE expect

21  that the historic flood of immigrants crossing

22  the southwest border will become worse if the

Transcript of Corey A. Price
September 9, 2022                                        111

1    Title 42 Order is rescinded?

2         MR. DARROW:  Objection, and I would let the

3    witness answer but direct him not to reveal any

4    privileged information.

5         A.   I can't speculate as to what the

6    future holds, but given our recent history, I

7    would -- again, I can't really speculate as to

8    what that future is going to be.  But we need to

9    plan for it.

10        Q.   Okay.  Director Price, is ERO

11   releasing aliens who were encountered on the

12   southwest border who are likely inadmissible?

13             MR. DARROW:  Objection.

14        A.   Is ERO --

15        Q.   Releasing aliens encountered on the

16   southwest border, who are likely in

17   inadmissible?

18             MR. DARROW:  Objection.

19        A.   So, after CBP encounters them,

20   processes them, and determines the processing

21   disposition, those that are deemed appropriate

22   for release on ATD or what have you, ERO would

Transcript of Corey A. Price
September 9, 2022

1    be performing that function, yes.

2         Q.   And many of those -- that you're doing

3    the release function for are people that are

4    inadmissible, correct?

5         A.   Inadmissible and deportable, both

6    correct.  Yes.

7         Q.   That was going to be my next question.

8    So, you just beat me to it.  All right.

9    Director Price, is ERO releasing aliens

10   encountered on this southwest border who haven't

11   even made an asylum claim?

12             MR. DARROW:  Objection.

13        A.   Yes.

14        Q.   Okay.  Director Price, is ERO

15   releasing aliens on the southwest border for

16   which CIS has not done an asylum interview?

17             MR. DARROW:  Objection.

18        A.   Yes.

19        Q.   Okay.  Director Price, is ERO

20   releasing aliens on the southwest border who do

21   not have a positive credible fear finding?

22             MR. DARROW:  Objection.

Transcript of Corey A. Price
September 9, 2022                                    113

```
 1       A.   Yes.
 2       Q.   Okay.  Director Price, if a family
 3  unit is encountered at the southwest border, and
 4  that family unit is not subject to Title 42,
 5  that family unit is going to be released no
 6  matter what, correct?
 7            MR. DARROW:  Objection.
 8       A.   Yes.
 9       Q.   I'm going to show you what I've marked
10  as you Exhibit 18 to your deposition.  Exhibit
11  18 is the administrative record for the parole
12  plus alternatives to detention, correct?  Take
13  your time.  You can look past the affidavit or
14  read the affidavit.
15       A.   Yes.
16       Q.   All right.  This --
17            MR. DARROW:  Can we just clarify it's
18       the ICE portion of the --
19            MR. GUARD:  Sure, I should have made
20       that clear.  I was not going to hand you
21       the CBP portion of the administrative
22       records.
```

Transcript of Corey A. Price
September 9, 2022

1          MR. DARROW:  I appreciate that.

2     Q.   This is the ICE portion of the

3  administrative record for the alternatives to

4  detention memorandum, correct?

5     A.   Yes.  It's the memo of policy on use

6  of parole plus alternatives to detention to

7  decompress border locations.

8     Q.   All right.  And you're actually

9  looking at the policy memorandum now, you've

10  moved past the declaration.  So, you're three or

11  four pages into the to the document and the

12  policy itself was issued on July 18, 2022?

13     A.   Correct.

14     Q.   And it was issued for you and Chief

15  Raul Ortiz, right?

16     A.   That's correct.

17     Q.   And Chief Ortiz is the Chief of the

18  Border Patrol, correct?

19     A.   Correct.

20     Q.   Why was this memorandum issued?

21          MR. DARROW:  Objection and I will

22  instruct the witness not to reveal any

Transcript of Corey A. Price
September 9, 2022

```
 1   privileged information in his answer.
 2        A.   It's my understanding that this was
 3   written to limit the number of individuals that
 4   were being released on NTR and in the case -- in
 5   the circumstances on when the board parole would
 6   use that, they would have some triggers, you
 7   know, a certain number of people encountered per
 8   day, a certain number in custody for when they
 9   could use parole plus ATD.
10        Q.   Okay.  And if you -- before this
11   policy existed, there was a prior policy
12   relating to parole plus ATD that existed for
13   Border Patrol.  If you want to flip to about
14   three pages more into the document, you'll see a
15   copy of that policy, correct?
16        A.   Yes.
17        Q.   And the policy memorandum that you
18   were looking at before, not Mr. Chief Ortiz's
19   policy, the July 18th policy rescinded Chief
20   Ortiz's original policy, correct?
21             MR. DARROW:  Objection.
22        A.   That's correct.
```

