## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                                Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## FLORIDA'S RESPONSE TO
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

On Friday, October 21, 2022, Defendants published their latest data on monthly releases at the southwest border. Doc. 95-24 at 3–4. The numbers are astounding. In September 2022, Defendants released over 100,000 inadmissible aliens under the challenged policies. Doc. 95-24 at 3–4. And the numbers do not just show more releases, they show that Defendants are steadily decreasing the number of detained aliens.[1] Yet, Defendants still contend that Florida cannot prove a non-detention policy, that their actions comply with the law, and that this Court cannot review those actions.

---

[1] The two rows that reflect detention are "Expedited Removal (ER)" and "Warrant of Arrest/Notice To Appear – (Detained)," which appear under the heading "USBP Monthly Southwest Border Encounters by Processing Disposition." Doc. 95-24 at 4.

This Court should deny Defendants' motion for summary judgment, Doc. 88-1, which is largely a rehash of arguments this Court rejected in denying Defendants' motion to dismiss, Doc. 45. Defendants offer two new arguments: (1) that illegal border crossers are not governed by 8 U.S.C. § 1225 at all but by § 1226, which governs aliens in the interior arrested pursuant to a warrant, and (2) that the undisputed evidence shows that no non-detention policy exists. Doc. 88-1 at 16, 39. Both contentions are wrong, as are the arguments this Court already rejected. Florida can identify more than enough evidence to take this case to trial.

## BACKGROUND

### I.    LEGAL BACKGROUND.

The relevant provisions of the Immigration and Nationality Act (INA) have been thoroughly described in Florida's response to Defendants' motion to dismiss, Doc. 31, the second amended complaint, Doc. 74, and this Court's order denying Defendants' motion to dismiss, Doc. 45.

This Court aptly summarized the two statutes Florida primarily relies on. First, 8 U.S.C. § 1225(b)(1) and (b)(2) "mandate detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." Doc. 45 at 4 (quoting *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018)). Second, while the government has authority to temporarily parole an alien applying for admission to the United States, "[t]his parole may only be granted

'on a case-by-case basis for urgent humanitarian reasons or significant public benefit,'" and "the alien shall be returned to the custody from which he or she was paroled when 'the purposes of such parole . . . have been served.'" *Id.* at 5–6 (quoting 8 U.S.C. § 1182(d)(5)(A)).

One further statute bears discussion. In discovery, the government admitted that it has been relying on another authority—8 U.S.C. § 1226—to release certain inadmissible aliens caught crossing the border illegally. *See* 8 U.S.C. § 1226(a)(2) (allowing "release" on "bond" or "conditional parole"); Doc. 85-11 at 4. As explained *infra* 19–22, that provision plainly does not apply to illegal border crossers, and Defendants' invocation of § 1226 provides an additional basis to find Defendants' actions unlawful. Section 1226 "generally governs the process of arresting and detaining" certain aliens who are "already in the country"—that is, aliens who do not have a "right to remain" in the United States. *Jennings*, 138 S. Ct. at 837–38.

## II.   FACTUAL AND PROCEDURAL BACKGROUND.

Florida challenges two policies in this case: (1) the non-detention policy and (2) the Parole + ATD policy. The non-detention policy is the operative policy. The Parole + ATD policy, by contrast, is simply a subset of the broader non-detention policy. In other words, Parole + ATD exists only because DHS has a broader policy of refusing to detain illegal border crossers. Thus, the Court should view the memos

3

purporting to create the Parole + ATD policy, as well as the accompanying administrative records, in context with the broader non-detention policy rather than in a vacuum.

For these reasons, the factual background proceeds in three parts: (1) evidence regarding the non-detention policy, which includes the Parole + ATD policy; (2) evidence regarding the Parole + ATD administrative record; and (3) evidence of Florida's harm.

### a. Facts regarding the non-detention policy.

In President Trump's last full month in office, Border Patrol released only 17 aliens into the interior of the United States. Doc. 85-7 at 3. That month was neither an anomaly nor a product of the COVID-19 pandemic, as the highest number of Border Patrol releases in any month in 2020 was 91. Doc. 95-1 at 5. As the current Chief of Border Patrol, Raul Ortiz, acknowledged in his deposition, Border Patrol under President Trump was only authorized to release aliens at the border under "very exigent circumstances." Doc. 95-20 at 173.[2]

Then-candidate Joseph Biden disagreed with President Trump's detention policies. During the 2020 election, he promised to "[e]nd prolonged detention" by using "alternatives to detention" and "enabl[ing] migrants to live in dignity and safety while awaiting court hearings." Doc. 95-2 at 6. He did so notwithstanding the

---

[2] For depositions, Florida cites the transcript page rather than the ECF page.

Supreme Court's holding that § 1225 does not allow the use of so-called "alternatives to detention." *See Jennings*, 138 S. Ct. at 850–51 (discussing conditional releases).

Shortly after taking office, the Biden Administration took steps to keep this promise. On March 20, 2021, a senior Border Patrol official sent an email authorizing officers "to exercise prosecutorial discretion authority and release illegal aliens without placing them in removal proceedings" (the March 20, 2021 email). Doc. 85-12 at 4. Alternatively, the email authorized Border Patrol officials to release illegal border crossers under § 1226(a)(2), referred to as a "Release on Own Recognizance." Doc. 85-12 at 5; Doc. 85-11 at 4 (confirming that a release on recognizance is grounded in § 1226(a)(2)). Similar changes were also communicated by telephone. Doc. 95-20 at 173, 175–76.

