# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA,<br><br>　　　　　Plaintiff,<br>v.<br><br>The UNITED STATES OF AMERICA, *et al.*,<br><br>　　　　　Defendants. | Case No. 3:21-cv-1066-TKW-EMT |

**BRIEF OF *AMICUS CURIAE* IMMIGRATION REFORM LAW INSTITUTE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Central to the executive branch's immigration policy since the start of the current administration have been its refusal to detain inadmissible aliens who cross the border illegally and its abuse of its parole authority in a program of releasing vast numbers of such aliens *en masse* into the United States. Defendants' central premise in their motion for summary judgment is that they have discretion to determine which aliens should be detained and which released. But this premise is flawed because Congress circumscribed the executive's discretion with respect to illegal border crossers and mandated their detention or removal. Because Defendants' actions fall outside the bounds of discretion afforded the executive branch, this Court should rule that the Defendants' actions are unlawful.

1

## ARGUMENT

**I.      Florida need not show direct injury from Defendants' actions.**

Defendants suggest that Florida cannot show cognizable harm because it is not the object of the challenged federal action. Doc. 88-1 at 20[1] (citing *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019)). Defendants further suggest that states may only file suit against federal officials if they suffer a "'*direct* injury' at the hands of the federal government." *Id.* (quoting *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (emphasis in *Mellon*). Neither suggestion is tenable.

As Texas and Louisiana argue in *United States v. Texas*, No. 22-58 (S. Ct.), to accept Defendants' object-of-the-challenged-action rule or their direct-injury rule would make the various states disfavored litigants with respect to standing. *See* Respondents' Brief, No. 22-58 (S. Ct., Oct. 2022) at 17-23. In fact, the opposite is the case.

The federal government lacks the authority under the Constitution to regulate States directly. *See*, *e.g.*, *New York v. United States*, 505 U.S. 144, 166 (1992) ("[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."). Therefore, to require a State to be

---

[1] Page citations to ECF documents are to the ECF header page number, not the internal page number.

2

the object of federal regulation in order to maintain suit in federal court would be to say that "States may not sue at all." Respondents' Brief, No. 22-58 (S. Ct., Oct. 2022) at 18.

As might be expected, no precedent (not even *Mellon*) requires States to show direct injury in order to establish standing.[2] Rather, States are often afforded "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). In *Massachusetts* itself, the State only alleged indirect harms, basing its purported injury on the theory that the Environmental Protection Agency's decision not to regulate greenhouse gases might cause third parties to emit these gasses in such amount as to contribute to a rise in sea levels, which might contribute to the erosion of its shoreline. 549 U.S. at 522-23. Here, it has been amply demonstrated that Defendants' policies have caused an influx of illegal

---

[2] As Texas and Louisiana note in their Supreme Court brief:

reliance on *Florida v. Mellon*, 273 U.S. 12, 18 (1927), is misplaced. There, a State challenged the collection of federal inheritance taxes when state law barred such taxes. *Id.* at 15. This Court resolved the case on the merits by concluding that, as a law "passed by Congress in pursuance of its power to lay and collect taxes," the federal inheritance tax was "the supreme law of the land." *Id.* at 17. Only then did the Court describe the State's theory of injury as "purely speculative, and, at most, only remote *and* indirect." *Id.* at 18 (emphasis added).

Respondents' Brief, No. 22-58 (S. Ct., Oct. 2022) at 19-20. Florida has presented evidence of concrete harms sufficient to establish standing. *See* Doc. 86 at 10-14.

3

aliens into Florida, and that Florida has suffered injury from that influx. *See* Doc. 86 at 4-7 (summarizing evidence relating to the number of aliens unlawfully released by Defendants and who now reside in Florida); *id.* at 10-14 (summarizing evidence of the expenses incurred by Florida as a result of the influx).

Florida's injury, moreover, is tied directly to her interest in controlling her borders.[3] Florida is precluded from exercising her sovereign prerogative to control her borders because "the removal process is entrusted to the [sole] discretion of the Federal Government." *Arizona v United States*, 567 U.S. 387, 409 (2012). Under the resulting "special solicitude" standard, because "there is some possibility that the requested relief will prompt [Defendants] to reconsider" their nonenforcement policies, Florida meets the Article III standard for standing. *Massachusetts*, 549 U.S. at 518.

