UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

v.   Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

   *Defendants*.
_____/

## FLORIDA'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants do not dispute that they have released over 800,000 inadmissible aliens at the southwest border since President Biden took office.[1] Doc. 86 at 4. Defendants also do not dispute that over 100,000 of those aliens are now in Florida. Doc. 86 at 7. Nor can Defendants seriously dispute that Florida spends hundreds of millions of dollars per year on inadmissible aliens. Doc. 86 at 10–14.

These undisputed facts are sufficient to establish Florida's standing. And Defendants' procedural objections to Florida's motion are plainly wrong. This Court should grant partial summary judgment for Florida on standing or at a minimum treat certain facts as established under Rule 56(g).

---

[1] The number is now over 900,000 given the September 2022 numbers, which Defendants announced after Florida filed its motion. *See* Doc. 98 at 1 ("In September 2022, Defendants released over 100,000 inadmissible aliens under the challenged policies.").

# ARGUMENT

I. **PARTIAL SUMMARY JUDGMENT ON STANDING IS PROCEDURALLY PROPER.**

Defendants argue that a motion for partial summary judgment on standing is "procedurally improper." Doc. 97 at 13. Defendants are wrong. A "party may move for summary judgment" on any "claim or defense" or on "*part* of each claim or defense." Fed. R. Civ. P. 56(a) (emphasis added). Standing is "part of" each of Florida's claims because it is something the State must prove to prevail. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (explaining that the elements of standing are "an indispensable part of the plaintiff's case" and "must be supported in the same away as any other matter on which the plaintiff bears the burden of proof"). Courts thus routinely consider and grant motions for partial summary judgment on standing filed on behalf of plaintiffs. *E.g.*, *Broyles v. Commonwealth Advisors, Inc.*, 936 F.3d 324, 326 (5th Cir. 2019) (reversing district court's failure to grant plaintiff's motion for partial summary judgment on standing); *Petty v. Bd. of Cnty. Comm'rs*, 168 F.R.D. 46, 49 n.2 (D. Kan. 1996) (rejecting the argument Defendants' advance here in a short footnote).

Defendants do not expressly contest any of the above, and they fail to cite a single case holding that standing is not "part of [a] claim" under Rule 56(a). Instead, they argue that Florida's motion is improper because "defense" in Rule 56(a) refers to affirmative defenses, and standing is not an affirmative defense. Doc. 97 at 5. As

2

discussed, however, Florida's motion is not based on the position that standing is an affirmative defense but that it is part of a claim. Defendants' argument is therefore beside the point.[2]

## II. FLORIDA CAN RELY ON ITS AGENCY DECLARATIONS.

Defendants suggest that this Court should not consider declarations from Florida's agency witnesses. Rule 56(c)(1)(A), however, expressly contemplates the citation of "affidavits" and "declarations" in support of summary judgment. Defendants appear to assume that Florida may only rely on Rule 30(b)(6) deposition testimony elicited by Defendants. *See* Doc. 97 at 11 ("[R]ather than use this sworn deposition testimony, Florida submits newly submitted declarations."). But Rule 30(b)(6) is a mechanism for *Defendants* to collect evidence from Florida—it is not the mechanism Florida will use at trial to present its own evidence. *See* Fed. R. Civ. P. 32(a)(3) (explaining that Rule 30(b)(6) deposition testimony "may [be] use[d] for any purpose" by "[a]n *adverse party*" (emphasis added)). Declarations are therefore a proper way for Florida to show what its witnesses will say at trial.

To be sure, the Court may disregard a declaration "when, without explanation, it flatly contradicts [the declarant's] prior deposition testimony," *Fucron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306 (11th Cir. 2016), especially if the witness was

---

[2] In the interest of completeness, the Court should also grant summary judgment on Defendants' "affirmative defense" that "Plaintiff lacks standing," Doc. 79 at 15, especially because Defendants now agree that defense is improper.

3

deposed as a Rule 30(b)(6) designee for a party. But Florida's declarations do not contradict any deposition testimony. The excerpts Defendants cite, Doc. 97 at 11, demonstrate a point that Florida does not contest—that Florida's agencies do not systematically track expenditures on aliens released under the challenged policies. *E.g.*, Doc. 87-3 at 35:15–23 (admitting that "immigrant student" under 20 U.S.C. § 7011 is not coterminous with alien); Doc. 87-4 at 31:16-19 (admitting that the Department of Corrections does not know if an illegal alien qualifies as an "applicant for admission" under 8 U.S.C. § 1225(a)); Doc. 87-6 at 32:22–33:13 (similar); Doc. 87-7 at 36:5–13 (similar); Doc. 87-8 at 67:16–23 (similar); Doc. 87-10 at 57:14–58:13 (similar).

