1              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF FLORIDA**
2               **PENSACOLA DIVISION**

3  STATE OF FLORIDA,              )
                               ) Case No: 3:21-CV-1066
4              Plaintiff,     )
     vs.                      ) Pensacola, Florida
5                              )
 UNITED STATES OF AMERICA; ALEJANDRO  ) November 18, 2022
6  MAYORKAS, Secretary of the U.S.     ) 1:59 p.m.
 Department of Homeland Security, in  )
7  his official capacity; U.S. DEPARTMENT )
 OF HOMELAND SECURITY; TROY MILLER,   )
8  Acting Commissioner of U.S. Customs   )
 and Border Protection, in his official )
9  capacity; U.S. CUSTOMS AND BORDER     )
 PROTECTION; TAE JOHNSON, Acting       )
10  Director of U.S. Immigration and     )
 Customs Enforcement, in his official  )
11  capacity; U.S. IMMIGRATION AND CUSTOMS )
 ENFORCEMENT; UR M. JADDOU, Director of )
12  U.S. Citizenship and Immigration     )
 Services, in her official capacity;   )
13  U.S. CITIZENSHIP AND IMMIGRATION     )
 SERVICES,                        )
14                              )
                Defendants.     )
15  _____)

16

       **TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE**
17      **BEFORE THE HONORABLE T. KENT WETHERELL, II**
          **UNITED STATES DISTRICT JUDGE**
18              **(Pages 1 through 61)**

 <u>APPEARANCES</u>:
19

 For State of Florida:    Office of the Attorney General
20                      by:  **JAMES H. PERCIVAL, ANITA J. PATEL,**
                        **NATALIE CHRISTMAS** and **JOSEPH HART**
21                     The Capitol, Suite PL-01
                    400 South Monroe Street
22                     Tallahassee, Florida 32399
                    (850) 414-3300
23                     *james.percival@myfloridalegal.com*
                    *anita.patel@myfloridalegal.com*
24

             *Julie A. Wycoff, RMR, CRR*
25           *Official United States Court Reporter*
         *(850) 470-8196 * julieawycoff@gmail.com*

1   <u>APPEARANCES CONTINUED:</u>

2   For the United States:    Office of Immigration Litigation
                              by:  **ERIN T. RYAN**
3                                  **JOSEPH A. DARROW**
                              450 5th Street NW
4                             Washington, D.C. 20001
                              (202) 532-5802
5                             *erin.t.ryan@usdoj.gov*
                              *joseph.a.darrow@usdoj.gov*

6

7                             United States Attorney's Office
                              by:  **MARIE A. MOYLE**
8                             111 North Adams Street
                              Fourth Floor
9                             Tallahassee, Florida 32301
                              (850) 942-8430
10                            *marie.moyle@usdoj.gov*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

*(Call to Order of the Court.)*

THE COURT:  All right.  Good afternoon.  This is Case Number 3:21cv1066, State of Florida versus the United States.

I understand we have Ms. Patel and Mr. Percival here for the State; Ms. Ryan, Mr. Darrow, and Ms. Moyle here for the Federal Government.

Was there any other counsel that I missed?

MR. PERCIVAL:  Your Honor, this is James Percival for the State.  I have Natalie Christmas and Joseph Hart in the room with me as well.

THE COURT:  All right.  Very well.

The initial purpose of our call today was to try to identify a date that we could have an oral argument on the motions for summary judgment, either in conjunction with or in relation to a pretrial conference.  Since that order went out and parties' response came in, I've gotten two additional motions, one of them from the defendants regarding an alternative pretrial scheduling order that I guess was triggered by the order that I sent out trying to combine the oral argument and the pretrial conference.

Then I also have a Motion to Supplement the Summary Judgment Record.  I know that motion was just filed yesterday and the federal defendants have not had a chance to respond to it, but I would like to go ahead and try to deal with both of

these motions and get a better sense of where we are and where

we're going and potentially give y'all some guidance here.

So, Mr. Darrow, would you be the one that would be

able to respond to the Motion to Supplement the Summary Judgment

Record?

MR. DARROW:  Yes, Your Honor.  So the Federal

Government does oppose that motion for many of the same reasons

that -- I know very haven't had the opportunity to file our

formal response yet, but many of the reasons would be similar to

those we gave in the response to the last motion by plaintiff to

add materials to the record.

And, largely, this was a document that we would say

is -- neither counts as newly discovered evidence because it's

been on the Government's website for, you know, a very long

period of time.  But more importantly, we would say that this

document is irrelevant to this case because it is a document

that pertains to Notice to Report, a policy which has ended, was

rescinded by the Parole/ATD memo and which when plaintiff

amended its complaint chose to remove all claims related to

Notices to Report.

There are -- to the extent that this document would

pertain to Parole/ATD in any way, shape, or form, we would say

that that -- the Court has already prohibited extra record

discovery on that particular issue.  And just at this point,

it's -- you know, the record is what it is for summary judgment.

| | | |
|---|---|---|
| 02:02:35 | 1 | We've already -- both sides have, you know, exhaustively briefed |
| 02:02:41 | 2 | it on the basis of evidence.  It would be prejudicial now to |
| 02:02:45 | 3 | admit new evidence that defendants wouldn't have a chance to |
| 02:02:48 | 4 | respond to. |
| 02:02:50 | 5 | THE COURT:  Well, I guess I see two issues here.  One, |
| 02:02:54 | 6 | Florida argues that this should have been in the administrative |
| 02:03:00 | 7 | record or, I guess, the supplemental administrative record |
| 02:03:04 | 8 | because this was -- and I think you just argued it.  This was |
| 02:03:07 | 9 | one of the documents that was repealed by the ATD memo.  And if |
| 02:03:12 | 10 | that's the case, I'm not sure how it couldn't be part of the |
| 02:03:18 | 11 | administrative record.  So that's one component of it. |
| 02:03:22 | 12 | And then from -- even if it's not part of the |
| 02:03:25 | 13 | administrative record, the summary judgment record includes this |
| 02:03:31 | 14 | email that I know the parties have been -- at least at one point |
| 02:03:35 | 15 | were arguing over as to whether Florida should have got it to |
| 02:03:39 | 16 | begin with.  But it seems like this memo that's attached to |
| 02:03:42 | 17 | Florida's motion is essentially the same thing as that email, |
| 02:03:46 | 18 | and probably the formal document from which that email was then |
| 02:03:51 | 19 | transmitted out the next day. |
| 02:03:54 | 20 | So I guess I'm struggling to understand, one, why it |
| 02:03:57 | 21 | shouldn't be in the administrative record -- or maybe why it |
| 02:04:01 | 22 | isn't in the administrative record -- and then, two, how is the |
| 02:04:04 | 23 | Government prejudiced if it's added to the summary judgment |
| 02:04:07 | 24 | record from the arguments that the -- Florida is making from the |
| 02:04:13 | 25 | March 20th email.  It seems like what they're essentially saying |

02:04:18  1  is we should have been making those arguments to this March 19th

02:04:22  2  memo.

02:04:28  3         MR. DARROW:  Sure, Your Honor.  And I'll take your

02:04:32  4  questions one at a time.

02:04:34  5         So the current operative Parole/ATD memo said that

02:04:40  6  it's rescinded, the prior memo and all previous Parole/ATD

02:04:46  7  guidance.  You know, granted, the prior memo had -- that was

02:04:49  8  rescinded in the original administrative record that has been

02:04:52  9  replaced by the new one talked about rescinding previous Notice

02:04:58  10 to Report memo; but, you know, at this point, we're dealing with

02:05:02  11 a different operative memo that, you know, just blankety

02:05:06  12 rescinded all prior guidance.  That's a pretty broad rescission

02:05:11  13 to, you know, have to say that rule to include all that prior

02:05:17  14 guidance that was rescinded under that memo in the record.

02:05:21  15        And it's not to say that Notices to Report themselves

02:05:25  16 were not addressed in the administrative record.  They are.

02:05:29  17        THE COURT:  Well, let me interrupt you for a second.

02:05:31  18 If I understand what you're arguing is that the supplemental

02:05:36  19 record that relates to the most recent ATD memo isn't what

02:05:43  20 repealed this memo, but the administrative record for the

02:05:49  21 original ATD memo is within and is part of the supplemental

02:05:56  22 record.  So, I mean, it's kind of like the Chinese nesting

02:06:01  23 doll-type situation.

02:06:02  24        So I guess maybe your point is well taken that it

02:06:04  25 otherwise wouldn't be part of the supplemental record because

| | |
|---|---|
| 02:06:07 | 1 |
| 02:06:13 | 2 |
| 02:06:19 | 3 |
| 02:06:23 | 4 |
| 02:06:28 | 5 |
| 02:06:34 | 6 |
| 02:06:38 | 7 |
| 02:06:42 | 8 |
| 02:06:45 | 9 |
| 02:06:47 | 10 |
| 02:06:51 | 11 |
| 02:06:55 | 12 |
| 02:06:59 | 13 |
| 02:07:06 | 14 |
| 02:07:10 | 15 |
| 02:07:14 | 16 |
| 02:07:16 | 17 |
| 02:07:20 | 18 |
| 02:07:21 | 19 |
| 02:07:23 | 20 |
| 02:07:27 | 21 |
| 02:07:32 | 22 |
| 02:07:37 | 23 |
| 02:07:41 | 24 |
| 02:07:47 | 25 |

the supplemental record relates to a memo that repeals a prior
ATD memo.  But given that the original administrative record
which repealed, best I can tell, this policy -- or, excuse me,
this memo is part of the supplemental record, it seems like this
memo should be part of the original administrative record which
is now part of the supplemental record.

MR. DARROW:  There is case law on the fact -- and I
apologize, I don't have it off the top of my head, Your Honor,
because we haven't, you know, put together our response yet --
that says that, you know, every document that is referenced by a
document in the record also doesn't need to be included in the
record.  Maybe if you were just talking about the original
Parole/ATD memo and its record, then the argument I'm trying to
make, which is that at this point the Notice to Report documents
are, you know, pretty attenuated, maybe one could argue at that
point that, you know, they were still, you know, pretty
proximate to what was being rescinded and so there should have
been more of an inclusion.

But here we're, you know, in the second record.  We're
a couple steps removed.  And, you know, the memo is just talking
about blanketly rescinding a whole lot of guidance.  It doesn't
seem at that point that, you know, a complete record would
necessarily require including all of that, you know, more
attenuated guidance going back as far as you want to trace, you
know, Notices to Report.

| | | |
|---|---|---|
| 02:07:49 | 1 | THE COURT:  All right.  I at least understand that, |
| 02:07:51 | 2 | your argument.  What about the fact -- even if I agreed with you |
| 02:07:55 | 3 | that this memo isn't within and shouldn't be supplemented into |
| 02:08:02 | 4 | the administrative record or supplemental administrative record, |
| 02:08:05 | 5 | whatever you want to call it, what say you to the argument that |
| 02:08:10 | 6 | it shouldn't be in the summary judgment record at all? |
| 02:08:19 | 7 | MR. DARROW:  To respond to that, Your Honor, I would |
| 02:08:21 | 8 | say that it isn't new evidence and it would be prejudicial to |
| 02:08:27 | 9 | add that to the record after the parties have fully briefed, you |
| 02:08:31 | 10 | know, the record based on the existing evidence. |
| 02:08:36 | 11 | THE COURT:  Am I miss -- I'm sorry, go ahead. |
| 02:08:39 | 12 | MR. DARROW:  I'm sorry.  No, I didn't mean to speak |
| 02:08:41 | 13 | over Your Honor. |
| 02:08:43 | 14 | We have arguments regarding how the document is |
| 02:08:46 | 15 | itself, you know, irrelevant because it is a document about |
| 02:08:49 | 16 | Notices to Report; but that, you know, I think, is a separate |
| 02:08:53 | 17 | issue than -- to whether it should be added to the record.  And, |
| 02:08:56 | 18 | you know, there our argument is just, you know, discovery is |
| 02:09:00 | 19 | closed.  It's, you know, a pretty high bar to reopen and add |
| 02:09:05 | 20 | things to the record after discovery is closed.  Florida hasn't |
| 02:09:10 | 21 | met that bar here.  It hasn't shown that this is, you know, |
| 02:09:13 | 22 | something brand new that couldn't have been obtained before, and |
| 02:09:17 | 23 | it would be, you know, prejudicial for -- for both parties but |
| 02:09:21 | 24 | especially for defendants -- to have to proceed on, you know, |
| 02:09:26 | 25 | new evidence that wasn't part of what it briefed. |

02:09:31  1        THE COURT:  Do you disagree with Florida's

02:09:33  2  characterization that this is the formal document that generated

02:09:41  3  or is summarized in that March 20th email that the parties have

02:09:45  4  been fighting about?

