# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                                Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## JOINT PRETRIAL STIPULATION

Pursuant to this Court's November 18, 2022 order, Doc. 118, the parties submit this joint pre-trial stipulation.[1]

### Basis of Federal Jurisdiction

The parties disagree as to whether Florida can establish Article III standing. The parties agree that the Court has jurisdiction to determine whether Florida has standing. If this Court finds that Florida has established standing, Florida maintains that this Court otherwise has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361, and 5 U.S.C. §§ 702–03. Defendants maintain that the Court lacks subject matter jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii) and 5 U.S.C. § 701(a)(1)–(2), although they recognize that the Court has thus far disagreed. The

---

[1] The parties agree that this document also serves as their Rule 26(a)(3) disclosures.

parties agree that any other disputes between the parties do not go to subject matter jurisdiction.

### Nature of the Action

Florida challenges two immigration policies that, according to Florida, Defendants are implementing: (1) the alleged non-detention policy and (2) the Parole + ATD policy. The currently operative Parole + ATD policy is the July 18, 2022 memorandum; the parties dispute the existence of the non-detention policy.

Florida's second amended complaint, Doc. 74, asserts eight counts: (1) a contrary to law claim against the non-detention policy under the Administrative Procedure Act (APA), (2) a contrary to law claim against the Parole + ATD policy under the APA, (3) an arbitrary and capricious claim against the non-detention policy under the APA, (4) an arbitrary and capricious claim against the Parole + ATD policy under the APA, (5) a notice and comment claim against the non-detention policy under the APA, (6) a notice and comment claim against the Parole + ATD policy under the APA, (7) a claim for agency action unlawfully withheld or unreasonable delayed under the APA, and (8) an equitable and constitutional claim, brought pursuant to the Take Care Clause, the separation of powers doctrine, and the ultra vires doctrine, asserting that Defendants are violating the Immigration and Nationality Act (INA).

Florida seeks vacatur of the non-detention and Parole + ATD policies under 5 U.S.C. § 706, a declaratory judgment under 28 U.S.C. § 2201, and an injunction under 28 U.S.C. §§ 1361 and 2202.

Defendants maintain that Florida lacks standing to bring this case; that Florida's claims raise nonjusticiable political questions; that Florida cannot obtain review of its claims under the APA; that Florida lacks any cause of action under the United States Constitution; and that each of Florida's claims lacks legal and factual merit. Further, Florida cannot obtain injunctive relief, or any relief that operates as a functional equivalent of an injunction, under 8 U.S.C. § 1252(f)(1), including vacatur and certain declaratory relief.

## General Statement of Case

A. <u>Florida's Case</u>

8 U.S.C. § 1225(b)(1)–(2) mandates that Defendants detain applicants for admission, as defined in 8 U.S.C. § 1225(a)(1), until Defendants adjudicate whether the alien is to be removed.[2] Section 1182(d)(5) provides an exception. It allows Defendants, "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," to parole into the United States aliens otherwise subject to mandatory detention under § 1225(b)(1)–(2). *See* 8 U.S.C. § 1182(d)(5)(A).

---

[2] Defendants object to using the term "alien" as they prefer the term "non-citizen." Florida uses "alien" for the reasons stated in the Court's Order Denying Defendant's Motion to Dismiss. *See* Doc. 45 at 2 n.2.

Importantly, even when parole is permitted, "such parole . . . shall not be regarded as an admission of the alien and when the purposes of parole shall . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.*

Florida contends that, soon after President Biden took office, Defendants began systematically ignoring the mandatory detention language in § 1225(b) and misusing their parole authority in § 1182(d)(5). Beginning in February 2021, Defendants began taking steps to abolish all family detention and to reduce ICE's detention capacity for single adults. In March 2021, Defendants began releasing illegal border crossers into the interior of the United States under the guise of "prosecutorial discretion." Defendants also began releasing aliens under 8 U.S.C. § 1226(a), which does not apply to the aliens at issue in this case.

On November 2, 2021, after Florida filed this suit but before Defendants' motion to dismiss was due, Defendants issued the first Parole + ATD memo, though there is evidence that Parole + ATD began earlier. The November Parole + ATD memo purported to rescind the prosecutorial discretion policy, though it did not rescind the authorization to release under § 1226(a). The November Parole + ATD policy framed the policy as a COVID mitigation policy and limited its use to family units.

On July 18, 2022, Defendants issued a second Parole + ATD memo, which rescinded the November 2 version. This policy is not limited to family units and is not based on COVID. As with the November memo, there is evidence that these changes to Parole + ATD occurred before Defendants issued the July memo.

Since March 2021, Border Patrol has released approximately one million applicants for admission at the southwest border, including as many as 105,000 in a single month. These numbers reflect (a) prosecutorial discretion releases, (b) releases under § 1226(a), and (c) Parole + ATD releases. By comparison, the Trump Administration's Border Patrol released 17 applicants for admission in December of 2020.

