# Exhibit 1

# DEPOSITION OF
# COREY A. PRICE

```
1              MS. RYAN:  Erin Ryan for the United

2    States.

3              VIDEOGRAPHER:  The court reporter

4    today is Mawira Nyamete, representing Planet

5    Depos.  Would the reporter please swear in the

6    witness and then we may proceed.

7              COURT REPORTER:  Please raise your

8    right hand.  Do you solemnly swear or affirm

9    under the penalties of perjury that the

10   testimony you shall give today shall be the

11   truth, the whole truth, and nothing but the

12   truth?

13             THE WITNESS:  I do.

14             COURT REPORTER:  Counsel, you may

15   proceed.

16

17   Whereupon,

18                  COREY A. PRICE,

19   being first duly sworn or affirmed to testify to

20   the truth, the whole truth, and nothing but the

21   truth, was examined and testified as follows:

22     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
```

1    BY MR. GUARD:

2         Q.    Good morning, Director Price.

3         A.    Good morning.

4         Q.    Can you please state and spell your

5    name for the record.

6         A.    Yes.  Corey Allen Price, C-O-R-E-Y A-

7    L-L-E-N P-R-I-C-E.

8         Q.    Director Price, we're obviously on the

9    record and you have to your left, my right, a

10   court reporter who is taking everything down.

11   That means that, you know, if you and I were

12   meeting and we were talking, we'd probably, you

13   know, finish each other's sentences, talk over

14   each other like normal human beings, but because

15   we have a court reporter, we can't do that.  So,

16   I'd ask -- I'll try not to talk over you, and

17   I'd ask that you try not to talk over me.  Is

18   that fair?

19        A.    Fair.

20        Q.    All right.  If you don't understand a

21   question I ask, please ask me to either restate

22   it or rephrase it, and I will try to make it so

1    That's basically the main gist of it.

2         Q.   Okay.  And since I haven't asked you

3    this yet, Director Price, you currently serve as

4    the Executive Associate Director of Enforcement

5    and Removal Operations for ICE.

6         A.   Yes.

7         Q.   Okay.  And is it all right with you if

8    I use the acronym because it's a government

9    agency, ERO, it's for Enforcement and Removal

10   Operations?

11        A.   Yes.

12        Q.   All right.  And I already did once,

13   but is it all right if I use the acronym ICE for

14   Immigration and Customs Enforcement?

15        A.   Yes.

16        Q.   All right.  And ICE is a component of

17   the Department of Homeland Security, correct?

18        A.   Yes.

19        Q.   And just because we have to have more

20   acronyms, is it all right if I use the acronym

21   DHS for Department of Homeland Security?

22        A.   Yes.

1        A.    Yes.

2        Q.    And is it alright with you if I use

3   CBP as an acronym?

4        A.    Yes.

5        Q.    Okay.  And ERO deals frequently with

6   parts of CBP, correct?

7        A.    All right.  ERO deals with the Office

8   of Field Operations, correct?

9        A.    Yes.

10        Q.    All right, and I'll use again, just

11   have to have a lot of acronyms because we're the

12   government, is it all right if we use the

13   acronym OFO?

14        A.    Yes, it is.

15        Q.    All right.  And among other

16   responsibilities, OFO runs the ports of entry on

17   the US border, including the southwest border,

18   right?

19        A.    Yes.

20        Q.    All right.  And ERO also deals

21   frequently with US Border Patrol, correct?

22        A.    Yes.

1       Q.    All right.  And the Border Patrol is a

2    component of CBP?

3       A.    Yes.

4       Q.    All right.  And the Border Patrol is

5    responsible, among other things, for the areas

6    of the border between ports of entry?

7       A.    Yes.

8       Q.    All right.  And finally, to the right,

9    CBP is US Citizenship and Immigration Services

10   on Exhibit 1, correct?

11      A.    Yes.

12      Q.    All right.  And is it all right if I

13   use acronyms CIS?

14      A.    Yes.

15      Q.    Okay.  And CIS performs, among other

16   things, is responsible for conducting asylum

17   interviews, correct?

18      A.    Yes.

19      Q.    You have been the Executive Associate

20   Director for ERO since August of 2021, correct?

21      A.    I believe I became permanent about

22   that time.  I cannot remember the exact date.

1    But I was acting immediately prior to that.

2         Q.   You were acting since February of

3    2021, right?

4         A.   Yes.

5         Q.   Okay.  And that was when Director

6    Lucero left?

7         A.   Yes.

8         Q.   Okay.  And you are the highest

9    management official at ERO, right?

10        A.   Yes.

11        Q.   All right.  And you report directly to

12   the deputy director of ICE, correct?

13        A.   Yes.

14        Q.   And Patrick -- I hope I don't miss-say

15   his last name -- Lechleitner is performing the

16   duties of the deputy director.

17        A.   Great, yes.

18        Q.   Okay.  And how long approximately has

19   Deputy Director Lechleitner served in that

20   position?

21        A.   It was sometime in the summer of 2021,

22   I believe.  He succeeded Matt Allen, who was

1    acting prior to him.  I just don't recall the

2    exact date.

3         Q.   Okay.  So, you've been the highest

4    ranking official at ERO for almost all of the

5    Biden administration, correct?

6         A.   Yes.

7         Q.   All right.  And you've been with ICE

8    or its predecessor since 1998, correct?

9              MR. DARROW:  Objection

10        A.   Yes.

11        Q.   Okay.  ICE came into being as -- as --

12   as part of the Homeland Security Act in 2003ish?

13        A.   Yes.

14        Q.   Okay, all right.  So, you spent

15   twenty-four years with ICE or it's its

16   predecessor agency, correct?

17        A.   Yes.

18        Q.   Okay.  Is it fair to say, Director

19   Price, that you have either yourself arrested

20   and had detained or supervised the detention of

21   aliens illegally present in the United States?

22             MR. DARROW:  Objection.

1       A.   Could I ask you to repeat the

2  question?

3       Q.   Sure.  Is it fair to say -- and before

4  I say it, from time to time, your counsel is

5  going to object.  Obviously, we do not have a

6  judge here.

7       A.   Okay.

8       Q.   And so, unless he instructs you not to

9  answer it, you're going to go ahead and answer

10  the question, even if he objects, and it

11  probably be a good idea to pause a minute after

12  I finish or pause a second, not a minute, after

13  I ask you a question so that he can object or

14  not.

15       A.   Sounds good, thank you.

16       Q.   Okay.  Now, I'll restate the question.

17  Is it fair to say that you have either yourself

18  arrested and had detained or supervised the

19  detention of aliens illegally present in the

20  United States?

21            MR. DARROW:  Objection.

22       A.   Yes.

1        Q.    Okay.  Is it fair to say that over

2    your twenty-four-year ICE career that you have

3    either yourself arrested and had detained or

4    supervised ICE employees who are responsible for

5    the detention of hundreds of thousands of aliens

6    who were illegally present in the United States?

7              MR. DARROW:  Objection.

8        A.    I do not know the number.  But

9    otherwise, that's a yes.

10       Q.    Okay.  It would be a -- it's not a low

11   number; it's going to be a high a high number.

12       A.    Yes.

13       Q.    Okay.  There is nothing inhumane about

14   attaining an alien who entered this country

15   illegally, is there?

16       A.    No.

17       Q.    Okay.  There's nothing cruel about

18   detaining an alien who entered this country

19   illegally, right?

20       A.    No.

21       Q.    Okay.  Would you agree, Director

22   Price, that detention of aliens ensures ICE's

1    ability to remove an inadmissible alien?

2         A.    That's not entirely accurate.

3         Q.    how is it not accurate?

4         A.    Detention in and of itself does not

5    always result in a removal from the United

6    States.

7         Q.    Okay.  But you have two options,

8    detention or release, correct?

9              MR. DARROW:  Objection.

10        A.    We have various options, but -- but in

11   a nutshell, that would be correct.  We can

12   detain, we can place on -- we can have a bond

13   issued for that individual, we can place them on

14   various forms of alternative to detention that

15   can include electronic monitoring, they can be

16   released on an order of recognizance or

17   supervision.  So, we do have various methods,

18   yes.

19        Q.    All those other methods are different

20   forms of release with different levels of

21   supervision, right?

22        A.    Yes.

1    Q.   Okay.  And all those other various

2    forms -- all the forms of release -- and I was

3    very careful to use the word release versus one

4    of those specific forms -- have a risk of

5    absconding, right?

6    A.   Yes.

7    Q.   Okay.  And for inadmissible aliens,

8    the surest way to -- to be to be sure that

9    you're going to be able to remove them is to

10   keep them in detention, correct?

11   A.   Yes.

12   Q.   Okay.  Now, I think I've got all the

13   acronyms out of the way, and I'll move on from

14   that.  I want to talk to you about what ERO

15   does.  In your own words, what does ERO do?

16   A.   ERO enforces the immigration law on

17   the interior of the United States.  Part of that

18   includes the detention of aliens while going

19   through immigration proceedings, and then

20   subsequent to that, those who've been ordered

21   removed, we then detain them until their

22   ultimate removal, which we then perform those or

1  carry out those duties to remove those

2  individuals.  We also have our officers work

3  with consulates and embassies to obtain travel

4  documents and things of that nature, which are

5  required to perform that removal.  We also have

6  at-large teams that include fugitive operations

7  teams that conduct arrests on the interior of

8  the United States of those that are here

9  unlawfully or otherwise ordered removed from the

10  United States.  We have officers that work with

11  state, local -- yeah, state, local, and federal

12  prisons and jails to identify those that are --

13  that have committed crimes while they were here

14  in the United States and are also amenable to

15  removal from the United States so we can place

16  them into proceedings and get them removed.

17  That's the main thing.  Oh, and we perform the

18  docket management of those that are both in our

19  custody and out of our custody while they're

20  going through those proceedings as well.

21      Q.   Okay.  With respect to the border, and

22  specifically the southwest border, what is your

1   role with respect to the border?

2         A.   ERO has been assisting CBP for many

3   years with being able to detain those that

4   they've arrested and made a custody

5   determination should either come to our custody

6   or requesting that we place them on ATD or

7   things of that nature.  We've been helping

8   there.  We've also been helping them with

9   transportation, both ground and air

10  transportation, to detention facilities or other

11  destinations to include other border patrol or

12  other CBP offices for processing and things of

13  that nature.

14        Q.   Okay.  And you take transfers of

15  aliens from time to time and then repatriate

16  them or -- or return them home if they're

17  subject to remove or expedited removal decision?

18             MR. DARROW:  Objection.

19        A.   Yes.

20        Q.   With bag and baggage?  Have you heard

21  that term before?

22        A.   Yep.

1      A.    We do have Removal Division.  That is

2  one of them.  Field Operations is one of them.

3  Mission Support, otherwise known as Operation

4  Support Division, is another.  Detention

5  Management is -- is another one.  But

6  Enforcement and Secure Communities are actually

7  one division.  It's just called Enforcement.

