# Exhibit 3

## DEPOSITION OF
## TONY BARKER

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      a few ground rules before we begin.

2                So, we are here.  The court reporter is

3      taking down everything that we say, so I ask that

4      you give audible responses.

5                If I don't understand a question that I

6      ask, please, just let me know and I can rephrase it

7      or repeat it.

8                Your attorney, Mr. Darrow, might from time

9      to time lodge an objection.  If he does so, please,

10     go ahead and answer the question unless you're

11     specifically instructed not to.

12               If you need to take a break, please, let

13     me know.  I just ask that we don't take a break

14     while there's a question pending.

15               And since there is a court reporter taking

16     down everything that we're saying, let's try not to

17     talk over each other.  Otherwise, it will make her

18     job pretty difficult today.

19               And where are you currently located?

20          THE STENOGRAPHER:  Hold on.  I'm going to

21      break in because I didn't swear in the witness.

22      Here we go.

23          Mr. Barker, would you raise your right

24      hand for me, please?

25          Do you solemnly swear or affirm that the

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1        testimony that you are about to give in this

 2        cause will be the truth, the whole truth and

 3        nothing but the truth?

 4             THE WITNESS:  I do.

 5             THE STENOGRAPHER:  Thank you very much and

 6        I apologize.

 7                  DIRECT EXAMINATION (Cont'd)

 8     BY MS. PATEL:

 9        Q.   All right.  So, let's just quickly go over

10     this again.  Chief Barker, have you ever been

11     deposed before?

12        A.   Yes.

13        Q.   And how many times?

14        A.   Once.

15        Q.   When was that?

16        A.   In the 2018, 2019 time frame.

17        Q.   Okay.  And what type of case?

18        A.   An EEO case.

19        Q.   Okay.  And that's an employment case?

20        A.   Yes.

21        Q.   Okay.  And were you testifying as a

22     corporate representative for CBP?

23        A.   Yes, fact witness for CBP.

24        Q.   Okay.  And that was in your corporate

25     capacity as opposed to an individual?
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 11

```
 1   on your computer?

 2        A.   No.

 3        Q.   Do you have a cell phone in the area?

 4        A.   It's on my hip.

 5        Q.   Okay.  Do you understand that you're under

 6   oath and you're required to tell the truth today?

 7        A.   Yes.

 8        Q.   Okay.  And if, at any time during this

 9   testimony, you realize that you misspoke, please,

10   just let me know.  Okay?

11             Are you under the influence of any alcohol

12   or substances that would impair your ability to tell

13   the truth?

14        A.   No.

15        Q.   Okay.  And you understand that you are

16   being deposed today in both your corporate capacity

17   and in your individual capacity?

18        A.   Yes.

19        Q.   Okay.  And so, in order to -- just so

20   you're clear, the first part of this deposition will

21   be me asking you questions in your corporate

22   capacity.  We will then switch to me asking you

23   questions in your individual capacity.  Does that

24   make sense?

25        A.   Yes.
```

Page 33

1       Q.   And then did you move to your current

2   position at DHS?

3       A.   Right.  So, it would have been...  I don't

4   know, probably right around, say, February,

5   March-ish time frame, somewhere right around in

6   there, 2021 moved into the Acting Chief role.  It

7   would have been somewhere right around there.  I

8   can't remember the exact time frame.  Obviously, I

9   would have to look it up.

10       Q.   And Acting Chief, is that of a specific

11   unit?

12       A.   No, the same thing, over operations at

13   headquarters border patrol.  And ultimately it's

14   just, just overseeing that same functionality just

15   at a different -- you know, instead of a deputy

16   level at the principal level as the chief.

17       Q.   Okay.  And were you promoted again?

18       A.   Nope.  That's currently what I'm doing

19   right now.

20       Q.   All right.

21       A.   We've reached the end of the road.

22       Q.   All right.  I have as your title the Chief

23   of Law Enforcement Operations Director.  That's what

24   we're referring to?

