# Exhibit 4

## DEPOSITION OF ROBERT GUADIAN

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 4

1  Proceedings began at 10:14 a.m. EST:

2          THE VIDEOGRAPHER:  We are now on the record,

3  and the time is 10:14 a.m.

4          This is the video-recorded deposition of

5  Robert Guadian, as corporate rep of Homeland Security,

6  in the matter of the State of Florida versus the United

7  States of America, et al.

8          This deposition is being held via Zoom video

9  on July 14th, 2022.

10          The videographer is David Celani, and the

11  stenographer is Francine O'Claire, both in association

12  with Phipps Reporting.

13          Will counsel please announce their appearances

14  for the record?

15          MS. BRODEEN:  This is Karen Brodeen from the

16  Florida Office of Attorney General on behalf of

17  plaintiff, State of Florida.

18          MR. DARROW:  Joseph Darrow from U.S.

19  Department of Justice on behalf of the United States.

20          THE STENOGRAPHER:  Sir, would you raise your

21  right hand, please?

22          Do you consent to my administering the oath

23  remotely?

24          THE WITNESS:  Yes.

25          THE STENOGRAPHER:  Do you solemnly swear the

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 5

1  testimony you give will be the truth, the whole truth,

2  and nothing but the truth?

3          THE WITNESS:  Yes.

4          THE STENOGRAPHER:  Thank you.

5  THEREUPON,

6                  ROBERT GUADIAN,

7  having been first duly sworn or affirmed remotely, as

8  hereinafter certified, testified as follows:

9                  DIRECT EXAMINATION

10 BY MS. BRODEEN:

11      Q.  Okay.  Mr. Guadian, am I pronouncing your name

12 correctly, by the way --

13      A.  Yes.

14      Q.  -- Mr. Guadian?  Thank you.  And can you tell

15 me what your business address is?  Okay.

16      A.  No, it's at the Potomac Center, north building

17 in Washington, D.C., just on K and Independence, I

18 believe -- 500 12th Street, Washington, D.C.

19      I apologize.  I didn't know it off the top of my

20 head.

21      Q.  And where do you work currently?

22      A.  I'm currently senior executive service member

23 assigned to enforcement removal operations with

24 Immigration and Customs Enforcement.

25      Q.  Okay.  And you said enforcement removal

Page 6

 1  operations?

 2       A.  Oh, I'm sorry.  It's enforcement and removal

 3  operations with Immigration and Customs Enforcement.

 4       Q.  Okay.  So from this point on, we can refer to

 5  that as ERO, okay?

 6       A.  Yes.

 7       Q.  And then ICE is --

 8       A.  ICE.

 9       Q.  Have you ever given a deposition before?

10       A.  Yes.

11       Q.  How many times?

12       A.  I apologize -- No, I go back.  I need to

13  clarify.  No, I have not given a deposition.

14       Q.  All right.  And your attorney's probably gave

15  you some ground rules on how a deposition works, so I'm

16  gonna give you some also.

17       A.  Okay.

18       Q.  Remember to give audible responses.  Don't

19  shake your head or nod, give an audible response for

20  the court reporter to get down.

21       A.  Okay.

22       Q.  If you don't understand a question, please ask

23  me to repeat it.

24       If it's vague or you don't understand it perhaps,

25  ask me to rephrase it; can you do that for me?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  the field office director in Chicago.

2       All those positions are law enforcement positions.

3       **Q.  Okay.  And then you beat me to my next**

4  **question, summarize professional work experience.**

5       **Is there anything else you've done professionally**

6  **that you'd just not list for me?**

7       A.  Yes.  So my current position is the deputy

8  assist director for field operations here in

9  Washington, D.C.  And my responsibilities are to

10  supervise the 12 ERO field offices east of the

11  Mississippi.

12       **Q.  Okay.  And how long have you been in that**

13  **position?**

14       A.  Since 2020.

15       **Q.  Okay.  You say that is a position with**

16  **responsibility in the east side of the United States?**

17       A.  Correct.

18       **Q.  Okay.  So if we imagine the southwest border,**

19  **does it bisect that in some way?**

20       A.  No.  The east -- The east does not -- I don't

21  have any offices along the southwest border.

22       **Q.  Okay.  Do you have any offices in Florida?**

23       A.  I do.  So our Miami field office is

24  responsible for the entire state of Florida.  Within

25  the state of Florida are a large -- Most of our

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  footprint is within an hour of the Miami city limits.

2  But we do have offices in Tallahassee.  We do have

3  offices in Jacksonville, Orlando, and Tampa, as well as

4  smaller -- We have some smaller offices as well,

5  co-located within some of our county jails.

6      But I don't recall exactly which county jails

7  those would be.

8      **Q.  Have you --**

9      A.  We have a fairly large footprint in Florida.

10     **Q.  And have you ever been stationed along the**

11  **southwest border for any of these jobs you've had?**

12     A.  Yes; yes.  So the majority of my career was

13  spent along the southwest border.  I became an

14  immigration inspector in Laredo, Texas.

15     I became a deportation officer in Harlingen,

16  Texas, which is in deep South Texas.  Then I went to

17  San Antonio, which also has offices along the southwest

18  border.

19     And then I was in Dallas, which we also have a

20  nexus to the southwest border in some of our locations.

21     **Q.  Have you been stationed at the south -- Are**

22  **you finished?  I'm sorry.**

23     A.  Oh, I was about to say I spent 18 years

24  working with the southwest border.

25     **Q.  Okay.  And how much time have you spent**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      A.  I don't know.  I don't know anything beyond
2   the ATD component of anything they may be doing.
3         Q.  And does ERO operate detention facilities?
4      A.  Yes, we do.
5         Q.  Okay.  Does CBP sometimes transfer noncitizens
6   to your facilities?
7      A.  Yes.
8         Q.  Under what circumstances do they transfer
9   noncitizens to your detention facilities?
10     A.  Those aliens that require detention, they
11  would be transferred to one of our detention locations.
12        Q.  Let's talk about the first topic, which is
13  Parole Plus ATD.  You've already gotten into that a
14  little bit.
15        Can you explain to me the history of ATD; when did
16  it start becoming a thing?
17     A.  Sure.  Approximately 2002 was when we started
18  receiving funding for the alternatives to detention
19  program.
20        That's been very successful.  Over the last five
21  years, we've -- Congress has allotted additional funds
22  towards the ATD program.
23        The program is a success because it -- It
24  increases or it has a very high appearance rate
25  within -- with the immigration courts, meaning when we

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 58

1    A.  So that's -- That's also a difficult question

2  to answer.  I can say that some facilities -- we always

3  try to max -- to limit the amount of movements that we

4  try to -- from the -- from the new arrests arrive in

5  the southwest borders, so typically the first stop for

6  an alien that has been arrested and requires detention

7  would be to one of our locations on the southwest

8  border.

9    But we also need those facilities to have the

10  capacity to decompress the Border Patrol station.

11    Decompress is a term that the Border Patrol uses

12  that signifies a need to decrease the amount of aliens

13  in their -- in the Border Patrol stations.

14    So we have to keep those facilities that are close

15  to the southwest border in a position to absorb and to

16  support the decompression efforts from the Border

17  Patrol.

18    We also operate a fleet of aircraft.  And we'll

19  move detainees around the country to different

20  detention locations based on that capacity.

21    Q.  When you say that you help -- you assist

22  Border Patrol with decompressing, are you saying that

23  when they need extra capacity for their custody, you

24  will step in and assist them with capacity?

25    I'm sorry, I don't understand how you help them

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1  decompress.

 2      A.  Yeah.  No, so it's -- The Border Patrol has

 3  the authority -- or their facilities are built for

 4  short-term processing.

 5      So we don't house for the Border Patrol while

 6  they're processing people.

