# Exhibit 5

## DEPOSITION OF MATTHEW DAVIES

Matthew Davies
July 18, 2022

Page 6

```
 1              (Brief break.)
 2              THE VIDEOGRAPHER:  The time is 9:34 and
 3         we are back on the record.
 4              MS. PATEL:  Okay.  So before we swear in
 5         the witness by Zoom so I just want to confirm
 6         that the Defendants consent to continuing the
 7         deposition in a remote format.
 8              MS. RYAN:  We consent.
 9              THE STENOGRAPHER:  Would you raise your
10         right hand, please?
11              THE WITNESS:  Yes.
12               Do you solemnly swear that the testimony
13         you shall give today will be the truth, the
14         whole truth, and nothing but the truth?
15              THE WITNESS:  Yes.
16    Thereupon:
17                   MATTHEW DAVIES,
18    the Witness, after having been first duly sworn, was
19    examined and testified as follows:
20                   DIRECT EXAMINATION
21    BY MS. PATEL:
22         Q.  Good morning, Mr. Davies.  My name is
23    Anita Patel, and I am representing the State of
24    Florida.  I will be taking your deposition
25    today.
```

Matthew Davies
July 18, 2022

1          Could you please state your name for the
2    record?
3          A.   Matthew Scott Davies.
4          Q.   And where are you located today?
5          A.   In Washington, D.C.
6          Q.   Have you ever been deposed before?
7          A.   Yes, ma'am.
8          Q.   How many times have you been deposed?
9          A.   Just a couple I think.
10         Q.   Okay.  By a couple, you mean what, like a
11   handful?
12         A.   Maybe two or three.
13         Q.   Okay.  And how long ago were those
14   depositions?
15         A.   Several years ago, maybe the most recent
16   was maybe three or four years ago.
17         Q.   Okay.  For each one of those depositions,
18   what type of proceedings were they?
19         A.   I believe each of those proceedings were
20   for OFO employee related type proceedings.
21         Q.   Okay.  And were you appearing as a
22   corporate representative?
23         A.   Yes.
24         Q.   In each of those depositions?
25         A.   In at least one of those, yes.  I think

Matthew Davies
July 18, 2022

Page 10

```
 1   you?
 2         A.  I do over on the side but it's silenced.
 3         Q.  Okay.  And again, you can't see the
 4   screen or anything?
 5         A.  No, it's in a holder.
 6         Q.  Okay.
 7         A.  That's it.
 8         Q.  All right.  So you understand that you
 9   are required to tell the truth today?
10         A.  Yes.
11         Q.  Is there anything that would prevent you
12   from telling the truth today?
13         A.  No.
14         Q.  Are you under the influence of alcohol or
15   substances that would impair your ability to tell the
16   truth?
17               MS. RYAN:  Objection.
18         A.  No.
19   BY MS. PATEL:
20         Q.  Okay.  Do you understand that you are
21   being deposed today as both a corporate
22   representative and in your individual capacity?
23         A.  Yes.
24         Q.  Okay.  Just for clarity, for the first
25   half of this deposition what we're doing right now,
```

Matthew Davies
July 18, 2022

1    I'm deposing you in your corporate capacity.  After

2    we finish this, we will move on to your individual

3    deposition, does that make sense?

4         A.  Yes.

5         Q.  Okay.  So I'm going to use the chat

6    feature today to drop documents.  So I'm going to go

7    ahead and drop the first exhibit, just give me a

8    moment.  Okay.  So I have dropped Exhibit 1 into the

9    Chat.  If you can go ahead and open that up and let

10   me know when you're ready.

11        A.  Yeah.

12        Q.  Okay.  So do you recognize this document?

13        A.  Yes, it looks like the Notice of

14   this -- these proceedings.

15        Q.  Okay.  So the Notice of Taking

16   Deposition?

17        A.  Yes.

18        Q.  Okay.  So we're going to go ahead and

19   mark that as Exhibit 1.

20             (Exhibit Number 1 was marked for

21             identification.)

22   BY MS. PATEL:

23        Q.  And if you could turn to Page 5 of the

24   document, it's where the topics of examination start.

