State of Florida

vs.

United States

---

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

July 13, 2022

---

*Vol 1*

# PHIPPS REPORTING

*Raising the Bar!*

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

                  Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

                  Defendants.
_____/

VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
BEHALF OF THE PLAINTIFF

Volume 1
Pages 1 through 137

Wednesday, July 13, 2022
8:33 a.m. CT - 2:17 p.m. CT

Location:  Remote via Zoom
           Washington, D.C.

Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 2

1    APPEARANCES: (All appearing remotely via Zoom)

2

     On behalf of the Plaintiff:

3
         OFFICE OF THE ATTORNEY GENERAL
4        The Capitol, PL-01
         Tallahassee, Florida 32399-1050
5        850.414.3665
         BY:   ANITA J. PATEL, ESQ.
6              ELIZABETH TEEGEN, ESQ.
               anita.patel@myfloridalegal.com
7

8    On behalf of Defendant United States of America:

9        DEPARTMENT OF JUSTICE
         P.O. Box 868
10       Ben Franklin Station
         Washington, D.C. 20044
11       202.514.0618
         BY:   JOSEPH ANTON DARROW, ESQ.
12             ELISSA FUDIM, ESQ.
               joseph.a.darrow@usdoj.gov
13

14   On behalf of Defendant Department of Homeland
     Security:
15
         DEPARTMENT OF HOMELAND SECURITY
16       Office of the General Counsel
         2707 Martin Luther King, Jr.  Avenue SE
17       Washington, D.C. 20528
         BY:   KAITLYN CHARETTE, ESQ.
18

19   On behalf of Defendant U.S. Customs and Border
     Protection:
20
         U.S. CUSTOMS and BORDER PROTECTION
21       Office of Chief Counsel
         1300 Pennsylvania Avenue, Suite 4, 4-B
22       Washington, D.C. 20229
         BY:   STEPHANIE MUFFETT, ESQ.
23             SAMANTHA POON, ESQ.

24
     ALSO PRESENT:  David Celani, Videographer
25

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

```
 1                      I N D E X              Page 3

 2   July 13, 2022                          Page

 3   TONY BARKER
         Direct Examination by Ms. Patel............   6
 4       Cross-Examination by Mr. Darrow........... 198
         Redirect Examination by Ms. Patel......... 200
 5
     Certificate of Oath........................ 204
 6   Certificate of Reporter.................... 205
     Read and sign letter to witness............ 206
 7   Errata sheet (forwarded upon completion)... 207

 8                    E X H I B I T S
                              Identified   Marked
 9   Plaintiff's Exhibit 1           12        12
         Deposition Notice (7 pages)
10
     Plaintiff's Exhibit 2           19        19
11       DHS Organizational Chart (1 page)

12   Plaintiff's Exhibit 3           21        21
         CBP Organizational Chart (1 page)
13
     Plaintiff's Exhibit 4           34        34
14       CBP website Information Center
         (3 pages)
15
     Plaintiff's Exhibit 5           44        45
16       CBP Encounters Fiscal Year 2022
         to Date (1 page)
17
     Plaintiff's Exhibit 6           82        82
18       USCBP Processing Pathways Chart
         (1 page)
19
     Plaintiff's Exhibit 7           83        83
20       USCBP Custody and Transfer
         Statistics FY 2022 (5 pages)
21
     Plaintiff's Exhibit 8          115       114
22       USCBP Custody and Transfer
         Statistic FY 2021 (4 pages)
23
     Plaintiff's Exhibit 9          119       119
24       USCBP Custody and Transfer
         Statistics FY 2020 (7 pages)
25
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1                                                                    Page 4

2                     E X H I B I T S (Cont'd)

3     VOLUME 2

                                              Identified  Marked
4
      Plaintiff's Exhibit 10                      142        142
5        USCBP November 2, 2021 memorandum
         (3 pages)
6
      Plaintiff's Exhibit 11                      160        160
7        Fiscal Year 2020 Enforcement
         Lifecycle Reporter (21 pages)
8
      Plaintiff's Exhibit 12                      169        169
9        DHS April 26, 2022 memo (20 pages)

10    Plaintiff's Exhibit 13                      182        182
         Texas v. Biden Monthly Report
11       Reporting Period: April 1, 2022 -
         April 30, 2022 (6 pages)
12
      Plaintiff's Exhibit 14                      188        188
13       Defendant's Response to Plaintiff's
         First Set of Interrogatories (11 pages)
14
      Plaintiff's Exhibit 15                      184        184
15       Texas v. Biden Monthly Report
         Reporting Period: January 21, 2021 -
16       November 30, 2021 (13 pages)

17

18

19

20

21

22

23

24

25

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 21

1    does, I'll say, criminal prosecutions, you know,

2    for -- from migrants who, you know, are living,

3    residing in the United States away from the exact

4    border area, you know, kind of beyond our -- you

5    know, I would say beyond what would be commonly

6    patrolled by the border patrol.  You know, as well

7    as administrative removal and so on, but...

8         Q.    And I'm going to drop one more exhibit.

9    This is Exhibit 3.

10        A.    Okay.

11             (Plaintiff's Exhibit 3 was received

12             electronically, marked for identification and

13             is attached hereto.)

14    BY MS. PATEL:

15        Q.    Is this the organizational chart for CBP?

16        A.    It is an organizational chart of CBP.

17        Q.    Okay.  And in the middle, the four blocks,

18    it says Chief of Border Patrol and then Office of

19    Field Operations.  Do you see that?

20        A.    Yes.

21        Q.    Okay.  What is the difference between

22    these two components?

23        A.    United States Border Patrol protects the

24    nation's border between the ports of entry.  Office

25    of Field Operations runs and oversees legitimate

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 22

1    trade and travel at the ports of entry.

2         Q.   Okay.  Do you share a processing station?

3         A.   So, how are you defining a "station"?  I

4    ask because are you talking about an actual terminal

5    or are you talking about a system, are you talking

6    about a building?

7         Q.   I'm talking about a building.  So, let's

8    say, for instance, border patrol apprehends someone.

9    Do they bring them to a building or office that's

10   operated by OFO?

11        A.   No, not, not -- no.

12        Q.   Okay.

13        A.   I mean, in rare circumstances, we can work

14   together, you know, in regards to that type of

15   format, but there's no, there's no, I would consider

16   as a joint processing location if that's what you're

17   asking.

18        Q.   Okay.  And in which component of DHS did

19   you first start working?

20        A.   In the border patrol.

21        Q.   Okay.  So, you spent all 21 years in

22   border patrol; is that correct?

23        A.   Yes.  Yeah, I've been a border patrol

24   agent.

25        Q.   Okay.  And what was your job title when

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 35

1    to review it.

2         A.    All right.  Yup, I've reviewed it.

3         Q.    So, on the first page, the second bullet

4    point, it talks about instruction regarding

5    administration law and immigration law?

6         A.    Correct.

7         Q.    Can you briefly describe the types of

8    instruction that's given?

9         A.    Yeah.  We, we have a -- whether it's

10   border patrol agents or attorneys -- by and large,

11   it's attorneys to be honest -- and come in and

12   provide, you know, training in regards to the

13   administrative and immigration law.

14        Q.    Okay.  Sometimes there are active border

15   patrol agents that provide that training?

16        A.    Yeah, it's more the -- you know, it's the

17   hand-to-hand instruction between the attorneys and

18   the agents who deliver the training so that the

19   agents can speak to what I consider as kind of the

20   practical application of the law, right, marrying

21   up, you know, art and science, if you will.

22        Q.    And why is it important for the agents to

23   have instruction on immigration law?

24        A.    Because it's very complex.

25        Q.    Is it something that they apply doing

Page 36

1    their jobs?

2        A.    Absolutely.

3        Q.    And how so?

4        A.    I mean, as we encounter individuals who

5    are entering illegally between the ports of entry,

6    you know, we have to, to determine, you know, if

7    there is a, a legal basis for, for the arrest,

8    which, obviously, would be a violation of law and,

9    of course, you know, the -- what I would consider is

10   the legal application of, you know, that, that law.

11   Right?  So, you know, whether we're taking them into

12   custody or whatever that may be, you know, having a

13   foundational knowledge of immigration law is

14   fundamental.

15       Q.    So, are you familiar with 8 U.S.C. Section

16   1225?

17       A.    Yes.

18       Q.    Okay.  Also referred to as INA 235?

19       A.    Yes.

20       Q.    Is that a statute that CBP implements?

21       A.    It is -- well, yes, it is.  Yes.

22       Q.    Okay.  And what is your understanding of

23   that provision?

24       A.    In, in -- coming from the basis of the

25   memo, the November 2nd memo, it's the ability to

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1      Q.   Okay.  At the Border Patrol Academy do

2   they provide training on what to do when you

3   encounter someone who's crossing illegally?

4      A.   Yes.

5      Q.   Okay.  Is that both -- is that between

6   ports of entry?

7      A.   Yes.

8      Q.   And at a port of entry?

9      A.   No, we do not, we do not train on at ports

10   of entry encounters.

11      Q.   And what does that training entail?

12      A.   So, between the ports of entry encounters

13   is what we, what we train on.  So, it's, it's

14   everything from how to detect that there is illegal

15   entry to what to do when we first encounter someone

16   to certain questions that we would need to ask in

17   order to be able to determine illegal alien -- I'll

18   just say aliens period.

19           If there is a violation of law, taking

20   that person safely into custody, transporting them

21   back to a location where we would be able to process

22   them, how to process an individual and any type of

23   disposition after that, whether that is a removal or

24   return, you know, an expulsion now with Title 42,

25   transferring to ICE, whatever that -- whatever --

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 39

1   some of those dispositions, whatever the myriad of

2   dispositions could be.

3       Q.   Okay.  So, who exactly attends the Border

4   Patrol Academy?  Is it just patrol officers?

5       A.   It's just agents that would attend the

6   Border Patrol Agent Academy.  We have, we have

7   other -- we have other individual border patrol

8   processing coordinators who also go to a similar

9   type of academy, but it is not an agent -- the

10  agents' academy.

11      Q.   Okay.  And so, when you refer to a border

12  patrol agent, that would be someone who is

13  performing the law enforcement function out in the

14  field; is that accurate?

15      A.   Correct.

16      Q.   All right.  What other types of officers

17  or positions are there within the border patrol?

18      A.   Are you talking about a law enforcement

19  position?

20      Q.   Not necessarily.

21      A.   So, I mean, you know, we have everything

22  from, from mission support staff, you know,

23  individuals who, you know, you know, help us out in

24  regards to the administrative aspect of the job,

25  right, you know, to keep the wheels turning, gas in

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 40

1    the vehicles, lights on and people paid.

2              You know, we additionally have, obviously,

3    the agents that you just spoke about.

4              We have seized property specialists that

5    we employee as well who, who, you know, focus on the

6    asset forfeiture aspect of the job.

7              We have border patrol processing

8    coordinators who, who assist us with, you know, the

9    processing and detention logistics of, of -- you

10   know, of the minors who we are encountering.

11             There's a myriad of different positions

12   within the border patrol.

13        Q.   All right.  Are the persons who engage in

14   the processing aspect, are they border patrol

15   agents?

16        A.   Yes, border patrol agents are going to be

17   one of the individuals.  We also have, like I said,

18   border patrol processing coordinators as well as we

19   just recently let a contract for individuals who are

20   assisting us with processing functions but they are

21   not fully processing people.

22        Q.   Okay.  Do the persons who engage in

23   processing, do they receive any type of training?

24        A.   Yes, yes, but I, I -- you know, there's --

25   I think that it is important to delineate as we

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 41

1    speak about what I would consider as, you know, the

2    different people who can process, there are really,

3    you know, some fundamental aspects that only the

4    agents are going to be doing, right, and that's

5    determining lineage, determining which pathway an

6    individual's going to be processed in, taking an

7    oral declaration as well as a sworn declaration, and

8    serving paperwork, you know, serving processing

9    paperwork.  An agent will retain those duties to

10   just an agent.

11          So, do they receive training?  Yes, they

12   receive training in those aspects.

13      Q.   Okay.  And is that training limited to the

14   Border Patrol Academy or do they receive ongoing

15   training?

16      A.   Ongoing.

17      Q.   Okay.  How often is that training?

18      A.   It just -- you know, it really depends.  I

19   mean, as there are new evolutions made to the,

20   the -- I'll say the, the process.  Right?  Whether

21   that's legal or law changes, whether that's policies

22   and procedures, whether that's evolution within the

23   processing main frame in and of itself that we

24   process people in, there will be, you know,

25   reiterative training, you know, that, that gets

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1   rolled out for those.

2        Q.   Okay.  Let's talk about all of the changes

3   at the Southwest Border.  You briefly described how

4   policy changes were -- how you were informed of

5   policy changes when you were a border patrol agent.

6   Is that same process being followed today at the

7   Southwest Border?

8        A.   Yes.

9        Q.   Okay.  And do the agents receive any

10  training or instructions as to MPP or Parole + ATD?

11  Do you provide any training to border patrol agents

12  regarding MPP, the Minor Protection Protocol?

13       A.   Yup.  No, I'm familiar with MPP.  Yeah, we

14  have -- yes, we have field guidance that was sent to

15  the field in regards to MPP.

16       Q.   Okay.  And how...  And how was that

17  guidance communicated to actual agents on the

18  ground?

19       A.   So, in essence, what happens is we have a

20  branch that, that sits within RIAD (phonetic), which

21  is what I oversee, that will create the field

22  guidance based on, you know, for instance, MPP.  So,

23  it will be field guidance with, in essence, like a

24  Power Point associated with it in regards to how to

25  process somebody, and that information is sent to

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 43

1    individuals in the sectors who have that same degree

2    of role and responsibility.  Their focus is that

3    processing, you know, and aspect.  That's what they

4    focus in.  So, that information is sent to the

5    sectors, the chief, the deputy, and those

6    individuals, you know, who will then, you know,

7    cascade that information out and to the, to the

8    agents.

9         Q.    Okay.  Is that Power Point presentation

10   accompanied by some type of verbal instruction?

11        A.    Right.  So, they'll, they'll, you know,

12   speak to that when they're briefing their, their

13   agents in regards to the -- whatever the change may

14   be.

15        Q.    Okay.  Was there any type of training or

16   instruction provided in relation to Parole + ATD?

17             MR. DARROW:  Objection.  Parole + ATD is

18        not binding, it's an administrative record.

19             You can answer if you know.

20        A.    So, we have the memo.  We have the

21   November 2nd memo which came out, which is, which is

22   guidance.

23   BY MS. PATEL:

24        Q.    Okay.  Was that -- was training to the

25   border patrol agents provided on that memo?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    who is an unaccompanied child and who is not.

2         Q.    Okay.   What constitutes a family unit?

3         A.    So, a family unit is a child who -- or,

4    you know, a child who is, you know, with their,

5    their parent or legal guardian when they are

6    encountered by us.

7         Q.    Would you say that everyone who crosses

8    the border fits into one of these categories, either

9    single adult, family unit or unaccompanied minor/

10   single minor?

11        A.    Yes.

12        Q.    Okay.   So --

13        A.    And I'll -- yeah, I mean, by and large.

14   They're not all illegal migrants.   We do have United

15   States citizens and others as well, but,

16   nevertheless, yes, those categories.

17        Q.    Okay.   I just want to walk through some

18   hypotheticals with you.   So, let's just say that

19   border patrol encounters a single adult that's 100

20   feet past the Southwest Border on U.S. soil.   Can

21   you walk me through the steps that the border patrol

22   agent would take at that point?

23        A.    Yes, sure.   So, the agent will encounter

24   that individual, determine if that -- determine,

25   basically, who the individual is, you know, ensure

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 48

1    that that person is not posing any threat or harm to

2    the agent.  You know, at that point in time, when

3    the agent is considered that -- whatever, considers

4    the scene is safe, if you will, or that encounter is

5    safe at that moment, then the agent will, you know,

6    attempt to identify who that individual is as well

7    as their -- you know, determining if they are

8    legally, if they are legally present in the United

9    States, you know, or if there's any other applicable

10   rule or law that may apply to them.

11           So, so, you know, if, if a violation of

12   law is found, that person is determined illegally

13   present or there's a different violation of law that

14   may be present, then the agent would take that

15   person into custody and then process them

16   appropriately, you know, with -- through whatever

17   disposition is appropriate to that individual.

18       Q.   All right.  So, I just want to break that

19   down a little bit.  How would the border patrol

20   agent confirm the identity of the person?

21       A.   You know, through just the encounter,

22   speaking to the individual.  Does he have any form

23   of identification on them?  You know, it just --

24   just determining -- you know, attempting to

25   determine who they are.

1     Q.    Do they typically have a form of

2     identification?

3         A.    It just depends.   I mean, I've -- on

4     numerous occasions I've personally encountered

5     people who have not and on numerous occasions I've

6     encountered people who have.   It just depends.

7         Q.    Okay.   How do they determine the alienage?

8         A.    So, you know, you know, again, going back

9     to determine -- you know, asking somebody, you know,

10    where they're born, looking for any type of

11    documentation they may have.   Some people do cross

12    with passports, they do -- sometimes they do cross

13    with birth certificates, and then other times they

14    don't.   And then ultimately, you know, the interview

15    that we're having with that person, you know, is

16    what we will take into consideration.

17        Q.    Is that interview considered to be an

18    inspection?

19        A.    So, so, that -- ultimately it is.   Right?

20    We are interviewing an individual at that point in

21    time and inspecting them.

22        Q.    Okay.   If the border patrol agent

23    determines that they may be violating law, meaning

24    that they are here illegally, what happens at that

25    point?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 50

1          MR. DARROW:  Objection to the form.

2          You can answer.

3     A.    So, if we determine that the individual

4  has entered illegally, then, then most -- well, I'll

5  say most often we will, we will take that person and

6  arrest them, but, again, you know, I think that

7  it's -- I think it's critical to say up front every

8  circumstance is independent upon that circumstance

9  of that encounter.  Right?  So it's -- every

10 encounter is very unique.  We have to evaluate each

11 of those circumstances per that individual.

12   BY MS. PATEL:

13     Q.    Okay.  What do you mean by that?

14     A.    So, you know, it just -- it depends,

15 right, the circumstances surrounding the encounter.

16 You know, as an example, if I have somebody who just

17 purely, you know, crossed the border illegally, you

18 know, who, who might have identification on them,

19 you know, you know, identifying them as born in a

20 foreign country -- we'll just use Guatemala as an

21 example -- you know, and does not have any legal

22 documentation to be legally present in the United

23 States, we'll apprehend them.

24          If we have another individual who's

25 entered illegally but they have created some degree

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    of crime in the process, granted, we may apprehend

2    them, but we may be turning them over to a partner

3    organization or agency for their prosecutorial

4    process.  Right?  It just depends upon the

5    circumstances.

6           Or we can have somebody who has entered

7    between the ports of entry as a United States

8    citizen and not necessarily entering the United

9    States illegally in the fashion where we would

10   apprehend them, but we will turn them over to Office

11   of Field Operations.

12          So, those are just three examples of

13   situations I confronted myself in my own duties and

14   roles and responsibilities.  And, again, kind of

15   going back to we have to -- each individual

16   circumstance is evaluated, you know, by the officer

17   or the agent.  To broadbrush it is extremely

18   difficult.

19       Q.   Okay.  So, if someone has entered

20   illegally without committing any type of crime --

21       A.   Well, if they entered illegally, they

22   would have committed a crime.

23       Q.   Well, so --

24       A.   Term of illegal means it's committing a

25   crime.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 52

1    Q.   Right.  So, if they committed -- if they

2    entered illegally and then they committed a crime --

3    A.   So, we have two crimes?  I'm just trying

4    to determine --

5    Q.   I'm sorry.  Maybe I'm not being clear.

6    A.   No.

7    Q.   So, they entered illegally and in doing so

8    they've committed a crime?

9    A.   Yes.

10    Q.   Okay.  At that point, is that person

11   arrested and taken to a separate location for

12   processing?

13    A.   So, yes, depending upon the circumstance.

14   It depends on what their nationality is.  So, you

15   know, we, we have the, the public health authority

16   of Title 42, which we would detain somebody, process

17   them, right, which is really just recording the

18   encounter.  You know, and, and then ultimately expel

19   them.  You know, so it's not necessarily an arrest.

20   It's an encounter.  So, it's through the expulsion.

21   Right?

22          And in other circumstances where we can

23   not apply Title 42 to somebody, then -- yes, then

24   they are placed under arrest and taken to a

25   location, you know, most often in order to process.

Page 53

