State of Florida

vs.

United States

---

Deposition of:

Tony Barker

August 25, 2022

*Vol 1*

---



PHIPPS REPORTING

*Raising the Bar!*

Tony Barker
August 25, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO.:  3:21-CV-1066

STATE OF FLORIDA,

    Plaintiff,

vs.

The UNITED STATES OF AMERICA; ALEJANDRO
MAYORKAS, Secretary of the United States
Department of Homeland Security, in his
official capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity; U.S.
CUSTOMS AND BORDER PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration and
Customs Enforcement, in his official
capacity; U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT; UR M. JADDOU, Director of U.S.
Citizenship and Immigration Services, in her
official capacity; U.S. CITIZENSHIP AND
IMMIGRATION SERVICES,

    Defendants.

_____/


REMOTE VIDEO-RECORDED DEPOSITION OF

TONY BARKER,
As Corporate Representative
of United States Department of Homeland Security,
Pursuant to Rule 30(B)(6)

Thursday, August 25, 2022
12:20 p.m. - 2:44 p.m.

Remote via Zoom
Washington, D.C.

Stenographically Reported By:
Cassie O. May, RPR, RMR
Job No.: 268754

Tony Barker
August 25, 2022

Page 2

```
 1    APPEARANCES VIA ZOOM:

 2
      On behalf of Plaintiff:
 3
           OFFICE OF THE ATTORNEY GENERAL
 4         The Capitol, PL-01
           Tallahassee, Florida  32399
 5         BY:  ANITA J. PATEL, ESQ.
                anita.patel@myfloridalegal.com
 6
      On behalf of Defendant United States Department of
 7    Homeland Security:

 8         OFFICE OF IMMIGRATION LITIGATION
           450 5th Street NW
 9         Washington, D.C.  20001
           BY:  ERIN T. RYAN, ESQ.
10              erin.t.ryan@usdoj.gov

11    On behalf of Defendant United States of America:

12         DEPARTMENT OF JUSTICE
           P.O. Box 868
13         Ben Franklin Station
           Washington, D.C.  20044
14         BY:  JOSEPH ANTON DARROW, ESQ.
                joseph.a.darrow@usdoj.gov
15
      On behalf of Defendant Department of Homeland Security:
16
           DEPARTMENT OF HOMELAND SECURITY
17         Office of the General Counsel
           2707 Martin Luther King, Jr. Avenue SE
18         Washington, D.C.  20528
           BY:  KAITLYN CHARETTE, ESQ.
19
      On behalf of Defendant U.S. Customs and Border
20    Protection:

21         U.S. CUSTOMS AND BORDER PROTECTION
           Office of Chief Counsel
22         1300 Pennsylvania Avenue, Suite 4, 4-B
           Washington, D.C.  20229
23         BY:  SAMANTHA POON, ESQ.
                STEPHANIE MUFFETT, ESQ.
24

25    ALSO PRESENT:  Richard McNulty, Videographer
```

Page 3

1                          EXAMINATION INDEX

2

3    Testimony of Tony Barker

4        Direct Examination by Ms. Patel              5
         Cross-Examination by Ms. Ryan               81
5        Certificate of Oath                         87
         Certificate of Reporter                     88
6        Errata Sheet                                89
         Witness Review Letter                       90
7

8                          EXHIBIT INDEX

9

10   EXHIBIT NO.                                  PAGE NO.

11   1    Plaintiff State of Florida's Second          7
          Amended Notice of Taking Rule 30(B)(6)
12        Deposition of Defendant United States
          Department of Homeland Security
13
     2    CBP Administrative Document for July 18th    9
14        policy
          SAR0001 through SAR0157
15
     3    Certified Administrative Record from ICE    56
16        SAR0158 through SAR0273

17   4    03/24/21 e-mail re: Update 3:               77
          Prosecutorial Update Authority
18        USA 002419 through USA 002423

19

20        STENOGRAPHER'S NOTE:  Four (4) exhibits
     received electronically, marked for identification
21   and attached hereto.

22

23

24

25

Tony Barker
August 25, 2022

1     Q    Okay.  Have you spoken to any of DHS's other

2  witnesses regarding the testimony that they gave?

3     A    No.

4     Q    Okay.

5     A    I couldn't even tell you who they are.

6          (Exhibit No. 2 was received electronically,

7          marked for identification, and is attached hereto.)

8  BY MS. PATEL:

9     Q    Okay.  So I dropped another exhibit into the

10  chat.  Let me know when you have it pulled up.  It's a

11  bigger document.

12     A    Yeah, that 160-page document.  Yes, I am

13  familiar.

14     Q    Okay.  So you are familiar with this?  Can you

15  identify the document for me?

16     A    Yeah.  It should be the record that was --

17  that was provided.

18     Q    Okay.  So is this the U.S. Customs and Border

19  Patrol administrative record for the July 18th policy?

20     A    Yes, yes.

21     Q    Okay.  And so it looks like you attested that

22  this -- that that record contains all the non-privileged

23  documents that were considered; is that accurate?

24     A    Those were the -- yeah, those were the

25  non-privileged documents that were considered in the

Tony Barker
August 25, 2022

1  creation of the memo, yes.

2      Q     And you signed this document on August 15th;

3  is that accurate?

4      A     Yes.

5      Q     Okay.  And since that date, has any other

6  non-privileged documents come to your attention that

7  should be part of this administrative record?

8      A     Not that I'm aware of.

9      Q     So this document has Bates stamp numbers at

10  the bottom.  I am going to refer to those Bates stamp

11  numbers.

12     A     Yep.  I'm familiar with what you are talking

13  about.

14     Q     Okay.  So let's start with SAR0001 to 0004.

15     A     The memo.

16     Q     Yes.  So this is a copy of the July 18th

17  Parole + ATD memo; is that correct?

18     A     Yes, ma'am.

19     Q     All right.  When did you first become aware of

20  this memo?

21     A     Prior to -- prior to July 18th as we were --

22  what I would consider is, you know, considering what

23  the -- what we needed to put in a new guidance memo for

24  Parole ATD just based upon some best practices, lessons

25  learned, and the flow which we were receiving at that

Tony Barker
August 25, 2022

1    point in time and continue to receive now.

2            So it would be prior to that date.  I can't

3    remember the exact date we started talking about a new

4    memo.

5       Q    Okay.  Was it in that same month of July or

6    was it before then?

7            MS. RYAN:  Objection.  You can answer.

8       A    So that was the ATD -- it had to be in June,

9    but it wouldn't have been -- you know -- I can't -- I

10   don't think it was much probably before June if there

11   was any time period, but I'm not sure of the exact date.

