# Exhibit 1

30(b)(6) Deposition of Tony Barker
(July 13, 2022)

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 63

1    A.   It's dependent upon -- well, (a), no.  So,
2   it's dependent upon the, the -- our ability to be
3   able to prove that criminal history, right, or to be
4   able to gain the information.  Not every country
5   submits their information into a database which
6   we're able to see, right, international.  It's
7   dependent upon our ability to be able to see the
8   information when a crime is committed in an
9   international -- on an international basis.
10   **Q.   Okay.  And so, at the point that we just**
11   **left off a few minutes ago regarding the obtaining**
12   **of biographical and biometric information from the**
13   **individual, at that point is a decision made as to**
14   **processing pathway?**
15    A.   Yes, most often, you know, you know,
16   because we have to determine what pathway we're
17   going to process somebody into, correct.
18   **Q.   So, before we get into the processing**
19   **pathway, I just want to back up and give you a**
20   **hypothetical.  Instead of it being an individual**
21   **that was caught -- like, let's just say we have a**
22   **family unit that crosses the border, they're a**
23   **hundred feet onto U.S. soil and they're an applicant**
24   **for admission.  Can you describe the pathway in that**
25   **circumstance?**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 88

1    And I just say "may," because it's, it's not a
2    shall.
3      BY MS. PATEL:
4      Q.   All right.  Does permission need to be
5    obtained on a case-by-case basis from a supervisor
6    or someone higher up in order to apply Parole + ATD
7    to a single adult?
8           MR. DARROW:  Same objection.
9           You can answer.
10     A.   No, no.  The utilization of Parole ATD in
11   a sector, you know, obviously, you know, that
12   permission is given by a supervisor, actually, you
13   know, at the commissioner level.  But the
14   application of Parole ATD to a specific individual,
15   each and every time that is determined on a
16   case-by-case basis to the agent or officer that is
17   processing that individual.
18     BY MS. PATEL:
19     Q.   Okay.  And since when has Parole + ATD
20   been authorized to apply to single adults?
21          MR. DARROW:  Same objection.
22          You can answer.
23     A.   It's going to be within the past couple
24   months.  I can't recall exactly when we started, you
25   know, utilization of it for single adults.

Page 89

```
 1    BY MS. PATEL:
 2       Q.   Okay.  And is this being -- is this
 3    process available at only the two sectors referenced
 4    in the Parole + ATD memo or in additional sectors as
 5    well?
 6            MR. DARROW:  Same objection.
 7            You can answer.
 8       A.   The Parole ATD is currently being utilized
 9    in Yuma and Del Rio Sectors.
10    BY MS. PATEL:
11       Q.   Okay.  So, it's not being used in the Rio
12    Grande Valley?
13       A.   There -- it's used on an ad hoc basis in
14    the Rio Grande Valley based upon what the conditions
15    of their detention is, you know, currently.  So, as
16    their numbers are lower and the detention, you know,
17    is less, you know, then, then they're not going to
18    utilize Parole ATD.  They have the authorization to
19    use Parole ATD, but -- but, again, you know, if they
20    don't -- if they do not need to utilize Parole ATD,
21    then they're not utilizing it, and they will utilize
22    it in the Del Rio and Yuma Sectors.
23       Q.   Okay.  When was the Yuma Sector authorized
24    to use Parole + ATD?
25            MR. DARROW:  Same objection.
```

Page 90

1          You can answer.
2     A.   It's going to be around the December-ish
3  time frame.  I can't remember exactly.
4    BY MS. PATEL:
5     Q.   And when you say December, are you talking
6  about 2021?
7     A.   2021, yes.
8     Q.   Okay.  And for Rio Grande Valley, how
9  often has it been used since this policy memo came
10 out?
11         MR. DARROW:  Same objection.
12         You can answer.
13    A.   I don't know what their sector by sector
14 PATD numbers are off the top of my head.
15   BY MS. PATEL:
16    Q.   Okay.  So, you're saying that currently,
17 as we sit here today, it's not being used there?
18         MR. DARROW:  Same objection.
19         You can answer.
20    A.   They'll utilize it depending upon the
21 circumstances.  They're involved in lateral
22 decompression, you know, because Del Rio Sector is
23 extremely high, they're taking on large -- they're
24 accepting, if you will, large volumes of migrants to
25 process because of Del Rio's volumes, you know, then

