# Exhibit 2

# 30(b)(6) Deposition of Tony Barker August 25, 2022

Tony Barker
August 25, 2022

Page 17

```
 1        Q    Okay.  And so when we -- let's turn back to
 2   the memo.  This memorandum is directed towards Border
 3   Patrol and ICE; is that accurate?
 4        A    Correct.
 5        Q    And so why is it directed towards both CBP and
 6   ICE as opposed to just CBP?
 7        A    So CBP is on there due to the fact that
 8   obviously we are utilizing Parole ATD.  ICE is on there
 9   because of the fact that they -- the ATD portion sits
10   within ICE's functionality.  And what -- and a central
11   part of this memo is also directing the communication
12   between CBP and ICE in regards to expansion, meaning,
13   you know, the application of Parole ATD in a sector or,
14   you know, ceasing, you know, the cessation of
15   utilization of Parole ATD in a sector.
16             What this does is it allows ICE to more
17   effectively plan operationally for the utilization of
18   their ATD mechanisms.  So what it's doing is it's
19   driving a communication between the two as well as a
20   multi-component utilization to be able to process Parole
21   ATDs.
22        Q    And was this specific memorandum distributed
23   to Border Patrol officers?
24        A    To Border Patrol agents, yes.
25        Q    When was it distributed to them?
```

Tony Barker
August 25, 2022

Page 18

```
 1      A    I believe on the 19th is when we had sent it
 2   out.
 3      Q    And that's -- you are referring to July 19th?
 4      A    Yes, ma'am.
 5      Q    And how was it distributed to them?
 6      A    Through our chief of staff mechanism, so they
 7   will be -- you know, they are the ones who distribute
 8   the material.
 9      Q    What is that mechanism?
10      A    Just through e-mail.
11      Q    Okay.  And was there a different version of
12   this memo that was distributed to them as well?
13      A    It would be that version.
14      Q    Okay.  There wasn't a cover memo that was also
15   distributed to Border Patrol agents?
16      A    Not that I'm aware of.  I don't believe we
17   covered it at all.  I think we sent it out as it is.
18      Q    Okay.  Was any training provided to Border
19   Patrol agents?
20      A    No, no, just the memo pretty much speaks for
21   itself as the training for Parole ATD has already been
22   provided to the sectors, the personnel that was
23   previously discussed.
24      Q    Was this memo also distributed to ICE
25   personnel?
```

Tony Barker
August 25, 2022

Page 19

```
 1     A     I believe so, yes.
 2     Q     When was it distributed to them?
 3     A     I'm not sure.  I just know it was sent out.
 4     Q     Okay.  Do you know how it was sent?
 5     A     Via e-mail.
 6     Q     Was any training provided to ICE personnel?
 7     A     I don't believe there was any additional
 8   training as it literally is a continuation of an already
 9   existing mechanism.
10     Q     Do you know if there was a summary version of
11   this document that was also distributed to ICE
12   employees?
13     A     Unknown.  I don't know off the top of my head.
14   I would have to look.
15     Q     Okay.  And so I think during the last
16   deposition you testified as to the processing pathways.
17   Do you remember that?
18     A     Yes.
19     Q     And Parole + ATD was one of those pathways; is
20   that accurate?
21     A     Yes.
22     Q     Is that still one of the main processing
23   pathways that CBP utilizes?
24           MS. RYAN:  Objection.  This is outside the
25       scope of the topic.  He is here to speak about the
```

Page 27

1 and there is security concerns in disseminating
2 that information.
3 BY MS. PATEL:
4     Q    Okay.  Are you applying Parole + ATD currently
5 to persons from countries other than Cuba, Venezuela,
6 and Nicaragua?
7     A    Yes.
8     Q    And how did that come to be under this new
9 policy?
10     MS. RYAN:  Objection.  You can answer.
11     A    Again, it's -- the utilization and application
12 of Parole ATD is not -- the foundation and the criteria
13 is not solely dependent upon the nationality that
14 somebody is, you know, or where they are coming from.
15 There are many other contributing factors that go into
16 whether or not we are going to utilize Parole ATD.
17     We are not solely utilizing Parole ATD for
18 Cubans and Venezuelans, you know, per your question.  It
19 is beyond that scope of demographics.
20 BY MS. PATEL:
21     Q    Okay.  So it is just my understanding from
22 your prior deposition testimony that Parole + ATD was
23 being applied primarily to persons from Cuba, Venezuela,
24 and Nicaragua.  So I am just trying to figure out if
25 there is something under this policy that has allowed it

Tony Barker
August 25, 2022

Page 28

1   to be expanded to persons from other nationalities.

2     A   Sure.  So you are correct in what you just
3  said, but -- the word "primarily" is, you know, your
4  qualifying, you know, adjective, right.  So it's --
5  that's what I was saying.

6        As I sit here today, are we primarily, you
7  know, applying it to Cubans and Venezuelans?  Yes.  Are
8  there other demographics?  Absolutely.  Is it solely
9  based upon, you know, consideration of somebody's
10  demographic?  Absolutely not.  There are several factors
11  that go into whether we are going to utilize Parole ATD
12  or not.

