State of Florida

vs.

United States

Deposition of:

C/R: US Department of Homeland Security (Tony Barker)

July 13, 2022

*Vol 1*

# PHIPPS REPORTING

*Raising the Bar!*

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  3:21-cv-1066

STATE OF FLORIDA,

        Plaintiff,

vs.

UNITED STATES OF AMERICA, et
al.,

        Defendants.
_____/

VIDEO RECORDED REMOTE RULE 30(b)(6) DEPOSITION OF
TONY BARKER, CORPORATE REPRESENTATIVE FOR UNITED
STATES DEPARTMENT OF HOMELAND SECURITY, TAKEN ON
BEHALF OF THE PLAINTIFF

Volume 1
Pages 1 through 137

Wednesday, July 13, 2022
8:33 a.m. CT - 2:17 p.m. CT

Location:  Remote via Zoom
Washington, D.C.

Stenographically Reported Via Zoom By:
Helen Marie Chase
Job No.: 259222

Page 31

1   aspect, which is the delineating difference between

2   the previous role, but as well as the professional

3   staff, mission support, all of those type of things.

4   So, totally encompassing the operations of the

5   sector.

6        Q.    And then, what was your next position

7   within DHS?

8        A.    Sure.  So, after that my next move was

9   here to Washington, D.C. as the Deputy Chief of

10  Operations at headquarters U.S. Border Patrol.  And

11  that was in 2016 -- or, excuse me, that was in 2020,

12  rather.

13       Q.    And what were your job duties and

14  responsibilities?

15       A.    So, at that period of time, you know, in

16  essence, I, I oversee... I'll say the operations,

17  you know, or the liaison in representation of the

18  various sectors in the U.S. Border Patrol through

19  corridors; and then, of course, you know, that

20  thereby I can brief headquarters' leadership in

21  regard to what the field's needs are as well as the

22  national intelligence component for the U.S. Border

23  Patrol.

24       Q.    Okay.  And in that position, were you

25  implementing -- or were you developing any policies?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 32

1      A.    So, in that, in that role I was absolutely

2   involved in the development of policy, advising, if

3   you will, you know.  And, of course, when a policy

4   was decided, you know, then, then, you know,

5   dissemination to the field with regards to

6   implementation.  As far as the execution that

7   happens in the field, I was no longer involved in

8   the execution phase, but really just a compilation

9   in regards to development and then implementation.

10      Q.    Okay.  What type of policies did you help

11   develop?

12      A.    I mean, you know -- you know, as an

13   example, as we're, you know, moving through and

14   helping, you know -- and the policies are in

15   constant, constant periods of reevaluation.  Right?

16   You know, helping to support, you know, our pursuit

17   policies, canine policies, our horse patrol.  These

18   are all different, different policies that were --

19   are in a -- what I consider is a constant state of

20   review and implementation.  We have a policy branch

21   at, at headquarters border patrol which is SPAD, our

22   Strategic Policy Analysis Directorate.  They are the

23   ones who actually do most of the policy work.

24   Ultimately we're in a -- more of a consultation type

25   of application.

Page 49

1      Q.    Do they typically have a form of

2  identification?

3      A.    It just depends.  I mean, I've -- on

4  numerous occasions I've personally encountered

5  people who have not and on numerous occasions I've

6  encountered people who have.  It just depends.

7      Q.    Okay.  How do they determine the alienage?

8      A.    So, you know, you know, again, going back

9  to determine -- you know, asking somebody, you know,

10  where they're born, looking for any type of

11  documentation they may have.  Some people do cross

12  with passports, they do -- sometimes they do cross

13  with birth certificates, and then other times they

14  don't.  And then ultimately, you know, the interview

15  that we're having with that person, you know, is

16  what we will take into consideration.

17      Q.    Is that interview considered to be an

18  inspection?

19      A.    So, so, that -- ultimately it is.  Right?

20  We are interviewing an individual at that point in

21  time and inspecting them.

22      Q.    Okay.  If the border patrol agent

23  determines that they may be violating law, meaning

24  that they are here illegally, what happens at that

25  point?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1          MR. DARROW:  Objection to the form.

2          You can answer.

3     A.   So, if we determine that the individual

4  has entered illegally, then, then most -- well, I'll

5  say most often we will, we will take that person and

6  arrest them, but, again, you know, I think that

7  it's -- I think it's critical to say up front every

8  circumstance is independent upon that circumstance

9  of that encounter.  Right?  So it's -- every

10 encounter is very unique.  We have to evaluate each

11 of those circumstances per that individual.

12   BY MS. PATEL:

13     Q.   Okay.  What do you mean by that?

14     A.   So, you know, it just -- it depends,

15 right, the circumstances surrounding the encounter.

