State of Florida

vs.

United States

---

Deposition of:

Matthew Davies

July 18, 2022

*Vol 01*

---



Matthew Davies
July 18, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA PENSACOLA DIVISION

CASE NO.: 3:21-cv-1066

STATE OF FLORIDA,

             Plaintiff,

VS.

THE UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
Of the United States Department of
Homeland Security, in his official
Capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER,
Acting Commissioner of U.S. Customs
and Border Protection, in his
Official capacity; U.S. CUSTOMS
AND BORDER PROTECTION; TAE JOHNSON,
Acting Director of U.S. Immigration
and Customs Enforcement, in his
official capacity; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; UR M. JADDOU,
Director of U.S. Citizenship
And Immigration Services, in her
Official capacity; U.S. CITIZENSHIP
AND IMMIGRATION SERVICES,

             Defendants.
_____/

REMOTE VIDEO-RECORDED DEPOSITION OF
MATTHEW DAVIES
CORPORATE REPRESENTATIVE OF
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
PURSUANT TO RULE 30 (b)(6)

Monday, July 18, 2022
9:30 a.m. - 12:32 p.m.
Via Zoom
Washington, D.C.

STENOGRAPHICALLY REPORTED BY:
MICHELLE SMITH, RDR, FPR, LCR, CCR, CLR, CLVS, CDVS

Job No. 259225

Matthew Davies
July 18, 2022

Page 2

```
 1    APPEARANCES VIA ZOOM:

 2
      On behalf of Plaintiff:
 3
      OFFICE OF THE ATTORNEY GENERAL
 4    The Capitol, PL-01
      Tallahassee, Florida 32399
 5    (850)414-3665
      ANITA J. PATEL, ESQ.
 6    Anita.patel@myfloridalegal.com
      NATALIE CHRISTMAS, ESQ.
 7    Natalie.christmas@myfloridalegal.com

 8

 9    On behalf of Defendant United States Department of
      Homeland Security:
10
      OFFICE OF IMMIGRATION LITIGATION
11    450 5th Street NW
      Washington, DC 20001
12    202-532-5802
      ERIN T. RYAN, ESQ.
13    Erin.t.ryan@usdoj.gov

14

15    On behalf of Defendant United States of America:

16    DEPARTMENT OF JUSTICE
      P.O. Box 868
17    Ben Franklin Station
      Washington, D.C. 20044
18    202-514-0618
      JOSEPH ANTON DARROW, ESQ.
19    Joseph.a.darrow@usdoj.gov

20

21    On behalf of Defendant Department of Homeland
      Security:
22
      DEPARTMENT OF HOMELAND SECURITY
23    Office of the General Counsel
      2707 Martin Luther King, Jr.  Avenue SE
24    Washington, D.C. 20528
      KAITLYN CHARETTE, ESQ.
25
```

