State of Florida

vs.

United States

---

Deposition of:

C/R: Department of Homeland Security (Robert Guadian)

July 14, 2022

---

*Vol 1*



C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

CASE NO:  3:21-cv-1066

STATE OF FLORIDA,

       Plaintiff,

v.

The UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, Secretary
of the United States Department of
Homeland Security, in his official
capacity; UNITED STATES DEPARTMENT
OF HOMELAND SECURITY; TROY MILLER, Acting
Commissioner of U.S. Customs and Border
Protection, in his official capacity;
U.S. CUSTOMS AND BORDER PROTECTION;
TAE JOHNSON, Acting Director of U.S.
Immigration and Customs Enforcement, in
his official capacity, U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; UR M. JADDOU,
Director of U.S. Citizenship and Immigration
Services, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION SERVICES,

       Defendants.
_____/

VIDEO-RECORDED REMOTE DEPOSITION OF
ROBERT GUADIAN,
CORPORATE REPRESENTATIVE OF
UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
PURSUANT TO RULE 30(b)(6)

VOLUME 1
(Pages 1-188)

THURSDAY, JULY 14, 2022
10:14 a.m. - 4:05 p.m. EST
Remote via Zoom
Washington, D.C.

STENOGRAPHICALLY REPORTED REMOTELY VIA ZOOM
BY:  FRANCINE O'CLAIRE, RPR

Job No.:  259224

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 2

```
 1                        APPEARANCES:

 2                      REMOTE VIA ZOOM

 3          On behalf of the Plaintiff:

 4               Office of Attorney General
                 400 South Monroe Street
 5               Tallahassee, FL  32399
                 850-414-3665
 6

 7                BY:  KAREN BRODEEN, ESQ.
                   karen.brodeen@myfloridalegal.com
 8

 9          On behalf of the Defendant United States of
    America:

10

11               U.S. Department of Justice-USAO
                 Civil Division - Immigration Litigation
12               P.O. Box 868
                 Ben Franklin Station
13               Washington, D.C.  20044
                 202-514-0618
14

15               BY:  JOSEPH DARROW, ESQ.
                 joseph.a.darrow@usdoj.gov
16

17               Also Present:  Collin Vickers, DOJ Paralegal
                                Maria Latimer, DOJ Paralegal
18                              Elissa Fudim, DOJ
                                Samantha Poon, CBP
19                              David Celani, Videographer

20

21

22

23

24

25
```

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 3

1                       I N D E X

2     Testimony of ROBERT GUADIAN                    PAGE

3  Direct Examination by Ms. Brodeen                   5
   Cross-Examination by Mr. Darrow                   182
4

5  Certificate of Oath                               185
   Certificate of Reporter                           186
6  Read and Sign Letter                              187
   Errata Sheet                                      188
7

8                   PLAINTIFF'S EXHIBITS

9  EXHIBIT  DESCRIPTION                             PAGE

10    1     Notice of Deposition                       9
      2     DHS Public Organizational Chart           19
11    3     Parole Plus ADT Chart                     40
      4     Notice to Report                          50
12    5     1/27/21 Email from Enrique Lucero         93
      8     Defendants' Responses to Plaintiff's     161
13          First Set of Interrogatories
      9     ICE Data                                 118
14   10     4/29/22 Letter to Alejandra Mayorkas     167
            and Tae Johnson
15   12     2/16/21 Email from Rodney Scott          149
            to redacted name/cc: Raul Ortiz

16

17

18

19

20                (Exhibits are attached.)

21

22

23

24

25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  the field office director in Chicago.

