1              UNITED STATES DISTRICT COURT

2          for the Northern District of Florida

3    -------------------------------------------------

4    STATE OF FLORIDA,

5                   Plaintiff,

6      v.

7    UNITED STATES OF AMERICA, et al.,

8                   Defendant.

9    -------------------------------------------------

10

11            Deposition of COREY A. PRICE

12                  Washington, DC

13            Friday, September 9, 2022

14                   11:00 a.m.

15

16

17

18

19

20   Job:  463273

21   Pages:  1 - 155

22   Transcribed by:  Pamela A. Flutie

1        Deposition of COREY A. PRICE, held at the

2   offices of:

3

4

5           ICE Headquarters

6           500 12th Street SW, #5600

7           Washington, DC 20536

8

9

10       Pursuant to Notice/Pursuant to agreement,

11   before Mawira Nyamete, Notary Public in and for

12   the District of Columbia.

13

14

15

16

17

18

19

20

21

22

1          Q.    Okay.  Is it fair to say that over

2     your twenty-four-year ICE career that you have

3     either yourself arrested and had detained or

4     supervised ICE employees who are responsible for

5     the detention of hundreds of thousands of aliens

6     who were illegally present in the United States?

7               MR. DARROW:  Objection.

8          A.    I do not know the number.  But

9     otherwise, that's a yes.

10         Q.    Okay.  It would be a -- it's not a low

11    number; it's going to be a high a high number.

12         A.    Yes.

13         Q.    Okay.  There is nothing inhumane about

14    attaining an alien who entered this country

15    illegally, is there?

16         A.    No.

17         Q.    Okay.  There's nothing cruel about

18    detaining an alien who entered this country

19    illegally, right?

20         A.    No.

21         Q.    Okay.  Would you agree, Director

22    Price, that detention of aliens ensures ICE's

1    ability to remove an inadmissible alien?

2         A.    That's not entirely accurate.

3         Q.    how is it not accurate?

4         A.    Detention in and of itself does not

5    always result in a removal from the United

6    States.

7         Q.    Okay.  But you have two options,

8    detention or release, correct?

9              MR. DARROW:  Objection.

10        A.    We have various options, but -- but in

11   a nutshell, that would be correct.  We can

12   detain, we can place on -- we can have a bond

13   issued for that individual, we can place them on

14   various forms of alternative to detention that

15   can include electronic monitoring, they can be

16   released on an order of recognizance or

17   supervision.  So, we do have various methods,

18   yes.

19        Q.    All those other methods are different

20   forms of release with different levels of

21   supervision, right?

22        A.    Yes.

1  role with respect to the border?

2       A.   ERO has been assisting CBP for many

3  years with being able to detain those that

4  they've arrested and made a custody

5  determination should either come to our custody

6  or requesting that we place them on ATD or

7  things of that nature.  We've been helping

8  there.  We've also been helping them with

9  transportation, both ground and air

10 transportation, to detention facilities or other

11 destinations to include other border patrol or

12 other CBP offices for processing and things of

13 that nature.

14      Q.   Okay.  And you take transfers of

15 aliens from time to time and then repatriate

16 them or -- or return them home if they're

17 subject to remove or expedited removal decision?

18           MR. DARROW:  Objection.

19      A.   Yes.

20      Q.   With bag and baggage?  Have you heard

21 that term before?

22      A.   Yep.

1        Q.    All right.  Again, the 2022 number is

2   roughly half of the 2020 number, right?

3        A.    Correct.

4        Q.    And roughly a third of the 2019

5   number, right?

6        A.    Correct.

7        Q.    All right.  The Biden administration

8   is arresting less illegal aliens than any recent

9   administration, Democrat or Republican, right?

10            MR. DARROW:  Objection.

11       A.    I don't have that data to show the

12   cumulative arrests that the administration

13   regardless of agency has made.

14       Q.    Okay.  And we earlier were speaking

15   about Director Lucero, correct?

16       A.    Correct.

17       Q.    And you actually took over for him --

18   from him, right?

19       A.    I succeeded him, yes.

20       Q.    Okay.  And he was -- actually had the

21   title acting associated director, right?

