|  | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
|  | **NORTHERN DISTRICT OF FLORIDA** |
| 2 | **PENSACOLA DIVISION** |

| | | |
|---|---|---|
| 3 | STATE OF FLORIDA, | ) |
|  | | ) |
| 4 | Plaintiff, | ) |
|  | vs. | ) Case No: 3:21-CV-1066 |
| 5 | | ) |
|  | UNITED STATES OF AMERICA; ALEJANDRO | ) Pensacola, Florida |
| 6 | MAYORKAS, Secretary of the U.S. | ) |
|  | Department of Homeland Security, in | ) December 16, 2022 |
| 7 | his official capacity; U.S. DEPARTMENT | ) 9:01 a.m. |
|  | OF HOMELAND SECURITY; TROY MILLER, | ) |
| 8 | Acting Commissioner of U.S. Customs | ) |
|  | and Border Protection, in his official | ) |
| 9 | capacity; U.S. CUSTOMS AND BORDER | ) |
|  | PROTECTION; TAE JOHNSON, Acting | ) |
| 10 | Director of U.S. Immigration and | ) |
|  | Customs Enforcement, in his official | ) |
| 11 | capacity; U.S. IMMIGRATION AND CUSTOMS | ) |
|  | ENFORCEMENT; UR M. JADDOU, Director of | ) |
| 12 | U.S. Citizenship and Immigration | ) |
|  | Services, in her official capacity; | ) |
| 13 | U.S. CITIZENSHIP AND IMMIGRATION | ) |
|  | SERVICES, | ) |
| 14 | | ) |
|  | Defendants. | ) |
| 15 | _____ | ) |

| | |
|---|---|
| 16 | |
| 17 | **TRANSCRIPT OF PRETRIAL HEARING** |
|  | **BEFORE THE HONORABLE T. KENT WETHERELL, II** |
|  | **UNITED STATES DISTRICT JUDGE** |
| 18 | **(Pages 1 through 128)** |
|  | <u>APPEARANCES</u>: |
| 19 | |
| 20 | For State of Florida:   Office of the Attorney General |
|  |                         by:  **JOHN M. GUARD, JAMES H. PERCIVAL,** |
| 21 |                               **ANITA J. PATEL, NATALIE CHRISTMAS** |
|  |                               **JOSEPH HART** and **KAREN BRODEEN** |
| 22 |                         The Capitol, Suite PL-01 |
|  |                         400 South Monroe Street |
| 23 |                         Tallahassee, Florida 32399 |
|  |                         (850) 414-3300 |
| 24 |                         *james.percival@myfloridalegal.com* |
|  |                         *anita.patel@myfloridalegal.com* |
| 25 |                         *joseph.guard@myfloridalegal.com* |
|  |                         *natalie.christmas@myfloridalegal.com* |

1    APPEARANCES CONTINUED:

2    For the United States:    Office of Immigration Litigation
                               by:  **ERIN T. RYAN**
3                                   **JOSEPH A. DARROW**
                               450 5th Street NW
4                              Washington, D.C. 20001
                               (202) 532-5802
5                              *erin.t.ryan@usdoj.gov*
                               *joseph.a.darrow@usdoj.gov*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2         *(Call to Order of the Court.)*

3              THE COURT:  Good morning.  Please be seated.

4              All right.  This is Case Number 3:21cv1066 State of

5    Florida versus United States.  We're here today for a pretrial

6    conference.

7              Why don't we begin with appearances.

8              MR. GUARD:  Good morning, Your Honor.  John Guard

9    Chief Deputy Attorney General for the State of Florida.

10             MR. PERCIVAL:  James Percival for the State of

11   Florida.

12             MS. CHRISTMAS:  Natalie Christmas for the State of

13   Florida.

14             MS. BRODEEN:  Karen Brodeen for the State of Florida.

15             MR. HART:  Joseph Hart for the State of Florida.

16             MS. PATEL:  Anita Patel for the State of Florida.

17             MS. GERDTS:  I'm a paralegal.  Simona Gerdts.

18             THE COURT:  All right.  Good morning.

19             MR. DARROW:  Good morning, Your Honor.  Joseph Darrow

20   for the United States.

21             MS. RYAN:  Good morning.  Erin Ryan also for the

22   United States.

23             THE COURT:  I think they have you outnumbered,

24   Mr. Darrow.

25             MR. DARROW:  That's how we like it, Your Honor.

1          THE COURT:  All right.

2          All right.  We've got a lot to cover this morning.

3   And one thing I -- well, let me ask this.  From the State's

4   perspective, who's going to be leading the charge?

5          MR. PERCIVAL:  Your Honor, I'll be principally leading

6   the charge.  We did hope to give some of our more junior

7   attorneys an opportunity to talk today, so we've kind of

8   assigned them portions of the motions in limine.  I'm prepared

9   to address everything if you want; but if you're okay with that,

10  we always like to give our junior attorneys an opportunity to

11  speak with the Court.

12         THE COURT:  Any concern with that from the Federal

13  Government's perspective?

14         MR. DARROW:  No, Your Honor.

15         THE COURT:  All right.  Then I'll hear from whoever

16  talks.  If you'll just identify yourself to make sure you get

17  the appropriate designation in the transcript.

18         MR. PERCIVAL:  Thank you, Your Honor.

19         THE COURT:  And y'all can keep your seats for purposes

20  of today since we're fairly informal in this setting.

21         One thing that whenever I have a pretrial conference

22  in preparing for a trial, I typically talk to the parties about

23  the efforts they've made to resolve the case.  This case is

24  obviously a little bit different because it's not:  Write a

25  check and things will go away.  That being said and, you know, I

1   want to preface this with the statement that, you know,

2   obviously I'm going to make a decision in this case based upon

3   the facts and the laws that are presented to me.  But I'm not

4   oblivious to what's going on in the real world, what's being

5   covered in the press, what's going on in Congress.  And while

6   those things don't influence the decision I make, it does raise

7   a question in my mind, because at some level we're all on the

8   same team:  We're all Americans; we're all interested in our

9   country.  And it certainly seems that what's going on at the

10  border is unsustainable.  Whether it's legal, whether it's bad

11  policy, whether it's good policy, whatever it might be, what's

12  going on down there is unsustainable.

13          And I guess what I'm wondering is has there been any

14  efforts at any level to try to come up with a solution that

15  addresses Florida's concerns, recognizing the practical reality

16  that you can't detain everybody.  Have y'all thought about any

17  way to potentially get policymakers or whoever would need to be

18  involved in coming up with a solution to come up with a

19  solution?

20          I'll maybe address that to the Federal Government

21  first.

22          MR. DARROW:  I can stay seated?

23          THE COURT:  However you're comfortable.

24          MR. DARROW:  Thank you, Your Honor.

25          Well, I mean, I think, as you say, all the states, not

1    just Florida, has a very strong interest in the security of the

2    country and border security.  Our clients are constantly working

3    on improving their programs and trying to achieve that.  You

4    know, they're not at all oblivious to the fact that there are a

5    large number of people coming over, and that's why, for

6    instance, the Parole/ATD program has gone through so many

7    iterations.  They're, you know, trying to improve it, make it

8    more efficient so they can process people more efficiently and

9    get them to either removed if they're going to be removed or,

10   you know, provide them permanent lawful status if that's what

11   they're entitled to.

12        I don't think, you know, we have specifically among

13   the parties talked about a way to address this because it's

14   something that, you know, needs to kind of be addressed on a

15   larger national scale.  And, you know, our clients are

16   definitely trying to improve that.  It's just, you know, a slow

17   process.  And to be frank, a lot of it requires some

18   congressional input which we haven't had in decades.

19        THE COURT:  And I think that is what -- and I can't

20   remember if it made it into an opinion or it was just the

21   questions that at least the last immigration case in the U.S.

22   Supreme Court where Justice Roberts, I believe it was, Chief

23   Justice Roberts was lamenting the fact that this is being thrown

24   in the lap of the judiciary, when you have congressional

25   statutes that seem to say one thing and you have the practical

1    reality on the ground that seems to be inconsistent with what

2    Congress contemplated and -- I don't know.  Again, I appreciate

3    your comments.

4            Does Florida have anything to add to that?

5            MR. GUARD:  No, Your Honor.  I just think that given

6    where things are, I think it's going to be incredibly difficult

7    to reach any kind of compromise.  I think that the

8    Administration from the federal side is going to have a hard

9    time.

10           We had another case against the CDC.  And Judge

11   Merryday, I mean, we spent a month and a half trying to

12   negotiate something out.  We made little to no progress.  So

13   just because it's just very difficult and, you know, the

14   solution would be Congress taking some kind of action in

15   reality.  So, I mean, I just think that that makes it almost

16   impossible to do.

17           THE COURT:  And I appreciate that.  And I appreciate

18   both your comments on that, and we'll decide the case that's

19   been presented.  But it certainly -- and I know this kind of

20   dovetails right into the Federal Government's argument that this

21   is all one big political question that the Court shouldn't be

22   involved with.  I share that to a point.  But I think as I've

23   outlined in the some of the prior orders, there's enough legal

24   standards here for me to determine whether they're being met or

25   not.  But at the end of the day, whether -- whatever I do in

1    this case, one way or the other, is not going to solve anything

2    down there.  And it seems to me that the solution is in the

3    political branches, whether that be Congress amending the

4    statutes to reflects that, yeah, we know we said to detain

5    people but we know you don't have the capacity or providing the

6    capacity to do it or coming up with some other solution.  It's

7    just frustrating to me as a judicial officer trying to apply the

8    law to a set of facts that the law doesn't seem contemplated to

9    address.

10           With that said, we'll move on to what we can do, which

11   is get the case ready to be presented, what the facts are, and

12   figure out how the law applies to them.

13           First thing I want to address -- and we'll start with

14   the easy stuff -- I got an unopposed motion to withdraw from a

15   State lawyer, Mr. Faruqui, and I'll grant that motion and direct

16   the clerk to terminate him as counsel in this case.  The next

17   issue -- and we got rid of the easy stuff real quick, and now

18   we'll get to the more challenging things.

19           Procedurally, here's what I'd like to try to cover

20   today.  We've got the motion in limine that we -- I'd like to

21   address first because hopefully that will help deal with some of

22   these deposition designations one way or the other.  And I got

23   those late yesterday.  I got Florida's at 5:30, and I think I

24   got the Federal Government's at 8:45.  And to be frank with you,

25   I haven't reviewed them, so unfortunately we're going to just

1   have to walk through those.  To the extent the motion in limine

2   rulings don't resolve objections, we're just going to have to

3   walk through those one by one.

4        I don't know what happened in the parties both

5   overlooking what was in the pretrial order, but the whole

6   purpose of that was so this didn't get dropped on me the night

7   before and not have time to do it.  Because ideally, I would

8   have had this well in advance and would be able to come in and

9   focus on one or two that we needed to argue, but that water --

10  that ship has sailed, and we are where we are.  So we'll deal

11  with that after the motions in limine.

12       And then there were a number of objections laid out in

13  the pretrial stipulation, two specific exhibits.  And I know the

14  Federal Government dropped a footnote saying they may not really

15  have those objections, depending on how the trial goes, and

16  maybe the motions in limine will address some of them.  To the

17  extent they don't, I don't want to go through exhibit by exhibit

18  because I do think it may depend upon how the evidence develops

19  whether they even make the objection, whether that comes in; but

20  if there are a couple that the Federal Government believes would

21  be helpful to get a resolution on to facilitate trial, I'll be

22  happy to consider those.

23       And then the final thing I want to talk about is the

24  witness lists.  The parties put in their pretrial stipulation a

25  number of stipulated facts that seem to go directly to the issue

1    of Florida standing, yet we still have listed as potential

2    witnesses a lot of witnesses that go to the question of Florida

3    standing.  And it's -- I just want to explore with the parties

4    why that's necessary given the factual stipulations.

5           And related to that, I want to talk about the length

6    of the trial.  Florida says that it may need a third day, the

7    Federal Government says it needs two days, and my math says

8    that's five days and that's a day longer than you've got and a

9    day longer than I can give you.  Because as important as this

10   case is, there are other things on the docket that are equally

11   important, and I've got something set for Friday already.  So

12   that day is not available to you, and hopefully some of these

13   rulings today will narrow that down, and we'll go from five days

14   down to at least four and hopefully even less than that.

15          So that's what I wanted to try to cover today, and

16   it's quite a bit, but I think we can get through it.

17          Anything else the State expected to cover today?

18          MR. GUARD:  No, Your Honor.

19          THE COURT:  Anything else the Federal Government

20   wanted to cover today?

21          MR. DARROW:  No, Your Honor.

22          THE COURT:  Then after we --

23          MR. PERCIVAL:  I actually -- sorry, Your Honor.  I had

24   one question.

25          Given those timing concerns, does Your Honor want

1   opening statements in this case?

2          THE COURT:  We'll talk about -- if we get through all

3   of this, we'll talk about the logistics of the trial such as

4   opening statements.  And I know we at least preliminarily talked

5   about the idea of proposed findings in lieu of closing

6   arguments, but we'll talk about that if we -- if we're still

7   speaking to each other at the end of this.

8          All right.  Motions in limine.

9          Mr. Darrow, are you handling that or is Ms. Ryan?

10         MR. DARROW:  I am, Your Honor.

11         THE COURT:  Okay.  Talk to me then -- all of them are

12  still pending.  I didn't have a chance -- I've gone through the

13  motion.  I've gone through the response.  I understand the

14  issues generally.  But obviously at this point I haven't ruled

15  on it, so I am happy to hear anything else you want to tell me.

16  I'll probably have questions as we go through them, and what I'd

17  like to do is handle them one at a time.

18         So your first one deals with evidence regarding the

19  Parole + ATD policy.

20         MR. DARROW:  Yes, Your Honor.

21         As the Court indicated in the ruling on the Motion for

22  Summary Judgment, Parole/ATD is going to be decided, as it

23  should be, on the basis of the separate administrative record.

24  And this motion in limine is basically just to ensure the

25  integrity of that decision.

1          We think that bringing Parole/ATD into the trial as

2    part of a larger claim is both improper under the APA which

3    doesn't allow to you aggregate all these different policies

4    under one name of policy that defendants never created it under.

5    You know, to say that it's part of some larger alleged

6    nondetention policy is -- violates, you know, what the point of

7    APA review on the basis of a discrete record requires.

8          Moreover, not only would it be contrary to the

9    precepts of the APA, but it also stands to prejudice the actual

10   record determination of Parole/ATD because we're going to be

11   bringing in extrinsic evidence not contained in the record

12   through witnesses, you know, individual understandings of what

13   the program's about, and other facts that postdate the decision

14   to go with the program, evidence that was not in front of

15   decision-maker when the decision-maker decided on Parole/ATD

16   that would confuse the issues and, you know, prejudice the

17   record-based determination.

18          THE COURT:  Well, let me maybe ask Florida.  What is

19   the purpose of the evidence you want to bring in related to the

20   ATD policy?

21          MR. PERCIVAL:  We'll let Ms. Christmas address that,

22   Your Honor.

23          THE COURT:  Yes, ma'am.

24          MS. CHRISTMAS:  Yes, Your Honor.

25          We think that the Parole + ATD evidence at a minimum

1    is relevant background as to what's happening and why the

2    policies -- and specifically the nondetention policy -- have

3    been crafted the way they have.  I think specifically, though,

4    we do allege that the nondetention policy, part of it is an

5    abuse of the parole authority.  So to the extent that Parole +

6    ATD is emblematic of that, it is relevant.

7            THE COURT:  As I understand Florida's theory of the

8    case is that when the new administration came in, they shifted

9    gears from the prior administration and essentially said we're

10   not going to send people back to Mexico and we're not going to

11   detain them.  And as a result they came up with this Notice to

12   Report policy, which I think -- I don't know if it was in your

13   complaint, or somewhere -- you called it "immigration on the

14   honor system."  And if I kind of understand Florida's theory of

15   the case is that that is still continuing in practice albeit not

16   in name.

17            Is that -- am I oversimplifying it?

18            MS. CHRISTMAS:  Yes, Your Honor.  I think that's

19   generally right.  It -- I think Florida's case is that the

20   Administration came in, and they made this decision that they

21   did not want to detain people, and they've now used several

22   different mechanisms over the last year and a half since, you

23   know, January 2021 to achieve that desired outcome.  So, you

24   know, at the beginning, it was Notice to Report, and they were

25   releasing people without anything but a piece of paper.  And

1     then they shifted Notices to Report into a Parole + ATD and this

2     1226 Notice to Appear, Orders of Recognizance kind of framework,

3     and that's where we are today.

4            THE COURT:  And so when I'm going to determine whether

5     their Parole + ATD policy is valid, I'm looking at a -- I've got

6     it over here below me -- a binder with a couple hundred pages in

7     it.  What is this other information you want me to -- I mean, I

8     think their concern is if that comes into trial, it will bleed

9     into my determination of the policy's validity beyond that

10    binder of information I got from the record.  How will that not

11    happen?

12           MS. CHRISTMAS:  Well, Judge, you know, I think, first,

13    we trust you to make your decision exclusively on the record as

14    it pertains only to Parole + ATD, and I think that the other

15    evidence is certainly relevant to understanding the nondetention

16    policy as they've crafted it.  So, you know, I think the

17    arguments that we intend to make on Parole + ATD are exclusive

18    to things that you can tie directly to the record.  We don't

19    intend on, you know, bringing in all this other information.

20           THE COURT:  So what is the other information that you

21    would be trying to bring in?  What is it?

22           MS. CHRISTMAS:  I think some of it is the

23    understanding of how they've tried to clean up this Parole + ATD

24    on the back end -- "Operation Horizon" is what they call it --

25    of issuing the Notices to Appear after the immigrants have been

1    released into the interior and, you know, several other things

2    about how often they're paroling people.  You know, specifically

3    the statistics that I think both parties have admitted give a

4    very clear picture of the kind of fluctuation and which release

5    mechanisms they're using that paint the whole picture of how

6    many people they're releasing on a regular basis.

7          THE COURT:  All right.  Mr. Darrow.

8          MR. DARROW:  Well, Your Honor, I mean, to that -- that

9    sounds like bringing in extra record evidence, which, you know,

10   Your Honor previously ruled there had with been no showing that

11   that's required for Parole/ATD.

12         THE COURT:  Right.  To determine whether it's valid or

13   not.  But why shouldn't the record explain kind of the

14   progression of all this, and particularly if what Florida is

15   saying that there's -- I mean, is your argument that there

16   should be nothing spoken of Parole + ATD at trial?

17         MR. DARROW:  I think that the fact of the program and

18   basic details can be discussed, but the actual -- you know, to

19   get to Florida's point, which is whether or not it comports with

20   the parole statute, I mean, that's one of their APA claims

21   against Parole/ATD; and that can be -- that clearly can be

22   decided on the basis of the administrative record.

23         And bringing in all of these extrinsic events that

24   postdate the creation of the program, even the most recent

25   creation of the program, that alters and paints the facts that

1    were present to the decision-maker.  I mean, not that we're

2    saying that Your Honor can't bifurcate it, but it's very

3    difficult if you're bringing in a whole lot of new evidence to

4    segregate what was known and what was not known at the time.

5            THE COURT:  Anything further from Florida?

6            MS. CHRISTMAS:  You know, I think, Your Honor,

7    we're -- as I hear the Government's argument, it's basically

8    saying that this couldn't possibly be relevant to anything else,

9    even though Parole + ATD evidence would be relevant outside of

10   the consideration of Parole + ATD, and we just think that that

11   is not the case here.  And we think that the arguments that

12   we're going to make are going to be based purely on the

13   administrative record when talking about the claims as to

14   Parole + ATD, and it will be very clear for Your Honor to make

15   the decision.

