1              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF FLORIDA**
2                 **PENSACOLA DIVISION**

3    STATE OF FLORIDA,                    )
                                          )
4                     Plaintiff,          )
         vs.                              ) Case No: 3:21-CV-1066
5                                         )
     UNITED STATES OF AMERICA; ALEJANDRO  ) Pensacola, Florida
6    MAYORKAS, Secretary of the U.S.      )
     Department of Homeland Security, in  ) January 9, 2023
7    his official capacity; U.S. DEPARTMENT ) 8:57 a.m.
     OF HOMELAND SECURITY; TROY MILLER,   )
8    Acting Commissioner of U.S. Customs  )
     and Border Protection, in his official )
9    capacity; U.S. CUSTOMS AND BORDER    )
     PROTECTION; TAE JOHNSON, Acting      )
10   Director of U.S. Immigration and     )
     Customs Enforcement, in his official )
11   capacity; U.S. IMMIGRATION AND CUSTOMS )
     ENFORCEMENT; UR M. JADDOU, Director of )
12   U.S. Citizenship and Immigration     )
     Services, in her official capacity;  )
13   U.S. CITIZENSHIP AND IMMIGRATION     )
     SERVICES,                            )
14                    Defendants.         )
     _____)

15

16            **TRANSCRIPT OF BENCH TRIAL - DAY 1**
         **BEFORE THE HONORABLE T. KENT WETHERELL, II**
17              **UNITED STATES DISTRICT JUDGE**
                  **(Pages 1 through 173)**

18

19   <u>APPEARANCES</u>:

20   For State of Florida:    Office of the Attorney General
                              by:  **JOHN M. GUARD, JAMES H. PERCIVAL,**
21                                 **ANITA J. PATEL, NATALIE CHRISTMAS**
                                   and **JOSEPH HART**
22                            The Capitol, Suite PL-01
                              400 South Monroe Street
23                            Tallahassee, Florida 32399
                              (850) 414-3300
24                            *james.percival@myfloridalegal.com*
                              *anita.patel@myfloridalegal.com*
25                            *joseph.guard@myfloridalegal.com*
                              *natalie.christmas@myfloridalegal.com*

1   APPEARANCES CONTINUED:

2   For the United States:    Department of Justice
                              Office of Immigration Litigation
3                             by:  **ELISSA FUDIM, ERIN T. RYAN
                                   and JOSEPH A. DARROW**
4                             450 5th Street NW
                              Washington, D.C. 20001
5                             (202) 532-5802
                              *elissa.p.fudim@usdoj.gov*
6                             *erin.t.ryan@usdoj.gov*
                              *joseph.a.darrow@usdoj.gov*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3                THE COURT:  Good morning.  Please be seated.

4                All right.  This is Case Number 3:21cv1066, State of

5     Florida versus the United States.  Let's begin with appearances,

6     please.

7                MR. PERCIVAL:  James Percival for the State of

8     Florida.

9                MR. GUARD:  John Guard for the State of Florida, Your

10    Honor.

11               MS. GERDTS:  I'm Simona Gerdts.  I'm a paralegal for

12    the State of Florida.

13               MR. HART:  Joseph Hart for the State of Florida.

14               MS. CHRISTMAS:  Natalie Christmas for the State of

15    Florida.

16               MS. PATEL:  Anita Patel for the State of Florida.

17               THE COURT:  All right.  And for the Federal

18    Government.

19               MR. DARROW:  Joseph Darrow for the United States.

20               MS. RYAN:  Erin Ryan for the United States.

21               MS. LATIMER:  Maria Latimer, paralegal for the United

22    States.

23               THE COURT:  All right.  Good morning.

24               Again, I think the Federal Government is outnumbered

25    in people.  But it appears you brought a large amount of

1    documents, so it seems like a fair fight.

2         All right.  Before we get going today, a couple of

3    things I wanted to talk about.  I did receive the parties joint

4    Notice of Supplemental Depositions Designations, Objections and

5    Stipulations, and it didn't look like there was anything that

6    needed to be addressed with that at this point.

7         Is that correct?

8         MR. PERCIVAL:  That's correct, Your Honor.

9         THE COURT:  Mr. Darrow?

10         MR. PERCIVAL:  That's my understanding.

11         MR. DARROW:  Same.

12         THE COURT:  All right.  The other thing, maybe to

13    minimize some of the paperwork that I'm going to get, the

14    supplemental administrative record that I'm going to be

15    reviewing in conjunction with the parole policy, Parole Plus ATD

16    policy, that was submitted at summary judgment, it was document

17    87-1.  I assume that is not going to change and that's the

18    document that I can look at; I don't need to get it again.  Is

19    that fair?

20         MR. DARROW:  That's correct, Your Honor.

21         MR. PERCIVAL:  That's fine with us, Your Honor.  We

22    are offering that as a trial exhibit, but that's for a different

23    purpose.

24         THE COURT:  What other purpose would it be?  Why would

25    I need to have it again?

1          MR. PERCIVAL:  Well, Your Honor, we just wanted to

2   make sure it's in the trial record.  If we just want to

3   stipulate that insofar as we're relying on that evidence at

4   trial, you can look at the file, the administrative record,

5   that's fine.  But some of that material we're going to use for

6   purposes of talking about nondetention policy.

7          THE COURT:  All right.  Mr. Darrow.

8          MR. DARROW:  I mean, we previously objected to that in

9   our motions in limine, but Your Honor said that, you know, they

10  can discuss Parole ATD in the trial.  We would object to the

11  extent that anything is coming in from the merits of Parole ATD.

12         THE COURT:  Okay.  And I think that's consistent with

13  what I previously ruled.  I guess my question is just from a

14  physical perspective.  Why do I need to have that document

15  again, whatever purpose you're using it for?  Why can't your

16  witness just refer to the document that I already have?

17         MR. PERCIVAL:  That's totally fine with us, Your

18  Honor.

19         THE COURT:  Okay.  All right.  Well, let's do that

20  because it looks like I'm going to get a lot of paper, and I

21  don't want any more than I otherwise have to have.

22         MR. PERCIVAL:  Your Honor, just for clarity, can -- do

23  I understand you to have -- insofar as we would need to move to

24  admit that at trial should, I just handle that now or -- because

25  we have it in our order of proof to move that into trial as

1    trial evidence.  Do you want us to just handle that in the

2    ordinary course, or do you want to just grant that motion now?

3              THE COURT:  Mr. Darrow, any reason other than the ones

4    you previously raised that I've dealt with already as to why

5    that can't be an exhibit as well?

6              MR. DARROW:  Not facially, Your Honor.  But we would

7    reserve our ability to object to the extent that they intend to

8    use the record for the merits of Parole Plus ATD at any point

9    throughout the trial.

10             THE COURT:  I'm not sure what that means.

11             MR. DARROW:  I mean, we agree that it's, you know,

12   admissible for the reasons Your Honor has stated; but to the

13   extent that they try and discuss the merits of Parole ATD, we

14   would object to that at that point.

15             THE COURT:  Is that the same argument you made

16   previously?

17             MR. DARROW:  Yes.

18             THE COURT:  Okay.  All right.  Then with that ruling

19   having previously been made, that document, 87-1, will be the

20   supplemental record that I review and is an exhibit for

21   evidentiary purposes over your objection.  Okay?

22             MR. PERCIVAL:  Thank you, Your Honor.

23             THE COURT:  All right.  That's all I wanted to talk

24   about.

25             Mr. Percival, anything from the State that you want to

1    talk about before we get going?

2              MR. PERCIVAL:  No, Your Honor.

3              THE COURT:  Mr. Darrow?

4              MR. DARROW:  No, Your Honor.

5              THE COURT:  All right.  Then, Mr. Percival, the floor

6    is yours for any opening statements you want to make.

7              MR. PERCIVAL:  Thank you, Your Honor.

8              As a candidate, President Biden promised to end or

9    substantially curtail the detention of migrants who arrive at

10   the border.  Over the next four days, the evidence is going to

11   show that President Biden kept his promise.  His administration

12   is breaking federal law, unlawfully releasing inadmissible

13   aliens and causing ongoing harm to the State of Florida and the

14   rest of the Nation.

15             Florida is going to begin its case by entering into

16   evidence two different video excerpts, Exhibit 61 and 62.  Those

17   excerpts are of President Biden's Secretary of Homeland

18   Security, Alejandro Mayorkas, testifying in front of Congress on

19   two occasions.

20             Exhibit 62 contains an excerpt of the Secretary's

21   testimony on May 26, 2021.  In that excerpt the Secretary states

22   that in his view, immigration detention should only be used for

23   aliens he deems to be a public safety risk or a flight risk.  He

24   also testifies that he is, quote, "concerned about the overuse

25   of detention," end quote.

1          The second exhibit, Exhibit 61, is part of Secretary

2     Mayorkas's testimony from almost a year later on May 4th, 2022.

3     In that testimony to Congress, the Secretary repeats his prior

4     view and discusses the pretrial detention standard in criminal

5     cases, not Section 1225(b) standard as the standard that ought

6     to be applied to immigration detention.  The Secretary then

7     states two different times, quote, "detention has been misused

8     in the immigration system for many years."

9          Florida is starting with these two exhibits because

10    Secretary Mayorkas makes immigration policy for the United

11    States, and there is no better evidence of a new nondetention

12    policy than the policymaker's own words.  But Florida has more

13    than the Secretary's words demonstrating a deliberate

14    nondetention policy.  The evidence will show that DHS has

15    systematically diminished resources for detention, not increased

16    them, in the face of a historic immigration search.

17         Exhibits like Exhibit 12, 13, and 15 will show that

18    ICE expected a surge post-COVID and in 2020 even requested more

19    resources to deal with that surge.  But other exhibits, like

20    Exhibit 25 through 28, will demonstrate that the Biden

21    Administration instead reduced detention resources accomplishing

22    the Secretary's stated desire to stop the overuse of detention.

23         And for family units, Exhibits 19 and 33 will show

24    that the Biden Administration abolished detention altogether.

25    The testimony of Chief Ortiz of Border Patrol and Director Price

of ICE ERO will confirm that soon after President Biden took office DHS reduced detention capacity by almost half of what it was in the last immigration surge, abolished family detention altogether, and substantially narrowed the pathways designed to alleviate resource constraints including the migrant protection protocols and expedited removal.

Most significantly, Exhibit 98, which is a chain of emails involving senior Border Patrol officials will show that eight days after President Biden took office, these officials warned the Administration that its new policies were going to cause the mass release of inadmissible aliens.

Exhibit 98 explicitly states that, quote, "recent policy changes," end quote, are part of the cause. And Director Price will confirm that DHS knew that its policies would cause the mass release of aliens.

Further, Florida will introduce into evidence exhibits and testimony that together show the evolution and the extent of the nondetention policy. Exhibits 1 through 4 will show that by the middle of March 2021 there were massive increases in releases under Section 1226(a), also known as Orders of Recognizance, or NTA/OR releases.

And Exhibit 21, which is a March 2021 email, will show that Border Patrol agents understood that they were authorized to mass release aliens under Section 1226. And Chief Ortiz will confirm that Border Patrol was not using Section 1226(a) in this

1  manner prior to January 20th, 2021.

2          Around the same time that Border Patrol changed its

3  use of Section 12, it created a prosecutorial discretion policy.

4  Now, the evidence will show that this policy has changed several

5  times from its incarnation.  Florida will put into evidence

6  Exhibits 20, 40, 41, and 59.  These exhibits include the

7  original prosecutorial discretion memo, which is Exhibit 20; a

8  draft Notice to Report memo, Exhibit 59; and two different

9  Parole Plus ATD memos which are in the administrative record

10  that the Court has already admitted.

11          What this evidence shows is that the rationale for

12  releasing aliens at the border is constantly changing.

13  Sometimes it is lack of resources.  Sometimes it's COVID.  And

14  now defendants are resting on the vague term "disease

15  mitigation."  But what Florida's evidence will make clear is

16  that all of this is really about a desire to release rather than

17  detain which is what Secretary Mayorkas admitted when he

18  testified to Congress.

19          Florida expects the defendants will attempt to

20  distract from all of their unlawful conduct by arguing that

21  DHS's detention and parole practices have not changed since

22  President Biden was inaugurated.  But Secretary Mayorkas's

23  admission to Congress shows otherwise.

24          The deposition testimony of Chief Ortiz and Director

25  Price will confirm the Secretary's admissions.  And Exhibit 18,

1    a Border Patrol email from February 2021, will confirm the,

2    quote, "rapid changes," end quote, in policy that occurred

3    shortly after President Biden took office.

4         Likewise, Florida expects defendants to argue that the

5    historic nature of the search has made detention of all

6    inadmissible aliens impossible, but that is a problem of

7    defendants's own making.  Defendants reduced or eliminated the

8    lawful ways that aliens could be processed without releasing

9    them, and defendants have significantly reduced their detention

10   capacity in bad faith.

11        Further, evidence like Exhibit 47 and Chief Ortiz's

12   deposition testimony will show that defendants caused the surge

13   at the border and they know it.  Defendants' impossibility

14   defense is therefore contrived and created by their own

15   decisions.

16        Finally, Florida will prove that it is harmed by

17   defendants' unlawful policies.  In President Trump's last full

18   month in office, Border Patrol released 17 aliens at the

19   southwest border.  By March 2021, the monthly number was over

20   26,000.  In July 2021, the number of aliens released broke

21   60,000.  And at this point defendants are releasing over 100,000

22   inadmissible aliens per month rather than detaining them.

23        Since President Biden took office, over 1 million

24   aliens have been released at the southwest border.  And

25   according to Exhibit 10, which is a report created by defendants

1  in the summer of 2022, more than 150,000 of those aliens had

2  provided a Florida address or had their cases assigned to the

3  Miami docket.  That number is increasing every day and will

4  continue unless Florida obtains relief in this case.

5       Florida has stipulated to a set of facts with

6  defendants which establish how these unprecedented releases harm

7  the State.  In addition, Florida will present the testimony of

8  Jacob Oliva, senior chancellor of the Division of Public Schools

9  for the Florida Department of Education.

10      We're going to call him first, Your Honor, because

11 Mr. Oliva has just been appointed Secretary of Education for

12 Arkansas and begins his new job shortly.  Before his current

13 role in Florida, Mr. Oliva was both a teacher and an

14 administrator.  He dealt directly with student families, and he

15 personally dealt with the issues that individuals can cause for

16 schools when they lack English proficiency.

17      Mr. Oliva will also testify that the Department of

18 Education has a good, while imperfect, system for tracking

19 increases of these aliens in schools.  Again, this is not a

20 perfect proxy, but the agency tracks something called "immigrant

21 children and youth."

22      Immigrant children and youth are children who are not

23 born in the United States and were not educated in the United

24 States in the last three years.  Now, even though this

25 definition would include others, immigrants released under the

1  challenged policy are likely to have children that meet this

2  definition.  And the evidence will show major increases in the

3  enrollment of immigrant children and youth in Florida's public

4  schools since President Biden took office.

5          At the end of this case, we are going to ask the Court

6  to conclude that defendants have systemically created an

7  unlawful detention policy, and we are going to ask the Court to

8  vacate that policy, declare it unlawful, and enjoin defendants'

9  misuse of the parole authority.  Thank you.

10          THE COURT:  All right.  Mr. Darrow.  Ms. Ryan.

11          MS. RYAN:  Good morning, Your Honor.

12          No administration in the history of this country has

13  ever had the resources to detain every noncitizen who comes to

14  our border.  No administration has ever requested that much

15  funding.  Congress has never authorized that staggering amount

16  of funding that would require.  So every administration has had

17  to make a choice who to prosecute, who to detain, who to

18  release, how to most efficiently and effectively use the

19  resources that it has been provided.

20          Detention space is a finite resource.  It always has

21  been.  And it also requires many things:  actual facilities,

22  yes, but also beds, supplies, food, services, staff, law

23  enforcement officers.  And in order to have those things, the

24  Department of Homeland Security needs funding from Congress.

25          And you just heard about DHS decreasing its funding

1    and presidential requests, but in this trial you will hear how

2    it's Congress who decides how much detention space to provide.

3    And Congress has never provided enough funding to detain more

4    than a small percentage of the people that DHS seeks to remove.

5    So there must be decisions made.

6              The Department of Homeland Security prefers to detain

7    the bad guys, the terrorists, the flight risks, the drug mules,

8    the human traffickers.  Florida would seem to prefer that DHS

9    detain the families, the small children, the people who pose no

10   safety risk.  And that may be the role that Florida wants, but

11   the reality is that would never be feasible, let alone sensible,

12   policy.

13             And the mere fact that DHS has different priorities

14   than Florida does not mean that DHS is violating the law, nor

15   does it mean that there's an unwritten nondetention policy.  And

16   defendant will prove -- defendants will prove both of those

17   things during this trial.

18             You'll hear from three DHS witnesses during this

19   trial.  Customs and Border Protection, or CBP, is made up of two

20   parts:  the Office of Field Operations, which manages the

21   ports of entry, and Border Patrol, which patrols between the

22   ports of entry.  And you'll hear from both of those sections

23   during the trial.

24             First, from the Office of Field Operations, OFO,

25   you'll hear from Executive Director Matthew Davies.  He'll

1    explain the different processing pathways that an agent must

2    decide between and how complicated and complex that decision is,

3    how it's a case-by-case determination based on the specific

4    unique circumstances of the individual in front of the officer.

5          He'll discuss how noncitizens can claim asylum and

6    when they get transferred to ICE for further detention.

7    Essentially, Mr. Davies will give you an overview of the

8    immigration process relevant to this case and how OFO functions

9    in light of the operational realities.  And he'll tell you he's

10   not aware of any new policy communicated by this Administration

11   suggesting a preference for release or discouraging the

12   detention of noncitizens.

13         The next witness you'll hear from is Raul Ortiz, the

14   chief of the Border Patrol.  He'll explain the procedure that

15   Border Patrol uses when it encounters noncitizens unlawfully

16   crossing the border, how processing again is different for every

17   person depending on a number of factors.

18         You'll hear how the agents have to make intricate

19   ever-evolving decisions every single day to secure those

20   borders.  You just heard a lot about a surge of people coming

21   over the border; but Chief Ortiz has been with Border Patrol for

22   31 years, and he will put those numbers into context for you.

23         He'll tell you how surges have happened for decades

24   across multiple presidential administrations and what those

25   higher numbers actually mean for the agents on the ground.

1         And importantly, he'll tell you that since January of

2    2021, he has not been told about or disseminated any policies

3    changing the requirements for releasing someone or any policies

4    directing that noncitizens be released.

5         In addition to CBP, you'll also hear from ICE,

6    Immigration and Customs Enforcement.  Robert Guadian, who is the

7    deputy assistant director for Domestic Operations East in ICE's

8    Enforcement and Removal Operation section, which is a mouthful

9    of a title I know.  He will also be here to testify.

10        You'll hear how CBP can temporarily hold noncitizens;

11   but if further detention is warranted, they get transferred to

12   ICE ERO.  Mr. Guadian will explain that relationship between CBP

13   and ICE and how and when noncitizens get transferred.  He'll

14   tell you what's required to detain someone, the costs involved,

15   and the detailed balancing that an ICE officer has to undertake

16   to determine who to detain with limited resources.

17        You'll hear during this trial that ICE has recently

18   started using its family detention centers to house single

19   adults, and that's because families make up a small percentage

20   of people that DHS encounters.  So there are expenses and

21   limitations involved in detaining families.

22        And ICE made the decision to apply their detention

23   centers to single adults instead of families.  Mr. Guadian will

24   explain that change, why it is necessary, and why it is the best

25   use of resources at the moment.

1        You will also hear how it's reversible.  Should the

2   population coming over the border change, ICE can change with

3   it.  And unlike what Florida will try to likely imply during

4   this trial, you'll hear how -- just because you come over the

5   border in a family is not a get-out-of-jail-free card.  All

6   members of the family still go through processing, background

7   checks, security checks; and if a member of that family poses a

8   danger, they will be detained.

9        And you'll also hear that because of the limited

10  funding and the priorities that DHS has to undertake, ICE has

11  been investing more in alternatives to detention which cost less

12  than a tenth as much as detaining someone while still allowing

13  ICE to track their location and ensure that they show up for

14  immigration proceedings.

15       You'll hear that ATD has over a 90 percent compliance

16  rate and how the resources saved by using ATD allows ICE to

17  leave open detention space for noncitizens who pose a safety or

18  security threat.

19       And finally, Mr. Guadian will tell you that ICE does

20  not have any new policies enacted since this Administration

21  started calling for or preferring the release of noncitizens

22  transferred to them.  And, in fact, you'll hear how ICE is still

23  following the same parole guidance that was issued in 2009 and

24  followed by the last three administrations.

25       You may have noticed a pattern in what I just said

1    about those witnesses.  They are all going to tell you that

2    there are no new policies enacted by this Administration

3    directing, encouraging, or even hinting that DHS should simply

4    not detain people coming over the border.

5         All of the witnesses you'll hear from are high-level

6    supervisory positions.  They oversee thousands of agents and

7    officers.  Their jobs are to disseminate policy, enforce policy,

8    and making sure that their agents on the ground enact the

9    policies.  And not a single witness will tell you that they're

10   aware of any new policies to not detain people at the border

11   because there is no nondetention policy.

12        Florida wants you to infer that there is, but the

13   evidence will not support that inference, which brings us to an

14   important distinction that's central to this case that we would

15   like to you keep in mind while you hear the facts:  the

16   difference between an inference and an assumption.

17        An inference requires facts, things you can point to

18   that logically makes other facts more likely.  For example, if

19   somebody walked into this courtroom all wet carrying an

20   umbrella, we can infer that it's raining even if we don't see

21   the rain for ourselves.  That's a logical inference.

22        But an assumption is something presupposed built into

23   the premise that doesn't necessarily follow.  For example,

24   pointing to high numbers of people being released at the border

25   and saying therefore it must be a policy of this Administration

1   to release people, that's an assumption and is not supported by

2   the evidence, and we will show that during this trial.

3             Florida is also asking this Court to make assumptions

4   for its standing.  To have standing, Florida has to show that it

5   actually suffered an injury that is directly traceable to the

6   policies it is challenging and is redressable by this Court.

7   And to meet its burden, Florida has to show all three elements,

8   and it will not be able to do so.

9             It has already stipulated to the fact that it cannot

10  meet that's elements.  Quote, "Florida does in the tract alien

11  expenditures in a manner that allows it to identify expenditures

12  on specific aliens released under the challenged policies."

13  That's been stipulated.  That's enough to defeat their standing

14  claim because traceability is a required element.

15            And you should also pay attention as to whether they

16  show any evidence of redressability to you during this trial.

17  If they cannot trace their alleged injuries to the policies they

18  challenge, then they also cannot say how altering those policies

19  would affect their alleged injuries.  Proving all of those

20  elements is their burden; and if they fail to address

21  redressability, then they lack standing on that basis alone.

22            Every administration has had to make a choice based on

23  the resources it is provided by Congress.  Congress gives DHS a

24  limited amount of funding, but it has also given people the

25  right to come to this country and claim asylum.  And there's no

1   off switch for that; there's no "we are closed" sign that we can

2   put on the border.

3            So when there is another surge or resources are

4   strained and more people keep coming, Congress has directed DHS

5   to prioritize.  Florida may wish that DHS's priorities were

6   different, but that does not mean the decisions that DHS is

7   making violate the law.

8            As defendants have maintained throughout this case,

9   this is about different points of view and a political dispute

10  that needs to be resolved in the voting booth and not in a

11  courtroom.

12           Thank you, Your Honor.

13           THE COURT:  Thank you, Ms. Ryan.

14           All right.  Florida, your first witness.

15           MR. PERCIVAL:  Your Honor, before we call our first

16  witness, we would move Exhibit 62 into evidence.

17           THE COURT:  All right.  Any objection?

18           MR. DARROW:  Yes, Your Honor.  Exhibit 62 contains

19  quite a lot of hearsay.  There are questions from congress

20  members directed at Secretary Mayorkas which are hearsay, and

21  those questions sometimes include statements from, you know, a

22  second layer of hearsay recounting statements that those

23  congress members have heard.

24           MR. PERCIVAL:  Your Honor --

25           THE COURT:  I assume you're offering the answer he

1  gives rather than the question, correct?

2         MR. PERCIVAL:  Well, I have two answers.  One, I

3  believe, Your Honor, that Mr. Darrow is confusing Exhibit 61

4  and 62.  Exhibit 62 is actually just Mayorkas talking.  We've

5  cut the video to exclude the questions.  We're happy to address

6  that other issue.  I'm going to do 61 next.

7         MR. DARROW:  Sorry, I was referring to 61.

8         THE COURT:  So as to the -- which was the first number

9  you gave me?

10         MR. PERCIVAL:  62 is the first one we're offering, and

11  that is only Mayorkas talking.

12         THE COURT:  As to that one, any objection?

13         MR. DARROW:  No objection.  Just we would note that we

14  haven't seen the full -- we got the time stamps, but we haven't

15  actually seen the final video cuts.  So to the extent that the

16  video exceeds the time stamps that we saw, we would object at

17  that point.  Not that we expect that that's going to happen.  We

18  just wanted to note that.

19         MR. PERCIVAL:  Your Honor, we've faithfully edited the

20  video as we represented we would with counsel.

21         THE COURT:  Okay.  I trust that that should have been

22  worked out beforehand.  So Exhibit 62 will be received and why

23  don't we just go ahead --

24         MR. PERCIVAL:  May I publish, Your Honor?

25         THE COURT:  -- and deal with 61.

1      (PLAINTIFF EXHIBIT 62:  Received in evidence.)

