<pre>
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
 2                      PENSACOLA DIVISION

 3   STATE OF FLORIDA,                    )
                                         )
 4                  Plaintiff,            )
          vs.                            ) Case No: 3:21-CV-1066
 5                                        )
     UNITED STATES OF AMERICA; ALEJANDRO  ) Pensacola, Florida
 6   MAYORKAS, Secretary of the U.S.      )
     Department of Homeland Security, in  ) January 10, 2023
 7   his official capacity; U.S. DEPARTMENT ) 8:57 a.m.
     OF HOMELAND SECURITY; TROY MILLER,   )
 8   Acting Commissioner of U.S. Customs  )
     and Border Protection, in his official )
 9   capacity; U.S. CUSTOMS AND BORDER    )
     PROTECTION; TAE JOHNSON, Acting      )
10   Director of U.S. Immigration and     )
     Customs Enforcement, in his official )
11   capacity; U.S. IMMIGRATION AND CUSTOMS )
     ENFORCEMENT; UR M. JADDOU, Director of )
12   U.S. Citizenship and Immigration     )
     Services, in her official capacity;  )
13   U.S. CITIZENSHIP AND IMMIGRATION     )
     SERVICES,                            )
14                  Defendants.           )
     _____)

15

16            TRANSCRIPT OF BENCH TRIAL - DAY 2
           BEFORE THE HONORABLE T. KENT WETHERELL, II
17                UNITED STATES DISTRICT JUDGE
                   (Pages 1 through 181)
18

19   APPEARANCES:

20   For State of Florida:    Office of the Attorney General
                              by:  JOHN M. GUARD, JAMES H. PERCIVAL,
21                                  ANITA J. PATEL, NATALIE CHRISTMAS
                                    and JOSEPH HART
22                            The Capitol, Suite PL-01
                              400 South Monroe Street
23                            Tallahassee, Florida 32399
                              (850) 414-3300
24                            james.percival@myfloridalegal.com
                              anita.patel@myfloridalegal.com
25                            joseph.guard@myfloridalegal.com
                              natalie.christmas@myfloridalegal.com
</pre>

```
 1   APPEARANCES CONTINUED:

 2   For the United States:    Department of Justice
                               Office of Immigration Litigation
 3                             by:  ELISSA FUDIM, ERIN T. RYAN
                                    and JOSEPH A. DARROW
 4                             450 5th Street NW
                               Washington, D.C. 20001
 5                             (202) 532-5802
                               elissa.p.fudim@usdoj.gov
 6                             erin.t.ryan@usdoj.gov
                               joseph.a.darrow@usdoj.gov
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3                THE COURT:  Good morning.  Please be seated.

4                All right.  We are back for Day 2 of the trial in

5    Florida versus United States, Case Number 3:21cv1066.

6                One thing that came to my mind last night that I need

7    to make sure you do, I guess primarily Florida, with these

8    videos that you're playing.  Because the court reporter is not

9    transcribing them, you need to make sure that if you want them

10   as part of record, that a thumb drive or something be submitted.

11   And you can just mark that as whatever your next exhibit number

12   in line is.

13               And I don't think, Federal Government, you didn't have

14   any videos, correct?

15               MR. DARROW:  No, Your Honor.

16               THE COURT:  Okay.

17               MR. PERCIVAL:  And, Your Honor, I believe we've

18   already given a thumb drive to the clerk.

19               Is that right?

20               MS. CHRISTMAS:  We have not of the depositions.

21               MR. PERCIVAL:  Oh, we haven't done it yet.

22               MS. CHRISTMAS:  We have of the evidence.

23               MR. PERCIVAL:  Of the evidence.  We're not doing it

24   with the depo videos because we're submitting transcripts of

25   those, but for the video exhibits, the ones that have been

```
 1    admitted, we've already given a thumb drive copy to the clerk.
 2              THE COURT:  Okay.  So your intention is to simply
 3    instead of admitting the video deposition by thumb drive, you're
 4    going to do the transcript of that?
 5              MR. PERCIVAL:  Yes, Your Honor.
 6              THE COURT:  Okay.  Is that suitable to the Federal
 7    Government?
 8              MR. DARROW:  Yes, Your Honor.
 9              THE COURT:  Presumably whoever reviews this next won't
10    need to watch the video.  They will be looking at a cold record.
11              All right.  I think that was the only thing I wanted
12    to bring up this morning.
13              Anything that the parties need to bring up this
14    morning?
15              MR. PERCIVAL:  Just one thing, Your Honor.  I
16    understand the defendants are withdrawing their objection to
17    Exhibit 98, so we would move that into evidence.
18              THE COURT:  All right.  That will be received.
19         (PLAINTIFF EXHIBIT 98:  Received in evidence.)
20              MR. PERCIVAL:  And you already have a copy, Your
21    Honor, correct?
22              THE COURT:  I am sure it's up there somewhere.
23              All right.  Well, I think yesterday we were in the
24    middle of Mr. Guadian's deposition and there was an issue that
25    arose as to whether proper portions had been designated and were
```

1   being played.

2         Have y'all sorted that out?

3         MR. PERCIVAL:  Yes, Your Honor.  We have resolved

4   that.  The video is consistent with the file designations.

5   Defendants do have one additional objection, and we have no

6   objection to them offering the objection.  But consistent with

7   the approach at the pretrial conference, the parties have agreed

8   that the objection will go to weight.  So I was going to briefly

9   describe the issue and the objection, and if Mr. Darrow thinks

10  that I haven't covered it, he can stand up and weigh in.

11        Basically, as Your Honor understands, the NTR policy

12  and the Parole Plus ATD policy, a feature of that is a release

13  with instructions to check in at the ICE office in sort of the

14  final destination.  And there was this issue, as you already

15  heard, Mr. Guadian testified to about lines outside the Orlando

16  office which I believe he said was caused in part by the office

17  still being closed due to COVID.

18        Defendants have objected on relevance to that sort of

19  line of evidence, but again they've agreed that it goes to

20  weight.

21        THE COURT:  Okay.

22        Is that correct?

23        MR. DARROW:  Yes, that's correct.

24        THE COURT:  All right.  Well, then, that will be noted

25  and we'll move forward.

1          So where are we going to be picking up?

2          MR. PERCIVAL:  We're going to go back about a minute

3     from where we stopped just because --

4          THE COURT:  Okay.

5          MR. PERCIVAL:  -- there was some talking while the

6     video was playing.

7          THE COURT:  All right, very well.  Just for planning

8     purposes, how long do we have left with Mr. Guadian's

9     deposition?

10         MS. GERTDS:  48 minutes or so.

11         MR. PERCIVAL:  Okay.  About 48 minutes left.

12         THE COURT:  All right.  One other housekeeping matter.

13    I've got a criminal matter I need to tend to at noon.  It

14    shouldn't take long.  But if we're at a stopping point for lunch

15    at noon, that would be ideal.  I can get that done and we'll

16    come back.  If not, we may be able to just stop for 15 minutes

17    or so and then I'll come back and we'll do what we need to do to

18    get to a lunch break.

19         MR. PERCIVAL:  So we have the, you know, 40 or so

20    minutes of the Guadian video, and then I've already done the

21    batch of documents that goes with the Price video.  So all I

22    need do is give you the cheat sheet, we can turn the Price video

23    on, and whenever Your Honor wants to stop that video, we'll just

24    stop.

25         THE COURT:  Okay.  Very well.

1         **VIDEO DEPOSITION OF ROBERT GUADIAN (Continued)**

2                   **DIRECT EXAMINATION**

3     *(Video recording played in open court.)*

4         MR. PERCIVAL:  Your Honor, I thought it might be

5 helpful just to explain what's going on here.  So while the

6 deposition was being taken  we didn't have all the numbers; but

7 as you heard them say, they were going to produce them.  And

8 what you have has all the numbers.

9         THE COURT:  I see that.

10         MR. PERCIVAL:  Okay.  Just making that clear.

11     *(Video recording continued.)*

12         MR. PERCIVAL:  I think that's the end, Your Honor.

13         THE COURT:  All right.

14         MR. PERCIVAL:  So, Your Honor, as I mentioned, we

15 already did the batch of documents for Corey Price.  I have your

16 cheat sheet here, but I wanted to explain one other thing before

17 we jump into the Corey Price video, which is that during that

18 deposition, we had printed copies of documents that are

19 identical to some of the trial exhibits, but they were printed

20 in a slightly different format.

21         And so in order -- and I'm going to give opposing

22 counsel a copy.  In order to allow Your Honor to follow along,

23 we did go ahead and reprint them with the same page numbers as

24 they were in the deposition.  We're not offering those as trial

25 exhibits, but we thought you might find them helpful just so you

1    can see what page they're referring to.

2         THE COURT:  Well, at a minimum, I want your cheat

3    sheet.

4         MR. PERCIVAL:  I got your cheat sheet.  I have this

5    binder here, and I can give it to you.

6         THE COURT:  Let me see the cross-reference sheet

7    first.  We'll call Court Exhibit 4, I believe.

8         *(COURT EXHIBIT 4:  Received in evidence.)*

9         MR. PERCIVAL:  Is it fair to say you have no

10   objection?

11        MR. DARROW:  Yeah, no objection.

12        MR. PERCIVAL:  There's no objection from defendants,

13   Your Honor.

14        THE COURT:  Okay.  Let me see what that is and maybe

15   give me an example of how it differs so I can have a sense of

16   what I'm looking at here.

17        So it's 5, 6, and 7 are the only ones that we're

18   talking about?

19        MR. PERCIVAL:  So these are the -- some of the data

20   spreadsheets.  It might not surprise Your Honor that sometimes

21   when you print Excel sheets, there's different ways to do it and

22   sometimes the columns get sort of cut off in ways that make it

23   harder to read.

24        So unfortunately for the deposition, they were printed

25   in a less helpful way, and for Your Honor we made sure they were

1   printed in the more helpful way.  So that's why we're offering

2   the trial exhibits in the format we've offered them, but it may

3   be helpful to Your Honor just when we're referring to page

4   numbers during the deposition to have the other copy available

5   just to orient yourself.  But it's really up to Your Honor.  We

6   have no strong preference.

7          THE COURT:  I'm just trying to find the trial exhibits

8   just to see what the difference is.  At some point I may have to

9   go back through all of this stuff, make sense of it.

10          We've got to make sense of all of this at some point.

11          MR. PERCIVAL:  Your Honor, if it's helpful, this is

12   the batch that I moved into evidence yesterday when we had

13   issues with the Guadian video, I believe.

14          THE COURT:  Okay.

15          MR. PERCIVAL:  If you go to page 5 of the actual trial

16   exhibit, 5, not the new copy.

17          THE COURT:  Okay.

18          MR. PERCIVAL:  Let me know when you're there.

19          THE COURT:  I'm there.  And it's printed so small

20   that...

21          MR. PERCIVAL:  So Your Honor might understand the

22   tension, we shrunk it down to get it to fit on one page so lines

23   weren't being cut off.  Whereas, the deposition copy we printed

24   it larger, but because it cut lines off some of the -- some of

25   the rows go into the next page.

1        THE COURT:  All right.  Let's do this.  The

2   information on the trial exhibit that you gave me is so small,

3   almost to be -- almost to the point of being illegible.  And so

4   I'm going to mark and -- assuming without objection -- receive

5   as exhibits 5A, 6A, and 7A, what you've given me in this

6   notebook that is still fairly small print but slightly more

7   legible.

8        MR. PERCIVAL:  And, Your Honor, in the pretrial

9   stipulation, we actually stipulated to the public URL for all of

10  this data with a hyperlink.  And the parties stipulated to that.

11  So that's available to Your Honor, too, as another format.

12       THE COURT:  I strongly doubt that I'm going to go look

13  at a hyperlink.

14       MR. PERCIVAL:  Well, Your Honor, we're also -- if it

15  is helpful, we can give you on a thumb drive the native Excel

16  sheet.

17       THE COURT:  I probably don't want that either.

18       MR. PERCIVAL:  Fair enough.

19       THE COURT:  I'll make do with what I've got.

20       All right.  Any objection to me marking and receiving

21  5A, 6A, and 7A?

22       MR. DARROW:  No, Your Honor.

23     (PLAINTIFF EXHIBIT 5A, 6A, and 7A:  Received in evidence.)

24       THE COURT:  All right.  So at this point we're going

25  to have Mr. Price tell us about all this.

```
1              MR. PERCIVAL:  Thank you, Your Honor.

2              THE COURT:  And this is Corey Price?

3              MR. PERCIVAL:  Yes, Your Honor.

4              THE COURT:  And this is how long?

5              MR. PERCIVAL:  An hour and 45 minutes, but we can

6    break at any time, Your Honor.

7              THE COURT:  All right.

8         VIDEO DEPOSITION OF PLAINTIFF WITNESS COREY PRICE

9         (Video recording played in open court.)

10             MR. PERCIVAL:  Your Honor, I was just going to pause

11   it because it looked like you were looking for a paper.

12             THE COURT:  No, just keep playing.

13             MR. PERCIVAL:  Keep playing?  Okay.

14        (Video recording played in open court.)

15             THE COURT:  Let's take a break.

16             How long do we have left?

17             MR. PERCIVAL:  Looks like we have about 50 minutes

18   left, Your Honor.

19             THE COURT:  All right.  I think if we take ten minutes

20   now, we'll come back, and then it will be a good time to break,

21   that I need to break.

22             MR. PERCIVAL:  Okay.  Your Honor.

23             THE COURT:  We're in recess.

24        (Recess taken from 10:53 a.m. to 11:06 a.m.)

