1             **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF FLORIDA**
2               **PENSACOLA DIVISION**

3  STATE OF FLORIDA,           )
                           )
4             Plaintiff,     )
    vs.                   ) Case No: 3:21-CV-1066
5                            )
 UNITED STATES OF AMERICA; ALEJANDRO  ) Pensacola, Florida
6  MAYORKAS, Secretary of the U.S.    )
 Department of Homeland Security, in  ) January 11, 2023
7  his official capacity; U.S. DEPARTMENT ) 8:56 a.m.
 OF HOMELAND SECURITY; TROY MILLER,   )
8  Acting Commissioner of U.S. Customs   )
 and Border Protection, in his official )
9  capacity; U.S. CUSTOMS AND BORDER    )
 PROTECTION; TAE JOHNSON, Acting      )
10 Director of U.S. Immigration and     )
 Customs Enforcement, in his official  )
11 capacity; U.S. IMMIGRATION AND CUSTOMS )
 ENFORCEMENT; UR M. JADDOU, Director of )
12 U.S. Citizenship and Immigration     )
 Services, in her official capacity;   )
13 U.S. CITIZENSHIP AND IMMIGRATION     )
 SERVICES,                       )
14               Defendants.    )
 _____)

15

16           **TRANSCRIPT OF BENCH TRIAL – DAY 3**
17     **BEFORE THE HONORABLE T. KENT WETHERELL, II**
          **UNITED STATES DISTRICT JUDGE**
            **(Pages 1 through 90)**
18

19 <u>APPEARANCES</u>:

20 For State of Florida:    Office of the Attorney General
                   by:  **JOHN M. GUARD, JAMES H. PERCIVAL,**
21                      **ANITA J. PATEL, NATALIE CHRISTMAS**
                     and **JOSEPH HART**
22                  The Capitol, Suite PL-01
                 400 South Monroe Street
23                  Tallahassee, Florida 32399
                 (850) 414-3300
24                  *james.percival@myfloridalegal.com*
                 *anita.patel@myfloridalegal.com*
25                  *joseph.guard@myfloridalegal.com*
                 *natalie.christmas@myfloridalegal.com*

1    APPEARANCES CONTINUED:

2    For the United States:    Department of Justice
                               Office of Immigration Litigation
3                              by:   **ELISSA FUDIM, ERIN T. RYAN**
                                     **and JOSEPH A. DARROW**
4                              450 5th Street NW
                               Washington, D.C. 20001
5                              (202) 532-5802
                               *elissa.p.fudim@usdoj.gov*
6                              *erin.t.ryan@usdoj.gov*
                               *joseph.a.darrow@usdoj.gov*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2       *(Call to Order of the Court.)*

3               THE COURT:  Good morning.  Please be seated.

4               All right.  This is Case Number 3:21cv1066.  And we

5       are here for Day 3 of our trial.  I think we are in the

6       defendants' case.

7               Anything we need to talk about before we get going?

8               MR. PERCIVAL:  Yes, Your Honor.  The parties have

9       reviewed each other's paper deposition designations.  Everything

10      is ready for Your Honor, so we were hoping to both approach and

11      formally offer those.

12              THE COURT:  Okay.  Let's do that.

13              All right.  Let me make sure I understand what I've

14      gotten here.  So from Florida, I've got a deposition excerpts

15      from Matthew Davies.

16              And I've not heard -- not watched a video of him,

17      correct.

18              MR. PERCIVAL:  That's correct, Your Honor.  Everything

19      else you have -- you either watched a video or you heard the

20      Barker regarding.  Davies was the one that was never read to

21      Your Honor or shown in the video.

22              THE COURT:  So the other things I've gotten are Price,

23      Guadian, Barker, and Ortiz.

24              MR. PERCIVAL:  That's correct, Your Honor.  And

25      because the court reporter was not transcribing the videos, we

1   just gave you a copy of what was shown in the videos.

2            THE COURT:  And Barker, did I watch a video of him?

3            MR. PERCIVAL:  That was the one that Ms. Christmas

4   read from the stand.

5            THE COURT:  Okay.  That's right.  Okay.

6            From Federal Government, I've gotten James Heckman;

7   Jesse Bottcher, B-O-T-T-C-H-E-R; Tony Barker and Tony Barker.

8            MS. RYAN:  That's correct, Your Honor.  There were two

9   30(b)(6) depositions on different dates for Mr. Barker, and

10  there are designations for both.

11           THE COURT:  And the Tony Barker that I got that

12  Ms. Christmas read was from July 13th.  I also have a

13  July 13th from you.

14           MS. RYAN:  Yes.

15           THE COURT:  Are they different?

16           MS. RYAN:  Yes, Your Honor.  Those are our affirmative

17  designations with plaintiff's counter-designations to our

18  sections.  And what Ms. Christmas read was their designations

19  with our counter-designations, and they mostly do not overlap.

20           THE COURT:  Okay.  And flipping through the documents,

21  each one of them appears to have some highlighted language and

22  some non-highlighted.  I'm assuming I'm only to read the

23  highlighted language.

24           MS. RYAN:  Yes, Your Honor.

25           MR. PERCIVAL:  Yes, Your Honor.

1          THE COURT:  All right.  What I will endeavor to do in

2    our time apart today is go through that so I'm fully informed on

3    all the evidence that I've gotten for purposes of our

4    discussions tomorrow.

5          All right.  Anything else from the state we need to

6    do?

7          MR. PERCIVAL:  No, Your Honor.

8          THE COURT:  Ms. Ryan or anyone else from the defendant

9    that --

10          MS. FUDIM:  Yes.  Good morning, Your Honor.

11          Before we get started with our first witness, there's

12    a few matters that we'd like the Court to take judicial notice

13    of.

14          When Mr. Ortiz was on the stand, he was asked a

15    question about the dates that the ACR and PACR programs were

16    paused as referenced in one of the documents, and his answer was

17    he didn't know.  So we have public-facing documents that we'd

18    ask the Court to take judicial notice of as to the dates of

19    those pauses.

20          The U.S.-Guatemala Asylum Cooperative Agreement, which

21    is the ACA, was paused starting in March 2020 under the Trump

22    Administration due to COVID-19.  The agreements with El Salvador

23    and Honduras were never implemented, and that information --

24    which we'd ask the Court to take judicial notice of -- is

25    available on a public-facing government website.  I can provide

1    the link, the URL, but I also have a copy of the material for

2    opposing counsel as well as the Court, which I can hand up.

3                    THE COURT:  What about the PACR program?

4                    MS. FUDIM:  The PACR pilot program has not been

5    operational since March of 2020 as a result of the COVID-19

6    pandemic and DHS's role in implementing the CDC orders

7    suspending introduction of persons from a country where a

8    communicable disease exists.  That was released on March 2020

9    and its subsequent related orders issued pursuant to this

10   authority.  And for that material, I have another public press

11   release which contains -- and I can point the Court to the

12   specific portions that contain that information.  It's a --

13   sorry, not -- this is not the press release.  This is a signed

14   government document indicating that information from Homeland

15   Security.

16                   So I can pass copies of those up to the Court just so

17   the Court can have -- just for the limited purpose of the date

18   on which those programs were paused.

19                   May I hand a copy up to the Court?

20                   THE COURT:  Well, let me -- does the State have any

21   issue?

22                   MR. PERCIVAL:  Your Honor, we have no issue in

23   principle.  This is the first we're learning of this, so we

24   would just reserve the right to offer any additional evidence

25   that may be relevant on rebuttal to flesh out the details here;

 1   but no, we have no objection.

 2              THE COURT:  All right.

 3              MS. FUDIM:  We have a copy for both opposing counsel

 4   and the Court.

 5              And then the third matter -- or I can wait a moment

 6   until you get that if you'd like.

 7              THE COURT:  Okay.

 8              MS. FUDIM:  May I continue, Your Honor?

 9              THE COURT:  Hold on.  Let me look at this.

10              MS. FUDIM:  Sure.

11              MR. GUARD:  Your Honor, the first document you were

12   given has a date of February 6, 2021.

13              THE COURT:  All right.  Let me look at it for a

14   second.

15              MR. GUARD:  Maybe, Your Honor, if we could just review

16   these and then come back in front of the Court on this issue

17   since this is the first we're seeing it.

18              THE COURT:  I'm not paying attention to you because I

19   asked you to let me read this, please.

20              I think, Ms. Fudim, I'm going to defer consideration

21   of this until Florida has a chance to digest it.  Because I'm

22   looking at these documents, and I don't think they -- I mean, I

23   see the point you're raising, but reading the documents, it

24   raises a number of other questions in my mind.  Both of these

25   things occurred -- one of them was in February of 2021, the

1   other is in September of 2020 -- describing something that the

2   document says happened years prior.  I'm not sure that's the

3   kind of information that I can use to take judicial notice of, a

4   fact that occurred years before.

5           I mean, when you were talking about it, it made me

6   think this was a document prepared around the time the event

7   happened saying, We hereby do what you're saying it did, and

8   that might be a different circumstance.  But this *post hoc*

9   explanation of something, I'm not sure is enough for me to --

10  I'm kind of flipping through the standard for judicial notice,

11  and it seems to be a fact that's capable of -- well, let me just

12  read it.

13          It's got to be a fact "that's generally known within

14  the Court's territorial jurisdiction."  This is certainly not

15  that.  "And can accurately and readily be determined from some

16  source whose accuracy cannot be reasonably questioned."  I'm not

17  sure that a printout from a website, even if it's a government

18  website, in a letter two years later is something that would

19  meet that definition.  But I'll reserve ruling on that until

20  Florida has a chance to digest it.

21          And maybe the parties can reach some sort of

22  agreement.  I mean, it sounds like it's very similar to what

23  the -- what Chief Ortiz told me yesterday about the MPP program,

24  that it was paused because of COVID back in 2020.  And then when

25  President Biden came into office, he formally terminated it.  It

1    seems like reading the documents that's the same thing that

2    says.  I'm not sure who's position that helps.  Maybe it helps

3    yours because these processing pathways were not in place when

4    President Biden took office.  Maybe it helps Florida's that

5    these processing pathways may not have been active, but they

6    weren't killed until President Biden took office.  That seems to

7    me to be what's happening with all these programs.

8            MS. FUDIM:  Yeah, Your Honor, I mean, don't think that

9    these are make-or-break facts for the case.  We just wanted to

10   have that information for the Court since there may have been an

11   implication that, at least from the way the question came out on

12   Mr. Ortiz's testimony with Exhibit 98, that President Biden had

13   paused these pathways.  And so we just wanted the date to be

14   provided just so the Court would have background familiarity.

15   Again, I don't think this is make-or-break fact for the case.

16           THE COURT:  I understand.  We'll hear further argument

17   from Florida.  But at the end of the day, I'm not sure this is

18   inconsistent with what I heard from the chief yesterday, that

19   COVID kind of put a pause on everything, and then when the new

20   administration came into office -- frankly, I don't think this

21   is disputed or really surprising -- the new administration came

22   into office, they formalized the fact that these things weren't

23   being utilized.  How that plays out will remain to be seen.

24           Okay.  Anything else?

25           MS. FUDIM:  Yes, one final thing.

1          Mr. Ortiz had testified, or at least in response to a

2    question posed by plaintiff's counsel, that CBP officers stopped

3    acting as asylum officers under the Biden Administration.  And

4    we wanted the Court to take judicial notice that under the Trump

5    Administration there was an injunction in 2020 enjoining CBP

6    officers from acting as asylum officers, and we wanted the Court

7    to just take judicial notice of the Memorandum and Order which

8    implemented that injunction.

9          And I have a copy of it for the Court.

10          THE COURT:  All right.

11          MR. PERCIVAL:  Your Honor, this is starting to feel a

12    little bit like defendants don't like Chief Ortiz's testimony

13    and wished they had had more exhibits prepared.  And I think,

14    you know, we're happy to review it, but at some point we think

15    this might be just sort of outside the scope of what we should

16    be doing with judicial notice at this point.

17          THE COURT:  Well, you may very well be right on all

18    counts, but if this is an injunction, it seems like court action

19    that is more akin to judicial notice than the other things I've

20    been told.  And how it relates to what the chief told me and,

21    frankly, why it matters that Border Patrol officers are doing

22    these asylum determinations.  I assume we have well-trained

23    bureaucrats that are supposed to be doing these determinations,

24    not people that are supposed to be rounding people up at the

25    border.

1          What I heard the chief say is, We were doing that at

2     some point, but I never thought was appropriate for us to be

3     doing it.  And so that makes sense to me, frankly.  And so the

4     fact that the federal government doesn't have enough of these

5     people or is -- got policies in place that too many people are

6     coming to the country that they can't do the work they're

7     supposed to be doing, that's a whole nother problem.  But if

8     there was a court order that was the reason that told them to

9     stop and that occurred during the Trump Administration, that

10    fact from this document seems to be something I probably could

11    take judicial notice of.  Frankly, I don't think this is a big

12    deal --

13          MR. PERCIVAL:  No, it's not.

14          THE COURT:  -- in the grand scheme of things, and we

15    probably spent more transcript space on it than it's worth at

16    this point.  But I'll put that one in the pile, too, because I

17    assume this is the first you're hearing of this as well.

