```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
 2                       PENSACOLA DIVISION

 3   STATE OF FLORIDA,                )
                                      )
 4                 Plaintiff,         )
           vs.                        ) Case No: 3:21-CV-1066
 5                                    )
     UNITED STATES OF AMERICA; ALEJANDRO ) Pensacola, Florida
 6   MAYORKAS, Secretary of the U.S.  )
     Department of Homeland Security, in ) January 12, 2023
 7   his official capacity; U.S. DEPARTMENT ) 9:00 a.m.
     OF HOMELAND SECURITY; TROY MILLER, )
 8   Acting Commissioner of U.S. Customs )
     and Border Protection, in his official )
 9   capacity; U.S. CUSTOMS AND BORDER )
     PROTECTION; TAE JOHNSON, Acting   )
10   Director of U.S. Immigration and )
     Customs Enforcement, in his official )
11   capacity; U.S. IMMIGRATION AND CUSTOMS )
     ENFORCEMENT; UR M. JADDOU, Director of )
12   U.S. Citizenship and Immigration )
     Services, in her official capacity; )
13   U.S. CITIZENSHIP AND IMMIGRATION )
     SERVICES,                        )
14                    Defendants.     )
     _____)

15

16             TRANSCRIPT OF BENCH TRIAL - DAY 4
           BEFORE THE HONORABLE T. KENT WETHERELL, II
17              UNITED STATES DISTRICT JUDGE
                   (Pages 1 through 261)
18

19   APPEARANCES:

20   For State of Florida:   Office of the Attorney General
                             by:  JOHN M. GUARD, JAMES H. PERCIVAL,
21                                ANITA J. PATEL, NATALIE CHRISTMAS
                                  and JOSEPH HART
22                           The Capitol, Suite PL-01
                             400 South Monroe Street
23                           Tallahassee, Florida 32399
                             (850) 414-3300
24                           james.percival@myfloridalegal.com
                             anita.patel@myfloridalegal.com
25                           joseph.guard@myfloridalegal.com
                             natalie.christmas@myfloridalegal.com
```

1   APPEARANCES CONTINUED:

2   For the United States:   Department of Justice
                             Office of Immigration Litigation
3                            by:  **ELISSA FUDIM, ERIN T. RYAN**
                                  **and JOSEPH A. DARROW**
4                            450 5th Street NW
                             Washington, D.C. 20001
5                            (202) 532-5802
                             *elissa.p.fudim@usdoj.gov*
6                            *erin.t.ryan@usdoj.gov*
                             *joseph.a.darrow@usdoj.gov*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **P R O C E E D I N G S**

2          *(Call to Order of the Court.)*

3             THE COURT:  Good morning.  Be please be seated.

4             All right.  This is Case Number 3:21cv1066.  We're

5 here for our fourth and final day of trial.  Anything we need to

6 talk about before getting going today from the State?

7             MR. PERCIVAL:  I don't believe, Your Honor.

8             THE COURT:  From the Federal Government?

9             MS. FUDIM:  No, Your Honor.

10            THE COURT:  All right.  Were you able to come to any

11 resolution on that judicial notice issue?

12            MS. FUDIM:  We were not.  I had proposed a stipulation

13 to opposing counsel just that the two programs were suspended

14 during the Trump Administration, but they -- I don't want to

15 speak for them -- but changed their mind about wanting to

16 stipulate to it.

17            THE COURT:  Okay.

18            MS. FUDIM:  I can say that from our position I'll try

19 one more time.  I understand where the Court's head was.  From

20 our point of view, the document that was a separate document, I

21 can represent to the Court that it was served as part of an

22 administrative record in another case.  And we believe that,

23 coupled with the presumption of regularity for government

24 documents, the Court can take judicial notice of it.

25            And with regard to the website --

1          THE COURT:  Let me ask a question.  That case that you

2  referred to yesterday --

3          MS. FUDIM:  I did look at that, and I can --

4          THE COURT:  -- what was the resolution?

5          MS. FUDIM:  It was not contemporaneous.  It was closer

6  to what Your Honor thought it would be when we took a look at

7  it.  We still believe that these matters are appropriate for

8  judicial notice.  Ultimately, I have to say that I don't think

9  this is a make-or-break issue for the Court.

10          Our biggest concern, to be candid, was just that

11  opposing counsel not argue that President Biden suspended these

12  programs.  And I don't actually think they're going to argue

13  that in good faith given everything that we know.  So I think we

14  stand on our request to take judicial notice, but it is what it

15  is.  I'm not going to die on this mountain, Your Honor.

16          And with regard to the taking judicial notice of the

17  fact that it was under the Trump Administration, that there was

18  a judicial injunction preventing Border Patrol officers from

19  acting as -- in the place of asylum officers, again, I don't

20  think that that fact is relevant at all to this case.  And if

21  anything, it probably helps us.  But we raised it because we

22  heard a witness say something we did not think was fully

23  accurate.  And as officers of the Court, particularly for the

24  United States, we felt compelled to correct it and ensure that

25  there was accurate information being presented to the Court.

1          We think that the Court can take judicial notice of

2     the injunction.  But again, we don't feel strongly about this

3     because, frankly, I don't really think it's relevant to this

4     case.  So I leave you with that, Your Honor.

5          THE COURT:  Okay.  Mr. Guard, you've approached.

6          MR. GUARD:  Yes, Your Honor.  To the extent I need to

7     be heard, we countered with what the -- what we countered with

8     offering, just to let those two documents come in for whatever

9     purpose they want to use them for, and that wasn't what they

10    wanted.

11          And on the second matter, they've not gotten us any

12    information other than the opinion.  And we just have -- we have

13    questions that are not answered by that opinion.  So if they're

14    not pushing forward and moving for judicial notice, then I guess

15    I don't need to say more than that.

16          THE COURT:  Well, as I understood where we left it

17    yesterday was my inference from these documents, from what I

18    heard from the chief and what we all know was going on in the

19    world during COVID, is that factually inaccurate that these

20    programs were suspended because of COVID during the Trump

21    Administration and then terminated completely by President

22    Biden?

23          MR. GUARD:  We are willing to stipulate to that.  I

24    don't think the United States is willing to stipulate to that

25    fact.

1          MS. FUDIM:  The problem is that there is some nuance

2     there.  One of those agreements had counterparts in different

3     countries.  So there was the Guatemala counterpart, and there

4     was counterparts with other countries.  They weren't all

5     terminated.  Some of them were never implemented in the first

6     place; and in other situations, there were portions that were

7     just -- remained on indefinite pause and not the terminated.

8          So for the sake of accuracy and the fact that this is

9     an open public court, we can't stipulate to something that has

10    those nuances which is why we simply propose to say that the

11    programs were paused under the Trump Administration without the

12    latter part.

13         As for putting the documents into evidence, we think

14    that the documents are -- other than for that fact, they're

15    irrelevant to this case, and we're not seeking to introduce as

16    exhibits irrelevant evidence when I think the Court has a lot of

17    documents before it already.  So we do not want to put them into

18    evidence.  And as I said, I'm not going to die on this hill, but

19    I think it's a fairly simple matter which we're asking the Court

20    to take judicial notice of.

21         THE COURT:  Okay.  And maybe there is a nuance there

22    that I'm not fully appreciating, but we've got the executive

23    orders that President Biden issued I think his first day in

24    office, or maybe it was the first month, first couple weeks in

25    office, that look like -- I tried to compare them yesterday, and

1  it looked to me like the things that he was talking about in

2  that executive order -- I use the word "terminate," you use the

3  word "not implemented," or whatever words you were using -- it

4  seemed like that's what he was talking about in that executive

5  order.

6          Is that a greater nuance than I'm seeing?

7          MS. FUDIM:  My understanding is yes.  I do not have

8  the sufficient nuance language to explain it, but when I walked

9  it up within DOJ and within agency, it was conveyed to me that

10  there is a distinction with regard to some of the countries and

11  the way the programs were conceptualized in later years that

12  some of them were never implemented.  And so I did not have

13  authority to represent in a stipulation that they were

14  terminated across the border.

15          I admit that I don't have the requisite nuance

16  knowledge to explain that to you, but that's why we resisted on

17  that line.  But I think colloquially speaking, and colloquially

18  thinking about it, Your Honor is thinking about it correctly.

19  But I just -- there is some nuance there with words I'm told.

20          THE COURT:  All right.  Here's what I'm going to do.

21  I'm not going to take judicial notice of these press releases --

22  well, one of them is a press release, one of them is a letter

23  from February of 2021 and September of 2022 -- for the reasons I

24  stated yesterday.

25          And as to the judicial injunction, I will take

1  judicial notice of it; but frankly, I'm probably not going to

2  concern myself with it.  Because as I understand what this all

3  relates to is the chief's testimony about Border Patrol officers

4  doing asylum interviews and his view that that was inappropriate

5  from the outset, whether -- whether, you know, there was an

6  injunction entered by people who didn't like that being done, I

7  don't know why that matters to this case.  But in any event, I

8  will take judicial of that judicial record but not of the other

9  two.

10          That being said, I think I can infer from the evidence

11  I have received, including the executive orders that -- exactly

12  what I've been saying all along as to what I think happened, I

13  think the evidence supports that.  And to the extent there is

14  some nuance that some higher up at the Department of Justice

15  wants to die on the hill over, they can die on the hill over it.

16  And if the Eleventh Circuit thinks that finding I'm inferring

17  from that is clearly erroneous, then so be it; but that's how

18  I'll resolve all this.

19          All right.  With that, anything else we need to talk

20  about this morning?

21          MR. GUARD:  No, Your Honor.

22          THE COURT:  All right.

23          MS. FUDIM:  We're ready to call our next witness, Your

24  Honor.

25          THE COURT:  Let's do it.

1      MS. FUDIM:  We call Patricia Grogan to the stand.

2      **PATRICIA GROGAN, DEFENSE WITNESS, DULY SWORN**

3      DEPUTY CLERK:  Please be seated.

4      State and spell your full name.

5      THE WITNESS:  Patricia Grogan.  P-A-T-R-I-C-I-A.  Last

6      name G-R-O-G-A-N.

7                        **DIRECT EXAMINATION**

8      BY MS. FUDIM:

9      Q.   Good morning, Ms. Grogan.

10     A.   Good morning.

11     Q.   My name is Elissa Fudim.  We haven't met before.  I'm going

12     to be asking you some questions today.

13            Are you employed?

14     A.   Yes.

15     Q.   Where are you employed?

16     A.   The Department of Children and Families.

17     Q.   If I refer to the Department of Children and Families as

18     CFS, will you know what I'm talking about?

19     A.   Yeah.  We prefer DCF.

20     Q.   DCF.  I'll go with DCF then.  If I make a mistake, let me

21     know.  DCF.

22            Okay.  You've been with DCF for a long time, right?

23     A.   Yes.

24     Q.   How long have you been working with DCF?

25     A.   Since 1996.

1   Q.   Have you been in the same role that entire period of time?

2   A.   No.

3   Q.   What's your current role?

4   A.   I'm the Director of Economic Self-Sufficiency Policy and

5   Programs.

6   Q.   What is the Department of Economic Self-Sufficiency Policy

7   and Programs?

8   A.   We implement all of the economic self-sufficiency programs

9   which includes our major public benefits programs, SNAP, food

10  assistance, temporary cash assistance, Medicaid eligibility.

11  Although, the rest of Medicaid is run by the Agency for

12  Healthcare Administration.

13          Also, a number of other programs including relative

14  and nonrelative caregiver, the homelessness programs, and

15  refugee services programs.  Plus the ancillary SNAP-related

16  programs, including SNAP employment and training in conjunction

17  with the Department of Economic Opportunity, and SNAP education

18  and outreach programs.

19  Q.   Okay.  I do want to talk about all those, but I think let's

20  take them one at a time because you said a lot.

21  A.   Okay.

22  Q.   So I want to talk to you first about Medicaid eligibility.

23  A.   Okay.

24  Q.   Now, if I understand you correctly, you don't oversee

25  Medicaid, but DCF determines eligibility for Medicaid.  Do I

GROGAN - DIRECT

1   understand that correctly?

2   A.   Yes -- well, we determine eligibility for some individuals

3   receiving Medicaid.  The Social Security Administration also

4   determines eligibility for people who receive SSI who are then

5   categorically eligible for Medicaid, and they also receive

6   Medicaid and they're not determined by DCF.

7   Q.   Okay.  I want to show you a document.  We can pull up

8   Exhibit 89 on the screen.  I have a hard copy if you want it.

9   It's also going to be on the screen.  It's up to you what you

10  prefer.  Do you have a preference?

11  A.   This is fine.

12  Q.   Okay.  Do you recognize the document that I'm showing you?

13  A.   Yes.

14  Q.   Do you recognize this to be a noncitizen handbook which

15  colloquially provides details on noncitizen eligibility for

16  benefits in the State of Florida?

17  A.   For certain benefits, yes.

18  Q.   Certain benefits in the State of Florida?

19  A.   Mm-hmm.

20  Q.   Is that a yes?

21  A.   Yes.

22  Q.   Sorry.  The court reporter takes down what you say, so if

23  you say "uh-huh" or "uh-uh," she can't write that down.

24       And one of the benefits that the noncitizen handbook

25  provides information on eligibility is for Medicaid, right?

1    A.    That's correct.

2    Q.    Okay.  And the information in this handbook is a guide,

3    right?

4    A.    Yes.

5    Q.    And the information actually comes from various statutes

6    and regulations, correct?

7    A.    Correct.

8    Q.    Florida didn't make this up, right?

9    A.    No.

10   Q.    Okay.  And those statutes and regulations, are you aware

11   that they're 8 U.S.C. 1612 and 1613?

12   A.    That's some of them.  There's also state policy and state

13   law that's included.

14   Q.    Okay.  Let me be more specific, that the two statutes I

15   referenced relate to Medicaid benefits in particular and the

16   eligibility?

17   A.    Yes, but that's not the only guidance related to Medicaid.

18   There are state options related to Medicaid which are also

19   incorporated into the handbook.

20   Q.    Okay.  So the handbook would incorporate whatever statutes

21   are out there that govern the eligibility requirements for

22   Medicaid.  It's been synthesized into this handbook as a guide

23   for people you oversee?

24   A.    Yes.

25            MS. FUDIM:  Okay.  I'd like to enter into evidence

GROGAN - DIRECT

```
 1    Plaintiff's Exhibit 89, which I don't believe has been entered
 2    into evidence, Your Honor.
 3              THE COURT:  Any objection?
 4              MS. PATEL:  No objection.
 5              THE COURT:  All right.  That will be received.
 6              Do you have a copy of it for me?
 7              MS. FUDIM:  I do.  It's not clipped, Your Honor.  I
 8    apologize.
 9              THE COURT:  I can accomplish that.  Thank you.
10    BY MS. FUDIM:
11    Q.   Now, one of the -- I'm going to ask --
12              THE COURT:  Ms. Fudim, let me interrupt you for a
13    second.
14              MS. FUDIM:  Sure.
15              THE COURT:  Do you want this marked as Exhibit 89, or
16    do you want this marked as your next in line?
17              MS. FUDIM:  I'm not sure it really matters, whatever
18    the Court would prefer.  We can do our next in line since we're
19    entering it is fine with me.
20              THE COURT:  What would that be?
21              MS. FUDIM:  Ms. Latimer, do you know what number?
22              DEPUTY CLERK:  PP.
23              THE COURT:  PP, I'm hearing.
24              MS. FUDIM:  What was the reference, Your Honor, just
25    so I can refer to it correctly?
```

1        THE COURT:  PP, Paul Paul.

2        MS. FUDIM:  Thank you.

3     *(DEFENSE EXHIBIT PP:  Received in evidence.)*

4        MS. FUDIM:  If you could pull up page 24, Ms. Latimer,

5  put it on the screen for me, please.

6  BY MS. FUDIM:

7  Q.   Can you see that, Ms. Grogan?

8  A.   Mm-hmm.

9  Q.   Okay.  Looking at page 24 of Exhibit PP, am I correct that

10  with limited exceptions, which we'll talk about in a minute,

11  applicants for admission paroled into the United States after

12  August 22nd of 1996 have to have been in the country for five

13  years before they're eligible for Medicaid; is that correct?

14  A.   Noting the exception that appears on the fourth line.

15  Q.   Okay.  And with regard to the exception, that applies to

16  Haitians and Cubans.  Am I correct?

17  A.   There have been some changes since this was published

18  related to Ukrainian parolees and Afghan parolees.  So they also

19  are excepted from this.

20  Q.   Okay.  So those four:  Haitians, Cubans, Afghans, and

21  Ukrainians --

22  A.   Correct.

23  Q.   -- is that correct?

24        And so with the exception of those four populations of

25  people, applicants for admission who were paroled at the

1   southwest border on, let's say, January 1st of 2021, they're not

2   yet eligible for Medicaid in the State of Florida, correct?

3   A.   That's correct.

4   Q.   Okay.  Now, there's also an income component to Medicaid,

5   correct?

6   A.   Mm-hmm.

7   Q.   Sorry.  You have so say yes or no.

8   A.   Sorry.  Yes.

9   Q.   And are you aware of the fact that that number for an

10  individual is approximately $18,000, give or take?

11  A.   It would depend on your age and -- there's number of

12  different factors.  So in some areas it would be considerably

13  less than that.  There's a different standard for somebody who

14  is an adult versus a child versus a pregnant woman.  There's a

15  number of different income eligibilities, so I don't know that

16  we can give that average.

17  Q.   And there's statutes that bring us to those numbers, right?

18  A.   Yes.

19  Q.   Right.  So like Florida, for example, provides that -- that

20  eligibility is dependent on a certain percentage of the federal

21  poverty level, correct?

22  A.   Correct.

23  Q.   And then the federal government establishes what that

24  federal poverty level is, correct?

25  A.   Correct.

1   Q.   And you do some math and you get to a number, right?

2   A.   Right.

3   Q.   Okay.  And at the high end for single adults, that number

4   is around 18,000; is that accurate?

5   A.   I believe it's less than that.

6   Q.   Okay.  So for applicants for admission who have been

7   paroled into the country, am I correct that they can obtain work

8   authorizations?

9   A.   It's been a moving target that has changed in the last

10  couple of years.  I believe they can now obtain work

11  authorization and discretionary to the Department of Homeland

12  Security.

13          MS. FUDIM:  Okay.  I would just refer the Court to

14  paragraph 52 of the parties' joint stipulation which provides

15  that aliens released under 8 U.S.C. 1182(d)(5) are eligible to

16  apply for work authorization.

17          THE COURT:  I assume, ma'am, that's not your bailiwick

18  to determine?

19          THE WITNESS:  Yes, right.  We don't...

20          THE COURT:  Okay.  I'll accept what's in the

21  stipulation.

22  BY MS. FUDIM:

23  Q.   So a paroled applicant for admission other than -- or

24  excuse me, even including a Haitian, a Cuban, a Ukrainian or an

25  Afghani individual, they may not qualify for Medicaid based upon

GROGAN - DIRECT

1    their income, right?

2    A.   Certainly.

3    Q.   Okay.  Or they might not be eligible because they have

4    health insurance, excuse me, through their employer if they're

5    employed, correct?

6    A.   Health insurance may or may not be a disqualifying

7    characterization.

8    Q.   It usually is, though, isn't it?

9    A.   It can be, yes.

10   Q.   And they could have private insurance.  That's possible,

11   right?

12   A.   Yes.

13   Q.   Okay.  And they can also purchase insurance on the public

14   marketplace; isn't that correct?

15   A.   Correct.

16   Q.   Okay.  And that would be another reason that they may not

17   be eligible for Medicaid, right?

18   A.   Yes.

19   Q.   Okay.  And with all of those possibilities, is it fair to

20   say that you can't tell us with any degree of certainty how much

21   money, if any, Florida has spent on Medicaid benefits for

22   applicants for admission paroled at the southwest border since

23   January 1st of 2021?

24   A.   Can you repeat that question?  It was a long one.

25   Q.   Sure.

1          Is it fair to say that with all of those possibilities

2    we just talked about, you can't tell us with any degree of

3    certainty -- thank you -- with any degree of certainty how much

4    money, if any, Florida has spent on Medicaid benefits for

5    applicants for admission paroled at the southwest border since

6    January 1st of 2021?

7    A.   I can tell you that we looked at the numbers we provided

8    during the deposition to determine what number, what percentage

9    of them were Cubans and Haitians and how much money of the

10   people who received benefits during that time were Cubans and

11   Haitians, and it was approximately 96 percent of the money

12   expended during that time period.

13   Q.   Okay.  But just to circle back, even as to Cuban and

14   Haitians, as to that subpopulation, you can't tell us how many,

15   if an  of them, were paroled at the southwest border since

16   January 1st of 2021, can you?

17   A.   We cannot tell you -- we don't track the place of entry.

18   Q.   So that's a "correct" to my question?

19   A.   Correct.  We don't track the place of entry, so I can't

20   tell you anybody who came across the southwest border.

21   Q.   Okay.  And, in fact, many Cubans and Haitians have come to

22   Florida via boat, so by sea, correct?

23   A.   Many is a -- define "many."

24   Q.   Well, some.  You're aware that there --

25   A.   Some.  Certainly some, yes.

GROGAN - DIRECT

1    Q.   Okay.  And some of the Cuban and Haitians for whom

2    benefits, perhaps, are being paid may have come to the country

3    prior to January 1st of 2021, right?

4    A.   Certainly.

5    Q.   Okay.  So let's talk now for a moment about emergency

6    Medicaid.  That's a little different than regular Medicaid,

7    correct?

8    A.   Correct.

9    Q.   Okay.  And that's also something that --

10            DCF, is that right?  Getting the acronym right?

11            -- DCF oversees?

12   A.   Yes.  The eligibility, yes.

13   Q.   The eligibility, understood.

14            And emergency Medicaid is available for certain

15   emergent conditions, right?

16   A.   Yes.

17   Q.   So if someone goes to the hospital with an acute emergency,

18   it may cover treatment for that, but it's not going to cover

19   long-term care beyond the acute emergency; is that right?

20   A.   Yes.

21   Q.   Emergency Medicaid is available to individuals who are

22   ineligible for standard Medicaid solely as a result of their

23   immigration status, right?

24   A.   Correct.

25   Q.   That would include a number of different categories of

1    noncitizen; am I right?

2    A.    Yes.

3    Q.    So that would include undocumented noncitizens?

4    A.    Yes.

5    Q.    And that would include noncitizens with pending orders of

6    removal?

7    A.    Yes.

8    Q.    And that would include noncitizens --

9    A.    Let me backtrack.

10   Q.    Sure.

11   A.    That would include some people with pending orders of

12   removal.  Again, Cubans and Haitians who have pending orders of

13   removal would be eligible for regular Medicaid.

14   Q.    And some would, depending on their nationality might --

15   A.    I said Cubans and Haitians, but others would.

16   Q.    Okay.  And it would cover noncitizens released from custody

17   on, for example, judicial order, correct?

18   A.    Correct.

19   Q.    Okay.  And there are other categories I'm not naming --

20   A.    That's what I -- yeah.

21   Q.    -- that's fair to say?

22          Okay.  And it's also not available -- excuse me.

23          It's also available, excuse me, for citizens who don't

24   have insurance and are otherwise not eligible for Medicaid or

25   Medicare.  Is that accurate?

1  A.    No, that's not accurate.

2  Q.    Okay.  Well, I appreciate the correction.

3         What about legal permanent residents who don't have

4  insurance and aren't eligible for Medicaid, is it available to

5  them?

6  A.    No.

7  Q.    Okay.  So solely individuals who are ineligible as a result

8  of immigration status?

9  A.    Correct.

10  Q.    And we've established that's a broad category of different

11  types of people?

12  A.    Yes.

13  Q.    Okay.  And you can't quantify the cost to Florida from

14  applicants for admission paroled at the southwest border since

15  January 1st of 2021 for whom emergency Medicaid expenditures

16  have been made.  Is that right?

17  A.    Correct.

18  Q.    And it's not just that you can't quantify the dollar

19  amount, you also can't quantity the number of applicants for

20  admissions paroled at the southwest border since January 1st,

21  2021, who have obtained emergency Medicaid benefits, correct?

22  A.    Correct.

23  Q.    And as far as you know, you can't say whether that number

24  is zero or not, correct?

25  A.    Correct.

1    Q.   Now, I want to talk -- withdraw.

2         In order to make a conclusion that emergency Medicaid

3    benefits are being made on behalf of applicants for admission

4    paroled at the southwest border, first we'd have to make a

5    series of assumptions, right?

6    A.   Okay.

7    Q.   Okay.  Bear with me.  First, you'd have to assume that

8    these individuals, after they've been paroled, are settling in

9    Florida; that some portion of these individuals are coming to

10   Florida, right?

11   A.   Yes.

12   Q.   And then you'd have to assume that they have medical

13   emergencies, right?

14   A.   Yes.

15   Q.   And then you'd have to assume that they chose to go to the

16   hospital for these emergencies?

17   A.   Yes.

18   Q.   And that they didn't have private insurance?

19   A.   Yes.

20   Q.   And that they didn't have insurance through their employer?

21   A.   Yes.

22   Q.   And that they didn't have insurance through the public

23   exchange?

24   A.   Yes.

25   Q.   And that they otherwise couldn't pay for it?

1   A.    Yes.

2   Q.    And just to be clear, for applicants' admissions paroled at

3   the southwest border since January of 2021, we don't know any of

4   those things, right?

5   A.    We don't track any of those things, yes.

6   Q.    And as a result of not tracking them, we don't know them,

7   correct?

8   A.    Right.

9   Q.    Okay.  You mentioned earlier SNAP.

10  A.    Mm-hmm.

11  Q.    I heard you say -- can you just explain for the Court what

12  that is.

13  A.    SNAP is what most people know as food stamps.  It's a

14  federal food assistance programs to low-income families.

15  Q.    Okay.  And the acronym, for the record, is Supplemental

16  Nutrition Assistance Program; is that right?

17  A.    Yes.

18  Q.    Okay.  And SNAP is available to all qualifying low-income

19  individuals in the state, right?

20  A.    Yes.  Qualifying, yes.

21  Q.    Okay.  And that's citizens and noncitizens alike?

22  A.    Certain noncitizens, not all noncitizens.

23  Q.    Correct.  And, in fact, the SNAP benefit, the

24  noncitizens -- well, withdrawn.

25          The benefits -- those benefits are also -- in terms of

1    which noncitizens are entitled to those benefits, we can also

2    track that by looking at Exhibit 89; is that correct?

3    A.    Yes.

4    Q.    Now, the benefits provided under the program, those

5    benefits are entirely funded by the federal government; isn't

6    that correct?

7    A.    The benefits are entirely funded.  The administrative costs

8    of implementing the program is split between the state and the

9    federal government, generally.

10   Q.    I was just going to get to that.  The split's about 50/50?

11   A.    Generally, yes.

12   Q.    Okay.  And the way that the federal government funds those

13   benefits, it actually funds the benefits directly to recipients.

14   Is that accurate?

15   A.    Yes.

16         MS. FUDIM:  Okay.  So I'm going to ask Mr. Latimer to

17   pull up the stipulation, paragraph 58, that the parties entered

18   into.

19   BY MS. FUDIM:

20   Q.    Okay.  So if you look at -- Ms. Grogan, if you'd look at

21   what the parties have entered into as a stipulation.  And it

22   does go on to a second page, so I'll give the Court and you a

23   minute to look at it, and then we can flip to the next page.

24         There's a figure there.  It says from January 2020

25   through January 2022, DCF spent approximately 2 million -- I'm

GROGAN - DIRECT

1    not good at reading these numbers, but you see the big number

2    I'm looking at with the "2" -- approximately $2.1 million of

3    state funds providing Supplemental Nutrition Assistance Program

4    for qualifying noncitizens, which is on the next page.

5            Do you see that?

6    A.   Yes.

7    Q.   So just so we're clear as to what this means, that roughly

8    $2 million figure represents the State's share of administrative

9    costs for the program, right?

10   A.   Correct.

11   Q.   Okay.  So I want to talk about who qualifies for SNAP

12   benefits.  I believe we said that we can look at Exhibit 89 to

13   derive that information.  Am I right?

14   A.   Yes.

15   Q.   And again, the individuals who qualify unless -- they're a

16   Cuban, Haitian and now, I'm assuming, a Ukrainian or an Afghani,

17   and you can correct me if I'm wrong -- they're not eligible to

18   receive SNAP benefits until they've been in the country, paroled

19   into the country for at least five years.  Am I correct?

20   A.   With those exceptions, yes.

21   Q.   Right.  And parole has to be a parole for longer than one

22   year, right?

23   A.   Not for Cubans and Haitians.

24   Q.   Yeah.

25   A.   But for other ones, yes.

GROGAN - DIRECT

1    Q.   Thank you.  I appreciate the clarification.  Right.

2         And so what that means if someone were paroled into

3    the country for, let's say, five months and they've been here

4    more than five years but the parole expired at the five-month

5    mark, they're not eligible for benefits, putting aside the

6    limited nationality group we talked about, right?

7    A.   The scenario is somebody had a parole for a period of less

8    than a year and now we're five years down?  I mean, they

9    probably wouldn't still have that parole.

10   Q.   Correct.  That's what I'm getting at.  So they would be --

11   they would not --

12   A.   We don't know what they would be.

13   Q.   Okay.  And so the limited exceptions we talked about, they

14   don't apply to Central Americans, right?

15   A.   Correct.

16   Q.   They don't apply to South Americans?

17   A.   Correct.

18   Q.   And they don't apply to Mexicans?

19   A.   Correct.

20   Q.   So any money that your department has spent on

21   administrative costs for SNAP since January 2021, none of it can

22   be fairly allocated to Central Americans paroled at the

23   southwest border, correct?

24   A.   Correct.

25   Q.   And it can't can be attributed to South Americans paroled

1  at the southwest border, correct?

2  A.   Correct.

3  Q.   It can't be attributed to Mexicans paroled at the southwest

4  border?

5  A.   Correct.

6  Q.   And that's because none of them would even be eligible --

7  another reason would be none of them would even be eligible for

8  these benefits until, at the earliest, 2026?

9  A.   Correct.

10  Q.   Assuming that they're even still here in the state of

11  Florida?

12  A.   Correct.

13  Q.   Right.  Which we --

14  A.   Unless they have -- unless they have acquired some

15  additional status, yes.

16  Q.   Okay.  Now, Cubans and Haitians paroled under 1182(d)(5) --

17       MS. FUDIM:  And we can go back, Maria, please.  If we

18  can go back to Exhibit 89, and I believe it's going to be

19  page 25 now, one page further than we were before.

20  BY MS. FUDIM:

21  Q.   Cubans and Haitians that are eligible for benefits prior to

22  the five years and with parole periods of less than one year,

23  they still have to have been paroled under Section 212(d)(5) of

24  the INA, right?

25  A.   No, they can have -- yeah.  Under this category, yes.

1    Q.   Okay.  And right at the top of the page it says --

2    A.   Right.

3    Q.   -- it says "national of Cuba or Haiti paroled under Section

4    212(d)(5)," right?

5    A.   Right.

6    Q.   And is that the same for Afghanis and for Ukrainians, do

7    you know?

8    A.   I think it's under -- I believe it's under the same

9    212(d)(5), humanitarian or public special interest parole.

10   Q.   Okay.  Thank you.

11        And, in fact, they have to have certain documentation,

12   right?

13   A.   We're just talking about the parolees?  Because there's a

14   whole bunch of other categories of Cubans and Haitians that are

15   eligible, right?

16   Q.   I'm just talking about individuals that come -- on page 25.

17   We've got Cubans and Haitians who are going to be eligible for

18   certain benefits, including SNAP benefits; they have to have

19   documentation, specifically an I-94.

20        That's correct, right?

21   A.   Not -- not just an I-94.  There's a number of different

22   documents that they -- I mean, you can have a stamp in your

23   passport that indicates you've been paroled.  There is a number

24   of different documents.  And actually, as I'm contemplating, if

25   you read the Refugee Education Assistance Act, it just says to

1    be eligible you have to be paroled.  It doesn't specify a

2    212(d)(5) parole.  And as I recall, it's something like a

3    special immigrant juvenile status is also considered a parole,

4    and a Cuban with an SIJ status could be considered.  Those

5    are --

6    Q.    Okay.

7    A.    -- rare case, you know, unusual cases, not most of the

8    cases.

9    Q.    Okay.  And the way that we know that it's not most of the

10   cases is that when Florida was crafting this guide to assist its

11   own employees in making accurate determinations of eligibility,

12   Florida went ahead and put for this category that individuals

13   have to be paroled under Section 212(d)(5), right?

14   A.    I would actually say that a little bit differently.  I

15   said -- what that manual says is for people who are paroled

16   under Section 212(d)(5).  It doesn't indicate these are the only

17   people who could be eligible.

18   Q.    Okay.  Is there a page of this manual that explains that

19   individuals who have been released -- Cubans and Haitians, and

20   if we include Afghans and Ukrainians, fine.  And I understand

21   that this was -- predated that.  So it may not say that.

22         But is there a page of this manual that provides that

23   Cubans and Haitians who have been released on mechanisms other

24   than parole under Section 212(d)(5) are eligible for benefits,

25   or is that just a small subset of people that it's not in the

1    leading guidance that Florida has provided to its employees?

2    A.    As it relates to parole or other mechanisms of entry, such

3    as being in removal proceedings or is an asylum applicant?

4    Because those two are addressed in the manual.

5    Q.    Okay.  I'm talking about just in terms of release, release

6    mechanism.

7    A.    Certainly, there -- I believe there's another category for

8    individuals who are -- there's several categories.  Cubans who

9    are given an indefinite -- I mean, we can go back to the

10   beginning, we can walk through it.  Go back to the table of

11   contents.  I can show you.

12   Q.    Yeah, you can go to the Table of Contents.

13   A.    Okay.  So if you can -- let's see.  Under deportation

14   withheld, Number 28 and 29, national of Cuba or Haiti with an

15   indefinite stay of deportation or deportation withheld.  There's

16   also --

17   Q.    Okay.  I think perhaps we were talking -- now that I see

18   what you're looking at, I think perhaps we were talking -- there

19   was a miscommunication between us.  I'm talking about release

20   mechanisms.  So I understand that there's individuals who may be

21   eligible -- Cuban and Haitian individuals that may be eligible

22   because deportation has been withheld, but that is not connected

23   to their original type of entry into the country or their

24   original type of release, correct?

25   A.    Can I suggest we go to page 32 and look at the

1    Cuban/Haitian entrant definition?

2    Q.    Sure.

3    A.    So there you'll see all of the different types of --

4    Cuban/Haitian entrant is not an immigration status, but it's

5    defined in the Refugee Education Assistance Act to be people who

6    are eligible for assistance.  And it includes not only

7    individuals who have been paroled but also those who are -- have

8    an asylum application pending or are in removal proceedings.

9    And there's a bunch of different categories here.

10   Q.    Okay.  So I just want to make sure that it's clear for the

11   Court.  So any type of Cuban or Haitian -- and possibly the two

12   other nationalities you --

13   A.    The other one is a little more restrictive, too.

14   Q.    Those are more restrictive?

15          So if you're a Cuban or a Haitian and you've been

16   released and you have documentation to show that you've been

17   released with any of the documents listed under the word

18   "documentation" on page 32, you would then be eligible for these

19   benefits --

20   A.    Correct.

21   Q.    -- is that correct?

22   A.    Mm-hmm.

23   Q.    Okay.  And if it's a parole, in particular, you would have

24   to have the I-94 or a similar stamp in your passport?

25   A.    Some kind you have a stamp -- some kind of an indication

GROGAN - DIRECT

1  that you've been paroled, yes.

2  Q.   Okay.  Now, you have no idea how many, if any, Cubans or

3  Haitians who have received SNAP benefits were paroled at the

4  southwest border, correct?

5  A.   Let me think about that.  We -- yes, we -- well, not at the

6  southwest border.  I can tell you how many have been paroled but

7  not at the southwest border.

8  Q.   Okay.  And that's because the Department doesn't track

9  where noncitizens have entered the country, right?

10 A.   Right.

11 Q.   And again some, we know, come from boats via sea to the

12 state of Florida --

13 A.   Correct.

14 Q.   -- right?

15        We see that in the news here all the time, right?

16 A.   Yes.

17 Q.   Okay.  So you can't tell me -- if we go back to the

18 stipulation where we were looking at the roughly $2.1 million

19 number that we were looking at a moment ago, you can't tell me

20 roughly how much of this roughly $2.1 million figure of

21 administrative costs spent on SNAP benefits from January 2020 to

22 January 2022 is attributable to Cubans or Haitians paroled at

23 the southwest border, correct?

24 A.   Correct.

25 Q.   And you can't more broadly tell us how much of this

1    $2.1 million figure of administrative costs is attributable to

2    applicants for admission paroled at the southwest border post

3    January 1 2021?

4    A.    Again, because we don't know whether they came at the

5    southwest border or not, I can't attribute any specific costs.

6    Q.    Okay.  Now, I want to talk about TANF.  That was another

7    program I believe you mentioned.

8    A.    Yeah, Temporary Assistance for Needy Families.  Yes.

9    Q.    Okay.  What is Temporary Assistance for Needy Families?

10   A.    Depending on which -- what you would mean, Temporary

11   Assistance for Needy Families is both a block grant and another

12   word used for this specific program in Florida known as

13   Temporary Cash Assistance.  So there's a block grant, a TANF

14   grant, and then there is a program to provide cash assistance to

15   low-income families, qualified low-income families.

16   Q.    And if I'm trying to understand this at sort of the 101

17   level, would it be fair to say that this program is essentially

18   a cash welfare program to qualifying households with a child?

19   A.    Yes.

20   Q.    Okay.  And right now, or at least at the time of your

21   deposition, there were about 46,000 people in the state

22   receiving those benefits?

23   A.    Sounds about right.  It's a little bit higher than that

24   now.

25   Q.    And TANF benefits, just like SNAP benefits, are not

1  available to parolees from South America, for example, until

2  they've been here five years?

3  A.   Correct.

4  Q.   And not available to Central Americans until they've been

5  here five years?

6  A.   Correct.

7  Q.   Not available to Mexicans until they've been here five

8  years?

9  A.   Correct.

10  Q.   And there is the exception for Cubans and Haitians which

11  we've gone through already, right?

12  A.   Yes.

13  Q.   And is there also the same exception for a TANF benefits

14  for the Ukrainians and the Afghanis to some extent?

15  A.   Yes.

16  Q.   Okay.  And you can't tell us again how many, if any, of the

17  46 -- roughly 46,000 noncitizens receiving TANF benefits are

18  applicants for admission paroled at the southwest border since

19  January 1st, 2021, right?

20  A.   Correct.

21  Q.   So if we go to paragraph 57 of the stipulation, which

22  Ms. Latimer has on the screen, we were just talking about the

23  number of noncitizens, not knowing how many of them were

24  applicants for admission paroled at the southwest border.  Now

25  in 57, we're talking about a dollar figure.

GROGAN - DIRECT

1              You can't tell us how much, if any, of this dollar

2    figure was spent on applicants for admission paroled at the

3    southwest border since January 1st, 2021, right?

