# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

STATE OF FLORIDA,

    *Plaintiff*,

v.                               Case No. 3:21-cv-1066-TKW-ZCB

The UNITED STATES OF AMERICA;
*et al.*,

    *Defendants*.

_____/

## **FLORIDA'S PROPOSED FINAL ORDER**

In *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), the Supreme Court held that 8 U.S.C. § 1225(b) "mandate[s] detention of applicants for admission" through the completion of removal proceedings. *See Jennings*, 138 S. Ct. at 842. According to Florida, within days of President Bident taking office, his Department of Homeland Security (DHS)[1] issued an unwritten policy of releasing applicants for admission into the interior unless DHS determines that they are a public safety or flight risk. Florida calls this policy the Non-Detention Policy and argues that it violates § 1225(b).

---

[1] Defendants in this case include DHS, its components Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and Citizenship and Immigration Services (USCIS), the heads of each of these entities in their official capacity, and the United States of America. The Court refers to Defendants collectively as DHS. *See* 5 U.S.C. § 702 (explaining that "[t]he United States may be named as a defendant" in an Administrative Procedure Act (APA) case but that the judgment must specify the officers "personally responsible for compliance").

This Court held a bench trial to determine whether that policy exists. The Court heard testimony from senior DHS officials, including the Chief of Border Patrol, and reviewed videoed congressional testimony from DHS Secretary Alejandro Mayorkas. The Court also admitted more than 100 exhibits, which include DHS policies, data, and email communications.

Border Patrol Chief Raul Ortiz testified that, under the prior administration, DHS only allowed the release of applicants for admission at the Southwest Border under "very exigent circumstances." [FOF ¶ 17.] Secretary Mayorkas stated to Congress that DHS's current policy at the Southwest Border is as follows: "We are increasing our use of alternatives to detention, and we are using detention when it is a public safety imperative or an imperative to ensure the continued appearance of individuals in immigration enforcement proceedings." [FOF ¶ 24.] Florida contends that this change in policy is the Non-Detention Policy, and the State seeks vacatur of that policy under the Administrative Procedure Act (APA).

Based on the evidence at trial, the Court agrees with Florida that DHS made this change in policy and that it is reviewable under the APA. DHS cannot reasonably dispute that the agency changed its detention policy, and its implicit argument that it "depart[ed] from [its] prior policy *sub silentio*" does not persuade the Court that the policy change is unreviewable. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (Scalia, J.) (explaining that such a change

would violate the APA per se); *Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.").

In addition to the Non-Detention Policy, Florida challenges DHS's Parole Plus Alternatives to Detention Policy (Parole + ATD Policy), the latest iteration of which is reflected in a July 18, 2022 memorandum. The Parole + ATD Policy takes the narrow parole authority in 8 U.S.C. § 1182(d)(5)—which is only available "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"— and substitutes it for the inspection requirements in § 1225 as a means to mass release applicants for admission into the interior without initiating removal proceedings. Since issuing that policy, DHS has not used it "sparingly" as the memo suggests but has leveraged Parole + ATD to make *en masse* parole without the initiation of removal proceedings the primary processing mechanism for migrants at the Southwest Border.

Many of the questions presented in this case were before the Supreme Court in *Biden v. Texas*, 142 S. Ct. 2528 (2022), although the Supreme Court did not reach them. In dissent, Justice Alito expressed concern that DHS was releasing "more than 27,000" aliens a month. *Id.* at 2554 (Alito, J., dissenting). As the Court will explain, the numbers in this case exceed that number by a considerable margin, and the more

developed evidence before this Court regarding DHS's implementation of these releases demonstrates that they are unlawful.

For the reasons explained in this Order, both challenged policies are reviewable under the APA and must be vacated.

## EXECUTIVE SUMMARY

While the Court's findings of fact will address many issues, the Court recognizes that the principal dispute in this case is the existence of the Non-Detention Policy. Recognizing the importance of this issue to the parties, as well as to any reviewing court, the Court begins with a short summary of the facts that lead to the conclusion that the Non-Detention Policy exists:

- In President Trump's last full month in office, Border Patrol released 17 aliens at the Southwest Border. [FOF ¶ 6.] At that time, DHS only authorized Border Patrol to release applicants for admission at the border under "very exigent circumstances." [FOF ¶¶ 17–18.]

- In President Biden's first full month in office, Border Patrol released 8,798 aliens at the Southwest Border. [FOF ¶¶ 6, 19.] As explained below, what caused this significant increase was a change in policy away from the "very exigent circumstances" policy.

- As a candidate, President Biden promised to change this policy within 100 days of taking office. [FOF ¶ 11.]

- On President Biden's first day in office, his Acting Secretary of DHS formally rescinded guidance designed to end so-called catch-and-release, which is a euphemism for the release of applicants for admission subject to detention under 8 U.S.C. § 1225(b). [FOF ¶ 13.]

4

- Senior officials at ICE warned that this policy change would result in a substantial reduction in the number of aliens in ICE detention, and senior officials at CBP warned that this policy change would result in a substantial increase in the number of aliens being released at the Southwest Border. [FOF ¶¶ 14–15.]

- Within days of President Biden taking office, senior officials at DHS informed Border Patrol Chief Raul Ortiz—then the Deputy Chief—that Border Patrol was now authorized to release aliens who were not deemed a public safety or flight risk. [FOF ¶¶ 17–18.] Chief Ortiz viewed this as a change in policy because the previous policy only allowed release under "very exigent circumstances." [FOF ¶¶ 17–18.] These communications occurred by telephone. [FOF ¶ 17.]

- Releases increased exponentially at the Southwest Border during President Biden's first month in office, even as the total amount of border traffic did not exceed similar months where releases were low under President Trump. [FOF ¶¶ 19–20.]

- Secretary Mayorkas told Congress on two occasions that DHS made the precise policy change that Florida calls the Non-Detention Policy. [FOF ¶ 24.]

- Secretary Mayorkas also told Congress that DHS had substantial excess detention capacity at the time these releases began, which corroborates Florida's contention that the increased releases were the result of a policy change rather than increased border traffic. [FOF ¶ 55.]

- DHS began reducing its detention capacity around that time and even left certain detention facilities completely unoccupied. [FOF ¶¶ 58–59.]

- DHS is now releasing more than 100,000 aliens per month at the Southwest Border. [FOF ¶ 47.]

- These increased releases began due to a policy change, even if DHS has since completely lost control of the border. It is notable, however, that DHS continues telling Congress the following regarding its reductions in detention capacity: "[A] reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety." [FOF ¶ 59.]

## BACKGROUND AND PROCEDURAL HISTORY

Florida filed this action on September 28, 2021. [Doc. 1.] In its initial Complaint, the State challenged two policies: (1) DHS's Non-Detention Policy, issued in January or February of 2021, which authorizes DHS to release aliens at the Southwest Border unless they are a public safety or flight risk, and (2) DHS's Prosecutorial Discretion Policy, which was reflected in a March 19, 2021 memorandum signed by then-Border Patrol Chief Rodney Scott (the March Memo).[2] [Doc. 1 ¶¶ 30, 54–55; Pl. Ex. 20.]

Under the March Memo, DHS asserted "discretionary authority" to mass release aliens at the Southwest Border "without placing them in removal proceedings." [Pl. Ex. 20 at 1.] Instead of issuing a Notice to Appear, the agency invented a new document called a "Notice to Report," which asked released aliens to turn themselves in at an ICE field office at a later date. [Doc. 87-1 at SAR 93.]

---

[2] Florida originally challenged the Prosecutorial Discretion Policy on information and belief, and the State appeared to assume that no formal memorandum existed. [*See* Doc. 1 ¶ 7 (discussing "guidance sent to border patrol").] Similarly, DHS did not include the March Memo in the administrative record in this case, did not produce it in discovery, and strongly implied that no formal memorandum existed in its Answers. [*See* Doc. 53 ¶ 11 (discussing "guidance to individual Border Patrol Agents"); Doc. 79 ¶ 11 (same).] After the close of discovery, Florida obtained a copy of the March Memo, which DHS produced to a third party in response to a FOIA request. At a telephonic hearing scheduled soon thereafter, the Department of Justice (DOJ) represented that, during the first 14 months of this litigation, neither the attorneys who appeared in this case nor their contacts at DHS were aware that the March Memo existed. For ease of discussion, the Court treats Florida's original challenge as a challenge to the March Memo, which is moot in any event.

Florida called this practice "immigration enforcement by the honor system." [Doc. 1 ¶ 31.]

In what became a pattern in this case, DHS reacted to Florida's Complaint by rescinding the March Memo. [*See* Doc. 6-1 at 18 (moving to dismiss Florida's complaint as moot).] Specifically, on November 2, 2021, Border Patrol Chief Raul Ortiz issued the first written Parole + ATD Policy (the November Memo). According to the November Memo, Notices to Report were used as a "significantly faster mechanism for processing noncitizens." [Doc. 87-1 at SAR 93.] In other words, they allowed Border Patrol to release aliens more quickly than if the agency initiated removal proceedings prior to release.

The November Memo sought to continue the practice of rapid release without initiating removal proceedings, but it grounded the policy in the parole authority in 8 U.S.C. § 1182(d)(5). [Doc. 87-1 at SAR 94]; *see* 8 U.S.C. § 1182(d)(5) (allowing temporary parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"). As a basis to invoke the parole standard, the November Memo relied on the need to prevent "the spread of COVID-19." [Doc. 87-1 at SAR 94.]

The November Memo applied Parole + ATD only to family units, required that these family units be placed on an alternative to detention (such as an ankle

monitor or ICE issued cell phone), and requested that these family units "report to ICE within 15 days to be processed for" a Notice to Appear. [Doc. 87-1 at SAR 94.]

On February 1, 2022, Florida filed its First Amended Complaint. [Doc. 16.] The State continued to challenge the Non-Detention Policy, but the State replaced its challenge to the March Memo with a challenge to the November Memo. On March 7, 2022, DHS moved to dismiss the First Amended Complaint. [Doc. 23.] On May 4, 2022, this Court denied that motion. [Doc. 45.] On May 24, 2022, DHS filed its Answer. [Doc. 53.]

In its Answer, DHS took the position that "the alleged 'nondetention policy' does not exist." [Doc. 53 ¶ 20.] The parties thus began discovery, which was principally aimed at resolving that factual dispute.

On July 13, 2022, Florida discovered during a deposition that Border Patrol had expanded the Parole + ATD Policy without informing Florida or this Court and without altering the November Memo. [Doc. 70 at 2.] Specifically, Border Patrol expanded Parole + ATD to apply to single adults—rather than just family units—and for reasons unrelated to COVID-19. [Doc. 70 at 2.] Five days after Florida made that discovery, DHS replaced the November Memo with the July 18, 2022 Parole + ATD Policy (the July Memo), which is the policy now before this Court. [Doc. 87-1 at SAR 1–4.]

Unlike the March Memo and November Memo, the July Memo is not signed by the Chief of Border Patrol. Instead, it is cosigned by Acting ICE Director Tae Johnson and then-CBP Commissioner Chris Magnus. [Doc. 87-1 at SAR 1.] The July Memo no longer limits Parole + ATD to family units, and it replaces the COVID rationale with a more general concern regarding DHS's need to "treat and control contagious illnesses." [Doc. 87-1 at SAR 2.]

On August 12, 2022, Florida filed its Second Amended Complaint to replace its challenge to the November Memo with a challenge to the July Memo. [Doc. 74.] On October 3, 2022, DHS moved for summary judgment. [Doc. 88.] Florida did not move for summary judgment on the merits, but the State did move for partial summary judgment on standing. [Doc. 86.] On November 11, 2022, the Court denied both motions. [Doc. 117.]

A four-day bench trial began on January 9, 2023. The parties presented documentary evidence, live testimony, video deposition testimony, and written deposition testimony. The documentary evidence consisted mostly of DHS documents, including formal policies, public statements, and internal communications.

Witnesses from DHS included Raul Ortiz, Chief of Border Patrol at CBP, Corey Price, Executive Associate Director of Enforcement and Removal Operations (ERO) at ICE, Tony Barker, (former) Chief of the Law Enforcement Operations

Directorate at Border Patrol, Robert Guadian, Deputy Assistant Director of ERO, and Matthew Davies, Executive Director of the Office of Field Operations (OFO) at CBP. These witnesses provided testimony on DHS's policies and practices, including changes in DHS policy on or after January 20, 2021.

Witnesses from Florida included Jacob Oliva, Senior Chancellor for the Florida Department of Education, Lavitta Stanford, Budget Director for the Florida Department of Corrections, Patricia Grogan, Director of Economic Self-Sufficiency Policy and Programs for the Florida Department of Children and Families, James Heckman, Bureau Chief of Workforce Statistics and Economic Research at the Florida Department of Economic Opportunity, and Jesse Bottcher, Administrator in the Bureau of Medicaid Policy at the Florida Agency for Health Care Administration. These witnesses provided testimony regarding Florida's standing.

With the benefit of post-trial briefing and several hours of oral argument, the Court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### General Background on Immigration Enforcement

1. The Department of Homeland Security (DHS) is the agency responsible for immigration enforcement. The Executive Office of Immigration Review (EOIR) within the Department of Justice runs the immigration courts. [Doc. 122 ¶ 2; Pl. Designation of Robert Guadian at 125:16–125:22.]

2. The two DHS components principally at issue here are Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP).

3. ICE, through its subcomponent Enforcement and Removal Operations (ERO), is responsible for immigration enforcement in the interior and for running DHS's immigration detention. [Doc. 122 ¶¶ 11–12.]

