# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:21-cv-01066 |
| | ) | |
| The UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND POST-TRIAL BRIEF

## TABLE OF CONTENTS

INTRODUCTION..................................................................................1

LEGAL FRAMEWORK ........................................................................7

PROPOSED FINDINGS OF FACT .....................................................16

PROPOSED CONCLUSIONS OF LAW...............................................42

POST-TRIAL BRIEF IN SUPPORT OF DEFENDANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW ...........................67

I.  Plaintiff Does Not Have Standing to Bring This Case ...........................67

    A.  Plaintiff's standing claim is legally insufficient.............................67

    B.  The majority of Plaintiff's standing evidence is "useless"..............75

    C.  Plaintiff has not shown the injuries alleged by the Florida
    Department of Education are traceable to the challenged policies . 78

    D.  Plaintiff has not shown its claims are redressable........................82

II.  Plaintiff's Claims Are Not Reviewable Under the APA........................84

    A.  Committed to agency discretion by law.......................................84

    B.  No final agency action...............................................................88

    C.  Statutes preclude jurisdiction and zone of interests .....................91

III.  The Parole+ATD Policy is Not Contrary to Law .................................94

    A.  Factual background....................................................................95

    B.  The Parole+ATD program does not violate the law ....................100

    C.  The Parole+ATD program is not arbitrary or capricious............114

**D.    The Parole+ATD program was not subject to notice and comment** .................................................. **122**

**IV.    There is No Non-Detention Policy** ................................ **126**

    **A.    Plaintiff has not identified a specific agency statement that is reviewable under the APA** .......................................... **126**

    **B.    Plaintiff has not proven that Defendants have a non-detention policy** .......................................................... **137**

        **i.    The detention and parole statistics Plaintiff relied on do not establish a non-detention policy** ........................................... **137**

        **ii.    Funding requests are not evidence of a non-detention policy 140**

        **iii.    ICE's closure of its family residential centers increased, rather than decreased, detention capacity defeating Plaintiff's claim that the conversion is evidence of a non-detention policy** ...... **146**

        **iv.    Border Patrol's use of Parole+ATD is not evidence of a non-detention policy** ................................................ **148**

        **v.    Border Patrol's temporary use of Notices to Report is not evidence of a non-detention policy** ....................................... **149**

        **vi.    The termination of MPP is not evidence of a non-detention policy** ................................................................. **151**

    **C.    The alleged non-detention policy is not arbitrary or capricious** ... **152**

    **D.    The alleged non-detention policy is not contrary to law** .............. **154**

    **E.    The alleged non-detention policy was not subject to notice and comment** ................................................... **163**

**V.    The Take Care Clause Does Not Provide a Private Cause of Action for Plaintiff to Sue the Executive Branch** ................................. **164**

**VI.    There are Limited Remedies Available to Plaintiff** ............................ **173**

**A.** **Injunctive relief is inappropriate** ................................................ **174**

    **i.** **Injunctive relief is barred by 8 U.S.C. § 1252(f)(1)** .............. **174**

    **ii.** **Plaintiff has not shown it is entitled to injunctive relief** ........ **178**

**B.** **Declaratory relief is inappropriate unless properly crafted** ......... **182**

**C.** **At most, the Court may remand to the agency without vacating the policies** ........................................................................................ **186**

    **i.** **The APA bars universal vacatur of the challenged policies** ... **186**

    **ii.** **Universal vacatur is also barred by 8 U.S.C § 1252(f)(1)** ...... **189**

    **iii.** **At most, the only proper remedy is to remand to the agency without vacatur** ................................................................. **190**

**D.** **Any remedy provided must be limited to the injuries actually proved by Plaintiff** ................................................................... **194**

**CONCLUSION** ........................................................................................ **199**

# INTRODUCTION

Plaintiff, the State of Florida, has opinions regarding the federal government's current management of immigration enforcement at the Southwest border. Determining immigration policy, however, is not the role of the States in our federal system. The "federal power to determine immigration policy is well settled." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Indeed, a "principal feature" of federal power is the "broad discretion exercised by immigration officials." *Id*. at 395-96. The system reflects the reality that immigration officials must determine how to deploy finite resources when enforcing the Nation's immigration laws.

Congress has made the Secretary of Homeland Security responsible for "establishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and "administering rules . . . governing . . . parole," 6 U.S.C. § 202(4). U.S. Customs and Border Protection ("CBP"), the component of the Department of Homeland Security ("DHS") responsible for enforcing immigration laws at ports of entry and between ports of entry, authorized its immigration officers to take certain enforcement actions in specific circumstances to relieve overcrowding, protect its workforce and noncitizens in CBP custody, and maximize its limited resources. Similarly, U.S. Immigration and Customs Enforcement ("ICE"), the DHS component responsible for, among other things, detaining noncitizens in removal proceedings or awaiting removal, has, within the boundaries of what Congress has

authorized, adjusted its detention capacity and improved compliance rates of non-detained noncitizens reporting to ICE.

Plaintiff asks this Court to undermine those decisions, curtail DHS's discretion to determine which noncitizens arriving at the border should be charged and detained, and supervise the Executive Branch's oversight of immigration more broadly. Plaintiff challenges Defendants' Parole Plus Alternatives to Detention ("Parole+ATD") policy, which informs discretionary parole authority under 8 U.S.C. § 1182(d)(5) in limited circumstances. Plaintiff also challenges a purported non-detention policy, which it asserts violates the Immigration and Nationality Act ("INA") and the Constitution under the Separation of Powers Doctrine and Take Care Clause. Plaintiff's claims are not supported by law, evidence, or the administrative record. Accordingly, Plaintiff cannot prevail.

First, the Court lacks authority to review Plaintiff's claims. As a threshold matter, Plaintiff lacks standing. After months of discovery and a four-day trial, Plaintiff failed to establish that it has suffered an actual or imminent injury caused by the challenged policies that is redressable by the Court. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Plaintiff presented statistics purportedly showing it sustained costs from the presence of "noncitizens" and "immigrants" in the State. The statistics covered a period beginning in 2020, before the challenged practices were allegedly implemented. Plaintiff failed to establish that these costs were

2

attributable to applicants for admission who were paroled or otherwise released at the Southwest border since January 2021, or a result of either challenged policy. Plaintiff also failed to show any causation between Florida Department of Education ("DOE") expenditures and the commencement of DHS's Parole+ATD and alleged non-detention policies. As such, Plaintiff failed to establish standing to challenge either policy.

Additionally, Plaintiff's claims are not reviewable under the Administrative Procedure Act ("APA"). Plaintiff challenges discretionary resource allocation and conditional-release decisions that are committed to agency discretion by law, do not constitute challengeable final agency actions, and are shielded from judicial review by 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e). Further, Plaintiff does not fall within the zone of interests to challenge the Immigration and National Act's ("INA)" detention and release provisions under the APA.[1]

Second, Plaintiff's challenge to the purported non-detention policy is non-justiciable because Plaintiff has not identified a specific agency "rule" that it challenges. 5 U.S.C. § 551(4). Plaintiff asks the Court to assume the existence of a

---

[1] These arguments were briefed previously at summary judgment and rejected by the Court in a short order without explanation (*see* ECF No. 117). The Supreme Court is set to hear argument in April regarding whether legal issues briefed and rejected at summary judgment are preserved for appeal absent repetition in a post-trial motion or brief. *See Dupree v. Younger*, 22-210. There is a circuit split on this issue, and the Eleventh Circuit has never taken a position. *Id.*, Petition for a Writ of Certiorari. Accordingly, in an abundance of caution, to ensure preservation for appeal, and because the Court's view might have changed following development of the record at trial, Defendants are raising these legal arguments again here.

non-detention policy by amalgamating numerous discrete agency decisions and actions by individual immigration officers, in contravention of Supreme Court precedent. *Biden v. Texas*, 142 S.Ct. 2528, 2545 (2022) (holding that federal courts may not "postulat[e] the existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision.").

Third, Plaintiff did not establish that the purported non-detention policy exists. Plaintiff asks the Court to infer its existence from the false premise that the prior administration's policies and priorities are the standard against which all others should be evaluated. But the determinative statute, 8 U.S.C. § 1182(d)(5), provides that DHS may parole any applicant for admission into the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Plaintiff failed to show that Defendants paroled any noncitizens in violation of the statute. Plaintiff also argues that ICE's closure of three family residential centers, and Border Patrol's ("BP")[2] temporary use of Notices to Report ("NTRs") and subsequent use of Parole+ATD are evidence of a non-detention policy. The evidence established, however, that DHS had reasoned and independent bases for these decisions in the service of efficiency and the prioritization of resources.

---

[2] Border Patrol is the operational component of CBP that enforces immigration law between ports of entry. Tr. Day 2, 42:13-17, 43:25-44:8.

4

Fourth, none of DHS's decisions were arbitrary or capricious. They were rational responses to the nation's current immigration circumstances, where there is a lack of detention capacity sufficient to detain all noncitizens in removal proceedings. Given that reality, DHS prioritized detention for noncitizens who pose national security, public safety, or flight risks, and used parole for low-risk individuals. Parole+ATD rationally addresses the lengthy time required for full processing of border arrivals, the health and safety risks posed by overcrowding in BP processing facilities, and the need to supervise noncitizens to ensure their compliance with their immigration proceedings.

Fifth, the government's actions were lawful. Plaintiff's non-detention theory—either under its as-pled broad and vague definition of the alleged policy as the release of applicants for admission subject to mandatory detention, or Plaintiff's impermissible post-hoc theory that Defendants are detaining only noncitizens who fall into "public safety categories," Tr. Day 4, 71:22-72:7—is not supported by the evidence. Defendants detain tens-of-thousands of noncitizens monthly, including many who do not present a public safety threat. Plaintiff's preferred approach would render rational enforcement of the immigration laws functionally impossible and has not been followed by any administration. And Plaintiff's legal theory, at its core, presents a fundamental misunderstanding of the INA. The use of the term "shall" in section 8 U.S.C. § 1225(b) does not create a detention mandate for all applicants for

admission and does not override either Defendants' inherent law-enforcement resource prioritization discretion or the INA's interlocking provisions providing for release of applicants for admission on parole under section 1182(d)(5)(A). Further, the INA also grants DHS the discretion to process applicants for admission who enter the country illegally under section 1226(a) and to grant them conditional parole pending the outcome of their removal proceedings. Finally, even if the non-detention policy existed (which it does not), it would not be a rule subject to notice and comment. *See Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

Sixth, the Supplemental Administrative Record ("SAR") establishes that DHS's July 18, 2022 memorandum providing guidance for the Parole+ATD program is a lawful use of the parole authority under section 1182(d)(5)(A). The SAR also shows that the Parole+ATD policy is not arbitrary and capricious. Finally, the July 18, 2022 memorandum explains the agency's view of its authority under section 1182 as a statement of policy, and not as the creation of rights or duties subject to notice and comment. 5 U.S.C. 553(b)(A).

Finally, any redress here is limited by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) bars this Court from issuing an injunction directing how the INA's detention and release provisions should be implemented. Section 1252(f)(1) also bars vacatur of the Parole+ATD policy or any purported non-detention policy, or declaratory relief that functions like an injunction. 8 U.S.C. § 1252(f)(1); *see*

*Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Because any remedy must be narrowly tailored to the established injury, the only appropriate remedy here would be a remand to DHS without vacatur. Any additional relief would impermissibly force this Court to oversee discretionary policy within the exclusive domain of the Executive Branch.

At bottom, the evidence presented by Plaintiff at trial established nothing more than that there was a change in approach to immigration between one administration and the next. But the fact that priorities may change when there is a change in administration is unsurprising. That is what democracy is meant to accomplish. As the Court noted, "that's just how the process works." Tr. Day 4, 78:25-79:1. "Congress intended whether the [Executive Branch] is adequately guarding the borders of the United States to be 'committed to agency discretion by law' and, thus, unreviewable," and challenges asserting such claims invoke fundamentally "political questions." *Chiles v. United States*, 69 F.3d 1094, 1096, 1097 (11th Cir. 1995). Plaintiff's policy dispute is simply a political question better suited to the voting booth than the courtroom.

## **LEGAL FRAMEWORK**

The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see*, *e.g.*, 6 U.S.C. § 202(5); 8 U.S.C.

§ 1103(a)(3). Noncitizens who lack valid entry documentation or enter the country without inspection are inadmissible and potentially removable. 8 U.S.C. §§ 1182(a)(6)-(7). However, DHS has "broad discretion" to decide "whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. If removal is initiated, the Executive nevertheless maintains the discretion to halt removal proceedings at any stage "for humanitarian reasons or simply for its own convenience." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). The government may detain noncitizens it does decide to remove on the basis of their civil immigration offenses "for the limited period necessary for their removal proceedings." *Demore v. Kim*, 538 U.S. 510, 526 (2003). However, the government may not indefinitely detain noncitizens it cannot realistically remove. *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

Plaintiff's challenge to Defendants' alleged policy of releasing inadmissible noncitizens who enter at the Southwest border implicates two overlapping INA provisions governing detention and release of noncitizens: 8 U.S.C. §§ 1225 and 1226.

1. Inspection of applicants for admission. Section 1225 applies to "applicants for admission"—noncitizens who are present in the United States without being admitted or "who arrive[] in the United States" "whether or not at a designated port of arrival." *See* 8 U.S.C. § 1225(a)(1). Those who apply for admission or attempt to

apply to the United States via a port-of-entry are termed "arriving aliens." 8 C.F.R. §§ 1.2, 1001.1(q). Section 1225(b) provides for "inspection of applicants for admission." 8 U.S.C. § 1225(b). Following inspection, applicants for admission are processed through one of two main pathways. "Arriving aliens," and certain other noncitizens such as those who have entered the United States without having been admitted or paroled and are apprehended within 100 miles of the border and 14 days of entry, may, in the discretion of DHS, be placed in expedited removal procedures under section 1225(b)(1). 8 U.S.C. § 1225(b)(1)(A); 69 Fed. Reg. 48,877 (Aug. 11, 2004).[3] Arriving aliens, and other applicants for admission not placed in expedited removal proceedings, but who "are not clearly and beyond a doubt entitled to admission," may alternatively be placed in full removal proceedings under section 1229a. *See, e.g.,* 8 U.S.C. § 1225(b)(2)(A).[4] DHS has authority to place applicants for admission in full removal proceedings even if they may also be subject to expedited removal. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 523 (BIA 2011).

---

[3] Under "expedited removal" procedures, certain noncitizens who lack valid entry documentation or make material misrepresentations shall be "order[ed] . . . removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1964-67 (2020) (discussing expedited removal).

[4] Section 1229a removal proceedings provide more extensive procedures than expedited removal, *compare* 8 U.S.C. § 1229a *with id.* § 1225(b)(1), including a right to appeal to the Board of Immigration Appeals (BIA) and a federal court of appeals. *Id.* § 1252(a)(1).

Further, neither section 1225(b)(1) nor section 1225(b)(2) mandates commencement of proceedings against amenable applicants for admission. *Matter of J-A-B- & I-J-V-A-*, 27 I. & N. Dec. 168, 172 (BIA 2017) (section 1225(b)(1)); *E-R-M-*, 25 I. & N. Dec. at 523 (section 1225(b)(2)(A)).[5] The decision whether to place any particular noncitizen in removal proceedings is a matter of DHS's core prosecutorial discretion. DHS is "invested with the sole discretion to commence [such] removal proceedings." *Matter of Avetisyan*, 25 I. & N. Dec. 688, 690-91 (BIA 2012), *overruled on other grounds by Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018), *reinstated by Matter of Cruz-Valdez*, 28 I. & N. Dec. 326 (A.G. 2021). Section 1225 thus "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane v. Johnson*, 783 F.3d 244, 249 (5th Cir. 2015).

2. <u>Detention and release of applicants for admission</u>. If a noncitizen subject to expedited removal expresses a fear of persecution, torture, or return to their country

---

[5] This discretion recognized by the BIA is fully consistent with *Matter of M-S-,* 27 I. & N. Dec. 509 (A.G. 2019), which addressed the authority to detain noncitizens "originally placed in expedited [removal]" but then referred for "further consideration of the[ir] application for asylum" in full removal proceedings, 8 U.S.C. § 1225(b)(2)(B)(ii), and whether those noncitizens qualified for a bond hearing before an immigration judge. *Id.* at 511-12. *M-S-* rejected the availability of bond because their continued detention was governed by section 1225(b) rather than section 1226(a). *Id.* at 516. Bond hearings before immigration judges are not a release mechanism at issue in the case. *M-S-* does not address DHS's recognized discretion to select between expedited and full removal proceedings for applicants for admission at the outset. *See E-R-M-*, 25 I. & N. Dec. at 523. Additionally, *M-S-* recognized section 1226(a) "provides an independent ground for detention that does not limit DHS's separate authority to detain aliens originally placed in expedited removal." 27 I. & N. Dec. at 516.

of origin or indicates an intent to apply for asylum, and is then found to have a credible fear of persecution by an asylum officer, or an immigration judge upon review, that noncitizen is placed into proceedings "for further consideration of the application for asylum." 8 U.S.C. §§ 1225(b)(1)(A)(i), (b)(2)(B)(ii), (b)(2)(B)(iii)(I); 8 C.F.R. § 235.3(b)(4). Regardless of whether applicants for admission receive final executable expedited removal orders, demonstrate a credible fear and pursue relief or protection from removal, or are placed into full removal proceedings under section 1225(b)(2)(A), section 1225(b) provides that they "shall be detained" for those procedures. 8 U.S.C. §§ 1225(b)(2)(B)(ii), (b)(2)(B)(iii)(IV), (b)(2)(A). But these detention provisions are implicated only if DHS exercises its prosecutorial discretion in the first instance to charge a particular noncitizen with inadmissibility and seek their removal. *See Arizona v. Biden*, 40 F.4th 375, 391 (6th Cir. 2022). DHS has discretion whether to seek removal at all. *Arizona*, 567 U.S. at 396. Thus, DHS lacks "an obligation to take a noncitizen into custody, or keep them in custody, if they decide at that point or later on not to bring an enforcement action." *Arizona*, 40 F.4th at 391. Further, because "common sense" dictates that law enforcement officers retain "discretion, even in the presence of seemingly mandatory legislative commands," interpreting a provision using the term "shall," to be "a true mandate [to charge and detain all applicants for admission] … would require some stronger indication" in the legislation. *Town of Castle Rock v.*

*Gonzales*, 545 U.S. 748, 761 (2005). Section 1225(b) provides no "stronger indication" that this use of "shall" creates a judicially enforceable detention mandate. *See Arizona*, 40 F.4th at 391 ("[T]he use of "shall" does not automatically create a judicially enforceable mandate, especially when criminal or civil law enforcement is at issue.").

Even apart from DHS's inherent prosecutorial discretion, the interlocking provisions of the INA dealing with applicants for admission—sections 1225(b)(1) and (b)(2)—afford DHS discretion to grant parole to applicants for admission "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Under a regulation applying this authority (which has not been challenged here), parole is generally permissible for arriving aliens and other applicants for admission subject to expedited removal "whose continued detention is not in the public interest" as determined by DHS officials, provided they do not present a national security, public safety or flight risk. 8 C.F.R. §§ 212.5(b)(5), 235.2(c), 235.3(b)(2)(iii), 235.3(b)(4)(ii). The Parole+ATD program is a use of the parole authority under section 1182(d)(5)(A). SAR0002.[6]

Applicants for admission who enter the country unlawfully between ports of entry may be be detained or paroled under sections 1225(b) and 1182(d), as already described, or may be detained or released under section 1226(a) as noncitizens

---

[6] The Supplemental Administrative Record is contained in trial Exhibits 40 and 41.

present in the United States, as discussed immediately below. *See Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116, 1118 (9th Cir. 2007).

3. <u>Noncitizens who enter without inspection</u>. Applicants for admission who do not seek entry at a port of entry or other place designated by DHS, but who are apprehended inside the United States after crossing the border illegally, that is, those who "enter without inspection," may be subject to detention or released on conditional parole under 8 U.S.C. § 1226. *Ortega-Cervantes*, 501 F.3d at 1116, 1118; *see, e.g.*, DHS Memorandum, *Re: Section 212(a)(6) of the Immigration and Nationality Act, Illegal Entrants and Immigration Violators*, 2009 WL 888664, at *5 (Mar. 3, 2009) ("Alien D arrives in the United States by crossing the border undetected 25 miles east of the port of entry at Sweet Grass, Montana. Sometime after his or her arrival, a CBP officer takes custody of Alien D and places him/her in removal proceedings. DHS determines that Alien D may be released from custody on posting a bond pursuant to section 236 of the Act (conditional parole).").

Section 1226(a) provides that, "[o]n a warrant issued by the [Secretary of DHS],[7] [a noncitizen] may be arrested and detained pending a decision on whether the alien is to be removed from the United States" or may be released on bond or "conditional parole." 8 U.S.C. § 1226(a); *see Matter of Castillo-Padilla*, 25 I. & N.

---

[7] Following the Homeland Security Act of 2002, statutory references to the Attorney General in immigration statutes are generally construed as referencing the appropriate Department of Homeland Security official. 6 U.S.C. §§ 251, 552(d); *see Thuraissigiam*, 140 S. Ct. at 1965 n.3.

Dec. 257 (BIA 2010) (distinguishing "conditional parole" under section 1226(a)(2)(B) from parole under section 1182(d)(5)), *aff'd*, *Castillo-Padilla v. U.S. Att'y Gen.*, 417 F. App'x 888 (11th Cir. 2011). Outside of noncitizens with a qualifying criminal history or those subject to terrorism-related grounds of removability covered by section 1226(c), noncitizens covered by section 1226(a) are eligible for release on bond or conditional parole at DHS's discretion. 8 U.S.C. § 1226(a)(2). Indeed, an applicant for admission, who has been apprehended by BP or ICE after entering the United States between ports of entry, and then is released, is presumed to have been released on "conditional parole" pursuant to section 1226(a). *Ortega-Cervantes*, 501 F.3d at 1116. Alternatively, DHS may consider that noncitizen under section 1225(b) and parole her under section 1182(d)(5)(A). *Id.* But in that case, because section 1226(a) and not section 1225(b) is the default provision governing noncitizens who enter unlawfully between ports of entry, DHS must "make[] its intention" to use section 1182(d)(5) parole and not section 1226(a) conditional parole "clear, for example, by expressly referencing § 1182(d)(5)(A) and by issuing an I–94 card." *Id.* The release of a noncitizen on his own recognizance accompanied by service with a "Notices to Appear" in removal proceedings, such as used by both BP and ICE, constitutes a "conditional parole" under section 1226(a). Tr. Day 2, 112:6-113:1; Tr. Day 3, 22:14-23.

4. <u>Administrative warrant requirement</u>. Unlike section 1225, section 1226 provides for enforcement action "[o]n a warrant issued by" DHS, that is, an administrative warrant. 8 U.S.C. § 1226(a); *see Abel v. United States*, 362 U.S. 217, 232 (1960) (differentiating between administrative warrant for civil immigration offenses and judicial warrants for criminal offenses). Regulations prescribe the supervisory immigration officers, including "[s]upervisory border patrol agents," authorized to issue administrative arrest warrants. 8 C.F.R. § 287.5(e)(2).

However, a warrant, as referenced in section 1226, is not required to arrest a noncitizen who is "entering or attempting to enter" the United States or is "in the United States" in violation of immigration law or regulation, if the noncitizen "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); *see Aguirre v. Immigr. & Naturalization Serv.*, 553 F.2d 501, 502 (5th Cir. 1977) (holding warrantless arrest of unlawfully present noncitizen under 8 U.S.C. § 1357(a)(2) was lawful because officer believed noncitizen might abscond before a warrant could be obtained). In such cases, the noncitizen "shall be taken without unnecessary delay" before an examining officer. 8 C.F.R. § 287.3(a), (b) (recognizing the availability of warrantless arrest for noncitizens entering or present in the country unlawfully and amenable to arrest under section 1226); *see Aguirre*, 553 F.2d at 502 (holding warrantless arrest of unlawfully present noncitizen under 8 U.S.C. § 1357(a)(2) was lawful because officer believed noncitizen might abscond

before a warrant could be obtained). With such warrantless arrests, "a determination will be made within 48 hours of the arrest" whether the noncitizen will continue in custody or be released on bond or recognizance, and "whether a notice to appear and warrant of arrest … will be issued" if the decision has been made to charge the noncitizen with removal and to continue his detention 8 C.F.R. § 287.3(d). The immigration officers authorized to use the warrantless arrest authority under 8 U.S.C. § 1357(a)(2) are identified by regulation, and include "Border patrol agents," "Deportation officers," "CBP officers," "Immigration enforcement officers," and their respective supervisors. 8 C.F.R. § 287.5(c)(1).[8]

## PROPOSED FINDINGS OF FACT[9,10]

1.  No administration since the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") has been appropriated the

---

[8] These categories of line immigration officers are also authorized to exercise the authority specified in 8 U.S.C. § 1357(a) to serve administrative arrest warrants for immigration violations. 8 C.F.R. § 287.5(e)(3).

[9] It is not appropriate for the Court to make findings of fact on the Parole+ATD claims. "When a party challenges agency action under the APA, the district court does not perform its normal role but instead sits as an appellate tribunal." *United States v. Schwarzbaum*, 24 F.4th 1355, 1364 (11th Cir. 2022) (internal quotation omitted). Under APA review, "the material facts are those facts present in the agency's administrative record" and the Court's function "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Sea Turtle Conservancy v. Locke*, No. 1:09-CV-259-SPM-GRJ, 2011 WL 13227945, at *2 (N.D. Fla. July 5, 2011). The facts as found by the agency in the administrative record are delineated *infra*.

[10] To the extent the Court determines that a statement listed as a Finding of Fact is more appropriately viewed as a Conclusion of Law, or vice versa, the Court should treat that statement as whichever it deems most appropriate.

resources that would be necessary to apprehend or detain every noncitizen[11] apprehended at or near the border. Tr. Day 3, 38:18-39:14.

2.   Because there is not enough funding to detain every applicant for admission in removal proceedings, administrations have to make "tough decisions" about whom to detain and whom to release. Tr. Day 3, 41:2-7; Ex. C[12] at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

3.   Releasing low-risk noncitizens frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; Ex. C at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

4.   Multiple presidential administrations have construed section 1182(d)(5) as permitting parole of noncitizens detained pursuant to 8 C.F.R. § 235.3(b) or (c) who "present neither a security risk or a risk of absconding" and "whose continued detention is not in the public interest." 8 C.F.R. § 212.5(b)(5).

5.   In 2005, ICE issued guidance indicating that noncitizens subject to mandatory detention or a high priority for detention should be released at the time of processing only "when national bed space population is at capacity." Memorandum from Victor X. Cerda, Acting Dir., Det. and Removal Operations, ICE, *ICE Transportation, Detention and Processing*

---

[11] In this memorandum, Defendants use the term "noncitizens" in lieu of the statutory term "aliens," except where quoting statutes or decisions using the latter term.
[12] All references to exhibits are to trial exhibits, except where specifically noted.

*Requirements* (Jan. 11, 2005), available at https://www.ice.gov/doclib/foia /dro_policy_memos/icetransportationdetentionandprocessingrequirements.p df, at 2.[13]

6. In 1992, the former Immigration and Naturalization Service ("INS"), expanding upon a pilot project conducted in May 1990 to October 1991, issued guidelines on releasing, through parole, asylum seekers from INS detention. In the memorandum, INS explained that it "has limited detention space" and that by adopting the parole project it would "be able to detain those persons most likely to abscond or to pose a threat to public safety rather than to base the detention decision solely or primarily on the availability of detention space." *See* Memorandum from Gene McNary, INS Comm'r, *Parole Project for Asylum Seekers at Ports of Entry and INS Detention* (Apr. 20, 1992), 9 Immigration Law Service 2d PSD Selected DHS Document 4110, at 1.

7. In February 2017, then-Secretary John Kelly issued a policy memorandum stating that "[a]s the Department works to expand detention capabilities,

---

[13] A court may take judicial notice, "whether requested or not" of a fact "not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b), 201(c). And a court may do so at any stage of proceedings. *Id*. 201(f). Defendants submit that the Court can take judicial notice of existence of the fact that this guidance, and those noted in the following paragraphs, were issued. To be clear, Defendants are not asking the Court to assume the truth of any facts set forth therein— just the fact that guidance was issued.

detention of all [individuals described in section 1225] may not be immediately possible, and detention resources should be prioritized based upon potential danger and risk of flight if an individual [noncitizen] is not detained, and parole determinations will be made in accordance with current regulations and guidance. *See* 8 C.F.R. §§ 212.5, 235.3." Memorandum from John Kelly, Sec'y of Homeland Security, *Implementing the President's Border Security and Immigration Enforcement Improvement Policies* (Feb. 20, 2017), available at https://www.dhs.gov/sites/default/files /publications/17_0220_S1_Implementing-the-Presidents-Border-Security-Immigration-Enforcement-Improvement-Policies.pdf, at 3.

8.    In 2017, ICE similarly issued policy guidance stating that "[p]arole or other release, with all available safeguards, may also be warranted where detention capacity limits the agency's ability to detain the [noncitizen] consistent with legal requirements, including court orders and settlement agreements." Memorandum from Matthew T. Albence, Exec. Assoc. Dir., ICE, *Implementing the President's Border Security and Interior Immigration Enforcement Policies* (Feb. 21, 2017), available at https://www.ice.gov/doclib/foia/eoRecords/eoRecordsEnforcement_01-20-2017_03-14-2017.pdf, at 3.

9.   In July 2019, following legal decisions addressing whether certain noncitizens were entitled to bond hearings before an immigration judge, *see Padilla v. ICE*, 387 F. Supp. 3d 1219 (W.D. Wash. 2019); *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019), ICE issued interim guidance to its workforce specifically noting that it lacked the detention capacity to detain all noncitizens to whom the immigration law detention provisions could be applied, that the agency accordingly needed to appropriately prioritize the use of this limited detention capacity, and that the public interest favored maintaining custody of noncitizens posing the greater potential danger to public safety or risk of flight. *See* ICE, *Interim Guidance for Implementation of* Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019): Parole of Aliens Who Entered Without Inspection, Were Subject to Expedited Removal, and Were Found to Have a Credible Fear of Persecution or Torture* (July 2019).

10.  In 1996, when Congress amended the parole statute and replaced the phrases "emergent reasons" and "reasons deemed strictly in the public interest" with "urgent humanitarian reasons" and "significant public benefit," it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H. R. 2202, "Immigration in the National Interest Act of 1995," August 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih (*e.g.*,

"the alien is needed in the United States in order to donate an organ or other tissue for transplant into a close family member," or "only if the alien has assisted the United States Government in a matter, such as a law enforcement activity, and either the alien's presence in the United States is required by the Government or the alien's life would be threatened if the alien were not permitted to come to the United States).

Standing

11.  The State of Florida does not track noncitizen related expenditures in a manner that allows it to identify expenditures on specific noncitizens released under the challenged policies. Joint Pretrial Stipulation, ECF 122, at ¶ 27.

12.  Florida's Agency for Health Care Administration ("AHCA") does not determine the eligibility for the programs it administers; eligibility is determined by Florida's Department of Children and Families ("DCF"). Bottcher Dep.,[14] 23:9-24:25, 44:12-46:11.

13.  AHCA does not keep the information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Bottcher Dep., 25:1-16, 36:5-38:1, 41:4-10.

