# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

May 09, 2023

Joseph Anton Darrow
DOJ-CIV
Office of Immigration Litigation, District Court Section
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044

Elissa Fudim
DOJ-CIV
Office of Immigration Litigation, District Court Section
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044

Erin Ryan
DOJ-CIV
Office of Immigration Litigation, District Court Section
PO BOX 868
BEN FRANKLIN STATION
WASHINGTON, DC 20044

Appeal Number:  23-11528-C
Case Style:  State of Florida v. USA, et al
District Court Docket No:  3:21-cv-01066-TKW-ZCB

## CIVIL DOCKETING NOTICE

The above-referenced case has been docketed in this Court. All documents filed in this appeal must include the Case Style and Appeal Number shown above.

Appellant Requirements
Unless the following requirements have already been satisfied, **within 14 days of the date of this notice the appellant MUST:**

1. Pay to the **District Court** the Filing Fee **OR** File a <u>Motion to Proceed In Forma Pauperis (IFP)</u> in the district court. <u>See</u> FRAP 3(e), FRAP 24.

   *If the filing fee is not paid and a motion to proceed IFP has not been filed in the district court within 14 days of the date of this notice, this appeal will be dismissed without further notice pursuant to 11th Cir. R. 42-1(b).*

   *If the district court has denied the appellant IFP status on appeal, the appellant has 30 days from the date of the district court's order to file an IFP motion in this Court. <u>See</u> FRAP 24(a)(5).*

2. File in this Court **AND** in the district court a <u>Transcript Order Form</u> **OR** file a certificate in this Court stating no transcripts will be ordered. <u>See</u> FRAP 10(b)(1), 11th Cir. R. 10-1. (Not applicable in certain bankruptcy appeals. <u>See</u> FRAP 6(b)).

   *If no transcripts are ordered, appellant's brief is due 40 days after **<u>05/09/2023</u>**, except as otherwise provided by the rules. <u>See</u> 11th Cir. Rules 12-1 and 31-1.*

3. File a <u>Certificate of Interested Persons and Corporate Disclosure Statement (CIP)</u>. See 11th Cir. R. 26-1(a)(1).

4. Complete the <u>Web-Based CIP</u> (attorneys only). <u>See</u> 11th Cir. R. 26.1-1(b).

5. File a <u>Civil Appeal Statement</u> (attorneys only). <u>See</u> 11th Cir. R. 33-1(a)(3).

<u>Mediation</u>
If a Civil Appeal Statement is required to be filed <u>and</u> the appeal is fully counseled on all sides, your appeal will be reviewed and considered for mediation. Mediation services are at no cost to the parties. If no Civil Appeal Statement is required or you or any party to the appeal is self-represented or *pro se* then the appeal is not eligible for mediation. <u>See</u> 11th Cir. R. 33-1.

<u>Appellee Requirements</u>
Unless the following requirements have already been satisfied, **within 28 days of the date of this notice, all appellees participating in this appeal MUST:**

1. File a <u>CIP</u> or a notice. <u>See</u> 11th Cir. R. 26.1-1(a)(3).

2. Complete the <u>Web-Based CIP</u> (attorneys only). <u>See</u> 11th Cir. R. 26.1-1(b).

<u>Attorney Participation</u>
All attorneys (except court-appointed attorneys) who wish to participate in this appeal must file an <u>Appearance of Counsel Form</u> within 14 days of the date of this notice. See 11th Cir. R. 46-6(b). Please also see FRAP 46 and the corresponding circuit rules.

All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. <u>Although not required</u>, non-incarcerated pro se parties are

permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website.

Obligation to Notify Court of Change of Addresses

Each pro se party and attorney has a continuing obligation to notify this Court of any changes to the party's or attorney's addresses during the pendency of the case. See 11th Cir. R. 25-7.

Additional Information

Rules, forms, and additional information, including a handbook for pro se litigants, can be found at www.ca11.uscourts.gov.

Clerk's Office Phone Numbers

| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| New / Before Briefing Cases: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| Cases in Briefing / After Opinion: | 404-335-6130 | CM/ECF Help Desk: | 404-335-6125 |
| Cases Set for Oral Argument: | 404-335-6141 | | |

CIVIL - Notice of Docketing

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                       Case No.  3:21-cv-1066

The UNITED STATES OF AMERICA;
et. al,

     Defendants.

_____

### NOTICE OF APPEAL

Pursuant to Federal Rule of Appellate Procedure 3, notice is hereby given that all Defendants appeal to the United States Court of Appeals for the Eleventh Circuit from the Court's Opinion and Order of March 8, 2023, ECF No. 157, and Judgment, ECF No. 158, as well as any and all associated opinions and orders.

Date:  May 5, 2023

JASON R. COODY
*United States Attorney*

MARIE A. MOYLE
*Assistant United States Attorney*
Northern District of Florida

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Assistant Director*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA FUDIM
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

*Counsel for Defendants*

1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2023, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which provided an electronic notice and electronic link of the same to all attorneys of record.

By: */s/ Joseph A. Darrow*
JOSEPH A. DARROW
Trial Attorney
United States Department of Justice
Civil Division

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA,

     Plaintiff,

v.                                                    Case No. 3:21-cv-1066-TKW-ZCB

UNITED STATES OF
AMERICA, et al.,

     Defendants.

_____/

## JUDGMENT

Pursuant to and at the direction of the Court,

Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion and Order entered on this date. Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice.

JESSICA J. LYUBLANOVITS
CLERK OF COURT

March 8, 2023_____          s/ Jennifer F. Johnson, Deputy Clerk___
DATE                                                    Deputy Clerk

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**STATE OF FLORIDA,**

    **Plaintiff,**

**v.**                               **Case No. 3:21-cv-1066-TKW-ZCB**

**UNITED STATES OF
AMERICA, et al.,**

    **Defendants.**

_____/

## <u>OPINION AND ORDER</u>

After due notice, the Court held a bench trial in this case on January 9-12, 2023.  Based on the testimony and evidence presented at the trial, the parties' oral arguments and post-trial filings (Docs. 155, 156), and the supplemental administrative record for the Parole Plus Alternative to Detention (Parole+ATD) policy (Doc. 87-1), the Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## I.    Executive Summary

There is an immigration "crisis" at the Southwest Border.  The Chief of the U.S. Border Patrol (USBP) candidly admitted it in his

testimony and the overwhelming weight of the evidence confirms it.  The crisis has been ongoing for over two years and shows no sign of abating.

The evidence establishes that the current status quo at the Southwest Border is unsustainable, but it is not the Court's job to solve the immigration crisis—that is the job of the political branches.[1]  Nor is it the Court's job to decide whether the policies challenged by Florida in this case (or the underlying immigration laws) are good or bad public policy—that too is the job of the political branches.  Instead, the Court's only job is to determine based on the evidence presented whether challenged policies comply with the immigration laws, as written.

\*   \*   \*

The Supreme Court has recognized that immigration officials have "broad discretion" in carrying out the immigration laws, *see Arizona v.*

---

[1]  It is noteworthy that the President made his first visit to the Southwest Border the day before the trial in this case started.  That visit was preceded by the announcement of a new immigration policy that is intended to dissuade aliens from continuing to simply show up at the Southwest Border.  However, it does not appear that this new policy will repeal the Parole+ATD policy or mandate detention of aliens who do show up at the Southwest Border in contravention of the new policy, and Defendants have not argued the new policy moots or otherwise has any bearing on this case.  Moreover, the legality the new policy has been already challenged by a group of 20 states, including Florida, in *Texas v. Department of Homeland Security*, Case No. 6:23-cv-007 (S.D. Tex.).

*United States*, 567 U.S. 387, 396 (2012).  But that discretion must be exercised within the confines established by Congress because, as the Supreme Court has repeatedly held, Congress—not the President or Executive Branch officials—has the "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens.[2]  *See, e.g.*, *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)); *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 343 (1909).

Congress exercised that power by enacting the Immigration and Nationality Act (INA), which is codified as amended in 8 U.S.C. §1101 et seq.  Most pertinent to this case is 8 U.S.C. §1225, which establishes the policies and procedures for processing what the statute refers to as "applicants for admission"—that is, aliens arriving in the United States at ports of entry or other locations.

---

[2]  The Court uses the term "alien" because that is the term used by Congress in the immigration laws.  *See* 8 U.S.C. §1101(a)(3).  Also, "alien" is also more accurate than Defendants' preferred—and allegedly less "dehumanizing"—term, "non-citizen," because the statutory definition of "alien" excludes U.S. nationals even though nationals can be "non-citizens."  *See Miller v. Albright*, 523 U.S. 420, 467 n.2 (1998) (Ginsberg, J., dissenting) ("Nationality and citizenship are not entirely synonymous; one can be a national of the United States and yet not a citizen.").

Under §1225(b)(1)(A), certain arriving aliens, including those who lack proper admission documents, are subject to expedited removal "without further hearing or review." However, if such an alien indicates an intention to apply for asylum or a fear of persecution, the alien "**shall be detained**" pending a final determination of asylum or credible fear of persecution. *See* 8 U.S.C. §1225(b)(1)(B)(ii), (b)(1)(B)(iii)(IV) (emphasis added). For all other arriving aliens, unless an immigration official determines that the alien is clearly and beyond a doubt entitled to be admitted, the alien "**shall be detained**" for removal proceedings. *See* 8 U.S.C. §1225(b)(2)(A) (emphasis added).

In 2018, in *Jennings v. Rodriguez*, the Supreme Court held that "§§1225(b)(1) and (b)(2) <u>mandate detention</u> of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." 138 S. Ct. 830, 845 (2018) (emphasis added). Last year, in *Biden v. Texas*, the Supreme Court assumed without deciding that the federal government was violating §1225(b)(2)(A) by not detaining aliens arriving at the Southwest Border, *see* 142 S. Ct. 2528, 2542 (2022), but the Court left unanswered the question of "whether the detention requirement in section 1225(b)(2)(A) is subject to principles of

law enforcement discretion, as the Government argues, or whether the Government's current practice simply violates that provision," *id.* at 2542 n.5.  This case requires that question to be answered.

The State of Florida contends that Defendants[3] are violating the statutory detention mandates in §1225(b)(1) and (b)(2) by releasing aliens arriving at the Southwest Border into the country *en masse* through various "non-detention policies," including the Parole+ATD policy and the exercise of "prosecutorial discretion" under 8 U.S.C. §1226(a).  Defendants respond that there is no overarching "non-detention policy"; that they have the discretion not to detain aliens notwithstanding the mandatory language in §1225(b)(1) and (b)(2); and that Florida does not have standing to challenge their discretionary decisions to release aliens into the country on parole or otherwise.

For the most part, the Court finds in favor of Florida because, as detailed below, the evidence establishes that Defendants have effectively turned the Southwest Border into a meaningless line in the sand and

---

[3] The United States of America and various federal immigration agencies and officials, including the Department of Homeland Security (DHS), Customs and Border Patrol (CBP), and Immigration and Customs Enforcement (ICE).  At times in this Opinion and Order, the Court refers to Defendants collectively as "DHS."

5

little more than a speedbump for aliens flooding into the country by prioritizing "alternatives to detention" over actual detention and by releasing more than a million aliens into the country—on "parole" or pursuant to the exercise of "prosecutorial discretion" under a wholly inapplicable statute—without even initiating removal proceedings. The evidence further establishes that Florida is harmed by the challenged policies because well over 100,000 aliens have been released into Florida under the policies and the state has incurred substantial costs in providing public services to aliens, including those who should have been detained under §1225(b)(1) and (b)(2) and would not have been in the state but for the challenged policies. However, the Court only has the authority to vacate the Parole+ATD policy because the overarching "non-detention policy" is not discrete "agency action" that is subject to judicial review under the Administrative Procedure Act (APA).

## II.   Findings of Fact

The Court adopts and incorporates by reference the facts agreed to by the parties, *see* Doc. 122 at 16-24 (¶¶1-63); Doc. 143 at 1-2 (¶¶71, 72)), but for sake of brevity, only the facts most pertinent to the Court's analysis are set forth below. The findings related to the merits of the

Parole+ATD policy are based on the documents in the supplemental administrative record, *see* Doc. 55; Doc. 117 at 2; Doc. 130 at 3-4 (¶8.b.i), whereas the findings on other issues are based on a thorough assessment of the weight and credibility of the entire evidentiary record.

### A.    Immigration Enforcement, Generally

DHS is the cabinet-level agency that is primarily responsible for implementing and enforcing the immigration laws.

CBP and ICE are component agencies within DHS.

CBP is generally responsible for immigration enforcement at the borders—with CBP's Office of Field Operations (OFO) having responsibility for the ports-of-entry and the USBP having responsibility between ports-of-entry.

ICE is generally responsible for immigration enforcement in the interior of the country—with ICE's Enforcement and Removal Operations (ERO) having responsibility for detaining and removing aliens.

CPB and ICE both have detention facilities, but the CBP facilities are only intended for temporary detention of up to 72 hours, after which continued detention requires a transfer to ICE custody.

The length of time that an arriving alien can be detained in CBP or ICE custody is also impacted by judicial decisions.  For example, the consent decree and subsequent orders in *Flores v. Garland*, No. 2:85-cv-4544 (C.D. Cal.), effectively limit the detention of minors (and, thus, family units) to 20 days—although the evidence establishes that period is more than enough time to at least initiate removal proceedings.

There is nothing inherently inhumane or cruel about detaining aliens pending completion of their immigration proceedings.  The CBP and ICE witnesses admitted as much in their testimony and there is no contrary evidence in the record.

Detention is the surest way to ensure that an alien will not abscond pending completion of their immigration proceedings.

B.    Alien Apprehensions and Releases at the Southwest Border

CBP maintains monthly data on the number of arriving aliens apprehended at the Southwest Border and the "processing disposition"

for those aliens.  *See* P.Ex.[4] 1 through 4 (monthly data from January 2020 through November 2022).  The data only includes "Title 8 apprehensions" and does not include aliens excluded under the "Title 42 Order."[5]

The data shows that in the three months before the COVID-19 pandemic (January through March 2020), about 25,000 aliens per month were being apprehended at the Southwest Border.  The monthly apprehensions dropped significantly (to less than 1,200) in April 2020 because of the pandemic and the Title 42 Order, and they remained at relatively low levels through January 2021.

