UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA,<br><br>                  *Plaintiff,*<br><br>    v.<br><br>ALEJANDRO MAYORKAS, Secretary of Homeland Security, in his official capacity; RAUL ORTIZ, Chief of Border Patrol, in his official capacity; the UNITED STATES OF AMERICA.<br><br>                  *Defendants.* | Civil Action No. 3:23-cv-09962-TKW-ZCB |

**DECLARATION OF DEPUTY EXECUTIVE ASSOCIATE DIRECTOR
DANIEL A. BIBLE**

I, Daniel A. Bible, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge, experience as a law enforcement officer, and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am currently employed by the U.S. Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) as the Deputy Executive Associate Director. I held this position in an acting capacity starting February 14, 2022, and I formally entered on duty in the position on May 8, 2022. As Deputy Executive Associate Director, I oversee the

mission of ERO's eight headquarters divisions: Enforcement, Removal, Non-Detained Management, Custody Management, Field Operations, ICE Health Service Corps, Law Enforcement Systems and Analysis, and Operations Support.

2. Prior to this position, I served as the Acting Assistant Director for Field Operations, which I started on January 16, 2022. In this capacity, I was responsible for the oversight, direction, and coordination of immigration enforcement activities, programs, and initiatives carried out by ERO's twenty-five field offices, including sub-offices and other locations with an ERO presence. I further managed ERO Headquarters components, including Domestic Operations and Special Operations.

3. I have been employed with ICE and the former Immigration and Naturalization Service since 1998, when I was hired as an Immigration Agent in Huntsville, Texas. From 2001 to 2006, I served as a Deportation Officer in Oakdale, Louisiana. In 2006, I was promoted to the position of Supervisory Detention and Deportation Officer (SDDO) in San Francisco, California. During my tenure as SDDO, I was responsible for supervisory oversight of two fugitive operations teams: the non-detained section and the Alternatives to Detention section. In 2009, I was promoted to the position of Assistant Field Office Director (AFOD) for the Washington Field Office. During my tenure as AFOD, I had supervisory oversight of SDDOs in charge of what is now the Criminal Apprehension Program (CAP), the 287(g) program, the Field Office's command center, the office currently titled the ERO criminal prosecutions unit, and two fugitive operations teams. In 2012, I was promoted to the position of Deputy Field Office Director for the New York Field Office. From June 2015 to June 2016, I served as the Field Office Director (FOD) in

the Salt Lake City Field Office. From June 2016 to June 2020, I served as FOD in the San Antonio Field Office. From June 2020 until January 16, 2022, I served as FOD for the Houston Field Office. I am a member of the Senior Executive Service, and I report directly to ERO Executive Associate Director Corey Price.

4. ICE is the principal investigative arm of DHS, and its primary mission is to promote homeland security and public safety through the enforcement of criminal and civil federal laws governing border control, customs, trade, and immigration. Within ICE, ERO oversees programs and conducts operations to identify and apprehend removable noncitizens, detain these individuals when necessary, and remove noncitizens with final orders of removal from the United States. ERO manages and oversees all aspects of the removal process within ICE, including domestic transportation, detention, Alternatives to Detention programs, bond management, supervised release, and removal to more than 170 countries around the world. As part of the removal process, ERO manages a non-detained docket of more than 5.4 million cases, which includes noncitizens currently in removal proceedings and those who have already received removal orders and are pending physical removal from the United States.

5. ERO is currently using existing personnel in Southwest Border Field Offices to support DHS's response to the ongoing surge of migrants attempting to enter the United States. Most of these Southwest Border Field Offices have been forced to reassign personnel from other programs, like CAP and Fugitive Operations, to support and sustain detention, releases, and decompression efforts. To further support these efforts, ERO currently has 133 personnel deployed to support these

Southwest Border Operations. ERO continues to evaluate the impacts of the lifting of the Centers for Disease Control and Prevention's Title 42 public health Order (Title 42 Order) and may increase the number of deployed staff as necessary to address activity along the Southwest Border.