1      Q.   Okay.  I want to talk a minute about

2  that -- that second policy -- the policy from

3  Border Patrol alone.  When did ICE become aware

4  of -- we talked earlier about NTR -- so, move

5  NTR to the side -- when did ICE become aware of

6  Border Patrol's parole plus ATD policy?

7      A.   I would say on or after November 2,

8  2021.

9      Q.   Okay, all right.  And how did ERO

10  become aware of Border Patrol's parole plus ATD

11  policy?

12     A.   I don't recall specifically how we --

13  how we found out about it.

14     Q.   Okay, all right.  Like with NTR,

15  Border Patrol's parole plus ATD policy added to

16  the backlog, right?

17          MR. DARROW:  Objection.

18     A.   Yes.

19     Q.   Okay.  And the reason why, again,

20  there was a backlog?  Well, strike that.  The

21  reason that there was a backlog at ICE was just

22  like in -- for the NTR policy under the parole

Transcript of Corey A. Price
September 9, 2022                                    117

1   plus a TD policy, Border Patrol was not

2   completing notices to appear and it was instead

3   having aliens report to ICE facilities to

4   complete that process, correct?

5         MR. DARROW:  Objection.

6       A.    That's correct.

7       Q.    Okay.  And, we talked about this kind

8   of again, tangentially, but notices to appear

9   began the immigration removal process, right?

10      A.    That's correct.

11      Q.    Okay.  And without them, there is no

12  immigration proceeding, right?

13        MR. DARROW:  Objection.

14      A.    That's correct.  That's what we refer

15  to as a charging document.

16      Q.    Okay.  So, both the NPR policy and the

17  parole plus ATD policy for Border Patrol were

18  taking aliens that were subject to mandatory

19  detention unless paroled and potentially

20  expedited removal and paroling them into the

21  United States and placing those aliens

22  potentially on the standard docket, right?

Transcript of Corey A. Price
September 9, 2022                                            118

1              MR. DARROW:  Objection.

2         A.    That is correct.  They'd be on the

3    non-detained docket.

4         Q.    Okay.  And expedited -- expedited

5    removal and the detained docket moves

6    significantly more quickly than the non-detained

7    docket, right?

8              MR. DARROW:  Objection.

9         A.    Yes.

10        Q.    Okay.  The non-detained document --

11   non-detained docket can take upwards of five

12   years before a removal is ordered, correct?

13             MR. DARROW:  Objection.

14        A.    That is my understanding.

15        Q.    Okay.  Now, under Border Patrol's

16   parole plus ATD policy or the July 18th joint

17   parole plus ATD policy, the policy exists to

18   deal with circumstances where appropriate

19   detention space is unavailable, correct?

20             MR. DARROW:  Objection.

21        A.    Yes.

22        Q.    Okay.  When it comes to family units,

Transcript of Corey A. Price
September 9, 2022                                    119

1    there is never detention space available, right?

2             MR. DARROW:  Objection.

3        Q.   At this point.

4        A.   There is not currently detention space

5    available for families.  That is correct.

6        Q.   So, no matter what, alien family --

7    family units legally entering the United States

8    are going to be released, whether it's this

9    policy or through some other authority, right?

10            MR. DARROW:  Objection.

11       A.   That is correct.  The Flores decision

12   has really impacted our ability to detain

13   families to the point where they can be removed.

14       Q.   Now, this memorandum on page 2, so the

15   July 18th memorandum on page 2, indicates a

16   parole plus ATD is supposed to be utilized

17   sparingly, right?