Around the same time, DHS began reducing or eliminating detention capacity.[3] In February 2021, ICE began closing its family detention centers, Doc. 95-3 at 3–6; Doc. 95-19 at 141–42; Doc. 95-20 at 66, 72; Doc. 95-17 at 100; Doc. 95-15 at 2, even though Presidents of both parties have detained family units for

---

[3] Defendants' suggestion that they have *increased* detention capacity and built new facilities hides the ball. Doc. 88-1 at 36, 45. They are referring to CBP's *holding* capacity. Doc. 88-1 at 36. CBP (through Border Patrol) is responsible for arresting aliens at the border, and ICE is responsible for detaining them. After making an arrest, CBP holds inadmissible aliens temporarily in its processing centers. Within 72 hours, CBP aims to transfer aliens who will be detained to ICE. Doc. 87-1 at 4. As such, increases in CBP holding capacity—rather than ICE detention capacity—are beside the point. *See* Doc. 95-17 at 100.

decades, Doc. 95-20 at 27–29. As things now stand, ICE has zero detention capacity for family units, Doc. 95-3 at 3–6; Doc. 95-19 at 141–42; Doc. 95-20 at 66, 72; Doc. 95-17 at 100, which means that aliens who bring their minor children to the border are guaranteed release, Doc. 95-21 at 62–63, 113; Doc. 95-4 at 2; Doc. 95-20 at 158; Doc. 95-19 at 141–42.[4]

Although DHS has not eliminated all detention capacity for single adults, it is still releasing them in droves. *Compare* Doc. 95-5 at 4 (showing the total number of family unit aliens processed at the southwest border in August 2022); *with* Doc. 95-24 at 3–4 (showing the total number of aliens released at the southwest border in August 2022). And despite what DHS is telling courts, including this one, Doc. 23-1 at 37 n.7; Doc. 88-1 at 16, these mass releases are not merely an accident of circumstances driven by resource constraints. In its March 23, 2022 budget request, DHS asked Congress to cut ICE's detention capacity to less than 50% of what it was under President Trump. Doc. 95-21 at 102–03, 105–07 (describing the changes); Doc. 95-6 at 12 (showing 60,000 beds in FY 2021); Doc. 95-7 at 49 (showing 25,000 beds in FY 2023). In doing so, DHS told Congress that this "reduction in detention capacity level will not impede [its] ability to apprehend, detain, and remove

---

[4] The exception is family units who are expelled under Title 42. But Title 42 will not be in effect forever. And DHS is applying Title 42 to only a fraction of family units. In August 2022, for example, DHS processed only 12% of family unit aliens under Title 42, leaving 45,609 subject to the non-detention policy. Doc. 95-5 at 4.

noncitizens that present a threat to national security, border security, and public safety." Doc. 95-7 at 49. *But see* Doc. 95-21 at 102–03 (agreeing that these cuts would "ensur[e] that more illegal aliens would be released into the interior").[5] Surprisingly, DHS's attorneys told this Court, only 19 days later, that Congress has given DHS "insufficient resources" to comply with § 1225. Doc. 40 at 11; Doc. 95-8 at 2 (showing the date of the budget request); *see also Texas v. United States*, 40 F.4th 205, 217 n.5 (5th Cir. 2022) (affirming district court's finding that similar resource-based arguments were "not in good faith").[6]

On September 28, 2021, Florida filed this suit to challenge DHS's refusal to detain illegal border crossers as required by law. Doc. 1. As part of Florida's original complaint, the State also challenged DHS's policy of issuing "Notices to Report" at the border instead of charging documents. Doc. 1 ¶¶ 31, 56. Florida has since learned that Notices to Report were part of the broader authorization to exercise "prosecutorial discretion," which was communicated in the March 20, 2021 email. Doc. 85-12 at 4; Doc. 95-11 at 4; Doc. 95-12 at 4.

---

[5] This is not the first time the Biden Administration has asked Congress to cut its detention capacity. Doc. 95-9 at 44.

[6] Beyond their reductions in detention capacity, Defendants' resource arguments are disingenuous for a second reason—Defendants are the ones causing the border surge. The more Border Patrol releases illegal border crossers, the more aliens illegally cross the border. Doc. 95-20 at 171–72. This is so because a significant "[d]river[] of [m]igration" is aliens' "[p]erceptions of favorable U.S. immigration policy." Doc. 95-10 at 2–3. And Border Patrol Chief Ortiz agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what is actually happening in the United States." Doc. 95-20 at 68.

Notices to Report were a disaster. One ICE official described it this way: "[O]ver the summer we had well over 150,000 folks come in. They were issued a piece of paper that said go 'find somebody in ICE.' And that was pretty much it." Doc. 95-23. This statement was made during a video training series for a new DHS initiative, called "Project Horizon," under which ICE officials are working overtime to locate the hundreds of thousands of inadmissible aliens that Border Patrol released into the country so ICE can serve them with a Notice to Appear (NTA). Doc. 95-11 at 4; Doc. 95-12 at 4.

Approximately one month after Florida filed suit, DHS rescinded the Notice to Report policy and replaced it with the Parole + ATD policy in a November 2, 2021 memo (the November memo). Doc. 87-1 at 96–98. The Parole + ATD policy continued the mass release of illegal border crossers but attempted to formalize them as grants of parole under 8 U.S.C. § 1182(d)(5). Doc. 87-1 at 97. The November memo also purported to provide a rationale—COVID-19 concerns in crowded settings—and it limited Parole + ATD to family units. Doc. 87-1 at 97.

There are serious reasons to question Defendants' candor in insisting that the November memo reflects the formal decision to transition from Notices to Report to Parole + ATD. Instead, the memo appears to be a document created for litigation

purposes.[7] For example, even though the memo was issued November 2, 2021, DHS began implementing Parole + ATD well before that date. Operation Horizon documents show that "CBP began paroling" aliens and "collaborating with ICE to enroll them into ICE's Alternatives to Detention (ATD) program" in "July 2021." Doc. 95-12 at 4; *see also* Doc. 95-16 at 16 (showing that Border Patrol authorized the use of Parole + ATD on July 31, 2021); Doc. 85-8 at 4 (reporting Parole + ATD grants before November 2021).

A recent GAO report confirms that Defendants initiated Parole + ATD on July 31, 2021, and ended Notices to Report on October 15, 2021:



Doc. 95-16 at 16.

---

[7] The COVID rationale in the November memo also appears to be driven by litigation, as at least one earlier draft did not contain this rationale and instead suggested that Notices to Report were a matter of administrative convenience. *See* Doc. 89-1.

Defendants also departed from the terms of the November memo without updating that document. For example, even though the November memo limits Parole + ATD to family units, Doc. 87-1 at 96; Doc. 23-1 at 15 (representing that Parole + ATD applies "only to family units"), DHS expanded Parole + ATD to single adults without altering the memo. Doc. 95-16 at 8 n.4 (noting this expansion happened on March 20, 2022). Florida first became aware of this in a July 13, 2022 deposition, where a DHS witness disclosed that the agency had been applying Parole + ATD to single adults for "the past couple months." Doc. 95-17 at 87–88.