---

[3] It has long been recognized that the power "to forbid the entrance of foreigners … or to admit them only in such cases and upon such conditions as it may see fit to prescribe" is an inherent sovereign prerogative. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). Under our Constitution, this sovereign prerogative is entrusted exclusively to Congress. *See Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress . . . ."). Thus, upon her admission to the Union, Florida (at least absent "actual[] inva[sion]," U.S. CONST. art. I, § 10) ceded her sovereign prerogative to control her respective borders to the federal government—and to Congress in particular.

## II.     Defendants' actions are reviewable.

Defendants assert that the executive branch exercises "broad discretion" under the Immigration and Nationality Act ("INA"), and that their actions are committed to agency discretion by law and therefore unreviewable. *See* Doc. 88-1 at 33 (citing *Arizona*, 567 U.S. at 395-96; *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 484, 490 (1999)). But Defendants' arguments conflate the broad discretion that Congress conferred upon the executive branch with respect to the removal of certain classes of aliens with the mandatory inspection and detention scheme governing arriving aliens apprehended at the border. Whatever discretion Congress has left open for enforcing the immigration laws with respect to aliens who are removable, it did not leave such discretion unbounded with respect to inadmissible applicants for admission. *See* Doc. 36-1 at 11-13 (describing the detention scheme imposed on B-1 and B-2 aliens).

Remarkably, Defendants assert that they retain discretion to release aliens caught illegally crossing the border because "section 1226, not section 1225(b), governs many or most of the noncitizen releases Florida challenges in this case." Doc. 88-1 at 39. As Florida points out, this is a "breathtaking" and "absurd[]" position that has been rejected by the Attorney General. Doc. 98 at 20 (citing *Matter of M-S-*, 27 I&N Dec. 509, 516 (A.G. 2019)). In *M-S-*, the Attorney General "read section [1225](b)(1)(B)(ii) to mandate detention (i) for the purpose of

5

ensuring additional review of an asylum claim, and (ii) for so long as that review is ongoing. In other words, section [1225](b)(1)(B)(ii) requires detention until removal proceedings conclude."[4] *Id.* The Attorney General further stated, "I do not read section [1226](a) to authorize granting bond to aliens originally placed in expedited proceedings, even if they are later transferred to full proceedings after establishing a credible fear." *Id.* The Attorney General reasoned that "section 235 (under which detention is mandatory) and section 236(a) (under which detention is permissive) can be reconciled only if they apply to different classes of aliens." *Id.*

Not only does the Attorney General's ruling in *M-S-* "make[] sense," Doc. 98 at 21, it is entitled to deference. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999) (explaining that the Attorney General's decisions are entitled to *Chevron* deference because the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling") (quoting 8 U.S.C. § 1103(a)(1)). Defendants' attempt to justify the release of not just some, but "many or most of the noncitizen releases Florida challenges in this case," Doc. 88-1 at 39, by relying on the clearly inapplicable provision of 8 U.S.C. § 1226(a) just highlights the unlawfulness of Defendant's actions.

---

[4] In *Matter of M-S-*, the Attorney General cites to the section of the INA as passed instead of the section in the United States Code.

Defendants rely on *Chiles v. United States*, 69 F.3d 1094, 1096, 1097 (11th Cir. 1995), for the proposition that Florida's claims are unreviewable because the question whether the government is adequately guarding the borders of the United States is committed to agency discretion by law and thus unreviewable. *See* Doc. 88-1 at 29, 35. Defendants' reliance on *Chiles* is misplaced.[5]

*Chiles* is distinguishable because it was decided prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996). Congress first introduced the concept of expedited removal when it enacted IIRIRA. *See* § 302 IIRIRA (amending 8 U.S.C. § 1225), 110 Stat. 3009-579-84. Thus, prior to the enactment of IIRIRA, Congress had not yet mandated the detention and removal of illegal border crossers as it now does in 8 U.S.C. § 1225(b). *See Matter of M-S-*, 27 I&N Dec. at 516.

Indeed, in *Chiles*, the only statutes identified by the court are § 1103(a) and the former § 1251(a).[6] Section 1103(a), at that time, charged the Attorney General with the duty to "control and guard the boundaries and borders of the United States

---

[5] Although this Court distinguished *Chiles* in is prior order, *see* Doc. 45 at 21 n.14, it did not do so for the reasons set forth here, which *amicus* suggests are pertinent to the issue of whether Congress has constrained the executive's discretion under section 1225(b).