Without contradicting that undisputed proposition, Florida's declarations provide information on the categories of aliens the agencies *do* track—which do not line up perfectly with aliens released under the challenged policies but are nonetheless probative of Florida injuries. *E.g.*, Doc. 85-2 ¶ 7 (tracking "specific inmates who are known aliens or are reasonably and in good faith believed to be . . . undocumented criminal aliens"); Doc. 85-4 ¶ 6 (tracking the number of "immigrant children and youth" as defined in 20 U.S.C. § 7011(5)).

Finally, Defendants quibble with documents attached to Mr. Kynoch's declaration, Doc. 85-1, which show several specific examples of aliens released at the southwest border who are now in Florida seeking public services. Defendants

say they were "deprived of an opportunity to develop and test this contradictory evidence during discovery." Doc. 97 at 28. That is false. Putting aside that the evidence is not "contradictory," Florida disclosed it in amended Rule 26 disclosures filed on July 21, 2022. *See* Doc. 73 at 4 (identifying "[d]ocuments regarding applicants for a Florida Driver's License or Identification Card who appear to have been released by DHS"). And Florida produced the documents to Defendants on August 23, 2022, Ex. 1 at 2, well before discovery closed on September 12, 2022, Doc. 71 at 1. Defendants thus had ample opportunity to probe these documents.

### III.   FLORIDA HAS MET ITS BURDEN TO SHOW STANDING.

#### a. Florida has shown injury that is traceable to the challenged policies.

The undisputed facts are sufficient to establish standing. *See Texas v. United States* (*DACA II*), 50 F.4th 498, 517–18 (5th Cir. 2022) (finding standing based on "emergency Medicaid to noncitizens and public education to all children regardless of their immigration status"); *see also* Doc. 98 at 36–39 (responding to Defendants' standing arguments).

In arguing otherwise, Defendants ask this Court to presume that *none* of the over 100,000 aliens now present in Florida—not to mention the thousands more Defendants are releasing every day—will enroll a child in school, seek emergency medical care, commit a crime, seek unemployment, request a driver's license, or otherwise seek public assistance. No reasonable factfinder could reach that

5

conclusion. *See DACA II*, 50 F.4th at 518 (finding injury where the "record d[id] not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients"); *Texas v. United States* (*DAPA*), 809 F.3d 134, 160 (5th Cir. 2015) ("DAPA beneficiaries have strong incentives to obtain driver's licenses, and it is hardly speculative that many would do so if they became eligible."), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016).

Of course, Florida does not (and cannot) systematically track the specific aliens released under the challenged policies who consume public services in Florida or otherwise cost the State money. But it is not "mere speculation" to make inferences about "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). And if it is not speculation to infer that aliens are less likely to respond to the census if a citizenship question is added, *id.*—even though failing to respond to the census is a crime—it is certainly not speculation to infer that at least one of the over 100,000 released aliens now in Florida will consume available public services or commit a crime.

Were all that not enough, the head of ICE Enforcement and Removal Operations, Executive Associate Director Corey Price, admitted Florida's standing in his deposition. He admitted that "some number of aliens that are included in this parole population are going to commit crimes," Doc. 85-13 at 130–31, that this

6

population "ha[s] children" and will cost the States "education costs," Doc. 85-13 at 131, and that they will impose "health care . . . costs . . . to the extent they qualify for Medicaid," Doc. 85-13 at 131–32. Mr. Price even admitted that he "assume[s]" that "states are going to incur costs regarding any form of government assistance that [they] offer" and that "they would not have incurred those costs" if the aliens "were in ICE custody," Doc. 85-13 at 132–33, as Florida argues they should be.

Defendants respond to Mr. Price's admissions in a single footnote. Doc. 97 at 12 n.3. They argue that this evidence is "inadmissible speculation."[3] But Mr. Price's testimony is not speculative. He based his testimony on his "*past experience*" working at ICE. Doc. 85-13 at 130 (emphasis added); *see also* Doc. 85-13 at 131 ("[T]hat's been the way our immigration system has worked for as long as I've been in this job."). Indeed, Mr. Price's personal knowledge on these topics is unassailable. Surely a senior ICE official responsible for "managing *all* aspects of the immigration enforcement process," Doc. 75 at 10, can testify to the likely conduct of aliens who are released into the United States.

### b. Florida's harms are redressable.

Defendants press three arguments for why Florida cannot establish redressability: (1) that Florida "fails to address" redressability at all, Doc. 97 at 38,

---

[3] Whether Mr. Price is Defendants' Rule 30(b)(6) designee, *see* Doc. 97 at 12 n.3, is irrelevant to admissibility. *See* Fed. R. Civ. P. 32(a)(3) (explaining that depositions of "managing agent[s]" are admissible by an adverse party for "any purpose"); *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1451 (D.C. Cir. 1986).

7

(2) that "[t]here is no evidence indicating whether Florida's agencies provide services to" aliens released under the challenged policies, Doc. 97 at 39, and (3) that the Court lacks authority to fashion a remedy, Doc. 37 at 40–41.