02:09:50  5        MR. DARROW:  Well, Your Honor, I can't say one way or

02:09:53  6  the other.  I mean, it seems like it could be, but the problem

02:09:57  7  was that it wasn't actually attached to that email when -- so,

02:10:03  8  you know, this document is also news to us and our clients.

02:10:09  9  They weren't able to obtain it, and just accidentally it, you

02:10:13  10  know, happened to be -- happened that the Government came across

02:10:18  11  it when it was looking into this other FOIA matter.

02:10:20  12        But, you know, we didn't see it, and there was --

02:10:24  13  during one of our witness's depositions, there was a discussion

02:10:31  14  of some guidance that came out in March regarding Notices to

02:10:35  15  Report.  And so, you know, our client, you know, did its

02:10:38  16  diligence:  went and searched -- he even went and searched

02:10:41  17  through Rodney Scott email's, and he wasn't one of the

02:10:44  18  custodians the parties agreed to -- to try and find this Notice

02:10:47  19  to Report guidance.  All we found was that email that was, you

02:10:52  20  know, already part of the record.  And when our -- the CBP went

02:11:01  21  to the deponent and said, Hey, is this what you referred to, and

02:11:03  22  he said yes and he didn't say if there was anything else.

02:11:06  23        So, you know, it seems like it could be, but it wasn't

02:11:10  24  actually attached to that email, and the person who identified

02:11:14  25  it didn't indicate that there was this other document hanging

02:11:16   1   out there that he was also thinking of, so --

02:11:19   2       THE COURT:  And now -- let me interrupt you.  If I

02:11:22   3   understand your argument there, it's:  You couldn't find this

02:11:26   4   document, yet you're faulting Florida for not finding it because

02:11:31   5   it was on your website.  Is that what you're saying?

02:11:36   6       MR. DARROW:  No, we're not faulting Florida, Your

02:11:38   7   Honor.

02:11:38   8       THE COURT:  Then why isn't it newly discovered

02:11:42   9   evidence, if nothing else?

02:11:48   10       MR. DARROW:  I mean, you know, it's new to the counsel

02:11:52   11   in this case, both sides.  I don't -- you know, I don't know off

02:11:57   12   the top of my head whether that meets the legal bar for newly

02:12:02   13   discovered evidence.

02:12:06   14       THE COURT:  Okay.  And explain to me what the

02:12:12   15   prejudice -- I mean, from what I understand Florida's

02:12:16   16   essentially asking me to do is, for all intents and purposes,

02:12:20   17   everywhere they reference that March 20th email, they would want

02:12:26   18   me to read it as a reference to this March 19th memo.  And if

02:12:32   19   that's -- if I'm understanding that correctly, and I'll

02:12:34   20   certainly ask Mr. Percival or Ms. Patel.  But if I'm

02:12:39   21   understanding that correctly as to what they see this as, how is

02:12:42   22   the Government, the Federal Government, prejudiced by that

02:12:45   23   becoming part of the record rather than the March 20th email?

02:12:58   24       MR. DARROW:  Well, I mean, so -- there are -- I mean,

02:13:01   25   if that's all it is, a substitution, that's one matter; and I

02:13:08   1   guess, you know, plaintiff can clarify if that's what they're

02:13:12   2   going at.  But, you know, to the extent that any sort of

02:13:15   3   substantive response is required, and in their motion plaintiff

02:13:20   4   points out that this memo says something slightly different than

02:13:24   5   the email, we haven't had an opportunity -- first of all, we

02:13:26   6   haven't had an opportunity to verify that this is, in fact, that

02:13:29   7   memo reference and haven't had an opportunity to address that in

02:13:34   8   our briefing.  But, you know, even assuming that it was, we

02:13:36   9   haven't had the opportunity to address the difference in what

02:13:40   10   this memo says versus the email that was part of the record.

02:13:45   11        THE COURT:  All right.  Well, let me hear from

02:13:48   12   Mr. Percival and make sure I understand what he's -- what

02:13:51   13   significance he thinks there is and what difference he might be

02:14:00   14   wanting me to draw from it.

02:14:02   15        Mr. Percival or Ms. Patel, whoever, would address

02:14:02   16   that.

02:14:06   17        MR. PERCIVAL:  Your Honor, this is Mr. Percival.

02:14:07   18        I think you've stated it perfectly, I mean, in that we

02:14:08   19   essentially want you to, every time we reference the

02:14:14   20   March 20th email, refer to the March 19 memo.  I mean, I do

02:14:18   21   think it is relevant that the March 19 memo contains slightly

02:14:23   22   different language and says some different things that we

02:14:25   23   pointed out, but we're not anticipating, you know, giving it

02:14:27   24   some majorly different relevance.  I mean, I think we just think

02:14:31   25   it gives more accurate information on the events that we

| | | |
|--|--|--|
| 02:14:36 | 1 | described as occurring on March 20th actually occurred on |
| 02:14:39 | 2 | March 19th and under slightly different conditions. |
| 02:14:42 | 3 | I would agree with the way you characterized our |
| 02:14:45 | 4 | position, I think. |
| 02:14:45 | 5 | THE COURT:  And what is the material difference that |
| 02:14:49 | 6 | you saw between the email and the memo? |
| 02:14:55 | 7 | MR. PERCIVAL:  Well, I mean, first of all, the email |
| 02:14:58 | 8 | did just authorize it in certain sectors, and it looks like a |
| 02:15:02 | 9 | little bit more of a targeted policy.  We didn't realize that |
| 02:15:07 | 10 | there was something signed by the Border Patrol chief the day |
| 02:15:11 | 11 | before creating some sort of blanket authorization.  So that |
| 02:15:14 | 12 | would be the first thing. |
| 02:15:17 | 13 | I'm just trying to find the page in our brief where we |
| 02:15:21 | 14 | highlight the differences. |
| 02:15:25 | 15 | I mean, we do think that the key difference, the one |
| 02:15:28 | 16 | thing that, like, we wish we had known when we referenced the |
| 02:15:31 | 17 | March 20 email is this assertion which is discussed on page 4 of |
| 02:15:35 | 18 | our motion that according to this, DHS has taken the position, |
| 02:15:40 | 19 | even before this, that they had this discretion but they had a |
| 02:15:45 | 20 | rule not to exercise it.  And essentially on March 19th, they |
| 02:15:48 | 21 | created a memo that says this discretion that we think we've |
| 02:15:52 | 22 | always had but chosen not to exercise, now we're going to |
| 02:15:55 | 23 | exercise it. |
| 02:15:56 | 24 | And, you know, one of the big things that is all over |
| 02:15:58 | 25 | defendants' summary judgment filing is that there was no massive |

02:16:02  1    change in detention policy after President Biden took office,

02:16:05  2    that this is just sort of like, you know, a reaction to more

02:16:08  3    border traffic.  And if there's a document that says we have

02:16:12  4    this discretion, we've never used it, and we're going to start

02:16:15  5    using it now, I just -- I can't understand how that's not

02:16:17  6    extraordinarily relevant to the claims in this case.

02:16:23  7            THE COURT:  Well, very interesting argument.  In a lot

02:16:29  8    of respects, Mr. Darrow was making your newly discovered

02:16:33  9    argument and you're making his prejudice argument in the sense

02:16:37  10   that if this is information that had you had it back when

02:16:43  11   discovery was going on, you would have explored with the Border

02:16:47  12   Patrol witnesses, what they thought they had and what they now

02:16:53  13   think they have.  And, I mean, I guess I'm not sure where that

02:16:59  14   leaves us.

02:17:01  15           My initial inclination was this was just a pull out

02:17:04  16   the March 20th email and insert the March 19th memoranda, and

02:17:08  17   the parties' argument would not change.  But I'm now starting to

02:17:13  18   think that this may be more significant than just that.  And,

02:17:19  19   again, to me, the relevance -- and I understand the Federal

02:17:22  20   Government's argument that nothing related to the Notice to

02:17:25  21   Report policy is relevant to anything any more because it was

02:17:29  22   repealed, but it seems to me now having reviewed the summary

02:17:35  23   judgment evidence that, at a minimum, this is relevant

02:17:38  24   background information to where we were today, and I think it

02:17:42  25   ultimately helps explain this -- I don't want to call it a

02:17:49  1   shift, but at least a greater emphasis on this 1226 statute that

02:17:56  2   I hadn't focused on before.  And so I'm not sure where that

02:18:00  3   leaves me, frankly.  I came in here with the intention of this

02:18:04  4   being a pretty simple decision to make, and that's why I started

02:18:08  5   with it, that I was going to grant the motion and, you know, at

02:18:13  6   a minimum, add it to the summary judgment record and take the

02:18:17  7   parties' arguments as they currently exist based on this memo.

02:18:21  8   But now, it's making me think that this might be more

02:18:27  9   significant, that that would not be the best thing to do at this

02:18:32  10  late stage of the process and the parties can just argue

02:18:36  11  whatever significance is, if they get it admitted at trial.

02:18:44  12          MR. PERCIVAL:  May I respond to one more point, Your

02:18:45  13  Honor?

02:18:47  14          THE COURT:  Certainly.

02:18:47  15          MR. PERCIVAL:  It just strikes Florida that the fact

02:18:49  16  that defendants didn't know the documents existed makes it hard

02:18:57  17  for us to think that it was our fault that we didn't get it.

02:19:01  18  And admittedly it was on their website, but it was on an

02:19:04  19  extremely obscure portion of their website, and we don't

02:19:08  20  understand our obligations to be to scour every page of their

02:19:11  21  website in the darkest corners on the expectation that we're not

02:19:14  22  going to get things in discovery.  And so if defendants didn't

02:19:18  23  produce it because they didn't know it existed, we think that

02:19:21  24  any prejudice that results from that should be against them and

02:19:23  25  not against us.  It is ultimately their responsibility to know

02:19:27   1    what policies they have made.

02:19:29   2             THE COURT:  Right.

02:19:29   3             MR. PERCIVAL:  And this is signed by the Border Patrol

02:19:32   4    chiefs and sent to a named defendant in this case, if my

02:19:35   5    recollection is correct, the head of Customs and Border

02:19:35   6    Protection.  It's defendants' job to know that document exists;

02:19:40   7    and if they didn't, that really should be on them.

02:19:44   8             THE COURT:  And I agree with you that much, and as I

02:19:46   9    said, I think Mr. Darrow was making your newly discovered

02:19:51   10    evidence argument when he was telling me that their people

02:19:55   11    didn't give it to them and counsel, at least, didn't even know

02:19:59   12    about it.  So I agree with you there, but I'm still struggling

02:20:02   13    with the question of what to do about that.  Because I'm sure

02:20:05   14    the last thing Florida wants me to do is to say this is newly

02:20:11   15    discovered evidence, it's something that can be considered, but

02:20:16   16    we're going to reopen discovery so y'all can figure out what it

02:20:21   17    is and who knew what when and what actually it authorized.

02:20:25   18          And so that's where I'm struggling at this point,

02:20:28   19    because I agree with you that this is something that, frankly,

02:20:33   20    Mr. Darrow effectively conceded is newly considered evidence

02:20:40   21    that Florida can't be faulted for not finding, but the question

02:20:43   22    now is what to do about that.  And I think there does sound like

02:20:47   23    there's a degree of prejudice to the defendant to the extent

02:20:52   24    that Florida's going to be using it for something that it didn't

02:20:56   25    use the March 20th email for, and I think that's what you told

02:21:00  1    me you intend to do.