Even as the border crisis has worsened, Defendants have continued to cut detention capacity, all the while telling Congress that these cuts will not interfere with their duties.

As injury to support standing, Florida relies on a variety of public services and other expenditures that it makes available to unauthorized aliens, including the cost of (a) incarcerating inadmissible aliens who commit crimes, (b) public school expenses, (c) public assistance, (d) emergency medical services, (e) unemployment benefits, and (f) costs associated with issuing driver's licenses and identification cards.

B. Defendants' Case

Section 1225(b) provides for detention of applicants for admission pending expedited removal proceedings or proceedings under 8 U.S.C. 1229a. 8 U.S.C. 1182(d)(5)(A) provides for parole of noncitizens from custody under section 1225(b), without numerical limitation unlike other provisions of the INA, so long as it is granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Regulation makes clear that parole is available for noncitizens "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5). Finally, applicants for admission who are unlawfully present inside the country may be released on bond or conditional parole pending removal proceedings under 8 U.S.C. § 1226(a).

In this case, Florida challenges (1) the Parole + ATD policy and (2) an alleged, but non-existent, "non-detention policy" under the APA and U.S. Constitution. The Court has previously indicated why Florida's constitutional claim lacks merit, and that it will be separately adjudicating the APA challenges to Parole + ATD on the basis of the administrative record, as is required under the APA.

At issue in this trial are (1) Florida's APA claims challenging the alleged "non-detention policy," (2) whether Florida has standing to bring this action, and (3) the scope of relief the Court can provide. Florida bears the burden of establishing that such a policy exists, much less that it violates the INA. Florida has not and

cannot meet this burden.  At threshold, there is no "non-detention policy." Rather, Florida takes issue with an amalgam of individual parole decisions and agency budgetary judgments that do not represent a challengeable agency action under the APA, and are fully within Defendants' discretion even if they were challengeable.

Outside of Parole + ATD—a policy not at issue in the trial but also fully in compliance with 8 U.S.C. § 1182(d)(5)(A)—Defendants have not promulgated any presently operative general policies concerning the release of noncitizens encountered at the Southwest border in the past two years. Rather, Defendants rely on their longstanding authority under 8 U.S.C. §§ 1182(d)(5)(A) and 1226(a), and their inherent enforcement discretion to make detention and release decisions guided by 8 C.F.R. § 212.5 and detention-and-parole guidance issued by prior Administrations. Regardless of the number of noncitizens paroled, all such paroles are granted only on an individualized "case-by-case" basis for an "urgent humanitarian reason or significant public benefit." Further, many of the releases Florida identifies are of noncitizens apprehended inside the United States border subject to and released pursuant to DHS's authority under 8 U.S.C. § 1226(a), which places no substantive limitation on Defendants' discretion to conditionally release them pending removal proceedings.

Florida has not and cannot show that Defendants are abdicating their statutory responsibilities under 8 U.S.C. §§ 1225 or 1226 to initiate removal and detain

applicants for admission. Undisputed statistics demonstrate that Defendants detain noncitizens presenting a public safety or flight risk. Defendants have also leveraged the Alternatives to Detention program to ensure a vastly greater number of noncitizens show up for their removal proceedings than if Defendants' resources were devoted to traditional detention alone. Florida's quantitative disagreements with Defendants' operational decisions do not show any violation of the law, but are instead policy debates ripe for resolution in the voting booths, not the courts.

Finally, Florida lacks standing to even challenge the alleged "non-detention policy" or Parole + ATD at all. It must establish an injury caused by these alleged practices that can be redressed by this Court. However, Florida lacks any injury against the federal government where it is challenging only the indirect effects to it of federal actions and decisions that operate directly upon the people in the States. Even if indirect effects in the form of costs to Florida's agencies were cognizable injuries, Florida has no evidence tracing these costs to the conduct challenged here. At most they can show only the general presence of third-party noncitizens under a variety of statuses in the State, which is insufficient to demonstrate Article III standing.  Finally, given this lack of evidence that Florida's costs are caused by the alleged practices at issue here, and that the Court cannot order injunctive or vacatur relief, or enter a declaration that functions as the equivalent of an injunction under 8 U.S.C. § 1252(f), Florida lacks redress.

# Exhibit List

Florida's exhibits are listed in the following table along with Defendants' objections.