8  There is no Secure Communities.  And then the

9  other one we have as the Law Enforcement Systems

10  and Analysis Division, LESA, as we call it.  So,

11  you could think the scratch out Secure

12  Communities and replace that with LESA, and it

13  will be correct.

14      Q.    Okay, all right.  Since you mentioned

15  LESA, what is -- what is Lisa do?

16      A.    Law Enforcement Systems and Analysis

17  is responsible for our, you know, we call it

18  data and reporting on behalf of ERO.

19      Q.    Okay.  I want to talk a minute about

20  the removal group.  What does the removal group

21  do?

22      A.    So, the removal group, it does a

1    number of things, but it's primary mission is

2    overseeing functions like ICE Air, which is our

3    air transportation, which both executes removals

4    via air and also lateral transfers.  What I mean

5    by lateral transfer is if we have people in El

6    Paso, for instance, and we need to transfer them

7    to Dallas, Texas for detention, then they would

8    perform that mission of transferring up there so

9    they can go into ERO custody there.  They also

10   oversee post-order custody reviews.  It falls

11   under the Removal Division.  The engagements

12   that we have internationally with foreign

13   consulates and embassies to obtain travel

14   documents and things and otherwise arrange for

15   removals with, that's -- that all falls under

16   the Removal Division.

17       Q.   Okay.  I'm show you what I've marked -

18   - I'm going to mark for identification as

19   Exhibits 3, 4, 5, and 6.  So, here's 3.  Here's

20   4.

21       A.   Thank you.

22       Q.   Here's 5.

1      A.    Thank you.

2      Q.    And here's 6.

3      A.    Thank you.

4      Q.    And I apologize, this is a large --

5  these are large spreadsheets that are actually

6  on ICE's website and when they print out, they -

7  - I could not get them all to print out on a

8  single page where you can see all of it except

9  for one of them.  So, we have a format of that.

10  I think it's 2021.  I got everything on, and so

11  they got on one page, and you can actually read

12  it.  The rest of them, it carries over, but

13  we'll try to muddle through it.

14      A.    Okay.

15      Q.    All right.  So, 3 -- Exhibits 3, 4, 5,

16  and 6 are ICE detention data and alternatives to

17  detention data for four separate years, correct?

18      A.    Sorry, I'm looking for the alternative

19  to detention data sheet.

20      Q.    It would be towards the back.

21      A.    Yes, that appears to be what's

22  reflected on these.

1          Q.    Okay.  And Exhibit 3 is ICE detention

2     and alternative to detention data for the year

3     2019, right?

4               MR. DARROW:  Objection.

5          A.    Yes.

6          Q.    Okay.  Exhibit 4 is the ICE detention

7     and alternatives to detention data for 2020,

8     correct?

9          A.    Correct.

10         Q.    All right.  And I'm saying 4 is 2020.

11    It's actually a fiscal year.

12         A.    FY -- FY 2020.

13         Q.    Correct.

14         A.    Yes.

15         Q.    Because the government is on a fiscal

16    year system, which ends in September and begins

17    in October and not a calendar year system.

18         A.    Correct.

19         Q.    All right.  Well, I just -- is it

20    easier -- is it okay if I just use the year and

21    don't keep on using the word fiscal because

22    he'll keep on writing it physical and we're

1    going to have a problem at the correction stage.

2    Is that okay?

3         A.    No issues with me.

4         Q.    Okay.  All right.  And then, Exhibit 6

5    is the ICE detention and alternative data for

6    2022, correct?

7         A.    That's correct.

8         Q.    Okay.  Since President Biden became

9    president on January 20, 2021, EOR [sic] is

10   removing less aliens, correct?

11           MR. DARROW:  Objection.

12        A.    That's correct.

13        Q.    Okay.  Since President Biden

14   became president, EOR [sic] is removing

15   significantly less aliens, right?

16           MR. DARROW:  Objection.

17        A.    ERO is removing less aliens, but part

18   of that is also because there's a significant

19   number of being expelled under Title 42, which

20   wouldn't be accounted for in this.  So, I just

21   wanted to make sure to let you know about that.

22        Q.    Okay.  In 2019, ICE removed 267,258

1    aliens and that's on page 3 on the back.  I'll

2    just try to help you.  So -- so, the third page,

3    on the front and back because I was trying not

4    to kill trees and having you weighed down with

5    paper.

6         A.    267,258, correct.

7         Q.    Okay.  And in 2020, which is Exhibit

8    4, ICE removed 185,884 aliens, and I think

9    that's on page 1, I think, on the front.  It's

10   not on the front, it's on the back.

11        A.    185,884, correct.

12        Q.    And in 2021, ICE removed 55,598,

13   right?  And it's on page 2 on the front.

14        A.    That appears correct.

15        Q.    Okay.  And that's -- so, the 55,590

16   alien removals in 2021 under the Biden

17   administration is roughly 20% of the number that

18   were removed in 2019, correct?

19             MR. DARROW:  Objection.

20        A.    That appears correct.

21        Q.    Okay.  And 2019 was a year when the

22   southwest border received a surge of traffic,

1    right?

2         A.    Yes.

3         Q.    Okay, all right.  And 2022 -- so,

4    Exhibit 6, ICE 57,710 aliens, right?

5         A.    Correct.

6         Q.    All right.  Again, that number is just

7    slightly more than 20% of ICE's 2019 number,

8    right?

9              MR. DARROW:  Objection.

10        A.    That appears correct.

11        Q.    Director, ICE currently is removing

12   less aliens from the United States than it has

13   in the last decade, right?

14             MR. DARROW:  Objection.

15        A.    I do not have the last ten years' data

16   available.  But it is less than at least the

17   last four years that I have here.

18        Q.    Okay.  Director, isn't it true that

19   ICE currently is removing less aliens from the

20   United States than it ever has in the agency's

21   existence?

22             MR. DARROW:  Objection.

1       A.    I  wouldn't -- I don't have the data

2   for, you know, our entire existence.  But I do

3   know that you would need to add the number of

4   removals that we do, along with the number of

5   expulsions, which expulsions only came around at

6   the beginning of the pandemic when the Title 42

7   order came out to give an accurate depiction of

8   everybody who was like, removed from the United

9   States.

10      Q.    Okay.  I'm going to show you what I

11  marked for identification as Exhibit 7.

12      A.    Thank you.

13      Q.    Director, Exhibit 7 is ERO's 2016

14  Removal Operations report. right?

15      A.    Yes.

16      Q.    2016 was the last year of the Obama

17  administration, correct?

18      A.    Yes.

19      Q.    All right.  The Obama administration,

20  like the Biden administration, had prioritized

21  public safety in its immigration policies,

22  right?

1          MR. DARROW:  Objection.

2      A.   Yes.

3      Q.   Okay.  If you turn to the second page

4  of Exhibit 7, there is a chart detailing the

5  removals by ICE from every year from 2008

6  through 2016, correct?

7      A.   Yes.

8      Q.   All right.  And for President Obama in

9  2008 to 2016 was the eight years roughly,

10 because I know there's three months one way and

11 three months from the other way, but it's

12 roughly President Obama's entire term in office,

13 correct?

14     A.   That's correct.

15     Q.   All right.  And from 2008 through

16 2016, ICE never removed less than 230,000

17 aliens, right?

18         MR. DARROW:  Objection.

19     A.   It does not appear so.

20         Q.   All right.  And even multiple

21 years, from 2008 through 2016, ICE removed

22 nearly or just over 400,000 aliens, correct?

1            MR. DARROW:  Objection.

2       A.   That appears correct.

3       Q.   In 2012, a decade ago, under President

4  Obama, ICE removed almost eight times or excuse

5  me, almost seven times the number of aliens than

6  the Biden administration did in either 2021 or

7  2022, right?

8            MR. DARROW:  Objection.

9       A.   That appears correct.

10      Q.   All right.  You can put Exhibit 7

11  aside and get back 3, 4, 5, and 6 in front of

12  you.  Are you familiar with the term book in as

13  it is used by ICE?

14      A.   Yes.

15      Q.   What is a book in under ICE parlance?

16      A.   A book in is when somebody is booked

17  into our custody, our custody meaning ICE ERO's.

18      Q.   Okay.  And how is a book in different

19  than an arrest?

20      A.   An arrest is an act where we actually

21  have an officer, whether it be a border patrol

22  agent, OFO officer, HSI special agent, or ERO

1    officer make a physical arrest of an individual

2    for a violation of immigration law.

3        Q.    Okay.  So, what would the term book in

4    be broader than the term arrest?

5        A.    Yes.

6        Q.    Okay.  Would the term book in also

7    include arrest?

8        A.    Yes.  Well, I believe so.

9        Q.    Okay.  Now, under President Biden, ICE

10   is not only removing fewer aliens than ever, ICE

11   is booking in fewer aliens than it did under

12   President Trump, correct?

13           MR. DARROW:  Objection.

14       A.    Let me see the book-in data.

15       Q. If you want, I can run through it pretty

16   quickly.

17       A.    If you wouldn't mind.

18       Q.    Okay.  In 2019, look at 3, look at 3,

19   ICE had 137,084 book ins and that's if you look

20   to the third piece of paper on the front.

21       A.    Oh.  I'm looking at page 5.

22       Q.    I know, I know.  It's --

1      A.    The third piece of paper, okay.

2      Q.    137,084 on the front.

3            MR. DARROW:  Just for clarification,

4   where does that chart begin?

5            MR. GUARD:  It begins on, I believe

6       it's on -- it begins on page 1, so, the

7       front of page 1.

8            MR. DARROW:  Yeah, I see that.

9            MR. GUARD:  October, November,

10  December, and if you go to page 3 --

11           MR. DARROW:  Oh, okay.

12           MR. GUARD:  -- it continues to page 3.

13           MR. DARROW:  There's no title on that

14  so I couldn't tell.

15           MR. GUARD:  I see.  Again, I --

16           MR. DARROW:  It seems like we have

17  something to fix there.

18           MR. GUARD:  It will allow people to

19  change the print on it, but it will not allow

20  them to change the size.

21           MR. DARROW:  Got it.

22           MR. GUARD:  And I wasn't going to like

1    alter an ICE document and have a problem, so.

2          MR. DARROW:  Sounds good.  But yes, if

3    you could ask the question again, sorry.

4          Q.    Sure.  So, the total number of book

5    ins in 2019 was 137,084.

6          A.    Correct.

7          Q.    Okay.  If you'll look at Exhibit 4

8    now.  In 2020, despite COVID and the lockdowns,

9    ICE had 99,774 book ins, and that's on the

10   second page on the front is the total.

11         A.    Correct.

12         Q.    Okay.  And in 2021, so that would be

13   the first year of President Biden's term in

14   office, ICE had only 45,680 book ins, right?

15         A.    Correct.

16         Q.    Okay.  And 45,680 book ins is

17   approximately half the 2020 number.  The 2020

18   number was 99,000.