25       A.   Yes.

Page 51

```
 1    of crime in the process, granted, we may apprehend

 2    them, but we may be turning them over to a partner

 3    organization or agency for their prosecutorial

 4    process.  Right?  It just depends upon the

 5    circumstances.

 6              Or we can have somebody who has entered

 7    between the ports of entry as a United States

 8    citizen and not necessarily entering the United

 9    States illegally in the fashion where we would

10    apprehend them, but we will turn them over to Office

11    of Field Operations.

12              So, those are just three examples of

13    situations I confronted myself in my own duties and

14    roles and responsibilities.  And, again, kind of

15    going back to we have to -- each individual

16    circumstance is evaluated, you know, by the officer

17    or the agent.  To broadbrush it is extremely

18    difficult.

19         Q.   Okay.  So, if someone has entered

20    illegally without committing any type of crime --

21         A.   Well, if they entered illegally, they

22    would have committed a crime.

23         Q.   Well, so --

24         A.   Term of illegal means it's committing a

25    crime.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 52

1      Q.   Right.  So, if they committed -- if they
2   entered illegally and then they committed a crime --
3      A.   So, we have two crimes?  I'm just trying
4   to determine --
5      Q.   I'm sorry.  Maybe I'm not being clear.
6      A.   No.
7      Q.   So, they entered illegally and in doing so
8   they've committed a crime?
9      A.   Yes.
10      Q.   Okay.  At that point, is that person
11   arrested and taken to a separate location for
12   processing?
13      A.   So, yes, depending upon the circumstance.
14   It depends on what their nationality is.  So, you
15   know, we, we have the, the public health authority
16   of Title 42, which we would detain somebody, process
17   them, right, which is really just recording the
18   encounter.  You know, and, and then ultimately expel
19   them.  You know, so it's not necessarily an arrest.
20   It's an encounter.  So, it's through the expulsion.
21   Right?
22          And in other circumstances where we can
23   not apply Title 42 to somebody, then -- yes, then
24   they are placed under arrest and taken to a
25   location, you know, most often in order to process.

Page 61

1      A.    Exactly.

2      Q.    Okay.  And when the person is taken into

3    custody or arrest, is there a warrant that's

4    obtained first?

5      A.    No.  No, I mean, we -- I mean, don't get

6    me wrong.  I mean, we execute warrants for sure, you

7    know, but, but, you know, I mean, we don't have

8    warrants when we're encountering somebody between

9    the ports of entry.  You know, we -- obviously, we

10   don't do that, so...

11     Q.    Okay.  Is a warrant obtained at some later

12   point or date?

13     A.    It just depends.  I mean, we, we have --

14   you know, we have the ability to process somebody

15   for a Warrant of Arrest/Notice to Appear where we've

16   kept them in detention.  But, you know, it's

17   dependent upon the circumstances that are in front

18   of us.  Sometimes there's no warrant that is, that

19   is generated for an individual who, who we are --

20   have arrested in processing.

21     Q.    So, under what circumstances would a

22   warrant be generated?

23     A.    As an example, if somebody has a -- you

24   know, a criminal history and we are, you know, going

25   to be processing somebody for -- you know, for

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 62

1   detention or prosecution is a perfect example, you

2   know, we'll do a Warrant of Arrest/Notice to Appear

3   or we'll have a warrant completed.

4       **Q.   So, when you say "criminal history," are**

5   **you referring to any type of criminal history?**

6       A.   It just depends.  So, it depends on

7   severity of the crime, what the crime is.  You know,

8   are they a CIMT, crime of immoral turpitude.  You

9   know, it just depends on what the criminal history

10  is.  But, ultimately, you know, you know,

11  somebody -- as an example, somebody may have a

12  criminal history for burglary who we're absolutely

13  going to, you know, try to prosecute and detain and

14  remove from the country.  Somebody has a criminal

15  history of speeding on their record, we may not be

16  doing that.

17          It just depends.  It's dependents upon the

18  circumstances in front of us.  And it's dependent

19  upon other circumstances as well.  You know, for

20  instance, the ability for DOJ to prosecute, for us

21  to be able to detain.  There are several

22  circumstances that surround what the ability is.

23      **Q.   Okay.  Does it matter whether the person**

24  **committed a crime in another country as opposed to**

25  **in the United States?**

Page 99

1    not they are or are not a family unit is one of the

2    criteria?

3         A.   Absolutely.

4         Q.   And how is that criteria applied?

5         A.   So, for family units, you know, if we're

6    able to expel them, if we're able to return them

7    rapidly through ER, as an example, you know, then we

8    will -- if those countries are able to or are

9    accepting, you know, individuals back, right,

10   they're allowing us to return or remove individuals,

11   then we will, right, and we'll apply that specific

12   pathway.

13        You know, if they're from a country who is

14   not accepting, you know, returns, removal or

15   expulsions from us, and we have, we have no bed

16   space for detention, then we will utilize a release

17   mechanism for families we have no availability to

18   detain.

19        Q.   Okay.  First you mentioned ER.  Were you