 7      You know, they have to be charged and issued

 8  either a warrant of arrest requiring their detention or

 9  they'll have to have a final order in the terms of

10  expedited removal, something that makes them --

11  something that requires their -- the aliens that

12  they're processing to be detained.

13      At that point ICE will accept custody of that

14  alien at that point.

15      We don't -- We don't hold unprocessed or aliens

16  that have not been issued a notice to appear or warrant

17  of arrest or final order of removal from the Border

18  Patrol.

19      And Border Patrol stations -- don't want to speak

20  for them -- but typically their stations are built for

21  short-term holds, so it's not -- It's not for long

22  terms.

23      And when I say we -- we keep -- we support them in

24  their decompression efforts, I mean, we keep enough

25  beds at our facilities along the southwest border to

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   support those arrests because we're seeing that the

2   arrests from the southwest border can fluctuate; so we

3   want to make sure and keep that capacity available for

4   the Border Patrol to use within a close distance of the

5   border.

6        **Q.  So how many detention facilities does ICE**

7   **operate along the southwest border?**

8        A.  I'm sorry.  I don't recall that number.

9        **Q.  Like --**

10       A.  I can tell -- I don't know an approximate.

11       What I can say is that a majority of our bed space

12   is located along the southwest border.  There's -- That

13   would be the majority of it.

14       **Q.  Okay.  So a majority of your entire detention**

15   **capacity throughout this vast network is located along**

16   **the southwest border; did I get that correct?**

17       A.  Yes, that's my understanding.  I don't have

18   the specific numbers.  But we have a large capacity to

19   hold along the southwest border.

20       **Q.  How many detention facilities does ICE**

21   **operate, not through vendors, but independently operate**

22   **yourselves?**

23       A.  I don't recall.  The Port Isabel Service

24   Processing Center, the -- There's a facility in

25   Phoenix, which is the Florence Service Processing

Page 68

1    Q.  This reduction in funding you referred to most

2  recently, was that a reduction in capacity based on a

3  request from the White House, to your knowledge?

4          MR. DARROW:  Objection to -- I need

5  clarification.

6          Do you mean request from the president or do

7  you mean from the White House itself as in --

8          MS. BRODEEN:  The president.  The president.

9  The president.  Same thing; he lives there.

10          MR. DARROW:  You can answer.

11    A.  I don't know the answer to that question.

12  BY MS. BRODEEN:

13    Q.  All right.  Do you need a break yet?

14    A.  I do.  I was just about to ask you.

15    Q.  You should have spoken up.

16    A.  We were on a roll there.

17    Q.  I know.  You're doing a great job being very

18  forthcoming.  I appreciate that.

19          THE VIDEOGRAPHER:  The time is 11:42.  We are

20  off the record.

21          (Recess had 11:42 a.m. - 11:53 a.m. EST.)

22          THE VIDEOGRAPHER:  The time is 11:53, and we

23  are back on the record.

24  BY MS. BRODEEN:

25    Q.  All right.  I want to circle back to something

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 69

1  you said earlier that ERO has a fairly-large footprint

2  in Florida; what do you mean by that?

3      A.  So ERO's Miami is responsible for the entire

4  state of Florida as well as the Virgin Islands and

5  Puerto Rico.

6      And what I mean by "footprint," I mean staffing.

7  Our staffing is quite large in the ERO field office.

8      We have many suboffices in terms of when you

9  relay -- You know, when you look other -- as compared

10  to other field offices around the nation.

11      You know, as I mentioned, we have offices in

12  Tallahassee.  We have offices in Jacksonville, Tampa,

13  Orlando, and a bunch of locations around Miami proper

14  all within an hour to include the Krome process --

15  service processing center.

16      So if Miami's got -- is considered a large field

17  office when it comes to field offices for ERO, it's one

18  of the larger ones, it's got quite a large -- In our

19  terms, it's a large footprint in terms of staffing and

20  of the -- and of the actual physical structures that we

21  have in the Miami field office.

22      Q.  So you had a large footprint in terms of

23  personnel and also infrastructure, correct?

24      A.  Correct.

25      Q.  Okay.  And is there any other state that has

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   more ERO personnel and infrastructure than Florida?

2        A.  I don't recall.  Florida's got to be in the --

3   one of the top -- top five offices.  San Antonio was

4   recently split in two.  So it was our largest office,

5   and now I'm not sure what the ranking is for Florida,

6   but it's -- it's one of our largest.

7        Q.  Okay.  And is Florida ERO presence so large

8   because there's such a large number of migrants that

9   end up in Florida?

10       A.  I don't know the answer to that.  But what I

11  can say are we're always looking at our resources in

12  terms of criminal program.  We're looking at our

13  resources when it comes to prosecutions, our detention

14  capacities.

15       So if we would -- We are continually evaluating

16  where to put our staffing, when to put it, when to add

17  additional office space.  It's all a range of factors.

18       I don't know specifically, but enforcement actions

19  would be one that we would consider when looking at

20  augmenting or building out new offices in any of our

21  AORs.

22       Q.  And what about the offices along the southwest

23  border, how do they compare in size and personnel to

24  southwest Florida ARO?

25            MR. DARROW:  Objection.  What topic does that

Page 87

1    Q.  And if a noncitizen fails to report to ICE

2  pursuant to a notice to appear, what does ERO do, if

3  anything?

4    A.  Oh, I'd ask that you just clarify the

5  statement a little bit because they're certain aliens

6  that aren't required to report to ICE ERO at all while

7  they're going through their immigration proceedings.

8    Can you give me an example of what type of --

9  what -- if somebody that was -- Can you just tell me

10  what -- Give me an example so I can kind of think about

11  it?

12    Q.  Okay.  So what is your understanding of what a

13  notice of appear is -- notice to appear is?

14    A.  So a notice to appear is the charging document

15  that is utilized by ICE and Customs and Border

16  Protection to be filed with immigration court.  And the

17  immigration court schedules hearings based on that

18  notice to appear.

19    That notice to appear has address -- an address

20  for the respondent.

21    And our attorneys and DHS will be representing the

22  government.  And the alien will either secure counsel

23  or appear on his own.

24    But after the charging document, the NTA is filed

25  with the court.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      The role that ICE has is to track that case

2  through -- or I should say ERO has is to track that

3  case through the proceedings.

4      **Q.  If somebody is scheduled to appear and they**

5  **don't, does ICE do anything about that?**

6      A.  Can you clarify scheduled to appear where?

7      **Q.  Before an immigration judge.**

8      A.  Okay.  I would -- I would refer you to EOIR

9  and what their policies are for people that don't --

10  for respondents that don't appear in court.

11      But what I can say is that if an immigration judge

12  enters an order in absentia, meaning that the

13  respondent hasn't appeared for his hearing, and the

14  immigration judge has ordered removal, then that case

15  would be referred to ERO.  And we would -- We would

16  locate, arrest, detain and remove that individual from

17  the United States.

18      **Q.  So in the ICE tracking mechanism, do you track**

19  **the scheduling of an immigration proceeding?  Is that**

20  **part of your tracking or is that not in it?**

21      A.  No, not generally.  We do -- we do have -- We

22  get notifications of when hearings occur, our systems

23  that EOIR provides us a next hearing date for

24  individuals.  But there's no -- we're -- We're only

25  coming to -- It's really an EOIR function on how they

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1   schedule their respondents and when they come in.

2        As I said, we just -- We enforce the decisions of

3   an immigration judge.  If one of those failures to

4   appear in court results in a hearing in absentia and

5   the IJ issues that removal order, at that time ERO will

6   identify where -- actually will locate, arrest, detain

7   and remove an individual.