25   It's my understanding that you are speaking to topics

Matthew Davies
July 18, 2022

Page 17

1  University that I received as part of the Department

2  of Homeland Security Senior Executive Service

3  Candidate Development Program in 2015.  I forget

4  exactly what that's called, it was issued through

5  their office of Public Administration.  Beyond that,

6  no.

7        Q.  Okay.  Are you a trained law enforcement

8  officer?

9        A.  I am.

10       Q.  Okay.  When did you first start working

11 for DHS?

12       A.  I was a founding member of DHS in 2003

13 when it was created.

14       Q.  Okay.  So was your employment at DHS your

15 first employment following you receiving your

16 bachelor's degree?

17       A.  So I had employment throughout college

18 and including when I graduated prior to entering

19 service with the Immigration and Naturalization

20 Service, but if I would say in terms of a career,

21 this was my first job out of college that was a

22 career focus for me, yes.

23       Q.  Okay.  And you currently work for Customs

24 and Border Protection, that specific component within

25 DHS; is that accurate?

Matthew Davies
July 18, 2022

1          A.   Yes, that's correct.

2          **Q.   So have you always worked with CBP?**

3          A.   Yes.  Yes.  So I started my career with

4    the Immigration and Naturalization Service, and

5    when -- as an immigration inspector and went to the

6    immigration officer basic training course at the

7    Federal Law Enforcement Training Center before

8    returning to Buffalo, New York where I was assigned

9    as an immigration inspector.

10          And when parts of the INS became part of what

11   is now CBP, Customs and Border Protection, I

12   transitioned from an immigration inspector

13   into a Customs and Border Protection officer

14   position.

15          **Q.   Okay.  When that transfer occurred,**

16   **did you have to engage in any type of additional**

17   **training to become a Customs and Border Patrol**

18   **officer?**

19          A.   So there was cross-training that was

20   provided to us in the field at the time of the

21   transition, and I underwent that training, yes.

22          **Q.   Okay.  And it's my understanding that**

23   **there is in fact, an academy?**

24          A.   Yes, there is.  That's what I referenced,

25   the Federal Law Enforcement Training Center.

Matthew Davies
July 18, 2022

Page 23

1    Washington, D.C. in a director position working under

2    the executive director of Admissibility and Passenger

3    Programs.

4         Q.  Okay.

5         A.  In January of 2020 I was promoted into

6    the position of deputy executive director for

7    Admissibility and Passenger Programs.  Over some

8    months of 2020 while there was a transition of

9    leadership I was in an acting capacity as the acting

10   executive director of Admissibility and Passenger

11   Programs, a position that I formally received on a

12   permanent basis on January 4th, 2021 in the position

13   that I am still.

14        Q.  Did you say January 12th, 2021?

15        A.  I think it was January 4th, 2021.

16        Q.  And so you are currently the executive

17   director of Admissibility and Passenger Programs; is

18   that accurate?

19        A.  Admissibility and Passenger Programs,

20   yes.

21        Q.  Okay.  And can you please describe, what

22   is Admissibility and Passenger Programs?

23        A.  So there are 11 director positions that I

24   oversee, but largely they entail the processing of

25   individuals who arrive at ports of entry and are

Matthew Davies
July 18, 2022

1   inspected by the Office of Field Operations, which

2   again includes the policy, the programs, the systems

3   that are combined to ensure that the field is able to

4   process effectively people who are arriving into the

5   United States.

6          So for example things like our Trusted

7   Traveler Programs Global Entry, that's one of the

8   divisions that I oversee.  We have Systems

9   Enforcement Analysis and Review, a group that looks

10  at various systems used for primary processing.  We

11  have a group that is called the Admissibility Review

12  Office that coordinates with State Department for

13  waivers on individuals who might be inadmissible

14  seeking a Visa to come to the United States.  We have

15  the Immigration Advisory Program where we station

16  officers overseas to assist with determination of

17  admissibility prior to travelers coming to the United

18  States.

19         So there's a number of different offices and

20  programs that I oversee, but in a nutshell it's as I

21  stated in the beginning, that anything that touches

22  on admissibility or inspection of travelers coming

23  into the United States is something that my office

24  has on role in.