```
 1   In certain circumstances, you know, we, we even have

 2   the ability to process directly in the field.  So,

 3   taking somebody to a place is really subjective due

 4   to the circumstances that, that are present with

 5   that, that exact individual.

 6       Q.    Okay.  So, under the situation of Title

 7   42, what would happen at that point if you

 8   determined that someone would be expelled under

 9   Title 42?

10       A.    Right.  So, we'll take a Mexican national

11   as an example under the circumstances that I'm

12   working on the border with Mexico just to kind of --

13   to, to hone in the situation.

14            So, if we encounter a Mexican national

15   who's crossed illegally into the United States,

16   doesn't have any documentation to be and remain in

17   the United States legally, right, but that person is

18   applicable to Title 42, which we can, we can still

19   apply Title 42 to Mexico, that person's --

20   basically, their biographical and biometric

21   information will be taken in order to be able to

22   record the encounter and to ensure what was the

23   criminality of that person that's in front of us,

24   right, or do they pose a national security or border

25   security risk.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 54

1          If they pose a national security or border
2    security risk, we are not going to Title 42 them
3    back to Mexico.  We will take them into custody and
4    then we'll, obviously, prosecute and all kinds of --
5    place him into Title 8 proceedings.
6          If that person does not present any type
7    of border security or national security risk and is
8    applicable to Title 42, then we will expel them
9    directly from the field and return them over to
10   Mexico.
11         That's the circumstances.  That's just an
12   example.
13     **Q.    Okay.  And so, when you take this**
14   **biographical and biometric information in the field,**
15   **how do the agents do that?**
16     A.    So, it -- (a), first off, it's dependent
17   upon connectivity.  But when we have connectivity,
18   certain places have what I would say is
19   sufficient -- the reality is we work in austere
20   environments, but when we can and we can work into a
21   situation or an area to where we have sufficient
22   connectivity, we actually have two different devices
23   which, which we can search somebody's biometric or
24   biographic information.
25     **Q.    Okay.  So, you're searching that**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 55

1   information?  You're not necessarily taking

2   biographic information?

3        A.   Well, no, we take it, you have to take it,

4   and then it's ran through a series of databases in

5   order to be able to determine if that person has a,

6   a border security, national security, criminal

7   history or immigration history nexus or history, if

8   you will.

9        Q.   And what type of biometric information do

10  you take?

11       A.   So, it's, you know, facial, right, so a

12  picture, basically.  So, facial as well as, as their

13  fingerprints.

14       Q.   Okay.  So, now let's say that the person

15  is not amenable to Title 42 and goes through Title

16  8.  What happens at that point?

17       A.   So, if we cannot expel that individual --

18  you know, because not all countries will accept, you

19  know, Title 42 returns in their countries.  So, if

20  we cannot expel that individual, then we will place

21  them into a -- you know, a Title 8 proceeding.  Now,

22  with that -- or I should say that track, if you

23  will.  Processing track.

24            So, with that being the case, you know,

25  the first and foremost thing is we will try and,

Page 56

 1    and -- we will attempt to be able to detain anyone

 2    that we can for detention or removal.  All right?

 3    So, we're immediately taking a look at can I remove

 4    this person from, from the United States or not?

 5    Can I detain them and can I remove them?

 6             If we cannot detain them or remove them,

 7    then, obviously, other pathways are applicable.  And

 8    if we can detain them or remove them, we have to

 9    take a look if this is their first entry, if this is

10    a repeated entry, so they might be a reinstatement,

11    you know, are there, are there -- are there other

12    contributing aspects with this that, you know, as

13    we, as we evaluate the case to where we would seek a

14    prosecution?  It just depends very specifically on

15    the individual.  But, in essence, we are going to

16    take a look to see, you know, what we can -- you

17    know, what the legal charges are if we're going to

18    charge somebody and then place them into detention

19    and removal proceedings.

20        Q.    Okay.  So, at that point if you're going

21    to pursue the Title 8 option, what type of interview

22    or information do you obtain from them?

23        A.    So, I mean, it's really all the

24    circumstances from, from, you know -- I'll put it to

25    you this way:  The interviews that we conduct in the

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 57

1    field are very, are very comprehensive.  So, it's

2    going to be everything that we can find out about

3    that individual who is in front of us as well as

4    everything along their journey.  Everything from how

5    did you make the arrangements to come to this

6    country to what were your steps along the way, who

7    did you contact, what organization did you meet

8    along the way in order to be able to get here?  All

9    to be able to try and gain what I would consider is

10   knowledge or intelligence to illuminate the criminal

11   network that's even bringing people here in the

12   first place.

13          So, not only the information about the

14   individual, but the circumstances that, that, I'll

15   say, facilitated them arriving at our border.  So,

16   all of that stuff is going to be taken into account

17   during the interview.

18       Q.   Okay.  Does that interview -- you said it

19   occurs in the field, correct?

20       A.   So, it, it -- by and large, no.  That

21   interview, because it's, obviously, a longer time

22   period that we're with somebody, it typically

23   happens, you know, at a station or a processing

24   center.