12   BY MS. PATEL:

13      Q    Okay.  And how did you become aware of it?

14      A    As we were working collectively to draft the

15   new guidance.

16      Q    Who informed you that there would be new

17   guidance?

18      A    Well, I was part of the team that was going to

19   draft the new guidance to be able to provide us

20   additional operational -- what I would consider as

21   operational flexibility in the application of Parole

22   ATD, you know, so I was in the initial discussions.

23      Q    Okay.  Was -- did someone in particular have

24   an idea to put the document together?

25           MS. RYAN:  Objection.  I am just going to

Tony Barker
August 25, 2022

1          direct the witness to not say anything that is

2          deliberative process privileged.

3          A     Can you repeat the question?

4     BY MS. PATEL:

5          **Q     Yes.  Is there someone in particular that**

6     **wanted to put a new document together?**

7          A     No -- well, I mean collectively, CBP as well

8     as ICE as components wanted to put the new -- the new

9     guidance memo together.  There is no one singular

10    person.  I mean, I wanted -- I personally wanted

11    additional flexibility in how we were applying Parole

12    ATD.  That was some of the impetus in regards to why we

13    were creating a new version.

14         **Q     What type of flexibility did you want to see?**

15         A     So just operational flexibility.  One of the

16    fundamental challenges between the last memo, the last

17    guidance that we spoke about, and this new memo which

18    you are referencing right now on July 18th is the fact

19    of it doesn't only -- I will say identify within the

20    triggers that a sector may be over a hundred percent

21    capacity but more so also takes into consideration the

22    Centralized Processing Centers along the Southwest

23    Border, thereby you could have a sector that may not be

24    a hundred percent over capacity in an aggregate level

25    but at the central processing area or center, CPC, they

Tony Barker
August 25, 2022

Page 13

1    could be over a hundred percent and thereby trigger the

2    application of Patrol ATD.

3          There is other triggers obviously involved,

4    but just talking about the operational flexibility, that

5    would provide additional flexibility for the application

6    of Patrol ATD for the decompression methodologies that

7    we have previously discussed.

8    **Q   So when was the decision made to rescind the**

9    **November 2nd memo?**

10   A   July 18, 2022.  I mean, that is -- this is --

11   when we made the memo, it rescinded -- when we signed

12   the memo and issued the memo, it rescinded the other one

13   because it created new triggers.

14   **Q   Okay.  And so do you have an understanding as**

15   **to the circumstances that led to the issuance of this**

16   **memo?**

17         MS. RYAN:  Objection.  I am going to direct

18         the witness not to answer.  That's deliberative

19         process.

20         MS. PATEL:  Can you provide some explanation

21         as to why that's deliberative process.

22         MS. RYAN:  You are asking why the memo was

23         issued.

24   BY MS. PATEL:

25   **Q   What specific problems was this new memo**

Tony Barker
August 25, 2022

Page 15

1   Texas, you know, and those are Centralized Processing

2   Centers.

3          El Paso Sector, as an example, has one

4   Centralized Processing Center that is -- that is, you

5   know, near their sector and stationed in El Paso proper.

6          So every sector has one, and each sector will

7   utilize their Centralized Processing Center, you know, I

8   will say as a -- as a centralized processing location

9   where multiple assets and multiple agencies are brought

10  in in order to be able to process the migrants we

11  encounter.

12     **Q    Okay.  And so how does this memo address --**

13  **strike that.**

14          **How does this memo alter the way decompression**

15  **occurs in comparison to the November 2nd memo?**

16     A    So it's not going to alter the decompression,

17  so the methodologies will all remain the same.  The

18  triggers to utilize or not utilize Parole ATD are, I

19  will say broadened, if you will, with this memo in the

20  fact of in the previous memo that was rescinded, it was

21  just based upon, as one of the triggers, that a sector

22  was over 100 percent capacity.

23          This is now not only identifying the sector

24  but also identifying a Centralized Processing Center as

25  a -- as a trigger stipulation or criteria for the

Tony Barker
August 25, 2022

Page 16

1    application of Parole ATD.  That's one of the

2    fundamental changes.

3        **Q    Okay.  So whereas -- just to make sure I**

4    **understand, under the November 2nd policy, all of, for**

5    **instance, RBG would have had to have met the triggering**

6    **factors, the capacity levels, but under the current**

7    **memo, only one of the CPCs within RBG could meet the**

8    **triggering conditions?**

9        A    So -- correct.  You know, not -- we not only

10   are looking at an aggregate level in order to be able to

11   trigger, you know, the application, right, meeting the

12   criteria, but we have also included the ability for a

13   location, meaning the Centralized Processing Center, to

14   also trigger the application of Parole ATD.

15           So kind of going back to the scenario I just

16   gave, you may have a sector that is not reaching a

17   hundred percent capacity level, but we have -- you know,

18   we are well over capacity at a Centralized Processing

19   Center, so thereby the Parole ATD can be triggered on a

20   specific -- on a location-specific basis, the

21   Centralized Processing Center, not necessarily the

22   center as a whole.  So it's providing me as overseeing

23   operations a greater degree of flexibility at how to

24   apply Parole ATD in order to be able to reach a point of

25   decompression.

Tony Barker
August 25, 2022

1      Q     Okay.  And so when we -- let's turn back to

2  the memo.  This memorandum is directed towards Border

3  Patrol and ICE; is that accurate?

4      A     Correct.

5      Q     And so why is it directed towards both CBP and

6  ICE as opposed to just CBP?

7      A     So CBP is on there due to the fact that

8  obviously we are utilizing Parole ATD.  ICE is on there

9  because of the fact that they -- the ATD portion sits

10  within ICE's functionality.  And what -- and a central

11  part of this memo is also directing the communication

12  between CBP and ICE in regards to expansion, meaning,

13  you know, the application of Parole ATD in a sector or,

14  you know, ceasing, you know, the cessation of

15  utilization of Parole ATD in a sector.

16          What this does is it allows ICE to more

17  effectively plan operationally for the utilization of

18  their ATD mechanisms.  So what it's doing is it's

19  driving a communication between the two as well as a

20  multi-component utilization to be able to process Parole

21  ATDs.

22      Q     And was this specific memorandum distributed

23  to Border Patrol officers?

24      A     To Border Patrol agents, yes.

25      Q     When was it distributed to them?

Tony Barker
August 25, 2022

1    administrative records.