Page 91

1  they may end up utilizing it, but, but, you know,
2  it's very specific to the circumstances at the time
3  and the individual they have in front of them.
4    BY MS. PATEL:
5        Q.   Okay.  You just used the term "lateral
6  decompression."  What do you mean by that?
7        A.   That means, basically, that a sector, you
8  know, has -- is significantly over their 100 percent
9  capacity.  And I say significant.  They're over
10 their 100 percent capacity.
11       Q.   Okay.  And then what happens at that
12 point?
13       A.   So, then --
14            MR. DARROW:  Same objection.
15            You can answer.
16       A.   -- we'll utilize various conveyances, such
17 as a plane and/or to move migrants from an area that
18 has, you know, very high custody numbers to areas
19 that have lower custody numbers in order to be able
20 to, you know, just decompress ultimately.
21   BY MS. PATEL:
22       Q.   And when you say transfer them, are you
23 referring to transferring them from border patrol
24 custody to border patrol custody?
25       A.   Yes, for processing, correct.

Page 134

```
 1  sorry.  So, yeah, are single adults under Parole +
 2  ATD also given tracking devices, the same type of
 3  tracking devices that you just mentioned?
 4       A.   Yeah, I mean, again, I'd defer you to ICE
 5  in regards to what methodologies they're applying to
 6  single adults versus families.  I'm assume that's
 7  your next question.  It just -- really, I defer you
 8  to ICE on what they're applying and the reasoning
 9  why.  That's all their -- that's their program,
10  their policy, their procedures, their protocols.
11  That's all their stuff.  You know, with that, I'm
12  just aware of tracking of both families and single
13  adults by those methodologies I just said.
14       Q.   What about for persons who have an NTA/OR?
15       A.   ATD is not inclusive or mutually exclusive
16  of processing pathway.  So, we have absolutely
17  released people on an NTA/OR with ATD.  Right?  ATD
18  is just a tracking methodology, not a processing
19  pathway.
20       Q.   Okay.  So, I'm not sure that I'm clear as
21  to what you were just saying.  I guess my
22  question -- and maybe your answer was responsive,
23  but my question was, those who are released on their
24  own recognizance, are they also tracked?
25       A.   So, the... the application of ATD in an
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 135

1   NTA/OR processing pathway is not necessarily
2   inclusive.  Right?  Just because I'm processing an
3   NTA/OR doesn't mean that ICE is going to attach ATD
4   on somebody, but it doesn't mean that they won't.
5   ICE can, if they decide to, place ATD on an
6   individual released on NTA/OR.  So, they're not
7   mutually exclusive or, you know, inclusive, either.
8   Like, it's dependent upon the circumstances, which
9   is really ICE's decision if they're going to place
10  somebody on ATD intensive.  The reason why I'm --
11  I'm trying to answer the best I can, but I really
12  defer you to ICE in regards to that decision-making
13  process and how they're -- and what they're doing
14  with it.
15       **Q.   So, if ATD is an ICE decision-making**
16  **process, then why is it that, for instance, on**
17  **Exhibit 7, which has U.S. Border Patrol Monthly**
18  **Southwest Border Encounters, Parole + ATD is listed**
19  **with numbers for the number of people who are**
20  **processed under the Parole + ATD?**
21       A.   Sure.  So, that is, that is ultimately
22  when ICE is, in essence, placing ATD on somebody who
23  we are processing for parole.  Right?  So, it's the
24  tracking mechanism that is associated with it.
25       Q.   All right.  Is the November memo the only

Page 145

1   Notice to Appear and migrating over to a Parole +
2   ATD in the -- you know, so that -- that's my -- that
3   was my involvement, if you will, in helping, I'll