13     Q   So let's go back to the actual policy itself
14  if you can, the administrative record page 2.

15     A   Yes, ma'am.

16     Q   So what is the basis for this policy as it's
17  outlined in this memo?

18     A   What do you mean?  Can you explain?  You mean
19  why we are utilizing Parole ATD?

20     Q   Correct.

21     A   So again, it's going to go directly back to
22  the previous testimony as well.  You know, as we sit
23  here today at 6,500 encounters a day, if not more, we
24  have had days over 7,000, in a finite set of detention
25  capacity and resources along the southwest border, the

Page 63

1    Q    Okay.  Well, thank you.  I appreciate you
2    giving that clarification.
3         All right.  So speaking of this new graph on
4    0247, so can you kind of describe to me the information
5    that is contained in this graph, the chart?
6    A    Yeah, the chart, yeah.  So it's -- you know,
7    the office or facility, you know, in your farthest
8    left-hand side of the column, then the date.  You know,
9    it's a month/year type of date, and then at what degree
10   of capacity of which they are -- you know, the
11   appointments, the people checking in, you know, I will
12   say their ability to be able to accommodate the flow to
13   that office.
14   Q    Okay.
15   A    And it's color-coded, obviously, to the
16   degrees of which that capacity is consumed based on a 0
17   to 100 scale.
18   Q    How does the information contained in this
19   chart support the decision to implement Parole + ATD?
20        MS. RYAN:  Objection, and I will remind the
21   witness not to reveal anything deliberative process
22   privileged.
23   A    So this is not -- this does not impact the
24   triggers identified in the application of Parole + ATD.
25   BY MS. PATEL:

Page 64

```
 1      Q     Okay.  Does it support the decision to
 2   implement Parole + ATD?
 3            MS. RYAN:  Objection, same reminder.
 4      A     This does not -- this does not -- this -- the
 5   information depicted in this chart does not impact the
 6   implementation triggers identified in the memo of
 7   July 18th.
 8   BY MS. PATEL:
 9      Q     Okay.  Well -- but outside of that, those
10   triggers, right, does this in any way support the
11   implementation of Parole + ATD?
12            MS. RYAN:  Objection, same reminders.
13      A     So this -- the information depicted in this
14   chart does not impact the implementation or utilization
15   of Parole ATD, as identified in the triggers in the
16   memo.
17   BY MS. PATEL:
18      Q     All right.  So let's move on to SAR2055.
19      A     Can we take a break just for a second, just
20   for my own -- I don't know if we can or not.
21            MS. RYAN:  Yes, that's fine.
22            THE VIDEOGRAPHER:  Okay.  The time is 2:02 and
23       we are now off the record.
24            (Break from 2:02 p.m. to 2:04 p.m.)
25            THE VIDEOGRAPHER:  The time is 2:04.  We are
```

Tony Barker
August 25, 2022

Page 65

1      now back on the record.
2   BY MS. PATEL:
3       Q   Okay.  During that break, did you discuss any
4   testimony that you previously gave?
5       A   No.
6       Q   Did you discuss any testimony that you were
7   anticipating to give?
8           MS. RYAN:  Objection.  That's attorney-client
9       privilege, the conversations we have.
10          MS. PATEL:  If you are discussing his
11      testimony during a break, that's problematic.
12          MS. RYAN:  He was checking on whether
13      something was privileged.
14  BY MS. PATEL:
15      Q   Okay.  So let's pick up with SAR0255.  And so
16  my question is, what is the information that is
17  reflected in these charts?
18      A   Sure.  So it's the fiscal year -- so we will
19  just take it from the top.  So it's the fiscal year in
20  which the data was collected, right.  So as an example,
21  the top left-hand corner, fiscal year 2014, FMAU [sic],
22  it is an acronym that depicts families.  So it's -- and
23  then these are obviously -- they are compliance metrics.
24          Compliance metrics is indicating the
25  compliance in which they complied to the conditions of

Tony Barker
August 25, 2022

Page 77

```
 1   Customs Enforcement is mailing charging documents to
 2   place noncitizens in removal proceedings who have been
 3   paroled or released under prosecutorial discretion by
 4   Customs and Border Protection."
 5            Do you see that?
 6       A    Yes.
 7       Q    So when it uses the term "parole," is that
 8   referring to parole under Parole + ATD?
 9       A    Yes.
10       Q    Okay.  And then it also uses the term
11   "prosecutorial discretion."  Do you see that?
12       A    Yes.
13       Q    I am going to drop a document into the chat,
14   and so this is an e-mail, the subject of which is
15   Prosecutorial Discretion Authority.
16            (Exhibit No. 4 was received electronically,
17       marked for identification and is attached hereto.)
18   BY MS. PATEL:
19       Q    Have you seen this e-mail before?
20       A    Yes.
21       Q    Okay.  It looks like you are copied on it,
22   right?
23       A    Yes.
24       Q    Is this the prosecutorial discretion that is
25   being referred to in the Comms plan?
```

Page 78

1       A     Yes.

2       Q     Okay.  What is prosecutorial discretion?

3             MS. RYAN:  Objection.  You can answer if you
4       know.

5       A     So as you recall from the first time that we
6   spoke and gave the deposition, we referred to NTRs, the
7   notice to reports.  The original -- you know, before it
8   was realistically applied, you know, we were asking in
9   regards to prosecutorial discretion authority.  That
10  became known as NTR, the notice to reports.  That is
11  what you are looking at right now is the notice to
12  report aspect, the communication pattern in regards to
13  it.

14  BY MS. PATEL:

15      Q     Okay.  So is prosecutorial discretion still
16  being utilized?

17            MS. RYAN:  Objection.

18      A     So we as law enforcement use prosecutorial
19  discretion every day.  Prosecutorial discretion is
20  probably one of the greatest tools that law enforcement
21  has at its disposal to be able to effectively, and
22  through high moral standards, ethics, you know, to be
23  able to apply law with discretion.  I mean, it's the
24  difference what keeps us between a police state and not.
25            So with that being said, that's -- you know,