16 You know, as an example, if I have somebody who just

17 purely, you know, crossed the border illegally, you

18 know, who, who might have identification on them,

19 you know, you know, identifying them as born in a

20 foreign country -- we'll just use Guatemala as an

21 example -- you know, and does not have any legal

22 documentation to be legally present in the United

23 States, we'll apprehend them.

24          If we have another individual who's

25 entered illegally but they have created some degree

Page 51

```
 1    of crime in the process, granted, we may apprehend
 2    them, but we may be turning them over to a partner
 3    organization or agency for their prosecutorial
 4    process.  Right?  It just depends upon the
 5    circumstances.
 6              Or we can have somebody who has entered
 7    between the ports of entry as a United States
 8    citizen and not necessarily entering the United
 9    States illegally in the fashion where we would
10    apprehend them, but we will turn them over to Office
11    of Field Operations.
12              So, those are just three examples of
13    situations I confronted myself in my own duties and
14    roles and responsibilities.  And, again, kind of
15    going back to we have to -- each individual
16    circumstance is evaluated, you know, by the officer
17    or the agent.  To broadbrush it is extremely
18    difficult.
19         Q.   Okay.  So, if someone has entered
20    illegally without committing any type of crime --
21         A.   Well, if they entered illegally, they
22    would have committed a crime.
23         Q.   Well, so --
24         A.   Term of illegal means it's committing a
25    crime.
```

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 52

1     Q.    Right.  So, if they committed -- if they

2   entered illegally and then they committed a crime --

3     A.    So, we have two crimes?  I'm just trying

4   to determine --

5     Q.    I'm sorry.  Maybe I'm not being clear.

6     A.    No.

7     Q.    So, they entered illegally and in doing so

8   they've committed a crime?

9     A.    Yes.

10    Q.    Okay.  At that point, is that person

11  arrested and taken to a separate location for

12  processing?

13    A.    So, yes, depending upon the circumstance.

14  It depends on what their nationality is.  So, you

15  know, we, we have the, the public health authority

16  of Title 42, which we would detain somebody, process

17  them, right, which is really just recording the

18  encounter.  You know, and, and then ultimately expel

19  them.  You know, so it's not necessarily an arrest.

20  It's an encounter.  So, it's through the expulsion.

21  Right?

22           And in other circumstances where we can

23  not apply Title 42 to somebody, then -- yes, then

24  they are placed under arrest and taken to a

25  location, you know, most often in order to process.

Page 53

1    In certain circumstances, you know, we, we even have

2    the ability to process directly in the field.  So,

3    taking somebody to a place is really subjective due

4    to the circumstances that, that are present with

5    that, that exact individual.

6         **Q.    Okay.  So, under the situation of Title**

7    **42, what would happen at that point if you**

8    **determined that someone would be expelled under**

9    **Title 42?**

10        A.    Right.  So, we'll take a Mexican national

11   as an example under the circumstances that I'm

12   working on the border with Mexico just to kind of --

13   to, to hone in the situation.

14             So, if we encounter a Mexican national

15   who's crossed illegally into the United States,

16   doesn't have any documentation to be and remain in

17   the United States legally, right, but that person is

18   applicable to Title 42, which we can, we can still

19   apply Title 42 to Mexico, that person's --

20   basically, their biographical and biometric

21   information will be taken in order to be able to

22   record the encounter and to ensure what was the

23   criminality of that person that's in front of us,

24   right, or do they pose a national security or border

25   security risk.

Page 62

1    detention or prosecution is a perfect example, you

2    know, we'll do a Warrant of Arrest/Notice to Appear

3    or we'll have a warrant completed.

4        **Q.   So, when you say "criminal history," are**

5    **you referring to any type of criminal history?**

6        A.   It just depends.  So, it depends on

7    severity of the crime, what the crime is.  You know,

8    are they a CIMT, crime of immoral turpitude.  You

9    know, it just depends on what the criminal history

10   is.  But, ultimately, you know, you know,

11   somebody -- as an example, somebody may have a

12   criminal history for burglary who we're absolutely

13   going to, you know, try to prosecute and detain and

14   remove from the country.  Somebody has a criminal

15   history of speeding on their record, we may not be

16   doing that.

17            It just depends.  It's dependents upon the

18   circumstances in front of us.  And it's dependent

19   upon other circumstances as well.  You know, for

20   instance, the ability for DOJ to prosecute, for us

21   to be able to detain.  There are several

22   circumstances that surround what the ability is.

23       **Q.   Okay.  Does it matter whether the person**

24   **committed a crime in another country as opposed to**

25   **in the United States?**

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 63

1      A.    It's dependent upon -- well, (a), no.  So,

2    it's dependent upon the, the -- our ability to be

3    able to prove that criminal history, right, or to be

4    able to gain the information.  Not every country

5    submits their information into a database which

6    we're able to see, right, international.  It's

7    dependent upon our ability to be able to see the

8    information when a crime is committed in an

9    international -- on an international basis.

10      Q.    Okay.  And so, at the point that we just

11    left off a few minutes ago regarding the obtaining

12    of biographical and biometric information from the

13    individual, at that point is a decision made as to

14    processing pathway?