Matthew Davies
July 18, 2022

Page 3

```
 1    On behalf of Defendant U.S. Customs and Border
      Protection:
 2
      U.S. CUSTOMS and BORDER PROTECTION
 3    Office of Chief Counsel
      1300 Pennsylvania Avenue, Suite 4, 4-B
 4    Washington, D.C. 20229
      STEPHANIE MUFFETT, ESQ.
 5    SAMANTHA POON, ESQ.

 6
      Also Present:
 7    David Celani, Legal Videographer
      Carmen Oquendo
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Matthew Davies
July 18, 2022

1   gain a deeper understanding of certain mission

2   support functions.  So I was responsible for their

3   budget, I was responsible for their fleet operations,

4   I was responsible for labor-employer relations and

5   engagement with the Border Patrol union, the typical

6   things you would expect would be related to a mission

7   support position, those were the things that I was

8   responsible for in that position.

9          **Q.  Okay.  So I want to talk to you a little**

10   **bit about the difference between OFO, the Office of**

11   **Field Operations and Border Patrol, what is the**

12   **difference between the two?**

13          A.  The primary difference is that the Office

14   of Field Operations operates at ports of entry,

15   whereas Border Patrol operates between the ports of

16   entry.

17          **Q.  Okay.  So other than the physical**

18   **locations in which they operate, do they have**

19   **different operational, do they operate differently?**

20          A.  So yes, I would say there are some

21   significant differences in our operations.  I think

22   for -- for one, at ports of entry we have some

23   capability to manage the flow of people coming into

24   the ports of entry.  There are operational hours,

25   there are types of ports of entry, classes, so

Matthew Davies
July 18, 2022

1    there's -- there's a way through regulation that we

2    manage that.

3           But I think also very different from Border

4    Patrol, we have a large volume of travelers that we

5    see every day who are legitimate travelers, where

6    people are lawfully entering the United States for

7    all sorts of reasons, who include U.S. citizens, that

8    include non U.S. citizens, both immigrants and

9    non-immigrants.

10          We're required to understand a much more

11   complex mission set I feel at the ports of entry in

12   terms of processing cargo and processing, you know,

13   the people that are coming across that may also

14   include enforcement outcomes similar to what

15   Border Patrol would encounter, but that I think

16   is -- is in a greater level of complexity because of

17   the types of activities we might see at a port of

18   entry.

19          **Q.  Okay.  So do you share similar policies**

20   **with Border Patrol as it relates to undocumented**

21   **citizens, noncitizens?**

22          MS. RYAN:  Objection.

23          A.  So there are authorities, the authorities

24   that we derive are the same, you know, for example

25   when, you know, when I went to the immigration

Matthew Davies
July 18, 2022

Page 29

1          Q.  Who -- what positions would those

2    be?

3          A.  So typically we have within Office of

4    Field Operations you're looking at second-level

5    supervisors who are above that might, if there was a

6    need to issue a warrant or arrest, and maybe I should

7    state that in the majority of our cases where we are

8    processing enforcement actions, the Office of Field

9    Operations does not actually issue a warrant of

10   arrest.  The individuals are in our custody already

11   at the time we're processing them.

12         The -- the general exception that I can think

13   of to that is -- well, there may be cases where there

14   is already a warrant issued, for example in the case

15   where there's already been a removal order issued and

16   we're processing someone who we've encountered who

17   either may -- maybe an arriving alien or maybe is not

18   an arriving alien, but we're not always issuing a

19   warrant in every case.  And in fact, in the majority

20   of our cases we are not issuing warrants at all, it's

21   not required.

22         Q.  Okay.  Does OFO make decisions regarding

23   how to process a specific person, such as choosing

24   one pathway over another?

25         A.  Yes.  I mean on a daily basis we

Matthew Davies
July 18, 2022

Page 30

1   have -- so it kind of starts off before people even

2   cross, you know, in the land border context, before

3   they cross the limit line to see whether they have

4   documents, and then you go from there in terms or

5   whether an individual is a U.S. citizen or non U.S.

6   citizen.

7          And if they are a non U.S. citizen, whether

8   they're an immigrant or nonimmigrant, and if we're

9   getting down to the point where you're talking about

10  noncitizens who don't have proper documents for entry

11  and the types of pathways under which they may be

12  processed, yes, then there -- there is a -- there are

13  generally a number of options available to us, and so

14  there are decisions made at the field level about how

15  and which pathways those individuals would be

16  processed.

17          Q.  Okay.  What is a limit line?

18          A.  The limit line is a reference to the

19  International Boundary Line typically with Mexico and

20  the United States.

21          Q.  Okay.  Do -- does OFO have separate

22  processing facilities than Border Patrol?

23          A.  Yes.  At the ports of entry where OFO

24  operates is typically where we have our facilities,

25  Border Patrol's facilities are -- stations are

Matthew Davies
July 18, 2022

Page 66

1   BY MS. PATEL:

2          Q.  Okay.  So does detention capacity,

3   is that a factor that impacts the processing

4   capacity?

5              MS. RYAN:  Objection.

6          A.  So the detention capacity, so for us at

7   the ports of entry we have temporary holding

8   capacity.  And I think that to the extent we

9   have -- we have worked to minimize the time that

10  individuals are in our temporary holding capacity

11  making referrals to ICE when long-term detention is

12  required.

13          So there is -- there is some consideration

14  given to detention capacity, but for OFO, I will say

15  we have made referrals to ICE for detention on a