2      All those positions are law enforcement positions.

3      **Q.   Okay.  And then you beat me to my next**

4  **question, summarize professional work experience.**

5      **Is there anything else you've done professionally**

6  **that you'd just not list for me?**

7      A.   Yes.  So my current position is the deputy

8  assist director for field operations here in

9  Washington, D.C.  And my responsibilities are to

10 supervise the 12 ERO field offices east of the

11 Mississippi.

12     **Q.   Okay.  And how long have you been in that**

13 **position?**

14     A.   Since 2020.

15     **Q.   Okay.  You say that is a position with**

16 **responsibility in the east side of the United States?**

17     A.   Correct.

18     **Q.   Okay.  So if we imagine the southwest border,**

19 **does it bisect that in some way?**

20     A.   No.  The east -- The east does not -- I don't

21 have any offices along the southwest border.

22     **Q.   Okay.  Do you have any offices in Florida?**

23     A.   I do.  So our Miami field office is

24 responsible for the entire state of Florida.  Within

25 the state of Florida are a large -- Most of our

Page 16

```
 1   footprint is within an hour of the Miami city limits.
 2   But we do have offices in Tallahassee.  We do have
 3   offices in Jacksonville, Orlando, and Tampa, as well as
 4   smaller -- We have some smaller offices as well,
 5   co-located within some of our county jails.
 6        But I don't recall exactly which county jails
 7   those would be.
 8        Q.    Have you --
 9        A.    We have a fairly large footprint in Florida.
10        Q.    And have you ever been stationed along the
11   southwest border for any of these jobs you've had?
12        A.    Yes; yes.  So the majority of my career was
13   spent along the southwest border.  I became an
14   immigration inspector in Laredo, Texas.
15        I became a deportation officer in Harlingen,
16   Texas, which is in deep South Texas.  Then I went to
17   San Antonio, which also has offices along the southwest
18   border.
19        And then I was in Dallas, which we also have a
20   nexus to the southwest border in some of our locations.
21        Q.    Have you been stationed at the south -- Are
22   you finished?  I'm sorry.
23        A.    Oh, I was about to say I spent 18 years
24   working with the southwest border.
25        Q.    Okay.  And how much time have you spent
```

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 60

1  support those arrests because we're seeing that the

2  arrests from the southwest border can fluctuate; so we

3  want to make sure and keep that capacity available for

4  the Border Patrol to use within a close distance of the

5  border.

6      **Q.   So how many detention facilities does ICE**

7  **operate along the southwest border?**

8      A.   I'm sorry.  I don't recall that number.

9      **Q.   Like --**

10     A.   I can tell -- I don't know an approximate.

11     What I can say is that a majority of our bed space

12  is located along the southwest border.  There's -- That

13  would be the majority of it.

14     **Q.   Okay.  So a majority of your entire detention**

15  **capacity throughout this vast network is located along**

16  **the southwest border; did I get that correct?**

17     A.   Yes, that's my understanding.  I don't have

18  the specific numbers.  But we have a large capacity to

19  hold along the southwest border.

20     **Q.   How many detention facilities does ICE**

21  **operate, not through vendors, but independently operate**

22  **yourselves?**

23     A.   I don't recall.  The Port Isabel Service

24  Processing Center, the -- There's a facility in

25  Phoenix, which is the Florence Service Processing

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      The role that ICE has is to track that case

2  through -- or I should say ERO has is to track that

3  case through the proceedings.

4      Q.    If somebody is scheduled to appear and they

5  don't, does ICE do anything about that?

6      A.    Can you clarify scheduled to appear where?

7      Q.    Before an immigration judge.

8      A.    Okay.  I would -- I would refer you to EOIR

9  and what their policies are for people that don't --

10  for respondents that don't appear in court.

11      But what I can say is that if an immigration judge

12  enters an order in absentia, meaning that the

13  respondent hasn't appeared for his hearing, and the

14  immigration judge has ordered removal, then that case

15  would be referred to ERO.  And we would -- We would

16  locate, arrest, detain and remove that individual from

17  the United States.

18      Q.    So in the ICE tracking mechanism, do you track

19  the scheduling of an immigration proceeding?  Is that

20  part of your tracking or is that not in it?