22       A.    I believe he was --

1   administration decide that ICE should no longer

2   detain family units?

3           MR. DARROW:  Objection.

4       A.   I believe it was the summer or early

5   fall of 2021.

6       Q.   So, it was not days after President

7   Biden was inaugurated?

8           MR. DARROW:  Objection.

9       A.   No.  We were still housing family

10  units there for several months after the

11  administration began.

12      Q.   My -- my question to you was not

13  whether ICE was actually housing any family

14  units.

15      A.   Okay.

16      Q.   My -- my question was when was it

17  decided that the detention -- the family units

18  would end for ICE?

19          MR. DARROW:  Objection.

20      A.   I would not have knowledge of when

21  that decision was made.

22      Q.   Okay.  As you were pretty early on in

1  February of 2021 as the director of ERO, when

2  was it communicated to you that it was decided

3  that ICE would stop housing family units?

4          MR. DARROW:  Objection.

5      A.   We had multiple discussions, I would

6  say over the course of 2021, where we would get

7  the best bang for our buck out of our detention

8  facilities to include the FRCs for a number of

9  reasons.  Border Patrol was in great need of

10  additional detention beds.  So, I think we

11  actually converted back and forth from family to

12  adults a couple of times at places like Diley to

13  try to maximize the utilization of those beds.

14  So, I don't recall like a single point in time

15  when the administration, you know, directed

16  anybody to end family detention.

17      Q.   Who inside ICE would have knowledge

18  about the decision regarding detention of family

19  units?

20          MR. DARROW:  Objection.

21      A.   Again, I -- I would have some

22  knowledge because we did have discussions that

1    were more, I would say, logistical in nature,

2    where we were going to get the best bang for our

3    buck and then, so I would have some of that

4    knowledge.

5        Q.   Who beside you?

6        A.   Acting Director Johnson would have

7    knowledge.  Peter Berg, who is the Acting Deputy

8    Executive Associate Director would have

9    knowledge.  Chief of Staff -- well, former Chief

10   of Staff Tim Perry would have knowledge, and I

11   believe former Deputy Director Matt Allen.  I

12   don't know if PJ Lechleiter was in place at the

13   time, but if he was, then he would have

14   knowledge.

15       Q.   Okay.  I'm going to show you an E-mail

16   then I'm going to mark for identification as

17   Exhibit, I think it's 9 to your deposition.

18   Exhibit 9 is a border patrol E-mail that you're

19   not copied on that recounts a conversation

20   between someone -- and I can't tell you who

21   because it's blacked out -- at ERO and someone

22   at Border Patrol -- and I can't tell you who at

1    border patrol because that also is blacked out -

2    - but the E-mail itself is dated February 16,

3    2021, right?

4         A.   Yes.

5         Q.   Okay.  Just take a minute and you can

6    read it and I'll then ask you a series of

7    questions.

8         A.   Okay.

9         Q.   All right.  And February 16, 2021 is

10   twenty-six days after President Biden was

11   inaugurated, correct?

12              MR. DARROW:  Objection.

13        A.   Correct.

14        Q.   Okay.  And some time before this E-

15   mail was sent, ERO had decided that it was no

16   longer going to detain family units that had

17   previously been detained under the Trump

18   administration, right?  Objection.

19        A.   I can't assume this is a Border Patrol

20   E-mail.  I wasn't part of this.  So, I -- I have

21   no knowledge of any decision in February of 2021

22   to end the family detention, no.

1       Q.   All right.  Well, someone who again, I

2   can't tell who because it's been blacked out,

3   because there's been a privilege claimed, from

4   ERO, at least that's what it's recounting a

5   conversation, right, and somebody at ERO was

6   telling the, I think it's the acting chief of

7   law enforcement at Border Patrol, right, that

8   ERO was no longer going to detain family units,

9   right?

10      A.   That's what it appears on this E-mail

11  that Border Patrol was speaking about, but I

12  don't have knowledge of that conversation.  I

13  don't recall this.

14      Q.   Okay.  Do you recall ever authorizing

15  anyone to communicate to Border Patrol that ERO

16  was ending family detention in February of 2021?