16           THE COURT:  Before I rule on that, let's talk about

17   the next motion because I think it's somewhat related in

18   concept, this argument that there shouldn't be any evidence

19   concerning the Notice to Report practice.  I mean, is your

20   argument essentially the same thing:  That's not at issue here

21   because it doesn't exist anymore.

22           MR. DARROW:  Not only does it not exist anymore, but

23   Florida amended its Complaint a long time ago to drop all claims

24   against it, which, you know, makes sense to us because it

25   doesn't exist anymore.  But, you know, we note that there's a

1   parallel case brought by the State of Arizona where they

2   continued to challenge NTR as part of their case.  And, you

3   know, by contrast, we cited a lot of case law that if a party

4   either has a claim dismissed from the complaint or drops it,

5   then it's no longer relevant.

6            THE COURT:  How, though, is that practice, the

7   background of it, not relevant to their claim that there's a

8   broader nondetention policy?  Because again, as I understand,

9   their complaint is that from a practical matter, what's going on

10  now is the same thing as the Notice to Report.  The piece of

11  paper they're getting is still a little bit different; but as a

12  practical matter, they're coming to the border, they're getting

13  a piece of paper, whether it's a parole piece of paper, a 1226

14  piece of paper -- or whatever it might be -- they're still

15  getting a piece of paper and they're coming into the country.

16  So as I understand their argument, it's that's -- that's how

17  they started, and that's what they're still doing.  They've just

18  dressed -- "they" being Federal Government -- has just dressed

19  it up as something else.  So why isn't it at least relevant to

20  me understanding where we were to understand where we are?

21           MR. DARROW:  A few points to that, Your Honor.

22           I mean -- and, you know, we will get more into the

23  merits of this later on.  But it's not exactly the same program

24  because the individuals who are being released under Parole/ATD

25  are being -- those determinations are being made under a

1   different standard, under the case-by-case standard of INA

2   212(d)(5)(A).  And then they're getting the ATD attached to them

3   so that, you know, they're being tracked and many of them in

4   real time, which sets it apart from the Notice to Report where

5   there was no, you know, parole determination and there was no

6   ATD.

7          And also there is built into -- the newest iteration

8   of the Parole/ATD program there is an endeavor to process these

9   people faster.  You know, Border Patrol is working on actually

10  creating, you know, real-time on-the-field processing systems so

11  that they can speed that part up.  But that is, I think, beside

12  the point of --

13         THE COURT:  I think that's exactly -- as I understand

14  their case, that's exactly the point.  It's the desire to

15  expedite the process and get them from the border into the

16  country is exactly the problem.  And however they're doing that

17  is -- and, again, I'm playing devil's advocate here and

18  obviously not deciding the merits, but it seems like that's

19  their point is that things are being done under the guise of

20  different programs but the end result is the same:  Getting

21  people into the country rather than doing what the statute seems

22  to tell to you do, which is detain them and remove them.

23         So why wouldn't that be at least relevant background?

24  I mean, the same on the ATD.  The development of this, why isn't

25  that relevant to understanding where things are now to determine

1    whether, in fact, there is a bigger puppet-string-pulling

2    nondetention policy above all this?  And I know you disagree

3    that it exists, but why isn't it relevant to that claim that

4    they have made in this case?

5           MR. DARROW:  Well, I mean, I think the fact that NTRs

6    have been rescinded and fully stopped a long time ago, even if

7    it was at one point, you know, relevant should indicate, you

8    know, is no longer relevant because, you know, they're

9    challenging a currently operative nondetention policy.  And

10   anything the Government decided a long time ago to fully

11   cease -- and I don't think it's disputed that they've ceased

12   that -- should no longer be relevant to whether --

13        *(Interruption by the court reporter.)*

14           MR. DARROW:  Should no longer be relevant to whether

15   there is an ongoing policy.

16           But I think we'd also say that even if the Court found

17   it relevant as background, it's background to Parole/ATD.  You

18   know, it -- as you noted, the NTRs kind of flowed into

19   Parole/ATD, and they developed Parole/ATD after looking at the

20   experience with NTRs.  And if that's the case, then it would be

21   relevant only in the Parole/ATD record as -- and which the

22   Parole/ATD record itself addresses NTRs and why they're

23   rescinded and different problems and costs that were still

24   ongoing from that program.

25           So, you know, if the Court wants to consider it, then

1    it should be considered as part of the Parole/ATD analysis but

2    still not as part of the general trial.

3         MS. CHRISTMAS:  Yes, Your Honor, just to respond to a

4    couple of points.

5         I think overall Your Honor's correct in your

6    understanding of Florida's arguments.  And I think that the

7    Government's position seems to be more about the merits than

8    relevance of the evidence.  And I think those are all great

9    merit points that I'm sure we'll brief up and talk about in

10   front of Your Honor.  It seems to us that the Government just --

11   you know, it doesn't really want to talk about anything at the

12   trial and maybe just wants to get only to Parole + ATD.  But

13   Your Honor had very good reasons for denying our summary

14   judgment motions, and we think that the Notice to Report

15   evidence is certainly relevant background.

16        To respond to Mr. Darrow's point about it being only

17   evidence that's background to the Parole + ATD policy, you know,

18   even though the Parole + ATD policy does say that it rescinds

19   all NTR guidance, I think it's pretty hard to separate when you

20   get down to, you know, would all of the aliens who were released

21   under Notice to Report be funneled into Parole + ATD, or would

22   some of them be in these NTA-OR sort of releases.  I think that

23   just gets down to kind of an assumption that we can't really

24   make based off of the evidence.

25        So unless you have any other questions, Your Honor, I

1   think you stated it pretty well.

2          THE COURT:  All right.  Mr. Darrow, anything further

3   to wrap up on that one?

4          MR. DARROW:  Just the point that -- the fact that also

5   Florida dropped the complaints indicates that they're no longer

6   claiming that the NTR practice even is bad, that it violates the

7   law.  If so, why would they have dropped their claims

8   challenging that as a violation of the law?

9          THE COURT:  I guess, you know, certainly once it was

10   rescinded, I couldn't do anything about it.  I can't invalidate

11   it or -- I don't know even know under 1252 whether I can do

12   anything, or I couldn't make a declaration about it because it

13   doesn't exist anymore.  And so I think -- it seemed to me that

14   became moot as a:  Is the NTR practice valid or invalid.  I

15   think it's fairly -- I would hope it would be fairly obvious to

16   everyone that it's not.  You can't just -- that's nowhere in the

17   statutes.

18          But in any event, irrespective, it seems to me that

19   the fact that they dropped the challenge to that specific thing

20   at the same time they added this broader -- and I know you

21   disagree, and I'm still in my mind trying to conceptualize what

22   it is -- this nondetention policy.  It seems like the point is,

23   as I understand it and they seem to acknowledge, is that the

24   same thing -- practically the same thing is happening now as it

25   was then.  And so even though we're not challenging the specific

1  policy, because it doesn't exist anymore, the practice is --

2  what they are challenging is practically the same thing.

3  And maybe the evidence will show it's not.  I mean,

4  you've made a compelling argument that, you know, people are

5  being -- how are they being tracked?  What's the evidence going

6  to show how they're being tracked in real time?  Are they

7  getting ankle monitors?

8  MR. DARROW:  Ankle monitors.  They have this facial

9  recognition app that they have on the phones.  Some of them are

10  given phones with, you know, directions to call in at periodic

11  intervals.  Others have this facial recognition --

12  Yes, GPS on the phones as well.

13  THE COURT:  Interesting.  Okay.  And that's part of

14  the ATD policy?

15  MR. DARROW:  Yes.

16  THE COURT:  But not the Notice to Appear-OR policy?

17  MR. DARROW:  People -- my understanding is folks can

18  be fitted with ATD on NTA-OR.  I mean, any -- we'll have

19  witnesses who can talk more about this.  It wasn't really -- to

20  the extent it was used during -- with NTRs, I don't believe it

21  was used much, if at all.  So that, that is a major development

22  between NTRs and Parole/ATD.

23  THE COURT:  One question I'm curious about -- and I'm

24  sorry I'm bouncing back and forth, but when things come to my

25  mind that I'm curious about, I'll ask before I forget them.

1          Is there -- am I going to hear evidence about anyone

2   being removed from parole?  In the sense that, you know, the

3   statute says that once the circumstances that led you to be put

4   on parole have resolved themselves, you're supposed to go back

5   into the system at the same point you were before.  Am I going

6   to hear any evidence about that happening?

7          MR. DARROW:  Yes, Your Honor.  I mean, not specific

8   cases, but we do have witnesses prepared to talk generally about

9   when parole ends and how it can be ended and what time frame.

10          THE COURT:  Okay.  All right.

11          All right.  As to these two motions in limine, I guess

12   the way I see it is this.  To me, I think you're both right in

13   the sense that the evidence about the Parole + ATD policy and

14   evidence about the Notice to Report policy can't be admitted for

15   purposes of establishing the merits of the ATD policy or the

16   reasons that it was adopted, because I think that, to me, is

17   bound up in the administrative record.

18          And so to the extent the evidence was being introduced

19   for that purpose, I think the Government -- Federal Government

20   is right that it would be excluded.  However, I do agree with

21   Florida that that evidence about the progression of things from

22   where we started to where we are is relevant to determining

23   whether the "where we are" is where we started.

24          And so I'm not sure how to characterize that in an

25   order so much, but I think what -- really what it seems to me

1   that will be happening at trial, evidence that's being

2   introduced related to ATD or related to the Notice to Report

3   policy will only be accepted for the limited purpose of

4   evaluating -- for either background purposes, just to understand

5   the lay of the land, or to evaluate the existence or legality of

6   this nondetention policy and it won't be admitted for purposes

7   of evaluating the merits of the ATD policy, which will be

8   limited to the administrative record, or the merits of the

9   Notice to Report practice because it doesn't exist anymore.

10          Is that clear enough, from the Federal Government's

11   perspective?

12          MR. DARROW:  Yes, Your Honor.

13          THE COURT:  State?

14          MS. CHRISTMAS:  Yes, Your Honor.

15          THE COURT:  All right.  So that will be the

16   disposition of those two motions.

17          Third motion, Mr. Darrow argues that I should exclude

18   evidence of cost from, quote, "illegal immigration."

19          Help me understand what your argument is there.

20          MR. DARROW:  Sure, Your Honor.  And it's not clear to

21   us that all of Florida's -- or even most -- of its evidence of

22   costs to its various state agencies are from illegal

23   immigration.  It's just that term was used, you know, pretty

24   repeatedly throughout the Complaint and other documents, and so

25   we wanted to make clear from the outset that we're not talking

1    about illegal immigration here.

2            We're talking about -- you know, our definition of

3    illegal immigration are folks who have flown under the radar,

4    right?  They've totally evaded inspection and apprehension by

5    authorities, and they're living in the United States without

6    status and, you know, without people knowing about them.  We're

7    talking about a different segment of noncitizens.  Maybe some of

8    them did cross the bordered briefly illegally; but at this

9    point, they've all been apprehended and inspected and released

10   on Parole/ATD or NTA-OR and, you know, the Government has them

11   in their system.

12           So, you know, we're talking about two segments of the

13   population.  And a lot of times, particularly with, you know,

14   various cost studies and discussion in the press, that these two

15   groups of people get conflated and costs that are attributable

16   to people who are, like, totally -- present totally

17   clandestinely are attributed to people who are actually part of

18   the process, and we just want to make clear that we're talking

19   about people who are part of the process and that costs

20   associated with the other group of people are not relevant.

21           THE COURT:  All right.  Who's handling this one?

22           MR. PERCIVAL:  I am, Your Honor.

23           THE COURT:  Yes, sir.

24           MR. PERCIVAL:  As I understand the dispute, I think

25   this is just a terminological dispute.  We use unlawful

1   immigration to apply to the practices Mr. Darrow's describing

2   that he thinks are lawful and that we think are not lawful, but

3   the evidence we're presenting at trial will be evidence that

4   this population would be within.

5   So let me give you an example.  We have the Department

6   of Corrections' expenditures on this category called

7   Undocumented Criminal Aliens.  And one of our exhibits shows the

8   definition of undocumented criminal aliens, and it includes any

9   alien that's in a removal proceeding.  So somebody who enters

10  surreptitiously, is never caught by Border Parole, ends up in

11  Miami in a removal proceeding, they would be included in that

12  number.  But somebody released by Border Patrol at the border

13  under one of the challenged practices who is later put in a

14  removal proceeding and ends up in Miami, these two people end up

15  in prison, both of them are in this number.

16  Now, there's a separate issue about the disaggregation

17  of this number and the inferences we're asking Your Honor to

18  draw from the evidence, but the numbers we are presenting Your

19  Honor included the population at issue in this case.

20  THE COURT:  Okay.  I guess, Mr. Darrow, if -- I do

21  agree with you that what I'm concerned about here are the people

22  who are being released under one of these practices.  So it's

23  not the getaways; it's somebody who came in and -- I guess

24  inspected might be the right word, but they were rushed through

25  the system in the field, or whatever you say is going on out

1    there, but they have some case number.

2            That's the people that you're challenging, right,

3    Mr. Percival?

4            MR. PERCIVAL:  Yes, Your Honor.

5            THE COURT:  And so it sounds like the parties are in

6    agreement that my determination as to whether Florida has

7    established their standing will be related to the costs

8    associated with -- I don't know what we can call them -- the

9    documented people rather than the getaway people.  And so with

10   that understanding, I think the rest of your argument goes to

11   what Mr. Percival said, that there may be a problem Florida's

12   got that that information, their data, is aggregated.  It

13   includes the getaways as well as the documented.  But that just,

14   to me, goes more to the weight of the evidence rather than

15   trying to say they can't introduce any of that aggregated

16   information because it includes people that aren't people

17   subject to the program.

18           Is that consistent -- I think we're all saying the

19   same thing, are we not?

20           MR. DARROW:  Yes, Your Honor.  And I think so long as

21   we just all understand the population of people we're talking

22   about, then that was, you know, one of the main thrusts of our

23   motion, just to kind of clear that up so we're not bringing in

24   facts from other people.

25           THE COURT:  Well, it sounds like there will be facts

1    coming in from those other people because their data isn't

2    aggregated.  Your argument is going to be that they're bringing

3    you, Judge, a number that says $20 million.  You can't determine

4    from that number alone whether it's $20 million of getaways or

5    $10 million of getaways and $10 million of documentation.  And

6    as a result, you can't make that determination because they

7    haven't given you good data, they haven't shown their standing.

8                Isn't that what you're going to be arguing?

9                MR. DARROW:  Correct, Your Honor.

10               THE COURT:  And, Mr. Percival, you're going to be

11   arguing it would be unreasonable to make an inference that

12   there's no documented people in that number?

13               MR. PERCIVAL:  Especially given the evidence regarding

14   the total number of released aliens that are present in the

15   state.

16               THE COURT:  All right.  So with the collective

17   understanding that the -- my evaluation, my ultimate evaluation

18   of whether Florida has shown its standing through financial

19   impact is going to be based upon whether I'm persuaded that the

20   evidence shows that there's financial impact from documented

21   people not just getaway people.  That's -- in that respect, I

22   guess your motion is denied with that understanding.

23               Is that clear?

24               MR. DARROW:  Yes, Your Honor.

25               MR. PERCIVAL:  Yes, Your Honor.  And if we put a

1  witness on the stand who had starts talking about harm that is

2  exclusive to that population, Mr. Darrow can object to that and

3  Your Honor can revisit it.

4          THE COURT:  Absolutely.

5          Well, let me ask one other question while I'm thinking

6  about it since we're going to start shifting to more procedural

7  matters.

8          Florida has presented a number of different programs

9  or government agencies that they say incur money related to

10  people who have come in the country under this program.  You've

11  got Medicaid, you've got unemployment, you got driver's

12  licenses, you've got DCF, food stamps, you got DOC, prisons.  I

13  may have left somebody out.  Are each and every one of those

14  mandated in some way by the federal government that you provide

15  these services to these documented people?

16          MR. PERCIVAL:  No, I think it's case specific.  So

17  Medicaid, for example, it's a condition for participating in

18  Medicaid which maybe isn't mandated in a strict sense but the

19  Supreme Court has said it rises to the level of being coercive.

20  For education, it's constitutionally required by *Plyler v. Doe*,

21  but if you take --

22          THE COURT:  The federal Constitution requires that?

23          MR. PERCIVAL:  Yes, Your Honor.

24          And then with Corrections, for example, it's not

25  required; but the alternative would be to let these people

1   commit crimes and suffer no consequences, which we don't think

2   is a viable alternative.

3           THE COURT:  And I think the reason I'm asking that

4   question -- and nobody has argued it up to this point, and maybe

5   the reason they haven't argued it is because it's not a thing --

6   but I'm wondering, is there a self-inflicted injury component to

7   standing?  In other words, if the federal government is not

8   telling you that you're required to provide unemployment

9   compensation or driver's licenses to aliens that come in through

10  their parole programs but you choose to do so, for whatever

11  political reasons Florida might have to do that, is that on you

12  rather than on them?

13          MR. PERCIVAL:  So --

14          THE COURT:  The injury you suffer.

15          MR. PERCIVAL:  Our position would be no.  And we think

16  this is the exact position that was rejected in the *DAPA*

17  decision in the Fifth Circuit with Texas' driver's licenses.

18  Now, the Supreme Court ultimately affirmed that case 4-4, so

19  it's not strictly binding.  But I have not seen the federal

20  government advance this argument as much since the *DAPA* decision

21  in the Fifth Circuit because my understanding is that they lost

22  that argument in that case.

23          THE COURT:  And at this point, you haven't advanced

24  that argument here, right, that they've brought these injuries

25  upon themselves by politically choosing to provide services that

1   otherwise they wouldn't have any sort of constitutional or

2   federal requirement to provide, right?

3        MR. DARROW:  We have not specifically made that

4   argument.

5        THE COURT:  Okay.

6        MR. PERCIVAL:  Your Honor, actually, my very smart

7   colleague, Ms. Christmas, just reminded me of an additional fact

8   in *DAPA* that may be helpful.

9        One of the things the Fifth Circuit said is that it's

10  injury either way:  Either on the one hand you incur the costs;

11  or on the other hand the state suffers a coercive effect to

12  change its policies, and that is a separate injury for

13  Article III purposes.

14       THE COURT:  All right.  Well, that just struck me as

15  very -- it struck me as an interesting political nuance.  And,

16  again, it's another political aspect of the question that if

17  Florida didn't like the fact that these folks are coming into

18  the state using their services and there's no constitutional or

19  federal requirements saying you got to give them those services,

20  well, you've got a very strong governor and a very amenable

21  legislature that could amend the statutes to say these folks

22  don't get these things; but I understand your alternative point

23  that that's forcing you to take -- make policy decisions you

24  otherwise might not have made.

25       But in any event, that's not in this case, so I'm not

1    going to concern myself with it until it does get in the case.

2    If it does and if -- we'll hear arguments about *DAPA* and other

3    things.

4          All right.  Mr. Darrow, your fourth motion argues that

5    the plaintiff should not be able to present deposition

6    designations of witnesses who are available to testify, and you

7    cite Rule 32(a)(4).  Florida says no, no, no.  Rule 32(a)(3) is

8    what applies here.

9          So why are they wrong?

10         MR. DARROW:  Yes, Your Honor.  32(a)(3) addresses

11   deposition testimony for folks in the 30(b)(6) capacity.

12         THE COURT:  Well, does it?  I mean, that's what --

13   when you read 32(a)(3), it says, "An adverse party may use for

14   any purpose the deposition of a party or anyone who when deposed

15   by a party's officer, director, managing agent, or designee

16   under Rule 30(b)(6)."