2           MR. PERCIVAL:  Go ahead.

3           THE COURT:  I'm sorry.

4           MR. PERCIVAL:  I'm sorry.

5           THE COURT:  Deal with the objection.  He's got an

6    objection to the exhibit where there's questions from

7    senators --

8           MR. PERCIVAL:  Oh, you want me to deal with 61 and

9    just play them both?

10          THE COURT:  No, just -- what's your response to his

11   argument so I can --

12          MR. PERCIVAL:  On 61?

13          THE COURT:  -- deal with that?

14          Yes, sir.

15          MR. PERCIVAL:  Your Honor, we're not offering the

16   questions for the truth of the matter asserted.  We just think

17   that you ought to see the whole exchange so you can understand

18   Secretary Mayorkas's answers.  And we only want you to consider

19   Secretary Mayorkas's answers.

20          THE COURT:  In view of that, is there still an

21   objection?

22          MR. DARROW:  I mean, we think that the questions paint

23   the answers, and it would be very difficult not to take into

24   consideration the truth of the matter asserted since they are

25   asserting statements about what's happening at the border.

1        THE COURT:  All right.  I'm going to overrule the

2   objection.  I can receive the exhibit certainly with his

3   answers.  Those are not hearsay, and to the extent I've got to

4   have the questions to get context for the answers.  And so

5   certainly not going to take whatever a congressman says at face

6   value for a variety of reasons.

7        But anyway, they're both admissible and you can play

8   them.

9        *(PLAINTIFF EXHIBIT 61:  Received in evidence.)*

10        MR. PERCIVAL:  Okay.  Your Honor, we'll play them in

11   order.

12        Ms. Gerdts, please play Exhibit 62 first.

13        THE COURT:  If you'll just let me know when you change

14   to a different exhibit.

15        *(Video recording played in open court.)*

16        MR. PERCIVAL:  Sorry, Your Honor.  That was 62.  We're

17   now going to play Exhibit 61.

18        THE COURT:  Okay.  Thank you.

19        *(Video recording played in open court.)*

20        MR. PERCIVAL:  That's the end of the exhibit, Your

21   Honor.

22        THE COURT:  Okay.

23        And just to be clear, obviously all the information

24   that the senator provided there about people in camouflage,

25   that's not evidence and certainly nothing I'm going to consider,

1    just the things tightly close to his -- the response that -- or

2    the question that generated a response is relevant; but all that

3    other stuff, I don't know if it's true or not.  It really has no

4    bearing here.

5              All right.  Yes, sir.

6              MR. HART:  Your Honor, Joseph Hart for the State of

7    Florida.  We would like to call our first witness, Mr. Jacob

8    Oliva.

9              THE COURT:  Okay.

10             **JACOB OLIVA, PLAINTIFF WITNESS, DULY SWORN**

11             DEPUTY CLERK:  Please state and spell your full name.

12             THE WITNESS:  Jacob, J-A-C-O-B, Oliva, O-L-I-V-A.

13             THE COURT:  Go ahead.

14                            **DIRECT EXAMINATION**

15   BY MR. HART:

16   Q.   Good morning, Mr. Oliva.  Could you please state where

17   you're currently employment.

18   A.   Yes, I currently am employed with the Florida Department of

19   Education.

20   Q.   And what is your role with the Department of Education?

21   A.   My title is senior chancellor.

22   Q.   And how long have you been employed at the Department of

23   Education?

24   A.   Just over five and a half years.

25   Q.   And what are your duties as the senior chancellor?

1   A.   Primarily I support the working division of our

2   Commissioner of Education and implement the strategic plan

3   outlined by our State Board of Education.

4          The portfolio that I directly oversee include

5   different divisions such as the Division of Early Learning, the

6   Office of Safe Schools, the Division of Public Schools, the

7   Office of Independent Education and School Choice, and the

8   office that's for assessment, research and measurement.

9   Q.   And how long have you been the senior chancellor?

10  A.   About two years.

11  Q.   Have you held any other positions at the Department of

12  Education?

13  A.   I have.  Prior to being a senior chancellor, I was the

14  chancellor for the Division of Public Schools; and prior to that

15  I started off as a vice-chancellor.

16  Q.   And could you briefly describe your job duties in those two

17  positions?

18  A.   When I was with the vice-chancellor at the Department of

19  Education, I oversaw different bureaus.  There's different

20  layers throughout our organization.  Primarily, I supported the

21  Bureau of Exceptional Student Education; the Bureau of Student

22  Instructional Services; the Bureau for English Language

23  Learners, also known as SALA, which is Student Achievement

24  through Language Acquisition, in making sure that we were

25  supporting school districts and holding them accountable for all

1    Florida statutes and state board rules.

2    Q.   And could you describe the role of the Bureau of English

3    Language Learners?

4    A.   Sure.  So the SALA office, Student Achievement through

5    Language Acquisition, helps oversee and monitor the use and

6    assurances of a Title III grant that we receive some federal

7    funds for it.  It's about $50 million a year.  And those dollars

8    get directly allocated to school districts to support students

9    that are acquiring English as a second language.

10           Not only do we monitor the support and oversight of

11   how those dollars are being used to make sure districts are

12   spending them in accordance of guidance with federal

13   expectations and assurances.  We also provide professional

14   development and support, working with school districts, helping

15   them utilize best strategies in evidence-based options for

16   students to acquire English and be successful in Florida

17   schools.

18   Q.   And prior to joining the Department of Education, what was

19   your line of work?

20   A.   So I spent about 17 years in public schools.  Pretty much

21   that entire career was in school district here in Florida called

22   Flagler County.  It's just north of Daytona Beach, south of

23   St. Augustine.

24           My first job in Flagler schools was a classroom

25   teacher.  I taught elementary education primarily working with

1    students with exceptionalities in special education.  I also

2    supported students that were in the ESOL program, English

3    Speakers of Other Languages.

4           Then I went into school administration.  I served as a

5    elementary school principal.  I also served as a high school

6    principal.  And then I worked at the district office and was the

7    superintendent of schools for about four and a half years before

8    joining the Department.

9    Q.    Are you familiar with the Department of Education's budget

10   and expenditures?

11   A.    Yes.

12   Q.    What is the Florida Education and Finance Program?

13   A.    The Florida Education and Finance Program is also referred

14   to as the FEFP.  That's what we refer to it kind of out in --

15   throughout the agency and throughout the state.  It's a very

16   complicated formula that has several different categories that

17   get factored in together to basically determine how much funding

18   a school district's going to receive for the number of students

19   that are enrolled in that district based on the level of support

20   they need, such as the different programs or the courses that

21   students are enrolled in.  And those are the dollars that are

22   collected through the state, and it's how we allocate the state

23   budget that is authorized through the legislature and

24   distributed to school districts.

25   Q.    So the legislature allocates money and then that money is

1    distributed to the school districts?

2    A.    That is correct.  We receive our state budget through the

3    legislature; and then when the legislature votes on that through

4    the chambers, it goes to the governor for signature to become

5    law.

6    Q.    And is there any federal funding incorporated in this

7    expenditure?

8    A.    The Florida Education and Finance Program is state dollars.

9    It's primarily sales tax revenue and local property tax revenue.

10   Q.    And so approximately how much money did Florida spend per

11   student in the fiscal year 2020-2021?

12   A.    In the 2020-2021 school year, it was about $8,000 a

13   student.

14   Q.    And this $8,000 per student is all state funds?

15   A.    Yes, sir.

16   Q.    And approximately how much money in the aggregate did

17   Florida spent educating students in fiscal year 2020-2021?

18   A.    That was around 22 and a half billion dollars.

19   Q.    And if more students enroll in Florida schools after the

20   budget is already set by the legislature, how does that affect

21   schools in the state for that particular fiscal year?

22   A.    So when we get the state budget that's appropriated to the

23   state, those dollars go out to the school districts in a very

24   complicated formula.

25            We collect data from the school districts throughout

1    the year to determine how many students are enrolled in each

2    district, the courses they're in, the programs that they're in;

3    and those dollars are allocated to the State.  If more students

4    show up throughout the year and it changes the projection that

5    they have been allocated for and we get the actual numbers, a

6    redispersion of those funds would occur based on where those

7    students are.  If more students enroll in Florida schools, the

8    budget doesn't go up.  The budget is a set amount, which means

9    the per-student allocation would have to decrease based on

10   supporting the needs of additional students.

11   Q.   So if more students enrolled in the Florida schools during

12   a particular fiscal year after the budget had already set, would

13   that create a strain on schools' resources?

14   A.   It could be a significant strain on school resources

15   because schools are going to enroll students as they come in and

16   give them every piece of service that they need in order to be

17   successful.  Those services may cost dollars.  If students -- if

18   there are spikes of enrollment that were not projected for,

19   especially in certain parts of the state, those dollars are

20   going to be recalibrated; and some of those resources may move

21   from one district to another, which would face the district

22   that's getting a recalibration or a shortage in funding would

23   have to go through and make those necessary budget adjustments

24   in the middle of a school year.

25   Q.   And if more students enroll in Florida schools, how does

1    that affect the budget for the next fiscal year?

2    A.   When the legislature is looking at setting a state budget,

3    there's a very complicated forecasting formula and conferences

4    that look at projected revenues, and they look at historical

5    trends of students over time.

6         So if they see the trend line of students moving where

7    we're enrolling more students in the state of Florida, that

8    would be reflected in the future forecast for additional years

9    so that they can budget according to the state revenues to meet

10   the needs of that per-student allocation.

11   Q.   So if more students are enrolling in Florida schools, is

12   the state legislature likely to allocate more money in total?

13   A.   They would have to either allocate more money in total to

14   make up for the difference of those schools if they're going to

15   keep the per-student allocation; but if they don't increase the

16   state budget, then schools are just going to get less money.

17   Q.   And approximately how much money did Florida spend per

18   student in the fiscal year 2021 to 2022?

19   A.   That was pretty close to around 22 and a half billion,

20   maybe a little over.

21   Q.   And then how much money did Florida spend per student in

22   the fiscal year 2021-2022?

23   A.   It was about $7,800 a student.

24   Q.   And approximately how much money does Florida expect to

25   spent per student in the 2022-to-2023 fiscal year?

1    A.   It's around $8,200 a student.

2    Q.   And approximately how much money in the aggregate does

3    Florida expect to spend educating the fiscal year 2022 to 2023?

4    A.   It was about 24 and a half billion dollars.

5    Q.   Does the Department of Education record whether students

6    enrolling in Florida schools was ever apprehended at the border?

7    A.   It does not.

8    Q.   Does the Department of Education record whether a student

9    enrolling in Florida schools was admitted into the country via

10   parole?

11   A.   It does not.

12   Q.   Does the Department of Education have any way of knowing

13   how a student enrolling in Florida schools might have even

14   arrived in the United States?

15   A.   Not to my knowledge.

16   Q.   Does the Department of Education record the citizenship

17   status of students enrolling in Florida schools?

18   A.   It does not.

19   Q.   And why not?

20   A.   We are prohibited per federal law to ask for citizenship

21   status of any of our students and families.

22   Q.   And is Florida required to provide an education to all

23   students regardless of citizenship status?

24   A.   Florida has compulsory attendance laws that start between

25   ages 6 and 16.  So students within that age range are required

1   to go to school.

2   Q.   Are you familiar with the Every Student Succeeds Act?

3   A.   Yes, sir.

4   Q.   Does Florida receive -- excuse me.

5        Does the Department of Education receive federal

6   funding for children who qualify as, quote, "immigrant children

7   and youth," end quote, pursuant to Every Student Succeeds Act?

8   A.   Yes.

9   Q.   And how is immigrant children and youth defined in the act?

10  A.   Florida uses the federal definition for calculating that

11  data, and that is to define a student that has been born outside

12  of the United States and educated outside of the United States

13  for three or more years.

14  Q.   And what must DOE -- excuse me, the Department of Education

15  do in order to receive funding for educating immigrant children

16  and youth?

17  A.   With all of the entitlement dollars that we receive from

18  the federal government, the Department of Education has to fill

19  out assurances basically outlining what the intention of those

20  dollars are -- it's kind of like an application -- and where the

21  resources, the methodology for disbursing those resources, and

22  assigned assurances that we're going to use those dollars in

23  accordance to federal expectations.

24  Q.   Does the Department of Education have to track the number

25  of immigrant children and youth enrolling in Florida schools?

A.   The Department of Education collects that data from the
school district when they enroll -- when parents enroll
students.  If the parent chooses to share that information, the
schools would then have that and the districts would report that
to the State.

Q.   And so in your role at the Department, are you familiar
with the Department's efforts and processes to identify and
track immigrant children and youth enrolling in Florida schools?

A.   Yes.

Q.   And can you provide in more detail the identification
process and the process for collecting information?

A.   Sure.  So when a family shows up at a school, they'll go to
the registration office and fill out a packet of information
where they provide all the information on their children.
Hopefully they have transcripts in previous coursework.

          Districts pretty regularly require proof of residency
to make sure they're attending the home's own school.  There are
some shot records that are asked for at the time of enrollment.

          Then there's also some questions that include a home
language survey to see if a student may qualify for ESOL
students or to be an English Speaker of Other Language or
English Language Learner services.  But then also that
enrollment packet will ask if the child was born outside of the
United States and educated in a school outside the United States
for three or more years.

1  Q.  And does -- and how does the school districts -- what is

2  the process for the school districts submitting that information

3  to the Department?

4  A.  When the school direct's enrolling the student information,

5  it goes into a state database.  So we have a very complicated

6  reporting process.  So all of the school districts are required

7  to participate in our state survey system, and they send that

8  data to the Department where we collect that data throughout the

9  school year.

10  Q.  Does the Department audit this information?

11  A.  Yes, absolutely.

12  Q.  And does -- you said previously the Department will provide

13  this information to the federal government for purposes of

14  funding.  Does the federal government rely on this information?

15          MS. RYAN:  Objection.

16          THE COURT:  All right.  Rephrase it.

17  BY MR. HART:

18  Q.  Is the information you provide to the federal government

19  required by the federal government to obtain funding for the

20  State of Florida?

21  A.  Yes.  We submit the -- we share our data with the federal

22  government, and then the federal government then would use the

23  data that we submit in determining how they're going to

24  distribute funds to other states.

25  Q.  In your time at the Department, has the federal government

1  ever denied the validity or challenged the substance of the

2  information you or the Department provided to the government?

3  A.   So the federal government audits states just as the state

4  audits school districts.  So we participate in desktop

5  monitoring and on-site visits in accordance to the schedule that

6  the federal government follows.  So we would be monitoring for

7  that as well.

8  Q.   Has the federal government ever failed to provide funding

9  to Florida during your time at the Department on the basis that

10 this information as collected by the State is incorrect?

11 A.   Not to my knowledge.

12 Q.   Is the process of identifying and tracking immigrant

13 children and youth part of the normal course of the Department's

14 operations?

15 A.   Yes.

16 Q.   Can you please turn to Exhibit 95 in your binder.  I think

17 it's to your right.  Mr. Oliva, you have the binder marked

18 with -- there's a couple different binders up there.

19 A.   Yeah.  It's the tab for 95, but it's stamped

20 Plaintiff's Exhibit 72.  So I don't know if that's right.

21       THE COURT:  Why don't you come up, Mr. Hart, and give

22 him the right document.

23       THE WITNESS:  Oh, wait.  Here we go.  I think I was

24 on 72.  I think I have 95 now.  This one says Plaintiff's

25 Exhibit 95.  Sorry about that.

```
 1   BY MR. HART:
 2   Q.   And just to make sure that we're talking about the right
 3   document, is this document entitled "Enrollment by Immigrant
 4   Status 2020-2021 through 2021-2022 Final Surveys 2, 3, and 5"?
 5   A.   Yes, sir.
 6   Q.   Are you familiar with this document?
 7   A.   Yes, sir.
 8   Q.   And what is this document?
 9   A.   This is a document that is reporting data based on surveys.
10   The State of Florida -- when we talk about that robust data
11   sharing system that we have, we collect snapshots in time from
12   school districts, and there's some very important surveys.
13          And this one looks what is called Survey 2 and
14   Survey 3 which is where the State does an accurate snapshot of
15   every single student in the programs that the students are
16   enrolled in.  Survey 2 happens in October.  Survey 3 happens in
17   February.  Then survey 5 is the culmination of those surveys for
18   a final enrollment or allocation amount that happens in June to
19   July over the summer.
20   Q.   In this -- the information in this document particularly
21   refers to the immigrant children and youth information?
22   A.   Correct.  This is on the immigrant status.
23   Q.   And was this document created for purposes of this
24   litigation?
25   A.   I believe so.
```

OLIVA - DIRECT

1  Q.   Are you familiar with the underlying information in this

2  document?

3  A.   Yes.

4  Q.   And is this document a summary of records and information,

5  voluminous records and information, retained by the Department?

6  A.   Yes.

7  Q.   And do you use and rely upon the information in this

8  document in your current role with the Department?

9  A.   Yes.

10  Q.   And is the information in this document publicly available?

11  A.   Yes.

12  Q.   Is the information contained in this document a record made

13  at or near the time of its collection?

14  A.   I'm sorry.  Can you restate that?

15  Q.   Is the information retained in this document made at or

16  near the time of the collection by the schools and by the

17  Department?

18  A.   Yes.

19  Q.   And is it the regular practice of the Department to collect

20  and maintain and retain the information in this document?

21  A.   Yes.

22          MR. HART:  Your Honor, I'd like to enter into evidence

23  what will be Plaintiff's Exhibit 95.

24          THE COURT:  Any objection?

25          MS. RYAN:  No objection.

1          THE COURT:  All right.  That will be received.

2          *(PLAINTIFF EXHIBIT 95:  Received in evidence.)*

3          MR. HART:  Your Honor, do you have a copy?

4          THE COURT:  I do not have a copy.  I would like a

5     copy.

6          MR. HART:  Your Honor, if I may approach?

7          MR. PERCIVAL:  We have a copy.

8          THE COURT:  Just going forward, as you introduce them,

9     bring them up to the clerk and she'll get them to me.

10          MR. HART:  Okay.  I believe the clerk has a binder.

11     Do you --

12          MR. PERCIVAL:  No, he doesn't, Joe.

13          MR. HART:  Would you like us to publish it on the

14     screen as well?

15          THE COURT:  That's fine.

16          Okay.  You can proceed while they're finding their

17     document.  I can see it.

18          MR. HART:  Thank you, Your Honor.

19     BY MR. HART:

20     Q.   Can you please define the term "immigrant status" as used

21     in this document?

22     A.   So the State of Florida uses the federal definition, and

23     it's for students that were born outside of the United States

24     and educated outside of the United States for three or more

25     years.

1   Q.   And does that definition stem from the Every Student

2   Succeeds Act?

3   A.   Yes, sir.

4   Q.   In your role at the Department are you familiar with the

5   costs associated with educating immigrant children, the

6   additional costs that might be associated?

7   A.   Yes.

8   Q.   And does federal funding cover all the costs associated

9   with immigrant children and youth enrolled in Florida schools?

10  A.   The dollars we received from federal government would not

11  cover the cost of total education for that student.  The dollars

12  that we receive from the federal government is to supplement the

13  State's investment in educating students.  In fact, we're

14  prohibited from supplanting the State investment with the use of

15  federal dollars.

16  Q.   And what are some of the costs or additional costs that

17  might be associated with educating immigrant children and youth?

18  A.   Well, each student is evaluated independently.  So part of

19  that registration packet in -- in the questionnaires parents are

20  asked to fill out, there will be some questions around student

21  language acquisition.  So there's a home language survey that

22  I'll ask the parents of the child, if English is the first

23  language they've learned, if the student speaks another language

24  besides English, if English isn't the only spoken language at

25  home.

1          And based on how the parents respond, there will be a

2    screen done on the students that will measure the student's

3    ability to speak, listen, read, and write.  Based on the results

4    of that assessment would determine the level of services that a

5    student may need.

6          Those services can range from small group instruction

7    to summer programs to after-school programs.  It could be very

8    intensive.  Some students may also qualify for ESOL services,

9    the English Speakers of Other Language services but also have

10   dyslexia.  They may have reading difficulties.  They may need

11   additional layers of support.

12         So every student has to be assessed individually, but

13   every student is going to be assigned the appropriate levels of

14   support that they are afforded to, to make sure that they're

15   successful in school.

16   Q.   So looking at this document, Survey 2 based on your prior

17   statement would have been in October of 2020, Survey 2 of the

18   2020-2021?

19   A.   That's correct.

20   Q.   And that states approximately 84,000 immigrant students?

21   A.   That's correct.

22   Q.   And Survey 3 would have been January of -- February of

23   2021?

24   A.   It would have been in February.

25   Q.   And that states 83,505 immigrant students?

```
 1   A.   That's correct.
 2   Q.   And Survey 5 would have been collected in the -- sometime
 3   during the summer, and it says -- summer of 2021, and it says
 4   95,000?
 5   A.   Right.  And that's typically referred to as the final
 6   number for the school year.
 7   Q.   And Survey 2 of 2021 would have been October of 2021, and
 8   it has about 90,000?
 9   A.   That's correct.
10   Q.   And Survey 3 would have been collected in January of 2022,
11   and it has 101,000?
12   A.   In February, yes.
13   Q.   And Survey 5 would have been in this past summer, and -- of
14   2022, and it has 112,375 immigrant students?
15   A.   That's correct.
16   Q.   So could you -- since January of 2021, approximately how
17   many more immigrant students have been enrolled in Florida
18   schools?
19   A.   Over the two years, it would be about 17,000.
20   Q.   And I notice down here there is a "not reported."  Could
21   you expand upon that column?
22   A.   So when a parent is enrolling their student and filling out
23   their registration packet, if they don't respond to certain
24   sections, when the data clerk is entering in that information,
25   if the parent chose to leave it blank, they would click the box
```

1    that says not reported by the parent during registration.

2            THE COURT:  Let me ask you a question before you

3    continue.  The 17,000 number that you gave, what are the two

4    components of that, to get to that?  What did you start with --

5    where did you get the January 2021 number and then what do you

6    subtract --

7            THE WITNESS:  Right.

8            THE COURT:  -- that from to get 17,000?

9            THE WITNESS:  So to get to 17,000, I look at the final

10   allocation which is Survey 5.  Survey 2 and Survey 3 are those

11   two different snapshots.  Survey 5 is kind of the average of the

12   school year because students come, students go.  Sometimes it's

13   not the same.  So final calculation for Survey 5 in 2020-2021 is

14   95,000.  Final calculation for Survey 5 in 2021-2022 is 112,000.

15           THE COURT:  But I thought I understood your testimony

16   to be that the Survey 5 is done at some point in the summer.

17           THE WITNESS:  That's correct.  Because it's a

18   culmination of what was submitted in Survey 2 and Survey 3

19   combined, so there's fluctuation.  That's why we -- we use

20   Survey 5 as final numbers for that school year.  That's what we

21   would report out.

22           THE COURT:  And so how does that summer of 2021

23   number -- I think his question was from January of 2021 -- I

24   thought Survey 3 was January -- or February of 2021.

25           THE WITNESS:  It is.  And that's why Survey 5 gets a

OLIVA - DIRECT

1  little bit nuanced because Survey 2 can be different students

2  that have received services throughout the year.  They may not

3  be in Survey 3.  Survey 3 could be different students from

4  Survey 2.  Survey 5 is a culmination of the number of students

5  served throughout the year.

6          THE COURT:  Okay.  Gotcha.  Thank you.

7          All right.  Go ahead, Mr. Hart.

8  BY MR. HART:

9  Q.   Could you remind us, how long did you say you worked in the

10  school system prior to joining the Department?

11  A.   About 17 years.

12  Q.   And in your time as a teacher and principal, did you

13  educate students who were born abroad?

14  A.   I educated students that qualify for English Speakers of

15  Other Language services.  Sometimes students shared with us that

16  they were born abroad, yes.

17  Q.   So you educated students for whom English was a second

18  language?

19  A.   Yes.

20  Q.   Did you educate students who knew no English?

21  A.   Yes.

22  Q.   In your experience, is it different educating a child with

23  no English skills versus educating a child who already has some

24  English skills?

25          MS. RYAN:  Objection, Your Honor, calls for expert

1    opinion.

2              THE COURT:  I think he's established a sufficient

3    background, and I hope we're not going to spend too much time on

4    this.

5              MR. HART:  Yes, Your Honor.

6              THE WITNESS:  Yeah, so if a student -- I taught fifth

7    grade one year, and we had students that moved in from other

8    countries that didn't speak any English.  And in my experience,

9    when a student is older and coming in the school system -- and

10   even when I worked at the high school level -- there's a lot

11   more challenges in acquiring a second language than typically

12   younger students.  So depending on the age and the background

13   and the education that the child receives.  Sometimes students

14   might come from another country and have not been enrolled in

15   school.  They don't have the opportunity to be educated.  So

16   they can be significantly delayed in grade-level expectations.

17             MR. HART:  One second, Your Honor.

18   BY MR. HART:

19   Q.   Could you provide any information upon what extra resources

20   a state might spend on the students who are acquiring English as

21   a second language?

22   A.   So when a student qualifies for those services, there's

23   actually certifications that teachers receive to be qualified to

24   support those services.  So we have to invest in making sure we

25   find certified teachers, provide the training to teachers to

1    earn that certification, make sure that they have the ability to

2    implement the best strategies, evidence-based strategies for

3    those children.  And typically the students that are

4    significantly behind their peers would require intensive,

5    sometimes one-on-one instruction that has to happen throughout

6    the school day.  It may require after-school interventions, it

7    may require summer interventions based on that child's needs.

8            And additionally, the amount of resources:  buying

9    more curriculum, finding translators.  Sometimes students are

10   speaking -- or families speak languages that nobody in the

11   school knows how to communicate, and they may have to

12   communicate with a translator to talk to the students and talk

13   to the families.  So it varies based on student need, but it --

14   the range can be very significant.