25             THE COURT:  You may be seated.
```

1          A moment ago I think Director Price was talking about
2    the Federal Register notice that was Plaintiff's Exhibit 64.
3    I'm not sure we ultimately resolved how all that is going to be
4    dealt with in the record.
5          MR. PERCIVAL:  Your Honor, because we have testimony
6    admitted on it and given the voluminous nature of it, we're
7    withdrawing the exhibit.
8          THE COURT:  I assume the Federal Government is okay
9    with that.
10         MS. RYAN:  That's fine, Your Honor.
11         THE COURT:  All right.  I'll have that delivered back
12   to you.
13         I guess at this point it's probably too late to
14   reconsider the order denying transfer of venue to Tallahassee?
15         MR. PERCIVAL:  Yes, Your Honor.
16         THE COURT:  One thing as I was sitting here -- and I
17   obviously said that in jest.  But as I was sitting here trying
18   to digest all that's going on, because it's been a little bit of
19   unorthodox presentation, are we going to have time on Thursday
20   to -- time before the end of the day that is vacant?
21         Maybe the better way is when do you expect your case
22   to end on Thursday?
23         MS. RYAN:  As of now, given the pace we're at, we
24   would expect that we would have only the one witness on Thursday
25   who is physically unavailable to come on Wednesday.  So we

 1   imagine it would be a rather short day on Thursday.

 2          THE COURT:  Okay.  And knowing what you expect the

 3   Federal Government to put on in their case, what do you

 4   anticipate from a rebuttal case?

 5          MR. PERCIVAL:  We're not anticipating much of a

 6   rebuttal case, if at all, Your Honor.

 7          THE COURT:  Well, I think what I would like to do is

 8   have some time on Thursday for the parties to kind of sum

 9   everything up.  So it would be an oral closing, not to replace

10   proposed findings afterwards, but to help me get a roadmap for

11   where the parties think the evidence came in and what I can

12   anticipate seeing in their proposed findings and perhaps give me

13   an opportunity to ask some questions for clarification and

14   things of that nature.

15          So I just -- I didn't want to spring that on you five

16   minutes before I ask you to do it.  So be planning to do that.

17   And again, I don't anticipate that will be accompanied by

18   "Here's what I think of the case."  But I think you may be able,

19   through my questions, to get an idea of what I think about at

20   least some of the issues, and it may help the proposed findings

21   moving forward.

22          Is that suitable?

23          MR. PERCIVAL:  Yes, Your Honor.  Would you like to

24   talk about the law and the facts?

25          THE COURT:  The law and the facts.

1    MS. RYAN:  And would Your Honor be setting a time

2    limit for any closing statements that we would give on Thursday?

3    THE COURT:  I don't anticipate -- well, what I would

4    anticipate it being more of is an interrupted closing statement,

5    such that it's more like an oral argument as to what you

6    think -- both what you think the evidence shows, and I may ask

7    questions about, "Well, what about this?"  "What about that?"

8    "How does that play in?" -- as well as the law.

9    So I would anticipate it being a free-form discussion,

10   and so no set time limit, but certainly any prepared remarks you

11   have, the more concise they can be, the better.

12   MS. RYAN:  And, Your Honor, if counsel were to split

13   it between ourselves, or would you prefer only one from each

14   side present this to you?

15   THE COURT:  I don't have a problem with multiple

16   people weighing in, particularly the way the case has developed.

17   I understand some people are focusing on some issues versus the

18   other, and that's been the same on both sides.

19   State okay with that?

20   MR. PERCIVAL:  That's fine with us, Your Honor.  I

21   anticipate I'll probably do most of the talking on our side, but

22   however defendants want to do it is fine.

23   THE COURT:  We'll plan on doing that on Thursday after

24   the evidence closes.

25   Back to Director Price.

1          *(Video recording played in open court.)*

2                    MR. PERCIVAL:  That's the end, Your Honor.

3                    THE COURT:  All right.  Perfect timing.

4                    Remind me again what the afternoon entails.

5                    MR. PERCIVAL:  Yes, Your Honor.

6                    We have some documents to go through, and then we

7    have some videos.  Some of those exhibits are some very short

8    Operation Horizon training videos, just excerpts, five to ten

9    minutes total.

10                   THE COURT:  Okay.

11                   MR. PERCIVAL:  But we're done with witnesses -- well,

12   other than possibly calling Chief Ortiz out of time, which I

13   think we need to discuss with opposing counsel.  But otherwise,

14   we would be done with our case.

15                   THE COURT:  Okay.  All right.  I've pulled those.  You

16   can have your notebook back.  I've got the exhibits themselves

17   that came in.

18                   MR. PERCIVAL:  May I approach, Your Honor?

19                   THE COURT:  All right.  As I said, I've got a criminal

20   matter to tend to that would take a little portion of time, and

21   I would like to eat because I tend to be less cranky and make

22   better decisions on a full stomach.  So why don't we take -- if

23   we come back at 1:30, will that give you sufficient time this

24   afternoon to do what you want to do?

25                   MR. PERCIVAL:  Yes, Your Honor.

1    THE COURT:  And was the Federal Government

2  anticipating starting anything this afternoon?

3    MR. DARROW:  Yes, Your Honor.  Actually we had two

4  witnesses we were thinking of calling this afternoon.

5    THE COURT:  Okay.  How long do you anticipate the rest

6  of your case, Mr. Percival?

7    MR. PERCIVAL:  I think less than an hour, Your Honor,

8  perhaps even half an hour.

9    THE COURT:  Okay.  We'll make it work.

10    MR. DARROW:  Thank you, Your Honor.

11    THE COURT:  All right.  1:30.

12    *(Luncheon recess taken from 12:01 to 1:31 p.m.)*

13    **A F T E R N O O N   S E S S I O N**

14    *(All parties present.)*

15    THE COURT:  You may be seated.

16    A couple of housekeeping matters.  Defendants'

17  exhibit -- or, excuse me, Plaintiff's Exhibit 17 was something

18  we deferred ruling on.  And that was something that I think

19  Director Price talked about in his testimony, about book-ins and

20  things of that nature.

21    What is the government's -- Florida's intention with

22  respect to that exhibit?

23    MR. PERCIVAL:  Your Honor, as I watched the deposition

24  and followed along with the document, it occurred to me that the

25  entire contents of the document were summarized in the

1    testimony.  So I'm happy to move it into evidence again if the

2    Court thinks it will be helpful, but we have no strong

3    preference for me to get it in.

4              THE COURT:  It's not my case.  It's your case.

5              MR. PERCIVAL:  Yeah.  So we'll withdraw it.

6              THE COURT:  Okay.  Set that aside.

7              I assume the Federal Government is fine with that?

8              MS. RYAN:  Yes, Your Honor.

9              THE COURT:  All right.  And we talked before lunch

10   about argument potentially on Thursday, and I think one of you

11   relayed a question to the law clerk about the Parole Plus ATD

12   policy being included in that discussion.  And that seems to

13   make sense to do that, particularly given that as we sit here,

14   there's only a motion from the Federal Government for summary

15   judgment that would cover that, and there's not one for Florida.

16             And I think when I had initially was contemplating

17   oral argument that would have been given Florida the opportunity

18   to argue that judgment should be entered in its favor on that

19   policy under 56(f) or whatever provision of 56 that would allow

20   me to grant summary judgment, even without a motion.

21             So I think we'll hear some argument on that too.

22             MS. RYAN:  So, Your Honor, just to be clear, you'd

23   like us to argue about the validity of the policy based on the

24   supplemental administrative record?

25             THE COURT:  I think that's how I will determine

1    whether it's valid, so yes.

2              MR. PERCIVAL:  That's fine, Your Honor.

3              THE COURT:  All right.  Mr. Percival, where are we

4    going next?

5              MR. PERCIVAL:  I have one cleanup issue to deal with

6    Your Honor, which is you had previously denied our motion to

7    admit Plaintiff's Exhibit 16, and I was going to take another

8    run at that and demonstrate to Your Honor some of the other

9    documents in the record that demonstrate the relevance of that

10   document.

11             THE COURT:  What was that exhibit?

12             MR. PERCIVAL:  That was the Pekoske Memo.  It's a

13   January 20th, 2021 memo.

14             THE COURT:  Okay.  So that's the nonenforcement -- or

15   non-removal policy --

16             MR. PERCIVAL:  That's correct.

17             THE COURT:  -- that's at issue?

18             MR. PERCIVAL:  Well, we'll call it the "Enforcement

19   Priorities," because that's what the document calls itself.

20             THE COURT:  Enforcement Priority memo that is --

21   that's at the Supreme Court right now?

22             MR. PERCIVAL:  A subsequent version of Enforcement

23   Priorities are.  That one is not.  That one was rescinded.  But

24   I can get into explaining why we still think it's relevant.

25             THE COURT:  So the one reflected in Exhibit 16 is not

1    the current policy?

2            MR. PERCIVAL:  That's correct.

3            THE COURT:  Okay.  So tell me why you think this is

4    relevant and anything I need to know about it.

5            MR. PERCIVAL:  Yeah, Your Honor.  So if you could also

6    grab a copy of Exhibits 20 and 59, which were admitted into

7    evidence.

8            THE COURT:  All right.  I have them all.

9            MR. PERCIVAL:  So if you'll start with Exhibit 20 and

10   if you start on that first page, there's a paragraph and then

11   there's a set of bullets, and then there's another paragraph.

12   So we're going to go to that paragraph at the bottom of the

13   page.

14           And if you go to the fourth line down, this memo is

15   talking about when not to issue a Notice to Report.  And what it

16   says in -- the sentence starting with "Agents will consider

17   whether the subject poses a threat to national security," it

18   lays out the standards in the Enforcement Priorities.  And it

19   says, "as outlined in the Enforcement Priorities prior to making

20   this decision."

21           So what this document says is that the application of

22   the NTR policy ought to be informed by the priorities in the

23   Pekoske Memo.

24           THE COURT:  Okay.  And what does 59 have to do with

25   this?

1          MR. PERCIVAL:  59 is similar, Your Honor.  At the top

2     of the second page, this draft of the policy makes the same

3     basic point, but here, helpfully, rather than referring to

4     enforcement priorities, generally it actually cites the policy

5     by name.  But I think -- defendants can tell me if they

6     disagree.  I think it's fair from the context that Exhibit 20

7     refers to this document too, but in 59 it's very expressed.

8          THE COURT:  All right.  So this sounds a like a

9     different argument than you were making before.

10          MR. PERCIVAL:  Yes, Your Honor.

11          THE COURT:  I understood your prior argument as to its

12     relevance it was because -- if I followed the argument, it was

13     that if they're not arresting people to remove them, then they

14     would have space in their detention facilities to keep people

15     who are applying for admission.

16          MR. PERCIVAL:  No.  I think that was my argument on

17     Exhibit 17, Your Honor.

18          THE COURT:  Oh, okay.

19          MR. PERCIVAL:  Which was the book-in email.

20     Ms. Christmas handled this one, and she did say that this is a

21     general nonenforcement policy that applies also at the border.

22     But we were just trying to corroborate that claim with specific

23     documents that show that to be the case.

24          THE COURT:  Okay.  But now the argument you're making

25     to me is that this memo is being offered for the limited purpose

1    of explaining what the scope of the nonenforcement -- or, excuse

2    me, the Notice to Report policy was.

3            MR. PERCIVAL:  Well, I think it's -- I think that's

4    part of it, Your Honor.  I think it's two ways.  This policy

5    both shows the way Border Patrol was reading the Pekoske Memo,

6    and the Pekoske Memo shows how to read the Border Patrol policy.

7    Because, I mean, they're just interacting with each other.

8            Just to give you an example, the Pekoske Memo says

9    on -- let me find it, Your Honor -- on page 2 that individuals

10   apprehended at the border are priorities, but the Notice to

11   Report policy says we're going to release people at the border

12   unless they meet the other two priorities in the Pekoske Memo,

13   which is public safety and national security, but not

14   Priority 2, border security.

15           So I understand it's a little confusing, but it just

16   shows these two documents are interacting, and the policies that

17   we're challenging are certainly relying on this Pekoske Memo.

18           THE COURT:  Okay.  Well, let me maybe hear from the

19   Federal Government and see if that helps clear it up.

20           MR. DARROW:  Thank you, Your Honor.  So our general

21   objections to this document are the same reasons we expressed

22   yesterday.  They're talking about reasons, you know, primarily

23   dealing with ICE's decision whether to arrest and place in

24   removal proceedings people not about whether ICE should be

25   taking transferees from Customs and Border Protection that

1    they've arrested because they're coming across the border.

2           The two references in these other exhibits don't

3    really add to that.  I read them as saying these are still two

4    separate programs.  So the two exhibits that deal with Notices

5    to Report, they're saying, you know, your reasons to release a

6    person.  But if the person is a priority because they're a

7    national security threat or a public safety threat, as talked

8    about in this whole other memo, then don't be releasing them on

9    Notice to Report.

10           But that doesn't mean you need to know about that

11   other memo in order to be able to understand the Notice to

12   Report policy.  They're just saying, Look, these are two

13   different things; but if a person is under that, then you don't

14   want to be releasing them under this, is how I read it at least.

15           Also, as Your Honor noted, there is litigation and

16   priorities memos have been vacated.  So they are not being

17   enforced at this time.

18           THE COURT:  I guess where I'm still confused,

19   Mr. Percival, is -- well, I mean, one, we're talking about

20   Notice to Report policy which itself has been replaced by

21   another policy.  And we're talking about it potentially

22   incorporating by reference a policy that's been replaced by

23   another policy that's being litigated somewhere else.  And so it

24   seems fairly far removed from the question of whether there is a

25   nondetention policy.

1          And I was kind of going down the road with you to the

2    point that really what I needed to know -- to understand what

3    the Notice to Report policy was when it was in existence, I had

4    to know what the criteria were that were incorporated by

5    reference.  That makes sense to me.  But the other argument you

6    were making doesn't make sense to me.

7          MR. PERCIVAL:  I'm happy to allow you to admit it for

8    the purpose you've articulated, Your Honor.  This is -- we're

9    not going to stand up in closing and say, This case is all about

10   the Pekoske Memo, but we just think it's helpful for Your Honor

11   to understand what's going on in the NTR policy.

12         THE COURT:  And for that limited purpose, I guess

13   I'm -- I understand -- your threshold objection is that the

14   Notice to Report policy has nothing to do with this case anymore

15   because it's been replaced by something else.  But given my

16   prior rulings that the Notice to Report policy may inform the

17   existence of a nondetention policy, so getting over that

18   threshold objection, why isn't it properly admitted for the

19   limited purpose of understanding what the heck the policy was?

20         MR. DARROW:  I mean, I would just say again that I

21   don't think you actually need it to understand what the policy

22   is.  I read the references to the -- to the Pekoske Memo in the

23   Notice to Report documents as saying if somebody is a priority

24   under this other thing, then don't be releasing them under

25   Notices to Report.

1        THE COURT:  But if our record doesn't tell us what

2   that other thing is, how do I -- how can I even assess what the

3   Notice to Report policy was when it existed?

4        MR. DARROW:  I mean, it's a pretty tangential

5   reference.  But if Your Honor is only admitting it for the

6   limited purpose of explaining what this tangential reference is

7   referring --

8        THE REPORTER:  Can you slow down, please.

9        MR. DARROW:  I'm sorry.

10        THE REPORTER:  Thank you.

11        MR. DARROW:  If Your Honor, would only be admitting it

12   for the limited purpose of explaining what the tangential

13   reference references, then I think that's fine.

14        THE COURT:  I think that's as far as I'm willing to

15   go, Mr. Percival.  I just don't see how -- I mean, I understand

16   conceptually what you're getting at, that there's a broader

17   thing going on here.  They're not detaining people.  They're not

18   arresting people.  They're not doing anything they're supposed

19   to be doing in your view.  I get that.  But there are components

20   of that that are not -- that are beyond the purview of what I

21   can deal with in this case.

22        And so I'm willing to go down the road with you to the

23   point of saying that this nondetention policy as it evolved into

24   other things embodies this broader policy.  And so for that

25   limited purpose of understanding what the nondetention policy --

1    or, excuse me, the Notice to Report policy once was for

2    prosecutorial discretion, I'll receive it for that limited

3    purpose but no other.

4              MR. PERCIVAL:  Understood, Your Honor.  Thank you.

5              THE COURT:  All right.  Ms. Christmas.

6         (PLAINTIFF EXHIBIT 20:  Received in evidence.)

7              MS. CHRISTMAS:  Yes, Your Honor, the State will be

8    moving in a few exhibits into evidence.

9              May I approach?

10             THE COURT:  Sure.

11             MS. CHRISTMAS:  The State would like to move in

12   Exhibits 34, 35, and 36 which are all exhibits related to the

13   Operation Horizon program.  And then after that, we'll be moving

14   in Exhibits 37, 38, and 39, which are videos Ms. Gerdts can play

15   also related to Operation Horizon.  So it may make sense to deal

16   with any relevance objections on a broad scale.

17             THE COURT:  All right.  Are there any objections to

18   these three documents?

19             MS. RYAN:  One moment, Your Honor.

20             We have no objections to Exhibits 34, 35, and 36.

21             THE COURT:  All right.  Then those will be received.

22        (PLAINTIFF EXHIBIT 34, 35, and 36:  Received in evidence.)

23             THE COURT:  And then, Ms. Christmas, there's some

24   videos.  So the way that you said that made me think you might

25   have an objection to the videos.

1          MS. RYAN:  Possibly, Your Honor.

2          THE COURT:  Okay.

3          MR. DARROW:  Your Honor, we do have objections to the

4    videos.

5          THE COURT:  Okay.

6          MR. DARROW:  They contain hearsay.  And I know the

7    Court before has said that defendants' employees, you know,

8    should not be considered as producing hearsay because it's, you

9    know, party admission.  But these are not high-ranking

10   employees.  These are lower-level employees who are boots on the

11   ground doing the trainings, participating in the trainings, and

12   making comments.

13         Also, there is a Rule 402/403 objection, and primarily

14   we're leaning on the Rule 403 part of this.  Some of the

15   employees, you know, who are not the high-ranking policymakers,

16   they're the people that are dealing with Operation Horizon,

17   which, at this point Your Honor might have a sense of what it

18   was.  It was the effort that ICE undertook to get NTAs to the

19   people who were released and hadn't checked in yet.  And there

20   was some comments by the employees of, you know, just it's a lot

21   of work and, you know, we didn't ask for this and -- but they're

22   not reflective of, you know, the policymakers.

23         THE COURT:  That's what we heard Director Price just

24   tell us, right?  Did we not?  I mean, he said that the fact that

25   Border Patrol wasn't doing its job created more work for ICE on

1    the back end.

2          MR. DARROW:  Yes, Your Honor.  These -- but these

3    lower-level employees, I don't know, they're more explicit about

4    their frustration.

5          THE COURT:  Okay.  Ms. Christmas.

6          MS. CHRISTMAS:  Yes, Your Honor.  There is a case on

7    point directly, and I think it's a former Fifth Circuit case

8    that's binding here that basically explains that 403 objections

9    in bench trials really are not relevant, to use a poor term.

10   But I would say that specific to these --

11         THE COURT:  Well, let me ask you this.  What purpose

12   are you offering this?  I mean, I heard the director say that --

13   exactly what I just said, which was Border Patrol's supposed to

14   be doing this.  They weren't doing it, so it fell upon us -- as

15   in ICE -- to clean up the mess, so to speak, and that we had to

16   do it in overtime and it was burdensome and it's going to take

17   five years, or whatever the numbers showed in the supplemental

18   administrative record.

19         What beyond that am I going to learn from watching

20   videos?

21         MS. CHRISTMAS:  Yes, sir, Your Honor.

22         I think there's a little more detail in these videos

23   provided by the individual employees who are dealing with it in

24   more of a hands-on, day-to-day basis.  And we really think that

25   the description from the employees goes to the ongoing harm to

1    the State of Florida because they're very explicit about how

2    long this program will go on and that, you know, the continued

3    efforts -- I think there's a quote in one of the videos that the

4    change from NTR to Parole Plus ATD has not fixed the problem.

5    We're still having problems finding these people and getting out

6    this information.

7              So it will provide a little more color and detail to

8    the extent of how many of these applicants for admission are

9    still remaining.

10             THE COURT:  How long are the videos?

11             MS. CHRISTMAS:  Less than ten minutes total.

12             THE COURT:  All right.  I'm going to reserve ruling

13   until I see the videos.  Again, we don't have a jury here who

14   would be potentially prejudiced by seeing it before making those

15   determinations.  So let me see them, and we'll -- I'll give you

16   a better ruling then, but I understand both sides' arguments.

17             MS. CHRISTMAS:  Ms. Gerdts, can you play Exhibit 37.

18        *(Video recording played in open court.)*

19             MS. CHRISTMAS:  Ms. Gerdts, will you please play

20   Exhibit 38.

21             THE COURT:  All right.  Before you do that, I didn't

22   hear or see anything objectionable or unduly prejudicial about

23   that exhibit.  If anything, it was somewhat duplicative of what

24   I heard from Director Price.  But I'm not going to exclude that

25   so that will be admitted.

1          (PLAINTIFF EXHIBIT 37:   Received in evidence.)

2          (Video recording played in open court.)

3               THE COURT:  Is that it for that one?

4               MS. CHRISTMAS:  That's it for that one.

5               THE COURT:  I think that falls into the same category.

6     I mean, I've watched both videos now.  I haven't seen really

7     anything other than what I heard from Director Price, which was,

8     as I've summarized now twice, so I don't see anything

9     objectionable, or -- nothing properly objectionable so I'll

10    receive that as well.

11              Am I going to see anything else in this next one?

12         (PLAINTIFF EXHIBIT 38:   Received in evidence.)

13              MS. CHRISTMAS:  The other one does provide a little

14    bit more context about the continuation from the NTR version of

15    this --

16              THE COURT:  All right.  Play it.

17              MS. CHRISTMAS:  -- program.  But I will warn the Court

18    that there are some redactions in it based off of what we've

19    received during discovery that have kind of a jarring noise in

20    the middle.  So if you hear a large kind of beeping noise,

21    that's what that is.

22              THE COURT:  Okay.

23         (Video recording played in open court.)

24              THE COURT:  I guess with that one, the concern I have

25    is she spewed out a bunch of numbers, and I'm not sure how

1    important -- what does the Government want me to take -- Florida

2    want me to take from that?

3         MS. CHRISTMAS:  I think the main point we'd like for

4    you to take away from that one specifically is the comment that

5    the problem has not been fixed between Operation Horizon 1 and

6    Operation Horizon 2.  Operation Horizon 2 occurs in February

7    2022.  So to the extent that this is a continuing policy

8    consideration, we think that there are people remaining in

9    Florida longer, that the Federal Government is not able to

10   effectively issue Notices to Appear, which means they will

11   remain in the state longer and consume services from the State.

12        THE COURT:  How is that point any different than what

13   is in the supplemental administrative record that talked about

14   Operation Horizon and the backlog that the Parole Plus ATD

15   policy created and the five years to clear the backlog?

16        MS. CHRISTMAS:  I don't know that it's distinctly

17   different, Your Honor, but it is corroborative and it does, you

18   know, provide duplicative evidence of the same thing but just

19   from a different perspective.

20        THE COURT:  I've got so much duplicative evidence I

21   don't know if I want more.  I mean, you're kind of arguing

22   against yourself there.

23        MS. CHRISTMAS:  Well, Your Honor, I think to the

24   extent that you can view different decisions from different

25   angles that does inform the -- both the facts and, to a second

1    point of relevance, the idea that these decisions are arbitrary

2    and capricious if people within DHS know that there are problems

3    and they continue down the same policy route.

4            THE COURT:  Okay.  Mr. Darrow, anything else you want

5    to be heard on?

6            MR. DARROW:  Well, just to start with that last point,

7    I mean, it was my understanding that we had all agreed that we

8    weren't going to be introducing evidence at this trial to show

9    whether Parole Plus ATD was arbitrary and capricious, that that

10   was going to be separately adjudicated on the basis of the

11   record, which Your Honor points out already has this

12   information.  We don't need this other hearsay testimony to get

13   us there.

14           THE COURT:  Let me ask a question.  When you made the

15   arbitrary and capricious, you're talking about this parole -- or

16   excuse me, the nondetention policy generally?

17           MS. CHRISTMAS:  Yes, Your Honor, the general policy,

18   not specific to the Parole Plus ATD policy.

19           MR. DARROW:  Okay.  It just -- my understanding was

20   that was what was referenced because, as Your Honor knows, there

21   are no more NTRs and that to the extent that we move forward,

22   the backlog we're talking about is a backlog created by Parole

23   ATD and -- you know, as you've seen in the record, that that is

24   part of the Parole ATD record is this backlog that is being

25   addressed.  Which, you know, there is still a backlog.  Your

1    Honor doesn't need the videos to tell him that.

2            THE COURT:  All right.  I guess here's my thought on

3    it.  I mean, if we had a jury, I would certainly not introduce

4    this because somebody with a blurred screen who we have no idea

5    who she is -- I guess she gave us some slight context of who she

6    is talking about this program -- giving us a bunch of numbers

7    that I have no idea where those numbers came from.

8            That being said, and we've -- I don't think it's

9    disputed that the continuation of this program is creating a

10   bigger -- I mean, the supplemental record tells us every 30 days

11   this program continues, it's another year's worth of delay and

12   another $8 million.

13           And so if that's the fact that you want me to draw

14   from this, I don't need that to draw that fact.  If the fact you

15   want me to draw from it is that the first phase of Operation

16   Horizon didn't fix the problem, I don't need that video to tell

17   me that because the prior two videos tell me we've got a

18   Phase 2.

19           So I will give Mr. Darrow a bone here and say I'm not

20   going to consider that exhibit.  But that being said, all the

21   information you wanted me to glean from that exhibit is already

22   in there.  So as much as anything, I'll find that it's a

23   duplicative exhibit and exclude it on that basis, even though I

24   think Florida's right, that a 403-type argument in this context

25   is less meritorious simply for the reasons I've just stated,

1   that I'm going to sort out the wheat from the chaff and have

2   essentially done that.

3          So I'm not going to receive that last video.  If for

4   nothing else, I don't have to listen to that horrible noise

5   again.

6          MS. CHRISTMAS:  Yes, Your Honor.  Thank you.

7          THE COURT:  All right.  Is that the end of the case

8   for the State of Florida?

9          MS. PATEL:  One more, Your Honor.

10         THE COURT:  Wonderful.

11         MS. PATEL:  I have an additional batch of exhibits.

12         May I approach?

13         THE COURT:  Sure.

14         MS. PATEL:  So at this time Florida would like to move

15   into evidence Exhibits 48, 63, and 96.

16         THE COURT:  All right.  Tell me -- I see, 48 is the

17   Responses to Interrogatories.  63 is Responses to Requests for

18   Admission.

19         Is there going to be an objection to these exhibits,

20   those two?

21         MR. DARROW:  No objections, Your Honor.

22         THE COURT:  All right.  They'll be received.

23      *(PLAINTIFF EXHIBITS 48, 63:  Received in evidence.)*

24         THE COURT:  But what in particular do you think is

25   important for me to know?

1          MS. PATEL:  There is some explanations regarding how

2    the Federal Government applies some of the particular statutory

3    cites in the Request for Admissions in the Interrogatories.

4          THE COURT:  Let me ask one other question.  Are

5    there -- are you offering this for every single response, or are

6    there one or two that you want me to consider?  And if so, I can

7    maybe highlight those and that will be the portion of it that I

8    receive.

9          MS. PATEL:  The responses that specifically relate to

10   the warrants.

11         THE COURT:  So starting on Exhibit 48, which response

12   is that?

13         MS. PATEL:  I think that would be Interrogatory

14   Number 5.

15         THE COURT:  So of Exhibit 48, that's what you want me

16   to have?

17         MS. PATEL:  If I can just take a quick look.

18         THE COURT:  Uh-huh.

19         MS. PATEL:  And also Interrogatory Number 4.

20         THE COURT:  So I can ignore the rest of it?

21         MS. PATEL:  Yes, Your Honor.

22         THE COURT:  All right.  I'm going to go ahead and

23   annotate the official exhibit with a line through everything

24   else.

25         All right.  And give me the same information on 63.

1     MS. PATEL:  Request for Admission Number 4, and I

2  believe again Request for Admission Number 5.

3     THE COURT:  So I don't need to consider anything other

4  than that, correct?

5     MR. PERCIVAL:  Your Honor, we would reserve the right

6  to admit additional portions of this in the rebuttal case as

7  necessary, but that's consistent at this time.

8     THE COURT:  All right.  Well, I won't mark that one up

9  yet, and it was admitted without objection, but please circle

10  back and let me know that I can mark it up when it's time.

11     All right.  Ms. Patel, Number 96.

12     MS. PATEL:  Yes.

13     THE COURT:  What is that and what purpose are you

14  offering it?

15     MS. PATEL:  So Number 96 is a document that's put

16  forth by the Bureau of Justice Assistance.  It relates to the

17  application process for a federal reimbursement program.  As the

18  parties have stipulated to in this case, Florida expends money

19  on incarcerating undocumented criminal aliens.  A portion of

20  that is offset by this SCAAP program.

21     We're offering this document for the definitions --

22  two definitions that are located on page 7 of the document.

23  It's the definition of "undocumented" and the definition of

24  "criminal alien."  At this point there's -- as it relates to

25  this portion of Florida's standing piece, those documents are

1   undefined.  There's no evidence in the record.

2          THE COURT:  That's the only thing I need to concern

3   myself with in this document?