18          MR. PERCIVAL:  Yes, Your Honor.

19          THE COURT:  All right.  I'll defer consideration of

20    that.  But, Ms. Fudim, you got a much better shot on that than

21    you do on your other two.

22          MS. FUDIM:  Okay.  Thank you.

23          And at this time, we're going to call our next

24    witness, Robert Guadian.

25          THE COURT:  Okay.

1      **ROBERT GUADIAN, DEFENSE WITNESS, DULY SWORN**

2           DEPUTY CLERK:  You may be seated.

3           Please state and spell your full name.

4           THE WITNESS:  My first name is Robert, R-O-B-E-R-T.

5    My last name is Guadian.  It's spelled G-U-A-D, as in David,

6    I-A-N, as in November.

7           THE COURT:  Thank you, sir.

8                    **DIRECT EXAMINATION**

9    BY MR. DARROW:

10   Q.   Good morning, Mr. Guadian.

11   A.   Good morning.

12   Q.   Thank you for joining us today.

13   A.   My pleasure.

14   Q.   Who is your employer?

15   A.   I am employed by Immigrations and Customs Enforcement.

16   Q.   Is ICE a component of a Cabinet agency?

17   A.   Yes.  The Cabinet agency is the Department of Homeland

18   Security.

19   Q.   What division in ICE do you work for?

20   A.   I work for the Enforcement and Removal Operations Division.

21   Q.   Can we call that ERO for short?

22   A.   Yes.

23   Q.   What is ERO's mission?

24   A.   So our mission is primarily an interior enforcement

25   mission.  We arrest, detain, and remove aliens that are present

1    illegally in the interior of the United States.

2    Q.   Can you describe some of ERO's responsibility in fulfilling

3    that mission?

4    A.   Sure.  So some of our responsibilities include having

5    enforcement teams like our Fugitive Operations Teams that will

6    actively locate foreign-born nationals that have been ordered

7    removed from the United States by a immigration judge, and we

8    seek them out and arrest them and remove them.

9         We also have the responsibility of maintaining a

10   nationwide network of detention beds across the nation.

11   Q.   Is ERO responsible for the detention of noncitizens whom

12   ICE is seeking to remove?

13   A.   Yes, it is.

14   Q.   What is your title at ERO?

15   A.   My title is deputy assistant director for Field Operations

16   East.

17   Q.   Can we call that DAD for short?

18   A.   Yes.

19   Q.   What are your responsibilities as DAD for Field Operations

20   East?

21   A.   So as the DAD for the East, my responsibilities include

22   managing and providing oversight for all 12 of the ICE ERO field

23   offices east of the Mississippi.

24   Q.   How many field offices does ERO have in total?

25   A.   We have 25 field offices.

1    Q.    How many divisions does ERO have?

2    A.    Oh, let me think.  We have about six divisions within ICRO.

3    My division, which is Field Operations, which is -- one DAD has

4    the 12 -- myself, have the 12 offices east of the Mississippi,

5    and another DAD, which is also an SES -- senior executive

6    service member -- has the 13 offices west of the Mississippi.

7              We have an Enforcement Division that provides

8    oversight to -- or for our enforcement programs like the

9    Fugitive Operations teams, like the Criminal Alien Program,

10   Prosecution's teams that we have nationwide.

11             We have a Custody Management Division which supports

12   our bed-space needs nationwide.  We also have a Law Enforcement

13   Systems Analysis Division, which are our statisticians.  They're

14   the ones that provide Congress and others with data related to

15   ICE ERO mission results.  We also have an IHSC, which stands for

16   Immigration Health Service Corps, which is made up of medical

17   professionals that provides oversight of medical practices

18   amongst our different facilities and manages those.

19             And each one of those divisions is supervised or led

20   by an assistant director, and they are also senior executive

21   service members.

22   Q.    When did you become DAD for Field Operations East?

23   A.    I became the DAD for Field Ops East in approximately 2020,

24   about September of 2020.

25   Q.    Which administration was that under?

GUADIAN - DIRECT

1   A.   That was under the Trump Administration.

2   Q.   Is DAD a political appointment?

3   A.   No, DAD is not a political appointment.  I'm a senior

4   executive service member.  I'm a career senior executive service

5   member.  I am not a political appointee.

6   Q.   What did you do prior to becoming DAD for Field Operations

7   East?

8   A.   Before DAD Field Ops East, I was the field office director

9   in Chicago.

10  Q.   And roughly when were you in that job?

11  A.   In 2019.  From the summer of 2019, August or July, till

12  September of 2020 when I went to Washington D.C.

13  Q.   And before you were the field office director in Chicago,

14  what were you doing?

15  A.   Before I was the field office director in Chicago, I was

16  the deputy field office director in Dallas, and that -- I was

17  there from 2016 to 2019.

18  Q.   And before you were the deputy field officer director in

19  Dallas, what were you doing?

20  A.   Before that, I was the assistant field office director in

21  San Antonio, Texas, and that was from about 2009 to 2016.

22  Q.   When did you first start working for ICE?

23  A.   I started working for ICE when it was first organized and

24  formed in 2003.  Before that I was with the legacy Immigration

25  and Naturalization Service.

1  Q.  When did you start with the legacy INS, if we can call it

2  that?

3  A.  Sure.  I began with legacy INS in 1997.

4  Q.  And what was your position then?

5  A.  I was an immigration inspector in Laredo, Texas.

6  Q.  Have you been working for federal immigration authorities

7  continuously from 1997 until present?

8  A.  Yes, I have.  I've worked as an immigration inspector from

9  1997 to 1999.  I became a deportation officer in 1999 to about

10  2003 at the Port Isabel Detention Center in Deep South Texas in

11  Harlingen -- close to Harlingen, Texas.  And I became a

12  supervisory detention and deportation officer in South Texas

13  from '03 to '06, I believe, before I was promoted to assistant

14  field office director in San Antonio.

15  Q.  So it's fair to say that in your career with the INS and

16  then ICE, you've worked both in the field and in leadership?

17  A.  Yes, that would be correct.

18  Q.  You mentioned before that ERO is involved with detention?

19  A.  Yes.

20  Q.  What is ERO's role with regard to detention of noncitizens

21  in the United States?

22  A.  So we're -- we bear the responsibility to manage our

23  detention network to support the detention of aliens pending

24  removal proceedings.  So we -- our nationwide network of

25  detention beds are located in different areas of the U.S.

1    Primarily our bed space is along the southwest border where we

2    need it, where we have -- where we have the most arrests

3    occurring and the most need.

4           But our -- we're responsible for the oversight of our

5    detention beds, and we -- we're the ones responsible for

6    long-term detention, as opposed to short-term detention, which

7    Border Patrol and the Office of Field Operations, they typically

8    will hold somebody for less than 72 hours, just for purposes of

9    processing them for removal from the United States.  They'll

10   then turn over that alien to ICE's custody in order to -- for

11   that person as they're going through the court proceedings,

12   immigration court proceedings.  They're detained in our custody

13   because we have the ability to hold somebody for over 72 hours,

14   whereas Border Patrol and OFO do not.

15   Q.   So what is the purpose of immigration detention?

16   A.   So a couple of reasons.  One is that there are certain --

17   there's a requirement in statute that requires the detention of

18   certain aliens.  That is one purpose.  But primarily immigration

19   detention is required -- is really for two things.  One is for

20   removal.  We detain to remove.  And, two, is detain for their

21   immigration proceedings.  Those are the only two reasons that

22   we'll detain somebody.

23   Q.   Is immigration detention punitive?

24   A.   No, immigration detention is not punitive.

25   Q.   Is deterring migration a permissible use of immigration

1   detention?

2   A.    No.  No, it's not.

3   Q.    You mentioned that CBP holds noncitizens.  Do they do

4   detention?

5   A.    So from my understanding -- and I was immigration inspector

6   back in the '90s -- the Border Patrol and OFO are only set up

7   for short-term processing, short-term detention, not long-term

8   detention.  They only conduct their detention processes pending

9   the -- their removal processing of that person.

10  Q.    So if a noncitizen is going to be detained while they're in

11  removal proceedings, it's going to be ERO handling that

12  detention?

13  A.    Yes, that's correct.

14  Q.    How do noncitizens come into ERO's custody for detention?

15  A.    So there's different ways that someone will come into ERO's

16  custody.  One is direct transfer from the Border Patrol, will be

17  one way that they come into ICE custody.  Another is when our

18  enforcement teams, the ICE enforcement teams make arrests,

19  at-large arrests or arrests for people coming out of local jails

20  or prisons.  They'll also be transferred into an ICE bed.

21        Those are primarily the ways that someone comes into

22  ICE custody.

23  Q.    And you mentioned direct transfer from Border Patrol.  Do

24  you also receive direct transfers from the Office Field

25  Operations?

1    A.    Yes.  It's my understanding it's a lot less, though, than

2    what the -- what the Border Patrol sends over to us, but yes.

3    Q.    What percentage of noncitizens coming into ICE's custody

4    would you say are transferred from CBP?

5    A.    I don't know the exact figure, but I know it's higher than

6    50 percent.  More than 50 percent of the people in our

7    population are southwest border arrests done by the Border

8    Patrol.  That's my sense.

9    Q.    What are the different processing pathways by which

10   noncitizens would come into ERO's custody?

11   A.    So the different ways that -- the different pathways that

12   someone would come into our custody are when the arresting

13   agency like Border Patrol is issued an Expedited Removal Order,

14   which is an I-860, or they've issued another type of charging

15   document known as the reinstatement, which is the reinstatement

16   of a prior order of removal, or they have issued a warrant of

17   arrest, slash, NTA, Notice to Appear, for an individual for

18   removal proceedings.  Those are the different pathways.  Those

19   are the primary ones.

20          There's a couple others that are rarely used.  There's

21   also an administrative deportation pathway where an ag felon --

22   it's similar to the reinstatement, but there's no prior order.

23   An immigration officer can enter an order of removal based on

24   the criminal history alone.  Those are few and far between, but

25   that's another pathway as well.

1    Q.   You mentioned that some have received an NTA.  That's the

2    Notice to Appear?

3    A.   Correct.

4    Q.   And Notice to Appear in removal proceedings?

5    A.   That's correct.

6    Q.   You mentioned some noncitizens are Reinstatements?

7    A.   Correct.

8    Q.   What does that mean?

9    A.   So a Reinstatement -- that form number is I-871.  And the

10   Reinstatement authorizes an immigration officer to reinstate the

11   prior order of an immigration judge.

12          For example, if someone was here illegally and they

13   had been presented before an immigration judge and the

14   immigration judge ordered that person removed and ERO had

15   removed that person, if that person is reencountered by the

16   Border Patrol -- or by any other agency or other -- any other

17   agency that has the ability to enforce immigration law, they can

18   reinstate that prior order with that I-871.  They don't get an

19   opportunity to go before an immigration judge again.

20   Q.   You had mentioned that one portion of the noncitizens

21   coming into ERO's custody from CBP were those with Expedited

22   Removal Orders.

23   A.   Correct.

24   Q.   Can you briefly describe what expedited removal is?

25   A.   Sure.  So expedited removal is a process where there's an

1   Order of Removal entered against an alien without that alien

2   ever having to go before a immigration judge.  So that order is

3   issued by an immigration officer.  There's a couple of caveats

4   to that.  It has to be -- the alien must have entered the United

5   States within two weeks, be a recent entrant in that sense, and

6   they have to have been arrested within a hundred air miles of

7   the southwest border.

8           So that order carries the same weight as a judge's

9   order, and it's a very effective tool.

10  Q.   Can a noncitizen who's charged with expedited removal raise

11  a fear of return to their home country?

12  A.   Yes.  So during the processing of expedited removal, there

13  is a portion where there's a sworn statement taken from the

14  alien.  And one of the questions that's always asked, that has

15  to be asked during all these expedited removal proceedings, is

16  do you have a fear of returning to your country.  If the answer

17  is yes, then that expedited removal pathway goes into a

18  different path.  It's still an ER, but it goes -- it has to be

19  referred to an asylum officer for further processing at that

20  point.

21  Q.   And while those fear claims are being adjudicated, are

22  those noncitizens still considered in the expedited removal

23  process?

24  A.   Yes.

25  Q.   So let's talk about the detention of the different types of

1  noncitizens transferred to ICE from CBP separately.

2         First, the reinstatements.  Are they eligible for

3  release from detention?

4  A.   No, they're mandatory detention under 241.

5  Q.   And how about the aggravated felons, are they eligible for

6  release from detention?

7  A.   No, they're mandatory detention under 236(c).

8  Q.   Now, the noncitizens served with NTAs to appear in full

9  removal proceedings, what authority is their detention subject

10 to?

11 A.   It's under Section 236.

12 Q.   Okay.  And that's Section 236 of the INA?

13 A.   Correct, yes.

14 Q.   What release mechanisms would ICE use for noncitizens being

15 released under Section 236?

16 A.   So if there was a decision that was made by a supervisor

17 that the subject is eligible for release, that alien would be

18 subject to release on an order of release on their own

19 recognizance, which is an OREC for short, and there are some

20 conditions associated with that OREC.  There could also be a

21 bond in that particular alien's case that may be ordered by an

22 immigration supervisor.  That's another method of release for

23 those type of cases:  bond and OREC.