4    A.    That's correct.

5    Q.    Okay.  And as far as you know or could prove, it could be

6    zero?

7    A.    I think that's unlikely.

8    Q.    Okay.  But you're not able to provide us with any facts to

9    establish that the number is not zero?

10   A.    Correct.

11   Q.    Okay.  Now, I want to talk about the Relative and

12   Nonrelative Caregiver Financial Assistance programs.  Those are

13   two separate but closely related programs.  Fair to say?

14   A.    Yes.

15   Q.    Okay.  And these programs provide assistance to individuals

16   providing care to a dependent child, usually following a court

17   order; is that right?

18   A.    Yes, a child placed by the Department, that was dependent

19   and placed by the Department.

20   Q.    And because they're both components of TANF, they have the

21   same eligibility requirements that we've been talking about

22   already?

23   A.    Yes.

24   Q.    And so again, most noncitizens paroled since January 2021,

25   other than the limited groups we've carved out, are not going to

1   be eligible to receive these benefits until 2026, right?

2   A.    Correct.

3   Q.    And so if we look at paragraph 59 of the stipulation --

4   Ms. Latimer -- where we see a figure, approximately $12,000, it

5   says from January 2020 through January 2022, DCF spent $12,236

6   providing Relative Caregiver Financial Assistance from state

7   funds to qualifying noncitizens.

8              Once again, we have no idea how much, if any, of that

9   is attributable to applicants for admission paroled at the

10  southwest border since January 2021, right?

11  A.    Correct.

12  Q.    And we know a lot of it -- or potentially a good portion of

13  it may be attributable to individuals who came in prior to

14  January 2021, because it actually goes back a year before

15  January of 2021, right?

16  A.    Actually goes back a yeah before -- yeah.  I guess, yeah.

17  Q.    So once again the number could be zero?

18  A.    Could be.

19  Q.    Okay.  Now, Refugee Assistance Program, that's another

20  program that DCF is -- oversees?

21  A.    Mm-hmm.

22  Q.    Sorry.  You have so say yes or no for the court reporter.

23  A.    Yes.  I'm sorry.

24  Q.    Okay.  Thank you.

25             And that's a welfare program that mirrors TANF, but

1   it's for families who don't have children; am I right?
2   A.   The Refugee Cash Assistance component of the refugee
3   program mirrors TANF, yes.
4   Q.   Okay.  For families without children?
5   A.   Correct.
6   Q.   Okay.  And this program is a 100 percent funded by the
7   federal government, right?
8   A.   Yes.
9   Q.   And that's true for Cubans and Haitians as well?
10  A.   Yes.
11  Q.   And, in fact, all the refugee programs in the State of
12  Florida are a 100 percent federally funded, right?
13  A.   Yes.
14  Q.   Now, I'm not sure if you mentioned this, so correct me if
15  I'm wrong, but there's also a substance abuse and mental health
16  program that's overseen by DCF?
17  A.   There is.
18  Q.   And that program provides both inpatient and outpatient
19  services, right?
20  A.   Yes.
21  Q.   Okay.  So focusing solely on outpatient services for one
22  moment, fair to say that you can't tell us how many of the
23  individuals receiving those services are applicants for
24  admission who crossed the southwest border and were paroled
25  since January of 2021?

1   A.   That's correct.

2   Q.   So if we go to paragraph -- again 59 in the stipulation --

3   maybe the wrong number there.  The -- I think I have the wrong

4   number.  The paragraph that says "for fiscal year 2021 to 2022

5   DCF spent 900" -- yeah, thank you, 61.  I have the wrong

6   paragraph.  Thank you.

7           Looking at paragraph 61 where we see this $940 million

8   figure -- am I saying that right?  Yeah.  Once again, you can't

9   tell us if any of that dollar amount is being spent on

10  applicants for admission paroled at the southwest border since

11  January of 2021?

12  A.   Yes.

13  Q.   It's a mouthful to say.

14          Now, your department does track citizenship status for

15  individuals receiving inpatient services, right?

16  A.   They try to, yes.

17  Q.   Okay.  But again, that's just citizen information; citizen,

18  noncitizen, correct?

19  A.   I think it's -- they try hard -- they try to find the

20  eligibility of people for benefits like Medicaid, particularly

21  when somebody is going to be released so they can continue to

22  have ongoing services.  So they do attempt to find some

23  additional citizenship information.  It's not a condition of

24  eligibility for services, so it's not tracked in the same way.

25  It is for the economic self-sufficiency programs.

```
 1   Q.   Okay.  But in terms of what data is stored, that's just
 2   citizenship status; isn't that correct?
 3   A.   I believe that's correct, yes.
 4   Q.   Okay.  So you can't tell me if any of the individuals
 5   taking up beds in inpatient facilities are applicants for
 6   admission paroled at the southwest border since January 1st of
 7   2021?
 8   A.   That's correct.
 9           MS. FUDIM:  If we could look at paragraph 60 of the
10   stipulation, Ms. Latimer.
11   BY MS. FUDIM:
12   Q.   Okay.  Paragraph 60 says "For fiscal year 2021 to 2022, DCF
13   spent $7,636,351 specifically on unlawfully present aliens in
14   state residential treatment facilities."
15           Do you see that?
16   A.   Mm-hmm.
17   Q.   Sorry.  You have to say yes or no for the court reporter.
18   A.   Yes.
19   Q.   Thank you.
20           Isn't it true that Florida considers noncitizens
21   paroled into the United States as lawfully residing in Florida?
22   A.   Florida is a big -- tell me what you mean by "Florida
23   considers."
24   Q.   Okay.  Well, you -- I'm going to --
25           MS. FUDIM:  Can I have a copy of Ms. Grogan's
```

1   deposition, please?

2   BY MS. FUDIM:

3   Q.   Bear with me for one second, Ms. Grogan.

4   A.   Mm-hmm.

5   Q.   I'm going to show you -- well, withdrawn.

6        Isn't it true -- you had your deposition taken in this

7   case, correct?

8        Sorry.  You have so say yes or no for the court

9   reporter.

10  A.   Yes.

11  Q.   And you were asked a series of questions and gave a series

12  of answers?

13  A.   Yes.

14  Q.   And you tried to be truthful when you gave those answers?

15  A.   Yes.

16  Q.   Does it refresh your recollection at all to know that you

17  were asked a question:

18        "Question" -- and I'm referring opposing counsel and

19  the Court to page 58, starting at line 2, for context and going

20  down to line 10.

21        "Question:  Individuals who are seeking asylum, would

22  they be considered lawfully residing?

23        "Yes, if they have a pending application for asylum

24  that has not -- that hasn't had a final determination.

25        "Question:  And how about individuals who are released

1    on parole?

2            "Yes, they would be considered lawfully residing."

3            Does that refresh your recollection that individuals

4    that are paroled into the United States are considered lawfully

5    residing in Florida?

6    A.   I believe that question referred to the discussion about

7    Medicaid eligibility, not about what the substance abuse and

8    mental health, how they were categorizing lawfully present

9    versus unlawfully present.

10   Q.   So is it your testimony here in this court that individuals

11   paroled into the United States are considered not lawfully

12   residing in the state of Florida for the purpose of benefits,

13   inpatient benefits at mental health facilities?

14   A.   No.  My testimony was I didn't understand the question when

15   you said does Florida consider parole to be lawfully -- I

16   thought that was -- I didn't understand the question of what

17   Florida meant in that context.

18   Q.   Okay.  I'm sorry.  Let's go back.

19           Isn't it true that noncitizens paroled into the United

20   States are lawfully present in Florida, as that term is used for

21   eligibility benefits, for inpatient services at mental health

22   facilities?

23   A.   I believe that's correct.

24   Q.   Okay.  And that's true for individuals who have a pending

25   asylum application, correct, they would be lawfully residing

1    here?

2    A.   Yes, I believe that's correct.

3    Q.   And noncitizens who have been released on their own

4    recognizance would also be considered lawfully residing here?

5    A.   For the purposes of substance abuse and mental health?

6    Q.   Yes.

7    A.   I'm not sure.

8    Q.   Okay.  Fair enough.

9             MS. FUDIM:  If you could pull back up the stipulation,

10   please.

11   BY MS. FUDIM:

12   Q.   So knowing -- focusing solely on the individuals paroled at

13   the southwest border since January of 2021 and knowing that

14   individuals who are paroled into the United States are lawfully

15   residing in Florida, would it be fair to say that none of this

16   $7.6 million figure was spent on individuals paroled into the

17   country?

18   A.   I believe that is correct.

19   Q.   Now, there's also a homeless program of sorts that's

20   overseen by your office; is that correct?

21   A.   Yes, correct.

22   Q.   And it's a shelter and rehousing program?

23   A.   Outreach, number of other components, but yes.

24   Q.   I didn't mean to oversimplify it, but just colloquially

25   speaking, it's shelters, outreach, wraparound services for

1    individuals who are without homes?

2    A.   And rehousing yes.

3    Q.   Okay.  And eligibility is not dependent on immigration

4    status, right?

5    A.   For most of the components, correct.  Homeless is --

6    Q.   And because eligibility has no immigration component, your

7    office doesn't collect or maintain information on the immigrant

8    status of those receiving benefits, correct?

9    A.   That's correct.

10   Q.   So fair inference again, we don't know how many of them

11   paroled, southwest border, 2021, right?

12   A.   Agreed.

13   Q.   Okay.  Child welfare.  Your office seems to do a lot of

14   things.  Child welfare is one of them, right?

15   A.   We do.

16   Q.   And that's an Office of Child Welfare Services, is that

17   the -- is that the right name?

18   A.   They just changed it but it's close enough.

19   Q.   And colloquially speaking, we're talking foster homes and

20   home care for children?

21   A.   Including investigations and a wide range of preventive and

22   other services; but, yes, it also includes foster care and other

23   residential care for children.

24   Q.   And these are provided without regard to immigration

25   status?

1  A.   Yes.

2  Q.   But there's a funding difference depending upon the status

3  of the immigrant child; is that right?

4  A.   Yes.  Some can qualify for certain federal funding based on

5  their immigration status.

6  Q.   Okay.  So I want to look at paragraph 62 of the

7  stipulation, and I want to just break this down a bit to make

8  sure that it's clear.

9       So paragraph 62 reads:  "For fiscal year 2021 to 2022

10  DCF spent approximately" -- and then there's a huge number,

11  5 million -- I'm bad at reading numbers into words, but a

12  $5.3 million figure "on Office of Child and Family Well-Being

13  Services for nonqualifying alien children which include those

14  who were paroled under 8 U.S.C. 1182(d)(5) for less than one

15  year, although DCF does not track which is of those qualifying

16  aliens children are such parolees."

17       Did I read that accurately?

18  A.   I believe so.

19  Q.   Thank you.

20       So I want to break this down.  So first of all,

21  Department of Children and Family spent roughly $5 million for

22  services for nonqualifying alien children, right?

23  A.   Correct.

24  Q.   And nonqualifying alien children includes a number of

25  different -- there's a number of different types of people who

GROGAN - DIRECT

1    would fall within that definition, right?

2    A.    Yes.

3    Q.    And one of the groups would be children who were paroled

4    for less than one year, right?

5    A.    Yes.

6    Q.    Okay.  And Department of Children and Families can't say

7    which children who receive -- which children who are paroled,

8    which children received those benefits were, in fact, paroled.

9    Correct?

10   A.    Correct, we don't track that.

11   Q.    Okay.  But it's actually even more than that.  It's not

12   just that Department of Children and Families can't identify

13   which of those nonqualifying alien children are such parolees.

14   Department of Children and Families also can't say if any of the

15   children receiving these benefits are such parolees, right?

16   A.    Correct.

17   Q.    Okay.  And then it would be fair to say that the Department

18   of Children and Families cannot establish that any of the

19   children for whom it funds child welfare services are applicants

20   for admission who are paroled by the federal government at the

21   southwest border since January 2021, correct?

22   A.    Correct.

23   Q.    Domestic violence program, did you mention that one?

24   A.    Maybe I did.  I don't remember.

25   Q.    Okay.  Neither do I.

1    A.    It's there.

2    Q.    There is a domestic violence program --

3    A.    There is a domestic violence --

4    Q.    -- overseen by your office?

5    A.    Overseen by the Department, yes.

6    Q.    Yes.  And it includes the provision of shelters and

7    nonresidential resources for victims of domestic violence?

8    A.    Yes.

9    Q.    And these programs as well is if -- they are available

10   regardless of immigration status?

11   A.    Yes.

12   Q.    And because of that, the office doesn't track the

13   immigration status of individuals who make use of these

14   services, correct?

15   A.    Correct.

16   Q.    And so fair to say we can't quantify or establish if any of

17   the recipients or benefits -- the recipients of benefits, excuse

18   me, are applicants for admission paroled at the southwest border

19   since January 1st of 2021?

20   A.    Correct.

21   Q.    And because you can't tell us if any of the recipients are

22   applicants for admission paroled at the southwest border, you

23   also can't tell us the corollary, which is how much money, if

24   any, Department of Children and Families has spent on behalf of

25   such individuals, right?

1    A.    That's correct.

2    Q.    Those things will always go together, right?

3    A.    Yes.

4    Q.    So if you don't know one, you won't know the other?

5    A.    Yes.

6    Q.    Okay.  So if we look at paragraph 63 of the stipulation

7    where it refers to expenditures for state funds of domestic

8    violence services, the $38 million figure, we don't know if any

9    of this is attributable to applicants for admission paroled at

10   the southwest border since January 2021, correct?

11   A.    Correct.

12   Q.    Okay.  So fair to say that taking all the different

13   services together that your department oversees -- and I

14   understand that's a lot -- that we can't say how many, if any,

15   applicants for admission paroled at the southwest border since

16   January of 2021 are consuming services that your office oversees

17   or provides eligibility for, correct?

18   A.    We can't specify that, correct.

19   Q.    Right.  And, in fact, you don't even know if the total

20   number of applicants for admission paroled at the southwest

21   border who have -- since January of 2021 who have resettled in

22   Florida and received benefits administered by DCF, to the extent

23   there are any, has increased or decreased since January of 2021,

24   correct?

25   A.    I can infer.

1   Q.   But you don't know?

2   A.   I don't know.

3   Q.   Okay.  And because you don't know, it's possible that there

4   are fewer applicants for admission paroled at the southwest

5   border who are now in Florida consuming services, the subset

6   that are consuming services, than there was a year ago?

7   A.   That would be extraordinarily unlikely given what we do

8   know.

9   Q.   Okay.  But the data that you do know is not tied to

10  applicants for admission, correct?

11  A.   Not entirely.

12  Q.   And it's not tied to port of -- place of entry, I should

13  say.

14  A.   It's not tied to place of entry.

15  Q.   Right.  And we went through earlier that we don't really

16  know who is consuming services and who is not, right?

17  A.    I'm not sure that's -- I mean, we have to get to the Cuban

18  and Haitian issue, and then we do know who is consuming services

19  as Cuban and Haitians who have been paroled or otherwise

20  released.

21  Q.   Okay.  But even as for Cubans and Haitians, we don't know

22  if a Cuban or Haitian is consuming services.  We know that

23  they're Cuban or Haitian, right?

24  A.   Uh-huh, yes.

25  Q.   And we may know if they were paroled, correct?

1    A.    Yes.

2    Q.    But we don't necessarily know when they were paroled, if it

3    was before a certain date or after a certain date, correct?

4    A.    No, we don't.

5    Q.    And we don't know where they entered the country?

6    A.    We don't track where they enter the country, correct.

7    Q.    Okay.  Now, expenditures made by the State of Florida to

8    fund programs overseen or administered by DCF are funded with

9    tax revenue, correct?

10   A.    Of some sort or another, they're -- yes.

11   Q.    And in the state of Florida, tax revenue, a lot of it comes

12   from sales taxes, correct?

13   A.    Yes.

14   Q.    And you also pay property taxes here in the state of

15   Florida, correct?

16   A.    Most property taxes go to local government, but this is not

17   my area of expertise.

18   Q.    Fair enough.  But some -- some property tax does, in fact,

19   go to the State; isn't that correct?

20           THE COURT:  I'm not sure that's correct.

21   BY MS. FUDIM:

22   Q.    If you don't know, you can say you don't know.

23   A.    Yeah, I don't believe that's correct, but -- unless you

24   consider water management districts and everything as entities

25   of the state.

GROGAN - DIRECT

1  Q.   And in the state of Florida there's also various fees for

2  services?

3  A.   Yes.

4  Q.   Right.  Like marriage licenses if you get married, right?

5  A.   Yes.

6  Q.   Driver's licenses if you get a driver's license, right?

7  A.   Yes.

8  Q.   Okay.  And various occupations in the state of Florida

9  require licensing by the State, right?

10 A.   Not my area of expertise, but I assume so.

11 Q.   Okay.  And applicants for admission paroled into the

12 country who settle in Florida and make purchases in stores, fair

13 to assume that they're paying sales tax like everybody else?

14 A.   Again, not my area of expertise, but I would assume so.

15 Q.   Okay.  So not only do you not know what costs the State has

16 incurred from applicants for admission paroled at the southwest

17 border since January of 2021 with relation to services provided

18 by your office, you also can't tell us whether that cost is

19 greater or lesser than any revenue derived from that same

20 population; fair to say?

21 A.   Certainly that's not something I can provide to you.

22 Q.   Okay.  Fair enough.

23        So is it fair to say that if the policies and alleged

24 policies challenged in this lawsuit, to the extent you're even

25 familiar with them, were terminated or otherwise altered, you

GROGAN - CROSS

1    can't tell us how that would affect your dollar-for-dollar

2    costs, if at all, correct?

3    A.    Again, certainly I couldn't.

4    Q.    Okay.  Thank you.

5            MS. FUDIM:  I have nothing further, Your Honor.

6            THE COURT:  All right.

7            MS. FUDIM:  I would -- if the Court wants to take

8    judicial notice, I do have the statutes that provide the $18,000

9    roughly -- or the figures for how much money -- I'm not sure

10   it's entirely relevant, but I do have statutes.

11           THE COURT:  I think the witness agreed with you that

12   that's the ballpark number.

13           MS. FUDIM:  Okay.  Thank you, Your Honor.  I have

14   nothing further.

15           THE COURT:  Ms. Patel.

16                         **CROSS-EXAMINATION**

17   BY MS. PATEL:

18   Q.    Good morning, Ms. Grogan.

19   A.    Good morning.

20   Q.    So I just want to make sure that I'm clear on a few issues.

21   So generally speaking, Cubans and Haitians who arrive through

22   the southwest border and are granted parole are eligible for

23   economic self-sufficiency benefits so long as they meet the

24   specific program requirements, correct?

25   A.    Correct.

1    Q.   So that would include food assistance?

2    A.   Yes.

3    Q.   And cash assistance?

4    A.   Yes.

5    Q.   Okay.  And they're also eligible to receive those benefits

6    regardless of how long ago they were granted parole, correct?

7    A.   Yes.

8    Q.   Okay.  So a Cuban or Haitian who entered the southwest

9    border and was released on parole, say two weeks ago, and made

10   their way to Florida, they would be eligible for SNAP benefits;

11   is that right?

12   A.   Yes.

13   Q.   They would also be eligible for TANF benefits?

14   A.   Yes.

15   Q.   And for Medicaid?

16   A.   Assuming they meet all the other qualifications, yes.

17   Q.   Okay.  And that's the same for Medicaid?

18   A.   Yes.

19   Q.   Okay.  And so Cubans and Haitians who entered and were

20   otherwise released pending their removal proceedings, they're

21   also eligible for those same benefits; is that accurate?

22   A.   Yes.

23   Q.   All right.  And again, there's no time restriction as it

24   relates to their immigration status?

25   A.   Correct.

GROGAN - CROSS

1  Q.   So if they crossed the border two weeks ago and came to

2  Florida, those Cubans and Haitians would be eligible if they

3  were released pending their removal proceedings?

4  A.   Correct.

5  Q.   Okay.  And so is it fair to say that with regard to -- with

6  regards to Cubans and Haitians, that because there is no time

7  restriction as relates to their immigration status, that they

8  comprise most of the noncitizens that receive ESS benefits?

9  A.   That's a little broad because that would include any lawful

10 permanent -- the whole group of lawful permanent residents.  I

11 would say it certainly is correct as it relates to the people

12 who have paroles.

13 Q.   Okay.  All right.  And as part of your job duties with the

14 refugee program, do you have some understanding as to the number

15 of Cubans and Haitians who consumed services and benefits?

16 A.   Yes.

17 Q.   And so is it true that approximately 153,000 Cubans and

18 Haitians who entered the country between October 1 of 2021 and

19 September 30th of 2022 received benefits or services in Florida?

20 A.   Through the refugee program services or benefits, yes.

21 Q.   Okay.  And those same 150,000 Cubans and Haitians would

22 also be benefits for programs such as SNAP if they meet the

23 program eligibility requirements?

24 A.   Yes.

25 Q.   Okay.  And it's likely that at least some of those Cubans

1    and Haitians are receiving ESS benefits, correct?

2              MS. FUDIM:  Objection.

3              THE COURT:  Rephrase that, please.

4    BY MS. PATEL:

5    Q.   So you said that Cubans and Haitians are eligible -- those

6    Cubans and Haitians, those 150,000 Cubans and Haitians who

7    entered between October 1, 2021, and September 30, 2022, would

8    be eligible for SNAP benefits for instance, correct?

9    A.   Yes.  Assuming they meet the other criteria, yes.

10   Q.   Okay.  And do you know if any of those Cubans and Haitians

11   are, in fact, receiving SNAP benefits?

12   A.   We -- what I -- I am having trouble answering the question

13   because we didn't pull the data in that way because the data

14   that we pulled and provided was prior to that, had very little

15   crossover with that time period.  But the Cubans and Haitians

16   who file a request for assistance to receive refugee cash and

17   refugee medical assistance, the same application is for SNAP,

18   and most people check both boxes and would receive -- would be

19   eligible and receive both benefits.

20   Q.   Okay.  So it's likely that they would also receive SNAP

21   benefits if they --

22             MS. FUDIM:  Objection.

23             THE COURT:  How do you know that the Cuban or Haitian

24   entered between those dates?

25             THE WITNESS:  For the refugee program, we track the

1   entry date because that is the -- there's a time frame of

2   eligibility for refugee services and benefits that starts with

3   their date of entry.  So we don't track it for the SNAP and TANF

4   and Medicaid programs, but we do track it for the refugee cash

5   and medical assistance and the refugee program.  So we do record

6   on a monthly and annual basis the date of entry.  So the

7   139,000, or whatever the number was that you gave us, was for

8   that period of October 1st through September 31st of 2022.

9          THE COURT:  But again, you don't know where they

10  entered, you just know they did enter?

11         THE WITNESS:  Correct.

12         THE COURT:  Gotcha.

13         And so your question was what, Ms. Patel?

14         MS. PATEL:  I was asking whether it's likely that some

15  of those Cubans and Haitians that entered, some of those

16  153,000, is it likely they're also receiving economic

17  self-sufficiency benefits such as SNAP?

18         MS. FUDIM:  And I object to that, Your Honor.

19         THE COURT:  I'll allow her to answer, and you can

20  explore the basis for that knowledge on redirect.

21         You can answer.

22         THE WITNESS:  Okay.  Yes, it's likely.

23  BY MS. PATEL:

24  Q.   Okay.  And you were also asked about residential mental

25  health services that are provided to noncitizens.  Do you recall

1    that?

2    A.    Yes.

3    Q.    All right.  And again, those services are available to

4    anyone regardless of their citizenship status; is that accurate?

5    A.    Correct.

6    Q.    So if someone, an alien were to cross the southwest border

7    and be released by the federal government, either through parole

8    or some other release mechanism pending their removal

9    proceedings, and they made their way to Florida and they were in

10   need of residential mental health services, Florida would

11   provide those services; is that correct?

12   A.    Yes.

13   Q.    And Florida would bear the costs of those services; is that

14   accurate?

15   A.    Yes.

16   Q.    And if that same alien was released and needed community

17   mental health services, would the State provide those services?

18   A.    Yes.

19   Q.    And the State would bear the costs of those services?

20   A.    Yes.

21   Q.    And if that same alien were to come to Florida and need

22   domestic violence services, would the State provide those

23   services?

24   A.    Yes.

25   Q.    And would they provide those services and bear the costs of

1    those services?

2    A.   Yes.

3           MS. PATEL:  All right.  I have no further questions.

4           THE COURT:  All right.  Ms. Fudim.

5           MS. FUDIM:  Yes, Your Honor.  Thank you.

6                      **REDIRECT EXAMINATION**

7    BY MS. FUDIM:

8    Q.   Okay.  You told the judge in response to his question

9    regarding data tracked by the State of Florida with regard to

10   date of entry on parole, that that information is not tracked

11   for TANF, SNAP, Medicaid, and you may have mentioned other

12   programs; is that correct?

13   A.   Correct.

14   Q.   You told us that it's tracked only with regard to the

15   Refugee Assistance Program?

16   A.   It is tracked in the Refugee Assistance Program, yes.

17   Q.   And just to recap from earlier, a hundred percent of the

18   refugee programs are federally funded, correct?

19   A.   Correct.

20   Q.   Okay.  And you were asked a series of questions by

21   Ms. Patel regarding if an alien comes to Florida and needs

22   mental health services would Florida provide those services.

23   A.   Yes.

24   Q.   And if the alien needs medical -- emergency Medicaid

25   services, would Florida provide those services, correct?

1    A.    Yes.

2    Q.    And if such an alien paroled at the southwest border came

3    to Florida and needed domestic violence services, would Florida

4    provide those services, and you said yes.  And then you were

5    asked would Florida bear those costs, and you said yes.

6              Have I summarized that more or less?

7    A.    I think so, yeah.

8    Q.    Okay.  But you can't tell us sitting here today whether

9    Florida has provided those services to applicants for admission

10   who are paroled by the federal government at the southwest

11   border since January 1st of 2021, correct?

12   A.    That's correct.

13   Q.    Okay.  And when you tell us that it's likely that some

14   Cubans or Haitians paroled at the southwest border since January

15   of 2021 have consumed such services, that's based solely on the

16   number of Cubans and Haitians that you're aware of in the state

17   who are obtaining services, correct?

18   A.    I wouldn't say it's only based on that.

19   Q.    What else would you say it's based on?

20   A.    Well, periodically we will get calls escalated to our

21   office of an individual who is having trouble getting their

22   benefits and that we will have to assist them.  And I can

23   certainly indicate that I have, on more than one occasion, had a

24   Cuban or a Haitian client who's been here since 2021 who has

25   received SNAP assistance who needed assistance.

1   Q.   Okay.  But you don't know where that individual crossed

2   into the United States?

3   A.   I do not.

4   Q.   Right.  So there is no data from which we can infer that

5   Cubans or Haitians paroled at the southwest border since January

6   of 2021 are consuming these benefits, correct?

7   A.   That's correct.

8            MS. FUDIM:  Nothing further, Your Honor.

9            THE COURT:  Thank you, ma'am.  Thank you for being

10   here.  You're released from your subpoena and free to go.

11        *(Witness excused.)*

12            THE COURT:  Any further witnesses from the Federal

13   Government?

14            MS. FUDIM:  No further witnesses on behalf of defense.

15            MS. PATEL:  Is the witness released?

16            MS. FUDIM:  Yes.  I'm sorry.  Thank you.

17            THE COURT:  All right.  Any rebuttal case from the

18   State?

19            MR. GUARD:  Briefly, Your Honor.

20            THE COURT:  Okay.

21            MR. GUARD:  Your Honor, I've already provided

22   Mr. Darrow with copies of what we're going to discuss.  The

23   State is going to ask to enter part of one exhibit that I'm

24   going to substitute that you haven't admitted yet and then

25   judicial notice of two items.

1          Before, Your Honor, we talked about Exhibit 64, which
2    was the Department of Homeland Security regulation about
3    apprehension processing care and custody of alien minors and
4    unaccompanied children.  I think you returned it to us.
5          THE COURT:  Okay.
6          MR. GUARD:  And that was -- if you'll recall, a
7    144-page document.  We only want -- we have two pages.  It's
8    actually one sentence in the document that we are seeking to
9    enter into evidence from that document.
10         THE COURT:  This was the Federal Register notice?
11         MR. GUARD:  Yes, Your Honor.
12         THE COURT:  Okay.  I vaguely remember it.
13         MR. GUARD:  Okay.  And it's at the bottom of page --
14   the portion that we're seeking to enter and I can -- if Your
15   Honor doesn't want to enter the exhibit, I would ask you to take
16   judicial notice -- is on page 44.  I believe it's 05 -- in the
17   copy I have.
18         4401, third column over, bottom of it, and it's just
19   talking about the *Flores* decision and *Flores* agreement.  And
20   this is why it's relevant, because we had testimony from
21   Mr. Guadian about how long it takes to process credible fear and
22   for expedited removal of non-UAC children, and it's 20 days.
23         So that's the limited purpose we are seeking to enter
24   Exhibit 64.
25         THE COURT:  All right.  Do you have a copy of it?

1          Any objection to that?

2          MR. DARROW:  Your Honor, I think it would be very

3   difficult for us to argue about judicial notice of the Federal

4   Register.  The filing -- although I will point out that the

5   response here is in 2015.  So things might have changed

6   substantially since 2015 in terms of processing time.

7          THE COURT:  That goes to the weight rather than -- and

8   I'm sorry.  Tell me again --

9          MR. GUARD:  2019.

10         THE COURT:  -- exactly where --

11         MR. GUARD:  Page 4401, third column, bottom of the

12  page.  It's the last sentence on the page.  In the decision,

13  it's talking about the *Flores* decision, the court referenced and

14  then it continues on to the -- there's one word on the next page

15  which is removed -- expedited and then the last word is

16  "removal," period.

17         THE COURT:  I'm going to highlight that just so I know

18  what you think is pertinent.

19         So do I need the cover page in there?

20         MR. GUARD:  The only reason the cover page was there,

21  Your Honor, was because it shows it's from the Department of

22  Homeland Security and it -- but if Your Honor does not want the

23  cover page --

24         THE COURT:  I'll put the cover page on it.

25         All right.  Then I heard no objection?

1          MR. DARROW:  No objection.  We just wanted to note

2     that the *Flores* regulations have been partially enjoined through

3     other litigation.  I'm not sure how that would pertain to this

4     line that Florida's counsel cites.  We just wanted to note that

5     context, Your Honor.

6          THE COURT:  I'm sensing a theme here that they're

7     competing injunctions.  I think, Justice Kagan --

8          MR. GUARD:  It was Justice Kagan, Your Honor.

9          THE COURT:  -- in the most recent argument at the

10    Supreme Court was lamenting the fact that immigration policy is

11    being made by competing red state/blue state lawsuits.  And I

12    guess if we had a Congress that would do its job, that wouldn't

13    be necessary, but it appears that it is.

14         MR. GUARD:  The second thing, Your Honor, it kind of

15    goes to the same point.  We're asking you to take judicial

16    notice of 8 CFR Section 1003.42(e).  If I can approach, I'll

17    show Your Honor.

18         May I approach?

19         THE COURT:  Yes, sir.

20         MR. GUARD:  And this one, Your Honor, I have

21    highlighted the portion that I would like the Court to take

22    judicial notice.  And this is dealing with credible-fear

23    determinations.  And according to DHS regulation, "The

24    immigration judge shall conclude the review to the maximum

25    extent practicable within 24 hours, but in no case later than

1    seven days, after the date that the supervisory asylum officer

2    has approved the asylum officer's negative credible-fear

3    determination issued on the record of negative credible-fear

4    finding and request for review."

5          THE COURT:  All right.  I guess any objection to me

6    taking judicial notice of this regulation?

7          MR. DARROW:  To the extent that it's the current

8    operative regulation, which we haven't had a chance to check

9    now, but I would take, you know, Florida's word on that, we just

10   wanted to point out that this regulation is actually issued by

11   the Executive Office of Immigration Review, not defendants in

12   this case.

13         THE COURT:  All right.  Y'all can argue to me what the

14   significance of it is.  I mean, I assume Florida is going to

15   argue that that decision is made very quickly, at least on

16   paper.  Whether it really happens that quickly is probably a

17   whole nother question but it's an official -- accepting

18   Florida's representation that that is the current and official

19   version of 8 CFR 1003.42 I think is something I can properly

20   take judicial notice of and will.

21         MR. GUARD:  And the last point, Your Honor, is in the

22   State of Texas v. Biden, the Department of Justice on behalf of

23   its clients, which include defendants here, filed a monthly

24   report for April 2022, and in it -- and so that's case number,

25   so the record, is 2:21-CV-67.  And in Docket Entry 139-1, the

1  Department of Justice on behalf of its clients indicated that in

2  April of 2022 the Office of Field Operations paroled 48,429

3  individuals into the country.

4          Mr. Davies said he didn't know when he was asked, and

5  so we just ask you to take judicial notice of that fact.

6          THE COURT:  All right.  Any objection to that?

7          MR. DARROW:  No, Your Honor.

8          THE COURT:  All right.  I'll take judicial notice of

9  that fact in that court file document.

10         MR. GUARD:  With that, the State has nothing further,

11  Your Honor.

12         THE COURT:  All right.  Why don't we do this --

13         MS. RYAN:  Your Honor?

14         THE COURT:  Yes, ma'am.  I'm sorry.

15         MS. RYAN:  A few things.  Now that the plaintiff has

16  officially rested --

17         Is that correct?

18         MR. GUARD:  We're doing a rebuttal case, but I guess

19  we never asked if the defendants rested.

20         THE COURT:  They did.

21         MR. GUARD:  Oh.

22         THE COURT:  You have.  So we're at the end of that.

23         MS. RYAN:  Just to confirm, Your Honor, defendants

24  have a Rule 52(c) motion that we would like to make, and we can

25  keep it brief, and then defendants would also just ask for a

1   brief break before we go into closing arguments.

2           THE COURT:  Okay.  I was going to do the latter first,

3   but I'll go ahead and hear --

4           MS. RYAN:  Sure.  I'll turn it over to Mr. Darrow.

5           MR. DARROW:  Your Honor, we'll keep this brief because

6   we're about to rehash this all in a few minutes in our closing,

7   but we will move for judgment at the close of plaintiff's

8   evidence.  They have now been heard, and they have failed to

9   carry their burden of establishing by a preponderance of the

10  evidence that either Florida has standing or that defendants

11  have a, quote, nondetention policy that violates the law.

12          You've heard from various Florida witnesses as well as

13  stipulations in the record, they cannot trace the costs incurred

14  by their agencies to any applicants for admission who have been

15  released under parole or conditional release or the other

16  practices challenged in this case, so they can't establish

17  traceability, which is one of the requirements of standing,

18  injury in fact traceable to defendants' conduct and likely to be

19  redressed by the Court.

20          Plaintiff has also failed to offer any evidence

21  showing that a favorable ruling by this Court would redress

22  those costs for the same reason since they don't really know how

23  many of the noncitizens who are at issue are showing up, and

24  they don't know how many costs are attributable to them.  They

25  can't say if changing, you know, the rate of the noncitizens

1   showing up would alter or eliminate those costs.

2          And then as for the merits, Florida has failed to

3   establish that there is a nondetention policy that violates the

4   law.  The number of people released on parole or on recognizance

5   has no bearing on whether those release decisions are lawful.

6   Florida's evidence has not shown that there is a coherent policy

7   at all, just disparate actions by different DHS subagencies that

8   Florida disagrees with.

9          But under *Lujan* and a host of other Supreme Court

10  cases, you cannot challenge an administration's approach to an

11  issue wholesale and amalgamate disparate actions into a

12  cognizable APA case.

13         Further, Florida has not made a prima facie case that

14  defendants are violating 8 U.S.C. 1226(a), under which

15  defendants have unqualified discretion to release noncitizens in

16  removal proceedings on bond or recognizance.

17         And as to the noncitizens considered under 8 U.S.C.

18  1225(b), Florida has offered nothing to show that their release

19  does not comport with the parole statute which requires a

20  release on a case-by-case basis for an urgent humanitarian

21  reason or safety and public benefit.

22         Florida has offered no evidence to show that those

23  determinations are not being done on an individualized

24  case-by-case basis and that there aren't significant public

25  interests at stake and motivating the releases.

1          I'm keeping it short because I don't want to waste

2   Your Honor's time.  We're about to go through all those points

3   again.

4          THE COURT:  Right.  All right.  Well, what I'm going

5   to do, Mr. Percival, is take that motion under advisement and

6   allow you as part of your argument and my questioning to address

7   his concerns -- or his issues that he's raised.  But you

8   preserved that for the record.  I'll hear the argument and deal

9   with it after that.

10         All right, let's take maybe 15 minutes at this point,

11  then we'll come back and hear robust oral argument/discussion

12  and see where that leaves us.

13         MR. DARROW:  Thank you, Your Honor.

14     *(Recess taken from 10:20 a.m. to 10:39 a.m.)*

15         THE COURT:  Y'all can be seated.

16         All right.  Mr. Percival, I'm going to try to do what

17  the Supreme Court has been doing lately, give the advocate an

18  opportunity to say something that they prepared before I jump in

19  with questions, but I can't promise you that's what's going to

20  happen.  But the floor is yours.

21         MR. PERCIVAL:  Understood, Your Honor.  And I only

22  have about three sentences that I was hoping to get out.

23         THE COURT:  Okay.

24         MR. PERCIVAL:  So the Department of Homeland Security

25  has created and is implementing a nondetention policy.  The

1    basis for that policy is a preference by this administration not

2    to detain migrants unless they meet certain very narrow public

3    safety categories.

4            So I want to talk about four things today, Your Honor.

5    I'm about to lay out the order that I plan to proceed in.  If

6    Your Honor wants to go in a different order, that's totally fine

7    with me.

8            So I want to talk first about the facts that

9    demonstrate that the nondetention policy exists, and I want to

10   point Your Honor to what I think are a few distinct categories

11   of evidence, what I think the most important evidence is and the

12   page numbers, and I may even pull those up on the screen if that

13   would be helpful to Your Honor.

14           And then the second thing I want to talk about is why

15   we believe that policy is unlawful.  I think there are a few

16   different things we have to talk about there because we have

17   this question about when Section 1225 applies and when

18   Section 1226 applies.  We have questions about 1182, and I want

19   to deal some of those because I think Your Honor might benefit

20   from some more legal argument on that, although we did brief

21   that at summary judgment.

22           Next I want to address the validity of the Parole Plus

23   ATD on the administrative record.  And then finally I want to

24   close with talking about Florida's standing.

25           Now, again, if Your Honor prefers to go in a different

1    order, that's totally fine with me.

2              THE COURT:  Let's go in the order you wanted to go.

3              MR. PERCIVAL:  That works for me, Your Honor.

4         So starting with the evidence that the nondetention

5    policy exists.  As I said, I think we can kind of break this

6    into categories.  We gave Your Honor some longer documents, but

7    one of the things I want to show Your Honor is that for most of

8    the budget documents, which are the longer documents, we're

9    relying on essentially one to two pages of those documents, and

10   I think we can sort of trim down the record for Your Honor a bit

11   as we talk.