4. CBP is responsible for border enforcement. The Office of Field Operations (OFO) enforces immigration law at ports of entry, and Border Patrol enforces immigration law between ports of entry. [Doc. 122 ¶¶ 9–10.]

5. OFO and Border Patrol maintain temporary holding facilities where they generally aim to detain aliens for no more than 72 hours. After 72 hours, continued detention requires a transfer to ICE custody. [Doc. 122 ¶¶ 13–15.]

Immigration Detention Prior to the Biden Administration

6. Before January 20, 2021, DHS rarely released aliens apprehended at the Southwest Border. For example, in the entire month of December 2020, Border Patrol released only 17 aliens. [Pl. Ex. 2 at 2–3.]

7. DHS's policy of rarely releasing aliens at the Southwest Border was informed by the statutory language in 8 U.S.C. § 1225(b), which states that applicants for admission "shall be detained." *See Jennings*, 138 S. Ct. at 842.

8. DHS's policy was also informed by Executive Order 13767, Border Security and Immigration Enforcement Improvements, 82 Fed. Reg. 8,793 (Jan. 25, 2017), which

instructed DHS to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings." *Id.* at 8,795. That language related specifically to aliens apprehended while committing "[i]llegal [e]ntry." *Id.* [Pl. Ex. 54.]

9. DHS's policy was not a byproduct of COVID-19 or of low overall border traffic. For example, in February 2020, Border Patrol apprehended over 30,000 aliens at the Southwest Border but released only 91. [Pl. Ex. 1 at 4.]

10. As Border Patrol Chief Raul Ortiz testified, the policy was reflected in instructions from DHS leadership. Those instructions were to only release aliens at the Southwest Border under "very exigent circumstances." Those instructions applied both to releases under the parole authority in 8 U.S.C. § 1182(d)(5) and releases under 8 U.S.C. § 1226(a). [Pl. Designation of Raul Ortiz at 173:13–174:7; Tr. Day 2 at 146:4–146:7.] Releases under § 1226(a) are referred to as Order of Recognizance releases or NTA/OR releases. [Doc. 122 ¶ 19.]

<u>Changes in Detention Policy Under the Biden Administration</u>

11. In 2020, then candidate-for-president Joseph R. Biden promised that, within 100 days of being inaugurated, his administration would "[e]nd prolonged detention" of migrants, which he viewed as improperly "punitive," and transition them to so-called "alternatives to detention." [Pl. Ex. 45 at 5.]

12. Immediately after he became President on January 20, 2021, DHS began implementing this policy change. [Tr. Day 2 at 148:13–148:21.]

13. On January 20, 2021, then Acting Secretary of DHS David Pekoske signed a memorandum entitled Review of and Interim Revisions to Civil Immigration Enforcement and Removal Policies and Priorities (the Pekoske Memo). The Pekoske Memo substantially narrowed DHS's immigration priorities. Most relevant here, the Pekoske Memo rescinded DHS's guidance implementing Executive Order 13767—which instructed DHS to detain aliens apprehended at the Southwest Border—even though President Biden had not yet formally rescinded Executive Order 13767. [Pl. Ex. 16 at 5.]

14. On January 27, 2021, senior officials at ICE determined that the Pekoske Memo would result in 50% fewer aliens entering into DHS detention as compared to historical numbers. [Pl. Designation of Corey Price at 43:18–45:10.]

15. On January 28, 2021, senior officials at Border Patrol informed senior officials at CBP that these policy changes, as well as other policy changes like the termination of the Migrant Protection Protocols, would result in the mass release of aliens into the interior of the United States. [Pl. Ex. 98 at 5; Tr. Day 2 at 133:5–133:10, 158:15–158:18.]

16. On February 2, 2021, President Biden issued Executive Order 14010, Creating a Comprehensive Regional Framework To Address the Causes of Migration, To

Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, 86 Fed. Reg. 8,267 (Feb. 2, 2021). That Executive Order formally rescinded Executive Order 13767, *id.* at 8,270, which the Pekoske Memo had already functionally abrogated. [Pl. Ex. 53.]

17. Consistent with these policy changes, DHS leadership communicated to Border Patrol officials that the Trump-era limitations on alien releases—specifically, limiting releases to "very exigent circumstances"—were no longer in effect. Many of those communications occurred by telephone. [Pl. Designation of Raul Ortiz at 173:13–174:2, 175:5–177:8.]

18. On its face, the Pekoske Memo indicates that border security, including the removal of aliens illegally entering the United States, is a priority for DHS components. But Border Patrol Chief Ortiz (who was then Deputy Chief) testified that his understanding of DHS policy was that detention of illegal border crossers who were not deemed a public safety threat was not a priority. [Tr. Day 2 154:23–155:4, 155:24–156:3.] As such, Chief Ortiz understood that Border Patrol was now authorized to release all other aliens into the interior, even if those aliens qualified as applicants for admission under 8 U.S.C. § 1225(a). [Pl. Designation of Raul Ortiz at 163:1–163:17.] Notably, both iterations of the Parole + ATD Policy are consistent

with this understanding, as both policies carve out public safety risks but not border security risks. [Doc. 87-1 at SAR 4, 95.]

19. Around that same time, and consistent with Chief Ortiz's understanding, Border Patrol began exponentially increasing the number of aliens it was releasing at the Southwest Border. In February 2021, Border Patrol released 8,798 aliens at the Southwest Border, compared to only 17 in December 2020. [Pl. Ex. 2 at 2.]

20. These express changes in detention policy described in ¶¶ 17–18 caused these increased releases, not increases in apprehension or detention capacity constraints. For example, Border Patrol released only 91 aliens at the Southwest Border in February 2020, when apprehensions were 20% higher than in February 2021. [*Compare* Pl. Ex. 1 at 4, *with* Pl. Ex. 2 at 2–3.]

21. These Border Patrol releases principally invoked 8 U.S.C. § 1226(a) as authority, even though the aliens at issue qualify as applicants for admission under 8 U.S.C. § 1225(a), [Pl. Ex. 2 at 2; Doc. 122 ¶ 19; Doc. 87-1 at SAR 1–2; Tr. Day 2 at 59:11–60:11], and were arrested without an administrative warrant as contemplated by 8 U.S.C. § 1226(a), [Pl. Ex. 48 at 5–6; Pl. Ex. 63 at 6–8; Pl. July 13 Designation of Tony Barker at 61:2–62:3; Tr. Day 1 at 118:13–119:8].

22. Some, though certainly not all, of these releases were of family units. [Doc. 87-1 at SAR 93.] Family units, as DHS uses that term, include aliens traveling as a

family and must include a parent and a minor child. [Tr. Day 2 at 68:7–68:17, 118:15–119:5.]

23. In February 2021, DHS categorically abolished the detention of migrant families. DHS converted some family detention centers to single adult detention centers. DHS closed other facilities altogether. In the case of the Berks facility, for example, DHS left that facility vacant from February 2021 through June of 2021 until DHS could terminate its contract. [Pl. Ex. 19 at 5; Pl. Ex. 60 at 10, 16; Pl. Designation of Robert Guadian at 144:6–146:1; Tr. Day 2 at 75:6–76:8; Tr. Day 3 at 48:22–49:24.]

24. Secretary Mayorkas has been candid about this change in policy. He testified to Congress on two occasions—May 26, 2021 and May 4, 2022—where he affirmed that DHS changed its detention policy under President Biden. On May 26, 2021, he testified as follows: "Congressman, one of the things that I have observed is the detention of individuals that do not pose a threat to public safety or do not pose a risk of flight . . . . I am concerned about the overuse of detention where alternatives to detention, ATD, would suffice in ensuring the integrity of the immigration system." [Pl. Ex. 62.] On May 4, 2022, he testified that, in his view, "detention has been misused in the immigration system for many years," and he described DHS's current detention policy as follows: "We are increasing our use of alternatives to detention, and we are using detention when it is a public safety imperative or an

imperative to ensure the continued appearance of individuals in immigration enforcement proceedings." [Pl. Ex. 61.] Secretary Mayorkas made these statements specifically with respect to DHS's practices at the Southwest Border.

25. The decision to eliminate family detention was an application of this policy. In the rare circumstances where a member of a family unit qualifies for detention under DHS policy, DHS separates the family and detains the parent as a single adult. Thus, DHS no longer has any use for family detention. [Tr. Day 2 at 75:13–76:8, 121:7–121:12.]

26. According to Border Patrol Chief Raul Ortiz, the effect of this change in detention policy was a substantial increase in border traffic. This is because immigration enforcement, including detention when required by the immigration laws, serves as a deterrent. [Tr. Day 2 at 150:3–151:12.] From February 2021 to March 2021, the number of apprehensions at the Southwest Border more than doubled. [Pl. Ex. 2 at 2–3.]

27. Even as border traffic skyrocketed, DHS's "daily detention population levels" remained "near historic lows." [Pl. Ex. 23 at 63.] In other words, DHS had excess detention capacity as a result of its change in detention policy, and DHS did not react to the resulting increase in border traffic by revisiting that change in detention policy.

<u>The March 19, 2021 Prosecutorial Discretion Policy</u>

28. By the middle of March 2021, Border Patrol's facilities were becoming increasingly overcrowded. This overcrowding was caused by increases in border traffic, the time it takes for Border Patrol to effectuate a release under 8 U.S.C. § 1226(a), and Border Patrol's failure to transfer aliens to ICE custody for continued detention—often because ICE refused to accept custody. [Pl. Ex. 20; Tr. Day 2 at 61:3–61:17, 125:15–125:24, 164:16–164:18; Doc. 87-1 at SAR 93.]

29. On March 19, 2021, Border Patrol issued its Prosecutorial Discretion Policy. Border Patrol issued that policy in response to that overcrowding, and two factors played a critical role. First, it takes Border Patrol two hours or longer to complete the paperwork necessary for a release under 8 U.S.C. § 1226(a), which includes a Notice to Appear to initiate removal proceedings. [Doc. 87-1 at SAR 5, 93; Pl. Ex. 20.] Second, Border Patrol understood that the policy changes discussed in ¶¶ 12–18 authorized Border Patrol to create such a policy. [Tr. Day 2 154:23–155:4, 155:24–156:3, 160:11–161:9.]

30. The Prosecutorial Discretion Policy authorized Border Patrol agents to release aliens at the border with minimal processing and without initiating removal proceedings, which can occur much more quickly than releases under 8 U.S.C. § 1226(a). [Pl. Ex. 20; Doc. 87-1 at SAR 5, 93.] As one ICE official put it, Border Patrol was releasing aliens at the border with nothing more than "a piece of paper

that said 'go find somebody at ICE.'" [Pl. Ex. 38 at 1:35–1:46.] This "piece of paper" was called a "Notice to Report," and it instructed the alien to turn himself in to the ICE field office at his final destination. [Tr. Day 2 at 161:10–161:19.]

31. In March 2021, Border Patrol's monthly releases at the Southwest Border reached 26,037. [Pl. Ex. 2 at 2.]

32. Border Patrol continued the Prosecutorial Discretion Policy for several months. During that time, Border Patrol continued to release aliens under that policy, but Border Patrol also continued releasing aliens at the Southwest Border under 8 U.S.C. § 1226(a). [Pl. Ex. 2 at 2; Pl. Ex. 23 at 11.]

33. These releases continued to cause an increase in migration flows, which caused releases to increase even more. [Tr. Day 2 at 150:3–151:6; Pl. Designation of Raul Ortiz at 171:13–173:12; Pl. Ex. 2 at 2–3; Pl. Ex. 23 at 16–17; Pl. Ex. 30.] In July 2021, Border Patrol released over 60,000 aliens at the Southwest Border. [Pl. Ex. 2 at 2–3.]

34. That same month, DHS began seeking to shore up the lawfulness of Prosecutorial Discretion. DHS also began making greater efforts to track aliens released at the Southwest Border. DHS did so due to concerns with the lawfulness of Prosecutorial Discretion and because only "approximately 30%" of released aliens reported to ICE as instructed. [Pl. Ex. 34 at 3.]

35. These efforts had two features. First, Border Patrol began phasing out the Notice to Report and replacing it with a formal grant of parole under 8 U.S.C. § 1182(d)(5). Second, ICE began placing aliens on Alternatives to Detention (ATD) at the time of release from Border Patrol. This occurred by embedding ICE officers in Border Patrol facilities. ICE gave some aliens ankle monitors. ICE gave other aliens cell phones. [Pl. Ex. 23 at 23, 33; Pl. Ex. 34 at 3; Tr. Day 2 at 113:17–114:9.]

The November 2, 2021 Parole + ATD Policy

36. On September 28, 2021, Florida filed this suit. As part of this suit, Florida challenged the Prosecutorial Discretion Policy. Florida did so on information and belief because DHS had not made that policy public. *See supra* n.2.

37. On November 2, 2021, Border Patrol issued its first written Parole + ATD Policy (the November Memo). The Parole + ATD policy formally authorized Border Patrol to release aliens *en masse* using the limited case-by-case parole authority in 8 U.S.C § 1182(d)(5). Although presented as a new policy, the November Memo essentially formalized what Border Patrol was already doing and provided an explanation for purposes of judicial review. The November Memo also formally rescinded the March 2021 Prosecutorial Discretion Policy, which Border Patrol was already phasing out. [Doc. 87-1 at SAR 93–95; Pl. Ex. 34 at 3; Pl. Ex. 23 at 23, 33; Pl. July 13 Designation of Tony Barker & Def. July 13 Designation of Tony Barker at 145:6–149:1.]