---

[14] All citations to depositions refer to the deposition designation excerpts the Parties provided to the Court during trial.

14. Florida's Department of Economic Opportunity ("DEO") does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Heckman Dep., 32:11-33:13, 135:4-17, 139:15-140:5.

15. Florida's Department of Corrections ("DOC") does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 3, 77:12-21, 78:23-79:13, 81:10-82:1.

16. DCF does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 4, 21:13-25, 32:17-33:5, 34:16-20, 35:1-10, 36:8-11, 37:21-38:12, 42:12-18, 43:10-12, 45:17-22, 46:16-47:1, 50:23-51:3.

17. DCF's Medicaid, Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF") services have a five-year waiting period before the majority of noncitizens released on parole are eligible to use those services, and thus many of the noncitizens released under

22

the challenged policies would not be eligible to use those services until 2026 at the earliest. Tr. Day 4, 14:9-15:3, 25:15-20, 33:25-34:15, 35:24-36:2.

18. Paroled Cubans, Haitians, Ukrainians, and Afghans are the only populations of paroled noncitizens immediately eligible for the majority of services overseen by DCF. Tr. Day 4, 14:9:22, 16:23-17:2, 25:15-25.

19. However, DCF does not track the place of entry, mode of entry, or date of entry for Cubans, Haitians, Ukrainians, and Afghans, and therefore cannot say if they were released at the Southwest border under the challenged policies. Tr. Day 4, 18:13-19, 32:8-10, 48:21-49:6, 18:21-25, 19:1-4, 48:21-49:6.

20. While DCF does track, and therefore does have data to support the number of Cuban and Haitian noncitizens who entered the country between October 2021 and September 31, 2022, and who have used services provided by the refugee assistance program in Florida, Tr. Day 4, 53:13-20, those refugee services were fully funded by the federal government, Tr. Day 4, 37:11-13. And DCF still cannot say where these Cuban and Haitian noncitizens entered the country, or whether any of them received services funded by the State of Florida. Tr. Day 4, 53:13-20, 54:10-55:11.

21. All refugee programs in the State of Florida are 100 percent federally funded. Tr. Day 4, 30:17-31:20, 37:6-13.

22. The Department of Education ("DOE") does not track the citizenship of its students, where they entered the country, how they entered the country, the date they entered the country, or the mechanism by which they were released from federal immigration custody. Tr. Day 1, 31:8-18.

23. DOE does not collect information necessary to determine whether noncitizens using its services were released under the challenged policies, and thus cannot determine whether any funds were spent on noncitizens released under the challenged policies. Tr. Day 1, 31:8-18, 47:17-48:7, 48:13-15, 49:1-4, 51:23-52:1, 53:2-7.

24. Plaintiff defines "immigrant" children as those "who are not born in the United States and were not educated in the United States in the last three years." Tr. Day 1, 12:22-24.

25. DOE can provide the total number of "immigrant" students (the term it uses, and the population for which it has data) enrolled in public schools but is unable to identify whether any of these immigrant students are applicants for admission released at the Southwest border since January 2021. Tr. Day 1, 46:21-47:8. DOE therefore cannot determine how many noncitizens enrolled in public schools were released under the challenged policies, or if it has incurred expenditures for children released under the challenged policies.

26. DOE has not shown that students requiring English as a Second Language services are noncitizens, let alone that any were released under the challenged policies; citizen students may also not speak English. Tr. Day 1, 49:16-24.

27. Plaintiff has provided English as a Second Language services for decades. Tr. Day 1, 50:19-21.

28. Plaintiff receives federal funding for English Speakers of Other Language services. Tr. Day 1, 49:25-50:11.

29. DOE's total yearly cost per student was approximately $8,000 in the 2020-2021 school year, $7,800 in the 2021-2022 school year, and $8,200 in the 2022-2023 school year. Tr. Day 1, 28:10-15, 30:21-31:1.

30. DOE was able to spend more money per student in the 2022-2023 school year than the prior year because the State's economy was "thriving" during the Pandemic, as a result of remaining open. Tr. Day 1, 28:10-15, 30:21-31:1, 53:22-54:6.

31. The State of Florida was "open" during the pandemic, "attracting a lot of people from places that weren't open." Tr. Day 1, 53:22-54:6.

32. Plaintiff has not presented evidence that the increase in "immigrant" children is related to the challenged policies or other factors, including Florida's COVID policies. Tr. Day 1, 53:22-54:6.

33. Plaintiff cannot say whether the costs Plaintiff allegedly spent on noncitizens released under the challenged policies is greater or lesser than any revenue the State has derived from the same population. Tr. Day 4, 49:7-50:21.

Alleged Non-Detention Policy

34. Plaintiff has not identified any direct evidence that Defendants have a non-detention policy.

35. In his current position as the Executive Director for Admissibility and Passenger Programs at the Office of Field Operations ("OFO")[15], Matthew Davies would know about any policy instituted regarding the processing of migrants at ports of entry along the Southwest land border. Tr. Day 2, 73:14-17.

36. Executive Director Davies is not aware of any policy implemented since January 2021 suggesting a preference for any particular processing pathway over another. Tr. Day 2, 73:18-20.

37. Executive Director Davies is not aware of any policy suggesting a preference for parole over detention. Tr. Day 2, 73:21-23.

38. Executive Director Davies is not aware of any policy communicating an abdication of case-by-case review for parole. Tr. Day 2, 73:24-74:1.

---

[15] The Office of Field Operations ("OFO") is the operational component of CBP that enforces immigration law at ports of entry.

26

39. Executive Director Davies is not aware of any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 74:2-4.

40. In his current position as Chief of Border Patrol and in his prior position as Deputy Chief of Border Patrol, Raul Ortiz would know about any policy instituted regarding the processing of noncitizens at the Southwest land border. Tr. Day 2, 139:12-16.

41. Chief Ortiz is not aware of any policy implemented since January of 2021 that suggests a preference for parole over detention. Tr. Day 2, 129:17-19.

42. Chief Ortiz is not aware of any policy communicating an abdication of case-by-case review for parole. Tr. Day 2, 139:20-23.

43. Chief Ortiz is not aware of any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 139:24-140:2.

44. No one from the Biden Administration or DHS has instructed Chief Ortiz that the BP should not detain noncitizens. Tr. Day 2, 140:3-6.

45. In his capacity as ICE's Deputy Assistant Director for Field Operations East, Robert Guadian would know about any new ICE detention policy. Tr. Day 3, 31:18-32:2.

46. Deputy Assistant Director Guadian is not aware of any new ICE policy since January 2021 dealing with the release of noncitizens transferred from CBP. Tr. Day 3, 32:3-6.

47. Deputy Assistant Director Guadian is not aware of any new ICE policy since January 2021 directing ICE Enforcement and Removal Operations ("ERO") to release noncitizens transferred from CBP to ICE rather than detaining them. Tr. Day 3, 63:6-12.

48. The fact that there are statistics showing an increase in the use of parole and conditional parole under the Biden administration, as compared to the end of the Trump administration, is not evidence of a non-detention policy.

49. In 2019, there was a surge of families crossing the Rio Grande Valley. Tr. Day 2, 130:1-8.

50. In 2014, there was a surge of unaccompanied children. Tr. Day 2, 130:13-21.

51. Over the past three decades, there have been numerous periodic surges in migration. Tr. Day 2, 131:7-15.

52. At the end of the previous administration, the country was at the height of an ongoing global pandemic, and there were travel restrictions in place at that time, which severely depressed the number of noncitizens who were coming to the United States both lawfully and unlawfully. Tr. Day 2, 93:10-17; Ex. 1 at 4; Ex. 2 at 3-4.

53. In April 2020, there was a precipitous drop in illegal migration to the United States over the Southwest border, which slowly increased thereafter, month-by-month. Ex. 98, pg. 3; Ex. 1, at 4; Ex. 2 at 3.

54. After President Biden took office, CBP saw an increase in border crossings by Cubans, Nicaraguans, and Venezuelans. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 198:14-199:7.

55. Repatriation of Cubans, Nicaraguans, and Venezuelans is often not possible. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 94:10-13, 109:20-25.

56. If repatriation of a noncitizen is not possible, the likelihood that a noncitizen will be released increases because they cannot be detained indefinitely. Barker July 13, 2022 Dep., 94:4-95:5.

57. In March 2020, in response to the COVID-19 pandemic, the U.S. Department of Health and Human Services ("HHS") and Centers for Disease Control and Prevention ("CDC") issued an interim final rule to establish a procedure for CDC to temporarily suspend the introduction of certain noncitizens into the United States under Section 265. 85 Fed. Reg. 16,559 (Mar. 24, 2020). CDC invoked that procedure to issue an order suspending the introduction of certain noncitizens. 85 Fed. Reg. 17,060 (Mar. 26, 2020). HHS and CDC later finalized the rule and issued additional suspension orders. *See* 85 Fed. Reg. 56,424 (Sept. 11, 2020) (finalizing 42 C.F.R. 71.40); 85 Fed. Reg. 65,806 (Oct. 16, 2020). The currently operative order was issued in August 2021. 86 Fed. Reg. 42,828 (Aug. 5, 2021) ("Title 42").

58. The Title 42 orders apply to certain noncitizens arriving from Canada or Mexico who would otherwise be held in a "congregate setting" at a port of entry or U.S. BP station at or near the U.S. land and adjacent coastal borders, thereby risking the spread of COVID-19. 86 Fed. Reg. at 42,841. Under the orders, "covered noncitizens apprehended at or near U.S. borders" are "expelled" to Mexico, Canada, or their country of origin. *Id.* at 42,836.

59. The government's ability to expel noncitizens under Title 42 is constrained by "a range of factors, including, most notably, restrictions imposed by foreign governments." 86 Fed. Reg. at 42,836. Noncitizens cannot be expelled to Mexico or to their home countries unless those countries consent, and different countries have withheld or limited their consent in various ways. *Id.* Those realities, and the case-by-case exceptions in the Title 42 orders themselves, mean that many noncitizens have been processed under Title 8 even while the Title 42 orders have been in effect. *See* U.S. CBP, Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2022, www.cbp.gov/newsroom/stats/cbp-enforcement-statistics/title-8-and-title-42- statistics-fy22.

60. While the number of applicants for admission released by BP increased as total apprehensions increased, so too did the use of expedited removal and detention. Ex. 2 at 3-4.

61. The fact that President Biden requested less funding for custody operations than President Trump is not evidence of a non-detention policy.

62. In his Fiscal Year 2021 budget request, President Trump requested $4,137,380,000 for custody operations. Ex. NN, at 10.

63. Congress appropriated $2,836,128,000 for custody operations for FY2021, 32% less than what President Trump requested. Ex. OO at 5.

64. In his FY2022 budget request, President Biden requested $2,775,100,000 for custody operations, 2.5% less than what Congress funded in 2021. Ex. OO, at 5.

65. Congress appropriated $2,874,481,000 for custody operations in FY2022, 1% more than President Biden requested and more than it appropriated for FY2021 during the Trump Administration. https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt2-PgS8553-2.pdf, pg. 8608.

66. It currently costs $125 a day to detain a single adult. Tr. Day 3, 37:7-10.

67. It previously cost $235 a day to detain each member of a family unit. Tr. Day 3, 37:11-14.

68. Alternatives to Detention ("ATD") is a flight mitigation tool used by ICE to promote accountability for noncitizens in removal proceedings. Tr. Day 3, 43:44:3.

69. There are three primary types of ATD: (i) ankle monitors, which can track in real time the location of noncitizens released on ATD; (ii) a smartphone app that uses facial identification software and allows deportation officers to, *inter alia*, verify noncitizen's identity at required remote check-ins, and (iii) voice recognition system that allows deportation officers to verify noncitizens' identities when they call in to check in via a landline. Tr. Day 3, 43:18-44:3.

70. It currently costs less than $8 day to enroll a noncitizen in ATD. Tr. Day 3, 46:10-12. Therefore, DHS can supervise and monitor 15 times as many noncitizens via ATD than traditional detention dollar for dollar.

71. President Biden requested more funding for alternatives to detention than President Trump. *Compare* Ex. NN at 10 with Ex. OO at 5.

72. Congress has consistently appropriated more funding for alternatives to detention year-after-year since 2018. Ex. LL at ICE-O&S 92; Ex. MM at 10; Ex. NN at 10; Ex. OO at 5; https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228.

73. Congressional appropriations for alternatives to detention more than doubled from 2018 to 2022. Ex. LL at ICE-O&S 92; https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf,        at 1228.

74. In every year from 2018 through 2022, Congress has appropriated more funding for alternatives to detention than the President requested. Ex. LL at ICE-O&S 92; Ex. MM at 10; Ex. NN at 10; Ex. OO at 5; https://www.govinfo.gov/content/pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228.

75. DHS statistics for FY2022 through April 2022, indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

76. Approximately 4.7 million noncitizens are currently in removal proceedings. Tr. Day 3, 38:14-17.

77. For the last year for which there is public data available, 2018, there were about 11.4 million removable noncitizens residing in the United States.[16]

78. Approximately 50% of those 4.7 million noncitizens may have been apprehended at the Southwest border. Tr. Day 3, 38:18-21.

79. To detain just the noncitizen adults apprehended at the Southwest border who are currently in removal proceedings, it would cost at least, roughly estimated, $45,625,000,000 a year, Tr. Day 3, 38:22-39:9—which is more than five times

---

[16]https://www.dhs.gov/sites/default/files/publications/immigration-statistics/Pop_Estimate/UnauthImmigrant/unauthorized_immigrant_population_estimates_2015_-_2018.pdf.

ICE's entire operating budget for FY2022. Ex. DD at 136 STAT 317. ICE's entire operating budget covers more than just detention and removal of noncitizens. It also includes, among other programs, Homeland Security Investigations. *See* Ex. DD.

80. In 2020, ICE had funding for 45,000 detention beds. Tr. Day 3, 38:3-13.

81. For 2021, President Trump requested funding sufficient to fund 60,000 beds. Ex. 13 at 3.

82. Congress appropriated only sufficient funding for ICE to fund 31,500 beds in FY2021. Tr. Day 3, 37:24-25.

83. In the 2022 budget, President Biden requested funding for 32,500 beds. Ex. 25, at 3.

84. Congress appropriated enough funding for 34,000 beds in 2022, which was more than Congress appropriated for FY2021. Tr. Day 3, 37:18-23.

85. Administrations prior to that of President Trump requested funding amounts for detention comparable to the current Administration. *See, e.g.*, DHS Budget in Brief for FY 2014, at 130 (describing presidential funding request for 31,800 beds), https://www.dhs.gov/sites/default/files/publications/FY%202014 %20BIB%20-%20FINAL%20-508%20Formatted%20%284%29.pdf.[17]

---

[17] Publicly available DHS budget documents from 2003 to present can be accessed at https://www.dhs.gov/dhs-budget.

86. The fact that ICE repurposed two family detention centers to single adult housing and closed a third is not evidence of a non-detention policy.

87. ICE previously operated three family residential centers ("FRCs"), which DHS used to house children with their parents. The FRCs were known as Berks County FRC, Karnes County FRC, and Dilley South Texas Family FRC. Tr. Day 3, 49:2-6.

88. Dilley and Karnes are located in Texas, and Berks was located in Pennsylvania. Tr. Day 3, 49:1-6.

89. Tae Johnson, the then-Acting ICE Director, made the decision to close the Berks FRC and repurpose the Karnes and Dilley FRCs to house single adults. Tr. Day 3, 49:25-50:3.

90. Mr. Johnson's decision to close and repurpose the three FRCs was a business decision. Tr. Day 3, 50:20-22; Guadian Dep., 145:4-7, 145:23-146:1.

91. Pursuant to a 1997 consent decree in *Reno v. Flores*, 507 U.S. 292, 296 (1993)[18], FRCs must provide, among other things, schooling with bilingual instructors, as well as specialized medical care including access to pediatricians. Tr. Day 3, 47:5-48:7.

92. When FRCs are used, there are limitations on mixed gender family detention—such that, for example, a dual head-of-household mother and

---

[18] *See also Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016).

father with a six-year-old daughter cannot be housed in the same dorm as a father with a thirteen-year-old son. Price Dep., 145:5-146:1; Ex. OO at 123 ("The true capacity of the FRCs is much lower than the total number of beds due to restrictions on the types of family compositions that can room together.").

93. Dilley and Karnes were repurposed to house single adults. Tr. Day 3, 49:15-21; Price Dep., 62:6-9.

94. Dilley and Karnes could be reconfigured back to FRCs. Price Dep. 52:15-21; Tr. Day 3, 51:9-13.

95. Converting Dilley and Karnes from FRCs to detention for single adults allowed ICE to increase the number of people it could hold in custody. Price Dep., 57:14-22; Tr. Day 3, 37:18-23.

96. Pursuant to an order issued in the *Flores* litigation in 2015, families generally can be detained no more than twenty days. Tr. Day 3, 48:8-16; Price Dep., 146:7-19; Guadian Dep., 147:5-7; *See Flores v. Barr*, 2020 WL 3488040, *3 (C.D. Cal. June 26, 2020).

97. Therefore, ICE is often unable to detain families long enough to see their immigration proceedings to completion. Tr. Day 3, 48:20-21; 50:13-51:8; 53:22-25; Price Dep., 119:11-13.

98. If one adult member of a family poses a national security or public safety risk, the family can be separated so the adult who poses the risk may be detained and the rest of the family granted parole. Tr. Day 2, 121:7-12; Tr. Day 3, 53:7-15.

99. Neither the temporary Notice to Report ("NTR") program nor the Parole+ATD program are evidence of a non-detention policy.

100. In March 2021, CBP, utilizing its prosecutorial discretion authority, began a practice of issuing NTRs, under which it released certain noncitizens with orders to report to the appropriate ICE field office to receive their NTAs. Tr. Day 2, 61:3-16.

101. Due to the strain of an influx of migrants on processing resources, CBP released noncitizens with NTRs to report to ICE within a specified timeframe to receive their charging documents. SAR0162.

102. CBP processing facilities are not structured or equipped for detention longer than 72 hours; extending detention of noncitizens poses challenges to CBP's ability to provide safe holding conditions and appropriate medical care, and to treat and control the spread of contagious diseases. SAR0002.

103. Without other intervention, high rates of border encounters may lead to overcrowding in CBP facilities which poses health and safety risks to both individuals in custody and CBP employees working there. SAR0002.

104. NTRs provided a significantly faster mechanism for processing noncitizens apprehended at the border as compared to the time-consuming process required to issue NTAs prior to release. Preparing NTA requires labor intensive information gathering, interagency coordination and scheduling, and the creation of an A-file (the comprehensive file that document all of a noncitizen's interactions with DHS and immigration courts throughout their lives). These steps are necessary for the noncitizen to be provided a legally sufficient NTA that includes the charge of removability and the date and location of their immigration court hearing. SAR0162.

105. The use of NTRs was officially and fully rescinded on November 2, 2021 and replaced with Parole+ATD. Ex. 40 at 96.

106. The Parole+ATD program is a BP policy, designed to decompress Border Patrol Stations operating at over one-hundred percent capacity. Tr. Day 2, 60:12-25, 113:17-114:6; Ortiz Dep., 117:15-118:3; Barker July 13, 2022 Dep., 150:22-151:24; Barker Aug. 25, 2022 Dep., 12:14-13:7, 15:14-16:25, 28:16-29:23.

107. Parole+ATD maintained the benefits of the NTR practice—reducing processing time by comparison to full NTA issuance and thereby decompressing overcrowding in CBP facilities—while addressing the limitation of the NTR practice in creating accountability that noncitizens

check in with ICE and complete their removal proceedings, by enrolling parolees in ICE's ATD program. SAR0002, SAR0162-0163.

108. The ICE ATD program employs various types of monitoring technology and supervision to increase noncitizens' compliance with release conditions, court appearances, and removal orders. SAR0002.

109. DHS statistics for the most recent period available (FY2022 through April 2022) indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

110. The spread of COVID-19 in CBP facilities led to the hospitalizations and deaths of many noncitizens and employees. SAR0101, 0114, 0116.

111. Regardless of whether from COVID-19 or other health conditions, continuing high border encounter rates mean that facility over-crowding and associated health and safety challenges are expected to continue. SAR0002.

112. Decompression of facilities and reduction of processing time provides the further significant public benefit of ensuring that BP has sufficient resources focused on border security operations and other critical aspects of its mission through maximizing deployment of agents (who would otherwise be tasked with processing) to the field. SAR0163.

113. To address the case-processing backlog, the Parole+ATD program now requires that CBP and ICE find ways to streamline processing and that each will be responsible for 50% of the subsequent processing of the parolees' NTAs to place them into removal proceedings. SAR0004.

114. ICE has also undertaken an initiative to further relieve backlogs at its regional offices and expedite the service of NTAs on the NTR and Parole+ATD population by serving thousands of NTAs via mail. SAR0165-69.

115. In addition to section 1225, DHS also releases noncitizens apprehended after crossing the border on conditional parole under section 1226(a) via BP's release on Notice to Appear/Own Recognizance ("NTA/OR") or ICE's release of noncitizens transferred from CBP on Order of Release on Recognizance ("OREC"). Tr. Day 2 112:6-113:1; Tr. Day 3 22:14-23.

116. Orders of release under section 1226(a) constitute hundreds of thousands of the releases of border arrivals falling under the alleged non-detention policy. Ex. R at 3; Ex. S at 2-3; Tr. Day 2 59:11-60:11.

117. BP routinely arrests noncitizens unlawfully present inside the United States in circumstances where agents have no advance notice of the noncitizens' unlawful entry and thus no opportunity to obtain a warrant in advance of arresting them in the field. Tr. Day 2 124:17-125:2.

40

118. To ensure a warrant is already available in case a noncitizen released under section 1226(a) fails to appear for their subsequent removal proceedings, BP practice is to issue an I-200 Warrant of Arrest to the noncitizens processed under NTA/OR. Tr. Day 2 124:10-125:14.

119. DHS is detaining multiple tens of thousands of applicants for admission subject to section 1225(b) each month. Ex. R at 1-3; Ex. S at 1, 3.

120. OFO, CBP, and ICE officers and agents are subject to policies and guidance directing them how to apply the section 1182(d)(5)(A) standard in their parole decisions. Tr. Day 2, 63:25-64:5, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-28:1; Ex. B at § 8.2; Ex. C at ¶ 5.3; Ex. 40 at 5.

121. Every administration operating under section 1225(b) has had to make "tough decisions" about how to use limited detention space and thus has recognized that the use of parole frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; Ex. C at 2-3; Ex. I at 3-5; Ex. K at 10 n.8.

122. In this case, were the Court to enjoin the use of the Parole+ATD program, there would be disastrous consequences for the border. The number of people in BP stations would immediately increase, Tr. Day 3, 56:6-20, and because the Parole+ATD program is being used only when BP custody is already at full capacity (of 15,000 noncitizens), SAR0003, border patrol stations would

become substantially over-crowded. Ex 3, at 3 (showing that in September 2022, 95,191 noncitizens were released on Parole+ATD). If this happens, agents would need to be pulled from the field to process these noncitizens, which, in turn, would open the border for cartels and criminal organizations to exploit. Tr. Day 2, 115:16-116:24. Such overcrowding would also pose a threat to agents and migrants who would be forced to be in close contact with a border operation and medical system that is strained. Tr. Day 2, 125:18-126:11.

## **PROPOSED CONCLUSIONS OF LAW**

<u>Standing</u>

1.  Plaintiff has the burden of establishing Article III standing. *Lujan*, 504 U.S. at 561. Standing requires showing three elements: an (1) "injury in fact…which is concrete and particularized and actual or imminent, not conjectural or hypothetical," that is (2) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party…," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal citations omitted).

2.  Plaintiff has failed to meet its burden to establish standing because it has not shown a direct injury it suffered because of the challenged policies. *Florida v. Mellon*, 273 U.S. 12, 18 (1927).

42

3. Indirect financial harm to the State's economy is insufficient to establish standing. *Id.*; *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues").

4. A State "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014), *aff'd*, 797 F.3d 11 (D.C. Cir. 2015).

5. Plaintiff "lacks a judicially cognizable interest in the prosecution or non-prosecution of another," *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and therefore cannot allege harm based on the government declining to detain or initiate removal proceedings against individuals. *See Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws").

6. Plaintiff is not entitled to special solicitude in assessing its standing in this context. Special solicitude is available to "a litigant to whom Congress has accorded a procedural right to protect his concrete interests." Such a litigant "can assert that right without meeting all the normal standards for redressability and immediacy." *Massachusetts v. EPA*, 549 U.S. 497, 517-518

(2007). Plaintiff has not identified any procedural right Congress provided States to sue to enforce the provisions of 8 U.S.C. §§ 1225 and 1226. Thus, Plaintiff is not entitled to a relaxed burden to establish its standing. *See Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 713 (2021) (a "claim of procedural injury does not relieve Plaintiff . . . of [its] burden—even if relaxed—to demonstrate causation and redressability."); *Arizona*, 40 F.4th at 385 ("[*Massachusetts*] does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability.").

7.    Plausible assumptions are not sufficient to establish standing at the merits stage. *Lujan*, 504 U.S. at 561. A state must put forth "concrete evidence" that state "costs had increased or will increase as a result" of the particular challenged action, otherwise traceability is "purely speculative." *Id.*; *see also Texas v. California*, 141 S. Ct. 2104, 2119 (2021) (holding that "theory of standing" that "rests on a highly attenuated chain of possibilities" is insufficient—"would require far stronger evidence than the States have offered here to support their counterintuitive theory of standing").

8.    Plaintiff has failed to meet its burden to prove a concrete injury in fact.

9.  The evidence from AHCA does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

10. The evidence from DEO does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

11. The evidence from DOC does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

12. The evidence from DCF does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

13. The evidence from DOE does not show a direct, concrete injury traceable to the challenged policies, and thus is not sufficient to find standing. *See Mellon*, 273 U.S. at 18; *Lujan*, 504 U.S. at 562; *TransUnion LLC*, 141 S. Ct. at 2203.

14. Showing an increase in "immigrant" children—those not born in the United States or educated in the United States for the past three years (Tr. Day 1, 12:22-24)—is not specific enough to show traceability to the challenged policies.

15. Plaintiff has not proven that the increase in "immigrant" children is a result of the challenged policies, and not a result of "unfettered choices made by independent actors" deciding to move to Florida during the pandemic. *Lujan*, 504 U.S. at 562. There is no traceability if the "record reveals only speculation about the complex decisions made by non-citizens…." *Arpaio*, 797 F.3d at 20 (D.C. Cir. 2015). The Supreme Court has "rejected theories that rest on speculation about the decisions of independent actors," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), and standing based on speculative future unlawful conduct, *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

16. Plaintiff has failed to show that its alleged injury is redressable by a favorable decision.

17. None of the Florida State agencies track or retrain data sufficient to trace their alleged injuries to the challenged policies. Thus, Plaintiff cannot say whether a change in policy would impact its alleged injuries. If the Court were to assume that a policy change would address Plaintiff's injuries, that would be speculative and not sufficient to show redressability. *See Arpaio*, 797 F.3d at 22; *O'Shea v. Littleton*, 414 U.S. 488, 497 (1974); *Clapper*, 568 U.S. at 414; *Lyons*, 461 U.S. at 105.

APA Reviewability

18. The practices Plaintiff challenges, the alleged non-detention policy and Parole+ATD, both involve the "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," and are therefore committed to agency discretion by law. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

19. Budgetary practices, and resource allocation and prioritization considerations, are core discretionary decisions. *See Heckler*, 470 U.S. at 831.

20. Defendants' decisions about how to process applicants for admission, including both whether to initiate a removal proceeding against them in the first place, and whether to detain them pending any such proceeding or removal, are inherently discretionary decisions committed to the agency's discretion. *See Heckler*, 470 U.S. at 831.

21. Such charging and detention decisions require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another, whether the agency is likely to succeed" in actually obtaining this noncitizen's removal if it commits detention resources to ensuring their presence in removal proceedings, and whether detention or release for this person "best fits the agency's overall policies," considerations which are committed to agency discretion. *See Heckler*, 470 U.S. at 831.

22. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean v. Nelson*, 727 F.2d 957, 966 & n.8 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (*Jean II*). Further underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See*, *e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty v. Bulger*, 204 F. Supp. 2d 1366, 1382 (S.D. Fla. 2002), *aff'd*, 321 F.3d 1336 (11th Cir. 2003).

23. "Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable." *Chiles*, 69 F.3d at 1096.

24. Plaintiff additionally cannot obtain APA review because it does not challenge a "final agency action," 5 U.S.C. § 704, either with regard to the alleged non-detention policy or Parole+ATD.

25. Agency action is final if it determines legal "rights or obligations." *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

26. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action"

48

is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

27. There is no identifiable, concrete agency action underlying Plaintiff's alleged non-detention policy claims at all, let alone a final one. Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)).

28. Plaintiff cannot challenge an "amalgam of release decisions" or "some generalized and amorphous conception of Defendants' detention and parole policies" under the APA because these do not provide the requisite "agency action." *Brnovich v. Biden*, No. CV-23-01568-PHX-MTL, 2022 WL 4448322 at *10, 12 (D. Ariz. Sept. 23, 2022).

29. The Parole+ATD program does not require CBP or ICE officers to take any specific action; it neither imposes an obligation on them to detain or release in any particular case, nor does it grant a noncitizen the right to release in any particular case. *See Bennett*, 520 U.S. at 178.

30. Because agency officials are "free to exercise discretion" to grant or deny parole in particular cases, or apply different types of ATD, the July 18, 2022 memorandum does not constitute final agency action. *See Jean v. Nelson*, 711

F.2d 1455, 1481 (11th Cir. 1983), *aff'd*, 472 U.S. 846 (1985) (Jean I); *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*, 2021 WL 5910702 (11th Cir. Dec. 14, 2021).

31. Additionally, Plaintiff cannot obtain APA review because statutes in the INA, specifically 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e), preclude the Court's review of essential parts of the alleged non-detention policy and Parole+ATD, 5 U.S.C. § 701(a), and Plaintiff does not fall within the zone of interests of the statutes it is suing to enforce.

32. Plaintiff's challenges to Defendants' decisions to release noncitizens on parole are barred by section 1252(a)(2)(B)(ii)—which bars review of "decision or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security"— because the INA specifically provides that the decision whether to grant parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A); *see Jeanty*, 204 F. Supp. 2d at 1382.

33. There is also no judicial review of release decisions under section 1226. DHS's "discretionary judgment regarding the application of [section 1226] shall not be subject to review. No court may set aside any action or decision … under this section regarding the detention or release of any alien or the

grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e); *see United States v. Velasquez-Velasquez*, 524 F.3d 1248, 1252 & n.3 (11th Cir. 2008).

34.   Because the Court lacks jurisdiction to review any individual determination by DHS that release under either section 1182(d) or 1226 is warranted, it follows that the Court also lacks jurisdiction to review any challenge to an amalgamation of these individual decisions, or policy or procedure guiding these decisions. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (both DHS's "discretionary judgment regarding the application of parole" and "the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are not subject to review).

35.   Plaintiff also cannot obtain APA review because Plaintiff does not fall within the zone of interests of sections 1182(d)(5), 1226(a), or 1225(b).