Apprehensions returned to their pre-pandemic levels in February 2021 and increased dramatically thereafter.  By July 2021, monthly apprehensions reached 100,000, and for the most part, they have stayed at or above that level since then.

In the last three months for which there is data in the record (September to November 2022), monthly apprehensions averaged about

---

[4]  "P.Ex." refers to the exhibits introduced by Florida.  "D.Ex." refers to the exhibits introduced by Defendants.

[5]  As explained in more detail below, the Title 42 Order was issued by the Centers for Disease Control (CDC) to prohibit certain aliens from entering the country during the COVID-19 pandemic.

135,000.  These numbers are expected to increase significantly when the Title 42 Order is no longer in place.

USBP agents routinely arrest aliens in the field without a warrant, as authorized by 8 U.S.C. §1357.  An arrest warrant is not issued (if at all) until after the alien is in custody, and unless the alien is going to be detained for prosecution, the warrant is merely a Form I-200 "administrative warrant" that is issued in conjunction with a notice to appear (NTA).[6]

The monthly data also includes different categories of "processing dispositions."  The most pertinent dispositions for this case are Notice to Appear/Own Recognizance (NTA/OR), Parole+ATD,[7] and Warrant of Arrest/Notice to Appear (Warrant/NTA).

The Warrant/NTA category includes the aliens who were detained for prosecution or removal.  The other two categories are comprised of

---

[6]  The NTA is the document that formally initiates a removal proceeding against an alien.  *See* 8 C.F.R. §1239.1(a) ("Every removal proceeding conducted under [8 U.S.C. §1229a] to determine deportability or inadmissibility of an alien is commenced by the filing of a notice to appear with the immigration court.").

[7]  The data for fiscal year 2021 included releases on parole in the "other" category, but that category clearly included releases on Parole+ATD because the numbers in that category increased significantly starting in August 2021 after the Parole+ATD program was created.

aliens who have been released pending completion of their immigration proceedings, either under the Parole+ATD program, the predecessor Notice to Report (NTR) program, or "prosecutorial discretion" under §1226(a).

The data shows that the Warrant/NTA category has remained relatively consistent since the "surge" of arriving aliens started in March 2021. The data reflects that typically more than 20,000 arriving aliens per month are being detained.

The data also shows that a substantial number of aliens have been released each month since March 2021. For example, in the first month of the NTR program (March 2021) there were more than 26,000 releases categorized as NTA/OR, and by the time that program was terminated in November 2021, there had been over 256,000 releases under the NTA/OR category.

In total, between March 2021 and November 2022, the data shows that more than 1.16 million aliens have been released under the NTA/OR and Parole+ATD categories.

DHS has never had sufficient funding to apprehend and detain every alien illegally in the country.  As a result, DHS must make "tough decisions" about which aliens to detain and which aliens to release.

The fact that DHS must make those "tough decisions" does not mean that it has free rein to adopt policies that contravene the clear mandates in the INA or create "processing pathways" that contort statutory language to effectuate its preferred policy of "alternatives to detention" over actual detention.

Likewise, the fact that prior Administrations (may have[8]) utilized similar "processing pathways" as those being challenged in this case does not make those policies lawful because, as Saint Augustine and William Penn said, "wrong is wrong even if everyone is doing it."

---

[8]   Defendants post-trial brief quoted and provided Internet links to "policy memoranda" and "guidance" issued by various immigration officials from 1992 to 2019 that purport to show that prior Administrations (including the Trump Administration) prioritized detention of aliens who posted a threat to public safety and used parole to release lower-risk inmates.  *See* Doc. 156 at 22-24.  Some of those documents are in the record (e.g., D.Ex. A, I, K), but others are not.  Defendants argue that the Court can take judicial notice of all these documents under Fed. R. Evid. 201, but the Court declines to do so because Defendants had ample opportunity to present this evidence at trial if they thought it was important to their case, and at this stage of the case, the Court is not inclined to surf the Internet looking for these (or other) facts that might be relevant to the issues in this case.

That said, the detention policies that were in effect before January 20, 2021, provide necessary background and context for the current policies and they are relevant to the Court's assessment of whether, as Florida claims, the current Administration adopted a new "non-detention policy" that should have been formally adopted pursuant to the APA.

### C.    Detention Policy During the Trump Administration

Shortly after taking office in January 2017, President Trump issued Executive Order 13767 (P.Ex. 54), which instructed DHS to "take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings." This directive was intended to "terminat[e] the practice commonly known as 'catch and release' whereby aliens are routinely released in the United States shortly after their apprehension for violations of immigration law."

The following month, then-DHS Secretary Kelly issued a memorandum to implement the directive in Executive Order 13767. *See* D.Ex. K. The memorandum acknowledged that because "detention of all [aliens subject to §1225(b)] may not be immediately possible" due to limited detention capacity, "detention resources should be prioritized

based upon potential danger and risk of flight if an individual alien is not detained." However, the memorandum made clear that "[p]olicies that facilitate the release of removable aliens apprehended at and between the ports of entry [i.e. 'catch-and-release'] shall end" because those policies "allow [aliens] to abscond and fail to appear at their removal hearings [and] undermine the border security mission."

The memorandum stated that "parole determinations will be made in accordance with current regulations and guidance" pending establishment of additional processing and detention facilities. However, the memorandum made clear that the parole authority "should be exercised <u>sparingly</u>" (emphasis added) on a case-by-case basis because "[t]he practice of granting parole to certain aliens in pre-designated categories in order to create immigration programs not established by Congress, has contributed to a border security crisis, undermined the integrity of the immigration laws and the parole process, and created an incentive for additional illegal immigration."

Consistent with the directives in Executive Order 13767 and Secretary Kelly's implementing memorandum, USBP Chief Raul Ortiz testified that aliens encountered at the Southwest Border during the

Trump Administration were only released under "very exigent circumstances." This was true both for releases under the parole authority in 8 U.S.C. §1182(d)(5) and "prosecutorial discretion" or NTA/OR releases under §1226(a).

USBP Chief Ortiz's testimony that aliens apprehended at the Southwest Border during the Trump Administration were rarely released is borne out by the data. For example, in February 2020 (before the COVID-19 pandemic), USBP apprehended around 30,000 aliens at the Southwest Border and only released 91. And, in the entire month of December 2020, USBP released only 17 aliens.

### D.    Changes in Detention Policy Under the Biden Administration

One of the issues presidential candidate Joe Biden campaigned on was taking a different approach to immigration enforcement and border security than President Trump. His official campaign website included an extensive discussion of immigration, titled "The Biden Plan for Securing Our Values as a Nation of Immigrants." P.Ex. 45 (hereafter "the Biden Plan").[9]

---

[9] The "Biden Plan" provides background and context for the events that follow, but it has no bearing on the legality of the challenged policies. *See Trump v. Hawaii*,

The Biden Plan described the border wall championed by President Trump as "a waste of money" and "not a serious policy solution," and it also promised to end the Migrant Protection Protocols (MPP) that was commonly known as the "Remain in Mexico" program.   And, most pertinent to this case, the Biden Plan promised to "[e]nd prolonged detention" by utilizing "alternatives to detention" that "enable migrants to live in dignity and safety while awaiting their court hearings."

President Biden was true to his word.   He issued a series of Executive Orders during his first two weeks in office, including one that set the stage for the termination of the "Remain in Mexico" program[10] and rescinded Executive Order 13767.   *See* P.Ex. 53 (Executive Order No. 14010).

Even before Executive Order 13767 was formally rescinded, DHS had already started to move away from it.   Most significantly, on President Biden's first day in office, the Acting Secretary of DHS issued

---

138 S. Ct. 2392, 2417–18 (2018) (acknowledging but not giving any significance to President Trump's campaign statements about a "Muslim travel ban" when evaluating the validity of his executive orders limiting travel from certain countries).

[10]   The termination of this program was the subject of the litigation that culminated in the Supreme Court's decision in *Biden v. Texas, supra*.

a memorandum rescinding the guidance implementing Executive Order 13767 and establishing more restrictive "enforcement priorities" that applied to a "broad range of … discretionary [immigration] enforcement decisions," including "whom to detain or release" and whether to issue an NTA. *See* P.Ex. 16 ("the Pekoske Memo").[11]

On its face, the Pekoske Memo states that border security and removal of aliens illegally entering the United States was a priority, but CBP officials credibly testified that they understood that was not actually the case—at least for illegal border crossers who were not deemed to be a threat to public safety. Indeed, USBP Chief Ortiz testified that it was his understanding based on communications from DHS officials that releases were no longer limited to "very exigent circumstances" and that USBP was now authorized to release aliens who were not deemed to be a threat to public safety into the country irrespective of the detention mandates in §1225(b).

Around the same time, DHS started closing family detention facilities—either by converting them to detention facilities for single

---

[11] Substantially similar enforcement priorities to those in the Pekoske Memo are contained in the "guidelines" issued by the Secretary of DHS that are currently under review by the Supreme Court in *United States v. Texas*, No. 22-58.

adults or closing them altogether.  Although DHS claimed that it took

these steps to address the increase in single adults that were being

encountered at the border, the practical effect of closing the family

detention facilities was to guarantee that family units arriving at the

border would have to be released into the country rather than being

detained.  This, in turn, contributed to the overcrowding of CBP facilities

as family unit encounters increased during the first six months of the

Biden Administration—from just over 7,000 in January 2021 to nearly

83,000 in July 2021.

Collectively, these actions were akin to posting a flashing "Come In,

We're Open" sign on the southern border.[12]  The unprecedented "surge"

of aliens that started arriving at the Southwest Border almost

---

[12] The Court uses this analogy not only because it is a fair characterization of
what Defendants did but also because Defendants elicited testimony and argued at
trial that they could not simply hang a "Closed" sign on the border.

Moreover, although Defendants' argument that they could not simply "close"
the border to arriving aliens may be technically accurate, it is somewhat
disingenuous because 8 U.S.C. §1182(f) specifically authorizes the President to
"suspend the entry of all aliens" whenever he finds that their entry would be
"detrimental to the interests of the United States."  That statute "exudes deference,"
*Hawaii*, 138 S. Ct. at 2408, and if it is broad enough to authorize the President to
"establish a naval blockade that would … deny illegal Haitian migrants the ability to
disembark on our shores," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 187
(1993), it would certainly seem to authorize the President to close the border to
arriving aliens one it became apparent that CBP and ICE facilities were not going to
be able to handle the "surge" of aliens coming to the border.

immediately after President Biden took office and that has continued unabated over the past two years was a predictable consequence of these actions. Indeed, USBP Chief Ortiz credibly testified based on his experience that there have been increases in migration "when there are no consequences" and migrant populations believe they will be released into the country.

High-ranking immigration agency officials were made aware of the impact of these actions on border security as early as January 28, 2021, when CBP officials prepared an email about the "release of migrants along border" in advance of a briefing with the Assistant Secretary of DHS. *See* P.Ex. 98.

The email explained that CBP was seeing "a stark increase in monthly illegal migration into the U.S., especially in the South Texas area" that was expected to "immediately overwhelm USBP's short-term detention capacity"; that "[t]he pause on processing pathways[13] … and recent policy changes have also impacted USBP's ability to expeditiously

---

[13]   The pathways referred to in the email—MPP, Asylum Cooperation Agreement (ACA), and Prompt Asylum Claim Review (PACR)—were formally terminated in the first weeks of the Biden Administration, although they had been "paused" towards the end of the Trump Administration due to the COVID-19 pandemic.

process and remove those encountered" (emphasis added). The email also warned that "USBP will be required to promptly process and release [aliens] due to lack of adjudication pathways and the necessity to maintain the health and safety of the workforce and those in detention during the pandemic."

The email did not specifically identify the "recent policy changes" that it was referring to, but USBP Chief Ortiz (who was on the email chain) testified that it was his understanding that the policy changes referred to in the email were the Pekoske Memorandum and move away from detention to "alternatives to detention." The record contains no contrary evidence on this point.

The email provides some support for Defendants' position that the need to release rather than detain aliens arriving at the Southwest Border was attributable, at least in part, to COVID-related issues, but it provides more support for Florida's position that Defendants' "pause on processing pathways … and recent policy changes" led to DHS's subsequent inability to comply with the statutory detention mandates in §1225(b)(1) and (b)(2).

The greater weight of the evidence establishes that the dramatic increases in the number of aliens being released at the Southwest Border was attributable to changes in detention policy, not increases in border traffic.  Indeed, this can be seen by comparing the apprehension and release data for February 2020 (the last month of the Trump Administration before the COVID-19 pandemic) and February 2021 (the first full month of the Biden Administration) because that data shows that nearly 8,800 aliens were released at the Southwest Border in February 2021 even though apprehensions in that month were 20% <u>lower</u> than in February 2020 when only 92 aliens were released.

There were undoubtedly geopolitical and other factors that contributed to the surge of aliens at the Southwest Border, but Defendants' position that the crisis at the border is not largely of their own making because of their more lenient detention policies is divorced from reality and belied by the evidence.  Indeed, the more persuasive evidence establishes that Defendants effectively incentivized what they call "irregular migration" that has been ongoing since early 2021 by establishing policies and practices that all-but-guaranteed that the vast majority of aliens arriving at the Southwest Border who were not

excluded under the Title 42 Order would not be detained and would instead be quickly released into the country where they would be allowed to stay (often for five years or more) while their asylum claims were processed or their removal proceedings ran their course—assuming, of course, that the aliens do not simply abscond before even being placed in removal proceedings, as many thousands have done.

It is particularly noteworthy that USBP Chief Ortiz testified that the current surge differs from prior surges that he seen over his lengthy career in that most of the aliens now being encountered at the Southwest Border are turning themselves in to USBP officers rather than trying to escape the officers.  It is reasonable to infer (and just plain common sense) that aliens are doing this because they are aware that they will be expeditiously processed and released into the country.  Indeed, on this point, Chief Ortiz credibly opined based on his experience that the aliens are likely "turning themselves in because they think they're going to be released."

### E.     NTR Policy

By the middle of March 2021, CBP facilities were becoming increasingly overcrowded as a result of the increases in border traffic, the

time it takes to issue an NTA to initiate removal proceedings, and CBP's failure to transfer aliens to ICE custody for continued detention—often because ICE refused to accept custody.