6. The support ERO provides at the Southwest Border includes but, is not limited to: transporting; processing; enrollment in Alternatives to Detention; removals; bedspace management of those taken into custody, including those subject to expedited removal proceedings pursuant to 8 U.S.C. § 1225(b)(1); and transfers of those taken into custody.

7. On May 10, 2023, U.S. Customs and Border Protection (CBP) announced a policy memorandum from Raul L. Ortiz, Chief, U.S. Border Patrol, *Policy on Parole with Conditions in Limited Circumstances Prior to the Issuance of a Charging Document (Parole with Conditions)* (May 10, 2023), addressing case-by-case exercise of the agency's discretionary parole authority for urgent humanitarian reasons or significant public benefit.

8. I am providing this declaration in support of the Emergency Motion to Stay Temporary Restraining Order Pending Appeal filed in *Florida v. Mayorkas*, No. 23-9962 (N.D. Fla. filed May 10, 2023). I have read and am familiar with the Temporary Restraining Order issued by the U.S. District Court for the Northern District of Florida, Pensacola Division. As discussed in more detail below, implementing the terms of the temporary restraining order would be unreasonably and unduly burdensome.

9. ICE lacks the capacity to immediately detain every noncitizen encountered by CBP.

The is relevant because ERO manages the only longer-term immigration detention capacity in the United States. During FY23 to date, USBP has encountered approximately 1.33 million noncitizens. The termination of the Title 42 Order is expected to lead to a further surge in migrants, with the number of encounters predicted at an average of 12,000-14,000 noncitizen per day.  CBP's inability to parole pursuant to the court's order could prompt CBP to request bedspace, personnel, and other resources from ICE that it simply cannot provide. ERO is currently appropriated sufficient funding for approximately 34,000 detention beds nationwide to support its mission to enforce immigration law.  ICE's access to its full inventory of bedspace is limited due to various court orders and state laws limiting the intake and detention of noncitizens, detention facility contract terminations, and detention facility contract modifications.  Due to this finite number of detention beds, to meet the Department's important mission, ERO must prioritize its limited detention resources to facilitate the detention of certain noncitizens, including those who are convicted criminals and public-safety threats and those who are otherwise subject to mandatory detention. If CBP is forced to transfer to ICE custody thousands of noncitizens vetted and identified on a case-by-case basis by U.S. Border Patrol (USBP) as amenable to release on parole, ICE detention capacity would quickly diminish to the point where CBP requests for bedspace would have to be denied. Not only would ICE's interior enforcement mission be compromised, but this would also lead to CBP holding more migrants for longer periods of time.  Alternatively, were CBP to actively not apprehend unlawful border crossers, ICE's interior mission would be further compromised by increasing

the number of unprocessed removable noncitizens in the interior. This would be significantly more burdensome on ICE than Parole with Conditions because such noncitizens would have no obligation or incentive to report to ICE. Alternatively, use by CBP of the Notice to Report (NTR) processing pathway would result in more removable noncitizens in the interior who have not checked in to receive in person or electronically a Notice to Appear for removal proceedings. This is because the Parole with Conditions pathway, which grants a limited period of parole and imposes conditions requiring reporting, is more likely to cause noncitizens to report than using NTRs.

10. ERO took a number of proactive efforts in planning for the end of the enforcement of the Title 42 Order, including: (1) coordinating with foreign governments to increase repatriation flights; (2) introducing technical solutions and coordinating with U.S. Citizenship and Immigration Services and DOJ's Executive Office for Immigration Review to build efficiencies and reduce timelines for review of credible fear claims by noncitizens in ICE custody; (3) transferring detainees from ICE facilities along the Southwest Border to facilitate orderly transfer of cases from CBP; (4) coordinating between ERO field offices and ground transportation contractors to ensure that ground transportation bringing noncitizens from the border to interior facilities not return empty, but rather carry noncitizens who are prepared for removal to Mexico; and (5) co-locating noncitizens with executable final orders of removal to the same country to increase the cadence of repatriation flights, among other efforts.