18            MR. DARROW:  Objection.

19       A.   Yes.

20       Q.   So, the final paragraph on the bottom

21   of the page actually uses the word sparingly.

22   Has -- again, I'm trying to talk just about the

Transcript of Corey A. Price
September 9, 2022                                    130

```
 1   activity, yes.

 2        Q.   All right.  I mean, you have right

 3   now, I mean, you have -- you launched detainers,

 4   ERO does, all the time, correct?

 5        A.   Every day.

 6        Q.   Every day.  And you -- and you're your

 7   lodging detainers against aliens who've

 8   committed crimes, right?

 9             MR. DARROW:  Objection.

10        A.   Yes.

11        Q.   Okay.  And so, past experience tells

12   you why you may not be able to see the future,

13   that some number of aliens that are included in

14   this parole population are going to commit

15   crimes, right?

16             MR. DARROW:  Objection.

17        A.   Yes.

18        Q.   And they're going to be -- that that's

19   going to cause the states where these aliens

20   live to incur cost for state criminal

21   proceedings, correct?

22             MR. DARROW:  Objection.
```

1          A.    Yes, that's been the way our

2    immigration system has worked for as long as

3    I've been in this job.

4          Q.    Okay.  And it's going to cause states

5    to incur the cost of providing housing if the

6    aliens are put in prison, right?

7                MR. DARROW:  Objection.

8          A.    I don't know the state funding

9    mechanism for that, but, you know, yes, it's

10   reasonable to assume that wherever they're

11   incarcerated, they would incur those costs, yes.

12         Q.    Okay.  And cost -- and to the extent

13   that they have children, schooling costs for

14   those -- education costs for those for those

15   kids, right?

16               MR. DARROW:  Objection.

17         A.    Yes.

18         Q.    And costs for health care to the

19   extent they qualify for Medicaid, right?

20               MR. DARROW:  Objection.

21         A.    Yeah, I don't know the, you know,

22   qualifications for Medicaid myself, but yes.

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2       I, Mawira Nyamete, Notary Public for the

 3   State of Maryland, do hereby certify that on

 4   September 9, 2022, the witness, Corey Price, was

 5   sworn before me at the aforementioned location,

 6   and that I am neither counsel for, related to,

 7   nor employed by any of the parties to this case

 8   and have no interest, financial or otherwise, in

 9   its outcome.

10       IN WITNESS WHEREOF, I have hereunto set my

11   hand and affixed my notarial seal this 9th day

12   of September, 2022.

13

14   _____
       Mawira Nyamete

15   NOTARY PUBLIC IN AND FOR THE STATE OF MARYLAND

16

17

18

19

20

21

22
```

1                CERTIFICATE OF TRANSCRIBER

2           I, Pamela A Flutie, do hereby certify

3    that the foregoing transcript is a true and

4    correct record of the recorded proceedings; that

5    said proceedings were transcribed to the best of

6    my ability from the audio recording and

7    supporting information; and that I am neither

8    counsel for, related to, nor employed by and of

9    the parties to this case and have no interest,

10   financial or otherwise, in its outcome.

11

12

13

14   _____

15   Pamela A. Flutie

16

17

18

19

20

21

22

ERRATA SHEET FOR THE TRANSCRIPT OF:

Caption:  State of Florida v. The United States of America, et. al.

Deponent: Corey A. Price, Individually

Deposition Date: September 9, 2022

Case No.: 3:21-cv-1066

| Page | Line | Correction | Reason |
|------|------|-----------|--------|
| Pg 15 | 7 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 47 | 14 | Change "loss" to "ALOS" | Mis-spelled.  ALOS is an acronym. |
| Pg 115 | 5 | Change "board parole" to "Border Patrol" | Mis-spelled |
| Pg 122 | 15 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 122 | 16 | Change "Q" to "A" | It was an Answer, not a Question |
| Pg 122 | 17 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 147 | 12 | Change "we're" to "we use" | Mis-spelled |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true to the best of my knowledge and belief.


Signature of Deponent: _____


Dated this: ___21___ day of ____September____, 2022