Five days after that deposition, DHS issued a new Parole + ATD memo (the July memo). Doc. 87-1 at 4. The July memo expressly rescinds the November memo. Doc. 87-1 at 4. It all but abandons any COVID-rationale, instead relying on the more general rationale of "disease-mitigation" and "overcrowding." Doc. 87-1 at 5. And the policy now applies to single adults in addition to family units. Doc. 87-1 at 4–7. Florida amended its complaint a second time to incorporate challenges to this new memo. Doc. 74.

### b.  The Parole + ATD Administrative Records.

On April 20, 2022, Defendants produced the administrative record for the November memo. *See* Doc. 87-1 at 90–124. That administrative record was a mere 30 pages and contained little-to-no documents about COVID-related risks or policies—the purported impetus behind the policy. Doc. 87-1 at 90–124. Florida

moved to supplement the administrative record citing these peculiarities. Doc. 47. This Court denied Florida's request but emphasized that any deficiencies would "go[] more to the merits of Florida's claims" and that "an inadequate or incomplete administrative record will presumably work in Florida's favor." Doc. 55 at 3–4.

After issuing the July memo, Defendants produced a "Supplemental Administrative Record" (SAR). Doc. 87 at 1; Doc. 87-1. The SAR contains both a CBP and an ICE portion and includes various reports about border conditions and detention capacity, court orders, and the administrative record for the November memo. Doc. 87-1 at 1, 3, 161, 163–64. Notably, the SAR also includes estimates about the amount of administrative backlog Parole + ATD has and will continue to cause. Doc. 87-1 at 268–73. Specifically, this backlog includes aliens released under Parole + ATD who did not receive charging documents upon release and for whom ICE needs to issue an NTA. Doc. 95-18 at 68–69. By Defendants' estimates, continuing Parole + ATD for an additional 90 days after May 6, 2022, would create a backlog that would take over five years and $49 million to clear. Doc. 87-1 at 268–69.

### c. The effects of Defendants' policies.

By July of 2021, the Biden Administration's policy changes had increased Border Patrol's releases from 19 per month to over 60,000 per month. Doc. 85-7 at 3; Doc. 85-8 at 4. The "crisis at the border"—a phrase Border Patrol Chief Ortiz

agreed was accurate, Doc. 95-20 at 40—is now so dire that the vast majority of illegal border crossers are not even fleeing federal officials. Doc. 95-20 at 249–50. For the first time in history, they are turning themselves in because they know the Biden Administration will release them. Doc. 95-20 at 249–50.

The cumulative effect of these policies on the State of Florida is staggering. Nearly 160,000 aliens released under the challenged policies now reside Florida. *See* Doc. 86 at 4–7. And nearly 48,000 of those have not checked in with ICE as required. Doc. 86 at 6–7. This makes sense given ICE's internal documents, which confirm that "only a fraction of" aliens released under prosecutorial discretion or parole "have reported to ICE for processing." Doc. 95-12 at 4. And when ICE says it will take years to clear the backlog, it is referring to *initiating* removal proceedings against these aliens. Doc. 87-1 at 268–72. Once those proceedings begin, it will be several more years at least until the aliens are removed, if ever. *See* Cong. Rsch. Serv., R47077, U.S. Immigration Courts and the Pending Cases Backlog 1 (Apr. 25, 2022).

## LEGAL STANDARD

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court is to "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable

doubts about the facts in favor of the non-movant." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (quotations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## ARGUMENT

### I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE NON-DETENTION POLICY CLAIMS.

#### a. There is evidence that DHS has created and is implementing a non-detention policy.

Defendants insist that "there is no such policy." Doc. 88-1 at 35; *see also* Doc. 54 at 1 n.1 (calling the non-detention policy "imaginary"). Notably, however, they provide no sworn declaration attesting that the policy does not exist. Doing so would be the bare minimum if Defendants hoped for summary judgment, and their failure to do so suggests that no official was willing to say so under penalty of perjury.

In any event, Florida possesses abundant evidence that the policy exists. First, the sheer number of releases, especially compared to the previous administration, demonstrate the existence of a policy. Within six months of taking office, Border Patrol's releases went from 17 per month to 60,000 per month. Doc. 85-7 at 3. As this Court recognized, "it defies logic and common sense to suggest that there is no overriding policy against detaining aliens when hundreds of thousands have been

paroled or otherwise released into the country." Doc. 45 at 24; *see also* Doc. 55 at 5 n.2 (explaining that it would be "likely statistically impossible" to release hundreds of thousands of migrants on a case-by-case basis).

Comparing months with similar apprehension numbers is instructive. In January 2020, for example, President Trump's Border Patrol apprehended 29,205 illegal border crossers. Doc. 95-1 at 5. That is almost 4,000 *more* apprehensions than in February 2021, President Biden's first full month in office. Doc. 85-7 at 4. Yet in January 2020 Border Patrol released only 76 aliens, less than 1% of the 8,798 aliens released by Border Patrol in February 2021. *Compare* Doc. 95-1 at 5, *with* Doc. 85-7 at 3. Put simply, an exponential change in releases under similar circumstances suggests a change in policy.

Second, the March 20, 2021 email demonstrates a non-detention policy. That email authorizes Border Patrol to release aliens *en masse* by invoking either "prosecutorial discretion" or § 1226(a)(2). Doc. 85-12 at 4–5. Chief Ortiz similarly testified in his deposition that DHS eliminated strict limits on the release of illegal border crossers after President Biden took office. Doc. 95-20 at 173–77. And even though the November memo purported to rescind the authorization to exercise "prosecutorial discretion" in the March 20, 2021 email, Doc. 87-1 at 96, it did not rescind the authorization to release illegal border crossers under § 1226. Moreover,

14

DHS replaced prosecutorial discretion with Parole + ATD, which similarly involves the mass release of illegal border crossers. Doc. 95-12 at 4.

Third, DHS's detention capacity decisions demonstrate the existence of a non-detention policy. By DHS's own admission, it has completely abolished detention of family units. Doc. 95-3 at 3–6; Doc. 95-19 at 141–42; Doc. 95-20 at 66, 72; Doc. 95-17 at 100. Similarly, DHS has made significant cuts to detention capacity for single adults, even while telling Congress that those cuts will not prevent it from fulfilling its statutory duties. Doc. 95-7 at 49.

Finally, additional facts corroborate the existence of a non-detention policy. As a candidate, President Biden pledged to create such a policy if elected. Doc. 95-2 at 6. *See also Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 138–39, 145–49 (D.D.C. 2018) (recognizing the existence of an unwritten policy based on statements of high-ranking officials). And given DHS's legal positions throughout this case—which demonstrate a profound misunderstanding of its statutory duties—the agency was fertile ground for the creation of such a policy.