[6] Section 305(a) of IIRIRA, redesignating section 1251 as 1227. 110 Stat. 3009-597-98.

against the illegal entry of aliens …." 8 U.S.C. § 1103(a) (1993) (quoted in *Chiles v. United States*, 874 F. Supp. 1334, 1339 (S.D. Fla. 1994)). Former § 1251, now codified at 8 U.S.C. § 1227, simply defined the classes of deportable aliens. *See* 8 U.S.C. § 1251 (1994). Thus, in *Chiles*, there were no statutory directives comparable to those found in current § 1225(b) against which to gauge the executive's exercise of discretion. As this Court observed in its prior order, Doc. 45 at 20-21, § 1225(b) requires the detention of aliens who illegally cross the border. Because *Chiles* pre-dates the enactment of IIRIRA and the establishment of clear enforcement directives by Congress, it is distinguishable.

Post-IIRIRA, Congress directs the Department of Homeland Security ("DHS") to enforce the immigration laws in specific ways (mandatory detention and initiation of removal proceedings) against specific classes of individuals (inadmissible applicants for admission). Contrary to Defendants' suggestion, this is not a case where "Florida seeks to substitute its judgment for that of the federal political branches in determining which noncitizens should be detained and which released, and how best to fund and deploy enforcement resources, [where] Florida would have the judiciary formulate or rewrite immigration policy to that end." Doc. 88-1 at 29 (internal quotations omitted). Instead, Florida asks this court to rule that Congress has set the enforcement priorities for inadmissible applicants for

8

admission in 8 U.S.C. § 1225(b), and that Defendants actions are contrary to those statutory requirements.

It is the Court's duty to adjudicate such disputes and decide whether executive actions comply with the relevant statutory requirements. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 614 (1952) ("It is not a pleasant judicial duty to find that the President has exceeded his powers and still less so when his purposes were dictated by concern for the Nation's well-being….") (Frankfurter, J., concurring). As Justice Jackson stated in *Youngstown*:

> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.
>
> Such institutions may be destined to pass away. But it is the duty of the Court to be last, not first, to give them up.

*Id.* at 655 (Jackson, J., concurring). Justice Jackson put *Youngstown* within a "judicial tradition" beginning with Chief Justice Coke's admonishing his sovereign that "[the King] is under God and the Law." *Id.* at 655 n.27 (interior quotation marks omitted). By framing the Take Care Clause as a duty, the Framers rejected the idea that the executive should be vested with the power to suspend or dispense with laws enacted by Congress, and this Court has not only the authority under the Constitution to decide this question, but the duty to do so. *See Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 604 (D.C. Cir. 1974) ("[T]he judicial

branch of the Federal Government has the constitutional duty of requiring the executive branch to remain within the limits stated by the legislative branch.").

Florida has presented specific evidence showing that Defendants have instituted an unlawful nonenforcement policy at the border. As Florida notes, Defendants are now releasing more than 100,000 aliens into the United States at the southwest border each month. *See* Doc. 98 at 1 (citing Doc. 95-24 at 3-4). In contrast, fewer than 100 aliens were released during any one month of the last year of the Trump administration. Doc. 98 at 4 (citing Doc. 85-7 at 3 and Doc. 95-1 at 5). Notably, the number of aliens would likely be much higher in the absence of the Centers for Disease Control and Prevention order suspending the right to introduce aliens into the United States ("Title 42 order"), which remains in place and under which authority DHS currently expels nearly 75,000 aliens each month. *See* Doc. 95-5 at 4 (showing 73,153 aliens, 36 percent of the total, were processed for expulsion under Title 42 at the southwest land border in August 2022). As this Court observed in its order denying Defendants' motion to dismiss, "it defies logic and common sense to suggest that there is no overriding policy against detaining aliens when hundreds of thousands have been paroled or otherwise released into the country, and it would be highly improbable (if not statistically impossible) for this to have resulted by happenstance from an 'amalgamation' of individual case-

by-case decisions rather than a policy directive." Doc. 45 at 24. These specific facts alone are enough to defeat Defendants' motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for summary judgment.

Respectfully submitted:

October 28, 2022

/s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
matt.crapo@pm.me
litigation@irli.org

Counsel for *Amicus Curiae*
Immigration Reform Law Institute

## CERTIFICATE OF WORD COUNT

I hereby certify, in conformance with Local Rule 7.1(F), that this brief contains 2,373 words.

/s/ Matt Crapo
MATT A. CRAPO

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2022, a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) and served on all counsel of record.

/s/ Matt Crapo
MATT A. CRAPO