As to the first issue, Florida addresses redressability in its motion for partial summary judgment. *See* Doc. 86 at 9 (discussing the three elements of standing). Specifically, Florida argues "that aliens are coming to Florida and would not be in Florida but for the challenged policies." Doc. 86 at 9. If the Court grants Florida's request and vacates these policies—thus "depriving th[em] of legal effect," Doc. 98 at 38—the injuries caused by the ever-increasing release of aliens into Florida would be mitigated.

As to Florida's supposed lack of evidence, that argument merely restates Defendants' flawed traceability argument and fails for the same reasons. Similarly, Defendants are wrong that this Court cannot fashion a remedy, as Florida has already explained. *See* Doc. 98 at 38–39.

### c. Florida is entitled to special solicitude.

While Florida meets the traditional requirements of standing, Florida is nonetheless entitled to "'special solicitude' in the standing analysis," which "allows a state to establish standing 'without meeting all the normal standards for redressability and immediacy.'" Doc. 45 at 12 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 517–20 (2007)). This Court has recognized that Florida meets both

prerequisites for special solicitude: (1) Florida has "quasi-sovereign interests" in its "sovereign prerogative to keep aliens out of its territory," and (2) Florida has a procedural right to challenge the action through the APA. *See* Doc. 45 at 12–13; *accord DACA II*, 50 F.4th at 514–17.

Defendants advance an exceedingly narrow view of "quasi-sovereign interest," limited only to "loss of territory." Doc. 97 at 19. But Defendants cite no authority endorsing that view, and it makes no sense. A State has "a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982)). And courts have routinely found quasi-sovereign interests in cases where territorial land was not at issue. *See DACA II*, 50 F.4th at 515 (finding a quasi-sovereign interest in classifying aliens); *Nelson*, 576 F. Supp. at 1032 (finding a quasi-sovereign interest where a federal regulation might preempt state law).

### IV. AT A MINIMUM, THIS COURT SHOULD EXERCISE ITS DISCRETIONARY RULE 56(g) AUTHORITY TO STREAMLINE THE TRIAL.

"If the court does not grant all relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). If the Court declines to grant Florida partial summary judgment on standing, it should at a minimum treat the

following facts as undisputed, which will streamline the trial and preserve judicial resources:

- Between January 20, 2021, and July 4, 2022, Defendants released over 100,000 aliens who are now in Florida. Doc. 86 at 7.

- Those releases were grounded in the three release mechanisms that, according to Florida, Defendants are using to implement the non-detention policy. *See* Doc. 86 at 7; Doc. 98 at 17.

- Since July 4, 2022, Defendants have continued releasing aliens under these authorities, including over 100,000 in September 2022. Doc. 98 at 1.

- Florida spent $911,395 in fees related to aliens seeking IDs and driver's licenses between January 2020 and August 2022. Florida also spends at least 50 cents when an alien is denied an ID card or license, and Florida does not receive any funds from the alien when it issues a denial. Doc. 85-1 ¶¶ 4, 7.

- Florida spent $131,529,255 incarcerating illegal aliens from July 1, 2018, to June 30, 2019. The federal government only reimbursed $8,236,498. Doc. 85-2 at 3–4.

- Florida provides a variety of public services. Some services are provided regardless of immigration status. Others are expressly available to certain aliens. These services include direct financial assistance and food assistance, substance abuse and mental health treatment, and child welfare and domestic violence services. Doc. 85-3 at 3–7.

- Florida provides free public education regardless of immigration status. The average cost per student in fiscal year 2021–2022 was $7,812.17, and the projected cost in fiscal year 2022–2023 is $8,216.74. Florida does not track applicants for admission, but it does track "immigrant children" as defined in 20 U.S.C. § 7011(5). For fiscal year 2020–2021, there were 95,084 "immigrant children" enrolled in Florida's schools. As of February 2022, there were 101,125 "immigrant children" enrolled in Florida's schools. *See* Doc. 85-4 ¶¶ 5–6.

10

- Federal law requires Florida's Medicaid Program to cover certain emergency medical services for illegal immigrants. From January 2020 to April 2022, Florida paid for the emergency services of 153,575 aliens. Florida's share of the cost for these services was $111,451,901. Doc. 85-5 ¶¶ 5, 7.

- Aliens paroled under 8 U.S.C. § 1182(d)(5) are eligible for work authorization and can therefore become eligible for unemployment in Florida. From January 2020 to May 2022, Florida paid $168,909 in unemployment claims for aliens. Doc. 85-6 ¶ 7.

- The head of Enforcement and Removal Operations at ICE agreed that these costs are a predictable result when DHS does not detain aliens. He stated as follows: "[T]hat's been the way our immigration system has worked for as long as I've been in this job." Doc. 85-13 at 130–33.

## CONCLUSION

For these reasons, this Court should grant Florida's motion for partial summary judgment on standing. At a minimum, the Court should grant relief under Rule 56(g).

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

Bilal Faruqui (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 56.1(D), this response contains 2,619 words.

## CERTIFICATE OF SERVICE

I certify that on October 31, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
Deputy Attorney General