02:21:01  2        So I'm a little bit concerned about what I can do

02:21:05  3    about it without reopening discovery and letting y'all figure

02:21:09  4    out what this is, particularly given that this issue was

02:21:16  5    foreshadowed when there was a dispute about that

02:21:20  6    March 20th email and whether Florida should have ever got it to

02:21:24  7    begin with.  And there was -- I think that may have been the

02:21:27  8    request to reopen discovery -- or there was some request related

02:21:31  9    to that that I denied summarily.  And so now we're arguing about

02:21:37  10   the same thing that I thought we had resolved, but now I think

02:21:41  11   it's more -- it's different, at least.

02:21:44  12       So, Mr. Percival, tell me what you're asking me to do.

02:21:56  13       MR. PERCIVAL:  Well, without consulting with my

02:21:57  14   superiors, I guess I can't represent to you that we'd rather

02:22:00  15   have more discovery than proceed to trial as scheduled because

02:22:02  16   my last understanding from talking to my superiors is that we do

02:22:05  17   not want to move the trial date.

02:22:06  18       One thing that strikes me that might resolve this

02:22:10  19   problem for summary judgment purposes is for summary judgment we

02:22:13  20   could agree for you to use this memo solely as a substitute for

02:22:18  21   the March 20 emails.  And we feel good enough about our summary

02:22:24  22   judgment arguments that we might think we're okay there.  And

02:22:25  23   then to the extent the Court takes this case to trial, obviously

02:22:29  24   we would be able to make more arguments at trial.

02:22:32  25       THE COURT:  All right.  Mr. Darrow, what's the

02:22:35  1    defendants' position?  I've rejected your it's not newly

02:22:43  2    discovered evidence argument; but in light of that, where do you

02:22:46  3    see -- how do you see me dealing with this?

02:22:53  4         MR. DARROW:  I suppose that as long as, you know,

02:22:55  5    plaintiff agrees that, you know, there'd be no new meaning

02:23:01  6    derived from this and it, you know, is essentially just a

02:23:05  7    substitute for that email that's in the record.  I think we

02:23:13  8    would still like to address this, but I suppose we could do this

02:23:18  9    at oral argument to the extent that there's anything different,

02:23:24  10   rather than having to, you know, request new briefing on it.

02:23:29  11        THE COURT:  All right.  Well, I think as may become

02:23:33  12   apparent as our call goes on, it's not going to really make a

02:23:38  13   difference to me one way or the other in how I look at the

02:23:43  14   summary judgment issues.  So with what I heard as a caveated

02:23:52  15   agreement between counsel, I'll grant Florida's motion to

02:23:56  16   supplement the summary judgment record to include the memo,

02:24:03  17   which is Document 115-1, as a substitute for the March 20, 2021

02:24:15  18   email; and thus, any time any party referenced the email, I will

02:24:19  19   have considered that as referencing the memo.  Because in my

02:24:23  20   mind, there really wasn't a whole heck of a lot of difference

02:24:27  21   between the two of them.  But at least at this point I'm going

02:24:30  22   to consider there was no difference between the two of them

02:24:33  23   leaving open the possibility the parties can argue at trial, or

02:24:36  24   wherever else, that there was some more significant difference

02:24:41  25   and that has some relevance to an issue I need to decide.

02:24:45  1          Is that clear enough?

02:24:51  2          MR. PERCIVAL:  Clear to Florida, Your Honor.

02:24:53  3          THE COURT:  Mr. Darrow?

02:24:53  4          MR. DARROW:  Yes.  Yes, Your Honor.

02:24:55  5          THE COURT:  All right.  Well, that resolves that

02:24:56  6  motion.

02:24:57  7          The next thing I want to talk about is the defendants'

02:25:00  8  motion for an alternative pretrial scheduling order.  And I got

02:25:06  9  the motion, I got the response, and I've read them both.  I

02:25:10  10  guess as I understand the Federal Government's position, you

02:25:16  11  know, the bottom line is that you want a summary judgment ruling

02:25:21  12  before the pretrial conference; and thus, oral argument needs to

02:25:27  13  be scheduled in a way that accommodates that.  Is that a fair

02:25:31  14  summary?

02:25:33  15          MR. DARROW:  Yes, Your Honor.  And it mostly just

02:25:35  16  hinges on making a productive pretrial conference, you know, so

02:25:39  17  we can have the motions in limine filed in advance.  And, you

02:25:43  18  know, in order to do that, we need to know what issues are still

02:25:45  19  live and in what way and, you know, what witnesses we're going

02:25:48  20  to need, and all of that, in order to make it a productive

02:25:51  21  pretrial conference.

02:25:53  22          THE COURT:  And Florida's position is that you don't

02:25:57  23  care how it's structured; you just want to go to trial on the

02:26:01  24  9th of January?

02:26:03  25          MR. PERCIVAL:  That's perfectly stated, Your Honor.

02:26:06  1        THE COURT:  Okay.  The problem that I've got -- well,

02:26:09  2   let me stop here.  I think both parties' positions are correct

02:26:16  3   in this point.  I think this case needs to go to trial on the

02:26:20  4   9th of January as we've previously scheduled.  But I do agree

02:26:24  5   with the Federal Government's view, and it wasn't one that I

02:26:28  6   fully appreciated when I sent the order out -- or email or

02:26:33  7   however it got communicated to you -- that I wanted to have this

02:26:35  8   conversation about the oral argument.  I hadn't fully

02:26:38  9   appreciated the sequencing of things, and I think that's a fair

02:26:41  10  point, a good point.

02:26:44  11       The problem that all that creates is the window of

02:26:47  12  time within which there is to get an oral argument scheduled,

02:26:53  13  get a ruling out, build in time for motions in limine and

02:26:59  14  pretrial stipulations and everything else that would need to

02:27:01  15  happen before the pretrial conference and our January 9th trial,

02:27:07  16  layered in on the holidays.  I just don't see anyway that can

02:27:12  17  happen.  In the alternative, though, is to utilize the January

02:27:19  18  date as the oral argument date and then push the trial off.  The

02:27:23  19  problem with that is I've got a month-long antitrust trial in

02:27:28  20  February which would mean that the earliest I could get back to

02:27:31  21  this case would be March and under the circumstances, I don't

02:27:35  22  think that is a viable alternative either.

02:27:41  23       And so what I am prepared to do -- and I'm going to

02:27:48  24  walk through it right now -- is I've digested the summary

02:27:53  25  judgment evidence as greatly as I can, I understand the parties'

02:28:00  1  argument, and I'm prepared to articulate what I think about the

02:28:05  2  state of the case right now, such that you will have your ruling

02:28:10  3  on summary judgment and that we can then move to get a pretrial

02:28:17  4  conference date and move forward.

02:28:19  5       The downside to that, though, is I won't have the

02:28:23  6  benefit of oral argument, because there were a few areas that I

02:28:26  7  did have questions that I wanted to probe a little bit further

02:28:31  8  on.  But given the countervailing interests, it seemed to me

02:28:37  9  that any additional insight that I might have gained through

02:28:40  10  getting those questions answered and that probing done is

02:28:45  11  outweighed by the need to accommodate both parties' desires

02:28:50  12  here:  Florida's desire for their current trial date and

02:28:54  13  defendants' reasonable request that they get a ruling before

02:28:57  14  they need to go prepare the case for trial.

02:29:01  15       So what I was going to do with the rest of our time

02:29:04  16  together, unless the parties have some strong view that I

02:29:09  17  shouldn't, is go ahead and tell you what I think about your

02:29:13  18  summary judgment motions.  Obviously, you're not going to get a

02:29:16  19  written product from me; you can get the written product from

02:29:21  20  the court reporter.  But I've always thought that orders denying

02:29:26  21  summary judgment really only need to say that there's facts in

02:29:30  22  dispute and they need to be tried and here's what they are, more

02:29:34  23  so than documents that get published and reporters.

02:29:40  24       So, Mr. Percival, is there any concern with me doing

02:29:42  25  that?

02:29:45  1          MR. PERCIVAL:  No, Your Honor.

02:29:46  2          THE COURT:  Mr. Darrow?

02:29:49  3          MR. DARROW:  No, Your Honor, but I would add that, you

02:29:52  4   know -- and I know we're not prepared for this, but if Your

02:29:55  5   Honor does have questions about the record, you know, speaking

02:30:01  6   for defendants, we'd be happy to answer them if they would

02:30:04  7   assist the Court at all before it makes up its mind.

02:30:08  8          THE COURT:  Okay.  Well, what I'll do is --

02:30:10  9          MR. PERCIVAL:  We are as well as, Your Honor.

02:30:12  10         THE COURT:  Okay.  Well, what I --

02:30:12  11         MR. PERCIVAL:  Sorry.

02:30:13  12         THE COURT:  What I will do is I will articulate where

02:30:15  13  my thinking is; and if there are areas after I articulate that,

02:30:19  14  I will give you an opportunity to try to change my mind and

02:30:26  15  explain to me why I'm wrong.  And I won't consider that as

02:30:30  16  arguing with the ruling.  These will be tentative rulings

02:30:33  17  subject to the parties convincing me I'm wrong here today;

02:30:36  18  otherwise, this will be how I would dispose the summary judgment

02:30:40  19  motions.

02:30:41  20         All right.  With that said, I agree with Florida that

02:30:46  21  financial harm to the State caused by the implementation of an

02:30:50  22  allegedly unlawful federal policy can give rise to standing.

02:30:55  23  The fact that the injuries in this case are at least partially

02:30:59  24  dependent upon the actions of third parties in that they've

02:31:03  25  chosen to come to Florida, they've applied for public services

| | |
|---|---|
| 02:31:07 | 1 |
| 02:31:10 | 2 |
| 02:31:13 | 3 |
| 02:31:17 | 4 |
| 02:31:23 | 5 |
| 02:31:26 | 6 |

02:31:07  1   in Florida, they may or may not have committed crimes in

02:31:10  2   Florida.  Those factors, it seems to me, don't mean that the

02:31:13  3   injuries are indirect such that they couldn't support standing,

02:31:17  4   particularly in light of that New York census case which held,

02:31:23  5   in effect, that standing can be based on third parties'

02:31:26  6   predictable reaction to Government action.

02:31:29  7        So as to that point, that's my view on the nature of

02:31:33  8   the harm here.  I reviewed all of the defendants' challenges to

02:31:40  9   the various declarations submitted by Florida; and, frankly, I

02:31:44  10  just didn't find them persuasive.

02:31:48  11       Florida here says they've proved standing in two ways.

02:31:52  12  First, through costs that are incurred by specific individuals

02:31:58  13  that are released under the challenged policies -- and that's

02:32:02  14  namely in the driver's license arena -- and then, second, based

02:32:08  15  upon general expenditures on immigrants in the State who use

02:32:14  16  public services.  In my view, both of those potential grounds

02:32:20  17  for standing require too many inferences for me to grant summary

02:32:25  18  judgment in Florida's favor.

02:32:28  19       As to the first ground, seems to me that I would have

02:32:32  20  to infer that the aliens for which we do have evidence of

02:32:37  21  licenses being issued were actually paroled under -- or released

02:32:42  22  or paroled under the challenged policy rather than some other

02:32:45  23  mechanism.  I would also have to infer that Florida makes a net

02:32:50  24  profit of less than 50 cents when it issues a license such that

02:32:56  25  the 50 cents charged that the Federal Government imposed causes

02:33:00   1   it -- net profit to become a net loss.

02:33:06   2         And, you know, I know there was evidence about the

02:33:10   3   total cost that Florida charges for the license and how much

02:33:14   4   they bring in on licenses, but I don't remember seeing any

02:33:18   5   evidence as to the amount that it costs Florida to produce the

02:33:22   6   licenses.  And that's why I say that unless I have -- I would

02:33:27   7   have to infer that those costs are, at least as to a license,

02:33:32   8   $47.51 such that that additional 50 cents would push them from a

02:33:39   9   profit standpoint to a loss standpoint.

02:33:42   10        I didn't overlook Florida's argument that individuals

02:33:48   11  who come in for a license or an ID and don't get one, Florida

02:33:54   12  doesn't get any income from it, but it is required to expend

02:34:00   13  money on it.  But I don't think there was evidence in the record

02:34:06   14  that I have that -- as to any of those specific individuals for

02:34:10   15  whom that actually happened.  So, again, that would be an

02:34:12   16  inference that I would have to draw.