| Exhibit Number | Description | Defendants' Objections[3] |
|---|---|---|
| Exhibit 1 | Customs and Border Protection Custody and Transfer Statistics FY2020 | |
| Exhibit 2 | Customs and Border Protection Custody and Transfer Statistics FY2021 | |
| Exhibit 3 | Customs and Border Protection Custody and Transfer Statistics FY2022 | |
| Exhibit 4 | Customs and Border Protection Custody and Transfer Statistics FY2023 | |
| Exhibit 5 | ICE Detention Data FY19 | |
| Exhibit 6 | ICE Detention Data EOFY2020 | |
| Exhibit 7 | ICE Detention Data, FY21 YTD | |
| Exhibit 8 | ICE Detention Data, FY2022 | |
| Exhibit 9 | ICE Detention Data, FY2023 (current through October 2022) | |
| Exhibit 10 | Data produced by Defendants regarding numbers of aliens present in Florida | |
| Exhibit 11 | Fiscal Year 2016 ICE Enforcement and Removal Operations Report | |
| Exhibit 12 | ICE Fiscal Year 2020 Enforcement and Removal Operations Report | |
| Exhibit 13 | FY2021 Budget in Brief (Price Ex. 13) | |
| Exhibit 14 | DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program (January, 20, 2021) | Fed. R. Evid. (FRE) 402, 403 |
| Exhibit 15 | ICE Budget Overview, Fiscal Year 2021 Congressional Justification | |
| Exhibit 16 | January 20, 2021 Pekoske Memo | FRE 402, 403 |
| Exhibit 17 | January 27, 2021 Email from Enrique Lucero re: ERO historical book-in data compared to new DHS memo and PEP | FRE 402, 403, 802 |
| Exhibit 18 | U.S. Border Patrol February 16, 2021 Email re "ERO Changes" | FRE 802 |
| Exhibit 19 | March 2021 Interim Report of Juvenile Coordinator in *Flores v. Garland*, C.D. Cal., 2:85-cv-4544 | FRE 402, 403, 802 |
| Exhibit 20 | March 19, 2021 Memo re: Prosecutorial Discretion | FRE 402, 403 |

---

[3] Pursuant to the Court's rule that any objections not listed will be deemed waived, Doc. 118, Defendants make all potential objections based on the face of the document in an abundance of caution. Defendants may not assert all objections listed at trial depending on the foundation laid and the context in which each exhibit is proffered.

| Exhibit 21 | U.S. Border Patrol March 20, 2021 Email regarding "Prosecutorial Discretion Authority" | FRE 402, 403, 802 |
| Exhibit 22 | U.S. Border Patrol May 21, 2021 Email regarding "HOT TASKER – FMUA Daily Ave" | FRE 402, 403, 802 |
| Exhibit 23 | July 27, 2021 DHS and Mayorkas Testimony to Sen. Comm. on Hom. Sec. and Gov. Affairs | FRE 402, 403, 701, 802 |
| Exhibit 24 | October 20, 2021 Letter from Tae Johnson to Governor Ron DeSantis | FRE 402, 403, 802 |
| Exhibit 25 | DHS FY2022 Budget in Brief | |
| Exhibit 26 | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2022 | |
| Exhibit 27 | DHS FY 2023 Budget in Brief | |
| Exhibit 28 | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2023 | |
| Exhibit 29 | April 29, 2022 Letter from U.S. Reps. Soto and Murphy re: Backlog at Orlando ICE Facility | FRE 402, 802 |
| Exhibit 30 | May 15, 2022 Email from Tony Barker re: Quick Look Report | FRE 402, 403, 802 |
| Exhibit 31 | May 19, 2022 Memo from Chief Ortiz re: Noncitizens releases from U.S. Border Patrol Custody | |
| Exhibit 32 | November 2, 2021 Parole + ATD Memo Administrative Record | FRE 402, APA Record Rule |
| Exhibit 33 | July 1, 2022 Annual Report of Immigration and Customs Enforcement in *Flores v. Garland*, C.D. Cal., 2:85-cv-4544 | FRE 402, 403 |
| Exhibit 34 | Operation Horizon, Concept of Operations, November 2021 | FRE 402, 403 |
| Exhibit 35 | Operation Horizon Phase 2, Concept of Operations, February 2022 | FRE 402, 403 |
| Exhibit 36 | Operation Horizon NTA Packet Example | |
| Exhibit 37 | Operation Horizon ICE Training Video 1 (produced file name: "1066 - ICE - OH Video-Redacted 101222") | FRE 402, 802 |
| Exhibit 38 | Operational Horizon ICE Training Video 2 (produced file name: "1066 - ICE - Processing Officers-Meeting Recording 1st Session-Redacted 101422") | FRE 402, 802 |
| Exhibit 39 | Operational Horizon ICE Training Video 3 (produced file name: "1066 - Ice - Operation Horizon Phase 2 ----HSI & CBP   Train-the-Trainer 101422") | FRE 402, 802 |
| Exhibit 40 | July 18, 2022 Parole + ATD Memo CBP Supplemental Administrative Record | FRE 402, APA Record Rule |
| Exhibit 41 | July 18, 2022 Parole + ATD Memo ICE Supplemental Administrative Record | FRE 402, APA Record Rule |
| Exhibit 42 | Press Release: CBP Releases August 2022 Monthly Operational Update | FRE 402, 403 |
| Exhibit 43 | U.S. Government Accountability Office September 2022 Report regarding Challenges and Efforts Implementing New Processes for Noncitizen Families | FRE 402, 403, 701, 802 |