19         A.    Correct.

20         Q.    Okay.  In 2022, there have been only

21   48,226 book ins so far by ICE, correct?

22         A.    That appears correct.

1        Q.    All right.   Again, the 2022 number is

2   roughly half of the 2020 number, right?

3        A.    Correct.

4        Q.    And roughly a third of the 2019

5   number, right?

6        A.    Correct.

7        Q.    All right.   The Biden administration

8   is arresting less illegal aliens than any recent

9   administration, Democrat or Republican, right?

10            MR. DARROW:   Objection.

11       A.    I don't have that data to show the

12   cumulative arrests that the administration

13   regardless of agency has made.

14       Q.    Okay.   And we earlier were speaking

15   about Director Lucero, correct?

16       A.    Correct.

17       Q.    And you actually took over for him --

18   from him, right?

19       A.    I succeeded him, yes.

20       Q.    Okay.   And he was -- actually had the

21   title acting associated director, right?

22       A.    I believe he was --

1          Q.    Okay.

2          A.    -- in the position.  I believe he was

3     the executive associate director.

4          Q.    Okay, all right.  I'm going to show

5     you what I've marked for identification as

6     Exhibit 8 to your deposition.  This document was

7     part of an administrative record in a suit

8     brought by Arizona.  If you look at the bottom,

9     it says Arizona, AR, at the bottom of it.

10         A.    I see it.

11         Q.    Okay, all right.  And Exhibit 8 is a

12    copy of an E-mail -- an ICE E-mail that you were

13    copied on, correct?

14         A.    Correct.

15         Q.    What is the date of Exhibit 8?

16         A.    January 27, 2021.

17         Q.    So, Exhibit 8 was sent seven days

18    after President Biden was inaugurated, right?

19         A.    Correct.

20         Q.    All right.  The E-mail was sent to

21    Director Johnson among others, correct?

22         A.    Correct.

1        Q.    What role was Mr. Johnson serving at

2    that point in time?

3        A.    He was the deputy director of ICE and

4    I believe was already named acting director at

5    that point.

6        Q.    Okay.  And he's still acting director

7    of ICE?

8        A.    He is.

9        Q.    And Exhibit 8 refers to LESA, correct?

10       A.    Yes.

11       Q.    Okay.  And so, evidently, Director

12   Lucero had a query run by LESA.  Is that -- is

13   that what this E-mail is summarizing?

14             MR. DARROW:  Objection.

15       A.    That is what appears to be referenced

16   here, yes.

17       Q.    Okay.  And there's a reference to PEP

18   in this E-mail.

19       A.    Yes.

20       Q.    What is PEP?

21       A.    That would be the Priority Enforcement

22   Program under President Obama.

1      Q.   Okay, all right.  The others copied on

2   this E-mail were parts of ICE's senior

3   leadership, correct at that time?

4      A.   All except for one.

5      Q.   Okay.  Who was not part of ICE's

6   senior leadership at the time?

7      A.   Eliman Solorzano.

8      Q.   Okay.

9      A.   She's support staff in the ERO front

10  office.

11     Q.   Okay.  Now, in Exhibit 8, Director

12  Lucero is referring to the effect of the Biden

13  administration interim Priorities on

14  Enforcement, correct?

15               MR. DARROW:  Objection.

16     A.   I apologize.  Could you repeat that

17  one more time?

18     Q.   Sure.  In Exhibit 8, Director Lucero

19  is referring to the effect of the Biden

20  administration interim Priorities on

21  Enforcement, correct?

22               MR. DARROW:  Objection.

```
1        A.    That appears correct.

2        Q.    Okay.  And his conclusion -- Director

3   Lucero's conclusion was that ICE book ins were

4   going to be reduced by half of historical

5   numbers, right?

6              MR. DARROW:  Objection.

7        A.    That appears correct.

8        Q.    So, the Biden administration

9   administrated -- the Biden administration's

10  interim priorities were going to cut in half

11  ICE's book ins.

12             MR. DARROW:  Objection

13       A.    that appears correct.

14       Q.    And ICE, as an agency, its own book

15  ins were actually going to be reduced by more

16  than that because the vast majority of book ins,

17  according to Director Lucero, were going to be

18  transfers from CBP, correct?

19             MR. DARROW:  Objection.

20       A.    Correct.

21       Q.    And transfers -- well, we kind of

22  talked about a little bit earlier -- but
```

1    transfers from CBP refers to aliens that are

2    encountered by a CBP component at the border and

3    transferred to ICE, right?

4            MR. DARROW:  Objection.

5        A.   Correct.

6        Q.   Okay.  And despite this data, DHS and

7    ICE went ahead and altered ISE's priorities that

8    had existed under past presidents, correct?

9            MR. DARROW:  Objection.

10       A.   Correct.

11       Q.   Okay.  And given the data that we just

12   looked at on Exhibits 3, 4, 5, and 6, it looks

13   like LESA and Director Lucero were almost right

14   on the money on their predictions, correct?

15           MR. DARROW:  Objection.

16       A.   That appears correct.

17       Q.   Now, the priorities that Director

18   Lucero is referring to, were actually changed

19   several times in the last two years, correct?

20           MR. DARROW:  Objection.

21       A.   That's correct.

22       Q.   Okay.  And those priorities, as they

1   existed in 2022, were vacated by a District

2   Court Judge, right?

3       A.   Correct.

4       Q.   Okay, all right.  You can set Exhibit

5   8 and please have Exhibits 3, 4, 5, and 6 back

6   in front of you.  Now, not only are removals and

7   book ins declining under the Biden

8   administration, ICE is detaining less aliens

9   than it did during the Trump administration,

10  correct?

11          MR. DARROW:  Objection.

12      A.   That's correct.

13      Q.   And measuring detention, ICE uses a

14  measure known as average daily population or

15  ADP, right?

16      A.   Correct.

17      Q.   And how does ICE calculate ADP?

18      A.   I don't know exactly what methodology

19  is used, but it is the average length of stay

20  for an alien in our detention.

21      Q.   Okay.

22      A.   For any alien.

1        Q.   Okay.  Is it the average -- the

2    average across a month of how many aliens are in

3    detention on a particular day?

4             MR. DARROW:  Objection.

5        A.   It is an average of how long their

6    stay is in ICE detention, yes.  I might have

7    misunderstood.

8        Q.   Okay.  Average daily population.  Is

9    that the number of aliens ICE detains --

10       A.   Oh, yes.

11       Q.   -- on your -- I think you're talking

12   about something completely different.  I'm

13   sorry, you know, that's --

14       A.   loss versus ADP.

15       Q.   I'm talking about ADP.

16       A.   Yep.  That is the average number of

17   aliens in our custody, yes, across a month.

18       Q.   Okay, all right.  In 2019, if you want

19   to look at Exhibit 3, ICE had an average daily

20   population overall for the year of 50,165

21   aliens, correct, and that's on the right -- you

22   have to go all the way back to page 4, four

1    sheets of paper on the front.

2         A.    Okay.  Here it is.

3         Q.    So, on page 2, the second page on the

4    front, I think it goes through August.

5         A.    Um-hum.

6         Q.    Actually, I'm wrong, but it's actually

7    on -- yeah, it goes through August.

8         A.    Three.

9         Q.    And then, you'll have September on the

10   fourth page -- September and FY overall.

11        A.    Got it.

12        Q.    50,165, right?

13        A.    Correct.

14        Q.    All right.  If you look at Exhibit 5,

15   in 2021, ICE had an average daily population

16   overall for the year of 19,254 aliens, correct,

17   and that's on the back of page 1.

18        A.    Correct.

19        Q.    All right.  And in 2021, ICE detained

20   approximately 40% of the aliens than it did in

21   2019, right?

22             MR. DARROW:  Objection.

1       Q.    And it's 50,000 to 19,254.

2       a.    That appears correct.

3       q.    Okay, all right.  In 2021, ICE had a

4    low average daily population -- a monthly low

5    average daily population of 14,084 aliens and

6    that's in February of that year.  So, Exhibit --

7    we're back at Exhibit 5, it's on the back of the

8    first page, it's all the months, but February is

9    the lowest.

10      A.    Correct.

11      Q.    You can put Exhibit 5 aside.  In 2022,

12   under the Biden administration, ICE had an

13   average daily population overall for the year of

14   22,142, and that's on page 1 on the back of that

15   exhibit.

16      A.    Correct.

17      Q.    Again, under the Biden administration

18   in 2022, ICE detained 40% of the aliens that it

19   did in 2019 during the last immigration search,

20   right?

21            MR. DARROW:  Objection.

22      A.    That appears correct.

1        Q.    Under the Biden administration, ICE is

2    detaining significantly less aliens, right?

3              MR. DARROW:   Objection.

4        A.    Yes.

5        Q.    Prior to the Biden administration, ICE

6    detained family units who -- who illegally

7    entered the United States, correct?

8              MR. DARROW:   Objection.

9        A.    We detained some.

10       Q.    Okay.  Indeed, ICE had family

11   detention going as far back as the Obama

12   administration, right?

13       A.    I do not know the date it began, but

14   yes, that that sounds correct.

15       Q.    Okay.  And -- and until recently, ICE

16   had facilities known as FRCs, correct?

17       A.    Yes.

18       Q.    All right.  What does FRC stand for?

19       A.    Family residential center.

20       Q.    Okay.  And family residential centers

21   were specially built and configured facility --

22   facilities to house aliens -- families, right?

1          MR. DARROW:  Objection.

2      A.   Yes, they were facilities that were

3   configured to house families together, yes.

4      Q.   Okay.  Versus separating a child from

5   -- from their parents?

6      A.   That's correct.

7      Q.   Okay.  In 2019, Exhibit 3, which was

8   again, a previous border surge, ICE never had an

9   average daily population at an FRC greater than

10   2240 or 2,240, and that's in February of 2018,

11   correct?

12          MR: DARROW:  Objection.

13      Q.   That's on page 2 -- I think page 2 is

14   the February number, and it continues over if

15   you want to see September's number, it's on page

16   4.

17      A.   What was the number you --

18      Q.   2,240 in February.

19      A.   That's correct.

20      Q.   Okay.  In 2019, ICE had 2,500 beds at

21   its family residential centers, correct?

22          MR. DARROW:  Objection.

1          A.    I don't recall the total number

2     exactly, but that sounds correct.

3          Q.    Okay.   The Biden administration ended

4     the detention of family units, right?

5          A.    Correct.

6          Q.    Okay.   And ICE is repurposing the

7     family -- family residential centers to house

8     single adults, correct?

9          A.    Correct.

10          Q.    Okay.   Once repurposed, ICE will lose

11     the ability to detain families unless it

12     reconfigures or builds new facilities, correct?

13          MR. DARROW:   Objection.

14          A.    Could you repeat that one more time?

15          Q.    Sure.   Once repurposed, ICE will lose

16     the ability to detain families unless it

17     reconfigures or builds new facilities, right?