20   referring to Expedited Removal?

21        A.   Expedited Removal.

22        Q.   And you also said when there is no bed

23   space for detention.  Were you referring to bed

24   space at a border patrol facility?

25        A.   So, so, we don't detain.  We will hold in

Page 100

1   a border patrol facility, right, but ICE has

2   detention and ICE does not currently have any bed

3   space for detention of family units.

4        Q.    And why is that?

5        A.    You'd have to ask ICE, ma'am.

6        Q.    Okay.  So, does that mean that they will

7   not accept any family units?

8        A.    Meaning ICE?

9        Q.    Correct.

10       A.    Yeah, ICE has no current bed space for

11  family units, to detain family units.

12       Q.    And so, how does that then impact CPB --

13  CBP?

14       A.    So, as we, as we decide which pathway we

15  are going to apply to a family, we have to keep in

16  mind that, that this family will not be able to be

17  detained outside of border patrol's detention

18  center -- or holding center, I'll say.

19       Q.    So, does that mean that they have to be

20  released into the interior?

21       A.    Depending upon the pathway.

22       Q.    So, what -- in what circumstance would

23  they not be released into the interior?

24       A.    As an example, if we're able to apply

25  Expedited Removal or Title 42, right, but I know

Page 102

1    illegally, that's what we're going to do.

2        Q.    In what circumstance would you not use

3    Expedited Removal for a particular family?

4        A.    As an example, if they claim fear, we will

5    place them into an, an NTA/OR process because we

6    have no family detentions.  Like, if you place them

7    into ERCF, we have no availability to detain them,

8    you know, and so it's -- ultimately if they claim

9    fear, we'll place them into NTA/OR and their claim

10   of fear will be heard on a non-detained docket.

11       Q.    Okay.  And what percentage of the families

12   complain fear?

13       A.    I couldn't tell you.

14       Q.    Is it a high percentage?

15       A.    So, it just -- it really is dependent.  I

16   couldn't even tell you.

17       Q.    All right.  What if they fail the credible

18   fear screening?

19       A.    That's really where ICE takes over and I

20   defer you to ICE as to their process.

21       Q.    Okay.  So, in the interim if the family

22   cannot be detained in ICE custody, where would they

23   be located?

24       A.    Well, they're placed on NTA/OR, so it's

25   wherever they would be destined to live at.  I mean,

Page 103

 1   we have -- we, as in CBP -- so, speaking strictly

 2   with the CBP path, you know, we -- after they are

 3   released from our custody, they are really the

 4   responsibility of, of -- I'll say the monitoring of

 5   that person falls to ICE.

 6       **Q.   Okay.  But, if I understand correctly,**

 7   **families who are not amenable to Expedited Removal**

 8   **as determined by CBP then get put into a Notice to**

 9   **Appear/Own Recognizance track, at which point they**

10   **can be paroled or bonded out; is that accurate?**

11           MR. DARROW:  Objection, misstates the

12       testimony.

13           You can answer.

14       A.   Yeah, that's, that's not accurate.  It's

15   my fault if I didn't explain it clearly enough.  So,

16   so, there are a couple different pathways.  If we

17   have a family who we cannot -- is not amenable to

18   Expedited Removal, we cannot return to their home

19   country, right, we can't or is not amenable, we will

20   place them into an NTA/OR or a Parole ATD type of

21   pathway for removal -- from release, rather, from

22   our custody.  I'll be very specific with my words.

23   From release from our custody.

24       **Q.   When you say release from your custody,**

25   **does -- that means that they are, in fact, released**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   from any custody, correct?

2       A.   So, you know, as a -- so, they're not in

3   custody, you know, by the term of law.  No, they're

4   not in custody anymore.

5       Q.   Okay.  So, they get released and then they

6   can go to whatever final destination they choose

7   within the United States; is that accurate?

8       A.   Correct.

9       Q.   Was there a family detention available

10   before January 20th of 2021?

11       A.   ICE had two or three -- two or three

12   different family detention locations, but I cannot

13   recall when they transitioned those locations to

14   single adult detention.  I just can't remember the

15   date.

16       Q.   Do you remember who was President at the

17   time?

18           MR. DARROW:  Objection.  Family detention

19       does not relate to any of the topics for which

20       Chief Barker is designated.

21           You can answer.

22       A.   I, I couldn't even tell you when -- again,

23   I don't remember the date in which they switched, so

24   I really refer you to ICE, to be honest, with

25   regards to the date.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 105

1    BY MS. PATEL:

2        Q.   All right.  You don't remember who was

3    President?

4            MR. DARROW:  Same objection.  Also,

5        objection, asked and answered.

6            You can answer.

7        A.   Yeah.  No, I have been through multiple

8    administrations in my role and responsibility.  I

9    cannot remember.  You'd have to ask ICE when they

10   switched over and then find the applicable

11   administration that was in office.

12   BY MS. PATEL:

13       Q.   Okay.  Does the location in terms of how

14   far a person made it into the interior affect what

15   processing pathway is applied?

16       A.   I mean, determining if they're applicable