8        **Q.  So if somebody is released under Parole Plus**

9   **ATD and they do not check-in to an ICE office, what**

10  **happens?**

11       A.  So the -- We have a scheduler within the

12  ICE.gov public-facing website for aliens to schedule

13  themselves to report in, so they very well -- because

14  they have -- Just because someone hasn't checked in,

15  they could still be within the time frame for scheduled

16  check-in, if that makes sense.  They could still be --

17  be with -- For example, if an alien went to check into

18  the -- the immigration appointment scheduler and

19  scheduled their appointment for two months from now,

20  the period from now for two months out doesn't mean

21  that they have -- they haven't -- they haven't failed

22  to check-in; they're just waiting for their appointment

23  to check-in with ICE.

24       **Q.  All right.  So can they check-in with ICE**

25  **online?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1     A.  They can.  So it's -- It's specific to

2  location.  So we -- In ICE we've recently been allowed

3  to bring our staff back at certain locations at 100

4  percent levels effective March of -- the end of March

5  of 2022.

6     So before that, there was very limited access to

7  -- to get an appointment with ICE because we -- the

8  posture that we had at our public-facing locations was

9  reduced because of the pandemic.

10     So that's part of the reason we saw some of the

11  long lines in our Orlando office and some of -- and our

12  Miramar office in Florida because we had that pent-up

13  interest in checking in with ICE.  They just couldn't

14  do it because some of these locations were closed.

15  There were at partial staffing, all because of our

16  posture as it relates to the pandemic.  As I said, we

17  just recently went -- got to our final stage.  March

18  29th we were allowed -- We allowed the field offices to

19  staff at 100 percent.

20     But it also has a caveat that we have to look at

21  our community-transmission levels to make sure that

22  we're operating in a safe space for not just our

23  employees but for our -- for our aliens that are

24  checking in as well.

25     Q.  Okay.  You mentioned March 29th you entered

Page 109

1 nationals or citizens into our custody.

2     Not every country is part of that agreement.  But

3 for the countries that are part of that agreement, we

4 do notify the local consulates for the embassy that

5 they are in our country -- in our custody.

6     **Q.  How do you know whether somebody committed a**

7 **crime in another country?**

8     A.  So we -- Our databases don't -- We run the --

9 the NCIC databases, which is just for the United

10 States.

11     We don't have any system that tracks foreign-born

12 convictions or indictments or any kind of wants, as I

13 said.

14     Typically that will come from the country that

15 wants that person.  And it will be delivered to us by

16 their councilor official or it will be delivered to an

17 attache officer, an ICE officer abroad; and they'll get

18 us that information.  But typically we don't have a

19 system that we can look for criminal histories and

20 charges similar to NCIC.

21     **Q.  So if somebody's from Guatemala, let's say for**

22 **example, and they've been convicted of murder in**

23 **Guatemala, you would not know he was convicted in**

24 **Guatemala unless Guatemala sent us something; is that**

25 **correct?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1          MR. DARROW:  Objection; calls for speculation.

2    You can answer.

3          A.  So, in my experience, the -- if that -- If

4    that occurred, it's really dependent on Guatemala

5    getting our ICE an attache at the embassy.

6          That information -- or for the councilor officials

7    to get us that information due to their regular lines

8    of communication with us.

9    BY MS. BRODEEN:

**10          Q.  Well, how would that initiate?  Would they**

**11   know that this person is in the United States now?**

12          A.  Yes, we have responsibilities to certain

13   countries to let them know that we have their nationals

14   in our custody.

**15          Q.  Are there some countries that are more**

**16   cooperative than others that you've dealt with?**

17          A.  As I mentioned, not every country is part of

18   that agreement.  I don't want to speculate on a

19   percentage.

20          But it's more than 50 percent of countries require

21   notification.  It's a reciprocal type of agreement

22   where if there's a U.S. citizen that's detained in that

23   country, we also -- not ICE -- but the U.S. Government

24   will receive notification that you've been taken into

25   custody abroad.  It's typically how that agreement

Page 112

 1            MS. BRODEEN:  So -- So we're not allowed to

 2  know which countries our federal government has an

 3  agreement with; did I get that correct?  Whatever.

 4  Okay.

 5            MR. DARROW:  Yes.

 6  BY MS. BRODEEN:

 7       **Q.  Okay.  All right.  So based on what ICE**

 8  **databanks have about people who have committed crimes,**

 9  **how many of those people are in Florida who have been**

10  **charged with committing a crime?**

11       A.  I have that number in part -- as part of the

12  production.  I don't have it here in front of me.

13       **Q.  Okay.**

14            MR. DARROW:  Here you go.

15            MS. BRODEEN:  Do you want to provide him that

16  number?  Okay.  What did you just get?

17            MR. DARROW:  Yeah, it's a copy of the ICE data

18  that we provided to you.

19            Do you have it handy, we can email it?  It's

20  the Excel spreadsheet.

21            MS. BRODEEN:  Is that part of the email

22  spreadsheet?

23            MR. DARROW:  Yes.

24       A.  I'm sorry, could you repeat which -- which

25  stack it was?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 113

1  BY MS. BRODEEN:

2      **Q.  Okay.  So how many aliens currently are in**

3  **Florida who have been charged with committing a**

4  **crime -- charged with?**

5      A.  So I know in here it doesn't have the columns,

6  but the last column, released after being -- And you're

7  talking for aliens that are in the community, not in

8  detention centers?

9      **Q.  Well, in Florida in the community.**

10     A.  Okay.  I don't have the -- I don't think it

11  was one of the questions in here, so there's not a

12  production on that number.

13     But I do have where the State of Florida for the

14  number of people that are at large or in the community

15  with pending criminal charges.

16     **Q.  Okay.  What number is that?**

17     A.  It is -- Forgive me if I get this wrong.  I'm

18  getting a little I can't read these.

19     So it looks like if you go to the second to the

20  last column, and it's the one, two, three, four, five

21  -- six -- it's row five and six, as well as the last

22  column, row five and six; so all those numbers added

23  together would be the pending criminal charges.

24     I don't have a calculator in front of me.

25     **Q.  I tell you what, it's been 15 minutes.  Is it**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 114

1  a good time to break for lunch?  Then we'll get back

2  into this?

3       A.  It's good with me.

4       Q.  Okay.  How long did you need for lunch,

5  Mr. Guadian?

6       A.  If we can do an hour, that would be great.

7            MS. BRODEEN:  What time would that be, 1:55?

8       A.  Yes.

9            MS. BRODEEN:  Okay.

10           THE VIDEOGRAPHER:  The time is 12:55, and we

11  are off the record.

12           (Recess had 12:55 p.m. - 2:04 p.m. EST.)

13           THE VIDEOGRAPHER:  The time is 2:04, and we

14  are back on the record.

15  BY MS. BRODEEN:

16       Q.  Okay.  All right.  I'd like to start to go

17  back to Exhibit 3, which is the Raul Ortiz November

18  2021 memo.  I think it's up on the screen, Exhibit 3.

19           MR. DARROW:  Karen, before we get to the

20  questioning, I just want to state on the record that

21  the defendant strongly objected to Exhibit 4, which we

22  looked up and is a document provided in discovery in a

23  different case in which Florida is a litigant over a

24  different program that we have not seen.

25           It's improper to use one case to obtain

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

                                                      Page 117
 1      A.  No, it may be possible.  I just don't have any
 2  information on that.
 3      Q.  Okay.  All right.  So let's get back to topic
 4  eight, information and data regarding the number of
 5  aliens in Florida DHS knows to have committed crimes.
 6      And this also dovetails into the topic about
 7  documents produced during discovery from defendant to
 8  State of Florida since I think you already testified
 9  that we have to look at those documents that were
10  provided in discovery, correct, about the numbers of
11  people committing crimes in Florida?
12      A.  Yes.  Yes.  The numbers were provided in the
13  production.
14      Q.  Okay.  So let's -- Let's call up Exhibit 9.  I
15  know you don't have these things memorized.
16      And we're gonna put it on the big screen since
17  some of this writing is very small.
18      Okay.  Can you -- It says disk error on my end.
19  Can you -- Can you get into there?
20          MR. DARROW:  Is it in the chat?  We don't see
21  it popping up yet.
22  BY MS. BRODEEN:
23      Q.  Okay.  It says disk I/O error.  I don't know
24  what that means.
25          Okay.  So -- All right.  It's on the big

Page 118

1   screen.  Can you see it?  All right.  Now, it should be

2   chat screened.