25         Q.  Okay.  And what are your specific job

Matthew Davies
July 18, 2022

Page 66

1    BY MS. PATEL:

**2              Q.  Okay.  So does detention capacity,**

**3    is that a factor that impacts the processing**

**4    capacity?**

5                    MS. RYAN:  Objection.

6              A.  So the detention capacity, so for us at

7    the ports of entry we have temporary holding

8    capacity.  And I think that to the extent we

9    have -- we have worked to minimize the time that

10   individuals are in our temporary holding capacity

11   making referrals to ICE when long-term detention is

12   required.

13             So there is -- there is some consideration

14   given to detention capacity, but for OFO, I will say

15   we have made referrals to ICE for detention on a

16   case-by-case basis as evaluated by our field

17   leadership and have seen that some of those cases

18   where we have made referrals have been accepted by

19   ICE for detention.

20             But I think -- yeah, sorry, so I'll say that

21   hopefully answers your question.

22   BY MS. PATEL:

**23             Q.  So have there been instances where they**

**24   have not accepted the request for detention?**

25                   MS. RYAN:  Objection.

Matthew Davies
July 18, 2022

Page 67

1          A.   So I -- in my understanding there have

2    been cases where ICE has expressed an inability or a

3    lack of available space.  And so I know that there

4    are cases where they have been unable to detain, and

5    whether it's for unavailable space or for other

6    reasons, and where ICE then may come along and

7    provide options, including alternatives to detention,

8    monitoring programs that they will enroll those

9    individuals in and where ICE will then execute a

10   release as opposed to OFO.

11   BY MS. PATEL:

12          **Q.   Okay.  So am I understanding correctly**

13   **that in the circumstance where OFO refers someone to**

14   **ICE, and ICE indicates that that they cannot take the**

15   **individual, ICE is the one who ultimately makes the**

16   **processing disposition?**

17          MS. RYAN:  Objection, he's here for OFO,

18          so he can't speak for what ICE does or does

19          not do.

20          A.   So when we make a referral, ICE provides

21   a response.  And if there's a response -- if the

22   initial request is for detention and ICE indicates

23   that they're not able to honor that request, then

24   there may be a conversation between local field

25   management from OFO and from ICE with regard to what

Matthew Davies
July 18, 2022

Page 68

1   other options ICE may provide if any.

2          So in the case where there's some other

3   option that is pursued, ICE is the one making those

4   decisions and ultimately executing.  There are other

5   cases, including cases that are not -- that may not

6   be referred to ICE on an individual basis where OFO

7   is executing a parole after the initiation of removal

8   proceedings.

9   BY MS. PATEL:

10         **Q.  In what such circumstances would OFO**

11   **entering a parole?**

12         MS. RYAN:  Objection.

13         A.  So if we're talking about people who are

14   issued a notice to appear, then OFO may -- may

15   execute a parole if there are humanitarian or medical

16   concerns.  Largely those are going to be the

17   overriding factors.

18         But we're also looking at whether there is a

19   flight risk, whether there are other factors that

20   would be aggravating and warrant detention.  So we're

21   looking at things like is there a threat posed to the

22   community, is there a concern about a terrorist

23   threat or a national security threat or is there

24   evidence of criminal history, those are the types of

25   things we will be looking at.  And if there was

Matthew Davies
July 18, 2022

Page 69

1   evidence of any of those threat factors, those are

2   the cases that we would typically be referring to ICE

3   for detention.

4   BY MS. PATEL:

5        **Q.  Okay.  I think it's a good time to**

6   **take a little ten-minute break if you want to do**

7   **that.**

8             MS. RYAN:  Yeah, let's do that, the time

9        is 11:00 exactly so.

10            MS. PATEL:  All right.  Let's be back at

11       11:10.

12            THE VIDEOGRAPHER:  The time is 10:59 and

13       we are off the record.

14            (Brief break.)