25       Q.   Okay.  So, I just want to make sure I have

Page 58

```
 1    this clear.  So, if the person is not amenable to

 2    Title 42, you start the process under Title 8, the

 3    person then goes, probably, to some other location

 4    that's not in the field --

 5         A.    Yes.

 6         Q.    -- where they are subjected to this

 7    interview or engaged in this interview and where

 8    biographic information and just history is taken.

 9    Is that accurate?

10         A.    Correct, biometric and biographic --

11    again, because in some locations in the field we may

12    not have biometric information that we're able to

13    capture there.  Right?  It's going to be dependent

14    upon technology and connectivity.  But back at the

15    station location biometric and biographic and what I

16    would consider history is -- you know, is taken from

17    that person in the interview.

18         Q.    Okay.  Is the person conducting the

19    interview the same person who encountered the

20    individual?

21         A.    That depends.  It just -- you know,

22    it's -- you know, in certain circumstances where we

23    have lesser traffic in a sector, it very well may be

24    the individual who encounters somebody in the field

25    who is, who is, you know, continuing that interview
```

Page 59

1   in the station or the processing center.

2            In other locations where it's extremely

3   busy, then in, in some circumstances it's not.  You

4   know, somebody might apprehend them in the field,

5   they're bringing very large groups into the stations

6   and the processing centers and there's, and there's

7   multiple people who are helping to interview that

8   group.

9            Now, if it's the same agent, you know, the

10  agent will just, you know, continue upon that course

11  of action.  If it's a different agent, the agent

12  when they, when they have that person in front of

13  them, will go back through all of what I would

14  consider is that biographical information of the

15  individual.

16       Q.   Okay.  Is that biographical information

17  then put into an electronic system or database?

18       A.   Correct.

19       Q.   Okay.  And I presume the file would be

20  under that person's name?

21       A.   No.

22       Q.   Okay.

23       A.   So, the reason why it's not -- now, to

24  explain the system.  So, we identify people

25  numerically.  So, there is, there is an event,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 60

 1   right, which means this whole group of people that

 2   we've encountered are under one specific event

 3   number, and then each individual person within that

 4   event will have an individual FINS.  And a FINS

 5   number, right, which is an identification number,

 6   Federal identification number, right, FINS, that is

 7   individual to the very specific person.

 8           Because the reality is is that people lie

 9   to us every day.  They may tell us different names

10   every time they encounter us.  But the information

11   of somebody's biometric and biographic information

12   is always kept consistent within, within them under

13   the FINS, which are identified by their fingerprints

14   as well as the information associated with, with

15   the -- their face.

16           I hope that makes sense.  I know it's a

17   complex system, but it's the way we're able to track

18   somebody numerically independent of the biographical

19   information that they're verbally telling us, which

20   is not always accurate.

21       Q.   Okay.  So, let's say that same person has

22   made multiple attempts to enter the country

23   illegally and has been -- has had multiple

24   encounters.  Would each encounter be noted

25   underneath that person's FINS?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 62

 1   detention or prosecution is a perfect example, you

 2   know, we'll do a Warrant of Arrest/Notice to Appear

 3   or we'll have a warrant completed.

 4        Q.   So, when you say "criminal history," are

 5   you referring to any type of criminal history?

 6        A.   It just depends.  So, it depends on

 7   severity of the crime, what the crime is.  You know,

 8   are they a CIMT, crime of immoral turpitude.  You

 9   know, it just depends on what the criminal history

10   is.  But, ultimately, you know, you know,

11   somebody -- as an example, somebody may have a

12   criminal history for burglary who we're absolutely

13   going to, you know, try to prosecute and detain and

14   remove from the country.  Somebody has a criminal

15   history of speeding on their record, we may not be

16   doing that.

17             It just depends.  It's dependents upon the

18   circumstances in front of us.  And it's dependent

19   upon other circumstances as well.  You know, for

20   instance, the ability for DOJ to prosecute, for us

21   to be able to detain.  There are several

22   circumstances that surround what the ability is.

23        Q.   Okay.  Does it matter whether the person

24   committed a crime in another country as opposed to

25   in the United States?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 63

1        A.    It's dependent upon -- well, (a), no.  So,

2   it's dependent upon the, the -- our ability to be

3   able to prove that criminal history, right, or to be

4   able to gain the information.  Not every country

5   submits their information into a database which

6   we're able to see, right, international.  It's

7   dependent upon our ability to be able to see the

8   information when a crime is committed in an

9   international -- on an international basis.

10       Q.    Okay.  And so, at the point that we just

11  left off a few minutes ago regarding the obtaining

12  of biographical and biometric information from the

13  individual, at that point is a decision made as to

14  processing pathway?

15       A.    Yes, most often, you know, you know,

16  because we have to determine what pathway we're

17  going to process somebody into, correct.

18       Q.    So, before we get into the processing

19  pathway, I just want to back up and give you a

20  hypothetical.  Instead of it being an individual

21  that was caught -- like, let's just say we have a

22  family unit that crosses the border, they're a

23  hundred feet onto U.S. soil and they're an applicant

24  for admission.  Can you describe the pathway in that

25  circumstance?

Page 64

1    A.    Same process by and large.  You know, it

2    depends if they have one adult, two adults in the

3    family unit.  Just it depends.  Is it a family group

4    or is this a family unit?  You know, this is the

5    complexities of an operational requirement.

6           So, if it's a family unit -- and I'll use

7    your word verbatim.  If it's a family unit, you

8    know, then we'll have to evaluate is there one adult

9    or two adults and it's the same process.  Right?

10   We're still determining, you know, border security,

11   national security nexus to those individuals.  We

12   are still, you know, evaluating that that child is

13   actually their child and not, not some other type of

14   circumstance, which is extremely, unfortunately,

15   presented sometimes.

16          So, so -- but by and large that same

17   circumstance, you know, the same, I'll say, process

18   is there.  Right?  We're going to determine if we

19   can Title 42 them.  If we can't Title 42 them, then,

20   you know, because they won't accept them, we'll

21   place them into a Title 8, you know, type of

22   pathway.  They're transported back to the station or

23   to a processing center.  It's the same, it's the

24   same process by and large.

25   Q.    Okay.  You say "by and large."  So, is

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 65

1    there anything specific that you can identify that

2    is different?

3        A.    Yeah, so, so, you know, we -- you know, as

4    we -- as we take a look at, you know, the

5    individuals who we have in front of us, you know,

6    there are circumstances where, you know, we may have

7    to separate that, that parent from the child

8    ultimately, but those are, those are extremely rare

9    circumstances and based upon, you know -- again, you

10   know, a much more complex situation that we end up

11   having in front of us.

12       Q.    When you say "separate," what are you

13   referring to?

14       A.    I'll give you an example of a situation

15   just yesterday.  So, you know, we have a mother who

16   crosses with her child.  The mother has significant

17   criminal history where we are going to prosecute the

18   mother for the illegal entry.  So, they are excepted

19   from the Title 42 pathway and they are placed into a

20   Title 8 proceeding.

21       Q.    Okay.  How do you verify whether a child

22   is, in fact, the child of the parent or legal

23   guardian?

24       A.    So, there are a couple different -- I

25   mean, obviously, interview is, is -- you know, is

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 66

 1    you know, critical, both interviewing the child as

 2    well as the parent, but we also have what we

 3    consider is rapid DNA processing, which is,

 4    essentially, able to determine, you know, a parental

 5    connection with the child.

 6         Q.    Okay.  So, how do you determine under

 7    Parole + ATD if the person is really a parent?

 8              MR. DARROW:  Objection, Parole + ATD is

 9         confined to administrative record.

10              You can answer the question.

11         A.    Could you reask your question?  My

12    apologies.

13      BY MS. PATEL:

14         Q.    Sure, of course.  So, how do you determine

15    under Parole + ATD whether the adult is actually the

16    parent?

17         A.    It's completely two separate -- a parental

18    hereditary, you know, or connection to an adult in

19    Parole ATDs is -- that's a, that's a processing

20    pathway versus if somebody is related to another

21    individual.  But I'll answer your question directly.

22              If we determine that, you know, a family

23    unit is a family unit, then they may be applicable

24    to various Title 8 pathways.  If we determine that a

25    child, through interview or rapid DNA, is not

Page 67

1    determined to be part of that family unit and it

2    would be either a family group or completely an

3    unaccompanied child and a single adult, which we

4    also encounter, then the child is, is processed for

5    Title 8 and turned over to the custody of HHS, to

6    Health and Human Services, DHHS, right, federal, and

7    we transfer them to OOR and then, of course, the

8    adult is processed in some degree of Title 8

9    pathway.

10    Q.    Okay.  So, do you do the DNA testing prior

11    to making a decision as to whether someone --

12    A.    Yes.

13    Q.    -- is eligible for Parole + ATD?

14    A.    We will do the -- we will do the

15    determination of -- you know, if it's in question,

16    we will determine parental relationship before a

17    Title 8 pathway is determined for those individuals.

18    Q.    So, when would, when would it not be a

19    question whether or not they are family?

20    A.    Well, I mean, if there's nothing that

21    indicates to us that it could be a fraudulent

22    family, then we're going to continue to process them

23    as a family unit.

24    Q.    Okay.  Is everyone given a DNA test?

25    A.    No.

Page 68

1      Q.    Okay.   Under what circumstances would a

2   family be given a DNA test?

3      A.    So, if there, if there is any -- if there

4   is, you know, anything within the case presented in

5   front of us that -- you know, that, that the agent

6   who is there or it may -- you know, quite possibly

7   an HSI agent, which is, which is a component of ICE,

8   Homeland Security Investigations, if they feel that

9   there is any degree of family fraud, then we will,

10  you know, conduct interviews and then -- and, if

11  necessary, get a rapid DNA test completed.

12     Q.    So, how would someone determine whether or

13  not there is fraud?  Is this just based on

14  questioning of the alleged parent and then the

15  alleged child?

16     A.    Yeah, so -- yeah, questioning, you know,

17  you know, whatever -- you know, whatever information

18  they may have on them at the time.  You know, it

19  just, just depends.

20     Q.    When you say information that they might

21  have on them, are you referring to documents?

22     A.    Yeah, I mean, documentation.  You know,

23  our lingo, you know, we call it pocket trash, but

24  whatever somebody might happen to have in their

25  pockets, you know, just whatever information happens

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 69

1    to be on their person or in their belongings.

2        Q.    Okay.  So, if a parent says, this is my

3    child, and the child says, this is my mother, is

4    that enough for the person to be -- or the family to

5    be confirmed, in fact, a family?

6             MR. DARROW:  Objection, calls for

7        speculation.

8             You can answer.

9        A.    I mean, you know, I hate to continue to

10   give you the "it depends."  So, you know, there's a

11   lot of conversation that is happening with this

12   family group, you know, you know, or this family

13   unit.  So, you know, both talking to the parent and

14   the child.  Sometimes we have children that are too

15   young to even speak, you know, so a lot of it we

16   have to -- we take, obviously, on face value of the

17   individual and the circumstances we have in front of

18   us.  If there's nothing to -- you know, to raise the

19   suspicious level of the agent or officer that

20   happens to be there processing them, you know, then

21   they will get processed as a family unit.

22   BY MS. PATEL:

23       Q.    Okay.  Is biographical information taken

24   as to each member of that family unit?

25       A.    Yes.

Page 70

1    Q.    Okay.  Is biometric information taken as
2  to each member of that family unit?

3    A.    It depends on the age of the child.

4    Q.    Okay.  So, is there a certain age upon
5  which biometrics would not be taken?

6    A.    Traditionally speaking it's 13 years of
7  age or older.

8    Q.    Okay.

9    A.    But between the ages of 6 and 13 we may
10  still take the biometric information of the child if
11  we believe that there is a family fraud type
12  situation that is occurring.

13    Q.    Okay.  Do you attempt to verify the age of
14  the child?

15    A.    Yes.

16    Q.    And how do you do that?

17    A.    Whether they have a birth certificate or
18  not on them, you know, that the parent -- you know,
19  whoever happens to be there, you know, whether
20  there's a birth certificate there, speaking to the
21  child, speaking to the, the -- you know, whoever
22  the -- you know, the parent is at that point.

23    Q.    Do you use any type of software or
24  technology to identify the age of the child?

25         MR. DARROW:  Objection as to form.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 72

1      Q.    Okay.  So, each member in that family unit
2    will have a FINS number.  Is that regardless of the
3    age of any children?
4      A.    Right.  So, so, you know, as we're
5    entering them into the system, they're issued a FINS
6    number.
7      Q.    Okay.
8      A.    And this is all automated.  It's not like
9    it's a human being that's doing these, by the way.
10     Q.    You mean the creation of the FINS number?
11     A.    All the numbers; the event, group, FINS.
12     Q.    Okay.  And is the number of encounters
13   also tracked for family units?
14     A.    So, yes, we can do a search for how many
15   family units that we encounter, but every individual
16   is tracked as an encounter.
17     Q.    Okay.
18     A.    That's the reason why -- when you saw on
19   that graphic a minute ago, you said what is FMUA or
20   FMU?  That's, that's how many family -- those are
21   individuals who are attached to a, to a -- as a
22   family.
23     Q.    How long does it take to go through the
24   processing that you just described for an
25   individual?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 73

1        A.     Which aspect?  Like, what pathway are you

2   talking about?

3        Q.     Well, not necessarily -- well, so, let's

4   say they're not -- well, let's start with Title 42.

5   How long does it take to identify whether someone is

6   amenable to Title 42?