2         MS. PATEL:  Well, I am asking about this

3    current memo.

4  BY MS. PATEL:

5         **Q    Is the Parole + ATD policy as outlined in this**

6  **July 18th memo one of the main processing pathways that**

7  **CBP uses?**

8         MS. RYAN:  Objection.  You can answer.

9    A    Yes.

10 BY MS. PATEL:

11        **Q    Okay.  And how has Border Patrol's**

12 **implementation of Parole + ATD changed since this policy**

13 **has been entered?**

14   A    The implementation of the pathway?  I am just

15 clarifying, trying to clarify your question.

16        **Q    Yeah.  The implementation of Parole + ATD.**

17   A    So you know, realistically speaking, the

18 utilization of the pathway has remained consistent.  We

19 haven't changed our process in any way.

20        As I sit here today, we are utilizing Parole

21 ATD in -- you know, beyond the locations where I spoke

22 about previously, you know, we are currently utilizing

23 it at El Paso sector, so in essence we have added an

24 additional sector, you know, since the -- since the

25 issuance of this memo on July 18th just due to the flows

Tony Barker
August 25, 2022

1  that we are seeing.

2       Q    Okay.  So other than the additional of -- the

3  addition of another sector, Parole + ATD under this memo

4  is being applied the same; is that accurate?

5       A    Yes.

6       Q    And when did -- and this July 18th memo

7  applies to both families and single adults; is that

8  right?

9       A    Yes.

10      Q    When did DHS start applying Parole + ATD to

11  single adults?

12      A    This would have been previous -- I mean, it

13  would have been previously.  I can't remember the date

14  exactly.  It would have been the last time that I

15  provided testimony in deposition, you know, it -- when

16  we spoke about it.  I don't know the date off the top of

17  my head as to when we were utilizing it for single -- or

18  we added single adults, if you will.

19      Q    Okay.  So under this July 18th memo, does the

20  Parole + ATD as it applies to single adults, is it only

21  for single adults from specific countries?

22      A    No.

23      Q    Okay.  So is it currently being applied to

24  single adults from a variety of countries?

25      A    Yes.

Tony Barker
August 25, 2022

Page 25

1      A    Sure, yeah.  So it just -- it's the

2   demographic breakdown as to what percentage that we are

3   encountering every day.

4           So it's important for me as the field

5   commander to understand who we are receiving or

6   encountering at the border because some of those

7   populations will be returnable via Title 42; others of

8   those populations will only be returnable to their

9   country after a formal removal through Title 8; and then

10  some of those countries are not a viable, you know,

11  candidate to be able to be removed or expelled.

12          So having an understanding of what percentage

13  that is based upon my daily encounter rate, as like, for

14  instance, as I sit here right now, we are encountering

15  roughly 6,500 people a day, the percentage of what and

16  who we are encountering is critical to understand.

17  BY MS. PATEL:

18      **Q    Okay.  And under what circumstances under this**

19  **new memo would you apply Parole + ATD to a single adult?**

20      A    Realistically, it all depends.  It goes

21  further than what's simply contained within this e-mail.

22  You know, a lot of it is going to be dependent upon each

23  sector, what percentage their -- you know, they are over

24  capacity, what their average TIC time -- TIC times that

25  they are facing, are there any extenuating circumstances

Page 26

1   to where ICE may or may not be able to take those

2   individuals from our custody, are the individuals who we

3   are encountering able to be returned to their home

4   country, do I have a viable pathway of removal or

5   expulsion.  These are all circumstances which will be

6   taken into account, you know, and again, of the things I

7   just noted, some are noted in this e-mail that you are

8   seeing in front of you.

9        **Q    Okay.  So whether or not you have a return**

10  **mechanism is something that's taken into consideration?**

11       A    Of course.

12       **Q    Okay.  And so for what countries at this point**

13  **do you not have a return mechanism?**

14            MS. RYAN:  Objection.  One moment.

15            THE VIDEOGRAPHER:  Did you want to go off the

16       record?

17            Did you want to go off the record for just a

18       bit?

19            MS. PATEL:  I don't think we need to go off

20       the record.

21            MS. RYAN:  We just needed to confer.

22            I am going to object and direct the witness --

23       direct the witness not to answer.  Which countries

24       do and do not have removal proceedings is law

25       enforcement privilege, is not public information,

1    to be expanded to persons from other nationalities.

2        A    Sure.  So you are correct in what you just

3    said, but -- the word "primarily" is, you know, your

4    qualifying, you know, adjective, right.  So it's --

5    that's what I was saying.

6            As I sit here today, are we primarily, you

7    know, applying it to Cubans and Venezuelans?  Yes.  Are

8    there other demographics?  Absolutely.  Is it solely

9    based upon, you know, consideration of somebody's

10   demographic?  Absolutely not.  There are several factors

11   that go into whether we are going to utilize Parole ATD

12   or not.

13       **Q    So let's go back to the actual policy itself**

14   **if you can, the administrative record page 2.**

15       A    Yes, ma'am.

16       **Q    So what is the basis for this policy as it's**

17   **outlined in this memo?**

18       A    What do you mean?  Can you explain?  You mean

19   why we are utilizing Parole ATD?

20       **Q    Correct.**

21       A    So again, it's going to go directly back to

22   the previous testimony as well.  You know, as we sit

23   here today at 6,500 encounters a day, if not more, we

24   have had days over 7,000, in a finite set of detention

25   capacity and resources along the southwest border, the

Page 29

```
 1   utilization of Parole ATD is utilized on a case-by-case
 2   basis based upon the individual who is in front of us in
 3   order to be able to use this processing pathway, if you
 4   will, for a decompression method in order to be able to
 5   ensure the safety of not only the migrants that we have
 6   in custody but the officers, agents, and professional
 7   staff who work in those processing centers and locations
 8   every day.
 9           So it is -- it is a -- it is a pathway of last
10   resort that is driven by extreme circumstances in order
11   to be able to protect the people who are in our custody
12   and who are working there.  And I think that's exactly
13   what is -- I am paraphrasing, obviously, of what is said
14   within the memo, but that's ultimately the foundation.
15       Q    So if you look at the second paragraph from
16   the bottom, it starts with, Parole + ATD provides a
17   processing mechanism to address situations in which
18   there is not appropriate detention space, and there are
19   operational concerns about the number of people present
20   in and potentially subject to a prolonged
21   time-in-custody at USBP facilities along the Southwest
22   border.  Do you see that?
23       A    Yes, ma'am.
24       Q    Okay.  So one of the bases would be detention
25   space, right, lack of detention space?
```

Tony Barker
August 25, 2022

Page 30

1        A    That is one, correct.

2        Q    **Okay.  And it also speaks about operational**

3   **concerns.  Do you know what specific operational**

4   **concerns this is referring to?**

5        A    Yeah.  I mean, it's the operational

6   difficulties that are encountered when you have a

7   facility that is well over a hundred percent, you know,

8   capacity and the risk that is not only given to the

9   agents, the officers, and professional staff but also

10   the migrants that work in there.