4   say, or being involved in crafting of this
5   operational guidance memo.
6       Q.   And prior to this operational guidance
7   memo, were families being paroled or released into
8   the interior?
9       A.   Were families being -- are you talking
10  about the, the Parole + ATD aspect of families, you
11  know, when we started utilizing it in the July time
12  frame?  Is that what you're asking for?  And I'm
13  trying to understand your question.
14      Q.   What do you mean "in the July time frame"?
15      A.   So, so, you know, basically, when we
16  started attaching NTRs and -- excuse me, attaching
17  Parole ATDs to those individuals we were placing on
18  parole would have been roughly around in July.  This
19  memo coming out, you know, I'll say formalizing
20  Parole ATD, if you will, under Chief Ortiz's
21  signature in November.  I guess that should probably
22  be the more direct answer for you.
23      Q.   Okay.  So, this guidance or what is
24  described in this guidance started in July of when?
25  2021?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 146

1    A.   Yes, yes.  So, it would have been roughly
2   that time frame when, when we started, you know,
3   collectively between CBP and ICE utilizing the ATD
4   portion of the parole, if you will.
5    Q.   Okay.  And then it wasn't formalized until
6   November of 2021?
7         MR. DARROW:  Same objections.
8         You can answer from your personal
9     capacity.
10    A.   That's when the memo was, was, was
11   completed.
12    BY MS. PATEL:
13    Q.   Okay.  Prior to this memo, were there any
14   trainings or instructions provided to staff as to
15   how to implement what is the process that is
16   described in this guidance?
17         MR. DARROW:  Same objection.
18         You can answer from your personal
19     capacity.
20    A.   You know, there, there is the, the March
21   2021 NTR guidance that was put out, I believe, at
22   that period of time under Chief Rodney Scott's
23   signature.  You know, that was, that was the
24   guidance at that period.
25    BY MS. PATEL:

Page 147

1    Q.   Okay.  So, the NTR policy is reduced to
2    writing?  NTR practice is reduced to writing?
3    A.   I guess I'm not understanding what the
4    question is.  It doesn't -- is there a question,
5    ma'am?  I apologize.
6    Q.   Yeah.  You were talking about the NTR
7    guidance.  Is that a written document?
8    A.   It's the one that's referring to the
9    document that you're, you're seeing here.  Right?
10   "...the prosecutorial discretion and issuance of
11   NTRs as issued in March of 2021."
12   Q.   Okay.  Was there any specific training
13   that border patrol officers received on the process
14   described in this November 2nd memo prior to this
15   memo being formalized?
16          MR. DARROW:  Same objection.
17          You can answer from your personal
18       capacity.
19   A.   So, there, there -- you know, there's a
20   written guidance of NTRs, right, that came out in
21   March 2021, you know, and that is the processing,
22   you know, I-385, G-56.  There was -- there's no
23   written guidance -- again, I'm going to go back to
24   attaching, you know, the monitoring mechanism of the
25   ATD is really ICE, so I defer you to ICE.  But, you

Page 148

1  know, during that time period, you know, previous to
2  November, like July I was just talking about, is
3  when ICE started really, I'll say, attaching the ATD
4  monitoring mechanisms to those who were, who were
5  getting processed for, for release.  Hence, the
6  creation of the Parole ATD application.
7     BY MS. PATEL:
8        Q.   Okay.  I understand that, but was there
9  any training in July that occurred, around July of
10 2021?
11       A.   You'd have to -- you'd have to ask ICE, I
12 mean, how they trained their people to attach ATD.
13 ATD is not a CBP program, so I'd really defer to
14 ICE.
15       Q.   Okay.  Who makes the decision to use a