15      A.    Yes, most often, you know, you know,

16    because we have to determine what pathway we're

17    going to process somebody into, correct.

18      Q.    So, before we get into the processing

19    pathway, I just want to back up and give you a

20    hypothetical.  Instead of it being an individual

21    that was caught -- like, let's just say we have a

22    family unit that crosses the border, they're a

23    hundred feet onto U.S. soil and they're an applicant

24    for admission.  Can you describe the pathway in that

25    circumstance?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 96

1        Q.    Okay.  So, let's go back to Exhibit 7 and

2    I just want to walk through each of these pathway

3    dispositions with you.

4             The first one is Notice to Appear/Own

5    Recognizance, NTA/OR.  So, when would that be

6    applied to a single adult?

7        A.    Again, it just depends on the

8    circumstances in front of them.  You know, an

9    individual who, you know, is claiming fear, an

10   individual who, you know, may have, we'll say, you

11   know, issues to where they cannot be detained.

12   Fraihat (phonetic) being -- just as an example, just

13   one example.  You know, if we have no available

14   space in order to be able to remove single adults

15   to, you know, in ICE custody; i.e., you know, that

16   locale has no available space open to them, we would

17   end up placing a single adult into an NTA/OR.  You

18   know, those are all -- there's just a variety of

19   circumstances where, where it can be applied.

20       Q.    Let me backtrack a little bit.  Do border

21   patrol agents have discretion in deciding which one

22   of these pathways to use?

23       A.    Yes.

24       Q.    Okay.

25       A.    We have the discretion in order to be able

Page 97

```
 1   to determine which pathway, but, but, you know,

 2   again, there's -- this kind of goes back to your

 3   previous question.  Supervision is well engaged in

 4   the processing areas in monitoring, you know, who

 5   agents are processing, which pathways are assigned

 6   to individuals and so on.

 7        Q.   Are there specific criteria that an

 8   officer would apply in determining which pathway to

 9   choose?

10        A.   It's based upon the circumstances of the

11   individual in front of them.

12        Q.   What do you mean by that?

13        A.   So, so, you know, as in -- I think it's

14   Exhibit 6, you had what appeared to be kind of

15   almost like a decision tree for lack of better

16   terms.  I think it was that number, so don't quote

17   me on it, but -- well, I guess you're going to quote

18   me on it, but, you know, the -- that's, that's like

19   a decision tree, but ultimately the determination is

20   based upon the circumstances in front of the agent

21   at the time of the individual there.

22        Q.   So, there are no set criteria that's

23   applied?

24        A.   Well, I mean, of course, yes, there's set

25   criteria.  I mean, if a person has, you know,
```

Page 98

1  previously been deported, so that's going to be for

2  instance, a reinstatement of a previous removal; if

3  they have an order of removal that has not been

4  effectuated, that's going to be a bag and baggage.

5  I mean, so you kind of see -- that -- again, I go

6  back to it's kind of like a decision tree.  It's not

7  a true decision tree.  So, there are circumstances

8  that are involved in what you're applying that Title

9  8 pathway to to those individuals.

10     Q.   Okay.  Are there any other criteria?  You

11  just named two.

12     A.   Yeah, I mean, there's going to be several.

13  Right?  So, national security, border security

14  threat, what's their criminal history, what's their

15  immigration history, are they applicable to -- you

16  know, to MPP, are they applicable to detention, are

17  they claiming fear, are they not claiming fear, you

18  know, are they a single adult, are they a family

19  unit, what's the detention availability for that

20  person?  I mean, it's -- you know, does ICE have bed

21  space, do they not have bed space to detain?  I

22  mean, these are all a variety of different

23  circumstances that are all taken into those

24  decisions.

25     Q.   Okay.  Does -- you mentioned whether or

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 99

1    not they are or are not a family unit is one of the

2    criteria?

3         A.    Absolutely.

4         Q.    And how is that criteria applied?

5         A.    So, for family units, you know, if we're

6    able to expel them, if we're able to return them

7    rapidly through ER, as an example, you know, then we

8    will -- if those countries are able to or are

9    accepting, you know, individuals back, right,

10   they're allowing us to return or remove individuals,

11   then we will, right, and we'll apply that specific

12   pathway.

13             You know, if they're from a country who is

14   not accepting, you know, returns, removal or

15   expulsions from us, and we have, we have no bed

16   space for detention, then we will utilize a release

17   mechanism for families we have no availability to

18   detain.

19        Q.    Okay.  First you mentioned ER.  Were you

20   referring to Expedited Removal?

21        A.    Expedited Removal.

22        Q.    And you also said when there is no bed

23   space for detention.  Were you referring to bed

24   space at a border patrol facility?

25        A.    So, so, we don't detain.  We will hold in

Page 102

1    illegally, that's what we're going to do.