16  case-by-case basis as evaluated by our field

17  leadership and have seen that some of those cases

18  where we have made referrals have been accepted by

19  ICE for detention.

20          But I think -- yeah, sorry, so I'll say that

21  hopefully answers your question.

22  BY MS. PATEL:

23          Q.  So have there been instances where they

24  have not accepted the request for detention?

25              MS. RYAN:  Objection.

Matthew Davies
July 18, 2022

Page 68

1    other options ICE may provide if any.

2          So in the case where there's some other

3    option that is pursued, ICE is the one making those

4    decisions and ultimately executing.  There are other

5    cases, including cases that are not -- that may not

6    be referred to ICE on an individual basis where OFO

7    is executing a parole after the initiation of removal

8    proceedings.

9    BY MS. PATEL:

10         **Q.  In what such circumstances would OFO**

11   **entering a parole?**

12         MS. RYAN:  Objection.

13         A.  So if we're talking about people who are

14   issued a notice to appear, then OFO may -- may

15   execute a parole if there are humanitarian or medical

16   concerns.  Largely those are going to be the

17   overriding factors.

18         But we're also looking at whether there is a

19   flight risk, whether there are other factors that

20   would be aggravating and warrant detention.  So we're

21   looking at things like is there a threat posed to the

22   community, is there a concern about a terrorist

23   threat or a national security threat or is there

24   evidence of criminal history, those are the types of

25   things we will be looking at.  And if there was

Matthew Davies
July 18, 2022

1    evidence of any of those threat factors, those are

2    the cases that we would typically be referring to ICE

3    for detention.

4    BY MS. PATEL:

5              **Q.  Okay.  I think it's a good time to**

6    **take a little ten-minute break if you want to do**

7    **that.**

8              MS. RYAN:  Yeah, let's do that, the time

9         is 11:00 exactly so.

10             MS. PATEL:  All right.  Let's be back at

11        11:10.

12             THE VIDEOGRAPHER:  The time is 10:59 and

13        we are off the record.

14             (Brief break.)

15             THE VIDEOGRAPHER:  The time is 11:13 and

16        we are back on the record.

17   BY MS. PATEL:

18             **Q.  All right.  So I want to go back to the**

19   **discussion we were having regarding transfer to ICE**

20   **custody, or ICE detention capacity.  So when you make**

21   **a referral to ICE, does ICE actually take custody of**

22   **the person?**

23             MS. RYAN:  Objection.

24             A.  So the way that we contact ICE in the

25   field, it sometimes varies, because we don't have ICE

Matthew Davies
July 18, 2022

Page 75

1    BY MS. PATEL:

2          Q.   And in what circumstances would OFO issue

3    a notice to appear?

4          A.   So if there is a noncitizen who is

5    inadmissible and CBP has determined that we would not

6    exercise discretion in allowing that individual to

7    voluntarily withdraw their application for admission,

8    or if that person in fact will not voluntarily

9    withdraw their application for admission, those would

10   be the types of cases where OFO might refer an

11   individual for removal proceedings through an

12   NTA.

13         Q.   Okay.   And are the persons listed in this

14   row, are they released or are they detained?

15              MS. RYAN:   Objection, can you clarify

16         which row?

17   BY MS. PATEL:

18         Q.   The row that we were speaking about, the

19   notice to appear row that has the footnote 2

20   associated with it?

21         A.   So I don't think I can tell from the

22   statistics the way they're identified here, whether

23   these individuals were released or retained.

24         Q.   Are there instances that OFO issues a

25   notice to appear but then detains the person?

Matthew Davies
July 18, 2022

Page 76

1            MS. RYAN:  Objection.

2        A.  So there are instances where an

3   individual has been detained after OFO issued a

4   notice to appear, but the person is not detained by

5   OFO, they are transferred to the custody of ICE for

6   that detention.

7   BY MS. PATEL:

8        Q.  Okay.  Does OFO issue notices to appear

9   for individuals and for family units?

10       A.  So when we issue a notice to appear, we

11  issue a notice to appear for each individual.  So

12  even if an individual is part of a family unit, each

13  individual will receive a notice to appear.

14       Q.  And that's regardless of whether the

15  individual is under the age of 18?

16       A.  We would also issue NTA's for people who

17  are under the age of 18, yes.

18       Q.  Okay.  Are there any instances in which a

19  notice to appear is entered for members of a family

20  unit and they are detained?

21            MS. RYAN:  Objection.

22       A.  There might be circumstances that would

23  warrant detention of a family unit.  However, I think

24  in recent history what -- what I am aware of is more

25  often circumstances where an individual, typically a

Matthew Davies
July 18, 2022

Page 77

1  parent of a family unit is separated from other parts

2  of their family for detention if for example it's not

3  possible to detain the entire family unit together.

4  BY MS. PATEL:

5       **Q.  Okay.  Are there any other circumstances**

6  **in which a family unit would not be detained?**

7           MS. RYAN:  Objection.

8       A.  I think there are other circumstances

9  that ICE would be able to identify where they are

10  unable to detain family units.

11  BY MS. PATEL:

12       **Q.  Do you have an understanding of where the**

13  **family units would be detained?**

14           MS. RYAN:  Objection.

15       A.  I -- I don't really know at this point.

16  I know that ICE has -- has changed some of their

17  family detention facilities or contracts recently, so

18  I'm not aware of exactly where.

19  BY MS. PATEL:

20       **Q.  So does OFO just have discretion in**

21  **determining what processing pathway to use?**

22       A.  Are you talking about whether we have

23  discretion to determine whether to apply expedited