21      A.    No, not generally.  We do -- we do have -- We

22  get notifications of when hearings occur, our systems

23  that EOIR provides us a next hearing date for

24  individuals.  But there's no -- we're -- We're only

25  coming to -- It's really an EOIR function on how they

Page 89

1  schedule their respondents and when they come in.

2      As I said, we just -- We enforce the decisions of

3  an immigration judge.  If one of those failures to

4  appear in court results in a hearing in absentia and

5  the IJ issues that removal order, at that time ERO will

6  identify where -- actually will locate, arrest, detain

7  and remove an individual.

8      **Q.   So if somebody is released under Parole Plus**

9  **ATD and they do not check-in to an ICE office, what**

10  **happens?**

11      A.   So the -- We have a scheduler within the

12  ICE.gov public-facing website for aliens to schedule

13  themselves to report in, so they very well -- because

14  they have -- Just because someone hasn't checked in,

15  they could still be within the time frame for scheduled

16  check-in, if that makes sense.  They could still be --

17  be with -- For example, if an alien went to check into

18  the -- the immigration appointment scheduler and

19  scheduled their appointment for two months from now,

20  the period from now for two months out doesn't mean

21  that they have -- they haven't -- they haven't failed

22  to check-in; they're just waiting for their appointment

23  to check-in with ICE.

24      **Q.   All right.  So can they check-in with ICE**

25  **online?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 140

1  the family residential standard.

2      They don't fall under PBNDS.  There's specific

3  standards that we utilize to house family units.

4      **Q.   Okay.  And where have you applied those family**

5  **residential unit standards to facilities?**

6      A.   Nowhere currently.  Previously we had applied

7  the family residential standards at our Karnes facility

8  in Texas and our Dilley facility in Texas, and in

9  Pennsylvania the Burkes facility, and as well as our

10 hotel -- our hotels as well when we had hotels.

11     **Q.   Did you say hotels, H-O-T-E-L-S?**

12     A.   Right.

13     **Q.   Like hotels that people check-in to on a**

14 **transient basis?**

15     A.   Yes.  Yes.  So in May of 2021, we entered into

16 a -- a contract with a contract provider to give us

17 act -- to provide us beds at hotels.

18     And what we -- what we did was -- or what the

19 contractor did is rented out the entire hotel so

20 people -- The public weren't allowed to check-in to

21 those particular hotels.  We utilized those hotels for

22 our family detention.

23     **Q.   And where were those hotels located?**

24     A.   I don't know, but the majority of them were

25 along the southwest border --

Page 141

1      Q.    Okay.

2      A.    -- typically.

3      Q.    **And during what period of time were those**

4    **hotels under contract to house family units by ICE?**

5      A.    May 2021 to -- I'm sorry.  March of 2021 to

6    March of 2022.

7      Q.    **Okay.  And what happened in March of 2022 that**

8    **caused them to no longer be used by family units?**

9      A.    So ICE determined that we were experiencing a

10   large number of adults crossing the southwest border,

11   and we needed additional adult beds; and also we

12   determined that ATD was a better alternative for family

13   units.  It was in -- When we released the family on

14   alternatives to detention, it's more humane.  It's a

15   more humane system -- effort in order to track those

16   cases through the system.

17        What we found with our family residential

18   standards were also impacted by litigation that doesn't

19   allow us to detain families more than 20 days.

20        So we made the decision -- As we always are

21   looking at our detention inventory to see how best to

22   support the U.S. Border Patrol in their bed space

23   needs, we made the decision that since more single

24   adults were crossing the southwest border, we made

25   those -- We converted the family residential centers to

Page 144

1  humane.

2      Q.   Oh, okay.  Were the -- Were the conditions at

3  Dilley, Karnes and Burke for family units humane, in

4  your opinion?

5      A.   The conditions were humane, yes.

6      Q.   Okay.  All right.  And were Dilley, Karnes and

7  Burke in operation for family units in 2020?

8      A.   Yes.

9      Q.   What -- Were they used in 2021 for family

10  units for part of that year?