17           MR. DARROW:  Objection.

18      A.   I don't recall that.  I do recall that

19  there were many discussions over the course of

20  2021 on what options we could come up with to

21  increase the number of people we could take into

22  custody or otherwise assist with decompressing,

1    which was the word that Border Patrol was using,

2    decompressing their stations.  But I don't

3    specifically recall this.

4        Q.   Okay.  Are you aware that the -- the

5    communication that is contained in this E-mail

6    or the discussion that is summarized in this E-

7    mail caused Border Patrol to undertake -- to

8    undertake some actions?

9             MR. DARROW:  Objection.

10       A.   No, I'm not aware of that.

11       Q.   Have you ever heard of a program

12   called notice to report?

13       A.   I have.

14       Q.   Okay.  What is noticed to report?

15       A.   I would have to defer to CBP,

16   specifically Border Patrol, what their

17   definition of that is.  I am aware that they --

18   they instituted that.  But for all specifics,

19   I'd have to defer to them.

20       Q.   Okay.  I understand that, you know,

21   you didn't run notice to report.  But notice to

22   report had had an impact -- an effect on ICE,

1   could detain them, but as of today, no, we

2   cannot.

3       Q.   Okay.  So, family units illegally

4   entering the United States across the border

5   right now cannot be detained?

6            MR. DARROW:  Objection.

7       A.   Without converting them back, that's

8   correct.

9       Q.   Okay, all right.  Now, under the

10  Immigration and Nationality Act, aliens who are

11  caught illegally entering the United States are

12  subject to mandatory -- mandatory detention

13  unless they're paroled, right.

14           MR. DARROW:  Objection.

15      A.   Yes.

16      Q.   Okay.  And that parole is supposed to

17  be on a case-by-case decision, correct?

18      A.   To the best of my knowledge, yes.

19      Q.   Okay.  But with this policy on family

20  units, a case-by-case decision cannot be made,

21  because there's no option to detain, right?

22           MR. DARROW:  Objection.

1      A.   I can't speak to that because ICE

2   isn't issuing those paroles.  That's being

3   handled by Border Patrol.  So, I would have to

4   defer to Border Patrol on how they're -- they're

5   instituting their case-by-case decisions.

6      Q.   Okay.  But detention is not an option?

7      A.   For family units right now today,

8   detention is not an option.

9      Q.   Under the Trump administration, parole

10   had been significantly curtailed, right?

11        MR. DARROW:  Objection.

12      A.   I don't know, to the extent of what

13   CBP was, you know, issuing for all under that

14   administration.  I can't speak to that, I'm

15   sorry.

16      Q.   Okay.  Now, are you familiar with a

17   concept called expedited removal?

18      A.   I am.

19      Q.   What is expedited removal?

20      A.   Expedited removal is an authority that

21   an immigration officer can use when that

22   individual is eligible for expedited removal

1    is going out and contracting -- signing a

2    multimillion-dollar contract to put aliens in

3    hotels, right?

4              MR. DARROW:  Objection.

5         A.   Correct.

6         Q.   Right.  Now, the Biden administration

7    has not only ended family detention, the Biden

8    administration have cut ICE's detention capacity

9    significantly, correct? Objection.

10        A.   There have been some facilities that

11   have that have closed or otherwise had contracts

12   terminated while we've had other facilities that

13   have been stood up.  So, I don't know off the

14   top of my head what the total net number of beds

15   is.  Unfortunately, we've had a lot of

16   litigation that has, you know, hampered our

17   ability to detain at some facilities.  So, I'd

18   have to get some more details on that.

19        Q.   I'm going to -- why don't we take a

20   break?

21        A.   Sounds good.

22             VIDEOGRAPHER:  It's 12:29 and we are

1        going off the record.

2    [Off the record at 12:29 p.m.]

3    [On the record at 12:53 p.m.]

4           VIDEOGRAPHER:   The time is 12:53 and

5    we are going back on the record.

6    BY MR. GUARD:

7       Q.   Director Price, your counsel, while we

8    were on break indicated that you wanted to

9    clarify something or talk about something.   Go

10   ahead.