17         So it seems to me that the text of the rule, a

18   30(b)(6) designee is just one of the types of people that would

19   give party status to an individual.  So there's -- well, let me

20   step back and I'll let you answer the question in a minute.

21         There's no dispute that Mr. Price or Mr. Ortiz at the

22   time they were deposed were high-level people that would qualify

23   as either an officer or a managing agent, right?

24         MR. DARROW:  Well, I think we dispute that they

25   qualify as a managing agent.

1          THE COURT:  Why is that?

2          MR. DARROW:  Because plaintiff sued the Department of

3    Homeland Security and ICE and CBP.  And Mr. Price and Mr. Ortiz,

4    they are high up, but they don't -- you know, they don't manage

5    CBP.  They don't manage ICE.  They have people above them that

6    do that.  They are their deputies.

7          THE COURT:  Right.  But you were opposed to them even

8    deposing those folks at that level.  I assume if they had tried

9    to go higher, all the way to the Secretary who is actually

10   running it, I can only imagine the level of objection you would

11   have had to that, right?

12         MR. DARROW:  Oh, yes, yes.  We would have objected.

13   But that's more based on the fact that, you know, in real life,

14   they're doing quite a lot of the work on a daily basis.  Not

15   that the Secretary isn't, but the Secretary has other political

16   responsibilities that they're engaged in.  With somebody like

17   Mr. Price is, you know, like -- is heavily engaged in running

18   the organization.

19         THE COURT:  Why is that not making their managing

20   agent argument?

21         MR. DARROW:  Because when -- outside of being

22   designated as a 30(b)(6) officer, he can't speak to bind the

23   agency, Mr. Price, the entirety of ICE.

24         THE COURT:  Well, I guess -- I mean, when I initially

25   looked at this, I was thinking that makes sense, that the reason

1    you designation somebody as a 30(b)(6).  But you can designation

2    the janitor as a 30(b)(6) or, you know, a secretary as a

3    30(b)(6), as long as they're the person in the agency who knows

4    the most about the subject and you want them to speak as the

5    agency.  It doesn't matter what level they are.

6           And so initially when I read this dispute, I thought

7    you were right that, okay, we're talking about a party that is

8    the 30(b)(6) person in the name of corporation.  But when you

9    read this rule, it seems like it talks about that 30(b)(6)

10   person as just one of the types of people who is a party for

11   purposes of allowing a deposition to come in under that rule.

12   And I guess that's what I'm struggling to understand, and I'm

13   not sure I've heard a response that disputes that that's how you

14   read that rule.

15          MR. DARROW:  We don't dispute that other people are

16   included in the rule.  We just dispute that Mr. Ortiz and

17   Mr. Price in these circumstances qualify as a managing agent.

18          THE COURT:  And that's simply because there's people

19   above them that they respond to?

20          MR. DARROW:  That manage their particular agency.

21          THE COURT:  Even though the argument you were just

22   making to me, they're the ones that are really doing the grunt

23   work because the Secretary's busy trying not to be impeached --

24   and I say that facetiously.

25          MR. DARROW:  They are doing a lot of the work, which

1    is why, you know, we had issues with their time being taken for

2    depositions.  But at the end of the day, they're not the ones

3    who can call the shots to the bind Customs and Border Patrol or

4    ICE.  They need to have, you know, somebody above them make that

5    decision.

6            THE COURT:  All right.  Anything else you want to add

7    before I give the other side a chance?

8            MR. DARROW:  (No verbal response.)

9            MR. PERCIVAL:  Your Honor, Mr. Guard's going to

10   address this one.  He's not a junior lawyer, but he wanted a

11   chance to talk because he sits in meetings all day and he's a

12   seasoned litigator.

13           THE COURT:  Very well.  Go ahead, sir.

14           MR. GUARD:  Your Honor, the test, and we've cited it

15   to you, is whether the person has power over the matters that

16   are at stake in the litigation and that a person's interests are

17   aligned with the entity.

18           I cannot think of two people inside both of those

19   organizations where that -- you know, that they definitely have

20   powers over the matters at stake.  They're ultimately

21   responsible for the -- you know, you're talking about the chief

22   of the Border Patrol and the director of enforcement of removal

23   operations for ICE.

24           They've issued memos.  They've had memos issued

25   directly to them directing them to do things that are at stake

1    in this litigation.  They've issued emails to their

2    subordinates -- at least Mr. Ortiz has.  And, you know, I'm

3    not -- I don't think I need to argue whether their interests are

4    aligned given they're current employees of the federal

5    government and they were at the time of the deposition.

6         THE COURT:  I guess -- what I guess just doesn't make

7    a lot of sense to me, again, when you're talking about a

8    party -- I guess you're saying they're essentially an agent of

9    the party.  They're either the party -- they're not the party

10   because it's a corporate party, so we can't have some amorphous

11   bureaucratic building in Washington come sit on the stand and

12   testify.  So they're not the party, they're not the designee

13   because they weren't designated as 30(b)(6) witnesses, but

14   you're saying essentially they're the agent of the party and,

15   thus, under the rule, the rule allows agents that meet your

16   qualifications you laid out to essentially bind the agency even

17   though they're not designated to bind the agency.  Right?

18        MR. GUARD:  Yes, Your Honor.  It would be the same as

19   an officer of a corporation or some other high-ranking official

20   at a corporation.  Just because the government is involved it

21   doesn't mean that they -- this rule becomes meaningless.  These

22   are high-level people that are vested with discretion and set

23   policy and direct policy on these issues.

24        And I get that the United States doesn't like how

25   their depositions went and doesn't want them played; but under

1    the rule, they are managing agents of those two agencies.

2          THE COURT:  Mr. Darrow, did I understand it -- it's

3    been a while since I've taken a deposition from an organization,

4    but there's two ways to do it:  One, you can -- "you," the party

5    wanting the deposition.  You can notice somebody -- an officer,

6    director, managing agent -- say, I want to take the deposition

7    of the corporate president, the idea being because of their

8    position, because of their aligned interests, the testimony they

9    give will bind the company.  Or, Option B, is say, I want to

10   depose the corporation and you, the party who's receiving that

11   notice, says, Okay, what do you want to talk to them about?  Oh,

12   that subject?  Well, the janitor is the one who's the right one

13   for that, and that's who we're going to give you to notice.

14          But they're not mutually exclusive are they?  You can

15   both depose -- they can choose somebody within the agency they

16   want to depose, and as long as they meet that qualification of

17   an officer, director, or managing agent, that's -- that

18   testimony binds the corporation or agency here just as much as

19   the person you pick to say that's the best person to speak to

20   that.  Right?  Isn't that how that works?

21          MR. DARROW:  To be frank, Your Honor, I've never

22   really dealt with a 30(b)(6) deposition that went that way,

23   where the person was picked out by the other side.

24          THE COURT:  Right.  They wouldn't pick the 30(b)(6).

25   You get to pick who is going to be the 30(b)(6); but that

1  doesn't preclude them, does it, from noticing somebody else in

2  the organization?

3          MR. DARROW:  No.  No, it doesn't.  And I think if you

4  picked somebody high enough, like if the director of ICE was

5  here, it would be hard to argue that what he said did not in

6  some way bind ICE.

7          But to Mr. Guard's point, the people we're talking

8  about, Mr. Ortiz and Mr. Price -- and I know you don't have the

9  benefit of their testimony yet; but when they're sitting here in

10 court in a few weeks, they're going to tell you they don't

11 create policy, they simply carry out the policy.  I think as

12 Mr. Guard pointed out, there is a certain corporate-y feel to

13 this particular federal rule, and the rule seems to talk about

14 people who would be in, like, the CEO shoes in -- you know, in

15 the private sector.

16         And, you know, in our view, they're talking about

17 people that create the policy and ultimately call -- you know,

18 call the shots for the corporation.  And as high up as Mr. Price

19 and Mr. Ortiz are, they're not that person.

20         THE COURT:  Weren't they -- I mean, I remember in the

21 summary judgment evidence there were memos that they wrote.  I

22 think it's one of those -- that email that we -- that was hiding

23 on -- or the memo that was hiding on the website somewhere.

24 Wasn't that a Price memo?

25         MR. GUARD:  That's Rodney Scott.

1          THE COURT:  Or Scott, so different person.  But didn't

2     Mr. Price put together one of these emails that went down the

3     chain?

4          MR. GUARD:  Yes, Your Honor.  And Mr. Ortiz actually

5     signed the original version of Parole + ATD.  I mean, the

6     actual -- not the version of the policy that we're now on, but

7     the original version of Parole + ATD was signed by Mr. Ortiz.

8     Mr. Scott, who is Mr. Ortiz's predecessor, signed the NTR memo

9     and sent -- I believe sent the email.

10          THE COURT:  How did you -- which was the one that the

11     magistrate judge had to deal with the objection to the

12     deposition?

13          MR. GUARD:  That was Mr. Price.

14          THE COURT:  Mr. Price.  What about Mr. Ortiz?  How did

15     he come to be deposed?

16          MR. GUARD:  So he was actually designated on the

17     Parole + ATD policy as a 30(b)(6) witness.

18          THE COURT:  And so obviously that testimony is not,

19     presumably, what this motion is going after.  I guess he gave

20     some other testimony during that deposition that you like and

21     they don't?

22          MR. GUARD:  Well, we actually took -- we set him both

23     individually and as a corporate representative.  And so we took

24     his individual deposition, and then we asked actually only a

25     handful of questions in the 30(b)(6) deposition, which was

1    largely the testimony that you just gave about Parole + ATD,

2    would it be the same in your corporate capacity, and his answer

3    was yes.

4         THE COURT:  And when you say -- you said two different

5    words there.  You said "individual deposition" and then

6    "corporate capacity."

7         MR. GUARD:  Sorry.  30(b)(6).

8         THE COURT:  Okay.  All right.  What do you mean by

9    "individual capacity"?

10        MR. GUARD:  We sent a notice noticing his -- him for

11   deposition.

12        THE COURT:  So just --

13        MR. GUARD:  Raul Ortiz.

14        THE COURT:  -- Raul Ortiz, public citizen.

15        MR. GUARD:  Yes, Your Honor.  And we took that

16   deposition -- well, yeah, I think it said chief of the Border

17   Patrol.  I don't have the notice in front of me, but it would

18   not have said Raul Ortiz, individual citizen.  It would have

19   been Raul Ortiz, you know, his title, and probably Mr. Darrow's

20   address because we did not, of course, have his address.

21        THE COURT:  Does that make a difference?

22        MR. GUARD:  No, Your Honor.  Because, again, the test

23   at least that's been employment generally in this circuit is

24   whether they have powers over the matter that's at stake.  We

25   cited you to the Southern District of Florida case.  There's

1   also a former Fifth Circuit case that we didn't cite in our

2   papers that I could give you a cite to that predates that.

3           But the general test is whether they have powers over

4   the matter at stake and their interests are aligned with the

5   entity.  And here you have people that are actually sending out

6   the policies.

7           THE COURT:  All right.  I'm sorry.  Go ahead.

8           MR. GUARD:  And, you know, in establishing the

9   policies for the respective agencies who are executing and

10  performing the actions.

11          THE COURT:  As a practical matter, what's -- why is

12  this such a big deal?  Why are we spending so much time on this?

13          You said you're bringing them down to testify live.

14  So this -- whatever they like in their depositions, they will,

15  I'm sure, ask them the same question.  They'll either give the

16  same answer, at which point the information they want to come in

17  through the deposition is going to come in, or they will give a

18  different answer, at which point they will be presumably

19  impeached on that, and then it will be up to me to evaluate what

20  I believe and what I don't.  Right?

21          MR. DARROW:  Yes, but if we rely primarily on their

22  live testimony, then we have a clean record of what they say and

23  Florida has the opportunity there to cross-examine them and live

24  and Your Honor has the ability to judge the credibility of their

25  answers in a way that Your Honor can't from, you know, the cold

1   page of the deposition transcript.

2            MR. GUARD:  Well, Your Honor, we're going to be play

3   videos.  So you're going to be able to see them you're going to

4   be able to see how they behave.  My expectation is that the

5   Department of Justice and/or the Department of Homeland Security

6   is now going to spend significant time getting these witnesses

7   prepared, and their performances are going to be vastly

8   different than when they were in deposition.  Maybe I'll be

9   wrong about that.  But, you know, we're proving our case and we

10  have videos that we're going to put on.  We videotaped them.

11  And, you know, while I'm a pretty skilled trial lawyer, you

12  know, I think that usually the --

13            THE COURT:  If you do say so yourself.

14            MR. GUARD:  Well, yeah, but -- you know, like -- it's

15  often difficult when you have an adverse party and you're trying

16  to prove your case, and so that just ups the level of difficulty

17  here.  And obviously we have a videotaped deposition that we'll

18  play in court, and the Court will be able to see it.  They've

19  obviously had the opportunity to object, which they've done to a

20  lot of the different passages which we'll get to later.

21            And, you know, so it's not going to be the cold

22  record.  It's going to be -- you're going to get to see, hear,

23  and observe.

24            THE COURT:  All right.  Anything further, Mr. Darrow?

25            MR. DARROW:  I would just say to that point that

1    that's really not an efficient use of the Court's resources if

2    they're going to be here and talking about these issues to have

3    them, you know, also then play a long video that talks about the

4    same things.  I mean, that -- it's going to take a lot more time

5    than we need to, you know, get to the point and get to the

6    questions that need to be asked.

7            THE COURT:  All right.  I guess the counterargument

8    probably would be you don't have to call them.  You can just let

9    them testify, counter-designate whatever they want to, and that

10   would save everybody a lot of time.  I'd just watch portions of

11   a deposition rather than hearing them live.  I understand why

12   you might want to call them live, and my preference certainly is

13   for live witnesses.

14           But as I see this motion, the -- again, when I

15   initially read it, I thought that doesn't make any sense that

16   somebody who's not a 30(b)(6) can bind a corporation, a

17   governmental agency; but when you read the rule as I read it and

18   read the cases that Florida has cited, it does support the idea

19   that more than a 30(b)(6) is covered by 32(a)(3).  And the

20   people that we're talking about here, Mr. Ortiz and Mr. Price,

21   at least as I view it, meet the definition of a managing agent

22   as the Eleventh Circuit has described what such a person is.

23           So I think their depositions come in under

24   Rule 32(a)(3).  So that motion is denied.

25           All right.  Next motion is wanting to exclude

1   speculative hearsay testimony from Ortiz and Price.  Is that

2   something that is bound up in the deposition designations, or

3   are there other things?  Your objections to their deposition

4   designation.

5           MR. DARROW:  Yeah, that would be reiterated in our

6   objections.

7           THE COURT:  Okay.  So is there -- would that be the

8   more efficient way to handle that, go through those deposition

9   designations and identify?  You know, certainly in the abstract,

10  we don't -- I wouldn't let hearsay or speculative testimony in;

11  but without knowing what you're talking about, I couldn't grant

12  a motion that broad.  And if what you're telling me is, in

13  essence, your deposition designation objections are what you're

14  talking about with speculative and hearsay, I'd rather just do

15  that then.  Is that suitable?

16          MR. DARROW:  Yes, Your Honor.

17          THE COURT:  Okay.  Is that suitable to the State?

18          MR. PERCIVAL:  Yes, Your Honor.

19          THE COURT:  All right.  So that addresses all the

20  defendants' motions in limine.

21          Florida didn't have a motion in limine, but you did --

22  and let's go ahead and start.  We'll turn now to the deposition

23  designations, and there's one broader overriding issue that

24  deals with this Mr. Barker.  The Federal Government wants to

25  present Mr. Barker's deposition testimony or portions of it

1    because he is unavailable.  Florida says you're not persuaded

2    he's unavailable.

3            So tell me, Mr. Percival, why -- what the issue is

4    here?

5            MR. PERCIVAL:  I think it's really three things, Your

6    Honor.  The first is that they have not told us where he is.  As

7    we best understand it, we have a representation from counsel

8    that says, well, when he left the agency, he lived in

9    Fredericksburg, Virginia.  But the rules require them to give us

10   his address.  We've tried to provide a mechanism to keep that

11   confidential.  We separately asked them for an affidavit from

12   someone at DHS that just says this is where Mr. Barker lives.

13   They've been unwilling to give us that either.

14           THE COURT:  Does it matter where he lives?

15           MR. PERCIVAL:  Well, no.  It really matters where he

16   is, Your Honor, which takes me to another of our points, which

17   is that we've asked for his contact information because DHS's

18   position is that they no longer have a fiduciary relationship

19   with him.  They've said that.  So if that's true, then there

20   shouldn't be any problem with us requesting his presence at

21   trial, but they've been unwilling to allow us to do that.

22           So essentially we have this secret witness.  We don't

23   know where he is, we're not allowed to contact him, and we're

24   supposed to take a representation of counsel that based on his

25   last-known address he's going to be more than a hundred miles

1   from the court.  And we just don't think that's enough,

2   especially because their preventing from us contacting him, we

3   think, is procuring his unavailability under the rule, and

4   that's in, what is it, 32(a)(4)(B).

5          The other issue, Your Honor, is that when we had a

6   dispute about taking the deposition of former Border Patrol

7   Chief Rodney Scott, one of the things they put in their filing

8   is that these former employees have ongoing obligations to the

9   agency.  They said that if we wanted to depose Rodney Scott, we

10  would have to go through them, and they would have to authorize

11  it.  And so we've asked for them to give us some more details

12  about any continuing contractual obligations that Mr. Barker

13  might have to appear in this case if they ask, and they haven't

14  been willing to give us answers on anything.

15         THE COURT:  How is that pertinent to whether he's

16  available or not?

17         MR. PERCIVAL:  Well, we think that if all they have to

18  do is ask, and he's contractually bound to be here, then they

19  would be procuring his lack of availability by not asking.

20         Now, I'm prepared to drop all of these objections.  I

21  just think that we're entitled to this information so that we

22  can confirm some things.  But I think if the Federal Government

23  gives it to us, we can drop these objections.

24         THE COURT:  All right.  Mr. Darrow, it seems to me

25  that under Rule 26(a)(3) you have to give them contact

1    information for witnesses that they -- unless they've had it

2    previously.

3           MS. RYAN:  Your Honor, he's not listed as one of our

4    trial witnesses under 26(a)(3).  We don't have him listed as a

5    live witness, and we've amended our initial disclosures --

6           THE COURT:  So that's how you read that, is only for

7    live witnesses, not people who are being designated by

8    deposition?

9           MS. RYAN:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MS. RYAN:  And if I could speak to a few of

12    Mr. Percival's points.

13          THE COURT:  Sure.

14          MS. RYAN:  They've never said that they actually want

15    him here to testify live.  They've never -- they've asked for

16    his contact information in the sense of trying to prove he's

17    unavailable, but they've not affirmatively said, We want him,

18    please provide us with his contact information.  And under

19    Rule 26, he's not one of our live witnesses, so we do not have

20    an obligation to give out his personal contact information.

21          Additionally, when he says "ongoing relationship" in

22    relation to the Rodney Scott issue, that is not what that means.

23    What the case law said is that if a former employee is going to

24    speak in a way that may bind the agency, the agency has to

25    approve it.  It does not mean that these former employees have a

1    contractual ongoing obligation to testify if we ask.

2           Mr. Barker is now a private citizen.  He resigned.  We

3    don't have control or agency over him, and he lives well over a

4    hundred miles.

5           THE COURT:  Why does it matter where he lives?  For

6    all we know, he's going to be vacationing in Perdido Key

7    15 miles from here at the time of trial.  Isn't that the

8    important question:  Where he's going to be at the time of

9    trial?