15           MR. HART:  Your Honor, that's all my questions for

16   now.

17           THE COURT:  All right.  Thank you.

18           MR. PERCIVAL:  Your Honor, do you want us to approach

19   with a copy?

20           THE COURT:  Yes.

21           Ms. Ryan.

22           MS. RYAN:  May I proceed, Your Honor?

23                        **CROSS-EXAMINATION**

24   BY MS. RYAN:

25   Q.   Good morning.

1   A.   Good morning.

2   Q.   You said the Department of Education defines an immigrant

3   student as a child born abroad who was educated outside the

4   United States in the last three academic years, correct?

5   A.   Correct.

6   Q.   So for the 2020-2021 school year, the total number of

7   immigrant students in Florida was 95,084.  I can put the exhibit

8   up.

9   A.   I just want to clarify.  You're still talking about

10  Exhibit 95?

11  Q.   Yes.

12       And I can put that up on the screen as well if that

13  would be easier for Your Honor.

14       Okay.  So for the 2020-2021 school year, the total

15  number of immigrants at the end of the year was 95,084, correct?

16  A.   Yes, ma'am.

17  Q.   And for the 2021-2022 school year, the number was -- the

18  final number was one thousand twelve, three hundred

19  seventy-five, right?

20  A.   112,375.

21  Q.   But a child classified as an immigrant student is not

22  necessarily a noncitizen; is that right?

23  A.   It's not equal, no.

24  Q.   So those immigrant students could be green-card holders?

25  A.   They could.

1    Q.    They could be lawful permanent residents?

2    A.    They could.

3    Q.    They could be U.S. citizens who were born outside of U.S.

4    soil?

5    A.    They could.  But the likeliness of many of those students

6    not being a citizen is very high.

7    Q.    But you don't know?

8    A.    We don't collect that data at the state.

9    Q.    Because you don't track that information.

10   A.    The federal government prohibits us from tracking that

11   information.

12   Q.    They were approximately 2.8 million students in the Florida

13   school system last year?

14   A.    Roughly.  I would say yes.

15   Q.    Your final survey shows just over 3 million?

16   A.    That's correct.

17   Q.    So the immigrant students make up about 3 percent of the

18   total student body?

19   A.    That's correct.

20   Q.    But you don't know if any of them are noncitizens who

21   attempted to enter at the southwest border?

22   A.    We do not collect that information.

23   Q.    You don't know if they're applicants for admission?

24   A.    We don't collect that information.

25   Q.    You don't know if they were paroled?

1    A.    We don't collect that information.

2    Q.    You don't know if they were conditionally released pending

3    removal proceedings?

4    A.    We don't collect that.

5    Q.    In fact, it's possible that none of them fit those

6    definitions?

7    A.    We don't check -- there's no way for us to know.

8    Q.    On direct you testified about the mandatory school

9    requirements under Florida law.  And as an educator, you assume

10   that these parents are enrolling their students in public

11   schools; is that right?

12   A.    I don't assume.  I know firsthand they are.

13   Q.    But you have no idea how many applicant-for-admission

14   families are actually coming to Florida?

15   A.    We don't have that information.

16   Q.    You don't know how many of them are enrolling their

17   children in private schools?

18   A.    We don't -- we don't know that information.

19   Q.    You don't know how many are being homeschooled?

20   A.    The Department doesn't track that information.

21   Q.    You're just assuming that some applicants for admission

22   will come to Florida with children and some of them will enroll

23   their children in public schools?

24   A.    I'm not assuming.  I know firsthand.  I've met with these

25   families and seen these students in our classrooms.

OLIVA - CROSS

1  Q.   We don't have any evidence of examples of those

2  applicant-for-admission families with children being enrolled

3  under the challenged policies, though, do we?

4  A.   We don't collect that data.

5  Q.   There's no specific programs administered by the Department

6  that are only available to noncitizen students, right?

7  A.   That's correct.

8  Q.   There's no new programs that had to be added because of

9  noncitizen students?

10  A.   That's correct.

11  Q.   There are no classes or schools that had to be created only

12  because of noncitizen students?

13  A.   I would say that schools are having to adjust to student

14  enrollment.  That would include students that may not be

15  citizens.

16  Q.   If a student, any student, needs help with English

17  proficiency, the State gets federal grant money for that,

18  correct?

19  A.   We receive an entitlement grant from the state -- or from

20  the federal government to support that, yes.

21  Q.   And to be clear, "any student" includes citizen students?

22  A.   Yes.

23  Q.   Because citizen students sometimes don't speak English.

24  A.   That's correct.

25  Q.   And the grant money that you get for those programs is

1    separate and apart from the State's education budget?

2    A.   It's to supplement the State's investment.

3    Q.   And the amount received is based on the actual number of

4    students who speak limited English?

5    A.   It's part of.  It's a little bit more nuanced than that,

6    but for intent and purposes, that -- we report to the federal

7    government the number of students that qualify for ESOL

8    services.  How the federal government determines that

9    allocation, I'm not too familiar with their methodologies.

10   Q.   You report numbers and then you get money as a result?

11   A.   Yes.

12   Q.   You told a story on direct about when you taught fifth

13   grade and you had to teach students with English as a second

14   language, right?

15   A.   That's correct.

16   Q.   But that, to be clear, was under a different

17   administration?

18   A.   Yeah, that was decades ago.

19   Q.   So having students that don't speak English is not a new

20   problem that started in January of 2021?

21   A.   That is not new to the State of Florida.

22   Q.   On direct you talked about the average cost per student and

23   how that's calculated.  You referred to the FEFP.

24   A.   That's correct.

25   Q.   And that's the program that distributes money to the school

1    districts, right?

2    A.    Yeah, it's a complicated formula, yes.

3    Q.    It calculates how much each district will get?

4    A.    Pretty much, yes.

5    Q.    And it's based on a number of factors including how many

6    students they have and the services that those students require?

7    A.    Correct.

8    Q.    And then it also uses the cost per student?

9    A.    What do you mean the cost?

10   Q.    The cost per student is included in that calculation,

11   correct?

12   A.    Yes.

13   Q.    Last year the cost per student you said was approximately

14   $7800?

15   A.    That's correct.

16   Q.    And for the current academic year, it's approximately

17   $8200.  So the total school funding for the Department of

18   Education for the 2021-2022 school year from the State was

19   $12.8 billion, correct?

20   A.    Total is about 22 and a half billion.

21   Q.    But that includes local funding?

22   A.    Correct.

23   Q.    And you have no idea how much of that 22 billion-dollars,

24   if any, was spent on applicants for admission paroled at the

25   southwest border since January of 2021, right?

1   A.   We are prohibited from collecting that information.

2   Q.   The answer could be zero because you just don't know,

3   right?

4   A.   I have seen these students, and I've met with the families,

5   so I can tell you with certainty it's not zero.

6   Q.   So you've spoken to actual families who said, "I'm an

7   applicant for admission who was paroled at the southwest border

8   since January of 2021 and I have come to Florida"?

9   A.   I have visited these schools and met with administrators

10  who are receiving influx of students from other countries that

11  have no formal spoken language and have sat in these classrooms

12  with these children and met some of these families to talk about

13  implementing strategies on how we can support them because they

14  don't have any background knowledge, any formal written

15  language, and they're coming to us at 10 to 12 years old and

16  they're significantly behind their peers.  And we're going to

17  ensure that we put them on a successful path to graduating from

18  Florida schools.

19  Q.   I appreciate that, but my question was:  You haven't spoken

20  to anyone who has said to you, "I'm an applicant for admission

21  who came over the southwest border and were paroled under the

22  current policies since January of 2021"?

23  A.   They have not used those terms specifically --

24  Q.   Okay.

25  A.   -- but they told me that they have come here recently from

OLIVA - CROSS

1    another country.

2    Q.   So the Department of Education does not know if Florida is

3    educating any applicants for admission or if it spends any money

4    on them.  So you have no idea how the federal government

5    detaining more applicants for admission would actually affect

6    your school system, do you?

7    A.   We don't collect that data.

8             MR. HART:  Your Honor, objection, argumentative.

9             THE COURT:  It's a little bit compound, too, but I

10   think he's answered it.  She's made her point.

11            MS. RYAN:  It's cross-examination, Your Honor.

12            THE COURT:  I know but you still can't ask a -- I

13   can't even count the number of parts to that question.  It was

14   extremely compound.  And had that been the objection, I would

15   have sustained it.  But it wasn't and you made your point

16   multiple times.

17   BY MS. RYAN:

18   Q.   You can't say if more applicants for admission were

19   detained whether that would impact the Department's budget, can

20   you?

21   A.   We don't collect that information.

22   Q.   The cost per student went up from last year to this year?

23   A.   That's correct.

24   Q.   Because the Department of Education got more money from the

25   state legislature?

1   A.   Florida is open and the state legislature has been a

2   benefit of the revenue that Florida has received thanks to the

3   wonderful leadership.

4   Q.   You previously testified -- I think you used the word

5   "thriving," right?

6   A.   Yes.

7   Q.   So even though you had more students enrolling in schools

8   this year compared to last year, you're also able to spend more

9   money per student?

10  A.   That's correct.  The legislature allocated more dollars per

11  student.

12  Q.   And you said a lot of the State's revenue is coming from

13  sales tax and property tax.

14  A.   Primarily.

15  Q.   And the FEFP distributions shows that from -- distributions

16  from the State's general revenue fund?

17  A.   I'm sorry.  Can you restate that?

18  Q.   Yes, I can.

19       The FEFP distributions that we talked about, those

20  come from the State's general revenue fund which you said is

21  made up primarily of property tax and sales tax, correct?

22  A.   And it comes in a categorical set by the legislature of how

23  much is going to be spent.

24  Q.   Anyone who owns property in the State of Florida has to pay

25  for education, right?

1  A.   It's part of millage that's collected in property tax.

2  Q.   And anyone who shops in a store in Florida pays sales tax?

3  A.   That's correct.

4  Q.   Which is then used to pay for the school system?

5  A.   Unless you have a tax exemption.  I mean, there's nuances

6  to that.

7  Q.   And the State also takes in fees for services it provides

8  like marriage licenses, right?

9  A.   I'm not part of that.

10  Q.   And driver's licenses?

11  A.   That's not under the purview of the Department of

12  Education.

13  Q.   All those service fees go into the general revenue fund

14  that the state uses to pay for the school system, right?

15  A.   I don't oversee that.

16  Q.   So if applicants for admission paroled into the country

17  settle in Florida, they pay sales tax like everyone else, right?

18  A.   You used the word "assumptions" before, so I'm going to use

19  that with you.

20         I would assume.

21  Q.   Do you think that there's a tax exemption for applicants

22  for admission?

23  A.   I don't know.  I don't know who these people are.

24  Q.   If applicants for admission buy property they pay property

25  taxes?

1    A.    That's another assumption.

2    Q.    You have no reason to believe that because they're an

3    applicant for admission they would be exempt from property

4    taxes, do you?

5    A.    Not to my knowledge.

6    Q.    If they got married, they would need to pay for a marriage

7    license?

8    A.    I don't oversee these agencies.  I work for the Department

9    of Education.

10   Q.    If they want to drive, they pay for a license?

11   A.    I don't oversee the department of vehicles.

12   Q.    When they live in Florida and they pay sales tax and pay

13   property tax, they are contributing to the Florida school

14   system, right?

15   A.    If you say they're paying taxes, then they're paying taxes.

16   Q.    And those taxes pay for the school system.

17   A.    The dollars would go to the State, the State for

18   appropriation.

19   Q.    So not only do you not know what costs the State has

20   incurred from enrolling applicants for admission, you also don't

21   know whether that cost is greater than or less than any tax

22   revenue the State gets from the same population, do you?

23   A.    I can tell you when more students come to school, our

24   schools are going to welcome these students and make sure they

25   have all the services afforded to them to get a proper

1  education.

2  Q.  But as you just said, you don't know who any of these

3  people are, so you don't know if they're enrolled in your

4  schools, do you?

5  A.  I've already stated that I've met some of these families

6  and seen these students firsthand.

7  Q.  So a few minutes ago when you said you don't know who any

8  of these people are, was that accurate?

9         MR. HART:  Objection, Your Honor, argumentative.

10         THE COURT:  All right.  Sustained.

11         MS. RYAN:  Your Honor, I'm entitled to probe this

12  witness's credibility.  He said two different statements about

13  applicants for admission and whether he knows them or not.

14         THE COURT:  I've heard his testimony, and I've heard

15  enough of that.

16         MS. RYAN:  No further questions, Your Honor.

17         THE COURT:  Redirect?

18         MR. HART:  Yes, Your Honor.

19                    **REDIRECT EXAMINATION**

20  BY MR. HART:

21  Q.  So opposing counsel discussed the knowledge of immigrant

22  status.  Can you just clarify once more why don't you know or

23  have information about the immigrant -- immigration status of

24  students enrolling in Florida schools?

25  A.  When a parent registers, they're asked questions on if

1    their child was born outside the United States -- and it also

2    gets nuanced because it doesn't include D.C. and Puerto Rico --

3    but basically were they born outside the United States and

4    participating in education for three or more years outside of

5    the United States.  If a parent chooses to disclose that

6    information, that student may be eligible to receive immigration

7    services; but we do not directly ask the families if they're a

8    citizen or an immigrant.

9    Q.   And you said you were prohibited by federal law from asking

10   about citizenship status?

11   A.   That is correct.

12   Q.   So the federal government prohibits the Department from

13   collecting that piece of information?

14   A.   That's correct.

15   Q.   And we talked earlier about federal grants, and just to

16   clarify, do federal grants cover all the resources the State

17   spends on students lacking English proficiency?

18   A.   It does not.

19   Q.   And can you provide just a little bit more detail as to why

20   these ESOL services are more expensive than your standard

21   education services?

22   A.   Students that typically qualify for ESOL students, they

23   need more intensive instruction and intervention which means we

24   have to hire additional resources for teachers that are licensed

25   to support these students.  They will work in the classroom with

the general education teacher.  So sometimes you have two

teachers in a classroom to support students that are learning an

extra language.  They're providing one-on-one and small group

instruction above and beyond the student learning day.

           And you have to acquire resources, you have to buy

textbooks, sometimes in very -- in all different kinds of

languages.  Sometimes you have to bring in translators, that can

be very costly, to work with schools and families to make sure

these students are set up based on the level of support they

need.

Q.   And so you mentioned earlier that you have personal

experience both as a teacher and in your current role with

providing resources to educate these students?

A.   Yes, I have.

Q.   Have you ever in your experience dealt with or overseen a

situation where a large amount of students who maybe don't know

English have enrolled in a school?

A.   In my experience even -- especially throughout this past

school year, through my role working with superintendents and

conversations with them, I've been to districts where they're

supporting large numbers of students where there may be a church

or a local family member that's taking in a hundred families in

the area, and then you have a hundred students enroll in a

school all at once.  That's a lot of additional resources,

because we also have to follow class-size mandates.

1          So when you go over class-size mandates, you have to

2    hire more teachers throughout the school year, you have to

3    provide those services find the -- buy that curriculum, and make

4    some necessary adjustments throughout the school year.

5    Q.   And so is it fair to say that when you have a situation as

6    you described, resources have to be pulled from one area to

7    accommodate and provide a proper education to these students?

8    A.   When the school budget is set, it's set for the year.  And

9    when you have to move resources around, it's going to impact a

10   student experience and other resources.  So if you have to hire

11   additional teachers or support for students that are acquiring

12   English as a second language, those consumables are going to

13   come from another classroom.

14          So now you're telling science teachers you have to

15   simulate labs because we can't -- we have to move those dollars

16   that we allocated for buying resources or current technical

17   programs.  It's a very big burden and challenge on school

18   administrators as well school districts to navigate and

19   fluctuate those challenges, but those students are going to get

20   the services they need in order to be successful.

21   Q.   And just to clarify, you've seen this in your role.  Have

22   you seen this reallocation of resources in the past two years?

23   A.   Absolutely.

24          MR. HART:  No further questions, Your Honor.

25          THE COURT:  All right.  Thank you, sir.  You're free

1    to go.

2        *(Witness excused.)*

3            THE COURT:  Next witness.

4            MR. GUARD:  Your Honor, John Guard, Chief Deputy

5    General for the State of Florida.

6            We have some exhibits, and then we're going to be

7    playing videotape deposition of Chief Ortiz, and that's going to

8    last about an hour and 45 minutes.  If you want -- this might be

9    a good -- I guess this is my way of saying this might be a good

10   place to take a break because we're going to have about two

11   hours of deposition testimony.  Or we can do the exhibits and

12   then take a break.

13           THE COURT:  Let's do that.

14           MR. GUARD:  Okay.

15           Your Honor, Florida would offer what has previously

16   been marked for identification as Exhibits 1, 2, 3, 4,

17   Exhibit 10, 13, 15, 18, 22, 25, 26, 27, 28, 30, 31, 46, 47, 49,

18   97, and 98 into evidence.  I previously provided a list to

19   opposing counsel that we are going to move in at this time.

20           MR. PERCIVAL:  Your Honor, I apologize, one

21   clarification.  I think 40 and 41 were the administrative record

22   issues we dealt with before, so we'll withdraw those.

23           MR. GUARD:  I didn't say...

24           MR. PERCIVAL:  You said one of them.

25           MR. GUARD:  Oh, sorry.

1          THE COURT:  I don't think those were on the list that
2  I wrote down.
3          MR. GUARD:  Oh, I apologize.
4          THE COURT:  All right.  Mr. Darrow, walk through those
5  one by one, or are there a group of them that there is no
6  objection to?
7          MR. GUARD:  That's no objections up through, at least
8  my understanding, to Exhibits 1, 2, 3, 4, 10, 13, and 15.
9          THE COURT:  Is that correct, Mr. Darrow?
10          MR. DARROW:  That's correct, Your Honor.
11          THE COURT:  All right.  Then those will be received.
12          Why don't you tell me what they are.
13          MR. GUARD:  Sure, Your Honor.  I can -- would you like
14  a -- I have a list that happens to have that information.
15          THE COURT:  I know our deputy clerk would.
16          MR. GUARD:  May I approach?
17          THE COURT:  Sure.
18          MR. GUARD:  So Exhibits 1, 2, 3, and 4 are Customs and
19  Border Protection custody and transfer statistics for the fiscal
20  year 2020, 2021, 2022, and 2023.
21          Exhibit 10 is data produced by the United States
22  government regarding the number of aliens released at the
23  southwest border who gave addresses in Florida or who have been
24  added to the Miami docket for processing.
25          Exhibit 13 is the Department of Homeland Security's

1    fiscal year 2021 budget and brief.

2              Exhibit 15 is Immigration and Customs Enforcement

3    budget overview for the fiscal year 2021, congressional

4    justification.  And so those are those exhibits.

5              THE COURT:  And at some point, is Florida going to

6    tell me what portions of that they think is important and what

7    all that means?  Because it looked like a big stack of stuff.

8              MR. GUARD:  It is a big -- which I'm going to provide

9    to the Court.  Yes, Your Honor, during some of the witness

10   testimony they're going to testify about different parts of

11   those documents.

12             THE COURT:  All right.  Well, those -- 1 through 4,

13   10, 13, and 15 -- will be received without objection.

14       (PLAINTIFF EXHIBITS 1-4, 10, 13, 15:  Received in

15   evidence.)

16             THE COURT:  All right.  Next one on your list was

17   Number 18.

18             MR. GUARD:  Exhibit 18 is a U.S -- it's an email

19   amongst U.S. Border Patrol officials dated February 16, 2021.

20             THE COURT:  All right.  And there are no objections to

21   that?

22             MR. DARROW:  Yes, Your Honor.  We object on the basis

23   of hearsay to that.  It's an email that recounts what the --

24             THE COURT:  Let me have it.

25             MR. GUARD:  Yes, Your Honor.  May I approach?

1          THE COURT:  All right.  Go ahead, Mr. Darrow.

2          MR. DARROW:  As you'll see, the email writer is

3    recounting what he heard in a conversation where he just spoke

4    with somebody else whose name has been redacted for privilege

5    concerns.

6          THE COURT:  I'm sure Mr. Guard will tell me that

7    that's subject to -- it's either not hearsay because it's an

8    admission or it's a statement of the party opponent.  Why is it

9    not?

10          Even the hearsay within the hearsay, I assume you

11    wouldn't have redacted somebody's name if it wasn't an agency

12    employee.

13          MR. DARROW:  Because, Your Honor, it's not from one of

14    the named parties.  It wouldn't be a party admission.  And the

15    internal hearsay is not identified at all.

16          MR. GUARD:  I mean, Your Honor, this is -- the ERO is

17    a component of ICE who I believe is a named party in this

18    lawsuit.

19          THE COURT:  I'm looking at the bottom of the email

20    chain.  It's from chief -- name redacted, chief law enforcement

21    operations directorate, United States Border Patrol

22    headquarters.

23          That sounds like somebody that works for one of the

24    parties here, doesn't it?

25          MR. DARROW:  It is, Your Honor, but, you know, under

1   the APA, the named party is the agency.  It's not one of its

2   employees.

3            THE COURT:  It looks like it came from a public email.

4   It was not like he's sending it from his Gmail from home outside

5   of the course of his duties.  I think that comes in as an

6   admission or a statement of party opponent, whatever the proper

7   terminology is.

8            That will be received over your hearsay objection.

9       *(PLAINTIFF EXHIBIT 18:  Received in evidence.)*

10           THE COURT:  Number 22.

11           MR. DARROW:  Your Honor, if I may, that's just the

12   first layer of hearsay.  Then the second layer of hearsay is the

13   statement from somebody recounting, you know, I just spoke with

14   blank and that person told me.

15           THE COURT:  Right.  But you've redacted the name of

16   that person.  So I mean, if you thought it was a nonemployee,

17   you're going to redact nonemployee's names.  This is somebody at

18   ERO.

19           MR. DARROW:  We redacted lower ranking employees'

20   names, Your Honor.

21           THE COURT:  At ERO.  I mean, it's an agency employee

22   talking to another agency employee about agency business.

23           MR. DARROW:  But not every employee is, you know, a

24   party to the case.

25           THE COURT:  I just don't agree with you.  So that's

1    received over your objection.

2              All right.  Number 22.

3              MR. GUARD:  22 is another email between Border Patrol

4    employees in the course and scope of their employment under --

5    and so we're offering that.  It's dated May 21st of 2021.

6              THE COURT:  All right.  Let me see that one.  I assume

7    there's the same objection.

8              MR. DARROW:  Same objections, Your Honor.

9              MR. GUARD:  May I approach?

10             THE COURT:  Yes, sir.

11             MR. DARROW:  It also appears that the exhibit is

12   highlighted in parts, and so we object to the highlighting.

13             THE COURT:  I don't have any highlighting; I just have

14   a bunch of stuff that's been redacted.  Oh, I'm sorry, I do see

15   the highlighting.

16             Is that something you highlighted, Mr. Guard?

17             MR. GUARD:  It is not something that we highlighted,

18   Your Honor.  We can work on getting a substitute and see if we

19   can manipulate the PDF that we were given, or at least the PDF

20   that's in our file.

21             THE COURT:  So was it given to you highlighted?

22             MR. PERCIVAL:  I don't believe so, Your Honor, but we

23   can check and confirm.  We removed the highlighting that was in

24   the document that we had added during the deposition, but there

25   was some other highlighting that looks like it was there when it

1   was scanned in.  But we can talk with counsel during the break

2   and just make sure on this.

3          THE COURT:  All right.  If the objection's the same,

4   the ruling is the same.

5          And I'm not particularly concerned about the

6   highlighting or lack of highlighting.  I'll just recognize that

7   that's something that came later in the process, not when it was

8   created.  And if the parties are up in a twitter about that,

9   they can give me an unhighlighted version, but I'm not going to

10  give any significance to the highlighting except to the extent

11  that becomes a pertinent piece of information I need to see

12  through other evidence.

13         (PLAINTIFF EXHIBIT 22:  Received in evidence.)

14         THE COURT:  All right.

15         MR. GUARD:  Next, Your Honor, we have Exhibit 25 which

16  is DHS's -- I think 25, which is DHS's fiscal year 2022 budget

17  and brief.  I don't think there's an objection that.

18         The next one is 26 which is the U.S. Immigration and

19  Customs Enforcement budget overview congressional justification

20  for fiscal year 2022.  Again, I don't believe there is an

21  objection.

22         Exhibit 27 is Department of Homeland Security's fiscal

23  year 2023 budget and brief.  And I don't believe that is an

24  objection to that.

25         And then twenty -- last one before we get to an

1    objection is 28 which is the U.S. Immigration and Customs

2    Enforcement budget overview, congressional justification for

3    fiscal year 2023.  And again I don't believe there is an

4    objection to that.

5              THE COURT:  Is that correct, Mr. Darrow?

6              MR. DARROW:  Yes.  No objections to that list, Your

7    Honor.

8              THE COURT:  I'll receive 25 through 28.  Again you're

9    going to have somebody come in and point me to things in the

10   budget you think are important.

11         *(PLAINTIFF EXHIBITS 25 - 28:  Received in evidence.)*

12             MR. GUARD:  Chief Ortiz's deposition testimony talks

13   about these documents and the important parts of these

14   documents.

15             THE COURT:  All right.  Next exhibit.

16             MR. GUARD:  The next exhibit is Exhibit 30, which is a

17   May 15th, 2022 email from a Border Patrol -- well, now former

18   employee, but at the time Border Patrol employee, Tony Barker.

19   Same -- 801(d)(2)(D), I think it's the same objection by

20   opposing counsel.