4          MS. PATEL:  That is correct, Your Honor.

5          THE COURT:  All right.  Mr. Darrow or Ms. Ryan, any

6   objection to that document coming in so I can know what the

7   definition of "undocumented" and "criminal alien" are?

8          MR. DARROW:  For those specific purposes, Your Honor,

9   no.

10         THE COURT:  That's the only purpose that's been

11  offered, and that's the only purpose it's been received.  And so

12  I will put the highlighter around that so I know what to look

13  for.

14         *(PLAINTIFF EXHIBIT 96:  Received in evidence.)*

15         THE COURT:  All right.  Mr. Percival.

16         MR. PERCIVAL:  Yeah, just two housekeeping matters,

17  Your Honor.  The first, is we haven't dealt with the Davies

18  deposition.  We do have prepared highlighted excerpts.  We can

19  give those to Your Honor now, or we can just give them to the

20  clerk at the close of the case.  We just want to make sure --

21         THE COURT:  If you have them now, we'll go ahead and

22  take them now.

23         MR. PERCIVAL:  We also brought copies of all the

24  transcripts for the videos that were read, highlighted, as well

25  as the Barker one.  Do you want us to just give you everything

1   now?

2          THE COURT:  Let me answer your question with a

3   question.  Are the ones you're going to give me with the Davies

4   deposition as well as the other ones you described, are those --

5   do they include all the counter-designations as well?

6          MR. PERCIVAL:  Yes, Your Honor.  And we sent those to

7   defendants last night.  Although if they need more time to

8   double-check those, we're happy to give them to you tomorrow.

9   We just want to make sure we get them in before we close our

10  case.

11         MS. RYAN:  That would be appreciated, Your Honor, just

12  to double-check them.

13         THE COURT:  Okay.  That's fine.  Well, we'll leave

14  your case open to submit those documents once y'all have gone

15  through them together.

16         MR. PERCIVAL:  And that actually transitions nicely

17  into the other issue, Your Honor, because we were going to keep

18  our case open anyway, because Chief Ortiz is on our witness

19  list, but to accommodate his schedule, we've agreed to call him

20  out of order.

21         So what the parties have agreed to is that essentially

22  the cross will be without a scope limitation.

23         THE COURT:  Is that correct?

24         MS. RYAN:  Yes, that's correct, Your Honor.

25         THE COURT:  All right.  Very well.  Understood.

1           MR. PERCIVAL:  Thank you, Your Honor.

2           THE COURT:  All right.  Mr. Darrow, I believe we're on

3   your case now.

4           MS. RYAN:  I'm going to kick us off, Your Honor.

5           THE COURT:  All right.  Very well.

6           MS. RYAN:  First, Your Honor, we also have deposition

7   designations highlighted for Your Honor.

8           I don't know if you also would like a night to

9   double-check them.

10          MR. PERCIVAL:  Yes, please.

11          THE COURT:  Okay.

12          MS. RYAN:  So it's just for Davies, Mr. -- excuse me,

13  Mr. Barker, Mr. Heckman, and Mr. Bottcher.

14          THE COURT:  All right.  Why don't you give us their

15  full names just so we have them.

16          MS. RYAN:  Sure.  Tony Barker, he's a DHS witness who

17  was unavailable; and Jesse Bottcher, from the Florida Department

18  of -- the Agency of Healthcare Administration; and James Heckman

19  from Florida's Department of Economic Opportunity.

20          THE COURT:  Okay.

21          MS. RYAN:  We also at this time would like to move

22  into evidence without objection Exhibits A through DD, and

23  Exhibits L through OO.

24          MR. PERCIVAL:  We haven't objected to any of their

25  exhibits, Your Honor.

1          THE COURT:  Okay.

2          MS. RYAN:  And we have hard copies in the binders that

3    we can hand up.

4          MR. GUARD:  The only thing I'll raise, Your Honor, is

5    there are -- several of those exhibits are consolidated

6    appropriations acts, so we're talking federal government funding

7    multiple agencies.  We don't object to them coming in, but

8    they're -- it's the federal budget, so you can imagine how

9    voluminous that is.  I just wanted the Court to be aware of

10   that.

11         MS. RYAN:  Yes, Your Honor.  In our closing we will be

12   pointing the Court to the specific passages that we think are

13   relevant, but we included the entire exhibit because we did not

14   want to limit that without speaking to counsel or to alter the

15   pretrial stipulation.

16         THE COURT:  All right.  I assume there's no reason for

17   me to have the budget of whatever federal agency -- whatever

18   myriad of federal agencies there might be out there.  So is

19   there a reason that you can't pull out everything other than

20   the -- either the HHS or the ICE or CBP, whatever you can get it

21   down to?

22         MR. PERCIVAL:  We have no objection to that, Your

23   Honor.

24         MS. RYAN:  Your Honor, we're not sure that it's

25   assembled in such a manner, that it's sectioned off like that.

1  We believe it is for Homeland Security as a whole.  We will

2  take -- we can take a look at it and see if there is a way that

3  we can cut down on the paper.

4          THE COURT:  How many of those notebooks over there are

5  you going to deliver to me?

6          MS. RYAN:  Those are all for you, Your Honor.

7          THE COURT:  Wonderful.  And how many of those

8  notebooks have budget in them?  In other words, does the federal

9  budget make up one entire notebook?

10          MS. RYAN:  It makes up a few of those notebooks, yes.

11          THE COURT:  Okay.  Well, I would certainly like to

12  have less paper.

13          MS. RYAN:  Would you like us to hand up the other

14  binders at this time?

15          THE COURT:  Sure.

16          Let me ask one other question.  It appears -- I mean,

17  I just flipped to one of the exhibits.  It looks like something

18  I've got in evidence already.  Is there duplication in here as

19  well?

20          MR. DARROW:  Yeah, some of our exhibits are also some

21  of plaintiff's exhibits.

22          THE COURT:  Okay.  Ideally, I would only have one copy

23  of it; but at this point, I guess that ship may have sailed.

24          Right now I've got your Notebooks Number 1, 5, 6, 7,

25  and 8.  So am I to infer from that Exhibits 2 -- or Notebooks 2,

1    3, and 4 are the federal budget?

2         MS. RYAN:  Yes, Your Honor.  And we will take a look

3    at those.

4         THE COURT:  Yeah.

5         MS. RYAN:  And so at this time, Your Honor, the

6    defendants call Matthew Davies.

7         THE COURT:  Okay.  Ms. Fudim, which notebook shall I

8    have handy for that?

9         MS. FUDIM:  We'll be looking at B and L, which are

10   very short exhibits.

11        MS. RYAN:  We will also have them on the screen for

12   you, Your Honor.

13        MS. FUDIM:  And we're also going to have them on the

14   monitor, so if you don't want to --

15        THE COURT:  Okay.

16        MS. FUDIM:  -- go into the binders.

17        **MATTHEW DAVIES, DEFENSE WITNESS, DULY SWORN**

18        DEPUTY CLERK:  You may be seated.

19        Please state and spell your full name.

20        THE WITNESS:  Matthew S. Davies, M-A-T-T-H-E-W, S,

21   D-A-V-I-E-S.

22                    **DIRECT EXAMINATION**

23   BY MS. FUDIM:

24   Q.  Good afternoon, Mr. Davies.  Can you please introduce

25   yourself by name, which you just did, and title to the Court,

1   please.

2   A.    Yeah, I'm Matthew Davis.  I'm the executive director for

3   Admissibility and Passenger Programs within the Office of Field

4   Operations, U.S. Customs and Border Protection.

5   Q.    What is U.S. Customs and Border Protection?

6   A.    U.S. Customs and Border Protection is a part of the

7   Department of Homeland Security that focuses on border

8   management at our borders.

9   Q.    Are there other components within the Department of

10  Homeland Security?

11  A.    There are.  There are approximately 22 different agencies

12  that make up the Department of Homeland Security.

13  Q.    And you mentioned that you are part of the Office of Field

14  Operations.  Can you tell us what that is?

15  A.    The Office of Field Operations within CBP, Customs and

16  Border Protection, is the operational component that's

17  responsible for our operations at ports of entry.

18  Q.    What is a port of entry?

19  A.    A port of entry is a location that's been designated for

20  people and goods to lawfully enter or exit from the United

21  States.

22  Q.    Are there different types of ports of entry?

23  A.    There are.  Traditionally, we would separate ports of entry

24  into three main categories being land, air, and sea.

25  Q.    How many ports of entry are there?

1    A.    There are approximately 328 ports of entry.

2    Q.    And in terms of land ports of entry, are there different

3    mechanisms for encountering or crossing over a land port of

4    entry?

5    A.    There are.  Individuals can arrive on foot as a pedestrian.

6    They can arrive in a personally owned vehicle, on a bicycle, in

7    a commercial vehicle.  We don't have any passenger train

8    crossings on the southwest border, but that's another option at

9    land borders.  So any modes of conveyance you can imagine to

10   come across a land port of entry we see at our land border

11   ports.

12   Q.    How many land ports of entry are there across the southwest

13   border?

14   A.    There's approximately 30 land border ports of entry on the

15   southwest border.

16   Q.    And is each one occupied by an OFO facility?

17   A.    There are OFO facilities at all of our ports of entry, yes.

18   Q.    And what comprises an OFO facility?  What is that?

19   A.    So it's an operational space where we can conduct our

20   inspections.  It will vary based on the type of traffic that

21   goes through a particular port of entry in terms of what types

22   of facilities will be included.  But in general, it includes

23   both primary, secondary inspectional space and any additional

24   functional spaces that are required for those inspections.

25   Q.    Are there any other operational offices within CBP other

DAVIES - DIRECT

1    than OFO?

2    A.   There are.  The two other main operational offices would be

3    U.S. Border Patrol and Office of Air and Marine Operations.

4    Q.   Is there a physical difference in terms of location between

5    OFO and Border Patrol?

6    A.   The biggest difference from a physical location perspective

7    would be that OFO operates at ports of entry and the Border

8    Patrol operates between ports of entry.

9    Q.   Are there any operational differences between OFO and

10   Border Patrol?

11   A.   The biggest operational difference is the complexity of the

12   scope of work in our mission set.  For OFO at a port of entry,

13   it's not -- I don't want to make it sound like Border Patrol's

14   mission is easy, but it's not just a case of encountering

15   individuals who are unlawfully attempting to enter.  We see a

16   tremendous volume of people who are coming in lawfully who need

17   to be inspected and goods that need to be inspected every day at

18   all of our ports of entry.

19   Q.   What types of lawful crossings are you referring to?  Just

20   a couple examples.

21   A.   Yeah, so we would have individuals U.S. citizens, lawful

22   permanent residents.  We have visitors from all over the globe

23   that have the proper visas and documents to come into the

24   country where an officer may have to determine whether they have

25   the appropriate type of visa and conduct questioning to ensure

1    that they are fully admissible in the category they're seeking

2    to enter.

3    Q.   And do you also see cargo that comes across at ports of

4    entry --

5    A.   Yes.

6    Q.   -- through OFO?

7    A.   Yes, we do see cargo, especially along our southwest

8    border.

9    Q.   And are cargo crossings also inspected?

10   A.   Yes.

11   Q.   How long have you been with OFO?

12   A.   I've been a part of OFO since the creation of CBP in 2003.

13   Prior to that, I was with the Immigration and Naturalization

14   Service.

15   Q.   And how long were you with Immigration and Naturalization

16   Service prior to becoming part of OFO?

17   A.   I started my career in August of 2002, so just over 20

18   years now.

19   Q.   You mentioned earlier that your position is the executive

20   director of Admissibility and Passenger Programs.  Can you

21   explain to the Court what the Admissibility and Passenger

22   Programs are?

23   A.   Yeah.  I have 11 director-level divisions that cover a

24   variety of programs and systems related to the arrival of people

25   through our ports of entry.

DAVIES - DIRECT

1   Q.   And can you give us an example of some of those different

2   director programs that you oversee?

3   A.   Yeah.  So we have the Admissibility Review Office which

4   handles waivers of inadmissibility for people seeking visas to

5   come to the United States.

6        We have our Fraudulent Document Analysis Unit that

7   reviews all the fraudulent documents that are intercepted coming

8   into the United States.

9        We have our Enforcement Programs Divisions which help

10  to implement guidance for enforcement-related programs.  We have

11  our Systems Enforcement Analysis and Review which does

12  analytical review of cases processed in the field.

13       We have our Biometric Entry-Exit Program which focuses

14  on the -- they use a biometrics, both fingerprints and

15  photographs, for people coming to make sure that their

16  identities are confirmed as they enter and leave the United

17  States.

18       We have our Electronic System for Travel Authorization

19  Division which focuses on the visa waiver program.  And the --

20  we call it an ESTA, Advanced Travel Authorization that's

21  required from people from those 40 countries to come to the

22  United States.

23       We have our External Engagements and Initiatives

24  Division, which deals a lot with carrier liaison, working with

25  the travel industry to ensure that they know what those

DAVIES - DIRECT

1   requirements are.  We also have our Immigration Advisory Program

2   and -- let's see, Our Operational Support Unit.

3         So Immigration Advisory Program, just to clarify, is a

4   program where we deploy officers overseas to assist with

5   carriers and with other governments in identifying fraudulent

6   trends or legitimate travelers before they get on a plane to

7   come to the United States.

8         And then our last two are the Traveler Entry Programs

9   which focuses a lot on the systems that we use at ports of entry

10  for primary and secondary processing of individuals.  And our

11  Trusted Traveler Program.  So like Global Entry, our marquise

12  program.

13  Q.   And you oversee all of those programs?

14  A.   That's correct.

15  Q.   Do you create policy, Mr. Davies?

16  A.   So for any of the programs that I directly oversee, I would

17  say I implement policy guidance that is restricted only to those

18  programs.  But to the extent that there is consideration for

19  broader policies, something that comes from a higher level, I

20  don't do that type of policy.  We may put out guidance that

21  implements that policy instead.

22  Q.   So to the extent that you can create guidance for any of

23  the 11 programs you mentioned, would that guidance be able to

24  affect other components of immigration operations, say, within

25  Border Patrol or within ICE?

1   A.   No, if there was going to be something that affected other

2   parts of the organization in that way, the approval authority

3   would have to be elevated in keeping with our chain-of-command

4   principal.

5   Q.   In your current position, do you communicate with directors

6   of field office operations along the southwest border?

7   A.   I do.

8   Q.   How often do you do that?

9   A.   On a regular basis.  Usually, at least once a week if not

10  more frequently.

11  Q.   And in your current position, do you travel to the

12  southwest border physically?

13  A.   I do.

14  Q.   And how often do you do that?

15  A.   At least several times a year.  I think I was most recently

16  in El Paso and San Diego in December.

17  Q.   Now, you had mentioned earlier that there's different modes

18  of transportation by which an individual can cross into the

19  United States via a port of entry.  Are all such individuals

20  inspected regardless of which mode of transportation they may

21  use?

22  A.   Yes.  We conduct primary inspections on everyone entering

23  the United States at a port of entry.

24  Q.   Are you familiar with the term "asylum"?

25  A.   Yes.

DAVIES - DIRECT

1    Q.   What is asylum as you're familiar with it?

2    A.   Asylum is a protection that's available for individuals who

3    are seeking to flee persecution or a fear of persecution in

4    their home country which may be related to their race, their

5    religion, their nationality, or participation in a particular

6    social class.

7    Q.   Where does a person have to be in order to claim asylum?

8    A.   In the United States, an individual seeking to claim asylum

9    has to be physically located in the United States.

10   Q.   The right to claim asylum, is that a new policy?

11   A.   No.

12   Q.   Do you know how long that that ability to claim asylum has

13   existed within the United States?

14   A.   I believe it's been -- well, over half a century.

15   Certainly long before I started my career with INS and CBP.

16   Q.   So I'm going to ask you now, Mr. Davies, if you can just

17   take us through in your own words what happens when with an

18   individual comes to a pedestrian port of entry to seek entrance

19   into the United States.  Take us through the different stages

20   that that individual would encounter, if you would.

21   A.   So the first thing that is worth explaining is that

22   currently at our southwest border land ports of entry, we are

23   still enforcing Section 265 of Title 42.  So we have officers

24   positioned at the international boundary line -- we sometimes

25   refer to that as a limit line -- looking to see whether

DAVIES - DIRECT                                    50

1    individuals seeking to cross on foot have valid documents for

2    entry.

3            In most locations, that's as simple as the individual

4    holding up their passport or their travel document, their border

5    crossing card, to show the officers they're approaching the

6    limit line and then the officer allowing them to proceed for the

7    actual inspection at primary inspection in the United States.

8    Q.   So just to be clear, the process that you've just described

9    beyond the limit line, is that taking place then in Mexico?

10   A.   So where people are approaching the limit line, yes, that

11   part where people are getting ready to present their documents,

12   that's all happening in Mexico, yes.

13   Q.   And if a person doesn't have a document?

14   A.   If a person doesn't have the document as they approach the

15   line, the officer will direct them -- may direct them back to

16   Mexico or may ask them to wait in line because they are

17   prevented from being -- prevented from entering under the

18   Title 42 that we're currently enforcing.

19   Q.   Okay.  And just in terms of semantics, a person who's

20   turned away at the limit line under Title 42, would we say that

21   that person is expelled or something else?

22   A.   No.  When we're talking about what happens at the limit

23   line, that's a prevention of entry.  An expulsion under Title 42

24   happens once the person's actually crossed into the United

25   States and then is returned foreign.

DAVIES - DIRECT

1   Q.   Okay.  After a person has crossed beyond the limit line,

2   what, if anything, happens in terms of that person being

3   processed by OFO officers?

4   A.   So the next step in the process is primary inspection.  And

5   so if you'd like me to kind of explain primary inspection a

6   little bit, that is questioning of an individual, review of

7   their documents, review of our systems to ensure that we've

8   identified the person's nationality, their identity, their

9   admissibility to the United States.  And a decision is made in

10  relatively short order, usually under a minute, whether that

11  person can be admitted from primary and released into the United

12  States or if there is a reason to refer them to secondary for

13  additional inspection.

14  Q.   Okay.  You just mentioned "under our systems."  What do you

15  mean by that?

16  A.   Our primary system, so we have -- in different environments

17  we may have different names for our primary systems, but we

18  always have a primary technology system that our officers use to

19  access information about people who are crossing.

20  Q.   Is there any issue with people presenting fabricated

21  documents at ports of entry?

22  A.   Yeah, we would call them counterfeit or fraudulent

23  documents.  We do encounter those on a regular basis, but we

24  also encounter genuine documents that are presented by

25  individuals who are impostors to those documents.  That happens

1   on a daily basis.

2   Q.   And are your officers trained to confront and deal with

3   those situations?

4   A.   Yes.

5   Q.   Now, what percentage of people coming to land ports of

6   entry at the southwest border have documents?

7   A.   Well over 90 percent.  I think it's actually 98 or

8   99 percent of people at our southwest border ports of entry have

9   legitimate documents to cross.

10  Q.   And what percentage of people who pass through primary

11  inspection are deemed admissible?

12  A.   Again, it's a high-90s' percentage of people who are

13  admitted directly from primary.

14  Q.   Now, you mentioned a moment ago something called secondary

15  inspection.  Can you tell us a little bit about that, please.

16  A.   Yeah.  Secondary inspection is a place where we can take a

17  little bit more time to more fully assess someone's

18  admissibility into the United States.  It may be for

19  admissibility reasons.  People may also be referred to secondary

20  for other reasons, because, again, at our ports of entry we have

21  a very complex mission.  We may be looking for narcotics.  We

22  may be looking for intellectual property rights' violations.  We

23  may be looking for prohibited agricultural items.

24          So depending on the nature of the referral, there may

25  be different actions that are taken with that individual to

 1    conclude their secondary inspection.

 2    Q.   You said with regard to secondary inspection your officers

 3    have the ability to take a little bit more time.  Can you give

 4    us an idea, first, of how long primary inspection generally

 5    takes?

 6    A.   Yeah.  Primary inspection is usually done in less than a

 7    minute.

 8    Q.   And secondary?

 9    A.   So again, depending on the type of the referral, secondary

10    inspection can be anywhere from just a few minutes to several

11    hours; or for those cases that ultimately might lend themselves

12    to a detention setting, it may be a few days.

13    Q.   Now, what happens if someone is determined to be

14    inadmissible?

15    A.   When we identify that someone is inadmissible, we have a

16    number of different processing pathways.  So we can decide and a

17    supervisor, a second-line supervisor will be involved in helping

18    to determine which is the most appropriate pathway to choose for

19    an individual case.

20         MS. FUDIM:  Okay.  I'd like to share at this time with

21    Mr. Davies and with the Court what's been marked as Exhibit L in

22    evidence.  I'm going to ask our paralegal to pull it up on the

23    screen, please.

24    BY MS. FUDIM:

25    Q.   Mr. Davies, can you see this document, or would you prefer

DAVIES - DIRECT                                    54

1    a hard copy for you?

2    A.    I can see it here.

3    Q.    Okay.  And if we can just zoom in -- well, before that,

4    excuse me, do you recognize this document, Mr. Davies?

5    A.    Yes.

6    Q.    Can you tell us what it is?

7    A.    This is a document showing the processing pathways under

8    U.S. Border Patrol.

9    Q.    So this is a Border Patrol document?

10   A.    That's correct.

11   Q.    Have you seen it before?

12   A.    I have.

13   Q.    And you're familiar with it?

14   A.    Yes.

15        MS. FUDIM:  Okay.  So I'm going to ask our paralegal

16   to please zoom in on the column that shows different processing

17   pathways.

18   BY MS. FUDIM:

19   Q.    Taking a look at what's been just highlighted for you,

20   Mr. Davies, the very first one says "Voluntary Return/Withdrawal

21   of Application for Admission."

22        Is that something that you're familiar with?

23   A.    Yes.

24   Q.    Can you tell us a little bit about what that is?

25   A.    Yeah.  So for us on the OFO side, withdrawal of application

1   for admission would be an individual who has arrived at a port

2   of entry, we believe that they are likely inadmissible to the

3   United States, but we believe as an act of discretion that they

4   can be allowed to return directly to the place that they came

5   from.  It has to be done voluntarily.  They have to choose to do

6   that willingly.  But it -- essentially it avoids any negative

7   repercussions or consequences from an immigration perspective

8   for them.

9            Voluntary return is very similar to that.  We in OFO

10  would typically use a voluntary return option when someone is

11  already encountered having been in the United States without

12  having been admitted or paroled.

13           So if you think about when we do outbound inspections

14  for people leaving the United States and Mexico, we may

15  encounter someone who was never properly admitted but whose

16  intention is to go into Mexico.  And so it doesn't serve us a

17  significant benefit to detain or otherwise hold onto that person

18  instead of letting them voluntarily fulfill their intentions to

19  leave the country.

20  Q.   So do I understand you correctly that OFO uses both

21  mechanisms:  voluntary return and withdraw of application for

22  admission?

23  A.   Yes, yes.  Predominantly withdrawal, but yes.

24  Q.   Okay.  And the next item says "Warrant of Arrest/NTA."  Are

25  you familiar with that?

A.    Yes.

Q.    Can you tell the judge what that is?

A.    So Warrant of Arrest/NTA, it's a processing disposition
that Border Patrol typically will use.  They issue an
administrative warrant to take an individual into custody who is
present without admission or parole in the United States.  And
the NTA is a charging document that initiates proceedings before
an immigration judge.

Q.    Does OFO use Warrant of Arrest/NTA?

A.    Not typically.  There are times where we may use that; but
more often than not, we don't use warrants of arrest because
individuals are arriving aliens, arriving noncitizens, and
they're already in our custody at that point.

Q.    The next item says, "Reinstatement of Order of Removal/Bag
and Baggage."  What are those?

A.    So these are both cases where there's already been an
outstanding Order of Removal which could either have been from a
CBP officer; for example, a formal Order of Expedited Removal or
a Final Order of Removal from an immigration judge.

        In the first case, reinstatement is where an
individual has been removed but they're seeking to reenter or
they have reentered the United States.  And instead of
restarting proceedings all over again, it's actually in the
government's interest to just reinstate the prior order to more
swiftly remove them from the United States.

DAVIES - DIRECT

1                A bag and baggage case is again similar but where the

2    order of removal has not previously been executed.  And so it's

3    the first instance of us executing the order that was issued by

4    either the immigration judge or potentially by a CBP

5    officer/Border Patrol agent for an expedited removal case.

6    Q.   And does OFO use both of these mechanisms?

7    A.   Yes, we would.

8    Q.   Now, the next item says "Expedited removal."  Are you

9    familiar with expedited removal?

10   A.   Yes.

11   Q.   Okay.  Can you tell us what that is?

12   A.   Expedited removal is the authority that we have, that CBP

13   has to remove individuals who are inadmissible under grounds of

14   not having the proper documents or for fraud and

15   misrepresentation.

16   Q.   As part of the expedited removal process, are noncitizens

17   able to claim asylum?

18   A.   Yes.  As a requirement for the expedited removal case

19   processing, there is a document that we are required to complete

20   that provides an opportunity for the noncitizen to identify any

21   fear they have of return to their home country.

22   Q.   And who evaluates the fear-based claim?

23   A.   If a noncitizen affirmatively answers questions on that

24   form as asked by CBP, CBP will make a referral to USCIS.  The

25   asylum officers will be the first ones who hear that credible

1   fear in an interview process.

2   Q.   You just used the acronym USCIS.  Can you tell the Court

3   what that stands for?

4   A.   Yeah, that's United States Citizen and Immigration

5   Services.

6   Q.   And is that one of other components of DHS that you had

7   mentioned earlier?

8   A.   It is, yes.

9   Q.   Now, is there a consequence for a migrant or a noncitizen

10  who is removed from the country pursuant to expedited removal?

11  A.   Once an expedited removal order is effected, it carries a

12  five-year bar -- a period of five years before that person can

13  seek to be readmitted to the United States, yes.

14  Q.   Thank you.

15        Now, looking down again at Exhibit L, the next item in

16  the column says "MPP."  Are you familiar with that acronym?

17  A.   Yes.

18  Q.   What is that?

19  A.   That stands for Migrant Protection Protocols.  It was a

20  program that we used under the authority of 8 U.S.C.

21  1225(b)(2)(C) to return individuals who are pending proceedings

22  before the immigration court to Mexico before the date of their

23  next hearing.

24  Q.   And does OFO currently use MPP?

25  A.   OFO is not currently enrolling individuals in MPP, no.

1          *(Reporter clarification.)*

2     A.     The Office of Field Operations is not currently enrolling

3     individuals in MPP, no.

4     Q.     Do you currently see individuals seeking to enter the

5     United States who may have previously been enrolled in MPP at

6     land ports of entry or otherwise across the southern border?

7     A.     We do on occasion encounter those individuals, yes.  And

8     when they're seeking to return for the purpose of attending an

9     upcoming court hearing, we facilitate their entry into the

10    United States for that purpose.

11    Q.     The next item on Exhibit L says "Notice to Appear/Own

12    Recognizance."  Do you see that?

13    A.     Yes.

14    Q.     What is that?

15    A.     This is a disposition that the Border Patrol uses when

16    they've issued a Notice to Appear for somebody but that

17    individual is not going to be detained.  They will be released

18    on recognizance.

19    Q.     Does OFO use the Notice to Appear/Own Recognizance?

20    A.     Not typically, no.  We generally within OFO use a Notice to

21    Appear followed by a parole disposition.

22    Q.     Operationally, what is the difference between an NTA/OR and

23    NTA parole?

24    A.     Yeah, so the -- operationally, I think largely we're

25    looking at the authorities that we use for this.  So the release

DAVIES - DIRECT

1    on recognizance is under 8 U.S.C. 1226, whereas the authority

2    used for the subsequent parole following an NTA issued by OFO is

3    under 8 U.S.C. 1182.

4    Q.   And is the paperwork any different between the two

5    mechanisms?

6    A.   Yes, there's a different form for the release on

7    recognizance.  I believe it's an I-220 as opposed to an I94 that

8    we issue to document the parole.

9    Q.   Do you know if Border Patrol uses both NTA/OR and NTA

10   parole?

11   A.   I believe that they predominantly use NTA/OR.

12   Q.   Turning now to the last item that we see in the column, it

13   says "Parole Plus ATD."  Do you see that?

14   A.   Yes.

15   Q.   What is that?

16   A.   That was a program -- is a program where Border Patrol, in

17   lieu of initiating full removal proceedings at the point of

18   encounter would parole the individual to appear subsequently at

19   an ICE facility and be issued an Alternatives to Detention, an

20   ATD, to monitor that individual while they're pending that

21   appearance.

22   Q.   And does OFO use Parole Plus ATD?

23   A.   No.  We may coordinate with ICE on Alternatives to

24   Detention, but we don't have as a programmatic disposition

25   Parole Plus ATD.

1    Q.    And is that just currently, or historically as well?

2    A.    That includes historically.

3    Q.    Now, not on this document, but I want to ask you about the

4    term "Notice to Report."  Is that a term that you're familiar

5    with?

6    A.    Yes.

7    Q.    And if I refer to it as "NTR," you'll know what I'm talking

8    about?

9    A.    Yes.

10   Q.    Okay.  What is the -- what is an NTR?

11   A.    An NTR, Notice to Report, was a processing disposition that

12   was used by Border Patrol as they were seeking a high number of

13   encounters and were unable to initiate the charging documents

14   and were giving people, noncitizens who were encountered, a

15   Notice to Report to an ICE field office at a date in the future.

16   Q.    And is that a program of that ever used by OFO?

17   A.    No.

18   Q.    Okay.  Now, are there any other pathways or dispositions --

19         THE COURT:  Let me interrupt you for a second.

20         I thought I heard you say that Border Patrol primarily

21   uses the NTA/OR and OFO primarily uses parole.

22         THE WITNESS:  Right.

23         THE COURT:  But not Parole Plus ATD.

24         THE WITNESS:  So there's a number of paroles that OFO

25   does that are separate from an NTA with a parole as a release.