24 Q.   What factors do ICE officers look at in determining whether

25 to release those noncitizens that -- the 236 noncitizens on bond

1   or OREC?

2   A.   So some of the -- one of the factors, one of the most

3   important factors is threat to the community, public safety

4   threat, based on criminal history.  That's something we look at

5   when making any determination whether we're going to release

6   somebody either on OREC or bond.  We look at criminal history,

7   first and foremost.  Threat to the community.

8            Risk to abscond is another.  Does this person have

9   equities in the United States?  Has he lived here -- he or she

10  lived here before?  Have they been working in the United States?

11  Do they have a Social Security card?  What type of -- do they

12  have relatives with some type of legal status, immediate

13  relatives -- brother, sister, unmarried daughter, son -- that

14  type of thing is what we look at.

15  Q.   You had mentioned threat to the community and those with

16  criminal history.

17  A.   Mm-hmm.

18  Q.   How does ICE determine if a noncitizen has a criminal

19  history?

20  A.   So we'll run a criminal history check on NCIC, and we'll

21  obtain the criminal history from the NCIC.  National Crime

22  Information Center, I believe that's what it stands for.

23  Q.   Is the information just limited to domestic offenses and

24  crimes?

25  A.   For the most part, yes, but there are occasions when

1  Interpol warrants may be placed into the NCIC.  For example, if

2  a country is looking for a particular individual for some crime,

3  they may place a lookout, or an advisal, in NCIC that that

4  person is wanted in a foreign country.

5  Q.   Is there anything that helps ERO officers determine whether

6  a noncitizen is a good candidate for release?

7  A.   There is.  So during the -- and mind you, I haven't

8  processed one in years, but there is in the current system a

9  tool called the RCA tool -- it's the Risk Classification

10  Assessment tool -- that helps officers identify if a

11  candidate -- if an alien is a good candidate for release,

12  release on OREC or on bond.  These are only cases where release

13  is a possibility.  RCA would not be looked at if they're a

14  mandatory detention case.

15  Q.   For these noncitizens who are being released under INA 236,

16  does ICE supervise them while they're released?

17  A.   Yes, we do.  So we have a very large unit at each one of

18  our 25 field offices called the nondetained docket unit which is

19  comprised of deportation officers and legal assistants and

20  docket clerks, and they essentially operate kind of like a

21  probation office.

22        There are certain conditions that aliens need to abide

23  by as a condition of their release.  For example, they can't get

24  into trouble.  They can't be arrested.  They can't on -- in some

25  circumstances, they can't leave a certain area or a state.  They

1   may also have a requirement to check in every three months,

2   every six months, nine months, or even sometimes up to a year,

3   depending on -- each case is very different.  We look at each

4   case separately in terms of reporting requirements.  But

5   physical requirement, physical check-in is part of those, part

6   of the requirements, conditions for release.

7   Q.   And do those check-in requirements, those pertain even to

8   the OREC releases?

9   A.   Correct.  They do.  They do -- they do.

10  Q.   Okay.  So now let's talk about the noncitizens subject to

11  the expedited removal process.

12  A.   Okay.

13  Q.   What authority is their detention subject to?

14  A.   Their detention is subject to 235.

15  Q.   Okay.  235 of the INA?

16  A.   That's correct.

17  Q.   Under what mechanism would ICE release noncitizens subject

18  to INA 235?

19  A.   The only release mechanism for somebody that's detained

20  under 235 is the parole mechanism.

21  Q.   And how would ICE determine whether to parole a noncitizen

22  under INA 235?

23  A.   So we have controlling guidance in a memorandum that was

24  issued in 2009 and effective in 2010 that outlines what we

25  should -- as ICE, what we should look at if determining -- when

1    determining if somebody is eligible for release on parole while

2    in expedited removal proceedings.

3            Each of those determinations is made on a case-by-case

4    basis.  It's very fact-dependent on that individual case, and it

5    spells out things like risk to the community, risk to abscond,

6    do we have good identification for that person.  That sort of

7    thing.

8    Q.   I'd like to show Your Honor and the witness what has

9    already been admitted as Defendants' Exhibit C.

10           All right.  Mr. Guadian, what is this document?

11   A.   This is the parole policy.

12   Q.   So you're familiar with this document?

13   A.   Yes.

14   Q.   You've used it in the course of your job?

15   A.   I have, yes.

16   Q.   And if we look at the top, when does this document say it

17   went into effect?

18   A.   The effective date is January 4th, 2010.

19   Q.   Has ICE since then issued anything replacing this guidance?

20   A.   No.

21   Q.   Okay.  So this guidance is still in effect?

22   A.   Yes.

23   Q.   All right.  So do you see in paragraph 1 where it says it

24   applies to arriving aliens who have demonstrated a credible

25   fear -- yes, in the -- that's second sentence.

1          "This directive provides guidance to Detention and

2    Removal Operations, DRO, field office personnel for exercising

3    their discretion to consider the parole of arriving aliens

4    processed under the expedited removal provisions of Section 235

5    of the Immigration and Nationality Act, INA, who have been found

6    to have a credible fear of persecution or torture by a U.S.

7    Citizenship and Immigration Services, USCIS, or an immigration

8    judge of the Executive Office for Immigration Review."

9          Do you see where I'm looking?

10   A.   Yes.

11   Q.   Okay.  Does that statement mean that this document pertains

12   to noncitizens initially processed under expedited removal who

13   are still being detained under INA 235?

14   A.   Yes.

15   Q.   Now, if we scroll down to paragraph 4.2, do you see in that

16   second sentence -- well, the second full sentence after the

17   citation where it says, "Such aliens, however, may be paroled on

18   a case-by-case basis for, quote, 'urgent humanitarian reasons'

19   or, quote, 'significant public benefit' provided the aliens

20   present neither a security risk nor a risk of absconding."

21          Do you see that?

22   A.   Yes, I do.

23   Q.   All right.  Are you familiar with this language?

24   A.   Yes.

25   Q.   Does this accurately reflect how ICE grants paroles?

1   A.   Yes.

2   Q.   And then in the next paragraph, we go to 4.3.  If we look

3   at the first sentence, it states that: "The applicable

4   regulations describe five categories of aliens who may meet the

5   parole standards based on a case-by-case determination provided

6   they do not present a flight risk or security risk."

7           And now we're not going to go through all the

8   conditions, but if you look at Number 5 there where it says

9   "aliens whose continued detention is not in the public

10  interest."  Do you see that?

11  A.   Yes.

12  Q.   Is that the category of noncitizens that this guidance

13  addresses?

14  A.   Yes.

15  Q.   Now, if we go down to paragraph 6.2 -- I'm sure the Court's

16  tired of hearing my voice, Mr. Guadian.  If you could read that

17  paragraph for us.

18  A.   Sure.  So 6.2 says that "each alien's eligibility for

19  parole should be considered and analyzed on its own merits and

20  based on the facts of the individual alien's case.  However,

21  when an arriving alien found to have a credible fear establishes

22  to the satisfaction of DRO, his or her identity that he or she

23  presents neither a flight risk nor a danger to the community,

24  DRO should, absent additional factors as described in paragraph

25  8.3 of this directive, parole the alien on the basis that his or

1    her continued detention is not in the public interest.  DRO

2    field offices shall uniformly document their parole

3    decision-making processes using the attached Record of

4    Determination/Parole Determination worksheet."

5    Q.    Thank you.

6            Is this ICE's current procedure for paroling these

7    noncitizens under INA 235?

8    A.    Yes, it is.

9    Q.    How long has ICE been following this procedure?

10   A.    Since 2010.

11   Q.    For this category of noncitizens, does ICE supervise them

12   while they are released on parole?

13   A.    Yes, it's a different type of supervision, though, than

14   somebody who's released under OREC.  Paroles are not indefinite.

15   They're -- they have to be renewed on a yearly basis.  So that

16   alien would need to check in with the nondetained docket officer

17   to get that parole extended.

18   Q.    When does parole normally end?

19   A.    So paroles, we don't -- as a general practice, we don't

20   issue paroles longer than a year.  And typically it's all done

21   on a case-by-case basis.  If there's a court hearing coming up,

22   we'll issue the parole to the date or a few days after the

23   hearing to determine what occurred at the hearing.

24           So it kind of varies, but the maximum amount of time

25   that ERO will provide on a parole document is one year.

1    Q.   And if ERO has provided a parole for, say, one year, can

2    ERO end that parole sooner?

3    A.   Yes.

4    Q.   As DAD for Field Operations East, are you involved in the

5    formulation for policy for ICE?

6    A.   No.

7    Q.   Who creates policy for ICE?

8    A.   So I've seen in my experience the policies created either

9    by the Department, by the director of ICE, or by the boss of

10   ERO, which is the Executive Associate Director Corey Price.

11   Q.   And when you say "Department," you mean Department of

12   Homeland Security?

13   A.   I'm sorry.  Yes, Department of Homeland Security.

14           THE COURT:  Let me ask you a question before you move

15   off this policy.

16           Am I understanding this correctly that this only

17   applies once a credible fear determination has been made?

18           THE WITNESS:  Correct.

19           THE COURT:  So until that -- if that determination

20   hasn't been made, they remain in detention?

21           THE WITNESS:  Correct.

22           THE COURT:  Okay.

23           MR. DARROW:  Do you want us -- we can pull that back

24   up if you have any more questions about that document.

25           THE COURT:  No, he's answered the question.

1       MR. DARROW:  Okay.  Thank you.

2   BY MR. DARROW:

3   Q.   Mr. Guadian, so then what is your role with regard to

4   policy for ICE?

5   A.   So my role as the DAD for the East when this comes to

6   policy is to operationalize the policy, make sure it's

7   consistent across my 12 field offices that I manage and

8   supervise.

9   Q.   How do you operationalize the policy?

10  A.   So typically we'll -- the policy we send out via email, and

11  then we'll have follow-up phone calls.  And, of course, the

12  FODs, the field office directors, if -- you know, every area of

13  responsibility is very different.  So if there are challenges

14  unique to that area, the FOD and I will work through those

15  challenges to make sure that the policy is applied consistently.

16  Q.   So you communicate new ICE policies to the field offices?

17  A.   Correct, yes.

18  Q.   In your position as DAD of Field Operations East, are you

19  aware of policies being communicated to the ERO field offices?

20  A.   Yes.

21  Q.   And this would include any policies addressing ERO

22  detention?

23  A.   Yes.

24  Q.   Is it possible that a new ICE detention policy could have

25  been issued during your time as DAD and you would not know about

1    it?

2    A.    No, I don't see that.

3    Q.    Since January 20th, 2021, have there been any new ICE

4    policies dealing with the release of noncitizens transferred

5    from CBP?

6    A.    No.

7    Q.    Let's talk a bit about ICE's detention capacity.

8          You mentioned before that ICE detains noncitizens in a

9    network of facilities?

10         MR. GUARD:  Objection, foundation.  Counsel's not put

11   a foundation that he knows anything about custody management.

12   He's not part of Custody Management Division, Your Honor.

13         THE COURT:  Only he's the DAD of the eastern division

14   with 12 facilities.

15         MR. GUARD:  With field offices, Your Honor, not

16   detention facilities.

17         THE COURT:  Okay.  Maybe fill in a few gaps here,

18   Mr. Darrow.

19   BY MR. DARROW:

20   Q.    Mr. Guadian, you had mentioned that one of the divisions of

21   ERO is Custody Management before?

22   A.    Yes.

23   Q.    How are you involved, if at all, with that division?

24   A.    So among the 12 field offices that I currently manage and

25   supervise, each of those field office directors is responsible

GUADIAN - DIRECT

1    for their own detention management.

2              So, for example, in the case of, let's say, New

3    Orleans, which is in -- under my supervision, there are

4    currently about 6,000 beds in the state of Louisiana that are

5    used for ICE purposes.  Those beds are managed by the field

6    office director, and that field office director answers to me.

7    Q.   So by supervising field office directors, you are thereby

8    supervising all the detention that they are overseeing?

9    A.   Correct.

10   Q.   All right.  So going back to ICE's network of facilities,

11   what determines the maximum amount of ICE's detention capacity

12   in those facilities?

13   A.   There's variable factors that will determine the maximum

14   capacity.  So we -- we've got at our detention centers, we've

15   got -- we follow Performance-Based National Detention Standards,

16   and that spells out, for example, how many -- the ratios of, for

17   example, showers and toilets to individuals.  So those are --

18   based on the setup of that particular jail or facility, our

19   PBNDS, or our standards, will dictate what the maximum capacity

20   is at those locations.

21             And that's -- one example is if there's, let's say,

22   one toilet, you can -- you know, maybe four people for that one

23   toilet.  So that's how we generate or identify the capacity at

24   certain locations.

25   Q.   On that point, has the COVID pandemic affected ICE's

1    detention capacity?