12        So I talked about categories of evidence, and I think

13   we can talk about them in kind of four categories.  So Category

14   Number 1 is the numbers themselves.  Now, we're not saying that

15   numbers alone are sufficient to infer a policy, but we think

16   they are corroborative and we think when we look at the rest of

17   the evidence along with the numbers, there are inferences Your

18   Honor may draw.

19        The second category of evidence is statements by

20   senior officials.  The third categories are actions taken that

21   made releases inevitable.  And then the final category are new

22   or changed release mechanisms that were completely

23   unprecedented.

24        I want to start with the numbers, as I said.

25             THE COURT:  Let me stop you right away then.  I guess

1    my biggest obstacle or hurdle with respect to this nondetention

2    policy is that there's nothing -- there's no piece of paper,

3    that typically these cases involve some executive order, some

4    memorandum, some something that you can put your hands on and

5    you can touch, and that is what is being challenged.  And so

6    that's agency action.

7         And that's the biggest struggle I'm having with this

8    nondetention policy concept, that there are -- you have to glean

9    it from four categories of information.  And so help me overcome

10   the fact that what we're not just talking about here is policy

11   preferences that amalgamate into this bad outcome that we're

12   seeing.

13        MR. PERCIVAL:  Yes, Your Honor, and I agree.  If all

14   it were is just we don't like an amalgam of policies and we're

15   trying to put them together, I think that would be a different

16   case.  What we're alleging is the existence of an unwritten

17   policy.  And I have never heard defendants' contest that an

18   unwritten policy is subject to APA challenge.  We've cited at

19   various times in this case D.C. Circuit precedent that says that

20   unwritten policies can be challenged.

21        And we cited the *Damus v. Nielsen* case, which is

22   actually just a District of DC case.  I think it's illustrative

23   because it kind of shows -- I don't want to say the inverse,

24   but -- a different situation under a different administration

25   where the allegation was essentially that the Trump

1   Administration substantially narrowed exercises of parole

2   without putting it in writing, and that District Court decision

3   said it's pretty clear there's an unwritten policy going on here

4   and it reviewed that policy.

5           And I think maybe there's a hypothetical.  This is

6   just one I've been playing with, Your Honor, that might sort of

7   illustrate the point.  So think about the *DACA* case from a few

8   Supreme Court terms ago.  You know, a very prominent case Your

9   Honor is most likely familiar with at least some of the minimal

10  facts of that case.  But just imagine hypothetically that

11  instead of signing -- Jeff Sessions signing the Sessions memo

12  and then Secretary Duke signing the Duke memo.  Imagine instead

13  that President Trump called Secretary Duke on the phone and

14  said, Stop granting new DACA applications but don't put it in

15  writing.  I don't think anyone would disagree that that would be

16  subject to the same form of judicial review as the written

17  policy.

18          So to Florida, the question is just are we correct

19  based on all the facts that there is an unwritten policy in this

20  case.  And so that's why I think it's not a legal barrier; it's

21  the facts, and I want to sort of walk through those facts.

22          THE COURT:  But I guess in that hypothetical, the

23  unwritten policy is discrete, identifiable, and articulable.

24  And that's what I'm having trouble understanding:  What is the

25  policy, what are you saying is the policy.  Is it -- I mean, it

1    isn't we're not going to detain anybody because they are

2    detaining people.  So what is -- in a sentence, what does the

3    policy say?

4          MR. PERCIVAL:  The policy is we are not going to

5    detain individuals unless they fall into the Secretary's -- as

6    he articulated in the videos we showed, these very narrow public

7    safety categories.  So I think the videos we played at the

8    beginning, those are Exhibits 61 and 62, the Secretary is very

9    express about this.  He says he doesn't want to use detention

10   unless the person is a public safety risk or they're unlikely to

11   appear for their immigration proceedings.

12         And Section 1225, as I think Your Honor has already

13   held, has a very different standard.  And so it's this policy of

14   putting people on alternatives to detention or nothing as

15   opposed to detaining them and applying these criteria that are

16   not the statutory criteria.

17         THE COURT:  What number was the Pekoske memo?

18         MR. PERCIVAL:  The Pekoske memo?

19         THE COURT:  Pekoske memo.

20         MR. PERCIVAL:  16, Your Honor.

21         THE COURT:  And I guess one question I have in looking

22   at that evidence, because that's -- that's the policy it sounds

23   like what you're saying, isn't it?

24         MR. PERCIVAL:  We're not saying that we're challenging

25   the Pekoske memo.

1          THE COURT:  No, no, not challenging it, but that's the

2     embodiment of the policy, that is the category of people that

3     you say the policy says detain those people, everybody else you

4     don't have to.

5          MR. PERCIVAL:  I think that is one embodiment of it.

6     I think it's one piece of evidence that reflects what the

7     preferences are.  And you heard Chief Ortiz essentially say that

8     that was what he understood, that he understood that he was only

9     being told -- that mandatory detention applied to the sort of

10    priorities, so to speak.

11         THE COURT:  Right.  But I guess my question is if

12    that's the case, Category 2 of the Civil Enforcement Guidelines

13    is individuals apprehended at the border of entry while

14    attempting to unlawfully enter on or after November 1st, 2020,

15    or who were not physically present on or before November 1,

16    2020.

17         So if I'm reading that right, one of the Civil

18    Enforcement Guidelines, one of the people that they would

19    mandatorily detain under this policy are most of these folks

20    that have come in across the border.

21         MR. PERCIVAL:  And that's exactly why we're just using

22    this to kind of inform what they mean by the public safety

23    priorities, which is a narrower category within the Pekoske

24    memo.  Because it's very clear from the evidence that -- and

25    from Mr. Ortiz's testimony that they are not applying that

1    border security priority to the decision whether to detain.

2              And that's why we think there's a different unwritten

3    policy that the Pekoske memo may shed some light on.  But the

4    unwritten policy is at the border the people we want to detain

5    are these -- what they believe to be public safety risks, and

6    everybody else we want to put on alternatives to detention or

7    otherwise release them because we -- as a policy matter we

8    disagree with detaining them.

9              THE COURT:  But I'd have to glean that -- the various

10   things that are written down and the reason that I ultimately

11   allowed this memo to be admitted was because it was incorporated

12   by reference into the Notice to Report, the Parole Plus ATD

13   policy, the prosecutorial discretion memo, all those things,

14   that they essentially reference back to this and said these are

15   the standards to apply.

16             Maybe they're not applying those standards and maybe

17   that's your argument, but I guess I'm struggling to understand

18   how all of the written documentation I have about what this

19   policy is seems to say detain these folks, but you're saying,

20   well, the reality is they're ignoring all this directive, if I'm

21   understanding your argument correctly.

22             MR. PERCIVAL:  Well, I think you heard Chief Ortiz to

23   say that that's not what he understood the directive to be on

24   cross-examination.  He understood the directive to be that the

25   only people they have to detain are sort of public safety risks,

1    not what we call the border security risks.  But I think maybe

2    it may make sense for me to just start walking through some of

3    the evidence I planned to walk through to sort of demonstrate

4    some of these points.

5         THE COURT:  Let me ask, really, the $122 billion -- or

6    whatever the number was that Mr. Darrow or Ms. Ryan, or whoever

7    it was, had the witness doing the math on or didn't make them do

8    the math on.  I mean, the reality of the situation is this

9    administration, the prior administration, and no administration

10   could comply with the letter of the immigration statute.  Is

11   that a fair statement?

12        MR. PERCIVAL:  I'm not sure it is, Your Honor, and

13   that's part of the evidence I was planning to show you, so maybe

14   we should just -- maybe we should just go right into that

15   evidence.

16        THE COURT:  Okay.

17        MR. PERCIVAL:  Ms. Gerdts, can you pull up Exhibit 2

18   and turn to page 20.

19        And so if you see this chart at the bottom, I think it

20   does run into page 3, this is Border Patrol apprehensions by

21   processing disposition.  It shows the last few months of the

22   Trump Administration and the first few months of the Biden

23   Administration.  And you can see right there down at the bottom,

24   the second column from the bottom, that's the Notice to

25   Appear/Order of Recognizance and I-385 released categories.

1            So the way we understand this, and I believe some of

2    the witnesses agreed with this, Notice to Appear/Order of

3    Recognizance, we've talked about that.  I-385 is actually the

4    Notice to Report.  So this is sort of adding together both of

5    these releases and it's showing the number.

6            And, Ms. Gerdts, if you'll turn to the next page,

7    there's this other category.  And as you'll see in the footnote,

8    Your Honor, any paroles that were performed by Border Patrol

9    would fall into that category.  So we don't have a lot of

10   information about what those releases are, but even assuming all

11   of those are parole, it looks like we have between 1 and 200

12   there.

13           And, Ms. Gerdts, go back a page.

14           And about 20, 13 and 17 in President Trump's last full

15   month in office.

16           So I think it is technically accurate that the

17   previous administration did not detain all illegal border

18   crossers, but they were doing 99 percent of the work, Your

19   Honor.  I mean, we don't -- we don't know exactly why these

20   particular individuals are released, but Chief Ortiz said that

21   they were only authorized to release illegal border crossers

22   under very exigent circumstances.  So the undisputed evidence in

23   the case would tell you that these numbers represent minimal

24   situations where very exigent circumstances caused a release.

25           And I think I want to anticipate two questions that

might come up from this data.  So question number one that you

might ask from this data is what about COVID-19.

So, Ms. Gerdts, can you pull up Exhibit 1, please, and

flip to page 4.

So we actually have this data all the way back -- I

think DHS did not begin reporting this data in this format until

2020, but we know that even before Title 42 and issues related

to the COVID pandemic you can see the numbers in those last two

months were 76 and 91.  The other number's admittedly slightly

higher, 398, but nowhere near what we're talking about under

this administration.

And then I want to anticipate a second question that

Your Honor might ask, which may be is this really driven by the

apprehension numbers and not something else.  And this is very

important.

So if you look at this chart, February 2020, what you

will see is 30,000 apprehensions, 91 releases.

Okay.  Ms. Gerdts, please go back to Exhibit 2, and

we'll go to page 2 on that.  Actually go to page 3, sorry.

So as I just said, in February of 2020, we had 30,000

apprehensions and only a handful of releases.  Now go to

February 2021.  You can see there at the top of the screen, the

number of apprehensions is 25,000.  So in February of 2020, the

number of apprehensions as compared to February 2021 was

actually 20 percent higher.

1    So President Trump's Administration pre-COVID-19 had a

2    monthly apprehension number of 30,000, and they were still

3    overwhelmingly complying with the mandates of the immigration

4    laws.  But if you look at the releases -- please go back a page,

5    Ms. Gerdts -- the spike that occurred under President Biden had

6    already begun.

7    So December 2020, 17; January 2021, 1,321.  And we can

8    assume, or I think it's reasonable to infer from the facts, that

9    that was the last ten days of that month.  And you get into

10   February 2021 where the traffic levels are still at a level that

11   the Trump Administration had no problem managing, and you see

12   almost 9,000 releases.

13   So again, the data is not enough alone.  What the

14   defendants are going to tell you is that these are situations

15   beyond their control.  There was no change in policy.  All that

16   happened is that more people came to the border.  But what these

17   data tell you is that the release change preceded the traffic

18   change.

19   THE COURT:  I think the evidence was pretty clear that

20   there was a change in approach.  Frankly, I don't think it

21   should surprise anybody.  That was what the Candidate Joe Biden

22   said he was going to do on the campaign trail, said he was going

23   to do in the exhibit I received, and in fact did it.  I don't

24   think that is particularly surprising because you have a new

25   administration, you have new priorities, and that's just how the

1   process works.

2           And so -- and I think the evidence persuades me,

3   subject to the argument I'm going to hear, that it's a cause and

4   effect and they knew it was a cause and effect.  But again, I'm

5   still struggling to understand, does the APA contemplate that

6   type of practice change being reviewable judicially.

7           MR. PERCIVAL:  I think the question is whether it is

8   an unwritten policy, and we believe that it is.  And I think

9   there are other writings that corroborate the existence of the

10  unwritten policy.  I want to show Your Honor another one.  We

11  admitted into evidence -- or you admitted into evidence on our

12  motion Exhibit 53 -- which was the Biden executive order that

13  rescinded a number of other executive orders, and we put those

14  other executive orders into evidence.

15          Ms. Gerdts, can you please turn to Exhibit 54.  And

16  please turn to page 3.  And just for the Court's benefit, can

17  you enlarge Section 6 at the top, that entire paragraph.

18          So this was a President Trump executive order that

19  said, "The Secretary shall immediately take all appropriate

20  actions to ensure the detention of aliens apprehended for

21  violations of immigration law pending the outcome of their

22  removal proceedings or their removal from the country to the

23  extent permitted by law."  And then it goes on to refer to this

24  colloquially as "catch and release."

25          So one of the first things that President Biden did is

1    he rescinded an executive order that said please stop catch and

2    release.  Now, under the APA, you don't review the President's

3    actions.  You review their implementation by agencies.  And we

4    think this rescission is another piece of corroborative evidence

5    that there was a policy of nondetention.  And I think --

6              Ms. Gerdts, can you actually pull up Exhibit 53.

7              This is the Biden executive order.  And if you turn to

8    page 4, this is where you see the rescission of President

9    Trump's executive order.

10             And Ms. Gerdts, do you see about two-thirds of the way

11   down there, there's a paragraph with a big G.  Can you just

12   highlight that.  Just up until the B, so just that four lines.

13   That's fine.  That's fine.

14             So it says:  "The Secretary of State and the Attorney

15   General and the Secretary of Homeland Security shall promptly

16   take steps to rescind any agency memoranda or guidance issued in

17   reliance on or in furtherance of any directive revoked by

18   Section 4(a)(ii)(F) of this order."

19             So in other words, any guidance that had been sent to

20   the field that said comply with this executive order which

21   required them to honor the obligations of Section 1225,

22   instructions were supposed to come from the top all the way down

23   that they weren't to do that anymore.

24             THE COURT:  I didn't get any evidence, did I, that

25   there was such a directive, that there were specific guidance

1    memos or directives that were in place prior to January 2021

2    that pursuant to that provision of the executive order are

3    hereby repealed?

4         MR. PERCIVAL:  I think you did in part, Your Honor.

5    So Chief Ortiz testified both in his deposition and again on

6    cross-examination that under President Trump they were only

7    allowed to do parole and they were only allowed to release on

8    recognizance under very exigent circumstances.

9         THE COURT:  But there was no written policy to that

10   effect?

11        MR. PERCIVAL:  No, but he -- in the deposition

12   Mr. Guard asked how was that communicated to you, and he said we

13   had these weekly telephone calls and that's how the guidance was

14   sent to the field.

15        THE COURT:  Okay.

16        MR. PERCIVAL:  So we've already talked about this a

17   little bit, Your Honor.  But you also heard Chief Ortiz testify

18   that that's how he understood the executive order, that's how he

19   understood the instructions that he was getting that there was a

20   change in detention policy that.  Whereas previously they were

21   only to release people under very exigent circumstances, now

22   they were only being instructed to detain people that met

23   certain public safety priorities.

24        And I think that takes me to my third point, because

25   the way we see this case, there was an unwritten policy from the

1    top not to release.  And we've talked about some of the ways

2    they did that, but the other way they did that is they caused a

3    series of events that made release inevitable.  We talked about

4    the narrowing of pathways and the closing of detention centers

5    and reductions in detention capacity.  You saw some emails about

6    these.  I don't want to spend too much time those because I

7    think those are short and Your Honor is no doubt familiar with

8    them, but Exhibit 18 and 98 in particular are ones that we think

9    are very relevant.

10          But I want to talk a little bit about the reductions

11   in detention capacity and I want to talk about it for two

12   reasons.

13          So Ms. Gerdts, can you pull up Exhibit 25 -- actually,

14   scratch that.  Let's just go straight to Exhibit 28, page 48.

15   Excuse me.  Let's do Exhibit 26, page 44.

16          This same statement, Your Honor, that I'm about to

17   read is on Exhibit 26, page 44, and Exhibit 28, page 48.  It

18   actually occurs in both years of some of President Biden's

19   budget requests.  But the reason I want to show this to Your

20   Honor is because one of the defenses you're going to hear in

21   this case is that this is really about Congress.  This is up to

22   Congress; and Congress decides how much money they are going to

23   appropriate, and DHS just has to do what they can.

24          THE COURT:  Isn't that ultimately correct?

25          MR. PERCIVAL:  It is correct in a sense, Your Honor,

1    but let me show you the statement, and then we can talk about

2    kind of what the takeaway is here.

3          So they're asking for a reduction in detention, and

4    then they say --

5          And can you just highlight, yeah, that whole

6    paragraph.  Perfect.  Okay.

7          This is what Department of Homeland Security is

8    representing to the U.S. Congress.

9          Quote:  "A reduction in detention capacity level will

10   not impede ICE's ability to apprehend, detain, and remove

11   noncitizens that present a threat to national security, border

12   security, and public safety."

13         Now, Your Honor has already pointed out that when we

14   talk about the border security priorities, what that's supposed

15   to mean is all illegal border crossers.  So just to make clear

16   what we think DHS is doing.  DHS is telling Congress, We have

17   everything we need, please reduce our detention capacity.  And

18   then they are coming into this court and saying, This isn't our

19   fault.  Congress didn't give us enough to do our job.

20         And we don't think they should be permitted to argue

21   that, Your Honor.  If they need more resources, they should be

22   asking Congress for more, not making misrepresentations.

23         THE COURT:  Well, I guess their point, to play devil's

24   advocate, is even if Congress gave them everything that the

25   Trump Administration had asked for, the 55,000 or so many beds,

1    it really wouldn't have made a dent in the millions of people

2    that were coming.  What's your response to that?

3              MR. PERCIVAL:  I think my response is the numbers that

4    we walked through, Your Honor.  President Trump's administration

5    was enabled to ensure substantial compliance, and we saw the

6    compliance dip before we saw the numbers go up.

7              THE COURT:  Right.  But once the numbers went up, even

8    if they had the 55,000 beds or whatever they -- whatever the

9    Trump Administration asked for, whatever they -- even the number

10   they started with that has been reduced, it really wouldn't have

11   made a material dent after the surge happened, would it have?

12             MR. PERCIVAL:  Well, we think that if you apply the

13   law, the surges will go down, and Chief Ortiz affirmed that.  We

14   think part of the reason that an order in this case would make a

15   difference is because if you go back to the system Congress

16   created and start applying the appropriate standard, I think

17   Chief Ortiz testified very clearly that that would have an

18   affect on the flows.

19             Now, if Your Honor vacates their policy, are they

20   going to be able to the next day detain a hundred percent of

21   people crossing the border?  No, of course not.  But we don't

22   have to show complete redressability.  We have to show some

23   redressability, and we think we can certainly show that.

24             THE COURT:  So your argument, if I understand it and

25   probably oversimplifying it, is they brought the problem on

1   themselves by expressing a more lenient view of immigration

2   enforcement.  They then tied one hand behind their back by

3   cutting off various pathways to address the problem they've

4   created, and I should do something about that.

5           MR. PERCIVAL:  Yeah.  We think you should vacate that

6   policy, Your Honor.

7           Now, I do want to make sure we're talking about the

8   different release mechanisms, because I think part of what

9   happened in this case is what started may have been a

10  substantial increase in the 1226(a) releases.  You know, we saw

11  guidance as of March 2021 that they were using Section 1226(a)

12  on illegal border crossers, and then we see the Notice to Report

13  memo.  And then after Florida files this lawsuit -- not that I'm

14  saying it was the cause, but after we filed this lawsuit, we see

15  various iterations of different policies.  And all of these,

16  according to Chief Ortiz, are completely unprecedented policies

17  and release mechanisms that have never existed before.

18          THE COURT:  Well, I mean, that's fair to a point, but

19  the chief did testify that he and I think Mr. Scott came up with

20  this idea about using the I-385 because they did it 30 years

21  ago.  Am I misremembering that testimony?

22          MR. PERCIVAL:  That may be correct, Your Honor.  I

23  don't recall, but I don't remember what the -- I don't think

24  there was any testimony about the extent of the I-385 or who it

25  was being applied to.  But that may be correct, Your Honor.

1          THE COURT:  Which witness was it -- I think it was one

2     of the ICE witnesses, maybe Mr. Price, maybe somebody else --

3     who said he had never heard of NTRs before all this started?

4          MR. PERCIVAL:  I think Mr. Price affirmed that it was

5     something that Border Patrol made up.  I think that was the

6     statement that he agreed with.

7          THE COURT:  Okay.

8          MR. PERCIVAL:  And, Your Honor, I mentioned 1226.  I'm

9     going to get to that in a moment because I think one of the

10    disputes in this case is a legal dispute about whether

11    Section 1226 applies.  I'm going to get to that in a minute when

12    I finish talking about the existence of a nondetention policy.

13         THE COURT:  Your position -- just to cut to the chase

14    on that, your position is it doesn't apply because it's a

15    prerequisite to have a warrant issued before the discretion that

16    that statute gives kicks in?

17         MR. PERCIVAL:  I think that's a secondary position.  I

18    think our primary position is that it just doesn't apply.  And

19    maybe we should just go ahead and move on to that topic.

20         So Ms. Gerdts, can you please pull up the supplemental

21    administrative record.  And this is the first page of the Parole

22    Plus ATD memo.

23         So what I'm going to attempt to do here is demonstrate

24    to you that when Border Patrol takes custody of an illegal

25    border -- illegal border crosser for processing, that that

1    individual's detention is governed by Section 1225 and that it

2    continues to be governed by Section 1225 through the completion

3    of removal proceedings.  The warrant point is a secondary point

4    which we really thought was just corroborative of that position.

5            Now, I understand defendants have kind of changed the

6    story on the warrant piece, and so I want to start with this

7    broader point that just as a matter of statutory interpretation,

8    Section 1226 doesn't apply.  So let me attempt to do that, Your

9    Honor.

10            So Ms. Gerdts, if you can just highlight the entire

11   second paragraph.

12            So as I read this -- and you see that reference to

13   Section 1225 (a) on the fourth line down.  Well, let me just

14   start at the top of the paragraph.  It says, "Undocumented

15   noncitizens who are not expelled pursuant to Title 42" -- so put

16   Title 42 to the side -- and then at the end of the second line,

17   it says, "Are inspected by Border Patrol upon encounter

18   consistent with 8 U.S. Code Section 1225(a).  This is often

19   referred to as processing."

20            So, everyone in this case agrees that when Border

21   Patrol takes custody of an illegal border crossers and processes

22   them, it appears to be undisputed in this case that at that time

23   they are detained under Section 1225(a) not Section 1226.

24            THE COURT:  Does it matter -- I heard evidence from

25   the OFO people and the Border Patrol -- of course, they patrol

```
 1    different areas or are responsible for different areas, OFO for
 2    the ports of entry and the Border Patrol for people within
 3    entry.  I'm not sure if I heard direct testimony, but the
 4    inference that I had was that the folks showing up that are
 5    presenting themselves saying, I'm here, I want in, that's
 6    happening at ports of entry as compared to between ports of
 7    entry where the Border Patrol are encountering them and then
 8    administratively arresting them.  Either way they're still
 9    applicants for admission, but does that make -- did I hear any
10    testimony about that, and does that make a difference in your
11    argument?
12              MR. PERCIVAL:  I agree with what Your Honor said,
13    which is that the definition of applicants for admission
14    encompasses both of those groups.  I don't know what the
15    testimony said, but I think you are going to hear that DHS's
16    position is that it may apply Section 1226.  That's what I want
17    to walk through, and I want to explain in some detail why that
18    position is incorrect.
19              So it seems to me that even if they, you know, make it
20    into the interior, if Border Patrol encounters them, what this
21    memo says is that the initial screening is conducted under
22    Section 1225(a).  So when Border Patrol first takes custody,
23    everybody agrees they're detained under Section 1225.
24              The question then is if DHS's position were correct,
25    that would mean that at some future time before they're released
```

1    on their own recognizance, the basis for their detention

2    switches.

3            And what I expect defendants to say is that at the

4    time they issue the Notice to Appear, detention switches out of

5    1225 and it moves over into 1226.  And what they say is that

6    1225 only continues to govern if they keep them in expedited

7    removal, but if they put them in regular removal, they're no

8    longer governed by 1225, they're governed by 1226.

9            And so I would like to -- I think I can demonstrate

10   very clearly that that's not correct.

11           Does Your Honor have a copy of Section 1225?

12           THE COURT:  I do.

13           MR. PERCIVAL:  Okay.  So if we go to

14   Section 1225(b)(1), so (b)(1) is what we traditionally call

15   expedited removal, and it repeatedly references the phrase

16   "without further hearing and review."  And, of course, there's a

17   question about whether they're going to claim credible fear of

18   persecution.  There's then a screening and ultimately if they

19   fail the screening, they go right back into "without further

20   hearing and review," which is a way of saying expedited removal.

21   If they pass the credible-fear screening, they go into full

22   removal proceedings.  So that's expedited removal, and that's

23   laid out in this.  I won't walk through that in too much detail.

24           What I want to show Your Honor is Section 1225(b)(2).

25   What Section 1225(b)(2) refers to is inspection of other aliens.

1    So when you're doing an inspection and you do not place the

2    alien in expedited removal, you apply (b)(2) rather than (b)(1).

3    And I think *Jennings* discusses this is as well, the principal

4    Supreme Court decision we've relied on in this case.

5         And I have a copy of that, Your Honor, if you need it.

6    Do you have one?

7         THE COURT:  I'm familiar with that.  Go ahead.

8         MR. PERCIVAL:  So what this case says -- and it says

9    subject to paragraphs (b) and (c) but that's not essential to

10   this discussion.  This is just what happens when you don't apply

11   expedited removal.  It says, "If the examining officer

12   determines that an alien seeking admission is not clearly and

13   beyond a doubt entitled to be admitted, the alien shall be

14   detained for a proceeding under Section 1229(a) of this title."

15        Section 1229(a) is Section 240 of the INA, and that's

16   a standard removal proceeding.  So (b)(1) tells you if we put

17   you in expedited removal, you're subject to mandatory detention

18   under (b)(1).  And if you're subject to standard removal, you're

19   subject to expedited removal under (b)(2).

20        Now, for reasons that are not totally clear to me,

21   defendants' position is that even though these people are being

22   inspected, they qualify as applicants for admission under 1225.

23   When they decide to put them in a 1229(a) proceeding instead of

24   going from (b)(1) to (b)(2), they're saying they go from (b)(1)

25   to 1226, and that's not correct.  That's not what the statute

1   says.  And it seems to me that no category of aliens would be

2   subject to (b)(2) if defendants' theory were correct.

3          And turning back to *Jennings*, Your Honor, this was one

4   of the issues that was actually litigated in *Jennings*, and it's

5   on 844 and 845 of the opinion.  One of the arguments that was

6   presented in *Jennings* was that 1225(b)(2) simply governed

7   detention up to the point that the individual was placed in

8   removal proceedings, and then the basis for the detention

9   switched over from 1225(b)(2) to 1226.  And on 844 and 845 in a

10  majority opinion, Justice Alito rejects that argument.

11         And I'll just summarize the holding, which is at the

12  bottom of 845.  He says, "In some sections, 1225(b)(1) and

13  (b)(2) mandate detention of aliens throughout the completion of

14  applicable proceedings and not just until the moment those

15  proceedings begin."

16         So *Jennings* in the statutory text rejects this

17  position.  And we also cited an Attorney General opinion, *Matter

18  of M-S-*, which was a post-*Jennings* opinion.  It addressed a

19  slightly different issue which was if you go back to (b)(1), as

20  I mentioned, Your Honor, if an alien passes a credible-fear

21  screening, (b)(1) also sends them over to the 240 proceeding,

22  just like (b)(2).

23         And the issue in *M-S-* was when you pass a

24  credible-fear screening and in that way move over to a full

25  removal proceeding, does the basis for your detention switch

1    from 1225 to 1226.  And the Attorney General opinion, which

2    because of the way immigration works and the Executive Office of

3    Immigration Review is binding on the Department of Homeland

4    Security, *M-S-* says in that situation, which is exactly the same

5    situation, that sort of 1225(b) decisional chart pulls you out

6    and pushes you over into full removal proceedings, that case

7    says the basis for detention does not change from Section 1225

8    to 1226.

9            THE COURT:  All that makes a lot of sense, and I think

10   I've said this previously in this case.  I never focused on 1226

11   because I always assumed that 1225 governs the initial

12   admission.  1226 is dealing with situations, the enforcement

13   component of it, when you catch them in the country, that's when

14   you arrest them on a warrant issued by the Attorney General.

15           So I guess I looked at the warrant component of it as

16   the more significant component.  That's why Mr. Guard was all

17   upset when the -- Chief Ortiz seemingly contradicted the

18   30(b)(6) witness about when a warrant was issued.

19           And it seems to me the irony of the whole thing -- and

20   certainly I'll explore this with the defendant -- looking at the

21   numbers in the Exhibits 2 through 4 I think it was, the

22   apprehensions by processing disposition, there's -- they

23   separately categorized the OR releases and the Warrant of

24   Arrest/Notice to Appears.  They separately keep that data.

25           And the evidence that I heard, notwithstanding what

1 the chief said, which I think I find -- I don't give that much

2 weight.  What I heard the evidence everywhere else was the only

3 time they issue a warrant is when they're going to detain them

4 because of some sort of criminal history or threat.

5 And so it seemed to me that -- it just made no sense

6 to me how if you have a category of people you are issuing a

7 warrant for, you're not issuing a warrant for anybody else, and

8 the reason you took them into custody is the unwarranted arrest

9 authority that Border Patrol officers have between ports, I just

10 didn't understand how 1226(a) was implicated at all.

11 MR. PERCIVAL:  I agree with that, Your Honor.  You

12 know, I think these two points actually play together, because

13 one of the things that *M-S-* says is the idea that you would

14 switch to 1225 -- from 1225 to 1226, once you already have them

15 in custody would be absurd, because in order to detain under

16 1226 you'd have to get a warrant, and so you'd essentially be

17 getting a warrant for someone you were already detaining.

18 And even if what Chief Ortiz said were true, what he

19 said was --

20 THE COURT:  Even more than that, the people that I

21 understood the evidence to show me a warrant is being issued are

22 the ones they're going to detain.  Those aren't the ones that

23 they're exercising their discretion on to release.  And it would

24 make -- based on what I heard from the chief and other

25 witnesses, those people are not going to be released because

1    they're a danger to the public or a danger to national security.

2    So they're going to be detained until they are removed from the

3    country, and so they wouldn't be exercising whatever

4    discretionary authority they have under 1226 as to those people.

5         So again -- I'm preaching to the choir here.  I'm

6    going to have tough questions for the defendants on that because

7    it just made no sense to me how 1226 applies to these folks.

8    And you've identified an alternative reason that it didn't apply

9    that maybe is textually as strong as the reason I have concerns

10   about.  Maybe they'll overcome those concerns and I'll go back

11   to the issue that you're raising.

12         MR. PERCIVAL:  Well, I guess what I was attempting to

13   do, Your Honor -- I agree with everything you said.  I guess

14   what I'm trying to demonstrate is that even if Chief Ortiz's

15   testimony were found credible and even if everything he said

16   were true, they still have a problem and here's why.

17         THE COURT:  I think -- and again, subject to the

18   Federal Government convincing me otherwise, I think Chief

19   Ortiz's testimony on that point is contrary to all the other

20   evidence I've heard in this case, all of the data that I've seen

21   in this case.  And I'm not going to give it a whole lot of

22   weight.  I understand his position in the organization is higher

23   than the -- Mr. Price, who gave the different testimony.

24         Was it Mr. Price that gave the different testimony?

25         MR. PERCIVAL:  The 30(b)(6)?

1           THE COURT:  Yeah.

2           MR. PERCIVAL:  That was Barker.

3           THE COURT:  Barker.  That Barker gave the different

4    testimony and Ortiz was higher than Barker, correct?

5           MR. PERCIVAL:  Yes.

6           THE COURT:  But -- and that almost proves the point:

7    The guy closer to the bottom has more information and more

8    knowledge about what's actually going on than the guy at the

9    top.

10          So anyway, I'll leave that for the Federal Government

11   to convince me otherwise and ask you to kind of move on to your

12   next point.

13          MR. PERCIVAL:  That's fine, Your Honor.  So we talked

14   about 1225 and the interaction with 1226.

15          We should talk about 1182, although I thought it might

16   make sense to actually talk about that when we talk about Parole

17   Plus ATD in the administrative record because otherwise I think

18   we're going to talk about some of the 1182 issues twice.  So I

19   wanted to talk about why the nondetention policy would be

20   arbitrary and capricious and subject to notice and comment.

21          THE COURT:  Let me ask you a question on that.  Do I

22   have to get to those questions if I determine that it's contrary

23   to law?

24          MR. PERCIVAL:  That's an interesting question, Your

25   Honor.  We have different claims, so I think properly, because

1    we've gone to trial, you should address all claims.  But

2    certainly we're not super focused on those arguments if you

3    think it's contrary to law.  But, you know, in a preliminary

4    injunction posture, I think it's more permissible for the Court

5    to grant the injunction on one basis and not rule on the others.

6    But we're at final judgment on all of our claims, I think we are

7    entitled to a ruling on all of our claims.

8                    THE COURT:  Okay.

9                    MR. PERCIVAL:  So on arbitrary and capricious, where I

10   want to start is that the most recent U.S. Supreme Court

11   decision on that standard is a case called *Prometheus*.  Your

12   Honor may be familiar with it.  And what it basically says is

13   that agency action must be reasonable and reasonably explained.

14                   And if we are correct that there is an unwritten

15   policy, and it seems very hard for me to understand how the

16   policy has been reasonably explained.  Now, Your Honor may wish

17   to consider some of the testimony in this case, but I don't

18   think the explanations given were very good ones.  And I think

19   with what Chief Ortiz basically said is, you know, I thought

20   this was what they wanted and they tied my hands behind my back

21   and so I did it, at least portions of it.

22                   THE COURT:  Well, I think to be fair, if you're right

23   that there is such a policy and it says, in effect, only detain

24   bad criminals and people that are a danger to the national

25   security, the rationale for that that I heard throughout this

1    trial was we have to make choices because we don't have enough

2    space for everybody.  And prioritizing those people over women

3    and children and families, I'm not sure how that would be

4    arbitrary.

5            MR. PERCIVAL:  I think it's -- I think it's arbitrary

6    in the sense that -- well, I guess we dispute that that's really

7    the case, that they can't detain anybody else, and I think the

8    facts show that.  But maybe that goes more to the contrary to

9    law points, so maybe we don't need to spend too much time on

10   this topic.

11           THE COURT:  Again, I think that's your toughest

12   argument because given the realities out there, the number of

13   people -- and I know your argument is, and I think I tend to

14   agree with it -- that they kind of brought this surge upon

15   themselves, at least in part.  I know there were other things

16   going on in the global community and root cases and all that

17   stuff that our border czar tells us about, but the -- you know,

18   the fact remains they had to deal with the situation, and the

19   way they chose to deal with it, it doesn't seem to me -- it may

20   be unlawful because they're not supposed to do that, but it

21   doesn't seem to me to be unreasonable to choose to utilize your

22   resources to detain the more dangerous people than the less

23   dangerous people.

24           MR. PERCIVAL:  I think that's right, except that it

25   presupposes, I think, something we dispute that they're really

1    doing everything they can to detain -- you know, that they're

2    not basically intentionally not detaining everybody else, Your

3    Honor.

4            THE COURT:  Okay.  Point made.

5            MR. PERCIVAL:  On notice and comment, I think we've

6    briefed this a lot.  I don't want to spend a lot of time on this

7    unless Your Honor has questions, but I do think that if we prove

8    that an unwritten nondetention policy exists a policy of that

9    magnitude would require either notice and comment or a finding

10   of a notice and comment exception by good cause.  And there's no

11   finding on that point.

12           THE COURT:  Okay.

13           MR. PERCIVAL:  So I think that moves me nicely into

14   Parole Plus ATD.

15           THE COURT:  Let me ask one question about that, notice

16   and comment.  For that to be required, it has to be meet the

17   definition of a rule, or no?

18           MR. PERCIVAL:  Yes, Your Honor.

19           THE COURT:  Okay.

20           MR. PERCIVAL:  On Parole Plus ATD I want to actually

21   walk through what I think are sort of three contrary to law

22   arguments and point to specific pages of the administrative

23   record that support those contrary to law arguments.

24           So our first contrary to law argument is that the

25   Parole Plus ATD policy along with the administrative record

1    completely fails to respect in any way the requirement that the
2    individual be taken back into custody when the purpose of parole
3    has been served.
4           And, Ms. Gerdts, if you could turn to SAR page 110 of
5    the administrative record.
6           So, Your Honor, this is a copy of a parole stamp that
7    is placed on the documents of the alien at the time that Parole
8    Plus ATD is granted.  It gives an "until date," so an end of the
9    parole, and then it gives the purpose.  And that purpose
10   presumably is used or should be used to determine whether the
11   purpose of parole has been served.
12          Now, that determination will have to be made by
13   obviously a different immigration officer because these
14   individuals are traveling to the interior.
15          THE COURT:  What, in your understanding of the
16   administrative record, is the purpose of the parole?
17          MR. PERCIVAL:  Well, this says the purpose is
18   212(d)(5), which is just a citation of the statute.  And that's
19   part of the argument, is how is an immigration officer supposed
20   to determine whether the purpose has been served and take them
21   back into custody when the purpose that DHS is writing on the
22   parole is just a citation to the statute.
23          But to answer Your Honor's question directly --
24          Ms. Gerdts, can you please turn to SAR 168.
25          So at the time you release somebody on parole, it's

1    sometimes difficult to know when the purposes of parole will

2    have been served.  So you would think that some future

3    immigration officer would be making a judgment at a future time

4    about when the purposes of parole has been served.

5            And that first full bold at the top, Ms. Gerdts, can

6    you highlight that.

7            These are, I guess talking points, that were used at

8    the time this policy was rolled out, and they were included in

9    the administrative record.  And this is talking about reporting

10   to an ICE field office.  And if you start at the second sentence

11   it says, quote, "Unless they have committed a serious crime or

12   the government thinks they may be a risk to the United States, a

13   noncitizen will not be taken into custody at the appointment."

14           So I think the point there, Your Honor, is how could

15   DHS know if the basis for parole is resource constraints, that

16   when they encounter that alien at a future date as a categorical

17   fact that alien will not be taken back into custody because the

18   purpose of parole will have been served?

19           And I believe the answer to that question, Your Honor,

20   is the answer to your question, which is the only way you could

21   be sure that you weren't going to take someone back into custody

22   at the time they reported to ICE is if the purpose for parole

23   was that you preferred not to detain them.

24           THE COURT:  Well, is that -- and I'm trying to in my

25   mind separate the testimony out from what's in the

1   administrative record.  I think they're both consistent on this

2   point that the reason this policy was created had more to do

3   with the mass of people at CBP and OFO offices than it did to

4   the inability to detain at ICE offices.  Do you agree with that

5   or no?