20

38. The November Memo, on its face, limited Parole + ATD to family units. The November Memo states that the Parole + ATD Policy's purpose is to quickly move family unit aliens out of Border Patrol facilities by foregoing the initiation of removal proceedings prior to releasing them into the interior. According to the November Memo, this helps avoid overcrowding in Border Patrol processing centers, which can lead to the spread of COVID-19. [Doc. 87-1 at SAR 93–95.]

39. The November Memo was, in part, a solution to a problem DHS created when it ended family detention. Specifically, that decision caused family unit encounters to increase by 1,000% in the first six months of the Biden Administration, from 7,296 in January to 82,966 in July. [Pl. Ex. 23 at 16.] And overcrowding in Border Patrol facilities was further exacerbated by the fact that ICE was not accepting transfers of custody for family units. [Tr. Day 2 at 164:16–164:18; Pl. Designation of Raul Ortiz at 157:4–158:21, 168:19–169:2; Pl. Ex. 18.]

40. As with Prosecutorial Discretion, aliens released under Parole + ATD were instructed to report to ICE for processing so that DHS could initiate removal proceedings. [Pl. Ex. 23 at 23, 33; Doc. 87-1 at SAR 93–94.]

41. Also in November 2021, DHS initiated Operation Horizon. Operation Horizon involves DHS officials, mainly from ICE, seeking to locate aliens released under Prosecutorial Discretion or Parole + ATD in order to serve them with a Notice to Appear. Internal ICE documents from that month note that "CBP has released over

130,000 noncitizens with [a Notice to Report] or parole." These documents also note that "only a fraction of these noncitizens (approximately 30%) have reported to ICE for processing." Operation Horizon continues to this day. [Pl. Ex. 34 at 3; Pl. Ex. 35 at 3; Pl. Designation of Corey Price at 128:4–128:10.]

42. In early 2022, Border Patrol expanded Parole + ATD. While this decision is not reflected in any memorandum of which the Court is aware, the evidence shows that Border Patrol began applying the policy to single adults in addition to family units. Border Patrol also began using Parole + ATD for purposes unrelated to COVID-19 mitigation. [Def. July 13 Designation of Tony Barker at 88:4–88:25; Pl. July 13 Designation of Tony Barker at 109:14–110:5.]

<u>The July 18, 2022 Parole + ATD Policy</u>

43. On July 13, 2022, Florida took a deposition of Tony Barker, Acting Chief for the Law Enforcement Directorate of CBP. At that deposition, Chief Barker disclosed DHS's decision expanding Parole + ATD beyond the scope contemplated by the November Memo. [Def. July 13 Designation of Tony Barker at 88:4–88:25; Pl. July 13 Designation of Tony Barker at 109:14–110:5.]

44. Five days later, CBP and ICE jointly issued the second formal Parole + ATD Policy (the July Memo). [Doc. 87-1 at SAR 1–4.]

45. The July Memo maintains the same basic structure as the November Memo, except that it expands Parole + ATD to single adults in addition to family units.

46. The July Memo also abandons the COVID-19 rationale in the November Memo. Instead, the July Memo states that avoiding overcrowding in Border Patrol facilities is necessary for general "disease-mitigation." [Doc. 87-1 at SAR 2.]

47. In the first few months following the November Memo, Border Patrol continued to use 8 U.S.C. § 1226(a) as its principal release mechanism. For example, Border Patrol released 34,705 aliens under § 1226(a) in November 2021 as compared to 5,683 under Parole + ATD. [Pl. Ex. 3 at 3.] Beginning in April 2022, however, Parole + ATD became Border Patrol's primary release mechanism. In that month, Border Patrol released 39,918 aliens under Parole + ATD and 22,523 aliens under § 1226(a). [Pl. Ex. 3 at 3.] Today, the numbers are even more stark. For example, of the 141,140 aliens Border Patrol apprehended in November 2022, it released 88,851 aliens under Parole + ATD and 16,501 aliens under § 1226(a). [Pl. Ex. 4 at 3.]

<u>Whether the Non-Detention Policy Exists</u>

48. Florida contends that DHS created a Non-Detention Policy shortly after President Biden took office. DHS denies that it created such a policy, and its witnesses testified that they received no blanket instruction not to detain aliens at the border.

49. The Court finds that much of this disagreement is caused by Florida's use of the term "Non-Detention Policy," which is a label the State chose for ease of discussion. When Florida refers to the Non-Detention Policy, it refers to the change in policy

that occurred in late January or early February of 2021 whereby DHS no longer detains aliens at the border unless DHS determines that they are a public safety risk or flight risk. Border Patrol Chief Ortiz testified that he understood his directives to change shortly after President Biden took office. [Tr. Day 2 at 133:5–133:10, 148:13–148:21, 154:23–155:4, 155:24–156:3, 158:15–158:18; Pl. Designation of Raul Ortiz at 173:13–174:2, 175:5–177:8.] And Secretary Mayorkas affirmed that fact in testimony to Congress on two occasions. [Pl. Exs. 61, 62.]

50. DHS's witnesses, by contrast, testified that DHS does not "have a policy of not detaining noncitizens." [Tr. Day 2 at 140:7–140:9.]

51. But Florida does not contend that DHS has a categorical non-detention policy, and DHS witnesses did not deny that DHS made the policy change Florida describes as the Non-Detention Policy.

52. DHS witnesses also testified that DHS does not have "a preference for parole over detention." [Tr. Day 2 at 73:18–73:3, 139:17–140:2.] But again, Florida does not contend that DHS has a categorical *preference* for release as opposed to detention, but that DHS changed *which aliens* are eligible for detention as opposed to release.

53. Moreover, to the extent the DHS witnesses at trial intended to communicate that DHS has no policy preference for releasing aliens from detention if they are not a public safety or flight risk, the Court finds that testimony not credible and against

the great weight of the trial evidence. As discussed, Secretary Mayorkas stated to Congress on two separate occasions, in unambiguous language, that DHS has such a policy preference. And, as discussed above, DHS has a clear pattern since January 20, 2021 of releasing rather than detaining aliens at the Southwest Border whom the agency determines are not a public safety or flight risk.

54. The Court therefore finds that in late January or early February of 2021, DHS leadership told Border Patrol that strict limits on the release of aliens at the border were no longer in place and that aliens should only be detained if they are a public safety risk or flight risk. That policy remains in effect to this day, and when the Court refers to the Non-Detention Policy it intends to refer to that change in policy.

### DHS's Detention Capacity Defense[3]

55. Throughout this case, DHS has insisted that it lacks the resources to comply with the mandatory detention requirements in 8 U.S.C. § 1225(b). Out the gate, the Court reiterates its finding that DHS made a change in detention policy *before* the number of migrants traveling to the border reached unprecedented levels. In fact, DHS had substantial excess detention capacity in the first few months of 2021 when Border Patrol's releases reached unprecedented levels: "When the budget was being formulated during Spring 2021, ICE's adult daily detention population levels were

---

[3] The Court refers to DHS's detention capacity arguments as a "defense" because 8 U.S.C. § 1225(b) requires detention. The Court, however, does not mean that this is an affirmative defense or that DHS has the burden of persuasion.

near historic lows." [Pl. Ex. 23 at 63.] Having said that, the Court makes the following additional findings.

56. During the last immigration surge in 2019, DHS maintained sufficient capacity to detain an average daily population (ADP) of as high as 55,000. [Pl. Ex. 12 at 3; Pl. Ex. 13 at 37.]

57. In 2020, DHS anticipated that border traffic would increase again when the COVID-19 pandemic ended. [Pl. Ex. 12 at 9.] It therefore requested an increase to 60,000 ADP in its fiscal year 2021 budget request. [Pl. Ex. 13 at 11, 40.]

58. Shortly after President Biden took office, DHS requested a reduction to 32,500 ADP for fiscal year 2022. [Pl. Ex. 25 at 7; Pl. Ex. 26 at 43, 147.] For fiscal year 2023, DHS requested a further reduction to 25,000 ADP. [Pl. Ex. 27 at 10, 47; Pl. Ex. 28 at 48.]

59. In both fiscal year 2022 and fiscal year 2023, DHS made the following representation to Congress on behalf of ICE, which manages DHS's detention capacity: "[A] reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety." [Pl. Ex. 26 at 44; Pl. Ex. 28 at 48.]

60. This Court finds that DHS's detention capacity arguments are not made in good faith given the agency's representations to Congress. *Cf. Texas v. United States*, 40

F.4th 205, 217 n.5 (5th Cir. 2022) (affirming district court's finding that similar resource-based arguments were "not in good faith").

<u>Effect of the Challenged Policies in Florida</u>

61. Since President Biden took office, Border Patrol has released more than one million aliens at the Southwest Border. [Pl. Ex. 2 at 2; Pl. Ex. 3 at 3; Pl. Ex. 4 at 3.] This does not include OFO or ICE releases, which are also substantial, [Tr. Day 4 at 63:25–64:9; Pl. Ex. 8 at 5–6], because OFO does not publicly report its releases, and ICE does not distinguish in its public data between interior enforcement and border enforcement. [*E.g.*, Pl. Ex. 2 at 1; Pl. Ex. 8 at 5–6.]

62. In this case, DHS provided data from January 2021 to July 2022. That data indicates that DHS currently believes that 160,000 of these aliens are currently in either Florida, Puerto Rico, or the Virgin Islands, which is the territorial responsibility of the Miami ERO office. [Pl. Ex. 10.] These numbers do not account for aliens released after July 2022, which is particularly notable because DHS's monthly releases have increased since then. [Pl. Ex. 3 at 3; Pl. Ex. 4 at 4.]

63. Based on the above, and the testimony in this case, the Court finds that well over 100,000 aliens released under the challenged policies are currently in Florida.

64. While DHS says it is screening people to determine if they are a public safety threat, DHS cannot reliably make that determination. According to DHS witnesses, the agency has no way to determine if an alien has a criminal history in his home

country unless that country reports the information to the U.S. government or the alien self-reports. [Tr. Day 2 at 95:1–95:25.] Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime *in the United States*. Because many of these aliens are coming to the United States for the first time, DHS does not know their criminal history.

65. Florida is required to include inadmissible aliens in the State's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). Florida law requires that all children ages six to sixteen attend school. § 1003.21(1)(a), Fla. Stat. [Tr. Day 1 at 31:22–32:1.]

66. Florida's Department of Education tracks the number of "immigrant children and youth" enrolled in Florida's schools. *See* 20 U.S.C. § 7011(5). "Immigrant children and youth" include students born abroad who did not attend school in the United States in the last three academic school years. [Doc. 122 ¶¶ 33, 36; Tr. Day 1 at 32:4–32:13.]

67. In the 2020–2021 school year, 95,084 "immigrant children and youth" were enrolled in Florida's schools. In the 2021–2022 school year, 112,375 were enrolled in Florida's schools. [Pl. Ex. 95; Tr. Day 1 at 41:2–41:15.]

68. Since January 2021, approximately 17,000 more "immigrant children and youth" enrolled in Florida's schools. [Pl. Ex. 95; Tr. Day 1 at 41:2–41:15.]

69. Florida spends roughly $8,000 per student per year on primary and secondary education. [Doc. 122 ¶¶ 37–39; Tr. Day 1 at 30:17–31:1.]

70. Jacob Oliva, Senior Chancellor at the Department of Education, testified about his experiences visiting schools and meeting families and students who had recently enrolled in Florida schools. When probed by defense counsel, Mr. Oliva testified that he was aware of students and families who had recently come to Florida from another country and enrolled in public schools. The Court finds his testimony credible. [Tr. Day 1 at 24:20–21, 48:21–48:25, 52:2–53:1.]

71. When coupled with the data presented in this case, as well as common sense, the Court finds that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the State financial injury.

72. Florida's Department of Corrections tracks expenditures on "undocumented criminal alien[s]" under 8 U.S.C. § 1231(i) in order to participate in the State Criminal Alien Assistance Program, a grant program run by the U.S. Department of Justice. [Doc. 122 ¶¶ 29–31.]

73. Undocumented criminal aliens include persons released under 8 U.S.C. § 1182(d)(5) or 8 U.S.C. § 1226(a) who have been convicted of at least one felony or two misdemeanors. [Pl. Ex. 96 at 7 (explaining that "undocumented" aliens

includes aliens who entered unlawfully and aliens who have pending removal proceedings).]

74. In each of the last four reporting cycles (2015–2019), Florida received partial reimbursement for approximately 7,000 eligible undocumented criminal aliens. Of the more than $119 million in expenditures incurred by the State each year incarcerating these aliens, the federal government reimbursed less than $9 million per year. [Doc. 122 ¶ 32.]

75. Based on these past expenditures and the large number of aliens released under the challenged policies that are present in the State, the Court finds it likely that at least one such alien will commit a crime and impose costs on the State. On this point, the Court finds credible Director Price's testimony that based on his past experiences some number of aliens released on parole would commit crimes. [Pl. Designation of Corey Price at 130:11–131:11.]

76. Florida's Agency for Health Care Administration administers Medicaid throughout the State. [Doc. 122 ¶ 41.]

77. Under 42 U.S.C. § 1395dd, participating medical facilities must provide emergency medical services to immigrants regardless of their legal status, and the State covers a portion of the costs of these services for aliens who meet eligibility requirements. [Doc. 122 ¶ 43.]