36.   The zone-of-interests inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which the State of Florida is not, for either the alleged non-detention policy or Parole+ATD, whose objects would be the noncitizens detained or released—the plaintiff has no right of review as its

"interests are so marginally related to or inconsistent with the purposes implicit in the statute[.]" *Clarke*, 479 U.S. at 399.

37.   Nothing in the text, structure, or purpose of sections 1182(d)(5), 1225(b), or 1226(a) suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration enforcement policies to contest those policies. *See Fed'n for Am. Immigration Reform (FAIR), Inc. v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996).

38.   The statutory scheme indicates third parties like States, who are at most indirectly affected by discretionary parole decisions, do not fall within the zone of interest of the INA's detention and parole provisions. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (e), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g); *United States v. Fausto*, 484 U.S. 439, 448 (1988); *see also Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993) (concluding that plaintiffs who are not specific individuals who can pursue their claims through immigration proceedings lack a cause of action under the INA).

Parole+ATD

39.   The Court's consideration of Parole+ATD is confined to the administrative record Defendants produced. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). "[T]he task of the reviewing court is to apply the appropriate . . .

standard of review . . . to the agency decision based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's Hist.*, 87 F.3d at 1246.

40. The July 18, 2022 memorandum, and not the rescinded and replaced Parole+ATD guidance from November 2, 2021, is the operative agency action at issue in Plaintiff's challenge to Parole+ATD. *See Texas*, 142 S. Ct. at 2545; *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 81 (2021).

41. The Court cannot second-guess the agency's thought process "as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

42. The July 18, 2022 memorandum is not contrary to law because it provides guidance for the Parole+ATD program requiring case-by-case parole decisions only for an urgent humanitarian reason or significant public benefit and otherwise in accord with the requirements of 8 U.S.C. § 1182(d)(5)(A).

43. Defendants' conclusions about the advisability of providing the Parole+ATD pathway as defined under the July 18, 2022 memorandum are more than

"rational," *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264, and its path to those conclusions "may reasonably be discerned," *Bowman Transp., Inc.*, 419 U.S. at 286.

44. The July 18, 2022 memorandum is fully consistent with section 1182(d)(5)(A) because it requires, even when the triggering overcapacity criteria are met, that each noncitizen be "assessed on a case-by-case individualized basis to determine whether he or she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit" in order to release him or her on Parole+ATD. SAR0003-04; 8 U.S.C. § 1182(d)(5)(A).

45. Under the APA, BP agents are entitled to a presumption of regularity that they properly discharge their duties under the July 2022 guidance, and the record offers no basis suggesting they are not performing the analyses required by the July 18, 2022 memorandum. *See Latif*, 666 F.3d at 748.

46. The record establishes that individualized inquiries are being conducted for each noncitizen, and those ineligible for parole are not being released on Parole+ATD. A significant number of noncitizens are still in BP custody: there were on average 11,500 noncitizens in BP custody each day in FY2022 through July 22, 2022, with an average of 14,400 in custody each day in May 2022. SAR0005.

47. After a case-by-case review, releasing noncitizens on Parole+ATD serves a "significant public benefit" and "urgent humanitarian need" in that it responds to important health and safety risk concerns through decompression of overcrowded BP processing facilities. *See* 8 U.S.C. § 1182(d)(5)(A); *Grand River Enters. Six Nations*, 425 F.3d at 169.

48. The Parole+ATD program represents a more than "rational" response to address overcrowding at BP processing facilities. *See Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264.

49. Further, the July 18, 2022 memorandum and accompanying administrative record indicate that Defendants considered all appropriate factors, including detention capacity, the processing backlog created by the program, and migratory flows, to the extent relevant and legally permissible. *See Bowman Transp., Inc.*, 419 U.S. at 286.

50. The July 18, 2022 memorandum did not have to undergo notice and comment rulemaking. It merely interprets and provides guidance for applying DHS's statutory parole authority under 8 U.S.C. § 1182(d)(5)(A) and constitutes, at most, an "interpretative rule," "general statement of policy," or rule of "agency organization, procedure, or practice," which are exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A).

51. The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

52. Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute means"; they do not create rights or duties but merely "remind[] affected parties of existing duties." *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

53. "Generally, whether a particular agency proceeding announces a rule or a general policy statement depends upon whether the agency action establishes a binding norm. The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case, or on the other hand, whether the policy so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion. As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983) (quotation marks and internal citations omitted).

54. Whether an agency pronouncement is a legislative rule versus a general policy statement "depends upon whether the agency action establishes a binding

norm." *Nat'l Min. Ass'n v. Sec'y of Lab.*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted). "As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm." *Id.*

55. The July 18, 2022 memorandum is an interpretive rule rather than a substantive rule because it does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. It merely states DHS's understanding of one possible use of its 8 U.S.C. §1182(d)(5)(A) authority. *See Warshauer*, 577 F.3d at 1337.

56. Further, the July 18, 2022 memorandum represents a general statement of policy because it does not establish a binding norm, as the agency remains free to consider facts in individual cases that arise, both in the particular release decisions of individual noncitizens, and in the week-by-week, sector-specific assessments as to whether to continue to authorize Parole+ATD for that sector based on its current capacity conditions. *See Nat'l Min. Ass'n*, 589 F.3d at 1371.

57. "Procedural rules," the general label for rules falling under the 5 U.S.C. § 553(b)(A) exception for "rules of agency organization, procedure, or practice," are "primarily directed toward improving the efficient and effective

operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted).

58. Parole+ATD represents a procedural rule because it is aimed at improving the internal operations of BP by speeding up border processing when necessary and decompressing holding facilities. *See id.*

Conclusions Relevant to Both Non-Detention Policy and Parole+ATD

59. The INA does not define "urgent humanitarian reasons" or "significant public benefit."

60. In fact, in 1996, when Congress drafted the parole statute and created these terms, it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H. R. 2202, "Immigration in the National Interest Act of 1995," August 4, 1995, https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih.

61. Congress delegated to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1175 n.5 (D.N.M. 2020) (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits").

62. Defendants' implementation of "significant public benefit" to include preventing health and safety risks resulting from overcrowded detention

facilities, SAR0002-03, and prioritizing limited detention resources for more-dangerous noncitizens is reasonable. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-425 (1999) ("we have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context").

63.  A DHS regulation and numerous authorities recognize the significant public benefit in fighting the spread of disease and protecting public health generally. *See, e.g.,* 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens detained pursuant to 8 C.F.R. § 235.3(b) or (c) with "serious medical conditions in which continued detention would not be appropriate"); *see also Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) (noting "it doubtlessly advances the public interest to stem the spread of COVID-19"); *Grand River Enters. Six Nations*, 425 F.3d at 169 (identifying the promotion of "public health" as a "significant public interest[]").

Alleged Non-Detention Policy

64.  To challenge a rule under the APA, a plaintiff must point to a specific statement of agency policy that it is challenging. *Biden*, 142 S. Ct. at 2545 (2022); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990).

65.  The Court cannot rely upon circumstantial evidence to "postulat[e] the existence of an agency decision wholly apart from any 'agency statement. . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545. *See Brnovich*

*v. Biden*, --- F.Supp.3d ----2022 WL 4448322, at *10 (D. Ariz., Sept. 23, 2022) (addressing the identical alleged non-detention policy as challenged here).

66. The Court cannot aggregate separate agency decisions or decisions by individual immigration officers into a policy. *Lujan*, 497 U.S. at 891 (prohibiting broad programmatic attacks on day-to-day agency operations); *Whitewater Draw*, 5 F.4th at 1012, cert. denied, 142 S. Ct. 713 (2021) (Plaintiffs cannot obtain APA review of a collection of individual actions pertaining to a single subject simply by labeling those individual actions a policy); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022), *appeal dismissed*, No. 22-15519, 2022 WL 6105386 (9th Cir. Sept. 12, 2022) (State may not challenge under the APA a "collection of actions" as a "*de facto* program."); 33 Charles Alan Wright et al., Fed. Prac. and Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update) (APA "does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program.'"); *see also Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences. . . but rather, Plaintiffs must first identify the 'policy or custom'" they contend violates the law).

67. The Budget and Accounting Act requires the President to submit a budget, *see* 31 U.S.C. §1101, et seq., but Congress is free to enact appropriations that are

less than, more than, or consistent with the President's budget request. Constitution, Article I, Section 9, Clause 7.

68. Individual decisions by CBP agents to release applicants for admission, who have been apprehended at or after crossing the Southwest border, are not contrary to law. Those decisions represent: (a) valid exercises of Defendants' authority to release, on a case-by-case basis for an urgent humanitarian reason or significant public benefit, 8 U.S.C. § 1182(d)(5)(A), noncitizens subject to 8 U.S.C. § 1225(b), just as every administration has done, *Texas*, 142 S. Ct. at 2543, and (b) valid conditional releases of noncitizens who are present in the country and have been placed in removal proceedings, under 8 U.S.C. § 1226(a), *see Ortega-Cervantes*, 501 F.3d at 1116, 1118.

69. The INA provides for warrantless arrests where the noncitizen has entered the country illegally and is likely to escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(2).

70. Sections 1225(b)(1)(b)(ii) and 1225(b)(2)(A) not only fail to provide any "stronger indication" that their use of the term "shall" creates a judicially enforceable detention mandate, *see Town of Castle Rock*, 545 U.S. at 761, but the interlocking provisions of the INA in fact indicate the opposite, as section 1182(d)(5)(A) provides for release on parole of applicants for admission subject to section 1225, *see Texas*, 142 S. Ct. at 2543.

71. Plaintiff has not identified an agency "rule" at issue in its alleged non-detention policy and therefore the APA's notice and comment requirements, which only govern "rulemaking," are categorically not implicated in this case. *See* 5 U.S.C. §§ 533, 551(4)-(5).

72. Even were there a "rule" at issue in the purported "non-detention policy," it would not be subject to notice and comment rulemaking because it would merely guide the agency in the application of its detention and release authorities under 8 U.S.C. §§ 1182(d), 1225(b), and 1226(a) and constitute, at most, an "interpretative rule," "general statement of policy," or procedural rule, 5 U.S.C. § 553(b)(A), for the same reasons as with Parole+ATD.

Take Care Clause

73. Both the Constitution and the INA vest the Executive with authority over decisions regarding detention and removal of noncitizens. *See*, *e.g.*, *U.S. ex rel. Knauff*, 338 U.S. at 543; *Velasquez*, 524 F.3d at 1253.

74. Federal courts should avoid creating new constitutional causes of action or even extend the application of previously implied causes of action. *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004).

75. The Take Care Clause of the Constitution does not create a private right of action to challenge agency action. *Las Americas Immigrant Advocacy Center*

*v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *see, e.g., Brnovich*, 2022 WL 4448322, *14; *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985).

76. Even if the Take Care Clause can be pursued as a stand-alone cause of action, relief is possible "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 602 (D.C. Cir. 1974); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020).

77. The Executive's duties under § 1225(b)(1) and (b)(2), and § 1182(d)(5) are not purely ministerial, *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *14 (N.D. Fla. May 4, 2022), and therefore, Plaintiff cannot prevail on its Take Care Clause claim as a matter of law. *Nixon*, 492 F.2d at 602; *Columbus*, 453 F. Supp. 3d at 800.

Remedy

78. Any injunctive relief that "enjoins or restrains" DHS's use of 8 U.S.C. § 1225 or § 1226—including any court order that directs DHS as to how it should implement the covered provisions or which noncitizens it should or should not detain, release, or parole, or in what numbers—is barred by 8 U.S.C. § 1252(f)(1). 8 U.S.C. § 1252(f)(1); *see also Garland v. Aleman Gonzalez*, 142

S. Ct. 2057, 2064 (2022); *Texas*, 142 S. Ct. at 2538. Here, the Court cannot issue any of the relief Plaintiff seeks, whether injunctive relief or relief setting aside or vacating the challenged agency actions—because such an order would impermissibly enjoin or restrain DHS's implementation of multiple covered provisions, including sections 1225, 1226, 1229a, and 1231. Nor can the Court issue any injunctive or set/aside vacatur relief as to section 1182(d)(5), because although section 1182 is not covered by section 1252(f)(1), any injunction of section 1182 would directly impact DHS's use of section 1225(b), which *is* a covered provision in section 1252(f)(1).

79. Were the Court to nonetheless conclude that some form of injunctive relief is appropriate despite the limitations of 8 U.S.C. § 1252(f)(1), that relief must be limited only to Florida. *See Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Granting Plaintiff relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [its] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).

80. Any declaratory relief that is the functional equivalent of an injunction is also barred by section 1252(f)(1). 8 U.S.C. § 1252(f)(1).

81. Were the Court to issue declaratory relief that substitutes its judgement for that of the Executive Brach in determining which noncitizens should be detained or released, how many to detain or release, or how to best fund and deploy enforcement resources, that would be an inappropriate violation of the separation of powers. *See Chiles*, 69 F.3d 1094, 1096-1097 (11th Cir. 1995).

82. The APA does not affirmatively authorize a universal vacatur or nationwide relief. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."); *Virginia Society for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power.").

83. Vacatur is not appropriate given the disruptive consequences of vacating the challenged policies, which must be considered by the Court when deciding whether vacatur is appropriate. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *see also Am. Great Lakes Ports Ass'n v. Schultz,* 962 F.3d 510, 518 (D.C. Cir. 2020).

84. Given the disruptive consequences of any order vacating a policy impacting thousands of individuals monthly, the only appropriate remedy is to remand to the agency for further consideration or explanation without vacatur. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000). For the same reason, even if an injunction were available in this context, the court should decline to award injunctive relief as a matter of equity. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008).

## POST-TRIAL BRIEF IN SUPPORT OF DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Plaintiff Does Not Have Standing to Bring This Case

The threshold question is whether Plaintiff has standing to bring the present action. As explained below, the answer is no.

#### A. Plaintiff's standing claim is legally insufficient.

A case or controversy exists only if a plaintiff has standing—that is, only if the plaintiff has suffered an injury-in-fact that is traceable to the challenged action and would likely be redressed by judicial relief. *TransUnion LLC*, 141 S. Ct. at 2203. An Article III injury requires the invasion of a "legally and judicially cognizable" interest, which means the dispute must be of the sort "traditionally thought to be capable of resolution through the judicial process." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

A State may sue the federal government when the State is an object of the challenged action— for example, where the United States requires the State to act or to refrain from acting, determines how much federal funding it receives, or deprives it of a legal right. *See*, *e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (standing based on potential loss of federal funding awarded on basis of state population); *Printz v. United States*, 521 U.S. 898, 904 (1997) (federal

statute directed local law enforcement officers to participate in federal gun-regulation program). But a State may not sue the federal government simply because a federal policy has incidental effects on the State, like Plaintiff's argument here of possible downstream financial consequences and incidental effects of federal immigrant policy. To have standing it must have suffered a "*direct* injury" at the hands of the federal government. *Mellon*, 273 U.S. at 18 (emphasis added).[19] Indirect financial harm to the State's coffers or economy is insufficient. *Id.*; *cf. Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (no standing "where the claim was that actions taken by [federal] agencies had injured a State's economy and thereby caused a decline in general tax revenues").

A State "has not suffered an injury in fact to a legally cognizable interest" when "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources." *Arpaio*, 27 F. Supp. 3d at 202 (D.D.C. 2014). To hold otherwise would inject the federal courts into all manner of policy controversies at the behest of States seeking to secure by court order what they could not obtain through the political process. The Supreme Court has distinguished between suits against private defendants to vindicate proprietary interests and suits against the United States to vindicate

---

[19] The Supreme Court is currently considering the circumstances in which a State may have standing to challenge federal immigration policy that has only an indirect effect on that State. *See United States v. Texas*, No. 22-58.

governmental interests. *See Alfred L. Snapp & Son, Inc., v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601-602 (1982). Thus, when a State sues the United States, additional principles come into play. *See, e.g.*, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) (holding that States may not bring *parens patriae* suits against the United States). Hence the requirement that a State may only sue the United States if it has suffered a direct injury at the hands of the federal government. *Florida*, 273 U.S. at 18.

Plaintiff alleges that the Parole+ATD policy and the purported non-detention policy have increased its noncitizen population and, as a result, Plaintiff will expend more resources on noncitizens. Second Amended Complaint ("SAC"), ECF 74, ¶¶ 69-76. Any such correlation would not give rise to standing, however, because any "injury" would be indirect. Plaintiff cannot show a direct injury because the challenged policies do not instruct Plaintiff what to do, operate on Plaintiff directly, or deprive Plaintiff of any legal rights. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009). Such an injury is a non-cognizable generalized grievance. *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013); *Arizona*, 40 F.4th at 383 ("Contingent injuries, especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies."). Nor would the challenged policies directly deprive Florida of any federal funding. *Dep't of Commerce*, 139 S. Ct. at 2565.

Federal policies regulating people within a State will often have derivative effects on the State itself—but that has never been thought sufficient to vest a State with standing to challenge such policies. In our federal system, the United States and the States share sovereignty over the same territory and people. The Constitution empowers the United States to act on those people directly rather than through the States. *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). But dual sovereignty does not authorize a State to assert a judicially cognizable interest in avoiding incidental effects of federal policies. *Printz*, 521 U.S. at 920, especially where, as here, those effects derive from the independent actions of individuals in the State. *Lujan*, 504 U.S. at 560. The Supreme Court has repeatedly held that actions taken by the United States that indirectly injure the State's economy is not a direct injury sufficient to show standing. *See, e.g.*, *Florida,* 273 U.S. at 18 (holding that a federal inheritance tax that prompted a "withdrawal of property" and thus diminishing the State's tax base was not a "direct injury"); *Wyoming*, 502 U.S. at 448 ("Courts of Appeals have denied standing to States where the claim was that actions taken by the United States government agencies had injured a State's economy and thereby caused a decline in general tax revenues.").

Were the Court to find that any federal action that increases the number of noncitizens in a State establishes standing because it indirectly increases the State's expenditures, then other States could use similar logic to claim injury from any

federal action *reducing* their noncitizen populations who would otherwise pay state taxes. If such incidental financial effects satisfied Article III, every immigration policy dispute between the federal government and the States could end up in federal court. Indeed, such indirect injuries would not be limited to immigration policy disputes. Virtually any federal action can have an incidental effect on State finances because almost every federal policy will affect people within a State. Granting standing to a State for every such instance would remove all limitations to standing and "would permit nearly all state officials to challenge a host of Federal laws simply because they disagree with how many—or how few—Federal resources are brought to bear on local interests." *Arpaio*, 27 F. Supp. 3d at 202. States could then treat the federal courts as "an open forum for the resolution of political or ideological disputes," *United States v. Richardson*, 418 U.S. 166, 192 (1974) (Powell, J., concurring), and "open the Judiciary to an arguable charge of providing government by injunction." *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 222 (1974). Federal judges would become "virtually continuing monitors of the wisdom and soundness of Executive action." *Laird v. Tatum*, 408 U.S. 1, 15 (1972).

Plaintiff also lacks standing because a litigant "lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S.*, 410 U.S. at 619. Plaintiff's claims are premised on its opinion that the government is not sufficiently initiating removal proceedings or detaining noncitizens. Such claims are

foreclosed. *See Sure-Tan, Inc.*, 467 U.S. at 897 (third parties "have no judicially cognizable interest in procuring enforcement of the immigration laws"). [20]

Finally, Plaintiff is not entitled to special solicitude in this case. In *Massachusetts v. EPA*, Massachusetts sued the Environmental Protection Agency (EPA) for denying its rulemaking petition asking the agency to regulate greenhouse gases. 549 U.S. at 505. In concluding that Massachusetts had standing, the Supreme Court explained that "a litigant to whom Congress has accorded a procedural right to protect his concrete interests … can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 517-18 (internal citations omitted). The Court observed that Congress had specifically granted States a special solicitude to challenge the EPA's denial of its petition for rulemaking. *Id.* at 519-20. ("Given that procedural right and Massachusetts' stake in protecting its quasi-sovereign interests, the Commonwealth [wa]s entitled to special solicitude in [the] standing analysis.").

"Special solicitude" lowers a litigant's burden as to standing where there is an allegation of deprivation of a procedural protection, as was true in *Massachusetts*. *Id.* at 518 (citation omitted); *see Lujan*, 504 U.S. at 572 n.7. Congress did not provide the States with a procedural right to the administration of immigration law in general,

---

[20] This argument is also currently pending at the Supreme Court. *See United States v. Texas*, No. 22-58.

or parole in particular. And the Supreme Court did not create a new doctrine in *Massachusetts* that States are always favored litigants for purposes of Article III and can circumvent all the traditional requirements of standing—in particular, causation and redressability. *See Whitewater Draw Nat. Res. Conservation Dist.*, 5 F.4th at 1015 (a "claim of procedural injury does not relieve Plaintiff . . . of [its] burden—even if relaxed—to demonstrate causation and redressability."); *Arizona*, 40 F.4th at 385 ("[*Massachusetts*] does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability."); *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1005 (D. Ariz. 2022), *reconsideration denied*, No. CV-21-00617-PHX-DWL, 2022 WL 2304527 (D. Ariz. June 27, 2022) ("Whatever its contours, the special solicitude doctrine cannot be some sort of magic wand that a state can wave over an otherwise inadequate record to automatically cure standing defects that would be fatal to a private litigant.") (internal citations omitted).

Moreover, even if States were entitled to favored treatment in some circumstances, Plaintiff would not be entitled to such treatment here. *Massachusetts* attached "critical importance" to the state's "procedural right" under the Clean Air Act ("CAA") to challenge the denial of a petition for rulemaking on emissions standards. 549 U.S. at 516, 518. *Massachusetts* also involved the threatened loss of territory owned by and subject to the sovereignty of the State—a harm that this Court

has long treated as distinctive and legally cognizable. *See* State Standing, 81 Va. L. Rev. at 415-416 (discussing 19th-century cases). This case, by contrast, involves "indirect fiscal burdens allegedly flowing" from a federal policy—a harm that not only is not "uniquely sovereign," but is entirely "humdrum." *Arizona*, 40 F.4th at 386. This case also involves immigration, for which the National Government, and not the States is the "key sovereign with authority and 'solicitude.'" *Id*. And, unlike the CAA, the INA creates no procedural right for any third party such as a State to challenge immigration enforcement and detention practices. *See, e.g.*, *Chiles*, 69 F.3d at 1096 ("Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable.").

Indeed, outside the limited context discussed in *Massachusetts*, the Supreme Court has not afforded a State "special solicitude" in any other setting. To the contrary, since *Massachusetts*, the Court has consistently analyzed State standing without granting States favorable treatment simply because they are States. *See, e.g.*, *California v. Texas*, 141 S. Ct. 2104, 2116-2120 (2021); *Dep't of Commerce*, 139 S. Ct. at 2565; *Arizona*, 40 F.4th at 385.[21] In the cases where States were found to have

---

[21] As the Court discussed during oral arguments, the Fifth Circuit has also addressed the issue of special solicitude for States challenging immigration policies and found standing based on the doctrine. Tr. Day 4, 198:4-12; *see also Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015), *as revised* (Nov. 25, 2015). *Texas*, however, dealt with States' challenge to an articulable, concrete policy–the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

standing, the States demonstrated a direct financial injury (*Dep't of Commerce*, 139 S. Ct. at 2565), or a loss of State-owned real property (*Massachusetts*, 549 U.S. at 517-20). Here, Plaintiff is alleging indirect, downstream financial harms identical to those alleged in *Arizona*, 40 F.4th at 386. The Court did not find the alleged harms were sufficient for special solicitude there, and neither should the Court here.[22]

Plaintiff lacks standing to bring this case as a matter of law. Because Plaintiff failed to show at trial any direct, redressable harm that is traceable to the challenged policies, Plaintiff also lacks standing as a matter of fact.

### B. The majority of Plaintiff's standing evidence is "useless."

As this Court noted at the end of the trial, the majority of Plaintiff's standing evidence was "useless" and not "particularly helpful." Tr. Day 4, 119:16-120:7. Plaintiff claimed that five of its agencies incurred costs from the challenged policies, thereby establishing standing. Those agencies are the Department of Education ("DOE"), Department of Corrections ("DOC"), Department of Children and Families ("DCF"), Department of Economic Opportunity ("DEO"), and Agency for

---

*Id.* at 146. This case, however, is more comparable to *Arizona*, as both cases deal with a challenge to an amalgamation of policies and decisions. *See Arizona*, 40 F.4th at 380. Thus, the Court should follow the of the Sixth Circuit's interpretation of *Massachusetts* here.

[22] Even were Plaintiff entitled to special solicitude, such designation still "does not remove Article III's imperative of a cognizable case or controversy or the requirements of injury, causation, and redressability." *Arizona*, 40 F.4th at 385-86.

Health Care Administration ("AHCA").[23] *See* Pretrial Stipulation, ECF 122, ¶¶ 27-63. However, the only witness Plaintiff presented to testify regarding standing at trial—indeed the only witness Plaintiff presented at all—was a representative from the Department of Education. Plaintiff otherwise relied only upon the Parties' December 9, 2022 pretrial stipulation to establish standing. This Court determined the evidence from the DOC, AHCA, DEO, and DCF was insufficient to show standing. Tr. Day 4, 119:16-120:7. Indeed, Plaintiff has admitted it does not track expenditures or data in a manner that allows it to identify expenditures made on specific noncitizens released under the challenged policies.[24] Therefore, Plaintiff cannot determine whether stopping or changing the challenged policies would impact its alleged costs. Even assuming Plaintiff's theory of indirect injury is cognizable, therefore, the evidence it presented fails to carry its burden of demonstrating Article III standing.

Notably, many of the stipulations include expenditures that *predate* the policies challenged in this case. Tr. Day 4, 36:8-18; 120:8-17; Pretrial Stipulation, ECF 122, ¶¶ 32, 34, 37, 44, 54, 55, 57, 58, 59. For example, paragraph 59 of the

---

[23] Plaintiff also previously alleged injuries from the Department of Highway Safety and Motor Vehicles, however, those alleged injuries and attendant pretrial stipulations (¶¶ 64-70) were withdrawn prior to the start of trial. *See* Transcript from Jan. 5, 2023 conference, at 20:2-21:9.
[24] Pretrial Stipulation, ECF 122, ¶ 27; Bottcher Dep., 25:1-16, 36:5-38:1, 41:4-10; Heckman Dep., 32:11-33:13, 135:4-17, 139:15-140:5; Tr. Day 1, 31:8-18, 47:17-48:7, 51:23-52:1, 53:2-7; Tr. Day 3, 77:12-21, 78:23-79:13, 81:10-82:1; Tr. Day 4, 21:13-25, 32:17-33:5, 34:16-20, 35:1-10, 36:8-11, 37:21-38:12, 42:12-18, 43:10-12, 45:17-22, 46:16-47:1.

Pretrial Stipulation provides that from January 2020 through January 2022, DCF spent $12,236 providing Relative Caregiver Financial Assistance from State funds to qualifying noncitizens. Pretrial Stipulation, ECF 122, ¶ 59. But a good portion, if not all, of this $12,236 may be attributable to noncitizens who entered the country before January 20, 2021, the date the challenged practices allegedly began. Tr. Day 4, 36:12-16, 36:17-18. Many of the other stipulations on which Plaintiff relies to establish standing suffer the same infirmity. *Id.* at ¶¶ 44, 54, 55, 57, 58, 59. The Court, therefore, cannot determine what, if any, portion of the stipulated costs incurred by the various agencies could be attributable to the practices challenged here after January 2021. Tr. Day 4, 120:8-17, 36:3-18.

Defendants adduced witness testimony to show the insufficiency of Plaintiff's standing claims. For example, Defendants showed that many of the services DCF oversees and administers (including SNAP, TANF, and Medicaid) have a five-year waiting period before many noncitizen applicants for admission would be eligible to receive their benefits, such that Florida could not incur resulting expenses until 2026 at the earliest. Tr. Day 4, 14:9-15:3, 25:15-20, 33:25-34:15, 35:24-36:2. The only exceptions to that waiting period are Cubans, Haitians, Ukrainians, and Afghans. Tr. Day 4, 14:9:22, 16:23-17:2, 25:15-25. The DCF witness, Patricia Grogan, was unable to testify whether any of the Cubans, Haitians, Ukrainians, or Afghans receiving DCF services were released at the Southwest border under the challenged

policies, however. Tr. Day 4, 18:13-19, 32:8-10, 48:21-49:6, 18:21-25, 19:1-4, 48:21-49:6. She admitted that many Cubans and Haitians arrive to the United States via boat. Tr. Day 4, 32:11-16. Thus, Plaintiff cannot reasonably argue that Cubans or Haitians using DCF services have any nexus to the challenged policies. Tr. Day 4, 120:25-121:7. While DCF tracks data of Cuban and Haitian noncitizens who entered the country between October 2021 and September 31, 2022, and who have consumed services provided by the refugee assistance program in Florida, Tr. Day 4, 53:13-20, those refugee services were fully funded by the federal government, Tr. Day 4, 37:11-13. And DCF still cannot show where these Cuban and Haitian noncitizens entered the country, or whether any of them received services funded by the State of Florida. Tr. Day 4, 53:13-20, 54:10-55:11. Therefore, Plaintiff is unable to establish that it suffered any injury providing DCF services to these populations, let alone other applicants for admission released at the Southwest border after January 2021.

In sum, the injuries alleged by AHCA, DOC, DEO, and DCF are too attenuated to establish standing. Tr. Day 4, 194:14-24.

### C. Plaintiff has not shown the injuries alleged by the Florida Department of Education are traceable to the challenged policies.

Similarly, Plaintiff's allegation of indirect injury to the Florida Department of Education ("DOE") is not sufficiently traceable to the challenged policies and cannot establish standing.

As an initial matter, it is undisputed that DOE "does not track alien expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies." Pretrial Stipulation, ECF 122, at ¶ 27. Plaintiff has conceded it cannot show traceability based on DOE's evidence. If Plaintiff cannot quantify its harm, it cannot establish standing, which requires the evidence of harm to be "concrete and particularized" and have a "causal connection…to the conduct complained of…" *Lujan*, 504 U.S. at 560-61. Thus, to find standing for Plaintiff, this Court would have to engage in chain of speculation involving several impermissible inferences and assumptions. Tr. Day 4, 122:17-19.

Plaintiff put forward evidence that there were 17,000 more "immigrant" students in Florida's public schools in the 2021-2022 school year compared to the 2020-2021 school year. Tr. Day 1, 41:16-19. Notably, the definition of an "immigrant" student—the only metric Plaintiff has to track this increase—is broader than just noncitizens and is certainly broader than applicants for admission paroled at the Southwest border since January 2021. Tr. Day 1, 46:21-47:8. It can include lawful permanent residents or even U.S. citizens. *Id.* Just showing an increase in "immigrant" students is not enough to show traceability to the challenged policies. These "immigrant" children may not be noncitizens at all, and if they are, there is no basis for determining whether they were released subject to the challenged policies, or if they are present in Florida under other immigration statutes. DOE does not track

their students' citizenship status, and if they are noncitizens, how they arrived in the country, where they arrived in the country, or their release mechanism, if any. Tr. Day 1, 31:8-18. So, Plaintiff cannot show that the increase of "immigrant" students in the most recent school year was caused by the challenged policies.