On March 19, 2021, in an effort to reduce overcrowding at CBP facilities, then-USBP Chief Rodney Scott issued memoranda authorizing the use of "prosecutorial discretion" to release arriving aliens into the country "without placing them in removal proceedings." *See* P.Ex. 20 ("the March Memo").

The March Memo stated that "[p]rocessing an alien for release without entering them into proceedings is not taken lightly," but the only authority cited in the memo for the policy was 8 C.F.R. §287.3.

That regulation does not come close to providing legal support for the March Memo because it expressly contemplates that the alien will be placed in some form of immigration proceeding if there is "prima facie evidence that the arrested alien was entering, attempting to enter, or is present in the United States in violation of the immigration laws." 8 C.F.R. §287.3(b). The regulation does authorize the official examining the alien to take other action as "appropriate or required under the laws or regulations applicable to the particular case," *id.*, but the March Memo

did not identify any law or regulation that authorizes arriving aliens to be released without first being placed in some form of removal proceeding—and there is none.

The March Memo allowed USBP agents to release aliens into the country more quickly with only minimal processing and without initiating removal proceedings.  As one ICE official described it, USBP was releasing aliens at the border under the March Memo with nothing more than a "piece of paper that said 'go find somebody at ICE.'"  The "piece of paper" was a Notice to Report (NTR) and, thus, the Court refers to the March Memo as the NTR policy.

The NTR policy was aptly described by Florida in its original complaint as "immigration enforcement by the honor system" because, under the policy, arriving aliens were not placed in removal proceedings and, instead, they were simply released into the country with direction to self-report to an ICE office to be placed in removal proceedings.

Not surprisingly, "only a fraction … (approximately 30%)" of the aliens released under the NTR policy reported to ICE as directed.  This ultimately led DHS to establish a program called "Operation Horizon,"

pursuant to which ICE officials tried to locate the aliens who had not reported so they could be served with an NTA.

The "surge" of aliens continued unabated while the NTR policy was in effect, and by July 2021, CBP was apprehending more than 100,000 aliens per month at the Southwest Border. The mass release of aliens likewise continued over that period—with over 170,000 aliens being released between March and July 2021.

Instead moving away from "alternatives to detention" to dissuade aliens from continuing to come to the Southwest Border, Defendants doubled down on that approach to border enforcement by adopting the Parole+ATD policy.

### F.    Parole+ATD Policy

The Parole+ATD policy was formally adopted through a memorandum issued by USBP Chief Ortiz on November 2, 2021. *See* Doc. 87-1 at SAAR0093 ("the November Memo"). However, the administrative record for that policy establishes that USBP started using "parole" as a means of improving "processing efficiencies" several months prior.

Specifically, in an email dated July 31, 2021, an assistant chief of CBP stated that "[e]ffective immediately and until further notice [CBP] will begin to include considering certain non-citizens for processing utilizing the <u>Parole</u> pathway." *Id.* at SAR0117 (emphasis in original). The email stated that CBP agents may "issue a Parole to family units or single adults on a case-by-case basis" after considering four factors: (1) whether ICE will accept custody of the alien; (2) whether the alien poses a threat to national security, border security, or a heightened public safety risk; (3) the border sector's total detention capacity exceeds 75% and arrivals exceeded discharges over a 24-hour period; and (4) the average time-in-custody (TIC) of unprocessed aliens exceeds 48 hours and the arrivals over the next 24-hour period are projected to exceed the discharges.

An alien released on "parole" received an alien registration number but was not issued a NTA for removal proceedings. The only condition of the "parole" was that the alien "REPORT TO THE [ICE] OFFICE NEAR YOUR FINAL DESTINATION WITHIN 60 DAYS OR FACE REMOVAL FROM THE UNITED STATES" (capitalization in original). The 60-day period was subsequently reduced to 15 days.

The July 31 email did not mention COVID-19 or health issues as a reason for authorizing the use of "parole" as a processing "pathway," nor did the email mention §1182(d)(5) as authority for the "parole" determination. Agents were directed to document "why" the alien was paroled on the I-213 form[14] by stating "[s]ubject was paroled due to time in custody constraints at the [CBP facility]." Subsequently, in an effort "to strengthen the validity of the Parole" agents were directed to stamp the alien's I-94 form[15] "PAROLED" with the notation "212(d)(5)."[16]

The November Memo differed from the July 31 email in several material respects, most notably that it only applied to family units (and not single adults), it specifically referred to §1182(d)(5) as a source of authority for the policy, and it identified COVID-19 as a justification for the policy.

---

[14] This form, titled "Record of Deportable/Inadmissible Alien," is prepared by immigration officials for aliens who will be placed in removal proceedings and contains basic biographical information about the alien; the date, place, time, and manner of entry to the United States; and immigration and criminal history.

[15] This form, titled "Arrival/Departure Record," is provided to nonimmigrant aliens who are admitted into the country with a visa, are adjusting their status while in the country, or are extending their stay in the country.

[16] "212(d)(5)" refers to section 212(d)(5) of the INA, which is codified in 8 U.S.C. §1182(d)(5).

The November Memo started by providing a post-hoc justification for CBP's use of NTRs—i.e., "to relieve overcrowding in congregate settings, thus better protecting both the workforce and noncitizens in [CBP] custody"—and the memo boasted that the use of NTRs "decreased processing times significantly" as compared to the "much more time consuming" issuance of a NTA.

Despite these benefits, the November Memo stated that CBP is ceasing the use of NTRs "[e]ffective immediately" and that it will "prioritize resources to issue noncitizens NTAs immediately." However, the memo also established "an alternative processing pathway," Parole+ATD, to use to "address urgent crowding and excessive [TIC] in USBP facilities."

From a practical standpoint, the Parole+ATD "pathway" described in the November Memo is indistinguishable from the NTR pathway because the memo explained that an alien released under Parole+ATD is not issued an NTA and only condition of the release on "parole" is that the alien "report to ICE within 15 days to be processed for an NTA."

The November Memo explained that the Parole+ATD pathway was necessary because of the "urgent humanitarian need to protect the

workforce, migrants, and American public against the spread of COVID-19 that may be exacerbated by overcrowding in CBP facilities." The memo only authorized the use of this pathway in two sectors (Del Rio and Rio Grande Valley) when certain TIC and capacity issues were present, but it also stated that the CBP chief and commissioner could authorize its use in other sectors in which "capacity constraints or conditions in custody show that there is an urgent humanitarian reason to release [family units] in a more expeditious fashion in order to avoid crowding in CBP facilities and the resulting COVID-19 health risks to the workforce and migrants in custody."

The November Memo concluded by stating that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

In April 2022, CDC determined in the "Title 42 Order" that the public health order entered in August 2021 suspending the entry of certain aliens in the country under the Public Health Services Act should

be terminated because it was no longer justified by COVID-19 pandemic.[17]

Despite the CDC's determination that the pandemic no longer justified the Title 42 Order, CBP did not eliminate the Parole+ATD pathway.  Instead, the Parole+ATD policy was effectively reauthorized in a July 18, 2022, memorandum jointly issued by CBP and ICE titled. "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations."  Doc 87-1 at SAR0001, SAR0158 ("the July Memo").

The July Memo expands the Parole+ATD policy to single adults, rather than only family units.  It also abandons the COVID-19 rationale in the November Memo, stating more generally that avoiding overcrowding in CBP facilities is necessary for "disease-mitigation."

The supplemental administrative record for the July Memo is comprised of 160 pages complied and certified by CBP (Doc. 87-1 at SAR0001-SAR0160) and 120 pages complied and certified by ICE (*id.* at SAR0161-SAR0280).   Collectively, the supplemental administrative

---

[17]     The Supreme Court is currently considering a case involving the termination of the Title 42 Order, *see Arizona v. Mayorkas*, No. 22-592, as is the Fifth Circuit, *see Louisiana v. CDC*, No. 22-30303.

record contains "all of the non-privileged documents and materials considered by [CBP and ICE] in issuing the [November memo]."

The supplemental administrative includes considerably more information than the administrative record for the original Parole+ATD policy.[18]  Of particular significance, the portion of the supplemental administrative record compiled by CBP includes the permanent injunction entered by a federal judge in the District of Arizona in April 2020 mandating conditions of confinement for certain individuals in CBP custody (hereafter "the *Nielsen* injunction"), the CDC notice explaining its decision to terminate the Title 42 Order in April 2022, and the preliminary injunction entered by a federal judge in the Western District of Louisiana in May 2022 enjoining the termination of the Title 42 Order.

The *Nielsen* injunction enjoined CBP from detaining aliens for more than 48 hours in Tucson Sector Border Patrol stations unless certain

---

[18]  The original administrative record—which is included in the supplemental record (Doc. 87-1 at SAR0093-SAR0123)—was comprised of only 31 pages did not come close to justifying the establishment of the Parole+ATD "pathway."  *See* Doc. 55 at 3 (describing the administrative record as "paltry" and noting that "an inadequate or incomplete record will presumably work in Florida's favor because if the parole + ATD policy is not sufficiently supported by the record, it will be invalidated"). Notably, the original administrative record did not include any information about COVID-19 that might justify the creation of a "pathway" to ameliorate the impacts of the virus and it only provided minimal information about capacity constraints or TIC statistics.

conditions of confinement were met for beds, showers, food, water, and medical needs. The injunction provided that compliance with its requirements could be temporarily excused in "exigent circumstances," but it stated that "[p]eriodic surges that occur along the border are a chronic condition that do not constitute Exigent Circumstances."

The CDC notice terminating the Title 42 Order recounted the history of the COVID-19 pandemic, detailed the current status of the pandemic, and outlined the "mitigation measures" being taken by CBP. The mitigation measures included vaccination of the CBP workforce and a program started in March 2022 to vaccinate aliens arriving at the southern border. The notice explained that the Title 42 Order was intended to be temporary and that it was not a substitute for processing aliens under the INA. The notice concluded that "the danger of further introduction, transmission, or spread of COVID-19 into the United States from covered noncitizens … has ceased to be a serious danger to the public health."

The portion of the supplemental administrative record complied by ICE included information about the percentage of aliens released under the Parole+ATD that checked in with ICE as directed, information about

the "Operation Horizon" program, and information about the processing backlog created by the failure to issue an NTA before the alien is released on parole.

This information reflected that as of May 2, 2022, approximately 65% of aliens released under the Parole+ATD policy checked-in with ICE as directed, which means that 35% (almost 50,000) did not. Of the aliens who did not check-in, approximately 20% were "noncompliant" because they had not checked in with ICE within 60 days of their release.

The Operation Horizon program was created November 2021 to mail NTAs to aliens "who have been paroled or released under prosecutorial discretion by [CBP]." As of April 22, 2022, the program had mailed more than 72,000 NTAs at a cost of over $15.3 million.

The information about Operation Horizon reflected that as of April 26, 2022, there had been over 226,000 aliens released under "prosecutorial discretion" under the NTR and Parole+ATD policies. More than 110,000 of those aliens had not been issued NTAs and more than 66,000 were outside the period that they were supposed to have reported to ICE to be issued an NTA.

ICE officials estimated that it would take nearly 3 years (and $25 million) to clear the "backlog" and issue NTAs to these 110,000 aliens if the Parole+ATD policy was stopped at that point.  For every 30 days that the policy continued in place, approximately an additional year and $8 million were added to the time and cost of clearing the backlog.

In the first few months following the November Memo, CBP continued to use §1226(a) as its principal release mechanism.   For example, in November 2021, CBP released 34,705 aliens under §1226(a) (i.e., NTA/OR) and only 5,683 under Parole+ATD.

Parole+ATD became CBP's primary release mechanism starting in April 2022, when 39,918 aliens were released under Parole+ATD as compared to 22,523 released under §1226(a).

Defendants continue to make heavy use of Parole+ATD even though the COVID-19 pandemic has been over for quite some time and the November Memo creating the Parole+ATD "pathway" stated that "when COVID-19 conditions eventually improve, it is expected that there will no longer be a need for this alternative pathway."

In November 2022, which is the last month of data in the record, almost 89,000 aliens (out of the 141,000 apprehended) were released into the country under the Parole+ATD "pathway."

Although DHS says it is screening arriving aliens released on Parole+ATD to determine if they are a public safety threat, the more persuasive evidence establishes that DHS cannot reliably make that determination.  Indeed, according to Defendants own witnesses, DHS has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports.  Therefore, DHS is mainly only screening aliens at the border to determine if they have previously committed a crime <u>in the United States</u>, and because many of these aliens are coming to the United States for the first time, DHS has no idea whether they have criminal histories or not.

Use of "alternatives to detention" (ATD) are unquestionably more cost-effective for the federal government than actual detention.  It costs $125 per day to detain a single adult and $235 per day to detain a family unit, whereas enrolling an alien in an ATD costs less than $8 per day.

There are three primary types of ATD, but only one of which (ankle monitor with GPS monitoring) can fairly be characterized as detention-like. The other types of ATD simply involve the alien periodically "checking in" with ICE remotely though a smart phone app or over the telephone. The record does not reflect how many aliens are on each type of ATD.

The "absconder rate" for aliens on ATD is better than it was for aliens who were simply issued an NTR. But, in 2022, the absconder rate for aliens on ATD was still 14.8%, which equates to tens of thousands of unaccounted-for aliens in the country.

ATD is less effective in ensuring that aliens will not abscond during their immigration proceedings than detention. Indeed, ERO Director Corey Price acknowledged in his testimony that all forms of release have a risk of absconding and that the "surest way" to be able to remove inadmissible aliens is to "keep them in detention." This is common sense.

G.     Existence of a "Non-Detention Policy"

Florida contends that the Non-Detention Policy it is challenging in this case was created "in late January or early February of 2021 when

36

DHS leadership told CBP that strict limits on the release of aliens at the border were no longer in place and that aliens should only be detained if they are a public safety risk or flight risk."[19]

Defendants contend that there is no such policy and, to be sure, their witnesses testified that they received no blanket instruction not to detain aliens at the Southwest Border and that they are unaware of any formal policy that prioritizes release over detention.  However, the more persuasive evidence establishes that aliens arriving at the Southwest Border are no longer being detained as a matter of course unless they are deemed to be a public safety risk or flight risk.