11. As of May 10, 2023, ICE had 21,967 noncitizens in custody, comprising

approximately 64% of its 34,000 funded beds. This is because, in addition to the measures noted above, ICE proactively reduced its population over the last several weeks by conducting a case-by-case review and, when appropriate, releasing or removing noncitizens, in order to prepare for the lifting of the Title 42 Order on May 11, 2023. The purpose of this move was to enable ERO to continue with its interior enforcement mission and ensure sufficient detention bedspace remains available for public safety threats, national security threats, and others found not suitable for release, including release on parole by CBP. For this to remain workable, and for ERO to continue delivering consequences for unlawful migration, CBP would need to have access to all available processing pathways. However, if CBP is not permitted to parole noncitizens pursuant to its May 10, 2023 memorandum, and if it were determined that the only feasible operational pathway were to be detention, then ICE's detention capacity could be quickly overwhelmed. As noted by USBP Deputy Chief Matthew J. Hudak, over the last week CBP's ten-day average of daily encounters is 9,087, with May 8-10 surpassing 10,000 daily encounters. CBP predicts this will only get worse with the end of the Title 42 Order, with an anticipated average of 12,000-14,000 daily encounters. If CBP were unable to release noncitizens on parole pursuant to its May 10, 2023 memorandum, and those noncitizens were instead transferred to ICE custody rather than being released pursuant to some other pathway, it would only be a matter of days before ICE reaches full saturation of its limited detention capacity.

12. Limitations on the ability of CBP to parole these noncitizens, and the other pathway were to be detention, could also have a significant impact on ICE transportation

resources. If CBP sectors become overwhelmed to the point where their transportation assets and contracts are insufficient to manage the flow, ICE would have to divert its transportation resources from interior and removal operations to assist CBP. This would include the use of ICE Air Charters that are normally needed for removal and interior movements to decompress the border, an increase in ICE Air Commercial removals, and increased ground transportation for removals to Mexico. With its assets committed to assisting CBP, ERO could become unable to carry out its core enforcement mission of apprehending and removing noncitizens from the interior of the United States. If ICE becomes unable to transfer and remove noncitizens in ICE custody, bedspace would become completely unavailable for any interior or border enforcement activity. Ultimately, ICE would be left with no other legal option than to release noncitizens who have been ordered removed – including, potentially, public safety threats – back into the interior of the United States.

13. Surging resources to assist CBP with the processing of noncitizens or custodial transfers would add more stress to local ERO field offices who are short-staffed and whose enforcement teams are being temporarily realigned to assist with local processing of noncitizens. ERO employs approximately 6,000 immigration officers nationwide, including executive leadership, the supervisory chain of command, and all field officers. Since 2021, the non-detained docket has grown from 3.6 million to more than 5.4 million, with an average non-detained caseload to officer ratio of 2,700:1, though some offices have a much higher ratio. If resources continue to be diverted from core functions, then ERO's ability to manage the non-detained and detained populations will diminish while immigration court delays and backlogs will

be exacerbated, leading to increased absconder rates and reduced capacity to detect and mitigate potential threats. As of May 7, 2023, ERO had a fugitive backlog of 654,389 at-large noncitizens. Focusing more resources at the border could adversely impact the ability of ICE to take immediate enforcement action against noncitizens who pose a security threat or other real harm to U.S. communities. And, given the limited detention capacity described above, detaining such individuals may well prevent ICE from arresting other individuals who would become subject to detention under section 1226(c) or section 1231(a)(2), and individuals who otherwise present a danger to the community or a flight risk. It is critical that ICE focuses its finite law enforcement resources on its public safety mission and targeted enforcement operations.

Executed this 12th day of May, 2023 in Washington, D.C.

Daniel A. Bible
Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security