Taken together, these facts more than support the inference that the Biden Administration has a policy of "releasing aliens subject to mandatory detention." Doc. 74 ¶ 20. To be sure, Florida has not obtained a document that says "DHS's policy is not to detain aliens subject to mandatory detention." But the fact that the policy is not in writing does not defeat its existence. *See Venetian Casino Resort v.*

*EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (finding the existence of a policy supported by the record where "the details of the . . . policy [were] still unclear"); *accord RIL-R v. Johnson*, 80 F. Supp. 3d 164, 176 (D.D.C. 2015) ("The Court . . . is satisfied that ICE has a policy of taking deterrence of mass migration into account in making custody determinations . . . ."); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (finding the existence of a policy where statistics of parole application denials were "irrefutable").

Nor can Defendants escape that conclusion merely by labeling Florida's evidence as "operational decisions," Doc. 88-1 at 36, when the evidence taken as a whole supports an inference that there is an agency-wide policy against detention driving these decisions.

### b. The non-detention policy is contrary to law.

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). There are at a minimum genuine issues of material fact regarding whether the non-detention policy is contrary to law.

The non-detention policy contemplates the *en masse* release of illegal border crossers, who are subject to mandatory detention under 8 U.S.C. § 1225. Doc. 45 at 20 ("The cited provisions in § 1225 clearly and unambiguously state that aliens

arriving at the border 'shall be detained,' not that they may be detained."). Since the Biden Administration has taken office, it has relied on three authorities to justify releases: (1) general "prosecutorial discretion," *see* Doc. 85-12 at 4, (2) bond or conditional parole under 8 U.S.C. § 1226(a), *see* Doc. 88-1 at 39, 42–43; Doc. 95-13, and (3) humanitarian parole under 8 U.S.C. § 1182(d)(5). None of these authorities justifies the non-detention policy.[8]

> ### i. *Defendants do not have discretion to ignore the commands of § 1225(b).*

As this Court explained, § 1225(b)(1)(B)(iii)(IV) and (b)(2)(A) "clearly and unambiguously state that aliens arriving at the border 'shall be detained,' not that they may be detained." Doc. 45 at 20. The Supreme Court has likewise interpreted § 1225 to "mandate detention of applicants for admission until certain proceedings have concluded." *Jennings*, 138 S. Ct. at 842.

Nonetheless, Defendants created a "prosecutorial discretion" policy, under which they assert unfettered power to ignore § 1225. Doc. 85-12 at 4–6. In defense of these actions, Defendants insist that "electronic monitoring and other [alternatives to detention]" satisfy the "ultimate[] . . . purpose of detention pending removal."

---

[8] For the same reasons the non-detention policy is contrary to law, it is also "agency action unlawfully withheld." 5 U.S.C. § 706(1); *see Samma v. U.S. Dep't of Defense*, 486 F. Supp. 3d 240, 275 (D.D.C. 2020) (considering contrary to law and unlawfully withheld claims together where plaintiffs alleged an agency failed "to take a discrete agency action that it is required to take" (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004))).

Doc. 88-1 at 37–38. That argument, however, was squarely rejected in *Jennings*. There, the Court held that "detain" in § 1225 means to "keep in custody" or "confine" and is not satisfied by alternatives to detention. *See Jennings*, 138 S. Ct. at 848–49 (rejecting the dissent's definition of "detain," which only requires "the absence of unrestrained freedom").

As a last resort, Defendants insist that they can avoid mandatory detention entirely by making a threshold decision not to initiate removal proceedings. Doc. 88-1 at 41–42. Even if Defendants had this discretion—and they do not—this argument is beside the point because Defendants *are* initiating removal proceedings. As they admit, "DHS policy and practice is to serve NTAs—both by mail and in person—on all noncitizens conditionally released at the border." Doc. 88-1 at 41. Indeed, Defendants created an entire program, Operation Horizon, to do just that. Doc. 95-11 at 4; Doc. 95-12 at 4.

In any event, § 1225 does not give DHS discretion to refuse to initiate removal proceedings against illegal border crossers. Section 1225's commands are abundantly clear. *See* 8 U.S.C. § 1225(b)(1)(A)(i) ("*shall* order the alien removed from the United States without further hearing or review" (emphasis added)); *id.* § 1225(b)(1)(B)(iii)(IV) ("*shall be detained* pending a final determination of credible fear of persecution and, if found not to have such a fear, *until removed*" (emphasis added)); *id.* § 1225(b)(1)(B)(iii)(I) ("*shall order the alien removed*"

(emphasis added)); *id.* § 1225(b)(1)(B)(ii) ("*shall* be detained for further consideration of the application for asylum" (emphasis added)); *id.* § 1225(b)(2)(A) ("*shall* be detained *for a proceeding* under section 1229a" (emphasis added)).[9]

> ### ii. *Section 1226(a) does not authorize the mass release of illegal border crossers.*

For the first time in this case, Defendants insist that "section 1226, not section 1225(b), governs many or most of the noncitizen releases Florida challenges in this case." Doc. 88-1 at 39. That position is wrong for two reasons. First, § 1225, not § 1226, governs the detention of illegal border crossers apprehended by Border Patrol. Second, even if DHS had discretion to apply § 1226 (it does not), that provision only applies when DHS obtains an immigration arrest warrant, which Border Patrol does not do when it arrests illegal border crossers.

**1.** "An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1); *accord* Doc. 45 at 3. Applicants for admission are subject to

---

[9] While Defendants rely on their "discretion to not pursue removal at all," *see Arizona v. United States*, 567 U.S. 387, 396 (2012), that reliance is misplaced. *See* Doc. 88-1 at 41. The Supreme Court was clear in *Jennings* that the word "shall" in § 1225 "connotes a requirement." 138 S. Ct. at 844. Moreover, *Arizona* and *Reno v. AADC*, 525 U.S. 471, 483–84 (1999), involved discretion to initiate removal proceedings against aliens in the interior of the United States, which are governed by § 1226(a)'s non-mandatory language. *See* 8 U.S.C. § 1226(a) ("an alien *may* be arrested and detained" (emphasis added)). And neither *Reno* nor *Crane v. Johnson*, 783 F.3d 244, 247 (5th Cir. 2015), reached the merits of the challenges. *See Reno*, 525 U.S. at 492 (concluding that federal courts did not have jurisdiction over claims); *Crane*, 783 F.3d at 255 (affirming dismissal for lack of standing).

mandatory detention. *See* Doc. 45 at 20–21. Whereas § 1225 applies to "aliens seeking admission into the country," § 1226 applies to aliens "already in the country." *Jennings*, 138 S. Ct. at 838. Section 1226(a) states that, "[o]n a warrant . . . , an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). In addition to using the discretionary "may," § 1226(a) expressly authorizes "release" of aliens on "bond" or "conditional parole." 8 U.S.C. § 1226(a)(2).