02:34:16   17        And also, it was a little unclear to me which group of

02:34:19   18  aliens I should consider when determining whether there was a

02:34:23   19  net loss on providing licenses.  Is it just the ones who were

02:34:27   20  ultimately not issued licenses or IDs, or was that 50-cent loss

02:34:35   21  on each one of those people, do I offset that against anything

02:34:39   22  Florida might be making profit-wise on licenses issued to other

02:34:44   23  immigrants or aliens who come in under the challenged policies?

02:34:48   24        So again, that's a lot of other inferences I would

02:34:52   25  have to draw to come to the conclusion that Florida has suffered

02:34:57  1   injury based upon specific individuals released under the

02:35:01  2   challenged programs.

02:35:03  3          As to the second ground that Florida searched for

02:35:06  4   standing, I would first have to infer that people who have been

02:35:12  5   released under the challenged programs who have immigration

02:35:15  6   cases in Florida and who gave Florida addresses actually ended

02:35:19  7   up coming to Florida rather than absconding or going somewhere

02:35:25  8   else, which seems like there's evidence that that does happen.

02:35:29  9   Then I would have to infer that the aliens that have been

02:35:31  10  released under the challenged policies actually used services,

02:35:35  11  because the Florida witnesses admitted that the data that they

02:35:39  12  keep is not that granulated.  There was also, frankly, some

02:35:45  13  evidence from those witnesses of expenditures that predated the

02:35:50  14  program.

02:35:51  15         So all of those inferences, it seems to me, might very

02:35:54  16  well be reasonable inferences.  And once I am the fact-finder

02:35:59  17  and in weighing and balancing the evidence, I may, in fact, make

02:36:02  18  those inferences, because as one of the cases I think Florida

02:36:06  19  cited, one of the Texas cases, it just seems incomprehensible

02:36:11  20  that a hundred thousand people have come to Florida and haven't

02:36:16  21  used a nickel's worth of services.  But again, at this point I

02:36:20  22  can't draw those inferences in Florida's favor.

02:36:23  23         On the flip side, because it seems to me that those

02:36:26  24  inferences could reasonably be drawn from the evidence by a

02:36:30  25  fact-finder, I would find that defendants are equally not

| | |
|---|---|
| 02:36:34 | 1 |
| 02:36:39 | 2 |
| 02:36:42 | 3 |
| 02:36:46 | 4 |
| 02:36:51 | 5 |
| 02:36:56 | 6 |
| 02:37:00 | 7 |
| 02:37:05 | 8 |
| 02:37:09 | 9 |
| 02:37:12 | 10 |
| 02:37:16 | 11 |
| 02:37:21 | 12 |
| 02:37:26 | 13 |
| 02:37:32 | 14 |
| 02:37:36 | 15 |
| 02:37:38 | 16 |
| 02:37:41 | 17 |
| 02:37:46 | 18 |
| 02:37:51 | 19 |
| 02:37:56 | 20 |
| 02:37:59 | 21 |
| 02:38:04 | 22 |
| 02:38:11 | 23 |
| 02:38:16 | 24 |
| 02:38:21 | 25 |

1  entitled to summary judgment on the issue of standing.  I found

2  a couple of other reasons, at least in my mind, that support the

3  denial of defendants' motion for summary judgment on standing,

4  in addition to the inferences that I think I would have to draw

5  against the Federal Government in looking at their motion.

6      The first was one of defendants' witnesses, Mr. Price,

7  the ICE employee, who essentially admitted, based upon his past

8  experience, that states bear the brunt of the cost for aliens

9  who are released rather than detained.  And I know the Federal

10 Government had issues with Mr. Price's statement, whether he was

11 making it as a corporate representative or in his individual

12 capacity; but either way, given his experience and frankly given

13 common sense, I think that construing his testimony in the light

14 most favorable to Florida would cut against granting summary

15 judgment to the defendant on standing.

16     Second, I adhere to the view that states are entitled

17 to special solicitude in the standing analysis here because a

18 state is uniquely harmed when the federal government, as it's

19 alleged to have done here, shirks its duty to enforce the

20 immigration law because the state ceded its authority to

21 determine who can be admitted and excluded from the state when

22 it ratified the Constitution.  So frankly, I can't think of a

23 potential plaintiff who would be more prejudiced, more impacted

24 by the federal government's failure to do its job under the

25 immigration statutes.

02:38:25  1          So for all of those reasons, I think both parties'

02:38:28  2     summary judgment motions on standing would be denied.

02:38:32  3          As to defendants' redressability, justiciability, and

02:38:37  4     political questions arguments, I didn't find those particularly

02:38:40  5     persuasive here.  Seems to me that an order vacating the

02:38:45  6     challenged policies under the APA may not completely eliminate

02:38:51  7     Florida's injury, but it would certainly offer some relief.  In

02:38:55  8     fact, in the *Chiles* case from the Eleventh Circuit, even though

02:38:58  9     that court held that the suit there was a nonjusticiable

02:39:02  10    political question about the enforcement of immigration laws, it

02:39:08  11    recognized that an order against the defendant, the named

02:39:12  12    defendant there, the attorney general in that case, would offer

02:39:15  13    Florida some relief sufficient to give it standing.  So the

02:39:19  14    court found standing yet found there to be a political question.

02:39:23  15    And I'll talk in a minute as to why I don't think that holding

02:39:25  16    is binding here.

02:39:28  17         Additionally, I don't read 1252(f) to preclude the

02:39:32  18    Court from granting relief under the APA if the Parole + ATD

02:39:39  19    policy or the broader nondetention policies are found to violate

02:39:43  20    the APA.  I think those are two separate remedies.  I know the

02:39:47  21    U.S. Supreme Court is looking at that issue.  It's unfortunate

02:39:50  22    that we won't have their input on it before we need to decide

02:39:54  23    this case, but at least in my view, I find the Fifth Circuit's

02:39:59  24    view on that point to be more persuasive.

02:40:03  25         And even if 1252(f) would not allow me to enjoin the

02:40:10  1   nondetention policy to the extent that it's granted on a

02:40:14  2   misapplication or a misunderstanding of either 1225 or 1226, I

02:40:20  3   adhere to the view that I could enjoin any misapplication of the

02:40:24  4   parole policy because as I said in the summary -- or, excuse me,

02:40:27  5   the Motion to Dismiss order, 1182 is not part of the INA that's

02:40:36  6   referenced in 1252(f).

02:40:39  7        Now, admittedly, there's a large part of me that would

02:40:42  8   like to say that elections have consequences and that people

02:40:45  9   knew what they were getting in immigration policy when they

02:40:48  10  elected President Biden based upon the campaign policy position

02:40:53  11  statements that are in evidence and that it would be up to

02:40:56  12  Congress to rein in the Administration if they think that he's

02:41:00  13  violating their commands.  All that being said, I don't think

02:41:05  14  this is a nonjusticiable political question because the statutes

02:41:11  15  on which the defendants rely for the policies, at least as I

02:41:15  16  understand the statutes that they're relying on for these

02:41:18  17  policies, includes sufficient standards from which I could

02:41:21  18  decide whether they're complying with the law or not.

02:41:24  19        And on that point, it was noteworthy to me that the

02:41:28  20  majority opinion in the immigration case from this last term at

02:41:33  21  the Supreme Court stated with respect to parole that, quote,

02:41:39  22  "Under the APA, DHS's exercise of discretion within that

02:41:46  23  statutory framework must be reasonable and reasonably

02:41:49  24  explained."

02:41:50  25        So it seems to me that the Supreme Court had

02:41:53  1    recognized -- and again, I understand that it wasn't the issue

02:41:55  2    they were deciding and it was dicta, but it seems like they

02:41:59  3    recognize that an evaluation of whether the parole powers being

02:42:06  4    exercised reasonably was judicially reviewable.

02:42:11  5         Back to *Chiles* from the Eleventh Circuit.  I agree

02:42:14  6    with the *amicus* that that case is distinguishable because the

02:42:18  7    statutory language they were interpreting and applying and was

02:42:24  8    at issue in that case was different and much less detailed than

02:42:28  9    the current language that I'm dealing with.  And so I understand

02:42:32  10   why they said in *Chiles* that that's a nonjusticiable political

02:42:37  11   question because they were looking at a much more generic

02:42:41  12   statute than the specific statutes that I'm looking at here

02:42:44  13   today.

02:42:46  14        The rest of the arguments about whether Florida can

02:42:50  15   obtain APA review at all seems to me to be essentially rehashes

02:42:56  16   of the arguments that were presented and rejected at the motion

02:42:59  17   to dismiss stage.  And at least at this point, I adhere to my

02:43:03  18   prior rulings on those issues.

02:43:07  19        That all being said, I do tend to agree with the

02:43:10  20   defendants that the constitutional claim here will ultimately

02:43:14  21   fail because when I denied the motion to dismiss on that claim,

02:43:18  22   it was based on allegations that in effect the defendants

02:43:24  23   weren't detaining anybody, thereby amounting to a complete

02:43:29  24   abdication of their statutory responsibilities.  But the

02:43:34  25   evidence I've seen at the summary judgment stage suggests that

02:43:38   1   defendants are at least -- or they're detaining a number of

02:43:41   2   aliens.  Maybe they should be detaining more.  But I think

02:43:45   3   Florida, in light of the undisputed evidence that there is some

02:43:50   4   detention going on, I think Florida's going to be hard-pressed

02:43:53   5   to show any sort of independent Take Care Clause violation.

02:44:00   6          So that's my assessment of standing, justiciability,

02:44:07   7   and the related political question and redressability issues.

02:44:13   8          On the Parole + ATD policy, I agree with the

02:44:21   9   defendants that the validity or the ultimate success of that

02:44:25  10   policy, their successful ability to defend that policy, is going

02:44:32  11   to be based on the administrative record or the supplemental

02:44:34  12   administrative record.  And that's consistent, I think, with

02:44:38  13   what I said in the order denying Florida's motion to expand the

02:44:43  14   administrative record.

02:44:44  15          And in light of that, frankly I was expecting that

02:44:48  16   issue to be resolved by cross motions for summary judgment.  And

02:44:52  17   that was one of the main reasons that I be wanted to set oral

02:44:57  18   argument, to give Florida an opportunity to persuade me that the

02:45:04  19   administrative record or supplemental administrative record --

02:45:07  20   and when I say "administrative record," I mean the operative

02:45:10  21   administrative record -- does not support the policy.  I haven't

02:45:14  22   come to a firm conclusion one way or the other on the merits of

02:45:18  23   the ATD policy yet, but I was in a bit of a procedural quandary

02:45:23  24   about what to do in the event that I determined that the summary

02:45:28  25   judgment -- excuse me, that the administrative record did not

02:45:30  1   support the policy because given the motions that were in front

02:45:34  2   of me, all I could do was say that summary judgment to defendant

02:45:37  3   was denied.  I couldn't grant summary judgment to Florida.

02:45:41  4        At this point, as we talked previously, the schedule

02:45:45  5   just doesn't allow for oral argument, and so what I intend to do

02:45:49  6   is allow the parties an opportunity, either at or in posttrial

02:45:54  7   filings, to be heard on the question of whether summary judgment

02:45:57  8   should be granted for Florida in the event that I determine that

02:46:02  9   ATD policy is not supported by the administrative record.  That

02:46:07  10  way in the final order that I enter in this case I'll be able to

02:46:10  11  grant summary judgment to somebody on that claim while at the

02:46:14  12  same time that I dispose of the remaining claims.

02:46:19  13       The final issue that I saw framed by the summary

02:46:22  14  judgment motions related to the nondetention policy.  And on

02:46:25  15  that, the parties continue to disagree whether there even is

02:46:31  16  such a policy.  Florida says that the defendants presented no

02:46:34  17  affirmative evidence from a witness swearing that there is no

02:46:36  18  such policy.  And frankly, I'm not sure that's actually correct

02:46:41  19  because Mr. Barker testified that nothing has changed in how

02:46:46  20  they're doing business from the prior Administration to the

02:46:50  21  current Administration.  Irrespective, Florida says that you can

02:46:54  22  infer the existence of a nondetention policy from the sheer

02:47:00  23  number of releases that have been had since January of 2021.