| Exhibit 44 | December 16, 2014 memo from Acting Executive Director, Admissibility and Passenger Program re: Parole of Inadmissible Aliens | FRE 402 |
|---|---|---|
| Exhibit 45 | The Biden Plan for Securing Our Values as a Nation of Immigrants | FRE 402, 403, 802 |
| Exhibit 46 | U.S. Border Patrol Processing Pathways | |
| Exhibit 47 | U.S. Customs and Border Protection (CBP), Overview of the Southwest Border | FRE 802 |
| Exhibit 48 | Defendants' Responses to Plaintiff's First Set of Interrogatories | |
| Exhibit 49 | Secretary Mayorkas Delivers Remarks in Del Rio, TX (September 20, 2021) | FRE 402, 403, 802 |
| Exhibit 50 | Customs and Border Protection Custody and Transfer Statistics FY2023 | |
| Exhibit 51 | [Intentionally left blank to avoid renumbering issues. Will be cut form final exhibit list.] | |
| Exhibit 52 | [Intentionally left blank to avoid renumbering issues. Will be cut form final exhibit list.] | |
| Exhibit 53 | Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border (Feb. 2, 2021) | |
| Exhibit 54 | Executive Order 13767 of January 25, 2017 (Border Security and Immigration Enforcement Improvements) | FRE 402, 403 |
| Exhibit 55 | Proclamation 9880 of May 8, 2019 (Addressing Mass Migration Through the Southern Border of the United States) | FRE 402, 403 |
| Exhibit 56 | Presidential Memorandum of April 29, 2019 (Additional Measures to Enhance Border Security and Restore Integrity to Our Immigration System) | FRE 402, 403 |
| Exhibit 57 | Presidential Memorandum of April 6, 2018 (Ending ''Catch and Release'' at the Border of the United States and Directing Other Enhancements to Immigration Enforcement) | FRE 402, 403 |
| Exhibit 58 | Presidential Memorandum of April 4, 2018 (Securing the Southern Border of the United States) | FRE 402, 403 |
| Exhibit 59 | June 2021 Memo re Notice to Report | FRE 402, 403, deliberative process privilege |
| Exhibit 60 | OIG Report re ICE Housing Migrant Families in Hotels (April 12, 2022) | FRE 402, 403, 802, 701 |
| Exhibit 61 | May 4, 2022 Testimony of Alejandro Mayorkas before Senate Comm. on Homeland Security and Governmental Affairs (https://www.hsgac.senate.gov/hearings/05/04/2022/resources- | FRE 402, 403, 802 |

| | and-authorities-needed-to-protect-and-secure-the-homeland) [Timestamp: 2:27:00–2:34:00] [updated with correct date] | |
|---|---|---|
| Exhibit 62 | May 26, 2021 Testimony of Alejandro Mayorkas, Tae Johnson, and Troy Miller before House Committee on Appropriations, Subcommittee on Homeland Security | FRE 402, 404, 701, 802 |
| Exhibit 63 | Defendants' Responses to Plaintiff's First Set of Requests for Admission | |
| Exhibit 64 | Apprehension, Processing, Care, and Custody of Alien Minors and UAC, 84 Fed. Reg. 44,392 (Aug. 23, 2019) (Price Ex. 12) | FRE 402 |
| Exhibit 65 | AHCA Florida Emergency Assistance for Noncitizens (Ex. B to AHCA Depo) | FRE 402 |
| Composite Exhibit 66 | Composite Exhibit 66: Data from Florida Department of Economic Opportunity | FRE 402, 802 |
| Exhibit 67 | Florida Department of Education State FEFP Distributions by Month from FY 2019–2020 through 2022–23 | FRE 402 |
| Exhibit 68 | Florida Department of Education State Class Size Reduction Distributions by Month from FY 2019–20 through 2022–23 | FRE 402 |
| Exhibit 69 | Florida Education and Finance Program 2021–22 Final Calculation | FRE 402 |
| Exhibit 70 | Florida Education and Finance Program 2020–21 Final Calculation | FRE 402 |
| Exhibit 71 | Florida Education and Finance Program 2022–23 Second Calculation | FRE 402 |
| Exhibit 72 | Florida Department of Education Enrollment by Immigration Status 2020–21 and 2021–22, Final Surveys 2,3,5 | FRE 402 |
| Exhibit 73 | FLHSMV Non-Immigrants Transactions from Jan. 1, 2020 through May 31, 2022 | FRE 402 |
| Exhibit 74 | FLHSMV Non-Immigrants Transactions from Jan. 1, 2020 through August 31, 2022 | FRE 402 |
| Composite Exhibit 75 | Highway Safety Examples of Paroled Noncitizens who Applied for a Driver's License or ID Card | FRE 402 |
| Exhibit 76 | FDC Costs of Incarceration Per Month | FRE 402, 802 |
| Exhibit 77 | FDC FY 15–16 SCAAP Data | FRE 402 |
| Exhibit 78 | FDC FY 16–17 SCAAP Data | FRE 402 |
| Exhibit 79 | FDC FY 17–18 SCAAP Data | FRE 402 |
| Exhibit 80 | FDC FY 18–19 SCAAP Data | FRE 402 |
| Exhibit 81 | FDC List of Criminal Aliens in FDC Custody as of May 6, 2022 | FRE 402, 802 |
| Exhibit 82 | DCF Domestic Violence Contractual Payments from July 1, 2020 through June 30, 2021 | FRE 402, 802 |
| Exhibit 83 | DCF Cheat Sheet for Domestic Violence Providers | FRE 402, 802 |
| Exhibit 84 | DCF FY 19–20 Bed Cost Chart | FRE 402, 802 |
| Exhibit 85 | DCF FY 20–21 Bed Cost Chart | FRE 402, 802 |
| Exhibit 86 | DCF FY 21–22 Bed Cost Chart | FRE 402, 802 |
| Exhibit 87 | DCF OCW Noncitizen Payments | FRE 402, 802 |