18          MR. DARROW:   Objection.

19          A.    We can reconfigure those same

20     facilities back to family detention so that we

21     could, yes.

22          Q.    Okay.   When did the Biden

1          A.     Correct.

2          Q.     Okay.  When did you learn about the

3    notice to report program?

4                 MR. DARROW:   Objection.

5          A.     I don't recall the specific date, but

6    it was sometime in 2021.

7          Q.     Okay.  And what was your response to

8    learning about the notice to report program?

9    Objection.

10         A.     I was very concerned at the amount of

11   workload that was going to be put onto my staff

12   and our facilities.

13         Q.     Okay.  Now, are you familiar with the

14   Immigration and Nationality Act?

15         A.     I am.

16         Q.     Okay.  Are you generally familiar with

17   the regulations that -- that are there under it

18   as well?

19         A.      In general.  Of course, I consult with

20   my team at OPLA on many specific laws, but yes,

21   in general.

22         Q.     Okay.  Is the notice to report

1    anything under either the Immigration and

2    Nationality Act or under the regulations?

3              MR. DARROW:  Objection.

4         A.   I've never heard of the term notice to

5    report prior to 2021.

6         Q.   Okay.  It was a program that Border

7    Patrol basically just made up, correct?

8              MR. DARROW:  Objection.

9         A.   To the best of my knowledge.

10        Q.   Okay, all right.  Now, at some point

11   in time, it was decided and -- and your

12   testimony was that it was later in 2021 that ICE

13   would no longer detain family units, correct?

14        A.   That's correct.

15        Q.   Okay.  With that decision -- that

16   decision by the Biden administration on family

17   units, family units entering this country

18   illegally will never be detained, right?

19             MR. DARROW:  Objection.

20        A.   I can't say that because we could

21   always convert them back.  You know, our FRCs,

22   the three of them that we have, so that they

1    could detain them, but as of today, no, we

2    cannot.

3        Q.   Okay.  So, family units illegally

4    entering the United States across the border

5    right now cannot be detained?

6             MR. DARROW:  Objection.

7        A.   Without converting them back, that's

8    correct.

9        Q.   Okay, all right.  Now, under the

10   Immigration and Nationality Act, aliens who are

11   caught illegally entering the United States are

12   subject to mandatory -- mandatory detention

13   unless they're paroled, right.

14            MR. DARROW:  Objection.

15       A.   Yes.

16       Q.   Okay.  And that parole is supposed to

17   be on a case-by-case decision, correct?

18       A.   To the best of my knowledge, yes.

19       Q.   Okay.  But with this policy on family

20   units, a case-by-case decision cannot be made,

21   because there's no option to detain, right?

22            MR. DARROW:  Objection.

1      A.   I can't speak to that because ICE

2   isn't issuing those paroles.  That's being

3   handled by Border Patrol.  So, I would have to

4   defer to Border Patrol on how they're -- they're

5   instituting their case-by-case decisions.

6      Q.   Okay.  But detention is not an option?

7      A.   For family units right now today,

8   detention is not an option.

9      Q.   Under the Trump administration, parole

10   had been significantly curtailed, right?

11          MR. DARROW:  Objection.

12      A.   I don't know, to the extent of what

13   CBP was, you know, issuing for all under that

14   administration.  I can't speak to that, I'm

15   sorry.

16      Q.   Okay.  Now, are you familiar with a

17   concept called expedited removal?

18      A.   I am.

19      Q.   What is expedited removal?

20      A.   Expedited removal is an authority that

21   an immigration officer can use when that

22   individual is eligible for expedited removal

1      A.    Correct.

2      Q.    And there was a battle -- I don't

3   remember the year right offhand -- whether that

4   only included unaccompanied minors versus

5   accompany minors, correct?

6           MR. DARROW:  Objection.

7      A.    Correct.

8      Q.    I'm going to show you what is Exhibit

9   10 to your deposition.  We were just speaking

10  about Flores and it was almost like you were

11  reading my mind.

12     A.    It's magic.

13     Q.    Exhibit 10 is an ICE juvenile

14  coordinator report in the Flores case, right?

15     A.    Correct.

16     Q.    All right.  And the date on it is --

17  you can either look at the -- I think the one

18  the last paper -- the signature page -- I won't

19  say the last page because I think it has

20  attachments -- or you can look on the front of

21  the final document, which also has a date.  I

22  think earlier on there's an actual signature.

1      A.    3/5/21?

2      Q.    Yes, yes.  That's the ICE juvenile

3   coordinator report for March 5, 2021, right?

4      A.    Correct.

5      Q.    And we're now at roughly forty-four

6   days after President Biden was inaugurated,

7   right?

8            MR. DARROW:  Objection.

9      A.    That appears correct.

10     Q.    Okay.  This is a document filed by ICE

11  in court, correct?

12     A.    Correct.

13     Q.    And if you'll flip to -- and depending

14  on if you're going to look at the top of the

15  page or the bottom of the page, because they're

16  different numbers -- if you look at first page 2

17  on the bottom or page 3 on the top --

18     A.    Okay.

19     Q.    Because there's a cover page.  On

20  point 1, the first sentence, it's been reads,

21  "ICE would like to note that it's revising its

22  current family detention posture at the FRCs to

1   allow for a broader repurposing of physical

2   facilities to better meet operational needs."

3   Correct?

4        A.   Correct.

5        Q.   So, it looks like, at least according

6   to that sentence, that it was already

7   contemplated by ICE forty-four days after

8   President Biden was inaugurated, that the FRCs

9   were going to be repurposed.

10            MR. DARROW:  Objection, and I'll let

11        the witness answer, but I would admonish

12        him not to reveal any privileged

13        information.

14        Q.   I'm not asking for anything that an

15   attorney has told you or that would otherwise be

16   privileged.  I'm just asking you if that's what

17   that sentence appears to say, correct?

18        A.   It's my understanding that this

19   sentence is referring to, like I mentioned

20   before, a number of things that we were looking

21   at to help decompress Border Patrol facilities

22   faster, while this would have meant still

1    detaining families there.  But what we could do

2    to expedite the processes that we have to go

3    through in their enrollment on ATD while they're

4    there, you know, in that twenty-day maximum

5    period that we can detain them and then release

6    them on ATD.

7         Q.   Okay.  If you look at -- depending if

8    you're going to look at the top or the bottom of

9    the page, it's either page 6 if you look at the

10   top or page 5 of the Exhibit 10 -- there's a

11   chart.

12        A.   I'm sorry, was it -- you said page --

13        Q.   Page 5 if you look at the bottom, 6 if

14   you look at the top.

15        A.   Page 5 at the bottom, got it.

16        Q.   There, the third column of the chart

17   indicates percentage of beds.

18        A.   Um-hum.

19        Q.   In any case, only 13% of beds were

20   being utilized, right?

21        A.   That appears so.

22        Q.   Now, ICE at the beginning of the Biden

1   administration actually entered a no-bid

2   contract to house aliens at hotels, correct?

3           MR. DARROW:  Objection.

4       A.   That's correct.

5       Q.   Okay.  So, someone at the Biden

6   administration wanted to not detain aliens, if

7   you were willing to put them in hotels, right?

8           MR. DARROW:  Objection.

9       A.   So, to the best of my knowledge, the

10  intent behind that was to ensure that we could

11  get more people out of Border Patrol stations

12  where they were, you know, over capacity, get

13  them to other facilities other than an FRC,

14  which, you know, since they're so few of them,

15  it's very difficult to get them there.  So, we

16  were expanding our footprint of where we could

17  get people to, to do their processing, the COVID

18  testing, you know, things of that nature before

19  they couldn't be released on ATD.

20      Q.   Okay.  At the time that ICE entered

21  into that contract, you -- you've got -- the

22  capacity at the facilities is 13% and yet, ICE

1   is going out and contracting -- signing a

2   multimillion-dollar contract to put aliens in

3   hotels, right?

4           MR. DARROW:  Objection.

5       A.   Correct.

6       Q.   Right.  Now, the Biden administration

7   has not only ended family detention, the Biden

8   administration have cut ICE's detention capacity

9   significantly, correct? Objection.

10      A.   There have been some facilities that

11  have that have closed or otherwise had contracts

12  terminated while we've had other facilities that

13  have been stood up.  So, I don't know off the

14  top of my head what the total net number of beds

15  is.  Unfortunately, we've had a lot of

16  litigation that has, you know, hampered our

17  ability to detain at some facilities.  So, I'd

18  have to get some more details on that.

19      Q.   I'm going to -- why don't we take a

20  break?

21      A.   Sounds good.

22          VIDEOGRAPHER:  It's 12:29 and we are

1    may be processed on the spot and released on ATD

2    and never be booked in.  So, they would never be

3    reflected as a book in.

4         Q.   Okay, all right.  From -- again, I am

5    talking about ICE not CBP --

6         A.   Yep.

7         Q.   -- exclude those.  How common is it

8    for kind of on-the-spot releases to occur in

9    your enforcement operations?

10        A.   It's a case-by-case.  I wouldn't say

11   that it's real common, but they do occur.  It

12   really depends on, you know, the facts of that

13   case and what the officer is faced with at that

14   time.

15        Q.   Okay, all right.  But anyone who was

16   transferred by CBP to ICE would be included in

17   the CBP book in numbers, correct?

18        A.   Again, I'm not the data expert.  I

19   would have to go to either CBP or my LESA

20   Division to get that, but that's my

21   understanding.

22        Q.   Okay, all right.  I'm going to show

1   you what I'm going to mark for identification as

2   Exhibit 11 to your deposition.

3       A.   Sure.

4       Q.   Now Exhibit 11 is -- ICE's fiscal year

5   2020 Enforcement and Removal Operations report,

6   correct?

7       A.   Correct.

8       Q.   Okay.  One rule that I did not go

9   over, is that because we are -- everything is

10  being taken down by a court reporter, you

11  actually have to answer audibly.  So, while if

12  we were talking somewhere else, we'd both be

13  doing head nods and saying, uh huh, yeah,

14  whatever, you actually have to answer audibly.

15  So, I'll try not to do that to you, and I'd ask

16  that you try not to do it to me, okay?

17      A.   Sounds good.  Thank you.

18      Q.   All right.  Now, this is an annual

19  report that ERO publishes, correct?

20      A.   That's correct.

21      Q.   Okay.  And so, this report would have

22  been published at the end of the fiscal year of

1        A.    My bad.

2        Q.    No, no, no, no.  It's okay.  I want to

3   make sure we're clear here.

4        A.    Yeah.

5        Q.    And so, you know, November, December

6   of 2020, this report would have actually been

7   published.

8        A.    Correct.  It would have been

9   published, again, like I said, from my

10  experience, it's usually around the December

11  timeframe that it actually goes out.  So, it's

12  usually like I said, within a couple of months

13  of the end of the fiscal year.

14       Q.    Okay.  So, you're talking roughly

15  about a month before Joe Biden was inaugurated,

16  right?