17   to ER.

18       Q.   Okay.  How so?

19       A.   I mean, there's certain standards of ER.

20   You know, there's certain time frames and mileage

21   requirements.  Otherwise, if we catch somebody who's

22   what we consider is -- or encounter somebody who is,

23   you know, more along the interior, they may not be

24   applicable to ER, but they'd be applicable to other

25   Title 8 pathways and we just process them on other

Page 106

1    Title 8 pathways.

2         Q.   And then, does the determination as to

3    whether a family is, in fact, a family unit, does

4    that impact the decision as to which processing

5    pathway to choose?

6         A.   Yes.

7         Q.   How so?

8         A.   Because if they're not a family unit, then

9    they're an unaccompanied child and a single adult.

10        Q.   If they are a family unit, how does that

11   impact the decision making in terms of processing

12   disposition?

13        A.   So, if they're a family unit, knowing that

14   there's no family unit detention, you know, we will

15   not utilize a pathway that will -- that would

16   intentionally place a family into, into a detention,

17   right, situation.  You know, there's no point in

18   doing all the paperwork, you know, when there's no

19   detention available.

20        Q.   Okay.  So, going back to Exhibit 7, which

21   of these pathways would be amenable to family units?

22        A.   Well, they would technically all be

23   amenable to family units depending if we had

24   detention or not.

25        Q.   Okay.  Well, you do not have detention,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 107

1    correct?

2        A.    Right.

3        Q.    And you --

4        A.    You mean right now?  You mean currently?

5        Q.    Currently, correct.

6        A.    Okay.  I gotcha, I gotcha.

7              So, amenable to family units right now.

8    Family unit right now would be NTA/OR, Parole ATD,

9    ER.  We could even do -- we could even reprocess

10   somebody who has a previous removal through an ER

11   again.  Warrant of Arrest/Notice to Appear, meaning

12   detention ultimately would not be applicable.  We

13   can voluntary return a family.  We are not currently

14   implementing or applying MPP to families.  When I

15   say ER, it's going to be dependent because the

16   circumstances surrounding the ER is going to

17   determine if, if they're, obviously, amenable to ER

18   or not.  Right?  You know, if -- yeah, I guess

19   that's the easiest way to explain it.

20       Q.    When did you stop applying MPP to

21   families?

22             MR. DARROW:  Objection.  That's beyond the

23             scope of this deposition and the topics for

24             which he's designated.

25             You can answer if you know.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      A.   Under the -- when we had the restart of

2   MPP -- and I don't recall the time frame.  I just --

3   I can't remember the month that we restarted MPP in,

4   but, you know, under, under the most recent

5   application or iteration of MPP it's been applied to

6   single adults.

7           MS. PATEL:  And I just want to note for

8        the record that Topic 4 is directly on point as

9        to this line of questioning.

10   BY MS. PATEL:

11      **Q.   All right.  So, under what circumstance**

12   **would CBP apply the NTA/OR to individuals?**

13      A.   Single adults?

14      **Q.   Correct.**

15      A.   It kind of goes back to the question I

16   answered on this earlier, which is really, you know,

17   depending upon the circumstances of that single

18   adult, you know, does ICE have detention

19   availability or not?  You know, does -- is the

20   person applicable to, you know, the Fraihat

21   detention restriction where it's not applicable to

22   them?  You know, these are circumstances where we

23   would, you know, apply an NTA/OR to a single adult.

24      **Q.   Okay.  Did you say a Fraihat detention?**

25      A.   Yeah.  So, Fraihat litigation is certain

Page 109

1    circumstances which prohibit us detaining.  And it's

2    not us.  I'm using "us" as the larger DHS entity.  I

3    really kind of defer you to counsel and to ICE in

4    regards to that because that's their standards of

5    detention.  But when ICE tells us that they cannot

6    detain a certain individual -- a single adult, they

7    cannot detain a single adult, then that detention

8    pathway is removed, obviously.

9         Q.   Okay.  Do -- those same factors, are they

10   considered as to a family unit?

11        A.   Well, there is no detention of family

12   units currently available, so, yeah, but it's

13   implied, right, because there's no detention.

14        Q.   Understood.  Under what circumstances

15   would CBP apply Parole + ATD to a family unit?

16             MR. DARROW:  Objection, Parole ATD is

17        beyond the scope.  Also, we have another

18        witness to discuss Parole ATD.

19             You can answer.

20        A.   So, Parole ATD would be applied to a

21   Cuban, Nicaraguan or Venezuelan family unit as these

22   three demographic -- or these three country

23   demographics or citizenships, nationalities

24   currently do not allow us to repatriate those

25   individuals, so no returns, no removals, and we have

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 135

1    NTA/OR processing pathway is not necessarily

2    inclusive.  Right?  Just because I'm processing an

3    NTA/OR doesn't mean that ICE is going to attach ATD

4    on somebody, but it doesn't mean that they won't.

5    ICE can, if they decide to, place ATD on an

6    individual released on NTA/OR.  So, they're not

7    mutually exclusive or, you know, inclusive, either.