3           MR. DARROW:  We just saw a pop up come on.

4   Let me see if we can open it.

5   BY MS. BRODEEN:

6       Q.  Okay.  Now, we're gonna share a screen.  There

7   we go.

8       Okay.  Now, if you can look at this -- And I think

9   you need to scroll down too.

10      Okay.  Let's start at this part of Exhibit 9.

11          (Exhibit No. 9 was marked.)

12  BY MS. BRODEEN:

13      Q.  And this has rows and columns with headings,

14  and then it has some information filled in.  Most of it

15  is N, slash, A; and then there's some numbers in some

16  of these.

17      Do you see that right now, Mr. Guadian?

18      A.  Yes, I do see it.

19      Q.  Okay.  And have you seen this document before,

20  this page?

21      A.  Yes, I have.

22      Q.  Did you help prepare this document?

23      A.  No.

24      Q.  Okay.  Let's look at the first row going

25  across.  There is an acronym, this sentence, NTA.  It

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  says released after being encountered at or near

2  southwest Florida on January 2020 to January 19, 2021.

3  NTA, slash, own recognizance.

4      What does NTA stand for?

5      A.  Notice to appear.

6      Q.  Okay.  And own recognizance, what is that?

7      A.  That refers to release on their own

8  recognizance.  It's from I-220 alpha.

9      Q.  And who releases these people on their own

10  recognizance; is that done by ICE?

11      A.  If we go to the next tab, STU, STU provided,

12  it kind of gives the background who -- 1359, was

13  that -- I'm sorry.  Was that the number on the first

14  one?  Yeah, 1359.

15      Q.  1359; okay.

16      A.  And this -- this -- This number is

17  representative of not just ICE releases.  This -- This

18  could also have been Border Patrol releases as well,

19  ICE -- that are currently on ICE -- ICE nondetained

20  docket.

21      And if we look at the footnote, the very last

22  footnote, I think line 24, ERO cannot identify if the

23  release is directly following an encounter at or near

24  the southwest border.

25      Our statisticians could not isolate that

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  population, so they included the entire universe of

2  arrests to include arrests that occurred that ICE may

3  have made as well just to give you a little background

4  in regards to that number.

5       Q.  Okay.  Thank you.  Let's go back to the --

6  Okay.  Okay.  Then we go down the column, there's

7  several different categories.

8       Do any of these have any additional qualifications

9  to them?

10      A.  Yes.  So I'll start with the row with the --

11  I'm sorry, the column B.

12      Can you go back to the STU provided again?  And I

13  want to amend what that order of release on

14  recognizance.  I want to qualify that with this

15  particular footnote on line 18, an ICE -- Let me see,

16  where is it?  An ICE -- An ICE final release is defined

17  as a final book-out that reflects one of the following

18  release reasons, although it says OREC, which is order

19  of release on recognizance, it's actually a large -- It

20  includes a larger number of people than just people

21  released on recognizance.

22      It also includes people that bonded out of

23  custody.  It includes people that released on an order

24  of supervision, which is an I 220B, as in bravo.

25      It also includes people that were paroled and

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 121

1 those released on prosecutorial discretion.

2    So it's just to clarify that the OREC is actually

3 a larger group than just OREC releases.

**4    Q.  Thank you.  What is an order of supervision?**

5    A.  Order of supervision is different.  It's

6 similar to an order of recognizance in that it has

7 conditions that an alien must abide by while they're

8 released into the community.

9    But the difference within an OREC to an OSUP is

10 that only aliens that have final orders of removal are

11 issued orders of supervision.  I-220 bravo, whereas

12 I-220 alphas are given to aliens that are currently

13 pending removal proceedings before an immigration

14 Judge.

**15    Q.  All right.  Let's go back to the -- I don't**

**16 know what you call it -- rows and columns.  Okay.  Any**

**17 other qualifications you want to make about what's on**

**18 the rows and columns?**

19    A.  Yes.  Let me take a look -- another look at

20 that.  ERO docket with criminal history and the

21 criminal charges could represent misdemeanors to

22 include traffic offenses all the way up to felonies; so

23 it's not just one type of criminal history, just if

24 we're representing everything that we had encountered

25 in the NCIC databases, which is the national system

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 122

1   that we search for criminal histories to include also

2   the state identification bureau's criminal histories.

3        Typically those are like traffic offenses and

4   things of that nature.

5        ERO Miami check-in I would add as a qualifier that

6   although this check-in number -- this check-in, the

7   definition of check-in does not include people that

8   arrived at ERO offices and were given a sheet of how to

9   enroll into the ICE appointment scheduler.

10       So it -- It may look like they didn't check-in

11  officially.  But they -- we have officers working these

12  lines that are giving information to the aliens as they

13  wait to actually go back home and to check-in on the --

14  on the I scheduler.  That -- Those numbers are not

15  captured here.

16       Although we do have people that try to show up,

17  it's not captured as a check-in.

18       Q . All right.  Let's go back to STU provided.

19       Okay.  So -- Okay.  So what are the number of

20  paroled -- Okay.  Under which statute are people

21  paroled?  Is it under section 1182 or 1226?

22       A.  Can you give me the corresponding INA?  I'm

23  not familiar.

24       Q.  Okay.  So 8 U.S.C. 1182 or 8 U.S.C. 1226, that

25  would be INA 212?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 123

1        A.  212B5 is the authoritative parole.

2        Q.  Okay.  Thank you.  All right.  Let's go back

3   to that rows and columns.

4        Okay.  Now, I'm looking at row 11.  It says

5   individuals who failed to check-in who provided a

6   Florida address, and then all across it's N/A.

7        I thought that ICE had that information.  Why am I

8   incorrect?

9        A.  The last two boxes were the ones that applied

10  to this particular releases after being encountered at

11  or near southwest border January 2021 to November 1st

12  on a notice to report.

13       We have that number.  It should have been provided

14  in production, I believe.  I don't have it in front of

15  me.

16       The reason the others are N/As, if we look at like

17  column -- at column E, released after encountered at or

18  near southwest border, January 20th, 2021, to present,

19  on the NTA own recognizance, go back to the first

20  column.

21       Q.  Okay.  So where it's blank for F and G, are

22  there numbers?

23       A.  There are.  I don't think it was in this

24  particular -- We do have those numbers though.

25       Q.  Can we get those numbers, and then also below

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 124

1  it too?

2      A.  So you all have the numbers for the one below.

3  We weren't able to capture the numbers or our

4  statisticians because these numbers have -- were

5  drawing a lot -- a lot on the Customs and Border

6  Protection databases, so it's really difficult to

7  reconcile that.

8      So we do have the numbers for row 11, column F

9  and G.

10     Q.  Okay.

11     A.  We can produce those.

12     Q.  I would like that.  When do you think we could

13 get them?

14     A.  Confer with my attorneys for a second.

15     Q.  I got them here.  Okay.  Okay.  Are you

16 conferring with Mr. Darrow about when he can produce?

17     MR. DARROW:  Yes, I'm sorry.  I was just

18 trying to figure out when we can produce them to you.

19 One second.

20     MS. BRODEEN:  Anything else on this?  I got

21 your questions.