15            THE VIDEOGRAPHER:  The time is 11:13 and

16       we are back on the record.

17  BY MS. PATEL:

18       **Q.  All right.  So I want to go back to the**

19  **discussion we were having regarding transfer to ICE**

20  **custody, or ICE detention capacity.  So when you make**

21  **a referral to ICE, does ICE actually take custody of**

22  **the person?**

23            MS. RYAN:  Objection.

24       A.  So the way that we contact ICE in the

25  field, it sometimes varies, because we don't have ICE

Matthew Davies
July 18, 2022

Page 70

1    physically co-located with us typically at most of

2    our locations.  There may be times where we are

3    experiencing surges or where we expect and we are

4    able to coordinate to have ICE on site, but that

5    typically isn't the way it happens.  And so referrals

6    are usually a phone call or an e-mail to the points

7    of contact locally.

8            There have been times where we have known,

9    again, at various levels in the field, that there may

10   not be the ability locally to detain individuals

11   based on capacity from ICE.  And where we know that

12   for example, as opposed to on a case-by-case basis

13   calling them up or e-mailing them where say for this

14   period of time we may not have bed space available

15   because of other priorities.  And so in those cases

16   the individual would not actually be physically

17   transferred to ICE.

18           But when, as I pointed out earlier, when

19   there is a decision made to pursue some other sort of

20   alternative, OFO has no independent capability, for

21   example, to provide monitoring devices or other

22   alternatives that are available to ICE, and so in

23   those cases, we could consider those cases

24   to be -- have custody transferred to ICE, and for ICE

25   to enroll the individual in whatever alternative that

Matthew Davies
July 18, 2022

Page 71

1   is, and ICE to make that decision if a decision is to

2   release at that point.

3   BY MS. PATEL:

4        **Q.   Okay.   So would it be accurate to say**

5   **that in such a circumstance OFO does not make a**

6   **determination to release the person?**

7             MS. RYAN:  Objection.

8        A.   So we have -- and I think this is maybe

9   in some of the different numbers that we provided.

10  There is a difference between what we would consider

11  to be a pure disposition of parole in a case and what

12  we would see as the paroles that occur where removal

13  proceedings have been initiated, where for us the

14  disposition would be notice to appear, but the

15  custody status is released.

16            And so those are where we would indicate that

17  the custody status was released, it would be because

18  OFO made the decision to release the individual on

19  parole status as opposed to transferring that custody

20  to ICE.

21  BY MS. PATEL:

22       **Q.   And so has ICE expressed to OFO any**

23  **reasons other than lack of detention capacity as to**

24  **why they wouldn't accept custody of an individual?**

25            MS. RYAN:  Objection.

Matthew Davies
July 18, 2022

Page 72

1           A.   So I've been engaged with ICE at the

2      headquarters level on a number of occasions over the

3      past few years, and I know that our field leadership

4      has been engaged with ICE as well.   And those

5      conversations for us typically fall down to

6      prioritization of detention capacity.

7           So there may be detention capacity available,

8      there may be detention capacity available that would

9      also require a certain amount of transportation.

10          And so sometimes the conversations are about,

11     you know, whether OFO would be able to provide

12     transportation to the long-term detention facility

13     because maybe it's a case where ICE has detention

14     capacity but they don't have transportation

15     capacity.

16          So any -- the point I'm trying to make is

17     that when we have cases that we -- that we feel

18     strongly about a recommendation to detain and we feel

19     that they should be a priority case for ICE

20     consideration, we have a process where those cases

21     can be escalated both between local field leadership

22     and including headquarters to have those

23     conversations.   And it's been my experience that when

24     those cases have been escalated for prioritization of

25     detention, that ICE has taken action to detain those

Matthew Davies
July 18, 2022

Page 73

1    individuals.

2    BY MS. PATEL:

3         **Q.  Okay.  I dropped another exhibit, this is**

4    **Exhibit 4.**

5              (Exhibit Number 4 was marked for

6              identification.)