7        A.     I mean, to determine if somebody is

8   amenable it would take minutes.  You know, the --

9   we're pretty clearly defined on which countries will

10  take back people via Title 42 at this point.

11       Q.     Okay.  And that's irrespective of whether

12  it's a family or an individual that's encountered?

13       A.     By and large.  I mean -- I think your

14  question was to determine if somebody is amenable to

15  Title 42.  I mean, Title 42, we know the countries.

16  So, they'll be amenable.  Whether they're accepted

17  is a whole different conversation.

18       Q.     Okay.  What about to find out whether or

19  not they would be accepted?

20       A.     So, I mean, there's going to be the

21  circumstances that, that are in front of us.  Right?

22  So, you know, I mean, it may be they may not be

23  amenable to Title 42 at that moment because they

24  have a clear -- a claim of fear at the CAT

25  withholding standard, you know, which, you know, we

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 74

 1    have to move into the CIS process for CIS to

 2    determine what that is, if it's a valid claim or

 3    not.

 4              So, there are many circumstances around

 5    that to determine if somebody is not going to be

 6    placed into, into Title 42 and is going to either

 7    (a) going into what I would consider like a delayed

 8    Title 42, you know, status, if you will, like,

 9    basically, hey, there's other things we have to do

10    in order to be able to determine if they're

11    applicable to -- for the actual expulsion or we're

12    placing them into Title 8.

13              So, certain circumstances are very easy.

14    Other circumstances, like I just talked to you about

15    the family, that is going to be hours upon hours

16    upon hours upon hours.  So, you know, sometimes days

17    even just depending upon how rapid we can get the

18    results of the DNA testing.  Sometimes DNA testing

19    takes up to 48 hours.  And, you know, we, obviously,

20    don't want to, you know, improperly release a child

21    to somebody we don't believe is their parent.

22              So, it just takes -- it just depends, and

23    the reason why I say that is that, you know, the

24    time in custody is something that we watch very

25    closely.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 75

1       Q.   Okay.  Right.  So, in those instances

2   where it does not take minutes, are those persons

3   brought into a CPB detention facility?

4       A.   So, so, if somebody's going to be -- if

5   somebody cannot be processed for Title 42 in the

6   field and must be brought into a station or a

7   processing center or somebody's going to be placed

8   into a Title 8 pathway, then they're brought in,

9   they're brought into those, those various locations

10  and then, obviously, you know, that's a much longer

11  time period as we are transporting somebody from the

12  field to one of those stations or processing center

13  locations and, of course, the interview and

14  processing and so on and so forth.

15      Q.   Okay.  And at that point, once they're

16  transferred into that station, is it a matter of

17  days versus hours before that person is --

18      A.   It just depends on the circumstances

19  present.  There's a lot of, there's a lot of factors

20  that impact time in custody.

21      Q.   Okay.  So, let's say it's not Title 42 and

22  it's Title 8.  In that instance, what would be the

23  processing time for an individual?

24      A.   For what pathway?  I think it's depending

25  upon the pathway that you tell me.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    Q.   Okay.  So, you're talking the ultimate

2  processing disposition?

3    A.   Right.  So, so, you know, interviewing --

4  it's just going to -- it's going to vary greatly.

5  Right?  You may have somebody who has a -- you know,

6  is very forthcoming, is not trying to lie to us, you

7  know, who, who we can process relatively quickly

8  just depending on what, what type of pathway we're

9  processing them into, and there's other individuals

10  who, who, you know, you know, for lack of better

11  terms, are pure criminals, you know, and we're

12  prosecuting them and that will be a much longer time

13  frame.  You now, so it's going to vary based upon

14  the circumstance of that individual.

15       You know, our current time in custody

16  right now before I walked in here, you know, on

17  average across the entire country is sitting at

18  right around 60 hours.  Right?  That's the entire

19  country, you know, and that's just approximately.

20  It's not the exact time frame, but approximately

21  that.  You know, the -- but there are certainly

22  individuals who are processed faster than that and

23  there are most certainly individuals who are

24  processed in a longer time period than that.

25    Q.   Okay.  But those 60 hours, would that be

Page 77

```
 1   referring to just conducting the interview or
 2   conducting the interview through the processing
 3   disposition?
 4        A.   Right, exactly correct.  So, that would be
 5   encompassed between the period of time which we took
 6   them in custody to the period of time in which they
 7   are either released, returned, removed, expelled,
 8   transferred to ICE.
 9        Q.   Okay.  I'm just going to get into the
10   processing pathways, but we have been going for a
11   while, so I just wanted to check to see if you
12   need --
13        A.   A break would be great.
14        Q.   All right.
15             MS. PATEL:  What do you want, like ten
16        minutes?
17             MR. DARROW:  Yeah.
18             THE WITNESS:  Yeah.
19             MS. PATEL:  All right, sounds good.
20             MS. POON:  Before you go, we're having a
21        hard time with the documents your paralegal
22        sent last night.  We can't open them.  We've
23        had two tech people try to do it.
24             THE STENOGRAPHER:  Let me go off the
25        record first.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 78

1           MS. POON:  I thought we were off the

2      record.  I'm sorry.

3           THE STENOGRAPHER:  No, we're not, not yet.

4           THE VIDEOGRAPHER:  The time is 10:06 and

5      we are off the record.

6           (Brief recess 10:06 a.m. until 10:17 a.m.)

7           THE VIDEOGRAPHER:  The time is 10:17 and

8      we are back on the record.

9   BY MS. PATEL:

10      Q.   All right.  Chief Barker, it has come to

11   my attention that I was previously saying CPB

12   instead of CBP.  Do you understand that I was

13   referring to Customs and Border Protection?

14      A.   Yes.

15      Q.   All right.  So, you mentioned earlier, you

16   made a distinction between family units and family

17   groups.  Can you, please, explain what the

18   difference is between the two?

19      A.   Sure.  So -- and one clarifying point, you

20   know, in regards to my, my aspect as well.  So, I

21   think you had previously asked if I was familiar

22   within 1324, 25, 26, those types.  Yes, I'm very

23   familiar with that, those legal aspects.  You know,

24   if I was questioning that at all, I'm familiar with

25   that.  So, just for clarity, and that was some of

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    the previous questions that you asked, but --

2            So, to go into the family group versus

3    family unit.  So, family unit is clearly defined by

4    the TVPRA, which is a parent or legal guardian of

5    the child.  That's it.  Family group can be anything

6    other than that, in essence, that is showing up at

7    our borders.  Quite often we end up seeing where

8    this is something along the lines of a child with an

9    uncle, aunt, cousin, some type of relative, right,

10   some other type of relative that's not the parent or

11   legal guardian.  That would be the definition of a

12   family group.

13       Q.    Okay.  Thank you for that.

14             And I don't know that I asked you this

15   before, but how do you determine whether someone is,

16   in fact, a legal guardian of a child?

17       A.    So, you know, often what we'll see in

18   those circumstances is there will be something from

19   the state or the country or, or, to be honest with

20   you, sometimes counsel, you know, those type of --

21   those type of individuals, you know, from the

22   different countries, they'll have some type of

23   documentation on them, you know, so and so is the

24   legal guardian of -- you know, of a certain child,

25   and, of course, you know, it's the interview, you

Page 80

 1   know, as well.  So, you know, talking, talking to

 2   whoever the individual is and the child.

 3       Q.    Okay.   Is there any attempt that's made to

 4   verify whether or not the documents are, in fact,

 5   you know, legitimate?

 6       A.    If there's any indication or concern

 7   that -- and just for note, I mean, it is more on the

 8   rare side that we see this, although we have seen

 9   this.  In those type of circumstances we do feel

10   there's some degree of fraud there, you know, at

11   all, if there's any concern, we'll typically reach

12   out to that country's consulate and have them start

13   engaging as well.  Most often in circumstances where

14   there's either family fraud or, you know, I would

15   consider, you know, as a family unit like we were

16   just talking about, you know, where there's question

17   there, the consulates gets very heavily engaged with

18   us as well.  Most often they'll even show up to the

19   building and interview the child and the -- and

20   whoever that parent is as well.

21       Q.    Are family groups processed in a different

22   manner than family units?

23       A.    So, family group is a -- I'm trying to

24   stay away from calling it a term of art, but a

25   family group, in essence, is an unaccompanied child

Page 81

1    and a relative adult.  So, they are processed as an

2    unaccompanied child and the other person is

3    processed as a single adult.

4         Q.    Okay.  Understood.

5              So, you mentioned previously that you use

6    facial recognition as a form of biometrics.  Do you

7    also have any type of software that estimates the

8    age of someone, of a child?

9         A.    No, not that I'm aware of.

10        Q.    Okay.  And is there any -- do you actually

11   track the length of the interviews?

12        A.    No.

13        Q.    Each family and individual?

14        A.    No, if -- well, again, I go back to it

15   depends.  You know, the system, in and of itself,

16   will track when we are, you know, entering data and

17   those type of aspects.  So, at that point in time,

18   obviously, it's tracking and identifying when we're,

19   you know, quote, unquote, interviewing or engaging

20   somebody if it's on the computer base.

21             As well as if we think that we're going to

22   prosecute somebody we will -- we'll start, you know,

23   taking down a -- you know, a chronological time

24   frame order of when we are, you know, interviewing

25   and, you know, things that we have been, you know,

Page 87

1    I couldn't understand you at all.

2        Q.    Can individuals be processed under

3    Parole + ATD?

4            MR. DARROW:  Objection.  Parole + ATD is

5        defined as the administrative record.

6            You can answer.

7    A.    Yes.

8    BY MS. PATEL:

9        Q.    So, so I understand, individuals who are

10   not a part of a family unit as they present at the

11   border or on U.S. soil, Parole + ATD is an option to

12   them?

13           MR. DARROW:  Same objection.

14           THE WITNESS:  Can I answer?

15           MR. DARROW:  Yes, you can answer.

16   A.    Yes.

17   BY MS. PATEL:

18       Q.    Okay.  Under what circumstances is it

19   available for single adults?

20           MR. DARROW:  Same objection.

21           You can answer.

22       A.    If they're a Cuban, Venezuelan or

23   Nicaraguan single adult who does not have a border

24   security or national security risk, then, then a

25   Parole ATD may be utilized with that individual.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 88