11            So I would refer you to the following

12   paragraph as well that says that it's justified by

13   urgent humanitarian reasons or because it yields a

14   significant public benefits.  That form is disease

15   mitigation and also a relief valve to that overcrowding,

16   you know.

17            And so that is the reason why -- those are

18   operational impacts.  You know, the reality is, is that

19   we have a finite set of Border Patrol agents and OFO

20   officers and personnel assisting us along the Southwest

21   Border.  It takes a lot of personnel in order to be able

22   to deal with the flows and the complications that come

23   of that specifically when you start taking in those

24   considerations of what I was just talking about, you

25   know, and so that is the reason why we utilize Parole

Page 31

1   ATD.

2       Q    Okay.  And that was -- were those reasons also

3   applicable under the November 2nd memo?

4       A    Yes.

5       Q    So let's go to page 3, the threshold criteria.

6   I think you have already started to discuss this a

7   little bit.  You said that you helped to develop that

8   criteria; is that correct?

9       A    Yes.

10       Q    Okay.  When was the decision made to change

11   this criteria?

12            MS. RYAN:  Objection.  You can answer.

13       A    July 18, 2022.  I mean, that was the finite

14   decision.  Beyond that period of time of which it's --

15   it is signed by the commissioner and by the director, I

16   mean, it's purely speculative and literally just our

17   recommendations.  But ultimately the deciding moment is

18   when that is signed by our senior-most leader.

19   BY MS. PATEL:

20       Q    Okay.  And how do the triggering criteria

21   differ under this memo as compared to the November 2nd

22   memo?

23       A    That's a great question.  So the exclusion of

24   the 72-hour time frame, you know, in what ICE would be

25   able to take out of our custody within a 48-hour time

Tony Barker
August 25, 2022

1   frame, so that, I will say, the TIC time piece of it

2   being excluded.

3           Additionally speaking, you know, there is

4   obviously a marker now of 15,000, you know, people in

5   Border Patrol custody across the entire Southwest Border

6   or a sector or Centralized Processing Center having, you

7   know, in-custody status of or holding status of over a

8   hundred percent.  I think we just talked about that,

9   about how that provided additional operational

10  flexibility.

11          And then, of course, you know, the encounter

12  rate of 12 -- excuse me -- of 6,000, you know, migrants

13  per day across the Southwest Border over a 72-hour time

14  frame.  That's just an average time frame.

15  **Q    And correct me if I'm wrong, but this also**

16  **looks like the Parole + ATD under this memo has to be**

17  **authorized by the commissioner, but under the**

18  **November 2nd memo, it could have been authorized also by**

19  **the Chief of Border Patrol; is that an accurate**

20  **statement?**

21          MS. RYAN:  Objection.  Can you direct him to

22      the November memo if you are going to ask him

23      questions about it so he has it in front of him?

24          MS. PATEL:  Yeah.  I will just drop it in the

25      chat.  But I don't think we need to mark it as an

Tony Barker
August 25, 2022

Page 35

1      deliberative.

2    BY MS. PATEL:

3      Q    All right.  Does this document at all have a

4    deadline for someone to report?  Was that removed in

5    this document compared to the November 2nd document?

6           MS. RYAN:  Objection.  You can answer.

7      A    The November 2nd document didn't have a parole

8    time frame attached to it either.

9      Q    Okay.  What was -- so while there is not a

10   time frame in this document, are the parolees provided

11   with a specific time frame in which to report?

12     A    Yes.

13     Q    Okay.  And how are they provided that

14   information?

15     A    On an I-385.

16     Q    And who provides that information to them?

17     A    CBP.

18     Q    Who makes the determination of how long that

19   time frame will be?

20     A    ICE based upon their -- you know, in essence

21   what their offices can handle for people showing up and

22   trying to report into their offices.

23     Q    Okay.  So if someone does not report within a

24   timely fashion, does DHS hold those persons accountable?

25     A    Yes.

Tony Barker
August 25, 2022

1      Q      How so?

2      A      Then ICE will -- well, I should say when an

3    immigration officer enforcement official encounters

4    them, because they did not abide by the conditions of

5    their parole, then they are rearrested, or I should say

6    arrested.

7      **Q      How would they locate the person in order to**

8    **arrest them?**

9      A      There is several methodologies.  We can

10   utilize, you know, various database systems in order to

11   be able to ascertain that person's location, utilization

12   of any ATD mechanism that is attached to that person, or

13   just regular patrol encounters, or through operations as

14   well, concerted operations, which, again, utilize some

15   of those databases in order to be able to locate

16   individuals who have failed to appear or absconded.

17     **Q      Okay.  And so how -- while we are on the topic**

18   **of the actual processes in which alternative detention**

19   **is utilized, what type of technology is utilized under**

20   **this memo?**

21           MS. RYAN:  Objection.  This is outside the

22           scope of the administrative record and it is also

23           law enforcement sensitive to go into details of the

24           technology they use in this procedure.

25           MS. PATEL:  Well, another one of your

Tony Barker
August 25, 2022

Page 41

1    check-in process for --

2        A    No.

3        Q    -- for instance --

4        A    No.

5        Q    So let's go back to the Individual Assessment

6    section on page 3 to 4.  So just what I want to ask you

7    about is actually on page 4 at the top.  The last

8    sentence in the first paragraph says, "Upon placing an

9    individual in Parole + ATD, CPB will temporarily pause

10   the completion of the removal paperwork under INA

11   Section 240, which will instead be completed at a later

12   date."

13           When this -- the reference to the later date

14   here, is this referring to a subsequent processing by

15   ICE?

16       A    ICE and CBP.

17       Q    Okay.  So can you explain to me what is meant

18   here by this later date?  What happens at the later

19   date?

20           MS. RYAN:  Objection.

21       A    Meaning that a migrant will not be issued a

22   notice to appear, hence their parole, and that notice to

23   appear is -- will be issued at a later date.  That's the

24   "completed at a later date" portion.

25   BY MS. PATEL:

1     Q     Okay.  So isn't it ICE that completes or

2     issues the notice to appear?