16 tracking device?
17       A.   You've got to talk to ICE on that one.
18 That's their -- that's their program.
19       Q.   Okay.  So, does that mean that CBP does
20 not make a decision whether to use a tracking
21 device?
22       A.   That's completely ICE's decision.
23       Q.   Okay.  So, prior to the use of Parole +
24 ATD, were families being processed and released
25 under NTA/OR?

Page 149

1    A.    Yes.

2    Q.    Okay.  Was there any other mechanism that
3  families were being processed and released into the
4  interior?

5    A.    So, you know, in certain circumstances,
6  you know, the, the border patrol has utilized parole
7  for humanitarian reasons as well.  An example of
8  that would be, for instance, if somebody, you know,
9  has an extremely serious injury is a prime example.
10  You know, they fall from a fence or, you know -- you
11  know, had a tragic accident in, you know, a
12  smuggling load or something along those lines.  And
13  I -- just to give as an example.  You know, we may,
14  we may place and effectuate humanitarian parole of
15  that individual.  You know, parole is applied on an,
16  on an individual case-by-case basis and thereby, you
17  know, is contingent upon the circumstances
18  surrounding that individual's, you know, situation.

19    Q.    Okay.  Are there any other instances in
20  which you would provide humanitarian parole other
21  than for medical reasons?

22    A.    Oh, of course.  Of course.  I mean, it --
23  it just depends on the circumstances that are, that
24  are surrounding it.  You know, we've had individuals
25  who have, you know, shown up to -- you know, at the

Page 189

1  that's an applicant for admission.  Right?  So, we
2  are, we are determining, you know, on a case-by-case
3  basis what pathway we're going to place that
4  individual into.  Again, I go back to the Title 42,
5  determining if somebody is a border security,
6  national security threat, you know, are they
7  removable, returnable back to their country, you
8  know, what processing pathway is applicable with the
9  TIC time and the detention capacity capabilities of
10 both the sector as well as ICE.  You know, all of
11 these different degrees of factors go into
12 determining that case-by-case basis.
13       **Q.   Okay.  Under the NTA/OR that we were**
14 **previously discussing, do you obtain a warrant for**
15 **arrest?**
16       A.   No, I do not believe a, a warrant for
17 arrest is in an NTA packet.
18       **Q.   Okay.  And in the Warrant for Arrest/NTA -**
19 **detained, in that case a warrant for arrest is**
20 **obtained, correct?**
21       A.   Yes.
22       **Q.   Under what circumstances would you get a**
23 **warrant for arrest?**
24       A.   Most often when they're, when they're
25 getting detained and prosecuted.

Page 190

 1      Q.   Are there any other --
 2      A.   And if they're moving into a period of
 3 detention, right, for administrative proceedings.
 4      Q.   Is that the only instances in which you
 5 would get a warrant of arrest?
 6      A.   No, I mean, there's numerous.  Right?  I
 7 mean, there's, there's numerous.  If, if -- you
 8 know, I mean, you know, we, we get warrants on a
 9 daily basis to be able to arrest criminals, you
10 know, within our, within our operational space on a,
11 on a daily basis.  You know, whether -- you know,
12 for, for a myriad of reasons.  You know, criminal
13 violations.
14      Q.   What about administrative warrants
15 specifically?
16      A.   Yeah, I mean, again, going back to the, to
17 the detention.
18      Q.   Okay.  I just want to make sure I'm clear.
19 So, for -- under what circumstances would you get an
20 administrative warrant of arrest?
21      A.   For the detention -- when somebody is
22 remaining in custody pending their removal
23 proceedings.
24      Q.   Is that the only circumstance in which you
25 would get an administrative warrant of arrest?

Page 191