2         Q.    In what circumstance would you not use

3    Expedited Removal for a particular family?

4         A.    As an example, if they claim fear, we will

5    place them into an, an NTA/OR process because we

6    have no family detentions.  Like, if you place them

7    into ERCF, we have no availability to detain them,

8    you know, and so it's -- ultimately if they claim

9    fear, we'll place them into NTA/OR and their claim

10   of fear will be heard on a non-detained docket.

11        Q.    Okay.  And what percentage of the families

12   complain fear?

13        A.    I couldn't tell you.

14        Q.    Is it a high percentage?

15        A.    So, it just -- it really is dependent.  I

16   couldn't even tell you.

17        Q.    All right.  What if they fail the credible

18   fear screening?

19        A.    That's really where ICE takes over and I

20   defer you to ICE as to their process.

21        Q.    Okay.  So, in the interim if the family

22   cannot be detained in ICE custody, where would they

23   be located?

24        A.    Well, they're placed on NTA/OR, so it's

25   wherever they would be destined to live at.  I mean,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 103

1    we have -- we, as in CBP -- so, speaking strictly

2    with the CBP path, you know, we -- after they are

3    released from our custody, they are really the

4    responsibility of, of -- I'll say the monitoring of

5    that person falls to ICE.

6        Q.   Okay.  But, if I understand correctly,

7    families who are not amenable to Expedited Removal

8    as determined by CBP then get put into a Notice to

9    Appear/Own Recognizance track, at which point they

10    can be paroled or bonded out; is that accurate?

11        MR. DARROW:  Objection, misstates the

12       testimony.

13        You can answer.

14       A.   Yeah, that's, that's not accurate.  It's

15    my fault if I didn't explain it clearly enough.  So,

16    so, there are a couple different pathways.  If we

17    have a family who we cannot -- is not amenable to

18    Expedited Removal, we cannot return to their home

19    country, right, we can't or is not amenable, we will

20    place them into an NTA/OR or a Parole ATD type of

21    pathway for removal -- from release, rather, from

22    our custody.  I'll be very specific with my words.

23    From release from our custody.

24        Q.  When you say release from your custody,

25    does -- that means that they are, in fact, released

Page 106

1    Title 8 pathways.

2        Q.    And then, does the determination as to

3    whether a family is, in fact, a family unit, does

4    that impact the decision as to which processing

5    pathway to choose?

6        A.    Yes.

7        Q.    How so?

8        A.    Because if they're not a family unit, then

9    they're an unaccompanied child and a single adult.

10       Q.    If they are a family unit, how does that

11   impact the decision making in terms of processing

12   disposition?

13       A.    So, if they're a family unit, knowing that

14   there's no family unit detention, you know, we will

15   not utilize a pathway that will -- that would

16   intentionally place a family into, into a detention,

17   right, situation.  You know, there's no point in

18   doing all the paperwork, you know, when there's no

19   detention available.

20       Q.    Okay.  So, going back to Exhibit 7, which

21   of these pathways would be amenable to family units?

22       A.    Well, they would technically all be

23   amenable to family units depending if we had

24   detention or not.

25       Q.    Okay.  Well, you do not have detention,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 108

1    A.    Under the -- when we had the restart of

2   MPP -- and I don't recall the time frame.  I just --

3   I can't remember the month that we restarted MPP in,

4   but, you know, under, under the most recent

5   application or iteration of MPP it's been applied to

6   single adults.

7           MS. PATEL:  And I just want to note for

8           the record that Topic 4 is directly on point as

9           to this line of questioning.

10   BY MS. PATEL:

11    Q.    All right.  So, under what circumstance

12   would CBP apply the NTA/OR to individuals?

13    A.    Single adults?

14    Q.    Correct.

15    A.    It kind of goes back to the question I

16   answered on this earlier, which is really, you know,

17   depending upon the circumstances of that single

18   adult, you know, does ICE have detention

19   availability or not?  You know, does -- is the

20   person applicable to, you know, the Fraihat

21   detention restriction where it's not applicable to

22   them?  You know, these are circumstances where we

23   would, you know, apply an NTA/OR to a single adult.

24    Q.    Okay.  Did you say a Fraihat detention?

25    A.    Yeah.  So, Fraihat litigation is certain

Page 109

1   circumstances which prohibit us detaining.  And it's

2   not us.  I'm using "us" as the larger DHS entity.  I

3   really kind of defer you to counsel and to ICE in

4   regards to that because that's their standards of

5   detention.  But when ICE tells us that they cannot

6   detain a certain individual -- a single adult, they

7   cannot detain a single adult, then that detention

8   pathway is removed, obviously.

9        Q.   Okay.  Do -- those same factors, are they

10  considered as to a family unit?

11       A.   Well, there is no detention of family

12  units currently available, so, yeah, but it's

13  implied, right, because there's no detention.

14       Q.   Understood.  Under what circumstances

15  would CBP apply Parole + ATD to a family unit?

16            MR. DARROW:  Objection, Parole ATD is

17       beyond the scope.  Also, we have another

18       witness to discuss Parole ATD.