24  removal or to issue a notice to appear, I would say

25  generally, yes.

Matthew Davies
July 18, 2022

Page 78

1          Q.  Okay.  Are there specific factors OFO

2     considers when making that determination?

3          A.  So there's a number of factors that are

4     outlined by our discretion directive and that are

5     part of a discretionary checklist that are used by

6     managers in the field any time they are coming to a

7     decision for any adverse action, and those same

8     factors would be -- would be used when making a

9     decision about what type of processing or pathway to

10    pursue.

11         Q.  Okay.  Are those factors the same

12    regardless of whether we're talking about an

13    individual or a family unit?

14              MS. RYAN:  Objection.

15         A.  I think to the extent we look at

16    maintaining family unity, that is a -- an additional

17    factor that may not be considered when we're looking

18    at an individual case, but the general theme of the

19    factors that would be considered is otherwise fairly

20    consistent, yes.

21    BY MS. PATEL:

22         Q.  Okay.  And so what are those other

23    factors?

24         A.  So there's -- there's a checklist that I

25    don't have in front of me, but I know we look at age,

Page 79

1    health.  We look at prior instances of immigration

2    violations.  We look at prior instances of criminal

3    history.  We look at whether there's any threats

4    related to national security or violence to the

5    community.

6         We look at whether we've been able to

7    validate their identity and their citizenship.

8    We -- we look at whether there's any other derogatory

9    information available to us about those

10   individuals.

11        There's a handful of other factors, I don't

12   think I'm capturing all of them, but those are some

13   of the main ones.

14        **Q.  Did you say derogatory information about**

15   **the individuals?**

16        A.  Yes.  What I meant there was that

17   in -- if when reviewing results of our systems

18   queries there was information that reflected a

19   potential risk, we would continually refer to that as

20   derogatory information.

21        **Q.  Okay.  When choosing a processing**

22   **pathway, does OFO consider detention capacity?**

23        MS. RYAN:  Objection.

24        A.  So there are -- we sometimes think about

25   our holding capacity in terms of whether there's

Matthew Davies
July 18, 2022

Page 80

1   going to be an impact on OFO operations.  If we are

2   required to hold an individual, and which may also be

3   impacted by whether there is detention capacity, so

4   in a roundabout way, even if we're not directly

5   considering detention capacity, we may be concerned

6   about the impacts of holding individuals for a

7   prolonged period of time in our limited holding

8   facilities at ports of entry.

9   BY MS. PATEL:

10          **Q.  Are there any restrictions or guidelines**

11  **on how long you can hold someone at your temporary**

12  **holding facility?**

13          A.  Typically we try not to keep people at a

14  port of entry in the holding facility longer than 72

15  hours.  Really we try to get people out quicker than

16  that if at all possible.  And if it -- typically in a

17  case where we're going to have someone who may extend

18  beyond 24 hours, if it's -- if it's possible, we try

19  to temporarily transfer that person into ICE custody

20  so that they can have access to a facility that meets

21  certain standards in regard to detention that we are

22  unable to provide at a port of entry.

23          **Q.  Does the country of origin make a**

24  **difference as to the available processing outcome?**

25          A.  So typically would say no, I know that

Matthew Davies
July 18, 2022

Page 84

1    the circumstances where an individual could be

2    inadmissible after having been inspected at a port of

3    entry.

4            And the cases that would potentially be

5    eligible for parole following that issuance would be

6    those where there are -- where management has decided

7    based on a review of the totality of circumstances

8    and all of the factors outlined in the discretionary

9    checklist, that that's an appropriate outcome, you

10   know, largely focusing on those factors that would

11   represent a threat to the community as the reasons

12   for pursuing detention.

13   BY MS. PATEL:

14       **Q.   Okay.  And that option is available for**

15   **both individuals and families; is that accurate?**

16           MS. RYAN:  Objection.

17       A.   The option of issuing an NTA and then

18   being paroled?

19   BY MS. PATEL:

20       **Q.   Correct.**

21       A.   Yes.

22       **Q.   Okay.  How long does that process**

23   **typically take for an individual?**

24           MS. RYAN:  Objection.

25       A.   It varies.  It varies on a number of

Matthew Davies
July 18, 2022

1    things, depending on what else is actually happening
2    at the port of entry.  If there was -- if there was
3    nothing else happening and it was just an officer
4    focused on processing an individual case, it may take
5    as little as a few hours to complete all of the steps
6    required for processing a notice to appear.
7    BY MS. PATEL:
8         **Q.  And what about the circumstance of a**
9    **family unit?**
10        MS. RYAN:  Objection.
11        A.  So a family unit shouldn't really take
12   that much longer than an individual to the extent
13   that much of their information may be the same.
14   Again, all of this is relative based on whether there
15   are other -- other things, other cases happening at a
16   port of entry, which there always are, but if we had
17   an officer that was processing a family unit and
18   all of the information was the same, and because we
19   have -- if we have determined that for example for
20   minor children it's unnecessary to collect a sworn
21   statement or additional information because we found
22   out from the parents that the information is the
23   same, then that -- that would be time saved in terms
24   of issuing an NTA on an individual basis.  So there
25   would be some increase in the processing time, but it

Matthew Davies
July 18, 2022