11      A.   Yes.

12      Q.   Okay.  Did it change from family units to

13  something else at any time?

14      A.   Yes, it did.  It changed from family units to

15  single adults.

16      Q.   Single adults; when did it change?  Did all

17  three of them change at the same time?

18      A.   About -- No, they were -- There were different

19  times.  I want to -- I don't know exactly the dates.

20      But about February 2021, we started transitioning

21  the family residential centers to adult beds.  I don't

22  know the exact order.  But I believe that was completed

23  a few months after February where all three locations

24  were converted to single adults.

25      Q.   Okay.  So is it your understanding that

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1  currently those three facilities, Dilley, Karnes and

2  Burke, are operated to detain single adults?

3      A.   Correct.

4      Q.   Who made the decision to transition away from

5  family units being housed by ICE?

6      A.   ICE made that decision.

7      Q.   Okay.  Who at ICE?

8           MR. DARROW:  Objection; that's beyond the

9  scope of any of these topics.

10          MS. BRODEEN:  We have a whole topic about

11 detention capacity.

12          MR. DARROW:  About the capacity, not about

13 decisions on families versus individuals.

14          MS. BRODEEN:  It says including inference to

15 increase or decrease that capacity.  I think this is a

16 reasonable topic under that topic.  It's a reasonable

17 question.

18          Just object and then, you know, let's get on

19 with the answer if he can answer it, if he knows who at

20 ICE made the decision to transition away from family

21 units being housed by ICE.

22 BY MS. BRODEEN:

23      Q.   Who at ICE made that decision?

24          MR. DARROW:  Same objection.  You can answer,

25 if you know.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1      A.    That answer is Tae Johnson, the ICE director.

2  BY MS. BRODEEN:

3      **Q.    And ICE -- something called a Flores consent**

4  **decree?**

5      A.    Can you repeat the question?  I'm sorry.

6      **Q.    Are you familiar with the Flores, F-L-O-R-E-S,**

7  **consent decree?**

8            MR. DARROW:  I'm gonna object again.

9            Flores is not relevant to any of these topics.

10           MS. BRODEEN:  It has to do with your detention

11  centers.  It's one of your --

12           MR. DARROW:  It hasn't conditions --

13           MS. BRODEEN:  Okay.  Just object to the form.

14           Okay. All right.  Go ahead.  You know, you

15  objected; it's outside the scope of topics.

16  BY MS. BRODEEN:

17     **Q.    Go ahead and answer if you can.**

18     A.    Can you repeat the question?

19     **Q.    Are you familiar with the Flores consent**

20  **decree?**

21     A.    Yes.

22     **Q.    Okay.  Is it fair to say that it's difficult**

23  **to create family detention centers that comply with**

24  **that consent decree?**

25     A.    I can't speak to the difficulty.  The family

Page 147

1  residential standards are -- are based on a civil

2  detention model, and we take the Flores agreement

3  into -- And we factor those into our family residential

4  standards.

5      As I stated previously, it's -- The Flores

6  litigation does not allow us to detain families beyond

7  20 days.

8      **Q.   Is it possible for ICE to create new detention**

9  **centers that comply with the Flores consent decree?**

10         MR. DARROW:  Objection again; beyond the scope

11  of this topic.

12         MS. BRODEEN:  Okay.

13         MR. DARROW:  If you know.

14  BY MS. BRODEEN:

15      **Q.   Is it possible that ICE could create new**

16  **detention centers that comply with the Flores consent**

17  **decree?**

18      A.   I don't know that answer.  I know that our

19  authorization for funding of new facilities would be

20  based by congressional appropriation.