11      A.   Okay.  Yeah -- no, I believe I might

12   have twisted some words when it comes to book

13   ins versus arrests and because I'm not a data

14   expert, I wanted to try to just put it in my --

15   the best English that I could.  Not -- so, every

16   -- there's going to be more arrests than there

17   would be book ins at the end of the day.   I

18   think I might have said that there's more book

19   ins than arrests.  If I did, then that was --

20   that was a mistake.  Whether it be an arrest

21   from CBP, ICE, you know, whatever, there --

22   there's going to be that that whole universe of

1    arrests, but the book ins are going to be those

2    that actually come to ICE custody, and then

3    after they go to ICE custody from that book in,

4    and they may be released on ATD or held in

5    custody.  So, I just wanted to make sure I was

6    clear on that.

7         Q.   Okay.  So, let me make sure I

8    understand it.

9         A.   Yep.

10        Q.   Because that's what part of the

11   purpose is, is to make sure the record is clear.

12   Book ins -- so, arrests include anyone who's put

13   into custody by ICE or CBP?

14        A.   If they're arrested by an immigration

15   officer, they should have an arrest associated,

16   but they wouldn't necessarily have a book in.

17   Again, I'm not the data expert, but that's --

18   that's the best of my understanding, yes.

19        Q.   Okay.  And if they're -- if they are

20   transferred to ICE and a custody decision,

21   detain or release, is being made, then that

22   would record the book in, right?

1   that are in the data on the ICE line, those

2   would be aliens that ICE has arrested, correct?

3       A.   Yes.

4       Q.   All right.  And I think what's you're

5   -- I just want to make sure it's clear -- you're

6   -- what you're -- what you were saying in your

7   clarifying statement is that the aliens that are

8   listed or that are contained in the data that's

9   listed on the ICE line, ICE may have actually

10  arrested more people than that number.  Is that

11  what you're trying to say?

12      A.   That's correct.

13      Q.   Okay.  And so, ICE --

14      A.   I can give you an example of one if --

15  if it's helpful, where it would not result in a

16  book in.

17      Q.   Okay.

18      A.   Like if ICE were to make an arrest,

19  and we make an arrest in Miami, Florida of an

20  at-large alien, but we get there and we find out

21  the alien has a significant medical problem,

22  they're eight months pregnant, whatever, they

1    may be processed on the spot and released on ATD

2    and never be booked in.  So, they would never be

3    reflected as a book in.

4         Q.   Okay, all right.  From -- again, I am

5    talking about ICE not CBP --

6         A.   Yep.

7         Q.   -- exclude those.  How common is it

8    for kind of on-the-spot releases to occur in

9    your enforcement operations?

10        A.   It's a case-by-case.  I wouldn't say

11   that it's real common, but they do occur.  It

12   really depends on, you know, the facts of that

13   case and what the officer is faced with at that

14   time.

15        Q.   Okay, all right.  But anyone who was

16   transferred by CBP to ICE would be included in

17   the CBP book in numbers, correct?

18        A.   Again, I'm not the data expert.  I

19   would have to go to either CBP or my LESA

20   Division to get that, but that's my

21   understanding.

22        Q.   Okay, all right.  I'm going to show

1    we're now -- before the first bullet point on

2    that page, which is kind of a continuation of

3    the bullet from page 3, there's a paragraph that

4    discusses alternatives to detention.  Do you see

5    that?

6         A.   I'm sorry, can you say which paragraph

7    that was again?

8         Q.   So, it's the first full paragraph on

9    page 4.

10        A.   It starts with additionally?

11        Q.   It starts with additionally?

12        A.   Okay.

13        Q.   And that paragraph is discussing

14   alternatives to detention.

15        A.   That's correct.

16        Q.   Okay.  This paragraph discusses that

17   the alternative detention program had an overall

18   absconder rate of 33%, correct?

19        A.   That's correct.

20        Q.   All right.  I'm sure that absconder

21   rate of 33% is lower than if you don't use

22   alternatives to detention.  I'm assuming that

1    for people that are on no supervision, they show

2    up -- they're less likely to show up.

3              MR. DARROW:  Objection.

4         A.   I don't have the data to compare it

5    to.  But yeah, I can assume that.