10          MS. RYAN:  No, Your Honor.  The case law, in large

11   part, especially -- I would point the Court especially to the

12   *Chao* case that we listed in our filings which talks about even

13   if it's a current employee, if they live or work more than a

14   hundred miles from the courthouse, they're deemed unavailable

15   and the agency doesn't have an obligation to bring them.  So

16   it's -- and it goes --

17          THE COURT:  So your position is even if a witness is

18   sitting out on the corner of Palafox and Garden on the day of

19   trial, he is unavailable because he works in Fredericksburg,

20   Virginia?

21          MS. RYAN:  If he personally on his own dime shows up

22   at the courthouse, that's different, but we have no -- we're not

23   asking him to come, we're not calling --

24          THE COURT:  Right.  And that's -- that wasn't my

25   question.  My question was -- at this point, I think the State

1   can accept, or should accept, your representation as officers of

2   the Court that he lives and works in Fredericksburg, Virginia;

3   but that doesn't answer the question of whether he's

4   unavailable.  That doesn't make him unavailable for trial.  What

5   makes him unavailable for trial is that he will be a hundred

6   miles away from the courthouse on the date of trial.  And your

7   information that you've represented to him doesn't answer that

8   question.

9          MS. RYAN:  Your Honor, the case law, the standard, is

10  where he lives and works, not where his -- 9:00 a.m. on

11  January 7th where he will be.

12         THE COURT:  And so that's -- the courts have put that

13  gloss on it?  So in response to -- my question would be if he's

14  standing out on the corner Palafox and Garden a hundred yards

15  from the courthouse on the day of trial, the Government's --

16  Federal Government's position is he is still unavailable?

17         MS. RYAN:  Yes, Your Honor.

18         THE COURT:  And your best case on that is what?

19         MS. RYAN:  I would -- all of the cases that we cite in

20  our filing -- and I can give you all the names here, Your Honor.

21  The *Kreitman* case --

22         THE COURT:  Just point me to the page.

23         MS. RYAN:  Sure.  Starting on page 3 of our filing,

24  the *CFTC* case, the *A.H. v. Evenflo*, *3M* case out of the Northern

25  District here, the *Walmart Stores* case has a collection of

1    cases, and the *Chao* case also talks specifically about former

2    and current employees.

3           THE COURT:  All right.  Well, why is this such a big

4    secret?  I mean, if they want to bring him to trial, okay,

5    accepting the proposition that you don't have to bring him to

6    trial because he's not your current employee, not your -- or

7    he's not your current employee, you don't have any contractual

8    relationship with him, and if he wanted to come in here and

9    testify, he can do it.  Is that the Federal Government's

10   position?

11          MS. RYAN:  If -- yes, if Florida had said to us

12   affirmatively, We want him, we want to subpoena him, there are

13   still personal and safety and security concerns about giving out

14   his personal contact information; but that's a different

15   situation than what we're in.  They have not affirmatively

16   represented to us that they want his contact information for the

17   purposes of calling him.

18          MR. PERCIVAL:  Your Honor, that's not true, and I can

19   produce emails if you prefer.

20          THE COURT:  I don't want to get into who said what to

21   whom when, but if that's what they want, if they want to contact

22   him and try to make arrangements to get him here live and in

23   person, why does the Federal Government care?

24          MS. RYAN:  Your Honor, it's -- he's outside the

25   subpoena power, so even if they wanted to get him here, he says,

1    I live in Virginia -- they were to call him today and he says, I

2    live in Virginia, I'm not going to be in Florida, they would

3    also have no way of getting him here.  But he's a private

4    citizen now.

5            THE COURT:  That's their problem.  But they could call

6    him today and say, Hey, we'd like you to come down, we'll pick

7    up the plane ticket, and we'd like you to come testify; and he

8    says, Absolutely, I'd love to come testify -- they don't even

9    have that opportunity at this point because you won't give them

10   the contact information, which -- and when I read 26(a)(3), I'm

11   not sure it says what you are saying it says.

12           What it says is "In addition to the disclosures

13   required under (a)(1) and (a)(2), a party must provide to the

14   other parties and promptly file the following information about

15   the evidence it may present at trial for purposes other than

16   impeachment."  And then Number 1, "The name and, if not

17   previously provided, the address and telephone number of each

18   witness the party expects to present."  And it doesn't say in

19   person.  It just says "expects to present."  You expect to

20   present his testimony through his deposition, right?

21           MS. RYAN:  Yes, Your Honor.  We read that as present

22   as in put on the stand.

23           THE COURT:  And then it does talk about designation of

24   those witnesses.  The next paragraph:  "The designation of those

25   witnesses whose testimony the party expects to present by

1    deposition."  But I'm not sure -- you've got cases that say

2    those two are mutually exclusive?

3              MS. RYAN:  Not at hand, Your Honor, but we'd be happy

4    to file a supplemental briefing on this if Your Honor would

5    like.

6              THE COURT:  I'm just not understanding why this is

7    such -- why this is such a big deal.  I mean, what's -- Florida

8    wants to get in touch with him to try to see if he will come

9    down and testify.

10             MR. PERCIVAL:  That's correct, Your Honor.  I mean,

11   just to be frank, we think of all of deponents that Mr. Barker's

12   credibility was the most suspect.  We think he said a lot of

13   things that are demonstrably untrue, and we would at least like

14   to make a call and say, Hey, are you willing to be down here,

15   because we would rather --

16             THE COURT:  I wouldn't preface it by saying that

17   because --

18             MR. PERCIVAL:  We'd call and request his presence.

19   Then if he says no, he says no.  If he really does live in

20   Fredericksburg, he's outside the subpoena power.  But, I mean, I

21   guess -- I want to address this interpretation question on (i)

22   and (ii), because I think understanding the way this rule works

23   is when you call -- when you designate a deposition based on an

24   unavailable witness, that's on the premise that you would like

25   to call them but can't.  So they're a witness for purposes of

1   trial that then gets offered through deposition testimony

2   because they're unavailable.

3          So for them to just say, Well, he's unavailable so we

4   don't have to give you his contact information I think is

5   putting the cart before the horse.  And that's why (i) and (ii)

6   both use the word "witness" because it's clear that somebody who

7   ends up being presented through deposition testimony is a

8   witness under the rule.

9          THE COURT:  What do you say to the Government's

10  argument that it doesn't matter where he is on the day of trial,

11  it just matters where he lives on the day of trial?

12         MR. PERCIVAL:  That's just not a correct reading of

13  the rule.  And I think the *Chao* case, for example, those cases

14  talk about where they reside as evidence to support the

15  conclusion that they're not going to be present on the day of

16  trial.  But the ultimate question is whether they're going to be

17  within a hundred miles on the day of trial; and to the extent

18  they discuss residence, that's just a relevant step in the

19  analysis of reaching the conclusion based on the way Your Honor

20  and the State of Florida read the rule.

21         THE COURT:  All right.  So what am I being asked to do

22  here?  Florida's asking me not to allow Mr. Barker's deposition

23  at all because the Federal Government hasn't shown that he's

24  unavailable?

25         MR. PERCIVAL:  That's right, Your Honor.  And I guess

1    to put a finer point on it, as I've said, if we can get the

2    right information, we will drop this objection.  But we've been

3    asking for this information and we've been told no, and we don't

4    want to get sandbagged at the eleventh hour with the

5    information.  So we would like Your Honor to tell them either

6    give us the information in a week or you're not going to be

7    allowed to present this evidence at trial because it, frankly,

8    should have been disclosed already.

9              THE COURT:  All right.  Ms. Ryan?

10             MS. RYAN:  Your Honor, our concern of providing

11   contact information is only that Mr. Barker is a lifelong law

12   enforcement officer.  There are safety and security concerns,

13   and we have not been able to get a guarantee that that

14   information would be kept confidential under Florida's broad

15   public record laws.

16             So if it can be guaranteed to be kept attorneys' eyes

17   only and kept confidential, then I think there might be a

18   slightly different analysis here providing a phone number for

19   him, for example.

20             MR. PERCIVAL:  Your Honor, I have two responses to

21   that.  One, we do have a public records exception, and we've

22   offered to let them sign an affidavit to invoke the exception;

23   but if Your Honor feels like he needs to enter a protective

24   order to prevent us from disclosing his contact information,

25   that's an option too.

1           THE COURT:  All right.  Frankly, I don't see why this

2    is such a big deal, but I read the rule the same way Florida

3    does, that simply because you're calling somebody by deposition

4    doesn't exclude your obligation under (i) to provide the contact

5    information for all of the reasons we've been talking about

6    today:  To confirm their unavailability and to give the other

7    side an opportunity to bring them here live if that's what they

8    want to do.  So I think the Federal Government has an obligation

9    to do that.

10          Ultimately, I don't -- I just don't accept the

11   proposition that somebody who is physically within a hundred

12   miles of the court on the day of trial is unavailable simply

13   because they live somewhere else.  That -- I just don't accept

14   that as being the law, and the cases that you've cited I don't

15   think say that.  They are talking about residency, but I don't

16   think they were specifically addressing a situation where you

17   had somebody that was within a hundred miles of the courthouse

18   that nevertheless was unavailable because they live somewhere

19   else.  That just makes no sense to me.  If I'm wrong about that,

20   I'm wrong about that.

21          But I think this whole issue gets resolved if the

22   Federal Government complies with its obligation under

23   26(a)(3)(A)(i) in providing the contact information for

24   Mr. Barker.  That will allow Florida to confirm that he's not

25   going to be in Perdido; he's in fact going to be in

1    Fredericksburg and, in all likelihood, he's not going to want to

2    come down.  I haven't heard anything beyond that to suggest that

3    the Federal Government is procuring his unavailability; and so

4    in the event that Florida gets the information, confirms that

5    he's going to be in Fredericksburg, he doesn't want to come down

6    to testify at trial, he's beyond my subpoena power, he will be

7    unavailable and you can present his deposition.

8           And so to the extent that a protective order is

9    necessary, y'all can come up with language for it and give it to

10   me.  To the extent you can resolve this through some affidavit

11   of non-Public Records Act disclosure, do that.  So however it

12   needs -- however you need it to be accomplished.  Because I

13   understand the point that we don't want law enforcement

14   officers' information floating around the public domain, but

15   that's not an unsolvable problem for Government lawyers who are

16   used to dealing with this type of situation.

17          So however you need to do it, if I need to be involved

18   through protective order, give it to me, I'll sign it; but this

19   needs to happen very quickly.  And absent that happening, it

20   certainly seems to me that -- I haven't been persuaded, as of

21   yet, that Mr. Barker is not going to be standing outside the

22   courthouse on the day of trial; and so if y'all don't figure out

23   a way to work this out, I'm going to assume that despite the

24   fact that he lives in Fredericksburg, he'd rather be in

25   Pensacola, Florida, in January than Fredericksburg, Virginia, in

1    January, and go from there.

2          MR. PERCIVAL:  Your Honor, would you be willing to

3    enter a final deadline for that, disclosure of that information?

4          THE COURT:  How long do you need to work out whatever

5    order, affidavit you need?

6          MS. RYAN:  We can reach out to our clients today.

7    Mr. Darrow and I will also be traveling today, so we may need

8    until Wednesday next week.

9          MR. PERCIVAL:  As long as it's within the next week,

10   we're fine.  We just want there to be a deadline.

11         THE COURT:  All right.

12         MS. RYAN:  Maybe next Friday then, Your Honor.

13   Just --

14         THE COURT:  Next Friday.

15         MS. RYAN:  -- to give the agency some time.

16         THE COURT:  That will all happen by next Friday.

17         All right.  So that's the only issue with

18   Mr. Barker's -- no, it's not.  At least as to the Federal

19   Government's designations, in the event that he comes in by

20   deposition, Florida's counter-designations there, there's no

21   issues separate and apart from -- or are those -- I'm sorry.

22   I'm talking and thinking at the same time.

23         Are the counter-designations you made, Mr. Percival,

24   are they different from the designations you made?

25         MR. PERCIVAL:  Yes, Your Honor.

1          THE COURT:  Okay.  So in the event that Mr. Barker's

2    deposition comes in, there's nothing else I need to do with your

3    objections to their designations of his testimony, correct?

4          MR. PERCIVAL:  No, I don't think so, Your Honor.

5          THE COURT:  And from the Federal Government's

6    perspective, assuming it comes in, there's nothing I need to do

7    with respect to Florida's counter-designations, correct?

8          MS. RYAN:  Correct.

9          THE COURT:  All right.  That will be set aside.

10         All right.  Well, let's now turn then to the

11   defendants' objections to the plaintiff's designations.  And I

12   guess we can do this one of two ways -- really one of one way at

13   this point probably.  We're just going to have to go through

14   them item by item, correct, and if there's something that the

15   prior rulings resolved, you'll tell me?  Otherwise, we'll just

16   deal with them as they come.  Is that how we're going to need to

17   do this?

18         MR. PERCIVAL:  I suppose so, Your Honor.  I mean, we

19   think these objections are a little over the top, but if we need

20   to go through all of them -- especially a bench trial.  But, you

21   know, we can certainly have these go to weight, would be how we

22   would prefer to handle it.

23         THE COURT:  You'd prefer what?

24         MR. PERCIVAL:  In some bench trials, most bench trials

25   we've been involved in, the parties just agree that objections

1    go to the weight of the evidence just to streamline things; but

2    if the defendants are not willing to agree to that and we have

3    to go through all of them, we can do that.

4            THE COURT:  Mr. Darrow?  I'm sorry, Ms. Ryan.

5            MS. RYAN:  One moment, Your Honor.

6            MR. DARROW:  I apologize, Your Honor.  We were just

7    saying that if we -- I think your rulings have rendered a few of

8    them moot, a few of our objections.  And also we can, you know,

9    go back through and determine what the showstopper ones are as

10   opposed to dragging through Your Honor each line by line because

11   some of them could go to weight.

12           THE COURT:  Okay.  I would prefer to not be drug, and

13   so if that's an alternative, that would suit me fine.  What I

14   don't want to do, given the limited time we're going to have at

15   trial, I don't want these to just be lingering out there to

16   trial and me have to spend time at trial dealing with them.

17   We've got time set aside today, and so if we can deal with

18   whatever you call the "showstoppers," I'd like to deal with that

19   so when we get to trial, you know, we're -- looking at just the

20   first one.  Plaintiff is going to either play or read that,

21   page 51 through page 52.  I don't want to have to stop and rule

22   -- have argument and rule on objections.  I just want that to

23   flow.  And so is figuring out the showstoppers something you can

24   do in short order, or how do you propose we do that?

25           MR. PERCIVAL:  Your Honor, I have a suggestion.  I

1   know we have a few other things to handle.  I don't know if we

2   were planning to break for lunch, but if we --

3              THE COURT:  I hope to be finished by lunch.

4              MR. PERCIVAL:  Well, fair enough.  Withdrawn then.

5              THE COURT:  We will break at some point.

6              Let's do this.  Let's put a pin in this right now, and

7   y'all can think about a procedural way to do.  When we take a

8   convenience break, we will maybe come back from that with a plan

9   to deal with it.

10             All right.  I guess, Mr. Darrow, the objections to all

11  the pre-- strike that.

12             The objections to the exhibits and the pretrial

13  stipulation, are there any of those that fall into like your

14  showstopper category or not?  Anything you need a ruling from me

15  on today that would facilitate things at trial?

16             MR. DARROW:  Yes, Your Honor.  I think Ms. Ryan is

17  going to address that.

18             MS. RYAN:  Yes.

19             I think there's a few categories here.  There's a

20  couple that invoke the record rule, as we've kind of discussed

21  before about these administrative records coming in as exhibits

22  that will then be discussed, and it goes to our motion in lim

23  about extra-record discovery concerns.

24             And then we also, you know, as to Your Honor's point

25  earlier about standing and the number of witnesses that go to

1    standing and the exhibits, we'd point Your Honor to paragraph 27

2    of the Stipulated Facts where Florida admits they do not track

3    their expenditures in a manner that allows it to identify

4    specific aliens released under the challenged policies which

5    goes to the direct injury requirements that they have to show.

6    And they have conceded that they cannot do that, and that

7    puts -- if Your Honor agrees, that takes out a lot of the

8    standing exhibits.

9             THE COURT:  I don't agree with that.  That, to me,

10   goes to the weight that I'm going to give this evidence, and

11   that was the whole discussion we had at summary judgment.  I

12   can't make that leap that Florida wants me to make without

13   making inferences.  And I think the point that they don't track

14   the information may ultimately be fatal to them, but the sheer

15   number and sheer amount, particularly if I'm going to hear any

16   evidence of before expenditures and after expenditures, I may be

17   able to make the inference that they want me to make.

18            I think I've -- I can't remember which case it was,

19   but one of the Texas cases they talked about, you know, common

20   sense.  And when we instruct a jury, we tell them not to check

21   their common sense at the door.  And as I think I talked about

22   before, I think common sense would dictate, even if they're not

23   tracking it specifically, if I'm persuaded that these

24   non-getaway people are in those numbers, I may be able to make

25   an inference.  Maybe I won't make the inference after I hear all

1    the evidence, but it doesn't make it go away.

2            What my point was, given the facts you've admitted,

3    why am I going to need somebody -- and maybe it's more of a

4    question for Florida.  Why am I going to need somebody from ACA

5    or somebody else to sit on the stand given the facts that y'all

6    have stipulated to?  What are they going to tell me beyond what

7    you've have stipulated to?

8            MR. PERCIVAL:  A few points, Your Honor.  One, we're

9    considering dropping some of these witnesses.  One of the

10   questions we had for you today is you talked about drawing these

11   inferences.  And is Your Honor comfortable drawing those

12   inferences on a cold stipulation, or do you feel like you need

13   to see witnesses and judge credibility to make those inferences?

14           THE COURT:  I'm not going to answer that.  I can't

15   tell you how to try your case.  You've got to put on the

16   evidence you think is necessary for me to draw those inferences.

17           But that being said, for example, you stipulate for

18   fiscal year -- I'm reading paragraph 37.  "For fiscal year 2020

19   to 2021 the average cost per student was 8,000-something

20   dollars."

21           I certainly don't need a Department of Education

22   witness to come in and tell me what their average costs per

23   students are.  If there's something that you think fills in gaps

24   between some of this that would help me make the inferences you

25   want me to make, your case, you put it on.  They're going to

1    cross-examine and try to show that that really would require a

2    leap of speculation rather than an inference; and I guess I'm

3    just going to have to figure out, after I hear all the evidence,

4    what the answer is.

5            MR. PERCIVAL:  Well, we're going to go through this

6    with a fine-tooth comb, Your Honor, and see if there are

7    witnesses we can drop entirely.  And we're certainly going to

8    seek to streamline the witnesses to the extent that relevant

9    facts are already in the stipulation.

10            There are some exhibits we plan to offer that are

11    essentially the background data on this.  And the defendants

12    have objected on hearsay grounds, so we might need the witnesses

13    just to lay a foundation for the exhibits.

14            THE COURT:  Well, let me ask on that, and maybe it

15    will go to some of your points, why do I need the background

16    data?  Why do I need -- if they've stipulated -- if you've

17    stipulated that this is the number, why do I need to know where

18    that number came from?  On my example, pulled out of there, the

19    cost per student, why do I need to see the work, so to speak, to

20    the math of the stipulation you've agreed to?

21            MR. PERCIVAL:  I don't think that you do, but I do

22    think that there might be -- there might be some numbers that

23    aren't in here, Your Honor, because -- I wouldn't consider this

24    an exhaustive stipulation, but we'll go back to the drawing

25    board and see what we really need and try to streamline the

1    trial as much as possible.

2         THE COURT:  Because I guess my point is and to the

3    extent a number of these objections -- and I started looking at

4    maybe Exhibit 65 pretty much all the way -- close to the end.