21             THE COURT:  Is there anything different about this

22   one?

23             MS. FUDIM:  Yes, Your Honor.  Elissa Fudim behalf of

24   the United States.  We're objecting to this one on the grounds

25   of hearsay.  And to anticipate your question of why this isn't a

1   statement by a party opponent, to address that, there is a

2   question posed to Mr. Barker and Mr. Barker is in this email

3   relaying, allegedly, supposedly, we don't know, the statement of

4   another person within the department.

5          If that statement were accurately quoted or

6   attributed, we knew that for a fact, then, yes, it would be a

7   statement by a party opponent.  But because we don't, it's a

8   second layer of hearsay, and it's therefore inadmissible, Your

9   Honor.

10          THE COURT:  All right.  Mr. Guard, may I have a copy

11   of it, please?

12          MR. GUARD:  May I approach?

13          THE COURT:  Yes, sir.

14          What is an SOC?

15          MR. GUARD:  I actually do not know, Your Honor, what

16   the SOC is.  What I do know is that Mr. Barker, who is a chief

17   at Border Patrol, is asking for a, quote, "to go into that

18   document," but from -- coming from the deputy commissioner of

19   the Border Patrol -- or Customs and Border Protection.

20          And then we have the relevant part and the reason why

21   we're introducing this document, is in that top email where the

22   quote that Mr. Barker is giving is:  "We must ensure that we are

23   detaining and removing the demographics that are amenable, or

24   else the flows will only compound more."

25          THE COURT:  So nobody knows what an SOC is?

1          MS. FUDIM:  I'm not sure, but I think it points to one

2     of the problems with the document.  If there's not a witness on

3     the stand to provide testimony to give context, that would, I

4     think, certainly go to one of the problems which potentially

5     then becomes relevance.

6          But the objection that I made was one to hearsay, and

7     I hear counsel to be responding with regard to the quote in the

8     first email more on a relevance basis.

9          MR. GUARD:  My objection --

10         MS. FUDIM:  The fact --

11         THE COURT:  Hold on.  Stop talking over each other.

12         Go ahead, Ms. Fudim.

13         MS. FUDIM:  The fact that this is a statement made by

14    one employee of the government attributing certain words to

15    another employee of the government without having him here to

16    testify makes the statement hearsay, notwithstanding any

17    exception that would normally apply to a statement by a party

18    opponent, Your Honor.

19         THE COURT:  And, Mr. Guard, I'm not -- I guess I'm not

20    even following on what's going on here, but your view of this

21    document is that Mr. Barker is providing this quote to somebody

22    to put in some thing?

23         MR. GUARD:  To put into a government document.  So

24    they evidently had whatever -- they had an exercise day --

25         THE COURT:  Well, hold on.  Stop.

1          So that's what you think the quoted portion is, is

2    Mr. Barker's words to be put into something?

3          MR. GUARD:  It's not Mr. Barker's words.  Mr. Barker

4    is giving a quote for the deputy commissioner of the U.S.

5    Customs and Border Protection to Mr. Barker.  Border Patrol is

6    one of the components.

7          THE COURT:  Well, isn't that what I just said?

8          MR. GUARD:  Well, it's not Mr. -- I think you said

9    Mr. Barker's words.  I was just being -- trying to be precise.

10   It was -- it's the deputy commissioner's words.

11         THE COURT:  Mr. Barker was giving words to be

12   attributed to the deputy commissioner in some document?

13         MR. GUARD:  In a government document, yes, Your Honor.

14         THE COURT:  And what do you think it is, Ms. Fudim?

15         MS. FUDIM:  Well, I think the problem is I'm not in a

16   position to guess, Your Honor, and I would suggest that neither

17   is opposing counsel.

18         Mr. Barker did not provide -- is not coming to court

19   to testify, and there is going to be no explanation.  So for us

20   to sit and guess --

21         THE COURT:  Well, that all goes to the weight.  That

22   all goes to the weight, it seems to me.  And you may be very --

23   very right that that doesn't -- shouldn't get a lot of weight

24   because we're speculating to a point as to what -- who is saying

25   what to whom and why it's being said.  But I don't see that it's

1  inadmissible on that basis.

2          MS. FUDIM:  Well, I would suggest, Your Honor,

3  respectfully, that where it says the deputy commissioner said

4  within the policy section suggests that there was some other

5  document with a policy section or some other speech with a

6  policy section where the deputy commissioner said something and

7  now Mr. Barker is reiterating it here.  And I would submit that

8  that is hearsay.

9          And it also is bringing us in a gray area where I

10 believe we're all now speculating what it means.  And without a

11 witness, I think that that underscores the second problem with

12 the document, which is one of relevance and a lack of

13 foundation, Your Honor.

14         THE COURT:  All right.  Mr. Guard, anything further?

15         MR. GUARD:  Again, Your Honor, 801(d)(2)(D).  We think

16 it's clear in it.  Obviously the creator of this email,

17 Mr. Barker, incorporated that statement into the email.

18 Mr. Barker is an employee of the Border Patrol working in the

19 course and scope of his employment, and we think that gets past

20 hearsay.

21         Additionally, Chief Ortiz is going to testify about

22 the statement in this email and that he actually agrees with it.

23 But that's for a deposition that you will see.

24         THE COURT:  All right.  I don't see a hearsay problem.

25 I think you're going to have a hard time convincing me as to who

1    says what to whom -- whose words those were.  My initial

2    assumption is that this was Barker trying to give proper

3    language to somebody above him.  But that may be too much of a

4    leap.  So I think your objections go more to weight than their

5    admissibility, and they'll be dealt with accordingly.

6              *(PLAINTIFF EXHIBIT 30:  Received in evidence.)*

7              THE COURT:  All right.  Next exhibit.

8              MR. GUARD:  Exhibit 46, which is the -- a --

9              THE COURT:  Did you not do -- did we do 31, or was

10   that not on your list?

11             MR. GUARD:  Excuse me.  I skipped over it, Your Honor.

12   I apologize.

13             31 is a May 19th, 2022, memo from Chief Ortiz

14   regarding noncitizen releases from U.S. Border Patrol custody.

15             THE COURT:  No objection to that I understand,

16   correct?

17             MS. FUDIM:  Correct, Your Honor.

18             THE COURT:  All right.  That will be received.

19             *(PLAINTIFF EXHIBIT 31:  Received in evidence.)*

20             THE COURT:  All right.  Now 46.

21             MR. GUARD:  46 is -- I don't believe there's an

22   objection to it.  It's the U.S. -- it's a one-page exhibit.  It

23   has the U.S. Border Patrol Processing Pathways.

24             THE COURT:  All right.  Without objection that will be

25   received.

1          (PLAINTIFF EXHIBIT 46:  Received in evidence.)

2          MR. GUARD:  The next exhibit is Exhibit 47.  It is a

3    document titled "U.S. Customs and Border Protection Overview of

4    the Southwest Border."  I believe there is an objection to this

5    one.

6          MS. FUDIM:  Yes, Your Honor.  With regard to

7    Number 47, hearsay.  There's reference at the bottom of the page

8    to what migrants continue to --

9          THE COURT:  Hold on just a second.  Let me get a copy

10   of the document.

11         MR. GUARD:  May I approach, Your Honor?

12         THE COURT:  Yes, sir.

13         All right.  Ms. Fudim, where is your concern?  What

14   was your concern?

15         MS. FUDIM:  Yes, Your Honor, at the bottom of the

16   document there's a hearsay statement with respect to what

17   migrants continue to say in the cite.

18         THE COURT:  I've got eight pages.  Bottom of what

19   page?

20         MS. FUDIM:  The first, Your Honor, excuse me.

21         And I believe with regard to prior rulings of the

22   Court, the Court previously kept out certain designations from

23   the depositions that were of similar nature referring to

24   statements made by migrant individuals on the same basis of

25   hearsay, Your Honor.

1              THE COURT:  Mr. Guard.

2              MR. GUARD:  Your Honor, this is not hearsay.  A, it's

3    an adoptive admission.  Customs and Border Protection is

4    preparing a report.  They have gathered this information and

5    they put this in the report as the reasons why immigrants are

6    flowing to the border.

7              THE COURT:  What you really want in is the migrant

8    perceptions of immigration policy shifts?  I mean, that's -- I

9    mean, the rest of it -- I assume.

10             MR. GUARD:  Yes, Your Honor.

11             THE COURT:  The rest of it really is common sense.

12             MR. GUARD:  Yes, Your Honor.

13             THE COURT:  I think Ms. Fudim is right that I tended

14   to not think that agency people could put themselves in the

15   minds of migrants and tell me their perception.  So why should

16   that ruling be any different here?

17             MR. GUARD:  Your Honor, you have policymakers making

18   decisions on courses and actions to take, and here they are --

19   in order to do that they have to rely on facts from

20   subordinates.  Subordinates have gathered facts, prepared a

21   report on what's going on at the border and why it is happening

22   and are presenting it to their higher-ups in this report, and

23   then they're making decisions on policies.

24             THE COURT:  But you want me to make a finding as to

25   the truth of that, that the migrants had perceptions that

1    immigration policy shifted, right, ultimately?

2         MR. GUARD:  Well, I think you're going to hear that

3    from Chief Ortiz himself in deposition testimony.  But putting

4    that aside -- if I can talk to my co-counsel before I say

5    something.

6         It goes to notice.  I guess I could also argue that --

7    or as a nonhearsay purpose.  And obviously to the extent that

8    they alter policy or believe it -- that's why I think it's an

9    adoptive admission, because they put this together into a

10    document.

11         THE COURT:  All right.  I don't think that one

12    statement makes this document inadmissible, but it does seem to

13    me that that component, at least to the extent you're offering

14    it for its truth, would be hearsay.  And I think there are

15    probably nonhearsay purposes, so that portion could come in.

16    And you can argue that to me at the present time, but I don't

17    think that makes that one comment potentially being hearsay --

18    likely being hearsay makes this document inadmissible, does it?

19         MS. FUDIM:  Well, I would suggest that it does

20    because, Your Honor, counsel has the ability to redact documents

21    and present them to the Court in redacted fashion.  And to the

22    extent that we -- that there could be a ruling that Section U,

23    Drivers of Migration, which addresses migrants' perceptions of

24    push-and-pull factors is redacted.  We have no objection to the

25    remainder of the document.

1              But without redaction, I would say that yes, a hearsay

2    statement in a document that counsel has chosen not to redact

3    does in fact invalidate the document as a hearsay document.

4              Because I would suggest that the purpose that counsel

5    is trying to admit this for is, in fact, for migrant perceptions

6    of push-and-pull factors with respect to migration, which is an

7    issue that is important in this lawsuit, Your Honor, and frankly

8    I would be surprised if we don't see that cited in posttrial

9    briefing.

10             THE COURT:  Is that really in dispute, though?  And I

11   tend to agree with -- I agree with your argument, but I don't

12   agree that that makes the document inadmissible.

13             But, I mean, the fundamental question, is that really

14   in dispute that migrants make decisions?  Isn't that one of the

15   root causes that we've heard so much about?  When they've got a

16   bad situation in their country, they have a perception that the

17   situation in our country is better, that's one of the -- both

18   better and more amenable to them being here, isn't that really

19   an undisputed fact as to what brings them here?

20             MS. FUDIM:  I can't say that it is, Your Honor.  I

21   think that there are many -- and as the witnesses will

22   testify --

23             THE COURT:  But you can't say that it's not, can you?

24             MS. FUDIM:  I can't say either way, but we're here to

25   elicit facts, Your Honor --

1          THE COURT:  Okay.

2          MS. FUDIM:  -- without assumptions and witnesses

3   made --

4          THE COURT:  All right.  All right.  I've -- I'm sure

5   one of the myriad of witnesses that I'm going to hear from today

6   with all these titles and positions in the federal government

7   can attest to that commonsense factor.  And maybe they can't and

8   we will deal with that at the appropriate time.

9          But your document is not inadmissible, but I do note

10  that there is hearsay in there that you're going to have to

11  bring in somebody on the witness list that can tell me that

12  commonsense piece of information.

13         MR. GUARD:  Yes, Your Honor.

14    (PLAINTIFF EXHIBIT 47:  Received in evidence.)

15         MR. GUARD:  The next one is Plaintiff's Exhibit 49.

16  May I approach?

17         THE COURT:  Sure.

18         MR. GUARD:  49 is remarks given by the Secretary of

19  Department of Homeland Security, the commissioner of Customs and

20  Border Protection, and chief of Border Patrol in Del Rio, Texas.

21         THE COURT:  All right.  Is there any objection to

22  that?

23         MS. FUDIM:  I'll withdraw our objection to Exhibit 49.

24         THE COURT:  All right.  That will be received.

25    (PLAINTIFF EXHIBIT 49:  Received in evidence.)

1        MR. GUARD:  Exhibit 97 is a Public Health

2  Determination Order regarding suspending the right to introduce

3  certain persons from countries where quarantinable communicable

4  disease exists from April 6, 2022.

5        THE COURT:  Don't I have that in the administrative

6  record already?  That's the repeal of the Title 42 order?

7        MR. GUARD:  Yes, Your Honor.  If it is, I'll withdraw

8  that.

9        THE COURT:  Isn't that in the administrative record or

10  supplemental administrative record?

11        MR. GUARD:  We will check, Your Honor, and we'll

12  revisit it if we need it.  We're using it for just a single date

13  that's in the document.  But we'll check on a break, Your Honor.

14        THE COURT:  I'm looking at pages 122 through --

15        MR. GUARD:  I've been informed that it is in the

16  administrative -- supplemental administrative record, and we'll

17  just withdraw that.

18        THE COURT:  All right.  122 to 151.

19        Okay.  That's withdrawn.

20        198, that's the new exhibit?

21        MR. GUARD:  Yes, Your Honor.

22        THE COURT:  All right.  Is there any objection to

23  that?  Why don't you go ahead and give it to me.

24        MR. GUARD:  Yes, Your Honor.  May I approach?

25        MS. FUDIM:  Yes, Your Honor, we have an objection to

1   hearsay.  Not to the letter, but to the emails that follow it.

2   There are hearsay within hearsay statements.

3           And again to address what I suspect will be your

4   question with respect to are these not statements by a party

5   opponent, we would suggest again that the extent that

6   individuals are attributing third-party statements to other

7   people that we don't know if those attributions are accurate or

8   not, that would not make them fall within the exception.

9           Specifically I refer to the bottom of page that is

10  Bates numbered 812.  There's a statement there saying:  "Spoke

11  to Chief Hastings and RGB and Chief Skero in Del Rio earlier,

12  and they mentioned they have engaged their NGO, sheriffs,

13  federal law enforcement partners; and today they are discussing

14  it with mayors and county judges," dot, dot, dot, dot, dot.

15          THE COURT:  I respect Mr. Guard probably doesn't care

16  about that statement at all.

17          MR. GUARD:  I do not, Your Honor.

18          THE COURT:  And so to the extent that's the concern,

19  I'm happy to redact that.

20          MS. FUDIM:  Give me one moment, Your Honor.

21          That is our sole objection to the document on hearsay

22  grounds, Your Honor.

23          THE COURT:  Pardon me?  I'm sorry, I didn't hear you.

24          MS. FUDIM:  I said that is our sole objection to the

25  document on hearsay grounds, Your Honor.

1          THE COURT:  All right.  So if that entire paragraph

2     under the question mark down on the bottom of 812 is redacted,

3     any objection -- other objection to the document?

4          MS. FUDIM:  Yes, Your Honor.  With regard to relevance

5     in terms of everything at the back of the document.  Certainly

6     we may withdraw that objection if there is a witness on the

7     stand that's going to speak to what's in this document and the

8     relevance and what it means and what implications should be

9     drawn from it, then we would withdraw.  But standing on its own,

10    we would assert a relevance objection, Your Honor.

11         MR. GUARD:  Eight days after Joe Biden was

12    inaugurated, Your Honor, officials of Border Patrol prepared

13    talking points or bullet points for the commissioner -- or the

14    acting commissioner of Customs and Border Protection about what

15    is going on at the border and what policy changes were going to

16    cause, including the mass release of single aliens and family

17    units.  The relevance appears on the face of the document

18    itself.

19         MS. FUDIM:  Respectfully, if I may respond, Your

20    Honor?

21         THE COURT:  Sure, why not.

22         MS. FUDIM:  Respectfully, Your Honor, counsel can't

23    lead the witness that provides the foundational testimony.

24    Nowhere on this document does it identify that these are talking

25    points.  If a witness wants to get on the stand --

1          THE COURT:  Are you really making that argument?  You

2     don't see that?

3          MS. FUDIM:  I don't see those words, Your Honor, but

4     perhaps -- if I'm missing them, then I apologize to the Court,

5     but I don't.  And if a witness --

6          THE COURT:  Let me tell you what I see in this

7     document.  We have Mr. Padilla, the chief of law enforcement

8     operations, send an email to Mr. Ortiz, who is the deputy chief

9     of Border Patrol, with a bunch of bullets.  The Border Patrol

10    chief, Mr. Ortiz, simply forwards that to COS, which I assume is

11    the chief of staff.  And then there's additional discussion up

12    the email chain about a meeting with the AC, which I assume is

13    the acting -- or AS, which I assume is the acting secretary that

14    day.

15         And if you've got an argument that that is anything

16    other than a document that is going to be presented to the

17    acting secretary, I'd like to hear it, but that sure seems like

18    what that is on its face.

19         MS. FUDIM:  Yes, Your Honor.  My position is simply

20    that I don't think that we can make those assumptions.

21    Mr. Ortiz is going to testify.  And I suspect if this document

22    is presented to him, he probably can lay the foundation for it.

23    But absent having Mr. Ortiz on the stand to connect those dots,

24    which may be --

25         THE COURT:  All right.  I'll tell you what I'll do.  I

1   will hold it.  We're going to hear from Mr. Ortiz in person?

2            MR. GUARD:  If he actually -- if they bring him and

3   actually have him testify, yes, Your Honor.  And I kind of find

4   it rich that they wrongfully pull the document and they are now

5   claiming the need for a witness.

6            THE COURT:  Okay.  If you want to waste our time by

7   having him identify that and explain to you that that's what I

8   just summarized from the face of the document, is not what it

9   is, if you can -- if you think that's what he will come in to

10  testify to, I'll hold on to it and we'll hear -- I'll reserve

11  ruling on it.  But I certainly hope if you talk to Mr. Ortiz and

12  he tells you exactly what I just told you the face of the

13  document suggests that it is, you're not going to waste our time

14  with that.

15           MS. FUDIM:  We will speak to Mr. Ortiz and get back to

16  the Court.  I just don't have that information, and so I

17  can't --

18           THE COURT:  All right.  Well, you're --

19           MS. FUDIM:  -- state that on the record, Your Honor.

20           THE COURT:  I don't know how long you've been with the

21  government, but you're a sophisticated lawyer, and you can read

22  a document just as easily as I can.  And I can't imagine that

23  it's anything other than that.  But maybe Mr. Ortiz will say

24  that.  And in the event that that's the case, then I will -- I

25  will stand corrected.  Otherwise, it certainly seems to be an

1     admissible document to me.

2           And frankly, as I talked about when we had the hearing

3     on this at the pretrial conference, there's as much information

4     that is helpful to the federal government in those bullet points

5     as the information that Florida wants to highlight.  So to me,

6     this is a very important document and a very relevant document,

7     but I will give you an opportunity to suggest that there is no

8     foundation that can be laid to get to the point that I think

9     we're at.

10          MS. FUDIM:  Respectfully, Your Honor, just so the

11    record's clear, we do intend to show the witness -- or likely

12    will show the witness this document.  He will speak to it, but

13    it's our position that foundation is still a requirement for the

14    admission of documents.

15          And we mean no disrespect to the Court by suggesting

16    as much, but given that this witness --

17          THE COURT:  And I wholeheartedly --

18          MS. FUDIM:  -- will testify.

19          THE COURT:  -- agree with you.  I mean, we have to

20    have a foundation for a document; but if there's a no good faith

21    basis to believe that there's not a proper foundation for it,

22    there shouldn't be a need to go through the process to establish

23    the foundation.  That should be something the parties can

24    stipulate to.

25          And what you're suggesting to me by the fact that

1    you're continuing to argue the objection is that you're -- you

2    have a good faith basis to believe that the foundation for that

3    document couldn't be established for what it appears to be on

4    its face.  And I'm going to give you that opportunity to explore

5    that.  And if you're right, then perhaps that document won't be

6    admitted.  But if you're wrong and it is what it appears to be,

7    I expect you to come back in and say we have no objection, and

8    we'll go from there.

9            All right.

10           MR. GUARD:  That's the end of the list of exhibits,

11   Your Honor.  The next thing is we were -- I'm going to give Your

12   Honor a copy of the exhibits that were just admitted, and we are

13   going to play the deposition excerpts from Chief Ortiz, which

14   lasts about an hour and 45 minutes, again.  So good time to take

15   a break probably.

16           THE COURT:  It will be a good time to take a break.

17   So we will take a break for ten minutes.  We'll come back and

18   you'll have that cued up and ready to roll.

19           MR. GUARD:  Thank you, Your Honor.

20        (Recess taken from 10:55 a.m. to 11:08 a.m.)

21           THE COURT:  All right.  Mr. Guard, whose deposition am

22   I about to watch?

23           MR. GUARD:  You're about to watch the Border Patrol

24   Chief Raul Ortiz, and I'll recall that deposition up.

25           But before we begin, Your Honor, we prepared a chart

1  which converts -- I'm going to ask permission to approach in a

2  second -- that converts deposition exhibits into trial exhibits.

3  So I've already provided it to opposing counsel.

4           If I could approach.

5           THE COURT:  Sure.

6           MR. GUARD:  I provided the Court two copies.  One copy

7  I thought your law clerk might find helpful later on as this

8  case progresses.

9           And with that I would ask --

10          THE COURT:  Hold on.  Before we -- let me make sure I

11  understand what I'm looking at.

12          MR. GUARD:  Yes, Your Honor.

13          THE COURT:  So the first column has deposition exhibit

14  numbers, so he's going to be referred to a deposition exhibit of

15  that number.  Second column then will show me what trial exhibit

16  number he's actually talking about?

17          MR. GUARD:  Yes, Your Honor.

18          THE COURT:  Okay.  All right.  Let me do this.  I'm

19  going to mark that chart as Court Exhibit Number 1.

20          Any objection to that being received?

21          MS. RYAN:  No objection, Your Honor.

22          THE COURT:  All right.  Court Exhibit 1 will be

23  received.

24      (COURT EXHIBIT 1:  Received in evidence.)

25          THE COURT:  All right.  Let me take a minute and get

1    this pile of stuff organized in a way that -- I assume he talks

2    about these sequentially?

3              MR. GUARD:  Yes, Your Honor.

4              THE COURT:  By deposition number?

5              MR. GUARD:  Yes, Your Honor.

6              THE COURT:  All right.  And so some of them that

7    aren't on that list he's not going to talk about?

8              MR. GUARD:  He's not going to talk about, Your Honor.

9              And in the future we'll put them in deposition order

10   when we hand them up.  I apologize.

11             THE COURT:  Oh, no, that's fine.  I think we had to do

12   it to the way we did it to get through the exhibits.  But this

13   certainly is --

14             I think I'm missing Number 44, or I've misplaced it.

15             MR. GUARD:  Your Honor, 44 has not been admitted yet.

16             THE COURT:  All right.  Well, it's on your list here.

17             MR. GUARD:  My understanding is there actually is no

18   objection to 44, so we'll just --

19             THE COURT:  Is that correct?

20             MR. GUARD:  -- admit it.

21             MS. RYAN:  No objection, Your Honor.

22             THE COURT:  All right.  That will be received.

23          (PLAINTIFF EXHIBIT 44:  Received in evidence.)

24             MR. GUARD:  May I approach?

25             THE COURT:  Yes, sir.  All right.  We've got all those

1   exhibits in order, and we are ready to hear Mr. Ortiz's

2   deposition testimony played.

3          MR. GUARD:  Mr. Gerdts, if you'd please play it.

4          **VIDEO DEPOSITION OF PLAINTIFF WITNESS RAUL ORTIZ**

5      *(Video recording played in open court.)*

6          THE COURT:  Hold on a sec.

7          MR. PERCIVAL:  It gets louder, Your Honor.

8          THE COURT:  Pause it for a second.

9          Are y'all expecting the court reporter to transcribe

10  this because this is something that's not going to be coming in

11  as a separate exhibit?

12         MR. GUARD:  We can file the transcript if that would

13  be easier for the court reporter.  I know there's different

14  preferences depending on the judge on this be kind of testimony.

15  We can file a copy of -- a highlighted copy.  I think we already

16  have, actually, of the excerpts.

17     *(Off-the-record discussion between the Court and court

18  reporter.)*

19         THE COURT:  All right.  We'll do that.  Those were

20  attached to something.  What were they attached to?

21         MR. GUARD:  I believe the pretrial stipulation, Your

22  Honor.

23         MR. PERCIVAL:  They're filed, Your Honor, but you did

24  make objections, and if you want us to refile them to take out

25  the parts that you sustained the objection to.

1          THE COURT:  All right.  We'll cross that bridge when

2     we come to it.  I'm obviously going to take notes as I hear his

3     testimony as if he's a live witness.  But to save the court

4     reporter creating a second record, we'll figure out a way either

5     to have what's already in the record as the copy or file a

6     separate copy.  It's only electronic paper at this point, so it

7     probably doesn't matter that much one way or the other.