```
 1   But you're right, we don't do Parole Plus ATD as a program.

 2            THE COURT:  And what is -- I mean, looking at the

 3   processing pathways, I don't see NTA parole.

 4            THE WITNESS:  Right.  So because this is a Border

 5   Patrol document, so it doesn't have on there what we would use

 6   with an OFO, which would be the NTA as the disposition and then

 7   the parole is the custody determination, the release.

 8            THE COURT:  Okay.  All right.  Thank you.

 9   BY MS. FUDIM:

10   Q.   Are there any other pathways -- and I think this piggybacks

11   a little bit off the judge's question.  Are there any other

12   pathways that OFO uses that aren't on this Border Patrol

13   document?

14   A.   There are.  In the context of the southwest border, the

15   ones that we see most prevalently would be things like parole

16   or, you know, there are documentary waivers that we can issue.

17   It depends on the intent, the purpose of the person's travel.

18   Q.   Well, let's break that down and just talk about the

19   examples that you gave, just so we can have some concept of what

20   the other may be.

21            You mentioned documentary waiver.  What's that about?

22   A.   So that may be for someone who just doesn't have the right

23   type of nonimmigrant visa or maybe they forgot their passport

24   but in all other aspects they're admissible.  They're seeking

25   entry at a port of entry, we believe that the purpose for their
```

1    trip is legitimate, and there's a way for us to overcome that.

2    There's a regulation that allows us to waive that documentary

3    requirement in consultation with Department of State.  We do

4    that at ports of entry on a regular basis.

5              And the difference -- it's important to underscore

6    here -- is when we conclude that process, that person is

7    admitted in that nonimmigrant classification.

8    Q.   And when you say are able to -- I don't know how to -- I

9    don't want to paraphrase exactly what you said, but you're able

10   to determine in consultation with other individuals or entities.

11   Are you also checking that individual against any databases to

12   ensure that they are who they say they are, or anything similar

13   to that effect?

14   A.   Yeah.  So that is part of -- any time we would do this, it

15   would be a secondary referral.  And so, again, our officers

16   would have access to the secondary case-processing systems which

17   includes, for example, access to State Department information

18   about visas that have already been issued, even though the

19   person may not have that, for example, in their passport, in

20   their possession.

21   Q.   Now, you also mentioned there could be other paroles.  Are

22   you familiar with just port of entry parole?

23   A.   Yes.

24   Q.   What's that?

25   A.   So a port of entry parole can be exercised for a number of

1    reasons.  Again, that same authority comes from 8 U.S.C.

2    1182(d)(5) where we can parole individuals typically for reasons

3    that are not just simple documentary deficiencies, whether for

4    urgent humanitarian reasons, medical concerns, or for law

5    enforcement purposes.

6    Q.   So would those individuals be getting an NTA as well under

7    the POE parole?

8    A.   So, no.  I mean, every case is evaluated on its own merits,

9    but there are individual cases who we process for just what we

10   call port of entry paroles, where we expect that the person is

11   going to return to their home country at the conclusion of the

12   purpose for which the parole is being granted, and it's

13   unnecessary in our view to initiate removal proceedings in those

14   cases.

15   Q.   So you mentioned medical being one of the kind of examples.

16   What do you mean by that?

17   A.   So individuals who -- for example, it's not uncommon for us

18   to see gunshot victims on our southwest border or other

19   individuals with serious medical complications.  We have

20   individuals who come over who are passed out, whether from drug

21   use or from other things.

22        And obviously as part of the inspection process, we

23   don't want to slow down the lifesaving efforts to save that

24   person, so we allow that person to be facilitated through the

25   port of entry to receive that medical treatment.  We may --

1    depending on the circumstances of a case, we may provide CBP

2    officers to act as guards at the hospital while that person is

3    there.  But more typically, we stay in communication with the

4    medical professionals to follow up on that case when the person

5    is -- again, has concluded the purpose for which the parole was

6    granted.

7    Q.   You also mentioned a law enforcement basis.  What's that?

8    A.   Right.  So individuals who are brought into the country for

9    the purpose of prosecution.  We may have people who are material

10   witnesses.  We see this quite commonly on our southwest border

11   where noncitizens who are smuggled in a vehicle, actually

12   secreted into a vehicle compartment, will be used as material

13   witnesses in a case.  And those individuals will be paroled into

14   the country to provide that law enforcement support.

15   Q.   And these paroles, are they of indefinite duration?

16   A.   No, there's a date certain that's set for all of our

17   paroles.

18   Q.   Now, what factors does OFO consider when choosing a

19   processing disposition for an inadmissible noncitizen?

20   A.   There's a variety of factors.  Again, I think the most

21   important things that we start with are making sure we've

22   identified the nationality, the identity, and the admissibility

23   of the individual, whether there's a threat to the community

24   that's possessed by them, what the intent of the travel was,

25   what the results of our systems checks have shown, and a number

DAVIES - DIRECT

1    of other factors that we evaluate on a case-by-case basis.

2    Q.   How long have the factors that you use been the factors

3    that are used to make these types of determinations?

4    A.   We've had our discretionary factors documented in policy

5    since 2008.

6           MS. FUDIM:   I'm going to ask my paralegal to put

7    Exhibit B on the screen, please.

8    BY MS. FUDIM:

9    Q.   Do you recognize Defendants' Exhibit B, Mr. Davies?

10   A.   Yes, I do.

11   Q.   Okay.  What are we looking at here?

12   A.   This is our CBP, our OFO policy on the exercise of

13   discretionary authority.

14   Q.   Okay.  And it has a September 3rd, 2008 date at the top.

15   Is that the date you were referring to when you mentioned 2008?

16   A.   Yes, it is.

17   Q.   And is this parole directive still operative?

18   A.   It is, yes.

19   Q.   Now, have the factors used to determine a processing

20   disposition changed since January of 2021?

21   A.   Not significantly.  I think we've updated the discretionary

22   checklist form that's addended at the end of this document, but

23   most of the factors are still the same.

24   Q.   Okay.  Since you mentioned the form, let's just -- can you

25   just flip towards the end just so we can have it on the screen.

1          Is this the discretionary checklist form that you were

2    mentioning?

3    A.   Yes, it is.

4    Q.   So do I understand you to be saying that there have been

5    changes to the form but the factors are generally the same that

6    have persisted since 2008?

7    A.   That's correct, yes.

8          MS. FUDIM:  Now you can take the document off.  Thank

9    you.

10   BY MS. FUDIM:

11   Q.   Have you ever been advised that this administration favors

12   one pathway over another?

13   A.   No.

14   Q.   And is there any oversight over a line OFO officer's

15   decision to utilize a particular processing disposition for a

16   particular noncitizen?

17   A.   There is, yes.  Every one of our cases will be reviewed by

18   both a first- and a second-line supervisor.

19   Q.   And do you use the same factors when considering pathways

20   for dispositions for families?

21   A.   We do, yes.

22   Q.   Will all members of a family unit necessarily be processed

23   under the same pathway?

24   A.   No, not necessarily.

25   Q.   Will OFO separate family units?

1    A.   We do on occasion separate family units, particularly

2    when -- usually the case for us is where an adult member of the

3    family unit has what we would call derogatory information or

4    where they are specifically a threat to the welfare of the child

5    or there's significant criminal history or, for example, when

6    there is actually a want or warrant for that parent.

7    Q.   Okay.  And just for the record, what is a family unit?  How

8    do you define that term?

9    A.   A family unit would be a group of noncitizens that includes

10   both a parent and a child, at least one parent and one child,

11   child being someone who's under the age of 18 who are

12   inadmissible to the United States.

13   Q.   And is that different in any way from the term "family

14   group"?

15   A.   A family group is a bit more encompassing of other

16   individuals who may not have a direct parental relationship to

17   the children.

18   Q.   Okay.  And is there a process by which you verify if a

19   family unit is a true family unit?

20   A.   So the primary way that we do that would be through our

21   inspection, through questioning, and through verification of

22   documents.  But there are other methods we could use if

23   necessary in a particular case.

24   Q.   What other methods?  Give us an example.

25   A.   So, for example, we could contact the consulate that the

 1    individuals are citizens of to see if they have additional

 2    information to verify, validate those claims.  OFO does not

 3    typically use things like rapid DNA testing, but we have had, on

 4    occasion, cases where we have used that process that's available

 5    through ICE to confirm family relationship as well.

 6    Q.    And presumably that's in situations where you have reason

 7    to doubt the validity of the family unit?

 8    A.    That's correct.

 9    Q.    Now, are you familiar with the terms "holding capacity" and

10    "detention capacity"?

11    A.    Yes.

12    Q.    What are they?

13    A.    So for OFO we would typically refer to holding capacity to

14    be that amount of space we have available at a port of entry to

15    temporarily hold an individual while they're being processed,

16    whereas we would consider detention capacity to be the long-term

17    capacity, typically within ICE facilities, once a determination

18    has been made to transfer custody.

19    Q.    And if we were to apply one of those two terms to the space

20    that Border Patrol has, which one would you apply?

21    A.    I would say they would be similar to OFO as holding

22    capacity instead of detention capacity.

23    Q.    In terms of physical accommodations, is there a difference

24    between holding capacity and detention capacity?

25    A.    Typically detention facilities have higher standards in

1    terms of the services that need to be provided, additional

2    wraparound services that may not be existing at all holding

3    facilities.

4    Q.    How long does OFO hold individuals in its holding

5    facilities?

6    A.    Generally, no longer than 72 hours.

7    Q.    How long has it been the case that generally OFO will not

8    hold noncitizens in holding capacity beyond 72 hours?

9    A.    At least throughout my career.

10   Q.    So at least 20 years?

11   A.    At least 20 years, yeah.

12   Q.    Does ICE available detention capacity affect OFO's decision

13   as to what processing disposition to pursue?

14   A.    It may.  I mean, it's a consideration, as is when we're

15   having those conversations whether there's the proximity of that

16   detention capacity, because it also factors for us the

17   transportation that's required to move that individual or that

18   group to wherever their ultimate detention is likely to be.

19   Q.    So tell me a little bit more about the transportation,

20   piece.  What's entailed in ensuring that transportation may be

21   feasible for a noncitizen?

22   A.    Yeah.  So we have requirements on our side in terms of what

23   has to go into transporting a noncitizen safely in a government

24   vehicle.  And so it's down to the number of officers, the types

25   of restraints, the distance.  And typically we're not -- OFO

1    doesn't have the resources to engage in long-term

2    transportation, so things that would take more than a day's trip

3    with a noncitizen for the purposes of continuing their

4    detention.

5    Q.    Is ICE detention capacity determinative of what processing

6    pathway OFO will utilize for a particular noncitizen?

7    A.    No.

8    Q.    And your answer, Mr. Davies?

9    A.    No.

10   Q.    Is there any ability on the OFO side to escalate a

11   determination regarding a particular noncitizen if OFO believes

12   that detention is necessary but there may be obstacles in the

13   way of ensuring detention, either because of transportation or

14   detention capacity?

15   A.    Yes.  We have worked out processes both locally and

16   nationally to elevate cases where OFO feels strongly that

17   detention is required as an outcome of our case processing.

18           And so that first happens locally where -- up to our

19   director of Field Operations.  So those who are responsible for

20   OFO field leadership in a particular region will reach out to

21   the ICE field office director; and if there's not satisfaction

22   at the end of that, then the DFO can escalates to myself or

23   other headquarters' offices for us to engage at the national

24   level.

25   Q.    And do you typically see resolution in those circumstances,

DAVIES - DIRECT

1  your own experience?

2  A.    In every case that I've seen the last two years since I've

3  been in this position, it has been escalated to the

4  headquarters' office.  We have been successful in securing

5  detention for every one of those cases.

6  Q.    How does a line OFO officer know if there's sufficient

7  detention capacity in ICE?

8  A.    So a frontline officer may not know themselves, but as

9  they're having the conversation with their first- and

10  second-line supervisors about the disposition of a particular

11  case, those supervisors will have general awareness of what

12  detention capacity might be available from ICE through the local

13  coordination that occurs at that level.

14  Q.    If a decision is made by OFO to parole an individual with

15  or without an NTA, is any documentation given to that individual

16  who's being paroled?

17  A.    Yes.  We document the parole.  Again, whether through an

18  NTA or separate and apart from an NTA on what's called an I-94,

19  an arrival/departure document.

20  Q.    And is any information gathered from the individual?

21  A.    Yes.  All of their biographic information and their

22  biometric information -- their fingerprints, their photograph --

23  will be collected as a part of that process.

24  Q.    And with regard to all different types of parole, are they

25  all of -- are any of them, I should say, of indefinite duration?

```
 1   A.   I can't think off the top of my head of any parole type
 2   that is of indefinite duration, no.
 3   Q.   So they're all limited?
 4   A.   Yes.
 5   Q.   In the year since you've been with OFO, have new policies
 6   been instituted that affect processing at the southwest land
 7   border?
 8   A.   Yes.  I think there have been a number of policies that
 9   have changed throughout my career that affect the southwest
10   border processing of individuals.
11   Q.   And how were those new policies communicated to you?
12   A.   So always -- we are an organization that is based on the
13   chain of command, so it would always come from the top down.
14   Q.   And would it be possible for a policy regarding the
15   processing of migrants at ports of entry along the southwest
16   land border to be instituted without you knowing about it?
17   A.   In my current position, no.
18   Q.   Are you aware of any policies suggesting a preference for
19   any particular processing disposition over another?
20   A.   No.
21   Q.   Are you aware of any policy suggesting a preference for
22   parole over detention?
23   A.   No.
24   Q.   Are you aware of any policy communicating an abdication of
25   case-by-case review for parole?
```

1   A.    No.

2   Q.    Are you aware of any policy discouraging transfer to ICE

3   for the purpose of detention?

4   A.    No.

5           MS. FUDIM:  Nothing further at this time, Your Honor.

6           THE COURT:  All right.  Mr. Guard.

7           MR. GUARD:  Sure.

8                        **CROSS-EXAMINATION**

9   BY MR. GUARD:

10  Q.    Good afternoon, Mr. Davies.

11  A.    Good afternoon.

12  Q.    First I wanted to ask you, Mr. Davies, does the

13  availability of the detention when that frontline officer is

14  talking with the supervisors influence the processing path?

15  A.    It may.  It may.

16  Q.    And so if those supervisors -- I think you said first- or

17  second-level supervisors have been told by ICE there is no

18  detention capacity for families or for single adults that will

19  affect the decision that -- the processing pathways that are

20  available for the OFO officer, correct?

21  A.    Well, it doesn't change the options that are available.  It

22  may have an impact on the outcome as one of the factors we

23  consider.

24  Q.    Okay.  If ICE tells you that there's no detention capacity,

25  you can't detain that alien, right?

1    A.   Well, there is an escalation process if we feel strongly

2    that there is good reason to detain an individual.

3    Q.   So you would be relying on being able to detain that

4    individual on some higher-level decision; is that correct?

5    A.   Right.  It would be escalated, as we outlined.

6    Q.   Okay.  And there is currently no family detention available

7    with ICE, right?

8    A.   That's a question you should probably ask ICE, but --

9    Q.   So in your title, in your role, you don't know that ICE

10   doesn't have any family detention capacity?

11             MS. FUDIM:  Objection.

12             THE COURT:  Overruled.

13             THE WITNESS:  So I'm aware that we have not

14   transferred a family unit to ICE for detention since February of

15   2021.

16   BY MR. GUARD:

17   Q.   So that's now -- we're at January of 2023.  So for over two

18   years, you have not been able to transfer a single family unit,

19   right?

20   A.   Right.  I think what we've focused on instead has been, at

21   least within OFO, looking at an individual determination so that

22   if an individual who is part of a family unit requires detention

23   based on the threat to the community, a criminal history, then

24   we have escalated those cases individually for detention by ICE.

25   Q.   But you have not been able to detain an inadmissible group

1    of -- a family group of aliens, right?

2    A.    I don't know that an OFO supervisor would find that it's

3    compelling to detain an entire family unit including small

4    children because of the actions or disposition outcome of a

5    single adult in that family unit.

6    Q.    In the past, prior to February 2021, OFO was able to detain

7    family units, correct?

8    A.    OFO would refer to ICE for detention of family units, yes.

9    Q.    Okay.  I want to get into your background just briefly.

10             Mr. Davies, in your career with Customs and Border

11   Protection, you have spent a total of four months assigned to

12   positions located at the southwest border, right?

13   A.    That's correct.

14   Q.    Okay.  And your four months assigned at the southwest

15   border was over a decade ago in 2011, right?

16   A.    That's correct.

17   Q.    And you weren't even assigned at the southwest border to an

18   OFO office, right?

19   A.    I was assigned to Border Patrol, Sand Diego Sector, that's

20   correct.

21   Q.    And during those four months that you were temporarily

22   assigned to the southwest border, you were responsible for that

23   Border Patrol sector's budget, fleet operations, and labor

24   employment, correct?

25   A.    That's correct.

1    Q.    Now, under OFO's processes, aliens without appropriate

2    documentation are inadmissible unless they're entitled to an

3    asylum or qualify for a waiver, right?

4    A.    Can you repeat that for me?

5    Q.    Sure.

6          I think I understood your testimony -- I'm just trying

7    to make sure -- under OFO's processes, aliens without

8    appropriate documentation are inadmissible unless they are

9    entitled to asylum or you described a waiver process, correct?

10   A.    I would say -- generally speaking, yes.  What I'm trying to

11   figure out in my mind is whether I think that their ability to

12   obtain asylum changes the fact that they're inadmissible.  But I

13   think generally if they don't have documents, they're

14   inadmissible until something happens to overcome that

15   inadmissibility, yes.

16   Q.    If they were granted asylum, they would be admissible at

17   that point, correct?

18   A.    Potentially.  Again, someone who has been granted asylum

19   still has to have travel documents that are -- that allow them

20   to travel, to be readmitted to the United States in that status.

21   Q.    All right.  You talked with counsel about the process.  You

22   talked about OFO's -- OFO officers conducting a four-question

23   screening to see if a credible-fear interview needed to take

24   place.  Do you recall that?

25   A.    Yes.

DAVIES - CROSS

1    Q.    Okay.  And you also talked about how credible-fear

2    interviews are conducted by U.S. Customs and Immigration

3    Services, right?

4    A.    U.S. Citizenship and Immigration Services.

5    Q.    Ah, you're right.  And credible-fear interviews don't have

6    to occur in person, correct?

7    A.    They may be telephonic, yes.

8    Q.    Okay.  And they do occur telephonically, right?

9    A.    That's correct.

10   Q.    In fact, isn't it true that credible-fear interviews on

11   occasion take place in OFO facilities, right?

12   A.    They may.

13   Q.    Okay.  And under OFO's processes, if an asylum officer does

14   not find a credible fear of persecution or torture, is an

15   inadmissible alien supposed to be removed?

16   A.    Yes, if there's removal orders.  So if we have processed

17   someone for an expedited removal and there's a negative finding

18   from the asylum officer, then that individual is to be removed,

19   yes.

20   Q.    And when we talk about expedited removal, expedited removal

21   doesn't take very long as far as a process, right?

22   A.    Well, it depends.  I think if you're -- if we're able to,

23   for example, take a Mexican national who arrived at the

24   southwest border and immediately return them to Mexico, that

25   doesn't take a long process.  But if it's an individual that

1  can't be returned to Mexico because they're not a national of

2  Mexico and if they don't have documents from their country, it

3  could be quite a lengthy process to actually obtain the

4  documents from their consulate and coordinate transportation.

5          And typically, again, at that point, the person would

6  not likely be in OFO custody while that's all happening.  They

7  would be transferred to ICE to secure all the transportation

8  logistics required to remove them.

9  Q.  Because ICE provides the transportation logistics, correct?

10 A.  ICE is the one that ultimately will remove individuals who

11 need to be, for example, flown to their home country of

12 residence, yes.

13 Q.  So it's possible at least for some inadmissible aliens that

14 they can be subjected to expedited removal without even leaving

15 the OFO port of entry, right?

16 A.  It's possible.  I would say that, you know, the likelihood

17 that we're able to secure and interview a credible-fear

18 interview within 72 hours is rather low.  But it's possible.

19 Q.  Now, you were shown Defendants' Exhibit B, which is the

20 U.S. Customs and Border Protection, CBP Directive

21 Number 3340-043.  Do you recall that?

22 A.  Yes.

23 Q.  Now, counsel didn't actually show you the parole section of

24 that document.

25          MR. GUARD:  If I could please have, Ms. Gerdts,

DAVIES - CROSS                    80

```
 1    Exhibit B.  If you could turn to page 7, it's at the bottom.
 2    BY MR. GUARD:
 3    Q.   Are you familiar with that parole section --
 4    A.   Yes.
 5    Q.   -- sir?
 6              Now, in this parole section which continues on from
 7    page 7 through I think page 9, there are a number of items or
 8    reasons that are listed as examples in which parole may be
 9    appropriate.
10              Are you familiar with those, sir?
11    A.   Generally, yeah.  I think if you're going to ask me
12    questions about them, I'd like to just look at the document.
13    Q.   Sure, sure.  Let's turn to page 8 at the bottom.  It starts
14    at 8.2.6, if you want to take a minute and look at it, sir.
15    A.   Okay.
16    Q.   On page 8, there's seven instances that are examples of
17    reasons for parole, correct?
18    A.   Yes.
19    Q.   And if you flip to page 9 -- because I'm not trying to hide
20    the ball at all, there are three more reasons, top of the page
21    on page 9, correct?
22    A.   You said there was three?
23    Q.   There's three more.  So it's seven, and then you have
24    8.2.6.8, 8.2.6.9, and 8.2.6.10.
25    A.   Yeah.  And I guess I would just point out that in 8.2.7, it
```