2    A.    Absolutely, yes.

3    Q.    How so?

4    A.    So during the COVID pandemic, there was a series of rulings

5    from different district courts that impacted our ability to

6    house at detention centers.  Some of the court decisions I'll

7    name here, like the *Gayle* litigation in Miami, the *Fraihat*

8    litigation out of California, the *Roman* litigation out of

9    California, and the *Santos* litigation out of Virginia -- just

10   off the top of my head -- are all very similar in the sense that

11   they required ICE to minimize or try to minimize the impact of

12   COVID to some of the -- of our ICE detain -- the possibility

13   of -- how can I say this?  To minimize the exposure of COVID-19

14   to aliens in our custody that may have significant health

15   factors that may contribute to, like, more -- can be problematic

16   medically for those individuals.

17          So what that did essentially for us, it minimized our

18   ability to house people.  We were required to maintain a 6-foot

19   distancing.  We had to keep a 75 percent capacity at most of our

20   facilities.  We had to look at medical conditions as a factor

21   for release, which typically we hadn't done before.  So that

22   greatly impacted our ability to house at our detention centers.

23          THE COURT:  Are those orders still in place?

24          THE WITNESS:  Yes, Judge.  My understanding, those

25   orders are still in place.

1          THE COURT:  Is there a sunset provision on them that

2     they're going to go away at some point here?

3          THE WITNESS:  I'm sorry, Judge.  I don't know the

4     answer to that.  I know our attorneys in DOJ and OPLA are

5     actively litigating those cases.  I don't know the -- I would

6     hope so.

7          THE COURT:  Right.  The reason I'm asking is I get a

8     lot of motions in the criminal context for prisoners who don't

9     like where they are and they want to get out and they blame

10    COVID for it.  And there's federal statutes dealing with release

11    under COVID, the CARES Act, and things like that.  But what I've

12    always struggled with in evaluating those is once you let them

13    out, how are you going to put them back in?

14          And so it seems like once your capacity -- the reason

15    somebody might have been released is because of a capacity

16    constraint.  Once that capacity constraint is lifted, are there

17    plans to go round them back up and put them back where they're

18    supposed to be?

19          THE WITNESS:  Not that I'm aware of, but that makes

20    sense to me, Judge.  But I'm not aware of any plans to -- now

21    that our capacity is built up in the -- you know, I think we're

22    on our fourth vaccination, I think, for -- I think --

23          I haven't seen any plans, to answer your question.

24          THE COURT:  Okay.  And I'm not sure that's -- it may

25    be a digression of where we are in this case, but it's just --

 1            THE WITNESS:  Oh, yeah.

 2            THE COURT:  It's always struck me as odd that, you

 3   know, you give somebody a release under a -- based on a

 4   temporary condition.  They get permanent relief based on a

 5   temporary condition.  That's always kind of irked me; but

 6   that's, again, neither here nor there in this case, so anyway.

 7            Go ahead, Mr. Darrow.

 8            MR. DARROW:  Thank you, Your Honor.

 9   BY MR. DARROW:

10   Q.   Just to dovetail on that, when you say that these rulings

11   are still in effect, does that mean that these court orders are

12   still limiting the capacity of these facilities?

13   A.   Yes.

14   Q.   Okay.  Now, in talking about capacity generally, does

15   budgetary funding exert an influence?

16   A.   Absolutely.  So Congress appropriates every year our

17   funding limits, and we have to work within that appropriation.

18   Q.   What unit does ICE measure its detention capacity in?

19   A.   So our -- the unit of measure for detention capacity is

20   average daily population, ADP.

21   Q.   And can you describe what that is?

22   A.   Sure.  It's, you know -- that ADP is something that our

23   Custody Management Division develops.  It's a dashboard telling

24   us exactly how many beds we have today, how many are available,

25   how many are offline, and it also tells us, for example, if we

1    have people in transit to certain locations.  And so the ADPs,

2    it's tied into our funding amount, so we can't go over our

3    funding amount.  It's a dashboard that we get every day on a

4    daily basis.

5    Q.   So ADP is looking at the number of detention beds?

6    A.   Correct.

7    Q.   How much money does it cost to provide one detention bed

8    for one day?

9    A.   The last stat I saw in regards to the funding, it was $125

10   per day, per person.  Per adult.

11   Q.   Per adult.  How about for family detention beds?

12   A.   So the family detention beds were much more expensive.  It

13   was at least $235, was the last that I saw, but it may be a

14   little higher than that.

15   Q.   And that $230 figure, give or take, was that for the whole

16   family unit or for an individual family member?

17   A.   It's for the individual family member.

18   Q.   How many detention beds is ICE funded for for FY 2022?

19   A.   For FY 2022, we were funded for 31,500, but the operational

20   capacity was 34,000 because 2500 of those beds were -- the line

21   item was for family detention, but it was determined that

22   those -- that funding for family detention can be used for

23   adults, so it increased our capacity to 34,000.

24   Q.   And what was your detention capacity for FY 2021?

25   A.   The same.  It was 31,500.

1    Q.    How about funding for family detention in FY 2020?

2    A.    I believe it was the same:  2500.

3    Q.    And how about for FY 2020, what was ICE's funded detention

4    capacity then?

5    A.    We were at 45,000 in 2020.  That's what we were

6    appropriated for.

7    Q.    And you said that's what you were appropriated for.  Do you

8    know what the -- President's budget he requested?

9    A.    My sense is that it was more than that.  I think the

10   President requested more than 45,000.  I'm not a hundred percent

11   sure, but that's my sense is that it was more than 45,000.

12   Q.    But Congress only appropriated 45,000?

13   A.    Correct.  Congress appropriated 45,000.

14   Q.    Let's put some context on these numbers.  How many

15   noncitizens are currently in removal proceedings?

16   A.    There is about 4.7 million people in immigration removal --

17   immigration proceedings currently.

18   Q.    Okay.  Any idea what percentage of those 4.7 million people

19   would have been apprehended at the border?

20   A.    I don't know the exact figure, but my sense is at least

21   50 percent.

22   Q.    All right.  And even taking that 50 percent, so, you know,

23   2.3 million, say, do you have any idea how much detention

24   funding -- funding -- ICE would need to detain that population?

25   A.    I don't have a calculator in front of me.  It would be 125

1    times 2.3.  But not including juveniles because we don't house

2    juveniles.  So part of that docket would be made up of

3    juveniles.

4            So let's say a million times $125 per day, so it would

5    be $125 million per day is what I'm thinking.  My math could be

6    wrong, Judge, but I'm thinking that's about what it would be.

7    Q.  So for a year, we're talking about multiples of billions?

8    A.  I don't even know what -- 125 million times 365.  I don't

9    know what that is.  It's a big number.

10   Q.  Has Congress ever provided that much detention funding?

11   A.  No.

12   Q.  Has any administration ever requested that much detention

13   funding?

14   A.  Not to my knowledge.  I'm not aware of that.

15   Q.  So were ICE to receive all of that funding, whatever that

16   number calculates out to, would that make detention of the

17   noncitizens apprehended at the border feasible even still?

18   A.  Although -- no, because although we do have the -- let's

19   say we did get $125 million per day.  You would still -- we

20   still would need to have partners in the sense that currently

21   our detention operations operate at county jails wherever

22   there's beds available.  So we would have to actively look at

23   every county jail in America to determine a couple of things.

24           One, do they -- can they work with ICE.  Many state

25   laws prohibit -- state, local laws prohibit county jails from

1    working with us.

2              Two, do they have the available capacity at their

3    county jails to even offer up any beds.  My sense is that the

4    answer would be no, that $125 million per day translates --

5    well, that's 1 million beds a day.  I don't think there's -- I

6    haven't researched it, but I don't know if we have a million

7    empty beds available at any given time in the United States.  It

8    would be -- my sense is it's a much smaller number of available

9    beds that are currently available.

10   Q.   So you're saying that if ICE had the 45,000 beds that it

11   had in FY 2020, it would still be impossible to detain the vast

12   majority of border arrivals?

13   A.   Yes.

14   Q.   Does ICE release noncitizens due to lack of detention

15   capacity?

16   A.   ICE release -- sorry.  Can you say that again?

17   Q.   Does ICE ever release noncitizens due to lack of detention

18   capacity?

19   A.   No, not to my knowledge.

20   Q.   You had mentioned before that ERO's mission was to conduct

21   immigration enforcement.  Does reduction in detention bed

22   funding since FY 2020 interfere with that mission?

23   A.   Our mission is still there.  We still actively look for

24   at-large criminals.  We still make arrests for absconders.  In

25   that sense, it doesn't interfere because we still look at -- we

1   still make those types of arrests.  Yeah, I think that's --

2   Q.   Would it be easier if you had the 45,000 detention beds?

3   A.   We could detain, what, 10,000 more?  But still, even with

4   10,000 additional beds, we'll still be making tough decisions as

5   we were in 2020 when, you know, we're still making at-large

6   arrests and we still have to make tough decisions about who to

7   place in those beds.

8          Our enforcement teams, our primary -- our largest

9   amount of cases that come from the interior are from county jail

10  releases.  So, for example, if a county jail has arrested

11  somebody that's here illegally in the United States, we have

12  interoperability with their systems through fingerprints that we

13  know when that person is being booked into the county jail, and

14  we'll issue a detainer to that county jail.

15         A detainer is a request for a hold or request to

16  advise ICE that -- letting the jail know that we're interested

17  in that person, please don't release them.  Give us enough time

18  to get there, pick him up, and bring him back.

19         For those counties that cooperate with ICE, that's a

20  large amount of our at-large arrests, are done from county jails

21  and that type of environment.  We'll go to the county jail, pick

22  up -- you know, if it's -- if it's a large county jail, it's not

23  uncommon to bring back a van-load of people that have been

24  arrested in the United States and bring them back to the office

25  for processing.

1    So having additional beds, even in the days of having

2    45,000 beds back in 2020, we still had to make tough decisions

3    on who gets those limited amounts of beds.  We still have

4    van-loads of people that we're arresting at county jails.  We

5    still have to make those tough decisions on who gets that

6    limited amount of beds.

7    THE COURT:  Let me ask you a question about that.  And

8    again, this is aside from this case.  But periodically I

9    sentence immigration violators, and they sometimes get federal

10   sentences.  Other times it's a time-served and then released to

11   immigration.  I assume they then go to your agency?

12   THE WITNESS:  Yes, Judge.

13   THE COURT:  How long from when they walk in the door

14   to your agency are they on a plane or boat to wherever they're

15   supposed to be?

16   THE WITNESS:  Great question, Judge.  So our average

17   length of stay in 2021 was about 30 days.  So meaning that on an

18   average, when somebody's turned over to ICE from -- let's say

19   the marshals or let's say the Bureau of Prisons.  On average,

20   it's taking ICE 30 days to remove that person from the United

21   States.

22   THE COURT:  Okay.  Interesting.

23   Okay.  Back to this case.

24   MR. DARROW:  That's a good transition point anyway.

25   ///

BY MR. DARROW:

Q.   So, Mr. Guadian, outside of traditional detention, does ICE have other ways of ensuring the accountability of noncitizens with removal process?

A.   We do.  We have an Alternatives to Detention program that allows for the supervision -- it's a flight mitigation tool, meaning that this program has a higher percentage of people that go to their immigration court proceedings when they're out in the community.

So our current success rate with that program is right at about 90 percent.  90 percent of the people enrolled to this Alternatives to Detention program, ATD program for short, 90 percent of those individuals will appear at their immigration removal proceedings.  So it's been very successful.

Q.   And you mention that alternatives to detention are typically called ATD for short?

A.   Yes.

Q.   What types of ATD does ICE have?

A.   So we have three primary types of alternatives to detention.  We have the GPS ankle bracelet which can track in real time the location of aliens that were released.  We also have a facial recognition system that uses a smartphone that verifies that person, that they can check in virtually on this iPhone or on this smartphone with a deportation officer.  We also have a voice recognition system where somebody can call in

 1    on a landline and verify, do their check-ins virtually but on a

 2    landline.  So we have three primary tools that we use on the ATD

 3    program.

 4    Q.   What categories of noncitizens would be eligible for ATD?

 5    A.   Essentially anyone released into the community by

 6    immigration enforcement or immigration agency, like the Border

 7    Patrol, OFO, or ICE.  There are some caveats.  For example, we

 8    don't place juveniles on ATD.  We don't place GPS ankle monitors

 9    on someone that may have medical conditions that may impact --

10    where an ankle monitor may impact their health.  We typically

11    don't put people on ATD that we can't remove.

12              For example, we do have some people in our country

13    that -- where we don't have diplomatic relations with their

14    particular country.  Those would not typically be good

15    candidates for alternatives to detention.

16    Q.   How does an ICE officer determine whether to place a

17    noncitizen on ATD or what type of ATD to give them?

18    A.   So an ICE supervisor will conduct an ICE -- an analysis of

19    the individual case on a case-by-case basis.

20    Q.   Who supervises the ATD placed on noncitizens on a daily

21    basis?