6           MR. PERCIVAL:  Yes, although my understanding is some

7   of the crowding at Border Patrol facility -- I mean, this,

8   again, this is going beyond the administrative record; but just

9   to answer Your Honor's question, the cause of the crowding at

10  Border Patrol facilities is the fact that ICE won't take

11  referrals.  So they are intertwined.

12          THE COURT:  And so I guess that goes to my question.

13  If -- and I agree with you.  I mean, the statute says once the

14  reason for parole is satisfied -- again, it caveats it with the

15  discretion of the Attorney General, but once the reason is

16  satisfied they're to go back into the place in the process they

17  were before -- it actually says "case."  I don't know if that's

18  part of your argument as to inconsistent with law, but it is a

19  question I have.

20          But if the evidence in the administrative record

21  shows, I think consistent with the testimony I heard, that the

22  reason they adopted this processing pathway is to get people out

23  of their offices quicker, it seems to me that that's the public

24  purpose, the public interest, that we need to focus on to

25  determine whether that condition has resolved itself such that

1    these people should be brought back in to some sort of custody.

2           If, on the other hand, the administrative record shows

3    that the reason they adopted this policy is because there were

4    capacity issues at ICE facilities due to COVID or otherwise, the

5    question is have those conditions resolved themselves such that

6    these people now should be pulled off parole and done with what

7    the statute says they ought to be done with?

8           And so that's my confusion here as to what at least

9    Florida thinks the administrative record establishes the reason

10   for this policy is.

11          MR. PERCIVAL:  Well, I think it's a little internally

12   inconsistent, because this page suggests that the reason for the

13   parole is just a general preference not to detain because why

14   else would you promise somebody in advance that you weren't

15   going to end their parole when they reported to ICE.

16          But to deal directly with Your Honor's question, I do

17   think it is the inability to process at the Border Patrol

18   facility, though, again, I think they're very intertwined.  And

19   maybe we can go back to page 1 of the administrative record,

20   which I think is Exhibit 40, first couple pages, just look at

21   the memo.

22          One second, Your Honor.

23          Can you go to the next page, Ms. Gerdts.

24          THE COURT:  And I guess while you're looking for that,

25   what this goes to if -- and it's part of the supplemental

1    administrative record is the original administrative record with

2    the original memo, and in that memo Parole Plus ATD memo, the

3    November 2021 memo, it said when COVID conditions improve, it's

4    expected we won't need this pathway anymore, which seems to me

5    to be consistent with what I'm understanding they're trying to

6    deal with here is a surge of people coming in, crowding their

7    offices, that they just need to process quicker.  Because all

8    the evidence in support of the policy seems to be it takes us a

9    long time to do an NTA packet.  We can do this parole mechanism

10   in 15 minutes, and we can get people out a lot quicker.

11          And so they're trying to -- and I think I heard this,

12   again separating it out in my mind, but I did hear testimony

13   that the idea was they wanted to decompress their offices, and

14   that, of course, made ICE folks mad because you're pushing your

15   problem up to us.  But that seems to me, unless you're able to

16   convince me otherwise, that that was the purpose of this policy.

17          MR. PERCIVAL:  I agree with that, Your Honor.  The

18   only point I'm making is that I do think there's -- ICE's

19   ability to accept referrals is intertwined with that, and there

20   are references in the third paragraph there to transfers to ICE

21   on the memo.

22          So, yes, I guess the best way to put it is I agree

23   with Your Honor that the purpose was to deal with the processing

24   at the CBP facilities; although, of course, I think the

25   administrative record also reflects that ICE decisions were

1    probably the cause of that problem, even if that's not the

2    problem that it was solving, if that makes any sense.

3              THE COURT:  And I guess -- and I know you told me

4    you've got three contrary to laws, but this gets into an

5    arbitrary and capricious.

6              If that's what the issue was -- we've got COVID

7    problem, we can't have a bunch of people standing around our

8    waiting rooms -- the administrative record includes the CDC

9    Title 42 repeal order that said we don't have a COVID problem

10   anymore, in effect -- and I know I'm overly simplifying that,

11   but that seems to me to call into question the -- I mean, that

12   happened several months before this memo was entered.

13             So we have a November memo that said once COVID goes

14   away or ameliorates, we won't need this policy anymore.  We have

15   an intervening CDC order saying COVID's not really a problem

16   anymore, and then despite that evidence, they adopt this policy.

17   So to the extent it's based on COVID, I'm not sure how that

18   makes any sense.

19             But again that may be more questions for them than

20   you.

21             MR. PERCIVAL:  I agree with all that; although, I

22   don't see the COVID rationale in the second Parole Plus ATD.

23             THE COURT:  It's certainly not mentioned in the

24   second, and maybe that's the point:  They're no longer saying

25   it's a COVID problem.  And so if that's the case, why do you

1    need this anymore?  But in any event --

2              MR. PERCIVAL:  And I think, Your Honor --

3              THE COURT:  -- give me your second contrary to law.

4              MR. PERCIVAL:  Well, I want to -- I don't want to

5    switch totally to arbitrary and capricious, but you're right.

6    There's an arbitrary and capricious section here.  Whether we

7    want to call this contrary to law or arbitrary and capricious,

8    at a minimum, the memorandum should tell immigration officers

9    how to apply the parole requirement, that once the reasons for

10   parole have been served, the person be taken back into custody.

11   If -- I think it's either contrary to law or arbitrary and

12   capricious that the memo provides no instructions about what to

13   do about that, and we haven't seen any other evidence that that

14   should be done.

15             THE COURT:  Is the page you referred me to with the

16   stamp, I think there was other discussion in the various

17   iterations and emails that were in the administrative record --

18   oh, I found it -- that there was initially a 60-day report

19   period that was reduced down to 15 days.  The stamp and the

20   directions on what to put on the stamp correspond to that.  So I

21   mean, it leaves the impression that they're being paroled until

22   they report to the ICE facility.

23             MR. PERCIVAL:  It does, I think, leave that

24   impression, Your Honor.  And, again, it's a little hard to

25   separate trial evidence because, you know, the trial evidence

1    told us that the 60 days are not very important, that actually

2    when they got to the ICE facilities, they were closed and they

3    had to camp outside.  I'm trying to disentangle the evidence in

4    my head.

5            THE COURT:  But I guess what I'm -- where do you see

6    that?  Which bucket does that go in -- a contrary to law, an

7    arbitrary and capricious -- if the purpose of this is to

8    decompress the facilities, and so instead of writing 212(d)(5)

9    they just said decompress, and the parole period is for the

10   period that they're supposed to report to an ICE office to begin

11   the processing, do things shift at that point?

12           So they go to the ICE office, they get their NTA, are

13   they now in a separate proceeding?  They're no longer on parole;

14   they're under OR?  Is that what you think is happening?  Does

15   that make a difference?

16           MR. PERCIVAL:  Well, I think it depends, and I don't

17   want to go outside the administrative record.  I mean, one thing

18   we know from the trial is that they're actually just mailing

19   things out.  And you can't release somebody on their own

20   recognizance if you never have them in custody, so they're

21   mailing the NTA packet.  So it seems to me if they were going to

22   withdraw the parole, they would have to take you into custody

23   and release you under Section 1226.  Now, I'm not sure we think

24   that that would be legal.

25           THE COURT:  I'm not sure that was outside the

administrative record.  We have in the administrative record a

lot of discussion and data -- maybe not a lot -- but there is

discussion and data in the ICE portion of the supplemental

administrative record about Operation Horizon.

MR. PERCIVAL:  Okay.

THE COURT:  So I think it's --

MR. PERCIVAL:  I brushed up on it last night, Your

Honor.  I might have missed some stuff.

THE COURT:  All right.  I'm sorry.  I've diverted you

from telling me why it's contrary to law.  You gave me one

reason, that it doesn't respect the take-them-back-into-custody-

when-the-purpose-is-served component of the statute.

MR. PERCIVAL:  That's correct, Your Honor.  The second

reason is we think it's clear, even from the administrative

record combined with some common sense, that there's not a

meaningful case-by-case adjudication going on.

Ms. Gerdts, if you could turn to SAR 5.

So what we know from this page -- it's down there at

the bottom -- is that Parole Plus ATD processing takes 15 to 30

minutes.  And what we also know is that during that 15 to 30

minutes, they're doing biometrics, they're trying to figure out

if a person is a criminal, they're putting their name into the

system and assigning an alien number, they're attaching

alternatives to detention to a person or to a family.  Maybe

it's an ankle monitor, maybe it's a cell phone.

1            And so just using common sense about how long the rest

2      of that takes, I think it leaves the impression that the

3      threshold decision of whether the person satisfies the parole

4      standard is essentially -- basically, I mean, no time.

5            THE COURT:  What is the case by case -- reading the

6      statute, it says, "may parole temporarily under such conditions

7      as he," the Attorney General, "may prescribe only on a

8      case-by-case basis for urgent humanitarian reasons or

9      significant public benefit."

10           So in your view does the statute require a

11     determination as to whether there's a significant public benefit

12     or humanitarian reason?  There has to be a case-specific one of

13     those, or can there be a global significant public benefit,

14     i.e., decompression, that then we look at -- so that trigger has

15     been met, and now we're looking at this individual and saying

16     can that person be released.

17           Does that question makes sense?

18           MR. PERCIVAL:  The question makes perfect sense, and

19     our position is the former.  I think in some of our briefing

20     we've relied specifically on the term "basis" in the statute,

21     that it has to be granted on a case-by-case basis.  And the

22     statute tells you what criteria you apply to determining the

23     basis, which is the statutory standard.  And so we read that to

24     say you have to look at the alien specifically and determine

25     whether their situation presents either urgent humanitarian

1    reasons or significant public benefit, not just that you say,

2    well, we think it's a significant public benefit that we're

3    overcrowded, and then you just basically walk down a line

4    stamping pieces of paper to each individual person rather than,

5    you know, giving one piece of paper to 30 people.

6            We think it requires -- you know, I guess the other

7    way to read the statute -- and the way we think is wrong -- is

8    that all it means is you can't say we're granting parole to all

9    patients, or something like that.  We think it's much more

10   specific than that because it has to be on a case-by-case basis

11   which invokes the standard.

12           THE COURT:  And so in your view it would be

13   insufficient to say there's -- this room is overcrowded, so

14   that's a good enough reason for you, Mr. Percival, to be sent

15   out in the hall, it's the same good enough reason for Mr. -- the

16   same good enough reason for Mr. Darrow to be sent out in the

17   hall, Ms. Ryan to be sent out in the hall.  That's not good

18   enough.

19           MR. PERCIVAL:  That's not good enough alone.  Now,

20   let's -- I mean, just to change the hypothetical, suppose that

21   it's so overcrowded that this particular person's in some sort

22   of danger.  I mean, you might look at them specifically and say

23   the parole standard is satisfied as to that person.  But what

24   you can't do is just make a categorical judgment that under

25   certain circumstances everybody gets paroled.

1          And, you know, what this memo really discusses are

2     operational realities.  And the way it's set up is essentially

3     certain triggers are met, once those triggers are met, there's a

4     presumption of parole, and then there's carve-outs, you know,

5     you have disqualifying crimes or things like that.

6          And so one way to put it is just the memo flips the

7     presumption.  It says you're eligible unless, instead of making

8     an individual determination of eligibility.

9          THE COURT:  Okay.  What's your third reason that it's

10    contrary to law?

11         MR. PERCIVAL:  Well, I think this intertwines with the

12    last one, and I don't want to spend too much time on it.  I

13    separated out the case-by-case basis language and the urgent

14    humanitarian reasons language, and I think we've covered all of

15    those, Your Honor.

16         THE COURT:  Let me ask one -- I'm going to ask the

17    government about but I'll ask you about as well.

18         The statute talks about:  So after they're paroled,

19    after the Attorney General determines that the conditions

20    warranting parole have been met, they're to be returned to the

21    custody from which he was paroled, and thereafter his case shall

22    continue to be dealt with in the same manner as any other

23    applicant.

24         It seems to me that the word "case" has some legal

25    significance.  It contemplates that a proceeding has begun.

```
 1    Here, as described in the policy and the administrative record,
 2    the whole purpose of the policy is not to begin the case at the
 3    time parole was entered, it's to begin the case 60 days later,
 4    15 days later when you show up at an ICE facility.  Is that a
 5    contrary to law possibility as well?
 6              MR. PERCIVAL:  That may be -- I'm going to pull up the
 7    statute, Your Honor.  My binders clips are sticking together.
 8              Remind me which paragraph you were discussing.
 9              THE COURT:  I'm reading 1182(c)(5)(A), the last phrase
10    or two there.
11              MR. PERCIVAL:  You mean (d)(5)(A), Your Honor?
12              THE COURT:  Oh, I'm sorry, (d)(5)(A).
13              MR. PERCIVAL:  1182 is a voluminous one.  Bear with
14    me.
15              I have never really thought about that argument, Your
16    Honor, to be honest, whether a case means an immigration
17    proceeding or something more colloquial.
18              THE COURT:  If you don't want to make that argument,
19    then I will --
20              MR. PERCIVAL:  We haven't made it, Your Honor.
21              THE COURT:  Okay.  Is it one --
22              MR. PERCIVAL:  Although you may very well be correct,
23    but I think we've -- we feel confident about our other argument.
24              THE COURT:  All right.  So from a -- you've talked to
25    me about contrary to law, why you believe the record-based
```

1    review is contrary to law.  Do you have any arbitrary and

2    capricious or any other types of arguments on that, or is your

3    solely -- or contrary to law there?

4           MR. PERCIVAL:  We do have several arbitrary and

5    capricious arguments, Your Honor.  The first -- and this

6    probably won't surprise Your Honor -- is that the memo does not

7    address the backlog.  It doesn't acknowledge it.  It doesn't

8    explain how to deal with it.  It doesn't consider any

9    alternatives.  But we know from SAR 262 --

10          And I don't think Ms. Gerdts needs to turn there

11   because I think Your Honor expressed that he's pretty familiar

12   with the backlog issues.

13          But at a minimum, if that's sort of what I would call

14   "grenade" is sitting in the administrative record, you would

15   expect at least the memo to discuss it and address it.  And --

16          THE COURT:  Does it have to specifically discuss it,

17   or the fact that they didn't discuss is sufficient to say

18   implicitly they obviously were aware of it because it's part of

19   the administrative record but determine that the benefits

20   obtained by getting people through the ICE -- or through the CBP

21   offices quicker out -- in the health and safety and all those

22   other kind of difficult to quantify but significant interests

23   outweigh the backlog and the processing.  I mean, isn't that a

24   fair reading of what happened here?

25          MR. PERCIVAL:  Well, I think, Your Honor, the

1    administrative record tells you what was before the agency.  But

2    the decisional document tells you the agency's reasoning.  And

3    your job is to decide whether their decision is reasonable and

4    reasonably explained.

5            And one of the things the U.S. Supreme Court said, for

6    example in the *DACA* case, is that if an agency ignores an

7    important aspect of the problem, the decision is arbitrary and

8    capricious.  I think it is very hard to look at that page of the

9    administrative record and not think that the increasing backlog

10   is an important aspect of the problem.  And what *Regents* --

11   that's the *DACA* case -- says is that the agency's decisional

12   document doesn't address that problem, it's arbitrary and

13   capricious.

14           THE COURT:  So I guess your answer there is that it's

15   not sufficient to have implicitly rejected it, you must

16   specifically reject it.

17           MR. PERCIVAL:  Yes.  That's a much more concise way of

18   saying it, Your Honor.

19           THE COURT:  And you think that comes out of the *DACA*

20   case?

21           MR. PERCIVAL:  Yeah, the *DACA* case cites many other

22   APA cases.  I mean, it's just black letter law that ignoring an

23   important aspect of the problem in the decisional document under

24   review makes the agency decision arbitrary and capricious.  But

25   if Your Honor looks at that case, that case will have all the

1    other cases.

2            The second issue -- and I want to discuss this

3    carefully, because I don't want to go beyond the administrative

4    record -- is that neither the administrative record nor the

5    decisional document acknowledge inconsistent agency positions.

6    And I think it's especially notable that ICE in the second

7    Parole Plus ATD memo as compared to the first Parole Plus ATD

8    memo is a cosignatory to that policy document.

9            So I think Your Honor knows what I'm referring to.  We

10   saw some OFO guidance, which is not ICE, but we saw some ICE

11   parole guidance.  Now, Your Honor cannot consider that guidance

12   because it's not in the administrative record, but I do believe

13   that Your Honor can take note of the fact that it's not

14   discussed and it's not in the administrative record.  And the

15   fact that ICE signed on to a policy that essentially changed

16   their position on how parole was going to be applied without

17   even acknowledging that we think makes it arbitrary and

18   capricious.

19           THE COURT:  Initially, when I got that evidence

20   yesterday, it raised some -- raised my eyebrow a little bit.

21   But I guess it seemed to me that why the ICE person -- and maybe

22   this is an inference that I can't draw.  But I think what I

23   gleaned from the testimony to help me understand the

24   administrative record on this particular point was the reason

25   ICE signed on to this is because they were going to have a

1    component of the workload.  But this policy only governs and

2    applies to the decision CBP is making.

3              So the fact that ICE has a different policy out there

4    that I heard about yesterday dictating when they will give

5    parole, I'm not sure that really makes a difference because the

6    ICE person, Mr. -- was it Guadian, yesterday? -- essentially

7    said, I don't know anything about Parole Plus ATD because all

8    that gets done -- those decisions get made before people even

9    show up to my door.

10             MR. PERCIVAL:  Well, okay.  Let's put aside the fact

11   that ICE signed on to the policy.  They're all components of the

12   Department of Homeland Security, and they are applying this

13   statute in different ways and taking inconsistent positions on

14   when it can be used, and they're not accounting for that.  And

15   we think that alone renders it arbitrary and capricious.

16             THE COURT:  But you'd acknowledge I don't know that

17   unless I go outside the administrative record?

18             MR. PERCIVAL:  Yes, and no, Your Honor.  I do think

19   it's permissible.  You can't go beyond the administrative record

20   to review the agency's decision, but you can take note of other

21   things in the universe that are not in the administrative

22   record.

23             I mean, just to go back to the first Parole Plus ATD

24   policy, we pointed out that a lot of things were not in the

25   administrative record, and I think you can take note of the fact

1    that they're not in there.  Now, you can't review them and rely

2    on them, but I think you can take note of their omission.

3           THE COURT:  And I think I was pretty clear in that

4    order that I'm not going to supplement the administrative

5    record, but I was also very clear that if they had not come up

6    with a new memo and a new administrative record, the

7    administrative record they created for the original policy, it

8    was dead on arrival because it said it was based on COVID and

9    there wasn't boo about COVID in the 31 pages.

10          So, again, I'm not going to attribute adverse motives

11   to them, but it seems pretty obvious to me that they created

12   this new July memo to backfill the problem they had with a

13   policy that was completely indefensible record-wise, not

14   substance-wise.

15          But anyway that's neither here nor there.

16          MR. PERCIVAL:  I'm sure you're not surprised that I

17   agree with you, Your Honor.  But, again, it's neither here nor

18   there.

19          Again I'm trying to be careful here not to bring in

20   the trial evidence, but I do think that Your Honor can take note

21   of things that are not addressed in the memo.  Because

22   regardless of taking account of other evidence, you can at least

23   take account of things that should have been considered that

24   were not considered.  I think you can use your common sense on

25   that.

1            And so I want to talk about two other things that we

2   think the agency did not consider that they should have

3   considered.  One is that they don't discuss at all the effect

4   that the Parole Plus ATD policy might have on migration flows.

5            Now, again, you can't consider the evidence we've

6   presented that these policies had a negative effect on migration

7   flows; but going back to our discussion about ignoring an

8   important aspect of the problem, we think you can use your

9   common sense that that's something that you might expect the

10  agency to discuss and consider.  And so in that way, we think

11  they -- because it's not in the administrative record, we think

12  that's a problem for the agency.

13           And the other issue that we don't think they really

14  explained is the first Parole Plus ATD policy was limited to

15  family units.  The second Parole Plus ATD expanded it to single

16  adults.  And I don't think there's any discussion in the Parole

17  Plus ATD -- the second Parole Plus ATD policy about why it made

18  sense to expand the scope of the policy in that manner.  And

19  that is a significant change between policies that we might

20  expect some discussion of.

21           And then finally, my last point on Parole Plus ATD is

22  just the notice and comment stuff.  I think sort of similar

23  discussion that we talked about with nondetention, and I won't

24  belabor that point too much, Your Honor, unless you have

25  questions.

 1          THE COURT:  I don't.  I need to brush up on notice and

 2   comment.

 3          MR. PERCIVAL:  On the Take Care Claim, I heard Your

 4   Honor at summary judgment essentially reject that argument,

 5   although you didn't formally grant summary judgment on it.  And

 6   we didn't present a lot of independent evidence on that.  I

 7   wasn't really planning on talking about that very much today,

 8   again, unless Your Honor has questions.

 9          THE COURT:  I just don't see -- I mean, certainly

10   the -- what's going on certainly raises the eyebrow as to

11   whether they're -- whether they care about applying the law, but

12   it's clear that they are -- they've made policy choices.

13   Florida doesn't agree with those policy choices, but they

14   haven't said, which is what I said at the motion to dismiss

15   stage, there's at least an allegation that they're just not

16   doing anything and that -- the evidence just didn't bear that

17   out.  So you're not going to prevail on that argument, but I'll

18   let you brief it.

19          MR. PERCIVAL:  I may not do so, if that's all right --

20   if that's where Your Honor is.  I don't want to waste Your

21   Honor's time.

22          THE COURT:  Okay.

23          MR. PERCIVAL:  So I just want to end on standing.  And

24   I want to discuss a couple points, because I think the way the

25   evidence -- you sort of take the stipulations and then you see

1    the way the evidence played out at trial, I think you can kind

2    of separate this into two buckets.

3            So the first bucket is what we think under the Fifth

4    Circuit case we cited at summary judgment, which I think was one

5    of the more recent *DACA* cases, is we think all we need to show

6    is historical expenditures that will continue, eligibility of

7    the new population, and a big increase in population.  And with

8    those three things, the Court can infer that some of those

9    aliens in the future will consume some of those services and

10   that a vacatur of the policy will cause less of those -- less of

11   that consumption to occur.

12           And what the Fifth Circuit basically said is it would

13   be so ridiculous to draw the opposite inference, just given the

14   numbers and the commonsense point that some of these individuals

15   will consume services, that that's a permissible inference.

16           THE COURT:  I think standing is where I expect the

17   Federal Government to begin because I think that's their

18   strongest position in this case.  And I guess what I'm troubled

19   by, the DOC witness we heard from yesterday that was -- I think

20   the DOC evidence is useless in my mind.  The DEO and AHCA

21   witness depositions that I read yesterday afternoon really fall

22   into the same bucket.  I put it in two buckets, too.  I put it

23   in the bucket of expenditure evidence that isn't particularly

24   helpful and expenditure evidence that is more helpful.  And

25   AHCA, DEO, DOC, to me fall into the that-doesn't-get-you-there

```
 1   type evidence.

 2              MR. PERCIVAL:  And, Your Honor, if I can just

 3   address --

 4              THE COURT:  And I'll give you an opportunity to.

 5              MR. PERCIVAL:  Sorry.

 6              THE COURT:  And the DCF evidence I heard today falls

 7   into that similar category too.  And here's why.

 8              First and foremost, a lot of the stipulations and the

 9   evidence is for fiscal years -- or for years, for dates that

10   predate the policy.  And so it seems to me that you give me a

11   number -- I'm looking at Stipulation 57, for example, which

12   talks about the TANF program.  And it says that from January of

13   2020 through January of 2022 you spent 974,000 and some change

14   of State money providing those benefits to noncitizens.  I can't

15   infer from that -- I mean, for all I know, $974,774.07 of it

16   occurred before President Biden even took office, and so to me

17   that stipulation tells me nothing.

18              And the witness's testimony today from DCF that talked

19   about these various programs that a lot of them have waiting

20   lists -- or not waiting lists, waiting periods; they probably

21   have waiting lists too -- but they have waiting periods before

22   they're even eligible.  So a lot of the people that have come

23   across the southern border aren't even eligible for these

24   programs at this point.

25              We have the Cubans and the Haitians that fall into a
```

1    different category, but we saw in the press this past week a

2    bunch of Cubans or Haitians, or maybe both, showing up in a boat

3    down in the Keys.  And so I'm not persuaded that I can infer

4    from the fact that Cubans and Haitians, for example, are

5    eligible immediately for these benefits that it's Cubans and

6    Haitians that have come in across the southern border during the

7    pertinent time period.

8            And she got a little bit closer today with the

9    evidence about the refugee program where they did at least

10   capture data about when people came.  But if I understood the

11   testimony correctly, those benefits are paid solely by the

12   federal government.

13           So at the end of the day, I didn't see anything in the

14   DOC testimony, the DEO testimony, or the AHCA testimony that

15   really helped me pinpoint whether that money being spent by the

16   State is as a result of these aliens that are coming in under

17   these challenged policies or aliens who are here for other

18   reasons.

19           And so that's why I found the DEO, the Department of

20   Education, witness, Mr. Oliva's testimony so helpful, because he

21   was the only witness who was able to break out that the numbers

22   of students -- I mean, give me a discrete number of additional

23   people that have come to the State -- noncitizens, aliens,

24   whatever you want to call them, children in that case -- have

25   come to the state during the challenged period of time.  And it

1    seems to me that the State's best argument on financial impacts

2    is from the DEO -- or, excuse me, the education testimony

3    because that shows that there are additional people that are

4    here now that weren't here before this program started.

5           And I've got other evidence that shows me that we've

6    got a hundred thousand of these people have at least given

7    Florida addresses.  And I know the Federal Government's going to

8    argue to me that, well, the fact that they're on a Florida

9    docket or they gave Florida addresses and then disappeared

10   doesn't mean they're actually in Florida.  But I think it's

11   reasonable to infer, and they can convince me that I'm wrong,

12   that it's reasonable to infer -- not assume, but infer -- that

13   those people are here:  We have a discrete number of additional

14   students that are here, and so I think that helps you get to

15   that point.

16          So try -- I'll give you an opportunity to convince me

17   that you can prove standing under this more amorphous.  And I

18   agree, there's common sense involved, but I can't make a

19   standing finding based on common sense.  If I could, I would do

20   exactly what I did at summary judgment or exactly what I did at

21   the motion to dismiss and say it would be illogical to assume

22   that all of these aliens coming into Florida, they're coming to

23   the country not because they have large amounts of money and

24   aren't going to need government services, they're coming to the

25   country for economic opportunity.  So these are discretely the

1    people that are using these services.

2            And so common sense would tell me that these people

3    that are coming are using your services, your Florida services.

4    That's not enough.  And that's why I think the DOE, education,

5    Mr. Oliva's testimony was so helpful.  But I'll give you an

6    opportunity to convince me why you think all that other

7    testimony is enough as well.

8            MR. PERCIVAL:  Okay.  Your Honor.  I'm not going to

9    disagree that the DOE evidence was helpful, but I want to

10   address two points:  One discrete point and one big picture

11   point.  I'm going to start with the discrete point just to get

12   that out of the way.

13           On DCF and on the Haitian issue, there is record

14   evidence that large numbers of Haitians are entering through the

15   southwest border.  That was in Chief Ortiz's testimony, some of

16   the testimony about large numbers, you know, waiting under

17   bridges and things like that.  So there's definitely evidence

18   from which the Court can infer that these very large numbers of

19   Haitians coming into Florida are not only coming by boat.

20           I agree with Your Honor that the way Ms. Grogan knows

21   about these 150 new Cubans and Haitians is through a refugee

22   program that's funded by the federal government, but I think

23   what she was testifying to was that as a general matter, large

24   numbers of those same people, because they meet some of the same

25   criteria, are going to be eligible for the other services.

1          Now, that doesn't mean that she can point to specific

2   ones who consumed the services, but she's saying we have 150,000

3   new Cubans and Haitians, and these services we're talking about

4   they'll have eligibility.

5          THE COURT:  Right.  I certainly understood that

6   testimony, but it -- I guess to that extent, I disagree with the

7   Fifth Circuit's view that all you need to show is a bunch of

8   people are coming that would be eligible for services and you're

9   spending money under that program.  I mean, to me, I think you

10  have to show some incremental increase in expenditures to show

11  that that population made a dent -- there was a blip in the

12  radar.  I mean, you look at the data, and you can say, okay,

13  it's reasonable to infer that we're spending more money now or

14  we're seeing more people now in a program and then as a result

15  we're -- I think that inference I can draw.  But the other

16  inferences, you know, require me to start stacking things that

17  I'm a little uncomfortable doing.

18          MR. PERCIVAL:  Well, fair enough, Your Honor.  I guess

19  I'll make sort of two final points.  One is I don't think we

20  need to show this, like, total increase.  I think we just need

21  to show classic pocketbook injury, which is spending some money

22  on some of these individuals.  Because they could be going up or

23  down for any number of other reasons, and so you just have to

24  show some pocketbook injury, some expenditure.

25          But I think moving on to Your Honor's bigger-picture

1   point, I think it's useful to talk about kind of why we've set

2   this with up the 2020 and the 2021 data and eligibility and then

3   asking Your Honor to draw this inference.  And one of the

4   reasons for that is you have to think about this case in terms

5   of redressability.

6          So if it turns out that we spent more money last year

7   than the year before because of these challenged policies, that

8   harm is not redressable by Your Honor.  We're not seeking

9   damages.  We're seeking vacatur of the policy.  So the past

10  expenditures are corroborative of the real injury that should be

11  the focus of Your Honor's inquiry, which is the future injury

12  that will continue to occur absent vacatur that would be

13  remedied by Your Honor's order.

14         THE COURT:  And I understand that.  I guess what I'm

15  focused more on is traceability.  I mean, I've got to find an

16  injury in fact which is caused by, traceable to, the challenged

17  policy that then would be redressable by a favorable injury.

18         And so my concern is more on the causation

19  traceability aspect of it.  I certainly understand that

20  Florida's argument that they keep coming, you're going to keep

21  spending, I get that.  I mean, that's common sense, and I get

22  it.  So I understand your argument, but I think you understand

23  my --

24         MR. PERCIVAL:  I do.  And --

25         THE COURT:  -- position.

1          MR. PERCIVAL:  Sorry.  I didn't mean to interrupt.

2          My point is we can't actually prove what we haven't

3    spent yet, and what we haven't spent yet is the real crux of the

4    issue from a redressability perspective.  But we think we've

5    provided sufficient evidence from which the Court can infer that

6    we will make those expenditures.

7          THE COURT:  I get it.  I understand that.

8          And then on the flip side of it, where do you see the

9    special solicitude coming in?

10         MR. PERCIVAL:  So one of the things -- I think the two

11   things that special solicitude are supposed to relax is

12   immediacy and redressability.  And we still have to satisfy

13   those requirements, but the State gets sort of preferential

14   treatment on those two things in a -- we get special solicitude

15   in meeting those two requirements.

16         And if you remember the case that special solicitude

17   came from was sort of a big challenge related climate change

18   and, you know, in the far future:  rising sea levels and

19   weather changes and things like that.  And the Court found that

20   while a little hard to quantify because the plaintiffs were

21   states, they were entitled to special solicitude and they were

22   able to establish standing.

23         THE COURT:  Okay.  You view that as -- or you think I

24   should properly view that as a gloss that goes on those couple

25   elements rather than an independent basis for standing?

1           MR. PERCIVAL:  I think that's right, Your Honor.

2           THE COURT:  In other words, the -- You said "right"?

3           MR. PERCIVAL:  I'm going to look at my trusted

4    adviser.

5           Yes, Your Honor, that's our position.

6           THE COURT:  So where does, then -- I've always looked

7    at that in the context of states are uniquely harmed when the

8    federal government doesn't do its job in immigration.  I'm not

9    saying the federal government is not doing its job in

10   immigration, but that's what you're asking me to find in this

11   case is they're not doing their job and as a result people are

12   coming into our borders, or the State's borders, that we can't

13   do anything about because we gave up our right to exclude when

14   we joined the ratification or joined the Union and ratified the

15   constitution.

16          Is that not part of State's argument anymore?  Is that

17   not special solicitude?  Where does that fall?

18          MR. PERCIVAL:  I mean, I agree with all that.  I think

19   all that goes to why we get special solicitude, which relaxes

20   those two standards.

21          I'm going to look back at my trusted adviser.  Hold

22   on, Your Honor.

23          Yes, Your Honor.

24          THE COURT:  Okay.  Anything else you want to talk

25   about on standing?

1          MR. PERCIVAL:  If Your Honor has any specific

2     questions about Mr. Oliva's testimony, I'm happy to address

3     those.

4          THE COURT:  I don't think so.

5          MR. PERCIVAL:  Okay.  Nothing further, Your Honor.

6          THE COURT:  All right.  We've been going for a little

7     bit, and I expect we'll be going for a little bit when,

8     Ms. Ryan, you get up there.  So why don't we take ten minutes,

9     and we'll come back for the defendants' closing argument/oral

10    argument/discussion.

11        *(Recess taken from 12:12 p.m. to 12:24 p.m.)*

12         THE COURT:  All right.  Y'all can be seated.

13         One housekeeping matter before you get started.  Were

14    y'all able to trim down the budget exhibit?

15         MS. RYAN:  Yes, we were, Your Honor.  And we cleared

16    this with plaintiff this morning, and we're now handing up the

17    shortened version of Exhibit CC.

18         THE COURT:  That went from three notebooks down to --

19         MS. RYAN:  Yes, Your Honor.

20         THE COURT:  Thank you very much, both of you, for

21    that.

22         All right, Ms. Ryan.  I will attempt to do the same

23    thing to you, or for you, that I did for Mr. Percival and give

24    you an opportunity to at least get started before I jump in.

25         MS. RYAN:  Yes, Your Honor.

1          I have a slightly longer introduction than

2     Mr. Percival, but I will lay out a roadmap of what we are going

3     to discuss and ask your preference on order so that we can turn

4     to each topic in turn.

5          No administration in modern history has ever had the

6     resources to detain every noncitizen who comes to our border.

7     Congress gives DHS a limited amount of funding.  And as we have

8     shown through this trial, DHS must prioritize the best use of

9     those resources because Congress has also given people the right

10    to come to our country and claim asylum, and there is no "off"

11    switch for that, there is no "work closed" sign on the door.

12         As I said to you Monday morning, Florida may wish that

13    DHS's priorities were different, but that does not mean that the

14    decisions being made violate the law, and nothing we have seen

15    this week provides anything different.

16         As this Court correctly pointed out, the fact that

17    policies changed when the administration changed is expected,

18    unsurprising.  That's what our democracy was meant to

19    accomplish.  If one administration enacts certain policies and

20    practices and the majority of citizens disagree with those

21    policies, they can express their opinion in the voting booth,

22    and that is exactly what happened in 2020.  The majority of this

23    country voted to change the administration and, therefore, to

24    change the policies being enacted.  But such policy changes are

25    not illegal just because they differ from the previous

1  administration and nor are they illegal because Florida

2  disagrees with them.

3          As we heard through this trial, there have been surges

4  of migrants for decades.  The amount of people, the demographics

5  of those people.  When they come to the border, those are not

6  things that DHS can control.  It's an incredibly complex balance

7  of socioeconomic, political, and environmental factors just to

8  name a few.

9          You heard Chief Ortiz tell you, CBP is the one agency

10  who cannot say no.  The relationship between migrants and DHS is

11  much more complicated than Florida would have you believe.  They

12  want you to think the issue is black or white, detain or not

13  detain, but the reality is much more nuanced and detailed as we

14  showed you.

15          We know Your Honor has questions you would like to

16  ask, and defendants would like the opportunity to summarize our

17  case and give context for some of the evidence you've seen, so

18  here is an overview of the topics defendants will cover during

19  this closing.

20          First, if Your Honor would like this order, Mr. Darrow

21  will discuss the relevant immigration authorities and the legal

22  landscape at issue in this case and the different parole

23  directives we've seen and where each one of those derives.  Then

24  Ms. Fudim will show how the defendants have proven there is no

25  unwritten nondetention policy, despite the myriad of theories

1    Florida has tried to pursue.  I will then address some of the

2    other shortfalls in Florida's case and their failure to meet

3    their burden.

4         Next, although Florida argues that more noncitizens

5    should be detained, it's important to keep in mind the realities

6    of what that actually means, which I will illustrate for the

7    Court.  As requested by Your Honor, Mr. Darrow will discuss the

8    validity of the Parole Plus ATD program based on the

9    supplemental administrative record, and finally Mr. Darrow will

10   address the remedies that are available and how that should

11   shape this Court's decision.

12        Does Your Honor have a preference in the order in

13   which we proceed?

14        THE COURT:  I'll let you go down that road, and I'll

15   do my best not to ask questions that fall outside of that scope,

16   but -- so I assume you're all capable of answering all the

17   questions.

18        MS. RYAN:  If not, I'm happy to step aside.

19        THE COURT:  That's fine.

20        MS. RYAN:  Then I'll turn the podium over to

21   Mr. Darrow to discuss the legal authorities in this case.

22        MR. DARROW:  Thank you, Erin.

23        Thank you, Your Honor.

24        So in this case Florida claims that defendants are

25   illegally releasing noncitizens at the border.  The two

1    detention statutes that would apply to these noncitizens are

2    8 U.S.C. 1225 and 8 U.S.C. 1226.  With Your Honor's permission,

3    we're going to draw a little chart to lay out those laws and how

4    the different programs we discussed fall into them.  We think

5    it's easier just to see visually, and this chart will bring the

6    statutes and programs together for Your Honor.

7          MS. RYAN:  Is this okay placement for the board, Your

8    Honor?

9          THE COURT:  Yeah, that's fine.

10         MR. DARROW:  So on the one hand, we have 8 U.S.C.

11   1225, which applies to applicants for admission at ports of

12   entry or in between, along the border.

13         As relevant here, 1225 provides two primary pathways

14   for these applicants for admission.  First, they can be

15   processed for expedited removal, and that is it under 8 U.S.C.

16   1225(b)(1).  If a noncitizen lacks valid entry documentation or

17   misrepresents their authorization to enter the United States,

18   they can be quickly removed to their home country under

19   expedited removal, that is if their home country is willing to

20   accept them back from us.

21         THE COURT:  Did I hear evidence -- well, give me your

22   second category; and then as part of that, you can tell me did I

23   hear evidence as to what portion -- proportion are coming in

24   that would be (b)(1) aliens to versus (b)(2) aliens.

25         MR. DARROW:  I don't know if we actually -- if we

1    provided specific evidence on the ratio.  I mean, the (b)(1) --

2    and you can see when we get into it.  By looking at the

3    programs, you know, perhaps we can correlate the programs to the

4    statutes after we --

5            THE COURT:  Okay.

6            MR. DARROW:  -- lay them all out.

7            But just to finish up with expedited removal real

8    fast, in expedited removal, so they can either be expeditiously

9    removed or if those noncitizens claim fear and then are found to

10   have a credible fear in an interview with a USCIS asylum

11   officer, they are not removed under expedited removal and,

12   instead, are allowed to pursue an asylum application in further

13   proceedings.