78. From January 2020 to April 2022, the State paid over $111 million to provide emergency services to over 150,000 noncitizens. [Doc 122 ¶ 44.]

79. Florida's Department of Economic Opportunity provides reemployment assistance benefits to state residents. [Doc. 122 ¶ 48.]

80. If an alien is authorized to work in the United States and meets other eligibility criteria, the alien is eligible to receive these benefits. [Doc. 122 ¶ 51.] Aliens released under 8 U.S.C. § 1182(d)(5) are eligible to apply for work authorization. [Doc. 122 ¶ 52.] Aliens released under other mechanisms, such as 8 U.S.C. § 1226(a), are eligible to apply for work authorization 150 days after submitting an application for asylum. [Doc. 122 ¶ 53.]

81. From January 2020 to May 2022, the State paid over $425 million in reemployment assistance benefits to noncitizens. [Doc. 122 ¶ 54.]

82. Florida's Department of Children and Families provides a variety of public services. For some of these services, aliens are expressly eligible. For others, the State provides services regardless of immigration status. [Doc. 122 ¶ 56.]

83. Through its administration of a federally funded program for refugees, the Department of Children and Families tracks information regarding Cubans and Haitians receiving federal refugee benefits. [Tr. Day 4 at 51:20–55:22.] Roughly 150,000 Cubans and Haitians who entered the United States between October 1, 2021, and September 30, 2022, received federal refugee benefits in Florida. [Tr. Day

4 at 53:17–55:22.] These aliens more likely than not received other similar benefits, especially given the significant proportion of aliens released under the challenged policies who are from Cuba or Haiti. [Tr. Day 4 at 18:7–18:12, 54:5–55:22, 58:8–58:25; Doc. 87-1 at SAR 5; Pl. Designation of Raul Ortiz at 63:6–64:13.]

84. Given the large number of aliens released under the challenged policies who are in Florida, and the breadth of benefits available to them, the Court finds that at least some aliens released under the challenged policies have caused the State to incur additional expenses and that these expenses will increase absent relief in this case. [Pl. Designation of Corey Price at 131:4–131:22; 132:16–134:8.]

The <em>Flores</em> Consent Decree

85. In 1997, the INS (now part of DHS) voluntarily entered a consent decree in *Flores v. Garland*, No. cv-85-4544 (C.D. Cal.), as part of litigation regarding detention of minors. [*See* Pl. Exs. 19, 33.]

86. As interpreted, the *Flores* consent decree limits the length of detention of minors and creates a presumption against detention longer than 20 days. [*See* Pl. Ex. 19 at 1 (interim report regarding number of class members in custody over 20 days).]

87. The *Flores* 20-day presumption is intended to allow DHS time to complete the expedited removal process under 8 U.S.C. § 1225(b)(1). [Pl. Ex. 64 at 1–2; 8 C.F.R. § 1003.42(e); Tr. Day 4 at 62:14–63:20.]

88. At a minimum, where *Flores* causes DHS to release a family unit, 20 days is ample time for DHS to initiate removal proceedings with respect to members of that family unit.

89. The initiation of removal proceedings against released aliens would mitigate Florida's injuries given the significant backlog the challenged policies have caused in the initiation of removal proceedings against applicants for admission, as well as the approximately five years it takes to remove an alien once removal proceedings begin. [Doc. 87-1 at SAR 261–66; Tr. Day 3 at 67:14–68:6.]

## CONCLUSIONS OF LAW[4]

The Court's conclusions of law proceed in the following order: (1) Florida's Article III standing; (2) Florida's prudential standing, sometimes referred to as statutory standing or the zone of interests test; (3) the Non-Detention Policy; (4) the Parole + ATD Policy; and (5) the remedy. For the Parole + ATD Policy, the Court relies on the administrative record. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs* (*PEACH*), 87 F.3d 1242, 1246 (11th Cir. 1996). For the remaining issues, the Court relies on the trial record.[5]

---

[4] To the extent the Court discusses facts not expressly listed in the findings of fact, the Court intends them as findings of fact.

[5] DHS does not contend that the Court should review the Non-Detention Policy based on an administrative record because DHS has not provided one.

## Article III Standing

To establish Article III standing, Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Moreover, "the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

At trial, Florida presented evidence of various state expenditures applicable to aliens in the State. Specifically, Florida presented evidence from five state agencies: the Florida Department of Education; the Florida Department of Children and Families; the Florida Department of Economic Opportunity; the Florida Department of Corrections; and the Florida Agency for Health Care Administration. The Court discusses each in turn, but the Court discusses Florida's Department of Education evidence in more detail because it finds that evidence most persuasive.

### Special Solicitude

"States are not normal litigants for purposes of invoking federal jurisdiction." *West Virginia v. Dep't of Treasury*, No. 22-10168, 2023 WL 334914, at \*4 (11th Cir. Jan. 20, 2023). Rather, States are entitled to "special solicitude" in establishing standing. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). To invoke that special

solicitude, a State must show (1) a procedural right and (2) a quasi-sovereign interest. *Id.* at 519–20. Once a State does so, the requirements of traceability and redressability are relaxed. *Texas v. United States (DAPA)*, 787 F.3d 733, 753 (5th Cir. 2015), *aff'd by an equally divided court*, *United States v. Texas*, 579 U.S. 547 (2016).

Florida's procedural right in this case is provided by the APA. *See DAPA*, 809 F.3d at 752; *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021). The only question is whether Florida can show a quasi-sovereign interest. When Florida joined the Union, it ceded certain sovereign prerogatives to the federal government concerning immigration enforcement. *See Massachusetts*, 549 U.S. at 519 ("When a State enters the Union, it surrenders certain sovereign prerogatives."); *Arizona v. United States*, 567 U.S. 387, 436 (2012) (Scalia, J., concurring in part and dissenting in part) (observing that States "jealously guarded" their sovereignty with regards to immigration enforcement during the Constitutional Convention of 1787). Accordingly, the Court concludes that Florida has a quasi-sovereign interest in its territory, in the presence of unauthorized aliens within that territory, and in the effect those aliens have on the public fisc. *See DAPA*, 809 F.3d at 752.

And surely that must be correct—if special solicitude is to have any meaning, it must apply in the immigration context. Having surrendered many of their sovereign prerogatives, the States are left at the mercy of the federal government. As

the Supreme Court recognized in *Arizona*, the federal government's failures have led to an "epidemic of crime, safety risks, serious property damage, and environmental problems." *Arizona*, 567 U.S. at 398.

Before applying this standard to Florida's evidence, the Court briefly reviews how the Supreme Court applied special solicitude in *Massachusetts v. EPA*. In that case, the States alleged that global warming would cause a "rise in sea levels," lead to "severe and irreversible changes to natural ecosystems," "increase . . . the spread of disease," and "contribute to the ferocity of hurricanes." *Massachusetts*, 549 U.S. at 521–22. The Court recognized that the States' traceability and redressability arguments were in many ways speculative—for example, "China and India" were likely to "offset any marginal domestic decrease" in greenhouse gas emissions. *Id.* at 523–24. Nonetheless, the Court applied the relaxed special solicitude standard and found that the States established standing because the risk of harm "would be reduced to some extent." *Id.* at 526. As the Court will explain, Florida's standing evidence is far stronger than the States' evidence in *Massachusetts v. EPA*.

### Florida Department of Education

Like all States, Florida is required to include inadmissible aliens in the State's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982). And Florida law requires that all children ages six to sixteen attend school. *See* § 1003.21(1)(a), Fla. Stat. At trial, Florida presented testimony from Senior Chancellor Jacob Oliva from

the Florida Department of Education. Mr. Oliva testified that Florida spends roughly $8,000 per student per year on primary and secondary education. [FOF ¶ 69.] To demonstrate that Florida spends these funds on aliens released under the challenged policies, Florida relies on two categories of evidence.

First, as this Court found, there are more than 100,000 aliens currently in Florida who were released under the challenged policies. [FOF ¶ 63.] Moreover, many of these aliens are family units. [FOF ¶ 22.] Based on that evidence, Florida asks the Court to infer that some of these aliens will enroll their children in public schools.

Second, Florida seeks to corroborate that inference with testimony from Mr. Oliva. Specifically, Mr. Oliva testified that Florida tracks the number of "immigrant children and youth" enrolled in its schools each year. [FOF ¶ 66.] Immigrant children and youth include children who (a) were born outside the United States and (b) were not educated in the United States in the last three years. *See* 20 U.S.C. § 7011(5). In the 2021–2022 school year, Florida enrolled over 112,000 such children in its public schools, an increase of approximately 17,000 students since January 2021. [FOF ¶ 67–68.] In addition to the data, Mr. Oliva provided anecdotal testimony regarding aliens who recently entered the country enrolling in Florida's schools. [FOF ¶ 70.]

While "immigrant children and youth" certainly would include aliens other than those released under the challenged policies, the increase of 17,000, along with the other evidence in this case, supports a finding that at least some aliens released under the challenged policies are enrolling their children in Florida's schools and will continue to do so. [FOF ¶ 71.] This evidence is legally sufficient to demonstrate standing.

As to injury in fact, "[e]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *see also Plyler*, 457 U.S. at 228 n.23 (noting that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service"). Florida's expenditures plainly qualify as economic detriment.

As to traceability, these costs are traceable to the challenged policies. In December 2020—before the challenged policies went into effect—Border Patrol released only 17 aliens at the Southwest Border. [FOF ¶ 19.] In November 2022, the challenged policies caused Border Patrol to release over 100,000 aliens at the Southwest Border. [FOF ¶ 47.] Moreover, the Parole + ATD Policy and its predecessor policies have caused Border Patrol to release these aliens without initiating removal proceedings. [FOF ¶¶ 40–41.] Even as compared to other released aliens, aliens without pending removal proceedings will remain in Florida for additional time, costing the State additional funds. [FOF ¶ 89.]

DHS contends that the intervening decisions of aliens to unlawfully enter the country and travel to Florida negate traceability. But intervening actions of third parties—even unlawful actions—do not negate a finding of traceability where the third parties have "react[ed] in predictable ways" to government actions. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). In this case, the Court has found that (a) the challenged policies have resulted in the release of aliens who would not otherwise have been released, [FOF ¶ 61], (b) some of those aliens have traveled to Florida and enrolled their children in public schools, [FOF ¶¶ 62–63, 68–71], and (c) the challenged policies have caused an increase in border traffic, which has compounded these issues, [FOF ¶ 26]. The third-party reactions Florida asserts are therefore not only predictable but were confirmed as matter of fact at trial.

Finally, as to redressability, "redressability and traceability overlap" in this case "as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Florida seeks declaratory relief, vacatur under the APA, and, consistent with the limits on injunctive relief in 8 U.S.C. § 1252(f), permanent injunctive relief limited to DHS's violations of 8 U.S.C. § 1182(d)(5). Each form of relief would provide Florida at least partial redress. *See Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff need not show that its injuries will be completely redressed).

Courts have "long presumed that officials of the Executive Branch will adhere to the law as declared by the court." *Comm. on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008). Similarly, vacatur under the APA would "deprive" the challenged policies "of force," *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)), preventing DHS from continuing to apply them at the Southwest Border. Finally, injunctive relief would prevent DHS from paroling aliens *en masse* as a mechanism to avoid initiating removal proceedings. *Cf. Chiles*, 865 F.2d at 1209–10 (finding that an injunction against the United States would remedy the injury to a local government caused by persons escaping from a federal detention center).

Were all that not enough, because Florida invokes procedural rights under the APA, Florida need only show that "there is some possibility that the requested relief will prompt the injury-causing party to reconsider" its unlawful decisions. *Massachusetts*, 549 U.S. at 518; *see also Nelson*, 576 F. Supp. 3d at 1032 (explaining that APA review is a procedural right for purposes of *Massachusetts v. EPA*).

DHS contests redressability on the ground that released aliens who enroll their children in school are typically family units, and DHS's ability to detain family units is limited by the consent decree in *Flores v. Garland*, No. cv-85-4544 (C.D. Cal.). According to DHS, the *Flores* consent decree generally limits detention of family units to 20 days. [FOF ¶ 86.] Thus, DHS argues, even absent the challenged policies,

applicants for admission subject to mandatory detention under 8 U.S.C. § 1225(b) will be released after 20 days.

DHS's redressability argument is wrong for three reasons. First, Florida is not required to prove with certainty the "practical impact of any decision." *Chafin v. Chafin*, 568 U.S. 165, 175 (2013). Rather, Florida satisfies redressability if the *relief* Florida seeks will redress its harm. For example, courts "decide cases against foreign nations" even though their "choices to respect final rulings are not guaranteed." *Id.* at 176. Similarly, "the fact that a defendant is insolvent does not moot a claim for damages." *Id.* at 175–76. As the Court already explained, the three forms of relief Florida seeks will redress the State's injuries.

Second, if Florida prevails in its argument that 8 U.S.C. § 1225(b) mandates detention for aliens apprehended at the Southwest Border—and if DHS insists that *Flores* is causing the agency to violate that statute—one would expect DHS to bring that to the attention of the *Flores* court. *But see Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016) (holding that *Flores* does not "grant release rights to parents"); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (clarifying that district courts may not enjoin the operation of 8 U.S.C. § 1225(b) on a class-wide basis). To

41

instead insist that DHS may consent to violate the law and that doing so *eliminates Article III jurisdiction* is plainly wrong.[6]

Third, the evidence at trial showed that *Flores* does not categorically prevent DHS from detaining family units in a way that would negate redressability. The purpose of the *Flores* 20-day presumption is to allow DHS to apply expedited removal to family units under 8 U.S.C. § 1225(b)(1), which can be completed in that short window. [FOF ¶ 87.] And even if DHS fails to complete removal in 20 days, the agency has ample time to at least *initiate* removal proceedings prior to release. [FOF ¶ 88.] As this Court has found, releasing aliens without initiating removal proceedings extends the total time the aliens are enrolled in Florida's schools, and a favorable judgment for Florida would redress that harm. [FOF ¶ 89.]