Exhibit 95 shows there were 95,084 "immigrant" students enrolled in Florida's public schools, on average, during the 2020-2021 school year. Ex. 95. During the 2021-2022 school year, there were, on average, 112,375. *Id.* The DOE witness, Jacob Oliva, explained that Surveys 2 and 3 were taken at specific times during the school year, but Survey 5 was done at the end of the year and is a culmination of enrollment throughout the school year. Tr. Day 1, 42:2-43:5. Thus, Plaintiff cannot show when, during the school year, the increase started, which is important because the 2020-2021 school year spanned two different administrations.

Plaintiff also did not offer any evidence of the number of "immigrant" students enrolled in Florida public schools in school years prior to 2020-2021. For example, the Court does not know how many "immigrant" students were enrolled in Florida public schools in the 2017-2018, 2018-2019, or 2019-2020 year. For all the Court knows, the number of "immigrant" students enrolled in Florida public schools in 2021-2022 may well be lower than the historic or pre-pandemic average, despite being greater than the number in 2020-2021. Indeed, according to Plaintiff's own witness, because the State of Florida was open during the pandemic, its economy

was "thriving," and the State was "attracting a lot of people from places that weren't open," Tr. Day 1, 53:22-54:6—perhaps even "immigrant" students from other States who already have permanent residence or were paroled into the country many years ago.[25] Simply put, the Court cannot conclude that the increase in immigrant children from the 2020-2021 school year to the 2021-2022 school year is a result of the challenged policies.

Nevertheless, based on the increase of "immigrant" students in the 2021-2022 school year, Plaintiff presented two theories of injury: that the increase of "immigrant" students requires Plaintiff to spend more money on English Speakers of Other Language ("ESOL") services; and that the increase means Plaintiff has less money to spend per student. However, both these theories are flawed and not supported by the evidence.

First, Plaintiff alleges that it uses more resources on students that require ESOL services than those who do not because it must invest in certified teachers, translators, and provide additional instruction for those students. Tr. Day 1, 44:19-45:14. However, just because a student does not speak English does not mean they are an "immigrant" student, let alone an applicant for admission paroled at the Southwest border. Even U.S. citizen students may not speak English. Tr. Day 1,

---

[25] Plaintiff cannot base its standing on the "unfettered choices made by independent actors." *Lujan*, 504 U.S. at 562. "Where predictions are so uncertain, [the Court] is prohibited from finding standing." *Arpaio*, 797 F.3d at 22; *see Arizona*, 40 F.4th at 387.

49:16-24. In any event, Plaintiff did not provide the number of students that require ESOL services, so there is no evidence before the Court as to what injury, if any, might have resulted from the presence of those students.[26]

Plaintiff's second theory of injury is that having more students means it has less money to spend on each student. Tr. Day 1, 28:19-30:10. That allegation is refuted by the evidence. First, Florida has allocated more money per student in the 2022-2023 school year, than it did in the prior two years. Tr. Day 1, 28:10-15, 30:21-31:1. Mr. Oliva testified that Florida is able to spend more per student in the 2022-2023 school year because the State was open during the pandemic, the State legislature benefited from increased revenue over the prior year, and that increase in revenue allowed it to allocate more dollars per student, despite an increase in enrollment. Tr. Day 1, 53:22-54:11. So rather than showing an injury, Plaintiff showed the opposite—it was able to spend more per student even as enrollment increased.

**D. Plaintiff has not shown its claims are redressable.**

Plaintiff also failed to prove that its alleged injuries were redressable. A plaintiff has the burden of supporting each element of standing according to the degree of proof required at that particular stage of the litigation. *Bischoff v. Osceola*

---

[26] Plaintiff also receives federal funding for ESOL services, reducing any alleged injury it claims to suffer. Tr. Day 1, 49:25-50:11.

*Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000). Not only did Plaintiff fail to show redressability by a preponderance of the evidence, *see Lujan*, 504 U.S. at 561,[27] it offered no evidence how detaining additional noncitizens would impact the Florida school system. Tr. Day 1, 53:18-21.

Additionally, should this Court find Plaintiff has only shown standing because additional "immigrant" children have come to Florida and enrolled in public schools, and that those "immigrant" children were released by the federal government at the southwest border and were subject to the challenged policies, any remedy must be related to the release of those "immigrant" children. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). Thus, if Plaintiff can show only an indirect fiscal injury as a result of more children coming to Florida, then any remedy must be limited to that direct injury. Potential remedies requested by Plaintiff are discussed further at Point VI, *infra*.

---

[27] "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Crafting such a remedy, however, would be difficult because family units can generally be detained for only 20 days, Tr. Day 3, 48:8-13, 48:17-21, and unaccompanied children are placed in the care of the Department of Health and Human Services, which is not a party to this case. Even if the Court were to direct the federal government to detain more family units, or to cease releasing families on Parole+ATD, Plaintiff has not shown that a 20-day delay in those families arriving in Florida would have any impact on the annual cost of educating their children. Tr. Day 4, 196:8-17.

## II.     Plaintiff's Claims Are Not Reviewable Under the APA

This Court should also deny Plaintiff's APA claims because they are not subject to judicial review. The challenged decisions are committed to agency discretion by law, Plaintiff does not challenge final agency action, and statutes preclude the Court's review. Although this Court declined to grant summary judgment for these reasons, the evidence adduced at trial demonstrates that the threshold requirements for APA review were not satisfied.

### A. Committed to agency discretion by law.

The practices Plaintiff challenges are committed to agency discretion by law. 5 U.S.C. § 701(a)(2).

First, the aggregated detention and budgeting decisions Plaintiff challenges as part of an alleged non-detention policy involve the same "complicated balancing of

a number of factors which are peculiarly within [the agency's] expertise" and are therefore committed to agency discretion. *Heckler*, 470 U.S. at 831. Resource availability, allocation, and prioritization considerations are core agency discretionary decisions. *Id*. Congress has specifically tasked DHS with developing and implementing Congress's "policies and priorities" for resource allocation among other enforcement duties. 6 U.S.C. § 202(5).

Plaintiff's claims against the other part of the alleged non-detention-policy theory, and its claims against Parole+ATD, challenge Defendants' decisions about how and to process applicants for admission, including whether to detain them pending removal. *Infra* Point IV. Those matters are likewise committed to agency discretion by law and therefore not subject to judicial review under the APA. Both the decision whether and when to issue charging documents for removal proceedings, and the decision to detain or release pending those proceedings, in addition to implicating resource allocation considerations, also require balancing "whether agency resources are best spent on [enforcing] this violation [of the immigration laws] or another." *Heckler*, 470 U.S. at 831. These considerations are exactly the kind Congress has committed to agency discretion. *Id.* Indeed, the determination to detain or release on parole encompasses, *inter alia*, discretionary considerations relying on agency expertise and resource prioritization, difficult for a court to review, such as "the possibility that [a noncitizen] may abscond to avoid

being returned to his or her home country," "priorities for the use of limited detention space," and of course, the statutory requirements that parole be for "urgent humanitarian reasons or significant public benefit." *See Jeanty*, 204 F. Supp. 2d at 1382; 8 U.S.C. § 1182(d)(5)(A). The evidence established that these are in fact the considerations DHS officers and agents currently take into consideration in deciding whether to detain or parole, and Plaintiff offered no evidence establishing the contrary. Tr. Day 2, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-29:10; Ex. B at § 8.2 & pp. 13-14 (checklist); Ex. C at ¶¶ 5.3, 6.2, 8.3; Ex. 40 at 5-7. Plaintiff's post hoc reformulation of its claim to challenge Defendants' alleged focus of detention resources for public-safety risks only underscores the discretionary prioritization that must occur even under its (unsupported) reading of the evidence.

Plaintiff maintains that section 1225(b) requires DHS to detain all amenable applicants for admission. Leaving aside that some may alternatively be subject to 1226(a), *infra* Point IV(D), section 1225(b) imposes no such unconditional duty. Although section 1225 uses the word "shall," the Supreme Court has instructed that the "deep-rooted nature of law-enforcement discretion" persists "even in the presence of seemingly mandatory legislative commands." *Town of Castle Rock*, 545 U.S. at 761. In any event, nothing in the statute evinces a "strong[] indication" of intent to impose a "true [detention] mandate" on the Executive. *Id.*; *accord, Arizona*, 40 F.4th at 391. If anything, the opposite is true, because of the INA's provision of

release on parole under section 1182(d)(5)(A) for section 1225(b) detainees. *See MSPA Claims 1, LLC v. Kingsway Amigo Ins. Co.*, 950 F.3d 764, 776 (11th Cir. 2020) (court looks at statutory text in "relation to other provisions in the Act" to determine its meaning).

And parole is inherently discretionary, *see* 8 U.S.C. § 1182(d)(5)(A), further indicating that the structure of the INA commits the release decisions Plaintiff challenges to agency discretion. "Congress has delegated remarkably broad discretion to executive officials under the [INA]" and its grants of authority "are nowhere more sweeping than in the context of parole." *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir. 1985); *see Jean II*, 727 F.2d at 966 & n.8. Further underscoring the unreviewable discretion inherent in parole, courts lack jurisdiction to review parole and bond decisions under 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii). *See, e.g.*, *Alonso-Escobar v. USCIS Field Off. Dir. Miami, Fla.*, 462 F. App'x 933, 935 (11th Cir. 2012) (unpublished); *Jeanty*, 204 F. Supp. 2d at 1382.

In sum, Plaintiff challenges Defendants' discretionary decisions regarding how to prioritize detention resources and process noncitizens arriving at the country's border. However, "Congress intended whether the [Secretary] is adequately guarding the borders of the United States to be committed to agency discretion by law and, thus, unreviewable." *Chiles*, 69 F.3d at 1096. The evidence conclusively establishes that some prioritization of detention resources will always

be necessary. Defendants could not detain all noncitizens in removal proceedings, not even the subsidiary but substantial portion of whom are applicants for admission at the Southwest border, without Congress providing appropriated funding on a scale never-before-contemplated that is practically incalculable. *Infra* Point IV(B), (D). And neither the evidence at trial nor Plaintiff's arguments offered any meaningful standard to guide this Court to manage prioritization. *See Heckler*, 470 U.S. at 831–32 ("The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."). Thus, as a matter of law, evidentiary fact, and from a practical application perspective, the detention-resource-prioritization decisions challenged in this case, under both the non-detention policy and Parole+ATD, are committed to agency discretion by law and Plaintiff's claims cannot be reviewed under the APA.

## B. No final agency action.

Plaintiff additionally cannot obtain APA review because it does not challenge "final agency action," 5 U.S.C. § 704, either with regard to the non-detention policy or Parole+ATD. Agency action is final if it determines legal "rights or obligations." *Bennett*, 520 U.S. at 178. Agency action that "does not itself adversely affect" a party but instead "only affects his rights adversely on the contingency of future administrative action" is "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003). Neither the alleged non-detention policy nor

Parole+ATD finally determine rights or obligations and are not final agency actions for APA purposes.

First, the evidence has not established the existence of any concrete "non-detention policy." *Infra*, Point IV. Instead, Plaintiff has merely pointed to an amalgam of distinct agency operations and individual release determinations—not any regulation, rule, or policy statement. *Id.* These assorted (and conjectured but not demonstrated) decisions do not represent an "agency action" cognizable under the APA, much less a "final" one. *Lujan*, 497 U.S. at 891. Courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Texas*, 142 S. Ct. at 2545 (quoting 5 U.S.C. § 551(4)). Applying these precedents, a court recently rejected an identical challenge to Defendants' alleged "mass-parole and non-detention policies," holding that a state could not challenge an "amalgam of release decisions" or "some generalized and amorphous conception of Defendants' detention and parole policies" under the APA because they did not provide the requisite "agency action." *Brnovich*, 2022 WL 4448322 at *10, 12. Even if there were a concrete action at the heart of the alleged "non-detention policy," Plaintiff still failed to offer any evidence that it establishes rights or obligations. Even under Plaintiff's post hoc reformulation of its "non-detention" to focus on alleged prioritization of detention for public safety risks, DHS officers must still apply the

"public safety risk" rule to individual noncitizens' processing decisions before any such alleged "policy" could become final. *See Norton*, 324 F.3d at 1237.

As for Parole+ATD, while the July 18, 2022 memorandum provides a concrete agency action, it is also not final agency action because it neither creates legal rights or obligations nor is self-executing. *See id.* at 1236; SAR0002-04. The Parole+ATD program does not require CBP agents or ICE officers to take any specific action; it neither imposes an obligation to detain or release a noncitizen, nor does it grant a noncitizen the right to release. SAR0002-04; *see Bennett*, 520 U.S. at 178. The agents and officers retain discretion to detain or parole noncitizens on a "case-by-case basis," and nothing in the guidance mandates a specific result in any circumstance. SAR0003-04. Likewise, there is no requirement that ICE apply any particular type of ATD, as it is determined in each individual case. *Id.* Parole+ATD does not become final and challengeable until after a decision to detain or release, and what type of ATD to apply, if any, are made in an individual's case. *See Norton*, 324 F.3d at 1237. Because agency officials are "free to exercise discretion" to grant or deny parole in particular cases, or apply different types of ATD, the July 18, 2022 memorandum does not constitute final agency action. *See* Jean I, 711 F.2d at 1481; *Florida v. United States*, 540 F. Supp. 3d 1144, 1157 (M.D. Fla. 2021), *vacated on other grounds*.

**C. Statutes preclude jurisdiction and zone of interests.**

Additionally, Plaintiff cannot obtain APA review because provisions in the INA, specifically 8 U.S.C. §§ 1252(a)(2)(B)(ii) and 1226(e), preclude the Court's review of essential parts of the alleged non-detention policy and Parole+ATD. 5 U.S.C. § 701(a). Further, Plaintiff does not fall within the zone of interests of the statutory provisions it is suing to enforce.

Two statutes limit the Court's ability to review Defendants' decisions to release noncitizens on parole under section 1182(d)(5)(A) or conditional parole under section 1226(a), which form the core of Plaintiff's challenges. First, regarding parole under section 1182(d)(5)(A), Plaintiff's challenges are precluded by section 1252(a)(2)(B)(ii)—which bars review of "decision or action[s] … the authority for which is specified under this subchapter to be in the discretion of … the Secretary of Homeland Security"—because the INA specifically provides that any decision whether to grant parole is "in [the] discretion" of the Secretary. 8 U.S.C. § 1182(d)(5)(A). In addition to the text, traditional considerations concerning law enforcement discretion further confirm the conferral of parole decisions to DHS's discretion. *Supra,* Point II(A).

Review of decisions to release noncitizens subject to section 1226, as many of the releases challenged here, *infra,* Point IV(D), are limited by the statute's jurisdiction-stripping provision. The statute provides that DHS's "discretionary

judgment regarding the application of [section 1226] shall not be subject to review. No court may set aside any action or decision … under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole." 8 U.S.C. § 1226(e).

Thus, these statutory provisions preclude jurisdiction, and therefore APA review, of individual decisions to release under sections 1182(d) and 1226(a). 5 U.S.C. § 701(a). Further, because the court lacks jurisdiction to review any individual parole determination by DHS, it follows that the court also lacks jurisdiction to review any challenge to an amalgamation of individual decisions as a purported "non-detention policy." Indeed, the Court cannot review an actual parole policy or procedure. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 (5th Cir. 2000) (both DHS's "discretionary judgment regarding the application of parole" and "the manner in which that discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints" are not subject to review).

To the extent Plaintiff also challenges decisions to release noncitizens subject to the expedited removal or credible fear process under section 1225(b)(1), review is available, if at all, only in the U.S. District Court for the District of Columbia, and is otherwise forcefully barred by section 1252. *See* 8 U.S.C. § 1252(a)(2)(A)(i), (iv), (e)(3).

Plaintiff's claims also do not fall within the zone of interests of section 1225(b), the allegedly mandatory detention provision it claims is being violated, or sections 1182(d)(5) or 1226(a) for that matter. The zone-of-interests inquiry asks whether Congress intended for a particular plaintiff to invoke a particular statute to challenge agency action. *See Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). If a plaintiff is not the object of a challenged regulatory action—which Florida is not, for either the purported non-detention policy or Parole+ATD—the plaintiff has no right of review as its "interests are so marginally related to or inconsistent with the purposes implicit in the statute[.]" *Clarke*, 479 U.S. at 399.

Nothing in the text, structure, or purpose of the INA generally, or sections 1182(d)(5), 1225(b), or 1226(a) specifically, suggests that Congress intended to permit a State to invoke attenuated financial impacts of immigration enforcement policies to contest those policies. *See FAIR, Inc.*, 93 F.3d at 902. *FAIR* rejected a similar challenge that the federal government's "scheme for parole" of inadmissible noncitizens violated statutory limits on parole authority, holding the plaintiff was not within the zone of interests as there was nothing in the "language of the statutes on which it relies" nor the "legislative history that even hints at a concern about regional impact" of immigration. *Id.* at 900-01. This rationale applies with equal force here: nothing in sections 1225(b) or 1226(a) indicates these statutes were designed to control migration to individual states.

Congress has enacted several provisions specifically aimed at protecting the Executive's discretion from the courts, *AADC*, 525 U.S. at 486-87, making clear that only noncitizens may challenge enforcement of certain types of decisions, and only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g); *United States v. Fausto*, 484 U.S. 439, 448 (1988) (a detailed review scheme that allows challenges by particular parties is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review"); *Ayuda, Inc. v. Reno*, 7 F.3d 246, 250 (D.C. Cir. 1993). The statutory scheme thus indicates that only the individual noncitizens directly affected by detention or release decisions, and not third parties like states, who might be indirectly affected by these decisions, fall within the zone of interest of the INA's detention and parole provisions.

## III.   The Parole+ATD Policy is Not Contrary to Law

Plaintiff claims that the Parole+ATD program violates substantive and procedural requirements of the APA as (1) being contrary to law, SAC, ECF 74, ¶¶ 83-86; (2) arbitrary and capricious, *id.* at ¶¶ 95-100; and (3) having been adopted

without notice and comment, *id.* at ¶¶ 104-106. For the reasons explained below, none of these claims establishes an APA violation.

### A. Factual background.[28]

Beginning in March 2021, due to the strain of an influx of migrants on processing resources, BP released certain low-risk noncitizens with NTRs that contained instructions to report to ICE within a specified timeframe to receive their charging documents. SAR0162. CBP processing facilities are not structured or equipped for the detention of individuals for longer than 72 hours; extending detention of noncitizens challenges CBP's ability to provide safe housing conditions and appropriate medical care. SAR0002. Without other intervention, high rates of border encounters lead to overcrowding in CBP facilities, which poses health and safety risks to both the individuals in custody and CBP employees. *Id.*

NTRs provided a significantly faster mechanism for processing noncitizens apprehended at the border in comparison to the time-consuming process required to issue an NTA. SAR0162. NTAs require a higher degree of detail gathering, interagency coordination and scheduling, the creation of "A-files" (comprehensive files that document a noncitizen's interactions with DHS and immigration courts), and a means to notify the noncitizen of the charge of removability and the date and

---

[28] This factual background reflects the facts identified by the agency in creating the Parole+ATD memorandum and accompanying record. *Sea Turtle Conservancy*, 2011 WL 13227945, at *2.

location of their immigration court hearing. SAR0162; *see Pereira v. Sessions*, 138 S. Ct. 2105, 2110-11, 2115 (2018) (detailing the information that must be contained in an NTA). Because NTRs reduced processing time and the concomitant holding time, NTRs reduced the time CBP had to hold noncitizens, resulting in less crowding in its facilities and better protection of its employees and the detained noncitizens. SAR0162.

In November 2021 guidance, DHS replaced the use of NTRs with the Parole+ATD policy. SAR0162. Parole+ATD maintained the benefits of the NTR practice—reducing processing time and crowding in CBP facilities as compared to the use of NTAs—while addressing the limitation of the NTR program, by providing accountability and helping to ensure that noncitizens check in with ICE and complete their removal proceedings. SAR0002, SAR0162-63. The November 2021 Parole+ATD guidance formally memorialized the practical combination of two pre-existing authorities long used by DHS: the release of noncitizens on parole in appropriate circumstances pursuant to 8 U.S.C. § 1182(d)(5)(A), with enrollment in one of ICE's ATD programs. SAR0162-63. Despite the longstanding availability of these resources, the November 2021 guidance restricted Parole+ATD's use to times and sectors when and where necessary to address urgent crowding conditions. SAR0162. DHS recognized that the goal was to prioritize resources in the short term

and eventually issue NTAs to all noncitizens when the use of Parole+ATD was no longer necessary. *Id.*

ICE's ATD program employs various types of monitoring technology and supervision to increase noncitizens' compliance with release conditions, court appearances and removal orders. SAR0002. The level of technology and supervision assigned to a noncitizen under ICE's ATD program is determined by a case-by-case assessment of the noncitizen's immigration status, criminal history (if any), compliance history, community or family ties, role as a caregiver or provider, and any other relevant humanitarian or medical factors. *Id.* ICE may adjust the level of technology and supervision under ATD as the noncitizen's level of compliance increases or decreases. *Id.* DHS statistics for the most recent period available at the time (FY2022, through April 2022) indicate that the compliance rate of single adults and family units in the ATD program was 93.2% and 82.1%, respectively, with absconder rates of only 5.6% and 14.8%, respectively. SAR0255, 0272.

On July 18, 2022, DHS rescinded the November 2021 guidance memorandum, and provided new guidance to further specify and limit Parole+ATD's use, including requiring as a prerequisite that certain processing (explained *infra*) be completed and overcapacity circumstances exist. SAR0001. Under the current guidance, Parole+ATD is available only for individual BP sectors

following a weekly determination by CBP leadership that threshold overcapacity exists, using the following criteria:

- There are more than 15,000 noncitizens in BP custody across all Southwest border sectors, *or*, a sector or central processing center's in-custody total exceeds 100% of its full capacity; *and*
- CBP has encountered more than 6,000 noncitizens per day across the Southwest border over a 72-hour period.

SAR0003.

The July 2022 memorandum explains that when both circumstances exist, they create urgent crowding and excessive time-in-custody concerns that justify application of ICE's limited ATD resources to support CBP's use of parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit. SAR0003. The use of Parole+ATD is reassessed for an individual sector every week: a BP sector cannot utilize Parole+ATD unless the CBP Commissioner authorizes it on a week-by-week basis. *Id.* Further, regarding the processing requirement, BP must conduct biometric identity verification and thoroughly evaluate any potential public safety or national security concerns, as well as collect and document a physical destination address for each noncitizen prior to releasing that noncitizen on Parole+ATD. SAR0004.

Even when the threshold criteria are met and the CBP Commissioner has authorized a sector to use Parole+ATD, BP agents still must assess "each individual noncitizen … on a case-by-case individualized basis to determine whether he or she

is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit." SAR0003-04; *see also* 8 U.S.C. § 1182(d)(5)(A). In doing so, the agents must consider individualized circumstances, including a noncitizen's current immigration status, criminal history, compliance history, community or family ties, role as a caregiver or provider, and any other humanitarian or medical factors. SAR0004. Parole+ATD may not be used for individuals who pose a national security risk, unmitigable flight risk, or public safety threat, or who are unaccompanied children or who are criminal noncitizens subject to the mandatory detention requirements of 8 U.S.C. § 1226(c). *Id.*

Parole+ATD provides the significant public benefits of mitigating the spread of disease and preventing overcrowding in facilities that jeopardizes the health and safety of the noncitizens and workforce. SAR0002-03. As a point of reference, the spread of COVID-19 in BP facilities led to the hospitalizations and deaths of many noncitizens and employees. SAR0101, 0114, 0116. Regardless of whether from COVID-19 or other health conditions, continuing high border encounter rates mean that facility overcrowding, and associated health and safety challenges are expected to continue. SAR0002. Decompression of facilities (i.e., reducing overcapacity) and reduction of processing time provide the further significant public benefit of ensuring that BP has sufficient resources focused on border security operations and

other critical aspects of its mission by maximizing the deployment of agents who would otherwise be tasked with processing. SAR0163.

The July 2022 guidance memorandum evinces a recognition of, and response to, the processing backlog that developed due to the use of NTRs and Parole+ATD. SAR0261-71. The memorandum provides that CBP and ICE must streamline processing and that each agency will be responsible for 50% of the subsequent processing of the parolees' NTAs to place them into removal proceedings. SAR0004. In addition to serving NTAs on parolees when they check into regional DHS offices, ICE and CBP have also undertaken an initiative to further relieve backlogs at these regional offices and expedite the service of NTAs via mail to further relieve backlogs. SAR0165-69.

## B. The Parole+ATD program does not violate the law.

Plaintiff argues that the current Parole+ATD policy is unlawful because the July 18, 2022 memorandum[29] describing that policy violates section 1182(d)(5)(A)

---

[29] To the extent Plaintiff challenges the November 2, 2021 memorandum, Defendants' official rescission of that memorandum and replacement with a new and different Parole+ATD memorandum on July 18, 2022 moots Plaintiff's challenge to the November 2021 iteration of the program. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020), *cert. denied*, 142 S. Ct. 81 (2021). Only the July 2022 memorandum is a live agency action subject to review here, as that memorandum expressly "rescinds and replaces all prior guidance regarding the use of Parole+ATD, including but not limited to the November 2, 2021, memorandum[.]" SAR0001. The July 2022 memorandum represents a new, distinct agency action because it looked at the issue afresh and provided "several new reasons" for the policy, as well as altered parts of the practice and added additional aspects, ECF 87-1, SAR0003-0004, "absent from the [earlier] memorandum." *See Texas*, 142 S. Ct. at 2544.

in three ways: (1) it "completely fails to respect in any way the requirement that the individual be taken back into custody when the purpose of parole has been served," Tr. Day 4, 99:1-3; (2) Parole+ATD does not involve "a meaningful case-by-case adjudication" in determining whom to release, *id.* at 107:15-16; and (3) the program violates the "urgent humanitarian interest or significant public benefit" requirement because humanitarian interests or public benefits must be unique to an individual and cannot be shared, *id.* at 110:9-15. *See also* SAC, ECF 74, ¶¶ 83-86. Those arguments are without merit.

Parole+ATD's statutory authority, section 1182(d)(5)(A), provides that the Secretary of Homeland Security may

> in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A).

The July 18, 2022 memorandum is consistent with section 1182(5)(A). The memorandum provides that to release a noncitizen on Parole+ATD, each noncitizen must be "assessed on a case-by-case individualized basis to determine whether he or

she is eligible for parole based on an urgent humanitarian reason or whether there is a significant public benefit," even when the triggering overcapacity criteria are met. SAR0003-04; 8 U.S.C. § 1182(d)(5)(A). Under the APA, BP agents are entitled to a presumption of regularity that they properly discharge their duties under the governing agency policy. *See Latif*, 666 F.3d at 748. The record offers no basis to suggest the BP agents are not performing the analyses required by the July 18, 2022 memorandum. On the contrary, the record establishes that BP agents are conducting individualized inquiries and are not releasing noncitizens who are not eligible for parole on Parole+ATD. SAR0005. The record shows that significant numbers of noncitizens are still detained for processing: there were on average 11,500 noncitizens in BP custody each day in FY2022 through July 22, 2022, with an average of 14,400 in custody each day in May 2022. *Id*. And even if Plaintiff did object to the parole decisions made by individual officers, it has not identified those decisions as the relevant agency actions in this lawsuit. This lawsuit would accordingly be an improper vehicle for challenging specific parole decisions by individual officers.

First, Plaintiff argues that Parole+ATD violates the requirement that, "when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). The record does not support this argument.

While the health and safety risk management through decompression of overcrowded BP processing facilities is at least one of the significant public benefits served by releasing noncitizens on Parole+ATD, that motivation does not exhaust all the "purposes" of that parole.[30] The purposes of releasing a noncitizen on Parole+ATD include the need "to facilitate the initiation of removal proceedings" and "ensure their compliance with," among other things, "court appearances" and "final orders of removal."[31] SAR0002. Thus, the July 18, 2022 memorandum indicates that the purposes of release on Parole+ATD have not fully been served until a noncitizen appears in and completes their removal proceedings and complies with any subsequent removal orders. *See id.* As with CBP, ICE also has limits on its detention capacity so, absent the ability by ICE to re-detain a substantial portion of the Parole+ATD population, monitored and supervised parole under Parole+ATD is the best available tool for ensuring their compliance with the removal process. *See* SAR0255, 0272. Release on Parole+ATD is not open-ended but rather terminates upon the completion of immigration proceedings or removal (if so ordered), or at

---

[30] These causes for Parole+ATD have not resolved, as indicated by the fact that the CBP Commissioner continues each week to authorize some sectors to utilize Parole+ATD, which he may only do when specified overcapacity conditions exist. SAR0003. Whatever the cause for the high border encounter rates leading to those overcapacity conditions, Parole+ATD continues to be necessary for significant public benefit of providing "a safety valve to address overcrowding" and the numerous health and safety issues that can cause. SAR0002.

[31] The statute's use of the plural term "purposes," as opposed to merely "purpose," evinces Congressional recognition that release on parole may simultaneously serve multiple purposes and ends, and the value of the parole is not deemed exhausted until *all* of them have been achieved. *See* 8 U.S.C. § 1182(d)(5)(A).

any earlier point in ICE's discretion. *See id*. The DHS officer(s) supervising the noncitizen's proceedings are positioned to know when these endpoints have been reached. The portion of the record highlighted by Plaintiff at trial confirms that CBP and ICE share authority over the noncitizens' ongoing parole. If upon checking in, ICE determines that the noncitizen has committed a serious crime or disagrees with CBP's initial assessment regarding their national security or public safety risk, an ICE officer can revoke the parole and take the individual into custody pending removal proceedings. SAR0168; *see* Tr. Day 4, 99:24-100:23.

Were the Court to adopt the more limited view that the purposes of release on Parole+ATD are deemed fully served as soon as the noncitizen checks in with ICE or otherwise receives their NTA, even under this view Parole+ATD still comports with the statute. The custody "from" and "to" which the noncitizen is paroled is one and that same, that of the same overarching agency, DHS. That the border component (currently CBP) handles the initial parole and the interior enforcement component (currently ICE) takes over upon check-in and initiation of removal proceedings is immaterial for purposes of the statute, which was passed and last updated when all immigration functions were performed by the legacy Immigration and Naturalization Service. *See Delgado-Sobalvarro v. Att'y Gen.*, 625 F.3d 782, 786 (3d Cir. 2010) (describing history of parole statute). This principle is illustrated in *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961), which dealt with the parole of a

Cuban national under section 1182(d)(5). *Id.* at 412. In 1959, Rojas fled Cuba to the United States and applied for admission at the port of entry at Key West, Florida, where he was paroled into the United States. *Id.* at 407. He underwent exclusion (the precursor to removal) proceedings and received a final deportation order. The defendant, the INS District Director, ordered him to return to his custody for removal, but eventually decided to let him remain on parole in Miami due to his physical condition. *Id.* However, Rojas was planning an armed assault on Cuba, and the Secretary of State intervened to request that the INS revoke his parole, which it did, and detained him in a border patrol detention facility; the Fifth Circuit upheld that revocation. *Id.* at 407-408. *Ahrens* indicates that a parole granted at a port of entry (by the precursor to OFO) could be both revoked and regranted by the INS District Director (the precursor to ICE), and that a parolee could upon the second revocation be held by yet a third immigration component, border patrol (although the Fifth Circuit still deemed that border-patrol detention "returning the plaintiff to the custody of the defendant," that is, the INS Miami district director, *id.* at 412), all as a valid operation of the parole authority under section 1182(d)(5). In other words, *Ahrens* indicates that "the custody from which he was paroled" in 8 U.S.C. § 1182(d)(5)(A) refers to *federal immigration custody*, not a particular component or office of INS/DHS.