This is unquestionably a change from the policy that was in place during the Trump Administration, as USBP Chief Ortiz acknowledged in his testimony.  Moreover, DHS Secretary Mayorkas effectively confirmed the change in policy (and, thus, the existence of the Non-Detention Policy challenged by Florida) when he testified to Congress in May 2022 that "detention has been misused in the immigration system for many years"

---

[19] The Court did not overlook Defendants' argument that Florida did not clearly articulate the precise nature of the "non-detention policy" that it claimed to exist until after the trial ended.  However, Florida's description of the policy in its closing argument and its post-trial brief is consistent with how Florida described the policy in the Pre-trial Stipulation that supplanted the pleadings and framed the issues for trial.  *See* Doc. 122 at 26.

and he explained that DHS is "increasing [its] use of alternatives to detention, and … using detention when it's a public safety imperative or an imperative to the continued appearance of individuals in immigration enforcement proceedings."

The fact over a million aliens have been released rather than detained at the Southwest Border since January 2021 is further evidence of a change in detention policy.   The testimony from Defendants witnesses that the increased number of aliens being released is attributable to something other than a change in policy (such as the post-pandemic increase in migration, either generally or from specific countries) is simply not credible and is contrary to the weight of the evidence.

Thus, notwithstanding Defendants' denials, the Court finds that the Non-Detention Policy challenged in this case does, in fact, exist.

## H.    Detention Capacity Reductions by Defendants

The evidence establishes that Defendants do not have sufficient detention capacity to detain all arriving aliens, but that does fact alone is not justify the Non-Detention Policy because, as discussed above, the policy itself contributed to "surge" of aliens arriving at the Southwest

38

Border, which, in turn, exacerbated to the capacity issues.  Additionally, despite the historic increases in border traffic, President Biden terminated the "Remain in Mexico" program authorized by 8 U.S.C. §1225(b)(2)(C) and Defendants took steps to reduce detention capacity, including closing all of DHS's family detention facilities and requesting less detention capacity from Congress.

During the last immigration surge in 2019, DHS maintained sufficient capacity to detain an average daily population (ADP) of as high as 55,000.

In 2020 (during the Trump Administration), DHS anticipated that border traffic would increase again when the COVID-19 pandemic ended so it requested an increase to 60,000 ADP in its fiscal year 2021 budget request.

Shortly after President Biden took office, DHS requested a reduction to 32,500 ADP for fiscal year 2022.  And for fiscal year 2023, DHS requested a further reduction to 25,000 ADP.

It is true that Congress is ultimately responsible for allocating the funds that are required to detain more aliens.  However, DHS led Congress to believe that it did not need more detention capacity because

it represented in its fiscal year 2022 and 2023 budget requests that "a reduction in detention capacity level will not impede ICE's ability to apprehend, detain, and remove noncitizens that present a threat to national security, border security, and public safety."

The fact that DHS continued to ask for less detention capacity and more money for "alternatives to detention" is another indication that the Non-Detention Policy challenged by Florida exists because it confirms Defendants' prioritization of "alternatives to detention" over actual detention.

Thus, like a child who kills his parents and then seeks pity for being an orphan, it is hard to take Defendants' claim that they had to release more aliens into the country because of limited detention capacity seriously when they have elected not to use one of the tools provided by Congress in §1225(b)(2)(C) and they have continued to ask for less detention capacity in furtherance of their prioritization of "alternatives to detention" over actual detention.

Likewise, it is hard to take seriously Defendants' argument that there would be "disastrous consequences" if the challenged policies were enjoined or vacated because the evidence establishes Defendants have

chosen to combat the historic "surge" of aliens arriving at the border with one hand tied behind their back by not taking advantage of all of the statutory tools provided by Congress—such as returning aliens to a contiguous territory under §1225(b)(2)(C) or, potentially, closing the border to particular classes of aliens under §1182(f).

This is particularly true now that the COVID-19 pandemic is "over" and people are able to congregate at sporting events, concerts, and other crowded venues. Indeed, at this point, the health risks associated with overcrowding at CBP facilities is simply no excuse for releasing an arriving alien without first initiating removal proceedings.

I.    Impact of the Challenged Policies on Florida

The immigration crisis at the Southwest Border most significantly affects border states and communities, but its impacts are not limited to those areas. Florida and other states are also impacted by the border crisis because arriving aliens are being released at the border into the interior of the country in historic numbers. Indeed, the stated purpose of the challenged policies is to "decompress" CBP's border facilities and shift the processing of arriving aliens to ICE facilities around the country that are closer to the aliens' final destinations.

Since President Biden took office on January 20, 2021, USBP has released more than one million aliens at the Southwest Border. That figure does not include releases by OFO because OFO does not publicly report its releases, nor does it include releases by ICE because ICE does not distinguish between interior enforcement and border enforcement in its publicly released data. And that figure does not include "get aways"— i.e., aliens who get into the country without being apprehended. Thus, the actual number of additional aliens that have come into the country since President Biden took office is unknown.

DHS provided information in discovery estimating that about 160,000 of the aliens released into the country between January 2021 and July 2022 provided a Florida address or are on the Miami ERO docket, which covers Florida, Puerto Rico, and the Virgin Islands. That number does not account for aliens released after July 2022, which is notable because DHS's monthly releases have increased since then.

This evidence does not establish with absolute certainty the precise number of aliens who have been released into Florida under the challenged policies, but the Court has no trouble finding from this

evidence that well over 100,000 aliens released at the Southwest Border under the challenged policies ended up in Florida.[20]

Florida claims that it has expended millions of dollars of public funds on these aliens, but it is impossible to determine with any certainty how much was actually spent on aliens who are in the state as a result of the challenged policies because Florida does not track alien-related expenditures in a manner that allows it to identify expenditures on specific aliens released under the challenged policies.

The fact that Florida cannot tie a specific public expenditure to a specific alien impacted the weight the Court gave to the evidence from Florida's agency witnesses, but the Court did not discount that evidence in its entirety.

---

[20] During oral argument at the end of trial, Defendants' counsel suggested that the Court could only "assume" from this data that aliens released under the challenged policies were in Florida because the addresses were "self-reported" and an alien "may give a Florida address but may not reside there." However, when the Court pressed counsel on why the self-reported addresses were good enough for DHS to rely on to keep tabs on the released aliens but not good enough for the Court to rely on in making a finding that the aliens are where they said they were going to be, counsel was initially stumped (although the long pause and blank look on counsel's face does not come through in the transcript) before conceding that it would not be unreasonable to rely on this data to conclude that aliens released under the challenged policies were in Florida. *See* Doc. 151 at 192-94.

For example, the Court gave no weight to the evidence of public expenditures that pre-dated the challenged policies; expenditures that could not have applied to aliens who were released into Florida under the challenged policies because of eligibility requirements of the applicable statutory program (e.g., food stamps and standard Medicaid); or expenditures on programs that were fully funded by the federal government (e.g., refugee assistance program). However, the Court gave some weight to the other agency expenditure evidence (e.g., costs of incarceration, unemployment benefits, and emergency Medicaid) and it gave substantial weight to the testimony and evidence from the Florida Department of Education (DOE) witness.[21]

DOE does not maintain data about where and when alien students entered the country (or their immigration status) that would allow the Court to determine with absolute certainty that children of aliens

---

[21] The Court expressed a more jaded view of Florida's standing evidence during the oral argument after the close of evidence and the Court adheres to the view that some of Florida's standing evidence was "useless," some of it was "not particularly helpful," and some of it (namely, the DOE evidence) was fairly compelling. To the extent that there is any inconsistency in what the Court said at oral argument and what the Court is saying now about Florida's standing evidence, the findings in this Opinion and Order control because they are based on the Court's further consideration of the evidence based on the case law cited by the parties and discussed below.

released under the challenged polices enrolled in Florida schools. However, DOE does keep data on the number of "immigrant children and youth"[22] enrolled in Florida's public schools and that data provides sufficient information from which the Court can draw reasonable inferences about the number of alien children released under the challenged polices that are enrolled in Florida public schools.

In the 2020-21 school year there were just over 95,000 immigrant children and youth in Florida's public schools. That number increased by more than 17,000 in the 2021-22 school year, and although there is no direct evidence establishing exactly how many of these children were released into the country under the challenged policies, it can be reasonably inferred from the testimony of the DOE witness (who personally visited schools and met with families) that a good number of these children were released into Florida under the challenged policies.

---

[22] This term refers to individuals between the ages 3 and 21 who were not born in the United States and have not attended school in the United States in the last three academic school years. *See* 20 U.S.C. §7011(5).

Florida spends roughly $8,000 per public school student per year, and an increase in the number of students in Florida's schools requires the state to spend more money over time.

Thus, even considering the other factors that might have contributed to an increase in immigrant children and youth in Florida's public schools (e.g., the fact that Florida and its schools were more "open" than other states during the COVID-19 pandemic), the Court has no trouble finding that at least some of the aliens released under the challenged policies have enrolled their children in Florida's public schools and caused the state financial harm.

The same is true with respect to the other programs under which Florida expends funds for aliens that are not fully reimbursed by the federal government—e.g., costs of incarceration, unemployment benefits, and emergency Medicaid—because it implausible that none of the more than 100,000 aliens released into Florida under the challenged policies have committed crimes or received benefits under those programs. Thus, although the evidence is not sufficient to establish with absolute certainty that Florida has expended public funds on specific aliens

released under the challenged policies, the evidence is sufficient for the Court to infer that it is more likely than not that it has done so.

It is unknown whether the costs that Florida spends on aliens released under the challenged policies are more or less than any revenue Florida derives from those aliens. However, there is no evidence (or at least none that the Court found credible) that aliens released into Florida under the challenged policies provide any meaningful amount of revenue to the state.

In sum, despite the shortcomings in the evidence presented by Florida on public expenditures, the Court finds that at least some of the aliens released under the challenged policies have caused the Florida to incur additional expenses. And, based on the large number of aliens released into Florida under the challenged policies and the breadth of the public benefits available to them (and the likelihood that at least some of them will commit crimes[23]), the Court further finds that these expenses will increase absent relief in this case.

---

[23]  This is an unfortunate reality, as ERO Director Price acknowledged in his testimony. It is also not particularly surprising because, as noted above, DHS has no way of knowing whether the aliens being released under the challenged policies have

## III.   CONCLUSIONS OF LAW

Before getting to the merits of Florida's claims, the Court must address two "threshold" issues raised by Defendants—standing and justiciability.

### A.   Standing

Defendants have argued from the outset of this case that Florida lacks standing to sue over the challenged policies.  The Court has rejected this argument twice—first at the motion to dismiss stage, *see* Doc. 45 at 11-18, and again at the summary judgment stage, *see* Doc. 117 at 2; Doc. 119 at 21-26.  The third time is not the charm for Defendants.

#### 1.   *Article III Standing*

"Federal courts have authority under the Constitution to decide legal questions only in the course of resolving 'Cases' or 'Controversies.'" *Hawaii*, 138 S. Ct. at 2416 (quoting Art. III, §2).  "One of the essential elements of a legal case or controversy is that the plaintiff have standing to sue." *Id.*

---

committed crimes in their home country unless that information happens to be shared by the home country or the alien self-reports his or her criminal history.

"Standing requires more than just a 'keen interest in the issue.'" *Id.* (quoting *Hollingsworth v. Perry,* 570 U.S. 693, 700 (2013)). "It requires allegations—and, eventually, proof—that the plaintiff 'personal[ly]' suffered a concrete and particularized injury in connection with the conduct about which he complains." *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016)).

To establish its "Article III standing," Florida must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant [and not the result of independent action of some third party], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338; *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

An "injury in fact" must be "concrete and particularized, and actual or imminent, not conjectural of hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). However, injuries to "state sovereignty" can be real and concrete even though they are "intangible." *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023).

Additionally, states are entitled to "special solicitude" in establishing standing because, as the Eleventh Circuit recently held,

"[s]tates 'are not normal litigants for purposes of invoking federal jurisdiction.'" *Id.* (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)); *see also Massachusetts*, 549 U.S. at 520; *Texas v. United States*, 787 F.3d 733, 753 (5th Cir. 2015) [hereafter *DAPA*],[24] *aff'd by an equally divided court, United States v. Texas*, 579 U.S. 547 (2016).

To invoke that special solicitude, a State must show (1) a procedural right and (2) a quasi-sovereign interest. *See Massachusetts*, 549 U.S. at 519–20. Once a State does so, the requirements of traceability and redressability are relaxed.

Here, Florida has procedural right under the APA, *see DAPA*, 787 F.3d at 751–52; *Florida v. Nelson*, 576 F. Supp. 3d 1017, 1032 (M.D. Fla. 2021); and, Florida has a quasi-sovereign interests in its territory, in the presence of unauthorized aliens within that territory, and in the effect those aliens have on the public fisc, *see DAPA*, 787 F.3d at 752; *Arizona*,

---

[24] The Court did not overlook Defendants' argument that this case is more like *Arizona v. Biden*, 40 F.4th 375 (6th Cir. .2022), than *DAPA*, because this case is merely "a challenge to an amalgamation of policies and decisions." *See* Doc. 156 at 74-75 n.21. The Court finds this argument unpersuasive for three reasons: first, although the challenged "non-detention policy" is a bit abstract, the Court found as a matter of fact that it exists; second, the Parole+ATD policy is indisputably an articulatable, concrete policy; and, third, the Eleventh Circuit's articulation of state standing and the special solicitude doctrine in *West Virginia* is more like the Fifth Circuit's decision in *DAPA* than to the Sixth Circuit's decision in *Arizona*.

50

567 U.S. at 422, 436 (Scalia, J., concurring in part and dissenting in part) (recognizing that controlling immigration "is an inherent attribute of sovereignty" and questioning whether the States, which "jealously guarded" their sovereignty during the Constitutional Convention, would have ratified the Constitution if it had provided that limits on immigration "will be enforced only to the extent the President deems appropriate"). Thus, Florida is entitled to special solicitude in the standing analysis.

If special solicitude is to have any meaning, it must apply in the immigration context because the states are dependent on the federal government to keep inadmissible aliens out of their territories since they ceded their sovereign right to do so to the federal government when they joined the Union. Thus, if the DHS ignores the detention mandates in the INA and releases aliens into the country that Congress said it should be detaining, then the sovereign interests of states are concretely harmed because they cannot do anything to keep those aliens out of the state.