Defendants' position is apparently that illegal border crossers are subject to *both* § 1225 and § 1226, giving Border Patrol discretion to decide whether the alien must be detained under the former or may be released under the latter. According to Defendants, "section 1226 . . . *also* applies to noncitizens who have illegally crossed the border." Doc. 88-1 at 39 (emphasis added).

That is a breathtaking position. It would mean that § 1225 mandates detention, but only when Defendants decide that § 1225 should apply. The absurdity of this position explains why the U.S. Attorney General recently rejected it. He explained that § 1225 and § 1226 "can be reconciled only if they apply to different classes of aliens." *Matter of M-S-*, 27 I&N Dec. 509, 516 (2019); *accord Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1081 (9th Cir. 2015) (explaining that "permissive and mandatory [provisions] are in harmony, as they apply to different situations").

20

The Attorney General's position makes sense. Section 1225 applies to "applicants for admission," including aliens "present in the United States who ha[ve] not been admitted" or aliens "who arrive[] in the United States." 8 U.S.C. § 1225(a)(1). The purpose of § 1225 is to require aliens who are seeking admission or who surreptitiously avoid the admission process to demonstrate that they are entitled to enter the United States. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting § 1225(a)(3))). Section 1226, by contrast, is about aliens "already in the country" whom the federal government wishes to remove. *Jennings*, 138 S. Ct. at 838. Illegal border crossers arrested while entering plainly fall into the former category.

**2.** Relatedly, even if Defendants had some discretion to apply § 1226 to aliens apprehended while illegally crossing the border, doing so would require Defendants to obtain an arrest warrant. Section 1226 applies when the initial arrest is made "[o]n a warrant issued by the Attorney General." 8 U.S.C. § 1226(a). As the government recognizes, § 1226 "permits detention only on an arrest warrant." *Matter of M-S-*, 27 I&N Dec. at 515.

Defendants, however, do not arrest illegal border crossers with a warrant under § 1226(a). Doc. 95-17 at 61. Instead, they rely on the authority in 8 U.S.C. § 1357(a)(2) to arrest without a warrant an "alien who in [an officer's] presence or

view is entering or attempting to enter the United States in violation of law." Doc. 85-11 at 7; Doc. 95-17 at 189; *see, e.g.*, *Torres-Navarro v. Barr*, 756 F. App'x 772, 772 (9th Cir. 2019) (discussing a warrantless arrest under §1357(a)(2) for someone apprehended within 25 minutes of crossing the border).

To be abundantly clear, Defendants are (a) arresting aliens without a warrant under § 1357(a)(2) on the theory that the alien is illegally entering, then (b) reclassifying the alien as an alien in the interior so the alien can be released under § 1226(a), but (c) never giving the alien the attendant benefits of requiring an arrest warrant, an express condition for detention under § 1226(a). In short, Defendants are attempting to pick and choose from conflicting authorities—taking aspects of each authority that are beneficial for the government while ignoring the conditions Congress has placed on the exercise of those authorities. In Defendants' view, aliens crossing the border are applicants for admission subject to §1225 when Defendants do not want to obtain a warrant but transform into aliens in the interior subject to § 1226 when Defendants want discretion to release them. To say the government wants to "have its cake and eat it too," Doc. 82 at 3 n.2, does not begin to state the matter.

For these reasons, Defendants' policy of mass releasing illegal border crossers under § 1226(a) is contrary to law.

       *iii.  Section 1182(d)(5) does not authorize the mass release of illegal border crossers.*

The final release mechanism Defendants rely on is § 1182(d)(5). Because these releases are principally applications of Parole + ATD, Florida will address the lawfulness of those releases in Section II.a.

### c.  The non-detention policy is arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Indeed, meaningful judicial review requires an agency to "disclose the basis of its action." *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019) (quotations omitted).

Defendants are not entitled to summary judgment on this claim. Because Defendants insist the non-detention policy does not exist, it is hard to imagine how they could have "examine[d] the relevant data and articulate[d] a satisfactory explanation." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants instead attempt to justify discrete parts of the non-detention policy. *See* Doc. 88-1 at 44–47. But those contentions cannot support the non-detention policy as a whole.

Indeed, the fact that Defendants established this policy without delineating its parameters in writing or explaining their decisions is arbitrary and capricious per se.

*See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (holding "an unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice" (quotations omitted)).

In any event, it is clear Defendants failed to consider lesser alternatives, such as maintaining existing detention capacity and continuing to operate detention centers for family units, or to explain such an extreme departure from prior practice. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). Further, Defendants failed to account for a major consequence of their policy—the resulting surge in migration. As Defendants acknowledge, aliens crossing the border are citing "favorable U.S. immigration policies" as a factor in their decision to come to the border. Doc. 95-10 at 3. And this is confirmed by agents on the ground. Doc. 95-20 at 60, 67–68, 171–72. Defendants did not consider that not detaining aliens who have crossed the border illegally would prompt more aliens to cross the border illegally. Indeed, if they had adequately considered this outcome, it is unlikely they would have gone forward with the non-detention policy. Doc. 95-20 at 40, 53; Doc. 95-12 at 4 ("These types of releases have not shown any signs of slowing and are increasing by approximately 700 per day."); Doc. 95-24 at 4 (showing over 100,000 releases in September 2022).

### d.  The non-detention policy is subject to notice and comment.

As explained above, there is evidence from which a reasonable factfinder could conclude that Defendants have a policy of not detaining aliens subject to mandatory detention under § 1225. If that policy exists, it is subject to notice and comment under 5 U.S.C. § 553 because it "affect[s] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979) (quotations omitted). This policy without a doubt establishes "new marching orders" directing immigration officials, whether in writing or not, not to comply with the law. *City of Dania Beach. v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007). And because it is a policy that involves standards of general applicability regarding the detention or non-detention of aliens, it was subject to rulemaking. *Jean v. Nelson* (*Jean I*), 711 F.2d 1455, 1476–77 (11th Cir. 1983).[10]

Defendants argue that the non-detention policy relates to "agency management." Doc. 88-1 at 47–48 (discussing 5 U.S.C. § 553(a)(2)). But that argument proceeds from Defendants' position that the non-detention policy is not a single policy but many individual decisions. In any event, that exception to notice and comment is a "narrow[]" one that does not apply when the policy is not

---

[10] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson* (*Jean II*), 727 F.2d 957, 962 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

"primarily for the internal benefit" of agency employees. *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1344 (Fed. Cir. 2005).