02:47:07  24       And on that point, it's noteworthy that in his dissent

02:47:12  25  in the immigration case last term, Justice Alito said that the

02:47:17  1   number of aliens being paroled, quote, "Gives rise to a strong

02:47:21  2   inference that the Government is not really making parole

02:47:24  3   decisions on a case-by-case basis."

02:47:28  4        So again I think that's an inference that contradicts

02:47:31  5   what Mr. Barker testified to.

02:47:36  6        And I understand that the defendant says that the

02:47:38  7   evidence shows that the increase is merely a function of the

02:47:42  8   increase in migration and the fact that more people are coming

02:47:47  9   from areas that they can't be sent back to, the need to protect

02:47:51  10  aliens, workers, and local communities from COVID; but on the

02:47:57  11  flip side of that, there's the evidence that Florida presented

02:48:01  12  that the defendants essentially brought this problem upon

02:48:06  13  themselves by canceling the Stay in Mexico program and shutting

02:48:14  14  down detention facilities.

02:48:17  15       Additionally, Florida cited that March 2021 email --

02:48:23  16  or now, as we might talk about, the March 2021 memo -- which

02:48:29  17  appears to show that Border Patrol was directed to ramp up

02:48:34  18  prosecutorial discretion and other release pathways.  So again,

02:48:39  19  I think that's another potential inconsistency with what

02:48:42  20  Mr. Barker said, that nothing has changed about how they're

02:48:45  21  doing business.

02:48:46  22       As to the detention facilities, you know, certainly

02:48:48  23  there was evidence that the defendants closed them down.

02:48:52  24  Defendants counter with evidence saying that they closed them

02:48:55  25  down to address a surge in individuals and so, again, conflicts

02:49:04  1   as to what this evidence actually means, what inferences to draw

02:49:08  2   from it.

02:49:08  3          The defendants' witnesses testified that this NTA-OR

02:49:14  4   is the preferred pathway.  But it seems to me, as I understand

02:49:18  5   the evidence, and again this is an area that would have been

02:49:21  6   nice to -- and will be nice at trial -- to hopefully have

02:49:24  7   somebody explain to me.  As I understand, when the witnesses are

02:49:28  8   referring to that, they're really referring to prosecutorial

02:49:32  9   discretion and 1226.  And to the extent that I'm understanding

02:49:35  10  that correctly, it seems to be undisputed that that is being

02:49:40  11  done without issuing arrest warrants as would be required to

02:49:45  12  justify release on your recognizance under 1226.

02:49:50  13         And it doesn't appear that all aliens are being issued

02:49:53  14  NTAs -- Notice to Appears -- right away.  Rather, it seems like,

02:49:58  15  like the NTR policy that allegedly was revoked, they're just

02:50:02  16  being issued NTAs later when and if they report to their final

02:50:07  17  destination and or by mail.

02:50:10  18         And so it seems to me that there are just a lot of

02:50:14  19  conflicting inferences that can be drawn from the evidence:

02:50:17  20  Either, as the defendant claims, release under parole,

02:50:24  21  prosecutorial discretion, and/or 1226 has always been available

02:50:30  22  and it just appears to be more prevalent because of the recent

02:50:35  23  surge or the post-January 2021 surge; or, as Florida claims, the

02:50:40  24  defendants went out of their way to create a problem by

02:50:44  25  canceling the Stay in Mexico and reducing the detention capacity

02:50:48 1 and then established *de facto* policies to solve the problem by

02:50:52 2 misusing the parole authority and using the seemingly

02:50:58 3 inapplicable authority under 1226 in a way that largely mirrors

02:51:02 4 the NTR policy and the prosecutorial discretion directive in the

02:51:08 5 March '21 email/memo.

02:51:15 6 So all of those disputes, it seems to me, cannot be

02:51:17 7 resolved on summary judgment. So in my view, both parties'

02:51:23 8 motions for summary judgment would be due to be denied and we

02:51:25 9 would need to have a trial on essentially the issues of Florida

02:51:29 10 standing as well as the existence of the nondetention policy and

02:51:36 11 its consistency with the law.

02:51:40 12 So I know I said a mouthful there. Julie's been

02:51:45 13 typing it all down very diligently. I'm sure you've been

02:51:49 14 writing it down just as diligently, but I'm happy to entertain

02:51:53 15 any, "Judge, you really screwed that one up" argument at this

02:51:56 16 point.

02:51:57 17 Mr. Percival.

02:51:59 18 MR. PERCIVAL: I only have two quick things to

02:52:01 19 address, and I think one of them you already addressed. But one

02:52:05 20 of the reasons we didn't move for summary judgment on

02:52:08 21 Parole + ATD is because we think it would cause a number of

02:52:11 22 problems for the Court to resolve Parole/ATD first. In other

02:52:16 23 words, to vacate Parole + ATD and have the Government attempt to

02:52:20 24 take an interlocutory appeal or an appeal of that vacatur and

02:52:26 25 not have this whole case travel together. It sounds like you're

02:52:29　1　　not contemplating that; that what you're contemplating is after

02:52:30　2　　the trial issuing a final order.  So as long as that's what

02:52:35　3　　you're contemplating, then I won't spend more time talking about

02:52:40　4　　why we think it makes sense not to vacate it immediately.  But

02:52:42　5　　if Your Honor has different thoughts on that, I'm happy to

02:52:44　6　　address that in more detail.

02:52:48　7　　　　　　THE COURT:  Well, I don't think even if I wanted to,

02:52:50　8　　even if I was persuaded that on the merits I could, I don't have

02:52:54　9　　any pleading or any paper in front of me asking me to vacate it

02:53:00　10　　at this point.  And so I don't think I could even if I wanted

02:53:03　11　　to, and that's why I was suggesting we have oral argument to at

02:53:08　12　　least give the mechanism under 56(f) to give the defendants an

02:53:13　13　　opportunity to explain why I shouldn't if that's the route I

02:53:18　14　　wanted to go.  But given that that's not logistically possibly

02:53:21　15　　anymore, what you ultimately said is correct, that that would

02:53:24　16　　be something that would be disposed of on the record either at

02:53:30　17　　or after trial.

02:53:33　18　　　　　　MR. PERCIVAL:  That makes perfect sense, and maybe we

02:53:36　19　　should have asked more questions of Your Honor to get, kind of,

02:53:40　20　　the most efficient way to do this.  It wasn't that we didn't

02:53:43　21　　think we could get summary judgment on the record; it was really

02:53:45　22　　just that we were trying to ensure that all the remedies in this

02:53:47　23　　case came out at the same time because we think that's most

02:53:51　24　　efficient, both for the defendants' administration and also for

02:53:53　25　　the appeal.  So that was really the only reason.  So we're happy

| | |
|---|---|
| 02:53:56 | 1 |
| 02:54:02 | 2 |
| 02:54:04 | 3 |
| 02:54:08 | 4 |
| 02:54:11 | 5 |
| 02:54:14 | 6 |
| 02:54:17 | 7 |
| 02:54:21 | 8 |
| 02:54:25 | 9 |
| 02:54:30 | 10 |
| 02:54:36 | 11 |
| 02:54:40 | 12 |
| 02:54:47 | 13 |
| 02:54:50 | 14 |
| 02:54:53 | 15 |
| 02:54:59 | 16 |
| 02:55:07 | 17 |
| 02:55:11 | 18 |
| 02:55:13 | 19 |
| 02:55:16 | 20 |
| 02:55:20 | 21 |
| 02:55:23 | 22 |
| 02:55:24 | 23 |
| 02:55:28 | 24 |
| 02:55:30 | 25 |

to deal with that and to file something addressing that.

The only other thing I wanted to ask Your Honor is that we did ask in the alternative on standing for Rule 56(g) relief, which is essentially just to treat certain facts as undisputed, and I just -- I was just sort of interested if Your Honor had any thoughts on that request.

THE COURT:  I'm not particularly interested in doing that.  The parties will have an obligation to put together a pretrial stipulation, and they can flag facts that they think are undisputed and don't require any sort of proof at trial. And again, frankly a number of those facts that you identified as being stipulated or undisputed -- I don't want to say a number of them.  Some of them, at least.  I'm not sure how significant they were in light of my view that, okay, you spent $5 million on providing healthcare to immigrants.  Well, so what.  Unless we can somehow tie that into -- not we, you -- can somehow tie that to these specific individuals, or at some point I'm just going to have to make an inference.

So again, I didn't think that that really added anything to the process here.  So I did see that, and I'm not inclined to do it.

MR. PERCIVAL:  Understood, Your Honor.  I don't have anything else to say; although, I would request to the extent Mr. Darrow makes any further argument to have a chance to respond.

02:55:32  1          THE COURT:  Understood.

02:55:33  2          Mr. Darrow.

02:55:37  3          MR. DARROW:  Thank you, Your Honor.  And before I

02:55:39  4   begin, I'll try to keep it brief.

02:55:43  5          It's still defendants' position that the Court really

02:55:48  6   would benefit by oral arguments and that, you know, we're not

02:55:53  7   trying to delay the case; but, you know, we do think that it's

02:55:57  8   really important to, you know, have full disposition of summary

02:56:01  9   judgment before proceeding to trial.  But, you know, if Your

02:56:04  10  Honor's mind is made up about, you know, how we're going to do

02:56:08  11  it now and proceed ahead, just a few things to address.

02:56:15  12         Regarding standing, it was our position that, you

02:56:19  13  know, the requirement that a court engage in inference

02:56:25  14  whatsoever, engage in speculation is, on its own, an indication

02:56:30  15  that plaintiff hasn't met its evidentiary burden of actually

02:56:37  16  establishing, of providing any evidence to establish the link

02:56:39  17  between what their injury is and the particular policies or

02:56:45  18  practices that they're challenging under this case.  That, on

02:56:49  19  its own, the failure to provide that connective evidence, is

02:56:52  20  itself, you know, worthy of granting summary judgment in our

02:56:56  21  favor, because that's just an evidentiary deficiency.  They

02:57:00  22  totally don't have that evidence.

02:57:05  23         THE COURT:  Well, on that point, as I tried to explain

02:57:10  24  that, and here it was a little bit -- it was a challenge

02:57:14  25  intellectually to keep separate each parties' motion.  Because

02:57:17 1   in looking at Florida's motion, I had to construe the evidence

02:57:22 2   in the light most favorable to you; and in construing your

02:57:25 3   motion as to standing, I had to construe the evidence in the

02:57:28 4   light most favorable to them.

02:57:30 5           And in my view, while I agreed with you that in the

02:57:35 6   light most favorable to you, Florida hasn't connected all the

02:57:39 7   dots.  In the light most favorable to them, I didn't view it as

02:57:43 8   speculative to connect the dots.  I just thought -- I just

02:57:47 9   viewed that as inferences that are reasonable that a fact-finder

02:57:51 10  could make, but I just couldn't make those inferences on summary

02:57:56 11  judgment.

02:57:56 12          So I understood your argument.  I just don't see it

02:58:00 13  that way.  And, you know, again, we're not going to convince

02:58:03 14  each other that one of us is right and one of us is wrong.  I

02:58:06 15  just want to make sure you understand what I'm saying.

02:58:11 16          MR. DARROW:  Understood, Your Honor.

02:58:11 17          THE COURT:  Okay.

02:58:17 18          MR. DARROW:  Thank you for the explanation.

02:58:17 19          On 1252(f) it is our position that vacating a policy

02:58:23 20  would be, you know, a form of injunctive relief that is

02:58:28 21  prohibited under that statute.  Although, as you know, the

02:58:32 22  Supreme Court is still sorting this out.

02:58:36 23          THE COURT:  And on that -- let me just make sure I

02:58:38 24  understand.  On that, as I understand what the issue is at the

02:58:43 25  Supreme Court -- and it's the same one the parties have laid out

02:58:46  1    here -- 1252 says what it says, the Supreme Court has

02:58:49  2    interpreted that the way they've interpreted it; but the

02:58:54  3    question really is, is whether that overrides the APA authority

02:58:59  4    to vacate agency action generally that is contrary to law.  Is

02:59:06  5    that how you understand the issue and it's just your view that

02:59:10  6    1222 trumps the APA vacate provision here?