| Exhibit 88 | DCF ESS Data | FRE 402, 802 |
| Exhibit 89 | DCF Noncitizens Guide | FRE 802 |
| Exhibit 90 | DCF FY 19–20 Undocumented Persons in State Mental Health Treatment Facilities | FRE 402, 403, 802 |
| Exhibit 91 | DCF FY 21–22 Undocumented Persons in State Mental Health Treatment Facilities | FRE 402, 403, 802 |
| Exhibit 92 | DCF Community Mental Health Services Expenditures | FRE 402, 403, 802 |
| Exhibit 93 | DCF ESS Summary of Costs | FRE 402, 802 |
| Exhibit 94 | Summary of FLHSMV DL and ID Issuances | FRE 402, 802 |
| Exhibit 95 | Copy of PERA 4206 Immigration Enrollments 2021–2022 FS235 | FRE 402, 802 |
| Exhibit 96 | BJA FY 2021 State Criminal Alien Assistance Program Grant Solicitation O-BJA-2021-171190 | FRE 402, 403 |
| Exhibit 97 | Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where A Quarantinable Communicable Disease Exists (April 6, 2022) | FRE 402 |

Defendants' exhibits are listed in the following table. Florida has no objections.

| Exhibit No. | Description |
|---|---|
| A | *Padilla* Injunction Implementation Guidance and the Interim Parole Policy |
| B | CBP Parole Directive 3340-043 |
| C | ICE Parole Directive 11002.1 |
| D | CBP – Paroling Arriving Fugitives (Aug. 8, 2012) |
| E | CBP – Parole of Inadmissible Nonimmigrant Aliens (Nov. 19, 2014) |
| F | CBP – Parole of Inadmissible Nonimmigrant Aliens (Dec. 16, 2014) |
| G | CBP – Parole of Inadmissible Nonimmigrant Aliens (May 12, 2015) |
| H | ICE Academy: Guidelines for the Enforcement of Civil Immigration Law: Foundational Training |
| I | ICE Transportation, Detention and Processing Requirements (Jan. 11, 2005) |
| J | ICE ERO, Parole of Arriving Noncitizens Considered for Release (broadcast email) (Nov. 17, 2021) |
| K | DHS Memo – "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017) |
| L | USBP Processing Pathways Prioritization |
| M | DHS Southwest Border Task Force Executive Leadership Report (excerpt) |
| N | Statement by Secretary Mayorkas on CDC's Title 42 Order Termination |
| O | *Flores v. Rosen*, No. 19-56326 (9th Cir. Dec. 29, 2020) |
| P | "Prosecutorial Discretion Authority" email (March 20, 2021) |

| | |
|---|---|
| Q | CBP – Custody and Transfer Statistics FY2021 |
| R | CBP – Custody and Transfer Statistics FY2022 |
| S | CBP – Custody and Transfer Statistics FY2023 |
| T | ICE Detention Data, FY2021 |
| U | ICE Detention Data, FY2022 |
| V | ICE Detention Data, FY2023 |
| W | DHS FY2019 Budget in Brief |
| X | DHS FY2020 Budget in Brief |
| Y | DHS FY2021 Budget in Brief |
| Z | DHS FY2022 Budget in Brief |
| AA | Consolidated Appropriations Act 2019, H.J. Res. 31, P.L. 116-6 (DHS appropriations) |
| BB | FY 2020 Consolidated Appropriations Act, P.L. 116-93 (DHS appropriations) |
| CC | FY 2021 Omnibus and COVID Relief and Response Act, P.L. 116-260 (DHS appropriations) |
| DD | FY 2022 Consolidated Appropriations Act, P.L. 117-103 (DHS appropriations) |
| EE | Original Complaint, ECF No. 1 |
| FF | First Amended Complaint, ECF No. 16 |
| GG | Second Amended Complaint, ECF No. 74 |
| HH | Plaintiff's Response to Defendants' First Set of Interrogatories |
| II | Plaintiff's Amended Response to Defendants' First Set of Interrogatories |
| JJ | Plaintiff's Second Amended Response to Defendants' First Set of Interrogatories |
| KK | Plaintiff's Second Amended Response to Defendants' First Set of Interrogatories |
| LL | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2019 |
| MM | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2020 |
| NN | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2021 |
| OO | U.S. Immigration and Customs Enforcement, Budget Overview – Congressional Justification, FY2022 |

## Witness List

The parties plan to present both live testimony and deposition testimony.