17             MR. DARROW:  Objection.

18       A.    Yes.

19       Q.    Okay, all right.  If you look at what

20  is page 3, of Exhibit 11, there's a section at

21  the bottom of the page, it's the bullet point

22  and it has custody and case management.

1      A.   Yes, I see that.

2      Q.   All right.  It states that ICE's ERO's

3 detained population generally averages around

4 45,000.  Do you see that?

5      A.   Yes.

6      Q.   Okay.  And it also says that ICE's --

7 ICE's ERO's detained population peaked in 2019

8 during a border surge to 55,000, right?

9      A.   Yes.

10      Q.   Okay, all right.  If you look at the

11 next paragraph under that bullet point, the

12 first sentence reads, "However, detention

13 remains necessary for some aliens and continues

14 to be the primary pathway by which ICE ERO was

15 able to effectuate removals."  Right?  Did I

16 read that correctly?

17      A.   Correct.

18      Q.   All right.  Is that that sentence a

19 true statement?

20           MR. DARROW:  Objection.

21      A.   It is.

22      Q.   Okay.  Now, turning to page 4, I think

1    we're now -- before the first bullet point on

2    that page, which is kind of a continuation of

3    the bullet from page 3, there's a paragraph that

4    discusses alternatives to detention.  Do you see

5    that?

6          A.    I'm sorry, can you say which paragraph

7    that was again?

8          Q.    So, it's the first full paragraph on

9    page 4.

10         A.    It starts with additionally?

11         Q.    It starts with additionally?

12         A.    Okay.

13         Q.    And that paragraph is discussing

14   alternatives to detention.

15         A.    That's correct.

16         Q.    Okay.  This paragraph discusses that

17   the alternative detention program had an overall

18   absconder rate of 33%, correct?

19         A.    That's correct.

20         Q.    All right.  I'm sure that absconder

21   rate of 33% is lower than if you don't use

22   alternatives to detention.  I'm assuming that

1    for people that are on no supervision, they show

2    up -- they're less likely to show up.

3              MR. DARROW:  Objection.

4         A.   I don't have the data to compare it

5    to.  But yeah, I can assume that.

6         Q.   Okay.  Well, I'll mark this as -- I

7    thought you might know that -- I'll mark this as

8    Exhibit 12 to your deposition.

9         A.   Thank you.

10        Q.   This is a rule that was promulgated

11   by, I believe, the Department of Homeland

12   Security.

13        A.   That's what it says, Department of

14   Homeland Security and Department of Health and

15   Human Services.

16        Q.   Okay, all right.  And I'm just going

17   to briefly -- if you'll flip to page 44405, of

18   Exhibit 12.  If you look at the bottom of the

19   page it says, "According to EOIR," bottom of the

20   page on the far right column.

21        A.   According to EOIR, yep.

22        Q.   Okay.  What is EOIR?

1       A.     Executive Office of Immigration

2    Review.  That's within the Department of

3    Justice.

4       Q.     Okay.  And it reports that 43% of

5    completed cases from January 1, 2014 through

6    March 31, 2019 involving family unit aliens who

7    were in detention, released, failed to appear at

8    the required proceedings, and were issued final

9    orders of removal and extension.

10          MR. DARROW:  Read that page number

11       again, I'm sorry.

12          MR. GUARD:  44406.

13       Q.     Did I read that correctly?

14       A.     Yes, you did.

15       Q.     Okay.  And then if you look over at

16    the far right column on page 44406, it has --

17    there's a sentence, "As seen in Table 3, DHS

18    OIS."  What is DHS OIS?

19       A.     Office of Immigration Statistics.

20       Q.     All right.  That's found when looking

21    at all family unit aliens encountered at the

22    southwest border from FY 2014 through FY 2018,

1  the in-absentia rate for completed cases as of

2  the end of the fiscal year 2018 was 66%.

3      A.   Correct.

4      Q.   Okay, all right.  So, I guess my

5  question before was, alternatives to detention

6  have caused the aliens to appear at a higher

7  rate than not -- no form of supervision.

8      A.   Yes, that's correct.

9      Q.   Okay, all right.  And it looks like

10 it's 66 versus 33, right?

11     A.   Yes.

12     Q.   Okay.  At least according to these.

13     A.   According to this, yes.

14     Q.   Okay, all right.  You can put that

15 aside.  Looking at page -- going back to page, I

16 think it's Exhibit 11, the ERO Operations report

17 for 2020.

18     A.   Um-hum.

19     Q.   If you look at page 9, it's, I think

20 it has a section called detained population.  Do

21 you see that?  At the top the page, it says

22 detained population.

1     A.    Yes.

2     Q.    All right.  If you look at the fourth

3  paragraph down, it starts with, "These

4  significant decreases."

5     A.    Um-hum.

6     Q.    All right.  If you look at the final

7  sentence of that paragraph -- so, at the end of

8  fiscal year 2020, ICE anticipated that migration

9  was going to surpass pre-pandemic levels once

10 COVID conditions began to resolve within the

11 United States, correct?

12          MR. DARROW:  Objection.

13    A.    That's what this report states, yes.

14    Q.    All right.  And ICE or ERO in this

15 report is saying that you're going to need

16 adequate resources to address such a shift,

17 right?

18    A.    That's correct.

19    Q.    Okay.  And was that true, as you were

20 taking over ERO in February 2021?

21          MR. DARROW:  Objection.

22    A.    Is what true?  That the conditions

1    were resolving or just --

2        Q.   That the conditions were resolving,

3    and you were having -- seeing a significant

4    increase in migration to the border?

5            MR. DARROW:  Objection.

6        A.   No, we were still in the middle of the

7    pandemic.  They were not getting better.

8        Q.   Okay.

9        A.   Did I understand that correctly?

10       Q.   So, were you seeing a surge of the

11   border in February of 2021?

12       A.   Oh, yes.

13       Q.   Okay.

14       A.   I'm sorry.  I thought you were asking

15   of the conditions had been improved.

16       Q.   Okay, all right.  So, prior to

17   President Biden taking office, ICE was aware

18   that once pandemic conditions began to resolve

19   or were perceived to be resolving within the

20   United States, that migration may meet or

21   surpass pre-pandemic levels, right?

22           MR. DARROW:  Objection.

1      A.   Yes.

2      Q.   Okay.  And those pre-pandemic levels

3   would have included the surge that was seen in

4   2019, right? Objection.

5      A.   I could assume.

6      Q.   Okay.  Well, I mean, 2019 happened

7   before this report, right?

8      A.   Yeah.

9      Q.   All right.  And in the lead up to the

10  transfer between the Trump administration to the

11  Biden administration, ICE was aware that it

12  could need more detention capacity than it

13  needed in response to the 2019 migrant surge,

14  right?

15          MR. DARROW:  Objection.

16     A.   I was not in this position at that

17  time.  But I would believe that we would -- I'm

18  sure that leadership took that into

19  consideration that we would need more detention

20  capacity.

21     Q.   Okay.  And Mr. Johnson, I believe, at

22  the time was deputy director, right?

1        A.    Mr. Johnson was the Deputy Executive

2   Director of ERO at that time.

3        Q.    Okay.  So, he would have been aware,

4   right?

5              MR. DARROW:  Objection.

6        A.    I could assume.

7        Q.    All right.  I want to talk a minute

8   about ICE's budget.  You can put Exhibit 11

9   aside.  Now, in ICE's budget for fiscal year --

10  fiscal year 2021, DHS sought increased funding

11  for detention capacity for ICE, correct?

12             MR. DARROW:  Objection.  What ICE

13  submitted itself is privileged information.  Are

14  we talking about the President's budget?

15             MR. GUARD:  I'm talking a document

16  that we've already talked about in this case.

17  DHS's budget in brief.

18       Q.    You can answer.

19       A.    Can you please repeat the question/

20       Q.    Sure.  Fine, we'll call it the

21  President's budget.

22       A.    Okay.

1        Q.    All right.  In the President's budget,

2    DHS sought increased funding for additional

3    detention capacity in fiscal year 2021, correct?

4              MR. DARROW:  Objection.

5        A.    I believe that's correct.

6        Q.    Okay.  And I'll mark this as Exhibit

7    13 to your deposition.  Exhibit 13 is the 2021

8    DHS budget in brief, right?

9        A.    Correct.

10       Q.    All right.  This is a document that

11   DHS itself creates, right?

12       A.    I assume DHS creates it.  I am not

13   involved with it, but that's my understanding.

14       Q.    Okay, all right.  If you'll turn to

15   page 28, of Exhibit 13.  Page 28 starts the

16   section in this proposed budget for DHS that

17   discusses ICE, right?

18       A.    Correct.

19       Q.    All right.  And on pages 28 through

20   pages 32, it contains information regarding the

21   proposed budget highlights from the last year

22   and other information that is relevant to ICE's

1    budget, correct?

2          MR. DARROW:  Objection.

3       A.   Yes.

4       Q.   Okay.  And if you'll turn to page 32,

5    32 is where the highlights of ICE's fiscal year

6    2021 proposed budget are contained, correct?

7       A.   Yes.

8       Q.   And there are a number of items

9    starting on page 32 going through page 33.

10   We'll talk about the second item -- second

11   bolded item on page 32.

12      A.   Okay.

13      Q.   The second bolded item was an increase

14   to 60,000 ADP, correct?

15      A.   Correct.

16      Q.   Okay.  And if you look at the language

17   that's underneath it, it's -- it's increasing or

18   seeking an increase of 55,000 adult beds and

19   5,000 family beds, correct?

20      A.   Correct.

21      Q.   And the language below that says an

22   increase in detention capacity is critical to

1    supporting ICE's ability to apprehend, detain,

2    and remove aliens.  Did I read that correctly?

3         A.   You did.

4         Q.   Okay.  I'm going to show you now --

5    and I'm going to give it to you in the folder

6    because it's a large document -- and I'm going

7    to mark this Exhibit 14 to your deposition.

8    Thank you.  Can we put this back in order?

9    Thank you.  And Exhibit 14 is ICE's

10   Congressional justification for its proposed

11   2021 budget request, right?

12        A.   Yes.

13        Q.   Okay.  If you'll -- and this is --

14   whoever came up with this numbering system -- if

15   you'll look at the page that reads ICE-ONS,

16   which means Operations and Support, I believe --

17   17.

18        A.   Okay.

19        Q.   And this -- the number one program

20   change that's been highlighted in this

21   Congressional justification involves increasing

22   detention capacity, correct?

 1        A.    Yes, it does.

 2        Q.    And it's increasing it an additional

 3   12,226 adult detention beds to 55,000 ADP,

 4   right?

 5              MR. DARROW:  Objection.

 6        A.    That's what it says.

 7        Q.    So, fearing another immigration surge,

 8   the Trump administration tried to leave the

 9   Biden administration with additional detention

10   capacity to deal with any surge that occurred

11   post-COVID, right?