8    Like, it's dependent upon the circumstances, which

9    is really ICE's decision if they're going to place

10   somebody on ATD intensive.  The reason why I'm --

11   I'm trying to answer the best I can, but I really

12   defer you to ICE in regards to that decision-making

13   process and how they're -- and what they're doing

14   with it.

15        **Q.   So, if ATD is an ICE decision-making**

16   **process, then why is it that, for instance, on**

17   **Exhibit 7, which has U.S. Border Patrol Monthly**

18   **Southwest Border Encounters, Parole + ATD is listed**

19   **with numbers for the number of people who are**

20   **processed under the Parole + ATD?**

21        A.   Sure.  So, that is, that is ultimately

22   when ICE is, in essence, placing ATD on somebody who

23   we are processing for parole.  Right?  So, it's the

24   tracking mechanism that is associated with it.

25        **Q.   All right.  Is the November memo the only**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    **Parole + ATD policy?**

2         A.   Well, it's not a policy, but that's the

3    only Parole ATD guidance that we have out at this

4    time is the November -- that's the -- what I

5    consider the superseding memo.

6         **Q.   Okay.  You're saying it's not a policy**

7    **because it's guidance?**

8         A.   Yes, it's operational guidance.

9         **Q.   Okay.  So, is it also authorized by some**

10   **other SOP?**

11        A.   No, just the memo.

12        **Q.   Give me a minute.  I'm going through my**

13   **outline.  I might have asked you some of these**

14   **questions already, so we can...**

15             MS. PATEL:  Well, actually, can we take

16        like a five-minute break?

17             MR. DARROW:  Sure.

18             THE WITNESS:  That'd be fantastic.

19             MS. PATEL:  Sorry.  If you ever need a

20        break, please, let me know.

21             THE WITNESS:  I'm hanging with you.  I'm

22        hanging with you.

23             MS. PATEL:  All right.  Let's take a

24        five-minute break and we can go off the record.

25             THE VIDEOGRAPHER:  The time is 11:41 and

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1          to that.  It does discuss Parole + ATD as a

2          possible choice among the different processing

3          dispositions, but if you're going to down and

4          question about how Parole + ATD came to be and

5          the different policy decisions that went into

6          it, that seems much more appropriate to Topic

7          Number 1.

8              MS. PATEL:  Okay.  Understood.

9      BY MS. PATEL:

10         **Q.   Chief Barker, I think you can answer the**

11     **question unless your counsel's instructing you not**

12     **to.**

13             MR. DARROW:  You can answer if you know

14         from your personal capacity.

15         A.   So, can you, can you restate your

16     question?

17      BY MS. PATEL:

18         **Q.   Sure.  Did you have any role in developing**

19     **this policy?**

20         A.   So, the operational guidance, yes.  I

21     mean, it, it -- I was at that period of time, you

22     know, engaged as we were looking to define triggers,

23     if you will -- that's further down the document --

24     as to when, you know, Parole ATD would be utilized,

25     formally, you know, ceasing the utilization of

Page 145

1   Notice to Appear and migrating over to a Parole +

2   ATD in the -- you know, so that -- that's my -- that

3   was my involvement, if you will, in helping, I'll

4   say, or being involved in crafting of this

5   operational guidance memo.

6       **Q.   And prior to this operational guidance**

7   **memo, were families being paroled or released into**

8   **the interior?**

9       A.   Were families being -- are you talking

10  about the, the Parole + ATD aspect of families, you

11  know, when we started utilizing it in the July time

12  frame?  Is that what you're asking for?  And I'm

13  trying to understand your question.

14      **Q.   What do you mean "in the July time frame"?**

15      A.   So, so, you know, basically, when we

16  started attaching NTRs and -- excuse me, attaching

17  Parole ATDs to those individuals we were placing on

18  parole would have been roughly around in July.  This

19  memo coming out, you know, I'll say formalizing

20  Parole ATD, if you will, under Chief Ortiz's

21  signature in November.  I guess that should probably

22  be the more direct answer for you.

23      **Q.   Okay.  So, this guidance or what is**

24  **described in this guidance started in July of when?**

25  **2021?**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 146

1     A.   Yes, yes.  So, it would have been roughly

2  that time frame when, when we started, you know,

3  collectively between CBP and ICE utilizing the ATD

4  portion of the parole, if you will.

5     **Q.   Okay.  And then it wasn't formalized until**

6  **November of 2021?**

7          MR. DARROW:  Same objections.

8          You can answer from your personal

9     capacity.

10    A.   That's when the memo was, was, was

11 completed.

12   BY MS. PATEL:

13    **Q.   Okay.  Prior to this memo, were there any**

14 **trainings or instructions provided to staff as to**

15 **how to implement what is the process that is**

16 **described in this guidance?**

17          MR. DARROW:  Same objection.

18          You can answer from your personal

19    capacity.

20    A.   You know, there, there is the, the March

21 2021 NTR guidance that was put out, I believe, at

22 that period of time under Chief Rodney Scott's

23 signature.  You know, that was, that was the

24 guidance at that period.

25   BY MS. PATEL:

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 151