22 BY MS. BRODEEN:

23     Q.  Okay.  So I have general questions about these

24 sheets.  How does a person get referred to the

25 nondetained docket?

Page 125

1    A.  So the deportation officers are responsible

2  for tracking AL institute black cycle in their

3  immigration proceedings, and that can be in one of two

4  ways.

5    One is through the detained -- through detained

6  docket management, which is -- Essentially when we have

7  aliens into custody in -- in one of our detention

8  centers, we'll track those cases on a detained docket.

9    It's also different when it's on a different track

10 as well with EOIR.  It's on a detained track.

11    And we also supervise aliens in a nondetained

12 setting, those aliens that are not in custody at one of

13 our detention centers.  They're tracked separately from

14 the detained docket, and they're also tracked

15 separately and differently by EOIR.

16    **Q.  And when you say EYOR (sic), what is that?**

17    A.  Executive Office for Immigration Review.

18    There's -- that's what the -- That's where the

19 immigration judges -- That's the agency that

20 immigration judges work for.

21    **Q.  And who employs those people; which agency?**

22    A.  Department of Justice.

23    **Q.  So for these people who get referred to the**

24 **nondetained docket, can some of those have been**

25 **detained at one point and then released?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 126

1      A.  It's possible, yes.

2      **Q.  Okay.  And if they were released, under what**

3  **specific statutory authority would they have been**

4  **released?**

5           MR. DARROW:  Objection; calls for legal

6  conclusion.

7           MS. BRODEEN:  Well, he applies statutes all

8  the time.  This is part of his job.

9           MR. DARROW:  He applies the programs.  Whether

10 or not those programs fall under particular statute,

11 that's a legal conclusion.

12          MS. BRODEEN:  Well, go ahead and answer it if

13 you can.

14          MR. DARROW:  If you know the answer, you can

15 answer.

16     A.  I'm not gonna guess at the different statutes,

17 but there's -- There's quite a few different statutes

18 that allow us to release aliens from ICE detention.

19          MS. BRODEEN:  And in the future, Mr. Darrow,

20 could you just object to form instead of coaching him

21 with speaking objections?

22          MR. DARROW:  Sure.  I just thought you'd want

23 the basis for my objection.

24          MS. BRODEEN:  Well, if I need it, I will ask

25 you for it; but don't coach him, please.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 127

1  BY MS. BRODEEN:

2      Q.  Okay.  When these people are in the -- Do

3  these people get referred to a specific docket in Miami

4  as opposed to another location?

5      A.  From an ICE perspective, once that alien is

6  placed on a nondetained track, their NTA is filed with

7  the Executive Office for Immigration Review and EO -- I

8  don't want to speak to ERs -- EYO -- EOIR's processes,

9  but generally, they'll be placed on a nondetained

10  track; and typically those cases are set with different

11  time frames than the detained docket is.

12      Q.  But if they're in a docket in Miami, is that

13  because they provided a destination in Florida?

14      A.  Yes.  So if they're docketed in Miami, their

15  resident -- Their area of response -- if EOIR -- The

16  location of their residence dictates where the NTA will

17  be filed.

18      Q.  And what is meant by the statement ERO cannot

19  identify if the release is directly following an

20  encounter at or near the southwest border?

21      A.  So our databases, our statisticians, as I

22  stated previously, we have to rely on Customs and

23  Border Protection data, our systems aren't capable of

24  identifying the subset of people that cross through the

25  southwest border because we have two different systems

Page 128

1   that we're looking at.

2        We only see part of the story.

3        Q.  So -- So can they only identify that they're

4   in the country illegally as opposed to when they

5   entered?

6        A.  I'm sorry, I didn't understand the question.

7   Can --

8        Q.  Okay.  So -- So the customs -- I mean, the

9   customs' database, does it identify that -- only that

10  they're in the country illegally; they don't tell you

11  where they crossed into?

12       A.  I'm sorry, I don't know that answer.

13       I don't know what their databases do show and

14  don't show.

15       Q.  Okay.  Who would know that at ICE?

16       A.  At ICE we wouldn't know about CBP databases.

17  That would be a CBP question.

18       Q.  Okay.  What does "directly released" mean?

19       A.  I'm sorry, what -- What line are you looking

20  at, so I can follow along?

21       Q.  Let's find that.  Line 24.  ERO cannot

22  identify if the release is directly following an

23  encounter at or near southwest border; what does

24  directly mean?

25       A.  Yes, that's -- That's what I'm mentioning is

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 129

1  that we can't identify the subset of individuals that

2  crossed specifically through the southwest border in

3  this particular data set.

4      Q.  Okay.  And then as to the terms convicted

5  criminal pending, criminal charges and immigration

6  violator, there's the term at the time of enforcement

7  action; what does that enforcement action refer to

8  there?

9      A.  Typically that enforcement action will be the

10 issuance of a charging document, whether that's a

11 notice to appear, an expedited removal, a

12 reinstatement, some type of enforcement action that

13 the -- that the Department has taken.

14     Q.  And what does OREC, O-R-E-C, stand for?

15     A.  Order of release on their own recognizance.

16     Q.  And what is an ICE final release?

17     A.  What line is that?

18     Q.  19 -- or 18, 19.  And ICE -- It's defined in

19 several of these things.  Never mind.  You answered

20 that.  Knock that off my question.

21     Let's go back to the chart.  When it talks about

22 people with criminal history, is that a criminal

23 history only in this country or can it include other

24 countries?

25     A.  So typically it would only include criminal

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 130

1    history from this country, so crimes that we've

2    identified in -- in NCIC or the State Identification

3    Bureau.

4         Q.  Okay.  Pending criminal charges, row -- those

5    are -- Are those U.S. charges pending or abroad?

6         A.  Correct -- Oh, no, I'm sorry.

7         Q.  Pending --

8         A.  U.S. charges, not abroad.

9         Q.  Okay.  And are they for any particular -- Are

10   they for charges for crimes that occurred before or

11   after they were released into the interior?

12        A.  I can't tell that from the data.

13        Q.  Okay.  Let's look at 22, ICE defines

14   immigration violators criminality in the following

15   manner; what is other immigration violators referring

16   to?

17        A.  Oh, the last, on line 22, other immigration

18   violators refers to immigration violators without any

19   known criminal convictions or pending charges entered

20   into the ICE system of record at the time of the

21   enforcement action so --

22        Q.  Go ahead.

23        A.  So immigration violators could also include

24   overstays on visas.  They can include overstays on visa

25   labor pilot programs, other forms of immigration

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 131

1  violations other than criminal convictions.

2  Administrative violators, I think it got -- That's a

3  little bit more clear.

4       A lot of our work is done not in the criminal

5  setting but in the administrative setting.

6       **Q.  So does the term "other immigration violators"**

7  **include people who entered the United States illegally?**

8       A.  Yes.

9       **Q.  That alone is a violation that's picked up**

10 **here?**

11      A.  It is.

12      **Q.  Okay.**

13      A.  The notice to appear is an administrative

14 process.  It's not a criminal one, so it would be

15 captured in that.

16      **Q.  What do you think it is?  Okay.  So let's look**

17 **at the bottom of request F2, F4 footnotes.**

18      **Is the information that's missing in the chart in**

19 **rows F and G here perhaps, if you look at the**

20 **footnotes; and we just need to put them in the blanks?**

21      A.  No, no, that's not the same.  This is

22 different.

23      **Q.  Okay.  Let's look at request D2 to D4, top**

24 **sort of.  What is this showing us here on this chart**

25 **here?  Would you sum it up real quick?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 132

1      A.  It's after being encountered at or near

2  southwest border January '20 to January 19, 2021, on

3  Parole Plus ATD.

4      Q.  So --

5      A.  Excuse me.  So these -- These numbers are not

6  just Border Patrol numbers, but they're both ICE and

7  CBP numbers.

8      Q.  Okay.  So are these people who were

9  encountered that were released under Parole Plus ATD

10  between January 2020 to January 19, 2021?  I'm trying

11  to understand.