7    BY MS. PATEL:

8         **Q.  And this is custody and transfer**

9    **statistics for the year 2022 that was pulled from the**

10   **Customs and Border Protection website.**

11             MS. RYAN:  For the record there are no

12             Bates numbers on this; is that correct?

13             MS. PATEL:  Do you see Bates numbers on

14             it?  I don't believe that they are.

15             MS. RYAN:  And the date is that it was

16             pulled on June 30th; correct?

17   BY MS. PATEL:

18        **Q.  All right.  Do you recognize the**

19   **statistics that are on this document?**

20        A.  I mean, they look generally familiar

21   based on what we report on our public website.  I

22   don't have the actual numbers in front of me,

23   but it looks like these are relatively consistent,

24   yes.

25        **Q.  Okay.  So if you look at Page 1, the**

Matthew Davies
July 18, 2022

Page 82

 1                    MS. RYAN:  Objection.

 2            A.  So there -- separate from those two

 3    recent instances there are other programs run by DHS

 4    largely administered by USCIS that are available only

 5    to certain countries of origin.  I think about --

 6    well, there are a number of programs or options

 7    available to Cubans I suppose.

 8            There is a Haitian Family Reunification

 9    Program, there are, you know, other programs that

10    they're working to reinstate the Central American

11    Minors Program, so some of these programs do take

12    into account as a factor whether what someone's

13    nationality is.

14    BY MS. PATEL:

**15            Q.  Okay.  And I think you used the phrase**

**16    "to parole directly", what did you mean by that?**

17            A.  I -- if I'm -- if I'm trying to remember,

18    it may have been where CBP is exercising our

19    discretionary authority to parole, I believe that's

20    what I may have meant.

**21            Q.  Okay.  As opposed to who exercising?**

22            A.  As opposed to for example USCIS issuing a

23    document for advanced parole.

**24            Q.  Okay.  All right.  So we have previously**

**25    talked about Title 42, and that is something that**

Page 83

1   isn't a potential processing pathway; is that

2   accurate?

3             MS. RYAN:  Objection.

4        A.   We are currently processing people who

5   may have -- who have entered the United States for

6   expulsion to the extent they don't need an exception

7   under Title 42.  And yes, we are still preventing the

8   entry of individuals.

9             To the extent we are preventing their entry,

10   I don't know that we would call it a processing

11   disposition, because they're not really being

12   processed, but the expulsions I think may be

13   clarified fairly as a processing disposition.

14   BY MS. PATEL:

15        Q.   Okay.  Does OFO issue notices to appear

16   and then release persons on their own recognizance?

17        A.   Typically when OFO issues a notice to

18   appear and that person is not put into detention,

19   they are paroled from custody by OFO.

20        Q.   Under what circumstances would OFO issue

21   a notice to appear and then parole, issue parole?

22             MS. RYAN:  Objection.

23        A.   So we -- I think I covered when we came

24   back.  So there is a number of instances where we

25   would issue a notice to appear, largely for any of

Matthew Davies
July 18, 2022

Page 84

1    the circumstances where an individual could be

2    inadmissible after having been inspected at a port of

3    entry.

4            And the cases that would potentially be

5    eligible for parole following that issuance would be

6    those where there are -- where management has decided

7    based on a review of the totality of circumstances

8    and all of the factors outlined in the discretionary

9    checklist, that that's an appropriate outcome, you

10   know, largely focusing on those factors that would

11   represent a threat to the community as the reasons

12   for pursuing detention.

13   BY MS. PATEL:

14           **Q.  Okay.  And that option is available for**

15   **both individuals and families; is that accurate?**

16           MS. RYAN:  Objection.

17           A.  The option of issuing an NTA and then

18   being paroled?

19   BY MS. PATEL:

20           **Q.  Correct.**

21           A.  Yes.

22           **Q.  Okay.  How long does that process**

23   **typically take for an individual?**

24           MS. RYAN:  Objection.

25           A.  It varies.  It varies on a number of

Matthew Davies
July 18, 2022

Page 94

1          Q.   Do you understand what I mean by MPP?

2          A.   So yes, I think I do, it's -- if I

3     remember, at U.S.C. 1225(d)(2)(c), and so if that's

4     what you're referring to, the ability to return

5     individual to a contiguous territory while they're

6     pending removal proceedings.