```
 1   And I just say "may," because it's, it's not a
 2   shall.
 3     BY MS. PATEL:
 4       Q.   All right.  Does permission need to be
 5   obtained on a case-by-case basis from a supervisor
 6   or someone higher up in order to apply Parole + ATD
 7   to a single adult?
 8             MR. DARROW:  Same objection.
 9             You can answer.
10       A.   No, no.  The utilization of Parole ATD in
11   a sector, you know, obviously, you know, that
12   permission is given by a supervisor, actually, you
13   know, at the commissioner level.  But the
14   application of Parole ATD to a specific individual,
15   each and every time that is determined on a
16   case-by-case basis to the agent or officer that is
17   processing that individual.
18     BY MS. PATEL:
19       Q.   Okay.  And since when has Parole + ATD
20   been authorized to apply to single adults?
21             MR. DARROW:  Same objection.
22             You can answer.
23       A.   It's going to be within the past couple
24   months.  I can't recall exactly when we started, you
25   know, utilization of it for single adults.
```

Page 91

1    they may end up utilizing it, but, but, you know,

2    it's very specific to the circumstances at the time

3    and the individual they have in front of them.

4        BY MS. PATEL:

5        Q.   Okay.  You just used the term "lateral

6    decompression."  What do you mean by that?

7        A.   That means, basically, that a sector, you

8    know, has -- is significantly over their 100 percent

9    capacity.  And I say significant.  They're over

10   their 100 percent capacity.

11       Q.   Okay.  And then what happens at that

12   point?

13       A.   So, then --

14            MR. DARROW:  Same objection.

15            You can answer.

16       A.   -- we'll utilize various conveyances, such

17   as a plane and/or to move migrants from an area that

18   has, you know, very high custody numbers to areas

19   that have lower custody numbers in order to be able

20   to, you know, just decompress ultimately.

21       BY MS. PATEL:

22       Q.   And when you say transfer them, are you

23   referring to transferring them from border patrol

24   custody to border patrol custody?

25       A.   Yes, for processing, correct.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    **single adults?**

2          MR. DARROW:  I'm going to object again.

3          Anita, we have somebody else prepared to speak

4          to this topic.

5          MS. PATEL:  Well, if he doesn't know, then

6          he doesn't know, but, you know, I think it's

7          fair to ask the question.

8          MR. DARROW:  You can answer if you know.

9     A.   You know, any utilization of Parole ATD,

10    whether that's changed, meaning that it's moved to a

11    different sector, moved to a different demographic,

12    you know, that's approved by the chief of the border

13    patrol and the commissioner.

14    BY MS. PATEL:

15    **Q.   For what reason do they authorize use of**

16    **Parole + ATD for a single adult?**

17          MR. DARROW:  Objection again, beyond the

18          scope of this witness' testimony and also

19          Parole + ATD is confined to the administrative

20          record.

21          You can answer if you know.

22    A.   We included single adults in the, in the

23    Parole ATD pathway due to the fact that 73 percent

24    of all individuals who we were -- we were and are,

25    roughly -- I say roughly -- encountering -- we can

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 94

1   use 70 as an average -- are single adults.  Very

2   specifically from Cuba, Venezuela or Nicaragua.

3     BY MS. PATEL:

4       Q.   And so, I think -- so, I need you to

5   connect the dots for me here.  Simply because most

6   of the people are single adults, why does that mean

7   that you approve the use of Parole + ATD?

8           MR. DARROW:  Same objection.

9           You can answer if you know.

10      A.   We utilize the application of Parole + ATD

11   for Cuban, Venezuelan and Nicaraguan single adults

12   due to the fact that there is no return mechanisms

13   to those countries.  So, if we would place a person

14   into detention, the detention would not have any

15   degree of finalization of removal.  You know, the

16   person may receive a final order of removal and then

17   we would have no mechanism to actually remove that

18   person from the country.

19    BY MS. PATEL:

20      Q.   And what is the consequence of that?

21          MR. DARROW:  Same objection.

22          You can answer.

23      A.   The consequence of what?  I'm not sure

24   what --

25    BY MS. PATEL:

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1     Q.    Of you not being able to remove them from

2  the country.

3     A.    Well, so, if we can't remove them from the

4  country to any other country, you know, by default

5  and they're here, they continue to remain here.

6     Q.    Would they remain here in detention?

7        MR. DARROW:  Same objection.  Also,

8        objection as to vague.

9  BY MS. PATEL:

10     Q.    You say that they would remain here.  If

11  you didn't apply Parole + ATD to them, would they be

12  subject to detention?

13        MR. DARROW:  Same objection.

14        You can answer.

15     A.    So, if we didn't apply Parole + ATD to

16  them, there are various pathways that they could

17  be -- that would be able to be applied to them, not

18  all of them resulting in detention.

19  BY MS. PATEL:

20     Q.    Okay.  What pathways could be applied

21  where they would not be subject to detention?

22        MR. DARROW:  Same objection.

23     A.    NTA/OR.  So, a notice to appear, released

24  on their own recognizance.

25  BY MS. PATEL:

Page 96

1      Q.   Okay.  So, let's go back to Exhibit 7 and

2   I just want to walk through each of these pathway

3   dispositions with you.

4           The first one is Notice to Appear/Own

5   Recognizance, NTA/OR.  So, when would that be

6   applied to a single adult?

7      A.   Again, it just depends on the

8   circumstances in front of them.  You know, an

9   individual who, you know, is claiming fear, an

10   individual who, you know, may have, we'll say, you

11   know, issues to where they cannot be detained.

12   Fraihat (phonetic) being -- just as an example, just

13   one example.  You know, if we have no available

14   space in order to be able to remove single adults

15   to, you know, in ICE custody; i.e., you know, that

16   locale has no available space open to them, we would

17   end up placing a single adult into an NTA/OR.  You

18   know, those are all -- there's just a variety of

19   circumstances where, where it can be applied.

20      Q.   Let me backtrack a little bit.  Do border

21   patrol agents have discretion in deciding which one

22   of these pathways to use?

23      A.   Yes.

24      Q.   Okay.

25      A.   We have the discretion in order to be able

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    to determine which pathway, but, but, you know,

2    again, there's -- this kind of goes back to your

3    previous question.  Supervision is well engaged in

4    the processing areas in monitoring, you know, who

5    agents are processing, which pathways are assigned

6    to individuals and so on.

7        Q.   Are there specific criteria that an

8    officer would apply in determining which pathway to

9    choose?

10       A.   It's based upon the circumstances of the

11   individual in front of them.

12       Q.   What do you mean by that?

13       A.   So, so, you know, as in -- I think it's

14   Exhibit 6, you had what appeared to be kind of

15   almost like a decision tree for lack of better

16   terms.  I think it was that number, so don't quote

17   me on it, but -- well, I guess you're going to quote

18   me on it, but, you know, the -- that's, that's like

19   a decision tree, but ultimately the determination is

20   based upon the circumstances in front of the agent

21   at the time of the individual there.

22       Q.   So, there are no set criteria that's

23   applied?

24       A.   Well, I mean, of course, yes, there's set

25   criteria.  I mean, if a person has, you know,

Page 98

1    previously been deported, so that's going to be for

2    instance, a reinstatement of a previous removal; if

3    they have an order of removal that has not been

4    effectuated, that's going to be a bag and baggage.

5    I mean, so you kind of see -- that -- again, I go

6    back to it's kind of like a decision tree.  It's not

7    a true decision tree.  So, there are circumstances

8    that are involved in what you're applying that Title

9    8 pathway to to those individuals.

10       Q.   Okay.  Are there any other criteria?  You

11   just named two.

12       A.   Yeah, I mean, there's going to be several.

13   Right?  So, national security, border security

14   threat, what's their criminal history, what's their

15   immigration history, are they applicable to -- you

16   know, to MPP, are they applicable to detention, are

17   they claiming fear, are they not claiming fear, you

18   know, are they a single adult, are they a family

19   unit, what's the detention availability for that

20   person?  I mean, it's -- you know, does ICE have bed

21   space, do they not have bed space to detain?  I

22   mean, these are all a variety of different

23   circumstances that are all taken into those

24   decisions.

25       Q.   Okay.  Does -- you mentioned whether or

Page 99

1  not they are or are not a family unit is one of the

2  criteria?

3      A.    Absolutely.

4      Q.    And how is that criteria applied?

5      A.    So, for family units, you know, if we're

6  able to expel them, if we're able to return them

7  rapidly through ER, as an example, you know, then we

8  will -- if those countries are able to or are

9  accepting, you know, individuals back, right,

10  they're allowing us to return or remove individuals,

11  then we will, right, and we'll apply that specific

12  pathway.

13          You know, if they're from a country who is

14  not accepting, you know, returns, removal or

15  expulsions from us, and we have, we have no bed

16  space for detention, then we will utilize a release

17  mechanism for families we have no availability to

18  detain.

19      Q.    Okay.  First you mentioned ER.  Were you

20  referring to Expedited Removal?

21      A.    Expedited Removal.

22      Q.    And you also said when there is no bed

23  space for detention.  Were you referring to bed

24  space at a border patrol facility?

25      A.    So, so, we don't detain.  We will hold in

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    illegally, that's what we're going to do.

2        Q.    In what circumstance would you not use

3    Expedited Removal for a particular family?

4        A.    As an example, if they claim fear, we will

5    place them into an, an NTA/OR process because we

6    have no family detentions.  Like, if you place them

7    into ERCF, we have no availability to detain them,

8    you know, and so it's -- ultimately if they claim

9    fear, we'll place them into NTA/OR and their claim

10   of fear will be heard on a non-detained docket.

11       Q.    Okay.  And what percentage of the families

12   complain fear?

13       A.    I couldn't tell you.

14       Q.    Is it a high percentage?

15       A.    So, it just -- it really is dependent.  I

16   couldn't even tell you.

17       Q.    All right.  What if they fail the credible

18   fear screening?

19       A.    That's really where ICE takes over and I

20   defer you to ICE as to their process.

21       Q.    Okay.  So, in the interim if the family

22   cannot be detained in ICE custody, where would they

23   be located?

24       A.    Well, they're placed on NTA/OR, so it's

25   wherever they would be destined to live at.  I mean,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 103

1    we have -- we, as in CBP -- so, speaking strictly

2    with the CBP path, you know, we -- after they are

3    released from our custody, they are really the

4    responsibility of, of -- I'll say the monitoring of

5    that person falls to ICE.

6         Q.   Okay.  But, if I understand correctly,

7    families who are not amenable to Expedited Removal

8    as determined by CBP then get put into a Notice to

9    Appear/Own Recognizance track, at which point they

10   can be paroled or bonded out; is that accurate?

11             MR. DARROW:  Objection, misstates the

12        testimony.

13             You can answer.

14        A.   Yeah, that's, that's not accurate.  It's

15   my fault if I didn't explain it clearly enough.  So,

16   so, there are a couple different pathways.  If we

17   have a family who we cannot -- is not amenable to

18   Expedited Removal, we cannot return to their home

19   country, right, we can't or is not amenable, we will

20   place them into an NTA/OR or a Parole ATD type of

21   pathway for removal -- from release, rather, from

22   our custody.  I'll be very specific with my words.

23   From release from our custody.

24        Q.   When you say release from your custody,

25   does -- that means that they are, in fact, released

Page 109

1    circumstances which prohibit us detaining.  And it's

2    not us.  I'm using "us" as the larger DHS entity.  I

3    really kind of defer you to counsel and to ICE in

4    regards to that because that's their standards of

5    detention.  But when ICE tells us that they cannot

6    detain a certain individual -- a single adult, they

7    cannot detain a single adult, then that detention

8    pathway is removed, obviously.

9        Q.    Okay.  Do -- those same factors, are they

10   considered as to a family unit?

11       A.    Well, there is no detention of family

12   units currently available, so, yeah, but it's

13   implied, right, because there's no detention.

14       Q.    Understood.  Under what circumstances

15   would CBP apply Parole + ATD to a family unit?

16            MR. DARROW:  Objection, Parole ATD is

17       beyond the scope.  Also, we have another

18       witness to discuss Parole ATD.

19            You can answer.

20       A.    So, Parole ATD would be applied to a

21   Cuban, Nicaraguan or Venezuelan family unit as these

22   three demographic -- or these three country

23   demographics or citizenships, nationalities

24   currently do not allow us to repatriate those

25   individuals, so no returns, no removals, and we have

Page 110

1  no current detention capability to be able to detain

2  families; so, therefore, we may utilize the Parole

3  ATD in certain circumstances in the sectors who are

4  impacted by flow with high TIC times as well as high

5  custody numbers.

6      BY MS. PATEL:

7      Q.   All right.  Under what circumstances would

8  Notice to Report be applied to individuals?

9      A.   None.

10     Q.   What about to families?

11     A.   None.

12     Q.   What about Expedited Removal as to

13  individuals?

14     A.   So, if we're able to --

15     Q.   Single adults.

16     A.   Yeah, yeah, yeah, you're talking single

17  adults.  You know, for those, for those single

18  adults who, you know, are originating from a country

19  to where we have, you know, the availability to be

20  able to remove or return them, then we'll place them

21  into an ER, an ER pathway and then, and then place

22  them into custody.  You know, transfer to ICE if ICE

23  has -- and, of course, this is dependent upon ICE

24  either having the availability, meaning the

25  detention space, or CBP having the available holding

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 111

1    space and capacity to be able to expeditiously

2    remove somebody, you know, you know, through,

3    through the ER pathway.  Right?  If we're able to

4    get somebody on a flight within 24 to 48 hours, like

5    I was just discussing earlier, we'll hold them

6    within our custody and get them to a flight line.

7        Q.    If you have a single adult where ER is

8    not -- they're not amenable to ER, what is typically

9    done at that point, what pathway?

10       A.    So, first off we'll determine if we're

11   going to prosecute them.  Right?  1325, 24, 26, it

12   just depends.  So, if we're going to, to prosecute

13   them, then they'll go -- you know, they could go

14   into a WA/NTA, which is your Warrant of

15   Arrest/Notice to Appear, you know, a WA/NTA type of

16   pathway, you know, we could place them -- you

17   know -- and, of course, that's going to be holding

18   them and then removing them.  This will be a

19   post-prosecution, by the way.

20             Or we could go like a 1326 where we're

21   reinstating a previous order of removal.  You know,

22   they may serve some jail time on the prosecution,

23   remain detained and then removed.

24             Or, you know, they could be placed into

25   MPP, which is a prime example as to what we're doing

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 112

1    right now as well, you know, and -- you know, those

2    are -- you know, they could be placed into NTA/OR or