3     A     Not necessarily.  CBP issues notices to appear

4     daily; so does CIS.

5     Q     Even in this Parole + ATD context?

6     A     Yes.

7     Q     And then that -- the paragraph below it, the

8     last sentence says, "USBP must also collect and document

9     a physical address for each noncitizen processed via

10    Parole + ATD."

11          Did I read that correctly?

12    A     Yes.

13    Q     Were there instances in which this information

14    was not being recorded?

15          MS. RYAN:  Objection.

16    A     Not to my knowledge.  We have been doing this

17    well outside even beyond the scope of Parole ATD.  This

18    is a -- as long as I have been a Border Patrol agent, I

19    have also done this, you know, whenever I have processed

20    somebody.  You know, this is simply putting a known

21    codified process in writing is all.  So...

22    BY MS. PATEL:

23    Q     Okay.  So let's go down to the Subsequent

24    Processing paragraph that is on the same page.

25    A     Yes.

Tony Barker
August 25, 2022

1    Q    And so this section speaks about, like, the

2   joint process that CBP and ICE engage in, right, under

3   this policy?

4    A    Yes.

5    Q    So can you explain the specific role that CBP

6   has and the specific role that ICE has?

7    A    The CBP will process individuals for -- they

8   will finish out their notice to appear paperwork and we

9   will issue the notice to appear to the migrant, whether

10   that is in person or through mail, and it's just really

11   dependent upon when that person is checking in and those

12   type of aspects.  That is what that is referring to, so

13   that is a CBP and ICE process.

14    Q    Okay.  It also says that "Each agency is

15   responsible for completing the processing of 50 percent

16   of the total Parole + ATD caseload."

17           Is that referring to, for instance, for a

18   specific migrant, CBP would complete half of the process

19   and ICE would complete the other half of process?

20    A    No.  So of the -- I will say of, you know, a

21   quantity of people who are processed for Parole ATD, I

22   will just use ten as an example, so if ten people are

23   processed for Parole ATD, the finalization of their

24   paperwork, their notice to appear, you know, CBP will

25   process five of them and ICE will process five of them.

Tony Barker
August 25, 2022

Page 44

1  It is just sharing the caseload.

2      Q      Is that how it functioned under the prior

3  policy?

4      A      The quantitative stipulation of 50 percent is

5  new to this memo.  But has CBP and ICE, you know,

6  utilized and conducted this processing, which I was just

7  referring to previously, even since the November 8th

8  memo?  Yes, we have done that.

9      Q      Okay.  Has CBP taken on more responsibility

10  for that processing under this memo?

11          MS. RYAN:  Objection.

12      A      I mean, it's the same degree of

13  responsibility, right?  I mean, we are assisting them

14  with processing.  You know, this memo stipulates

15  50 percent as, you know, you just noted within the memo

16  in writing.  So that's -- that -- that's establishing

17  that -- what I would consider is that expectation.

18      Q      Okay.  Under the Reporting and Oversight

19  section, the same page at the bottom, it says, "CBP must

20  notify ICE in writing each time Parole + ATD is

21  authorized in a sector to ensure that ICE has

22  appropriate staff."

23          Do you see that?

24      A   Yes.

25      Q      Were there instances in which there was

1    them included in this administrative record, for

2    instance starting on page 7?

3        A    Is that page 7?  That's my report.  That is

4    how they inform me.

5        Q    Okay.  So this daily snapshot is different

6    than the daily report that's referenced in the memo?

7        A    Yes.  That is different, yes.

8        Q    And then have any operational changes been

9    made since the date of this memo?

10       A    We included El Paso, as previously indicated.

11       Q    Okay.  Has the Parole + ATD process changed in

12   any way as outlined in this memo?

13       A    No.

14       Q    If you go back to the Background section on

15   page 2, there is a reference to this policy in the

16   middle of the second to last paragraph.  It says, "It is

17   significantly more efficient -- approximately 60 minutes

18   faster -- to process individuals, consistent with USC

19   Section 225(a), for Parole + ATD as opposed to issuing a

20   Notice to Appear or charging document at the time of

21   encounter."

22            Do you see that?

23       A    Yes, if not faster, you know, if not a greater

24   change, if you will.

25       Q    Okay.  So how did DHS determine that it was

Tony Barker
August 25, 2022

Page 48

```
 1    approximately 60 minutes faster?

 2              THE WITNESS:  I can answer?

 3              MS. PATEL:  Objection.  I am going to remind

 4         the witness not to disclose anything that would be

 5         deliberative process or security concerns.

 6    A    Sure.  So in the record there is -- it was the

 7    document that you had me reference earlier, it has those

 8    time frames in there.  That is something that we

 9    monitor.  You know, it -- I will use my terminology,

10    like time in motion, if you will, how long it takes to

11    be able to complete a process.

12              So that is something that we evaluate on a

13    regular basis.  That's the reason why I can sit here and

14    say that, you know, that's probably the lower end,

15    honestly, of the time change.  Sometimes it can take up

16    to two hours in order to be able to process a full NTA

17    versus a 15- to 30-minute process for Parole ATD.

18              And those exact numbers are referenced in the

19    AR that you -- the actual piece of the record which you

20    referenced earlier.

21    BY MS. PATEL:

22    Q    Okay.  Are you talking about the daily

23    snapshot?

24    A    No, ma'am.  I am talking very specifically

25    SAR0005, bottom of the page.
```

Tony Barker
August 25, 2022

Page 58

1        A     So it's the field office, you know, the ICE

2   field office as well as -- so the ICE field office,

3   which location they are at, obviously the date of the

4   reporting, if you will, the number of appointments that

5   they had, how many noncitizens that they saw, and then

6   the capacity in which that -- that show-up rate, that

7   flow, if you will, bared against the capacity of the

8   office in order to be able to process.

9        Q     Okay.  So let's start with the capacity date

10  column.  If you look at page 0170 towards the bottom,

11  the second to last entry has a date of September 1,

12  2023.  That seems to be a date in the future.  So can

13  you kind of explain to me what -- what information is

14  represented in this column, the capacity date column?

15       A     Unknown.  It would be completely speculative

16  to me at this point.

17       Q     All right.  What about in the column for

18  number of appointments, what type of appointment is that

19  referring to?

20       A     So those are the report-in appointments,

21  appointments that migrants would have that are going to

22  the office to check in or get processed.

23       Q     Okay.  So is this limited to persons checking

24  in under the Parole + ATD program?