```
 1     A.   I'm sure there's others, but that's the
 2   one that, that comes to mind.
 3          MS. PATEL:  Okay.  Can I just have a
 4     minute?
 5          MR. DARROW:  Sure.
 6          THE VIDEOGRAPHER:  The time is 1:56 and we
 7     are off the record.
 8          (Brief recess 1:56 p.m. until 1:58 p.m.)
 9          THE VIDEOGRAPHER:  The time is 1:58 and we
10     are back on the record.
11   BY MS. PATEL:
12     Q.   So, when persons are released from CBP
13   custody, do you provide them with information on
14   available resources?  Such as community resources or
15   resources in the communities.
16     A.   So, we provide them with a list of pro
17   bono attorneys, but almost all individuals who are
18   released are transferred -- and this is -- and my
19   assumption is you're talking about people who are
20   released.
21          Released, we transfer them to an NGO, a
22   nongovernment organization, who works to be able to
23   provide them the resourcing that you're talking
24   about as well as onward movement and so on and so
25   forth, you know, and services.  So, we organically
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 198

```
 1    available to people who are released into the
 2    interior?
 3         A.   I don't know.
 4              MS. PATEL:  Okay.  I think I have no
 5         further questions for the 30(b)(6) component of
 6         this deposition, so, Mr. Darrow, if you have
 7         any follow-up.
 8              MR. DARROW:  Yes.  Just briefly and then
 9         we're going to switch over to fact witness
10         time; is that correct?
11              MS. PATEL:  Correct.
12                      CROSS-EXAMINATION
13      BY MR. DARROW:
14         Q.   Chief Barker, when you testified a bit
15    before that we were -- and I don't want to
16    paraphrasing incorrectly, but that you had seen that
17    there were more parole dispositions since January
18    20, 2021, was that due to any policy telling you to
19    use parole more often?
20         A.   No.
21         Q.   What would you describe -- the use of
22    parole more frequently, what were the causes with
23    respect to that?
24         A.   That directly related to the aspect of,
25    you know, we're seeing increased migration to very
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 199

1   specific geographical locations along the Southwest
2   Border, principally Del Rio and Yuma right now -- it
3   was RGV, Del Rio and Yuma, but Del Rio and Yuma
4   right now -- with the population which cannot be
5   removed or returned back to their home country,
6   which is, which is, you know, Cubans, Venezuelans
7   and Nicaraguans.
8           You know, coupled with at the rate that we
9   are encountering and -- you know, and the extremely
10  high, you know, detention rates that we have within
11  the stations and the processing centers in those
12  locations, dangerously high, you know, custody
13  numbers and exaggerated TIC times or high TIC times,
14  you know, the utilization of Parole ATD was
15  utilized -- or is utilized in order to be able to
16  rapidly what I would consider is decompress in
17  selected populations where, again, we have really
18  either no ability to detain or no ability to remove,
19  either.  So, that, that would be utilization of, of
20  the Parole ATD during those time frames that you're
21  referring to.
22      **Q.   And even in scenarios -- I should say in**
23  **scenarios where the high TIC times and high**
24  **decompression rates helps lead to Parole ATD, does**
25  **that necessitate, then, that a particular individual**

Page 200

```
 1   will be realized?
 2        A.   Absolutely not.  You know, very
 3   specifically it's based upon the circumstances of
 4   the individual there.  You know, so it does not
 5   dictate that in any way.  You know, as a matter of
 6   fact, quite conversely.  You know, one of the things
 7   that I had said a couple times so far is that, you
 8   know, our first principal, you know, course of
 9   action is to try and expel someone, and if not, then
10   it is to detain or remove -- you know, detain and
11   remove someone.  So, return or remove.
12             You know, so, so, those are the actual
13   principal mechanisms which we rely on.  You know,
14   for lack of better terms, we're utilizing Parole ATD
15   as an, as an emergency mechanism, you know, a course
16   of last resort, for lack of better terms, in order
17   to be able to rapidly decompress the holdings in
18   woefully overcrowded detention centers with high --
19   or detention facilities, if you will, or processing
20   facilities.  You know, that's, that's what we're
21   utilizing it for.
22             MR. DARROW:  I don't have any more
23       questions.
24             MS. PATEL:  I do have some brief redirect.
25                    REDIRECT EXAMINATION
```