19            You can answer.

20       A.   So, Parole ATD would be applied to a

21  Cuban, Nicaraguan or Venezuelan family unit as these

22  three demographic -- or these three country

23  demographics or citizenships, nationalities

24  currently do not allow us to repatriate those

25  individuals, so no returns, no removals, and we have

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 110

1  no current detention capability to be able to detain

2  families; so, therefore, we may utilize the Parole

3  ATD in certain circumstances in the sectors who are

4  impacted by flow with high TIC times as well as high

5  custody numbers.

6      BY MS. PATEL:

7      Q.   All right.   Under what circumstances would

8  Notice to Report be applied to individuals?

9      A.   None.

10      Q.   What about to families?

11      A.   None.

12      Q.   What about Expedited Removal as to

13  individuals?

14      A.   So, if we're able to --

15      Q.   Single adults.

16      A.   Yeah, yeah, yeah, you're talking single

17  adults.   You know, for those, for those single

18  adults who, you know, are originating from a country

19  to where we have, you know, the availability to be

20  able to remove or return them, then we'll place them

21  into an ER, an ER pathway and then, and then place

22  them into custody.   You know, transfer to ICE if ICE

23  has -- and, of course, this is dependent upon ICE

24  either having the availability, meaning the

25  detention space, or CBP having the available holding

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 112

1    right now as well, you know, and -- you know, those

2    are -- you know, they could be placed into NTA/OR or

3    even Parole ATD, just depending on the circumstances

4    surrounding that.

5              It's really is depending on the

6    circumstances with the individual as well as the

7    circumstances around what I consider is custody and

8    detention.

9         Q.   I think we've been over the circumstances

10   in which Expedited Removal would be applied to a

11   family unit.  I'm going to move to the next entry.

12             In what circumstances would Reinstatement

13   of Prior Order of Removal apply to an individual?

14        A.   When we have a previous order of removal

15   and we're reinstating it.

16        Q.   Can it be applied to a family unit?

17        A.   Individuals within the family unit, yes.

18        Q.   Okay.  And what circumstances would a

19   Warrant of Arrest/Notice to Appear-(detained) be

20   applied to an individual?

21        A.   There's a myriad of circumstances.  So,

22   this could be from anything from -- you know, from

23   prosecuting on a simple 1325, you know -- you know,

24   1324s if there -- you know, if there's some type of

25   criminality.  You know, again, I'll broadbrush it in

Page 113

1 regards to if there's a national security or border

2 security or criminal threat there where we're

3 seeking a prosecution or, or we're not -- you know,

4 we're going to place somebody into a detention

5 setting with ICE for, for a removal as well, you

6 know, due to whatever circumstance, criminal ICE

7 maybe one where we're not necessarily going to

8 prosecute for the 1325, but we're going to continue

9 to detain and remove, another example of that.

10         So, these would be all circumstances where

11 we would issue an WA/NTA.  And that's just an

12 example.  There's a myriad of different reasons.

13    Q.    Okay.  What about as a family unit?

14    A.    When would we put a WA/NTA in regards to a

15 family unit?

16    Q.    Correct.

17    A.    We're not right now.  There's no detention

18 for family units.

19    Q.    What about when is there a Voluntary

20 Return for individuals?

21    A.    And it's a Title 8 pathway, so Canada is a

22 perfect example, Mexico is another perfect example.

23 You know, if we encounter, you know, single adults

24 or families, you know, from those countries, you

25 know, we could place them into Voluntary Return,

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 136

1    Parole + ATD policy?

2        A.    Well, it's not a policy, but that's the

3    only Parole ATD guidance that we have out at this

4    time is the November -- that's the -- what I

5    consider the superseding memo.

6        Q.    Okay.  You're saying it's not a policy

7    because it's guidance?

8        A.    Yes, it's operational guidance.

9        Q.    Okay.  So, is it also authorized by some

10   other SOP?

11       A.    No, just the memo.

12       Q.    Give me a minute.  I'm going through my

13   outline.  I might have asked you some of these

14   questions already, so we can...

15           MS. PATEL:  Well, actually, can we take

16       like a five-minute break?

17           MR. DARROW:  Sure.

18           THE WITNESS:  That'd be fantastic.

19           MS. PATEL:  Sorry.  If you ever need a

20       break, please, let me know.

21           THE WITNESS:  I'm hanging with you.  I'm

22       hanging with you.

23           MS. PATEL:  All right.  Let's take a

24       five-minute break and we can go off the record.

25           THE VIDEOGRAPHER:  The time is 11:41 and

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 145

1   Notice to Appear and migrating over to a Parole +

2   ATD in the -- you know, so that -- that's my -- that

3   was my involvement, if you will, in helping, I'll

4   say, or being involved in crafting of this

5   operational guidance memo.

6        Q.   And prior to this operational guidance

7   memo, were families being paroled or released into

8   the interior?