```
 1                   THE VIDEOGRAPHER:  The time is 12:11 and
 2           we are back on the record.
 3    BY MS. PATEL:
 4           Q.  Okay.  So I'm going to drop an exhibit
 5    into the chat.
 6                   (Exhibit Number 5 was marked for
 7           identification.)
 8    BY MS. PATEL:
 9           Q.  And so this is Exhibit 5, and it is a
10    copy of one of the monthly status reports for
11    reporting period April 1, 2022 to April 30, 2022,
12    following the Texas v. Biden matter, have you seen
13    this before?
14           A.  Yes.
15           Q.  Okay.  So I'm going to direct you to page
16    five and six.
17           A.  Okay.
18           Q.  So on Page 5 under Office of Field
19    Operations there are two rows, one that
20    says "NTA and Paroled into the U.S. on a case-by-case
21    basis pursuant to 8 U.S.C. § 1182(d)(5)" and
22    another that says "Parole Disposition", do you see
23    that?
24           A.  Yes.
25           Q.  Can you explain to me the difference
```

1   **between the data that's contained in each of these**

2   **rows?**

3        A.  Sure.  So the first row that says NTA and

4   Paroled into the U.S. on a case-by-case basis, that

5   reflects the individuals who -- the noncitizens who

6   were processed for NTA on our Southwest Border and

7   were subsequently paroled, that not -- not referred

8   for detention by ICE.

9        The second column parole disposition is all

10  of the other noncitizens that we processed at the

11  Southwest Border during that period of time, that

12  particular month where the individual was paroled,

13  where they were not put into removal proceedings but

14  where there was some other circumstance that

15  warranted the exercise of our discretionary

16  authority, so.

17       **Q.  Can you give me an example as to the**

18  **parole disposition?**

19       A.  Sure, so there are a number of reasons we

20  might parole an individual into the United States for

21  either humanitarian, law enforcement purposes, for

22  significant public benefit.

23       The most common reasons that we see I think

24  typically along the Southwest Border are urgent

25  medical concerns, there are people coming to attend

Matthew Davies
July 18, 2022

Page 106

1    funerals within a couple of days of a family member

2    who deceased in the United States and they were

3    unable to obtain travel documents.

4           We have noncitizen emergency response workers

5    who are part of mutual assistance agreements between

6    border communities along the border where they come

7    to provide emergency response services in the United

8    States, but would be inadmissible under our temporary

9    visitor classifications.

10          And so they need to be paroled in to perform

11   those functions, those are the types of examples of

12   what would be under the parole disposition.

13          **Q.  And so when they're paroled under the**

14   **parole disposition, are they given any type of**

15   **paperwork?**

16          A.  Yes.  So the -- the documentation for a

17   parole is typically what we call an I-94, that's an

18   arrival/departure record.  Up until a few years ago,

19   we would have given those in paper format but we have

20   been working to automate those records so that

21   individuals who are, even those processed for parole,

22   are able to access an electronic version of their

23   arrival/departure record, their I-94 through CBP's

24   website, i94.cbp.dhs.gov.

25          **Q.  Are there specific conditions for this**

Matthew Davies
July 18, 2022

1    type of parole?

2            A.  So there may be conditions placed on

3    parole.  The primary condition for any parole is that

4    the individual depart the United States either at the

5    completion of the purpose for which it was issued, or

6    at the time frame for which it was approved by

7    CBP.

8            There are other examples of conditions where

9    we have been more explicit, you know, maybe not

10   within the context of this report and, you know, what

11   happened on the Southwest Border in April.

12           But for example with the Operation Allies

13   Welcome, the Afghan individuals who were fleeing that

14   I mentioned earlier, they -- many of those who were

15   processed through ports of entry in Philadelphia and

16   Dulles, Virginia, Washington D.C. area were given

17   explicit conditions on their parole in that they were

18   expected to comply with certain medical procedures,

19   you know, vaccine, and follow up with USCIS

20   after their parole, and those were part of the

21   conditions.

22           So it's possible that conditions are given,

23   but it's not always explicit or put in a written

24   document or served on noncitizen per se.

25           Q.  Okay.  Am I understanding correctly that

Matthew Davies
July 18, 2022

Page 115