21      I'm sorry, I don't know the answer to that.

22      **Q.   And did you ever express concerns about**

23  **closing any of these family-unit facilities?**

24         MR. DARROW:  Objection.  You're talking to the

25  witness now as a 30(b)(6) witness.  If you have

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 156

1      Q.    Okay.  Well, go ahead.

2      A.    So if my memory serves correct, our family

3   residential centers in our hotels did not -- We didn't

4   cease our hotel functions until March of this year of

5   2022, so we would have housed in our hotels.

6         And previous to that, our FRCs were open up until

7   February.  We didn't shut down our first FRC

8   approximately February of 2021, so there should have --

9   there could have been -- There could have been some

10  detentions that our family residential centers in those

11  time frames.

12     Q.    And -- And since November 2, 2021, how many

13  family units have been in ICE detention anywhere?

14     A.    I'm sorry, I don't have that data.

15     Q.    Are there family units since November 2, 2021,

16  that have been in ICE detention?

17     A.    So when -- The term ICE detention, I'm taking

18  it to mean that it also includes hotels?

19     Q.    Yeah.  Your vendors too.

20     A.    Yeah, our vendors.  So we -- we -- Our hotels,

21  we stopped hoteling family units in March of 2022.

22     Q.    And when did Dilley, Karnes and Burke

23  transition to single adults; is that in 2021, did you

24  say?

25         MR. DARROW:  I'm gonna object again before he

Page 175

1  because we're actively working with the lines and

2  getting them -- getting the information to them about

3  how to schedule themselves on the -- on the -- on the

4  scheduler.

5      **Q.   On the online scheduler, correct?**

6      A.   Correct.

7      **Q.   Okay.  So do they need a device to connect to**

8  **the internet and internet service provider to do that?**

9      A.   Yes, they need to go online either with -- and

10  get onto the internet, just like the regular public

11  would either through cellular capabilities or through

12  Wi-Fi or if you're with an internet service provider.

13      **Q.   And do you know how many of these people that**

14  **are released through Parole Plus ATD have access to the**

15  **internet through a device and an internet provider?**

16         MR. DARROW:  Object to form.

17      A.   I don't know the answer to that question.

18  BY MS. BRODEEN:

19      **Q.   What happens to somebody if they fail to**

20  **check-in timely?**

21      A.   Could you explain what you mean by "check-in,"

22  and what do you mean by "timely"?

23      **Q.   Well, I mean, if they're told to check-in to**

24  **ICE within a certain number of days, and they don't**

25  **check-in within that time period, what happens?**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    A.    So there's a -- There's a few things.  So if

2    they're -- A lot of the check-ins, typically a person

3    checks into ICE, they're issued the charging document

4    for these NTR and these Parole Plus ATD cases.

5        As I mentioned previously, some individuals do

6    arrive in line without an appointment.  Those

7    individuals are told to go back home and schedule

8    themselves online.  Excuse me.

9    **Q.    Okay. So -- Go ahead. Keep going.  I'm**

10   **sorry.**

11   A.    No, I was gonna just mention that they're told

12   to go back home and schedule themselves online for an

13   appointment that makes sense to them, you know, working

14   around their schedules.  They can -- It's a self-

15   service type website.  So it's not fair to say, you

16   know, just because they didn't check-in, ICE has to

17   take an action.  They -- They may have checked in, but

18   they're within the time frame to actually check-in.

19   **Q.    What happens if they don't check-in at all?**

20   A.    Again, in this -- In this scenario, just to

21   add some more context, can you describe who ordered the

22   check-in or did they themselves or --

23   **Q.    Okay.  So under the Parole Plus ATD policy, if**

24   **somebody's who released but told to check-in to ICE and**

25   **they fail to check-in to ICE at all, what happens to**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 177

 1   that family unit or the head of household?

 2       A.   So I can tell you that we -- knowing that

 3   during the time period, especially during COVID and

 4   when we were closed, we had quite a bit of people that

 5   couldn't check-in; so what we ended up doing was

 6   issuing their notice to appear via certified mail to

 7   get them in immigration proceedings.  And, furthermore,

 8   we placed -- If they were family units and they were

 9   eligible, if they lived in 11 cities that were

10   considered -- that were cities under our program called

11   dedicated docket, we placed those families on the

12   dedicated docket.