6         Q.   Okay.  Well, I'll mark this as -- I

7    thought you might know that -- I'll mark this as

8    Exhibit 12 to your deposition.

9         A.   Thank you.

10        Q.   This is a rule that was promulgated

11   by, I believe, the Department of Homeland

12   Security.

13        A.   That's what it says, Department of

14   Homeland Security and Department of Health and

15   Human Services.

16        Q.   Okay, all right.  And I'm just going

17   to briefly -- if you'll flip to page 44405, of

18   Exhibit 12.  If you look at the bottom of the

19   page it says, "According to EOIR," bottom of the

20   page on the far right column.

21        A.   According to EOIR, yep.

22        Q.   Okay.  What is EOIR?

1    requirements of parole, right?

2              MR. DARROW:  Objection.

3         A.   Yes.

4         Q.   Okay.  And so, despite that

5    requirement, or that requirement of mandatory

6    detention, the Biden administration sought to

7    reduce ICE's detention capacity, correct?

8              MR. DARROW:  Objection.

9         A.   I don't know what went into the

10   methodology used in this, but I can tell you

11   that we've never been in a position to detain

12   everybody who has come across the southwest

13   border.

14        Q.   I appreciate that.  But my question

15   was that in the -- with the mandatory detention

16   subject of parole, with a historic surge of

17   aliens across the border, the Biden

18   administration's response was to reduce

19   detention capacity, correct?

20             MR. DARROW:  Objection.

21        A.   It appears so.

22        Q.   Okay.  So, looking at that document

1    being removed in absentia, right?

2              MR. DARROW:  Objection.

3         A.   I would have to discuss with the

4    Office of the Principle Legal Advisor to verify,

5    but I do not believe so.

6         Q.   Okay, all right.  And if Border Patrol

7    had issued them a notice to appear instead of an

8    NTR or processing them pursuant to a parole plus

9    ATD, those same aliens would have been subject

10   to being removed in absentia, correct?

11        A.   That's my understanding.

12        Q.   Okay.

13        A.   Do aliens who are paroled and place on

14   alternatives to detention, either the original

15   Border Patrol policy or their joint policy,

16   remain on ATD until they are removed or granted

17   asylum?

18             MR. DARROW:  Objection.

19        A.   It's a case-by-case basis.  Each case

20   is reviewed by an officer, and depending upon a

21   number of things like medical and criminal

22   history, new criminal history, you know, where

1   the individual is from, I mean, a number of

2   factors would go into that and an officer would

3   make a decision whether to de-escalate or even

4   escalate the form of supervision they're under.

5       Q.   Okay.  Have aliens that were paroled

6   and granted ATD been taken off ATD before they

7   have gone to ICE and completed their immigration

8   interview and gotten into -- gotten a notice to

9   appear?

10          MR. DARROW:  Objection.

11      A.   I don't know if any have or not.  Some

12  ATDs were done via mailout.  So, I just don't

13  have that data.

14      Q.   Okay.  If you want to turn back to

15  Exhibit 18, are you familiar with something

16  known as Operation Horizon?

17      A.   I am.

18      Q.   All right.  What was Operation

19  Horizon?

20      A.   Operation Horizon was an operation

21  that we put together in ICE ERO to address the

22  outcome of the parole plus ATD and before that,

1          MR. GUARD:  I tried to help you there.

2          MR. DARROW:  You tried, thank you.

3      EXAMINATION BY COUNSEL FOR THE DEFENDANT

4  BY MR. DARROW:

5      Q.   Director Price, thank you again for

6  your time today.  Throughout the course of this

7  deposition, there have been a lot of questions

8  that talk about what ICE knew or what ICE did.

9  But just to be clear in this deposition, are you

10 speaking in your individual capacity or on

11 behalf of ICE?

12     A.   My individual capacity.

13     Q.   We talked before about overall figures

14 for removals being down in the past two years.

15     A.   Um-hum.

16     Q.   Can you give us some reasons why that

17 would be the case?

18     A.   Yes, I mean, as I mentioned before,

19 with Title 42, we had a new thing called

20 expulsions where somebody could be expelled

21 under that Title 42 order.  When I say we, it's

22 really CBP that is performing those expulsions.