5    Maybe not all the way, maybe to the 90-something -- seemed to

6    fall within the category that I think Ms. Ryan was speaking to

7    of documents that are embedded -- the stipulation -- what you

8    stipulated to comes from those documents.  So why do I need the

9    documents?  What am I going to find in those documents that

10   helps me decide the case?

11        I mean, if there's something in there that you think

12   is pertinent, like I'm looking at Number 77, fiscal year data

13   from Florida Department of Corrections from 2015 to 2016, I

14   mean, that was two administrations -- yeah, almost two

15   administrations ago.  Why is that relevant to anything at this

16   point?

17        MR. PERCIVAL:  Well, the way the SCAAP program works

18   is it takes several years for these numbers to be calculated.

19   So to some degree, we're using historical expenditures as a

20   demonstration of likely future expenditures, because like the

21   most current year -- the program takes several years to go back

22   and do the calculation with the federal government about the

23   portion they reimburse.  That would explain the past years.  But

24   I take Your Honor's broader point that we may be able to drop

25   some of the exhibits, and we'll take a look at that.

1          THE COURT:  All right.  With that guidance -- I don't

2     know if I'm going to be able to rule, "Yes, irrelevant, yes,"

3     but I think the guidance hopefully will hone that down a little

4     bit, make some of your objections unimportant.  Because I agree

5     with you generally speaking that once the parties stipulate to a

6     fact, I don't need evidence about that fact.  What I need, if

7     the parties think it's pertinent, is information that helps me

8     understand that fact in context.  And if that is, "This year the

9     number is 800,000; last year the number was 600,000; therefore,

10    Judge, we want you to infer from that fact that the reason the

11    number's higher this year is because we've got all these

12    documented people in the state."  They're going to say, "Oh, no,

13    no, no.  Wait a minute.  That still doesn't granulate it

14    enough." And that's the kind of information I think would be

15    pertinent and might still be relevant here.

16          But generally speaking, you know -- and I saw a lot of

17    it in the summary judgment evidence when I was going through

18    that.  We had the affidavits from the individuals, and then we

19    had all their backup work.  And I understand why you gave me all

20    that, but it was unhelpful.

21          Okay.  So any other categories of cases that might

22    be -- guidance might be helpful?

23          MS. RYAN:  Yes, Your Honor.  Exhibits 54 through 58

24    are Presidential Proclamations from President Trump.  They all

25    precede the Biden Administration, and we've made relevance

1    objections on all of those.

2            MR. PERCIVAL:  Your Honor, there's actually a really

3    straightforward explanation for this that I might be able to

4    offer.

5            So the Biden Executive Order rescinds a bunch of Trump

6    Executive Orders, and all we did was attach the Executive Orders

7    that were rescinded so that the Biden Executive Order -- it

8    could be understood, the practical effect of the Biden Executive

9    Order.

10           THE COURT:  Okay.  And that would -- so again, it

11   sounds like it's just a background perspective of where we were,

12   where we started, and you're going to ask me to say we're now

13   back to where we started?

14           MR. PERCIVAL:   (Nodding head.)

15           THE COURT:  Gotcha.  Okay.

16           I guess for that limited purpose, is there still an

17   issue?

18           MS. RYAN:  I think it depends on the foundation and

19   how it comes in.  If it's just for that limited background --

20   but, you know, we keep hearing the term "background," but at

21   some point, the background has to stop.  Right?  We can't go all

22   the way back to 2015, 2014 in order to paint the picture of

23   where we are today.  It's just not necessary.

24           THE COURT:  And I agree with you.  I think what

25   obviously is important here is starting -- started in January

1    2021.  And Florida's position is when you compare the world as

2    it existed before January -- immediately before January 2021 and

3    you compare the world immediately after, something happened,

4    something changed.  A new policy was put in effect.  That's

5    their position.  I know the Federal Government has a different

6    view, I think, but I think for that limited purpose to know --

7    again, what I know about life, you know, the prior

8    administration took a much different approach to dealing with

9    the border than the current administration.

10        And so to me, that's essentially what all that

11   evidence would be boiled down to in a paragraph or so:  That

12   under the prior administration, they had these policies; the

13   current administration, in February of 2021, rescinded all of

14   those policies; and then they started with a Notice to Report.

15   They've evolved to this; they've evolved to that.  And

16   ultimately, beyond that transitional background, I'm not sure

17   how this is -- what significance this is, but for that purpose,

18   I do think -- I do see the relevance of it.

19        Any other broad categories?

20        MS. RYAN:  Not at this time, Your Honor.  I think a

21   lot of this will depend on the foundation that's laid.  We will

22   note that our 802 hearsay objections, we're not -- not on the

23   face of the document itself -- we understand 803(6) -- but the

24   content of those documents.  So it will depend how it comes in,

25   if it's for the truth or for the effect on the listener, and we

1    will raise the necessary objections at the time they're entered.

2           THE COURT:  Okay.  Well, hopefully a lot of them will

3    go away.

4           MR. PERCIVAL:  I just want to clarify.  I mean,

5    there's no authenticity objection to, for example, all of these

6    emails from the Department of Homeland Security.  So when she

7    says what foundation is raised, what we're envisioning is at the

8    beginning of our case in chief, just moving a bunch of these

9    into evidence.

10          So if there's some dispute about hearsay, it probably

11   makes sense to resolve it now.  And what I would say is that

12   there's a general hearsay exception for statements by employees

13   that are within the scope of their duties when they're an

14   employee of the defendant.  And that to would cover basically

15   all of these.  This is 801 -- let me just pull it up here.

16   801(d)(2)(D).

17          THE COURT:  All right.  Ms. Ryan, in light of their

18   procedural plan to just drop a bunch of documents on me at the

19   outset of trial, do you still have the confidence that this can

20   be addressed at trial, or is this something we need to talk

21   about now?

22          MS. RYAN:  Your Honor, there's no authenticity

23   objections which would go to its admissibility, but they still

24   have to lay foundation for the relevance of each of these

25   exhibits.  They can't just offer them in bulk.  They have to

1   show why they are relevant.

2           And as to the hearsay objection, 801(d)(2)(D) goes to

3   party opponent admissions, so they have to be said by a party

4   against their interest.  And if we're talking about emails, the

5   email itself, yes, is a DHS email, so it is under the business

6   records exception.  But some of these emails say, "Just spoke to

7   Bob at ICE.  He said to me this."  And so to the extent that

8   that level of hearsay is coming in for its truth, we still

9   maintain our objection unless it's coming in for the effect on

10  the listener, which is why we say we need the context of where

11  they're bringing these in.

12          THE COURT:  And I think she's right, but it doesn't

13  sound like I'm going to get a lot of context on some of this.

14          MR. PERCIVAL:  801(d)(2)(D) does not require it to be

15  an opposing -- stated by the opposing party because it defines

16  as an opposing party statement, a statement that was made by the

17  party's employee on a matter within the scope of that

18  relationship.

19          THE COURT:  Right.  But I guess she's talking about

20  there could be hearsay within hearsay here, and without

21  knowing -- you're going to walk in and hand me a big stack of

22  exhibits, and then at the end of trial I may not have heard

23  anything about these exhibits from a witness.  So I'm not going

24  to know really what purpose you're offering it for to know

25  whether there is an actual hearsay within hearsay or hearsay

1  objection here.  And I guess that's a concern I have about how

2  we're intending to proceed.  Because I think Ms. Ryan's point is

3  correct that, you know, normally you got a witness up there who

4  identifies it, authenticates it.  That doesn't necessarily need

5  to happen because there's no authenticity issues, but at least I

6  would understand the purpose you're offering it for.  And

7  depending upon the purpose you're offering it for, there may not

8  be an objection or there may be an objection.  So how are we

9  going to overcome that issue?

10         MR. PERCIVAL:  Well, Your Honor, I guess 801 -- the

11  exception we're talking about doesn't depend on the purpose.

12  Our view is that all of these emails on their face satisfy this

13  hearsay exception.

14         MS. RYAN:  Your Honor, if I may.

15         THE COURT:  Yes, ma'am.

16         MS. RYAN:  Just as it satisfies the hearsay exception,

17  it still has to go through an analysis of relevance and 403.

18  And that is our point is there has to be a relevance foundation

19  laid for these exhibits.

20         MR. PERCIVAL:  Your Honor, we think the documents on

21  their face will also demonstrate their relevance.

22         THE COURT:  But how am I going to -- I mean, you're

23  going to walk in, it sounds like, on the first day of trial,

24  hand me a big stack of exhibits and say, "We move these exhibits

25  into evidence."

1          MR. PERCIVAL:  We can go through them one by one with

2    Your Honor and have argument if that's what defendants are

3    insisting on, but because there's no authenticity objection and

4    because we think the face of the documents establish both

5    relevance and the application of a hearsay exception or an

6    exclusion from the definition because hearsay is confusing like

7    that.

8          THE COURT:  They don't agree with you.  And so it

9    sounds like I am going to have to go through each -- I can't

10   make that determination now because I don't have those documents

11   in front of me.  I don't know what purpose Florida's offering

12   them for.  And so it does sound like, at least to the ones they

13   have an objection to, that y'all -- that isn't worked out before

14   trial, you're going to have to offer it individually and explain

15   to me how it meets whatever exception and how it's relevant.  It

16   seems like that's where we're going to have to go.

17          Is that what the government, Federal Government --

18          MS. RYAN:  Yes, Your Honor.

19          THE COURT:  All right.  Well, plan accordingly,

20   because I can't rule right now.  I don't have the document.  I

21   don't know -- you may be right.  When I look at it, I may say,

22   Oh, okay.  I understand why you're offering it, what it's

23   relevant to, and it's apparent on its face that it meets the

24   criteria necessary to be admitted as an opposing party statement

25   or there's no hearsay within hearsay issue.  It comes in.  But I

1    can't do that right now.

2          MR. PERCIVAL:  Understood, Your Honor.  And we'll be

3    prepared with a manner to streamline that as much as possible.

4          THE COURT:  Well, obviously the direction, though,

5    between now and then will be to work to hone down the ones that

6    we have to spend time at trial hearing those individual

7    objections to.

8          All right.  I think I've talked about everything I

9    want to talk about except those deposition designations, so why

10   don't we take -- we've been going for a fair amount of time.

11   Why don't we take 15 minutes for a convenience break, as well as

12   to give the opportunity for the Federal Government to identify

13   any showstoppers that we need to talk about today, otherwise --

14   we need to talk about today, number one; number two, that really

15   don't go to the weight of this.  Because if it goes to the

16   weight in a bench trial, I can weigh the evidence at the

17   appropriate time.  If it's completely irrelevant or completely

18   speculative, whatever you want to hear me decide, I can do that

19   today; but, otherwise, it seems like something that really will

20   just go to trial.

21         All right.  Let's take 15.  We'll come back and see

22   where we are.

23      *(Recess taken from 10:41 a.m. to 10:57 a.m.)*

24         THE COURT:  All right.  Mr. Darrow, who do we need to

25   do?

1              MR. DARROW:  Deposition designations.

2              THE COURT:  Yes, sir, which ones you want to talk

3      about?

4              MR. DARROW:  So, you know, we've narrowed down I think

5      a lot of ours.

6              THE COURT:  Okay.

7              MR. DARROW:  I think we'd say broadly across a few of

8      witnesses where we object that it calls for a legal conclusion

9      that we think is still something that doesn't go to the weight,

10     that, you know, we had witnesses being asked where there are

11     certain -- actions were justified by certain statutes, and

12     that's a lawyer's opinion.

13             THE COURT:  All right.  Which ones?  Let's talk about

14     specific ones.

15             MS. RYAN:  So, for example, in the Ortiz deposition.

16             THE COURT:  Okay.

17             MS. RYAN:  Page 88.

18             THE COURT:  Do you have a -- I didn't print out --

19             MS. RYAN:  Yes, Your Honor.

20             THE COURT:  Maybe I can load it up here on the screen.

21             MS. RYAN:  It starts on line 13 on page 88.

22             MR. PERCIVAL:  And, Your Honor, I may be able to

23     offer -- I don't want to call it a concession, but a

24     clarification that may streamline this discussion.

25             So when we ask an agent in DHS about how they

administer a particular statute, we're not offering it for the

proper interpretation of the statute.  We understand that's a

conclusion for Your Honor, and we don't expect the Court to give

any weight to what Chief Ortiz says about what Section 1225

means.  But there's a close intersection between the legal

conclusion that you have to reach about what the statute

requires and the way that DHS is, in fact, administering the

statute now.

        And so some of this testimony we can get into the

specifics, but some of it is being offered for the evidentiary

point about how DHS is administering these provisions and what

they understand them to do.  And this is something that agents

on the ground, they administer these statutes every day.  And so

to the extent that we need to clarify that we're not asking Your

Honor to reach conclusion about what the statutes actually mean

for purposes of your role as the drawer of legal conclusions, we

can stipulate to that.

        I don't know if that made sense.

        THE COURT:  Does that help anything, Ms. Ryan?

        MS. RYAN:  It does, Your Honor.  I would note, though,

just because these agents are enforcing these statutes on the

ground, they don't need to know the number of the statute that

they're enforcing.  They just need to know what the policies and

practices of the agency are.

        So these witnesses may not know the difference between

1    1225(a).  They may not know the legal nuances, nor do they have

2    to understand the legal nuances.  So to the extent that they're

3    being asked for a legal interpretation of these statutes, with

4    the clarification Mr. Percival just gave and if that is indeed

5    how it is offered, I think that quells some of our concerns.

6              THE COURT:  All right.  I've got it pulled up now.  Go

7    to the one we're specifically talking about.  I pulled up the

8    wrong thing.

9              Were those -- I guess they're attached to your Notice

10   of Deposition Designations.  There it is.

11             MR. PERCIVAL:  They're attached to our file.

12             THE COURT:  125, right?

13             MR. PERCIVAL:  Because we don't have any objections,

14   Your Honor, if you just pull up all our designations that we

15   attached, that will give you everything you need to see for

16   purposes of this discussion.

17             THE COURT:  I'm just trying to pull up the deposition

18   itself.  I've got it now.  Okay.  So I'm going to...

19             Okay.  So you're on -- the one you're bringing my

20   attention to is their designation at page 87 of the Ortiz

21   deposition, line 14.

22             MS. RYAN:  Page 88, line 13, Your Honor.

23             THE COURT:  I'm sorry.  Page 88, line 13.

24             What's the objection to that?  He asked him if he sees

25   a particular statute, and he said he did.

1          MS. RYAN:  Yes.  And then the next question in that

2     designation, Your Honor, is about what to do then in a

3     hypothetical situation applying that statute.

4          THE COURT:  And what's the issue?

5          MS. RYAN:  They're asking this lay individual witness

6     for his legal opinion of applying this statute to different

7     situations.

8          MR. PERCIVAL:  And, Your Honor my understanding is

9     that these agents are out in the field making decisions about

10    how to process and how to apply these statutes, and it's not

11    like they have lawyers out there with them telling them what to

12    do.  It's their job to go through the decisional, you know, sort

13    of flowchart of the statute.  And so asking Border Patrol chief

14    what happens next is fair game, we think.

15         THE COURT:  I guess I'm struggling to understand,

16    Ms. Ryan, what the issue is.  I mean, certainly if Chief Ortiz

17    or any other witness read a statute and said it means X, that's

18    not binding upon me nor is it particularly important what they

19    think as a matter of law it means.  But why isn't it relevant

20    for somebody who is it enforcing the statute to tell me how

21    they're enforcing it?

22         MS. RYAN:  I think our main concern, Your Honor, is

23    the -- yes, the agents are in the field enforcing what is

24    required by the statute, but they don't have a copy of the INA

25    in front of them.  They may have a decisional "ask these

1   questions," but they're not going, Okay, 1225(b)(21)(B)(34) says

2   I do this.  And so, you know, asking a lay witness what these

3   intricate details of a statute mean, you know -- but Your Honor

4   just said it does go to weight, not admissibility, for you as

5   the decision-maker.  So we can withdraw this and argue it on

6   closing and how it gets argued by Florida.  But we just want to

7   point out that, you know, asking these lay witnesses the

8   intricate meanings of these very detailed, very complicated

9   statutes, they're not experts.  They're not legal experts.

10              THE COURT:  And I think Florida has acknowledged that

11  and with the understanding that -- I guess the fundamental issue

12  is if the Border Patrol thinks the statute tells them to do one

13  thing yet they're doing another, that's an important piece of

14  factual information.  If they're doing something, whatever

15  they're doing, and it happens to be that's exactly what the

16  statute means, then great.  If they're doing something and

17  that's not what the statute means, how significant that is, I

18  guess we'll have to figure out at some point.  I'll have to

19  figure out at some point.  But okay.

20              All right.  I don't see anything objectionable to the

21  line that you're pointing me to with the understanding that he

22  can't -- his view of what the law says isn't significant.  It's

23  whether ultimately he's complying with the law whether he

24  understands it or not.  So I think everybody's saying the same

25  thing and we're on the same page, and so I don't have an issue

```
 1    with that line giving it the weight that I'm going to give it.
 2              MS. RYAN:  Yes, Your Honor.  And I think looking --
 3    just zooming out for a second for Mr. Davies, we think all of
 4    our objections go to weight, not admissibility.
 5              THE COURT:  Mr. who?
 6              MS. RYAN:  Matthew Davies.
 7              THE COURT:  Okay.  So there's nothing you're asking me
 8    to resolve with respect to that?
 9              MS. RYAN:  Correct.  And then on Mr. Barker --
10              MR. PERCIVAL:  I'm sorry.  Are we done with Ortiz?
11    I'm just --
12              MS. RYAN:  No, we're going to come back to Ortiz.
13              MR. PERCIVAL:  Okay.  We're coming back.  Okay.
14              MS. RYAN:  Sorry.
15              THE COURT:  Can we stay on Mr. Ortiz since I have that
16    pulled up right now?
17              MS. RYAN:  We -- someone from our team is still going
18    through Ortiz for us --
19              THE COURT:  Oh, I'm sorry.  Okay.
20              MS. RYAN:  -- kind of in the background.
21              THE COURT:  All right.
22              MS. RYAN:  But we can talk -- we have Price, Guadian,
23    and Mr. Barker ready to discuss.
24              THE COURT:  Okay.  Let's talk about Mr. Price because
25    he's the first one on -- I'm sorry.  We'll talk about
```

 1   Mr. Barker.  That's who you wanted to talk about first.  I will

 2   pull that up.  That's Document 125-3.

 3           All right.  I've got that pulled up.  Where do you

 4   want me to go?

 5           MS. RYAN:  So I think the only one that we would like

 6   to discuss is the designation that starts on page 171, line 8.

 7           THE COURT:  All right.  I'm there.

 8           MS. RYAN:  And his answer -- this is two questions and

 9   answers that have been designated.  In his answer starting on

10   line 16, he straight up says he's assuming, his answer is

11   speculation.  So we would obtain that speculation objection on

12   this designation.

13           MR. PERCIVAL:  Do you want me to respond, Your Honor?

14           THE COURT:  Give me a second.  Let me just read it

15   first.

16           MR. PERCIVAL:  Okay.

17           THE COURT:  And give me some context of what he's

18   talking about here.

19           MS. RYAN:  He has a document in front of him.  Let me

20   confirm.  It's a DHS memorandum from April of 2022, and he's

21   being asked specific questions about the context.  And they're

22   asking him to -- why does this document say a certain thing.

23   He's not the author of that document.

24           And it is from DHS headquarters, whereas Mr. Barker

25   was within the CBP subsection of DHS.  So he's saying:  I didn't

1    write this.  I'm assuming this is what this means, but I don't

2    know for sure.