8          Okay.  Go ahead.  You can play it.

9          *(Video recording played in open court.)*

10          MS. RYAN:  Your Honor.

11          *(Pausing the video.)*

12          MS. RYAN:  I apologize for the interruption, but I

13     just want to clarify because these last couple of designations

14     or counter-designations have been included and played in the

15     context, but we are missing counter-designations for previous

16     designations.  We assumed they'd all be coming at the end, which

17     is why I did not raise this objection previously; but if they're

18     going to be coming in context for some and not all, then we

19     might be missing counter-designations in the video.

20          MR. PERCIVAL:  Your Honor, I want to compare notes,

21     but -- maybe we should take a break, but I'm pretty sure we

22     checked all these and they included their counter-designations.

23          THE COURT:  Why don't you spend a minute or to

24     chatting amongst yourselves and make that determination.

25          *(Pause in proceedings.)*

1            MS. CHRISTMAS:  Your Honor, I think Ms. Gerdts is

2    going to back it up two minutes.  I think there was a little bit

3    of a discrepancy over whether a portion was played, so we'll

4    just play through.  And counsel is going to note any

5    designations that we believe might be missed, and we'll circle

6    back.  And if there are any, we'll read them in to the Court at

7    the end.

8            THE COURT:  Okey-doke.

9            Does that satisfy you, Ms. Ryan?

10           MS. RYAN:  Yes.  Thank you.

11           MR. PERCIVAL:  Go back a little bit, Ms. Gerdts, and

12   I'll just have to use the transcript --

13           MS. GERDTS:  Go back two minutes.

14           MR. PERCIVAL:  What I'll do is I actually have all the

15   pages highlighted.

16           MS. GERDTS:  Okay.

17           MR. PERCIVAL:  So go back two minutes.  I'll figure

18   out where we are.

19           MS. GERDTS:  Okay.  Got it.

20           Are you ready?

21           MR. PERCIVAL:  Yeah, go ahead.

22       *(Video recording played in open court.)*

23           MR. PERCIVAL:  I apologize, Your Honor.

24           THE COURT:  I'd prefer not to go backwards.

25           MR. PERCIVAL:  Well, then let's just keep going.

1          MS. RYAN:  We'll make a note, Your Honor.  We'll

2    circle back with counsel at the end.

3          THE COURT:  Thank you.

4      *(Video recording played in open court.)*

5          THE COURT:  Pause it for a second.

6          How much longer do we have?

7          MR. GUARD:  Probably about 36 minutes, Your Honor.

8          THE COURT:  All right.  I think it's good time to take

9    a break and go to lunch.  It's 12:30-ish at this point.

10          So we'll break for an hour, and hopefully during that

11    time y'all will be able to get something to eat and also address

12    whatever the federal government's concern was about the portions

13    that weren't played, and we'll hear the rest of that testimony

14    on the video this afternoon.

15          What's your next witness after this video?

16          MR. GUARD:  After this video, Your Honor, I believe

17    we're doing another batch of documents, and then Mr. Barker, his

18    deposition, which is actually reading a deposition.

19          THE COURT:  Okay.  All right.  Well, we will come back

20    and do all that this afternoon.  We'll be in recess for an hour.

21      *(Luncheon recess taken from 12:32 to 1:33 p.m.)*

22              **A F T E R N O O N   S E S S I O N**

23          THE COURT:  Y'all can be seated.

24          All right.  Before we begin again with the chief's

25    deposition video, the next deposition you have is just on paper?

1          MR. GUARD:  Yes, Your Honor.

2          THE COURT:  And do you have other paper depositions or

3    video depositions?  What's next after that?

4          MR. GUARD:  Another paper deposition, I believe, and

5    then it's a video.  Video first of Mr. Guadian, and then a paper

6    deposition of Mr. Davies and a video deposition of Mr. Price.

7          THE COURT:  The video deposition is helpful in

8    allowing me to see demeanor and that sort of thing.  The paper

9    deposition obviously won't be because it's just going to be read

10   by somebody.  That said, it has been helpful going through the

11   deposition to be able to follow along with the exhibits as they

12   would have been introduced if this was a live witness.  So we

13   may try the reading of the deposition; and if the benefit I get

14   from it of having the corresponding testimony and exhibits to

15   follow along with don't outweigh the lack of excitement that

16   creates, we may dispense with the reading of depositions.  I'm

17   happy to watch depositions, but just so you know.

18         MR. GUARD:  The paper -- the paper depositions have

19   less exhibits.  I will tell the Court to preview that for the

20   Court.

21         THE COURT:  Like I said, we'll try it with the first

22   one.  If that doesn't seem like it's providing any benefit, I

23   may dispense with that.

24         From the Federal Government's perspective, all your

25   witnesses are live except for the State's -- couple of State

1    witness depositions you plan to read?

2              MS. RYAN:  And as well as the deposition of Mr. Barker

3    who's unavailable, and we were going to read that for Your Honor

4    during our case in chief.

5              THE COURT:  And the depositions that you plan to read,

6    do they have a lot of exhibits that will be helpful to kind of

7    follow along with, or do they fall in the category of more

8    testimony?

9              MS. RYAN:  More testimony, Your Honor.  We'll take a

10   look at the standing exhibits to double-check, but I believe

11   they're more testimony based.

12             THE COURT:  All right.  Does anyone have any

13   particular position one way or the other on that approach?

14             MR. GUARD:  No, Your Honor.  It's -- from the State of

15   Florida, it's up to your preferences.

16             MR. DARROW:  No position, Your Honor.  Whatever you

17   prefer.

18             THE COURT:  Okay.  You know, my initial thought was,

19   obviously I would prefer that they were sitting there and I can

20   see them and hear them and follow along as things were going

21   along.  That obviously is not feasible for a variety of

22   different reasons.  But the upside of doing it that way,

23   continuing to read these depositions, it at least creates a

24   small prospect of at the conclusion of the case, I will have all

25   the evidence, have heard all the evidence, and would be in a

1    position to shift from post-filings to closing argument and give

2    you an answer.  The likelihood of that is pretty slim under any

3    circumstances, so the orange may not be worth the squeeze, so to

4    speak.  But we'll cross that bridge probably as we get through

5    the State's first reading deposition.

6            All right.  Let's go back to Chief unless there is

7    something else we need to talk about.

8            MR. GUARD:  One more thing.  Counsel for the United

9    States raised that there were some missing designations.  We're

10   able to replay the portion of video that they thought was

11   missing, and it was actually played for the Court.  So I think

12   that situation has been completely resolved, and I just wanted

13   to let the Court know that.

14           MS. RYAN:  It has, Your Honor.

15           THE COURT:  Okay.  Very well.

16       *(Video recording played in open court.)*

17           MR. GUARD:  That is the end of Chief Ortiz's

18   deposition testimony, Your Honor.

19           THE COURT:  That included everything the Federal

20   Government wanted to -- or would have crossed on?

21           MS. RYAN:  Your Honor, that last question and answer

22   was missing the question and the first half of the answer that

23   we had counter-designated, pages 249, lines 3, through 250, 14.

24           THE COURT:  All right.  What did that say?

25           MR. PERCIVAL:  Could you show me your

 1   counter-designations?  Because I remember thinking this is odd,

 2   but I remember thinking this is what you countered.

 3           MS. RYAN:  Okay, sure.

 4           MR. PERCIVAL:  And that's why we did it that way.

 5           MS. RYAN:  Little tech issues over here.

 6           MR. GUARD:  Your Honor, I'm okay if you just want to

 7   read it into the record.

 8           MR. PERCIVAL:  Oh, yeah, that's fine.  If you guys

 9   just want to read it in, that's fine.

10           THE COURT:  That's fine.  Just somebody do that.

11           MS. RYAN:  Okay.  It's just the question and the first

12   half of that same answer.

13           MR. GUARD:  That's fine.

14           MS. RYAN:  Would you like us to or -- up to you.

15           MR. PERCIVAL:  Yeah, I can do it.  I don't really

16   care.

17           And finally --

18           Is the court reporter ready?  Sorry.

19           "And finally -- well, I may have two

20   questions.  You mentioned that you had been chasing

21   traffic since you had got on the job and had seen

22   previous surges, right?  Have you ever seen traffic

23   like this before?

24           "Answer:  Yes, in -- let me explain.  In

25   1991 when I started, we had about 4,000 Border

 1   Patrol agents and the amount of apprehensions didn't

 2   even come close to the amount of people that got

 3   away from us.  There -- I mean, we couldn't even

 4   count how many people got away from us.  So I can

 5   tell you that, you know, those first couple of years

 6   in my career weren't even close, and that was -- and

 7   I was only one sector.  I didn't have the national

 8   perspective, but I'm sure that played out in

 9   multiple sectors.

10           "Two, the population that we're

11   experiencing now is a little bit different than

12   we've experienced in other surges."

13           Do you want me to keep going, Your Honor, so you can

14   see the context?  That was the omitted part, but it probably

15   hard to play.

16           MS. RYAN:  And that part that he just started reading

17   was played for Your Honor, so this comes before that last --

18           MR. PERCIVAL:  So what I'm about to read is where it

19   picks up.

20           THE COURT:  Okay.

21           MR. PERCIVAL:  Do you want me to keep going?  I can

22   just finish the question and answer.

23           "When I was assigned to South Texas in

24   '96, Arizona in 2000, Southern California in '98,

25   during those surges, that population wasn't turning

1    themselves in to our Border Patrol agents.  They

2    were all trying to evade apprehension.  What we're

3    experiencing now, specifically in Yuma, Del Rio, and

4    to some degree Rio Grand Valley, is, you know,

5    75 percent of that population is turning themselves

6    in.  And then roughly 25 or maybe a little bit more

7    than that are actually trying to evade apprehension.

8    This isn't a matter of us not having the ability to

9    encounter those groups.  This is when you break down

10   the 1.8 million apprehensions that we've already

11   made so far this year.

12          "I would imagine quite a few of those

13   large groups are this no-threat humanitarian

14   population that, you know, should be processed at a

15   port of entry.  Are the individuals that are turning

16   themselves in, are they turning themselves in

17   because they believe they're going to be paroled?

18          "Mr. Darrow:  Objection.

19          "The Witness:  I would imagine that

20   they're turning themselves in because they think

21   they're going to be released, yes."

22          MS. RYAN:  That's fine, Your Honor.

23          THE COURT:  All right.  Thank you.

24          MS. RYAN:  We just want to remind, Your Honor.  Chief

25   Ortiz will be testifying in person in our case in chief.  And we

 1   will be asking questions, but he will also probably address some

 2   of these topics.  So I don't know if Your Honor wants to think

 3   of that as the cross, but he will be here later in the week.

 4            THE COURT:  Wonderful.  Look forward to having him.

 5            All right.  What's Florida's next course of action?

 6            MS. CHRISTMAS:  Yes, Your Honor.  Natalie Christmas

 7   for the State.  We have some exhibits that we'd like to move in.

 8            THE COURT:  Is that this pile over here?

 9            MS. CHRISTMAS:  No.  I think that is the pile that we

10   moved in before that was not used for the deposition purposes.

11            MR. PERCIVAL:  Just one clarifying point, Your Honor.

12   Some of those exhibits are going to be used in future

13   depositions, so I wouldn't move them too far away.

14            MS. CHRISTMAS:  It's a lot of paper moving around.

15            THE COURT:  Okay.

16            MS. CHRISTMAS:  So the State would like to move in

17   Exhibits 14, 16, 20, 21, 43, 45, 53, 54, 55, 56, 57, 58, and 59.

18            And we can -- whatever, Your Honor thinks is easiest.

19   We can just walk through those one by one.  I think quite a few

20   of them have objections.  But I have --

21            THE COURT:  Bring me the whole piles.

22            MS. CHRISTMAS:  Yeah, I'll bring you -- may I

23   approach?

24            THE COURT:  All right.  Is there any low-hanging fruit

25   of no objections to any of this?

1        MR. DARROW:  Yes, Your Honor, we have quite a few
2   objections to a number of exhibits.
3        THE COURT:  Are there any that --
4        MS. CHRISTMAS:  Would you rather go exhibit by
5   exhibit, or do you want to just --
6        THE COURT:  Let's do it by exhibit.  I was just trying
7   to pick off the ones that we could pick off.  But...
8        All right.  Exhibit 14, is there an objection to that?
9        MR. DARROW:  Yes, Your Honor.  Relevance and balancing
10   under Rule 402 and 403.  This document is the January 2021
11   statement on the suspension of MPP.  MPP is not challenged in
12   this case, and it's a wholly different thing.  The State of
13   Florida is claiming that the government is releasing people that
14   should be detained, and MPP was a third, totally different
15   processing outfit for people who were in removal proceedings.
16        THE COURT:  That's the Stay-in-Mexico program, right?
17        MR. DARROW:  Yes.  Yes, Your Honor.  And even to the
18   extent the Court thinks that MPP is relevant, this document is
19   no longer in operation.  The -- it was -- it's been superseded
20   twice, and the currently operative document for MPP is an
21   October 29th, 2021 memo that is currently in litigation in the
22   Northern District of Texas.
23        THE COURT:  All right.  In Florida's view the
24   relevance of it is it's the self-induced harm?
25        MS. CHRISTMAS:  Yes, Your Honor.  It's evidence that

1    the very early days of the Biden Administration that they were

2    eliminating processing pathways.  That's why we've presented the

3    January announcement, as opposed to the currently operative

4    document, is kind of a timeline piece for Your Honor.

5          THE COURT:  Are there others that fall into that

6    category?  Mr. Darrow, your objections are what they're

7    providing doesn't have anything to do with the policies they're

8    challenging?  Maybe I can give you an overriding ruling, and --

9          MR. DARROW:  Yes.  So just looking at this batch,

10   there's at least among the first number, the next two -- well,

11   no.  Exhibit 16, yeah, also falls in that category.  The Pekoske

12   Memo, that's the shorthand for the memo that was put out

13   regarding using prosecutorial discretion for arrest and charging

14   decisions.  It does not provide for any sort of guidance

15   regarding when people should be released from detention; and for

16   that reason, we also think that it falls under Rule 402, 403.

17         THE COURT:  All right.  Is that the same class of --

18         MS. CHRISTMAS:  Yes, Your Honor.  It's just an

19   early-day decision about the changes that the Biden

20   Administration was making to overall immigration enforcement,

21   while not always specific to the detention issues that we

22   address later on.  But it is relevant background to the changes

23   that were happening at the beginning and how the capacity for

24   DHS was shifting.

25         THE COURT:  I guess, Mr. Darrow, I'm struggling to

1   understand how this is not relevant.  If part of their theory of

2   this case is that the decisions were made early in the

3   Administration to emphasize things other than detention, why

4   isn't this type of information relevant to that?  That

5   emphasizing things other than the detention, meaning this broad

6   nondetention policy, why wouldn't this be relevant?

7            MR. DARROW:  Well, Your Honor, this is -- that's kind

8   of apples and oranges because what we're talking about in this

9   case is whether people who, you know, are subject to detention

10  should be released.  And this document is about whether we want

11  to seek removal of certain people.  It's not about, you know,

12  their detention decision so much as is this somebody who, you

13  know, we think we want to prioritize for removal because they're

14  a national security threat.

15           Also, it's not limited to people coming to the border.

16  Actually, that's not even its primary aim.  Its primary aim is

17  guidance for ICE on the interior enforcement when they are

18  looking at, you know, criminal aliens primarily to exert their

19  prosecutorial discretion to prioritize over noncitizens who

20  don't pose that degree of threat.

21           THE COURT:  You're talking specifically about

22  Exhibit 16?

23           MR. DARROW:  Yes, Your Honor.

24           THE COURT:  Okay.  I guess my question was still back

25  on Exhibit 14.

1      Generally speaking, it seems to me -- maybe this will

2  be the ruling.  It seems to me that evidence of processing

3  pathways that were eliminated seems to me to be relevant to both

4  the State's position that there is a nondetention policy as well

5  as rebutting the Government's -- the Federal Government's

6  defense that the only reason we're seeing so many releases is

7  because there's so many people coming, not anything we've done

8  to contribute to that.  And so in that regard, I certainly see

9  the relevance, and we'll receive over your objection Exhibit 14.

10         *(PLAINTIFF EXHIBIT 14:  Received in evidence.)*

11         THE COURT:  Ms. Christmas, if I understand what

12  Mr. Darrow is saying about Exhibit 16, this is talking about

13  removing folks that are already here.  The true prosecutorial

14  discretion decision, and that's the issue that's in -- at the

15  Supreme Court now, I think, isn't it?

16         MS. CHRISTMAS:  Yes, Your Honor.  The internal

17  enforcement of, you know, finding people who are here and

18  removing them is the issue before the Supreme Court right now.

19         This document does list as one of the priorities

20  people who have illegally crossed the border after the beginning

21  of the Administration -- I'm sorry, I'm trying to find that

22  exact phrase for you.

23         At the bottom of page 3.  And so it does list that

24  people who have crossed the border surreptitiously are a

25  priority for the Administration, and we've -- we have other

1    evidence that we'll enter in later that shows that that may not

2    have been exactly how it was applied as it went forward.

3          But beyond that, Your Honor, I do think that it is

4    relevant to understanding the very beginning of -- the early

5    days of the Administration there was a shift in how the

6    Administration viewed immigration as a whole.

7          THE COURT:  Well, I can only solve -- I can't solve

8    any of this problem, but I can only adjudicate part of the

9    problem.  Other people are adjudicating their decisions not to

10   remove people as zealously as some people might think they

11   should.  And so it seems to me that if that's what this

12   memorandum is talking about, that has a better place in some

13   other case.  We're just dealing here with whether they ought to

14   be detaining people as the statute tells them to rather than

15   whether they should -- how they should exercise their true

16   prosecutorial discretion in deciding who to remove.

17         And so I will agree with Mr. Darrow's objection to

18   Government's Exhibit 16, subject to later on you showing me how

19   that has anything to do with admissions more so than it does

20   removals.

21         MS. CHRISTMAS:  Yes, Your Honor.

22         THE COURT:  All right.  What's your next one?

23         MS. CHRISTMAS:  Exhibit 20 which is the March 19th

24   memo regarding prosecutorial discretion.  I believe that any

25   objections to this were overruled at the pretrial conference.

1          MR. DARROW:  Yes, Your Honor.  The objection we had

2     was based on our general motion in limine to exclude evidence

3     pertaining to Notices to Report which, Your Honor, you've

4     already provided the ruling on.

5          THE COURT:  And I emphasized that today.  So that will

6     be admitted over your motion in limine and as clarified today.

7          *(PLAINTIFF EXHIBIT 20:  Received in evidence.)*

8          THE COURT:  All right, 21.

9          MS. CHRISTMAS:  The next exhibit is Exhibit 21.

10         THE COURT:  Is that just the memo that -- or the

11    email?

12         MS. CHRISTMAS:  Yes, the email, correct.

13         THE COURT:  That corresponded to the memorandum that

14    we talked about at the pretrial conference, one substituting for

15    the other?

16         MS. CHRISTMAS:  Yes, Your Honor.

17         THE COURT:  So same ruling there, Mr. Darrow.

18         MR. DARROW:  That had an addition of a hearsay

19    element.

20         THE COURT:  Oh, okay.

21         MR. DARROW:  Sorry, we withdrew that.

22         MS. CHRISTMAS:  I believe they withdrew it.

23         THE COURT:  All right.  So that will be received as

24    well.

25         *(PLAINTIFF EXHIBIT 21:  Received in evidence.)*

1          THE COURT:  43.

2          MS. CHRISTMAS:  The next one is a GAO report,

3   Government Accountability Office, regarding the southwest

4   border.  It addresses Parole Plus ATD and NTR policies and just

5   kind of an overview of how those policies were developed and

6   implemented.

7          MS. FUDIM:  Your Honor, we object to that document on

8   the basis of hearsay as well as hearsay within hearsay.

9          As to the first level, the Government Accountability

10  Office is an independent agency that works for Congress.  So

11  it's not a party in any sense of the word in this case.  So the

12  entire document, to the extent it's putting forth facts, is

13  hearsay.

14          In addition, there are a number of instances, and I

15  won't give the Court examples of all of them but perhaps one or

16  two, of additional layers of hearsay.  For example, on page --

17  it's Bates numbered page 36, but it says on it page number 31,

18  for example.  For example, it says, "Officials at one field

19  office said that on certain days 300 to 500 individuals may

20  report in person to the field office, most of whom do not have

21  appointments.  In such cases ERO officials stated," dot, dot,

22  dot, dot, dot.

23          On the following page which is Bates numbered page 37

24  but says on it, page 32, there's a sentence that says:  "Second,

25  officials at ERO headquarters and at each of the five field

1  offices we spoke with said they were concerned about ERO's lack

2  of personnel," dot, dot, dot, dot, dot.

3        There are many examples.  I won't bombard the Court

4  with them, but there are numerous examples within this document

5  of hearsay within hearsay.  But at the outset, the entire

6  document is also hearsay, Your Honor.

7        THE COURT:  What purpose are you offering this for?

8        MS. CHRISTMAS:  Oh, we're offering this to give

9  information to the Court regarding the Notice to Report -- the

10  development of the Notice to Report policy and the continuing

11  change into the Parole Plus ATD policy.

12        THE COURT:  So this is some governmental auditing

13  agency that --

14        MS. CHRISTMAS:  Yes, Your Honor.  The GAO is an agency

15  that reports to Congress and does investigations on their

16  behalf.  So I believe if you look at the second page, that it

17  says that they were asked to review Border Patrol and ICE's

18  implementation of the NTR and Parole Plus ATD processes, and it

19  then goes on to describe it.  And then there is a letter at the

20  beginning of the document to Senator -- a few senators who had

21  requested the investigation.

22        THE COURT:  I'm a little bit skeptical as to whether

23  this is something that has any evidentiary value.  I mean, my

24  task here is for you to present the information that was

25  apparently presented to the GAO and me make findings based upon

1   what I think is going on out there and how things developed.

2   And I know the Federal Government doesn't think that's relevant

3   to anything, but I seem to think it is.  But I don't think I

4   particularly care what the GAO did, so I'm not going to receive

5   that.

6            MS. CHRISTMAS:  Okay.

7            THE COURT:  45.

8            MS. CHRISTMAS:  45.

9            THE COURT:  This was the campaign website?

10           MS. CHRISTMAS:  Yes, this is the campaign website

11   document.

12           THE COURT:  Any objection to that?

13           MR. DARROW:  Yes, Your Honor.  We had objections based

14   on relevance and hearsay.  What the candidate said as a

15   candidate -- I mean, you know, what's the famous line from

16   former New York Governor Mario Cuomo, that you campaign in

17   poetry and govern in prose.  I mean, this has no relevance on

18   the actual actions taken by DHS.

19           THE COURT:  Well, it seems to me it certainly won't

20   determine the validity of the subsequent actions that were

21   taken, but I do see some level of relevance.  Just like in the

22   Muslim ban case, the Supreme Court acknowledged the various

23   statements that Candidate Trump, and even President Trump, said

24   about the purpose of the travel ban but ultimately didn't give

25   it any weight in determining whether the travel ban was legal or

```
 1   not.  But certainly at least if it was good enough for the
 2   Supreme Court to be aware of it's good enough for me to be aware
 3   of.  So I'll receive that document.
 4        (PLAINTIFF EXHIBIT 45:  Received in evidence.)
 5             MS. CHRISTMAS:  Yes, Your Honor.
 6             THE COURT:  You've got a series of executive orders.
 7             MS. CHRISTMAS:  Yes, I believe we discussed these at
 8   the pretrial conference, and you overruled the objections to
 9   Exhibits 54 through 58, which were only included because they're
10   referenced in the Executive Order, Exhibit 35.
11             THE COURT:  Is that right, Mr. Darrow?  Have I already
12   ruled on this?
13             MR. DARROW:  Yes, but we didn't discuss this at the
14   pretrial conference.  Our objection was on the basis that
15   statements by a previous administration can offer no insight on
16   what this administration is doing.  I think Your Honor had
17   mentioned that -- you know, some context beforehand is fine, but
18   some of these go all the way back to 2017 which seems like it's
19   going further back in history than we need for context of what
20   happened in January of 2021.
21             THE COURT:  And so the -- Exhibit 53 is a February
22   2021 Executive Order, so that would fall under, yes, Joseph R.
23   Biden.
24             MR. DARROW:  Your Honor, apologies.  That one we're
25   not objecting to.
```

1          THE COURT:  So 53 will be admitted.

2          *(PLAINTIFF EXHIBIT 53:  Received in evidence.)*

3          MS. CHRISTMAS:  Yes, Your Honor.

4          THE COURT:  And you're suggesting, Ms. Christmas, that

5    the relevance of 54 through --

6          MS. CHRISTMAS:  Through 58.  All of those --

7          THE COURT:  -- 58, are those are all executive orders

8    or presidential actions that are referenced in and repealed by?

9          MS. CHRISTMAS:  Exhibit 53, yes, Your Honor.

10         THE COURT:  Okay.  And you're offering them for what

11   purpose?

12         MS. CHRISTMAS:  Purely to understand what the -- you

13   know, because they're only referenced by name in Exhibit 53.  It

14   doesn't say we're repealing this policy that does X and Y, so

15   that the Court can see what that actually means.

16         THE COURT:  And for that limited purpose, what's the

17   objection?

18         MR. DARROW:  For that limited purpose, Your Honor, no

19   objection.

20         THE COURT:  Okay.  Then for that limited purpose --

21   you're not offering them to prove anything other than that, are

22   you?

23         MS. CHRISTMAS:  I don't believe so, Your Honor.

24         THE COURT:  All right.  Then they will be received for

25   that limited purpose.

1    (PLAINTIFF EXHIBIT 54 - 58:  Received in evidence.)

2         THE COURT:  So that leaves us with 59.  Is that --

3         MS. CHRISTMAS:  Yes.  59 is a June 2021 memo regarding

4    Notices to Report.  You might remember it from some previous

5    motions practice.