```
 1   does say -- even though it's talking about expedited removal, it
 2   does say in the second sentence, "Parole may be permitted if
 3   there's a medical emergency or necessary for legitimate" -- so I
 4   don't know if that would count as another reason, but...
 5   Q.   Sure.  But if we go back to page 8 in 8.2.6.1 --
 6   A.   Yeah.
 7   Q.   -- that actually -- emergency medical treatment is the
 8   first example given, right?
 9   A.   Yeah.  Yeah, so as a subsection, there are the ten
10   examples, yes.
11   Q.   Okay.  And most of the examples, is it fair to say, deal
12   with either emergency situations or the need for emergency
13   medical treatment?
14   A.   Yes.  Several of them do deal with emergency medical
15   treatment.
16   Q.   Okay.  Or emergency situations like 8.6.2 deals with
17   emergency workers responding to a crisis, right?
18   A.   Yes.
19   Q.   8.6.3 deals with medical evacuation, right?
20   A.   Yes.
21   Q.   And then the second kind of class of things deal with
22   minors, right?
23   A.   Yes, there's references here to parole of minors.
24   Q.   Okay.  And all these situations that are listed in this
25   document are very limited and very particular as far as
```

1   examples, correct?

2   A.    Well, I think they're intended to be examples.  I don't

3   know that it was intended that this would be an exhaustive list

4   of cases where parole would be appropriate.

5   Q.    But none of those ten examples that are listed in this

6   document point to this broad grant of parole authority that lets

7   the OFO or any other component just parole anyone that they feel

8   that they should, correct?

9   A.    Parole is a discretionary authority, and as we were

10  identifying some of these examples here, we were -- when this

11  document was created, there was a specific set of circumstances

12  that we were trying to remind the field about.  I don't think it

13  was intended that that should limit our ability to use the

14  discretionary parole authority that we have.

15  Q.    Okay.  Now, after that directive, there have actually been

16  a couple of memoranda that have been sent out, actually by -- I

17  guess maybe somebody who was one of your predecessors, right?

18  A.    That's correct.

19  Q.    Are you familiar with those memoranda?

20  A.    Yes.

21  Q.    Those memoranda came out during the Obama Administration,

22  right?

23  A.    I believe 2014, 2015, yes.

24  Q.    Okay.  You mentioned the 2015 memorandum.  In May 12th,

25  2015, your predecessor or one of your predecessors -- maybe

1    multiple people before him and you, or her and you -- published

2    a memorandum entitled "Parole of Inadmissible Nonimmigrant

3    Aliens," right?

4    A.   Yes.

5    Q.   Right.  And in the May 2015 memorandum, your predecessor

6    set out the criteria to be applied by OFO officers in making a

7    parole decision under Section 212(d)(5), right?

8    A.   So I think in that document that the reference that was

9    being made to the parole authority was specific to cases that

10   were being processed under Section 235(b)(1) under expedited

11   removal authority or any Section 217 as visa waiver refusal

12   cases and not just broad parole authority, but --

13   Q.   Well, let's -- it's not been admitted into evidence.  Would

14   you like to -- would it refresh your recollection to look at

15   Exhibit G?

16   A.   Sure.  Yes, please.

17             MR. GUARD:  May I approach?

18             THE COURT:  Yes, sir.

19             MR. GUARD:  And this is Defendant Exhibit G.  It's not

20   been admitted.

21             MS. FUDIM:  I believe we've admitted all of our

22   exhibits.

23             MR. GUARD:  Oh, G's admitted?  Okay.

24             MS. FUDIM:  So it's in evidence.

25             MR. GUARD:  Okay.  I wasn't sure whether it was

1    because I thought there was a gap from what they said.

2              But, Ms. Gerdts, please put up Exhibit G.

3    BY MR. GUARD:

4    Q.   If you look at the second paragraph of this memo, it reads:

5    "Effective immediately, any parole under Section 212(d)(5) of

6    the Immigration Nationality Act for nonimmigrant aliens that

7    meet the following criteria."  Right?

8    A.   Yes.

9    Q.   And so it says "any parole"?

10   A.   Yes.  And in -- that meet the following criteria, and in

11   Number 2 criteria, it says "is inadmissible and would otherwise

12   be removed under Section 235(b)," which is expedited removal

13   authority, "refused under Section 217," which is our visa waiver

14   refusal authority, to include 212.1(q) or withdrawal in lieu

15   of."

16   Q.   So that is -- but the criteria for parole, so "any parole,"

17   is the lead in the sentence.  Then it has four criteria

18   underneath it, correct?

19   A.   Yes.

20   Q.   Okay.  And we were just talking about the second criteria

21   suggesting that parole only applies if that second criteria is

22   met, right?

23   A.   I think the intent of this memo, as I understand it and I

24   understood at the time, was that it applied only to those cases

25   of parole that were related to an expedited removal or visa

1    waiver refusal case.

2    Q.    Okay.  All right.  I get that is your understanding, but

3    the criteria that was -- lists four criteria here.

4    A.    Yes.

5    Q.    Right.  The first, a person who is a nonimmigrant alien,

6    right?

7    A.    Yes.

8    Q.    The second is that the person is subject to those two

9    proceedings that you just mentioned, correct?

10   A.    Yes.

11   Q.    The third is an emergent need exists, correct?

12   A.    Yes.

13   Q.    And the fourth is the person is not a flight risk or a risk

14   to adding to illegal population, correct?

15   A.    Yes.

16   Q.    All right.  Now, there are examples on the third criteria,

17   the emergent need, correct?

18   A.    You're saying there's examples on this form?

19   Q.    It says "i.e.," right?

20   A.    Oh, right, yes.  Yes.

21   Q.    And again, it limits it to a medical emergency or a

22   legitimate law enforcement purpose, correct?

23   A.    Yes.

24   Q.    If you look at the bottom of the 2015 memorandum -- let me

25   see where it is here.  Oh, it's on the second page.  If we could

1    turn to the second page of the 2015 memorandum.

2              At the top it indicates "Lack of detention space,

3    requests from other law enforcement agencies, unless accompanied

4    by a valid unexpired I-512 issued by HSI or other purposes not

5    considered essential for law enforcement, are not appropriate

6    reasons to parole an inadmissible alien."

7              Did I read that correctly?

8    A.   You did, but I would point again out the context that was

9    in the preceding paragraph that again referenced the sections

10   related to expedited removal and visa waiver refusal cases.

11   Q.   All right.  The 2015 memorandum says lack of detention

12   space should not be a consideration for a parole, correct?

13   A.   Again, so what -- what -- if I can clarify, what was

14   happening with this memo was there was specific concern that for

15   those cases.  They would be processed as either an expedited

16   removal or as a visa waiver refusal case, that we wanted to make

17   sure those cases were being considered at a sufficiently high

18   approval level.

19             And so if you look at the documents in context, at one

20   point it was determined that only a GS-15 port director -- so a

21   rather senior field leader -- could be the one to make those

22   decisions.  This document then allowed for re-delegation of that

23   back down to a GS-14, watch commander position.

24             In the circumstances of cases where individuals would

25   otherwise have been processed as an ER or as a visa waiver

1    refusal and subsequently issued a parole, it's talking about who

2    has that parole authority, not --

3    Q.   I was specifically asking, sir.  I was not asking about who

4    had the approval.  I was just asking that one of the

5    considerations that it was not allowed for OFO officers and

6    supervisors was the lack of detention capacity, correct?

7    A.   Again, yes.  I'm happy to provide more context here.

8    Q.   Sir --

9              MS. FUDIM:  Objection, Your Honor.

10             THE COURT:  All right.  This has been asked, answered,

11   reasked, reanswered.  I think we need to move on.

12   BY MR. GUARD:

13   Q.   Now, the 2015 memorandum doesn't make any -- doesn't allow

14   for unfettered parole of aliens, right?

15   A.   Again, it's tailored narrowly to expedite removal of these

16   waiver refusal type -- narrowly tailored to cases related to

17   expedited removal or visa waiver refusal.

18   Q.   Now, there was a previous policy that OFO published which

19   is -- I have it admitted as Exhibit F.  That's again -- it was

20   on December 16, 2014, correct?

21   A.   I don't have it on the screen, but I believe I understand

22   the one you're talking about.

23   Q.   Hold on.  We'll...

24   A.   Yes.

25   Q.   And this, again, is another policy that indicates any

1  parole under Section 212(d)(5) -- and it has the same four

2  criteria, right?

3  A.   Again as I pointed out, this was the predecessor which had

4  very much the same language, but this is the one that said it

5  had to be approved at the GS-15 level which was later allowed to

6  be re-delegated down to a GS-14 level.  So if you look at those

7  documents side by side, you'll see that that's really the

8  distinction that was trying to be made for the field is the

9  level of approval authority, not trying to change anything with

10 respect to how we use our parole authority more broadly.

11 Q.   But the three written documents that exist regarding OFO's

12 parole authority are Exhibit B, Exhibit F, and Exhibit G,

13 correct?

14 A.   Yes.

15 Q.   Now, since President Biden was inaugurated on January 20th,

16 2021, aliens who came to a port of entry and were processed by

17 OFO have been paroled because ICE has told OFO that it lacks

18 detention capacity, correct?

19 A.   Again, we make processing dispositions on a case-by-case

20 basis, and one of the factors we may consider is the

21 availability of detention space.  But I think it would be

22 disingenuous to say that those paroles happened solely because

23 of the availability of, or lack thereof, detention space with

24 ICE.

25 Q.   Sir, isn't it true in April 2022, OFO released 48,429

1   aliens into the United States on parole?

2   A.   That may be accurate.  I don't have the specific numbers in

3   front of me to validate.

4   Q.   Sir, as part of your job, are you aware of how many aliens

5   are being released on parole?

6   A.   I have general awareness, yes.

7   Q.   Okay.  And you're aware that thousands of aliens every

8   month are being released on parole by OFO, correct?

9   A.   I'm aware that we're exercising our parole authority, yes.

10  Q.   In thousands upon thousands of cases, correct?

11  A.   Each one of those cases being subject to a case-by-case

12  determination by our officers and supervisors in the field, yes.

13  Q.   And prior to President Biden taking over, OFO was not

14  exercising its parole authority in thousands upon thousands of

15  cases each month, right?

16  A.   Well, if you look at the context, I think it's important to

17  note that right before the administration changed we were in

18  the --

19         MR. GUARD:  Your Honor, can you instruct --

20  A.   -- grips of a national pandemic.

21         MR. GUARD:  -- the witness to answer the question I

22  asked.

23         MS. FUDIM:  Objection, Your Honor, I would ask that

24  the witnessing allowed to answer the question, and he's

25  attempting to do so.

1          THE COURT:  I think if you can answer his question,

2    then if you need to explain, you can do so.

3          So reask the question.

4          Don't explain first and answer later.

5    BY MR. GUARD:

6    Q.   Prior to the Biden Administration taking over on

7    January 20th, 2021, OFO was not paroling thousands of aliens

8    into the United States, correct?

9    A.   In the months immediately preceding the change of

10   administration, we were not paroling as many noncitizens.

11   Q.   Now, most of those, including those who are part of the

12   48,429 that were released in April of 2022, are not being

13   released because of a medical emergency, correct?

14   A.   I don't have all the specific case details in front of me,

15   but I believe that that's accurate, yes.

16   Q.   Most of those being released, including those 48,429 in

17   April of 2022, by OFO are not being released because of some

18   legitimate law enforcement purpose, correct?

19   A.   I don't believe that they're -- I believe that's accurate,

20   yes.

21   Q.   Okay.  Now, in 2008, 2014, and 2015, OFO thought it

22   necessary to send out memos and directives regarding the use of

23   parole authority, right?

24   A.   Yes.

25   Q.   And OFO has not done so here, correct?

1    A.   That's correct.

2           MR. GUARD:  May I consult with my co-counsel, Your

3    Honor, for a second?

4           THE COURT:  Sure.

5           MR. GUARD:  Nothing further, Your Honor.

6           THE COURT:  All right.  Thank you.

7           Redirect.

8           MS. FUDIM:  I'd like to show the witness, Ms. Latimer,

9    Exhibit G.  If you could put it on the screen, please.

10                      **REDIRECT EXAMINATION**

11   BY MS. FUDIM:

12   Q.   Would you like a hard copy, Mr. Davies, or is the screen

13   okay?

14   A.   No, the screen's fine.

15   Q.   You were asked questions, Mr. Davies, about Defendants'

16   Exhibit G.  So let me start by asking you, what is your

17   understanding of what Exhibit G was?

18   A.   Exhibit G was a way to communicate the delegation authority

19   in the field for who could approve paroles when someone was

20   subjected to expedited removal or to visa waiver refusal.

21   Q.   What is visa waiver refusal?

22   A.   Visa waiver refusal is a case-processing type where someone

23   who is from one of the 40 countries who we have agreements

24   called the visa waiver program that they can enter the country

25   without having to first obtain a physical visa from the

 1    Department of State.  When that individual has been determined

 2    to be inadmissible by OFO at a port of entry, it's another

 3    processing pathway where they have already waived their rights

 4    to go before a judge.  By virtue of applying under the visa

 5    waiver program, we're able to immediately refuse their admission

 6    and return them foreign.

 7    Q.   Now, looking at this document in the very first paragraph,

 8    it says:  "This memorandum is to further clarify guidance

 9    previously issued on November 19, 2014, titled 'Parole of

10    Inadmissible Nonimmigrant Aliens'."  Do you see that?

11    A.   Yes.

12    Q.   And then it continues, "and on December 16, 2014, titled

13    'Parole of Inadmissible Nonimmigrant Aliens'."

14         Do you see that?

15    A.   Yes.

16    Q.   What is a nonimmigrant alien?

17    A.   A nonimmigrant alien would be someone who would be

18    determined to be seeking to enter the United States in a

19    nonimmigrant status, so someone who's not coming to live for --

20    remain permanently in the United States.

21    Q.   So not someone who's claiming asylum?

22    A.   Right.

23    Q.   And that is the limited context, just to be clear, in which

24    Exhibit G and F, which you were shown -- and I can put back on

25    the screen if you'd like -- apply to?

DAVIES - REDIRECT

1    A.    Yes.

2    Q.    Now, you were asked a question on cross-examination

3    regarding whether the administration -- or, excuse me, whether

4    OFO was paroling fewer people, fewer noncitizens in the months

5    leading up to January of 2021.  Do you recall that question?

6    A.    Yes.

7    Q.    And you confirmed that there were fewer paroles during that

8    time period, correct?

9    A.    Yes.

10   Q.    Can you give us some context as to why that was the case?

11   A.    Yeah.  We were obviously in the middle of an ongoing global

12   pandemic.  There were travel restrictions more broadly that

13   severely depressed the number of travelers who were coming to

14   the United States both lawfully and unlawfully.  And so as a

15   result, we not only would have expected but actually saw that

16   there was a significant decrease in the number of parole cases

17   that we were processing during that time period as well.

18   Q.    And was Title 42 also in effect during that time period?

19   A.    Yes.

20   Q.    Now, the document that was entered into evidence as

21   Exhibit B, the September 3rd, 2008 parole directive, is that

22   parole directive still operative today, notwithstanding the fact

23   that there were changes, I heard you say, in the GS level

24   necessary at a supervisory capacity to authorize parole?

25   A.    Yes, it is.

DAVIES - REDIRECT

1  Q.   And does OFO have statutory authority to issue parole?

2  A.   Yes.

3  Q.   And is that statutory authority 1182(d)(5)?

4  A.   8 U.S.C. 1182(d)(5), yes.

5         MS. FUDIM:  Thank you.  I have nothing further, Your

6  Honor.

7         THE COURT:  Let me ask you a question.  One of the

8  policies being challenged in this case is the Parole Plus ATD

9  policy.  You're aware of that, right?

10        THE WITNESS:  Yes.

11        THE COURT:  If this 2008 memorandum is what provides

12  guidance on when you issue -- grant parole or don't grant

13  parole, why is there another memo out there that's Parole Plus

14  ATD policy?

15        THE WITNESS:  So that's -- one of the distinctions

16  here is that policy, even though it's a CBP directive, it's

17  really directing only the Office of Field Operations with

18  respect to our parole authority.  So it would --

19        THE COURT:  2008 policy.

20        THE WITNESS:  The 2008 policy, yeah.  It's really

21  guidance for OFO, not for Border Patrol.

22        THE COURT:  And so does the Parole Plus ATD policy,

23  does that not apply to your operation?

24        THE WITNESS:  Right.  We don't do Parole Plus ATD in

25  OFO.

1      THE COURT:  One other question I've been curious about

2  based on some of the evidence I've heard, it's my understanding

3  that the only criminal history evaluation that's undertaken by

4  border officers, I guess whether OFO or CBP, is criminal

5  activity in our country.  Is that correct?

6      THE WITNESS:  So that's part of what we have access to

7  via automated systems.  We do as a part of our inspection

8  process ask questions to individuals as we determine it's

9  warranted about whether they have criminal history.  And we do

10  by virtue of -- I mean, we have case examples that we could

11  point to where we've asked someone as part of an inspection if

12  they have a criminal history in their home country, and they

13  tell us because very often they think we already know the

14  answer, and we find out.

15      And then we're available to pursue that through our

16  contacts either with Department of State or with our foreign

17  government partners to actually obtain specifics about that

18  criminal history information.  But we don't always have

19  automated systems availability for criminal history for all of

20  the countries in the world, obviously.

21      THE COURT:  So generally speaking, unless somebody

22  tells you that they have a criminal history in their home

23  country, you have no way of knowing that in evaluating what

24  processing pathway to put them on?

25      THE WITNESS:  Right, right.

1            THE COURT:  All right.  Does that generate any need

2      for any questions from the attorneys?

3            MR. GUARD:  No, Your Honor.

4            MS. FUDIM:  No, Your Honor.

5            THE COURT:  All right.  Thank you, sir.  Appreciate

6      you being here.

7            THE WITNESS:  Thank you.

8         (Witness excused.)

9            MS. RYAN:  Your Honor, just really briefly as

10     Mr. Davies leaves, we're going to be releasing our witnesses as

11     they leave the stand.  We just wanted to confirm that with

12     Florida in case they have a rebuttal case.

13            MR. GUARD:  We're not going to need Mr. Davies in

14     rebuttal case.

15            THE COURT:  All right.  Thank you, sir.  You're

16     released and free to go.

17            All right.  What length of time is your next witness

18     going to take?

19            MS. RYAN:  The direct of our next witness is probably

20     about an hour, so it might be a good time for an afternoon

21     break.

22            THE COURT:  All right.  And who is that next witness?

23            MS. RYAN:  Raul Ortiz.

24            THE COURT:  All right.  Very good.  All right.  We'll

25     take our afternoon break at this point.

1              And can we afford 15 minutes?

2              MS. RYAN:  Yes, Your Honor.

3              THE COURT:  All right.  We'll take 15.

4        *(Recess taken from 3:34 p.m. to 3:50 p.m.)*

5              THE COURT:  Y'all can be seated.

6              All right.  Ms. Ryan, your next witness.

7              MS. RYAN:  Defendants call Raul Ortiz.

8              THE COURT:  Okay.  Come up here, sir.

9              **RAUL ORTIZ, DEFENSE WITNESS, DULY SWORN**

10             DEPUTY CLERK:  You may be seated.

11             Please state and spell your full name.

12             THE WITNESS:  Raul, R-A-U-L, Ortiz, O-R-T-I-Z.

13                        **DIRECT EXAMINATION**

14   BY MS. RYAN:

15   Q.   Good afternoon, Chief.

16   A.   Good afternoon.

17   Q.   Where are you currently employed?

18   A.   Washington, D.C.

19   Q.   And what's your job title?

20   A.   Chief of the United States Border Patrol.

21   Q.   And how long have you worked for Border Patrol?

22   A.   31 years and about 8 months now.

23   Q.   And how long have you been the chief?

24   A.   Since August of last year, August 15th.

25   Q.   You said 31 years, so you've spent your entire career with

1   the Border Patrol?

2   A.   Yes, ma'am.  I did a small stint overseas in Afghanistan as

3   the DHS attaché, but the rest of the time has been with the U.S.

4   Border Patrol in uniform.

5   Q.   I want to talk a little bit about Border Patrol as an

6   agency.

7   A.   Mm-hmm.

8   Q.   Border Patrol is part of Customs and Border Protection,

9   correct?

10  A.   That's right.

11  Q.   Can you explain what Border Patrol is responsible for?

12  A.   So the United States Border Patrol is responsible for those

13  areas in between our ports of entry along the southwest border,

14  the northern border, and then some coastal regions in Puerto

15  Rico, Miami Sector Florida, and then New Orleans Sector.

16       We have about 19,350 Border Patrol agents.  Our job is

17  to provide security in between our land ports of entry and then

18  cover some of the littoral sections or the waterways on the

19  coast.

20  Q.   And who is responsible for the ports of entry?

21  A.   So there are multiple operational components within CBP.

22  We are one of six.  The Office of Field Operations customs

23  officers are responsible for our land, sea, and airports.

24  Q.   And if I refer to them as OFO, is that okay?

25  A.   Yes, ma'am.

1   Q.   Okay.  Can you describe the relationship between Border

2   Patrol and OFO?

3   A.   So it's a complementary relationship.  Once again, we

4   operate in between the ports of entry.  The Office of Field

5   Operations support or operate at the designated ports of entry

6   where commercial and visitors that are coming into the U.S. will

7   present themselves for inspection.  And so the Border Patrol's

8   job is to ensure that we cover those more remote areas in

9   between those ports of entry, and more often than not our job is

10  also to provide some support in and around those ports of entry

11  which typically are around community centers.

12  Q.   And does Border Patrol also work with ICE?

13  A.   That's correct.  ICE is an operational component of the

14  Department.  They handle investigations as well as removal

15  operations for the populations that we have in custody.

16  Q.   You said you became chief recently.  What position did you

17  hold before that?

18  A.   Prior to becoming named -- prior to being named the 25th

19  chief of the United States Border Patrol, I was the deputy chief

20  of the Border Patrol which was the number two person in the

21  country.

22  Q.   And can you tell the Court as chief what some of your

23  duties and responsibilities are?

24  A.   So I am in essence the chief operating officer for the

25  United States Border Patrol.  I answer to the Commissioner of

1    Customs and Border Protection.  My responsibilities are both

2    administrative and operational in nature.

3            I have a team of about 4-, or 500 personnel in

4    Washington, D.C.  I have executive directors and a chief of

5    operations that run directorates.

6            And then I have 20 sectors in the field:  nine along

7    the southwest border and then three coastal sectors and then

8    eight up on the northern border.  And then we also have an

9    academy and a special operations group in El Paso, Texas.

10           So my responsibilities also require that I manage

11   roughly about a $6 billion budget.  And so I think that when you

12   look at, you know, 20,000 Border Patrol personnel plus 2,000

13   plus professional staff members, it's quite a large

14   organization.  But on top of coordinating domestic operations, I

15   do have some personnel overseas that work in our attaché

16   offices.

17   Q.   Are you involved in creating policy for Border Patrol?

18   A.   What we do is we create guidance, operational guidance more

19   specifically.  I tend to focus on tactical and operational

20   guidance for our field elements.  From time to time that will

21   certainly drive some policy discussions, but more importantly,

22   what we try and do is establish standard operating procedures or

23   internal operating procedures for our personnel so they know

24   their left and right limits when they're performing their

25   functions.  Most of what we do is written in law.

1  Q.   Does anyone higher up in your chain of command create any

2  policy for Border Patrol?

3  A.   At the department level we do have a policy shop and then

4  within CBP we do have offices that also support policy

5  discussions at the national level, yes.

6  Q.   So if a policy comes down from one of those places, do you

7  disseminate that to your agents?

8  A.   That's correct.  What we do typically is we put together

9  implementation guidance to ensure our personnel know exactly

10  what their roles and responsibilities will be when we have to

11  initiate a new policy.

12  Q.   And how is that then shared with the agents?

13  A.   So it's shared probably a couple of different ways.

14  Memoranda is still a form of communication to our component

15  offices.  We also share via, you know, email exchanges and then

16  ensuring that at some point we have memorialized the

17  implementation guidance either in an operational plan or in,

18  like I said, an IOP or an SOP, the standard operating

19  procedures.

20  Q.   Now, you discussed how Border Patrol is responsible for the

21  security of the border.  Approximately how many miles of the

22  border are you responsible for?

23  A.   So on the southwest border, it's about a little less than

24  2,000 miles of the southwest border.  And then up on the

25  northern border, a little over 5,000 miles.  And then the

ORTIZ - DIRECT

1    coastal sections, it varies because that's a complementary

2    relationship with the U.S. Coast Guard in our Air Marine

3    Operations component.

4    Q.   And does patrolling and securing the border include

5    encountering and processing noncitizens?

6    A.   It does.

7    Q.   I just want to go through what a typical encounter with a

8    noncitizen might look like.

9            So first, in what situation would one of your agents

10   typically encounter a noncitizen?

11   A.   So noncitizens or migrants or aliens who cross in between

12   the ports of entry illegally are encountered by Border Patrol

13   agents either through observations or through field encounters

14   or perhaps at one of our checkpoints.  We operate checkpoints

15   throughout the country.  And these encounters can be through

16   observation or we have technology that's employed throughout the

17   country that may cue an agent to respond to a certain area where

18   an incursion has occurred.

19   Q.   When you say "observation," like an agent might see them

20   cross the border?

21   A.   Yeah, most definitely.  Whether it's our Border Patrol

22   agents or even our partner agencies, if they see individuals

23   crossing the border, whether it's the land border, we have a

24   rivering environment from El Paso, Texas, all the way down to

25   South Texas.  If we encounter somebody coming across that border

1    at any given time, our responsibility is to respond as quickly

2    as we possibly can to make an interdiction.

3    Q.   And so what does that involve?

4    A.   So more often than not, it could be very consensual.  We

5    would, you know, encounter an individual -- and it's quite

6    remote, so it may be just, Hey, we saw somebody in the brush or

7    on the ranchland, farmland.  We have some very rural areas that

8    we patrol.

9         And then in other situations, it could be the fact

10   that there is somebody trying to evade apprehension, so it may

11   require that Border Patrol agents pursue them on foot or in

12   vehicles or some other type of conveyance.  We still use horses

13   both on the northern and southern border.

14        So these encounters vary.  For most of the individuals

15   that we are encountering currently, quite a few of them are

16   turning themselves in to Border Patrol agents in some of the

17   sectors that we have out there.

18   Q.   So once you apprehend someone and you have them in your

19   custody, what happens next?

20   A.   So the Border Patrol agent will make a determination that

21   they're in the country illegally, and right away they start

22   identifying who this individual is.  In some areas we have some

23   remote technology that we've deployed out to the field where

24   agents can start the biographical information for the migrants

25   that they've encountered.  In other situations they may have to

1    transport that individual into a processing center or a station

2    so they can determine who they have in their custody.

3    Q.   So either in the field or at a processing station you

4    determine, you said, identity.  How does the Border Patrol

5    determine that identity?

6    A.   So it's through a couple of methods.  The first one

7    obviously would be the consensual questioning of the individual,

8    and we have biographical information that we are looking to

9    gather:  name, date of birth, where they're from.  And we can

10   actually run records checks based upon those types of

11   information.

12          In other cases it may be through the -- taking some

13   sort of biographical or biometric information from them,

14   fingerprints.  We do use some facial recognition in some

15   locations that we're experimenting with.  But more often than

16   not, it's through fingerprints and through running their names

17   against our databases that we already have.  And quite often we

18   run those databases against other agency databases also.

19   Q.   You mentioned you find out where they're from.  Why is that

20   important as part of the processing?

21   A.   So part of the processing requires that we initiate a

22   determination as to what pathways we're going to utilize for the

23   individuals we encounter.  On any given day, Border Patrol

24   agents could potentially encounter somebody anywhere from 150 to

25   160 different countries.  And so every migrant noncitizen that