22    A.   So the supervision is typically conducted by our

23    contractors.  There's a company named BI, Behavioral

24    Intervention, and that company will supervise those aliens

25    released on ATD.  They'll conduct home visits, if necessary.

```
 1    They have office space, so the aliens will report to their

 2    office as opposed to an actual ICE office.

 3            Sometimes they'll also obtain travel documents in

 4    cases where an ATD participant has been ordered removed from the

 5    United States, the ATD contractor will help work with the

 6    consular officials to obtain a travel document for that person's

 7    departure.

 8    Q.   Are noncitizens ever not compliant with ATD?

 9    A.   Yes.

10    Q.   What happens when a noncitizen is not compliant with ATD?

11    A.   So we have Fugitive Operations teams in every field office.

12    And that case -- for somebody that had not been compliant with

13    ATD, that case will be referred to the Fugitive Operations team

14    for -- to locate and arrest.

15    Q.   So you go find them?

16    A.   Yes.

17    Q.   All right.  Going back to our categories of noncitizens

18    transferred to ICE from CBP.  Are parolees under INA 235

19    eligible for ATD?

20    A.   Yes.

21    Q.   Okay.  And how about noncitizens released under INA 236?

22    A.   Yes.

23    Q.   What is the purpose of ATD?

24    A.   ATD is a flight mitigation tool, meaning that it helps

25    increase the possibility that people that have been released by
```

1    an immigration enforcement agency appear at their immigration

2    hearings.

3    Q.   Is ATD as effective at that purpose as traditional

4    detention is?

5    A.   No.

6    Q.   Then why do you use ATD?

7    A.   We have a limited amount of beds that are appropriated by

8    Congress, and wherein we have 4.7 million people on the dockets

9    awaiting their immigration hearings.  So it's a valuable tool.

10   Q.   How much does it cost to place a noncitizen on ATD for one

11   day?

12   A.   Less than $8 per day.

13   Q.   And how many noncitizens is ICE currently supervising on

14   ATD?

15   A.   So I think that number fluctuates between 250,000 and

16   400,000.  It varies.  I want to say our average ATD population

17   in 2022 was right at 230,000, I believe, per day.

18   Q.   Have funding levels for ATD changed since FY 2020?

19   A.   Yes.

20   Q.   How so?

21   A.   They've increased.  In FY '22, there was nearly a

22   hundred-million dollar increase in the ATD program that was

23   appropriated by Congress.

24   Q.   And why have they increased, to the extent that you know?

25   A.   So my sense is that it was increased to -- it's a very

successful tool, and adding more money to the ATD program means

adding more participants to more effectively mitigate or help

increase the appearance rate in court.

Q.   Let's talk a bit about family detention.

Can ICE detain family units in regular detention

facilities?

A.   No.

Q.   Why not?

A.   So family detention has to be compliant with *Flores*, the

*Flores* agreement from 1997.  The *Flores* agreement places certain

requirements on family detention.  You can't house families in

an adult correctional setting.  It has to be a facility, an FRC,

a family residential center.  Family residential centers, some

differences between that and adults, an adult detention center,

for example, are that at family residential centers you have a

school, you'll have certified bilingual instructors at each one

of those FRCs.  That's a huge difference with an adult detention

or a county jail where we typically don't have that to that

extent.

You also have at family residential centers a

requirement -- the medical requirements are much more -- they're

increased.  You have to have a certain amount of pediatricians.

You have to have enough family care, family providers at family

residential centers.  You also need to be licensed by the state,

and it's very difficult.  Many states don't really have a

1  licensing process for FRCs, for family residential centers.  I

2  know in the case of Texas when we built Dilley, it was

3  concurrent with Texas also providing some type of licensing.  So

4  licensing is also -- at FRC is also a major challenge.

5  Q.  Are those reasons why it's more expensive to house families

6  than single adults?

7  A.  Yes, it is.

8  Q.  So you mentioned the *Flores* court order.  Did that place

9  any temporal limitations on family detention?

10  A.  It did.  One of the major challenges with the *Flores*

11  agreement is that families have to be released within 20 days of

12  their arrival at family residential centers.  You don't have

13  that requirement with adults.

14  Q.  And about when was that 20-day limit imposed?

15  A.  Shortly after we built the South Texas Family Residential

16  Center in Dilley, Texas.  I believe it was about 2014.

17  Q.  So since that time, the government has only been able to

18  detain families a maximum 20 days?

19  A.  Correct.

20  Q.  Are 20 days enough to complete immigration proceedings?

21  A.  No, no, not even close.

22  Q.  Does ICE currently operate any family residential centers?

23  A.  No, we don't.

24  Q.  But it did previously?

25  A.  Yes, we did.

1   Q.   How many?

2   A.   Previously, we had three family residential centers.  We

3   had the South Texas Family Residential Center in Dilley, Texas;

4   we had the Karnes Family Residential Center in Karnes County,

5   Texas; and we had the Berks Family Residential Center in Berks

6   County, Pennsylvania.

7   Q.   And we can call those Dilley, Karnes, and Berks for short?

8   A.   Yes.

9   Q.   When did Dilley, Karnes, and Berks come into operation?

10   A.   Dilley came into operation in about 2013 from my

11   recollection.  Karnes was shortly after that, maybe 2014.  Berks

12   had already been in existence.  I want to say it was the early

13   2000s, maybe like 2002 is what I'm thinking for Berks.  It was

14   one of the older -- one of our first FRCs.

15   Q.   And are these three facilities still in operation for any

16   purpose?

17   A.   Yes.  So South Texas Family Residential Center is currently

18   holding adult females.  It was converted to hold adult females,

19   no longer holding families.  And Karnes, I believe, is holding

20   adult males.  Berks is no longer being used by ICE for any

21   purpose.

22   Q.   When did these facilities stop housing families?

23   A.   My recollection is that they stopped housing families in

24   about March of -- I'm sorry, February of 2021.

25   Q.   Who made the decision to stop housing families at these

1    facilities?

2    A.    My understanding, that decision was made by the ICE

3    director, Tae Johnson.

4    Q.    To your knowledge, did the President direct ICE to stop

5    housing families?

6    A.    Not to my knowledge.

7    Q.    To your knowledge, did the Secretary of Homeland Security

8    direct ICE to stop housing families?

9    A.    Not to my knowledge.

10   Q.    So you had mentioned that Karnes and Dilley are still in

11   operation and housing adults?

12   A.    That's correct.

13   Q.    Okay.  Why did ICE switch these facilities to housing

14   single adults?

15   A.    So there was a need for additional adult beds close to the

16   southwest border.  So we looked at the fact that -- the

17   proximity of these facilities versus what we were actually

18   getting in terms of family residential centers.  And, you know,

19   we had to release families within 20 days.  We couldn't get them

20   before an immigration judge in those 20 days.  A business

21   decision was made to change them from family residential centers

22   to adults.

23   Q.    Does detaining adults rather than families in these

24   facilities make them more cost-effective?

25   A.    I would say yes.

1   Q.   Why?

2   A.   Because you can actually get case completion with adults.

3   You can -- as I said earlier, there's only two reasons we hold

4   people in ICE detention:  One is for removal from the United

5   States, and the other is pending their immigration hearing.  If

6   we are -- as we are using the adult -- as we've converted Dilley

7   to adults, we can actually get to case completion in Dilley now

8   with adults where we couldn't with families.

9   Q.   Could the FRCs, the family residential centers, be used for

10  family detention again?

11  A.   My understanding is yes, but I'm not -- that would be the

12  Custody Management division.  But my sense is that, yes, that

13  that ability can be turned back on.

14  Q.   Was the transition for these facilities from family

15  detention to single adult housing direct?

16  A.   I'm sorry?

17          MR. GUARD:  Objection, foundation.  He's not

18  established the witness knows anything about the transition

19  here.

20          THE COURT:  He doesn't understand the question either,

21  so maybe back up a step.

22  BY MR. DARROW:

23  Q.   You said that the facilities stopped housing family units

24  in and around February 2021?

25  A.   Correct.

1   Q.   Okay.  And are you familiar with what happened to the
2   facilities immediately after that?
3   A.   Yep.  My -- I remember that those facilities were converted
4   into a staging-type operation where families were held there for
5   short periods of time, under 72 hours, for purposes of COVID
6   testing.
7   Q.   Are the family residential centers the only way that ICE
8   has ever detained families?
9   A.   No.  Shortly after that transition where we transition the
10  FRCs to under-72-hour facilities, ICE entered into a contract to
11  house families at hotels for purposes of COVID testing.
12  Q.   And what was the time frame when ICE was housing families
13  in hotels?
14  A.   I believe that was March of 2021 to March of 2022.
15  Q.   Why did ICE use the hotels for families during that period?
16  A.   There was -- they were held at those hotels for purposes of
17  COVID testing.
18  Q.   Were the families securely guarded while they were at the
19  hotels?
20  A.   Yes, they were supervised.
21  Q.   Does the absence of the FRCs mean that the government can't
22  detain any individuals who claim to be members of family units?
23  A.   So ICE has a limited capacity to hold families for purposes
24  of removals, for purposes of removal at hotels.  It's very
25  rarely done.  But we do have that capability and it's within

1    *Flores* as well.

2            For example, if a family is ordered removed by an

3    immigration judge, we can house that family in a hotel for a

4    very short period of time pending their placement on a

5    commercial airliner or on one of our ICE air flights.  That's

6    the only capability that I'm aware of.

7    Q.   And if there was a family unit where one of the members was

8    identified as being a threat or flight risk, what would ICE do?

9    A.   What I've seen -- so typically those type of arrests are

10   being done by the Border Patrol for newly arriving families into

11   the U.S.  They're arrested.  And in some occasions there are two

12   parents, and what I've seen is that the arresting agency will

13   send one of the adults -- in that case that you presented, the

14   one that may be a threat to the community -- and refer that case

15   over to ICE while paroling the rest of the family unit.

16   Q.   Does the current absence of dedicated family housing at the

17   FRCs, does that interfere with ERO's ability to ensure the

18   compliance of family units with the removal process?

19   A.   I think that the ATD program has a very high success rate.

20   It has a 90-percent success rate, you know, when families appear

21   before -- for families going before the immigration court.  I

22   think that that's a positive.  I think that at family

23   residential centers where you're only allowed to keep families

24   for 20 days, it's very difficult, almost impossible, to get that

25   case to completion; whereas, the ATD provides that resource to

GUADIAN - DIRECT

```
 1   where we can get that family to completion with their
 2   immigration proceedings.
 3   Q.   Are you familiar with an initiative called Operation
 4   Horizon?
 5   A.   Yes.
 6   Q.   What is Operation Horizon?
 7   A.   So Operation Horizon was an operation that was developed in
 8   our Enforcement Division at headquarters, and it was targeting
 9   those individuals that were released by Customs and Border
10   Protection on parole, and it was issuing Notice to Appears via
11   mail and getting those Notice to -- getting those individuals
12   processed for immigration proceedings and getting them before
13   the immigration judge.
14   Q.   You mentioned parole did -- or, rather, does Operation
15   Horizon deal with noncitizens who have been released on Parole
16   ATD as well?
17   A.   Yes.
18   Q.   And speaking of that, what is Parole ATD?
19   A.   So my understanding -- I read the memo from the U.S. Border
20   Patrol and from ICE about Parole Plus ATD.  It's essentially
21   Border Patrol is making custody decisions for individuals to be
22   released into the community.  And ICE's role in that is
23   applying -- after the Border Patrol has made the custody
24   determination, ICE is applying some type of ATD technology onto
25   that individual before they're released into the community.
```

1    Q.    So ICE's role is applying the ATD?

2    A.    Correct.

3    Q.    Does ICE participate in the parole decision?

4    A.    No.

5    Q.    Who does that?

6    A.    Customs and Border Protection.

7    Q.    Turning back to Operation Horizon, when --

8          THE COURT:  Before you do that, let me ask a question,

9    because that's part of the nub of this case is the Parole Plus

10   ATD policy.  And as I understand what you're saying, your

11   organization, ICE, doesn't deal with the question of whether to

12   put these individuals on parole or not.

13         THE WITNESS:  That's correct, Judge.

14         THE COURT:  And so this policy that you have that says

15   before somebody can be put on parole, they've got to have had a

16   credible-fear determination.  It doesn't appear that's what's

17   happening in the Parole Plus ATD policy.  So help me

18   understand -- or do you have enough --

19         THE WITNESS:  I do, Judge.  So I think the major

20   difference with that policy is that that policy is in regards to

21   aliens that are in ICE detention, people that are already in our

22   detention.  Parole Plus, those people never go to ICE detention.

23   They don't ever get transferred to an ICE detention bed.

24         For example, if my -- let's say we have somebody in --

25   that was in ICE detention that was an expedited removal case

1    from somewhere.  That guidance would then apply because that

2    person is in ICE custody.  These cases from Parole Plus never

3    get transferred into an ICE bed.  So those custody decisions and

4    the parole policy is a hundred percent Customs and Border

5    Protection.  It's got no involvement from ICE.

6           THE COURT:  And what would happen if I were to say

7    that that policy of making that parole decision or preempting

8    any sort of detention until these threshold questions --

9    credible fear, those sorts of things -- are made, I say you

10   can't do that.  So that means all these people would come into

11   your custody, and you would make the determinations under your

12   policy as to what to do with them?

13          THE WITNESS:  I think that -- good question, Judge.  I

14   don't know if I have the answer for it.  What I can speak to is

15   that -- and I don't want to speak for the Border Patrol, but my

16   sense is that if those requirements were implemented for the

17   Border Patrol, for example making the parole policy that ICE

18   currently has and applying it to the Border Patrol, if I'm

19   hearing correctly, I think that would lead to an increase in the

20   number of people at Border Patrol stations.