14           So now, still in 1225, all other applicants for

15   admission who are not clearly and beyond a doubt entitled to

16   admission are subject to being placed into full removal

17   proceedings.  And the section for that is 8 U.S.C.

18   1225(b)(2)(A).

19           So now with all applicants for admission, the

20   mechanism for their release is parole, which is under 8 U.S.C.

21   1182(d)(5)(A).  And examples of this that you have heard

22   testimony about are the parole/NTA program and Parole ATD.

23           So now jump over to 1226 land.  8 U.S.C. 1226

24   addresses noncitizens who are encountered inside the United

25   States.  It doesn't draw distinctions as to where they are

1    inside the United States or how long they've been here.  1226

2    provides that on a warrant issued by immigration authorities --

3    that is, as administrative warrant -- a noncitizen may be

4    arrested and detained --

5             THE COURT:  Hold on a second.  That's not -- that's

6    not what it says, though, is it?  It says a warrant -- on a

7    warrant issued by the Attorney General.

8             MR. DARROW:  Yes.  And the -- most of the Attorney

9    General references in the INA -- and this is one of them -- had

10   been replaced when the Department of Homeland Security was

11   created.  And the enforcement actions of the former INS were

12   conferred over to DHS, whereas the Attorney General retains the

13   adjudicatory, you know, the Executive Office of Immigration

14   Review, that falls under the Attorney General.

15            So now the warrant authority is exercised by the

16   Secretary of DHS and is delegated down to his officers.

17            THE COURT:  And there's a specific regulation that

18   talks about that delegation, right?

19            MR. DARROW:  Yes, there is a regulation that spells

20   out the supervisory DHS officers that are authorized to issue a

21   warrant.

22            THE COURT:  And it's been a while since I reviewed it,

23   but my recollection was that doesn't -- that authorization to

24   issue that warrant does not go all the way down to the line

25   officers out patrolling the border, right?

1          MR. DARROW:  My understanding -- and I can definitely

2    verify this for our final briefing -- is that the line officers

3    have authority to execute the warrants.  But it's the one step

4    above them, it's their supervisors.  So in the ICE context, you

5    know, the bottom-level enforcement officer, so to speak, is the

6    deportation officer.  And then above them there's like a

7    supervisory deportation officer.  They're the ones who would be

8    authorized to issue the warrant, and then the deportation

9    officer is the one who executes it.

10         THE COURT:  But that's different than an arrest

11   without a warrant, right?

12         MR. DARROW:  Yes, yes, that's a different thing.  And

13   that is under 8 U.S.C. 1357(a) which provides that if an

14   official witnesses or has reason to believe that a noncitizen is

15   unlawfully entering the country and there is no time to go and

16   obtain a warrant, they can be arrested without a warrant in

17   those circumstances.

18         THE COURT:  And that was my understanding, I think, of

19   the chief's testimony, and maybe there was some other testimony

20   as well.  That the bulk of the detentions that are occurring by

21   Border Patrol, the bulk of the people Border Patrol is taking

22   into custody are pursuant to 1357.  They're not actually getting

23   warrants to arrest them.  They're encountering them having

24   reason to believe that they're in the country unlawfully, taking

25   them into custody for processing.

1          Did I misunderstand that evidence?

2          MR. DARROW:  That's generally true, but there's a

3    nuance there, which is that there's no warrant being obtained

4    when they're arrested, because, you know, we're just seeing them

5    come over the border and so someone's going after them, or, you

6    know, maybe we see them within, you know, a day.  But, you know,

7    we're trying to get -- so there's no warrant before the arrest,

8    but then when they are being processed, there is an

9    administrative warrant, the I-200 that chief mentioned, which is

10   issued into their A-file, which is the long, you know,

11   immigration file that follows them for the rest of their lives

12   until they become citizens.

13         THE COURT:  So your assessment is that it's an I-200

14   form?

15         MR. DARROW:  Yes.

16         THE COURT:  So your assessment is the I-200 form is

17   the warrant -- meets the requirements of the warrant referred to

18   in 1226(a)?

19         MR. DARROW:  Yes, for, you know, they're -- to the

20   extent they're going to be continually detained or released.  No

21   warrant is required for that, the initial arrest though, under

22   1357(a).

23         THE COURT:  Okay.  And help me understand then the

24   question I had with -- or the discussion I had with

25   Mr. Percival.  There's all of the data, Exhibits 2, 3, and 4,

1    that talk about processing dispositions, encounters by

2    processing dispositions, one of the processing dispositions is

3    NTA/OR, which is what I understood 1226 to be, you're --

4              MR. DARROW:  Yes.

5              THE COURT:  -- releasing them under your discretion,

6    right?

7              MR. DARROW:  That's correct, Your Honor.

8              THE COURT:  And there's a separate line for processing

9    the dispositions, Warrant of Arrest/Notice to Appear.  So I

10   guess what's confusing to me by that argument is what is the

11   difference between the warrant of arrest, that is specifically a

12   line item in this data, and what you're telling me that

13   everybody gets, which is this I-200 warrant to arrest.

14             MR. DARROW:  So the form is the same, but that's

15   actually two different groups of people.  The people that are

16   going to be OR'd, those -- let me start the other way.

17             The Warrant of Arrest/NTA, that is where ICE is

18   planning to -- or, you know, CBP, whoever is doing the

19   determination is planning to detain the person generally due to

20   them being a criminal noncitizen.  And so they're -- you know, a

21   warrant is, you know, initially obtained, and that's why you see

22   that there.

23             For the people that are being OR'd, the warrant is

24   obtained after the arrest and is put into their A-file.

25             THE COURT:  Well, I guess I understand what you're

1    saying.  And even if it all shakes out in the evidence and the

2    delegation, it seems like it's backwards than what the statute

3    contemplates.  The statute says, "upon warrant issued, alien may

4    be arrested."  What you're telling me is under the 1226 category

5    of people, they've been arrested and then a warrant's being

6    issued.  I mean, that's not what the statute seems to be talking

7    about.

8              MR. DARROW:  I think that is the way that DHS has

9    reconciled their authority under 1357(a) with under 1226(a),

10   because 1357(a) does let them do the arrest without the warrant.

11   But, you know, as the chief said in a belt-and-suspenders

12   approach, they're still getting the warrant and still putting it

13   into the A-file.

14             THE COURT:  But might that be an indication that

15   they're misunderstanding what 1226 is intended to do?  What

16   1226, it seems like, again just reading the language, "upon

17   warrant issued by the AG and whoever he delegates that authority

18   to, an alien may be arrested."

19             I mean, that seems to contemplate that a warrant is

20   issued, you go out and find them, and you bring them in, which

21   is talking more about people who are either absconders or people

22   that are -- overstay their visa.  Whatever it might be, they're

23   known people.  That's how you can get a warrant.  You can't get

24   a warrant for somebody you don't know.

25             So they get a warrant, go arrest them is what that

1    statute's talking about, which kind of proves the point that --

2    or not the point, but proves my concern that that statute just

3    doesn't apply.

4          I know that you're telling me and I've heard, I think

5    the chief, telling me they are applying it, but it seems to me,

6    it's kind of proving the point, that it shouldn't be applied.

7          MR. DARROW:  Well, I think if you look at the context

8    of 1226(a) -- 1226, rather, like the overall statute, the

9    1226(a) people are the ones for whom discretionary is

10   permissive.  1226 -- and, you know, I'm not -- I don't want to

11   speak for Congress, but it seems to me that the real thrust of

12   1226 and 1226(c), which is the criminal alien program that we

13   heard testimony --

14       *(Interruption by the reporter.)*

15          MR. DARROW:  Sorry.

16          The criminal alien program in 1226(c), which is what

17   we heard a lot of testimony about.  And in that process, you

18   know, ICE has -- generally we're talking about ICE, right, in

19   the circumstances of criminal aliens -- they have identified

20   somebody, as you say, you know, in advance.  Generally, it's by

21   correspondence with state and local law enforcement agencies who

22   tell them, Hey, we got this guy, he's got this conviction, we

23   think he's, you know, a noncitizen suspected of immigration

24   offenses.  And so the officer, the ICE officer, the CBP officer,

25   whoever's involved, knows in advance who it is.

1           But that's why, you know -- and so that's the overall

2    framework and thrust of 1226.  I mean, of course, there's

3    1226(a), but Congress recognized that there's going to be a

4    problem with this when we were just encountering an alien coming

5    over the border, which is why they created 1357(a), which

6    addresses that scenario and stills lets you arrest somebody

7    under 1226, even when you don't have a chance to go get a

8    warrant because you don't know they're going to come over the

9    border.

10          THE COURT:  And if all of that's true -- and again,

11   it's got one factual issue that I want to talk to you about, but

12   even if all that's true, isn't that kind of odd that 1225 is

13   talking about applicants for admission and what you do for

14   people who are trying to get in and it doesn't refer in any way,

15   shape, or form, best I can recall, to 1226?  It's not like it

16   incorporates it by reference and says "you shall detain except

17   as provided in 1226" or anything like that, does it?

18          MR. DARROW:  To my knowledge, it doesn't incorporate.

19   The two don't talk about each other.

20          THE COURT:  Isn't that another textual indication that

21   they're talking about two different groups of people?

22          MR. DARROW:  Honestly, I think it's a textual

23   indication that the INA is messy and was created, you know, in a

24   patchwork --

25          THE COURT:  I think I can take judicial notice of

1    that.

2            MR. DARROW:  Yeah.

3            And, you know, was created over many years to address

4    many different problems.  Like for instance, you know, 1225 was

5    dramatically revamped in 1996 to deal with, you know, a

6    different type of surge.  And they were writing on law that

7    already existed, but they wanted to create the expedited removal

8    program without necessarily, you know, altering the things that

9    had already, you know, served the INS very well.

10           And so that's why we have -- and, I mean, the point of

11   this chart, which we'll eventually get to, is that there is an

12   overlap that.  To plaintiff's counsel's point, it's not so much

13   that somebody's 1225 suddenly turns into 1226 at a certain

14   point, it's that both statutes apply to them from the incep --

15   for a person who's coming over the border illegally and is not

16   apprehended by immigration authorities until they're inside the

17   United States, both statutes apply simultaneously.  And it is

18   and it has always been the discretion, going back to -- like in

19   1997 right after the laws changed of the INS and now, the

20   immigrate -- you know, the current immigration system to

21   determine which statute should apply to that particular alien,

22   1225 or 1226.

23           THE COURT:  Two questions:  One, historical practice

24   is interesting, but that doesn't necessarily make it right, I

25   guess, it seems to me.  I wasn't here in 1996 or 1997 to see how

1    it's been applied.  And the fact that it's been misapplied for

2    20 years, doesn't change my job, does it?

3              MR. DARROW:  No, but it's not just historical

4    practice.  So there is a Border of Immigration Appeals case,

5    *Matter of E-R-M-*, that talks about the discretion of DHS to

6    place somebody who could qualify for expedited removal into full

7    removal proceedings and vice versa.

8              THE COURT:  Well, one other -- I mean, going back, I

9    think your argument assumes that the evidence that I've heard

10   establishes that there's an administrative warrant, I-200, in

11   every one of these NTA/OR cases or all of these cases.  And I

12   certainly heard conflicting evidence on that point, didn't I?

13             MR. DARROW:  You did.  And, I mean, to address

14   Mr. Barker, I mean, I think he was not -- you know, it was a

15   30(b)(6), and honestly, the 1226 issues, he hadn't been prepped

16   on them yet because he was not designated for that particular

17   part of the discussion.  He hadn't, you know, been prepped on

18   warrants before we went into that deposition.

19             And I don't really know the whole history.  It's

20   possible that that practice wasn't -- you know, hasn't always

21   been followed, and it could be impacted by litigation.  You

22   know, the issuance of the I-200 into the A-file, that's what I'm

23   talking about, what Chief Ortiz said, and -- or, you know, it's

24   possible Mr. Barker was confused and thought we were talking

25   specifically about the criminal alien context.

1          THE COURT:  Okay.  So for you to prevail on this

2   argument, putting aside my legal concerns, I would have to find

3   as a matter of fact that an I-200, administrative arrest

4   warrant, is included in all of these -- all of the files for the

5   aliens released on OR; is that right?

6          MR. DARROW:  For -- well, I mean, there's a period of

7   time where they wouldn't need an I-200, right?  Like when

8   they're being arrested and, you know, the period of time that

9   1357(a) allows them for processing.  And the period after

10  they've been released under 1226(a), I'm also not sure they

11  would need a warrant for.  But I think to Your Honor's point,

12  there is a period in there when the determination to release

13  them on 1226(a) after they've been lawfully arrested without a

14  warrant would require some evidence of a warrant being issued

15  for them, even if it's to the A-file.

16         THE COURT:  And so where is that evidence here?  The

17  chief's testimony, is that it?  Did I get any exhibits showing

18  me that here's what a file looks like for this alien or that

19  alien?

20         MR. DARROW:  No, Your Honor.  I'm sure -- and I think

21  this is something we can --

22         THE COURT:  Right.  And you'll have that opportunity.

23  So I'm not going to hold it against you couldn't give it to me

24  now so it must not exist.  But I guess it would seem to me that

25  that -- if the Federal Government's position is that some

1    component of these releases are being done under 1226(a), you're

2    going to have to show me that there is a warrant associated with

3    that release.  Otherwise, even under what I think is a backwards

4    reading of 1226, it wouldn't apply, right?

5              MR. DARROW:  Under Your Honor's reading of it, yeah.

6              THE COURT:  Or even under your reading of it, there's

7    got to be an arrest -- there's got to be a warrant somewhere.

8              MR. DARROW:  Yes, yes.

9              THE COURT:  I think it has to come first, you're

10   saying it can come after the arrest, but if there is no I-200

11   associated with it, there is no warrant associated with it, so

12   1226 doesn't apply, right?

13             MR. DARROW:  I agree that there has to be a warrant

14   somewhere.

15             THE COURT:  And so which group of people are we

16   talking about that are the 1226 people?

17             MR. DARROW:  Okay.  So let's go back to the chart.

18             So, and -- you know, we -- I've already kind of walked

19   through this, but 1226 breaks up the noncitizens subject to it

20   into two main groups:  There are those with the qualifying

21   criminal history, or the ones commonly called criminal aliens,

22   and there's everybody else encountered inside the U.S.

23             All right.  We already got that.

24             All right.  Criminal aliens are subject to mandatory

25   detention under 1226(c).  All of the other 1226 noncitizens may

1    be released on bond or conditional parole under 1226(a), and

2    examples of conditional parole that you've received evidence

3    about are the NTA/OR program as used by Border Patrol, and the

4    OREC as used by ICE, Order of Release On Recognizance.

5            THE COURT:  I'm kind of flipping through the

6    administrative record, because I do remember there was some

7    discussion in the administrative record about the A-file.  But I

8    don't remember -- and maybe that's a different group of people,

9    but I don't remember there being anything that talked about them

10   getting an I-210 -- if I got my number correct.

11           MR. DARROW:  I-200, Your Honor.

12           THE COURT:  I-200.  They didn't get an I-200 before

13   they were released on that parole.  So is that your -- I guess

14   your position is they're going to get the I-200 when they show

15   up at the ICE office?

16           MR. DARROW:  Actually, I think our position is the

17   chief's testimony, which is that they -- for people who are

18   being released, they might never even get a copy of I-200.  Or I

19   suppose they could obtain a copy later on, but -- because it's

20   being issued to their immigration file which is maintained by,

21   you know, the DHS officials that are supervising their case.

22           THE COURT:  Okay.

23           MR. DARROW:  Okay.  So then with our chart here, we'll

24   talk about the requirements for releasing the noncitizens in

25   these two groups, and we'll start with 1226 because that's more

1    straightforward.

2         The statute places no standard or limit on the

3    discretion of DHS officers to release noncitizens on NTA/OR or

4    OREC or bond or any other 1226(a) mechanism.

5         And so now let's turn back to 1225, the noncitizens

6    who are being released on parole.  The parole statute provides

7    DHS discretion to grant parole so long as it's on a case-by-case

8    basis for urgent humanitarian reasons or significant public

9    benefit.

10        You've heard testimony from all the Government's

11   witnesses that their respective components undertaken,

12   individualized, case-by-case basis inquiry to decide parole and

13   require an urgent humanitarian reason or significant public

14   benefit, such as medical concerns on the threat to public health

15   and safety posed by overcrowded holding facilities?

16        THE COURT:  And it seems to me that this -- I mean,

17   which -- are you relying upon the significant public benefit

18   aspect of that, or the urgent humanitarian reason aspect of it?

19        MR. DARROW:  Well, my understanding of the case law,

20   Your Honor, is they kind of just collide them together

21   generally.  There's not a lot of -- some -- you know, in certain

22   cases, it's easier to draw a distinction.  But, you know,

23   with -- for instance, overcrowded facilities causing diseases

24   and death, diseases and deaths, I think you can argue that it's

25   both a humanitarian interest and a significant public benefit.

1              THE COURT:  And I don't know -- are we talking about

2      just now the Parole Plus ATD component of this or any --

3              MR. DARROW:  Oh, no.  Or any.  And so you heard

4      testimony from, for instance, Matt Davies, talking about a lot

5      of different uses of parole that they've used over the years for

6      people coming in with, you know, urgent medical concerns.

7      They're coming --

8              THE COURT:  But that's not what we're dealing with

9      here.  I mean, I don't think if that's -- if you had the number

10     of aliens that are coming in, all of whom had gunshot wounds or

11     were pregnant, I don't think Florida would be arguing that you

12     can't use the parole statute to let those people in to get their

13     gunshot wounds treated or get their pregnancy handled.  What I

14     understand we're talking about are circumstances where the

15     Homeland Security, or whomever is making the parole decision,

16     says the benefits of having this person out of custody outweigh

17     the benefits of this person being in custody.

18             And what I'm struggling to understand is, at least in

19     the Parole Plus ATD context, it seems like the real reason is

20     the overcrowding of CBP facilities.  That's the public interest

21     that's justifying you, the next guy, and the next guy being

22     released under that program.  Am I misunderstanding it?

23             MR. DARROW:  That, I'd say, is the one large part of

24     that public interest, but the public interest doesn't just

25     extend to the facility themselves.  And it's well explained, I

1    think, in the first memo and just barely referenced in the

2    second.  But -- and, you know, I -- if we're going to talk about

3    Parole ATD, I don't want to bring in the chief's testimony, but

4    if we're talking about nondetention generally.

5          (Interruption by the reporter.)

6          MR. DARROW:  Sorry.

7          Chief Ortiz explained very well how pulling agents in

8    because you have all these facilities flooded, right, and so you

9    need to get your agents in to process them quickly if you don't

10   have Parole ATD.  Then they're not out on the border trying to

11   catch the smugglers and traffickers and cartel guys.  And so

12   that's part of the significant public interest is that not only

13   do we want to, you know, prevent all the dire health

14   consequences from the overcrowding facilities, but we also want

15   to be able to go out and catch the criminals crossing the border

16   and not have our agents hanging out on the sidelines processing

17   people.

18         THE COURT:  That didn't come through, I didn't think,

19   to -- in the administrative record.  What I had saw in the

20   administrative record was more focused on the overcrowding at

21   the CBP facilities and the need to get people out of that

22   facility more quickly because of the health risk associated with

23   a lot of people being in the facility and the speed at which the

24   parole decision could be made, rather than the issuance of the

25   NTA.

1          Do you see elsewhere in there -- I mean, everything

2     you're telling me makes sense, but I'm not sure I saw that in

3     the administrative record.

4          MR. DARROW:  I mean, the thrust of the discussion in

5     the administrative record, you're correct, was not about that.

6     But there is -- and I can go back and pull up the record and

7     give you the page cite.  There is, I remember specifically in

8     the first memorandum, a discussion of how the agents are needed,

9     you know, out on the border, as opposed to processing the

10    facilities.

11         THE COURT:  Okay.  All right.  Go ahead.  I'm sorry.

12    I interrupted.

13         MR. DARROW:  So to go back to Your Honor's question

14    about the parole statute.

15         And it's actually even easier to see the lawful

16    application of the parole statute to the paroles we're talking

17    about in this case because DHS has gone ahead and interpreted

18    this statute to provide its officers with some guidance in a

19    regulation for back in the '90s that Florida is not challenging,

20    and that is 8 CFR 212.5(b).

21         That's the regulation that had been cited in, for

22    instance, the ICE parole directive that Mr. Guadian walked us

23    through yesterday.  And that's the one that provides for -- and

24    so I should point out that this does not provide guidance for

25    all applicants for admission.  It just provides guidance for

1  arriving aliens.  So, you know, 1225 aliens who come to ports of

2  entry and also for noncitizens who can be in the ER -- in the

3  expedited removal process, whether they're coming to ports of

4  entry and being put into ER or whether they're being

5  apprehended, you know, in between, along the border and being

6  put into ER.  That's who this regulation applies to.

7         And it interprets the case-by-case, urgent

8  humanitarian interest/significant public benefit standard to

9  provide that, you know, so long as a noncitizen doesn't present

10 a security risk or risk of absconding, their parole is generally

11 permissible if it is determined that they are a noncitizen whose

12 continued detention is not in the public interest as determined

13 by DHS officials.

14        And a good example of using parole in the public

15 interest, such as Chief Ortiz and Mr. Guadian testified, and I

16 think Your Honor also just summarized pretty well, is -- are

17 aware, low-risk individuals are not detained in order to be able

18 to prioritize limited resources for criminals and other

19 high-risk individuals.

20        And critically, Florida has presented no evidence that

21 any of the paroles at issue in this case are not because

22 detention is not in the public interest, as determined by DHS

23 officials, where it might apply to arriving aliens or people who

24 have come out of the expedited removal process.

25        Your Honor also asked Mr. Guadian yesterday about

1    another regulation that's relevant to parole,

2    8 CFR 235.3(b)(2) -- (2) -- (b)(2), excuse me, (iii), three

3    small I's, for Erin who's writing up there.

4              THE REPORTER:  Can you say the regulation again?

5              MR. DARROW:  Yeah.  Sorry.  8 CFR 235.3(b)(2)(iii).

6              And that was the one that's used to provide for parole

7    only where it is required to meet a medical emergency or a

8    legitimate law enforcement objective.  This regulation was

9    actually amended last year, in 2021, and the new regulatory

10   language says that the population that's at issue; that is,

11   noncitizens who are placed in the expedited removal process but

12   who have their credible-fear claims denied.  So the ones, you

13   know, who are not going to be permitted to pursue asylum,

14   they're still subject to parole under 8 CFR 212.5, same as the

15   other arriving aliens and noncitizens in expedited removal.

16             THE COURT:  And so what you're telling me is that now

17   people who are going to have their asylum claims denied, some

18   asylum officer's already determined that, or at least made that

19   preliminary determination, those people can now be released

20   if -- overcrowding issues or whatever else?

21             MR. DARROW:  Under the same terms as other -- as the

22   other people in that category.  I should note that that revision

23   is under litigation as well.

24             THE COURT:  I would suspect it is --

25             MR. DARROW:  Yeah.

1           THE COURT:  -- because it's directly contrary to the

2    statute.  Obviously, that's not for me to decide.  I appreciate

3    you bringing the amendment to my attention.  But, I mean,

4    that's -- that's clearly directly contravenes that statutory

5    language.  And, my God, I can't think of a worse policy to tell

6    somebody:  You're not going to get asylum, but we're going to

7    release you anyway.  That's ridiculous.

8           But anyway, that's not my case.  So, not my dog, not

9    my shovel.

10          MR. DARROW:  But I think the thing that -- you know,

11   we dragged you through this whole process, and I dragged

12   Ms. Ryan up here to draw for us, which she did very admirably,

13   I'd say.  My handwriting is not as good -- is that the 1226

14   noncitizens and the -- the 1225 noncitizens, rather, and the

15   1226 noncitizens are not mutually exclusive.  There is an

16   overlap for the noncitizens that Border Patrol encounters after

17   having illegally crossed the border between ports of entry who

18   are both applicants for admission and noncitizens encountered

19   inside the United States; and they can be subjected to expedited

20   removal -- or full removal proceedings, for that matter -- under

21   1225, or they can be placed into full removal proceedings and

22   detained or released under 1226.

23          THE COURT:  What happens if I disagree with you?  What

24   happens if I view 1225 being the universe dealing with

25   applicants for admission and 1226 dealing with people that an

1    actual warrant is issued before they're arrested to go out and

2    get them?  What if I say those are two difference things, where

3    does that leave you?

4            MR. DARROW:  I mean, I think that would -- legally or

5    practically?

6            THE COURT:  Both.

7            MR. DARROW:  Well, legally, I think that view would

8    ignore the authority provided by 1357(a), which says, you know,

9    specifically for people that are entering the country illegally,

10   we don't need to go and obtain a warrant first.  We can arrest

11   you and the warrant come afterwards.

12           But practically, that would be -- I mean, that would

13   basically mean that that whole authority couldn't apply to

14   arresting people coming over at the border or, you know,

15   apprehended inside the country.  Basically, as Your Honor said,

16   it could only apply to people that ICE affirmatively knows in

17   advance is somebody that it wants to place into removal

18   proceedings.

19           THE COURT:  Doesn't that makes sense?  Isn't that why

20   I have 1357, so you don't have to get a warrant for those

21   people?  So, you have a Border Patrol officer who's patrolling

22   between -- the Rio Grand sector, which seems to be a hotbed,

23   based on the evidence I've gotten here.  So you have --

24   patrolling there, he sees somebody coming across the border, he

25   doesn't need a warrant.  He arrests them.  He has probable cause

1    to make an arrest because somebody is sneaking across the

2    border.  He makes the arrest.  I mean, they have been arrested

3    at that point and then can be processed, by definition, as an

4    applicant for admission.  That seems to kind of support my view

5    of the statute, that 1226 is talking about completely different

6    people.  Why would you go get a warrant for somebody you've

7    already arrested?  That makes no sense to me.  Is there any

8    other context you're aware of that a warrant is obtained after

9    an arrest has been effectuated?

10        MR. DARROW:  I think we have to be careful not to

11   bring criminal warrant conceptions into the administrative

12   warrant arrest, you know, edifice, even as, you know, natural as

13   it might seem.

14        THE COURT:  The Secretary brought criminal releases,

15   criminal bond decisions into this.  So it seems to me that at

16   least the higher-ups in the Department seem to think there's a

17   correlation between criminal law and immigration law.

18        MR. DARROW:  And there might be in certain contexts,

19   but I would submit that's not the case in the administrative

20   warrant -- administrative warrant context.

21        For instance, the, you know, administrative warrant,

22   like I said, is issued by the same agency that's executing it.

23   It's, you know, a totally different concept than going to a

24   neutral judicial officer to obtain a warrant.  It's -- it, you

25   know, doesn't have the same scope, it doesn't have, you know --

1    there's no, as far as I know, probable cause requirement

2    attached, for instance, issuance of a warrant for somebody you

3    believe is, you know, a qualifying criminal alien.  It's --

4    they're -- it's a totally different thing.  And I think -- if

5    Your Honor notes in 1225, there's no require -- there's no

6    mention of a warrant required.

7            So I think the fact that in 1357(a), Congress is

8    saying the warrant requirement is not necessary to arrest these

9    people, it's specifically referring to 1226.  And if Congress

10   didn't intend for Border Patrol to be able to use 1226 to deal

11   with these people that it is encountering illegally entering the

12   country, why would it reference warrants in 1357(a)?

13           THE COURT:  Okay.  I understand your argument.  I'm

14   not sure I agree with it, but I'll keep an open mind.

15           MR. DARROW:  I think Your Honor got the overlap point,

16   and that was, you know, the primary point of this exercise.

17           I just wanted to note a point raised by opposing

18   counsel regarding the use of the term "inspection" in 1225(a)

19   and that applicants for admission as a category are much broader

20   than those who are inspected, right?  Because the inspection

21   occurs at -- if somebody who is, you know, coming to the border

22   lawfully, people who enter without inspection, you know, the

23   people that we're dealing with are, by definition, entering

24   without inspection, but they can still be, as we said,

25   considered an applicant for admission.

1          And then unless Your Honor has any further questions

2     about the law specifically, I'll turn it over to my colleague,

3     Ms. Fudim.

4          THE COURT:  Okay.  Thank you.

5          MR. DARROW:  Thank you.

6          MS. FUDIM:  Good afternoon.

7          At the beginning of this trial, my co-counsel,

8     Ms. Ryan, told you that we would establish that there is no

9     nondetention policy.  Now, that's certainly not our burden;

10    Florida has that burden.  But we believe that we have fulfilled

11    that promise all the same.  We have shown that there is no

12    nondetention policy.

13         So how do you get there?

14         Well, first and foremost, three high-ranking

15    officials, law enforcement officers, all three, at OFO, Border

16    Patrol, and ICE, came here and told you that they are not aware

17    of any such policy, whether written or oral.

18         Matthew Davies, the executive director of

19    Admissibility and Passenger Programs who oversees 11

20    directorates at OFO; Chief Ortiz, the chief of all of Border

21    Patrol for the United States; and Robert Guadian, the deputy

22    assistant director for Field Operations East.  All three told

23    you that if there were a policy affecting parole or detention

24    along the southwest border, they would know about it.  And none

25    of them were aware of any such policy, and they said that

1    unequivocally.

2         THE COURT:  Didn't Chief Ortiz essentially testify, or

3    directly testify, that his understanding of who they were to

4    detain was colored by the Civil Enforcement Priorities?   In

5    other words, they're supposed to detain people that are threats

6    to national security and people that are criminals?

7         MS. FUDIM:  I think that that testimony has to be

8    viewed in light of the rest of his testimony, which was that

9    determinations regarding detention are still going to be made on

10   a case-by-case basis and that there is a practical reality to

11   the fact that in terms of priorities and importance, that there

12   is a preference to detain the bad guys, as opposed to, as the

13   Court said, women and children, families.  I did not hear

14   testimony from Chief Ortiz that that was communicated to him as

15   a policy of nondetention or as an abdication of case-by-case

16   analysis.

17        THE COURT:  And I guess that kind of really gets to

18   the most difficult issue in this case, it seems to me, that the

19   statute says to do one thing; the practical reality demonstrates

20   you can't do that.  And so I guess what I'm struggling with is

21   it seems pretty clear to me based upon the progression of things

22   down from the executive order, even if you put aside the

23   Secretary's testimony to Congress -- because I don't remember

24   exactly when that was -- but, you know, if you follow it down

25   the chain, it seemed like the chief, at least, was under the

1    impression that his direction -- and I think he even said, It's

2    the same direction I've had throughout my career was to detain

3    the worst of the worst and make those decisions on a law

4    enforcement/prosecutorial-discretion type standpoint.  But

5    still, isn't that a policy, a practice, a procedure that's

6    inconsistent with the plain direction in the statute?

7            MS. FUDIM:  I don't think it is, Your Honor, because

8    the -- well, first, let me cabin what I'm saying into two parts,

9    to make sure I'm following you.

10           I think the first part which Your Honor has recognized

11   is that Chief Ortiz has said, This is the same logic that has

12   applied going back his entire career.  I don't think it's hard

13   to guess why that might be the logic, that multiple

14   administrations would want to suggest that we go after the bad

15   guys.  But he never testified that there is any sort of

16   abdication of case-by-case review and that other factors are not

17   also considered.

18           Other factors we've heard about throughout this trial

19   might be flight risk, might be country of origin, might be

20   repatriation abilities.  And so I don't think that there has

21   been any evidence that suggests to this Court that there is some

22   policy that is being directed down the chain within Border

23   Patrol or ICE, or OFO for that matter, that is violating

24   statutory directives regarding a case-by-case analysis in the

25   case of parole.

1        If I may, Your Honor, jump to what I think is a big

2   issue in this case.

3        THE COURT:  Let me ask you before you go on, though.

4   I mean, the parole -- well, I guess it goes to Mr. Darrow's

5   argument that outside of the parole context, there's no

6   constraints upon our -- on the defendants' discretion to release

7   somebody, that that is consistent with the statute, "shall

8   detain," because they've also given us discretion to release

9   whoever we want, or for any reason or no reason.

10       MS. FUDIM:  Well, I would defer to Mr. Darrow, but I

11  think the answer to that is that that's just strict law

12  enforcement/prosecutorial discretion, but I would -- to the

13  extent you want to get back into the intricacies and the

14  differences, I would defer to Mr. Darrow on that portion.

15       THE COURT:  So you see built into the "shall detain"

16  language in 1225, "shall" doesn't mean shall.  It means you

17  "shall unless you determine in your law

18  enforcement/prosecutorial discretion that you shouldn't?"

19       MS. FUDIM:  Yeah, I believe that the position that the

20  Government takes on that stems from the *Castle Rock* case, which

21  talks to prosecutorial discretion generally in terms of the fact

22  that law enforcement across this country has prosecutorial

23  discretion.  There are many statutes at the federal level, state

24  level, local levels that say you shall arrest a person for

25  driving over the speed limit, you shall arrest a person for

1    assault in these circumstances.

2         THE COURT:  And those are -- would you concede those

3    are different?  When a statute says you shall arrest somebody,

4    that's the essence of prosecutorial discretion.  That is, you

5    know, the essence of what's in 1226:  An alien may be arrested.

6    It doesn't tell you you shall arrest them.  I mean, that's

7    inherent.  But once you make that prosecutorial decision that

8    you're going to arrest a person, isn't it different when a

9    statute says:  Having decided to exercise that discretion

10   whether to arrest them, you shall detain him.

11        MS. FUDIM:  Well, I think you have to read into the

12   statute at the time of its writing.  And again, this goes into a

13   little bit of the history, but this has been the same case for

14   the entirety of the written history of this country, that there

15   has just never been enough detention resources to actually

16   detain all those people.  So I think there is an argument that

17   if in that context in 1225 that "shall" means "must," you have a

18   problem at the time that the statute's written because there's

19   never been enough money provided to do that.

20        I know that Solicitor General Prelogar addressed some

21   of the arguments with respect to the meaning of the word "shall"

22   when the MPP case was before the Supreme Court.  And certainly I

23   would defer to her summary of those.

24        THE COURT:  And I think that's a fair -- and this is

25   an interesting argument.  Where it really -- where I've been

1    excited to have this case and dreading to have this case all at

2    the same time is in the *Texas v. Biden* opinion, the Supreme

3    Court kicked that question down the road.  I mean, they

4    specifically had language in there essentially on this exact

5    discussion we're having.

6            MS. FUDIM:  That's correct.

7            THE COURT:  And what it seems to me that this is the

8    case where somebody's going to need to answer that question,

9    because -- and I think it goes back to what Chief Justice

10   Roberts said during one of those oral arguments where he said,

11   "Why is that my problem" -- or "the Court's problem?"  Why is

12   that the Court system's problem if a statute tells you to do

13   something and you're practically unable to do it, why does that

14   fall on the Court to save you from the statute?

15           MS. FUDIM:  Well, I guess I would say to that that I

16   don't disagree with you that at some point that question is

17   going to find its way back to Chief Roberts' desk and that at

18   some point, I imagine someone, probably the solicitor general

19   herself, will get up and there will be arguments with regard to

20   that.

21           From our point of view, our position remains the same

22   as the one argued by General Prelogar before the Supreme Court

23   in the MPP case.

24           THE COURT:  Okay.  I think that's the best you can do

25   at this point.

1           MS. FUDIM:  Moving forward, I was going to say that I

2   think one of the big issues we have in this case is that when

3   plaintiff's counsel was talking about this nondetention policy,

4   they said, you know, no one has disputed that if there was a

5   specific oral policy disseminated down through the chain of

6   command, "you shall not detain anybody," that is a policy that

7   can be challenged under the APA.  But there's no evidence of

8   that -- assuming that that's not correct, and I'm not disputing

9   that.  But there is it no evidence of that in this case.  There

10  were no witnesses who said, I am aware of an oral nondetention

11  policy, and if you --

12          THE COURT:  But I guess, just to push back a little

13  bit, that's not surprising, is it?  If people are -- and, again,

14  I know you disagree that it's violating the law in the first

15  place, but if people are going to do something in violation of

16  the law, they're not going to write it down.  I mean, most

17  people aren't.  So the fact that you're having to piece together

18  the existence of it, I think there's a strong argument maybe it

19  doesn't exist, but doesn't it also -- it doesn't foreclose the

20  possibility that it does exist.

21          MS. FUDIM:  I'm not arguing that it forecloses the

22  possibility that there could be this oral statement that could

23  create a policy.  What I'm saying is that we had three extremely

24  high-ranking career law enforcement officers who have served for

25  multiple decades under multiple administrations come into this

1    court and say that they are not aware -- oral other otherwise --

2    of a policy that has been disseminated down through the ranks.

3    And I don't think there is any reason to think that career law

4    enforcement officers, specifically the ones we saw on the stand,

5    would put their entire careers on the line to make a statement

6    in this court of that sort were that not true to their

7    knowledge.  And they all testified that it would be virtually

8    impossible for a policy like that, even if oral, to exist and

9    affect the southwest border without them knowing about it.

10           So I think where that leaves us, then, is with the

11   notion --

12           THE COURT:  Let me ask you two questions about that.

13   And before I forget, one issue I have -- and I explored a lot

14   with Mr. Percival -- was assuming I agree with you -- him, that

15   there is circumstantial evidence to find that there is a policy

16   that he's talking about, is that something that is reviewable

17   under the APA, this unwritten policy?

18           MS. FUDIM:  Well, that's the exact one I was just

19   about to phase into.

20           THE COURT:  Okay.  Well, hold that thought because the

21   other question I had was -- now I've lost it, so go to your

22   point.

23           MS. FUDIM:  What I was going to say was that if you

24   assume that there is this policy -- and I think that we can say

25   this policy could be one of two things, and I will address both,

1    but just to big-picture it, on the one hand, if the Court were

2    to find that there is a specific delineated oral policy, which I

3    would submit there has been no evidence of, but assuming that

4    the Court --

5              THE COURT:  Okay.  Here's my thought, and I apologize

6    for doing this to you.  But it seems to me -- and what was

7    interesting about this case, all of the witnesses who came in to

8    testify, I thought, were credible, likable.  The OFO guy maybe a

9    little less likable than the others, but I thought all of them

10   came in and credibly testified, were forthright in their

11   testimony.

12             But the question I had -- and they all seemed to say

13   that nothing has changed.  Nothing has changed in the way we're

14   doing our jobs before the administration change and after the

15   administration change.  But I'm not sure if that necessarily

16   forecloses the possibility that there is a -- this policy of

17   we're only going to detain certain people.

18             Maybe that question wasn't clearly asked, but does

19   that make a difference?  If the idea that on January 19th Chief

20   understood -- I guess he may have been deputy chief at that

21   time -- understood his job to prioritize resources by detaining

22   bad guys and letting less dangerous people out, and the same was

23   on January 21st, does that necessarily foreclose the possibility

24   that that policy is contrary to statute?