Accordingly, the Court finds that Florida has established Article III standing based on the funds it spends providing public education.

*Florida's Remaining Standing Evidence*

Florida's remaining standing evidence, which is from four other state agencies, is less powerful than its Department of Education evidence. Florida offers evidence of historical expenditures on unauthorized aliens—specifically, the cost of incarcerating criminal aliens and the cost of public benefits like emergency

---

[6] At the beginning of the trial, DHS objected to all evidence regarding the *Flores* consent decree on relevance grounds. That the agency now argues that *Flores* defeats jurisdiction in this case is a noteworthy shift.

Medicaid, unemployment, and public assistance. [FOF ¶¶ 72–83.] On the basis of these historical expenditures, Florida asks the Court to infer that the State will spend some of these resources on aliens released under the challenged policies.

For costs of incarceration, Florida principally relies on the testimony of the head of ERO at ICE and on common sense. According to Florida, at least one of the over 100,000 aliens in the State who were released under the challenged policies will commit a crime serious enough to end up in state prison. Executive Associate Director Price of ERO agreed this was likely. [FOF ¶ 75.] For Emergency Medicaid, Florida relies on a similar common sense argument and the fact that the State is required to pay for emergency services to unauthorized aliens as a condition of participation. *See* 42 U.S.C. § 1395dd; [FOF ¶ 77]. Finally, for public benefits, Florida relies on the fact that 153,000 Cuban and Haitian nationals who entered between October 1, 2021, and September 30, 2022, have sought federally funded refugee benefits. [FOF ¶ 83.] And Florida contends that these same aliens are likely to be eligible for other benefits that are partially state funded, especially given the substantial portion of aliens released under the challenged policies who are from Cuba or Haiti. [FOF ¶ 83.]

While the Court finds this evidence to be less persuasive than the State's education evidence, the Court concludes that this evidence—which is at least as persuasive as the evidence in *Massachusetts v. EPA*—is sufficient to establish

standing given that "States are not normal litigants for purposes of invoking federal jurisdiction." *West Virginia*, 2023 WL 334914, at *4.

As to injury, Florida need only show a "substantial risk" that the State will suffer injury from the challenged policies in the future. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 407 (2013). Florida's evidence of over 100,000 aliens in the State, along with its historical expenditures on unauthorized aliens, meets this standard. [FOF ¶¶ 63, 72–83.]

As to traceability, while Florida has not identified specific released aliens who have cost the State money on these programs, the Eleventh Circuit does not require such specific evidence even *without* special solicitude. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280–81 (11th Cir. 2015) (agreeing that a plaintiff's injury need not "be traced to specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (quotations omitted)). Florida certainly need not make this showing *with* the benefit of special solicitude. *See Texas v. United States* (*DACA II*), 50 F.4th 498, 517–18 (5th Cir. 2022) (applying the special solicitude standard and finding standing even though "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients").

44

Finally, Florida has shown redressability for the same reasons it has shown redressability as to the Department of Education evidence. In fact, Florida's redressability arguments are even stronger because these other expenditures are not disproportionately caused by family units.

<u>Zone of Interests</u>

To challenge either the Non-Detention Policy or the Parole + ATD Policy under the APA, Florida must fall within the "zone of interests" of the INA. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interests test is "not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the benefit of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225.

Florida satisfies that test here. "It's clear that the INA aimed, at least in part, to protect States from" harms to their fisc. *Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds Biden v. Texas*, 142 S. Ct. 2528 (2022); *accord Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 220 (7th Cir. 2020) (holding that a county was within the zone of interests of the INA); *see also Demore v. Kim*, 538 U.S. 510, 517–21 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's failure to remove deportable aliens).

In fact, several provisions of the INA specifically seek to protect the States from the injuries the federal government causes when it fails to fulfill its duties. For

example, one provision of the INA grants the States partial reimbursement for the costs of incarcerating criminal aliens. *See* 8 U.S.C. § 1231(i). Another provision seeks to ensure that "Federal, State, or local government entit[ies]" can share "information regarding the citizenship or immigration status" of "any individual." *See* 8 U.S.C. § 1373(a). Still another allows state officers to supplement the efforts of federal officials by "perform[ing] a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g).

For these reasons, Florida satisfies the zone of interests test.

### The Non-Detention Policy

In late January or early February of 2021, DHS made a discrete change in detention policy. Before that time, DHS limited the release of aliens at the Southwest Border to very exigent circumstances. Under the new policy, the Non-Detention Policy, DHS began instructing agents to release aliens at the Southwest Border unless an alien is a public safety or flight risk.

As this Court explained in its Executive Summary, the change in policy away from the "very exigent circumstances" standard to the "not a public safety or flight risk" standard is the Non-Detention Policy Florida seeks to challenge.

Florida contends that the Non-Detention Policy is (1) contrary to law and in excess of statutory authority, 5 U.S.C. § 706(2)(A), (C); (2) arbitrary and capricious,

5 U.S.C. § 706(2)(A); and (3) promulgated without notice and comment as required by 5 U.S.C § 553. The Court considers each argument in turn, but the Court first addresses DHS's contention that the Non-Detention Policy is not subject to judicial review.

### APA Reviewability

"The APA establishes a basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2567 ("The Administrative Procedure Act embodies a basic presumption of judicial review." (quotations omitted)). To overcome that presumption, DHS argues that the Non-Detention Policy is unreviewable because it is not "final agency action," 5 U.S.C. § 704, and because it is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

As to final agency action, DHS presents two arguments: First, DHS argues that the Non-Detention Policy is not agency action at all. Second, DHS argues that, even if agency action, the Non-Detention Policy is not final under the APA.

The APA defines agency action as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *See* 5 U.S.C. § 701(b)(2) (explaining that the APA incorporates the definition of "agency action" in 5 U.S.C § 551); 5 U.S.C § 551(13) (defining "agency action" to include a "rule"); 5 U.S.C. § 551(4) (defining

"rule"). As the Supreme Court made clear in *Biden v. Texas*, a reviewing court's role is to review an "agency statement of general or particular applicability . . . designed to implement" the relevant decision. 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)). A court errs if it instead attempts to review "an abstract decision apart from specific agency action." *Id.*

Here, Florida challenges the policy change that replaced the "very exigent circumstances" standard with the "not a public safety or flight risk" standard. The fact that Florida identifies no specific written document does not foreclose APA review. Courts have routinely recognized that a policy need not be reduced to writing to be subject to APA review. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting authorities); *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 165 (E.D.N.Y. 2018) (same); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 339–42 (D.D.C. 2018) (finding the existence of a policy where statistics of parole application denials were "irrefutable"). And DHS has identified no contrary authority. *Cf. Regents*, 140 S. Ct. at 1905 ("The APA establishes a basic presumption of judicial review.")

Moreover, "depart[ure] from a prior policy *sub silentio*" would violate the APA per se. *See Fox Television*, 556 U.S. at 515 (Scalia, J.); *accord id.* ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). The Court

thus views the absence of a written decisional document as more of a problem for DHS than a problem for Florida. *See Lone Mountain Processing, Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" (quotations omitted)).

For these reasons, Florida has demonstrated that the Non-Detention Policy is "agency action." This agency action is also "final." 5 U.S.C. § 704. Agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

The Non-Detention Policy clearly marks the consummation of DHS's decisionmaking process and determines legal rights and obligations. *See id.* The policy established "new marching orders" directing immigration officials to only detain individuals if they are a public safety risk or a flight risk. *City of Dania Beach v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007). For aliens, release results in free movement in the United States rather than detention pending removal. *See Zadvydas v. Davis*, 533 U.S. 678, 690–96 (2001) (describing the liberty interest in detention of aliens). If that were not enough, aliens paroled under 8 U.S.C. § 1182(d)(5) or

those with pending asylum claims are eligible to apply for work authorization.[7] And as explained above, the release of applicants for admission at the border determines Florida's obligations—including its constitutional obligation to provide education and its statutory obligations under Medicaid. [FOF ¶¶ 65, 77.]

Finally, the Non-Detention Policy is not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That exception is read "quite narrowly" and applies only where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2568 (explaining that the agency's discretion must be "unbounded" for § 701(a)(2) to apply). For reasons the Court will address when determining whether the Non-Detention Policy is contrary to law, the relevant statutes do not confer unbounded discretion to DHS, and § 701(a)(2) does not apply.

* * *

The Non-Detention Policy is subject to judicial review under the APA. Before turning to that review, the Court briefly notes DHS's argument that the Non-Detention Policy is the result of a change in Administration and that political considerations are a perfectly valid basis for a change in policy. DHS's argument

---

[7] 8 C.F.R. § 274a.12(c)(8), (11) (recognizing that aliens with pending asylum claims and paroled aliens are eligible to apply for work authorization).

goes to the standard the Court should apply in reviewing the Non-Detention Policy rather than whether it is reviewable in the first instance.

"[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com.*, 139 S. Ct. at 2573; *see also Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 979 (9th Cir. 2015) (Smith, J., dissenting) (noting that "[e]lections have legal consequences" and "policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the" APA).

Similarly, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part).

But just as the APA does not require a heightened standard under these circumstances, neither do these circumstances create a more favorable standard. *See Fox Television*, 556 U.S. at 514. And, importantly, a new administration certainly "may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions." *State Farm*, 463 U.S. at 59 n.* (Rehnquist, C.J., concurring in part and dissenting in part).

*Contrary to Law*

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Florida contends that the Non-Detention Policy is contrary to law because 8 U.S.C. § 1225(b) requires DHS to detain aliens apprehended crossing the Southwest Border, but the Non-Detention Policy instructs DHS's officials to release these aliens except under narrow circumstances. DHS presents two arguments in response. First, DHS argues that detention under 8 U.S.C. § 1225(b) is discretionary. Second, DHS argues that, even if § 1225(b) is mandatory, DHS has discretion to release the aliens under either 8 U.S.C. § 1226(a) or 8 U.S.C. § 1182(d)(5).

Under the INA, certain aliens are "deemed . . . applicant[s] for admission." 8 U.S.C. § 1225(a)(1). Specifically, applicants for admission include aliens "who arrive[] in the United States . . . whether or not at a designated port of arrival" and aliens "present in the United States who ha[ve] not been admitted." 8 U.S.C. § 1225(a)(1). Section 1225 imposes certain duties on immigration officers to "[i]nspect" applicants for admission, regardless whether the aliens are "arriving in the United States" or whether they are present without having "been admitted or paroled." 8 U.S.C. § 1225(b); *see id.* § 1225(a)(3) (explaining that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected").

This broad definition of applicants for admission is a relatively recent addition to the INA. Before 1996, the INA only contemplated inspection of aliens arriving at ports of entry. *See* 8 U.S.C. § 1225(a) (1995) (discussing "aliens arriving at ports of the United States"); *id.* § 1225(b) (1995) (discussing "the examining immigration officer at the port of arrival"). Other aliens, such as those who entered illegally, were not subject to § 1225(b). *See* 8 U.S.C. § 1251(a)(1)(B) (1995) (explaining that an alien "who entered the United States without inspection . . . is deportable" rather than being subject to inspection and exclusion).

In 1996, however, Congress expanded § 1225 by adding the broad definition of "applicant for admission" discussed above. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). In doing so, Congress subjected a broader category of aliens to the inspection regime that applied to aliens who showed up at a port of entry seeking admission. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting 8 U.S.C. § 1225(a)(3)); 8 U.S.C. § 1225(a)(3) ("All aliens . . . who are applicants for admission . . . shall be inspected by immigration officers.").

All parties agree, and the Court has found, that the aliens at issue meet the statutory definition for applicants for admission and are subject to inspection under § 1225. [*See* FOF ¶ 21; Doc. 87-1 at SAR 1 (explaining that what DHS refers to as

"processing" of illegal border crossers is an "inspect[ion] . . . consistent with 8 U.S.C. § 1225(a)").] The Court therefore turns to the three points of contention relevant to the lawfulness of the Non-Detention Policy: (1) whether detention of applicants for admission under 8 U.S.C. § 1225(b) is mandatory; (2) whether and when DHS may release applicants for admission at the Southwest Border under 8 U.S.C. § 1226(a); and (3) whether and when DHS may release these aliens under 8 U.S.C. § 1182(d)(5).

Section 1225(b) lays out a complex decision tree governing the inspection process for applicants for admission. Certain aliens are subject to a process called expedited removal, 8 U.S.C. § 1225(b)(1), with exceptions for those seeking asylum who make an affirmative showing that they fear persecution in their home country, 8 U.S.C. § 1225(b)(1)(B)(ii). Section 1225(b)(2) then contains a catch all governing applicants for admission not subject to (b)(1) whom DHS instead places in standard removal proceedings. *See* 8 U.S.C. § 1225(b)(2)(A) (explaining that "other aliens . . . shall be detained for a proceeding under" 8 U.S.C. § 1229a). The Court will not dedicate detailed discussion to each step in the decision tree because, regardless of the specific path an alien takes, the alien "shall be detained" pending immigration proceedings, and that mandate continues until the proceedings are complete. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) ("shall be detained"); *id.* § 1225(b)(1)(B)(iii)(IV) (same); *id.* § 1225(b)(2)(A) (same); *see also* 8 U.S.C.