Section 1182(d)(5)(A) also provides that, upon that return to custody, the noncitizen's "case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Although Plaintiff might prefer to read "case" in this clause to refer narrowly to the noncitizen's removal proceedings, such that the availability of parole must be tied to ongoing removal proceedings, precedent demonstrates that "case" need not be read so narrowly, but rather sweeps in other noncitizen activities, procedures, and statuses. As *Ahrens* demonstrates, even once a final deportation order has been issued, parole may be reauthorized to accommodate a noncitizen's physical condition, which would have been impermissible if "case" were limited to specific exclusion (removal) proceedings. *See id.* at 407. In interpreting section 1182(d)(5)(A), the Supreme Court has also indicated that "case" cannot be limited to removal proceedings because noncitizens with final removal orders who are still present in the United States (who are no longer in removal proceedings) are eligible for parole under section 1182(d)(5)(A). *Clark v. Martinez*, 543 U.S. 371, 386 (2005) (explaining that in such circumstances, "[t]he manner in which the case of any other applicant would be 'dealt with'" as provided in section 1182(d)(5)(A) would be the procedures in 8 U.S.C. § 1231(a) for noncitizens who are no longer in removal proceedings but rather are awaiting execution of removal orders). Thus, while the record makes clear that the purpose of Parole+ATD is to facilitate the initiation,

conduction of, and completion of removal proceedings against the parolees, SAR0002, even were removal proceedings not the purpose, parole would still be viable under section 1182(d)(5)(A) to address other aspects of their immigration "case[s]."

Plaintiff also argues that Parole+ATD does not involve "a meaningful case-by-case adjudication" in determining whom to release because BP processing takes approximately 15 to 30 minutes per individual, during which agents are undertaking multiple inquiries and leaving little to no time to determine if the parole standard is met. Tr. Day 4, 107:15-108:4.

The record contradicts Plaintiff's assumption that the entirety of the process for interviewing a noncitizen and determining whether he or she is eligible for Parole+ATD takes 15 to 30 minutes; instead, the record provides only that the ministerial *processing* necessary to release the individual on Parole+ATD is what takes 15 to 30 minutes. SAR0005. As the July 18, 2022 memorandum indicates, starting the processing for Parole+ATD presupposes that a decision has already been made *to* process that individual for Parole+ATD, and not through other available Title 8 pathways like expedited removal. *Id.* The July 18, 2022 memorandum requires that officers consider a noncitizen's individual circumstances and verify they are not a national security risk, unmitigable flight risk, public safety threat, unaccompanied child, or are likely subject to mandatory detention for criminal

noncitizens before deciding to place them on Parole+ATD—not to mention the officer must first determine whether the noncitizen satisfies the section 1182(d)(5)(A) standard. SAR0003-04. Further, the July 18, 2022 memorandum explicitly requires that the biometric identity verification and national security and public safety screening be performed "*[p]rior* to a noncitizen's processing via Parole+ATD." SAR0004 (emphasis added). Hence, the individualized consideration of a noncitizen's security and flight risks, urgent humanitarian reason or significant public benefit for parole, and biometric verification have already occurred before BP agents begin the 15-to-30-minute processing phase (which also excludes the time frame in which ICE contractors are assessing the individual for risk in order determine the appropriate level of ATD, SAR0002).

Further, Plaintiff's processing-time argument based on an out-of-context detail from the administrative record does not and cannot articulate any flaw in the July 18, 2022 decisional memorandum itself, which does not impose any time limit on determining whether a noncitizen is eligible for Parole+ATD. *See* SAR0001-04. Rather, the memorandum requires that an individual determination be conducted in all cases, and the noncitizen may be released only if a case-by-case assessment establishes an urgent humanitarian reason or significant public benefit. SAR0003-04. As explained, BP agents are entitled to a presumption of regularity that they are properly conducting this determination. *See Latif*, 666 F.3d at 748.

Third, Plaintiff also maintains the July 18, 2022 memorandum violates the "urgent humanitarian reasons or significant public benefit" requirement in section 1182(d)(5)(A) because it argues, humanitarian reasons or public benefits cannot be the same for more than one individual. Tr. Day 4, 110:9-15.

The INA does not define "urgent humanitarian reasons" or "significant public benefit." In fact, in 1996, when Congress drafted the parole statute and created these terms, it explicitly removed language from the original bill that would have limited these circumstances to a defined set of rare situations. H.R. 2202, Immigration in the National Interest Act of 1995, § 523 (Aug. 4, 1995).[32] Congress eliminated these restrictions from the bill after concerns were raised about the importance of giving the Secretary "flexibility to deal with compelling immigration situations."[33] That Congress rejected the House's proposal of these limits in favor of the un-limited version the Senate eventually adopted weighs heavily against an overly restrictive interpretation of section 1182(d)(5). *See, e.g.*, *Hamdan v. Rumsfeld*, 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved

---

[32] https://www.congress.gov/bill/104th-congress/house-bill/2202/text/ih.

[33] https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf, at P. 538. At the time, there were competing versions of what the parole standard should include. The IIRIRA House Report proposed constraints on parole authority, which would have tightly limited the substantive grounds for release. *See* H.R. Rep. No. 469, 104th Cong., 2d Sess. Pt. 1, at 77-78 (1996) (cited in *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011)). However, Congress did not enact the House's proposed constraints, instead adopting the Senate's amendment to section 1182(d)(5)(A), which proposed, in material respects, the current standard, which more broadly authorizes release on parole to advance an (undefined) significant public benefit. *See* H.R. Rep. No. 828, 104th Cong., 2d Sess. 245 (1996).

the result the Government urges here weighs heavily against the Government's interpretation.") (citing *Doe v. Chao*, 540 U.S. 614, 621-623 (2004)).

The resulting absence of any statutory provision defining or limiting "urgent humanitarian reasons or significant public benefit" means that Congress delegated to the agency the role of adjudicating these terms. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see also New Mexico*, 450 F. Supp. 3d at 1175 n.5 (Section 1182(d)(5)(A)'s "vague standard conceivably encompasses a wide range of public benefits"). Defendants' implementation of "significant public benefit" to include preventing health and safety risks resulting from overcrowded detention facilities, SAR0002-03, is reasonable. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (further noting "judicial deference to the Executive Branch is especially appropriate in the immigration context"). Regulations and numerous authorities recognize the significant public benefit in fighting the spread of disease, and ensuring public health generally.[34] *See, e.g.,* 8 C.F.R. § 212.5(b)(1) (providing parole for noncitizens with "serious medical conditions in which continued detention would not be appropriate"); *Swain*, 961 F.3d at 1293 (noting "it doubtlessly advances the public interest to stem the spread

---

[34] To the extent detention capacity plays any role in this disease and death mitigation rationale, regulation, precedent, and accepted agency practice have recognized the need to prioritize limited detention space as a valid basis for parole. *See* Point III(A), *supra*.

of COVID-19"); *Grand River Enterprises Six Nations, Ltd.*, 425 F.3d at 169 (identifying the promotion of "public health" as a "significant public interest[]").

Plaintiff's argument that the urgent humanitarian reasons or significant public benefit must be unique to each individual noncitizen and cannot be shared with other similarly situated noncitizens or DHS personnel interacting with them, lacks any support and indeed is contradicted by the plain text of section 1182(d)(5)(A) and a regulation implementing its authority, 8 C.F.R. § 212.5(b), which Plaintiff does not challenge.[35] The former provides for parole based on "significant *public* benefit" and the latter provides, in relevant part, for parole of noncitizens "whose continued detention is not in the *public* interest." 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(b)(5) (emphasis added). These authorities thus expressly contemplate parole based on "public" considerations, that is, based on a larger group or community than simply the one noncitizen at issue. *See* "Public," https://www.merriam-webster.com/dictionary/public ("of, relating to, or affecting all the people or the whole area of a nation or state"). Moreover, in the adjacent subsection, which limits

---

[35] Any challenge to this regulation, promulgated in 1996, would be time-barred regardless. *See* 28 U.S.C. § 2401(a); *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006); *see also* 47 FR 30044-01 (1982). While 8 C.F.R. § 212.5(b) applies only to arriving aliens and noncitizens in the expedited removal process, it interprets the same authority, section 1182(d)(5)(A), providing the authority for Parole+ATD. And this regulation establishes DHS's reasonable and unchallenged interpretation of section 1182(d)(5)(A) that urgent humanitarian interests and significant public benefits need not be unique and can be realized if an individual falls within a group sharing common characteristics such as being a minor in DHS custody, 8 C.F.R. § 212.5(b)(3), or in another group whose detention is not in the public interest, *id.* § 212.5(b)(5).

the Secretary's authority to parole noncitizens who are determined to be refugees, Congress expressly employed the phrase "compelling reasons in the public interest *with respect to that particular alien*." 8 U.S.C. § 1182(d)(5)(B) (emphasis added). *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Had Congress intended to include that limiting phrase in section 1182(d)(5)(A), it could have readily done so. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2414 (2018) ("Had Congress instead intended in [this section of the INA] to constrain the President's power to determine who may enter the country, it could easily have chosen language directed to that end."). And it is well settled that the Secretary is empowered to establish general policies in relation to his exercise of discretionary parole authority under section 1182(d)(5). *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230, 244 (2001); *Reno v. Flores*, 507 U.S. 292, 313-14 (1993); *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 612 (1991); *Heckler v. Campbell*, 461 U.S. 458, 467 (1983); *Yang v. INS*, 79 F.3d 932, 936 (9th Cir. 1996); *Mak v. INS*, 435 F.2d 728, 730 (2d Cir. 1970); *see also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 163 (2003) ("In each of these instances, we draw a conclusion on grounds of plausibility: if Congress had meant to set a counterintuitive limit on authority to act, it would have said more than it did . . . .").

In fact, just a few years ago, when issuing the National Defense Authorization Act for Fiscal Year 2020, Congress explicitly recognized the "importance" of, in part, the Secretary's authority to make class-based parole eligibility rules. https://www.congress.gov/116/plaws/publ92/PLAW-116publ92.pdf, Section 1758, at pg. 133 STAT. 1861 (regarding parole in place eligibility for members of the armed forces). Congress has also funded several nationality-based parole programs for certain populations including, for example, Ukrainians. *See* 47 Fed. Reg. 30044-01 (1982). The fact that Congress has provided funding for group-specific parole programs indicates that Congress sanctions basing parole eligibility upon broad parole factors. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986). Plaintiff's critique is, in effect, a request for greater arbitrariness in making parole determinations. But nothing in the statute requires DHS to eschew general principles in making parole determinations, so long as those principles allow officers to take into account an individual's unique factual circumstances.

Next, Plaintiff argues that Parole+ATD "flips the presumption" in section 1182(d)(5)(A) and "make[s] a categorical judgment that under certain circumstances everybody gets paroled" unless they fall into "carve-outs" for "disqualifying crimes, or things like that." Tr. Day 4, 109:23-110:5. The June 2022 memorandum does not support this argument. The memorandum indicates that the presence of the triggering conditions that permit the CBP Commissioner to authorize Parole+ATD only creates

one more processing tool that officers *may* use. *See* SAR0002-05. The memorandum does not provide that Parole+ATD becomes the presumptive processing tool for all applicants for admission that BP encounters, and certainly not that all individuals eligible for Parole+ATD will presumptively be released without any case-by-case assessment to determine whether referral for detention or release is more appropriate. *See* SAR0002-05. Indeed, the record refutes the notion that BP is applying a blanket presumption of release, because it shows BP is still detaining significant numbers of noncitizens pending their processing. To trigger the (continually reevaluated) availability of Parole+ATD at all, there have to be over 15,000 noncitizens in custody across the Southwest border and/or the particular sector's facility is over 100% maximum detention capacity. SAR0003. And even after Parole+ATD had been authorized for some sectors, BP was still detaining on average 11,500 noncitizens per day throughout FY2022. SAR0005.

The administrative record establishes that the Parole+ATD program is not contrary to law.

## C. The Parole+ATD program is not arbitrary or capricious.

Plaintiff contends that Parole+ATD is arbitrary and capricious because the July 18, 2022 memorandum: (1) does not "tell immigration officers how to apply the parole requirement, that once the reasons for parole have been served, the person be taken back into custody;" Tr. Day 4, 105:8-10; (2) does not address the backlog or

"explain how to deal with it," *id.* at 112:4-9; (3) does not acknowledge "inconsistent agency positions" based on extra-record evidence that ICE has its own parole policy, *id.* at 114:2-18; (4) does not discuss "the effect the Parole Plus ATD policy might have on migration flows," *id.* at 117:3-4; and because (5) "the first Parole Plus ATD policy was limited to family units" but the "second Parole Plus ATD expanded it to single adults" which "is a significant change between policies that" was not discussed in the memorandum, *id.* at 117:13-20; *see also* SAC, ECF 74, ¶¶ 95-100.

As noted, the standard for showing a decision to be arbitrary and capricious is extremely deferential to agency decision-making. *See Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996). The courts cannot second guess an agency's thought process "as long as its conclusions are rational." *Miccosukee*, 566 F.3d at 1264. The "court is not to substitute its judgment for that of the agency" and should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp.*, 419 U.S. at 286.

The agency's conclusions in the July 18, 2022 memorandum about the advisability of providing the Parole+ATD pathway are more than "rational," and its path to those conclusions "may reasonably be discerned." High border encounter rates cause overcrowding at BP facilities, which causes health and safety risks. SAR0001-04. The goal of Parole+ATD is to serve significant public interests by

maximizing the resources used for both processing noncitizens for removal and making BP agents available to protect the border, while minimizing the hazards caused by overcrowding. SAR0001-02. The Parole+ATD program is a rational means that accomplishes this goal. Parole+ATD reduces the time BP must hold noncitizens, decompressing its holding facilities and mitigating the overcrowding risk, while the component of enrollment in ATD highly increases the likelihood that noncitizens so enrolled will comply with and undergo removal proceedings. This reasoned approach more than suffices under the deferential APA review standard. *See Miccosukee Tribe*, 566 F.3d at 1264.

Plaintiff's arguments that the July 18, 2022 memorandum is arbitrary and capricious do not alter this conclusion. First, there is no need for the July 18, 2022 memorandum to address how and when DHS officers are to end a grant of parole. As noted, parole under section 1182(d)(5)(A) is a longstanding INA authority that BP agents have employed for years. The parameters and procedures for termination of parole are provided in regulations. *See* 8 C.F.R. § 212.5(e). Further, the July 18, 2022 memorandum addresses the conditions under which BP agents may release a noncitizen under Parole+ATD to initiate removal proceedings, and that supervision and any continued parole will be handled by ICE. SAR0002-04.

Second, the record demonstrates that DHS considered and took efforts to address the backlog via changes to the Parole+ATD program in the July 18, 2022

memorandum. Prior to reauthorizing the program on July 18, 2022, the agency considered the size of the processing backlog resulting from the use of NTRs and Parole+ATD, but also considered the time and expenses that would be required to clear the backlog should Parole+ATD be fully ended at various points in time. SAR0261-71. Responding to and attempting to counteract the growth of this processing backlog, the July 18, 2022 memorandum directed CBP and ICE to find ways to streamline processing and designated each to be responsible for 50% of the subsequent processing of NTAs. SAR0004. Further, the record demonstrates that ICE has also undertaken an initiative to further relieve backlogs at regional offices and expedite the service of thousands of NTAs by mail. SAR0165-69. More is not required, as the agency "need not write an exegesis" on an issue so long as its decision indicates that it "considered and reasoned through" the evidence. *Farah v. U.S. Att'y Gen.*, 12 F.4th 1312, 1329 (11th Cir. 2021). Evidence of the backlog data in the record and the July 18, 2022 memorandum demonstrate that DHS "considered and reasoned through" the backlog created by Parole+ATD, alternatives such as ceasing it or changing the program to improve processing capacity (a path which the agency decided to pursue), and ultimately determined that the benefits of Parole+ATD still outweighed the backlog's associated costs.

Plaintiff relies on *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1912 (2020), in support of its argument that the

Parole+ATD memorandum itself, as opposed to the memorandum in combination with its supporting record, failed to consider an important aspect of the problem in the form of the backlog. In *Regents*, the Supreme Court held that the Secretary's reasoning only touched on the illegality of providing affirmative benefits under DACA and failed to consider or provide a basis for rejecting another part of the program, forbearance. *Id.* The issue in *Regents* was whether the agency considered continuing the forbearance piece *at all*, not, as Plaintiff focuses on here, a matter of how much of the consideration of the issue was presented in the decisional memorandum versus the administrative record. *Id.* Here, the agency unmistakably recognized the issue of the backlog and called for measures to address it. *Regents* does not indicate that Defendants' decision regarding authorizing Parole+ATD was deficient.

Third, Plaintiff improperly relies on extrinsic evidence to support its argument that the July 18, 2022 memorandum does not acknowledge "inconsistent agency positions," pointing to extra-record evidence that ICE has its own parole policy, ICE Parole Directive 11002.1 (Dec. 9, 2008), Ex. C, in contrast to Parole+ATD. Extra-record arguments are not a basis for challenging an agency action under the APA, where "the task of the reviewing court is to apply the appropriate … standard of review … to the agency decision based on the record the agency presents to the reviewing court." *Pres. Endangered Areas of Cobb's Hist.*, 87 F.3d at 1246. "[T]he

focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Plaintiff has not demonstrated that the Parole+ATD record requires supplementation, and the Court has agreed that review of Parole+ATD must be limited to the administrative record, *see* ECF 55, and therefore an argument based on extrinsic evidence about how another component of DHS addresses parole is irrelevant to the substantive validity of the July 18, 2022 memorandum.

However, even if the Court considers ICE Parole Directive 11002.1, it does not demonstrate that Parole+ATD is arbitrary and capricious. The ICE Directive provides guidance to ICE for paroling certain noncitizens, "arriving aliens," who come to it through the expedited removal process after demonstrating a credible fear. *Id.* The July 18, 2022 memorandum, by contrast, provides parole guidance to BP officers, not ICE (whose only roles in Parole+ATD are to determine the appropriate type of ATD for noncitizens BP has already decided to release, SAR0003, and then to decide whether to re-detain the noncitizen at later stages of the removal process). The July 2022 memorandum does not apply to "arriving aliens" coming through the expedited removal process, but limits its focus to those who will be processed with NTAs and placed directly into removal proceedings under section 1229a. *Id.* Even so, both the July 18, 2022 memorandum and the ICE Directive apply the section

1182(d)(5)(A) standard, requiring that any releases be justified by an urgent humanitarian interest or significant public benefit; require a case-by-case adjudication; and prohibit release of noncitizens who are national security, public-safety or unmitigable-flight risks. *Compare* SAR0002-03 *with* Ex. C at ¶¶ 4.2, 4.3, 5.3, 6.2 (both providing for parole only based on an individualized inquiry under section 1182(d)(5)(A) standard where the person is not a flight nor security risk).

Fourth, without support, Plaintiff argues Parole+ATD encourages migration. The July 18, 2022 memorandum reflects DHS's consideration of migratory flows by only permitting a sector to utilize release under this mechanism for the specified period when high encounter rates have the sector (or border generally) at overcapacity. SAR0003. Plaintiff suggests that Parole+ATD is encouraging migration, but this inverts cause and effect. The record establishes that Parole+ATD was developed to respond to a record number of border encounters, and not that border encounters increased after the use of Parole+ATD. SAR0001-04, 0162-63. By contrast, nothing in the record indicates that noncitizens were drawn to the Southwest border principally by the prospect of Parole+ATD, or even that Parole+ATD specifically was a factor at all in the migrants' decision-making. *See Whitewater Draw*, 5 F.4th at 1015 ("myriad economic, social, and political realities [] might influence an alien's decision to risk life and limb to come to the United States.") (cleaned up). Even were it possible to undertake some empirical study of

the effect of Parole+ATD on migration patterns, "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies" before reaching decisions. *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021). Further, the premise of Plaintiff's argument, that the government could or should use its parole authority to deter migration, has been called into question by courts. *See Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 157 (D.D.C. 2018) (directing the government in that case to provide a new parole decision "without considering immigration deterrence" as a factor).

Fifth, Plaintiff incorrectly argues the expansion of Parole+ATD from just family units to include single adults constitutes a change of position and requires additional explanation under the APA. *If* an agency "*is* changing position," and particularly if that new position "rests upon factual findings that contradict those which underlay its prior policy," *then* the APA may require some explanation regarding the change. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). That is not the case here. While the November 2021 memorandum contemplated that Parole+ATD would be used, at that time, *primarily* for family units, it did not preclude the use of the policy for single adults. SAR0163. There is nothing inherent in the policy as originally described in November 2021 that is limited only to family units. *See id.* Further, both the November 2021 and July 2022 memoranda reflect that in-custody figures will trigger the use of Parole+ATD,

without any distinction between family units or individuals. SAR0003, 0163. BP agents must undertake the same individual-specific inquiry under section 1182(d)(5)(A) when deciding whether to grant parole. SAR0164. Thus, since the agency never adopted a prohibition on using it for single adults, and the apparatus for applying Parole+ATD was the same for both adults and families, the application of the program to single adults did not represent an inconsistent position by comparison to past practice and required no further explanation. *See Fox Television Stations*, 556 U.S. at 515.

Accordingly, the July 18, 2022 memorandum is not arbitrary and capricious.[36]

## D. The Parole+ATD program was not subject to notice and comment.

Plaintiff incorrectly claims that the July 18, 2022 memorandum was required to undergo notice-and-comment rulemaking. Tr. Day 4, 117:21-25; *see* SAC, ECF 74, ¶¶ 104-106. However, the Parole+ATD guidance is not the type of rights-creating document that requires notice and comment rulemaking, as it only provides guidance for the implementation of the Parole+ATD policy consistent with section 1182(d)(5)(A).

The notice-and-comment rulemaking requirement does not apply to "interpretative rules" or "general statements of policy." 5 U.S.C. § 553(b)(A); *Perez*

---

[36] Plaintiff's arguments on the arbitrary and capricious claim from summary judgment that were not discussed at trial, to the extent not waived, lack merit for the reasons previously briefed by Defendants. ECF 88-1 at 42-46; ECF 107 at 14-15.

*v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike legislative rules, interpretive rules "simply state[] what the administrative agency thinks the statute means." *Warshauer*, 577 F.3d at 1337. Such guidance does not create rights or duties but merely "remind[] affected parties of existing duties." *Id.* The difference "likely turns on how tightly the agency's interpretation is drawn linguistically from the actual language of the statute." *Id.* Similarly, whether an agency pronouncement is a rule versus a general policy statement "depends upon whether the agency action establishes a binding norm." *Nat'l Min. Ass'n v. Sec'y of Labor*, 589 F.3d 1368, 1371 (11th Cir. 2009) (quotation omitted). The memorandum does not produce a binding rule because it permits agents to continue considering the individual circumstances of each case. *See id.* ("As long as the agency remains free to consider the individual facts in the various cases that arise, then the agency in question has not established a binding norm."); *see also Texas v. United States*, 50 F.4th 498, 522 (5th Cir. 2022) (whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion"). Rules of "agency organization, procedure, or practice" are also exempt from the notice and comment requirement. 5 U.S.C. § 553(b)(A); *see Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014).

The July 18, 2022 memorandum is, at most, an interpretive rule or general statement of policy because it offers guidance that directly tracks the language of

section 1182(d)(5)(A): release on Parole+ATD may only be granted "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." SAR0003. The July 18, 2022 memorandum does not create any rights or duties for DHS or noncitizens, and the guidance does not expand the use of parole beyond the confines permitted under the statute. *See Warshauer*, 577 F.3d at 1337. Rather, the July 18, 2022 memorandum provides that DHS's determination of an "urgent humanitarian reason" or "significant public benefit" can include considerations of health and safety where overcrowding conditions are present. Thus, the July 18, 2022 memorandum is at most an interpretive rule. Additionally, it may be viewed as a general policy statement, as the July 18, 2022 memorandum does not establish a binding norm, because the agency remains free to consider facts in individual cases and in the week-by-week, sector-specific assessments as to whether to continue to authorize Parole+ATD. SAR0002-04; *see Nat'l Min. Ass'n*, 589 F.3d at 1371. Indeed, mirroring the parole statute, the procedures outlined in the July 18, 2022 memorandum are applied "on a case-by-case basis," and provide no assurance that parole will be granted in any specific case. SAR0002-04. Rather, the July 18, 2022 memorandum falls comfortably within the longstanding rule that agency policies or procedures that inform the public of the agency's current policy regarding enforcement and use of discretionary authorities (here, the parole authority) are general statements of policy. *See, e.g.*, *Innovation Law Lab v. McAleenan*, 924 F.3d

503, 509 (9th Cir. 2019) (explaining that the agency policy which directed immigration officers to consider whether they "may return" a noncitizen to Mexico pending removal proceedings was a statement of policy "because immigration officers designate applicants for return on a discretionary case-by-case basis"), *stay granted*, 140 S. Ct. 1564 (2020); *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions). In short, the July 2022 memorandum merely "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted).

Alternatively, the July 2022 memorandum qualifies as a rule of "agency organization, procedure, or practice." 5 U.S.C. § 553(b). "Procedural rules," the general label for rules falling under this exemption, are "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza*, 754 F.3d at 1023 (quotation omitted). Parole+ATD is aimed at improving the internal operations of BP by speeding up border processing and addressing overcrowding and detention facilities. SAR0001-04. The July 18, 2022 memorandum improves the DHS subcomponents' use of parole authority without changing the substantive rights of the affected noncitizens or third parties. *See Mendoza,* 754 F.3d at 1023. By contrast, processing via Parole+ATD does not alter the "the substantive criteria by which"

DHS will "approve or deny" a parole request or an ultimate claim for relief. *James v. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).

Under any scenario, the July 18, 2022 memorandum does not promulgate a substantive, rights-altering rule and consequently was not required to undergo notice and comment.

## IV.   <u>There is No Non-Detention Policy</u>

Plaintiff alleges that in 2021, Defendants instituted an unwritten non-detention policy at the Southwest border. Plaintiff challenges this unwritten policy under the APA as contrary to law, arbitrary and capricious, and as procedurally improper based on Defendant's failure to engage in notice and comment rulemaking. SAC, ECF 74, at ¶¶ 77-82, 87-94, 101-103. This claim raises five questions for the Court: (1) has Plaintiff identified a specific agency statement of non-detention that can be challenged as a policy under the APA; (2) has Plaintiff proven the alleged policy exists; (3) is the policy arbitrary and capricious; (4) is the policy contrary to law; and (5) did the policy have to undergo notice and comment? For the reasons discussed below, the answer to each of these questions is no.

### A. Plaintiff has not identified a specific agency statement that is reviewable under the APA.

Plaintiff claims that Defendants' non-detention policy is unwritten. But whether written or unwritten, a challenged policy must be tied to a specific agency statement to be reviewable under the APA. *See Texas*, 142 S. Ct. at 2545 (Courts

126

may not "postulat[e] the existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision."). *Texas* concerned the Secretary of Homeland Security's termination of the Migrant Protection Protocols ("MPP") via a June 1, 2021 memorandum, and later in an October 29, 2021 memorandum. On December 13, 2021, the Fifth Circuit affirmed the district court's decision requiring the government to re-implement MPP. *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021). As relevant here, the court of appeals held that the October 29 memorandum terminating MPP did not constitute final agency action because it (like the June memorandum) was merely evidence of the Secretary's separate, freestanding, policy decision to terminate MPP, and that only the Secretary's freestanding decision had legal effect. 20 F.4th at 951, 950-58. The Supreme Court reversed. It held the Fifth Circuit committed reversible error because Courts are not free to "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision." *Id.* at 2545. The Supreme Court explained, "[t]o the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error." *Id*. "It was not the case that the [June and October memoranda] simply *explained* DHS's decision [to terminate MPP]…To the contrary, the [memoranda] were themselves the operative agency actions, each of them an agency statement…designed to implement,

interpret, or prescribe law or policy." *Id*. Thus, assuming Plaintiff can challenge an unwritten policy under the APA, *Texas* makes clear that Plaintiff must identify a specific "agency statement" that it is challenging. Plaintiff has not done so here—as a matter of pleading or as a matter of proof.

In the SAC, Plaintiff broadly—and vaguely—defined the alleged non-detention policy as "the government's policy of releasing aliens subject to mandatory detention." ECF 74, ¶ 20. At summary judgment, Plaintiff similarly described it as the government's "*general* policy of releasing aliens subject to mandatory detention." ECF 86 at 2 (emphasis added). Plaintiff abandoned that articulation of the policy during closing arguments after the Court observed that "[the policy cannot be] we're not going to detain anybody because they are detaining people." Tr. Day 4, 72:1-2. Plaintiff narrowed its description and claimed, for the first time, that the policy is that Defendants "are not [] detain[ing] individuals unless they fall into. . . narrow public safety categories." Tr. Day 4, 71:22-72:7.

The Court should not consider Plaintiff's post-trial articulation of the alleged non-detention policy. A plaintiff may not change its claims after trial merely because the evidence failed to support the claims alleged in its complaint. *See, e.g.*, *Washington A. & G. R. Co. v. Bradleys*, 77 U.S. 299, 303 (1869) ("It is hardly necessary to repeat the axioms in the equity law of procedure, that the allegations and proofs must agree, that the court can consider only what is put in issue by the

pleadings, that averments without proofs and proofs without averments are alike unavailing."). While Federal Rule of Civil Procedure 15(b) "allows parties to add unpled issues to a case if those issues have been tried with the express or implied consent of the parties," *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1335 (11th Cir. 2020), Defendants neither expressly nor impliedly consented to Plaintiff changing its definition of the non-detention policy during closing arguments. Implied consent requires actual notice of the new claim or theory. *Id*. at 1339; *Cioffe v. Morris*, 676 F.2d 539, 541–42 (11th Cir. 1982). Actual notice is required because a party moving under Rule 15(b) "must comply with the notice demands of procedural due process." *Doe #6*, 974 F.3d at 1335.

Here, Defendants did not have actual notice of Plaintiff's new explanation of the alleged non-detention policy until after the conclusion of the evidentiary portion of the trial. That delay prejudiced Defendants, because Defendants, who have consistently denied there is any non-detention policy, were struggling to understand what the non-detention policy supposedly was. Indeed, the Court seemingly had the same struggle: "I've been trying to struggle to put my arms around this and understand what it was, and [Plaintiff's counsel's explanation during oral argument] was the first time it really kind of made sense to me." Tr. Day 4, 165:22-25. It is no small thing that, in a trial whose primary purpose was to determine whether

Defendants have a non-dentition policy, Plaintiff changed its articulation of what it claims the policy is after the submission of all the evidence.

The Court should not entertain Plaintiff's post-trial articulation of the alleged non-detention policy. *See Doe #6*, 974 F.3d at 1335 (Holding the district court did not abuse its discretion when, on that last day of a five-day bench trial, it declined to permit plaintiff to change its case theory from a facial constitutional challenge to an as-applied challenge, because fair notice was not given to the defendant and due process was therefore not satisfied); *Vital Pharms., Inc. v. Monster Energy Co.*, 553 F. Supp. 3d 1180, 1236 (S.D. Fla. 2021) (declining to permit plaintiff, after trial, to change its pre-trial definition of its unregistered trade dress); *c.f. Theni Guru Krishna Textile Mills, Ltd v. World's Glob. Source, LLC*, 844 F. App'x 279, 280 (11th Cir. 2021) (Defendant was not prejudiced by a new issue introduced during trial, where the district court recessed the bench trial for four-and-a-half weeks so that defendant could prepare to address the new claim when the case continued).