Not only that, but Defendants' failure to detain arriving aliens as required by the INA also requires states to spend a considerable amount of public money—which is unquestionably a concrete harm. Indeed, on

that issue, the Supreme Court has recognized that states "bear[] many of the consequences of unlawful immigration," *Arizona*, 567 U.S. at 397, and that commonsensical proposition was also established by the evidence in this case—including the testimony of ERO Director Price that "that's been the way our immigration system has worked" for the 24 years that he's worked in the system.

Before applying the special solicitude standard to Florida's evidence, the Court briefly reviews how the Supreme Court applied special solicitude in *Massachusetts*. In that case, the states alleged that global warming would cause a "rise in sea levels," lead to "severe and irreversible changes to natural ecosystems," "increase . . . the spread of disease," and "contribute to the ferocity of hurricanes." *Massachusetts*, 549 U.S. at 521–22. The Supreme Court recognized that the states' traceability and redressability arguments were in many ways speculative—for example, "China and India" were likely to "offset any marginal domestic decrease" in greenhouse gas emissions. *Id.* at 523–24. Nonetheless, the Supreme Court applied the relaxed special solicitude standard and found that the states established their standing because the risk of harm to the states' sovereign interests in their territories

"would be reduced to some extent if [the states] receive the relief they seek." *Id.* at 526.

Florida's standing evidence in this case is far stronger than the states' evidence in *Massachusetts*, particularly with respect to impact of the challenged policies on its public education expenditures.

Like all states, Florida is required to include inadmissible aliens in the state's free public education. *Plyler v. Doe*, 457 U.S. 202, 230 (1982); *see also* §1003.21(1)(a), Fla. Stat. (requiring that all children ages six to sixteen attend school). And because Florida spends roughly $8,000 per student per year on primary and secondary education, an increase in alien children in the state will result in the state having to spend more money on education.

The evidence presented by Florida at trial, which the Court found credible and persuasive, established that Florida has and will continue to expend funds on aliens who were released under the challenged policies and would not otherwise be in the state. Specifically, the evidence showed that the number of "immigrant children and youth" enrolled in Florida schools have increased by more than 17,000 students since January 2021, which is corresponds to the timeframe within which

53

more than 100,000 aliens (including many family units with children) were released into Florida under the challenged policies.  Although the Court recognizes that "immigrant children and youth" include aliens other than those released under the challenged policies, the increase of 17,000 such students since January 2021, along with the other evidence in this case, establishes to the Court's satisfaction that at least some aliens released under the challenged policies are enrolling their children in Florida's schools and it is reasonable to expect that they will continue to do so as long as the challenged polies are in place.

This evidence is sufficient to establish each of the required elements for standing—injury in fact, traceability, and redressability—as discussed below.

As to injury in fact, "[e]conomic detriment . . . is the epitome of an injury in fact." *Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *see also Plyler*, 457 U.S. at 228 n.23 (noting that "unchecked unlawful migration might impair the State's economy generally, or the State's ability to provide some important service").  Florida's public education expenditures plainly qualify as economic detriment.

As to traceability, these additional public education costs are traceable to the challenged policies because the increase in alien children in Florida schools corresponded to the dramatic increase in the number of aliens being released into Florida under the challenged policies. The fact that Florida cannot tie specific education expenditure to particular children released under the challenged policy is not required *without* special solicitude, *see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1280–81 (11th Cir. 2015) (agreeing that a plaintiff's injury need not "be traced to specific molecules of pollution emitted by the alleged polluter," only "that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged" (quotations omitted)), so Florida certainly need not make this showing *with* the benefit of special solicitude, *see Texas v. United States*, 50 F.4th at 517–18 (applying the special solicitude standard and finding standing even though "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients").

Finally, as to redressability, "redressability and traceability overlap" in this case "as two sides of a causation coin." *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997). Florida seeks

55

declaratory relief, vacatur under the APA, and, consistent with the limits on injunctive relief in 8 U.S.C. §1252(f), permanent injunctive relief limited to DHS's violations of §1182(d)(5). Each form of relief would provide Florida at least partial redress. *See Massachusetts*, 549 U.S. at 518 (recognizing that a litigant has standing when "there is some possibility that the requested relief will prompt the injury-causing party to reconsider" its unlawful decisions); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (explaining that a plaintiff need not show that its injuries will be completely redressed). Specifically, vacatur under the APA would "deprive" the challenged policies "of force," *Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797 (D.C. Cir. 1983) (quoting 91 C.J.S. *Vacate* (1955)), and is akin to an injunction in that it will prevent DHS from continuing to apply the policies at the Southwest Border and it will preclude DHS from using "parole" to release aliens *en masse* without initiating removal proceedings. This, in turn, will remedy (or at least reduce) the harm to Florida by reducing the number of aliens released into the state  *Cf. Chiles*, 865 F.2d at 1209–10 (finding that an injunction against the United States would remedy the injury to a local government caused by persons escaping from a federal detention center).

DHS contests redressability on the ground that released aliens who enroll their children in school are typically family units, and DHS's ability to detain family units for more than 20 days is limited by the *Flores* consent decree.  Thus, DHS argues, even absent the challenged policies, applicants for admission subject to mandatory detention under §1225(b) will be released after 20 days.  The Court finds this argument unpersuasive for two reasons.

First, if Florida prevails in its argument that §1225(b) mandates detention for aliens apprehended at the Southwest Border—and if DHS insists that *Flores* is causing the agency to violate that statute—one would expect DHS to bring that to the attention of the *Flores* court.  *Cf. Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016) (holding that *Flores* does not "grant release rights to parents"); *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022) (clarifying that district courts may not enjoin the operation of §1225(b) on a class-wide basis).  To instead insist that DHS may consent to violate the law and that doing so eliminates Article III jurisdiction is just plain wrong.

Second, the evidence at trial showed that *Flores* does not categorically prevent DHS from detaining family units in a way that

would negate redressability. The purpose of the *Flores* 20-day presumption is to allow DHS to apply expedited removal to family units under §1225(b)(1), which can be completed in that short window. And even if DHS fails to complete removal in 20 days, the agency has ample time to at least *initiate* removal proceedings prior to release—which could result in those proceeding concluding sooner and thereby reducing the total time the aliens are enrolled in Florida's schools.

Accordingly, the Court finds that Florida has established Article III standing based on the funds it spends providing public education to alien children. Florida's remaining standing evidence, which is from four other state agencies, bolsters Florida's standing because the Court can infer from that evidence that Florida likely has and will continue to spend some amount of public funds on aliens released under the challenged policies.

The Court did not overlook Defendants' argument that Florida derives more revenue from aliens released into the state under the challenged policies than it incurs in costs. However, there is no evidence that revenues generated from aliens released under the challenged policies exceeded the costs incurred by Florida on those aliens. Moreover,

as the Fifth Circuit has explained, once the plaintiff has shown that it has suffered an injury, it is not the role of the Court to engage in the "accounting exercise" of weighing costs and benefits for standing purposes. *See Texas v. United States*, 50 F.4th 498, 518 (5th Cir. 2022); *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (quoting *NCAA v. Governor of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

### 2.   Statutory Standing

In addition to Article III standing, Florida must also establish that it has "statutory" standing under the APA.  That requires Florida to show that its claims fall within the "zone of interests" of the statutes on which the claim is based—here, the INA.  *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interests test "is not meant to be especially demanding," *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987), and "the benefit of any doubt goes to the plaintiff," *Patchak*, 567 U.S. at 225.

Florida satisfies that test because "[i]t's clear that the INA aimed, at least in part, to protect States from" harms to their fisc.  *See Texas v. Biden*, 20 F.4th 928, 975 (5th Cir. 2021), *rev'd on other grounds*, *Biden v. Texas*, 142 S. Ct. 2528 (2022); *accord Cook Cnty., Ill. v. Wolf*, 962 F.3d

208, 220 (7th Cir. 2020) (holding that a county was within the zone of interests of the INA); *see also Demore v. Kim*, 538 U.S. 510, 517–21 (2003) (explaining that the 1996 amendments to the INA were motivated in part by the costs caused by the government's failure to remove deportable aliens). Indeed, several provisions of the INA specifically seek to protect the States from the injuries the federal government causes when it fails to fulfill its duties. *See, e.g.*, 8 U.S.C. § 1231(i) (granting the States partial reimbursement for the costs of incarcerating criminal aliens).

*   *   *

In sum, for the reasons stated above, the Court finds that Florida has standing under Article III and the APA to challenge the policies at issue in this case.

## B.    Justiciability

Defendants argue that Florida's claims are non-justiciable "political questions" and that the challenged policies are not subject to judicial review under the APA. The first argument is unpersuasive, but the second argument is in part.

### 1.   *Political Question*

Defendants "political question" argument relies primarily on *Chiles v. United States*, in which the Eleventh Circuit held that questions about whether the Executive Branch "is adequately guarding the borders of the United States" are nonjusticiable "political questions."  69 F.3d 1094, 1096–97 (11th Cir. 1995).  However, *Chiles* is distinguishable because, in that case, Florida officials were challenging the Attorney General's failure to perform his <u>general</u> duty under 8 U.S.C. §1103(a) (1993), "to control and guard the boundaries and borders of the United States against the illegal entry of aliens."   Here, by contrast, Florida is challenging Defendants' alleged noncompliance with statutes that contain <u>specific</u> requirements, including one, §1225(b), that "mandates" detention, *see Jennings*, 138 S. Ct. at 845, and another, §1182(c)(5), that according to the Supreme Court, is not "unbounded" and contains standards that are susceptible to judicial evaluation, *see Biden v. Texas*, 142 S. Ct. at 2543 ("Importantly, the [parole] authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'

And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained.").

Moreover, not every case that has significant political overtones (as this one certainly does) presents a non-justiciable political question. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (explaining that the doctrine "is one of 'political questions,' not one of 'political cases'"). Thus, although it would certainly be much easier for the Court to simply say that elections have consequences and that the parties' disagreement over proper immigration policy should be resolved in Congress or at the ballot box rather than in court, the Court sees no jurisdictional or prudential reason why it should not exercise its duty to "say what the law is" in this case and then let the political chips fall where they may.

That said, there is nothing particularly surprising about the fact that the Biden Administration had different immigration policy preferences and priorities than the Trump Administration.   That fact alone does not make the challenged policies illegal because "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for any executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, C.J., concurring in part and dissenting in part); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (explaining that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better") (emphasis in original); *Dep't of Com.*, 139 S. Ct. at 2573 ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 979 (9th Cir. 2015) (Smith, J., dissenting) (noting that "[e]lections have legal consequences" and "policies of the new president will occasionally clash with, and supplant, those of the previous president, often leading to changes in rules promulgated pursuant to the [APA]").  However, that does not mean that every policy change that is influenced by a change in Administrations is immune from judicial review because a new Administration may not simply "choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its

regulatory functions." *State Farm*, 463 U.S. at 59 n.* (Rehnquist, C.J., concurring in part and dissenting in part); *see also Fox Television*, 556 U.S. at 515 (explaining that an agency "may not … depart from a prior policy *sub silentio* or simply disregard rules that are still on the books").

### 2.     APA Reviewability

"The APA establishes a basic presumption of judicial review." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2567 ("The Administrative Procedure Act embodies a basic presumption of judicial review." (quotations omitted)).  To overcome that presumption, DHS argues that the challenged policies (a) are not "final agency action" under 5 U.S.C. §704 and (b) are "committed to agency discretion by law" under 5 U.S.C. §702(a)(1), and that (c) review is barred by §§1252(a)(2)(B)(ii) and 1226(e).  Each argument will be addressed in turn.

### a.     Final Agency Action

DHS presents two arguments as to why the challenged policies are not final agency action:  first, it argues that the challenged policies are

not agency action at all; and second, it argues that even the challenged policies are agency action, they are not final under the APA.

The APA defines "agency action" as "the whole or a part of an agency rule,[25] order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C §551(13); *see also* 5 U.S.C. §701(b)(2) (explaining that the APA incorporates the definition of "agency action" in 5 U.S.C §551).  An agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations omitted).

### i.     *Non-Detention Policy*

Florida characterizes the Non-Detention Policy as Defendants' decision to replace the "very exigent circumstances" standard for releasing arriving aliens into the country with the "not a public safety or flight risk" standard.  The evidence undoubtedly shows DHS's expressed

---

25   A "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  5 U.S.C. §551(4).

preference for release of arriving aliens over detention. However, the Non-Detention Policy is not a judicially reviewable agency action because the policy preference embodied in the policy was not imposed as a blanket mandate but rather it was implemented through a series of discrete policies, including the NTR policy and the various iterations of the Parole+ATD policy. Those discrete policies are (or were) subject to judicial review under the APA, but the overarching Non-Detention Policy is not. *See Biden v. Texas*, 142 S. Ct. at 2545 (holding that the lower court erred in reviewing an abstract decision instead of each individual operative agency action); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890–91 (1990) (rejecting a wholesale challenge to an entire "program" under the APA because that program was not an agency action, but rather was made up of many individually challengeable agency actions); *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011–12 (9th Cir. 2021) (rejecting a broad APA challenge to immigration policies that the plaintiffs labelled a "program" to try to challenge them all in "one fell swoop," and instead requiring the plaintiffs to either "identify a particular action … that they wish to challenge under the APA, or … pursue their remedies before the agency or in Congress"); *Brnovich v.*

*Biden*, -- F. Supp. 3d --, 2022 WL 4448322, at *10 (D. Ariz. Sept. 23, 2022)

(applying *Biden v. Texas* to reject a challenge to the defendants' "policy

of programmatically mass-granting parole to unauthorized aliens"

because the plaintiffs "d[id] not challenge a particular, discrete agency

action, but rather some generalized and amorphous conception of

Defendants' detention and parole policies"). Thus, the Non-Detention

Policy is not subject to review under the APA.

### ii.    *Parole+ATD Policy*

Unlike the Non-Detention Policy, the Parole+ATD policy is a

discrete agency action. The policy is contained in the July Memo, which

is signed by the heads of ICE and CBP, and it instructs agents how to

exercise their discretionary authority under the parole statute and sets

criteria by which aliens are eligible or ineligible for parole. It is also

"final" because it established "new marching orders" by which

immigration officials would determine whether or not to detain arriving

aliens, *see City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1188 (D.C.