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE PAROLE + ATD CLAIMS.

The Parole + ATD policy, reflected in both the November and July memos, is merely an outgrowth of the non-detention policy and should not be viewed in a vacuum. For that reason, Florida anticipates asking this Court to supplement the administrative record at trial because this Court cannot fully "evaluate the challenged action on the basis of the record before it." *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) (quotations omitted). Specifically, this Court's review of the Parole + ATD policy would be incomplete without agency statistics showing how often the policy is being applied, Doc. 85-7; Doc. 85-8; Doc. 95-24; Doc. 55 at 5 n.2 (noting that statistics reflecting parole grants are "hard to square" with the case-by-case requirement), Defendants' decisions to eliminate family detention capacity, Doc. 95-3 at 3–6; Doc. 95-19 at 141–42; Doc. 95-20 at 66, 72; Doc. 95-17 at 100, and evidence regarding the disastrous effects of the policy, which Defendants were aware of when they issued the policy, Doc. 95-22 (explaining that Parole + ATD has not fixed the problems caused by Notices to Report); Doc. 95-11; Doc. 95-12.

Moreover, while the July memo may have rescinded and replaced the November memo in a formal sense, the memo is nothing more than a modification

of an existing policy that seeks to justify preexisting practices. *See* Doc. 95-16 at 20 ("Border Patrol developed and implemented the NTR and parole plus ATD processes in 2021 as an exercise of prosecutorial discretion."). For example, despite the November memo being expressly limited to "FMUs" or family units, Doc. 87-1 at 96, Defendants revealed that they operationally expanded the policy to single adults sometime in the Spring of 2021, Doc. 95-17 at 86–88; Doc. 95-16 at 8 n.4, 16. The July memo was thus a formalistic update to reflect what Defendants were already doing. Doc. 87-1 at 4–7; Doc. 95-18 at 21. And Defendants' representations to Florida are telling: they labeled the administrative record for the July memo as the "Supplemental Administrative Record," Doc. 87 at 1, and they even opposed additional discovery after issuing the July memo because they had already produced a witness to speak to "'the Parole + ATD policy' en toto, . . . not just one timeframe or iteration of it," Doc. 95-14 at 2. *See also* Doc. 95-18 at 18–19 (explaining that DHS officers received no additional training after issuance of the July memo because it was "literally . . . a continuation of an already existing mechanism").

For all these reasons, the Court cannot adequately review Parole + ATD on the administrative record provided for the July memo. Nonetheless, the Parole + ATD policy is flawed even on its own terms, and Defendants are not entitled to summary judgment as to the Parole + ATD claims.

### a.  The Parole + ATD policy is contrary to law.

Under 8 U.S.C. § 1182(d)(5)(A), DHS may temporarily parole an alien applying for admission to the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Defendants' use of the parole authority as described in the July memo contravenes that provision.

First, the July memo violates the "case-by-case" requirement. 8 U.S.C. § 1182(d)(5)(A). While the July memo pays lip service to individual circumstances, it authorizes parole whenever certain thresholds are met, subject only to grounds of *ineligibility*. Doc. 87-1 at 6–7. That suggests parole is being granted on a categorical rather than individual basis, and CBP's reported numbers confirm as much. In September 2022, for example, CBP reported over 95,000 grants of parole—more than three thousand grants per day. Doc. 95-24 at 4.

Second, the July memo violates the requirement that parole be granted on a "case-by-case *basis*." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Exercising parole on a "case-by-case basis" means evaluating the circumstances of each alien and determining that the alien satisfies the statute's criteria. *See Basis*, New Oxford American Dictionary (3d ed. 2010) ("The justification for or reasoning behind something."). The July memo, however, is not principally focused on whether the alien's circumstances qualify as "urgent humanitarian reasons" or a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Rather, the July memo focuses on *DHS's*

circumstances. *See* Doc. 87-1 at 6 (discussing overcrowding). And any case-by-case consideration of the *alien's* circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety or flight risk, Doc. 87-1 at 7, not on the parole standard.

Third, overcrowding in facilities is not an "urgent humanitarian reason" or "significant public benefit" justifying parole. 8 U.S.C. § 1182(d)(5)(A). "Urgent humanitarian reasons" and "significant public benefit"—compared to its predecessor language "for emergent reasons or for reasons strictly in the public interest"—reserves the parole authority for extraordinary circumstances. *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1191 (11th Cir. 2018) ("[C]hanges in statutory language generally indicate an intent to change the meaning of the statute."); Doc. 45 at 5 n.5 (discussing legislative changes to § 1182). And even if resource constraints could sometimes qualify as an "urgent humanitarian reason" or "significant public benefit," Defendants' actions foreclose that option. As this Court recognized, even if Defendants do have discretion to fill in the gaps in § 1182(d)(5)(A), they "do not have unfettered discretion to define those terms however they choose." Doc. 45 at 22. A reasonable interpretation of "urgent humanitarian reasons" or "significant public benefit" cannot include "health and safety risks result[ing] from overcrowding," Doc. 88-1 at 51, created by Defendants' own reductions in detention capacity, Doc. 95-21 at 102–03 (agreeing that these cuts

would "ensur[e] that more illegal aliens would be released into the interior"); Doc. 95-3 at 3–6; Doc. 95-19 at 141–42; Doc. 95-20 at 66, 72; Doc. 95-17 at 100; *see also* Doc. 95-20 at 68 (agreeing that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what is actually happening in the United States").