02:59:16  7                MR. DARROW:  Yes.

02:59:18  8                THE COURT:  Okay.

02:59:19  9                MR. DARROW:  Yes, that's correct.  That is our view.

02:59:20  10               THE COURT:  Okay.  I think you've certainly preserved

02:59:23  11   that view, and I just tend to agree with the Fifth Circuit.  And

02:59:27  12   obviously the Supreme Court will have the final say on it, and

02:59:30  13   they may very well agree with you and say that 1252 is more

02:59:35  14   specific than the APA; and thus, in the immigration context, the

02:59:39  15   APA remedy of vacatur is not available.  And if that's the case,

02:59:45  16   then I would acknowledge that I'm wrong on that.  And how that

02:59:51  17   would shake out as to what remedy I can provide, it probably

02:59:55  18   would impact it.  It might be limited to some sort of

02:59:58  19   declaratory relief.

03:00:00  20               Is that how you see it shaking out?

03:00:02  21               MR. DARROW:  Yes.

03:00:04  22               THE COURT:  Okay.

03:00:05  23               MR. DARROW:  Yes.

03:00:07  24               I think the biggest issue I'd like to address -- and I

03:00:09  25   will keep it very brief, Your Honor -- is the nondetention

```
03:00:13   1   policy.  And I think, you know, if you were to give all
03:00:17   2   inferences that the facts might support to Florida and find that
03:00:21   3   there is a policy that the March 19th or 20th email and memo,
03:00:26   4   you know, suggest some sort of policy, at the end of the day,
03:00:32   5   Florida still needs to show that it violated the law.  Even if
03:00:35   6   you accept all the facts in their favor here, the Court can
03:00:39   7   still grant us summary judgment because none of those facts show
03:00:42   8   that defendants are actually violating the law.  And as the
03:00:45   9   Court noted before, there are really two statutes that are
03:00:49  10   relevant here:  1225 and 1226.  And I'll just -- 1226 first.
03:00:54  11        THE COURT:  Let me interrupt you for a second, because
03:00:56  12   that's really one of the areas that I've struggled with the most
03:01:00  13   in this case, and it's not entirely clear to me.  But again
03:01:06  14   construing the evidence in the light most favorable to Florida,
03:01:10  15   it seemed to me that the Government witnesses' positions is that
03:01:16  16   they derive this prosecutorial discretion authority from 1226,
03:01:23  17   that that's where this is coming from.  Am I right about that or
03:01:27  18   wrong about that?
03:01:30  19        MR. DARROW:  Well, so, I think prosecutorial
03:01:34  20   discretion is kind of a very broad term, and I know it's used by
03:01:36  21   DHS in a very broad, you know, degree of ways.  It can refer to
03:01:41  22   all kinds of things; but in the particular context of, like, the
03:01:46  23   March 19th and March 20th documents, prosecutorial discretion
03:01:49  24   there is, yes, referring to Notices to Report which were a
03:01:53  25   function of 1226 and the ability under 1226(a) to release
```

03:01:59  1  noncitizens on bond or conditional parole.

03:02:02  2          And actually, if Your Honor looks at the regulation,

03:02:07  3  8 CFR 287.3 that's referenced in those documents, it actually

03:02:13  4  talked about the ability of the border authorities to exercise

03:02:20  5  that discretion in charging and releasing those noncitizens who

03:02:25  6  are, you know, falling under Section 1226.

03:02:28  7          THE COURT:  Right.  And I appreciate that

03:02:30  8  clarification, and I think it's going to be very helpful as we

03:02:33  9  move forward because ultimately if that's what the evidence ends

03:02:40  10  up showing, that's the hook that the Border Patrol officials are

03:02:46  11  using to release people without putting them at least into a --

03:02:52  12  into a removal proceeding, I think there's an interesting legal

03:02:59  13  argument the parties have both laid out, the *amicus* lays out, as

03:03:03  14  to whether 1226 even applies here.

03:03:06  15          And Florida took the position that you -- not you,

03:03:11  16  Mr. Darrow -- but the defendants are just dropping 1226 into

03:03:15  17  this case out of nowhere.  The first time we've ever seen this

03:03:18  18  is in their summary judgment filings.  And frankly, I was

03:03:21  19  surprised when I saw 1226 because I never thought it applied to

03:03:25  20  these circumstances.  But I looked back at the motion to dismiss

03:03:29  21  stage, and the defendants did identify 1226 in various places.

03:03:36  22  So it's been in the case, but it certainly hasn't been something

03:03:40  23  I've focused on is why it's been so hard for me to understand

03:03:44  24  what a nondetention policy is.  But once it crystallized in my

03:03:49  25  mind that it is the defendants' implementation of the authority

03:03:54  1    they think they have under 1226, it all made sense.  And

03:03:59  2    ultimately I think it's going to come down to a question of

03:04:01  3    whether 1226 applies in these circumstances.

03:04:04  4              And I know the Federal Government's view is that it

03:04:06  5    does.  I'm not entirely convinced on that.  It seems to me that

03:04:14  6    that's talking about a different set of aliens triggered by a

03:04:17  7    different thing, which is an arrest warrant, which I didn't see

03:04:20  8    any evidence.  And I think one of the defendant witnesses said

03:04:24  9    arrest warrants are not part of the NTA package -- NTA-OR

03:04:29  10   package.  And there's also a regulation under that 1226 that

03:04:34  11   talks about who can make those decisions, and I'm not sure that

03:04:40  12   any of the people that I understand the evidence is saying is

03:04:43  13   making the decisions, those individual -- allegedly individual

03:04:47  14   release decisions are people that are authored by the regulation

03:04:50  15   to make those decisions under 1226.

03:04:53  16             So I really do look forward to the additional briefing

03:04:56  17   on this and maybe the evidence as it comes out, but -- and I'm

03:05:01  18   sorry.  I didn't mean to hijack your argument, but I'm just

03:05:05  19   telling you that if you're going to try to convince me right now

03:05:08  20   that 1226 allows to you do all this, I'm just suggesting to you

03:05:12  21   my initial blush on that is 1226 just doesn't apply to these

03:05:17  22   circumstances.

03:05:17  23             But I'll hear your argument, and I'll let you make it

03:05:20  24   without my interruption.

03:05:22  25             MR. DARROW:  Okay.  Your Honor.  I mean, that's

03:05:23   1   helpful.

03:05:25   2         So while 1226 talks about an arrest warrant, there is

03:05:28   3   actually no -- well, you know, an arrest warrant is generally

03:05:33   4   required, but there's a very broad exception under 8 U.S.C.

03:05:36   5   1357(a) that permits an officer to arrest a noncitizen who, you

03:05:46   6   know, either they're witnessing or they believe has entered

03:05:50   7   unlawfully if there's no opportunity for them to obtain a

03:05:54   8   warrant before that person might get away.  And then, you know,

03:05:57   9   it -- Your Honor, it then goes to the regulation 8 CFR 287.3.

03:06:02   10   That is also talking about, you know, quote, "An alien arrested

03:06:07   11   without a warrant of arrest under the authority contained in

03:06:10   12   that section will be examined by an officer" -- and provides a

03:06:15   13   process for disposing of cases where an alien has been arrested

03:06:21   14   without a warrant. That's something that happens quite

03:06:24   15   frequently.

03:06:24   16         The warrants in practice are generally only used when

03:06:28   17   you have a noncitizen who has been criminally incarcerated.  And

03:06:33   18   when that happens, then their information is input into a number

03:06:37   19   of national security databases, and it comes up for ICE.  And

03:06:41   20   ICE says, okay, X person over here is hanging onto this

03:06:45   21   particular noncitizen, so we're going to serve them with a

03:06:48   22   detainer saying hand that guy over to us when their time there

03:06:52   23   is up because we're going begin the removal proceedings.  And

03:06:55   24   under, you know, an ICE policy that's a couple years old at this

03:06:59   25   point, they have to provide a warrant along with that.  And

03:07:01  1  that's generally where the warrants are used.

03:07:04  2          For the other segment of -- the other large segment, I

03:07:07  3  should say, because 1226 is used in a lot of scenarios.  The

03:07:11  4  other large segment of 1226 arrests are those conducted by

03:07:16  5  people at the border where, you know, 1226 applies to any alien

03:07:21  6  who's unlawfully present in the country.  So they don't have to

03:07:24  7  be here a long period of time.  They've managed to sneak a

03:07:27  8  couple miles into the country.  They are, you know, still

03:07:30  9  subject to 1226.  And in that case, we have a border patrolman

03:07:34  10  who's doing his patrol and sees the person and doesn't have time

03:07:38  11  to go through the whole administrative process and arrest them.

03:07:42  12  But that's still, you know, a valid arrest under 8 U.S.C.

03:07:45  13  1357(a) and thereby under 1226a.

03:07:50  14          THE COURT:  All right.  Well, I look forward to

03:07:53  15  learning more about that because, again, my initial reading of

03:07:58  16  the two statutes is that 1225 is dealing with people that are

03:08:03  17  showing up at the border, which is the bulk of what I understand

03:08:06  18  we're talking about here; 1226 is dealing with another -- a

03:08:11  19  different class of people.

03:08:12  20          And I understand what you're saying, that typically an

03:08:17  21  arrest warrant -- I think some of the witness testimony went

03:08:19  22  down this road.  Typically an arrest warrant is issued when

03:08:22  23  you've got a criminal alien, you're going to actually start

03:08:26  24  removing them.  I'm not so sure that your interpretation of the

03:08:31  25  law that it applies to this set of people that are arrested

03:08:35  1   without a warrant under 1357 is correct, but again I'll keep an

03:08:41  2   open mind on that.

03:08:42  3          But again, what this all does is it really kind of

03:08:46  4   ties back together what we were talking about at the beginning

03:08:49  5   of the day, which was this March 2021 email.  And while the

03:08:59  6   practice that was described in that memo and that email may have

03:09:01  7   been taken off the books by the subsequent memos and the

03:09:10  8   Parole + ATD policy, the witness testimony was almost uniform

03:09:16  9   that the NTR-OR pathway is the preferred pathway.  That's the

03:09:23  10  pathway by which they prefer to process people.  And if what

03:09:28  11  that in code means is 1226, then I think, as I found, there's at

03:09:35  12  least evidence construed in the light most favorable to Florida

03:09:39  13  that irrespective of the fact that the NTR policy came off the

03:09:43  14  books, so to speak, the essence of the nondetention concept

03:09:48  15  remains and is embodied in 1226.

03:09:53  16         So again, I haven't made any firm decisions because

03:09:55  17  I'm only looking at summary judgment and seeing what a

03:09:58  18  fact-finder could find.  And the evidence may develop different

03:10:03  19  than I've seen up to this point, but it seems to me that that is

03:10:08  20  evidence that a fact-finder could find, that there actually

03:10:12  21  is -- there was, starting in March of 2021 and through various

03:10:17  22  iterations, there is still a nondetention policy out there

03:10:25  23  derived from 1226.  And the ultimate question I'm going to have

03:10:28  24  to decide is whether that complies with the law or it doesn't.

03:10:35  25         But again, obviously the facts may develop slightly

1   differently at trial, and I may be educated more about what's

2   going on down there and maybe see the light that you want me to

3   see, Mr. Darrow.  But this has been very, very helpful.

4        Anything else that the defendant wanted to point out

5   before I give Mr. Percival his last word that he wanted?

6        MR. DARROW:  Yes, Your Honor.  I'm sorry.  And I'll

7   keep it brief.  I just wanted to respond to that very simply,

8   which is that, you know -- so let's take that and assume that

9   Your Honor finds that the people that the Government is

10   considering under 1226 actually aren't -- you know, according to

11   the statute, they should not be under 1226.  Then as a result,

12   then they'd have to be viewed as under 1225.  I don't really

13   know of any other -- you know, unless they're aggravated felons,

14   which are kind of outside the scope here, I don't really know of

15   any other authority they would be talking about.