Pursuant to the timing requirements of Rule 26(a)(3), the parties will promptly file

their deposition excerpts and will file objections and counter designations by Friday,

December 23.

Plaintiff's Witness List:

Kimberly Thomas
Florida Department of Corrections

Lavitta Stanford
Florida Department of Corrections

Jacob Oliva
Florida Department of Education

Tony Lloyd
Florida Department of Children and Families

Patti Grogan
Florida Department of Children and Families

Jesse Bottcher
Florida Agency for Health Care Administration

James Heckman
Florida Department of Economic Opportunity

Robert Kynoch
Florida Department of Highway Safety and Motor Vehicles

Chief Raul Ortiz (by deposition, Florida may also call as a live witness)
Border Patrol, U.S. Customs and Border Protection

Executive Director Matthew Davies (by deposition, Florida may also call as live
witness)
Office of Field Operations, U.S. Customs and Border Protection

Deputy Assistant Director Robert Guadian (by deposition, Florida may also call as
live witness)
Enforcement and Removal Operations, Immigration and Customs Enforcement

Executive Associate Director Corey Price (by deposition, Florida may also call as a live witness)
Enforcement and Removal Operations, Immigration and Customs Enforcement

Tony Barker (by deposition, Florida may also call as a live witness)
Former Chief of Law Enforcement Operations Directorate of
the U.S. Border Patrol, U.S. Customs and Border Protection

Defendants' Witness List:

Chief Raul Ortiz
Border Patrol, U.S. Customs and Border Protection

Executive Director Matthew Davies
Office of Field Operations, U.S. Customs and Border Protection

Deputy Assistant Director Robert Guadian
Enforcement Removal Operations, Immigration and Customs Enforcement

Executive Associate Director Corey Price
Enforcement and Removal Operations, Immigration and Customs Enforcement

Tony Barker (by deposition)
Former Chief of Law Enforcement Operations Directorate of
the U.S. Border Patrol, U.S. Customs and Border Protection
(No longer employed by Defendants)

## Admitted Facts

Background Facts on the Parties

    1. Plaintiff is the State of Florida.

    2. Defendant Department of Homeland Security (DHS) is the federal agency

principally responsible for immigration enforcement.

3. DHS oversees Defendants U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE).

4. Defendant Alejandro Mayorkas is the Secretary of Homeland Security.

5. Defendant Tae Johnson is the Acting Director of ICE.

6. Defendant Troy Miller is the Acting Commissioner of CBP and is automatically substituted for Chris Magnus under Federal Rule of Civil Procedure 25(d).

7. Defendant Ur M. Jaddou is the Director of USCIS.

8. Defendant United States of America is the country bearing that name.

9. CBP's component, Office of Field Operations (OFO), is responsible for, among other things, immigration enforcement at the ports of entry.

10. CBP's component, U.S. Border Patrol, is responsible for immigration enforcement between ports of entry.

11. Enforcement and Removal Operations (ERO), an ICE component, is responsible for interior immigration enforcement.

12. ERO is also responsible for managing ICE's immigration detention.

13. CBP holding capacity and ICE detention capacity are distinct.

14. Border Patrol and OFO generally seek to limit detention in their holding facilities to 72 hours or less.

15. Longer term detention requires a transfer of custody to ERO.

DHS Data

16. CBP's dispositions and transfers from the Southwest Border for FY 2023 to date and the last three fiscal years are available at https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy22, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy2021, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics-fy-2020.

17. Border Patrol dispositions and transfers are provided in the "U.S. Border Patrol - Dispositions and Transfers" tab on the above-linked webpages.

18. Releases designated as "Parole + ATD" are releases under one of the iterations of that policy.

19. Releases designated as "Notice to Appear/Own Recognizance" are releases that, on DHS's view, are authorized under 8 U.S.C. §§ 1229a and 1226(a).

20. Before Border Patrol began reporting Parole + ATD releases in fiscal year 2021, Border Patrol reported releases under 8 U.S.C. § 1182(d)(5) as part of "Other."

21. ICE's detention statistics for FY 2023 year to date and the prior four fiscal years are available at https://www.ice.gov/detain/detention-management.

Facts Relevant to the Presence of Aliens in Florida

22. During discovery, Defendants produced data from ICE internal databases reflecting information about aliens released by DHS from January 20, 2021, to July 5, 2022.

23. An NTA/Own Recognizance release reflects a release purportedly under 8 U.S.C. § 1226(a).

24. A Notice to Report release reflects aliens released under prosecutorial discretion.

25. A Parole + ATD release reflects aliens released under 8 U.S.C. § 1182(d)(5)(A) pursuant to Defendants' Parole + ATD policy.