12              MR. DARROW:  Objection.

13        A.    It appears so.

14        Q.    And those additional beds never came

15   online, right?

16              MR. DARROW:  Objection.

17        A.    No, they did not.

18        Q.    Okay.  And instead, the Biden

19   administration sought to reduce ICE's use of

20   detention, correct?

21              MR. DARROW:  Object.  I will admonish

22   the witness not to reveal any privileged

1    Chief Financial Officer or the Office of

2    Director.  We have visibility and we assist them

3    in some parts of it with our budget staff.  But

4    as far as like this, what you're asking for, no,

5    we're not involved in that.

6        Q.   Okay, all right.  Well, let's look at

7    one of those public documents.  We're on 15, I

8    think.  I'm going to show you what I marked for

9    identification as Exhibit 15 to your deposition.

10       A.   Thank you.

11       Q.   Exhibit 15 is the Department of

12   Homeland Security's 2022 budget in brief,

13   correct?

14       A.   Yes, it is.

15       Q.   And this budget in brief would be

16   DHS's first proposed budget under President

17   Biden, correct?

18            MR. DARROW:  Objection.

19       A.   Yes, I believe that's correct.

20       Q.   Okay.  We'll turn to page 32 of

21   Exhibit 15.  Page 32 of Exhibit 15 begins --

22   again begins the highlights of the proposed

1    budget for ICE, and that continues through page

2    35, right?

3        A.    Correct.

4        Q.    All right.  If you'll turn to page 35

5    of Exhibit 15, on page 35, there is one single

6    major decrease to ICE's budget that is being

7    highlighted in this document, correct?

8        A.    That is correct.

9        Q.    All right.  Go ahead.  All right.  And

10   that one single major decrease to ICE's proposed

11   budget is to decrease the detention capacity of

12   ICE, right?

13           MR. DARROW:  Objection.

14       A.    It appears so.

15       Q.    Okay.  When this budget was being

16   proposed, the southwest border was seeing a

17   historic surge of illegal aliens entering the

18   United States, correct?

19           MR. DARROW:  Objection.

20       A.    I don't know the whole history of the

21   data on what the numbers at the southwest border

22   have shown, but we have seen a significant

1    increase at the southwest border for the last

2    few years, yes.

3         Q.   Okay.  So, you're unaware that roughly

4    1.9 million encounters occurred on the southwest

5    border in 2021 and more than 2 million

6    encounters have occurred on the southwest border

7    this past year?

8              MR. DARROW:  Objection.

9         A.   I would defer to Border Patrol on this

10   specific numbers, but that does sound right from

11   my understanding.

12        Q.   Okay.  And that's higher than any

13   previous year ever in the history of the United

14   States, right?

15             MR. DARROW:  Objection.

16        A.   Again, I don't -- I don't have those

17   numbers, but from what I've seen in the public

18   data from Border Patrol, that appears so.

19        Q.   Okay.  Now, I think we talked about

20   this a little bit earlier.  Illegal aliens

21   caught entering the United States are subject to

22   mandatory detention unless they meet the

1    requirements of parole, right?

2            MR. DARROW:  Objection.

3        A.    Yes.

4        Q.    Okay.  And so, despite that

5    requirement, or that requirement of mandatory

6    detention, the Biden administration sought to

7    reduce ICE's detention capacity, correct?

8            MR. DARROW:  Objection.

9        A.    I don't know what went into the

10   methodology used in this, but I can tell you

11   that we've never been in a position to detain

12   everybody who has come across the southwest

13   border.

14       Q.    I appreciate that.  But my question

15   was that in the -- with the mandatory detention

16   subject of parole, with a historic surge of

17   aliens across the border, the Biden

18   administration's response was to reduce

19   detention capacity, correct?

20           MR. DARROW:  Objection.

21       A.    It appears so.

22       Q.    Okay.  So, looking at that document

1   the Trump administration was proposing a 55,000

2   bed capacity -- was actually proposing an

3   increase from the 55,000 bed capacity it had for

4   the 2019 surge to 60,000 capacity, right?

5       A.   Yes, that's what that said.

6       Q.   Okay.  And instead of having a 60,000

7   capacity, the Biden administration is reducing

8   that in roughly half, right?

9           MR. DARROW:  Objection.

10      A.   Yes, it appears so.

11      Q.   All right.  With reduced detention

12  capacity and the ending of other programs like

13  the Migrant Protection Protocols, the Biden

14  administration was ensuring more illegal aliens

15  were going to be released into the United

16  States, correct?

17          MR. DARROW:  Objection.

18      A.   I apologize.  Can you just repeat that

19  one more time?

20      Q.   I don't know if I can.

21      A.   Okay.

22      Q.   I'm going to ask the reporter if he

1    can read it back.  If not, I'll try.

2        A.    Okay.  I just want to make sure I

3    understood it correctly.

4        Q.    I'll just do it.  I'll try to

5    remember.

6        A.    Okay.

7        Q.    With reduced -- I'll just do it,

8    sorry.  With reduced detention capacity and

9    ending of other programs like the Migrant

10   Protection Protocols, the Biden administration

11   was ensuring that more illegal aliens would be

12   released into the United States, correct?

13            MR. DARROW:  Objection.

14       A.    That would have been the end result.

15       Q.    I'm going to show you what I'm going

16   to -- I'm going to show you what I've marked for

17   identification as Exhibit 16 to your deposition.

18       A.    Thank you.

19       Q.    Exhibit 16 is the Department of

20   Homeland Security's 2023 budget in brief, right?

21       A.    Yes, it is.

22       Q.    This would have been President Biden's

1    second proposed budget, correct?

2         A.   Yes.

3         Q.   All right.  If you'll turn to page 33

4    of Exhibit 16.  Page 33 of Exhibit 16 starts the

5    section of DHS's proposed budget in brief

6    relating to ICE's budget, correct?

7         A.   Yes.

8         Q.   And that continues through, I think,

9    it's about page 37.

10        A.   Page 40.

11        Q.   Page 40, sorry.  If you'll turn to

12   page 40 of Exhibit 16.  Page 40 of Exhibit 16

13   lists yet again one single major decrease to

14   ICE's budget, right?

15        A.   That's correct.

16        Q.   And in its second budget, the Biden

17   administration is proposing an additional

18   reduction of adult beds and the elimination of

19   all family detention beds, correct?

20             MR. DARROW:  Objection.

21        A.   Yes.

22        Q.   So, the Biden administration was

1    proposing a further decrease to a detention

2    capacity of 25,000 beds, while a historic

3    migration surge had been occurring for more than

4    a year, right?

5              MR. DARROW:  Objection.

6         A.   Yes.

7         Q.   So, ICE will not have the

8    approximately 55,000 bed capacity it had for the

9    2019 surge, nor the 60,000 capacity the Trump

10   administration tried to secure before the end of

11   COVID, but it instead would have less than half

12   that capacity, right?

13        MR. DARROW:  Objection.

14        A.   That's correct.

15        Q.   And again, you would have -- and on

16   top of that, ICE would have no capacity to house

17   family units, right?

18             MR. DARROW:  Objection.

19        A.   That's correct.

20        Q.   Okay.  By further reducing detention

21   capacity, the Biden administration with its 2023

22   budget was ensuring that more illegal aliens

1    were going to have to be released into the

2    interior, right?

3            MR. DARROW:  Objection.

4        A.   I can't speak to the administration's

5    intent.  But yes, that would have been the

6    result.

7        Q.   Okay.  Put that aside.  I'm going to

8    show you what I've marked for identification as

9    Exhibit 17 to your deposition.  Exhibit 17 Is

10   the Congressional justification for ICE's 2023

11   budget request, correct?

12       A.   Yes, it is.

13       Q.   All right.  If you look -- I don't

14   know who came up with this page numbering system

15   -- to the page that's marked ICE-3.

16       A.   Okay, I have it.

17       Q.   All right.  If you'll look at the

18   third set of blocks or third, I guess, table

19   down, it has a -- it has a section that deals

20   with the detention capacity.

21       A.   Page ICE-3?

22       Q.   It's just ICE-3.  It looks like --

1          A.    You mean ICE -- hold on.

2          [Discussion and cross-talk regarding

3   pages.]

4          Q.    All right.  Now, going back to Exhibit

5   17.  Let's go to -- let's try to see if this is

6   there, ICE ONS-29.

7          A.    Got it.

8          Q.    That one was easy to find.

9          A.    Hopefully it's the one on the top that

10  says program change 11.

11         Q.    Yes, it is.

12         A.    We've got the same paper.

13         Q.    Okay, program change 11 provides the

14  justification for the family bed decrease,

15  correct?

16         A.    That is correct.

17         Q.    All right.  And the justification for

18  getting rid of -- at least what is expressed in

19  this document -- of all family detention beds,

20  is to ensure a -- I need some water -- to ensure

21  a more humane treatment of families, right?

22              MR. DARROW:  Objection.

1      A.    That is what that says.

2      Q.    Okay.  From your perspective, was

3   there anything inhumane about how families were

4   being detained?

5      A.    No.

6      Q.    Okay.  Now, we've got a while and we

7   kind of hit at it a little bit, but we've not

8   really talked about the southwest border.  You,

9   during your career, were actually stationed at

10  the southwest border, now El Paso, correct?

11     A.    That's correct.

12     Q.    All right.  Director, as we speak here

13  today in this deposition, are there aliens

14  entering this country illegally --

15          MR. DARROW:  Objection.

16     Q.    -- across the southwest border?

17     A.    Yes.

18     Q.    Okay.  Director, are there historic

19  numbers of aliens attempting to enter this

20  country along the southwest border since

21  President Biden was inaugurated?

22          MR. DARROW:  Objection.

1    Title 42 Order is rescinded?

2        MR. DARROW:  Objection, and I would let the

3    witness answer but direct him not to reveal any

4    privileged information.

5        A.    I can't speculate as to what the

6    future holds, but given our recent history, I

7    would -- again, I can't really speculate as to

8    what that future is going to be.  But we need to

9    plan for it.

10        Q.    Okay.  Director Price, is ERO

11    releasing aliens who were encountered on the

12    southwest border who are likely inadmissible?

13            MR. DARROW:  Objection.

14        A.    Is ERO --

15        Q.    Releasing aliens encountered on the

16    southwest border, who are likely in

17    inadmissible?

18            MR. DARROW:  Objection.

19        A.    So, after CBP encounters them,

20    processes them, and determines the processing

21    disposition, those that are deemed appropriate

22    for release on ATD or what have you, ERO would

1    be performing that function, yes.

2         Q.   And many of those -- that you're doing

3    the release function for are people that are

4    inadmissible, correct?

5         A.   Inadmissible and deportable, both

6    correct.  Yes.

7         Q.   That was going to be my next question.

8    So, you just beat me to it.  All right.

9    Director Price, is ERO releasing aliens

10   encountered on this southwest border who haven't

11   even made an asylum claim?