```
 1   COVID-19 would be, would be a case in point of a --

 2   you know, a humanitarian utilization of Parole ATD,

 3   right, in order to be able to rapidly decompress,

 4   decompress our, our detention facilities or, you

 5   know, our custody and holding numbers because of the

 6   pandemic.

 7           You know, I'll be honest with you, we've

 8   lost 19 border patrol agents to COVID, COVID deaths,

 9   you know, directly associated with COVID that they

10   have contracted on duty working in, you know,

11   facilities which are, which are well over capacity

12   and in that congregate setting, you know, creating a

13   significant life and safety risk to the agents,

14   officers, migrants and professional staff that are

15   all being detained there.

16           So, so, I'll be honest, sitting here as

17   the Chief of Operations, having spent, you know, 21

18   plus years in a green uniform working on the border,

19   19 deaths that, that are associated with, you know,

20   a public health pandemic due to overcrowding within

21   our facilities is something that we take direly

22   seriously not only for the agents, but for the

23   migrants and the professional staff working in that

24   environment as well.

25        Q.   Okay.   I believe you previously testified
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 152

1    that border patrol agents have discretion as to

2    whether to apply Parole + ATD; is that accurate?

3         A.   Within the confines of the, of the

4    guidance that has been sent out, which you,

5    obviously, have it.  You sent it to us.