12      A.  Release with -- release reason of parole

13  between January 20 -- or January 1st, 2020, and January

14  19, 2021.  They were released on parole.

15      Q.  It says Parole Plus ATD above that right under

16  request D2 to D4, release after encountered at

17  southwest border January 2020 -- January 2020 to

18  January 19, 2021, hyphen, Parole Plus ATD.  It looks

19  like they're encountered under -- and released under

20  Parole Plus ATD.

21      A.  No, I think that might be incorrect because

22  Parole Plus ATD program didn't start until November of

23  2021.

24      Q.  Are you sure it started in November of 2021?

25      A.  From an ICE perspective, I only have the memo

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 133

1  to go by, the memo from Chief Ruiz.

2      **Q.  Okay.  Request E2 to E4.  And for these people**

3  **who were released on -- on -- at or near southwest**

4  **border January 2020 -- 2021 to present, hyphen, NTA,**

5  **slash, on recognizance; can you tell me under what**

6  **authority they were released?**

7      A.  No, I can't.  As I mentioned earlier, the

8  data's not broken down by this specific statute that

9  they were released on.

10      There's multiple statutes that allow or order ICE

11  release on their own recognizance to include IJ

12  decisions that we have to enforce, if an IJ orders

13  somebody removed -- released on their own recognizance,

14  that's something that ICE will enforce.

15      **Q.  Do -- Go ahead.**

16      A.  No, there's also other litigation.  District

17  courts may order people released as well.

18      **Q.  Can you give me some examples of statutes**

19  **under which these people would have been released, just**

20  **some of them, one or two even?**

21      A.  The -- the authority -- The bond rules allow

22  ICE to release people on their own recognizance.  I'm

23  not -- I don't know the exact section of law that that

24  is.

25      **Q.  All right.  So let's move to request F9 to**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 134

1  F10.  And then I think it's also related to G9 and G10.

2       Can you first look at F9 to F10?  Can you tell

3  what check-in facilities were used for this data?

4       A.  Sure.  So check-ins represent individuals that

5  have checked into an ERO office.

6       It also represents individuals that weren't --

7  didn't check-in but were issued a charging document.

8       As I mentioned earlier, many of our locations

9  didn't have the capability to have aliens check-in.

10  They were processed remotely, issued NTAs via the mail;

11  and that was considered a check-in as well.

12       If they checked in virtually on the phone, that

13  was also counted.

14       What's not represented here are the check-ins done

15  by our contractor for the ATD program.  If they checked

16  in with the ATD program and our contractor,

17  behavioral -- BI, that number is not included here on

18  the check-ins; so they're not checked in.

19       Q.  Okay.  So what's the name of the vendor again?

20  You said it real quickly.

21       A.  BI, as in bravo, India; BI, Incorporated.

22       Q.  If you don't know, that's okay.

23       A.  I thought I answered it.

24       MR. DARROW:  I'm sorry, I think you were muted

25  in the first part of that second question, Karen.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 135

1          We didn't hear it.

2    BY MS. BRODEEN:

3        **Q.  So where is that vendor located or based out**

4    **of?**

5        A.  I don't know.  I'm sorry.

6        **Q.  That's okay.  Okay.  So this information on**

7    **check-in facilities, was that gathered from Florida or**

8    **do you know what database that was gleaned from?  Was**

9    **it Florida specific or more national database?**

10       A.  No, this particular one says noncitizens

11   release with a notice of report between January 20th,

12   2021, to November 1st, 2021, by check-in and latest

13   case criminality; so this is a nationwide number.  This

14   isn't a Florida-specific number.

15       **Q.  Okay.  What about request G9 to G10; do you**

16   **have the same information about where that data came**

17   **from or is it different?**

18       A.  This is similar in the sense that this is a

19   nationwide data, and the check-ins are the same.

20       It's -- We included people that physically

21   checked-in, people that checked-in virtually, people

22   that were issued their notice to appears -- notice to

23   appears via mail.

24       What we did not include is those individuals that

25   had checked-in to the BI, ATD -- the BI contractor

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    under the ATD program.

2         Q.   Did you just mention check-in by mail?

3         A.   Notice to appear by mail.  We issued --

4         Q.   Okay.

5         A.   We had a time frame that, due to our

6    reconstitution plan and ICE, that many of our offices

7    were either minimally staffed or not open.  So we

8    issued our NTA's via certified mail to those aliens,

9    and we also considered that a check-in.

10        Q.   Got it.  Okay.  That covered two of our

11   topics, by the way, not just one.

12        Okay.  I want to go back to detention capacity.

13        How is it determined what a detention facility's

14   maximum capacity is?  Is there some kind of regulation

15   or guidelines that's applied that determines how many

16   people you can house at one place?

17        A.   So we -- In ICE we have our -- our

18   performance-based national detention standards, and the

19   capacity is the factors varies when it comes to

20   capacity.  We work closely with the vendor, whether the

21   vendor's a private contractor, state, local, to

22   determine what their capacities are.

23        For example, some things we look at are the number

24   of showers in each individual pod, the number of

25   toilets in each individual pod, the type of medical

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1       Q.  Okay.

2       A.  -- typically.

3       Q.  And during what period of time were those

4  hotels under contract to house family units by ICE?

5       A.  May 2021 to -- I'm sorry.  March of 2021 to

6  March of 2022.

7       Q.  Okay.  And what happened in March of 2022 that

8  caused them to no longer be used by family units?

9       A.  So ICE determined that we were experiencing a

10 large number of adults crossing the southwest border,

11 and we needed additional adult beds; and also we

12 determined that ATD was a better alternative for family

13 units.  It was in -- When we released the family on

14 alternatives to detention, it's more humane.  It's a

15 more humane system -- effort in order to track those

16 cases through the system.

17      What we found with our family residential

18 standards were also impacted by litigation that doesn't

19 allow us to detain families more than 20 days.

20      So we made the decision -- As we always are

21 looking at our detention inventory to see how best to

22 support the U.S. Border Patrol in their bed space

23 needs, we made the decision that since more single

24 adults were crossing the southwest border, we made

25 those -- We converted the family residential centers to

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 142

1  adult beds as opposed to family beds based on the need

2  on the southwest border.

3      Q.  And what about the hotels, were individual

4  adults housed in hotels after March --

5      A.  No.

6      Q.  -- 2022?

7      A.  No.  No, they weren't.

8      Q.  Was that contract just dropped with the hotels

9  after March 2022, no need for the space?

10     A.  I don't know the status to the contract.

11     Q.  Okay.

12     A.  We don't use the hotels as of March 2022.

13     Q.  Okay.  So would you say that ATD was more

14  humane, something like that; did you say something

15  about --

16     A.  So we've seen a high success rate with our

17  alternatives to detention program.  A high percentage

18  remain compliant with the program.  We see a very high

19  rate of court appearances within the program.  And that

20  particular population, as vulnerable as they are, as

21  family units crossing with small children, we made the

22  decision -- ICE made the decision that alternatives to

23  detention was our best option for that particular

24  subset of detainee.

25     Q.  Okay.  And then when those people were

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

 1  humane.

 2      Q.  Oh, okay.  Were the -- Were the conditions at

 3  Dilley, Karnes and Burke for family units humane, in

 4  your opinion?

 5      A.  The conditions were humane, yes.

 6      Q.  Okay.  All right.  And were Dilley, Karnes and

 7  Burke in operation for family units in 2020?

 8      A.  Yes.

 9      Q.  What -- Were they used in 2021 for family

10  units for part of that year?