7          We, as OFO, have executed on that authority

8     since before it became a program called the Migrant

9     Protection Protocols.  In fact, we have done that for

10    many years both on the Mexican border and on the

11    Canadian border.

12         And at least with respect to our operations

13    on the Canadian border, we continue to exercise that

14    authority, even though it's not under a formal

15    program known as MPP, with respect to exercising that

16    authority on the southern border currently that

17    exercise is limited to Border Patrol operations

18    because of the agreement with the government of

19    Mexico that limited our ability to implement in

20    numbers that would exceed Border Patrol capacity to

21    return individuals under that program.

22         Q.   Okay.  So am I understanding correctly

23    that OFO does not currently apply MPP?

24              MS. RYAN:  Objection.

25         A.   So OFO is not currently returning

Matthew Davies
July 18, 2022

Page 95

1  individuals to Mexico pursuant to

2  U.S.C. 1225(d)(2)(c).  We are processing individuals

3  who return to ports of entry for the purposes of

4  attending their removal proceedings when they have

5  been enrolled in MPP, but OFO is not enrolling

6  individuals and returning them directly to Mexico

7  under that program.

8  BY MS. PATEL:

9          Q.  Okay.  Was there a point in which OFO was

10  enrolling persons in that program?

11          MS. RYAN:  Objection.

12          A.  Yes.

13  BY MS. PATEL:

14          Q.  And when was that?

15          A.  That was in 2000 and -- forgive me

16  because I can't remember if it started in 2019.  I

17  think it was 2019, 2020, somewhere around there.

18  BY MS. PATEL:

19          Q.  Okay.  So since that time, OFO has not

20  been enrolling persons in MPP; is that accurate?

21          MS. RYAN:  Objection.

22          A.  So since January of 2021 OFO has not been

23  enrolling people in MPP, yes.

24  BY MS. PATEL:

25          Q.  Okay.  Was it enrolling both family units

Matthew Davies
July 18, 2022

Page 96

1   and single adults?

2              MS. RYAN:  Objection.

3         A.  Yes, we were enrolling both family units

4   and single adults in MPP.

5   BY MS. PATEL:

6         Q.  Does OFO apply the Parole Plus ATD

7   policy?

8         A.  So I believe the policy you're

9   referencing is a Border Patrol policy that OFO does

10  not follow, no.

11        Q.  Okay.  Is there a requirement for OFO to

12  utilize one of the processing pathways that we just

13  discussed more frequently than others?

14             MS. RYAN:  Objection.

15        A.  There's no quotas or requirements that we

16  send out to the field about using any one particular

17  pathway or another.

18  BY MS. PATEL:

19        Q.  Okay.  Is there an expectation that OFO

20  will use one policy more than another?

21             MS. RYAN:  Objection.

22        A.  No.  I think we leave it to the field to

23  determine what is an appropriate disposition in every

24  case based on the totality of circumstances.

25  BY MS. PATEL:

Matthew Davies
July 18, 2022

Page 112

 1   families are separated.  So typically that means that

 2   the individual who is a part of a family who may have

 3   a criminal history or represent a threat to the

 4   community would be prioritized for detention, and if

 5   it was not possible to detain the family unit, the

 6   rest of that family with that individual, then that

 7   individual would be prioritized for detention and

 8   the rest of the family would be paroled, presuming

 9   that they did not present similar risks to the

10   community.

11   BY MS. PATEL:

12        **Q.  And would that parole decision be made by**

13   **OFO?**

14             MS. RYAN:  Objection.

15        A.  Again, that would depend on the

16   circumstances of the case.  It may be the case, and I

17   would -- I would expect that in most cases because of

18   our guidance to maintain family unity, that

19   where OFO was advocating for prioritization of one

20   member of a family unit, the entire family unit would

21   be referred to ICE for determination of detention

22   capacity.

23             But I can't rule out the possibility that

24   there might have been some case at some point where

25   OFO would have made that decision, but typically it