3    even Parole ATD, just depending on the circumstances

4    surrounding that.

5            It's really is depending on the

6    circumstances with the individual as well as the

7    circumstances around what I consider is custody and

8    detention.

9       Q.   I think we've been over the circumstances

10   in which Expedited Removal would be applied to a

11   family unit.  I'm going to move to the next entry.

12           In what circumstances would Reinstatement

13   of Prior Order of Removal apply to an individual?

14      A.   When we have a previous order of removal

15   and we're reinstating it.

16      Q.   Can it be applied to a family unit?

17      A.   Individuals within the family unit, yes.

18      Q.   Okay.  And what circumstances would a

19   Warrant of Arrest/Notice to Appear-(detained) be

20   applied to an individual?

21      A.   There's a myriad of circumstances.  So,

22   this could be from anything from -- you know, from

23   prosecuting on a simple 1325, you know -- you know,

24   1324s if there -- you know, if there's some type of

25   criminality.  You know, again, I'll broadbrush it in

Page 113

1  regards to if there's a national security or border

2  security or criminal threat there where we're

3  seeking a prosecution or, or we're not -- you know,

4  we're going to place somebody into a detention

5  setting with ICE for, for a removal as well, you

6  know, due to whatever circumstance, criminal ICE

7  maybe one where we're not necessarily going to

8  prosecute for the 1325, but we're going to continue

9  to detain and remove, another example of that.

10         So, these would be all circumstances where

11  we would issue an WA/NTA.  And that's just an

12  example.  There's a myriad of different reasons.

13     Q.     Okay.  What about as a family unit?

14     A.     When would we put a WA/NTA in regards to a

15  family unit?

16     Q.     Correct.

17     A.     We're not right now.  There's no detention

18  for family units.

19     Q.     What about when is there a Voluntary

20  Return for individuals?

21     A.     And it's a Title 8 pathway, so Canada is a

22  perfect example, Mexico is another perfect example.

23  You know, if we encounter, you know, single adults

24  or families, you know, from those countries, you

25  know, we could place them into Voluntary Return,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 114

1    even children, to be honest, but it's just depending

2    certain circumstances depending -- surrounding that.

3    But, yeah, so Mexico or Canadian nationals.

4        Q.    What about under what circumstances would

5    you put an individual in MPP?

6        A.    So, if the individual in front of us is

7    claiming fear of returning to their home country but

8    not claiming fear of returning to Mexico -- Mexico's

9    the only country applicable, and in the geographic

10   areas that Mexico has agreed to be able to take back

11   MPP returns and were within the numerical limiting

12   framework that Mexico has restricted us to in

13   regards to MPP returns and an individual is not

14   excepted from MPP for a myriad of different reasons,

15   right, because of vulnerabilities, and that person

16   doesn't have fear of going back to Mexico, they

17   could be placed into MPP.   There's a lot of coulds

18   in there.

19       Q.    Is that the same for family units?

20       A.    We are currently not applying MPP to

21   family units.

22       Q.    And I'm going to drop another exhibit.

23             (Plaintiff's Exhibit 8 was received

24             electronically, marked for identification and

25             is attached hereto.)

Page 117

1    Release, yeah.

2         Q.   You referred to NTA/OR in the last 2022

3    statistics; is that accurate?

4         A.   Right, right, NTA/OR.

5         Q.   But there is an addition of the I-385.  Do

6    you see that?

7         A.   Yes.

8         Q.   So, what is I-385?

9         A.   So, an I-385, I believe, is -- we used to

10   call them like camp cards.  Essentially, it's,

11   basically, like an identification document.

12        Q.   So, why would I-385 be included here as a

13   processing disposition?

14        A.   So, it's, it's not a disposition.  So,

15   there is -- I didn't create the form, so I'm not

16   sure the ideology behind why it's numerically

17   created that way, but a, but a 385 is not a

18   processing disposition.  It's, basically, an

19   identification card.

20        Q.   Okay.  So, do you have any understanding

21   of why it would be included in this chart?

22        A.   I didn't create the chart, so I'm not sure

23   where it's included in this format.

24        Q.   Is this identification card, would it be

25   something that's completed for all of the other

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 118

1    processing pathways?

2         A.   So, so -- we call them camp cards.  Right?

3    So, it's created on numerous pathways, but an

4    I-385... an I-385 was utilized during this time

5    frame attached to the NTR process, the Notice to

6    Report process.  Because the I-385 was a form of

7    identification which would allow that individual to

8    be able to board a plane.  I'm recalling as I'm

9    sitting here.

10        Q.   Okay.  So, the numbers that are reflected

11   in this row for NTA/OR, I-385 include persons who

12   were released on a Notice to Report?

13        A.   Again, I didn't create this nor do I --

14   so, from looking at this, you know, it appears in

15   the nomenclature that 385 is included just from the

16   processing disposition header, but I can't speak to

17   the numbers.

18        Q.   Okay.  So, the Notice to Report was being

19   used in the time frame reflected in this chart,

20   correct?

21        A.   I believe that we, we started the Notice

22   to Report in the March time frame.

23        Q.   Okay.  And there's not a separate entry

24   related in the report; is that accurate?

25        A.   Not that it appears in the processing

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1    disposition drop down here.

2        Q.    Okay.  So, is it fair to assume that

3    anyone that was issued a Notice to Report would be

4    included in the NTA/OR column or row?

5        A.    That's what the name appears.

6        Q.    And going back to the PACR, HARP, ACA, are

7    those no longer in use?

8        A.    Correct.

9        Q.    Okay.  And what happened to those?  Why

10   are they no longer in use?

11       A.    They were discontinued.  The direction

12   from, from -- you know, from the department was that

13   we were going to cease the utilization of PACR and

14   HARP.

15       Q.    Do you know the reason?

16       A.    You'd have to ask the department, ma'am.

17       Q.    All right.  And then I'm going to drop

18   another exhibit.  This is Exhibit 9.  It is also

19   statistics pulled from CBP's website and this one is

20   for fiscal year 2020.

21           (Plaintiff's Exhibit 9 was received

22           electronically, marked for identification and

23           is attached hereto.)

24   BY MS. PATEL:

25       Q.    If you can turn to page 4.  Does this

Page 120

1    reflect all of the processing dispositions that were

2    available during this fiscal year?

3         A.    Going back to the same type of comment

4    earlier, it's not all, but those are the, the vast

5    majority.

6         Q.    Were all of these available to single

7    adults?

8         A.    Yes.

9         Q.    Were they all available to family units?

10        A.    Yes, to a degree, yeah, yeah.

11        Q.    What do you mean "to a degree"?

12        A.    Well, I'm not going to put a child into

13   Reinstatement of a Previous Order of Removal unless

14   a child has a removal, obviously, which is not

15   common.  But, yes, yeah.

16        Q.    Okay.  Did any of these require a family

17   unit to be detained?

18        A.    Yes.

19        Q.    Which ones required the family unit to be

20   detained?

21        A.    During this time period, you know, we did

22   have family detention, so we could place families

23   into an ERCF process and transfer them to ICE

24   custody.  HARP and PACR is applicable to families

25   and would have remained in CBP custody through their

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 121

1    asylum hearing, right, so their claim of fear

2    hearing.  ER would be applied.  MPP would be

3    applied.  Even NTA/OR would have been applied to

4    families as well.

5         Q.   Okay.  If we go back to Exhibit 8 for the

6    fiscal year 2021, I don't think I asked you, would

7    all of these processing dispositions have been

8    applied to single adults?

9         A.   We were not applying NTRs to single

10   adults.  Meaning the 385 piece of that number would

11   not have been single adults.

12        Q.   Okay.  Would all of these processing

13   dispositions have applied to family units?

14        A.   Yeah, again, same statement, right, you

15   know, to a degree in regards to the Reinstatement --

16   the Reorder -- Reinstatement of Order of Removal,

17   but, yes, yeah.

18        Q.   With any of these processing dispositions

19   would family units have been detained?

20        A.   Yeah.  Yeah.  Family units would have been

21   detained for -- or kept into custody I think is the

22   easier way to explain it, you know, for certain

23   aspects.  Right?  You know, HARP, PACR.  You know,

24   they would have remained into custody, application

25   for ER, much like they're doing now as well.  Just

Page 122

 1    to give you an example.

 2         Q.    Would they have been -- when you say

 3    "detained," I was referring to ICE, detained by ICE.

 4         A.    Okay.  So, ICE detention?

 5         Q.    Yes.

 6         A.    So, if they were placed -- again, I'll go

 7    back to -- so, I'm going to caveat it with you're

 8    going to have to check with ICE with regards to

 9    when -- you have to ask ICE when they, when they

10    switched family detention to single adult detention

11    in their facilities, but, you know, we were

12    detaining families for an ERCF process within ICE

13    holdings.

14         Q.    So, I think you mentioned earlier -- and

15    correct me if I'm wrong, but that the processing

16    times would vary depending upon the actual

17    processing disposition that was chosen; is that

18    accurate?

19         A.    Yes.

20         Q.    All right.  So, as we look back at Exhibit

21    7, the NTA/OR, what would the processing disposition

22    time typically be for an individual?

23         A.    An hour and a half to two hours.

24         Q.    What about for a family?

25         A.    Depends on the composition of the family,

Page 123

1    but per person it's going to, roughly, be an hour

2    and a half to two hours just depending.

3          Q.    What about for Parole + ATD for an

4    individual?

5          A.    About 15 minutes.

6          Q.    What about Parole + ATD for a family?

7          A.    Again, same thing, composition of the

8    family.  So, if you have two people in the family,

9    30 minutes.  You see where I'm going with that?

10         Q.    So, it would be 15 minutes per person?

11         A.    Yeah, roughly.

12         Q.    Okay.  What about how long would it take

13   to process Expedited Removal for an individual?

14         A.    Hour and a half.

15         Q.    What about for a family?

16         A.    Same thing, right, it's per person, right,

17   it's compounding.  Hour and a half for the adult, an

18   hour and a half for the child, you know.

19         Q.    Understood.

20         A.    To give you an example.

21         Q.    Okay.  And so, what about for

22   Reinstatement of Prior Order of Removal for

23   individual?

24         A.    Yeah, so that's a whole -- that's a

25   different process.  So, you're talking several hours

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

 1   somebody, you know, that we were trying to process

 2   somebody into and their country cannot accept them

 3   back, for instance, Cubans, Venezuelans,

 4   Nicaraguans, we would not be processing them under

 5   Title 42.

 6       Q.   Okay.  So, let's change it to

 7   circumstances in which we're only looking at Title 8

 8   processing disposition.

 9       A.   You know, I mean, the only -- I'd say the

10   time frames when -- so much of this is dependent

11   upon the circumstances of the individual in front of

12   us, but time periods when we would inherently have

13   to enact a different process is when somebody would

14   claim fear.

15       Q.   Okay.  So, as to the issue of pathways

16   that we discussed, is the person given

17   documentation -- for instance, if they're not -- if

18   they're not detained, if they're released, are they

19   given any type of immigration papers or documents

20   that show their status?

21       A.   That show their -- that they've been

22   released from custody, you mean?

23       Q.   Correct.

24       A.   Yes.

25       Q.   So, what type of documentation would they

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 129

1    receive under Parole + ATD?

2        A.   They would receive a copy of the

3    documentation demonstrating that they've been

4    paroled and then a G-56, which is a document which

5    provides them the locations of the various ICE

6    offices throughout the United States, along with

7    their addresses and contact numbers.  A document

8    that -- and all of this is incorporated within the

9    parole documentation.  A document that also

10   demonstrates or defines the conditions of the parole

11   as well as any ATD documentation.  That's what they

12   would ultimately end up having.

13       Q.   Would somebody -- I'm sorry.

14       A.   Go ahead.  I was going to go on an NTA/OR,

15   but go ahead.

16       Q.   That's exactly what I was going to ask you

17   about.

18       A.   Now, under an NTA/OR they are provided

19   with the documentation of their, their Notice to

20   Appear.  They're going to have a copy of, you know,

21   in essence, when, where, what time, date, location

22   they're to appear, you know, for their court

23   hearing.  They're also going to get a copy of pro

24   bono attorneys.  They are going -- you know, in case

25   they want to contact an attorney.  They're also

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 130

1    going to get information in regards to the closest

2    ICE offices, just like I was talking about earlier,

3    and a copy of what is considered their processing

4    paperwork, if you will.  So, it's a packet of

5    information.

6        Q.    And is this information given by border

7    patrol?

8        A.    Yes.

9        Q.    Does CBP ask where the family intends to

10   go when they're paroled or otherwise released into

11   the interior?

12       A.    Yes.

13       Q.    Okay.  And do they record that information

14   in a database?

15       A.    Yes.

16       Q.    Is that put in their FINS file?

17       A.    It's placed in their -- yes, to a degree.

18   I understand your question.  It is placed in the

19   data that is -- that is individualized to them.

20       Q.    Okay.  Do they inquire as to whether the

21   family members have any other family in the United

22   States?

23       A.    No, we do not get into sponsor

24   information, if that's what you're asking about, or

25   relative information.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 132

1    A.    Yeah, we don't, we don't, we don't ask

2    adults, right, regardless if they're a family unit

3    or a single adult, who they know in the U.S. and why

4    they're traveling to a certain area necessarily.

5    Necessarily.  Again, I go back to the interview may

6    go in that direction.  Again, based upon the

7    circumstances that that individuals who are

8    immigrating present, it may go that way, but it is

9    not dictated that it's going to go that way.

10    Q.    All right.  And I may have asked you this

11    already, but do you make a notation of where they

12    plan to resettle in your files?

13    A.    Yes.

14    Q.    All right.  For those families that are

15    paroled or otherwise released into the interior, are

16    they tracked in any way through a monitoring device?

17    A.    Yes.

18    Q.    Okay.  So, let's start with Parole + ATD.

19    Families that are released pursuant to Parole + ATD,

20    are they tracked?

21    A.    Yes.

22    Q.    How so?

23    A.    Through various ATD methodologies.

24    Q.    Can you describe those methodologies?

25          MR. DARROW:  Objection.  We have another

Page 133

1    witness who's going to speak to Parole + ATD.

2    If you're going to keep going down the Parole +

3    ATD with Chief Barker here, he can answer in

4    his personal capacity, but he's not speaking as

5    a Rule 36 witness for DHS.

6              MS. PATEL:  Understood.

7              MR. DARROW:  You can answer in your

8    personal capacity.