25       A     No.  I think it's holistic.  It's people

Page 59

1    checking in, not just for Parole ATD, obviously.

2        Q    Okay.  So could they be checking in for --

3    like could this even include citizens that are checking

4    in to an ICE office?

5             MS. RYAN:  Objection.

6    BY MS. PATEL:

7        Q    People who have, for instance, a permanent

8    resident status?

9        A    Well, that wouldn't be a citizen.  That would

10   still be an alien, you know.

11       Q    Right.  Well, I assume that maybe a citizen

12   wouldn't be checking into an ICE office, so I decided to

13   modify the question.

14            Would this include someone such as a permanent

15   resident that is checking into an ICE office?

16       A    It could be.  It just depends.  You could have

17   a -- somebody who is a permanent resident, like a LPR,

18   who is going through a criminal procedure because of a

19   violation of law, could be -- you know, could have their

20   case, you know, you know, to determine if they are going

21   to be removed or not and their LPR status voided and

22   placed on some type of ADT tracking which would have

23   them checking in and reporting to an ICE office

24   regularly.

25            This is purely an example, but I think you

Tony Barker
August 25, 2022

1  asked for -- you asked it as an example, so that's an

2  example.

3      Q    Okay.  And then what specifically is

4  represented in the capacity column?

5      A    The percentage of capacity that this showing

6  up or checking in or appointments is baring against the

7  total capacity of that office to be able to accommodate

8  or process.

9      Q    Okay.  And how does the information that's

10  contained in this capacity report bear on or support the

11  decision to implement the Parole + ATD policy?

12          MS. RYAN:  Objection.  I will remind the

13      witness not to reveal anything deliberative process

14      privileged.

15      A    So I mean, this is indicating what I would

16  consider is the amount of people who are showing up to

17  an office.  CBP assists in decreasing that total amount

18  as we were -- as we are obviously processing, you know,

19  50 percent, as indicated in the memo, of individuals who

20  are showing up to ICE offices or would have been showing

21  up to ICE offices in Parole ATD.

22  BY MS. PATEL:

23      Q    Can you turn to SAR0247.

24          MS. RYAN:  Hey, Anita, can we just take a

25      five.

Tony Barker
August 25, 2022

Page 62

1  in the future.  That's the future date of appointments

2  that was going out.

3          It is just because, as I look at this, it also

4  runs all the way out to 2023.  It just triggered my

5  memory.

6          MS. RYAN:  You mean on the last chart?

7      A    That last document.

8          MS. RYAN:  Anita, I think he is talking about

9      the chart that started on SAR0170, with the four or

10     five columns.

11  BY MS. PATEL:

12      Q    **Yeah.  So that column was called capacity**

13  **date.**

14      A    Right.

15      Q    **So you think that was the date of the**

16  **check-in, the appointment date?**

17      A    So if we scroll back up, to me what it looks

18  like is that is the projected date -- like for instance,

19  I am looking at one right now.  It would have been on

20  246.  You know, March 1, 2023, the field office, right

21  now they have one appointment scheduled with one

22  migrant, and it obviously is only not even a 1 percent

23  capacity -- taking up 1 percent capacity of that office.

24  Now, that is obviously a future check-in date.  It just

25  triggered my memory when I looked at the next graph.

Page 67

```
 1   absconder category?

 2        A    Correct, exactly.  Exactly.

 3        Q    Now let's go to SAR0257 -- I'm sorry --

 4   SAR0261.

 5             I think according to the index, this starts

 6   the cost of P + ATD halted?

 7        A    Yes, ma'am.  I am tracking.

 8        Q    So if you go to -- let's just start on

 9   SAR0262.  So this is an e-mail dated May 6, 2022, and

10   the subject is "Forward:  Projecting ICE workload."

11        A    Yes.

12        Q    So I just want to ask you, it says P + ATD.

13   Is that Parole + ATD?

14        A    Yes, ma'am.

15        Q    All right.  And so these e-mails show the cost

16   of -- the cost to ICE if Parole + ATD is halted as of

17   May 6th and projecting out 30, 60, and 90 days; is that

18   correct?

19        A    Yes.

20        Q    Okay.  Do you know who asked for this

21   information to be compiled?

22             MS. RYAN:  Objection.  I am going to direct

23        the witness not to answer to the extent it gets

24        under any of the redactions you see on this

25        document or reveals anything privileged; otherwise,
```

Tony Barker
August 25, 2022

Page 70

1    A    Yes.

2    Q    Is that correct?

3         So how does the information contained in this

4    e-mail support the decision to implement Parole + ATD?

5         MS. RYAN:  Objection.  I will remind the

6         witness not to reveal anything deliberative process

7         privileged.

8    A    It does not.

9    BY MS. PATEL:

10   Q    It does not support the decision to implement

11   ATD?

12   A    No.

13   Q    Okay.  Is this something that weighs against

14   implementing Parole + ATD?

15        MS. RYAN:  Objection, same reminder.

16   A    No.

17   BY MS. PATEL:

18   Q    So what is involved in clearing this backlog?

19   A    Processing somebody who was processed for

20   Parole ATD for an NTA because, right, they would be --

21   you know, they are not in custody so they would be

22   placed on an NTA because they are on -- they would be

23   placed onto a non-detained docket, ultimately.  So

24   that's what it would require and necessitate.

25   Q    And has ICE taken measures to improve that

Tony Barker
August 25, 2022

Page 71

1   backlog?

2       A    Yes.

3       Q    What measures has it already taken?

4       A    They have conducted several focused operations

5   along with CBP in order to be able to collectively

6   process the backlog.

7       Q    When you say "focused operations," can you

8   expand on that, what do you mean?

9       A    No.  Absolutely, meaning that they have --

10  they have dedicated staff to process the NTAs for -- you

11  know, related to those individuals who have been

12  processed and released for Parole ATD.  So both CBP and

13  ICE have dedicated staff in order to be able to address,

14  you know, the -- as -- and I will just use the

15  terminology in the AR, the backlog.

16      Q    So when you talk about dedicating staff, are

17  you talking about hiring new staff?

18      A    No, dedicating -- utilizing existing current

19  staff in order to be able to process those individuals

20  for an NTA, place them on a non-detained docket, and

21  begin their -- what I would consider is their

22  immigration proceedings.

23      Q    And has this backlog impacted ICE's ability to

24  engage in its enforcement operations?

25      A    So this -- this function is directly related

Tony Barker
August 25, 2022

Page 72

1   to their enforcement operations.  I mean, this is

2   literally part of their job.