9        A.   Were families being -- are you talking

10  about the, the Parole + ATD aspect of families, you

11  know, when we started utilizing it in the July time

12  frame?  Is that what you're asking for?  And I'm

13  trying to understand your question.

14       Q.   What do you mean "in the July time frame"?

15       A.   So, so, you know, basically, when we

16  started attaching NTRs and -- excuse me, attaching

17  Parole ATDs to those individuals we were placing on

18  parole would have been roughly around in July.  This

19  memo coming out, you know, I'll say formalizing

20  Parole ATD, if you will, under Chief Ortiz's

21  signature in November.  I guess that should probably

22  be the more direct answer for you.

23       Q.   Okay.  So, this guidance or what is

24  described in this guidance started in July of when?

25  2021?

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 146

1     A.   Yes, yes.  So, it would have been roughly

2   that time frame when, when we started, you know,

3   collectively between CBP and ICE utilizing the ATD

4   portion of the parole, if you will.

5     **Q.   Okay.  And then it wasn't formalized until**

6   **November of 2021?**

7           MR. DARROW:  Same objections.

8           You can answer from your personal

9       capacity.

10    A.   That's when the memo was, was, was

11   completed.

12    BY MS. PATEL:

13    **Q.   Okay.  Prior to this memo, were there any**

14   **trainings or instructions provided to staff as to**

15   **how to implement what is the process that is**

16   **described in this guidance?**

17          MR. DARROW:  Same objection.

18          You can answer from your personal

19      capacity.

20    A.   You know, there, there is the, the March

21   2021 NTR guidance that was put out, I believe, at

22   that period of time under Chief Rodney Scott's

23   signature.  You know, that was, that was the

24   guidance at that period.

25    BY MS. PATEL:

Page 147

1    Q.    Okay.  So, the NTR policy is reduced to

2    writing?  NTR practice is reduced to writing?

3    A.    I guess I'm not understanding what the

4    question is.  It doesn't -- is there a question,

5    ma'am?  I apologize.

6    Q.    Yeah.  You were talking about the NTR

7    guidance.  Is that a written document?

8    A.    It's the one that's referring to the

9    document that you're, you're seeing here.  Right?

10    "...the prosecutorial discretion and issuance of

11    NTRs as issued in March of 2021."

12    Q.    Okay.  Was there any specific training

13    that border patrol officers received on the process

14    described in this November 2nd memo prior to this

15    memo being formalized?

16          MR. DARROW:  Same objection.

17          You can answer from your personal

18          capacity.

19    A.    So, there, there -- you know, there's a

20    written guidance of NTRs, right, that came out in

21    March 2021, you know, and that is the processing,

22    you know, I-385, G-56.  There was -- there's no

23    written guidance -- again, I'm going to go back to

24    attaching, you know, the monitoring mechanism of the

25    ATD is really ICE, so I defer you to ICE.  But, you

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 148

1    know, during that time period, you know, previous to

2    November, like July I was just talking about, is

3    when ICE started really, I'll say, attaching the ATD

4    monitoring mechanisms to those who were, who were

5    getting processed for, for release.  Hence, the

6    creation of the Parole ATD application.

7        BY MS. PATEL:

8        Q.    Okay.  I understand that, but was there

9    any training in July that occurred, around July of

10   2021?

11       A.    You'd have to -- you'd have to ask ICE, I

12   mean, how they trained their people to attach ATD.

13   ATD is not a CBP program, so I'd really defer to

14   ICE.

15       Q.    Okay.  Who makes the decision to use a

16   tracking device?

17       A.    You've got to talk to ICE on that one.

18   That's their -- that's their program.

19       Q.    Okay.  So, does that mean that CBP does

20   not make a decision whether to use a tracking

21   device?

22       A.    That's completely ICE's decision.

23       Q.    Okay.  So, prior to the use of Parole +

24   ATD, were families being processed and released

25   under NTA/OR?

Page 149

1      A.   Yes.

2      Q.   Okay.  **Was there any other mechanism that**

3  **families were being processed and released into the**

4  **interior?**

5      A.   So, you know, in certain circumstances,

6  you know, the, the border patrol has utilized parole

7  for humanitarian reasons as well.  An example of

8  that would be, for instance, if somebody, you know,

9  has an extremely serious injury is a prime example.

10  You know, they fall from a fence or, you know -- you

11  know, had a tragic accident in, you know, a

12  smuggling load or something along those lines.  And

13  I -- just to give as an example.  You know, we may,

14  we may place and effectuate humanitarian parole of

15  that individual.  You know, parole is applied on an,

16  on an individual case-by-case basis and thereby, you

17  know, is contingent upon the circumstances

18  surrounding that individual's, you know, situation.