```
 1                 (Brief break.)
 2                 THE VIDEOGRAPHER:  The time is 12:28 and
 3            we are back on the record.
 4    BY MS. PATEL:
 5            Q.  All right.  Well, I have concluded my
 6    questioning as to the 30(b)(6) portion of the depo.
 7    So Ms. Ryan, if you have any questions, feel
 8    free.
 9                      CROSS-EXAMINATION
10    BY MS. RYAN
11            Q.  Yes, one question.  You mentioned earlier
12    holding capacity and detention capacity, are those
13    two different things?
14            A.  Yes.  In the context of holding capacity
15    we look at the ability for OFO specifically at
16    ports of entry to hold in a temporary way individuals
17    who we're processing.  That -- that ability is
18    distinct from the detention capacity that ICE has for
19    what we would typically consider longer term
20    detention.
21            And I think I pointed it out at one point
22    earlier, but just to reiterate, the holding
23    facilities that we have at a port of entry, although
24    they follow certain facility design standards for
25    OFO, they are not intended for long-term duration to
```

Matthew Davies
July 18, 2022

Page 116

1   the point that they don't have typically shower

2   facilities, they don't have some of the other

3   amenities that would be affiliated with a long-term

4   detention, there's no library, some of the

5   other things that would be required in an ICE

6   facility.

7          And again, for us, the ability to move people

8   through those holding facilities and either out into

9   a longer-term detention setting or to complete the

10   processing, that is what the holding facilities are

11   designed for, is for us to hold someone temporarily

12   to complete our processing and move them on to the

13   next step so.

14          **Q.  So when you use the phrase "detention**

15   **facility" or "detention capacity", you are referring**

16   **to ICE?**

17          A.  Yes.

18          **Q.  I have no further questions.**

19              MS. PATEL:  I have no redirect.

20              THE VIDEOGRAPHER:  Reading?  Waving?

21          Ordering?

22              MS. PATEL:  So we will order expedited

23          basis, three days, and just a copy of the

24          transcript, not the recording.

25              MS. RYAN:  And Anita, we would ask that