13       The dedicated docket means that they would get

14   expedited hearings.  We would get an immigration

15   hearing done more quickly on a faster track than we

16   would in a regular non-docket.

17       Q.   Okay.  And what percentage of those mailings

18   that were sent by certified mail were returned?

19       A.   So I don't have the data in front of me, but

20   less than five percent of the -- of the individuals

21   that we issued NTAs for have invalid addresses.

22       Q.   Okay.  So you said individuals, what about

23   family units?

24       A.   Yes, that's head of households.

25       Q.   Head of households, so -- And do you track

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

1    sense is that CBP has their own systems that can verify

2    the ability to impact address.

**3        Q.    And match it up with the people that**

**4    supposedly live at that address?**

5        A.    I would have to defer on CBP.  I don't know

6    the mechanics of that end of it in regards to the

7    addresses.

**8        Q.    Okay.  So how did you meet with your field**

**9    director who works for you about what to do for**

**10   response?  Is he -- Is he directing a response or do**

**11   you know if anybody has responded to this letter?**

12             MR. DARROW:  Object to form.

13       A.    I can't answer that.

14             MS. BRODEEN: All right.  Anything else?

15   Okay.  I don't have anything further, so I'll turn it

16   over to -- Hold on.  Let's take a break.  Somebody has

17   a question.  Can we take a five-minute break?

18             MR. DARROW: Sure.

19             THE VIDEOGRAPHER:  The time is 3:47, and we

20   are off the record.

21             (Recess had 3:47 p.m. - 4:00 p.m. EST.)

22             THE VIDEOGRAPHER:  The time is four

23   o'clock p.m., and we are back on the record.

24   BY MS. BRODEEN:

**25       Q.    Okay.  Shortly before we broke, we were**

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 180

1  talking about what happens when somebody who is

2  released under Parole Plus ATD does not check-in, and I

3  believe you said there's a certified letter that's sent

4  to their address?

5      A.   Okay.  So I'll need to clarify.  There

6  isn't -- The notice to appear isn't sent certified

7  mail.  It's sent by regular mail.

8      Q.   Oh, regular mail.  Okay.

9      A.   Correct.

10      Q.   So -- And when you said before about five

11  percent of them come back, is that still your answer

12  that five percent of those sent by regular mail come

13  back?

14      A.   I wouldn't say regular five -- Less than five

15  percent are invalid addresses, and I don't know exactly

16  if we're determining that by the number of returned

17  NTAs or if we're actually doing a home visit; so it

18  could be a combination of things.

19      Q.   So if they give an address and it's actually a

20  valid address, just not theirs, would it necessarily be

21  returned or would they -- would the person who gets it

22  just throw it out?

23          MR. DARROW:  Object to form.  You can answer.

24      A.   I don't know the answer.  Sorry.  The -- The

25  way the NTAs, they're issued via regular mail.

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 185

1                    CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA     )

5    COUNTY OF ESCAMBIA  )

6

7

8

9

10            I, the undersigned authority, certify that

11   ROBERT GUADIAN, Corporate Representative of United

12   States Department of Homeland Security, pursuant to

13   Rule 30(b)(6), appeared remotely before me on the 14th

14   day of July, 2022, and was duly sworn.

15   Identification Produced:  Driver's License

16            Signed this 18th day of July, 2022.

17

18

19

20

21   _____

22

23   FRANCINE O'CLAIRE
     Notary Public State of Florida
24   Comm# 1654948 Exp. 03/31/2025

25

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 186

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA        )

4

5    COUNTY OF ESCAMBIA      )

6

7              I, FRANCINE O'CLAIRE, RPR, do hereby certify

8    that I was authorized to and did stenographically

9    report the foregoing video-recorded remote deposition

10   of ROBERT GUADIAN, Corporate Representative of United

11   States Department of Homeland Security, pursuant to

12   Rule 30(b)(6); that a review of the transcript was

13   requested; and that the foregoing transcript, pages

14   numbered 1 through 184, is a true record of my

15   stenographic notes.