1   So, those people who have been at court are

2   being expelled now would have ordinarily been

3   put under normal immigration removal proceedings

4   and been removed.  There are two different

5   things.  A removal is not an expulsion, and an

6   expulsion is not a removal.  So, you would have

7   to add them both up collectively to get what

8   should have been just removals in the past.

9         Q.   So, is it fair to say that Title 42 is

10  the most significant piece of the equation as to

11  why removals have been down over this period?

12        A.   I think that's fair.  I mean, we --

13  the pandemic has really changed the entire

14  landscape for us.  So, yes, that would be

15  probably the most significant.

16        Q.   Has the fact that removal numbers are

17  down impaired ICE at all in its mission?

18        A.   No.  Has the fact that the removal

19  numbers are down, has it impaired our mission?

20  No.

21        Q.   Per dollar spent, can ICE ensure

22  greater accountability of non-citizens via

1    alternatives for detention or detention?

2         A.    Greater accountability?  Detention.

3    However, alternatives to detention is a fraction

4    of the cost.  So, I believe the average is

5    around the $7 a day to have somebody on ATD as

6    opposed to, I believe, it's around $130 a day to

7    keep somebody in detention.

8         Q.    So, per dollar spent, ICE is able to

9    have more non-citizens in alternatives for

10   detention than it could if that same amount of

11   money was spent on detention?

12        A.    Yes.  I mean, we have what roughly

13   300,000 on ATD today.  We have approximately

14   26,000 in custody.  So, obviously, we're able to

15   keep tabs, you know, for lack of a better term,

16   on more than 10 times the number today.

17        Q.    We talked a bit about the parole ATD

18   program.  In that program, which agency makes

19   the decision whether to release the non-citizen?

20        A.    On the parole plus ATD program?

21   Border Patrol.

22        Q.    Okay.  What's ICE's role in that

1  program?

2      A.   If the determination is made that that

3  person is going to be released, then ICE -- an

4  officer would come in, review that case for that

5  individual to see what form of ATD would be

6  appropriate, and then they would go ahead and do

7  that.  And not all cases are going to get

8  electronic monitoring.  We have limitations on

9  you know, the number and also there's things

10  like, again, like I mentioned earlier, if we

11  have somebody who is a say a minor, or somebody

12  who is pregnant, they're not going to have say

13  an ankle bracelet.  So, we can't just put that

14  on everybody.

15      Q.   With the family residential centers

16  that ICE formerly had --

17      A.   Yes.

18      Q.   -- what were some of the factors that

19  limited the ability to maximize use of all the

20  space in family residential centers when they

21  were in operation?

22      A.   A number of factors.  So, we have

1  litigation, of course, like I had mentioned

2  before, but one of the biggest drivers I would

3  say would be because of COVID and the

4  restrictions that were put in place because of

5  COVID.  We also have logistical concerns.  If

6  somebody is arrested in say California, you

7  can't necessarily get them to an FRC.  They

8  would have to sit with Border Patrol for several

9  days until they can get a flight for us to fly

10 them down to, you know, South Texas to be held

11 at one of our FRCs.  Like I said, there's a

12 variety of things that impact, you know, our

13 ability to maximize all of our beds.  You have

14 things like the -- the demographics of the

15 family unit itself and, you know, I'm not the

16 expert.  I would defer to my Custody Division to

17 give you all the, you know, facts there.  But if

18 you have, say, a dual head of household mom and

19 dad with a 6-year-old girl, they're not going to

20 be able to be held in the same dorm, as say, a

21 dad with a 13-year-old son.  So, those also kind

22 of limit our ability to how many -- how many

1    people we can put into facility.

2          Q.   Are there fewer limitations with

3    detention of single adults?

4          A.   There are still limitations, but there

5    are fewer than with family.  That's -- that's

6    for sure.

7          Q.   We talked about the Flores consent

8    decree.  That's been in place for decades,

9    right?

10         A.   Yes.

11         Q.   And throughout that entire period of

12   time, ICE always had to release family units

13   before that 21-day mark?