3           So it's just blatant speculation.

4           MR. PERCIVAL:  And I would just remind the Court that

5    this was a 30(b)(6) deposition, so technically Mr. Barker's

6    personal knowledge is not relevant.  He's speaking for the

7    agency.  But I have other responses too, but I just wanted to

8    provide that background.

9           THE COURT:  Even if he's a 30(b)(6) deponent, he's

10   telling you, at least in that second part -- at least the first

11   two sentences of that second answer, that he doesn't know the

12   answer to your question.  Maybe he had an obligation to know the

13   answer to the question, but he's saying he doesn't.  At the end,

14   though, he says -- he does answer the question.

15          MR. PERCIVAL:  Well, let me give a little more

16   background, if that's all right, Your Honor.

17          I believe this document was this Administration's

18   Border Plan, and one of the things listed in the Border Plan is

19   detaining single adults when appropriate.  And so, you know,

20   part of our theory in this case is that they've categorically

21   abolished detention of so-called family units, so the question

22   was why does this document mention only detaining single adults

23   when appropriate?  It's sort of glaring omission.

24          And as I understood Mr. Barker's answer, he was like,

25   Well, I don't know because I didn't draft it, but it would make

1    sense that this document mentions only detaining single adults

2    because we've abolished family detention.  And so, in other

3    words, his knowledge of agency practice -- he doesn't know for a

4    fact because he didn't draft it, but he has a very good idea of

5    why it was written that way because it reflects the agency's

6    policies.  And then his response says "These are our policies."

7                THE COURT:  I guess I don't even understand the second

8    question and answer.  I mean, the question asks at line 8: "Why

9    does this document only reference detaining single adults and

10   omit any reference to family units?"  He gives a very direct

11   answer to that question.  And as the agency representative,

12   that's the answer.  The second --

13               Is there an objection to that:  8 through 12?

14               MS. RYAN:  No, but this was all designated as, like,

15   one designation, so we raised our objection to the whole thing.

16   So, yes, that first question and answer is not where our

17   objections lie.

18               MR. PERCIVAL:  And, Your Honor, I think we only

19   designated the second half because we thought it was in fairness

20   to Mr. Barker to include the caveats to his statement.  But if

21   the preference from defendants is just to designate the top and

22   leave out the additional context, that's totally fine with us.

23   We'll drop that part.  We thought they would counter-designate

24   it, so I think we just designated it ourself.

25               THE COURT:  Well, the way I see it is he's answered

 1   the question, you've asked for a clarification, and he's now

 2   essentially calling into question the weight that somebody

 3   should give the answer that he gave initially because he didn't

 4   draft it.  So if you really want to object to it, what I would

 5   not consider would be the second part, and you'd be stuck then

 6   with his answer, which was very clear and unequivocal until we

 7   get to the second part, and he raises some questions in a

 8   reader's mind as to whether he really knew the answer to the

 9   first question, if that makes any sense.

10          MS. RYAN:  That's fine, Your Honor.  We can -- we do

11   think that context is important if the first question is coming

12   in, so we will withdraw that objection.

13          THE COURT:  All right.  Anything else in particular

14   you want me to look at with Mr. Barker while we have him open?

15          MS. RYAN:  No, Your Honor.

16          THE COURT:  All right.  And so as to the other

17   objections that you've laid out in your deposition designation

18   response, by not raising any of the other ones, are you saying

19   you now think all those really go more to weight than

20   admissibility?

21          MS. RYAN:  Yes, Your Honor.

22          THE COURT:  All right.  Who do you want to talk about

23   next?

24          MR. DARROW:  Would you like to do Mr. Price?

25          THE COURT:  Sure.

1          MR. PERCIVAL:  And Mr. Hart next to me is going to

2     address Mr. Price, Your Honor.

3          THE COURT:  All right.  Very well.

4          All right.  Where do you want me to go first with

5     Mr. Price?

6          MR. DARROW:  The designation that begins around -- at

7     page 101, line 14.  Trying to find exact...

8          All right.  While I find the exact line in here, there

9     is discussion of the Migrant Protection Protocols and the repeal

10    of the same, and that is just categorically --

11         MR. PERCIVAL:  Is it 102-11, Mr. Darrow?  Sorry.  I'm

12    just trying to find the spot.

13         MR. DARROW:  Oh, yes.  Let me just -- yes.  Yeah, the

14    question, 102-11.

15         THE COURT:  When does he get around to --

16         MR. PERCIVAL:  I think it's actually 103-7.  I don't

17    want to speak for Mr. Darrow, but I think there was some

18    objections and back and forth, and the answer start -- or the

19    question answer starts at 103-7.

20         I'm sorry.  My fault, Your Honor.  I forgot it wasn't

21    my turn.

22         MR. DARROW:  That's fine.  Thank you.

23         THE COURT:  What's your objection?

24         MR. DARROW:  That it's a wholly separate and

25    irrelevant program.  I mean, even if Florida is challenging

1    everything conceivable involving detention of immigrants under

2    the, quote, "nondetention policy," the Migrant Protection

3    Protocols were not a detention policy.  They were about making

4    people wait in the desert in Mexico.  It's just a wholly

5    separate thing.  It goes back to our earlier point that you just

6    can't aggregate everything that a different administration is

7    doing under one broad, you know, We Don't Like This Policy

8    policy and challenge it all wholesale.

9             THE COURT:  So your objection is relevance?

10            MR. DARROW:  Yes.

11            THE COURT:  All right.  Mr. Hart.

12            MR. HART:  Yes, Your Honor.

13            THE COURT:  What's it relevant to.

14            MR. HART:  One of the central issues in this case is

15   whether or not defendants are trying -- are reducing detention

16   capacity or not detaining people to the extent that they can,

17   and we have evidence relating to their budget request to reduce

18   detention capacity.

19            So to the extent that they knew that the Migrant

20   Protection Protocols might be going away and that they -- and

21   this question is asking, Well, if you knew the Migrant

22   Protection Protocols might be going away and you're now

23   attempting to reduce the detention capacity, wouldn't the result

24   be that more aliens are released?  Thus, going to the

25   nondetention policy put forth by the State of Florida.

1          THE COURT:  Is this really in dispute?

2          MR. DARROW:  I mean, in our opinion, MPP isn't in

3   dispute in this case.

4          THE COURT:  No, I mean, in -- from a practical

5   standpoint, is it really in dispute?  I mean, I thought the

6   Government's whole defense was we're being -- the reason more

7   people are being released into the country is more people are

8   arriving at the border.

9          MR. DARROW:  That's one of the major reasons.

10          THE COURT:  And I think Florida's position is the

11   reason more people are arriving at the border is because you've

12   eliminated the Stay In Mexico program, and you've adopted these

13   other policies that send a message that people won't be

14   detained.

15          Is that part of Government's point here -- or

16   Florida's point?

17          MR. HART:  Yes, Your Honor.

18          THE COURT:  And so why wouldn't this information be

19   relevant to evaluating your defense, if nothing else?

20          MR. DARROW:  Because it's not just -- you can't draw a

21   clear line.  And, you know, we don't have -- because it's not at

22   issue in this case, we don't have the testimony here to provide

23   sufficient context for MPP.  But it's not simply a question of

24   whether the United States does it or not.  Mexico has to be a

25   willing partner, and they have severely restricted the number of

1  people that they're willing to take under the program.

2          So it's not -- whatever relevance Your Honor can find

3  from eliminating it is fairly prejudicial to the actual analysis

4  undertaken by defendants, because it wasn't simply 100 percent:

5  How many people do we want to keep in Mexico.  It was:  We have

6  to work with Mexico as well.

7          THE COURT:  Right.  And I'm not going to be evaluating

8  whether it was a good policy decision, legal policy decision to

9  end that program or modify it in whatever way it now exists.  I

10  mean, that was the *Texas v. United States* case, and the U.S.

11  Supreme Court said they're not getting involved in the question

12  of whether to end that program because of some of the issues you

13  described.

14          But I guess it seems to me that -- and I remember

15  from -- I think I remember from the summary judgment filings

16  that was kind of the pitch that some of the witnesses were

17  making:  We're being overrun, we had to do something, we can't

18  have them just lingering spreading COVID -- and whatever else

19  was going on down there at the outset.  We have to -- and you

20  talked about it today -- get in the field and get them processed

21  and get them somewhere other than here as quickly as we possibly

22  can.  But if there's countervailing evidence that you're -- go

23  back to the, kind of, you-brought-this-on-yourself questions I

24  was asking Florida, why wouldn't that -- if there is evidence

25  that you've created the problem that you're now solving in a way

1      that the statute doesn't allow, why isn't that relevant?

2              MR. DARROW:  It's just that we don't have the

3      information here to determine its relevance because -- I mean,

4      we don't have evidence that --

5              THE COURT:  We've got Mr. Ortiz testifying that the

6      end result of doing what was done with the Stay In Mexico

7      program and the reduced detention capacity is more people are

8      going to be released.  And the reason more people are going to

9      be released is because more people are coming, is what you've

10     told me in your filings.

11             And so I guess -- I'm not going to keep debating it

12     back and forth.  I think I've heard enough to find some

13     relevance in this.  Understand, I'm not -- the validity of the

14     Stay In Mexico program is not at issue here.  But the

15     Government's defense as to why things are the way they are,

16     which Florida characterizes as nondetention policy, is relevant

17     in this case, and this goes directly to that.  How much weight

18     it gets -- you know, frankly, I didn't think this was in

19     dispute.  I didn't think anybody was disputing the fact that the

20     reason we have more people coming is because policies changed;

21     but if that is in dispute, then I will resolve that once I hear

22     the evidence.  And maybe the evidence won't show that.

23             All right.  Next issue you want to talk about.

24             MR. DARROW:  The only other major thing we want to

25     discuss with Mr. Price is the testimony beginning on page 129.

1   And this was primarily what we also discussed in our motion

2   in limine, so that the Court has some background.  And -- sorry.

3   My computer froze for a second.  My colleague is pulling it up.

4           But this is -- there's a long series of questions and

5   answers that deal with what, you know, are the assumed impacts

6   on states from releasing noncitizens who might end up living

7   there.  And this essentially calls for expert testimony, which

8   is why we think it's also something that doesn't go to the

9   weight.  There are people that write, you know, entire theses,

10  whole reports on the socioeconomic impacts on the United States

11  of migration, and Mr. Price is not one of those, nor was he

12  qualified as an expert.  As he says many times in his

13  questioning, which -- we'll pull it up.  Bottom of 129, and it

14  runs through 133.

15          THE COURT:  Where at the point do you want me?  I know

16  the designations start at 128, line 4, but I'm reading that and

17  that doesn't appear to --

18          MR. DARROW:  No, no.

19          THE COURT:  -- have anything to do with the issue

20  you're raising.  So where does the issue you're raising start

21  up?

22          MR. DARROW:  129 -- yes, 129-12.

23          THE COURT:  Okay.

24          MR. DARROW:  "During that period of time those aliens

25  would be at large in different -- whatever states."  And then

1    the next question:  "Some of them would commit crimes."  And

2    then it goes from crimes to detainers.  "This parole population

3    is going to commit crimes" and then incurred costs to states,

4    housing.

5         THE COURT:  I think this came up in the context of the

6    motion for summary judgment, and -- I don't have the documents

7    in front of me, but I did say in the order, I remember in my

8    oral comments and also the order, that I didn't accept -- or I

9    wasn't persuaded by the Government's argument that that was not

10   proper testimony because he is the border chief with however

11   many years of experience, and so he can testify in that context

12   as to what he's observed and what he's seen and what his

13   experiences are.

14        So I understand your point that he's not a sociologic

15   expert, but it didn't seem to me that some of this -- he did

16   qualify a lot of this in some ways, you know, about people

17   committing crimes.

18        I mean, to me that is a bit of -- gets to be at some

19   point a bit of a stretch.  But, you know, talking about his past

20   experience, that they're going to incur -- states are going to

21   cost money, and then it gets down to the bottom-line question --

22   I don't remember where it was, but I remember reading it in the

23   summary judgment filings where he essentially says that's how

24   our immigration system has always worked.

25        And I don't understand why he can't give me that

1    testimony based on his experience and the position he's in.

2            MR. DARROW:  I think he --

3            THE COURT:  And I'll let you respond.  And I don't

4    mean to do this.  I'm thinking out loud as I'm talking here.

5            Is this the same argument you were making at the

6    summary judgment stage?

7            MR. DARROW:  Yes, we are.  I think if I could just --

8            THE COURT:  Sure.

9            MR. DARROW:  -- add one response or one nuance.

10           We're not saying that he doesn't have a great deal of

11   expertise in the immigration realm, but this isn't the

12   immigration realm.  This is the effects on states.  This is

13   state budgeting.  This is state decisions to prosecute people.

14   This is who commits crimes in states.  This isn't, you know,

15   something that he, or even DHS, generally considers in, you

16   know, like, the daily course of being a removal officer.  You're

17   not thinking about, you know, what the state budgetary costs --

18           THE COURT:  Florida says you ought to be.

19           MR. DARROW:  What's that?

20           THE COURT:  Florida says you ought to be considering

21   that.

22           MR. DARROW:  And he wasn't a 30(b)(6) witness at all,

23   actually.

24           THE COURT:  And I think the fact that he wasn't a

25   30(b)(6) witness doesn't matter.  His experience, he can testify

1    to these things.  To the extent that -- it probably doesn't

2    provide you a great deal of comfort, but I get the point.  I

3    understand the point.  To me it goes to the weight.  I mean,

4    you've got the border patrol chief coming in.  He has a better

5    understanding of how the system operates, both at his level and

6    what happens after it, than certainly I do.

7            But at the same time, I get the point.  I understand

8    that he is making general statements about what these people

9    might do down the road.  And ultimately it's going to be up to

10   me to infer from the evidence that I have whether what he's

11   saying -- which again, frankly, I didn't think was really all

12   that much in dispute -- is true or not.

13           And so I don't think this is inadmissible testimony,

14   but it certainly, you know, once he starts -- for example, on

15   page 132, you know, he's asked:  "And many of these folks coming

16   over the border are within the lower socioeconomic demographics,

17   right?"  It would seem to me that the obvious answer to that

18   question is yes.  But he gives the answer:  "I don't know the

19   percentages; but, yeah, the aliens cut across all demographic

20   areas.  At least some of them aren't rich."  He then finally

21   gives the yes answer.

22           Is that really in dispute?  Are you really disputing

23   that, the fact that even though it came from a non-30(b)(6)

24   witness, even though it didn't come from a socioeconomic expert,

25   are you really disputing that?

1          MR. DARROW:  I mean, generally speaking that a lot of

2     people are in lower socioeconomic status, I mean, I guess, but I

3     don't know --

4          THE COURT:  But why doesn't -- you know, you or I,

5     guess we're not on -- he's the border parole expert with all

6     this experience.  He knows that information a lot more.  We

7     can -- you or I or us lawyers or average citizen would answer

8     yes to that question more speculatively -- probably correctly

9     but speculatively -- but why a border patrol person can't answer

10    yes to that question and it not be speculation because of where

11    they are in their process and what they're dealing with.

12         MR. DARROW:  One clarification, Your Honor, is that

13    Mr. Price is in ICE.  He's in ICE leadership.  He's --

14         THE COURT:  I'm sorry.  ICE.

15         MR. DARROW:  -- not on the border.

16         THE COURT:  I get him and Ortiz confused.

17         MR. DARROW:  But whether that matters or not.

18         THE COURT:  It doesn't, does it?  I mean, they're

19    intimately involved in the immigration, coming across the

20    border, right?

21         MR. DARROW:  Eventually, yeah.  Eventually, ICE will

22    get them after they've come across the border.

23         THE COURT:  So I guess what I'm getting to is why is

24    this objection you're making so significant to the Federal

25    Government when the answers he's giving are -- really would seem

1    to be common sense?

2         MR. DARROW:  We don't so much object to the what-the-

3    socioeconomic-status-of-the-aliens part is.  We object to

4    somebody who has no experience with the matter talking about

5    what -- the costs to state budgets and whether states -- people

6    would commit crimes.  He's got no experience with that, no

7    particular knowledge about what, you know, the state budget

8    mechanisms are, as he says.

9         THE COURT:  Do I really need a witness to tell me

10   that?  These are questions maybe I'll ask the State.  But do I

11   need a witness to tell me that people coming across the border

12   are in the low socioeconomic status and that it's reasonable to

13   infer that they're going to need social services?  Do I really

14   need a witness to tell me that?  Why is that not a stipulated

15   fact?

16        MR. DARROW:  Because it's -- I mean, and I again, I'm

17   also not an expert in this realm, but I don't know if the people

18   coming over the border always try to avail themselves of social

19   services.  I think many of them are skeptical of the government

20   or don't know the programs that are available or don't want to

21   bring themselves above the radar.  I mean, that -- but also, I'm

22   not an expert, so take that with a grain of salt.

23        THE COURT:  Nor am I --

24        MR. DARROW:  Yeah.

25        THE COURT:  -- but ultimately I'm going to have to --

1    when we bring injuries in, they're not experts.  We ask them to

2    make factual findings and draw reasonable inferences from the

3    evidence they hear.  But we also tell them:  Don't check your

4    common sense at the door; use your common sense to make those

5    inferences from the evidence you hear.  And I guess what I'm

6    struggling to understand in this case and why when we had these

7    conversations a long time ago, why there wasn't a stipulated set

8    of facts that both parties could agree to that I could just make

9    findings on?  And it seems like this is the perfect example of

10   it.

11           For example, he talks about based on his past

12   experience that some number of aliens are going to commit

13   crimes.  I mean, it seems like that's a -- yes, that's going to

14   happen.  Whether it's the aliens that have come through this

15   program that are in Florida is a different question.  But the

16   fact that he's testifying to, I really don't understand why

17   that's not a stipulated fact.  Why is that in dispute?  Why is

18   the Government so -- Federal Government so concerned about me

19   drawing the same commonsense inferences that this border patrol

20   person did based upon his experience with immigration?  That's

21   what I just don't get.

22           MR. DARROW:  I don't think it's the factual assumption

23   that some percentage of all populations are going to commit

24   crimes.  It's the dropping the shoe in the next question:  Does

25   that mean the State's going to incur costs to incarcerate or to

1    prosecute them?  That is not something that the Federal

2    Government has any control over.  The State could choose not to

3    charge these people.  They could, you know, have a leniency

4    policy.  The individual --

5           So I guess, yeah.  To Your Honor's points, right, the

6    commonsense assumptions about what large groups of people will

7    do, that's not what we have a problem with.  It's the

8    connection.  Okay.  And then that's going to cost the states.

9    That part we don't know.  That requires a lot more expertise

10   than somebody who works in immigration enforcement for the

11   Federal Government and doesn't spend a lot of time with the

12   state government can talk about.

13          THE COURT:  All right.  Let me then turn to the State

14   because, you know, there does seem to be a line that

15   Mr. Price -- or anybody.  We could probably get somebody off the

16   corner of Palafox and Garden right now and ask these exact same

17   questions to, and they would give us the same answers because I

18   don't think there's really any dispute.

19          But how would Mr. Price or the guy on Palafox and

20   Garden have any expertise or ability or knowledge to come in and

21   make the connection, the next step in that process?  I mean,

22   this was the building of the inferences that I was talking about

23   at summary judgment.  He can't come in and say, Yeah, that's

24   going to cost the state money.  Some state person would have to

25   fill that gap in.

1          So help me understand why we don't get to a line at

2     which Mr. Price's testimony needs to stop because it's becoming

3     speculative?  Maybe reasonably speculative but still

4     speculative.

5          MR. HART:  Your Honor, two points.  First is on

6     Rule 701, the standard is "rationally based on a witness's

7     perception and helpful to determining a fact in the issue and

8     not based on the expert witness standard in 702."