6         THE COURT:  Can't say that I do, but does this fall

7    into that category of things you don't think are pertinent here

8    but I do because it may go to the question of whether there's a

9    nondetention policy as a whole?

10        MR. DARROW:  That's one piece, Your Honor.  The other

11   piece is that we object to this under deliberative process

12   privilege.  This was not provided by us.  This was an email that

13   was independently obtained, and it's actually a draft that was

14   never sent.  And it is subject -- I don't know what happened,

15   but, you know, in the litigation in which it was produced, there

16   was a clawback request to claw it back because it's privileged

17   and should never have been disclosed.

18        THE COURT:  I do remember it now.  What's your

19   response?

20        MS. CHRISTMAS:  Yes, Your Honor.  This document was

21   produced to us by the Department of Homeland Security in FOIA

22   production.  And when we brought it to the attention of both the

23   counsel in our corresponding FOIA case and this case, the other

24   counsel in the other case did send us a clawback letter, but we

25   contested the ability to claw back FOIA documents.  That's not

1    in the FOIA statute, and so we pushed back on that.  And by that

2    time we had already filed it with the Court here.  And since

3    then, the Department of Homeland Security has not made any

4    attempts to recall the document or push any issues any further,

5    so we believe that the deliberative process privilege is waived.

6            THE COURT:  All right.  Mr. Darrow, what say you to

7    that?  I mean, this was -- wasn't produced in discovery by

8    mistake.  It was produced in response to a FOIA request.  Is

9    that fair?

10           MR. DARROW:  Right, that is fair.  Although it was an

11   erroneous production because it would have fallen within one of

12   the exemptions under FOIA which it should not have been produced

13   under, and that was what spurred the clawback letter once we

14   realized it had been produced and should not have been.  And in

15   this case, it would have been deliberative process privilege

16   which is why it wasn't produced here.

17           THE COURT:  What would make it deliberative process?

18           MR. DARROW:  Your Honor, because it's a draft.  It's

19   undated and unsigned.  It was -- it's not a final memo.  And the

20   fact that it was, you know, merely a draft floating around is

21   what makes it deliberative process.

22           THE COURT:  All right.  Well, I don't feel compelled

23   to weigh into a FOIA person's mistake.  The fact that it's a

24   draft to me really goes to the weight of the thing, rather than

25   the admissibility of it.  If there was a FOIA person here, there

```
 1   was some FOIA litigation going on, maybe I'd have to decide that
 2   question.  But the fact remains it was produced as a public
 3   record.  The draft nature of it obviously impacts the weight of
 4   it, but I'm not going to not receive it because it's -- simply
 5   was produced in error.  It was produced.
 6          All right.  So that will be received.
 7      (PLAINTIFF EXHIBIT 59:  Received in evidence.)
 8          THE COURT:  All right.  Anything else?
 9      (No response.)
10          THE COURT:  Yes, ma'am?
11          MS. PATEL:  Good afternoon, Your Honor.  The next part
12   of our presentation will be Tony Barker's deposition.
13          THE COURT:  Okay.
14          MS. PATEL:  And much like we had with Mr. Ortiz, we
15   have an exhibit chart that shows the corresponding deposition
16   exhibits with Florida's trial exhibits.  If I may approach.
17          THE COURT:  You may.
18          MS. PATEL:  I would like to note that two of the
19   exhibits that are listed in Mr. Barker's deposition Florida is
20   not offering as trial exhibits.
21          THE COURT:  Hold on.  I'm trying to find the two
22   exhibits.  Was that -- were those exhibits that were not
23   referenced in -- yes, they were not referenced in the last
24   deposition.
25          All right.  I've got them.
```

BARKER - DIRECT

1        MS. PATEL:  Okay.

2                **TONY BARKER, PLAINTIFF WITNESS,**

3             **TESTIMONY READ INTO THE RECORD**

4        MS. PATEL:  "The Stenographer:  Hold on.  I'm going to

5   break because I didn't swear in the witness.  Here we go.

6        "Mr. Barker, would you raise your right hand for me

7   please.  Do you solemnly swear or affirm that the testimony that

8   you are about to give in this cause will be the truth, the whole

9   truth, and nothing but the truth?"

10       THE WITNESS:  I do.

11             **DIRECT EXAMINATION**

12  BY MS. PATEL:

13  Q.   Okay.  And you understand that you are being deposed today

14  in both your corporate capacity and in your individual capacity?

15  A.   Yes.

16  Q.   Okay.  And so in order to -- just so you're clear, the

17  first part of this deposition will be me asking you questions in

18  your corporate capacity.  We will then switch to me asking you

19  questions in your individual capacity.

20       Does that make sense?

21  A.   Yes.

22  Q.   And then what was your next position within DHS?

23  A.   Sure.  So after that, my next move was here to Washington,

24  DC, as the deputy chief of operations at headquarters, U.S.

25  Border Patrol.  And that was in 2016 -- or, excuse me, that was

BARKER - DIRECT

1    in 2020 rather.

2    Q.   And what were your job duties and responsibilities?

3    A.   So at that period of time, you know, in essence, I -- I

4    oversee, I'll say the operations, you know, or the liaison and

5    representation of the various sectors in the U.S. Border Patrol

6    through corridors.

7              And then, of course, you know, that thereby I can

8    brief headquarter's leadership in regard to what the fields'

9    needs are as well as the national intelligence component for the

10   U.S. Border Patrol.

11   Q.   Okay.  And in that position, were you implementing or were

12   you developing any policies?

13   A.   So in that -- in that role I was absolutely involved in the

14   development of policy advising, if you will, you know.  And, of

15   course, when a policy was decided, you know, then -- then, you

16   know, dissemination to the field with regards to implementation.

17             As far as the execution that happens in the field, I

18   was no longer involved in the execution phase but really just a

19   compilation in regards to development and then implementation.

20   Q.   Okay.  What type of policies did you help develop?

21   A.   I mean, you know, you know, as an example as we're, you

22   know, moving through and helping, you know, and the policies are

23   in constant, constant periods of reevaluation, right.

24   Q.   And then did you move to your current position at DHS?

25   A.   Right.  So it would have been, I don't know, probably right

1    around, say, February, March's time frame.  Somewhere right

2    around in there.  2021, moved into the acting chief role.  It

3    would have been somewhere right around there.  I can't remember

4    the exact time frame.  Obviously I would have to look it up.

5    Q.   And acting chief, is that of a specific unit?

6    A.   No.  The same thing over operations at headquarters Border

7    Patrol, and ultimately it's just, just overseeing that same

8    functionality just at a different -- you know, instead of deputy

9    level, at the principal level as the chief.

10   Q.   Okay.  And were you promoted again?

11   A.   Nope.  That's currently what I'm doing right now.

12   Q.   All right.

13   A.   We've reached the end of the road.

14   Q.   All right.  I have as your title the chief of law

15   enforcement operations director.  That's what we're referring

16   to?

17   A.   Yes.

18   Q.   Okay.  If the Border Patrol agent determines that they may

19   be violating law, meaning that they're here illegally, what

20   happens at that point?

21          MR. DARROW:  Objection to form.

22          You can answer.

23          THE WITNESS:  So if we determine that the individual

24   has entered a legally then, then most -- well, I'll say most

25   often well, we will -- we will take that person and arrest them.

1    But again, you know, I think that it's -- I think it's critical

2    to say up front, every circumstance is independent upon that

3    circumstance of that encounter, right.  So it's every encounter

4    is very unique.  We have to evaluate each of those circumstances

5    per that individual.

6    BY MS. PATEL:

7    Q.    Okay.  What do you mean by that?

8    A.    So, you know, it just -- it depends, right, the

9    circumstances surrounding the encounter.  You know, as an

10   example, if I have somebody who just purely, you know, crossed

11   the border illegally, you know, who might have identification on

12   them, you know, you know, identifying them as born in a foreign

13   country -- we'll just use Guatemala as an example, you know --

14   and does not have any legal documentation to be legally present

15   in the United States, we'll apprehend them.

16         If we have another individual who's entered illegally

17   but they have created some degree of crime in the process,

18   granted we may apprehend them, but we may be turning them over

19   to a partner organization or agency for their prosecutorial

20   process, right?  It just depend upon the circumstances.

21         Or we can have somebody who has entered between the

22   ports of entry as a United States citizen and not necessarily

23   entering the United States illegally in the fashion where we

24   would apprehend them, but we will turn them over to Office of

25   Field Operations.

BARKER - DIRECT

1            So those are just three examples of situations I

2      confronted myself in my own duties and roles and

3      responsibilities.  And again, kind of going back to we have

4      to -- each individual circumstance is evaluated, you know, by

5      the officer or the agent.  To broadbrush:  It is extremely

6      difficult.

7      Q.   Okay.  If someone has entered illegally without committing

8      any type of crime --

9      A.   Well, if they entered illegally they would have committed a

10     crime.

11     Q.   Well, so --

12     A.   Term of "illegal" means it's committing a crime.

13     Q.   Right.  If they entered illegally and then they committed a

14     crime.

15     A.   So we have two crimes?  I'm just trying to determine.

16     Q.   I'm sorry.  Maybe I'm not being clear.

17     A.   No.

18     Q.   So they entered illegally; and in doing so, they've

19     committed a crime?

20     A.   Yes.

21     Q.   At that point is that person arrested and taken to a

22     separate location for processing?

23     A.   So, yes, depending upon the circumstance.  It depends on

24     what their nationality is.  So, you know, we have -- we have the

25     Public Health Authority at Title 42 which we would detain

1    somebody, process them, right, which is really just recording

2    the encounter, you know, and -- and then ultimately expel them.

3    You know, so it's not necessarily an arrest; it's an encounter.

4    So it's through the expulsion, right?

5            And in other circumstances where we cannot apply Title

6    42 to somebody, then, yes.  Then they are placed under arrest

7    and taken to a location, you know, most often in order to

8    process.  In certain circumstances, you know, we -- we even have

9    the ability to process directly in the field.

10           So taking somebody to a place is really subjective due

11   to the circumstances that -- that are present with that, that

12   exact individual.

13   Q.   Okay.  And when the person is taken into custody or arrest,

14   is there a warrant that's obtained first?

15   A.   No.  No, I mean, we -- I mean, don't get me wrong.  I mean,

16   we execute warrant for sure, you know, but -- but, you know, I

17   mean, we don't have warrants when we're encountering somebody

18   between the ports of entry.  You know, we -- obviously we don't

19   do that, so.

20   Q.   Okay.  Is a warrant obtained at some later point or date?

21   A.   It just depends.  I mean, we -- we have -- you know, we

22   have the ability to process somebody for a Warrant of Arrest

23   slash Notice to Appear where we've kept them in detention.  But,

24   you know, it's dependent upon the circumstances that are in

25   front of us.  Sometimes there's no warrant that is -- that is

1    generated for an individual, who -- who we are -- have arrested

2    in processing.

3    Q.   So under what circumstances would a warrant be generated?

4    A.   As an example, if somebody has a, you know, a criminal

5    history and we are, you know, going to be processing for

6    somebody, for, you know, a detention -- or prosecution is a

7    perfect example.  You know, we'll do a Warrant of Arrest slash

8    Notice to Appear or we'll have a warrant completed.

9    Q.   So when you say criminal history, are you referring to any

10   type of criminal history?

11   A.   It just depends.  So it depends on severity of the crime,

12   what the crime is.  You know, are they a CIMT, crime of moral --

13   of immoral turpitude.  You know, it just depends on what the

14   criminal history is.

15           But ultimately, no.  You know, somebody -- as an

16   example, somebody may have a criminal history for burglary who

17   we're absolutely going to, you know, try to prosecute and detain

18   and remove from the country.  Somebody has a criminal history of

19   speeding on their record, we may not be doing that.  It just

20   depends.  It's dependent upon the circumstances in front of us,

21   and it's dependent upon other circumstances as well.

22           You know, for instance, the ability for DOJ to

23   prosecute, for us to be able to detain.  There are several

24   circumstances that surround what the ability is.

25   Q.   Okay.  Does it matter whether the person committed a crime

BARKER - DIRECT

1  in another country as opposed to the United States?

2  A.    It's dependent upon -- well, A, no.  So it's dependent upon

3  the -- the -- our ability to be able to prove the criminal

4  history, right, or to be able to gain the information.  Not

5  every country submits their information into a database which

6  we're able to see, right, international.  It's dependent upon

7  our ability to be able to see the information when a crime is

8  committed in an international -- on an international basis.

9  Q.    Okay.  So let's go back to Exhibit 7.  And I just want to

10  walk through each of these pathway dispositions with you.

11          The first one is Notice to Appear slash Own

12  Recognizance, NTA/OR.  So when would that be applied to a single

13  adult?

14  A.    Again, it just depends on the circumstances in front of

15  them.  You know, an individual who, you know, is claiming fear,

16  an individual who, you know, may have -- we'll say, you know,

17  issues to where they cannot be detained.  Fraihat being just as

18  an example, just one example.  You know, if we have no available

19  space in order to be able to remove single adults to -- you

20  know, in ICE custody, i.e., you know, that locale has no

21  available space open to them, we would end up placing a single

22  adult into an NTA/OR.  You know, those are all -- there's just a

23  variety of circumstances where -- where it can be applied.

24  Q.    Let me backtrack a little bit.  Do Border Patrol agents

25  have discretion in deciding which one of these pathways to use?

1    A.    Yes.

2    Q.    Okay.

3    A.    We have the discretion in order to be able to determine

4    which pathway, but -- but, you know, again, there's -- this kind

5    of goes back to your previous question.  Supervision is well

6    engaged in the processing areas and monitoring, you know, who

7    agents are processing, which pathways are assigned to

8    individuals, and so on.

9    Q.    Are there specific criteria that an officer would apply in

10   determining which pathway to use?

11   A.    It's based upon the circumstances of the individual in

12   front of them.

13   Q.    And what do you mean by that?

14   A.    So -- so, you know, as in -- I think it's Exhibit 6 you had

15   what appeared to be kind of almost like a decision tree, for

16   lack of better terms.  I think it was that number, so don't

17   quote me on it.  But, well, I guess you're going to quote me on

18   it.  But, you know, the -- that's -- that's like a decision

19   tree.  But ultimately the determination is based upon the

20   circumstances in front of the agent at the time of the

21   individual there.

22   Q.    So there are no set criteria that's applied?

23   A.    Well, I mean, of course.  Yes, there's set criteria.  I

24   mean, if a person has, you know, previously been deported so

25   that's going to be, for instance, a reinstatement of a previous

BARKER - DIRECT

1    removal, if they have an order of removal that has not been

2    effectuated, that's going to be a bag and baggage.  I mean, so

3    you kind of see that again.

4         I go back to it's kind of like a decision tree.  It's

5    not a true decision tree.  So there are circumstances that are

6    involved in what you're applying that Title 8 pathway to those

7    individuals.

8    Q.   Okay.  Are there any other criteria?  You just named two.

9    A.   Yeah, I mean, there's going to be several, right?  So

10   national security, border security threat.  What's their

11   criminal history?  What's their immigration history?  Are they

12   applicable to, you know, to MPP?  Are they applicable to

13   detention?  Are they claiming fear?  Are they not claiming fear?

14   You know, are they a single adult?  Are they a family unit?

15   What's the detention availability for that person?

16        I mean, it's -- you know, does ICE have bed space, do

17   they not have bed space to detain.  I mean, these are all a

18   variety of different circumstances that are all taken into these

19   decisions.

20   Q.   Okay.  Does -- you mentioned whether or not they are or are

21   not family unit is one of the criteria.

22   A.   Absolutely.

23   Q.   And how is that criteria applied?

24   A.   So for family units, you know, if we're able to expel them,

25   if we're able to return them rapidly through ER, as an example

BARKER - DIRECT

1    then we will -- if those countries are able to or are accepting,

2    you know, individuals back, right?  They're allowing us to

3    return or remove individuals, then we will, right?  And we'll

4    apply that specific pathway.

5             You know, if they're from a country who is not

6    accepting, you know, returns, removal, or expulsions from us and

7    we have -- we have no bed space for detention, then we will

8    utilize a release mechanism for families we have no availability

9    to detain.

10   Q.   Okay.  You -- first you mentioned ER.  Were you referring

11   to expedited removal?

12   A.   Expedited removal.

13   Q.   And you also said when there is no bed space for detention.

14   Were you referring to bed space at a Border Patrol facility?

15   A.   So -- so we don't detain.  We will hold in a Border Patrol

16   facility, right, but ICE has detention and ICE does not

17   currently have any bed space for detention of family units.

18   Q.   And why is that?

19   A.   You'd have to ask ICE, ma'am.

20   Q.   Okay.  So does that mean that they will not accept any

21   family units?

22   A.   Meaning ICE?

23   Q.   Correct.

24   A.   Yeah, ICE has no current bed space for family units, to

25   detain family units.

1    Q.    And so how does that then impact CPB, CBP?

2    A.    So as we -- as we decide which pathway we are going to

3    apply to a family, we have to keep in mind that this family will

4    not be able to be detained outside of Border Patrol's detention

5    center, or holding center I'll say.

6    Q.    So does that mean that they have to be released into the

7    interior?

8    A.    Depending on the pathway.

9    Q.    In what circumstance would you not use expedited removal

10   for a particular family?

11   A.    As an example, if they claim fear, we will place them into

12   an NTA/OR process because we have no family detentions.  Like if

13   you place them into ERCF, we have no availability to detain

14   them, you know.  And so it's ultimately, if they claim fear,

15   we'll place them into NTA/OR and their claim of fear will be

16   heard on a nondetained docket.

17   Q.    Okay.  So in the interim, if the family cannot be detained

18   in ICE custody, where would they be located?

19   A.    Well, they're placed on an NTA/OR, so it's wherever they

20   would be destined to live at.  I mean, we have -- we, as in CBP,

21   so speaking strictly with the CBP path, you know, we -- after

22   they are released from our custody, they are relieved the

23   responsibility of -- of -- I'll say the monitoring of that

24   person falls to ICE.

25   Q.    Okay.  But if I understand correctly, families who are not

BARKER - DIRECT

1  amenable to expedited removal as determined by CBP then get put

2  into a Notice to Appear/Own Recognizance track at which point

3  they can be paroled or bonded out.  Is that accurate?

4         MR. DARROW:  Objection, misstates the testimony.

5         You can answer.

6         THE WITNESS:  Yeah, that's -- that's not accurate.

7  It's my fault if I didn't explain it clearly enough.

8         So -- so there are a couple different pathways.  If we

9  have a family who we cannot -- is not amenable to expedited

10 removal, we cannot return to their home country, right, we

11 can't -- or is not amenable, we will place them into an NTA/OR

12 or a Parole ATD type of pathway for removal -- from release,

13 rather, from our custody.  I'll be very specific with my words.

14 From release from our custody.

15 BY MS. PATEL:

16 Q.   When you say release from your custody, does that mean that

17 they are, in fact, released from any custody, correct?

18 A.   So, you know, as a -- so they're not in custody, you know,

19 by the term of law.  No, they're not in custody anymore.

20 Q.   Okay.  So they get released and then they can go to

21 whatever final destination they choose within the United States.

22 Is that accurate?

23 A.   Correct.

24 Q.   Was there a family detention available before

25 January 20th of 2001?

1    A.   ICE had two or three, two or three different family

2    detention locations, but I cannot recall when they transitioned

3    those locations to single adult detention.  I just can't

4    remember the date.

5    Q.   Do you remember who was president at the time?

6             MR. DARROW:  Objection.  Family detention does not

7    relate to any of the topics for which Chief Barker is

8    designated.

9             You can answer.

10            THE WITNESS:  I -- I couldn't even tell you when.

11   Again, I don't remember the date in which they switched, so I

12   really refer you to ICE, to be honest, with regards to the date.

13   BY MS. PATEL:

14   Q.   All right.  You don't remember who was president?

15            MR. DARROW:  Same objection.  Also objection, asked

16   and answered.

17            You can answer.

18            THE WITNESS:  Yeah.  No, I have been through multiple

19   administrations in my role and responsibility.  I cannot

20   remember.  You'd have to ask ICE when they switched over and

21   then find the applicable administration that was in office.

22   BY MS. PATEL:

23   Q.   And then does the determination as to whether a family is,

24   in fact, a family unit, does that impact the decision as to

25   which processing pathway to choose?

BARKER - DIRECT

1    A.    Yes.

2    Q.    How so?

3    A.    Because if they're not a family unit, then they're an

4    unaccompanied child and a single adult.

5    Q.    If they are a family unit, how does that impact the

6    decision-making in terms of processing disposition?

7    A.    So if they're a family unit, knowing that there's no family

8    unit detention, you know, we will not utilize a pathway that

9    will -- that would intentionally place a family into -- into a

10   detention, right, situation.  You know, there's no point in

11   doing all the paperwork, you know, when there's no detention

12   available.

13   Q.    Okay.  So going back to Exhibit 7, which of these pathways

14   would be amenable to family units?

15   A.    Well, they would technically all be amenable to family

16   units, depending if we had detention or not.

17   Q.    Okay.  Well, you do not have detention, correct?

18   A.    Right.

19   Q.    And you --

20   A.    You mean right now?  You mean currently?

21   Q.    Currently, correct.

22   A.    Okay.  I gotcha, I gotcha.  So amenable to family units

23   right now, family unit right now would be NTA/OR, Parole ATD,

24   ER.  We could even do -- we could even reprocess somebody who

25   has a previous removal through an ER again.  Warrant of

BARKER - DIRECT

```
1   Arrest/Notice to Appear, meaning detention ultimately would not
2   be applicable.  We can voluntary return a family.  We are not
3   currently implementing or applying MPP to families.
4          When I say ER, it's going to be dependent because the
5   circumstances surrounding the ER is going to determine if -- if
6   they're obviously amenable to ER or not, right?  You know, if --
7   yeah, I guess that's the easiest way to explain it.
8   Q.   All right.  So under what circumstances would CBP apply the
9   NTA/OR to individuals?
10  A.   Single adults?
11  Q.   Correct.
12  A.   It kind of goes back to the question I answered on this
13  earlier, which is really, you know, depending upon the
14  circumstances of that single adult, you know.  Does ICE have
15  detention availability or not?  You know, does -- is that person
16  applicable to, you know, the Fraihat detention restriction where
17  it's not applicable to them.  You know, these are circumstances
18  where we would, you know, apply an NTA/OR to a single adult.
19  Q.   Okay.  Did you say a Fraihat detention?
20  A.   Yeah.  So Fraihat litigation is certain circumstances which
21  prohibit us detaining, and it's not us.  I'm using "us" as the
22  larger DHS entity.  I really kind of defer you to counsel and to
23  ICE in regards to that because that's their standards of
24  detention.  But when ICE tells us that they cannot detain a
25  certain individual, a single adult, they cannot detain a single
```

BARKER - DIRECT

1   adult, then that detention pathway is removed obviously.

2   Q.   Okay.  Do those same factors, are they considered as to a

3   family unit?

4   A.   Well, there is no detention of family units currently

5   available.  So yeah, but it's implied, right, because there's no

6   detention.

7   Q.   Understood.  Under what circumstances would CBP apply

8   Parole Plus ATD to a family unit?

9        MR. DARROW:  Objection.  Parole ATD is beyond the

10  scope.  Also, we have another witness to discuss Parole ATD.

11       You can answer.

12       THE WITNESS:  So Parole ATD would be applied to a

13  Cuban, Nicaraguan, or a Venezuelan family unit as these three

14  demographic -- or these three country demographics or

15  citizenships, nationalities currently do not allow us to

16  repatriate those individuals.  So no returns, no removals, and

17  we have no current detention capability to be able to detain

18  families.  So therefore we may utilize the Parole ATD in certain

19  circumstances in the sectors who are impacted by flow with high

20  TIC times as well as high custody numbers.

21  Q.   Okay.  In what circumstances would a Warrant of

22  Arrest/Notice to Appear, in parentheses, detained, be applied to

23  an individual?

24  A.   There is a myriad of circumstances.  So this could be

25  from -- anything from, you know, from prosecuting on a simple

 1    1325, you know.  You know, 1324s if they're -- you know, if

 2    there's some time of criminality.  You know, again I'll

 3    broadbrush it in regards to if there's a national security or

 4    border security or criminal threat there where we're not --

 5    where we're seeking a prosecution or we're not -- you know,

 6    we're going to place somebody into a detention setting with ICE

 7    for removal as well, you know, due to whatever circumstance.

 8    Criminal ICE may be one where we're not necessarily going to

 9    prosecute for the 1325 but we're going to continue to detain and

10    remove.  Another example of that.

11          So these would all be circumstances where we would

12    issue a WA/NTA.  And that's just an example.  There's a myriad

13    of different reasons.

14    Q.   All right.  Is the November memo the only Parole Plus ATD

15    policy?

16    A.   Well, it's not a policy, but that's the only Parole ATD

17    guidance that we have out at this time, is the November.  That's

18    the -- what I consider the superseding memo.

19    Q.   Okay.  You're saying it's not a policy because it's

20    guidance?

21    A.   Yes, it's operational guidance.

22    Q.   Okay.  So is it also authorized by some other SOP?

23    A.   No, just the memo.

24    Q.   Sure.  Did you have any role in developing this policy?

25    A.   So the operational guidance, yes.  I mean, it -- it -- I

1    was at that period of time, you know, engaged as we were looking

2    to define triggers, if you will.  That's further down the

3    document as to when, you know, Parole ATD would be utilized

4    formally, you know, ceasing the utilization of Notice to Appear

5    and migrating over to a Parole Plus ATD in the, you know -- so

6    that -- that's my -- that was my involvement, if you will, in

7    helping, I'll say, or being involved in crafting of this

8    operational guidance memo.