```
 1   we encounter requires a different level of processing based upon
 2   our ability to repatriate or adjudicate their claim to be in the
 3   U.S.
 4   Q.   And does it matter for Border Patrol if the person you
 5   encounter is by themselves or with a family, for example?
 6   A.   Yeah, most definitely.  You know, every demographic, every
 7   population we encounter is treated just a little bit
 8   differently.  Unaccompanied children are treated one way.
 9   Family units have a certain care and requirement and segregation
10   requirement.  And then single adults, which make up a large
11   portion of the individuals we encounter, can be treated a little
12   bit more independently than you would a family unit or an
13   unaccompanied child.
14   Q.   Okay.  So you just said single adults, family units, and
15   unaccompanied children.  Did I get the three groups?
16   A.   Yeah, those three demographics make up --
17   Q.   Okay.
18   A.   -- the populations we encounter.
19   Q.   All right.  So let's start with single adults.
20   A.   Okay.
21   Q.   I know this is complicated so just starting at a very high
22   level, can you just list the different pathways that are
23   available to your agents when processing a single adult?
24   A.   So once again depending on their citizenship and their
25   nationality and their claim when they are encountered by a
```

ORTIZ - DIRECT

1   Border Patrol agent.  Single adults can be processed right now

2   through really two methods.

3           We have the availability of Title 42, which is the CDC

4   order to expel migrants based upon the COVID health crisis that

5   we've experienced globally.

6           Then the second pathway is Title 8 processing, which

7   is our traditional processing that we've used since I became a

8   Border Patrol agent.

9   Q.   And are there different pathways under Title 8 that would

10  be amenable for single adults?

11  A.   Yes, there are.  So if we're going to process somebody for

12  Title 8, it will certainly depend on with their claim is.  If

13  they claim credible fear, then, you know, there's a certain

14  process that we have to adhere to to ensure that they have a

15  credible-fear determination before an asylum officer at some

16  point during the process.

17  Q.   So let's go through some of the possible pathways one at a

18  time.

19  A.   Okay.

20  Q.   Do you ever criminally prosecute any of the individuals

21  that you encounter?

22  A.   Yeah, most definitely.  As I mentioned we take biometrics

23  and we run records checks to include immigration and criminal

24  database checks against the individuals we encounter.  And this

25  is principally for adults.  We run some biometrics on children

ORTIZ - DIRECT

1    between the age of 14 and 17, but for the most part most of this

2    is centered around adults.

3            So we run those record checks and we determine that

4    somebody has either a criminal history or an immigration record.

5    That will notify the Border Patrol agent that we need to go back

6    and research exactly what those criminal checks indicate and

7    what those immigration checks also indicate to determine what

8    pathway they will take.

9            And so if an individual that we encounter is wanted by

10   another jurisdiction, another state, we -- it may require that

11   we transfer that individual to the custody of another agency.

12   If an individual has an extensive criminal history, it may make

13   the -- then there may be a decision by the Border Patrol agent

14   that we may have to prosecute that individual because they are

15   an aggravated felon.

16           And then if they have an extensive immigration history

17   or an immigration history, it may require that we process them

18   for a reinstatement or reinstate a prior order of removal if

19   they've already been deported.

20   Q.   Okay.  We'll come back to that in one second.

21           You mentioned that they might actually be prosecuted.

22   When you said "we," did you mean Border Patrol does the

23   prosecution?

24   A.   So we work collectively with the Department of Justice to

25   prosecute individuals for certain crimes.  It could be from

ORTIZ - DIRECT

1   alien smuggling, which is a 1325 charge; it could be for illegal

2   entry, which is a 1325 charge; or it could be for 1326, which is

3   a reinstatement of -- for an ag felon.

4           And so those typically are the principal charges.  On

5   occasion we may file assault charges against some of the

6   individuals we encounter.  We've seen a bit of an increase of

7   individuals assaulting our officers, so 111 is a charge that we

8   also leverage from time to time.

9   Q.   And when you look at a criminal history, do you only look

10  at their history within the United States or do you look at

11  other countries as well?

12  A.   So we do run some checks against Interpol records.  So on

13  occasion we may encounter somebody who has an Interpol record or

14  is wanted by Canada or Mexico.  And we do have some repatriation

15  agreements with them where we can extradite some individuals

16  based upon the seriousness of those crimes.

17  Q.   You mentioned some people have an extensive immigration

18  history and you mentioned a reinstatement.  Could you just

19  explain to the Court what that means?

20  A.   Yeah.  So if you have been ordered deported before, then

21  typically what the Border Patrol agent -- or an immigration

22  officer, not just Border Patrol agent.  This could also happen

23  at a port of entry.  Then what that Border Patrol agent would do

24  was just reinstate that previous order of removal against that

25  individual.

1        And then if you have multiple charges for illegal

2   entry, then we could potentially charge you for reentry after

3   deportation, which would be a 1326 charge.

4   Q.   Okay.  So if they have a reinstatement, if that's the

5   pathway you're processing, and just talking about single adults,

6   are they then removed from the country?

7   A.   Yeah.  Typically they're transferred over to ICRO, and then

8   ICRO is responsible for repatriating them back to their home

9   country.

10  Q.   Again, still talking about single adults, does Border

11  Patrol ever use expedited removal?

12  A.   Yes.

13  Q.   In what situations?

14  A.   So an expedited removal is a form of deportation where an

15  individual does not go through the full immigration proceeding

16  before an immigration judge.  And we leverage it -- you know, I

17  think 1996 we started using ERs when I was a senior patrol

18  agent.  And it just really varies on the circumstances, and it's

19  usually on a case-by-case basis.

20  Q.   And what kind of circumstances do you look at?

21  A.   Whether we can remove that person to the country that we're

22  talking about; and then, two, whether -- there's no extenuating

23  circumstances.  In other words, they haven't claimed a credible

24  fear.  There's no extensive criminal history associated with

25  that individual.

1   Q.   So if their home country won't take them back, then you

2   can't use expedited removal?

3   A.   It becomes a challenge for us there because the expedited

4   removal requires that -- a willingness to send them back to

5   their home country.  So, yeah, there would have to be a

6   repatriation agreement with the country or with another country.

7   Q.   And we've also heard some testimony about voluntary return.

8   Is that something Border Patrol uses with single adults?

9   A.   When I started in the Border Patrol, voluntary return was

10  probably our number one pathway; and over the years it's used

11  less and less.  We do it with individuals from Mexico because

12  they can be immediately returned to a port of entry and actually

13  doesn't require coordination with ICO.  Border Patrol agents

14  themselves can voluntary return individuals back to Mexico.  And

15  then, of course, we do it on the northern border in Canada also,

16  but very small numbers up on the northern border.

17  Q.   And what's the process for a voluntary return?

18  A.   We process them very similarly to Title 8 processing

19  outside of issuing a Notice to Appear or warrant of arrest.  And

20  then we notify our government of Mexico counterparts, and then

21  we transfer them into their custody at a port of entry.

22  Q.   You just mentioned a Notice to Appear.  What is that,

23  first?

24  A.   So a Notice to Appear is a notice to the migrant that they

25  are to appear before an immigration judge, and it's really just

1   a schedule for an immigration hearing.

2   Q.   And do these noncitizens who receive Notice to Appear, do

3   they all remain in custody waiting for those immigration

4   proceedings?

5   A.   No, ma'am.

6   Q.   Okay.  So for those who are released with a Notice to

7   Appear, what are the different options available to Border

8   Patrol for releasing them?

9   A.   So we have a couple of options.  In some cases, there are

10  individuals that will be mandatory detention:  if they are a

11  threat, if they have an extensive criminal history.  There's

12  just certain criteria that would mandate that we turn them over

13  to ICRO.

14        And then you have other populations where we have no

15  detention space.  This really I think is driven by, you know,

16  ICRO's ability to maintain custody of them until they are

17  presented before an immigration court.  And so Border Patrol has

18  no detention space.  We are strictly limited to processing

19  areas.  On occasion we've held people for longer periods of

20  time, but really we're talking about days, not weeks.  We try

21  and release or transfer individuals within 72 hours to ICRO or

22  to an NGO whenever we can.

23  Q.   What's an NGO?

24  A.   Nongovernmental organization.  So we have some faith-based

25  groups and community organizations throughout the border that

1    support migrant populations after they are processed and turned

2    over to ICRO and some of the other agencies.

3    Q.   So just to clarify, if they're mandatory detention, they

4    are transferred to ICRO?

5    A.   That's correct.

6    Q.   Okay.  Are noncitizens ever released with a Notice to

7    Appear without any conditions?

8    A.   Typically there are a couple of reasons, some reporting

9    requirements.  So if we issue a Notice to Appear, we're either

10   going to parole somebody into the country or we're going to

11   release them on their own recognizance.  But both, I think, have

12   a requirement that they are to advise the court if -- whenever

13   they get to their final destination, then they're to advise the

14   court when they -- if they make -- if there's any change in

15   their condition.  In other words, where they're living or who

16   their sponsorship is.

17   Q.   So talking about being released on their own recognizance,

18   how is that different from someone being released on bond, for

19   example?

20   A.   The bond requires a monetary guarantee to the court.  If

21   you release somebody on their own recognizance, you're in

22   essence saying that, Hey, we're releasing you based upon the

23   fact that you're not a threat, we do think that you're going to

24   be able to make your immigration hearing.  And those criteria

25   exist, and so there's a determination that they should be

1    released on their own recognizance without any bond whatsoever.

2    Q.    And if they were to be released on their own recognizance

3    or with a bond but then not show up, is that something Border

4    Patrol would follow up on?

5    A.    No.   ICRO has an office that -- or some officers that would

6    respond to that situation.

7    Q.    So once they're released from Border Patrol in whatever

8    pathway they kind of go into ICE's jurisdiction?

9    A.    That's correct.

10   Q.    Okay.   What does it mean to parole a citizen with a Notice

11   to Appear?

12   A.    So when you parole somebody, you're paroling somebody into

13   the country, and it's for a limited time.   It isn't for the rest

14   of their life.   There's an expectation that they're going to

15   have an immigration hearing and that they're going to report to

16   an immigration office at some point.

17   Q.    And does Border Patrol use the Parole Plus ATD program?

18   A.    Yes.

19   Q.    And what is that?

20   A.    So Parole Plus ATD, ATD just stand for Alternatives to

21   Detention.   So it's a form of monitoring the migrant

22   populations, and this is also coordinated through ICE

23   Enforcement Removal Operations.

24         And what I've seen in my experience, it can manifest

25   itself in a couple different ways.   It could be ankle monitors

1    or bracelets attached to the migrants.  It could be a mobile

2    device that they issue the migrant and ask that they are --

3    report via the cell phone or mobile device.  And then it could

4    just be self-reporting.  There's an expectation that the migrant

5    would report regularly to an ICE office whenever they reach

6    their final destination.

7    Q.   But ICE determines which of those ATD operations is

8    appropriate?

9    A.   That's correct.

10   Q.   Can Border Patrol just parole someone without putting them

11   into this Parole Plus ATD program?

12   A.   So on occasion we have leveraged parole.  We work closely

13   with our CIS offices.  And typically those are exigent

14   circumstances, somebody with some humanitarian need, or there

15   may be an emergent situation.

16   Q.   How long has Border Patrol used parole?

17   A.   As long as I've been a Border Patrol agent, and I'm sure

18   before.

19   Q.   So this isn't something new to the current administration?

20   A.   No, ma'am.

21   Q.   And how does Border Patrol determine if someone is eligible

22   for parole?

23   A.   It's a case-by-case basis.  It's not something that's --

24   every Border Patrol agent will make a determination, and then it

25   will be run up the chain of command, and then that decision is

1   made by the leadership in the field.

2   Q.   And what are some of the factors they look at when making

3   those case-by-case determinations?

4   A.   If somebody's a flight risk, if potentially somebody's a

5   danger to the community, they wouldn't qualify for parole.

6   Q.   And have any of those parole factors changed since January

7   of 2021?

8   A.   No, ma'am.

9   Q.   Chief Ortiz, portions of your deposition that you gave in

10  this case were entered into the record previously, so I just

11  want to ask you about them.

12       Do you remember being asked about whether the southern

13  border is in crisis and you had said yes?

14  A.   Yes, ma'am.

15  Q.   Okay.  What did you mean by that?

16  A.   So the southern border, I have nine sectors along the

17  southwest border.  I have four out of the nine southwest border

18  sectors that have seen a dramatic increase in encounters and

19  apprehensions.  I have five of the southwest border sectors that

20  have maintained a level of security that I've been somewhat

21  comfortable with, but that hasn't existed everywhere.

22       My ability to move my resources around along the

23  southwest border is challenged through a couple ways.  I've got

24  a union workforce that I have to coordinate with.  At one point

25  during this last year, I had 850 officers from the northern

1    border deploy down to the southwest border for about 60, 70

2    percent of the time.  That took a tremendous toll on the men and

3    women of the Border Patrol, their families.  And I made a

4    decision at some point to reduce that number to volunteers, and

5    now I have roughly about 35 or 40 volunteers from the northern

6    border.

7             Well, the same things existed along the southwest

8    border.  When you go from California to South Texas, San Diego,

9    I've got double-layer fencing technology, 2,000-plus Border

10   Patrol agents.  I feel like I've got a pretty good handle on

11   operations there.  In El Centro, the same type of infrastructure

12   and personnel exists.

13            But then when you go to Yuma, Arizona, where I have a

14   very small sector and I have some gaps that are challenging for

15   us, the cartels and the criminal organizations continue to push

16   migrants through those areas, and that has really taxed our

17   workforce in those areas.

18            And so when -- I think about, you know, 2,000 miles of

19   the southwest border, and roughly half of it is being stretched

20   beyond its capacity, that's what I meant by, you know, the

21   southwest border is in crisis.  I've got some sectors that I'm

22   really challenged with making sure that we have enough capacity

23   to support the enforcement operations that are happening in

24   those areas.

25   Q.   You also previously were asked in a deposition about

1  whether the current situation is making the border less safe for

2  Americans and aliens alike, and you said yes.  Do you remember

3  that?

4  A.    I do.

5  Q.    What did you mean by that?

6  A.    So when you think about the border communities -- and, you

7  know, we'll use El Paso and Del Rio for example.  Both of those

8  communities have seen dramatic increases in encounters over the

9  last 24 months.  And what it has done for those communities is

10 it's taxed the medical and the law enforcement elements or

11 organizations, and so it has put a tremendous pressure both from

12 a safety perspective and a security perspective.

13          I was in El Paso three or four weeks ago, and they

14 were in a Condition Red.  And so in federal facilities, we had

15 to wear masks.  That hasn't existed for about six or seven

16 months.

17          So, you know, the conditions can change and vary

18 significantly in some of these border communities.  And so for

19 me, when I look at, Do I have enough resources in those areas,

20 are my law enforcement partners stretched, and can we respond to

21 the folks that are getting away from us in a way that we can

22 have a law enforcement resolution, that's what I'm talking about

23 when we talk about less safe.

24 Q.    You said Condition Red.  That's in reference to COVID?

25 A.    That's correct.

1   Q.   You've mentioned asylum a few times.  So can noncitizens

2   claim asylum with Border Patrol agents?

3   A.   They can.

4   Q.   And would that change the pathway that they're processed

5   under?

6   A.   Yeah.  So typically if a migrant claims asylum in Border

7   Patrol custody, our obligation is to present them for an

8   immigration hearing before an asylum officer to see if there's a

9   requirement to -- whether they actually receive a credible-fear

10  claim.

11  Q.   And who makes that determination?

12  A.   Typically the asylum officer.  Border Patrol agents did it

13  for small period several years back, but now it's typically the

14  responsibility of CIS.

15  Q.   Okay.  So we've talk about single adults.  Now let's talk

16  with family units.

17          So, first, what is considered a family unit?

18  A.   So a family unit is made up of a parent or legal guardian

19  and a minor child under the age of -- or 17 and under.

20  Q.   And how is that different from a family group?

21  A.   So family group could be a mother, father, and several

22  children.  A family unit could typically only be made up of one

23  parent and one child.

24  Q.   So when you say "family group," are you referring to maybe

25  unrelated children with that mother and father?

1    A.    No, because typically we expect that there's going to be

2    some sort of parent or legal guardian relationship.

3    Q.    And what if there's not a parent or legal guardian

4    relationship between the adult and the child?

5    A.    Then they would be considered an unaccompanied child.

6    Q.    We'll talk about those in a second.

7    A.    Okay.

8    Q.    So when you're processing family units, what pathways are

9    available to Border Patrol?

10   A.    So family units pose a significant challenge for us.  One,

11   they're typically a low-threat population, and our facilities

12   were never designed to house large groups of family units.  In

13   2019 we experienced a surge in family units, and then we have

14   seen that sort of maintained steady throughout the last three

15   years.

16          And so family units require that we transfer them to

17   ICRO for a period and then ultimately to a nongovernmental

18   organization because there is no detention space for family

19   units within the Department, or very limited detention space for

20   family units.  And so when we process a family unit, if we can't

21   transfer them or repatriate them back to their home country --

22   in other words, Mexico or Canada -- then our obligation is to

23   release them to what we call our nongovernmental organization

24   partners so they can help facilitate their travel to their final

25   destination.

ORTIZ - DIRECT

1  Q.   I notice you used different words "holding" versus

2  "detention."  Can you explain the difference.

3  A.   Yeah.  So if you were to hold somebody in custody, the

4  expectation is you're going to hold that person in custody

5  before they -- until they go before an immigration judge or an

6  immigration proceedings.  If that option's not available to you

7  and you don't have the capacity to maintain custody of those

8  individuals, then the only option to us as Border Patrol agents

9  is to release them.

10  Q.   So Border Patrol does not detain anyone?

11  A.   That's correct.  We do not.

12  Q.   And you mentioned that there's no detention space within

13  the Department.  How is that impacting Border Patrol holding

14  families?

15  A.   So once again, we are sort of one step in the whole

16  process, and we were the first step.  I say this quite often

17  that we're the only agency that can't say no.

18          And so when we encounter somebody out in the field,

19  our responsibility is to process them and then make a

20  determination on what we're going to do with those individuals

21  as part of this immigration continuum.  And so if it means that

22  we have to turn them over to ICRO, we'll do that.  They have to

23  be willing to accept them or have the space for them.  If they

24  don't, then we look at other options, which would be to transfer

25  them to a nongovernmental organization.

1            One of the things we've been able to do over the last,

2    I'm going to say about eight years, established tremendous

3    partnerships with communities, faith-based organizations, and

4    some NGOs out there, in that they know exactly how many people

5    we have in custody and they know typically how many people we

6    may be transferring to them at some point.

7    Q.   So what if one member of a family unit has a criminal

8    record or poses a security threat, would that whole family unit

9    still get transferred to an NGO?

10   A.   So in that situation, we would separate the family and the

11   adult would be maintained into some sort of custody and the

12   child would be placed into Health and Human Services' custody.

13   Q.   Do people ever come over the border with an unrelated child

14   pretending they were a family unit?

15   A.   Yeah, most definitely.  We saw this quite a bit in 2019,

16   what we call family fraud.  And so adults were claiming both to

17   be -- to have a familial relationship with minor children.  And

18   then we also saw on occasion where adults were claiming to be

19   children when they were, in essence, adults.

20   Q.   So how do you prevent this family fraud?

21   A.   So we do it through a couple of ways.  One, our Border

22   Patrol agents, they go to the academy for 117 days, and we do

23   scenario-based training, and we teach them how to do --

24   interview and find discrepancies in responses.

25            And then the second way is through some sort of

1    records checks.  Quite often somebody may have already been

2    apprehended by us previously and said they had no children and

3    all of a sudden they have three children.  That raises a red

4    flag.

5            And then thirdly, we work very closely with our

6    consulate offices.  We have consulate representatives that have

7    access to our processing centers.  So any time we recognize or

8    we think there may be a discrepancy, we can actually notify the

9    consulate to help interview those individuals to determine

10   whether there is, in fact, a relationship.

11           And then lastly, if it comes to that, we could run DNA

12   to ensure that there's a relationship there.

13   Q.   Okay.  So let's turn to our third group of unaccompanied

14   children that you've mentioned a few times.

15           Who's considered an unaccompanied child?

16   A.   Anyone under the age of 17 without a parent or legal

17   guardian.

18   Q.   Okay.  So if, for example, they come over with a distant

19   relative like an aunt, they're still considered unaccompanied?

20   A.   That's correct.

21   Q.   And if Border Patrol were to encounter an unaccompanied

22   child what happens?

23   A.   So typically when we encounter a unaccompanied child, the

24   clock really starts ticking for us because we want to get them

25   transferred to Health and Human Services as quickly as possible.

1    We don't want them in our custody any longer than they have to

2    be, and so the placement of that child and the identification of

3    potentially a sponsor already in the U.S. may happen.

4         What we've seen quite a bit is there may already be a

5    parent or legal guardian in the U.S., and so quite often the

6    child will tell the Border Patrol agent that, Hey, I'm going to

7    New York because my mother or my father or both my parents are

8    there and I want to be reunified with them.  So we will

9    coordinate that with HHS, and they will start the notification

10   process of the sponsorships.

11        And quite often it's a matter of processing them as

12   quickly as we possibly can, making sure that they get medical

13   care.  We have what we call four wraparound services for

14   children.  We ensure that we have caregivers, clean clothes --

15   all the things that one might expect in a juvenile setting based

16   upon some support decisions that have happened over the last

17   couple of decades, and then we ensure that we transfer them as

18   quickly as we can.

19   Q.   You mentioned earlier mandatory detention.  What

20   noncitizens must be detained?

21   A.   So individuals with an extensive criminal history that will

22   be prosecuted or somebody who might have a terrorist screening

23   database hit.  We run records checks against FBI databases, and

24   we have a national targeting center in Virginia.  And if

25   somebody is identified as being a foreign fighter in another

1    country and they ping off one of our databases, that sends off

2    another whole level of security and scrutiny that needs to

3    happen.  And so we ensure that it's reported all the way up the

4    chain of command, and those folks will stay in our custody until

5    they're transferred and interviewed by FBI or Joint Terrorism

6    Task Forces.

7    Q.   In your 31 years of experience, has DHS ever been able to

8    detain all the noncitizens that come over the border?

9    A.   No, ma'am.

10   Q.   Does Border Patrol ever get warrants for the noncitizens

11   that they encounter?

12   A.   Yes.

13   Q.   In what situations?

14   A.   So if we issue a -- or if we put -- if we process somebody

15   for removal proceedings, we will issue a warrant of arrest in

16   that A-file packet.

17   Q.   Do you have a warrant for every noncitizen you encounter?

18   A.   That's an adult, yes.

19   Q.   Before you encountered them or before you take them into

20   custody?

21   A.   No.

22   Q.   Why not?

23   A.   Well, because we don't -- we don't know who they are.  You

24   know, it's presumptive that somebody is in the country illegally

25   or not.  The determination has to be that they're in the country

ORTIZ - DIRECT

```
 1    illegally and that we're going to set them up for a removal

 2    proceeding.

 3    Q.   And by "removal proceedings," are you referring to like

 4    Notice to Appear or an immigration proceeding?

 5    A.   Yeah, an immigration proceeding.

 6    Q.   So a warrant will get issued if they are be referred for

 7    immigration proceedings?

 8    A.   If we were processing them for Title 8, then they will get

 9    a warrant to -- a Notice to Appear and a warrant of arrest.

10    Q.   And why does a warrant get issued at that time?

11    A.   Because there's an expectation that if -- if the individual

12    doesn't show up for court, then that warrant would be issued.

13    Q.   So it's like a just-in-case form?

14    A.   It is.

15    Q.   Okay.  We've been hearing about Notices to Report

16    throughout this trial.  Are you familiar with that?