21          I think that -- I don't want to speak for the Border

22   Patrol, but my sense is they came out with the Parole Plus

23   policy in order to eliminate the massive numbers in the stations

24   themselves because they -- you know, for the safety of the

25   alien, the safety of their own officers, they want to limit the

1     amount of people inside the number -- the number of people

2     inside their stations.

3            I think if you were to order that, Judge, I think that

4     you may -- we may -- there may be an increase in the number of

5     people at the stations waiting for these questions to be

6     answered.

7            THE COURT:  And I think you're exactly right.  That's

8     what they've told me --

9            THE WITNESS:  Okay.

10           THE COURT:  -- why they did that.  The question is

11    whether that's legal to do it that way.

12           THE WITNESS:  Oh.

13           THE COURT:  And so what I'm trying to assess is in the

14    event that it's not, that they need to have made the

15    determination -- because what's interesting about your policy is

16    one of the portions that Mr. Darrow referred to, it talks about

17    a provision that cites 235.3(b)(4)(ii) stating that "aliens who

18    have not been determined to have credible fear will not be

19    paroled unless necessary for medical emergency or legitimate law

20    enforcement" --

21           THE WITNESS:  Correct.

22           THE COURT:  So if this policy was in place at the

23    Border Patrol station, these people would not be getting parole.

24           THE WITNESS:  That's correct.

25           THE COURT:  And so the question I'm faced with is

1   whether that's okay or not.

2                THE WITNESS:  Yeah.

3                THE COURT:  And I understand -- okay.  Thank you.

4                MR. DARROW:  Thank you, Your Honor.

5   BY MR. DARROW:

6   Q.   So with the Operation Horizon, when did ICE start Operation

7   Horizon, if you know?

8   A.   It was In 2021.  I'm sorry.  I don't know the exact date,

9   but I want to say in the middle of 2021, maybe the late spring.

10  Q.   And is it still ongoing?

11  A.   It is.

12  Q.   And you mentioned that this initiative serves NTAs by mail?

13  A.   Correct.

14  Q.   Does ICE do anything else with Operation Horizon to try and

15  serve NTAs?

16  A.   So, yes.  What we've also experienced is an increase in the

17  number of families that are appearing at ICE offices nationwide,

18  especially at the very beginning of NTR and Parole Plus.  So

19  part of their operation also includes, as those families arrive

20  to the offices that they're given and provided Notice to Appear

21  before an immigration judge at that point.

22                So you have the report-ins that are coming in.  We

23  give them an NTA -- or at least we try to to the best extent

24  possible -- or we'll issue them a Notice to Appear and serve

25  that by mail to get them into immigration proceedings.

1   Q.   Has Operation Horizon been successful?

2   A.   It has in my opinion, because the numbers that I saw in

3   terms of those Notice to Appears that return to us that have

4   gone to -- that have been returned to us because the person

5   doesn't live there or the address doesn't exist is very low.

6   Q.   And if a noncitizen still doesn't appear in their

7   immigration proceedings despite having received the NTA, what

8   happens then?

9   A.   So typically what happens if an alien doesn't appear before

10  the immigration hearing, the immigration judge is likely to

11  order a hearing *in absentia* and order that person removed.  Once

12  we get that order from the judge, that file will go to our

13  Fugitive Operations team who will track that person down, arrest

14  them, and remove them.

15  Q.   So not checking in is not a free pass to remain in the

16  country indefinitely?

17  A.   Correct.

18  Q.   We watched your video deposition yesterday where there was

19  some discussion about lines outside of ICE field offices of

20  people waiting to check in.  And your deposition was back from

21  this summer.  Are the lines at field offices still as bad as

22  they were this past summer?

23  A.   So most offices, our lines have gotten smaller.  There are

24  a couple of offices where we're still struggling; namely, the

25  New York City area.  But our offices, we made some improvements

1    to the way we conduct -- we offer our check-ins.  An alien can

2    now schedule their own appointment at a time that suits them the

3    best and suits ICE the best so they're not having to wait out in

4    the hot sun.  We've made those -- that capability.  It didn't

5    exist before.

6          We didn't have and we weren't built, really, to intake

7    that number of -- large number of people at once.  ICE offices

8    were generally kind of like probation offices.  They were small

9    in scope, and we don't have very large waiting rooms or waiting

10   areas.  So we had to make some improvements on our technology

11   side of the house in order to accommodate.

12          THE COURT:  We heard from Director Price yesterday or

13   the day before that from an ICE standpoint -- I know y'all are

14   on the same team, but ICE was not particularly happy with having

15   to do Border Patrol's intake processing job.

16          THE WITNESS:  Yeah.

17          THE COURT:  Is that a fair statement?

18          THE WITNESS:  Judge, I think that's fair to stay.  I

19   think any deportation officer will -- this is not normally --

20   you know, typically we would not issue a Notice to Appear for a

21   noncriminal.

22          Our assets are typically used, as I mentioned earlier,

23   in the jails looking for people that are about to be released

24   from county jails and taking those people into custody and

25   giving them Notice to Appears.  We really focus in on that, and

1   we focus in on threats to the community.

2           Normally, we would not have NTA, especially at this

3   large a scope, so many people that are noncriminals.

4           THE COURT:  And one other question before we get off

5   that.  As I understand it, and again through your testimony as

6   well, there's essentially two classes of people.  There are

7   people that come in and claim -- are subject to expedited

8   removal but claim a credible fear, and then there's everybody

9   else.  Is that a fair --

10          THE WITNESS:  That's fair, yes.

11          THE COURT:  And are NTAs issued for people that claim

12  a credible fear or only the other group?

13          THE WITNESS:  So, Judge, I don't know the answer to

14  that, but -- only because most of the processing that occurs

15  along the southwest border is done by the Border Patrol.  And

16  I've seen them do expedited removal for asylum seekers.  I've

17  seen NTAs issued sometimes for asylum seekers.  I really don't

18  know.

19          THE COURT:  That's fair.  I appreciate that.

20          Okay.  I'm sorry, Mr. Darrow.

21          MR. DARROW:  Thank you, Your Honor.

22  BY MR. DARROW:

23  Q.   Mr. Guadian, are you familiar with the Civil Enforcement

24  Priorities memo, the first version of which was colloquially

25  called the Pekoske memo?

1    A.    Yes.

2    Q.    Okay.  And was the Pekoske memo replaced?

3    A.    Yes, I believe so.

4    Q.    So there was a newer version of the Civil Enforcement

5    Priorities memo?

6    A.    Correct.

7    Q.    Is ICE following that newer version of the Civil

8    Enforcement Priorities memo?

9    A.    No.

10   Q.    Why not?

11   A.    So -- well, maybe a year ago, it's been some time now that

12   we -- there was a federal court decision that the Pekoske memo

13   was either enjoined or vacated altogether, or the guidance memo,

14   the supplemental guidance after the Pekoske memo.  So we don't

15   use that, any of those memos to prioritize our arrests.

16   Q.    So if ICE isn't using those memos, what guides enforcement

17   officers now?

18   A.    So that's a great question.  We've -- we rely on law

19   enforcement officers' experience, and field office directors run

20   their areas of responsibility.  They determine who and when to

21   go after certain individuals.  That is a -- that is field office

22   directors do that on a daily basis.  They're the ones that

23   determine who to go after, when to go after, how many beds to

24   use.  That's done on an operational basis on a daily basis --

25   that's done operationally on a daily basis.

1    Q.    Mr. Guadian, to your knowledge since January 20th, 2021,

2    has the Secretary of Homeland Security directed ERO to release

3    noncitizens transferred from CBP rather than detaining them?

4    A.    No, not to my knowledge.

5    Q.    To your knowledge, since January 20th, 2021, has the

6    President directed ERO to release noncitizens transferred from

7    CBP rather than detaining them?

8    A.    No, not to my knowledge.

9    Q.    To your knowledge, since January 20th, 2021, does ICE have

10   a policy of releasing noncitizens who have been apprehended at

11   the border?

12   A.    Not to my knowledge.

13   Q.    In your opinion, does ICE have a nondetention policy?

14   A.    No.

15        MR. DARROW:  That's it, Your Honor.

16        THE COURT:  Mr. Guard, I assume you have a reasonable

17   amount of time you want to spend with the witness?

18        MR. GUARD:  I think it's going to be shorter than the

19   other two, but I think it's going to be a reasonable still.

20        THE COURT:  Okay.  Let's take a morning break right

21   now.  It's 10:32.  We'll come back at 10:45 and begin with

22   cross-examination.

23        THE WITNESS:  Yes, sir.

24        *(Recess taken from 10:32 a.m. to 10:47 a.m.)*

25        THE COURT:  All right.  Y'all can be seated.

1          Sir, you're still under oath, and Mr. Guard has some

2     questions for you.

3                          **CROSS-EXAMINATION**

4     BY MR. GUARD:

5     Q.   Mr. Guadian.

6     A.   Yes, sir.

7     Q.   Your job at ERO is to supervise the 12 field offices east

8     of the Mississippi River, right?

9     A.   That's correct.

10    Q.   And not to overstate the obvious, but the southwest border

11    is to the west of Mississippi River, correct?

12    A.   That's correct.

13    Q.   And so you do not supervise any of ICE's operations along

14    the southwest border, right?

15    A.   That's correct.

16    Q.   All right.  And most of ICE's detention facilities are west

17    of the Mississippi River, right?

18    A.   That's correct.

19    Q.   Most of ICE's detention facilities are actually along the

20    southwest border, correct?

21    A.   Correct.

22    Q.   Indeed at your deposition in this matter, you could not

23    recall how many detention facilities that ICE operates along the

24    southwest border, correct?

25    A.   That's correct.

1  Q.   And so for the entirety of President Biden's

2  Administration, you had zero responsibility for ICE's operations

3  along the southwest border, correct?

4  A.   That's correct.

5  Q.   All right.  You talked in your direct about budgets.  Do

6  you recall that?

7  A.   Yes.

8  Q.   All right.  You have no responsibility in formulating ICE's

9  budget, correct?

10  A.   That's correct.

11  Q.   You're not responsible for communicating ICE's needs to the

12  President of the United States, are you?

13  A.   No, I'm not.

14  Q.   And you're not responsible at ICE for communicating ICE's

15  needs to Congress, correct?

16  A.   That's correct.

17  Q.   In fact, you're probably not even allowed to speak from

18  someone with Congress without approval, right?

19  A.   That's correct.

20  Q.   All right.  In your testimony you also spoke about Tae

21  Johnson and Secretary Mayorkas.  Do you recall that?

22  A.   I remember the Tae Johnson.  I don't remember the Mayorkas.

23  Q.   Okay.  You don't speak to Mr. Johnson -- or, excuse me, I

24  should call him Director Johnson -- often, correct?

25  A.   That's correct.

1   Q.   And you didn't speak to him before you came here and

2   testified, right?

3   A.   That's correct.

4   Q.   So you actually have no personal knowledge about what

5   Director Johnson has done, right?

6   A.   That's correct.

7   Q.   And you would have no knowledge except for what you have

8   been told by others about what the President's done or Secretary

9   Mayorkas has done, right?

10  A.   Correct.

11  Q.   Now, you did some calculations and you mentioned a number,

12  $4.7 million.  Do you recall that?

13  A.   4 point --

14  Q.   4.7 million aliens.

15  A.   Correct.

16  Q.   All right.  That $4.7 million -- I'm sorry.  I'm in budget

17  mode here.  4.7 million aliens are aliens that are both on the

18  detained docket and the nondetained docket, right?

19  A.   That's correct.

20  Q.   And the detained docket moves quickly, right?

21  A.   It does, yes.

22  Q.   It goes to completion in a matter of days, right?

23  A.   I think the average -- it is, yes.  That's correct.

24  Q.   What is the average if you know it?

25  A.   In my experience, typically our -- as I spoke earlier, the

1  average length of stay in our detention facilities in 2022 was

2  right at 30 days.

3  Q.   Okay.  So less than a month?

4  A.   Mm-hmm.

5        THE REPORTER:  Is that a yes?

6        THE WITNESS:  Yes.

7  BY MR. GUARD:

8  Q.   All right.  That's how fast the detained docket moves?

9  A.   Correct.

10  Q.   And at the end of that process, either the alien is found

11  removable and is removed or is released or found admissible,

12  correct?

13  A.   Correct.

14  Q.   All right.  The nondetained docket, which is the vast

15  majority of aliens in that 4.6 million dollar -- 4.6 million

16  alien number -- I'll get it right one of these times -- that

17  moves much more slowly, right?

18  A.   That's correct.

19  Q.   It takes years, correct?

20  A.   That's correct.

21  Q.   In fact, it takes more than five years for a case to be

22  resolved on the nondetained docket?

23  A.   That's my experience is that typically the immigration

24  judges and immigration court will fast-track the detained docket

25  because they are held at government expense and for other

GUADIAN - CROSS

1    reasons.  I don't have -- I'm not privy to their decision-making

2    process in the Executive Office for Immigration Review, but in

3    my experience, the nondetained docket takes a longer track and

4    it's very common for cases to drag out for years.