25             MS. FUDIM:  Well, I think that I would make two points

1   before I circle back, because I think that there is a difference
2   between "prioritize" and "only detain."  And I think what we've
3   heard some evidence of is that Chief Ortiz said, Operationally
4   we are prioritizing detention for people largely who pose
5   national security or criminal threats to our community.  I think
6   that is distinguishable from, We are only detaining people who
7   are criminal threats to our communities.  And I didn't hear any
8   evidence of that.

9         And I think in order to have the actionable policy
10   that Florida is postulating, we'd have to be hearing evidence of
11   the latter, which also really bring me to a point -- which at
12   this point I would say goes to weight, if anything -- which is
13   that today was the first time, from our point of view, that we
14   have ever heard Florida delineate and articulate what the actual
15   nondetention policy they're challenging is.

16         The Court specifically asked Florida that, and Florida
17   said, It's that this administration won't detain unless there's
18   a security risk.  But that articulation was not -- it was not
19   narrowed down to that until we came here today, which I find
20   interesting for a few reasons.

21         But if I could circle back a moment to --

22         THE COURT:  And for what it's worth, I did too.  I've
23   been trying to struggle to put my arms around this and
24   understand what it was, and that was the first time it really
25   kind of made sense to me, but anyway.

1          MS. FUDIM:  And I would suggest that there are

2     practical difficulties in defending against a case challenging a

3     policy under the APA when the policy has not been defined until

4     closing arguments following trial.

5          But be that as it may, if I circle back to the two

6     big -- where I had my hands up in the air a moment ago.  Press

7     rewind.

8          On the one side, we have potentially a suit where the

9     Court finds that there is an oral policy:  We're not going to

10    detain anybody.  And as I just said, I don't think there was any

11    evidence of that.  And over here, we've got what I think is more

12    what the -- I won't say the evidence supports, but what the

13    evidence supports the allegation really is, which is that we

14    have a number of distinct, separate policies and decisions that

15    taken together create a *de facto* umbrella policy.  And I think

16    that both of those are problematic, and I'm going to tell you

17    why.

18          So in *Texas v. Biden*, which went up to the Supreme

19    Court, the Fifth Circuit -- excuse me, the Supreme Court held

20    that the Fifth Circuit committed reversible error by postulating

21    the existence of an agency decision wholly apart from any agency

22    statement of general or particular applicability designed to

23    implement that decision.  And it stated that -- and this is a

24    quote -- "To the extent the Court of Appeals understood itself

25    to be reviewing an abstract decision apart from specific agency

1    action as defined in the EPA, that was error."

2              And I think that that problem permeates this case at a

3    pretty high level.

4              On the one hand, there's allegations that there is

5    this oral policy, but I think it has been presented, at best, in

6    a very abstract way, particularly because it was not delineated

7    until closing arguments.  And so I think that presents a problem

8    under the APA and under *Texas v. Biden*.  I also think there is a

9    real problem in taking Policy A plus Policy B plus Decision C

10   equals *de facto* policy.  I think that's a problem under the APA,

11   because the APA, we're supposed to be looking at individual

12   policies, and they're supposed to be challenged on records.

13   And, in fact, the different piecemeal policies and decisions

14   that it appears Florida is taking issue with in this litigation,

15   many of them are subject to other lawsuits.

16             So we have, for example -- and I'm sure I'm not

17   telling the Court anything it does not know, but, for example,

18   the family detention issue that's tied up in the *Flores*

19   litigation.  MPP is being litigated in Texas and West Virginia

20   and elsewhere.  ICE's priorities litigation is being litigated

21   in Ohio and Louisiana.  Title 42 is being litigated in Louisiana

22   and the District of D.C.  And so we have a situation where I

23   think what they're saying is -- and I get that they might come

24   back and say, Well, we're not really challenging the termination

25   of MPP.  But to the extent that they're claiming that other

1    decisions that this administration made are unlawful or

2    arbitrary and capricious because other pathways --

3            THE COURT:  I don't know if I interpret them saying

4    that.  I think they're saying that they -- those pathways which

5    existed before don't exist.  And so it's, you know, fighting the

6    fight with one hand tied behind your back, is how I understand

7    their argument.

8            MS. FUDIM:  That's how I understand it.  That's what I

9    was trying to get at.  I think that they might come back and

10   say, We're not challenging MPP, we're just saying that these

11   other decisions you made temporally following the termination of

12   MPP makes a problem.  And I think that a component of that, if

13   that's truly illegal, I think an ingredient of that has to be,

14   Well, was the decision to terminate MPP lawful?  Because if the

15   answer to that question is yes, then I don't know that you can

16   get to the secondary, Well, doing that created this other

17   problem and is therefore unlawful, if a Court, arguably --

18           THE COURT:  Well, I think I understand their point to

19   be when you take tools out of your tool belt, you can't come

20   into court and complain that -- Well, let me use that analogy a

21   little better.

22           If you take the screwdriver and the wrench out of your

23   tool belt, you can't come into court and say, I can't fix this

24   screw with only a hammer.  That's the only tool I've got.  I've

25   got a problem, and all I've been given is a hammer.  It seems a

1     little bit disingenuous to say that -- make that argument when

2     if you didn't take the screwdriver out of your tool belt, you

3     could easily fix the screw.

4           MS. FUDIM:  I understand that to be their argument,

5     but I don't think that legally that's right.  And I say that

6     from two point of views.  One from the notion that if a court

7     were to find that removing those tools from your toolbox was

8     totally legal, and the administration had every right to do

9     that, I don't know in a commonsense, logistic, logical

10    perspective that you can get there.

11          I would also think, in my own head, just standing here

12    now, about the MPP case and about the -- you know, there were

13    arguments made at the Supreme Court on the MPP case that Remain

14    in Mexico had to continue to exist as a relief valve because if

15    it didn't, then the Administration would not be able to comply

16    with their detention authority -- detention responsibilities, or

17    at least would not be able to comply as well with their

18    detention responsibilities.  And what the Supreme Court said is,

19    No, we look at those separately.  The fact that removing one may

20    not allow you to comply with the other doesn't go to the

21    legality of whether or not you can remove a tool from your

22    toolbox.

23          So I think that there are some issues there, and I'd

24    be happy for us to probe those further in briefing, if that's an

25    area you're interested in.

1          THE COURT:  I think that would be helpful.

2          And, again, I guess what I see -- and I think you put

3     a good -- I understand your argument, at least, and it does have

4     some weight to it, that when you trace this back, I mean, again,

5     as I've said multiple times throughout this, I'm firmly

6     convinced that there's been a change of practice -- or change of

7     policy, at least.

8          And that's completely expected because this is a

9     different administration.  I mean, it started with his executive

10    order saying, I'm rescinding the provision of the Trump

11    Executive Order on catch and release.  It didn't say, I'm

12    reimplementing catch and release, but that's an inference one

13    might draw.  And you trace it down to the things they canceled,

14    the fact they -- and you may disagree with this -- but I think

15    the fact I can find, based on the evidence I heard, that all of

16    the decisions, may be independent, all legal ballot-box type

17    decisions, they all had a predictable consequence of bringing

18    more -- having more immigrants come to the country.  Not the

19    sole reason, but I'm confident that the evidence supports that

20    finding that I likely will make.  But it still begs the question

21    of whether all these piecemeal things can be put together and

22    have a *de facto* policy that's challenged under the APA, and

23    that's the struggle I'm having with that.

24          MS. FUDIM:  Well, I would suggest to you that the

25    answer is no.  We believe that there's simply no evidence of

1    this *de facto* policy and that it can't be challenged under the

2    law, both of the APA and of other precedent sets by the courts,

3    and we will obviously brief that in our closing papers.

4          But I would pivot now to sort of a defensive posture

5    to address some of the arguments that Florida has made that

6    suggests there is this *de facto* policy.  Assuming -- this goes

7    to sort of the second prong.  If you come to find that this is

8    properly challengeable under the APA, and there -- you know,

9    then we have to answer the question does this policy exist.  And

10   Florida --

11         THE COURT:  Wouldn't it go the other way?  Wouldn't I

12   first determine whether there is a policy?

13         MS. FUDIM:  I think you could do it either way.

14         THE COURT:  That's how I've conceptualized it.  If

15   they can't show me that there is a policy, then I don't have to

16   answer the question of what whether something that doesn't exist

17   could be reviewed under the APA.  And to me, their strongest

18   argument is there is this *de facto* policy that at least results

19   in more people being released.

20         MS. FUDIM:  I mean, I think you could think about it

21   in either order.  If one order makes more sense to you --

22         THE COURT:  Okay.

23         MS. FUDIM:  -- I won't argue that.

24         THE COURT:  But you got to the point that I was going

25   to address first.  You're ready to hit that --

1          MS. FUDIM:  Yeah.

2          THE COURT:  -- because I think your strongest

3    argument -- I understand why you did it the other way because

4    your strongest argument, it seems to me, is that even if there

5    is it this amorphous thing out there, it's not subject to APA

6    review.

7          But now you're going to tell me why there's not even

8    an amorphous thing to not APA review.

9          MS. FUDIM:  I am going to tell you that, yes.

10         Florida has argued three big buckets, and I'm going to

11   address all of them.

12         So the first is that this administration has paroled

13   more noncitizens; the second is that this administration has

14   requested less funding for detention; and the third is that this

15   administration has eliminated family detention.  So I'm going to

16   address all three in that order.

17         So the first is the parole of more noncitizens under

18   the current administration.  Now --

19         THE COURT:  And one -- and I hate to keep interrupting

20   you.  One question.  When you use the word "parole" there, are

21   you meaning that to be 1182 parole, or are you meaning that to

22   be any sort of release?

23         MS. FUDIM:  I think it's fair to talk about the latter

24   because I think there was evidence of both.  So I'm using it --

25   it's the word that most naturally comes out of my mouth, but I'm

1    using it in this context, colloquial.  I'll try to say the word

2    "release," but that's what I'm talking about.

3             THE COURT:  Okay.  As long as we're understanding each

4    other.

5             MS. FUDIM:  Yeah.

6             Florida has thrown a lot of data at the Court showing

7    that fewer people were released under the Trump Administration

8    than under the Biden Administration.  And I can see how that

9    might be a compelling sound bite if we were in the business of

10   selling newspapers, but more parole does not *ipso facto* mean

11   there is a nondetention policy.  If it did, this would be a

12   relatively simple case, and I think the number of binders

13   sitting on your desk right now suggests that it's not.  Those

14   numbers really need to be understood in context.

15            So first what I would say is that parole and release

16   is not new to the Biden Administration and that those policies

17   have not changed since the Biden Administration, according to

18   witnesses on the stand.

19            Now, you heard from Mr. Davies, Mr. Ortiz, and

20   Mr. Guadian that each of the OFO, Border Patrol, and ICE are

21   making release decisions, either on a case-by-case or, in the

22   case of 1226 releases, it's a discretionary basis, case by case.

23   And there may be a question as to, Well, why are there more

24   parole and releases now.

25            And Mr. Davies spoke to that when he was on the stand,

1    and he explained that there were fewer paroles during the Trump

2    Administration because we were at the peak of a global pandemic

3    during which there were travel restrictions which severely

4    depressed the number of travelers coming to the U.S., both

5    lawfully and unlawfully.  There was, therefore, a decrease in

6    paroles because there was simply fewer people coming to the

7    border.

8         THE COURT:  How do you address Mr. Percival's argument

9    comparing February '20 and February '21 numbers?  Because

10   generally I was skeptical of the argument that the numerosity

11   alone of releases is evidence that there's a policy because

12   there are just a lot more people coming.  The detention capacity

13   has stayed flat or been reduced somewhat.  So obviously you

14   match the two up and more people are going to be released.

15        But he gave me specific reference to February '20 data

16   and February '21 data which suggested, if he was presenting it

17   correctly, that there was a similar number of apprehensions in

18   the two years but more releases in '21 than '20.

19        MS. FUDIM:  I think you have to go to -- I think it

20   was Mr. Price's testimony from his video deposition.  I think it

21   was him.  That the populations who are coming to the border also

22   changed.  So there has been a change under the more recent

23   administration.  We've started seeing a lot more noncitizens

24   from coming from countries to which we cannot repatriate.

25        So you heard about Nicaraguans, Cubans.  There were

1    other populations that were also spoken of.  And Mr. Guadian

2    explained that if we cannot repatriate somebody, then we're

3    going to end up -- we're going to release them because we can't

4    keep people in detention indefinitely.  And I think that that is

5    a big part of the answer to that question.

6              Give me one second, Your Honor.

7              Moving along to the detention capacity basket, if I

8    could.  We heard a lot about detention capacity and the fact

9    that the Biden Administration requested less funding for

10   detention than President Trump.  And I want to talk about why I

11   think that that's not really the relevant thing to look at here,

12   and I say that for a few different reasons.

13             So what presidents ask for is irrelevant to this case.

14   What's relevant is what Congress actually appropriates.  And the

15   budget documents that are in evidence in this case clearly shows

16   that Congress does what it wants.  You'll see in the budget

17   documents -- and we'll point this all out specifically with page

18   cites in our briefing.

19             But speaking now more generally, that with respect to

20   detention beds, ICE does not receive funding tied to a certain

21   number of beds.  ICE receives funding for custody operations,

22   and that includes costs of detention.  And when Congress

23   provides funding for custody operations, it does not limit ICE

24   to a certain number of beds; although, you can do some math and

25   figure out how many beds that would equal based upon cost for a

1    given year.

2            So in the last year in office under President Trump,

3    that is in his 2021 budge request, President Trump requested --

4    and it's a big number, so I'm just going to give you the

5    approximate.  It's in Exhibit NN, Nancy, Nancy -- approximately

6    $4.1 billion for detention operations.  And Congress only

7    appropriated $2.8 billion.  And that's going to be in OO.  And

8    what that works out to at a cost per bed is about 60,000 beds,

9    and Congress gave him about 45,000.  And that's going to come

10   from Exhibit 13.

11           THE COURT:  Let me ask you this.  And at one level, I

12   agree with you that a lot of this falls to Congress.  And the

13   policy -- I'm not the policymaker, but the policymakers at some

14   point are going to have to figure out a solution to, one, all

15   these people that are here, and the people that keep coming.

16   And whether that means at some point we put a "closed" sign on

17   the border -- I doubt that's going to happen from a policy

18   perspective -- they've got to figure out a solution, and funding

19   is a component of that.

20           And I understand that Congress appropriates the money,

21   but I think what -- to be fair, what the government was -- what

22   Florida was presenting was they don't do that in a vacuum.

23   Congress isn't the expert in knowing what's needed.  They rely

24   upon the agencies to submit budget requests -- and I've got

25   stacks of those in there -- and that even though there's not a

1    one-to-one correlation between what Congress gives and what you

2    ask for as an agency, the best evidence that we have as to what

3    the agency's view as to what it needs is what it requests.  It

4    may not get all that it requests.  It may get more than it

5    requests or different than it requests.  So why isn't the fact

6    of what was requested really -- why isn't that the important

7    thing for me to focus on?  Because that shows what the agency

8    with the expertise is saying; this is what we -- how we want

9    you, Congress, to allocate the resources you give us.

10          MS. FUDIM:  Well, I think it's two things.  I think

11   one is the point I was speaking to and one is the point I was

12   going to get to a little further down my page.  But I think the

13   first is that there isn't this very tight correlation between

14   what an administration asks for and what Congress does.  I think

15   that's the point that I was making.

16          For example, in his last budget request, President

17   Trump received 25 percent less than what he asked for.  That's a

18   pretty big percentage.  And so I think the fact that, you know,

19   what President Biden requested was approximately $2.775 billion,

20   that's only a 3 percent difference compared to what Congress

21   appropriated the prior year based on President Trump's request

22   for way more money.

23          So I think ultimately it comes down to the fact that,

24   one, Congress is going to do what it's going to do.  I mean, it

25   may base its funding upon what is being requested, but it's not

1    a one-to-one tie.  Congress exists in the world and sees what's

2    going on.  And Congress calls in secretaries all the time to

3    provide testimony.  We had Senator Mayorkas provided testimony

4    to Congress, and there was testimony and questions from various

5    senators about, you know, we have these problems, what are you

6    doing about it.

7             So I think the idea that Congress isn't aware that --

8             THE COURT:  I get it.  I don't want you to belabor the

9    point.  I guess my experience in a past life in the legislative

10   process, or more relationship to the legislative process, is

11   that the legislators who appropriate the money, they do that

12   based upon budget requests; and they do that based upon

13   prioritization that the budget requestors make.  And so it seems

14   to me -- and how it shakes out in everything, it just didn't

15   seem to me particularly disputed that the budget requests made

16   by this administration are for less detention beds and more

17   alternative to detention money.

18            And that's a policy choice that this administration is

19   making, that they have every right to make, because they won and

20   they got elected.  And it's certainly then up to Congress.

21   Congress could have said, no, no, no, we're not doing

22   alternatives to detention, we're doing detention.  So we're

23   going to give you that -- I don't have the number in front of

24   me, that 400-something million dollars that you're asking for

25   for alternatives.  We're going to give you that, but we're going

1    to put a proviso in the Appropriations Act that says that you

2    cannot use it for.  I mean, that happens all the time in

3    legislative process.

4           So I don't want to cut your argument short, but you're

5    not going to get anywhere with me arguing that the fact that

6    Congress appropriated less money is not necessarily an

7    indication of what the agency wanted to do.

8           MS. FUDIM:  Let me try the other side of the coin --

9           THE COURT:  Okay.

10          MS. FUDIM:  -- with you, Your Honor.

11          So Congress has been steadily increasing the amount of

12   funding it provides for alternatives to detention.  And again,

13   this is another place where we see Congress going a little bit

14   off script, right?  So if you look at 2018, the Department of

15   Homeland Security requested about $178 million for alternatives

16   to detention.  That was under the Trump Administration, and

17   that's Exhibit LL.  And Congress appropriated about $187 million

18   for that year, and that's Exhibit MM.

19          So we see the fact with the 2021 budget that there's

20   this 25 percent discrepancy between what Congress is

21   appropriating for detention based on what's asked for, and then

22   we also see that steadily since 2018 to today Congress has been

23   incrementally increasing its funding for alternatives to

24   detention.  And when we talk about inferences, I think there is

25   a fair inference there as to what's going on.  And frankly I

```
1   think the evidence supports that that makes sense at a very

2   practical level.

3         We heard evidence that it costs $8 a day to place

4   somebody on alternatives to detention, whereas it costs $125 a

5   day to detain a single adult.  And that's because when someone's

6   in detention, the government has to pay for their food, their

7   medical care, other wraparound services; and when someone is

8   paroled on ATD, they can often work because many of those

9   individuals obtain work authorization, and then they can put

10  money back in to the economy.

11        So from a business --

12        THE COURT:  Mr. Percival will tell me the states pick

13  up all those costs that the federal government would be paying

14  if they were detained.

15        MS. FUDIM:  And I think we already established that

16  the Court can't rely upon Mr. -- sorry, excuse me.  I thought

17  you said Mr. Price, because I was remembering some of his

18  deposition testimony that the Court excluded.

19        THE COURT:  I don't know if I excluded that part.

20        MS. FUDIM:  You said it went to weight.

21        THE COURT:  Right, went to weight.  And I think that's

22  common sense so --

23        MS. FUDIM:  Yeah.

24        THE COURT:  -- give it a fair amount of weight.

25        Anyway, I get your point that if Congress is putting
```

```
 1    more money in -- whether it's on its own initiative or at the
 2    request of the agency, putting more money into alternatives for
 3    detention, you can infer from that that Congress is okay with
 4    the idea that people are being released.  That's the inference
 5    you want me to draw?
 6              MS. FUDIM:  Yeah.
 7              THE COURT:  Okay.  I get it.
 8              MS. FUDIM:  And it's been steadily increasing.
 9              I would also say that third, under the same heading
10    here, is that the difference between what President Biden
11    requested and what Trump actually requested -- and even closer
12    what he received -- is really insignificant when compared to how
13    much it would cost to detain everybody who is in removal
14    proceedings.
15              Mr. -- I can't recall if it was Mr. Ortiz or
16    Mr. Guadian.  It may have been Mr. Guadian -- told us that it
17    would be about $165 million per day to detain every single
18    person.  So when we're looking at these numbers and we're
19    talking about this differential, the delta that we're talking
20    about is, I would submit, statistically fairly insignificant
21    when we talk about compared to how much it would be in the
22    abstract to detain everybody.
23              And the last point I had under this heading, which I
24    think we've visited before, is that even if one were to think it
25    was a bad policy choice to request less funding for detention
```

1    and more funding for the ATD, that doesn't make the request

2    illegal, and it doesn't establish that there is a nondetention

3    policy.  It establishes that this administration has a different

4    set of priorities than Florida may like.

5            I'll move now, unless you have further questions, to

6    the family detention which was the third basket I was going to

7    address.

8            Mr. Guadian told us that transitioning the family

9    residential centers to single adult housing was a business

10   decision, and I believe that was a quote from what he said,

11   based on the fact that it was about cost efficiencies.  He told

12   us that it costs about $125 a day to detain a single adult but

13   $230 a day to detain each member of a family unit.

14           And we also heard that the government can detain more

15   single adults in those FRCs, even putting aside costs, just

16   looking at number of human beings, than individuals within

17   families because of constraints on family demographics.  If a

18   mother is traveling with her 16-year-old son, and a father is

19   traveling with his 14-year-old daughter, you cannot house those

20   individuals together.

21           We also heard about transportation issues with regard

22   to the FRCs.  There are two that were in Texas, one that was in

23   Pennsylvania.  And so we heard testimony that if a family unit

24   is encountered in California or Arizona, you've got to then

25   figure out transportation for these people.

1           And we heard testimony that family units are, for the

2      most part, lower risk when paroled and when you're talking about

3      both national security and I believe there was also testimony on

4      risk of absconding.

5           And I think one of the most significant reasons that I

6      would like to speak to you with regard to family detention is

7      that Mr. Guadian told us that families can be detained no more

8      than 20 days.  And that's because of *Flores*.  And I really think

9      that that bears repeating.  Families cannot be detained more

10     than 20 days.  So if we're going to have to release a family at

11     the conclusion of 20 days, I think there is a very obvious

12     policy question of does it make sense operationally to detain

13     these low-risk people in the first place.

14          We also heard from Mr. Guadian that there is no way,

15     or at least it is extremely unlikely, that removal proceedings

16     can be concluded even on the detained docket within 20 days,

17     whereas with single adults, because you can detain them for

18     longer, there is a reasonable chance that you can get to the

19     point of completion in immigration court and keep them detained

20     for that duration.

21          Finally, on the issue of the family units, coming as a

22     family unit is not a get-out-of-jail-free card.  We heard

23     testimony from Mr. Davies, as well as Mr. Ortiz, that if one

24     person in a family poses a risk, that the family can be --

25     excuse me, the family can be separated, and that one individual

1    can be detained and the rest of the family can be released.

2           THE COURT:  I guess -- not to nitpick you, but it is a

3    get-out-of-jail-free card for everyone else in the family.

4           MS. FUDIM:  Is very well may be an ability to be

5    released for the other members of the family, but again that is

6    a decision that I think makes extreme practical sense.  So if

7    we're talking about --

8           THE COURT:  It may make extreme practical sense, but

9    it's not something that's made on a case-by-case basis.  If a

10   family unit comes to the border, even if -- let's assume family

11   unit is mom, dad, and child.  Even if dad has criminal history

12   or is a national security threat and therefore is detained, mom

13   and child will be released.  Period.  Not on a case-by-case

14   basis assessment but simply because there is it no detention

15   capacity for them, correct?

16          MS. FUDIM:  I don't know that I would say that that's

17   always correct, because I think that the family could still

18   be -- number one, the family could still be removed, depending

19   upon where they're from.  For example, if they're from Mexico

20   and they're placed into expedited removal, which can happen much

21   more quickly if you're talking about the country that's just

22   right over the border, as opposed to if you're talking about,

23   you know, a country in South America.  So I think there are

24   situations where they still could be removed.

25          And I also think there is still at this point in time

1    Title 42.  So at least for individuals who are approaching ports

2    of entry at OFO facilities, there is still the ability at the

3    limit line to prevent people from entering, which is perhaps a

4    slightly different thing than you asked, but to prevent people

5    from entering under Title 42.

6             THE COURT:  What significance, if any, should I give

7    to the last week's announcement of this new policy -- I guess

8    it's going to even go through rulemaking -- that will have

9    individuals from certain countries doing their processing before

10   they get here rather than after they get here, and for the

11   President for the first time that I can recall saying, Do not

12   come to the country, do your processing there.  Should I give --

13   nobody's argued that that moots anything here, and I don't think

14   it does, but should I give any significance to that event?

15            MS. FUDIM:  I think my answer would be no, because

16   it's not part of record in this case and it wasn't part of the

17   trial in this case.  But if I were to speak to those policies

18   with the caveat that, no, I don't think that we should be

19   including those within this case because there wasn't evidence

20   of it.

21            But just to answer your question, I mean, I think the

22   announcement of these policies could arguably -- and I think the

23   intent is obviously that they should -- ameliorate the situation

24   at the southwest border because individuals from these

25   countries, like it was premised upon the Venezuela situation,

1    will now be having to arrive by air and will have to have

2    applied for parole from their home countries.  And if they try

3    to come over the border at the southwest border, they will be

4    expelled.

5            And there's also a financial sponsor component, which

6    I think to some extent may -- if we were considering this, may

7    address some of the financial arguments we've heard from

8    Florida.  But from a legal perspective, I don't think you need

9    to consider any of that because it's really not part of this

10   case as the evidence was submitted.

11           THE COURT:  And that's a fair point.  It just seemed

12   to me coincidental that that happened last week and seemed to me

13   to be -- and again, taking off my judicial hat, putting on my

14   public citizen hat -- it seemed to me a concession by the

15   Administration that what was happening needed to change, and

16   it's good to see that occurring.

17           So with my public citizen hat off, I will get back my

18   judge hat on and go from there.

19           MS. FUDIM:  I can't speak to that.

20           THE COURT:  I know.  I don't expect you to.

21           MS. FUDIM:  So the last point I was going to make

22   about the family detention is that ultimately we heard testimony

23   that should the flow of individuals change, should demographics

24   change, those facilities can be converted.

25           And with that, I would just end by, you know, saying

1   ultimately, the DHS and its various components have been trying

2   to address a fluid situation and manage finite resources in the

3   most cost-effective manner.

4         And with regard to the component piece of family

5   detention, even if this Court were to find that that is itself a

6   policy, first of all, I don't think it's being challenged

7   individually.  So I don't know that the Court can do that as a

8   legal matter.  It's being challenged as one piece of a larger

9   consortium that makes up a policy, but at least on an APA --

10        THE COURT:  I don't even know if it's even being

11  challenged as that.  I just think it was just presented as

12  evidence of the existence of such a policy.  So I certainly

13  didn't contemplate that I was going to be asked to -- even if I

14  had the authority to -- direct them to convert things over and

15  start detaining families.

16        MS. FUDIM:  And I certainly wasn't suggesting that you

17  did.  I mean, my point was simply that it's not being challenged

18  as this standalone policy but that, you know, it really -- even

19  if you were to think about arbitrary and capriciousness in the

20  more abstract context, I mean, the decision makes practical

21  sense, and there's nothing there to suggest that detaining more

22  single adults who are more likely to be bad guys, where it costs

23  less makes -- that that makes sense over detaining families who

24  are generally less of a risk and it costs much more to detain

25  them.

1          So with that, if you have no further questions, I

2     would turn over the lectern to my colleague, Ms. Ryan, to --

3     who's going to address some other irrelevant evidence, in our

4     view, that came in and talk a little bit more about

5     efficiencies.

6          THE COURT:  Who's going to be talking about the Parole

7     Plus ATD policy on the record?

8          MS. FUDIM:  Mr. Darrow.

9          THE COURT:  Okay.  Thank you.

10          MS. RYAN:  Your Honor, as Ms. Fudim just said, I just

11    want to go over a few other issues with Florida's case that they

12    have the burden to prove and we want to highlight to Your Honor.

13    But I will try to keep it brief so that we can -- looking at the

14    clock and getting to the Parole Plus ATD section.

15          First, Mr. Percival earlier talked about, as one of

16    the major pieces of evidence, the number of paroles under this

17    administration versus the prior administration.  But --

18          THE COURT:  And real quick, same question for you:

19    When you use the word "parole," are you using that to include

20    releases on 1182 parole as well as releases on 1226?

21          MS. RYAN:  Yes, Your Honor, I think the releases, like

22    as we saw in the charts that were shown to you during the

23    plaintiff's closing.

24          THE COURT:  Okay.

25          MS. RYAN:  Florida has pointed to those numbers and

1    said an increase of those numbers is evidence that the policies

2    of this administration are unlawful because the last

3    administration released less people.  But we have not seen

4    anything that establishes that what the prior administration

5    done -- was doing was lawful or that that is the standard by

6    which all future administrations should be compared to.  That is

7    their opinion, but it's an assumption at the heart of their

8    case, which is that the prior administration had it right and

9    therefore this administration must be acting unlawfully.

10          Another issue we saw was a lot of irrelevant or

11   useless information, as Your Honor had pointed out this morning,

12   particularly in the standing case but I think elsewhere.

13   Particularly, you know, we saw a lot of individual policies

14   being raised.  And I think the first day of this trial, Your

15   Honor said you're not here to address all of the actions of this

16   administration, you're here to discuss detention and the

17   decisions with that.

18          But we heard a lot of evidence of the number of

19   removals being done, the number of book-ins being done, the

20   number of expulsions, Title 42.  But this case is about

21   detention.  And so the amount of time and airtime that Florida

22   has given to these irrelevant policies, I think it's a little

23   bit of trying to show Your Honor very stark, black-and-white

24   pictures of just numbers without giving the context behind those

25   numbers, which I think is very important for Your Honor's

1    consideration.

2            Looking at Title 42 specifically, for example, Florida

3    put forward evidence that the Administration is executing less

4    removals, and that is an indicator of a nondetention policy.

5    But when we watched the deposition video of Director Price, he

6    said that looking at those numbers, you have to consider that

7    with the existence of Title 42, there's far more individuals

8    being expelled under Title 42 than being removed.  So to get the

9    true picture, you have to put those numbers together.  So it's

10   not an apples-to-apples comparison to just say you can only look

11   at the number of removals.  That's why there is such a big

12   difference between those numbers from 2019 and 2020 to 2021.

13           Turning briefly to standing, because I think we see

14   some gaps in their evidence on that as well.

15           As Your Honor pointed out, we saw a lot of

16   expenditures and numbers that predate this administration which

17   are not helpful to showing actual injury that is traceable to

18   the alleged policies.

19           THE COURT:  And it didn't sound like when I pressed

20   Mr. Percival on that he's intending that to be used for purposes

21   of showing traceability; rather, it's to show redressability

22   that those -- what's your response to that?

23           MS. RYAN:  We disagree, Your Honor.  The -- I think

24   there's a -- if you're looking at these numbers in the

25   aggregate, and I think Your Honor pointed out with specifically

1    the Department of Education, that they're showing an increase in

2    immigrant children.  I think it's inflating causation and

3    correlation, because people could be moving to the State of

4    Florida from within the United States increasing that number.

5    Just because that number is going up does not mean they are

6    coming from the border under these policies.

7            THE COURT:  And I agree with you on that.  I mean, one

8    thing our state has prided itself on is that we're open.  And

9    we've been open.  And so it's attracting a lot of people from

10   places that weren't open.  But that really goes to the weight of

11   that.  I mean, when I'm evaluating that increase, that

12   incremental increase over the pertinent time period of immigrant

13   children, in weighing and balancing that, what I have to

14   consider are those people from New York that just got tired of

15   the life they were having to live up there and came to Florida,

16   or are those people people that just came into the country and

17   told the Homeland Security component agencies that, I'm going to

18   Florida, either gave them Florida address or were put on a

19   Florida docket.  And I'm struggling to understand why an

20   inference that at least some component of that are the latter

21   class rather than the former class; and if that's the case, why

22   that wouldn't be sufficient to show some standing.

23           MS. RYAN:  I think there's two pieces to that.  First,

24   the definition of immigrant student, which is the only data we

25   were provided, is not specific only to those children that may

1    have come over the border.  An immigrant child is just someone

2    who was born outside the United States and was educated outside

3    the United States for the last three years.  Those children

4    could still be U.S. citizens.  They could have been born outside

5    of the United States and still be lawful permanent residents or

6    Green Card holders.

7            We also saw evidence of the -- specifically English as

8    a second language pointing to this problem.  But as we

9    established, citizens don't always speak English.  And I think

10   the other side of this is the inferences and the assumptions

11   that would need to be stacked in order to get to the conclusion

12   that they're asking, specifically on Department of Education.

13   Even if we assume that some people from the border are coming to

14   Florida, we have to then assume --

15           THE COURT:  Do I have to assume that though?  I mean,

16   I know that based upon the evidence -- I think it was Exhibit 10

17   that I got -- that a hundred thousand people during the

18   pertinent time period have been released to either a Florida

19   address or a Florida docket.  And I know some point in here I've

20   heard that the Florida ERO office covers Puerto Rico and Virgin

21   Islands, so conceivably some people on the Florida docket really

22   are in Puerto Rico or the Virginia islands.

23           But, I mean, is that an assumption at this point?  I

24   mean, can't I take that evidence and find, as a matter of fact

25   that, if not the entire 100,000, a substantial number of people

```
 1   have been released under these policies and are in the state of
 2   Florida?
 3            MS. RYAN:  I would say those numbers are
 4   self-reported, first.  The addresses are self-reported, and they
 5   may give a Florida address but may not reside here.
 6            But to Your Honor's point, even if we --
 7            THE COURT:  I've got to push back on that.  The whole
 8   idea of them giving you this address is so you can keep up with
 9   them.  And if you don't think it's credible enough or a reliable
10   enough piece of information for me to make a finding on that
11   they are actually coming to Florida, y'all have got a bigger
12   problem.
13            MS. RYAN:  Your Honor, I'm not calling the data into
14   credibility.  I'm saying we didn't have the burden, and so --
15            THE COURT:  And I'm asking why can't I rely upon the
16   same information that your people are relying upon to know where
17   they are to find them, that there is, if not a hundred thousand,
18   a substantial number of aliens that came in under the challenged
19   policies in the state of Florida.
20            MS. RYAN:  And if that is how Your Honor views the
21   evidence, you know, we're not saying that's an unreasonable
22   assumption, but we are pointing out that the burden is on
23   plaintiff, in our opinion, to prove that these individuals are
24   here.  But if we make that assumption, we still then have to
25   assume --
```

1      THE COURT:  All right.  Well, let's not make the

2  assumption.  I'm going to tell you that's a finding I'm going to

3  make based upon the evidence I heard.

4      MS. RYAN:  Okay.

5      THE COURT:  All right.  So that's not an assumption

6  that needs to be stacked at this point.  That's a finding.

7      MS. RYAN:  Yes, Your Honor.

8      So on top of that finding, we would have to assume

9  that those individuals had children of a school age, that they

10  then enrolled those children in public schools funded by the

11  state of Florida -- that they weren't homeschooled, they didn't

12  go to private schools, they didn't go to religious schools --

13  and it's just, at some point, the inferences become too much.

14      As we saw this morning with Ms. Grogan when we were

15  talking about emergency Medicaid, I counted.  It was eight

16  different assumptions or inferences that needed to be stacked

17  before we could say that, okay, yes, maybe.  And I think that's

18  the line that Your Honor might be struggling with is how many

19  inferences is too many inferences.

20      THE COURT:  And with respect to the DCF witness this

21  morning, the DOC witness, the economic opportunities witness,

22  and the AHCA witness, I tend to agree with the Federal

23  Government's position that there would be too many inferences

24  necessary to stack to show that the individuals -- and, again,

25  taking my commonsense hat off, putting on my -- I got to make

1    findings, I can't leave my common sense at the door, but I do

2    need some evidence in addition to common sense.  I think you

3    have a much stronger argument there, and you may ultimately

4    convince me that they haven't shown standing based upon the

5    impacts of those agencies.

6            But when they bring in a witness who I had found to be

7    credible, who gives me year-over-year data that shows me that

8    there are 17,000 more immigrant children -- and I understand

9    your argument that that definition includes people beyond the

10   ones that came across the border -- it doesn't seem to me to be

11   an unreasonable inference to make that some component of that

12   are children of family units that couldn't be detained and thus

13   were released.

14           I'm struggling to understand -- I've never understood

15   why the Federal Government is willing to die on the standing

16   hill in this case given that common sense, and what Director

17   Price told me emphasizing that common sense, that if people are

18   coming in, not being detained, states are going to incur costs

19   taking care of them.  I've never understood that, and I'll

20   certainly keep an open mind until the evidence is closed, but

21   you're going to have a hard road to convince me why there's not

22   sufficient evidence to show they have standing, but I'll let you

23   keep trying.

24           MS. RYAN:  Even if Your Honor finds that injury based

25   on those commonsense inferences, there are still two other

1    elements to standing:  traceability, as Your Honor pointed

2    out, which I think is key.

3            THE COURT:  That's what I think we're talking --

4    that's what I think we've been talking about, right?

5            MS. RYAN:  I think -- I think it's a mix of actual

6    injury, because -- and traceability they kind of merge a little

7    bit.  But also redressability.

8            For example, talking about Department of Education and

9    families with school-age children.  If Your Honor were to say

10   that more families need to be detained, for example.  Families

11   can only be detained for 20 days, and so we've seen no evidence

12   that a 20-day delay would have any impact on the ultimate

13   injuries that they -- that Florida is alleging, right?  It's

14   only a 20-day delay, and so in any given school year, those

15   costs are not changing.  So that lack of redressability showing

16   that this Court could do something to fix the injuries that they

17   are alleging is a gap in their standing claim.

18           THE COURT:  But their argument is that to establish

19   redressability, they don't have to show that a judicial remedy

20   would completely cure the harm.  They just have to show that it

21   can help ameliorate it.  And I think that's what they've argued

22   to me is that we recognize that you can't -- whatever you do is

23   not going to eliminate the harm we're suffering to any of these

24   individual component agencies, but if two more people are

25   detained for two more days, that's two more people and two more

1   days of services we wouldn't have to provide, so it's at least

2   ameliorating.

3            What's your response to that?  If I'm understanding

4   you correctly.

5            MS. RYAN:  Mr. Darrow's going to talk about

6   remedies --

7            THE COURT:  Okay.

8            MS. RYAN:  -- in more detail.  But, you know, our

9   position is that they have to show, they have to put forward

10  this evidence.  And just to touch on something you spoke with

11  Mr. Percival about this morning, special solicitude.

12           It's still our position that Florida is not entitled

13  to special solicitude.  The *Massachusetts* case dealt with

14  specific property and harm that that state owned that was trying

15  to be taken away.  It doesn't take away -- even if they were to

16  be found to have special solicitude, that doesn't take away

17  their requirement to show the injury, which we maintain they

18  have not.

19           And the claim that Florida is making of these indirect

20  fiscal burdens from these different policies, the *Arizona* case

21  in the Sixth Circuit that came out earlier this year directly

22  shot down that argument and pointed out that the Supreme Court

23  has never afforded special solicitude in any other case outside

24  the *Massachusetts* case.  And they have not extended the

25  *Massachusetts* doctrine to a theory such as the one that Florida

1    is providing.