§ 1225(b)(1)(A)(i) ("the officer shall order the alien removed from the United States without further hearing or review"); *id.* § 1225(b)(1)(B)(iii)(I) (same). As the Supreme Court explained in *Jennings*, "§§ 1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." *Jennings*, 138 S. Ct. at 842.

Notwithstanding the plain text of § 1225(b) and the Supreme Court's holding in *Jennings*, DHS argues that detention of applicants for admission is discretionary. In DHS's view, § 1225(b)'s mandatory language flows in only one direction—the statute prevents aliens from obtaining release, but it does not create obligations for DHS. In other words, DHS interprets the "shall" language in § 1225(b) to limit the rights of aliens but not to limit the agency's own discretion.

The Court rejects DHS's argument and concludes that § 1225(b)'s "shall be detained" requirements are mandatory. As the Supreme Court recognized in *Jennings*, "the word 'shall' usually connotes a requirement." *Jennings*, 138 S. Ct. at 844 (quotations omitted). This is because "[t]he word 'shall' does not convey discretion." *United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007). Rather, "where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest." *Id.* That conclusion is confirmed by the heading for § 1225(b)(1)(B)(iii)(IV), which describes that provision as creating "[m]andatory detention." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,

554 U.S. 33, 47 (2008) (explaining that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (quotations omitted)). And the other detention provisions of § 1225(b) use the identical phrase "shall be detained." *Compare* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV), *with id.* § 1225(b)(1)(B)(ii), *and id.* § 1225(b)(2)(A).

Moreover, Congress's use of the discretionary "may" in other similar provisions of the INA bolsters the Court's conclusion that § 1225(b)'s detention requirements are mandatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)). For example, § 1226(a) states that certain other aliens "*may* be arrested and detained." *See* 8 U.S.C. § 1226(a) (emphasis added). And in other provisions of § 1225 Congress recognized the difference between a discretionary option and a mandatory command. *E.g.*, 8 U.S.C. § 1225(b)(2)(C) ("[T]he Attorney General *may* return the alien to [a contiguous territory] pending" removal. (emphasis added)); *Biden v. Texas*, 142 S. Ct. at 2541 (concluding that § 1225(b)(2)(C) "clearly connotes" discretion).

In arguing otherwise, DHS relies on *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), *Heckler v. Chaney*, 470 U.S. 821 (1985), and the "deep-rooted

nature of law-enforcement discretion," *Castle Rock*, 545 U.S. at 761.[8] But these cases do not "set agencies free to disregard legislative direction," and they make clear that Congress is free to cabin enforcement discretion by providing "guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832–33; *accord Castle Rock*, 545 U.S. at 761 (explaining that, to find a mandatory duty, the Court "would require some stronger indication from the Colorado Legislature" than the phrase "shall use every reasonable means"). As explained above, Congress cabined DHS's discretion in § 1225(b) when it commanded the agency, in clear and unambiguous language, to detain applicants for admission pending removal proceedings.

Having concluded that § 1225(b) is mandatory rather than discretionary, the Court turns to whether either of the release mechanisms DHS invokes are permissible in light of the mandatory language in § 1225(b). As explained in the Court's findings of fact, DHS applies the Non-Detention Policy in some instances by releasing aliens under § 1226(a) and in other instances by releasing aliens under § 1182(d)(5). [FOF ¶ 47.]

---

[8] DHS also argues that it has enforcement discretion to forego any immigration enforcement against a particular alien and can thereby avoid § 1225(b)'s detention requirements. The evidence at trial, however, shows that DHS is initiating removal proceedings against the population of aliens at issue. As such, DHS's argument is beside the point.

The Court begins with § 1226(a). While § 1225(b) governs the detention of applicants for admission, § 1226(a) states that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed." *See* 8 U.S.C. § 1226(a). It then states that, following such arrest, the Attorney General "may continue to detain the arrested alien" or "may release the alien" either "on bond" or on "conditional parole." *See* 8 U.S.C. § 1226(a).

DHS contends that § 1226(a) applies to aliens at the Southwest Border so long as the alien reaches U.S. soil. And because § 1225(a)'s definition of applicants for admission also includes these aliens, *see* 8 U.S.C. § 1225(a), DHS contends that Congress gave the agency a choice—if DHS wants to detain an alien at the Southwest Border, it can apply § 1225(b), but if DHS wants to release the alien, it can apply § 1226(a).

The Court rejects DHS's argument for two reasons. First, § 1226(a) does not apply to applicants for admission apprehended by DHS at the Southwest Border. Second, even if it could apply under some circumstances, the evidence at trial showed that DHS is initially processing applicants for admission at the Southwest Border under § 1225, and, at a minimum, DHS may not switch back and forth between § 1225 and § 1226 when processing aliens at the border.

Starting with the first point, § 1225(a) treats a specific class of aliens as "applicants for admission," and § 1225(b) mandates detention of these aliens throughout their removal proceedings. Section 1226(a), by contrast, states in general terms that detention of aliens pending removal is discretionary unless the alien is a criminal alien. *See* 8 U.S.C. § 1226(c).

As the Supreme Court stated in *Jennings*, § 1226 applies to "certain aliens *already in the country*." 138 S. Ct. at 838 (emphasis added). And even if an alien crossing the Southwest Border fell within § 1226(a)'s general language, § 1225(b)'s specific mandatory language would trump § 1226(a)'s general permissive language. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). This canon applies to §§ 1225 and 1226, as it is "most frequently applied to statutes in which a general permission . . . is contradicted by a specific prohibition," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, DHS's position would render mandatory detention under § 1225(b) meaningless. As explained above, Congress expanded § 1225(b) in 1996 to apply to a broader category of aliens, including illegal border crossers. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). That change would make little sense if DHS retained discretion to apply § 1226(a) and release illegal border crossers whenever the agency saw fit. *Cf. Demore*, 538 U.S. at 518 (explaining that "wholesale

failure[s]" by the federal government motivated the 1996 amendments to the INA). In fact, as the U.S. Attorney General recently explained, "section [1225] (under which detention is mandatory) and section [1226(a)] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens." *Matter of M-S-*, 27 I&N Dec. 509, 516 (2019).[9]

That brings the Court to the second point. Even if DHS were correct that § 1225(b) and § 1226(a) overlap, and even if DHS were correct that the agency has discretion to decide which provision to apply, what DHS certainly may not do is initiate an inspection under § 1225 and then, at some later time, attempt to shift the alien's detention to § 1226(a). As explained below, *Jennings* expressly rejects that approach.

DHS's initial apprehension and processing of applicants for admission at the Southwest Border is an "inspection" under 8 U.S.C. § 1225. [FOF ¶ 21; Doc. 87-1 at SAR 1.] During that inspection, if DHS decides to release an alien under § 1226(a), it initiates a removal proceeding against the alien under 8 U.S.C. § 1229a by serving a Notice to Appear and then relies on those pending removal proceedings as a basis to shift the alien's detention from § 1225(b) to § 1226(a). At closing argument, counsel for DHS described the agency's position that the decision to place

---

[9] The Attorney General's opinion cites sections 235 and 236 of the INA, which are 8 U.S.C. § 1225 and 8 U.S.C. § 1226 respectively.

an applicant for admission in standard removal proceedings under 8 U.S.C. § 1229a, instead of expedited removal proceedings under § 1225(b)(1), causes § 1226(a) to govern the alien's detention. The Court concludes that these applications of § 1226(a) are unlawful because § 1225(b)(2), not § 1226(a), governs the detention of applicants for admission whom DHS places in standard removal proceedings following in inspection under § 1225.

As explained above, § 1225(b)(1) discusses expedited removal for applicants for admission, and § 1225(b)(2) discusses standard removal for applicants for admission. Section 1225(b)(2) expressly states that aliens not subject to expedited removal under (b)(1) "shall be detained for a proceeding under section 1229a," which is the provision of the INA governing standard removal proceedings. In *Jennings*, the plaintiffs made the basic argument DHS advances here—arguing that "for a proceeding" in § 1225(b)(2) means "only until the *start* of applicable proceedings," and that § 1226(a) governs detention once those proceedings begin. *Jennings*, 138 S. Ct. at 844. The Supreme Court, however, rejected the plaintiffs' position that § 1226(a) governs the detention of applicants for admission once removal proceedings begin, holding that "(b)(2) mandate[s] detention of aliens *throughout the completion of applicable proceedings* and not just until the moment those proceedings begin." *Id.* at 845 (emphasis added).

Making matters worse for DHS, the evidence at trial showed that DHS is not obtaining warrants for aliens arrested at the Southwest Border. Because a warrant is a precondition for detention under § 1226(a), it is also a precondition for a release under § 1226(a). Section 1226(a) "authorizes detention only '[o]n a warrant issued' by the Attorney General." *Jennings*, 138 S. Ct. at 845 (quoting 8 U.S.C. § 1226(a)). And DHS does not obtain a warrant under § 1226(a) at the time the agency apprehends an alien at the Southwest Border but rather relies on the warrantless arrest provision in 8 U.S.C. § 1357(a)(2). *See* 8 U.S.C. § 1357(a)(2) (allowing a warrantless arrest when an alien "is entering or attempting to enter the United States in violation of law" in the "presence or view" of an immigration officer); [FOF ¶ 21]

In DHS's Rule 30(b)(6) deposition, the agency's representative testified that DHS does not obtain an arrest warrant at any time before releasing an applicant for admission at the Southwest Border under § 1226(a). [Pl. July 13 Designation of Tony Barker at 61:2–62:3.] At trial, however, DHS insisted that it obtains such a warrant at the time of *release* (not at the time of *arrest*) and places the warrant in the alien's case file. [Tr. Day 2 at 124:10–125:14.] The Court does not find DHS's evidence credible given what the agency's corporate representative said in his deposition. But the Court also finds the dispute immaterial because what DHS claims to be doing is equally unlawful. [FOF ¶ 21.]

Warrants under § 1226(a) are *arrest* warrants. But what DHS claims to be doing is using warrants as a basis for *release* of an alien that the agency has already arrested under different authority—namely, § 1225's inspection provisions and § 1357(a)(2)'s warrantless arrest provision. These warrants—to the extent DHS is obtaining them at all—are at best a form of administrative hand-waving designed to invoke a release mechanism that plainly does not apply. The Supreme Court described this approach aptly in *Jennings*:

> If respondents' interpretation of § 1225(b) were correct, then the Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien. To put it lightly, that makes little sense.

*Jennings*, 138 S. Ct. at 845.

Having concluded that § 1225(b) requires detention of applicants for admission at the Southwest Border and that DHS may not release these aliens under § 1226(a), the Court must address whether DHS's releases under § 1182(d)(5) are lawful. Because Florida separately challenges the Parole + ATD Policy, and because that policy explains how DHS is using § 1182(d)(5) at the Southwest Border, the Court will address that question when it discusses the Parole + ATD Policy.

### Arbitrary and Capricious

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). This standard "requires that

agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Indeed, meaningful judicial review requires an agency to "disclose the basis of its action." *See Dep't of Com.*, 139 S. Ct. at 2573 (quotations omitted).

Florida contends that DHS's refusal to acknowledge its change in policy renders the Non-Detention Policy arbitrary and capricious. The Court agrees. As Justice Scalia explained in *Fox Television*, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." 556 U.S at 515. And an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* DHS's issuance of the Non-Detention Policy was a distinct change in detention policy, and DHS's failure to acknowledge that change, or to provide a decisional document or administrative record for this Court to review, is fatal because the Court has no way to assess whether the agency's actions are reasonable and reasonably explained.

Accordingly, the Court concludes that the Non-Detention Policy is arbitrary and capricious.

### Notice and Comment

The parties' contentions regarding notice and comment center largely on their factual disagreements. Florida argues that a significant change in detention policy is

subject to notice and comment, while DHS argues that Florida merely challenges an amalgam of individual enforcement decisions. The Court has already found that the Non-Detention Policy is a distinct and reviewable policy. That leaves the Court with only minimal arguments from DHS regarding why that policy is not subject to notice and comment.

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C § 553). The APA distinguishes between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quotations omitted).

For similar reasons that the Non-Detention Policy is final agency action, it is a substantive rule. It gives new marching orders to immigration officials, determines whether aliens are detained or free to move in the United States, and implicates Florida's obligations to provide services and benefits to released aliens.  Because the Non-Detention Policy is a "rule of general applicability" regarding the detention or

non-detention of aliens, it is subject to rulemaking. *Jean v. Nelson* (*Jean I*), 711 F.2d 1455, 1476–77 (11th Cir. 1983).[10]

DHS principally invokes the "agency management" exception to notice and comment in 5 U.S.C. § 553(a)(2). But that exception is a "narrow[]" one that does not apply when the policy is not "primarily for the internal benefit" of agency employees. *Tunik v. Merit Sys. Prot. Bd.*, 407 F.3d 1326, 1344 (Fed. Cir. 2005). A policy governing when aliens may be detained or released goes far beyond the internal management of DHS.

Because the Non-Detention Policy affects the rights and obligations of both aliens and Florida, it is a substantive rule subject to notice and comment.

<u>The Parole + ATD Policy</u>

In addition to the Non-Detention Policy, Florida challenges DHS's Parole + ATD Policy. As discussed, the July Memo reflects the latest iteration of that policy. Florida contends that the Parole + ATD Policy is contrary to law, arbitrary and capricious, and subject to notice and comment. DHS contends that the Parole + ATD Policy is not subject to judicial review.