Regardless, Plaintiff failed to establish the existence of the non-detention policy under any theory. *See* 5 U.S.C. § 551(4) ("rule" for purposes of the APA "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency…"); *Texas*, 142 S.Ct. at 2545 (federal courts may not "postulat[e] the

existence of an agency decision wholly apart from any agency statement . . . designed to implement that decision."). The Court received testimony about the Defendants' detention policies and operations from five witnesses, three who testified in court and two by deposition. Given their roles since January 2021, each of the three live witnesses would know if a non-detention policy existed. Tr. Day 2, 73:14-17, 139:12-16; Tr. Day 3, 31:18-32:2. Critically, none of these witnesses testified to the existence of a non-detention policy. Indeed, the three witnesses who testified in court—whom the Court found credible (Tr. Day 4, 164:6-11)—testified to the contrary: Matthew Davies, Executive Director of Admissibility and Passenger Programs for OFO, testified that he is not aware of any generalized preference for parole over detention, any policy discouraging detention, or any abdication of case-by-case review for determining the appropriate processing disposition for any noncitizen. Tr. Day 2, 73:14-74:4. Robert Guadian, ICE's Deputy Assistant Director for Field Operations East testified he is not aware of any policy directing ICE to release noncitizens transferred to ICE from CBP rather than detaining them. Tr. Day 3, 63:3-12. Raul Ortiz, Chief of the Border Patrol, testified that he is not aware of any directive suggesting a preference for release over detention, any policy communicating an abdication of case-by-case review, or any policy discouraging the transfer of noncitizens to ICE for detention. Tr. Day 2, 129:17-140:6.

Plaintiff relies on the Interim Civil Enforcement Priorities adopted immediately after the beginning of the current administration (a.k.a. the Pekoske Memo, Ex. 16) to argue that DHS has followed a broad non-detention policy. That argument is meritless. The Pekoske Memo is legally irrelevant here, and in any event, Plaintiff mischaracterizes its significance. Whereas Chief Ortiz testified that the Pekoske Memo "drove part of [the] decision-making" as to who should be detained "on a mandatory basis," Tr. Day 2, 155:17-156:3, he did not testify that he understood the Pekoske Memo to say that Border Patrol could *only* detain those categories of noncitizens listed in the Memo. On the contrary, he testified that BP continues to assess parole on a case-by-case basis, based on the same factors used prior to January 2021, which have always included flight risk and danger to the community. Tr. Day 2, 114:21-115:8, 175:10-14. Any in any event, the Pekoske Memo has long been superseded and bears no relevance to the issues in this case. The Court received the Pekoske Memo into evidence "for th[e] limited purpose of understanding what . . . the Notice to Report policy once was for prosecutorial discretion, . . . but no other." Tr. Day 2, 24:24-25:3.[37]

---

[37] Further, the reviewability and legality of the final enforcement priorities—as set forth in a later, superseding, iteration of the Pekoske Memo—is already pending before the Supreme Court. *See United States v. Texas*, No. **Error! Main Document Only.**22-58. Florida also filed a lawsuit challenging the enforcement priorities in Orlando and lost that challenge. *See Florida v. United States*, No. 8:21-cv-541-CEH-SPF, 2021 U.S. Dist. LEXIS 94083, at *28-29 (M.D. Fla. May 18, 2021) (Prioritization guidelines "are not statutes and do not have the status of law as they constitute a prioritization and not a prohibition of enforcement"). Undeterred, Florida then joined the States

In short, there was no direct evidence presented at trial—testimonial or documentary—that Defendants have a non-detention policy. By contrast, when district courts that have permitted APA review of unwritten policies, there was at least some direct evidence of a specific agency statement subject to review. *See, e.g.*, *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 146 (D.D.C. 2018) ("public statements by high level government officials . . . indicating the existence of a deterrence policy" even under less-rigorous preliminary-injunction standard); *id.* at 147 (noting government actually "admitted to a deterrence policy" in *R.I.L.-R v. Johnson*, 80 F.Supp.3d at 177); *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 929–30 (D.C. Cir. 2008) (Commission failed to deny or refute that it had a "policy of disclosing confidential information without notice.").

Instead of direct evidence of a non-detention policy, Plaintiff presented the Court with evidence of assorted decisions made by Defendants, which it alleges, taken together, are evidence of a non-detention policy.[38] But the Court may not

---

of Alabama and Georgia to challenge the enforcement priorities in the Northern District of Alabama. *See Alabama v. Biden*, 22-CV-418, which is currently stayed pending the Supreme Court's decision in *United States v. Texas*. *Id*. ECF No. 17.

[38] Among the discrete decisions challenged by Plaintiff are Defendants' decision to (i) close and/or repurpose three FRCs, (ii) seek more funding for alternatives to detention and less funding for detention operations than the prior administration, (iii) prioritize the detention of noncitizens who pose a national security risk over the detention of individuals who do not pose such a threat, (iv) use Parole+ATD to decompress Border Patrol stations, and (v) use, for a limited period of time, NTRs to decompress Border Patrol stations (a decision that is now rescinded and moot), and (vi) terminate MPP. The substance of each of these as they relate to the non-detention policy of these is discussed below in turn.

"postulat[e] the existence of an agency decision wholly apart from any 'agency statement'" implementing that decision, *Texas*, 142 S. Ct. at 2545; *accord Brnovich*, 2022 WL 4448322, at *10, nor aggregate individual decisions or policies into a super-policy, *Whitewater Draw*, 5 F.4th at 1012 (citing *Lujan*, 497 U.S. at 891).

In *Brnovich*, a case almost identical to this one, a district court in Arizona found that the Supreme Court's decision in *Texas* precluded it from considering the plaintiffs' challenge to Defendants' alleged non-detention policy under the APA.

> To the extent Plaintiffs contend their claims are directed at Defendants' "mass-parole and non-detention" policies in general, however, rather than any specific agency decision or document, they misunderstand the scope of judicial review under the APA. Courts should not, and indeed cannot, review broad, generalized agency policies in the abstract. Nor can they separate an agency's decision from the statement intended to implement that decision. *See Texas*, --- U.S. ---, 142 S. Ct. at 2545 (courts cannot "postulat[e] the existence of an agency decision wholly apart from any 'agency statement of general or particular applicability . . . designed to implement' that decision" (quoting 5 U.S.C. § 551(4))). That is because an agency's statement is in fact the "action" that the APA permits courts to review…. The Supreme Court's language applies with equal force in this case… Accordingly, Plaintiffs' APA claims related to the NTR policy are reviewable, but to the extent Plaintiffs attempt to challenge amorphous parole policies, those APA claims must be dismissed.

*Id.,* 2022 WL 4448322, *10.

Not only is Plaintiff prohibited from postulating the existence of an agency policy from a collection of data and separate decisions, *Texas*, 142 S. Ct. at 2545, it

also cannot aggregate separate agency decisions into a policy. Rather, the APA requires Plaintiff to "direct its attack against some *particular* 'agency action.'" *Lujan*, 497 U.S. at 891 (emphasis added).

In *Lujan*, environmentalists challenged what they termed the Bureau of Land Management's "land withdrawal review program." 497 U.S. at 890. They alleged that the program violated the law in numerous respects. *Id* at 891. But instead of attacking each alleged failing as final agency action individually subject to review under the APA, the *Lujan* plaintiffs sought to have the entire program declared illegal. The Supreme Court did not allow that. It held that a "challenge [to] the entirety of petitioners' so-called 'land withdrawal review program' . . . [was] not an 'agency action' . . . , much less 'final agency action,'" because the challenged program was "simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans." *Id.* at 890. The Court concluded that this type of broad, programmatic attack is not actionable under the APA and instead should be addressed in "the halls of Congress, where programmatic improvements are normally made." *Id*.

Similarly, here, Plaintiff broadly attacks what it calls the non-detention policy—which, absent a specific policy statement, can be characterized, at best, as

an amalgam of separate decisions made by the Secretary of Homeland Security, BP, OFO, and ICE with respect to detention and parole priorities. Pursuant to *Lujan*, judicial review of such aggregated decisions is not permitted under the APA. *See Whitewater Draw*, 5 F.4th at 1012, *cert. denied*, 142 S. Ct. 713 (2021) (no APA review of a collection of individual actions pertaining to a single subject simply by labeling those individual actions a policy); *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 791 (D. Ariz. 2022), *appeal dismissed*, No. 22-15519, 2022 WL 6105386 (9th Cir. Sept. 12, 2022) (holding that State's challenge to a "collection of actions" as a "*de facto* program" that has encouraged migration and population growth is not actionable under the APA); *see also Lightfoot v. D.C.*, 273 F.R.D. 314, 326 (D.D.C. 2011) ("The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences. . . but rather, Plaintiffs must first identify the 'policy or custom'" they contend violates the law). "The APA authorizes challenges to specific actions—such as a particular rule or order. It does not authorize plaintiffs to pile together a mish-mash of discrete actions into a 'program' and then sue an agency to force broad policy changes to this 'program.'" 33 Charles Alan Wright et al., Fed. Prac. & Proc. Judicial Review § 8322 (2d ed., Apr. 2021 update). Indeed, what Plaintiff seeks to do in this lawsuit is challenge the current administration's "change in approach" to immigration. Tr. Day 4, 78:20. But, as the Court noted, changes in approach between administrations are not

"particularly surprising because you have a new administration, you have new priorities, and that's just how the process works." *Id.* at 78:24-79:1.[39] In short, Plaintiff has neither identified nor established a specific agency statement which is challengeable under the APA.

**B. Plaintiff has not proven that Defendants have a non-detention policy.**

Even if Plaintiff could challenge a policy untethered to a specific agency statement or a policy built by aggregating other policies into a super-policy—neither of which it can do as set forth above—the evidence that Plaintiff offered in support of the existence of such a policy does not survive scrutiny.

i. The detention and parole statistics Plaintiff relied on do not establish a non-detention policy.

Plaintiff presented the Court with statistics showing that since January 2021, more noncitizens who have entered the country at the Southwest border have been released than during the previous administration. *See, e.g.*, Ex. 1, at 4, Ex. 2 at 2-3. Plaintiff argues that this trend provides evidence of a non-detention policy. Tr. Day 1, 9:16-21, 11:16-22; Tr., Day 4 77:5-25, 79:7-8. Not so: the evidence demonstrates other factors account for these differences.

First, at the end of the previous administration, the country was at the height of an ongoing global pandemic, and "there were travel restrictions . . . which severely

---

[39] For the same reason, Plaintiff cannot aggregate individual immigration officer decisions granting parole or release under sections 1225 and 1226 into a policy.

depressed the number of travelers who were coming to the United States both lawfully and unlawfully." Tr. Day 2, 93:10-17. For example, in January and February 2020, BP was apprehending about 30,000 migrants a month at the Southwest border. Ex. 1 at 4. In March 2020, as the pandemic was intensifying, that number fell to about 23,000. *Id.* By April that number fell to under 1,200 and remained low for months. *Id.*

Second, beginning near the end of the previous administration, and continuing into the current administration, there was a trending increase in monthly irregular migration to the United States over the Southwest border. Ex. 98 at 3. For example, in the last three months of the previous administration there were 6,041, 7,881, and 10,546 apprehensions by BP respectively. Ex. 2 at 3. In the first three months of the current administration that trend continued with apprehensions of 12,787, 25,325, and 61,972 respectively. *Id.* By July 2021, that number surpassed 100,000. *Id.*[40] And, while releases increased as a result of the influx of migration, so too did the use of expedited removal and detention. *See, e.g.*, Ex. 2 at 3-4. For example, in December 2020, only 1,643 noncitizens were processed through expedited removal. Ex. 2 at 3. But that number increased almost month-by-month, and by July 2021, that number

---

[40] Data shows that many of these apprehensions were repeat border-crossers. By June 2022, "51 percent of Title 42 expulsions were followed by re-encounters of the same individuals." https://www.dhs.gov/sites                                          /default/files/2022-12/2022_1114_plcy_enforcement_actions_fy2021.pdf. This suggests that apprehension numbers may be elevated because migrants are repeatedly trying to enter the country after prior Title 42 expulsions.

stood at almost 13,000. *Id*. Similarly, in December 2020, only 4,183 noncitizens were transferred to ICE by BP for detention; by July 2021, that number was over 28,000. *Id*. Voluntary returns also increased month by month over this same period. *Id*.

Third, at the same time that BP was seeing increases in migration, there was a change in the demographics of those migrants crossing the border between points of entry. Most notably, there was increase in migration by noncitizens from Cuba, Nicaragua, and Venezuela. Ortiz Dep., 93:4-14; Barker July 13, 2022 Dep., 198:14-199:7. Because repatriation was generally not possible for those populations, *id.*, and Defendants may not indefinitely detain populations subject to final orders of removal for whom removal is unlikely, *Zadvydas*, 533 U.S. at 699 (noting such detention would be unconstitutional), noncitizens from these countries often had to be released. Barker July 13, 2022 Dep., 198:14-199:7.

Fourth, Mexico passed a law which precluded Mexican officials from detaining children who are not Mexican nationals, even if they were with their families. Because Mexico would not accept such children, especially those from Cuba, Nicaragua, and Venezuela, this new law, which sent into effect on January 11, 2021,[41] adversely affected the Border Patrol's ability to expel family units under Title 42. *Id*. That necessarily meant that more individuals had to be either detained,

---

[41] https://imumi.org/wp-content/uploads/2021/03/Asylum-migrant-children-march-2021.pdf

or—as was the case, since detention capacity was over-stretched and pandemic conditions created a risk of disease transmission—paroled using Parole+ATD. which resulted in more paroles.

As set forth above, the evidence at trial established that a variety of factors contributed to the increase in the number of applicants for admission released at the Southwest border. And critically, the evidence failed to show that any increase in the number of noncitizens released was due to an alleged non-detention policy.

ii.   Funding requests are not evidence of a non-detention policy.

It is undisputed that the current administration requested less funding for detention operations than the previous Administration. *See* Ex. NN, at 10; Ex. OO, at 5. But this is irrelevant. The Budget and Accounting Act requires the President to submit a budget proposal to Congress, *see* 31 U.S.C. §1101, *et seq.*, but Congress is free to enact appropriations that are less than, more than, or consistent with the President's budget request. *See* U.S. Const., art. I, §9, cl. 7. Indeed, in his FY2021 budget request, President Trump requested $4,137,380,000 for ICE custody operations.[42] Ex. NN, at 10 (all figures are noted in thousands). But Congress largely

---

[42] DHS receives its appropriations for the costs of detention and ATD through ICE's appropriations. *See, e.g.,* Ex. AA at 18. ICE receives an annual appropriation for Operations and Support, which contains a set aside amount for Enforcement, Detention, and Removal Operations. *Id*. Congress, in the Joint Explanatory Statement that accompanies the appropriation further divides the funding provided into Programs, Projects, and Activities, or PPAs. *See, e.g.,* Ex. OO at 3, 5. ICE receives an annual PPA for "custody operations," which is where it funds the costs of detention. *Id; see also* Exhibit NN at ICE-O&S-125. ICE also receives an annual PPA for

rejected that administration's request. Indeed, Congress appropriated only $2,836,128,000 for custody operations for 2021—*thirty-two percent* less than what was requested. Ex. OO, at 5. President Biden, in his 2022 budget request, then requested $2,775,100,000 for custody operations, Ex. OO, at 5, about 2.5% less than what Congress appropriated in 2021.[43] Detaining just the noncitizen single adults apprehended at the Southwest border who are currently in removal proceedings would cost at least a roughly-estimated $45,625,000,000 a year, Tr. Day 3, 38:22-39:9—which is more than five times ICE's entire operating budget for 2022, Ex. DD, at 136 STAT 317. Viewed in that light, the roughly 2.5% difference between the funding requested for custody operations for FY2022, and what Congress appropriated under the previous administration for FY2021, is miniscule and

---

"alternatives to detention," which funds that program. *Id.* at ICE-O&S-165. With respect to detention beds, ICE does not receive funding tied to a certain amount of bed space. Tr. Day 3, 36:18-37:4. ICE receives funding for custody operations, which includes the costs of detention, and it tries to estimate how many beds a certain amount might cover under current market conditions. Exhibit NN at ICE-O&S-125. When Congress provides funding for custody operations, however, it does not limit ICE to a certain number of beds. *See, e.g.*, Ex. OO at 3, 5, NN at ICE-O&S-125. ICE may purchase however much detention space it can afford, based on the amount of funding provided. Tr. Day 3, 36:18-37:4. President Trump's request for $4,137,380,000 for custody operations in 2021 (which is not limited to beds, but includes funding for related costs, such as guards, healthcare, and other services for custody operations, Ex. NN at ICE-O&S-130), was anticipated to cover the cost of 60,000 beds. Ex. 13 at 3.

[43] Congress appropriated $2,800,481,000 for custody operations in 2022, very close to what the administration requested, https://www.congress.gov/117/crec/2022/12/20/168/198/CREC-2022-12-20-pt2-PgS8553-2.pdf, pg. 8608, and actually slightly more than was appropriated to the prior administration.

insignificant.[44]

Furthermore, while President Biden requested less funding for custody operations than President Trump, he requested more funding for alternatives to detention. *Compare* Ex. NN at 10 *with* Ex. OO at 5. That decision was rational: whereas it costs at least $125 a day to detain a single adult noncitizen, Tr. Day 3, 37:7-10, it costs less than $8 day to place a noncitizen on alternatives to detention, Tr. Day 3, 46:10-12. Thus, dollar-for-dollar, far more people can be supervised while undergoing removal proceedings with alternatives to detention than via detention— fifteen times more.

Congress appears to have agreed that increasing funding for alternatives to detention makes sense. Congress has consistently appropriated more funding for

---

[44] The difference can also be considered in terms of number of beds that the funding requests and appropriations can purchase. In 2020, ICE had 45,000 detention beds. Tr. Day 3, 38:3-13. For 2021, President Trump requested funding for 60,000 beds. Ex. 13 at 3. Congress appropriated sufficient funding for ICE to fund 31,500 beds in 2021. Tr. Day 3, 37:24-25. In the 2022 budget, President Biden requested funding for 32,500 beds. Ex. 25, at 35. Congress appropriated enough funding for 34,000 beds. Tr. Day 3, 37:18-23. Administrations prior to that of President Trump requested funding amounts for detention comparable to the current Administration. *See, e.g.*, DHS Budget in Brief for FY 2014, at 130 (cited at ¶ 85 of the Findings of Fact.) Critically, ICE would need 4.7 million beds to detain all the noncitizens currently in removal proceedings, Tr. Day 3, 38:14-17, which is more detention beds than exist in the country, Tr. Day 3, 39:24-40:9. So again, the difference in the number of beds requested by President Biden compared to both the number of beds sought by President Trump and appropriated by Congress is contextually insignificant. Also, Congress actually appropriated *more* funding to President Biden for 2022 than it did to President Trump for 2021.

alternatives to detention year-after-year since 2018.[45] In fact, the Congressional appropriation more than doubled from 2018 to 2022. *Id*. Not only has Congress appropriated more funding year-after-year for alternatives to detention relative to the prior year, in every year from 2018 through 2022, Congress has appropriated more funding for alternatives to detention than the President requested. *Id*. These legislative acts demonstrate that Congress recognizes and approves the use of alternatives to detention. *See Schor*, 478 U.S. at 846 ("Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive.") (internal citations omitted); *Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983).

Moreover, as the Court noted, this administration's decision to request less funding for custody operations and more funding for alternatives to detention than the prior administration is "a policy choice that this administration . . . [has] every

---

[45]

| Fiscal Year | Requested | Funded |
|---|---|---|
| 2018 | $177,700,000 (Ex. LL at ICE-O&S 92) | $187,205,000 (Ex. MM at 10) |
| 2019 | $184,446,000 (Ex. MM at 10) | $274,621,000 (Ex. NN at 10) |
| 2020 | $209,913,000 (Ex. MM at 10) | $319,213,000 (Ex. NN at 10) |
| 2021 | $353,941,000 (Ex. NN at 10) | $440,122,000 (Ex. OO at 5) |
| 2022 | $440,476,000 (Ex. OO at 5) | $442,662,000 (https://www.govinfo.gov/content/ pkg/CPRT-117HPRT47047/pdf/CPRT-117HPRT47047.pdf, at 1228) |

right to make, because they won and they got elected." Tr. Day 4, 178:8-179:3. Indeed, under separation of powers principles, the Court can neither direct the President to seek more funding for detention nor demand Congress appropriate more funding for detention—precisely indicating that the dispute before this Court is largely a political one. Tr. Day 4, 236:1-19; *see Castanon v. United States*, 444 F. Supp. 3d 118, 130 (D.D.C. 2020) ("We are troubled by the import of Plaintiffs' central premise: that it is both feasible and proper for this Court to order (or otherwise seek to compel) Congress to enact particular legislation. The concerns raised by such a premise include Article I's Speech or Debate Clause, general separation-of-powers principles, and Article III standing.") (cleaned up). Simply put, there was no evidence introduced at trial that the current administration's budget request for custody operations was made pursuant to, or is evidence of, a non-detention policy.

In rebuttal, however, Plaintiff's counsel pointed out an apparent inconsistency in Defendants' explanation for why it requested less funding for detention—an inconsistency that Plaintiff claims is evidence of a non-detention policy. Specifically, Plaintiff noted that in Exhibit 23, according to the Secretary, DHS's justification for requesting less funding for detention operations was that "[w]hen the budget was being formulated during Spring 2021, ICE's adult daily detention population levels were near historic lows." Tr. Day 4, 254:13-255:13, referring to

Ex. 23, at 117. But Plaintiff's counsel argued that, at trial, Defendants' witnesses testified that ICE needed to release noncitizens because of a *lack* of detention capacity. Plaintiff claims this inconsistency is evidence of a non-detention policy. Tr. Day 4, 254:13-255:13. Not so. Plaintiff's argument ignores relevant testimony about the pandemic's influence upon detention capacity. DAD Guadian explained that during the pandemic, various court orders limited DHS's ability to use all its beds. Tr. Day 3, 33:25-36:13.[46] Indeed, as both he and Chief Ortiz explained, both BP and ICE were generally required to keep 75% of their available detention space empty so as to maintain six-foot distancing and minimize the risk of disease transmission. *Id.*; Tr. Day 2, 134:6-17. Chief Ortiz explained that if an ICE facility was operating at 18% of its total physical capacity, that would still be considered "full" capacity during the pandemic. Tr. Day 2, 177:2-12. So, contrary to Plaintiff's argument, single adult detention may have been "historically low" and yet still at 100% capacity. Therefore, there is no inconsistency between the Secretary's statement and witness testimony at trial—and this illusory inconsistency is not evidence of a non-detention policy. Rather, Plaintiff simply wants the Court to conclude that because the President requested less funding for custody operations,

[46] Court orders and settlement agreements limiting detention capacity include, *inter alia*: *Zepeda Rivas v. Jennings*, 465 F.Supp.3d 1028 (N.D. Cal. 2020); *Fraihat v. ICE*, 445 F.Supp.3d 709 (C.D. Cal 2020); *Hernandez Roman v. Wolf*, No. 20-00768 (C.D. Cal. filed Apr. 4, 2020), *appeal docketed*, No. 20-55436 (9th Cir. filed June 29, 2020); *Gayle v. Meade*, No. 20-21553 (S.D. Fla. filed Apr. 13, 2020); *Santos Garcia v. Mayorkas*, No. 20-821 (E.D. Va. filed July 23, 2020).

*ipso facto*, there must be a non-detention policy. The proof does not bear that out.

iii. <u>ICE's closure of its family residential centers increased, rather than decreased, detention capacity defeating Plaintiff's claim that the conversion is evidence of a non-detention policy.</u>

Plaintiff has argued that the closure of one family residential center (Berks), and the conversion of two others to single adult housing (Dilley and Karnes), is evidence of a non-detention policy. *See* Tr. Day 1, 8:23-9:6. The evidence established no such connection, however. On the contrary, the evidence established that ICE then-Acting Director Tae Johnson's decision to close Berks and repurpose Dilley and Karnes was a "business decision," Tr. Day 3, 49:25-50:3, 50:20-22, driven in large part by costs, that actually resulted in *increased* detention capacity of higher-priority individuals. Tr. Day 3, 37:18-23; Price Dep., 57:14-22. Indeed, the evidence demonstrates that repurposing these facilities increased detention capacity and was a rational "business decision." The uncontested rationality of the decision undermines Plaintiff's argument that the closures were made in furtherance of a non-detention policy.

The evidence demonstrates that Defendants' decision to close or repurpose these facilities was rational, and not part of some broad, unwritten non-detention policy. First, Defendants faced a substantial need for more single adult detention space close to the Southwest border, Tr. Day 3, 50:13-16; Guadian Dep., 141:7-11,

and Dilley and Karnes are in southern Texas, Tr. Day 3, 49:1-6.[47] Second, detaining a family is substantially more expensive than detaining a single adult because of limitations imposed in a 1997 consent decree in *Flores v. Rosen*, No. 85-CV-4544 (C.D. Cal.). Tr. Day 3, 47:5-48:7. For example, family residential centers must provide schooling with bilingual instructors, as well as specialized medical care and access to pediatricians. *Id.* As such, it cost $235 a day to house each member of a family unit in a family residential center, Tr. Day 3, 37:11-14, whereas it costs only $125 a day to house a single adult, Tr. Day 3, 37:7-10. Third, family demographics limit how many and which families can be housed in a dorm together. Ex. OO at 123, Ex. 98 at 4. For example, a dual head-of-household mother and father with a six-year-old daughter cannot be housed in the same dorm as a father with a thirteen-year-old son. Price Dep., 145:5-146:1. Accordingly, transitioning Dilley and Karnes from family detention to single adult housing, which is not limited in the same way, increased the number of individuals who could be detained. Tr. Day 3, 37:18-23;

---

[47] In closing argument, Plaintiff's counsel said that "you heard some testimony during this case from one of defendants' witnesses that there was a real need to re-purpose facilities to deal with single adults and that single adults were driving the surge," Tr. Day 4, 254:7-10, but argued that this alleged testimony is belied by Exhibit 23, which shows that in the first seven months of 2021, the number of family units coming to the Southwest border increased eleven-fold, whereas single adult traffic increased only two-fold. Tr. Day 4, 253:22-254:11, referencing Exhibit 23 at 70-71. Plaintiff's counsel's argument is flawed. No witness testified that single adults were solely driving the surge and the need to convert the FRCs to single adult detention. Rather DAD Guadian testified only that there was "a large number of adults crossing the Southwest border," and as a result, ICE "needed additional adult beds." Guadian Dep., 141:9-11; *see also* Tr. Day 3, 50:13-16. Exhibit 23 confirms this. While percentage-wise there was a larger increase in family traffic than single adult traffic, the total number of single adults crossing the border remained significantly higher than individuals in family units. Exhibit 23 at 70-71.

Price Dep., 57:14-22. Stated differently, had ICE not converted Dilley and Karnes to single adult detention, Defendants would have had to release *more* individuals, not fewer.

Fourth, pursuant to an order issued in the *Flores* litigation in 2015, families generally can be detained no more than twenty days, after which they must be released. Tr. Day 3, 48:8-16; Price Dep., 146:7-19; Guadian Dep., 147:5-7; *See Flores v. Barr*, 2020 WL 3488040, *3 (C.D. Cal. June 26, 2020). As a result, ICE is often unable to detain families long enough for their immigration proceedings to conclude, Tr. Day 3, 48:20-21, 50:13-51:8, 53:22-25; Price Dep., 119:11-13, whereas single adults can be detained through the completion of their immigration proceedings. Tr. Day 3, 51:2-8. These combined realities supported the "business decision" to convert Dilley and Karnes to single adult housing, and to close Berks, located in Pennsylvania—far from the Southwest border. Tr. Day 3, 49:1-6.

In short, while Plaintiff has suggested that the conversion of Dilley and Karnes to single adult housing and the closure of Berks were part of a purported non-detention policy, there is no evidence to support that conclusion. Rather, the evidence shows it was a sensible decision necessitated by the large number of single adults CBP encountered, who are generally a higher detention priority than families.

iv.   Border Patrol's use of Parole+ATD is not evidence of a non-detention policy.

Plaintiff also asks the Court to consider the Parole+ATD program not only as

a stand-alone policy, which it is separately challenging under the APA, but also as evidence of a larger general non-detention policy. As set forth *supra* at Point IV(A), the Court cannot amalgamate individual, discrete policies to create an overall policy as Plaintiff asks it to do. Even if it could, the evidence established that the Parole+ATD program was not part of a general non-detention policy, but rather was a discrete BP policy, designed to decompress BP stations operating at over 100% capacity. Tr. Day 2, 60:12-25, 113:17-114:6; Ortiz Dep., 117:15-118:3; Barker July 13, 2022 Dep., 150:22-151:24; Barker Aug. 25, 2022 Dep., 12:14-13:7, 15:14-16:25, 28:16-29:23. The policy just addresses short-term CBP holding for processing, and leaves it to ICE to decide whether to take a noncitizen released on Parole+ATD into detention following check-in. SAR0168. Further, validity of Parole+ATD must be determined on the basis of the administrative record, *supra*, Point III.

    v.    <u>Border Patrol's temporary use of Notices to Report is not evidence of a non-detention policy.</u>

Plaintiff has also argued that BP's temporary use of NTRs shows that Defendants were implementing a general non-detention policy. That argument is meritless. In the first place, the use of NTRs is legally irrelevant to this case, because that practice was eliminated more than a year ago, when BP ceased their use and switched to Parole+ATD. Any in any event, the evidence established that NTRs were used by BP to respond to an emergency situation of overcrowding in BP facilities that threatened to spread disease. *See* Tr. Day 2, 61:3-17, 161:13-19; Tr. Day 2,

125:15-127:1; Price Dep., 61:6-9. Chief Ortiz and former-Chief Scott created the program at the height of the pandemic and during a period of high encounters. Tr. Day 2, 125:15-127:1. Chief Ortiz explained that 17 BP officers had died from Covid, more than 3,000 officers were in quarantine, noncitizens were arriving from countries with different states of disease, and the medical infrastructure along the border was strained. Tr. Day 2, 125:15-127:1. It was under these conditions that Chief Ortiz and former-Chief Scott came up with the NTR program to decompress overcrowded BP stations. Tr. Day 2, 125:15-127:1; Ex. 20. Pursuant to that policy, and relying upon prosecutorial discretion, BP agents released noncitizens who did not pose a security or flight risk, with instructions to report to ICE within a specified period of time to receive their Notices to Appear. Ex. 20; Tr. Day 2, 61:10-15, 160:11-22, 161:13-23, 162:25-163:17. To be clear, the Court cannot determine whether the issuance of NTRs was lawful, as the program is no longer in existence, Plaintiff no longer challenges it, and even if it did, any challenge would be moot. The only relevance of the NTR program is whether it is evidence of a non-detention policy. ECF 130 at 3-4. Thus, as with Parole+ATD, the evidence does not establish that NTRs were evidence of a non-detention policy by the current administration, as the program was created solely by officers at BP to address its own emergent issues and provided only short-term release for NTA processing. It was not designed to address detention by ICE.

vi.    The termination of MPP is not evidence of a non-detention policy.