Cir. 2007), and it effectively determined Florida's obligations with respect

to those aliens—including its constitutional obligation to provide

education and its statutory obligations under Medicaid. The fact that

CBP officers retain discretion to detain or parole individuals does not negate the finality of the agency action embodied in the July Memo.  *See Home Builders Ass'n of Greater Chi. v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 614–15 (7th Cir. 2003).  Thus, the Parole+ATD Policy is subject to judicial review under the APA.

### b.     *Committed to Agency Discretion*

The "committed to agency discretion" exception is read "quite narrowly" and applies only where the relevant statute leaves "no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quotations omitted); *accord Dep't of Com.*, 139 S. Ct. at 2568 (explaining that the agency's discretion must be "unbounded" for §701(a)(2) to apply).  This exception does not apply to either of the challenged policies.  Specifically, with respect to the Parole+ATD policy, Supreme Court indicated—albeit in dicta—that DHS's use of the parole authority in §1182(d)(5) is not categorically exempt from judicial review because the "exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. at 2543.

68

### c.     *Review Precluded by the INA*

Defendants' argument that judicial review of the challenged policies is precluded by the INA is essentially the same argument that they made—and the Court rejected—at the motion to dismiss stage. *See* Doc. 45 at 26-27.  Defendants' arguments are no more persuasive now than they were then, and they are again rejected for the reasons stated in the Order denying Defendants' motion to dismiss. *See also Jennings*, 138 S. Ct. at 841 (rejecting argument that §1226(e) precludes a challenge to the extent of the Government's detention authority under the statutory framework as a whole).

*   *   *

Having determined that Florida has standing to assert its claims and that the claims related to the Parole+ATD Policy are justiciable, the Court will now turn to the merits of the claims.  The Court will also discuss the merits of the Non-Detention Policy—both for sake of completeness and to avoid a remand if a higher court determines that the policy is judicially reviewable under the APA.

## C.    Merits

The Court must separately analyze the claims related to the alleged "non-detention policy" and the claims related to the Parole+ATD policy because the former is based on the entire evidentiary record whereas the latter is based on the supplemental administrative record.[26]

---

[26]    The Court anticipated that the claims related to the Parole+ATD policy would be decided on cross-motions for summary judgment, but only Defendants sought summary judgment on that policy.  This created a procedural quandary because if the Court determined at the summary judgment stage that the Parole+ATD policy contravened the law or was not supported by the evidence in the supplemental administrative record, the Court could only deny Defendants' motion and it could not enter summary judgment in Florida's favor.

The Court sought to address this procedural quandary by scheduling oral argument on the parties' motions for summary judgment before trial to "give the parties an opportunity to address whether the Court could grant summary judgment for Florida on its challenge to the Parole + ATD policy under Fed. R. Civ. P. 56(f)(1) if the Court … determines that the record does not support the policy." Doc. 110 at 1 (footnote omitted).  For various reasons, *see* Doc. 119 at 18-21, the oral argument could not be scheduled before trial, so the Court deferred review of the Parole+ATD policy "until at or after trial so all of the issues in this case can be resolved at the same time," Doc. 117 at 2.

At the conclusion of the trial, the Court afforded the parties an opportunity to present oral argument addressing both how the Court should view the evidence presented at trail and how the Court should assess the Parole+ATD policy based on the supplemental administrative record.  The oral argument lasted for more than five hours, and the Court extensively questioned both sides about the legality of the Parole+ATD policy and the evidentiary support for the policy in the supplemental record.  The Court finds that the oral argument (coupled with the opportunity to file post-trial briefs) afforded Defendants the "reasonable time to respond" contemplated by Rule 56(f)(1).

Thus, notwithstanding the fact that Florida did not file a motion for summary judgment with respect to the Parole+ATD policy, the Court can now grant judgment in favor of Florida on that policy if that is what the law requires.  Alternatively, if the Court determines that Defendants are entitled to summary judgment on the Parole+ATD motion, the Court can grant their motion.  On the latter point, the Court

### 1.   *Non-Detention Policy*[27]

The evidence establishes that in late January or early February of
2021, DHS made a discrete change in detention policy from "release only
if there is a compelling reason to" to "release unless there is a compelling
reason not to."   Specifically, before January 2021, DHS limited the
release of aliens at the Southwest Border to very exigent circumstances,
but under the new policy—what Florida characterizes as the Non-
Detention Policy—DHS began instructing agents to release aliens at the
Southwest Border unless the alien is a public safety or flight risk.

Florida claims that this Non-Detention Policy is (a) contrary to law
and in excess of statutory authority in violation of 5 U.S.C. §706(2)(A)
and (C); (b) arbitrary and capricious in violation of 5 U.S.C. §706(2)(A);

---

did not overlook that it previously "denied" Defendants' motion for summary
judgment, *see* Doc. 117 at 2 (¶4), but upon reflection, that disposition should have
stated that the motion was "denied in part and deferred in part" because, as the body
of the Order denying the motion explains, the Court was deferring judicial review of
the Parole+ATD policy until at or after trial, *id.* at 2.  That Order is hereby amended
*nunc pro tunc* to reflect that disposition.

[27]  The Court recognizes that this discussion of the merits of the Non-Detention
Policy is effectively dicta based on the conclusion that the policy is not "agency action"
subject to judicial review.  However, because the "agency action" issue was a close
question in the Court's mind, the Court elected to include a robust analysis of the
merits of the Non-Detention Policy to avoid the need for a remand in the event that
a higher court determines that the Court erred in concluding that the Non-Detention
Policy was not "agency action."

and (c) promulgated without notice and comment as required by 5 U.S.C §553.  Each claim will be considered in turn.

### a.    *Contrary to Law (Count 1)*

Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," 5 U.S.C. §706(2)(A), or "in excess of statutory . . . authority, or limitations, or short of statutory right," *id.* at §706(2)(C).

Florida contends that the Non-Detention Policy is contrary to law because §1225(b) requires DHS to detain aliens apprehended crossing the Southwest Border, but the Non-Detention Policy instructs DHS's officials to release these aliens except under narrow circumstances.  DHS responds that detention under §1225(b) is discretionary, and that even if detention under that statute is mandatory, it has discretion to release arriving aliens under either §1226(a) or §1182(d)(5).

Under the INA, certain aliens are "deemed . . . applicant[s] for admission."  8 U.S.C. §1225(a)(1).  Specifically, applicants for admission include aliens "who arrive[] in the United States . . . whether or not at a designated port of arrival" and aliens "present in the United States who

ha[ve] not been admitted." *Id.* Section 1225 imposes certain duties on immigration officers to "[i]nspect" applicants for admission, regardless of whether the aliens are "arriving in the United States" or whether they are present without having "been admitted or paroled." 8 U.S.C. § 1225(b); *see also* 8 U.S.C. §1225(a)(3) (explaining that "[a]ll aliens . . . who are applicants for admission . . . shall be inspected").

This broad definition of applicants for admission is a relatively recent addition to the INA. Before 1996, the INA only contemplated inspection of aliens arriving at ports of entry. *See* 8 U.S.C. § 1225(a), (b) (1995). Other aliens, such as those who entered illegally, were not subject to §1225(b). *See* 8 U.S.C. §1251(a)(1)(B) (1995) (explaining that an alien "who entered the United States without inspection . . . is deportable" rather than being subject to inspection and exclusion).

In 1996, however, Congress expanded §1225 by adding the broad definition of "applicant for admission" quoted above. Pub. L. No. 104-208 § 302, 110 Stat. 3009-579 (1996). In doing so, Congress subjected a broader category of aliens to the inspection regime that applied to aliens who showed up at a port of entry seeking admission. *See Jennings*, 138 S. Ct. at 836–37 ("Applicants for admission must be 'inspected by

immigration officers' to ensure that they may be admitted into the country consistent with U.S. immigration law." (quoting 8 U.S.C. §1225(a)(3)).

All parties agree, and the Court has found, that the aliens at issue in this case meet the statutory definition for applicants for admission and are subject to inspection under §1225. *See* Doc. 87-1 at SAR0001 (explaining that what DHS refers to as "processing" of illegal border crossers is an "inspect[ion] . . . consistent with 8 U.S.C. §1225(a)"). The Court therefore turns to the three points of contention relevant to the lawfulness of the Non-Detention Policy: (1) whether detention of applicants for admission under §1225(b) is mandatory; (2) whether and when DHS may release applicants for admission at the Southwest Border under §1226(a); and (3) whether and when DHS may release these aliens under §1182(d)(5).

Section 1225(b) governs the inspection process for applicants for admission. Certain applicants are subject to "expedited removal" under §1225(b)(1), pursuant to which they are to be removed "without further hearing" unless they seek asylum or establish a credible fear persecution in their home country. All other applicants are subject to "standard"

removal proceedings under §1225(b)(2).  The nuances of each type of proceeding are immaterial to the issues in the case because, regardless of the specific proceeding the applicant is subject to, he or she "shall be detained" pending immigration proceedings, *see* 8 U.S.C. §§1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), and the detention mandate continues "until [the applicable removal] proceedings are complete." *Jennings*, 138 S. Ct. at 842.

Notwithstanding the plain text of §1225(b) and the Supreme Court's holding in *Jennings*, DHS argues that detention of applicants for admission is discretionary. In DHS's view, §1225(b)'s mandatory language flows in only one direction—the statute prevents aliens from obtaining release, but it does not create obligations for DHS.  In other words, DHS interprets the "shall" language in § 1225(b) to limit the rights of aliens but not to limit its discretion.

The Court rejects DHS's argument and concludes that §1225(b)'s "shall be detained" means what it says and that is a <u>mandatory</u> requirement.  This conclusion flows directly from *Jennings* in which the Supreme Court explicitly stated that "§1225(b)(1) and (b)(2) … <u>mandate</u> detention," 138 S. Ct. at 842 (emphasis added), and explained that "the

word 'shall' usually connotes a requirement," *id.* at 844 (quotations omitted); *see also United States v. Quirante*, 486 F.3d 1273, 1275 (11th Cir. 2007) (explaining that "[t]he word 'shall' does not convey discretion" and that "where Congress uses the word 'shall' to describe a party's obligation, Congress intends to command rather than suggest"). This conclusion is confirmed by the heading for §1225(b)(1)(B)(iii)(IV), which describes that provision as creating "[m]andatory detention." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (explaining that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute" (quotations omitted)).

Moreover, Congress's use of the discretionary the word "may" in other similar provisions of the INA bolsters the Court's conclusion that §1225(b)'s detention requirements are mandatory. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." (quotations omitted)). For example, §1226(a) states that certain other aliens "*may* be arrested and detained" (emphasis added). And in other

provisions of §1225, Congress recognized the difference between a discretionary option and a mandatory command. *See, e.g.*, 8 U.S.C. §1225(b)(2)(C) ("[T]he Attorney General *may* return the alien to [a contiguous territory] pending" removal. (emphasis added)).

DHS argument that "shall" in the detention statutes actually means "may" relies primarily on *Town of Castle Rock v. Gonzales* and the "deep-rooted nature of law-enforcement discretion." 545 U.S. 748, 761 (2005).[28] But nothing in that case undermines the settled principles that the concept of law-enforcement discretion does not "set agencies free to disregard legislative direction" and that Congress is free to cabin enforcement discretion by providing "guidelines for the agency to follow in exercising its enforcement powers." *Heckler v. Cheney*, 470 U.S. 821, 832-33 (1985); *see also Texas v. United States*, 40 F.4th 205, 225–26 (5th Cir. 2022) (distinguishing *Castle Rock* because it concerned a singular, individualized instance of nonenforcement, not any agency-wide policy of nonenforcement in the face of an "incontrovertibly mandatory" statutory

---

[28] DHS also suggests that it has discretion to forego any immigration enforcement against a particular alien altogether, which in turn, would allow it to avoid §1225(b)'s detention requirements. *See* Doc. 156 at 160. However, even if that is true (and politically feasible), the evidence in this case establishes that DHS is initiating removal proceedings against the aliens subject to the challenged policies.

command to the contrary).  Here, as explained above, Congress cabined DHS's discretion in §1225(b) when it commanded the agency, in clear and unambiguous language, to detain applicants for admission pending removal proceedings.

Having concluded that §1225(b) is mandatory rather than discretionary, the Court turns to whether either of the release mechanisms DHS invokes are permissible.  As detailed in the findings of fact, DHS has applied the Non-Detention Policy in some instances by releasing aliens under §1226(a) and in other instances by releasing aliens under §1182(d)(5).

The Court begins with § 1226(a).  That statute begins by stating that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed."  It then states that, following such arrest, the Attorney General "may continue to detain the arrested alien" or "may release the alien" either "on bond" or on "conditional parole."  8 U.S.C. §1226(a)(2).

DHS contends that §1226(a) applies to aliens arriving at the Southwest Border once the alien reaches U.S. soil.  And because §1225(a)'s definition of applicants for admission also includes these

aliens, DHS contends that Congress gave the agency a choice—if DHS wants to detain an alien at the Southwest Border, it can apply §1225(b), but if DHS wants to release the alien, it can apply §1226(a).

The Court rejects DHS's argument for two reasons.  First, §1226(a) does not apply to applicants for admission apprehended at the Southwest Border.  Second, even if the statute could apply under some circumstances, the evidence at trial showed that DHS is initially processing applicants for admission at the Southwest Border under §1225, and there is nothing in the INA that contemplates that processing can switch between §1225 and §1226.

Starting with the first point, §1225(a) treats a specific class of aliens as "applicants for admission," and §1225(b) mandates detention of these aliens throughout their removal proceedings. Section 1226(a), by contrast, states in general terms that detention of aliens pending removal is discretionary unless the alien is a criminal alien.

As the Supreme Court stated in *Jennings*, §1226 applies to "certain aliens *already in the country*." 138 S. Ct. at 837–38 (emphasis added). And even if an alien crossing the Southwest Border fell within §1226(a)'s general language, §1225(b)'s specific mandatory language would trump

§1226(a)'s general permissive language.  Indeed, "it is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).  And this canon squarely applies to §1225 and §1226, as it is "most frequently applied to statutes in which a general permission . . . is contradicted by a specific prohibition." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, DHS's position would render mandatory detention under §1225(b) meaningless.  Indeed, the 1996 expansion of §1225(b) to include illegal border crossers would make little sense if DHS retained discretion to apply §1226(a) and release illegal border crossers whenever the agency saw fit.  *Cf. Demore*, 538 U.S. at 518 (explaining that "wholesale failure[s]" by the federal government motivated the 1996 amendments to the INA).  In fact, as the Attorney General has explained, "section [1225] (under which detention is mandatory) and section [1226(a)] (under which detention is permissive) can be reconciled only if they apply to different classes of aliens." *Matter of M-S-*, 27 I. & N. Dec. 509, 516 (Att'y Gen. 2019); *see also Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007) (holding that an alien who was apprehended within the

interior of the United States necessarily must have been paroled under §1226(a), not §1182(d)(5)(A), because he was not apprehended at the border as a §1225 arriving alien, as is required to be eligible for parole under §1182(d)(5)(A)).