Finally, Defendants' reliance on 8 C.F.R. § 212.5(b)(5), permitting DHS to parole "[a]liens whose continued detention is not in the public interest," is misplaced. That regulation was promulgated before the 1996 amendment to § 1182(d)(5)(A), which added the "case-by-case," "urgent humanitarian," and "significant public benefit" conditions on the parole authority. Pub. L. No. 104-208, 110 Stat. 3009-689 (1996). The "public interest" language in the regulation thus mirrors language in § 1182(d)(5) that is no longer in effect, 47 Fed. Reg. 30,044, and was simply not updated when Congress amended the statute in 1996.[11]

At bottom, the use of parole authority contemplated by the July memo satisfies neither the "case-by-case assessment" requirement nor the "urgent humanitarian reasons" or "significant public benefit" conditions and is contrary to § 1182(d)(5)(A).

---

[11] If a regulation parroting the statute does not get deference, *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006), then a parroting regulation that the agency never bothered to update does not either.

### b. The Parole + ATD policy is arbitrary and capricious.

The July memo cannot justify DHS's Parole + ATD policy. As explained above, the July memo merely put into writing policies that were already in place, namely expansion of Parole + ATD to single adults. Thus, the memo is nothing more than a "post hoc rationalization[]" that is "not properly before" the Court. *Regents*, 140 S. Ct. at 1909. Nonetheless, the July memo is arbitrary and capricious for several additional reasons.

First, Defendants failed to adequately consider the administrative backlog perpetuated by Parole + ATD. When DHS paroles an alien under § 1182(d)(5)(A), it does not issue an NTA contemporaneously. *See* Doc. 87-1 at 5 (noting that it is more efficient to process individuals for Parole + ATD than issuing an NTA at the border). Instead, DHS serves NTAs on parolees either by mail or at a regional ICE office if they check in after reaching their final destination. Doc. 88-1 at 15. This has led to a "growing processing backlog" in processing NTAs. Doc. 88-1 at 15. Every day Parole + ATD continues, the backlog grows. *See* Doc. 87-1 at 268–78. In fact, as of May 6, 2022, Defendants estimated that continuing Parole + ATD another 90 days would nearly double the backlog and take $24 million and 5.5 years to clear. Doc. 87-1 at 268–69; *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022) (noting that a court may look to evidence in the administrative record for an important aspect of the problem that should be addressed by the agency). Yet, the

only discussion of this backlog that appears in the July memo is a note that CBP and ICE "will work jointly to streamline and complete charging document issuance." Doc. 87-1 at 7. That aspirational instruction does not explain why Defendants continued down a path that would create an insurmountable administrative task or how DHS intends to tackle this aspect of the problem. *See State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action . . . .").

Second, though Defendants say they considered "detention capacity," Doc. 88-1 at 45, they fundamentally misunderstand Florida's claim—that Defendants failed to consider "whether *to increase detention capacity or reopen family detention centers*," Doc. 74 ¶ 98 (emphasis added). In all their written consideration of overcrowding at detention centers, Defendants never discuss whether increasing detention capacity would be a viable alternative, especially where DHS had previously utilized more detention capacity. *Regents*, 140 S. Ct. at 1913 (requiring agency to explore reasonable alternatives where agency was not "writing on a blank slate").

Third, the July memo does not address whether Defendants' mass grants of parole are causing an even greater surge at the border, despite the fact that this is an opinion held within the agency. Doc. 95-20 at 68. An agency decision is certainly not "reasonable" if it is likely to worsen the very problem it aims to fix. *Prometheus*

32

*Radio Project*, 141 S. Ct. at 1158 ("[A]rbitrary-and-capricious standard requires that agency action be reasonable . . . .").

Finally, Defendants did not consider the enormous costs to the States caused by this program. Defendants seem to think that screening parolees for "public-safety or national security threat[s]," Doc. 88-1 at 53, is sufficient to protect the States. But as Florida showed in its motion for partial summary judgment, the policies at the border cost Florida millions of dollars, *see* Doc. 86, and Defendants' screening is not enough to prevent the danger to communities that comes with a mass influx of people, *see* Doc. 95-21 at 130–31 (admitting that some paroled aliens will commit crimes); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1178 (9th Cir. 2019) (discussing the "epidemic of crime, safety risks, serious property damage, and environmental problems" associated with illegal immigration (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012))).

### c.  The Parole + ATD policy required notice and comment.

The Parole + ATD policy is subject to notice and comment because it "affect[s] individual rights and obligations." *Chrysler Corp.*, 441 U.S. at 302. The July memo clearly changes the substantive criteria for when a legal benefit may be granted to aliens. And it instructs officers in how to exercise the discretionary parole authority. *See Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987).

Defendants claim that the July memo "is, at most, an interpretive rule or general statement of policy." Doc. 88-1 at 57. But the July memo does not "purport to interpret a statute or regulation;" it merely announces DHS's approach to the parole authority. *Brown Exp., Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979).[12] And "[a]n announcement stating a change in the method by which an agency will grant substantive rights is not 'a general statement of policy.'" *Id.* at 701.

Likewise, Defendants' argument that the July memo is merely a rule of "agency organization, procedure, or practice" is plainly wrong. Doc. 88-1 at 58 (citing 5 U.S.C. § 553(b)(A)). That exception only applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). Here, the July memo "alter[s] the standards imposed" on aliens and is therefore a substantive rule. *Id.* at 1024.

## III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON FLORIDA'S CLAIM FOR VIOLATIONS OF THE INA AND THE CONSTITUTION.

Florida alleges that—APA aside—Defendants' conduct violates the INA and the Take Care Clause of the U.S. Constitution. Doc. 74 ¶¶ 109–11. Defendants move

---

[12] Fifth Circuit decisions issued before close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

for summary judgment on that claim, arguing that enactment of the APA eliminated "[e]quitable ultra vires relief" and that "the Take Care Clause provides [no] private right of action." Doc. 88-1 at 58–59. Both contentions are wrong. As the Eleventh Circuit has recognized, "the Constitution" does not require "federal courts [to] refrain from reviewing decisions dealing with immigration," and "federal courts have regularly entertained challenges to immigration decisions." *Chiles v. Thornburgh*, 865 F.2d 1197, 1216 (11th Cir. 1989).

To begin, Florida has a standalone cause of action for Defendants' violations of the INA. The Supreme Court has explained that "courts generally have jurisdiction to grant relief" when "an official violates the law." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *accord Stark v. Wickard*, 321 U.S. 288, 310 (1944); *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958). And the prevailing view is that enactment of the APA did not eliminate this cause of action. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *cf. Georgia v. President of the U.S.*, 46 F.4th 1283, 1308 (11th Cir. 2022) (affirming a preliminary injunction in a case brought against the President under this cause of action).