16        So even assuming, right, that all these people are

17   improperly classified and they should be viewed as under 1225,

18   even assuming that's the case, Section 1182 offers a very valid

19   release mechanism from detention for 1225.  And, you know, there

20   is -- there's been no limitation placed on -- there are a lot of

21   statutes throughout the INA.  Congress has placed a lot of

22   limits on the Government's ability to admit different

23   classifications of aliens under different circumstances, but

24   there never was anything imposed on 1182.

25        Granted, there was a case-by-case for urgent

03:12:05  1  humanitarian reasons or significant public benefit, but the

03:12:10  2  plaintiff has provided no evidence that these are not

03:12:13  3  case-by-case determinations.  They didn't even respond to our

03:12:16  4  arguments about how public health issues constitute -- have been

03:12:21  5  found by courts to constitute significant public benefit.

03:12:25  6       And I will note that, granted, there are a large

03:12:29  7  number of people being paroled, but that's not at all

03:12:31  8  inconsistent with other periods in United States history where

03:12:35  9  we've had a large influx of people.  If Your Honor, you know, in

03:12:39  10  Florida, looks at periodically we had a huge migration of

03:12:42  11  Cubans, and then we had Haitians.  And, you know, the fact that

03:12:46  12  now it's Venezuelans and Nicaraguans, for instance, large

03:12:51  13  populations of people come in who we can't repatriate for one

03:12:54  14  political reason or another, that doesn't set this apart from

03:12:58  15  those circumstances.  You know, parole authority has always

03:13:01  16  been -- has always been used a lot in this context, but the fact

03:13:06  17  that there are large numbers doesn't mean that it's being

03:13:09  18  improperly used.

03:13:09  19       THE COURT:  All right.  And I certainly understand

03:13:10  20  that argument, and I guess I would just reiterate what I said

03:13:18  21  previously, quoting from Justice Alito.  And I understand he was

03:13:21  22  in the dissent, but, you know, the point that he was making and

03:13:27  23  the citations that he gave -- and I think the Fifth Circuit had

03:13:33  24  previously discussed this -- that, you know, parole in its

03:13:37  25  present form was not intended to be a programmatic tool the way

03:13:45  1    that the evidence here suggests that it may be being used.

03:13:49  2         So again, construing the light -- and I'm not making

03:13:54  3    any of these findings now.  I'm just saying this is how in the

03:13:56  4    light most favorable to Florida the evidence could be construed,

03:13:59  5    that's how I see that issue.

03:14:01  6         And the other issue, frankly, that I have with parole,

03:14:03  7    and I'm interested to see how the evidence develops, the way the

03:14:07  8    parole statute -- I think it's a statute, not the regulation --

03:14:11  9    and on the regulation, I do agree with the defendants that the

03:14:15  10   regulation, although it includes language that was in the

03:14:20  11   pre-'96 INA amendments, the regulation was amended after the '96

03:14:29  12   amendments to include that language.

03:14:33  13        So if the bureaucracy that existed at that time was

03:14:37  14   able to slip back in the old statutory standard -- and perhaps

03:14:42  15   they shouldn't have, they did, it seems like, but I don't buy

03:14:46  16   Florida's argument, the *amicus's* argument that the regulation is

03:14:49  17   outdated for that reason.  But I digressed on that for a minute.

03:14:54  18        But the other question I ultimately am going to be

03:14:57  19   interested in looking at in parole, either the statute or

03:14:59  20   regulation talks about the idea that parole is intended to

03:15:05  21   address a limited circumstance; and once that circumstance ends,

03:15:10  22   the person is supposed to be brought back into the system at the

03:15:13  23   same place they were before.  And at least based upon the

03:15:18  24   evidence that I've seen thus far in the summary judgment record,

03:15:24  25   either -- there doesn't appear to be any end to the parole.

I mean, some of the parole documents I've seen have
dates on them, but it's not as if they say that once the
overcrowding or the public health issue or COVID, or whatever
explanation was given for the parole, goes away, then they're to
be detained.  And it seems to me that that, at least in the
light most favorable to Florida, is an inconsistency between the
way parole is being used and what the statute contemplates.

For example, in the regulation it talks about the
various examples of when parole can be used -- things like
pregnancy or a medical treatment or something else -- that
contemplates that you're on parole until you have your baby or
you get your medical treatment, and then you go right back into
the system, i.e. detention, that you were in before this.  And
it doesn't seem to me from what I've reviewed, and maybe I
missed something in the evidence, that that's what's happening,
that essentially this is indefinite parole.  Maybe there's a
date on it, but it's not like these people are actually going to
be put back in detention where the statute contemplated they
would be paroled from.  It doesn't even look like it says
anything about once the capacity constraints are resolved then
we will detain these people that we were supposed to detain but
we paroled because we couldn't detain them.

So again, maybe I missed something in the evidence,
but that, at least, again in the light most favorable to
Florida, seemed to be another potential problem with the way I

1    understand parole is being used here.

2              Does that make sense, Mr. Darrow?

3              MR. DARROW:  Yes, Your Honor.  I'm trying to figure

4    the best way to explain it.  We possibly might need to provide

5    more evidence on it.  But I think maybe one of the reasons

6    you're having those questions is that in a lot of cases,

7    particularly, you know, in the case of a large number of paroles

8    that are Parole/ATD and generally paroles by -- that are

9    conducted at the border by CBP, those -- you know, that issuance

10   of parole is kind of superseded once the noncitizen is placed in

11   removal proceedings and has, you know, checked in with ICE.

12   Then ICE is responsible for determining whether they should be

13   detained or released and, you know, reevaluate that on the --

14   throughout the course of their removal proceedings.  But CBP's

15   initial parole is, you know, basically just until they check in

16   with ICE.

17             THE COURT:  All right.  And again, maybe I'm

18   misunderstanding some things, but I thought that's what that

19   Parole/ATD policy, that's who that was directed to was the CBP

20   people and that that's who was governed by this.  And again,

21   if -- I don't want to beat a dead horse here, because I do want

22   to give Mr. Percival his last word, and we do need to pick a

23   date for a pretrial conference.  But again, I'm just trying to

24   identify the issues that I saw in the evidence construed in the

25   light most favorable to Florida that suggested a problem for the

03:18:47  1  Government here, which was why, as I tried to articulate, I

03:18:49  2  could not grant summary judgment in the Government's favor here.

03:18:52  3  And that doesn't necessarily mean that if the evidence develops

03:18:57  4  in a way that addresses, overcomes these concerns, then the

03:19:01  5  outcome may be different.  But certainly based on the record

03:19:04  6  that I have in front of me, it's really just confirming that

03:19:12  7  I've decided it correctly, at least in my mind.

03:19:16  8          But I do appreciate your argument.  Anything else you

03:19:18  9  wanted to add?

03:19:23  10          MR. DARROW:  No -- well, one question for

03:19:25  11  clarification.  Maybe this is more when we get back to talking

03:19:27  12  about the pretrial conference.

03:19:30  13          At one point Florida had suggested that Parole/ATD

03:19:35  14  should also be considered at trial; and, you know, if that was

03:19:40  15  still on the table, I think a lot of defendants' motions in

03:19:42  16  limine were going to be addressing that.  But then I heard, you

03:19:46  17  know, Your Honor say before that you believe it should be

03:19:47  18  addressed on the record, so -- and, you know, you don't have to

03:19:50  19  address this now if we get to this in the planning stage, but we

03:19:52  20  were just hoping for some clarification on whether, you know, at

03:19:56  21  the trial there would be evidence and argument on Parole/ATD or,

03:20:02  22  you know, when -- in what way you are planning on having that be

03:20:07  23  subject to trial.

03:20:09  24          THE COURT:  My current view and at least preliminary

03:20:12  25  ruling, subject to being persuaded by some pre-pretrial

| | |
|---|---|
| 03:20:17 | 1 |

conference motion, is that the validity of the Parole + ATD

policy will be decided based upon the summary judgment -- or,

excuse me, based upon the supplemental administrative record and

that what we would have related to that, either at trial or in

posttrial filings, would essentially be argument from the

parties as to whether that record supports the policy or it

doesn't, either from an arbitrary/capricious, from a compliance

with the law -- I'm probably forgetting something -- but from an

APA standpoint.

I didn't anticipate that there was going to be

evidence at the trial from which I was going to determine

whether the Parole + ATD policy was valid or invalid.  That

being said, given the evolution of the policies down there, I

don't think that would necessarily foreclose evidence coming in

about the policy, if that makes sense.  But ultimately my

determination as to whether at that particular policy is valid

or invalid would be based on the supplemental record.  That's at

least where I am right now, subject to being persuaded otherwise

in some sort of pre-pretrial conference filing.

Does that answer your question?

MR. DARROW:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Mr. Percival, you wanted last

word on things, and this is your last-word opportunity.

MR. PERCIVAL:  Thank you, Your Honor.  Actually, the

only thing I was going to say is that I actually think that we

| 03:21:58 | 1 | all agree on what the record should be.  What we had in mind was |

03:21:58  1  all agree on what the record should be.  What we had in mind was

03:22:03  2  you would issue an order reaching a conclusion on Parole + ATD

03:22:08  3  on the administrative record, and then you would also issue a

03:22:12  4  posttrial order on the nondetention policy but that we may want

03:22:18  5  to present evidence about the Parole + ATD policy simply insofar

03:22:22  6  as it is relevant to the nondetention policy.  So if that's what

03:22:27  7  Your Honor was saying and what Mr. Darrow was saying, I think

03:22:30  8  we're all on the same page.

03:22:31  9      THE COURT:  That's at least what I was saying, and I

03:22:34 10  think -- I don't know if Mr. Darrow is on that same page, but at

03:22:37 11  least he understood what I was saying.  So if there's a

03:22:40 12  disagreement between the parties about that, then it will be

03:22:44 13  fleshed out in some sort of motion filed before the pretrial

03:22:48 14  conference and we'll hammer it out.  But I think my intent is to

03:22:52 15  take the supplemental record, make a ruling on that, and this

03:22:59 16  will all be part of one big order on which I've been able to

03:23:03 17  make factual findings, drawing inferences that I deem

03:23:06 18  appropriate, weighing the evidence as I deem appropriate.  So

03:23:09 19  that's my ultimate intent is to wrap it up in a nice big bow.

03:23:17 20      All right.  Well, if there's nothing further that

03:23:19 21  needs to be said about those summary judgment rulings, I will

03:23:23 22  memorialize those -- or based upon that reasoning that I gave, I

03:23:32 23  will enter an order just summarily denying both of the summary

03:23:38 24  judgment motions and referring back to the comments that I made

03:23:42 25  on the record, the essence being that there are, in my view,

03:23:46  1  facts in dispute that require a trial on the issues as I've

03:23:51  2  described.  So that will come out of today.

03:23:53  3          The other thing that we need to get on the books then

03:23:56  4  is a pretrial conference.  And the dates that were laid out for

03:24:11  5  what was going to be a combined pretrial conference/oral

03:24:14  6  argument will now just be a pretrial conference.  And -- let me

03:24:18  7  pull my calendar up here.  I think the December 16 date looked

03:24:22  8  pretty good on the calendar, but let me double-check.

03:24:31  9          And my view on that is that I'd rather set it in kind

03:24:34  10  of the later period of time to give y'all an opportunity to put

03:24:38  11  together any sort of motions in limine and work towards getting

03:24:42  12  a meaningful pretrial stipulation and give you as much time as

03:24:45  13  possible to do that.  But give me one second.

03:25:07  14          So looking at the dates y'all gave me, really that

03:25:11  15  December 16th, looking back at the calendar, is essentially the

03:25:15  16  only date during that period that I don't have something else

03:25:22  17  already booked.  So absent something that has changed between

03:25:27  18  the time y'all gave me those dates, I would set the pretrial

03:25:31  19  conference on December 16th.  Any concerns with that?

03:25:37  20          MR. PERCIVAL:  No concerns with that on Florida's end,

03:25:39  21  Your Honor.  Although, I am in my head trying to back out some

03:25:43  22  of the deadlines, and it might be helpful for you to clarify

03:25:48  23  exactly what you think those deadlines are, because I think on

03:25:51  24  the, kind of, default rules, some things would be due maybe even

03:25:54  25  like the day after Thanksgivings and pretty soon after.  I just

03:25:58  1   want to make sure we're all on the same page as the other

03:26:02  2   deadlines.