26. The Miami ERO Field Office has responsibility for Florida, Puerto Rico, and the U.S. Virgin Islands.

<u>Facts Relevant to Florida's Alleged Expenditures</u>

27. Florida does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies.

28. As such, Florida relies on expenditures on aliens that it tracks in broader categories, and the parties dispute whether this evidence is sufficient to support standing.

29. Florida's Department of Corrections (FDC) tracks expenditures on "undocumented criminal alien[s]" under 8 U.S.C. § 1231(i).

30. FDC does so in order to participate in the State Criminal Alien Assistance Program (SCAAP), a grant program run by the U.S. Department of Justice.

31. SCAAP implements 8 U.S.C. § 1231(i), which authorizes the federal government to "enter into a contractual arrangement which provides for compensation to the State or a political subdivision of the State, as may be appropriate, with respect to the incarceration of the undocumented criminal alien."

32. The following reflects the information tracked by FDC and the reimbursements provided by the federal government through SCAAP.

| Reporting Period | 7/1/15 – 6/30/16 | 7/1/16 – 6/30/17 | 7/1/17 – 6/30/18 | 7/1/18 – 6/30/19 |
|---|---|---|---|---|
| Eligible Inmates Reported | 7,320 | 7,103 | 6,923 | 6,848 |
| Number of Inmate Days Reported | 2,231,181 | 2,171,574 | 2,118,554 | 2,115,979 |
| Costs of Incarceration Per Day | $53.52 | $55.80 | $59.57 | $62.16 |
| Estimated Costs to Incarcerate Reported Eligible Inmates | $119,412,807 | $121,173,829 | $126,202,262 | $131,529,255 |
| Amount Reimbursed by Federal Government | $6,823,144 | $6,786,271 | $7,380,287 | $8,236,498 |

33. Florida's Department of Education (DOE) tracks the number of "immigrant children and youth" enrolled in Florida's schools.

34. For fiscal year 2020–2021, the total number of "immigrant children and youth" enrolled in Florida's schools was 95,084.

35. For fiscal year 2021–2022, the data are not complete, but as of February 2022 there were 101,125 "immigrant children and youth" enrolled in Florida's schools.

36. "Immigrant student" is defined as any student who was born abroad and has been educated outside the United States in the last three academic school years, though the parties disagree as to whether the definition comes from federal or state law.

37. For fiscal year 2020–2021, the average cost per student was $8,034.39.

38. For fiscal year 2021–2022, the average cost per student was $7,812.67.

39. For fiscal year 2022–2023, the projected average cost per student is $8,216.74.

40. Federal funds received for "immigrant children and youth" are used to provide supplementary services and are not used to offset general education costs.

41. Florida's Agency for Health Care Administration (AHCA) administers Florida's Medicaid program.

42. Under 42 U.S.C. § 1395dd, participating medical facilities must provide emergency medical services to immigrants regardless of status.

43. AHCA covers these emergency medical services for aliens who meet eligibility requirements for Medicaid.

44. From January 2020 to April 2022, AHCA's records show that it paid emergency services for 153,575 noncitizens, totaling $345,639,592.

45. Those costs are shared between Florida and the federal government.

46. Florida's share of these expenditures was $111,451,901.

47. Because providers are given a year after performing a service to submit a claim, AHCA's data is not complete until a year after a service is performed.

48. Florida's Department of Economic Opportunity pays temporary wage replacement benefits to eligible individuals who are without employment through no fault of their own.

49. These benefits are paid from the Unemployment Compensation Trust fund, § 443.191, Florida Statutes, and is funded from state taxes paid by employers.

50. In order to qualify for benefits, the claimant must have been employed in Florida, earned at least $3,400 before taxes in the first four complete quarters beginning 18 months prior to their claim, and be able to work and actively seeking employment.

51. If an alien is authorized to work in the United States and meets other eligibility criteria, the alien is eligible to receive these benefits.

52. Aliens released under 8 U.S.C. § 1182(d)(5) are eligible to apply for work authorization.

53. Aliens released under other mechanisms, such as 8 U.S.C. § 1226(a), are eligible to apply for work authorization 150 days after submitting an application for asylum.

54. From January 2020 to May 2022, DEO paid $426,521,033.00 in reemployment assistance benefits to noncitizens.

55. From January 2020 to May 2022, DEO incurred staffing costs of $5,824.48/month, for a total of $168,909.92, associated with the processing of alien claims.

56. Florida's Department of Children and Families (DCF) provides a variety of public services, which aliens are either expressly eligible for or for which DCF provides services regardless of immigration status.

57. From January 2020 through January 2022, DCF spent $974,774.08 of state funds providing Temporary Assistance for Needy Families benefits to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

58. From January 2020 through January 2022, DCF spent approximately $2,162,194.18 of state funds providing Supplemental Nutrition Assistance Program

benefits to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

59. From January 2020 through January 2022, DCF spent $12,236 providing Relative Caregiver Financial Assistance from state funds to qualifying noncitizens. The parties could not agree as to the criteria for qualifying noncitizens and will present evidence at trial on that issue.