12             MR. DARROW:  Objection.

13        A.   Yes.

14        Q.   Okay.  Director Price, is ERO

15   releasing aliens on the southwest border for

16   which CIS has not done an asylum interview?

17             MR. DARROW:  Objection.

18        A.   Yes.

19        Q.   Okay.  Director Price, is ERO

20   releasing aliens on the southwest border who do

21   not have a positive credible fear finding?

22             MR. DARROW:  Objection.

1      A.    Yes.

2      Q.    Okay.  Director Price, if a family

3  unit is encountered at the southwest border, and

4  that family unit is not subject to Title 42,

5  that family unit is going to be released no

6  matter what, correct?

7            MR. DARROW:  Objection.

8      A.    Yes.

9      Q.    I'm going to show you what I've marked

10  as you Exhibit 18 to your deposition.  Exhibit

11  18 is the administrative record for the parole

12  plus alternatives to detention, correct?  Take

13  your time.  You can look past the affidavit or

14  read the affidavit.

15      A.    Yes.

16      Q.    All right.  This --

17            MR. DARROW:  Can we just clarify it's

18        the ICE portion of the --

19            MR. GUARD:  Sure, I should have made

20        that clear.  I was not going to hand you

21        the CBP portion of the administrative

22        records.

1      Q.   Okay.  I want to talk a minute about

2  that -- that second policy -- the policy from

3  Border Patrol alone.  When did ICE become aware

4  of -- we talked earlier about NTR -- so, move

5  NTR to the side -- when did ICE become aware of

6  Border Patrol's parole plus ATD policy?

7      A.   I would say on or after November 2,

8  2021.

9      Q.   Okay, all right.  And how did ERO

10  become aware of Border Patrol's parole plus ATD

11  policy?

12      A.   I don't recall specifically how we --

13  how we found out about it.

14      Q.   Okay, all right.  Like with NTR,

15  Border Patrol's parole plus ATD policy added to

16  the backlog, right?

17           MR. DARROW:  Objection.

18      A.   Yes.

19      Q.   Okay.  And the reason why, again,

20  there was a backlog?  Well, strike that.  The

21  reason that there was a backlog at ICE was just

22  like in -- for the NTR policy under the parole

1    plus a TD policy, Border Patrol was not

2    completing notices to appear and it was instead

3    having aliens report to ICE facilities to

4    complete that process, correct?

5            MR. DARROW:  Objection.

6        A.    That's correct.

7        Q.    Okay.  And, we talked about this kind

8    of again, tangentially, but notices to appear

9    began the immigration removal process, right?

10       A.    That's correct.

11       Q.    Okay.  And without them, there is no

12   immigration proceeding, right?

13           MR. DARROW:  Objection.

14       A.    That's correct.  That's what we refer

15   to as a charging document.

16       Q.    Okay.  So, both the NPR policy and the

17   parole plus ATD policy for Border Patrol were

18   taking aliens that were subject to mandatory

19   detention unless paroled and potentially

20   expedited removal and paroling them into the

21   United States and placing those aliens

22   potentially on the standard docket, right?

1          MR. DARROW:  Objection.

2     A.   That is correct.  They'd be on the

3  non-detained docket.

4     Q.   Okay.  And expedited -- expedited

5  removal and the detained docket moves

6  significantly more quickly than the non-detained

7  docket, right?

8          MR. DARROW:  Objection.

9     A.   Yes.

10     Q.   Okay.  The non-detained document --

11  non-detained docket can take upwards of five

12  years before a removal is ordered, correct?

13          MR. DARROW:  Objection.

14     A.   That is my understanding.

15     Q.   Okay.  Now, under Border Patrol's

16  parole plus ATD policy or the July 18th joint

17  parole plus ATD policy, the policy exists to

18  deal with circumstances where appropriate

19  detention space is unavailable, correct?

20          MR. DARROW:  Objection.

21     A.   Yes.

22     Q.   Okay.  When it comes to family units,

1    there is never detention space available, right?

2              MR. DARROW:  Objection.

3         Q.    At this point.

4         A.    There is not currently detention space

5    available for families.  That is correct.

6         Q.    So, no matter what, alien family --

7    family units legally entering the United States

8    are going to be released, whether it's this

9    policy or through some other authority, right?

10             MR. DARROW:  Objection.

11        A.    That is correct.  The Flores decision

12   has really impacted our ability to detain

13   families to the point where they can be removed.

14        Q.    Now, this memorandum on page 2, so the

15   July 18th memorandum on page 2, indicates a

16   parole plus ATD is supposed to be utilized

17   sparingly, right?

18             MR. DARROW:  Objection.

19        A.    Yes.

20        Q.    So, the final paragraph on the bottom

21   of the page actually uses the word sparingly.

22   Has -- again, I'm trying to talk just about the

1  July 18th policy not the other prior policies --

2  has the July 18th policy for parole post ATD

3  been utilized since it was announced to your

4  knowledge?

5      A.   Yes, and parole plus ATD does continue

6  to be used by Border Patrol.

7      Q.   All right.  Do you know how frequently

8  since July 18th this policy has been utilized?

9      A.   I do not know the total number that

10  have been paroled under this policy.

11      Q.   Okay, all right.  If you look at, I

12  think it's labeled -- if you look at the bottom

13  of the page, there's some numbering, which I

14  didn't realize was there originally.  I think

15  it's --

16      A.   SAR?

17      Q.   The SAR number and I think if you

18  think you look at -- we're going to go way back,

19  so SAR 257.

20      A.   Man, I was right there.  Okay.

21      Q.    Okay.  This is an E-mail.  All I know

22  is it copies a Jason Houser, and I believe he's

1   a chief of staff.

2          A.   He is the Chief of Staff for ICE, yes.

3          Q.   Okay, all right.  And it has numbers

4   about -- it appears about NTRs at least.

5          A.   Yes.

6          Q.   And it has that there were 93,964

7   NTRs.  Is that correct?

8               MR. DARROW:  Objection.

9          A.   It is referring to that number, yes.

10         Q.   And it -- and it indicates that 19,158

11  of that number were over the 60-day mark, and

12  then in parentheses says were non-compliant,

13  right?

14              MR. DARROW:  Objection.

15         A.   That's correct.

16         Q.   So, that's 20% roughly had had not

17  reported, correct?

18         A.   That 20% in that 19,158 would be

19  either non-reported or otherwise violated the

20  terms, yes.

21         Q.   Okay.  I'm going to show you what I've

22  marked for identification as Exhibit 19 to your

1   deposition.  Just keep this by you, because

2   we're going to get back to it.

3       A.   Thank you.

4       Q.   This is a document -- I think it's a

5   query from LESA, right?

6       A.   Yes, that's what it appears to be.

7       Q.   All right.  And LESA is part of --

8   again, part of ERO?

9       A.   That is correct.  That's one of the

10  divisions of ERO.

11      Q.   Okay.  And how many aliens who had

12  indicated they were going to a Florida address

13  who were put on NTR failed to be compliant?

14           MR. DARROW:  Objection.

15      A.   It's the top query.

16      Q.   As of this date, it says 1,127.

17      A.   Okay, all right.  And since we're --

18  so, maybe you can just put aside this document.

19  There's a second query on this exhibit, Exhibit

20  19, how many aliens who were put on parole plus

21  ATD, which would be assumingly just the Border

22  Patrol policy given the date of the query,

1    failed to be compliant?

2              MR. DARROW:  Objection.

3        A.   As of this date that's reflected of

4    July 4th, 47,983.

5        Q.   Okay.  So, almost -- between the two,

6    almost 50,000 aliens who said they were going to

7    go to Florida failed to show up in an ICE

8    location and finish their -- the processing and

9    the issuance of a notice to appear, right?

10             MR. DARROW:  Objection.

11       A.   That was the data as of July 4, 2022,

12   yes.

13       Q.   Okay.  And July 4, 2022, the other

14   policy we were looking at, the new policy, was

15   July 18th, right?

16       A.   Yes, I believe that's correct.

17       Q.   So, this data --

18       A.   Right before that policy, yes.

19       Q.   Okay.  Because there was never a

20   notice to appear issued to any of the 50,000

21   non-compliant aliens who gave Florida addresses,

22   those non-compliant aliens are not subject to

1   being removed in absentia, right?

2         MR. DARROW:  Objection.

3      A.   I would have to discuss with the

4   Office of the Principle Legal Advisor to verify,

5   but I do not believe so.

6      Q.   Okay, all right.  And if Border Patrol

7   had issued them a notice to appear instead of an

8   NTR or processing them pursuant to a parole plus

9   ATD, those same aliens would have been subject

10  to being removed in absentia, correct?

11     A.   That's my understanding.

12     Q.   Okay.

13     A.   Do aliens who are paroled and place on

14  alternatives to detention, either the original

15  Border Patrol policy or their joint policy,

16  remain on ATD until they are removed or granted

17  asylum?

18        MR. DARROW:  Objection.

19     A.   It's a case-by-case basis.  Each case

20  is reviewed by an officer, and depending upon a

21  number of things like medical and criminal

22  history, new criminal history, you know, where

1    the individual is from, I mean, a number of

2    factors would go into that and an officer would

3    make a decision whether to de-escalate or even

4    escalate the form of supervision they're under.

5        Q.   Okay.  Have aliens that were paroled

6    and granted ATD been taken off ATD before they

7    have gone to ICE and completed their immigration

8    interview and gotten into -- gotten a notice to

9    appear?

10           MR. DARROW:  Objection.

11       A.   I don't know if any have or not.  Some

12   ATDs were done via mailout.  So, I just don't

13   have that data.

14       Q.   Okay.  If you want to turn back to

15   Exhibit 18, are you familiar with something

16   known as Operation Horizon?

17       A.   I am.

18       Q.   All right.  What was Operation

19   Horizon?

20       A.   Operation Horizon was an operation

21   that we put together in ICE ERO to address the

22   outcome of the parole plus ATD and before that,

1    the NTR that was occurring.  So, essentially,

2    the individuals that were paroled or otherwise

3    released that didn't have a charging document,

4    ERO officers primarily, it did include some from

5    HSI, but it was -- the vast majority was ICE ERO

6    officers completing mailout NTAs when they

7    could.  For those that they could not to do

8    mailout, they would bring into the office to do

9    an NTA in person and they would also go out and

10   target and arrest those that were at large that

11   were not complying with the terms of it.  This

12   was largely accomplished on overtime, as opposed

13   to, you know, during their normal course of

14   duty.

15       Q.   Okay.  So, Operation Horizon was ERO's

16   effort to get the backlog kind of at least into

17   a more -- a better posture.  Let's just say

18   better posture.

19       A.   Yes.

20       Q.   Okay.  There still is -- even after

21   Operation Horizon, there still is a backlog,

22   correct?

1        A.    Yes.

2        Q.    Okay, all right.  And every thirty

3   days that DHS continues parole plus ATD, it's

4   going to take another year and cost $8 million

5   more to clear the backlog, correct?