6         Q.   Okay.  Understood.

7              So, is there any mechanism in place to

8    review those individual enforcement decisions?

9         A.   Yes, actually.  I mean -- so, I mean,

10   there's various levels of supervision within any

11   processing location, all the way from a patrol agent

12   in charge all the way to, to what I would consider

13   the first line, you know, supervisor or supervisory

14   border patrol agent.  It's kind of what I referred

15   to when I was talking about some of the previous

16   jobs that I had held.  You know, all of those

17   individuals are, you know, commonly operating or

18   commonly involved in the processing areas and

19   overseeing the process.

20             You know, it -- you know, additionally

21   speaking, you know, we, we look at the same numbers

22   that, that you presented here today as well as on a

23   daily basis, you know, so that we can monitor the

24   detention capacities within the sectors that are

25   impacted, principally Del Rio and Yuma, you know,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 166

1      A.    Since January 2021?  So, you know, the --

2   and it's really not even a pathway, to be honest,

3   but, you know, the application or utilization of

4   parole, which was a pathway previous to January 20,

5   2021, you know, is a pathway that we have utilized

6   more often, but as far as new pathways being

7   presented, it's not a new pathway.

8      Q.    Why has parole been used more often?

9      A.    Again, it goes back to the processing time

10  frames that we, we spoke about earlier.  Again, it

11  goes back to the detention conditions, the high TIC

12  times, the high capacity numbers, the fact that we

13  have no return mechanisms to, to certain

14  demographics like Cubans, Venezuelans, Nicaraguans.

15  It's those circumstances which we talked about

16  earlier.

17          I mean, the COVID pandemic, you know, the

18  literal death and dying of agents and officers as

19  they try to do their job, you know, in protecting

20  the border, you know, and as well as protecting the

21  migrants and the professional staff that are working

22  every day as well.

23          So, there are certain real -- there's

24  certain applications of parole like we've spoken

25  about during those circumstances.  Again, based upon

Page 167

1    the circumstance of the individual in front of us as

2    well.

3         Q.   I just want to -- a point of

4    clarification.  For Parole + ATD, when it comes to

5    family units, is that applied to families regardless

6    of their nationality?

7         A.   So, it -- Parole + ATD may be applied,

8    and, and at this point in time, you know, the

9    nationalities in which we are applying Parole ATD

10   are Cubans, Venezuelans and Nicaraguans because we

11   have no return rights to those countries, either.

12   We can't send them back.

13        If we have a return mechanism in order to

14   be able to send somebody back to another country --

15   I'll just use Colombia as an example -- you know, we

16   will process them accordingly and, and return them

17   to the best of our ability.  Guatemala is another

18   prime example of a country, you know, that we have

19   return rights to.  Right?  So, if we're able to

20   return somebody to their home country, then we will,

21   we will place them into a removal type proceeding.

22        Q.   Okay.  So, as of right now, it's only

23   being applied to those nationalities that you just

24   mentioned; is that fair?

25        A.   So, yes, by and large to those, those

Page 168

```
 1   nationalities in which, in which we were -- you

 2   know, we are not able to return to.  You know, there

 3   are countries -- Colombia is another example to

 4   where through, I'll say, political dynamics we have

 5   recently gained the ability to start return or

 6   returning to, but we had not previously.  So,

 7   through negotiations gained the ability to return to

 8   Colombia, and hence, now, you know, processing more

 9   Colombians to -- you know, with a, with a removal

10   pathway.

11        Q.   Were there other nationalities that you --

12   since Parole + ATD has been implemented, are there

13   other nationalities to which it has been applied?

14             MR. DARROW:  Objection.  We're going to

15        have another witness speak to Parole + ATD.

16             You can answer.

17        A.   Not that I'm aware of off the top of my

18   head.  I'm not -- I would have to ask.  I just don't

19   know.  I don't know off the top of my head.

20   BY MS. PATEL:

21        Q.   Okay.  So, since January 20, 2021, have

22   any pathways been removed?

23        A.   Yes.

24        Q.   Which pathways?

25        A.   HARP and PACR.
```