11      A.  Yes.

12      Q.  Okay.  Did it change from family units to

13  something else at any time?

14      A.  Yes, it did.  It changed from family units to

15  single adults.

16      Q.  Single adults; when did it change?  Did all

17  three of them change at the same time?

18      A.  About -- No, they were -- There were different

19  times.  I want to -- I don't know exactly the dates.

20      But about February 2021, we started transitioning

21  the family residential centers to adult beds.  I don't

22  know the exact order.  But I believe that was completed

23  a few months after February where all three locations

24  were converted to single adults.

25      Q.  Okay.  So is it your understanding that

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 145

1   currently those three facilities, Dilley, Karnes and

2   Burke, are operated to detain single adults?

3        A.   Correct.

4        Q.   Who made the decision to transition away from

5   family units being housed by ICE?

6        A.   ICE made that decision.

7        Q.   Okay.   Who at ICE?

8             MR. DARROW:   Objection; that's beyond the

9   scope of any of these topics.

10            MS. BRODEEN:   We have a whole topic about

11  detention capacity.

12            MR. DARROW:   About the capacity, not about

13  decisions on families versus individuals.

14            MS. BRODEEN:   It says including inference to

15  increase or decrease that capacity.   I think this is a

16  reasonable topic under that topic.   It's a reasonable

17  question.

18            Just object and then, you know, let's get on

19  with the answer if he can answer it, if he knows who at

20  ICE made the decision to transition away from family

21  units being housed by ICE.

22  BY MS. BRODEEN:

23       Q.   Who at ICE made that decision?

24            MR. DARROW:   Same objection.   You can answer,

25  if you know.

Page 146

1       A.  That answer is Tae Johnson, the ICE director.

2  BY MS. BRODEEN:

3       Q.  And ICE -- something called a Flores consent

4  decree?

5       A.  Can you repeat the question?  I'm sorry.

6       Q.  Are you familiar with the Flores, F-L-O-R-E-S,

7  consent decree?

8            MR. DARROW:  I'm gonna object again.

9            Flores is not relevant to any of these topics.

10           MS. BRODEEN:  It has to do with your detention

11  centers.  It's one of your --

12           MR. DARROW:  It hasn't conditions --

13           MS. BRODEEN:  Okay.  Just object to the form.

14           Okay.  All right.  Go ahead.  You know, you

15  objected; it's outside the scope of topics.

16  BY MS. BRODEEN:

17       Q.  Go ahead and answer if you can.

18       A.  Can you repeat the question?

19       Q.  Are you familiar with the Flores consent

20  decree?

21       A.  Yes.

22       Q.  Okay.  Is it fair to say that it's difficult

23  to create family detention centers that comply with

24  that consent decree?

25       A.  I can't speak to the difficulty.  The family

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 153

1  conditions like heart disease, lung disease, high blood

2  pressure.

3       Many different types of illnesses were considered

4  high risk for -- for developing serious complications

5  from COVID.

6       Q.  Diabetes, for example?

7       A.  Yes, diabetes was one as well.

8       Q.  Okay.  Obesity?

9       A.  Yes.

10      Q.  So do you know whether ICE ever considered

11  releasing people who have high-risk conditions as

12  opposed to not detaining family units?

13           MR. DARROW:  Objection as to form.  You can

14  answer.

15      A.  Can you restate the question?  I'm not sure I

16  followed.

17  BY MS. BRODEEN:

18      Q.  Do you know if ICE ever considered as an

19  alternative to releasing family units just releasing

20  people who are high risk for COVID if they got

21  infected?

22      A.  No, I don't have any knowledge on that.

23      Q.  And for the facilities that ICE operated, what

24  were the COVID protocols that you put in place like

25  safe distancing, how many beds in a pod, for example?

Page 155

1  things are added based on new guidance that CDC

2  provides, as well as our healthcare professionals that

3  we have within ICE.

4      One group that we have within ICE that we rely on

5  for our medical operation, which is the Immigration of

6  Health Service Corps, IHOC, and their public health

7  service officers; and we rely on them as well to

8  interpret the CDC data; and we operationalize that into

9  our pandemic response requirement.

10      **Q.  To the best of your knowledge, since**

11  **January 20, 2021, has any family unit been detained**

12  **anywhere in the ICE network?**

13      A.  Can you repeat the question?

14      **Q.  Okay.  Since January 20th, 2021, has a family**

15  **unit been housed anywhere in an ICE detention unit**

16  **facility?**

17      A.  Just to clarify, that's an adult ICE detention

18  facility?

19      **Q.  Well -- Well, any facility that you have or**

20  **you have under contract, have you housed a family unit**

21  **since January 20, 2021?**

22      MR. DARROW:  Before he answers, I'm gonna

23  object again; beyond the scope of detention capacity

24  guidelines.

25  BY MS. BRODEEN:

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 156

1       Q.   Okay.  Well, go ahead.

2       A.   So if my memory serves correct, our family

3  residential centers in our hotels did not -- We didn't

4  cease our hotel functions until March of this year of

5  2022, so we would have housed in our hotels.

6       And previous to that, our FRCs were open up until

7  February.  We didn't shut down our first FRC

8  approximately February of 2021, so there should have --

9  there could have been -- There could have been some

10  detentions that our family residential centers in those

11  time frames.

12      **Q.   And -- And since November 2, 2021, how many**

13  **family units have been in ICE detention anywhere?**

14      A.   I'm sorry, I don't have that data.

15      **Q.   Are there family units since November 2, 2021,**

16  **that have been in ICE detention?**

17      A.   So when -- The term ICE detention, I'm taking

18  it to mean that it also includes hotels?

19      **Q.   Yeah.  Your vendors too.**

20      A.   Yeah, our vendors.  So we -- we -- Our hotels,

21  we stopped hoteling family units in March of 2022.

22      **Q.   And when did Dilley, Karnes and Burke**

23  **transition to single adults; is that in 2021, did you**

24  **say?**

25           MR. DARROW:  I'm gonna object again before he

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 157

1   answers; beyond the scope of detention capacity topic.

2   BY MS. BRODEEN:

3       **Q.  Go ahead.  Is that 2021 that they transitioned**

4   **to single adult?**

5       A.  The transition began in February of 2021, but

6   it was staged transition, it was -- Not all facilities

7   went offline at the same time.  I don't know exactly

8   the dates that they all -- that the last one went

9   offline.

10      But we started transitioning in -- Actually, no,

11  I'm getting confused.  Let me strike that.

12      They -- we were -- Before they closed, they were

13  family trans -- where they were held for under 72

14  hours, so we had that first.  Then we closed those

15  facilities and became -- They became adult detention

16  centers.

17      I'm not clear on the exact dates though.

18      **Q.  Have you ever seen anything in writing about**

19  **there being a preference to not detain family units**

20  **anymore?**

21          MR. DARROW:  Objection; far beyond the scope

22  of topic 12.

23  BY MS. BRODEEN:

24      **Q.  Go ahead and answer.**

25      A.  I don't recall.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 168

1     A.  I don't know the -- I don't know the ICE

2  facility.  I'd have to make assumption.

3     I'm thinking that that's the ERO ICE facility in

4  Orlando, but I'm not 100 percent sure because I don't

5  know the address to that location.

6     **Q.  So what did you do to prepare for this topic**

7  **14 that we have in the deposition notice?**

8     A.  So I believe there was a response to this

9  letter, that's what I'm looking at.  And I also spoke

10 to the field office director in Miami in regards to

11 this situation.

12    **Q.  Okay.  So who is the field office director in**

13 **Miami?**

14    A.  Field office -- It's the Acting Field Office

15 Director Juan Agudela, A-G-U-D-E-L-A.

16    **Q.  And who is the head of the facility in**

17 **Orlando?**

18    A.  I'm sorry, I don't know that answer.

19    **Q.  So you did not talk with anybody in Orlando**

20 **ICE facility, correct?**

21    A.  Correct.  The FOD, the field office director,

22 in Miami has the responsibility for the Orlando office.