9         A.    I'm personally familiar with various ATD

10   methodologies.  Right?  Where people call and phone

11   into ICE and, you know, ankle bracelets or phones,

12   you know, that they utilize, but I really defer you

13   to ICE and the specifics of the ATD program.

14     BY MS. PATEL:

15        Q.    I mean, do you have a general idea of the

16   types of tracking devices that are used?

17        A.    I just, I just gave them.  You know,

18   again, you know, cellular, like a phone, ankle

19   bracelet, you know -- you know, people who call in,

20   show in certain dates and times, that type of thing.

21   But that's just my general knowledge of that.  I

22   mean, I really defer you to ICE in regards to ATD

23   methodologies and all that kind of stuff.  That's is

24   truly their program.

25        Q.    All right.  Are single adults -- I'm

Page 134

1    sorry.  So, yeah, are single adults under Parole +

2    ATD also given tracking devices, the same type of

3    tracking devices that you just mentioned?

4          A.    Yeah, I mean, again, I'd defer you to ICE

5    in regards to what methodologies they're applying to

6    single adults versus families.  I'm assume that's

7    your next question.  It just -- really, I defer you

8    to ICE on what they're applying and the reasoning

9    why.  That's all their -- that's their program,

10   their policy, their procedures, their protocols.

11   That's all their stuff.  You know, with that, I'm

12   just aware of tracking of both families and single

13   adults by those methodologies I just said.

14         Q.    What about for persons who have an NTA/OR?

15         A.    ATD is not inclusive or mutually exclusive

16   of processing pathway.  So, we have absolutely

17   released people on an NTA/OR with ATD.  Right?  ATD

18   is just a tracking methodology, not a processing

19   pathway.

20         Q.    Okay.  So, I'm not sure that I'm clear as

21   to what you were just saying.  I guess my

22   question -- and maybe your answer was responsive,

23   but my question was, those who are released on their

24   own recognizance, are they also tracked?

25         A.    So, the... the application of ATD in an

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 135

1   NTA/OR processing pathway is not necessarily

2   inclusive.  Right?  Just because I'm processing an

3   NTA/OR doesn't mean that ICE is going to attach ATD

4   on somebody, but it doesn't mean that they won't.

5   ICE can, if they decide to, place ATD on an

6   individual released on NTA/OR.  So, they're not

7   mutually exclusive or, you know, inclusive, either.

8   Like, it's dependent upon the circumstances, which

9   is really ICE's decision if they're going to place

10  somebody on ATD intensive.  The reason why I'm --

11  I'm trying to answer the best I can, but I really

12  defer you to ICE in regards to that decision-making

13  process and how they're -- and what they're doing

14  with it.

15      Q.   So, if ATD is an ICE decision-making

16  process, then why is it that, for instance, on

17  Exhibit 7, which has U.S. Border Patrol Monthly

18  Southwest Border Encounters, Parole + ATD is listed

19  with numbers for the number of people who are

20  processed under the Parole + ATD?

21      A.   Sure.  So, that is, that is ultimately

22  when ICE is, in essence, placing ATD on somebody who

23  we are processing for parole.  Right?  So, it's the

24  tracking mechanism that is associated with it.

25      Q.   All right.  Is the November memo the only

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 145

1   Notice to Appear and migrating over to a Parole +

2   ATD in the -- you know, so that -- that's my -- that

3   was my involvement, if you will, in helping, I'll

4   say, or being involved in crafting of this

5   operational guidance memo.

6        Q.   And prior to this operational guidance

7   memo, were families being paroled or released into

8   the interior?

9        A.   Were families being -- are you talking

10  about the, the Parole + ATD aspect of families, you

11  know, when we started utilizing it in the July time

12  frame?  Is that what you're asking for?  And I'm

13  trying to understand your question.

14       Q.   What do you mean "in the July time frame"?

15       A.   So, so, you know, basically, when we

16  started attaching NTRs and -- excuse me, attaching

17  Parole ATDs to those individuals we were placing on

18  parole would have been roughly around in July.  This

19  memo coming out, you know, I'll say formalizing

20  Parole ATD, if you will, under Chief Ortiz's

21  signature in November.  I guess that should probably

22  be the more direct answer for you.

23       Q.   Okay.  So, this guidance or what is

24  described in this guidance started in July of when?

25  2021?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 146

1    A.    Yes, yes.  So, it would have been roughly

2    that time frame when, when we started, you know,

3    collectively between CBP and ICE utilizing the ATD

4    portion of the parole, if you will.

5    **Q.    Okay.  And then it wasn't formalized until**

6    **November of 2021?**

7              MR. DARROW:  Same objections.

8              You can answer from your personal

9         capacity.

10   A.    That's when the memo was, was, was

11   completed.

12     BY MS. PATEL:

13   **Q.    Okay.  Prior to this memo, were there any**

14   **trainings or instructions provided to staff as to**

15   **how to implement what is the process that is**

16   **described in this guidance?**

17             MR. DARROW:  Same objection.

18             You can answer from your personal

19        capacity.

20   A.    You know, there, there is the, the March

21   2021 NTR guidance that was put out, I believe, at

22   that period of time under Chief Rodney Scott's

23   signature.  You know, that was, that was the

24   guidance at that period.

25     BY MS. PATEL:

Page 147

1    Q.    Okay.  So, the NTR policy is reduced to

2    writing?  NTR practice is reduced to writing?

3    A.    I guess I'm not understanding what the

4    question is.  It doesn't -- is there a question,

5    ma'am?  I apologize.

6    Q.    Yeah.  You were talking about the NTR

7    guidance.  Is that a written document?

8    A.    It's the one that's referring to the

9    document that you're, you're seeing here.  Right?

10   "...the prosecutorial discretion and issuance of

11   NTRs as issued in March of 2021."

12   Q.    Okay.  Was there any specific training

13   that border patrol officers received on the process

14   described in this November 2nd memo prior to this

15   memo being formalized?

16          MR. DARROW:  Same objection.

17          You can answer from your personal

18          capacity.

19   A.    So, there, there -- you know, there's a

20   written guidance of NTRs, right, that came out in

21   March 2021, you know, and that is the processing,

22   you know, I-385, G-56.  There was -- there's no

23   written guidance -- again, I'm going to go back to

24   attaching, you know, the monitoring mechanism of the

25   ATD is really ICE, so I defer you to ICE.  But, you

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 148

1    know, during that time period, you know, previous to

2    November, like July I was just talking about, is

3    when ICE started really, I'll say, attaching the ATD

4    monitoring mechanisms to those who were, who were

5    getting processed for, for release.  Hence, the

6    creation of the Parole ATD application.

7       BY MS. PATEL:

8       Q.   Okay.  I understand that, but was there

9    any training in July that occurred, around July of

10   2021?

11      A.   You'd have to -- you'd have to ask ICE, I

12   mean, how they trained their people to attach ATD.

13   ATD is not a CBP program, so I'd really defer to

14   ICE.

15      Q.   Okay.  Who makes the decision to use a

16   tracking device?

17      A.   You've got to talk to ICE on that one.

18   That's their -- that's their program.

19      Q.   Okay.  So, does that mean that CBP does

20   not make a decision whether to use a tracking

21   device?

22      A.   That's completely ICE's decision.

23      Q.   Okay.  So, prior to the use of Parole +

24   ATD, were families being processed and released

25   under NTA/OR?

Page 149

1    A.    Yes.

2    Q.    Okay.  Was there any other mechanism that

3    families were being processed and released into the

4    interior?

5    A.    So, you know, in certain circumstances,

6    you know, the, the border patrol has utilized parole

7    for humanitarian reasons as well.  An example of

8    that would be, for instance, if somebody, you know,

9    has an extremely serious injury is a prime example.

10   You know, they fall from a fence or, you know -- you

11   know, had a tragic accident in, you know, a

12   smuggling load or something along those lines.  And

13   I -- just to give as an example.  You know, we may,

14   we may place and effectuate humanitarian parole of

15   that individual.  You know, parole is applied on an,

16   on an individual case-by-case basis and thereby, you

17   know, is contingent upon the circumstances

18   surrounding that individual's, you know, situation.

19   Q.    Okay.  Are there any other instances in

20   which you would provide humanitarian parole other

21   than for medical reasons?

22   A.    Oh, of course.  Of course.  I mean, it --

23   it just depends on the circumstances that are, that

24   are surrounding it.  You know, we've had individuals

25   who have, you know, shown up to -- you know, at the

Page 150

1    border with, with, you know, bullet wounds.  We've

2    had -- I mean, just it -- you know, there are just

3    different circumstances.  Right?  I mean, the vast

4    majority of them are, are all medical related.

5         Q.    Okay.  I'm just tying to figure out

6    whether there's, like, an unfettered discretion in

7    when to provide humanitarian parole or whether

8    there's any confines of criteria with respect to

9    that?

10        A.    So, you know, again, I go back to the

11   case-by-case basis.  Right?  So, there's -- it's not

12   what I would consider as unfettered, by any means.

13   I mean, when we you take a look at each individual

14   circumstance that's presented to us, you know, we

15   attempt to detain or remove those individuals, you

16   know, it may be other circumstances with that

17   individual detention or capacity which drive us to

18   utilize different pathways.

19        Q.    So, whether you use humanitarian parole

20   could also be driven by detention capacity?

21        A.    True, could be.

22        Q.    How often does that happen?

23        A.    So, the, the -- you know, the

24   circumstances which we face -- and it's actually

25   noted in the memo that you just sent us -- with

Page 151

1   COVID-19 would be, would be a case in point of a --

2   you know, a humanitarian utilization of Parole ATD,

3   right, in order to be able to rapidly decompress,

4   decompress our, our detention facilities or, you

5   know, our custody and holding numbers because of the

6   pandemic.

7            You know, I'll be honest with you, we've

8   lost 19 border patrol agents to COVID, COVID deaths,

9   you know, directly associated with COVID that they

10  have contracted on duty working in, you know,

11  facilities which are, which are well over capacity

12  and in that congregate setting, you know, creating a

13  significant life and safety risk to the agents,

14  officers, migrants and professional staff that are

15  all being detained there.

16           So, so, I'll be honest, sitting here as

17  the Chief of Operations, having spent, you know, 21

18  plus years in a green uniform working on the border,

19  19 deaths that, that are associated with, you know,

20  a public health pandemic due to overcrowding within

21  our facilities is something that we take direly

22  seriously not only for the agents, but for the

23  migrants and the professional staff working in that

24  environment as well.

25       Q.    Okay.  I believe you previously testified

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 163

1    to this document.

2             So, what instructions has CBP been given

3    since January 20, 2021 regarding the detention of

4    applicants for admission at the Southwest Border?

5        A.   Are you talking about out of port of

6    entry?

7        Q.   Let's start with between a port of entry.

8        A.   It's exactly what I just referred earlier.

9    So, you know, we will, we will utilize all the

10   processes in order to, to detain, remove, expel, you

11   know, or in some circumstances release individuals

12   based upon the processing pathways and the

13   circumstances of that individual's time in custody.

14   There is no -- there is no change, I would say, in

15   regards to necessarily how we're doing business.

16       Q.   Okay.  Well... were any specific

17   instructions given regarding family units?

18       A.   No, no, just the normal processing

19   pathways which we described earlier, and that's what

20   would be applicable to family units.

21       Q.   Okay.  Have any instructions been given

22   since January 20, 2021 regarding a preference for

23   one of the pathways that we had discussed over the

24   other pathways?

25       A.   No.  No, I mean, it would -- again, I go

Page 164

1    back to, you know, the first thing we'll take a look

2    at is if somebody's applicable to Title 42.   If

3    they're not applicable to Title 42, we will look to

4    detain or remove them, and, you know -- and then

5    after that we'll take a look at the various

6    circumstances that might be applicable to that

7    individual or family.   I guess you were talking

8    about family.

9         Q.   Okay.   Is there a greater preference to

10   use orders of recognizance?

11        A.   So, that is -- you know, I would say if we

12   are, if we are faced with the circumstances where

13   somebody is going to be released and the myriad of

14   circumstances that we spoke about earlier, our, our

15   primary or principal avenue in which we will process

16   somebody for that release pathway is going to be an

17   NTA/OR, right, but, again, caveated with when

18   applicable in the myriad of circumstances we

19   described earlier.

20        Q.   All right.   Is there a greater preference

21   to use of parole?

22             MR. DARROW:   Objection.   Can you clarify,

23        a greater preference as to when?

24   BY MS. PATEL:

25        Q.   From January 20, 2021 to present, has

Page 165

1    there been a greater preference to use parole?

2        A.   So, there is -- there's not a

3    preference -- the preference still remains to

4    utilize NTA/OR, to be honest.  I mean, that's the

5    preference.  If, if it is a circumstance that is

6    going to result in having to utilize a pathway which

7    will result in a release, i.e., an NTA/OR, that is

8    the preferred pathway.

9        Q.   And why is that the preferred pathway?

10       A.   Because that person is provided a Notice

11   to Appear with a date, time, place, location to be

12   able to appear in front of a, of a judge.

13       Q.   Okay.  Since January 20, 2021, has there

14   been a preference against using Expedited Removal?

15       A.   Only since we've been enjoined.  So, you

16   know, Expedited Removal or ER when applicable has

17   definitely been utilized and will continue to be

18   utilized.  We're currently on a -- and by no means

19   am I an attorney, you know, but we are currently

20   under a TRO in -- you know, to utilize Title 42 and

21   not utilize other pathways like ER, so we continue

22   to utilize Title 42, but we absolutely utilize an ER

23   pathway when we can.

24       Q.   Okay.  Since January 20, 2021, have any

25   pathways been added?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 167

1  the circumstance of the individual in front of us as

2  well.

3       Q.   I just want to -- a point of

4  clarification.  For Parole + ATD, when it comes to

5  family units, is that applied to families regardless

6  of their nationality?

7       A.   So, it -- Parole + ATD may be applied,

8  and, and at this point in time, you know, the

9  nationalities in which we are applying Parole ATD

10 are Cubans, Venezuelans and Nicaraguans because we

11 have no return rights to those countries, either.

12 We can't send them back.

13           If we have a return mechanism in order to

14 be able to send somebody back to another country --

15 I'll just use Colombia as an example -- you know, we

16 will process them accordingly and, and return them

17 to the best of our ability.  Guatemala is another

18 prime example of a country, you know, that we have

19 return rights to.  Right?  So, if we're able to

20 return somebody to their home country, then we will,

21 we will place them into a removal type proceeding.

22      Q.   Okay.  So, as of right now, it's only

23 being applied to those nationalities that you just

24 mentioned; is that fair?

25      A.   So, yes, by and large to those, those

Page 177