3       Q    When it's dedicating staff, is it dedicating

4   staff away from other units or divisions?

5       A    I couldn't speak to what their daily

6   deployment structure looks like in ICE, but processing

7   somebody who has been paroled into the United States for

8   an NTA and placing them into a non-detained docket and

9   beginning their immigration process and procedures is in

10  direct alignment with the roles and responsibilities of

11  ICE as an organization, as well as CBP and CIS, anybody

12  who is an immigration officer.

13      Q    Does this backlog affect the ICE offices in

14  Florida?

15      A    I would -- I mean, the ICE offices in Florida,

16  you know, are seeing a -- you know, migrants showing up

17  and checking in at their facilities.  Just like on many

18  others that were on the previous chart who are

19  scheduling appointments further out, you know, I have no

20  doubt based upon the information in the record that

21  those ICE offices are in there as well, the Florida

22  ones.

23      Q    How significant was this backlog before Biden

24  took office?

25           MS. RYAN:  Objection.  That's outside the

Tony Barker
August 25, 2022

Page 73

1         scope of the administrative record, Anita, unless

2         you can point me to something.

3              MS. PATEL:  I am asking about a backlog that's

4         referenced in this e-mail.  So if he knows the

5         answer, he can answer it.

6         A    So prior to this administration, the average

7    wait time for somebody to be able to have their parole

8    heard in front of immigration court was still roughly

9    about the same time frame of seven to ten years on

10   average.  So it is not indicative of sole -- of this

11   administration but several administrations previous

12   thereof as well.

13   BY MS. PATEL:

14        **Q    But this is specific to the backlog related to**

15   **Parole + ATD; is that accurate?**

16        A    That wasn't your question that you asked.

17        **Q    Right.  How much has this backlog cost DHS**

18   **thus far?**

19        A    Well, as indicated on the AR record that you

20   have in front of you, you know, the -- and surmising

21   that, you know, I will say taking as an assumption of

22   the 90-day spectrum of the analysis, you know,

23   49 million in order to be able to clear it at this point

24   in time.  That is again taking into account the

25   assumption that 90 days holds accurate in the analysis,

1    you know, for our current time period now here in

2    August.

3         Q    So let's move to SAR0272 through SAR0273.

4         A    Yes, ma'am.

5         Q    I think these charts are probably similar to

6    the ones that you previously discussed regarding the

7    family unit compliance rates?

8         A    Yes, ma'am.

9         Q    Okay.  So is this the same type of data that's

10   applied to non-family units?

11        A    Yes, ma'am.

12        Q    Okay.  So when it says non-family unit, is

13   that referring to single adults?

14        A    Yes, ma'am.

15        Q    Is there anything else that's included in that

16   as a non-family unit?

17        A    You could say a child, but I couldn't -- I

18   couldn't accurately depict whether a child would be

19   placed into an ATD type of structure or not and whether

20   they would be included into this analysis, but I can

21   tell you it would obviously include single adults.

22        Q    Now let me just have a brief minute.  I am

23   going to look through my outline.  It looks like we

24   might be almost done here.

25             MS. RYAN:  Can we just take five so I can look

Page 78

```
 1      A    Yes.
 2      Q    Okay.  What is prosecutorial discretion?
 3           MS. RYAN:  Objection.  You can answer if you
 4      know.
 5      A    So as you recall from the first time that we
 6      spoke and gave the deposition, we referred to NTRs, the
 7      notice to reports.  The original -- you know, before it
 8      was realistically applied, you know, we were asking in
 9      regards to prosecutorial discretion authority.  That
10      became known as NTR, the notice to reports.  That is
11      what you are looking at right now is the notice to
12      report aspect, the communication pattern in regards to
13      it.
14 BY MS. PATEL:
15      Q    Okay.  So is prosecutorial discretion still
16 being utilized?
17           MS. RYAN:  Objection.
18      A    So we as law enforcement use prosecutorial
19      discretion every day.  Prosecutorial discretion is
20      probably one of the greatest tools that law enforcement
21      has at its disposal to be able to effectively, and
22      through high moral standards, ethics, you know, to be
23      able to apply law with discretion.  I mean, it's the
24      difference what keeps us between a police state and not.
25           So with that being said, that's -- you know,
```

Tony Barker
August 25, 2022

Page 79

1    we utilize discretion every day.  Now, do we utilize

2    NTRs?  No.  We utilize Parole ATD.

3    BY MS. PATEL:

4        Q    So prosecutorial discretion as discussed in

5    this e-mail is not being utilized today?

6            MS. RYAN:  Objection.

7        A    The NTRs were ceased per the November memo and

8    utilized -- we now currently utilize Parole ATD.

9    BY MS. PATEL:

10       Q    So let's go back to that Comms plan, the

11   second page of it, so that's 0166.  If you look under

12   the bullet point that says, "Why is ICE embarking on

13   this initiative," my question is, is ICE still following

14   the process of mailing out packets as is outlined in

15   this paragraph?

16       A    I am just reading the paragraph.  My

17   apologies.

18       Q    Sure.

19       A    Yes.

20       Q    Okay.  And then if you look on the following

21   page 0167, there is a bullet point that says, "If we

22   don't receive viable addresses of those past the

23   60-report window, what happens to those noncitizens?"

24       A    Yes.  That's what I was speaking about

25   earlier.

Tony Barker
August 25, 2022

1    bullet point that says, "What happens when a noncitizen

2    arrives for their appointment at a field office," are

3    you still following the process outlined in this

4    paragraph?

5         A    Yes.

6         Q    All right.  Well, I have no further questions,

7    so I will turn it over to Ms. Ryan.

8                        CROSS-EXAMINATION

9    BY MS. RYAN:

10        Q    Can you pull up the ICE SAR.  Okay.

11             So looking at SAR0247.

12        A    Yes.

13        Q    So you were asked about this document by

14   Ms. Patel, correct?

15        A    Yes.

16        Q    And she asked you whether this document,

17   quote, "supported the decision to implement ATD," and

18   you said no.  Do you remember that?

19        A    Yes.

20        Q    Can you explain that answer?

21        A    So the document is not taken into

22   consideration as to whether we implement Parole ATD.

23   The implementation of Parole ATD is clearly delineated

24   in the memo in association with triggers, right, the

25   criteria that's assigned to it.  So that -- the

Tony Barker
August 25, 2022

Page 82

1    implementation of Parole ATD is directed, in essence, by

2    the conditions in which CBP is encountering.