19      Q.   Okay.  **Are there any other instances in**

20  **which you would provide humanitarian parole other**

21  **than for medical reasons?**

22      A.   Oh, of course.  Of course.  I mean, it --

23  it just depends on the circumstances that are, that

24  are surrounding it.  You know, we've had individuals

25  who have, you know, shown up to -- you know, at the

Page 150

 1   border with, with, you know, bullet wounds.  We've

 2   had -- I mean, just it -- you know, there are just

 3   different circumstances.  Right?  I mean, the vast

 4   majority of them are, are all medical related.

 5        Q.   Okay.  I'm just tying to figure out

 6   whether there's, like, an unfettered discretion in

 7   when to provide humanitarian parole or whether

 8   there's any confines of criteria with respect to

 9   that?

10        A.   So, you know, again, I go back to the

11   case-by-case basis.  Right?  So, there's -- it's not

12   what I would consider as unfettered, by any means.

13   I mean, when we you take a look at each individual

14   circumstance that's presented to us, you know, we

15   attempt to detain or remove those individuals, you

16   know, it may be other circumstances with that

17   individual detention or capacity which drive us to

18   utilize different pathways.

19        Q.   So, whether you use humanitarian parole

20   could also be driven by detention capacity?

21        A.   True, could be.

22        Q.   How often does that happen?

23        A.   So, the, the -- you know, the

24   circumstances which we face -- and it's actually

25   noted in the memo that you just sent us -- with

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

Page 151

1    COVID-19 would be, would be a case in point of a --

2    you know, a humanitarian utilization of Parole ATD,

3    right, in order to be able to rapidly decompress,

4    decompress our, our detention facilities or, you

5    know, our custody and holding numbers because of the

6    pandemic.

7            You know, I'll be honest with you, we've

8    lost 19 border patrol agents to COVID, COVID deaths,

9    you know, directly associated with COVID that they

10   have contracted on duty working in, you know,

11   facilities which are, which are well over capacity

12   and in that congregate setting, you know, creating a

13   significant life and safety risk to the agents,

14   officers, migrants and professional staff that are

15   all being detained there.

16           So, so, I'll be honest, sitting here as

17   the Chief of Operations, having spent, you know, 21

18   plus years in a green uniform working on the border,

19   19 deaths that, that are associated with, you know,

20   a public health pandemic due to overcrowding within

21   our facilities is something that we take direly

22   seriously not only for the agents, but for the

23   migrants and the professional staff working in that

24   environment as well.

25           Q.   Okay.  I believe you previously testified

Page 166

1    A.    Since January 2021?  So, you know, the --

2    and it's really not even a pathway, to be honest,

3    but, you know, the application or utilization of

4    parole, which was a pathway previous to January 20,

5    2021, you know, is a pathway that we have utilized

6    more often, but as far as new pathways being

7    presented, it's not a new pathway.

8    **Q.    Why has parole been used more often?**

9    A.    Again, it goes back to the processing time

10   frames that we, we spoke about earlier.  Again, it

11   goes back to the detention conditions, the high TIC

12   times, the high capacity numbers, the fact that we

13   have no return mechanisms to, to certain

14   demographics like Cubans, Venezuelans, Nicaraguans.

15   It's those circumstances which we talked about

16   earlier.

17              I mean, the COVID pandemic, you know, the

18   literal death and dying of agents and officers as

19   they try to do their job, you know, in protecting

20   the border, you know, and as well as protecting the

21   migrants and the professional staff that are working

22   every day as well.

23              So, there are certain real -- there's

24   certain applications of parole like we've spoken

25   about during those circumstances.  Again, based upon

Page 167

1    the circumstance of the individual in front of us as

2    well.

3         Q.    I just want to -- a point of

4    clarification.  For Parole + ATD, when it comes to

5    family units, is that applied to families regardless

6    of their nationality?

7         A.    So, it -- Parole + ATD may be applied,

8    and, and at this point in time, you know, the

9    nationalities in which we are applying Parole ATD

10   are Cubans, Venezuelans and Nicaraguans because we

11   have no return rights to those countries, either.

12   We can't send them back.

13              If we have a return mechanism in order to

14   be able to send somebody back to another country --

15   I'll just use Colombia as an example -- you know, we

16   will process them accordingly and, and return them

17   to the best of our ability.  Guatemala is another

18   prime example of a country, you know, that we have

19   return rights to.  Right?  So, if we're able to

20   return somebody to their home country, then we will,

21   we will place them into a removal type proceeding.

22        Q.    Okay.  So, as of right now, it's only

23   being applied to those nationalities that you just

24   mentioned; is that fair?