16             I FURTHER CERTIFY that I am not a relative,

17   employee, attorney or counsel of any of the parties or

18   counsel connected with the action, nor am I financially

19   interested in the action.

20             DATED this 18th day of July, 2022.

21

22

23   _____

24        FRANCINE O'CLAIRE, RPR
          Stenographer
25

Page 187

July 18, 2022

Robert Guadian,
Corporate Representative of
United States Department of Homeland
Security, Pursuant to Rule 30(b)(6)


C/O Joseph Darrow, Esquire
joseph.a.darrow@usdoj.com

Re:  State of Florida v. United States of America, et
al.
Case No.:  3:21-cv-1066


Please take notice that on the 14th day of July, 2022,
you gave your deposition in the above cause.  At that
time, you did not waive your signature.  The transcript
is now available for your review.

Please call (888)811-3408 or e-mail
production@phippsreporting.com between the hours of
9:00 a.m. and 4:00 p.m., Monday through Friday, for
access to a read-only PDF transcript via computer.

Please execute the PDF-fillable Errata Sheet which will
be forwarded to you by Phipps Reporting.  The Errata
Sheet can also be downloaded from
www.phippsreporting.com. Once completed, please print,
sign and return to us for distribution to all parties.

If you wish to waive your signature now, please sign in
the blank at the bottom of this letter and return to
the address listed below.


Very truly yours,


Francine O'Claire, RPR
Phipps Reporting, Inc.
www.PhippsReporting.com

I do hereby waive my signature.


_____

ROBERT GUADIAN

Job No.:  259224

C/R: Department of Homeland Security (Robert Guadian)
July 14, 2022

Page 188

1              E R R A T A   S H E E T

2              DO NOT WRITE ON TRANSCRIPT
               ENTER CHANGES ON THIS SHEET

3

4    Style of Case:      STATE OF FLORIDA V. UNITED
                         STATES OF AMERICA, ET AL.
5    Deponent:           ROBERT GUADIAN, CORPORATE
                         REPRESENTATIVE OF UNITED STATES
6                        DEPARTMENT OF HOMELAND SECURITY,
                         PURSUANT TO RULE 30(b)(6)
7    Date of Deposition: JULY 14, 2022
     Case No.:           3:21-cv-1066
8

     PAGE LINE        CORRECTION            REASON

9    Page 19 Line 4 " EMI" delete    recording artifact

10   Page 24 Line 23 "ICRO" to "ICE ERO"     misspelt
     Page 28 Line 9 " Chart to Charge"       misspelt
11   Page 28 Line 19 "INAP" to "INA"         misspelt

12   Page 28 Line 22 "INAP" to "INA"         misspelt
     Page72 Line 18 "BINS" to "FINS"         misspelt
13   Page 78 Line 18 "ADT" to "ATD"          misspelt
     Page 107 Line 16 "NCIC" to "CIS"        misspelt
14

15   Page 123 Line 1 "212b5" to "212d5"
     Page 125 Line line 2 "AL institute black cycle" delete
16   Page 130 line 25 "labor to "waiver"     misspelt

17

18   Page 155 line 6 " IHOC" to "IHSC" misspelt
     Page 168 line 15 "Agudela" to "Agudelo" misspelt
19   Page 173 line 20 "and of equal" delete ,artifact

20   page 179 line 2 "ability to impact" delete,artifact
     page 181 line 14 " "FR" delete , artifact

21

22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
     are true.
23

     SIGNATURE OF DEPONENT: _____
24   Dated this:_____day of _____, 2022.

25   Job No.:  259224