14         A.   Oh, yes.

15         Q.   And when ICE had to release those

16   aliens before that 21-day mark, they were then

17   always being placed on the non-detained docket?

18         A.   They'd be on the non-detained docket,

19   yes.

20         Q.   Okay.  During the period of time when

21   family units were being temporarily held in

22   hotels, were they still being detained by ICE

1    during that period?

2         A.    Yes.

3         Q.    Have the changes to ensuring the

4    accountability of family units impacted ICE's

5    ability to determine the whereabouts and ensure

6    the accountability of those family units?

7         A.    Can you say that one more time?

8         Q.    Sure.  Have the changes to ICE's

9    ability to detain family units impacted ICE's

10   ability to ensure the whereabouts and the

11   accountability of those family units?

12        A.    I mean, we're ATD on them, so we're

13   still, you know, tracking where their locations

14   are, whether they're in custody or out of

15   custody.

16        Q.    Are all non-citizens who are caught

17   entering the country illegally subject to

18   mandatory detention under INA 235?

19        A.    I do not believe so.  I would have to

20   consult with OPLA to verify but no, I do not

21   believe they all are.

22        Q.    They might be subject to other

1   detention authority?

2          A.    Correct.

3          Q.    Do you know what that would be?

4          A.    I don't know the -- the actual

5   citation.  I would have to consult with OPLA to

6   get that.

7          Q.    That authority would allow other

8   release options besides just parole for those

9   aliens?

10         A.    Yes.

11         Q.    What would those release options be?

12         A.    The same that we use now when we

13  release somebody on a bond or order

14  reconnaissance or supervision and then place ATD

15  along with it, we can still use that.

16         Q.    Okay, that's it for me.  Thank you.

17         EXAMINATION BY COUNSEL FOR PLAINTIFF

18  BY MR. GUARD:

19         Q.    All right, I have a few questions.

20         A.    Yes, sir.

21         Q.    You talked about expulsions?

22         A.    Yes.

1              CERTIFICATE OF NOTARY PUBLIC

2      I, Mawira Nyamete, Notary Public for the

3  State of Maryland, do hereby certify that on

4  September 9, 2022, the witness, Corey Price, was

5  sworn before me at the aforementioned location,

6  and that I am neither counsel for, related to,

7  nor employed by any of the parties to this case

8  and have no interest, financial or otherwise, in

9  its outcome.

10      IN WITNESS WHEREOF, I have hereunto set my

11  hand and affixed my notarial seal this 9th day

12  of September, 2022.

13

*Mawira Nyamete*
14  _____

15  NOTARY PUBLIC IN AND FOR THE STATE OF MARYLAND

16

17

18

19

20

21

22

1                    CERTIFICATE OF TRANSCRIBER

2             I, Pamela A Flutie, do hereby certify

3    that the foregoing transcript is a true and

4    correct record of the recorded proceedings; that

5    said proceedings were transcribed to the best of

6    my ability from the audio recording and

7    supporting information; and that I am neither

8    counsel for, related to, nor employed by and of

9    the parties to this case and have no interest,

10   financial or otherwise, in its outcome.

11

12

13

14   _____

15   Pamela A. Flutie

16

17

18

19

20

21

22

ERRATA SHEET FOR THE TRANSCRIPT OF:

Caption:   State of Florida v. The United States of America, et. al.

Deponent: Corey A. Price, Individually

Deposition Date: September 9, 2022

Case No.: 3:21-cv-1066

| Page | Line | Correction | Reason |
|------|------|-----------|--------|
| Pg 15 | 7 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 47 | 14 | Change "loss" to "ALOS" | Mis-spelled.  ALOS is an acronym. |
| Pg 115 | 5 | Change "board parole" to "Border Patrol" | Mis-spelled |
| Pg 122 | 15 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 122 | 16 | Change "Q" to "A" | It was an Answer, not a Question |
| Pg 122 | 17 | Change "A" to "Q" | It was a Question, not an Answer |
| Pg 147 | 12 | Change "we're" to "we use" | Mis-spelled |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true to the best of my knowledge and belief.

Signature of Deponent: _____

Dated this: ___21___ day of ___September___, 2022