9          And, second, at the beginning of his deposition when

10    describing the role of ERO, Mr. Price specifically states, "We

11    have officers that work with state, local -- yeah, state, local,

12    and federal prisons and jails to identify those that are -- that

13    have committed crimes while they were here in the United States

14    and are also amenable to removal from the United States."

15         So he's clearly setting forth the fact that in his

16    role as the director of ERO, he's working with state and local

17    officials, at least in one category that directly impacts the

18    coffers of the state government.  And that's page 23 where he

19    sets forth the role of ERO.

20         THE COURT:  I'm looking at 131, line 12.  I assume

21    this is still within the designation and the objection.  It is

22    asking, "And to the extent that the aliens have children,

23    schooling costs for those, education costs for those kids,

24    right?"  "Yes."

25         He doesn't -- how in the world would he know that?

1    How in the world would he know what it costs to educate -- that

2    there are costs to educate a child?

3              MR. HART:  Your Honor, because ERO when they had

4    family detention had to provide schooling.

5              THE COURT:  And was that foundation laid in his

6    deposition?

7              MR. HART:  Your Honor, I do not believe that it was.

8              THE COURT:  And I guess where -- and I don't know

9    if -- ultimately, to me, this all goes to the weight to give his

10   testimony, but there -- just so the State's aware, there does

11   come a point in time where it's one thing for a federal

12   immigration official to tell me that poor people are coming

13   across the border.  Some of these people are going to commit

14   crimes.  Some of them are going to need social services.  And

15   maybe he could even tell me, "We" at least in the immigration

16   system, "We don't provide those services for the people once

17   they're out of our custody."  Maybe they could go that far.  But

18   beyond that, it's going to be up to some State witness to tell

19   me that the people that are committing the crimes, using the

20   services, having their kids educated are costing the State

21   money.  And in particular, it's going to have to come from some

22   State witness to tell me that it's this group of people that are

23   costing the State money.

24              So I think the Federal Government is right that there

25   are points in time that Mr. Price gets out of his lane and his

1    testimony becomes somewhat speculative.  Again, commonsense

2    speculative but speculative nonetheless; and, thus, goes to the

3    weight.  I don't think it makes his testimony inadmissible

4    because, as you say, there is a lay witness component to an

5    opinion.

6          MR. HART:  And, Your Honor, we just believe that that

7    goes to the weight.  So to the extent that you don't believe

8    that his opinion testimony is worth anything more than the man

9    on the street, then we trust the Court's discretion.

10          THE COURT:  I don't think the Federal Government does.

11          So, all right.  Again, I think I've been as clear as I

12   can be.  Really, to me, the bottom line you get to -- and I

13   remember this from the summary judgment filings.  The

14   bottom-line point is really -- gets to on page 133 -- when you

15   ask the question, effectively saying:  Assuming the states are

16   incurring costs -- because, again, I don't think he can do

17   anything but speculate that that's the case.  But assuming

18   they're incurring costs, if you detain these folks, they

19   wouldn't be incurring the costs.  That's the bottom-line issue

20   here, and he equivocates a little bit and I think properly

21   qualifies his answer saying "It's a little bit complicated."

22   But the bottom line is if they were detained, the State wouldn't

23   be bearing those costs.  That's correct.

24          And again, I know you objected there, Mr. Darrow, and

25   it's designated as an objection; but, again, is that really a

1    disputed fact?  Why is that not a stipulated fact that if these

2    individuals were detained the State wouldn't be bearing costs

3    for them?

4              MR. DARROW:  Because I still don't think it's clear

5    that even if they weren't detained that they would necessarily

6    be seeking emergency healthcare or education.  And maybe, like,

7    overall, the whole population; but the particular people from

8    Parole/ATD who end up in Florida.  Is that population?  I mean,

9    as you break it down to smaller groups, I think it becomes more

10   and more speculative exactly how much, if any, money we're

11   talking about that's attributable to the program challenged

12   here.

13             THE COURT:  I guess as I read his -- the question and

14   the answer here, "But at least for the period of time they're

15   detained, the State would not bear those costs.  Correct."

16             Isn't that just commonsense intuitive that if somebody

17   is detained at some facility down on the border, they're not in

18   the state using whatever services the state would be providing

19   them?

20             MR. DARROW:  I mean, there are -- yeah, probably they

21   will be in a state.  We don't know which state.  I mean, a lot

22   of the detention facilities we're talking about are not in

23   Florida.  So if they're not going to be detained and they're

24   going to be released, they'll probably be hanging out in Texas

25   or California by the law of big numbers.  But, I mean, Your

1    Honor is correct.  They have to be somewhere if they're not in a

2    detention facility.

3              THE COURT:  So somebody is going to be incurring some

4    costs, and I guess ultimately I'm going to have to decide

5    whether Florida has persuaded me that the people that are coming

6    in under the Parole + ATD policy, or if I find there to be a

7    nondetention policy, are actually coming to Florida and are

8    actually using services.  But these questions he's been asked

9    and answered, again, frankly, I think would be facts that are

10   not disputed.

11             But anyway, so bottom line is the objections as to the

12   128, 129 through 33, 34 are overruled.  I see that going to

13   weight, and I think -- I hope -- I've provided guidance to both

14   parties as to where -- or maybe not exactly where -- the line

15   is, but there is a line at which an immigration official can't

16   talk about state budgeting, and that information's going to have

17   to come from state budget -- or not budget people but state

18   witnesses.

19             With that, were there other areas of Mr. Price's

20   deposition we should talk about?

21             MR. DARROW:  Those were the showstoppers, Your Honor.

22             THE COURT:  All right.  Who do you want to speak about

23   next?

24             MS. RYAN:  So for Mr. Guadian, Your Honor, we do not

25   have any.  We think all of our objections go to weight, not

1   admissibility.

2           THE COURT:  All right.

3           MS. RYAN:  And so then the only ones remaining would

4   be for Mr. Ortiz.

5           THE COURT:  Okay.

6           MS. RYAN:  And just to try to streamline this for Your

7   Honor.  So there are a few objections we made where the witness

8   in his answer openly says it's basically speculation:  He's

9   assuming, He would need to confirm.  Would you like us to go

10  over that, or is it Your Honor's --

11          THE COURT:  Let's look at one example, and then maybe

12  I'll be able to answer that.

13          MS. RYAN:  Sure.  So, for example, on page 164,

14  starting on line 4 going through line 16.

15          THE COURT:  I guess I'm not seeing what your point is.

16          MS. RYAN:  So, for example, his answer on line 15 and

17  16, he ends it by -- he says, "Typically, I think they were

18  categorized, but I'd have to confirm that."

19          Your Honor seems to have indicated a preference that

20  where the answer openly contains those qualifications it goes to

21  weight not admissibility.  And I just want to confirm that so

22  that -- not to waste the Court's time on some of these

23  particular objections.

24          THE COURT:  I think that would.  Does Florida have a

25  different view?

1          MR. PERCIVAL:  No, I think that goes to weight, Your

2    Honor.

3          THE COURT:  Yeah.  So I certainly -- I thought you

4    were talking about that being speculative.  I mean, he says a

5    couple questions above he's not going to speculate on something,

6    but he didn't say that with this question although he did

7    qualify it in some way.  So I think it would certainly go to the

8    weight, but it wouldn't be inadmissible speculation.

9          MS. RYAN:  Yes, Your Honor.

10         So then we would say, focusing on -- so, for example,

11   on page 59, Mr. Ortiz is asked about the migrants' opinions of

12   the Administration's policies.  And that is pure speculation and

13   hearsay.

14         THE COURT:  Starts where?

15         MS. RYAN:  Starts at the top of page 59, line 1.  It's

16   asking what do migrants think and would that stop them from

17   coming or encourage them to come.  It's all speculation and

18   hearsay as to the migrants' opinions.

19         THE COURT:  Absent Florida persuading me otherwise, I

20   certainly don't see how a witness can testify about some other

21   person's view of something.  So that would seem to make the

22   answer to the question -- the answer at line 6 to the previous

23   question wouldn't seem to be admissible, nor would the answer to

24   line 11.  I don't see how that, though, has anything -- that

25   objection you're making has anything to do with the question and

 1   answer at lines 12 through 16.

 2          MS. RYAN:  That's correct, Your Honor.

 3          THE COURT:  I think your objection, again subject to

 4   the Florida convincing me otherwise, does seem to be well taken.

 5          MR. PERCIVAL:  Your Honor --

 6          THE COURT:  Slightly different on the next question.

 7   That's talking about a document indicating something or another.

 8          Anyway.  All right.  Does Florida want to try to

 9   convince me that this witness can tell me migrants' views of

10   things?

11          MR. PERCIVAL:  Well, one, Your Honor, this exchange is

12   happening in the context of looking at a CBP document where

13   they're talking about anticipated challenges in the future as a

14   result of migrants' changing perceptions of immigration policy

15   with the change in administration.  And from the face of the

16   document, it does sort of look like they're -- DHS is actually

17   conducting some sort of survey or asking migrants these

18   questions and is using that to populate the document.

19          But even if Your Honor thinks it's hearsay, we still

20   think it's relevant for something other than the truth of the

21   matter asserted, which is that the fact that DHS believed that

22   migrants had shifting perceptions of immigration policy based on

23   the policies they were setting and that that was affecting the

24   flows, we think is relevant to this whole idea that these were

25   sort of self-caused harms.

1        MS. RYAN:  Your Honor, if I could speak to that

2   briefly.

3        THE COURT:  Sure.

4        MS. RYAN:  He gave this testimony in his personal

5   opinion not as representative of DHS.  So to the extent he's

6   arguing effects on the listener -- the listener being DHS --

7   Mr. Ortiz was not speaking in his corporate capacity here, so he

8   can't speak to that effect.

9        THE COURT:  You haven't persuaded me that -- my

10   tentative ruling as to Answer 6 and Answer 11 was wrong.  Answer

11   on 16 is fine.  Answer on 20 and 21 is fine.  Those are just

12   factual statements.  And then the answer on page 60, line 5, I

13   don't think I have enough information to say one way or the

14   other because he's -- it may not be best evidence.  The document

15   says whatever it says, but he's just commenting about a document

16   rather than any individual view.

17        So I guess that objection is sustained in part and

18   overruled in part.

19        All right.  What else can we talk about?

20        MS. RYAN:  In the same vein, Your Honor, there's a

21   designation that begins on page 67, line 11.  It begins with him

22   being asked about statements in the document.  That is not where

23   our objection lies.  Our objection lies later on where they ask

24   him what smugglers are doing with specific information, what

25   they're saying to people in order to bring them to the border.

1    And it's the same basis:  It's speculation, it's hearsay.

2              THE COURT:  You're starting at line --

3              MS. RYAN:  Designation starts at line 11.

4              THE COURT:  But your concern, your objection starts at

5    line 16?

6              MS. RYAN:  Yes, Your Honor.

7              THE COURT:  All right.  Florida, how is that --

8              MR. PERCIVAL:  Your Honor, this isn't being offered

9    for the truth of the matter asserted.  It's being offered just

10   to show that -- the way that changes in immigration policy get

11   back to migrants.  And what Chief Ortiz testified to is that

12   when there are changes in immigration policies, the human

13   smugglers south of the border pass that information along to

14   would-be migrants and sort of uses that as a pull factor to get

15   them to travel to the border.

16              And so I think it's certainly within Chief Ortiz's

17   personal knowledge the way smuggling networks work as chief of

18   border patrol.  And the point of this is not that what the

19   smugglers are telling the migrants is true or false; it's just

20   the fact that it's being communicated down to them, the

21   mechanism that the information gets to would-be migrants.

22              THE COURT:  How would he know?  What you're saying is

23   not what's said here.  I mean, if he was testifying, you know,

24   "Based on my experience, these type of things happen," that

25   would be one thing.  But what he's saying here is you asked --

1    or somebody asked "And what are smugglers doing with the

2    information on TPS?"  They're telling people this, that, or the

3    other.  How does he have personal knowledge of that?

4           MR. PERCIVAL:  Well, he's -- so the -- if you look

5    above, he's talking about his own statement that he gave at a

6    press conference.  And Mr. Guard is asking him:  "You said at

7    the conference the smugglers leverage misinformation to mislead

8    people."  And he's essentially expounding on that and trying to

9    understand what Chief Ortiz meant when he said that at a press

10   conference.

11          THE COURT:  All right.  Ms. Ryan, do you agree that's

12   what's going on here:  He provided an opinion in some press

13   conference or email?  Is that what he's being asked about here?

14          MS. RYAN:  I believe that's the larger context from

15   further up, but it's still hearsay.  And Mr. Percival just said

16   they're going to use it to show the truth that smugglers are

17   saying certain things to migrants and then migrants are acting

18   on it.  So it is for the truth of this statement.  And even if

19   it weren't for the truth, if its effect on the listener, the

20   listener here is the migrants, and we don't have the migrants

21   here nor does Chief Ortiz be able to speak to migrants acting on

22   what they heard from the smugglers.

23          So we still have a hearsay problem.  We still have a

24   speculation problem.

25          MR. PERCIVAL:  Well, Your Honor, can I respond to

1    that?  Because it strikes me that, as I now understand it,

2    there's two layers of hearsay, potential hearsay here as I

3    understood Ms. Ryan.  And I think I can go through both layers.

4              Although Your Honor just gave me a look like I

5    might --

6              THE COURT:  Well, I'm --

7              MR. PERCIVAL:  -- I'm not making sense.

8              THE COURT:  I didn't know we were -- I was lost on the

9    number of levels here.

10             But ultimately Chief Ortiz offers an opinion based

11   upon his experience that smugglers are giving misinformation to

12   mislead people, and you're probing into essentially what

13   misinformation are they giving them.

14             MR. PERCIVAL:  Yes, Your Honor.

15             THE COURT:  All right.  Now you can talk about what

16   layers of hearsay if you want.

17             MR. PERCIVAL:  Ms. Ryan can correct me if I'm wrong,

18   but I think what she's saying is Chief Ortiz made a statement at

19   a press conference, and that's hearsay.  He also made a

20   statement about what smugglers are telling would-be migrants,

21   which is the second layer of hearsay.  And so under the rules,

22   you kind of have to go and address why each one either qualifies

23   for an exception or is not hearsay.

24             So if I start with the Ortiz statement, then we would

25   say that that falls within the exclusion from the definition of

1    hearsay that I explained earlier in the hearing, which is that

2    he's an employee of a defendant and he's making a statement

3    that, you know, sort of falls within the scope of his duties.

4    I'll pull the rule up, Your Honor, very quickly.

5              THE COURT:  Pull the rule up.

6              MR. PERCIVAL:  I said "falls under in the scope of his

7    duties," but let me actually give you the text.

8              MS. RYAN:  I believe he's referring to 801(d)(2)(D).

9              Is that correct?

10             MR. PERCIVAL:  Yeah.  So it was "made by the party's

11   agent or employee on a matter within the scope of that

12   relationship and while it existed."

13             So while he was the chief of border patrol, he stood

14   up at a press conference, an official DHS press conference, and

15   made this statement about what smuggling networks are doing.  So

16   we would say that the statement of Ortiz itself falls within

17   that exclusion from the hearsay rule.

18             And then when you get to the statement of the

19   smugglers, which is the so-called hearsay within hearsay, that's

20   not being offered for the truth of the matter asserted, which is

21   that what the smugglers are telling migrants is true.  It's

22   being offered to prove that the smugglers are saying it, which

23   isn't hearsay because it's not being offered for the truth of

24   the matter asserted.

25             MS. RYAN:  **But** then, Your Honor, you'd have to show an

1  effect on the listener in order for it to be relevant, and the

2  listener here are the migrants.  And this statement by Chief

3  Ortiz cannot speak to the effect on these unknown migrants.

4        MR. PERCIVAL:  I don't agree that we have to show the

5  effect on the listener, because if it's not being offered for

6  the truth of the matter asserted, then it's just not hearsay.

7        THE COURT:  And maybe I'm getting well afar from where

8  I need to be at this point, but why is it important for me to

9  know what precisely smugglers were telling migrants?

10       MR. PERCIVAL:  We don't think it is, and we're not

11 offering it for that.  We're just offering it for the general

12 point that DHS's understanding is that when they change

13 immigration policies, the smuggling networks use those changes

14 to give information to would-be migrants.  In other words, this

15 is how the information of the changed immigration policy

16 trickles down to the would-be migrants, and a more lax

17 immigration policy causes more people to come to the border.

18 That's the relevance of this testimony.

19       THE COURT:  But I guess the point that the Federal

20 Government, I assume, seems most concerned about was this --

21 that the migrants are being told, regardless of when you enter a

22 process, that you'd be allowed to stay.

23       MR. PERCIVAL:  And we're not asking Your Honor to

24 consider this evidence for the truth that, in fact, when

25 migrants enter, they will be allowed to stay.  We're just

1    offering it to show how information trickles down to would-be

2    migrants.  And how this mechanism works, that when you relax

3    immigration policies, you have a predictable effect.

4           THE COURT:  All right.  Maybe it's getting too late,

5    too close to the lunch break that I am not following either side

6    here, but it certainly seems to me that if Chief Ortiz made this

7    opinion testimony that smugglers are giving misinformation to

8    people, that's a nonhearsay statement and a fact that can be

9    attributed to the Department because of his role -- or agency or

10   whatever we're talking about here.  But precisely what

11   misinformation they were being given, I don't see how that's

12   particularly relevant to anything.

13          So I guess what I would say is that, just to give you

14   a ruling on it, I don't see the relevance to that answer at 18

15   through 21.  In the general sense, I don't have a particular

16   concern with Florida presenting evidence -- and if it's

17   elsewhere in this deposition, then so be it -- that the

18   Department of Homeland Security understands that if immigration

19   policies are more lenient, more people will come.  If that's

20   what he's testifying to elsewhere, I don't have an issue with

21   that; but particularly what they're being told to send that

22   message isn't important, I don't think.

23          So with that, I would agree with the Government --

24   Federal Government's objection to that particular one with the

25   understanding that the point they want to make is fair game.

1          MS. RYAN:  Yes, Your Honor.

2          THE COURT:  All right.  Anything else?

3          MS. RYAN:  One more to bring to your attention --

4          THE COURT:  Sure.

5          MS. RYAN:  -- and we can all go to lunch.

6          On page 180, the designation begins on line 14, but

7    our concerns would begin with the question on line 20, and it is

8    in the same vein of asking what smugglers and others are reading

9    and their perception of that and then what they do as a result

10   of reading these newspaper articles that are unspecified.

11         THE COURT:  I don't see anything inadmissible about

12   this.  I don't see any issue with that.

13         MS. RYAN:  Yes, Your Honor.

14         THE COURT:  All right.  Anything else we need to talk

15   about with Mr. Ortiz?

16         MS. RYAN:  No, that's it from us on the designations,

17   Your Honor, and we do have logistical questions whenever Your

18   Honor is ready to finish with the conference.

19         THE COURT:  All right.  Anything else Florida wants

20   any rulings on?

21         MR. PERCIVAL:  No, Your Honor.

22         THE COURT:  Good.

23         All right.  Looking back at my list, I think we've

24   addressed -- either ruled on or given guidance on -- everything

25   I wanted to talk about.  So I am happy to talk about any other

1    logistical issues, and then we'll talk about tasks that are

2    following now, both from our side, what you're going to get from

3    us, and what we're expecting y'all to do.

4         So logistically, go ahead, Ms. Ryan.

5         MS. RYAN:  First, I think Mr. Percival raised it

6    earlier, is whether Your Honor would like opening statements

7    from the parties.

8         THE COURT:  I think it would be helpful to have short

9    opening statements to kind of frame, really give me a true

10   opening statement as to what your witnesses are likely going to

11   testify, maybe not substantively.  But we're going to call

12   Officer X who's going to kind of give you information about

13   this -- just to kind of give me a framework of what the

14   presentation is going to be.