9    Q.   And prior to this operational guidance memo, were families

10   being paroled or released into the interior?

11   A.   Were families being -- are you talking about the Parole

12   Plus ATD aspect of families, you know, when we started utilizing

13   it in the July time frame?  Is that what you're asking for?  And

14   I'm just trying to understand your question.

15   Q.   What do you mean in the July time frame?

16   A.   So -- so, you know, basically when we started attaching

17   NTRs and -- excuse me, attaching Parole ATDs to those

18   individuals we were placing on parole would have been roughly

19   around in July.  This memo coming out, you know, I'll say

20   formalizing Parole ATD, if you will, under Chief Ortiz's

21   signature in November.  I guess that should probably be the more

22   direct answer for you.

23   Q.   Okay.  So this guidance or what is described in this

24   guidance starting -- started in July of when, 2021?

25   A.   Yes, yes.  So it would have been roughly that time frame

1    when we started, you know, collectively between CBP and ICE

2    utilizing the ATD portion of the parole, if you will.

3    Q.   Okay.  And then it wasn't formalized until November of

4    2021?

5              MR. DARROW:  Same objection.

6              You can answer from your personal capacity.

7              THE WITNESS:  That's when the memo was --

8    was completed.

9    BY MS. PATEL:

10   Q.   Okay.  Prior to this memo were there any trainings or

11   instructions provided to staff as to how to implement what is

12   the process that is described in this memo?

13             MR. DARROW:  Same objection.

14             You can answer from your personal capacity.

15             THE WITNESS:  You know, there -- there is the -- the

16   March 2021 NTR guidance that was put out, I believe, at that

17   period of time under Chief Rodney Scott's signature.  You know,

18   that -- that was -- that was the guidance at that period.

19   BY MS. PATEL:

20   Q.   So the NTR policy is reduced to writing.  NTR practice is

21   reduced to writing?

22   A.   I guess I'm not understanding what the question is.  It

23   doesn't -- is there a question, ma'am?  I apologize.

24   Q.   Yeah.  You were talking about the NTR guidance.  Is that a

25   written document?

BARKER - DIRECT

1   A.   It's the one that's referring to the document you're --

2   you're seeing here, right?  Quote, "The prosecutorial discretion

3   and issuance of NTRs as issued in March of 2021," end quote.

4   Q.   Okay.  Were there any specific training that Border Patrol

5   officers received on the process described in this

6   November 2nd memo prior to this memo being formalized?

7            MR. DARROW:  Same objection.

8            You can answer from your personal capacity.

9            THE WITNESS:  So, there -- there -- you know, there's

10  a written guidance of NTR's, right, that came out in March 2021,

11  you know, and that is the processing, you know, I-385, G-56.

12  There was -- there's no written guidance.  Again, I'm going back

13  to attaching, you know, the monitoring mechanism of the ATD is

14  really ICE, so I defer you to ICE.

15           But, you know, during that time period, you know,

16  previous to November, like July 1 -- July I was just talking

17  about is when I started really, I'll say attaching the ATD

18  monitoring mechanisms to those who were -- who were getting

19  processed for -- for release, hence the creation of the Parole

20  ATD application.

21  Q.   Okay.  Was there any other mechanism that families were

22  being processed and released into the interior?

23  A.   So, you know, in certain circumstances, you know, the --

24  the Border Patrol has utilized parole for humanitarian reasons

25  as well.  An example of that would be, for instance, if

1    somebody, you know, has an extremely serious injury is a prime

2    example.  You know, they fall from a fence or, you know, you

3    know, had a tragic accident and, you know, a smuggling load or

4    something along those lines.  And I, just to give an example,

5    you know, we may -- we may place and effectuate humanitarian

6    parole of that individual.

7           You know, parole is applied on an -- on an individual

8    case-by-case basis and therefore, you know, is contingent upon

9    the circumstances surrounding that individual's, you know,

10   situation.

11   Q.   Okay.  Are there any other instances in which you would

12   provide humanitarian parole other than for medical reasons?

13   A.   Oh, of course, of course.  I mean, it -- it just depends on

14   the circumstances that are surrounding it.  You know, we've had

15   individuals who have, you know, shown up to, you know, at the

16   border with, you know, bullet wounds.  We've had -- I mean,

17   just, you know, there are just different circumstances, right?

18   I mean, the vast majority of them all medical related.

19   Q.   Okay.  I'm just trying to figure out whether there's like

20   an unfettered discretion and when to provide humanitarian parole

21   or whether there's any confines of criteria with respect to

22   that.

23   A.   So, you know, again I go back to the case-by-case basis,

24   right?  So there's -- it's not what I would consider as

25   unfettered by any means.  I mean, when we -- you take a look at

BARKER - DIRECT

1   each individual circumstance that's presented to us.  You know,

2   we attempt to detain or remove those individuals.  You know, it

3   may be other circumstances with that individual detention or

4   capacity which drive us to utilize different pathways.

5   Q.   So whether you use humanitarian parole could also be driven

6   by detention capacity?

7   A.   True.  Could be.

8   Q.   How often does that happen?

9   A.   So the -- you know, the circumstances which we face, and

10  it's actually noted in the memo that you just sent us with

11  COVID-19, would be -- would be a case in point of a, you know, a

12  humanitarian utilization of Parole ATD, right?  In order to be

13  able to rapidly decompress -- decompress our detention

14  facilities or, you know, our custody and holding numbers because

15  of the pandemic.

16          You know, I'll be honest with you.  We've lost 19

17  Border Patrol agents to COVID.  COVID deaths, you know, directly

18  associated with COVID that they have contracted on duty while

19  working in, you know, facilities which are -- which are well

20  over capacity.  And in that congregate setting, you know,

21  creating a significant life and safety risk to the agents,

22  officers, migrants, and professional staff that are all being

23  detained there.

24          So -- so I'll be honest.  Sitting here as the chief of

25  operations, having spent, you know, 21-plus years in a green

1   uniform working on the border, 19 deaths that are associated

2   with, you know, a public health pandemic due to overcrowding

3   within our facilities is something that we take direly

4   seriously, not only for the agents but for the migrants and the

5   professional staff working in that environment as well.

6   Q.   Okay.  I believe you previously testified that Border

7   Patrol agents have discretion as to whether to apply Parole Plus

8   ATD.  Is that accurate?

9   A.   Within the confines of the guidance that has been sent out,

10  which you obviously have it; you sent it to us.

11  Q.   Well, has parole been used more often?

12  A.   Again, it goes back to the processing time frames that we

13  spoke about early.  Again, it goes back to the detention

14  conditions, the high TIC times, the high capacity numbers, the

15  fact that we were no return mechanisms to certain demographics

16  like Cubans, Venezuelans, Nicaraguans.  It's those circumstances

17  which we talked about earlier.

18         I mean, the COVID pandemic, you know, the literal

19  death and dying of agents and officers as they try to do their

20  job, you know, in protecting the border, you know, and -- as

21  well as protecting the migrants and the professional staff that

22  are working every day as well.  So there are certain real --

23  there's certain applications of parole, like we've spoken, about

24  during those circumstances.  Again based upon the circumstance

25  of the individual in front of us as well.

BARKER - DIRECT

1   Q.   I just want to -- a point of clarification.  For Parole

2   Plus ATD, when it comes to family units, is that applied to

3   families regardless of their nationality?

4   A.   So it -- Parole Plus ATD may be applied and -- and at this

5   point in time, you know, the nationalities in which we are

6   applying Parole ATD are Cubans, Venezuelans, and Nicaraguans

7   because we have no return rights to those countries either.  We

8   can't send them back.

9        If we have a return mechanism in order to be able to

10  send somebody back to another country, I'll just use Colombia as

11  an example, you know, we will process them accordingly and

12  return them to the best of our ability.

13       Guatemala is another prime example of a country, you

14  know, that we have return rights to, right?  So if we're able to

15  return somebody to their home country, then we will -- we will

16  place them into a removal-type proceeding.

17  Q.   Okay.  So as of right now it's only being applied to those

18  nationalities that you just mentioned.  Is that fair?

19  A.   So, yes, by and large to those -- those nationalities in

20  which -- in which we were -- you know, we are not able to return

21  to.  You know, there are countries -- Colombia is another

22  example to where through -- I'll say, political dynamics -- we

23  have recently gained the ability to start return or returning

24  to, but we had not previously.  So through negotiations gained

25  the ability to return to Colombia and hence now, you know,

1    processing more Colombians to, you know, with a removal -- with

2    a removal pathway.

3    Q.   Were there other nationalities that you -- since Parole

4    Plus ATD has been implemented, are there other nationalities to

5    which it has been applied?

6    A.   Not that I'm aware of off the top of my head.  I'm not -- I

7    would have to ask.  I just don't know.  I don't know off the top

8    of my head.

9    Q.   Why does this document only reference detaining single

10   adults and omit any reference to family units?

11   A.   Because there's currently no family unit detention.

12   Q.   So it's because there's no ability to detain family units.

13   Am I understanding that correctly?

14   A.   So A, first off, I mean, that would be my -- I'm not the

15   author of the document, so that's just me assuming based on the

16   circumstances.  You know, you have to ask the Secretary as to

17   the family piece.  But the -- you know, obviously, yes,

18   detaining single adults only can.

19   Q.   Okay.  And so it looks like according to this chart, about

20   105,504 people were released on NTA or OR due to lack of space.

21   Is that accurate?

22   A.    I think -- so out of the report, as I'm looking at the -- I

23   think it's, what, 5,889, something around there.

24   Q.   Are you looking at -- oh, I'm sorry.  Are you on page -- I

25   think I told you page 13.  I meant page 12.

1              Can you look at page 12 for me?

2    A.    Okay.  All right.  I'm on page 12 now.

3    Q.    I'm looking at the top chart.

4    A.    Okay.  I gotcha.

5    Q.    Okay.  Can you actually explain to me what's in this chart?

6    A.    Let me just read real quick.

7              All right.  So these are going to be all individuals

8    who -- who we have -- just one second.  Just one second.  Let me

9    zoom out here.

10             Okay.  So these are going to be individuals who -- who

11   were processed for an NTA/OR and that -- that could have been

12   detained, and they were placed on an NTA/OR due to the fact that

13   ICE did not have space available for detention.  So then, of

14   course, the parole aspect is exactly the same thing, right?  So

15   they were processed for parole due to the fact that ICE did not

16   have space for detention.

17   Q.    Okay.  Is that as to both of the totals as listed in the

18   right-hand column, the 105,000 and the 101,000?  Because I see

19   that lack of space is --

20   A.    Yes.

21   Q.    -- also noted for that top row.

22   A.    Yeah.  I mean, I'm not the originator of the document.  Do

23   I know the numbers?  I mean, I think it's probably the way that

24   I'm reading it, is encompassing both of those aspects for lack

25   of space, but -- but I'd have -- you'd have to ask who pulled

1    it.

2    Q.   So I'm looking at the footnote below.  It essentially

3    infers or states that the lack-of-space category was kind of

4    added in by whoever was inputting the information.

5    A.   Yes.

6    Q.   Okay.  But that's not something that the agent necessarily

7    has to put in the descriptor.  Is that accurate?

8    A.   It is not a -- what I would consider as a prefill or a

9    checkbox or a dropdown.  You know what I mean?  So there's -- so

10   it has to be manually entered.

11   Q.   Okay.  Under the NTA/OR that we were previously discussing,

12   do you obtain a warrant for arrest?

13   A.   No.  I do not believe a warrant for arrest is in an NTA

14   packet.

15   Q.   Okay.  And in the Warrant for Arrest/NTA detained, in that

16   case a warrant for arrest is obtained, correct?

17   A.   Yes.

18   Q.   Under what circumstances would you get a warrant for

19   arrest?

20   A.   Most often when they're -- when they're getting detained

21   and prosecuted.

22   Q.   Are there any other --

23   A.   And if they're moving into a period of detention, right,

24   for administrative proceedings.

25   Q.   Is that the only instances in which you would get a warrant

1  of arrest?

2  A.   No.  I mean, there's numerous, right?  I mean, there's

3  numerous.  If -- if, you know, I mean, you know, we -- we get

4  warrants on a daily basis to be able to arrest criminals, you

5  know, within our -- within our operational space on a -- on a

6  daily basis.  You know, whether, you know, for -- for a myriad

7  of reasons, you know, criminal violations.

8  Q.   What about administrative warrants specifically?

9  A.   Yeah.  I mean, again, going back to the -- to the

10 detention.

11 Q.   Okay.  I just want to make sure I'm clear.

12         So for -- under what circumstance would you get an

13 administrative warrant of arrest?

14 A.   For the detention when somebody is remaining in custody

15 pending their removal proceedings.

16 Q.   Is that the only circumstance in which you would get an

17 administrative warrant of arrest?

18 A.   I'm sure there's others, but that's the one that -- that

19 comes to mind.

20         MS. PATEL:  Okay.  That concludes the Barker

21 deposition.

22         THE COURT:  Does that encompass the cross-designations

23 the defendants wanted?

24         MS. RYAN:  Yes, Your Honor.

25         THE COURT:  All right.

1          All right.  Ms. Patel and Ms. Christmas, you did a

2   fine job reading and answering that, but I'm not sure I can take

3   that anymore.  I think I'll just receive the documents and we'll

4   move forward.

5          MS. CHRISTMAS:  Understood, Your Honor.

6          MR. PERCIVAL:  I think Ms. Christmas is grateful as

7   well, Your Honor.

8          MS. CHRISTMAS:  Yes.

9          MS. RYAN:  Your Honor, would you like that to apply

10  for written deposition designations in our case as well?

11         THE COURT:  I think so, unless you have a great desire

12  to sit up there and read.

13         MS. RYAN:  No, I think that's fine you with us.

14         THE COURT:  Okay.

15         MS. RYAN:  So we'll make sure we have hard copies for

16  Your Honor.

17         THE COURT:  All right.  Thank you.

18         Let's take a short break and regroup, and you're going

19  to come back and at least we'll be watching a video next?

20         MR. PERCIVAL:  A batch of documents, Your Honor, and

21  then a video deposition.

22         THE COURT:  All right.  Wonderful.

23         All right.  Let's take ten.

24     (Recess taken from 3:22 p.m. to 3:38 p.m.)

25         THE COURT:  All right.  Y'all can be seated.

1          All right.  What does the State have for us next?

2          MR. HART:  Your Honor, Joe Hart for the State of

3    Florida.  We're going to be moving into evidence three exhibits.

4          If I may approach, I can just give you the stack.

5          THE COURT:  All right.  And while you're doing that,

6    I've marked and will receive as Court Exhibit 2, the

7    cross-reference chart for Mr. Barker's deposition.

8          *(COURT EXHIBIT 2:  Received in evidence.)*

9          MR. PERCIVAL:  Your Honor, just one point the

10   organization with your papers up there.  We may attempt to

11   further demonstrate the relevance of Exhibit 16 over the next

12   half a day and maybe tomorrow.  So don't just let that go too

13   far because we don't want you to lose your copy.  I know you

14   denied our motion, but I want to make sure you still have it.

15         THE COURT:  I haven't thrown it away.

16         MR. HART:  Your Honor, the first exhibit we'd like to

17   move into evidence is Exhibit 23.  This is the written testimony

18   from Secretary Mayorkas to the senate committee on Homeland

19   Security and Government Affairs.  I believe there were

20   objections to this.

21         MR. PERCIVAL:  One moment, Your Honor.

22         THE COURT:  Is that the same hearing that I saw an

23   excerpt from the video this morning?

24         MR. HART:  Your Honor, I believe it is.  It was the

25   written follow-up questions.

1          MS. FUDIM:  Just one question to counsel.

2          Is this the exhibit wherein it was previously -- there

3     was a bunch of testimony that you subsequently removed from what

4     you were seeking to admit and get email correspondence regarding

5     that?

6          MR. GUARD:  Yes.

7          MS. FUDIM:  Okay.  With that caveat, we don't object

8     it this version of it which is a reduced version of -- at the

9     time we issued the stipulation and inserted the objections, just

10    so the Court's aware, there were additional pages, but those

11    have been removed.  So as to the current version, we have no

12    objection.

13         THE COURT:  Okay.  And so for my information, these

14    are questions that senators submitted to the Secretary after the

15    meeting that he responded to in writing?

16         MR. HART:  Yes, Your Honor.

17         THE COURT:  Okay.  All right.  Then I will receive

18    that without objection.

19         (PLAINTIFF EXHIBIT 23:  Received in evidence.)

20         MR. HART:  Thank you, Your Honor.  The next exhibit we

21    would like to tender is Exhibit 24, and this is an October 20th,

22    2021 letter from Tae Johnson to Governor Ron DeSantis, and I

23    think there were objections to this as well.

24         MR. DARROW:  Yes, Your Honor.  Primary objections are

25    relevance and hearsay.  This letter is a response to a request

1  from the Governor to provide some information and address long

2  lines at ICE offices in Florida, which are irrelevant to whether

3  or not people are being lawfully detained and released at the

4  border.

5          That's 24?

6          MR. HART:  24, the letter from Tae Johnson to Governor

7  Ron DeSantis.

8          You're not -- not the --

9          MR. DARROW:  Oh, all right.

10         MR. HART:  -- 2022 letter.

11     *(Reporter clarification.)*

12         THE COURT:  She's not going to record y'all's chitchat

13  because I'm not paying attention to it either.

14         MR. DARROW:  All right.  Sorry, Your Honor.  We're

15  looking at the wrong letter from Tae Johnson.

16         THE COURT:  Okay.

17         MR. DARROW:  Sorry, Your Honor.  Bit of confusion.

18  We're not going to object to that.

19         THE COURT:  All right.  Then I will receive

20  Exhibit 24.

21     *(PLAINTIFF EXHIBIT 24:  Received in evidence.)*

22         MR. HART:  Thank you, Your Honor.

23         And the final exhibit we'd like to tender is a report

24  from the Department of Homeland and Security, Office of

25  Inspector General, regarding the title ICE spent funds on unused

1  beds, and it -- so it goes through and explains how ICE failed

2  to utilize all of their bed space that they procured under a

3  sole-source contract, and I think that there were objections to

4  this.

5          MS. FUDIM:  Yes, Your Honor.

6          Our objections to this report are similar to the

7  objection we raised regarding the Government Accountability

8  Office report that the information that's within the report is

9  hearsay by an independent agency reporting on the Department of

10  Homeland Security and that while underlying facts and

11  conclusions -- while the underlying facts may go to conclusions,

12  those are the conclusions that this Court should be making as

13  opposed to conclusions that are preserved with -- in the

14  document.

15          THE COURT:  Isn't the difference the GAO is some

16  third-party agency?  This, if I'm looking at the title

17  correctly, this is a component of Homeland Security, which I

18  think is a defendant in this case.  And so it's internal

19  investigation of itself.  Why would that not be an admission,

20  statement against a party opponent?  Why wouldn't that be a

21  nonhearsay statement on that basis?

22          MS. FUDIM:  My understanding, Your Honor, is that this

23  was a subcomponent oversight committee, and there was a

24  separation with regard to conclusions that were drawn here as

25  opposed to by the agency itself.  To the extent that I'm

1  mistaken about that, I will withdraw that objection; but that

2  was -- that had been my understanding.

3          I believe that there was also an 802 objection, but

4  give me one second to speak with co-counsel with regard to that,

5  if I may.

6      *(Off-the-record discussion between counsel.)*

7          MS. FUDIM:  Okay.  After conferring with my

8  colleagues, we will withdraw that portion of the objection, Your

9  Honor.

10         THE COURT:  So there's a portion of the objection

11 remaining?

12         MS. FUDIM:  For the record -- I see the way the

13 Court's going with this, but for the record our position is

14 portions of the document are hearsay, Your Honor.

15         THE COURT:  All right.  Mr. Hart, anything further you

16 want to add?

17         MR. HART:  We just stand on the fact that this is a

18 party admission and also, to the extent that it's not, would

19 fall under the 803.8(c) exception to hearsay as a public record

20 for a factual -- lawfully authorized factual investigation.

21         THE COURT:  All right.  You want to be heard on that,

22 Ms. Fudim?

23         MS. FUDIM:  I can't speak to that, so we'll withdraw

24 the objections that were articulated for the record.

25     *(Off-the-record discussion between The Court and Deputy*

1   *Clerk.)*

2          THE COURT:  This is Number 60.

3          It seems to me that when something comes to me under

4   the heading of Homeland Security Inspector General, that's a

5   component of that agency.  That agency is a party in this case,

6   so its statements against itself are nonhearsay when they're

7   being offered at -- its statements are nonhearsay when they're

8   being offered against them.

9          I think Mr. Hart is probably right.  There's a public

10  records exception to it.  They may want to argue that with

11  respect to the GAO office, but again, I still thing the GAO is a

12  whole separate kettle of fish.  But we'll get that if we ever

13  hear argument related to it.  So I'll receive it over your

14  objection.

15         MR. HART:  Thank you, Your Honor.

16     *(PLAINTIFF EXHIBIT 60:  Received in evidence.)*

17         MR. HART:  Your Honor, that's all the exhibits that we

18  would like to enter at this time and I think right now we're

19  going to play the --

20         Davies?

21         MR. PERCIVAL:  Guadian.

22         MR. HART:  -- Guadian video.

23         MR. PERCIVAL:  Your Honor, we have another exhibit --

24  an exhibit guide for you.

25         THE COURT:  Okay.

1          MR. HART:  May I approach, Your Honor?

2          THE COURT:  Come on.

3          All right.  And I'll mark and receive this cheat sheet

4    as the Court Exhibit 3.

5          (COURT EXHIBIT 3:  Received in evidence.)

6          MR. PERCIVAL:  And, Your Honor, just as you're putting

7    your exhibits in order, for planning purposes, this is going to

8    be about an hour, and then we have a couple batches of exhibits.

9    But the next thing would be another video that's about an hour

10   and 45 minutes.  So just to give you a kind of sense --

11         THE COURT:  This video will be the last video that we

12   can watch today then.

13         MR. PERCIVAL:  Thank you, Your Honor.

14         THE COURT:  All right.  Go ahead and cue it up.  I'll

15   find what I'm looking for.

16         MR. PERCIVAL:  Your Honor, is that loud enough?  We

17   have to actually pause the program in order to adjust the

18   volume.

19         THE COURT:  I think it is.

20         **VIDEO DEPOSITION OF PLAINTIFF WITNESS ROBERT GUADIAN**

21   *(Video recording played in open court.)*

22         MR. DARROW:  Your Honor, I'm sorry to interrupt.

23         We don't have this section on the list of designated

24   testimony.  This is, I think -- it started around 1:13.  Now

25   we're around 1:18 or 1:19.

1              MR. PERCIVAL:  Your Honor.

2              MR. DARROW:  I was just going to say I apologize.  It

3    may be our records.  We have it going from 1:10 then the next

4    starts on page 140.

5              MS. CHRISTMAS:  We can confer.

6              MR. PERCIVAL:  It would make sense to confer for a few

7    minutes, Your Honor.

8              THE COURT:  Okay.  It will take less than a few

9    minutes, but go ahead.

10             While y'all are trying to figure that out, the cheat

11   sheet you gave me also refers to Trial Exhibit 29.

12             MR. PERCIVAL:  We withdrew that, Your Honor.

13             THE COURT:  Okay.  That explains why I don't have

14   that.

15        *(Pause in proceedings.)*

16             MS. RYAN:  Your Honor, Just for the record, we're

17   basing this off of ECF 128, which is the chart of designations

18   and cross-designations that we filed with Your Honor.

19             MR. PERCIVAL:  Your Honor, I think we're going to need

20   a break to deal with this.  I can work on a batch of documents

21   and we can come back to this, because we do have another batch

22   to get through if that's a good way to handle it, but I don't

23   want to waste your time while we stand here trying to sort this

24   out.

25             THE COURT:  I prefer my time not to be wasted.  So

1    what is your suggestion?

2          MR. PERCIVAL:  Well, I have another batch of documents

3    to move into evidence that I was going to do in advance of

4    Price.  So we could handle that now and then tomorrow we can

5    play Guadian and Price for you back to back.

6          THE COURT:  That sounds like a plan.

7          MR. DARROW:  Yes, Your Honor.

8          THE COURT:  Okay.  All right.  Let's do that.

9          MR. PERCIVAL:  Your Honor, may I approach?

10         THE COURT:  You may.

11         MR. PERCIVAL:  And I'll just read them -- even though

12   you have them, Judge, I'll just read them off for the court

13   reporter.

14         It's Exhibits 5, 6, 7, 8, 9, 11, 12, 17, 19, 33, 42,

15   and 64.

16         And I believe that 5, 6, 7, 8, 9, 11, and 12 do not

17   have an objection.

18         MS. RYAN:  That's correct, Your Honor.

19         THE COURT:  All right.  We'll admit --

20         MR. PERCIVAL:  The first --

21         THE COURT:  -- those without objection.

22       *(PLAINTIFF EXHIBIT 5 - 9:  Received in evidence.)*

23         MR. PERCIVAL:  The first one we need to deal with is

24   Exhibit 17, and I do believe there was an objection to that.

25         THE COURT:  Okay.  You said Exhibit 17?

1          MR. PERCIVAL:  Yes, Your Honor.

2          THE COURT:  All right.  Why don't we do it this way.

3   Why don't you tell me what this is, what you're offering it for,

4   and they'll tell me what their objection is.

5          MR. PERCIVAL:  Yes, Your Honor.

6          So this is an email from January 27, 2021, from the

7   then-head of Enforcement and Removal Operations, which is the

8   job that Corey Price subsequently took over.  And what this

9   email is talking about is the effect of the Biden

10  Administration's new enforcement priorities on the total number

11  of what are called book-ins, which are the number of people who

12  are entering ICE custody.