17    A.   I am.

18    Q.   What was that process?

19    A.   So when I was a deputy chief and Rodney Scott was the chief

20    of the Border Patrol, we were encountering a high encounter rate

21    along the southwest border in several of our sectors, and our

22    ability to transfer the migrants into the custody of some of the

23    other agencies was becoming strained.  And so we needed to speed

24    up the process; otherwise, we were in a situation where it was

25    becoming a health risk for our officers, as well as the migrant
```

1    populations that we had in custody.

2            This is right in the middle of the COVID pandemic.  I

3    had lost about, when it was all said and done, 17 officers due

4    to COVID.  At one point I had probably over 2- or 3,000 Border

5    Patrol agents in some variation of quarantine status.  And so

6    all of that coupled with the fact that I had a migrant

7    population that were coming from some areas that didn't have the

8    same health conditions that we were experiencing here in the

9    U.S., and we already had a medical, you know, enterprise along

10   the southwest border that was strained.  We felt like we needed

11   to process the migrants much quicker than we were doing.

12           And so back roughly about 30, 31 years ago, we used

13   I-385 to transfer individuals from ourselves to our Removal

14   Operations Offices.  This was prior to the merging of DHS.  And

15   so Chief Scott and I both had roughly about 30 years of

16   experience, and we remember using this form 30 years ago.  And

17   so both of us made the decision that we needed to issue some

18   sort of document that would speed up the processing and increase

19   the throughput so we could transfer individuals out of our

20   custody much quicker because we couldn't keep pace with the

21   level of encounters that we were seeing on a day-to-day basis.

22   Q.   You mentioned that your ability to transfer to other

23   agencies were strained.  Was that also because of COVID?

24   A.   It was.

25   Q.   And are Notices to Report still being used?

1    A.    No, ma'am.

2    Q.    You've also been hearing about prosecutorial discretion.

3    Are you familiar with that?

4    A.    I am.

5    Q.    Okay.  What is it?

6    A.    So prosecutorial discretion is a decision by a law

7    enforcement organization, officer, or the courts to limit who

8    you're going to prosecute based upon certain conditions or

9    factors.

10   Q.    And in what situations would prosecutorial discretion be

11   used by Border Patrol?

12   A.    So if we do not have the ability to detain an individual,

13   chances are we may limit how many people we would prosecute for

14   a given -- in a perfect world, you know, if somebody violates a

15   crime in any jurisdiction -- not just in the border environment

16   but in any jurisdiction -- you would prosecute that individual.

17   But based upon capacity, core capacity, based upon detention

18   capacity, and based upon law enforcement capacity, a decision

19   has to be made on the seriousness of the crime and whether you

20   can actually adjudicate that crime in a way that makes sense.

21   So you really just have to prioritize who you're willing to

22   prosecute.

23   Q.    And is that type of discretion something new to the Biden

24   Administration?

25   A.    It's not new to any law enforcement organization, no.

ORTIZ - DIRECT

1    Q.   Do you need any water?  Are you all set?

2    A.   I'm good.  Thank you.

3    Q.   Okay.  So I want to show you what's been entered into

4    evidence as Plaintiff's Exhibit 98.  I have hard copies, but it

5    will also show up on the screen, so I don't know if you have a

6    preference.

7         Is the screen okay, Chief, or do you know a hard copy?

8    A.   No, I can see it.  Thank you.

9    Q.   First of all, have you seen this document before?

10   A.   Yes, ma'am.

11   Q.   Okay.  And it's four pages, and it looks like this is an

12   email chain.  So let's start at the bottom of the chain with the

13   first email.  So if you go to page 3 here.  Okay.

14        Can you tell us who wrote this email?

15   A.   It looks like Manny Padilla who at the time was my chief of

16   operations, which would have been my Number 3 person in the

17   chain of command.

18   Q.   Okay.  And it looks like he was writing this email to you?

19   A.   That's correct.

20   Q.   And what's the date on this email?

21   A.   Thursday, January 28th, 2021.

22   Q.   What's your understanding of the purpose for this email?

23   A.   I think it was to provide a situational update to the

24   leadership within CBP and the Department.

25   Q.   Okay.  Let's go through this a little bit.  So let's look

1    at the first bullet point.  Mr. Padilla discusses a law that

2    Mexico passed that impacts Border Patrol's ability to expel

3    families under Title 42.

4              Can you explain what he's talking about.

5    A.    Yeah.  So Mexico enacted a law where they could not detain

6    children at the time.  And so for purposes of expulsion, that

7    would mean that family units, which are made up of children,

8    could no longer be expelled.

9    Q.    So if Mexico won't accept any families with children, did

10   that limit the options available to Border Patrol when

11   processing family units?

12   A.    It did.

13   Q.    Okay.  And is the laws that Mexico passed about detaining

14   children, is that something that Border Patrol is able to

15   control in any way?

16   A.    No, ma'am.

17   Q.    Okay.

18   A.    I wish I could.

19   Q.    Looking at the second bullet point there and the third

20   bullet point, these both talk about a rapid increase in families

21   and children coming over the border at the time this email was

22   written, right?

23   A.    Yes, ma'am.

24   Q.    Do you need me to zoom in on it at all?

25   A.    No, I'm good.

ORTIZ - DIRECT

1    Q.    We see that there's a mention of a 2019 crisis.  What was

2    that?

3    A.    So in 2019 we had an increase in family units across the

4    southwest -- in some of the sectors along the southwest border,

5    more specifically in Rio Grande Valley.  At the time, you know,

6    I was the deputy chief in Rio Grande Valley, and at one point

7    the acting chief down there, and so family units were coming

8    over in large numbers.

9    Q.    And how long would you say that surge lasted?

10   A.    Well, if you look at these numbers, roughly about a year.

11   Q.    Okay.  And which administration was that under?

12   A.    The Trump Administration.

13   Q.    Okay.  And we also see reference to a crisis experienced in

14   2014.  Do you see that?

15   A.    Yes, ma'am.

16   Q.    What was that crisis?

17   A.    Unaccompanied children.  At the time we were seeing a spike

18   in unaccompanied children, same -- in the same location, really,

19   in Rio Grande Valley, in South Texas.  That was the -- sort of

20   the epicenter of migration from about 2013, is when I got there,

21   till 2019.  So some people say I caused it.

22   Q.    And would you say that the surge lasted that entire time?

23   A.    No, ma'am.  We saw some ebbs and flows during that time.

24   Q.    For the peak of that surge, approximately how long would

25   you say it lasted?

ORTIZ - DIRECT

1    A.    About a year each time.

2    Q.    And which administration was that under?

3    A.    The Obama Administration.

4    Q.    So both of these surges we've been -- they talk about here,

5    they lasted about a year each?

6    A.    I believe so.

7    Q.    Is that typical for a surge to kind of come and go like

8    that?

9    A.    You know, my experience, I've been doing this job 31-plus

10   years, and I've been deployed all over the country.  I've been

11   deployed in South Texas in '96 and El Centro, California, in

12   '98; Tucson, Arizona, in 2000; and then, of course, you know,

13   what I've done over the last eight or nine years.  And so we've

14   seen spikes in migration throughout my career in different

15   locations.

16   Q.    Does Border Patrol have any control over the different

17   populations that may come to the border at any given time?

18   A.    No, ma'am.  I'm sorry.  You know, once again, I may -- we

19   try and deter and try and influence the traffic patterns as much

20   as we possibly can, but it can become a challenge.  I think the

21   cartels have more influence than we do sometimes.

22   Q.    Looking at the next bullet point here, the fourth bullet

23   point, it talks about a pause on processing pathways.  Do you

24   see that?

25   A.    I do.

1    Q.   So there's three pathways listed there in parentheses.

2    First, can you tell us what each of those pathways are?

3    A.   So the Migrant Protection Protocols, which would have been

4    the Remain-in-Mexico policy, that was coordination with the

5    government of Mexico to process individuals and then return them

6    to Mexico to await their immigration hearing.

7          The next one is the Asylum Cooperative Agreement,

8    which was an agreement with safe third countries.  In other

9    words, if Costa Rica was willing to maintain custody of certain

10   populations, if those individuals had crossed or entered through

11   those countries prior to presenting themselves along the

12   southwest border, we could ultimately leverage that cooperative

13   agreement with those same third countries.

14          And then the PACR program, I'm trying to remember the

15   acronym.  Sorry.

16   Q.   Can you describe the program.

17   A.   Yeah, it is very similar to parole -- I'm drawing a blank

18   here.  I'm sorry.

19   Q.   It's okay.  This --

20   A.   I'll come back to it.

21   Q.   It will come back to you later probably, right?

22   A.   Yes.

23   Q.   So it mentions that these pathways were paused.  Do you

24   know when MPP was paused?

25   A.   I want to say in May, I believe.

1    Q.   Of which year?

2    A.   '20.

3    Q.   Okay.  And do you know when ACA was paused?

4    A.   No, I do not.

5    Q.   So do you see also in the bullet point here it says,

6    "recent policy changes."  Do you see that?

7    A.   Yes, ma'am.

8    Q.   What is your understanding of what Mr. Padilla meant by

9    that?

10   A.   The executive orders, I would imagine.

11   Q.   Did you understand this to refer to a nondetention policy?

12   A.   No, ma'am.

13   Q.   In the next bullet point, we see a reference to local INM.

14   What does that mean?

15   A.   INM is the immigration office in Mexico, which would be

16   sort of ICRO and Border Patrol's equivalent, and they handle

17   immigration matters for the government of Mexico.

18   Q.   And according to this email, it looks like they agreed to

19   take family units under Title 42, unless the family had

20   tender-aged children or vulnerable populations.

21         Why was that important for you to know?

22   A.   So in Tamaulipas -- which is in Rio Grande Valley, South

23   Texas -- once again, that was sort of the epicenter of where

24   most of our traffic was occurring.  And so it was important for

25   us to be able to leverage that as a release valve for the

1    populations that we had in custody.

2    Q.   And so if the government in Mexico agrees or refuses to

3    take certain populations back, is that something Border Patrol

4    has any control over?

5    A.   No, ma'am.

6    Q.   Looking at the next bullet point, it talks about how Border

7    Patrol stations have decreased by 75 percent.  What does that

8    mean?

9    A.   So in a COVID environment, we weren't able to maintain the

10   same level of capacity that we would have been able to maintain

11   under normal conditions due to the health risk and the fact that

12   we had to take some concessions based upon the amount of space

13   that we had.  And so to limit the exposure of our employees, as

14   well as the migrant populations, there was a reduction in our

15   detention capacity.

16   Q.   So were you limited by 75 percent?

17   A.   Yes.

18   Q.   Okay.  Taking a look at the top of the next page, the

19   bullet point mentions that ICE ERO having limited placement at

20   Family Residential Centers and that their centers are at

21   near-maximum capacity.  Do you see that?

22   A.   I do.

23   Q.   Is the capacity or limitations of ICE ERO centers anything

24   that Border Patrol can impact?

25   A.   No, ma'am.

ORTIZ - DIRECT

1    Q.   And throughout this email, we also see that Mr. Padilla was

2    writing about the health and safety concerns mitigating the risk

3    of overcrowding and watching for signs of illness.

4              Was that because of COVID?

5    A.   It was.

6    Q.   So just to clarify, it sounds like there were a lot of

7    complex changing factors that were limiting Border Patrol's

8    options to process family units at that time.  Is that a fair

9    summary?

10   A.   Yeah, there were a lot of conditions that were in existence

11   that really changed some of the decisions that needed to be made

12   at the time.

13   Q.   So after you received this email, what did you do?

14   A.   I forwarded it to our chief of staff, Lise Clavel, within

15   CBP.

16   Q.   And what, if anything, if you know, was done with it after

17   you forwarded it?

18   A.   I have to assume that she shared it with the leadership

19   within CBP and potentially at the Department.

20   Q.   But you don't know for sure?

21   A.   No.

22   Q.   It looks like she then, if we go back one page, wrote back

23   to you talking about community stakeholder engagement.  What

24   does that mean?

25   A.   So one of the requirements that we wanted to ensure is that

1  we were working closely with our community partners to make sure

2  that we were advising them of the conditions within our

3  facilities and the level of activity that we were encountering.

4  And so there were constant communication between our sectors and

5  our community partners.

6          MS. RYAN:  Do you need a moment, Your Honor?

7          THE COURT:  No.

8          MS. RYAN:  Okay.

9  BY MS. RYAN:

10  Q.   You mentioned a little while ago that throughout your

11  career, there have been different surges.  How has Border Patrol

12  dealt with or adapted to those higher numbers?

13  A.   So just real quick before I lose my train of thought:

14  PACR, Prompt Asylum Claim Review process.  So I just wanted to

15  make sure that this was entered in that, you know, this was our

16  ability to hear asylum claims much quicker than they normally

17  would be.  Sorry.

18  Q.   Okay.  No, I told you it would come to you later, right?

19  A.   Yeah.

20  Q.   Do you know when that pathway was paused?

21  A.   No, ma'am.

22  Q.   Okay.  Do you need me to repeat the question?

23  A.   Please.

24  Q.   And you can take down this exhibit.

25          So you mentioned surges throughout your career.  How

1  has Border Patrol dealt with or adapted to those higher numbers?

2  A.   So throughout our career, we have tried to move resources

3  into those areas that are seeing a high level of activity.  Once

4  again, it becomes a bit of a challenge for us.  You know, even

5  back in September when we saw the huge increases in Del Rio,

6  that required a lot of coordination with a lot of different

7  agencies to make ensure that we managed that situation the way

8  we did.

9        And so we have a Mass Migration Plan set up for every

10  sector, and so any time we start to see increases that are to

11  the point where they're taxing the capacity of those individual

12  sectors, we may activate our Mass Migration Plan, which will

13  require that we send more resources into those areas.  Even most

14  recently, I've done the same thing here in Florida.

15        And so we continue to look at the conditions within

16  the local areas and our ability to respond.  And so once again,

17  it becomes a leadership decision that I have to make because any

18  time I take personnel resources from one area, I'm opening up

19  some potential vulnerability for that particular sector.

20  Q.   You mentioned coordination with other agencies, why is that

21  important?

22  A.   So this isn't -- this has got to be a whole-of-government

23  approach.  Border security, we like to say, is a team sport in

24  that you have, you know, medical requirements, you have court

25  requirements, you have requirements with foreign governments.

1    We do coordination with the State Department and other agencies.

2              And so I do think that this -- you know, what we're

3    dealing with now, it used to be Border Patrol was, you know, the

4    primary and, quite often, the one agency that was intimately

5    involved in what was happening.  That doesn't happen anymore.

6    Almost every sector runs a unified command-type structure so

7    they can work collaboratively with our state and local partners

8    to address some of the issues that we have out there.

9    Q.   In your 31 years of Border Patrol, have there ever been new

10   policies instituted that impact how noncitizens are processed at

11   the border?

12   A.   Yes.

13   Q.   And how were those new policies communicated to you?

14   A.   Typically, it would be either a memoranda or a -- some sort

15   of document from higher headquarters, whether it's the

16   Department or CBP.

17   Q.   Portions of your deposition that we heard previously dealt

18   with how changes to parole policies were communicated to you and

19   then to the field, and you had testified that it was through

20   phone and email between headquarters and sectors.  Do you

21   remember giving that testimony?

22   A.   Yes, ma'am.

23   Q.   Okay.  What policies were you referring to with that

24   answer?

25   A.   So, one, MPP.  Some of the other platforms that we were

1    using at the time.  And then looking at some of the other

2    options that were available to us.  Even when we rolled out

3    Title 42, you know, we had to figure out the implementation

4    guidance for how we were going to leverage Title 42 because we

5    had never used a CDC order to expel migrants before.

6              So all of this required that we have a better

7    understanding of what the law prescribed and how we would

8    execute or implement that guidance.

9    Q.   With that testimony you gave, though, were you referring to

10   a general nondetention policy?

11   A.   No, ma'am.

12   Q.   In your current position and your previous position as

13   deputy chief, would it be possible for a policy regarding the

14   processing of a noncitizen at the border to be instituted

15   without you knowing it?

16   A.   It better not happen.  No, ma'am.

17   Q.   Are you aware of any policy implemented since January of

18   2021 that suggests a preference for parole over detention?

19   A.   No, ma'am.

20   Q.   Are you aware of any policy implemented since January of

21   2021 communicating changes to the case-by-case review required

22   for parole?

23   A.   No, ma'am.

24   Q.   Are you aware of any policy implemented since January of

25   2021 discouraging transfer of citizens from CBP to ICE for

1    detention?

2    A.   No, ma'am.

3    Q.   Has anyone from DHS or the Administration ever contacted

4    you, as chief of Border Patrol, and directed you not to detain

5    noncitizens?

6    A.   No, ma'am.

7    Q.   In your opinion does Border Patrol have a policy of not

8    detaining noncitizens?

9    A.   No, ma'am.

10              MR. GUARD:  Objection, Your Honor.

11              THE COURT:  Overruled.  He can answer in his capacity.

12              THE WITNESS:  No, ma'am.

13              MS. RYAN:  One moment, Your Honor.

14              THE COURT:  Mm-hmm.

15              MS. RYAN:  No further questions, Your Honor.

16              THE COURT:  All right.  Thank you.

17              Mr. Guard?

18              MR. GUARD:  Your Honor, there is a matter that I would

19    like to take up with you outside the presence of the witness, if

20    that's possible.

21              THE COURT:  Okay.

22              MR. GUARD:  It's about his testimony.

23              THE COURT:  Come up sidebar.

24         (Following conference held at the bench.)

25              THE COURT:  Mr. Guard.

1        MR. GUARD:  So Ms. Ryan elicited testimony about

2   warrants from this witness, and they had a 30(b)(6) witness who

3   testified to the contrary.  And I don't -- I don't think that

4   the chief of Border Patrol is -- I think he may be mistaken.

5   I'm trying it figure out how to deal with the fact that their

6   30(b)(6) testimony binding this agency is different from what

7   the --

8        THE COURT:  Who was the 30(b)(6) witness?

9        MR. GUARD:  Mr. Barker, I believe.

10        MR. PERCIVAL:  Yes.

11        MR. GUARD:  It starts on page 189 and goes on to

12   page 190.

13        THE COURT:  When he gave that testimony, it did stand

14   out to me as being inconsistent with everything I remember

15   reading at summary judgment that they only issue -- they only

16   give warrants when they're going to send them for prosecution.

17   He certainly seemed do testify that every time a removal case

18   was opened, they would get a warrant.

19        MS. RYAN:  And he's making that testimony in his

20   individual capacity.  As the fact-finder, if you want to weight

21   counter-testimony that has been entered into the record, that is

22   for your determination on credibility as to this fact.  This is

23   his --

24        THE COURT:  I don't know if -- is this in the record?

25        MR. GUARD:  Yes.

1          MR. PERCIVAL:  Yes, Your Honor.  We haven't formally

2    handing it to you, but it's among the depositions.

3          MR. DARROW:  If I may add, Your Honor, that was

4    Mr. Barker's 30(b)(6) testimony.  He was not specifically

5    prepared on the issue of warrants, so I mean, that was -- just

6    so you know.  Like he hadn't, you know, done a lot of homework

7    on warrants before that was done.

8          MS. RYAN:  There's also a difference betweens warrant

9    and administrative warrant, and Mr. Ortiz, I believe, is

10   speaking about the administrative warrant that accompany an NTA.

11   The context of Mr. Barker's testimony may be different, but

12   this -- there is no need for a sidebar on this.  If there's

13   discrepancies that they feel are in the record, they can point

14   that out on their cross-examination.

15         THE COURT:  Are you asking whether you can impeach him

16   with this?

17         MS. RYAN:  Mm-hmm.

18         MR. GUARD:  I don't know how I can impeach him with it

19   when it's a statement of the agency he works at.  It is binding

20   on them.  I don't know how they can adduce testimony that is

21   contrary.

22         THE COURT:  You can do -- you can cross-examine him

23   and explore.

24         MR. GUARD:  Okay.

25         MR. PERCIVAL:  Your Honor, I --

1          MS. RYAN:  Your Honor, on scheduling, since we're

2    reaching 5:00 o'clock, should we plan further cross-examination

3    be in the morning?  Because we're sure how long Mr. Guard's

4    cross is.

5          THE COURT:  How long do you expect to go?

6          MR. GUARD:  It could be probably a little bit longer

7    than the last gentlemen that I crossed.  35, 45 minutes, maybe

8    longer.

9          THE COURT:  I would rather try to push through because

10   I'm sure he has better places to be than here.

11         MS. RYAN:  He's available tomorrow.  We made sure that

12   his schedule is free.  So he is able to come back first thing in

13   the morning.

14         MR. GUARD:  I'm ready to go but I can wait.

15         THE COURT:  I would rather just try to get through it.

16   And if it gets to 6:00 o'clock, we'll have another discussion,

17   but I think we can -- he's a talker.

18         MS. RYAN:  Yes.

19         THE COURT:  And I think we can get through it.

20         But I think, Mr. Guard, just to your point, I know

21   there's a conflict in the evidence.  Ms. Ryan suggested maybe

22   there's a reasonable explanation.  Maybe there is, maybe there

23   isn't.  But you got a witness you can cross-examine and raise

24   these issues with him --

25         MR. GUARD:  Okay.

ORTIZ - CROSS

1    Q.      -- and I'll he weigh the evidence when it

2    comes time.

3                MR. GUARD:  Okay.

4           *(End of bench conference.)*

5                          **CROSS-EXAMINATION**

6    BY MR. GUARD:

7    Q.   Good afternoon again, Chief Ortiz.  It's good to see you

8    again.

9    A.   Good to see you again.

10   Q.   Now, I want to first go over some of the things you

11   testified here today about.  You were asked about credible fear.

12   Do you recall that?

13   A.   Yes, sir.

14   Q.   All right.  Aliens currently being released by Border

15   Patrol at the border are not being interviewed currently for

16   credible fear before release, right?

17   A.   So if they make a claim for credible fear to a Border

18   Patrol agent, then they will be processed and they will

19   ultimately wind up going before an asylum officer, a CIS

20   officer, who will hear their credible-fear claim.

21   Q.   But they will go in front of an asylum officer after

22   they've been released, correct?

23   A.   Yes.

24   Q.   All right.  Under the Trump Administration, you mentioned

25   Border Patrol agents were able to do credible -- to serve as

ORTIZ - CROSS

1    asylum officers, right?

2    A.   Say the question again.  I'm sorry.

3    Q.   Under the Trump Administration, Border Patrol officers were

4    able to serve as asylum officers, right?

5    A.   That's correct.

6    Q.   All right.  And the Biden Administration ceased that

7    practice, correct?

8    A.   It -- yeah, it was no longer being exercised under the

9    Biden Administration.

10   Q.   Okay.

11   A.   But I will tell you, it's not something I ever supported.

12   To me, Border Patrol agents should be out there being -- should

13   be doing Border Patrol work.  I think asylum officers, they're

14   the ones that are trained to hear credible-fear claims.

15   Q.   Okay.  The Biden Administration ended that practice?

16   A.   That's correct.

17   Q.   All right.  And since the Biden Administration has taken

18   over, you mentioned in your testimony expedited removal, right?

19   A.   That's correct.

20   Q.   And they've contracted that pathway as well?

21   A.   We still are able to remove folks via expedited removal,

22   but it isn't at the same levels that it has been in the past.

23   Q.   Okay.  And under the Trump Administration expedited removal

24   was more expansive?

25   A.   That's correct.

ORTIZ - CROSS

1   Q.   Okay.  And that's what changed since the Biden
2   Administration took over, right?
3   A.   That's correct.
4   Q.   All right.  You mentioned and talked a lot about parole,
5   right?  And parole under the Trump Administration was limited to
6   exigent circumstances, right?
7   A.   That's correct.
8   Q.   All right.  And now parole decisions are being made in
9   large part based on ICE's detention capacity, right?
10  A.   It's being made on a couple of bases.  One, our level of
11  activity is much higher, and then certainly our ability to
12  maintain individuals in detention via ICRO is limited, yes.
13  Q.   Okay.  And you also mentioned MPP, correct?
14  A.   That's correct.
15  Q.   All right.  And the Migrant Protection Protocols were
16  terminated under the Biden Administration, right?
17  A.   That's correct.
18  Q.   All right.  You mentioned the May 2020 date, May 2020 date
19  where MPP was suspended.  Was that because at the time the Trump
20  Administration was not allowing people to enter the country?
21  A.   I don't know that -- not allowing people to enter the
22  country.  I'm not -- I'm not sure what -- maybe the question,
23  maybe I'm not understanding the question correctly.
24  Q.   Okay.  Was there a time period during COVID where
25  restrictions on entry were more so than they are even now?

1    A.   That's correct.

2    Q.   Okay.  That may be phrased a little bit better.

3    A.   Sorry about that.

4    Q.   I apologize about my inartful asking.

5          MR. GUARD:  Now, I'm going to ask Ms. Gerdts if we can

6    have the screen.  I'm going to ask her to put up what has

7    admitted as Florida's Exhibit 18.

8    BY MR. GUARD:

9    Q.   And this is an email I believe you've seen before, right?

10   A.   That's correct.

11   Q.   And the chief of Border Patrol who's copied on this email

12   was Chief Scott, right?

13   A.   That's correct.

14   Q.   And this email is from February 16th, 2021, correct?

15   A.   Yes, sir.

16   Q.   And that's 26 days after President Biden was inaugurated,

17   right?

18   A.   Yes, sir.

19   Q.   And this email is being sent and circulated internally to

20   the highest leaders at Border Patrol, right?

21   A.   It was the top three on the email string, so -- that I can

22   see, yes.

23   Q.   Okay.  And we've talked before -- and I'm not going to ask

24   you because I'm going to try real hard not to have you repeat

25   anything that you said in your deposition, but if we can look at

ORTIZ - CROSS

1    the second page of this email.  And this is from your chief of

2    law enforcement operations, right?

3    A.    That's correct.

4    Q.    And that's your -- at the time was he a direct report to

5    you?

6    A.    He was the third in the chain of command.

7    Q.    Okay.  All right.  And he writes -- because we don't --

8    obviously it's blacked out.  I think I know who it is based on

9    other emails, but I'm going to respect the PII.

10            It says:  "Thanks.  Many rapid changes happening."

11            Do you see that?

12   A.    I do.

13   Q.    Would you agree, Chief Ortiz, that there were many rapid

14   changes happening that affected the Border Patrol right after

15   President Biden was inaugurated?

16   A.    Yes.

17   Q.    And would you agree, Chief Ortiz, that the many rapid

18   changes that were happening were substantial changes?

19            MS. RYAN:  Objection.

20            THE COURT:  Overruled.

21            THE WITNESS:  Yes.

22   BY MR. GUARD:

23   Q.    And ERO, according to this email, was ending family

24   detention, correct?

25            If you go back to page 1.

1    A.    Yes.

2    Q.    And DHS had paused or suspended multiple processing

3    pathways, right?

4    A.    That's correct.

5    Q.    And those were not small matters.  Those were matters that

6    had profound effects on Border Patrol's operations, right?

7              MS. RYAN:  Objection.

8              THE COURT:  On what basis?

9              MS. RYAN:  The adjective use, "profound" impacts and

10   effects.

11             THE COURT:  He can either agree or not.  Overruled.

12             THE WITNESS:  It had an impact.

13   BY MR. GUARD:

14   Q.    Okay.  And it was not an insubstantial impact, right?

15   A.    Any impact to our operations to me is a significant impact.

16   Q.    Okay.  And those impacts -- or strike that.

17             Those substantial rapid changes were occurring as a

18   new border surge was just beginning, right?

19   A.    I don't know about a new border surge.  It's been -- like I

20   say, we've been busy for a while.  I felt like since 2013 we

21   have steadily increased the levels of encounters that we've seen

22   across the southwest border.  So I'm not so sure I would

23   characterize it as a new border surge, but we were busy.

24   Q.    All right.  Now, that increase, or however you want to

25   phrase it if you don't want to call it a new surge, was

1    occurring during a pandemic as well, right?

2    A.   That's correct.

3    Q.   All right.  Now, Chief Ortiz, would you agree that

4    consequences can deter migrant flows?

5    A.   Yes.

6    Q.   And consequences that can deter migrant flows from coming

7    to the United States include the detention of aliens attempting

8    to illegally enter the United States, right?

9    A.   Yes.

10   Q.   And a consequence that can deter migrant flows from coming

11   to the United States is expedited removal, right?

12   A.   Yes.

13   Q.   And if you do not have consequences that deter migrant

14   flows, illegal immigration is going to increase, right?

15   A.   That's an assumption, yes.

16   Q.   From your experience, from 31 years in Border Patrol, is

17   that assumption correct?

18   A.   Yes.

19   Q.   And if you reduce consequences that deter migrant flows,

20   illegal immigration is going to increase in the United States,

21   right?

22   A.   Yes.

23   Q.   And at the beginning of the Biden Administration, the Biden

24   Administration reduced the potential consequences facing

25   migrants traveling to the border, right?

ORTIZ - CROSS

1    A.    Yes.

2    Q.    At the beginning of the Biden Administration, the Biden

3    Administration reduced the potential consequences facing

4    migrants and that increased flows to the border, right?

5    A.    I would imagine that it had an impact on the flows that we

6    were experiencing, yes.

7    Q.    Okay.  And during the Trump Administration, did some aliens

8    not flow to the border because of the policies that were enacted

9    by that Trump Administration?

10   A.    I believe there was a perception that there were potential

11   consequences, so there were -- I'm assuming migrants that made

12   the decision not to travel to the U.S., yes.

13   Q.    Okay.  I want to now look at what is Florida Exhibit 98.

14   That was the email you were just looking at with Ms. Ryan.

15            MR. GUARD:  If we can flip to I think the first page

16   of the email, which I think is on page 3 -- no, page 3 of 6.

17            Thank you, Ms. Gerdts.  I appreciate it.

18   BY MR. GUARD:

19   Q.    You were talking about this email.  This is an email on

20   January 28, 2021, right?

21   A.    Yeah.

22   Q.    And that is eight days after President Biden's

23   inauguration, correct?

24   A.    Yes.

25   Q.    And if you look down on this first page -- you weren't

ORTIZ - CROSS

1    asked about this email -- there's an email from Ms. Clavel to

2    you.  You see that?

3    A.   I do.

4    Q.   All right.  And she asked -- or she states:  "Thanks,

5    Deputy Chief.  Are you the best person to ask to be added to the

6    2:00 p.m. with the AS?"

7              Do you see that statement?

8    A.   I do.

9    Q.   Who was the AS?

10   A.   Assistant secretary.

11   Q.   Assistant secretary of the Department of Homeland Security.

12   A.   Yes.

13   Q.   Do you know that individual's name at the time?  Are you

14   sure it wasn't the acting secretary?

15             MS. RYAN:  Objection.

16             THE WITNESS:  I would have assumed --

17             THE COURT:  Overruled.

18             THE WITNESS:  -- it was the assistant secretary.

19   BY MR. GUARD:

20   Q.   Okay.  And you don't recall who that was?

21   A.   No.

22   Q.   Okay.  And the other people copied on this email -- first,

23   Ms. Clavel, she's an employee of Customs and Border Protection,

24   right?

25   A.   At the time she was the acting chief of staff.

ORTIZ - CROSS

1   Q.   Okay.  So she's the chief of staff who works for the
2   commissioner?
3   A.   That's correct.
4   Q.   And the acting commissioner at that time was Mr. Miller
5   who's also copied on this email, right?
6   A.   That's -- yes.
7   Q.   And then Mr. Quinn who's copied on this email as well, his
8   title was the executive director, Office of Intergovernmental
9   Public Liaison for Customs and Border Protection, right?
10  A.   That's correct.
11  Q.   All right.  And so this is not just an email with Border
12  Patrol; this is an email with Customs and Border Protection?
13  A.   A lot of the CBP leadership, yes.
14  Q.   Okay.  And in this email at different times it refers to
15  "BP."  That's Border Patrol, correct?
16  A.   That's correct.
17  Q.   All right.  Now, the last email, if we can go to the -- I
18  guess it's page 5 of Exhibit 98.  You were talking before about
19  this series of bullet points.
20        Who had asked Chief Padilla to prepare the bullet
21  points in Florida Exhibit 98?
22  A.   I'm assuming from Lise Clavel had sent a request for
23  information through our Chief of Staff Office who would
24  ultimately end up tasking one of the directorate chiefs to put
25  together the information.

1   Q.   And why was Chief Padilla being asked to prepare this

2   bullet point list?

3   A.   Because he was the chief of operations at the time.

4   Q.   Okay.  And you reviewed this bullet point list?

5   A.   I did.

6   Q.   Okay.  You didn't make any changes to this bullet point

7   list, did you?

8   A.   I don't believe so.

9   Q.   Did you at the time agree with the information reflected in

10  the bullet points in Florida Exhibit 98?

11  A.   Yes.

12  Q.   All right.  If we could direct your attention down to the

13  fourth bullet point.  So it starts off with "The pause in

14  processing pathways."

15  A.   Yes, sir.

16  Q.   I think we're in -- we were trying to enlarge it to make it

17  easier for you and I, because we now need to make it bigger, it

18  reads:  "The pause on processing pathways," and then it says

19  "MPP, ACA, PACR, and recent policy changes have also impacted

20  USBP's ability to expeditiously process and remove those

21  encountered, including jail releases that do not fit into the

22  Civil Enforcement Priorities."

23        All right.  The Civil Enforcement Priorities that are

24  referenced there, what were those?

25  A.   Individuals that had an extensive criminal history, folks

ORTIZ - CROSS

1    that were a public threat, the Secretary had issued I think --
2    or the Department had issued a list of four or five criteria
3    where folks would fall into mandatory detention or enforcement
4    priorities for us.
5    Q.   Is that a document that was created on January -- or
6    executed on January 20th, 2021 by Acting Secretary Pekoske?
7    A.   I'm not sure about the date, but it probably would have
8    been around that time frame.
9    Q.   Okay.  And so from your perspective, in your belief, that
10   document set out the policies and practices of the United States
11   as far as detention?
12   A.   Yes.
13   Q.   And detention by the Border Patrol for aliens that had been
14   encountered?
15   A.    I think detention for the whole department, not just the
16   Border Patrol.
17   Q.   And so from your perspective, those civil enforcement
18   priorities formed the basis of what you then believed -- or the
19   individuals you believed should be detained on a mandatory
20   basis; is that correct?
21   A.    That drove part of decision-making, and then, of course,
22   obviously COVID and the ability of ICE to detain individuals was
23   a factor that was considered.
24   Q.   So you, as the deputy chief of Border Patrol, when you got
25   the Pekoske Memo, thought that you should detain on a mandatory

1    basis only those individuals listed within those priorities,

2    correct?

3    A.   That's correct.

4    Q.   Okay.  Now, if we can take that enlargement down for a

5    second.  If you would, look down to the second-to-last bullet

6    point.  I think it's the -- one, two, three, four, five, six --

7    seventh bullet point.

8          This bullet point reads:  "The U.S. Border Patrol will

9    be required to promptly process and release family units and

10   single adults due to the lack of adjudication pathways and the

11   necessity to maintain the health and safety of the workforce and

12   those in detention during the pandemic."

13         So the policy changes and the processing pathways that

14   have been restricted by the Biden Administration were going to

15   cause the Border Patrol to have to release single adults and

16   family units; is that correct?

17   A.   That coupled with the reduced processing space or detention

18   capacity within our facilities and the increases in encounters

19   that we were experiencing at the time all were part of that

20   decision, yes.

21   Q.   Okay.  And if ICE either doesn't respond to your detention

22   request or one of your officer's detention requests or tells you

23   no, Border Patrol just doesn't have anything to do other than to

24   release?

25   A.   We don't have a choice.  You're right.

ORTIZ - CROSS

1   Q.   Okay.  And was it common at that time period for either ICE

2   to be nonresponsive or be telling you no?

3   A.   I don't know about nonresponsive, but, yeah, there was

4   quite a few times where they weren't able to take people into

5   custody that we were processing.

6   Q.   Okay.  If you look at the next bullet point down, I guess

7   it's the eighth bullet point on this email, it reads:  "These

8   releases are sought to mitigate risks experienced from

9   overcrowding at U.S. Border Patrol facilities to maintain

10  COVID-19 mitigation protocols and due to U.S. Border Patrol's

11  inability to turn the detained migrants over to partner

12  agencies."

13          Are the partner agencies that are referred to in this

14  bullet point ICE?

15  A.   Yes.

16  Q.   Okay.  Are there any other partner agencies that Border

17  Patrol has that it turns over detained migrants for custody?

18  A.   We -- if -- during the time if we were to prosecute

19  somebody, we also experienced a reduced number of individuals

20  that we could place on a -- our court dockets.  And so, no,

21  different than ICE.  We hold people in custody in local

22  detention facilities, local jails, and they were no longer

23  accepting some of those transferees at the time also.

24  Q.   Okay.  And for the last two bullet points, with this email,

25  for sure, the acting commissioner of CBP was aware that the

ORTIZ - CROSS

1    policy changes were going to cause releases?

2            MS. RYAN:  Objection.

3            THE COURT:  All right.  You'll have to rephrase that.

4            MR. GUARD:  Okay.

5    BY MR. GUARD:

6    Q.   Do you know whether these bullet points were presented to

7    the -- strike that.

8            These bullet points were emailed to the acting

9    commissioner?

10   A.   That's correct.

11   Q.   And they were emailed to his chief of staff, right?

12   A.   That's correct.

13   Q.   And the chief of staff actually responded to you?

14   A.   That's correct.

15   Q.   All right.  And so they -- Customs and Border Protection

16   was aware that you were going to have to release because of the

17   recent policy changes and the processing pathways, right?

18   A.   That's correct.

19   Q.   All right.  Did you take part in the call with the AS?

20   A.   Typically I would participate in conference calls.  At the

21   time, once again, we were in a COVID environment so almost

22   everything was virtual.  And so if the assistant secretary

23   wanted to have a call, reference the information in this, I

24   probably would have participated in it, yes.

25   Q.   Do you recall participating in it?

1    A.   I participate in a lot of meetings and a lot of calls, so

2    this specific call just doesn't stand out.

3    Q.   Okay.  All right.  Do you have reason to think that you did

4    not sit on that call?

5    A.   No.

6    Q.   Now, in response -- well, one more thing, if we can go down

7    to the -- I think it's the ninth bullet point.  There's a bullet

8    point about family residential centers, top of the page.

9    A.   Okay.

10   Q.   All right.  This one reads:  "USBP works in close

11   coordination with ICE ERO to transfer family units to family

12   residential centers, but placement to these facilities is

13   limited and criteria/family demographic precludes many from

14   being placed.  EOR has already communicated that FRCs are near

15   maximum capacity."

16             Now, do you see that?

17   A.   I do.

18   Q.   All right.  Would you have, as deputy chief of Border

19   Patrol, any way to know whether that were true or not, that FRCs

20   were at maximum capacity or not?

21   A.   We communicated quite regularly with our ICE partners, so

22   if my chief of operations was indicating or describing the

23   conditions over one of their facilities, I have to assume that

24   it was true.

25   Q.   Okay.  And so if in reality there's evidence in the record

ORTIZ - CROSS

1   that suggests that they were at a capacity of less than

2   100 percent, would that have made a difference to what was being

3   communicated to your superiors?

4   A.   If it was less than a 100 percent?

5   Q.   Yes, that these facilities actually were at a capacity of,

6   like, 18 percent.

7   A.   Oh, certainly.

8   Q.   All right.  Now --

9        MR. GUARD:  We can take this document down.

10  BY MR. GUARD:

11  Q.   In response to the Biden Administration changes and the

12  difficulties that it was causing to the Border Patrol's

13  operations, Border Patrol rolled out a policy called

14  "prosecutorial discretion," correct?

15  A.   That's correct.

16  Q.   I'm going to show you what is marked as Florida Exhibit 20.

17       You talked about this on direct.  Was Exhibit 20 the

18  document that you were talking about you and Chief Scott came up

19  with?

20  A.   Well, I think we were specifically talking about the 385,

21  but this sort of drove the conversation about the I-385, the

22  Notice to Report.

23  Q.   Okay.  And, you know, the date on this memorandum is

24  March 19, 2021, correct?

25  A.   That's correct.

1   Q.   And it's less than two months after President Biden was

2   inaugurated, right?

3   A.   That's correct.

4   Q.   And again, this memorandum was sent to the acting

5   commissioner of CBP, right?

6   A.   That's correct.

7   Q.   And so Customs and Border Patrol would have been aware of

8   it, right?

9   A.   Yes, sir.

10  Q.   You've heard of the term "Notice to Report" before.  I

11  think you testified about it earlier, right?

12  A.   I did.

13  Q.   How does Notice to Report and -- this is called

14  prosecutorial discretion.  How do they differ?

15  A.   So the Notice to Report was the actual document that was

16  issued to the migrant explaining to them that there was an

17  expectation that they were to report to an immigration facility.

18  And so it was the processing tool that the Border Patrol agents

19  were going to utilize out in the field.

20  Q.   Okay.  And so the policy or guidance, or however you want

21  to call it, was called prosecutorial discretion, but the form

22  itself was called Notice to Report?

23  A.   That's correct.

24  Q.   Okay.  Now, we've seen from OFO written policies that

25  predate the Biden Administration allowing for limited parole.

ORTIZ - CROSS

1    On direct, you didn't not offer any written policies for Border

2    Patrol allowing for release or parole predating the Biden

3    Administration, correct?

4                MS. RYAN:  Objection.

5                THE COURT:  Overruled.

6                THE WITNESS:  No.

7    BY MR. GUARD:

8    Q.   Okay.  On direct you didn't offer any written memorandum

9    asserting that Border Patrol prior to the Biden Administration,

10   quote, "Already retained the discretion to not place a removal

11   alien into proceedings."  Correct?

12   A.   Correct.

13   Q.   What did you believe Border Patrol's authority was to

14   simply not do a Notice to Appear for an inadmissible alien?

15   A.   Can you ask me the question again?  Sorry.

16   Q.   Sure.

17              What did you believe your authority, your legal

18   authority was to simply not do a Notice to Appear for an

19   inadmissible alien?

20              MS. RYAN:  Objection.

21              THE COURT:  On what basis?

22              MS. RYAN:  It calls for a legal conclusion.

23              THE COURT:  Overruled.  You can testify from an

24   operational standpoint.

25              THE WITNESS:  So I'm taking you're asking what was our

ORTIZ - CROSS

1   authority to use the NTR as opposed to issuing an NTA?

2   BY MR. GUARD:

3   Q.   Sure.

4   A.   I'm assuming that's the question.

5   Q.   Sure, yes.

6   A.   So for us, there were operational considerations that we

7   took as part of our decision matrix.  One, the conditions of our

8   facilities; two, the conditions of the communities that we were

9   seeing significant increases in migrant populations; three, the

10  conditions of our workforce; and then, four, the conditions

11  that -- or the potential risk to the migrant populations.

12          And so knowing that we were going to leverage

13  prosecutorial discretion, we set forth the criteria.  We were

14  going to run records checks on these individuals, and as long as

15  they did not meet the criteria for mandatory detention and they

16  were not a health risk or a potential public safety risk, then

17  we were going to process them with a Notice to Report.

18  Q.   Can you cite either a statute or a regulatory basis that

19  supported the prosecutorial discretion memoranda?

20          MS. RYAN:  Objection.

21          THE COURT:  I'll sustain that.

22          MR. GUARD:  I'll move on, Your Honor.  I think that

23  point has already been made.

24  BY MR. GUARD:

25  Q.   Were aliens subject to this policy released by Border

ORTIZ - CROSS

1    Patrol itself or by ICE?

2    A.    They -- so we had ICE officers in many of our facilities,

3    so it was a coordinated effort.

4    Q.    All right.  And aliens that were released under this policy

5    were both parts of family units and single adults, correct?

6    A.    That's correct.

7    Q.    All right.  Looking at the bottom of page 1 of Florida

8    Exhibit 20, the reasons given in this memorandum for the

9    policies are first COVID-19, correct?

10   A.    Yes.

11   Q.    Second, unaccompanied minor encounters, right?

12   A.    Yes.

13   Q.    And third, it lists custody challenges and finite

14   resources, right?

15   A.    That's correct.

16   Q.    The custody challenges would relate again to ICE either

17   telling you no or not accepting transfers, right?

18   A.    Yeah, inability to transfer.  Yes.

19   Q.    Okay.  I'm going to show you now what has been admitted

20   into evidence as Plaintiff's Exhibit 22.  This is a string of

21   emails that we'll -- if you look at the last page of the

22   document -- well, let's go back to page 3.  I'm sorry.  I

23   thought was the last page.  I didn't realize there was these...

24          This is not the...

25          *(Off-the-record discussion.)*

ORTIZ - CROSS