5    Q.   Half a decade, right?

6    A.   Yes.

7    Q.   All right.  And so you did some rough math and you talked

8    about ATD.

9    A.   Correct.

10   Q.   And the folks who are put on ATD, they're on the

11   nondetained docket, right?

12   A.   That's right.

13   Q.   And so ICE is spending $8 a day; and if it keeps ATD on

14   that alien, it's spending $8 a day for five years, right?

15   A.   So ATD typically is not kept on that long.  There is a

16   step-down process.  Typically -- our typical ATD participant

17   might only remain on ATD for a year or a year and a half.

18   Q.   Okay.  So even at a year, year and a half -- let's use year

19   and a half, 18 months.  That's roughly 540 days, right?

20   A.   Correct.

21   Q.   So if you took that number of days times $8, that would be

22   a cost to ICE, right?

23   A.   Yes.

24   Q.   And if you took the $125 number and times it by 30 days,

25   that would also be the cost?

1    A.    Absolutely.

2    Q.    I'm not going to ask you to do the math.

3    A.    Thank you.

4    Q.    We can do that later.

5              All right.  You talked about absconsion rates,

6    correct?

7    A.    Correct.

8    Q.    All right.  Historically, there has been a higher

9    absconding rate than the 10 percent rate that you mentioned,

10   correct, from ATD?

11   A.    For participants on ATD, what I saw in the last three years

12   of data was that it was -- it hovered between 85 percent and

13   90 percent for participants that were on ATD.

14   Q.    All right.  Are you familiar with the U.S. Immigration and

15   Customs Enforcement Fiscal Year 2020 Enforcement and Removal

16   Operations report?

17   A.    I'm sure I've seen it.  I don't recall it though.

18   Q.    All right.  ICRO every year publishes a report.

19   A.    Correct.

20   Q.    It's been admitted as Florida Exhibit 12.  Do you have

21   Florida Exhibit 12?

22              Mr. Guadian, Florida Exhibit 12 is the ICE ERO Fiscal

23   Year 2020 ERO Operations report, correct?

24   A.    Correct.

25   Q.    All right.  If we could, flip to page 12 of that report.

1    And if you'll look at the third paragraph down, we'll try to

2    enlarge it here.

3           At least at that time for Fiscal Year 2019, the

4    absconder rate for family units was 26.9 percent; and in Fiscal

5    Year 2020, that rate increased to 39 percent, correct?

6    A.   Correct.

7    Q.   And overall, for all ATD participants, one third of them

8    absconded, right?

9    A.   I'm sorry.  What line is that?

10   Q.   It's down --

11   A.   The last line?

12   Q.   The last sentence.

13   A.   Correct.

14   Q.   All right.  You can take that down.

15          Mr. Guadian, are you aware of the Department of

16   Homeland Security -- strike that.

17          You discussed the *Flores* decision.

18   A.   That's correct.

19   Q.   Okay.  Are you aware of how that 20-day rule came about?

20   A.   No.

21   Q.   So you're not aware that the 20-day -- at least according

22   to something published in the Federal Register that the 20-day

23   rule came about because the government asserted that DHS on

24   average would detain minors who were not UACs for 20 days.  Are

25   you aware of that?

1   A.   No.  So ICE doesn't have the capability to hold

2   unaccompanied children.

3   Q.   I believe what I -- I believe what I said are minors who

4   are not UACs for 20 days.

5   A.   Oh, I see, I see.  I'm sorry.  Could you repeat the

6   question?

7   Q.   Sure.  Are you aware -- it's part of the *Flores* decision --

8   that the Department of Homeland Security represented that DHS on

9   average would detain minors who are not UACs for 20 days, the

10  general length of time required to complete credible- or

11  reasonable-fear processing at the time for aliens in expedited

12  removal?

13  A.   No, I'm not aware of that.  And I think for the

14  credible-fear processing, that may be accurate; but for case

15  completion is something completely different.  The credible-fear

16  referrals refer to giving the asylum officer an opportunity to

17  evaluate the merits of the claim.  So that does sound accurate

18  to me.  But case completion is not done before 20 days.

19  Q.   All right.  But at the very least, credible-fear screening

20  can be done within 20 days, right?

21  A.   That sounds accurate.

22  Q.   In fact, credible-fear screening is supposed to occur much

23  faster than that, correct?

24  A.   I don't know.  Since credible fear and asylum interviews

25  are done by USCIS, I don't know the time frames.

1  Q.   So you're not aware of any time frame of seven days?

2  A.   I'm not aware.  I know we make the referrals to Citizenship

3  and Immigration Services and their Asylum Division and we do

4  that quickly, but I'm not aware of time frames.

5           MR. GUARD:  Okay.

6           If I could have a moment, Your Honor.

7           THE COURT:  Yes, sir.

8           MR. GUARD:  I have nothing further, Your Honor.

9           THE COURT:  All right.

10          Any redirect?

11          MR. DARROW:  Yes, Your Honor.  Thank you.

12                    **REDIRECT EXAMINATION**

13  BY MR. DARROW:

14  Q.   Mr. Guadian, you were asked on cross about whether you had

15  any experience at the southwest border.  Prior to becoming DAD

16  for Field Operations East, do I correctly remember from your

17  earlier testimony that you held leadership roles in both the

18  Dallas and San Antonio ICE field offices?

19  A.   That's correct, as well as the Deep South Texas in

20  Harlingen.

21  Q.   And are those field offices near the border?

22  A.   They are.  They are.  San Antonio has border offices and so

23  does Harlingen.  Dallas is one county away, their area of

24  responsibility is one county away.  But we also do -- in Dallas

25  did a large number of transfers from the Border Patrol into our

1    detention facilities in the Dallas area of responsibility.

2    Q.   And on your cross-examination testimony, you also discussed

3    how you were not responsible for ICE's budgeting or

4    communications with Congress.  Do you remember that?

5    A.   Yes.

6    Q.   Does not being responsible mean that you're not aware of

7    ICE's budgeting?

8    A.   No, I do have -- I'm aware of what we're budgeted for and

9    what Congress does appropriate for us.

10   Q.   As part of your job?

11   A.   As part of my job, yes.

12   Q.   There was some discussion about how the detained docket

13   moved more quickly than the nondetained docket?

14   A.   Correct.

15   Q.   Going back to those number we had discussed, if those

16   4.7 million people on the nondetained docket were suddenly moved

17   to the detained docket, would the detained docket go as fast?

18   A.   My sense, that it would not because without an increase in

19   immigration judges, you would see an increase in the time that

20   the judges -- this is just my sense -- that it would take for

21   those judges to complete those cases because their dockets would

22   increase.

23   Q.   Mr. Guadian, you also discussed with opposing counsel ATD

24   compliance rates, and you looked at a budget document from FY

25   2020 that showed a 33-percent absconsion rate.  But you had

1    previously mentioned that you saw recent rates of 85 percent to

2    90 percent?

3    A.    That's correct.

4    Q.    Why do you think those two rates would be different?

5    A.    I don't know.  I know the documents that I saw were from

6    '22 and '21.  I may have seen '20's.  I'm not entirely sure, but

7    I don't know -- my division doesn't -- we don't manage the ATD

8    program.  It's actually another division.  But part of me wants

9    to say that there may have been new technologies in the time

10   period.  I don't know if facial recognition technology was out

11   in 2019 or 2020.  That could be a reason.

12            But to answer your question, I don't know.

13            MR. DARROW:  No further questions, Your Honor.

14            THE COURT:  Thank you, sir.  I appreciate your time

15   here today.

16            THE WITNESS:  Thank you, Judge.

17            THE COURT:  You are free to go.

18            MR. GUARD:  And he is released.

19            THE COURT:  And released from all your subpoenas.

20            THE WITNESS:  Thank you.

21        *(Witness excused.)*

22            THE COURT:  All right.  Mr. Darrow.

23            MR. DARROW:  The defense now calls Lavitta Stanford

24   from the Florida Department of Corrections.

25            THE COURT:  While we're waiting for that witness, was

1    the Federal Government able to pare down the budgeting documents

2    yet?

3                MS. RYAN:  We're working on that, Your Honor.  We're

4    going to be turning to that this evening, and we will do that

5    before the record is closed tomorrow.

6                THE COURT:  That's fine.

7    **LAVITTA STANFORD, DEFENSE WITNESS, DULY SWORN**

8                DEPUTY CLERK:  Please state and spell your full name.

9                THE WITNESS:  My name is Lavitta Stanford.  That's

10   L-A-V-I-T-T-A.  Stanford, S-T-A-N-F-O-R-D.

11                          **DIRECT EXAMINATION**

12   BY MR. DARROW:

13   Q.   Ms. Stanford, thank you very much for joining us today.

14   I'll try not to take up too much of your time.

15                Where are you employed?

16   A.   Florida Department of Corrections.

17   Q.   And what is your position at the Florida Department of

18   Corrections?

19   A.   The budget director.

20   Q.   And what are your responsibilities as budget director?

21   A.   We oversee the budget development process over -- monitor

22   expenditures throughout the year, do analysis, provide

23   information to the program areas if they have -- things that

24   they want to do, just giving them budget information, basically,

25   trying to help them out if they're trying to do certain things

1    throughout the year.  So we monitor their expenditures to let

2    them know if that's something they can do or can't do.

3    Q.   Are you familiar with the State Criminal Alien Assistance

4    Program?

5    A.   Yes.

6    Q.   And how are you familiar with that program?

7    A.   I'm familiar with it because I am the entity administrator

8    for the JustGrants portal, federal grants portal, and also I

9    make sure that everybody has the correct access, and we make --

10   in the budget office, we make sure that there's enough authority

11   to receive those funds and make sure that they're transferred to

12   the state general revenue.

13   Q.   And State Criminal Alien Assistance Program is kind of a

14   mouthful.  Can we call that SCAAP for short?

15   A.   Yes.

16   Q.   So could you just briefly describe what the purpose of

17   SCAAP is?

18   A.   The purpose of SCAAP is to -- is federal assistance to

19   provide local and state government assistance to offset the

20   costs for incarcerating criminal aliens.

21   Q.   So the SCAAP program provides some funding to help Florida

22   with the cost of incarcerating noncitizens?

23   A.   Yes.

24   Q.   Does the SCAAP program provide -- does the SCAAP program

25   totally reimburse the costs to Florida for incarcerated

1    noncitizens?

2    A.    No.

3    Q.    How does -- as part of the SCAAP program, how does Florida

4    determine whether it is incarcerating noncitizens?

5    A.    Can you repeat that?

6    Q.    How does Florida know whether, and how many, noncitizens

7    it's incarcerating?

8    A.    Based on the definition in SCAAP, it is someone who's

9    committed a felony or a misdemeanor and has been incarcerated

10   for four consecutive days.  So an undocumented alien or

11   undocumented citizen.

12   Q.    And outside of being an undocumented citizen, the SCAAP

13   program doesn't provide any further information about that

14   person's immigration status, does it?

15   A.    I don't know.

16   Q.    Okay.  SCAAP can't tell you whether a noncitizen that

17   you're incarcerating is an applicant for admission, can it?

18   A.    I don't think so.  I don't know.

19   Q.    And it can't tell you whether the person entered the

20   country by the southwest border?

21   A.    I don't know.

22   Q.    You testified that the costs incurred are due to

23   incarcerating undocumented noncitizens, correct?

24   A.    Mm-hmm, yes.

25   Q.    And that's actually a term from statute, right,

1    "undocumented criminal aliens"?

2    A.    That -- I believe that term is on the SCAAP application.

3    Q.    Okay.  Are you aware --

4    A.    Or the -- I'm sorry.

5    Q.    Continue.  I didn't mean to interrupt.

6    A.    The -- well, yes, the SCAAP application or the requirements

7    or when the portal is open for entities to actually submit an

8    application, it provides definitions.

9    Q.    And are you aware that that term "undocumented criminal

10   alien" comes from a federal statute, 8 U.S.C. 1231(i)?

11   A.    No.

12   Q.    Okay.  Are you aware that that term as defined by federal

13   law includes a very broad range of immigration statuses?

14   A.    No.

15   Q.    And that broad range can include people who have entered

16   illegally, people who have removal proceedings, or nonimmigrants

17   who failed to maintain their status.  Are you aware of that?

18   A.    No.

19   Q.    So under this definition of "undocumented criminal alien,"

20   for all you know, you could be incarcerating green-card holders

21   charged with crimes; isn't that right?

22   A.    I don't know that.

23   Q.    And you don't know if any of these noncitizens who are

24   termed "undocumented criminal aliens" are applicants for

25   admission who have been released at the southwest border, do

1    you?

2    A.    No.

3    Q.    And so you have no idea how much, if any, of your budget is

4    spent on the applicant for admission that we're talking about in

5    this case?

6    A.    I know how much it costs to incarcerate an inmate on a

7    daily basis, and that cost -- the per diem is based on the total

8    of inmates at -- the average daily population at the end of the

9    fiscal year.

10   Q.    But you don't know how many of those inmates are applicants

11   for admission who have been released by the federal government

12   at the border, do you?