2              We can go into more detail in our briefing on this,

3    but it is our position --

4              THE COURT:  Right.  And I've seen the argument, and

5    I'll keep an open mind on it, but you'd agree that the Fifth

6    Circuit has a different view.  I mean, there's essentially a

7    conflict between the Fifth and Sixth Circuit on that question.

8              MS. RYAN:  Yes, Your Honor, there is a conflict on

9    this.

10             THE COURT:  And the Eleventh Circuit hasn't weighed in

11   on it yet, right?

12             MS. RYAN:  No.

13             THE COURT:  Okay.

14             MS. RYAN:  Turning to, I think, one more thing that we

15   would like to point out to Your Honor is kind of the realities

16   that we've been trying to highlight for Your Honor throughout

17   this trial.

18             We've heard a lot about the realities of COVID and how

19   that impacted this administration, especially when deciding the

20   policies to make, and all the ways that DHS in particular were

21   impacted.  The different lawsuits which resulted in preliminary

22   injunctions, social-distancing requirements in their detention

23   facilities, inmates with medical vulnerabilities, staffing

24   shortages.

25             Chief Ortiz told you that at one point they had 2- to

1    3,000 agents in quarantine and 17 agents who died.  Even if

2    those limitations did not exist and the Court did what

3    Florida -- everything that Florida has asked the Court to do in

4    this case -- I think Ms. Fudim, looking at the numbers, hinted

5    at this -- but we could never detain everybody.  The funding we

6    would need is staggering.  And we would like to provide slightly

7    more detail on -- I think we've been hearing about numbers of

8    beds and requests.  And the difference between the last year of

9    the Trump Administration and the first year of the Biden

10   Administration is a difference of 10,000 beds.

11            THE COURT:  Let me -- and I don't want to belabor it.

12   I certainly understand the argument, and I want to get to the

13   record discussion with Mr. Darrow.

14            But I guess what really is troubling about the

15   argument -- and maybe you can -- the question will ultimately

16   be, Where does that fit in?  What legal component do I look at

17   this?  Is it a political question?  What is it?  Because it

18   seems to me that -- I'm a court.  My job is to say what the law

19   is.  It's the policymaker's job to apply the law as I say that

20   it is.  And in making that determination, why does the practical

21   reality, why does that color my interpretation of the law?

22            If I say -- if a different law says you have to jump

23   up and down three times before you admit an alien, and that's --

24   that's difficult because it just takes more time.  But that's

25   what the law says, and the deal -- the remedy for a practical

1    reality or law that can't be practically complied with is to get

2    the law amended.  And so where does that come into any sort of

3    legal argument?

4             MS. RYAN:  We definitely agree with you on the last

5    point that, you know, as I think Mr. Darrow said earlier, the

6    INA's a little bit of a mess.  But I think this kind of

7    dovetails a little bit with the remedies that Mr. Darrow will

8    talk about, but it also looks at the -- you know, the context of

9    the evidence that Your Honor heard.

10            And what Ms. Fudim was talking about with there being

11   no nondetention policy, it is not enough for Florida to point

12   you to charts and just say more numbers equals bad.  There has

13   to be an understanding of the reality and the world in which

14   those numbers came in.

15            If you look at the Obama Administration, the Trump

16   Administration and the Biden Administration, those are three

17   different worlds.  There are different global challenges,

18   different diseases, different political problems around the

19   world.  So it's not the same hundred people coming to each of

20   their doors and then saying how did each of you deal with it.

21   It's very different landscapes that they are all trying to

22   navigate.  And so I think these difficulties need to be

23   presented to Your Honor to understand the numbers that Florida

24   has put forward to you.

25            I think as I said to you earlier, it's not so black

1    and white.  There are these gray areas and these nuances that go

2    to -- you know, I know Mr. Darrow will talk about it with the

3    record and why the Parole Plus ATD policy was implemented.  As

4    Your Honor said earlier, the COVID numbers, the overcrowding, it

5    colors the decisions and it's considered by these

6    decision-makers.  And so I think it is important for Your Honor

7    to understand that.

8            And I know we've talked about it and we're getting a

9    little bit late in the day, so I'm happy to save more of these

10   details for our final brief and turn over the podium, if Your

11   Honor would like to --

12           THE COURT:  Yeah, I think let's do that.  I think

13   let's -- let me know where else we're going to go.  Mr. Darrow

14   is going to talk to me about the administrative record.

15           MS. RYAN:  And some of -- and the remedies and then we

16   are -- we're done, unless Your Honor has any more questions.

17           THE COURT:  Okay.  And I will give Mr. Percival --

18   it's his case, and so he'll have a brief opportunity to rebut.

19   And then we'll be closed.

20           Well, let's -- I've worked the court reporter pretty

21   hard here, so let's take -- and I've worked us all well through

22   the lunch hour, so we'll all have a late lunch or early dinner.

23           Let's take ten minutes and come back, and then we'll

24   do Mr. Darrow, Mr. Percival, and then we'll wrap it up.

25           *(Recess taken from 2:13 p.m. to 2:25 p.m.)*

1          THE COURT:  Y'all can keep your seat.

2          All right, Mr. Darrow.  You're back in cleanup.

3          MR. DARROW:  I used that analogy in this case -- just

4    as an aside -- and I was told, Don't use sports analogies.  But

5    I like the analogy so I appreciate that, Your Honor.

6          All right.  So Parole ATD, last but not least.  Well,

7    not last, because I have a few things to say about remedies at

8    the end, but last big bunch of discussion.

9          Parole ATD is not unlawful, it's not arbitrary and

10   capricious, and notice and comment were not required under the

11   APA.

12         As the July 2022 memo and the accompanying record

13   indicate, the program is designed to serve a significant public

14   benefit of preventing dangerous health and safety conditions

15   imposed by overcrowding in Border Patrol's processing facilities

16   and the related threat to border security if Border Patrol

17   officers have to be pulled from policing the border to

18   processing applicants for admission in order to quickly get them

19   out of the facilities.

20         And by the way, Your Honor, I found the cite to the

21   sentence I was thinking when I mentioned that before.  That's on

22   SAR 163, which is the first Parole ATD memo.  I can also throw

23   it on the ELMO, if that's --

24         THE COURT:  I've got it here.  Go ahead.

25         MR. DARROW:  Okay.  And it's in the first full

1     paragraph, and it is the second sentence there.  "The use of

2     Parole Plus ATD in these circumstances will ensure that USBP can

3     continue to meet its mission requirements, such as border

4     security operations by maximizing deployment of agents to the

5     field."

6             THE COURT:  Let me ask you a question about that, and

7     it kind of goes to the COVID question as well.

8             What significance, if any, is there to the fact that

9     that was in the November memo but not the July memo, and COVID

10    was in the November memo, but it wasn't in the July memo?  Is

11    there any significance to that in evaluating -- I'm evaluating

12    the November memo.  I've got all this other stuff in the record.

13    But the fact that that justification was provided in November

14    but not repeated in July, is there any significance to that just

15    like the COVID justification was given in November but not,

16    again, in July?

17            MR. DARROW:  I don't think there is any significance.

18    As Your Honor kind of pointed out, Parole ATD has been an

19    evolving program, and it has, you know, evolved to address

20    different circumstances.

21            The first time the memo was being issued, it was

22    primarily providing guidance on dealing with the circumstances,

23    which at that point were -- you know, COVID-19 was very

24    significant, and also the program was replacing NTRs and so it

25    had to provide, you know, discussion of why this would be more

1    effective to accomplish the purposes.  And the purposes are, you

2    know, both decompressing the facilities and ensuring that the

3    noncitizens who are decompressed are -- you know, show up for

4    their proceedings, that -- you know, moving them along towards

5    case completion.

6         And so, you know, as the program evolved, then you get

7    to July 2022.  COVID is still a concern, but it's not the only

8    concern.  And Border Patrol has realized that there are many --

9         THE COURT:  Let me ask one question on this, because I

10    found this interesting, and your argument there brought it up.

11         And the November 2 started by talking about the NTR

12    policy saying that the purpose of that was -- the benefit of

13    that was to relieve overcrowding in congregate settings, better

14    protecting the workforce and noncitizens, and it boasted about

15    using -- "boasted" is my word -- the use of NTR decreasing

16    processing time significantly, as compared to the much more

17    time-consuming issuance of the NTA.

18         So you have -- it's talking about all of the good

19    things that NTRs had; yet despite that, they said we're

20    repealing that.  How does that make sense?  Or why did that

21    happen, or both?

22         MR. DARROW:  Well, I mean, this memo did repeal NTRs,

23    but you can also view Parole ATD as just building on the

24    experience with NTRs and bringing it up one better.  Right?

25         So they realized that being able to release

1    noncitizens and process their NTAs later helped address all of

2    these critical public interests that were going to be addressed,

3    but they wanted to increase the accountability of the

4    noncitizens while they were released.  They wanted to make sure

5    that they were going to show up at the ICE offices, and so they

6    said, That's why we're going to add the ATD component to the

7    release.  We want to -- you know, it's been successful in

8    decompressing, but we want to ensure the case completion part of

9    program.

10              THE COURT:  Is there any significance -- or maybe a

11   better way to say it is how does that argument dovetail or be

12   inconsistent with the idea that NTRs were issued, if I

13   understood correctly, both from the documents and then outside

14   the evidence, that NTRs were issued under this discretionary

15   1226-type authority, and now Parole Plus ATD relies upon 1182?

16              MR. DARROW:  Well, first, Your Honor, the NTRs weren't

17   under 1226(a).  And I think when we had our phone call, I might

18   have given some indication of that many months ago, and I didn't

19   realize, because, you know, that we hadn't actually -- we were

20   trying to keep NTRs out the case entirely.  You know, in further

21   discussion with DHS and their view, certainly the 1226 component

22   comes into play once the person is put in removal proceedings.

23   But for that initial decision to release them and, you know --

24   before they're put into removal proceedings, that is inherent

25   prosecutorial discretion.  That's not -- that part of it is not

1   a function of 1226(a).

2          THE COURT:  And so I think your point that the Parole

3   Plus ATD is kind of NTR Plus?  I mean, as a practical matter,

4   they seem very similar in what they were trying to accomplish,

5   which was getting people through the CBP and OFO offices quicker

6   and getting their processing done somewhere else.  And so they

7   both were intended to accomplish that.  Parole Plus ATD puts a

8   little additional monitoring on them, perhaps.

9          But it seemed to me that the real reason we went from

10  A to B is because the legal authority for doing prosecutorial

11  discretion releases and the I-385s was more challenging to

12  defend than something based upon a specific parole statute.  Is

13  that a fair assumption or not so much?

14         MR. DARROW:  I actually don't know --

15         THE COURT:  Okay.

16         MR. DARROW:  -- the -- you know, the behind-the-scenes

17  rationale that went in to that.

18         THE COURT:  Would that be an inappropriate inference

19  for me to draw from the progression of things reflected in the

20  administrative record?

21         Here comes Ms. Fudim.

22         MR. DARROW:  I just don't know if -- oh, I'm sorry.

23         Ms. Fudim just wanted me to note.  I think earlier in

24  the discussion there had been some mention of NTRs and Parole

25  ATDs coming from the Office of Field Operations, and I just

1  wanted -- we wanted to clarify that.  This is just a Border

2  Patrol thing.

3        I think Your Honor knows that, but just --

4        THE COURT:  And maybe I missed --

5        MR. DARROW:  -- in case somebody misspoke before.

6        THE COURT:  Maybe I did misspeak.

7        MR. DARROW:  But to go back to -- I don't know if

8  anything in the record supports the inference either way, just

9  because really there's no discussion of the legal authority

10  aspect.  The record seems to be focused -- you know.  I mean,

11  there's a discussion of legal authority in the sense of does

12  this fall under the parole statute, but it doesn't really

13  discuss the legal authority for NTRs and rescinding them.

14        THE COURT:  Let me try to steer the discussion.  I

15  don't want to cut off what you had prepared, but given the hour

16  and given the depth at which we've discussed it, and given the

17  fact that y'all are going to file things after the fact, what

18  I'd really like you to focus on are -- I think your strongest

19  argument on Parole Plus ATD is related to the arbitrary and

20  capricious side of this.  To be arbitrary, you essentially have

21  to have no justification for it.

22        And I overstated or oversimplified the legal test, but

23  that's kind of the essence of it.  It's way outside the 20s.

24  And here, at least now, the current administrative record,

25  unlike the prior administrative record, probably includes enough

1    to explain to me that they had a reason for doing what they did.

2         And so the biggest challenge I think you have on this

3    and what I'd like you to spend some time addressing, are

4    Mr. Percival's arguments as to why this good idea, maybe, is

5    inconsistent with the parole statute?

6         And I think he gave a couple of reasons, and I added

7    another one on that I'd like you to address, but essentially

8    that it -- the policy doesn't take into account the parole

9    statute requirement as to bringing them back into custody.  You

10   probably wrote down what he said.  But anyway, address his

11   arguments as well as my question about whether the statutory

12   language referring to a case contemplates that there be an

13   immigration case going before you parole somebody.

14        MR. DARROW:  Right.  Okay.  So for the first argument

15   about the purposes of parole.

16        Here, I think it's helpful to remember that the parole

17   being issued by Parole ATD is that by Border Patrol, right?

18   ICE, who the Parole ATD releasees are going to end up with, they

19   have their own authority to issue parole, and they may decide to

20   do so.  But the specific purpose of the parole here is just to

21   get the person from the Border Patrol processing station to

22   check in with ICE.  That's the purpose of it, and so that's

23   the -- the period of time when it's issued.

24        As soon as they get to ICE, ICE will do its own thing.

25   They're out of Border Patrol's jurisdiction.  They're in ICE's

1    jurisdiction, and ICE will, you know, be the one supervising

2    them for the completion of their removal proceedings.  And so

3    ICE at that point may -- it's not going to -- you know, it makes

4    its own decision of what to do with the noncitizen at that

5    point.  It may decide to issue its own parole.  It may decide to

6    release the person on recognizance.  It might decide to take the

7    person into custody.

8         And there was -- there was a document that

9    Mr. Percival had cited, and I am -- I apologize because I don't

10   know if it was part of this argument or part of the nondetention

11   policy argument -- that talked about how ICE -- when people are

12   released on Parole ATD, they'll get to ICE, and then ICE will --

13   it discussed something about being a public safety threat and

14   national security threat and how, you know, ICE would detain

15   them if that was the case.  Does Your Honor remember that?

16   Otherwise, I can just avoid that.

17        THE COURT:  I'm not remembering it.  I guess as I

18   understood his argument, the parole statute contemplates that

19   you be released only on a temporary basis until whatever reason

20   that you were put on parole resolves itself.  And the policy and

21   the supplemental administrative record doesn't seem to take that

22   into account or work that in.  And I guess it sounds like your

23   response is that they are only on parole under Parole Plus ATD

24   until they get to the ICE office, and then they're under some --

25   they're under some other release.

1        MR. DARROW:  That's correct.  And they get to -- and

2   ICE may decide to, you know, continue to parole them for removal

3   proceedings, but that would be ICE's parole.  They're under

4   ICE's authority.  The Border Patrol parole is just for that

5   limited period of time to get them to the office.

6        THE COURT:  And is that, you think, clearly embodied

7   or reflected in the administrative record?  And what would you

8   point me to?

9        Let me do this.  You can do that in your briefing.

10       How then would that be -- if that's the point, if

11   that's the point of this whole Parole Plus ATD is just to get

12   them to the ICE office, then it would seem like there is no set

13   of circumstances that they would ever come back into Border

14   Patrol custody from which they were paroled.

15       MR. DARROW:  I mean, I don't want to say no set of

16   circumstances.  It could be -- I mean, maybe they decide to

17   accept a voluntary return and so, you know, they'll go back to

18   the border and they'll be permitted to do a voluntary return by

19   Border Patrol.  But I think generally speaking --

20       THE COURT:  Well, let me --

21       MR. DARROW:  -- for the run of people we're talking

22   about --

23       THE COURT:  Hold on.  Let me play that through with

24   you.  The way the statute is written is that you're temporarily

25   paroled, and when the purpose of such parole has been served,

1  the alien shall forthwith return to the custody from which he

2  was paroled.

3         Here, he was paroled from Border Patrol custody,

4  right?

5         MR. DARROW:  Yes.

6         THE COURT:  The purpose for which was to report to ICE

7  ERO.

8         MR. DARROW:  Yes.

9         THE COURT:  And so once that is complete, the statute

10 contemplates that he be returned to Border Patrol custody.  That

11 doesn't make any sense, does it?

12        MR. DARROW:  Well, I mean, I think you can -- it

13 doesn't say, you know, which narrow function of the DHS's

14 custody.  I mean, it could just be talking about to DHS's

15 custody overall.

16        THE COURT:  "Return to the custody from which he was

17 paroled."

18        MR. DARROW:  In other words, return to custody status,

19 the custody, as opposed to at that point we need to immediately

20 kick them out of country, or something like that.

21        THE COURT:  Okay.  I think what hopefully I'll see in

22 your briefing is if -- and I agree with you that that's the way

23 this policy is written.  We have a problem at the Border Patrol

24 facility.  It's overcrowded.  We need to get people through the

25 system quicker.  And to do that, we're going to put them on

1  parole under this statute and have them do processing at ICRO at

2  which -- I don't know if the record tells us what happens next,

3  but that makes sense, except that it doesn't make sense when you

4  apply the statute.

5         And I'm not trying to get you to agree with me, but I

6  hope in your briefing you'll focus on it and try to convince me

7  that this mechanism that's being used -- I mean, that's what I'm

8  looking at, whether this mechanism is legally permissible to do

9  what is being done.  I think I had that conversation with

10  Mr. Guadian where he said, This is why they're doing it.  I

11  said, I understand why they're doing it.  My challenge is to

12  determine whether they can legally do it.

13         And it just makes intellectually no sense to me

14  reading the statute that somebody is paroled from Border Patrol

15  custody for the purpose of showing up at ICE, the parole statute

16  then seems to contemplate, seems to say on its face, you're

17  supposed to be returned to the custody from which he was

18  paroled.  He was paroled from Border Patrol custody, but that's

19  not what's happening and it wouldn't make any sense to happen

20  that way.

21         And so what I'm suggesting is this mechanism that's

22  being used to essentially accomplish the same thing that the NTR

23  policy was trying to do, for potentially good reasons, logical

24  reasons, is probably not a legally permissible mechanism to do

25  it.  You probably were better off just doing it under NTR and

1    saying, We're doing it, rather than trying to come up with this

2    use of a policy that's not seeming -- or use of a statute that

3    it isn't seemingly designed for.

4          But, again, I'm not going to convince you, but I want

5    you to be aware that I have a significant concern with textually

6    the parole statute, how it makes any sense in the context of the

7    purpose for which this parole was being issued.

8          MR. DARROW:  Just one last thing on that point.  I

9    think it's important to remember the parole statute was, at

10   least, you know, here significantly updated in 1996 when a lot

11   of things were going on.  And at that point, all of this was the

12   INS, right?  So if you were being sent from the border to an

13   internal station -- you know, assuming this was happening under

14   the INS model -- you were still within not only the same agency

15   but also the same component.

16         You know, then DHS has created, and you create

17   different subcomponents to deal with the different functions,

18   but the people who are going, you know, from CBP to ICE, they're

19   still within the same agency, they're still within the same

20   function, and if they -- as existed under the prior INS.  They'd

21   just be going from one section of INS to the other section of

22   INS.

23         THE COURT:  Right.  And, you know, the other side of

24   this -- and I do want you to talk about the case, because that's

25   another textual problem I have with what's going on here.

1          The other side of this is if you think about it in one

2     way, if what was happening was down at the border, you had a

3     mass of people coming in, and so you had these Border Patrol

4     offices who have small waiting rooms, are not designed for this,

5     they don't have space to keep people for long times, they needed

6     to get them through the system.  If instead of coming up with

7     this machination that sent them to ICE and created a problem for

8     the ICE ERO offices, they said, You know what we're going to do?

9     We're going to rent the Texas El Paso stadium or civic center,

10    and we're going process them there.

11         So we're going to take them from a Border Patrol

12    office up to the football stadium or the -- to process them

13    where we can space people out, we have room for it, I don't know

14    if Florida has as compelling of a case, because at that point

15    they're not being released from anybody's custody.  They're just

16    being moved -- the processing location is being removed.

17         And from what the supplemental administrative record

18    says and what -- outside of that for the other purposes, what --

19    the witness testimony I had, this was just a processing location

20    exercise.  And so to use a parole statute to complete processing

21    just makes no sense.

22         So I guess what I'm suggesting to you -- and I'm happy

23    to hear the rest of your argument.  I do want to hear about

24    case.  I think the Federal Government's got a problem with the

25    legality of the Parole Plus ATD policy, trying to use a square

```
1    peg to fit into a round hole, understanding that that round hole

2    needed some sort of peg put it in.

3            So with that, I'll get off my preemptive findings

4    soapbox and ask you:  Talk to me about the statutory language

5    that says "and thereafter, after you're returned to the custody,

6    your case shall continue to be dealt with."

7            None of these people were released with a case.

8            MR. DARROW:  If I could throw in one last thing --

9            THE COURT:  Sure.

10           MR. DARROW:  -- about the uses of parole is that --

11   remember that parole under --

12           THE REPORTER:  Can you say that again?

13           MR. DARROW:  1182(d)(5)(A).

14           While it's often used to parole people while they're

15   in removal proceedings, it doesn't require that you're in

16   removal proceedings.  It just pertains to applicants for

17   admission.  And, you know, it's often used for other things,

18   just to let people in the country temporarily to, you know,

19   attend a particular event or surgery or something like that.

20           THE COURT:  Right.  But that's not what that policy is

21   dealing with.  This policy is dealing with the people who are

22   coming in who are -- who are being -- as you just told me, who

23   are being paroled to go to the ICE office.  That's the class of

24   people this policy deals with, as I understand it.  Right?  It's

25   not talking about what I think some other people -- some of the
```

1    witnesses talked about today, humanitarian parole:  the

2    gunshot victims, the pregnant women, those sorts of things.

3    They're not the ones that are being paroled under the Parole

4    Plus ATD policy.  This is people that need to be processed

5    further, right?

6           MR. DARROW:  Yes, yes.  Your Honor is correct, and I

7    will not beat a dead horse.  My point was just simply that

8    there's nothing in the statute that limits the use for which

9    parole can be put.

10          THE COURT:  Okay.  I'm with you.

11          So talk to me about how statutorily it makes any sense

12   to parole somebody before they have a case, immigration case.  I

13   mean, that doesn't happen until you get into NTA, right?

14          MR. DARROW:  That you have an immigration case?

15          THE COURT:  Yes.

16          MR. DARROW:  Well, you're not in removal proceedings

17   until you have an NTA, but you could have an A-file created for

18   you before you have an NTA.  I mean, there are many different

19   ways in which a person can -- I mean, there are lots of

20   different immigration proceedings, and there are a lot of

21   different ways that a person can obtain immigration status in

22   the United States.

23          So if you, you know, apply for a particular type of

24   visa, you might have -- you know, you'll have an A-file, which

25   is, you know, a file that accompanies all citizens -- or

1    noncitizens, rather, before, you know, somebody says, Actually,

2    they don't qualify for the visa, put them in removal

3    proceedings.  That could happen, you know, months later.  But

4    you already have your -- the case, your A-file, is created as

5    soon as you have, you know, any sort of immigration history

6    going on.

7                THE COURT:  Okay.  So that would be, I guess, the best

8    counterargument to the argument the government -- or Florida is

9    not even really making, which is you got to have an immigration

10   case proceeding, going on, before you can even be paroled.  Your

11   argument is really what "case" is talking about includes simply

12   having a file opened on you?

13               MR. DARROW:  Right.

14               THE COURT:  Okay.

15               MR. DARROW:  And some people don't even have a case

16   because, again, parole could be used for somebody who's simply

17   coming here to, I don't know, attend a conference or something.

18   So their case could be very limited.  It could just be a few,

19   you know, advanced parole documents or something like that.

20               THE COURT:  And that makes sense.

21               MR. DARROW:  So that's the priority case, but then did

22   you also want to address the case by case?

23               THE COURT:  Yeah.  Talk to me a little bit about case

24   by case, because it seems to me that the urgent humanitarian

25   reason or significant public benefit that is at issue here is

1    the public benefit of getting them out of the offices quicker,

2    and how is that unique to any individual?

3            The answer for everybody -- that that public interest

4    is the same for everybody.  Everybody may not be released

5    because there may be other considerations, but the urgent

6    humanitarian reason that this whole thing is created is the same

7    for everybody that is or is not released.

8            MR. DARROW:  Well, I would first hesitate to say it's

9    the same for everybody.  Because remember the structure of

10   Parole ATD?  It has to be authorized on a weekly basis for

11   particular offices, for particular sectors.

12           THE COURT:  And that's a fair -- just to qualify then,

13   everybody who shows up in a sector office that met the triggers

14   in Parole Plus ATD, the public interest for getting them through

15   the system quicker is the same for everybody there, right?

16           MR. DARROW:  Yes.  But not -- not just because we've

17   decided, you know, it's the same for everybody there.  That's

18   also the nature of, for instance, communicable diseases.

19           If you're all in the same facility and somebody has,

20   you know, an outbreak of smallpox, you're all susceptible to

21   smallpox.  And that's not simply just because we said that

22   facility is off limits, but that's just how -- you know, how

23   public safety threats work.  If you are in this facility and

24   Border Patrol says, All right, you know, the people who are

25   going to be in this facility, we have an outbreak of COVID.

1          So, yes, all of the people in that facility would have

2     the same interest, but it's not like it's just, you know, some

3     general thing.  It's the fact that if you are in a facility, you

4     could be exposed to the conditions within that facility.

5          But also, I don't think the statute requires that

6     people who are being paroled can't share the same urgent

7     humanitarian interest or significant public benefit.  And, I

8     mean -- and I know, you know, Your Honor said before, like

9     there's only so much weight you can give to the practice of

10    parole, but parole is -- has been used by many administrations,

11    as we noted in our briefing, not just this current

12    administration, to provide, you know, the opportunity for

13    individuals in particular countries when that country is hit by,

14    you know, some disaster or something to come to the United

15    States.

16         And there, the urgent humanitarian need is this

17    terrible thing that's happened in Nicaragua or this, you know,

18    huge political upheaval that's happened in XYZ country.  And the

19    fact that that's shared by all the people from that country

20    doesn't mean that they each still aren't subject to the direness

21    of that particular need.

22         THE COURT:  All right.  And I guess that -- and that's

23    kind of the new policy that Ms. Fudim and I were talking about

24    and agreeing is outside the scope of this case.  I mean, that's

25    exactly what that policy is intended to do.  And I'm sure it

1    will be challenged.  And, God, I hope it's somewhere else.

2          But the idea is that you're going to parole people

3    into the country, but when whatever condition -- the hurricane

4    or whatever their crisis is in their country -- ends, that's

5    when their parole ends.  And I guess that's just what I'm not

6    seeing that with this Parole Plus ATD policy.  I'm not seeing

7    anything that -- in the administrative record that would lead me

8    to believe that once the conditions in -- you show up in the Rio

9    Grand office -- when you show up in the Rio Grand office, things

10   were bad, COVID was spiking, whatever it might have been, and

11   they said we're implementing this.  There's nothing in this

12   policy that says that once that condition goes away, you're to

13   be taken back in to where you were when you got out.  Right?

14         MR. DARROW:  Not to that particular spot, but you

15   still are taken back into the custody of ICE.  You know, you

16   show up at their office, and at that point they decide how are

17   we going to treat this person.  Are we going to detain them, are

18   we going to continue to parole them, or are we going to release

19   them?  It's -- I mean, you know, you could argue that two

20   different paroles are happening.  It's like the initial parole

21   to get to the ICE office, but also, you know, because we're

22   envisioning these people are going to be in proceedings, it's,

23   you know, the larger parole that may follow them throughout the

24   proceedings.

25         THE COURT:  Right.  And I get it.  I don't know if I

1   buy that argument because, particularly -- I mean, I'm not going

2   to repeat it, but I'm not going to repeat it:  "Return to the

3   custody from which" -- "from which he was paroled."

4          So it just doesn't -- the statute doesn't contemplate

5   a kind of interim measure to get you to the point where you're

6   getting your permanent release mechanism.  I mean, it just --

7   the statute just doesn't contemplate that, that I can see just

8   reading the plain text of it.

9          It makes sense what you're describing, that we needed

10  some sort of interim mechanism to get them through the system

11  quicker and get them into whatever proceedings they're going to

12  be in, exercising whatever authority we're going to exercise to

13  then ultimately release them or detain them, but this mechanism,

14  I just -- I just don't see it.

15         But maybe you'll convince me in your written filings.

16         MR. DARROW:  I mean, last thing I would say is does it

17  help the Court to think of it not as different -- you know, the

18  names "Border Patrol" to "ICE," but just different functionings,

19  where, you know, you're still within DHS custody, but we're

20  moving you from the border processing function to the, you know,

21  removal proceeding/supervision function, but it's still the same

22  DHS custody?

23         THE COURT:  Maybe it does.  Maybe you'll convince me.

24  It's -- custody is custody.  Although I think the evidence I

25  heard -- and I know that's outside of this policy, but the

1    evidence I heard is that there's a difference between detention,

2    which ICE does, and holding, which CBP does.  And so to the

3    extent that's something that I think the Federal Government

4    really wanted me to take note of in different context, to the

5    extent there's a difference in holding somebody by CBP for 72

6    hours and detaining them by ICE for a longer period, I'm not

7    sure that's the same, practically speaking, for an alien,

8    whether they're locked up in a CBP facility or locked up in a

9    ICE -- actually, it's not the same, because I heard testimony

10   that ICE facilities are subject to essentially prison detention

11   requirements.

12           So anyway, all that's good fodder for your briefing.

13           MR. DARROW:  Okay.  But not prison detention.  They

14   can't be at the --

15           THE COURT:  I know.  It's not --

16           MR. DARROW:  Okay.

17           THE COURT:  What I'm pointing to is that -- I can't

18   remember which witness it was, talked to me, and maybe it was

19   the East Coast ICE ERO guy.  He talked to me about the

20   requirements that ICE detention facilities had.  They had to

21   meet higher standards, and that's the point I'm making.  They're

22   your -- detention is detention in some respects, but it's not

23   here.

24           So I'm not sure how that goes into your argument, but

25   I've belabored it.  I think you know where I stand, and I'll

1    maybe get moved by what y'all argue.

2            MR. DARROW:  Okay.  But going back to the case-by-case

3    part, not specifically the case.  I think that that -- I know we

4    keep beating it up, but that parole regulation, 212.5(b), is

5    illustrative because it provides evidence that, you know, we can

6    consider groups.  Like that statute says, if you fall within one

7    of these groups, you are presumptively eligible for parole,

8    assuming you yourself don't present a flight or security risk.

9            And, you know, that has been the agency's

10   interpretation since that came out in 1996 or '97.  Florida

11   doesn't challenge that.  And that shows that different people

12   can have the same humanitarian interest or significant public

13   need, you know, so long as the -- they're still being analyzed

14   as individuals, which, you know, I think everything in the

15   record indicates that, that it's still a case-by-case inquiry.

16   Each individual -- we're still running, you know, biographical

17   data on them, we're still looking at the equities of the

18   individuals.

19           THE COURT:  Let me ask you two other questions, just

20   to kind of -- because I want to get to your remedies point.

21           The other -- I think the toughest argument the Federal

22   Government faces, I think your strongest -- I think your

23   toughest argument is contrary to law as to the Parole Plus ATD

24   policy.  I think your strongest argument is arbitrary and

25   capricious.  But Mr. Percival made a compelling case that it is

1    arbitrary to the extent that you knew -- ICE, in particular,

2    knew when they entered into the Parole Plus ATD policy the costs

3    and the delays that it was going to create.

4            And so from an arbitrary and capricious standpoint, on

5    one hand they know it's going to cost a lot of money and delay

6    things for -- increase the backlog, on the other hand they're

7    weighing the importance of getting people out of the office.

8            So on that level, I think there's probably -- you can

9    overcome that.  He makes a pretty compelling argument, though,

10   given the cost, given the delays, given the increase in the

11   backlog.  The fact that it wasn't mentioned at all or addressed

12   at all in the memoranda is -- I think he cited the *DACA* case, or

13   something, that suggested that is an arbitrary and capricious

14   problem.

15           What's your response to that?

16           MR. DARROW:  Respectfully, Your Honor, I would say it

17   is addressed in the memoranda.  Granted, the word "backlog" is

18   not used, but that's one of chief reasons, actually -- you know,

19   if I could speculate to the decision-maker -- for issuing the

20   new memoranda is the burden-sharing component by ICE and Customs

21   and Border Protection that is on the fourth page, SAR 0004,

22   where it says "subsequent processing."

23           And this is a development over the first memo where

24   ICE was going to be, you know, solely tasked with doing the

25   processing, by which here we mean, you know, working out

1   everything that's required to issue the NTA.  And in this memo

2   it has to be a joint, 50/50 split between the workload, and that

3   is because, you know, ICE said, Look, we're creating this

4   backload.  We need to get the processing done.  You know, we

5   ourselves don't have enough resources, so CBP's going to step in

6   and take over half of the processing.

7          THE COURT:  And I think the -- I think clearly it's

8   implicit, because they knew there was an issue and they

9   proceeded anyway.  And I appreciate you pointing me to that.  It

10  still doesn't explicitly say, We realize this is going to create

11  a backlog, we realize this is going to incur a lot of additional

12  costs, but we think this decision we're making, the other

13  factors countervail that and we're making the decision anyway.

14         Mr. Percival argues that the absence of an explicit

15  determination of that point or discussion of that point is

16  fatal, even if the implicit point that you're making is in

17  there.

18         What's your response?

19         MR. DARROW:  The APA doesn't require that, you know,

20  you write an exegesis on every single issue.  It just requires

21  that there is an indication that the problem was looked at and

22  addressed.  And I don't think the fact that it doesn't

23  specifically use the word "backlog," shows that the problem

24  wasn't issued and addressed.  I mean, this is clearly the

25  solution, and there's really no other reason given or postulated

1    for why else Border Protection would be agreeing to take over

2    half of the workload to, you know, help clear the backlog which

3    isn't mentioned, but that's -- you know, that's the basis for

4    this.

5              And the fact that, you know, we included so many

6    documents in the record that showed, yeah, there's going to be

7    this backlog, and it's going to be expensive to us, just, you

8    know, further illustrates that this was on the mind of the

9    decision-maker when they were creating this new July 2022 Parole

10   ATD memo.

11             THE COURT:  Okay.  Anything else you want to talk to

12   me about Parole ATD, or do you want to talk to me about

13   remedies?

14             MR. DARROW:  Just the last thing on the notice and

15   comment issue.

16             As Your Honor pointed out, I think, in the notice and

17   comment argument with the nondetention policy, it -- there has

18   to be a rule; but even more so, there has to be a legislative

19   rule that creates rights or responsibilities and interpretive

20   rules or general statements of policy which, you know, are two

21   different ways of kind of getting at the same idea, which is,

22   you know, simply an issuance of guidance that explains to the

23   agency what the statute means for a particular thing but doesn't

24   create a new right or responsibility for somebody.  That is not

25   subject to notice and comment.  And I think Parole ATD is a very

1  clear example, because it is just explaining to the agents on

2  the field how this is an application of the parole statute which

3  it, you know, cites numerous times.  This is one particular

4  application based to this public interest, and you guys already

5  now how to do the case-by-case analysis part.

6          THE COURT:  Is that an independent -- I know it's an

7  independent count in the complaint, but is that -- does there

8  have to be notice and comment required before something can be

9  invalidated under the APA?  I probably didn't ask that

10  question -- is that just an independent -- in other words, if I

11  find that this policy is contrary to law, the fact that notice

12  and comment may not have been necessary, are those two

13  inconsistent findings?

14          MR. DARROW:  No, no.  I think, I mean, generally they

15  refer to -- like the notice and comment is a procedural APA

16  violation, and the arbitrary and capricious is a substantive APA

17  violation.  So you don't have to find that, although -- and this

18  kind of, you know, jumps into remedies, so I'll throw it out

19  there.  That if Your Honor is, you know, despite all our best

20  efforts, inclined to find that there's something defective with

21  the Parole ATD program, we think the appropriate remedy would be

22  to remand it to the agency to fix it without vacating it because

23  of, you know, the disastrous consequences, certainly in the near

24  term that, you know, ending Parole ATD would mean for the border

25  starting the day after it was ended.

1          THE COURT:  Again, I'm not sure -- and you're welcome

2     to argue all that to me.  My under -- well, I guess the first

3     question is, you know, on its face, the policy says it's

4     supposed to be used sparingly.  So one would hope that a

5     sparingly used policy if it's vacated would not cause the sky to

6     fall.  But my recollection -- well, the latest data I see,

7     Parole Plus ATD -- I'm looking at Exhibit 4, page 3, of that.

8     It does look like nearly half of the dispositions, or more than

9     half, in October and November of 2022, were being done through

10    Parole Plus ATD.

11         So you're right.  That is a massive number, and so you

12    think that if I determine that it's contrary to law, what

13    they're doing, what -- how can they fix that?

14         MR. DARROW:  Well, so -- let's talk about the remedies

15    overall, and we'll deal with Parole ATD first and then move

16    though nondetention policy, or do you want to --

17         THE COURT:  Right.  And one thing I don't want to hear

18    today because I'll see it in the briefing, and I recognize that

19    the Supreme Court right now is considering the question of

20    whether APA vacatur is even available in the immigration

21    context.  And so let's not spend time arguing about that.  You

22    certainly can brief it.  We're not going to have an answer from

23    the Supreme Court, but I don't think it's good use of our time

24    to try to debate that point at this point.

25         MR. DARROW:  Okay.  So we'll skip over that, but I

1    think at this point, you know, the general -- the generally

2    accepted application of 8 U.S.C. 1252(f)(1) is that, you know,

3    no injunctions or no orders that restrain or condition the --

4    and I'll read you the exact terms, quote:  "No Court, other than

5    the Supreme Court, shall have jurisdiction or authority to

6    enjoin or restrain the operation of specified provisions of the

7    INA."  And the specified provisions include 1225 and 1226.

8              THE COURT:  It doesn't include the parole statute?

9              MR. DARROW:  That's correct.  However, the parole

10   statute is how the government, you know, would implement the

11   release from 1225.  And enjoining the government to not issue

12   paroles or issue paroles in a specified way is basically

13   enjoining it to enforce 1225 in a particular way, because they

14   operate as an inverse.

15             THE COURT:  And I understand that argument, and I

16   think that's part of the discussion at the Supreme Court, which

17   is how -- where is that line on 1252?  And here, it's even a

18   little more challenging because 1252 only talks to Part 4, I

19   think, or Part 5 of the INA, whereas I'm dealing with the parole

20   statute in Part 2.  I understand your argument that there's

21   ancillary, you know, you push the lever down here, it's going to

22   go up there.