---

[10] The Eleventh Circuit granted rehearing en banc of that decision and did not reach the merits of the APA claims. *See Jean v. Nelson* (*Jean II*), 727 F.2d 957, 962 (11th Cir. 1984) (en banc). The en banc court did not address the notice and comment argument because the federal government conducted notice and comment in response to the panel opinion. *Id.* at 984.

The Court reviews these questions based on the administrative record provided by DHS, *see Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985), subject to two exceptions. First, the Court will look beyond the administrative record to determine "if an agency considered all the relevant factors." *See Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022).

Second, the Court will supplement the record to include DHS's publicly available data regarding the number of times the agency is using Parole + ATD per month. A Court may look beyond the record where the absence of evidence "effectively frustrates judicial review" by failing to present a clear picture of the agency's actions. *PEACH*, 87 F.3d at 1246 n.1. The July Memo states that "Parole + ATD is a tool that should be used sparingly" and is "not meant to be a primary processing tool." In reality, however, DHS has made Parole + ATD its primary processing pathway and is releasing as many as 88,000 applicants for admission per month. [FOF ¶ 47.] This extra-record evidence blatantly contradicts statements in the decisional document, and the Court must consider it to fairly determine whether the July Memo complies with the case-by-case requirement in § 1182(d)(5). *See Biden v. Texas*, 142 S. Ct. 2528, 2554 (2022) (Alito, J., dissenting) (looking to the number of parole grants per month to evaluate compliance with the case-by-case requirement).

Before delving into these issues, the Court briefly summarizes the July Memo. The memo outlines a Border Patrol policy for releasing applicants for admission under § 1182(d)(5). Section 1182(d)(5) authorizes DHS to "parole . . . any alien applying for admission to the United States" but "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," 8 U.S.C. § 1182(d)(5)(A). [Doc. 87-1 at SAR 1–4.] The policy seeks to bypass the inspection procedures in § 1225, including the initiation of removal proceedings, so that Border Patrol can move aliens out of its holding capacity and mitigate overcrowding. As the July Memo states, "Parole + ATD provides a processing mechanism to address situations in which there is not appropriate detention space available, and there are operational concerns about the number of people present in, and potentially subject to a prolonged time-in-custody at, USBP facilities along the Southwest border." [Doc. 87-1 at SAR 2.] The July Memo also describes itself as "a safety valve to address overcrowding." [Doc. 87-1 at SAR 2.]

The July Memo provides threshold criteria for when Border Patrol may authorize Parole + ATD in a sector. [Doc. 87-1 at SAR 3.] While the memo instructs agents to make an individualized assessment of "whether [an alien] is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit," it predetermines that "disease-mitigation" through the use of a

"safety valve to address overcrowding" satisfies § 1182(d)(5).  [Doc. 87-1 at SAR 2, 3–4.]

Importantly, the July Memo, unlike the November Memo, does not expressly limit Parole + ATD to family units. [*Compare* Doc. 87-1 at SAR 94.] The July Memo only disqualifies noncitizens who "pose a national security risk, unmitigable flight risk, [or] public safety threat," are unaccompanied children, or are subject to mandatory detention under 8 U.S.C § 1226(c). [Doc. 87-1 at SAR 4.] Finally, the memo instructs CBP and ICE to collaborate to locate released aliens for processing in the interior of the United States at a later date. [Doc. 87-1 at SAR 4.]

The administrative record contains various reports about processing times and detention capacity at the Southwest Border, talking points regarding the Parole + ATD Policy, the earlier November Memo and the administrative record associated with that policy, and internal discussions regarding the administrative backlog Parole + ATD has and will continue to cause. [Doc. 87-1 at SAR 5, 93–95, 165–69, 261–70.]

### *APA Reviewability*

The Court again begins with the APA's "basic presumption of judicial review." *Regents*, 140 S. Ct. at 1905 (quotations omitted). DHS argues that the Parole + ATD Policy is unreviewable because it is not "final agency action,"

5 U.S.C. § 704, and because it is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2).

As explained above, an agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (quotations omitted). The July Memo is a formal, signed memo by the heads of ICE and CBP that instructs agents how to exercise their authority. [Doc. 87-1 at SAR 1–4.] It also sets criteria by which aliens are eligible or ineligible for parole and release from DHS custody. [*E.g.*, Doc. 87-1 at SAR 4.] Moreover, granting parole has legal and financial consequences for the State of Florida because it determines eligibility for a variety of state programs. [FOF ¶ 80; *see also* FOF ¶ 65–84.]

DHS argues that the July Memo is not final because officers retain discretion to detain or parole individuals. But the fact that agency officials may retain a modicum of discretion does not negate the finality of the overarching policy directing their actions. *See Scenic Am., Inc. v. U.S. Dep't of Trans.*, 836 F.3d 42, 56 (D.C. Cir. 2016); *Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614–15 (7th Cir. 2003).

Likewise, the decisions reflected in the July Memo are not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). For reasons the Court will soon

explain, the parole authority in § 1182(d)(5) is not unbounded and provides a meaningful standard by which to review the agency's actions. *See Dep't of Com.*, 139 S. Ct. at 2568; *accord Weyerhaeuser*, 139 S. Ct. at 370 (explaining that § 701(a)(2) applies when these is "no meaningful standard against which to judge the agency's exercise of discretion" (quotations omitted)).

Finally, the Supreme Court has indicated—albeit in dicta—that DHS's use of the parole authority in 8 U.S.C. § 1182(d)(5) is at a minimum not categorically exempt from judicial review. As the Court explained in *Biden v. Texas*, "under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." 142 S. Ct. at 2543; *see Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (explaining that "there is dicta and then there is dicta, and then there is Supreme Court dicta").

For these reasons, the July Memo is subject to APA review.

### Contrary to Law

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Florida argues that the July Memo is contrary to law because it ignores the plain language of § 1182(d)(5). That statute authorizes parole only on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). It further

requires that a paroled alien be "forthwith . . . returned to the custody from which he was paroled" once "the purposes of such parole . . . have been served." 8 U.S.C. § 1182(d)(5).

The Court concludes that the July Memo is contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

The July Memo does not even acknowledge the requirement that an alien be returned to DHS custody when "the purposes of such parole shall . . . have been served." 8 U.S.C. § 1182(d)(5)(A). As counsel for DHS acknowledged during oral argument, the "purpose" of parole contemplated by the July Memo is moving aliens out of Border Patrol facilities faster than would occur if the alien were processed consistent with § 1225. [Tr. Day 4 at 208, 210; Doc. 87-1 at SAR 112.] In doing so, the July Memo seeks to shift the inspection contemplated by § 1225 to an ICE field office in the interior.

If that is the case, the purpose of parole is served when the alien has his first encounter with ICE. But nothing in the memo or administrative record contemplates a return to custody at that time or any time thereafter. In fact, the administrative record indicates that DHS promises aliens released under the July Memo that they "will not be taken into custody" when they report to ICE. [Doc. 87-1 at SAR 168.]

72

As to the "case-by-case" requirement, the phrase "case-by-case" indicates that DHS must conduct an individualized assessment of each alien to determine whether to grant parole. 8 U.S.C. § 1182(d)(5). Section 1182(d)(5) clarifies that "case" refers to the specific circumstances of the alien. *See* 8 U.S.C. § 1182(d)(5)(A) (explaining that when an alien is returned to custody after the purposes of parole have been served "his *case* shall continue to be dealt with in the same manner as that of any other applicant for admission" (emphasis added)).

As the Fifth Circuit recently explained, Congress amended § 1182(d)(5) in 1996 to add the "case-by-case" requirement and prevent *en masse* use of § 1182(d)(5). *See Texas v. Biden*, 20 F.4th at 997. Congress made these changes in response to the federal government "us[ing] the parole power to bring in large groups of immigrants." *Id.* at 947; *see also Biden v. Texas*, 142 S. Ct. at 2555 (Alito, J., dissenting) (reiterating the Fifth Circuit's explanation). Congress labeled that portion of its legislation "Limitation On Use of Parole." *See* Pub. L. No. 104-208 § 602(a), 110 Stat. 3009-689 (1996). And, in the same amendment, Congress also added a requirement that DHS report detailed statistics about the number of parolees, their length of parole, and if they had been returned to custody. Pub. L. 104-208 No. § 602(b), 110 Stat. 3009-689 to -690 (1996) (referred to as "8 USCA § 1182 Note").

The process set forth in the July Memo violates the case-by-case requirement. While the memo pays lip service to assessments of individual aliens, the July Memo

is largely focused on *DHS's operational circumstances* rather than an individual alien's circumstances. [Doc. 87-1 at SAR 3 (discussing overcrowding).] Any case-by-case consideration of the alien's circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety risk or flight risk, [Doc. 87-1 at SAR 4], not on whether the alien meets the exceedingly high parole standard. *See* 8 U.S.C. § 1182(d)(5) (discussing "urgent humanitarian reasons or significant public benefit"). And the memo turns the parole standard on its head by providing *ineligibility* criteria rather than *eligibility* criteria. [Doc. 87-1 at SAR 3–4.] In other words, the July Memo establishes a presumption of parole when the relevant "triggers" are met.

Time estimates in the administrative record confirm that Border Patrol is not conducting meaningful case-by-case consideration. The record indicates that the "processing time" for issuing a Notice to Appear is between two and two and a half hours. Parole + ATD, by contrast, takes only 15–30 minutes total. [Doc. 87-1 at SAR 5.] And this 15–30 minutes also includes placing the alien on ATD, collecting information including a physical address, and running the alien's biometric information through various databases to determine whether the alien is a public safety risk. [Doc. 87-1 at SAR 3–4.] In fact, if DHS were taking the "case-by-case" requirement seriously, the Court doubts that § 1182(d)(5) would form the basis for a new policy whose express purpose is *speeding up* the processing of migrants.

On this point, the Court finds persuasive Justice Alito's discussion of the case-by-case requirement in *Biden v. Texas*, 142 S. Ct. 2528, 2555 (2022) (Alito, J., dissenting). There, Justice Alito explains that "simply . . . going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review." *Id.* Further, Justice Alito notes that the number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis." *Id.* at 2554. Notably, the data before Justice Alito showed 27,000 paroles in April 2022, whereas the data before this Court shows more than 88,000 in November 2022. [FOF ¶ 47.]

Finally, the Court concludes that the July Memo violates § 1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit." "Urgent humanitarian reasons" and "significant public benefit" reserves the parole authority for extraordinary circumstances. Before 1996, § 1182(d)(5)(A) permitted parole "for emergent reasons or reasons strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A) (1995). The addition of "urgent" and "significant" added a higher level of exigency. *In re BFW Liquidation, LLC*, 899 F.3d 1178, 1191 (11th Cir. 2018) ("[C]hanges in statutory language generally indicate an intent to change the meaning of the statute.").

Fundamentally, the July Memo takes issue with the time it takes to conduct the mandated inspection under § 1225 and finds that speeding up processing yields

a significant public benefit. [*E.g.*, Doc. 87-1 at SAR 2 ("It is significantly more efficient—approximately 60 minutes faster—to process individuals, consistent with 8 U.S.C. § 1225(a), for Parole + ATD as opposed to issuing a Notice to Appear (NTA) or other charging document at the time of encounter.").]

Even assuming there may be circumstances where an individual alien might be eligible for parole based on overcrowding and safety concerns, creating an entirely new processing pathway to avoid the process mandated by § 1225 is not consistent with the narrow language in § 1182(d)(5). And it is clear that Parole + ATD has become the *primary* processing pathway for aliens at the Southwest Border. In November 2022, for example, Border Patrol apprehended 141,000 aliens at the border and released 88,000 of them on Parole + ATD. [FOF ¶ 47.]

DHS has suggested that the Court should read this standard broadly and defer to DHS's implementing regulations to define "urgent humanitarian reasons" and "significant public benefit." DHS defines these terms to include several medical conditions, custody of minors, witnesses in proceedings or investigations, and "[a]liens whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b). Thus, DHS contends, it may parole an alien who does not present a security risk or risk of absconding because that alien's "continued detention is not in the public interest." *Id.*

While Florida does not challenge this regulation, the State urges that 8 C.F.R. § 212.5(b) does not entitle DHS to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and that, in any event, the regulation does not support DHS's argument that Parole + ATD satisfies the "urgent humanitarian reasons or significant public benefit" standard. The Court agrees with Florida.

While *Chevron* deference would require DHS to show that § 1182(d)(5) is ambiguous, the Court need not address that question because DHS's interpretation is not reasonable. *See Chevron*, 467 U.S. at 843. Specifically, 8 C.F.R. § 212.5(b)(5) asks whether "detention" is "in the public interest." But that inquiry flips the INA on its head, as § 1225(b) requires detention *unless* an alien meets the exceedingly high parole standard. Thus, DHS cannot reasonably take the position that, absent an affirmative finding that detention is in the public interest, an alien is entitled to release.

Moreover, 8 C.F.R. § 212.5(b)(5)'s "public interest" language was not an attempt by the agency to interpret the phrase "urgent humanitarian reasons or significant public benefit," which is a prerequisite for *Chevron* deference. *See Jaen v. Sessions*, 899 F.3d 182, 187 n.4 (2d Cir. 2018) (denying *Chevron* deference for a document that did not "purport to interpret the statute"). The phrase "whose continued detention is not in the public interest," 8 C.F.R. § 212.5(b), tracks closely the pre-1996 text of § 1182(d)(5). *See* 8 U.S.C. § 1182(d)(5)(A) (1995) (permitting

parole "for emergent reasons or *reasons strictly in the public interest*" (emphasis added)). And the federal government promulgated that regulation under the pre-1996 statutory text. *See* 47 Fed. Reg. 30,044. Thus, the phrase "public interest" was parroting language, which receives no deference under *Chevron*. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006).