Plaintiff's counsel argued in his opening remarks that the termination of MPP is evidence of a non-detention policy because in terminating it, DHS narrowed the pathways designed to alleviate resource constraints. Tr. Day 1, 9:4-6. But Plaintiff adduced no evidence that the Secretary's decision to terminate MPP was based upon an unwritten, general non-detention policy, rather than the reasons stated in the October 29 memoranda terminating the MPP program and the administrative record supporting that decision.[48] Furthermore, if Plaintiff thought the reasons given in either the June 1 or October 29 memos terminating MPP were pretextual, it could have sued to challenge the termination—as other States did. But it did not do so, and it cannot collaterally attack the termination of MPP here.[49] Simply put, Plaintiff has not offered any evidence that MPP was terminated in furtherance of an unwritten

---

[48] An agency's designation of the administrative record is entitled to a strong presumption of regularity, *Oceana v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

[49] During closing arguments, the Court queried whether Defendants can argue that parole is necessary due to a lack of detention capacity, when the Secretary chose to terminate MPP, which Plaintiff claims helped alleviate the problem of lack of detention capacity. Tr. Day 4, 167:23-169:3. The answer is yes. In *Biden v. Texas*, the Supreme Court held that 8 U.S.C. § 1225(b)(2)(C)—the statute authorizing MPP—is not a "safety valve" for dealing with noncitizens who are "not detained under section 1225(b)(2)(A)." 142 S. Ct. at 2542. Rather, "the contiguous-territory return authority in section 1225(b)(2)(C) is discretionary—and remains discretionary notwithstanding any [putative] violation of section 1225(b)(2)(A)." *Id.* at 2544. (In *Biden v. Texas*, the Court assumed without deciding that detention under section 1225(b) is mandatory. 142 S.Ct. at 2542.) Regardless of what the Secretary does with his discretion under 1225(b)(2)(C), the use of parole remains lawful if each instance was assessed on a case-by-case basis for humanitarian need or significant public benefit, *id.* at 2543 ("the INA expressly authorizes DHS to process applicants for admission under a third option: parole")—which they were, as discussed further *infra* at Point IV(D).

non-detention policy.

### C. The alleged non-detention policy is not arbitrary or capricious.

To the extent the Court finds that Plaintiff established a reviewable non-detention policy—which again, it did not—the claim nonetheless fails as no part of it is arbitrary or capricious. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To survive scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). Here, if any non-detention policy exists, it satisfies this standard.

Plaintiff—realizing at the eleventh hour that its pleaded claim has no merit—now argues DHS is detaining only those noncitizens who pose a national security risk or flight risk. Tr. Day 4, 71:22-72:7. Plaintiff previously alleged that the non-detention policy is the "policy of releasing aliens subject to mandatory detention." SAC, ECF No. 74, at ¶ 20. Plaintiff cannot succeed on showing either iteration of the policy is arbitrary or capricious. Even if Defendants had a policy of releasing applicants for admission subject to alleged mandatory detention under section 1225(b), that policy would not be arbitrary or capricious because this administration,

like every other administration, has not had enough funding from Congress to detain everyone potentially subject to 1225(b) detention. Therefore, the release of some applicants for admission subject to detention under section 1225(b) is rationally related to this funding shortfall. And as explained above, Section 1225(b) does not mandate detention.

Plaintiff's post-trial definition of the alleged non-detention policy fairs no better. As this Court noted, "if [] there is such a policy and it says, in effect, only detain bad criminals and people that are a danger to the national security, the rationale for that that I heard throughout this trial was we have to make choices because we don't have enough space for everybody. And prioritizing those people over women and children and families, I'm not sure how that would be arbitrary." Tr. Day 4, 96:22-97:4. Given capacity constraints, prioritizing detention space for noncitizens who pose a danger to society over those who do not is more than rational. *See State Farm*, 463 U.S. at 43.

The current administration, like every administration before it, has had to make difficult choices about whom to detain and whom to release given grossly insufficient resources. Those choices would become no less difficult if Defendants had slightly more detention capacity because there still would not be even close to enough. Tr. Day 3, 41:2-7 ("even with 10,000 additional beds, we'll still be making tough decisions as we were in 2020 when, you know, we're still making at-large

arrests and we still have to make tough decisions about who to place in those beds"). Thus, any non-detention policy of the sort alleged by Plaintiff is plainly not arbitrary or capricious. *See State Farm*, 463 U.S. at 43; *see also Dep't of Commerce*, 139 S. Ct. at 2569 ("We may not substitute our judgment for that of the Secretary, but instead must confine ourselves to ensuring that he remained within the bounds of reasoned decisionmaking." (citations and quotation marks omitted)).[50]

**D. The alleged non-detention policy is not contrary to law.**

Even were the Court to find that Defendants have a non-detention policy as alleged by Plaintiff (both as defined in their complaint and through this litigation, and as amended by Plaintiff post-trial), such a policy is not contrary to law under the APA. Releasing some applicants for admission who are subject to detention under section 1225(b) is unavoidable and is lawful because the word "shall" as used in that statute is subject to prosecutorial discretion and the parole authority in section 1182. And, prioritizing the detention of noncitizens who pose a national security, public safety, or flight risk over those who do not, is lawful. Paroling noncitizens on a case-by-case basis for urgent humanitarian concerns or significant public benefit is also

---

[50] Because Plaintiff challenges the non-detention policy as its own distinct policy, whether the alleged policy is arbitrary and capricious must be assessed at that level. Stated differently, this Court should not separately consider whether each of the alleged sub-parts of the alleged non-detention policy are arbitrary or capricious—for example, if converting the FRCs to single adult housing was arbitrary and capricious, if using NTRs was arbitrary and capricious, if using Parole+ATD was arbitrary and capricious, if requesting more funding for alternatives to detention vis-a-vis detention was arbitrary and capricious, etc. But, even if the Court did so, as set forth in Point IV(B), each of these decisions was rational.

lawful. And finally, releasing noncitizens on conditional parole, colloquially referred to as NTA-OR, under section 1226(a) is also lawful.

First, holding Plaintiff to its definition of the non-detention policy as pleaded in the complaint—i.e. that Defendants are releasing applicants for admission subject to detention under section 1225(b)—those releases are not unlawful. *See* Point IV(A). Nor would it be unlawful for Defendants to "only" detain those noncitizens apprehended at or near the border who pose a national security, public safety, or flight risk (or even to prioritize their detention).

Section 1225(b) does not require that Defendants detain every noncitizen encountered at or near the border. First, nothing in sections 1225(b)(1) and (b)(2) overcomes the "deep-rooted nature of law-enforcement discretion," *Town of Castle Rock*, 545 U.S. at 760-61. Section 1225(b)(1)—which authorizes the expedited removal of certain noncitizens—does not mandate expedited removal. Immigration officers must first make a discretionary determination whether a noncitizen should be processed under section 1225(b)(1) at all. *See E-R-M- & L-R-M-*, 25 I. & N. Dec. at 523 ("DHS has discretion to put aliens in [§ 1229a] removal proceedings even though they may also be subject to expedited removal"); *cf., e.g.*, *Villa-Anguiano v. Holder*, 727 F.3d 873, 878-79 (9th Cir. 2013) (recognizing DHS discretion whether to place a noncitizen in section 1229a removal proceedings or to proceed with reinstatement of removal under section 1231(a)(5)); *Cazun v. U.S. Att'y Gen.*, 856

F.3d 249, 261 (3d Cir. 2017) (same); *Graham v. Mukasey*, 519 F.3d 546, 551-52 (6th Cir. 2008) (same – administrative removal under section 1228(b)). Nothing in section 1225(b)(2)(A) mandates the commencement of removal proceedings under section 1229a against all applicants for admission at the border or physically present in the country. *See, e.g., Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. at 523 (noting "broad discretion given to … charging decisions by the Executive Branch, that is, the DHS, in the immigration context"). Rather, section 1225(b)(2)(A) "authorizes the government to detain certain aliens" seeking admission to the United States if it decides to remove them through section 1229a removal proceedings. *Jennings v. Rodriguez*, 138 S. Ct. 830, 838 (2018). The antecedent decision whether to pursue removal at all is a separate, discretionary decision of the Secretary that is not subject to judicial review—just as prosecutors' decisions whether to bring criminal charges against suspected offenders are not subject to judicial review. *See Arizona*, 567 U.S. at 396; *AADC*, 525 U.S. at 483, 485-86, 485 n.9. Accordingly, even if Section 1225(b)(2)(A) "directs [immigration officers] to detain an alien for the purpose of placing that alien in removal proceedings"—a proposition the government disputes—the provision "does not limit the authority of DHS to determine whether to pursue the removal of the immigrant" in the first place. *Crane*, 783 F.3d at 249; *Cortez-Felipe v. INS*, 245 F.3d 1054, 1057 (9th Cir. 2001).

Finally, nothing in the statute requires DHS to detain all eligible noncitizens even once removal proceedings are commenced. Instead, the INA authorizes DHS to release detained noncitizens in particular circumstances, subject to statutory and regulatory limitations, including through parole, 8 U.S.C. § 1182(d)(5)(A), or "bond" and "conditional parole," 8 U.S.C. § 1226(a)(2)(A)-(B). And the decision whether to release is a complex decision that takes into account many factors. Noncitizens detained under Section 1225(b), and indeed all applicants for admission, regardless of whether they are in removal proceedings or not, are eligible for release on parole in DHS's discretion "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Testimony from all the CBP and ICE witnesses—as well as the documentary evidence–establish that their officers and agents are directed to apply this statutory standard in their parole decisions. Tr. Day 2, 63:25-64:5, 65:18-67:7, 89:7-12, 114:10-115:8; Tr. Day 3, 27:15-28:1; Ex. B at § 8.2; Ex. C at ¶ 5.3; Ex. 40 at 5.[51,52] Plaintiff has not identified even a single parole decision since January 20, 2021, that does not conform to components' parole policies. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011).

---

[51] Evidence concerning parole practices for non-immigrant noncitizens, that is, noncitizens entering the United States for some limited reason without the intent to seek asylum or the ability to remain in the United States permanently, is irrelevant as the release of nonimmigrant visitors is not being challenged here. Tr. Day 2, 92:7-93:1; *see* Ex. F at 1; Ex. G at 1.

[52] However, the lawfulness of releases under section 1182(d) on Parole+ATD is addressed based on record review *infra* in Point III.

Furthermore, and critically, Plaintiff's claim with respect to the alleged non-detention policy, as originally defined in the complaint, challenges Defendants' release of applicants for admission subject to "mandatory detention" under section 1225(b). But the supposedly "mandatory" detention aspect of section 1225(b) does not apply to releases under section 1226(a), which cover some or many of the noncitizen border dispositions Plaintiff challenges. Section 1226(a) does not mandate the detention of applicants for admission apprehended inside the United States. *See* 8 U.S.C. § 1226(a)(2); *Ortega-Cervantes*, 501 F.3d at 1116.

Other than noncitizens with a qualifying criminal history addressed in section 1226(c), section 1226(a) noncitizens are eligible for release on bond or conditional parole in DHS's unreviewable discretion. 8 U.S.C. § 1226(a)(2), (e). Even if they recently crossed the border, noncitizens apprehended inside the United States, may be subject to section 1226(a) and may be released under its unconditioned authority even if they are also applicants for admission who could alternatively be paroled under section 1182(d)(5)(A). *Ortega-Cervantes*, 501 F.3d at 1116. That is, contrary to Plaintiff's understanding, applicants for admission apprehended inside the United States may be subject to *either* section 1225/1182 or section 1226, in DHS's discretion, *ab initio*. *See id.* They are not initially subject to section 1225 and then at some later point processed under section 1226. *See* Tr. Day 4, 89:3-8. The evidence establishes that DHS routinely releases noncitizens apprehended after crossing the

border on conditional parole under section 1226(a), that is, under BP's release on NTA/OR or ICE's release of noncitizens transferred from CBP on OREC (order of release on recognizance). Tr. Day 2, 112:6-113:1; Tr. Day 3, 22:14-23. Orders of release on recognizance under section 1226(a) constitute hundreds of thousands of the releases of border arrivals that Plaintiff challenges here—but which do not fall within the definition of the policy as set forth in the complaint. *See, e.g.*, Ex. R at 3 (detailing BP releases on NTA/OR for FY2022); Ex. S at 2-3 (same for first month in FY2023); Tr. Day 2, 59:11-60:11 (describing NTA/OR as release under section 1226(a) and saying BP "predominantly use[s]" NTA/OR by comparison NTA/parole under section 1182(d)).[53]

Section 1226(a) calls for an administrative warrant to be issued to detain noncitizens taken into custody under that authority. However, the INA provides for warrantless arrests where the noncitizen has entered the country illegally and is likely to escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(2); *see Aguirre*, 553 F.2d at 502. This is the circumstance, where agents have no advance notice of the noncitizens' unlawful entry and thus no opportunity to obtain a warrant in advance of BP arresting them in the field. Tr. Day 2, 124:17-125:2. In these circumstances, regulation provides that a determination must "be made within 48

---

[53] These statistics also demonstrate the BP is issuing several thousands of NTAs each month to noncitizens referred to ICE for detention under section 1226, under the category "Warrant of Arrest/Notice to Appear – Detained." Ex R at 3; Ex S at 2-3.

hours of the arrest" as to whether a "warrant of arrest … will be issued" *if* that determination is to charge the noncitizen with removal and continue their detention. 8 C.F.R. § 287.3(d). Thus, governing statutory and regulatory law requires only that a warrant be issued for section 1226 noncitizens arrested without a warrant pursuant to section 1357(a)(2) *if* DHS decides to continue them in custody for removal proceedings, but not if it is going to release them on recognizance or not pursue removal proceedings. Even so, out of an abundance of caution that a warrant is already available in case the noncitizen fails to appear for their subsequent removal proceedings, Chief Ortiz's testimony established that BP practice is to issue a Form I-200 Warrant of Arrest to the A-files of noncitizens released on NTA/OR.[54] Tr. Day 2, 124:10-125:14.

Plaintiff's argument about impermissible releases from allegedly mandatory detention has bearing on that portion of the applicant for admission population processed under section 1225(b). However, the evidence shows Defendants are

---

[54] Former BP Deputy Chief Tony Barker's July 2022 deposition testimony that he did not believe that BP always obtains warrants for noncitizens arrested between ports of entry does not contradict Chief Ortiz's testimony on this point. Tr. Day 1, 118:13-119:2. Deputy Chief Barker was not asked about *administrative* warrants as relevant to noncitizens released on NTA/OR; he was asked only whether general warrants are obtained when noncitizens who have entered the country between ports of entry are arrested. *See id.* 116:7-119:2. His answers, which addressed the NTA/Warrant of Arrest pathway for criminal noncitizens as well as noncitizens who would be prosecuted criminally (requiring a judicial criminal warrant) made clear that he did not understand the question or his response to be limited solely to whether BP obtains administrative warrants for persons released on NTA/OR. *Id.* 118:20-119:24. There are several circumstances in which BP might process individuals arrested between ports of entry for which the INA does not call for a warrant at any point, such as those noncitizens being processed for expedited removal or removal proceedings under section 1225(b).

detaining multiple tens of thousands of this population each month. *See, e.g.*, Ex. R at 1-2 (showing FY 2022 statistics for OFO's monthly transfers of noncitizens processed for expedited removal and claiming fear to ICE/ERO for detention); *id.* at 3 (showing FY2022 statistics for BP's monthly transfers of noncitizens to ICE and other federal agencies for detention); Ex. S at 1, 3 (statistics for OFO and BP transfers for first month in FY2023). The evidence further establishes that, regarding the remaining portion of this population who Defendants are releasing, these releases are not contrary to the law.

While parole decisions sometimes take into consideration lack of detention and holding capacity, this is neither the dispositive factor, Tr. Day 2, 71:5-7, nor is it an unlawful consideration. Longstanding regulations applicable to noncitizens detained under 8 C.F.R. § 235.3(b) or (c) make clear that where "continued detention is not in the public interest," such as where space limitations require prioritization for detaining those most presenting a public danger, prioritizing detention capacity can constitute an urgent humanitarian reason or significant public benefit permitting parole on a case-by-case basis, provided there is no security or flight risk. 8 C.F.R. § 212.5(b)(5). Consistent with this authority to prioritize detention capacity, no administration since section 1225 was enacted has requested or received the capacity to detain every noncitizen applicant for admission who is potentially amenable to detention. Tr. Day 3, 38:18-39:14; *see Texas*, 142 S. Ct. at 2535 ("DHS has never

had sufficient detention capacity to maintain in custody every single person described in section 1225"). Every administration has to make "tough decisions" about how to use limited detention space and thus has recognized that the use of parole frees up limited detention capacity for other, higher-priority noncitizens like criminals. Tr. Day 3, 41:2-7; *see, e.g.*, Ex. C (ICE Parole directive 11002.1) at 2-3; Ex. I (ICE Transportation, Detention and Processing Requirements (Jan. 11, 2005)) at 3-5; Ex. K (DHS Memo – "Implementing the President's Border Security and Immigration Enforcement Improvements Policies" (Feb. 20, 2017) at 10 n.8 (maintaining operation of Ex. C). Courts have recognized that DHS's consideration of detention resources is appropriate in the exercise of the parole authority. *See Padilla v. ICE,* 953 F.3d 1134, 1145 (9th Cir. 2020), *vacated on other grounds*, 141 S. Ct. 1041 (2021); *Jeanty,* 204 F. Supp. 2d at 1377. Congress has amended the INA since the current version of section 1225(b) was enacted in 1996, for example with the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, but not once has it sought to disturb this longstanding agency practice of releasing low priority section 1225(b) noncitizens to prioritize space for those whose detention serves the public interest. Indeed, Congress has even provided Administrations *less* detention funding than they requested to cover even a small fraction of this population. *See* Ex. OO at 5; *supra*, Point IV(B)(ii). These actions and inactions constitute Congressional acquiescence to DHS's consideration of capacity and prioritization of detention

space. *See Schor*, 478 U.S. at 846; *Bob Jones Univ.*, 461 U.S. at 599 (Congress's clear awareness of, but failure to address, widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence").

To the extent the disparate actions Plaintiff challenges represent a policy at all, they do not violate the INA.

### E. The alleged non-detention policy was not subject to notice and comment.

Even if the evidence demonstrated that there was a non-detention policy, which it does not, Plaintiff's argument that any such policy must be subject to notice and comment rulemaking, SAC, ECF 74, ¶¶ 101-103, lacks a basis in law or fact. *See* Point III(D), *supra*. The APA requires notice-and-comment only for certain types of legislative rules. 5 U.S.C. § 553. As set forth above in Section II(D), a "rule" requires "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). "Rule making" means "an agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). Further, absent a "legislative rule," which "creates new law, rights, or duties," notice-and-comment is not required. *Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

The evidence at trial has not identified any "agency statement of general or particular applicability and future effect" or "process for formulating" such a statement related to Plaintiff's constantly changing conception of the non-detention policy, much less any document that "creates new law, rights, or duties." Even if plaintiff had identified such a statement, it would at most qualify as a general statement of policy, which is exempt from notice-and-comment requirements. Accordingly, notice and comment was not required with respect to the alleged non-detention policy. *See* Point III(D).

## V.   The Take Care Clause Does Not Provide a Private Cause of Action for Plaintiff to Sue the Executive Branch[55]

Plaintiff claims that "[t]he federal government cannot ignore federal statutes, and the Constitution—including the separation of powers doctrine and the Take Care Clause[56]—provides a separate cause of action to challenge the conduct described in Counts 1 and 2" (referring to the Parole+ATD policy and the alleged non-detention policy). SAC, ECF 74, ¶ 111. Plaintiff's Constitutional claim fails as a matter of law and evidentiary proof.

First, separation of powers principles, to the extent they are implicated at all,

---

[55] While Defendants acknowledge the Court's comments and position regarding Plaintiff's Take Care Clause claim, Tr. Day 4, 118:3-22, 257:19-258:3, Plaintiff did not withdraw its claim prior to the filing of the post-trial briefs. Therefore, Defendants include a fulsome argument on this claim out of an abundance of caution.

[56] The Take Care Clause (the "Clause") authorizes the President to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

defeat Plaintiff's legal theory. Both the Constitution and the INA vest the Executive with authority over decisions regarding detention and removal of noncitizens. *See, e.g.*, *Knauff*, 338 U.S. at 543; *United States v. Velasquez*, 524 F.3d 1248, 1253 (11th Cir. 2008) (holding that the Executive, not the judiciary, has the authority to decide to detain noncitizens). This Court previously rejected this argument at the motion to dismiss stage, noting that "the judiciary does have the authority to say what the law is and to invalidate action of the Executive Branch that contravenes the law and/or the Constitution." *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *13 (N.D. Fla. May 4, 2022). Respectfully, this explanation combines two separate issues—whether Plaintiff can maintain a cause of action challenging alleged statutory violations under the Constitution's separation of powers principle, versus whether the Court could issue injunctive or declaratory relief with respect to alleged statutory violations without contravening separation of powers principals. The answer to the latter question (which the Court addressed in its decision on the motion to dismiss) is yes, but the answer to the former question, at least as concerns the statutes in question here—§§ 1225(b) and 1182(d)(5)—is no. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994) (holding that claims that Executive Branch actions are inconsistent with carrying out their "statutory authority are not 'constitutional' claims" but rather statutory claims, and that the "distinction between claims that an official exceeded his statutory authority, on one hand, and claims that he acted in

violation of the Constitution, on the other, is too well established to permit this sort of evisceration"). Indeed, in a virtually identical case to this one, a district court in Arizona dismissed the plaintiff's Constitutional claims, which the plaintiffs based, in part, on separation of powers principles. *See Brnovich*, 2022 WL 4448322 at \*14 ("Plaintiffs fail to explain how Defendants could violate separation of powers principles when the Constitution and the INA vest the Executive with authority to carry out the immigration laws.").

Second, with respect to Plaintiff's Constitutional Take Care Clause claim, no court has ever found that the Take Care Clause provides a private right of action. *Las Americas Immigrant Advocacy Center v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *see, e.g.*, *Brnovich*, 2022 WL 4448322, \*14 ("the justiciability of a Take Care Clause claim is an open question, and neither the United States Supreme Court nor any circuit court has definitively found a private right of action stemming from the Clause"); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 800 (D. Md. 2020) ("No court in this circuit, or any other circuit, has definitively found that the 'Take Care Clause' provides a private cause of action which a Plaintiff may bring against the President of the United States or his administration."); *Robbins v. Reagan*, 616 F. Supp. 1259, 1269 (D.D.C.), *aff'd*, 780 F.2d 37 (D.C. Cir. 1985) (similar). Accordingly, the "viability of the 'Take Care Clause' as a stand-alone cause of action is, to put it lightly, uncertain." *City of*

*Columbus*, 453 F. Supp. 3d at 800.[57]   And that uncertainty and lack of precedent should foreclose finding a private cause of action under the Clause given the Supreme Court's repeated caution that courts should avoid creating new constitutional causes of action or even extend the application of previously implied causes of action. *See, e.g.*, *Egbert v. Boule,* 142 S. Ct. 1793, 1800 (2022) ("our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts. . .");  *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1856 (2017); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004). Thus, if this Court held that the Clause creates a private right of action, it would be reaching a novel conclusion that neither the Supreme Court nor any other court has reached and, in doing so, would disregard 40 years of Supreme Court precedent disfavoring the creation of new constitutional causes of action. This case does not present an occasion for such a drastic break from precedent.

   *Columbus* is instructive. In *Columbus*, plaintiffs sued the President and his

---

[57] At summary judgment, Plaintiff relied upon *Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987) to refute the proposition that no court has found that the Take Care Clause creates a private right of action. *See* ECF 98 at 35. Plaintiff misconstrued *Meese*. The Court in *Meese* did not find that the Take Care Clause creates a private right of action. In fact, they had no occasion to do so; the Plaintiff had not even pleaded the claim. *See Meese* Complaint, annexed hereto as Exhibit A (not available electronically). Rather, the Eleventh Circuit discussed the Take Care Clause in the context of its holding that separation of powers principles did not bar federal court review of prosecutorial decisions, which allegedly deprived black voters of their constitutional right to vote, as the district court had found.

delegates alleging they violated the Clause through several executive actions and a final rule, which, taken together, created a de facto repeal of the Affordable Care Act passed by Congress. *City of Columbus*, 453 F. Supp. 3d at 800-803. The Court held that the Clause does not create a private right of action, and even if it did, it would not extend far enough to encompass Plaintiff's claim, which hinged upon a challenge to the discretionary actions of the Executive rather than his failure to implement a non-discretionary ministerial function. *Id.* The distinction between discretionary actions and ministerial functions as relevant to the Take Care Clause, derives from *Marbury v. Madison*, 5 U.S. 137, 154 (1803) and *Mississippi v. Johnson*, 71 U.S. 475 (1866) and their discussion of the related cause of action of mandamus.[58] Where a plaintiff has a cause of action under mandamus, a court can grant relief "only where the duty to be performed is ministerial and the obligation to act peremptory, and plainly defined." *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 602 (D.C. Cir. 1974).

    At the motion to dismiss stage, this Court found that the Take Care Clause

---

[58] In each of those cases, the plaintiffs sought mandamus to compel the President to perform a single, specific act legislated by Congress that required no discretion to implement. These cases distinguished "executive and political" duties, also referred to as "discretionary" duties, from a "ministerial duty," which is "a simple, definite duty" that is "imposed by law" where "nothing is left to discretion." *Johnson*, 71 U.S. at 498. In contrast, "a duty is discretionary if it involves judgment, planning, or policy decisions." *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) (citation omitted). Pursuant to *Johnson*, "[t]he former could be enforced, by mandamus, on Executive Branch officials—and perhaps, though not clearly so, even on the President—while the latter were beyond the purview of the courts." *Columbus*, 453 F. Supp. 3d at 800.

could survive because "the statutory duties in this case fall somewhere in between [discretionary and ministerial] because although § 1182(d)(5)(A) clearly affords Defendants some discretion to parole aliens notwithstanding the explicit detention mandates in § 1225(b)(1) and (b)(2), that discretion is not absolute because the grounds and duration of parole authority are specifically limited by statute." *Florida*, 2022 WL 2431414, at *14. While that may be true, whether this Court could provide relief under the Clause presents a narrower question—is the duty that the Plaintiff claims the Executive Branch abdicated purely and unequivocally, ministerial. *Nixon*, 492 F.2d at 602 ("The law must not only authorize the demanded action but require it; the duty must be clear and indisputable.") (cleaned up). In *Nixon*, the Court found that the Federal Pay Comparability Act created a plainly defined, clear and undisputable, ministerial obligation on the part of the President, and that issuing a declaratory judgment would "not require any court supervision over the performance of duty by the Executive Branch." *Id.* at 605. This case and *Columbus* are distinguishable. Here, the Court acknowledged in its decision on the motion to dismiss that the Executive's duty under §§ 1225(b)(1) and (b)(2) and 1182(d)(5) is not *purely and unequivocally* ministerial. *Florida*, 2022 WL 2431414, at *14; *Nixon*, 492 F.2d at 602. As explained, there is a large aspect of discretion in granting parole under section 1182(d)(5)(A) and conditional parole under section 1226(a), and inherently always at least some in prioritizing detention resources and exercising

169

inherent law enforcement discretion under section 1225(b).

Considering *Nixon*, its analysis of *Marbury* and *Johnson*, and after canvassing for other relevant cases regarding whether the Clause creates a private right of action, the *Columbus* Court held that there is no precedential authority for finding the Clause creates a private right of action against the Executive Branch. *Columbus*, 453 F. Supp. 3d at 803. The *Columbus* Court further held: "Assuming, *arguendo*, that a valid Take Care Clause cause of action exists in some form, and that a district court may, as it did in *Nixon*, issue a declaratory judgment against the President—neither of which appears firmly grounded in precedent or sound constitutional principles—Plaintiff has nonetheless failed to state a claim." *Id*. The Court explained that none of the Executive's actions about which plaintiff complained were ministerial in the sense developed in *Johnson* and *Nixon*. "That is, there is no peremptory, and plainly defined, course of action the President could take to rectify the flaws that Plaintiffs perceive in his execution of the [statute]" and "[a]ny judgment to the contrary by this court would require court supervision over the performance of duty by the Executive Branch." *Id*. (cleaned up). So too here.

Courts have thus viewed attempts to supervise Executive discretion as infringing on the authority provided by the Clause to the Executive and thus protected from judicial interference. *See Lujan*, 504 U.S. at 577 (holding that it would be improper for the courts to take over the President's duty to "take Care that

the Laws be faithfully executed"); *Johnson*, 71 U.S. at 499 (The president's duty "to see that the laws are faithfully executed," falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there is "much weight against it."); *Citizens for Responsibility and Ethics in Washington v. Trump*, 302 F. Supp. 3d 127 (D.D.C. 2018) ("The Supreme Court has advised that how the President chooses to exercise the discretion Congress has granted him is not a matter for [the courts'] review") (quoting *Dalton v. Specter*, 511 U.S. 462, 476 (1994)); *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1139 (S.D. Cal. 2018) ("[G]iven that the challenged steps taken by the Secretary are ones that are plausibly called for by an act of Congress, a Take Care challenge in this case would essentially open the doors to an undisciplined and unguided review process for all decisions made by the Executive Department.").

At the motion to dismiss stage, this Court rejected this argument:

> [T]he Court sees no reason why such a claim could not be pursued at least in circumstances where (as alleged here) the Executive Branch has completely abdicated its responsibility to enforce the law as written . . . . This conclusion is supported by the Supreme Court's observation that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity" and the "long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

*Florida*, 2022 WL 2431414, at *13.

Respectfully, however, *Armstrong*—which rejected an attempt to craft a "right of action" for "private enforcement" under the Supremacy Clause—does not stand for the proposition that the Court could craft some novel cause of action or equitable relief here.[59] More to the point, Defendants indisputably "are detaining people," Tr. Day 4, 72:1-2, and therefore, Plaintiff cannot sustain a Take Care Clause claim based on the complete abdication of the Executive's duties. ECF No. 119, Transcript from November 18, 2022 conference, at 28:19-29:5. Stated differently, even if this Court were to hold that the Take Care Clause creates a private right of action, for which the Court could craft declaratory relief, Defendants have not violated that Clause, because Defendants are detaining noncitizens under § 1225(b)(1) and are lawfully releasing noncitizens on parole, on a case-by-case basis, under § 1182(d)(5). Point IV(D), *supra*.

In short, Plaintiff has not identified in the INA a plainly defined, clear and undisputable ministerial obligation that Defendants have abdicated, for which the

---

[59] The Supreme Court noted, "[t]he power … to enjoin unlawful executive action is subject to express and implied statutory limitations" and, based on the limited right of action in the statute at issue in that case, rejected an attempt to pursue a claim or seek relief different from what Congress set out in the statute. *Id*. at 327-28. Similarly, here, the INA provides for a particular, but limited, cause of action to enforce the statute, and the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Id*. The Clause's lack of any manageable legal standard to apply also counsels against finding it provides a stand-alone cause of action. Where a provision is of a "judicially unadministrable nature" it "preclude[s] the availability of equitable relief." *Id*. Additionally, the facts elicited at trial did not bear out that "the Executive Branch has completely abdicated its responsibility to enforce the law."