That brings the Court to the second point. Even if DHS were correct that §1225(b) and §1226(a) overlap, and even if DHS were correct that it has discretion to decide which provision to apply, what DHS certainly may not do is initiate an inspection under §1225 and then, at some later time, attempt to shift the alien's detention to §1226(a).

DHS's initial apprehension and processing of applicants for admission at the Southwest Border is an "inspection" under §1225. During that inspection, if DHS decides to release an alien under §1226(a), it initiates a removal proceeding against the alien under 8 U.S.C. §1229a by serving a NTA and then relies on those pending removal proceedings as a basis to shift the alien's detention from §1225(b) to §1226(a). At closing argument, counsel for DHS described the agency's position that the decision to place an applicant for admission in standard removal proceedings under §1229a, instead of expedited removal proceedings under §1225(b)(1), causes §1226(a) to govern the alien's detention. The

problem with this argument (and what makes DHS's application of §1226(a) in this manner unlawful) is that §1225(b)(2), not §1226(a), governs the detention of applicants for admission whom DHS places in standard removal proceedings following in inspection under §1225. *See* 8 U.S.C. §1225(b)(2)(A) (explaining that if the immigration officer determines that the alien is not clearly and beyond a doubt entitled to admission, "the alien shall be detained for a proceeding under §1229a").

In *Jennings*, the plaintiffs made the same basic argument DHS advances here—i.e., that "for a proceeding" in §1225(b)(2) means "only until the *start* of applicable proceedings" and that §1226(a) governs detention once those proceedings begin. *See* 138 S. Ct. at 844. The Supreme Court, however, rejected the plaintiffs' position that §1226(a) governs the detention of applicants for admission once removal proceedings begin, holding that "(b)(2) mandate[s] detention of aliens *throughout the completion of applicable proceedings* and not just until the moment those proceedings begin." *Id.* at 845 (emphasis added).

Another problem with DHS's reliance on §1226 is that the statute is not even triggered unless an arrest warrant is issued. *See* 8 U.S.C. §1226(a) ("<u>On a warrant issued by the Attorney General</u>, an alien may be

arrested and detained pending a decision on whether the alien is to be removed from the United States.") (emphasis added).  If the alien has not been arrested on a warrant, then the subsequent provisions giving the Attorney General discretion to detain or release "the arrested alien" are likewise not triggered.  *See* 8 U.S.C. §1226(a)(1), (a)(2).

Here, the evidence establishes that DHS is not obtaining warrants for aliens apprehended at the Southwest Border.  Instead, it relies on the warrantless arrest authority in 8 U.S.C. §1357(a)(2) to take the aliens into custody for inspection and processing.  Even if DHS is putting an "administrative warrant" in the alien's file when the NTA is issued the alien is released,[29] that is not happening for aliens released under the Parole+ATD policy until (or if) they report to an ICE office for issuance of an NTA.  But, by that point, the decision to release the alien has already been made.

Additionally, as the Supreme Court noted in *Jennings*, what DHS claims to be doing makes little sense.  *See* 138 S. Ct. at 845 ("If respondents' interpretation of § 1225(b) were correct, then the

---

[29]  Conflicting evidence on this point was presented at trial, but the Court credits the testimony of DHS's Rule 30(b)(6) witness who testified that a warrant (administrative or otherwise) is not obtained before the alien is released.

Government could detain an alien without a warrant at the border, but once removal proceedings began, the Attorney General would have to issue an arrest warrant in order to continue detaining the alien.  To put it lightly, that makes little sense.").  The warrants required by §1226(a) are *arrest* warrants, but by the time DHS puts the "administrative warrant" in the alien's file (if it is even doing so), the alien has already been arrested under §1357 and the warrant is only being issued to the alien can be *released*.  This sleight of hand—using an "arrest" warrant as de facto "release" warrant—is administrative sophistry at its worst.

Having concluded that §1225(b) requires detention of applicants for admission at the Southwest Border and that DHS may not release these aliens under §1226(a), the Court must next address whether DHS's releases under §1182(d)(5) are lawful.  However, because Florida separately challenges the Parole+ATD policy, and because that policy explains how DHS is using §1182(d)(5) at the Southwest Border, the Court will address that question when it discusses the Parole+ATD policy.  Suffice it to say at this point, if the Non-Detention Policy was "agency action" subject to judicial review, the Court would find that it is

unlawful insofar as it allows aliens arriving at the Southwest Border to be released under §1226(a).

*   *   *

In sum, although the Non-Detention Policy is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C), Defendants are entitled to judgment in their favor on Count 1 of the second amended complaint because the Non-Detention Policy is not discrete "agency action" that is subject to judicial review.

### b.    Arbitrary and Capricious (Count 3)

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious."  5 U.S.C. §706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Indeed, meaningful judicial review requires an agency to "disclose the basis of its action."  *See Dep't of Com.*, 139 S. Ct. at 2573 (quotations omitted).

Here, Florida contends that DHS's refusal to acknowledge its change in policy renders the Non-Detention Policy arbitrary and

capricious. The Court agrees. As Justice Scalia explained in *Fox Television*, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." 556 U.S at 515. And an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* DHS's issuance of the Non-Detention Policy was a distinct change in detention policy, and DHS's failure to acknowledge that change, or to provide a decisional document or administrative record for this Court to review, is fatal because the Court has no way to assess whether the agency's actions are reasonable and reasonably explained.

Nevertheless, because the policy is not "agency action" subject to judicial review, Defendants are entitled to judgment in their favor on Count 3 of the second amended complaint.

### c.    *Notice and Comment (Count 5)*

The APA "specifies that an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979) (discussing 5 U.S.C §553). The APA distinguishes

between interpretive rules, which are not subject to notice and comment, and substantive rules, which are. *Id.* at 301–03. A rule is substantive and thus subject to notice and comment if it "affect[s] individual rights and obligations." *Id.* at 302 (quoting *Morton v. Ruiz*, 415 U.S. 199, 232 (1974)). For similar reasons that the Non-Detention Policy is not final agency action subject to judicial review, it is not a substantive rule subject to notice and comment. Accordingly, Defendants are entitled to judgment in their favor on Count 5 of the second amended complaint.

### 2.    *Parole+ATD Policy*

The latest iteration of the Parole+ATD Policy is contained in the July Memo. As with the Non-Detention Policy, Florida claims that the Parole + ATD Policy is contrary to law, arbitrary and capricious, and subject to notice and comment. The legal standards that govern each of these claims are set forth above in the discussion of the Non-Detention Policy, and for the most part,[30] the Court reviews these issues based on

---

[30] The Court can look beyond the administrative record where the absence of evidence "effectively frustrates judicial review" by failing to present a clear picture of the agency's actions. *See Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.1 (11th Cir. 1996). Here, there is undisputed extra-record evidence showing that DHS has been using Parole+ATD as its primary processing pathway since April 2022—with almost 89,000 releases under the policy in November 2022 alone. *See* Pl. Ex. 3, 4. This evidence blatantly

the supplemental administrative record prepared by DHS.  *See Fla.*
*Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

### a.      *Contrary to Law (Count 2)*

Florida argues that the July Memo is contrary to law because it
ignores the plain language of §1182(d)(5).  That statute provides in
pertinent part:

> The Attorney General may … in his discretion <u>parole</u> into the
> United States temporarily under such conditions as he may
> prescribe <u>only on a case-by-case basis for urgent
> humanitarian reasons or significant public benefit</u> any alien
> applying for admission to the United States, … <u>and when the
> purposes of such parole shall … have been served the alien
> shall forthwith return or be returned to the custody from
> which he was paroled</u> and thereafter his case shall continue
> to be dealt with in the same manner as that of any other
> applicant for admission to the United States.

(emphasis added).

---

contradicts the statements in the July Memo that "Parole + ATD is a tool that should
be used sparingly" and that it is "not meant to be a primary processing tool."  Doc.
87-1 at SAR003.  Without considering this extra-record evidence, judicial review of
the Parole+ATD policy would be frustrated because the Court would not be able to
fairly assess whether the July Memo complies with the case-by-case requirement in
§1182(d)(5).  *See Biden v. Texas*, 142 S. Ct. at 2554 (Alito, J., dissenting) ("But the
number of aliens paroled each month under that provision—more than 27,000 in
April of this year—gives rise to a strong inference that the Government is not really
making these decisions on a case-by-case basis.").

For the reasons that follow, the Court concludes that the July Memo is contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

### i.    *Return to Custody Requirement*

The July Memo does not even acknowledge the requirement that an alien be returned to DHS custody when "the purposes of such parole shall . . . have been served." 8 U.S.C. §1182(d)(5)(A).  As counsel for DHS conceded during oral argument, the "purpose" of parole contemplated by the July Memo is moving aliens out of CBP facilities faster than would occur if the alien were processed consistent with the requirements of §1225.[31]   In doing so, the July Memo seeks to shift the inspection

---

[31]   DHS argues for the first time in its post-trial brief that decompression of CBP facilities was not the only purpose of the Parole+ATD policy. *See* Doc. 156 at 102-04.  This argument is refuted by face of the July Memo, which states that "Parole+ATD is … a safety valve to address overcrowding" and is a "processing mechanism to address situations in where there is not appropriate detention space available, and there are operation concerns about the number of people present in … USBP facilities along the Southwest Border." Doc. 87-1 at SAR0002.  Moreover, although the ATD component of the policy may help ensure compliance without court appearances, etc., the supplemental record as a whole leaves no doubt that the sole purpose of the policy was to relieve overcrowding at CBP border facilities by shifting the processing of "removal paperwork" to ICE field offices around the country.

contemplated by §1225 to an ICE field office in the interior of the country. That being the case, the purpose of the parole is served when the alien has his first encounter with ICE.  However, nothing in the July Memo or the supplemental administrative record contemplates a return to custody at that time or any time thereafter—indeed, the supplemental administrative record shows that aliens are all-but-guaranteed that they "will not be taken into custody" when they report to ICE for issuance of an NTA.  *See* Doc. 87-1 at SAR 0168.

Relatedly, §1182(d)(5) contemplates that the alien would have a "case" pending because it provides that once the purpose of parole has been served and the alien is returned to custody, "his case shall continue to be dealt with in the same manner as that of any other applicant for admission."  However, the entire purpose of the Parole+ATD policy is to expedite the processing of aliens at CBP facilities without initiating an immigration proceeding against them.  Thus, at the time the alien is released under the Parole+ATD policy, he has no immigration "case" that can "continue to be dealt with" upon a return to custody.

### *ii.    Case-by-Case Requirement*

With respect to the second point, the "case-by-case" requirement in §1182(d)(5) requires DHS to conduct an individualized assessment of each alien to determine whether to grant parole.  This requirement was added to the statute in 1996 "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool."  *Texas v. Biden*, 20 F.4th at 947; *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that the current language in the §1182(d)(5) was the result of amendments animated by concerns that the parole authority "was being used by the executive to circumvent congressionally established immigration policy").

The process set forth in the July Memo violates the case-by-case requirement because although the memo pays lip service to assessments of individual aliens, it is largely focused on DHS's *operational circumstances* rather than an individual alien's circumstances.  *See* Doc. 87-1 at SAR0002 (explaining that Parole+ATD should only be used "when justified by an urgent humanitarian reason or because it yields a significant public benefit <u>in the form of disease mitigation, as a safety valve to address overcrowding</u>" (emphasis added)).  Moreover, any case-

by-case consideration of the alien's circumstances—to the extent it occurs at all—focuses on whether the alien is a public safety risk or flight risk, not on whether the alien meets the exceedingly high parole standard.

Additionally, the July Memo turns the parole standard on its head by providing *ineligibility* criteria rather than *eligibility* criteria. In other words, the July Memo essentially establishes a presumption of parole when the relevant "triggers" are met.

The time estimates in the supplemental administrative record confirm that USBP is not conducting meaningful case-by-case analysis before placing releasing an individual under the Parole+ATD policy. The supplemental administrative record indicates that the "processing time" for issuing a NTA is between 2 to 2.5 hours, whereas Parole+ATD only takes 15 to 30 minutes. It is implausible that USBP could meaningfully assess an alien's individual circumstances in 15 to 30 minutes.

On this issue, the Court finds persuasive Justice Alito's discussion of the case-by-case requirement in *Biden v. Texas*, 142 S. Ct. at 2555 (Alito, J., dissenting). There, Justice Alito explained that "simply . . . going through a brief checklist for each alien" is "inconsistent with the ordinary meaning of 'case-by-case' review." *Id.* Further, Justice Alito

noted that the number of aliens paroled each month "gives rise to a strong inference that the [g]overnment is not really making these decisions on a case-by-case basis." *Id.* at 2554. Notably, at the time Justice Alito made this observation, DHS was paroling 27,000 aliens per month—whereas DHS released more than three times that number of aliens under the Parole+ATD policy in November 2022.

### *iii.    Urgent Humanitarian Reasons or Significant Public Benefit Requirement*

The July Memo also violates §1182(d)(5)'s requirement that parole only be granted "for urgent humanitarian reasons or significant public benefit." Before 1996, §1182(d)(5)(A) permitted parole "for emergent reasons or reasons strictly in the public interest." 8 U.S.C. §1182(d)(5)(A) (1995). The addition of "urgent" and "significant" required a higher level of exigency to justify a grant of parole.

The primary "public benefit" that the Parole+ATD policy sought to achieve was speeding up the inspection mandated by §1225 to "decompress" overcrowded CBP facilities. However, even if there may be circumstances where an individual alien might be eligible for parole based on overcrowding and health and safety concerns, creating an

93

entirely new "processing pathway" to avoid the process mandated by §1225 is inconsistent with the narrow language in §1182(d)(5).