Moreover, Defendants neglect Eleventh Circuit precedent in suggesting that "[n]o court has directly held that the Take Care Clause provides a private right of action." Doc. 88-1 at 58. In *Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987), the

35

court noted "[t]he Executive's constitutional duty to 'take care that the Laws be faithfully executed,'" *id.* at 1492 n.4, held that "exercise[s] of Executive discretion" are "subject to statutory and constitutional limits enforceable through judicial review," *id.*, and explicitly recognized that the plaintiffs had a viable "cause of action" consistent with those principles, *id.* at 1496. *See also* Doc. 45 at 33–34 (discussing other relevant authorities).

For these reasons, the Court should deny Defendants' motion for summary judgment on Florida's claim for violations of the INA and the Constitution.

## IV. DEFENDANTS' ACTIONS ARE SUBJECT TO JUDICIAL REVIEW.

### a. Florida has standing.

As explained in its motion for partial summary judgment, Florida has demonstrated actual, imminent harm that is traceable to Defendants' policy of releasing aliens subject to mandatory detention into the United States. *See* Doc. 86. While Defendants rehash many of the arguments this Court rejected in denying Defendants' motion to dismiss, Doc. 45, a few points bear discussion.

First, Florida's injuries are not mere incidental effects of federal action, but cognizable and direct harms. In its motion for partial summary judgment, Florida identified specific expenditures on aliens released at the southwest border. These types of injuries have been recognized time and again as a cognizable injury sufficient for Article III. *See Texas v. United States*, 2022 WL 5135501, at *9–10

(5th Cir. Oct. 5, 2022) (finding injury where Texas "identifie[d] expenditures in providing emergency medical services, social services and public education for illegal aliens").

Second, Florida's injuries are traceable to Defendants' unlawful conduct. Defendants argue otherwise, claiming that Florida's injuries are caused by third parties. But that is wrong. The aliens would not be allowed into the United States but for Defendants' unlawful conduct, and Article III only requires that the injury be "*fairly* traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (emphasis added). As the Court explained in *Department of Commerce v. New York*, a plaintiff may meet its burden to show a traceable injury if it can show that "third parties will likely react in predictable ways . . . even if they do so unlawfully." 139 S. Ct. at 2566.

Defendants quibble with some of the ways Florida agencies track unlawful aliens, Doc. 88-1 at 14–17, but do not—and indeed cannot—dispute that many aliens will seek medical and social services, place their children in public education, and even commit crimes once present in the United States. *See* Doc. 86 at 10–14; *see Texas*, 2022 WL 5135501, at *9 ("The record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are."). Nor can they dispute the increased likelihood of these expenditures given the large number of released aliens who have settled in Florida. *See* Doc. 86

at 4–7; Doc. 95-16 at 29 n.51 ("Five U.S. states—Florida, Texas, New York, California, and New Jersey—represent the destinations of more than half of the noncitizens whom Border Patrol processed under parole plus ATD from July 2021 through February 2022 . . . .").

Finally, Florida's claims are redressable. Defendants make two principal arguments on this point: (1) that Florida's challenge is a nonjusticiable political question and (2) that this Court does not have the power to grant injunctive relief under 8 U.S.C. § 1252(f). Doc. 88-1 at 28–30. But in both arguments, Defendants fundamentally misunderstand the relief Florida seeks.[13] Florida does not ask this Court to issue an order determining "how much or what type of detention . . . is enough to safeguard the country and facilitate immigration processing." Doc. 88-1 at 29. Florida asks this court to "set aside"—or vacate—the non-detention policy and the Parole + ATD policy, "the ordinary APA remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (quotations omitted); Doc. 74 at 31. All vacatur requires is this Court to deprive those policies of legal effect. "To 'vacate,' . . . means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or

---

[13] Defendants do not address Florida's request for declaratory relief, Doc. 74 at 31, and that is sufficient here to redress Florida's injuries. *Utah v. Evans*, 536 U.S. 452, 460 (2002) ("[W]e may assume it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of [a statute.]" (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion))).

validity; to set aside.'" *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)). Vacatur does not require this Court to "fashion a remedy," Doc. 88-1 at 29, or force any other type of compliance by Defendants and does not implicate the political problems posed by Defendants.

To be sure, Florida's prayer for relief also includes a request to "[i]ssue permanent injunctive relief enjoining Defendants from enforcing those policies." Doc. 74 at 31. And Florida acknowledges that under recent Supreme Court rulings 8 U.S.C. § 1252(f)(1) "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of'" some of the statutes applicable here. *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). The Court was clear, however, that this remedial bar does not limit a district court's subject matter jurisdiction, nor the possibility that the Supreme Court may ultimately grant injunctive relief. *Id.*; 8 U.S.C. § 1252(f)(1) (expressly exempting the Supreme Court). Thus, Florida includes this request to preserve that possibility. And in any event, Parole + ATD would be excluded from this remedial bar because § 1252 does not apply to § 1182, only to § 1225. *See* 8 U.S.C. § 1252(f)(1) ("no court . . . shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter"); *id.* § 1182 (located in Part II of the subchapter).

### b.  Defendants' actions are reviewable under the APA.

Defendants argue that the non-detention policy and Parole + ATD policy are unreviewable because they are not final agency action under the APA and are committed to agency discretion by law. Doc. 88-1 at 30–35. As to finality, Defendants merely repackage their arguments that the non-detention policy does not exist, Doc. 88-1 at 30–31, but Florida's evidence rebuts that point, *see supra* 13–16. Defendants also contend that the Parole + ATD policy is not final because "officers retain discretion to detain or parole." Doc. 88-1 at 31. This Court rejected that argument. *See* Doc. 45 at 25–26 ("Nor does the fact that agency officials may retain a modicum of case-by-case discretion because they are not specifically required to parole all arriving aliens necessarily negate the alleged overarching policy directive to release arriving aliens into the country . . . ."). Likewise, this Court has thoroughly rejected Defendants' contention that the practices Florida challenges are committed to agency discretion by law. Doc. 45 at 19–23. Both the non-detention policy and the Parole + ATD policy are subject to APA review.

## CONCLUSION

For these reasons, this Court should deny Defendants' motion for summary judgment.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

<u>/s/ James H. Percival</u>
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

Bilal Faruqui (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 56.1(C) and this Court's order expanding the word limit to 11,000 words, this response contains 9,844 words.

## CERTIFICATE OF SERVICE

I certify that on October 24th, 2022, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ James H. Percival
Deputy Attorney General