03:26:04  3           THE COURT:  I think what I would envision, I think our

03:26:09  4   typical -- and this case is far from typical, but in a typical

03:26:13  5   case, we would set -- the important deadline to me would be a

03:26:18  6   week before the pretrial conference, and that would be when the

03:26:25  7   parties' joint pretrial stipulation would be due as well as

03:26:29  8   exhibit lists; witness lists, which would be part of the

03:26:35  9   pretrial stipulation; any sort of trial briefs.  We don't need

03:26:40  10  jury instructions since it's a bench trial.

03:26:43  11          So, then backing out from that, usually we have two

03:26:47  12  weeks before that would be when the motions in limine would be

03:26:52  13  due with responses due the 9th.  So motions in limine would be

03:26:59  14  due the 2nd.  Responses would be due the 9th, along with the

03:27:04  15  pretrial stipulation, et cetera.  And then backing it up from

03:27:07  16  that date would be whatever date the parties could get together

03:27:12  17  and work on putting together the pretrial stipulation, as well

03:27:17  18  as comparing exhibit lists and witness lists and things of that

03:27:21  19  nature.

03:27:21  20          So that would be what a schedule would look like if we

03:27:24  21  do it on the 16th.  You know, obviously the concerns about

03:27:29  22  pushing it further is then you're right in the middle of

03:27:34  23  Christmas, and so you're either getting busy right around

03:27:40  24  Thanksgiving or busy between Christmas and New Years.  And it

03:27:45  25  seems to me that the former is better than the latter, but if

03:27:48  1    the parties would rather push some of that stuff out and set the

03:27:52  2    pretrial conference for -- you know, I hate to do it like the

03:28:00  3    30th but -- I may not be open the 30th.

03:28:04  4          But anyway, y'all tell me.  I -- kind of stream of

03:28:07  5    conscious talking, but at least what's on the table right now

03:28:10  6    would be a December 16th pretrial conference deadline with a

03:28:15  7    motion in limine deadline on the 2nd, response and pretrial

03:28:19  8    stipulation on the 9th.  And so what that means between now and

03:28:23  9    then to the parties is what you're going to tell me:  Is that

03:28:29  10   doable or not?

03:28:31  11         Mr. Percival.

03:28:32  12         MR. PERCIVAL:  That's doable for us.  Would the

03:28:34  13   morning on the 16th work, or are we picking the afternoon?

03:28:39  14         THE COURT:  I was going to ask y'all since y'all are

03:28:40  15   both traveling in.

03:28:42  16         MR. PERCIVAL:  I think we, at least on Florida's side,

03:28:43  17   prefer the morning.  We can travel the night before.  And I'll

03:28:46  18   let the defendants speak for themselves.  Although, I know they

03:28:50  19   have to fly, so maybe they have stronger feelings.

03:28:52  20         THE COURT:  All right.  Mr. Darrow, what say the

03:28:55  21   Federal Government as to the December 16th pretrial, which would

03:28:59  22   give those 2nd to 9th deadlines as well?

03:29:05  23         MR. DARROW:  The deadlines are fine, Your Honor.  We

03:29:09  24   will be flying in for the conferences in person, so probably the

03:29:14  25   morning is -- honestly, we'll most likely get in the day before

03:29:21   1   anyways, so at any point.  But, you know, we're fine with the

03:29:22   2   morning of the 16th.

03:29:24   3          THE COURT:  All right.  Well, we'll set the pretrial

03:29:27   4   conference for 9:00 a.m. on the 16th, and right now that day is

03:29:33   5   entirely clear.  I certainly hope we wouldn't need the entire

03:29:38   6   day to work through the issues that we've got, but I'll reserve

03:29:41   7   the entire morning.  So we'll reserve three hours with the hope

03:29:45   8   that we won't need that.

03:29:47   9          The primary focus of that conference will be a true

03:29:51   10  pretrial conference in the sense that we will hear argument on

03:29:56   11  any motions in limine, look at the pretrial stipulation, any

03:30:01   12  objections to witnesses or exhibits and try to hammer those

03:30:05   13  things out so the time we are going to be together for trial can

03:30:08   14  be as efficient as possible.

03:30:12   15         We've got three days reserved for trial right now.

03:30:18   16  Given the rulings -- I don't know if that helped anything, but

03:30:22   17  given the rulings on what's left to be tried, essentially

03:30:26   18  everything, is that three days too much, too little, from the

03:30:35   19  State's perspective?

03:30:37   20         MR. PERCIVAL:  Your Honor, I'm looking at my team

03:30:39   21  here.  I think there's a chance we might need a fourth day just

03:30:42   22  because we have so many standing witnesses to get through.  It

03:30:45   23  kind of depends.  You know, we'll try to see what we can

03:30:47   24  stipulate and how quickly we can get through those and, of

03:30:49   25  course, how long defendants need for cross-examination.  But

03:30:52   1   that's -- it's just I think we have six or so witnesses because

03:30:56   2   we have that many agencies.

03:30:58   3        And then on the -- in terms of the affirmative case,

03:31:00   4   most of our evidence is going to be documents and videotaped

03:31:04   5   deposition.  We don't plan to offer any live witnesses for the

03:31:07   6   Government, from the U.S. Government.

03:31:12   7        THE COURT:  Okay.

03:31:13   8        All right.  Mr. Darrow?

03:31:18   9        MR. DARROW:  Thank you, Your Honor.  I think it might

03:31:20   10   not be a bad idea to budget that extra fourth day that Florida

03:31:24   11   mentioned, just in case.  I mean, I hope we will be able to move

03:31:29   12   through witnesses fairly fast, and it's possible we can

03:31:34   13   stipulate to some of the facts regarding standing and, you know,

03:31:36   14   avoid having to go through all the different Florida agency

03:31:41   15   witnesses.  But it does seem like, you know, given that all the

03:31:44   16   issues are still left that having an extra day might be better

03:31:51   17   safe than sorry.

03:31:53   18        MR. PERCIVAL:  Your Honor, can I ask a clarifying

03:31:56   19   question, actually?  When you said four days, does that include

03:31:59   20   closing arguments?

03:32:02   21        THE COURT:  I would --

03:32:02   22        MR. PERCIVAL:  Or do you want to have posttrial

03:32:02   23   briefings?

03:32:03   24        THE COURT:  Yeah, I would anticipate that after we've

03:32:07   25   spent that much time together, we're probably going to want to

03:32:11  1  be done with each other, and so I had always anticipated that it

03:32:16  2  be more posttrial proposed orders/closing argument than an

03:32:23  3  actual oral closing.

03:32:25  4          MR. PERCIVAL:  So like, if anything, written closing?

03:32:28  5          THE COURT:  Yes.

03:32:30  6          MR. PERCIVAL:  Understood.

03:32:32  7          THE COURT:  All right.  Well, we will go ahead and set

03:32:35  8  aside that fourth day that week, and we're going to have to

03:32:39  9  juggle a few things around, but we'll make it work.

03:32:45  10          Okay.  So what's going to come out of today is two

03:32:49  11  things:  One, an order, as I mentioned, memorializing the

03:32:53  12  rulings I made on the two -- Florida's supplement motion and the

03:32:59  13  defendants' modify-the-schedule motion, and then my oral rulings

03:33:06  14  on the summary judgment motions.  And then also a pretrial

03:33:12  15  conference order that memorializes the dates that we've talked

03:33:16  16  about, as well as sets forth the substance of the pretrial

03:33:22  17  stipulation and things like that that we're expecting to see

03:33:26  18  from the parties.

03:33:27  19          And again, if you get that and there's particular

03:33:32  20  concerns about the deadlines, again, the one that's most

03:33:35  21  important to me is the 9th, because that will give me a week to

03:33:41  22  start digesting what the parties have submitted so we can have a

03:33:46  23  productive conference.  And any other dates preceding that that

03:33:51  24  you see in the order, if they're causing any sort of problems,

03:33:54  25  y'all are welcome -- and I think the order will probably say --

| | |
|---|---|
| 03:33:57 | 1 |
| 03:34:01 | 2 |
| 03:34:04 | 3 |

you're welcome to move those, as long as it doesn't affect the
things that are important to me, which are getting everything in
a big nice package on the 9th.

And anything else you see in the order that is causing
concern, obviously the parties here although have very divergent
views about the facts and the law, y'all have worked very well
together and I'm confident that if you identify something
jointly that's causing a problem, I'll be more than happy to
address it and make your life easier, or as easy as I can.

Anything else the parties think we need to do today,
Mr. Percival?

MR. PERCIVAL:  Yeah, just one more clarifying
question, Your Honor.  I believe the local rules contemplate
either a draft opinion or proposed findings of fact and
conclusions of law in a bench trial, but you also mentioned a
posttrial brief.  So we just wanted some clarification about
what you would want on the 9th.  Do you want either proposed
opinion or findings of fact/conclusions of law, or do you want
us to just save that for the posttrial briefs?

THE COURT:  Yeah, I wouldn't think that I would
want -- and I'll have to look back at the local rule.  You
probably know them better than I do.  Most people, at least the
bench trials I've had, haven't asked that question so I haven't
gone back and looked at it.  But I wouldn't anticipate wanting
proposed findings of fact until after the trial, because before

03:35:29  1   the trial, you know what the evidence you think is going to come

03:35:32  2   in but it may not or it may come in in a different way.  So I'm

03:35:36  3   not even sure how you would prepare proposed findings of fact

03:35:40  4   until after the trial.

03:35:41  5        So what I think we typically ask for is just a brief

03:35:46  6   of the legal issues that are outstanding.  But again, given the

03:35:50  7   extensive summary judgment briefing, given my familiarity with

03:35:55  8   the case, we may just omit that part from it and you can -- but

03:36:00  9   bottom line is I want to look at that part of our order, but I

03:36:05  10  definitely don't want proposed factual findings before the

03:36:08  11  trial.  I want them after the trial after you've heard the

03:36:11  12  evidence and you can articulate what you think I should find.

03:36:16  13  Make sense?

03:36:18  14       MR. PERCIVAL:  That makes sense, Your Honor, and we

03:36:20  15  certainly would not object to not having to file two briefs.

03:36:23  16  We're happy to only file one, so that works well.

03:36:27  17       THE COURT:  All right.  Mr. Darrow, anything else the

03:36:28  18  Federal Government wants to talk about today?

03:36:31  19       MR. DARROW:  No, Your Honor.

03:36:33  20       THE COURT:  All right.  Well, thank you for your time

03:36:35  21  today and your indulgences as I went through that process.  And

03:36:41  22  I think that gets us in a posture that we would have been in

03:36:46  23  anyway and it does so in the most efficient way.  And I do feel

03:36:50  24  like, and I hope the parties believe as well, that I have

03:36:54  25  reviewed the evidence enough and even without any additional

<div style="text-align: right; font-family: monospace; font-size: small;">

03:36:57  1   clarification that I get at oral argument, I feel like I have

03:37:01  2   enough of a sense of the record to make those rulings that I've

03:37:05  3   made, and we will go to trial and see how it all shakes out.

03:37:08  4   But thank you for your time.  Y'all have a good afternoon and

03:37:13  5   good weekend.

03:37:15  6           MR. PERCIVAL:  Thank you, Your Honor.

03:37:16  7           MR. DARROW:  Thank you, Your Honor.

03:37:18  8           THE COURT:  Bye-bye.

03:37:19  9       (Proceedings adjourned at 3:37 p.m.)

03:37:19 10

         11                    * * * * * * * *

         12       I hereby certify that the foregoing is a true and correct
             transcript of the stenographically reported proceedings held in
         13   the above-entitled matter, pursuant to the provisions of Section
             753, Title 28, United States Code.

         14

         15                                           11/29/22
             _____   _____
         16   Julie A. Wycoff, RMR, CRR          Date
             Official U.S. Court Reporter
         17

         18

         19

         20

         21

         22

         23

         24

         25

</div>