60. For fiscal year 2021–2022, DCF spent $7,636,351 specifically on unlawfully present aliens in state residential treatment facilities.

61. For fiscal year 2021–2022, DCF spent $940,389,499 on substance abuse and mental health services. DCF does not track the amount of these services to aliens.

62. For fiscal year 2021–2022, DCF spent $5,336,755.81 on Office of Child and Family Well-Being services for nonqualifying alien children, which include those who were paroled under 8 U.S.C. § 1182(d)(5) for less than one year, although DCF does not track which of those nonqualifying alien children are such parolees.

63. For fiscal year 2021–2022, DCF spent $38,511,217 in state funds on domestic violence services for victims. DCF does not track the amount of these services to aliens.

64. Florida's Department of Highway Safety and Motor Vehicles (FLHSMV) provides driver's licenses and state identification cards.

65. Aliens with certain immigration documents, such as a pending asylum application, a grant of parole under 8 U.S.C. § 1182(d)(5), and a Notice of Hearing before an immigration judge, are eligible for driver's licenses and state identification cards.

66. FLHSMV confirms immigration status via an inquiry in DHS's Systematic Alien Verification System (SAVE).

67. If an alien applies for an ID or driver's license, FLHSVM conducts at least one SAVE inquiry.

68. FLHSMV pays 50 cents for each SAVE inquiry.

69. FLHSMV charges applicants $48 for licenses and $25 for ID cards.

70. FLHSMV charges an applicant nothing if the SAVE inquiry reveals that the applicant is not eligible.

Facts Relevant to the Merits

The parties dispute virtually all facts on the merits in this case, or at least whether they are relevant, and thus prefer to present their respective cases at trial.

**Agreed Issues of Law**

The parties agree that the statutes at issue in this case are the relevant provisions of the INA, including 8 U.S.C. §§ 1182, 1225, 1226, 1229a, 1252, and 1357. As the Court is aware from previous briefing, the parties dispute the interpretations of these provisions and their application to the facts of this case.

## Disputed Facts

The principal dispute in this case is whether Defendants have issued a "non-detention policy."

Florida's position is that Defendants have (1) withdrawn strict limits on the release of aliens at the border, (2) drastically cut detention capacity, even while telling Congress that doing so will not impede their duties, and (3) intentionally transitioned away from detention in favor of so-called "alternatives to detention," unless DHS finds that the alien is a public safety or flight risk. Florida's position is that these facts are sufficient to infer a non-detention policy subject to challenge under the APA.

Defendants' position is that there is no "non-detention policy." Florida takes issue with an amalgam of individual parole decisions and agency budgetary judgments that do not represent a challengeable agency action under the APA, and are fully within Defendants' discretion even if they were challengeable. Defendants continue to detain noncitizens presenting a national security, public safety or flight risk but have leveraged the Alternatives to Detention program to ensure the compliance of vastly more noncitizens than if they focused on traditional detention alone. Outside of Parole + ATD, a policy not at issue in the trial but also fully in compliance with 8 U.S.C. § 1182(d)(5)(A), Defendants have not promulgated any presently operative general policies concerning conditions for release of noncitizens

encountered at the Southwest border in the past two years, but continue to rely on 8 C.F.R. § 212.5 and detention-and-parole guidance developed under previous Administrations.

Regardless of the number of noncitizens paroled, all such paroles continue to be granted on an individualized "case-by-case" basis for an "urgent humanitarian reason or significant public benefit." Further, many of the releases Florida identifies are of noncitizens apprehended inside the United States subject to and released pursuant to DHS's authority under 8 U.S.C. § 1226(a), which places no substantive limitation on Defendants' discretion to conditionally release them pending removal proceedings.

## Disputed Issues of Law

The principal legal disputes in this case are (1) the proper interpretation and application of 8 U.S.C. § 1226(a); (2) the proper interpretation and application of 8 U.S.C. § 1225(a)–(b); (3) the proper interpretation and application of 8 U.S.C. § 1182(d)(5); (4) the reviewability of the challenged actions under 8 U.S.C. § 1252(a) & (f); (5) the availability of judicial review under the APA and the Constitution; and (5) whether Florida has standing.

**Disagreement Regarding Rules of Evidence or Procedure**

The only disagreements the parties are aware of are reflected in Defendants' objections to Florida's exhibits, Defendants' motions in limine, and Florida's response to Defendants' motions in limine.

**All Motions or Matters Requiring Action**

Defendants' omnibus motions in limine. Doc. 120.

**Non-Jury Case**

This is a non-jury case.

**Length of Cases and Trial**

Florida hopes to finish its case in chief in two days but may need a third day depending on the Court's reception to Defendants' objections.

Defendants anticipate they will also need two days to present their case.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Karen Brodeen (FBN 512771)
SPECIAL COUNSEL

Bilal Faruqui (FBN 15212)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA P. FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 805-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

30

## CERTIFICATE OF SERVICE

I certify that on December 9, 2022, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
Deputy Attorney General