6              MR. DARROW:  Objection.

7        A.    I don't know if those figures are

8   accurate.

9        Q.    Well, let's look at SAR 262.

10       A.    Okay.  That's the Exhibit 7?

11       Q.    Exhibit 18, yeah.

12       A.    262?

13       Q.    Yep.  And again, I can't give you the

14   names of who's sending these E-mails, and I

15   don't even know if they're ERO or not ERO or who

16   they are.  I know they're ICE because I do have

17   the part of their E-mail address that has ICE in

18   it.  But if you look at the second E-mail on the

19   chain on this page, which is an E-mail dated May

20   5th of 2022, basically, every thirty days p-plus

21   ATD continues, this is this cost us about a year

22   and $8 million, right?

1           MR. DARROW:  Objection.

2       A.   That's what this reflects as of May

3   5th, yes.

4       Q.   Okay.  Was Operation Horizon completed

5   before May 5th, or was it continuing going on?

6       A.   No, it's ongoing and we run different

7   sprints with Operation Horizon.

8       Q.   Okay.

9       A.   I don't anticipate it ending until

10  we've addressed the entire backlog.

11      Q.   Okay, all right.  And if you look

12  down, there's a chart at the bottom of page SAR

13  262 of Exhibit 18.  It is saying that if parole

14  plus ATD continued for ninety days beyond May

15  5th, it would take five and a half years to

16  clear the backlog and cost $49 million, correct?

17          MR. DARROW:  Objection.

18      A.   That's correct.

19      Q.   And that would be five and a half

20  years to start the immigration process with

21  respect to the people that have been paroled

22  plus ATD, right?

1          MR. DARROW:  Objection.

2      Q.   Obviously, the people are coming in

3  over time.

4      A.   That's what I believe this to mean,

5  yes.

6      Q.   Okay.  And so, there would be some

7  period of time added to the five years that it

8  takes on the non-detained docket before an order

9  removal was entered.

10          MR. DARROW:  Objection.

11     A.   Yes.

12     Q.   And during that period of time, those

13  aliens would be at large in different --

14  whatever states they are residing in, correct?

15          MR. DARROW:  Objection.

16     A.   Yes.

17     Q.   Okay.  And some of them would commit

18  crimes, correct.

19          MR. DARROW:  Objection.

20     A.   I mean, I don't have -- I can't tell

21  the future, but it's reasonable to assume that

22  some would commit some kind of criminal

1    activity, yes.

2         Q.   All right.  I mean, you have right

3    now, I mean, you have -- you launched detainers,

4    ERO does, all the time, correct?

5         A.   Every day.

6         Q.   Every day.  And you -- and you're your

7    lodging detainers against aliens who've

8    committed crimes, right?

9              MR. DARROW:  Objection.

10        A.   Yes.

11        Q.   Okay.  And so, past experience tells

12   you why you may not be able to see the future,

13   that some number of aliens that are included in

14   this parole population are going to commit

15   crimes, right?

16             MR. DARROW:  Objection.

17        A.   Yes.

18        Q.   And they're going to be -- that that's

19   going to cause the states where these aliens

20   live to incur cost for state criminal

21   proceedings, correct?

22             MR. DARROW:  Objection.

1     A.   Yes, that's been the way our

2  immigration system has worked for as long as

3  I've been in this job.

4     Q.   Okay.  And it's going to cause states

5  to incur the cost of providing housing if the

6  aliens are put in prison, right?

7         MR. DARROW:  Objection.

8     A.   I don't know the state funding

9  mechanism for that, but, you know, yes, it's

10  reasonable to assume that wherever they're

11  incarcerated, they would incur those costs, yes.

12     Q.   Okay.  And cost -- and to the extent

13  that they have children, schooling costs for

14  those -- education costs for those for those

15  kids, right?

16         MR. DARROW:  Objection.

17     A.   Yes.

18     Q.   And costs for health care to the

19  extent they qualify for Medicaid, right?

20         MR. DARROW:  Objection.

21     A.   Yeah, I don't know the, you know,

22  qualifications for Medicaid myself, but yes.

1      Q.    But you understand that it's a

2  program aimed at primarily lower socioeconomic

3  demographics?

4      A.    I am aware of that.

5      Q.    Okay.  And many of the folks that are

6  coming over the border are within those lower

7  socioeconomic demographics, right?

8            MR. DARROW:  Objection.

9      A.    I don't know the percentages, but

10 yeah, the aliens cut across all demographic

11 areas.

12     Q.    All right.  But at least some of them

13 are -- are probably not rich, correct?

14           MR. DARROW:  Objection.

15     A.    Yes.

16     Q.    Okay, all right.  And, indeed, during

17 the time period -- in the delayed time period

18 caused by the backlog, states are going to incur

19 costs regarding any form of government

20 assistance that it offers, right?

21           MR. DARROW:  Objection.

22     A.    I would assume.

1      Q.   Okay.  If the aliens that were

2   released on either NTR or parole plus ATD were

3   instead detained, states would not have incurred

4   those costs, right?

5           MR. DARROW:  Objection.

6      A.   It's a little complicated.  They would

7   have not have incurred the costs while they were

8   in ICE custody.  We would -- the federal

9   government would then bear those costs, ICE

10  specifically, but when they are released, if

11  they are not, you know, removed within, you

12  know, a short amount of time because we can only

13  detain for so long, they're going to be released

14  anyway.  If there is somebody who we simply

15  cannot remove because their country won't accept

16  them back, they would have to be released

17  anyway, so.

18     Q.   Okay.  But for at least for the period

19  of time they are detained, the state would not

20  bear those costs, right?

21          MR. DARROW:  Objection.

22     A.   That is correct.

1          Q.   Okay, all right.  And the delay by not

2     issuing NTAs in an inadmissible alien -- the

3     delay and removal for an inadmissible alien,

4     because they were not provided an NTA, for that

5     additional time period, the state is going to

6     bear that additional cost, right?

7               MR. DARROW:  Objection.

8          A.   Yes, that's reasonable.

9          Q.   Okay, all right.  If you'll -- looking

10    back at 262, which we have in front of us, it

11    indicated at least as of May 5, 2022, there was

12    110,700 aliens that did not have notices to

13    appear issued, right?

14              MR. DARROW:  Objection.

15         A.   That's what this reflects, yes.

16         Q.   Okay, all right.  If you'll turn to

17    SAR 266, this indicates here at the top of the

18    page, total PD release cases since March 21,

19    2021, NTR, NTR plus, now parole plus ATD began

20    8/6/21 226,297, right?

21         A.   Yes.

22         Q.   Okay.  Do you know what NTR plus was?

1  alternatives to detention programs that don't

2  include technology?

3      A.    So, overall, anything that results in

4  the individual not being able to be in custody,

5  right?  So, it doesn't have to be electronic,

6  but even the order of recognizance or order of

7  supervision, bonds, things of that nature are

8  still technically ATD.  But, what we commonly

9  refer to as ATD does involve technology of some

10  of some form.

11      Q.    Okay, all right.  I appreciate that.

12  If we can go back, and I've gone back to this a

13  couple times, to Exhibits 3, 4, 5, and 6, those

14  three rate charts.

15      A.    I've got to dig -- 3, 4, 5, and 6?

16      Q.    Yeah.

17      A.    Okay.

18      Q.    We're going to go to the end.  We're

19  now talking about alternatives to detention, so

20  we're going to the end.  So, we're not going to

21  be looking at the parts of the document we

22  looked at before.  This is going to be fairly

1    quick.  If you look at the towards the end of

2    the of the document to the alternatives to

3    detention section.  First in Exhibit 3, which is

4    2019, there were 83,186, correct.

5              MR. DARROW:  Objection.

6        A.    That's correct.

7        Q.    All right.  If you turn to Exhibit 5,

8    2021, there were 136,026 aliens that were on ATD

9    in 2021, right?

10             MR. DARROW:  Objection.

11       A.    Correct.

12       Q.    Okay.  So, it almost -- it got up by

13   more than 50% President Biden's first year in

14   office, right?

15       A.    Correct.

16       Q.    Okay.  Now, looking at 2022, Exhibit

17   6, the alternative to detention section, the

18   total number of aliens that were on ATD in 2022

19   was 297,994, correct.

20             MR. DARROW:  Objection.

21       A.    Correct.

22       Q.    All right.  So more than -- in 2022,

1   that's more than triple the enrollment that was

2   in ATD in 2019, right?

3           MR. DARROW:  Objection.

4       A.   Yes.

5       Q.   And releases with ATD conditions from

6   the southwest border are what is driving the

7   increased ATD numbers, correct?

8           MR. DARROW:  Objection.

9       A.   Primarily, yes.

10      Q.   Okay.  If we could take a quick break,

11  I'm basically almost done.

12          VIDEOGRAPHER:  The time is 1412.  We

13  are going off the record.

14  [Off the record at 2:12 p.m.]

15  [On the record at 2:40 p.m.]

16          VIDEOGRAPHER:  The time is 1440.  We

17  are going back on the record.

18  BY MR. GUARD:

19      Q.   All right, Director Price.  I have no

20  further questions.

21      A.   Thank you.

22          MR. DARROW:  Unfortunately, I do.

1    immigration proceeding, roughly a third would

2    abscond, right?

3         A.    Yes, we did.

4         Q.    Okay.  And we've also looked at

5    documents in this case that 50,000 or almost

6    50,000 of them that were giving addresses in

7    Florida.

8         A.    That's correct, yeah.

9         Q.    They were not reporting as required,

10   right?

11            MR. DARROW:  Objection.

12        A.    Which one was that again?  I know

13   there was the 47,000.

14        Q.    It's a LESA document, Exhibit Number,

15   it's a one-pager.

16        A.    Yeah.

17        Q.    19.

18        A.    There it is.  Yes, 47,984 was the

19   number that were placed on parole ATD between

20   November 1, 2021 and July 4, 2022, and failed to

21   check in and had a Florida address, yes.

22        Q.    Okay.  And there's thousand -- over a

1  thousand that were on NTR and failed to check

2  in, right?  So, collectively, almost 50,000

3  folks who were released at the border on one of

4  these programs and they failed to check in.

5          A.    That's correct.

6          Q.    All right.  They've absconded, right?

7                MR. DARROW:  Objection.

8          A.    I wouldn't know if they all absconded

9  or not, but they didn't check in.  That is

10  factual.

11          Q.    Okay, all right.  And so, that's --

12  I think we looked at it -- if you want to look

13  at it, it's on the administrative record on page

14  SAR 266.  There's 226,297 releases, and there

15  are 50,000, almost 50,000 in Florida that failed

16  to check in.  So, 25% or 20%, right?

17          A.    Yes.  20%, yes.

18          Q.    All right.  You got asked some

19  questions about Flores.  Do you know what the

20  Department of Justice's position was as far as

21  whether Flores applied to accompanied minors

22  versus unaccompanied minors?