Page 171

```
 1      A.   Yes, ma'am.correct.
 2      Q.   All right.  So, I'd like to ask you about
 3   the second paragraph.
 4      A.   Sure.
 5      Q.   The reference to "detaining single adults
 6   when appropriate."
 7      A.   Uh-huh.
 8      Q.   Why does this document only reference
 9   detaining single adults and omit any reference to
10   family units?
11      A.   Because there's currently no family unit
12   detention.
13      Q.   So, it's because there's no ability to
14   detain family units.  Am I understanding that
15   correctly?
16      A.   So, (a), first off, I mean, that would be
17   my -- I'm not the author of the document, so that's
18   just me assuming based on the circumstances.  You
19   know, you have to ask the Secretary as to the family
20   piece.  But the -- you know, obviously, yes,
21   detaining single adults when we can.
22      Q.   Okay.  Does DHS believe that it's
23   appropriate to detain family units?
24           MR. DARROW:  Objection.  We have another
25      witness who's going to speak to detention
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   Exhibit Number 14 -- no, Exhibit Number 15.  We'll
2   take this a little out of order.  This is Texas v.
3   Biden Monthly Reporting for the reporting period
4   January 21, 2021 through November 30, 2021.  Is that
5   an accurate statement from this document?
6       A.   For the Title 8 reporting, yes.
7       Q.   Can you turn to page 13 (sic) of this
8   document?
9       A.   Yes, I gotcha.
10      Q.   So, at the top it says, this "Data
11  includes Deportable Migrants only."  So, what is
12  that referring to?
13      A.   There -- you know, so it's an immigration
14  classification.  Right?  So, somebody could be
15  non-deportable.  It'd be like a LAPR, a legal alien
16  permanent resident.
17      Q.   Okay.  And so, it looks like, according to
18  this chart, about 105,504 people were released on
19  NTA or OR due to lack of space; is that accurate?
20      A.   I think -- so, out of the report, as I'm
21  looking at, I think it's, what, 5,889, something
22  around there.
23      Q.   Are you looking at -- oh, I'm sorry.  Are
24  you on page -- I think I told you page 13.  I meant
25  page 12.  Can you look at page 12 for me?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      A.    Okay.  All right.  I'm on page 12 now.

2      **Q.    I'm looking at the top chart.**

3      A.    Okay.  I gotcha.

4      **Q.    Okay.  Can you actually explain to me**

5   **what's in this chart?**

6      A.    Let me just read real quick.  All right.

7   So, these are going to be all individuals who, who

8   we have -- just one second.  Just one second.  Let

9   me zoom out here.  Okay.  So, these are going to be

10  individuals who, who were processed for an NTA/OR

11  and that, that could have been detained and they

12  were placed on an NTA/OR due to the fact that ICE

13  did not have space available for detention.

14          So, then, of course, the parole aspect is

15  exactly the same thing.  Right?  So, they were

16  processed for parole due to the fact that ICE did

17  not have space for detention.

18     **Q.    Okay.  Is that as to both of the totals as**

19  **listed in the right-hand column, the 105,000 and the**

20  **101,000?  Because I see that "Lack of Space" is --**

21     A.    Yes.

22     **Q.    -- also noted for that top row.**

23     A.    Yeah, I mean, I'm not the originator of

24  the document.  Do I know the numbers?  I mean, I

25  think it's probably -- the way that I'm reading it

Page 187

1   is encompassing both of those aspects for lack of

2   space, but, but I'd have -- you'd have to ask who

3   polled it.

4        Q.   So, I'm looking at the footnote below.

5   It, essentially, infers or states that that "Lack of

6   Space" category was kind of added in by whoever was

7   inputting the information?

8        A.   Yes.

9        Q.   Okay.  But that's not something that the

10  agent necessarily has to put in a descriptor; is

11  that accurate?

12       A.   It is not a -- what I would consider as a

13  prefill or a check box or a drop down, you know what

14  I mean, so there's -- so, it has to be manually

15  entered.

16       Q.   Okay.  Other than Lack of Space, are there

17  other entries that people typically put in for the

18  reason for an NTA or OR?

19       A.   Yeah, I mean, it could be, you know, you

20  know, that, that they are claiming fear and placed

21  in a non-detained docket, you know, because they

22  are, you know, being processed, you know, to have

23  their fear claim heard.

24       Q.   Okay.  Have you seen people actually input

25  that descriptor into this information system?