23    He has subordinates that work at that location.

24    **Q.  And did you say there was a response to this**

25 **letter?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 169

 1      A.  I believe so.

 2      Q.  Have you seen the response?

 3      A.  I believe it was part of the production, if

 4  I'm not mistaken.

 5      Q.  It was part of what?

 6      A.  It may have been part of the production.  I

 7  remember seeing a letter.  Who is this from?  I could

 8  be mistaken.  I know I saw a letter from -- Maybe it

 9  was from Florida.

10      Maybe it was the State of Florida that was asking.

11      I could be mistaken though.

12      Q.  Are you thinking maybe the letter to Governor

13  DeSantis from Tae Johnson we talked about?

14      A.  Yes, yes, that's -- That's the letter.  That's

15  the letter I'm thinking.

16      Q.  And just to be clear, that letter is not a

17  response to this April 29th, 2022, letter, correct?

18      A.  Oh, gotcha.  I haven't seen the response to

19  this then.

20      Q.  Okay.  So what -- When did you talk to the

21  field -- acting field director in Miami about this

22  letter?

23      A.  I spoke to him this week.

24      Q.  Okay.  And how -- Did you talk to him by

25  phone?

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 170

1     A.  I did.

2     **Q.  And how long was that phone conversation?**

3     A.  I spoke to him a few times, a couple, maybe

4  two -- two, three times.  And each time was probably

5  for ten minutes.

6     Q.  Okay.  So does he work under you or is he --

7     A.  Yes.

8     Q.  Okay.  So you're his boss or his boss's boss

9  or something like that?

10     A.  I'm his boss, direct supervisor.

11     **Q.  Okay.  So the first time you talked, what did**

12  **you discuss specifically?**

13     A.  I don't recall the conversation, but it had to

14  do with to provide the information on what occurred in

15  Orlando and what steps we had taken to correct the --

16  to correct the issue of people waiting out in the sun.

17     **Q.  Okay.  And what -- What did he convey to you**

18  **was the situation in Orlando that led to this letter?**

19     A.  So there was a few factors.  One, as I

20  mentioned previously, is that we had our reconstitution

21  efforts.  We had just entered phase three at the end of

22  March where we allowed 100 percent of our employees to

23  come back to work, which meant that we could staff

24  our -- our check-in location more fully.

25     That led to an increase in reportings.  We had

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 171

1  people that had been waiting for us to be open and to

2  increase our capacity for interviews.

3      And when we opened back at 100 percent, they

4  arrived in mass, people that had been waiting to check-

5  in with ICE while we were -- These were people that

6  were waiting to check-in with ICE while we had

7  locations that were closed and locations that were

8  minimally staffed.  So once we went to 100 percent at

9  the end of March, the people started to arrive.

10      And, of course, ICE, we're not similar to

11  citizenship and immigration services where we have

12  large waiting rooms.  That's not something that ICE --

13  we really plan for.

14      Our waiting rooms are very small.  We have small

15  numbers of check-ins.  And numbers of people that

16  arrived at our location was overwhelming after March 29

17  and months of April, May.

18      So some steps that we took to -- to kind of

19  mitigate that and to prevent people waiting out in the

20  hot sun was we worked on our immigration ICE -- our ICE

21  check-in scheduler that's available now at our public-

22  facing website where the aliens that have -- that are

23  requesting check-ins can actually go into the website

24  and schedule themselves to speak to us.

25      So we are -- If people show up without an

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 172

1  appointment, we're not seeing them.  We're sending

2  those people back home to schedule themselves in the

3  ICE scheduler.

4      And that minimized the amount of people waiting in

5  line.

6      **Q.  I think you mentioned that there were other**

7  **locations that were closed which led --**

8      A.  Yes, so every location is different across the

9  U.S. with the pandemic.  The ICE reconstitution plan is

10  very flexible.  Depending on local transmission rates

11  for COVID, the field office directors have great

12  discretion on how much they actually open up their

13  public's -- public-facing services at each one of their

14  locations depending on community transmission.

15      **Q.  And those locations that were closed, were any**

16  **of them in Florida?**

17      A.  Yes.

18      **Q.  Which locations in Florida were closed at this**

19  **time?**

20      A.  I couldn't tell you the time frames or the

21  locations, but I know that there were multiple office

22  closures to include Orlando.

23      I couldn't tell you how long they were closed,

24  if -- And they were also opened at -- during periods of

25  time with a reduced staffing footprint, which also led

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  to reduced check-in capability at those locations.

2      Q.  Okay.  And did -- Did the field director

3  mention to you how many people were camped outside of

4  the ICE facility in Orlando?

5      The letter says at least 250 people.  Did he

6  confirm or deny that number?

7      A.  I think he -- He confirmed that that was

8  accurate.

9      Q.  Okay.  And it also says including small

10  children; did he confirm or deny that there were small

11  children waiting outside?

12      A.  I don't think we talked about small children

13  specifically.

14      Q.  Okay.  Were some of these people who are

15  waiting outside applicant's permission who crossed the

16  southwest border within the last since -- since

17  November 2021?

18      A.  I -- I don't know the answer to that question.

19      My sense is that many of these individuals were

20  part of the NTR and of equal plus.

21      Q.  So if -- And they're told to check-in within

22  how many days?

23      A.  That's -- Customs and Border Protection

24  actually provides the requirement.  How many days, I've

25  seen some paperwork that requires them to report within

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 174

1  15 days, other paperwork that requires them to report

2  in -- within 30 days.

3      So I don't know if it's -- And it's a question

4  better -- better situated for CBP on what stations do

5  operationally as far as their check-in dates are

6  concerned.

7      **Q.  Okay.  So if somebody was required to check-in**

8  **to ICE within -- within four months of being**

9  **encountered, they would have crossed the southwest**

10 **border under the A -- Parole Plus ATD policy, correct?**

11      MR. DARROW:  Object to form.

12 BY MS. BRODEEN:

13     **Q.  If it's a family unit, they're released,**

14 **they're told to check-in under the November 2021 memo,**

15 **they're sitting outside Orlando, would they have been**

16 **people who crossed -- include people who crossed the**

17 **southwest border under that policy?**

18     A.  It's possible.  I'd add that what we currently

19 do -- One of the steps that we've also taken to

20 minimize lines is that we have officers working outside

21 where the people are lined up.  And by issuing the

22 paperwork with instructions on how to check-in online,

23 using the online ICE appointment scheduler, and that

24 has greatly minimized the -- it has completely -- We

25 don't see people camping outside our facilities anymore

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 175

1  because we're actively working with the lines and

2  getting them -- getting the information to them about

3  how to schedule themselves on the -- on the -- on the

4  scheduler.

5      Q.  On the online scheduler, correct?

6      A.  Correct.

7      Q.  Okay.  So do they need a device to connect to

8  the internet and internet service provider to do that?

9      A.  Yes, they need to go online either with -- and

10  get onto the internet, just like the regular public

11  would either through cellular capabilities or through

12  Wi-Fi or if you're with an internet service provider.

13      Q.  And do you know how many of these people that

14  are released through Parole Plus ATD have access to the

15  internet through a device and an internet provider?

16          MR. DARROW:  Object to form.

17      A.  I don't know the answer to that question.

18  BY MS. BRODEEN:

19      Q.  What happens to somebody if they fail to

20  check-in timely?

21      A.  Could you explain what you mean by "check-in,"

22  and what do you mean by "timely"?

23      Q.  Well, I mean, if they're told to check-in to

24  ICE within a certain number of days, and they don't

25  check-in within that time period, what happens?