```
 1      cost.  I'm asking if he believes that

 2      immigration enforcement reduces cost to the

 3      states.

 4         A.   I couldn't tell you if it does or it

 5   doesn't.  I guess a lessening flow of migration may

 6   have a -- I'm pulling, I'm pulling at straws here --

 7   a lesser impact.  I couldn't quantify as to what

 8   that is or even speculate to be honest.

 9     BY MS. PATEL:

10         Q.   Okay.  Is it the Federal government's job

11   to enforce immigration law?

12         A.   Yes.

13         Q.   Can states enforce immigration laws

14   themselves?

15         A.   Not that I'm aware of.

16         Q.   Okay.  Do you believe that you have a duty

17   to enforce immigration law?

18         A.   Yes.

19         Q.   Do you believe that part of that duty is

20   preventing harm to the states and the people who

21   live in them?

22         A.   My duty is to protect the borders and

23   enforce immigration and criminal statutes, you know,

24   at the border.

25         Q.   Okay.  So, I'll ask again.  Do you believe
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 178

1    that part of the duty is preventing harm to the

2    states and the people who live in them?

3         A.    So, protecting those people or those

4    individuals in the state from any harm that could

5    befall them from somebody that crossed the border,

6    absolutely.

7         Q.    Does DHS consider the cost to the states?

8    Have they considered the cost to the states?

9              MR. DARROW:  Objection, vague.  In what

10             circumstances are you talking about?

11   BY MS. PATEL:

12        Q.    Well, does DHS have any information on

13   whether states will be financially impacted by the

14   release of tens of thousands of aliens into the

15   interior?

16        A.    So, I personally don't, but I, you know --

17   you know, I have absolutely been in discussions to

18   where the discussions surrounding the states, the

19   impact to the states of migration or migrants who

20   are released, as well as the impacts to the

21   nongovernment organizations that, that help service

22   both the state as well as the migrants in those

23   conditions, you know, have discussed various impacts

24   to them as well as the governments.  You know, and

25   mainly DHS through FEMA through the ESFP funding,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 179

1    which is the Emergency Supplemental Food and Shelter

2    funding, to the states has been discussed as well.

3    As to what those impacts are, the financial gravity

4    of what those may be or the financial assets that

5    are provided to the NGOs, that I don't have any

6    scope on.

7        Q.   So, what is your understanding as to

8    whether the states are impacted by DHS's release of

9    tens of thousands of people into the interior?

10           MR. DARROW:  Objection.  Are you asking

11       his understanding as an individual fact witness

12       or DHS's understanding?

13           MS. PATEL:  DHS's understanding.

14       A.   So, again, I go back to kind of my, my

15   statement a minute ago.  You know, I, I am generally

16   familiar with the concerns of various what I would

17   consider as border states in regards to, you know,

18   some of the financial impacts or strains upon the

19   state and/or the NGOs, those nongovernment

20   organizations, but what the specific constraints

21   are, specific impacts are I -- it's just not the

22   avenue that I -- that I am involved in.

23   BY MS. PATEL:

24       Q.   Okay.  So, you're speaking specifically as

25   to border states, meaning those states that are

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 180

1    along the Southwest Border?

2        A.   Well, I think it's, it's a broader -- let

3    me redefine and just say states period, because it's

4    been -- you know, I've been in conversations with --

5    and it was discussed beyond the border state area.

6        Q.   Did DHS consider the impact of closing the

7    family detention centers on the states?

8            MR. DARROW:   I'm going to object to that

9            as well as this witness has testified

10           detention -- family detention -- detention of

11           families is an ICE topic, which you will have

12           an ICE person to speak to, but more

13           importantly, the court's order said that you

14           can ask about consideration for, quote,

15           non-detention policies, not closing family

16           detention centers.

17           MS. PATEL:   We think they're interrelated.

18    BY MS. PATEL:

19       Q.   So, please, go ahead and answer if you

20    can.

21       A.   I defer to ICE.

22           MS. PATEL:   All right.  So, Joe, I think

23           that Chief Barker here was designated to talk

24           to Topic Number 9.  So, is the ICE witness

25           tomorrow going to be able to answer this

Page 188

1      A.    I have seen people identify that the

2    subjects are claiming fear.

3      Q.    Okay.

4      A.    It's because there's a CIS mechanism that

5    gets, you know, started, if you will, when that

6    happens.

7           (Plaintiff's Exhibit 14 was received

8           electronically, marked for identification and

9           is attached hereto.)

10   BY MS. PATEL:

11     Q.    I'm going to drop another exhibit.  This

12   is Exhibit Number 14 and it's DHS's response to

13   Florida's interrogatories, and if you could turn to

14   page 5, the response to our interrogatory number 4.

15   I'll give you a minute to read it.

16     A.    All right.  Gotcha.

17     Q.    Okay.  So, that last sentence says, "In

18   addition, CBP assesses whether each individual

19   applicant for admission may be considered for

20   release on a case-by-case basis."  What is this

21   referring to?

22     A.    So, it's, it's what I was talking about

23   earlier.  Right?  I mean, it's -- you know, each

24   individual who, who we are encountering between the

25   ports of entry or even at the ports of entry, right,

Page 189

1   that's an applicant for admission.  Right?  So, we

2   are, we are determining, you know, on a case-by-case

3   basis what pathway we're going to place that

4   individual into.  Again, I go back to the Title 42,

5   determining if somebody is a border security,

6   national security threat, you know, are they

7   removable, returnable back to their country, you

8   know, what processing pathway is applicable with the

9   TIC time and the detention capacity capabilities of

10  both the sector as well as ICE.  You know, all of

11  these different degrees of factors go into

12  determining that case-by-case basis.

13       Q.   Okay.  Under the NTA/OR that we were

14  previously discussing, do you obtain a warrant for

15  arrest?

16       A.   No, I do not believe a, a warrant for

17  arrest is in an NTA packet.

18       Q.   Okay.  And in the Warrant for Arrest/NTA -

19  detained, in that case a warrant for arrest is

20  obtained, correct?

21       A.   Yes.

22       Q.   Under what circumstances would you get a

23  warrant for arrest?

24       A.   Most often when they're, when they're

25  getting detained and prosecuted.

Page 198

1    available to people who are released into the

2    interior?

3         A.    I don't know.

4              MS. PATEL:  Okay.  I think I have no

5         further questions for the 30(b)(6) component of

6         this deposition, so, Mr. Darrow, if you have

7         any follow-up.

8              MR. DARROW:  Yes.  Just briefly and then

9         we're going to switch over to fact witness

10        time; is that correct?

11             MS. PATEL:  Correct.

12                       CROSS-EXAMINATION

13    BY MR. DARROW:

14        Q.    Chief Barker, when you testified a bit

15    before that we were -- and I don't want to

16    paraphrasing incorrectly, but that you had seen that

17    there were more parole dispositions since January

18    20, 2021, was that due to any policy telling you to

19    use parole more often?

20        A.    No.

21        Q.    What would you describe -- the use of

22    parole more frequently, what were the causes with

23    respect to that?

24        A.    That directly related to the aspect of,

25    you know, we're seeing increased migration to very

Page 199

1   specific geographical locations along the Southwest

2   Border, principally Del Rio and Yuma right now -- it

3   was RGV, Del Rio and Yuma, but Del Rio and Yuma

4   right now -- with the population which cannot be

5   removed or returned back to their home country,

6   which is, which is, you know, Cubans, Venezuelans

7   and Nicaraguans.

8           You know, coupled with at the rate that we

9   are encountering and -- you know, and the extremely

10  high, you know, detention rates that we have within

11  the stations and the processing centers in those

12  locations, dangerously high, you know, custody

13  numbers and exaggerated TIC times or high TIC times,

14  you know, the utilization of Parole ATD was

15  utilized -- or is utilized in order to be able to

16  rapidly what I would consider is decompress in

17  selected populations where, again, we have really

18  either no ability to detain or no ability to remove,

19  either.  So, that, that would be utilization of, of

20  the Parole ATD during those time frames that you're

21  referring to.

22      Q.   And even in scenarios -- I should say in

23  scenarios where the high TIC times and high

24  decompression rates helps lead to Parole ATD, does

25  that necessitate, then, that a particular individual

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 200

1   will be realized?

2       A.    Absolutely not.  You know, very

3   specifically it's based upon the circumstances of

4   the individual there.  You know, so it does not

5   dictate that in any way.  You know, as a matter of

6   fact, quite conversely.  You know, one of the things

7   that I had said a couple times so far is that, you

8   know, our first principal, you know, course of

9   action is to try and expel someone, and if not, then

10  it is to detain or remove -- you know, detain and

11  remove someone.  So, return or remove.

12          You know, so, so, those are the actual

13  principal mechanisms which we rely on.  You know,

14  for lack of better terms, we're utilizing Parole ATD

15  as an, as an emergency mechanism, you know, a course

16  of last resort, for lack of better terms, in order

17  to be able to rapidly decompress the holdings in

18  woefully overcrowded detention centers with high --

19  or detention facilities, if you will, or processing

20  facilities.  You know, that's, that's what we're

21  utilizing it for.

22          MR. DARROW:  I don't have any more

23      questions.

24          MS. PATEL:  I do have some brief redirect.

25                  REDIRECT EXAMINATION

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 201

1     BY MS. PATEL:

2        Q.    You just testified that the increase in

3     parole decisions is not due to a policy, but that it

4     was in part due to increased migration; is that

5     correct?

6        A.    Tell me that's -- again, I mean, that's

7     one facet of several facets that I just described,

8     right, so it's not just migration.  You know, it's,

9     it's very concentrated high flows of illegal

10    migration in very specific geographical areas of a

11    very specific demographic of which we have either no

12    ability to detain or no ability to remove as well.

13    Right?  So, it's,it's that complexity which has

14    created, you know, extremely high TIC times, you

15    know, time in custody time, extremely high

16    capacities with the very specific population.

17              With that being said, even with those

18    pieces involved, it's still based on a case-by-case

19    basis of the conditions of the individual who's

20    presented in front of us.

21       Q.    Is it fair to say that closing family

22    detention centers has, has led to an increase in

23    releases on parole or on an order of recognizance?

24              MR. DARROW:  I'm going to object as beyond

25         the scope of this witness' testimony, but he

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 207

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT
ENTER CHANGES ON THIS PAGE

In Re:  State of Florida vs. United States of
America, et al.
Case No.:  3:21-cv-1066
TONY BARKER (259222)
July 13, 2022

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 25 | 4, 12 | "Senoita" should be "Sonoita" | typo |
| 27 | 5 | missing word between "ultimately" and "and" | typo |
| 33 | 23 | "Director" should be "Directorate" | typo |
| 42 | 20 | Phonetic word is: LEOD | typo |
| 69 | 8 | "of immoral" should be "involving moral" | typo |
| 69 | 19 | "suspicious" should be "suspicion" | typo |
| 70 | 7 | "older" should be "younger" | typo |
| 77 | 20 | "Ms. Poon" is incorrect. Unclear who speaker was. Likely a Florida attorney. | typo |
| 91 | 17 | Missing word  after "and/or." Could be bus | typo |
| 185 | 15 | "legal alien" should be "lawfully admitted" | typo |
| 187 | 3 | "polled" should be "pulled" | typo |

_____

_____

_____

_____

Under penalties of perjury, I declare that I have
read the foregoing document and that the facts
stated in it are true.

  08-15-22                   _____
Date                        TONY BARKER