3            Now, with that being said, another part of the

4    memo which indicates the 50 percent responsibility that

5    CBP will assist ICE in processing what we have now seen

6    as the backlog as indicated by this chart in front of

7    us, that 50 percent dictated in the July memo, that is

8    what this is taking into consideration in regards to.

9            So obviously, as indicated by this chart, the

10   ICE, you know, has several field offices which are

11   booked at a hundred percent capacity, you know, into the

12   distant future, CBP now taking and helping ICE with a

13   50 percent effort, if you will, you know, 50 percent of

14   that backlog, and assisting with that will significantly

15   decrease the -- I will say that operational burden on

16   ICE and significantly change what that -- what this

17   chart looks like, you know, when that help or that aid

18   is provided.

19           So that is exactly what this chart supports

20   within the memo, not the implementation but the

21   50 percent processing requirement.

22       Q    And looking at SAR0261, you were asked that

23   same question about whether it supported the decision to

24   implement ATD and you also said no.  Can you explain

25   that answer?

Tony Barker
August 25, 2022

Page 83

```
1      A    As soon as we get to it.
2      Q    Yeah.  I passed it.
3      A    So this chart, this chart again goes back to
4   the backlog, right?  So understanding that, you know, we
5   are still enrolling in Parole ATD, and that Parole ATD,
6   you know, I will say the necessity to be able to do that
7   along the border area, it shifts, if you will, a
8   processing burden from immediately at the border area to
9   what I would consider as post-release.
10           So that is what this is referring to, that if
11  it was halted immediately, the backlog of 110,000, if
12  you -- if that rate is thereby, you know, expounded, you
13  know, 30, 60, 90 days -- of course we are beyond the
14  90-day mark, you know, that would be even -- that would
15  be, you know, more cases ultimately that ICE would have
16  to process, and there is a financial -- you know, there
17  is a financial or projected financial cost of what that
18  would look like.  That's obviously the projections that
19  you are seeing.
20           In order to be able to decrease the backlog
21  and to be able to mitigate any type of financial burden,
22  if you will, or to lessen that financial burden, that is
23  the driving analysis behind the 50 percent assistance
24  which CBP was going to provide ICE and be able to
25  address the cases, you know, post-release, that post-ATD
```

Tony Barker
August 25, 2022

Page 84

1    release.

2        Q    And how is CBP's 50 percent contribution

3    expected to alter this backlog?

4        A    So as we dedicate staff on a CBP basis, so

5    realistically a wholly DHS basis in order to be able to

6    address that, it will significantly decrease the burden

7    by ICE, as now we are -- CBP is now processing

8    50 percent, it will place migrants onto a notice to

9    appear, and of course, on a non-detained docket, but a

10   notice to appear and begin their immigration proceedings

11   sooner as we are now processing that.

12            Additionally speaking, because it is so

13   significantly less cost-wise to be able to process -- to

14   release somebody on ATD and then place them into a

15   non-detained docket in their immigration proceedings

16   versus a complete detention type of scenario is

17   decreasing the cost associated that it -- that it would

18   be to adjudicate that migrant through their entire

19   immigration proceeding.

20            So we are doing two things, right.  We are

21   decreasing the time and the cost associated with placing

22   that migrant into an immigration proceeding through the

23   help of CBP.  That is what drove the decision making to

24   be able to place CBP into what we are considering is a

25   processing requirement on the July 18th memo.

Tony Barker
August 25, 2022

1        Q    Now, these costs that we see here on the

2    backlog are also in an e-mail on the following page,

3    SAR0262, which you were also asked about.  Has DHS

4    actually incurred these costs that we see in this chart

5    on this e-mail?

6        A    No.  And the reason why is that these are

7    projections that they are given.  So it is a projected

8    cost if ICE solely would have to dedicate staff and

9    overtime in order to be able to process that backlog.

10   By CBP helping out and assisting -- and I really say CBP

11   -- it's really CBP and ICE, but CBP helping out with

12   that 50 percent that was annotated within the memo, all

13   of those things are decreased, right.  It's saving the

14   additional cost burden.  It is saving the time frame.

15   It is decreasing the overall cost of the migrant getting

16   into -- or getting into the immigration proceeding

17   process that -- you know, so that is -- that's

18   ultimately why the information is in there, how it was

19   utilized in order to be able to drive the inclusion into

20   the July 18th memo.

21       Q    So when it says stop P + ADT in 90 days, the

22   5.5 years to clear and the 49 million, that is a

23   projection if Parole + ATD had been stopped in May, that

24   would be the cost and the time for ICE to clear the

25   backlog --

Tony Barker
August 25, 2022

Page 86

1   A    Correct, and the costs associated, correct.

**2   Q    But Parole + ATD was not stopped --**

3   A    No, and it is continuing to go, obviously.

4        MS. RYAN:  No further questions.

5        MS. PATEL:  I have no redirect.

6        I think, Chief Barker, you are free to go.

7        THE VIDEOGRAPHER:  If there is a request for a

8   video, just state your name for the record or link.

9        MS. PATEL:  We do not have a request for the

10  video, but we will order the transcript.

11       THE VIDEOGRAPHER:  Are we good to go off the

12  record?

13       MS. PATEL:  Yes.

14       THE VIDEOGRAPHER:  The time is 2:44.  This

15  concludes the deposition today.  We are now off the

16  record.

17       THE STENOGRAPHER:  Ms. Ryan, did you say you

18  wanted a copy also?

19       MS. RYAN:  Yes.

20       MS. PATEL:  Can we get a three-day turnaround

21  on the transcript?

22       THE STENOGRAPHER:  Yes.

23       (Deposition concluded at 2:44 p.m.)

24

25

Tony Barker
August 25, 2022

Page 89

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT
ENTER CHANGES ON THIS SHEET

STATE OF FLORIDA VS. UNITED STATES
Deponent:  TONY BARKER, CORPORATE REPRESENTATIVE
Date of Deposition:  August 25, 2022
Case No.:  3:21-cv-1066

| PAGE | LINE | REMARKS |
|------|------|---------|
| 13 | 2 | "Patrol ATD" should be "Parole +ATD" |
| 13 | 6 | "Patrol ATD" should be "Parole + ATD" |
| 30 | 4 | Text should read "That is a form of disease mitigation." |
| 31 | 13 | "finite" should be "final" |
| 48 | 3 | "Ms. Patel" should be "Ms. Ryan" |
| 65 | 21 | "FMAU" should be "FAMU" |

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

Signature of Witness ____

Dated this ___22nd_____ day of __September____, __2022____.

Job No.:  268754