25        A.    So, yes, by and large to those, those

Page 186

```
 1        A.    Okay.  All right.  I'm on page 12 now.

 2        Q.    I'm looking at the top chart.

 3        A.    Okay.  I gotcha.

 4        Q.    Okay.  Can you actually explain to me

 5   what's in this chart?

 6        A.    Let me just read real quick.  All right.

 7   So, these are going to be all individuals who, who

 8   we have -- just one second.  Just one second.  Let

 9   me zoom out here.  Okay.  So, these are going to be

10   individuals who, who were processed for an NTA/OR

11   and that, that could have been detained and they

12   were placed on an NTA/OR due to the fact that ICE

13   did not have space available for detention.

14              So, then, of course, the parole aspect is

15   exactly the same thing.  Right?  So, they were

16   processed for parole due to the fact that ICE did

17   not have space for detention.

18        Q.    Okay.  Is that as to both of the totals as

19   listed in the right-hand column, the 105,000 and the

20   101,000?  Because I see that "Lack of Space" is --

21        A.    Yes.

22        Q.    -- also noted for that top row.

23        A.    Yeah, I mean, I'm not the originator of

24   the document.  Do I know the numbers?  I mean, I

25   think it's probably -- the way that I'm reading it
```

Page 187

1    is encompassing both of those aspects for lack of

2    space, but, but I'd have -- you'd have to ask who

3    polled it.

4          Q.   So, I'm looking at the footnote below.

5    It, essentially, infers or states that that "Lack of

6    Space" category was kind of added in by whoever was

7    inputting the information?

8          A.   Yes.

9          Q.   Okay.  But that's not something that the

10   agent necessarily has to put in a descriptor; is

11   that accurate?

12         A.   It is not a -- what I would consider as a

13   prefill or a check box or a drop down, you know what

14   I mean, so there's -- so, it has to be manually

15   entered.

16         Q.   Okay.  Other than Lack of Space, are there

17   other entries that people typically put in for the

18   reason for an NTA or OR?

19         A.   Yeah, I mean, it could be, you know, you

20   know, that, that they are claiming fear and placed

21   in a non-detained docket, you know, because they

22   are, you know, being processed, you know, to have

23   their fear claim heard.

24         Q.   Okay.  Have you seen people actually input

25   that descriptor into this information system?

Page 189

1    that's an applicant for admission.  Right?  So, we

2    are, we are determining, you know, on a case-by-case

3    basis what pathway we're going to place that

4    individual into.  Again, I go back to the Title 42,

5    determining if somebody is a border security,

6    national security threat, you know, are they

7    removable, returnable back to their country, you

8    know, what processing pathway is applicable with the

9    TIC time and the detention capacity capabilities of

10   both the sector as well as ICE.  You know, all of

11   these different degrees of factors go into

12   determining that case-by-case basis.

13        Q.   Okay.  Under the NTA/OR that we were

14   previously discussing, do you obtain a warrant for

15   arrest?

16        A.   No, I do not believe a, a warrant for

17   arrest is in an NTA packet.

18        Q.   Okay.  And in the Warrant for Arrest/NTA -

19   detained, in that case a warrant for arrest is

20   obtained, correct?

21        A.   Yes.

22        Q.   Under what circumstances would you get a

23   warrant for arrest?

24        A.   Most often when they're, when they're

25   getting detained and prosecuted.

C/R: US Department of Homeland Security (Tony Barker)
July 13, 2022

1       Q.    Are there any other --

2       A.    And if they're moving into a period of

3    detention, right, for administrative proceedings.

4       Q.    Is that the only instances in which you

5    would get a warrant of arrest?

6       A.    No, I mean, there's numerous.  Right?  I

7    mean, there's, there's numerous.  If, if -- you

8    know, I mean, you know, we, we get warrants on a

9    daily basis to be able to arrest criminals, you

10   know, within our, within our operational space on a,

11   on a daily basis.  You know, whether -- you know,

12   for, for a myriad of reasons.  You know, criminal

13   violations.

14      Q.    What about administrative warrants

15   specifically?

16      A.    Yeah, I mean, again, going back to the, to

17   the detention.

18      Q.    Okay.  I just want to make sure I'm clear.

19   So, for -- under what circumstances would you get an

20   administrative warrant of arrest?

21      A.    For the detention -- when somebody is

22   remaining in custody pending their removal

23   proceedings.

24      Q.    Is that the only circumstance in which you

25   would get an administrative warrant of arrest?

Page 191

1      A.    I'm sure there's others, but that's the

2  one that, that comes to mind.

3            MS. PATEL:  Okay.  Can I just have a

4      minute?

5            MR. DARROW:  Sure.

6            THE VIDEOGRAPHER:  The time is 1:56 and we

7      are off the record.

8            (Brief recess 1:56 p.m. until 1:58 p.m.)

9            THE VIDEOGRAPHER:  The time is 1:58 and we

10     are back on the record.

11  BY MS. PATEL:

12     **Q.   So, when persons are released from CBP**

13  **custody, do you provide them with information on**

14  **available resources?  Such as community resources or**

15  **resources in the communities.**

16     A.    So, we provide them with a list of pro

17  bono attorneys, but almost all individuals who are

18  released are transferred -- and this is -- and my

19  assumption is you're talking about people who are

20  released.

21            Released, we transfer them to an NGO, a

22  nongovernment organization, who works to be able to

23  provide them the resourcing that you're talking

24  about as well as onward movement and so on and so

25  forth, you know, and services.  So, we organically