15        As the parties know, I'm very familiar with what the

16   case is about.  And some of the issues, a lot of issues, it

17   seems to me, are ultimately going to be legal issues that these

18   facts will hopefully inform.  But ultimately, the law, we can

19   argue about in your posttrial, but I would like a brief opening.

20        MS. RYAN:  Yes, Your Honor.

21        We would also like to ask that we get an order of

22   witnesses from Florida.  Our witnesses that are flying down from

23   Washington, D.C., we have to make their travel arrangements, and

24   we can't have them for, you know, five days waiting.  And we can

25   talk with Florida about this offline if they're amenable, but

1  just a better understanding of if they are calling them live and

2  in what order so that we can make those flight arrangements.

3  　　　　　THE COURT:  And just before I turn to them, are you

4  talking about in order of -- you're most interested in when they

5  expect to need your witnesses, right?

6  　　　　　MS. RYAN:  Yes, Your Honor.

7  　　　　　THE COURT:  Gotcha.

8  　　　　　MR. PERCIVAL:  I can provide some clarity on that,

9  Your Honor, I think.  Mr. Guard will tap me on the shoulder if I

10  misstate anything.  But we listed them on our list for a couple

11  reasons.  One was we didn't know what Your Honor's ruling was

12  going to be on the depo designations.  That's been resolved.  So

13  I could only foresee us calling their witnesses if we have a

14  problem getting some of our evidence in.  They haven't objected

15  on authentication grounds, but if there's -- the stuff we talked

16  about, kind of laying a foundation for our evidence, if there

17  ends up being some dispute or some fact Your Honor needs, then

18  we may need to call one of their witnesses to speak to what a

19  document is.  Other than that, we would not plan to call any of

20  their witnesses.

21  　　　　　THE COURT:  I'm not sure that provides any helpful

22  clarity.  I guess at a minimum --

23  　　　　　MR. PERCIVAL:  We can do them in whatever order they

24  prefer I guess is what I'm saying.

25  　　　　　THE COURT:  Right.  But I guess what she's asking is

1  when are you going to first need them.  When do you expect to

2  first need them?  In other words, if you've got a full day's

3  worth of other witnesses you're going to present, there's no

4  need to have these officials sitting down here in Pensacola not

5  needed until the following day.

6       MR. PERCIVAL:  So the end of the second day I think we

7  would try to clean up any issues with exhibits if there's an

8  issue getting them admitted.

9       THE COURT:  Okay.  Does that give you what you need?

10       MS. RYAN:  Yes, Your Honor.

11       MR. PERCIVAL:  I'm sorry.  Just to be clear, Your

12  Honor, if there is no objection from their side, we would be

13  happy to do that portion out of order.  If they just want to,

14  like, stipulate to the fact that we can outside the scope on

15  cross as necessary to authentic documents or things like that,

16  we're happy to handle it in whatever way is most convenient for

17  their witnesses.

18       MS. RYAN:  Another question we had that might help

19  with this is we were wondering since there's still a question of

20  standing and Florida's burden on that, if Your Honor is planning

21  to bifurcate the trial at all to do -- No?

22       THE COURT:  No.

23       MS. RYAN:  Okay.

24       THE COURT:  I think we've come a lot further than I

25  know the Government wished we had come with both the issues

1   still -- Federal Government with both the issues still in play.

2   I think at this point it makes the most sense to try everything.

3   I'm not going to be in a position to -- well, I probably would

4   be in a better position at the end of the trial to give you a

5   ruling on standing than I would be on the merits of the entire

6   case, but I don't want to commit to that to say that we'll have

7   a minitrial on standing before we get into anything else.  I

8   think the better way to do it, given where we are and given

9   everything else that we'll talk about here in a minute from our

10  side, we'll just -- we're going to try it all together, and then

11  we'll argue it all together as well.

12          MS. RYAN:  Okay.  So, counsel, we can speak offline

13  and see if we can come up with an easy solution that also allows

14  our officials to kind of make their flight plans.

15          THE COURT:  It sounds like at least, unless when they

16  go back to the drawing board they hone their standing case down

17  pretty significantly, the representation currently is that

18  they're not going to be needed until the end of Day 2.

19          MS. RYAN:  Okay.  And then we were wondering if Your

20  Honor would like hard copies of anything, depositions or

21  exhibits, for the trial.

22          THE COURT:  Yes.  I'm trying to think.  Obviously, we

23  will get these witnesses -- well, let me ask this.

24          I know Florida had mentioned they've got some video

25  witnesses that -- video depositions that they wanted to play.

1     Was your intent to also read the portions of the depositions

2     that you don't have on video?

3              MR. GUARD:  I think they're very limited, and it's, I

4     think, Guadian and Davies are the only ones that we don't

5     have --

6              MR. PERCIVAL:  We have Guadian.  Just Barker and

7     Davies.

8              MR. GUARD:  Barker and Davies.  So I think that's

9     fairly limited, but we would probably read those; or if Your

10    Honor wants to use a different approach on the readable ones, we

11    can be amenable to that.

12             THE COURT:  I'm a little bit torn.  There's nothing

13    worse in a bench trial than having a deposition read to you.

14    But on the flip side of it, just getting handed a stack of

15    depositions that I will not have heard in context is

16    less-than-ideal as well.  Probably at the -- probably what I

17    would say is this:  Certainly for the ones you have by video

18    that you want me to watch them by video, obviously that will

19    happen in open court.

20             Let's tentatively plan, because there didn't seem to

21    be a lot of -- based on the representation, there's a lot of

22    them that fall outside of that category.  Let's tentatively plan

23    that those will be read in some fashion.  And if that's the way

24    it goes, then we won't need hard copies of that.

25             MS. RYAN:  Your Honor, for possible impeachment

1    purposes, we were thinking did Your Honor need a complete copy

2    of the deposition or --

3              THE COURT:  No, I don't need that.

4              MS. RYAN:  Okay.

5              THE COURT:  I wouldn't need that.

6              But for the exhibits, the actual documents, I don't --

7    they're probably in the summary judgment record somewhere, but I

8    would like those in hard form as they're introduced or as

9    they're dumped, however that comes in to evidence.  And in the

10   event that we read one deposition and it turns out that that's

11   not -- I'm not enjoying that, then we'll shift gears on that and

12   just say, Just hand me the deposition designations, and I will

13   review them afterwards.

14             Again, in my perfect world, I would hear all this

15   evidence and know what the answer is and be able to tell you

16   what the answer is.  I don't expect that to happen, at least

17   probably not anything except on standing because I think that is

18   very fact-dependent.  The law is very clear on that.  The rest

19   of it is going to require a lot of legal analysis and sorting

20   through complex congressional statutes and regulations and

21   applying the facts to.  So I don't expect we're going to be able

22   to do what I would love to be able to do.

23             Anyway, I've digressed a little bit.

24             MS. RYAN:  We'll speak with counsel about -- perhaps

25   each side can provide Your Honor a hard copy of all the

1    potential exhibits or the best way to do that so you're not just

2    getting pieces of paper one at a time.

3            THE COURT:  That being said, I don't -- right now

4    there are, you know, 90 or 100 exhibits.  What I don't want to

5    have to do at the end of the trial is go through and pull things

6    out that weren't introduced.

7            So I don't have a problem with them coming in

8    sequentially and creating a pile.  Just so when we walk out, we

9    have only the things we need and nothing that we don't.  And

10   however that comes -- if there's a stack that you can agree to

11   and say, Here, here they are.  Fine.  If there's some that may

12   come in, may not, I'd rather they come in individually.

13           MS. RYAN:  Understood, Your Honor.

14           THE COURT:  All right.

15           MS. RYAN:  And then our last logistical question is

16   just if Your Honor keeps typical trial hours, if you have a set

17   schedule that you like to keep during the trial.

18           THE COURT:  Jury trials are obviously different that

19   we really try to -- 8:30 to 5:00.  Bench trials are obviously a

20   little bit different.  We just have to be cognizant of our court

21   reporter, but I'm amenable to finding points to break that may

22   be slightly outside of the normal business hours.

23           But ideally we'll start no earlier than 8:30, unless

24   something goes completely haywire and we're running short on

25   time and we need to do longer hours; and we'll take a break in

1    the morning; hour to hour-and-a-half lunch; a break in the

2    afternoon; and ideally finish close to the end of business

3    hours.  Because as I'm sure y'all have other cases that you need

4    to keep track of and figure out what else is going on in your

5    office, prepare for the next day, and we do as well.

6              So that being said, I'm -- if we get to a point where

7    we need to push further or we have a witness that if we push

8    another half hour we can get them finished and move them on,

9    we'll do that.

10             MS. RYAN:  Thank you, Your Honor.  Just so we can make

11   some travel arrangements for our witnesses, we wanted to

12   understand Your Honor's preference on timing, but that's all the

13   logistical questions that we have.

14             THE COURT:  All right.  From Florida?

15             MR. PERCIVAL:  Can we agree to limit opening

16   statements to, I don't know, 15 minutes or something?  I just

17   want to -- I want to give them, but I also want to make sure we

18   have time to get through all our evidence.

19             THE COURT:  How long did the Federal Government expect

20   to need?

21             MS. RYAN:  I think that's fine, Your Honor.

22             THE COURT:  Okay.

23             MR. PERCIVAL:  On the hard copies of exhibits, we have

24   some videos and things like that.  Do you want us to submit

25   those to you on a CD, or what's the best way?

1          THE COURT:  What are those videos of?

2          MR. PERCIVAL:  Some of them are DHS training videos

3    that were produced during discovery.  Pretty much everything

4    else I think we're just going to play for you, like the

5    deposition videos.  And then we have some Excel documents that

6    are hard to PDF.

7          THE COURT:  I think we got some training videos at the

8    summary judgment stage, and I don't remember what -- how

9    significant they were.  How significant are they?

10         MR. PERCIVAL:  In terms of length?

11         THE COURT:  What are you attempting to show from them?

12         MR. PERCIVAL:  We're just showing kind of the effects

13   of these massive releases of individuals at the border and kind

14   of all the problems that they caused.

15         THE COURT:  And that's in a training video?

16         MR. PERCIVAL:  Mm-hmm.  There's this program called

17   Operation Horizon that was created by ICE to try to locate these

18   aliens that they don't have a good way of tracking.

19         THE COURT:  And how long is the video?

20         MR. PERCIVAL:  The videos themselves are very long.

21   We're only planning on playing very short portions of them for

22   Your Honor.  We can work with the other side to see if they want

23   to put the whole thing in evidence or if they're okay just

24   giving you short files.

25         THE COURT:  Well, I guess I would say this.  If

1    there's only portions of it that whoever is offering it thinks

2    are relevant and if there's no countervailing portions of it the

3    other side thinks are relevant -- and they may think your

4    portions are irrelevant, but -- I'm not going to sit there and

5    watch the rest of the video.  I'm going to watch what the

6    parties point me to.

7            So on something like that, I think you need to put

8    into evidence just the part that you want me to watch.  Because

9    I think the last thing either side wants me to do is take some

10   video and make some finding about something that happens at

11   minute 38 in the video -- which once it becomes evidence, I can

12   use it for whatever purpose -- that nobody really even expected

13   me to watch.

14           MR. PERCIVAL:  Yeah, we can do that.  We can -- so

15   would you want it on at CD and we can cut the file just to be

16   the portions --

17           THE COURT:  I think a thumb drive would be ideal.

18           MR. PERCIVAL:  Thumb drive.  We plan to play it in

19   open court --

20           THE COURT:  Okay.

21           MR. PERCIVAL:  -- just to be clear, but --

22           THE COURT:  That's fine.

23           MR. PERCIVAL:  -- we also want to put it in evidence.

24           THE COURT:  Right.  Yeah, I don't want more than I see

25   in court, and I don't think the parties should want more than I

1    see in court, because, again, once it's in evidence, I can

2    decide the entire case on some silly training video.  That would

3    be a shame for everybody.

4           Any other logistical questions the State Government

5    has?

6           MR. PERCIVAL:  Oh, trial briefs, Your Honor.

7           THE COURT:  I don't want anything before trial.  I've

8    been briefed enough.

9           We will talk at the conclusion of trial about what I'd

10   like at that point.  And what I'm expecting to want at that

11   point would be -- back in my DOAH days, back -- DOAH is a state

12   administrative adjudicatory office, and one of the things the

13   parties submitted as -- to me as an administrative law judge

14   were proposed recommended orders.  I would prepare a recommended

15   order.  And when I talk to people about what that ought to look

16   like is ideally you give me something that I take the word

17   "proposed" off and I sign it because you've given me a fair

18   presentation of the evidence.  Obviously, presented in the light

19   that you think helps you prevail.  But it's not an advocacy

20   brief; it's pretty much:  This is what we think the evidence

21   shows, and this is what we want you to find.

22          And so that's what at the end of the case I'm going to

23   ask for is proposed findings, proposed legal conclusions on the

24   disputed issues.  The likelihood -- and I tell people this when

25   I was at DOAH.  I said, I don't think -- I know I've never

1    signed -- never stricken the word "proposed" and signed a

2    document, because that's just not how I work, and it never came

3    to me in a form that would allow me to do that.  I'm hoping that

4    this is the first case that I get to do that, and I'll tell you

5    why in just a little bit.

6         So that's what I'm going to ask for at the end of the

7    case is not briefings, it's actually a proposed order.  So

8    you'll put your -- some of you who may have been law clerks in

9    the past, you'll put your law clerk hat back on and say, This is

10   what we want the judge to adopt.  And, ideally, I'll be able to

11   pull some out of Column A and pull some out of Column B.  And

12   I'll tell you why in a minute.

13        Go ahead.

14        MR. PERCIVAL:  Do you have a sense of sort of how

15   quickly you'll want that?

16        THE COURT:  Oh, after?

17        MR. PERCIVAL:  Yeah.

18        THE COURT:  Well, let me just tell you about -- and

19   we'll back into that.  Here's the rest of our January and

20   February, just so you know.  And I don't want to create

21   unreasonable expectations of when you're going to get a decision

22   in this case, unless, of course, at the close of the evidence

23   I'm able to just say, Here's what the answer is.

24        So this is January -- week of January 6 or

25   thereabouts -- 9th, week of January 9th.  The next week is a

1   criminal trial week, and every criminal trial that we had from

2   November and December is now in that one week.  And so I'm

3   hoping that things just filter out like they typically do, but

4   this is one of those the law of averages is going to catch up

5   with us.  So I'm expecting that we're going to be in criminal

6   trial that week.

7           The following week, the week of the 22nd, 23rd, I'm

8   going to sit with the Eleventh Circuit, which seemed like a good

9   idea at the time but it doesn't seem like a good idea now.

10          The week after that, we've got a specially set

11  criminal trial that has been continued a number of times and

12  looks like it actually is going to go.  And then when we get

13  into February, we've got a month-long antitrust trial.

14          So in all honesty, the likelihood will be that we're

15  not going to be able to really turn our attention back to

16  evaluating the parties' proposed findings and weighing and

17  balancing the evidence until March.  And I hate that because I

18  know this case has been around.  I hate that because I know this

19  is an important case for the parties, for the country.  And I

20  would love to be able to decide it a lot quicker, but the

21  reality is that probably is not going to be the case.

22          And so that weighs into your question which is when do

23  you want proposed findings afterwards.  And the bottom line is,

24  you can take -- not as much time as you need, but it's not going

25  to be a seven-day turnaround --

1           MR. PERCIVAL:  That's what I --

2           THE COURT:  -- because that's not fair to you for me

3      to tell you, Turn it around in seven days when I'm not going to

4      look at it for quite some time.  And maybe, God willing, this

5      antitrust trial will somehow resolve itself, and we'll have the

6      entire month of February open.  Because right now it's literally

7      every day of February is taken up with that trial, and so

8      nothing else has been scheduled.  So if that case were to go

9      away, I'll have a lot of time in February, and we'll focus on

10     this because of the priority that it needs.

11          So anyway, so that's -- and, again, I would love to be

12     able to decide this case a lot sooner because it is an important

13     case but, you know, in all honesty, Florida -- I know you've

14     been pushing, and I know the Federal Government has drug a

15     little bit but also been actively moving the case forward, but

16     no preliminary injunction was sought.  So it's an important

17     case, needs to be handled.  We've set it as quickly as we could,

18     but the world's not going to end if this case doesn't get

19     resolved on January 15th.

20          So anyway, that's kind of where we are.

21          Anything else from a logistical standpoint?

22          MR. PERCIVAL:  I don't think so, Your Honor.

23          MR. DARROW:  No, Your Honor.

24          THE COURT:  And so some of the discussions we had, the

25     one thing -- and the reason that fifth day is unavailable,

1    that's our pretrial day in the antitrust case.  And so that just

2    has to happen and will happen.  And so with the discussions

3    we've had today, how confident is Florida that you're going to

4    be able to hone down your two- and maybe three-day case to

5    something no more than two days?

6                MR. PERCIVAL:  We'll get it done, Your Honor.

7                THE COURT:  Federal Government, you're confident that

8    we're going to get it down in the time we have allotted?

9                MR. DARROW:  Yeah.

10               MS. RYAN:  Yes.

11               THE COURT:  All right.  Well, this has been very

12   helpful.  I hope -- it's been helpful to us.  I hope it's been

13   helpful to the parties.

14               And anything else, Jaden?

15               MR. PERCIVAL:  Oh, one more question.

16         *(Off-the-record discussion between The Court and law*

17   *clerk.)*

18               THE COURT:  Rule of sequestration, do the parties

19   expect to invoke that rule here?

20               MR. PERCIVAL:  No.

21               MR. DARROW:  No.

22               THE COURT:  Okay.  All right.  Then that will -- we

23   normally note that in the pretrial order.

24               So anyway, one last thing, and then I'll get your

25   question.  What's going to come from us next will be a pretrial

1   order that will attempt to memorialize the rulings we made on

2   the motions in limine, the deposition designations that we

3   addressed, as well as laying out the time limits that we talked

4   about, the general trial day, the opening statements.

5            Anything else we usually put in there?

6            LAW CLERK:  Yes, stuff about exhibits.  That's about

7   it.

8            THE COURT:  And just some of the things we talked

9   about today, just put them in there.

10           When you get that order, if we've put something in

11  there that you don't think we actually did here today -- because

12  it's intended to simply memorialize the rulings rather than rule

13  on new things -- talk amongst yourselves and get some sort of

14  motion to us, and we'll get it fixed.  If there's something we

15  put in there that makes life more challenging for you or

16  something comes up between now and then, again, talk amongst

17  yourselves and get back to us, and we'll get it squared away.

18  Because the intent of that order is not to make your lives more

19  difficult.  It's just simply to put something on the record to

20  explain, for whoever looks at this case next, how we dealt with

21  things we dealt with today.

22           All right.  Mr. Percival?

23           MR. PERCIVAL:  Did Your Honor want us to prefile our

24  exhibits on the docket?

25           THE COURT:  No.  I want to probably just hand you back

1    the ones you gave me before.

2           All right.  Well, I appreciate your time today.  I

3    hope everybody has a good trip back to Washington, good trip

4    back to Tallahassee, a good Christmas and New Years, and we will

5    regroup and get this done.

6           Thank you all.  We're adjourned.

7       *(Proceedings adjourned at 12:23 p.m.)*

8                     * * * * * * * *

9       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.  Any
10   redaction of personal data identifiers pursuant to the Judicial
     Conference Policy on Privacy are noted within the transcript.

11

12                                    1/2/2023

13   _____   _____
     Julie A. Wycoff, RMR, CRR           Date
     Official U.S. Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25