13         And the purpose of the document is to show both a

14  general point of a reduction in enforcement but the broader

15  point that the interior enforcement priorities actually freed up

16  detention capacity that could be used at the southwest border.

17         The last sentence of the first paragraph, I think, is

18  really the --

19         THE REPORTER:  "Is really the..."?

20         MR. PERCIVAL:  Sorry.  The last sentence of the first

21  paragraph is where I'm directing the Court.

22         THE COURT:  All right.  Mr. Darrow.

23         MR. DARROW:  Two bases for objection, Your Honor.

24         The first, hearsay.  I imagine the Court's going to

25  rule as it has with other of our arguments regarding hearsay

1    because this is reporting what numbers that ERO ran.

2             The second objection is based on relevance.  This --

3    the memo priorities for enforcement is the Pekoske Memo that we

4    discussed a few minutes ago when the Court excluded that

5    document from the record.  And we would make the same argument

6    here that that is pertaining to prosecutorial discretion and the

7    decision to fully charge, not who to detain.

8             THE COURT:  I don't even understand this,

9    Mr. Percival.

10            MR. PERCIVAL:  Well, Mr. Price is going to be asked

11   about it.  But, Your Honor, what this is saying is that

12   book-ins, which is people coming into ICE custody, is expected

13   to be reduced by 50 percent.  In other words, they're expecting

14   the number of people entering ICE custody to be cut in half.

15   And certainly if the federal government is saying that its

16   detention resources are totally overwhelmed, it's certainly

17   relevant that they're doing other things that are freeing up

18   detention capacity.

19            THE COURT:  I'm going to hold that until I hear what

20   Mr. Price says, because, again, I'm reading that, and it doesn't

21   make any sense to me -- even the point you're trying to make

22   doesn't make sense to me, so maybe he'll provide context that

23   will help it make sense.

24            MR. PERCIVAL:  Understood, Your Honor.

25            THE COURT:  So I guess that would go to his relevance

1    objection more than the hearsay objection.

2            MR. PERCIVAL:  Fair enough, Your Honor.

3            The next one is 19.  Although it may make sense to

4    deal with 19 and 33 together because they're essentially two

5    versions of the same thing.

6            And what these are is court filings by the Department

7    of Justice on behalf of ICE, a defendant in this case, in a case

8    called *Flores*, which involves a consent decree relating to

9    certain issues about family detention.  And these are documents

10   in which essentially ICE is representing that it's eliminating

11   family detention.

12           MR. DARROW:  Your Honor, our objection is that while

13   *Flores* does have an impact on this case because it does set some

14   standards on family detention, the juvenile coordinator here is

15   looking at what -- the detention of uncompanied -- or in some

16   cases accompanied -- alien minors.  It's solely focused on

17   conditions of detention of alien minors, which are irrelevant to

18   the reason why *Flores* is relevant here, which is the limit on

19   family detention.

20           MR. PERCIVAL:  And, Your Honor, I'll just direct you,

21   for example, to the fifth page of Exhibit 19 that says:  "As of

22   February 26, 2021, all families are released from the Berks FRC.

23   The facility is in the process of negotiating with ICE a

24   transition to an adult facility and will no longer house

25   families."

1          THE COURT:  Are you reading from page 5 of the filing

2    or page 5 Bates stamp?

3          MR. PERCIVAL:  I'm sorry, Your Honor.  It is Bates 5

4    of the exhibit and ECF page 5, but it is page 4 of the internal

5    pagination of the document.  And it's like the third paragraph

6    down.

7          THE COURT:  And your -- again, this is a court filing,

8    so it's certainly something I could take judicial notice of, is

9    it not?

10         MR. DARROW:  Yes.

11         THE COURT:  But your argument is it's not relevant.  I

12   mean, I can take judicial of all kinds of court filings; but

13   only the ones that are relevant, I should.  So you really --

14   it's a relevance objection?

15         MR. DARROW:  Yes.  And it does mention the family

16   detention centers, but that is, you know, what I would say a

17   throwaway line in a larger document that deals specifically at

18   the juvenile coordinator looking into whether the government is

19   complying with the -- *Flores*' conditions for detaining children,

20   in particular, not whether ICE's, you know, spending its

21   resources on families versus single adults.

22         MR. PERCIVAL:  And, Your Honor, the way *Flores* has

23   been interpreted by the Ninth Circuit is to apply to both UACs

24   and accompanied children.  So the *Flores* consent decree actually

25   does have a bearing on family detention because the Court

1   monitors the detention of the children along with families.  And

2   I think that is also judicially noticeable, Your Honor.

3           THE COURT:  It sounds like when we talk about

4   throwaway lines, it raises my goes-to-the-weight antenna.  If

5   you're saying there's -- acknowledge there's some conceivable

6   relevance here but it's not the focus of it, that really sounds

7   like it goes to the weight.

8           I'm not going to be asked to do any sort of monitoring

9   ever, am I?

10          MR. PERCIVAL:  I certainly hope not, Your Honor.

11  We're asking for vacatur.  Well, I guess we're asking for an

12  injunction on the parole piece, but we'll save that for the

13  posttrial order.

14          THE COURT:  All right.  I'll receive and/or take

15  judicial notice of 19 and 33 and consider that objection when

16  evaluating the weight of the statement or two that you want me

17  to consider in that.

18      *(PLAINTIFF EXHIBITS 19, 33:  Received in evidence.)*

19          MR. PERCIVAL:  Yes, Your Honor.  So was that on both

20  19 and 33?

21          THE COURT:  Yes.

22          MR. PERCIVAL:  I'm sorry.  They're basically the same

23  document.

24          42 is a Border Patrol press release from August 2022.

25  And essentially the reason we're offering this document, Your

1   Honor, is because there's some discussion in the depositions --

2   and this will come up in Mr. Price's as well -- although DHS

3   cannot detain family units, one of the things they will say is

4   that they have the option to expel under Title 42.  And this

5   document contains data on the proportions of family units in the

6   month of August, which was just the most recent month at the

7   time, the proportion of family units that are being processed

8   under Title 42 as opposed to Title 8 which results in a release.

9           And that's on the third page, I believe, of this

10  document.  And I can direct you to the bullet points.

11          THE COURT:  I'm looking at it.

12          The point you take from this is a relatively small

13  portion of the people being excluded under Title 42 are family

14  units?

15          MR. PERCIVAL:  Correct, Your Honor.  At times in this

16  litigation we've understood one of the defenses to be that the

17  lack of ability to detain family units is not significant

18  because Title 42 remains available.  But what this document

19  shows is that in the month of August 2022 only 12 percent of

20  family units were expelled under that authority.

21          THE COURT:  I thought the Federal Government's point

22  on family units was that they converted those spaces from family

23  units to single adult units because they were seeing more single

24  adults than families.  So isn't this kind of proving their

25  point?

1          MR. PERCIVAL:  Well, they're certainly entitled to

2    argue that, Your Honor, but I don't think that makes it not

3    relevant.  And I mean, we would say that if you look at the

4    total proportion of family unit detention to adult -- I mean,

5    that goes to argument, I guess, Your Honor, and I can make the

6    argument, but...

7          THE COURT:  Okay.  I'm just trying to understanding

8    the relevance you think this has.  But again, you may be right.

9    It may go more to the significance of it.

10          Mr. Darrow, what's your objection to this?

11          MR. DARROW:  Expulsions under Title 42 aren't being

12    challenged here.  That's a whole nother separate litigation

13    that's currently ongoing.  And, you know, there's a good reason

14    for that because there's a lot of exceptions from Title 42 that

15    this document doesn't go into and can't give us the context for

16    why, you know, large numbers in different categories of

17    noncitizens won't be expellable under Title 42.

18          THE COURT:  Again, it sounds like all of that goes to

19    the weight.  We are talking about -- I mean, I think he's tied

20    enough relevance in there with this argument about family units;

21    although, again, I'm not sure that this fully gets him where he

22    wants to go.  But with that understanding I'll receive the

23    document.

24          (PLAINTIFF EXHIBIT 42:  Received in evidence.)

25          THE COURT:  We got something out of the Code of

1    Federal Regulations.  That looks interesting.

2            What's this, Number 64?

3            MR. PERCIVAL:  Sorry, Your Honor.  Just -- I realize

4    we're not receiving argument right now, but when you said that

5    it was a very small number of family units, I want to make sure

6    you're seeing that the 6,000 is the Title 42 number.  And the

7    45,609 at the bottom, that's the Title 8.  You have to add them

8    together to get the total.  I just want to make sure I'm clear

9    for the Court's understanding.

10           You put it aside.  I'm sorry.

11           THE COURT:  Okay.  Well, we'll figure out what it

12   means at the appropriate time.

13           All right.

14           MR. PERCIVAL:  And the last one, Your Honor is

15   Exhibit 64.  This as was a rule published in the Federal

16   Register and enacted by the defendants during the previous

17   administration, and it discusses a lot of issues specific to the

18   detention of family units.

19           You know, just for example, I'll read from the first

20   page, middle column, around the center of the first paragraph.

21   It says: "The final rule creates an alternative to the existing

22   licensed program requirement for ICE family residential centers

23   so that ICE may use appropriate facilities to detain family

24   units together during their immigration proceedings consistent

25   with applicable law."

1          So this document is just going to the fact that the

2     previous administration was making significant efforts to

3     increase their ability to detain family units and that there was

4     a change in policy with the new administration.

5          THE COURT:  Okay.  Is this something I can take

6     judicial notice of, or is it something that has to have an

7     evidentiary basis to be admitted.

8          MR. PERCIVAL:  Your Honor, I think you can take

9     judicial notice of it.  Mr. Guard in his deposition of Mr. Price

10    is going to ask about specific pages of it was the only reason

11    we made it an exhibit.  But if Your Honor wants to follow along

12    in the document and just take judicial notice of the Federal

13    Register, that's fine too.

14         THE COURT:  All right.  Ms. Ryan.

15         MS. RYAN:  Yes, Your Honor.  This -- we have a

16    relevance objection.  It's from 2019, and as Mr. Percival said,

17    it covers a lot of issues.  So if there are specific portions

18    that they're trying to enter, that's a different conversation.

19    But we think Your Honor can take judicial without entering all

20    144 pages of this.

21         THE COURT:  Well, I can probably assure you I'm not

22    going to read all 144 pages of this.

23         MR. PERCIVAL:  We're fine with judicial notice route,

24    Your Honor.  We just want you to be able to follow along with

25    the deposition.

1          THE COURT:  What fact -- or what, I guess legislative

2    fact, or what would I take judicial notice of?  That there was a

3    regulation adopted by the prior administration --

4          MR. PERCIVAL:  Published at --

5          THE COURT:  -- to accommodate detention of family

6    units?

7          MR. PERCIVAL:  I mean, I think we just want you to

8    take -- I guess we want you to take judicial notice that this

9    rule was enacted, and we would want to be able to cite to the

10   Federal Register, which is judicially noticeable, in our

11   proposed order.  For example, there's facts in here about

12   absconsion rates and findings of the Department.

13         THE COURT:  Well, that's a little bit different.

14   There's -- in the back of this, there is actually regulatory

15   language.  Is that regulatory language still on the books, or

16   has that been repealed?

17         MR. PERCIVAL:  I believe that portions of it were

18   invalidated by the Ninth Circuit and no further review was

19   sought.  We're not seeing it to show the state of the law, Your

20   Honor.  We're offering it to show some of the efforts of the

21   prior administration and how those efforts have changed and some

22   of the assumptions behind those efforts.

23         MS. RYAN:  Your Honor, if I may?

24         THE COURT:  Sure.

25         MS. RYAN:  As we've previously stated, actions taken

1    by the last administration are not relevant to the claim here.

2    The previous administration's executive orders Your Honor let in

3    just for the fact that they existed because they were referenced

4    in the document from this administration, sounds like Florida is

5    trying to get in the content of this rule that the previous

6    administration admitted, which is not relevant to the claims at

7    issue in this case.

8              THE COURT:  I guess I'm struggling, Mr. Percival, to

9    understand.  You know, the fact that the prior administration

10   took one approach and the fact that the current administration

11   takes a different approach, that may show evidence of a change

12   in policy.  One would expect that with a change in

13   administrations.  But I'm just not sure that that hook is enough

14   for me to dump this into the record and then make findings based

15   upon comments and responses and discussions that were had in the

16   rulemaking process.

17             MR. PERCIVAL:  Why don't we do this, Your Honor.  Why

18   don't you defer on it for now.  We're going to play the Corey

19   Price deposition, and we can revisit it with you after.

20             THE COURT:  Okay.  I will do that, but I'm going to

21   tell you, you've got a steep hill to climb for me to put 140

22   pages of Federal Register back and forth of a prior

23   administration into the record.

24             It's one thing for me to take judicial notice of the

25   fact that the prior administration did X, hearing evidence that

1    current administration is doing Y, taking those two facts,

2    drawing whatever inferences I can from that.  It's another thing

3    to hand me this pile of stuff and then at some point, one,

4    expect me to read it and, two, expect me to make findings from

5    something on page 48 in here.  I'm not sure that's the way this

6    process is supposed to work.

7           MR. PERCIVAL:  Understood, Your Honor.

8           THE COURT:  All right.  Then I'll -- you can move that

9    at a later point in time but with that caveat.

10           MR. PERCIVAL:  I believe that's the entire batch.

11           May I have a moment, Your Honor?

12           THE COURT:  Sure.

13           MR. HART:  Your Honor, I'd like to address the

14    defendant's previous discussion about the deposition testimony

15    that we were just playing for Mr. Guadian.

16           Florida designated pages 117 through 136 in our

17    designations on Docket Entry 125, and it appears that the -- the

18    docket entry, 128, that the defendants are relying upon failed

19    to include that particular designation made by Florida.  So the

20    portion of the video that we played is indeed in our deposition

21    excerpts filed with the Court.

22           THE COURT:  What is -- I don't have the docket open.

23    What is Number 125?

24           MR. HART:  125 is Florida deposition designations.

25           THE COURT:  And what is 128?

1          MR. HART:  128 is the defendant's counter-designations

2     and objections.

3          THE COURT:  Okay.

4          MR. HART:  And on that 128, defendants, I think, just

5     overlooked pages 117 through -- I think 136, and I think that

6     the discrepancy.

7          THE COURT:  Ms. Ryan, does that clear it up for you?

8          MR. DARROW:  Your Honor, I think there was some

9     miscommunication which we haven't sorted out the basis of it,

10    but it's possible that we overlooked their filing.  But we were

11    doing ours based off of highlighted depositions that the parties

12    exchanged, and we didn't see any highlighting of that section

13    when we were doing our counter-designations.

14          It's, you know, possible that, you know, the documents

15    just got screwed up and we were looking at the wrong one, but --

16    I mean, maybe we can confer further among the parties.  I can

17    show them the highlighted...

18          THE COURT:  And I'm probably going to let you do that,

19    just -- who was that we were listening to?  Was it Guadian?

20          MR. HART:  Guadian.

21          THE COURT:  Guadian.  So what you're saying, Mr. Hart,

22    is that on Document 125, the document itself, the pages that

23    you've listed were what we were watching?

24          MR. HART:  Yes, sir.  Where we stopped was page 118.

25    And there's a section here where we list 117, line 3, through

1   136, line 9.

2        THE COURT:  Okay.  And then attached to that there was

3   a document, 125-4, which were the excerpts.  And what you're

4   telling me, Mr. Darrow, that's what you were focused on and you

5   didn't see the things that he's reading from?

6        MR. DARROW:  Actually, Your Honor, the thing I'm

7   talking about I don't believe we actually filed, the -- we

8   exchanged highlighted -- well, they sent over a highlighted

9   deposition, full transcript, with the portions that they were

10  going to designate.  Then we responded to that.  You know, we

11  internally have it, our own, and then filed the final filing

12  that was just the chart that we provided.

13        But I don't think we saw those pages on the document

14  that was originally sent over to us.  It's possible they were

15  added after the fact or -- I mean, I'm not saying anybody was

16  doing anything improper.  It's just --

17        MR. PERCIVAL:  I can clear that up.

18        MR. DARROW:  Okay.

19        MR. PERCIVAL:  So the parties initially served

20  highlighted copies of the depositions.  My understanding is that

21  we reserved the right to supplement those.  They were initial

22  designations.  So it sounds like we filed our final versions of

23  the designations and notwithstanding my email that said there

24  might be changes, Mr. Darrow relied on the previously

25  highlighted version, not on the filed version.

1          And I think because we filed it, we ought to be able

2     to play it, Your Honor.

3          THE COURT:  All right.  Well, let's do this.  We're at

4     as good a time anyway to break.  I'll let y'all see if that was

5     actually what happened.  Again, what I'm looking at is a docket

6     that shows they designated this.  But if there was something

7     going on behind the scenes that is not reflected on the docket

8     that created this confusion, then merely because it's on the

9     docket doesn't necessarily immunize myself whatever happened

10    behind the scenes.

11         And so, Mr. Darrow, if you'll go through -- they

12    clearly from a record purpose disclosed what they intended to

13    designate.  And so to the extent that you relied upon this

14    back-channel highlighted version instead of the later-produced

15    version, certainly I think you ought to have the opportunity to

16    go through the later-produced version, see if there's any

17    objections or any cross-designations that you need to do to

18    that.  And y'all can sort that out tonight so when we come back

19    tomorrow, everyone -- there will be nobody that's prejudiced by

20    what the record shows no prejudice should come from.

21         Does that make sense to everyone?

22         MR. PERCIVAL:  Yes, Your Honor.  And I will say, just

23    as a technical matter, it may be that if there's addition

24    portions we have to add, we may have to read them because

25    editing video is --

1          THE COURT:  That will be fun.

2          MR. PERCIVAL:  -- a little complicated.

3          THE COURT:  That's fine.

4          MR. PERCIVAL:  But I don't think it will be very much.

5          THE COURT:  All right.  Well, let's do that.

6          Anything else that we need to do or can do this

7     afternoon to make our day tomorrow more efficient?

8          MR. PERCIVAL:  I don't believe so.

9          MS. RYAN:  Yes, Your Honor.  Since Your Honor prefers

10    that we hand you deposition designations instead of reading them

11    on the stand, performing them for Your Honor, we wanted to know

12    what you preferred:  if you wanted highlighted excerpts, if

13    you wanted a complete transcript highlighted, redactions.  We

14    just want to be consistent with whatever is best for Your Honor.

15         THE COURT:  I'm not sure if I have a preference.  You

16    know, ideally we would only get what you want us to read.  But

17    because some of these pages -- some of the portions you want us

18    to read start on the middle of the page, probably it would be a

19    combination of -- or it would be highlighted excerpts I think

20    would be ideal.

21         MS. RYAN:  We do have the option of redacting the

22    lines that are not...

23         THE COURT:  That would be fine too.

24         MS. RYAN:  Okay.

25         THE COURT:  I don't see any need for us to have a

 1   250-page deposition when only 59 pages of it pages are something

 2   we ought to focus on.

 3          MS. RYAN:  Yes, Your Honor, so we will try to have

 4   those for you tomorrow in that format.

 5          THE COURT:  Okay.

 6          All right.  Anything else we can talk about tonight?

 7          MR. PERCIVAL:  And do you want paper copies of that or

 8   filed, Your Honor?

 9          THE COURT:  Yeah, I think we might as well get --

10   definitely want paper copies.  Yeah, definitely want paper

11   copies.

12          MR. PERCIVAL:  So we have highlighted paper copies

13   already prepared, Your Honor.  They only have the pages we've

14   designated, but they don't designate the rest of the -- or they

15   don't redact the rest of the text.  Would those be fine, or

16   would you like us to print new versions with redactions?

17          THE COURT:  That would be fine, as long as there's

18   some differentiation between what we should read and what

19   shouldn't read, whether it be because it's completely redacted

20   out what we shouldn't read or whether it's because it's just not

21   highlighted, either way is fine.  We'll know what to focus on

22   what not to.

23          MR. PERCIVAL:  Thank you.

24          MS. RYAN:  Your Honor, I think we just briefly should

25   take scheduling so that we can have our witnesses available to

1  continue.

2          THE COURT:  Sure.

3          MR. DARROW:  As I understand from plaintiffs, they

4  have two more videos.  They have to finish the Guadian video and

5  the Price video, and it sounds like they may then rest around

6  lunchtime.

7          If that's accurate, Mr. Percival.

8          MR. PERCIVAL:  Yeah, some of that depends on the

9  objection that hasn't yet been withdrawn.  We would reserve the

10  right to call Raul Ortiz to lay a foundation for Exhibit 98,

11  Your Honor.

12          THE COURT:  All right.  It does sound like midday

13  tomorrow you'll be finished.

14          MR. PERCIVAL:  I believe so.

15          MS. RYAN:  So we'll have our first witness available

16  around lunchtime tomorrow.

17          THE COURT:  Okay.

18          MS. RYAN:  Since we are losing so much time with these

19  deposition designations, we are concerned that we will finish

20  our case on Wednesday, but one of plaintiff's witnesses is not

21  available until Thursday.

22          THE COURT:  Okay.

23          MS. RYAN:  So we just wanted to bring that to Your

24  Honor's attention that it may be a shorter day on Wednesday and

25  Thursday, but we were told she's physically unable to be here

1   until Thursday.

2              THE COURT:  Okay.  That's the case?

3              MR. PERCIVAL:  That's correct, Your Honor.

4              THE COURT:  Okay.  Well, if we have a shorter day, we

5   will have a shorter day, and much better than a longer day.

6              Well, this has been a very interesting day, and we

7   will regroup tomorrow.  If we start at 9:00 o'clock, will that

8   be sufficient time to get done what the State expects to get

9   done by lunch?

10             MR. PERCIVAL:  Yes, Your Honor.

11             THE COURT:  Well, let's do that.  I hope everyone has

12  a good evening, and we will be in recess until 9:00 tomorrow.

13        *(Proceedings adjourned at 4:40 p.m.)*

14                        * * * * * * * *

15     I hereby certify that the foregoing is a true and correct
    transcript of the stenographically reported proceedings held in
16  the above-entitled matter, pursuant to the provisions of Section
    753, Title 28, United States Code.

17

18  *Julie A. Wycoff*                    1/19/23

19  _____    _____
    Julie A. Wycoff, RMR, CRR          Date
    Official U.S. Court Reporter
20

21

22

23

24

25

```
 1                           I N D E X

 2

 3   Plaintiff Witnesses              Direct   Cross   Redirect

 4   JACOB OLIVA ............................24     45       57

 5   RAUL ORTIZ (BY VIDEO) ...................88

 6   TONY BARKER (READ INTO RECORD) ..........113

 7   ROBERT GUADIAN (BY VIDEO) ...............149

 8

 9

10                      PLAINTIFF EXHIBITS

11   Exhibit   Description                    Marked  Admitted

12   1 - 4     CBP custody and transfer stats    63      63

13   5 - 9     ICE Detention Data 2019-2023     151     151

14   10        Data on aliens released at SW border  63   63
               who gave Florida addresses
15
     13        DHS fiscal year 2021 budget       63      63
16
     14        January 2021 statement on the    102     102
17             suspension of MPP

18   15        ICE budget overview for 2021      63      63

19   18        2/16/21 email amongst USBP officials  65   65

20   19        March 2021 Interim Report re:  Flores  156  156

21   20        March 19th memo regarding prosecutorial  104  104
               discretion
22
     21        3/20/21 email re:  Prosecutorial  104     104
23             Discretion Authority

24   22        5/21/21 email amongst USBP officials  67   67

25   23        Written testimony from Sec'y Mayorkas  144  144
               to senate committee
```

| 24 | 10/20/21 letter from Tae Johnson to Gov. DeSantis | 145 | 145 |
|----|---------------------------------------------------|-----|-----|
| 25 | DHS fiscal year 2022 budget | 68 | 68 |
| 26 | ICE budget overview for 2022 | 68 | 68 |
| 27 | DHS fiscal year 2023 budget | 68 | 68 |
| 28 | ICE budget overview for 2023 | 68 | 68 |
| 30 | 5/15/22 email from Tony Barker | 73 | 73 |
| 31 | 5/19/22 memo from Chief Ortiz re noncitizen releases | 73 | 73 |
| 33 | 7/1/22 Annual Report re: Flores | 156 | 156 |
| 42 | Border Patrol press release from August 2022 | 158 | 158 |
| 44 | 12/16/2014 memo re: parole of inadmissible aliens | 87 | 87 |
| 45 | Candidate Biden's plan | 108 | 108 |
| 46 | USBP Processing Pathways | 74 | 74 |
| 47 | U.S. Customs and Border Protection Overview of the Southwest Border doc | 78 | 78 |
| 49 | Remarks given by the Secretary of DHS | 78 | 78 |
| 53 | Executive Order 14010 re: Migration | 109 | 109 |
| 54 - 58 | Executive orders or presidential actions | 110 | 110 |
| 59 | June 2021 memo re: Notice to Report | 112 | 112 |
| 60 | DHS OIG report re: ICE funds on unused beds | 148 | 148 |
| 61 | Video of Secretary Mayorkas before Senate committee | 23 | 23 |
| 62 | Video of Secretary Mayorkas before House committee | 22 | 22 |

| 1 | 95 | Enrollment by Immigrant Status document | 38 | 38 |
|---|----|-----|----|----|
| 2 | | | | |
| 3 | 1 | Chart that converts depo exhibits to trial exhibits | 86 | 86 |
| 4 | | | | |
| | 2 | Cross-reference chart for Barker dep | 143 | 143 |
| 5 | | | | |
| 6 | 3 | Cross-reference chart for Guadian dep | 149 | 149 |
| 7 | | | | |