```
 1   BY MR. GUARD:
 2   Q.   We're looking at 21.  I apologize.  We had the wrong email
 3   up.
 4   A.   That's all right.
 5   Q.   I believe this -- if you'll look at the top of this chain,
 6   this is an email that copies you, right?
 7   A.   Yes.
 8   Q.   And it's right after the -- that memo that we just looked
 9   at came out, right?
10   A.   That's correct.
11   Q.   And so this is communicating this out to the field, right,
12   communicating the policy out to the field?
13          MS. RYAN:  Your Honor, I just ask that the witness
14   have a chance to read the entire document.
15          THE COURT:  Okay.  I saw him nod.  I thought he
16   answered.
17          But when you're ready, sir, if you'll answer the
18   question.
19          THE WITNESS:  I'm assuming it's going out to the
20   field, yes.
21   BY MR. GUARD:
22   Q.   Okay.  And the reason you don't know that is because all
23   the addresses have PII on them?
24   A.   It's redacted, yeah.
25   Q.   Okay.  If you look down at the bottom of the first page of
```

1    Florida Exhibit 21, the email reads:  "As you can imagine, there

2    are a ton of moving parts as we mature and refine prosecutorial

3    discretion."

4            Did I read that right?

5    A.   Yes.

6    Q.   And you were also copied on that email, correct?

7    A.   I am.

8    Q.   All right.  The policy enacted in Florida Exhibit 20 and

9    implemented by the emails in Exhibit 21 needed to be matured and

10   refined because Border Patrol had never had a policy like that

11   before, correct?

12           MS. RYAN:  Objection.

13           THE COURT:  Overruled.

14           THE WITNESS:  Correct.

15   BY MR. GUARD:

16   Q.   The policy enacted in Florida Exhibit 20 and implemented by

17   the emails in Florida Exhibit 21 was needed because there was a

18   lack of adjudication pathways and no detention capacity, right?

19   A.   And the COVID situation, yes.

20   Q.   Okay.  When was the policy in Exhibit 20 rescinded?

21   A.   I don't know about the exact date.

22   Q.   Okay.  You were the one who rescinded it?

23   A.   Yes.

24   Q.   Because by that point in time, you were the actual chief,

25   right?

ORTIZ - CROSS

1   A.   That's correct.

2   Q.   I'm going to show you what has been admitted as Florida

3   Exhibit 59.

4        All right.  This email -- or this memoranda is

5   undated.  Did you have -- did you ever review this memorandum?

6   A.   I probably reviewed it, yes.

7   Q.   Okay.  And it's undated, but if you look at the first

8   paragraph, it reports some statistics from today's early morning

9   report on June 15th of 2021.

10  A.   Yes, sir.

11  Q.   And if you look at the first two paragraphs, there's no

12  mention of COVID-19 at all, is there?

13  A.   No, sir.

14  Q.   This memorandum is all about capacity and operational

15  issues, right?

16  A.   Tempo, yeah, that's correct.

17       *(Reporter clarification.)*

18       THE WITNESS:  Operational tempo, yes.

19  BY MR. GUARD:

20  Q.   All right.  If we go to the second page of Plaintiff's

21  Exhibit 59, there's a reference here again to the -- what is

22  known as the Pekoske Memo; is that correct?

23  A.   Yes, sir.

24  Q.   And so the authority that at least is being -- that is

25  cited here is it that memo, correct?

ORTIZ - CROSS

1   A.   Correct.

2   Q.   All right.  If we can turn now to Florida Exhibit 30.

3         All right.  This email is an email dated from May 15,

4   2022, correct?

5   A.   May 14th, yes.

6   Q.   I think it's the 15th, actually, sir.

7   A.   Huh?

8   Q.   I think the last email in the chain is from May 15th?

9   A.   Okay.  Yes.

10  Q.   Okay.  And that was approximately eight days before

11  Title 42 was originally going to end at the southwest border,

12  right?

13  A.   Correct.

14  Q.   Okay.  And this email was about an exercise that Border

15  Patrol took part in, correct?

16  A.   Yes.

17  Q.   Okay.  And FEMA ran that exercise, correct?

18  A.   That's correct.

19  Q.   And FEMA is the federal agency that responds to disasters,

20  right?

21  A.   That's correct.

22  Q.   Did Border Patrol expect the rescission of Title 42 would

23  be a disaster?

24  A.    I don't know that I would characterize it as a disaster,

25  but we did expect an influx and higher numbers.

ORTIZ - CROSS

1    Q.   All right.  And was the -- was some document going to

2    result from that exercise?

3    A.   Typically after a exercise like that is conducted there

4    would be an After Action Report.

5    Q.   Okay.  And there's a reference to something that's called

6    an SOC.  Do you know what an SOC is?

7    A.   I'm trying to think of the acronym, but I'm drawing a

8    blank.  Sorry.

9    Q.   That's okay.  And the top email deals with an email from

10   Mr. Barker.  Is that correct?

11   A.   That's correct.

12   Q.   All right.  And Mr. Barker at that point in time was in the

13   law enforcement operations job; is that correct?

14   A.   That's correct.

15   Q.   So he was the Number 3 at Border Patrol, right?

16   A.   Yes, sir.

17   Q.   All right.  And he's talking about trying to get into a

18   policy section of a document, a quote from the deputy

19   commissioner.  Is that fair?

20   A.   Yes.

21   Q.   Okay.  And who was the deputy commissioner at the time?

22   A.   I believe it was Carry Huffman.

23   Q.   Okay.  Have flows compounded at the southwest border

24   because until at least this past week the United States under

25   the Biden Administration was not detaining and removing

ORTIZ - CROSS

1   demographics that are amenable?

2   A.   So ask me the question again.  I'm sorry.

3   Q.   Sure.

4        You see there is a quote in this document.  It says:

5   "We must ensure that we are detaining and removing the

6   demographics that are amenable or else the flows will only

7   compound more."

8   A.   Okay.

9   Q.   Have the flows compounded at the southwest border until

10  this past week because there was a new policy rolled out under

11  the Biden Administration because the United States was not

12  detaining and removing demographics that were amenable?

13  A.   I think we've seen increases for a variety of reasons, both

14  part of what you described, but also we've seen unrest in a lot

15  of different countries.  I mean, Brazil is going through some

16  tremendous challenges.  So I wouldn't -- it wouldn't surprise me

17  one bit if we start to see a spike in encounters from migrants

18  from Brazil.

19  Q.   All right.  And after NTR-PD, or however you want to

20  describe it, we then had Parole Plus ATD, correct?

21  A.   That's correct.

22  Q.   And then we had Parole Plus ATD for both CBP and ICE,

23  right?

24  A.   That's correct.

25  Q.   All right.  And so we've seen multiple written policies

ORTIZ - CROSS

1    after -- for the Border Patrol or governing the Border Patrol

2    after President Biden took office allowing for the release of

3    inadmissible aliens, right?

4    A.   That's correct.

5    Q.   All right.  And all those written policies were

6    disseminated by the Border Patrol to its agents, correct?

7    A.   Yes, sir.

8    Q.   We haven't seen a single written policy or a single email

9    prior to the Biden Administration allowing for the discretionary

10   release of inadmissible aliens --

11        MS. RYAN:  Objection.

12   BY MR. GUARD:

13   Q.   -- correct?  During your testimony.

14        THE COURT:  All right.  What's your basis?

15        MS. RYAN:  He asked ever before the Biden

16   Administration.  That's beyond the scope of this witness's

17   knowledge.

18        THE COURT:  If it is, he can tell us.  Overruled.

19        THE WITNESS:  So prior to me becoming the chief of the

20   deputy, is that what you're asking?

21   BY MR. GUARD:

22   Q.   No.  What I'm asking is during your direct testimony you

23   were shown a series of policies, right?

24   A.   Uh-huh.

25   Q.   And we haven't seen -- during that testimony we didn't see

ORTIZ - CROSS

1   a single written policy prior to the Biden Administration

2   allowing for the discretionary release of inadmissible aliens,

3   right?

4   A.   That's correct.

5   Q.   Okay.  Now, you testified on direct about warrants.  Do you

6   recall that?

7   A.   I do.

8   Q.   All right.  Mr. Barker was the Department of Homeland

9   Security's 30(b)(6) witness, which means that he spoke on behalf

10   of the agency.  Does Border Patrol obtain a warrant for an

11   individual -- strike that.

12          Under the Notice to Appear/Own Recognizance that I

13   think we've spoken about today that has been talked about

14   throughout this case, is a warrant obtained for arrest?

15   A.   The warrant is issued into the A-file jacket and is

16   administered to the migrant when they are processed by the

17   Border Patrol agent, that's correct.

18   Q.   Okay.  And if -- now, if on behalf of the agency Mr. Barker

19   testified that, no, he did not believe a warrant for arrest is

20   in the NTA packet, he would have been wrong?

21   A.   In the what packet?

22   Q.   In an NTA packet.

23   A.   Yes.

24          MR. GUARD:  May I have a minute, Your Honor?

25          THE COURT:  Sure.

1      MR. GUARD:  I'm going to pass the witness, Your Honor.

2      THE COURT:  All right.  Ms. Ryan.

3      MS. RYAN:  One moment, Your Honor.

4                  **REDIRECT EXAMINATION**

5  BY MS. RYAN:

6  Q.   Hello there, Chief.

7           You were just asked about some testimony from

8  Mr. Barker.  To be clear, you were Mr. Barker's supervisor,

9  correct?

10  A.   That's correct.

11  Q.   You also said on cross that expedited removal was not at

12  the same level as in the past.  Why is that?

13  A.   Our ability to process migrants in the coordination with --

14  in the other agencies and the government of Mexico has been

15  challenged.

16  Q.   And why is that?

17  A.   Just capacity.

18  Q.   And does your ability to use expedited removal depend on

19  other countries agreeing to take those immigrants back?

20  A.   That's correct.

21  Q.   So if expedited removal is being used at a lower level, it

22  may be from outside forces and not because of choices within the

23  Border Patrol?

24  A.   That's correct.  We have to be able to repatriate them back

25  to the country that they came from.

ORTIZ - REDIRECT

1   Q.   Okay.  You were also just asked about warrants, and you

2   said on direct that Notices to Appear that were issued by Border

3   Patrol, are accompanied by an administrative warrant, correct?

4   A.   That is correct.

5   Q.   How is that different from a regular warrant?

6   A.   A regular warrant would be, you know, if somebody fails to

7   show up to a court hearing, we would execute or administer a

8   warrant trying to obtain custody of that individual.  And

9   typically it would be multiple agents.  ICRO has a fugitive ops

10  component that actually serves those warrants for individuals

11  who fail to show up at immigration hearing.

12  Q.   Are you familiar with the Form I-200?

13  A.   Yes.

14  Q.   Is that the administrative warrant form that accompanies a

15  Notice to Appear?

16  A.   Yes.

17  Q.   You were shown Exhibit 59, which I have a copy of if you

18  need to see it, or do you recall it?

19  A.   Sorry.

20  Q.   I know we got a lot.  Here we go.

21       Do you recall being asked about this form?

22  A.   I do.

23  Q.   Is there a date on this?

24  A.   I don't see a date on the top, no.

25  Q.   Is it signed?

1   A.   No.

2   Q.   If it's unsigned, what does that indicate to you?

3   A.   That it was probably just a draft.

4   Q.   You were also asked about different policies being enacted,

5   additional policies that allow for release of inadmissible

6   aliens.  Do you remember that?

7   A.   Yes.

8   Q.   Do those policies require release of inadmissible aliens?

9   A.   No.

10  Q.   Does the standard by which you process those aliens change

11  at all?

12  A.   No.

13  Q.   So it's still done on a case-by-case basis?

14  A.   That's correct.

15  Q.   You were also asked about Plaintiff's Exhibit 18.

16          Looking at the last page real quick, there was a line

17  that you were asked about specifically.  At the top here:

18  "Thanks.  Many rapid changes happening."  Do you remember being

19  asked about that?

20  A.   Yes.

21  Q.   Did you write that email?

22  A.   No.

23  Q.   So do you know what they were referring to when they said

24  that?

25  A.   Not necessarily, but one might assume just because -- I

ORTIZ - REDIRECT

1   mean, there's changes happening due to the conditions that --

2   what's happening on the border between COVID and you had

3   administration change, you had leadership changes.  There were a

4   lot of changes occurring at the time.

5   Q.   Does that necessarily mean policy changes?

6   A.   Not necessarily, but I'm sure that was part of it.

7   Q.   And you were also asked about Exhibit 98 where there's a

8   reference to ICE ERO's capacity being at full capacity.

9        Do you remember that?

10  A.   Yes.

11  Q.   And you were also asked by counsel about other evidence

12  indicating that ICE's capacity was at 18 percent.  Do you recall

13  that?

14  A.   Yes.

15  Q.   Wouldn't capacity of 18 percent be unheard of in the time

16  of COVID for a detention facility?

17  A.   Yes.

18  Q.   18 percent would be unheard of because of COVID?

19  A.   Maybe I'm not following the question.

20  Q.   Sure.  Let me try to rephrase that for you.

21  A.   I'm sorry.

22  Q.   In this email here you had testified that Border Patrol

23  facilities were operating at only 25 percent, correct?

24  A.   That's correct.

25  Q.   At a 75 percent reduction?

1   A.    Reduction, yes.

2   Q.    So if an ICE facility was operating at only 18 percent of

3   its total physical capacity, would that be unheard of in the

4   time of COVID?

5   A.    Not -- not when you think about the limitations and the

6   PREA standards that ICE has to adhere to.  Their standards are

7   much -- they're governed by a much different policy than

8   processing facilities are.  It's much more strict.  So that

9   wouldn't be unheard of.

10  Q.    So if a detention facility was operating at 18 percent of

11  its physical capacity, that could still be considered full?

12  A.    And under these conditions, yes.

13           MS. RYAN:  No further questions, Your Honor.

14           THE COURT:  All right.  Thank you.

15           Chief, just a couple questions from me.

16           THE WITNESS:  Yes, sir.

17           THE COURT:  I had the pleasure, I guess, quotes,

18  watching your video deposition as well.  So I've seen you now,

19  I've heard you.  I got the sense both a little bit today and

20  also from your testimony on the deposition that you were not

21  overly happy with the ICE reductions in capacity because it tied

22  your hands somewhat.  Is that a fair assessment to take?

23           THE WITNESS:  Yeah.  One of the challenges that I've

24  always struggled with and I've heard from not just ICE but other

25  agencies is that, Hey, we have to adhere to, you know, certain

1    policies or guidance and, you know.  But they never factor in

2    the consideration that the Border Patrol has policies and

3    guidance that we want to adhere to also.

4             And that's, you know, in reference to my statement

5    earlier where I said, you know, I'm one of the few agencies --

6    or we're one of the few agencies that can't say no.  And so I'm

7    so reliant on all the other offices, whether it's a community,

8    whether it's an NGO, whether it's ICE, ERO, the government of

9    Mexico -- so my ability to dispo individuals in my custody

10   always depend on somebody else just about.

11            THE COURT:  And on the flip side of, that I also heard

12   testimony from Director Price who -- I think that was him.  He's

13   at ERO?

14            THE WITNESS:  Yes, sir.

15            THE COURT:  And I got the sense from him, his

16   testimony that he wasn't particularly happy with Border Patrol

17   with the Notices to Report and the Parole Plus ATD because it

18   was pushing your processing work to them.  Is that a fair

19   assessment as well?

20            THE WITNESS:  Yes, sir.  One of the things that we

21   heard initially is that there were long lines outside of ICE

22   offices in some of the areas that these migrants were traveling

23   to, and that was posing a challenge to them.  So, yeah, I would

24   imagine that he was probably less than happy with some of the

25   things that were happening -- or some of the decisions that we

1    were making within Border Patrol.

2           THE COURT:  All right.  Does that generate a need for

3    anything from the attorneys?

4           MR. GUARD:  No, Your Honor.

5           MS. RYAN:  No, Your Honor.

6           THE COURT:  All right.  Well, thank you, Chief, for

7    being here.  We hate to work you late but at least we're going

8    to get you out of here today.

9           THE WITNESS:  Thank you, sir.

10          THE COURT:  All right.  Have a good day.

11      *(Witness excused.)*

12          THE COURT:  All right.  I think, counsel, we are at a

13   good point to break for the day.

14          Ms. Ryan, what do you anticipate tomorrow?  Is it

15   still going to be a short day?

16          MS. RYAN:  I believe so.  At this time we only have

17   two witnesses, Robert Guadian from ICE and one of the

18   plaintiff's witnesses on standing will be here as well.

19          MR. GUARD:  And, Your Honor, just to be clear, we're

20   releasing Chief Ortiz.

21          THE COURT:  Okay.  If you'll just let him know he's

22   free to go about his business.

23          MS. RYAN:  I'll run after in a second.

24          THE COURT:  All right.  Well, we will reconvene then

25   at 9:00 tomorrow and go through what you describe, and we're

1    still on track then to recess for the day and then come back

2    Thursday morning and deal with the last standing witness and

3    then any rebuttal case that Florida has, correct?

4              MR. GUARD:  Yes, Your Honor.

5              THE COURT:  And then after that, we will hear argument

6    relating to the Parole Plus ATD policy as well as a preview of

7    what I might see in your proposed findings.  And you will engage

8    in discussion with me about all that, and we will leave each

9    other's company hopefully with less of the congressional budget

10   than you wanted to give me initially.

11             All right.  Well, we'll be in recess until

12   9:00 tomorrow morning.

13             *(Proceedings adjourned at 5:50 p.m.)*

14                         * * * * * * * *

15        I hereby certify that the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
16   the above-entitled matter, pursuant to the provisions of Section
     753, Title 28, United States Code.

17

18                                        1/20/23

19   _____    _____
     Julie A. Wycoff, RMR, CRR         Date
20   Official U.S. Court Reporter

21

22

23

24

25

```
 1                        I N D E X

 2                   PLAINTIFF EXHIBITS

 3    Exhibit   Description                      Marked  Admitted

 4    5A,6A,7A  ICE Detention Data spreadsheets    10      10

 5    20        3/19/21 memo re:  prosecutorial    25      25
                discretion
 6
      34,35,36  Documents on Operation Horizon     25      25
 7
      37        Operation Horizon ICE training, Video 1  29    29
 8
      38        Operation Horizon ICE training, Video 2  29    29
 9
      48        Defendants' Responses to           33      33
10              Interrogatories

11    63        Defendants' Responses to Requests for  33    33
                Admission
12
      96        Bureau of Justice Assistance 2021 grant  36    36
13              solicitation

14    98        1/28/21 email re:  Request for Info on   4     4
                releases
15

16    Plaintiff Witnesses          Direct   Cross   Redirect

17    ROBERT GUADIAN (BY VIDEO) .................7

18    COREY PRICE (BY VIDEO) ....................11

19

20

21    Defense Witnesses            Direct   Cross   Redirect

22    MATTHEW DAVIES ...........................41      74       91

23    RAUL ORTIZ ...............................97     144      173

24

25
```