13   A.    No.

14   Q.    And not only do you not know how many of those inmates are

15   applicants for admission released by the government at the

16   border, but you'd agree that it's impossible to predict how many

17   of your inmates might be applicants for admission released at

18   the border in the future, correct?

19   A.    I have -- I'm not in -- no, I don't have -- no.  I'm not in

20   the prediction field.  I'm just the budget director.

21   Q.    If you were predicting, you'd agree that there would be a

22   lot of factors that you'd have to consider.  Like you don't know

23   how many applicants for admission are going to be paroled or

24   released at the southwest border, do you?

25   A.    Yeah, I don't know that.

1  Q.   And you don't know how many of those people who are

2  released are going to move to Florida?

3  A.   I don't know that.

4  Q.   And you don't know how many of those people who are

5  released and move to Florida are going to commit crimes?

6  A.   No, I don't know that.

7  Q.   And you don't know how many of those people who commit

8  crimes are going to commit felonies?

9  A.   Correct.  I don't know.

10  Q.   And you don't know how many of those people who commit

11  felonies are actually going to be arrested by police, do you?

12  A.   No, I don't know that.

13  Q.   And you don't know how many of those people who are

14  arrested by police are going to -- that local prosecutors in

15  Florida are going to choose to indict and prosecute them, do

16  you?

17  A.   No, I don't.

18  Q.   And you also don't know if they're prosecuted whether any

19  of those prosecutions are going to result in convictions by

20  juries?

21  A.   I don't know.

22  Q.   And if they're convicted, you don't know how long, if any,

23  prison time those prosecutors might seek?

24  A.   That is correct.  I don't know that.

25  Q.   So you can't say with any certainty whether any applicants

1  for admission released at the border are going to end up in

2  Department of Correction facilities in the future?

3  A.   Yes, I don't know that.  Yeah.

4  Q.   Since you don't know that, you don't know how much of your

5  budget goes towards applicants for admission released under the

6  policies being challenged here, you don't know how your costs

7  might change if applicants for admission stopped coming to

8  Florida, do you?

9  A.   Can you repeat that?

10 Q.   Sure.  Since you currently don't know how much of your

11 budget goes towards these noncitizens released at the border and

12 come to Florida, you also can't say how much -- how your budget

13 might change if suddenly these noncitizens stopped coming to

14 Florida, can you?

15 A.   No.

16 Q.   Okay.  And since you don't know if any of these

17 noncitizens, for example, are being released on the Parole ATD

18 program, you don't know if stopping the Parole ATD program and

19 stopping releasing the people on Parole ATD would impact your

20 costs, do you?

21 A.   No.

22 Q.   Okay.  And the same for the government's other release

23 policies at the border.  If the government stopped releasing at

24 the -- people at the border for other reasons, you can't say

25 whether that would impact your costs in Florida?

1   A.   I don't know.  Right.

2              THE REPORTER:  You don't know -- what did you say?

3              THE WITNESS:  I was agreeing.  I don't know.  Sorry.

4   BY MR. DARROW:

5   Q.   And so you have no way of being able to say here today

6   whether Florida's winning this case and stopping those programs

7   or altering them would affect your costs, can you?

8              Excuse me.  Let me rephrase.

9              So you have no way of being able to say here today

10  that if Florida wins this case and halts or alters some of those

11  release practices, that that is going to decrease the cost to

12  Florida?

13  A.   What I can say is that the cost of incarceration is based

14  on the total year -- the prior operating expenditures and the

15  average daily population at a certain point, at the end of the

16  fiscal year.  So those are the two factors that goes into the

17  per diem to come up with your per diem rate, the cost of

18  incarceration.  It doesn't matter -- in the budget office,

19  it's -- an inmate is an inmate.  We count all.  We don't even

20  look into whether or not they're a citizen or noncitizen.  It's

21  just a count of all inmates at a certain point in time.

22             MR. DARROW:  Thank you.  No further questions.

23             THE COURT:  All right.  Ms. Patel?

24             MS. PATEL:  No cross, Your Honor.

25             THE COURT:  Thank you, ma'am.  I appreciate your time

1   being here today.  You're free to go.

2              MR. PERCIVAL:  Your Honor, may we release the witness?

3              MR. DARROW:  Oh, yes.

4              THE COURT:  Yes.  You're free from your subpoena.  You

5   can go about your day.

6        *(Witness excused.)*

7              THE COURT:  All right.  Is that all that you had

8   planned for today?

9              MS. FUDIM:  Yes, Your Honor.  We understand that our

10  last witness won't be available until tomorrow, so we'll examine

11  her at that time.

12             THE COURT:  Is your last witness going to provide

13  anything more than that?

14             MS. FUDIM:  I'm sorry.  I didn't hear you.  Provide

15  what?

16             THE COURT:  Is the last witness going to be the same

17  as that?  Are we going to see that again?

18             MS. FUDIM:  No, Your Honor.  I believe there's going

19  to be more substance to the examination of the last witness.

20             THE COURT:  Okay.

21             All right.  Then I guess we have come to the end of

22  the day.  So the Federal Government's going to continue working

23  to pare down the budgeting, I guess the Appropriations Act.  I

24  will review these depositions that you gave me today.  Not the

25  ones that I had already watched or had read to me but the new

1    ones so I'll be prepared to talk tomorrow.

2           I'm getting a very good sense of where I think this

3    case is going to come out, and so I will have some probing

4    questions for both sides to help me confirm in my mind or change

5    my mind as to where things might come out.

6           Again, I don't anticipate that I'll be in a position

7    to rule from the bench in the sense of giving you something that

8    can be memorialized and appealed from, but I do hope to give you

9    enough of my thoughts that the documents that you provide me as

10   your proposed findings will assist me in making that job -- or

11   doing that job in a much quicker basis than I otherwise might be

12   able to.

13          As I've told you before, I've got a very unfavorable

14   schedule coming up over the next month.  Unfavorable in the

15   sense that it will severely impact my ability to get a

16   substantive order out in this case over that time period.  And I

17   regret that because I know this is an important case and a

18   decision needs to be made sooner rather than later, but that's

19   just frankly the reality of the circumstances I'm in.

20          I've got a pretrial conference this Friday, and I'm

21   not particularly optimistic that that's going to result in that

22   case going away.  I'm not giving up hope.  If that case were to

23   go away, that would open up the month of February and I would

24   make this case my primary opportunity to accomplish something in

25   February.  In the event that doesn't happen, this case will

1    hopefully be near the top of my list in March.

2             But again, I'm hopeful that what I tell you

3    tomorrow -- because again, unless something in these depositions

4    changes my mind, I've read 90 percent of this stuff already on

5    summary judgment, so nothing -- there was some new information I

6    heard that factored into it and changed my mind in a couple

7    respects, but I've got a very, very good sense of this case.

8    And so I think I'm going to be able to give you some thoughts,

9    if not rulings, that will move the ball forward.

10            So that's my job this afternoon.  Federal Government's

11   got a job.  The State is doing what in our time apart, or do you

12   get a break?

13            MR. PERCIVAL:  Just be preparing for closing argument

14   tomorrow.

15            THE COURT:  All right.  And you're looking at the

16   requests for judicial notice and be prepared to address that,

17   right?

18            MR. PERCIVAL:  Yeah.  There's one issue we can address

19   now if Your Honor prefers.

20            THE WITNESS:  Okay.  Let's do that.

21            MR. PERCIVAL:  So the memorandum opinion in this *ABB*

22   case that Your Honor has, during our time here, we did look at

23   the docket in that case, and the issue there, Your Honor, is

24   that case was filed under seal.  We can't access anything other

25   than this opinion, and the Biden Administration has filed

1    several motions to stay that case jointly with the plaintiffs

2    that we do not have access to.

3          And so while I totally recognize Your Honor's point.

4    This isn't very relevant, and we actually agree with that.  We

5    don't know what we don't know.  And without understanding why

6    the Administration has voluntarily stayed this case with the

7    plaintiff several successive times, we just feel like this

8    paints a incomplete picture.  And we have Chief Ortiz's

9    testimony on this, so we're not sure why this needs to be in

10   evidence.

11         THE COURT:  All right.  So what I will ask you to do,

12   your homework is to have that discussion with Ms. Fudim and

13   figure out if there's a joint stipulation that the parties can

14   agree to that would, to the extent I need to know this

15   information in these documents, would accomplish what both

16   parties seem to want to do.

17         And again, maybe I'm missing something, but it seems

18   to me that what happened was all the programs that were listed

19   in that January 28th email were paused during the Trump

20   Administration because of COVID.  They still existed but they

21   were paused.  The Biden Administration comes in and they end

22   them.  And both parties can argue from those facts what they

23   need to argue, if that is a stipulation that y'all can enter

24   into if that's consistent with the documents, but that's what

25   appears to have happened to me and not inconsistent with what I

1    heard from the chief.

2           So y'all can discuss that amongst yourself, and if

3    that's the correct interpretation of all these documents, you

4    can argue from it, but that seems to be the pertinent fact.  If

5    not, I'm still leaning against taking judicial notice of press

6    releases and emails talking about actions that occurred at some

7    prior point in time.  I'm more open to taking judicial notice of

8    a court document recognizing, though, the weight that it would

9    be given for that fact, given I don't know what they don't know.

10   And they don't know what they don't know, and you know it and we

11   don't.

12          MS. FUDIM:  On that, Your Honor, I did have -- and I

13   don't have to present it to you now.  I can wait if you want to

14   table this.  But I was able to get some case law on the fact

15   that facts that are contained within public government press

16   releases and announcements can be subject to judicial notice.  I

17   have a case from within the Eleventh Circuit on that point.  I

18   can share it or not share it.  We can table this.

19          THE COURT:  Well, let me ask you this question without

20   having more for myself to do.  Would that be a case where the

21   press release announced a contemporaneous governmental action?

22          MS. FUDIM:  I would have to look at it more closely.

23   I had a colleague back at the office send me a case.  And I have

24   the synopsis of the case, but I haven't -- because we were

25   sitting here in court, I haven't put eyes on the case myself, so

1    I'm hesitant to provide that answer without having read it

2    myself.

3              THE COURT:  I understand.  And I don't read it if I

4    don't have to.  But my gut instinct and experience would tell me

5    if that was the circumstance -- I'm trying to think.  I'm sure

6    we have press releases somewhere in this pile.

7              But a government website press release announcing that

8    the President is going to the border for the first time, I could

9    take judicial notice of the fact that he's going to the border

10   for the first time.  A press release three years down the road

11   that says the President went to the border the first time the

12   day before an immigration trial started, I would be a little

13   skeptical of taking judicial notice of that fact based on that

14   information.

15             Do you see my distinction?

16             MS. FUDIM:  I totally see it, and my gut instinct

17   would be that there is a distinction there, and I track what

18   you're saying.  The case that was --

19             THE COURT:  But then again, if the Eleventh Circuit

20   has told me that I take judicial notice of things that are in

21   press releases whenever they're issued about whatever substance,

22   I will do what the Eleventh Circuit tells me.

23             MS. FUDIM:  It's the Northern District of George.  The

24   case does seem to be on point with the synopsis that was sent to

25   me; but again, I haven't put eyes on it myself.  Perhaps we can

1   reach an agreement with opposing counsel, because I think the

2   takeaway that Your Honor has said is that they were paused, and

3   then under the Biden Administration they were either terminated

4   or the pause was just -- they just never "re-upped" them might

5   be the way to phrase it.  I think that that's correct.  I don't

6   think that this is a cataclysmic fact for this case, so I'll

7   speak with opposing counsel about that.

8              THE COURT:  I agree.  I mean, what I view it as is

9   somebody's on life support.  They're going to die as soon as you

10  pull the plug, but they're not going to live a happy life while

11  they're on life support if we keep them on life support, so at

12  some point you got to pull the plug.  And that's what happened

13  here.

14             That's probably not a good analogy, but you get my

15  point.  I mean, I get it, I understand it, parties can both

16  argue from it, but I'd rather do it through some sort of joint

17  stipulation than taking judicial notice of things that I'm

18  uncomfortable taking judicial notice of.

19             MS. FUDIM:  Yes, Your Honor.

20             THE COURT:  All right.  Well, we will reconvene at

21  9:00 tomorrow to hear the Federal Government's last witness.

22             Any rebuttal case you're anticipating at this point?

23             MR. PERCIVAL:  It would only be documents, if

24  anything, Your Honor.

25             THE COURT:  Well, I don't have enough of those.

1        All right.  We'll be in recess till 9:00.  Y'all have

2   a good afternoon.

3        *(Proceedings adjourned at 11:25 a.m.)*

4                        * * * * * * * *

5        I hereby certify that the foregoing is a true and correct
    transcript of the stenographically reported proceedings held in
6   the above-entitled matter, pursuant to the provisions of Section
    753, Title 28, United States Code.

7

8                                           1/20/23

9   _____    _____
    Julie A. Wycoff, RMR, CRR           Date
    Official U.S. Court Reporter

10

11

12

13                        **I N D E X**

14

15  Defense Witnesses                 Direct   Cross   Redirect

16  **ROBERT GUADIAN** ...........................**12**        **64**      **72**

17  **LAVITTA STANFORD** .........................**75**

18

19

20

21

22

23

24

25