23             But I guess my question is this:  If I determine that

24   this policy is invalid, all I would be saying is you can't --

25   you can't do what you're doing under that policy.  That's not

1   saying you can't keep releasing people.  That's not saying you

2   can't -- I mean, it's essentially -- all it's doing is saying

3   you need to do what the statute contemplates, at a minimum, and

4   give them an NTA and begin that processing.  And then if you

5   want to release them on their own recognizance, or whatever

6   else -- I know Florida wants me to find that that process, apart

7   from this, is illegal.

8          And if I were to say that, then I see you'd have the

9   problem; but if I don't say that and I just say you can't use

10  the parole process to defer processing people, all that's doing

11  is creating additional work to be done at the Border Patrol

12  office.  The reason that you couldn't do that before is because

13  COVID was a problem.  Now we're repealing Title 42 because

14  COVID's not a problem anymore.  Why is that such a bad remedy at

15  this point?

16         MR. DARROW:  To be fair, the courts still think COVID

17  is a problem because they won't let us repeal Title 42.

18         THE COURT:  I think, you know, on that, I'm obviously

19  not on the Supreme Court, but I think Justice Gorsuch had that

20  right, and he's been saying that for quite some time in a lot of

21  different contexts.  And our President has said -- the current

22  President has said that.  COVID is over.  COVID can't be the

23  excuse for everything forever.

24         And Justice Gorsuch, I think, correctly recognized

25  that a policy that is premised on COVID can't continue.  We need

1    to get back to the orderly process.  If there's a problem with

2    immigration, it needs to be solved through the immigration

3    statutes, not the COVID statutes.

4           But, again, that's the Supreme Court.  They're

5    deciding that.

6           But I get your point.  But factually what I have in

7    the administrative record is the Title 42 repeal order, which

8    goes to great lengths to say -- and, again, I'm paraphrasing,

9    and I know there's qualifications -- but essentially say,

10   COVID's over, we don't need all of these protections anymore.

11          So in view of what I've got in this administrative

12   record, why is the parade of horribles that you're giving me

13   about that remedy something I really have an evidentiary basis

14   to be worried about?

15          MR. DARROW:  Well, I mean, going back to the Parole

16   ATD record, the newer memo isn't just limited to COVID.  It

17   talks about, you know, a wide range of public health risks that

18   can arise from the overcrowding facilities.  And that's not

19   just -- I mean, that's something the Court can take, you know,

20   judicial notice of outside of COVID entirely, that we have, you

21   know, these massive class action litigations going around the

22   country, like the *Doe* case in Arizona and the *Flores* case, which

23   continues, which, you know, have found issues with Border Patrol

24   processing facilities.  And they're being worked out in

25   settlements, but, you know, those are health and conditions of

1    confinement issues that are unrelated to COVID-19, even if

2    COVID-19 probably exacerbated them while they were -- while it

3    was at its peak.

4           THE COURT:  Okay.

5           MR. DARROW:  But to Your Honor's point, even saying

6    that you can't use a particular program is still restraining or

7    conditioning the way in which the government can use that

8    statute, right?  To say, for instance, the government -- you

9    know, you can't release somebody on an NTA/OR is to say -- is to

10   condition or restrain --

11          THE COURT:  That's a different issue.  That's a

12   different issue.  And on that -- and I forgot to ask

13   Mr. Percival so I will ask him in his rebuttal.  I've always

14   viewed that if I agree with Florida that there is a nondetention

15   policy that violates the law that's subject to review under the

16   APA, I think they've got a much harder remedy issue because of

17   the exact reason you're talking about.

18          If I say you can't release people NTA/OR, I'm

19   essentially enjoining, indirectly albeit, enjoining a provision

20   of Title 8 that the 1252 says I can't do.  And so I think you've

21   got a stronger argument there.  But when we're talking about

22   parole, it's something I can enjoin, and so the impacts that

23   you're telling me get me into 1252 trouble are really one

24   stepped removed, aren't they?

25          MR. DARROW:  I mean, logically, they're one step

1  removed.  Practically, you know, saying you can't release people

2  on parole immediately -- or even for a particular reason,

3  immediately requires that we're going to have to detain more

4  people under 1245.  That's just -- because, you know, they're

5  connected at the hip.

6          THE COURT:  Okay.  All right.  I understand.  I'm not

7  sure that's my problem.

8          MR. DARROW:  Declaratory relief, of course, is totally

9  not touched by 1252(f), and so that's...

10         THE COURT:  And I've always wondered about this.  If I

11 agree with Florida on everything they're putting forth and I

12 declare that what's going on under this administration is

13 unlawful, I make that declaration, I put it on pretty paper and

14 say it's so, that accomplishes nothing other than some

15 politicians getting to wave that around and other politicians

16 getting to bash the court.

17         Normally, when a court enters a declaration and people

18 continue doing something, there are consequences.  But I

19 couldn't do anything about it if you said, Well, that's a nice,

20 pretty piece of paper, but we're not going to do anything about

21 it, right?

22         MR. DARROW:  I actually -- because this scenario

23 doesn't really come up, I'm actually not sure what happens.  I

24 mean, I'm definitely not going to represent the federal

25 government will just ignore your order.

1          THE COURT:  I think Ms. Fudim will tell me the

2     solicitor general, I think, struggled with this question when

3     asked by the Supreme Court and said something essentially to the

4     effect of, We respect the law and we follow the law, and it

5     really didn't have an answer to it.

6          So the fact that you don't have an answer is not

7     surprising or an indictment on you in any way, shape, or form.

8     I think it's a very difficult problem.  The Supreme Court

9     obviously doesn't have the problem because they, under the

10    statute, have the ability to enjoin and do things.  But all of

11    us inferior courts can just say things on nice, pretty pieces of

12    paper.  And if it ever works its way up to the Supreme Court and

13    the Supreme Court agrees, I guess they could enjoin you.  But

14    all -- the interim, I just have to sit by and watch my

15    declaration get flaunted, flouted.  I used this word incorrectly

16    in a dismissal order, by the way.

17          MR. DARROW:  Two last points on remedies.  One is not

18    so much about the type of remedy but the scope of it, which is

19    that in this case -- assuming, you know, the Court rules for

20    Florida, assuming the Court finds standing for Florida, it's

21    Florida that's demonstrated the injury, right, not all the other

22    states in the nation.  So we think any appropriate relief would

23    be tailored to address Florida's injury.

24          THE COURT:  What would that look like?  I mean, again

25    take -- go down the road with me that I find that the ATD policy

1    is unlawful, and so that's the only thing that I think under the

2    APA I can do something about, what would you think that remedy

3    would be?  You shall not utilize this policy to release anybody

4    to Florida?

5              MR. DARROW:  I mean, honestly, it's probably a

6    declaration that it's unlawful as applied to Florida, and

7    Florida needs to take that up to the Supreme Court to get an

8    injunction.

9              THE COURT:  Again, go down with me a different path

10   that I think I have the authority to vacate the policy.  You

11   would just say I vacate it in part, to the extent that it's

12   being used to parole people to Florida for processing?

13             MR. DARROW:  Yes.  I know that sounds unwieldy, but

14   that's the basis of the jurisdiction.

15             THE COURT:  I'll let y'all brief that question,

16   because my experience, you're either pregnant or you're not; and

17   if it's -- if it violates the law, it violates the law as to

18   Florida and everybody else.  And my authority, the better use of

19   judicial authority is just to strike the whole thing down and

20   let the chips fall where they may.

21             But I'll keep an open mind if there's some partial

22   vacatur authority in the APA.

23             MR. DARROW:  And I think our last point with remedy is

24   that -- so we've kind of addressed the claims that Florida has

25   raised that are about, you know, we're releasing these people,

1    we shouldn't be releasing those people.  But there are a bunch

2    of other claims about, you know, what we've been doing with our

3    detention facilities and our budgeting and our detention

4    capacity.  And frankly, we don't even know what a remedy would

5    look like in those contexts.  Would the Court order the

6    President to request more funding for detention facilities?

7              THE COURT:  That would be fun, wouldn't it?

8              No, of course not.

9              MR. DARROW:  Or even if you were to order Congress to

10   provide more.  Like, that's -- it seems not only like something

11   you probably wouldn't want to do, but also something you

12   couldn't really do under the separation of powers.

13             THE COURT:  I agree.  There comes a point at which any

14   remedy I can provide would almost prove the point of a dispute

15   being a political question.  And I know from the Federal

16   Government's perspective, we were at that point from the

17   beginning, and Florida thinks not.  And there's -- I will have

18   to decide.  I think there's components of it that I'm leaning

19   both ways on.

20             MR. DARROW:  And just, you know, on the practical

21   consequences, too, you know, if the Court were to do something,

22   issue some sort of injunction regarding particular release

23   programs, that would probably require, you know, some monitoring

24   component that -- and, you know, the Court would, you know, in

25   some ways get into just micromanaging how releases or detentions

1    are happening at the border, which I also doubt the Court wants

2    to do.

3              THE COURT:  I don't want to do it, but if I have to do

4    it, I have to do it.  And I think all that Mr. -- and he can

5    clarify if I'm mistaken.  But all that Florida is asking me to

6    do is to vacate the Parole Plus ATD policy and vacate the

7    nondetention policy.  Consequences of that, I don't think he's

8    particularly concerned about.  Whether I should be concerned

9    about them I guess is something I'll look forward to the parties

10   briefing me on, as to whether I should or shouldn't be.  But I

11   don't think he's asking me to order more funding or worry about

12   that.  If that's a consequence of the outcome of that, that's

13   for the political branch to sort out.

14             MR. DARROW:  Okay.  And on that point, I would just

15   say, you know, if the Court's leaning that way -- and we're not

16   trying to encourage it that way -- but if the Court's leaning

17   towards finding some sort of APA violation with, you know,

18   either of the policies that are at issue, you know, remanding

19   for the agency saying, Hey, there's something wrong with this,

20   you need to fix it, without vacating it, you know, gives Florida

21   what it wants without creating this, you know, immediate

22   headache at the border that things like Parole ATD have been

23   trying to resolve over the course of its lifetime.

24             THE COURT:  Understood.

25             MR. DARROW:  Thank you.

1            THE COURT:  All right.  Thank you for your argument.

2            All right.  Mr. Percival.  I know you've probably got

3    a lot you want to rebut, you will have a --

4            MR. PERCIVAL:  I'm going to try to keep it relatively

5    brief, Your Honor.  I think it was a good strategy on your part

6    not to let us eat lunch, because you've given me an incentive to

7    try to be concise.  But I'm happy to make sure I cover all the

8    Court's question, and it sounded like you had a few.  And I have

9    one page of notes.

10           THE COURT:  Okay.

11           MR. PERCIVAL:  I'll go in order, but if you want to

12   interrupt me and move me to something else, that's fine.

13           First, I just wanted to start with the nondetention

14   policy.  And one thing I neglected to mention when Your Honor

15   was asking me questions before is the presumption of judicial

16   review that exists in the APA.  The Supreme Court has emphasized

17   this presumption in many cases.  *Regents* is one of them, which

18   is the *DACA* case I already mentioned, which has other relevant

19   material in it.

20           And, you know, we'll cover this more in posttrial

21   briefing, but we think that presumption of judicial review ought

22   to inform many of the questions that we've been discussing

23   today.

24           I do want to just talk for --

25           THE COURT:  And just to bring you in, I think the most

1    compelling part -- I don't want to say that.  A compelling part

2    of Ms. Fudim's argument -- and there were many, but a compelling

3    part of it was the idea -- I think it was the -- she referred me

4    back to the *Texas v. Biden* case.  And I vaguely remember this

5    part of the decision where they chastised the Fifth Circuit for

6    invalidating a policy that they had to kind of put together in

7    pieces.

8            And so I really will want -- you don't need to waste

9    your time on it today, but I really will want to hear argument

10   on that in the briefing because I do vaguely remember that.  And

11   one of the things I -- certainly appellate courts do what they

12   want to do and say what they want to say, and I try to comply

13   with it.  But if I can it avoid being chastised for doing

14   something that the Fifth Circuit was told not to do, I would

15   really like to do that.

16           MR. PERCIVAL:  Understood, Your Honor.  That was on my

17   list --

18           THE COURT:  Okay.

19           MR. PERCIVAL:  -- and if I could just talk about it

20   for 30 seconds, and then we'll brief it.

21           What was going on in *Texas v. Biden* is that there was

22   a policy before that Court.  That policy was MPP, and the

23   rescission of that policy was governed by discretionary "may"

24   language in the INA.  And what the Fifth Circuit did, according

25   to the majority, is they took a different statute that wasn't

1    directly relevant, and they sort of shoehorned it into the

2    question whether the MPP rescission was contrary to law, even

3    though MPP was discretionary.

4          That's how I understand the Supreme Court's criticism

5    to be, that the Fifth Circuit just kind of grabbed these other

6    things it didn't like it that weren't part of the policy that

7    was being challenged.  That was not a case where an unwritten

8    policy was alleged and shown and was under review.  And so I do

9    think it's completely distinguishable when you understand the

10   context of what the Supreme Court was really chastising the

11   Fifth Circuit for.

12         THE COURT:  Okay.

13         MR. PERCIVAL:  I do want to talk for 30 seconds or

14   less about the evidence, because you had some exchanges with

15   opposing counsel, and I think there's a little factual

16   correction I would at least try to attempt to make, which is

17   that I did not understand Chief Ortiz's testimony to be that he

18   was doing the same thing before January 20th, 2021, and doing

19   the same thing after.  Both in his deposition and at trial, he

20   said Border Patrol was only doing Order of Recognizance and

21   parole releases under, quote, "very exigent circumstances," end

22   quote.

23         And if you -- obviously that's not what happened

24   after, and we know that from his testimony and we know that from

25   the numbers.  The numbers corroborate what Chief Ortiz said.  So

1   just insofar as the Court is under the assumption that all of

2   this was happening totally outside of Chief Ortiz and he just

3   did the same things but different results occurred, I don't

4   think that's what the evidence said.

5   THE COURT:  I guess my point was the factors he was

6   considering to determine whether to release somebody, as I

7   understood his testimony, were the same:  the danger to the

8   public, national security, that that was what he was focused on

9   before in deciding whether to detain, and that's what he's still

10  focusing after.  But you can point me to the evidence that shows

11  me that I'm misremembering that testimony.

12  MR. PERCIVAL:  Well, I think just briefly, that would

13  be inconsistent with his statement that the only releases that

14  were occurring under President Trump were under very exigent

15  circumstances, because the mere existence of a person who didn't

16  meet those sort of public safety thresholds, that would not be a

17  very exigent circumstance that results in only 17 people being

18  released in December of 2020.  But we'll address that in our

19  briefing, Your Honor.

20  Ms. Gerdts, can you just pull up Exhibit 36, please.

21  This is -- flip to the next page.

22  This is not, Your Honor, our most significant piece of

23  evidence but this got moved in without objection, and we didn't

24  get a chance to tell you why we were putting it in evidence.

25  And it's really just --

1           If you could, Ms. Gerdts, just highlight the first

2      sentence there after "name" exactly.

3           This is the letter that the Department of Homeland

4      Security is sending to people being released under these

5      challenged policies at their final destination when it's serving

6      Notices to Appear by mail.  And it says, "You and your family

7      made a difficult and dangerous journey to get to the United

8      States.  Federal agents at the border released you so that you

9      can apply for legal status in the United States."

10          So I think this certainly supports Florida's view that

11     these releases are intentional, they're a preference, and

12     they're being done for a very specific reason.

13          I want to shift gears a little bit and talk about --

14     and I may have missed a couple factual points.  My notes may not

15     be in the best order, Your Honor.  But on the issue of

16     Section 1225 and 1226, what you heard Mr. Darrow say is that

17     they're overlapping.  And I want to point the Court to the

18     *Matter of M-S-* decision, which is binding on the Department of

19     Homeland Security.  We cited this in our summary judgment

20     briefing, but if it's helpful, I can read the citation into the

21     record so Your Honor has it.  It's 27 I&N Dec. 509.  This is a

22     2019 Attorney General opinion.

23          And this is just the sentence I wanted to read to Your

24     Honor.  Obviously, you can read the rest later, but it says --

25     and reminding Your Honor that Section 235 and Section 236 are

1    the INA numbers for 1225 and 1226.  This is a direct quote from

2    the opinion, quote:  "Section 235, under which detention is

3    mandatory, and Section 236, under which detention is permissive,

4    can be reconciled only if they apply to different classes of

5    aliens."

6              So that's a judgment of the Attorney General in his

7    adjudicatory capacity overseeing the Executive Office of

8    Immigration Review that is it binding on the Department of

9    Homeland Security.

10             Related to that, Mr. Darrow talked a little bit about

11   the discretion between expedited removal and standard removal.

12   And putting the question of whether that discretion exists to

13   the side, because I don't think it's relevant to what we're

14   talking about, the point we want to make is that if an alien is

15   not in expedited removal, (b)(2) tells you what governs.

16             And I think that Mr. Darrow was conflating whether an

17   alien goes from (b)(1) to (b)(2) to whether they go from

18   Section 1225 over to Section 1226, and I think whether there's

19   room to move between (b)(1) and (b)(2) is a very different

20   question from whether there's room to move between 1225(b)(2)

21   and 1226(a).  They're just different questions.

22             On the Barker deposition, I heard opposing counsel say

23   that they thought that was outside the scope of the topics.  We

24   didn't put the topics into evidence because we offered this

25   under Rule 32(a)(3), which is the mechanism to offer a corporate

1    representative deposition.  And if you go look at the

2    objections, they did not preserve a scope objection, so we

3    didn't feel the need to put the topics into evidence because no

4    scope objection was preserved for Your Honor.  But we're happy

5    to provide those for the Court if the Court intends to make a

6    judgment about whether the questions are within the scope.  We

7    just kind of think that ship has sailed.

8              THE COURT:  I don't have any particular need to see

9    any more paper.

10             MR. PERCIVAL:  Noted.

11             I know Your Honor had questions about the remedy, and

12   I think the questions are slightly different for -- maybe not

13   too different, actually -- for nondetention and Parole Plus ATD.

14             Your Honor is correct that we are asking for vacatur

15   and declaratory relief.  Now, I agree with Your Honor that APA

16   vacatur is not party-specific; but even if it were, you have to

17   remember the premise for the solicitor general's argument to the

18   U.S. Supreme Court that vacatur is supposed to be

19   party-specific.  That is all premised on the idea that you only

20   give relief insofar as it is necessary to remedy the harm.  And

21   because Florida's injury flows from what's happening at the

22   southwest border, even if vacatur could be party-specific, this

23   is a classic case where there's no way to fashion party-specific

24   relief, and so you would end up issuing complete relief.

25             THE COURT:  Well, I guess -- and on the ATD policy,

1    it's a processing pathway.  And I'm just trying to play this out

2    in my mind.  And again, I'll let the parties brief whether there

3    is partial vacatur.

4         If I were to say that that -- in effect that pathway

5    cannot be used for people going to Florida, that would address

6    Florida's issue with respect to that policy.

7         MR. PERCIVAL:  Yes, Your Honor.  It's not clear to me

8    that that's a manageable remedy because, you know, we think we

9    have a good idea of, you know, people reporting addresses and

10   things like that.  But some of the things the Fifth Circuit has

11   said in its decisions is people have, you know, free movement.

12   And while we think the numbers that DHS provided to us about

13   who's coming to Florida are generally reliable, we don't think

14   it would give us complete relief.

15        And so I guess, I mean, I think it would be pretty

16   unwieldy for Border Patrol officials to be sort of interviewing

17   people and asking them if they're going to Florida or not --

18        THE COURT:  They're getting that information anyway.

19   And, again, I'm not -- I'm not necessarily convinced that there

20   is such a thing as partial vacatur.

21        MR. PERCIVAL:  I'm not either, Your Honor.

22        THE COURT:  But I'm working under the assumption for

23   my questions that there is in trying to explore with you why

24   that wouldn't address Florida's issue.  And you've told me that

25   it didn't, but the fact that it would be a more unwieldy on the

1    Border Patrol officers, I'm not sure I agree with that, because

2    they've got to get the location information anyway as part of

3    their interview to know what ERO office to send them to.  And so

4    it's like, you know, if they say, Oh, you're going to Florida

5    ERO?  Sorry, can't help you.

6            MR. PERCIVAL:  Well, there is evidence in the record

7    about how information gets distributed through struggling

8    networks about how to get through the border, and if word

9    gets -- circulates down that the way to get Parole Plus ATD is

10   to say I'm not going to Florida, then we think that will happen

11   pretty quickly.

12           THE COURT:  That's a fair point.  Okay.  I understand.

13           MR. PERCIVAL:  Before I move on from nondetention, I

14   just wanted to address -- well, I guess maybe two issues.  I

15   think Your Honor understood our budgetary evidence correctly.

16   We think it's corroborative of the existence of the nondetention

17   policy.  We're certainly not asking Your Honor to sort of order

18   people to send budget requests or order -- we haven't sued

19   Congress, Your Honor, obviously -- or the President, frankly.

20   So Your Honor can't obviously order them to do different things

21   with their budget, and we're not suggesting otherwise.

22           But related to the budget requests, you did hear

23   opposing counsel argue about funding for ATD even prior to this

24   administration.  And we have no problem with ATD once you

25   establish that a lawful release has occurred.  And you've heard

1    a lot of argument today about how some, many, releases are valid

2    releases, either because you validly exercised the parole

3    authority or because of a particular alien, say an alien in the

4    interior, is released lawfully under Section 1226(a).

5           So we certainly agree with the Federal Government that

6    when people are lawfully released, ATD is a very good idea.

7           THE COURT:  Let me explore that with you, because

8    that's another question I had going towards the remedy.

9           The -- and this works under the assumption that I

10   can't -- either I don't find that there is a nondetention policy

11   factually, or I find that there is one but it's not something

12   that I can review under the APA.  So I know you disagree with

13   both of those assumptions, but for my question, assume that to

14   be the case.  So there's nothing I can do about releases outside

15   of the Parole Plus ATD policy.

16          In the event that I tell them that that's an unlawful

17   policy, the release is inconsistent with the parole statute or

18   arbitrary or capricious, whatever I end up determining under the

19   APA, and therefore vacate it, then what they're left with is

20   releasing people under programs that don't have alternatives to

21   detention components tied directly to them.  That seems to be a

22   less-than-ideal solution, because having ATD -- and I think I

23   heard testimony about this -- having ATD increases compliance

24   more than not having it.

25          And I think from Florida's perspective, if you're

1    going to have these people roaming the streets, you'd rather

2    have them on ankle monitors or doing some sort of check-ins.

3          MR. PERCIVAL:  Well, Your Honor, I guess what I would

4    say is we're asking -- if you -- you're talking about if you

5    issue an injunction related to the parole authority?

6          THE COURT:  Well, I didn't think you were asking me to

7    enter an injunction.  I thought you were -- I mean, a vacatur is

8    effectively an injunction.  I think that's the remedy I have

9    under the APA, is under -- just this Parole Plus ATD policy, I

10   said I've got an administrative record, I've got a policy, and I

11   don't think that complies with the law.  If that's where I end

12   up going in this case and that's the only thing that you prevail

13   on in this case, the remedy I think that you would receive is an

14   order vacating that policy, which would then leave all these

15   others processing pathways that don't have ATD tied to them.

16   And so I guess the question is, is that necessarily something

17   that Florida would view as a positive outcome?

18         MR. PERCIVAL:  Well, Your Honor, that's asking me to

19   predict a lot about what the government, the federal government

20   will do in response to the vacatur.  It's not clear to me that

21   vacating the Parole Plus ATD policy will completely prevent them

22   from attaching ATD to people they release in other ways.

23   According to them, they've been doing the ATD for a long time,

24   at least in some way.

25         THE COURT:  And that's a fair point.  And so maybe

1    that's an unfair question to, you because it does seem to me if

2    the point of this exercise is, at a minimum, to ensure that

3    people are not being released into the country without having an

4    immigration proceeding commenced against them, such that if they

5    fail to appear, they can be removed *in absentia*, then that will

6    accomplish something.  And I would assume with all the ATD money

7    they're getting, if they're told they can't utilize this

8    mechanism to do it, then they will -- when they inevitably

9    release these people, as a practical matter they've got to,

10   they're going to attach those conditions to it, one would hope.

11           MR. PERCIVAL:  And, Your Honor, just to remind me,

12   this hypothetical assumes that you give us neither declaratory

13   nor vacatur on anything other than vacating the Parol Plus ATD?

14           THE COURT:  That was the hypothetical.

15           MR. PERCIVAL:  I think assuming all those assumptions

16   are true, then I don't think I have anything to add.  I will say

17   I think we did plead an injunction insofar as it goes to the

18   parole authority, though sometimes what we see in these cases is

19   the Court, at least as an initial matter, limits the remedy to

20   vacatur, because it thinks that's going to provide complete

21   relief.  But we have reserved a request for an injunction

22   because it's not covered by 1252(f) insofar as it goes to the

23   parole authority.

24           THE COURT:  Okay.

25   ///

1          MR. PERCIVAL:  So I want though move on to make --

2    just make a couple points on Parole Plus ATD.

3          The first is related to Your Honor's question of

4    Mr. Darrow, which was about a point I made about reasoning and

5    the decisional document versus reasoning sort of implicit in the

6    administrative record.  And I don't mean to tell Your Honor that

7    every answer in this case is found in the *DACA* decision, but

8    this just so happens to be another question in this case that's

9    answered by the *DACA* decision.

10          If you read that opinion top to bottom, what the

11   Supreme Court consistently says is that the omissions in the

12   agencies' reasoning are that they do not appear in the Duke

13   memo.  In fact, I don't even think the word "administrative

14   record" is in that opinion.  I was Control F'ing for it during

15   Mr. Darrow's argument.  I don't think it appeared in there at

16   all.  So I think *Regents* is pretty supportive of our position on

17   that, Your Honor.

18          We also found some case law during the break, Your

19   Honor.  This is binding Eleventh Circuit case law written by the

20   current Chief Justice that says that when you're considering the

21   question of ignoring an important aspect of the problem and

22   you're noting an omission from either the reasoning or the

23   administrative record, you may, in fact, go outside the record

24   for that limited purpose.

25          And I'm going to read the cite for you --

1          THE COURT:  You don't need to.  You -- just cite it in

2   your briefs and --

3          MR. PERCIVAL:  Fair enough.

4          THE COURT:  -- refer me to it.

5          MR. PERCIVAL:  Fair enough.

6          THE COURT:  If the Eleventh Circuit's told me what to

7   do, I will follow dutifully.

8          MR. PERCIVAL:  And then just a couple additional

9   issues on Parole Plus ATD is we talked about release on parole

10  and then return to custody.

11         And, Ms. Gerdts, can you pull up SAR 165 of the

12  administrative record.

13         And I believe what Mr. Darrow said -- well, I'll let

14  Ms. Gerdts turn to it first.

15         THE COURT:  I've got it in front of me.

16         MR. PERCIVAL:  I believe what Mr. Darrow said was, you

17  know, they report to ICE, and then ICE makes a decision about

18  whether to continue the parole or not.

19         And one of the things I was looking for when he said

20  that was we know from the trial record that many of these people

21  are never showing up to ICE.  They're receiving mail, which

22  obviously doesn't allow a determination about whether to

23  continue the parole or not.  And I was just trying to make sure

24  that was reflected in the administrative record itself so I

25  could make this point.  And it is reflected, I believe, on this

1    page, about the mailing of the charging documents as part of the

2    Parole Plus ATD program.

3             So certainly insofar as they're never reporting to ICE

4    and they're just receiving a Notice to Appear via mail, it's

5    hard to imagine how there could be some determination by ICE

6    about whether to take them back into parole and determine

7    whether the purposes of parole have been served.

8             THE COURT:  I think the point he was making, I think,

9    was the purposes of parole are completely served once they

10   report -- once ICE begins their processing, because ICE then

11   issues some sort of separate release mechanism.  Maybe -- I'm

12   probably misstating it.  He stated it much more eloquently than

13   that.  But I guess the question I would ask is there anything in

14   the administrative record that explains what happens at ICE

15   beyond the mailing stuff?

16            MR. PERCIVAL:  Well, there's the stuff I mentioned

17   earlier that says -- it promises them that they will not be

18   taken into custody in advance.  Other than that, we can try to

19   address that in posttrial briefing.

20            THE COURT:  Okay.  Well, the thing I'd be interested

21   in knowing is if -- and I'll look for it as well in the

22   administrative record -- if it articulates what happens at ICE

23   in the sense that ICE prepares an NTA, they put a warrant in,

24   they create the -- or supplement the A-file with all the things

25   that should have been done, it's Border Patrol processing up to

1  and including an additional parole document.  That would be -- I

2  would be interested to know if that's all in the administrative

3  record.

4          MR. PERCIVAL:  Understood.  And then I just have two

5  points in closing, Your Honor.  They're both in one exhibit.

6          Ms. Gerdts, can you pull up Exhibit 23 and turn to

7  page 16.

8          So particularly given where Your Honor is going, or

9  appears to be going, with standing evidence that you believe is

10  most relevant, and some of the argument I heard from opposing

11  counsel from family units, I just wanted to point this page and

12  the next page out because all the other data we have from the

13  Department of Homeland Security doesn't have breakouts by family

14  unit numbers.

15          I did give you that press release just so you could

16  see the breakdown between Title 42 and Title 8 and see that a

17  very small percentage are being -- Title 42 is being applied.

18  But I think this chart, this is in the questions for the record

19  provided by Secretary Mayorkas in response to his congressional

20  testimony.  It's a little hard because the chart is two pages,

21  but you can see here, this is family unit traffic.  That's the

22  second number.  So in January -- this is apprehensions; this is

23  not releases.  But you can see it's about 7300, and you can see

24  that it increased -- by July it was up about 11 times as high as

25  what it was when President Biden took offices.

1          Now, Ms. Gerdts, can you go to the next page.

2          And let's see that single adults number at the top.

3    Go ahead and highlight that.

4          So if you look at the single adult traffic, what you

5    see is that when President Biden took offices, it was much, much

6    higher than family units, but the increase is only two times as

7    much.  So I believe you heard some testimony during this case

8    from one of defendants' witnesses that there was a real need to

9    re-purpose facilities to deal with single adults and that single

10   adults were driving the surge, but I think you can see in this

11   document that is simply not the case.

12         Now, Ms. Gerdts, can you please turn to page 63.

13         And this is where I want to close, Your Honor, because

14   I think one of the disputes in this case is about whether -- I

15   don't want to say it's one of major disputes, but part of what

16   goes to this question of whether there's a nondetention policy.

17   And I tried to walk Your Honor to compare the February 2020

18   numbers to the February 2021 numbers, and I think one of the

19   questions is, was there this increase in traffic that just sort

20   of naturally prompted releases, or was this intentional decision

21   to release that prompted the traffic.

22         And this was a question that was posed about the

23   budget requests and why they were asking for so little when they

24   were, you know, having a hard time managing the border.  The

25   specific -- well, let's just go to the question.

1          Can you zoom out from that and go to the question.

2          So the Department's request reduces detention space by

3   1500 beds, and it says some more stuff about that.  And then

4   let's go back to the answer.  The point I'm trying to make is

5   just one specific sentence.  It's the third line down, and it

6   starts two words from the left.  And this is what the Department

7   of Homeland Security said:  "When the budget was being

8   formulated during spring 2021, ICE's adult daily detention

9   population levels were near historic lows."

10          So DHS is saying in this case that they started mass

11   releasing people because they couldn't detain them.  But they

12   told Congress that the reason they wanted a budget cut was

13   because their detention facilities were empty.

14          I have nothing further, Your Honor.

15          THE COURT:  All right.  Thank you all for your

16   arguments today.  That's been very helpful.  And thank you all

17   for your presentations of the case today.  It was a little

18   disjointed at times with the piles of exhibits and witnesses by

19   video and Ms. Christmas reading depositions.  But all in all, I

20   think I've gotten a more complete picture of what is going on

21   that will help me sort through it all and decide the case.

22          The next thing -- or the last thing I'd like to talk

23   about is the proposed findings, because as I said, this closing

24   argument was as much for my benefit to understand the parties'

25   views of the evidence as well as some of these legal issues and

```
 1   give me a preview of what I might see and hopefully give the

 2   parties an idea of some of my thinking up to this point, but it

 3   didn't intend to replace the proposed findings.

 4           I think I have a pretty good idea of where I see the

 5   case coming out, but I'm certainly not in a position today to

 6   make oral findings that are sufficient enough to meet the

 7   Rule 52 standard and give the parties something to appeal.  So I

 8   will be issuing a written decision in this case.

 9           Proposed findings timing.  As I've told you multiple

10   times in this case, as much as I would like to tell you to give

11   me those findings on Monday and I'll give you a decision on

12   Tuesday, the reality is that my attention very quickly is going

13   to be turned to other matters and will be on other matters for

14   quite some time, and so that gives the parties an opportunity to

15   have more time that won't impact a decision in this case in any

16   way.

17           So what -- have the parties given any thought or had

18   any discussions as to how long they might want for written

19   findings?

20           MR. PERCIVAL:  We would like at least a few weeks.  I

21   haven't seen my family and, you know, if Your Honor's not going

22   to look at it right away, I guess we'd like a little bit of time

23   to digest what you've said.  But we're happy to do whatever's

24   most helpful for Your Honor.

25           MS. RYAN:  Yeah, we would agree.  And Your Honor gave
```

1    a lot of thoughts that he had of what he would like to see in

2    the briefing, and so we'd like to get the final transcript and

3    maybe give the court reporter a few days to take a break and --

4    before she has to do that.  So we would agree.

5         And I think our question on that, too, is does Your

6    Honor anticipate single cross-filings or do we have to have

7    responses factored into the schedule as well?

8         THE COURT:  I would anticipate single filings.  And

9    again, as we talked about at the pretrial conference, ideally

10   these would be documents that I would read and say that is

11   exactly what I find, would sign my name on the bottom of it, and

12   that would be the end of the case.  The likelihood of that

13   happening is very slim.  But this is an advocacy piece to the

14   extent you're going to be obviously giving me what you think the

15   evidence showed, as compared to what Florida thinks the evidence

16   showed.  But at the same time, it is what you think the answer

17   to the case ought to be, rather than briefing and

18   counter-briefing.

19        Ideally, there would be places that -- I think

20   Mr. Percival touched on it today, the Take Care Clause.  I've

21   expressed my views on that.  The evidence has come out the way

22   it is.  He may decide that he's not pursuing that any further.

23   You may or may not know that.  He will tell you if he decides

24   not to, so you don't have to address it.  But he may not make

25   that decision until late in the game, and so you may end up

1   addressing something that you want me to rule on that at the end

2   of the day will simply be Florida is no longer pursuing the Take

3   Care Clause.

4            So anyway, long answer to a short question, which was

5   not going to be any replies.  So that can probably give you more

6   time on the front end.

7            So three weeks?  28 days?

8            MR. PERCIVAL:  I'll take 28 days --

9            MS. RYAN:  Yes.

10           MR. PERCIVAL:  -- if you'll give it, Your Honor.

11           MS. RYAN:  28 days, please, Your Honor.

12           THE COURT:  That suits me fine.  And that will take us

13   to mid February, which, again, is not ideal because, again, I'm

14   not the policymaker.  The policymakers are elected and stand for

15   election.  But I'm also a citizen and I watch the news.  I see

16   things that are going on, and it certainly doesn't appear to be

17   a sustainable situation that's -- and the evidence I heard

18   supports that it's really not a sustainable situation.  So every

19   day that delays my ruling, whatever it's going to be, that the

20   parties can take to wherever they want to take it next is a day

21   that this continues to fester, and it needs to get resolved.

22           But taking us to mid February for your briefing will

23   give me an opportunity if, you know, my prayer's come true and

24   that antitrust case goes away, I'll be able to turn immediately

25   to this because all that time was blocked out.  If it doesn't,

1    it will be the first thing I get to in March.

2         And I'll get you a decision as quickly as I can,

3    understanding that whatever I say on it is not going to be the

4    last word on this, and the parties -- maybe both parties -- will

5    be disappointed in the outcome and both parties will be

6    appealing.  But at a minimum, one party's going to be

7    disappointed with the outcome, and so an appeal will likely need

8    to be had.

9         And this case, in my view, has always been one that is

10   going to be resolved by someone at a higher pay grade than me,

11   whether it's the policymakers who come together and solve the

12   problem politically, or whether it's a higher court that has the

13   authority, unquestioned authority, to do something.

14        So that's where we'll go next.

15        MS. RYAN:  Your Honor, one other question.

16        THE COURT:  Sure.

17        MS. RYAN:  Given the size and scope of this trial and

18   the arguments we had today, do we need to address the word limit

19   with you now, or should we submit something later?

20        THE COURT:  I don't think the -- at least in my view,

21   I haven't looked at the local rules to see if they have any

22   specific words limits on proposed posttrial filings; but if they

23   do, you can exceed whatever you need to do.  Be as concise as

24   possible.  Y'all have all been very good as not expending

25   unnecessary words to just add to it.  Nobody here is getting --

1    billing by the hour, so that's an unnecessary thing to do.

2            But certainly I would anticipate that whatever I write

3    is going to exceed the word limits on briefing in the local

4    rules, so certainly you don't need to be hampered by that.

5            There was something else this came to my mind that I

6    have now forgotten.

7            Anyway, anything further from the State?

8            MR. PERCIVAL:  No, Your Honor.

9            THE COURT:  Defendants?

10           MS. RYAN:  Nothing further, Your Honor.

11           THE COURT:  All right.  Well, thank you very much.

12           Ms. Gerdts and Ms. Latimer, thank you both for your

13   work on the computer.  That did make things very helpful to me

14   and the witnesses, and I appreciate your both being here today.

15           And we are adjourned.

16       *(Proceedings adjourned at 3:50 p.m.)*

17                         * * * * * * * *

18       I hereby certify that the foregoing is a true and correct
     transcript of the stenographically reported proceedings held in
19   the above-entitled matter, pursuant to the provisions of Section
     753, Title 28, United States Code.
20

21   *Julie A. Wycoff*                         1/22/23

22   _____    _____
     Julie A. Wycoff, RMR, CRR           Date
     Official U.S. Court Reporter
23

24

25

```
 1                            I N D E X

 2

 3   Defense Witnesses                    Direct   Cross   Redirect

 4   PATRICIA GROGAN ...........................9     51       57

 5

 6                        DEFENSE EXHIBITS

 7   Exhibit    Description                      Marked   Admitted

 8   PP         DCF noncitizen handbook            14       14

 9

10

11                                               Page

12   Rule 52(c) motion .........................................64

13   Closing Arguments by Mr. Percival .........................67

14   Closing Arguments by Ms. Ryan ............................129

15   Closing Arguments by Mr. Darrow   ........................131

16   Closing Arguments by Ms. Fudim ...........................156

17   Further Closing Arguments by Ms. Ryan ....................188

18   Further Closing Arguments by Mr. Darrow ..................202

19   Rebuttal Argument by Mr. Percival ........................238

20   Court Reporter's Certification ...........................260

21

22

23

24

25
```