The only question, then, is whether DHS's failure to update the regulation after the 1996 amendment—to reflect the change from "public interest" to "significant public benefit"—is subject to *Chevron* deference. The Court is skeptical that DHS's failure to update its regulations to track an amended statute was an attempt to interpret the amended statute. But if it were, such a decision would be so plainly unreasonable as to foreclose *Chevron* deference.

Finally, even if DHS were entitled to *Chevron* deference, 8 C.F.R. § 212.5(b) would not support the lawfulness of the Parole + ATD Policy. The mere fact that DHS may parole an alien whose "continued detention is not in the public interest" does not allow the agency to create an unprecedented new processing pathway, use that pathway in place of the mandated inspections under § 1225, and convert that pathway into the primary mechanism for processing aliens at the Southwest Border.

For these reasons, the Court concludes that the July Memo is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

78

*Arbitrary and Capricious*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). As explained, this standard "requires that agency action be reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158. Under the oft-repeated standard, a reviewing court must look to see if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "To determine if an agency considered all the relevant factors and important aspects of the problem, a court may look to the language of the relevant statutes, regulations, the administrative record, and even beyond the administrative record." *Bidi Vapor*, 47 F.4th at 1202 (quotations and citations omitted).

Florida presents five bases for why the July Memo is arbitrary and capricious: (1) DHS failed to adequately consider the ever-worsening backlog caused by earlier iterations of the Parole + ATD Policy; (2) DHS failed to acknowledge the extraordinary expansion of the agency's use of parole under § 1182(d)(5) as compared to the agency's historical practice; (3) DHS ignored the evidence when it concluded that Parole + ATD will only be "used sparingly" and that it is "not meant

to be a primary processing tool"; (4) DHS failed to consider whether the Parole + ATD policy would increase migration flows; and (5) DHS failed to acknowledge its decision to expand Parole + ATD to include single adults rather than only family units, much less explain why it did so.

As to the backlog, the administrative record contains estimates regarding the number of individuals released on Parole + ATD against whom DHS must still initiate removal proceedings. [Doc. 87-1 at SAR 261–66.] These projections show that for every 90 days Parole + ATD continues, the policy creates a backlog that takes 5.5 years and $49 million to clear. [Doc. 87-1 at SAR 261–62.] And this backlog only accounts for the time needed to *begin* removal proceedings—not the additional time to complete those proceedings and remove aliens. [FOF ¶ 89.] By these estimates, the backlog created by Parole + ATD will take *decades* to overcome.

The July Memo does not expressly consider this backlog, much less consider alternatives or explain why the backlog is not a reason to change course. But, DHS argues, the presence of this information in the administrative record demonstrates that DHS considered it. And, they say, the July Memo at least acknowledges the backlog insofar as it directs ICE and CBP to share the burden of clearing that backlog. [Doc. 87-1 at SAR 4.]

Given the gravity of the problem, the Court concludes that DHS did not adequately consider it. In *Regents*, for example, the reliance interests of DACA

recipients were sufficiently significant that the Court expected "the rescission memorandum" *itself* to discuss the issue. *See Regents*, 140 S. Ct. at 1913. And whatever the passing references to the backlog in the July Memo and the administrative record show, they do not provide the Court with a basis to evaluate DHS's *reasoning* as to that problem. *See Prometheus*, 141 S. Ct. at 1158 (explaining that the APA requires that "agency action be reasonable and reasonably explained"). Nor is the Court permitted to "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

As to whether DHS adequately explained its substantial expansion of the parole authority, the Court again agrees with Florida. At trial, DHS did not provide a single document pre-dating the events in this case that gave guidance to Border Patrol regarding the parole authority. DHS did, however, offer OFO and ICE documents. Those documents indicate that "[l]ack of detention space . . . [is] not [an] appropriate reason[] to parole an inadmissible alien," [Def. Ex. F], and that DHS previously paroled aliens under 8 C.F.R. § 212.5(b)'s "public interest" language only *after* the alien demonstrated a credible fear of persecution in his home country, [Def. Ex. C]. The Parole + ATD Policy is therefore an unprecedented expansion— now being used tens of thousands of times per month on aliens who have shown no

entitlement to remain in the United States—that DHS utterly failed to acknowledge or address.[11]

Relatedly, the July Memo says that the Parole + ATD Policy will only be "used sparingly" and that it is "not meant to be a primary processing tool." [Doc. 87-1 at SAR 2, 3.] Those statements—which turned out to be untrue—were contrary to "the evidence before the agency" when DHS issued the July Memo. *See State Farm*, 463 U.S. at 43. In the last full month applying the November Memo (June 2022)— the previous iteration of Parole + ATD—Border Patrol released over 40,000 applicants for admission under that policy, which was more than 40% of total apprehensions at the Southwest Border that month. [Pl. Ex. 3 at 3.] The July Memo *expanded* Parole + ATD to include single adults rather than just family units. It was therefore contrary to all available evidence to expect that the July Memo would be used sparingly and not become the primary processing pathway.

As to migration flows, the Court heard evidence at trial—including testimony from the Chief of Border Patrol—that changes in detention policy like the Parole + ATD Policy can substantially increase border traffic, and they have done so. [FOF ¶ 26.] Neither the July Memo nor the administrative record discuss effects on migration flows at all, which is surprising given DHS's consistent position that

---

[11] The Court acknowledges that the November Memo was the first expansion of the parole authority, but the November Memo similarly does not acknowledge this expansion.

increased border traffic, rather than a change in policy, is to blame for all of its failures. In any event, DHS's failure to even consider that effect is arbitrary and capricious. *State Farm*, 463 U.S. at 43.

Finally, Florida contends that DHS failed to explain why it expanded Parole + ATD to single adults. The November Memo, which formally established the Parole + ATD processing pathway, limited its application to family units. [Doc. 87-1 at SAR 94.] The July Memo does not limit parole to family units, and thus marks a change in the agency's policy. [Doc. 87-1 at SAR 1–4.] "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515. Failure to acknowledge this shift in agency policy is arbitrary and capricious per se.

Accordingly, the Court concludes that the July Memo is arbitrary and capricious.

## Notice and Comment

As stated above, the APA requires an agency to give notice and opportunity for comment for rules that affect rights and obligations. *See* 5 U.S.C. § 553; *Chrysler Corp.*, 441 U.S. at 302. Excluded from that obligation are "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

Florida claims that the July Memo is an agency rule affecting rights and obligations that was subject to notice and comment. DHS disagrees, arguing that the July Memo falls into the exceptions for notice and comment under 5 U.S.C. § 553(b)(A).

For the same reasons the July Memo is final agency action, it is a substantive rule. The July Memo instructs agents how to exercise their discretionary authority under § 1182(d)(5), sets criteria for determining grants of parole, and affects Florida's obligations to paroled aliens. Further, the July Memo sets a generally applicable policy to determine whether aliens are detained or paroled, which is subject to notice and comment. *Jean I*, 711 F.2d at 1476–77.

The Court concludes that none of the exceptions in 5 U.S.C. § 553(b)(A) apply to the July Memo. First, the July Memo is not an interpretive rule. An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Exp., Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)).[12] The July Memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of § 1182(d)(5), so it cannot be an interpretive rule.

---

[12] Fifth Circuit decisions issued before close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

Similarly, the July Memo is not a general statement of policy. "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quotations omitted). The July Memo does none of these things. It establishes a substantive change in policy effective immediately and cannot be a general statement of policy.

Finally, the July Memo is not a rule of agency organization. That exception applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). Here, the July memo "alter[s] the standards imposed" on aliens and the criteria by which parole may be granted to affected parties. *Id.* at 1024. Thus, the July Memo is not a "rule[] of agency organization, procedure, or practice," 5 U.S.C § 553(b)(A), and it is not exempt from notice and comment.

Accordingly, the July Memo is subject to notice and comment.

<u>Florida's Remaining Claims</u>

The Court does not reach Florida's constitutional claim or its claim that DHS's violation of the mandatory detention provisions in § 1225(b) is agency action unlawfully withheld under 5 U.S.C. § 706(1). As to the former, "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching

constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988); *accord Texas. v. United States*, No. 6:21-cv-16, 2022 WL 2109204, at *44 (S.D. Tex. June 10, 2022) (taking this approach with a similar claim in a similar case). As to the latter, because the Court grants vacatur of both challenged policies based on § 1225(b)'s requirements, it need not grant any further relief to compel compliance with § 1225(b). *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

## The Remedy

As explained above, the Non-Detention Policy and the Parole + ATD Policy violate the APA on several grounds. Florida asks this Court to vacate both policies, enjoin the Parole + ATD Policy, and issue declaratory relief. DHS argues that 8 U.S.C § 1252(f) bars both injunctive relief and APA vacatur and alternatively that this Court should limit relief to aliens released into Florida.

Under the APA, a court must "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. § 706. In the Eleventh Circuit, "[v]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted). Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining that "the ordinary result" of a

successful APA claim is that "the rules are vacated" and not that "their application to the individual petitioners is proscribed" (quotation omitted)).

Even if the party-specific vacatur DHS seeks were a proper remedy under the APA, complete vacatur is "necessary to grant complete relief to" Florida here. *Health Freedom Def. Fund v. Biden*, 599 F. Supp. 3d 1144, 1177 (M.D. Fla. 2022). Once released at the Southwest Border, aliens are free to travel throughout the United States. If the Court were to follow DHS's request—which would essentially involve DHS asking aliens where they are going and applying the challenged policies to aliens who don't respond with "Florida"—released aliens would be free to travel to Florida. *See id.* at 1178 (denying a request for partial vacatur where there were "no adequate assurances that the government can provide that its agents . . . will not violate this Court's order and deprive Plaintiffs of their relief"). Moreover, if DHS's policy were to detain applicants for admission who say they are traveling to Florida and release other aliens, the Court expects that it would not take long for immigration law violators to discover how to ensure their own release.

DHS also argues that 8 U.S.C. § 1252(f) bars this Court from vacating either policy because vacatur "enjoin[s] or restrain[s] the operation of" certain provisions of the INA. *See* 8 U.S.C. § 1252(f). The Supreme Court addressed that provision in two decisions last term. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022); *Biden v. Texas*, 142 S. Ct. at 2538–39. And in *United States v. Texas*, 143

S. Ct. 51 (July 21, 2022), argued this term, the Supreme Court granted certiorari on the question whether § 1252(f) bars APA vacatur.

For its part, this Court finds the Fifth Circuit's approach in the decision under review in that case persuasive. Observing that the Supreme Court "indicated that § 1252(f) is to be interpreted relatively narrowly," the Fifth Circuit concluded that "vacatur neither compels nor restrains further agency decision-making" and thus that § 1252(f) does not bar vacatur. *Texas v. United States*, 40 F.4th 205, 220 (5th Cir. 2022), *cert granted* 143 S. Ct. 51 (July 21, 2022). The Court agrees that vacatur is a distinct remedy not implicated by § 1252(f) and is appropriate in this case.

Florida also requests an order enjoining DHS from enforcing the Parole + ATD policy. The operation of parole under 8 U.S.C. 1182(d)(5)(A) is not implicated by § 1252(f) because it is not in the part of the INA to which § 1252(f) applies. *See* 8 U.S.C. § 1252(f) (applying to "provisions of part IV of this subchapter"); 8 U.S.C. § 1182(d)(5) (found in part II of the same subchapter). Thus, the Court has authority to enter an injunction with respect to Parole + ATD.

The Court, however, declines to issue an injunction because vacatur—"a less drastic remedy"—is "sufficient to redress" Florida's injury. *See Monsanto*, 561 U.S. at 165–66. Thus, the Court finds vacatur and declaratory relief the appropriate remedies at this time. If Florida discovers that this Court's Order has not provided

complete relief, the State may file a Rule 60(b) motion, which the Court will consider on an expedited basis.

## CONCLUSION

The Court finds that both the Non-Detention Policy and the Parole + ATD Policy violate the APA and that vacatur of both policies is the appropriate remedy. On its own motion, the Court stays its order for seven days to allow DHS to seek appellate relief. The Court denies any further stay of its order. Accordingly, it is **ORDERED** that:

1. The Court **DECLARES UNLAWFUL** and **VACATES** the Non-Detention Policy and Parole + ATD Policy, remanding them to the agency for further proceedings consistent with this opinion.

2. The Clerk is directed to **ENTER** final judgment in favor of the Plaintiff as to Counts 1–6 and in favor of the Defendants as to Counts 7–8 in accordance with this order and **CLOSE** this case.

3. The Court **STAYS** the effect of this order and the final judgment for seven days from the date of this order.

**DONE and ORDERED** this ___ day of ____, 2023.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

*/s/ James H. Percival*
James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Natalie P. Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Joseph E. Hart (FBN 124720)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Anita Patel (FBN 70214)
SENIOR ASSISTANT ATTORNEY GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
james.percival@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF SERVICE

I certify that on February 16, 2023, a true and correct copy of the foregoing

was filed with the Court's CM/ECF system, which will provide service to all parties.

*/s/ James H. Percival*
Deputy Attorney General