Court could order declaratory relief. *See Brnovich*, 2022 WL 4448322, *14 (holding, with similar claims, the "Court agrees that separation of powers principles and the Take Care Clause do not provide Plaintiffs with causes of action."). Indeed, crafting relief would require Court supervision over the performance of how the Executive Branch carries out broad statutory provisions, further defining the statutory obligations in ways the statutes themselves do not. No court has read the Clause to create such a cause of action or read it so broadly as to open the courtroom doors to challenges to *how* the Executive executes Congress's laws. Neither should this one in the circumstances presented here.

## VI.   There are Limited Remedies Available to Plaintiff

Plaintiff seeks declaratory relief, and vacatur, Tr. Day 4, 244:14-15, as well as an injunction "as it goes to the parole authority." *Id.* 249:21-23. Specifically, in its pleadings, Plaintiff asks this Court for "permanent injunctive relief enjoining Defendants from enforcing [the Parole+ATD and non-detention] policies," *see* SAC, ECF 74, at 30; "declaratory relief declaring the policies unlawful," *id.*; and "to vacate: (1) the government's policy of releasing aliens subject to mandatory detention (the non-detention policy), whether based on an untenable assertion of enforcement discretion to ignore § 1225 or an abuse of the parole authority under § 1182, and (2) the Parole+ATD policy, which also misuses the parole authority under § 1182." *Id.* at ¶ 20.

However, as discussed below, injunctive relief and vacatur would be inappropriate in this case, and any declaratory relief would have to be very narrowly crafted. If this Court determines that Plaintiff should prevail on any of its claims, given the disruptive consequences of any broad order, the Court should, at most, remand to the agency to address the issue identified by the Court without vacating the policy. Any additional relief would be broader than necessary to address the alleged injuries and would impermissibly place the Court in the position of overseeing discretionary policy choices that must be left to the discretion and expertise of the Executive Branch.

**A. Injunctive relief is inappropriate.**

First, Plaintiff seeks the stunning remedy of a nationwide injunction on the government's "parole authority." Tr. Day 4, 244:14-15, 249:21-23; *see also* SAC, ECF 74, at 30. Such an overbroad remedy would not only be unheard of, but also not permitted under the law.

    i.   Injunctive relief is barred by 8 U.S.C. § 1252(f)(1).

First, injunctive relief of the government's detention and parole authority in the circumstances presented in this case is barred by 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides that, except in a case brought by an "an individual [noncitizen]" in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of

the provisions of part IV of this subchapter [of the INA]." 8 U.S.C. § 1252(f)(1); *see Aleman Gonzalez*, 142 S. Ct. at 2064; *Texas*, 142 S. Ct. at 2538. That restriction applies in this case by its plain terms: Plaintiff is not an individual noncitizen in removal proceedings, and this case seeks to enjoin or restrain the operation of sections 1225 and 1226. *Texas*, 142 S. Ct. at 2538. Therefore, as Plaintiff's request for injunctive relief is directly aimed at the government's enforcement, implementation, or carrying out of covered provisions of the INA, it falls squarely within the Supreme Court's decision in *Aleman Gonzalez*, 142 S. Ct. at 2064.

The term "enjoin" carries not only a negative meaning, but also a positive one: it means "[t]o require; command; positively direct." Black's Law Dictionary 529 (6th ed. 1990). An "[i]njunction" is "[a] court order prohibiting someone from doing some specified act *or* commanding someone to undo some wrong or injury." *Id.* at 784 (emphasis added). Thus, by depriving lower courts of authority to "enjoin," section 1252(f)(1) bars not only injunctions that block the operation of the covered INA provisions on Constitutional or other grounds, but also injunctions that direct the Executive Branch to adhere to the court's reading of those provisions instead of the Executive's own interpretation and implementation of them. Thus, the Court cannot enjoin Defendants to, for example, strictly comply with a "mandatory" reading of section 1225(b). *See Aleman Gonzalez*, 142 S. Ct. at 2065 ("Those orders 'enjoin or restrain the operation' of § 1231(a)(6) because they require officials to

take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6). Those injunctions thus interfere with the Government's efforts to operate § 1231(a)(6), and the injunctions do not fall within the exception for individualized relief because the injunctions were entered on behalf of entire classes of aliens.").

Plaintiff is also seeking an injunction as to the federal government's parole authority under section 1182. *See* SAC, ECF 74, at ¶ 20. Although facially addressed to section 1182, this request implicates section 1225, because section 1182(d)(5)(A) is how Defendants implement their detention authority under section 1225. The parole statute explicitly states that parole is available only for applicants for admission, and thus parole under section 1182(d)(5) is the mechanism for releasing noncitizens detained pursuant to section 1225, which also governs "applicants for admission." 8 U.S.C. §§ 1182(d)(5)(A); 1225(a), (b). Should the Court place limitations on the government's use of section 1182, or mandate that it be used in a certain way, that would necessarily "restrain the operation of" section 1225. For example, in this case Plaintiff alleges that section 1182(d)(5) does not permit releases on parole based on detention capacity or based on health and safety considerations. *See, e.g.*, Tr. Day 4, 108:18-109:19. Were the court to grant Plaintiff an injunction on either of those grounds because it views section 1182(d)(5) as not

authorizing release on those bases, that order would necessarily impact section 1225, as that order would prohibits DHS from releasing individuals subject to section 1225 on that basis. Although the Supreme Court explained in *Aleman Gonzalez* that section 1252(f) may not apply to an order enjoining the "unlawful operation of a provision that is not specified in § 1252(f)(1)" where "that injunction has some *collateral* effect on the operation of a covered provision," *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4, an injunction here would be anything but collateral. *See, e.g.*, "Collateral," https://www.merriam-webster.com/dictionary/collateral ("accompanying as secondary or subordinate"); "Collateral," https://www.dictionary.com/browse/collateral ("accompanying; auxiliary," "aside from the main subject, course, etc."). Indeed, it would directly implicate the government's interpretation and operation of section 1225(b) by ordering the government: "to refrain from actions that ([] in the Government's view) are allowed by" section 1225(b). *Aleman Gonzalez*, 142 S. Ct. at 2065. Accordingly, for purposes of the claims in this case then, such an order concerning section 1182(d)(5) is inextricably intertwined with section 1225, and thus barred by section 1252(f).[60]

---

[60] Any restraint of the parole authority would also impact regulations that are not at issue in this case. For example, 8 C.F.R. § 212.5 and § 235.3 implement DHS's detention authority, including parole decisions. 8 C.F.R. § 212.5, § 235.3. Yet Plaintiff does not challenge these regulations, nor could it—any challenge to these regulations, implemented in 1982 and amended in relevant part in 1997, are long time-barred, so no order of this Court can set aside either provision. *See* 28 U.S.C. § 2401(a); *Ctr. For Biological*, 453 F.3d at 1334 (applying six-year statute of limitations for suits against the United States); *see also* 47 FR 30044-01 (1982).

Section 1252(f)(1) prohibits orders that restrain "the operation of " the covered provisions. 8 U.S.C. § 1252(f)(1). The term "operation," in this context, means execution, enforcement, or implementation. *See, e.g.*, "Operation," https://www.merriam-webster.com/dictionary/operation ("method or manner of functioning"). Section 1252(f)(1) therefore prohibits injunctions that restrain the Executive Branch's implementation of the immigration laws, whether the basis for the suit is that the agency has misinterpreted the relevant provisions or violated the APA or the Constitution. *See Aleman Gonzalez*, 142 S. Ct. at 2065; *Hamama v. Adducci*, 912 F.3d 869, 879–80 (6th Cir. 2018), *cert. denied*, 141 S. Ct. 188 (2020) ("The district court . . . created out of thin air a requirement . . . that does not exist in the statute; and adopted standards that the government must meet. … If these limitations on what the government can and cannot do under the . . . provision are not 'restraints,' it is not at all clear what would qualify as a restraint" under section 1252(f). Thus, any limitation on section 1182(d)(5)(A) authority necessarily implicates and constrains the government's operation and implementation of section 1225(b), which is not permitted under section 1252(f)(1).

ii.   Plaintiff has not shown it is entitled to injunctive relief.

Assuming the Court finds Plaintiff succeeded on the merits of any of their claims, and that the limitations of § 1252(f)(1) do not apply here, that still does not entitle Plaintiff to an injunction. Plaintiff must demonstrate: "(1) that it has suffered

an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (internal citations omitted). Thus, to be entitled to an injunction, Plaintiff must show that the "balance of equities tip in [its] favor," outweigh the harm to the Defendants, and that "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). These latter two factors "merge" where, as here, the government is the Defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiff has demonstrated, at most, an increase in "immigrant" children enrolled in Florida public schools over the last two years. *See* Point I, *supra*. However, none of the alleged costs Plaintiff put forward were traceable to the challenged policies, and Plaintiff has not (and cannot) quantify the magnitude of any such expenditures, either in the past or going into the future. *Id.* By contrast, enjoining the government's entire "parole authority" as Plaintiff requests in the Second Amended Complaint, or the Parole+ATD policy, would cause grave harm to the Executive.[61] Such an injunction would represent "an improper intrusion by a

---

[61] Such a widespread, universal injunction would also be improper, as any relief should be narrowly tailored to the policies at issue in the case and the injuries actually proven by Plaintiff. Discussed further at Point VI(D), *infra*.

federal court into the workings of a coordinate branch of the Government," *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers), and would "invade" the Executive's prosecutorial discretion, a "special province" that Article II commits to the President, *AADC*, 525 U.S. at 489. It would also "undermine[] the separation of powers," *Texas v. United States*, 14 F.4th 332, 340 (5th Cir.), *vacated*, 24 F.4th 407 (5th Cir. 2021) (en banc), and impair the government's "weighty" "interest in efficient administration of the immigration laws," *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

This injury is not merely theoretical. Were the Court to enjoin the use of the Parole+ATD program, or parole in general, there would be severe disruption in DHS's management of the border and "disastrous consequences" for the border. Tr. Day 4, 227:19-25. As an initial matter, the number of people in BP facilities would immediately increase. *See* Tr. Day 3, 56:6-20. The Parole+ATD program can be authorized in certain sectors when there are "more than 15,000 noncitizens in USBP custody across all Southwest border sectors…" Ex. 40 at SAR0003. Should Parole+ATD stop being an available pathway, then the noncitizens BP might have processed under that pathway would likely have to remain in custody. In September 2022, that number was 95,191. Ex 3 at 3. If having 15,000 noncitizens in custody is considered full capacity for BP, then the operational issues BP would face with an additional 95,000 noncitizens in their custody would be severe and debilitating.

If BP facilities were suddenly at seven times their capacity, that would necessitate agents be pulled from the field to help with processing, which poses a risk to the border. *See* Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-116:24. If agents taken out of the field to process the influx of noncitizens, the border will be open for cartels and criminal organizations to exploit. Tr. Day 2, 115:16-116:24. The Parole+ATD policy takes those concerns into consideration, increasing the disruption that would occur if the program were to suddenly be enjoined. Ex 41 at SAR0163 ("The use of Parole+ATD in these circumstances will ensure that the USBP can continue to meet its mission requirements, such as border security operations, by maximizing deployments of agents to the field."). Ending the Parole+ATD policy would also impact the safety of the noncitizens and the officers and could lead to unsafe conditions for everyone. Tr. Day 2, 56:21-57:2. Chief Ortiz explained, in detail, the significant risks of such overcrowding to agents and migrants who were forced to be in close contact with a border operation and medical system that is strained. Tr. Day 2, 125:18-126:11. These harms dwarf any incidental effect on Plaintiff.

Regardless, because nothing in the APA or the Court's equitable authority displaces Article III limitations or traditional principles of equity, *see* 8 U.S.C. § 702, any injunction must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction," *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), which are especially salient in the context of immigration

decisions impacting foreign affairs. *Knauff*, 338 U.S. at 543 ("[T]he power of exclusion of aliens is also inherent in the executive department of the sovereign."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations [and] the war power."); *Hawaii*, 138 S. Ct. at 2418-19 ("Because decisions in these matters may implicate relations with foreign powers, … such judgments are frequently of a character more appropriate to … the Executive.").

Any injunction, but particularly the broad injunction Plaintiff seeks requiring greater detention of, and/or less frequent parole of, noncitizens, that dictates that the Executive must alter its discretion in processing noncitizens, is a significant breach of separation of powers and should be rejected for that reason as well.

## B. Declaratory relief is inappropriate unless properly crafted.

Section 1252(f)(1) generally does not preclude declaratory relief that adheres to the proper scope for such relief and does not circumvent section 1252(f)(1)'s limitations by functioning as an injunctive order: a declaratory judgment "declare[s] the rights and other legal relations" of the parties, 28 U.S.C. § 2201(a), but does not coerce compliance or "interdict[ ] the operation" of the challenged statute or administrative action. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963).

Therefore, if any declaratory relief issued by this Court acts like an injunction, it would be barred by section 1252(f)(1).

The same logic applies should the Court disagree with Defendants' explanation of the application of sections 1225 and 1226 to noncitizens encountered "after having illegally crossed the border between ports of entry who are both applicants for admission and noncitizens encountered inside the United States…." Tr. Day 4, 152:10-155:12. The Court may not issue an order restraining Defendants' application of section 1226 to applicants for admission, nor can the Court make section 1225 mandatory to every noncitizen. Were the Court to issue an order directing Defendants how to interpret or apply sections 1225 or 1226, such as providing that they require Defendants to detain a certain type or quantity of individuals, or seek funding to permit greater detention[62], that would have the same effect as an injunction and would be unavailable under section 1252(f)(1), as well as violate the discretion of the Executive Branch.

Similarly, the Court is unable to issue declaratory relief concerning the "correct" number of releases or detentions of individual noncitizens without violating separation of powers principles. That is because the issues in this case are

---

[62] Further, any remedy from this Court that involves direction regarding funding requirements would also violate 8 U.S.C. § 1231(g)(1), which directs the Attorney General to "arrange" for detention of noncitizens. *See* 8 U.S.C. § 1231(g)(1). Any relief that directs DHS to detain certain groups, or at certain levels, would require more funding and would also implicate § 1231(g)(1).

nonjusticiable political questions; Plaintiff's claims boil down to its disagreement with how Defendants utilize various INA release mechanisms, and space and funding for prioritizing detention space. Plaintiff seeks to "require[] the Secretary to enforce the immigration laws" and to "change his priorities for" detention of noncitizens. *Texas v. United States*, 809 F.3d 134, 169 (5th Cir. 2015). Likewise, Plaintiff asks this Court to "substitute [its] judgment" for that of the federal political branches in determining which noncitizens should be detained and which released, and how best to fund and deploy enforcement resources, and Plaintiff would "have the judiciary formulate or rewrite immigration policy" to that end. *Id.* (quoting *Mathews v. Diaz*, 426 U.S. 67, 84 (1976)). As the Eleventh Circuit has explained, "Congress intended whether the [Executive Branch] is adequately guarding the borders of the United States to be 'committed to agency discretion by law' and, thus, unreviewable," and challenges asserting such claims invoke fundamentally "political questions." *Chiles*, 69 F.3d at 1096-97.

Defendants also retain prosecutorial discretion at every step of the removal process concerning whether to remove any specific noncitizen. *AADC*, 525 U.S. at 483-84. So, any declaratory relief that requires an expansion of DHS's resources beyond those currently budgeted and allocated by Congress is unreasonable, unduly burdensome, if not entirely impossible. Further, Plaintiff is not challenging "agency action[s]" but rather, at best, operational decisions, which are not addressable under

the APA. *See Lujan*, 497 U.S. at 891; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) (APA does not permit general challenges regarding "compliance with broad statutory mandates").

Such agency decisions are also committed to agency discretion by law. *See* Point II, *supra*. The Parole+ATD policy and the alleged non-detention policy both involve a "complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" which, by definition, are discretionary decisions. *Heckler*, 470 U.S. at 831. Here, there are no judicially discoverable or manageable standards for determining how much or what type of detention (which is funded by Congress) is enough to safeguard the country and facilitate immigration processing, how many and which applicants for admission ought to be paroled or otherwise released, and how much money should be sought or provided for immigration enforcement and for what operations in particular. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Chiles*, 69 F.3d at 1096-1097.

As this Court discussed during closing arguments, the Court has no power to order the President to request more funding for detention space, nor can this Court direct Congress to provide more funding. Tr. Day 4, 235:23-236:13. "There comes a point at which any remedy [this Court] can provide would almost prove the point of a dispute being a political question." *Id.* at 236:13-15. Any declaratory relief this Court could issue would highlight those concerns. For example, if this Court were

to find a non-detention policy that is actionable under the APA, and find that such policy is illegal, the natural implication from such a declaration would be that additional noncitizens must be detained for the government to comply with the Court's ruling. However, as the Court heard, the federal government would need a staggering amount of funding to detain every noncitizen it encounters. *See* Tr. Day 3, 38:14-39:9. And even if the federal government were to detain significantly more noncitizens than it is currently detaining, albeit less than all, the federal government would still require more funding for custody operations to do so, and that would require this Court to violate the separation of powers and instruct Congress to provide more funding consistent with such a dictate.

### C. At most, the Court may remand to the agency without vacating the policies.

i.   The APA bars universal vacatur of the challenged policies.

Plaintiff also seeks vacatur of the Parole+ATD policy. The APA, however, does not affirmatively authorize a universal vacatur or nationwide relief. *See Trump*, 138 S. Ct. at 2425 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions."). The APA provides only that a court may, at most, "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). That provision does not address remedies at all, which are governed by 5 U.S.C. § 703. But even assuming it did, nothing in § 706(2)'s text specifies whether a rule, if found invalid, should be set aside on its *face* or *as applied* to the challenger, let alone

that injunctive relief should extend beyond application to the plaintiff in a particular case. When used in the context of judicial review, "set aside" can refer to vacating an order—one might say, for example, that an appellate court "sets aside" a lower-court judgment. *See* John Harrison, *Section 706 of the Administrative Procedure act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. on Red. Bull. 37, 42 (2020) (Harrison). But "[t]hose words can also refer to a court's decision to regard a purportedly valid juridical act as ineffective." *Id.* at 43; *see Webster's* 2291 (defining "set aside" as a: "To put to one side; discard; dismiss" and b: "To reject from consideration; overrule") (emphasis omitted).

Statutes and judicial opinions often use the phrase in the latter sense when they refer to courts' "setting aside" unconstitutional legislation. *See*, *e.g.*, Act of Aug. 24, 1937, ch. 754, § 3, 50 Stat. 752-753; *Mallinckrodt Chem. Works v. Missouri ex rel. Jones*, 238 U.S. 41, 54 (1915); *see also* Harrison 43-45 (discussing other examples). The phrasing in that context means that courts disregard unconstitutional statutes when deciding the cases before them, not that they vacate the statutes. Courts "have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional." *Massachusetts v. Mellon*, 262 U.S. at 488. Instead, judicial review "amounts to little more than the negative power to disregard an unconstitutional enactment." *Id.*

Treating Section 706(2) as an instruction to disregard unlawful agency action thus aligns ordinary judicial review of agency action with judicial review of legislation. And it is also the only interpretation consistent with the statutory context. Section 706(2) requires a court to "hold unlawful and set aside agency action, findings, and conclusions." It would not make sense for a court to vacate an agency's "findings" and "conclusions." But it is entirely sensible for a court to disregard unfounded agency findings and conclusions in resolving the case before it.

Interpreting Section 706 to require universal vacatur would bring about the kind of remedial innovation that Congress disclaimed. Remedies "ordinarily 'operate with respect to specific parties,'" rather than "'on legal rules in the abstract,'" *California*, 141 S. Ct. at 2115 (citation omitted), but vacatur does the opposite. Universal relief "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case," *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, C.J., concurring). And reading Section 706(2) to authorize hundreds of district judges around the Nation to grant universal relief in every APA case would perpetuate all of the now-familiar problems with nationwide injunctions. See, *e.g.*, *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay); *Trump*, 138 S. Ct. at 2425-2433 (2019) (Thomas, J., concurring). Thus, the Court should adopt the narrower reading of the "set aside" language and not issue a nationwide vacatur. *See Virginia Society for Human Life*,

263 F.3d at 393 ("Nothing in the language of the APA, however, requires us to exercise such far-reaching power.").

ii.   Universal vacatur is also barred by 8 U.S.C § 1252(f)(1).

Vacatur is also barred under 8 U.S.C. § 1252(f)(1). Like an injunction, vacatur "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), by prohibiting officials from relying on the agency action under review. Vacatur is a "less drastic remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), than an injunction prohibiting the agency from re-adopting the challenged policy in the future. But a vacatur is practically equivalent to an injunction compelling the agency to rescind or stop implementing the challenged action. Vacatur thus possesses the hallmark of the relief barred by section 1252(f)(1).

As discussed *supra*, section 1252(f)(1) prohibits lower courts from "order[ing] federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2064. A vacatur as to the Parole+ATD policy renders that policy void; as to the government's "parole authority" and alleged non-detention policy, a vacatur would "enjoin or restrain" the "operation" of sections 1225 and 1226, which is specifically prohibited. 8 U.S.C. § 1252(f)(1). A vacatur of either of these policies would mean that DHS would be conditioned or limited in its authority to detain or release noncitizens under these statutes, nationwide, which is an

injunction in all but name. Consistent with that view, courts routinely treat vacatur as functionally equivalent to an injunction. Indeed, the Court recognized the same during oral arguments, noting that "a vacatur is effectively an injunction." Tr. Day 4, 248:7-8. Thus, the arguments discussed in Point VI(A), *supra*, as to why injunctive relief is inappropriate also preclude this Court from vacating the policies challenged in this case.

     iii.   <u>At most, the only proper remedy is to remand to the agency without vacatur.</u>

If the Court rules in Plaintiff's favor on any of Plaintiff's claims challenging agency actions, the only proper remedy is to remand to the agency for further consideration or explanation without vacatur of the policy. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

Where a challenge to agency action alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision, as Plaintiff does here, the agency should be given the opportunity to correct any procedural defects on remand, which it can readily do. Remand without vacatur is within the Court's power, and appropriate in this case. *Black Warrior Riverkeeper, Inc.*, 781 F.3d at

1289 ("Whether a court may remand a matter to an agency without vacating the agency's action is a question of first impression in our circuit. We agree, as have most other courts, that the remedy of remand without vacatur is within a reviewing court's equity powers under the APA.") (internal citations omitted). Only in "rare circumstances" is remand for agency reconsideration not the appropriate solution. *Fla. Power & Light*, 470 U.S. at 744. "Remand is generally appropriate when 'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Radio-Television News Directors Ass'n v. F.C.C.*, 184 F.3d 872, 888 (D.C. Cir. 1999), citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Remanding without vacating is particularly appropriate where vacatur would cause disruption or chaos, which halting the Parole+ATD program, or the government's use of parole in other contexts, would do. *See, e.g.*, *Radio-Television News Directors Ass'n*, 184 F.3d at 888; *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (similar).

The Eleventh Circuit's test for deciding whether an agency's action should be remanded without vacatur is to balance the equities at issue. *Black Warrior*

*Riverkeeper, Inc.*, 781 F.3d at 1290. The test considers "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* (citing *Allied–Signal, Inc.,* 988 F.2d at 150–51); *see also Am. Great Lakes Ports Ass'n v. Schultz,* 962 F.3d 510, 518 (D.C. Cir. 2020) (same). Among the equities to be balanced are both the "disruptive consequences" should the policy be vacated, as well as "the potential … damage that might continue unabated while [the agency] revisits its determinations." *Black Warrior Riverkeeper*, 781 F.3d at 1290.

Here, should the Court vacate the Parole+ATD policy or the alleged non-detention policy, or issue injunctive relief on either, there would be severe disruption in DHS's management of the border and "disastrous consequences" for the border. Tr. Day 4, 227:19-25. As discussed *supra*, there would be extensive crowding and backlogs in facilities, more agents taken out of the field for processing resulting in less patrols between ports of entry. Tr. Day 3, 56:5-20; Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-116:24, 56:21-57:2. This would result in significant risks to agents, migrants, and the local populations near the border. Tr. Day 2, 125:18-126:11. In addition, ICE detention capacity would quickly be full of noncitizens who do not pose a danger to the community or national security and higher risk individuals will be released. Such an outcome would be highly disruptive and unsafe for the country.

Given these clear consequences stemming from any vacatur, precedent requires the Court to avoid disruption and, at most, remand without vacatur or other injunctive relief because the agency can remedy any APA defect by providing further explanation. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018), *aff'd*, 962 F.3d 510 (D.C. Cir. 2020) (remanding without vacating after weighing the *Allied–Signal* factors and determining that "the disruptive consequences [of vacatur] would be considerable"); *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 14 (D.D.C. 2019), *rev'd on other grounds*, 967 F.3d 818 (D.C. Cir. 2020), *rev'd*, 142 S. Ct. 1896 (2022) (remanding without vacatur, noting that "the uncertainty surrounding this issue all but guarantees its resolution would be highly disruptive, should the Court vacate the [rules]"); *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000) ("remand, without vacatur" is appropriate where "it would be disruptive to vacate a rule that applies to other" groups beyond the plaintiffs and where the agency "may well be able to justify its decision" with further explanation). Similarly, should the Court find the government has an unwritten non-detention policy and vacate the government's ability to use parole or bond/conditional parole, the impact on border operations would be immediate and debilitating. There would be extensive crowding and backlogs in facilities, more agents taken out of the field for processing resulting in less patrols between ports of entry. Tr. Day 3, 56:5-20; Tr. Day 4, 148:7-17; Tr. Day 2, 115:16-

116:24, 56:21-57:2. This would result in significant risks to agents, migrants, and the local populations near the border. Tr. Day 2, 125:18-126:11. In addition, ICE detention capacity would quickly be full of noncitizens who do not pose a danger to the community or national security. ICE only has so many beds—detention space is a finite resource—so if ICE is not permitted to release lower threat individuals, then higher risk individuals may not be detained. Such an outcome would be highly disruptive and unsafe for the country, and thus strongly weighs against vacatur of the government's parole authority.

### D. Any remedy provided must be limited to the injuries actually proved by Plaintiff.

Were the Court to nonetheless conclude that some form of injunctive relief is appropriate despite the limitations of section 1252(f), that relief must be limited to the actual parties in this case. Thus, any injunction must be limited only to Florida.[63] Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citation omitted); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining

---

[63] A further limitation to any potential remedy available to this Court is statutory limitations on what is judicially reviewable, and where such claims must be heard. *See* 8 U.S.C. § 1252(a)(2)(A); § 1252(a)(2)(B)(ii) (prohibiting judicial review of "any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."); § 1226(e).

party, even though the court's judgment may benefit others collaterally."). Granting Plaintiff relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [its] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers*, 555 U.S. at 494.

Longstanding practice confirms that injunctions are limited to what is necessary to remedy a plaintiff's injury. The scope of a court's statutory authority to enter injunctive relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Hawaii*, 138 S. Ct. at 2427-28 (Thomas, J., concurring); *DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring) (same). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Id*. at 2428; *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) ("injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001)

("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Similarly, if the Court does not remand without vacatur—in direct contradiction to the APA—relief still should be limited to remedying the injuries of the parties before the Court. Relief should be, at most, vacatur of the portions of the policies found insufficient as applied to Plaintiff, with remand for further consideration or explanation, and not include injunctive relief for Plaintiff or nationwide. The common remedy in an APA case where a rule or policy is found arbitrary or capricious, is to vacate the part of the rule or policy that is unlawful. *See, e.g., Util. Solid Waste Activities Grp. v. Env't Prot. Agency*, 901 F.3d 414, 449 (D.C. Cir. 2018) (vacating and remanding portions of an agency rule for further consideration). Injunctive relief is inappropriate in such circumstances. Indeed, the Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction and would commit reversible error in doing so unless an injunction would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (reversing injunction in APA case where vacatur provided sufficient relief). This Court would invite error because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," or where "a less drastic

remedy such as partial or complete vacatur … [is] sufficient to redress" the Plaintiff's injury. *Id.*

Here, vacatur as to Plaintiff based on the specific claims the Court finds have merit, and remand to the agency to consider those issues anew, would more than redress any injury Plaintiff may establish without the need for more coercive relief. *See, e.g.*, *N. Air Cargo v. United States Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("It was quite anomalous [for the district court] to issue an injunction. When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal."). For example, were the Court to find that Plaintiff succeeded in meeting its burden in showing the Parole+ATD policy was contrary to law, and the Court did not find that remand without vacatur was appropriate, then a potential narrowly tailored remedy that would be appropriate would be to vacate the Parole+ATD policy for any noncitizens who have an intended destination of Florida. BP collects a physical address for each noncitizen processed through the Parole+ATD pathway, SAR0004, so a potential remedy would be to prohibit the use of that pathway for noncitizens who report a Florida address.

Likewise, any potential remedy must be limited to address the specific injuries Plaintiff actually proved were traceable to the challenged policies. Defendants

maintain Plaintiff has not established a cognizable injury, as discussed in Point I, *supra*¸ but if the Court finds that Plaintiff established a sufficient injury based on an increase in "immigrant" children enrolling in Florida public schools, and thus has standing only on that basis, then any relief issued by the Court has to be limited to that group as to all claims. *See DaimlerChrysler Corp.*, 547 U.S. at 352. (A "plaintiff must demonstrate standing for each claim he seeks to press" and "each form of relief sought."). Put plainly, if the Court finds that Florida has standing because more children are enrolling in Florida public schools, then the Court's remedy can only address children going to Florida. As children are processed either as unaccompanied minors or as part of a family unit, Tr. Day 2, 68:7-12, and unaccompanied minors are in the care of the Health and Human Services Department and outside the scope of this case, the processing of family units destined for Florida is all the Court would be empowered to redress. Any order from this Court dealing with the government's entire parole authority would be overbroad and inappropriate given that Plaintiff was able to prove only one discrete, traceable type of injury. *See* Point I, *supra*.

In conclusion, Plaintiff is not entitled to any relief. But if the Court finds Plaintiff has succeeded on the merits of any of its claims, the Court should remand to the agency for further consideration without vacating the challenged policy or limit its vacatur to portions of the challenged policy that apply to injuries Plaintiff

actually proved. Should the Court enter any judgment in Plaintiff's favor, Defendants respectfully request that the Court stay its order from taking effect for sufficient time to allow for potential new rulemaking, *see Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 50 F.4th 164, 172 (D.C. Cir. 2022), or to permit Defendants to decide whether to appeal and seek a stay pending appeal, given the national significance of the issues presented in this case. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

## CONCLUSION

For the foregoing, judgment should be entered in favor of Defendants, dismissing all of Plaintiff's claims with prejudice.

Date: February 16, 2023                    Respectfully submitted,

JASON R. COODY                             BRIAN M. BOYNTON
*United States Attorney*                    *Principal Deputy Assistant Attorney General*

MARIE A. MOYLE                             WILLIAM C. PEACHEY
*Assistant United States Attorney*          *Director*
Northern District of Florida               Office of Immigration Litigation
                                           District Court Section

                                           EREZ REUVENI
                                           *Assistant Director*

                                           /s/ *Joseph A. Darrow*
                                           JOSEPH A. DARROW
                                           ERIN T. RYAN
                                           ELISSA P. FUDIM
                                           *Trial Attorneys*
                                           U.S. Department of Justice
                                           Civil Division

Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023 I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of Florida by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division