DHS argues that the standard in the July Memo conforms to standard in 8 C.F.R. §212.5, which Florida has not directly challenged and which provides that parole is "generally justified" for aliens "whose continued detention is not in the public interest" so long as "the aliens present neither a security risk nor a risk of absconding." 8 C.F.R. §212.5(b)(5). The main problem with this argument is that it flips the INA on its head. Section §1225(b) requires *detention* unless parole is justified based on "urgent humanitarian reasons" or "significant public benefit" under §1182(d)(5), whereas the regulation effectively allows any alien to be *released* on parole whenever continued detention is not "in the public interest"—whatever that means—and the alien is not a security or flight risk. Another problem with this argument is that the supplemental administrative record does not explain how it CBP officers can make a meaningful determination as to whether the alien is a security risk (as contemplated by the regulation) if the alien's home country does not share its criminal history databases with the United States.

The Court did not overlook Defendants' argument that the legislative history of the 1996 amendment to §1182(d)(5) shows that Congress chose the language that is now in the statute over more narrow alternative language that would have limited parole to specific circumstances. Putting aside the limited weight the legislative history is due, the Court fails to understand how the fact that Congress apparently rejected more narrow language so DHS had "flexibility to deal with compelling immigration situations" justifies the creation of an entirely new processing pathway that has led to the mass release of aliens in the country with minimal processing merely for sake of administrative expediency.

*   *   *

For these reasons, the July Memo is "not in accordance with law" and is "in excess of statutory authority" under 5 U.S.C. §706(2)(A) and (C). Accordingly, Florida is entitled to judgment in its favor on Count 2 of the second amended complaint.

## b.    *Arbitrary and Capricious (Count 4)*

As explained above, the arbitrary and capricious standard "requires that agency action be reasonable and reasonably explained." *Prometheus*, 141 S. Ct. at 1158.  The reviewing court must look to see "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. And "[t]o determine if an agency considered all the relevant factors and important aspects of the problem, a court may look to the language of the relevant statutes, regulations, the administrative record, and even beyond the administrative record." *Bidi Vapor LLC v. U.S. FDA*, 47 F.4th 1191, 1202 (11th Cir. 2022) (quotations and citations omitted).

Florida contends that the Parole+ATD policy is arbitrary and capricious because DHS: (1) failed to adequately consider the ever-worsening backlog caused by earlier iterations of the policy; (2) failed to acknowledge the extraordinary expansion of the agency's use of parole under §1182(d)(5) as compared to the agency's historical practice; (3)

96

ignored the evidence when it concluded that Parole + ATD will only be
"used sparingly" and that it is "not meant to be a primary processing
tool"; (4) failed to consider whether the Parole + ATD policy would
increase migration flows; and (5) failed to acknowledge its decision to
expand Parole + ATD to include single adults rather than only family
units, much less explain why it did so.  The Court agrees with the first,
third, and fifth points.

With respect to the first point (backlog), the supplemental
administrative record contains estimates regarding the number of
individuals released on Parole+ATD against whom DHS must still
initiate removal proceedings.  These projections show that for every 90
days Parole + ATD continues, the policy creates a backlog that takes 5.5
years and $49 million to clear.  And this backlog only accounts for the
time needed to *begin* removal proceedings—not the additional time
required to complete those proceedings and remove aliens.  By these
estimates, the backlog created by Parole+ATD will take *decades* to
overcome.

The July Memo does not expressly discuss the backlog, much less
explain why the problems created by the backlog did not outweigh the

perceived benefits of continuing the Parole+ATD program. The fact that the supplemental administrative record contains information about the backlog suggests that DHS was at least aware of it, but that does not satisfy DHS's obligation to explain its consideration of the problem so the Court can determine whether the decision to continue the Parole+ATD program notwithstanding the backlog it was creating was reasonable and reasonably explained. Indeed, putting aside the fact that the Court cannot conceive of a reason to continue a program that increased delays and costs associated with initiating immigration proceedings, the Court cannot "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

With respect to the third point (ignoring evidence), the July Memo asserted that Parole+ATD will only be "used sparingly" and that it is "not meant to be a primary processing tool." Those statements turned out to be untrue, and they were also contrary to "the evidence before the agency" when the July Memo was issued because in preceding month (June 2022), CBP released over 40,000 applicants for admission under that policy, which was more than 40% of total apprehensions at the Southwest

Border that month.  And that was before the July Memo *expanded* the eligibility for Parole+ATD to single adults rather than just family units.

With respect to the fifth point (expansion to single adults), the July Memo reflected a significant expansion of the Parole+ATD program because it no longer limited eligibility to family units.  The July Memo does not offer any explanation as to why the program was expanded or even acknowledge the policy change reflected in the expansion of the program.  Those failures render the July Memo arbitrary and capricious because "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox Television*, 556 U.S. at 515.

Accordingly, the July Memo is arbitrary and capricious, and Florida is entitled to judgment in its favor on Count 4 of the second amended complaint.

### c.     *Notice and Comment (Count 6)*

Florida claims that the July Memo is an agency rule affecting rights and obligations that was subject to notice and comment.  DHS responds that the July Memo is not subject to notice and comment because it is

merely an interpretive rule, a general statement of policy, or a statement of agency organization—all of which are excepted from notice and comment under 5 U.S.C. §553(b)(A).

The July Memo is subject to notice and comment because it establishes a generally applicable policy to determine whether aliens are detained or paroled, it instructs agents how to exercise their discretionary authority under §1182(d)(5), it sets criteria for granting parole, and it affects Florida's obligations to paroled aliens. *See Jean v. Nelson*, 711 F.2d 1455, 1476–77 (11th Cir. 1983 (rejecting government's argument that a new policy concerning detention and parole of Haitian immigrants was not subject to notice-and-comment rulemaking because "the fact that an agency need not employ rulemaking in order to exercise its discretion [under §1182(d)(5)] on a case-by-case basis does not mean it cannot or has not resorted to a rule of general applicability which limits its discretionary function").[32]

---

[32] The Court did not overlook that this panel opinion was effectively vacated when the case was reheard en banc. *See Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984) (en banc). However, the en banc opinion did not repudiate the panel's analysis of the notice-and-comment issue (the issue was moot at that point, *id.* at 984), and even if the panel opinion is not binding precedent, the Court finds its analysis of the notice-and-comment issue persuasive here.

None of the exceptions relied on by DHS exempt the Parole+ATD policy from notice-and-comment.

First, the July Memo is not an interpretive rule. An interpretive rule is a "statement[] as to what the administrative officer thinks the statute or regulation means." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)[33] (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)). The July Memo does not "purport to interpret a statute or regulation," *id.*, or try to explain the meaning of §1182(d)(5), so it cannot be an interpretive rule.

Second, the July Memo is not merely a general statement of policy. "A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement" and "presages an upcoming rulemaking." *Id.* at 701 (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)). The July Memo does none of these things. It establishes a substantive change in policy

---

[33] Fifth Circuit decisions issued before the close of business on September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

that took effect immediately by creating a new "processing pathway" for aliens arriving at the Southwest Border.

Third, the July Memo is not a rule of agency organization. That exception applies where a rule is "primarily directed toward improving the efficient and effective operations of an agency, not toward a determination of the rights [or] interests of affected parties." *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) (quotations omitted). Here, the July Memo "alter[s] the standards imposed" on aliens and the criteria by which parole may be granted to affected parties. *Id.* at 1024 (emphasis removed).

Accordingly, the July Memo is subject to notice and comment and Florida is entitled to judgment in its favor on Count 6 of the second amended complaint.

### 3.   *Florida's Remaining Claims*

The Court does not consider Florida's constitutional claim (Count 8) or its claim that the Non-Detention Policy is agency action unlawfully withheld under 5 U.S.C. §706(1) (Count 7), because Florida concedes (and Defendants do not dispute) that the Court need not reach those claims.

That said, with respect to the constitutional claim, although Florida makes a compelling <u>political</u> case that the President and DHS leadership were derelict in their duties by releasing over a million aliens into the country in contravention of the detention mandates in the INA, Florida has not made a <u>legal</u> case under the Take Care Clause because (1) as Defendants persuasively argue in their post-trial brief, it is unclear whether there is even a private cause of action under the Take Care Clause, *see* Doc. 156 at 164-73, and (2) to the extent a private cause of action exists, Florida would have to show that the executive branch "completely abdicated" its statutory responsibilities, *see* Doc. 45 at 33-34 (deriving this standard from cases like *Heckler*), which it has not done here. Specifically, although the evidence established that Defendants have adopted policies that prioritize "alternatives to detention" over actual detention, they have not "completely abdicated" their detention responsibilities because the evidence establishes that they continue to detain a substantial number of arriving aliens each month.

## D.   Remedy

Having determined that the Parole + ATD Policy violates the APA on several grounds, the Court must consider the appropriate remedy.

Florida asks the Court to vacate the policy and issue declaratory relief. DHS argues that 8 U.S.C §1252(f)(1) bars both injunctive relief and APA vacatur and that declaratory relief would have to be narrowly tailored so as not to circumvent §1252(f)(1) or violate separation of powers principles. Alternatively, DHS argues that any remedy would need to be limited to Florida and the harm it suffered and not a "universal injunction."

Under the APA, a court must "hold unlawful and set aside agency action" that violates the APA. 5 U.S.C. §706(2). In the Eleventh Circuit, "[v]acatur . . . is the ordinary APA remedy." *Black Warrior Riverkeeper*, 781 F.3d at 1290 (quotation omitted). Vacatur typically operates to set aside a rule generally, not as a partial remedy for the plaintiffs. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (explaining that "the ordinary result" of a successful APA claim is that "the rules are vacated" and not that "their application to the individual petitioners is proscribed" (quotation omitted)).

Even if the party-specific vacatur DHS seeks were a proper remedy under the APA, complete vacatur is "necessary to grant complete relief to" Florida here. *Health Freedom Def. Fund, Inc. v. Biden*, 599 F. Supp.

3d 1144, 1177 (M.D. Fla. 2022).  Once released at the Southwest Border,

aliens are free to travel throughout the United States.  If the Court were

to adopt DHS's request—which would essentially involve DHS asking

aliens where they are going and applying the challenged policies to aliens

who don't respond with "Florida"—released aliens would be free to travel

to Florida.  *See id.* at 1178 (denying a request for partial vacatur where

there were "no adequate assurances that the government can provide

that its agents . . . will not violate this Court's order and deprive

Plaintiffs of their relief").  Moreover, if DHS only detained applicants for

admission who say they are traveling to Florida and released other

aliens, the Court expects that it would not take long for immigration law

violators to figure out how to ensure their own release.

DHS also argues that §1252(f)(1) precludes the Court from vacating

either of the challenged policies.  That statute provides in pertinent part

that "no court (other than the Supreme Court) shall have jurisdiction or

authority to enjoin or restrain the operation of the provisions of part IV

of this subchapter."  DHS contends that because vacatur of the policies

would violate this statute because it would effectively enjoin or restrain

the manner in which the referenced provisions of the INA operate.

The Supreme Court explained that §1251(f)(1) "generally prohibits lower courts from entering <u>injunctions</u> that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 142 S. Ct. at 2065 (emphasis added); *see also Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) (explaining that §1252(f)(1) is "nothing more or less than a limit on injunctive relief"). Neither the Supreme Court nor the Eleventh Circuit has decided whether this statute precludes vacatur under the APA, although the Supreme Court is poised to answer that question this Term in *United States v. Texas*, No. 22-58.

Vacatur is "a less drastic remedy" than an injunction, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010), and the Fifth Circuit concluded in the opinion currently on review at the Supreme Court that §1252(f)(1) does not preclude vacatur under the APA because vacatur "does nothing but re-establish the status quo absent the unlawful agency action" and "neither compels nor restrains further agency decision-making." *Texas v. United States*, 40 F.4th at 220. The Court finds the Fifth Circuit's reasoning persuasive. Thus, the Court finds that

§1252(f)(1) does not strip it of the authority to vacate either of the challenged policies under the APA.

Moreover, even if the Supreme Court quashes the Fifth Circuit's decision, that will likely[34] only impact the availability of vacatur with respect to the Non-Detention Policy because that policy implicates DHS's exercise of its authority under §1225 and §1226, which are both in part IV of the INA. By contrast, §1182(d)(5), which is the statute on which the Parole+ATD policy is based, is contained in part II of the INA, not part IV, and any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having "enjoin[ed] or restrain[ed]" the operation of that part.

Accordingly, vacatur of the Parole+ATD policy is not precluded by §1252(f)(1) and is the appropriate remedy under the circumstances. A separate declaration that the Parole+ATD policy is unlawful is

---

[34] The Court says "likely" because it is possible that the Supreme Court might go along with the Solicitor General's argument (echoed by Defendants in their post-trial brief, *see* Doc. 156 at 186), and hold that 5 U.S.C. §706(2) does not authorize vacatur. However, based on the Justices' comments at oral argument, that seems highly unlikely.

unnecessary because that is implicit in the Court's finding that the policy violated §706(2)(A) and (C) of the APA.

## IV.   CONCLUSION

In sum, for the reasons stated above, the Court finds that (1) the Non-Detention Policy exists but is not discrete "agency  action" that is subject to judicial review under the APA—although if it was, it would be subject to vacatur because it contravenes the INA; and (2) the Parole+ATD Policy is unlawful and is due to be vacated under the APA. Accordingly, it is

**ORDERED** that:

1. The deferred portion of Defendants' motion for summary judgment (Doc. 88) is **DENIED**.

2. The Parole+ATD Policy is **VACATED** under the APA, and that policy is **REMANDED** to DHS for further proceedings consistent with this Opinion and Order.

3. The Clerk shall enter a final judgment stating:

> Judgment is entered in favor of Plaintiff on Counts 2, 4, and 6 of the second amended complaint, and the Parole+ATD Policy is vacated and remanded to the Department of Homeland Security for further proceedings consistent with the Opinion

and Order entered on this date.   Judgment is entered in favor of Defendants on Counts 1, 3, 5, 7 and 8 of the second amended complaint and those claims are dismissed with prejudice.

4. The Judgment is **STAYED** for 7 days from this date to allow

Defendants to seek appellate review.

5. The Clerk shall close the case file.

**DONE and ORDERED** this 8th day of March, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**